**RECORD NO. 17-5**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID ANTHONY RUNYON,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT NEWPORT NEWS

## JOINT APPENDIX - VOLUME I OF X
### (Pages 1 - 502)

Michele J. Brace
VA Capital Representation
Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
(434) 817-2970
mbrace@mindsort.com

Dana C. Hanson Chavis
Susanne Bales
Assistant Federal Defender
Federal Defender Services
of Eastern Tennessee
800 South Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979
dana_hansen@fd.org
susanne_bales@fd.org

G. Zachary Terwilliger
Lisa R. McKeel
Brian J. Samuels
Office of the U. S. Attorney
Fountain Plaza 3, Suite 300
721 Lakefront Commons
Newport News, VA 23606
(757) 591-4000
zachary.terwilliger3@usdoj.gov
lisa.mckeel@usdoj.gov
brian.samuels@usdoj.gov

*Counsel for Defendant-Appellant*        *Counsel for Plaintiff-Appellee*

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

# TABLE OF CONTENTS

*Volume I of X*

<u>Appendix Page</u>

District Court Docket [4:08-cr-00016-RBS-DEM-3].................................................1

Indictment
     Filed February 13, 2008 (Doc.3) ....................................................46

Notice of Intent to Seek the Death Penalty
     Filed July 17, 2008 (Doc.67) ........................................................63

Voss Statement of Facts
     Filed July 18, 2008 (Doc.70) ........................................................70

Notice Pursuant to Fed. R. Crim. P. 12.2 with attachment1
     Filed December 12, 2008 (Doc. 135) ...........................................78

     Att. 1:   Abreviated CV – Evan S. Nelson, PH.D., ABPP (Doc.135-1)......83
     Att. 2:   CV – Evan S. Nelson, PH.D., ABPP (Doc.135-2).......................84

Defendant's Motion to Continue Trial
     Filed Feb. 20, 2009 (Doc.160)......................................................93

Order Granting Motion to Continue
     Feb. 23, 2009 (Doc.162) .............................................................97

Notice Regarding Mental Health Experts
     Filed April 8, 2009 (Doc.177) ....................................................101

Defendant's Motion to Continue Trial Date
     Filed April 13, 2009 (Doc.179) ..................................................105

Response of the USA to Defendant's Motion to Continue
     Filed April 21, 2009  (Doc.181) ..................................................122

Order Denying Defendant's Motion to Continue and USA Motion to Sever
     Entered May 7, 2009 (Doc.194) ..................................................126

i

Juror Questionnaire Order with attachment 1
    June 11, 2009 (Doc.211)...............................................................139

    Att. 1:   Blank Juror Questionnaire Filed June 11, 2009 (Doc.211-1) ......142

Memorandum Order Denying Defendant's Objections to Nonstatutory
Aggravating Factors
    Entered June 17, 2009 (Doc.217) ...............................................161

Defendant's Supp. Notice Regarding Mental Health Experts
    Filed June  29, 2009 (Doc.230) ..................................................173

Forensic Psychiatric Evaluation by Dr. Patterson
    Filed June 29, 2009 (Doc.276) (Unsealed March 2, 2016 Order dkt516)...177

Forensic Psychological Evaluation by Dr. Montalbano
    Filed June 30, 2009 (Doc.277) (Unsealed March 2, 2016 Order dkt516)...201

Transcript of First Day of Trial,
    On June 30, 2009 (Doc.326 filed Mar. 31, 2010) ......................................232

    Voir Dire (pp.1-134)....................................................................233

Transcript of Second Day of Trial,
    On July 1, 2009 (Doc.327 filed Mar. 31, 2010) .........................................365

    Voir Dire (pp. 138, 194-195)........................................................366

Transcript of Third Day of Trial,
    On Jul. 2, 2009 (Doc.328 filed Mar. 31, 2010) .........................................369

    Preliminary Proceedings (p.198) .................................................370

Transcript of Fourth Day of Trial,
    Jul. 6, 2009 (Doc.329, filed Mar. 31, 2010) ..............................................371

    Testimony of Rose Wiggins (pp.257-265)
        Direct Examination by Ms. McKeel....................................374
        Cross Examination by Mr. Woodward.................................380
        Redirect Examination by Ms. McKeel .................................382

Testimony of John Willmer (pp.353-374)
    Direct Examination by Mr. Samuels ................................................383
    Cross Examination by Mr. Woodward .................................................401
    Redirect Examination by Mr. Samuels................................................403

Testimony of Randy Lassiter (pp.435-469)
    Direct Examination by Ms. McKeel................................................406
    Cross Examination by Mr. Ellenson................................................463
    Redirect Examination by Ms. McKeel ................................................437

Transcript of Sixth Day of Trial,
    On July 8, 2009 (Doc.331filed March 31, 2010) ......................................440

Testimony of Nichole King (pp.731-764)
    Direct Examination by Ms. McKeel................................................442
    Cross Examination by Mr. Woodward.................................................469

Testimony of Lawrence Ford (pp.765-774)
    Direct Examination by Ms. McKeel................................................476
    Cross Examination by Mr. Clancy .......................................................484

Testimony of George Koski (pp.840-856)
    Direct Examination by Ms. McKeel................................................486
    Cross Examination by Mr. Woodward.................................................499

*Vol II of X*

Transcript of Seventh Day of Trial,
    On July 9, 2009 (Doc.332, filed Mar. 31, 2010) .........................................503

Testimony of Paul Swartz (pp.900-918)
    Direct Examination by Mr. Samuels ....................................................506

Testimony of William Banks (pp.1031-1063)
    Direct Examination by Ms. McKeel................................................526
    Cross Examination by Mr. Woodward................................................544
    Redirect Examination by Ms. McKeel .................................................556
    Recross Examination by Mr. Ellenson .................................................558

Testimony of Paul Swartz (pp.1065-1117)
    Direct Examination by Mr. Samuels ....................................................561

Cross Examination by Mr. Woodward ...................................................605
Redirect Examination by Ms. McKeel ..................................................612

Transcript of Eighth Day of Trial,
On Jul.y 13, 2009 (Doc.333, filed Mar. 31, 2010) ..........................613

Proceedings re Stipulation No. 94 .....................................................615

Testimony of Paul Swartz (pp.1354-1370) (recalled)
Direct Examination by Mr. Samuels ....................................................616

Transcript of Ninth Day of Trial,
On July 14, 2009 (Doc.334, filed Mar. 31, 2010) ..........................632

Testimony of Paul Swartz (pp.1378-1491) (resumed)

Direct Examination by Mr. Samuels ....................................................635
Cross Examination by Mr. Clancy ........................................................722
Redirect Examination by Mr. Samuels..................................................745

Transcript of Tenth Day of Trial,
On July 15, 2009 (Doc. 335, filed Mar. 31, 2010) .........................749

Proceedings re Stipulations (pp.1509-1519) .................................752
Court's Rulings re Motions ..................................................................754

Transcript of Eleventh Day of Trial,
On July 16, 2009 (Doc.336, filed Mar. 31, 2010) ..........................762

Closing Arguments:

AUSA McKeel, Guilt Phase Closing (pp.1582-1613) ...........................764
Counsel Woodward, Guilt Phase Closing (pp.1633-1656)....................796
AUSA McKeel, Guilt Phase Rebuttal Closing (pp.1656-1665)..............819

Court Jury Instructions (pp.1666-1714) ...................................829

Supplemental Motion to Continue Capital Sentencing Hearing
Filed July 17, 2009 (Doc.240) .......................................................882

Statement of Defense Counsel
Filed July 17, 2009 (Doc.242) .......................................................889

Verdict Guilt Phase
        Filed July 17, 2009 (Doc.245), ..................................................................894

Second Supp. Motion to Continue Capital Sentencing Hearing
        July 20, 2009 (Doc.247) ...........................................................................895

Transcript of Thirteenth Day of Trial,
        On July 22, 2009 (Doc. 338, filed Apr. 2, 2010).........................................902

        Counsel Hudgins,  Eligibility Phase Closing (pp. 1769-1772) ...................903

Order Granting Motion to Continue
        Filed July 22, 2009 (Doc.254) ...................................................................907

Special Verdict Eligibility Phase
        Filed July 22, 2009 (Doc.255) ...................................................................910

Order Appointing Dr. Merikangas
        Entered July 22, 2009 (Doc.257)................................................................917

Defendant's Motion to Supp. Mental Health Report
        Filed August 10, 2009 (Doc.269) ...............................................................919

*Vol III of X*

Transcript of Fifteenth Day of Trial,
        On August 20, 2009 (Doc. 340, filed Apr. 2, 2010)....................................924

        Argument/Ruling Dr. Cunningham Testimony (p.2076-2084)...................925

        Testimony of Dr. Cunningham (pp. 2084-2192)
        Direct Examination by Mr. Hudgins ......................................................933
        Cross Examination by Mr. Samuels ......................................................1007

Defendant's Mitigating Factors Enumerated
        Filed August 21, 2009 (Doc.285) ...........................................................1042

Transcript of Sixteenth Day of Trial,
        On August 24, 2009 (Doc.341, filed Apr. 29, 2010)................................1047

Testimony of Deputy Westrick, Portsmouth Sheriff's Office (pp.2199-2209)
    Direct Examination by Mr. Hudgins ...................................................1049
    Cross Examination by Mr. Samuels ...................................................1056

Testimony of Deputy Johnson, Portsmouth Sheriff's Office (pp.2209-2217)
    Direct Examination by Mr. Hudgins ...................................................1059
    Cross Examination by Ms. McKeel...................................................1065
    Redirect Examination by Mr. Hudgins...................................................1067

Testimony of Deputy Anderson, Portsmouth Sheriff's Office (pp.2217-2225)
    Direct Examination by Mr. Hudgins ...................................................1067
    Cross Examination by Ms. McKeel...................................................1072

Testimony of Deputy Marbry, Portsmouth Sheriff's Office (pp.2226-2234)
    Direct Examination by Mr. Hudgins ...................................................1076
    Cross Examination by Mr. Samuels ...................................................1080

Testimony of Deputy Singledecker, Portsmouth Sheriff's Office (pp.2234-2239)
    Direct Examination by Mr. Hudgins ...................................................1084
    Cross Examination by Ms. McKeel...................................................1087

Testimony of Deputy Diaz, Portsmouth Sheriff's Office (pp.2239-2244)
    Direct Examination by Mr. Hudgins ...................................................1089
    Cross Examination by Mr. Samuels ...................................................1092

Testimony of David H. Runyon (pp.2366-2409)
    Direct Examination by Mr. Hudgins ...................................................1095
    Cross Examination by Mr. Samuels ...................................................1136

Testimony of Suk Cha Runyon (pp.2410-2439)
    Direct Examination by Mr. Hudgins ...................................................1139

Transcript of Seventeenth Day of Trial,
    On August 25, 2009 (Doc.342, filed Apr. 29, 2010)..................................1170

Testimony of Phyllis Provost (pp.2518-2527)
    Direct Examination by Mr. Hudgins ...................................................1171
    Cross Examination by Ms. McKeel...................................................1177

Transcript of Eighteenth Day of Trial,
    On August 26, 2009 (Doc.343, filed Apr. 29, 2010)................................1181

    AUSA Samuels, Sentence Selection Closing (pp.2588-2626).................1182
    Counsel Woodward, Sentence Selection Closing (pp.2632-2656) ..........1226
    AUSA Samuels, Sentencing Rebuttal Closing (pp. 2656-2664)..............1250
    Court Jury Instructions (pp.2664-2696) ...................................................1258

Transcript of Nineteenth Day of Trial,
    On August 27, 2009 (Doc. 344, filed Apr. 29, 2010)...............................1292

    Jury Question  (pp.2707-2710) ........................................................................1298

Special Verdict Form - Selection Phase
    Filed August 27, 2009 (Doc.291) ............................................................1311

*Volume IV of X*

## <u>Gov't Trial Exhibits</u>

Gov't Ex. 23:    Commonwealth of Virginia Department of Forensic
                Science Certificate of Analysis ......................................1317

Gov't Ex. 28:    ATM Still Photos............................................................1318

Gov't Ex. 65:    Bates 065-006 Global Cash Receipt..............................1352

Gov't Ex. 94:    Summary of Funds Available to/Spent by Cat Voss......1364

Gov't Ex. 101:    Others' Inboxes.............................................................1365

Gov't Ex. 109:    Sprint Detail Records for Runyon phone
                304-685-6845...............................................................1367

Gov't Ex. 135:    Map of cell tower locations ...........................................1393

Gov't Ex. 217:    "Checklist for Crime" ....................................................1395

Gov't Ex. 236:    Photo of bullets.............................................................1397

Gov't Ex. 311:    City of Wichita Municipal Court 01-CR-1407.............1398

Gov't Ex. 313:    Wichita Police Dept. Incident Report dated
                Jul. 23, 1994................................................................1404

Gov't Ex. 315:    Magistrate Court of Monongalia County, West Virginia
1412 ..................................................................................1412

Gov't Ex. 316:    Morgantown Police Dept. Investigation/Incident Report
dated Jan. 6, 2007 ......................................................1433

Position of US with Respect to Sentencing Factors
Filed November 10, 2009 (Doc.301).........................................1443

Judgment
Filed December 4, 2009 (Doc.313) ...........................................1458

Defendant's Motion for Limited Unsealing of Record
On March 17, 2015 (Doc.415)....................................................1466

Memorandum in Support of Defendant's Motion for Limited Unsealing of
Record with Exhibit 3
On March 17, 2015 (Doc.416).....................................................1468

   Ex. 3:    Declaration of Michele Brace (Doc.416-3).............................1474

United States' Response to Motion for Limited Unsealing of Record
On March 31, 2015 (Doc.418)....................................................1476

Defendant's Rebuttal Supporting Motion for Limited Unsealing of Record
Filed April 3, 2015 (Doc.421) ...................................................1481

Order Granting Limited Unsealing of Record
Filed Apr. 7, 2015 (Doc.422) ...................................................1487

Supp. Order Regarding Limited Unsealing of Record Questionnaires
Filed April 13, 2015 (Doc.423), ...............................................1494

Original §2255 Motion with Exhibit 1
Filed October 5, 2015 (Doc.478)...............................................1497

   Ex. 1:    Records Request to Bureau of Prisons, 06/02/15
(Doc.478-1) .........................................................1622A – 1622C
Ex. 2–36:  Omitted – See JA pp. 1992 - 2247

Defendant's First Motion for Discovery  with Exhibits 1 – 5
Filed December 9, 2015 (Doc.491) ...........................................1623

Ex. 1:   ATF ROI dated Feb. 2, 2009 (Doc.491-1).....................................1661

Ex. 2:   USA v. Runyon Disk Index (Doc.491-2) ....................................1663

Ex. 3:   USA Gov't Witness List Fax, p.9 (Doc.491-3) ...........................1664

Ex. 4:   Medical/Mental Health Records Request to Portsmouth Sheriff's
         Department from FDSET dated Oct. 2, 2015 (Doc.491-4)..........1666

Ex. 5:   Medical/Mental Health Records Request to Portsmouth Sheriff's
         Department from FDSET dated Nov. 3, 2015 (Doc.491-5)........1667

United States' Response to Original §2255 Motion
         Filed January 11, 2016  (Doc.497) ...........................................1670

*Volume V of X*

Order directing reply to §2255
         Entered January 15, 2016 (Doc.499).......................................1811

USA Opposition to First Motion for Discovery
         Filed January 15, 2016 (Doc.500) ...........................................1812

Reply Supporting First Motion for Discovery
         Filed January 29, 2016 (Doc.506) ...........................................1824

Amended §2255 Motion  with Exhibits 1 – 39
         Filed February 4, 2016 (Doc.511) ...........................................1842

Ex. 1:   Placeholder (Doc.511-1) .........................................1991

Ex. 2:   Dr. Merikangas Report 9/25/15 (Doc.511-2)..........................1992

Ex. 3:   McNally Declaration 3/11/09 (Doc.511-3)..................................1998

Ex. 4:   Cronin Declaration 9/26/15 (Doc.511-4)....................................2002

Ex. 5:   Hudgins Declaration 9/22/15 (Doc.511-5) .................................2016

Ex. 6:   Woodward Declaration 9/24/15 (Doc.511-6) ............................2019

Ex. 7:   Costa Declaration 9/30/15 (Doc.511-7)....................................2022

Ex. 8:   Cunningham Declaration 9/25/15 (Doc.511-8) ..........................2024

ix

Ex. 9:   Cat Voss Declaration 9/10/15 (Doc.511-9) .................................2079

Ex. 10:   David Dalton Declaration 9/28/15 (Doc.511-10) ......................2082

Ex. 11:   Paula Dalton Declaration 9/28/15 (Doc.511-11) ......................2083

Ex. 12:   Matt Long Declaration 9/29/15 (Doc.511-12) ..........................2085

Ex. 13:   Scott Linker Declaration 9/24/15 (Doc.511-13) .......................2086

Ex. 14:   Excerpt Cell Phone Tracking Evidence (Doc.511-14) ..............2089

Ex. 15:   Babineau letter regarding death authorization 2/10/09
          (Doc.511-15),.................................................................................2109

Ex. 16:   Portsmouth Jail Records 2008 (Doc.511-16)............................2119

Ex. 17:   David Dombrowski progress notes (Doc.511-17) .....................2123

Ex. 18:   Lake Martin Community Hospital response (Doc.511-18) .......2125

Ex. 19:   Hudgins time schedule with mark ups ECF No 165
          (Doc.511-19)...................................................................................2128

Ex. 20:   Dr. Mirsky letter 7/2/09 (Doc.511-20).......................................2131

Ex. 21:   Dr. Mirsky/Hudgins emails 7/22-23/09 (Doc.511-21) ..............2132

Ex. 22:   Dr. Mirsky letter 9 18 09 (Doc.511-22)......................................2133

Ex. 23:   Army medical records (Doc.511-23) ..........................................2136

Ex. 24:   Handwritten letter regarding 1996 car accident (Doc.511-24)..2160

Ex. 25:   Suk Cha Runyon medical records (Doc.511-25) .......................2162

Ex. 26:   David Dombrowski declaration 9/23/15 (Doc.511-26)............2177

Ex. 27:   Mark Runyon declaration 9/25/15 (Doc.511-27) .....................2187

Ex. 28:   Maria Runyon declaration 9/16/15 (Doc.511-28).....................2194

Ex.29:   Dr. Dudley report 9/29/15 (Doc.511-29) ..................................2199

Ex. 30:   Thomas Preston interview 10/4/08 (Doc.511-30).....................2223

Ex. 31:   Robert Seeger declaration 8/24/15 (Doc.511-31) .....................2226

Ex. 32:   Deborah Seeger declaration 8/24/15 (Doc.511-32) ..................2229

Ex. 33:   Captain Harris Declaration Fayetteville GA Police Dept.
          1/13/16 (Doc.511-33) ...............................................2234

Ex. 34:   Scotty Fleming criminal history (Doc.511-34).........................2235

Ex. 35:   Dr. Mirsky report 8/28/15 (Doc.511-35) ...............................2237

Ex. 36:   Teresa Norris declaration 9/29/15 (Doc.511-36)......................2244

Ex. 37:   Racial Disparities Staff Report by the Subcommittee
          on Civil and Constitutional Rights (Doc.511-37) ....................2248

Ex. 38:   Cohen Bell Declaration (Doc.511-38) .................................2261

Ex. 39:   Declaration of Michele J Brace (Doc.511-39)........................2269

Order
          Entered February 8, 2016 (Doc.513) ....................................2271

*Volume VI of X*

Reply Supporting Original §2255 Motion
          Filed March 28, 2016 (Doc.526) .........................................2272

          Ex. A: Clinical Screening Information (Doc.526-1) ..................2366

Petitioner's Second Motion for Discovery
          Filed April 1, 2016 (Doc.530) ...........................................2368

United States' Response to Second Motion for Discovery
          Filed April 8, 2016 (Doc.532) ...........................................2376

Reply Supporting Second Motion for Discovery with Attachments A – C
          Filed April 13, 2016 (Doc.533) ..........................................2384

          Att. A:   Strengthening Forensic Science in the United States, A Path
                    Forward (Doc.533-1) ...........................................2392

          Att. B:   Charter USDOJ National Commission on Forensic Science
                    (Doc.533-2),.......................................................2473

Att. C:   National Commission on Forensic Science Views of the
         Commission Validation of Forensic Science Methodology
         (Doc.533-3)........................................................................2482

United States' Response to Amended §2255 Motion
         Filed April 22, 2016 (Doc.536) ....................................................2485

Motion for Leave to Supplement Second Motion for Discovery
         Filed May 24, 2016 (Doc.541) ......................................................2644

Order Granting Supplement of Discovery Motion
         Entered June 7, 2016 (Doc.544) ...................................................2648

Supplemental Memo to Second Motion for Discovery
         Filed June 8, 2016 (Doc.545) .......................................................2651

         Att. A:   John Nixon Declaration (Doc.545-1) ........................2654

Reply Supporting Amended §2255 Motion  with Exhibits 1 – 5
         Filed July 7, 2016 (Doc.551) ........................................................2656

         Ex. 1:   Stephen Hudgins Declaration dated Jun. 22, 2016 (Doc.551-1) .2803

         Ex. 2:   John Nixon Declaration dated May 18, 2016 (Doc.551-2) .........2807

         Ex. 3:   Joseph Kennedy Declaration dated Jul. 6, 2016 (Doc.551-3) .....2809

         Ex. 4:   Stephen Hudgins Calendar from Appointment to Beginning of
                  Runyon Trial (Doc.551-4) .........................................................2812

         Ex. 5:   USA Strikes of Black Veniremen Report (Doc.551-5) ...............2813

*Volume VII of X*

Order for Subpoena Duces Tecum
         Entered July 12, 2016 (Doc.552)..................................................2817

Subpoena to Dept. of Forensic Science with attachment 1
         Filed July 13, 2016 (Doc.553) ......................................................2818

Att. 1:    Order for Subpoena to Dept. of Forensic Science
(Doc.553-1)..................................................................2822

Order for Costa Grand Jury Testimony
Entered July 26, 2016  (Doc.555)....................................2823

Opinion Denying §2255 Motion and Denying Discovery
Filed Jan. 19, 2017 (Doc.560, 560-1, 560-2, 560-3, 560-4)...............2824

Judgment
Filed January 20, 2017 (Doc.561),....................................3070

Petitioner's Motion for Sealed Materials Subpoenaed by Court
Filed February 1, 2017 (Doc.564) ....................................3071

Petitioner's Memorandum for Sealed Materials Subpoenaed by Court
Filed February 1, 2017  (Doc.565) ...................................3074

Rule 59(e) Motion to Alter or Amend
Filed February 16, 2017 (Doc.566) ...................................3079

Rule 59(e) Memorandum with attachment A
Filed Feb. 16, 2017  (Doc.567) ......................................3081

Att. A:    Paula Dalton Declaration (Doc.567-1)...............3102

Order Denying Access to Sealed Material Subpoenaed by Court
Entered February 21, 2017 (Doc.568)................................3103

Petitioner's Third Motion for Discovery
Filed February 24, 2017 (Doc.570) ..................................3111

United States' Response to Third Motion for Discovery
Filed March 31, 2017 (Doc.574) .....................................3122

United States' Response to Rule 59(e) Motion
Filed March 31, 2017 (Doc.575) .....................................3132

Petitioner's Reply Supporting Third Motion for Discovery
Filed April 6, 2017 (Doc.576),.......................................3135

Record Notation Order
Filed June 16, 2017 (Doc.583) .......................................3138

Order Directing Re-entry of Order Denying 59(e) Motion and Denying Third Motion
for Discovery
    Entered June 21, 2017  (Doc.586) ..................................................... 3140

Re-entered Order Denying 59(e) Motion and Denying Third Motion for Discovery
    Filed June 21, 2017 (Doc.587), .......................................................... 3143

Petitioner's Motion to Expand Record
    Filed August 18, 2017 (Doc.588) ...................................................... 3154

Petitioner's Motion to Permit Copying and Distribution of Protected Documents
    Filed August 18, 2017 (Doc.589), ...................................................... 3157

Notice of Appeal
    Filed August 18, 2017 (Doc.590) ...................................................... 3160

Order Granting Motion to Expand the Record
    Entered September 15, 2017 (Doc.596) ............................................. 3163

Order Granting Motion to Permit Copying and Distribution of Protected Documents
    Entered September 15, 2017 (Doc.597) ............................................. 3166

*Volume VIII of X - Sealed*

Supplemental Motion for Neuropsychologist Expert Services and Approval of
Additional Funds for Paralegal/Discovery Coordinator Services Ex Parte
    Filed February 5, 2009 (Doc.153) ..................................................... 3169

        Att. 1:     02/05/09 Cover Letter (Doc.153-1) .................................... 3172
        Att. 2:     CV – Scott D. Bender, Ph.D., ABPP-CN (Doc153-2) ...................... 3173

Supplemental Motion for Psychiatrist and to Change the Designation of the
Neuropsychologist Expert Previously Approved by the Court
    Filed June 8, 2009 (Doc.204) .......................................................... 3176

Letter from Judge Smith directing three juror lists to be picked up by counsel
    Filed June 12, 2009 (Doc.210) ......................................................... 3178

Order deferring action on defendant's motion for psychiatrist Dr. Merikangas
    Entered June 23, 2009 (Doc.229) ..................................................... 3181

Psychological Evaluation of Dr. Mirsky
        Filed July 20, 2009 (Doc.246) .......................................................... 3184

Strike List for First Day
        Filed April 13, 2015 (Doc.424) ........................................................ 3190

Strike List for Second Day
        Filed Apr. 13, 2015 (Doc.424-1) ...................................................... 3194

Order sealing Claim S2 and Exhibit S-1
        Entered October 5, 2015 (Doc.477) ................................................. 3198

Original Claim S-2
        Filed Oct. 5, 2015 (Doc.477-1) ........................................................ 3203

Exhibit S-1
        Filed Oct. 5, 2015 (Doc.477-2) ........................................................ 3223

Addendum S-1 to First Motion for Discovery
        Dec. 4, 2015 (Doc.490) ................................................................... 3236

United States' Response to Original Claim S2
        Filed January 11, 2016 (Doc.498) .................................................... 3237

Petitioner's Motion to File Under Seal One Claim and One Exhibit in His
Amended Motion for Collateral Relief
        Filed February 4, 2016 (Doc507) .................................................... 3245

Amended Claim S2
        Filed Feb. 4, 2016 (Doc.508) .......................................................... 3249

Reply Supporting Original Claim S2
        Filed Mar. 28, 2016 (Doc.525) ........................................................ 3269

United States' Response to Amended Claim S2
        Filed Apr. 22, 2016 (Doc.537) ......................................................... 3275

Reply Supporting Amended Claim S2
        Filed July 7, 2016 (Doc.549) ........................................................... 3284

Completed Questionnaire of Prospective Juror 1 ...................................... 3291

Completed Questionnaire of Prospective Juror 2 ...................................... 3310

xv

Completed Questionnaire of Prospective Juror 4 ..................................................3329

Completed Questionnaire of Prospective Juror 7 ..................................................3348

Completed Questionnaire of Prospective Juror 10 ................................................3367

Completed Questionnaire of Prospective Juror 12 ................................................3386

Completed Questionnaire of Prospective Juror 13 ................................................3405

Completed Questionnaire of Prospective Juror 14 ................................................3424

Completed Questionnaire of Prospective Juror 15 ................................................3443

Completed Questionnaire of Prospective Juror 18 ................................................3462

Completed Questionnaire of Prospective Juror 20 ................................................3481

Completed Questionnaire of Prospective Juror 23 ................................................3500

Completed Questionnaire of Prospective Juror 24 ................................................3519

Completed Questionnaire of Prospective Juror 27 ................................................3538

Completed Questionnaire of Prospective Juror 28 ................................................3557

*Volume IX of X - Sealed*

Completed Questionnaire of Prospective Juror 29 ................................................3576

Completed Questionnaire of Prospective Juror 31 ................................................3595

Completed Questionnaire of Prospective Juror 32 ................................................3614

Completed Questionnaire of Prospective Juror 34 ................................................3633

Completed Questionnaire of Prospective Juror 35 ................................................3652

Completed Questionnaire of Prospective Juror 40 ................................................3671

Completed Questionnaire of Prospective Juror 46 ................................................3690

Completed Questionnaire of Prospective Juror 50 ................................................3709

Completed Questionnaire of Prospective Juror 51 ................................................3728

Completed Questionnaire of Prospective Juror 52 ................................................3747

Completed Questionnaire of Prospective Juror 54 ................................................3766

Completed Questionnaire of Prospective Juror 63.................................................3785

Completed Questionnaire of Prospective Juror 64.................................................3804

Completed Questionnaire of Prospective Juror 65.................................................3823

Completed Questionnaire of Prospective Juror 66.................................................3842

Completed Questionnaire of Prospective Juror 67.................................................3861

Completed Questionnaire of Prospective Juror 68.................................................3880

Completed Questionnaire of Prospective Juror 69.................................................3899

Completed Questionnaire of Prospective Juror 70.................................................3918

Completed Questionnaire of Prospective Juror 73.................................................3937

Completed Questionnaire of Prospective Juror 74.................................................3956

Completed Questionnaire of Prospective Juror 75.................................................3975

Completed Questionnaire of Prospective Juror 78.................................................3994

Completed Questionnaire of Prospective Juror 80.................................................4013

## *Volume X of X - Sealed*

Completed Questionnaire of Prospective Juror 81.................................................4032

Completed Questionnaire of Prospective Juror 82.................................................4051

Completed Questionnaire of Prospective Juror 84.................................................4070

Completed Questionnaire of Prospective Juror 86.................................................4089

Completed Questionnaire of Prospective Juror 87.................................................4108

Completed Questionnaire of Prospective Juror 91.................................................4127

Completed Questionnaire of Prospective Juror 95.................................................4146

Completed Questionnaire of Prospective Juror 97.................................................4165

Completed Questionnaire of Prospective Juror 98.................................................4184

Completed Questionnaire of Prospective Juror 100.................................................4203

Completed Questionnaire of Prospective Juror 106.................................................4222

Completed Questionnaire of Prospective Juror 107 ....................................................... 4241

Completed Questionnaire of Prospective Juror 109 ....................................................... 4260

Completed Questionnaire of Prospective Juror 110 ....................................................... 4279

Completed Questionnaire of Prospective Juror 113 ....................................................... 4298

Completed Questionnaire of Prospective Juror 115 ....................................................... 4317

Completed Questionnaire of Prospective Juror 116 ....................................................... 4336

Completed Questionnaire of Prospective Juror 117 ....................................................... 4355

Completed Questionnaire of Prospective Juror 118 ....................................................... 4374

Completed Questionnaire of Prospective Juror 119 ....................................................... 4393

Completed Questionnaire of Prospective Juror 120 ....................................................... 4412

Completed Questionnaire of Prospective Juror 124 ....................................................... 4431

Completed Questionnaire of Prospective Juror 126 ....................................................... 4450

2255,APPEAL,CLOSED,DEATHP

# U.S. District Court
## Eastern District of Virginia - (Newport News)
## CRIMINAL DOCKET FOR CASE #: 4:08-cr-00016-RBS-DEM-3

Case title: USA v. Voss et al                    Date Filed: 02/13/2008
Related Case: 4:15-cv-00108-RBS                  Date Terminated: 12/04/2009

---

Assigned to: Chief District Judge Rebecca
Beach Smith
Referred to: Magistrate Judge Douglas E.
Miller

Appeals court case numbers: '09-11' 'Beth
Walton, Case Manager', 17-5 RJ Warren

### Defendant (3)

**David Anthony Runyon**              represented by    **Michele Jill Brace**
*TERMINATED: 12/04/2009*                                Virginia Capital Representation Resource
                                                        Center
                                                        2421 Ivy Rd
                                                        Suite 301
                                                        Charlottesville, VA 22903
                                                        434-817-2970 202-223-6380
                                                        Email: mbrace@mindsort.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*
                                                        *Designation: CJA Appointment*

                                                        **Dana Catherine Hansen Chavis**
                                                        Federal Defender Services of Eastern
                                                        Tennessee, Inc.
                                                        800 S. Gay St
                                                        Suite 2400
                                                        Knoxville, TN 37929
                                                        **NA**
                                                        (865) 637-7979
                                                        Fax: (865) 637-7999
                                                        Email: dana_hansen@fd.org
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*
                                                        *Designation: Retained*

                                                        **Jennifer Tope Stanton**
                                                        J. T. Stanton, P. C.
                                                        207 Granby Street
                                                        #200
                                                        Norfolk, VA 23510
                                                        (757) 314-2354
                                                        Fax: 757-314-2352

**1**

Email: stantonlaw500@gmail.com
*TERMINATED: 02/11/2014*
*Designation: Retained*

**Jon M. Babineau**
Riddick Babineau PC
109 East Main St
Suite 413
Norfolk, VA 23510
(757) 622-8631
Fax: (757) 226-0621
Email: jon@babineaulaw.com
*TERMINATED: 02/13/2009*
*Designation: CJA Appointment*

**Lawrence Hunter Woodward , Jr.**
Ruloff Swain Haddad Morecock Talbert &
Woodward, PC
317 30th Street
Virginia Beach, VA 23451
757-671-6047
Fax: 757-671-6004
Email: lwoodward@srgslaw.com
*TERMINATED: 12/04/2009*
*Designation: CJA Appointment*

**Stephen Ashton Hudgins**
Stephen A Hudgins PC
360 Wythe Creek Rd
Suite E
Poquoson, VA 23663
(757) 868-8778
Fax: (866) 875-3328
Email: sahudginspc@aol.com
*TERMINATED: 07/25/2012*
*Designation: CJA Appointment*

## Pending Counts

T.18 USC 1958(a)- Conspiracy to commit
murder of hire. Notice of special findings -
T.18 USC 3591 and 3592.
(1)

T.18 USC 2119 and 2 - Carjacking resulting
in death.
(2)

T.18 USC 2113(a)(e) and 2 - Bank robbery
resulting in death.
(3)

T18 USC 1951(a)- Conspiracy to commit
robbery affecting commerce.
(4)

T.18 USC 924(j) and 2- Murder with a

## Disposition

Imprisonment: DEATH; Special
Assessment: $100.00; Restitution:
$100,000.00

Imprisonment: LIFE WITHOUT THE
POSSIBILITY OF RELEASE; Special
Assessment: $100.00

Dismissed 7/15/09 (Court granted
defendants' motion to dismiss count 3 of the
indictment.)

Dismissed on motion of the United States

Imprisonment: DEATH; Special

**2**

firearm in relation to a crime of violence.                    Assessment: $100.00
(5)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                          **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                                 **Disposition**

None

---

**Interested Party**

**Charles A. Daniels**                        represented by  **Katherine Siereveld**
*Warden at USP Terre Haute*                                   USP Terre Haute
                                                              4700 Bureau Road South
                                                              Terre Haute, IN 47802
                                                              (812) 238-3476
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              *Designation: Retained*

---

**Interested Party**

**Leann LaRiva**                              represented by  **Katherine Siereveld**
*Acting Complex Warden at USP Terre Haute*                    (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              *Designation: Retained*

---

**Plaintiff**

**USA**                                       represented by  **Jeffrey A. Zick**
                                                              United States Attorney Office - Newport
                                                              News
                                                              Fountain Plaza Three
                                                              721 Lake Front Commons
                                                              Suite 300
                                                              Newport News, VA 23606
                                                              **NA**
                                                              Email: jeffrey.zick@usdoj.gov
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              *Designation: US Attorney*

**Lisa Rae McKeel**
United States Attorney's Office
721 Lakefront Commons
Suite 300
Newport News, VA 23606
(757) 591-4000
Email: Lisa.McKeel@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

**Blair C. Perez**
United States Attorney's Office
101 W Main St
Suite 8000
Norfolk, VA 23510
NA
(757) 441-3554
Email: blair.perez@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

**Brian James Samuels**
United States Attorney's Office
Fountain Plaza Three
721 Lakefront Commons
Suite 300
Newport News, VA 23606
(757) 591-4032
Email: brian.samuels@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/13/2008 | 1 | MOTION to Seal Case by USA as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon. Filed in open court 2/13/08. (ldab, ) (Entered: 02/14/2008) |
| 02/13/2008 | 2 | ORDER Granting 1 Motion to Seal Case as to Catherina Rose Voss (1), Michael Anthony Eric Draven (2), David Anthony Runyon (3), entered and filed in open court 2/13/08. It is hereby ORDERED that the Indictment and Arrest Warrant are sealed. It is further ORDERED that the Indictment and Arrest Warrant will remain sealed until further order of the Court. Signed by Judge Tommy E. Miller on 2/13/08. (ldab, ) (Entered: 02/14/2008) |
| 02/13/2008 | | Case sealed as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon (ldab, ) (Entered: 02/14/2008) |
| 02/13/2008 | 3 | SEALED CRIMINAL INDICTMENT FILED IN OPEN COURT 2/13/08 as to Catherina Rose Voss (1) count(s) 1, 2, 3, 4, 5, Michael Anthony Eric Draven (2) count(s) 1, 2, 3, 4, 5, David Anthony Runyon (3) count(s) 1, 2, 3, 4, 5. On motion of Govt. Court directed: warrant to issue as to Catherina Rose Voss, Michael Anthony Eric Draven, and David |

| | | Anthony Runyon, indictment to be sealed, order entered and filed. (ldab, ) (Entered: 02/14/2008) |
|---|---|---|
| 02/13/2008 | 9 | Arrest Warrant Issued and Delivered to USM 2/13/08 directed by Tommy E. Miller as to David Anthony Runyon. (ldab, ) Additional attachment(s) added on 2/22/2008 (ldab, ). (Entered: 02/14/2008) |
| 02/22/2008 | 10 | MOTION to Unseal Indictment by USA as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon. (Attachments: # 1 Proposed Order)(ldab, ) (Entered: 02/22/2008) |
| 02/22/2008 | 11 | ORDER Granting 10 Motion to Unseal Indictment as to Catherina Rose Voss (1), Michael Anthony Eric Draven (2), David Anthony Runyon (3), entered and filed 2/22/08. (Signed by Judge Tommy E. Miller) copies mailed on 2/22/08. (ldab, ) (Entered: 02/22/2008) |
| 02/22/2008 | | Case unsealed as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon (ldab, ) (Entered: 02/22/2008) |
| 03/04/2008 | | Set/Reset Hearings as to David Anthony Runyon: Initial Appearance set for 3/4/2008 02:30 PM in N Mag Courtroom 2 before James E. Bradberry. (ldab, ) (Entered: 03/04/2008) |
| 03/04/2008 | | Attorney update in case as to David Anthony Runyon. Oral order appointing Attorney Lawrence Hunter Woodward and Jon M. Babineau for David Anthony Runyon. (ldab, ) (Entered: 03/04/2008) |
| 03/04/2008 | | Arrest of David Anthony Runyon (ldab, ) (Entered: 03/04/2008) |
| 03/04/2008 | | Minute Entry for proceedings held before Judge James E. Bradberry:(Court Reporter FTR.) Jessica Norris, AUSA appeared on behalf of USA, deft. present in custody.Initial Appearance as to David Anthony Runyon held, deft. advised of rights, charges & right to counsel, counsel desired, court DIRECTED appointment of counsel - 2 death penalty certified counsel. Govt. motion for Detention GRANTED, TEMPORARY DETENTION ORDERED. Detention Hearing set for 3/5/2008 at 03:00 PM before James E. Bradberry. Deft. remanded to custody of USM.THIS IS A TEXT ONLY ENTRY, A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (ldab, ) (Entered: 03/04/2008) |
| 03/04/2008 | 20 | Arrest Warrant Returned Executed on 03/04/08 in case as to David Anthony Runyon. (ldab, ) (Entered: 03/04/2008) |
| 03/04/2008 | 21 | CJA 23 Financial Affidavit by David Anthony Runyon, filed in open court 03/04/08. (ldab, ) (Entered: 03/04/2008) |
| 03/04/2008 | 22 | ORDER OF TEMPORARY DETENTION as to David Anthony Runyon, entered and filed in open court 03/04/08.( Signed by Judge James E. Bradberry) copies mailed on 03/04/08. (ldab, ) (Entered: 03/04/2008) |
| 03/05/2008 | | Minute Entry for proceedings held before Judge James E. Bradberry:(Court Reporter FTR.) Lisa McKeel, AUSA, Brian Samuels, AUSA and Blair Perez, SAUSA appeared on behalf of USA, deft. appeared through Larry Woodward, C/A and Jon Babineau, C/A. Detention Hearing as to David Anthony Runyon held, detention ordered, court to enter order. Arraignment set for 3/12/2008 at 09:00 AM before Tommy E. Miller. Deft. remanded. (Court Time: 3:00 pm - 3:51 pm) THIS IS A TEXT ONLY ENTRY, A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (ldab, ) (Entered: 03/06/2008) |
| 03/05/2008 | 27 | CJA 30: Appointment of Attorney Lawrence Hunter Woodward, Jr for David Anthony Runyon in Death Penalty Proceedings as to David Anthony Runyon. Entered 03/03/08 |

**5**

| | | and filed 03/04/08. (Signed by Judge Rebecca Beach Smith) original mailed to Mr. Woodward on 03/07/2008. (ldab, ) (Entered: 03/07/2008) |
|---|---|---|
| 03/12/2008 | 31 | Agreed Discovery Order as to David Anthony Runyon, entered and filed 3/12/08. Signed by Judge Tommy E. Miller on 3/12/08. (ldab, ) (Entered: 03/12/2008) |
| 03/12/2008 | | Minute Entry for proceedings held before Judge Tommy E. Miller:(Court Reporter Penny Wile, OCR.)Lisa Mckeel, AUSA appeared on behalf of USA, deft. appeared through Lawrence Woodward and Jon Babineau, C/A.Arraignment as to David Anthony Runyon (3) Count 1,2,3,4,5 held, deft. waived formal arraignment, deft. entered plea of not guilty, jury demanded, Court stated that deft. shall appear at preliminary hearings unless a Waiver of Appearance is executed, deft. wishes to be present at preliminary hearings. By agreement of all parties, due to the complexity of the case and in the interest of justice pursuant to 18 USC 3161(h) speedy trial waived. Status Conference set for 7/18/2008 11:00 AM in NN Courtroom 1 before Rebecca Beach Smith. Deft. remanded. (court time: 9:00 am - 9:11 am)THIS IS A TEXT ONLY ENTRY, A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (ldab, ) (Entered: 03/13/2008) |
| 03/12/2008 | 37 | CJA 30: Appointment of Attorney Jon M. Babineau for David Anthony Runyon in Death Penalty Proceedings as to David Anthony Runyon. Entered 3/4/08 and filed 3/12/08. (Signed by Judge Rebecca Beach Smith) original mailed to Mr. Babineau on 03/13/08. (ldab, ) (Entered: 03/13/2008) |
| 03/13/2008 | 36 | ORDER OF DETENTION as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon, entered 3/7/08 and filed 3/13/08. (Signed by Judge James E. Bradberry) copies mailed on 3/13/2008. (ldab, ) (Entered: 03/13/2008) |
| 04/04/2008 | 38 | TRANSCRIPT of Proceedings (Detention Hearing) as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon held on March 5, 2008 before Judge James E. Bradberry. Court Reporter: Gloria S. Smith, OCR. (ldab, ) (Entered: 04/04/2008) |
| 04/16/2008 | | MOTION as to David Anthony Runyon REFERRED to Judge Smith, USDJ. 42 Ex Parte Motion (ldab, ) (Entered: 04/18/2008) |
| 04/18/2008 | | MOTION as to David Anthony Runyon REFERRED to Judge Smith, USDJ. 43 Ex Parte Motion (ldab, ) (Entered: 04/18/2008) |
| 04/25/2008 | 46 | MOTION Regarding Mental Health Evidence by USA as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon. (Attachments: # 1 Proposed Order Regarding Mental Health Evidence)(Perez, Blair) (Entered: 04/25/2008) |
| 04/29/2008 | | Responses due by defendants on 5/9/2008 (arou) (Entered: 04/29/2008) |
| 05/01/2008 | 52 | RESPONSE to Motion by David Anthony Runyon re 46 MOTION Regarding Mental Health Evidence (Babineau, Jon) (Entered: 05/01/2008) |
| 05/06/2008 | 54 | MOTION for Extension of Time to Reply by USA as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon. (Attachments: # 1 Proposed Order to Extend Time to Reply)(Perez, Blair) (Entered: 05/06/2008) |
| 05/08/2008 | 55 | ORDER Granting 54 Motion for Extension of Time to File as to Catherina Rose Voss (1), Michael Anthony Eric Draven (2), David Anthony Runyon (3). The Court hereby GRANTS the motion of the United States and Orders that the United States time to file a rebuttal brief is extended until three days after the last defendant's response brief has been filed, or until May 14, 2008, whichever is earlier. IT IS SO ORDERED. Entered and filed 5/8/08. (Signed by District Judge Rebecca Beach Smith) copies mailed on 5/9/08. (ldab, ) (Entered: 05/09/2008) |

| | | |
|---|---|---|
| 05/14/2008 | 58 | REPLY TO RESPONSE to Motion by USA as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon re 46 MOTION Regarding Mental Health Evidence (Perez, Blair) (Entered: 05/14/2008) |
| 05/21/2008 | | Set/Reset Motion Hearing in case as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon 46 MOTION Regarding Mental Health Evidence. Motion Hearing set for 5/30/2008 11:00 AM in N Courtroom 1 before District Judge Rebecca Beach Smith. (mgra) (Entered: 05/21/2008) |
| 05/30/2008 | | MOTION HEARING proceedings held before District Judge Rebecca Beach Smith: Blair C. Perez, AUSA, Brian J. Samuels, AUSA, Paul G. Gill, Larry M. Dash, and Jeffrey A. Swartz, c/a counsel for defendant Voss; Timothy G. Clancy and James S.Ellenson, c/a counsel for defendant Draven; and Lawrence H. Woodward, Jr. and Jon M. Babineau, c/a counsel for defendant Runyon, present. Defendants Voss, Draven and Runyon present in custody. Motion Hearing as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon held on 5/30/2008 re 46 MOTION Regarding Mental Health Evidence filed by USA. Government presented evidence. Argued. Counsel given until June 6, 2008, to submit an agreed order to the court. Court took matter under advisement. Defendants remanded. Court time: 11:00 a.m. to 1:00 p.m. (Court Reporter Jody Stewart, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 05/30/2008) |
| 06/06/2008 | 63 | Supplemental MOTION Regarding Mental Health Evidence re Motion Hearing,,, by USA as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon. (Attachments: # 1 Proposed Order Regarding Mental Health Evidence)(Perez, Blair) (Entered: 06/06/2008) |
| 06/06/2008 | 64 | RESPONSE to Motion by Catherina Rose Voss as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon re 63 Supplemental MOTION Regarding Mental Health Evidence re Motion Hearing,,,, 46 MOTION Regarding Mental Health Evidence (Attachments: # 1 Proposed Order Proposed Order Requiring Recording of Gov't Examinations)(Gill, Paul) (Entered: 06/06/2008) |
| 06/16/2008 | 65 | ORDER Granting 63 Motion Regarding Mental Health Evidence as to Catherina Rose Voss (1); Granting 63 Motion Regarding Mental Health Evidence as to Michael Anthony Eric Draven (2); Granting 63 Motion Regarding Mental health Evidence as to David Anthony Runyon (3), entered 6/13/08 and filed 6/16/08. (Signed by District Judge Rebecca Beach Smith) copies mailed on 6/16/08. (ldab, ) (Entered: 06/16/2008) |
| 06/16/2008 | 66 | ORDER as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon re 64 Response to Motion, filed by Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon. The Court hereby ORDERS that a contemporaneous audio recording be made of any Government examination or testing of a defendant pursuant to Rule 12.2. The Court further ORDERS that such recordings be treated in the manner prescribed by Rule 12.2(c)(2) for results and reports of the Government examinations, to be disclosed only under the circumstances and procedures set forth in Rule 12.2(c)(3), and as may be more fully set forth in other orders of this Court governing such disclosures. Entered 6/13/08 and filed 6/16/08. (Signed by District Judge Rebecca Beach Smith) copies mailed on 6/16/08. (ldab, ) (Entered: 06/16/2008) |
| 07/17/2008 | 67 | NOTICE OF INTENT TO SEEK THE DEATH PENALTY as to David Anthony Runyon (Samuels, Brian) (Entered: 07/17/2008) |
| 07/18/2008 | | STATUS HEARING proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, Blair C. Perez, AUSA; James S. Ellenson and Timothy C. Clancy, c/a counsel for defendant Draven; and Lawrence H. Woodward, Jr. and Jon M. Babineau, c/a counsel for defendant Runyon, present. Defendants Draven |

| | | |
|---|---|---|
| | | and Runyon present in custody.Status Hearing as to Michael Anthony Eric Draven, David Anthony Runyon held on 7/18/2008. Comments of court and counsel heard. Counsel and defendants confirmed that due to the complexity of the case and in the interest of justice pursuant to 18 USA 3161(h) speedy trial is waived. Jury trial set for Friday, March 13, 2009, at 11:00 a.m. in Newport News. Court set motions cut-off date for September 2, 2008; government to respond on or before September 23, 2008. Defendants remanded. Court time: 11:00 a.m. to 12:30 p.m. (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra, ) (Entered: 07/18/2008) |
| 07/18/2008 | | Set/Reset Hearings as to Michael Anthony Eric Draven, David Anthony Runyon: Jury Trial set for 3/13/09 11:00 AM in NN Courtroom 1 before District Judge Rebecca Beach Smith. (mgra) (Entered: 07/18/2008) |
| 08/28/2008 | 77 | MOTION 404(B) Evidence by David Anthony Runyon. (Babineau, Jon) (Entered: 08/28/2008) |
| 08/28/2008 | 78 | MOTION for Leave to File *Additional Motions, Memoranda and Exhibits* by David Anthony Runyon. (Babineau, Jon) (Entered: 08/28/2008) |
| 08/28/2008 | 79 | MOTION for Discovery *and Inspection* by David Anthony Runyon. (Babineau, Jon) (Entered: 08/28/2008) |
| 08/28/2008 | 80 | Memorandum in Support by David Anthony Runyon re 79 MOTION for Discovery *and Inspection* (Babineau, Jon) (Entered: 08/28/2008) |
| 08/28/2008 | 81 | MOTION for Exculpatory Evidence by David Anthony Runyon. (Babineau, Jon) (Entered: 08/28/2008) |
| 08/28/2008 | 82 | Memorandum in Support by David Anthony Runyon re 81 MOTION for Exculpatory Evidence (Babineau, Jon) (Entered: 08/28/2008) |
| 08/28/2008 | 83 | MOTION for Disclosure *of Confidential Informants and Memorandum in Support Thereof* by David Anthony Runyon. (Babineau, Jon) (Entered: 08/28/2008) |
| 08/28/2008 | 84 | MOTION for Disclosure *by Government of Intention to Use Evidence at Trial* by David Anthony Runyon. (Babineau, Jon) (Entered: 08/28/2008) |
| 08/28/2008 | 85 | MOTION for Jencks Material *and Memorandum of Law in Support Thereof* by David Anthony Runyon. (Babineau, Jon) (Entered: 08/28/2008) |
| 08/28/2008 | 86 | MOTION for Disclosure *and Search of Electronic or Other Surveillance* by David Anthony Runyon. (Babineau, Jon) (Entered: 08/28/2008) |
| 08/28/2008 | 87 | Memorandum in Support by David Anthony Runyon re 86 MOTION for Disclosure *and Search of Electronic or Other Surveillance* (Babineau, Jon) (Entered: 08/28/2008) |
| 08/28/2008 | 88 | MOTION to Sever Defendant *David Anthony Runyon's Trial from Co-defendant Michael Draven* by David Anthony Runyon. (Babineau, Jon) (Entered: 08/28/2008) |
| 08/28/2008 | 89 | Memorandum in Support by David Anthony Runyon re 88 MOTION to Sever Defendant *David Anthony Runyon's Trial from Co-defendant Michael Draven* (Babineau, Jon) (Entered: 08/28/2008) |
| 09/02/2008 | 90 | MOTION for Leave to File Excess Pages *Supporting Various Motions in this Capital Case and Memorandum in Support Thereof* by David Anthony Runyon. (Babineau, Jon) (Entered: 09/02/2008) |
| 09/02/2008 | 91 | MOTION To Preclude a Penalty Phase Hearing and/or Imposition of the Death Penalty because the 1994 Federal Death Penalty Act is Unconstitutional *and Brief in Support* |

| | | |
|---|---|---|
| | | *Thereof* by David Anthony Runyon. (Babineau, Jon) (Entered: 09/02/2008) |
| 09/02/2008 | 92 | MOTION To Prohibit Punishment Related Questions During Voir Dire, or in the Alternative, to Impanel a "Death-Qualified" Penalty Phase Jury Only if a Non "Death-Qualified" Jury Convicts Mr. Runyon of Either Counts One, Two, Three, or Five by David Anthony Runyon. (Babineau, Jon) (Entered: 09/02/2008) |
| 09/02/2008 | 93 | MOTION To Trifurcate Jury Deliberations *and Brief in Support Thereof* by David Anthony Runyon. (Babineau, Jon) (Entered: 09/02/2008) |
| 09/03/2008 | 94 | MOTION for Leave to File *a Late Motion* by Michael Anthony Eric Draven as to Michael Anthony Eric Draven. (Attachments: # 1 Exhibit Motion to Suppress, # 2 Exhibit Memorandum in Support of Motion to Suppress, # 3 Proposed Order)(Clancy, Timothy) Modified on 9/4/2008 The text has been modified to reflect the correct party of the document.(ldab, ). (Entered: 09/03/2008) |
| 09/03/2008 | 95 | Memorandum in Support by Michael Anthony Eric Draven as to Michael Anthony Eric Draven re 94 MOTION for Leave to File *a Late Answer* (Clancy, Timothy) Modified on 9/4/2008 The text has been modified to reflect the correct party of the document. (ldab, ). (Entered: 09/03/2008) |
| 09/03/2008 | | Notice of Correction re 94 MOTION for Leave to File, 95 Memorandum in Support of Motion. The text has been modified to reflect the correct party (Michael A. Draven) of the document.(ldab, ) (Entered: 09/04/2008) |
| 09/23/2008 | 97 | MOTION for Issuance of Subpoenas by David Anthony Runyon. (Babineau, Jon) (Entered: 09/23/2008) |
| 09/23/2008 | 98 | RESPONSE to Motion by USA as to David Anthony Runyon re 85 MOTION for Jencks Material *and Memorandum of Law in Support Thereof*, 94 MOTION for Leave to File, 91 MOTION To Preclude a Penalty Phase Hearing and/or Imposition of the Death Penalty because the 1994 Federal Death Penalty Act is Unconstitutional *and Brief in Support Thereof*, 90 MOTION for Leave to File Excess Pages *Supporting Various Motions in this Capital Case and Memorandum in Support Thereof*, 93 MOTION To Trifurcate Jury Deliberations *and Brief in Support Thereof*, 83 MOTION for Disclosure *of Confidential Informants and Memorandum in Support Thereof*, 79 MOTION for Discovery *and Inspection*, 92 MOTION To Prohibit Punishment Related Questions During Voir Dire, or in the Alternative, to Impanel a "Death-Qualified" Penalty Phase Jury Only if a Non "Death-Qualified" Jury Convicts Mr. Runyon of Either Counts One, Two, Three, o, 84 MOTION for Disclosure *by Government of Intention to Use Evidence at Trial*, 81 MOTION for Exculpatory Evidence, 86 MOTION for Disclosure *and Search of Electronic or Other Surveillance*, 78 MOTION for Leave to File *Additional Motions, Memoranda and Exhibits*, 88 MOTION to Sever Defendant *David Anthony Runyon's Trial from Co-defendant Michael Draven*, 77 MOTION 404(B) Evidence (Samuels, Brian) (Entered: 09/23/2008) |
| 09/23/2008 | 99 | RESPONSE to Motion by USA as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon re 94 MOTION for Leave to File *Motion to Suppress* (Samuels, Brian) (Entered: 09/23/2008) |
| 09/26/2008 | 102 | MOTION for Extension of Time to File Response/Reply as to 98 Response to Motion,,,,, by David Anthony Runyon. (Babineau, Jon) (Entered: 09/26/2008) |
| 09/26/2008 | 103 | ORDER granting defendant's 102 Motion for Extension of Time to File his Reply Memorandum until 10/2/08 as to David Anthony Runyon (3) (Signed by District Judge Rebecca Beach Smith on 9/26/08) & filed on 9/26/08. (mnew) (Entered: 09/29/2008) |
| 10/01/2008 | 105 | REPLY TO RESPONSE to by David Anthony Runyon re 98 Response to Motion,,,,, |

| | | |
|---|---|---|
| | | (Babineau, Jon) (Entered: 10/01/2008) |
| 10/03/2008 | 107 | RESPONSE to Motion by USA as to David Anthony Runyon re 97 MOTION for Issuance of Subpoenas (Attachments: # 1 Exhibit)(Samuels, Brian) (Entered: 10/03/2008) |
| 10/10/2008 | 109 | Letter from Defense Counsel Requesting Hearing (Woodward, Lawrence) (Entered: 10/10/2008) |
| 10/17/2008 | | Set/Reset re Motions as to Michael Anthony Eric Draven, David Anthony Runyon 97 MOTION for Issuance of Subpoenas, 88 MOTION to Sever Defendant David Anthony Runyon's Trial from Co-defendant Michael Draven. Motion Hearing set for 12/8/2008, at 2:00 PM in N Courtroom 1 before District Judge Rebecca Beach Smith. (mgra) (Entered: 10/17/2008) |
| 10/20/2008 | 111 | ORDER Granting 90 Motion for Leave to File Excess Pages as to David Anthony Runyon (3).( Signed by District Judge Rebecca Beach Smith) copies mailed on 10/21/08. (ldab, ) (Entered: 10/21/2008) |
| 10/21/2008 | 112 | ORDER Denying 78 Motion for Leave to File as to David Anthony Runyon (3), entered and filed 10/21/08. (Signed by District Judge Rebecca Beach Smith) copies mailed on 10/21/08. (ldab, ) (Entered: 10/21/2008) |
| 10/21/2008 | 113 | ORDER Denying 77 Motion 404(B) Evidence as to David Anthony Runyon (3), entered and filed 10/21/08. (Signed by District Judge Rebecca Beach Smith) copies mailed on 10/21/08. (ldab, ) (Entered: 10/21/2008) |
| 10/22/2008 | 114 | ORDER Denying 84 Motion for Disclosure as to David Anthony Runyon (3), entered and filed 10/22/08. (Signed by District Judge Rebecca Beach Smith) copies mailed on 10/22/08. (ldab, ) (Entered: 10/22/2008) |
| 10/28/2008 | 115 | ORDER Denying 79 Motion for Discovery as to David Anthony Runyon (3); Denying 81 Motion for Exculpatory Evidence as to David Anthony Runyon (3); Denying 85 Motion for Jencks Material as to David Anthony Runyon (3); Denying 86 Motion for Disclosure as to David Anthony Runyon (3), entered and filed 10/28/08.( Signed by District Judge Rebecca Beach Smith ) copies mailed on 10/29/08. (ldab, ) (Entered: 10/29/2008) |
| 10/29/2008 | 117 | Sealed MEMORANDUM (ldab, ) (Entered: 10/30/2008) |
| 11/06/2008 | 120 | ORDER Denying 83 Motion for Disclosure as to David Anthony Runyon (3), entered and filed 11/6/08. (Signed by District Judge Rebecca Beach Smith) copies mailed on 11/6/08. (ldab, ) (ldab, ). (Entered: 11/06/2008) |
| 12/08/2008 | | MOTION HEARING for proceedings held before District Judge Rebecca Beach Smith: U.S. appeared through Brian J. Samuels, AUSA, Lisa R. McKeel, AUSA; defendant Michael Anthony Eric Draven, present in custody, with his court appointed counsel James S. Ellenson and Timothy G. Clancy; and defendant David Anthony Runyon present, in custody, with his court appointed counsel Lawrence H. Woodward, Jr., and Jon M. Babineau. Motion Hearing as to David Anthony Runyon held on 12/8/2008 re 93 MOTION To Trifurcate Jury Deliberations and Brief in Support Thereof filed by David Anthony Runyon, 92 MOTION To Prohibit Punishment Related Questions During Voir Dire, or in the Alternative, to Impanel a "Death-Qualified" Penalty Phase Jury Only if a Non "Death-Qualified" Jury Convicts Mr. Runyon of Either Counts One, Two, Three, or Five filed by David Anthony Runyon, 97 MOTION for Issuance of Subpoenas filed by David Anthony Runyon, 88 MOTION to Sever Defendant David Anthony Runyon's Trial from Co-defendant Michael Draven filed by David Anthony Runyon. Matter came on for a hearing on various pretrial motions filed by defendant David Anthony Runyon. Arguments heard. Defendant Runyon withdrew his Motion for Issuance of Criminal Subpoenas, as the parties have resolved the issues underlying the motion. The court |

|  |  | denied defendant Runyon's Motion to Sever for the reasons stated from the bench. The court likewise denied defendant Runyon's Motion to Limit Voir Dire. With respect to defendant Runyon's Motion to Trifurcate, the court granted the motion for the reasons stated from the bench, further notin g that neither the United States nor co-defendant Draven opposed trifurcation of the jury deliberations. Defendants remanded. CJA time: 2:00 p.m. to 2:45 p.m.(Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 12/09/2008) |
|---|---|---|
| 12/09/2008 | 132 | ORDER DENYING 88 Motion to Sever Defendant and 92 Motion to Limit Voir Dire as to David Anthony Runyon (3); and GRANTING 93 Motion to Trifurcate Jury Deliberations as to David Anthony Runyon (3). Signed by District Judge Rebecca Beach Smith on 12/8/08 & filed on 12/9/08. (ptom) (Entered: 12/09/2008) |
| 12/12/2008 | 135 | NOTICE *Pursuant to Fed. R. Crim. P.12.2* by David Anthony Runyon (Attachments: # 1 Exhibit Curriculum Vitae for Evan S. Nelson, Ph.D., ABPP, CSOTP, # 2 Exhibit Curriculum Vitae for Mark D. Cunningham, Ph.D., ABPP)(Babineau, Jon) (Entered: 12/12/2008) |
| 12/15/2008 | 136 | CJA 24 as to David Anthony Runyon: Authorization to Pay Gloria Smith, OCR. Expedited services denied. Signed by District Judge Rebecca Beach Smith on 12/12/08 & filed on 12/15/08. Original to Court Reporter. (Attachments: # 1 Cover Letter) (ptom) (Entered: 12/15/2008) |
| 01/07/2009 | 141 | 2 Subpoenas issued (Attachments: # 1 Letter)(ldab, ) (Entered: 01/07/2009) |
| 01/07/2009 | 142 | TRANSCRIPT of Proceedings (Hearing on Motions) as to Michael Anthony Eric Draven, David Anthony Runyon held on December 8, 2008 before Judge Judge Rebecca Beach Smith. Court Reporter: Gloria S. Smith, OCR. (ldab, ) (Entered: 01/08/2009) |
| 01/09/2009 | 143 | MEMORANDUM OPINION AND ORDER Denying 91 Motion to Preclude a Penalty Phase Hearing and/or Imposition of the Death Penalty as to David Anthony Runyon (3), entered and filed 1/9/2009. (Signed by District Judge Rebecca Beach Smith) copies mailed on 1/12/2009. (ldab, ) (Entered: 01/12/2009) |
| 01/09/2009 | 144 | 100 Blank Subpoenas issued 1/9/2009 (Attachments: # 1 Memorandum for 100 blank subpoenas)(ldab, ) (Entered: 01/13/2009) |
| 01/23/2009 | 147 | 100 Blank Subpoenas issued 1/23/09 (Attachments: # 1 Memorandum)(ldab, ) (Entered: 01/26/2009) |
| 01/30/2009 | 148 | 50 Blank Subpoenas issued 1/30/2009 (Attachments: # 1 Letter)(ldab, ) (Entered: 01/30/2009) |
| 02/02/2009 | 149 | MOTION Motion To Transfer Location of Trial from Newport News to Norfolk by David Anthony Runyon. (Babineau, Jon) (Entered: 02/02/2009) |
| 02/03/2009 | 150 | RESPONSE to Motion by Michael Anthony Eric Draven as to David Anthony Runyon re 149 MOTION Motion To Transfer Location of Trial from Newport News to Norfolk (Clancy, Timothy) (Entered: 02/03/2009) |
| 02/04/2009 | 151 | MOTION for Hearing *Inquiry Into Potential Conflict of Interest* by David Anthony Runyon. (Babineau, Jon) (Entered: 02/04/2009) |
| 02/09/2009 | 154 | RESPONSE to Motion by USA as to David Anthony Runyon re 151 MOTION for Hearing *Inquiry Into Potential Conflict of Interest* (Samuels, Brian) (Entered: 02/09/2009) |
| 02/09/2009 | 155 | RESPONSE to Motion by USA as to David Anthony Runyon re 149 MOTION Motion |

| | | To Transfer Location of Trial from Newport News to Norfolk (Samuels, Brian) (Entered: 02/09/2009) |
|---|---|---|
| 02/10/2009 | 156 | MOTION ON JURY SELECTION PROCEDURES AND FOR ADDITIONAL PRE-EMPTORY CHALLENGES by David Anthony Runyon. (Attachments: # 1 Exhibit 1) (Woodward, Lawrence) (Entered: 02/10/2009) |
| 02/10/2009 | 157 | Memorandum by David Anthony Runyon *CONCERNING JURY DEATH QUALIFICATION* (Woodward, Lawrence) (Entered: 02/10/2009) |
| 02/10/2009 | 158 | Proposed Voir Dire by David Anthony Runyon (Woodward, Lawrence) (Entered: 02/10/2009) |
| 02/13/2009 | 159 | ORDER Granting 151 Motion for Inquiry Into Potential Conflict of Interest as to David Anthony Runyon (3). Entered and filed 2/13/09. (Signed by District Judge Rebecca Beach Smith ) copies mailed on 2/13/2009. (Attachments: # 1 Letter) (ldab, ) (Entered: 02/13/2009) |
| 02/13/2009 | | Attorney update in case as to David Anthony Runyon. Attorney Jon M. Babineau terminated. (ldab, ) (Entered: 02/13/2009) |
| 02/20/2009 | 160 | MOTION to Continue *Trial* by David Anthony Runyon. (Woodward, Lawrence) (Additional attachment(s) added on 2/20/2009: # 1 Proposed Order) (Entered: 02/20/2009) |
| 02/20/2009 | 161 | CJA 30: Appointment of Attorney Stephen Ashton Hudgins for David Anthony Runyon in Death Penalty Proceedings as to David Anthony Runyon. Entered 2/18/09 and filed 2/20/09. (Signed by District Judge Rebecca Beach Smith) original mailed on 2/20/2009. (ldab, ) (Entered: 02/20/2009) |
| 02/23/2009 | 162 | ORDER Granting 160 Motion to Continue as to David Anthony Runyon (3), entered and filed 2/23/09. (Signed by District Judge Rebecca Beach Smith) copies mailed on 2/23/2009. (ldab, ) (Entered: 02/23/2009) |
| 02/23/2009 | | Terminate Jury Trial set for 3/13/2009 at 11:00 am as to David Anthony Runyon: Jury Trial continued until 5/4/2009 11:00 AM in Newport News Courtroom 1 before District Judge Rebecca Beach Smith. (ldab, ) (Entered: 02/23/2009) |
| 02/26/2009 | 164 | MOTION to Continue by David Anthony Runyon. (Hudgins, Stephen) (Entered: 02/26/2009) |
| 02/26/2009 | 165 | Memorandum in Support by David Anthony Runyon re 164 MOTION to Continue (Hudgins, Stephen) (Entered: 02/26/2009) |
| 03/03/2009 | | Set/Reset re Motion in case as to Michael Anthony Eric Draven, David Anthony Runyon 164 MOTION to Continue. Motion Hearing set for 3/13/2009 10:00 AM in N Courtroom 1 before District Judge Rebecca Beach Smith. (mgra) (Entered: 03/03/2009) |
| 03/09/2009 | 168 | RESPONSE to Motion by USA as to Michael Anthony Eric Draven, David Anthony Runyon re 164 MOTION to Continue, 166 MOTION to Continue (Samuels, Brian) (Entered: 03/09/2009) |
| 03/10/2009 | 169 | CERTIFICATE of Service re 168 Response to Motion (Samuels, Brian) (Entered: 03/10/2009) |
| 03/13/2009 | | MOTIONS HEARING proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy G. Clancy, c/a counsel for defendant Draven, and Lawrence H. Woodward, Jr. and Stephen A. Hudgins, c/a counsel for defendant Runyon, present. Defendants Draven and Runyon present in custody. Motion Hearing as to Michael Anthony Eric Draven, David Anthony |

| | | |
|---|---|---|
| | | Runyon held on 3/13/2009 re 164 MOTION to Continue filed by David Anthony Runyon, 166 MOTION to Continue filed by Michael Anthony Eric Draven, 149 MOTION Motion To Transfer Location of Trial from Newport News to Norfolk filed by David Anthony Runyon. Comments of court and counsel heard. Counsel and defendants confirmed that due to the complexity of the case and in the interest of justice pursuant to 18 USC 3161(h) speedy trial is waived. For the reasons stated from the bench, the court granted defendants' motions to continue the trial of this matter, and granted defendant Runyon's motion to transfer the location of the trial from Newport News to Norfolk. Jury Trial set for 6/30/2009 10:00 AM in N Courtroom 1 before District Judge Rebecca Beach Smith. Defendants remanded.(Court Reporter Gloria Smith, OCR.) CJA Time: 10:00 a.m. to 10:55 a.m. (mgra) (Entered: 03/13/2009) |
| 03/13/2009 | 171 | ORDER Granting 166 Motion to Continue as to Michael Anthony Eric Draven (2); Granting 164 Motion to Continue as to David Anthony Runyon (3)The trial in this matter is set for Tuesday, June 30, 2009 at 10:00 a.m. in Norfolk.( Signed by District Judge Rebecca Beach Smith) copies mailed on 3/13/09. (ldab, ) (Entered: 03/13/2009) |
| 03/18/2009 | 172 | 200 Subpoenas issued (Attachments: # 1 Memorandum)(ldab, ) (Entered: 03/19/2009) |
| 03/19/2009 | 173 | Proposed Voir Dire by USA as to Michael Anthony Eric Draven, David Anthony Runyon (Samuels, Brian) (Entered: 03/19/2009) |
| 03/19/2009 | 174 | PRETRIAL MEMORANDUM *Regarding Juror Voir Dire* by David Anthony Runyon (Samuels, Brian) (Entered: 03/19/2009) |
| 03/19/2009 | 175 | RESPONSE to Motion by USA as to David Anthony Runyon re 156 MOTION ON JURY SELECTION PROCEDURES AND FOR ADDITIONAL PRE-EMPTORY CHALLENGES (Attachments: # 1 Exhibit Proposed Questionnaire)(Samuels, Brian) (Entered: 03/19/2009) |
| 03/27/2009 | 176 | 50 Blank Subpoenas issued 3/27/09. (ldab, ) (Entered: 03/27/2009) |
| 04/08/2009 | 177 | NOTICE *Regarding Mental Health Experts* by David Anthony Runyon (Hudgins, Stephen) (Entered: 04/08/2009) |
| 04/13/2009 | 179 | MOTION to Continue *Trial Date* by David Anthony Runyon. (Hudgins, Stephen) (Entered: 04/13/2009) |
| 04/17/2009 | 180 | RESPONSE to Motion by Michael Anthony Eric Draven as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon re 179 MOTION to Continue *Trial Date* (Clancy, Timothy) (Entered: 04/17/2009) |
| 04/21/2009 | 181 | RESPONSE to Motion by USA as to David Anthony Runyon re 179 MOTION to Continue *Trial Date* (Samuels, Brian) (Entered: 04/21/2009) |
| 04/21/2009 | 182 | MOTION to Sever Defendant *Draven* by USA as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon. (Samuels, Brian) (Entered: 04/21/2009) |
| 04/23/2009 | 185 | RESPONSE to Motion by David Anthony Runyon re 182 MOTION to Sever Defendant (Woodward, Lawrence) (Entered: 04/23/2009) |
| 04/24/2009 | 186 | RESPONSE in Opposition by Michael Anthony Eric Draven as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon re 182 MOTION to Sever Defendant (Clancy, Timothy) (Entered: 04/24/2009) |
| 05/01/2009 | 190 | RESPONSE by David Anthony Runyon *to Proposed Jury Questionnaire* (Woodward, Lawrence) (Entered: 05/01/2009) |
| 05/04/2009 | 191 | RESPONSE by Michael Anthony Eric Draven as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon *Regarding Proposed Jury Questionnaire* |

| | | (Clancy, Timothy) (Entered: 05/04/2009) |
|---|---|---|
| 05/05/2009 | 193 | Objection by David Anthony Runyon re 173 Proposed Voir Dire *of the United States* (Woodward, Lawrence) (Entered: 05/05/2009) |
| 05/07/2009 | 194 | ORDER Denying 182 Motion to Sever Defendant as to Michael Anthony Eric Draven (2); Denying 179 Motion to Continue as to David Anthony Runyon (3), entered and filed 5/7/09. (Signed by District Judge Rebecca Beach Smith) copies mailed on 5/7/09. (ldab, ) (Entered: 05/07/2009) |
| 05/08/2009 | 195 | Objection by David Anthony Runyon *to Proposed Non-Statutory Aggravating Factors in Death Notice re 67 NOTICE OF INTENT TO SEEK THE DEATH PENALTY (Woodward, Lawrence) (Entered: 05/08/2009)* |
| 06/01/2009 | 199 | RESPONSE by USA as to David Anthony Runyon re 195 Objection (Samuels, Brian) (Entered: 06/01/2009) |
| 06/04/2009 | 202 | Petition and Order for Writ of Habeas Corpus ad Testificandum by Michael Anthony Eric Draven, David Anthony Runyon, entered and filed 6/4/09. (Signed by Magistrate Judge James E. Bradberry ) copies mailed on 6/5/09. (ldab, ) (Entered: 06/05/2009) |
| 06/04/2009 | 203 | Writ of Habeas Corpus ad Testificandum Issued and Delivered to USM 6/5/09 as to Lawerence Ford for July 6, 2009, at 10:00 a.m. in case as to Michael Anthony Eric Draven, David Anthony Runyon (ldab, ) (Entered: 06/05/2009) |
| 06/09/2009 | 205 | Sealed Memorandum (ldab, ) (Entered: 06/09/2009) |
| 06/10/2009 | 208 | Petition and Order for Writ of Habeas Corpus ad Testificandum by Michael Anthony Eric Draven, David Anthony Runyon, entered and filed 6/10/09. (Signed by Magistrate Judge F. Bradford Stillman) copies mailed on 6/12/09. (ldab, ) (Entered: 06/12/2009) |
| 06/10/2009 | 209 | Writ of Habeas Corpus ad Testificandum Issued and Delivered to USM 6/12/09 as to Lawerence Ford for July 6, 2009, at 10:00 a.m. in case as to Michael Anthony Eric Draven, David Anthony Runyon (ldab, ) (Entered: 06/12/2009) |
| 06/11/2009 | 211 | JUROR QUESTIONNAIRE ORDER as to Michael Anthony Eric Draven, David Anthony Runyon. Signed by District Judge Rebecca Beach Smith (Attachments: # 1 Questionnaire, # 2 Confidential Documents) (ldab, ) (Entered: 06/15/2009) |
| 06/16/2009 | 214 | MOTION for Issuance of Subpoenas *In A Criminal Case* by David Anthony Runyon. (Hudgins, Stephen) (Entered: 06/16/2009) |
| 06/16/2009 | 215 | MOTION to Seal *Exhibit A of the Motion to Issue A Subpoena In A Criminal Case* by David Anthony Runyon. (Hudgins, Stephen) (Entered: 06/16/2009) |
| 06/17/2009 | 216 | Acknowledgment of Receipt signed by USA and counsel for defendant Eric Draven & David Anthony Runyon 211 JUROR QUESTIONNAIRE ORDER (ldab, ) (Entered: 06/17/2009) |
| 06/17/2009 | 217 | MEMORANDUM ORDER as to David Anthony Runyon DENIES re 195 Objection filed by David Anthony Runyon, entered and filed 6/17/09. (Signed by District Judge Rebecca Beach Smith ) copies mailed on 6/17/09. (ldab, ) (Entered: 06/17/2009) |
| 06/18/2009 | 219 | RESPONSE to Motion by USA as to David Anthony Runyon re 214 MOTION for Issuance of Subpoenas *In A Criminal Case* (Samuels, Brian) (Entered: 06/18/2009) |
| 06/18/2009 | 220 | MOTION for Issuance of Subpoenas *and Payment of Witness Expenses* by David Anthony Runyon. (Attachments: # 1 Proposed Order)(Hudgins, Stephen) (Entered: 06/18/2009) |
| 06/22/2009 | 221 | ORDER granting 215 Motion to Seal Exhibit "A" of the Motion to Issue a Subpoena in a |

| | | |
|---|---|---|
| | | Criminal Case as to David Anthony Runyon (3), entered & filed 6/22/09. Signed by District Judge Rebecca Beach Smith on 6/22/09. (arou) (Entered: 06/22/2009) |
| 06/22/2009 | 223 | ORDER Denying 214 Motion for Issuance of Subpoenas as to David Anthony Runyon (3), entered and filed 6/22/09. (Signed by District Judge Rebecca Beach Smith) copies mailed on 6/23/09. (ldab, ) (Entered: 06/23/2009) |
| 06/23/2009 | 224 | Proposed Jury Instructions by David Anthony Runyon (Woodward, Lawrence) (Entered: 06/23/2009) |
| 06/23/2009 | 225 | Proposed Jury Instructions by David Anthony Runyon (Woodward, Lawrence) (Entered: 06/23/2009) |
| 06/23/2009 | 228 | Proposed Jury Instructions by USA as to Michael Anthony Eric Draven, David Anthony Runyon (Samuels, Brian) (Entered: 06/23/2009) |
| 06/29/2009 | 230 | NOTICE *Regarding Mental Health Experts* by David Anthony Runyon (Hudgins, Stephen) (Entered: 06/29/2009) |
| 06/29/2009 | 231 | SEALED NOTICE by USA as to David Anthony Runyon (ldab, ) (Entered: 06/29/2009) |
| 06/29/2009 | 276 | Psychiatric Report Received as to David Anthony Runyon 231 SEALED NOTICE by USA as to David Anthony Runyon. *** Document 276 unsealed per order filed 3/2/16. (ldab, (Entered: 08/17/2009) |
| 06/30/2009 | 232 | 25 Unserved Subpoenas Returned as to Michael Anthony Eric Draven, David Anthony Runyon. (ldab, ) (Entered: 06/30/2009) |
| 06/30/2009 | 233 | 173 Subpoenas Returned Executed as to Michael Anthony Eric Draven, David Anthony Runyon. (Attachments: # 1 subpoenas returned executed, # 2 subpoenas returned executed, # 3 subpoenas returned executed, # 4 subpoenas returned executed, # 5 subpoenas returned executed)(ldab, ) (Entered: 06/30/2009) |
| 06/30/2009 | 234 | Petition and Order for Writ of Habeas Corpus ad Testificandum re: Michael Anthony Eric Draven, David Anthony Runyon, entered and filed 6/30/09. (Signed by Magistrate Judge F. Bradford Stillman) copies mailed on 6/30/09. (ldab, ) (Entered: 06/30/2009) |
| 06/30/2009 | 235 | Writ of Habeas Corpus ad Testificandum Issued and Delivered to USM 6/30/09 as to Gary Lee Turner for July 13, 2009 at 10:00 a.m. in case as to Michael Anthony Eric Draven, David Anthony Runyon (ldab, ) (Entered: 06/30/2009) |
| 06/30/2009 | | JURY TRIAL (Day #1) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy J. Clancy c/a counsel for defendant Draven, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendant Draven and Runyon present in custody. Jury Trial as to Michael Anthony Eric Draven, David Anthony Runyon held on 6/30/09. Counsel and defendants appeared. For the reasons stated from the bench, the court granted in part and denied in part defendant Runyon's motion on jury selection procedures and for additional pre-emptory challenges. Voir Dire held on 6/30/2009 as to Michael Anthony Eric Draven, David Anthony Runyon, Jurors (1st panel) appeared as summoned and were sworn on their voir dire. 12 jurors were selected, and excused until Thursday, July 2, 2009, at 10:00 a.m. Jurors not selected were excused subject to call. Counsel and defendants excused until 10:00 a.m. on July 1, 2009. Defendants remanded. CJA Time: 10:00 a.m. to 6:10 p.m. (lunch 2:00 p.m. to 2:30 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 07/01/2009) |
| 06/30/2009 | | ORAL ORDER (at 1st day of jury trial on 6/30/09) granting in part and denying in part 156 Motion on jury selection procedures and for additional pre-emptory challenges as to |

| | | |
|---|---|---|
| | | David Anthony Runyon (3) (mgra) (Entered: 07/01/2009) |
| 06/30/2009 | 237 | 1 Subpoena Returned as to Michael Anthony Eric Draven, David Anthony Runyon. (ldab, ) (Entered: 07/02/2009) |
| 06/30/2009 | 277 | Psychiatric Report Received 6/30/2009 from Paul Montalbano, Ph.D. as to David Anthony Runyon. *** Document 277 unsealed per order filed 3/2/16. (ldab, (Entered: 08/17/2009) |
| 07/01/2009 | | JURY TRIAL (Day #2) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy J. Clancy c/a counsel for defendant Draven, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendants Draven and Runyon present in custody. Continuation of Jury Trial as to Michael Anthony Eric Draven, David Anthony Runyon held on 7/1/2009. Voir Dire held on 7/1/2009 as to Michael Anthony Eric Draven, David Anthony Runyon. Counsel and defendants appeared. Jurors (2nd panel) appeared as summoned and were sworn on their voir dire. 4 jurors were selected, and were excused until July 2, 2009, at 10:00 a.m. Jurors not selected were excused subject to call. Counsel, and defendants excused until 10:00 a.m. on July 2, 2009. Defendants remanded. CJA Time: 10:00 a.m. to 12:40 p.m. (did not break for lunch). (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 07/01/2009) |
| 07/02/2009 | | JURY TRIAL (Day #3) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy J. Clancy c/a counsel for defendant Draven, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendants Draven and Runyon present in custody. Continuation of Jury Trial as to Michael Anthony Eric Draven, David Anthony Runyon held on 7/2/2009. Jurors, counsel, and defendants appeared. 12 jurors, and 4 alternate jurors were sworn. Opening statements heard. Jurors, counsel, and defendants excused until 10:00 a.m. on July 6, 2009. Defendants remanded. CJA Time: 10:00 a.m. to 12:15 a.m. (did not break for lunch) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PED DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 07/02/2009) |
| 07/06/2009 | | JURY TRIAL (Day #4) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy J. Clancy c/a counsel for defendant Draven, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendants Draven and Runyon present in custody. Continuation of Jury Trial as to Michael Anthony Eric Draven, David Anthony Runyon held on 7/6/2009. Jurors, counsel, and defendants appeared. Government presented evidence. Jurors, counsel, and defendants excused until 10:00 a.m. on July 7, 2009. Defendants remanded. CJA Time: 10:00 a.m. to 5:00 p.m. (lunch 1:15 p.m. to 2:00 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUCMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 07/07/2009) |
| 07/07/2009 | | JURY TRIAL (Day #5) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy J. Clancy c/a counsel for defendant Draven, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendants Draven and Runyon present in custody. Continuation of Jury Trial as to Michael Anthony Eric Draven, David Anthony Runyon held on 7/7/2009. Jurors, counsel, and defendants appeared. Government presented evidence. Jurors, counsel, and defendants excused until 10:00 a.m. on July 8, 2009. Defendants remanded. CJA Time: 10:00 a.m. to 5:00 p.m. (lunch 1:10 p.m. to 2:00 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY |

| | | |
|---|---|---|
| | | ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 07/08/2009) |
| 07/08/2009 | | JURY TRIAL (Day #6) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy J. Clancy c/a counsel for defendant Draven, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendants Draven and Runyon present in custody. Continuation of Jury Trial as to Michael Anthony Eric Draven, David Anthony Runyon held on 7/8/2009. Jurors, counsel, and defendants appeared. Government presented evidence. Jurors, counsel, and defendants excused until 10:00 a.m. on July 9, 2009. Defendants remanded. CJA Time: 10:00 a.m. to 5:20 p.m. (lunch 1:45 p.m. to 2:30 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 07/09/2009) |
| 07/09/2009 | | JURY TRIAL (Day #7) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy J. Clancy c/a counsel for defendant Draven, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendants Draven and Runyon present in custody. Continuation of Jury Trial as to Michael Anthony Eric Draven, David Anthony Runyon held on 7/9/2009. Jurors, counsel, and defendants appeared. Government presented evidence. Jurors, counsel, and defendants excused until 10:00 a.m. on July 13, 2009. Defendants remanded. CJA Time: 10:00 a.m. to 5:40 p.m. (lunch 1:20 p.m. to 2:00 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 07/10/2009) |
| 07/12/2009 | 238 | MOTION in Limine by USA as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon. (Samuels, Brian) (Entered: 07/12/2009) |
| 07/13/2009 | | JURY TRIAL (Day #8) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy J. Clancy c/a counsel for defendant Draven, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendants Draven and Runyon present in custody. Continuation of Jury Trial as to Michael Anthony Eric Draven, David Anthony Runyon held on 7/13/2009. Jurors, counsel, and defendants appeared. Government presented evidence. Out of the presence of the jury, the court denied the government's motion in limine. Jurors, counsel, and defendants excused until 10:30 a.m. on July 14, 2009. Defendants remanded. CJA Time: 10:00 a.m. to 5:25 p.m. (lunch 1:15 p.m. to 2:00 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 07/14/2009) |
| 07/13/2009 | | ORAL ORDER (at 8th day of jury trial on July 13, 2009) denying 238 Motion in Limine by USA as to Michael Anthony Eric Draven (2), David Anthony Runyon (3). (mgra) (Entered: 07/14/2009) |
| 07/14/2009 | | JURY TRIAL (Day #9) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy J. Clancy c/a counsel for defendant Draven, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendants Draven and Runyon present in custody. Continuation of Jury Trial as to Michael Anthony Eric Draven, David Anthony Runyon held on 7/14/2009. Jurors, counsel and defendants appeared. Government presented evidence. Out of the presence of the jury, defendants moved to dismiss counts 2 and 3 of the indictment. Court took matter under advisement. Jurors, counsel, and defendants excused until 10:30 a.m. on July 15, 2009. Defendants |

| | | |
|---|---|---|
| | | remanded. CJA Time: 10:30 a.m. to 5:45 p.m. (lunch 1:50 p.m. to 2:30 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 07/15/2009) |
| 07/15/2009 | | JURY TRIAL (Day #10) proceedings held before District Judge Rebecca Beach Smith: Lia R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy J. Clancy c/a counsel for defendant Draven, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendants Draven and Runyon present in custody. Continuation of Jury Trial as to Michael Anthony Eric Draven, David Anthony Runyon held on 7/15/2009. Counsel and defendants appeared. For the reasons stated from the bench, the court denied defendants' motion to dismiss count 2 of the indictment, and granted defendants' motion to dismiss count 3 of the indictment. Jurors appeared. Stipulations filed. Government presented evidence, and rested. Defendants presented evidence, and rested. Counsel and defendants excused until 10:00 a.m. on July 16, 2009, and jurors excused until 10:30 a.m. on July 16, 2009. Defendants remanded. CJA Time: 10:30 a.m. to 4:40 p.m. (lunch 1:40 p.m. to 2:15 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 07/16/2009) |
| 07/15/2009 | 239 | STIPULATIONS by USA, Michael Anthony Eric Draven, and David Anthony Runyon, filed on July 15, 2009. (mgra) (Entered: 07/16/2009) |
| 07/15/2009 | | DISMISSAL OF COUNTS on Motion of Michael Anthony Eric Draven, David Anthony Runyon. Dismissed 7/15/09 (Court granted defendants' motion to dismiss count 3 of the indictment.) (ldab, ) (Entered: 07/21/2009) |
| 07/16/2009 | | JURY TRIAL (Day #11) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy J. Clancy c/a counsel for defendant Draven, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendants Draven and Runyon present in custody. Continuation of Jury Trial as to Michael Anthony Eric Draven, David Anthony Runyon held on 7/16/2009. Counsel and defendants appeared. Court and counsel reviewed jury instructions. Jurors appeared. Final arguments heard. Jury received court's charge and retired to the jury room to begin their deliberations. Alternate jurors excused. Jurors, counsel, and defendants excused until 10:00 a.m. on July 17, 2009. Defendants remanded. CJA Time: 10:00 a.m. to 6:05 p.m. (lunch 1:15 p.m. to 2:00 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) Modified on 7/21/2009, added time for lunch (mgra). (Entered: 07/17/2009) |
| 07/17/2009 | 240 | Supplemental MOTION to Continue *Capital Sentencing Hearing* by David Anthony Runyon. (Hudgins, Stephen) (Entered: 07/17/2009) |
| 07/17/2009 | 241 | MOTION to Seal *Exhibits* by David Anthony Runyon. (Hudgins, Stephen) (Entered: 07/17/2009) |
| 07/17/2009 | 242 | Notice: Statement of Counsel by David Anthony Runyon. (Hudgins, Stephen) (Entered: 07/17/2009) |
| 07/17/2009 | | JURY TRIAL (Day #12) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, James S. Ellenson and Timothy J. Clancy c/a counsel for defendant Draven, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendants Draven and Runyon present in custody. Continuation of Jury Trial as to Michael Anthony Eric Draven, David Anthony Runyon held on 7/17/2009. Jurors, counsel and defendants appeared. Jurors returned to jury room to continue their deliberations. Sometime later, the jury returned with their verdicts. Jury Verdict Forms (2) read into record and filed. Jurors excused until |

|  |  | Wednesday, July 22, 2009, at 10:00 a.m. for the next phase of the trial as to defendant David Anthony Runyon. Court denied defendants' motion to set aside the verdicts. Sentencing Procedures Order as to defendant Michael Anthony Eric Draven, entered & filed in open court. Sentencing for defendant Michael Anthony Eric Draven set for November 17, 2009, at 10:00 a.m. in Norfolk. Defendant Draven remanded. Court directed that by Monday, July 20, 2009, defendant shall file a pleading confirming or disavowing his intent to introduce mental health testimony at the penalty phase. By Tuesday, July 21, 2009, the report of the defense expert shall be released to counsel for the government or the defendant shall file a notice of withdrawal of his intent to introduce expert mental health evidence. Counsel and defendant David Anthony Runyon excused until 9:00 a.m. on July 22, 2009, to review jury instructions and to begin the next phase of the trial. Defendant Runyon remanded. CJA Time: 10:00 a.m. to 2:45 p.m. for counsel for defendant Draven; 10:00 a.m. to 3:00 p.m. for counsel for defendant Runyon (lunch 1:15 p.m. to 2:00 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) Modified on 7/20/2009, added more information (mgra). (Entered: 07/20/2009) |
| 07/17/2009 | 245 | JURY VERDICT FORM as to David Anthony Runyon (3) Guilty on Count 1,2,5; Not Guilty on Count 4. (mgra) (Entered: 07/20/2009) |
| 07/17/2009 |  | Set/Reset Hearings as to David Anthony Runyon: Jury Trial (Phase 2) set for 7/22/2009, at 10:00 AM in N Courtroom 1 before District Judge Rebecca Beach Smith. (mgra) (Entered: 07/20/2009) |
| 07/20/2009 | 246 | Psychological Evaluations Received from Allan F. Mirsky, Ph.D.,ABPP & Mark D. Cunningham, PH.D., ABPP (Sealed) as to David Anthony Runyon (ldab, ) (Entered: 07/20/2009) |
| 07/20/2009 | 247 | Second MOTION to Continue *Capital Sentencing Hearing* by David Anthony Runyon. (Hudgins, Stephen) (Entered: 07/20/2009) |
| 07/20/2009 | 248 | NOTICE *of Intent to Introduce Mental Health Testimony* by David Anthony Runyon (Hudgins, Stephen) (Entered: 07/20/2009) |
| 07/21/2009 | 249 | RESPONSE in Opposition by USA as to David Anthony Runyon re 247 Second MOTION to Continue *Capital Sentencing Hearing*, 240 Supplemental MOTION to Continue *Capital Sentencing Hearing* (Samuels, Brian) (Entered: 07/21/2009) |
| 07/21/2009 | 250 | Acknowledgment of Receipt of mental health reports: signed by USA as to David Anthony Runyon (ldab, ) (Entered: 07/21/2009) |
| 07/22/2009 | 252 | Acknowledgment of Receipt of mental health reports. Signed by US Attorney and defense counsel as to David Anthony Runyon (ptom) (Entered: 07/22/2009) |
| 07/22/2009 | 253 | ORDER GRANTING 241 Motion to Seal Exhibits as to David Anthony Runyon (3). Signed by District Judge Rebecca Beach Smith & filed on 7/22/09. (ptom) (Entered: 07/22/2009) |
| 07/22/2009 | 254 | ORDER Granting 240 Supplemental MOTION to Continue Capital Sentencing Hearing by David Anthony Runyon 247 Motion to Continue as to David Anthony Runyon (3). Phase Three of the trial will commence on Wednesday, August 19, 2009, at 10:00 a.m. in Norfolk. Entered and filed 7/22/09. (Signed by District Judge Rebecca Beach Smith) copies mailed on 7/22/09. (ldab, ) (Entered: 07/22/2009) |
| 07/22/2009 |  | JURY TRIAL (Day #13 - Phase Two - Eligibility Phase) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendant Runyon present in custody. Continuation of Jury Trial as to David |

**19**

| | | |
|---|---|---|
| | | Anthony Runyon held on 7/22/2009 (Phase Two - Eligibility Phase). Counsel and defendant appeared. Court and counsel reviewed jury instructions for phase two of the trial. Eleven jurors (the court excused one of the original 12 jurors for the reasons stated on the record), and the four alternate jurors previously selected, appeared. Arguments heard in re eligibility phase of the trial. Jurors received court's charge and retired to the jury room to begin their deliberations. Alternate jurors excused until August 19, 2009, at 10:00 a.m. in N Courtroom 1 before District Judge Rebecca Beach Smith for the penalty phase of the trial. Sometime later, the jury returned with their verdict. Special Verdict Form - Eligibility Phase read into record and filed. Jurors excused until August 19, 2009, at 10:00 AM in N Courtroom 1 before District Judge Rebecca Beach Smith for the penalty phase of the trial. Defendant remanded. CJA Time: 9:00 a.m. to 12:50 p.m. (did not break for lunch) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 07/22/2009) |
| 07/22/2009 | 255 | SPECIAL VERDICT FORM - ELIGIBILITY PHASE as to David Anthony Runyon (3) (mgra) (Entered: 07/22/2009) |
| 07/22/2009 | 256 | ORDER Granting 220 Motion for Issuance of Subpoenas as to David Anthony Runyon (3)entered and filed in open court 7/22/09. (Signed by District Judge Rebecca Beach Smith) copies mailed on 7/22/09. (ldab, ) (Entered: 07/22/2009) |
| 07/22/2009 | 257 | ORDER as to David Anthony Runyon re 206 Ex Parte Motion (This matter is no longer ex parte) entered and filed 7/22/09. (Signed by District Judge Rebecca Beach Smith ) copies mailed on 7/22/09. (ldab, ) (Entered: 07/23/2009) |
| 07/30/2009 | 262 | 3 Subpoenas Returned as to David Anthony Runyon. (ldab, ) (Entered: 08/03/2009) |
| 07/31/2009 | 260 | 17 Subpoenas issued (ptom) (Entered: 07/31/2009) |
| 08/06/2009 | 263 | Sealed Document (arou) (Entered: 08/06/2009) |
| 08/10/2009 | 266 | 8 Subpoenas issued (ldab, ) (Entered: 08/10/2009) |
| 08/10/2009 | 267 | MOTION in Limine by USA as to David Anthony Runyon. (Samuels, Brian) (Entered: 08/10/2009) |
| 08/10/2009 | 268 | MOTION To Issue A Subpoena And Pay The Travel Expenses Of One Witness by David Anthony Runyon. (Hudgins, Stephen) (Entered: 08/10/2009) |
| 08/10/2009 | 269 | MOTION To Allow Defendant To Supplement His Mental Health Reports by David Anthony Runyon. (Hudgins, Stephen) (Entered: 08/10/2009) |
| 08/10/2009 | 270 | MOTION To Take Defense Expert Trial Testimony Out Of Sequence by David Anthony Runyon. (Hudgins, Stephen) (Entered: 08/10/2009) |
| 08/13/2009 | 271 | ORDER Granting 268 MOTION To Issue A Subpoena And Pay The Travel Expenses Of One Witness as to David Anthony Runyon (3). Entered and filed 8/13/09. (Signed by District Judge Rebecca Beach Smith) copies mailed on 8/13/09. (ldab, ) (Entered: 08/13/2009) |
| 08/13/2009 | 272 | ORDER Granting 270 MOTION To Take Defense Expert Trial Testimony Out Of Sequence as to David Anthony Runyon (3). Entered and filed 8/13/09. (Signed by District Judge Rebecca Beach Smith) copies mailed on 8/13/09. (ldab, ) (Entered: 08/13/2009) |
| 08/14/2009 | 273 | RESPONSE to Motion by USA as to David Anthony Runyon re 269 MOTION To Allow Defendant To Supplement His Mental Health Reports (Samuels, Brian) (Entered: 08/14/2009) |

| 08/14/2009 | 274 | MOTION To Release Test Results To Counsel by David Anthony Runyon. (Hudgins, Stephen) (Entered: 08/14/2009) |
|---|---|---|
| 08/14/2009 | 275 | ORDER granting 274 Motion to Release Test Results to Counsel as to David Anthony Runyon (3); release to be under seal. Signed by District Judge Rebecca Beach Smith. Entered and filed 8/14/09. Copies mailed on 8/14/09. (kgri) (Entered: 08/14/2009) |
| 08/17/2009 | 278 | SEALED ORDER 269 Motion To Allow Defendant To Supplement His Mental Health Reports by David Anthony Runyon. Entered and filed 8/17/09. (Signed by District Judge Rebecca Beach Smith) copies mailed on 8/17/09. (ldab, ) (Entered: 08/17/2009) |
| 08/17/2009 | 279 | MOTION for Issuance of Subpoenas by David Anthony Runyon. (Hudgins, Stephen) (Entered: 08/17/2009) |
| 08/17/2009 | 280 | ORDER Granting 279 Motion for Issuance of Subpoenas as to David Anthony Runyon (3), entered and filed 8/17/09.( Signed by District Judge Rebecca Beach Smith ) copies mailed on 8/17/09. (ldab, ) (Entered: 08/17/2009) |
| 08/17/2009 | 281 | Subpoena issued 8/17/09 (order it will not be necessary to serve Ms. Linker, it will be necessary for her to pick it up at the Court) (ldab, ) (Entered: 08/17/2009) |
| 08/18/2009 | 283 | RESPONSE by David Anthony Runyon *to Motion in Limine Regarding Dr. Mark D. Cunningham* (Hudgins, Stephen) (Entered: 08/18/2009) |
| 08/19/2009 | | JURY TRIAL (Day #14 - Phase Three - Penalty Phase) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendant Runyon present in custody. Continuation of Jury Trial as to David Anthony Runyon held on 8/19/2009 (Phase Three - Penalty Phase). Counsel and defendant appeared. Twelve jurors, and the three alternate jurors previously selected, appeared. Opening statements heard. Government presented evidence. Jurors excused until 10:00 a.m. on August 20, 2009. Arguments heard in re government's motion in limine to limit testimony of defendant's expert Dr. Mark D. Cunningham. Court took motion under advisement. Counsel and defendant excused until 10:00 a.m. on August 20, 2009. Defendant remanded. CJA TIME: 10:00 A.M. to 6:05 p.m. (lunch 1:15 p.m. to 2:00 p.m.) (Court Reporter Gloria Smith, OCR.)THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 08/20/2009) |
| 08/20/2009 | | JURY TRIAL (Day #15 - Phase Three - Penalty Phase) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendant Runyon present in custody. Continuation of Jury Trial as to David Anthony Runyon held on 8/20/2009 (Phase Three - Penalty Phase). Jurors, counsel and defendant appeared. Government presented evidence, and rested. Out of the presence of the jury, the court stated what testimony may be presented by Dr. Mark D. Cunningham. Defendant presented evidence. Jurors, counsel, and defendant excused until 10:00 a.m. on August 24, 2009. Defendant remanded. CJA Time: 10:00 a.m. to 5:00 p.m. (lunch 11:30 a.m. to 1:30 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 08/21/2009) |
| 08/21/2009 | 285 | Mitigating Factors Enumerated filed by David Anthony Runyon. (Hudgins, Stephen)Modified on 8/24/09 per chambers to remove the wording of Motion. (Entered: 08/21/2009) |
| 08/24/2009 | | JURY TRIAL (Day #16 - Phase Three - penalty Phase) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant Runyon, |

| | | |
|---|---|---|
| | | present. Defendant Runyon present in custody. Continuation of Jury Trial as to David Anthony Runyon held on 8/24/2009 (Phase Three - Penalty Phase). Jurors, counsel and defendant appeared. Defendant presented evidence. Stipulation filed. Jurors, counsel, and defendant excused until 10:00 a.m. on August 25, 2009. Defendant remanded. CJA Time: 10:00 a.m. to 5:30 p.m. (lunch 1:20 p.m. to 2:05 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 08/25/2009) |
| 08/25/2009 | 286 | STIPULATION by USA and David Anthony Runyon, filed on August 24, 2009. (mgra) (Entered: 08/25/2009) |
| 08/25/2009 | | JURY TRIAL (Day #17 - Phase Three - Penalty Phase) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, Lawrence H. Woodward, Jr., and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendant Runyon present in custody. Continuation of Jury Trial as to David Anthony Runyon held on 8/25/2009 (Phase Three - Penalty Phase). Jurors, counsel and defendant appeared. Defendant presented evidence, and rested. Government presented rebuttal evidence, and rested. Counsel and defendant excused until 9:30 a.m. on August 26, 2009, and jurors excused until 10:00 a.m. on August 26, 2009. Defendant remanded. CJA Time: 10:00 a.m. to 3:00 p.m. (lunch 1:00 p.m. to 1:40 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 08/25/2009) |
| 08/26/2009 | | JURY TRIAL (Day #18 - Phase Three - Penalty Phase) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, Lawrence H. Woodward, Jr., and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendant Runyon present in custody. Continuation of Jury Trial as to David Anthony Runyon held on 8/26/2009 ((Phase Three - Penalty Phase). Counsel and defendant appeared. Court and counsel reviewed jury instructions. Defendant's motion in limine to bar comparative worth argument by government filed in open court. For the reasons stated from the bench, the court granted th motion. Jurors appeared. Final arguments heard. Stipulations filed. Jury received court's charge and retired to the jury room to begin their deliberations. Alternate jurors excused subject to call. Jurors, counsel and defendant excused until 9:30 a.m. on August 27, 2009. Defendant remanded. CJA Time: 9:30 a.m. to 5:45 p.m. (lunch 1:00 p.m. to 1:45 p.m.) (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 08/27/2009) |
| 08/26/2009 | 288 | MOTION in limine to bar "comparative worth" argument by the government by David Anthony Runyon, filed in open court on August 26, 2009. (mgra) (Entered: 08/27/2009) |
| 08/26/2009 | | ORAL ORDER (at trial on August 26, 2009) granting 288 Motion in limine to bar "comparative worth" agrument by the government as to David Anthony Runyon (3) (mgra) (Entered: 08/27/2009) |
| 08/26/2009 | 289 | STIPULATIONS by USA and David Anthony Runyon, filed on August 26, 2009. (mgra) (Entered: 08/27/2009) |
| 08/27/2009 | 287 | 23 Subpoenas Returned Unserved as to David Anthony Runyon. (ldab, ) (Entered: 08/27/2009) |
| 08/27/2009 | | JURY TRIAL (Day #19 - Phase Three - Penalty Phase) proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, Lawrence H. Woodward, Jr., and Stephen A. Hudgins c/a counsel for defendant Runyon, present. Defendant Runyon present in custody. Continuation of Jury Trial as to David Anthony Runyon held on 8/27/2009 (Phase Three - Penalty Phase). Counsel and defendant appeared. Jurors appeared. The court excused one of the original 12 jurors for |

|  |  | the reasons stated on the record, and an alternate juror replaced the excused juror with the agreement of all counsel. Jurors returned to jury room to continue their deliberations. Court and counsel reviewed jury question. Sometime later, the jury returned with their verdict. Special Verdict Form - Selection Phase read into record and filed. Jurors polled. Jurors excused. Sentencing set for 12/4/2009, at 11:00 AM, in Norfolk, Courtroom 1 before District Judge Rebecca Beach Smith. Defendant remanded. CJA Time: 9:30 a.m. to 6:30 p.m. (lunch 12:30 p.m. to 1:15 p.m.)(Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 08/28/2009) |
|---|---|---|
| 08/27/2009 | 291 | SPECIAL VERDICT FORM - SELECTION PHASE as to David Anthony Runyon (3) (mgra) (Entered: 08/28/2009) |
| 08/31/2009 | 292 | MOTION for Extension *to File Post-Trial Motions* by David Anthony Runyon. (Woodward, Lawrence) (Entered: 08/31/2009) |
| 09/01/2009 | 294 | RESPONSE to Motion by USA as to David Anthony Runyon re 292 MOTION for Extension *to File Post-Trial Motions* (Samuels, Brian) (Entered: 09/01/2009) |
| 09/04/2009 | 296 | ORDER Granting in part and Denying in part 292 Motion for Extension of Time as to David Anthony Runyon (3). The court GRANTS the defendant's motion for an extension of time to file post-trial motions, but DENIES the length of time requested. All post-trial motions pertaining to the selection/penalty phase of trial shall be filed no later than October 1, 2009, which is five weeks following the jury's verdict in this phase. Any response by the United States shall be filed on or before October 15, 2009 and any reply by the defendant shall be filed on or before October 22, 2009. No further extensions will be granted, absent exceptional circumstances. Entered and filed 9/4/09. (Signed by District Judge Rebecca Beach Smith) copies mailed on 9/4/09. (ldab, ) (Entered: 09/04/2009) |
| 09/30/2009 | 297 | MOTION to Set Aside Verdict *Death Penalty and Memorandum in Support Thereof* by David Anthony Runyon. (Woodward, Lawrence) (Entered: 09/30/2009) |
| 10/15/2009 | 298 | RESPONSE to Motion by USA as to David Anthony Runyon re 297 MOTION to Set Aside Verdict *Death Penalty and Memorandum in Support Thereof* (Samuels, Brian) (Entered: 10/15/2009) |
| 10/27/2009 | 299 | MEMORANDUM ORDER Denying 297 Motion to Set Aside Verdict as to David Anthony Runyon (3), entered and filed 10/27/09. (Signed by District Judge Rebecca Beach Smith) copies mailed on 10/27/09. (ldab, ) (Entered: 10/27/2009) |
| 11/24/2009 | 307 | RESPONSE by David Anthony Runyon *to Sentencing Background Report* (Woodward, Lawrence) (Entered: 11/24/2009) |
| 12/04/2009 |  | SENTENCING proceedings held before District Judge Rebecca Beach Smith: Lisa R. McKeel, AUSA, Brian J. Samuels, AUSA, Lawrence H. Woodward, Jr. and Stephen A. Hudgins c/a counsel for defendant, Amber Kidd, probation officer, and defendant, present. Sentencing held on 12/4/2009 for David Anthony Runyon (3). Count(s) 1, Imprisonment: DEATH; Special Assessment: $100.00; Restitution: $100,000.00; Count(s) 2, Imprisonment: LIFE WITHOUT THE POSSIBILITY OF RELEASE; Special Assessment: $100.00; Count(s) 3, Dismissed 7/15/09 (Court granted defendants' motion to dismiss count 3 of the indictment.); Count(s) 4, Dismissed on motion of the United States; Count(s) 5, Imprisonment: DEATH; Special Assessment: $100.00. The time, place, and manner of execution are to be determined by the Attorney General of the United States, provided that the time shall not be sooner than 61 days nor later than 90 days after the date of this judgment. If an appeal is taken from the conviction or sentence, such appeal must be noted within 10 days of today, and execution of the judgment shall |

**23**

| | | |
|---|---|---|
| | | be stayed pending further order of this court upon receipt of the mandate of the Court of Appeals or the United States Supreme Court.The defendant is hereby committed to the custody of the United States Bureau of Prisons to be confined until the sentence of death is carried out in regards to counts one and five.Defendant remanded. CJA Time: 11:00 a.m. to 11:25 a.m. (Court Reporter Gloria Smith, OCR.) THIS IS A TEXT ONLY ENTRY. A PDF DOCUMENT IS NOT ATTACHED TO THIS ENTRY. (mgra) (Entered: 12/04/2009) |
| 12/04/2009 | 311 | Restitution Judgment as to David Anthony Runyon. Signed by District Judge Rebecca Beach Smith on December 4, 2009. (mgra) (Entered: 12/04/2009) |
| 12/04/2009 | 312 | NOTICE OF APPEAL by David Anthony Runyon (Woodward, Lawrence) (Entered: 12/04/2009) |
| 12/04/2009 | 313 | JUDGMENT as to David Anthony Runyon (3), Count 1: Imprisonment: DEATH; Special Assessment: $100.00; Restitution: $100,000.00; Count 2: Imprisonment: LIFE WITHOUT THE POSSIBILITY OF RELEASE; Special Assessment: $100.00; Count 3: Dismissed 7/15/09 (Court granted defendants' motion to dismiss count 3 of the indictment.); Count 4: Dismissed on motion of the United States; Count 5: Imprisonment: DEATH; Special Assessment: $100.00. The time, place, and manner of execution are to be determined by the Attorney General of the United States, provided that the time shall not be sooner than 61 days nor later than 90 days after the date of this judgment. If an appeal is taken from the conviction or sentence, such appeal must be noted within 10 days of today, and execution of the judgment shall be stayed pending further order of this court upon receipt of the mandate of the Court of Appeals or the United States Supreme Court. The defendants is hereby committed to the custody of the United States Bureau of Prisons to be confined until the sentence of death is carried out in regards to counts one and five. The defendant is remanded to the custody of the United States Marshal, entered and filed 12/4/09. (Signed by District Judge Rebecca Beach Smith) copies mailed & e-designated on 12/4/09. (ldab, ) (Entered: 12/04/2009) |
| 12/04/2009 | 314 | Transmission of Notice of Appeal to 4CCA as to David Anthony Runyon to US Court of Appeals re 312 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (ldab, ) (ldab, ). (Entered: 12/07/2009) |
| 12/07/2009 | 316 | USCA Case Number 09-11 Beth Walton, Case Manager for 312 Notice of Appeal filed by David Anthony Runyon. (ldab, ) (Entered: 12/07/2009) |
| 12/07/2009 | 317 | ORDER of USCA as to David Anthony Runyon re 312 Notice of Appeal The Court appoints Lawrence H. Woodward, Jr. as lead counsel and Stephen A. Hudgins as co-counsel for the appellant pursuant to the provisions of 18 U.S.C. § 3599(c) and the Criminal Justice Act effective 12/04/2009. (09-11)(ldab, ) (Entered: 12/07/2009) |
| 12/21/2009 | 319 | Supplemental Paper Record Transmitted to 4CCA (Sealed PSR) as to David Anthony Runyon re 312 Notice of Appeal (ldab, ) (Entered: 12/21/2009) |
| 12/21/2009 | 320 | TRANSCRIPT REQUEST by David Anthony Runyon for proceedings held & on Voir /Dire 6/3/09, Jury Instructions 7/22/09, Sentencing 12/04/09, Pre-Trial Proceedings 5/30/08, 7/18/08, 12/8/08 & 1/7/09, Testimony 6/30/09 through 7/17/09 & 8/19/09 through 8/27/09 before Judge Rebecca Beach Smith, re 312 Notice of Appeal Transcript due by 3/1/2010. (ldab, ) (Entered: 12/21/2009) |
| 12/23/2009 | | TRANSCRIPT REQUEST by David Anthony Runyon for proceedings held on various dates from 6/30/09 - 8/27/09 (court reporter Gloria Smith) before Judge Judge Rebecca Beach Smith, re 312 Notice of Appeal Transcript due by 3/1/2010. (ldab, ) (Entered: 12/24/2009) |

| 12/23/2009 | | TRANSCRIPT REQUEST by David Anthony Runyon for proceedings held on 5/30/08 (court reporter Jody Stewart) before Judge Rebecca Beach Smith, re 312 Notice of Appeal Transcript due by 1/29/2010. (ldab, ) (Entered: 12/24/2009) |
| 01/04/2010 | 321 | TRANSCRIPT of Proceedings re 312 Notice of Appeal The transcript is a paper document which may be viewed at the Clerk's Office. Held on August 20, 2009,(Fifteenth Day of Trial - Penalty Phase - Testimony of Dr. Mark D. Cunningham) before Judge Rebecca Beach Smith. Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office.(ldab, ) (Entered: 01/05/2010) |
| 01/13/2010 | 322 | TRANSCRIPT of proceedings for dates of May 30, 2008, before Judge Rebecca Beach Smith, re 312 Notice of Appeal Court Reporter/Transcriber Jody A. Stewart, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 01/14/2010) |
| 02/23/2010 | 323 | ORDER of USCA [09-11] as to David Anthony Runyon re 312 Notice of Appeal The deadline for filing of transcript by Gloria M. Smith is extended to 4/1/10 without sanctions.(ldab, ) (Entered: 02/26/2010) |
| 03/24/2010 | 324 | ORDER of USCA as to David Anthony Runyon re 312 Notice of Appeal - the Deadline for filing the Transcript by Gloria M. Smith, OCR is extended to 5/3/10 without sanctions. (mnew) (Entered: 03/26/2010) |
| 03/31/2010 | 325 | TRANSCRIPT of proceedings for dates of July 18, 2008,(Status Hearing) before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |
| 03/31/2010 | 326 | TRANSCRIPT of proceedings for dates of June 30, 2009,( First Day of Trial) before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |
| 03/31/2010 | 327 | TRANSCRIPT of proceedings for dates of July 1, 2009 (Second Day of Trial), before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |
| 03/31/2010 | 328 | TRANSCRIPT of proceedings for dates of July 2, 2009 Third Day of Trial, before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |
| 03/31/2010 | 329 | TRANSCRIPT of proceedings for dates of July 6, 2009 Fourth Day of Trial, before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |
| 03/31/2010 | 330 | TRANSCRIPT of proceedings for dates of July 7, 2009 Fifth Day of Trial, before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |
| 03/31/2010 | 331 | TRANSCRIPT of proceedings for dates of July 8, 2009 Sixth Day of Trial, before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |

| 03/31/2010 | 332 | TRANSCRIPT of proceedings for dates of July 9, 2009,Seventh Day of Trial before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |
| --- | --- | --- |
| 03/31/2010 | 333 | TRANSCRIPT of proceedings for dates of July 13, 2009, Eighth Day of Trial before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |
| 03/31/2010 | 334 | TRANSCRIPT of proceedings for dates of July 14, 2009 Ninth Day of Trial, before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |
| 03/31/2010 | 335 | TRANSCRIPT of proceedings for dates of July 15, 2009 Tenth Day of Trial, before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |
| 03/31/2010 | 336 | TRANSCRIPT of proceedings for dates of July 16, 2009 Eleventh Day of Trial, before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |
| 03/31/2010 | 337 | TRANSCRIPT of proceedings for dates of July 17, 2009 Twelfth Day of Trial, before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 03/31/2010) |
| 04/02/2010 | 338 | TRANSCRIPT of proceedings for dates of July 22, 2009 (Thirteenth Day of Trial; Eligibility Phase), before Judge Rebecca Beach Smith, re 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 04/02/2010) |
| 04/02/2010 | 339 | TRANSCRIPT of proceedings for dates of August 19, 2009 Fourteenth Day of Trial Penalty Phase, before Judge Rebecca Beach Smith, re 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 04/02/2010) |
| 04/02/2010 | 340 | TRANSCRIPT of proceedings for dates of August 20, 2009 Fifteenth Day of Trial Penalty Phase, before Judge Rebecca Beach Smith, re 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 04/02/2010) |
| 04/29/2010 | 341 | TRANSCRIPT of proceedings for dates of August 24, 2009, (Sixteenth Day of Trial - Penalty Phase) before Judge Rebecca Beach Smith, re 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 04/30/2010) |
| 04/29/2010 | 342 | TRANSCRIPT of proceedings for dates of August 25, 2009 (Seventeenth Day of Trial - Penalty Phase) before Judge Rebecca Beach Smith, re 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 04/30/2010) |
| 04/29/2010 | 343 | TRANSCRIPT of proceedings for dates of August 26, 2009 (Eighteenth Day of Trial - Penalty Phase), before Judge Rebecca Beach Smith, re 312 Notice of Appeal Court |

| | | Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 04/30/2010) |
|---|---|---|
| 04/29/2010 | 344 | TRANSCRIPT of proceedings for dates of August 27, 2009 (Nineteenth Day of Trial - Penalty Phase), before Judge Rebecca Beach Smith, re 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 04/30/2010) |
| 04/29/2010 | 346 | TRANSCRIPT of proceedings for dates of December 4, 2009 (Sentencing), before Judge Rebecca Beach Smith, re 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 04/30/2010) |
| 07/13/2010 | 347 | CJA 24 as to David Anthony Runyon: Authorization to Pay Gloria Smith, Court Reporter, entered and filed 7/13/10. (Signed by District Judge Rebecca Beach Smith) original CJA 24 sent to Gloria Smith on 7/13/10. (ldab, ) (Entered: 07/13/2010) |
| 07/15/2010 | 348 | TRANSCRIPT of proceedings for dates of March 13, 2009, before Judge Rebecca Beach Smith, re 305 Notice of Appeal, 312 Notice of Appeal Court Reporter/Transcriber Gloria Smith, Telephone number Court Reporter. The transcript is a paper document which may be viewed at the Clerk's Office (ldab, ) (Entered: 07/15/2010) |
| 08/03/2010 | 349 | CJA 24 as to David Anthony Runyon: Authorization to Pay Gloria Smith, Court Reporter, entered and filed 8/3/10. (Signed by District Judge Rebecca Beach Smith) original CJA 24 sent to Gloria Smith, OCR on 8/4/10. (ldab, ) (Entered: 08/04/2010) |
| 02/25/2013 | 382 | Opinion of USCA as to David Anthony Runyon re 312 Notice of Appeal - Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Gregory joined. Judge Niemeyer wrote a concurring opinion. [09-11] (bnew) (Entered: 02/26/2013) |
| 02/25/2013 | 383 | JUDGMENT of USCA as to David Anthony Runyon re 312 Notice of Appeal - In accordance with the decision of this court, the judgment of the district court is affirmed. This judgment shall take effect upon issuance of this court's mandate in accordance with Fed. R. App. P. 41. [09-11] (bnew) (Entered: 02/26/2013) |
| 03/11/2013 | 384 | ORDER of USCA as to David Anthony Runyon re 312 Notice of Appeal - This court's mandate is stayed under Fed. R. App. P. 41(d)(1), which provides that "[t]he timely filing of a petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, stays the mandate until disposition of the petition or motion." [09-11] (bnew) (Entered: 03/12/2013) |
| 03/25/2013 | 386 | ORDER of USCA - The petition for rehearing en banc was circulated to the full court. No judge requested a poll under Fed. R. App. P. 35. The court denies the petition for rehearing en banc. as to David Anthony Runyon 09-11(ldab, ) (Entered: 03/26/2013) |
| 04/02/2013 | 387 | USCA Mandate as to David Anthony Runyon re 312 Notice of Appeal The judgment of this court, entered February 25, 2013, takes effect today. This constitutes the formal mandate of this court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure. 09-11(ldab, ) (Entered: 04/02/2013) |
| 04/22/2013 | | Appeal Record Returned as to David Anthony Runyon: 312 Notice of Appeal RECORD (paper) returned to VA Eastern District. Record Part: Sealed Volume. [09-11]as to B Walton(ldab, ) (Entered: 04/22/2013) |
| 11/14/2013 | 391 | NOTICE OF ATTORNEY APPEARANCE: Jennifer Tope Stanton appearing for David Anthony Runyon as Local counsel (Stanton, Jennifer) (Entered: 11/14/2013) |
| 11/14/2013 | 392 | MOTION to Appoint Counsel by David Anthony Runyon. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Memorandum in Support of Mot to appt counsel, # 2 Proposed Order)(Stanton, Jennifer) (Entered: 11/14/2013) |
| 11/14/2013 | 393 | Motion to appear Pro Hac Vice by Ruth Elissa Friedman and Certification of Local Counsel Jennifer Tope Stanton by David Anthony Runyon. (Stanton, Jennifer) (Entered: 11/14/2013) |
| 12/18/2013 | | Case file sent to the Federal Records Center (tlev, ) (Entered: 04/20/2015) |
| 12/20/2013 | 394 | MEMORANDUM ORDER as to David Anthony Runyon re: 391 MOTION to Appoint Counsel, 393 Motion to appear Pro Hac Vice by Ruth Elissa Friedman and Certification of Local Counsel Jennifer Tope Stanton. Accordingly, Ms. Stanton's Motion is DENIED, as is the pro hac vice application for a federal public defender from the District of Maryland to be appointed as counsel at this time. These denials are without prejudice to the Defendant's right and ability, or that of his appellate counsel, to petition the court for habeas corpus counsel, if needed at the appropriate time. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 12/20/2013. Copies distributed to the Defendant, appellate counsel of record for the Defendant, the United States Attorney for the Eastern District of Virginia, Ms. Stanton, and the Federal Public Defender for the District of Maryland 12/20/13. (Attachments: # 1 Exhibit A) (ldab, ) (Entered: 12/20/2013) |
| 01/24/2014 | | HEARING as to David Anthony Runyon set for 1/29/2014 at 02:00 PM in Norfolk Courtroom 1 before Chief District Judge Rebecca Beach Smith. (sche) (Entered: 01/24/2014) |
| 01/24/2014 | 395 | ORDER TO SHOW CAUSE as to David Anthony Runyon. Ms. Stanton is DIRECTED to appear before the court at a hearing on Wednesday, January 29, 2014, at 2:00 P.M.,1 and show cause for any potential improprieties in filing the Motion and Memorandum, and for entering an appearance as counsel for the Defendant, which remains of record. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith on 1/24/14. Copies distributed to Ms. Stanton; Ms. Friedman of the Federal Public Defender's Office for the District of Maryland; the Defendant; appellate counsel of record for the Defendant; and the United States Attorney for the Eastern District of Virginia 1/24/14. (ldab, ) (Entered: 01/24/2014) |
| 01/30/2014 | 397 | MOTION for Leave to File *written submission prior to show cause hearing* by David Anthony Runyon. (Stanton, Jennifer) (Entered: 01/30/2014) |
| 01/30/2014 | 398 | MOTION to Amend/Correct 397 MOTION for Leave to File *written submission prior to show cause hearing* filed by David Anthony Runyon *with corrected certificate of service* by David Anthony Runyon. (Stanton, Jennifer) (Entered: 01/30/2014) |
| 01/30/2014 | 399 | Second MOTION to Amend/Correct 398 MOTION to Amend/Correct 397 MOTION for Leave to File *written submission prior to show cause hearing* filed by David Anthony Runyon *with corrected certificate of service* filed by David Anthony Runyon, 397 MOTION for Leave to File *written submission prior to show cause hearing* filed by David Anthony Runyon by David Anthony Runyon. (Stanton, Jennifer) (Entered: 01/30/2014) |
| 01/31/2014 | | Show Cause Hearing as to David Anthony Runyon reset for 2/11/2014 11:00 AM in Norfolk Courtroom 1 before Chief District Judge Rebecca Beach Smith. (sche) (Entered: 01/31/2014) |
| 02/03/2014 | 400 | ORDER as to David Anthony Runyon. Show Cause Hearing has been rescheduled for Tuesday, February 11, 2014, at 11:00 A.M. The requirements and conditions of the court's Show Cause Order of January 24, 2014, ECF No. 395, remain in effect for the rescheduled hearing.. Signed by Chief District Judge Rebecca Beach Smith on 1/31/14 |

| | | and filed 2/3/14. Copies distributed to Ms. Stanton; Ms. Ruth Friedman of the Federal Public Defender's Office for the District of Maryland; the Defendant; appellate counsel of record for the Defendant; and the United States Attorney for the Eastern District of Virginia 2/3/14. (ldab, ) (Entered: 02/03/2014) |
|---|---|---|
| 02/04/2014 | 401 | ORDER denying 399 Second Corrected Motion for Leave to File as to David Anthony Runyon (3)pending a proper filing supported by proper reasons set forth in an accompanying brief. Signed by Chief District Judge Rebecca Beach Smith on 2/4/14. (Copies distributed as directed 2/4/14) (afar) (Entered: 02/04/2014) |
| 02/11/2014 | 402 | SHOW CAUSE HEARING held before Chief District Judge Rebecca Beach Smith: Jody Stewart, OCR. Brian Samuels, AUSA, and Lisa McKeel, AUSA, present on behalf of USA; Jennifer Stanton present. No appearance by defendant. Show Cause Hearing re Show Cause Order for J.T. Stanton held on 2/11/2014. Comments of Jennifer Stanton heard and evidence presented. Ms. Stanton's oral motion to withdraw her notice of appearance as counsel of record for Mr. Runyon and to dismiss the show cause. Comments of court heard. For the reasons stated on the record, the court grants the oral motion to withdraw. Further, the court dismisses the Show Cause Order against Ms. Stanton. Court to prepare order. (Attachments: # 1 Exhibit List)(sche) (Entered: 02/11/2014) |
| 02/11/2014 | 403 | ORDER - as to David Anthony Runyon (3). After conducting the show cause hearing on February 11, 2014, and for the reasons stated from the bench during the hearing, the court DISMISSES the Show Cause Order against Ms. Stanton, and the court GRANTS Ms. Stanton's motion to withdraw her appearance as counsel for the Defendant, made during the hearing. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 2/11/14. Copies distributed to Ms. Stanton; Ms. Ruth Friedman of the Federal Public Defender's Office for the District of Maryland; the Defendant; and appellate counsel of record for the Defendant; and the United States Attorney for the Eastern District of Virginia 2/11/14. (ldab, ) (Entered: 02/11/2014) |
| 02/26/2014 | 404 | TRANSCRIPT of Show Cause Proceedings held on 02/11/2014, before Chief Judge Rebecca Beach Smith. Court reporter/transcriber Jody Stewart, Telephone number 757-222-7071. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 3/28/2014. Redacted Transcript Deadline set for 4/28/2014. Release of Transcript Restriction set for 5/27/2014.**(stewart, jody) (Entered: 02/26/2014) |
| 10/09/2014 | 405 | MOTION to Appoint Counsel *For Proceedings Pursuant to 28 USC 2255* by David Anthony Runyon . (Attachments: # 1 Proposed Order)(Buchanan, Thomas) (Entered: 10/09/2014) |
| 10/09/2014 | 406 | Memorandum in Support by David Anthony Runyon re 405 MOTION to Appoint Counsel *For Proceedings Pursuant to 28 USC 2255* (Buchanan, Thomas) (Entered: 10/09/2014) |
| 10/22/2014 | 407 | RESPONSE to Motion by USA as to David Anthony Runyon re 405 MOTION to Appoint Counsel *For Proceedings Pursuant to 28 USC 2255* (Samuels, Brian) (Entered: 10/22/2014) |
| 10/24/2014 | 408 | REPLY TO RESPONSE to by David Anthony Runyon re 407 Response to Motion |

| | | (Buchanan, Thomas) (Entered: 10/24/2014) |
|---|---|---|
| 10/28/2014 | 409 | NOTICE of Submission without Oral Argument by David Anthony Runyon re 405 MOTION to Appoint Counsel For Proceedings Pursuant to 28 USC 2255 (Buchanan, Thomas) (Entered: 10/28/2014) |
| 11/05/2014 | 410 | MEMORANDUM ORDER re: 405 Motion to Appoint Counsel as to David Anthony Runyon (3). For the reasons stated herein, and since the Defendant has raised no exceptional issues, other than his death sentence, for why he is entitled to two attorneys at this juncture, the court GRANTS in part and DENIES in part the Defendant's Motion. The court hereby substitutes and appoints Ms. Michele Brace as counsel, pursuant to 18 U.S.C. § 3599, to represent the Defendant on collateral review in this court. To the extent that circumstances arise in the future to warrant the appointment of an additional attorney, and upon a motion filed by Ms. Brace, this court will consider the subsequent appointment of a second qualified attorney for collateral review proceedings in this court. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 11/5/14. Copies distributed to the Defendant, Ms. Brace, Ms. Norris, Mr. Farber, Mr. Buchanan, and the United States Attorney at Newport News 11/5/14. (ldab, ) (Entered: 11/05/2014) |
| 11/07/2014 | 411 | CJA 30: Appointment of Attorney Michele Jill Brace for David Anthony Runyon in Death Penalty Proceedings as to David Anthony Runyon.. Signed by Chief District Judge Rebecca Beach Smith on 11/5/14 and filed 11/7/14. Original CJA 30 mailed to Michele Jill Brace 11/7/14. (ldab, ) (Entered: 11/07/2014) |
| 01/22/2015 | 412 | TRANSCRIPT of Proceedings held on 03/04/2008, before Judge James E. Bradberry. Court reporter/transcriber Jody Stewart, Telephone number 757-222-7071. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov <br><br> Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/23/2015. Redacted Transcript Deadline set for 3/24/2015. Release of Transcript Restriction set for 4/22/2015.(stewart, jody) (Entered: 01/22/2015)** |
| 03/17/2015 | 415 | MOTION to Unseal Document Limited to Postconviction Review and Copying by David Anthony Runyon. (Attachments: # 1 Proposed Order)(Brace, Michele) (Entered: 03/17/2015) |
| 03/17/2015 | 416 | Memorandum in Support by David Anthony Runyon re 415 MOTION to Unseal Document Limited to Postconviction Review and Copying (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Brace, Michele) (Entered: 03/17/2015) |
| 03/18/2015 | 417 | ORDER re: 415 Motion to Unseal Document as to David Anthony Runyon (3). The United States is ORDERED to file responsive pleadings to the Defendant's submission within fourteen (14) days of the date of entry of this Order. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 3/18/15. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News 3/18/15. (ldab, ) (Entered: 03/18/2015) |
| 03/31/2015 | 418 | Reply to Motion by USA as to David Anthony Runyon re 415 MOTION to Unseal Document Limited to Postconviction Review and Copying (McKeel, Lisa) (Entered: 03/31/2015) |

| 03/31/2015 | 419 | MOTION for Leave to File *Rebuttal Brief* by David Anthony Runyon (Brace, Michele) (Entered: 03/31/2015) |
|---|---|---|
| 03/31/2015 | 420 | ORDER GRANTING 419 Motion for Leave to File Rebuttal Brief. the Defendant is DIRECTED to file any reply within 3 days of the entry of this order as to David Anthony Runyon (3). Signed by Chief District Judge Rebecca Beach Smith on 3/31/15. (copies distributed as directed 3/31/15) (afar) (Entered: 03/31/2015) |
| 04/03/2015 | 421 | RESPONSE in Support by David Anthony Runyon re 415 MOTION to Unseal Document *Limited to Postconviction Review and Copying* (Brace, Michele) (Entered: 04/03/2015) |
| 04/07/2015 | 422 | MEMORANDUM ORDER Granting in part and Denying in part re: 415 Motion to Unseal Document 415 MOTION to Unseal Document *Limited to Postconviction Review and Copying*, 416 Memorandum in Support of Motion as to David Anthony Runyon (3). Signed by Chief District Judge Rebecca Beach Smith and filed on 4/7/15. Copies distributed to counsel for the Defendant, United States Attorney at Newport News and to Jerome Grate, Jury Administrator 4/7/15. (ldab, ) (Entered: 04/07/2015) |
| 04/13/2015 | 423 | SUPPLEMENTAL ORDER as to David Anthony Runyon. Signed by Chief District Judge Rebecca Beach Smith and filed on 4/13/15. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News, with Exhibits A and B attached hereto under seal 4/13/15. (Attachments: # 1 Sealed Exhibit A, # 2 Sealed Exhibit B) (ldab, ) (Entered: 04/13/2015) |
| 04/13/2015 | 424 | Sealed Exhibits A and B re: 423 Supplemental Order as to David Anthony Runyon. Signed by Chief District Judge Rebecca Beach Smith on 4/13/15. (Attachments: # 1 Sealed Exhibit B) (ldab, ) (Entered: 04/13/2015) |
| 04/16/2015 | 425 | MOTION Clarification of Procedure Related to Documents Under Seal re 422 Order on Motion to Unseal Document, 423 Order, by David Anthony Runyon. (Attachments: # 1 Proposed Order)(Brace, Michele) (Entered: 04/16/2015) |
| 04/17/2015 | 427 | Certification and Acknowledgment of Receipt (Attachments: # 1 Acknowledgment of Receipt)(ldab, ) (Entered: 05/20/2015) |
| 04/17/2015 | 428 | Documents as to David Anthony Runyon released to Ms. Brace on 4/17/15. (ldab, ) (Entered: 05/20/2015) |
| 05/08/2015 | 426 | MEMORANDUM ORDER re: 425 Motion as to David Anthony Runyon (3). Ms. Brace's request to share any sealed or ex parte material with Mr. Farber is DENIED. However, to the extent Ms. Brace seeks to share the documents with her legal colleagues and support staff at the Virginia Capital Representation Resource Center, the Motion is GRANTED. Ms. Brace is reminded of her responsibility as postconviction counsel of record, to ensure that any of her legal colleagues or support staff granted access to the sealed or ex parte documents maintain the documents under seal or ex parte, pursuant to the Order of this court. Further, Ms. Brace is permitted to provide the documents to any other habeas counsel of record appointed by the court. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 5/8/15. Copies distributed to Ms. Brace and to the United States Attorney at Newport News 5/8/15. (ldab, ) (Entered: 05/08/2015) |
| 05/19/2015 | 431 | Certification and Acknowledgment of Receipt (Attachments: # 1 Acknowledgment of Receipt) (ldab, ) (Entered: 05/20/2015) |
| 05/20/2015 | 432 | MOTION to Appoint Counsel by David Anthony Runyon. (Attachments: # 1 Proposed Order)(Brace, Michele) (Entered: 05/20/2015) |
| 05/20/2015 | 433 | Memorandum in Support by David Anthony Runyon re 432 MOTION to Appoint |

| | | |
|---|---|---|
| | | Counsel (Attachments: # 1 Exhibit)(Brace, Michele) (Entered: 05/20/2015) |
| 05/20/2015 | 434 | MOTION to Expedite *Response of United States* by David Anthony Runyon. (Attachments: # 1 Proposed Order)(Brace, Michele) (Entered: 05/20/2015) |
| 05/22/2015 | 435 | ORDER Granting in Part and Denying in Part 432 Motion to Appoint Counsel as to David Anthony Runyon (3); Dismissing as Moot 434 Motion to Expedite as to David Anthony Runyon (3). Therefore, to the extent the Motion seeks the appointment of FDSET, the Motion is DENIED. However, to the extent the Motion seeks the appointment of Ms. Chavis, the Motion is GRANTED. The court hereby appoints Ms. Dana Hansen Chavis as habeas co-counsel, pursuant to 18 U.S.C. § 3599, to represent the Defendant on collateral review in this court, subject to her admission to practice pro hac vice. Signed by Chief District Judge Rebecca Beach Smith and filed on 5/22/15. Copies distributed to Ms. Brace, to Ms. Chavis, and to the United States Attorney at Newport News 5/22/15. (ldab, ) (Entered: 05/22/2015) |
| 05/22/2015 | 436 | Motion to appear Pro Hac Vice by Dana Hansen Chavis and Certification of Local Counsel Michele J. Brace (Filing fee $ 75 receipt number 0422-4466242.) by David Anthony Runyon. (Brace, Michele) (Entered: 05/22/2015) |
| 05/22/2015 | 437 | Motion to appear Pro Hac Vice by Helen Susanne Bales Levi and Certification of Local Counsel Michele J. Brace (Filing fee $ 75 receipt number 0422-4466250.) by David Anthony Runyon. (Brace, Michele) (Entered: 05/22/2015) |
| 05/26/2015 | 438 | ORDER granting 436 Motion for Pro hac vice for Dana Catherine Hansen Chavis as to David Anthony Runyon (3). Signed by Chief District Judge Rebecca Beach Smith on 5/26/15. (tlev, ) (Entered: 05/27/2015) |
| 06/03/2015 | 439 | ORDER Denying re: 437 Motion for Pro hac vice as to David Anthony Runyon (3). Signed by Chief District Judge Rebecca Beach Smith and filed on 6/3/15. Copies distributed to Ms. Brace, to Ms. Chavis, to Ms. Levi, and to the United States Attorney at Newport News 6/3/15. (ldab, ) (Entered: 06/03/2015) |
| 06/03/2015 | 440 | ORDER denying 437 Motion for Pro hac vice as to David Anthony Runyon (3) per order of June 3, 2015, ECF no. 439. Clerk's fee to be returned. Signed by Chief District Judge Rebecca Beach Smith and filed on 6/3/15. (tlev, ) (Entered: 06/03/2015) |
| 06/19/2015 | 441 | NOTICE OF ATTORNEY APPEARANCE Jeffrey A. Zick appearing for USA. (Zick, Jeffrey) (Entered: 06/19/2015) |
| 07/13/2015 | 442 | MOTION Copy Juror Questionnaires and Provide Accounting by David Anthony Runyon. (Attachments: # 1 Exhibit Proposed Order)(Brace, Michele) (Entered: 07/13/2015) |
| 07/13/2015 | 443 | Memorandum in Support by David Anthony Runyon re 442 MOTION Copy Juror Questionnaires and Provide Accounting (Brace, Michele) (Entered: 07/13/2015) |
| 07/15/2015 | 446 | ORDER re: 442 MOTION Copy Juror Questionnaires and Provide Accounting as to David Anthony Runyon (3). The court DENIES the Motion to the extent it seeks copies of the "missing" juror questionnaires, as the court cannot verify at this juncture whether or why any questionnaires are "missing." Therefore, the court DIRECTS both Ms. Brace and Ms. McKeel to contact the Clerk to arrange a meeting, in person, at the Norfolk Federal Courthouse, within twenty-one (21) days of the entry of this Order, namely on or before August 5, 2015, during which meeting each attorney will compare her set of questionnaires with the Clerk's records and original questionnaires. Ms. Brace and Ms. McKeel are DIRECTED to bring all of the copies of the juror questionnaires for which they signed an Acknowledgment of Receipt, dated May 19, 2015, for Ms. McKeel, and |

| | | |
|---|---|---|
| | | dated April 17, 2015, for Ms. Brace. As for an accounting of the juror questionnaires, counsel are advised that the court's records reflect that there were two hundred fifty-six (256) prospective jurors in this case. This accounting will be verified at the meeting with counsel and the Clerk, as directed above. A written verification signed by counsel and the Clerk shall then be entered into the record of the case. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 7/15/15. Copies distributed to Ms. Brace, to Ms. Chavis, and to the United States Attorney at Newport News 7/15/15. (ldab, ) (Entered: 07/15/2015) |
| 07/15/2015 | 447 | ORDER re: 444 (Ex Parte) MOTION Contact Visit by David Anthony Runyon 445 (Ex Parte) Memorandum in Support by David Anthony Runyon. Accordingly, Ms. Brace is DIRECTED to clarify, on or before July 17, 2015, the circumstances under which the Motion and Memorandum, ECF Nos. 444, 445, were filed, including whether they were improperly designated as ex parte documents or whether the certificates of service were false. She shall file this clarification on the public docket, as this confusing issue, at best, has been "set in motion" by Ms. Brace herself, thereby resulting in this Order.. Signed by Chief District Judge Rebecca Beach Smith and filed on 7/15/15. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News 7/15/15. (ldab, ) (Entered: 07/15/2015) |
| 07/16/2015 | | Case as to Catherina Rose Voss, Michael Anthony Eric Draven, David Anthony Runyon Reassigned to Magistrate Judge Douglas E. Miller. Magistrate Judge Tommy E. Miller no longer assigned to the case. (ldab, ) (Entered: 07/16/2015) |
| 07/16/2015 | 448 | RESPONSE by David Anthony Runyon re 447 Order,,, *Clarification Regarding Errors in Motion and Supporting Memorandum* (Brace, Michele) (Entered: 07/16/2015) |
| 07/20/2015 | 449 | ORDER re: 444 (Ex Parte) Motion Contact Visit by David Anthony Runyon. 445 (Ex Parte) Memorandum in Support by David Anthony Runyon. The court will treat the Motion and Memorandum in Support as ex parte filings. However, counsel of record both Ms. Brace and Ms. Dana Chavis - are advised that the instant Certificates of Service constitute false certifications to the court, and that counsel should review all future filings more thoroughly before submitting them for the court's consideration. Further, any future proposed orders shall not contain the "/s/" symbol above the undersigned's signature line. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 7/20/15. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News 7/20/15. (ldab, ) (Entered: 07/20/2015) |
| 07/28/2015 | 454 | MOTION Dispense with Meeting Regarding Inventory of Juror Questionnaires by David Anthony Runyon. (Attachments: # 1 Exhibit Brace Declaration)(Brace, Michele) (Entered: 07/28/2015) |
| 07/28/2015 | 455 | MOTION to Expedite *Motion to Dispense with Meeting* by David Anthony Runyon. (Brace, Michele) (Entered: 07/28/2015) |
| 07/30/2015 | 456 | ORDER - GRANTS 454 Motion to Dispense with Meeting Regarding Inventory of Juror Questionnaires. Accordingly, the Motion to Expedite is MOOT. Signed by Chief District Judge Rebecca Beach Smith on 7/30/15. (afar) (Entered: 07/30/2015) |
| 07/31/2015 | 457 | Letter received 7/31/15. (Attachments: # 1 Attachment)(ecav, ) (Entered: 07/31/2015) |
| 08/03/2015 | 458 | Letter to Michele J. Brace from Chief Judge Smith re: 457 Letter received 7/31/15. (ldab, ) (Entered: 08/03/2015) |
| 08/04/2015 | 462 | Sealed Order re: 459 Ex Parte Motion 460 Ex Parte Memorandum in Support; and 461 Ex Parte Motion. Signed by Chief District Judge Rebecca Beach Smith and filed 8/4/15. Copies distributed to the Warden at USP Terre Haute, Charles A. Daniels, not only by United States mail, but also by telefax 8/5/15. (ldab, ) (Entered: 08/05/2015) |

| | | |
|---|---|---|
| 08/11/2015 | 463 | Sealed Response from Warden re: 453 Sealed Order & 462 Sealed Order as to David Anthony Runyon. Faxed Copy Received and Signed by Katherine Siereveld, Attorney for Warden at USP Terre Haute on 8/11/15. (ldab, ) (Entered: 08/12/2015) |
| 08/13/2015 | 465 | MOTION for Jury Selection Documents by David Anthony Runyon. (Brace, Michele) (Entered: 08/13/2015) |
| 08/13/2015 | 466 | Memorandum in Support by David Anthony Runyon re 465 MOTION for Jury Selection Documents (Attachments: # 1 Exhibit Maland Records Response, # 2 Exhibit Sample Voter List File Structure, # 3 Exhibit Sample Program)(Brace, Michele) (Entered: 08/13/2015) |
| 08/14/2015 | 467 | ORDER re: 465 MOTION for Jury Selection Documents 466 Memorandum in Support as to David Anthony Runyon (3). The United States is ORDERED to file its response to the Defendant's submission on or before August 27, 2015. Counsel for the Defendant is ORDERED to file any reply deemed appropriate on or before September 4, 2015. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 8/14/15. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News 8/14/15. (ldab, ) (Entered: 08/14/2015) |
| 08/17/2015 | 468 | Sealed Response from Warden (original of document 463).(ldab, ) (Entered: 08/19/2015) |
| 08/27/2015 | 469 | Reply to Motion by USA as to David Anthony Runyon re 465 MOTION for Jury Selection Documents (Attachments: # 1 Exhibit EDVA Plan)(McKeel, Lisa) (Entered: 08/27/2015) |
| 09/04/2015 | 470 | Reply by David Anthony Runyon re 465 MOTION for Jury Selection Documents *in Support of Motion* (Brace, Michele) (Entered: 09/04/2015) |
| 10/02/2015 | 471 | MOTION to Seal *Three Claims and One Exhibit to his Forthcoming Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255* by David Anthony Runyon. (Attachments: # 1 Exhibit A: Email exchange between AUSA Samuels and Michele Brace re: proposed sealed claims)(Brace, Michele) (Entered: 10/02/2015) |
| 10/02/2015 | 472 | Memorandum in Support by David Anthony Runyon re 471 MOTION to Seal *Three Claims and One Exhibit to his Forthcoming Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255* (Brace, Michele) (Entered: 10/02/2015) |
| 10/02/2015 | 473 | MOTION to Expedite *Consideration of Motion to File Under Seal Three Claims and One Exhibit to His Forthcoming Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255* by David Anthony Runyon. (Brace, Michele) (Entered: 10/02/2015) |
| 10/02/2015 | 475 | MEMORANDUM ORDER re: 465 Motion as to David Anthony Runyon (3). Defendant's Motion is GRANTED in part and DENIED in part. The Clerk is DIRECTED to release to counsel for the Defendant and to the United States Attorney at Newport News the following: (1) a CD of the 2005 and 2007 Master Jury Wheels for Newport News and Norfolk in .txt format, with Social Security Numbers and addresses redacted; (2) a CD of the 2005 and 2007 Qualified Jury Wheels for Newport News and Norfolk in .txt format, with Social Security Numbers, addresses, and phone numbers redacted; (3) a statistical breakdown of the grand jury by race, gender, and age; (4) a statistical breakdown of the individuals drawn for the petit jury venire by race, gender, and age; and (5) a list of the reasons for any disqualifications, excusals, or exemptions from the petit jury venire, and the race, gender, and age of those individuals, but omitting any personal identifying information. Counsel for the Defendant and the United States Attorney are DIRECTED to make arrangements with the Clerk, within seven (7) days from the entry of this Memorandum Order, to pick up the above-listed CDs and records in person, and at such time to sign and date acknowledgement receipts that they have received the CDs and records. The Clerk shall enter these acknowledgement receipts on the case docket. The |

| | | |
|---|---|---|
| | | Clerk shall also maintain under seal an exact copy of the CDs and records received by counsel, together with any cover letter from the Clerk that accompanies the CDs and records. Counsel for the Defendant and the United States Attorney are ORDERED to maintain all of these CDs and records under seal and to return all CDs and records to the Clerk when the habeas litigation is complete, together with a sworn statement that the CDs and records have been maintained under seal, and no copies thereof of any nature paper, electronic, or otherwise have been made or exist, other than those maintained under seal by the Clerk. The court also reminds counsel for both parties that no contact, direct or indirect, may be made with any juror, grand or petit, who actually served or who was named in any lists, CDs, or records produced pursuant to this Memorandum Order. The sworn statement accompanying the return of the CDs and records shall also include an acknowledgement that no juror contact has been made, directly or indirectly, through someone else, or by any means. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 10/2/15. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News 10/2/15. (ldab, ) (Entered: 10/02/2015) |
| 10/05/2015 | 476 | MEMORANDUM ORDER GRANTED in part and DENIED in part re: 471 Motion to Seal as to David Anthony Runyon (3); Finding as MOOT re: 473 Motion to Expedite as to David Anthony Runyon (3). Defendant's Motion to Seal is GRANTED with respect to Claim S2 and Exhibit S-l, and the Clerk is ORDERED to file Claim S2 and Exhibit S-l under seal, with access granted to the United States Attorney at Newport News. The Motion to Seal is DENIED with respect to Claims S1 and S3. The Defendant also filed a Motion to Expedite Consideration of the Motion to Seal. ECF No. 473. As the court has ruled on the Motion to Seal, the Motion to Expedite is now MOOT. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 10/5/15. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News 10/5/15. (ldab, ) (Entered: 10/05/2015) |
| 10/05/2015 | 477 | **Sealed** Sealed Claim S2 and Exhibit S-1 as to David Anthony Runyon. Per Order filed on 10/5/15. (Attachments: # 1 Sealed Claim S2, # 2 Sealed Exhibit S-1) (ldab, ) (Entered: 10/05/2015) |
| 10/05/2015 | 478 | MOTION to Vacate under 28 U.S.C. 2255 by David Anthony Runyon. (Attachments: # 1 Exhibit 1 - BOP Records, # 2 Exhibit 2 - Merikangas Report, # 3 Exhibit 3 - McNally Declaration, # 4 Exhibit 4 - Cronin Declaration, # 5 Exhibit 5 - Hudgins Declaration, # 6 Exhibit 6 - Woodward Declaration, # 7 Exhibit 7 - Costa Declaration, # 8 Exhibit 8 - Cunningham Declaration, # 9 Exhibit 9 - Cat Voss Declaration, # 10 Exhibit 10 - D. Dalton Declaration, # 11 Exhibit 11 - P. Dalton Declaration, # 12 Exhibit 12 - M. Long Declaration, # 13 Exhibit 13 - S. Linker Declaration, # 14 Exhibit 14 - Excerpt article: Cell Phone Tracking, # 15 Exhibit 15 - Babineau letter re: Death Authorization, # 16 Exhibit 16 - Portsmouth Jail Records, # 17 Exhibit 17 - Dombrowski progress notes, # 18 Exhibit 18 - Lake Martin Community Hospital response, # 19 Exhibit 19 - Hudgins timesheet with markups, # 20 Exhibit 20 - Mirsky letter 7/2/09, # 21 Exhibit 21 - Mirsky/Hudgins emails 7/22-7/23/09, # 22 Exhibit 22 - Mirsky letter 9/18/09, # 23 Exhibit 23 - Runyon Army Medical Records, # 24 Exhibit 24 - Runyon letter re: 1996 car accident, # 25 Exhibit 25 - Suk Cha Runyon medical records, # 26 Exhibit 26 - Dombrowski Declaration, # 27 Exhibit 27 - Mark Runyon Declaration, # 28 Exhibit 28 - Maria Runyon Declaration, # 29 Exhibit 29 - Dudley Report and CV, # 30 Exhibit 30 - Thomas Preston Interview, # 31 Exhibit 31 - R. Seeger Declaration, # 32 Exhibit 32 - D. Seeger Declaration, # 33 Exhibit 33 - Capt. Harris Interview, # 34 Exhibit 34 - Scotty Fleming Criminal History, # 35 Exhibit 35 - Mirsky Report, # 36 Exhibit 36 - Teresa Norris Declaration)(Brace, Michele) Civil case 4:15-cv-00108 opened. (Entered: 10/05/2015) |
| | | |

**35**

| 10/06/2015 | 479 | ORDER re: 478 Motion to Vacate (2255) as to David Anthony Runyon (3). The United States is ORDERED to file responsive pleadings to the Petitioner's Motion within sixty (60) days of the date of entry of this Order. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 10/6/15. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News 10/6/15 (ldab, ) (Entered: 10/06/2015) |
| --- | --- | --- |
| 10/06/2015 | 480 | MOTION for Reconsideration re 475 MEMORANDUM ORDER by David Anthony Runyon. (Brace, Michele) (Entered: 10/06/2015) |
| 10/14/2015 | 484 | Certification and Acknowledgment of Receipt (Attachments: # 1 Acknowledgment of Receipt) (ldab, ) (Entered: 11/06/2015) |
| 10/26/2015 | 481 | MEMORANDUM ORDER re: 480 Motion for Reconsideration as to David Anthony Runyon (3). The Motion is GRANTED in part and DENIED in part. Signed by Chief District Judge Rebecca Beach Smith and filed on 10/26/15. Copies distributed to Ms. Brace, Ms. Chavis, and the United States Attorney at Newport News 10/26/15. (ldab, ) (Entered: 10/26/2015) |
| 10/27/2015 | 482 | MOTION for Extension of Time to File Response/Reply by USA as to David Anthony Runyon. (Attachments: # 1 Proposed Order)(Samuels, Brian) (Entered: 10/27/2015) |
| 10/27/2015 | 483 | ORDER Granting 482 Motion for Extension of Time to File Response/Reply as to David Anthony Runyon (3). IT IS THEREFORE ORDERED that the United States file an answer or other pleading in response to Petitioner's Motion to Vacate, Set Aside, or Correct Sentence previously imposed in this matter by January 11, 2016. Signed by Chief District Judge Rebecca Beach Smith and filed on 10/27/15. Copies distributed to all parties 10/27/15. (ldab, ) (Entered: 10/27/2015) |
| 10/29/2015 | 485 | Certification, Acknowledgment of Receipt & Sworn Statement Accompanying Return of CDs (Attachments: # 1 Acknowledgment of Receipt, # 2 SWORN STATEMENT ACCOMPANYING RETURN OF CDS) (ldab, ) (Entered: 11/06/2015) |
| 11/04/2015 | 486 | Certification and Acknowledgment of Receipt (Attachments: # 1 Acknowledgment of Receipt) (ldab, ) (Entered: 11/06/2015) |
| 12/04/2015 | 487 | MOTION to Seal *Addendum to Motion for Discovery* by David Anthony Runyon. (Attachments: # 1 Exhibit Government's Position, # 2 Proposed Order)(Brace, Michele) (Entered: 12/04/2015) |
| 12/09/2015 | 489 | Memorandum Order re: 487 Motion to Seal as to David Anthony Runyon (3). Defendant's Motion to Seal is GRANTED and the Clerk is ORDERED to file Addendum S-1 to Runyon's Discovery Motion under seal, with access granted to the United States Attorney at Newport News. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 12/9/15. Copies distributed to all parties 12/9/15. (ldab, ) (Entered: 12/09/2015) |
| 12/09/2015 | 490 | Sealed Addendum S-l re: 489 Memorandum Order as to David Anthony Runyon (ldab, ) (Entered: 12/09/2015) |
| 12/09/2015 | 491 | First MOTION for Discovery *and Consolidated Memorandum of Law* by David Anthony Runyon. (Attachments: # 1 Exhibit 1 - ATF Report of Investigation, # 2 Exhibit 2 - List of Disks, # 3 Exhibit 3 - Fax Listing Posey as Witness, # 4 Exhibit 4 - FOIA Request to Portsmouth Sheriff 10/23/15, # 5 Exhibit 5 - FOIA Request to Portsmouth Sheriff's Medical Director 11/3/15)(Brace, Michele) (Entered: 12/09/2015) |
| 12/11/2015 | 492 | ORDER re: 491 Motion for Discovery as to David Anthony Runyon (3). Due to the nature and volume of the discovery requests, the United States is ORDERED to file its response to the Petitioner's submission on or before January 6, 2016. Counsel for the |

| | | Petitioner is ORDERED to file any reply deemed appropriate on or before January 20, 2016. Signed by Chief District Judge Rebecca Beach Smith and filed on 12/11/15. Copies distributed to all parties 12/11/15. (ldab, ) (Entered: 12/11/2015) |
|---|---|---|
| 12/22/2015 | 493 | MOTION for Extension of Time to File Response/Reply as to 491 First MOTION for Discovery *and Consolidated Memorandum of Law* by USA as to David Anthony Runyon. (Attachments: # 1 Proposed Order)(Samuels, Brian) (Entered: 12/22/2015) |
| 12/31/2015 | 494 | ORDER Granting 493 Motion for Extension of Time to File Response/Reply 491 First MOTION for Discovery and Consolidated Memorandum of Law by David Anthony Runyon. (3). IT IS THEREFORE ORDERED that the United States file an answer or other pleading in response to Petitioner's Motion for Discovery and Consolidated Memorandum of Law by January 21,2016. Signed by Chief District Judge Rebecca Beach Smith and filed on 12/31/15. Copies distributed to all parties 12/31/15. (ldab, ) (Entered: 12/31/2015) |
| 01/08/2016 | 495 | MOTION for Leave to File *2255 in excess of 30 pages* by USA as to David Anthony Runyon. (Attachments: # 1 Proposed Order)(McKeel, Lisa) (Entered: 01/08/2016) |
| 01/08/2016 | 496 | ORDER granting 495 Motion for Leave to File 2255 in excess of 30 pages by USA as to David Anthony Runyon (3). The United States is granted permission to file an oversized response, in excess of the thirty page limit set forth under Local Rule 47 for the United States District Court. Signed by Chief District Judge Rebecca Beach Smith and filed on 1/8/16. (tbro) (Entered: 01/08/2016) |
| 01/11/2016 | 497 | RESPONSE in Opposition by USA as to David Anthony Runyon re 478 MOTION to Vacate under 28 U.S.C. 2255 (McKeel, Lisa) (Entered: 01/11/2016) |
| 01/15/2016 | 499 | ORDER entered and filed 1/15/16: This matter comes before the court on the Petitioner's 478 MOTION Under 28 U.S.C. 2255 to Vacate, Set Aside, or Correct Sentence ("Motion") , filed on October 5, 2015. TheUnited States filed its Response on January 11, 2016. ECF No. 497. The Petitioner is now DIRECTED to file any reply deemed necessary within thirty (30) days of the date of entry of this Order. The Clerk is DIRECTED to forward a copy of this Order to counsel for the Defendant and to the United States Attorney at Newport News. (Signed by Chief District Judge Rebecca Beach Smith on 1/15/16).Copies provided as directed 1/15/16.(ecav, ) (Entered: 01/15/2016) |
| 01/15/2016 | 500 | RESPONSE to Motion by USA as to David Anthony Runyon re 491 First MOTION for Discovery *and Consolidated Memorandum of Law* (Zick, Jeffrey) (Entered: 01/15/2016) |
| 01/21/2016 | 501 | MOTION for Scheduling Order by David Anthony Runyon. (Brace, Michele) (Entered: 01/21/2016) |
| 01/21/2016 | 502 | Memorandum in Support by David Anthony Runyon re 501 MOTION for Scheduling Order (Brace, Michele) (Entered: 01/21/2016) |
| 01/21/2016 | 503 | MOTION to Expedite *Motion for Scheduling Order* by David Anthony Runyon. (Brace, Michele) (Entered: 01/21/2016) |
| 01/22/2016 | 504 | RESPONSE to Motion by USA as to David Anthony Runyon re 501 MOTION for Scheduling Order (Zick, Jeffrey) (Entered: 01/22/2016) |
| 01/22/2016 | 505 | ORDER denying 501 MOTION for Scheduling Order as to David Anthony Runyon (3); finding as moot 503 MOTION to Expedite Motion for Scheduling Order as to David Anthony Runyon (3). As the Petitioner has failed to show; good cause, the January 29, 2016, deadline for the Petitioner's Reply to the government's Response to his Motion for Discovery and the February 16, 2016, deadline for the Petitioner's Reply to the government's Response to his § 2255 motion stand. Moreover, the February 4, 2016, deadline set by Federal Rule of Civil Procedure 15(a)(1)(B) for the Petitioner to file an |

| | | |
|---|---|---|
| | | amended § 2255 motion stands. To the extent that scheduling needs to be altered after the filing of any amended § 2255 motion, the court will address it, as necessary, at that time. Accordingly, the Petitioner's Motion for Modification is DENIED. The Petitioner also filed a Motion to Expedite. ECF No. 503. As the court has ruled on the Motion for Modification, the Motion to Expedite is now MOOT.Copy of order distributed to all parties as directed on 1/22/2016.Signed by Chief District Judge Rebecca Beach Smith on 1/22/2016. (bgra) (Entered: 01/22/2016) |
| 01/29/2016 | 506 | REPLY TO RESPONSE to by David Anthony Runyon re 500 Response to Motion *for Discovery* (Attachments: # 1 Attachment A - Racial Disparities in Federal Death Penalty Prosecutions, # 2 Attachment B - Declaration of Lauren Cohen Bell)(Brace, Michele) (Entered: 01/29/2016) |
| 02/04/2016 | 507 | MOTION to Seal *Amended Claim S2 and Exhibit S-1* by David Anthony Runyon. (Attachments: # 1 Proposed Order)(Brace, Michele) (Entered: 02/04/2016) |
| 02/04/2016 | 508 | Sealed Amended Claim S2 as to David Anthony Runyon. (Attachments: # 1 Sealed Exhibit S-1)(tbro) (Entered: 02/04/2016) |
| 02/04/2016 | 509 | MEMORANDUM ORDER granting 507 Motion to Seal Amended Claim S2 and Exhibit S-1 by David Anthony Runyon (3). The Clerk is ORDERED to file Amended Claim S2 and Exhibit S-1 under seal, with access granted to the United States Attorney at Newport News. Signed by Chief District Judge Rebecca Beach Smith and filed on 2/4/16. (tbro) (Entered: 02/04/2016) |
| 02/04/2016 | 510 | MOTION for Leave to File Excess Pages *as to Amended Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct A Sentence* by David Anthony Runyon. (Brace, Michele) (Entered: 02/04/2016) |
| 02/04/2016 | 511 | AMENDED MOTION to Vacate under 28 U.S.C. 2255 filed by David Anthony Runyon by David Anthony Runyon. (Attachments: # 1 Exhibit 1 - Placeholder, # 2 Exhibit 2 - Merikangas Report, # 3 Exhibit 3 - McNally Declaration, # 4 Exhibit 4 - Cronin Declaration, # 5 Exhibit 5 - Hudgins Declaration, # 6 Exhibit 6 - Woodward Declaration, # 7 Exhibit 7 - Costa Declaration, # 8 Exhibit 8 - Cunningham Declaration, # 9 Exhibit 9 - Cat Voss Declaration, # 10 Exhibit 10 - David Dalton Declaration, # 11 Exhibit 11 - Paula Dalton Declaration, # 12 Exhibit 12 - Matt Long Declaration, # 13 Exhibit 13 - Scott Linker Declaration, # 14 Exhibit 14 - Excerpt Cell Phone Tracking Evidence, # 15 Exhibit 15 - Babineau letter, # 16 Exhibit 16 - David Runyon Portsmouth Jail Records, # 17 Exhibit 17 - David Dombrowski progress notes, # 18 Exhibit 18 - Lake Martin Community Hospital response, # 19 Exhibit 19 - Hudgins Schedule with Mark-ups, # 20 Exhibit 20 - Mirsky letter 7/2/09, # 21 Exhibit 21 - Mirsky & Hudgins Email, # 22 Exhibit 22 - Mirsky letter 9/18/09, # 23 Exhibit 23 - Army Medical Records, # 24 Exhibit 24 - Runyon's handwritten letter re: 1996 car accident, # 25 Exhibit 25 - Suk Cha Medical Records, # 26 Exhibit 26 - David Dombrowski Declaration, # 27 Exhibit 27 - Mark Runyon Declaration, # 28 Exhibit 28 - Maria Runyon Declaration, # 29 Exhibit 29 - Dr. Dudley Report, # 30 Exhibit 30 - Thomas Preston Interview, # 31 Exhibit 31 - Robert Seeger Declaration, # 32 Exhibit 32 - Deborah Seeger Declaration, # 33 Exhibit 33 - Captain Harris Declaration, # 34 Exhibit 34 - Scotty Flemming Criminal History, # 35 Exhibit 35 - Dr. Mirsky Report, # 36 Exhibit 36 - Teresa Norris Declaration, # 37 Exhibit 37 - Racial Disparities - Staff Report Committee on Judiciary, # 38 Exhibit 38 - Cohen Bell Declaration, # 39 Exhibit 39 - Michele Brace Declaration)(Brace, Michele) (Entered: 02/04/2016) |
| 02/04/2016 | 512 | ORDER granting 510 Motion for Leave to File Excess Pages as to Amended Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct A Sentence by David Anthony Runyon (3). Signed by Chief District Judge Rebecca Beach Smith and filed on 2/4/16. (tbro) (Entered: 02/04/2016) |

| 02/08/2016 | 513 | ORDER re: 511 AMENDED MOTION to Vacate under 28 U.S.C. 2255 as to David Anthony Runyon (3). The government is ORDERED to file responsive pleadings to the Petitioner's Amended Motion within sixty (60) days of the date of entry of this Order. The Petitioner is ORDERED to file any Reply deemed necessary within thirty (30) days of the government's Response. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 2/8/16. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News 2/8/16. (ldab, ) (Entered: 02/08/2016) |
| --- | --- | --- |
| 02/10/2016 | 514 | MOTION for Extension of Time to File Response/Reply as to 497 Response in Opposition *to Defendant's Motion to Vacate, Set Aside, or Correct Sentence* by David Anthony Runyon. (Brace, Michele) (Entered: 02/10/2016) |
| 02/10/2016 | 515 | Memorandum in Support by David Anthony Runyon re 514 MOTION for Extension of Time to File Response/Reply as to 497 Response in Opposition *to Defendant's Motion to Vacate, Set Aside, or Correct Sentence* (Attachments: # 1 A - Email dated 02/10/16) (Brace, Michele) (Entered: 02/10/2016) |
| 02/11/2016 | 516 | ORDER Granting 514 Motion for Extension of Time to File Response/Reply as to David Anthony Runyon (3). For good cause shown, as the government's Response is one hundred forty-one (141) pages, the court GRANTS the Motion to the extent it gives the Petitioner an extension of thirty days to file his initial Reply. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith on 2/11/16. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News 2/11/16. (ldab, ) (Entered: 02/11/2016) |
| 02/12/2016 | 517 | MOTION to Unseal Document *the Government Experts' Reports* by David Anthony Runyon. (Brace, Michele) (Entered: 02/12/2016) |
| 02/12/2016 | 518 | Memorandum in Support by David Anthony Runyon re 517 MOTION to Unseal Document *the Government Experts' Reports* (Brace, Michele) (Entered: 02/12/2016) |
| 03/02/2016 | 519 | ORDER Granting 517 Motion to Unseal Document as to David Anthony Runyon (3). Accordingly, for good cause shown, the court GRANTS the Motion and ORDERS that the reports by Dr. Patterson (ECF No. 276) and Dr. Montalbano (ECF No. 277) be unsealed. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 3/2/16. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News 3/2/16. (ldab, ) (Entered: 03/02/2016) |
| 03/14/2016 | 520 | Second MOTION for Extension *of Time to File Reply* by David Anthony Runyon. (Attachments: # 1 Proposed Order)(Brace, Michele) (Entered: 03/14/2016) |
| 03/14/2016 | 521 | Memorandum by David Anthony Runyon *in Support of Second Motion for Extension of Time to File Reply* (Brace, Michele) (Entered: 03/14/2016) |
| 03/15/2016 | 522 | ORDER Granting 520 Motion for Extension of Time as to David Anthony Runyon (3). For good cause shown, the motion for an extension to and including March 27, 2016, is GRANTED. Signed by Chief District Judge Rebecca Beach Smith and filed on 3/15/16. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News. 3/15/16 (ldab, ) (Entered: 03/15/2016) |
| 03/28/2016 | 523 | MOTION for Leave to File Excess Pages by David Anthony Runyon. (Brace, Michele) (Entered: 03/28/2016) |
| 03/28/2016 | 524 | MOTION to Seal *Reply to Claim S2 to Motion for Collateral Relief* by David Anthony Runyon. (Attachments: # 1 Proposed Order)(Brace, Michele) (Entered: 03/28/2016) |
| 03/28/2016 | 526 | Reply to by David Anthony Runyon 497 *RESPONSE in Opposition by USA to* 478 |

| | | |
|---|---|---|
| | | *Motion to Vacate, Set Aside, or Correct Sentence* (Attachments: # 1 Exhibit)(Brace, Michele) (Entered: 03/28/2016) |
| 03/29/2016 | 527 | ORDER Granting 523 Motion for Leave to File Excess Pages as to David Anthony Runyon (3). Signed by Chief District Judge Rebecca Beach Smith on 3/29/16. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News 3/29/16 (ldab, ) (Entered: 03/29/2016) |
| 03/30/2016 | 528 | ORDER granting 524 Motion to Seal the Reply to Claim S2 as to David Anthony Runyon (3). Signed by Chief District Judge Rebecca Beach Smith on 3/29/16. (afar) (Entered: 03/30/2016) |
| 03/31/2016 | 529 | First MOTION for Extension of Time to File Response/Reply by USA as to David Anthony Runyon. (Attachments: # 1 Proposed Order)(Zick, Jeffrey) (Entered: 03/31/2016) |
| 04/01/2016 | 530 | Second MOTION for Discovery by David Anthony Runyon. (Attachments: # 1 Attachment A, Letter From Amy M. Curtis)(Brace, Michele) (Entered: 04/01/2016) |
| 04/01/2016 | 531 | ORDER Granting 529 Motion for Extension of Time to File Response/Reply as to David Anthony Runyon (3). IT IS ORDERED that the United States file an answer or other pleading in response to Petitioner's Amended Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct a Sentence by April 22, 2016. Signed by Chief District Judge Rebecca Beach Smith and filed on 4/1/16. Copies distributed to all parties 4/4/16. (ldab, ) (Entered: 04/04/2016) |
| 04/08/2016 | 532 | RESPONSE in Opposition by USA as to David Anthony Runyon re 530 Second MOTION for Discovery (Zick, Jeffrey) (Entered: 04/08/2016) |
| 04/13/2016 | 533 | REPLY TO RESPONSE to by David Anthony Runyon re 532 Response in Opposition *to Second Motion for Discovery* (Attachments: # 1 Attachment A: Portion of National Academy of Sciences - Strengthening Forensic Science in the U.S., # 2 Attachment B: National Commission on Forensic Science Charter, # 3 Attachment C: National Commission on Forensic Science - Views of the Commission: Validation of Forensic Science Methodology)(Brace, Michele) (Entered: 04/13/2016) |
| 04/21/2016 | 534 | MOTION for Leave to File Excess Pages by USA as to David Anthony Runyon. (Attachments: # 1 Proposed Order)(McKeel, Lisa) (Entered: 04/21/2016) |
| 04/22/2016 | 535 | ORDER Granting 534 Motion for Leave to File Excess Pages as to David Anthony Runyon (3). IT IS ORDERED that the United States is granted permission to file an oversized amended response, in excess of the thirty page limit set forth under Local Rule 47 for the United States District Court. Signed by Chief District Judge Rebecca Beach Smith and filed on 4/22/16. Copies distributed to all parties 4/22/16. (ldab, ) (Entered: 04/22/2016) |
| 04/22/2016 | 536 | RESPONSE by USA as to David Anthony Runyon *Amended Motion 2255* (McKeel, Lisa) (Entered: 04/22/2016) |
| 05/17/2016 | 538 | MOTION for Extension of Time to File Response/Reply as to 536 Response *to Amended Motion to Vacate, Set Aside, or Correct a Sentence* by David Anthony Runyon. (Brace, Michele) (Entered: 05/17/2016) |
| 05/17/2016 | 539 | Memorandum in Support by David Anthony Runyon re 538 MOTION for Extension of Time to File Response/Reply as to 536 Response *to Amended Motion to Vacate, Set Aside, or Correct a Sentence* (Brace, Michele) (Entered: 05/17/2016) |
| 05/17/2016 | 540 | ORDER Granting 538 Motion for Extension of Time to File Response/Reply as to David Anthony Runyon (3). For good cause shown, and as the government does not object, the |

| | | court GRANTS the Motion for a forty-five (45) day extension. Signed by Chief District Judge Rebecca Beach Smith and filed on 5/17/16. Copies distributed to counsel for the Petitioner and to the United States Attorney at Newport News 5/17/16. (ldab, ) (Entered: 05/17/2016) |
|---|---|---|
| 05/24/2016 | 541 | MOTION for Leave to File *Supplement to Second Motion for Discovery and Consolidated Memorandum of Law* by David Anthony Runyon. (Brace, Michele) (Entered: 05/24/2016) |
| 05/26/2016 | 542 | RESPONSE to Motion by USA as to David Anthony Runyon re 541 MOTION for Leave to File *Supplement to Second Motion for Discovery and Consolidated Memorandum of Law* (Zick, Jeffrey) (Entered: 05/26/2016) |
| 05/31/2016 | 543 | REPLY TO RESPONSE to by David Anthony Runyon re 542 Response to Motion *for Leave to Supplement Second Motion for Discovery and Consolidated Memorandum of Law* (Brace, Michele) (Entered: 05/31/2016) |
| 06/07/2016 | 544 | ORDER Granting 541 Motion for Leave to File as to David Anthony Runyon (3). Accordingly, in order to aid the court in resolving the Petitioner's Second Motion for Discovery, the court GRANTS the instant Motion and permits the Petitioner to file the declaration by John Nixon within five (5) days of the entry date of this Order. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 6/7/16. Copies distributed to counsel for the Petitioner and to the United States Attorney at Newport News 6/7/16. (ldab, ) (Entered: 06/07/2016) |
| 06/08/2016 | 545 | Supplemental Memorandum by David Anthony Runyon re 530 Second MOTION for Discovery (Attachments: # 1 Attachment A: Declaration of John Nixon, Athena Research & Consulting, LLC)(Brace, Michele) (Entered: 06/08/2016) |
| 07/07/2016 | 546 | MOTION to Seal *the Reply to Amended Claim S2 to Amended Motion for Collateral Relief* by David Anthony Runyon. (Attachments: # 1 Proposed Order to File Under Seal Reply to Amended Claim S2)(Brace, Michele) (Entered: 07/07/2016) |
| 07/07/2016 | 547 | MOTION for Leave to File Excess Pages by David Anthony Runyon. (Attachments: # 1 Proposed Order for Permission to File a Reply in Excess of the Page Limit Under the Local Rules)(Brace, Michele) (Entered: 07/07/2016) |
| 07/07/2016 | 548 | MEMORANDUM ORDER Granting 546 Motion to Seal as to David Anthony Runyon (3). The Petitioner's Motion to Seal is GRANTED, and the Clerk is ORDERED to file Runyon's reply to Claim S2 under seal, with access granted to the United States Attorney at Newport News. Signed by Chief District Judge Rebecca Beach Smith and filed on 7/7/16. Copies distributed to all parties 7/7/16. (ldab, ) (Entered: 07/07/2016) |
| 07/07/2016 | 550 | ORDER Granting 547 Motion for Leave to File Excess Pages as to David Anthony Runyon (3). This matter comes before the court on the Petitioner's Unopposed Motion for Permission to File a Reply in Excess of the Page Limit Under the Local Rules, filed on July 7, 2016. For good cause shown, the court GRANTS the Motion. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 7/7/16. Copies distributed to counsel for the Defendant and to the United States Attorney at Newport News 7/7/16. (ldab, ) (Entered: 07/07/2016) |
| 07/07/2016 | 551 | REPLY TO RESPONSE to by David Anthony Runyon re 536 Response *of the United States to Amended Motion to Vacate, Set Aside, or Correct Sentence* (Attachments: # 1 Exhibit 1: Stephen Hudgins Declaration, # 2 Exhibit 2: John Nixon Declaration, # 3 Exhibit 3: Joseph Kennedy Declaration, # 4 Exhibit 4: S. Hudgins Calendar from Appointment to Runyon's Case to Beginning of Trial, # 5 Exhibit 5: USA Strikes of Black Veniremen Fisher Exact Test)(Brace, Michele) (Entered: 07/07/2016) |

**41**

| 07/12/2016 | 552 | ORDER: The court DIRECTS the Clerk to prepare a subpoena duces tecum directing the Virginia Department of Forensic Science to produce under seal to the Clerk, on or before July 22, 2016, all records related to the above-captioned case, with corresponding FS Lab #T07-4553, for in camera review by the court. These records shall be maintained under seal, absent further action by the court. The subpoena shall be served by certified mail on the following: as to David Anthony Runyon. Signed by Chief District Judge Rebecca Beach Smith and filed on 7/12/16. Copies distributed to counsel for the Petitioner and the United States Attorney at Newport News 7/12/16. (ldab, ) (Entered: 07/12/2016) |
| --- | --- | --- |
| 07/13/2016 | 553 | Issued subpoena duces tecum and served by certified mail on Amy M. Curtis, Department Counsel Virginia Department of Forensic Science 700 North 5th Street Richmond, Virginia 23219. (Attachments: # 1 Order, # 2 Certified Mail Receipt) (ldab, ) (Entered: 07/13/2016) |
| 07/20/2016 | 554 | Certified Mail Receipt received for Subpoena Duces Tecum issued to Amy M. Curtis, with Virginia Department of Forensic Science (signed by S. Graves on July 18, 2016) as to David Anthony Runyon. (ldab, ) (Entered: 07/20/2016) |
| 07/26/2016 | 555 | ORDER as to David Anthony Runyon. The court DIRECTS the United States Attorney to file ex parte and under seal the grand jury testimony of Chad Costa, for in camera review by the court, on or before August 1, 2016. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 7/26/16. Copies distributed to counsel for the Petitioner and the United States Attorney at Newport News 7/26/16. (ldab, ) (Entered: 07/26/2016) |
| 01/19/2017 | 560 | OPINION re: 478 Motion to Vacate (2255) ; 491 First MOTION for Discovery ; 511 Motion to Vacate (2255); 530 Second Motion for Discovery as to David Anthony Runyon (3). For the reasons stated herein, the Petitioner's First and Second Motions for Discovery are DENIED, and the Motion to Vacate brought pursuant to 28 U.S.C. § 2255 is DENIED. The court declines to issue a certificate of appealability for the reasons stated in this Opinion. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 1/19/17. Copies distributed to counsel for the Petitioner and to the United States Attorney at Newport News 1/19/17. (Attachments: # 1 Opinion Part 2, # 2 Opinion Part 3, # 3 Opinion Part 4, # 4 Opinion Part 5, # 5 Exhibit A, # 6 Exhibit B, # 7 Exhibit C, # 8 Exhibit D) (ldab, Civil Case 4:15-cv-00108-RBS closed. (Entered: 01/19/2017) |
| 01/20/2017 | 561 | CLERK'S JUDGMENT. Signed by Clerk on 1/19/17 and filed 1/20/17. Copies distributed to all parties 1/20/17. (ldab, ) (Entered: 01/20/2017) |
| 02/01/2017 | 564 | MOTION for Access to Materials Subpoenaed and Filed Under Seal re 552 Order,, 555 Order, by David Anthony Runyon. (Brace, Michele) (Entered: 02/01/2017) |
| 02/01/2017 | 565 | Memorandum in Support by David Anthony Runyon re 564 MOTION for Access to Materials Subpoenaed and Filed Under Seal re 552 Order,, 555 Order, (Brace, Michele) (Entered: 02/01/2017) |
| 02/16/2017 | 566 | MOTION TO ALTER OR AMEND JUDGMENT UNDER FED. R. CIV. P. 59(e) re: 560 Order on Motion to Vacate (2255),, Order on Motion for Discovery,,,,,,,,,, 561 CLERK'S JUDGMENT *Under Fed. R. Civ. P. 59(e)* by David Anthony Runyon. (Brace, Michele) (Entered: 02/16/2017) |
| 02/16/2017 | 567 | Memorandum in Support by David Anthony Runyon re 566 MOTION to Amend/Correct 560 Order on Motion to Vacate (2255),, Order on Motion for Discovery,,,,,,,,,, 561 CLERK'S JUDGMENT *Under Fed. R. Civ. P. 59(e)* (Attachments: # 1 Attachment A: Paula Dalton Declaration 2/4/17)(Brace, Michele) (Entered: 02/16/2017) |
| 02/21/2017 | 568 | ORDER Denying 564 MOTION for Access to Materials Subpoenaed and Filed Under |

| | | Seal as to David Anthony Runyon. Accordingly, the court DENIES the Petitioner's Motion for Access to Materials with respect to the grand jury testimony of Chad Costa. For the reasons stated herein, the Petitioner's Motion for Access to Materials Subpoenaed and Filed under Seal, ECF No. 564, is DENIED. The Petitioner has simply received all documents to which he is entitled, and the court finds no reason to revisit its previous rulings. Signed by Chief District Judge Rebecca Beach Smith and filed on 2/21/17. Copies distributed to counsel for the Petitioner and to the United States Attorney at Newport News 2/21/17. (ldab, ) (Entered: 02/21/2017) |
|---|---|---|
| 02/22/2017 | 569 | MOTION to Hold Petitioner's Rule 59(e) Motion in Abeyance and Incorporated Memorandum in Support re 567 Memorandum in Support of Motion, 566 MOTION to Amend/Correct 560 Order on Motion to Vacate (2255),, Order on Motion for Discovery,,,,,,,,,, 561 CLERK'S JUDGMENT *Under Fed. R. Civ. P. 59(e)* by David Anthony Runyon. (Brace, Michele) (Entered: 02/22/2017) |
| 02/24/2017 | 570 | Third MOTION for Discovery *and Consolidated Memorandum of Law* by David Anthony Runyon. (Attachments: # 1 Attachment A: Declaration of John Nixon, # 2 Attachment B: Email string regarding examination of bullets)(Brace, Michele) (Entered: 02/24/2017) |
| 03/01/2017 | 571 | MOTION for Extension of Time to File Response/Reply as to 569 MOTION to Hold Petitioner's Rule 59(e) Motion in Abeyance and Incorporated Memorandum in Support re 567 Memorandum in Support of Motion, 566 MOTION to Amend/Correct 560 Order on Motion to Vacate (2255),, Order on Motion for Discovery, 566 MOTION to Amend/Correct 560 Order on Motion for Discovery,,,,,,,,,, 561 CLERK'S JUDGMENT *Under Fed. R. Civ. P. 59(e)*, 570 Third MOTION for Discovery *and Consolidated Memorandum of Law* by USA as to David Anthony Runyon. (Attachments: # 1 Proposed Order)(Samuels, Brian) (Entered: 03/01/2017) |
| 03/01/2017 | 572 | ORDER Granting 571 Motion for Extension of Time to File Response/Reply as to David Anthony Runyon (3). IT IS HEREBY ORDERED that the United States shall be granted an extension of time, until March 31,2017, within which to file responses to the three aforementioned motions of the petitioner. Signed by Chief District Judge Rebecca Beach Smith and filed on 3/1/17. Copies distributed to all parties 3/1/17. (ldab, ) (Entered: 03/01/2017) |
| 03/31/2017 | 573 | RESPONSE in Opposition by USA as to David Anthony Runyon re 569 MOTION to Hold Petitioner's Rule 59(e) Motion in Abeyance and Incorporated Memorandum in Support re 567 Memorandum in Support of Motion, 566 MOTION to Amend/Correct 560 Order on Motion to Vacate (2255),, Order on Motion for Discovery, 566 MOTION to Amend/Correct 560 Order on Motion to Vacate (2255),, Order on Motion for Discovery,,,,,,,,,, 561 CLERK'S JUDGMENT *Under Fed. R. Civ. P. 59(e)* (Zick, Jeffrey) (Entered: 03/31/2017) |
| 03/31/2017 | 574 | RESPONSE to Motion by USA as to David Anthony Runyon re 570 Third MOTION for Discovery *and Consolidated Memorandum of Law* (Samuels, Brian) (Entered: 03/31/2017) |
| 03/31/2017 | 575 | Supplemental Memorandum by USA as to David Anthony Runyon re 566 MOTION to Amend/Correct 560 Order on Motion to Vacate (2255),, Order on Motion for Discovery,,,,,,,,,, 561 CLERK'S JUDGMENT *Under Fed. R. Civ. P. 59(e)* (Samuels, Brian) (Entered: 03/31/2017) |
| 04/06/2017 | 576 | REPLY TO RESPONSE to by David Anthony Runyon re 574 Response to Motion, 570 Third MOTION for Discovery *and Consolidated Memorandum of Law* (Brace, Michele) (Entered: 04/06/2017) |

| 04/27/2017 | <u>579</u> | MEMORANDUM ORDER re: <u>566</u> MOTION TO ALTER OR AMEND JUDGMENT UNDER FED. R. CIV. P. 59(e) as to David Anthony Runyon (3); <u>569</u> MOTION to Hold Petitioner's Rule 59(e) Motion in Abeyance and Incorporated Memorandum in Support as to David Anthony Runyon (3); <u>570</u> Third MOTION for Discovery and Consolidated Memorandum of Law as to David Anthony Runyon (3). The Petitioner's Rule 59 Motion, Abeyance Motion, and Discovery Motion are DENIED. The court declines to issue a certificate of appealability for the reasons stated herein, and in the § 2255 Opinion. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 4/27/17. Copies distributed to counsel for the Petitioner and to the United States Attorney at Newport News 4/27/17. (ldab, ) (Entered: 04/27/2017) |
|---|---|---|
| 06/06/2017 | <u>581</u> | NOTICE *of Supplemental Authority in Support* by David Anthony Runyon re <u>566</u> MOTION to Amend/Correct <u>560</u> Order on Motion to Vacate (2255),, Order on Motion for Discovery,,,,,,,,,, <u>561</u> CLERK'S JUDGMENT *Under Fed. R. Civ. P. 59(e)* (Brace, Michele) (Entered: 06/06/2017) |
| 06/08/2017 | <u>582</u> | RESPONSE by USA as to David Anthony Runyon re <u>581</u> Notice (Other), (Zick, Jeffrey) (Entered: 06/08/2017) |
| 06/16/2017 | <u>583</u> | RECORD NOTATION ORDER re: <u>581</u> NOTICE of Supplemental Authority in Support by David Anthony Runyon. This matter comes before the court on the Notice of Supplemental Authority filed by the Petitioner on June 6, 2017. ECF No. 581. Said supplemental authority is noted for the record and requires no action on the part of this court. All previous Opinions, Orders, and rulings of the court remain in full force and effect, with attendant appellant deadlines running. Signed by Chief District Judge Rebecca Beach Smith and filed on 6/16/17. Copies distributed to all parties 6/16/17. (ldab, ) (Entered: 06/16/2017) |
| 06/20/2017 | <u>584</u> | MOTION to Amend/Correct <u>579</u> Order on Ex Parte, Order on Motion for Miscellaneous Relief, Order on Motion for Discovery,,,,,,,,,, by David Anthony Runyon. (Attachments: # <u>1</u> Attachment A: June 16, 2017 PACER download (pp.1, 51-53 of 53), # <u>2</u> Attachment B: June 19, 2017 a.m. electronic docket capture, # <u>3</u> Attachment C: June 19, 2017, 4:04 p.m. PACER email, # <u>4</u> Attachment D: June 19, 2017 p.m. electronic docket capture)(Brace, Michele) (Entered: 06/20/2017) |
| 06/20/2017 | <u>585</u> | MOTION to Expedite *Ruling on Petitioner's Unopposed Rule 60(b) Motion* by David Anthony Runyon. (Brace, Michele) (Entered: 06/20/2017) |
| 06/21/2017 | <u>586</u> | ORDER re: <u>584</u> Motion to Amend/Correct; and <u>585</u> Motion to Expedite as to David Anthony Runyon (3). The court now DIRECTS the clerk specifically to re-enter the Memorandum Order of April 27, 2017, on the public docket with a new, separate docket entry. The court DISMISSES the Petitioner's Emergency Rule 60(b) Motion, ECF No. 584, and the Petitioner's Motion to Expedite, ECF No. 585, as MOOT. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith and filed on 6/21/17. Copies distributed to counsel for the Petitioner and to the United States Attorney at Newport News 6/21/17. (ldab, ) (Entered: 06/21/2017) |
| 06/21/2017 | <u>587</u> | MEMORANDUM ORDER re: <u>566</u> MOTION TO ALTER OR AMEND JUDGMENT UNDER FED. R. CIV. P. 59(e) as to David Anthony Runyon (3); <u>569</u> MOTION to Hold Petitioner's Rule 59(e) Motion in Abeyance and Incorporated Memorandum in Support as to David Anthony Runyon (3); <u>570</u> Third MOTION for Discovery and Consolidated Memorandum of Law as to David Anthony Runyon (3). The Petitioner's Rule 59 Motion, Abeyance Motion, and Discovery Motion are DENIED. The court declines to issue a certificate of appealability for the reasons stated herein, and in the § 2255 Opinion. IT IS SO ORDERED. Signed by Chief District Judge Rebecca Beach Smith on 4/27/17 and filed on 6/21/17. Copies distributed to counsel for the Petitioner and to the United States Attorney at Newport News 6/21/17. (ldab, ) (Entered: 06/21/2017) |

| 08/18/2017 | 588 | MOTION Expand the Record *Unopposed* by David Anthony Runyon. (Attachments: # 1 Exhibit A - Email string 8/17-8/18/17 between Michele Brace and Brian Samuels, Lisa McKeel and Jeffrey Zick)(Brace, Michele) (Entered: 08/18/2017) |
|---|---|---|
| 08/18/2017 | 589 | MOTION to Permit the Copying and Distribution of Protected Documents *Unopposed* by David Anthony Runyon. (Attachments: # 1 Exhibit A - Email string 8/17-8/18/17 between Michele Brace and Brian Samuels, Lisa McKeel and Jeffrey Zick)(Brace, Michele) (Entered: 08/18/2017) |
| 08/18/2017 | 590 | NOTICE OF APPEAL by David Anthony Runyon as to 560 Order on Motion to Vacate (2255),, Order on Motion for Discovery,,,,,,,,, 587 Order,,, 561 CLERK'S JUDGMENT (Brace, Michele) (Entered: 08/18/2017) |
| 08/21/2017 | 591 | Transmission of Notice of Appeal to 4CCA as to David Anthony Runyon to US Court of Appeals re 590 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (ldab, ) (Entered: 08/21/2017) |
| 08/21/2017 | 592 | USCA Case Number 17-5 RJ Warren, case manager for 590 Notice of Appeal filed by David Anthony Runyon. (ldab, ) (Entered: 08/21/2017) |
| 08/21/2017 | 593 | ORDER of USCA as to David Anthony Runyon re 590 Notice of Appeal. The court appoints Michele Jill Brace as lead counsel and Dana Catherine Hansen Chavis as co-counsel for the appellant pursuant to the provisions of 18 U.S.C. § 3599(c) and the Criminal Justice Act effective 08/18/2017. 17-5 (ldab, ) (Entered: 08/21/2017) |
| 09/13/2017 | 594 | NOTICE by David Anthony Runyon re 588 MOTION Expand the Record *Unopposed* (Attachments: # 1 Proposed Order Regarding Unopposed Motion to Expand the Record) (Brace, Michele) (Entered: 09/13/2017) |
| 09/13/2017 | 595 | NOTICE by David Anthony Runyon re 589 MOTION to Permit the Copying and Distribution of Protected Documents *Unopposed* (Attachments: # 1 Proposed Order Regarding Unopposed Motion to Permit Copying)(Brace, Michele) (Entered: 09/13/2017) |
| 09/15/2017 | 596 | ORDER Granting 588 MOTION Expand the Record as to David Anthony Runyon (3). Signed by Chief District Judge Rebecca Beach Smith and filed on 9/15/17. Copies distributed to counsel for the Petitioner and to the United States Attorney at Newport News 9/15/17. (ldab, ) (Entered: 09/15/2017) |
| 09/15/2017 | 597 | ORDER Granting 589 Motion to Permit the Copying and Distribution of Protected Documents as to David Anthony Runyon (3). Signed by Chief District Judge Rebecca Beach Smith and filed on 9/15/17. Copies distributed to counsel for the Petitioner and to the United States Attorney at Newport News 9/15/17. (ldab, ) (Entered: 09/15/2017) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/02/2018 09:48:25 | | |
| **PACER Login:** | fd000385:2548123:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:08-cr-00016-RBS-DEM |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

FILED
IN OPEN COURT

FEB 1 3 2008

CLERK, U.S. DISTRICT COURT
NEWPORT NEWS, VA



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | <u>UNDER SEAL</u> |
| | ) | |
| v. | ) | CRIMINAL NO. 4:08cr 16 |
| | ) | |
| CATHERINA ROSE VOSS, | ) | 18 U.S.C. § 1958(a) |
| a/k/a "Cat Voss" | ) | Conspiracy to Commit |
| a/k/a "Cathleen Wiggins" | ) | Murder for Hire |
| (Counts 1, 2, 3, 4, 5) | ) | (Count 1) |
| | ) | |
| MICHAEL ANTHONY ERIC DRAVEN, | ) | 18 U.S.C. §§ 2119 and 2 |
| a/k/a "Anthony James Neff" | ) | Carjacking Resulting in |
| (Counts 1, 2, 3, 4, 5) | ) | Death |
| | ) | (Count 2) |
| and | ) | |
| | ) | |
| DAVID ANTHONY RUNYON | ) | 18 U.S.C. §§ 2113(a), (e) and 2 |
| (Counts 1, 2, 3, 4, 5) | ) | Bank Robbery Resulting in |
| | ) | Death |
| Defendants. | ) | (Count 3) |
| | ) | |
| | ) | 18 U.S.C. §§ 1951(a) |
| | ) | Conspiracy to Commit Robbery Affecting |
| | ) | Commerce |
| | ) | (Count 4) |
| | ) | |
| | ) | 18 U.S.C. §§ 924(j) and 2 |
| | ) | Murder with a Firearm in |
| | ) | Relation to a Crime of Violence |
| | ) | (Count 5) |
| | ) | |
| | ) | 18 U.S.C. §§ 3591, 3592 |
| | ) | Notice of Special Findings |

<u>INDICTMENT</u>

February 2008 Term -- at Newport News, Virginia.

THE GRAND JURY CHARGES THAT:

<u>GENERAL ALLEGATIONS</u>

**46**

1.    From on or about March 11, 1999, to on or about April 29, 2007, defendant CATHERINA ROSE VOSS (hereinafter "VOSS"), was married to Cory Allen Voss, an officer in the United States Navy.  The couple resided in Newport News, Virginia, within the Eastern District of Virginia.

2.    As a member of the United States Navy, Cory Allen Voss had a life insurance policy in the amount of $400,000 through the Office of Servicemember's Group Life Insurance (hereinafter "SGLI").  The primary beneficiary on this policy was VOSS.

3.    In or about the Fall of 2006, within the Eastern District of Virginia, defendant VOSS began an extramarital affair with defendant MICHAEL ANTHONY ERIC DRAVEN (hereinafter "DRAVEN"), a resident of Newport News, Virginia.  The affair began while VOSS's husband, Cory Allen Voss, was on a six month deployment aboard the USS Elrod.  VOSS and DRAVEN continued the affair after Cory Allen Voss returned from deployment in November 2006.  During the affair, VOSS and DRAVEN took overnight trips together, communicated frequently by telephone and electronic mail (hereinafter "e-mail"), and discussed marriage to one another.

4.    In or about the Fall of 2006 through April 30, 2007, VOSS and Cory Allen Voss were experiencing financial difficulties, resulting from outstanding and overdue mortgage, student loan and credit card payments.  During this time period, VOSS had no regular source of income.

5.    In or before January 2007, VOSS and DRAVEN began contemplating the murder of Cory Allen Voss.  At some point thereafter, DRAVEN solicited assistance and/or information from at least three individuals concerning contract killing for the death of Cory Allen Voss.

6.    In or about February 2007, DRAVEN met defendant DAVID ANTHONY RUNYON (hereinafter "RUNYON"), a resident of West Virginia, while the two were employed as subjects for a medical research study in Baltimore, Maryland.  RUNYON, a former enlisted member

2

**47**

of the United States Army and former police officer, was experienced with firearms.

7.      In or about March 2007, RUNYON and DRAVEN discussed the contract killing of

Cory Allen Voss. RUNYON and DRAVEN were released from the Baltimore research study on or

about March 14, 2007, and made arrangements to further discuss the killing later in the month.

8.      Between in or about March 2007 and April 29, 2007, VOSS, RUNYON and

DRAVEN crafted a plan to murder Cory Allen Voss at the Langley Federal Credit Union, Oyster

Point Branch, (hereinafter "LFCU"), located at 11742 Jefferson Avenue, in Newport News, Virginia,

in order to obtain life insurance proceeds and other benefits.

9.      VOSS communicated with RUNYON by telephone or text message

approximately 13 times between on or about March 24, 2007, and April 29, 2007, and approximately

three times on May 8, 2007. DRAVEN communicated with RUNYON by telephone or text message

approximately 30 times between on or about March 22, 2007, and April 29, 2007, and approximately

83 times between on or about May 8, 2007, and September 26, 2007.

10.     LFCU is a credit union, the deposits of which are insured by the National Credit

Union Administration Board.

11.     On or about April 29, 2007, between approximately 11:45 p.m. and midnight,

RUNYON shot and killed Cory Allen Voss in his vehicle in the area surrounding LFCU.

12.     On or about May 1, 2007, in the Eastern District of Virginia, VOSS received a

$100,000 Navy death gratuity due to the death of Cory Allen Voss. Furthermore, shortly thereafter,

VOSS signed and submitted a claim for the $400,000 life insurance policy.

3

**48**

COUNT ONE

1.      The Grand Jury re-alleges and incorporates by reference the General Allegations section contained above, as if fully set forth herein.

2.      Beginning in or about January 2007, and continuing to on or about December 14, 2007, within the Eastern District of Virginia, and elsewhere, CATHERINA ROSE VOSS, a/k/a "Cat Voss," (hereinafter "VOSS") and a/k/a "Cathleen Wiggins," MICHAEL ANTHONY ERIC DRAVEN, a/k/a "Anthony James Neff" (hereinafter "DRAVEN"), and DAVID ANTHONY RUNYON (hereinafter "RUNYON"), the defendants herein, did unlawfully, knowingly and intentionally conspire with one another to travel in and cause another to travel in interstate commerce, and to use and cause another to use facilities in interstate commerce, that is, automobiles and cellular telephones, with intent that a murder be committed, in violation of the laws of the United States and the Commonwealth of Virginia as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, resulting in the death of Cory Allen Voss.

OBJECT OF THE CONSPIRACY

The purpose and object of the conspiracy was to commission the murder of and, in fact, murder Cory Allen Voss, in order for the conspirators to obtain life insurance proceeds and other benefits that would accrue to VOSS upon the death of Cory Allen Voss.

WAYS, MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the foregoing objectives of the conspiracy to commit murder-for-hire were to be accomplished included, but were not limited to, the following:

1.      It was part of the conspiracy that the defendants combined, conspired and

4

**49**

contracted with one another to cause the death of Cory Allen Voss by forming a plan to cause defendant RUNYON to travel from Morgantown, West Virginia, to Newport News, Virginia, in order to murder Cory Allen Voss. It was part of the conspiracy that the defendants arranged for the time, place and manner of the death of Cory Allen Voss, as well as the roles each defendant would play in accomplishing the purposes of the conspiracy.

2.     It was further a part of the conspiracy that the defendants attempted to make the murder appear to be the result of a bank robbery and carjacking.

3.     It was further a part of the conspiracy that the defendants would and did derive substantial income in the form of a Death Gratuity Benefit in the amount of $100,000 and additional proceeds from their unlawful activity — the unlawful killing of Cory Allen Voss.

4.     It was further a part of the conspiracy that the defendants used telephones and e-mail to communicate with one another and coordinate the details and plans for the murder of Cory Allen Voss, as a story to provide to law enforcement during the subsequent investigation.

5.     It was further a part of the conspiracy that the defendants and would and did use various methods to conceal the conspiracy and to insure the conspiracy's continuing success, including but not limited to:

(a)     witness tampering;

(b)     obstructing justice;

(c)     creating false alibis; and

(d)     providing false information to law enforcement and other individuals concerning, among other matters, the nature of the relationship between VOSS and DRAVEN.

6.     It was further a part of the conspiracy that the defendants made numerous efforts

to obtain the life insurance proceeds and other Navy benefits that accrued to the estate of Cory Allen

Voss upon his death. Such efforts included, but were not limited to, regular contact with the United

States Navy and other agencies regarding the status of the benefit distribution; contact with law

enforcement regarding the insurance proceeds; and contacts with elected officials concerning the

status of the investigation into the murder of Cory Allen Voss and benefits due VOSS.

## OVERT ACTS

In furtherance of the conspiracy and to accomplish one or more of the purposes thereof, the

following overt acts, among others, were committed in the Eastern District of Virginia and

elsewhere:

1.     In or about 2007, the exact date being unknown to the Grand Jury, VOSS and

DRAVEN called a cooperating witness to discuss killing Cory Allen Voss.

2.     On or about January 2, 2007, DRAVEN sent an e-mail to an individual

inquiring as to whether this individual had done a "swipe or hit on someone before."

3.     In or about March 2007, DRAVEN called another cooperating witness and asked if

the witness knew anyone who could take care of a situation.

4.     On or about March 24, 2007, VOSS and RUNYON discussed a plan for

RUNYON to murder Cory Allen Voss, including the amount of money to be paid to RUNYON and

the timing of both the payment and the planned murder of Cory Allen Voss.

5.     On or about March 26, 2007, VOSS relayed the details of her March 24, 2007,

conversation with RUNYON to DRAVEN.

6.     Between on or about March 22, 2007, and April 29, 2007, RUNYON created notes

reflecting a plan to carry out the murder of Cory Allen Voss.

6

7.      On April 20, 2007, VOSS opened a bank account with $5.00 at LFCU.

8.      On or about April 24, 2007, VOSS prepared on her computer a Power of Attorney document, which attempted to grant VOSS power over financial matters in the event of the death of Cory Allen Voss.

9.      On or about April 28, 2007, VOSS submitted two Powers of Attorney documents for financial matters to LFCU, granting VOSS power over financial matters, one of which attempted to grant VOSS power in the event of Cory Voss' death.

10.     On or about April 29, 2007, RUNYON purchased a .357 caliber revolver in or around Morgantown, West Virginia.

11.     On or about April 29, 2007, RUNYON traveled in his vehicle from Morgantown, West Virginia, to Newport News, Virginia.

12.     On or about April 29, 2007, around 11:00 p.m., VOSS sent Cory Voss to the the LFCU to withdraw money from the account that VOSS had opened on April 20, 2007.

13.     On or about April 29, 2007, RUNYON received details necessary to identify Cory Allen Voss at the LFCU.

14.     On or about April 29, 2007, RUNYON wrote down these identification details on a map of the Hampton Roads area.

15.     On or about April 29, 2007, VOSS, DRAVEN and RUNYON communicated with one another by telephone call or text message approximately 23 times leading up to the time of the murder of Cory Allen Voss.

16.     On or about April 29, 2007, VOSS made two telephone calls from her home to

7

**52**

Cory Allen Voss on his cellular phone while he was en route and after he had arrived at LFCU.

17.    On or about April 29, 2007, at approximately 11:33 p.m., RUNYON entered Cory Voss' truck.

18.    On or about  April 29, 2007, at approximately 11:42 p.m., RUNYON directed Cory Voss to make three attempted withdrawals of United States currency from an automated teller machine at LFCU.

19.    On or about April 29, 2007, between approximately 11:45 p.m. and midnight, RUNYON shot Cory Voss five times in his vehicle in the vicinity of LFCU.

20.    On or about April 30, 2007, VOSS spoke to homicide detectives and lied about the circumstances of Cory Voss' trip to LFCU on April 29, 2007.

21.    On or about May 1, 2007, VOSS signed a Claim Certification and Voucher for Death Gratuity Payment form in connection with her claim to a $100,000 death gratuity from the Department of Defense.

22.    On or about May 1, 2007, VOSS deposited the $96,100.00 of the death gratuity payment she received into a Navy Federal Credit Union account.

23.    On or about May 3, 2007, VOSS further lied to homicide detectives about the status of her marriage and falsely denied that she had any extramarital relationships.

24.    On or about May 17, 2007, VOSS purchased a $1,300 cashier's check made payable to DRAVEN.

25.    Between on or about May 20, 2007, through on or about May 21, 2007, VOSS purchased jewelry for DRAVEN during a trip to the Outer Banks of North Carolina financed by VOSS.

26.    On or about May 23, 2007, VOSS paid $5,638 to an apartment complex for six months advance rent for DRAVEN.

27.    On or about June 11, 2007, VOSS submitted the SGLI Claim for Death Benefits form in connection with Cory Allen Voss' $400,000 life insurance policy.

28.    On or about June 11, 2007, VOSS submitted claims for benefits accruing to her minor children as a result of the death of Cory Allen Voss.

29.    On or about November 25, 2007, DRAVEN sent an e-mail to RUNYON directing RUNYON to lie about the nature of their relationship.

30.    On or about November 25, 2007, RUNYON sent a reply e-mail to DRAVEN agreeing to lie about the nature of their relationship.

31.    On or about November 27, 2007, DRAVEN lied to homicide detectives concerning the nature of his relationship to VOSS and his whereabouts on the night of the murder of Cory Allen Voss.

32.    On or about December 3, 2007, RUNYON lied to homicide detectives concerning his whereabouts on the night of the murder of Cory Allen Voss, his possession and ownership of firearms and his relationship with VOSS and DRAVEN.

33.    On or about December 5, 2007, RUNYON sent DRAVEN an e-mail alerting DRAVEN about the false alibi provided by RUNYON to homicide detectives.

34.    On or about December 10, 2007, VOSS traveled to the Federal Courthouse in Newport News, Virginia, and attempted to dissuade a witness from testifying before the Federal Grand Jury.

35.    On or about December 14, 2007, VOSS traveled to the headquarters of the

9

**54**

Newport News Police Department in Newport News, Virginia, and attempted to dissuade DRAVEN from speaking with homicide detectives.

(In violation of Title 18, United States Code, Section 1958(a)).

## COUNT TWO

1.     The Grand Jury re-alleges and incorporates by reference the General Allegations section contained above, as if fully set forth herein.

2.     On or about April 29, 2007, in Newport News, Virginia, within the Eastern District of Virginia, CATHERINA ROSE VOSS, a/k/a "Cat Voss," and a/k/a "Cathleen Wiggins," MICHAEL ANTHONY ERIC DRAVEN, a/k/a "Anthony James Neff," and DAVID ANTHONY RUNYON, the defendants herein, with the intent to cause death and seriously bodily harm, knowingly and unlawfully did take and attempt to take from the person and presence of another, that is Cory Allen Voss, by force, violence and intimidation resulting in the death of Cory Allen Voss, a Ford Ranger motor vehicle that had been transported, shipped and received in interstate commerce, and did aid, abet and assist each other and others in the commission of the offense.

(In violation of Title 18, United States Code, Sections 2119 and 2).

## COUNT THREE

1.     The Grand Jury re-alleges and incorporates by reference the General Allegations section contained above, as if fully set forth herein.

2.     On or about April 29, 2007, in Newport News, Virginia, within the Eastern District of Virginia, CATHERINA ROSE VOSS, a/k/a "Cat Voss," and a/k/a "Cathleen Wiggins," MICHAEL ANTHONY ERIC DRAVEN, a/k/a "Anthony James Neff," and DAVID ANTHONY RUNYON, the defendants herein, by force, violence and intimidation resulting in the death of Cory

10

**55**

Allen Voss, did attempt to take from the person or presence of another, money belonging to and in the care, custody, control, management and possession of the Langley Federal Credit Union, whose deposits were then insured by the National Credit Union Administration Board, and in committing such offense did force Cory Allen Voss, without his consent, to accompany defendant DAVID ANOTHONY RUNYON, and did aid, abet and assist each other and others in the commission of the offense.

(In violation of Title 18, United States Code, Sections 2113(a), (e) and 2).

COUNT FOUR

1.    The Grand Jury re-alleges and incorporates by reference the General Allegations section contained above and the Ways, Manner and Means of the Conspiracy and Overt Acts sections contained in Count One, as if fully set forth herein.

2.    On or about April 29, 2007, in Newport News, Virginia, within the Eastern District of Virginia, CATHERINA ROSE VOSS, a/k/a "Cat Voss," and a/k/a "Cathleen Wiggins," MICHAEL ANTHONY ERIC DRAVEN, a/k/a "Anthony James Neff," and DAVID ANTHONY RUNYON, the defendants herein, did knowingly and unlawfully conspire to obstruct, delay and affect commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), and the movement of articles and commodities in such commerce, by knowingly and willfully committing robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), in that the defendants did unlawfully conspire to obtain United States currency from the person of Cory Allen Voss against his will and by means of actual and threatened force, violence and fear of injury, immediate and future, to his person.

(In violation of Title 18, United States Code, Section 1951(a)).

11

**56**

## COUNT FIVE

1.      The Grand Jury re-alleges and incorporates by reference the General Allegations section contained above, as if fully set forth herein.

2.      On or about April 29, 2007, in Newport News, Virginia, within the Eastern District of Virginia, CATHERINA ROSE VOSS, a/k/a "Cat Voss," and a/k/a "Cathleen Wiggins," MICHAEL ANTHONY ERIC DRAVEN, a/k/a "Anthony James Neff," and DAVID ANTHONY RUNYON,  the defendants herein, did knowingly carry and use a firearm during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, (to wit: Conspiracy to Commit Murder for Hire, as set forth in Count One of this Indictment, which is re-alleged and incorporated by reference herein; Carjacking Resulting in Death, as set forth in Count Two of this Indictment, which is re-alleged and incorporated by reference herein; Bank Robbery Resulting in Death, as set forth in Count Three of this Indictment, which is re-alleged and incorporated by reference herein; and Interference with Commerce by Robbery, as set forth in Count Four of this Indictment, which is re-alleged and incorporated by reference herein) in violation of Title 18, United States Code, Section 924(c)(1), and in the course of this violation caused the death of a person through the use of a firearm, which killing was a murder, as defined in Title 18, United States Code, Section 1111, in that the defendants, with malice aforethought, did unlawfully kill Cory Allen Voss by shooting him with a firearm, and did aid, abet and assist others in the commission of the offense.

(In violation of Title 18, United States Code, Sections 924(j) and 2).

12

**57**

## NOTICE OF SPECIAL FINDINGS

THE GRAND JURY FURTHER CHARGES THAT:

a.      The allegations of Counts One, Two, Three, and Five of this Indictment are hereby re-alleged as if fully set forth herein and incorporated by reference.

b.      As to Counts One, Two, Three and Five of this Indictment, the defendants herein, CATHERINA ROSE VOSS, a/k/a "Cat Voss," and a/k/a "Cathleen Wiggins," MICHAEL ANTHONY ERIC DRAVEN, a/k/a "Anthony James Neff," and DAVID ANTHONY RUNYON:

(1)      were more than 18 years old at the time of the offense. (Title 18, United States Code, Section 3591(a));

(2)      intentionally killed Cory Allen Voss. (Title 18, United States Code, Section 3591(a)(2)(A));

(3)      intentionally inflicted serious bodily injury that resulted in the death of Cory Allen Voss. (Title 18, United States Code, Section 3591(a)(2)(B));

(4)      intentionally participated in an act, contemplating that the life of Cory Allen Voss would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Cory Allen Voss died as a direct result of the act. (Title 18, United States Code, Section 3591(a)(2)(C));

(5)      intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Cory Allen Voss died as a result of the act. (Title 18, United States Code, Section 3591(a)(2)(D));

(6)      committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value. (Title 18, United States Code, Section 3592(c)(8));

(7)      committed the offense after substantial planning and premeditation to cause the death

13

**58**

or a person. (Title 18, United States Code, Section 3592(c)(9)).

      c.      As to Counts One, Two, Three and Five of this Indictment, the defendants herein, CATHERINA ROSE VOSS, a/k/a "Cat Voss," and a/k/a "Cathleen Wiggins," and MICHAEL ANTHONY ERIC DRAVEN, a/k/a "Anthony James Neff":

      (1)      procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.  (Title 18, United States Code, Section 3592(c)(7)).

      (Pursuant to Title 18, United States Code, Sections 3591 and 3592).

14

**59**

UNITED STATES v. VOSS, DRAVEN and RUNYON
Criminal No.  4:08cr

A TRUE BILL:

REDACTED COPY

_____
FOREPERSON

CHUCK ROSENBERG                              Pursuant to the E-Government Act,
UNITED STATES ATTORNEY                   the original of this page has been filed
                                                              under seal in the Clerk's Office.

By: _____
     Lisa R. McKeel
     Assistant United States Attorney
     Fountain Plaza Three
     721 Lakefront Commons, Suite 300
     Newport News, VA 23606
     757/591-4000

By: _____
     Brian J. Samuels
     Assistant United States Attorney
     Fountain Plaza Three
     721 Lakefront Commons, Suite 300
     Newport News, VA 23606
     757/591-4000

By: _____
     Blair C. Perez
     Assistant United States Attorney
     Fountain Plaza Three
     721 Lakefront Commons, Suite 300
     Newport News, VA 23606
     757/591-4000

15

USCA4 Appeal: 17-5      Doc: 28-1      Filed: 08/24/2018      Pg: 80 of 521

**61**

# UNITED STATES DISTRICT COURT
*Eastern District of Virginia*
*Newport News Division*

THE UNITED STATES OF AMERICA

*v.*

CATHERINA ROSE VOSS

MICHAEL ANTONY ERIC DRAVEN

DAVID ANTHONY RUNYON

# INDICTMENT

18 U.S.C. § 1958 (a) - Conspiracy to Commit Murder for Hire  (Count 1)
18 U.S.C. §§ 2119 and 2 - Carjacking Resulting in Death (Count 2)
18 U.S.C. §§ 2113(a), (e) and 2 - Bank Robbery Resulting in Death (Count 3)
18 U.S.C. § 1951(a)  - Conspiracy to Commit Robbery Affecting Commerce (Count 4)
18 U.S.C. §§ 924(j) and 2 - Murder with a Firearm in Relation to a Crime of Violence (Count 5)
18 U.S.C. §§3591, 3592 - Notice of Special Findings

*A true bill.*

*Foreman*

*Filed in open court this ___ day,*
*of February A.D. 2008*

*Clerk*

*Bail, $*

AO 190(9/91)

# *United States District Court*

EASTERN DISTRICT OF VIRGINIA

NEWPORT NEWS DIVISION

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

REDACTED COPY

| UNITED STATES OF AMERICA | RECORD OF GRAND JURORS CONCURRING |
|---|---|

v.

CATHERINA ROSE VOSS                          CASE NUMBER: 4:08CR

MICHAEL ANTHONY ERIC DRAVEN

DAVID ANTHONY RUNYON

I, the foreperson of the grand jury of this court, begun and held at Newport News, Virginia

on the _____ day of February, 2008, hereby file with the clerk of the court as required by Rule 6(c),

Federal Rules of Criminal Procedure, a record of the number of grand jurors concurring in finding

an indictment in the above case, which record shall not be made public except upon order of the court:

REDACTED COPY
_____ grand jurors concurring.

REDACTED COPY

REDACTED COPY

_____              _____
            Date                                        Foreperson

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 4:08cr16 |
| | ) | |
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF INTENT TO SEEK A SENTENCE OF DEATH**

The United States of America hereby notifies the Court and the defendant, DAVID
ANTHONY RUNYON, and his counsel, that in the event of the defendant's conviction on any of
Counts One, Two, Three or Five of the Indictment, wherein the defendant is charged respectively
with Conspiracy to Commit Murder for Hire, in violation of Title 18, United States Code,
Section 1958(a) (Count 1), Carjacking Resulting in Death, in violation Title 18, United States Code,
Sections 2119 and 2 (Count 2), Bank Robbery Resulting in Death, in violation of Title 18, United
States Code, Sections 2113(a), (e) and 2 (Count 3), and Murder with a Firearm in Relation to a
Crime of Violence, in violation of Title 18 United States Code, Sections 924 (j) and 2 (Count 5), the
United States will seek the sentence of death, in that the circumstances of the offenses are such that
a sentence of death is justified.

**I. Statutory Threshold Findings Enumerated in 18 U.S.C. § 3591(a)(2)(A)-(D):**

The United States will seek to prove four threshold findings as the basis for imposition of
the death penalty in relation to Counts One, Two, Three, and Five of the Indictment:

1.    The defendant, DAVID ANTHONY RUNYON, intentionally killed Cory Allen Voss.
Section 3591(a)(2)(A);

**63**

2.      The defendant, DAVID ANTHONY RUNYON, intentionally inflicted serious bodily injury that resulted in the death of Cory Allen Voss.  Section 3591(a)(2)(B);

3.      The defendant, DAVID ANTHONY RUNYON, intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Cory Allen Voss died as a direct result of the act.  Section 3591(a)(2)(C);

4.      The defendant, DAVID ANTHONY RUNYON, intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Cory Allen Voss died as a direct result of the act.   Section 3591(a)(2)(D).

## II. Statutory Aggravating Factors Enumerated under 18 U.S.C. § 3592(c)(1) through (16):

The United States will seek to prove the following statutory aggravating factors as the basis for imposition of the death penalty in relation to Counts One, Two, Three, and Five of the Indictment:

1.      The defendant, DAVID ANTHONY RUNYON, committed the offenses described in Counts One, Two, Three, and Five, as consideration for the receipt, or in the expectation of the receipt, of anything of value.  Section 3592(c)(8).

2.      The defendant, DAVID ANTHONY RUNYON, committed the offenses described in Counts One, Two, Three, and Five, after substantial planning and premeditation to cause the death of a person.  Section 3592(c)(9).

III. <u>Other Non-Statutory Aggravating Factors Identified under 18 U.S.C. & 3593(a) and (C):</u>

The United States will seek to prove the following non-statutory aggravating factors as the basis for imposition of the death penalty in relation to Counts One, Two, Three, and Five of the Indictment:

1.     The defendant, DAVID ANTHONY RUNYON, caused injury, harm and loss to the victim and the victim's family and friends, as evinced by the victim's personal characteristics and by the impact of his death upon the victim's family, friends and co-workers.

2.     The defendant, DAVID ANTHONY RUNYON, utilized education, training and experience that he received in college courses focused on criminal justice, as a law enforcement and correctional officer, as an officer of the Kansas National Guard and as a member of the United States Army to kill Cory Voss.

3.     The defendant, DAVID ANTHONY RUNYON, engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend.

4.     The defendant, DAVID ANTHONY RUNYON, has demonstrated a lack of remorse for his actions as demonstrated by the evidence in the case after the murder of Cory Allen Voss.

The United States further gives notice that in support of imposition of the death penalty it intends to rely upon all the evidence admitted by the Court at the guilt phase of the trial and the offenses of conviction as described in the Indictment as they relate to the background and character of the defendant, DAVID ANTHONY RUNYON, his moral culpability, and the nature and circumstances of the offenses charged in the Indictment.

3

Respectfully submitted,

CHUCK ROSENBERG
UNITED STATES ATTORNEY
EASTERN DISTRICT OF VIRGINIA


By: _____/s/_____
      Lisa R. McKeel
      Assistant United States Attorney
      Virginia Bar No. 28652
      Attorney for the United States of America
      United States Attorney's Office for the
      Eastern District of Virginia
      Fountain Plaza Three, Suite 300
      721 Lakefront Commons
      Newport News, Virginia 23606
      Tel. (757) 591-4032
      Fax: (757) 591-0866
      Lisa.McKeel@usdoj.gov


By: _____/s/_____
      Brian J. Samuels
      Assistant United States Attorney
      Virginia Bar No. 65898
      Attorney for the United States of America
      United States Attorney's Office for the
      Eastern District of Virginia
      Fountain Plaza Three, Suite 300
      721 Lakefront Commons
      Newport News, Virginia 23606
      Tel. (757) 591-4032
      Fax: (757) 591-0866
      Brian.Samuels@usdoj.gov


By: _____/s/_____
      Blair C. Perez
      Assistant United States Attorney
      Attorney for the United States of America
      United States Attorney's Office for the
      Eastern District of Virginia
      Fountain Plaza Three, Suite 300

4

721 Lakefront Commons
Newport News, Virginia 23606
Tel. (757) 591-4032
Fax: (757) 591-0866
Blair.Perez@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of July 2008, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF)

to the following:

Jon M. Babineau
Saunders, Babineau & Brewbaker, P.C.
705 W. Washington Street
Suffolk, VA 23434
jbabineau@saundersbarlow.com

Lawrence Hunter Woodward, Jr.
Shuttleworth, Ruloff, Swain, Haddad &
Morecock, P.C.
4525 South Blvd., Suite 300
Virginia Beach, VA 23452-1137
lwwodward@srgslaw.com

Larry Mark Dash
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, VA 23510
Larry_Dash@fd.org

Jeffrey A. Swartz
Rabinowitz, Swartz, Taliaferro, Lewis, Swartz & Goodove, P.C.
Town Point Center, Suite 800
150 Boush Street
Post Office Box 3332
Norfolk, VA 23514-3332
jswartz@rstsg.com

James Stephen Ellenson
Law Office of James Stephen Ellenson
2600 Washington Ave., Suite 1000
Newport News, VA 23607
jseatty@aol.com

Timothy Gerard Clancy
Moschel, Gallo & Clancy, L.L.C.
2101 Executive Drive
Tower Box 78
Hampton, VA 23666
tclancy@moschelandclancy.com

Paul G. Gill
Office of Federal Public Defender
830 E. Main Street, Suite 1100
Richmond, VA 23219
Ph. (804) 565-0870
Fax (804) 648-5033
Paul_Gill@fd.org

_____/s/_____<br>
Brian J. Samuels<br>
Assistant United States Attorney<br>
Virginia Bar No. 65898<br>
Attorney for the United States of America<br>
United States Attorney's Office for the<br>
Eastern District of Virginia<br>
Fountain Plaza Three, Suite 300<br>
721 Lakefront Commons<br>
Newport News, Virginia 23606<br>
Tel. (757) 591-4032<br>
Fax: (757) 591-0866<br>
brian.samuels@usdoj.gov

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

FILED
IN OPEN COURT

JUL 1 8 2008

CLERK, U.S. DISTRICT COURT
NEWPORT NEWS, VA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 4:08cr16 |
| | ) |
| CATHERINA ROSE VOSS, | ) |
| a/k/a "Cat Voss" | ) |
| a/k/a "Cathleen Wiggins" | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF FACTS

If this matter were to proceed to trial, the United States of America would prove beyond a reasonable doubt, by competent and admissible evidence, the following facts:

1.    From on or about March 11, 1999, to on or about April 29, 2007, defendant CATHERINA ROSE VOSS (hereinafter "VOSS") was married to Cory Allen Voss. The couple resided in Newport News, Virginia, within the Eastern District of Virginia. In 2006, after graduating from Old Dominion University, Cory was commissioned as an officer in the United States Navy. He was stationed at the Norfolk Naval Base aboard the USS Elrod as the Communications Officer. During the course of their marriage, they had two children: Casey, age 8, and Cory Jr., age 7.

2.    As a member of the United States Navy, Cory Allen Voss had a life insurance policy in the amount of $400,000 through the Office of Servicemember's Group Life Insurance (hereinafter "SGLI"). The primary beneficiary on this policy was VOSS.

3.    In or about the late Summer to Fall of 2006, within the Eastern District of Virginia, defendant VOSS began an extramarital affair with co-defendant MICHAEL ANTHONY ERIC DRAVEN (hereinafter "DRAVEN"), a resident of Newport News, Virginia. The affair began while



**70**

VOSS's husband, Cory Allen Voss, was on a six-month deployment aboard the USS Elrod. VOSS and DRAVEN continued the affair after Cory Allen Voss returned from deployment in November 2006. During the affair, VOSS and DRAVEN took overnight trips together, communicated frequently by telephone and electronic mail (hereinafter "e-mail"), discussed marriage with each other and referred to each other as husband and wife.

4.    In or about the Fall of 2006 through April 30, 2007, VOSS and Cory Allen Voss were experiencing financial difficulties, resulting from outstanding and overdue mortgage, student loans, and credit card payments and VOSS' prolific spending habits. During this time period, VOSS had no regular source of income.

5.    In or before January 2007, VOSS and DRAVEN began contemplating the murder of Cory Allen Voss. In early 2007, DRAVEN called a cooperating witness to discuss killing Cory Allen Voss. On January 2, 2007, DRAVEN sent an e-mail to an individual inquiring as to whether this individual had done a "swipe or hit on someone before."

6.    In or about February 2007, DRAVEN met co-defendant DAVID ANTHONY RUNYON (hereinafter "RUNYON"), a resident of West Virginia, while the two were employed as subjects for a medical research study in Baltimore, Maryland. RUNYON, a former enlisted member of the United States Army and former police officer, was experienced with firearms.

7.    In or about February or March 2007, RUNYON and DRAVEN discussed the contract killing of Cory Allen Voss. RUNYON and DRAVEN were released from the Baltimore research study on or about March 14, 2007, and made arrangements to further discuss the killing later in the month.

8.    On or about March 24, 2007, VOSS and RUNYON discussed a plan for

2




RUNYON to murder Cory Allen Voss, the amount of money to be paid to RUNYON and the timing of both the payment and the planned murder of Cory Allen Voss. Their conversation lasted approximately an hour and a half, as confirmed by telephone records. On or about March 26, 2007, VOSS relayed the details of her March 24, 2007 conversation with RUNYON to DRAVEN.

9.      Between in or about March 2007 and April 29, 2007, VOSS, RUNYON and DRAVEN crafted a plan to murder Cory Allen Voss at the Langley Federal Credit Union, Oyster Point Branch, (hereinafter "LFCU"), located at 11742 Jefferson Avenue, in Newport News, Virginia, in order to obtain life insurance proceeds and other benefits that VOSS would receive upon her husband's death. LFCU is a credit union, the deposits of which are insured by the National Credit Union Administration Board. The activities of LFCU operate in and affect interstate commerce.

10.     VOSS and/or DRAVEN communicated with RUNYON by telephone or text message approximately 13 times between on or about March 24, 2007, and April 29, 2007 — the date of the murder — and approximately three (3) times on May 8, 2007. DRAVEN communicated with RUNYON by telephone or text message approximately 30 times between on or about March 22, 2007, and April 29, 2007, and approximately 83 times between on or about May 8, 2007, and September 26, 2007.

11.     On April 20, 2007, VOSS opened a bank account with $5.00 at LFCU. No other deposits were made to this account. VOSS and Cory Allen Voss had a total of four (4) other bank accounts at Navy Federal Credit Union.

12.     On or about April 24, 2007, VOSS prepared on her home computer a Power of Attorney document, which attempted to grant VOSS power over financial matters in the event of the death of Cory Allen Voss. Earlier she had Cory Allen Voss obtain a similar Power of Attorney through the United States Navy; however, this document did not grant VOSS power over financial

3

 

matters at LFCU in the event of Cory Allen Voss' death. On Saturday April 28, 2007, the day before

the murder of Cory Allen Voss, VOSS hand delivered to the LFCU Oyster Point branch these two

(2) Powers of Attorney documents.

13.    On April 29, 2007, RUNYON purchased a .357 caliber revolver in or around

Morgantown, West Virginia, and traveled in his vehicle from Morgantown, West Virginia, to

Newport News, Virginia, to kill Cory Allen Voss.

14.    Around 11:00 p.m., on April 29, 2007, VOSS sent Cory Allen Voss to the

the LFCU Oyster Point branch to withdraw $40.00 or $60.00 dollars from the account that VOSS

had opened on April 20, 2007, with $5.00. VOSS made two (2) telephone calls from her home to

Cory Allen Voss on his cellular phone while he was en route and after he had arrived at LFCU. Cory

Allen Voss drove to the LFCU in his 1997 Ford Ranger pick-up truck. The Ford Ranger pick-up

truck with Virginia license plate number, JDS-7544, had been transported and shipped in interstate

commerce.

15.    On or about April 29, 2007, VOSS, DRAVEN and RUNYON communicated with

one another by telephone or text message approximately 23 times leading up to the time of Cory

Allen Voss's trip to the LFCU. Specifically, DRAVEN placed or received four (4) telephone calls

between 10:12 p.m. to 10:16 p.m. to/from RUNYON, as RUNYON stopped at pay telephones off

of Interstate 64 in the City of Newport News. During one of these calls or in person, DRAVEN

passed on to RUNYON specific details regarding Cory Allen Voss's pick-up truck, including its

make and model, and the location of the LFCU where Voss would be that night. The identification

details given to RUNYON were found written down on a map of the Hampton Roads area that was

subsequently found in RUNYON's vehicle in December 2007.




4

16.    On or about April 29, 2007, Cory Allen Voss appeared at the drive-up ATM of the

LFCU Oyster Point branch in his Ford Ranger at 11:31 p.m. He first attempted a transaction with

a bank card belonging to VOSS, but entered a wrong Personal Identification Number (PIN). Video

still shots and phone records reveal Cory Allen Voss talking on his cellular phone to VOSS at this

time. At approximately 11:33 p.m., RUNYON, while armed with a firearm, entered Cory Allen

Voss's truck while Voss was at the ATM machine at the LFCU and caused Cory Allen Voss at

gunpoint to drive around the LFCU building and reenter the ATM drive-up. RUNYON directed Cory

Allen Voss to make three attempted withdrawals of United States currency from an automated teller

machine at the LFCU. These withdrawals were unsuccessful because sufficient funds did not exist

in the account opened by VOSS.

17.    Between approximately 11:45 p.m. and midnight on April 29th, RUNYON shot Cory

Allen Voss five (5) times in his vehicle in the vicinity of LFCU, within the Eastern District of

Virginia. His lifeless body was discovered, riddled with bullets, at approximately 6:45 a.m. on April

30th. A subsequent autopsy report performed by the Virginia Medical Examiner's Office found that

the cause of death was three separate gunshot wounds to the chest and abdomen (although the victim

was shot five times). Forensics analysis on the bullets found at the crime scene indicated that the

rounds were Caliber .38 Class and the markings on the bullets were consistent with that of a .357

magnum revolver, the same type of firearm purchased by RUNYON in West Virginia sometime in

the late morning or early afternoon on the day of the murder.

18.    During the early morning hours of April 30, VOSS attempted to create an alibi for

herself as a concerned wife by calling area hospitals, police, and other numbers trying to find Cory

Allen Voss before ultimately calling the police at approximately 6:15 a.m. to report Cory Allen Voss

5



missing. Furthermore, in the early morning hours of April 30, VOSS enlisted her mother to ride around Newport News to search for Cory Allen Voss.

19.     On or about May 1, 2007, in the Eastern District of Virginia, VOSS received a $100,000 death gratuity from the United States Navy due to the death of Cory Allen Voss and of that amount deposited $96,100.00 into a Navy Federal Credit Union account. Shortly thereafter, VOSS signed and submitted a claim for the $400,000 SGLI life insurance policy.

20.     After receiving this death gratuity payment, VOSS made a number of purchases for and payments to DRAVEN. On May 17, 2007, VOSS purchased a $1,300 cashier's check made payable to DRAVEN. Between on or about May 20, 2007, through on or about May 21, 2007, VOSS purchased over $10,000 in jewelry for DRAVEN and herself during a trip to the Outer Banks of North Carolina financed by VOSS. On May 23, 2007, VOSS paid $5,638 to an apartment complex for six months advance rent for DRAVEN.

21.     On June 1, 2007, a Western Union money gram for $275.00 was sent to RUNYON in Morgantown, West Virginia, and was purportedly signed by DRAVEN's brother.

22.     On June 11, 2007, VOSS submitted the SGLI Claim for Death Benefits form in connection with Cory Allen Voss' $400,000 life insurance policy. VOSS made repeated inquiries to SGLI as to why these funds were not being disbursed to her. From May 1, 2007 through July 2007, VOSS spent the $100,000 death gratuity benefit.

23.     During the investigation by law enforcement authorities into the murder of Cory Allen Voss, VOSS, DRAVEN and RUNYON communicated with one another by e-mail and telephone in order to coordinate false alibis, cover the nature of their relationships and provide false information to law enforcement.

6



24.    In the early morning hours of December 14, 2007, Newport News Police Department officers arrested VOSS for the murder of Cory Allen Voss. After being advised of her *Miranda* rights, VOSS agreed to speak with law enforcement. VOSS admitted that she and DRAVEN had had an affair and conspired with RUNYON to murder Cory Allen Voss. VOSS stated that she agreed to pay RUNYON $20,000 to murder her husband, but that she refused to pay him after the murder. As a result, RUNYON kept increasing the amount he was owed. VOSS stated that she had not yet paid RUNYON the $20,000 as originally agreed.

25.    The acts taken by the defendant, CATHERINA ROSE VOSS, in furtherance of the offenses charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to murder Cory Allen Voss and violate the law.

Respectfully Submitted,

CHUCK ROSENBERG
UNITED STATES ATTORNEY

By: _____

Lisa R. McKeel
Assistant United States Attorney

By: _____

Blair C. Perez
Assistant United States Attorney

By: _____

Brian J. Samuels
Assistant United States Attorney

7

**76**

After consulting with my attorneys and pursuant to the plea agreement entered into this date

between the defendant CATHERINA ROSE VOSS, and the United States, I hereby stipulate that the

above Statement of Facts is a partial summary of the evidence which is true and accurate, and that

had the matter proceeded to trial, the United States would have proved the same beyond a reasonable

doubt. The defendant further acknowledges that she is obligated under her plea agreement to provide

additional information about this case beyond that which is described in this Statement of Facts

_____
CATHERINA ROSE VOSS
Defendant


We are counsel for CATHERINA ROSE VOSS. We have carefully reviewed the above

Statement of Facts with her. To our knowledge, her decision to stipulate to these facts is an informed

and voluntary one.

_____
Paul G. Gill
Counsel for the Defendant

_____
Gerald Zerkin
Counsel for the Defendant

_____
Larry M. Dash
Counsel for the Defendant

_____
Jeffrey A. Swartz
Counsel for the Defendant

8

77

USCA4 Appeal: 17-5    Doc: 28-1    Filed: 08/24/2018    Pg: 97 of 521

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.: 4:08cr16 |
| | ) | |
| DAVID ANTHONY RUNYON | ) | |
| | ) | |
| Defendant | ) | |

## NOTICE PURSUANT TO Fed. R. Crim. P. 12.2

NOW COMES the defendant, David Anthony Runyon ("Runyon"), by counsel, and pursuant to Rule 12.2 of the Federal Rules of Criminal Procedure and the Court's Order of June 16, 2008, hereby gives notice that he may introduce, at the penalty phase of this capital case, expert mental health evidence bearing on the issue of punishment. At this time, the following mental health experts may be called to testify:

1. **Evan S. Nelson, Ph.D., ABPP, CSOTP**

Dr. Nelson is a licensed clinical psychologist whose professional qualifications are documented in the attached curriculum vitae. Dr. Nelson will present a reliable social history of David Runyon and his family. The social history will focus especially on the major influences that have shaped David Runyon's life, including factors that may have contributed to David Runyon's psycho-social development and functioning.

**78**

2.    **Mark D. Cunningham, Ph.D., ABPP**

Dr. Cunningham is a licensed clinical psychologist whose professional qualifications are documented in the attached curriculum vitae.

Dr. Cunningham will describe developmental factors in the defendant's background that singly and cumulatively increased his risk of adverse adolescent and adult outcomes, including delinquency, criminality, and criminal violence. Dr. Cunningham will describe and particularize to the defendant scholarly findings supporting the nexus that such risk factors have with adverse outcomes, providing the jury with a basis for giving informed weight to the defendant's history as it considers mitigation. Dr. Cunningham's testimony will be accompanied by numerous digital demonstrative exhibits to facilitate the jury's understanding of the defendant's history, the implications of this history, and the associated scholarly perspectives.

Pending review and analysis of correctional records and other factors, as well as strategic determinations by counsel, Dr. Cunningham may be called upon to address factors that increase the likelihood of the defendant making a positive adjustment to a life term in the federal Bureau of Prisons ("BOP) (i.e., positive prisoner evidence). If called upon to provide such analysis and testimony, Dr. Cunningham will particularize to the defendant scholarly and research findings regarding rates and correlates of prison misconduct and violence, including the effectiveness of BOP in securely managing prisoners and in limiting serious violence against staff and other inmates.

3.   **Neuropsychologist**

Based on recent information provided by Dr. Nelson, Runyon is in the process of seeking Court budget approval for retaining a neuropsychologist to evaluate Runyon for the presence of neuropsychological deficits that may bear on mitigation.  If and when Runyon receives such Court approval, Runyon will supplement this Disclosure with the appropriate information.

Respectfully Submitted,

DAVID ANTHONY RUNYON

BY: _____ /s/ _____
Jon M. Babineau, Esquire
Virginia Bar Number: 27461
Attorney for Defendant, David Anthony Runyon
Saunders Barlow Riddick Babineau, PC
705 W. Washington Street
Suffolk, VA  23434
Phone:  (757) 934-1313
Fax:  (757) 934-1318 Fax
jbabineau@saundersbarlow.com


BY: _____ /s/ _____
Lawrence Hunter Woodward, Jr., Esquire
Virginia Bar Number:  21756
Attorney for Defendant, David Anthony Runyon
Shuttleworth, Ruloff, Swain, Haddad
  & Morecock, P.C.
4525 South Boulevard, Suite 300
Virginia Beach, VA  23452-1137
Phone:  (757) 671-6047
Fax: (757) 671-6004
lwoodward@srgslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of December, 2008, I electronically filed the foregoing Notice Pursuant to Fed. R. Crim. P. 12.2 with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:


Brian J. Samuels, Esquire
United States Attorney's Office
721 Lake Front Commons, Suite 300
Newport News, VA  23606
Email:  brian.samuels@usdoj.gov

Lisa Rae McKeel, Esquire
United States Attorney's Office
721 Lake Front Commons, Suite 300
Newport News, VA  23606
Email:  Lisa.McKeel@usdoj.gov

Larry Mark Dash, Esquire
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, VA  23510
Email: Larry_Dash@fd.org

Paul G. Gill, Esquire
Office of the Federal Public Defender
830 E. Main Street, Suite 1100
Richmond, VA  23219
Email:  Paul_Gill@fd.org

Jeffrey A. Swartz, Esquire
Rabinowitz Swartz Taliaferro Swartz & Goodove
150 Boush Street, Suite 800
Norfolk, VA  23510
Email:  jswartz@rstsg.com

4

**81**

James Stephen Ellenson, Esquire
Law Office of James Stephen Ellenson
2600 Washington Avenue, Suite 1000
Newport News, VA   23607
Email:  jseatty@aol.com


Timothy Gerard Clancy, Esquire
Moschel, Gallo & Clancy, L.L.C.
2101 Executive Drive
Tower Box 78
Hampton, VA  23666
Email:  tclancy@moschelandclancy.com


                              _____/s/_____
                              Jon M. Babineau, Esquire
                              Virginia Bar Number: 27461
                              Attorney for Defendant, David Anthony Runyon
                              Saunders Barlow Riddick Babineau, PC
                              705 W. Washington Street
                              Suffolk, VA   23434
                              Phone:  (757) 934-1313
                              Fax:  (757) 934-1318 Fax
                              jbabineau@saundersbarlow.com


                              _____/s/_____
                              Lawrence Hunter Woodward, Jr., Esquire
                              Virginia Bar Number: 21756
                              Attorney for Defendant, David Anthony Runyon
                              Shuttleworth, Ruloff, Swain, Haddad
                                & Morecock, P.C.
                              4525 South Boulevard, Suite 300
                              Virginia Beach, VA  23452-1137
                              Phone:  (757) 671-6047
                              Fax: (757) 671-6004
                              lwoodward@srgslaw.com

# EVAN S. NELSON, PH.D., ABPP
### Licensed Clinical Psychologist & Certified Sex Offender Treatment Provider

| | |
|---|---|
| Forensic Psychology Associates, P.C. | Voice (804) 739-4669 |
| 5900 Harbour Park Drive | Fax (804) 739-6725 |
| Midlothian, VA 23112 | E-mail esnelson@psylaw.com |

## LICENSES AND CERTIFICATIONS
Licensed Clinical Psychologist, Virginia Board of Psychology
Diplomate in Forensic Psychology, American Board of Professional Psychology (ABPP)
Certified Sex Offender Treatment Provider, Virginia Board of Psychology

## EDUCATION
| | |
|---|---|
| Ph.D., M.A. | University of North Carolina at Chapel Hill, 1991 |
| Internship | Indiana University School of Medicine, 1991 |
| Post-doctoral Residency | Forensic Unit of Central State Hospital in Petersburg, Virginia, 1992 |

## WORK EXPERIENCE
| | |
|---|---|
| Private Practice | Specializing in psychological evaluations for the courts, 1994 - Present |
| Acting Forensic Coordinator | Forensic Unit, Central State Hospital, 1994 |
| Psychologist Senior | Forensic Unit, Central State Hospital, 1991 - 1994 |

## SELECTED PROFESSIONAL PRESENTATIONS
Capital Sentencing Evaluations
- Developing Capital Sentencing Mitigation: Annual Conference of the Virginia Public Defenders, 1996
- Capital Sentencing Evaluations on Motion of the Commonwealth: Institute for Law, Psychiatry and Public Policy, 1994 - 2002; Annual Conference of the Commonwealth's Attorneys' Services Council, 1998

Risk Assessment, Future Dangerousness, and Sex Offender Issues
- Sexually Violent Predator Evaluations: Virginia Association of Criminal Defense Lawyers, 2005
- Sex Offender Risk Assessment: Circuit Court Judges' Conference, 2005
- Sexually Violent Predator Evaluations: Institute for Law, Psychiatry and Public Policy, 2003
- Juvenile Risk Assessment, Annual Conference of the Commonwealth's Attorneys' Services Council, 2002
- Using the ABEL Assessment for Sexual Interest: Virginia Department of Corrections conference, 2000
- Preserving the Record for Sexually Violent Predator Hearings: Commonwealth's Attorneys Services Counsel, 1999
- Use of the Violence Risk Appraisal Guide: Virginia Department of Mental Health, 1999
- Sex Offenders - Predicting Recidivism: Annual Conference of the Virginia Public Defenders, 1999
- Actuarial Predictions of Future Dangerousness: Forensic Unit of Central State Hospital, 1998; Probation and Parole Conference, 1999

The Detection of Malingered Mental Illness
- Virginia Psychological Association Annual Conference, 1995
- Grand Rounds, Department of Psychiatry of the Medical College of Virginia, 1994
- Annual Conference of the Virginia State Employed Psychologists Association, 1994

Other Forensic Psychological Issues
- Responding to Insanity and Mental Retardation: Commonwealth's Attorneys Homicide Conference, 2001 - 2003
- Qualification and Expert Use of an Expert: Virginia Trial Lawyers Association, 1999
- Mitigation Evaluations in Non-Capital Trials: Virginia College of Criminal Defense Attorneys, 1998
- Competency, Sanity, and Mitigation Evaluations: Arlington Commonwealth's Attorneys' Office, 1994; Duke University Law and Psychiatry Program, 1995; Petersburg Public Defender's Office, 1996; Arlington Bar Association, 1997

## FACULTY AND SUPERVISORY EXPERIENCE
- Assistant Clinical Professor of Psychiatry, Medical College of Virginia, 1992 - present
- Supervised Psychology Interns from the Federal Corrections Institute, Medical College of Virginia, and Virginia State University
- Trained Institute for Law, Psychiatry, and Public Policy students (psychiatrists, psychologists, and lawyers)

*Please call or write for the complete vita*

# MARK D. CUNNINGHAM, PH.D., ABPP

*Board Certified in Clinical Psychology  -  Board Certified in Forensic Psychology*
*American Board of Professional Psychology*

417 Oak Bend, Suite 260      Lewisville, Texas 75067
972-459-0658  Fax 972-459-0958  mdc@markdcunningham.com

*Licensed psychologist: Arizona #3662, Arkansas #98-17P, Colorado #2305, Connecticut #846,*
*Idaho #PSY-379, Illinois #071-006010, Indiana #20041376A, Louisiana #794, New Mexico #0768,*
*New York #017111, Oklahoma #1002, Oregon #1333, South Carolina #764, Tennessee #2255, Texas #22351*

## CURRICULUM VITAE
Updated 11-10-08

## EDUCATION

| | |
|---|---|
| **Postdoctoral:** | Yale University School of Medicine, New Haven, Connecticut |
| | (September 1979 to June 1981) |
| | NIMH-sponsored training program, part-time |
| | |
| **Internship:** | National Naval Medical Center, Bethesda, Maryland |
| | (February 1977 to February 1978) |
| | Specialty:  Clinical Psychology (APA accredited) |
| | |
| **Graduate:** | Oklahoma State University, Stillwater, Oklahoma |
| | *Doctor of Philosophy* (December 1977) |
| | *Master of Science* (December 1976) |
| | Specialty:  Clinical Psychology (APA accredited) |
| | |
| **Undergraduate:** | Abilene Christian College, Abilene, Texas |
| | *Bachelor of Arts*, (May 1973) |
| | Majors: Psychology, Mass Communications |

## BOARD CERTIFICATIONS

Clinical Psychology: American Board of Clinical Psychology, a specialty board of the American
   Board of Professional Psychology (ABPP), Diploma #6462

Forensic Psychology: American Board of Forensic Psychology, a specialty board of the American
   Board of Professional Psychology (ABPP), Diploma #4551

## PROFESSIONAL PRACTICE

| | |
|---|---|
| **1981 - date** | Clinical and Forensic Psychologist |
| | Private practice (Texas: Abilene, 1981-2002; Dallas, 2002 - date) |
| | |
| **1998 - date** | Research scientist |
| | |
| **1978 - 1981** | Clinical Psychologist (Lieutenant, MSC, USNR) |
| | Naval Submarine Medical Center, Groton, Connecticut |

## AWARDS, DECORATIONS, AND DISTINCTIONS

*American Psychological Association Award for Distinguished Contributions to Research in Public Policy* – annual award bestowed for distinguished empirical and/or theoretical contribution to research in public policy, either through a single extraordinary achievement or a lifetime of work, 2006 recipient.

*Texas Psychological Association Award for Outstanding Contribution to Science* – annual award in recognition of significant scientific contribution in the discovery and development of new information, empirical or otherwise, to the body of psychological knowledge, 2005 recipient.

*John Augustus Award* - annual award bestowed for outstanding contributions to the profession of sentencing advocacy, National Association of Sentencing Advocates, 2004 recipient.

*Al Brown Memorial Award* – award bestowed for outstanding achievement, National Institute of Mental Health (NIMH) Sex Therapy Training Program, Yale University School of Medicine, 1979-1981.

*Navy Commendation Medal* – decoration for meritorious service as a clinical psychologist, Naval Submarine Medical Center, United States Navy, 1978-1980.

*Fellow, American Psychological Association (Division 41: American Psychology-Law Society)* – distinction reflecting outstanding and uncommon contributions having national impact on the science and practice of psychology, 2007 election.

*Fellow, American Academy of Clinical Psychology* – distinction reflecting diplomate in clinical psychology by the American Board of Professional Psychology.

*Fellow, American Academy of Forensic Psychology* – distinction reflecting diplomate in forensic psychology by the American Board of Professional Psychology.

*Magna cum Laude* - Bachelor of Arts, Abilene Christian College, 1973.

## PROFESSIONAL LICENSES

*Licensed Psychologist:*

| | | |
|---|---|---|
| Arizona #3662 | Arkansas #98-17P | Colorado #2305 |
| Connecticut #846 | Idaho #PSY-379 | Illinois #071-006010 |
| Indiana #20041376A | Louisiana #794 | New Mexico #0768 |
| New York #017111 | Oklahoma #1002 | Oregon #1333 |
| South Carolina #764 | Tennessee #2255 | Texas #22351 |

85

## ACADEMIC APPOINTMENTS

**1981 - 1983**    Assistant Professor: Psychology Department,
                   Hardin-Simmons University, Abilene, Texas

**1978 - 1980**    Instructor (part-time): Psychology Department,
                   Old Dominion University (U.S. Submarine Base Extension);
                   Mohegan Community College, Norwich, Connecticut

**1974 - 1977**    Teaching Assistant: Psychology Department
                   Oklahoma State University, Stillwater, Oklahoma


## PROFESSIONAL AFFILIATIONS

American Psychological Association – *Fellow* (Division 41)

American Board of Professional Psychology – *Diplomate (clinical, forensic)*
American Academy of Clinical Psychology - *Fellow*
American Academy of Forensic Psychology - *Fellow*
       Workshop faculty, 1998-
       ABFP examiner, 1996-2006

National Register of Health Service Providers in Psychology
Certificate of Professional Qualification in Psychology (CPQ) #1303

Texas Psychological Association
National Association of Sentencing Advocates
American Association for Correctional Psychology


## EDITORIAL

Guest editor: Capital sentencing (special issue in press). *Journal of Psychiatry and Law*

Consulting editor: *Assessment* (2006- )

Ad hoc reviewer: *Behavioral Sciences & the Law*
                 *Criminal Justice Policy Review*
                 *Criminal Justice Review*
                 *Law & Human Behavior*
                 *Southwest Journal of Criminal Justice*

Pre-publication book manuscript reviewer: John Wiley & Sons, Inc. (2007)
                                          Professional Resource Press (2003)

---

**86**

## SCHOLARLY PUBLICATIONS

*Books and edited volumes:*

Cunningham, M. D. ( Ed.) (*in press*). Capital sentencing (special issue). *Journal of Psychiatry and Law.*

*Chapters in edited books:*

Cunningham, M. D. (*in press*). Competency to waive appeals. In B. L. Cutler (Ed.), *Encyclopedia of psychology and law*. Thousand Oaks, CA: Sage Publications, Inc.

Cunningham, M. D. (2008). Institutional misconduct among capital murderers (pp. 237-253). In M. DeLisi & P. J. Conis (Eds.), *Violent offenders: Theory, research, public policy, and practice*. Boston: Jones & Bartlett Publishers.

Cunningham, M. D. (2007).  Forensic psychology evaluations at capital sentencing (pp. 211-238). In R. L. Jackson (Ed.), *Learning forensic assessment*. Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Cunningham, M. D. & Goldstein, A. M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), *Forensic psychology* (vol. 11 of 12). I. Weiner (Ed.), *Handbook of psychology*. New York: John Wiley & Sons.

*Papers in peer-reviewed journals:*

MacVaugh, G. & Cunningham, M. D. (*in press*). *Atkins v. Virginia*: Implications and recommendations for forensic practice. *Journal of Psychiatry and Law*.

Sorensen, J. R. & Cunningham, M. D. (*in press*).  Conviction offense and prison violence: A comparative study of murderers and other offenders. *Crime & Delinquency*.

Sorensen, J. R. , & Cunningham, M. D. (*in press*). Once a killer always a killer? Prison misconduct of former death-sentenced inmates in Arizona. *Journal of Psychiatry and Law*.

Kuanliang, A., Sorensen, J. R., & Cunningham, M. D. (2008). Juvenile offenders in an adult prison system: A comparative examination of rates and correlates of misconduct. *Criminal Justice and Behavior, 35*, 1186-1201.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2008). Assertions of "future dangerousness" at federal capital sentencing: Rates and correlates of subsequent prison misconduct and violence. *Law and Human Behavior, 32,* 46-63.

Cunningham, M. D. & Sorensen, J. R. (2007). Capital offenders in Texas prisons: Rates, correlates, and an actuarial analysis of violent misconduct. *Law and Human Behavior, 31*, 553-571.

Cunningham, M. D. & Sorensen, J. R. (2007). Predictive factors for violent misconduct in close custody. *Prison Journal, 87*, 241-253.

Sorensen, J. R. & Cunningham, M. D. (2007). Operationalizing risk: The influence of measurement choice on the prevalence and correlates of violence among incarcerated murderers. *Journal of Criminal Justice, 35*, 546-555.

Cunningham, M. D. (2006). Dangerousness and death: A nexus in search of science and reason. *American Psychologist, 61*, 828-839.

Cunningham, M. D. (2006). Informed consent in capital sentencing evaluations: Targets and content. *Professional Psychology: Research and Practice, 37*, 452-459.

Cunningham, M. (2006). Special issues in capital sentencing. In Conroy, M. A., Lyons, P. M., Jr., & Kwartner, P. P. (Eds.). *Forensic mental health services in Texas* [special issue, electronic version]. *Applied Psychology in Criminal Justice, 2*, 205-236.

Cunningham, M. D. & Sorensen, J. R. (2006). Actuarial models for assessment of prison violence risk: Revisions and extensions of the Risk Assessment Scale for Prison (RASP). *Assessment, 13*, 253-265.

Cunningham, M. D. & Sorensen, J. R. (2006). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates. *Criminal Justice and Behavior, 33*, 683-705.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. *Behavioral Sciences & the Law, 23*, 307-320.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. *Assessment, 12,* 40-49.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. *Criminal Justice Policy Review, 15,* 365-376.

Shuman, D. W., Cunningham, M. D., Connell, M. A, & Reid, W. H. (2003). Interstate forensic psychology consultations: A call for reform and proposal for a model rule. *Professional Psychology: Research and Practice, 34,* 233-239.

Cunningham, M. D. & Reidy, T .J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior, 29*, 512-537.

Cunningham, M. D. & Vigen, M. P. (2002). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. *Behavioral Sciences & the Law, 20*, 191-210.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life or death:  Special considerations and heightened practice standards in capital sentencing evaluations. *Behavioral Sciences & the Law, 19*, 473-490.

Reidy, T. J., Cunningham, M. D. & Sorensen, J. (2001).  From death to life: Prison behavior of former death row inmates in Indiana. *Criminal Justice and Behavior, 28,* 62-82.

Cunningham, M. D., & Reidy, T. J. (1999).  Don't confuse me with the facts:  Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26*, 20-43.

Cunningham, M. D. & Vigen, M. P. (1999).  Without appointed counsel in capital postconviction proceedings: The self-representation competency of Mississippi death row inmates. *Criminal Justice and Behavior, 26*, 293-321.

Cunningham, M. D., & Reidy, T. J. (1998).  Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. *Behavioral Sciences & the Law, 16*, 333-351.

Cunningham, M. D. & Reidy, T. J. (1998).  Integrating base rate data in violence risk assessments at capital sentencing.  *Behavioral Sciences & the Law, 16*, 71-95.

Cunningham, M. D. & Murphy, P. J. (1981). The effects of bilateral EEG biofeedback on verbal, visual-spatial, and creative skills in learning disabled male adolescents. *Journal of Learning Disabilities, 14*, 204 -208.

*Papers in edited legal journals:*

Lyon, A. D. & Cunningham, M. D. (2006) Reason not the need: Does the lack of compelling state interest in maintaining a separate death row make it unlawful? *American Journal of Criminal Law, 33*, 1-30.

*Case reports and teaching points:*

Cunningham, M. D. (*in press*). [Professional profile]. *Exploring criminal justice: The essentials*. Boston: Jones & Bartlett Publishers.

Cunningham, M. D. (2007*)* Capital violence risk assessment [case report]. In Mary A. Conroy & D. Murrie, *From risk assessment to risk management: A model for forensic practice*. New York: John Wiley & Sons.

**89**

Cunningham, M. D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (152-171). New York: Oxford University Press.

Cunningham, M. D. (2002). Competence to be executed [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (96-114). New York: Oxford University Press.

Cunningham, M. D. (2002). How do you evaluate the accuracy of different sources of third-party information? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (171-173). New York: Oxford University Press.

Cunningham, M. D. (2002). Why and how do you attribute information to sources in a forensic mental health assessment? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (114-115). New York: Oxford University Press.

*Articles in professional periodicals:*

Cunningham, M. D. (2001). Bias in capital sentencing evaluations [invited opinion column]. *American Psychology and Law Society News, 21, 2,* 8-9.

Cunningham, M. D. & Reidy, T. J. (1998). Antisocial personality disorder vs. psychopathy as diagnostic tools. *Prosecutor's Brief: California District Attorneys Association, 20,* 9-11.

Marcy, M. R., Hopkins, J. B. & Cunningham, M. D. (1978). A behavioral treatment of nocturnal enuresis, *U.S. Navy Medicine, 69,* 26-28.

*Manuscripts in preparation:*

Cunningham, M. D. (*invited book under contract*). *Evaluations for capital sentencing.* A volume in the *Oxford forensic best practices series,* Series Editors: A. Goldstein, T. Grisso, Ph.D., and K. Heilbrun. New York: Oxford University Press.

Cunningham, M. D., & Hedrick, M. (*manuscript in preparation*). Slippery slope: Bias in forensic evaluations.

Cunningham, M.D., & Sorensen, J. R. (*manuscript under review*). Improbable predictions at capital sentencing: Contrasting prison violence outcomes.

Cunningham, M. D., Sorensen, J. R., Vigen, M. P., & Woods, S. O. (*manuscript in preparation*) Inmate homicides in Texas prisons: Killers, victims, motives, and circumstances.

Sorensen, J. R., Reidy, T. J., & Cunningham, M. D. (*manuscript in preparation*). A comparative study of inmate misconduct on federal death row.

## SCHOLARLY SYMPOSIA / ADDRESSES

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. San Francisco, California, May 2008.

Death penalty on trial. Symposium with Joel Dvoskin, Ph.D., Solomon Fulero, Ph.D., & Christopher Slobogin, J.D., Ph.D., American Psychological Association 115th Annual Convention. San Francisco, California, August 2007.

Implications of developmental research for juvenile adjudications. Alabama Council of Community Mental Health Boards, Southern Poverty Law Center: 33rd annual conference. Birmingham, Alabama, May 2007.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. San Diego, California, January 2007.

Dangerousness and death: A nexus in search of science and reason. Invited Award Address, American Psychological Association 114th Annual Convention. New Orleans, Louisiana, August 2006.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. La Jolla, California, March 2005.

Informed consent in forensic evaluations. Symposium with Mary Connell, Ph.D., William Foote, Ph.D., & Daniel Shuman, J.D., American Psychology-Law Society Annual Conference. LaJolla, California, March 2005.

Psychological evaluations in death penalty litigation. Texas Psychological Association, Pre-convention workshop. Dallas, Texas, November 2003.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. Cincinnati, Ohio, September 2003.

Competency to be executed. Symposium with Stanley Brodsky, Ph.D. & Patricia Zapf, Ph.D., American Psychology-Law Society Annual Conference. Austin, Texas, March 2002.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. San Diego, California, February 2002.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. Monterey, California, January 2000.

Psychological expertise and criminal justice (panel member). American Psychological Association / American Bar Association Conference. Washington, DC, October 1999.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. Austin, Texas, February 1999

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic
Psychology: Workshop Series. Milwaukee, Wisconsin, March 1998

## AMICUS CURIAE

*Consultation and assistance in preparation of:*

Brief of the *Amici Curiae* Texas Psychological Association and Texas Appleseed in Support of
Appellant, *Noah Espada vs. The State of Texas*, in the Court of Criminal Appeals of Texas at
Austin (2007).

Brief of *Amicus Curiae* American Psychological Association in Support of Defendant-Appellant,
*U.S. v. Sherman Lamont Fields* in the United States Court of Appeals for the Fifth Circuit
(2005).

## TESTIMONY BEFORE COMMISSIONS AND LEGISLATIVE COMMITTEES

Texas State Senate, Criminal Justice Committee, 79th Legislative Session, Austin, 2005

Texas State Senate, Criminal Justice Committee, 78th Legislative Session, Austin, 2003

Illinois Governor's Commission on Capital Sentencing, Chicago, 2002

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## Newport News Division

UNITED STATES OF AMERICA,

v.                                                    CRIMINAL NO. 4:08cr16

DAVID ANTHONY RUNYON,

   Defendant.

### <u>MOTION TO CONTINUE TRIAL</u>

  COMES NOW the Defendant, David Runyon, by counsel, and moves for a continuance of the trial scheduled for March 13, 2009 for the reasons set forth below:

  The defendant, David Runyon, is indicted for various capital offenses and the United States has filed a notice that it is seeking the death penalty.  On Friday, February 13, 2009, one of Runyon's counsel, Jon Babineau, withdrew from the case due to a conflict of interest.  On Wednesday, February 18, 2009, the court appointed new counsel for Runyon, Mr. Stephen A. Hudgins.

  The case involves tens of thousands of documents and potentially more than 100 witnesses.  A continuance is necessary in order to allow Mr. Hudgins to read and analyze the voluminous material in order to effectively represent Runyon.

  Additionally, Mr. Hudgins will need to review and analyze the extensive investigative material developed by the defense, meet with and discuss the case with the defendant, review and analyze the mitigation materials, and meet with

the defense experts and investigators.

Without the time to prepare, Mr. Hudgins, will not be able to effectively advise and defend Runyon.

Counsel for the United States and for Runyon's co-defendant, Michael Draven, have been contacted and do not object to a continuance. Both Runyon and Draven have previously waived speedy trial and the court has made a finding that the waiver of speedy trial was appropriate due to the complex nature of the case.

The Defendant, David Runyon, requests that the trial be rescheduled to allow proper preparation by his new counsel.

Respectfully submitted,


_____/s/_____
Lawrence Hunter Woodward, Jr., Esq.
Virginia Bar No. 21756
Attorney for Defendant,
   David Anthony Runyon
Shuttleworth, Ruloff, Swain, Haddad &
   Morecock, P.C.
4525 South Blvd., Suite 300
Virginia Beach, VA 23452-1137
Phone: (757) 671-6047
Fax: (757) 671-6004
lwoodward@srgslaw.com

### CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February, 2009, I electronically filed the foregoing Motion to Transfer Location of Trial with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Brian J. Samuels, Esq.
United States Attorney's Office
721 Lake Front Commons, Suite 300
Newport News, VA 23606
brian.samuels@usdoj.gov

Lisa Rae McKeel, Esq.
United States Attorney's Office
721 Lake Front Commons, Suite 300
Newport News, VA 23606
Lisa.McKeel@usdoj.gov

Larry Mark Dash, Esq.
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, VA 23510
Larry_Dash@fd.org

Paul G. Gill, Esq.
Office of the Federal Public Defender
830 E. Main Street, Suite 1100
Richmond, VA 23219
Paul_Gill@fd.org

Jeffrey A. Swartz, Esq.
Rabionowitz Swartz Taliaferro Swarts & Goodove
150 Boush Street, Suite 800
Norfolk, VA 23510
jswartz@rstsg.com

James Stephen Ellenson, Esq.
Law Office of James Stephen Ellenson
2600 Washington Avenue, Suite 1000
Newport News, VA 23607

jseatty@aol.com

Timothy Gerard Clancy, Esq.
Moschel, Gallo & Clancy, LLC
2101 Executive Drive
Tower Box 78
Hampton, VA 23666
tclancy@moschelandclancy.com


Stephen A. Hudgins, Esq.
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
sahudginspc@aol.com




_____/s/_____
Lawrence Hunter Woodward, Jr., Esq.
Virginia Bar No. 21756
Attorney for Defendant,
    David Anthony Runyon
Shuttleworth, Ruloff, Swain, Haddad &
    Morecock, P.C.
4525 South Blvd., Suite 300
Virginia Beach, VA 23452-1137
Phone: (757) 671-6047
Fax: (757) 671-6004
lwoodward@srgslaw.com



FILED

FEB 23 2009

CLERK, US DISTRICT COURT
NORFOLK, VA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Newport News Division

UNITED STATES OF AMERICA

v.                                        Criminal No.: 4:08cr16

DAVID ANTHONY RUNYON

       Defendant.

## O R D E R

THIS DAY CAME, counsel for the defendant, David Anthony Runyon, and
moved the Court to continue the trial in this matter so that his newly-appointed
counsel can have adequate time to prepare.

It appearing to the Court that there is no objection to this request and that
a continuance is necessary in order to protect the rights of David Anthony Runyon,
it is hereby **GRANTED** that this case is continued until _May 4_____, 2009
with a jury.

**IT IS SO ORDERED**

                               /s/
                            Rebecca Beach Smith
                            United States District Judge

                            Rebecca Beach Smith
                            United States District Judge

Norfolk, Virginia
February _23_, 2009

Page 1 of 2

**97**

/s/

Rebecca Beach Smith
United States District Judge

I ASK FOR THIS:


_____/s/_____
Lawrence H. Woodward, Jr.



SEEN AND AGREED:


_____/s/_____
Lisa Rae McKeel


_____/s/_____
Brian J. Samuels


_____/s/_____
James Stephen Ellenson


_____/s/_____
Timothy Gerard Clancy



Page 2 of 2

**99**

RECEIVED
CLERKS
OFFICE

2009 FEB 23  P 2: 17

NORFOLK, VA.

**100**

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
## Newport News Division

**UNITED STATES OF AMERICA**

v.                                                        Criminal No. 4:08cr16

**DAVID ANTHONY RUNYON**

## <u>NOTICE REGARDING MENTAL HEALTH EXPERTS</u>

Defendant, David Anthony Runyon, hereby gives notice of his intent to offer mental health experts as follows; this notice is dependent on defendant's receipt of his and his family's medical records from the United States Government for periods of time when defendant was in the Army and when he and his mother were Army dependents:

Scott D. Bender, PhD.
545 Ray C. Hunt Drive, Suite 240
Box 801004, Charlottesville, Virginia 22908-1004
434-243-5622

Dr. Bender is a neuropsychologist who will do psychological testing on the defendant if deemed appropriate once the medical records of defendant and his family are received.

-1-

**101**

Dr. Seymour Halleck, Phd.
University of North Carolina Hospital
UNC Medical School Wing B207H
Chapel Hill, North Carolina 27514

Dr. Halleck is a psychiatrist who will be testifying to factors discovered in defendant's medical records and those of his family and who may interview defendant on issues discovered in the medical records, all as determined to be necessary and appropriate once the medical records are received.

DAVID ANTHONY RUNYON

By:_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of April, 2009, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels, Esquire
VSB No. 65898
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
brian.samuels@usdoj.gov

-2-

Lisa R. McKeel, Esquire
VSB No. 28652
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
lisa.mckeel@usdoj.gov

Lawrence Hunter Woodward, Jr., Esquire
Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
Counsel for David Anthony Runyon
4525 South Boulevard, Suite 300
Virginia Beach VA 23452
Telephone: 757.671.6047
Telefax: 757.671.6004
lwoodward@srgslaw.com

Larry M. Dash, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
150 Boush Street, Suite 403
Norfolk, VA 23510
larrydash@fd.org

Paul G. Gill, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
830 E. Main Street, Suite 1100
Richmond, VA 23219
paulgill@fd.org

Jeffrey A. Swartz, Esquire
Rabinowitz, Swartz, Taliaferro, Swartz & Goodove
Counsel for Catherina Rose Voss
150 Boush Street, Suite 800
Norfolk, VA 23510
jswartz@rstsg.com

-3-

James S. Ellenson, Esquire
Law Office of James Stephen Ellenson
Counsel for Michael Anthony Eric Draven
Bank of America Building
2600 Washington Avenue, Suite 1000
Newport News, VA 23607
jseatty@aol.com

Timothy G. Clancy, Esquire
Moschel & Clancy, PLLC
Counsel for Michael Anthony Eric Draven
2101 Executive Drive, Third Floor
Tower Box 78
Hampton VA 23666
tclancy@moschelandclancy.com

_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

-4-

**104**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 4:08cr16 |
| | ) | |
| CATHERINA ROSE VOSS, | ) | |
| | ) | |
| MICHAEL ANTHONY ERIC DRAVEN, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT'S MOTION TO
CONTINUE TRIAL DATE**

**COMES NOW** Defendant, by and through his appointed counsel, hereby requests this Honorable Court enter an Order continuing the trial of this case.

**I. Introduction**

Capital cases are difficult no matter what - we recognize the need to move forward but despite our best efforts to date, as detailed below, we cannot provide competent representation under the current scheduling order. The necessary investigation, discovery and defense scientific testing cannot be accomplished without additional time.

To assist the Court and government counsel in appreciating the critical need for this continuance and to demonstrate that this request is not the

-1-

**105**

result of procrastination by defense counsel, this motion will outline numerous stumbling blocks to a June 30, 2009, trial date and the general areas in which extensive work remains to be accomplished.

## II. Governing Legal Principles

The Sixth Amendment entitles a criminal defendant to more than mere legal representation; an accused has the right to the effective assistance of competent counsel. *Powell v. Alabama*, 287 U.S. 45, 58, (1932). In order to fulfill that Constitutional guarantee and render effective assistance of counsel, counsel must be given adequate time to prepare for a case. *See Powell v. Alabama*, 287 U.S. 45, 71 (1932) (inadequate case preparation can jeopardize an accused's right to effective assistance of counsel). While "the Constitution nowhere specifies any period which must intervene between the required appointment of counsel and trial, the denial of adequate time for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel." *Avery v. Alabama,* 308 U.S. 444, 446 (1940). "The prompt disposition of criminal cases is to be commended and encouraged.   But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense." *Powell v. Alabama*, 287 U.S. at 59.  Obtaining adequate time to properly prepare for representing a person facing death is essential.

Defense counsel face difficult and time-consuming tasks in capital cases, especially in light of the fact that they operate without the resources available to the government.  When a person's life is at stake counsel are required to exhaustively explore every factual and legal aspect of the

-2-

**106**

"defendant's character... and any of the circumstances of the offense..."
***Lockett v. Ohio,*** 438 U.S. 586, 604 (1978), preparing in effect for two
trials.  Moreover, a capital trial is different from all other cases, not just by
degree, but by kind.

The American Bar Association Guidelines for the Appointment and
Performance of Defense Counsel in Death Penalty Cases (Rev. ed. 2003)
established the expectations of the profession concerning the obligations of
counsel in capital cases. If particular Guideline 10.7 states:

A. Counsel at every stage have an obligation to conduct thorough and
independent investigations relating to the issues of both guilt and penalty.

> 1.  The investigation regarding guilt should be conducted regardless
>     of any admission or statement by the client concerning the facts
>     of the alleged crime, or overwhelming evidence of guilt, or any
>     statement by the client that evidence bearing upon guilt is not to
>     be collected or presented.

> 2.  The investigation regarding penalty should be conducted
>     regardless of any statement by the client that evidence bearing
>     upon penalty is not to be collected or presented.

The United States Supreme Court has also been clear about the duties
of capital case counsel to conduct a thorough investigation. ***See e.g.,***
***Rompilla v. Beard,*** __ U.S. __, 125, S. Ct. 2456 (2005)(even when a
capital defendant and his family members have suggested that no mitigating
evidence is available, his lawyer is bound to make reasonable efforts to
obtain and review material that counsel knows the prosecution will probably
rely on as evidence of aggravation at the trial's sentencing phase); ***Wiggins***
***v. Taylor***, 529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to

uncover and present evidence of defendant's "nightmarish childhood," borderline mental retardation, and good conduct in prison).

Following the requirements of a complete and thorough investigation established in ***Wiggins***, the United States Court of Appeals for the Eighth Circuit in ***White v. Roper***, 416 F. 3d 728 (8th Cir. 2005), reversed a death penalty sentence when the defense counsel failed to conduct a complete investigation and identify and call as a witness an individual who would have provided strong testimony of mistaken identity. The Court stated the "presumption of sound trial strategy founders....on the rocks of ignorance, as in ***Wiggins v. Smith***, 539 U.S. 510, 527-28 (2003)." ***Id.*** at 732. Other Circuits agree, and have reversed for failure to conduct an adequate investigation. ***See, e.g. Coleman v. Mitchell***, 268 F.3d 417, 449-51 (6th Cir. 2001) (though counsel's duty to investigate mitigating evidence is well established, counsel failed to investigate and present evidence that defendant had been abandoned as an infant in a garbage can by his mentally ill mother, was raised in a brothel run by his grandmother where he was exposed to group sex, bestiality and pedophilia, and suffered from probable brain damage and borderline personality disorder); ***Jermyn v. Horn***, 266 F. 3d 257, 307-08 (3d Cir. 2001) (counsel ineffective for failing to investigate and present evidence of defendant's abusive childhood and "psychiatric testimony

-4-

**108**

explaining how Jermyn's development was thwarted by the torture and psychological abuse he suffered as a child"); *Caro v. Woodford,* 280 F. 3d 1247, 1255 (9th Cir. 2002), *cert. denied*, 122 S. Ct. 2645 (2002) (counsel ineffective for failing to investigate and present evidence of client's brain damage due to prolonged pesticide exposure and repeated head injuries, and failing to present testimony explaining "the effects of the severe physical, emotional, and psychological abuse to which Caro was subjected as a child").

Here, counsel have tried to be diligent in attempting to fulfill their responsibilities as outlined by the ABA, standards which the United States Supreme Court "long...[has] referred as 'guides to determining what is reasonable.'" *Wiggins v. Smith*, 123 S.Ct. 2527, 2537 (2003). These Guidelines upgrade the minimum standard from "quality" legal representation to "high quality" legal representation. *See, American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* 31 *Hofstra L. Rev.* 913, 939 (2003) (outlining the 2003 revisions to the Guidelines). Included in the guidelines is the requirement that the capital defendant "receive the assistance of all expert, investigative, and other ancillary professional services...appropriate...at all sates of the proceeding." *Id.* at 952.

-5-

**109**

Capital cases are fundamentally different than any other criminal case, not only in the severity of the potential penalty but in the nature of the evidence and information which must be developed.  Sensitive facts need to be disclosed to members of the defense team who are essentially strangers to the defendant.  This takes months.

In the community for ABA Guideline 6.1 at page 967 it states that:

> studies have consistently found that defending capital cases takes vastly more time and effort by counsel than non-capital matters.  One study found that defense attorneys in federal capital cases bill for over twelve times as many hours as non-capital homicide cases.  Recent studies indicate that several thousand hours are typically required to provide appropriate representation.

ABA Guideline 10.7 which deals with the investigation required in defense of a capital case states that:

> counsel at every stage have an obligation to conduct thorough and independent investigations relating to both guilt and penalty.

The commentary for guideline 10.7 elaborates on the requirements of investigation to include, ..."intergenerational medical records, employment records, educational history, military service, family history and social history".Then evaluation by relevant experts must follow.  It is an incrementally slow process.

-6-

**110**

[R]ecently, in **Wiggins v. Smith**, [539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (1993)] the Court declared that counsel's failure to fully investigate Wiggins' background and present mitigating evidence of his unfortunate 'excruciating life history' violated his Sixth Amendment right to counsel. The Court, citing **Williams v. Taylor**, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) and its language on prevailing norms for thorough penalty phase investigation, including those reflected in ABA standards and guidelines, found that counsel's actions could not be construed as strategic as counsel had failed to conduct a thorough social history investigation. The actions of counsel could not, according to the Court, be deemed reasonable as facts known to counsel at the time would have led "a reasonable attorney to investigate further."

These decisions clarify the responsibilities of counsel in a capital case, particularly as it relates to preparation for and presentation in the penalty phase. In addition to the usual requirements for trying a difficult homicide case, counsel in a capital case is required, pursuant to the revised Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, to thoroughly investigate the background and circumstances of the client in order to prepare a case for the penalty phase. Given the severity and irrevocability of a death sentence, extraordinary obligations are properly placed on counsel to prepare and try such a case.

J. Miller, **The Defense Team in Capital Cases, 31 Hofstra L. Rev.** 1117, 1119-1120 (2003)

Without adequate time to develop the relationship of trust required for effective representation in a capital case, counsel may never learn or be able to present the most crucial facts about the defendant, facts without which any possible understanding of his actions is impossible.

In **Ungar v. Sarafite**, 378 U.S. 575 (1964) the Supreme Court explained:

-7-

**111**

"The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. **Avery v. Alabama**, 308 U.S. 444. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. **Chandler v. Fretag**, 348 U.S. 3. There is no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. **Nilva v. United States**, 352 U.S. 385; **Torres v. United States**, 270 F. 2d 252 (C.A. 9th Cir.); **cf. United States v. Arlen,** 252 F. 2d 491 (C.A. 2d Cir.)."

**Sarafite**, 378 U.S. 598-90.

Consistent with the Supreme Court's decision in **Sarafite**, other federal courts have held that the denial of a motion for continuance raises constitutional concerns "if there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." **United States v. Gallo**, 763 F. 2d 1504, 1523 (6th Cir. 1985) (citation omitted), **cert. denied,** 474 U.S. 1068 (1986). **See, e.g., United States v. King**, 664 F 2d 1171, 1173 (10th Cir. 1981); **United States v. Verderame.** 51 F.3d 249 (11th Cir. 1995); **see also, United States v. Poston**, 902 F. 2d 90, 96 (D.C. Cir. 1990) (denial of a continuance to allow new counsel to prepare implicates the Sixth Amendment right to counsel).

-8-

**112**

Here, undersigned are of the firm belief that to require the defendant to proceed to trial on June 30, 2009, will deprive the defendant of his constitutional right to the effective assistance of counsel as mandated by both the Constitution of the United States and the pronouncements of the Supreme Court of the United States regarding representation in capital cases.

### III.   The Defendant Requests an Order Continuing This Case

Given these obligations and duties, we are bound to request more time because our failure to secure adequate time to perform the minimally required functions of counsel would result in providing ineffective counsel. Therefore, we respectfully request that the Court take note that we cannot be adequately prepared to try this case on June 30, 2009, and continue the matter out six (6) months to an appropriate date in October.

### IV.   Factual Background

David Runyon was arrested on state charges in West Virginia on December 12, 2007. He was indicted on federal charges on February 13, 2008. Defendant Runyon received notice that the United States would seek the death penalty in July, 2008. The case was set for trial on March 13, 2009, and counsel diligently set out investigating and preparing the matter for trial. Defendant was represented by Lawrence Woodward

-9-

113

and Jon Babineau.   Counsel decided to divide the labor so that Woodward would have primary responsibility for the guilt/innocence phase and Babineau would be primarily responsible for the penalty phase.

A mitigation expert and investigator were retained to assist in preparation. Investigation into Defendant Runyon's past was difficult from the beginning.  At the time of the alleged crime he was living in a trailer park in Morgantown, West Virginia.  He had absolutely no ties to the local community and none of the potential mitigation evidence/witnesses was in this area.

Runyon's mother and adoptive father live in Richland, Missouri.  His mother, Suk Cha Runyon is a refugee from the Korean War who found her way out of North Korea through some remarkable circumstances, married an American serviceman and came to the United States.  She had a difficult pregnancy with David and she and David suffered physical and emotional abuse at the hands of her husband, David's father.   She divorced this man and later married another serviceman who adopted David.

David spent his whole juvenile life as a military dependant which caused him to have to relocate frequently.  He lived in Texas two different times, Panama, Germany, Missouri, Korea and Fort Belvoir, Virginia.  Of

-10-

course this means his school and medical records are spread far and wide and people with whom he was associated during his formative years are likewise spread out, difficult to locate and inconvenient and expensive to contact and interview.

After high school David Runyon went to Wentworth Military Academy in Missouri. After graduation he moved to Wichita, Kansas, where he held several different jobs including being a member of the National Guard. He joined the army, met and married his wife, Maria and they moved with the army to Ft. Lee, Virginia, for a short time. From there he was ordered to Ft. Benning, Georgia.

When he left the army he took some law enforcement classes and was on the Fayetteville Police Department for a short period. In 1998, he moved back to Wichita, Kansas, where he held several jobs until 2001 when he moved to Missouri where he held several jobs. In 2003, he moved to Morgantown, West Virginia, where he lived until the time of his arrest.

From this brief listing of the locations where David Runyon has lived it is easy to see that this is not the typical case as far as investigating possible mitigating evidence for the penalty phase of the trial.

-11-

Attached hereto as exhibit "1"[1] is the current status of the identified records that have been requested. Of particular concern is the lack of any medical records for defendant and his mother. Also not yet received are the military records of defendant's birth father which should contain information about the physical abuse of defendant and his mother. These records are absolutely necessary before defense experts on mental health can perform testing and render opinions.

Attached as exhibit "2"[2] is a list with the current status of contact with known possible mitigation witnesses. Because of the distance all of these witnesses are from the Tidewater area, investigation of their location has taken time and is continuing.

## V.    Conflict of Babineau

Very late in the case Counsel Babineau developed a conflict when a co-defendant in this case was placed in proximity to a client Babineau represented who was unrelated to this matter. The co-defendant talked to Babineau's client about this case. Babineau's client told him of the situation and Babineau immediately requested the two be separated. Unfortunately it took some time for that to occur and Babineau had a

---

[1] Ex parte motion, ex parte order, and exhibit "1" submitted under seal

[2] Ex parte motion, ex parte order, and exhibit "2" submitted under seal

-12-

**116**

conflict which caused him to request to be relieved in this case. That occurred on February 13, 2009. Stephen Hudgins was appointed to replace Babineau on February 18, 2009.

At that point the case was scheduled for trial on March 13, 2009. Of course, Hudgins could not be prepared to try the case in less than a month but, the case could not have gone forward on that date even if Babineau had not developed the conflict. The mitigation investigation for the penalty phase was not complete and still is not complete at this time.

## VI    Current Status of Mitigation Investigation

Counsel, the mitigation expert and the investigator have been and continue to diligently prepare this matter for trial. Unfortunately several factors cause this to be a very difficult process. The first factor is that the necessary medical records are in the possession of the United States Army or some other branch of the government which makes their timely acquisition impossible. The second factor is the remoteness of all mitigation witnesses and documentation not in possession of the government. Both of these factors are beyond anyone's control and we must just deal with them in the best way we can.

The reality is that it will take more time to investigation and prepare this case. If adequate time is not given, Runyon will not receive the

-13-

effective assistance of counsel.  If the case proceeds to trial on June 30, 2009 that will be the case.

### Conclusion

This request for a continuance of the trial date is not the result of procrastination or a desire for delay on the part of the defense, but for the simple fact that additional time is required in order to insure that defendant receives the effective assistance of competent counsel, as mandated by the Sixth Amendment to the United States Constitution. *See e.g. Powell v. Alabama*, 287 U.S. 45, 58, (1932).

The fundamental concern that drives this request for a resetting of the trial date is the need to provide David Runyon with the degree of legal representation to which he is entitled under our system of law.  That concern is grounded on the proposition that David Runyon must be provided a fair and just trial.  That can only occur if the present trial date is rescheduled and the defense is given a reasonable and adequate time in which to prepare.

In accordance with *Title 18, United States Code,* defendant submits the above stated reasons for this continuance request outweigh the interests of the public and the defendant to a speedy trial under *Title 18, United States Code § 3161 ( c) (1).*

-14-

**118**

WHEREFORE, for the above stated reasons defendant respectfully requests this Honorable Court grant his request for continuance and continue the trial of this case until October of 2009.

DAVID ANTHONY RUNYON

By:_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of April, 2009, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels, Esquire
VSB No. 65898
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
brian.samuels@usdoj.gov

-15-

**119**

Lisa R. McKeel, Esquire
VSB No. 28652
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
lisa.mckeel@usdoj.gov

Lawrence Hunter Woodward, Jr., Esquire
Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
Counsel for David Anthony Runyon
4525 South Boulevard, Suite 300
Virginia Beach VA 23452
Telephone: 757.671.6047
Telefax: 757.671.6004
lwoodward@srgslaw.com

Larry M. Dash, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
150 Boush Street, Suite 403
Norfolk, VA 23510
larrydash@fd.org

Paul G. Gill, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
830 E. Main Street, Suite 1100
Richmond, VA 23219
paulgill@fd.org

Jeffrey A. Swartz, Esquire
Rabinowitz, Swartz, Taliaferro, Swartz & Goodove
Counsel for Catherina Rose Voss
150 Boush Street, Suite 800
Norfolk, VA 23510
jswartz@rstsg.com

-16-

James S. Ellenson, Esquire
Law Office of James Stephen Ellenson
Counsel for Michael Anthony Eric Draven
Bank of America Building
2600 Washington Avenue, Suite 1000
Newport News, VA 23607
jseatty@aol.com

Timothy G. Clancy, Esquire
Moschel & Clancy, PLLC
Counsel for Michael Anthony Eric Draven
2101 Executive Drive, Third Floor
Tower Box 78
Hampton VA 23666
tclancy@moschelandclancy.com

                                    _____/s/_____
                                    Stephen A. Hudgins, Esquire
                                    VSB No. 20315
                                    Counsel for David Anthony Runyon
                                    Cope & Olson, P.L.C.
                                    11836 Canon Blvd., Suite 100
                                    Newport News, VA 23606
                                    Telephone: 757.596.0316
                                    Telefax: 757.596.5320
                                    shudgins@com.hrcoxmail.com

-17-

**121**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 4:08cr16 |
| | ) | |
| MICHAEL ANTHONY ERIC DRAVEN, | ) | |
| a/k/a "Anthony James Neff" | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAVID ANTHONY RUNYON | ) | |
| | ) | |

## RESPONSE OF UNITED STATES
## TO DEFENDANT RUNYON'S MOTION TO CONTINUE

COMES NOW, the United States of America, by and through its attorneys, Dana J. Boente,

Acting United States Attorney, Lisa R. McKeel and Brian J. Samuels, Assistant United States

Attorneys, and responds to defendant DAVID ANTHONY RUNYON's Motion To Continue.  In

view of the representations made by defendant's counsel as to their inability to provide effective

representation for a June 30, 2009, trial date,[1] and after having considered the numerous legal

authorities cited by the defendant, the United States does not object to the defendant's motion.  The

United States does, however, object to continuing the trial date for defendant MICHAEL

ANTHONY ERIC DRAVEN.  The case against defendant DRAVEN, in which the United States

---

[1]The United States does note that it has provided counsel for defendant RUNYON with
voluminous background materials, including school, employment and military records.  The
United States cannot comment with particularity on the status of yet to be obtained records and
witnesses, as the exhibits containing such information were filed ex parte and under seal.  The
pre-indictment investigation conducted by the United States did not reveal a background of
abuse or hospitalization of the defendant, which appears to serve as the justification for obtaining
certain types of records.

is not seeking the death penalty, does not present the same readiness issues in terms of mitigation

evidence as does the case against defendant RUNYON. As both parties can be prepared to try the

case against defendant DRAVEN on June 30, 2009, the United States will move to sever the trial

in this matter in a separate filing.

Respectfully submitted,

DANA J. BOENTE
ACTING UNITED STATES ATTORNEY

By: _____/s/_____
Lisa R. McKeel
Assistant United States Attorney
Virginia Bar Number: 28652
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: 757/591-4000
Fax: 757/591-0866
Email: Lisa.McKeel@usdoj.gov

By: _____/s/_____
Brian J. Samuels
Assistant United States Attorney
Virginia Bar Number: 65898
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: 757/591-4000
Fax: 757/591-0866
Email: Brian.Samuels@usdoj.gov

2

<u>CERTIFICATE OF SERVICE</u>

     I HEREBY CERTIFY that a true copy of the foregoing Response of the United States to

Defendant's Motion to Continue was filed electronically using the CM/ECF system, on this 21st

day of April, 2009, which will result in notification to:

     Lawrence Hunter Woodward, Jr., Esquire
     Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
     4525 South Boulevard, Suite 300
     Virginia Beach, Virginia 23452
     Phone: (757) 671-6047
     Fax: (757) 671-6004
     lwoodward@srgslaw.com
     (Counsel for the defendant, David Anthony Runyon)

     Stephen A. Hudgins, Esquire
     Cope & Olson, P.L.C.
     11836 Canon Boulevard, Suite 100
     Newport News, Virginia 23606
     Phone: (757) 696-0316
     Fax: (757) 596-5320
     shudgins@com.hrcoxmail.com
     (Counsel for the defendant, David Anthony Runyon)

     Larry M. Dash, Esquire
     Office of the Federal Public Defender
     150 Boush Street, Suite 403
     Norfolk, VA 23510
     larrydash@fd.org
     (Counsel for the defendant, Catherina Rose Voss)

     Paul G. Gill, Esquire
     Office of the Federal Public Defender
     830 E. Main Street, Suite 1100
     Richmond, VA 23219
     paulgill@fd.org
     (Counsel for the defendant, Catherina Rose Voss)

     Jeffrey A. Swartz, Esquire
     Rabinowitz Swartz Taliaferro Swartz & Goodove
     150 Boush Street, Suite 800
     Norfolk, VA 23510

jswartz@rstsg.com
(Counsel for the defendant, Catherina Rose Voss)

James Stephen Ellenson, Esquire
Law Office of James Stephen Ellenson
2600 Washington Avenue, Suite 1000
Newport News, VA 23607
jseatty@aol.com
(Counsel for the defendant, Michael Anthony Eric Draven)

Timothy Gerard Clancy, Esquire
Moschel, Gallo & Clancy, L.L.C.
2101 Executive Drive
Tower Box 78
Hampton, VA 23666
tclancy@moschelandclancy.com
(Counsel for the defendant, Michael Anthony Eric Draven)

                              _____/s/_____
                              Brian J. Samuels
                              Assistant United States Attorney
                              Virginia Bar Number: 65898
                              Attorney for the United States
                              United States Attorney's Office
                              Fountain Plaza Three, Suite 300
                              721 Lakefront Commons
                              Newport News, Virginia 23606
                              Phone: 757/591-4000
                              Fax: 757/591-0866
                              Email: Brian.Samuels@usdoj.gov

4

**125**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES OF AMERICA,

     v.                             Criminal No. 4:08cr16

MICHAEL ANTHONY ERIC DRAVEN

     and

DAVID ANTHONY RUNYON,

               Defendants.

**ORDER**

This matter comes before the court on two pending motions: (1) defendant David Anthony Runyon's Motion to Continue Trial Date; and (2) the United States' Motion to Sever Trial.

I.  **Motion to Continue**

On April 13, 2009, counsel for defendant David Anthony Runyon ("Runyon") moved the court to continue the trial in this case. Defendant Michael Anthony Eric Draven ("Draven") responded to the motion on April 17, 2009, and noted no objection. On April 21, 2009, the United States filed a response indicating that, as to Runyon, it did not object to a continuance, but that it did object to continuing Draven's trial date. That same day the United States filed a motion to sever the trials of Draven and Runyon.[1]

---

[1] The government's Motion to Sever is discussed below. See infra Part II.

### A.   Defendant Runyon's Position

On behalf of Runyon, defense counsel Lawrence H. Woodward, Jr. ("Woodward") and Stephen A. Hudgins ("Hudgins") move the court to continue trial in this matter for several months.   Counsel seek additional time to complete "necessary investigation, discovery and defense scientific testing . . ." (Mot. to Continue 1.)   Notably, counsel's argument, and the exhibits submitted in support of their motion,[2] focus entirely on appropriate preparation for the penalty phases of this trial, not the guilt/innocence phase.[3]

As explained in their motion, defense counsel have divided the labor in this case.   Woodward, who has represented Runyon since March 3, 2008, bears "primary responsibility for the guilt/innocence phase of the trial." (Id. 10.)   Hudgins is primarily responsible for the penalty phases, as was his predecessor Jon M. Babineau.[4]   Defense

---

[2]  Counsel submitted two ex parte exhibits in support of their motion to continue.   The court granted counsel's motion to seal these exhibits on April 28, 2009.

[3]  As explained in the court's December 9, 2008, Order, trial in this matter will proceed in three phases.   In the first phase ("merits" or "guilt/innocence" phase), the jury will deliberate on the defendants' guilt or innocence of the charged offenses.   Should defendant Runyon be found guilty, a second phase ("eligibility" phase), will be held wherein the jury will determine whether the government has proven, beyond a reasonable doubt, the mental state factors and the statutory aggravating factors required to impose the death penalty.   Finally, in the third ("selection" phase), the jury will decide on the nonstatutory aggravating factors and the mitigating factors, undertake the process of weighing these factors, and determine the appropriate sentence.

[4]  Mr. Hudgins was appointed to represent defendant Runyon on February 18, 2009, after attorney Jon M. Babineau ("Babineau"),

2

counsel assert that "the mitigation investigation for the penalty phase[s]" is not complete, and that counsel require additional time to investigate and prepare. (<u>Id.</u> 13.) In support of their request, counsel aver that Runyon has lived in varied locales, making it difficult to contact and interview mitigation witnesses. Additionally, both Runyon and his biological father were members of the armed forces. As such, the United States government has many relevant medical and military records, and the defense team has had difficulty obtaining them in a timely manner. (<u>Id.</u> 12.)

Counsel never claim that more time is needed to prepare for the guilt/innocence phase of trial, but rather boldly assert that they will require six additional months from the current trial date of June 30, 2009, to perform the "minimally required functions of counsel." (<u>Id.</u> 9.)[5] No reasons are then given other than the need

---

appointed March 4, 2008, developed a conflict of interest. However, Babineau had performed and billed for considerable time and services relating to the penalty phases of this trial prior to any conflict of interest and withdrawal as Runyon's counsel. When Babineau withdrew, he had been paid for considerable legal services, in addition to significant payments having been made for various investigative and expert services on behalf of Runyon, relating to the penalty phases of the proceedings. All payments, and supporting documentation, are a matter of record in this case and are subject to disclosure under the provisions of 18 U.S.C. § 3006A(d)(4). All of Babineau's research and legal work was shared throughout with co-counsel Woodward, and then passed on to Hudgins.

[5] Such an assertion defies the record of the legal and investigative services itemized and claimed to have been rendered to date, and which have been carefully reviewed by the court before reimbursement was authorized by court order. See <u>supra</u> note 4 and <u>infra</u> note 10 and accompanying text.

3

for more preparation of the mitigation evidence for the penalty phases. (Id. 10-13.) "The mitigation investigation for the penalty phase was not complete [on Babineau's withdrawal] and still is not complete at this time." (Id.) Defense counsel then conclude that a continuance is necessary in order that they be "given a reasonable and adequate time in which to prepare." (Id. 14.) All of the reasons given preceding this conclusion relate to preparation for the penalty phases.[6]

## B. Position of Defendant Draven and the United States

Draven does not object a continuance, nor does the United States with respect to the trial of defendant Runyon. The United States does, however, object to continuing the trial date for defendant Draven, because Draven's case "does not present the same readiness issues in terms of mitigation evidence as does the case against

---

[6] The reasons detail the widespread locations for witnesses and records, and the difficulties attendant thereto in accessing them. Specifically, counsel assert that at the time of the alleged crime, Runyon was living in a trailer park in West Virginia, a community to which he had no ties, and where "none of the potential mitigation evidence/witnesses was" located. (Mot. to Continue 10.) Further, counsel note that Runyon was raised in a military family and lived across the globe, making location of pertinent records and interview of mitigation witnesses difficult. (Id. 11.) Counsel also explain that, in Runyon's adult life, he has lived and worked in many locations across the United States. (Id.) From the wide range of places Runyon has lived and worked, counsel assert that "this is not the typical case as far as investigating possible mitigating evidence for the penalty phase[s] of the trial" (Id.) and that the difficulty obtaining pertinent government records, (Id. 12), combined with the "remoteness" of other mitigation witnesses and documentation, have rendered the mitigation investigation a "very difficult process." (Id. 13.)

4

defendant Runyon" for purposes of any potential penalty phases.[7] (U.S. Response 2.) As such, the United States has moved to sever the two cases. See infra Part II.

### C. Law and Analysis

Trial courts are granted "broad discretion" on matters of continuances and "only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." Morris v. Slappy, 461 U.S. 1, 11-12 (internal quotation marks and citation omitted). There are "no mechanical tests" a trial court must employ when deciding whether continuance is appropriate, rather "[t]he answer must be found in the circumstances present . . . particularly in the reasons presented to the trial judge at the time the request" is made. Ungar v. Sarafite, 376 U.S. 575, 589 (1964). The difficulty inherent in scheduling trials places a burden on trial judges that, "except for compelling reasons," counsels against continuances. Morris, 461 U.S. at 12; see also United States v. Hutchison, 352 F.2d 404, 405 (4th Cir. 1965) (granting a continuance is a matter within the sound discretion of trial judge; reasonable latitude must be

---

[7] As the United States has not sought the death penalty for defendant Draven, he will not be sentenced pursuant to the procedures outlined in the Federal Death Penalty Act. 18 U.S.C. § 3593(b) (outlining procedures for sentencing hearing of defendants for whom the United States has noticed its intent to seek the death penalty). Thus, no penalty phase hearings are required and, if Draven is found guilty, he will be sentenced by the court.

allowed).

Defense counsel assert that Runyon's Sixth Amendment right to counsel will be violated unless they have more time to prepare. "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise prepare for trial violates a defendant's Sixth Amendment right to counsel." Morris, 461 U.S. at 12. Even if a defendant is unable to offer evidence or is compelled to defend without counsel, not every denial of a request for more time violates the Constitution. Ungar, 376 U.S. at 589. Further, although the court recognizes that defense counsel have significant and time-consuming obligations, it need not afford additional time for preparation at the cost of delaying the prompt disposition of criminal cases. See, e.g., United States v. Stewart, 256 F.3d 231, 245 (4th Cir. 2001) (denial of motion to continue does not violate defendant's Sixth Amendment right to effective assistance of counsel where counsel had over six weeks to prepare and court sought to accommodate the interests of the public and defendants in a reasonably speedy trial).

A party seeking a continuance must show that a delay is necessary for just determination of the case. United States v. Clinger, 681 F.2d 221, 223 (4th Cir. 1982). Based upon the grounds presented, the court does not find that a continuance is warranted with respect to the guilt/innocence phase of this trial, in which the jury selection is not scheduled to begin for almost eight weeks.

6

**131**

Counsel have not alleged that they have been unable to prepare adequately to defend Runyon in this first phase, nor can the court find any reason that this representation would be in any way deficient. Indeed, since defendant Runyon has enjoyed uninterrupted representation by Woodward for over fourteen months, and Woodward has the primary responsibility for the guilt/innocence phase of this trial,[8] the court can comprehend no reason that additional time to prepare for the guilt/innocence phase would be needed.[9]

Additionally, this is the second time that Runyon has moved for a continuance of this trial. On March 13, 2009, the court held a hearing on the motion. At that time, counsel for all parties assured the court that they would be prepared and ready for trial by June 30, 2009, including Woodward __and__ Hudgins. While the court understands that Hudgins -- newly appointed at the time of that hearing -- might not have understood the full scope of the penalty-phase work for which he was responsible, Woodward, who had represented Runyon for

---

[8] As specifically stated in their motion, "[c]ounsel decided to divide the labor so that Woodward would have primary responsibility for the guilt/innocence phase and Babineau would be primarily responsible for the penalty phase." (Mot. to Continue 10.) Hudgins was appointed to replace Babineau. See __supra__ note 4 and accompanying text.

[9] Moreover, the facts and preparation for the guilt/innocence phase of this trial are no more protracted or complicated than other criminal conspiracy trials. In fact, under the allegations of the indictment, there are only three co-conspirators/defendants, one of whom, Catherina Rose Voss, has already pleaded guilty and been sentenced. Also, the defense attorneys are all clearly among the most experienced criminal practitioners in this court.

7

over a year at that time, was surely aware of defense counsel's preparedness for the guilt/innocence phase of the case.[10]

With respect to the penalty portions of this trial, if such phases are even needed, the court will consider continuing them as appropriate following the guilt/innocence phase. While the Federal Death Penalty Act requires penalty phase hearings to be held "before the jury that determined the defendant's guilt," 18 U.S.C. § 3593(b)(1), it does not specify the time frame in which such hearings must take place. The jury, with appropriate cautionary instructions, may be reconvened at a later time to conduct any necessary penalty phases, if a continuance to complete preparation for those phases is deemed necessary.[11]

**D.   Conclusion**

Defendant Runyon's Motion to Continue is **DENIED** as to the guilt/innocence phase of the trial, which will go forward as scheduled, with jury selection to begin on June 30, 2009. Should penalty phases be required for Runyon, based on the outcome of the

---

[10]  See supra notes 8 and 9 and accompanying text. The court further notes that Woodward has been paid for considerable legal services relating to the guilt/innocence phase of the proceedings. All payments, and supporting documentation, are a matter of record in this case and are subject to disclosure under the provisions of 18 U.S.C. § 3006A(d)(4).

[11]  See generally United States v. Stitt, 552 F.3d 345, 352 (4th Cir. 2008), rev'g and remanding, 475 F. Supp. 2d 571 (E.D. Va. 2007) (citing the mandate of 18 U.S.C. § 3593(b) to conduct penalty hearings before the jury that determined the defendant's guilt, as applied to a case in which defendant was found guilty during a trial that took place in 1998).

8

**133**

guilt/innocence phase, counsel may renew the motion for a continuance at that time.[12]

## II. **Motion to Sever**

On April 21, 2009, the United States filed a motion to sever the trials of Runyon and Draven. Responding on April 23, 2009, Runyon indicated that he did not oppose severance. On April 24, 2009, however, defendant Draven responded in opposition to the motion.

This court has considered severing the trial once before. On August 28, 2008, Runyon filed a motion to sever his trial from that of Draven, and raised two arguments in support of severance. First, Runyon claimed that a joint trial would violate his rights under the Confrontation Clause of the Sixth Amendment because the United States planned to introduce at trial certain custodial statements made by Draven that inculpate Runyon. Second, Runyon argued that a joint trial would violate his Fifth Amendment due process rights. While defendant Draven did not oppose a severance, the United States did. In its opposition, filed September 28, 2008, the government represented that it would not seek to introduce in its case-in-chief the post-arrest confession made by Draven to law enforcement officers.

---

[12] As described above, trial will be conducted in three phases. See supra note 3 and accompanying text. The court may consider continuing the latter two phases, applicable only to death penalty-eligible defendants such as Runyon, if the result of the guilt/innocence phase so requires, and the parties make an appropriate showing of need for a continuance at that time.

9

During a hearing held December 8, 2008, the court addressed Runyon's motion to sever. On the evidence before it, the court found insufficient grounds to warrant separate trials. Additionally, the court noted that the United States' representation that it would not introduce Draven's statement, coupled with any necessary limiting instructions to the jury, would be sufficient to avoid any potential Confrontation Clause issues. Finally, the court did not find any Fifth Amendment problems in holding a joint trial. The court denied Runyon's motion to sever from the bench on December 8, 2008, and memorialized its ruling in an order filed the next day.

**A. The United States' Position**

Despite it opposition to Runyon's motion to sever last fall, the United States contends that severance is now warranted. The government argues that the interests of the public, the government, and defendant Draven outweigh an interest in the economy of a joint trial. (Mot. to Sever 5.) Asserting that the "benefits of efficiency and consistency inherent in a joint trial" are overcome by the "strong interest in bringing finality to this case and the crime it involves," the United States seeks to sever the trials of Runyon and Draven. (Id. 4, 6.) The court notes that the government's motion is premised upon the court granting such a continuance. This premise is incorrect. See supra Part I.D. Moreover, Draven now objects to any severance. See infra Part II.B.

10

**135**

### B.    Defendant Draven's Objection

Defendant Draven objects to a severance on several grounds. Importantly, Draven's counsel argue that the posture of his case has changed dramatically based on the United States' representations in its opposition last fall, 2008, to Runyon's motion to sever.

As outlined above, in response to Runyon's motion to sever, the government represented that it would not seek to introduce, during its case-in-chief, the post-arrest confession made by Draven to law enforcement officers. This concession "rendered moot" a Motion to Suppress such statement previously made by Draven's defense counsel.[13] For the past seven months, counsel have relied on the government's representation that it would not seek to use this statement against Draven and, as a result, have significantly altered their defense preparation and trial strategy. If severance is granted, defense counsel will be required to pursue the Motion to Suppress anew, and to request a hearing on the same. (Draven Response 3.)[14]

### C.    Law and Analysis

"There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506

---

[13]  Draven filed this Motion to Suppress on September 3, 2008. The United States responded to this motion on September 23, 2008, and noted that "in order to facilitate one trial of this matter," it would not use this statement in its case-in-chief. (U.S. Response to Draven Mot. to Suppress 1.)

[14]  Alternatively, if severance is granted, Draven argues that the government should be estopped from introducing this statement in its case-in-chief. (Draven Response 3.)

11

U.S. 534, 537 (1993). Such joint trials promote efficiency and serve the interests of justice by avoiding inconsistent verdicts. <u>Id.</u>, quoting <u>Richardson v. Marsh</u>, 481 U.S. 200, 210 (1987).

Federal Rule of Criminal Procedure 14(a) contemplates severance of defendants charged in the same indictment if consolidation "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a); <u>accord</u> <u>United States v. Brugman</u>, 655 F.2d 540, 542 (4th Cir. 1981) ("Barring special circumstances, individuals indicted together should be tried together."). Severance of properly-joined defendants is appropriate only if there is "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." <u>Zafiro</u>, 506 U.S. at 539 (further noting that the Federal Rules of Criminal Procedure concerning severance and joinder are designed to promote economy and efficiency, and to avoid multiplicity of trials). Severance is a matter within the sound discretion of the trial court. <u>United States v. Spitler</u>, 800 F.2d 1267, 1271 (4th Cir. 1986).

The court finds no reason to sever the trials of Draven and Runyon. All of the reasons previously articulated by the court on December 8, 2008, still apply; and no new, meritorious reason to justify severance has been offered by the United States. It is a waste of judicial and public resources to hold two trials in this matter involving a conspiracy to commit murder-for-hire and robbery

affecting commerce. As the United States acknowledges: "[A] severance could well result in two trials with largely the same evidence." (Mot. to Sever 6.) Additionally, the court finds that severance would work severe prejudice on Draven, as it would yet again significantly alter his counsel's preparation and trial strategy. Neither defendant in this case seeks severance at this juncture. Finally, the government's primary concern, with which this court agrees -- the strong interest in bringing finality to this case and the crime it involves -- is no longer at issue, since the court has denied Runyon's Motion to Continue. See supra Part I.D.

**D.   Conclusion**

In denying the prior motion to sever trial, the court relied on the well-established principles of joinder and severance outlined above, as well the representations of the parties. These same principles, together with the above reasons, compel the court to deny this second motion for severance, now filed by the United States. Thus, the United States's Motion to Sever Trial is **DENIED**.

-------------------

The Clerk shall forward a copy of this Order to counsel for the parties.

IT IS SO ORDERED.

/s/
Rebecca Beach Smith
United States District Judge

Rebecca Beach Smith
United States District Judge

Norfolk, Virginia
May 7 , 2009

13

**138**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA

    v.                                        Criminal No. 4:08cr16

MICHAEL ANTHONY ERIC DRAVEN
a/k/a ANTHONY JAMES NEFF

and

DAVID ANTHONY RUNYON,

            Defendants.

## JUROR QUESTIONNAIRE ORDER

General Information

    You are being considered for jury duty in a criminal case.  This questionnaire is designed to obtain information about your background as it is related to your service as a juror in this case, and the use of this questionnaire will substantially shorten the jury selection process.  The purpose of these questions is to determine whether prospective jurors can impartially decide this case based upon the evidence at trial and the instructions on the law given by the presiding judge.  The questions are not intended to unnecessarily inquire into personal matters.  **All information obtained in this questionnaire will be kept confidential and under seal.**

Instructions

    Please answer each question to the best of your ability.  If you do not know the answer to a question, please write "I don't know."

**139**

If the question does not apply to you, please write "N/A." **Do not leave any question blank.** The answers to these questions must be yours alone. As such, **do not discuss any of these questions or your answers with anyone else,** including your family, friends, and other prospective jurors.

Please keep in mind that there are no "right" or "wrong" answers, only complete and incomplete answers. If you need more space for your responses or wish to make further comments regarding any of your answers, please use the Explanation Sheets at the end of the questionnaire. Put the number of the question you are answering on the Explanation Sheet before you write the response or comment. Remember, **you are sworn to give true and complete answers to all questions.**

The questions contained in this questionnaire are intended only to provide the court and the parties with information about you and your views. Unless the question states otherwise, the fact that a particular question is asked does not imply that the subject matter of the question is an issue in this case. As you read the questions, you are not to draw any inferences about the issues that must be decided in this case. **You must not conduct any individual investigation or research pending final selection of the jury and, if selected, until further order of this court.**

2

**140**

Please print or write legibly and be sure to put your juror number on each page. When you have finished answering the questionnaire, you must sign it, under penalty of perjury, on the last page. By signing this page, you are affirming the accuracy of your answers.

Once you complete your questionnaire, your service with the court is done for today. After 6:00 p.m. on Thursday, June 25, 2009, you must call the automated juror service line at **(866) 224-9867**. Please have your juror number ready when you call. The automated message will indicate whether or not you are summoned to report for jury duty on **Tuesday, June 30, 2009.**

Thank you for your cooperation.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
**United States District Judge**

UNITED STATES DISTRICT JUDGE

Attachment: Questionnaire (19 pages)

3

**141**

**QUESTIONNAIRE**

Personal Background

1.   Name: _____

     Age: _____ Sex: _____ Race: _____

     Birthplace: _____

2.   Address: _____

     Home Phone: _____ Business Phone: _____

3.   How long have you lived at this address? _____

4.   If you have lived at this address for fewer than five years,

     indicate your prior address: _____

     _____

5.   What is your current marital status? _____

6.   Check the highest level of education for you and your spouse:

                                             <u>You</u>              <u>Spouse</u>

     a)    Elementary school or less      _____         _____
     b)    Some high school               _____         _____
     c)    High school graduate           _____         _____
     d)    Technical or business school   _____         _____
     e)    Some college                   _____         _____
     f)    College degree                 _____         _____
     g)    Graduate work or degree        _____         _____

     If you attended college, or received a graduate degree, identify

     all colleges and graduate schools you attended.  Also identify

     your major field of study and any degrees received.

     _____

     _____

7.   Please provide the following information about your children, if
     any:

          <u>Age</u>                <u>Sex</u>                <u>School or Occupation</u>
     1)  _____

                              1          Juror Number: _____

**142**

2) _____

3) _____

4) _____

5) _____

8.   What special training or skills do you have? _____

_____

List any professional licenses you hold or have held: _____

_____

9.   What is your present occupation? _____
     If you are currently unemployed or retired, please list your
     jobs or positions for the past five years and skip to question
     13. _____

_____

_____

10.  Name and address of current employer: _____

_____

11.  Describe your current job.  What do you do? _____

_____

_____

_____

12.  If you have been at your current job for less than five years,
     list previous employment for the past five years.

_____

_____

_____

_____

13.  Spouse's present occupation: _____

14.  Name and address of spouse's employer: _____

_____

2        Juror Number: _____

**143**

15.  Spouse's occupations in the past five years, if different from
     above: _____

     _____

     _____

16.  What is or was your father's occupation?

     _____

17.  What is or was your mother's occupation?

     _____

18.  Please provide the following information about your brothers and
     sisters, if any:

     | Age | Sex | School or Occupation |
     |-----|-----|----------------------|
     | 1)  |     |                      |
     | 2)  |     |                      |
     | 3)  |     |                      |
     | 4)  |     |                      |
     | 5)  |     |                      |

Military and Law Enforcement

19.  Have you ever served in the military? _____ If so, please give
     the following information:         Branch: _____
     Years of service: _____  Rank at discharge: _____
     Dates of service: _____
     List each place you were stationed: _____

     _____

     _____

     Combat experience: _____

     _____

20.  Has your spouse ever served in the military? _____ If so, please
     give the following information:      Branch: _____
     Years of service: _____  Rank at discharge: _____
     Dates of service: _____
     List each place your spouse was stationed: _____

     _____

                         3        Juror Number: _____

_____

_____

Combat experience: _____

21.   Have you ever worked in public or private law enforcement?
      Yes _____   No _____

22.   If you have worked in law enforcement, please answer the
      following:
      a)   Agency (e.g., FBI, Newport News Police Department):

      _____

      b)   Job Title:

      _____

      c)   Dates of service:

      _____

      d)   Your current status:

      _____

23.   Has an immediate family member ever worked in public or private
      law enforcement?  Yes _____   No _____

24.   If yes, please provide the following information:
      a)   Family member and relationship:

      _____

      b)   Agency (e.g., FBI, Newport News Police Department):

      _____

      c)   Job Title:

      _____

      d)   Dates of service:

      _____

      e)   Their current status:

      _____

25.   A number of the witnesses at trial may be members of the Newport
      News Police Department; Alcohol, Tobacco and Firearms (ATF); the

                        4        Juror Number: _____

Naval Criminal Investigative Service (NCIS); and other law enforcement agencies. The Judge will instruct you to consider and evaluate those persons' testimony just as you consider every witness' testimony. Can you follow this instruction?

Yes _____   No _____   If no, please explain:

_____

_____

_____

## Legal and Jury Experience

26. Have you ever been involved in a lawsuit?  Yes _____   No _____

    How many lawsuits have you been involved in? _____

    Were you the plaintiff, the defendant, or a witness?

    _____

    What was the nature and outcome of the lawsuit(s) (e.g., car accident, suit to collect money, etc.) _____

    _____

    Were you satisfied with the outcome?  Yes _____   No _____

27. Have you served as a juror in the past?  Yes _____   No _____

    If yes, how many times have you served? _____

    How long ago? _____

    How many cases were criminal? _____ Civil? _____

    If criminal, generally describe the type of case: _____

    _____

    How many were in state court? _____ Federal court? _____

    Did you reach a verdict?  Yes _____   No _____

    Were you the jury foreperson?  Yes _____   No _____

    Did the jury decide the punishment?  Yes _____   No _____

28. Have you served as a grand juror?  Yes _____   No _____

    If yes, how many times have you served? _____

    How long ago? _____

5         Juror Number: _____

**146**

Was it a state grand jury or federal grand jury? _____

Were you the grand jury foreperson?  Yes _____   No _____

29. Would anything about your previous jury service prevent you from serving on a jury now?  Yes _____   No _____.  If yes, please explain:_____

_____

_____

30. Have you, or any member of your immediate family, ever worked for, or been associated with, a state or federal prosecutor's office (District Attorney's Office or a United States Attorney's Office)?  Yes _____   No _____.  A Public Defender's Office? Yes _____   No _____.  If yes to either, please indicate who and the position: _____

_____

_____

_____

31. Have you ever worked in a law office?  Yes _____   No _____ If yes, what were your responsibilities: _____

_____

What kind of practice did the lawyer or law office engage in (e.g., criminal, civil, corporate, etc.)? _____

_____

_____

32. Have you, or any member of your immediate family, been the victim of a crime?  Yes _____   No _____. If yes, please describe who and the circumstances of the crime:

_____

_____

33. Have you, or any member of your immediate family, been involved in a crime involving guns or violence?  Yes _____   No _____

6         Juror Number: _____

**147**

If yes, please describe who and the circumstances of the crime:

_____

_____

34. Have you ever been convicted of a felony (a crime carrying punishment of greater than one year imprisonment) or any crime involving dishonesty or fraud?  Yes _____  No _____

If yes, when? _____

If yes, please describe the nature of the crime: _____

_____

_____

## Physical / Medical Conditions

35. Do you have any difficulty reading or writing English?  If yes, please explain: _____

_____

36. Do you have any difficulty in sight or hearing, or do you have any other medical condition, disability, or disease that would make jury service a hardship for you?  If yes, please explain:

_____

_____

37. Are you a smoker?  Yes _____  No _____  If yes, how often do you need to smoke? _____

38. Are you or any of the members of your immediate family currently being treated for a medical illness which would prevent or impair your jury service?  If so, please explain:

_____

_____

_____

## Hobbies, Other Interests, and Media Consumption

39. What newspapers, periodicals, and magazines do you regularly

7       Juror Number: _____

**148**

read? _____

_____

_____

40. What television or radio programs do you regularly watch or
listen? _____

_____

_____

41. How often do you watch television news or listen to radio news?

_____

How often do you read a newspaper?

_____

How often do you get news off the internet?

_____

42. Please list the names of all organizations to which you
currently belong and are actively involved with, including
clubs, unions, societies, fraternal organizations, and
professional organizations. _____

_____

_____

If you hold an office or official position in any of these
organizations, please state the organization and the position.

_____

_____

43. If you do volunteer work, please indicate the organization(s)
for which you volunteer, and describe the services you provide.

_____

_____

_____

44. Do you regularly contribute money or services to any charitable
organization?  If so, please describe: _____

_____

8        Juror Number: _____

**149**

45. What are your hobbies, favorite recreational activities, or pastimes? _____

_____

_____

46. Do you have a religious affiliation?  Yes _____    No _____

If yes, please state the affiliation: _____

_____

47. Have you ever run for or held public office? _____

If yes, please give details: _____

_____

_____

Knowledge of the Case

    The defendants in this case are charged with conspiring to commit the murder-for-hire, and murdering, Cory Allen Voss.  Cory Allen Voss was killed on April 29, 2007, in Newport News, Virginia. This case has received some publicity.

48. Have you seen, heard, or read any press coverage of this case?

Yes _____    No _____

If yes, please summarize the information you recall from that press coverage: _____

_____

_____

_____

If yes, has your exposure to that press coverage left you with any impression about the guilt or innocence of these defendants for the crimes with which they are charged in this case?

Yes _____    No _____  If yes, what are those impressions?

_____

_____

_____

9        Juror Number: _____

**150**

49.  Did / do you have any connection (personal, business, or
social) with the deceased, Cory Allen Voss, or his family?
Yes _____  No _____   If yes, please explain:

_____

_____

_____

50.  Do you know, or have you had any contact (personal, business,
or social), with the defendant, David Anthony Runyon, or his
family? Yes _____  No _____   If yes, please explain:

_____

_____

_____

51.  Do you know, or have you had any contact (personal, business,
or social), with the defendant, Michael Anthony Eric Draven, or
his family? Yes _____  No _____   If yes, please explain:

_____

_____

_____

52.  The Acting United States Attorney for the Eastern District of
Virginia is Dana J. Boente.  Do you know, or have you had any
contact (personal, business, or social), with Mr. Boente?
Yes _____  No _____   If yes, please explain:

_____

_____

53.  In this case, the government will be represented by Assistant
United States Attorneys Lisa McKeel and Brian Samuels,
prosecutors from the Office of the United States Attorney for
the Eastern District of Virginia.  Do you know, or have you had
any contact (personal, business, or social), with Ms. McKeel or
Mr. Samuels?  Yes _____  No _____   If yes, please
explain:_____

10        Juror Number: _____

**151**

_____

_____

54. In this case, David Anthony Runyon is represented by Mr. Lawrence H. Woodward, Jr., and Mr. Stephen Hudgins. Michael Eric Anthony Draven is represented by Mr. Timothy Clancy and Mr. James Ellenson. Do you know, or have you had any contact (personal, business, or social), with any of these attorneys? Yes _____ No _____ If yes, please explain: _____

_____

_____

Capital Punishment

55. At the present time, do you support or oppose the use of the death penalty? Support _____ Oppose _____ Neither support nor oppose the use of the death penalty _____

56. How strongly do you hold your present opinion about the death penalty? Very strongly _____ Moderately _____ Not strongly at all _____

57. Has your opinion about the death penalty changed over time? Yes _____ No _____. If yes, in what way has your opinion changed? _____

_____

_____

_____

58. Do you or a family member belong to any group or organization that takes a position (by lobbying or otherwise) for or against the death penalty? Yes _____ No _____ If yes, describe the group or organization: _____

_____

_____

_____

59. How important would each of the following factors be to you in

11        Juror Number: _____

**152**

making a decision between the death penalty and life in prison without the possibility of release? (Check one answer for each factor.)

|  | Not at all important | A little important | Somewhat important | Very important |
|---|---|---|---|---|
| a)   A defendant given life without the possibility of release will remain in prison for the rest of his/her life. |  |  |  |  |
| b)   Someone who kills another is always a danger to others, even if in prison. |  |  |  |  |
| c)   Even someone who kills can change for the better. |  |  |  |  |
| d)   When you take a life through intentional murder, you forfeit your life. |  |  |  |  |
| e)   It is wrong to take a life, even as punishment. |  |  |  |  |
| f)   The costs of keeping someone in prison. |  |  |  |  |
| g)   A defendant's specific role in the offense. |  |  |  |  |

60.  Would your feelings regarding the death penalty affect your ability to decide in the first part of the trial whether a defendant is guilty or not guilty of the crimes charged?

Yes _____   No _____   If yes, please explain: _____

_____

_____

_____

61.  Which of the following statements most accurately represent(s) the way you feel about the death penalty?  You can circle one or more than one of the choices.

a)    If a person is convicted of murder and the death penalty is requested, I would always vote to impose it, regardless of the facts and the law in the case.

b)    I am strongly in favor of the death penalty, and would have a difficult time voting against it, regardless of the facts of the case.

c)    I generally favor the death penalty, but I would base a decision to impose it on the facts and the law in the case.

d)    I am generally opposed to the death penalty, but I believe I can put aside my feelings against the death penalty and impose it if it is called for by the facts and law in the case.

e)    I feel that my opposition to the death penalty will make it difficult for me as a juror to reach a verdict of guilty or not guilty, despite the facts and law in the case.

f)    I am strongly opposed to the death penalty, and I will have a difficult time voting to impose it, regardless of the facts and the law in the case.

g)    I am personally, morally, or religiously opposed to the death penalty, and would never vote to impose it, regardless of the facts and the law in the case.

Miscellaneous Questions

62.  Do you know, or believe you know, anything about the facts or purported facts of this case, either from the newspaper, television, or other sources?   Yes _____   No _____   If so, what facts or purported facts do you know, or believe you know, and from what source? _____

_____

_____

_____

63.  The jury will be instructed that a defendant is presumed to be innocent throughout the trial and that a defendant cannot be

                          13        Juror Number: _____

**154**

found guilty of any offense unless and until the government has proven each element of the offense against that defendant beyond a reasonable doubt. Would you find it difficult to obey this instruction? Yes _____ No _____ If yes, please explain: _____

_____

_____

_____

64. There are two defendants in this case -- David Anthony Runyon and Michael Anthony Eric Draven. You must make a separate determination of guilt or innocence as to each defendant, based solely upon the evidence presented in the case and the instructions of law given by the court. Can you so assess the guilt or innocence of each defendant individually? Yes _____ No _____ If no, please explain:

_____

_____

_____

65. The jury will be instructed that a defendant in a criminal case has a constitutional right to testify, or not to testify in his own defense; that the burden of proof is always on the government; and that no inference or suggestion of guilt can be drawn against a defendant because he elects not to testify or not to present evidence. Would you find it difficult to obey this instruction? Yes _____ No _____ If yes, please explain: _____

_____

_____

_____

66. Do you know of any reason whatsoever that you cannot sit as a juror in this case and decide it fairly and impartially

14        Juror Number: _____

according to the law?

Yes _____  No _____ If yes, please explain: _____

_____

_____

67.  Attached is a preliminary list of potential witnesses.  Do you
     know, or have you had any contact (personal, business, or
     social), with any of these individuals? Yes _____  No _____
     If yes, please explain: _____

     _____

68.  Is  there  any  additional  information  not  asked  in  this
     questionnaire that you feel the judge or the lawyers should
     know about before you are considered for jury service?

     Yes _____   No _____   If yes, please explain: _____

     _____

     _____

     _____

     _____

**CAUTION**

<u>Reminder</u>:   You  are  under  court  order  not  to  discuss  this
questionnaire, its contents, or this case with anyone, nor are you
permitted to do any research or make any investigation on your own
pending final selection of the jury and, if selected, until order of
the court.

15      Juror Number: _____

**156**

<u>Explanation Sheet</u>

If you need more space for your responses, or wish to make further
comments regarding your answers, please use these Explanation
Sheets.   Be sure to indicate the number of the question you are
answering before you write your response.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

16      Juror Number: _____

**157**

Explanation Sheet, continued.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

17      Juror Number: _____

Explanation Sheet, continued.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

If more space is needed, please request additional blank Explanation
Sheets from the Clerk.  As above, please be sure to include your
Juror Number and the question to which you are responding on each
extra Explanation Sheet.

18      Juror Number: _____

**AFFIRMATION**

I, _____, hereby declare

under penalty of perjury that the foregoing answers set forth in

this Juror Questionnaire are true and correct to the best of my

knowledge and belief.  I have not discussed my answers with others,

or received assistance in completing the questionnaire.  I have

answered all of the above questions in this Juror Questionnaire

myself.

Executed in the United States District Court for the Eastern

District of Virginia, on this _____ day of _____, 2009.


_____

Signature


19      Juror Number: _____

**160**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES OF AMERICA,

v.                                          Criminal No. 4:08cr16-3

DAVID ANTHONY RUNYON,

    Defendant.

### MEMORANDUM ORDER

This matter comes before the court on defendant David Anthony Runyon's "Objections to Proposed Non-Statutory Aggravating Factors in Death Notice," filed May 8, 2009, to which the United States responded on June 1, 2009. Finding defendant's motion both untimely and meritless, the court **DENIES** defendant's motion and **OVERRULES** the objections raised therein.

### I.  Background

Defendant was named in a five-count Indictment, filed February 13, 2008, charging him with: (Count 1) Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a); (Count 2) Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2; (Count 3) Bank Robbery Resulting in Death, in violation 18 U.S.C. §§ 2113(a), (e) and 2; (Count 4) Conspiracy to Commit Robbery Affecting Commerce, in violation of 18 U.S.C. §§ 1951(a); and (Count 5) Murder with a Firearm in Relation to a Crime of Violence, in

violation of 18 U.S.C. §§ 924(j) and 2.[1]  Four of these charges,
Counts One, Two, Three, and Five, are punishable by death.

Pursuant to 18 U.S.C. § 3593(a), the United States filed a  a
Notice of Intent to Seek a Sentence of Death (the "Notice") as to
defendant on July 17, 2008.[2]  The Notice indicated that, in the event
defendant was found guilty of an offense punishable by death, the
United States would first seek to prove four statutory threshold
intent findings enumerated in 18 U.S.C. § 3591(a)(2)(A)-(D).  Next,
the United States would seek to prove two statutory aggravating
factors, set forth at 18 U.S.C. § 3592(c)(8) and (c)(9).  Finally, if
the United States was successful in proving at least one intent
factor and at least one statutory aggravating factor, it would seek
to prove four non-statutory aggravating factors.[3]  See 18 U.S.C.

---

[1]  The indictment also named Catherina Voss and Michael
Anthony Eric Draven as co-defendants.

[2]  The United States did not seek the death penalty as to
defendant Voss or defendant Draven.

[3]  Only if the government establishes one of the § 3591(a)(2)
intent factors and one or more of the statutory aggravating factors
may the jury consider any non-statutory aggravating factors for
which notice has been given.  See 18 U.S.C. § 3593(e).  As outlined
in this court's December 8, 2008, order, trial will proceed in
three phases:  (1) the guilt/innocence phase, (2) the eligibility
phase, and (3) the selection phase.  During the eligibility phase,
the government will seek to prove, beyond a reasonable doubt, at
least one intent factor and at least one statutory aggravating
factor required to impose the death penalty.  If successful, the
selection phase will be held, wherein the jury will consider the
non-statutory aggravating factors and the mitigating factors,
undertake the process of weighing these factors, and determine
sentence.  Defendant's objections here, the non-statutory
aggravating factors, concern only this third phase of trial.

2

§ 3593(a) and (c).   It is these four non-statutory aggravating factors to which defendant objects.   Specifically, the Notice provided that the United States would seek to prove the following non-statutory aggravators as the basis for imposition of the death penalty:

> 1.   The defendant, DAVID ANTHONY RUNYON, caused injury, harm and loss to the victim and the victim's family and friends, as evinced by the victim's personal characteristics and by the impact of his death upon the victim's family, friends and co-workers.

> 2.   The defendant, DAVID ANTHONY RUNYON, utilized education, training and experience that he received in college courses focused on criminal justice, as a law enforcement and correctional officer, as an officer of the Kansas National Guard and as a member of the United States Army to kill Cory Voss.

> 3.   The defendant, DAVID ANTHONY RUNYON, engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend.

> 4.   The defendant, DAVID ANTHONY RUNYON, has demonstrated a lack of remorse for his actions as demonstrated by the evidence in the case after the murder of Cory Allen Voss.

Notice at 3.   Defendant raises objections to each of these four factors and seeks to limit and/or strike each of them.

## II.   Arguments and Analysis

### A.   Defendant's Objections are Untimely

At a threshold level, the court notes that defendant's objections are exceptionally untimely.   The Notice was filed on July 17, 2008, and, at a hearing held that same date, the court ordered all parties to file pretrial motions by September 2, 2008.   Defendant filed numerous pretrial motions, including an omnibus motion to

3

**163**

dismiss the Indictment based on various constitutional challenges to the Federal Death Penalty Act.  See Docket No. 91.  In this omnibus motion, defendant challenged the use of non-statutory aggravating factors by the United States, as well as several other aspects of the death penalty scheme.  The court denied this motion, finding ample support in Fourth Circuit precedent that the use of non-statutory factors was constitutional.  See Docket No. 143.  The court also denied defendant's general motion for leave to file additional motions out of time,[4] noting that defendant must make the requisite demonstration of good cause in order to file additional motions after the motions cut-off date of September 2, 2008.  See Docket No. 112.

Defendant sought no leave of court to submit the instant motion, filed eight months after the deadline, nor has he made any showing of good cause.  Unless a defendant demonstrates good cause for late filings, his failure to raise defenses, objections, or requests by motion constitutes a waiver of said motion.  Fed. R. Crim. P. 12(e) and 45(b).  Not only has defendant failed to demonstrate such good cause, he has not moved the court for leave to file this specific late pleading.

Further, the first phase of trial in this matter is scheduled to commence on June 30, 2009.  Defense counsel has appeared before the

---

[4]  Defendant's Motion for Leave to File Additional Motions, Memoranda, and Exhibits, filed August 28, 2008, argued that, "for good cause shown," the court should allow him an opportunity to file additional motions and memoranda based on discovery received from the government.  See Docket No. 78.

4

**164**

court on numerous occasions since the pretrial motions deadline
passed, and has submitted a substantial number of motions.  Not once
has counsel raised these objections or sought to have them resolved,
and no excuse for this late filing has been offered.  Accordingly,
defendant's motion is **DENIED** as untimely.

**B.   Defendant's Objections are Meritless**

Although the court denies defendant's motion as untimely, it
also notes that the arguments raised therein are without merit.
After an overview of the role non-statutory aggravating factors play
in capital sentencing, the court briefly addresses each of
defendant's objections below.

**1.   Non-Statutory Aggravating Factors Generally**

The Supreme Court has admonished that a capital sentencing
scheme must "genuinely narrow the class of persons eligible for the
death penalty and must reasonably justify the imposition of a more
severe sentence on the defendant compared to others found guilty of
murder." Zant v. Stephens, 462 U.S. 862, 877 (1983); accord Lewis v.
Jeffers, 497 U.S. 764, 776 (1990) ("[A]ggravating circumstances must
be construed to permit the sentencer to make a principled distinction
between those who deserve the death penalty and those who do not.").
Non-statutory aggravating factors come into play if, and only if, the
jury finds the requisite mental intent factor and at least one
statutory aggravating factor beyond a reasonable doubt.  18 U.S.C.
§ 3593(e).  Thus, non-statutory aggravating factors help to ensure

5

that a sentence of death is based up on an individualized consideration of the character of the offender and the circumstances of the offense. <u>Tuilaepa v. California</u>, 512 U.S. 967, 972 (1994); <u>see also</u> <u>Lewis</u>, 497 U.S. at 776 (non-statutory aggravating factors must address whether a defendant merits the death penalty).

To come before the jury, "an aggravating factor cannot be unconstitutionally vague, overbroad, duplicative or irrelevant." <u>United States v. Grande</u>, 353 F. Supp. 2d 623, 630 (E.D. Va. 2005) (collecting cases). The standard for finding a factor to be vague or overbroad is quite stringent. An aggravating factor is vague if it lacks a "common-sense core of meaning" that a jury should be capable of understanding. <u>Tuilaepa</u>, 512 U.S. at 973; <u>accord</u> <u>United States v. Tipton</u>, 90 F.3d 861, 895 (4th Cir. 1996). Vagueness review is "quite deferential" because it "is not susceptible of mathematical precision." <u>Tuilaepa</u>, 512 U.S. at 973 (citation omitted).

A factor is unconstitutionally overbroad if "the sentencer fairly could conclude that an aggravating circumstance applies to <u>every</u> defendant eligible for the death penalty[.]" <u>Arave v. Creech</u>, 507 U.S. 463, 474 (1993); <u>see also</u> <u>Tuilaepa</u>, 512 U.S. at 972 (explaining that a factor "may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder."). With respect to relevance, aggravating factors must assist the sentencer in distinguishing those who deserve capital punishment, and must be sufficiently relevant to the inquiry of who

6

**166**

should live and who should die. <u>Grande</u>, 353 F. Supp. 2d at 631. Finally, aggravating factors that duplicate each other are prohibited, as they raise constitutional concerns. <u>See</u> <u>Tipton</u>, 90 F.3d at 899.

The court must ensure that information regarding aggravating factors to be presented at sentencing is relevant, reliable, and less prejudicial than probative. <u>See</u> 18 U.S.C. § 3593(c); <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978) (death penalty cases require heightened reliability). At the same time, however, the court "should lean in favor of admitting as much information as possible to allow the jury to make an individualized determination of whether the defendant merits the death penalty." <u>United States v. Rivera</u>, 405 F. Supp. 2d 662, 668 (E.D. Va. 2005) (further collecting Supreme Court cases outlining the "inherent tension" in capital cases between reliability and providing the jury with as much information as possible to make an individualized determination).

### 2.  Defendant's Objections

Defendant seeks to limit and/or strike each of the four non-statutory aggravating factors identified in the Notice. Although the court need not reach the merits of each objection, having denied defendant's motion as untimely, the court reviews their contents below.

7

### a.   Factor One:  Victim-Impact Evidence

Defendant objects to the presentation of victim-impact evidence beyond the impact of the murder on the victim's family, and thus seeks to strike all references to the victim's friends and co-workers.  Relying solely on the language of 18 U.S.C. § 3593(A), and the Supreme Court's decision in *Payne v. Tennessee*, 501 U.S. 808 (1991), defendant contends that presentation of this evidence would be inappropriate.   The Court in *Payne* held that there was no constitutional bar to the admission of victim-impact evidence, and emphasized that such evidence "is designed to show . . . each victim's 'uniqueness as an individual human being,' whatever the jury might think the loss to the community resulting from his death might be." *Payne*, 501 U.S. at 823 (citing *Booth v. Maryland*, 482 U.S. 496, 506 n.8 (1987)).  Thus, contrary to defendant's assertion, the *Payne* Court did not limit the victim-impact evidence the jury may consider, and explicitly referenced the impact the loss to the community resulting from the victim's death.

Despite defendant's contention that limitation of victim-impact evidence to the victim's family is "supported by the statute and case law" (Mot. 7), the court can find no such support.  Thus, were the court to rule on this objection, it would find that victim-impact evidence need not be limited to that concerning the victim's family, and would allow this non-statutory aggravating factor to stand as written.

8

**168**

### b.   Factor Two:  Military and Law Enforcement Training

Defendant contends that this factor is vague, overbroad, and not
of sufficient relevance and reliability to meet the standard for
consideration by a sentencing jury.  Because defendant has cited
nothing in support of this argument, and because the court finds that
the factor does not suffer from any of these purported flaws,[5] the
court would overrule defendant's objection.

### c.   Factor Three:  Physical Violence Toward Women

Defendant contends that this factor is vague and overbroad, and
seeks to strike or amend it to be more specific.  Defendant does
acknowledge that the Notice identifies defendant's estranged spouse
and former girlfriend, but contends that the Notice is deficient
because it does not specify any times, places, or acts of abuse.  The
government is not required, however, to detail in the Notice the
specific evidence that will be used to establish the alleged non-
statutory factor.  See United States v. Higgs, 353 F.3d 281, 325 (4th
Cir. 2003) ("The FDPA and the Constitution require that the defendant
receive adequate notice of the aggravating factor . . . not notice of

---

[5]  For instance, with respect to the allegation that this
factor is vague, the court, in its "quite deferential" review,
cannot conclude that the factor lacks a "common-sense core of
meaning" that a criminal jury would be unable to understand.
Tuilaepa, 512 U.S. at 973.  Further, this factor is relevant
because, if proven, it would demonstrate that defendant used a
specialized skill, gained through military and police training, to
murder the victim.  Because the sentencer should consider "all of
the circumstances of the crime in deciding whether to impose the
death penalty," defendant's specialized knowledge is clearly
relevant.  Jones v. United States, 527 U.S. 373, 401 (1999).

9

**169**

the specific evidence that will be used to support it"); 18 U.S.C.
§ 3593(a) (requiring notice of non-statutory aggravating factors, not
evidence supporting those factors).  Defendant's other objections to
this factor are likewise without merit.[6]

    **d.    Factor Four:  Lack of Remorse**

Defendant contends that he is not able to prepare for trial
because he has insufficient notice of the evidence upon which the
United States intends to rely to establish this factor, and that the
government should be forced to specify which of defendant's actions
or conduct demonstrate lack of remorse.  As outlined above, however,
the government is not required to detail such evidence in its Notice.
Further, "[a]ny lawful evidence which tends to show the motive of the

----

[6] For instance, with respect to defendant's objection to the
use of unadjudicated conduct to form the basis for certain evidence
of physical violence against women, there is no per se ban on the
admission of unadjudicated criminal conduct in the selection phase.
Eaton v. Angelone, 139 F.3d 990, 998 (4th Cir. 1998).  Moreover,
defendant's contention that the prejudicial potential of this
conduct outweighs its probative value is unpersuasive.  Violent
unadjudicated criminal acts that tend to show a pattern of violence
against women are relevant, probative, and helpful to the sentencer
in distinguishing those who deserve capital punishment, and must be
sufficiently relevant to the inquiry of who should live and who
should die.  See Grande, 353 F. Supp. 2d at 631, 637 (refusing to
strike non-statutory aggravating information concerning threats and
assaults on women because these allegations are relevant to
determining whether defendant exhibits a pattern of violent
criminal behavior; further holding that the word "abuse" is not
unconstitutionally vague b/c it has a "common-sense core of
meaning"); accord United States v. Beckford, 964 F. Supp. 993, 1000
(E.D. Va. 1997) (unadjudicated criminal acts, "especially crimes of
violence, are arguably more relevant and probative than any other
type of aggravating evidence supporting imposition of the death
penalty") (internal quotation omitted).

defendant, <u>his lack of remorse</u>, his general moral character, and his predisposition to commit other crimes is admissible in aggravation." <u>Zant</u>, 462 U.S. at 885 n.22 (1983) (citation omitted) (emphasis added); <u>see also</u> <u>United States v. Nguyen</u>, 928 F. Supp. 1525, 1542 (D. Kan. 1996) (refusing to strike lack of remorse as aggravating factor as long as the government's evidence in support of the factor was more than mere silence).

The government responds that it intends to show defendant's lack of remorse through his statements to others. Specifically, the government avers that "the basis for this evidence has been or will be provided to the defense in the course of discovery, when the United States provides witness statements" and argues that they should not be required to identify "the exact nature of these statements or the individuals to whom they were made in the Notice." (Resp. 16.) The court agrees. Discovery in this case has been ongoing for well over a year,[7] and to assert that defendant is unaware of the evidence that may be presented against him as to this factor is unbelievable. The court would overrule this objection.

---

[7] Counsel for defendant entered an agreed discovery order on March 12, 2008. <u>See</u> Docket No. 31.

11

### III.  Conclusion

For the foregoing reasons, each of defendant's motion is **DENIED** and the objections raised therein are **OVERRULED**.   The Clerk shall forward a copy of this Memorandum Order to counsel for the parties.  **IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
United States District Judge

Rebecca Beach Smith
United States District Judge

Norfolk, Virginia
June 17 , 2009

12

**172**

USCA4 Appeal: 17-5    Doc: 28-1    Filed: 08/24/2018    Pg: 192 of 521

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Newport News Division

**UNITED STATES OF AMERICA**

v.                                                    Criminal No. 4:08cr16

**DAVID ANTHONY RUNYON**

### SUPPLEMENTAL NOTICE REGARDING MENTAL HEALTH EXPERTS

Defendant, David Anthony Runyon, hereby gives notice of his intent to offer mental health experts as follows; this notice is dependent on defendant's receipt of his and his family's medical records from the United States Government for periods of time when defendant was in the Army and when he and his mother were Army dependents:

Allan F. Mirsky, Ph. D. ABPP-CN
Diplomate in Clinical Neuropsychology
American Board of Professional Psychology
Center for Psychological Evaluation and Consultation
5502 Spruce Tree Avenue
Bethesda, MD 20814
301-435-9813

Dr. Mirsky is a neuropsychologist who will do psychological testing on the defendant if deemed appropriate once the medical records of defendant and his family are received.

-1-

**173**

James R. Merikangas, M.D.
4938 Hampden Lane #428
Bethesda, MD 20814
301-654-1934

Dr. Merikangas is a psychiatrist who will be testifying to factors discovered in defendant's medical records and those of his family and who may interview defendant on issues discovered in the medical records, all as determined to be necessary and appropriate once the medical records are received.

DAVID ANTHONY RUNYON

By:_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of June, 2009, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Blair C. Perez, Esquire
United States Attorney's Office
101 W. Main Street, Suite 8000
Norfolk, VA 23510
Telephone: 757.441.6331
Telefax: 757.441.6689
blair.perez@usdoj.gov

-2-

Brian J. Samuels, Esquire
VSB No. 65898
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
brian.samuels@usdoj.gov

Lisa R. McKeel, Esquire
VSB No. 28652
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
lisa.mckeel@usdoj.gov

Lawrence Hunter Woodward, Jr., Esquire
Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
Counsel for David Anthony Runyon
4525 South Boulevard, Suite 300
Virginia Beach VA 23452
Telephone: 757.671.6047
Telefax: 757.671.6004
lwoodward@srgslaw.com

Larry M. Dash, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
150 Boush Street, Suite 403
Norfolk, VA 23510
larrydash@fd.org

-3-

Paul G. Gill, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
830 E. Main Street, Suite 1100
Richmond, VA 23219
paulgill@fd.org

Jeffrey A. Swartz, Esquire
Rabinowitz, Swartz, Taliaferro, Swartz & Goodove
Counsel for Catherina Rose Voss
150 Boush Street, Suite 800
Norfolk, VA 23510
jswartz@rstsg.com

James S. Ellenson, Esquire
Law Office of James Stephen Ellenson
Counsel for Michael Anthony Eric Draven
Bank of America Building
2600 Washington Avenue, Suite 1000
Newport News, VA 23607
jseatty@aol.com

Timothy G. Clancy, Esquire
Moschel & Clancy, PLLC
Counsel for Michael Anthony Eric Draven
2101 Executive Drive, Third Floor
Tower Box 78
Hampton VA 23666
tclancy@moschelandclancy.com

_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

-4-

176

*Raymond F. Patterson, M.D., D.F.A.P.A.*

1904 R STREET, N.W.
WASHINGTON, D.C. 20009
—
TELEPHONE (301) 292-3737
FACSIMILE (301) 292-6272



DIPLOMATE:
AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
IN GENERAL PSYCHIATRY
AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
IN FORENSIC PSYCHIATRY
AMERICAN ACADEMY OF PSYCHIATRY AND THE LAW
IN FORENSIC PSYCHIATRY

FELLOW:
AMERICAN PSYCHIATRIC ASSOCIATION
AMERICAN COLLEGE OF MENTAL HEALTH ADMINISTRATION



Unsealed March 2, 2016

## Forensic Psychiatric Evaluation

### Filed Under Seal

June 24, 2009

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
United States Attorney's Office
721 Lake Front Commons
Suite 300
Newport News, Virginia 23606

       Re: United States of America v. David Anthony Runyon
          Criminal No. 4:08cr16

Dear Mr. Samuels and Ms. McKeel,

### Introduction

This report is based on my independent forensic psychiatric evaluation of David A. Runyon in the above referenced matter. In accordance with the Court Order by the Honorable United States District Judge Rebecca Beech Smith, dated 6/13/2008, this report will be filed under seal and is not to be released to attorneys for the prosecution or defense unless there is a finding of guilt in the trial phase of this matter. Therefore, I am providing three copies of this report and three copies of the CD of my recorded psychiatric examination of David Runyon, which took place on February 4, 2009. In addition to the psychiatric examination of David Runyon, I had the opportunity to consult with Paul Montalbano, Ph.D., and to review a number of documents as listed below.

1

276





Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 2 of 24

## Reason for Referral and Process of Evaluation

David Anthony Runyon has been charged in Criminal No. 4:08cr16, United States of America vs. Catherina Rose Voss, Michael Anthony Eric Draven, and David Anthony Runyon, defendants, cases which are to be adjudicated in the United States District Court for the Eastern District of Virginia. The charges against Mr. Runyon include Conspiracy to Commit Murder, Carjacking Resulting in Death, Bank Robbery Resulting in Death, Conspiracy to Commit Robbery Affecting Commerce, and Murder with a Firearm in Relation to a Crime of Violence. The United States government filed a Notice of Intent to Seek a Sentence of Death against Mr. Runyon on July 17, 2008.

In addition to the independent forensic psychiatric examination of David Anthony Runyon conducted on February 4, 2009, I also had the opportunity to review the following documents:

1. Criminal complaint, dated 12/11/07

2. Indictment, dated 2/08

3. Motion of the United States regarding Mental Health Evidence, dated 4/25/08

4. Catherina Voss's Response to the Motion of the United States regarding Mental Health Evidence, dated 5/9/08

5. Brief of David Anthony Runyon In Response to the Motion of the United States regarding Mental Health Evidence, dated 5/1/08

6. Order regarding Mental Health Evidence, dated 6/13/08

7. Supplemental Order regarding Mental Health Evidence, dated 6/13/08

8. Notice Pursuant to Fed. R. Crim. P. 12.2, dated 12/12/08

9. Statement of Facts in U.S. v. Catherina Rose Voss

10. Report of Telephonic Interview of Suk Cha Runyon, dated 2/5/08

276

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2099
Page 3 of 24


11. Newport News police memoranda to Lieutenant Sutton regarding homicide, dated 4/3/07 and 5/1/07

12. Use of Canine report, dated 5/1/07

13. Crime scene report, dated 6/8/07

14. Search Warrant for David Runyon's home, car, and storage unit

15. Search results by Bureau of Alcohol, Tobacco and Firearms, dated 12/26/07

16. Autopsy Report by Leah Bush M.D., dated 5/23/07

17. Morgantown Police Department Records

18. NCIS Surveillance Record of Runyon, dated 11/8/07-12/5/07

19. Michael Draven's statements to police
    a. Newport News police (no date given) post-arrest
    b. Interview @ Michael Draven's residence, 11/27/07
    c. Interview with Newport News Police Department and Alcohol, Transportation and Firearms, 12/7/07 @ Voss's residence

20. Catherina Voss's statements to police
    a. 5/3/07 interview
    b. Notes of interview by Det. Riley and Williams
    c. 7/9/07 phone call re: insurance documents and being ruled out as a suspect
    d. 8/9/07 phone call re: misc info
    e. Transcription of sentencing proceedings in US vs. Catherina Voss, dated 11/14/08
    f. 911 Call

21. Statements of David Runyon to Newport News Police Department, dated 12/3/07; and to Newport News Police Department, Morgantown Police Department and NCIS, undated (approximately one week later)

22. Grand Jury Testimony
    a. Sarah Baker
    b. Christine Chipps


3

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 4 of 24


    c.  David Dalton
    d.  Paula Dalton
    e.  Justin Funk
    f.  Jason Guyton
    g.  George Koski
    h.  Virginia Pina
    i.  Chad Costa
    j.  David H. Runyon
    k.  Maria Runyon

23. Letter from Defense Attorneys to US Attorneys seeking withdrawal of Death Penalty Request dated 2/10/09

24. Transcript of Sentencing Proceedings against Catherina Voss

25. Voluminous emails from David Runyon to misc people

26. Narrative of interview of Larry Davis on 5/29/08, and handwritten notes by Larry Davis

27. Narrative of interview with Catherina Voss on 7/24/08

28. Narrative of interview with Catherina Voss on 12/3/08

29. Narrative of interview with Jamal Knowles on 10/9/08

30. U.S. Army records

31. Education Records of David Runyon

32. Employment records of David Runyon

33. Wichita Police Department Private Security Records of Training and Certificate of Completion 1993

34. Kendel Intl. Research Study Documents

35. Bristol Myers-Squib Drug Study Docs


4

**180**

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 5 of 24


   36. Parexel Covance Documents

   37. Parexel records of Michael Draven

   38. Parexel records of David A. Runyon

   39. Report of Mark Cunningham Ph.D

   40. Report of Paul Montalbano, Ph.D. (draft)


## Government Records Regarding the Alleged Instant Offense

The indictment states that on April 29, 2007 at approximately 11:45 p.m.-12:00 a.m. at or near the Langley Federal Credit Union in Newport News, VA, David A. Runyon shot and killed Cory Voss. Mr. Runyon is alleged to have conspired with Catherina Voss and Michael Draven to commit the murder in exchange for money. Mr. Runyon is alleged to have been the gunman in the conspiracy. The documents indicate Mr. Draven and Ms. Voss were having an affair that began sometime in late 2006 while Mr. Voss was away in his duties as a naval officer on the USS Elrod. After Mr. Voss's return in December 2006, the affair continued and that in January 2007, Catherina Voss and Michael Draven began conspiring to murder Cory Voss for a life insurance policy in the amount of $400,000. Mr. Draven reportedly solicited information from at least three individuals regarding the contract killing of Cory Voss and in February 2007 met Mr. Runyon. At the time they were both undergoing a drug study in Baltimore, MD. The study concluded in March 2007 and after that time there were a number of communications between Mr. Draven and Mr. Runyon. On March 24, 2007, Mr. Draven and Mrs. Voss discussed in a telephone conversation his fees and the plan to murder her husband. On April 20, 2007, Ms. Voss opened a bank account at the Langley Federal Credit Union in Newport News, VA, and on April 28, 2007, Mrs. Voss submitted two documents to Langley Federal Credit Union, granting her power of attorney over financial matters.

Mr. Runyon purchased a .357 caliber revolver in West Virginia on April 29, 2007, and subsequently received descriptive details to enable him to identify Mr. Voss at the Langley Federal Credit Union. This information was written on a map of the Hampton Roads area. Mr. Draven and Mr. Runyon spoke by telephone or communicated via text message on 4/29/07 approximately 23 times. On that same date, Mrs. Voss sent her husband to the Langley Federal Credit Union at approximately 11:00 p.m. to withdraw money and made two telephone calls to her husband while he was in route to the credit

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 6 of 24

union. Mr. Runyon entered Mr. Voss's truck at approximately 11:33 p.m. in a parking area near the Langley Federal Credit Union ATM, and at 11:42 p.m. Mr. Runyon directed Mr. Voss to make three attempts to withdraw money from the ATM machine. It is alleged that at approximately 11:45 p.m. Mr. Runyon shot Mr. Voss five times in his vehicle, killing him, and left the scene. On or about May 1, 2007, Mrs. Voss received a Navy death gratuity in the amount of $100,000 and subsequently submitted a claim for the $400,000 life insurance policy. On or about November 25, 2007, Mr. Draven communicated via email to Mr. Runyon, advising him to lie about the nature of their relationship, and Mr. Runyon replied his agreement to lie.

Statements by Catherina Voss indicate that in September 2005 she began using cocaine, and incurred debts. Approximately one year later in September 2006, she and Michael Draven met and began an affair during which they saw each other frequently. They began discussions to kill her husband in approximately January 2007, and Mr. Draven informed her in February 2007 that he had met someone who claimed to be a hitman during his participation in a drug study in Baltimore, MD. Mrs. Voss further stated she spoke with Mr. Runyon about the fee of approximately $20,000 which had been arranged during a previous conversation when she and Mr. Draven spoke with Mr. Runyon by telephone. In the second conversation, Mr. Runyon demanded an additional $10,000 and said that killing Mr. Voss would be "just a job". Mrs. Voss told Mr. Runyon she would pay him the $30,000 with the life insurance money. She continued that during a trip to Newport News Mr. Runyon identified the Langley Federal Credit Union as the location he had selected to commit the murder. In a statement to police, Mrs. Voss also reported she told Mr. Runyon that Mr. Voss had abused their children and was having an affair.

Mr. Runyon met Mr. Draven for dinner at a Waffle House in Newport News on April 25, 2007, and at that time, Mr. Draven gave Mr. Runyon the map on which he wrote down the information describing Mr. Voss and his vehicle. Mrs. Voss stated that after killing her husband in what he planned would appear like a robbery, Mr. Runyon was going to escape by foot to his vehicle. The record also indicates Mr. Runyon called Mr. Draven from payphones when he was travelling from West Virginia to Newport News and specific information about Mr. Voss's vehicle was discussed. Mr. Voss was discovered at approximately 6:49 a.m. in his vehicle after police were called by Ms. Dalton, an employee of a dentist in the area who observed the car as she had arrived for work. Mr. Voss was pronounced dead at the scene.

6

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 7 of 24


## Background Information and Psychosocial History

This history is based on examinations of David A. Runyon and my review of the
documents I received. David Anthony Runyon was born on January 7, 1971, in Ft. Hood,
Texas, to the union of David Dumbrowski and Suk Chung. Mr. Runyon has reported he
does not have many memories of his father other than recalling that his father was
physically abusive to his mother. He reported his father was not physically abusive to
him except on one occasion (see below). Mrs. Runyon subsequently divorced her
husband. Defense counsel has reported in a letter to prosecutors that Mrs. Runyon had
attempted suicide after being physically abused by her first husband prior to their divorce.
Defense counsel also provided information that his mother suffered from a mood disorder
and that at times she became physically violent, however David A. Runyon did not report
this information.

In 1976, his mother married David Harold Runyon. David Anthony Runyon described
his childhood as growing up with two loving parents although he reported his mother was
overprotective and the household was "strict". He reported there were no incidents of
abuse to his mother or to him by his stepfather.    Mr. Runyon reported his stepfather was
in the Army and that he was good to him. David A. Runyon further reported that he
subsequently joined the military, in part because of his father having been a military man.

In addition to his mother and stepfather, David A. Runyon grew up with a younger
brother, Mark, and reported that his younger brother frequently got into accidents and
that he was very protective of his younger brother. David A. Runyon has stated he and
Mark were close as children, but after he separated from his wife, he did not inform his
younger brother of his location and they have grown apart. He reported his brother
relocated to Hawaii, is married with three children, and that he does not know many more
details about him.

David A. Runyon reported he had been involved in fights when he was a young
adolescent usually related to protecting his younger brother. He said that this behavior
continued in high school where he got into fights with other high school students, but
none of these resulted in sanctions other than one suspension and discipline within the
family home. Mr. Runyon reported he attended schools in Germany, Korea, and the
United States because his father was in the military and his family moved according to
his father's assignments. He graduated from Hayfield High School in Virginia in 1989,
reportedly with a GPA of 3.0. He then attended Wentworth Military Academy in
Lexington, MD, on a scholarship from the Army. He reported he had a "C" average and
graduated in 1991 with an AA degree. He then joined the Kansas Army National Guard

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 8 of 24

at age 20, and became a commissioned officer in 1991. He then attended the Army
Infantry School at Ft. Benning, GA, and subsequently Wichita State University.

Mr. Runyon did not complete his college education, and in 1992 worked for the Wells
Fargo Guard Service. Later in 1992, he became a correctional officer at the El Dorado
Correctional Facility in Kansas where he remained until April 1994. It was noted he had
difficulty getting to work on time, however, in October 1993 he was recommended for
permanent status. He received two letters of reprimand in December 1993 and in January
1994, and an unsatisfactory performance evaluation because of chronic tardiness and
failure to report to work. After receiving a letter indicating he would be suspended for
three days because of tardiness in February 1994, Mr. Runyon submitted his letter of
resignation in March 1994. In his letter, he stated his belief that he had been falsely
accused of abusing sick leave, lying, and not informing his superiors of military leave,
and stated he refused to accept the suspension as punishment. He also noted he was tired
of dealing with unprofessional officers, and cited numerous issues related to his
relationship with other officers and the administration.

After leaving the Kansas Department of Corrections, Mr. Runyon enlisted in the U.S.
Army in September 1994. He was initially assigned to Fort Jackson, and subsequently
received airborne training at Fort Benning. He stated he wanted to join the Ranger
Support Platoon, and also the Criminal Investigation Command, but was not approved for
either. He entered Upper Iowa University in 1995 to study law enforcement, and in 1997
attended Troy State University in Alabama. He attempted to reenlist, however was not
allowed to reenlist with the reasons stated being his history of lateness, failure to follow
instructions, unsatisfactory job performance, and inability to properly manage his
financial and other recurring problems. He appealed this decision, however his appeal
was denied and he was discharged from the Army in September 1997. Mr. Runyon
stated he was denied for political reasons and, in statements similar to those he made
related to the Kansas Department of Corrections, he felt not being allowed to reenlist was
a "setup" and related to enemies he had made.

Mr. Runyon's next employment was at the Fayetteville Police Department from January
1998 through May 1998. On May 7, 1998 he received a written reprimand for chronic
tardiness and subsequently stated he was forced to resign because of politics. Mr.
Runyon also cited having personal problems with his wife that were interfering with his
judgment, and he did not feel the police department was supportive of him. Mr. Runyon
subsequently worked in construction and for a tree service, and in 2002 worked in
collections and customer relations for First American Rental in Atlanta, Georgia. He left
that job because his wife was reportedly unhappy with the area where they lived and

8

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 9 of 24

returned to Wichita, Kansas. He then worked at the Bullet Shop, a gun store, as a sales
person and became NRA certified as well as a pistol instructor. He remained in that job
until he had to leave because of a domestic violence charge. During his employment at
the gun shop, he purchased a number of handguns. He next became a valet driver and
valet manager for the Davis Moore Auto Group and subsequently a weekend manager at
a local hotel. He also had a part time job as a projectionist at a movie theater.

Mr. Runyon and his wife separated in 2001, and Mr. Runyon moved to Richmond,
Missouri, and lived with his family. He attended Columbia College, but did not receive
credit for some previous courses, which he thought was "political," and he left the school
reportedly owing over $2000. Mr. Runyon was employed with the Hampton Inn,
however he reported there had been a conflict between another employee and Mr.
Runyon's girlfriend, resulting in Mr. Runyon's decision to leave his employment at the
inn in 2003.

Mr. Runyon next worked at the Piney Ridge Residential Treatment Center as a youth care
worker from July to October 2003. Although Mr. Runyon reported he decided to leave
that job to return to West Virginia, records reviewed indicate he was fired from that job
because he did not come to work on several days in October 2003.

Mr. Runyon was a participant in a series of drug studies from November 2003 through
October 2007, beginning in November 2003 for Kendall International and subsequently
with Bristol Myers Squibb and Parexel.

Mr. Runyon reported his first serious relationship with a girl was while at the Wentworth
Military Academy. He has reported they dated for approximately one year and became
engaged, however she left school earlier than he did and the relationship ended. He
married his wife, Maria, in January 1995 and assisted with raising her two children.
Maria became pregnant soon after they were married and Mr. Runyon reported that their
relationship changed, becoming argumentative and unhappy, and his wife was abusing
marijuana. David A. Runyon's son, David, was born in January 1996, and he reported he
has had a very close relationship with his son. Mr. Runyon has reported that he was
threatened by his wife with a shotgun during the time he was employed as a police officer
in Georgia and that when the family moved to Kansas in 2000 he attempted to separate
from his wife. He reported his wife stated she could not support herself and he remained
in the relationship. In 2001, Maria reported that he had assaulted her, and a domestic
violence charge was lodged against him. Mr. Runyon finally separated from his wife
shortly after he left the Davis-Moore Auto Group, and he returned to Richmond,
Missouri. He has reported he did not pay child support and there were periods when he
had very little contact with his children because of the difficult relationship with his wife.

9

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 10 of 24

Mr. Runyon began dating Virginia Pina in 2001 and they moved in together. They
continued the relationship for approximately 5-6 years, and over that time he learned that
Ms. Pina was abusing illegal drugs and was in an ongoing custody battle for her child.
Mr. Runyon left his job at the hotel in 2003 because of allegations that Ms. Pina was
soliciting clients for prostitution at the hotel. The couple subsequently moved to West
Virginia in 2003. The relationship, however, did not work out and Mr. Runyon ended the
relationship. He had subsequent relationships with Paula Dalton, as they lived together in
2007, and later in that year with Sara Baker. Mr. Runyon has reported that Sara Baker,
Paula Dalton, Jason Guyton and he lived together for some time in 2007, however
ultimately he and Ms. Baker decided to move out of that situation and their relationship
continued until Mr. Runyon was arrested.

In addition to Mr. Runyon's self reported history, the records reviewed indicate electronic
correspondences by Mr. Runyon with a number of different women. Mr. Runyon met
many of these women online through dating and matchmaking websites, and most were
from Eastern Europe and other locations overseas. He reported he is exclusively
heterosexual and has never been involved in any homosexual activities.

In addition, Mr. Runyon had numerous electronic correspondences with his codefendants,
Catherina Voss and Michael Draven.

Since his arrest, he has not had any infractions or disciplinary actions and has remained in
general population. He has not requested or received any mental health treatment.

**Psychiatric Examination (February 4, 2009)**

I performed an independent forensic psychiatric examination of David A. Runyon at the
Portsmouth City Jail on February 4, 2009. The examination was held in a sound
confidential office setting and was conducted in 1 hr 48 minutes. Mr. Runyon was
apprised of the nature and purpose of the independent psychiatric examination and the
limits of confidentiality in that the results of the examination would not be confidential.
Indeed, he was also informed of the court's order that the examination be audio recorded
and he agreed to the recording. A copy of that recording is provided with this report. I
told Mr. Runyon I had been hired by the prosecution for this examination. I informed
Mr. Runyon that the process for this examination is called a Structured Therapeutic
Interview, where I would be asking specific questions about his psychosocial history, his
background, upbringing, etc., as well as the reason the examination was being conducted,
i.e., his legal circumstances. I also informed him that if there was anything I did not ask

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 11 of 24

him or if he felt he needed to clarify or add information, to make sure that he told me
before the conclusion of the examination. I also informed Mr. Runyon that the results of
this examination would be filed under seal with the court and would not be unsealed
unless there was a finding of guilt, and if found guilty then the information would be
provided to his attorneys, the prosecution, and the court. Mr. Runyon stated he
understood these parameters and the process.

Mr. Runyon stated that his date of birth was January 7, 1971 and he was born in Fort
Hood Army Hospital. Mr. Runyon reported he has one brother who is two years younger
than he and they have always been very close. He reported his mother is Korean and he
does not know much about his biological father. He said his mother and biological father
separated and subsequently divorced when he was about three years old. He reported his
stepfather has been with the family ever since and is of Irish-German descent. Mr.
Runyon stated he grew up as an "army brat", as his father was in the army. The family
initially stayed in a trailer park in Killeen, TX outside Fort Hood army base, and they
went to Panama for a year after his mother and stepfather were married. The family
moved to Germany for four years, Missouri for approximately four years, and then Korea
for one year. He reported he had a good cultural experience in Korea and returned to the
United States to Virginia, and attended all four years of high school at Hayfield
Secondary High School in Alexandria, Virginia. He reported his childhood was good,
and said "as to be expected since my mother was Asian, it was a strict household." When
asked whether there was any history of physical, sexual, or emotional abuse, Mr. Runyon
replied that he would not call it abuse, but that his mother was "real strict". He added
"honestly if it wasn't for, like, not sparing the iron rod I would have turned out really
bad", adding that he stayed out of trouble. He reports he has no juvenile criminal justice
history. He elaborated that the punishment was corporal punishment but nothing that he
felt "was over the top".

Mr. Runyon added, at that point, he recalled the reason his mother separated from his
biological father was because he was "beating on my mom". He then pointed out an area
on the right side of his face and said his lip "sags". He said he believes this "sag" was in
response to a physical interaction he had with his biological father. He elaborated that he
heard his mother screaming, and his dad threw his mother across the room after he had
come into the room. He stated he remembers "going up and biting him around the right
knee area as hard as I could". Mr. Runyon stated he recalls his biological father choking
him and hitting him, and he believes he passed out. He continued that he does not know
if he went to a hospital, and his mother subsequently left his biological father.

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 12 of 24

With regard to his medical history, Mr. Runyon reported "I try to stay away from the doctors", and that he only goes to doctors when he has a virus and goes in for a shot of penicillin or antibiotics. He added, "most of the time I tell the doctors what is wrong with me" and said the doctors usually tell him he is right. I then asked Mr. Runyon about any specific head traumas, and he reported "I've been knocked out before". He said the first time he remembers was "besides what I just told you, playing football" when he caught the ball, turned around, and ran into a telephone pole when he was approximately 5 or 6 years old. He stated he woke up with the football still in his hands and the other kids were playing football without him. Mr. Runyon said he has also been knocked out during military training with concussions from explosions, and "knocked out wrestling". He also reported he had "a bad car accident" while in the military in Alabama, and the doctors told him he should have died after he was hit by a drunk driver in a head-on collision, but he does not recall losing consciousness. He stated that as a result of this accident, he had severe tissue trauma/damage and had surgery on his left knee. He said the doctors told him initially he would never be able to jump out of airplanes again, but he fought with the doctors and after six months he was put back on jump status. He reported he still sometimes has trouble with his back and his neck, having pain if he is sitting for long periods of time, and that he has gone to a chiropractor and experienced some relief from treatments. He reported this accident occurred when he was age 26 at the end of 1996, and the doctors at some point indicated he should be in a wheelchair. He said he was treated with meclizine for vertigo, but he has not used it for a long time. He added that he has no other medical problems and takes no medications currently for any medical or psychiatric conditions.

When asked if he has talked to psychologists, psychiatrists, or counselors of any type other than in connection with this case, Mr. Runyon reported he had gone to group counseling with his wife and that he attended to try to support his wife, and she went to her own individual counseling.

I then asked Mr. Runyon about his involvement in drug trials, and he reported "that's what I was doing for a living—I think I've been doing full time for the last 3 years", "before I got locked up". He continued that he started four years before he was arrested and initially was participating in drug trials "on the side". He stated his mother was in a lot of physical pain, and he first found out about drug trials because he was doing research online resulting in his decision to participate in drug trials while he was in West Virginia. He reported a local drug company was targeting college kids to participate in studies on the weekends, and he became involved in drug studies in which companies were looking to develop generic drugs for drugs that were already on the market. When asked how many drug studies he had been involved with, he estimated that in the last

12

**188**

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 13 of 24

three years, he was "doing like 5 or 6 studies a year." He reported in the first year, he "only did maybe 3 or 4", but may have participated in more. He stated "I'm pretty picky about what studies I do, I try to stay away from any psychotropics." He reported he stayed away from psychotropics because they have made him sick and throw up, and he usually gets "all the side effects". He stated these studies "pay really good money" and cited an instance where he made "$9000 over a 26 or 27 day study". He also reported he enjoyed the jobs because "I enjoyed the freedom", and that he "was always reliable, always showed up on time, always was drug free, in good health." He stated he had built that reputation and there were times when drug companies would call him. Mr. Runyon also reported he feels like he is doing something good for people and he had only seen three or four other Asians so that he is "representing that culture." Mr. Runyon recalled that on one occasion he believes his feedback regarding a medication that was "causing complications or something having to do with the heart", in addition to other people reporting side effects, resulted in the medication trial being stopped and the doctor's and pharmaceutical company's "going back to the drawing board."

Mr. Runyon reported that right after high school in 1989, he went to a military prep academy for West Point and advanced ROTC, where he competed for and won a $30,000 scholarship. He stated he graduated with an Associate's degree and had received a reserve commission as an army officer. He stated he went on active duty and completed the infantry officer basic course, and was subsequently with the Kansas National Guard for three years. Mr. Runyon stated he was trying to go to college and get his Bachelor's degree at that time so that he could eventually go on active duty as an officer, however that didn't work out, as he ran into financial problems. He stated his chosen major was criminal justice.

Mr. Runyon stated he got a more stable job working for the Kansas Department of Corrections for a year and a half. The Kansas Department of Corrections included a year in "max", and six months in a minimum security facility. He said that he remembers an incident when he was sick "with the flu or something like that" and he called in sick for work on his last day of the work week. He stated there was a local gun show in progress at the time and after lying down he was feeling better, went out to get something to eat, and stopped by the gun show. Mr. Runyon said that "some people" saw him while he was at the gun show and this information got back to his boss, who wrote him up and said "I was playing hooky basically". He added he and the supervisor "didn't get along anyway" and that she wanted to punish him and he refused the punishment. He said this problem ended up going before the warden and upon his sergeant's recommendation, the warden wanted to give him "like a week suspension without pay or something, and I refused the punishment—it's the principle of the matter." Mr. Runyon stated he

13

**189**

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 14 of 24

submitted his resignation and quit. Mr. Runyon concluded with stating he believed that type of punishment was not appropriate for that type of action and he felt the people he worked for were not supporting him.

Mr. Runyon stated he was also in the National Guard at that time, and not too long after this he resigned his temporary commission and went active duty into the army in September 1994. He remained on active duty from September 1994 through September 1997.

Mr. Runyon stated that after he got out of the army in 1997, he was done with the military and attended the police academy and chose to work for the Fayetteville Police Department, just south of Atlanta, Georgia. He said he selected the Fayetteville Police Department instead of the Atlanta Police Department because the benefits were good and he had a wife and family at that time, however he did not realize it was "a very political area". He elaborated that he liked the police chief, but he only worked there for four months. He stated the police chief who hired him quit and "they put in a new police chief who was more politically oriented". He stated there was "a political situation" related to his having stopped a motorist and giving that motorist a ticket, with the motorist making racial allegations against him.

Mr. Runyon then continued that it was around that time his wife pulled a shotgun on him at their home. He said he was a courtesy officer living in an apartment rent free, and his wife had a problem with gossiping and had said things Mr. Runyon felt she shouldn't have said to neighbors. He went on to say that he had bought a shotgun and put it in the closet because during the short time they were there, they had already had people throw rocks at the window, and he, his wife, and his oldest son (of three children) would be able to use the shotgun if they were being threatened. He stated that a day or two after he had actually bought the shotgun, he came home late and his wife suspected him of cheating on her and was angry with him. Mr. Runyon stated he had worked late and had an early shift the next day, he wanted to go to sleep, and his wife insisted on talking to him about what was bothering her, resulting ultimately in her pointing the shotgun at him and threatening to shoot him. Mr. Runyon stated he told his wife that he was going to sleep and rolled over and turned his back to her. He stated she subsequently put the shotgun down but this really bothered him on the next day, and two days later he went to his captain and asked for psychological help for his wife. Mr. Runyon stated the following day "they asked me to resign" and had made arrangements to transfer him to another department. He stated he felt unwanted and betrayed, and resigned. He and his wife continued to live together for three or four years after this event, having lived together for a total of seven years, although they had separated "a couple times". He reported he kept

14

**190**

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 15 of 24


moving back in for the sake of his children. He reported the current status of the
marriage with his wife is that he believes she has filed divorce papers. He stated he
worked in Georgia for three more years after the police department job, but did not work
in law enforcement again. He reported he "did construction, worked a tree service off
and on for two years".

We then began to discuss how it is that Mr. Runyon is in the Portsmouth Jail with charges
pending against him at this time. I asked about him being one of three codefendants
charged in the violent death of Cory Voss in 2007. He replied that when you are
involved in drug trials, you see some of the same people over and over, and he met
"Draven" during the course of his involvement in drug studies. He stated he travelled a
lot to go to these jobs, and sometimes travelled 12-14 hours to do various jobs. Mr.
Runyon stated he did not have much social contact with other participants in the drug
studies, but occasionally he would meet them for social contact for such things as dinner
or lunch, or to "crash on their couch" rather than stay in a hotel. He stated that "with
Draven, I met him at a study in January 2007" and he continued that the two of them built
a rapport talking about movies. Mr. Runyon stated that Mr. Draven is an actor and he
had a short movie clip that he used with his portfolio. Mr. Runyon, when asked by Mr.
Draven what he thought of the clip, stated he told Mr. Draven he could help him with
special effects and explosives because the quality of the clip was poor. He stated that
was the extent of his discussions with Mr. Draven, and they never got together to produce
or make anything. Mr. Runyon reported he looked at this as a typical actor where Mr.
Draven "wanted something for nothing". Mr. Runyon continued that he lived in West
Virginia and would drive down to this area, but that he had also been interested in
working in special effects or stunt work before he met Mr. Draven. He continued that he
was hoping "we would produce something where I would get some kind of
acknowledgement or recognition because someone saw his movie clip" and "maybe I
could get started in the field like that." He continued, "I was real motivated about
producing something like that", but "nothing ever became of it."

Mr. Runyon then offered that "as far as Mrs. Voss goes, he gave me her first name and
number as a way to contact him because he wouldn't answer his phone sometimes." Mr.
Runyon stated he would sometimes get irritated with Mr. Draven because he could not
get in touch with him for some real good jobs in the drug trial area, and that Mr. Draven
would not call him back. Mr. Runyon reported he had loaned Mr. Draven money in
February and he wanted Mr. Draven to pay him back. He said he loaned him this money
because Mr. Draven was having trouble paying his bills and was in financial trouble, so
he had an interest in helping him find a good job so that Mr. Draven could catch up on his
bills and pay him back. He also added he thought the money would help him be able to

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 16 of 24

do a project. He stated the amount of money he loaned him was about $500. He added
"I just felt like I should loan it to him because he called me and he was in need, and a lot
of people call me and ask me for help because I'm the type of person who is there in dire
straights — if I can I'll try to help them." He added he had just met Mr. Draven but felt
he was in real trouble and had been sincere with him, so he went ahead and sent him the
money. He concluded with "that's pretty much the extent of it."

He then continued that "right before we got arrested, people are telling me all kinds of
stories", that "essentially everyone was looking for me, and I'm a murder suspect." Mr.
Runyon reported that a couple people told him about Newport News detectives and he
got to thinking and looked up Newport News on a map on the internet and found out that
the only person he knew down there was "Michael Draven". He stated he then called
Michael Draven and asked if he knew "anything about this stuff", and Newport News
detectives looking for him as well as the ATF, FBI, the local police, and the state
troopers, and Mr. Draven told him right away "yeah, this guy's name is Detective Riley
and his partner or whatever suspect me for being involved in this murder and they are
harassing all of my friends." He stated Mr. Draven told him they were harassing all of
his friend's whose numbers they had gotten from his phone. He also stated that Mr.
Draven warned him "this guy is a dirty cop, they just want to stick this on somebody, and
don't talk to him."

Mr. Runyon stated he already had a bad impression of this detective. He subsequently
went back home when he was done with a job in Maryland, and police knocked on his
door and they talked with him but would not give him any details about what was going
on. Mr. Runyon said he wanted to talk with them when they showed up, because he
wanted to find out what was going on, but the conversation didn't end very nicely
because "Detective Riley was trying to twist my words up on me and put words in my
mouth." He stated he was arrested at gunpoint a week later and he wasn't very happy
about that because the week before he had talked with them for an hour to an hour and a
half. He also stated he was told there was DNA from the suspect at the scene, and he was
fully cooperative and willing to give his DNA to the detectives. Mr. Runyon then stated
he still couldn't figure out how he was involved in any of this and "the story Michael was
giving me just didn't make any sense that they would go through so much trouble and
drive up there."

With regard to Mrs. Voss, he reported, "I met her after I was incarcerated—I had never
met her before". He stated they were brought up on state charges at first and when they
went to court and came back, she had been put across the hall in a holding cell from him
and he did not know who she was. He said he was upset because Michael Draven had

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 17 of 24

excused him so that he could talk with Catherina Voss in private. He stated he then felt Michael Draven was hiding something because he didn't tell him that she was the codefendant. He stated Michael Draven and Catherina Voss were talking to each other and kept looking at him during their conversation, but did not want him to hear what they were saying.

I then asked Mr. Runyon if he had seen some paperwork on this case since he had been incarcerated and he replied "It's a bunch of B.S.". He then continued, "they are taking circumstantial evidence and...umm...gossip...whatever...that pretty much they've created themselves when they went up there and was telling everybody I'm a murder suspect and creating the gossip and everything, and everybody saying I guess I told them I did it or something, and so I'm facing the death penalty and my attorneys telling me I can't beat this case, and the jury's gonna be desperate to find, and when they convict me they're gonna give me the death penalty." Mr. Runyon added, "That's a pretty heavy thing", and I agreed with him and asked, "So what do you say to that?" and reminded him that what we are taking about today will be under seal pending whatever verdict the jury comes back with, and he stated "I don't have anything to hide, my attorneys feel like they know I'm an intelligent person and they don't understand why I'm, you know, not willing to accept what he says". He added that his head attorney wants him to take a plea and plead guilty to everything if they would take the death penalty off the table. He added that his head attorney has told him that if he's willing to do that, the prosecution would accept that.

Mr. Runyon said that although his attorney has told him it's better to have life in prison rather than the death penalty, Mr. Runyon stated, "I disagree with that," adding "I think that I've been a good man, Christian man all my life, my past should count for something, and I do understand that despite all of that I can be, what they're telling me, inevitably will be convicted, but I'm not going to plead guilty to something I didn't do, so it's the principle of the matter that's important to me." Mr. Runyon added that honor is important to him and that he's not going to shame himself and admit to something that he would not do and that would bring shame upon his family. He said that there was no way that he would plead guilty, and he told his head attorney he was very upset about the situation, wants to go to trial, wants to go "all the way with this." Mr. Runyon added he does not think its right that "with no physical evidence especially they would lock somebody up and stamp out their life." I then said to Mr. Runyon, "I understand you do not agree with your attorney but have you listened to your attorney to be able to weigh the advice the attorney has given you", and he replied "Yes."

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 18 of 24

I then told Mr. Runyon my impression that he does not believe he is or has ever been mentally ill, and Mr. Runyon replied, "No", and I agreed with him that up until now I don't think so either, but that part of the issue with a plea of not guilty by reason of insanity for example is that the defendant is basically saying "I did it, but when I did it I was crazy—I was mentally ill", and I said to him, "I am not hearing that from you, what I am hearing from you is 'I didn't do it'.", and he replied , "Yes". I then advised him that the other component of mental illness issues is "I have a mental illness, and therefore that mental illness should have something to do with whatever sentence there might be", and I then said to Mr. Runyon "Again, I'm not hearing that from you" and that I really do want to understand his situation and how he sees it, and he replied "I think you're correct, I don't think I suffer from any mental illness or ever have, you know, I'm not a certified whatever doctor or whatever, but I don't feel like that and I don't think I ever have been, and I also think that, you know it's something that brings shame on me in a way because I think a lot of people try to do the insanity plea to excuse their actions, but I disagree with that line of thinking altogether."

Mr. Runyon added, "I don't do drugs" and continued that he has never used drugs except in pharmaceutical trials and that he does drink alcohol but that if he did it would be no excuse for him to be out of character or excuse his actions. Mr. Runyon then added, "So, you know anything that I do, I expect to be held accountable for completely." Mr. Runyon stated that he does drink alcohol socially but never to excess where he has had blackouts or seizures, and does not believe that he is an alcoholic. He has never been treated for substance or alcohol abuse.

At this point during the examination, Mr. Runyon added there was something that he felt was important. He elaborated that after his car accident, he had head trauma, as well as some back problems, as some speakers flew forward and hit him in the back of his head. He elaborated that upon impact "the floorboard wrinkled up", pushed his knees against the dash and he was pinned against the steering wheel. He reported it was estimated the other driver was going over 100 mph and he was going 50 mph, and that he had head trauma and that ever since then he has had problems with short term memory loss. He stated it has been getting better over the years, but he still has problems with it. Mr. Runyon said that a lot of people that know him are aware of this and they take advantage of him because he is a nice person. When asked how, he replied that people may borrow something small and he may forget about it and they just never return it. He added they may say "you promised me this and I can't remember so I may do whatever favor they ask me to do." I then said to Mr. Runyon that this situation he is in right now is not small, and asked him if he thinks in this situation, which he referred to as "huge", that he may have forgotten something he said or did, and he reported "I don't think it's

18

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 19 of 24

possible." He continued, "I mean first of all I would never conspire to do anything like that, to conspire something like what they're accusing me of, you'd have to do a lot of thinking and talking and planning, you know, I don't know the details about the crime or what happened or anything, but they're trying to say they have a video and it just doesn't make any sense that I would conspire to anything where I would be on video, you know that's foolish." Mr. Runyon then said that he understands the government is going to use his military and law enforcement training "against him", but "it's ridiculous to think" he would put himself on video with all that training. He reported there are a lot of things about this case that don't make sense to him with his experience with the Innocence Project and use of DNA where a lot of people have been wrongly convicted and have been given the death penalty.

Mr. Runyon stated he looks at the death penalty as "being dead" and that he enjoys his freedom. He reported he knows that if you get the death penalty it takes many years to go through the appeals process. He also reported that if he got life imprisonment, there are a lot of things he could do as a "strong Christian person" and a lot of people he could reach out to, and he could make a difference even if he is behind bars. Mr. Runyon added he is not afraid of death and it was an 'occupational hazard' when he was in the military. He added he has his faith and believes in 'being right with God' and sees death as 'another gateway'. He added "that takes a lot of faith".

**Mental Status Examination**

On mental status examination, David A. Runyon presents as a 38 year old Asian American male, appearing approximately his stated age. He is approximately 5'3", weighing approximately 135 to 140 pounds. He is alert and cooperative during the interview process, and is spontaneous in his answers. He is oriented times 4 including person, place, time, and situation. He repeated this was a psychiatric examination, and the results of this examination would be under seal and not released unless he is convicted or there is a finding of guilt, and the evaluation results could possibly be used at sentencing. Mr. Runyon's affect is appropriate even though he is somewhat subdued during the interview. His limited intensity appears to have been appropriate for his current situation of being incarcerated, and is consistent with his statements. He is able to display humor, sadness, and spoke of his anger and frustration with his current situation. His mood is mildly depressed and once again appears to have been appropriate to both his affect and his situation.

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 20 of 24


I asked Mr. Runyon about his memory, and he repeated that he has had some problems
regarding his short term memory since the car accident in 1996. Mr. Runyon reports that
his long term memory is "pretty good" and he doesn't have trouble with remembering
events that happened in the distant past. He also reports he has "figured out" his memory
and "remembers things by association." He also reports he dreams often and dreams
about things he is dealing with or that have been very important to him in the past. When
given three items to remember, Mr. Runyon was able to repeat these items and after
approximately five minutes was able to repeat two of three, slightly missing a number by
four digits. He recalled these items in the precise order I had given them to him. His
recall and attention span are adequate.

I then asked Mr. Runyon about his sleep, and whether he has continued to have dreams
since he has been incarcerated, and he reports that he sleeps "pretty good" and that he has
deep sleep. He also reports that sometimes he has nightmares, mostly having to do with
the death penalty. He also reports that since childhood, he has dreamt of "funny
monsters" and he doesn't think those are nightmares because he always ends up winning
against the funny monsters in his dreams. I asked Mr. Runyon how he is at math, and he
reported he is "very good at math" and was able to subtract serial 7's sequentially,
starting with 7 from 100, without error or difficulty. I then asked Mr. Runyon about
feelings of depression as well as happiness on a scale of 1-10 and he reported that since
incarceration, he's at about a 5-6, with 1 being feeling very badly and 10 being on top of
the world. In the 2-3 months prior to his incarceration, Mr. Runyon reported that on the
scale of 1-10 he was at 7-8. When asked if he had ever felt that he was at 10, he reported
that he was a 10 in the spring of 2007 around the time that the murder supposedly
occurred. He had been separated from his wife for six or seven years and he had had
very little contact with his son during that separation. He said he was a 10 because in the
spring of 2007 his son was living with him.

When asked to interpret proverbs or old sayings, Mr. Runyon said he had no idea of what
"A stitch in time saves nine" means, and focused on this not being a proverb even though
the instruction was what do you think the proverbs or old sayings mean. When asked the
meaning of "A rolling stone gathers no moss", he responded that any kind of friction
carries moss away, so moss would not grow on a moving stone. Lastly, when I asked "if
you can't run with the big dogs don't get off the porch", he responded initially with
"That's definitely not in the bible", and added "Don't get involved in something that's
too big for you". His interpretations demonstrate adequate abstraction.

When asked whether or not he had ever experienced hallucinations of any type, Mr.
Runyon reported he is clear on what hallucinations are, and he has never experienced any

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 21 of 24

hallucinations. When I asked specifically about auditory and visual hallucinations, he
reported there had been a couple times when he heard his name called when he was
alone. He elaborated on both occasions that he was "alone in the woods with nature",
and he heard his name called, and on one occasion he thought it was his father, which did
not make any sense to him since his father was not even in the same-state and he had not
seen him for a long time. His perception of reality appears unimpaired.

When asked if he had ever had any suicidal ideation or attempted to harm himself in any
way, Mr. Runyon reported he has never thought of hurting himself or tried to harm
himself. He reported he has had some girlfriends who were "self-harmers" but does not
believe that suicide is "the Christian thing to do" and is the "devil's work". When asked
about homicidal ideation or thoughts, he reported he has had thoughts about hurting
people out of anger, but no thoughts of killing people. He quoted scripture as "Revenge
is mine sayeth the Lord", but added it was something he had to deal with in being a
soldier in the military and balancing his job with being a Christian. He elaborated that in
the military and as a police officer he would do his job, would do his duty, and that he
would much rather make his enemy die for his country rather than he die for his. He said
he would not ever consider killing or kill someone with anger or grudge in his heart. He
does not appear to be an imminent danger to himself or others in his current situation.

When asked about delusional thinking or any thoughts that were not consistent with
reality, such as having special powers, Mr. Runyon replied "No, I definitely know I don't
have special powers", and laughed appropriately. He reported as a child he played make-
believe games, but he knows "none of that stuff was real". There is no evidence of any
thought disorder, including delusions or disorganized thought processes, such as
looseness of associations or flight of ideas during the psychiatric examination, or
historically. He does report feeling he has been treated unfairly for political reasons at
various jobs in the past, and has stood up for his beliefs.

Mr. Runyon reports he believes he does a fair job of evaluating himself, that he listens to
other people's opinions and feedback about himself, and he's open to listening and seeing
things about himself that he otherwise might not see. He added he always wants to
become a better person so he tries to be open to listening. Mr. Runyon reports he
believes he has good judgment and insight, but adds that "with hindsight being 20/20" he
feels there are a lot of things in his life he would have done differently. He added "the
smallest things you do can make a big difference in your life." He said that his regrets in
life are based on his inexperience with women and with developing relationships with
women, and learning about himself and what he is looking for in a soul mate. He said,
for example, that in high school he was not into girls very much except for one girl he

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 22 of 24

had a crush on.  He further added he only went on one date in high school because he was
focused on his studies, working out, playing football, and getting into West Point to make
his parents proud of him.  His judgment and insight appear to be adequate for his
activities of daily living, though he has personality traits that have affected his
interpersonal relationships and job performance.

At the end of the evaluation, I asked Mr. Runyon if there was anything that comes to
mind that we hadn't talked about or he wanted to elaborate on or anything else that would
help me understand his situation or him.  He stated his belief that he had been "open and
forthcoming" and that hopefully it would help me in my evaluation.  He quickly added
"No disrespect but I really feel like clinical evaluations only give you an idea of what
type of person I am, but I don't really think it really gives, really says who I am."  He
added that his actions and his past really speak for themselves and tell who he is.  He then
offered that he mentioned to his attorneys he has saved people's lives in the past, always
looked at himself as the "hero type" and he has a need to "make a positive difference in
the world."  He stated he has sought jobs that meet that need and he gets self gratification
from making a difference.  He continued he also pictures himself as "the good guy" and
that unfortunately in today's society there's not a lot of need for heroes.  He continued
that he feels displaced because of what his wife did to him in the past, which he
elaborated was the most malicious thing she could do to hurt him, resulting in him
pleading no contest to simple battery.  He stated he was not allowed to work in the "hero
type jobs" that he was made for, and that many times he was looking for the right jobs for
himself but felt he was displaced from working in those jobs.  He describes himself as a
very self sacrificing and kind person who is not afraid of dying.

Mr. Runyon then made a comment that he does have nightmares sometimes and fears not
being able to save someone he loves or cares for, even though he had earlier said the
nightmares are about the death penalty issue.  He stated he knows now it was a mistake to
plead guilty to the simple battery and had fought it in court for a year or more, and now
would not plead guilty to something he didn't do.  He stated he was under no
circumstances guilty of simple battery, and he broke down, feeling like his wife "would
win either way", and took a no contest plea resulting in one year of probation.  He asserts
he took the no contest plea to simple battery to "get it over with" so that he could leave
the state.  Mr. Runyon concluded by saying he felt "my spirit was gonna die, like I was
getting to the breaking point" and it was a "very depressing situation" for him to live
under.

When asked if he had any questions for me, Mr. Runyon replied "No", and the
examination was concluded.

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 23 of 24

## Diagnostic Impressions

| | | |
|---|---|---|
| Axis I: | No diagnosis | |
| Axis II: | Personality Disorder Not Otherwise Specified with Narcissistic features | |
| Axis III: | No diagnosis | |
| Axis IV: | Stressors include pending serious criminal charges with possibility of death penalty | |
| Axis V: | GAF: 70-75 | |

## Forensic Opinion

Based on my independent forensic psychiatric evaluation of David A. Runyon, including review of the documents listed in this report, psychiatric examination of David A. Runyon, and consultation with Paul Montalbano, Ph.D., it is my opinion that Mr. Runyon does not suffer from any serious mental illness, mental disorder, or brain pathology and that there are no mental health factors that are mitigating or aggravating to whatever sentence, if any, is determined by the court. Mr. Runyon states that he does not believe he is or has ever been mentally ill, or in need of any treatment for mental health reasons with the exception of marital counseling several years ago to help with a dysfunctional relationship with his wife, and I am in agreement with that self assessment.

Further in my opinion, David Anthony Runyon meets the criteria for a diagnosis of Personality Disorder, Not Otherwise Specified with Narcissistic Features. Personality Disorders are characterized by long term problems or conflicts with interpersonal relationships that effect social and/or occupational functioning. In my opinion, Mr. Runyon demonstrates features of narcissism including his externalizing his responsibilities for conflicts in several of his jobs as the faults of supervisors and coworkers, or because of "political" reasons. He does not take responsibility himself for these conflicts, minimizing or excluding his problems such as not being on time for work and other irresponsible behavior. He also demonstrates a sense of entitlement, that is, he is "deserving" of special consideration because he is a Christian, honorable, and "the hero type." These personality traits also appear to have affected his social relationships with women, including his wife and girlfriends. Although these personality traits have affected relationships and job performance, they do not, in my opinion, represent a serious mental illness that has any impact as mitigating or aggravating factors regarding sentencing on his current charges if found guilty.

Brian J. Samuels, Esquire
Lisa McKeel, Esquire
June 24, 2009
Page 24 of

Similarly, Mr. Runyon's self-reported history of "concussions" and short term memory
problems do not represent serious or severe impairments suggestive of significant brain
damage or dysfunction.

I did have the opportunity to consult with Paul Montalbano, Ph.D. regarding his
psychological examination and testing of David A. Runyon. Dr. Montalbano reported he
did not find any evidence, based on his examination and testing of Mr. Runyon, of any
serious psychopathology or brain pathology. His findings on psychological evaluation
are consistent with my findings on the psychiatric evaluation.

I hope this report has been informative. I will remain available for further participation in
this matter, as necessary.

Sincerely,

Raymond F. Patterson, M.D.



FILED

JUN 30 2009

CLERK, US DISTRICT COURT
NORFOLK, VA

SEALED
unsealed March 2, 2016

ORIGINAL

Paul Montalbano, Ph.D.
PO Box 225
5505 Connecticut Avenue, NW
Washington, D.C. 20015-2601

**FORENSIC PSYCHOLOGICAL EVALUATION**

**FILED UNDER SEAL**

Brian J. Samuels, Esquire
Lisa Rae McKeel, Esquire
United States Attorney's Office
721 Lake Front Commons, Suite 300
Newport News, Virginia 23606

Date of Report:       **June 27, 2009**

Re:               **United States of America v. David Anthony Runyon**
                  **Criminal No.: 4:08cr16**

**Identifying Information and Reason for Referral:**

David Anthony Runyon is a 38-year-old, single, Asian-American male, who is facing charges of Conspiracy to Commit Murder for Hire (Count 1), Carjacking Resulting in Death (Count 2), Bank Robbery Resulting in Death (Count 3), Conspiracy to Commit Robbery Affecting Commerce (Count 4) and Murder with a Firearm in Relation to a Crime of Violence (Count 5). On July 17, 2008 the government filed Notice of Intent to Seek a Sentence of Death. This evaluation was requested by the United States Attorney's Office. The examiner was asked to evaluate the defendant and render a diagnostic formulation. The scope of the examination was not perform an exhaustive review of the presence or absence of all potentially mitigating or aggravating factors but to more narrowly examine the defendant to ascertain the presence of absence of mental illness.

Pursuant to a Court order dated June 13, 2008 and filed under seal, any examination by Government experts "shall take place not later than 75 days after the filing of the defendant's notice, presuming the defendant is made available during that time." Further, "the report and examination shall be filed under seal with the Court before the commencement of jury selection. The mental health professional conducting the examination shall not discuss his examination with anyone who is not a mental health professional or member of his staff, unless and until the results to the examinations are released to counsel for the Government and counsel for the defendant following the guilt phase of the trial." Further, "the results of any examination shall be released to the Government only in the event that the jury reaches a verdict of guilty on a capital charge against the defendant, and only after the defendant confirms his or her intent to offer mental health or mental condition evidence in mitigation." In a supplemental order it was further stipulated that "a contemporaneous audio recording be made of any Government examination or testing of the defendant pursuant to Rule 12.2" Mr. Runyon was seen on two occasions on 2/20/09 and 2/21/09 for a total of approximately 13 ¾ hours.

277

**Forensic Psychological Evaluation**                                                    **David Anthony Runyon**
**Page 2**

**Non-Confidentiality Warning:**

Before the interviews or testing was performed Mr. Runyon and was informed of the nature of the evaluation as well as the limits of confidentiality. Mr. Runyon was read and given a copy of a detailed informed consent informing him that I had been retained by the United States Attorney's Office and that the evaluation was intended to gather information regarding his psychological functioning to be potentially used during the penalty phase. He was informed that the results may or may not be helpful to him. He was read the conditions outlined in the June 13, 2008 Court order regarding mental health evidence. He was specifically informed that the results would be filed under seal and released only in the event of a guilty finding and only after mental health issues were raised in mitigation. Mr. Runyon understood that the findings would be contained in a report that would be filed under seal with the Court and not unsealed until the penalty phase under the conditions noted above. He further understood that in accordance with a Supplemental Order, dated June 13, 2008, that the entire examination and testing would be recorded and that this recording would be treated in a manner similar to the report. During the course of the two day examination, Mr. Runyon was reminded several times about the non-confidential nature of the evaluation. Mr. Runyon appeared to understand the conditions of the evaluation and agreed to proceed.

**Records Reviewed and Sources of Information:**

I)    United States District Court for the Eastern District of Virginia- Newport News Division
    1)    Criminal Complaint (12/11/07)
    2)    Grand Jury Testimony of Sarah Baker, Christine Chipps, David Dalton, Paula Dalton, Justin Funk, Jason Guyton, George Koski, Virginia Pina, Chad Costa, David H. Runyon & Maria Runyon (1/14/08 & 1/25/08)
    3)    Indictment (2/08)
    4)    Motion of the United States Regarding Mental Health Evidence (4/25/08)
    5)    Defendant Catherina Rose Voss's Response to the Motion of the United States Regarding Mental Health Evidence (5/9/08)
    6)    Brief of Defendant, David Anthony Runyon In Response to Motion of the United States Regarding Mental Health Evidence ((5/1/08)
    7)    Order Regarding Mental Health Evidence (6/13/08)
    8)    Supplemental Order Regarding Mental Health Evidence (6/13/08)
    9)    Transcript of Sentencing Proceedings in U.S. v. Catherina Rose Voss (11/14/08)
    10)   Notice Pursuant to Fed. R. Crim. P. 12.2 (12/12/08)
    11)   Statement of Facts in U.S. v. Catherina Rose Voss

II)   United States Attorney's Office- Eastern District of Virginia
    1)    Report of Telephonic Interview of Suk Cha Runyon (2/5/08)
    2)    Summary of Interviews of Catherina Voss (7/24/08 & 12/3/08)
    3)    Summary of Interview of Larry Davis (5/29/08) and Handwritten Notes by Mr. Davis (4/4/08-6/5/08)
    4)    Summary of Interview of Jamal Knowles (2/9/09)

III)  Saunders Barlow Riddick Babineau, PC
    1)    Letter to Brian J. Samuels, Esquire & Lisa Rae McKeel, Esquire (2/10/09)

**Forensic Psychological Evaluation**                              **David Anthony Runyon**
**Page 3**

IV)    Newport News Police Department
    1)    Memoranda to Lieutenant Sutton Regarding Homicide (4/30/07 & 5/1/07)
    2)    Catherina Voss 911 Call
    3)    Use of Canine Report (5/1/07)
    4)    Catherina Voss Statement and Summary of Statement (5/3/07)
    5)    Crime Scene Report (6/8/07)
    6)    Catherina Voss Statements (7/9/07 & 8/9/07)
    7)    Michael Draven Statements (11/27/07 & 12/7/07)
    8)    Statements of David Runyon (12/3/07 & a second date)
    9)    Search Results by Bureau of Alcohol, Tobacco & Firearms, including photographs of evidence recovered from a search of Runyon's vehicle and documents recovered from Runyon's home (12/26/07)

V)    Morgantown Police Department, Morgantown, West Virginia
    1)    NCIC Criminal History Index Inquiry
    2)    History of Traffic Citations and Record of Pawning Items
    3)    Incident Report (7/18/04)
    4)    Incident/Investigation Report- Domestic Battery (1/7/07)
    5)    Arrest Report (1/12/07)

VI)    Department of Health- Office of the Chief Medical Examiner
    1)    Report of Autopsy by Leah L. Bush, M.D. (5/23/07)

VII)    United States Naval Service Investigative Service
    1)    Investigative Report on Results of Surveillance (11/8/07-12/5/07)

VIII)    Letter from Suzanne R. Dwyer of Alexander, Floodman & Casey, Chartered, Attorneys at Law to Mr. David Runyon with enclosed file-stamped copy of the Journal Entry of the Misdemeanor Case of the City of Wichita v. David Runyon, Sedgewick County Appear Case No. 01 CR 1407

IX)    Educational Records
    1)    Fairfax County Public Schools- Hayfield High School- Transcript (1985-1989)
    2)    Wentworth Military Academy- Transcript (1989-1991)
    3)    Wichita State University- Academic Record (1992)
    4)    Upper Iowa University (1995-1996)
    5)    Troy State University- Transcript (1997)
    6)    Columbia College- Columbia, Missouri (8/02-5/03)

X)    El Dorado Correctional Facility- Kansas Department of Corrections, El Dorado, Kansas (9/92-10/94)
    1)    Various Personnel and Employment Records
    2)    Application Records and Security and Background Information
    3)    Letter of Selection (9/18/92)
    4)    Probationary Evaluations (1/3/93 & 7/17/93)

**Forensic Psychological Evaluation**                                    **David Anthony Runyon**
**Page 4**

5) Performance Evaluations (4/4/93, 10/17/93 & 1/17/94)
6) Letter from Warden regarding his revoked driver's license (9/7/93)
7) Letter from M. J. Kitzke to David Runyon for Employee Performance regarding letter of reprimand for tardiness (12/18/93)
8) Letter from Supervisor, M.J. Kitzke for unsatisfactory attendance (2/2/94)
9) Letter from Warden Nelson of intent to suspend without pay for 3 days (2/25/94)
10) Letter of Resignation from David Runyon (3/3/94)

XI) Wichita Police Department Private Security (1993)
1) Records of Training
2) Certificate of Completion (9/24/93)

XII) United States Army
1) Report of Medical Examination (9/15/88)
2) Certification for Completion of U.S. Army Reserve Officers Training Corps Camp Challenge at Fort Knox, Kentucky (8/3/89)
3) Aptitude Test Results
4) Diploma for Completion of The Fort Riley ROTC Advanced Camp- Camp Warrior Training (7/20/90)
5) Men of Steel Certificate of Achievement or Outstanding Service in 1st Armor Training Brigade- Fort Knox, Kentucky (8/16/90)
6) Ordered to Active Duty (7/29/91)
7) Appointment in the Army National Guard as Second Lieutenant in Infantry (8/7/91)
8) Diploma for Completion of Infantry Officer Basic Course- Fort Benning, Georgia (12/12/91)
9) Army Achievement Medal- First Battalion 137th Regiment (6/11/92)
10) Report of Medical Examination (5/26/94)
11) Enlistment/Reenlistment Document (9/14/94)
12) Superior Performance Certificate U.S. Army Training Center- Fort Jackson, South Carolina (9/22/94-11/17/94)
13) Certificate of Commendation- Association of the U.S. Army (11/16/94)
14) Parachutist Badge for Successful Completion of Airborne Training (11/28/94)
15) 262d Quartermaster Battalion Certificate of Achievement (3/15/95 & 3/23/95)
16) Parachute Rigger Badge (1/27/95 & 4/10/95)
17) Personnel Action- Promotion to Specialist (E-4) (5/6/96)
18) Memorandum Recommending that SPC Runyon be Barred to Reenlist (2/24/97)
19) Bar to Reenlistment Certificate (2/25/97)
20) Statement by David Runyon
21) Request to Appeal your Bar to Reenlistment Denied (3/26/97)
22) Request for Orders Authorizing Acceptance and Wear of the German Armed Forces Jump Wings (4/16/97)
23) Recommend Appeal to Denied by Colonel John P. Lewis (4/22/97)
24) Denial of Appeal (5/1/97)
25) Disciplinary Action (7/28/97)
26) Reassigned for Release from Active Duty not by Reason of Physical Disability (9/10/97)
27) Certificate of Release or Discharge from Active Duty

**204**

USCA4 Appeal: 17-5    Doc: 28-1    Filed: 08/24/2018    Pg: 224 of 521

**Forensic Psychological Evaluation**                                    **David Anthony Runyon**
**Page 5**

XIII) Georgia Peace Officer Standards and Training (1997)
    1)     Various Records
    2)     Job Application
    2)     Record of Training

XIV) Fayetteville Police Department (1/12/5/14/98)
    1)     Various Records
    2)     Application for Employment
    3)     Disciplinary Action/Written Reprimand (2/18/98)
    4)     Letter from Captain Simmons for Disciplinary Action (5/12/98)
    5)     Letter of Resignation by David Runyon (5/18/98)
    6)     Separation Notice (5/14/98)

XV) The Bullet Shop- Wichita, Kansas
    1)     Letter dated 2/6/08 from Don Holman to Keith Cobb documenting the purchase of 3 firearms in 2001

XVI) Piney Ridge Center, Inc, - Waynesville, Missouri (7/9/03-10/17/03)
    1)     Records of Employment including his application, letters or recommendation, time cards
    2)     Disciplinary Action Documentation (10/17/03)

XVII) Certificates
    1)     Armament Systems and Procedures, Inc.- ASP Tactical Police Baton (5/24/94)
    2)     NRA Certified Pistol and Personal Protection Instructor (5/02)
    3)     Armorer's Course (2/6/01)

XVIII) Records from Kendall International CPU LLC (11/21/03-8/24/07)
    1)     Income Records and Check Register
    2)     Consent Forms, Volunteer Information Sheets, Medical Histories, Study Admission Questionnaires, Volunteer Responsibilities, Authorizations to Use and Disclose Health Information
    3)     Entrance & Exit Physical Exams, Adverse Event Reports, ECG's & Lab Results

XIX) Records from Bristol Myers-Squibb (8/30/04-10/24/07)
    1)     Action Number: 1:04CV907 (8/5/04)
    2)     Action Number: 1:04CV908 (8/5/04)

XX) Records from Parexel
    1)     Progress Notes and Records Michael Draven (2006-2007)
    2)     Progress Notes and Records for David Runyon (2004-2006)

XXI) Myspace Subscription Information, IP Activity Report and Messages (10/1/07-12/8/07)

XXII) meRHINO4U Member Profile

**Forensic Psychological Evaluation**                    **David Anthony Runyon**
**Page 6**

XXIII) Consultation by Mark D. Cunningham, Ph.D., ABPP (2/5/09)

XXIV) Review of Audiotaped Interview by Dr. Patterson of Mr. Runyon on 2/4/09

XXV)  Consultation with Dr. Patterson

XXVI) Collateral Interviews by Dr. Montalbano
　　　1)　Telephone Interview of Deputy Chapman at the Portsmouth City Jail on 6/4/09 for approximately 15 minutes
　　　2)　Telephone Interview of Deputy Hobbes at the Portsmouth City Jail on 6/4/09 for approximately 10 minutes
　　　3)　Telephone Interview of Deputy Harrington at the Portsmouth City Jail on 6/4/09 for approximately 10 minutes

XXVII) Interviews and Testing of Mr. Runyon by Dr. Montalbano
　　　1)　Clinical Interviews on 2/20/09 for approximately 7 hours and on 2/21/09 for approximately 6 3/4 hours

**Government's Notice of Intent to Seek a Sentence of Death**

　　　The United States will seek to prove the following statutory aggravating factors as the basis for the imposition of the death penalty.

　　　1.　The defendant, David Anthony Runyon, committed the offenses described in Counts One, Two, Three, and Five, as consideration for the receipt, or in the expectation of the receipt, of anything of value. Section 3592(c)(8).
　　　2.　The defendant, David Anthony Runyon, committed the offenses described in Counts One, Two, Three, and Five after substantial planning and premeditation to cause the death of a person. Section 3592(c)(9).

　　　The United will also seek to prove the following non-statutory aggravating factors as the basis for the imposition of the death penalty in relation to Counts One, Two, Three, and Five.

　　　1.　The defendant, David Anthony Runyon, caused injury, harm and loss to the victim and the victim's family and friends, as evinced by the personal characteristics and by the impact of his death upon the victim's family, friends and co-workers.
　　　2.　The defendant, David Anthony Runyon, utilized education, training and experience that he received in college courses focused on criminal justice, as a law enforcement and correctional officer, as an officer of the Kansas National Guard and as a member of the United States Army to kill Cory Voss.
　　　3.　The defendant, David Anthony Runyon, engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend.
　　　4.　The defendant, David Anthony Runyon, has demonstrated a lack of remorse for his actions as demonstrated by the evidence in the case after the murder of Cory Allen Voss.

Forensic Psychological Evaluation                                    **David Anthony Runyon**
Page 7

**Government's Version of Alleged Instant Offense:**

According to the Indictment, David Runyon shot and killed Cory Voss around 11:45 pm to 12:00 am in the area surrounding the Langley Federal Credit Union (LFCU) in Newport News, Virginia, on April 29, 2007. Mr. Runyon allegedly conspired with Catherina Voss and Michael Draven to perform the murder in exchange for money.

In the fall of 2006 Ms. Voss reportedly began an affair with Mr. Michael Draven while her husband was on deployment on the USS Elrod. The affair reportedly continued after Mr. Voss's return in November of 2006. The Vosses were experiencing financial problems due to mortgage difficulties, a student loan and credit card payments. Around or before January 2007 Catherina Voss and Michael Draven allegedly began contemplating the murder of Cory Voss, who had a life insurance policy in the amount of $400,000. Mr. Draven allegedly solicited information from at least three individuals regarding the contract killing of Cory Voss. Around February of 2007 Mr. Draven met Mr. Runyon, while both were employed as subjects in a medical research study in Baltimore, Maryland. On March 14, 2007 they were released from the study and reportedly made arrangements to further discuss the killing. Various communications were reportedly made between Mr. Draven and Ms. Voss and Mr. Runyon in the time frame before the alleged crime. On March 24, 2007 Ms. Voss reportedly discussed the plan to murder her husband in a phone conversation that last approximately 1 ½ hours. The government alleges that between on or about March 22, 2007 and April 29, 2007 Mr. Runyon created notes reflecting a plan to carry out the murder.

On April 20, 2007 Ms. Catherina Voss opened a bank account at the LFCU with $5.00. On April 24, 2007 Ms. Voss reportedly prepared a Power of Attorney document, which attempted to grant her power of attorney in the event of the death of her husband. On April 28, 2007 Ms. Voss submitted two Powers of Attorney documents to LFCU granting her power over financial matters.

On April 29, 2007 Mr. Runyon purchased a .357 caliber revolver in or around Morgantown, West Virginia. Mr. Runyon reportedly received the necessary details to identify Mr. Voss at the LFCU and he wrote this information down on a map of the Hampton Roads area. On April 29, 2007 Mr. Runyon, Ms. Voss and Mr. Draven reportedly communicated with one another by telephone or text message numerous times. On April 29, 2007, around 11:00 pm Ms. Voss sent her husband, Cory Voss, to the LFCU to withdraw money from the LFCU. She made two telephone calls to her husband while he was en route to the LFCU. At approximately 11:33 pm Mr. Runyon entered Mr. Voss's truck. At approximately 11:42 pm Mr. Runyon directed Mr. Voss to make three attempts to withdraw money from the ATM machine. Around 11:45 pm Mr. Runyon allegedly shot Mr. Voss five times in his vehicle, killing him.

On or around May 1, 2007 Ms. Voss received a $100,000 Navy death gratuity. Shortly thereafter, she signed and submitted a claim for the $400,000 life insurance policy. The government alleges that the co-defendants tried to make the murder appear to be the result of a robbery and carjacking. On or around November 25, 2007 Mr. Draven allegedly sent an email to Mr. Runyon telling to lie about the nature of their relationship and Mr. Runyon sent a reply agreeing to lie.

According to various statements made by Catherina Voss, after her 30th birthday in September of 2005, she started using cocaine and had incurred financial problems. In September 2006 she reportedly met Michael Draven and an affair ensured. The affair reportedly quickly intensified and they took overnight

**Forensic Psychological Evaluation**                    **David Anthony Runyon**
**Page 8**

trips, communicated frequently and discussed marriage. In December 2006 she purchased Mr. Draven a ring with six diamonds. Around January Mr. Draven brought up the idea of killing her husband and became obsessed with the idea. In February 2007 Mr. Draven returned from a drug study and reported that he had met someone, who was a hit man. In March and April they began to communicate with Mr. Runyon by phone or text message. Ms. Voss reported that she was asked to contact Mr. Runyon by Mr. Draven as Mr. Draven had missed a prearranged meeting due to his arrest. She reported that she spoke with Mr. Runyon about his background and the money and that the original fee was around $20,000, which had been previously arranged when she and Mr. Draven were speaking with him over the phone. Now Mr. Runyon wanted another $10,000 due to traveling for nothing and that he needed the money to pay for lawyers in a custody battle. Mr. Runyon reportedly told her that he did not care what kind of person Cory was and to him it was "just a job." Ms. Voss told him that she planned to pay the $30,000 with the life insurance money. She reported that during the trip to Newport News, Mr. Runyon had traveled around and selected LFCU as the site for the murder telling her that it was dark and had easy access to Interstate 64. Ms. Voss also told police that she told Mr. Runyon that her husband had abused their children and was having an affair. Ms. Voss reported that on the night of the alleged crime Mr. Draven drove to the Waffle House in Newport News and met Mr. Runyon for dinner. Mr. Draven reportedly bought a map at the gas station wrote down identifiers for Cory Voss and his vehicle. Ms. Voss stated that Mr. Runyon was going to make it look like a robbery, run back across the footbridge and flee in his vehicle. Ms. Voss also reported that on April 29, 2007, while traveling from West Virginia to Newport News, Mr. Runyon stopped at pay phones to communicate with Mr. Draven and during one of these calls received information including the specific information about Mr. Corey Voss's vehicle.

According to the Newport News Police Department, around 6:00 am on April 30, 2007, Officer Ritter responded to 740 Maryland Avenue to take a report from Ms. Voss about her husband missing. She stated that her husband left around 11:00 pm to go to the ATM and had not returned. Around 6:48 Ms. Dalton, an employee of a dentist, called the police to report a suspicious vehicle. Officer Bell arrived at the scene around 6:49 am. He approached the vehicle and observed a white male with blood covering his shirt and forearm. A medic responded to the scene and pronounced Mr. Corey Voss dead.

Search warrants were executed at various locations and revealed the following. A search of the self-storage unit on Smithson Road in Morgantown revealed a locked gun safe, bow, bow case, Browning gun box, tree stand, heater, gun cleaning kit, brief case, TV, duffle bags, bags of clothing, tapes, CD's, paperwork and letters. The locked gun safe contained a 22 caliber semi-auto rifle and several types of ammunition. A search of Mr. Runyon's vehicle revealed a Remington 870 Super magazine, a Browning 270 A-Bolt, a laptop computer and a Newport News/Hampton map with a photograph of Catherina Voss and Michael Draven with personal information written on the back to "LANGLEY FEDERAL CREDIT UNION- 97 GREY FORD RANGER- FL HUB CAP MISSING- TAILGATE DOWN- J MORRIS BLVD- CORY."

**Defendant's Version of Alleged Instant Offense:**

With the understanding that the following statements would not be disclosed, unless he was found guilty and raised mental health in mitigation, Mr. Runyon provided the following account of the alleged offense. Mr. Runyon stated that he was innocent and adamantly denied any involvement in the alleged offense. He stated, "I know I didn't do it" and "I don't care if the government puts me to death" and that he

**Forensic Psychological Evaluation**                          **David Anthony Runyon**
**Page 9**

"will never tell anybody I did something I didn't do." He stated that "it's the principle of the matter" and that as someone with Asian heritage "doing something like that brings shame on my family." He added that, "my father's name is very important to me" and "the last thing I want to do is bring shame on my family or my father." He stated that, "I believe that law enforcement made an error in arresting me." He added that "their theory is based on gossip." He objected to being arrested at gunpoint stating that, "I tried to cooperate" and "I feel like I bent over backward to be polite." He "had the impression they were just trying to hang this murder on somebody." He reported that he had lent Mr. Draven money to pay a utility bill and then Mr. Draven sent him some money back.

He described Mr. Draven as a business acquaintance. He met Mr. Draven during a drug study and was hoping to do some stunt work and special effects for his movie projects. He pointed out that with his firearm expertise he knew how to make blanks. Mr. Runyon was hoping to put together some film clips so that he "might get some recognition" and "maybe would have enjoyed making a career out of it." He reported that he knew Ms. Voss through Mr. Draven and "knew if I needed to get a hold of Draven I could contact her." He stated that he never met her but talked to her on the phone several times. He talked to her about the drug studies, about making a movie with Mr. Draven and about how to contact Mr. Draven. After reviewing material in the case, he has formed the opinion that Ms. Voss "is a very bad person," who "came up with a plan to betray her husband out of greed" and "used other men by sleeping with them to manipulate them by lying and scheming." He added that "Michael is just one of the people she used to meet that end." He added that, "Detective Ross told me Cat is a habitual liar." He stated that, "I got drug into this because I knew one person" and he was "wrong in my judgment of his personal character" and now wonders "if he was looking at me as a scapegoat from the beginning."

Asked if he had ever referred to himself as a hit man, Mr. Runyon answered that it "was a joke." He explained that "some of us in drug studies come up with different stories to tell girls and stuff" and that it is "easier to tell them you do something else" and the "hit man thing is like a standing joke." He added that he had also referred to himself as a computer specialist or doing work for the mob. He stated that he told others, "whatever you think the girls want to hear if they're looking for something dangerous or mysterious." He reported that he told the hit man story to Ms. Pina in part because "some of the people she parties with, when I'm away are not nice people" and "thought of that as a way to maybe protect her" since "they'd think twice."

During the time frame of the alleged instant offense, Mr. Runyon denied being under any significant pressure. He denied any undue interpersonal or financial pressure. He denied any significant mood, thought or memory disturbance. He added that during this time frame his son was living with him, which was positive experience for him.

**Legal History:**

According to the National Crime Information Center inquiry, Mr. Runyon was arrested for Battery in February 2001. According to a letter from Suzanne Dwyer from the law firm of Alexander, Floodman & Casey, which enclosed a journal entry from the District Court in Sedgwick County, Kansas, Mr. Runyon was convicted of Simple Battery on February 4, 2002.

Mr. Runyon denied assaulting his wife and reported that she lied to hurt him. He explained that she

**Forensic Psychological Evaluation**                                    **David Anthony Runyon**
**Page 10**

knew that he was planning on moving out and that once she made the allegation, she "put me out of job and into the court system" and "made me stay there longer which is what she wanted." He reported that he fought the charge for over a year but was let down by his attorney and the judge. He stated that the judge held it against him that he stopped his wife from calling 911. He explained that he had been instructed to do this by counselors and that you "don't allow any outside interference until she is over the panic attack" because "anyone from the outside coming in doesn't know what's going on." He stated that the judge was "obviously not educated about mental illness and panic attacks." He felt that he "was screwed by my ex-wife" and felt betrayed by her and the justice system. When asked to reflect on his current legal situation, he answered that it was the "same thing all over again" but on a "much larger scale" but that it "doesn't surprise me this time."

In her grand jury testimony, Maria Runyon reported that that her daughter was ill, and that she was using the car and running late and that her husband needed the car. Regarding the incident, she stated "one thing led to another and yelling became physical. I was throwing things. He was throwing things. He grabbed me and pulled and pushed me at one point and I called the police." She added that she was not taking her prescribed medication for anxiety and depression and "I know myself that I became pretty violent." She added that "we've had lots of fights."

According to records from the Morgantown Police Department, Mr. Runyon was charged with Domestic Battery on January 6, 2007. Ms. Pina, the alleged victim, reported that she got in an argument with her boyfriend, David Runyon, who was accusing her of sleeping with someone else. When she attempted to leave, he pushed her and smacked her in the face. She went to the bedroom and he followed and threw her down on the bed and punched her with a closed fist approximately three times. The police report indicates that her injuries consisted of a bruised and swollen right eye.

Mr. Runyon denied ever physically assaulting Mr. Pina. He stated that he had "absolutely not" hit her and "never have." He reported that she engages in self-harm and have "seen her hit herself" and "give herself a black eye." This would explain her injuries during the alleged domestic assault.

In her grand jury testimony, Ms. Pina stated that "he struck me because I wasn't working" and he "hit me about three times in the face and my whole face right here was bruised." She stated that she withdrew the charges "because I still have feelings for him." Mr. Pina stated that he had probably hit her about 20 times and that he had a "violent temper." Triggers for his temper included "me not working, me not cooking his food fast enough, me not getting him this fast enough or not letting him play on his computer."

Outside of traffic violations, Mr. Runyon denied committing other crimes. When asked if owning weapons was illegal in light of his past conviction, he stated that "technically I believe I should" but did not know "if it got fixed." He added that his attitude was that he "didn't want to mess with it" and "screw the government" and he was "not gonna go thru the red tape to fix it." He acknowledged that he had other people pawn weapons for him because he did not want to deal with any potential red tape.

**Psychosocial History:**

David Anthony Runyon is the oldest of two children born to David Dombrowski and Suk Cha

USCA4 Appeal: 17-5     Doc: 28-1     Filed: 08/24/2018     Pg: 230 of 521

Runyon, nee Chung, on January 7, 1971 in the Army hospital located at Fort Hood, Texas. He has one younger brother Mark Runyon, who is two years younger. Mr. Runyon reported that he has few memories of his biological father. He recalled his father "beating on my mom" and "throwing her across the coffee table." On one occasion he recalled feeling that "I had to do something" and biting his father on the leg because "I knew as long as he was busy with me he wasn't gonna hurt my mom." On that occasion he was not sure if his biological father "choked me or hit me." He did not recall any additional incidents of physical abuse by his biological father. His mother told the government that Mr. Dombrowski pushed her around when her son David was 3 or 4 but there was no injury. According to a letter from the defense, his biological father physically abused his wife and son David and the marital discord led to a suicide attempt by his mother after which the marriage dissolved and they divorced. His mother reported that she was married to David Dombrowski from 1970 to 1976. His mother reported that her son, David Runyon, was bullied by a daycare woman's son when he was 4 or 5 that the he had a fear of his biological father. Mr. Runyon reported that his mother told him his biological father was a drunk. Mr. Runyon indicated that he has had no subsequent contact with his biological father. As an adult his mother asked if he wanted contact information but he declined. He stated that "I grew up without him and felt like he hadn't tried to contact me or be involved in my life" and "I was happy with my stepfather." He added, "why open up old wounds." The letter from the defense reports that Mr. Dombrowski's childhood was marked by divorce and domestic violence, that he drank heavily, had a gambling addiction and physically abused his wife and son, David.

His mother divorced his biological father and remarried David Harold Runyon, who was also in the Army. Mr. Runyon reported that he began living with his stepfather as a young child. After his mother remarried in 1976, Mr. Runyon described a stable childhood in a "very strict household" with two loving parents. He described his mother as "overprotective" and "passionate." He indicated that she "does a lot of screaming." He denied that she was abusive and stated that she was "dramatic." He did not think that her mood was unstable and did not think that she was ever on medication to stabilize her mood. According to a defense letter, Suk Cha Runyon suffered from a mood disorder and had difficulty regulating her anger and at times became physically violent. In addition, she reportedly had problems during her pregnancy with David and passed out at the airport, when flying to the U.S. but when the baby was born, he was fine. The defense letter reports that his brother, Mark Runyon, described Suk Cha Runyon as "overbearing and emotionally abusive."

Mr. Runyon described his primary paternal caretaker, his stepfather, in positive terms as a "good, honest man." His father worked as an enlisted engineer in the Army. He reported that he was influenced by his father's values of "duty and love for country" and that later joining the armed forces was motivated in part by trying to "make my father proud." He reported that the "greatest gift my father gave me was appreciation of nature." He recounted hiking, camping, fishing and hunting with his father and credited him with developing his "outdoor skills." He reported that he was instructed on firearm use in "maybe 5th grade." A letter from the defense to the government describes David H. Runyon, Sr. as "intelligent and pleasant, but emotionally detached." In his grand jury testimony David Runyon Sr. described his son, David, as an extraverted person, who was outgoing and took care of his brother. Mr. Runyon Sr. described his wife as "overprotective" but that "to my knowledge there was no abuse." Mr. Runyon Sr. reported that "we have had a strained relationship with him."

Mr. Runyon described a positive relationship with his younger brother, Mark. He indicated that he

**211**

**Forensic Psychological Evaluation**                                    **David Anthony Runyon**
**Page 12**

was "very protective" of him. He recounted that his brother was "accident prone" and that there were frequent trips to the ER for his brother's injuries. He described his brother as his "best friend." He reported that since he joined the military he has had very little contact with his brother. His brother also joined the Army but now lives and works in Hawaii. He indicated that after he left his wife he did not want to disclose his location to anyone since she was looking for him. At one point he felt like his brother sided with her. He later found out that his brother was upset with him when his brother was not able to reach him. He recently received a letter from him but has not responded. He last talked with him the summer before he was arrested. When asked for details about his brother, he was not sure and admitted that he initially forgot that this was his brother's second marriage. He reported that his brother works for a power company and has three children.

Growing up in a military family Mr. Runyon traveled widely during his childhood. He reported that he spent his first years in Texas, then a year in Panama, then 4 years in Germany, then 4 years in Missouri, a year in Korea and then all 4 years of High School in Virginia. When asked what impact moving around had on his social development, Mr. Runyon reported that he "made friends easily but as far as maintaining friends that was non-existent."

Mr. Runyon reported growing up in strict household where he was expected to do chores and where discipline was firmly enforced. A schedule of chores was posted on the refrigerator. He added that "Asian punishment was different" and cited an example of standing in a corner holding a can of Pringles filled with marbles over your head. When punishment was necessary, his father would use a hand, belt or paddle for physical discipline. He added that there was a paddle with holes in it that stung more, which was hung on the wall "where we can see it." The defense letter to the government states that corporal punishment was often used against the children, including the use of a paddle with holes to increase the physical sting. The letter adds that other punishment included forced ingestion of cigarettes and being made to stand in a corner holding a heavy can in the air.

During his childhood and adolescence he reported that he was involved in numerous fights. He stated that he fought "all the time" since he was "constantly protecting my brother." His brother was repeatedly getting in trouble. He recalled that it was "not uncommon for him [his brother] to come running down the street yelling my name with a bunch of kids chasing him." In High School he was involved in a fight with several fellow students. He denied any childhood or adolescent history of fire setting, animal cruelty, truancy, stealing, bullying or destruction of property. In terms of bullying he stated that he did not like bullies and was sensitive to being picked on since he was small. He reported that he would "try to stay out of other people's business but when I can't take it anymore I intervene." He reported that he received a 3 day in house suspension in High School for the aforementioned fight. He stated that he and another student were wrestling rivals his senior year. During a wrestle off his rival broke his ankle and blamed him. This wrestler and two others subsequently jumped him. While defending himself he threw the other student in a garbage can. He reported that the other student was suspended for two weeks. The first weapon he owned was a 20 gauge single shotgun around age 10 to 12. He reported that he owned various firearms and received training from his father, in law enforcement and in the military on their proper use. He bought gun magazines to keep abreast of new developments. He had a compound bow, which he liked to hunt with because it was more challenging. He also owned decorative swords. He reported that he has never fired a weapon in self-defense or during the course of his police career.

**Forensic Psychological Evaluation**                           **David Anthony Runyon**
**Page 13**

Mr. Runyon was not aware of any family history of mental illness, although he acknowledged that he knew very little about his biological father. A defense letter, however, stated that his mother has a mood disorder. He reported that his mother told him that his biological father abused alcohol. Mr. Runyon reported that his parents were against his marriage. He lived with them after leaving his wife. Subsequently, he had long periods of no contact with either parent. He estimated that the longest period of no contact was about 5 years. He reported that he last saw his parents in 2002. In addition, as noted he reported that he has not seen his brother in some time.

**Interpersonal History:**

Mr. Runyon reported that as a child he was well-liked and had a lot of friends. However, it was difficult to maintain friends since he moved so often. He began dating around 18. He reported that he was "preoccupied with grades and sports" and not focused on dating in High School. His mother "tricked" him with his first date, when a girl showed up as arranged by his mother. He first had sex at age 18. He stated that he was at a party and drinking when two cheerleaders from another school initiated sex. He passed out but remembers "bits and pieces."

His first serious relationship was with Christiana Vanlook while at Wentworth. They dated for approximately one year and became engaged. She graduated before him and went off to another school. She had "cheated on me over the summer" and she subsequently broke off the relationship.

Around 1994 he was introduced to Maria Linker by her sister, who worked at the security company, where he was employed. They began dating. He liked her because she was a "cute little petite blonde hair blue eyed girl" who was "polite" and "Christian." Maria was a single parent with two children, Wren, approximately 5, and Kendi, approximately 3. Maria was divorced and had been in an abusive relationship. He "fell in love with the kids who were shy and well-mannered" and "couldn't say no to the little girl" with "the biggest blue eyes." They married January 20, 1995. They remained together for approximately 5 years. He accepted the role of father as a "great responsibility" adding "maybe because of what my father gave me." Maria got pregnant quickly which was not planned. As soon as she was pregnant "she just dropped the façade." He found out that she "wasn't a nice person" and was "very lazy" and she put the financial responsibility completely on him. He now saw her as "selfish," "argumentative," "unhappy" and "always griping, always complaining." Within a month she had called his sergeant and complained that they did not have enough food since he would not give her money for shopping. He stated that this was not true and he later discovered that "she does drugs" and "smokes marijuana." He stated that "it was obvious she had taken advantage of me" and "tricked me." He threw the wedding ring away since the marriage was a fraud. In retrospect he believes he was "blinded by lust" and ignored the "warning signs." However, he felt that "the responsible thing was to stay with her through the pregnancy."

His son David was born 1/26/96. He described a very close relationship with his son. However, he reported that he found it increasingly hard to stay in the marriage and was "detached" from his wife. He described Maria as emotionally volatile and recounted various episodes which illustrated this. For example, while working as a policeman in Georgia, one night his wife demanded to talk about something urgent but would not explain what it was about. He was very tired and told her he had to go to sleep. He went to bed and she got the shotgun out of the closet, pointed it at him, cocked the hammer and stated, "you're gonna talk to me one way or the other." Mr. Runyon told her that that would not happen because "you can shoot

**Forensic Psychological Evaluation**                                    **David Anthony Runyon**
**Page 14**

me and we won't talk or you won't and I'm going to sleep." He stated that she was trying to "manipulate" him and that "she wants to wear the pants and that's not the way it works." He reported that she would argue with him but that he was "polite and cordial to her" and "emotionally detached." He denied any history of physical abuse and denied ever threatening her with physical violence. He indicated that he repeatedly tried to separate from her but she would manipulate events to thwart his plans.

When he moved from Georgia back to Kansas in 2000, he wanted to move Maria back in with her family and separate. However, she was not able to support herself and he felt obliged to stay. In 2001 Maria claimed that she assaulted her. He was upset that his wife fabricated the domestic violence charge and felt that she did this to ensure that he would not be able to move away. Regarding the charge of domestic violence, he states that "she was just blatantly lying." He believes that she was upset because he had agreed to baby sit and when he was unable to that he had ruined her plans to cheat on him. He reported that she was "always unhappy" and there was "no peace" and she would "sabotage me." After leaving the car dealership, he finally moved away and separated. He stated that she knew this was going to happen. In her grand jury testimony, Maria Runyon stated that "he just walked out on me and my three kids. I had no idea he was leaving, none." After the separation, he moved in with his family in Richland, Missouri.

Mr. Runyon reported that leaving his children was the "single hardest thing I've ever done." He had limited contact with his children over the phone but felt Maria "would use the children to manipulate me to come back." Therefore there were periods when he had little contact with his children. He did not provide child support since "my whole marriage was her manipulating me for money."

His next significant relationship was with Virginia Pina. He met her in late 2000 or early 2001 when he was living in Missouri. He reported that he frequented a local bar, where she worked as a topless dancer. They "became good friends really fast" and moved in together. He reported that it "got physical real quickly" and "she's pretty aggressive" and the "sex was awesome." They remained involved for the next 5 to 6 years. At the time Ms. Pina was involved in a custody fight and wanted her own place to make her eligible to have custody of her child. Mr. Runyon helped arrange this but Ms. Pina was still not given custody due to concerns about her drug use. He eventually learned that she abused marijuana, cocaine and prescription drugs. He reported that she had been physically abused by her ex-husband and sexually abused when younger. In 2003 she was center of a dispute at the Hampton Inn, when a housekeeper alleged that she was soliciting clients there. When the housekeeper manager "said something unprofessional," he became upset and demanded an apology. He stated "I don't believe she was trying to solicit but later found out there were a lot of things I didn't know about her." He broke up with her for a time. However, she overdosed and her "party friends dropped her off at my door" and he performed CPR. He agreed to help her and they decided to move to West Virginia in part because "she needs to leave her drug friends behind." In addition her father, who lived in West Virginia, was scheduled to have open heart surgery. In general, they "got along great" and "never fought about anything except her drug dependency." They moved to West Virginia in the fall of 2003.

After moving to West Virginia, they both worked at local pizzeria. Mr. Runyon started doing drug studies. Ms. Pina cheated on him several times but the relationship continued. One time he was gone for a week or two and Ms. Pina "ended up getting in some trouble" at work involving the manager dating an employee and perhaps Ms. Pina dating the manager. He believes that she was fired. The relationship was demanding because she "required constant supervision." He reported that she had significant issues and

**214**

**Forensic Psychological Evaluation**     **David Anthony Runyon**
**Page 15**

was guilt ridden and at times suicidal. He tried to help her but she would inevitably falter. He denied ever physically abusing her and stated that her injury in the alleged domestic assault was self-inflicted. Due to her "lack of growth" and failure to work, he eventually decided to end the relationship.

In the spring of 2007 he picked up his son, David, and returned with him to West Virginia. He reported that his ex-wife was in trouble with the law and might be doing jail time and agreed that he could take David. He described the time he spent with his son as "awesome." In her grand jury testimony Maria Runyon reported that she picked up her son on 5/17/07.

Paula Dalton began living with Mr. Runyon. According to Mr. Runyon this relationship was not intimate but he enjoyed looking after Ms. Dalton's "beautiful daughter," a "miniature Kendi," who was "blond hair and blue eyed." A note from his cellmate, Mr. Davis, dated 4/4/08 contradicts this information and states "Paula- is the girl he was messing with at the time." In addition, in an email dated 7/3/07, Mr. Runyon writes, "Paula & I have been dating off & on for a little while now." His next significant relationship was with Sarah Baker. This relationship began later in 2007. He reported that he ran into her in a grocery store and they dated. The relationship "became physical right away" and she moved in. He later found out that she had significant drug problems and had overdosed on heroin in August. For a while he, Sarah Baker, Paula Dalton and Jason Guyton were living together. However, due to the "sexual tension" in the household, he and Ms. Baker decided to move out. He explained that Ms. Dalton was interested in him and Mr. Guyton was interested in Ms. Baker. He rented a room from Dave Dalton, Paula Dalton's father and a relative of Sarah Baker. The relationship with Ms. Baker evolved but ended when he was arrested. Mr. Runyon reported that "we didn't have a lot of time together to develop the relationship." In her grand jury testimony, Ms. Baker stated, "I loved him to death. We were going to get married. We were moving to Colorado and then this happened."

Mr. Runyon reported four significant interpersonal relationships in his life ranging from several months to approximately six years. There were three live-in relationships. He estimated approximately 20 sexual partners in his life. He denied any homosexual interests or contacts. He denied any deviant sexual interests. He described himself as "monogamous" and that "the physical side completes the emotional side."

The records reviewed in this case include numerous electronic correspondences between Mr. Runyon and various women or at least individuals claiming to be interested women on the internet. These correspondences begin around December of 2006 and continue up until his arrest. Therefore, they overlap with periods when he was involved with Ms. Pina and Ms. Baker and overlap with the time frame of the alleged offense. Mr. Runyon reported that he was looking for his "soul mate" and had decided to focus on other cultures such as Russia because he believed he had a better chance of finding a conservative female with similar values. He explained that in America females "learn at a very early age how to manipulate men by batting their eyes and tossing their hair" and they "put on an image of someone they're really not," which "contributes to the high divorce rate in America." He believed that "the female is encouraged in our society to be more dominant and aggressive." Mr. Runyon stated that in his view the "husband and wife should work together as a team but there can be only one captain at the wheel" and "with my beliefs in Christianity the husband is the head of the household." He hoped that "with a foreign woman and more traditional background there would be less conflict."

USCA4 Appeal: 17-5     Doc: 28-1     Filed: 08/24/2018     Pg: 235 of 521

**Forensic Psychological Evaluation**                                    **David Anthony Runyon**
**Page 16**

An examination of the meRHINO4U member profile of Mr. Runyon on the internet begins with a picture of two revolvers with the words "This Is What It Sounds Like When Thugs Cry." He describes himself as "GOOD AND BAD. NICE AND NAUGHTY. A GENTLEMAN ALSO AN ANIMAL. A LEADER AND A GOOD FOLLOWER. JACK OF ALL TRADES BUT MASTER OF NONE. I LIKE ARMANI SUITS AS WELL AS MY BIRTHDAY SUIT. I APPRECIATE LIFE MORE WHEN I AM CLOSER TO DEATH. ANDRENALINE JUNKIE OR DIE!!!" There are numerous photos of women and of himself. An examination of these web sites and electronic correspondences tends to conflict with Mr. Runyon's portrayal of himself as conservative Christian male.

**Educational and Occupational History:**

Mr. Runyon estimated attending about 6 different schools growing up, including schools in Germany and Korea. He reported that he attended a Korean school during 8th grade, had a Korean tutor and completed an English correspondence course. He attended Hayfield High School. He reported that he liked school and "enjoyed learning" and that school "was important to me." He recalled receiving average grades in elementary school. He reported experiencing culture shock when he moved from Korea back to the United States and attended school in Virginia. His grades suffered but he studied more and improved his grades. He graduated from Hayfield High School in 1989. He ranked 122nd in a class of 387 with a GPA of 3.0.

His scores on the Armed Forces Qualification Test placed him at the 87th percentile. However, according to Mr. Runyon his SAT's were not high enough to qualify for West Point and he opted for Wentworth Military Academy in Lexington, Maryland. He reported that he was awarded a $30,000 scholarship from the Army. At Wentworth he reported that "people mistook my confidence for being stuck up" and he was "singled out" and "constantly hazed and harassed, especially the first six months." His grades ranged from A to D and he probably averaged around C. He graduated in 1991 with an AA degree and ranked 24th in a class of 31. He subsequently joined the Kansas Army National Guard. In an e-mail he stated that "when I went into the Army for my Infantry Officer Training I was very young. I was only 20 years old & everyone else was at least 22. I was also the *shortest* among them. They called me baby Lieutenant. But I graduated in the top 10% of my class & even though I was short I was incredibly strong." In that correspondence he further stated that he became a "commissioned officer appointed by Congress in 1991" and "was one of the youngest Lieutenants in the Army." He attended U.S. Army Infantry School at Fort Benning, Georgia.

He reported that he tried to continue his education since his goal was to become an active duty officer. He attended Wichita State University in 1992. His grades ranged from B to F to Incomplete. He worked at Kinko's and another job as a line chef but reported that he was so tired he was not able to effectively study. He recalled falling asleep in his car. He later wrote in an e-mail that he was working over 100 hours a week and still attending his classes but could not complete his college education. In 1992 he also worked for Wells Fargo Guard Service.

For approximately 1 ½ years, from October of 1992 to April of 1994, he worked as a correctional officer at El Dorado Correctional Facility in Kansas. Records indicate a satisfactory probationary evaluation but with problems getting to work on time. In July of 1993 his evaluation noted that he "has the potential and experience to become a reliable employee, however, your chronic tardiness continues to

USCA4 Appeal: 17-5     Doc: 28-1     Filed: 08/24/2018     Pg: 236 of 521

**Forensic Psychological Evaluation**                          **David Anthony Runyon**
**Page 17**

affect staff morale." A letter from the warden noted that his driver's license had been revoked and he was given 30 days to verify a valid license. A Performance Evaluation from October of 1993 noted "a can do attitude and willingness to take on any assignment" and "outlook for a fruitful career" and a "wealth of undeveloped potential." He was recommended for permanent status. In December he received two letters of reprimand. In January of 1994 he received an unsatisfactory performance evaluation noting excessive absenteeism. Mr. Runyon stated that he had car trouble. In February he received notice of intent to be suspended without pay for 3 days for lateness. On March 3, 1994 Mr. Runyon submitted his letter of resignation. In his letter he stated that "acceptance of crimes that I have been falsely accused of which have been greatly exaggerated is an admission of guilt. Therefore, I refuse to accept the punishment." He added that he had been "falsely accused of abusing my sick leave, of lying, and not informing my superiors of my required military leave dates" and "I prefer not to work in an environment where I must constantly watch my back" and was "tired of seeing fellow DOC officers backstabbing each other" and "tired of the day to day disorganization of this facility" and was "tired of seeing officers escalate precarious situations" and "tired of being put 'on front street' by my fellow officers in front of everyone else" and "I am bored with the job and tired of dealing with unprofessional officers in the KDOC." When interviewed about this work experience, Mr. Runyon reported that he did not get along with a female sergeant. He recalled that he called in sick and then was observed at a gun show and they wanted to punish him. He reported that he rescued a female officer from being raped and stopped a potential riot in the gym. In both situations he reported that he was able to talk down the inmates because they respected him. He reported that part of the reason he did not get along with other officers was because he would not harass inmates. He stated that he was not "a groupie" and would not abuse his authority.

    In 1994 he enlisted in the regular army. He reported for active duty in September. He reported that he wanted to join the Ranger Support Platoon but did not get in. He stated that some politics were involved. He received a superior performance certificate at Fort Jackson. He successfully completed Airborne training at Fort Benning. He put in to be a warrant officer with the Criminal Investigation Command (CID) but was not approved.  In 1995 he resumed his education at Upper Iowa University and studied Law Enforcement. He received his Parachute Rigger Badge. In November of 1996 he was in a motor vehicle accident. In 1997 he attended Troy State University in Alabama. He was subsequently barred from reenlisting. Captain Hannaman cited unsatisfactory job performance, history of lateness, inability to properly manage finance and other recurring problems, specifically noting attention to detail as well as failure to follow instructions. His appeal to reenlist was denied and he was honorably discharged in September of 1997. When questioned about the reasons cited for denying his reenlistment, Mr. Runyon denied the allegations stating that he was only late for an award ceremony and that "the whole thing's a set up from the get go." He believed that he had "made enemies," who did not want him to become an officer. For example, according to Mr. Runyon certain NCOs made "immoral and unethical decisions," which he opposed. When the battalion commander asked him about failing parachutes, he told him that the person packing them was lazy. Mr. Runyon stated that in Japanese there is a saying that "the head of the nail that sticks out is the one that gets hammered." He stated, "if you don't conform you're the one that gets targeted" and "I don't have any problems standing up for what I believe." Regarding the letter by Captain Hannaman, Mr. Runyon stated that Captain Hannaman was unsympathetic after his accident and yelled at him for being unshaven on the Monday after the accident when "my sensory process was out of whack." He felt like his treatment was "very unfair." He acknowledged that he achieved certain awards such as the Army Achievement Medal but noted that after he probably saved the life of parachuter in an exercise the sergeant took the credit. In that instance he stated that the sergeant wanted to push the soldier out for the

**Forensic Psychological Evaluation**                                **David Anthony Runyon**
**Page 18**

jump but he noticed that the strap was not right and had to physically oppose the sergeant from pushing him out.

After leaving the military he applied for work with the Fayetteville Police Department. He wanted to work in Atlanta but his wife did not so he "compromised." For approximately 4 months, from 1/12/98 to 5/14/98, he worked for the Fayetteville Police Department. In February he received a written reprimand for speeding and having an expired tag. He liked the police chief, who he states was forced to resign because of politics. On 5/7/98 he received a written reprimand for chronic tardiness. During his tenure in the department, Mr. Runyon reported that he had "family issues" and that he wanted psychological services for his wife. He reported that wife suspected him of cheating "because I was coming home late," which he attributed to completing required paperwork. He reported that the police department made arrangements to transfer him and he decided to resign. In his letter of resignation he wrote that "I am trying to deal with some serious personal problems at home and cannot keep it from interfering with my judgement. I do not feel that I can remain focused while on the job until I have resolved my personal problems."

After leaving the police department, he reportedly worked in construction and for a tree service company for 2 to 3 years. Beginning around 2000 he worked for First American Rental in Atlanta, Georgia. He was responsible for collections and customer relations. He ended up as assistant store manager. He left because his wife was unhappy with the area and with their children attending a predominantly African-American school. He agreed to return to Wichita, Kansas. He took a job at the Bullet Shop, a gun store, as a salesperson. He helped the owner reorganize the inventory and install a new computer system. He became NRA certified and was a pistol instructor. He completed a Glock armourer's course certifying him to repair that particular weapon. He was able to buy weapons at cost and owned a Smith & Wesson 686, a Sig Sauer and an H&K 45. Records from the Bullet Shop indicate that he also purchased a Davis 380B and Taurus 444. He liked this job but had to leave due to the domestic violence charge.

After leaving the Bullet Shop, he worked for the Davis Moore Auto Group as a valet driver. By the time he left, he was a valet manager. He also worked as the weekend manager at the Candlewood Hotel. He stated that he did not want to be at home since he and his wife would argue and she "would threaten to call the cops and have me thrown in jail." During this time frame he also worked as a projectionist at the Premiere Palace Theater.

After separating from his wife, he moved back with his family in Missouri. He reported that he obtained employment as a front desk clerk. He attended night school at Columbia College. He reported that he performed well in school but the school denied him credit for past criminal justice experience. He stated that it "was ridiculous to make me go back and take elementary level classes" and that it was "another betrayal." Due to the "politics" he decided to leave. Records from the college indicate that he owed over $2000. At the Hampton Inn his boss was transferred to another hotel after she "apparently had a nervous breakdown." He stated that she "worrying and stressing about me taking her job," which he reported was not the case. He believed that his new boss "felt threatened right away." He reported that there was gossip that his girlfriend, Virginia Pina, was soliciting from the hotel. An employee insulted her and he demanded an apology. However, after the "weak little apology," he decided to leave.

In June of 2003 he applied for job at the Piney Ridge Adolescent Residential Treatment Center in Waynesville, Missouri. He worked there as a youth care worker for approximately three months, from

Forensic Psychological Evaluation                              **David Anthony Runyon**
Page 19

7/9/03 to 10/17/03. He stated, "I enjoyed that job" and "was looking at it as a career." However, he decided to quit and move with Ms. Pina to West Virginia. Records from Piney Ridge indicate that he did not show for work or call four times in October and was terminated with no eligibility for rehire. Mr. Runyon reported that he was "never even late" and was not terminated but quit.

Since leaving Piney Ridge, he has essentially been employed by doing drug studies for pharmaceutical companies. He reported that he became interested in this field because his mother had severe pain problems and he was "looking into that to discover something to help my mother." After moving to West Virginia, he saw an ad in the paper and participated in the study. Records indicate that his first drug study was in November of 2003 for Kendall International. In 2004 he made $5364 and in 2005 $3333 by doing in drug studies. He also worked for a local pizza shop, Vocelli's, distributing flyers. Participation in the drug studies often involved being gone for a week or two.

Regarding his employment history, he had "no idea" how many jobs he has worked. His longest regular job was for about three years in the military. He denied ever being fired. He reported that he was forced to leave his job at the gun shop due to his charge. He reported that his supervisors would describe him as "intelligent, hard working and polite." He reported that the only time he had a problem with punctuality was when "when I'm not happy." He denied any problem with absenteeism. When asked if there was any pattern about conflict and leaving positions, he stated "I don't like to be around negativity" and "I don't have to stay and tough it out" and would rather simply leave.

**Substance Abuse History:**

Mr. Runyon denied ever abusing drugs or alcohol. He reported that he had never used any illicit substances. There is no documented history of significant alcohol or substance abuse. He reported that he drank socially but not to excess. The laboratory results from numerous drug studies, which included drug urine screens, were consistently negative for amphetamines, barbiturates, benzodiazepines, cannabis, cocaine, opiates, phencyclidine and methadone. In her grand jury testimony, Sarah Baker, stated that Mr. Runyon "gave drugs to friends, mostly painkillers and Ecstasy." In her grand jury testimony, Virginia Pina stated, that he "used to be a social drinker but after I left him, he came to drink pretty good." In an email dated 12/23/06 Mr. Runyon writes, "we came up smoked some pot & did some fishing." In his notes, his former cellmate, Mr. Davis writes in one of his entries that "the girl Sarah and him were on their way to buy weed." In his statement to the government, another former cellmate, Jamal Knowles, reports that Mr. Runyon stated that during his arrest with his girlfriend in West Virginia, he had marijuana in his possession. However, there does not appear to any mention of marijuana being found in the arrest reports. While some information suggests some involvement with substances such as marijuana, there is no consistent evidence. In addition, as noted, Mr. Runyon would have forfeited his only source of income participating in drug studies if he tested positive for any illicit substances and all the drug tests which were performed were negative. In summary, there is not consistent substantiation of any pattern of substance abuse.

**Medical History:**

Numerous physical examinations including blood work and ECGs were performed during the course of his participation in various drug studies. The results were essentially within normal limits. Mr.

**Forensic Psychological Evaluation**                    **David Anthony Runyon**
**Page 20**

Runyon reported that he was in a bad car accident in 1996 when he was hit by a drunk driver in a head on collision. His former wife corroborated this during her grand jury testimony. Mr. Runyon reported that the drunk driver was going "well over 100 mph" and that objects from the back of the truck hit him in the back of the head and his knees went up into the steering column. He did not believe that he lost consciousness. He reportedly was treated at a local hospital and released. He received follow-up treatment at an Army hospital. He reported that he sustained "tremendous muscle damage" and tore his anterior cruciate ligament (ACL) in his left knee. He received physical therapy for 4 or 5 months. He indicated that he had memory problems and his wife told him he would forget things. He would get vertigo at times. He reported that his memory has improved but that he still gets vertigo at times. In one of his emails he also writes that he has "hearing loss & two bad knees."

In terms of head trauma, he reported several possible concussions. He recalled being knocked out playing football, when he ran into a telephone pole and was briefly "knocked out." He guessed he was in elementary school at the time. As an adult he reported that he was "knocked out" by a hand grenade simulator. After losing consciousness, he was dragged through the woods by two soldiers, who apparently thought this was part of a training exercise. During another military exercise, he reported that a C-4 explosive went off as he was diving into a bunker. He was already in the bunker from his waist up but the shock wave struck him from the torso down. He was stunned but did not believe that he passed out. He thought that there might be additional head trauma but could not recall any.

**Mental Health History:**

Military records indicate that Mr. Runyon was engaged in marital counseling. Mr. Runyon indicated that this counseling was focused on his wife's problems but had a component teaching him to deal with her problems. He reported that the marital counseling was in a group format and that there was "separate counseling for me on how to cope with her illness." Outside of this Mr. Runyon does not have any documented history of mental health treatment.

**Correctional Course and Adjustment:**

Mr. Runyon was arrested and taken into custody December 11, 2007. Major Benzies reported that Mr. Runyon has been at the Portsmouth City Jail since March 4, 2008. Records from any of the institutions, which housed Mr. Runyon, were not available for review. Dr. Cunningham reported that Mr. Runyon has had no disciplinary infractions at the time of his report and was credited with providing emergency first aid to a cellmate, who suffered a seizure and associated head injury. Dr. Cunningham noted that Mr. Runyon was placed in the general population, reflective of an appraisal that he was at low risk for violence in his correctional environment. A former cellmate, Larry Davis, who roomed with Mr. Runyon was interviewed by the Special Agents Banks and Liscinsky. Mr. Davis roomed with Mr. Runyon from March to at least July of 2008. Mr. Davis reported that Mr. Runyon stays quiet most of the time but had an explosive temper and that when topics such as the military or military females come up he gets loud and verbose. My interviews of correctional staff, detailed in the following section, corroborate a positive adjustment to his correctional setting. While staff interviewed reported limited direct interaction with Mr. Runyon, none reported any institutional infractions. In general, Mr. Runyon was described as an isolative individual, who spent much of his time in his cell. Mr. Runyon reported that life in jail was stressful but that he has tried to cope by remaining aware of his surrounding and engaging in activities such as reading.

**220**

**Forensic Psychological Evaluation**                    **David Anthony Runyon**
**Page 21**

**Collateral Interviews:**

On June 4, 2009 Deputies Chapman, Hobbes and Harrington were interviewed by phone. The interviews were arranged by Major Benzies, who reported that Mr. Runyon had been at the Portsmouth City Jail since March 4, 2008. In general correctional staff reported limited contact with Mr. Runyon and none reported regular conversations or interactions with him. Deputy Chapman reported that he observed Mr. Runyon around once a month. Based on his limited observations Mr. Runyon appeared "skittish and nervous" and as a "secretive type of guy." He recalled one occasion about "maybe 4 months ago" when he was very concerned about safeguarding information regarding his court case in his cell. Mr. Runyon asked if he could lock up the documents. Deputy Chapman's interactions with Mr. Runyon were described as brief and business-like. Deputy Chapman indicated that he is always aware of his surroundings. Mr. Runyon told him he was in the Army. Deputy Chapman reported that to his knowledge there have been no behavioral problems or infractions. Mr. Runyon resides in the general population in a single cell and can be observed reading in his cell or watching television. Deputy Chapman reported that "for the most part he stays to himself" but "does talk to several inmates." Mr. Runyon appears to be able to "carry a conversation with some intelligence." To his knowledge Mr. Runyon has never warranted any mental health interventions.

Deputy Harrington reported that he observes or interacts with Mr. Runyon "once or twice a month." Deputy Harrington described Mr. Runyon as "quiet." To some extent Mr. Runyon appears "scared." Deputy Harrington reported that he has "never had any trouble" with him and there have been no infractions to his knowledge. Deputy Harrington reported that he "stays to himself" and is often observed reading. They have had no in depth conversations but when asked "says he is fine." To his knowledge Mr. Runyon has not been referred for any mental health interventions.

Deputy Hobbs also reported limited contact with Mr. Runyon. Deputy Hobbs reported that he "keeps to himself" but has been observed talking to other inmates. Deputy Hobbs reported that he "sleeps a lot" and stay in his cell "mostly reading." Deputy Hobbs has never noted any unusual behaviors and reports that to his knowledge there has been no need for any mental health interventions. Deputy Hobbs noted that since he does not cause any problems he tends to fade into the background. To his knowledge there have never been any behavioral infractions. His overall adjustment "seems fine."

**Behavioral Observations/Mental Status Examination:**

David Anthony Runyon is a 5' 3", 38-year-old, separated, Asian-American male, with balding hair, who weighs approximately 130 lbs. He was escorted to each session by correctional staff. He was adequately groomed. He was pleasant, polite and cooperative throughout the evaluation. He was aware of the circumstances of the evaluation and the limits of confidentiality. He was aware that the sessions were being audio taped according to the court order. He appeared motivated to perform well and appeared able to sustain attention and to consistently exert effort over time.

Throughout each of the interviews Mr. Runyon was alert and oriented and made adequate eye contact. Speech was coherent and goal-directed. Attention and concentration appeared intact. Mr. Runyon reported some memory problems secondary to a car accident in 1996. Overall, in performing difficult cognitive tasks which required sustained attention he demonstrated good motivation, persistence and

**Forensic Evaluation**                                        **David Anthony Runyon**
**Page 22**

adequate frustration tolerance. No unusual movements or posturing was noted. He did not appear to be responding to internal stimuli. No delusions or hallucinations were elicited. His reality testing appeared intact. His intelligence as measured by testing was in the high average range. He reported that his mood was "pretty laid back" and "pretty steady." He indicated that he was depressed "sometimes, little bit." He stated that "it sucks being in jail" but added that "being institutionalized is not a bad thing" and that having a history of being in the military, a military prep academy and a strict household made it easier to cope. He stated that he was trying to "stay relaxed" and that he has "a lot of coping skills." He reported a lack of "real good deep sleep" and described his sleep as inconsistent, adding that this "wears on you over time." He reported that his appetite has decreased and estimated losing about 30 lbs since his arrest. He attributed this to the poor quality of the food and described eating as a "mechanical reaction to nourish myself." Affect was slightly restricted in range but he was able to smile and laugh appropriately. On a scale of 1 to 10 with 10 representing as good as you could feel about yourself, he rated himself as an 8-9 before his arrest and a 5 currently. He denied problems with anger management reporting that he did not have a temper and was the "exact opposite." He identified injustice as a trigger for anger. He denied any history of suicide attempts or of suicidal ideation. He added that suicide was counter to his religious beliefs.

Mr. Runyon reported that he was experiencing stress due to his legal situation and confinement. He stated that "I'm in the worst shape of my life" with limited opportunities of exercise. He added that his communications are very limited and his diet is poor. He reported that the living conditions in the jail were stressful and you "constantly have to watch your back" and when one individual misbehaves the whole block is locked down. He indicated that facing the death penalty was stressful. He tried to put this in perspective stating that "I have had to deal with death as a possibility" from an early age in the military and that "I realize life on earth is just a passing phase" and this stressor "doesn't affect me in a weird say." The stress has been intensified by having lost several attorneys resulting in continuances. He stated that "I am eager to proceed" and "want to get this part of my life over with." He tries to cope with stress by praying and reading. He reported that his parents are "coping the best they can" and that he was "very confident all of them know I'm innocent." He stated that his son was "aware" of his legal situation and wrote him a letter in February expressing support.

On the Mini-Mental State Examination (MMSE) he correctly answered 29 out of 30 questions. The MMSE is a brief and objective screening test for cognitive impairment that has proven to be valid and reliable in a wide variety of settings. Mr. Runyon was alert and generally oriented. Immediate and delayed recall as measured by the ability to immediately learn and retain three unrelated words and then recall the three words after a brief delay was intact. Attention and calculation ability as assessed by performing serial 7's was generally intact. Cognitive skills such as naming, repeating a sentence, reading and writing were intact. The comprehension and execution of a 3-stage command was performed successfully. Visuospatial ability as assessed by copying intersecting pentagons was intact. The median score for his age and education level is 30 and he achieved a score of 29. Normal cognitive function falls within the range of 27 to 30.

**Tests and Procedures Administered:**
1) Mini-Mental Status Examination (MMSE)
2) Validity Indicator Profile (VIP)
3) Wechsler Adult Intelligence Scale- Third Edition (WAIS-III)
4) Minnesota Multiphasic Personality Inventory-2 (MMPI-2)

Forensic Evaluation                                                    David Anthony Runyon
Page 23

**Test Results:**

### Interpretative Framework for Psychological Test Results:

The interpretative formulations produced by many psychological tests tend to be actuarially generated hypotheses based on objective scores and scale interpretations developed on diverse groups of individuals. The clinical hypotheses generated are probablistic in nature but have been identified as more likely to occur in individuals obtaining similar scores and similar patterns of scores. The application of these hypotheses to any given individual requires independent corroboration from other sources and integration with as many other sources of data as possible, including clinical interview, mental status examination, interview of collateral sources, independent records and other available test data. Without independent verification and corroboration it is not possible to determine whether the individual tested matches the prototype described by the test results. In addition, all the probabilistic hypotheses generated should be interpreted within the framework of the validity indices to ascertain whether the individual tested has generated a valid and reliable protocol.

### Validity and Analysis of Response Style:

The normative data from various psychological tests have been developed under standardized conditions. The introduction of any new variable to these standardized conditions may cast doubt on the validity of the results. The sessions of the testing were performed in a relatively quiet room, where Mr. Runyon had access to a flat surface for filling out a questionnaire. The WAIS-III was administered in a room with a large table, where there were no impediments restricting Mr. Runyon's range of motion or separating the examiner from the subject.

Before conducting the testing was conducted I was informed that the testing would be audio taped. I raised concerns about the potential effect of this procedure on the validity of the results and advised the United States Attorney's Office that even a seemingly unobtrusive deviation from the standardized administration might affect the validity of the results. Literature on the presence of third parties during neuropsychological testing suggests that there are potential impacts on performance by adding live observers or even by adding video or audio taping. While more literature is available on the effect of actual presence of an additional observer, there is some evidence that the indirect presence of an observer through tape recording may still affect performance. In one study, in the presence of an audio-recorder the performance on memory tests declined but the performance on motor tests was not affected (Contantinou, Ashendorf & McCaffrey, 2002, When the Third Party Observer of a Neuropsychological Evaluation is an Audio-Recorder, The Clinical Neuropsychologist, Vol 16, No.3, pp. 407-412). Taking this caution in the mind, the overall test results still appeared valid and interpretatively useful.

As noted in the following section, results of the VIP indicated that there was no effort to malinger cognitive impairment and that Mr. Runyon appeared to put forth good effort during the testing. Validity scales on the MMPI-2 indicated significant defensiveness. He was pervasively self-favorable and minimizing of weaknesses. Therefore, his own assessment of his faults, problems or distress may underrepresent what is actually occurring.

Forensic Evaluation                                          **David Anthony Runyon**
Page 24

**Test Results:**

**Cognitive Functioning:**

In order to assess the validity and response style to cognitive testing the Validity Indicator Profile (VIP) was administered. A valid assessment is possible only when the subject intends to answer correctly and exerts sufficient effort. The VIP is designed to assess effort and intention to determine whether the test results are valid. On the Nonverbal and Verbal sections of the test, Mr. Runyon appeared to exert good, consistent, sustained effort and to attend carefully to the item content. He appeared to make a consistent effort to respond correctly. A reasonable conclusion is that he answered items correctly on these sections until the item difficulty exceeded his ability. His score on the Nonverbal subtest suggests that his reasoning ability is at least average to high average or higher. His score on the Verbal subtest suggests that his word knowledge is at least low average to average or higher. Overall, his performance should be considered valid indicating he intended to do well and applied sustained effort. There was no evidence of attempting to malinger cognitive impairment.

Mr. Runyon was administered the Wechsler Adult Intelligence Scale (WAIS-III), a standardized test of intellectual functioning. He achieved a Verbal IQ of 111 (95% Confidence Interval 106-116), a Performance IQ of 122 (95% Confidence Interval 114-127) and a Full Scale IQ of 116 (95% Confidence Interval 112-120). The Verbal IQ is at the 77th percentile and falls into the high average range. The Performance IQ is at the 93rd percentile and falls in the superior range. The Full Scale IQ is at the 86th percentile and falls in the high average range. Mr. Runyon man appears to be an intelligent man with an overall IQ in the high average range.

| Scale | IQ Score | 95% Confidence Interval | Percentile Rank | Qualitative Description |
|---|---|---|---|---|
| Verbal | 111 | 106-120 | 77 | High Average |
| Performance | 122 | 114-127 | 93 | Superior |
| Full Scale | 116 | 112-120 | 86 | High Average |

In terms of more specific abilities Mr. Runyon achieved a Verbal Comprehension index score of 107 placing him at the 68th percentile, a Perceptual Organization index score of 130 placing him at the 98th percentile, a Working Memory index score of 113 placing him at the 81st percentile and a Processing Speed index score of 103 placing him at the 58th percentile.

| | Index Score | 95% Confidence Interval | Percentile Rank |
|---|---|---|---|
| Verbal Comprehension | 107 | 101-112 | 68 |
| Perceptual Organization | 130 | 121-135 | 98 |
| Working Memory | 113 | 105-119 | 81 |
| Processing Speed | 103 | 94-112 | 58 |

**Forensic Evaluation**                                                    David Anthony Runyon
**Page 25**

Mr. Runyon's specific subtest scores are listed below.

| Verbal Subtests | Raw Score | Percentile Rank |
|---|---|---|
| Vocabulary | 49 | 63 |
| Similarities | 25 | 63 |
| Arithmetic | 16 | 63 |
| Digit Span | 22 | 91 |
| Information | 20 | 75 |
| Comprehension | 28 | 91 |
| Letter-Number Sequencing | 12 | 75 |

| Performance Subtests | Raw Score | Percentile Rank |
|---|---|---|
| Picture Completion | 23 | 91 |
| Digit Symbol-Coding | 79 | 63 |
| Block Design | 61 | 98 |
| Matrix Reasoning | 22 | 91 |
| Picture Arrangement | 16 | 63 |
| Symbol Search | 32 | 50 |

As shown above Mr. Runyon consistently demonstrated skills and overall scores in the average to high average to superior range. He demonstrated a range of strengths and weaknesses relative to a standardized sample with scores on individual subtests ranging from the 50th percentile to the 98th percentile. He demonstrated a particular strength in perceptual organization skills. His working memory index score placed him near the 81st percentile, which does suggest significant deficits in short-term memory. Working memory is the capacity to temporarily store and manipulate information in short-term memory. Digit Span a subtest, which is a component of working memory, and measures the capacity to recall numbers presented auditorally, was at the 91st percentile.

**Clinical Syndromes and Personality Functioning:**

On the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), Mr. Runyon generated a consistent profile suggesting that he understood the test items and had no difficulty sustaining attention. However, he omitted 11 items. With this number of omissions some of his scale scores may be lower, which may render an incomplete and attenuated clinical profile. In terms of response style, Mr. Runyon endorsed few rare or atypical responses. However, he was significantly elevated for defensiveness. Individuals with elevations on the K scale tend to deny or minimize unacceptable feelings or impulses. Such individuals often strive to project the appearance of adequacy and control. They may be rigid, sanctimonious and intolerant. This defensiveness is often linked to poor insight and a limited capacity for psychological introspection and may indicate a poor prognosis for therapy, since such individuals tend to rigidly deny problems. Similarly, his score on the Superlative (S) scale, demonstrates a tendency to deny problems and present oneself as virtuous. These scores may reflect a lack of awareness and insight into oneself and one's problems and/or a deliberate effort at impression management, where negative features

**Forensic Evaluation**                                    **David Anthony Runyon**
**Page 26**

are intentionally denied in order to promote an overly positive view of oneself. While the profile is interpretatively useful, it should be interpreted within the context of an individual who is minimizing problems and faults and striving to project an overly favorable picture of himself. Therefore, the results may under represent the overall level of problems, faults or psychopathology. In pretrial settings the number of omissions and the elevation for defensiveness may reflect a response style marked by a high level of guardedness and suspicion generated by a concern about how the test results will be used. Mr. Runyon was fully aware that these results would be incorporated into a report that could potentially become part of the court record.

No clinical scales were significantly elevated and the overall profile was within normal limits. The results do not suggest gross disturbance of mood or reality testing. Mr. Runyon did not report significant distress and generally indicated that he was coping effectively with life's stressors. He did not endorse being significantly anxious and reports being confident and comfortable in social situations. He reports that he prefers stereotypically masculine interests and activities.

The Caldwell Report was also utilized. The Caldwell Report has a focus on psychotherapy intake, differential diagnosis and treatment planning but can be used to generate clinical hypotheses, which should be confirmed or verified with other data sources. According to the Caldwell Report there is "conscious defensiveness" but the overall profile was valid taking into account the tendency for self-favorable responding. The profile suggests "underlying distrust and projections along with emotional estrangement" and "an unevenness in empathy and feeling for others." The report suggests that he may annoy or bother others in subtle ways to "maintain a self-protective interpersonal distance," which "could interfere with the sustaining of warm or close relationships." He tends to "externalize blame and to rationalize his own behavior." Overall, he displays good ego strength. While there was no indication of significant paranoid thinking, in a small subgroup of cases this pattern is associated with "persisting projections and jealousies" and "other than their transient emotional outbursts, these patients showed little if any disorganization of their behavior or breakdown of their reality testing" and "attempted to maintain rigid controls and to play correct social roles." The Caldwell Report suggests that "recurrent problems of impulse control are indicated with what others would see as unpredictable reactions" and "underlying ambivalences around impulses to be deceiving or his impulses to lie to family members would be typical." In addition, "resentments are apt to be covered over by a cool and controlled veneer of social correctness." The report further suggests that "difficulties around sexual behavior are fairly typical with this pattern, although his individual items responses did not specifically report this." The report indicates that his "overall balance of interests appears exceptionally masculine for his age and education." He would "tend toward outdoor or mechanical pursuits with limited cultural and esthetic interests." The diagnostic impression is suggestive of borderline personality tendencies. However, the report notes that "his profile is diagnostically more mixed and less definitive than most profiles." In terms of treatment his underlying distrust would need to be taken into account.

**Diagnostic Discussion:**

Record review, interview and psychological testing did not indicate any gross disturbance of psychiatric functioning. Outside of some marital counseling there is no history of mental health treatment. Overall, his reality testing appeared intact. There was no indication by history, interview or testing of significant mood dysfunction. Cognitive testing indicated high average intellectual functioning. In general, there was no significant evidence of any major mental disorders. In an interview with a government his

USCA4 Appeal: 17-5    Doc: 28-1    Filed: 08/24/2018    Pg: 246 of 521

mother reported that he had had "no mental issues or problems and was a good kid."

However, there does appear to be some level of impairment in functioning associated with personality dysfunction. According to DSM-IV-TR a personality disorder is "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture" and is manifested by problems in at least two of the following areas: cognition, regulation of affect, interpersonal functioning and impulse control. The pattern is inflexible and leads to significant distress or dysfunction in social, occupational or other areas of functioning. Mr. Runyon appears to have a history of impairment in occupational functioning, interpersonal functioning and to some degree impulse control. His vocational history is marked by instability and significant underachievement. As noted he appeared unable to consistently maintain employment and finally settled on the less structured, less demanding and more financially unpredictable occupation of participating in drug studies. Earlier positions in the Army, police, corrections, and mental health appeared to fail for a variety of factors, including irresponsibility, impulsivity and interpersonal conflict. With his overall IQ in the high average range, he certainly had the intellectual capacity to procure more lucrative and rewarding employment. It appears that his failure to do so was a result of various personality driven factors. In addition, he has been unable to sustain a mutually rewarding and reciprocal intimate relationship and appears somewhat estranged from his family, with whom he has very limited and inconsistent contact.

In my view Mr. Runyon meets criteria for a personality disorder but does not meet full criteria for any one distinct personality disorder. His personality dysfunction appears centered in what is labeled Cluster B. The Cluster B Personality Disorders are evidenced by dramatic, erratic or emotional behaviors and include Narcissistic, Antisocial, Histrionic and Borderline Personality Disorder. The personality features tend to cause these individuals to feel and behave is socially distressing ways. In this case narcissistic features include deficits in empathy, arrogance, a sense of having some unique talents and perhaps some fantasies of ideal love. Antisocial features include irresponsibility, and some degree of impulsivity and irritability. In addition, he appears to lack remorse for past mistakes and to repeatedly project responsibility onto others for his failures and mistakes. Evidence for irresponsibility includes his failure to sustain consistent employment, his chronic tardiness in various jobs and his failure to consistently honor financial obligations. This is reflected in reports from the Army and Columbia College and his failure by his report to pay child support. In his grand jury testimony, Jason Guyton reported that Mr. Runyon was asked to leave their shared residence because he was not paying the bills. Impulsivity is reflected by leaving a job without having another position in place, involving himself in intimate relationships without sufficient deliberation and making decisions fueled by emotional reactions. In addition the Caldwell Report suggests "recurrent problems with impulse control." Evidence of irritability and interpersonal strife is supported by the reports of conflict in interpersonal relationships, the two charges of domestic violence and the history of conflict with workers and supervisors at work. In her grand jury testimony, his former wife stated that, "he has a temper" and Ms. Pina stated that he "has a violent temper." There is some evidence for proneness to boredom as reflected in his resignation letter to El Dorado Correctional Facility and his own self-report. He writes in one email, dated 6/8/07, "my problem is I get bored really quick. I find civilian jobs to not be challenging enough." Deficits in empathy are suggested by his lack of consistent contact with family. In addition, the Caldwell Report suggests "emotional estrangement" and "an unevenness in empathy and feeling for others." While less pronounced, a borderline personality feature to some degree appears to be a pattern of unstable and intense relationships marked by alternating between extremes of idealization and devaluation. Recall that after his initial intense infatuation

**Forensic Evaluation**                                    **David Anthony Runyon**
**Page 28**

to his wife, he threw away the wedding ring and called the marriage a fraud. All of these personality factors appeared to have combined and led to significant instability and poor judgment in relationships. Mr. Runyon repeatedly involved himself in relationships with women, who had either been abused, and/or had mood instability and/or were prone to substance abuse contributing to an erratic pattern of interpersonal functioning. While not clearly meeting the criteria for any one personality disorder, I believe that Mr. Runyon can be diagnosed with Personality Disorder Not Otherwise Specified with Cluster B Traits.

**Diagnostic Impression:**

| | | |
|---|---|---|
| Axis I: | Clinical Disorders/Other Conditions That May Be A Focus Of Clinical Attention | |
| | V71.09 | No Diagnosis on Axis I |
| Axis II: | Personality Disorders/Mental Retardation | |
| | 301.9 | Personality Disorder NOS with Cluster B Features |
| Axis III: | General Medical Conditions | |
| | None Known | |
| | History of Head Trauma (November 1996) by Self-Report | |
| Axis IV: | Psychosocial And Environmental Problems | |
| | Involvement with the Criminal Justice System (Potential Capital Case) | |
| | Prolonged Confinement and Isolation in Correctional Setting with Minimal Outside Contact | |
| | Problems with Primary Support Group (Limited Contact with Family) | |
| | Occupational Problems | |
| Axis V: | Global Assessment of Functioning | |
| | GAF = 65-70 (Current) | |

**Summary and Conclusions:**

David Anthony Runyon is a 38-year-old, separated male currently facing charges of Conspiracy to Commit Murder, Carjacking Resulting in Death, Bank Robbery Resulting in Death, Conspiracy to Commit Robbery Affecting Commerce and Murder with a Firearm in Relation to a Crime of Violence. The government has filed Notice of Intent to Seek a Sentence of Death. This examination was requested in order to determine the presence of absence of mental illness during the penalty phase should Mr. Runyon be found guilty and raise mental health evidence in mitigation.

There was no evidence of malingering or of exaggerating psychopathology. Rather, the test results suggest that Mr. Runyon is a markedly defensive individual, who strives to present himself in an overly favorable manner. With such a response style, the results may underrepresent the overall level of psychopathology. To some degree this defensiveness may be related to his current legal situation and to his concern about how his statements and/or the test results could impact on the pending legal proceedings. In addition, such defensiveness is often linked to poor insight and a limited capacity for psychological introspection. Such individuals tend to rigidly deny problems project a façade of adequacy and self-control. These features appear to accurately describe Mr. Runyon.

USCA4 Appeal: 17-5    Doc: 28-1    Filed: 08/24/2018    Pg: 248 of 521

**Forensic Evaluation**                                    **David Anthony Runyon**
**Page 29**

The essential finding from this evaluation is that Mr. Runyon does not suffer from any major psychopathology as reflected in the absence of any Axis I diagnosis. Overall, intellectual functioning was in the high average range. An administration of the WAIS-III yielded scores in various cognitive domains from average to high average to superior. The results of the WAIS-III found his working memory to be near the 81st percentile. His reality testing appeared intact. There was no evidence of delusions, hallucinations or disorganized speech or behavior. Outside of marital counseling Mr. Runyon had never interfaced with mental health professionals prior to his arrest. There is no evidence in his history of significant mood disturbance as manifested by episodes of mania or clinical depression.

The dysfunction which does exit appears centered in the domain of personality functioning. As noted Mr. Runyon's personality structure appears to have contributed to significant impairment in social and occupational functioning. Despite high average intellect he has not been able to maintain consistent employment due to what I believe are various personality driven factors such as irresponsibility, conflict with peers with supervisors, unrealistic expectations for success, irritability and lack of insight. When barred from reenlistment in the Army, Captain Hannaman (see document dated 2/24/97) cited various factors including 1) unsatisfactory job performance, 2) history of lateness, 3) inability to properly manage finances and noted that his "main problem is attention to detail related and failure to follow instructions." It should be noted that Mr. Runyon reportedly had a serious car accident in November of 1996 and that problems such as attention to detail may have been the part of the sequalae from this event. However, other areas of concern, such as problems with lateness and conflict with peers and/or supervisors predated the accident. Recall that Mr. Runyon was repeatedly cited for problems with lateness while employed as a correctional officer in 1993 and 1994. In addition, his letter of resignation from the El Dorado Correctional Facility, dated 3/3/94, makes clear that there was conflict with other officers as well as supervisors, especially when he was asked to take responsibility for his mistakes or misbehavior. After leaving the Army, Mr. Runyon worked a number of positions but was not able to sustain employment for any extended period of time. According to records from Piney Ridge, he was terminated as youth counselor in October of 2003 for absenteeism with no eligibility for rehire. Since that time, his major source of income has been participating in drug studies, which have no set schedule and no regular income.

Similarly, there was impairment in social and interpersonal functioning as Mr. Runyon engaged in a series of failed relationships with unstable females, who had histories of substance abuse, and/or mood disturbance and/or history of physical or sexual abuse. According to Mr. Runyon his marriage faltered rather quickly since he was not able to accurately perceive the qualities of his wife since he was "blinded by lust." According to Mr. Runyon the relationship was volatile and marked by dramatic episodes such as his wife pointing a gun at him and demanding to talk when he preferred to go to sleep. While Mr. Runyon denied any physical abuse in the relationship, he was convicted of Simple Battery. During her Grand Jury testimony, Maria Runyon reported that they "had lots of fights." Mr. Runyon reported that he eventually learned his ex-wife was a substance abuser, who had been in an abusive relationship. During her Grand Jury testimony, Ms. Runyon indicated that she was taking antidepressant and anti-anxiety medication during the marriage. After separating from her, Mr. Runyon involved himself with Virginia Pina, who was working as an exotic dancer and was a substance abuser. Mr. Runyon reported that Ms. Pina had been physically abused by her ex-husband and sexually abused when younger. Mr. Runyon described Ms. Pina as an individual with significant psychological issues, who was suicidal at times. Again this appears to have been a turbulent relationship marked by episodes such as him performing CPR on her after she overdosed and arguments at work around allegations that she was soliciting clients there. Mr. Runyon

reports that the relationship was demanding because she "required constant supervision." Again there was a charge of domestic battery. After ending this relationship and after the alleged offense he became involved with Sarah Baker, who reportedly had a history of heroin abuse. From around December of 2006 up until his arrest in December of 2007 and cotemporaneous with the time frame of his relationship with Ms. Pina and Ms. Baker, Mr. Runyon was corresponding electronically with various individuals purporting to be interested in a romantic relationship. The electronic record suggests that Mr. Runyon was focused on finding an idealized partner and contains various statements, which are derogatory and devaluing of American women. The correspondence suggests some degree of sexual preoccupation.

It should be noted that no records of treatment were available regarding the reported car accident so the exact nature and extent of the injury is not clear. Mr. Runyon reported that his vehicle was hit by another car going "well over 100 mph" and that objects from the rear of the vehicle reportedly hit him in the head. He did not believe that he lost consciousness. He reported memory problems and vertigo and that he received physical therapy for 4 or 5 months. In addition, Mr. Runyon reported several other possible concussive episodes. While a full neuropsychological battery was not performed, the results of cognitive testing during this evaluation did not reveal any significant cognitive impairment. As noted his overall intellectual functioning was in the high average range and his working memory was near the 81st percentile. Before admittance to the military Mr. Runyon was administered intelligence testing. His Armed Forces Qualification Test (AFQT) score was at the 87th percentile. His FSIQ on WAIS-III during this examination placed him at the 86th percentile. This suggests no significant decline in general intelligence.

Mr. Runyon flatly denied any mental illness. He understood that this evaluation was under seal and would only be part of the proceedings if convicted. Nevertheless, Mr. Runyon adamantly maintained that he was innocent of the charges and stated that he disagreed with any legal strategy to absolve him of responsibility or culpability for actions he did not commit. As noted the records reviewed and the testing performed during this evaluation support the conclusion that Mr. Runyon does not suffer from any major mental illness. There is however evidence of personality dysfunction. While only a more detailed neuropsychological, neurological and biopsychosocial investigation would definitely rule in or rule out brain dysfunction, the results of this evaluation find no significant impairment in overall intellectual functioning.

The scope of this examination was not to determine the presence or absence of the full range of aggravating or mitigating factors but to examine the defendant and his history to more narrowly ascertain the presence or absence of mental illness. I did not have access to family members and am unclear regarding the details of his early development history and its potential impact on his later functioning. In capital cases a wide range of mitigating factors may be considered, including formative events and experiences, family factors, school factors, peer-related factors, community and neighborhood factors and individual psychological factors. In this case Mr. Runyon was reportedly exposed to parental violence at an early age and may have been physically abused by his biological father. He experienced an early parental separation and divorce. His mother has been described as emotionally volatile. He also experienced considerable residential mobility, which may have contributed to difficulty in developing the capacity to sustain relationships. On the other hand, Mr. Runyon is an intelligent individual, who apparently had a positive school adjustment in general, with the exception of one suspension. In addition, there is no known juvenile delinquency. The adverse factors noted above may well have contributed to his personality disorder, which I believe, has contributed significantly to his poor vocational performance and his unstable

Forensic Evaluation                                          **David Anthony Runyon**
Page 31

interpersonal history.

    With regard to the mitigating factors of impaired capacity and severe mental or emotional disturbance, the results of this evaluation do not suggest that Mr. Runyon was under any under unusual or substantial emotional or psychological duress during the time frame of the alleged offense. Mr. Runyon reports that during this time frame he had custody of his son and that this was a very positive period. However, it should be noted that if Mr. Runyon was experiencing some distress, it is plausible that he would not be psychologically-minded enough to note it or that he would defensively deny it. Nevertheless, there is no substantive data to support the conclusion that he was suffering a severe mental or emotional disturbance in the time frame of the alleged offense. While Mr. Runyon did not raise an insanity defense, another potential mitigating factor is impaired capacity in appreciating the wrongfulness of his conduct or in being able to conform his conduct to the requirements of the law, regardless of whether the capacity was so impaired as to constitute a defense. In light of his overall high average intelligence, his intact reality testing, and the degree of planning purportedly involved in the crime, in my view that there was no substantial impairment in the capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

    This report is based on information from the different sources that were available to me at the time of writing and completing the report. To the best of my knowledge all the information obtained in this report is accurate. If any information is subsequently shown to be inaccurate, please bring this to my attention so that the report can be amended. If I learn of any additional information which might change my clinical opinion or recommendation, I will again submit an addendum to this report.


                                          Paul Montalbano, Ph.D.
                                          Licensed Clinical Psychologist


                                          6/27/09
                                          Date

231

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                  Newport News Division

4

5

6

7    UNITED STATES OF AMERICA      )
                                   )     CRIMINAL ACTION
8         v.                       )
                                   )     NO. 4:08cr16
     MICHAEL ANTHONY ERIC DRAVEN   )
9                                  )
         and                       )
10                                 )
     DAVID ANTHONY RUNYON,         )
11                                 )
              Defendants.          )
12

13

14

15                  TRANSCRIPT OF PROCEEDINGS

16                    Norfolk, Virginia

17                     June 30, 2009

18                  **FIRST DAY OF TRIAL**

19

20

21
     Before:    THE HONORABLE REBECCA BEACH SMITH
22              United States District Judge, and a Jury

23

24

25

GLORIA S. SMITH, OFFICIAL REPORTER

* * *                                                        3

1          THE CLERK:  Case No. 4:08cr16, United States of

2    America versus Michael Anthony Eric Draven, also known as

3    Anthony James Neff; and David Anthony Runyon.

4          Ms. McKeel, Mr. Samuels, is the government ready to

5    proceed?

6          MS. MCKEEL:  Good morning, Judge.  We are ready to

7    proceed.

8          MR. SAMUELS:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10         THE CLERK:  Mr. Ellenson, Mr. Clancy, is the

11   defendant Michael Anthony Eric Draven ready to proceed?

12         MR. CLANCY:  We are.  Good morning, Your Honor.

13         MR. ELLENSON:  We are, Judge.

14         THE COURT:  Good morning.

15         THE CLERK:  Mr. Woodward, Mr. Hudgins, is the

16   defendant David Anthony Runyon ready to proceed?

17         MR. HUDGINS:  Good morning, Your Honor.  We are,

18   subject to the motion for continuance that we previously made

19   and the court's ruling on that.

20         THE COURT:  I have already denied that.

21         MR. HUDGINS:  Yes, ma'am.

22         THE COURT:  Good morning.

23         MR. WOODWARD:  We are prepared, Your Honor.  Good

24   morning.

25         THE COURT:  That matter has been ruled on.  I have

GLORIA S. SMITH, OFFICIAL REPORTER


**233**

4

1    put it in writing, and I'm not going to revisit that this

2    morning.

3            MR. HUDGINS:  No, ma'am.

4            THE COURT:  Both defendants are present in person

5    with their counsel.

6            I would go through a couple of preliminary matters

7    before we start.  There have been just a couple of matters in

8    regard to *voir dire*, before we bring in the jurors.

9            As counsel is aware, juror questionnaires were sent

10   out, and those were completed, and the court very much

11   appreciates counsel's diligence in reviewing those

12   questionnaires and getting back to the court.

13           As a result of the questionnaires, there were 74

14   jurors which all counsel agreed were potentially qualified to

15   be jurors, and another 38 upon which counsel could not agree,

16   and the remaining jurors were on a list that all counsel

17   agreed were not so qualified to be called in at a threshold

18   level.

19           The jurors on the list upon which the attorneys

20   agreed would not be qualified have not been summoned for

21   service.  Of the ones upon which counsel agreed were

22   potentially qualified, 62 have been summoned for today, and 64

23   have been summoned for tomorrow.  The remaining 38 in the

24   third list upon which counsel could not agree one way or the

25   other have been summoned for Thursday.  So those individuals

GLORIA S. SMITH, OFFICIAL REPORTER

5

1   are summoned in that manner, and we do have 62 jurors who will

2   be here today.

3           In terms of the matters in regard to *voir dire*, the

4   court obviously utilized the jury screening questionnaires, so

5   any motion or part of a motion on *voir dire* to that effect is

6   now moot or has been granted through the use of the

7   questionnaire.

8           In terms of the use of individual *voir dire*

9   questioning, the court will bring in the jurors and question

10  them collectively, and then as the court deems appropriate,

11  the court will proceed with individual *voir dire*.

12          It is obviously well established under Federal Rule

13  of Criminal Procedure 24 that the court has broad discretion

14  in terms of the examination of potential jurors, and the

15  Fourth Circuit in *United States v. Bakker*, 925 F.2d 728 at

16  734, a 1991 Fourth Circuit case, has specifically ruled,

17  quote, that it is well established that a trial judge may

18  question prospective jurors collectively rather than

19  individually, end quote.

20          However, I do plan to proceed with individual

21  questions as appropriate, and I'm sure that that will become

22  necessary during the process.  But we will start with

23  collective questions, and then we will develop a list of

24  jurors who would need to be questioned individually.

25          In terms of the attorney participation in the *voir*

6

1   *dire* questioning, the court will ask all of the questions.

2   Attorneys will not be permitted to question the jurors

3   themselves.  However, as is the court's standard procedure,

4   the attorneys will be asked if there are further questions

5   that they want the court to ask and to have submitted those

6   questions, call them to the court's attention, and as the

7   court deems appropriate, it will ask the questions.  In other

8   words, we will start with *voir dire*, and then we will do

9   individual *voir dire*.  Obviously the court will be consulting

10  with counsel during the process as to whether there are

11  further questions and the need for further individual

12  questions or the need for further collective questions.

13          Again, that procedure is well established in the

14  *Bakker* case, 925 F.2d at 734, quote, It is well settled that a

15  trial judge may conduct *voir dire* without allowing counsel to

16  pose questions directly to the potential jurors, end quote;

17  and in *United States v. Duncan*, 598 F.2d 839, 865 at Note 25,

18  a 1979 Fourth Circuit case, that also stands for the same

19  proposition; as well as under Federal Rule of Criminal

20  Procedure 24(a)(2).

21          So the court will proceed with the questioning,

22  asking all of the questions itself, but consulting with

23  counsel in regard to any further collective or individual

24  questioning.

25          In terms of additional peremptory challenges, the

GLORIA S. SMITH, OFFICIAL REPORTER

**236**

7

1  court is not going to allow any additional peremptory

2  challenges.  Rule 24(b)(1) permits each side 20 peremptory

3  challenges when the government seeks the death penalty, and

4  the defendant has requested additional peremptory challenges.

5  The court does not allow any additional peremptory challenges.

6       We have had a complete screening questionnaire.  It

7  may be different if we hadn't gone through the process that we

8  have already gone through.  But we have gone through a week's

9  process of bringing in a few hundred jurors to fill out a

10 lengthy questionnaire, in which all counsel were able to

11 submit questions and review, and given the screening procedure

12 that has already gone forward, the request for any additional

13 challenges is denied.

14       I would note that defendants Runyon and Draven are

15 not each allowed 20 challenges.  Rather, they are considered

16 together.  The requirement to treat multiple codefendants as a

17 single party or side for the purpose of peremptory challenges,

18 quote, has long been a part of the federal system of

19 jurisprudence, end quote.  *Stilson v. United States*, 250 U.S.

20 583 at 586, a 1919 case, which is still good law and in

21 effect.

22       I would also note that in the one case that has been

23 cited to the court, *United States v. Lecco*, 2007 WESTLAW

24 894567, Southern District of West Virginia (2007), frankly it

25 is just a general proposition, obviously not binding on this

GLORIA S. SMITH, OFFICIAL REPORTER

**237**

8

1    court -- it is an unpublished case from a district court out

2    of West Virginia -- but in any event, in that case there was

3    some discussion of divergent strategic interests requiring

4    additional peremptory challenges.

5        However, in this case, the court would further note

6    that the questionnaire has sorted out any difference of

7    strategic interests and so forth that may be there, and the

8    court's questionings will so sort that out further.  The court

9    finds no need whatsoever at this juncture to allow any

10   additional peremptory challenges, with each side having 20,

11   which is frankly very generous.  It is a death penalty case,

12   and obviously that is the reason for the great number of

13   challenges, which are in an equal amount for both the United

14   States and the defendants collectively.

15       I would also cite additional Fourth Circuit

16   authority for this ruling.  *United States v. Meredith*, 824

17   F.2d 1418 at 1423, a 1987 Fourth Circuit case, upholding the

18   district court decision not to award seven defendants

19   additional peremptory challenges, because there just was not

20   the adequate necessity for such additional challenges.

21       There are other circuits that are in accord, and I

22   would also call everyone's attention to *United States v.*

23   *Cowan*.  It is a 1996 Fourth Circuit case.  It is unpublished,

24   but it does explain that multiple defendants in a capital case

25   must exercise their 20 statutorily mandated challenges

GLORIA S. SMITH, OFFICIAL REPORTER

9

1    jointly, and that there is no right to additional challenges

2    in capital cases.  That is 1996 WESTLAW 521049.

3           Again there are other circuits, the Seventh Circuit,

4    *United States v. Cortwright*, 528 F.2d 168 at 175, a 1975

5    Seventh Circuit case.  But as I have indicated, the Supreme

6    Court law goes back to 1919, and it has not been altered in

7    that regard.

8           So for all of those reasons the court would deny any

9    additional peremptory challenges, and each side will have a

10   total of 20, 20 total for both defendants and 20 total for the

11   United States.

12          I think that that concludes any outstanding motions

13   in regard to *voir dire*.

14          Are you aware of anything further that the court

15   needs to review at this time, Ms. McKeel?

16          MS. MCKEEL:  No, ma'am.

17          THE COURT:  Mr. Ellenson or Mr. Clancy?

18          MR. ELLENSON:  No, ma'am.

19          THE COURT:  Mr. Woodward or Mr. Hudgins?

20          MR. WOODWARD:  No, Your Honor.  We understand your

21   rulings, and we are ready.

22          THE COURT:  Then we can bring in the 62 jurors.  The

23   numbers were assigned alphabetically, and the group would be

24   in alphabetical order, if they come in and seat themselves

25   properly, which we assume that they will.

10

1           (The prospective jurors entered the courtroom.)

2           THE COURT:  Madam Clerk, if you would please call

3     the case and the roll of the jury.

4           THE CLERK:  Thank you, Your Honor.

5           Case No. 4:08cr16, United States of America versus

6     Michael Anthony Eric Draven, also known as Anthony James Neff,

7     and David Anthony Runyon.

8           Now, members of the jury, when I call your name,

9     would you please stand and answer "present," and remain

10    standing until the next name is called, and then be seated.

11          (The names of the prospective jurors were called.)

12          THE CLERK:  Are there any jurors whose name I have

13    not called?

14          All the jurors are present, Your Honor.

15          Members of the jury, would you please stand and

16    raise your right hands.

17          (The jury panel was sworn on the *voir dire.*)

18          THE CLERK:  Thank you.  You may be seated.

19          THE COURT:  Good morning, ladies and gentlemen of

20    the jury panel.  Today we have a criminal case which is

21    expected at this juncture to take approximately four weeks to

22    try.  In this case the defendants, Michael Anthony Eric Draven

23    and David Anthony Runyon, are charged with the following five

24    offenses:  Conspiracy to commit murder for hire, in violation

25    of 18 United States Code, Section 1958(a); carjacking

GLORIA S. SMITH, OFFICIAL REPORTER

**240**

1    resulting in death, in violation of 18 United States Code,

2    Sections 2119 and 2; bank robbery resulting in death, in

3    violation of 18 United States Code, Sections 2113(a)(e) and 2;

4    conspiracy to commit robbery affecting commerce, in violation

5    of 18 United States Code, Section 1951(a); and murder with a

6    firearm in relation to a crime of violence, in violation of 18

7    United States Code, Sections 924(j) and 2.

8            Now, at this time I'm going to list the names of the

9    parties and the lawyers representing the parties in this case,

10   and I'm going to ask that you pay close attention, because in

11   a few minutes, I will be asking you if you have had any

12   dealings with any of these individuals, either the parties or

13   the lawyers involved in the case, and if you have had any

14   association whatsoever with them, either personally or

15   professionally.

16           The prosecutor in this case is the United States of

17   America, and the case is being prosecuted by Lisa Rae

18   McKeel -- Ms. McKeel, you need to stand up -- an assistant

19   United States attorney; and Brian J. Samuels, an assistant

20   United States attorney.

21           The defendants are -- Mr. Draven, if you would stand

22   up -- Michael Anthony Eric Draven, and he is represented by

23   Timothy Clancy and James Ellenson.

24           Thank you.

25           The codefendant is David Anthony Runyon, and Mr.

12

1    Runyon is represented by Stephen A. Hudgins and Lawrence H.

2    Woodward, Jr.

3          Thank you.

4          We are now ready to begin the jury selection process

5    in this case.  A jury in a criminal case consists of 12

6    qualified individuals.  In addition to 12 regular jurors, we

7    are going to select four alternate jurors in this case.

8    However, for your purposes, it does not matter whether you are

9    a regular or an alternate juror, because you will all sit

10   together and have the same duties and obligations, and you

11   will not be aware of who are the regular jurors and the

12   alternate jurors.  That will only be made known if for some

13   reason the alternate jurors have not replaced a regular juror

14   during the trial process, because under our system of law,

15   only 12 individuals can deliberate towards a verdict.  But in

16   summary, for your purposes we will be selecting 16 people to

17   serve as jurors in this case.

18         The parties have a right for the case to be tried by

19   a qualified, fair, and impartial jury.  A qualified and

20   impartial jury is one which is responsible and capable and

21   which will, without fear, favor, bias, prejudice, sympathy, or

22   passion, objectively hear and decide the issues to be tried

23   and render a verdict based solely on the evidence presented at

24   this trial and the law that is applicable to the case as given

25   to you by the court.

GLORIA S. SMITH, OFFICIAL REPORTER

13

1          A juror's qualifications and impartiality may not be

2     assumed without inquiry under our system of justice.  The

3     inquiry which we are about to make is a time-honored process

4     which is known as the *voir dire* examination.  It is a process

5     by which the qualifications and impartiality of jurors may be

6     determined.

7          The purpose of the *voir dire* examination is to

8     develop the truth about a juror's competency, his or her frame

9     of mind, and ability to do his or her sworn duty in accordance

10    with the juror's oath.  Your answers to the questions which I

11    will ask will enable the court to determine whether you should

12    be excused for cause or whether you should be excused upon

13    motion by one of the counsel.

14          It will also allow the counsel to make an

15    intelligent use of what is called their peremptory challenges.

16    Peremptory challenges are challenges which the law gives to

17    each party to exercise without necessarily having to assign a

18    reason for the challenge.  It is important, therefore, that

19    your answers to the questions propounded be complete and

20    truthful.

21          Each of you is under a compulsion to disclose, upon

22    a general question, any and all matters which might tend to

23    disqualify you for any reason from sitting in this case.

24    However, you should not volunteer an answer.  You should just

25    make known to the court that there is something else you need

14

1    to respond to in regard to that question, and the court and

2    counsel will then determine the appropriate time to pursue

3    that matter.

4         It is your affirmative duty to honestly and

5    conscientiously answer the real implications of the questions

6    asked and to make your answers as full and complete as

7    possible under the circumstances.  False or misleading answers

8    may result in the seating of a juror who would not otherwise

9    have been selected if all answers were truthful, and thus that

10   would result in a miscarriage of justice.

11        Consider each question very carefully, and don't

12   wait until after you have been selected and sworn as a juror

13   to make something known to the court which should have been

14   made known at the time the question was asked, or when one

15   question suggests to you some other reason for

16   disqualification.

17        The questions that I'm going to ask you at this time

18   will be addressed to you collectively, but you must consider

19   them as if addressed to you individually.

20        Please stand if your answer is "no" to either of the

21   following two questions.

22        Can you read, write, speak, and understand the

23   English language?

24        (No response.)

25        THE COURT:  Can you hear and see properly?  When I

GLORIA S. SMITH, OFFICIAL REPORTER

**244**

15

1  say that, I don't mean if you wear eyeglasses, which many of

2  us do, or if you have an aid that then makes your vision and

3  your hearing proper.

4           So can you hear and see properly?

5           (No response.)

6           THE COURT:  Now, please stand if your answer is

7  "yes" to any of the following questions.

8           I realize that each of you have filled out detailed

9  questionnaires before you came here today, and I thank you on

10  behalf of the parties and the court for your patience.  So I'm

11  not referring to the questionnaires and the information

12  therein, but I'm asking if outside of the questionnaires and

13  any of the court proceedings, do you think that you know

14  anything about this case?

15           Have you read anything about it, or have you heard

16  any discussions concerning it?  If so, please stand.

17           What I will do is take your name, and you will

18  understand the process as we go through it.  We are recording

19  the proceedings, and of course there are a great number of

20  you, and we have to keep track of who stands up to what

21  questions.  So we will proceed a little bit more slowly at

22  first, until everybody gets the understanding of the process.

23           Ma'am, if you would please just state your name for

24  the record.

25           JUROR:  Toni Lewis Cary.

GLORIA S. SMITH, OFFICIAL REPORTER

**245**

1     THE COURT:  Thank you, Ms. Cary.  You may be seated.

2     Ma'am, your name, please?

3     JUROR:  Nancy Horton Canu, C-A-N-U.

4     THE COURT:  Thank you.

5     Could you give us your name, please?

6     JUROR:  Mary Fischer.

7     THE COURT:  You can be seated.

8     Sir?

9     JUROR:  Brent Gable.

10    THE COURT:  Thank you.

11    Ma'am?

12    JUROR:  Judith Goodman.

13    THE COURT:  Thank you.

14    Ma'am?

15    JUROR:  Becky Graham.

16    THE COURT:  Thank you, Ms. Graham.

17    JUROR:  Harriet Head.

18    THE COURT:  Thank you, Ms. Head.

19    JUROR:  Janet Hostetler.

20    THE COURT:  Thank you, Ms. Hostetler.

21    JUROR:  Patricia Jackson.

22    THE COURT:  Thank you, Ms. Jackson.

23    Ma'am?

24    JUROR:  Tempie Kessler-Roberts.

25    THE COURT:  Thank you, Ms. Roberts.

1              Anyone else?

2              (No response.)

3              THE COURT:  If you have previously served on a jury

4     of any kind before, either in state or federal court, and in

5     either a civil or a criminal case, would you please stand.

6              We will start on the first row, and then you will

7     begin to understand the scheme of my questions.  Could you

8     please give me your name.

9              JUROR:  Bobbette Abraham.

10             THE COURT:  Ms. Abraham, where did you sit on a

11    jury?

12             JUROR:  It was -- I believe it was Virginia Beach

13    Circuit Court, several years ago.  I believe I served two

14    different terms.

15             THE COURT:  Were they criminal, civil, or do you

16    remember?

17             JUROR:  I honestly don't remember.  I believe the --

18    my memory on this is very fuzzy.

19             THE COURT:  That's fine.  Then, would anything about

20    that experience affect your ability to sit on the jury in this

21    case?

22             JUROR:  No, Your Honor.

23             THE COURT:  Thank you.  You can be seated.

24             Sir, your name?

25             JUROR:  Michael Adams.

1          THE COURT:  Mr. Adams, where did you sit on a jury?

2          JUROR:  City of Chesapeake.

3          THE COURT:  When was that?

4          JUROR:  Ten years ago.

5          THE COURT:  Was it criminal, or civil?

6          JUROR:  Civil.

7          THE COURT:  Would anything about that experience

8    affect your ability to sit on this criminal case?

9          JUROR:  No.

10          THE COURT:  Thank you, Mr. Adams.

11          Sir?

12          JUROR:  Mike Arnold.

13          THE COURT:  Where and when did you sit on a jury,

14    Mr. Arnold?

15          JUROR:  City of Virginia Beach about ten years ago.

16          THE COURT:  Was it criminal, or civil?

17          JUROR:  I don't remember.

18          THE COURT:  Would anything about that experience

19    affect your ability to sit on a jury here in federal court?

20          JUROR:  No.

21          THE COURT:  Thank you.

22          Ma'am, your name?

23          JUROR:  Jacqueline Beale.

24          THE COURT:  Ms. Beale, where and when did you sit on

25    a jury?

1           JUROR:  Gates County, North Carolina.

2           THE COURT:  When was that?

3           JUROR:  About 20 years ago.

4           THE COURT:  Do you remember whether it was a

5    criminal or civil case?

6           JUROR:  Criminal.

7           THE COURT:  Would anything about that jury service

8    affect your ability to sit on this case?

9           JUROR:  No.

10          THE COURT:  Thank you.

11          Ma'am, your name?

12          JUROR:  Valerie Bennett.

13          THE COURT:  Ms. Bennett, where and when did you sit

14   on a jury?

15          JUROR:  I served about ten to 12 years ago, and it

16   was a civil case in Virginia Beach.

17          THE COURT:  Ms. Bennett, would anything about that

18   experience affect your ability to sit on this jury?

19          JUROR:  No.

20          THE COURT:  Thank you.

21          Sir?

22          JUROR:  John Campbell.

23          THE COURT:  Where and when, Mr. Campbell, were you

24   on a jury?

25          JUROR:  Westchester, Pennsylvania.

GLORIA S. SMITH, OFFICIAL REPORTER

1         THE COURT:  How long ago?

2         JUROR:  Early nineties, '92 or '93.

3         THE COURT:  Mr. Campbell, was it a criminal or a

4    civil case?

5         JUROR:  Criminal.

6         THE COURT:  Would anything about that jury service

7    affect your ability to serve here?

8         JUROR:  No.

9         THE COURT:  All right.  Thank you.

10        Ma'am?

11        JUROR:  Linda Connor.

12        THE COURT:  Ms. Connor, where and when did you sit

13   on a jury?

14        JUROR:  Norfolk.  It was civil, and ten years ago.

15        THE COURT:  Would anything about that service affect

16   your ability to be a juror here?

17        JUROR:  No.

18        THE COURT:  Thank you.

19        Sir?

20        JUROR:  Kevin Davidson.  Portsmouth.  I believe it

21   was civil.

22        THE COURT:  How long ago, Mr. Davidson?

23        JUROR:  I think a year and a half, two years.

24        THE COURT:  All right.  Would anything about that

25   civil jury service affect your ability here?

21

1          JUROR:  No.

2          THE COURT:  Thank you.

3          Ma'am?

4          JUROR:  Mollie Felton.

5          THE COURT:  Ms. Felton, where and when did you sit

6     on a jury?

7          JUROR:  In Suffolk, about ten years ago.

8          THE COURT:  Was it criminal, or civil?

9          JUROR:  Civil.

10          THE COURT:  Would anything about that experience

11    affect your ability here?

12          JUROR:  No.

13          THE COURT:  Sir?

14          JUROR:  Richard Lee Fenning.  Served in Virginia

15    Beach six years ago on a civil case.

16          THE COURT:  Mr. Fenning, would anything about that

17    service affect your ability to serve here?

18          JUROR:  No, Your Honor.

19          THE COURT:  Thank you.

20          Sir?

21          JUROR:  Michael Fien, Rochester, New York, about 20

22    years ago, and it was a criminal case.

23          THE COURT:  Mr. Fien, would anything about that

24    service affect your ability to serve as a juror here?

25          JUROR:  No, it would not.

```
1              THE COURT:  Thank you.

2              Ma'am?

3              JUROR:  Vanessa Golson, City of Norfolk, five years

4    ago, a civil case.

5              THE COURT:  All right.  Ms. Golson, would anything

6    about that service affect your ability to sit on the jury

7    here?

8              JUROR:  No, Your Honor.

9              THE COURT:  Thank you.

10             Ma'am?

11             JUROR:  Linda French.  I had grand jury duty.

12             THE COURT:  Was the grand jury in state, or federal

13   court?

14             JUROR:  State.

15             THE COURT:  What jurisdiction?

16             JUROR:  City of Virginia Beach.  I served two terms,

17   about 20 and 25 years ago.

18             THE COURT:  Ms. French, would anything about that

19   service affect your ability to sit on this jury here?

20             JUROR:  No, ma'am.

21             THE COURT:  Thank you.

22             Ma'am?

23             JUROR:  Patty Freeman.  City of Suffolk about 12

24   years ago on a civil case.

25             THE COURT:  Would anything, Ms. Freeman, about that
```

GLORIA S. SMITH, OFFICIAL REPORTER

23

1    service affect your ability to sit on the jury here?

2            JUROR:  No, Your Honor.

3            THE COURT:  Thank you.

4            Ma'am?

5            JUROR:  Judith Goodman.

6            THE COURT:  Ms. Goodman, where and when did you sit

7    on a jury?

8            JUROR:  City of Virginia Beach, and it was a

9    criminal case.

10           THE COURT:  When was that?

11           JUROR:  Oh, about 20 years ago.

12           THE COURT:  Ms. Goodman, would anything about that

13   service affect your ability to sit on this jury?

14           JUROR:  No.

15           THE COURT:  Thank you.

16           Ma'am?

17           JUROR:  Becky Graham, and it was in the City of

18   Norfolk about four years ago on a civil case.

19           THE COURT:  Ms. Graham, would that service affect

20   your ability here in any way?

21           JUROR:  No.

22           THE COURT:  Thank you.

23           Ma'am?

24           MR. HUDGINS:  Susan Head, City of Norfolk, maybe

25   five years ago.  I do not recall if it was civil or criminal.

GLORIA S. SMITH, OFFICIAL REPORTER

**253**

1          THE COURT:  Ms. Head, would anything about that jury

2     service affect your ability to serve here?

3          JUROR:  No, ma'am.

4          THE COURT:  Thank you.

5          Ma'am?

6          JUROR:  Janet Hostetler, Virginia Beach, about five

7     years ago, a civil case.

8          THE COURT:  Ms. Hostetler, would anything about that

9     service affect your ability to sit on the jury here?

10         JUROR:  No.

11         THE COURT:  Ma'am?

12         JUROR:  Lisa Hutchins, Virginia Beach.  It was a

13    criminal case about ten years ago.

14         THE COURT:  Ms. Hutchins, would anything about that

15    service affect your ability here?

16         JUROR:  No, ma'am.

17         THE COURT:  Sir?

18         JUROR:  Cecil Jennings, Chesapeake, a year ago.  I

19    believe it was civil.

20         THE COURT:  All right.  Mr. Jennings, would that

21    service affect your ability to sit on this jury?

22         JUROR:  No.

23         THE COURT:  Thank you.

24         Ma'am?

25         JUROR:  Tempie Kessler-Roberts, a civil trial in

25

1  Chesapeake in 2001.

2          THE COURT:  Ms. Kessler-Roberts, would anything

3  about that service affect your abilities here?

4          JUROR:  No.

5          THE COURT:  Thank you.

6          Anyone else?

7          (No response.)

8          THE COURT:  I introduced the parties to you, the

9  United States and the prosecutor, Ms. McKeel and Mr. Samuels,

10  and I introduced the two defendants to you, Mr. Draven and Mr.

11  Runyon, and their attorneys, Mr. Ellenson, Mr. Clancy, Mr.

12  Woodward, and Mr. Hudgins.

13          Do any of you think you know any of these

14  individuals either personally or professionally?  If so,

15  please stand.

16          (No response.)

17          THE COURT:  Has any member of the jury panel at any

18  time been involved in a criminal matter in a court that

19  concerned either you or a member of your immediate family?

20  And that involvement would be as either a defendant or a

21  witness.  If so, please stand.

22          Ma'am, if you would give me your name.

23          JUROR:  Joyce Godwin Buchanan.

24          THE COURT:  I'm sorry, I couldn't hear you.

25          JUROR:  Joyce Godwin Buchanan.

1          THE COURT:  All right, Ms. Buchanan.  That's all.

2    Thank you.

3          Ma'am?

4          JUROR:  I'm not sure if I was or not, so I'm

5    standing.  Susan Head.

6          THE COURT:  All right.  Would it have been you, or

7    someone else?

8          JUROR:  She was suing.

9          THE COURT:  Then that would have been a traffic

10   matter?

11         JUROR:  A traffic matter.

12         THE COURT:  All right.  And what is your name?

13         JUROR:  Susan Head.

14         THE COURT:  Thank you, Ms. Head.

15         Your name, please?

16         JUROR:  Jennifer Graham.

17         THE COURT:  Ms. Graham, would it have been you, or

18   someone else?

19         JUROR:  I'm not exactly sure.  I have been involved

20   in a traffic, and that was personal, and then personally I had

21   a misdemeanor crime when I was 18.

22         THE COURT:  You had a misdemeanor crime when you

23   were 18?

24         JUROR:  Yes, ma'am.

25         THE COURT:  Would anything about that experience,

27

1    Ms. Graham, as an 18-year-old or your traffic affect your

2    abilities here?

3              JUROR:  No, ma'am.

4              THE COURT:  Thank you.

5              Ma'am?

6              JUROR:  Patricia Jackson.

7              THE COURT:  Ms. Jackson, was it you, or someone

8    else?

9              JUROR:  It was me.

10             THE COURT:  All right.  And what type of case was

11   it?

12             JUROR:  The case has not -- I'm sorry.  The case has

13   not come up yet.

14             THE COURT:  All right.

15             JUROR:  I was held hostage.

16             THE COURT:  All right.  That's fine.  You can be

17   seated.

18             JUROR:  Your Honor, I don't know what you mean by

19   immediate family.  I do have a cousin who was convicted under

20   the RICO Act, and since that is a federal crime, I thought I

21   might mention that.

22             THE COURT:  What is your name?

23             JUROR:  Shirley Johnson.

24             THE COURT:  Ms. Johnson, did you have any

25   involvement whatsoever in the case?

GLORIA S. SMITH, OFFICIAL REPORTER

28

1          JUROR:  In the case?

2          THE COURT:  Yes.

3          JUROR:  No.

4          THE COURT:  I mean were you a witness?

5          JUROR:  No.

6          THE COURT:  So, in other words, it is just something

7    that occurred, but you weren't involved as a defendant or a

8    witness or didn't have any role in it.

9          JUROR:  He is my cousin.  He did the crime, he did

10   the time.  I had nothing to do with it.

11         THE COURT:  I understand.  Thank you very much.

12         Anyone else?

13         (No response.)

14         THE COURT:  And let me go back.  Ms. Buchanan, if

15   you could stand back up.  I sorry, I didn't follow through

16   with you.  Was it you, or someone else?

17         JUROR:  Someone else.

18         THE COURT:  What type of case was it?

19         JUROR:  It was a criminal case.

20         THE COURT:  All right.  That's fine.  Thank you.

21         I'm going to read a list of potential witnesses, and

22   I'm going to ask that you pay close attention to the names as

23   I go through them, because in the end I'm going to ask you if

24   you think you know any of these people either personally or

25   professionally.

GLORIA S. SMITH, OFFICIAL REPORTER

1          Also at this time I'm going to introduce the agent

2    -- is that Mr. Banks at the table?

3          MS. MCKEEL:  Yes, ma'am.

4          THE COURT:  Mr. Banks, if you would turn around.

5    This is William "Chip" Banks.  He is with the Bureau of

6    Alcohol, Tobacco & Firearms and is the federal agent on this

7    case.  Do any of you know Mr. Banks either personally or

8    professionally?

9          (No response.)

10         THE COURT:  I'm going to start reading the names of

11   the witnesses.  Also, counsel, I would ask that you pay close

12   attention, because if I overlook someone that you may call as

13   a witness at this juncture of the trial, please let me know.

14         Omni, O-M-N-I, M. Amen, A-M-E-N.  Stacy C. Anderson.

15   Mark Andrachek, A-N-D-R-A-C-H-E-K.  Mark Anthony.  Laurie

16   Arden, A-R-D-E-N.  Vincenzo Autolino, A-U-T-O-L-I-N-O.

17         Kelly Baker.  Matthew Baker.  Sarah Baker.  Judson

18   Ballentine.  Octavia Banks.  William Banks.  Sandra Barrow.

19   R. A. Bell.  Steven Bender, B-E-N-D-E-R.  Jack Benzy,

20   B-E-N-Z-Y.  Milagros Bisono, M-I-L-A-G-R-O-S B-I-S-O-N-O.  Ivy

21   L. Blue-Uzzle, and that is hyphenated, B-L-U-E dash U-Z-Z-L-E.

22         Brian Bozin, B-O-Z-I-N.  Debbie Bratton,

23   B-R-A-T-T-O-N.  Curtis Briggs.  Joseph Briggs.  Amit Broka,

24   A-M-I-T, last name B-R-O-K-A.  Deborah Bunch.  Elizabeth Buda,

25   B-U-D-A.  Christopher Burks.  Anna Ellis Burris.  Leah Bush.

```
1    Ralph Butler.  Kushtrim Bytyqi.  That's K-U-S-H-T-R-I-M, last
2    name B-Y-T-Y-Q-I.  Chris Campbell.  Larry Carr.  Robin
3    Carroll.  Amanda Carter.
4           I'm going to stop there and ask -- I will segment
5    the witnesses.  I know it is a lot of names for you to
6    remember, so I'm going to stop there and ask, do any of you
7    think that you know any of these individuals either personally
8    or professionally?  If so, please stand.
9           All right.  Ma'am, if you would give me your name
10   for the record, please.
11          JUROR:  Shirley Johnson, and I don't --
12          THE COURT:  Just respond to my questions, please.
13          Ms. Johnson, who is the witness that you think you
14   know?
15          JUROR:  There are three.
16          THE COURT:  If you would just give me their names.
17          JUROR:  Sarah Baker.
18          THE COURT:  Sarah Baker.
19          JUROR:  Chris Campbell.
20          THE COURT:  Chris Campbell.
21          JUROR:  Steven Bender.
22          THE COURT:  Steven Bender.  Now, could you please
23   tell me, the Sarah Baker that you know, do you know what she
24   does?
25          JUROR:  I don't know what she does.  She is a
```

31

1    tennis-playing friend of mine.

2              THE COURT:  And where does she live?  In what city?

3              JUROR:  Virginia Beach.

4              THE COURT:  Tennis player friend, Virginia Beach.

5              All right.  Chris Campbell -- do you know what he

6    does?

7              JUROR:  No.  He would be about 32 now.  He was the

8    son of a neighbor of mine several years ago.

9              THE COURT:  So he would be approximately in his

10   early thirties, and he would have been the son of a neighbor.

11             JUROR:  Yes.

12             THE COURT:  Steven Bender -- in what capacity?

13             JUROR:  I think he is the daughter of another friend

14   from Portsmouth that I used to play tennis with.

15             THE COURT:  You mean the son?

16             JUROR:  Uh-huh.

17             THE COURT:  And approximately what would be his age?

18             JUROR:  Late twenties, early thirties, and he did

19   live in Portsmouth.

20             THE COURT:  All right.  Thank you.

21             Counsel, if you would approach the bench?

22             (The following discussion occurred at side bar out

23   of the hearing of the jury:)

24             THE COURT:  Counsel, I would tell you now, for each

25   side during *voir dire*, one person is in charge of responding

GLORIA S. SMITH, OFFICIAL REPORTER

32

1    to the court and making things known to the court, for the

2    government and for each defendant, so you can decide which

3    counsel is going to.  When I ask you at some point are there

4    objections and do you have further questions and so forth, one

5    counsel for each side, one for the government, one for each

6    defendant, responds to the court.

7        You obviously can do it in conjunction with each

8    other, but one person deals with the court.  That is the same

9    rule on a witness for objections, for questioning, and so

10   forth.  One counsel for each side handles the witness.

11       The only thing that you can divide, if you want,

12   obviously, is your closing or opening statements.  If someone

13   wants to do half and half, or whatever time, you can, one at a

14   time.

15       Whose witnesses are these?

16       MS. MCKEEL:  Sarah Baker is from West Virginia.  It

17   is not the same person.

18       MR. WOODWARD:  She is on both lists.  It is clearly

19   not her.

20       THE COURT:  I didn't think that we had a tennis

21   player from Virginia Beach here.

22       Who is Chris Campbell?

23       MR. WOODWARD:  He must be one of yours.  He is one

24   of the people we stipulated.  Wasn't he a chain of custody?

25       MS. MCKEEL:  Chris Campbell?

33

```
1              THE COURT:  Is Chris Campbell somebody who is not
2   any longer on the list?
3              MS. MCKEEL:  That's right.  They may have stipulated
4   to him.
5              MR. WOODWARD:  We stipulated to like a hundred
6   things in terms of chain of custody and authority of records.
7              THE COURT:  So Chris Campbell is no longer on the
8   witness list?
9              MS. MCKEEL:  That's correct.
10             THE COURT:  Either due to a stipulation, or you have
11  removed him.
12             MR. WOODWARD:  Right.
13             THE COURT:  Now let's look at Steven Bender.
14             MR. WOODWARD:  He is our witness, Your Honor.  He is
15  a potential expert.  He is not the same person.  He is not
16  from Portsmouth, he's from Charlottesville.  Mr. Bender is
17  not -- that's not the Mr. Bender.
18             THE COURT:  So in other words, you are convinced he
19  is not.  Then I will continue.
20             MR. WOODWARD:  He is from Charlottesville, he's not
21  from Portsmouth.
22             (Proceedings resumed in open court as follows:)
23             THE COURT:  I'm going to continue.
24             Carl Cespedes, C-E-S-P-E-D-E-S.  Denise Chambers.
25  Lieutenant JG Jeremy Chayer, spelled C-H-A-Y-E-R.  Christine
```

GLORIA S. SMITH, OFFICIAL REPORTER

**263**

34

1    Chipps.  Steven Clement, C-L-E-M-E-N-T.  Keith Cobb.  David

2    Dalton.  Paula Dalton.  Mike Davenport.  Jennifer Davis.

3    Lucinda Dibble, D-I-B-B-L-E.  Jessica Farrell, F-A-R-R-E-L-L.

4    Randy Fitchett.  Edward Fodrey, F-O-D-R-E-Y.

5           Lawrence Ford.  Dr. Richard Fruncillo,

6    F-R-U-N-C-I-L-L-O.  Mike Garber, G-A-R-B-E-R.  Patricia Rachel

7    Garrido, G-A-R-R-I-D-O.  Commander Matthew Graham.  Pamela

8    Grohs, G-R-O-H-S.  Jason Guyton, G-U-Y-T-O-N.  Jeff Harris.

9    Ashley Holland.  Sergeant M. A. House.  Lieutenant JG Jennifer

10   Hubbard.  Anisa Jones.  Mitch Jones.  Officer H. Kim.  Nicole

11   King.

12          I will stop there, and I will ask, do any of you

13   think that you know any of these individuals either personally

14   or professionally?

15          All right.  Ma'am, if you would give me your name?

16          JUROR:  Bobbette Abraham.

17          THE COURT:  Who is it that you think that you know,

18   Ms. Abraham?

19          JUROR:  Jennifer Davis.

20          THE COURT:  And the Jennifer Davis that you know,

21   Ms. Abraham, who would that be?  How do you know her?

22          JUROR:  I worked with a Jennifer Davis several years

23   ago, Department of Defense.

24          THE COURT:  How many years ago would that be?

25          JUROR:  Less than ten.

35

1            THE COURT:  I'm just going to ask you an

2    approximation.  Approximately how old would the Ms. Davis be

3    that you worked with?

4            JUROR:  I think she would be in her thirties by now.

5            THE COURT:  Was she in law enforcement at the time?

6            JUROR:  No.

7            THE COURT:  Thank you.

8            Ma'am, your name?

9            JUROR:  Toni Lewis Cary.

10            THE COURT:  Ms. Cary, who is it that you think you

11    know?

12            JUROR:  Christine Chipps.

13            THE COURT:  Christina Chipps.  And where is the

14    Ms. Chipps that you know from?

15            JUROR:  Virginia Beach.

16            THE COURT:  Does she currently live in Virginia

17    Beach?

18            JUROR:  No, she does not.

19            THE COURT:  Do you know where she lives now?

20            JUROR:  I believe she has moved with her husband to

21    Fredericksburg.

22            THE COURT:  Virginia?

23            JUROR:  Yes.

24            THE COURT:  In what capacity did you know her?

25            JUROR:  A friend through my husband.  They worked

GLORIA S. SMITH, OFFICIAL REPORTER

**265**

36

1    together.

2              THE COURT:  And just one more question.  A friend

3    through your husband.  What is your husband's occupation?

4              JUROR:  He is a claims supervisor at Geico.

5              THE COURT:  Thank you very much.

6              Ma'am, your name?

7              JUROR:  Susan Gordon.

8              THE COURT:  All right, Ms. Gordon.

9              JUROR:  Mike Davenport.

10             THE COURT:  Mike Davenport.  And the Mike Davenport

11   that you know -- do you know his occupation?

12             JUROR:  I work with a Mike Davenport.  He is a

13   customer support representative.

14             THE COURT:  I couldn't hear you.

15             JUROR:  I work with a Mike Davenport, and he is a

16   customer support representative.

17             THE COURT:  A customer support representative.  All

18   right.  Thank you.

19             Sir?

20             JUROR:  Matthew Heim.

21             THE COURT:  Could you spell your last name, please?

22             JUROR:  H-E-I-M.

23             THE COURT:  All right.  Mr. Heim, who is it that you

24   think you know?

25             JUROR:  Lieutenant JG Jennifer Hubbard.

GLORIA S. SMITH, OFFICIAL REPORTER

1          THE COURT:  Is the Ms. Hubbard that you know

2    currently a lieutenant JG?

3          JUROR:  I wouldn't know that, Your Honor.

4          THE COURT:  Sir?

5          JUROR:  I wouldn't know that, Your Honor.

6          THE COURT:  And the Ms. Hubbard -- do you currently

7    know Ms. Hubbard?

8          JUROR:  I do not, Your Honor.

9          THE COURT:  Can you tell me, was this a friend or

10   a --

11         JUROR:  I believe we may have gone to high school

12   together.

13         THE COURT:  Can you just tell me where you went to

14   high school?

15         JUROR:  Princess Anne High School.

16         THE COURT:  Do you currently have any association

17   with Ms. Hubbard?

18         JUROR:  No, Your Honor.

19         THE COURT:  So you recognize the name Jennifer

20   Hubbard.

21         JUROR:  It sounds familiar, yes, Your Honor.

22         THE COURT:  But the Jennifer Hubbard, when you knew

23   her or do know her, did not have the title Lieutenant JG?

24         JUROR:  No, Your Honor.

25         THE COURT:  And do you know if the Ms. Hubbard that

GLORIA S. SMITH, OFFICIAL REPORTER

**267**

1    you knew went into the Navy?

2            JUROR:  I wouldn't know.

3            THE COURT:  Thank you.

4            Anyone else?

5            (No response.)

6            THE COURT:  Counsel, if you would please approach

7    the bench.

8            (The following discussion occurred at side bar out

9    of the hearing of the jury:)

10           THE COURT:  Counsel, Ms. Abraham knows a Jennifer

11   Davis.

12           MS. MCKEEL:  I don't think it is her, Judge.  Our

13   Jennifer Davis works at the Newport News Police Department.

14   She is in charge of communications, a supervisor, and I don't

15   know the rest of her background, but I don't think that that

16   would have been the same Jennifer Davis.

17           MR. CLANCY:  The only caveat I would suggest is that

18   this Juror No. 1, she was involved -- and this is from

19   memory -- she was involved with some sort of law enforcement

20   before she went to law school.

21           MR. WOODWARD:  She is from Department of Defense.  I

22   don't know whether Davis worked at DOD before she went to work

23   at the police department.

24           THE COURT:  I will ask her individually about

25   Jennifer Davis.

GLORIA S. SMITH, OFFICIAL REPORTER

1          MR. WOODWARD:  That's fine.

2          THE COURT:  In the meantime, Ms. McKeel, on a break

3     or so forth that we will have, because we will definitely be

4     having some type of break, find out if the Jennifer Davis --

5     she says the Jennifer Davis she knew worked with the

6     Department of Defense within the last ten years and is in her

7     thirties.  So I think that you have enough information to see

8     if you can ascertain the knowledge of Jennifer Davis for

9     Ms. Abraham.

10         Ms. Cary indicated that she knew a Christine Chipps.

11    It doesn't look like the same -- is everybody agreeing it is

12    not the same?

13         MR. CLANCY:  It is not.

14         MR. WOODWARD:  It is not the same.

15         THE COURT:  Everybody agrees that it is not the same

16    Christine Chipps.

17         Obviously the Mike Davenport is not the same Mike

18    Davenport that is listed.  Everybody agrees?

19         MS. MCKEEL:  Yes, ma'am.

20         MR. CLANCY:  Agreed.

21         THE COURT:  Mr. Heim knew a Jennifer Hubbard.  I

22    don't know if this is the same Jennifer Hubbard.

23         MS. MCKEEL:  I have no idea where she went to high

24    school, Judge.  She was a member of the Navy.  She was aboard

25    the USS ELROD.  If she knew him, I don't think there is any

40

```
1   type of prejudice, just because he knew her from high school.

2           MR. CLANCY:  I would agree it's too attenuated to

3   object.

4           MR. WOODWARD:  Seems like she didn't make a big

5   impression on him.  I agree, and if she walks in and it is the

6   same person, it is not going to affect him.

7           MS. MCKEEL:  No.

8           THE COURT:  Then we won't pursue that any further,

9   by agreement.

10          (Proceedings resumed in open court as follows:)

11          THE COURT:  I will continue.

12      Jamal Knowles.  Susan Koopmans, K-O-O-P-M-A-N-S.

13  George Koski, K-O-S-K-I.  Randi Lassiter.  Colleen Lawrence.

14  Michelle Lindblad, L-I-N-D-B-L-A-D.

15          Theresa, T-H-E-R-E-S-A, Linker, L I N K E R.  James

16  Liscinsky, L-I-S-C-I-N-S-K-Y.  He is a special agent with the

17  Bureau of Alcohol, Tobacco & Firearms.  Jay Mathieu,

18  M-A-T-H-I-E-U.

19          Barbara McLellan.  Kristin McManus.  Theresa

20  Merhige, a special agent with the Bureau of Alcohol, Tobacco &

21  Firearms.  Robert Merrill, M-E-R-R-I-L-L.  Dr. Paul

22  Montalbano, M-O-N-T-A-L-B-A-N-O, of Washington, D. C.

23          Amar Okanovic, O-K-A-N-O-V-I-C.  Denny Park.  Dr.

24  Raymond Patterson.  Virginia Pina, P-I-N-A.  Amer Ribic,

25  A-M-E-R R-I-B-I-C.  Detective L. P. Rilee, R-I-L-E-E, of the
```

GLORIA S. SMITH, OFFICIAL REPORTER

41

1    Newport News Police Department.  Lorri Lynn Robinson.  Teresa

2    Robinson.  Officer P. E. Ruhlen, R-U-H-L-E-N, of the Newport

3    News Police Department.

4            Theodore Schlossman, S-C-H-L-O-S-S-M-A-N.  Officer

5    N. Schmidle, S-C-H-M-I-D-L-E, of the Morgantown Police

6    Department in West Virginia.  Kevin Seidnitzer,

7    S-E-I-D-N-I-T-Z-E-R, with the Newport News Fire Department.

8            Richard Sherrill, S-H-E-R-R-I-L-L, with the Newport

9    News Police Department.  Erin Skiba, S-K-I-B-A.  Charles

10   Smith.  Kristen Smith.  Officer William Stevens with the

11   Wichita Police Department, Kansas.  Paul Swartz.  Michael

12   Talmo, T-A-L-M-O.  Dawn Tatar, T-A-T-A-R.  Gary Turner.

13           I will stop there.  Does anyone on the jury panel

14   think that you know any of these individuals either personally

15   or professionally?  If so, please stand.

16           (No response.)

17           THE COURT:  I will continue.

18           Deputy Sheriff Jim Vollmer, V-O-L-M-E-R of Yorktown,

19   Virginia.  Casey Voss.  Catherina Voss.  Cory Voss, Jr.  Rose

20   Wiggins.  Detective J. T. Williams of the Newport News Police

21   Department.  John Willmer, with the Virginia Department of

22   Forensic Science.  Barbara Wilson.  Malcolm Wilson.  William

23   Wynne, W-Y-N-N-E.  And Thomas Zeitter, Z-E-I-T-T-E-R, with the

24   Newport News Police Department.

25           Does anyone think that you know any of these

GLORIA S. SMITH, OFFICIAL REPORTER

42

1    individuals either personally or professionally?

2            Counsel, if you would approach with any further

3    witnesses.

4            (The following discussion occurred at side bar out

5    of the hearing of the jury:)

6            THE COURT:  Ms. McKeel, have I covered all of your

7    potential witnesses?

8            MS. MCKEEL:  You have, Judge.

9            THE COURT:  Mr. Clancy?

10           MR. CLANCY:  Judge, we had filed sometime ago three

11   names with the court.  We are going to redact two of them.  We

12   will not call them.  We are relying on several witnesses that

13   the government has subpoenaed.  We have notified the

14   government of that, to please not release any witnesses until

15   they clear it through us.

16           THE COURT:  Then I'm going to tell Ms. McKeel now

17   not to release any of their witnesses that I have called out

18   that they have under subpoena without the court's permission.

19           MR. CLANCY:  Thank you.

20           I would formally release, if you will, two of my

21   three witnesses.  Richard Harper and Juanita Harper we will

22   not be calling.  I had previously notified the court they were

23   on our witness list.  They are no longer.

24           THE COURT:  Richard Harper and Juanita Harper are

25   not being called.  Who are --

GLORIA S. SMITH, OFFICIAL REPORTER

43

1          MR. CLANCY:  They are my client's parents.

2          THE COURT:  Who are you are not releasing?

3          MR. CLANCY:  Randy Fitchett is a name that we had

4     filed with the court, and we are relying on several other

5     witnesses for the government.

6          THE COURT:  I understand.  I have not called out

7     Randy Fitchett.

8          MR. CLANCY:  You have already called him.

9          THE COURT:  So I have called out the names of any of

10    your potential witnesses.

11         MR. CLANCY:  Yes, ma'am.

12         MR. WOODWARD:  Judge, what I did, I did my list

13    before we did the stipulations.  If you will give me two

14    minutes, I will cross through the ones you have already

15    called.  If you will give me two minutes.

16         THE COURT:  All right.

17         MR. CLANCY:  Your Honor, while he is doing that,

18    this may not be the appropriate time, but I would respectfully

19    ask that you ask a follow-up question of any jurors who have

20    served on a civil jury and explain to them that the burden of

21    proof in a civil case is radically different.

22         THE COURT:  I'm going to go through all that in my

23    standard *voir dire*.

24         MR. CLANCY:  Fair enough.  I thought you might.  I

25    just wanted to let you know my concern.

GLORIA S. SMITH, OFFICIAL REPORTER

44

```
1           THE COURT:  And I won't conclude any voir dire,
2   Mr. Clancy, without giving you an opportunity to object,
3   without giving you an opportunity to ask me to do follow-up
4   questions.  I won't quit until I have asked you probably five
5   or six times.  You will get tired of me asking you.
6           MR. CLANCY:  We appreciate it, Your Honor.
7           MR. WOODWARD:  Judge, I think I caught all the ones
8   that they've either subpoenaed or that you've already called.
9   If there is any duplicates on there, there are just a couple.
10  I marked out all the ones that you have already called.
11          THE COURT:  That's fine.  I will tell them I may be
12  repeating names, but I would rather repeat them than not call
13  them.
14          MR. WOODWARD:  And I have the same agreement with
15  Ms. McKeel about some of the law enforcement witnesses that we
16  are relying on.  We double-subpoenaed a lot of people.  We are
17  relying on their subpoenas, before they release them.
18          THE COURT:  She understands.
19          MS. MCKEEL:  Tell me who they are again.
20          THE COURT:  We are not going to do this up here at
21  the bench, Ms. McKeel.  You all can do on that a break.
22          (Proceedings resumed in open court as follows:)
23          THE COURT:  I'm going to call a few more names.  I
24  may be repeating some names, but I would rather repeat a name
25  than to overlook a name.
```

GLORIA S. SMITH, OFFICIAL REPORTER

**274**

45

1            Steven Clement, C-L-E-M-E-N-T.  Scott Linker.

2    Tiffany Linker.  Christopher Larson.  Charles Ferguson.  David

3    Hill.  Thomas Preston.  Charles A. Smith.  Kelly Baker.  Craig

4    Robinson, R-O-B-I-N-S-O-N.  Charles M. Pruitt.  Maria Runyon.

5    Suk Cha Runyon.  David H. Runyon.  Mark D. Runyon, David T.

6    Dombrowski.

7            Robin Carroll.  David Costa.  Sharon Grbic,

8    G-R-B-I-C.  Michael Grbic, G-R-B-I-C.  Robert Seeger,

9    S-E-E-G-E-R.  Deborah Seeger, S-E-E-G-E-R.  Larry Carr.  Kelly

10   Baker.  Chanita Fitchett.  Jennifer Hammond.  Mark Kilby.

11   Mark Cunningham.  R. Glenn Ford.  Paula Funk.  Robert

12   Lockwood.

13           Reverend Phyllis Provost, P-R-O-V-O-S-T.  Thomas

14   Kumoroski, K-U-M-O-R-O-S-K-I.  Dr. Allen Mirsky, M-I-R-S-K-Y.

15   Dr. James Merikangas, M-E-R-I-K-A-N-G-A-S.

16           Do any of you think that you know any of those

17   individuals either personally or professionally?

18           Give me your name, please.

19           JUROR:  Jennifer Graham.

20           THE COURT:  Ms. Graham, who is it that you think you

21   know?

22           JUROR:  Larry Carr.

23           THE COURT:  Larry Carr.  And the Larry Carr that you

24   know, do you know what he does?

25           JUROR:  He worked for NASA.

46

```
 1              THE COURT:  And when did you know Mr. Carr?

 2              JUROR:  He adopted my daughter 19 years ago.

 3              THE COURT:  He went out with your daughter?

 4              JUROR:  No, he adopted my daughter 19 years ago.

 5              THE COURT:  And does the Larry Carr you know -- does

 6    he still work with NASA?

 7              JUROR:  I do not know.

 8              THE COURT:  Approximately how old would he be?

 9              JUROR:  I'm not exactly sure.  I would think

10    probably late 40s.

11              THE COURT:  Thank you.  Anyone else?

12              (No response.)

13              THE COURT:  Counsel, before I call you back up here,

14    are there any witnesses that you have that I may have

15    overlooked?

16              Ms. McKeel?

17              MS. MCKEEL:  No, ma'am.

18              THE COURT:  Mr. Clancy?

19              MR. CLANCY:  No, ma'am.

20              THE COURT:  Mr. Woodward?

21              MR. WOODWARD:  Your Honor, did you call out Sheila

22    Cronin?  If you didn't, I would ask that you call her.  I may

23    have neglected that.

24              THE COURT:  All right.  Sheila Cronin, C-R-O-N-I-N.

25    Does anyone know a Sheila Cronin or think they do, personally
```

GLORIA S. SMITH, OFFICIAL REPORTER

**276**

47

1    or professionally?

2              (No response.)

3              THE COURT:  Counsel, if you would please approach

4    the bench.

5              (The following discussion occurred at side bar out

6    of the hearing of the jury:)

7              MR. WOODWARD:  That guy lives in Michigan.  It is

8    not the same guy, not even close.  I can tell you that is not

9    the same Larry Carr.

10              THE COURT:  All right.  Thank you.

11              (Proceedings resumed in open court as follows:)

12              THE COURT:  Again I'm just going to ask you to

13   stand, and then I will ask a couple of follow-up questions

14   after you have stood up.

15              Have you or any member of your immediate family ever

16   been employed by a law enforcement agency?  If so, please

17   stand.

18              Your name?  For the record, we have to keep doing

19   it, Ms. Abraham.

20              JUROR:  Bobbette Abraham.

21              THE COURT:  Who is so employed?

22              JUROR:  My ex-husband was employed by law

23   enforcement.  Also a cousin was employed by law enforcement.

24              THE COURT:  All right.  Would anything about either

25   of their employments affect your ability to sit on this case

GLORIA S. SMITH, OFFICIAL REPORTER

48

1    and hear it and judge it fairly?

2              JUROR:  No, Your Honor.

3              THE COURT:  All right.  Thank you.

4              Sir?  Is it Mr. Adams?

5              JUROR:  Yes, Mike Adams.  My sister was a Norfolk

6    deputy and a deputy in Oshkosh, Wisconsin.  She is currently a

7    federal investigator.

8              THE COURT:  Would anything about your sister's

9    employment or your knowledge thereof affect your ability to

10   try this case fairly?

11             JUROR:  No.

12             THE COURT:  Thank you.

13             Sir, your name?

14             JUROR:  Charles Bell.

15             THE COURT:  Mr. Bell, who would that be?

16             JUROR:  I was employed by a security service one

17   time.

18             THE COURT:  Mr. Bell, would anything about that

19   employment affect your ability to try this criminal case

20   fairly?

21             JUROR:  No.

22             THE COURT:  Ma'am?

23             JUROR:  Toni Lewis Cary.  Both my uncle and his son

24   work for the New York State Police.

25             THE COURT:  Ms. Cary, would anything about their

1    employment affect your ability to try this case fairly?

2              JUROR:  No.

3              THE COURT:  Your name, please?

4              JUROR:  Ashley Carbonel.

5              THE COURT:  Ms. Carbonel, who is so employed?

6              JUROR:  My biological father in the past in Texas, a

7    police officer.

8              THE COURT:  A police officer in Texas?

9              JUROR:  Uh-huh.

10             THE COURT:  Would anything about his employment

11   there affect your ability to try this case?

12             JUROR:  No, ma'am.

13             THE COURT:  Thank you.

14             JUROR:  My ex father-in-law and brother-in-law were

15   in the police in St. Louis.  I don't know if that matters.

16             THE COURT:  And you are?

17             JUROR:  Nancy Canu.

18             THE COURT:  Ms. Canu, would anything about their

19   employment affect your ability to try this case here?

20             JUROR:  No.

21             THE COURT:  Thank you.

22             Ma'am, your name?

23             JUROR:  Barbara Davis.

24             THE COURT:  Ms. Davis, who is so employed?

25             JUROR:  My brother was a police officer for the City

GLORIA S. SMITH, OFFICIAL REPORTER

50

1    of Portland in Maine, and my brother-in-law is a state trooper

2    for the State of Alabama.

3           THE COURT:  Would anything about either of their

4    employments affect your ability to try this case?

5           JUROR:  No.

6           THE COURT:  Your name, please?

7           JUROR:  Denee Harris.

8           THE COURT:  Ms. Harris, who was so employed?

9           JUROR:  My husband.

10          THE COURT:  Where is he employed?

11          JUROR:  He works for the Department of Corrections.

12          THE COURT:  The Virginia Department of Corrections?

13          JUROR:  Yes, ma'am.

14          THE COURT:  Would anything about his employment with

15   the Department of Corrections affect your ability to try this

16   case fairly?

17          JUROR:  No, ma'am.

18          THE COURT:  Thank you.

19          Your name, sir?

20          JUROR:  Matthew Stephen Heim.

21          THE COURT:  Mr. Heim, who is so employed?

22          JUROR:  My brother-in-law.

23          THE COURT:  Where is he employed?

24          JUROR:  Virginia Beach Animal Control.

25          THE COURT:  Virginia Beach?

GLORIA S. SMITH, OFFICIAL REPORTER

**280**

51

1            JUROR:  Animal Control.

2            THE COURT:  Would anything about his employment

3    affect your ability to try this case?

4            JUROR:  No, Your Honor.

5            THE COURT:  Thank you.

6            Ma'am?

7            JUROR:  Janet Hostetler.  My husband is employed by

8    U. S. Customs/Homeland Security, and I have a nephew that is a

9    state patrolman in the State of Ohio.

10           THE COURT:  Would anything about either of those

11   employments affect your ability to try this case fairly?

12           JUROR:  No.

13           THE COURT:  Thank you.

14           Ma'am, your name?

15           JUROR:  Patricia Jackson.

16           THE COURT:  Ms. Jackson, who is so employed?

17           JUROR:  My cousin is a magistrate in the City of

18   Virginia Beach.

19           THE COURT:  All right.  Ms. Jackson, would anything

20   about his employment affect your ability to try this case?

21           JUROR:  No.

22           THE COURT:  All right.  Thank you.

23           Ma'am, your name?

24           JUROR:  Shirley Johnson.

25           THE COURT:  Ms. Johnson, who is so employed?

1          JUROR:  My brother-in-law was a police officer in

2     New York.

3          THE COURT:  And would anything about his employment,

4     Ms. Johnson, affect your ability to try this case?

5          JUROR:  No, ma'am.

6          THE COURT:  Thank you.

7          JUROR:  Carol Kocevar.

8          THE COURT:  Ms. Kocevar, who is so employed?

9          JUROR:  My son is a law enforcement officer for

10    Montgomery County, Maryland.

11         THE COURT:  Ms. Kocevar, would anything about his

12    employment affect your ability to try this case fairly?

13         JUROR:  No, ma'am.

14         THE COURT:  Thank you.

15         Now, would any of you give any more weight or any

16    less weight -- in other words, if you give more weight, you

17    believe somebody more; if you give less weight, you believe

18    somebody less -- merely because they are a law enforcement

19    officer, and for no other reason?  If so, please stand.

20         (No response.)

21         THE COURT:  If you are selected as a juror in this

22    case, you would be required to put aside any feeling of

23    passion or prejudice and decide this case solely on the

24    evidence that would be introduced during the trial and the

25    instructions that I would give you as the judge, as the court,

GLORIA S. SMITH, OFFICIAL REPORTER

**282**

53

1   concerning the law of this case.

2          Now, do any of you feel you cannot do that?  If so,

3   please stand.

4          All right.  Could you please give me your name?

5          JUROR:  Patricia Jackson.

6          THE COURT:  Thank you, Ms. Jackson.

7          Do any of you believe that any questions that you

8   have answered or been posed regarding punishment are a sign of

9   any defendant's guilt?  If so, please stand.

10         (No response.)

11         THE COURT:  Do any of you prior to today know any of

12  your fellow jurors that you are sitting with here?

13         All right, sir, if you would give me your name?

14         JUROR:  Mike Patrick Arnold.

15         THE COURT:  Mr. Arnold, which of the other jurors do

16  you know?

17         JUROR:  Back there in the pink shirt.

18         THE COURT:  What is his name?

19         JUROR:  Bill Kennedy.

20         THE COURT:  How do you know Mr. Kennedy?

21         JUROR:  I used to work with him.

22         THE COURT:  Where did you all work together?

23         JUROR:  Chesbay Distributing.

24         THE COURT:  How long ago was that?

25         JUROR:  Eight years ago, maybe.

GLORIA S. SMITH, OFFICIAL REPORTER

1          THE COURT:  How long did you all work together?

2          JUROR:  Ten years.

3          THE COURT:  All right.  Thank you, Mr. Arnold.

4          And, Mr. Kennedy, you have stood up.  Is that the

5    reason that you stood up?

6          JUROR:  Yes, Judge.

7          THE COURT:  Is there anything that you want to add

8    to what Mr. Arnold said?

9          JUROR:  I went to school with his girlfriend, too.

10         THE COURT:  All right.  You went to school -- is she

11   still his girlfriend?

12         JUROR:  I'm not sure.

13         THE COURT:  All right.  Thank you.

14         Was she your girlfriend, too?

15         JUROR:  No.

16         THE COURT:  Ma'am, your name?

17         JUROR:  Kathleen Barefoot.

18         THE COURT:  Ms. Barefoot, which of the other jurors

19   do you think you know?

20         JUROR:  Cecil Jennings, Jr.

21         THE COURT:  All right.  Cecil Jennings, Jr.  How do

22   you know Mr. Jennings?

23         JUROR:  My husband went to school with his father,

24   or his father was a coach for my husband, and he has done some

25   work at our house.  I have known of him all my life, and a

1    couple of years ago or eight years ago or something, he did

2    some tile work for us.

3              THE COURT:  Thank you, Ms. Barefoot.

4              And, Mr. Jennings, you stood up because you know

5    Ms. Barefoot?

6              JUROR:  Correct.

7              THE COURT:  Is there anything you would like to add

8    to what Ms. Barefoot has said?

9              JUROR:  No, ma'am.

10             THE COURT:  Thank you.

11             Your name?

12             JUROR:  Valerie Bennett.

13             THE COURT:  I couldn't hear your last name.

14             JUROR:  Bennett.

15             THE COURT:  Bennett.  All right.  I have a long list

16   here.

17             Ms. Bennett, who is it that you know?

18             JUROR:  I know Ms. Jackson, Patricia Jackson.

19             THE COURT:  And how do you know Ms. Jackson?

20             JUROR:  Our husbands are employed with the Postal

21   Service.

22             THE COURT:  Do you know her in any other capacity?

23             JUROR:  No.

24             THE COURT:  Do you all socialize together at all?

25             JUROR:  No, ma'am.

GLORIA S. SMITH, OFFICIAL REPORTER

56

1           THE COURT:  Thank you.

2           Ms. Jackson, I assume that that is why you stood up?

3           JUROR:  That's correct.

4           THE COURT:  All right.  Thank you.  Is there

5     anything else you need to add to that?

6           JUROR:  My husband really works for her husband.

7           THE COURT:  All right.

8           Ma'am?

9           JUROR:  Jennifer Graham.

10          THE COURT:  Ms. Graham, who is it that you know?

11          JUROR:  Ms. Harris.

12          THE COURT:  All right.  And how do you know

13    Ms. Harris?

14          JUROR:  Her husband gave me my first job.

15          THE COURT:  And what was that?

16          JUROR:  It was working in a restaurant, pizza

17    restaurant.

18          THE COURT:  And how long ago was that?

19          JUROR:  Twenty-four years ago.

20          THE COURT:  Have you stayed in touch through the

21    years?

22          JUROR:  From time to time, yes.

23          THE COURT:  With Ms. Harris, with her husband, or

24    both?

25          JUROR:  Mostly her husband.

GLORIA S. SMITH, OFFICIAL REPORTER

**286**

57

1        THE COURT:  And, Ms. Harris, I assume that's why you

2   stood up?

3        JUROR:  Yes, ma'am.

4        THE COURT:  Is there anything else that you would

5   like to add?

6        JUROR:  No, ma'am.

7        THE COURT:  Thank you.

8        Ma'am?

9        JUROR:  My name is Yvonne R. Jones, and I don't

10  really know this lady's name, but I have seen her at women's

11  breakfasts and women's events at churches.

12       THE COURT:  And who is it?

13       JUROR:  This lady right here.

14       THE COURT:  In the orange?

15       JUROR:  Yes.

16       THE COURT:  Now, Ms. Jones -- that is who you

17  pointed to, in the orange jacket?

18       JUROR:  Yes.

19       THE COURT:  And, ma'am, what is your name?

20       JUROR:  Vanessa Golson.

21       THE COURT:  So, Ms. Jones, you think that you have

22  seen Ms. Golson, but you are not friends with her?

23       JUROR:  I know I have seen her, but I'm not friends

24  with her.

25       THE COURT:  You all don't know each other outside of

GLORIA S. SMITH, OFFICIAL REPORTER

**287**

58

1    your having some facial recognition here.

2            JUROR:  I don't know her.

3            THE COURT:  All right.  Ms. Golson, I assume you

4    didn't stand up because you didn't necessarily know her.

5            JUROR:  I just recognize her face.

6            THE COURT:  Thank you.

7            Anyone else?

8            (No response.)

9            THE COURT:  Sometimes individuals enter into plea

10   agreements or agreements whereby they cooperate with the

11   United States in exchange for dismissal of some charges or a

12   lesser sentence, and they receive that benefit in exchange for

13   cooperation and testimony at trial.  Do any of you feel that

14   this would disqualify a witness for belief if they enter into

15   such agreement?  If so, please stand.

16           (No response.)

17           THE COURT:  Do any of you feel that that is an

18   improper practice?  If so, please stand.

19           Sir, what is your name?

20           JUROR:  Glenn Konowicz.

21           THE COURT:  Thank you Mr. Konowicz.

22           Ladies and gentlemen, as you know from completing

23   your questionnaires, the death penalty is one of the possible

24   penalties that may be given under certain circumstances if a

25   defendant is convicted of certain crimes charged in the

GLORIA S. SMITH, OFFICIAL REPORTER

**288**

59

1    indictment.

2        If the jury in the case returns a verdict of guilty

3    against an individual as charged in counts 1, 2, 3, and 5 of

4    the indictment, there would then be an additional proceeding

5    to decide whether or not the death penalty should be imposed

6    in regard to that defendant.  At this additional hearing the

7    parties may, but they are not required to, present further

8    evidence, and then the jury would deliberate the penalty as to

9    that defendant, if appropriate.

10       Now, do you understand that as a juror, however,

11   your first duty is to determine whether a defendant is guilty

12   or not guilty, without consideration of any possible penalty?

13   Is there anyone who doesn't understand that?  If so, please

14   stand.

15       (No response.)

16       THE COURT:  Is there anyone who doesn't understand

17   that, as I indicated, if it is appropriate, in a second stage

18   it would be your duty to listen to further evidence and

19   consider the court's instructions and make a determination

20   whether or not to vote for the death penalty?

21       Do any of you feel you cannot do that?  If so,

22   please stand.

23       If you would give me your names.

24       What is your name, ma'am?

25       JUROR:  Jill Beisel.

GLORIA S. SMITH, OFFICIAL REPORTER

1           THE COURT:  All right.  Ms. Beisel.  Thank you.

2           And your name?

3           JUROR:  Nancy Canu.

4           JUROR:  Janet Hostetler.

5           THE COURT:  Thank you, Ms. Hostetler.

6           JUROR:  Shirley Johnson.

7           THE COURT:  Now, do any of you know of any reason

8    why you think that you could not sit on this case and render a

9    just, fair, honest, and impartial verdict, other than a

10   question that you have previously stood up to?  If so, would

11   you please stand up now.

12          Your name, please?

13          JUROR:  Paige Going.  And I don't know that it --

14          THE COURT:  Wait.  All you can do on this question

15   at this juncture is give me your name.

16          JUROR:  Okay.

17          THE COURT:  Thank you, Ms. Going.

18          Your name, please?

19          JUROR:  Judith Goodman.

20          THE COURT:  Thank you, Ms. Goodman.

21          JUROR:  Janet Hostetler.

22          THE COURT:  Thank you, Ms. Hostetler.

23          JUROR:  Patricia Jackson.

24          THE COURT:  Thank you, Ms. Jackson.

25          JUROR:  Shirley Johnson.

GLORIA S. SMITH, OFFICIAL REPORTER

61

1          THE COURT:   Thank you.

2          Ladies and gentlemen of the jury panel, you will now

3    have a brief recess.  You are still in session, though.  You

4    are not released from the court, you are just going to be

5    escorted back to your jury room by the court security officer.

6    I will send any appropriate word in regard to further

7    questioning of individual jurors or questioning you as a

8    group, and when you may take a luncheon recess.  Right now you

9    are just on what would be called a recess from being in court

10   under questioning.

11         But you are still in session, and I would advise you

12   of the following.  Number one, you may not discuss any

13   question or any matter that has transpired in court with any

14   other juror.  You may not discuss anything at all with the

15   other members of the panel other than any human pleasantries,

16   but nothing of substance about the case or anything that the

17   court has asked you.  Again, you are in session, and I would

18   direct that the court security officer escort the jury to the

19   jury room on the second floor.

20         (The jury panel exited the courtroom.)

21         THE COURT:   Counsel, I'm going to proceed through a

22   series of questions with you, and we will examine cause for

23   some of the jurors thus far, and then if I haven't covered

24   something, you will have an opportunity to so advise the

25   court.

1          The first question I would ask you, are there any

2     objections to the court's *voir dire* so far, Ms. McKeel?

3          MS. MCKEEL:  No, ma'am.

4          THE COURT:  Mr. Clancy?

5          MR. CLANCY:  Not thus far, Your Honor.

6          THE COURT:  Mr. Woodward?

7          MR. WOODWARD:  Your Honor, are you asking that

8     question in terms of what you have asked or what you haven't

9     asked?

10         THE COURT:  What I have asked.

11         MR. WOODWARD:  I have no objections to what you have

12     asked.

13         THE COURT:  All I'm asking is, are there any

14     objections to the court's *voir dire* thus far.

15         MR. WOODWARD:  I understand.

16         THE COURT:  There are no objections.  Now we will

17     look at the individual jurors and any jurors that the court

18     will entertain a motion for cause.

19          I would first tell you that, without a motion, the

20     court would strike for cause, unless there is an objection,

21     Patricia V. Jackson.  Ms. Jackson indicated that she knew

22     about the case.  That would not be grounds at this juncture,

23     without further questioning.  But she indicated something

24     about being involved in a case where she was held hostage, and

25     she began to have some emotion.  Then she indicated to the

USCA4 Appeal: 17-5    Doc: 28-1    Filed: 08/24/2018    Pg: 312 of 521

1    last question that she knew of another reason.  She also

2    indicated that she didn't think she could be fair and render a

3    verdict.

4          With the whole combination of her questioning, the

5    court would strike Ms. Jackson for cause, unless there is a

6    contrary argument.

7          Ms. McKeel?

8          MS. MCKEEL:  No, ma'am, we have no objection to

9    that.

10         THE COURT:  Mr. Clancy?

11         MR. CLANCY:  No, ma'am.

12         THE COURT:  Mr. Woodward?

13         MR. WOODWARD:  No, Your Honor.

14         THE COURT:  Then Juror No. 110 is stricken for

15   cause.

16         The jurors that I would bring in at this juncture

17   for some further questioning -- and I would ask that the clerk

18   and the court security officer pay close attention, because

19   these jurors would need to be brought down.  The way that we

20   will do this is I have three CSOs on duty, one that is in the

21   room with the jurors, up there at all times; one escorting

22   them down; and another in the courtroom.  So the jurors are

23   not unattended, and there is also a clerk from the clerk's

24   office, the jury clerk, who is present with them in the jury

25   room, with instructions that the court just gave to the

GLORIA S. SMITH, OFFICIAL REPORTER

**293**

64

1    jurors.

2          But the jurors that I would have brought down at

3    this juncture and then brought in individually for follow-up

4    *voir dire* on their answers to the questions are the following

5    jurors, and this would be the grounds.

6          Juror No. 1, Ms. Abraham -- not yet.  Ms. McKeel is

7    supposed to check on Ms. Abraham, who knows Jennifer Davis.

8          Have you be been able to make any check on that?

9          MS. MCKEEL:  Not yet, Judge, but I have given it to

10   Investigator Banks, and whenever you allow him to go, he can

11   leave this room.

12         THE COURT:  He can leave anytime. I only require the

13   attorneys to be here at this juncture.

14         MS. MCKEEL:  We didn't want to be disruptive.  But I

15   can have him do that now, then, Judge.

16         THE COURT:  If you could check on that, Mr. Banks,

17   it would be appreciated.

18         MR. BANKS:  Yes, Your Honor.

19         THE COURT:  If you can't, we can do it after lunch.

20   But it would be good if we had that now.

21         The next question that I have, I would bring down

22   No. 4, Mike Patrick Arnold, who knows Mr. Kennedy, No. 118, to

23   find out exactly what their relationship is.  They haven't

24   worked together for a number of years, but I think that you at

25   least ought to have the benefit of further inquiry into that

GLORIA S. SMITH, OFFICIAL REPORTER

65

1    relationship.  Whether or not the court will strike them for

2    cause or whether you want to use a peremptory challenge, I

3    would feel that you need more information on that

4    relationship.  So I would bring Juror No. 4 and Juror No. 118

5    for further inquiry into their relationship.

6           Juror No. 13, Ms. Beisel, indicated questions about

7    the death penalty, and we need to pursue that.  She did not

8    indicate those same concerns on the questionnaire, but she did

9    stand up here, and we certainly will pursue that with her.

10          Juror No. 20, Ms. Buchanan, indicated something

11   about either she was a witness or someone was involved in a

12   criminal matter, and that would need to be followed up on.

13          Juror No. 27, Ms. Canu, said she knew something

14   about the case, in answer to that first question that I asked,

15   and she had questions about the death penalty.

16          No. 29, Toni Cary, indicated that she had read or

17   knew something about the case, and we need to follow up on

18   that.

19          Juror No. 69, Mary Fischer, indicated knowing

20   something about the case, and we need to follow up on that.

21          Brent Lee Gable indicated knowing something about

22   the case, and we need to follow up on that.  That is Juror No.

23   75, and Ms. Fischer is 69.

24          Paige Going, Juror No. 80, stood up to the last

25   question.

1          Judith Pearl Goodman indicated knowing something

2    about the case and stood up to the last question.  That is 82.

3          Juror No. 86, Becky Graham, indicated knowing

4    something about the case.

5          Jennifer Anne Graham -- does anyone feel she needs

6    follow-up on the questions so far?  All we are talking about

7    is follow-up on the questions thus far.  She indicated that

8    she knew Ms. Harris because she had gotten her first job 24

9    years ago at a pizza restaurant through Ms. Harris's husband.

10   Does anybody think we need follow-up on Ms. Graham?

11         Ms. McKeel?

12         MS. MCKEEL:  No, ma'am.

13         THE COURT:  Mr. Clancy?

14         MR. CLANCY:  Respectfully, yes, Judge.  She

15   indicated she still had some contact with the husband.

16         THE COURT:  All right.  I will do follow-up on her.

17         MR. CLANCY:  Thank you.

18         THE COURT:  And then, as appropriate, on No. 95,

19   Ms. Harris.

20         No. 98, Ms. Head, knew something about the case.

21         No. 106, Ms. Hostetler, knew something about the

22   case, had questions about the death penalty, and stood up to

23   the last question.

24         Ms. Johnson, No. 115, stood up with hesitancy on

25   imposing the death penalty and to the last question.

GLORIA S. SMITH, OFFICIAL REPORTER

67

1          I do not think any follow-up with Ms. Jones and

2     Ms. Golson, who recognize each other from some type of

3     meeting, is necessary.

4          Do you, Ms. McKeel?

5          MS. MCKEEL:  No, ma'am.

6          THE COURT:  Mr. Clancy?

7          MR. CLANCY:  No, ma'am.

8          THE COURT:  Mr. Woodward?

9          MR. WOODWARD:  I agree, Your Honor.  They didn't

10    seem like they had much of a relationship.

11         THE COURT:  And I would note that Ms. Golson did not

12    even stand up, so that I would agree.

13         Ms. Kessler-Roberts, No. 120, indicated knowing

14    something about the case.

15         I would strike Mr. Konowicz, who thought that a plea

16    agreement or plea bargaining is an improper practice, because

17    that is contrary to the law and any instructions that the

18    court would give.

19         Do you agree, Ms. McKeel?

20         MS. MCKEEL:  I agree with that, Judge.

21         THE COURT:  Mr. Clancy?

22         MR. CLANCY:  No objection to that.

23         THE COURT:  Mr. Woodward?

24         MR. WOODWARD:  I agree, Your Honor.

25         THE COURT:  Then on agreement, No. 126, Glenn

GLORIA S. SMITH, OFFICIAL REPORTER

68

1    Konowicz, is stricken for cause.

2           The only other one I have here is Kathleen Barefoot

3    and -- is it Mr. Jennings, who was a coach and did some tile

4    work?  I wouldn't think that needs follow-up, but I will if

5    somebody wants me to.

6           Ms. McKeel?

7           MS. MCKEEL:  Judge, we would let the court know that

8    our paralegal, Ms. Jahn, knows Ms. Barefoot, too.

9           THE COURT:  Then I'm going to strike Ms. Barefoot

10   for cause, because even though I know your paralegal is not

11   going to testify, with just that recognition, I think that

12   then she should be stricken.

13          Is everybody in agreement, then, that Ms. Barefoot

14   would be removed for cause?

15          MS. MCKEEL:  We have no objection to that, Judge.

16          MR. CLANCY:  Yes, ma'am.

17          MR. WOODWARD:  Yes, Your Honor.

18          THE COURT:  Then that would leave Mr. Jennings.

19   There would be no reason to follow up with him, because he is

20   not going to know a fellow juror if Ms. Barefoot is gone for

21   cause.

22          For purposes right now, then the follow-up

23   questioning for the reasons that I have indicated would be on

24   Juror 4, Mr. Arnold; Juror 13, Ms.  Beisel; Juror 20,

25   Ms. Buchanan; Juror 27, Ms. Canu; Juror 29, Ms. Cary; Juror

GLORIA S. SMITH, OFFICIAL REPORTER

**298**

69

1   69, Ms. Fischer; Juror 75, Mr. Gable; Juror 80, Ms. Going;

2   Juror 82, Ms. Goodman; Juror 86, Ms. Graham; Juror 87,

3   Ms. Graham; Juror 95, Ms. Harris; Juror 98, Ms. Head; Juror

4   106, Ms. Hostetler; Juror 115, Ms. Johnson; Juror 118,

5   Mr. Kennedy; Juror 120, Ms. Kessler-Roberts.

6          The only other one that stood up to questioning of

7   knowing someone was Ms. Bennett, who knew Ms. Jackson, but

8   again Ms. Jackson has been stricken for cause, so that is no

9   longer any type of issue.

10         I have 17 jurors for follow-up questioning.  Is that

11  the number that you have, Madam Clerk?

12         THE CLERK:  17 is correct, Your Honor.

13         THE COURT:  Then what I'm going to do is the

14  following.  My jury room is open and available, and I'm going

15  to direct that those 17 jurors be brought down there and that

16  the other jurors be released on a luncheon recess until 1:30.

17  It is 12:20 now.  The remaining jurors can be released by the

18  clerk on a luncheon recess until 1:30.  The other 17 need to

19  be brought back to the jury room, and while that is occurring,

20  we will take a ten-minute recess.

21         So we will be in a ten-minute recess.  The jury,

22  except for the 17, will be on a luncheon recess until 1:30

23  p.m., and the other 17 will be brought back to the jury room.

24  We will bring them in one by one, starting at 12:30, and then

25  I will release them for lunch one by one after they are

70

1    questioned, and then we will continue.

2          The court stands in recess.

3          (Recess)

4          THE COURT:  All of the counsel are here, and both

5    defendants are present.

6          Ms. McKeel, have you found out anything on

7    Ms. Abraham?

8          MS. MCKEEL:  I did, Judge.  It is not the same

9    Jennifer Davis.  Our Jennifer Davis works for the Newport News

10   Police Department.  She has never worked at the Department of

11   Defense.

12         THE COURT:  Does that satisfy counsel?  Mr. Clancy?

13         MR. CLANCY:  Yes, ma'am.

14         THE COURT:  Mr. Woodward?

15         MR. WOODWARD:  Yes, Your Honor.

16         And Mr. McCormack, who is a law student who is

17   working with me, brought to my attention during the break that

18   Juror No. 80, Paige Going, is someone that he knows pretty

19   well, and she knows him, and he is going to be here in and out

20   helping us during the trial, you know, associated with our

21   team.  So I didn't know -- I wanted to bring that to the

22   court's attention, similar to what had come up with their

23   paralegal.

24         THE COURT:  It may be the reason she stood up.

25         MR. WOODWARD:  It could be.

GLORIA S. SMITH, OFFICIAL REPORTER

1          THE COURT:  If we could bring in Juror No. 4,

2    Mr. Arnold.

3          (Mr. Arnold entered the courtroom.)

4          THE COURT:  Mr. Arnold, you indicated that you knew

5    Mr. Kennedy.

6          JUROR:  Yes.

7          THE COURT:  And that you all had worked at Chesbay

8    about eight years ago, and you worked together for about ten

9    years.

10         JUROR:  Uh-huh.

11         THE COURT:  Now, do you have a relationship with

12   Mr. Arnold outside of that working relationship?

13         JUROR:  You mean Mr. Kennedy?

14         THE COURT:  Excuse me.  Mr. Kennedy.

15         JUROR:  No.

16         THE COURT:  Have you kept in touch with him over the

17   years?

18         JUROR:  No.

19         THE COURT:  Would his opinion, if he voiced it,

20   affect your opinion, or would you change your opinion because

21   of his?

22         JUROR:  No.

23         THE COURT:  If there is anything further, counsel,

24   you want me to ask of Mr. Arnold, you need to approach the

25   bench.

GLORIA S. SMITH, OFFICIAL REPORTER

1          All right.  Then, Mr. Arnold, you are excused for

2    lunch until 1:45, and you will need to report back up to that

3    jury room in about an hour.

4          JUROR:  Okay.

5          THE COURT:  Thank you so much.  And you can go out

6    this front door.

7          (Mr. Arnold exited the courtroom.)

8          THE COURT:  Unless I hear something to the contrary,

9    I don't find any problem with leaving Mr. Arnold on the panel

10   at this juncture.

11         You can bring in Ms. Beisel.

12         (Ms. Beisel entered the courtroom.)

13         THE COURT:  Good afternoon, Ms. Beisel.

14         JUROR:  Hello.

15         THE COURT:  Ms. Beisel, you indicated a response to

16   the question I asked about the death penalty.  Can you tell me

17   why you stood up to that question?

18         JUROR:  I'm very sensitive to things like that, and

19   I think I would be very bothered, and it would affect me

20   mentally if I had to hear details or know that I had anything

21   to do with anything bad like that, as far as a decision.  I

22   think it would haunt me.  I don't like -- I'm sensitive to

23   anything on the news that is like that.

24         THE COURT:  All right.  I understand it may be

25   disturbing to you, but would you be unable to follow the

GLORIA S. SMITH, OFFICIAL REPORTER

**302**

73

1    court's instructions in regard to guilt, innocence, penalty,

2    so forth?

3              JUROR:  As far as the death penalty?

4              THE COURT:  Yes.

5              JUROR:  Would I be able -- what is the exact

6    question?

7              THE COURT:  Can you impose or not impose the death

8    penalty, depending upon the evidence and the instructions of

9    the court?  In other words, if someone is subject to the death

10   penalty, would you be able to impose it?

11             JUROR:  I don't know.  I don't know.

12             THE COURT:  If someone is not subject to it because

13   of the instructions of the court, would you follow that?

14             JUROR:  If they are not?

15             THE COURT:  And you felt they weren't subject to it,

16   could you vote against imposing the death penalty?

17             JUROR:  I'm not understanding exactly -- if they

18   were what, now?

19             THE COURT:  All right.  Someone may be convicted of

20   a crime which then makes them death-penalty eligible.

21             THE WITNESS:  Uh-huh.

22             THE COURT:  That doesn't necessarily mean that they

23   receive the death penalty.

24             JUROR:  Uh-huh.

25             THE COURT:  It means that they would receive the

GLORIA S. SMITH, OFFICIAL REPORTER

**303**

74

1    death penalty if the United States met its burden of proof

2    beyond a reasonable doubt on certain factors.  And then if

3    they did, and you believed they did, you would have to vote to

4    impose the death penalty.

5         On the other hand, you would also have to vote not

6    to impose a death penalty if they didn't meet their burden,

7    depending upon the court's legal instructions.  What I'm

8    asking you is, can you follow those instructions either way?

9         JUROR:  I don't know if I could follow the one that

10   would impose it.

11        THE COURT:  All right.  Is there anything further

12   anyone wants me to ask?  If so, approach the bench.

13        (The following discussion occurred at side bar out

14   of the hearing of the jury:)

15        MR. WOODWARD:  Your Honor, I think what you told her

16   is that if the United States met a certain burden, she would

17   have to vote to impose the death penalty, and I think that is

18   incorrect.  I don't think she -- he might be eligible, but the

19   law is clear you never have to vote to impose the death

20   penalty, and the question really is would her views

21   substantially impair her ability to consider the mitigating

22   and aggravating factors.  And I think I wrote it down

23   correctly that you indicated that if the United States met a

24   certain burden, she would have to vote to impose the death

25   penalty, and I just don't think that that's the

GLORIA S. SMITH, OFFICIAL REPORTER

**304**

                                                                  75

1    legal standard.

2              THE COURT:  I may have said it incorrectly, but the

3    bottom line is she has indicated she can't impose the death

4    penalty, and I'm not going to have somebody on the jury either

5    way.  I'm not going to have somebody that says they would or

6    they wouldn't.  I may not have phrased it correctly, but I'm

7    not going to keep somebody on the jury that stood up to the

8    question that I asked and then comes in here and says that

9    they think they would have difficulty doing it.  It has got to

10   be fair both ways.

11             MR. WOODWARD:  I agree, Your Honor.  I think, again,

12   and I won't belabor it, but that the legal standard is not

13   whether they have difficulty imposing the death penalty.

14             THE COURT:  Then tell me what it is.

15             MR. WOODWARD:  I think the legal standard is would

16   they be able to follow the court's instructions, and are their

17   personal views such that it would substantially impair their

18   ability to follow those instructions, to either give life

19   imprisonment or death.  But they never have to vote to impose

20   death.

21             MS. MCKEEL:  I think that is correct, Judge, but

22   nonetheless, with her I agree with the court, that you asked

23   her could she follow your instructions, and she can't.  Her

24   last answer was, I don't think that I can, with regard to

25   imposing the death penalty.  So she said to you she cannot

76

1  follow your instructions, so I think she should be struck for

2  cause.  We can argue over the wording.

3          THE COURT:  I agree.

4          MS. MCKEEL:  But I think this person needs to be

5  struck for cause.

6          MR. WOODWARD:  Again, I think the reason she said

7  that is because it was indicated that she might have to vote

8  that way.  But, look, I'm not -- I would note my objection.  I

9  understand.

10         THE COURT:  I'll ask it this way:  Could you vote to

11 impose the death penalty?  If she can't, she can't.

12         MR. WOODWARD:  I understand, Your Honor.  I'm

13 quoting back to you -- I don't like the way the wording is in

14 *Morgan*.

15         THE COURT:  Give me your exact wording.  You write

16 the question for me.

17         MS. MCKEEL:  Judge, may I go back and get my case,

18 the *Tipton* case that has *Morgan* in it?

19         THE COURT:  Sure.

20         MS. MCKEEL:  Thank you.

21         THE COURT:  I have received the following question

22 from Mr. Woodward, and let me read it to be sure that

23 everybody agrees that this is the question that should be

24 asked.

25         Do you have personal or moral opinions regarding the

GLORIA S. SMITH, OFFICIAL REPORTER

**306**

77

1    imposition of the death penalty that would substantially

2    impair your ability to weigh the aggravating and mitigating

3    factors and follow the court's instructions regarding the

4    death penalty?

5            MR. WOODWARD:  Yes.

6            THE COURT:  I will ask that.

7            MR. WOODWARD:  I don't know what she will say, but I

8    think that's the threshold question.

9            (Proceedings resumed in open court as follows:)

10           THE COURT:  Ms. Beisel, let me ask you this

11   question:  Do you have personal or moral opinions regarding

12   the imposition of the death penalty that would substantially

13   impair your ability to weigh the aggravating and mitigating

14   factors and follow the court instructions regarding the death

15   penalty?

16           JUROR:  I guess I do.

17           THE COURT:  All right.  Thank you very much,

18   Ms. Beisel.  You can go out the front door here, and report

19   back to the jury room by two o'clock on the second floor.  You

20   can go out this way, and then report back to the jury room,

21   where you were before, by two o'clock.

22           JUROR:  Okay.

23           (Ms. Beisel exited the courtroom.)

24           THE COURT:  Based upon Ms. Beisel's answer, I would

25   strike her for cause.  Hearing no objection, Ms. Beisel is

GLORIA S. SMITH, OFFICIAL REPORTER

**307**

78

1    stricken for cause.

2            If you could please bring in Juror No. 20, Ms.

3    Buchanan.

4            (Ms. Buchanan entered the courtroom.)

5            THE COURT:  Hello, Ms. Buchanan.

6            JUROR:  Hi.

7            THE COURT:  You indicated some involvement in a

8    criminal matter, and I did not want to press you on that.

9            JUROR:  Thank you.

10           THE COURT:  Can you tell me about it?

11           JUROR:  Yes.  It was my daughter, and when she was

12   17, somebody threatened her and scared her, and because of

13   other things that had happened previously in her life, she was

14   really scared, and she had something in her hand, and she hit

15   them and cut them just a little bit, and she is now a felon.

16           THE COURT:  All right.  Were you a witness in the

17   case, or just involved with it through your daughter?

18           JUROR:  Just involved with it through my daughter.

19           THE COURT:  How long ago was that?

20           JUROR:  A year and a half.

21           THE COURT:  All right.  Would that experience affect

22   your ability to try this criminal case?

23           JUROR:  Probably not.  I have tried to judge and

24   think and -- I didn't stand up -- you know, it's hard to try

25   to think as a mother, and then rational, too.

79

1          I don't think so, but I can't -- you know, as you

2    hear things and see things, it's hard, because I was really on

3    both sides in some ways, because something was done to her,

4    and then she did something back.  So I see both sides.  That's

5    a hard question to answer until you get into it, if you know

6    what I mean.

7          THE COURT:  I understand.

8          Then, Ms. Buchanan, you can go out that door, and

9    you have until two o'clock for a luncheon recess.  Then report

10   back to the jury room on the second floor.

11         JUROR:  Okay.

12         THE COURT:  Thank you very much.

13         JUROR:  Your Honor, may I say one more thing?

14         THE COURT:  Sure.

15         JUROR:  I don't -- this was something that I didn't

16   even think about till we were sitting in here.  I do have

17   fibromyalgia, and I have a real hard time sitting still for

18   very long.  I kept wanting to stand up, and that might be

19   somewhat of a problem if I'm sitting over here wiggling too

20   much.  But that's the only thing I wanted to say.

21         THE COURT:  Have you been diagnosed?

22         JUROR:  Yes, ma'am.

23         THE COURT:  Are you being treated?

24         JUROR:  We haven't found anything that helps a whole

25   lot.

80

```
 1              THE COURT:  All right.  Thank you.

 2              JUROR:  Thank you.

 3              (Ms. Buchanan exited the courtroom.)

 4              THE COURT:  Unless I hear something to the contrary,

 5      I'm going to strike Ms. Buchanan for cause for two reasons.

 6      First of all, she was limping as she was leaving the

 7      courtroom, and this is going to be a very long trial, and if

 8      she is suffering from fibromyalgia, that could be quite a

 9      difficulty.  I'm not sure we would keep her the whole time.

10              The second is, however she feels, one way or the

11      other, she has got tears in her eyes as she talks, and I don't

12      think that she could emotionally divorce herself from evidence

13      in a case of this nature, particularly involving potentially a

14      domestic type situation.  This isn't a drugs-and-guns case.

15              So I would strike her, unless I hear something to

16      the contrary from counsel.

17              All right.  Then Ms. Buchanan is stricken for cause.

18              Juror No. 27, Nancy Canu.

19              (Ms. Canu entered courtroom.)

20              THE COURT:  Good afternoon, Ms. Canu.

21              JUROR:  Good afternoon.

22              THE COURT:  Ms. Canu, you first indicated that you

23      thought you knew something about the case, had read something

24      or whatever.  Can you tell us what that is?

25              JUROR:  When I was getting dressed this morning, I
```

1   heard something on the news, that someone pleaded guilty and

2   got four life terms, a spouse.

3          THE COURT:  All right.  Did anything about what you

4   heard on the news affect any opinion -- create any opinion

5   about the case?

6          JUROR:  I could say it probably did, probably.  It's

7   not a good thing, you know, but it probably did.

8          THE COURT:  All right.  In one direction or the

9   other?

10         JUROR:  Yes, I would probably lean more for guilt

11   than I would innocence if a spouse had pleaded guilty.

12         THE COURT:  All right.  And you stood up to the

13   question that I asked about the death penalty.  Why was that?

14         JUROR:  I have a moral dilemma with that, whether

15   it's right or not.  I'm not quite sure how I feel.  Some days

16   I'm for it.  Some days I'm opposed.  I just have a moral

17   dilemma I haven't settled on that.

18         THE COURT:  I'm sorry?

19         JUROR:  I haven't settled my moral dilemma on that.

20         THE COURT:  Do you have a personal or moral opinion

21   regarding the imposition of the death penalty that would

22   substantially impair your ability to weigh the aggravating and

23   mitigating factors and follow the court's instructions

24   regarding the death penalty?

25         JUROR:  In the severity of the case, I think I

1   could.  Does that answer your question?

2           THE COURT:  I understand.

3           JUROR:  You understand that.  It would depend a lot

4   on the severity of the case.

5           THE COURT:  All right.  Thank you, Ms. Canu.

6           I'm sorry.  I need to tell you about lunch.  You can

7   have until two o'clock for lunch, and if you will, go out that

8   front door and report back up to the jury room on the second

9   floor.  Thank you.

10          JUROR:  Thank you.

11          (Ms. Canu exited the courtroom.)

12          THE COURT:  I would strike Ms. Canu for cause,

13  unless there is something to the contrary.  She has indicated

14  she heard something on the radio -- I don't know what it

15  was -- but that she would lien towards guilt, and I would

16  strike her for that reason.

17          She has indicated that she thinks she could impose

18  the death penalty, or not.  She has some moral dilemmas, but I

19  think she could follow that instruction.  But she has

20  indicated that she has a leaning towards guilt, having heard a

21  radio report.  So consequently, unless I hear something to the

22  contrary, I'm going to strike Ms. Canu for cause.

23          Juror No. 29, Ms. Cary.

24          (Ms. Cary entered the courtroom.)

25          THE COURT:  Good afternoon, Ms. Cary.

83

1          JUROR:  Hello.

2          THE COURT:  Ms. Cary, you indicated that you had

3    heard something or knew something about the case.  Can you

4    tell us what that is.

5          JUROR:  I believe in the Sunday paper there was an

6    article about the one defendant on the far end.  There was a

7    picture of him and -- do you want me to tell you what I read?

8          THE COURT:  You can just tell me.

9          JUROR:  What I read in the article was that he had

10   shot the -- Cory Voss, I believe is his name, five times at an

11   ATM.  His wife and I guess -- I believe she had a lover at the

12   time, and the article kind of led into that she had hired him

13   for, I believe, 20,000 that he never initially got paid for,

14   and that she had, I think, pleaded to the court that she was

15   guilty, but he was still going to go to trial.

16         THE COURT:  All right.  And you read that article in

17   the newspaper?

18         JUROR:  Correct.

19         THE COURT:  After reading that article, did you form

20   an opinion about the guilt or innocence of any of the

21   individuals?

22         JUROR:  Somewhat, but I would be open to listening

23   to what his case would be.

24         THE COURT:  Do you believe everything you read in

25   the newspaper?

GLORIA S. SMITH, OFFICIAL REPORTER

**313**

84

1          JUROR:  No.

2          THE COURT:  Can you still listen to all of the

3    evidence and follow that instruction that I indicated earlier,

4    decide the case solely based upon the evidence presented in

5    this courtroom and the legal instructions from the court?

6          JUROR:  I believe so, yes.

7          THE COURT:  All right.  Thank you.  You can go out,

8    Ms. Cary, that door, and report back to the jury room at

9    approximately two o'clock.  Take an hour for lunch, and then

10   report back up to the second floor jury room.

11         JUROR:  Okay.  Thank you.

12         (Ms. Cary exited the courtroom.)

13         THE COURT:  I don't find anything in Ms. Cary's

14   answer that would indicate she has an inability to listen to

15   the evidence.  You have your information.  If you want to use

16   one of your peremptory challenges, you certainly have the

17   information to do it, but I see nothing in her answer that

18   would be legal cause for striking her at this juncture.

19         MR. WOODWARD:  Your Honor, I would ask the court

20   note our objection.  I think she obviously recently read the

21   article.  She did say she could be fair, but she knows someone

22   pled guilty, knows a lots of the facts in the case.  With what

23   Mr. Runyon is facing, I wouldn't want to take the risk that

24   she is sitting here comparing and contrasting what is in the

25   newspaper to what may be presented in the courtroom over the

GLORIA S. SMITH, OFFICIAL REPORTER

**314**

85

1    next few weeks, so if you would note my exception.

2              THE COURT:  Your exception is noted, and I would

3    just add, she did indicate that she doesn't believe everything

4    she reads in a newspaper, and there is not any way in some

5    cases to screen someone from all accounts.  The important

6    thing is that they haven't formed an opinion, and they will

7    still listen to the evidence and decide the case solely on the

8    evidence.

9              But again if you use one of your peremptory strikes,

10   that is what *voir dire* is about.  You have your information,

11   and you know that she read a newspaper article.

12             All right.  Let's bring in No. 69, Mary Fischer.

13             (Ms. Fischer entered the courtroom.)

14             THE COURT:  Good afternoon, Ms. Fischer.

15   Ms. Fischer, you indicated that you had read something, heard

16   something, knew something about the case.  Can you tell us

17   what that is?

18             JUROR:  I saw it in the newspaper yesterday.

19             THE COURT:  All right.  And did you read the

20   article?

21             JUROR:  I did.

22             THE COURT:  Did you form an opinion about the case

23   or about the guilt or innocence of the individuals, having

24   read the article?

25             JUROR:  That's a hard question.

**315**

1          THE COURT:  Pardon?

2          JUROR:  I said, that's a hard question, I guess.  I

3    wouldn't consciously say I formed an opinion, but it was -- it

4    was a bad article, displayed, to me anyway, in a quick reading

5    of it, just a horrific crime.

6          THE COURT:  Would having read that article -- would

7    it affect your ability to follow the court's instruction that

8    you would have to disregard that article and decide this case

9    solely on the evidence presented in this courtroom and the

10    instructions of the law?  Would you able --

11          JUROR:  I could follow the instruction.

12          THE COURT:  Would you be able to do that?

13          JUROR:  Yes.

14          THE COURT:  All right.  Then, Ms. Fischer, you can

15    take about an hour for lunch, and then go back to your jury

16    room.  Be back there by ten minutes after two or so.  Thank

17    you.

18          (Ms. Fischer exited the courtroom.)

19          THE COURT:  I would make the same ruling on

20    Ms. Fischer that I did on the previous juror, Ms. Cary.  Are

21    there any objections or motions, Ms. McKeel?

22          MS. MCKEEL:  No, ma'am.

23          MR. WOODWARD:  Again, Your Honor, I would just state

24    for the record, she seemed to pause and hesitated.  I know she

25    did answer your question that she would follow your

1  instructions.  I think most jurors would say that.  She said

2  it was a horrific article, and I think her first response,

3  when you asked her whether she had formed any opinions about

4  the guilt or innocence of any individuals, she said, that's a

5  hard question.  So again I would make the same objection in

6  regard to Ms. Cary.

7       THE COURT:  All right.  I understand your

8  objection, but I would rule the same way, and I think the

9  svstem savs we have to count on what a iuror tells the court.

10  When she tells me that she can put aside the article and

11  decide the case based solely on the evidence and the

12  instructions of the court, I accept that answer, and having

13  observed her, I accept that answer from her.  I think that she

14  would be a very, frankly, conscientious juror, having observed

15  her.

16       But again you have the information.  If you feel

17  otherwise, you can use one of your peremptory challenges.

18       All right.  Mr. Gable?

19       (Mr. Gable entered the courtroom.)

20       THE COURT:  Good afternoon, Mr. Gable.

21       JUROR:  Good afternoon.

22       THE COURT:  Mr. Gable, you indicated that you knew

23  something about the case, had heard something, read something.

24  Can you tell me what that is?

25       JUROR:  There was a story in the *Virginian-Pilot*

GLORIA S. SMITH, OFFICIAL REPORTER

**317**

88

1    yesterday, and I read it.

2           THE COURT:  All right.  Did you form an opinion

3    about the guilt or innocence of anybody after reading that

4    article?

5           JUROR:  I did not.

6           THE COURT:  Would that article affect your ability

7    to hear the evidence as presented solely in this courtroom in

8    regard to the case and decide the case based solely on the

9    evidence and the instructions that the court would give you?

10   Can you do that?

11          JUROR:  I could.

12          THE COURT:  Thank you very much.  Take an hour for

13   lunch, Mr. Gable, and then go back up to the jury room on the

14   second floor.

15          JUROR:  Okay.  Thank you.

16          (Mr. Gable exited the courtroom.)

17          THE COURT:  I would make the same ruling that I have

18   on the other two jurors on Mr. Gable.

19          MR. WOODWARD:  Your Honor, again, I would make my

20   same objection.  I don't know exactly what he read, but you

21   just asked if he formed any opinion, and I would make the same

22   objection.  I think it is better to have people that don't

23   know anything about the case, as opposed to people that know

24   something.

25          THE COURT:  All right.  It is clear what he read.

GLORIA S. SMITH, OFFICIAL REPORTER

1    There was an article in the *Virginian-Pilot* yesterday, Monday.

2    I read the article.  You know what it is.  He said what he

3    read, and he has said very definitively that he formed no

4    opinion and that he could decide the case.  He was actually,

5    in my opinion, more definitive than the previous two

6    individuals.  I have no hesitancy about him in any regard, and

7    again you can use a peremptory challenge if you do.

8            All right.  That brings us to Juror No. 80,

9    Ms. Going.

10           (Ms. Going entered the courtroom.)

11           THE COURT:  Good afternoon, Ms. Going.  You stood up

12   to my last question about was there any reason that you ought

13   to make known to the court about something.  Can you just tell

14   me why you stood up?

15           JUROR:  Yes, ma'am.  I felt like I had to disclose

16   that I wasn't quite sure if it was a conflict or not, but I

17   knew someone sitting on that side of the courtroom, so I

18   thought I should say that, and we personally -- we know one

19   another.  So I thought I should let you know.

20           THE COURT:  I do appreciate it.  And Mr. Woodward

21   had indicated -- it's your summer associate?

22           MR. WOODWARD:  Yes, Your Honor.

23           THE COURT:  What is his name?

24           MR. WOODWARD:  John McCormack.

25           THE COURT:  John McCormack.  Is that who you know?

1          JUROR:  Exactly.

2          THE COURT:  Thank you very much, Ms. Going.  I'm

3   going to excuse you for the day.  You don't have to come back.

4   I appreciate your very diligently filling out the

5   questionnaire and being here today, but I'm going to excuse

6   you now.  Obviously if you come in contact with any other

7   jurors, you don't need to say anything, just you are excused.

8   You can just go out that door.

9          (Ms. Going exited the courtroom.)

10          THE COURT:  Counsel, I will obviously excuse

11   Ms. Going for cause.

12          MR. WOODWARD:  No objection.

13          That brings us to Ms. Goodman, Juror No. 82.

14          (Ms. Goodman entered the courtroom.)

15          THE COURT:  Ms. Goodman, you indicated to one of my

16   earlier questions that you thought you knew something about

17   the case, that you have either heard something or read

18   something.  Can you tell us about that?

19          JUROR:  I read about a case like this in yesterday

20   or Sunday's paper.  It was on the front page, that the case

21   was going to be heard starting on Monday, I guess, and I read

22   just two paragraphs, and I said, maybe I shouldn't be reading

23   this.  And I really don't remember the names or anything else

24   about it.

25          THE COURT:  You stopped after a couple of

GLORIA S. SMITH, OFFICIAL REPORTER

91

1    paragraphs?

2         JUROR:  Yes.

3         THE COURT:  Did you form any opinion, then, about

4    the case?

5         JUROR:  No, absolutely not.

6         THE COURT:  All right.  Would anything in those two

7    paragraphs that you read affect your ability to listen to the

8    evidence in this case and decide it solely upon the evidence

9    presented in this courtroom and based upon my legal

10   instructions?

11        JUROR:  No, it would not.

12        THE COURT:  All right.  Now, you stood up to the

13   last question, do you know of any reason why you couldn't sit

14   in this case and render a just, fair, honest, and impartial

15   verdict.  You stood up.

16        JUROR:  Okay.  When you said it was going to take

17   about four weeks, we have travel arrangements starting on the

18   21st of July to the 29th, and it would be hard to sit on a

19   jury knowing that I had been planning on this trip, and we

20   have airline tickets and hotel reservations.

21        THE COURT:  All right.  Anything else?

22        JUROR:  No, that's all.

23        THE COURT:  Ms. Goodman, you can take an hour for

24   your luncheon break, and then if you would report back up to

25   the jury room about 2:20.

GLORIA S. SMITH, OFFICIAL REPORTER

**321**

92

1          JUROR:  Okay.

2          THE COURT:  Thank you so much.

3          (Ms. Goodman exited the courtroom.)

4          THE COURT:  How quickly can I move you along, Ms.

5     McKeel?  Can you finish by then?

6          MS. MCKEEL:  Judge, I cannot finish by then.

7          THE COURT:  All right.  I don't think we will start

8     the evidence in the case -- I don't think, but I'm not making

9     any promises, because we are going to start the evidence or

10    your opening statements as soon as the jury is selected.  But

11    assuming it is Monday, July 6, from the witnesses that you all

12    have set, I don't think it is fair to a juror to put them in

13    that kind of distracted position.

14         So unless somebody objects, I'm going to remove her

15    for cause.  Is there any objection?

16         MS. MCKEEL:  No, ma'am.

17         MR. WOODWARD:  No, Your Honor.  We tried to get all

18    of those -- I looked to see if we missed it.  It wasn't noted.

19         THE COURT:  She didn't note it in the questionnaire.

20         MR. WOODWARD:  We tried to cull those out.

21         THE COURT:  I know you did.  You all did a very good

22    job.

23         MR. WOODWARD:  She obviously is going to be thinking

24    about something other than the case if she sits here, so I

25    agree.

93

```
1          THE COURT:  As an aside, I was very pleasantly
2     surprised at the ability of counsel -- not the ability, but
3     that you all did such a thorough and fine job of going through
4     the list.  It was very helpful to the court, and I do thank
5     you.  You all did a very good job.
6          All right.  I didn't see it either, so we will
7     remove Ms. Goodman for cause, because she would be obviously
8     distracted.
9          Let's bring in Juror No. 86, Ms. Graham, Ms. Becky
10    Plant Graham.
11          (Ms. Becky Plant Graham entered the courtroom.)
12          THE COURT:  Good afternoon, Ms. Graham.
13          JUROR:  Hello.
14          THE COURT:  You indicated early on that you knew
15    something about the case, you either heard something --
16          JUROR:  Oh, I just read the paper yesterday.  I saw
17    something in the paper yesterday.
18          THE COURT:  All right.  Was it the newspaper article
19    in the *Virginian-Pilot*?
20          JUROR:  Yes, it was.
21          THE COURT:  After you read the article, did you form
22    an opinion about the guilt or innocence of the parties?
23          JUROR:  No, I didn't.
24          THE COURT:  All right.  Would anything about the
25    article or having read the article prevent you from listening
```

GLORIA S. SMITH, OFFICIAL REPORTER

**323**

1   to the evidence in the case presented here in the courtroom

2   and deciding the case solely based on the evidence here and my

3   instructions on the law?

4           JUROR:  No.

5           THE COURT:  Thank you very much.  Ms. Graham, you

6   can have until 2:30 for lunch.  You can just go out this back

7   door, and then report back to the jury room on the second

8   floor by 2:30.

9           JUROR:  Okay.

10          (Ms. Becky Plant Graham exited the courtroom.)

11          THE COURT:  Based upon her answer, I would not

12  remove Ms. Graham for cause.

13          MR. WOODWARD:  Your Honor, I would, without stating

14  it again, make my same objection that I have on the previous

15  jurors who read that article.

16          THE COURT:  Now can you bring in Ms. Jennifer Anne

17  Graham, Juror No. 87?

18          (Ms. Jennifer Anne Graham entered the courtroom.)

19          THE COURT:  Good afternoon, Ms. Graham.

20          JUROR:  Hi.

21          THE COURT:  Ms. Graham, you indicated that you knew

22  the juror, Ms. Harris, because her husband had given you your

23  first job in a pizza restaurant.

24          JUROR:  That's correct.

25          THE COURT:  And that was approximately 24 years ago,

GLORIA S. SMITH, OFFICIAL REPORTER

1    and you indicated you have kept in touch primarily with the

2    husband.

3            JUROR:  That's correct.

4            THE COURT:  Do you keep in touch or have contact

5    with any frequency with Ms. Harris?

6            JUROR:  No, ma'am.

7            THE COURT:  Would your relationship with Mr. Harris

8    and him having given you the job -- would that affect your

9    ability to decide this case independently if both you and

10   Ms. Harris were selected as jurors?

11           JUROR:  No.

12           THE COURT:  Would you defer to Ms. Harris's opinion

13   just because it was her opinion?

14           JUROR:  No.

15           THE COURT:  Would you be able to form your own

16   independent opinion and assessment of the evidence?

17           JUROR:  Yes, ma'am.

18           THE COURT:  All right.  Thank you.  You can have

19   until 2:30 for lunch.

20           JUROR:  Okay.  Thank you.

21           (Ms. Jennifer Anne Graham exited the courtroom.)

22           THE COURT:  I don't find anything about that

23   relationship, from Ms. Graham's standpoint, to be any cause.

24   Does anyone else?  No one else indicates that they would, so

25   Ms. Graham, No. 87, Jennifer Graham, stays on the jury panel.

GLORIA S. SMITH, OFFICIAL REPORTER

96

1              If you would bring in Juror No. 95, Ms. Harris.

2              (Ms. Harris entered the courtroom.)

3              THE COURT:  Good afternoon, Ms. Harris.

4              JUROR:  Good afternoon.

5              THE COURT:  Ms. Harris, you indicated that you knew

6      Ms. Graham, and Ms. Graham indicated that she knew you because

7      your husband had given Ms. Graham her first job in his pizza

8      restaurant 24 years ago.

9              JUROR:  Yes, ma'am.

10             THE COURT:  Do you keep up with Ms. Graham or have

11     conversations with her on any kind of regular basis?

12             JUROR:  We probably haven't spoken in maybe about

13     the last five years or so.

14             THE COURT:  All right.  Would Ms. Graham's opinions

15     influence your opinions about this case?

16             JUROR:  No, ma'am.

17             THE COURT:  If you held a different opinion from her

18     and you firmly believed that opinion, would you stick to your

19     opinion?

20             JUROR:  Yes, ma'am.

21             THE COURT:  Would you be able to decide the case on

22     your own based on the evidence presented in this court and the

23     instructions of the law?

24             JUROR:  Yes, ma'am.

25             THE COURT:  All right.  Thank you very much.  You

GLORIA S. SMITH, OFFICIAL REPORTER

97

1    are excused for an hour for lunch, and if you would report

2    back to your jury room on the second floor at 2:30.

3                (Ms. Harris exited the courtroom.)

4                THE COURT:  Again I would see no reason in the

5    relationship to excuse Ms. Harris, and hearing nothing to the

6    contrary, she remains on the panel.

7                Juror No. 98, Ms. Head.

8                (Ms. Head entered the courtroom.)

9                THE COURT:  Good afternoon, Ms. Head.

10               JUROR:  Good afternoon.

11               THE COURT:  Ms. Head, you indicated to a question

12   that the court asked that you thought you knew something about

13   the case, had heard something, read something.  Can you tell

14   me what that is.

15               JUROR:  The front page of the *Pilot* yesterday had an

16   article.  I recognized the names, and that it was a federal

17   thing, so I assumed that it was this trial.  This morning as I

18   was getting out of the shower, the news was on, and that was

19   the lead story.

20               THE COURT:  What news this morning?

21               JUROR:  Channel 13, the local news.

22               THE COURT:  All right.  Now, having read the article

23   and heard that news report, did you form an opinion about the

24   case?

25               JUROR:  No.

GLORIA S. SMITH, OFFICIAL REPORTER

**327**

1    THE COURT:  Would anything about hearing that news

2    this morning or reading the article yesterday affect your

3    ability to listen to the evidence presented in this courtroom

4    and decide the case solely based on the evidence in this

5    courtroom and the instructions that the court would give you

6    on the law?

7    JUROR:  I don't believe it would affect me at all.

8    THE COURT:  It would not affect you at all?  I just

9    couldn't hear.

10    JUROR:  Would not color my opinion at all, no.

11    THE COURT:  Thank you.  You can be excused.  You may

12    go out this back door.  You have until 2:30 for your luncheon

13    recess, and then go back to the jury room.

14    JUROR:  All right.

15    (Ms. Head exited the courtroom.)

16    THE COURT:  For the same reasons, I wouldn't excuse

17    Ms. Head, and your objection, Mr. Woodward, is noted.

18    MR. WOODWARD:  Thank you, Your Honor.

19    THE COURT:  Juror No. 106, Ms. Hostetler.

20    (Ms. Hostetler entered the courtroom.)

21    THE COURT:  Good afternoon, Ms. Hostetler.

22    JUROR:  Good afternoon.

23    THE COURT:  Ms. Hostetler, you stood up to the

24    question that the court asked about the death penalty.  Can

25    you tell me why you stood up to that.

GLORIA S. SMITH, OFFICIAL REPORTER

99

1          JUROR:  After I filled out the form two weeks ago, I

2    have spent a lot of sleepless nights asking myself could I

3    really give a death sentence to someone, and I truly feel I

4    cannot.  I cannot.  I feel that people have worth.  No matter

5    what, there is something in life that there is some worth, and

6    I can't judge that you could take someone's life.

7          THE COURT:  All right.  Then I will ask you this

8    question, and you can give me a yes-or-no answer if you can.

9          Do your personal or moral opinions regarding the

10   imposition of the death penalty substantially impair your

11   ability to weigh the aggravating and mitigating factors and

12   follow the court's instructions regarding the death penalty?

13         JUROR:  I believe so, yes.

14         THE COURT:  And why did you stand up to the last

15   question, when I asked, do you know of any other reason you

16   think you can't be fair and honest?  Was it for the same

17   reason?

18         JUROR:  No, I think I misunderstood that question.

19   No.

20         THE COURT:  All right.  And you indicated that you

21   knew something about the case, I think.  Can you tell me what

22   that is?

23         JUROR:  Well, actually yesterday morning there was

24   an article in the paper.  My husband cut the article out of

25   the paper so I wouldn't be tempted to read it.  But when I

GLORIA S. SMITH, OFFICIAL REPORTER

**329**

1   went to the gym yesterday, I was among many people, and some

2   people were talking about a case.  I didn't pay too much

3   attention about it.  They talked about a woman who had been

4   given four life sentences, and a person who had shot her

5   husband five times, and I didn't put two and two together

6   until it was -- later on in the conversation they said

7   something about a murder for hire, and then I was like, this

8   was the case that -- this is what I'm involved in here.

9         THE COURT:  Having heard that, would just having

10  heard that affect or cause you to form an opinion about the

11  case?

12         JUROR:  I think I would be objective enough to rule

13  out anything I have heard.  I think I would.

14         THE COURT:  All right.  Thank you very much.  You

15  can go out the back door, and return in an hour -- or return

16  at 2:30 to the second floor jury room.  Thank you very much.

17         (Ms. Hostetler exited the courtroom.)

18         THE COURT:  I asked the other questions because I

19  wanted to know what she knew, just for your edification in

20  case there was something else out there, as opposed to the

21  article in the news report.  But her answer to the court's

22  question regarding the death penalty would require that she be

23  excused for cause.

24         Hearing no objection, Ms. Hostetler is removed for

25  cause.

1          Shirley Bethea Johnson, Juror No. 115.

2          (Ms. Johnson entered the courtroom.)

3          THE COURT:  Ms. Johnson, you stood up when I asked a

4     question about the death penalty.

5          JUROR:  Yes.

6          THE COURT:  Can you tell me why you stood up?

7          JUROR:  Yes, because I struggle with that question.

8     I'll read things about crimes in the paper, and I'll think,

9     oh, you know, that person should get the death penalty.  When

10    it comes right down to it, I'm not sure I could do it.  I

11    don't know.  I honestly don't know.

12         THE COURT:  All right.  Let me ask you this

13    question.  Do you have personal or moral opinions regarding

14    the imposition of the death penalty that would substantially

15    impair your ability to weigh the aggravating and mitigating

16    factors and follow the court's instructions regarding the

17    death penalty?

18         JUROR:  Probably not, no.

19         THE COURT:  All right.  Probably not, meaning you

20    would be able to follow the court's instructions?

21         JUROR:  Yes.

22         THE COURT:  Now, you stood up to the last question,

23    do you know of any reason why you think that you could not sit

24    in this case and render a just, fair, honest, and impartial

25    verdict.

1        JUROR:  That was your last question, because I was

2   talking actually about my medical problem right now.  No, I

3   don't have a problem with rendering a just verdict.  But I

4   didn't know if we would get another opportunity to -- I'm

5   supposed to be having surgery on this knee.  I don't know yet

6   when.  I will find out Tuesday.

7        THE COURT:  Is it scheduled?

8        JUROR:  No.

9        THE COURT:  All right.  Is it a knee replacement?

10        JUROR:  No, I have -- my meniscus is torn in four

11   places, and I have been trying to avoid surgery by rest.  It

12   is not working.  It is getting worse every day, so I have an

13   appointment Tuesday.

14        THE COURT:  All right.  You are able to sit and

15   walk?

16        JUROR:  Uh-huh.

17        THE COURT:  And your appointment is next Tuesday?

18        JUROR:  Next Tuesday.

19        THE COURT:  All right.  Ms. Johnson, you can have

20   until 2:30 for lunch, and then report back up on the second

21   floor.  Thank you very much.

22        JUROR:  Thank you.

23        (Ms. Johnson exited the courtroom.)

24        THE COURT:  I will entertain any motions.  I'm not

25   on my own motion going to strike her for cause.  I thought

GLORIA S. SMITH, OFFICIAL REPORTER

1    that she said that she has some problems with -- had some

2    sleeplessness and some problems with the death penalty, but

3    that her personal and moral opinions regarding it were not

4    such that it would substantially impair her ability.  Her

5    surgery isn't scheduled, and she is walking and appears okay

6    to the court, and if she is selected, she would just have to

7    schedule around her jury duty requirements.  That becomes a

8    fact of life at some point when you are on a jury or in a

9    trial or so forth.

10        Ms. McKeel?

11        MS. MCKEEL:  Judge, we would ask that you strike her

12    for cause.  She said that she struggled with the question.

13    Obviously I believe when she had to answer that questionnaire

14    and how she felt about the death penalty, she said she

15    struggled with the question and she had sleepless nights.  I

16    think in the end -- I know that we have agreed upon that

17    question.  It's that sometimes I'm not sure people quite

18    understand the words "substantially impair," because it seemed

19    to contradict what she had earlier said to you that she could

20    do.  I think it is something different than when someone says,

21    I'm not sure.  But when someone says they have sleepless

22    nights, I think that has gone to a different level.

23        She obviously -- on the second issue she obviously

24    has a doctor's appointment Tuesday.  She says that her

25    condition is getting worse and worse.  This is a long trial.

1    Unfortunately, it will be a long trial.  If we were to seat

2    her -- disregarding what she previously said, if we were to

3    seat her, she could be back in a week and say, I have got to

4    have this appointment, I'm in so much pain, and then we would

5    have a problem right at the beginning of trial.  I ask that

6    she be struck now.

7            THE COURT:  I would deny the motion on those bases.

8    Many of us have sleepless nights for many reasons, and I can

9    only trust her answer, as I have to on any juror appearing

10   before me.  A higher authority has written the words

11   "substantially impair," and those are the magic words, and I

12   have to assume that she understands them unless she tells me

13   she doesn't.

14           So I'm going to leave her on.  Again you can use a

15   peremptory challenge if that's what you so elect to do.

16           Are there any other matters in regard to

17   Ms. Johnson?

18           MR. WOODWARD:  No, Your Honor.

19           MR. CLANCY:  No, ma'am.

20           THE COURT:  Juror No. 118, Mr. Kennedy.

21           (Mr. Kennedy entered the courtroom.)

22           THE COURT:  Good afternoon, Mr. Kennedy.

23           JUROR:  Good afternoon.

24           THE COURT:  Mr. Kennedy, you indicated that you knew

25   Mr. Arnold.  I think you all had worked at Chesbay a few years

GLORIA S. SMITH, OFFICIAL REPORTER

1  ago and had worked together for about ten years, and you knew

2  his girlfriend.

3          JUROR:  Yes.

4          THE COURT:  Do you all correspond or keep up

5  together now?

6          JUROR:  No, we don't.

7          THE COURT:  So it was a business relationship.

8          JUROR:  Yes.

9          THE COURT:  Would that relationship, Mr. Arnold,

10  affect your ability to form your own opinion about this case,

11  whatever Mr. Arnold's might be, if you all were jurors

12  together?

13          JUROR:  I would form my own opinion.

14          THE COURT:  So, in other words if you had a

15  different opinion from Mr. Arnold, you wouldn't defer to

16  Mr. Arnold or change your opinion just because it was

17  Mr. Arnold's opinion.

18          JUROR:  No, I would not.

19          THE COURT:  Thank you very much.  You may take the

20  next 45 minutes for lunch, and then go back to the jury room

21  on the second floor by around 2:30.

22          JUROR:  Okay.  Thank you.

23          (Mr. Kennedy exited the courtroom.)

24          THE COURT:  Again I wouldn't find any reason to

25  strike Mr. Kennedy for cause, and hearing nothing to the

106

1   contrary, he remains on the panel.

2          Juror No. 120, Ms. Kessler-Roberts.

3          (Ms. Kessler-Roberts entered the courtroom.)

4          THE COURT:  Good afternoon, Ms. Kessler Roberts.

5   You indicated that you knew something about the case, you

6   heard something, read something.  Can you tell me what it is?

7          JUROR:  This morning as I was getting dressed to

8   come, my husband had the news on in the kitchen, and I

9   overheard the -- about the wife of the deceased, and the fact

10  that she is serving four life terms.

11         THE COURT:  All right.  Did you form an opinion

12  about the case from anything you heard?

13         JUROR:  No.

14         THE COURT:  Would anything that you heard prevent

15  you from hearing the evidence in the case in this courtroom

16  and deciding the case solely on the evidence heard in this

17  courtroom and the instructions of the court?

18         JUROR:  I don't believe so.

19         THE COURT:  Do you know of any reason that it would?

20         JUROR:  No.

21         THE COURT:  All right.  Then, Ms. Kessler-Roberts,

22  you may take the next 45 minutes for lunch, and be back at

23  your jury room on the second floor by 2:30.

24         JUROR:  Thank you.

25         THE COURT:  Thank you.

1          (Ms. Kessler-Roberts exited the courtroom.)

2          THE COURT:  For the same reasons that I previously

3     indicated, I don't excuse Ms. Kessler-Roberts for cause, and I

4     note your objection, Mr. Woodward.

5          MR. WOODWARD:  Thank you, Your Honor.

6          THE COURT:  To summarize, counsel, the following

7     jurors have been excused or will be excused for cause at the

8     conclusion of the luncheon recess that we will take in a few

9     minutes.  I will bring them in and thank them, because all

10    these jurors spent a lot of time and conscientiously filled

11    out a survey, and this would be their second appearance.

12         So I will bring the following jurors down first and

13    thank them and excuse them.  That would be Juror No. 10,

14    Ms. Barefoot; Juror No. 13, Ms. Beisel; Juror No. 20,

15    Ms. Buchanan; Juror No. 27, Ms. Canu; Juror No. 82,

16    Ms. Goodman; Juror No. 106, Ms. Hostetler; Juror No. 110,

17    Ms. Jackson; and Juror No. 126, Mr. Konowicz.

18         Juror No. 80, Ms. Going, has already been excused

19    for cause and allowed to go, because she knows the summer

20    attorney associate that is working on the case and is here in

21    court with Mr. Woodward.

22         Does that comport with everyone's list?

23         MS. MCKEEL:  Yes, ma'am.

24         MR. CLANCY:  Yes, ma'am.

25         MR. WOODWARD:  Yes, Your Honor.

108

1          THE COURT:   Are there any objections that have not

2    already been put on record to the court's *voir dire* thus far

3    and excuses for cause?

4          Ms. McKeel?

5          MS. MCKEEL:   None right now, Your Honor.

6          THE COURT:   I'm not going to allow you to go back

7    and make them.   What I'm asking you is do you have any

8    objections that you have not already expressed to the court's

9    *voir dire* thus far and the court's rulings on cause thus far?

10         Ms. McKeel?

11         MS. MCKEEL:   I have no objections.   About the death

12   penalty question, Judge, I would ask if we could reword that.

13         THE COURT:   You all can present something to me.

14   You agreed to it thus far, and my question is, is there

15   anything thus far that you haven't put on the record that you

16   want to object to?

17         MS. MCKEEL:   Judge, I would ask that the death

18   penalty question be the standard -- this is under *Barnette*, a

19   Fourth Circuit case -- that the standard for evaluating a

20   potential juror's views is whether the juror's views would

21   prevent or substantially impair the performance of his duties

22   as a juror in accordance with the instructions and his oath.

23         That comes from the Fourth Circuit.   I would ask

24   that we ask that question regarding the death penalty.

25         THE COURT:   Write that question out, you and Mr.

GLORIA S. SMITH, OFFICIAL REPORTER

**338**

1    Woodward look at that, and I will consider that after the

2    luncheon recess.  I will not let you go back and have that,

3    however, as an objection, because you didn't express it at the

4    time the questions were asked.

5             MS. MCKEEL:  Yes, ma'am.  That's fine.

6             THE COURT:  Is there anything else?

7             MS. MCKEEL:  No, ma'am.

8             THE COURT:  Mr. Clancy, anything that you haven't

9    put on the record thus far?

10            MR. CLANCY:  No objections to the *voir dire* thus

11   far, Your Honor.

12            THE COURT:  Mr. Woodward?

13            MR. WOODWARD:  Your Honor, the only objection I

14   would make, and if this is not the right time to make it, I'm

15   sure you will tell me, is with regard to the death penalty

16   part, we submitted something else.

17            THE COURT:  I haven't asked you if there is any

18   additional that you want to ask.  What I'm asking you is, are

19   there any objections to the court's *voir dire* thus far or any

20   rulings that the court has made thus far that you haven't

21   expressed?

22            MR. WOODWARD:  No, Your Honor.

23            THE COURT:  All right.  Everyone will have an

24   opportunity with the remaining jurors to -- I will ask you if

25   there are any further questions.  We are not there yet.

110

1          MR. WOODWARD:  I understand, Your Honor.

2          THE COURT:  Counsel, you can have until 2:30 for

3     your luncheon recess, and then we will reconvene and continue

4     with the *voir dire* process.

5          The court stands in recess until 2:30.

6          (A recess was taken for lunch.)

7                    AFTERNOON SESSION

8          THE COURT:  Counsel, in a couple of minutes we will

9     call the jurors in that have been excused for cause.  When

10    they arrive, we will stop our conversation and continue, and

11    then I'm going to go through your question that you want and

12    any other questions.

13         Do you have the list of jurors that I called out

14    before, Madam Clerk?

15         THE CLERK:  Yes, Your Honor.

16         THE COURT:  If you can bring those individuals down,

17    Mr. Ivey, or see that they come down.

18         COURT SECURITY OFFICER:  Yes, ma'am.

19         THE COURT:  Ms. McKeel, did you write out your

20    language?

21         MS. MCKEEL:  I did, Judge, and I have given it to

22    Mr. Woodward.

23         THE COURT:  Could you just walk up and give this to

24    the clerk, please.

25         MS. MCKEEL:  Yes, ma'am.

GLORIA S. SMITH, OFFICIAL REPORTER

111

1       THE COURT:  It seems like it is the same thing, just

2   with a few less words.

3       MR. WOODWARD:  Yes, Your Honor.  I think the

4   question that Ms. McKeel submitted is an appropriate question,

5   just like the one I submitted.  I don't think there is any one

6   question under *Witherspoon* and *Morgan* that can be asked to

7   death-qualify a juror.  I don't object to her question, as

8   long -- I mean, when we get to that, I think it is numerous

9   questions we need to ask.  But, yes, hers is a fair statement

10  of the law.  It doesn't mention aggravating and mitigating

11  factors.  But I think one case that I reviewed, they asked

12  that question, then went on with the -- I don't have any

13  problem with that being included when we get to that point.

14      THE COURT:  That's fine.

15      Now, Ms. McKeel, the court has completed its general

16  *voir dire*.  Are there additional questions that you wish the

17  court to ask?

18      (Ms. McKeel conferred with Mr. Samuels.)

19      MS. MCKEEL:  No, ma'am, we have no additional

20  questions.

21      THE COURT:  Mr. Clancy, are there additional

22  questions that you want the court to ask?

23      MR. CLANCY:  Yes, if the court please.

24      THE COURT:  Let me get your request.  I have that.

25      MR. CLANCY:  My supplemental *voir dire*?

1        THE COURT:  I have your proposed *voir dire.*

2        MR. CLANCY:  Yes, ma'am.  The question -- do you

3   want me to go through each question, Judge?

4        THE COURT:  Just tell me which questions that I

5   haven't asked in some form or substance that you want me to

6   ask now, and I will tell you whether I will ask it.

7        MR. CLANCY:  No. 1.  No. 2.

8        THE COURT:  Wait just a minute.  Are you just going

9   to read me every one of your numbers?

10       MR. CLANCY:  If you want me to, or we can go through

11  each one individually.  Whatever the court please.

12       THE COURT:  No. 1 -- I will ask that one.

13       MR. CLANCY:  Thank you.  No. 2?

14       THE COURT:  That was asked on the questionnaire,

15  Question No. 65.  It has already been asked, and you all have

16  reviewed that.  If there is a specific juror that answered it

17  in a way that I should follow up from the questionnaire, it is

18  No. 65 on the questionnaire.

19       MR. CLANCY:  Yes, ma'am.

20       Judge, No. 3 has been asked.  4 and 5, in

21  conjunction with one another.

22       THE COURT:  No, I'm not going to start describing

23  the evidence to the jury at this point in time.  I will ask

24  them the general questions or the appropriate legal questions

25  on the death penalty and following the evidence, but I'm not

GLORIA S. SMITH, OFFICIAL REPORTER

113

1  going to go into describing -- I think that could be error on

2  my part to even express an opinion from the court that I think

3  something depicts certain kinds of evidence.  I'm not going to

4  ask that, about depicting injuries and graphic and difficult

5  evidence.  That is a comment that I'm not willing to make on

6  it yet.

7          MR. CLANCY:  Yes, ma'am.  No. 6?

8          THE COURT:  I will ask a general question that is a

9  follow-up to your -- it is basically the same as No. 2, but I

10  will ask them do they think that the mere fact that someone

11  has been charged with a crime means that they are guilty of

12  that crime.  But I'm not going to single out defendants that

13  way here.

14          MR. CLANCY:  Yes, ma'am.

15          No. 7 was already asked.  You have asked that in

16  some form.

17          THE COURT:  All right.

18          MR. CLANCY:  No. 8?

19          THE COURT:  I will ask No. 8.  But that doesn't mean

20  I disqualify them.  What it would be is they can't make site

21  visits and things.

22          MR. CLANCY:  It's just helpful for our peremptories.

23          No. 9?

24          THE COURT:  I don't think that is relevant.  I don't

25  know them.  I can tell you that I certainly don't recognize

1    anybody, and to ask a question like that -- somebody may have

2    read about you in the newspaper or whatever.  That they know

3    me or know of me is irrelevant to these proceedings.  They are

4    the finders of fact, and I will tell you, if I knew a juror, I

5    would let you know.  I don't know any of them, and I'm not

6    going to ask whether they know or have heard of me, because I

7    don't think that is relevant.

8              MR. CLANCY:  That's fine, Your Honor.

9              No. 13 or 14 -- 13 and 14 are identical questions.

10             THE COURT:  They were asked on the questionnaire,

11   questions 63 and 65.

12             MR. CLANCY:  No. 15, I think, was asked in a form on

13   the questionnaire.

14             THE COURT:  Yes.

15             MR. CLANCY:  And No. 16 was asked on the

16   questionnaire.

17             THE COURT:  Yes.

18             MR. CLANCY:  That's all, then.

19             THE COURT:  I will ask those questions we just

20   talked about.  You can bring those jurors in.

21             (The group of jurors who have been struck entered

22   the courtroom.)

23             THE COURT:  Madam Clerk, would you please call the

24   names of the jury panel members present.

25             THE CLERK:  Yes, Your Honor.

GLORIA S. SMITH, OFFICIAL REPORTER

115

1          Kathleen Smith Barefoot.  Jill Ann Beisel.  Joyce

2    Elaine Buchanan.  Nancy Horton Canu.  Judith Pearl Goodman.

3    Janet Mahl Hostetler.  Patricia V. Jackson.  Glen Orion

4    Konowicz.

5          All of those jurors are present, Your Honor.

6          THE COURT:  Ladies and gentleman, I want to thank

7    you for your time and the effort that you've put forth thus

8    far in this case.  I know that you were here answering the

9    questionnaire, and you diligently completed that.  You have

10   appeared today, and you diligently answered the court's

11   questions.  On behalf of the court and all of your fellow

12   citizens and the litigants and parties to this case, I want to

13   thank you.

14         I normally would have just excused you, but because

15   of the time and effort that you have put in, I wanted to just

16   personally thank you before I excused you.  But all of you are

17   excused, and you are now free to go.

18         Please don't discuss the questioning or anything

19   with any of the people who have been here, although I doubt

20   you will see them again.  But thank you very much.

21         (The excused jurors exited the courtroom.)

22         THE COURT:  Mr. Woodward, is there anything further

23   that you want the court to ask?

24         MR. WOODWARD:  Yes, Your Honor.  In regard to -- and

25   I have, I'm sure -- I filed my *voir dire* back on February 10

GLORIA S. SMITH, OFFICIAL REPORTER

116

1    of '09.

2         THE COURT:  I have it right in front of me.

3         MR. WOODWARD:  Mine specifically relates to the

4    death qualification, Your Honor.  I believe that in terms --

5    and this is on Page 3 of 6 of my *voir dire*.  I think that A,

6    B -- A and B have been covered by the questionnaire.  I think

7    that the other questions in some form need to be covered more,

8    particularly with regard to them understanding in F that the

9    law never requires someone to be sentenced to death.  I

10   believe that the *Morgan* case requires specificity to the

11   charges, such as set out in G, H, and I, that you have to -- I

12   believe that *Morgan* stands for the proposition you have to ask

13   about the specific charges.

14        I know the court read the jurors a summary of the

15   charges, but I don't think you asked would they never or

16   always impose the death penalty on those specific charges, and

17   again I think that those questions need to be followed up with

18   regard to the two questions you have before you about their

19   moral views and their ability to follow the instructions and

20   the mitigating and aggravating factors.

21        I think they are both correct statements of the law.

22   Mine includes a specific asking about the aggravating and

23   mitigating factors, which were asked of the jurors that stood

24   up, but I don't believe the entire panel was asked those

25   series of questions, and that would be what we would request,

117

1   in addition to what you have already done.

2           THE COURT:  Now, in terms of the court's

3   questionnaire, much of this has been covered in the basics by

4   the court's questionnaire.  I will ask the question that they

5   understand that even if a person is convicted of a crime for

6   which they may be eligible for the death penalty, that the law

7   never requires that they be sentenced to death.  I will

8   certainly ask that, and do they understand that and can they

9   follow that.  Other than that, I think everything else has

10  been covered, and there is nothing more that needs to be

11  asked.

12          I asked them a question about the death penalty, and

13  the ones that stood up, I have followed through with the

14  appropriate question that you agreed upon.  I will ask it to

15  the whole panel if you want me to.

16          MR. WOODWARD:  Your Honor, again, I do believe that

17  the whole panel -- I think the question that you asked -- and

18  I'm going by memory.

19          THE COURT:  If you would like, I will ask the

20  questions that you and Ms. McKeel gave.  I will ask those to

21  the whole panel if you would like.  I will ask yours, and I

22  will ask hers.

23          MR. WOODWARD:  Yes, ma'am, I would request that.

24          THE COURT:  And I will ask Question F, and I will

25  then say, can you still follow this if the person is -- and I

GLORIA S. SMITH, OFFICIAL REPORTER

**347**

1   will give you some detail there, because of your client being

2   in that particular situation regarding the death-penalty

3   eligible.  I will give you F, G, H, and I there.

4           MR. WOODWARD:  Okay.

5           THE COURT:  As well as your questions that you

6   submitted about your personal or moral obligations.

7           MR. WOODWARD:  Thank you, Your Honor.  I think that

8   covers it, and the rest of them about life -- A, B, and C are

9   covered in the questionnaire.

10          THE COURT:  They are covered in the questionnaire.

11  And then I will give the question about your feelings, and I

12  will ask F, and then I will have covered, through Mr. Clancy's

13  questions, the fact that you are charged, are you guilty.  The

14  questions that he wants in general will pick up on much of

15  this, and then I will be specific with F, and I will

16  incorporate through F, G, H, and I.

17          MR. WOODWARD:  Yes, ma'am.

18          THE COURT:  And then I will give you an opportunity

19  to object and ask me to do something else if you would like,

20  after I have done that.

21          MR. WOODWARD:  Yes, ma'am.  Thank you.

22          THE COURT:  Mr. Clancy is the only one that can

23  address the court on this, Mr. Ellenson.  Remember I said one

24  attorney.  I'm not going to deal with six attorneys on every

25  issue.

1           MR. CLANCY:  May I?

2           THE COURT:  Yes.

3           MR. CLANCY:  Judge, could we identify one other

4   witness, a Ms. Judy Love?  She should have been identified

5   earlier.  I apologize for not doing so.

6           THE COURT:  That will be fine.  Is that what you

7   were jumping up about, Mr. Ellenson?

8           MR. CLANCY:  It was, Judge.

9           THE COURT:  Then I would have let him jump up for

10  that.  Ms. Judy Love.

11          If you all think of somebody at any time during the

12  course of this *voir dire*, do add them and let me know.

13          MR. CLANCY:  Thank you, Judge.

14          THE COURT:  We can bring the rest of the panel down.

15          MS. MCKEEL:  Judge, prior to that, may I make an

16  objection to the defense's G, H, and I?  We argued against

17  that in our memo to the court.  I just would like to say what

18  our objection is with regard to that.

19          THE COURT:  Go ahead.

20          MS. MCKEEL:  We don't believe *Morgan* requires that,

21  the specifics about a case.

22          A prospective juror -- this qualification of a

23  juror, we believe, turns on not how they are going to weigh a

24  specific case, but how they will weigh all the evidence,

25  mitigating and aggravating factors, in a capital case, and we

GLORIA S. SMITH, OFFICIAL REPORTER

120

1    don't think *Morgan* requires that you ask specifically about

2    bank robberies and triggermen in the case.

3        We think it is specifically not required by *Morgan*.

4    And indeed in *Witherspoon* and *Wainwright* and *Barnette* it

5    doesn't talk about the specifics of a particular case.  It

6    just talks about the in-general views of the death penalty of

7    the juror, and it talks about can you weigh the evidence for

8    both sides, whether it is aggravating or mitigating.

9        But to ask the juror -- and I think we have stated

10   in our case here, in *Witherspoon* on page 5 in our memo it

11   says, a prospective juror cannot be expected to say in advance

12   of trial whether he would in fact vote for the extreme penalty

13   in the case before him.

14       THE COURT:  I understand your objection, and you

15   have got it on record and in writing, but it is a little bit

16   of a reverse of that.  What the question is, is do you

17   understand that the law never requires a person to be

18   sentenced to death and what Mr. Woodward wants added, and I

19   will, is do you understand that this requirement would apply

20   to the triggerman in a murder-for-hire case.  That's what he

21   wants, and I don't think there is anything improper about the

22   generalized requirement then being put to the charges that are

23   before the jury.

24       MS. MCKEEL:  Yes, ma'am.

25       THE COURT:  I did interpret what you wanted

GLORIA S. SMITH, OFFICIAL REPORTER

1    correctly, did I not, Mr. Woodward?

2            MR. WOODWARD:  Right, Your Honor.  I'm not asking

3    for evidentiary specifics, just charge specifics.

4            THE COURT:  That's what I understood.  All right.

5            And you've got your objection, and I overrule it.

6            MS. MCKEEL:  Thank you, Judge.

7            (The remaining jurors returned to the courtroom.)

8            THE COURT:  Good afternoon, ladies and gentlemen of

9    the jury panel.  I hope that you had a nice luncheon recess,

10   some of you longer than others.  But I hope that it was a

11   relaxing luncheon recess, and I'm going to ask that the clerk

12   call the roll of the remaining jurors.  Again, if you would

13   stand when your name is called, and then sit down when the

14   next person is called.

15           Madam Clerk?

16           (The names of the prospective jurors were called.)

17           THE CLERK:  Are there any jurors whose name I have

18   not called?

19           All the jurors are present, Your Honor.

20           THE COURT:  Ladies and gentlemen of the jury panel,

21   there are just a couple of more questions.

22           First of all, the name of a potential witness was

23   overlooked, and her name is Ms. Judy Love.  Does anyone think

24   that they know Ms. Judy love, either personally or

25   professionally?  If so, please stand.

122

1          (No response.)

2          THE COURT:  I would instruct you, as I have

3     previously, that this is a criminal case, and in a criminal

4     case the burden of proof is beyond a reasonable doubt.  In a

5     civil case the burden of proof is a different one.  It is a

6     preponderance of the evidence.

7          Now, for those of you who have sat as a juror before

8     in a civil case, do you understand the difference between, or

9     can you put any burden of proof -- I'm not asking you to

10    necessarily understand the burdens until the court has

11    instructed you in a criminal case, but do you understand that

12    there is a difference in the burden of proof, and can you

13    ignore any instructions that you may have received in a civil

14    case on the burden of proof by a preponderance of the

15    evidence?

16         Do any of you who have sat on a civil case feel you

17    cannot do that?  If so, please stand.

18         (No response.)

19         THE COURT:  Now, I would also instruct you that the

20    fact that a person has been arrested and/or indicted for a

21    crime is not evidence of guilt of any kind in regard to that

22    crime.  An indictment is merely a charge brought by the United

23    States against the individual, and the burden of proof remains

24    with the United States to prove the case beyond a reasonable

25    doubt.  The court will so instruct you to this effect, as well

GLORIA S. SMITH, OFFICIAL REPORTER

1    as give you instructions on the burden of proof.

2            Do any of you feel that you cannot follow these

3    instructions?

4            (No response.)

5            THE COURT:  Do any of you feel that the fact that a

6    person has been arrested and charged in any way makes them

7    guilty?

8            (No response.)

9            THE COURT:  Have you or any member of your immediate

10   family that you are aware of been employed by or done business

11   with the Oyster Point Branch of the Langley Federal Credit

12   Union in Newport News?

13           (No response.)

14           THE COURT:  If your answer is "no" to the following

15   question, please stand.

16           Do you understand that the law never requires that a

17   person be sentenced to death?

18           (No response.)

19           THE COURT:  Again if your answer is "no" to any of

20   the following questions, please stand.

21           Do you understand that the law never requires a

22   person to be sentenced to death, even if they have been

23   convicted of being the triggerman in a murder-for-hire case?

24           (No response.)

25           THE COURT:  Do you understand that the law never

GLORIA S. SMITH, OFFICIAL REPORTER

124

1    requires a person to be sentenced to death even if someone who

2    murders a person by shooting him in the course of a carjacking

3    is so convicted?

4            (No response.)

5            THE COURT:  Do you understand that the law never

6    requires that a person be sentenced to death even if the

7    person is convicted of murdering a person by shooting him in

8    the course of a bank robbery?

9            (No response.)

10           THE COURT:  Please stand if your answer is "yes" to

11   the following question.  Do you have personal or moral

12   opinions regarding the imposition of the death penalty that

13   would substantially impair your ability to weigh the

14   aggravating and mitigating factors and follow the court's

15   instructions regarding the death penalty?

16           JUROR:  I do, Your Honor, after thinking.

17           THE COURT:  All right.  Just tell me your name.

18           JUROR:  Shirley Johnson.

19           THE COURT:  Thank you, Ms. Johnson.

20           Again, please stand if your answer is "yes" to the

21   following question.  Would your personal or moral views about

22   the death penalty prevent or substantially impair the

23   performance of your duties as a juror in accordance with your

24   instructions given to you by the court and your juror's oath?

25   Stand if your answer is "yes."

125

 1                (No response.)

 2                THE COURT:  I would ask finally again, do any of you

 3     know of any reason why you think you cannot sit in this case

 4     and render a just, fair, honest, and impartial verdict that

 5     you have not made known to the court previously?  If so,

 6     please stand.

 7                (No response.)

 8                THE COURT:  Counsel, please approach the bench.

 9                (The following discussion occurred at side bar out

10     of the hearing of the jury:)

11                THE COURT:  Counsel, first of all, I would excuse

12     Ms. Johnson for cause based upon her current answer, and

13     everyone is nodding in agreement.  But she will have to remain

14     for the selection.  Or I can tell her to go now.

15                MR. WOODWARD:  That is up to you, Your Honor.

16                THE COURT:  My procedure generally, if I haven't

17     done it up till now, is just to leave her here through the

18     selection process.  I think that's the better course.  But I'm

19     going to excuse her for cause.

20                All right.  Everybody is in agreement with that.

21                Now, counsel, are there any objections to the

22     court's *voir dire* that I have just conducted?

23                Ms. McKeel?

24                MS. MCKEEL:  No, ma'am.

25                THE COURT:  Mr. Woodward?

GLORIA S. SMITH, OFFICIAL REPORTER

**355**

126

1           MR. WOODWARD:  No, Your Honor.

2           THE COURT:  Mr. Clancy?

3           MR. CLANCY:  No, ma'am.

4           THE COURT:  Is there anything further that anybody

5   wants me to ask at this juncture?

6           MR. WOODWARD:  No, ma'am.

7           MS. MCKEEL:  No, ma'am.

8           MR. CLANCY:  No.

9           THE COURT:  Then we will start the jury selection

10  process from this pool.

11          (A discussion off the record then occurred at the

12  bench, after which the bench conference continued as follows:)

13          THE COURT:  Mr. Woodward is asking the court what

14  I'm going to do about jurors knowing each other tomorrow.  I

15  have already planned on that.  I will read out the names of

16  the jurors, and I will ask them the same question that I do

17  about knowing witnesses.  I will ask them if they think they

18  know any of these people personally or professionally.  I

19  won't tell them why.  I'll just read a list of names at the

20  conclusion of the witnesses, just an additional list of

21  people.  So I have already thought about that and asked

22  Ms. Graham to give me a highlighted list.

23          MR. CLANCY:  I just want to make sure I understand.

24  We have 52 potential jurors right now.  We are going to start

25  the jury selection process.

127

1      THE COURT:  We are going to start.  You have 52

2   qualified jurors.  You start the process, and you strike or

3   not strike, just like you would in any jury selection process.

4      MR. CLANCY:  That will get us down presumably to 12,

5   and then we'll worry about the rest tomorrow.

6      THE COURT:  We will just see.  I don't know.  We

7   will go as far as we go today, using all of our potential

8   jurors, and then we pick up tomorrow.  I can't anticipate

9   where we will be tomorrow.  We will go forward today and get

10   as many jurors as we can.  We may well get the panel and

11   alternates.  I don't know.  It just depends upon who is

12   pulled, who is stricken, and so forth.  I haven't counted the

13   numbers, but whoever is there that is left now, we have

14   finished the *voir dire* of this panel, and they are qualified

15   jurors subject to the appropriate use of your peremptory

16   challenges, 20 to a side.

17      (Proceedings resumed in open court as follows:)

18      THE COURT:  Ladies and gentlemen of the jury panel,

19   we are going to begin the jury selection process.

20      (The jury selection process was begun.)

21      THE COURT:  Counsel, please approach the bench.

22      (The following discussion occurred at side bar out

23   of the hearing of the jury:)

24      THE COURT:  Ms. McKeel, you are not going to sit

25   here and go back through the questionnaire on every single

GLORIA S. SMITH, OFFICIAL REPORTER

**357**

128

1    juror that is pulled.  You have been 20 minutes now sitting

2    there with 12 jurors.  You all are charged with being familiar

3    at this point.  You don't have a huge pool here.  You have got

4    52 people left, and you have been given a board of 12 for 20

5    minutes, and you still haven't gotten it to the other side.

6             And I am saying the same for everybody.  You have

7    had these questionnaires.  They have been put on disks for

8    you.  You have reviewed them and come up with lists of people

9    who are qualified or not qualified.  We have gone through *voir*

10   *dire*.  We are not going to have you sit here and go through a

11   20-page questionnaire.  I have been watching you turn it page

12   by page by page.

13            Do you understand?

14            MS. MCKEEL:  Yes, ma'am.

15            THE COURT:  All right.

16            (Proceedings resumed in open court as follows:)

17            THE COURT:  Ladies and gentlemen of the jury panel,

18   I'm going to give you a 15-minute break so that you can go

19   back up to the jury room and take a break and be back down

20   when I call you, but it should be within 15 minutes.

21            (The jury exited the courtroom.)

22            THE COURT:  Counsel, we will be in recess for 15

23   minutes, and then we will resume the jury selection process.

24            (Recess)

25            THE COURT:  We will continue with the jury selection

GLORIA S. SMITH, OFFICIAL REPORTER

129

1   process.

2               (Jury selection continued.)

3               THE COURT:  Ladies and gentlemen of the jury panel,

4   I don't think we will be too much longer, but I'm trying to

5   finish up the process today so that I don't have to bring all

6   of you back tomorrow.

7               (Jury selection continued.)

8               THE COURT:  Ladies and gentlemen of the jury panel,

9   I want you to listen very carefully.  I'm going to read out

10  the names of the people that are still subject to call through

11  the clerk's office.  You will be excused for this evening, and

12  you will be excused until tomorrow afternoon at two o'clock,

13  and you need to call the number that you have been given in

14  the clerk's office to find out your instructions.

15              The rest of you are excused from your jury duty in

16  this case, and I will thank all of you in advance, because I

17  know that you have spent a lot of time.  I want to thank every

18  one of you, because you filled out the questionnaire very

19  diligently, you have been here all day today, and I won't have

20  another opportunity to thank you.  So if I don't call your

21  name out, you are excused from jury duty in this case.

22              If I do call your name out, you are not yet excused,

23  and you have to call back into the clerk's office at two

24  o'clock tomorrow to find out your further instructions.  Does

25  anybody have any questions?

GLORIA S. SMITH, OFFICIAL REPORTER

1          I'm going to read out the names of the individuals

2     who are not excused and must call in tomorrow at two o'clock

3     to find out your further instructions.

4          Those individuals in alphabetical order are as

5     follows:  Michael P. Adams.  Charles Bell, Jr.  Elfriede

6     Cackowski.  Melvin Diaz.  Mollie Felton.  Michael Fien.

7     Jeffrey Fink.  Robin Foreman.  Becky Graham.  Jennifer Graham.

8     Denee Harris.  Harriet Head.  And Carol Kocevar.  You all, the

9     group that I just called, and I'm just going to repeat last

10    names -- Adams, Bell, Cackowski, Diaz, Felton, Fien, Fink,

11    Foreman, Graham, Graham, Harris, Head, Kocevar -- you are not

12    excused.  You must call in tomorrow at two o'clock to find out

13    your further instructions.

14          The remainder are excused, and again I thank you

15    very much for your time.

16          Now, before I dismiss you, the people who are not

17    excused, you must not in any way discuss this case or any

18    questions that you have been asked or anything in regard to it

19    with any other individuals, family or friends.  That is a

20    court order.  You simply must go home, put the case out of

21    your mind, and call back in tomorrow at two o'clock.  Thank

22    you very much.

23          (The jury pool exited the courtroom.)

24          THE COURT:  Counsel, the courtroom is cleared of all

25    of the jurors, and we do have a panel.  Mr. Diaz remains in

1   the group for the selection process for the alternate jurors.

2   He was not stricken, and he was the remaining name, Melvin

3   Amon Diaz.

4         Madam Clerk, he remains in the selection box for the

5   alternate jurors.

6         Consequently, we will convene tomorrow, and we will

7   continue with the jury selection process for the four

8   alternate jurors.

9         Is there anything else that the court needs to

10  address this evening, Ms. McKeel?

11        MS. MCKEEL:  Judge, if we could address when the

12  United States should put on its evidence.  We were originally

13  relying on that the court told us to begin evidence -- we

14  thought it would take three days, but we have gone fast --

15  that the evidence would be put on Monday, July 6.

16        Since this has gone faster, has the court changed

17  its mind, or do we begin with the evidence on Monday?  And you

18  are going to let the jurors go -- I think you said something

19  earlier, back in March, that you did want to be able to let

20  the jurors go for the holiday weekend.

21        THE COURT:  I am going to give them the holiday

22  weekend, and I will not be held to any particular schedule at

23  this point, because I can't predict how the selection process

24  is going to go.

25        What I anticipate is as follows.  I anticipate

132

1   having everything completed by two o'clock tomorrow, and the

2   direction to the 13 individuals will be to return to the

3   courthouse -- I don't know whether I will have them return

4   tomorrow afternoon for preliminary instructions or Thursday

5   morning, but I plan to get through the preliminary

6   instructions and any opening statements, and then plan to

7   start with the evidence on Monday.

8           MS. MCKEEL:  Yes, ma'am.

9           THE COURT:  So that's the plan right now, is to

10  finish the selection and give the instruction probably to the

11  jury to come in on Thursday morning at ten o'clock.  They will

12  be sworn in at that time, have their preliminary instructions,

13  and you will have to do your opening statements.

14          But in terms of evidence, I don't anticipate

15  starting the evidence until Monday morning.

16          MS. MCKEEL:  Thank you, Judge.

17          THE COURT:  Is there anything else, Mr. Clancy?

18          MR. CLANCY:  Thank you, Judge.  Two brief matters.

19  I'm wondering whether the court would allow us the courtesy of

20  getting here at eight o'clock in the morning, if we could get

21  into the building at eight o'clock as opposed to 8:30.  I come

22  from Williamsburg, Mr. Ellenson comes from this side of the

23  water, and that would give us time to prepare each day, since

24  my office is on the other side of the water.

25          THE COURT:  Certainly.  We have people here at eight

GLORIA S. SMITH, OFFICIAL REPORTER

1    o'clock, and I will instruct the court security officer and

2    the clerk to advise the court security officer on duty that

3    you can be here at eight o'clock in the morning.

4          MR. CLANCY:  And get into the courtroom that you are

5    kind enough to let us use.  Judge Morgan's courtroom, I think.

6          THE COURT:  Exactly.  That will be open for you.

7          MR. CLANCY:  One other matter, Judge, and I know the

8    court is reluctant to allow it, but much of the discovery that

9    was turned over to us is on CDs and DVDs, and I was wondering

10   whether I could bring a laptop computer for our use in that

11   courtroom, not in this courtroom, but over there, as evidence

12   proceeds over the next several weeks.  I will bring it and

13   leave it here.  I don't need to carry it in and out.  I will

14   leave a laptop here for the next several weeks.  But I would

15   like to have access to the discovery materials.  Much of it I

16   have printed, but much of it I have not.

17         THE COURT:  There can be nothing else on that

18   laptop, and I can tell you that if you have e-mail coming in,

19   you have any ability to send messages out, send messages in,

20   it is not allowed.  It has to be a blank laptop only for use

21   with the evidence here.  You had better be very careful about

22   this, Mr. Clancy, because it is a firm-and-fast rule, and if I

23   find out that there is anything else on that laptop, other

24   than your storage of discovery for this case and this case

25   only, you will be in contempt of court.

GLORIA S. SMITH, OFFICIAL REPORTER

1          MR. CLANCY:  I don't want to run that risk.  But

2     I'll see if my computer person that assists in my office could

3     give us a blank laptop just for our use.

4          THE COURT:  You should be able to do that.  If not,

5     I can make arrangements through the IT here for a blank

6     laptop.  So perhaps that is the best way to do it, and then

7     you are not --

8          MR. CLANCY:  That would be the best way.  Then I

9     don't run the risk of your wrath if I don't run it right.

10         THE COURT:  And you will receive my wrath if I find

11    out there is a cell phone or a laptop with other storage

12    capacity and other capacities on it in the courthouse.

13         MR. CLANCY:  If the court is kind enough to do that

14    for us, that will be great.

15         THE COURT:  I will talk to IT and see that you have

16    a laptop available for your use and that it is a blank laptop,

17    and I will have them check to be sure there is no other

18    capability.

19         MR. CLANCY:  Fair enough.  Thank you, Judge.

20         MR. WOODWARD:  We agree one laptop is enough.  When

21    you address the IT people, the wiretaps are on -- I think it

22    is called WordPerfect Media Player, to listen to wiretaps.

23         THE COURT:  I'm not going to get into what kind of

24    programs you have, and so forth.  But I will give you the

25    blank laptop, and if the IT person has any questions, they

GLORIA S. SMITH, OFFICIAL REPORTER

136

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION |
| v. | ) | |
| | ) | NO. 4:08cr16 |
| MICHAEL ANTHONY ERIC DRAVEN | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Defendants. | ) | |

TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

July 1, 2009

**SECOND DAY OF TRIAL**

Before:    THE HONORABLE REBECCA BEACH SMITH
           United States District Judge, and a Jury

GLORIA S. SMITH, OFFICIAL REPORTER

1          THE CLERK:  Case No. 4:08cr16, United States of

2    America versus Michael Anthony Eric Draven, also known as

3    Anthony James Neff; and David Anthony Runyon.

4          Ms. McKeel, Mr. Samuels, is the government ready to

5    proceed?

6          MS. MCKEEL:  We are ready, Your Honor.

7          MR. SAMUELS:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          THE CLERK:  Mr. Ellenson, Mr. Clancy, is the

10   defendant Michael Anthony Eric Draven ready to proceed?

11         MR. CLANCY:  We are.  Good morning.

12         MR. ELLENSON:  Good morning.

13         THE COURT:  Good morning.

14         THE CLERK:  Mr. Woodward, Mr. Hudgins, is the

15   defendant David Anthony Runyon ready to proceed?

16         MR. WOODWARD:  Good morning, Your Honor.  We are

17   ready.

18         MR. HUDGINS:  Good morning, Your Honor.

19         THE COURT:  Good morning.

20         THE CLERK:  Shall I call the roll, Your Honor?

21         Now, members of the jury, when I call your name,

22   would you please stand and answer "present," and remain

23   standing until the next name is called, and then be seated.

24         (The names of the prospective jurors were called.)

25         THE CLERK:  Thank you.  Is there any juror whose

GLORIA S. SMITH, OFFICIAL REPORTER

194

1  McKeel?

2          MS. MCKEEL:  Judge, I just have a question for you.

3  Each of those days next week, will we begin approximately ten

4  o'clock?

5          THE COURT:  Yes.

6          MS. MCKEEL:  That's all I have, Judge.

7          MR. CLANCY:  Judge, one matter.  I'm asking for some

8  guidance on what to do with all the questionnaires and the

9  CDs.  You had given them to us under strict -- you were very

10  strict about what we were to do with those.  We have the CDs

11  themselves, and I know we have printed them, and I need some

12  guidance from the court about what to do with them.  I would

13  prefer to turn them in or have them shredded.

14          THE COURT:  The clerk will maintain, obviously, the

15  original questionnaire, and a disk thereof will be maintained

16  in the records of the court.  What you should do is, through

17  Ms. Graham, and she will coordinate with the jury clerk, get

18  all of those turned in, and any copies will be shredded and

19  eliminated.  But we will maintain the original questionnaires,

20  and then at some point if everybody approves, just the disk

21  for the record.

22          But right now we are keeping all the original

23  questionnaires and one disk.  So if you want to turn

24  everything else in to Ms. Graham, for your convenience, you

25  can do it here in the courtroom.  We will have the jury clerk

GLORIA S. SMITH, OFFICIAL REPORTER

**367**

```
1    come up with a dolly or a cart.  That way you don't have to be

2    carrying it all around.  Jerome Grate, our jury clerk, will

3    make arrangements for proper disposal.

4              MR. CLANCY:  May we retain the 16 jury

5    questionnaires, just so I have a chance to review them one

6    final time?

7              THE COURT:  Yes, you may maintain your 16 for your

8    current jurors.  Everyone maintains those, and then at the

9    conclusion, you can turn those in.  Again, they will be part

10   of the record, if you want to access them in any way.

11             MR. CLANCY:  Yes, ma'am, thank you.

12             MR. WOODWARD:  That was what I was going to ask you.

13   We don't have anything else.  We will be ready tomorrow

14   morning.

15             THE COURT:  Arrangements are being made with IT, and

16   you should have the laptop there in Judge Morgan's courtroom

17   that you are using.  At the latest, it will be Monday that it

18   will be there.  It may be available tomorrow.

19             MR. CLANCY:  Thank you, Your Honor.

20             THE COURT:  Then the court stands in recess until

21   ten a.m. tomorrow morning.

22             (Proceedings were concluded at 12:39 p.m.)

23

24

25
```

GLORIA S. SMITH, OFFICIAL REPORTER

196

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF VIRGINIA

3                   Newport News Division

4

5

6

UNITED STATES OF AMERICA          )

7                                 )           CRIMINAL ACTION
        v.                        )
8                                 )           NO. 4:08cr16
MICHAEL ANTHONY ERIC DRAVEN       )

9                                 )
        and                       )
10                                )
DAVID ANTHONY RUNYON,             )

11                                )
            Defendants.           )

12

13

14

                   TRANSCRIPT OF PROCEEDINGS

15

                    Norfolk, Virginia

16

                    July 2, 2009

17

18               **THIRD DAY OF TRIAL**

19

20

21

Before:   THE HONORABLE REBECCA BEACH SMITH

22             United States District Judge, and a Jury

23

24

25

198

* * *

1       THE CLERK:  Case No. 4:08cr16, United States of

2  America versus Michael Anthony Eric Draven, also known as

3  Anthony James Neff; and David Anthony Runyon.

4       Ms. McKeel, Mr. Samuels, is the government ready to

5  proceed?

6       MS. MCKEEL:  Good morning, Judge.  The United States

7  is ready.

8       THE COURT:  Good morning.

9       THE CLERK:  Mr. Ellenson, Mr. Clancy, is the

10  defendant Michael Anthony Eric Draven ready to proceed?

11       MR. ELLENSON:  We are.  Good morning, Judge.

12       MR. CLANCY:  Good morning, Judge.

13       THE COURT:  Good morning.

14       THE CLERK:  Mr. Woodward, Mr. Hudgins, is the

15  defendant David Anthony Runyon ready to proceed?

16       MR. WOODWARD:  Good morning.  We are ready, Your

17  Honor.

18       THE COURT:  Good morning.  And both defendants are

19  present in person with their counsel.

20       Madam Clerk, I would ask that you call the roll of

21  the selected jury panel and swear the jury in.

22       Good morning, ladies and gentlemen.  You have been

23  selected to be a juror in this case, and your names will be

24  called, and you will be sworn accordingly.

25       (The jurors' names were called.)

GLORIA S✿ SMITH, OFFICIAL REPORTER

**370**

254

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                    Newport News Division

4

5

6

UNITED STATES OF AMERICA          )
7                                  )         CRIMINAL ACTION
        v.                         )
8                                  )         NO. 4:08cr16
MICHAEL ANTHONY ERIC DRAVEN        )
9                                  )
        and                        )
10                                 )
DAVID ANTHONY RUNYON,              )
11                                 )
            Defendants.            )
12

13

14

                    TRANSCRIPT OF PROCEEDINGS
15
                      Norfolk, Virginia
16
                      July 6, 2009
17

18                    **FOURTH DAY OF TRIAL**

19

20

21

    Before:   THE HONORABLE REBECCA BEACH SMITH
22            United States District Judge, and a Jury

23

24

25

GLORIA S. SMITH, OFFICIAL REPORTER

255

1    Appearances:

2            LISA R. MCKEEL
             BRIAN J. SAMUELS
3            Assistant United States Attorneys
                  Counsel for the United States
4
             TIMOTHY G. CLANCY
5            JAMES S. ELLENSON
                  Counsel for Michael Anthony Eric Draven
6
             STEPHEN A. HUDGINS
7            LAWRENCE H. WOODWARD, JR.
                  Counsel for David Anthony Runyon
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GLORIA S. SMITH, OFFICIAL REPORTER

**372**

256

1              (The jury entered the courtroom.)

2              THE COURT:  Good morning ladies and gentlemen of the

3    jury.  I hope you had a very nice holiday weekend, and I'm

4    going to ask that the clerk call the case and then the roll of

5    the jury.

6              THE CLERK:  Thank you, Your Honor.

7              Case No. 4:08cr16, United States of America versus

8    Michael Anthony Eric Draven, also known as Anthony James Neff,

9    and David Anthony Runyon.

10             Ms. McKeel, Mr. Samuels, is the government ready to

11   proceed?

12             MS. MCKEEL:  The United States is ready.  Good

13   morning, Your Honor.

14             THE CLERK:  Mr. Ellenson, Mr. Clancy, is the

15   defendant Michael Anthony Eric Draven ready to proceed?

16             MR. CLANCY:  We are.  Good morning.

17             THE CLERK:  Mr. Woodward, Mr. Hudgins, is the

18   defendant David Anthony Runyon ready to proceed?

19             MR. WOODWARD:  Good morning, Your Honor.  We are

20   prepared.

21             THE COURT:  Call the roll of the jury, please.

22             (The jurors' names were called.)

23             THE CLERK:  Thank you.  All the jurors are present,

24   Your Honor.

25             THE COURT:  Ms. McKeel, Mr. Samuels, you may call

GLORIA S. SMITH, OFFICIAL REPORTER

R. Wiggins - Direct                    257

1    your first witness.

2              MS. MCKEEL:  Thank you.  We call Rose Wiggins.

3              THE COURT:  Ms. Wiggins, you will need to come

4    forward and be sworn, please.

5              (Ms. Wiggins was sworn.)

6              ROSE WIGGINS, DIRECT EXAMINATION on behalf of the

7    government, as follows:

8                        DIRECT EXAMINATION

9    BY MS. MCKEEL:

10   Q    Good morning, Ms. Wiggins.  Will you please state your

11   name, and will you spell it for our court reporter, please.

12   A    Rose Wiggins, R-O-S-E W-I-G-G-I-N-S.

13   Q    Ms. Wiggins, are you employed?

14   A    Not now, no.

15   Q    Were you employed previously?

16   A    Yes.

17   Q    Where was that, ma'am?

18   A    The last was Trinity Lutheran School.

19   Q    What did you do for the school?

20   A    I drove school buses.

21             THE COURT:  For what school?  I couldn't hear you.

22             THE WITNESS:  Trinity Lutheran School.

23   BY MS. MCKEEL:

24   Q    Is that in Newport News, Virginia?

25   A    Yes, ma'am.

GLORIA S. SMITH, OFFICIAL REPORTER

R. Wiggins - Direct                                      258

1    Q    Is that where you live, in Newport News?

2    A    Yes.

3    Q    Now, do you have a daughter named Cat Voss?

4    A    Yes.

5    Q    And would you tell us what her full name is for us,

6    please?

7    A    Catherina Rose Voss.

8    Q    Her maiden name was Wiggins, like you; is that correct?

9    A    Yes, yes.

10   Q    Now, was she married to Cory Voss?

11   A    Yes.

12   Q    And do you recall approximately what year they got

13   married?

14   A    (Pause.)

15             I'm sorry.

16   Q    Would it be approximately 1999?

17   A    Yes.

18   Q    And where did they live?

19   A    In Newport News.

20   Q    Do you remember the address they lived at?

21   A    740 Mayland Drive.

22   Q    And who did they live at that location with?

23   A    Their two children.

24   Q    What are their names?

25   A    Casey and Cory Voss, Casey Voss and Cory Voss, Jr.

GLORIA S. SMITH, OFFICIAL REPORTER

R. Wiggins - Direct

259

1   Q    How old are they now, ma'am?

2   A    Nine and 10.

3   Q    Now, I would like to take you back to the night of

4   April 29 into the morning hours of April 30, 2007.

5        Did you receive a phone call approximately, I guess,

6   April 30 in the early morning hours?

7   A    Yes.

8   Q    Who did you receive a call from?

9   A    My daughter, Catherina.

10  Q    And what did she say to you?

11  A    She said Cory had gone to the bank and he hadn't come

12  home.

13  Q    What was her demeanor?

14  A    She was a little upset.

15  Q    Did she -- did you all have a conversation about Cory

16  being gone?

17  A    I asked her if she, you know, had called anybody.  She

18  says, no, I was trying to wait to see, you know, if he was

19  coming home.  She couldn't get him on the phone.

20  Q    Is that what she told you?

21  A    Uh-huh.

22  Q    About what time was this, ma'am?

23  A    I think it was around three in the morning, if I can

24  remember right.

25  Q    Did she ask you to do something on that phone call?

GLORIA S. SMITH, OFFICIAL REPORTER

R. Wiggins - Direct

260

1    A    She said she would go look for him, but the children were

2    asleep.  So I said, well, do you want me to look for him?  I

3    said, I'll go see if I can find him.  Maybe he broke down.

4    Q    Did she tell you which bank that he went to?

5    A    Yes.

6    Q    What bank was that?

7    A    Langley Federal Credit Union.

8    Q    And what did you do?

9    A    I got up and got dressed and went out and drove down

10   Jefferson and looked over at Langley, and I didn't see

11   anything, so I drove down Thimble Shoals and around, and back

12   and forth calling her, and she was calling me, and I turned

13   around and went back home.  I thought maybe he had gone to

14   take P.E. at work.

15   Q    Does he work early morning hours?

16   A    Well, he would go in early for P.E., I call it.

17   Q    Now, did you call her and she told you to go home, or did

18   you decide to go on home on your own?

19   A    I just went home.

20   Q    You did.  Do you recall what kind of vehicle Cory drove?

21   A    Most of the time he drove a truck.

22   Q    Is that what you were looking for?

23   A    I didn't know which one.  I was just looking for the car

24   or truck.  I didn't know for sure which one.

25   Q    What kind of car were you looking for?

R. Wiggins - Direct                                    261

1  A    A white BMW or the gray truck.

2  Q    You didn't see him?

3  A    No.

4  Q    What did you do next?

5  A    I went back home and laid down for a little while, and

6  she called me back.  I don't know what time she called me

7  back.

8  Q    Okay.  What happened next, then?

9  A    I went back, and she asked me to come over to the house,

10 and I think that's when I asked her if she called the police,

11 and see if -- she told me there are so many hours they have to

12 wait before they look for someone.  I said okay.  So I went

13 and I decided to drive back down like -- we always went -- I

14 call it the back way to their house.  I said maybe he drove

15 that way, and I went through the back way to see if he was

16 that way, and I went on to the house where she was.

17 Q    So she called you first, you think, roughly around three

18 o'clock in the morning?

19 A    Yes.

20 Q    And then she called you a second time, and you are not

21 sure which time that was?

22 A    No.

23 Q    Did you go look for him that second time again back at

24 the bank?

25 A    Yes, I drove through the bank, around that parking lot,

GLORIA S. SMITH, OFFICIAL REPORTER

R. Wiggins - Cross                                    262

1    and on down Thimble Shoals and on out Route 17 and back way

2    into Ivy Farms.

3    Q     Did you ever see his vehicle or the BMW?

4    A     No.

5    Q     Okay.  Did you tell your daughter, Cat Voss, to call the

6    police?

7    A     Yes.

8    Q     What did she say?

9    A     She said she had called, and they had told her it would

10   be so many hours before she could put a missing report or

11   something.

12          MS. MCKEEL:  That's all the questions I have, Your

13   Honor.

14                     CROSS-EXAMINATION

15   BY MR. ELLENSON:

16   Q     Cat told you she was doing medical experiments, didn't

17   she?

18   A     Yes, sir.

19          MS. MCKEEL:  Objection to beyond the scope of

20   direct.

21          THE COURT:  Sustained.

22   BY MR. ELLENSON:

23   Q     The morning of the 30th, did you go to Cat's house,

24   apartment?

25   A     Her house, yes, sir.

GLORIA S. SMITH, OFFICIAL REPORTER

**379**

1   Q    And who was there?

2   A    Her and the children.

3   Q    Anybody else?

4   A    No, sir.

5   Q    What time was it that you got there?

6   A    I don't remember for sure.  I know I took the children

7   out to the bus stop, so it had to be -- I don't know, maybe

8   before eight or around eight.  I'm not sure.

9   Q    Did you go by yourself, or were you accompanied by

10  anybody?

11  A    By myself.

12          MR. ELLENSON:  Judge, inasmuch as a number of the

13  questions that I have are probably going to be objected to

14  because they are beyond the scope, I guess I will have to ask

15  that this witness be held until it is my case.

16          THE COURT:  That's fine.

17                    CROSS-EXAMINATION

18  BY MR. WOODWARD:

19  Q    Hi, Ms. Wiggins.  How are you?

20          I just want to clarify a couple of things.  You

21  indicated you first went out at about three in the morning; is

22  that correct?

23  A    Yes, sir.

24  Q    Okay.  And did you drive down Thimble Shoals at that

25  time?

GLORIA S. SMITH, OFFICIAL REPORTER

R. Wiggins - Cross

1   A    Yes, sir, because I had to turn into the -- yes, sir, I

2   did.  I turned in.

3   Q    All right.  And did you drive, if you know, through the

4   600 block of Thimble Shoals?

5   A    I don't know the numbers, sir.

6   Q    But at that time you were familiar with both the BMW and

7   the truck?

8   A    The truck, yes, sir.

9   Q    And you didn't see either one of those vehicles?

10  A    No, sir.

11  Q    And the second time you went out at approximately what

12  time?

13  A    I'm not sure.  I don't remember.

14  Q    Okay.  Did you drive down Thimble Shoals again the second

15  time?

16  A    Yes, sir.  I even turned into where the bank is and drove

17  down around the bank and on out down Thimble Shoals and out to

18  Route 17.

19  Q    And again you were looking for either the BMW or the

20  truck?

21  A    Yes, sir.

22  Q    And you didn't see either one of them?

23  A    No, sir.

24       MR. WOODWARD:  Thank you, Your Honor.  That's all

25  the questions I have.

GLORIA S. SMITH, OFFICIAL REPORTER

R. Wiggins - Redirect                    265

REDIRECT EXAMINATION

1

2    BY MS. MCKEEL:

3    Q    Ms. Wiggins, is the area which the bank is in -- is it an

4    industrial park with offices?

5    A    Yes.

6    Q    When you say you went down Thimble Shoals, did you get

7    off and go into any of the places where the offices are?

8    A    No, just the bank.

9         MS. MCKEEL:  Just went to the bank.

10        That's all I have, Judge.

11        THE COURT:  All right.  Thank you, Ms. Wiggins.  You

12   are excused for now.  You will be subject to call at a later

13   time.

14        MR. SAMUELS:  Your Honor, we have a number of

15   stipulations that the parties have agreed to, and I would like

16   to hand those to the court and ask the court to read a few of

17   those stipulations.

18        THE COURT:  I have a copy of the stipulations.

19   Which ones do you want read?

20        MR. SAMUELS:  Judge, if you would read stipulations

21   No. 1, 2, and 3, please.

22        THE COURT:  Ladies and gentlemen of the jury, the

23   parties have stipulated to the following, and as a result, you

24   must accept these matters as proven and fact for purposes of

25   this case.          *      *      *

GLORIA S. SMITH, OFFICIAL REPORTER

J. Willmer - Direct                    353

1      THE COURT:  Thank you, Dr. Bush.

2      THE WITNESS:  May I be excused, ma'am?

3      THE COURT:  Yes, you may.

4      MR. SAMUELS:  The United States calls John Willmer.

5      THE COURT:  Mr. Willmer, if you would please come

6  forward and be sworn.

7          (Mr. Willmer was sworn.)

8          JOHN H. WILLMER, DIRECT EXAMINATION on behalf of the

9  government, as follows:

10                  DIRECT EXAMINATION

11  BY MR. SAMUELS:

12  Q    Good afternoon, Mr. Willmer.

13  A    Good afternoon.

14  Q    Would you please state and spell your name.

15  A    My name is John H. Willmer.  The last name is

16  W-I-L-L-M-E-R.

17  Q    Mr. Willmer, where do you work?

18  A    I'm employed by the Commonwealth's Department of Forensic

19  Science.  I work as a firearms and toolmark examiner at the

20  department's laboratory in Richmond, Virginia.

21  Q    How long have you done that, sir?

22  A    I have been with the department for the last 12 years.

23  Q    Always in the same capacity as a firearm and toolmarks

24  examiner?

25  A    Here in Virginia, yes.

GLORIA S. SMITH, OFFICIAL REPORTER

J. Willmer - Direct

354

1  Q    Prior to coming to the department, what did you do?

2  A    I was a Michigan state police officer for 25 years, the

3  last 20 years a firearms and toolmark examiner for the

4  Michigan State Police, worked in a crime laboratory in

5  Bridgeport, Michigan, which is near the thumb portion of the

6  state.

7  Q    What does a firemarks and tool examiner do?

8  A    Firearms and toolmark examination is the examination of

9  cartridge cases and bullets to determine whether they were or

10 were not fired in or from a particular firearm.  I also

11 examine cartridge cases involved to determine the type of

12 firearm that could have fired them, should no firearm be

13 recovered.

14 Q    Now, when you refer to cartridge casings and bullets, are

15 you referring to different parts of the bullet?

16 A    Yes, I am.

17 Q    Could you explain what you mean by that.

18 A    A cartridge is a complete unit of ammunition that would

19 be fed into a firearm.  It consists of a bullet at one end of

20 the case, a casing that holds propellant powder, and also

21 holds some type of a priming mixture, either a center-fire or

22 rim-fire ammunition component.  That unit would go into a

23 firearm, and during the firing process the bullet is expelled

24 because of a build-up of gasses caused inside the firearm

25 during the firing process.

GLORIA S. SMITH, OFFICIAL REPORTER

**384**

J. Willmer - Direct

1    The bullet is one item or one component of the

2    ammunition series that I would examine for marks that appear

3    on the bullet that could be identified back to that particular

4    firearm that fired it.  The cartridge case that is left behind

5    after the firing process would be another component that I

6    could also examine to try to determine whether it has marks on

7    it that again could be linked back to a firearm during the

8    firing process.

9    Q    Mr. Willmer, in terms of your qualifications to hold the

10   post of a forensic firearms and toolmark examiner, what

11   education and training have you received that enabled you to

12   hold the post you have now, sir?

13   A    I have a Bachelor of Arts degree from Northern Michigan

14   University.  I majored in chemistry, minored in mathematics.

15   I was a commissioned officer in the United States Navy.  I was

16   trained in explosive ordinance disposal, which is to render

17   safe and disposal of military weapons systems.

18        With regards to firearms identification, most of my

19   training was gained through an apprenticeship program.  I

20   completed two years of such training under the guidance of

21   senior firearms examiners.  I have had occasion to tour and

22   observe the manufacturing process at many different firearms

23   manufacturing facilities and tool manufacturing facilities

24   located on the East Coast and also in Michigan.  I have also

25   received training from the FBI at their facility in Quantico,

J. Willmer - Direct

356

1  Virginia, and also training from other laboratories within the

2  system that I worked in Michigan.

3      Over the last 32 years I have had occasion to

4  examine thousands of items of evidence pertaining to firearms

5  identification.  I have authored reports, and I have had

6  occasion to testify in courts of law.

7  Q    Have you been qualified as an expert in the field of

8  firearms and toolmark identification?

9  A    Yes.

10 Q    How many different times?

11 A    I have testified or been able to give opinion testimony

12 approximately 450 times.  I think it is 440-some times over

13 the last 32 years, courts in Michigan, here in the

14 Commonwealth of Virginia, and also a couple of other states in

15 the United States.

16 Q    Mr. Willmer, would these be state and federal courts?

17 A    In Michigan I testified at probate court level, which is

18 basically juvenile court, also district court, circuit court,

19 and federal district courts in Michigan, including the federal

20 courts in Bay City, Flint, and Detroit.  I also had occasion

21 to testify in federal district court in Waco, Texas.  Here in

22 Virginia I have testified in circuit courts and also federal

23 district court in Richmond, Virginia.  I also had occasion to

24 testify in federal district court in the Borough of Manhattan,

25 Manhattan, New York.

J. Willmer - Direct

1  Q    In all these occasions were you testifying about firearm

2  or toolmark identification?

3  A    Yes.

4  Q    Do you receive continuing education training in this

5  field?

6  A    Yes, there is education available in the field, training

7  sessions.

8  Q    And do you belong to any associations or groups for

9  individuals who do this type of examination?

10  A    Yes.  The Organization for Firearms and Toolmark

11  Examiners is AFTE, the Association of Firearms and Toolmark

12  Examiners.  I am a member of that organization.  It's a

13  professional organization that shares knowledge in the field

14  and new information, new updates in technology, and procedures

15  to analyze the components that we do.

16        MR. SAMUELS:  Thank you, Mr. Willmer.

17        Your Honor, at this time I would tender Mr. Willmer

18  as an expert the field of firearms and toolmark

19  identification.

20        THE COURT:  Does anybody want to examine him on

21  that?  Mr. Clancy?

22        MR. CLANCY:  No, ma'am.

23        MR. WOODWARD:  No, Your Honor.

24        THE COURT:  All right.  He is so qualified for

25  testimony in this case.

GLORIA S. SMITH, OFFICIAL REPORTER

J. Willmer - Direct                                    358

1          MR. SAMUELS:  Thank you, Your Honor.

2    BY MR. SAMUELS:

3    Q    Mr. Willmer, I'd like to ask you to look at a copy of

4    Government Exhibit 23.  Mr. Willmer, did you identify some

5    ammunition, as reflected in this exhibit?

6    A    Yes, I did.

7    Q    And what is Government Exhibit 23?

8    A    Government Exhibit 23 is a certificate of analysis.  It

9    is a laboratory report generated by the Department of Forensic

10   Science.  This particular report is authored by James

11   Pickelman.  He is a firearms -- or was a firearms and toolmark

12   examiner at the Richmond laboratory where I work.

13          It describes items of evidence that he had occasion

14   to examine, the same items of evidence I had occasion to

15   verify through the course of his examination when we got to

16   the point of identifying components as having been fired from

17   one firearm.

18   Q    Mr. Willmer, if I could hand you Government Exhibit 5 and

19   Government Exhibit 22, which I believe have already been

20   admitted into evidence.  Mr. Willmer, do you recognize that

21   ammunition as the ammunition you performed an examination on?

22          THE COURT:  We have 5 here.  He has 22, and here is

23   5.

24          THE WITNESS:  There is a few that I have not had

25   occasion to examine.

GLORIA S. SMITH, OFFICIAL REPORTER

**388**

J. Willmer - Direct                                                    359

1    BY MR. SAMUELS:

2    Q    You have 22 there, Mr. Willmer?

3    A    I have 22, which is a total of four envelopes, and --

4    Q    Do you have Government Exhibit 5 as well, sir?

5    A    Yes, I do.

6    Q    Is that another envelope containing a bullet that was the

7    subject of this examination?

8    A    Yes, that's correct.

9    Q    All right.  And who did the examination that is

10   referenced in Government Exhibit 23?

11   A    For each of these items, four bullets and one bullet

12   jacket, the examination firearms-wise was conducted by James

13   Pickelman.  James Pickelman is a senior firearms examiner at

14   the Richmond laboratory.  He was section chief and has since

15   retired from the department.

16   Q    In the course of preparing for this case, Mr. Willmer,

17   did you review the conclusions reached by Mr. Pickelman in his

18   report?

19   A    Yes, I did.

20   Q    How did you do that?

21   A    There is a certificate of analysis and also a written

22   report that is prepared, notes that are prepared as part of

23   the case file for firearms and toolmark examination.  I had

24   occasion to actually physically compare on a microscope myself

25   the bullets that are in the courtroom today, and bullet

GLORIA S. SMITH, OFFICIAL REPORTER

1    jackets, and reached an independent conclusion based on my own

2    personal examination of those items.  My opinion and the

3    opinion reflected in Mr. Pickelman's report are the same.

4              MR. SAMUELS:  Your Honor, at this time I would offer

5    Government Exhibit 23.

6              THE COURT:  Government Exhibit 23 -- that's the

7    report?

8              MR. SAMUELS:  Yes, ma'am.

9              THE COURT:  On 22 and 5.

10             MR. SAMUELS:  The report that reflects the

11   examination of 22 and 5.

12             THE COURT:  I will admit 23, which is the report

13   that he has just referred to.

14             MR. SAMUELS:  Yes, ma'am.

15             (Government Exhibit 23, admitted.)

16             MR. SAMUELS:  If we could pull up Government

17   Exhibit 23.

18   BY MR. SAMUELS:

19   Q    Mr. Willmer, I know on your copy of Government Exhibit 23

20   down here at the bottom there is a hole punch, but in the copy

21   behind that, can you see if your initials are actually on the

22   report?

23   A    Yes, I did.  I looked, and they were in fact there.  That

24   is the initials placed on the document during the peer review

25   portion of the examination.

J. Willmer - Direct                                    361

1  Q    And you started speaking about it a little bit before,

2  but how do you conduct an examination forensically of bullets

3  like you have there?

4  A    The examination is microscopic in nature.  The tool that

5  we use is a comparison microscope.  It is essentially two

6  ordinary compound microscopes that are hooked together by an

7  optical bridge, a series of mirrors inside that allow an

8  examiner to look through a pair of oculars and see two objects

9  at the same time in the same field of view.

10        The examination is conducted in this particular case

11  by placing one of the evidence bullets on one stage of the

12  microscope, and another evidence bullet on the other stage of

13  the microscope, and then by manipulating, turning, rotating,

14  adjusting the light that is shining on both objects, the

15  examiner can see both objects in the same field of view at the

16  same time.

17        What we are looking for for firearms identification

18  with bullets are a series of scratch marks that appear on the

19  bearing surface of the bullets.  These scratches are caused by

20  microscopic imperfections in the bearing surface of the

21  barrel.  As the bullet travels down the barrel during the

22  firing process, the bearing surface of the bullet comes in

23  contact with the barrel, and any imperfections are transferred

24  to the bullet surface as scratch marks.

25        What we are looking for in firearms identification

GLORIA S. SMITH, OFFICIAL REPORTER

J. Willmer - Direct                                              362

1    is a series of scratch marks that have the same contour,

2    shape, the same physical relationship between each scratch

3    mark, patterns of scratches, if you will, that an examiner can

4    conclude, based on his training and experience, that those

5    patterns that are on each bullet, matching as they do, are

6    indicators that both bullets were in fact fired at one time

7    from the same barrel.

8    Q    Were you able to make a determination as to whether each

9    of these five bullets were fired from the same gun?

10   A    Yes.

11   Q    What was your conclusion?

12   A    It is my opinion that the four bullets and one bullet

13   jacket represented as the five items on the certificate of

14   analysis that is on the screen in front of you -- those were,

15   in fact, all fired from the same firearm, one firearm.

16   Q    And what caliber bullet did you determine that these

17   bullets were?

18   A    The bullets are characteristic of .38 class.  .38 class

19   lumps a couple of calibers together.  The bullets are

20   characteristic of being revolver ammunition components, and

21   the predominant ammunition component in that caliber is .38

22   special and .357 magnum revolvers that would be typical of

23   firing this particular bullet with the rifling specifications

24   that it has.

25   Q    Mr. Willmer, can you tell us what the difference is

GLORIA S. SMITH, OFFICIAL REPORTER

**392**

J. Willmer - Direct                                              363

1    between a .38 police special and a .357 magnum?  Are you

2    talking about the gun, or are you talking about the cartridge?

3    A     The main difference is the ammunition -- the cartridge

4    that would differentiate the two loads, the two bullets.  They

5    are both the same diameter bullet.  They are both .357 inches

6    in diameter.  However, the cartridge case that holds those two

7    loads, the .38 special and .357 magnum, are a different

8    length.  The .38 special is a little bit shorter cartridge

9    than the .357 magnum by about an eighth of an inch.

10   Q     So just having the bullets, is there any way to determine

11   whether they are in fact .38 police special or .357 magnum

12   cartridges?

13   A     No.

14   Q     And you testified that these came from a revolver.  In a

15   revolver, where do the casings go?

16   A     The cartridges would fit into chambers of a cylinder.

17   The cylinder rotates around a central axis, and depending on

18   the number of cylinders and the direction of rotation, by

19   cocking the mechanism and firing it, one chamber in line with

20   the barrel holding a cartridge would fire.  When it is cocked

21   again, that cylinder rotates, a new chamber is brought into

22   position with the barrel, and if that holds a cartridge and

23   the hammer falls, again that one would fire next.

24         And you would keep doing this, either pulling the

25   trigger or manually cocking and releasing the trigger, until

GLORIA S. SMITH, OFFICIAL REPORTER

J. Willmer - Direct                              364

1    all the cartridges within the cylinder are fired.  At that

2    point you would have to manually open the cylinder from the

3    frame and remove the cartridges, now cartridge cases, from the

4    cylinder and reload by hand before you could fire again.

5    Q    Mr. Willmer, without having these cartridge casings which

6    would be in the firearm cylinder, there is no way to determine

7    which bullets these went with or what type of ammunition it

8    actually was?

9    A    In this particular case, no.

10   Q    And what type of firearms can you use for this type of

11   ammunition, for .38 class ammunition?

12   A    Brand of firearms?

13   Q    No, what type, .38, .357?

14   A    You can use both .38 and .357 for the bullet component.

15   However -- and you can fire .38 ammunition in a .357 magnum,

16   but you can't go the other way and fire .357 magnum cartridges

17   in a .38 special.  So the field is growing based on the

18   configuration of the cartridge that's involved.

19   Q    Mr. Willmer, what about a nine millimeter bullet?  What

20   is that in comparison to a .38 class bullet?  Is that similar?

21   A    Yes, it is, actually.  A nine millimeter is of the same

22   .38 class.

23   Q    In terms of the bullet?

24   A    In terms of the bullet.  However, the bullet style in

25   this case is a jacketed hollow point with a narrow cannula,

J. Willmer - Direct                    365

1    which is not typically found in a nine millimeter bullet that

2    would be fired from a pistol, as opposed to a revolver.

3    Q    And what do you mean by a hollow point bullet?  What does

4    that mean?

5    A    Hollow point is a design feature that an ammunition

6    manufacturer uses to make their ammunition components.  You

7    can have a bullet that has a total metal case on the outside,

8    a full-metal-jacketed bullet.

9          You can have a bullet that has a jacketed base, but

10   the nose is open, and it can either be flat across the front,

11   solid, which would be a semijacketed bullet component, or it

12   could have a nose cavity, a hole in the nose, the tip of the

13   bullet, and that would be referred to as a jacketed hollow

14   point bullet, where the jacket comes up, doesn't enclose the

15   nose.  There is a hole and also a recess in the nose that is

16   designed for that particular bullet on impact to expand and

17   get larger in diameter because of the disruption of the nose

18   of the bullet and the fact that it would be easier for that

19   style of bullet to open up than it would a solid-projectile-

20   nose bullet.

21   Q    Is there a difference in effect between a solid nose

22   bullet and hollow point bullet upon impact?

23   A    The solid nose bullet tends to penetrate through, pass

24   through.  It depends on what it strikes, of course.  The

25   hollow point bullet, again depending on what it strikes, has a

GLORIA S. SMITH, OFFICIAL REPORTER

**395**

1    tendency to open up, to expand, because of the material

2    hitting that opening in the front of the bullet.  And it is a

3    wedge effect.  It tends to open up the rest of the bullet as

4    the bullet penetrates the target.

5    Q    So would that cause more damage?

6    A    There is a possibility, yes, it would cause more damage.

7    Q    After identifying that these four bullets and one bullet

8    jacket were all fired by the same firearm, would you have been

9    able to determine which firearm they were fired from if you

10   had a test firearm -- or if you had the subject firearm?

11   A    Yes.

12   Q    How would you do that?

13   A    Again using a comparison microscope, I would test-fire

14   the weapon submitted to me.  We have a water recovery tank,

15   where you stand at one end and shoot down into a large column

16   of water, a large tank of water, and the bullets lose their

17   velocity and fall to the bottom on the tank.  We pick them up

18   with a little putty on the end of a stick.

19          Those become known test-fires for that particular

20   firearm.  They would be carefully marked, and one of them --

21   we would compare the two, and one of them would remain on one

22   stage of the microscope, and your evidence bullet would be on

23   the other stage, and now what you are looking for are scratch

24   marks that appear on your test that matches the scratch marks

25   that appear on your evidence bullets, and you would

1    manipulate, look at all the bearing surface of both items

2    until you were able to reach a conclusion one way or the

3    other.

4    Q    Mr. Willmer, are there alterations that could be done to

5    a firearm that would affect the testing of that test bullet

6    with a bullet you have got in evidence, alterations that could

7    be done to the barrel of the firearm?

8    A    There are.  Some occur in nature.  Rust is probably the

9    most horrifying thing to a firearms examiner, because I'm

10   looking for pristine barrels that have not undergone any type

11   of degradation due to the environment.  So rust is very

12   problematic for a firearms and toolmark examiner.

13          And a thoroughly leaded barrel that has -- the

14   interior bearing surface of the barrel is coated with lead

15   would also be problematic, because the bullet doesn't really

16   engage the barrel, and the fine marks that I'm looking for is

17   squished down the barrel with a coating of lead around it, and

18   it just doesn't mark very well.

19   Q    Mr. Willmer, are you familiar with what a bore brush is?

20   A    Yes, sir.

21   Q    What is a bore brush?

22   A    A bore brush is a device that normally screws onto a rod.

23   It has, in most cases, bristles.  And as you pass this bore

24   brush down the barrel of a firearm, it will tend to scrape

25   away or remove material that is on the inside of the barrel.

J. Willmer - Direct                                  368

1   Q    What types of materials are used to make these bore

2   brushes?

3   A    There are several.  Probably the most common and the one

4   that I would prefer to use is a brass alloy brush.  The

5   bristles are a little bit softer, and I'm less aggressive as

6   far as the possibility of scratching the barrel.

7         They do make more aggressive brushes.  Stainless

8   steel is a material that can be used, and I don't personally

9   use it in the laboratory, because I'm very concerned about the

10  inside barrel not picking up any additional marks during the

11  cleaning process.  But it would actually do a very good job of

12  aggressively removing things like rust or lead from inside the

13  barrel.

14  Q    Mr. Willmer, could the aggressive use of a stainless

15  steel brush make a firearms test more problematic because of

16  the markings it would place on the inside of the barrel?

17  A    For a firearms examiner, yes, it's possible.

18  Q    And what result would that aggressive use have on the

19  inside of the barrel?

20  A    It is going to add additional marks, and eventually you

21  would get to the point that the marks that were there at one

22  time are going to be camouflaged by numerous new marks, to the

23  point that an examiner may not see an identification that's

24  there, just because there are now many, many new marks that

25  were not there during the firing process.

GLORIA S. SMITH, OFFICIAL REPORTER

J. Willmer - Direct          369

1    Q    Mr. Willmer, did you, in reviewing Mr. Pickelman's work

2    and doing your own work on this, make a determination of what

3    types of firearms could have been used to fire the bullets you

4    examined?  I'm not talking about brand, but just what generic

5    types.

6    A    Yes.  Mr. Pickelman authored a report that includes .38

7    special brands of firearms, and also firearms that can fire

8    .357 magnum cartridges, brands of firearms that can fire

9    those, that have the rifling specifications, the number of

10   lands and grooves, the number of twist or spiral, and the

11   width of the lands and grooves all fit within the measured

12   parameters that he took.

13   Q    What are -- and you used that in your report, lands and

14   grooves.  What are lands and grooves?

15   A    Lands and grooves are phenomena that's put into the

16   barrel of a firearm by the manufacturer.  The manufacturer

17   decides how many lands he wants, and the direction of

18   rotation, whether the lands ten to rotate clockwise or they

19   rotate counterclockwise as the bullet passes down the barrel

20   of the firearm.  This is a preference of the manufacturer.

21   The width of the lands and grooves are also a design feature

22   of the firearm.

23        And for a firearms examiner this is good, because it

24   allows an examiner to measure the bullets, the width of the

25   lands and grooves, the number of lands and grooves, the

GLORIA S. SMITH, OFFICIAL REPORTER

J. Willmer - Direct                                        370

1    direction of twist, figure out the caliber of the bullet, and

2    then there are charts that we can refer to that list those

3    specifications, based on caliber, and it helps develop a

4    possible list of firearms that could have been involved as an

5    investigative aid for the police agency to help find, perhaps,

6    a firearm when no firearm was recovered.

7             Unfortunately the list is not all-inclusive.  So it

8    is merely an investigative tool.  There may be other firearms

9    not listed in the report that could have been involved,

10   perhaps many different firearms, so the ones that were listed

11   in the certificate of analysis is merely the ones available to

12   us at the time of our examination and is not an all-inclusive

13   list by any means.

14   Q    Mr. Willmer, the .38 special revolver and the .357 magnum

15   revolver -- are those common types of firearms, in your

16   experience?

17   A    Yes, they are.

18   Q    Many thousands of them in the United States?

19   A    Many thousands in the United States.

20             MR. SAMUELS:  Thank you, Mr. Willmer.  No further

21   questions, Your Honor.

22             THE COURT:  Mr. Clancy?

23             MR. CLANCY:  No questions, Your Honor.

24             THE COURT:  Mr. Woodward?

25             MR. WOODWARD:  Briefly, Your Honor.

GLORIA S. SMITH, OFFICIAL REPORTER

**400**

J. Willmer - Cross                                    371

                    CROSS-EXAMINATION

1

2    BY MR. WOODWARD:

3    Q    Hi, Mr. Willmer.  How are you?

4    A    Just fine.

5    Q    Do you still have Exhibit 23, your report, there in front

6    of you?

7    A    Yes, I believe I do.

8    Q    I just want to clarify a couple of things.  You list some

9    brand names of weapons there, and the jury will see that.  Do

10   you know how many of these firearms -- you said numerous,

11   thousands, I think were two terms you used -- can you tell the

12   jury, back in April of 2007 how many different weapons there

13   were in circulation that might have fired these bullets you

14   looked at?

15                THE COURT:  Is that part of your expertise?

16                THE WITNESS:  It's going to be very vague, Your

17   Honor, at best.

18                MR. WOODWARD:  I thought he testified that there

19   were thousands at least.  I was just trying to pin him down

20   more.

21                THE COURT:  I don't think that he is an expert on

22   how many guns are in circulation.  I think he was qualified as

23   basically examining the markings.  If you can qualify him and

24   you want to try, you can, but I don't think that he is so

25   qualified.

                GLORIA S. SMITH, OFFICIAL REPORTER

J. Willmer - Cross

1    MR. WOODWARD:  That's fine, Your Honor.  I will move

2    on to something else.

3    BY MR. WOODWARD:

4    Q    Is it your testimony that the bullets that you examined

5    had to be fired from a revolver?

6    A    That is the most likely choice.

7    Q    But it is certainly possible they could have been fired

8    from an automatic or semiautomatic weapon?

9    A    There are semiautomatic firearms that do fire revolver

10   ammunition in this class.  They are not very common, but they

11   are out there.

12   Q    Can you tell us some of them?

13   A    Not off the top of my head, no.

14   Q    Have you ever heard of a gun called a .38 super?

15   A    Yes, sir.

16   Q    A .38 super is a semiautomatic weapon that fires this

17   class of ammunition, isn't it?

18   A    Yes, it does.  However, whether or not it fires an

19   ammunition component that would be designed like the ones that

20   were submitted, I would have to check.

21   Q    Okay.  You are just not aware of that in your expertise.

22   A    No, I'm not aware of it.

23   Q    Just so I make sure, a .38 can fire .357 ammunition, but

24   a .357 cannot fire .38 ammunition.  I'm right about that;

25   correct?

GLORIA S. SMITH, OFFICIAL REPORTER

J. Willmer - Redirect                                    373

1   A    The .38 special cannot fire the .357 magnum ammunition.

2   The cartridge is too long.

3   Q    Okay.  And you were not provided any firearm in this case

4   to test?

5   A    No, sir.

6   Q    And looking again at your report, where you list the

7   numerous manufacturers that you say is not an inclusive list,

8   you didn't obtain any weapons from any of those manufacturers

9   and fire them to see if you could narrow it down any more?

10  A    No.

11              MR. WOODWARD:  You did not do that.  Okay.

12              Thank you, Your Honor.  That's all I have of this

13  witness.

14              MR. SAMUELS:  Briefly, Judge.

15                       REDIRECT EXAMINATION

16  BY MR. SAMUELS:

17  Q    Mr. Willmer, to make an identification of the firearm

18  that was used to fire these bullets that you examined, you

19  would have to have the actual firearm; is that right?

20  A    Yes, sir, that's correct.

21  Q    I mean, it couldn't just be one from a manufacturer,

22  could it?

23  A    No.

24              MR. SAMUELS:  Thank you, Your Honor.  Nothing

25  further.

GLORIA S. SMITH, OFFICIAL REPORTER

**403**

E. Buda - Direct                                    374

1      THE COURT:  Can I excuse this witness?

2      MR. SAMUELS:  Yes, ma'am.

3      THE COURT:  Thank you, Mr. Willmer.  You are

4  excused.

5      THE WITNESS:  Your Honor, thank you.

6      THE COURT:  Ladies and gentlemen of the jury, I

7  think this would be a good time to take a luncheon recess.  We

8  will be in recess for approximately 45 minutes for lunch.

9      The court stands in resets.

10     (A recess was taken for lunch.)

11                         AFTERNOON SESSION

12     (The jury returned to the courtroom.)

13     THE COURT:  Your next witness?

14     MR. SAMUELS:  Your Honor, the United States calls

15  Elizabeth Buda.

16     THE COURT:  Ms. Buda, if you would please come

17  forward and be sworn.

18     (Ms. Buda was sworn.)

19     ELIZABETH BUDA, DIRECT EXAMINATION on behalf of the

20  government, as follows:

21                        DIRECT EXAMINATION

22  BY MR. SAMUELS:

23  Q    Good afternoon, ma'am.  Would you please introduce

24  yourself to the court and the jury, and spell your last name?

25  A    My name is Elizabeth Buda.  The last name is spelled

GLORIA S. SMITH, OFFICIAL REPORTER
*   *   *

**404**

435

1  today about Mr. Runyon, by photograph or otherwise, so again I

2  would object to it on that basis.  And I understand your

3  ruling regarding evidentially how the statement is to be used,

4  but I want the record to reflect my objection to putting it on

5  at all at this point.

6        THE COURT:  I agree with you that at this juncture I

7  do not believe there has been evidence establishing that Mr.

8  Runyon was a part of any activity.  I'm anticipating from

9  their opening statement and all of the exhibits that they have

10  presented and all the pretrial matters and the agreed

11  statement of facts to which Ms. Voss pled guilty, and she is

12  listed as a witness, that the conspiracy will be established.

13  If it is not established, then they will probably run the risk

14  of more than just statements being thrown out.  There will be

15  some charges and other matters.  But I make the same ruling.

16        MR. WOODWARD:  I understand, Your Honor.

17        THE COURT:  All right.  We can bring the jury in.

18        (The jury returned to the courtroom.)

19        THE COURT:  All the jurors are back from break.

20  Your next witness, Ms. McKeel?

21        MS. MCKEEL:  Thank you, Judge.  We call Randy

22  Lassiter.

23        THE COURT:  Ms. Lassiter, if you would please come

24  forward and be sworn.

25        (Ms. Lassiter was sworn.)

R. Lassiter - Direct                                    436

1      MS. MCKEEL:  Your Honor, we have a stipulation with

2  regard to Langley Federal Credit Union, No. 22, if you would

3  please read it.

4      THE COURT:  Stipulation No. 22, ladies and

5  gentlemen, is as follows:  United States Exhibits 31 through

6  31KK are business records and bank security records from

7  Langley Federal Credit Union.  The records were made by an

8  employee at or near the occurrence, with knowledge of the

9  matters contained therein, kept in the regular course of

10  business, and it was a regular practice of Langley Federal

11  Credit Union to make the records.

12      Langley Federal Credit Union is a federal credit

13  union as defined by Title 18 of United States Code, Section

14  2113(g), which operates in, and activities of which affect,

15  interstate commerce.

16      MS. MCKEEL:  Thank you, Your Honor.

17      RANDY LASSITER, DIRECT EXAMINATION on behalf of the

18  government, as follows:

19                    DIRECT EXAMINATION

20  BY MS. MCKEEL:

21  Q    Ma'am, would you please tell us your name and spell it

22  for the court reporter.

23  A    Randy, R-A-N-D-Y, Lassiter, L-A-S-S-I-T-E-R.

24  Q    Do you have a first name, or is Randy your middle name?

25  A    First name is Mary, M-A-R-Y.

GLORIA S. SMITH, OFFICIAL REPORTER

**406**

R. Lassiter - Direct                                    437

1    Q    Do you go by Randy?

2    A    Yes.

3    Q    Would you please tell us where you are employed.

4    A    Langley Federal Credit Union.

5    Q    How long have you been there?

6    A    Fifteen years.

7    Q    And currently what is your job there?

8    A    I'm the custodian of records, paper records.

9    Q    And did you receive a grand jury subpoena from the United

10   States to produce some records from Langley Federal Credit

11   Union?

12   A    I did.

13   Q    And did you produce those?

14   A    Yes.

15   Q    Now, during your 15 years at Langley Federal Credit

16   Union, what have been your other jobs?

17   A    I started as a teller.  Then I worked the front desk.

18   Then I was an FSO, Financial Services Officer, opening

19   accounts, making loans.  Then I became a floating manager, a

20   manager of a branch.  I have been in records almost five

21   years.

22   Q    What exactly is Langley Federal Credit Union?  What type

23   of financial institution is it?

24   A    It is a federal credit union, and we are member-based, so

25   you have to be a member, and one share of stock, a $5 minimum

R. Lassiter - Direct                                    438

1    balance, and it is held, and that makes you a member, and then

2    you are eligible to do any of the services that you qualify

3    for.

4    Q    How many locations do you all have?

5    A    17.

6    Q    Are they based on the Peninsula, or are some over here on

7    the Southside?

8    A    We have one in Chesapeake.  The rest are in Newport News,

9    Hampton, on the two bases, which is Langley NASA, the --

10   excuse me -- three bases, Coast Guard, and two in

11   Williamsburg.

12   Q    As part of your job as the custodian of records, you have

13   reviewed some of these records here today; is that correct?

14   A    Right.

15   Q    I would ask that you take a look at Government

16   Exhibits 31 through 31F, and then 31G through 31BB, and then

17   31CC to 31KK.  I will hand these to you through the court

18   security officer.

19   A    Do you want me to describe what they are?

20   Q    If you could, just look through them right now, and just

21   tell everyone, do you recognize those documents?

22   A    Uh-huh.

23        MS. MCKEEL:  Your Honor, we would like to introduce

24   those documents at this time.

25        THE COURT:  All right.  They are admitted.

GLORIA S. SMITH, OFFICIAL REPORTER

R. Lassiter - Direct                    439

1     MS. MCKEEL:  Thank you.

2         (Government Exhibits 31, 31A through 31Z, and 31AA

3     through 31KK, admitted.)

4     BY MS. MCKEEL:

5     Q    Let's take a look, if we could, at 31, Government

6     Exhibit 31.

7     A    Uh-huh.

8     Q    Would you tell us, please, what this first document is?

9     A    This is a signature card, and this is for opening an

10    account for Catherina R. Voss.  That account was opened -- the

11    first page -- I'm sorry, that's the application --

12    Q    Just look at the first page right now.

13    A    Okay.  That's the application for the electronic

14    services.  She opened up a debit card, and it says that it was

15    a new card.

16    Q    What is the date that she opened that?

17    A    April 20.

18    Q    Of 2007?

19    A    Correct.

20    Q    And is she the only person on that account, or is there a

21    joint account authorized user?

22    A    On this particular one, no, ma'am.  That would be the

23    section underneath where she signed her name.

24    Q    So underneath what we are looking at here on the screen,

25    there is a section for a joint owner; is that correct?

GLORIA S. SMITH, OFFICIAL REPORTER

**409**

R. Lassiter - Direct                                    440

1   A    That's correct.

2   Q    Who would fill out this paper work?

3   A    It is filled out by the computer.  And then at the very

4   bottom is the approval process.

5   Q    Okay.  And that is someone sitting there from Langley

6   Federal Credit Union talking to her?

7   A    Yes.

8   Q    And then filling in -- is that what happens?

9   A    Correct.

10  Q    And then in that "member complete" section it says member

11  signature; is that correct?

12  A    That's correct.

13  Q    And then there is a date beside that; is that correct?

14  A    April 20, 2007, yes.

15  Q    Let's go to 31A, if you would, please.  Tell us what this

16  portion of the card is.

17  A    Okay.  This is a signature card.  This is where she

18  opened her account.  It is a single account, marked by the

19  very bottom left underneath the bold line.  It says on there,

20  "individual" is marked.  This is done as the person sits there

21  in front of them.  It's a savings account and a smart checking

22  account.

23  Q    Tell us what a smart checking account is.

24  A    It is just what we call our regular checking account,

25  does not earn any interest.  We do have to have an ongoing

GLORIA S. SMITH, OFFICIAL REPORTER

R. Lassiter - Direct                    441

1    deposit, and in the right-hand side it does say she is going

2    to have a hand-carry, rather than a payroll deduction or an

3    automatic deposit.

4    Q    Does that mean that when you open a checking account, you

5    have to have ongoing funds?

6    A    Correct.

7    Q    Based on these two pages and what you saw, what type of

8    account did Catherina Voss open on April 20?

9    A    She opened a regular savings account with a $5 minimum

10   balance, would be the normal deposit to open up the

11   membership.  The checking account was opened up, and on the

12   right-hand side near the top it says that it was a hand-carry

13   type payroll, and it also says that it was a new account at

14   the top.

15   Q    Let's look at that top right-hand section.  It has

16   checked off debit card and ATM card.  What is the difference?

17   A    Typically a debit card takes a little bit of time, and in

18   cases where someone wants access to their funds a little bit

19   quicker, they can ask for an ATM card first because they can

20   be made in the branch.

21   Q    It says underneath that, reason.  What does that mean?

22   A    Says member needed an ATM card until received her debit

23   card.  So she requested to have an ATM card made immediately

24   upon making her account active, and then she would have

25   ordered the debit card, which is what the first page was, and

GLORIA S. SMITH, OFFICIAL REPORTER

**411**

R. Lassiter - Direct

442

1   that would have come in the mail to her.

2   Q    Now, she requested this immediately.  So what does that

3   mean?  What happened?

4   A    That means as soon as the account was opened, the savings

5   was opened, the checking was opened, then they went to

6   wherever they have it -- depending on what branch it was, they

7   go to the area where the ATM card can be made, and she picks

8   her own password or PIN number.

9   Q    So when she left that day, she would have had an ATM

10  card; is that correct?

11  A    Correct.

12            THE COURT:  She only had access, though, to $5.

13            THE WITNESS:  Correct.  She really was -- yeah.

14            THE COURT:  All right.  Go ahead.

15  BY MS. MCKEEL:

16  Q    And down at the bottom again on this second page, 31A, it

17  says, individual account, and somebody has scratched through

18  any type of joint account; is that correct?

19  A    That's correct.

20  Q    What does that indicate to you?

21  A    The only time we use this front bottom part is if there

22  is going to be a joint person.  So being that has been struck

23  through, the signature follows on the second page.  It is a

24  two-page document.

25  Q    Okay.  If we can, go to document 31B.  Would you tell us

GLORIA S. SMITH, OFFICIAL REPORTER

**412**

1  what this is?

2  A    This is the second half of the signature card for the

3  checking and the savings account.  It shows the prime owner's

4  signature, which she being the prime owner here, and the only

5  owner in this case.  It shows the date it was opened, which is

6  April 20, 2007.  And then everything below that bold line at

7  the bottom is where we fill in what type of ID we got, how she

8  was able to join, looks like dependent military, U. S. Navy,

9  and then the type of identification that they took from her.

10  Q    And if you would, go to 31C.

11  A    This is the driver's license that they would have taken

12  as proof of who she was.

13  Q    And you kept these records -- someone made a copy of t

14  his and kept it in the record of her file; is that correct?

15  A    That's correct.

16  Q    Let's go to 31D, please.  Tell us what this document is

17  we are looking at.

18  A    Okay.  This is the first statement that is generated on

19  the account.  The date from that would be -- it is for the

20  month of April, but of course hers started on April 20, at the

21  top right-hand corner, April 20 being the day that it was

22  opened, and the last day of the month is the 30th.  And ours

23  do run the full calendar month.  It shows the $5 initial

24  balance made to the savings account.  There is a deposit

25  transaction number there showing the $5 received.  No balance

R. Lassiter - Direct                              444

1  in the checking account.

2          It shows the checking underneath the savings.  Says

3  share A/C, smart checking, and it has POD.

4  Q    The $5 credit shows up and corresponds, it looks like,

5  directly to the date of 4-20; is that correct?

6  A    That is correct.

7  Q    Does that mean that's the date that she put the $5 in her

8  savings account?  Is that correct?

9  A    Yes.

10  Q    How can you tell that this is savings?  You see the words

11  up there that say share and prime shares.  What do those words

12  mean?

13  A    To open an account, you must have a share account, which

14  is what we call a prime share, and that is the savings.  That

15  one share of stock, which is $5, is what makes you a member.

16  So you have to start with a $5 minimum balance.

17  Q    A little below it says summary, previous balance on 4-20,

18  and then ending balance.  What is that for?

19  A    That shows the beginning balance, which as you can see in

20  the top right-hand side under balance, it says zero, because

21  the account was started with zero.  So on 4-30, when the

22  account was generated, it has a zero balance until the $5 is

23  actually deposited.  Then the ending balance 4-30 showed a

24  zero balance.  That's the available.  That $5 is your money,

25  but it's showed as an unavailable amount in the account.

R. Lassiter - Direct                                445

1   Q    Would someone opening a bank account on April 20 be told

2   that, that their money was not available at that time?

3   A    Yes.  Yes.

4   Q    If you would, go to 31E.  Will you tell us what this

5   shows, ma'am.

6   A    That looks like a duplicate to what we just looked at.

7   Q    Okay.  Go to 31F, please.

8   A    Okay.  This would be the following statement, which

9   started May 1, to June 30.

10  Q    Where are you looking at that?

11  A    The top right-hand, under that big black bold line in the

12  top right-hand corner.

13  Q    Where it says statement period?

14  A    Correct.  Typically there would be a monthly statement if

15  you have a checking account, but that would be because you

16  have transactions in the checking account.  May 1, being the

17  following day of the last statement, being April 20, this

18  would be the beginning balance here, May 1, all the way to

19  June 30.  Since there were no transactions between May 1 and

20  June 30, it generated a quarterly balance.  And the checking

21  account does not appear because there were no transactions.

22  Q    So this is her savings account, Cat Voss's savings

23  account?

24  A    Correct.

25  Q    And this is the balance as of June 30?

GLORIA S. SMITH, OFFICIAL REPORTER

**415**

R. Lassiter - Direct                                        446

1    A    That's correct, and through the whole month.

2    Q    If there had been any other deposits or transactions into

3    that savings account, would that have appeared on this

4    statement?

5    A    Yes, it would.

6    Q    So what can you tell, from the time that she opened up

7    her account on April 20 to May 1, what was the balance in that

8    account, and the only transaction?

9    A    Just the $5, which is not available, unless she chooses

10   to close the account.

11   Q    Now, was that the only account of Cat Voss in Langley

12   Federal Credit Union records that was hers solely?

13   A    Correct.

14          THE COURT:  That was her what?

15          MS. MCKEEL:  That was in her name solely.

16   BY MS. MCKEEL:

17   Q    Ma'am, if you would look at 31G.

18   A    Uh-huh.

19   Q    Would you tell us what that is?

20   A    This is an account in the name of Anthony J. Neff.  It is

21   a statement from July 1, '06, to 9-30-06.  It is reflecting a

22   savings account, an S1 share, plus prime shares, showing a

23   balance of $12.45.

24   Q    Do you know when Anthony J. Neff opened up his account

25   with Langley Federal Credit Union?

GLORIA S. SMITH, OFFICIAL REPORTER

**416**

R. Lassiter - Direct                    447

1   A    The account was opened on July 3, 2003.

2   Q    And when it was originally opened, was there anyone else

3   sharing that account, a joint account user?

4   A    No.

5   Q    So let's take a look at this document 31G.  The statement

6   period is July 1, '06, to 9-30-06; is that correct?

7   A    That's correct.

8   Q    Is that a normal statement period?

9   A    Yes, that's a quarterly statement.

10  Q    And again is this a savings or a checking account?

11  A    This is a savings.

12  Q    And as of September 30, 2006, what was Mr. Neff's

13  balance?

14  A    $12.45.

15  Q    If will you go to document 31H, tell us what this

16  document is and what name is on this document.

17  A    The name is Michael Draven, same account number, and it's

18  the following statement, which started October 1, 2006, to

19  December 31, 2006.

20  Q    Now, obviously the name is different.

21  A    That's correct.

22  Q    Do you know what happened with this account?

23  A    I do.  It looks like on December 7, 2006, he came in and

24  did a name change from Anthony J. Neff to Michael Draven.

25  Q    Okay.  Those documents are later on; is that correct?

GLORIA S. SMITH, OFFICIAL REPORTER

**417**

R. Lassiter - Direct                                    448

1    A    I'm sorry?

2    Q    In your package those documents are a little bit later

3    on; is that correct?

4    A    That's correct.

5    Q    We can get to those.  Let's go back to 31H.  At this

6    point on this document, right under where it says S1 shares, A

7    slash C, it says joint, and who is that?  Would you please

8    read that?

9    A    Catherina R. Voss.  Says joint with, so it has the prime

10   shares savings account, and in parentheses under the dotted

11   line, joint with Catherina R. Voss.

12   Q    And what is the balance at that time?

13   A    The beginning balance was $12.45, and the closing balance

14   is $7.45.

15   Q    Now, was there some transaction activity going on in this

16   account during this monthly statement?

17   A    Yes, there was.

18   Q    If you could, would you please summarize what that is on

19   the document so we understand what we are looking at.

20   A    The first transaction on October 1 is the previous

21   balance of 12.45.  On December 7, the transaction number is

22   4027.  It was in the amount of $200.  Then on 12-9 it looks

23   like there was a balance inquiry done, also followed up by --

24   and that was the dollar charge.

25           12-9, it looks like a transaction fee of a dollar

GLORIA S. SMITH, OFFICIAL REPORTER

**418**

R. Lassiter - Direct                              449

1    and an ATM withdrawal for one hundred dollars, and that $2 is

2    normally a fee, since the machines only hold $20 bills.  So

3    typically that person would have used a machine outside of

4    Langley, being charged the $2, and then the dollar was the

5    transaction fee, which was a total of $3 in fees.

6              The 13th of December, looks like another transaction

7    fee of a dollar.  Then there was an ATM withdrawal of a

8    hundred dollars, and it was done on one of the Langley

9    machines, so that would have been no other fee.  So that was a

10   total of $100 received, leaving a balance of $7.45.

11   Q    So the fees, as you just told us -- is that because if

12   Michael Draven had used a Langley Federal Credit Union ATM,

13   there would be no fees?

14   A    That's correct.

15   Q    Okay.  Let's go to 31I, please.  Would you tell us what

16   is, ma'am.

17   A    Okay.  I believe that's the following statement.  It is.

18   January 1, '07, to March 31, '07.  It is still showing a

19   savings account joint with Catherina R. Voss, and it looks

20   like the previous balance and the closing balance is $7.45.

21   No transactions took place.

22   Q    Let's go next to 31J, please.

23   A    This is the signature card.  It's for the savings account

24   being opened in Anthony J. Neff's name.  It was an individual

25   account, as marked all the way down at the very bottom left

GLORIA S. SMITH, OFFICIAL REPORTER

R. Lassiter - Direct                          450

1    under the bold line.  Again, like the other card was, nobody

2    joint, so nobody signs on that page, and then the signature

3    would have been on the following page.

4    Q    Is that 31K you are talking about?

5    A    That's correct.

6    Q    Let's put that up.  Is that where it says prime owner

7    signature?

8    A    That's correct.

9    Q    Who signs there?

10   A    That's where the member, which would have been Mr. Neff

11   in that case, 7-3-03.

12   Q    Let's look at 31L, please.

13   A    And this is the ID that would have been received the day

14   the account was opened, and that is also dated -- we usually

15   put the account number -- whoever owns it puts their initials,

16   and then of course the date 7-3-03 was the date that they

17   received that ID, which corresponds with the signature card.

18   Q    If you would, go to 31M.  What does this indicate in your

19   records?

20   A    Looks like we did an updated ID.  And this was dated

21   4-5-04.  It is a driver's license, again an Anthony James

22   Neff.  I'm assuming that was brought in at a later date for

23   some reason.  Anytime anybody gets an updated -- or gets one

24   they don't feel like it is a good enough copy or it is a

25   different ID, which in this one it is -- it looks like he was

GLORIA S. SMITH, OFFICIAL REPORTER

1   under 21 the first one, since it's in the up-and-down

2   position.  Yeah, the original one had -- looks like it expired

3   in '05, so it looks like we got a new card.

4   Q    Let's look at document 31N, please.

5   A    That's a change-of-address card.  Anytime someone changes

6   their address, this is the type of form that we give them to

7   put their new change of address on.

8   Q    And what was the date that this was updated?

9   A    That was updated on 3-1-04.

10  Q    If you could go to 31O?

11  A    Uh-huh.

12  Q    Tell us what this is, please.

13  A    This is an application for an ATM card, and it is in

14  Anthony J. Neff's name only.  And that was done on -- well,

15  they didn't date it down in the bottom.  I'm not sure -- there

16  is no signature on this one, but that's what the form is that

17  is used.  And it looks like it was done and mailed on March 1,

18  '04 -- excuse me.  Not mailed.  It most likely was given to

19  him in person.

20  Q    If you would go to 31P, please.  What is this document?

21  A    Okay.  Up at the very top it says 2 of 2.  We always

22  notate anytime there is a change to a membership card for any

23  reason, whether it be adding someone, changing names.  In this

24  case it looks like it's a revision.  The revision says name

25  change from Anthony J. Neff, was the previous name, and then

GLORIA S. SMITH, OFFICIAL REPORTER

R. Lassiter - Direct                                    452

1    down in the left-hand side you will see where his name has

2    been changed with the pertinent information for him, and then

3    there is no joint signature at that point, so on the second

4    page there would be a signature.

5    Q     Is that 31Q?

6    A     That's correct.

7    Q     That signature right where it says prime owner signature;

8    is that correct?

9    A     Yes.

10   Q     And there is a date there; is that correct?

11   A     Uh-huh.  7 December '06.

12   Q     If we could, go back to 31P.  Along with this name

13   change, where it says member application and ownership

14   information, it has a home e-mail address; is that correct?

15   A     Yes.

16   Q     What does that say, please?

17   A     Mdravenphoto@aol.com.

18   Q     If we could now go to 31R.

19   A     This is a Maryland driver's license.  It looks like this

20   was used on 7 December '06, and it looks like there must have

21   been two, because it has 1 of 2 off to the right by his name,

22   a little bit lower.

23   Q     And would this have been brought into the bank?  You can

24   look next at 31S, where it says decree for name change.  Do

25   you see that?

GLORIA S. SMITH, OFFICIAL REPORTER

R. Lassiter - Direct                              453

1    A    Correct.

2    Q    So these documents for a name change had been brought in

3    by Mr. Draven?

4    A    Yes.

5    Q    And 31S is -- did the bank require that?

6    A    Yes.

7    Q    If you can, let's go to 31T, please.

8    A    Again that's a change-of-address form for Mr. Draven.

9    And that was dated --

10   Q    When was that dated?

11   A    That is dated 7 December '06.

12   Q    And the change of address is to -- what is his

13   residential address there?

14   A    Looks like the new one is 325 Circle Drive, Newport News,

15   23605.

16   Q    If you will look next to 31U, please, tell us what this

17   document is.

18   A    Okay.  It is a membership card just like you have seen

19   before.  It is in the name of Michael Draven.  It also has a

20   Catherina R. Voss added as a joint.

21   Q    What date was that done on?

22   A    7-3-03 -- no, excuse me.  I'm sorry.  That was the

23   account opened date.

24        12-8-06.

25   Q    And if you look down at the bottom of the left-hand side

R. Lassiter - Direct                    454

1   of the document, it has got signatures there; is that correct?

2   A    That's correct.

3   Q    Who would have to sign to make these changes?

4   A    Anybody that's on that account.  We normally have the

5   prime member sign last, authorizing that person to be added

6   joint, and it does say on here that it was joint with

7   survivorship.

8   Q    What does that mean?

9   A    They have a choice of with survivorship or without.  That

10  means if either of those two people die, the other person

11  would get the money without any question, because they were

12  joint.

13  Q    And let's look at 31V, please.

14  A    This is the second half of the signature card showing

15  both signatures.  Michael is on the left, Ms. Voss on the

16  right, and then of course just our authorizations at the

17  bottom, and what IDs they took.

18  Q    Is that one of the documents needed for adding the

19  additional person?

20  A    That's correct.  It is the updated signature card.

21  Q    If you will look at the next document, 31W?

22  A    This would have been the ID for Ms. Voss as she was added

23  to that account.  It looks like it was a military spouse's ID

24  and a Virginia driver's license adding her joint.

25  Q    And then 31X.  What is that?

R. Lassiter - Direct                         455

1    A    It looks like they have gone and copied the front on one

2    page, the back on another page, and then they have also

3    duplicated her driver's license for some reason.

4    Q    Let's take a look at document 31Y.

5    A    This is an application for L@ngley Link, which is our

6    online services that we use.  You can go on and do your online

7    banking.  It is also asking for the CHIPS password, which is

8    the audio response for telephone access to your account.  It

9    shows that ATM card was marked, and it shows that it was a new

10   ATM card.

11          In the middle section under "member complete," it

12   has Mr. Draven's information in the center section.  It

13   appears that with the printed part being struck through that

14   most likely they had not gone in and changed the address, so

15   they put one line through it, handwriting in the correct

16   address.  Again the same thing with the e-mail address.

17   Whatever was preprinted, they did the correction to the right,

18   and then they verified the signature with a signature card,

19   which would have been the previous document.

20          In the second bold section it does show that a card

21   was authorized for Ms. Voss, and then the approvals at the

22   bottom.

23   Q    Was that done December 8, 2006?

24   A    It appears so, yes.

25   Q    If you will look at 31Z.

GLORIA S. SMITH, OFFICIAL REPORTER

**425**

R. Lassiter - Direct

1   A     Okay.  This is a transaction that was done on the

2   account.  The top section is the first part of the

3   transaction.  It is kind of a two-part form because it gets

4   too long.  Yes.  That part there is the actual transaction.

5   It looks like a check was deposited for $116 into that prime

6   share account, and that was done on April 4, 2007.

7   Q     And can you tell whether or not this document, when you

8   say April 4, was it done at the drive-in?  Can you tell

9   whether or not, by looking at this document?

10  A     I can only assume because of the -- up by the initials it

11  has the type of ID that they used.  I would not know if this

12  was drive-through or not without knowing where that person

13  worked that day.  It gives the branch, and it gives the

14  operator, teller number, and their name.

15  Q     And if you would look at Government Exhibit 31AA?

16  A     That's the corresponding check that was actually

17  deposited that day, the $116.

18  Q     If we could look at, please, Government Exhibit 29?  If

19  you will look at your screen, ma'am, it will come up on your

20  screen.  Do you see that in front of you, ma'am?

21  A     Correct.

22  Q     And would that be -- if you can see, it says, LFCU, on

23  the left-hand side, Coliseum driveup.  Do you see that?

24  A     I do.

25  Q     If you go to the same part right under the exhibit

R. Lassiter - Direct                                457

1   sticker, it has a date and time there.  Is that what is

2   happening here with this document, 31Z and 31AA?

3   A    Looking at the time sequence, the dates, and the time

4   sequence, it would appear so, and due to the fact that the

5   initials part of the voucher or the deposit ticket having a

6   driver's license number, it is customary for drive-through

7   transactions to put -- document whatever type of ID they used

8   for the transaction in that area that says initials on the

9   deposit ticket.  So I would say, yes, it is.

10  Q    Let's look back, then, at your documents, ma'am, 31BB.

11  Can you tell us what this document is?

12  A    BB?

13  Q    It should be the last document in this section.

14  A    I'm sorry.  Yes.  That's the deposit ticket.

15  Q    Okay.  Can you tell us what date that was?

16  A    That was done on April 26, 2007.  And that was done at

17  the Oyster Point branch, and that was at 4:53 -- at 14:53.

18  Q    Let's take a look at your screen, please.  I believe it

19  is Government Exhibit 29C -- I'm sorry.  30.  Do you see that,

20  ma'am?

21  A    Yes.

22  Q    Does that appear to correspond with this document you

23  just told us about?

24  A    Yes, it does.

25  Q    I'd like to take you to -- those are the only two

GLORIA S. SMITH, OFFICIAL REPORTER

**427**

R. Lassiter - Direct

1    accounts that you have summarized for us with Catherina Voss

2    and Michael Draven; is that correct?

3    A    That's correct.

4    Q    I'd like to take you now to April 29, 2007, a series of

5    transactions that occurred on Ms. Voss's -- using her ATM

6    card.  Do you have Government Exhibit 31CC in front of you?

7    A    Yes.

8    Q    Okay.  If you can take a look at that, would you tell us

9    what this document is?

10    A    Okay.  It looks like it is a printout of a transaction

11    that was attempted through the ATM machine at the Oyster Point

12    branch.

13    Q    Okay.  And does it have a notation what happened with --

14    how did this get generated?

15    A    It looks like the ATM was accessed with an ATM card, and

16    it was a transaction, and they used the wrong PIN number, so

17    it wouldn't do anything.

18    Q    And it states at the top of the document -- is that how

19    you know whose name is on there, which account was trying to

20    be accessed?

21    A    That's correct.  The name and address and personal

22    information, correct.

23    Q    And this is Catherina Voss; is that correct?

24    A    That's correct.

25    Q    If you would go to Government Exhibit 31DD, tell us what

GLORIA S. SMITH, OFFICIAL REPORTER

**428**

R. Lassiter - Direct                                      459

1    this document means, please.

2    A    Okay.  On the same date, April 29, 2007, and it looks

3    like $60 was requested.  It shows net posted was zero, and the

4    net posted amount was zero.  So it looks like an attempt was

5    made to withdraw $60.  There was not enough funds in the

6    account, so no transaction took place.

7    Q    Up there closer to the top of the document, does that

8    stay T-R-A-N date?  Is that transaction date?

9    A    That's correct, and the time.

10   Q    And then it says time; is that correct?

11   A    That's correct.

12   Q    Do you know if the time on the machine is synced to the

13   time on the video camera?

14   A    It is usually very close.  It may be a minute, maybe two

15   minutes off.

16   Q    Let's go to Government Exhibit 31EE.  Tell us what this

17   document is, please.

18   A    It has got the personal information at the top for

19   Ms. Voss.  It is a transaction inquiry, so it looks like

20   someone tried to get an inquiry on the account, using that

21   particular number, using the --

22   Q    And the date and time is stated on there as such;

23   correct?

24   A    Yes, it is.  It is April 29 at 23:34.

25   Q    If you would go to Government Exhibit 31FF.

GLORIA S. SMITH, OFFICIAL REPORTER

R. Lassiter - Direct                              460

1    THE COURT:  That would be approximately 11:34 p.m.?

2    THE WITNESS:  Yes, that's correct.

3    BY MS. MCKEEL:

4    Q    Government Exhibit 31FF -- what does this transaction

5    inquiry show?

6    A    This is showing that three attempts were made on

7    Ms. Voss's account, transaction inquiries, the inquiry meaning

8    that they tried to get $60 out.  It is showing the transaction

9    numbers, and it shows 60, 40, and 20, out of the checking

10   account at the Oyster Point branch drive-through ATM.

11   Q    Now, the documents you just summarized -- there was no

12   money in Ms. Voss's checking account; is that correct?

13   A    That's correct.

14   Q    You have read 60, 40, 20, from the bottom; is that

15   correct?

16   A    Yes, that's correct.

17   Q    Does the time correspond when the person tried to get

18   that amount out with the document?

19   A    Yes, usually within a minute or two.

20   Q    Okay.  If you would go to 31GG, please.

21   A    Uh-huh.

22   Q    Tell us what this document is, please.

23   A    Again a transaction inquiry, it looks like at 23:41.

24   Let's see.  A transaction date, and that was on 4-29-07.  It

25   looks like it was an inquiry for $60.

GLORIA S. SMITH, OFFICIAL REPORTER

**430**

R. Lassiter - Direct                                    461

1    Q    Did the person get anything out?

2    A    No.

3    Q    Why?

4    A    There was no money available.

5    Q    And it says underneath it, A-U-T-H code denied,

6    insufficient funds?

7    A    Authorization code, so that would mean that a PIN number

8    is not correct.

9    Q    If you could, go to 31HH, please.

10   A    The same type of document, showing $40.  Insufficient

11   funds.  There is not enough money in the account to take the

12   $40, so it denies.

13   Q    And 31II, please take a look at that.

14   A    Same thing.  Twenty dollars was attempted, insufficient

15   funds.

16        THE COURT:  Which occurred first, the 60, the 40, or

17   the 20?

18        THE WITNESS:  The 60 was first.  Let me go back to

19   the time.  Looks like that was at 23:41 for the 60, 23:42 for

20   the 40, and 23:42 again for the 20.

21   BY MS. MCKEEL:

22   Q    All those were denied for insufficient funds; is that

23   correct?

24   A    That's correct.

25   Q    Was the person trying to get to the checking account on

GLORIA S. SMITH, OFFICIAL REPORTER

R. Lassiter - Direct                                    462

1   each of these occasions, or the savings account?

2   A     The checking account.  The S11 is the checking account.

3   Q     Would you please look at 31JJ.  Would you tell us what

4   this document is.

5   A     This is an account type showing the prime share account

6   showing a balance of $5, available zero, meaning that we keep

7   that $5 as a minimum balance.  The smart checking shows a zero

8   balance, and it shows that Ms. Voss is linked to a Michael

9   Draven's account, and his information is below.

10         THE COURT:  So, in other words, the linked account

11  had $7.45, so there was $2.45 available.

12         THE WITNESS:  That's correct.

13  BY MS. MCKEEL:

14  Q     And the last document, 31KK -- what is that?

15  A     This is a static detail on Mr. Draven's account, and it's

16  just basically showing his current information, showing his

17  name, address, his phone number, what branch the account was

18  opened at, that it was a good address, what is on the

19  signature card, just some internals, his date of birth, the

20  day he joined.  So it's just basically some detail.

21  Q     A summarization?

22  A     Correct.

23         MS. MCKEEL:  Your Honor, that's all the questions I

24  have for this witness.

25         THE COURT:  Mr. Clancy or Mr. Ellenson?

GLORIA S. SMITH, OFFICIAL REPORTER

**432**

R. Lassiter - Cross                                463

CROSS-EXAMINATION

BY MR. ELLENSON:

Q    I'm going to start with 31KK.

A    Yes.

Q    If you could -- if we can look at that part "PIN
altered," on the right-hand side?

A    Yes.

Q    All right.  What does that mean, PIN altered
8 December 2006?

A    I believe that corresponds with the day that Ms. Voss was
added to the account.

Q    All right.  I'm going to go back now to -- well, try
31DD.

A    Yes, sir.

Q    There is an address listed there, 11742 Jefferson Avenue,
Newport News?

A    Yes, sir.

Q    What is that an address to?

A    That's our Oyster Point branch on Jefferson Avenue.

Q    Okay.  Now, if we can look at 31H, if we could look at
the posting date of 12-18, that corresponds -- are you with
me?

A    Hold on.

Q    31H, and it says ATM withdrawal of 12-18?

A    Yes, sir.

GLORIA S. SMITH, OFFICIAL REPORTER

R. Lassiter - Cross                                464

1    Q     Okay.  And you see it says 11742 Jefferson Avenue; is

2    that correct?

3    A     Yes, sir.

4    Q     So that was an ATM withdrawal that was done at the Oyster

5    Point branch; is that correct?

6    A     Yes, sir.

7    Q     Are you aware of any pictures --

8            MR. ELLENSON:  If we could look at exhibits, either

9    29 and then 30, I'd like to show the witness those pictures.

10   BY MR. ELLENSON:

11   Q     Have you ever seen those?

12   A     Yes, just a minute ago.  That was the deposit that was

13   made.

14           MR. ELLENSON:  All right.  If the witness could be

15   shown all of the pictures of the 29 sequence, as well as the

16   30 sequence, please.

17   BY MR. ELLENSON:

18   Q     All right.  Now, if you could go back to 31H, do any of

19   those pictures reference the item on 12-18, the ATM withdrawal

20   on 31H?

21   A     It didn't appear that the date matched, no, sir.

22   Q     Okay.

23   A     Looked like they were April.

24   Q     31H -- what is 31H?

25   A     That's a statement.  That's a monthly statement.

R. Lassiter - Cross                              465

1   Q    Do you have -- in all these documents you have shown us,

2   do you have a corresponding statement from January forward for

3   this account?

4   A    Yes, sir, of Mr. Draven's account, yes.

5   Q    Okay.  What is that?

6   A    I have the one showing from January '1, '07, to March 31,

7   '07.

8   Q    What exhibit number is that?

9   A    That's 31I.

10  Q    All right.  And then you have one forward after that?

11  A    I do not, not in this package.

12  Q    Well, what did the grand jury subpoena tell you to bring?

13            THE COURT:  Wait.  This is the jury, not the grand

14  jury.

15  BY MR. ELLENSON:

16  Q    Did you not supply all the documents to the government in

17  response to their request to give them all the documents

18  relating to this, to Mr. Draven's account?

19  A    I supplied a lot of documents, yes.

20            THE COURT:  It is not in evidence.  Mr. Ellenson,

21  approach the bench, you and Ms. McKeel and Mr. Woodward or Mr.

22  Hudgins.

23            (The following discussion occurred at side bar out

24  of the hearing of the jury:)

25            THE COURT:  Now, Mr. Ellenson, listen to three

GLORIA S. SMITH, OFFICIAL REPORTER

**435**

1    things.

2              Number one, you are not going to imply that this

3    bank officer or the bank didn't comply with a subpoena,

4    because they did comply.  That is number one.

5              Number two, you ask about what is in evidence, and

6    if you want to offer something else into evidence, you are

7    free to do it.  You had better start following the rules.

8              MR. ELLENSON:  Okay.

9              (Proceedings resumed in open court as follows:)

10             (Mr. Ellenson conferred with Mr. Clancy.)

11   BY MR. ELLENSON:

12   Q    Would it be fair to say that there were more than two

13   transactions in total in Draven's account from October 2006

14   till the end of April 2007?

15   A    I think without those records, I don't know that I could

16   answer that.

17   Q    Based on the records in front of you?

18   A    In front of me?

19   Q    Yes, ma'am.

20   A    And the dates were?

21   Q    October of 2006 until April of 2007.

22             On 31H.  How many transactions are there?

23   A    31H would cover me from October 1 to the end of the year

24   of '06, and it looks like there was one deposit, there was one

25   balance inquiry, and then there was two transactions on the

R. Lassiter - Redirect                                       467

1   ATM, two withdrawals on the ATM, so a total of four

2   transactions, one deposit, two withdrawals, one balance

3   inquiry.

4   Q     Okay.  31AA?

5   A     No transactions, and that goes to the end of March '07.

6   Q     31AA?

7   A     Oh, I'm sorry.  31AA is the check for $116 that was

8   deposited, and that was deposited on April 4, 2007.

9   Q     And that was deposited into the same account that we have

10  seen in 31H; isn't that correct?

11  A     That is correct.

12  Q     And then 31DD?  Is that not another transaction that was

13  in that same account which we have referenced in 31H?

14  A     Yes.  That took place on April 26, '07.

15  Q     So would you not agree with me that based on the exhibits

16  that are in evidence now, that there were more than two

17  transactions in that account from October of 2006 through

18  April of 2007.

19  A     That is correct.

20              MR. ELLENSON:  I don't have anything else.

21              MR. WOODWARD:  We don't have any questions for this

22  witness, Your Honor.

23              MS. MCKEEL:  Just one, Judge.

24                     REDIRECT EXAMINATION

25  BY MS. MCKEEL:

GLORIA S. SMITH, OFFICIAL REPORTER

**437**

R. Lassiter - Redirect                              468

1    Q    Would you look back at 31DD, ma'am?

2    A    DD?

3    Q    31DD, yes, ma'am.

4    A    Yes, ma'am.  That was the transaction inquiry.

5    Q    On 4-29-07?

6    A    That's correct.

7    Q    Is that the one that Mr. Ellenson just referenced to you?

8    A    No, this was -- no, this is on another account.  This was

9    on her account, not Mr. Draven's.

10             MS. MCKEEL:  That's all I have, Judge.

11             THE COURT:  And this one was rejected because of an

12   invalid PIN.

13             THE WITNESS:  Yes.

14             THE COURT:  And the other two on that same date were

15   rejected because of insufficient funds?

16             THE WITNESS:  It was actually one for the PIN and

17   three for the insufficient funds.

18             THE COURT:  All right.

19             Anything else of Ms. Lassiter?

20             MS. MCKEEL:  No, ma'am.

21             THE COURT:  Then thank you, Ms. Lassiter.  You are

22   excused.

23             THE WITNESS:  You are welcome.

24             THE COURT:  Ladies and gentlemen of the jury, that

25   brings us to the end of our trial day, and I'm going to excuse

GLORIA S. SMITH, OFFICIAL REPORTER

469

1    you.  I'm going to tell you the same things that I will be

2    telling you every evening.  Put the case out of your mind for

3    the evening and enjoy your family and your friends.  Don't

4    discuss anything that has occurred with anyone else, and if

5    there are any media accounts, don't listen to them and don't

6    read them.

7              You are excused, and we will reconvene on this case

8    at ten a.m. tomorrow morning.  Have a great evening.

9              (The jury exited the courtroom.)

10             THE COURT:  Counsel, is there anything further for

11   the court to take up this evening?

12             Ms. McKeel?

13             MS. MCKEEL:  Nothing by the United States, Your

14   Honor.

15             MR. CLANCY:  No, ma'am.

16             MR. WOODWARD:  No, Your Honor.

17             THE COURT:  The court stands in recess until ten

18   a.m. tomorrow morning.

19             (Proceedings were concluded at 4:55 p.m.)

20

21

22

23

24

25

GLORIA S. SMITH, OFFICIAL REPORTER

**439**

692

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    Newport News Division

 4

 5

 6

 7   UNITED STATES OF AMERICA      )
                                   )        CRIMINAL ACTION
 8        v.                       )
                                   )        NO. 4:08cr16
 9   MICHAEL ANTHONY ERIC DRAVEN   )
                                   )
10        and                      )
                                   )
11   DAVID ANTHONY RUNYON,         )
                                   )
12        Defendants.              )

13

14

15                TRANSCRIPT OF PROCEEDINGS

16                    Norfolk, Virginia

17                     July 8, 2009

18                   SIXTH DAY OF TRIAL

19

20

21

22   Before:   THE HONORABLE REBECCA BEACH SMITH
               United States District Judge, and a Jury
23

24

25
```

693

1    Appearances:

2              LISA R. MCKEEL
               BRIAN J. SAMUELS
3              Assistant United States Attorneys
                    Counsel for the United States
4
               TIMOTHY G. CLANCY
5              JAMES S. ELLENSON

6                   Counsel for Michael Anthony Eric Draven

7              STEPHEN A. HUDGINS
               LAWRENCE H. WOODWARD, JR.
8                   Counsel for David Anthony Runyon

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**441**

* * *

N. King - Direct                                    731

1   subject to recall.

2              THE WITNESS:  Thank you.

3              THE COURT:  Your next witness?

4              MS. MCKEEL:  Nicole King.

5              THE COURT:  Ms. King, would you please come forward

6   and be sworn.

7              (Ms. King was sworn.)

8              NICOLE KING, DIRECT EXAMINATION on behalf of the

9   government, as follows:

10                       DIRECT EXAMINATION

11  BY MS. MCKEEL:

12  Q    Would you tell us your name, please, ma'am, and spell it

13  for our court reporter.

14  A    Nicole King.  N-I-C-O-L-E K-I-N-G.

15  Q    Ms. King, are you employed?

16  A    Yes, I am.

17  Q    Where are you employed?

18  A    Check Into Cash in Winchester.

19  Q    Where is that located?

20  A    Virginia.

21  Q    I'm sorry?

22  A    It's in Winchester, Virginia.

23  Q    How old are you, Ms. King?

24  A    I'm 22.

25  Q    Do you know someone named Michael Draven?

GLORIA S. SMITH, OFFICIAL REPORTER

**442**

N. King - Direct                                    732

```
 1    A    Yes, I do.

 2    Q    Do see him in the courtroom today?

 3    A    Yes, I do.

 4    Q    Would you please point him out for us?

 5    A    He's sitting at that table.

 6         MS. MCKEEL:  Your Honor, if you will allow the

 7    record to reflect she identified the defendant.

 8         THE COURT:  Which one in on that table?  Count from

 9    Ms. McKeel's side.  Which individual in?

10         THE WITNESS:  He is right over there.

11         THE COURT:  All right.  Well, the first individual

12    is a man in a gray suit, and then there is another individual

13    and another individual, and another individual, another

14    individual, and another individual.

15         In that line of six individuals, which one is he?

16         THE WITNESS:  He is the third one in.

17         THE COURT:  All right.

18         MS. MCKEEL:  Thank you, Judge.

19    BY MS. MCKEEL:

20    Q    How did you meet him?

21    A    Through my ex-boyfriend, Randy Fitchett.

22    Q    You said your ex-boyfriend, Randy Fitchett.  Can you tell

23    us when you dated Randy Fitchett?

24    A    I started dating Randy Fitchett when I was in high

25    school, my senior year of high school, so it was like '04,
```

GLORIA S. SMITH, OFFICIAL REPORTER

**443**

1   '05.

2   Q    2004?

3   A    Uh-huh.

4   Q    And is the relationship ended now?

5   A    Yes.  It ended in June 2007.

6   Q    Before your relationship ended in June of 2007, did you

7   travel to Newport News, Virginia, with Randy Fitchett?

8   A    Yes, I did.

9   Q    Was that approximately in January of 2007?

10  A    Yes, it was.

11  Q    And why did you all come down -- excuse me.  Where did

12  you live at the time?

13  A    At the time I lived with my dad in Strasburg, Virginia.

14  Q    Strasburg?

15  A    Uh-huh.

16  Q    Could you spell that for our court reporter?

17  A    S T A R -- wait.  I haven't lived there in like two

18  years.  I can't remember how to spell it.  S-T-R-A-S-P-U-R-G.

19  Q    In relation to where we are in Virginia, where is

20  Strasburg?

21  A    It's about five, ten minutes away from where I live now

22  with my mom in Stephens City.

23  Q    Near Winchester?

24  A    Yes.

25  Q    So the northern, western part of the state?

GLORIA S. SMITH, OFFICIAL REPORTER

**444**

N. King - Direct                              734

1    A    Yes.

2    Q    And from that area, how long does it take you to get down

3    here to Tidewater, Virginia?

4    A    Approximately three and a half to four hours.

5    Q    And when you traveled down here from that area, the

6    Winchester area, in January of 2007, why did you all come?

7    A    Just to visit his family.

8    Q    Randy Fitchett's family?

9    A    Yes.

10   Q    Who was Randy Fitchett's family?

11   A    Juanita Harper.  His stepdad's name is Richard.  And then

12   there was Michael.

13   Q    Michael Draven?

14   A    Yes.

15            THE COURT:  Who is Juanita Harper?

16            THE WITNESS:  Randy Fitchett's biological mother.

17            THE COURT:  So Juanita Harper is Mr. Fitchett's

18   biological mother.

19            THE WITNESS:  Uh-huh.

20            THE COURT:  And who else did you say?

21            THE WITNESS:  His stepdad, Richard.  I'm not sure of

22   the last name.

23            THE COURT:  So his stepfather Richard.  Was he

24   married to the biological mother?

25            THE WITNESS:  I'm pretty sure, yes.

GLORIA S. SMITH, OFFICIAL REPORTER

**445**

N. King - Direct                                     735

1              THE COURT:  Or they were together.

2              THE WITNESS:  Yeah, they lived together.

3              THE COURT:  So stepfather Richard.  And then Mr.

4    Draven.

5              THE WITNESS:  Mr. Draven, yes.

6              THE COURT:  What relationship was he, to your

7    knowledge, to Mr. Fitchett?

8              THE WITNESS:  Brother -- his real brother.

9    BY MS. MCKEEL:

10   Q    Was Randy Fitchett adopted?

11   A    Yes, he is.

12   Q    Do you know when Randy Fitchett and Michael Draven became

13   reacquainted?

14   A    It was right before Randy graduated from high school in

15   2006.

16   Q    So you and Randy traveled down here in January 2007 for a

17   family visit.

18   A    Yes.

19   Q    Did you see Michael Draven during that visit?

20   A    Yes, I did.

21   Q    Who did you see Michael Draven with?

22   A    Cat.

23   Q    Who is Cat?

24   A    His girlfriend -- it was his girlfriend.

25   Q    Do you recall where you stayed, where you and Randy

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct                                                    736

```
 1    stayed in January of 2007?

 2    A    We stayed at his parents' house.

 3    Q    And how long did you all stay?

 4    A    Just for the weekend.

 5    Q    Had you ever, before that weekend, been down to

 6    Tidewater, Virginia?

 7    A    Not that I can remember, unless I was down here a long

 8    time ago with my family.  But I don't remember ever being down

 9    here.

10    Q    Did you all know how to get down here from Winchester?

11    A    No.

12    Q    As a result of you all not knowing how to get down here,

13    did you ask Michael Draven to do something for you all?

14    A    He came up to Toms Brook.  He met us as a gas station in

15    Toms Brook, and we followed them down.

16    Q    Who is "them"?

17            THE COURT:  In Williamsburg?

18            THE WITNESS:  Toms Brook.

19            THE COURT:  Toms Brook.  Is that a place?

20            THE WITNESS:  Yeah.  It's -- it's about maybe a half

21    an hour away from Winchester.

22            THE COURT:  All right.  So Mr. Draven came to Toms

23    Brook, a place, to meet you to show you the way here?

24            THE WITNESS:  Yeah, because I wasn't sure how to get

25    here, and neither was Randy.
```

GLORIA S. SMITH, OFFICIAL REPORTER

**447**

N. King - Direct

1          THE COURT:  All right.  Go ahead.

2     BY MS. MCKEEL:

3     Q     So who did Mr. Draven show up with at Toms Brook?

4     A     Cat was riding with him.

5     Q     Then you traveled down to Newport News; is that correct?

6     A     Yes.

7     Q     And were you in separate vehicles?

8     A     Yes, we were.

9     Q     But when you got to Toms Brook, was that the first time

10    you had met Michael Draven and Cat Voss?

11    A     It was the first time I met Cat.  The first time I met

12    Michael was when he came up for Randy's graduation from high

13    school.

14    Q     In 2006, June 2006?

15    A     Yes.

16    Q     So this would have been the second time you saw him?

17    A     Yes.

18    Q     Now, when you met at Toms Brook with Michael Draven and

19    Cat Voss, did you get out and talk for a while?

20    A     Not that --

21          MR. CLANCY:  Your Honor, I'm going to object to

22    leading questions at this point.  We are now getting to the

23    point where they meet each other.  All the other questions

24    were prefatory leading up to it, but at this point these are

25    leading.

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct                                738

1      THE COURT:  I think it is okay to ask if they talked

2  for a while.  Then you can say, if they did, what is the

3  substance.  Just don't tell her what the substance is in your

4  question.

5      MS. MCKEEL:  Yes, ma'am.

6  BY MS. MCKEEL:

7  Q    Did you all talk for a while?

8  A    Not that I can remember, but we did stop at a restaurant

9  on the way back -- or on the way down here.

10 Q    Where did you all stop?

11 A    I can't remember the place.  I can't remember the name of

12 it.  It was -- it's just like a small little restaurant.  It

13 is on Route 11.  That's about all I can remember of that.

14 Q    When you stopped at the restaurant, did you all get out

15 and eat together at the restaurant?

16 A    Yeah, we sat at a table and ate.

17 Q    What did you all talk about?

18 A    We just really got acquainted with Cat and Michael, and

19 that was -- it wasn't really an in-depth conversation, so --

20 because we were trying to get down here faster, so --

21 Q    And when you finally arrived, where did you stay?

22 A    We stayed at his parents' house.

23 Q    Do you recall where that was?

24 A    On Circle Drive?

25 Q    And is that -- what type of home is it?

GLORIA S. SMITH, OFFICIAL REPORTER

**449**

N. King - Direct                                    739

1   A    It's a trailer.

2   Q    Now, during -- do you recall what date that was?  Was

3   that a Saturday or a Friday, or what day?

4   A    I'm pretty sure it was a Friday that we came down.  We

5   normally came down on the weekend, so --

6   Q    Did you stay until Sunday then, and return?

7   A    Yes.

8   Q    Now, during this weekend, did you all -- and when I say

9   "you all," I mean Michael Draven, Cat Voss, and Randy

10  Fitchett -- during that weekend did Michael Draven and Cat

11  Voss discuss getting married?

12  A    When we were at the restaurant before we got down here, I

13  think I recall asking him if they were married or whatever,

14  and they said something about they made a promise to each

15  other under the stars.  And she was wearing a ring, so --

16  Q    Now, during this trip -- after you go from the restaurant

17  with that conversation, during this trip, did you eventually

18  learn anything about Cat Voss being married?

19  A    Yes.  I'm pretty sure that's when we found out that she

20  was married.

21  Q    Did you know her husband's name?

22  A    I didn't at the time, no.  I did know that she had two

23  kids.

24          THE COURT:  So you learned she was married, and not

25  to Mr. Draven?

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct

740

1    THE WITNESS:  Right.

2    THE COURT:  Okay.

3    BY MS. MCKEEL:

4    Q    Now, during that trip, did the defendant, Michael Draven,

5    say anything about Cory Voss?

6    A    No.

7    Q    Did there come a time when you took another trip down

8    here in approximately April of 2007?

9    MR. CLANCY:  Judge, I would object.  That would

10   suggest the time she came down here.  That is my leading

11   objection.

12   THE COURT:  Overruled.  Go ahead.

13   BY MS. MCKEEL:

14   Q    Did you come down to Newport News again in approximately

15   April of 2007?

16   A    Yes.

17   Q    Do you recall that trip?

18   A    Yes.

19   Q    And who did you come down to Newport News with?

20   A    I came down with Randy Fitchett.

21   Q    And where did you go?

22   A    We came down to visit his family, so we were going to

23   stay the night, I think -- we were going to stay the weekend

24   at Cat's house, but Cory was home from -- I did know that he

25   was in the Navy, but Cory was home, so she had us stay at

1   Randy's parents' house.

2   Q    And did you stay there for the weekend?

3   A    Not the whole entire weekend.  We stayed for one night,

4   Friday night, and then Saturday night we got a hotel.

5   Q    And who got you that hotel?

6   A    Michael.

7   Q    And do you recall what that hotel was?

8   A    It is called the La Quinta.

9   Q    Do you recall where that was?

10  A    Off of Mercury Drive.

11  Q    Now, during that stay, did you all -- when I say "you

12  all," I mean Michael Draven, Cat Voss, and Randy Fitchett --

13  discuss Cory Voss?

14  A    There was one time that we were at the -- at his parents'

15  house, in the trailer.  I heard Michael say something about an

16  octopus ring.

17          THE COURT:  A what?

18          THE WITNESS:  An octopus ring, like he was going to

19  buy it.  Supposedly it releases toxins into your blood slowly.

20          THE COURT:  An octopus ring?

21          THE WITNESS:  Yeah.

22          THE COURT:  And you heard him discuss an octopus

23  ring in what context?

24          THE WITNESS:  He said he was going to buy it for Cat

25  to give to Cory.

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct                                742

1   BY MS. MCKEEL:

2   Q    Do you recall when you stayed -- what weekend it was that

3   you stayed, in April?

4   A    I can't recall the exact date.  I think it was -- it was

5   right -- I know it was before -- before Cory's death.

6   Q    Did you understand at that time what an octopus ring was?

7   Was there discussion about it?

8   A    There was, but, I mean, I just kind of shrugged it off.

9   I have never heard of that before, so -- I just left the room

10  after that.

11  Q    Did you feel uncomfortable?

12  A    Yes.

13  Q    Was Cat Voss present during that conversation?

14  A    No, she wasn't.  She wasn't feeling good that weekend.  I

15  don't think we saw her that much that weekend.

16          THE COURT:  So who was present during the

17  conversation?  Cat Voss wasn't.  It was you, and you said

18  Randy Fitchett?

19          THE WITNESS:  And Michael.

20          THE COURT:  And you left the room then?

21          THE WITNESS:  Yeah, after the discussion, I left the

22  room.

23  BY MS. MCKEEL:

24  Q    Did you recall Michael Draven ever having any

25  conversation other than the octopus ring about Cory?

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct

743

1    A    After that, no.

2    Q    Do you recall testifying at the federal grand jury on

3    December 11, 2007?

4    A    Yes, I do.

5    Q    Do you recall testifying about this event?

6    A    Yes, I do.

7    Q    I'd like to go over to recollect your -- excuse me -- to

8    refresh your recollection.  Question:  Did you during that

9    trip have conversations with Michael about Cory?  Answer:

10   Yeah.  Michael -- he was talking.  And now, I don't know if I

11   could take it seriously, but he made me really uncomfortable.

12   He talked about killing Cory.

13            Do you recall that?

14   A    Yes.

15   Q    Tell us about that.

16   A    That was with the octopus ring.

17   Q    That was the same conversation?

18   A    That's the same -- yeah, that's the same conversation.

19   There was never any other conversation after that.

20   Q    Now, that weekend in April, did you see Cat Voss?

21   A    Yes.

22   Q    Where did you see her?

23   A    We went to lunch.  I'm pretty sure it was Sunday

24   afternoon when we were going to go back home.  We went to

25   lunch.

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct                                744

1   Q    Who is "we"?

2   A    Michael, Cat, I, and Randy.

3   Q    Do you recall what you all discussed during that lunch

4   with Cat Voss present?

5   A    I can't recall that part.  I do know that we traveled

6   down to Waterside in Norfolk, and we had a conversation out on

7   the -- one of the back balconies.

8           THE COURT:  When you say "we traveled," who is "we"?

9           THE WITNESS:  Cat, Michael, and Randy and I.

10          THE COURT:  So the four of you?

11          THE WITNESS:  Yes.

12          THE COURT:  Were you in the same vehicle?

13          THE WITNESS:  Yes.  At that point, yes.

14  BY MS. MCKEEL:

15  Q    What did you learn during that conversation?  What was

16  talked about?

17  A    They had said something about going to the Bahamas or

18  St. Grand Lucia or St. Lucia -- I can't remember the names of

19  the islands that there are -- and not getting officially

20  married, but having a ceremony on the beach.

21  Q    During this conversation did Cat Voss ever mention

22  anything about a divorce?

23  A    Yes.

24          MR. CLANCY:  Your Honor, I object.  That's leading.

25          THE COURT:  Overruled.  Go ahead.

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct                                           745

1   BY MS. MCKEEL:

2   Q    What did she say?

3   A    She just told me that Cory had cheated on her quite a few

4   times since he was in the Navy, and just that she just -- I

5   assumed that they were already separated, so -- and then she

6   just told me that they were going to get a divorce.

7   Q    Did she say they were separated -- Cat Voss -- or did you

8   make an assumption?

9   A    I made an assumption.

10  Q    At any time before Cory's death did you ever talk to

11  Michael Draven about killing Cory?

12  A    Just that part before.

13       THE COURT:  When you say that part before, you are

14  referring back to the octopus ring?

15       THE WITNESS:  Yes.

16  BY MS. MCKEEL:

17  Q    When Cat Voss and Michael Draven were together, can you

18  describe how they acted together?

19  A    Do you mean before, or after?

20  Q    Before the murder.

21  A    They were holding hands -- I mean, they were -- it seemed

22  like they were in a relationship.

23  Q    At any time in your trips or any phone calls you may have

24  had with Michael Draven, did Michael Draven say anything about

25  getting married to Cat Voss?

GLORIA S. SMITH, OFFICIAL REPORTER

**456**

1    A    Yes.

2    Q    What did he say?

3    A    He just said he wanted to marry her and wanted to have

4    kids with her.

5    Q    Did they ever talk about Cat getting pregnant?

6    A    Yes.

7    Q    What did they say?

8    A    I had been told that she had gotten pregnant with twins

9    and had a miscarriage.

10   Q    Who told you that?

11   A    It was -- I was told on the phone.  I think it was before

12   the trip down there.  I was told on the phone from Michael.

13           THE COURT:  Which trip, the first one or the second

14   one?

15           THE WITNESS:  April.  The April trip.

16   BY MS. MCKEEL:

17   Q    Do you recall from your January trip to your April trip

18   in 2007 any other phone conversations you had with Michael

19   Draven regarding Cory Voss or Cat Voss?

20   A    Not that I can recall, no.

21   Q    When you mentioned the phone call about the pregnancy

22   from Michael, who was supposed to be the father of those

23   children she apparently miscarried?

24   A    Michael.

25   Q    Now, after you and Randy Fitchett returned from your

1  April trip, did you learn that Cory Voss was murdered?

2  A    Yes.

3  Q    How did you learn that?

4  A    A next message.

5  Q    From whom?

6  A    Michael Draven.

7  Q    Do you recall what date that may have been?

8  A    I'm not exactly sure.  The 29th, the 30th, or the 31st.

9  I cannot remember.

10 Q    Of what month?

11 A    Of April.

12 Q    Now, where were you the night of April 29, 2009, and the

13 early morning hours of April 30?

14 A    I was at home.

15 Q    Home in Strasburg?

16 A    In Strasburg, yes.

17 Q    Do you know where Randy Fitchett was?

18 A    He was with me.

19 Q    Did he live with you at that time, or live separately?

20 A    No, he lived with me.

21         THE COURT:  And you were with your father?

22         THE WITNESS:  Yes.  My dad had had him move in when

23 he graduated from school.

24 BY MS. MCKEEL:

25 Q    After Cory's murder did you and Randy Fitchett come down

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct                                    748

```
 1   to Tidewater, Virginia, again?

 2   A    Yes.

 3   Q    Do you recall when that was?

 4   A    It was roughly around Mother's Day in May of '07.

 5   Q    And why did you all travel down here again?

 6   A    I was called on the phone by Michael, and he had

 7   explained that Cat was freaking out.  She was just falling

 8   apart, and she was getting upset with Michael, and stuff like

 9   that, and he asked me to come down and just help her around

10   the house.

11   Q    Did you agree to do that?

12   A    I was a little leery.  I had -- I really needed to work.

13   I didn't want to, and I told him no, but he told me that if I

14   didn't, he would come up here and drag me down.

15   Q    Who told you that?

16   A    Michael.

17   Q    At this time was Randy Fitchett still living with you?

18   A    Yes.

19   Q    Did you all make a decision to come down here and stay

20   for a while?

21   A    Yeah.  We stayed for three weeks.  During that time

22   frame, we were talking about moving down here.  And then when

23   I had left after the three weeks, I had changed my mind.

24        THE COURT:  You say, Ms. King, you came down for

25   three weeks.  Are you now at the Mother's Day point, around
```

GLORIA S. SMITH, OFFICIAL REPORTER

**459**

1   May?  Is this where you are?

2              THE WITNESS:  Yeah.  We came down in May.

3              THE COURT:  And that's the three-week period.  It

4   was a consecutive three-week period after that?

5              THE WITNESS:  In May, yes.

6              THE COURT:  All right.

7   BY MS. MCKEEL:

8   Q    Were you -- having a conversation with whom about moving

9   down here?

10  A    Randy and I had a conversation with Michael that we were

11  going to move down here.

12  Q    Now, did you in fact come down here for three weeks?

13  A    Yes, we did.

14  Q    And where did you stay?

15  A    I stayed with Cat.

16  Q    And do you recall where that was?

17  A    I can't remember the name of -- or her address of her

18  house.

19             THE COURT:  What city?

20             THE WITNESS:  In Newport News.

21  BY MS. MCKEEL:

22  Q    Do you recall the house that she was in?  Was it a

23  one-story, two-story?  Can you describe anything like that?

24  A    It's a two-story house, and it has a garage, and it had a

25  pool in the backyard.

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct

1    Q    And who else was living at that -- in May of 2007 at the

2    house with Cat Voss?

3    A    Her two kids.

4    Q    Now, what were you supposed to be doing, according to

5    Michael?  What did he want you to do?

6    A    Basically be a live-in maid.  Just help her around the

7    house, do her laundry and wash the dishes and stuff like that.

8            THE COURT:  Was Mr. Fitchett with you?

9            THE WITNESS:  No, he was not.

10           THE COURT:  Where was he?

11           THE WITNESS:  He was saying with Michael at his

12   parents' house.

13           THE COURT:  Were you being paid?

14           THE WITNESS:  Yes.

15   BY MS. MCKEEL:

16   Q    Did you get paid?

17   A    Yes.

18   Q    How much money did you get paid?

19   A    She gave me $700 at the end of the trip.  She also bought

20   me clothes, and she bought jewelry.

21   Q    Okay.  We will get to that in just a moment.

22           Let's go back when you first came down here.  You

23   stayed just three weeks, ma'am?

24   A    Yes.

25   Q    During that time period, did Mr. Fitchett and Mr. Draven

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct                                            751

1    stay at the trailer with their parents?

2    A    Yeah.  They stayed at the trailer most of the time.

3    Q    Was there ever an apartment that you knew about?

4    A    Towards the end, the last week that I was there, Michael

5    and Randy had got an apartment.  Cat had loaned them $6,000

6    for the apartment.

7    Q    Did you ever go to that apartment?

8    A    Yes, I did.

9    Q    And from what you saw in that apartment, were Randy

10   Fitchett and Michael Draven living at that apartment?

11   A    Yes, they moved into that apartment.

12   Q    Now, at this point in May of 2007, what does the

13   relationship with Cat Voss and Michael Draven appear to you to

14   be?

15   A    Sometimes it's very tense and stressed, and then there

16   were times that it was -- she was happy, she was fine, she

17   wanted him around.

18   Q    Did you all -- when I say "you all," Michael Draven, Cat

19   Voss, and Randy Fitchett, take a trip?

20   A    Did we take a trip?  Yes, we did.

21   Q    Where did you all go?

22   A    Nags Head, North Carolina.

23   Q    And who else went?

24   A    It was Cat, I, and her two kids, Cory and Casey, and it

25   was Michael and Randy.

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct                    752

1   Q    Did you all travel together down there, or in separate

2   cars?

3   A    No, the kids and Cat and I were in one vehicle, and

4   Michael Draven and Randy were in another.

5   Q    When you got down, do you recall where you stayed at Nags

6   Head?

7   A    Originally it was supposed to be the kids, Cat, and I

8   were going to stay in a Hilton, and the guys were going to

9   stay in another hotel.  But that changed in the evening that

10  day.  Michael --

11  Q    The first day, or what day?

12  A    Yeah.  The first day that we were down there, Michael had

13  stayed with Cat and the kids, and Randy and I had been in the

14  other hotel.

15  Q    What happened?

16  A    What happened?

17  Q    What happened to change it?  Do you recall?

18  A    Michael wanted to be with her, so -- I mean, the Hilton

19  was a one-bed thing, so I felt more comfortable staying in the

20  other hotel anyway.

21  Q    So at the end, what were the sleeping arrangements?

22  A    It was Randy and I -- we were further down the beach in

23  another hotel, and I can't remember the name.  And then

24  Michael, Cat, and the two kids were in the Hilton.

25  Q    Did you and Randy visit Michael and Cat and the children

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct                              753

1   in their hotel?

2   A    Yes.

3   Q    Did you go out to eat and do things together in Nags

4   Head, or separately?

5   A    Yeah, we went out to eat.  We went to a restaurant called

6   Port O'Call.

7   Q    Do you recall eating at that restaurant, the Port O'Call?

8   A    Yes, I do.

9   Q    Is that a restaurant?  Does it have anything else

10  attached to it?

11  A    It has antique stuff in it.  It also has jewelry.

12  Q    You ate dinner there, is that what you said, one night?

13  A    Yeah.  It's also a dance club type thing, after they stop

14  serving food.

15  Q    During that time period that you were at the Port O'Call,

16  did anybody go and buy jewelry?

17  A    Not when I was there, no.

18  Q    Did you later learn or see evidence that jewelry had been

19  purchased?

20  A    Yes.

21  Q    Tell us about that.

22  A    Cat had gone out with her friend Kelly, and they had gone

23  there.

24          THE COURT:  Now, who is Kelly?

25          THE WITNESS:  Kelly is her friend.  I don't know her

GLORIA S. SMITH, OFFICIAL REPORTER

**464**

N. King - Direct                                    754

1   last name.  I only met her a few times.

2          THE COURT:  So Kelly was down there?

3          THE WITNESS:  Yes.  But she did not ride with us.

4   She was already down there when we got there.

5          THE COURT:  So Kelly, the friend, was already down

6   there when you got there.

7          THE WITNESS:  Yes.

8          THE COURT:  Go ahead.

9          THE WITNESS:  She went out to Port O'Call with her

10  friend Kelly, and they were partying.  From what I can

11  remember, I know exactly that she bought one ring, but I'm

12  pretty sure she bought two, and she also bought her friend

13  Kelly a diamond ring.

14  BY MS. MCKEEL:

15  Q    Did you get a ring from that weekend?

16  A    Yes, I did.

17  Q    How was that?

18  A    Cat had given -- had bought an engagement ring for my

19  ex-boyfriend, Randy, and he had given it to me.

20         THE COURT:  So you got a ring, Kelly got a ring, and

21  Cat got a ring.

22         THE WITNESS:  Yeah, and Michael also got a ring, and

23  so did Randy.

24  BY MS. MCKEEL:

25  Q    Do you know how Randy Fitchett paid for that ring?

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Direct

1  A      For my engagement ring?

2  Q      Yes.

3  A      He was -- I guess it was a loan.  He was supposed to pay

4  it back.

5  Q      From whom?

6  A      It was a loan from Cat.  He was supposed to pay her back.

7  Q      Did you pay for your dinner, or did someone else?

8  A      We didn't have money, so Cat paid mainly.

9  Q      At the time, the three weeks that you stayed with Cat

10  Voss, did she have a job?

11  A      No.

12         THE COURT:  Did you ever inquire about where the

13  money was coming from?

14         THE WITNESS:  I did not.

15  BY MS. MCKEEL:

16  Q      After the trip to Nags Head, did you come back and stay

17  in Newport News?

18  A      Yes.

19  Q      You stated that you left shortly -- during this

20  three-week span.  Did Randy Fitchett accompany you back to

21  Winchester, Virginia, area?

22  A      Yes.  I didn't want to drive home alone.  It was late at

23  night when I was back on the road.  So I had him come with me.

24  And his car was already -- it was at my dad's house.  We just

25  took mine down.  And so he came back with me and picked up his

GLORIA S. SMITH, OFFICIAL REPORTER

1  car and picked up his things, and then he left.

2  Q    Do you know where he went?

3  A    He went back to his and Michael's apartment.

4          THE COURT:  Did you all break up, or --

5          THE WITNESS:  At that time, no.

6          THE COURT:  All right.  But he left you at your

7  father's.

8          THE WITNESS:  Yes.

9          THE COURT:  And then took his vehicle and came back

10  here.

11          THE WITNESS:  Yes.

12  BY MS. MCKEEL:

13  Q    Why did you leave?

14  A    Why did I leave here?

15  Q    Yes, ma'am.

16  A    I had to get back to work.

17          THE COURT:  Where did you work?

18          THE WITNESS:  At that time I was working at

19  St. Paul's Lutheran Day Care in Strasburg.

20  BY MS. MCKEEL:

21  Q    After you went back home, did you speak to Michael

22  Draven?

23  A    Not that I can recall.  I spoke a lot more with Cat.  I

24  was closer with Cat than I was with Michael.  I did add him on

25  MySpace eventually.

GLORIA S. SMITH, OFFICIAL REPORTER

**467**

N. King - Direct                                                 757

1   Q      And did there come a time period where you and he texted?

2   A      Yeah, that was -- that was when the -- it was in November

3   of '07.  It was when the detectives came to my house to talk

4   to me.

5           THE COURT:  Is this a good time for a break?

6           MS. MCKEEL:  I don't have a whole lot more, Judge.

7           THE COURT:  Then go ahead.

8           MS. MCKEEL:  Thank you.

9   BY MS. MCKEEL:

10  Q      Let's go to that time period, then, with the text

11  messaging.  You said the police came to see you?

12  A      Yes.

13  Q      Then what happened with the text messaging?

14  A      Before the detectives left my house, they had asked me to

15  text Michael and ask why the hell were the Newport News police

16  at my mom's house.

17  Q      Did you do that?

18  A      Yes, I did.

19  Q      What happened?

20  A      I waited for five minutes.  I didn't get a response, so

21  the detectives left, and after they left, I got a response.

22  And he said, just tell them that we -- that Cat and I are

23  friends, that she loves Cory very much and would not hurt him.

24  Q      At that particular time do you know whether or not

25  Michael Draven knew of the federal grand jury investigation?

GLORIA S. SMITH, OFFICIAL REPORTER

**468**

N. King - Cross                                              758

1   A    He asked me in a text message when I was on my way down

2   to the testimony, the grand jury testimony -- when I was on

3   the way down, he texted me and asked me if I had been

4   summonsed, and I did not respond.

5   Q    You did not?

6   A    No.

7   Q    Did you ever respond back to him?

8   A    No.

9          MS. MCKEEL:  That's all the questions I have.

10         THE COURT:  Mr. Clancy?

11                     CROSS-EXAMINATION

12  BY MR. CLANCY:

13  Q    So you got to know Michael Draven when he came up to

14  visit his natural brother in June of '06?

15  A    Yes.

16  Q    And that would have been when your -- I guess your

17  fiance, or the two of you all were together, and he was about

18  to graduate from high school?

19  A    Yes, and at that time he was still my boyfriend.

20  Q    Okay.  And then sometime after that, you all decided, in

21  January of '07, to come down to Virginia to meet Michael?

22  A    Yes, to visit with his family.

23  Q    And his family would be defined as Michael Draven,

24  Juanita Harper, which is the mother of both your boyfriend and

25  Michael Draven, and Richard, who is the stepfather?

N. King - Cross

```
 1    A    Yes.
 2    Q    And you all came down here and stayed at Juanita and
 3    Richard's trailer?
 4    A    Yes.
 5    Q    And that's where Michael Draven was living?
 6    A    Yes.
 7    Q    And you saw evidence of that?
 8    A    Yes, I did.
 9    Q    And you were asked by the government in January of '07
10    were there any discussions about Cory, and your response was
11    no?
12    A    No, not at that time.
13    Q    And that would have been true in this restaurant that you
14    all ate at as you all had gone up to -- they had gone up to
15    pick you up?
16    A    Right.
17    Q    And then of course the weekend that you spent down here
18    at the trailer, at Juanita and Richard's trailer.
19    A    Right.
20    Q    The next trip you came down was in April of '07?
21    A    Yes.
22    Q    In April of '07 you said there was one time you heard
23    Michael talk about Cory?
24    A    Yes.
25    Q    And that was a situation where he said something about an
```

1  octopus ring?

2  A    Yes.

3  Q    Okay.  And Cat Voss wasn't there?

4  A    No.

5  Q    And there was a discussion about -- Michael had made a

6  discussion about an octopus ring, and you didn't even know

7  what that was?

8  A    No, I had never heard of it.

9  Q    Well, then, was he talking to you?

10 A    I think he was talking to Randy.  I was in the doorway.

11 Q    All right.  So you really weren't even part of the

12 conversation.

13 A    No.

14 Q    So you heard or observed Michael Draven and his brother,

15 Randy, talking about an octopus ring.

16 A    Yes.

17 Q    And the entire length of the conversation -- tell the

18 ladies and gentlemen of the jury, how long was it?

19 A    Just a few minutes.

20 Q    It was a very short conversation, wasn't it?

21 A    Yes.

22 Q    And how would you describe Michael Draven's demeanor?

23 A    When he was discussing the ring?

24 Q    Yes, ma'am.

25 A    I don't know.  Relaxed.  He had a smile on his face.

1   Q    In fact, as best you can remember, he was laughing during

2   the conversation?

3   A    If I can remember, yes.

4   Q    Laughing as he is talking about an octopus ring?

5   A    Right.

6   Q    Something you don't even know what that is?

7   A    Right.

8   Q    All right.  And after this brief conversation, you heard

9   no more discussions about Cory?

10  A    No.

11  Q    The next time you come down, Michael is begging you to

12  come down to help his friend Cat Voss?

13  A    Yes.

14  Q    You knew why, didn't you?

15  A    Yeah.

16  Q    Her husband had been murdered?

17  A    Yes.

18  Q    And she needed help coping with the children and with

19  everything that was going on.

20  A    Yes.

21  Q    Now, you did indicate that when you came back down and

22  stayed, the relationship appeared to change between Michael

23  Draven and Cat Voss; is that right?

24  A    At times it became strained.

25  Q    All right.  Would it be fair to say that she got very

GLORIA S. SMITH, OFFICIAL REPORTER

N. King - Cross                                    762

1   angry with him if he didn't do what she wanted him to do?

2   A    Yes.

3   Q    Excuse me?

4   A    Yes.

5   Q    During this -- you lived with Cat Voss, then, for three

6   weeks?

7   A    Yes, I did.

8   Q    Shortly after Mother's Day of '07?

9   A    Yes.

10  Q    Was Cat Voss going out?

11  A    Yeah.

12  Q    Not with Michael?

13  A    Sometimes -- actually no.  Michael stayed behind and

14  watched the kids for her.

15          THE COURT:  What did you do?

16          THE WITNESS:  I watched the kids sometimes, too,

17  because I wasn't 21, so I couldn't go with her anyway.

18  BY MR. CLANCY:

19  Q    I guess that means you weren't invited to go out drinking

20  and barhopping with Cat Voss.

21  A    I couldn't.

22  Q    Because you weren't 21.

23  A    Right.

24  Q    And Michael wasn't invited because he had to watch the

25  kids.

1    A    She asked him to watch the kids, yes.

2    Q    Do you know who she was going out with?

3    A    Sometimes she went out -- most of the time she went out

4    with Kelly.

5    Q    How long would she be out?

6    A    I'd be in bed by the time she got home.

7    Q    You have no idea if she even came home that night?

8    A    I know, because I got up early in the mornings.

9    Q    So she would be home by the time you got up?

10   A    Yeah.

11   Q    That's all you can tell us?

12   A    That's all.

13            THE COURT:  Pardon?

14            THE WITNESS:  That's all I could tell.

15   BY MR. CLANCY:

16   Q    Was Randy 21 at the time?

17   A    No.

18   Q    Did Cat ever go out with him?

19   A    No.

20   Q    So she would go out with her friends, you just don't know

21   who all they are.  Kelly is the only one you can remember?

22   A    Kelly is the only one I can remember.

23   Q    And when the police officers came up there to talk to

24   you, I think you said in November of '07, they asked you to

25   text Michael Draven with a message?

GLORIA S. SMITH, OFFICIAL REPORTER

1    A    Yes.

2    Q    The message -- what was that again?

3    A    Why the hell are the Newport News police at my mom's

4    house.

5    Q    And he responded some minutes later?

6    A    Just to tell them that Cat and I are friends, and that

7    she loved Cory very much and she would never hurt Cory.

8    Q    And Michael said this all in November of '07?

9    A    Yes.

10           THE COURT:  Did you ever meet anybody named Wookie?

11           THE WITNESS:  No.

12   BY MR. CLANCY:

13   Q    And the three weeks you were there -- do you remember

14   when exactly you got there?  I know you said just after

15   Mother's Day in '07.  But you said you stayed there just three

16   weeks?

17   A    Yeah, I stayed there just three weeks, because I had to

18   come back.  My brother was graduating from high school.

19   Q    And that would have been typically about the first week

20   in June.  Does that sound about right?

21   A    Yes.

22           MR. CLANCY:  All right.  That's all.  Thank you.

23           THE COURT:  Mr. Woodward?

24           MR. HUDGINS:  We don't have any questions for this

25   witness.  Thank you.

1        MR. WOODWARD:  No further questions, Judge.

2        THE COURT:  Can I excuse Ms. King?

3        MS. MCKEEL:  Yes, ma'am.

4        THE COURT:  Thank you, Ms. King.  You are excused.

5   Then this will be a good time to take a 15-minute recess.  We

6   will be in recess.

7        (Recess)

8        (The jury returned to the courtroom.)

9        THE COURT:  Your next witness?

10       MS. MCKEEL:  Yes.  Lawrence Ford.

11       THE COURT:  Can you get Mr. Ford, please?

12       MS. MCKEEL:  He is in lockup, Judge.

13       THE COURT:  All right.

14       (Mr. Ford was sworn.)

15       LAWRENCE FORD, DIRECT EXAMINATION on behalf of the

16   government, as follows:

17                      DIRECT EXAMINATION

18   BY MS. MCKEEL:

19   Q    Would you tell us your name, sir, and please spell it for

20   the court reporter.

21   A    Lawrence Ford, L-A-W-R-E-N-C-E F-O-R-D.

22   Q    Mr. Ford, where are you from?

23   A    Seat Pleasant, Maryland.

24   Q    Where is that in Maryland?

25   A    Prince Georges County, Maryland.

L. Ford - Direct                                    766

1    Q    How old are you, sir?

2    A    Twenty-seven.

3    Q    You are incarcerated; is that correct?

4    A    Yes.

5    Q    Why are you incarcerated?

6    A    A drug charge.

7    Q    Are you serving time for that now?  Is that correct?

8    A    Yes.

9    Q    Prior to your incarceration, were you in a musical group?

10   A    Yes, I was.

11   Q    What's your musical group called?

12   A    Insufficient Evidence.

13   Q    Do you have a MySpace page, sir?

14   A    Yes.

15   Q    On your MySpace page do you e-mail with other users of

16   MySpace?

17   A    Yes.

18   Q    What do you call yourself on your MySpace page?

19   A    L.

20   Q    I'm sorry?

21   A    L.

22   Q    Do you also go by I.E, for Insufficient Evidence?

23   A    Yes.

24   Q    I'd like to show you Government Exhibits 101 and 101A,

25   with the assistance of the court security officer, please, and

GLORIA S. SMITH, OFFICIAL REPORTER

**477**

L. Ford - Direct

1    ask you to take a look at those.

2            Let's look at 101 first, sir.  Do you see that?

3    A    Uh-huh.

4    Q    Have you seen that previously?

5    A    Yes.

6    Q    What is that?

7    A    It's a e-mail sent by -- by a friend of mine -- well, not

8    really a friend, but a MySpace friend.

9    Q    A MySpace friend.  Who is that?

10   A    A guy named Draven.

11   Q    Have you ever seen that person?

12   A    No.

13   Q    You just conversed with him on MySpace?

14   A    Yeah.

15   Q    Okay.  Is your user ID on there, sir, on this document?

16   A    Yes, it is.

17   Q    What is your user ID?

18   A    91786505.

19   Q    Do you recall this document, sir?

20   A    Yes, I do.

21           MS. MCKEEL:  Your Honor, at this time the government

22   would like to introduce United States Exhibit 101.

23           THE COURT:  It is admitted.

24           (Government Exhibit 101, admitted.)

25           MS. MCKEEL:  If we could publish that, please?

L. Ford - Direct                                    768

1    BY MS. MCKEEL:

2    Q    If you could, sir, would you read from the top where it

3    says "others' inboxes, to," and is that your number right

4    there?

5    A    Yes, it is.

6    Q    Let's highlight that portion, if we could.  Would you

7    read that for us?

8    A    I love the profile, but a simple but unusual question --

9    I love the profile, but a simple but unusual question have for

10   you.  Have you done a swipe or a hit on someone before?  Just

11   wondering.  I'm sorry about your loss.  I have had someone

12   take something close to me also.  If you need photos done, let

13   me know.  I just moved back down to Hampton Roads, Virginia,

14   from Baltimore.  So let me know what's up.  I might have a gig

15   or two for you.  Draven.

16   Q    Do you know who Draven was from conversing with him on

17   MySpace?

18   A    I just knew he was a guy that was into gothic.  That's

19   all.

20            THE COURT:  Was into what?

21            THE WITNESS:  Gothic.

22            THE COURT:  Gothic.

23            THE WITNESS:  Yes.

24   BY MS. MCKEEL:

25   Q    He asked about some photos.  What does that mean?

GLORIA S. SMITH, OFFICIAL REPORTER

**479**

L. Ford - Direct

1   A    I thought he might have been a photographer or a

2   musician, you know, somebody that get you jobs.

3           THE COURT:  And that was what his profile was

4   portraying?

5           THE WITNESS:  Yes.

6   BY MS. MCKEEL:

7   Q    If we could, let's go to the highlighted portion where it

8   says, others' inboxes.

9           MS. MCKEEL:  Make that a little bit larger, please.

10  BY MS. MCKEEL:

11  Q    Do you see that "to," and is that your number again, sir?

12  A    Yes, it is.

13  Q    What is that next section?  What does that say?  What are

14  the words underneath that?

15  A    10,000 sound nice.  Yeah, I'll be in your area soon.

16          THE COURT:  This is a response that you are sending

17  back?

18          THE WITNESS:  Yes.

19  BY MS. MCKEEL:

20  Q    Is that in response to the earlier e-mail that you read?

21  A    Yes, it is.

22  Q    Okay.  And that section in the middle of the section,

23  where it says user profile friend ID number, M. Draven

24  Photography, is that who you thought you were conversing with?

25  A    Yeah.

L. Ford - Direct                                     770

1    Q    Do you recall ever conversing with Mr. Draven prior to

2    this occasion?

3    A    No.

4    Q    Take a look, if you would, sir, to Government Exhibit

5    101A.  There is a number of pages there you can look at, sir.

6          THE COURT:  You can put it up on the screen for him,

7    if you want.

8          MS. MCKEEL:  Thank you, Judge.  That is Government

9    Exhibit 101A, and we would like to introduce that at this time

10   also.

11         THE COURT:  All right, assuming that's his.

12         MS. MCKEEL:  Yes, ma'am.

13         THE COURT:  Okay.  That's fine.

14         (Government Exhibit 101A, admitted.)

15   BY MS. MCKEEL:

16   Q    If you can look at the screen, too, sir, we can publish

17   that and it might be easier, or you can look at the piece of

18   paper, whatever is easier for you.  Is this your MySpace page?

19   A    Yes, it is.

20   Q    And it says I.E. at the top.  What does that mean?

21   A    Insufficient.

22   Q    What does the E mean?

23   A    Evidence.

24   Q    Okay.  And later on in the section it said contacting

25   I.E.  Is this where you would use that to hit the "send

GLORIA S. SMITH, OFFICIAL REPORTER

**481**

L. Ford - Direct

1    message" button?

2    A    Yes, it is.

3    Q    Let's go to the next page.  Did you create your MySpace

4    page yourself, sir?

5    A    Yes, I did.

6    Q    Okay.  Now, is that a picture of you, or is that a

7    picture of someone else?

8    A    No, that's three different rappers.

9    Q    Let's go to the next page, please, sir.  Explain what

10   this is.  There is a section entitled My Hit Man Name.  What

11   does that mean?

12   A    That's one of those advertise -- where you just type in

13   your information, like your regular name, where you live at,

14   and then the computer just prints out what your hit man name

15   would be.  Or I could have did what's your favorite superstar,

16   or who is your perfect movie star date, and you type your name

17   in, and it just shoots different answers out.

18          THE COURT:  But did you choose that name?

19          THE WITNESS:  No, I didn't choose that name.

20          THE COURT:  Okay.  Who chose it?

21          THE WITNESS:  The computer did itself.  When you go

22   to the little "get your hit man name," you would type in -- I

23   typed in my name Lawrence, and then that's what came out.

24   BY MS. MCKEEL:

25   Q    But did you choose the section to put on there about

L. Ford - Direct                                772

1   being a hit man?

2   A    Yeah.

3   Q    You chose that?

4   A    Yeah.

5            THE COURT:  Who filled in the other information

6   here?  "People iced:  Forty"?

7            THE WITNESS:  The computer.

8            THE COURT:  All right.  So that is from information

9   you put in, or --

10           THE WITNESS:  Uh-uh.  It just randomly does that

11  after you put in your name.

12           THE COURT:  You put in your name, and you chose to

13  go to the hit man.

14           THE WITNESS:  Right.  I seen it on somebody else

15  page, like the "my hit man name," so I went to get your hit

16  man name.  When you click on that, it asks your name, your

17  age, so I put in my name, my age, and then that's what come

18  out.

19           THE COURT:  All right.

20  BY MS. MCKEEL:

21  Q    Did you ever converse through e-mail with Draven again

22  after this?

23  A    Not that I remember.

24  Q    Do you recall what your e-mail address was, sir?

25  A    Icuenvymetonight@Verizon.net.

GLORIA S. SMITH, OFFICIAL REPORTER

**483**

L. Ford - Cross

1          MS. MCKEEL:  That's all I have for Mr. Ford.

2          THE COURT:  Mr. Clancy?

3                    CROSS-EXAMINATION

4    BY MR. CLANCY:

5    Q    Mr. Ford, let me make sure I understand this.  The

6    MySpace account that you created, you went to one of the --

7    you created the hit man -- you had seen that on some other

8    MySpace pages?

9    A    Right.

10   Q    And you liked it?

11   A    Yeah.

12   Q    So you decided I'm going to make one like that, so you go

13   to that site about how to create your home page, and one of

14   the choices you can make is pick hit man.

15   A    Right.

16   Q    And then they ask some basic information, name and age,

17   and then everything else is just randomly spit out?

18   A    Right.

19   Q    All right.  So there is nothing overly unique about your

20   site.

21   A    No.  The pictures I used and -- no.

22   Q    I'm more interested in the name that you used, my hit

23   man.

24   A    Right.

25   Q    Nothing unique about that?

GLORIA S. SMITH, OFFICIAL REPORTER

L. Ford - Cross                                        774

1    A    Uh-uh.

2    Q    You are certainly by far not the only one on MySpace.

3    A    No.

4    Q    So just out of the blue you get an e-mail on January 2,

5    2007, at 5:53 p.m. that you just read to the jury.

6    A    Right.

7    Q    And your response is, 10,000 sounds nice.  Yeah, I'll be

8    in your area soon.

9    A    No, my response was yeah, 10,000 sound nice.

10   Q    And then, yeah, I'll be in your area soon?

11   A    Oh, yeah, yeah, uh-huh.

12   Q    And that's the last communication you ever had with some

13   e-mail called Draven?

14   A    Right.

15   Q    You don't know who Draven is?

16   A    No.

17   Q    You have never communicated with him after this?

18   A    No.

19            MR. CLANCY:  Thank you.

20            MR. HUDGINS:  No questions, Your Honor.  Thank you.

21            MS. MCKEEL:  That's all we have, Judge.

22            THE COURT:  Mr. Ford, thank you.  You are excused.

23            MR. SAMUELS:  Charles Smith, Your Honor.

24            (Pause)

25            MR. SAMUELS:  Call Randall Fitchett, Your Honor.

GLORIA S. SMITH, OFFICIAL REPORTER

**485**

G. Koski - Direct                                    840

1          MR. SAMUELS:  The united States calls Charles Smith,

2     Your Honor.

3              (Pause)

4          MR. SAMUELS:  Mr. Smith has stepped into the

5     restroom.

6          THE COURT:  Mr. Smith is having problems.  Every

7     time we call him, he is not out there.

8          MR. SAMUELS:  Yes, ma'am.  We will call another

9     witness, Your Honor.

10         MS. MCKEEL:  George Koski.

11         THE COURT:  Mr. Koski, if you would please come

12    forward and be sworn.

13             (Mr. Koski was sworn.)

14         GEORGE KOSKI, DIRECT EXAMINATION on behalf of the

15    government, as follows:

16                   DIRECT EXAMINATION

17    BY MS. MCKEEL:

18    Q    Would you tell us your name, please, sir, and spell it

19    for our court reporter.

20    A    George Koski, K-O-S-K-I.

21    Q    Mr. Koski, are you employed?

22    A    I'm actually retired, but a part-time teacher,

23    substitute.

24    Q    Before you were retired, part-time retired, did you teach

25    full time?

G. Koski - Direct    841

1    A    All my life.

2    Q    And where did you teach?

3    A    Brooke County, Harrison County, and Marion County in West

4    Virginia.

5    Q    Is that where you live, in West Virginia, sir?

6    A    Yes, ma'am.

7    Q    What area of West Virginia do you live in?

8    A    Fairmont.  It's in Marion County.

9    Q    Is that near Morgantown, West Virginia?

10   A    15, 20 minutes away.

11   Q    At one time, Mr. Koski, were you a federally licensed

12   firearm dealer?

13   A    Yes, I was.

14   Q    Can you tell us when that was and where it was?

15   A    That was in Brooke County.  I ran a sports store, Ohio

16   Valley Sporting, and that was back in the early seventies.

17   Q    Does that go without saying that you are familiar with

18   guns, then, firearms?

19   A    Yes, ma'am.

20   Q    Approximately how long did you do that?

21   A    We were in the business six years, and then I left and

22   came to Harrison County, so I was no longer owner of that.

23   Q    Now, when you used to -- during your business, you did

24   then sell firearms?  Is that correct?

25   A    Yes, ma'am.

GLORIA S. SMITH, OFFICIAL REPORTER

G. Koski - Direct

1    Q    And when you would sell firearms, did you take down --

2    during that time period, did you get receipts for selling

3    firearms, use receipts?

4    A    Receipts?  Yeah, that was a sporting goods business.

5    Q    Now, beyond that, beyond your business at that time, are

6    you familiar with firearms just as a private citizen?

7    A    Yes, ma'am.

8    Q    Are you familiar with someone or did you sell a firearm

9    to someone by the name of David Runyon?

10   A    Yes, I did.

11   Q    Would you please tell us about that.

12   A    I advertised a handgun in *The Bulletin Board*.  That's a

13   public publication that anyone, anyone in this courtroom can

14   buy, purchase a gun.  Individuals -- you know, they give a

15   price and, you know, if you have the money, you can go pick it

16   up anytime.

17   Q    *The Bulletin Board* -- is that in the newspaper?

18   A    That's the name of it.  It is a special paper, comes out

19   all over West Virginia.  I know people in Pennsylvania, that,

20   you know -- it's widely spread in our area.

21   Q    I would like to show you Government Exhibits 103 and

22   103A.

23        Would you also look at 103A, too, sir?

24   A    Yes, ma'am.  This is correct.

25   Q    Are you familiar with those documents?

G. Koski - Direct                843

1    A    Yes, I am.

2    Q    Where did those documents come from?

3    A    Well, this was from me personally.  Anytime that I sold a

4    gun, particularly handguns, I kept a personal record for no

5    other reason than just I knew where it was at, if it ever had

6    to be tracked down, which I had never had that to happen

7    before, and --

8    Q    Are both these documents in your handwriting?

9    A    Yes, they are.

10            MS. MCKEEL:  Your Honor, at this time the United

11   States would like to introduce Government Exhibits 103 and

12   103A, please.

13            THE COURT:  They are admitted.

14            (Government Exhibits 103 and 103A, admitted.)

15            MS. MCKEEL:  If we can publish 103?

16   BY MS. MCKEEL:

17   Q    It is also on the screen, sir, but you can look at what

18   you have in your hand, but would you read that, and

19   specifically would you start with the date?

20   A    The date was 4-29-07.  I, George R. Koski, sold a Taurus

21   .357 magnum, Serial No. -- looks like it is YI11625, to the

22   following:  Name, David Runyon.  I have his cell phone number

23   there that I got on my caller ID, in case I had to communicate

24   with him, you know, on that, when he was going to come pick

25   the gun up, if he was interested, and driver's license number.

GLORIA S. SMITH, OFFICIAL REPORTER

G. Koski - Direct

1    I'm not required really to do any of this, but I did

2    it for my own -- you know, anybody in here, like I said, can

3    go buy a gun, no questions asked, out of that *Bulletin Board*,

4    anybody in here.  Now, if they do have a record -- committed a

5    felony -- but, you know, nobody has to really check them.

6    They just go buy them, just like at a flea market or -- that's

7    basically it.  But it's a publication.

8        THE COURT:  So in other words, you advertise in a

9    publication, someone responds, and you can sell them the gun.

10       THE WITNESS:  Right.  I put the ad in the paper with

11   a price, and if they are interested, you get a call.

12       THE COURT:  Then you yourself did this receipt.

13       THE WITNESS:  Yes, ma'am.

14       THE COURT:  All right.

15       THE WITNESS:  Well, when you say I did, I did ask

16   Mr. Runyon for a driver's license, and that's to be sure he

17   was 21.  I knew he was over 21, you know, when I saw him, but

18   I just -- that's what I did with everyone I have ever sold

19   like this.

20       THE COURT:  I know.  But what I was asking is, you

21   on your own -- you weren't required to do it, but you on your

22   own --

23       THE WITNESS:  Positively not required, no.

24       THE COURT:  But you on your own did the receipt and

25   filled this in and checked the driver's license and got the

G. Koski - Direct                                    845

1    cell phone from the individual.

2           THE WITNESS:  The cell phone, I got that off the

3    caller ID at home.  I just wrote that down.  And then I did

4    ask for a driver's license.  And, you know, it has been a

5    little while back, but I think that Mr. Runyon just presented

6    it to me, and I think maybe he even read that number off to me

7    that I copied down.  This was for my own personal use.

8           THE COURT:  All right.  But you got that driver's

9    license number from the person.

10          THE WITNESS:  Yes, I did.

11   BY MS. MCKEEL:

12   Q    Now, Mr. Koski, you said you got his cell phone number --

13   you first advertised, and then got a cell phone number.  Tell

14   us what happened from the time you put it in there.  Did you

15   receive a phone call?  And how did we get to that date of 4-29

16   for the sale?

17   A    Well, I know I received other calls, maybe two, three,

18   four, I don't know, about this gun, and people -- they

19   naturally ask for a certain model, certain make.  Somebody

20   wants a stainless steel barrel, somebody wants this, they want

21   that.  Then when I got the call from Mr. Runyon and told him

22   what I had, he seemed interested in it, and, you know, from

23   there, we just set a place where he could meet me.

24          And it happened to be on a Sunday, because actually

25   Monday through Friday during the day I was teaching,

GLORIA S. SMITH, OFFICIAL REPORTER

G. Koski - Direct                                846

1   substitute teaching and so forth, and weekends seemed to be

2   ideal.  If it was someone that I personally knew, it didn't

3   really matter, you know.  They could come at any time.  But I

4   preferred to not have people that I didn't know for any reason

5   to come to my house for guns.

6   Q    Where did you meet, then, for the sale of the firearm?

7   A    Well, actually, you know, when I look back, it was only

8   two places.  Number one, I always wanted to go where it was

9   populated.  I didn't want to go down some side street and sell

10  somebody a gun.

11        Middletown Mall in Fairmont, a big parking lot

12  there.

13        THE COURT:  Slow down just a bit.  Please say it

14  slowly.

15        THE WITNESS:  I'm sorry.  Middletown Mall, M-A-L-L,

16  in Fairmont.  It's a big parking lot.  The other place,

17  Muriel's Family Restaurant.  They are, I don't know, half a

18  mile apart, three quarters of a mile, on Route 250, right

19  along the road.

20        And, you know, I've thought about this, and, you

21  know, I could not tell anybody in here a hundred percent which

22  of those places we met.  I thought it was at the Muriel's

23  Family Restaurant.  It was close to me.  And you pull your

24  vehicle out of the way, though.  People start coming in for

25  lunch.  That's where I, you know -- that's where I believe I

GLORIA S. SMITH, OFFICIAL REPORTER

**492**

G. Koski - Direct    847

1    sold it to him, but between those two places, I go back and

2    forth, so it's not -- I can't tell you a hundred percent it

3    was one place or the other.  But you can bet your life it was

4    one of those two, because that's the only place I ever dealt,

5    you know, with something like that.

6    BY MS. MCKEEL:

7    Q    Do you recall -- you said it was a Sunday.  Do you recall

8    about what time of day it would have been?

9    A    I just gave a window of time between 12 and two o'clock,

10   the reason being Sunday mornings is either occupied by going

11   to church or helping my wife with a big family dinner.  And my

12   sons are actively involved in golf.  Usually Sunday morning is

13   a good time for them to play golf, so usually the dinner is

14   after two.  So I'm going to say here, between 12 to 2.  You

15   know, I did not for any reason think of an exact hour, but

16   somewhere in that time, that's the window that I would gather.

17   Q    Do you recall when you sold the firearm to Mr. Runyon,

18   was it clean, or would it have been dirty?

19   A    Well, definitely cleaned.  I wouldn't -- if I took a

20   dirty gun, somebody might look at it and think it was abused

21   or not taken care of.  But cleaned just simply by maybe

22   running a cloth with oil through it, gets a little loose dust

23   and stuff out like that.

24   Q    How do you clean inside the barrel?  What do you use?

25   A    Well, when I shoot the gun a good bit, any gun, I use a

GLORIA S. SMITH, OFFICIAL REPORTER

**493**

G. Koski - Direct                                    848

1   brass brush on a rod.  It's soft.  It will not scratch out the

2   barrel, will not mess up the rifling in the pistol or rifle.

3   And then I go over it with a rag and a little bit of oil, just

4   clean it up.  And also on a gun like that, the cylinder -- it

5   has to be cleaned up, because if not, it does not function

6   properly.

7   Q    Let's look at -- well, let's stay here.  Look at this

8   document 103, please.

9        Who signed the name David Runyon?  Did you sign it,

10  or did you have Mr. Runyon sign it?

11  A    Well, you know, if I would have -- if I would have asked

12  him to sign it, I would have had him to write it out.  So I'm

13  going to say that, number one, I knew the name of who was

14  coming, after talking on the phone, and so I just, you know --

15  I'm sure I printed that.  It looks like it.  I wouldn't have

16  signed it to forge a name.  It is just printed.

17  Q    And did you put the phone number on that document, the

18  cell phone number?

19  A    Yes.

20  Q    And did you write down -- is that your handwriting of the

21  driver's license number?

22  A    You know, it looks a lot like mine, the printing.  I

23  remember asking specifically -- I told him, I said, I know

24  you're over 21, but if you have something here that I can just

25  put down, and this was never seen by anybody except me, and I

G. Koski - Direct                                    849

1   put it in the file, and it just stayed there with the others.

2   Q    If you would, let's take a look at Exhibit 103, the next

3   one.  Tell us what that is, Mr. Koski.

4   A    Excuse me?

5   Q    Would you please tell us what this is, 103A?

6   A    That's the gun with the serial number.  That is the

7   handgun right there.

8   Q    Would you tell us a little bit about that handgun?  Is it

9   a revolver or a semiautomatic?

10  A    No, it's a five-shot revolver.  It is classified as

11  double action.

12  Q    What does that mean?

13  A    Double action means you can fire by just squeezing the

14  trigger, or you can cock the hammer and shoot, either way.

15  The other type of pistol, the old western style, was a single

16  action.  You had to cock it each time you shot.  This could be

17  squeezed, just the trigger, or either way you wanted to shoot.

18  That's why they call it that.

19  Q    What kind of bullets would go into that firearm?

20  A    Either a .357 magnum or a .38 special.  That's one of the

21  few guns you can interchange.  You can't put the .357 in the

22  .38, but the .38 will shoot in that.

23            THE COURT:  You can't put the .357 --

24            THE WITNESS:  They are too powerful.  They are more

25  powerful than a .38.  A .357 is made on a stronger frame,

GLORIA S. SMITH, OFFICIAL REPORTER

1   withstands more recoil and so forth.  You can put it in there,

2   but I wouldn't recommend anybody try to shoot something like

3   that.  But a .38, that is natural to put them in and shoot it.

4   It is cheaper, less recoil.

5   BY MS. MCKEEL:

6   Q    But the phone number, if we go back to Government Exhibit

7   103 -- that phone number, what is the area code for that?

8   A    This was a cell phone, and, you know, I don't really

9   know, but I'm going to assume -- 685 was like our area, but I

10  did not get -- you know, I would just think it was our local,

11  because I didn't -- you know, I never --

12  Q    What is your local area code?

13  A    Fairmont, our area is 304.

14  Q    Okay.  Now, the gun that you sold Mr. Runyon -- did you

15  give it to him in a box, or how did you give it to him?

16  A    Let's see.  You know, that's a while back.

17        I know that the one thing I don't do and never have

18  done was just hand somebody a gun.  I know there was no

19  holster.  Either -- I'm saying either -- this would be the

20  only two ways I can ever remember selling a gun to anybody.

21  One way, they come in a -- it's just like a black vinyl case,

22  almost like a square, opens up.  It has got the soft styrofoam

23  in it so, you know, you don't tear it up.  It comes in that.

24  Or lot of them are shipped in a box.

25        And the Taurus -- seemed to be like the ones that I

1    receive, the box -- just like a -- just like a faded blue,

2    kind of like smooth, but a faded blue box, and, you know, I

3    have some other handguns, so it could have been laying around,

4    could have gave it to him in of those.

5          But, you know, I just -- one of those would be my

6    answer, and I couldn't guarantee either one of them.  One of

7    them.

8    Q    How did Mr. Runyon pay for the firearm?

9    A    Cash.

10   Q    Now, did you give him or sell him any ammunition with the

11   firearm?

12   A    You know, when I thought about the word "sell" -- how I

13   got on that part, I had a good bit of old .38 special

14   ammunition.  And in my conversation with him, he was telling

15   me that he had a young son, and he got on that subject.  And

16   we were talking.  He said he'd like to teach him how to shoot

17   sometime, a safe way.  And I remember having a couple of boxes

18   of -- I'm just saying old, not anything you would want to --

19   you know, I wouldn't want to sell, but I do remember, I said

20   this would be a good way for him to start, one reason being it

21   is not going to have a lot of recoil or anything, and they are

22   kind of old and outdated.  You know, you wouldn't have to pay

23   twenty, twenty-five dollars for a box of them.

24   Q    Okay.  Mr. Koski, I'd like to hand you what has been

25   marked as Government Exhibit 216.  Do you see a driver's

G. Koski - Direct

1   license on that document?

2   A    I never saw anything that looked like that, no, I didn't.

3   Q    Which item did you not see?  Do you see a driver's

4   license on there?

5   A    Well, this precash card --

6   Q    No, sir.  Just look at the one little picture of the

7   driver's license.

8   A    License plate -- or license, I'm sorry.

9   Q    Yes, sir.  Do you see that license?  Just look at that.

10  Do you see it?

11  A    Yes, I do.

12  Q    Is that the same license number that you wrote down for

13  David Runyon that day that you sold the firearm to him?

14  A    Yes, ma'am, it is.

15  Q    It is?

16  A    Yes.

17  Q    And do you recall what Mr. Runyon looked like?

18  A    Yes.

19  Q    And is that his picture on that license?

20  A    It looks a lot like him.

21  Q    Would you have sold a gun to him if he had produced that

22  license and it wasn't him?

23  A    Would I what?

24  Q    Would you have sold the gun to him if it wasn't him and

25  he produced that license?

G. Koski - Cross                            853

1    A    Oh, no way.  I mean, I wouldn't have known who it was,

2    unless somebody didn't look anything like that.  Yeah, you

3    know, that's Mr. Runyon as I remember him.

4    Q    Okay.

5    A    But that is the correct license number.  It matches this

6    one.

7    Q    Okay.  Thank you.  I'll take that document back.

8              MS. MCKEEL:  That will be admitted later, Your

9    Honor.

10             THE COURT:  All right.

11             MS. MCKEEL:  That's all the questions I have for Mr.

12   Koski.

13             THE COURT:  Mr. Clancy?

14             MR. CLANCY:  I have no questions, Your Honor.

15             THE COURT:  Mr. Woodward?

16                     CROSS-EXAMINATION

17   BY MR. WOODWARD:

18   Q    Hi, Mr. Koski.

19             Mr. Runyon -- my name is Larry Woodward.  I

20   represent Mr. Runyon.  He contacted you a couple of times

21   prior to purchasing the weapon?

22   A    He could have called once before.  I remember when the --

23   the final call, if it was the second, because I got other

24   calls on the gun.  I do remember he said, do you still have

25   that handgun?  I said, yes, I do.  Then from there we

GLORIA S. SMITH, OFFICIAL REPORTER

**499**

G. Koski - Cross

1    transpired.  He possibly called twice.  I really don't know.

2    That is almost two years ago.

3    Q    And you all set up a time and place to meet?

4    A    We did.

5    Q    And he showed up approximately on time?

6    A    Yes, he did.

7    Q    And you mentioned in your direct examination that you all

8    had conversation about his son?

9    A    Yes.

10   Q    As a matter of fact, he showed you a picture of his son

11   with a fish, didn't he?

12   A    He did.

13   Q    And was talking about how proud he was of his son?

14   A    Exactly.  Now, I want to get it straight.  I mean, he

15   said it was his son.  I have no proof he was or wasn't, but he

16   was definitely concerned about this individual, and proud of

17   him.

18   Q    He pulled out a picture and was proud of him and said,

19   this is my son.

20   A    He showed me a picture.  In fact, he was holding a fish

21   up.  Looked like a big bass to me.  I think he said he caught

22   it in a farm pond.

23   Q    And he produced a driver's license.  He said on the phone

24   he was David Runyon, and he produced a driver's license that

25   said he was David Runyon?

GLORIA S. SMITH, OFFICIAL REPORTER

**500**

G. Koski - Cross

1   A     He didn't produce a driver's license on the phone, no.

2   Q     But I mean when he showed up?

3   A     Yes.

4   Q     He showed up, and as a matter of fact, you asked him his

5   known number to verify that he would tell you -- this person

6   who you hadn't met before would tell you that his phone number

7   was the same one you had gotten on caller ID?

8   A     I know that's where I got it.  If I asked that or not, I

9   don't know.

10  Q     And you then -- you gave him the weapon, he gave you the

11  money, you all shook hands, and he left?

12  A     Yes.

13  Q     And he knew that you were taking down his information.

14  As a matter of fact, he read off his operator's license number

15  to you?

16  A     Yeah.  I'm sure he read it, because I did print that out,

17  you know.

18  Q     Okay.  And you recall that you gave him some used --

19  "used" is the wrong word -- old ammunition?

20  A     Very old.

21  Q     And he had indicated to you that he wanted to teach his

22  son to perhaps shoot?

23  A     Yeah, he said he would like to teach him the correct way

24  to shoot a handgun.  And I thought, well, .357 magnum shells

25  aren't the correct way.  There is a lot of recoil, and

GLORIA S. SMITH, OFFICIAL REPORTER

G. Koski - Cross                                          856

1   expensive.  And I had those in my vehicle, and I do remember I

2   did give him some of those.

3   Q    And you all passed some other conversation -- you all

4   conversed for a while.  He told you that he had been in Kansas

5   for a while and had recently moved back to West Virginia?

6   A    I think it was Kansas.  I know he said out west.  I do

7   believe he said Kansas.

8   Q    Did he appear to be nervous or in a hurry or anything?

9   A    No.  I enjoyed the conversation.

10  Q    Pleasant interchange?

11  A    He was definitely that.

12  Q    And you've sold any number of guns through this

13  newspaper?

14  A    Through The Bulletin Board, several of them.

15          MR. WOODWARD:  Thank you, Your Honor.  That's all I

16  have for this witness.

17          MS. MCKEEL:  We don't have anything further for

18  Mr. Koski.

19          THE COURT:  Thank you, Mr. Koski.  You are excused.

20          Your next witness?

21          MR. SAMUELS:  Your Honor, we will try Charles Smith.

22          THE COURT:  All right.  Mr. Smith, if you would

23  please come forward and be sworn.

24          (Mr. Smith was sworn.)

25          CHARLES A. SMITH, DIRECT EXAMINATION on behalf of

GLORIA S. SMITH, OFFICIAL REPORTER
*    *    *