# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

## DAVID ANTHONY RUNYON,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT NEWPORT NEWS

**JOINT APPENDIX - VOLUME II OF X**
**(Pages 503 - 923)**

Michele J. Brace
VA Capital Representation
Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
(434) 817-2970
mbrace@mindsort.com

Dana C. Hanson Chavis
Susanne Bales
Assistant Federal Defender
Federal Defender Services
of Eastern Tennessee
800 South Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979
dana_hansen@fd.org
susanne_bales@fd.org

G. Zachary Terwilliger
Lisa R. McKeel
Brian J. Samuels
Office of the U. S. Attorney
Fountain Plaza 3, Suite 300
721 Lakefront Commons
Newport News, VA 23606
(757) 591-4000
zachary.terwilliger3@usdoj.gov
lisa.mckeel@usdoj.gov
brian.samuels@usdoj.gov

*Counsel for Defendant-Appellant*          *Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

*Volume I of X*

Appendix Page

District Court Docket [4:08-cr-00016-RBS-DEM-3].................................................1

Indictment
      Filed February 13, 2008 (Doc.3) ....................................................46

Notice of Intent to Seek the Death Penalty
      Filed July 17, 2008 (Doc.67).........................................................63

Voss Statement of Facts
      Filed July 18, 2008 (Doc.70).........................................................70

Notice Pursuant to Fed. R. Crim. P. 12.2 with attachment1
      Filed December 12, 2008 (Doc. 135) .............................................78

      Att. 1:    Abreviated CV – Evan S. Nelson, PH.D., ABPP (Doc.135-1)......83
      Att. 2:    CV – Evan S. Nelson, PH.D., ABPP (Doc.135-2)........................84

Defendant's Motion to Continue Trial
      Filed Feb. 20, 2009 (Doc.160)......................................................93

Order Granting Motion to Continue
      Feb. 23, 2009 (Doc.162)..............................................................97

Notice Regarding Mental Health Experts
      Filed April 8, 2009 (Doc.177) ....................................................101

Defendant's Motion to Continue Trial Date
      Filed April 13, 2009 (Doc.179) ..................................................105

Response of the USA to Defendant's Motion to Continue
      Filed April 21, 2009  (Doc.181) ..................................................122

Order Denying Defendant's Motion to Continue and USA Motion to Sever
      Entered May 7, 2009 (Doc.194) ..................................................126

Juror Questionnaire Order with attachment 1
June 11, 2009 (Doc.211)................................................................................139

Att. 1:    Blank Juror Questionnaire Filed June 11, 2009 (Doc.211-1) ......142

Memorandum Order Denying Defendant's Objections to Nonstatutory
Aggravating Factors
Entered June 17, 2009 (Doc.217) ................................................................161

Defendant's Supp. Notice Regarding Mental Health Experts
Filed June  29, 2009 (Doc.230) ...................................................................173

Forensic Psychiatric Evaluation by Dr. Patterson
Filed June 29, 2009 (Doc.276) (Unsealed March 2, 2016 Order dkt516)...177

Forensic Psychological Evaluation by Dr. Montalbano
Filed June 30, 2009 (Doc.277) (Unsealed March 2, 2016 Order dkt516)...201

Transcript of First Day of Trial,
On June 30, 2009 (Doc.326 filed Mar. 31, 2010) .......................................232

Voir Dire (pp.1-134).....................................................................................233

Transcript of Second Day of Trial,
On July 1, 2009 (Doc.327 filed Mar. 31, 2010) ..........................................365

Voir Dire (pp. 138, 194-195) .......................................................................366

Transcript of Third Day of Trial,
On Jul. 2, 2009 (Doc.328 filed Mar. 31, 2010) ...........................................369

Preliminary Proceedings (p.198) ..................................................................370

Transcript of Fourth Day of Trial,
Jul. 6, 2009 (Doc.329, filed Mar. 31, 2010) ...............................................371

Testimony of Rose Wiggins (pp.257-265)
Direct Examination by Ms. McKeel.........................................................374
Cross Examination by Mr. Woodward......................................................380
Redirect Examination by Ms. McKeel .....................................................382

Testimony of John Willmer (pp.353-374)
    Direct Examination by Mr. Samuels .................................................383
    Cross Examination by Mr. Woodward................................................401
    Redirect Examination by Mr. Samuels...............................................403

Testimony of Randy Lassiter (pp.435-469)
    Direct Examination by Ms. McKeel....................................................406
    Cross Examination by Mr. Ellenson...................................................463
    Redirect Examination by Ms. McKeel ...............................................437

Transcript of Sixth Day of Trial,
    On July 8, 2009 (Doc.331filed March 31, 2010) .......................................440

Testimony of Nichole King (pp.731-764)
    Direct Examination by Ms. McKeel....................................................442
    Cross Examination by Mr. Woodward................................................469

Testimony of Lawrence Ford (pp.765-774)
    Direct Examination by Ms. McKeel....................................................476
    Cross Examination by Mr. Clancy ......................................................484

Testimony of George Koski (pp.840-856)
    Direct Examination by Ms. McKeel....................................................486
    Cross Examination by Mr. Woodward................................................499

*Vol II of X*

Transcript of Seventh Day of Trial,
    On July 9, 2009 (Doc.332, filed Mar. 31, 2010) .........................................503

Testimony of Paul Swartz (pp.900-918)
    Direct Examination by Mr. Samuels .................................................506

Testimony of William Banks (pp.1031-1063)
    Direct Examination by Ms. McKeel....................................................526
    Cross Examination by Mr. Woodward................................................544
    Redirect Examination by Ms. McKeel ...............................................556
    Recross Examination by Mr. Ellenson ...............................................558

Testimony of Paul Swartz (pp.1065-1117)
    Direct Examination by Mr. Samuels .................................................561

Cross Examination by Mr. Woodward ..................................................605
Redirect Examination by Ms. McKeel ................................................612

Transcript of Eighth Day of Trial,
On Jul.y 13, 2009 (Doc.333, filed Mar. 31, 2010) .......................................613

Proceedings re Stipulation No. 94 ..............................................................615

Testimony of Paul Swartz (pp.1354-1370) (recalled)
Direct Examination by Mr. Samuels ......................................................616

Transcript of Ninth Day of Trial,
On July 14, 2009 (Doc.334, filed Mar. 31, 2010) ......................................632

Testimony of Paul Swartz (pp.1378-1491) (resumed)

Direct Examination by Mr. Samuels ......................................................635
Cross Examination by Mr. Clancy .........................................................722
Redirect Examination by Mr. Samuels...................................................745

Transcript of Tenth Day of Trial,
On July 15, 2009 (Doc. 335, filed Mar. 31, 2010) ....................................749

Proceedings re Stipulations (pp.1509-1519) .............................................752
Court's Rulings re Motions ........................................................................754

Transcript of Eleventh Day of Trial,
On July 16, 2009 (Doc.336, filed Mar. 31, 2010) ......................................762

Closing Arguments:

AUSA McKeel, Guilt Phase Closing (pp.1582-1613) ...........................764
Counsel Woodward, Guilt Phase Closing (pp.1633-1656) ....................796
AUSA McKeel, Guilt Phase Rebuttal Closing (pp.1656-1665).............819

Court Jury Instructions (pp.1666-1714) ....................................................829

Supplemental Motion to Continue Capital Sentencing Hearing
Filed July 17, 2009 (Doc.240) ........................................................................882

Statement of Defense Counsel
Filed July 17, 2009 (Doc.242)..............................................................889

Verdict Guilt Phase
Filed July 17, 2009 (Doc.245),..............................................................894

Second Supp. Motion to Continue Capital Sentencing Hearing
July 20, 2009 (Doc.247) ......................................................................895

Transcript of Thirteenth Day of Trial,
On July 22, 2009 (Doc. 338, filed Apr. 2, 2010)...........................902

Counsel Hudgins,  Eligibility Phase Closing (pp. 1769-1772) ....................903

Order Granting Motion to Continue
Filed July 22, 2009 (Doc.254) ....................................................907

Special Verdict Eligibility Phase
Filed July 22, 2009 (Doc.255) ....................................................910

Order Appointing Dr. Merikangas
Entered July 22, 2009 (Doc.257)..................................................917

Defendant's Motion to Supp. Mental Health Report
Filed August 10, 2009 (Doc.269) .................................................919

*Vol III of X*

Transcript of Fifteenth Day of Trial,
On August 20, 2009 (Doc. 340, filed Apr. 2, 2010)....................................924

Argument/Ruling Dr. Cunningham Testimony (p.2076-2084)....................925

Testimony of Dr. Cunningham (pp. 2084-2192)
Direct Examination by Mr. Hudgins ....................................................933
Cross Examination by Mr. Samuels ....................................................1007

Defendant's Mitigating Factors Enumerated
Filed August 21, 2009 (Doc.285) ............................................................1042

Transcript of Sixteenth Day of Trial,
On August 24, 2009 (Doc.341, filed Apr. 29, 2010)................................1047

Testimony of Deputy Westrick, Portsmouth Sheriff's Office (pp.2199-2209)
    Direct Examination by Mr. Hudgins ....................................................1049
    Cross Examination by Mr. Samuels ..................................................1056

Testimony of Deputy Johnson, Portsmouth Sheriff's Office (pp.2209-2217)
    Direct Examination by Mr. Hudgins ....................................................1059
    Cross Examination by Ms. McKeel......................................................1065
    Redirect Examination by Mr. Hudgins...............................................1067

Testimony of Deputy Anderson, Portsmouth Sheriff's Office (pp.2217-2225)
    Direct Examination by Mr. Hudgins ....................................................1067
    Cross Examination by Ms. McKeel......................................................1072

Testimony of Deputy Marbry, Portsmouth Sheriff's Office (pp.2226-2234)
    Direct Examination by Mr. Hudgins ....................................................1076
    Cross Examination by Mr. Samuels ..................................................1080

Testimony of Deputy Singledecker, Portsmouth Sheriff's Office (pp.2234-2239)
    Direct Examination by Mr. Hudgins ....................................................1084
    Cross Examination by Ms. McKeel......................................................1087

Testimony of Deputy Diaz, Portsmouth Sheriff's Office (pp.2239-2244)
    Direct Examination by Mr. Hudgins ....................................................1089
    Cross Examination by Mr. Samuels ..................................................1092

Testimony of David H. Runyon (pp.2366-2409)
    Direct Examination by Mr. Hudgins ....................................................1095
    Cross Examination by Mr. Samuels ..................................................1136

Testimony of Suk Cha Runyon (pp.2410-2439)
    Direct Examination by Mr. Hudgins ....................................................1139

Transcript of Seventeenth Day of Trial,
    On August 25, 2009 (Doc.342, filed Apr. 29, 2010).................................1170

Testimony of Phyllis Provost (pp.2518-2527)
    Direct Examination by Mr. Hudgins ....................................................1171
    Cross Examination by Ms. McKeel......................................................1177

Transcript of Eighteenth Day of Trial,
        On August 26, 2009 (Doc.343, filed Apr. 29, 2010)................................1181

        AUSA Samuels, Sentence Selection Closing (pp.2588-2626)..................1182
        Counsel Woodward, Sentence Selection Closing (pp.2632-2656) ...........1226
        AUSA Samuels, Sentencing Rebuttal Closing (pp. 2656-2664)...............1250
        Court Jury Instructions (pp.2664-2696) ..................................................1258

Transcript of Nineteenth Day of Trial,
        On August 27, 2009 (Doc. 344, filed Apr. 29, 2010)................................1292

    Jury Question  (pp.2707-2710) ......................................................................1298

Special Verdict Form - Selection Phase
        Filed August 27, 2009 (Doc.291) ..............................................................1311

*Volume IV of X*

**<u>Gov't Trial Exhibits</u>**

        Gov't Ex. 23:    Commonwealth of Virginia Department of Forensic
                                Science Certificate of Analysis ......................................1317

        Gov't Ex. 28:    ATM Still Photos...........................................................1318

        Gov't Ex. 65:    Bates 065-006 Global Cash Receipt..............................1352

        Gov't Ex. 94:    Summary of Funds Available to/Spent by Cat Voss......1364

        Gov't Ex. 101:  Others' Inboxes..............................................................1365

        Gov't Ex. 109:   Sprint Detail Records for Runyon phone
                                304-685-6845................................................................1367

        Gov't Ex. 135:   Map of cell tower locations ..........................................1393

        Gov't Ex. 217:   "Checklist for Crime".....................................................1395

        Gov't Ex. 236:    Photo of bullets.............................................................1397

        Gov't Ex. 311:    City of Wichita Municipal Court 01-CR-1407.............1398

        Gov't Ex. 313:    Wichita Police Dept. Incident Report dated
                                Jul. 23, 1994.................................................................1404

Gov't Ex. 315: Magistrate Court of Monongalia County, West Virginia 1412 ............................................................................1412

Gov't Ex. 316: Morgantown Police Dept. Investigation/Incident Report dated Jan. 6, 2007 ........................................................1433

Position of US with Respect to Sentencing Factors
Filed November 10, 2009 (Doc.301).........................................................1443

Judgment
Filed December 4, 2009 (Doc.313) ..........................................................1458

Defendant's Motion for Limited Unsealing of Record
On March 17, 2015 (Doc.415)...................................................................1466

Memorandum in Support of Defendant's Motion for Limited Unsealing of Record with Exhibit 3
On March 17, 2015 (Doc.416)...................................................................1468

Ex. 3: Declaration of Michele Brace (Doc.416-3)...............................1474

United States' Response to Motion for Limited Unsealing of Record
On March 31, 2015 (Doc.418)...................................................................1476

Defendant's Rebuttal Supporting Motion for Limited Unsealing of Record
Filed April 3, 2015 (Doc.421) ..................................................................1481

Order Granting Limited Unsealing of Record
Filed Apr. 7, 2015 (Doc.422) ...................................................................1487

Supp. Order Regarding Limited Unsealing of Record Questionnaires
Filed April 13, 2015 (Doc.423), ...............................................................1494

Original §2255 Motion with Exhibit 1
Filed October 5, 2015 (Doc.478)..............................................................1497

Ex. 1: Records Request to Bureau of Prisons, 06/02/15 (Doc.478-1)...............................................................1622A – 1622C
Ex. 2–36: Omitted – See JA pp. 1992 - 2247

Defendant's First Motion for Discovery with Exhibits 1 – 5
Filed December 9, 2015 (Doc.491) ..........................................................1623

Ex. 1: ATF ROI dated Feb. 2, 2009 (Doc.491-1)...................................1661

Ex. 2: USA v. Runyon Disk Index (Doc.491-2) .....................................1663

Ex. 3: USA Gov't Witness List Fax, p.9 (Doc.491-3) ............................1664

Ex. 4: Medical/Mental Health Records Request to Portsmouth Sheriff's
Department from FDSET dated Oct. 2, 2015 (Doc.491-4)..........1666

Ex. 5: Medical/Mental Health Records Request to Portsmouth Sheriff's
Department from FDSET dated Nov. 3, 2015 (Doc.491-5)........1667

United States' Response to Original §2255 Motion
Filed January 11, 2016 (Doc.497) ...........................................................1670

*Volume V of X*

Order directing reply to §2255
Entered January 15, 2016 (Doc.499)........................................................1811

USA Opposition to First Motion for Discovery
Filed January 15, 2016 (Doc.500) ...........................................................1812

Reply Supporting First Motion for Discovery
Filed January 29, 2016 (Doc.506) ...........................................................1824

Amended §2255 Motion with Exhibits 1 – 39
Filed February 4, 2016 (Doc.511) ...........................................................1842

Ex. 1: Placeholder (Doc.511-1) ...............................................................1991

Ex. 2: Dr. Merikangas Report 9/25/15 (Doc.511-2)...............................1992

Ex. 3: McNally Declaration 3/11/09 (Doc.511-3)..................................1998

Ex. 4: Cronin Declaration 9/26/15 (Doc.511-4)....................................2002

Ex. 5: Hudgins Declaration 9/22/15 (Doc.511-5) ..................................2016

Ex. 6: Woodward Declaration 9/24/15 (Doc.511-6) ..............................2019

Ex. 7: Costa Declaration 9/30/15 (Doc.511-7)......................................2022

Ex. 8: Cunningham Declaration 9/25/15 (Doc.511-8) ...........................2024

Ex. 9:  Cat Voss Declaration 9/10/15 (Doc.511-9) ...............................2079

Ex. 10:  David Dalton Declaration 9/28/15 (Doc.511-10) .......................2082

Ex. 11:  Paula Dalton Declaration 9/28/15 (Doc.511-11) .......................2083

Ex. 12:  Matt Long Declaration 9/29/15 (Doc.511-12) ...........................2085

Ex. 13:  Scott Linker Declaration 9/24/15 (Doc.511-13) ........................2086

Ex. 14:  Excerpt Cell Phone Tracking Evidence (Doc.511-14) ..............2089

Ex. 15:  Babineau letter regarding death authorization 2/10/09
(Doc.511-15),...................................................................................2109

Ex. 16:  Portsmouth Jail Records 2008 (Doc.511-16)............................2119

Ex. 17:  David Dombrowski progress notes (Doc.511-17) .....................2123

Ex. 18:  Lake Martin Community Hospital response (Doc.511-18) .......2125

Ex. 19:  Hudgins time schedule with mark ups ECF No 165
(Doc.511-19)...................................................................................2128

Ex. 20:  Dr. Mirsky letter 7/2/09 (Doc.511-20)......................................2131

Ex. 21:  Dr. Mirsky/Hudgins emails 7/22-23/09 (Doc.511-21) ..............2132

Ex. 22:  Dr. Mirsky letter 9 18 09 (Doc.511-22)....................................2133

Ex. 23:  Army medical records (Doc.511-23) .........................................2136

Ex. 24:  Handwritten letter regarding 1996 car accident (Doc.511-24)..2160

Ex. 25:  Suk Cha Runyon medical records (Doc.511-25).......................2162

Ex. 26:  David Dombrowski declaration 9/23/15 (Doc.511-26).............2177

Ex. 27:  Mark Runyon declaration 9/25/15 (Doc.511-27) ......................2187

Ex. 28:  Maria Runyon declaration 9/16/15 (Doc.511-28)......................2194

Ex.29:  Dr. Dudley report 9/29/15 (Doc.511-29) ..................................2199

Ex. 30:  Thomas Preston interview 10/4/08 (Doc.511-30)......................2223

Ex. 31:  Robert Seeger declaration 8/24/15 (Doc.511-31) ......................2226

Ex. 32:   Deborah Seeger declaration 8/24/15 (Doc.511-32) ...................2229

Ex. 33:   Captain Harris Declaration Fayetteville GA Police Dept.
          1/13/16 (Doc.511-33) ....................................................2234

Ex. 34:   Scotty Fleming criminal history (Doc.511-34).........................2235

Ex. 35:   Dr. Mirsky report 8/28/15 (Doc.511-35) ..................................2237

Ex. 36:   Teresa Norris declaration 9/29/15 (Doc.511-36)......................2244

Ex. 37:   Racial Disparities Staff Report by the Subcommittee
          on Civil and Constitutional Rights (Doc.511-37) .....................2248

Ex. 38:    Cohen Bell Declaration (Doc.511-38)......................................2261

Ex. 39:    Declaration of Michele J Brace (Doc.511-39).........................2269

Order
     Entered February 8, 2016 (Doc.513).....................................................2271

## *Volume VI of X*

Reply Supporting Original §2255 Motion
     Filed March 28, 2016 (Doc.526) ..........................................................2272

     Ex. A: Clinical Screening Information (Doc.526-1) .................................2366

Petitioner's Second Motion for Discovery
     Filed April 1, 2016 (Doc.530) ..............................................................2368

United States' Response to Second Motion for Discovery
     Filed April 8, 2016 (Doc.532) ..............................................................2376

Reply Supporting Second Motion for Discovery with Attachments A – C
     Filed April 13, 2016 (Doc.533) ............................................................2384

     Att. A:   Strengthening Forensic Science in the United States, A Path
               Forward (Doc.533-1) ...............................................................2392

     Att. B:   Charter USDOJ National Commission on Forensic Science
               (Doc.533-2),.............................................................................2473

Att. C:   National Commission on Forensic Science Views of the
        Commission Validation of Forensic Science Methodology
        (Doc.533-3)................................................................................2482

United States' Response to Amended §2255 Motion
        Filed April 22, 2016 (Doc.536) ...............................................2485

Motion for Leave to Supplement Second Motion for Discovery
        Filed May 24, 2016 (Doc.541) .................................................2644

Order Granting Supplement of Discovery Motion
        Entered June 7, 2016 (Doc.544) ..............................................2648

Supplemental Memo to Second Motion for Discovery
        Filed June 8, 2016 (Doc.545) ..................................................2651

        Att. A:   John Nixon Declaration (Doc.545-1) .......................2654

Reply Supporting Amended §2255 Motion  with Exhibits 1 – 5
        Filed July 7, 2016 (Doc.551)....................................................2656

        Ex. 1:   Stephen Hudgins Declaration dated Jun. 22, 2016 (Doc.551-1) .2803

        Ex. 2:   John Nixon Declaration dated May 18, 2016 (Doc.551-2) .........2807

        Ex. 3:   Joseph Kennedy Declaration dated Jul. 6, 2016 (Doc.551-3) .....2809

        Ex. 4:   Stephen Hudgins Calendar from Appointment to Beginning of
                Runyon Trial (Doc.551-4) .........................................2812

        Ex. 5:   USA Strikes of Black Veniremen Report (Doc.551-5) ...............2813

*Volume VII of X*

Order for Subpoena Duces Tecum
        Entered July 12, 2016 (Doc.552)..............................................2817

Subpoena to Dept. of Forensic Science with attachment 1
        Filed July 13, 2016 (Doc.553) ..................................................2818

       Att. 1:    Order for Subpoena to Dept. of Forensic Science
               (Doc.553-1) ............................................................... 2822

Order for Costa Grand Jury Testimony
     Entered July 26, 2016  (Doc.555) ........................................... 2823
Opinion Denying §2255 Motion and Denying Discovery
     Filed Jan. 19, 2017 (Doc.560, 560-1, 560-2, 560-3, 560-4) .............................. 2824

Judgment
     Filed January 20, 2017 (Doc.561), ................................................... 3070

Petitioner's Motion for Sealed Materials Subpoenaed by Court
     Filed February 1, 2017 (Doc.564) ................................................... 3071

Petitioner's Memorandum for Sealed Materials Subpoenaed by Court
     Filed February 1, 2017  (Doc.565) ................................................... 3074

Rule 59(e) Motion to Alter or Amend
     Filed February 16, 2017 (Doc.566) ................................................... 3079

Rule 59(e) Memorandum with attachment A
     Filed Feb. 16, 2017  (Doc.567) ....................................................... 3081

       Att. A:   Paula Dalton Declaration (Doc.567-1) ................................. 3102

Order Denying Access to Sealed Material Subpoenaed by Court
     Entered February 21, 2017 (Doc.568) ................................................. 3103

Petitioner's Third Motion for Discovery
     Filed February 24, 2017 (Doc.570) ................................................... 3111

United States' Response to Third Motion for Discovery
     Filed March 31, 2017 (Doc.574) ..................................................... 3122

United States' Response to Rule 59(e) Motion
     Filed March 31, 2017 (Doc.575) ..................................................... 3132

Petitioner's Reply Supporting Third Motion for Discovery
     Filed April 6, 2017 (Doc.576), ....................................................... 3135

Record Notation Order
     Filed June 16, 2017 (Doc.583) ....................................................... 3138

Order Directing Re-entry of Order Denying 59(e) Motion and Denying Third Motion for Discovery
Entered June 21, 2017  (Doc.586)....................................................................3140

Re-entered Order Denying 59(e) Motion and Denying Third Motion for Discovery
Filed June 21, 2017 (Doc.587), .......................................................................3143

Petitioner's Motion to Expand Record
Filed August 18, 2017 (Doc.588)......................................................................3154

Petitioner's Motion to Permit Copying and Distribution of Protected Documents
Filed August 18, 2017 (Doc.589),.....................................................................3157

Notice of Appeal
Filed August 18, 2017 (Doc.590)......................................................................3160

Order Granting Motion to Expand the Record
Entered September 15, 2017 (Doc.596) .............................................................3163

Order Granting Motion to Permit Copying and Distribution of Protected Documents
Entered September 15, 2017 (Doc.597) .............................................................3166

*Volume VIII of X - Sealed*

Supplemental Motion for Neuropsychologist Expert Services and Approval of Additional Funds for Paralegal/Discovery Coordinator Services Ex Parte
Filed February 5, 2009 (Doc.153) .....................................................................3169

Att. 1:    02/05/09 Cover Letter (Doc.153-1)......................................................3172
Att. 2:    CV – Scott D. Bender, Ph.D., ABPP-CN (Doc153-2).........................3173

Supplemental Motion for Psychiatrist and to Change the Designation of the Neuropsychologist Expert Previously Approved by the Court
Filed June 8, 2009 (Doc.204) ...........................................................................3176

Letter from Judge Smith directing three juror lists to be picked up by counsel
Filed June 12, 2009 (Doc.210) ..........................................................................3178

Order deferring action on defendant's motion for psychiatrist Dr. Merikangas
Entered June 23, 2009 (Doc.229) ......................................................................3181

Psychological Evaluation of Dr. Mirsky
Filed July 20, 2009 (Doc.246)...........................................................................3184

Strike List for First Day
Filed April 13, 2015 (Doc.424)..........................................................................3190

Strike List for Second Day
Filed Apr. 13, 2015 (Doc.424-1).......................................................................3194

Order sealing Claim S2 and Exhibit S-1
Entered October 5, 2015 (Doc.477) ...................................................................3198

Original Claim S-2
Filed Oct. 5, 2015 (Doc.477-1) ..........................................................................3203

Exhibit S-1
Filed Oct. 5, 2015 (Doc.477-2) ..........................................................................3223

Addendum S-1 to First Motion for Discovery
Dec. 4, 2015 (Doc.490) ......................................................................................3236

United States' Response to Original Claim S2
Filed January 11, 2016 (Doc.498).....................................................................3237

Petitioner's Motion to File Under Seal One Claim and One Exhibit in His
Amended Motion for Collateral Relief
Filed February 4, 2016 (Doc507).......................................................................3245

Amended Claim S2
Filed Feb. 4, 2016 (Doc.508) .............................................................................3249

Reply Supporting Original Claim S2
Filed Mar. 28, 2016 (Doc.525)...........................................................................3269

United States' Response to Amended Claim S2
Filed Apr. 22, 2016 (Doc.537) ...........................................................................3275

Reply Supporting Amended Claim S2
Filed July 7, 2016 (Doc.549)..............................................................................3284

Completed Questionnaire of Prospective Juror 1...........................................................3291

Completed Questionnaire of Prospective Juror 2...........................................................3310

Completed Questionnaire of Prospective Juror 4 ........................................................ 3329

Completed Questionnaire of Prospective Juror 7 ........................................................ 3348

Completed Questionnaire of Prospective Juror 10 ...................................................... 3367

Completed Questionnaire of Prospective Juror 12 ...................................................... 3386

Completed Questionnaire of Prospective Juror 13 ...................................................... 3405

Completed Questionnaire of Prospective Juror 14 ...................................................... 3424

Completed Questionnaire of Prospective Juror 15 ...................................................... 3443

Completed Questionnaire of Prospective Juror 18 ...................................................... 3462

Completed Questionnaire of Prospective Juror 20 ...................................................... 3481

Completed Questionnaire of Prospective Juror 23 ...................................................... 3500

Completed Questionnaire of Prospective Juror 24 ...................................................... 3519

Completed Questionnaire of Prospective Juror 27 ...................................................... 3538

Completed Questionnaire of Prospective Juror 28 ...................................................... 3557

*Volume IX of X - Sealed*

Completed Questionnaire of Prospective Juror 29 ...................................................... 3576

Completed Questionnaire of Prospective Juror 31 ...................................................... 3595

Completed Questionnaire of Prospective Juror 32 ...................................................... 3614

Completed Questionnaire of Prospective Juror 34 ...................................................... 3633

Completed Questionnaire of Prospective Juror 35 ...................................................... 3652

Completed Questionnaire of Prospective Juror 40 ...................................................... 3671

Completed Questionnaire of Prospective Juror 46 ...................................................... 3690

Completed Questionnaire of Prospective Juror 50 ...................................................... 3709

Completed Questionnaire of Prospective Juror 51 ...................................................... 3728

Completed Questionnaire of Prospective Juror 52 ...................................................... 3747

Completed Questionnaire of Prospective Juror 54 ...................................................... 3766

Completed Questionnaire of Prospective Juror 63 ...................................................... 3785

Completed Questionnaire of Prospective Juror 64 ...................................................... 3804

Completed Questionnaire of Prospective Juror 65 ...................................................... 3823

Completed Questionnaire of Prospective Juror 66 ...................................................... 3842

Completed Questionnaire of Prospective Juror 67 ...................................................... 3861

Completed Questionnaire of Prospective Juror 68 ...................................................... 3880

Completed Questionnaire of Prospective Juror 69 ...................................................... 3899

Completed Questionnaire of Prospective Juror 70 ...................................................... 3918

Completed Questionnaire of Prospective Juror 73 ...................................................... 3937

Completed Questionnaire of Prospective Juror 74 ...................................................... 3956

Completed Questionnaire of Prospective Juror 75 ...................................................... 3975

Completed Questionnaire of Prospective Juror 78 ...................................................... 3994

Completed Questionnaire of Prospective Juror 80 ...................................................... 4013

*Volume X of X - Sealed*

Completed Questionnaire of Prospective Juror 81 ...................................................... 4032

Completed Questionnaire of Prospective Juror 82 ...................................................... 4051

Completed Questionnaire of Prospective Juror 84 ...................................................... 4070

Completed Questionnaire of Prospective Juror 86 ...................................................... 4089

Completed Questionnaire of Prospective Juror 87 ...................................................... 4108

Completed Questionnaire of Prospective Juror 91 ...................................................... 4127

Completed Questionnaire of Prospective Juror 95 ...................................................... 4146

Completed Questionnaire of Prospective Juror 97 ...................................................... 4165

Completed Questionnaire of Prospective Juror 98 ...................................................... 4184

Completed Questionnaire of Prospective Juror 100 .................................................... 4203

Completed Questionnaire of Prospective Juror 106 .................................................... 4222

Completed Questionnaire of Prospective Juror 107......................................................4241

Completed Questionnaire of Prospective Juror 109......................................................4260

Completed Questionnaire of Prospective Juror 110......................................................4279

Completed Questionnaire of Prospective Juror 113......................................................4298

Completed Questionnaire of Prospective Juror 115......................................................4317

Completed Questionnaire of Prospective Juror 116......................................................4336

Completed Questionnaire of Prospective Juror 117......................................................4355

Completed Questionnaire of Prospective Juror 118......................................................4374

Completed Questionnaire of Prospective Juror 119......................................................4393

Completed Questionnaire of Prospective Juror 120......................................................4412

Completed Questionnaire of Prospective Juror 124......................................................4431

Completed Questionnaire of Prospective Juror 126......................................................4450

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

UNITED STATES OF AMERICA       )
                               )       CRIMINAL ACTION
       v.                      )
                               )       NO. 4:08cr16
MICHAEL ANTHONY ERIC DRAVEN    )
                               )
       and                     )
                               )
DAVID ANTHONY RUNYON,          )
                               )
          Defendants.          )

TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

July 9, 2009

**SEVENTH DAY OF TRIAL**

Before:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge, and a Jury

GLORIA S. SMITH, OFFICIAL REPORTER

**503**

Appearances:

       LISA R. MCKEEL
       BRIAN J. SAMUELS
       Assistant United States Attorneys
           Counsel for the United States

       TIMOTHY G. CLANCY
       JAMES S. ELLENSON

           Counsel for Michael Anthony Eric Draven

       STEPHEN A. HUDGINS
       LAWRENCE H. WOODWARD, JR.
           Counsel for David Anthony Runyon

GLORIA S. SMITH, OFFICIAL REPORTER

504

(The jury entered the courtroom.)

THE COURT: Good morning, ladies and gentlemen of the jury. I hope that you had a very nice evening, and I'm going to ask that the clerk call the case and the roll.

THE CLERK: Thank you, Your Honor.

Case No. 4:08cr16, United States of America versus Michael Anthony Eric Draven, also known as Anthony James Neff; and David Anthony Runyon.

Ms. McKeel, Mr. Samuels, is the government ready to proceed?

MR. SAMUELS: Good morning, Judge. We are ready.

MS. MCKEEL: Good morning, Your Honor.

THE CLERK: Mr. Ellenson, Mr. Clancy, is the defendant Michael Anthony Eric Draven ready to proceed?

MR. CLANCY: We are. Good morning.

MR. ELLENSON: Good morning, Judge.

THE CLERK: Mr. Woodward, Mr. Hudgins, is the defendant David Anthony Runyon ready to proceed?

MR. WOODWARD: Good morning. We are prepared, Your Honor.

THE COURT: Good morning.

(The jurors' names were called.)

THE CLERK: Thank you. All the jurors are present, Your Honor.

THE COURT: All right. Mr. Swartz, if you would

please come back on the stand.

MR. SAMUELS:  Your Honor, while Mr. Swartz is taking the stand, I would like to take this opportunity to move in Government Exhibit 3, which was the large aerial map that was shown on the first day of trial.

THE COURT:  That is admitted.

(Government Exhibit 3, admitted.)

MR. SAMUELS:  Thank you, Your Honor.

PAUL SWARTZ, DIRECT EXAMINATION (Cont'd.), on behalf of the government, as follows:

DIRECT EXAMINATION (Cont'd.)

BY MR. SAMUELS:

Q     Good morning, Mr.Swartz.

A     Good morning.

Q     Mr. Swartz, in addition to collecting phone calls during the course of the investigation, did you and other agents also obtain e-mails from the e-mail accounts of the defendants?

A     Yes, we did.

Q     And what e-mail accounts did you obtain these e-mails from, Mr. Swartz?

A     There were several e-mail accounts from MySpace.com that were associated with Catherina Voss, also Michael Draven. There were two accounts for Michael Draven from MySpace.com, and then there was a Yahoo account that was shared by Catherina Voss and Cory Voss, and there was an e-mail account

from MySpace as well as Yahoo for David Runyon.

Q    Mr. Swartz, how were these e-mails from these accounts obtained?

A    Numerous search warrants, federal search warrants, were executed to obtain the contents of those records.

MR. SAMUELS:  Your Honor, at this time I would like to request that the court read three stipulations.

THE COURT:  All right.

MR. SAMUELS:  These would be Stipulations 26, 27, and 28.

THE COURT:  26 is as follows:  United States Exhibits No. 137 through 140L, 142 through 146L, and 148 through 154 are e-mail records of MySpace.com from the accounts referenced in Stipulation No. 25.

And I have previously gone through that stipulation.

MR. SAMUELS:  Yes, ma'am, you have.

THE COURT:  The header information containing the date, time, and sender and recipient information of the e-mail messages contained herein are business records and were made by an employee at or near the time of occurrence, with knowledge of the matters contained therein, kept in the regular course of business, and it was a regular practice of MySpace.com to make the records.

The e-mail messages, including associated header information and content, were provided by the MySpace.com

custodian of records pursuant to the execution of a search warrant for the accounts of user or friend ID 123167515, user name mdravenphotography; user or friend ID 2713588499, user name, redsnowfilms; user or friend ID 257290865, user name merhino4U; and user or friend ID 98587840, user name KittyCatV.

What was the other one?

MR. SAMUELS:  27 and 28, Your Honor.

THE COURT:  27 is as follows:  Subscriber information reports from Yahoo.com provide the following Yahoo.com accounts, for Yahoo mail name bushido.dragon@yahoo.com, with the listed subscriber as David Runyon of Morgantown, West Virginia, 26505, United States, a birthdate of January 7, 1971, and a sign-up date of March 22, 2006, at 5:51 a.m.  And for Yahoo Mail cvoss2000@yahoo.com, with a listed subscriber as Cory Voss of Newport News, 23601, United States, birthdate of January 21, 1977, and a sign-up date of January 11, 2005, at 5:17 a.m., respectively, which were provided by the Yahoo.com custodian of records.  The subscriber information reports were made by an employee at or near the time of occurrence, with knowledge of the matters contained therein, kept in the regular course of business, and it was a regular practice of Yahoo.com to make the records.

28 is as follows:  United States Exhibits No. 155 through 158A are e-mail records of Yahoo.com from the accounts

referenced in Stipulation No. 27. The header information containing the date, time, and sender and recipient information of the e-mail messages contained herein are business records and were made by an employee at or near the time of the occurrence, with knowledge of the matters contained therein, kept in the regular course of business, and it was a regular practice of Yahoo.com to make the records.

The e-mail messages, including associated header information and content, were provided by the Yahoo.com custodian of records pursuant to the execution of a search warrant for the accounts of Yahoo Mail bushido.dragon@yahoo.com, and Yahoo Mail name cvoss2000@yahoo.com.

BY MR. SAMUELS:

Q    Mr. Swartz, do you have Government Exhibits 150 through 153 there, sir?

A    Yes, I do.

Q    And those four exhibits, 150, 151, 152 and 153 -- whose e-mail account are those associated with?

A    Catherina Voss.

Q    Are they from a MySpace account, or a Yahoo account?

A    This is from the MySpace account.

MR. SAMUELS:  Your Honor, I would offer Government Exhibits 150, 151, 152, and 153.

THE COURT:  They are admitted.

MR. SAMUELS:  Thank you.

(Government Exhibits 150 through 153, admitted.)

BY MR. SAMUELS:

Q    Mr. Swartz, I'd like to start with Government Exhibit 150.  Now, Mr. Swartz, the date and time of that e-mail -- what is the date and time of that, sir?

A    The date is October 9, 2006, and on the record is printed 9:30 a.m.

Q    Now, do you know whether that's East Coast time, or Central time or Pacific time?

A    That is Pacific time.  The servers for MySpace.com are located in California, and they keep track of their time based upon California time.  So the time of this e-mail would actually be at 12:30 p.m.

Q    Is this an e-mail sent by Cat Voss, or received by Cat Voss?

A    It is an e-mail sent by Cat Voss.

Q    Would you read the e-mail, please, Mr. Swartz.

A    You ever get those photos of Jeff Star?  I just went to make a comment to Michael.  His page is all fucked up.  Don't know what's up with that.  It wouldn't let me make a comment. He went home last night first in -- and it looks like it is misspelled -- it's P-V-E-R -- should be over a week, and now he won't answer the phone.  Still asleep?  Who knows?  I want to do that makeup sometime soon and get Michael to shoot me

crazy like.  My kids' b-day is this Saturday, so maybe before then or after.  What are you doing Saturday night?  I'm just chilling here with my babe.  LOL.  Things got crazy fast, but it is all good.  He blows my mind.  I love him so much.  I hope that he knows just how much.  Give me a holler, biatch. We got to hang out again.  Cat.

Q   Mr. Swartz, at the time this e-mail was sent, October 9, 2006, do you know from the investigation whether Cory Voss was in the area, or whether he was deployed?

A   It is my understanding that he was deployed on the ELROD at that time.

THE COURT:  Is there any indication who that was to?

THE WITNESS:  There is a friend ID number at the top left-hand corner.  I do not know who the subscriber to that is.

THE COURT:  All right.

BY MR. SAMUELS:

Q   Mr. Swartz, the next e-mail I'd like you to take a look at is Government Exhibit 152, and could you tell us who this e-mail is from, and the date and time on it, sir?  I'll blow it up for you.

A   This is an e-mail from Catherina Voss.  It is from her outgoing e-mail on the MySpace.com.  It occurred on December 24, 2006, and the time on the document is 12:01 a.m., but that would be 3:01 a.m. on the 24th.

Q    East Coast time?

A    East Coast time.

Q    Would you read that e-mail, please, Mr. Swartz.

A    Hey, you.  How long have you been seeing him?  He's def a keeper.  And he has a job worth merit.  Good choice.  Cute gurl, spelled G-U-R-L.  Hope all is well.  I am spending time with my family.  Mom is very sick -- cancer, and kids and I have been busy for the holidays.  So a lot is on my plate.  I will get through.  I always have.  Michael is a good thing in my life.  No drinking.  Lalala.  Just very good person, and he loves the kids like they are his own.

We got pregnant two times and lost both.  Second time was twins.  We are not trying anymore, not now.  Getting a stable home and environment and we are trying to open up a gallery together so letting that take off and then the family will come.  So I have been upset over that.  Staying at home, being all depressed, but, hey, I am truly thankful for what I have now, and everything I want will come to me soon enough. I know, you didn't ask, but I told you how my life is going.

So hope you have a wonderful Christmas.  P. S., whatever happened to Clay?  Haven't heard or got a letter from him after I didn't give him money for food in jail.  Go figure.  Love you, Cat.

Q    Mr. Swartz, the next e-mail is Government Exhibit 151. What is the date and time on that, sir, and who authored that

e-mail?

A    This is an e-mail from Catherina Voss's MySpace account that was sent to Michael, with the friend ID number of 123167515.  It was on December 24, 2006, and again the date on the document is 10:18 p.m., but that would be 1:18 a.m. on the 25th, Christmas morning.

Q    Mr. Swartz, do you recognize that friend ID that this e-mail has been sent to?

A    Yes.  That is Michael Draven's.

Q    Is that his MySpace account?

A    His MySpace account.

Q    Would you read that e-mail, please, Mr. Swartz.

A    Michael, tonight I will dream about you.  I will wish for you to be with me as a family.  You have made my Christmas a very special one by taking me as your wife.  I love you, and nothing would ever change that or our love for each other. You have such a special place in my heart, and I will always keep you in my thoughts as I go through tomorrow morning with the kids.

I wish you were here, and I will miss the hell out of you.  I love you forever and ever.  My heart, my soul, Merry Christmas, my love.  Catherina Draven.

Q    Mr. Swartz, the e-mail, Government Exhibit 153 -- what is the date and the time on that e-mail, and who is it from?

A    This is an e-mail that occurred on April 24, 2007.  The

time on the document is 6:01 a.m., which would make it 9:01 a.m., and it is sent from Catherina Voss's MySpace account to the friend ID number of 22873895.

Q    Would you read that e-mail, please, Mr. Swartz?

A    I don't know if you remember me, but I was at Barbie's Halloween party dressed in all black with my, quote, boyfriend at the time, end quote, now husband slash photographer. Congratulations on the baby.  Nice to see you are doing very well.  Cat Draven.

Q    Mr. Swartz, do you have Government Exhibits 137, 138 and 138A and B in front of you, sir?

A    Yes, I do.

Q    What accounts are these records from, sir?

A    These are e-mails that are from the Michael Draven MySpace account.

          MR. SAMUELS:  Your Honor, I would offer Government Exhibits 137, 138, 138A and 138B.

          THE COURT:  They are admitted.

          MR. SAMUELS:  Thank you.

          (Government Exhibits 137, 138, 138A, and 138B, admitted.)

BY MR. SAMUELS:

Q    Mr. Swartz, if we look at the first one, 137, is this the same e-mail that was sent by Cat Voss that we looked at previously as Government Exhibit 151?

A    Yes, sir, that is correct.  It is 151.

Q    And that user inbox, the from number, what is the ID there?

A    98587840.

Q    And is that the user ID of Catherina Voss?

A    Yes.

Q    So this shows that that e-mail has been brought into Michael Draven's inbox.

A    That is correct.

Q    If we look to the next e-mail, Government Exhibit 138, what is the time and the date on this e-mail, Mr. Swartz?  And would you read it, please.

A    The date is January 2, 2007, and the time on the document is 5:53 p.m., but it is actually 8:53 p.m. Eastern time, and this is an e-mail that was sent by Michael Draven from his MySpace account to user ID number 91786505.

I love the profile, but a simple but unusual question have for you.  Have you done a swipe or hit on someone before?  Just wondering.  I'm sorry about your loss. I have had someone take something close to me also.  If you need photos done, let me know.  I just moved back down to Hampton Roads VA from Bmore, so let me know what's up.  I might have a gig or two for you.  Draven.

Q    Now, Mr. Swartz, are Government Exhibits 138A and 138B just continuations on that thread?

A    Yes, that is correct.

Q    And that's the same thread that has been previously admitted and identified by Mr. Lawrence Ford?

A    That's correct.

        THE COURT:  Who is this "to" number?

        THE WITNESS:  Lawrence Ford.

        THE COURT:  All right.

BY MR. SAMUELS:

Q    Do you have Government Exhibits 155, 157, and 157A, Mr. Swartz?

A    Yes, I do.

Q    And what e-mail account are those records associated with?

A    These are e-mails that were retrieved from the bushido.dragon Yahoo account that is associated with David Runyon.

        MR. SAMUELS:  I would offer Government Exhibits 155, 157, and 157A.

        THE COURT:  They are admitted.

        (Government Exhibits 155, 157, and 157A, admitted.)

BY MR. SAMUELS:

Q    Mr. Swartz, pulling up 155, what is the date and the time on that e-mail, and who does it purport to be from and to?

A    This is an e-mail that occurred on Saturday, June 17, 2006, at 7:17 p.m. Pacific time, and it is from David Runyon

to a Charles Ferguson.

Q    Mr. Swartz, I'd like to blow up a portion of that e-mail and have you read it.  If you could just start with, It's been about four years.

A    It's been about four years since I played a good football game with friends.  Of course, same old story.  The young bucks had to buck and call me an old man, so I had to show them just how young, inexperienced, and foolish they were.  This old man has still got it.  I am still in good health and decent shape.  Much better than the majority of 18-year-olds nowadays.  I can still do most of the things I used to do when I was younger.  It just hurts worse the next day.

Two years ago I was challenged, and I told them to put their money where their mouth was.  I did 60 military standard pushups in 42 seconds and shut them up real quick, not to mention took their money with a smug smile.  Four years ago I jumped on a treadmill at the hotel where I worked at, and ran a clean ten miles in about one hour and 15.  A little slow for me, but I got out of the Army in '97, and I could run almost a six-minute-mile pace with 40 pounds ruck on my back, rifle, boots on, et cetera, for ten miles flat out, and that was my pace.  I wasn't hurting when I finished.  Matter of fact, you couldn't even hear me breathing.  After five minutes, I was back to normal.

Don't forget, I used to get paid to train to kill

people.  I took my job very seriously.  Besides, I didn't feel like dying for my country.  He, the enemy, could die for his.  I worked very hard at my job.  Fringe benefits for me was my body being in good athletic shape, but I do have hearing loss and two very bad knees to show for my extreme behavior.  I tried to slow down, but my spirit would get the better of me sometimes.  The next day my brain would remind me to slow it down when the pain would set in.

Anyways, I better make this short before I keep rambling on for a couple of more hours.  LOL.  Good thing there isn't a phone bill involved here, huh?  Write back soon, and feel free to share the pics with family, friends, or any cute girls you think might be interested.  LOL.  Later days and better lays, dude.  Catch you on the flipside.

Q    Mr. Swartz, do you have Government Exhibit 157 there, sir?

A    Yes, I do.

Q    Is this also from the David Runyon e-mail account bushido.dragon@yahoo.com?

A    Yes, it is.

Q    What is the date and the time of this e-mail?

A    The date is Sunday, April 29, 2007, at 1:20 p.m. Pacific time.

Q    And does it indicate who it is sent to?

A    It is sent to -- I'm going have to spell this --

A-L-E-V-T-I-N-A, Alevtina.

Q    And what is written here, the first three sentences, if you could just read those?

THE COURT:  And it is from?

MR. SAMUELS:  Thank you, Your Honor.

BY MR. SAMUELS:

Q    Who is it from, Mr. Swartz?

A    From David Runyon from the bushido.dragon Yahoo e-mail account.

Q    Read the first three sentences, Mr. Swartz.

A    My sweet Alevtina.  Sounds wonderful.  I must write quickly.  I will write more later, though.  Pittsburgh, Pennsylvania, is the closest city with a major airport near me, but Washington, D. C., or Baltimore, Maryland, can work. Maybe the airplane ticket might be cheaper to Washington, D. C.  I can drive and pick you up there.  It's a one-hour drive to Pittsburgh and a three-hour drive to Washington, D. C.

Q    Mr. Swartz, again the time, is there a PDT indication there?

A    Yes.

Q    Can you tell what time it is?  Is that in military time, or standard time?

A    It is in military time, 1320 hours, which would be 1:20 p.m. Pacific time.

THE COURT:  On what date?

THE WITNESS:  On the 29th of April, 2007.

BY MR. SAMUELS:

Q    Mr. Swartz, if you look down at the bottom, is that in reply to another e-mail from the individual that Mr. Runyon is writing to?

A    Yes, it is.

Q    From reading that e-mail through, can you tell where that individual lives?

A    In the Ukraine.

Q    Now, Mr. Swartz, do you have 157A in front of you, sir?

A    Yes, I do.

Q    What is the date and the time of 157A, and who are the parties to that e-mail?

A    This e-mail is from the bushido.dragon Yahoo account of David Runyon, and it occurred on Wednesday, May 2, 2007, at 5:21 p.m., Pacific time, and it is to the same person, Alevtina.

Q    And would you just read the first sentence of that e-mail, first full line and the next little bit.

A    My darling, I'm sorry I upset you.  I had to go out of town for work again.  It is getting harder to say goodbye to my little boy.  He started to cry this last time.  I tried to spend as much time as I could before I had to leave for work, even cutting into my sleep.

Q     And, Mr. Swartz, is that in response to this e-mail down below from Alevtina?

A     That is correct.

Q     Read that e-mail, please.

A     This is an e-mail that was to David Runyon at the bushido.dragon Yahoo account.  It occurred on Wednesday, May 2, 2007, at 6:16 a.m., and it says, Today I have not received your letter.  Why you do not write me?  Alevtina.

Q     Mr. Swartz, that last portion on the bottom of 157A -- is that the same e-mail as is written by Mr. Runyon on Government Exhibit 157?

A     That's correct.

Q     So this is the response to that e-mail?

A     Yes.

          MR. SAMUELS:  Thank you, Mr. Swartz.  No further questions at this time, Your Honor.

          MR. CLANCY:  I don't have any questions, Judge.

          THE COURT:  Mr. Woodward?

                    CROSS-EXAMINATION

BY MR. WOODWARD:

Q     Good morning, Mr. Swartz.

A     Good morning.

Q     Could we first start with what was admitted yesterday as Government Exhibit 159?  Are you able to -- that's the front page of the jail calls that was admitted as 159.  Can you pull

that up?

A    I can't from here today.

Q    Well, let me just -- there were a total of 36 jail calls for 433 minutes and 25 seconds; is that correct?

A    I know there were 36 calls, and I know that it is 400 --

Q    Now you have it in front of you.  Down at the bottom left?

A    433?

Q    433 minutes, 25 seconds; am I reading that right?

A    That is correct.

Q    When you talked about that system yesterday, is an inmate at that time allowed to make long distance calls if they have money on their account?

A    I don't know the answer to that.

Q    Certainly none of the calls that Mr. Draven made from the jail were to any phone associated with Mr. Runyon?

A    That is correct.

Q    Okay.  And you also indicated yesterday that the phone registered -- there was a call on April -- excuse me -- on March 24 from a phone registered to Ms. Voss and a phone registered to Mr. Runyon?

A    Correct.

Q    There is no recording of that call?

A    No, there is not.

Q    All right.  Now, getting back quickly to the e-mails that

you talked about today, just so I'm clear, the exhibits

beginning with 155, can you pull that up from there yet?

A    I have those.

Q    Okay.  You were asked to read a portion of that about two

thirds of the way down.  I'm not going to ask you to read it,

because the jury will be able to read it, and it is in

evidence.  But above that, Mr. Runyon is describing a vacation

he is on and a fishing trip and taking his girlfriend to New

Jersey and talking about a trip he took.

A    That is correct.

Q    Okay.  And then, so I'm clear, that would have been sent

at 10:17 p.m. Eastern standard time, because it was 7:17

Pacific time?

A    That is correct.

Q    Okay.  And then you also were asked about Exhibit 157.

Do you have that still in front of you?

A    Yes, sir.

Q    And again that's Mr. Runyon responding to an e-mail that

he received from someone named Alevtina, and that would have

been -- Mr. Runyon's response would have been sent at

4:20 p.m. Eastern standard time?

A    That's correct.

Q    Okay.  Fair enough.  And is the one down below that where

it shows the message from Alevtina to Mr. Runyon, Saturday,

6:59 a.m. -- was that 6:59 a.m. Russia time, or do you know

how that works?

A    I don't know the answer to that one.

Q    Okay.  And then the one that's 157A, up at the tag line, Mr. Runyon would have sent that e-mail on May 2 at 8:21 Eastern time, is that right, because it was 5:21 Pacific time?

A    That is correct.

Q    And you were also asked to read a portion of that e-mail, and again they will be able to read it, but after what you read, he is talking about his son and taking his son hunting and fishing and describing activities he wants to do with his son in that e-mail?

A    That is correct.

MR. WOODWARD:  Okay.

Thank you, Your Honor.  That's all I have for this witness.

MR. SAMUELS:  Nothing further, Your Honor.  Thank you.

THE COURT:  Thank you, Mr. Swartz.

THE WITNESS:  Thank you.

MR. SAMUELS:  Your Honor, he is subject to recall.

THE COURT:  All right.

Your next witness?

MR. SAMUELS:  The United States calls Mike Garber.

(Mr. Garber was sworn.)

MIKE GARBER, DIRECT EXAMINATION on behalf of the

A    Yes, ma'am.

Q    Detective, did you go to Morgantown, West Virginia, on a number of occasions during the course of the homicide investigation?

A    Yes, ma'am.

Q    Approximately from Newport News, Virginia, to Morgantown, how long did it take you to get to Morgantown, West Virginia?

A    Roughly six hours.

MS. MCKEEL:  That's all I have, Judge.

CROSS-EXAMINATION

BY MR. WOODWARD:

Q    Detective, good afternoon.

A    Good afternoon.

Q    You searched the car on December 11, of 2007?

A    Yes, sir.

Q    You had not searched the car any time prior to that?

A    No, sir.

Q    And you would agree with me that December 11 comes after November 17 in the calendar year?

A    Yes, sir.

MR. WOODWARD:  Thank you.  That's all I have.

MR. ELLENSON:  We don't have any questions, Judge.

MS. MCKEEL:  Nothing further, Judge.

THE COURT:  All right.  Thank you, Mr. Williams.

THE WITNESS:  Thank you.

MS. MCKEEL:  We next call Special Agent William Banks.

(Mr. Banks was sworn.)

WILLIAM BANKS, DIRECT EXAMINATION on behalf of the government, as follows:

DIRECT EXAMINATION

BY MS. MCKEEL:

Q    Would you state your name, please.

A    William Banks.

Q    And where are you employed, sir?

A    As a special agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives.

Q    How long have you been employed there?

A    Nine and a half years.

Q    Prior to serving at the ATF, where did you work before?

A    As a special agent with the Air Force Office of Special Investigations.

Q    Are you also in the military, sir?

A    Yes, ma'am, I am.

Q    Now, are you one of the ATF agents that was involved in the investigation into the murder of Cory Voss?

A    Yes.

Q    During the course of the investigation did you travel to West Virginia?

A    Yes, multiple times.

Q    And on December 11, 2007, did you travel to West Virginia to execute some federal search warrants?

A    Yes, ma'am, I did.

Q    Approximately how many search warrants did you execute?

A    We executed three federal search warrants, and one consensual search warrant.

Q    Okay.  If you would, please, tell us the locations of the search warrants.

A    The three search warrants were served -- federal search warrants were served at a 24/7 Self-Storage area in Morgantown, West Virginia.  We served another federal search warrant at 67 Overland Drive in Woodland Terrace Trailer Park in Morgantown, West Virginia; and on the 1998 Chevy Blazer that was just referenced by Detective Williams.

Q    And where was the consent search?

A    That was done at a past residence of Mr. Runyon that was over at -- I don't know if I have the address in front of me.

Q    Was that 400 Herman Avenue?

A    Yes, ma'am, sorry.  400 Herman Avenue.  It was a past residence of his, also in Morgantown, West Virginia.

Q    Now, let's go first to the location of Lot 67, Overland Drive.  What type of location is that, sir?

A    Lot 67 is a trailer park in West Virginia, multiple trailers in that, and then Lot 67 was a specific trailer in that park.

MS. MCKEEL: Your Honor, at this time we would ask the court to read Stipulation No. 84.

THE COURT: That stipulation is as follows: On December 11, 2007, agents with the Bureau of Alcohol, Tobacco, Firearms & Explosives, the Naval Criminal Investigative Services, and officers with the Newport News Police Department executed federal search warrants at Lot 67, Overland Drive, in the Woodland Terrace Trailer Park; the 24/7 Self-Storage Unit No. D-58; and a 1998 Chevrolet Blazer, West Virginia license plate No. 9KV854, all located in Morgantown, West Virginia.

United States Exhibits No. 217 through 231 and 237 through 238 were collected by various agents and officers and turned over to Special Agent William Banks, where the evidence was placed in a vault at the Bureau of Alcohol, Tobacco, Firearms & Explosives, located in Norfolk, Virginia, and were properly stored and maintained as evidence by the Bureau of Alcohol, Tobacco, Firearms & Explosives. The parties agree that the Bureau of Alcohol, Tobacco, Firearms & Explosives Special Agent William Banks may testify to all items seized on December 11, 2007, from various search locations.

MS. MCKEEL: Thank you, Judge.

BY MS. MCKEEL:

Q    The trailer park that you went to, Lot 67 on Overland Drive -- who lived there?

A    David Runyon resided there.

Q    And I'd like to show you what has been marked as Government Exhibits 217, 218, and 219.  If you could, Agent Banks, please tell us where Exhibit Number 217 was found, and what it is.

A    Exhibit No. 217 is a piece of notebook paper with writing on both sides, and it was recovered from the bedroom of David Runyon.

MS. MCKEEL:  Your Honor, at this time I would like to introduce Government Exhibit 217.

THE COURT:  It is admitted.

(Government Exhibit 217, admitted.)

MS. MCKEEL:  Thank you.

BY MS. MCKEEL:

Q    Let's take a look at 217.  If you could, Agent Banks, if you would look on the bottom right-hand corner of the piece of paper, can you tell us what is written there?

A    It appears to be a checklist in the bottom right-hand corner.  On the top it starts with the word "tarp," and at the bottom it finishes with "leather gloves, black."

Q    Would you read what each of those items are listed, please.

A    From top to bottom, ma'am, it reads tarp; trash bag; taser, which looks like 300K volts; Spyderco knife; contacts; watch cap; black hoodie sweatshirt; black BDU pants; black jungle boots; black dress socks; gel shoe inserts; leather

W. Banks - Direct 1035

gloves, black.

Q   Let's look next to Government Exhibit 218.

THE COURT:  Go to the top of it.  What does that say?

BY MS. MCKEEL:

Q   The very top of the document, sir.

A   It appears to be 6.25 hours, 380 miles.  Then there is an indication -- it looks like Pfizer Drug Company, call Wednesday, and it has some times and dates, 29 March, 0900; 9 through 16 April, $2,000, and looks like it says 18 comma 20, comma 23, comma 30, something then that I cannot make out, and then Langley Federal Credit Union, or F-E-D, abbreviated, Credit Union.

Q   What else does it say?  Is there an address at the bottom on the side?  Can you read from the side, sir?

A   Yes, ma'am, I can.  It says Exit 252, Jefferson, York Crossing Shopping, looks like a portion of a possible phone number, and then 1742 Jefferson lined through, another phone number lined through, (757)825-7108, and then written again is 11742 Jefferson, and then 873 dash, looks like 3944.

Q   Is there anything written on the back of that document?

A   Yes, ma'am.  There is another full page of notes.  Looks mostly to be car insurance type information.

Q   Let's go next to Government Exhibit 218.  Can you tell us what that is?

GLORIA S. SMITH, OFFICIAL REPORTER

**530**

A    Yes, ma'am.  Exhibit 218 is an orange piece of paper with some miscellaneous phone numbers on it that belong to Cat Voss, Michael Draven, and David Runyon.

Q    Where did you find that document?

A    This was also recovered from the bedroom of David Runyon.

MS. MCKEEL:  Your Honor, we would like to introduce Government Exhibit 218.

THE COURT:  All right.

(Government Exhibit 218, admitted.)

BY MS. MCKEEL:

Q    Can we look at that document?  Would you please point out where the phone numbers are on this document?  Do you see some large print?

A    In the top left corner you will see David parentheses (304)685-2230.  Then moving across the document to the right, there is a phone number that's written, (757)713-7570.  And then below the bold print of the advertisement is another phone number that says (757)715-2616, and then after it, it says Kat, K-A-T.

Q    The (757)713-7570 number -- what number do you know that to be?

A    Michael Draven's.

Q    Let's take a look at Government Exhibit 219.  Do you see that, sir?

A    Exhibit 219 is a yellow legal pad with miscellaneous

notes on it that was recovered from the bedroom of David Runyon.

MS. MCKEEL: Your Honor, we would like to introduce Government Exhibit 219.

THE COURT: It is admitted.

(Government Exhibit 219, admitted.)

MS. MCKEEL: If we could publish a picture of that?

BY MS. MCKEEL:

Q   Is this a full notebook -- could you hold that up so everyone can see that?

A   Yes, ma'am.

Q   Is it a full notebook?  Does it have writing on it?

A   It is full of writing, ma'am, yes.

Q   You have looked through that notebook; is that correct?

A   Yes, I have.

Q   If you would tell us, is there something important on that document to the case?

A   Well, what we had interest in was in the top right portion of one page, it says Dreven, and he spells it D-R-E-V-E-N, in the top right corner there.  It says, they cut out ten pieces of skin and suture you up, with an exclamation mark.

Q   Have you seen in David Runyon's belongings the name Dreven like that again?

A   Yes, ma'am.  Later in my testimony we recovered a cell

phone that had Draven's name in the address book spelled that same way.

Q    Let's move on to the next location, the storage unit.

A    Yes, ma'am.

Q    Where was that?

A    It was called 24/7 Self-storage.  It was a storage unit in Morgantown, West Virginia.

Q    And whose storage unit was that?

A    It belonged to David Runyon.

Q    Can you just briefly describe what items were in that storage unit?

A    We have -- we recovered a briefcase in the government exhibits -- well, all the government exhibits we have from this location were recovered from that briefcase.  It was a brown leather briefcase with two brass locks on it.

Q    I'm going to hand you Government Exhibits 220 to 231, sir.

A    Yes, ma'am.

Q    Were these documents that you have been handed, if you will take a look at them -- were they all found inside Mr. Runyon's briefcase?

A    Yes, ma'am, they were.

          MS. MCKEEL:  Your Honor, at this time we would like to introduce Government Exhibits 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, and 231.

THE COURT: They are all admitted.

(Government Exhibits 220 through 231, admitted.)

MS. MCKEEL: Thank you, Judge.

BY MS. MCKEEL:

Q    If you could, sir, please tell us what the first exhibit, 220, is.

A    Exhibit 220 is a copy of a Sprint cell phone bill to David Runyon.

Q    Is that what is shown up on the screen, sir?

A    Yes, it is.

Q    Let's move next to Government Exhibit 221. What is that, sir?

A    I think it was the second page or another portion of that, but it is again a Sprint cell phone bill mailed to David Runyon.

Q    Let's move to Government Exhibit 222.

A    Exhibit 222 is a child nutrition report for David Runyon's son, invoice date 5-07 of '07, with a due date of 5-25-07.

Q    Let's go next to Government Exhibit 223.

A    223 is a piece of paper with handwritten notes on it. But in the center -- well, three quarters of the way down, underneath the government exhibit sticker, is a reference to a stainless steel Brownell's catalog order brush with a confirmation order number to Andy Garcia, and some notes on

that item.

Q    Are you familiar with that stainless steel brush?

A    Yes, ma'am, I am.

Q    What is that for?

A    The stainless steel brush is used for aggressive cleaning of a barrel, of a gun barrel.

Q    Let's move next to Government Exhibit 224.

A    Exhibit 224 is a DD-214.  It is a certificate of release or discharge from active duty.  This was specifically a discharge for David Runyon, the pay grade of E-3, or Enlisted Grade 3.

Q    Let's move next to Government Exhibit 225.

A    Exhibit 225 is again a DD Form 214, certificate of release or discharge from active duty.  This was for the grade of second lieutenant, or Officer Grade One.

Q    And where was that from?

A    This was from the Guard, the Guard unit that he belonged to.

Q    Okay.  Let's move next to Government Exhibit 226.

A    Exhibit 226 is a position description for a corrections officer at the El Dorado Correctional Facility.

Q    Let's move next to 227.  Tell us what that is.

A    Exhibit 227 is two copies of a resume belonging to David A. Runyon.

Q    And if you would go next to Government Exhibit 228.

A    Exhibit 288 is a Georgia Peace Officer Standards and Training Council, Officer Profile Report for David A. Runyon.

Q    Is this for some sort of training, sir?

A    Yes, ma'am.  And if you look down at the bottom of the page, you will notice training history, and it will index the courses that he had taken and completed.

Q    Let's move next to Government Exhibit 229.

A    Exhibit 229 is a document dated October of '91 that was a infantry officer's basic records update, and it's the weapons qualifications that Second Lieutenant David Runyon held at that time, specifically M16, M60 machine gun, the M203 grenade launcher, and then the hand grenade itself.

Q    Let's go to Government Exhibit 230.  What is this, sir?

A    Exhibit 230 are two documents from Troy State University showing classes that Mr. David A. Runyon had taken.  This one here is for a course he took in weapons.

Q    Let's go to Government Exhibit 231.  What is that?

A    There were two documents with 230 as well, ma'am, just -- there were two documents from Troy State.  We showed one, but there were two there.

That was the second -- there is the second course. That was for Iowa University Covert Law Enforcement, again, course of completion.

And the last exhibit from this group was Exhibit 231, which are receipts for money orders that were used to, in

turn, pay rent, and we have the money orders marked with rent at 480 a month, $480 a month.

Q    Now, did you execute a search warrant at another location -- not a search warrant -- excuse me -- a consent search at another location?

A    Yes, we did.  We had agents go to 400 Herman Avenue and conduct a consent search, and some articles were collected at that location as well.

MS. MCKEEL:  Your Honor, at this time we have a stipulation, No. 85, regarding this search.

THE COURT:  That stipulation is as follows:  On December 11, 2007, agents with the Bureau of Alcohol, Tobacco, Firearms & Explosives, the Naval Criminal Investigative Services, and officers with the Newport News Police Department searched the premises of 400 Herman Drive, Morgantown, West Virginia, pursuant to consent by the homeowner.  United States Exhibits 232 through 238 were collected by various agents and officers and turned over to Special Agent William Banks, where the evidence was placed in a vault at the Bureau of Alcohol, Tobacco, Firearms & Explosives located in Norfolk, Virginia, and were properly stored and maintained as evidence by the Bureau of Alcohol, Tobacco, Firearms & Explosives.

The parties agree that Bureau of Alcohol, Tobacco, Firearms & Explosives Special Agent William Banks may testify as to all items seized on December 11, 2007, from this search

location.

MS. MCKEEL:  Thank you, Judge.

BY MS. MCKEEL:

Q    This Herman Avenue address, sir -- what is that?

A    It was a residential house that I think had been turned into some apartment or rental units.  At the time when we did the consent search, the residents were Christine Chipps and Jason Guyton at 400 Herman.

Q    Did we discover that David Runyon had items at this location?

A    Yes.  He had previously lived at that address, and when he had moved out, he had left some items in the basement.

Q    I'd like to show you what has been marked as Government Exhibits 232 -- they are photographs -- 233, 234, 235, and 236.  If you would take a look at those, please, do you recognize those photographs, sir?

A    Yes, ma'am.  These are the photos that were taken prior to them conducting the search in the basement area of 400 Herman Avenue.

MS. MCKEEL:  At this time I would introduce the photographs marked as exhibits 232 to 236.

THE COURT:  They are admitted.

(Government Exhibits 232 through 236, admitted.)

BY MS. MCKEEL:

Q    If we could look at those documents, please, 236, first,

tell us, please, sir, what we are looking at here. I'm sorry. 232.

A   Yes, what this is, this is an overall photo that was taken in the basement of 400 Herman Avenue. It was an area where the belongings of Mr. Runyon were. So the agents took pictures before they conducted the search of the items.

Q   Let's move next to Exhibit 233.

A   233 is again an overall photo, but an up-closer one. The ammunition and things that I'm going to talk about I believe were recovered from that white trash can there on the left.

Q   Okay. Let's look at 234.

A   234 is a plastic bag as it was found in that same area in the basement of 400 Herman. That's an overall photo.

Q   Okay. And Exhibit 235?

A   235 is those items just laid out individually for a better view. You get a better picture of the items that were inside that white plastic bag.

Q   And the last photograph, 236 -- what is that?

A   236 is a box of .357 magnum bullets, 35 live rounds, ten spent casings, and five missing bullets, no cartridge, no bullets.

Q   I'd like to show you what has been marked as Government Exhibits 237 and 238. If you would look first at 237.

A   Exhibit 237 is a box of .357 magnum 110-grain jacketed hollow-point Winchester ammunition.

Q    And what is a hollow point?  What does that mean?

A    It basically has a hollow point.  If you look at the top of the bullet, this one here is a jacketed hollow point.  The top is literally hollow, and there is a concave part to the top.

Q    Do we have a photograph of that picture we just saw with the five missing?

A    Yes, it was the last photo that was up on the screen. That is this here.

        MS. MCKEEL:  Your Honor, we would introduce Government Exhibit 237, the ammunition.

        THE COURT:  All right.  It's admitted.

        (Government Exhibit 237, admitted.)

BY MS. MCKEEL:

Q    If you would, sir, then take a look at Exhibit 238.  What is that, sir?

A    There's two different boxes.  The first one is a box of 50 center-fire Western brand .38 special 158-grain lead pistol cartridges.  The second box is also a Western .38 special 158-grain bullet.

        MS. MCKEEL:  Your Honor, we would introduce that box of ammunition, Government Exhibit 238.

        THE COURT:  It is admitted.

        (Government Exhibit 238, admitted.)

        MR. ELLENSON:  For the record, we would object.  I

understand the ruling.

May we approach?

THE COURT:  Overruled.

Go ahead.

MS. MCKEEL:  Thank you.

BY MS. MCKEEL:

Q    Now, sir, you spoke about the piece of paper that had Draven's name spelled D-R-E-V-E-N, and you referenced that you had seen that previously.  Did you also execute a search warrant on Mr. Runyon's cell phone?

A    Yes, sir, we did.  We looked at the Sprint Samsung cell phone that belonged to David Runyon, and we recovered three phone numbers of interest.  The first two belong to -- and it appears this way in the phone -- Dreven, D-R-E-V-E-N, Mike, and then (757)713-7570; and then a little further over, (757)713-3431, and then attorney dash, or comma, VA, capitalized for Virginia, attorney VA, (757)595-7777.

Q    What type of phone was that, sir?

A    That was a Sprint Samsung cell phone.

MS. MCKEEL:  Your Honor, at this time I don't have any further questions, but we do have two more stipulations for the court, 86 and 87.

THE COURT:  86 is as follows:  United States Exhibit No. 237 is a box of .357 caliber ammunition.  This item was collected at 400 Herman Drive, Morgantown, West Virginia, by

Naval Criminal Investigative Services Agent Maureen Evans on December 11, 2007, and turned over to Special Agent William Banks, where the evidence was placed in a vault at the Bureau of Alcohol, Tobacco, Firearms & Explosives, located in Norfolk, Virginia, and was properly stored and maintained as evidence by the Bureau of Alcohol, Tobacco, Firearms & Explosives. The ammunition was transported to the Commonwealth of Virginia Department of Forensic Science by M. C. Wachsmuth for analysis. On April 14, 2008, forensic scientist Wayne Bryan prepared a certificate of analysis on the box of ammunition. No latent prints of value could be lifted from the box of ammunition.

You also wanted No. 87?

MS. MCKEEL: Yes, ma'am.

THE COURT: That stipulation is as follows: United States Exhibit No. 238 is a box of .38 caliber ammunition. This item was located at 400 Herman Drive, Morgantown, West Virginia, by Naval Criminal Investigative Services Agent Maureen Evans on December 11, 2007, and turned over to Special Agent William Banks, where the evidence was placed in a vault at the Bureau of Alcohol, Tobacco, Firearms & Explosives, located in Norfolk, Virginia, and were properly stored and maintained as evidence by the Bureau of Alcohol, Tobacco, Firearms & Explosives. The ammunition was transported to the Commonwealth of Virginia Department of Forensic Science by

Bureau of Alcohol, Tobacco, Firearms & Explosives Agent James Liscinsky. On September 2, 2008, forensic scientist Wayne Bryan prepared a certificate of analysis on the box of ammunition. No latent prints of value could be lifted from the box of ammunition.

MS. MCKEEL: Thank you, Judge. That's all the questions I have for Agent Banks.

THE COURT: All right. Mr. Ellenson?

CROSS-EXAMINATION

BY MR. ELLENSON:

Q    Exhibit 218?

A    Yes, sir.

Q    Okay. The phone number that comes back and that you had -- that also comes back to Michael Draven is (757)713-7570; is that correct?

A    Yes, sir. I can double-check it with the -- that's what I have got listed in the phone, yes, sir.

Q    And on Exhibit 219, the second page, the first -- it looks like there is two lines through the middle of the page. So there is sort of like three sections to that page; is that correct?

A    Yes, sir.

Q    So the first -- let me start from the bottom. The bottom we have got Brad, Valley Auto Services, and a phone number, and then above that, you would have Wyeth, and that's the

extension, 4210 slash Lonnie?

A    Yes, sir.  That's how I read that, yes, sir.

Q    And then between the lines you have another one that talks about Altheimers (sic), and it gives some dates, and it talks about some outpatient, and it has an amount, $2,650?

A    Yes, sir.

Q    And then in the last part, the top one is Parexel, and that is diabetes, and it's talking about multiple sclerosis is $4,400, and then that's the portion of that statement which talks about Draven says they cut out ten pieces of skin and suture you up.  Is that correct?

A    Yes, sir.

MR. ELLENSON:  That's fine, Judge.  I don't have anything else.

THE COURT:  Mr. Woodward?

CROSS-EXAMINATION

BY MR. WOODWARD:

Q    Hi, Mr. Banks.

A    Good afternoon, sir.

Q    I'm going to kind of maybe start a little in reverse order.  The Samsung phone that you did a search warrant on of Mr. Runyon's -- what was the phone number of that phone?

A    From my paper work, sir -- I don't know if I have that in front of me.  It is in our evidence.

Q    Not to bog down, you determined that number at some

point, but you don't remember it as you sit there today?

A    What I have, sir, is in my paper work.  It says, Runyon, from old phone.  He had two phones.  This one was taken off his person at the vehicle.

Q    Okay.

A    And I have got a serial number and an ID number on the phone, but I don't have it in front of me what the actual phone number was.  I'm sure it is in my records, sir, but I don't have it in front of me.

Q    And then you indicated there were a couple of numbers put into the caller ID?

A    In the address book of the phone, yes, sir.

Q    And you don't know when they were put there?

A    No, sir.

Q    They were just there --

A    They were there on the 11th when we got the phone.

Q    Okay.  Let's go now to -- I think you started with Exhibit 217.  Is that right?  Can you go back to Exhibit 217?

A    Yes, sir.

Q    Okay.  Now, with regard to Exhibit 217, you were first shown off to the right of the page the list, tarp, trash bag, taser, Spyderco, contacts -- I don't need to read it all.  Did you find during the search of these areas that were related to Mr. Runyon any of those items?

A    I can't comment to that, sir.  We took a lot of clothing

out of Lot 67, and I'm not comfortable saying whether or not some of those clothing items -- I can tell you we never recovered a taser. I'm not sure about a Spyderco knife. But, again, there was a lot of clothing that was taken out of Lot 67, sir, so I can't answer that.

Q   You don't know. Okay. And then you don't know when that list was placed on this piece of paper?

A   No, sir, no idea. We just recovered it, again, on the 11th.

Q   Would it be fair to say, without bogging down on each piece of paper, you don't know when any of the information was placed on the various pieces of paper?

A   No, sir. I just know they were recovered on the 11th.

Q   You don't know who placed it there?

A   Well, going by handwriting, sir, it would be consistent with Mr. Runyon.

Q   Well, you are not a handwriting expert, are you?

A   No, sir, I'm not.

Q   You don't know who placed it there?

A   No, sir.

Q   And you don't know, certainly, if all of it was placed there at the same time or not?

A   No, sir, I don't.

Q   These pieces of paper -- this particular exhibit, before we move on, about a third of the page down, there was

something that looked like -- you said you couldn't make it

out, and I agree with you.  Does that look like a child's

writing to you, or are you able to say?

A    No, actually, sir, as I look at it now, and you say that,

it does.  It looks like maybe some child just scribbled.

Q    Just so it is clear, No. 217 was not found in

Mr. Runyon's briefcase?

A    No, sir, that was recovered from the bedroom at Lot 67.

Q    How long, if you have an understanding, had Mr. Runyon

been living in that bedroom?

A    That I cannot answer.  It had been for a short period of

time.  I would have to ask the Daltons, again, but I'm not

sure, sir.

Q    And was anyone else sharing that bedroom with him, to

your knowledge, either all the time or some of the time?

A    Yes, Sarah Baker was as well, yes, sir.

Q    Okay.  Let's go to the next exhibit, which is 218.  That

has the phone numbers.  Mr. Ellenson asked you a little bit

about that exhibit.  That also has David and the number that

you understand to be David's number, Mr. Runyon's number?

A    Yes, sir, in, as it appears here on the screen, the top

left corner.

Q    Again, you don't know who wrote that on there?

A    No, sir.

Q    But what this would indicate is that somebody wrote Mr.

Runyon's phone number on a piece of paper?

A    Yes, sir.

Q    Do you know if Mr. Runyon wrote his own phone number on this piece of paper for some reason?

A    No, sir, I don't.

Q    Okay.  And again, this was not found in Mr. Runyon's briefcase.

A    No, sir.  That again was found in the bedroom at Lot 67.

Q    And then we go to Exhibit 219, which is -- I believe that's the yellow pad of paper; is that right?  That's the legal pad?

A    Yes, sir.

Q    Okay.  Now, again you -- there is three pages of that legal pad that have been introduced here in this part of the case.  Is that the entire writing that is on the whole legal pad?  Are the rest of the pages blank?  Could you take a minute?  My only question is, is there any other writing on that legal pad that hasn't been shown to the jury?

A    That was 219, sir?

Q    Yes, sir.

A    No, sir, there is multiple pages here.

Q    There's a bunch of pages, and the whole exhibit is in evidence?

A    Yes, it is.  The whole legal pad is marked 219, but there is miscellaneous, lots of notes.

Q    And that was again found in the bedroom?

A    219 was recovered from the bedroom at Lot 67, yes, sir.

Q    Okay.  Now, if we could move on to 221 through -- and I will stand corrected.  I'm sorry.  220 through 231 were found in Mr. Runyon's briefcase; is that correct?  Am I right with those?

A    Can you run the numbers by me again, sir?

Q    I think I'm right.  What has been admitted as 220 through 231 were in the briefcase?

A    Yes, sir.

Q    And the briefcase was locked -- do you remember if the briefcase was locked?

A    We didn't have to force it open, sir, so I don't think it was locked.  It's still in operating condition now, so -- but it was in the storage shed.

Q    Okay.  Is there anything in the things that were in the briefcase that relate to Mr. Draven or Ms. Voss?  Any numbers, information, phone, anything in there, in Mr. Runyon's briefcase?

A    Not that I recall, sir.

Q    And you were asked some questions about some courses he took, some weapons courses and some military records.  Let me get to the right exhibit.  I think it was 230.  Okay?  Do you have that?  You are familiar with what I'm talking about?

A    I'm going to wait it till he brings it up.

Yes, sir. Those are the two university courses that it looked like were attended.

Q   And the second one, which you brought up that Ms. McKeel didn't ask you about, was the covert law enforcement course?

A   There were two transcripts there, yes, sir. One was weapons. That's the second one there, yes, sir.

Q   Did you have any occasion as part of your investigation to do any research or look into what the curriculum of that course is or what someone would learn in that course?

A   No, sir, I did not.

Q   Do you know if anybody in this investigation did that, to your knowledge?

A   No, sir, not to my knowledge.

Q   All right. And now we next get to the place where Mr. Runyon -- I'm using my words -- used to live, that he no longer lived, and you went down in a basement. And there were some people living there?

A   Yes, sir.

Q   They had access to the basement?

A   Yes, sir.

Q   Okay. And there were a number of things in that basement?

A   Yes, sir.

Q   Who was it there at the house that day that told you which things were stuff Mr. Runyon had left behind?

A    NCIS -- Naval Criminal Investigative Service -- talked to Christine Chipps and Jason Guyton.  So I'm not sure who told them, but one of those two individuals, sir.

Q    And we have stipulated that you received information, and you -- someone that lived there indicated what was Mr. Runyon's?

A    That's correct, sir, yes.  And I can tell you it was either Jason Guyton or Christine Chipps.  It was one of the two.  I just don't know which one.

Q    Did you find any bullets or ammunition in the basement down there that they said belonged to them?

A    Belonged to --

Q    Mr. Guyton or Ms. Chipps.

A    Not that I'm aware of.

Q    So what you understand from the investigation is that somebody that was living there after Mr. Runyon left -- let me start again.  They knew -- Mr. Guyton and Ms. Chipps, to your knowledge, knew that you were there investigating a murder and that you were federal agents or the police or law enforcement; that's correct?

A    Yes, sir.  I believe what happened, sir, was the NCIS approached the location at 400 Herman Avenue, identified themselves, and said they wanted to see any or all property that was left behind by Mr. Runyon.

Q    All right.  And then the people that lived there pointed

out the ammunition and said, that's what Mr. Runyon left behind?

A    They pointed out -- that overall photograph that I showed, they pointed out that -- that that equipment or that stuff over there, and they said all that stuff, was left behind.

Q    Do you know when Mr. Runyon last lived at this location where -- 400 Herman Avenue?  Is that the location?

A    It's 400 Herman Avenue.  I can't recall off the top of my head.  I was involved in surveillance when I saw him living there, so it was in the course of my investigation.  But I can't tell you right now off the top of my head when it was.

Q    Do you have any videotape or pictures of that surveillance, or was it just a visual --

A    No, just physical.

THE COURT:  What would be the time period?  You wouldn't have started the investigation before approximately when?

THE WITNESS:  We served the warrants, Your Honor, in December.  So I would have thought it would have been one to two months prior to that.  I would say probably October, November.  I know I was up there in October and at the Thanksgiving time frame.

THE COURT:  So it would have been in the fall of 2007.

GLORIA S. SMITH, OFFICIAL REPORTER

**552**

THE WITNESS: Yes, ma'am, absolutely.

BY MR. WOODWARD:

Q    And you were shown the exhibit, and just so it's clear, the Exhibit 236 -- can we pull that one back up? Now, Exhibit 236, there's ten spent casings in there?

A    That's correct.

Q    Do you know, as we look at it, standing right to left, are they in rows, or are they interspersed in and out of the --

A    No, you can see from this photo --

Q    The last two?

A    The far right, as I look at this, those ten rounds' primers have been hit, and if you hold them up, they are going to be shorter, because the bullets are gone. But as I look at it there, it's the first two rows to the far right. You see the primers have been hit, and those are the ten spent casings.

Q    And you didn't find any casings that -- you didn't find any casings that weren't in this box?

A    No, sir.

Q    Okay. This is the .357 ammunition; I'm right about that?

A    That's correct.

Q    The .38 ammunition that you found -- you found a box of .38 ammunition, or several boxes?

A    There were two that I have got here in front of me today.

Q    Did you have occasion to count that ammunition and see how many .38 rounds were missing out of those boxes?

A    No, sir.  I would have to dump them out and count them. They are not in styrofoam like that.

Q    Can you tell me -- the boxes that you recovered, can you look at them and tell how many were supposed to be in there?

A    They were boxes of 50.

Q    But do you know enough to recall that they weren't full?

A    I can't answer that.  I'm not sure.

Q    And you didn't recover any weapons at any of the four places that you searched?

A    No, sir.  We recovered weapons --

Q    There were some weapons -- a couple of guns have been introduced, long guns, shotguns and rifles, but you didn't recover any pistols or handguns anywhere you searched.

A    There were no handguns recovered.  The firearms that you see here were recovered from the vehicle, and there were some long guns recovered from the self-storage, the 24/7, but they haven't admitted.

Q    When we say long guns, so it is clear --

A    Rifles or shotguns, yes, sir.

MR. WOODWARD:  May I have one moment, Your Honor?

Your Honor, may I ask the court now to read Stipulation 88?

THE COURT:  That stipulation is as follows:  On

August 26, 2008, Forensic DNA Examiner Clint Buchanan tested various clothing items recovered from the search warrants executed in Morgantown, West Virginia, on December 11, 2007. The DNA of Cory Allen Voss was not found on said items.

MR. WOODWARD: Thank you, Your Honor.

BY MR. WOODWARD:

Q    Finally, Mr. Banks, how many times did you go up to Morgantown and surveil Mr. Runyon?

A    Half a dozen, sir, I believe. Well, half a dozen trips. They weren't always to surveil Mr. Runyon, but I have been to Morgantown multiple times.

Q    And the times that you surveilled him, you are aware of the vehicle he was arrested in?

A    Yes, sir.

Q    Was that the vehicle he was driving during all those times?

A    All the times I saw him, yes, sir.

Q    Okay. And did you also have occasion to see him go back and forth to this self-storage unit on occasion?

A    Yes, sir, I did.

Q    And you saw him sometimes at Herman Drive?

A    Yes, sir, I did.

Q    And you saw him sometimes at --

A    Lot 67.

Q    Lot 67, the place that he was living during the time

that -- the day of his arrest?

A    Yes, sir, that's correct.

Q    You also had occasion through your surveillance to know that he had been back and forth to Baltimore for a study?

A    Yes, sir.

Q    And that was near to the time -- that was near to the time of his arrest; he was in Baltimore in early December?

A    Yes, sir.

          MR. WOODWARD:  Thank you, Your Honor.  That's all I have for now.  I would like Mr. Banks to be subject to recall.

          THE COURT:  That's fine.

          MS. MCKEEL:  Judge, we have a couple of follow-up questions.

          THE COURT:  All right.

                    REDIRECT EXAMINATION

BY MS. MCKEEL:

Q    Mr. Woodward asked you about surveillance of David Runyon.  Do you see him in the courtroom today?

A    Yes, ma'am, I do.

Q    Would you point him out?

A    On the far side, all the way at the end.

          MS. MCKEEL:  If you would allow the record to reflect he identified the defendant, Your Honor.

          THE COURT:  All right.

BY MS. MCKEEL:

Q    Mr. Woodward asked you about the handwriting.  Have you been able to, during the course of this investigation, look at multiple documents of David Runyon's?

A    Yes, ma'am.

Q    And did that appear to be his handwriting, what was shown today?

MR. WOODWARD:  Your Honor, I'm going to object to this.

THE COURT:  Overruled.  The rules are clear on that.

BY MS. MCKEEL:

Q    Did it appear to be David Runyon's handwriting to you?

A    Yes, ma'am.

MS. MCKEEL:  That's all I have, Judge.

MR. ELLENSON:  I have got some questions.

THE COURT:  Did the handwriting that you observed as David Runyon's during the course of this investigation appear to be the same as on the sheets that you were looking at?

THE WITNESS:  Yes, Your Honor, that's correct.

MR. ELLENSON:  If I could see Exhibit 237.

THE COURT:  Wait.

MR. ELLENSON:  There were some questions that Mr. Woodward asked that opened up -- it was about Exhibit 237.

THE COURT:  Go ahead.

MR. ELLENSON:  It is on Exhibits 237 and 236.

Could I see Exhibit 237, please?  It is a box of

ammunition.

RECROSS-EXAMINATION

BY MR. ELLENSON:

Q    In Exhibit 237, which is -- is that what is in picture 236?

A    I would have to see.

MR. ELLENSON:  Can you put up 236 now?

THE WITNESS:  Could you hold that up?  It should be the exact same.

BY MR. ELLENSON:

Q    I'll let the court security officer bring it over to you.

A    It should be the exact same.

Yes, sir, appears to be the same to me.

Q    And you would agree with me that those are hollow-point bullets, aren't they?

A    I believe that's what I just testified to.  They were jacketed hollow points.

MR. ELLENSON:  Thank you.  I don't have anything else.

MS. MCKEEL:  Nothing further, Judge.

THE COURT:  You are excused for now, Mr. Banks.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  We will take a brief afternoon recess.

(Recess)
*    *    *

THE COURT: Ms. McKeel, where are you on your witnesses?

MS. MCKEEL: Judge, we will put another witness on.

THE COURT: How many more do you have to put on today?

MS. MCKEEL: We just have one left for today.

THE COURT: All right. And then how many more do you have? Who do we have still out there?

MS. MCKEEL: There are approximately 12 witnesses left, Judge. We think we will be done probably Tuesday morning.

THE COURT: Where are these 12 witnesses?

MS. MCKEEL: The next witnesses all are in West Virginia, Judge, and we have been through eleven witnesses, and that is what we have been going through, and we were bringing them in Sunday night.

THE COURT: All right. But they all couldn't be from West Virginia.

MS. MCKEEL: The next set are from West Virginia. Then we have inmates, Your Honor, and then we have the last couple of witnesses. One is out of town, and one is not present today. Those were the last two witnesses. We had scheduled for them to be here Monday.

THE COURT: All right. So you have out-of-town witnesses.

MS. MCKEEL: Yes, ma'am.

THE COURT: And you have incarcerated witnesses.

MS. MCKEEL: Yes, ma'am.

THE COURT: Do you have the proper writs out on everybody?

MS. MCKEEL: Yes, ma'am, I do.

THE COURT: Then you have got -- what did you say the last --

MS. MCKEEL: We have a detective over from Newport News, and then we have Special Agent Theresa Merhige, and she is out of town until tomorrow.

THE COURT: All right. So in other words, you have got one more today, and then that's the end of the evidence that you have got for this week.

MS. MCKEEL: Yes, ma'am. And then we can start up fresh on Monday with a number of witnesses from West Virginia, and then the inmates.

THE COURT: All right.

(The jury returned to the courtroom.)

THE COURT: All the jurors are back from break.

Your next witness?

MR. SAMUELS: Your Honor, the United States recalls Paul Swartz.

THE COURT: All right.

THE COURT: You are still under oath, Mr. Swartz.

GLORIA S. SMITH, OFFICIAL REPORTER

560

THE WITNESS:  Yes, ma'am.

PAUL SWARTZ, DIRECT EXAMINATION on behalf of the government, as follows:

DIRECT EXAMINATION (Rec.)

BY MR. SAMUELS:

Q     Good afternoon again, Mr. Swartz.

A     Yes, good afternoon.

Q     Mr. Swartz, in your prior testimony we talked about phone calls and e-mails that had been obtained before the murder of Cory Voss.

A     Yes.

Q     Were you involved in obtaining phone calls, wiretap surveillance, and e-mails following the murder of Cory Voss?

A     Yes, I was.

Q     And to begin that, I would like to get into your background a little bit more.  During the time of the investigation of the murder of Cory Voss, how were you employed by the Newport News Police Department?

A     I was a sergeant, and I was in charge of our intelligence division, which had responsibility for the -- it had three kinds of function.  Counterterrorism -- we had someone assigned to the FBI's joint terrorism task force, and I oversaw and coordinated things between our department and the FBI.

Another part of the unit was the technical

surveillance unit, and we maintained all of the sophisticated electronic surveillance equipment for our agency, and I had a couple of detectives that actually operated that on a daily basis. So I oversaw those activities.

Then we had an analytical component, and that was one of the things that consumed a large amount of our time, and that was the creation of a data base so that all intelligence information that was collected from throughout the agency, patrol officers, investigators, anybody who received any kind of intelligence could get it submitted into a centralized data base.

And we have two intelligence analysts, one of which you have heard from, Kristin McManus, who was our senior intelligence analyst. They analyzed that kind of information to be able to put out bulletins and keep the officers on the street aware of what is going on.

Q    Mr. Swartz, in your position as sergeant in the Intelligence Division, could you explain how electronic surveillance and phone analysis plays a role in that position.

A    Most of the time that we get involved in doing telephone work, it's actually with our Organized Crime Division, which handles narcotics and prostitution, gambling investigations. However, there are periodic times when investigators from our major crimes unit would contact us and request for us to do certain things.

In this case here, it was right -- almost from the get-go, I want to say about May 1, Detective Rilee, who was the lead homicide investigator on this case, came to us and had already obtained some state court orders for some telephone records, based upon some interviews that had been conducted. And I took care of executing those on the different companies, because we maintain contact with them.

And once we received those records, we then put those into a different data base. It is separate from the intelligence data base. It is called Pen-Link, and that is basically the industry standard right now for doing telephone analysis. The company has been in business for 20 years, and we are able to take telephone records and import those, oftentimes electronically, if the data comes electronically, but if not, on paper.

We then have a staff assistant actually do the data entry. Getting that information into Pen-Link software allows us to then analyze and look at things, such as sequence of events, the volume of call activity, and things like that.

Q    Mr. Swartz, what was the first step you took in this case towards doing that type of analysis?

A    The first step was serving those court orders to get certain toll records or billing records, which again are records which, if you have a telephone, you are going -- you may or may not receive detailed call information as to what

numbers you have called during a monthly period of time. Oftentimes, and if we are not going too far back in time, in history, we can get that data electronically. They e-mail it to us in response to grand jury subpoenas, court orders, and such, and then we again bring that into our data base to be able to do that kind of analysis. And that's that we did first.

Once we get telephone toll records, it's numbers, it's dates, times, it's duration of calls, and it's just telephone numbers. So we obviously would want to know who the subscribers to those are. With the Pen-Link telephone software we are able to run reports on the numbers that are being called, and we are able to identify what telephone companies they belong to, at least originally. It does not take into account whether or not the number has been ported.

So sometimes we may subpoena a telephone company for a certain number, and then they say, well, it was resold to another company. Then we have to serve another subpoena or court order to get the information from that.

So this is a multistep process which starts with toll records, and then goes into getting the subscriber information. We then make some sense of that, and then we probably will then proceed on and get additional telephone toll records for most frequently called people or certain members of the investigation that are important.

Q   Mr. Swartz, toward that end, was electronic surveillance used in this case?

A   Yes, it was.

Q   And did that take the form of both pen registers and wiretaps?

A   Yes.  Eventually we did obtain court orders from circuit court judges in Newport News for pen registers.

Q   What are pen registers, Mr. Swartz?

A   Pen registers -- we are now transitioning into the live collection of data.  What the court order authorized us to do is -- and in today's world, it's actually done through networking over the internet, where we have connections between our intercept equipment and the actual telephone companies themselves.

But we are able to monitor live their telephones, so that when the telephone starts to make a telephone call, we see the date, the time, and then we see when the call ended, so you get a duration from that, and we see what number is being dialed.  Either an outgoing call or an incoming call, we see that.

In the case of cellular telephones, and in this case there was also authorization to do what is known as cell site tracking, so that we can see where the telephone -- what tower it is hitting off of when the call originates, and then what tower the call -- when it ends, what tower it is hitting off

of.

And in this case, we did pen registers on the telephones of Catherina Voss and Michael Draven, both of their cell phones, and then we also eventually got to the point, right when we went to a wiretap, of actually being able to be on the pen register on the landline phone of Catherina Voss at 740 Mayland Drive.

Q    Mr. Swartz, when did the period of wiretaps start in this case?

A    We received authorization from a United States District Court judge here in Norfolk on November 7, and we had some technical difficulties getting things kind of started, but the interceptions actually began on November 14, 2007.

Q    Have you used in the past wiretaps in criminal investigations?

A    Yes, I have.

Q    How many wiretaps have you been involved with, Mr. Swartz?

A    During my career I have been involved in ten wiretap operations involving the interception of 32 different telephones.  That's a combination of cellular telephones and landline telephones, and if I tell on my age, it started out as landline telephones.  We have now transitioned to the point where most of what we do in terms of wiretaps is on cellular telephones.  But there was also a time when pagers were very

popular, and we did monitoring, if my memory serves me correctly, I think it is 15 different pagers we had Title III authorizations to do intercepts on those.

And then of course the latest phenomenon on hand-held cellular telephones is text messaging, and I want to say it is at least five, I'm thinking that it is about seven different phones that we have had authorization during those wiretap operations to actually monitor what is called electronic communications, which is the text messaging aspect of those phones.

Q    And, Mr. Swartz, you referenced Title III.  Is that the shorthand for the authorization for wiretaps?

A    The federal statute, yes.

Q    And how are wiretaps -- in this case, how were they used as an investigative tool?

A    This case was different than all the other cases that I have been involved in.  All of the other wiretap operations were focused on drug trafficking, organized crime, and that activity is ongoing in nature, and the process of actually obtaining that authorization is extremely difficult.  And once you get it, though, chances are you are on the right phone and you are going to be intercepting communications of ongoing criminal activity.

This case was a little bit different in the fact that Cory Voss was murdered in the late night April 29, early

morning hours of April 30, 2007, and as the investigation was unfolding, we were looking for a break in this case, and for us, that break came when we learned the contents of those jail calls that we listened to. And based upon that, the preparations then began in writing the affidavits and the applications and the orders, and seeking the authorization to get wiretap authority.

We knew that once we got that wiretap authority, because there had been this time frame between the time of the incident and the time that we were going to start listening to the phones, that we were going to need to do certain things from an investigative standpoint to be able to, what we call, tickle the wire. And that is, certain events would occur, and then we would see what kind of response we would get on the telephone in regards to the conversations.

Q   And, Mr. Swartz, in the course of these investigative steps to tickle the wire, were both phone calls intercepted and then e-mails received via search warrants?

A   Yes. The e-mail aspect of this was sort of after the fact, and we had to do multiple search warrants, because we did not have authority to be able to do live interception of the e-mail activity. And that was -- we did not seek that authority, but we also had some technical limitations at that time to be able to do that kind of monitoring of the e-mail activity.

But we did -- later on we were able to correlate certain telephone calls with e-mails that we ultimately were able to get the content of those through the execution of search warrants.

Q    Mr. Swartz, were some of those e-mails related to the investigative steps that were taken at this point in the investigation?

A    Yes, they were.

Q    And when was the time period of the wire we were talking about, tickling the wire?  When did that occur, sir?

A    We started -- the first investigative step that was taken was on November 15, 2007, shortly after actually starting the monitoring of the wire.  And the lead investigators, which were Detective Williams and Detective Rilee -- they were directed to go and interview Catherina Voss's mother, Rose Wiggins.

There was a strategy in this case where we were going to sort of treat it as a cold-case homicide, and start kind of on the outside and also take the logical steps from the very first thing that would have been done in a homicide and kind of go back through those steps.  So start on the outside, and then ratchet it up and get it closer to the parties that we believed were involved.

Q    Mr. Swartz, during this time period, were e-mails sent back and forth between different subjects of the

investigation?

A    Yes, they were.

Q    I'd like to hand you what has been marked as Government Exhibits 139 through 139D.  Mr. Swartz, do you recognize those pages, sir?

A    Yes, I do.

Q    What are 139 through 139D, Mr. Swartz?

A    These are all e-mails that were from the Michael Draven MySpace account that were obtained with the execution of search warrants.

Q    And do they all relate in some way to the investigation that's going on in November of 2007?

A    Yes, they do.

          MR. SAMUELS:  Your Honor, I would offer Government Exhibits 139, 139A, B, C, and D.

          THE COURT:  They are admitted.

          (Government Exhibits 139 and 139A through 139D, admitted.)

          MR. SAMUELS:  Thank you.

          If we could publish 139.

BY MR. SAMUELS:

Q    Mr. Swartz, each one of these e-mails is from whose account?

A    This is -- each one in this series of exhibits, 139 through 139D, they are from the Michael Draven MySpace

account, and there are some that are outgoing and some that are incoming.

Q   And this first e-mail -- when is it sent, and what is the time?

A   The first e-mail is sent on November 24, 2007.  The time on the page is 2:14 p.m., which would be 5:14 p.m. Eastern standard time, and it is an e-mail that is sent by Michael Draven to friend ID 257290865.

Q   And whose friend ID is that, Mr. Swartz?

MR. CLANCY:  Your Honor, respectfully I need to object.  I think all Mr. Swartz can say is that this e-mail was sent from Mr. Draven's account.  I don't think  -- I think it is beyond the --

MR. SAMUELS:  I believe there has been a stipulation on this, Your Honor.

MR. CLANCY:  But this comes from his MySpace account.

MR. SAMUELS:  I understand.  Whose account does it come to, and who is it sent to.

MR. CLANCY:  Right.  He is saying Michael Draven sent it.

THE COURT:  That's fine.  Just reword your question.

MR. CLANCY:  Thank you, Judge.

BY MR. SAMUELS:

Q   Whose account was it sent from, Mr. Swartz, and whose

account did it go to?

A    It was sent from the Michael Draven MySpace account to the David Runyon MySpace account.

Q    Would you read the e-mail, please.

A    I'll contact you in a few days.  A lot of stuff is going on, and I'll make sure I hook up your page -- I'll hook up your page -- I'll hook your page up soon.

Q    Mr. Swartz, did this time period, 11-24-2007, correlate with anything that was going on in the investigation?

A    Yes, it does.

Q    And what was happening in the investigation at this point?

A    At this point the detectives made telephone contact with both Rose Wiggins, Catherina Voss's mother, as well as Barbara Wilson, which was Cory Voss's mother, and asked about an individual which had a strange name.  And as a result of this, there was a flurry of telephone activity.

Q    And this e-mail was sent?

A    And then this e-mail.

Q    What is the next e-mail you have, Mr. Swartz?

A    This e-mail is dated November 25, 2007.

Q    Excuse me, sir.  Is that 139A?

A    Excuse me.  Yes, it is.  139A.  This is an e-mail dated November 25, 2007.  The time on the document is 8:31 a.m., which would be 11:31 a.m.  And it is an e-mail that is

received -- it's to the Michael Draven MySpace from the David Runyon MySpace account.

Q    And again that time there, 8:31 a.m. -- is that East Coast time, or Pacific Coast time?  Do you know?

A    This is Pacific Coast time.

Q    Is that because MySpace has its servers out there?

A    That is correct.

Q    Could you read that e-mail, please, Mr. Swartz.

A    The top part of the e-mail, which is the actual response to the earlier message, says, Okay.  Thanks.  I would have you work on it up here, but I didn't realize you were leaving so soon.  Otherwise I would have dedicated a little more time with you before you left.  Okay?  Thanks for everything. TTYL, David.

Q    Does this appear to be a response to the e-mail you just read, Mr. Swartz?

A    Yes, the thread is actually below that.

Q    Let's look at Government Exhibit 139B.  Mr. Swartz, what is the date and the time and the parties to this e-mail?

A    This e-mail occurred on November 25, 2007, at 10:24 a.m. Pacific Coast time, and it is an e-mail that is sent from the Michael Draven MySpace account to the David Runyon MySpace account.  And it says, I know.  Listen, just in case anyone contacts you, anyone, any weird numbers, are (sic) you are to me is a cousin, and you are a research buddy.  That's it.

Trust me.  I'll explain later.  Draven.

Q    Now, this says 10:24 a.m.  What time is that e-mail sent East Coast time, Mr. Swartz?

A    That would be at 12:24 p.m.

Q    Now, what investigative action was taken on November 25, 2007, at about ten in the morning?

A    This was when the detectives had traveled to the northwestern part of the state and interviewed Nicole King.

Q    If we could look at 139C, Mr. Swartz, what is the date, the time, and the parties to this e-mail?

A    This e-mail occurred on November 25, 2007, at 2:03 p.m. Pacific Coast time, and it is an e-mail that was received in the Michael Draven MySpace account from the David Runyon MySpace account.

Q    Would you read that e-mail, please.

A    It says, got it.  I'm a distant cousin, and we do research studies together.  Okay?  Got it.  No problem.  TTYL, David.

Q    And it is in response to that prior e-mail you just read, because the thread is there?

A    That is correct.

Q    And the last e-mail on this thread, Mr. Swartz, 139D?

A    This is an e-mail dated November 25, 2007, at 6:30 p.m. Pacific Coast time.  It is an e-mail sent from the Michael Draven MySpace account to the David Runyon MySpace account,

and it says, I'll talk to you soon.

Q    Were there any other investigative actions that were taken on November 25, 2007, Mr. Swartz?

A    After the detectives got in touch with Nicole King, they were able to track down Randall Fitchett, and they did interview Randy Fitchett.

Q    Mr. Swartz, I'd next like to hand you Government Exhibits 140 through 140L, and I will ask you if you recognize those, sir?

A    Yes, I do.

Q    What are they, Mr. Swartz?

A    These are additional e-mails from the Michael Draven MySpace account.

Q    Are they during the time period of the investigation, Mr. Swartz?

A    Yes, they are.

Q    Are they between the account for David Runyon and -- excuse me -- Michael Draven and the account for David Runyon?

A    Yes, they are.

        MR. SAMUELS:  Your Honor, I would offer Government Exhibits 140 through 140L.

        THE COURT:  All right.  They are admitted.

        (Government Exhibits 140 and 140A through 140L, admitted.)

BY MR. SAMUELS:

Q    If we could put up the first of those series, 140, Mr. Swartz, what is the date and the time, and who is the sender and recipient, the accounts, of course, for this e-mail?

A    This e-mail on Exhibit No. 140 is on November 30, 2007, at 9:54 a.m. Pacific Coast time.  It is an e-mail from the David Runyon MySpace account to the Michael Draven MySpace account.

Q    And would you read that e-mail, Mr. Swartz?

A    Some people from VA are looking fervently, it seems, for me.  Know anything about it?  How are things on the home front?

Q    Now, Mr. Swartz, this is November 30, 2007.  Were there any investigative actions that occurred in West Virginia in the days before this e-mail was sent?

A    Yes, sir.

Q    And what actions were taken?

A    On the prior two days, on November 28 and November 29, the investigators traveled to Morgantown, West Virginia, and started a series of interviews out there with Christine Chipps and Sarah Baker and Virginia Pina, associates of David Runyon.

Q    Mr. Swartz, let's look to the next e-mail in that thread, 140A.

A    Yes.

Q    Mr. Swartz, the date, the time, and the parties to this

e-mail?

A    This e-mail is on November 30, 2007, at 2:30 p.m. Pacific Coast time.  It is an e-mail that is sent from the Michael Draven MySpace account to the David Runyon MySpace account.

Q    Would you read the e-mail please, sir.

A    Fervently, what you mean?  I -- and the spelling D-I-N-T -- understand what you mean.  Things are good in NW on the home front.  Draven.

Q    And of course 2:30 on the page, but actually 5:30 East Coast time, Mr. Swartz?

A    That is correct.

Q    The next e-mail, 140B?

A    Yes, sir.

Q    Mr. Swartz, is this a response to that prior e-mail?

A    Yes, it is.

Q    And from whose account is it sent, and whose account does it go into?

A    This e-mail is from the David Runyon MySpace account to the Michael Draven MySpace account.

Q    Would you read this e-mail, please, Mr. Swartz.

A    This e-mail is on November 30, 2007, at 2:45 p.m. Pacific Coast time.  It says:  I've heard many stories.  Stopped at my home.  Have been questioning and finding past girlfriends that even I don't know about their locations.  They've been calling me to tell me someone is looking for me.  Bacon.  This morning

I got a call and told that a guy thinks I'm dodging him or something. Don't know which stories to believe. One story makes me to sound like I'm on America's Most Wanted or something. Another just sounds like they want to ask me some questions.

I'm trying to figure out what's true or not so I don't get blindsided and set up or something. That's all. I think after I finish my job, I'm going to call and talk to them without being too helpful, and if they are not satisfied, I'll just tell them to press charges and talk to my attorney. What do you think? Someone said it was two Newport News police and a West Virginia state trooper. Someone else said it was FBI. Someone else said West Virginia undercover popo. Who knows? Maybe the whole nation is out looking for me. LOL.

Someone even said that they had a pic of me, and it was stamped wanted on it. Someone that they -- someone said that they brought a dog out to their house, and it found something under the trailer. They are looking for a dead body, and they are getting kicked out of their house. It has become a crime scene, and they are going to start digging.

Man, things sound really crazy. I have no idea what's going on. I guess I'll just wait until I get out of here and deal with it when I get back. What else can I do? Maybe by then they'll figure out how stupid they are or

something.  Why would they want to talk to me about something that happened in Virginia anyways?  You know what I mean?  I wonder why they are all the way up here in West Virginia scouring the earth looking for me so hard just to ask me a few questions.  Do you feel me?  Got any ideas?  Anyways, think on it, and get back to my cousin.  TTYL, Dude.

Q    Mr. Swartz, is this close in time to the prior e-mail?

A    Yes, it is.

Q    And the next e-mail you have in front of you should be 140C?

A    Yes, sir.

Q    Mr. Swartz, this is 2:57 p.m.  Is this one very close in time to the one you just read?

A    Yes, it is.

Q    What is the separation in time?

A    The separation in time looks like 12 minutes.

Q    Who are the parties to this e-mail?

A    This is an e-mail that is sent from the Michael Draven MySpace account to the David Runyon MySpace account.

Q    Could you read this e-mail please, Mr. Swartz.

A    It's the police trying to, I guess, clear me or some shit.  I told them I had a alibi.  Answered all their questions.  The only thing I don't get is why are they coming to you?  You are just a friend of mine.  Hell, I rarely ever see you.  Shit, what, two times I have seen you, and that was

at the research facility.

Call them up and just tell them how you know me and that Cat is like my sister. That's the truth. And it's H-E-K-L-L, you never even met Cat or anyone other than me ever. That whole stamped wanted is probably bullshit. They are going through all my phone records. That's probably what they're doing. Sounds like a lot of bullshit to me.

They have been giving everyone down here a hard time. Cat's mom, my mom, Cat's mom's friend. Everyone is getting shit from them. Just tell them you barely know me, and to fuck off, and talk to your lawyer, because you barely know me, and there is no reason why they should be questioning you or anyone else for that matter. They are trying to connect lines that aren't there.

Me and Cat are like brother and sister, and they are questioning shit because assholes have said that me and Cat fucked each other, and that's not even the case. It's bullshit. They have no evidence, no leads, a cold case, and they are trying to connect something for a quick arrest, and it's bullshit, instead of doing their jobs. Draven.

Q    Mr. Swartz, if we go to the next e-mail, it is 140D.

A    Yes, I have that.

Q    What is the date and time and the parties to that e-mail, Mr. Swartz?

A    This e-mail occurred on November 30, 2007, at 3:19 p.m.

Pacific Coast time.  This is an e-mail that is sent from the Michael Draven MySpace account to the David Runyon MySpace account.

Q    Go ahead and read this e-mail please, Mr. Swartz.

A    My mom said that our lawyer said to tell them that you don't and will not answer any of their questions.  That's your right.  No setup at all.  This is just bullshit games.  The fucking pigs want to play because they got no leads, and they want to traumatize the family.  Fuck them.  They haven't done shit for seven months, and no cause the senator put fire underneath their ass, they want to hustle and ruffle some fathers.  It's bull.  Trust me.  Tell them to fuck off.  I'm tired of their shit.  Draven.

Q    This is on the same day in the thread, Mr. Swartz?

A    Yes, sir.

Q    The next e-mail, 140E?

A    Yes, I have that.

Q    Is that a response to 140D?

A    Yes, it is.

Q    What is the time and date on that, Mr. Swartz?

A    It's November 30, 2007, at 3:56 p.m., and it is an e-mail that was received to the Michael Draven MySpace account from the David Runyon MySpace account.

Q    Would you read that one please, Mr. Swartz.

A    Yes.  Okay.  I trust you completely.  That's exactly what

I will do.  Should I call them this weekend, or just make them wait a little while?  I can make them wait at least another week or maybe more.  What do you think?  Time is on our side, right?  Besides, I am busy at work and I can't spare the minutes on my phone, lest I go over and it get shut off and all.  It's not like I have a job where I can leave and go take care of personal business or anything, right?

I passed the word that I would be back in town in a couple of weeks already.  I am in no hurry to talk to them anyways.  I don't think that it would make me look guilty of anything anyways.  Maybe that's the way they could feel about it.  But it's their damn fault.  They are running out of time.  Right?  How does that sound to you?  I'm just out of town doing my job like I always do, and I don't feel like wasting my minutes on stupid questions that don't have anything to do with me.  I just figured I would deal with it when I got home.

Or would it be better to talk to them so they could get off your ass?  I think the less info they get on anything, the better, in my opinion.  Like I said, they are the ones running out of time; right?

Q    Mr. Swartz, the next exhibit is 140F?

A    Yes, sir.  This is an e-mail that was sent from the Michael Draven MySpace account to the David Runyon MySpace account.  It occurred on November 30, 2007, also at 3:56 p.m.

Q    Would you read that e-mail, Mr. Swartz.

A    You know, to think about it, I think I know why they might be calling you, because you remember, Cat and you talked on the house phone about her doing a research study.  She just brought that to my attention, but, see, that was the only time you two ever talked.  These pigs are assholes.  Draven.

Q    And is there a response to that e-mail, Mr. Swartz, that you have as 140G?

A    Yes, sir.  And that is a message from the David Runyon MySpace account to the Michael Draven MySpace account on November 30, 2007, at 3:58 p.m. Pacific Coast time.

Q    Would you read that one, please.

A    Wow.  She has a great memory.  I had completely forgotten about that.

Q    And is the next one you have 140H?

A    Yes, sir.

Q    Date, time, and parties, Mr. Swartz?

A    This is an e-mail that occurred on November 30, 2007, at 4:27 p.m. Pacific Coast time.  It is sent from the Michael Draven MySpace account to the David Runyon MySpace account.

Q    Would you read that e-mail, Mr. Swartz.

A    Yeah, she has a great memory.  LOL.  Yeah, I keep everything strictly curt and short, because they'll ask questions three or four times and try to catch you up in bullshit.  Tell them you will talk to them on the phone only, and to fuck off, because seriously, they're asses.  You're

like a bro in some ways.  I ain't lying on this shit.  They're digging for hope, and there is no such thing as hope, you know.  Draven.

Q    Do you have 140I after that, Mr. Swartz?

A    Yes, sir, I do.

Q    If you could just give us the date, time, and the parties, and read that e-mail.

A    This e-mail occurred on December 1, 2007, at 6:17 a.m. Pacific Coast time.  It is an e-mail from the David Runyon MySpace account to the Michael Draven MySpace account, and it says, okay, thanks, Cuz.  TTYL.

Q    And the next e-mail, 140J?

A    Exhibit 140J is an e-mail that occurred on December 1, 2007, at 7:53 a.m. Pacific Coast time.  It is an e-mail that is sent from the Michael Draven MySpace account to the David Runyon MySpace account, and it says:  Do me a favor.  Any number that calls you, answer it.  Okay?

Q    Now, Mr. Swartz, in the course of the investigation and in the course of the wiretap investigation, was there concern over calls and communications being intercepted that you observed?

A    Yes, there was.

Q    And how was that evident?

A    They would -- Catherina Voss and Michael Draven would call each other when certain things would be going on, and

most of the time it was Michael Draven calling Catherina Voss and telling her to, you know, get over here. Or he would call his mother to tell her, get over here, which he would be physically located over at the Voss residence at 740 Mayland Drive.

Q    If we could pull up 140K, I believe?

THE COURT:  I don't understand.

THE WITNESS:  When we would do certain investigative actions, Michael Draven would make a telephone call to -- sometimes Catherina Voss, sometimes to his mother, and would say, you know, get over here right now, I need to talk to you, and it was usually in response to some sort of investigative action that occurred.

THE COURT:  Oh, I thought you meant that he was saying get over here, and the person was already there.

THE WITNESS:  No, directing the other person to come see him.

THE COURT:  Okay.

BY MR. SAMUELS:

Q    This was over the phone, Mr. Swartz?

A    Over the phone. And then there was another discussion between Catherina Voss and Michael Draven where they were discussing whether or not to use -- to make a phone call to Mr. Runyon using Richard Harper's telephone, which was not being monitored.

Q    Now, Mr. Swartz, was that discussion right around the time of these e-mails?

A    Yes, it was.

Q    Let's look to the next e-mail, which is 140K, I believe.

A    Yes, sir.

Q    The date, the time, the parties, and the content of this e-mail, Mr. Swartz?

A    Exhibit 140K is an e-mail that occurred on December 1, 2007, at 10:47 a.m. Pacific Coast time.  It is an e-mail from the David Runyon MySpace account to the Michael Draven MySpace account, and it is a response to the earlier message that I read, and says, Okay.  But for how long?

Q    And finally the last e-mail in this thread is 140L; is that right, Mr. Swartz?

A    Yes, sir.

Q    And would you give us the date, the time, and the parties to this e-mail?

A    Exhibit 140L is an e-mail that occurred on December 1, 2007, at 3:53 p.m. Pacific Coast time.  It is an e-mail that is sent from the Michael Draven MySpace account to the David Runyon MySpace account.  And it says, what's the number there for me to call you on the clinic phone?

Q    Now, Mr. Swartz, right after this e-mail, was there a call from a phone of interest in this case to a phone subscribed in the name of David Runyon?

A    Yes, there was.

Q    And what was the phone of interest, and how long was that call?

A    On December 1, 2007, at 7:22 p.m. Eastern standard time, there was a 12-minute-and-4-second phone call from the telephone that was being used by Richard Harper to David Runyon's cellular telephone.

Q    And this time, the time of this e-mail, 3:53, that would actually be 6:53 East Coast time; is that right, Mr. Swartz?

A    That is correct.

Q    Mr. Swartz, I'd next like to hand you Government Exhibits 143 and 143A -- excuse me -- 142 through 142C.  Mr. Swartz, do you recognize those exhibits?

A    Yes, I do.

Q    What are they, sir?

A    These are e-mails from the Michael Draven MySpace account, and they are all e-mails with the David Runyon MySpace account.

Q    Is it another thread of e-mails?

A    Yes, it is.

        MR. SAMUELS:  Your Honor, I would offer Government Exhibits 142 and 142A, B, and C.

        THE COURT:  They are admitted.

        (Government Exhibits 142 and 142A, B, and C, admitted.)

MR. SAMUELS:  Thank you.

Can you pull up 142, please.

BY MR. SAMUELS:

Q    Mr. Swartz, what is the date and the time and the parties to this first e-mail?

A    Exhibit 142 is an e-mail that occurred on December 5, 2007, at 9:43 a.m. Pacific Coast time.  It is an e-mail from the David Runyon MySpace account to the Michael Draven MySpace account.

Q    And the date of December 5, 2007 -- was there any investigative action taken in the days before this e-mail?

A    Yes.  On December 3 was the first interview of David Runyon in Morgantown, West Virginia, once he left the study in Baltimore, Maryland, that he was participating in.

Q    Mr. Swartz, I would like you to read this e-mail.

A    I stopped by my home on Monday real quick to do a few things, and guess who stopped by?  Yep.  I ended up talking to them for about an hour in their car.  The bald-headed detective seems to be a real hardball.  He asked me a lot of questions and even tried to confuse me to make me out to be a liar.

I gave them a DNA swab cheek sample so they could eliminate me from their suspect pool.  Maybe I shouldn't have. I don't know.  Maybe I should have lawyered up.  I don't know. I just pretty much tried to answer their questions and make

them happy, so they could move on and leave me alone.

They asked me if I knew a girl named Cat or something. I told them no. They explained that she was a friend of yours, and I told them that I do remember talking to a female friend of yours about work. I found her a good drug study, but told them that I don't think she did the job because she was too scared. I can't remember much from way back then anyways. Hell, I have trouble remembering things from day to day anyways.

I told them I consider you a cousin, that I'm not sure, but I don't think we are necessarily blood-related, maybe distantly or something, that I've worked with you off and on for two years, that outside of work I have met with you only twice, once last summer to eat as you were traveling and I was passing through like somewhere around D. C. I also told them I ate with you at a Waffle House this year sometime. I was on my way to Florida and passing through on a fishing trip. So I gave you a ring, and we met up to chitchat while I ate.

He tried to ask me specific questions about my fishing trips, like where I fish at, and what moors I left out of. Then he practically implied that I was lying, that everyone remembers that kind of stuff. I told him he doesn't understand. I fish a lot, especially between jobs, and I don't really pay attention. I guess they don't understand my

carefree lifestyle.

It's not like I take off of work and plan shit out. I just go fish whenever and wherever. I go on boats, pary (sic) boats and personal charters. I explained that I put out a lot of calls to captains to put my name down just in case a charter is short a man, to give me a call and I'll try to make it in. When I do get a call, I simply get the address, time, and moor/dock so I can be sure to be there, punch it into Mapquest, and go. Wallah (sic). That simple. When I get there, I simply introduce myself, pay up, and go fishing. That simple.

I told them what kind of work I do and how much money I make. They don't seem to have believed me. I guess it is incredulous to them for something to make that kind of money and still have so much time off to spend vacationing. I explained that I worked my vacations and trips into my road trips for work, which is simple enough. They just looked at me, probably thinking that I'm lying.

I don't think that they really get it. I tried to tell them that I'm never really actually home most of the year. I guess I could have shown them the mileage on my truck from the title when I bought it and today's date. Maybe then they would have believed me. LOL.

I have actually put over 30K on my Blazer over the last nine months, and it was broke down for three of those

months.  Ha.  I didn't actually realize myself how much traveling I do until recently.  Pretty amazing, huh?

Well, anyways, just thought I would drop you a line, tell you what happened.  Hope I satisfied them and they will leave me alone.  If they get back with me and start asking me another 20 questions, I probably won't have time to give them any real help next time.  I got too much on my plate right now with some stuff going on with my new girl.  She is looking to need all of my attention and help here really quick and looks like for a while, too.  She has messed up a few things in her personal life that needs help getting fixed.  Everybody deserves a second chance, right?

Well, I am going to try and help her get that second chance.  She has a good heart and means well, just needs some polishing.  That's all.  She is pretty smart and seems to be open to learning and trying to improve her life.  I have high hopes for her and us.  TTYL, David.  My phone is temporarily shut off, by the way, so e-mail me back.

Q    Mr. Swartz, 142A -- is that the response to this e-mail?

A    Yes, sir.

Q    What is the date and time on that response, sir?

A    This e-mail occurred on December 5, 2007, at 4:26 p.m. Pacific Coast time.  It is an e-mail sent from the Michael Draven MySpace account to the David Runyon MySpace account.

Q    Would you read that e-mail, please, Mr. Swartz.

A    How could they get a DNA sample from you like that? That's weird.  Why was the A-C-T-I-N-F like assholes.  Call a lawyer and see what a lawyer says about that DNA shit, because that's weird.  Well, that's what did happen.  You talked to her about that, but you're right, she didn't, cause, one, she couldn't because of being afraid and because of not being able to have a babysitter for the kids.

He was acting like an ass trying to pin this shit on you.  I'm so tired of their asses.  God, I hate cops.  I mean, every other word when I do talk to you is about fishing and all the amazing fish you got.  Yeah, I tried to explain about me researching, and they are like, what's that, playing dumb and shit.  Yeah, people like us travel all the fucking time.

And the only reason the (sic) asked for a DNA sample is because a supposed hair was found in the truck when they searched it.  It could have been anyone's.  You know it's bullshit.  If they try to contact you again, tell them to talk to your lawyer.

God, I hate cops royally anyway.  Yeah, take care of your girl and kid.  These assholes have no evidence and no leads, and the (sic) are grasping at straws to get a quick arrest because the senator is on their asshole.  You know it's bullshit.  It's just bull.

Q    Mr. Swartz, in the course of the investigation, are you aware of any contact or any action from any senator about this

case and the progress of it?

A    Catherina Voss had made contact with Senator Jim Webb's office to try to elicit their support in finding out what the hold-up was on the life insurance benefits of Cory Voss's life insurance policy.  There was also a letter that was drafted and sent to the office of the late Congresswoman Joanne Davis, also expressing concern over not getting the life insurance benefits and requesting some assistance.

THE COURT:  And Catherina Voss did that letter?

THE WITNESS:  That's correct.

BY MR. SAMUELS:

Q    Did either Senator Webb or Congresswoman Joanne Davis, to your knowledge, take any steps to push this investigation forward with the police?

A    I'm not aware of any.

Q    Mr. Swartz, the next e-mail that you have there, is it 142B or C?

A    142B.

Q    And the date, the time, the parties, and the content of that e-mail, sir?

A    This e-mail message was on December 5, 2007, at 10:28 p.m. Pacific Coast time.  It is an e-mail that is sent from the Michael Draven MySpace account to the David Runyon MySpace account.

Q    Would you read that e-mail, sir?

A    Why did you let me swab your mouth?  Couldn't they try setting you up or something?  Did they threaten you if you didn't, cause I believe that's against the law, you know.

Q    Mr. Swartz, the last e-mail on that thread, 142C?

A    Yes, sir.  This is an e-mail dated December 6, 2007, at 1:31 p.m. Pacific Coast time.  It is an e-mail that is sent from the Michael Draven MySpace account to the David Runyon MySpace account.

Q    I'm sorry, you said it is from the Michael Draven MySpace account to the David Runyon MySpace account?

A    Yes, it is from the Michael Draven to the David Runyon MySpace account.

Q    Would you read that e-mail, please.

A    I just don't trust cops.  I guess it's something my dad instilled in me.  Hell, they're probably reading these messages, you know.  Fuck you if you are.  LOL.  True that. But like I said, I don't trust anyone except friends, family, and myself.

Yeah, it's amazing how they can track little things like exes and ex-family, cause let me tell you, if I had that type of info, I would be contacting some old high school friends I miss, or my mom's dad, which she can't find.

Girls, girls, girls.  Isn't that an Elvis movie? LOL.  Yeah, I know what they was doing by swabbing your mouth, but who are you to swab your mouth?  Why didn't they ask me?

It's weird. They're weird. I wonder how many other friends they did this to. Anyway, yeah, I heard about this good fishing hole out near Bryce Resort. Don't know if you know anything about it anyway. Talk to you later, and be careful in your travels.

Q    Mr. Swartz, is that the last e-mail in that thread?

A    Yes, sir.

Q    And at this time in the investigation, have a number of interviews been done?

A    Yes, sir.

Q    Have a number of grand jury subpoenas been served as well?

A    Yes, they have.

Q    I'm next going to hand you Government Exhibits 143 and 143A. Mr. Swartz, do you recognize those exhibits?

A    Yes, I do.

Q    And what are they?

A    These are e-mails from the Michael Draven MySpace account that were obtained from the execution of search warrants, and they are with the David Runyon MySpace account.

MR. SAMUELS: Your Honor, I would offer Government Exhibits 143 and 143A.

THE COURT: They are admitted.

(Government Exhibits 143 and 143A, admitted.)

MR. SAMUELS: Thank you.

BY MR. SAMUELS:

Q    Could we look at 143, Mr. Swartz.  Can you give us the date and the time?  And this e-mail looks a little different.  Can you explain that as well?

A    Yes.  This message occurred on December 7, 2007, at 5:31 p.m. Pacific Coast time.  It is an e-mail that is sent from the Michael Draven MySpace account to the David Runyon MySpace account, and you can see in the subject line there, it is Request to Approve Comment.  So this is a notification to David Runyon's account that there is a message available for approval.

Q    What is the message?

A    The message in there is, Lost your e-mail and pass -- and there is some computer language in there.  Thought this saying was nice.  It is better to remain silent and be thought the culprit than to speak and convict yourself.  Draven.

Q    Now, Mr. Swartz, December 7, 2007, this is actually 8:30 East Coast time; right?

A    That's correct.

Q    Was there anything in the investigation that was done that day, prior to this e-mail being sent?

A    Earlier that day was the second interview of Michael Draven, which was done at the residence of Catherina Voss while she was out of town.  And this was a confrontational interview where hard questions were asked of him, in contrast

to the first interview that was done with him, where it was more of a laid-back, easygoing type interview.

Q   Were there a number of calls that followed that interview as well?

A   Yes, there were.

Q   And the following e-mail, Mr. Swartz, 143A?

A   Yes, sir.

Q   What is the date and the time and the parties to this e-mail?

A   This e-mail occurred on December 7, 2007, at 6:33 p.m. Pacific Coast time.  It is an e-mail that is sent from the Michael Draven MySpace account to the David Runyon MySpace account.

Q   If I can make that a little bigger, would you read that e-mail please, Mr. Swartz?

A   Listen.  I tried to call you, but couldn't get in contact with you.  This is the deal.  The -- and it is I-V-I-E-S -- came to me with a ATF agent, and they are trying to get me to say I introduced you to Cat, which is bullshit, to hire to kill Cory, which is bullshit.

Now, when they asked me about the Waffle House, I told them you called me from a pay phone the night of cause you was passing through, but I could not meet you, but you went on to North Carolina or South Carolina to do your fishing or hunting trip.

Seriously, they wanted me to come out and say a butch of shit. Simply tell them if they come to see you again, call Marc Messier, (757)595-7777. That's your lawyer. You're protected by him. Just call me when you can, because I know outside of that steak/Waffle House we ate at was in D. C. I never net you other than that time.

Oh, and remember when I got locked up the night you was coming through. Well, they thought that the money I was supposed to give you was for Cory, even though it was that one thousand I borrowed from you, because of Parexel dicking me around.

I was going to give you 500, but I couldn't give you any because of me being in jail, and also they was asking questions cause of you talking with Cat for two hours cause of me being locked up, and she had to explain it all to you.

Look, one of Cat's friends and my stepdad is being pulled into a grand jury, and supposedly they are harassing all of us, all friends saying this was a murder for hire, and this is def not true. I hate this fucking shit. Contact me ASAP. Call me now.

Q    Mr. Swartz, is that the last e-mail that you got between Mr. Runyon and Mr. Draven on that thread?

A    Yes.

Q    I'd like to hand you one last e-mail, Government Exhibit 144. Mr. Swartz, do you recognize that document?

A    Yes, I do.

Q    What is it?

A    It is an e-mail from the Michael Draven MySpace account, and it is to a user ID number of 152670044.

MR. SAMUELS:  Your Honor, I would offer Government Exhibit 144.

THE COURT:  All right.

(Government Exhibit 144, admitted.)

MR. SAMUELS:  Could we publish that, please?

BY MR. SAMUELS:

Q    Now, Mr. Swartz, what is the date and the time of this e-mail, and who does it appear to be from and to?

A    It is from the Michael Draven MySpace account.  It is to the user ID number that I just mentioned.  I'm not -- I do not know who that user ID belongs to.  It occurred on December 10, 2007, at 7:52 p.m. Pacific Coast time.

Q    Could you read that e-mail, please?

A    Can't say hi to your friends anymore.  Those cops that came and saw you are assholes.  They lied to all of my friends, and trying to pin shit on people.  I'm sorry you had to deal with them.

Q    Mr. Swartz, were there any investigative actions taken on December 10, 2007, around the time of this e-mail?

A    There are -- there were -- we were in the process of serving grand jury subpoenas for the grand jury that was

occurring on December 10. That day was almost an all-day process with witnesses for this case.

Q   Mr. Swartz, is that the last of the e-mails from the Michael Draven MySpace account?

A   Yes, it is.

THE COURT:  Are you starting on something new?

MR. SAMUELS:  A new account, Your Honor.

THE COURT:  Are we at 145?

MR. SAMUELS:  We are, Your Honor, yes.

THE COURT:  So we have got the Runyon MySpace e-mail thread.

MR. SAMUELS:  Yes, ma'am.

THE COURT:  And then we have got the Voss, is that correct, MySpace e-mails?  And the Runyon Yahoo -- is Mr. Swartz the witness that is going all the way through 158?

MR. SAMUELS:  Yes, he is, Your Honor.

THE COURT:  All right.

MR. SAMUELS:  Some of the e-mails in the Voss MySpace account have been admitted already and discussed already.

THE COURT:  How long do you anticipate?

MR. SAMUELS:  Just for the e-mail section, Your Honor, it is probably about another 15 minutes or so.  Many of them in the Runyon are the same as that in the Draven, and so they would go more quickly.

THE COURT:  Let's try to finish the e-mail thread, if it's all right, this evening, and then we will adjourn until Monday.  So let's see if we can -- I'm not rushing you. You are doing a very good job of moving it along.  I'm just trying to bring it to a logical breaking point.

MR. SAMUELS:  That's fine, Your Honor.

BY MR. SAMUELS:

Q    Mr. Swartz, did we also obtain e-mails from Mr. Runyon's MySpace account?

A    Yes, we did.

Q    I'm going to hand you what has been marked as Government Exhibits 145 through 145D.  What are those, sir?

A    These are e-mails that were obtained with the execution of search warrants from the David Runyon MySpace account, and these reflect activity with Michael Draven's MySpace e-mail account.

Q    Now, Mr. Swartz, are those e-mails the matching-up e-mails from 139 and then 139A through D?

A    If you will give me just one second.

Q    Certainly.

A    That is correct.

MR. SAMUELS:  Your, I would offer Government Exhibits 145 and 145A, B, C, and D?

THE COURT:  They are admitted.

(Government Exhibits 145 and 145A through 145D,

admitted.)

BY MR. SAMUELS:

Q    So, Mr. Swartz, these are the same e-mails we already discussed.  These were just obtained from Mr. Runyon's MySpace account, as opposed to Mr. Draven's; is that correct?

A    That is correct.

Q    I'd next like to hand you Government Exhibit 146, then 146A through L.

THE COURT:  So in other words, we have already been through those.

THE WITNESS:  Yes, ma'am.

THE COURT:  You are just showing that you obtained them from that account.

THE WITNESS:  That is correct.

BY MR. SAMUELS:

Q    Mr. Swartz, what are 146, and then 146A through L, sir?

A    These are e-mails that were obtained from the execution of search warrants on David Runyon's MySpace account, and these are all e-mails that are in communication with the Michael Draven MySpace e-mail account.

THE COURT:  And we have previously gone through them?

THE WITNESS:  We have read these, yes, we have.

MR. SAMUELS:  Your Honor, I will offer Government Exhibits 146, and then 146A through L.

THE COURT: They are admitted.

MR. SAMUELS: Thank you.

(Government Exhibits 146 and 146A through 146L, admitted.)

BY MR. SAMUELS:

Q   Mr. Swartz, I'm next going to hand you Government Exhibits 148 and then 148A, B, and C. Mr. Swartz, again do you recognize those e-mails?

A   Yes. These are all e-mails that were obtained through the execution of search warrants on the MySpace e-mail account of David Runyon, and they are all associated with communication with the Michael Draven e-mail account from MySpace.

MR. SAMUELS: Your, I would offer Government Exhibits 148 through 148C.

THE COURT: They are admitted.

(Government Exhibits 148 and 148A through 148C, admitted.)

THE COURT: And again we have been through those. This is just the corresponding account.

MR. SAMUELS: Exactly.

BY MR. SAMUELS:

Q   Mr. Swartz, is that correct?

A   That is correct. These have all been read.

Q   Mr. Swartz, I'm also going to hand you 149 and 149A.

A       Yes, sir.

Q       Do you recognize those documents?

A       Yes, I do.

Q       What are those, Mr. Swartz?

A       These are also e-mails that were obtained with the execution of search warrants for the David Runyon MySpace account. These two exhibits are showing communication with the Michael Draven MySpace e-mail account which I have earlier read.

MR. SAMUELS: Your Honor, I would offer Government Exhibits 149 and 149A.

THE COURT: They are admitted.

(Government Exhibits 149 and 149A, admitted.)

MR. SAMUELS: Thank you.

Your Honor, if I could just have one moment here to go through my list?

Your Honor, I'm actually at a very good breaking point. There might be just one or two more e-mails, and if I could go into those on Monday, I'd appreciate that.

THE COURT: That's fine. We are at the end of this trail that we have been going back and forth on.

MR. SAMUELS: Exactly. We have matched up the ones from Mr. Runyon's account to Mr. Draven's account.

THE COURT: Mr. Clancy?

MR. CLANCY: Nothing further, Judge. I have no

**604**

questions, not now, Judge, on these.  I have already stipulated to these.  I have no questions about these at this point.

THE COURT:  All right, because I know we are going to continue, but we are going to finish with the cross-examination on this today.

MR. CLANCY:  On these sets of e-mails?

THE COURT:  Yes.

MR. CLANCY:  All right.  I don't have any questions, Judge.

THE COURT:  Mr. Woodward?

CROSS-EXAMINATION

BY MR. WOODWARD:

Q    Mr. Swartz, can you just go back to the first set, the Runyon account, since that encompasses all the responses and they are the same?  Exhibit 139 -- do you have that?

A    I don't have any of the exhibits in front of me.

THE COURT:  Can we put it up on the screen?  Would that help?

MR. WOODWARD:  Yes, ma'am.  I thought he had them up there.

THE COURT:  139.

BY MR. WOODWARD:

Q    That's the first one in the trail?  The "fix my page, will you," part of that -- did that come from David Runyon?

A    This was -- yes.  There were some earlier e-mail messages between the two of them about working on the MySpace page.

Q    So that answers -- so that page is Mr. Runyon asking Mr. Draven -- or that tag line reference is Mr. Runyon asking Mr. Draven to fix his -- do something with his MySpace page?

A    Yes, sir.

Q    Okay.  The next one that I want to ask you about is No. 140F.  Just so it is clear, that is an e-mail that it says replied, but Mr. Draven sent that e-mail?

A    That is an e-mail that was sent from the Michael Draven MySpace account, yes.

Q    If I slip up, I mean to say account to account, not person to person.  I'm trying to move along here.

THE COURT:  We will imply that into all of the questions on these e-mails.

MR. WOODWARD:  Yes, ma'am.

BY MR. WOODWARD:

Q    Then the next one is from Mr. Runyon's account, and that's the one that says, wow, she has a great memory, I had completely forgotten about that.

That is in reference to the 88-minute phone call that you previously testified about; right?

THE COURT:  Which one are we on?  11-30-2007?

MR. WOODWARD:  Yes, ma'am.  Exhibit 140G.

THE WITNESS: There was a reference to the fact that there was -- that we were looking at telephone records in one of those messages. And then Mr. Draven was reminding Mr. Runyon of the fact that there was a telephone call on her home phone. Presumably it's the 88-minute call that he is referencing.

BY MR. WOODWARD:

Q   All right. Then the next one that I would like to ask you about is 142, Exhibit 142. It has been admitted. Do you see that?

A   Yes, sir.

Q   Again that's an e-mail that Mr. Runyon sent to Mr. Draven?

A   Yes, sir.

Q   And I know you weren't present for it, you have talked about investigative steps, but to your knowledge, did Mr. Runyon in fact voluntarily talk to the police on December 3?

A   Yes, he did.

Q   And did he in fact, to your knowledge, voluntarily give a DNA sample?

A   Yes, he did.

Q   And he did not request an attorney at that meeting?

A   That is my understanding. He did not.

Q   And then I think finally, if I can make sure I've got this right, the last, 142B and 142C -- those are both e-mails

that Mr. Draven sent; is that correct?

THE COURT:  This is 142B?

MR. WOODWARD:  B and C, Your Honor.

THE COURT:  This is 142B.  Let's look at 142C.

MR. WOODWARD:  I keep forgetting that.  I don't have a screen right here.  They are up on the screen.

BY MR. WOODWARD:

Q    That was redundant.  142B is an e-mail that Mr. Draven sent.

A    That is correct.

Q    And 142C is an e-mail that Mr. Draven sent?

A    Could I look at 148C, which is the companion e-mail?

MR. WOODWARD:  All right.

You are asking me.  I assume you can.  It is in evidence.

THE COURT:  Yes, that's fine.

MR. WOODWARD:  I don't have the right to give you permission, but it is fine with me.

THE WITNESS:  Okay.

Yes, it was sent from Michael Draven to David Runyon's e-mail account.

BY MR. WOODWARD:

Q    What does the tag line up there on the right of 142C where it says unread -- what does that mean?

A    Unread --

Q    Is it up on the screen?  We need 142C.  Do you see up there, highlighted, it was sent, and then off to the right in bold print, there is a line that says unread?

A    Yes, sir.

Q    Did your investigation -- or do you have knowledge regarding what that means?

A    That would mean -- that's usually what kind of action was taken in regards to it.  You have seen replied and various things on there.  That would indicate that that message was not read.

Q    Okay.  Was not read by the person it was sent to, in this case, Mr. Runyon?

A    Correct.

Q    Without going through all of them, would that be true throughout all of the e-mail chains, that if that says unread over there, that means whoever received it didn't read it, and if it says replied, that's an indication that the person received it and --

A    The other is "read," I believe.

            THE COURT:  What is replied?

            THE WITNESS:  Replied means that they have read that message and then actually replied back to someone.

BY MR. WOODWARD:

Q    There's three things.  There can be "replied," which would indicate that they opened it, looked at it, and

responded or replied.  "Read" means that they opened it,

looked at it, and didn't reply.

A    Right.

Q    And "unread" is an indication that they never even looked

at it?

A    Correct.

THE COURT:  Go to -- what was the companion to

142C?

THE WITNESS:  Should be 148C.

THE COURT:  All right.  Go to 148C.  What does that

one say at the top?

THE WITNESS:  That one says replied.

BY MR. WOODWARD:

Q    Okay.  So which is it?

A    I can only go with what is on the records.

Q    They are both the same time.  They both say 1:31?

A    Yes.

Q    And they are both the same tag line, and I don't want to

go through them, but let me ask you this.

THE COURT:  Let me ask, the first one was from --

you took it off Mr. Draven's account.

THE WITNESS:  Yes.

THE COURT:  All right.  And he was the sender?

THE WITNESS:  Yes, ma'am.

THE COURT:  And the second one, you took it off Mr.

Runyon's account.

THE WITNESS:  Yes, ma'am.

THE COURT:  And he is the person who had received it.

THE WITNESS:  Yes.

THE COURT:  Or the account that received it.

THE WITNESS:  Yes, ma'am.

THE COURT:  And his account said replied.

THE WITNESS:  That's correct.

BY MR. WOODWARD:

Q    My question to you, sir, does the tag line up here indicate what the sender did with it, or what the receiver did with it, or do you know?

A    I don't know exactly whether it's the sender or the receiver.

Q    And that would be true, read, replied, unread -- you don't know whether that indicates the action taken by the sender or the receiver?

A    No.

Q    Did you investigate that?

A    No, I did not.

MR. WOODWARD:  Thank you.  That's all I have, Your Honor.

THE COURT:  All right.  Any redirect on this line?

MR. SAMUELS:  Just briefly.

REDIRECT EXAMINATION

BY MR. SAMUELS:

Q    Mr. Swartz, but a number of these e-mails that we have looked at in response to Mr. Woodward's questions, you have followed a train of e-mails back and forth; correct?

A    That is correct.

MR. SAMUELS:  Nothing further, Your Honor.

THE COURT:  All right.  Then you can step down, Mr. Swartz.  That concludes your testimony today.

MR. SAMUELS:  He is subject to recall, Your Honor.

THE COURT:  You are subject to recall.

Ladies and gentlemen of the jury, that brings us to the conclusion of our trial week.  As I told you earlier, we would be in trial on this case Monday through Thursday, so we will not be in trial tomorrow.  We will resume with the trial at ten a.m. on Monday morning, and you should plan to be here again Monday through Thursday.  I am hopeful that we can complete the evidence next week.  That doesn't mean the case is over, because there are still other things that have to occur, instructions, closing arguments, and I'm just being optimistic.  So I'm optimistic that we will conclude the evidence next week, if all things go as the attorneys have indicated to the court.

But in any event, I want you to do what I request of you every night.  Just put the case out of your mind, and go

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

UNITED STATES OF AMERICA )
)  CRIMINAL ACTION
v. )
)  NO. 4:08cr16
MICHAEL ANTHONY ERIC DRAVEN )
)
and )
)
DAVID ANTHONY RUNYON, )
)
Defendants. )

TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

July 13, 2009

**EIGHTH DAY OF TRIAL**

Before:    THE HONORABLE REBECCA BEACH SMITH
           United States District Judge, and a Jury

Appearances:

LISA R. MCKEEL
BRIAN J. SAMUELS
Assistant United States Attorneys
    Counsel for the United States

TIMOTHY G. CLANCY
JAMES S. ELLENSON

    Counsel for Michael Anthony Eric Draven

STEPHEN A. HUDGINS
LAWRENCE H. WOODWARD, JR.
    Counsel for David Anthony Runyon

THE WITNESS:  Thank you, Judge.

THE COURT:  Your next witness, Ms. McKeel?

MR. SAMUELS:  Your Honor, the United States recalls Paul Swartz.

THE COURT:  All right.

MR. SAMUELS:  Your Honor, while Mr. Swartz is taking the stand and getting set up, could I request that the court read a stipulation?  This is Stipulation No. 94, a new stipulation that was provided to the court today.

THE COURT:  Mr. Swartz, you are still under oath.

THE WITNESS:  Yes, ma'am.

THE COURT:  The stipulation is as follows:  On November 9, 2007, the interception of wire communications occurring over the following telephones was authorized:  The nTelos cellular telephone bearing Mobile Identification Number MIN (757)715-2616, which was used by and subscribed in the name of Catherina Voss, with a billing address of 740 Mayland Drive, Newport News, Virginia; the nTelos cellular telephone bearing MIN (757)713-7570, which was used by and subscribed in the name of Michael Draven, with a billing address of 325 Circle Drive, Newport News, Virginia; and the Cox Communications residential landline telephone at 740 Mayland Drive, Newport News, Virginia, bearing telephone number (757)223-1119, which was used by and subscribed in the name of Catherina Voss, with a billing address of 740 Mayland Drive,

Newport News, Virginia.

The monitoring of wire communications over (757)715-2616 and (757)713-7570 began at 4:07 p.m. on November 14, 2007.  The monitoring of wire communications over (757)223-1119 began at 2:53 p.m. on November 15, 2007.  The monitoring was terminated on December 14, 2007, and the magneto optical disks of the original wire communications have been maintained in the secure evidence room of the Bureau of Alcohol, Tobacco, Firearms & Explosives Office in Norfolk, Virginia.

The parties agree that interceptions of wire communications were properly conducted and the duplicate original recordings, the pen register information, and the transcripts of the intercepted telephone conversations are authentic and accurate.  United States Exhibit Nos. 174 through 205B are audio recordings with associated transcripts and pen register information that contain only excerpts of the full-length intercepted telephone conversations.

MR. SAMUELS:  Thank you, Your Honor.

THE COURT:  That's the stipulation.

MR. SAMUELS:  Thank you, Your Honor.

PAUL SWARTZ, DIRECT EXAMINATION on behalf of the government, as follows:

DIRECT EXAMINATION (Rec.

BY MR. SAMUELS:

Q    Good afternoon, Mr. Swartz.

A    Good afternoon.

Q    Mr. Swartz, as we move into discussing the wire intercepts that were collected in this case, just very briefly again, sir, what was your actual role in the conducting and management of the wire communications interceptions?

A    I was involved in the preparation of the affidavit in support of the application for the order to conduct the wire interceptions, and then I was on site on a daily basis overseeing the operation within the wire room, ensuring that quality control was being done and the operation was operating efficiently.

Q    Mr. Swartz, in terms of identifying the numbers that were used on the wires, how were you able to do that, both the numbers that were called out to and the numbers that were calling in to these phone numbers that there were wires on?

A    During the wire intercepts, we have taken one step further.  We were already operating pen registers, as I explained earlier in my testimony, on the respective telephones that were just mentioned by Your Honor, which were the cellular telephone of Catherina Voss, the cellular telephone of Michael Draven, and then the residential telephone at 740 Mayland Drive.  Operating those pen registers gives you the date, the time, the duration of the call, and the number that was either being called in or made in an

outgoing call.

The difference, once you go to a wiretap operation, is the phone company provides us audio separately through a ring-down telephone line, and the wiretap equipment brings those two together. So we now have audio to match up with the pen register information.

THE COURT: And that has to be authorized by a federal judge.

THE WITNESS: That is correct.

BY MR. SAMUELS:

Q    And the wiretaps were authorized on the cell phone and land lines of Catherina Voss?

A    Yes, sir.

Q    And the cell phone of Michael Draven?

A    Yes, sir.

Q    I'd like to hand you a number of other telephone records and ask you if you can identify these. I'm going to hand you Government Exhibits 123 through 131.

MR. SAMUELS: Your Honor, I have a number of additional stipulations covering these records.

THE COURT: All right.

MR. SAMUELS: The stipulations are 75 through 78, and No. 80, please.

THE COURT: 75 through 78. Those stipulations are as follows: 75 is, United States Exhibit No. 123 is a

telephone subscriber record from Alltel Communications for the cellular telephone number (757)570-1760, subscribed in the name of Jasenka Guyer, with a billing address of 552 Yorktown Road, Newport News, Virginia; an account activation date of August 16, 2003; and this telephone was used by Amar Okanovic; which was provided by the Alltel Communications custodian of records. The record was made by an employee of Alltel Communications at or near the time of occurrence, with knowledge of the matters contained therein, and it was a regular practice of Alltel Communications to make the record.

Stipulation No. 76 is as follows: United States Exhibit No. 124 is a telephone subscriber record from T-Mobile USA for the cellular telephone number (757)358-8720, subscribed in the name of and used by David Hill, with a billing address of 2067 Falcon Drive, Apartment D, Langley Air Force Base, Virginia; an account activation date of January 2, 2007; which was provided by the T-Mobile USA custodian of records. The record was made by an employee of T-Mobile USA at or near the time of occurrence, with knowledge of the matters contained therein, and it was the regular practice of T-Mobile USA to make the record.

77 is as follows: United States Exhibit No. 125 is a telephone subscriber record from Cellco Partnership, doing business as Verizon Wireless, for the cellular telephone number (757)812-3120, subscribed in the name of and used by

Rose Wiggins, with a billing address of 10 Terrell Road, Newport News, Virginia; an account activation date of November 25, 2005; which was provided by the Cellco Partnership doing business as Verizon Wireless custodian of records. The record was made by an employee of Cellco Partnership, doing business as Verizon Wireless, at or near the time of occurrence, with knowledge of the matters contained therein, and it was the regular practice of Cellco Partnership, doing business as Verizon Wireless, to make the record.

No. 78 is at follows: United States Exhibit Nos. 126 through 127 are telephone subscriber records from Cox Communications for the landline telephone number (757)223-1119, subscribed in the name of Catherina Voss, for service at 740 Mayland Drive, Newport News, Virginia; an account activation date of October 31, 2006; (757)928-3261, subscribed in the name of Rose Wiggins for service at 10 Terrell Road, Newport News, Virginia; an account activation date of November 1, 2006, respectively; which were provided by the Cox Communications custodian of records. The records were made by an employee of Cox Communications at or near the time of occurrence, with knowledge of the matters contained therein, and it was the regular practice of Cox Communications to make the records.

United States Exhibit No. 110 is telephone call detail record from Cox Communications for the landline

telephone number (757)223-1119, which was provided by the Cox Communications custodian of records.  The records were made by an employee of Cox Communications at or near the time of occurrence, with knowledge of the matters contained therein, and it was a regular practice of Cox Communications to make the records.

And you said 80?

MR. SAMUELS:  Yes, ma'am, that's the last one.

THE COURT:  United States Exhibit Nos. 128 through 132 are telephone subscriber records from Verizon for landline telephone numbers (301)490-1017, subscribed in the name of Charles Smith, for service at 11688 South Laurel Drive, Apartment 2A, Laurel, Maryland, and an account activation date of May 29, 2007; (757)886-6271 subscribed in the name of Mary Immaculate Hospital for service at 2 Bernadine Drive, Newport News, Virginia, and an account activation date of July 26, 1996; (757)444-7500 subscribed in the name of General Services Administration; (757)884-9308 subscribed in the name of Rogers Petroleum for a pay telephone located at 12257 Jefferson Avenue, Newport News, Virginia, and an account activation date of October 26, 2004; and (757)884-9744 subscribed in the name of Waffle House, for a pay telephone located at 12259 Jefferson Avenue, Newport News, Virginia, and an account activation date of October 14, 2003, respectively; which were provided by the Verizon custodian of records.  The records

were made by an employee of Verizon at or near the time of occurrence, with knowledge of the matters contained therein, and it was a regular practice of Verizon to make the records.

MR. SAMUELS:  Thank you, Your Honor.

THE COURT:  Was there one more?

MR. SAMUELS:  That was it, Your Honor, for now. Thank you.

BY MR. SAMUELS:

Q    Now, Mr. Swartz, these subscriber records -- do they provide the subscriber information for phone numbers captured during the wire?

A    Yes, and other telephone numbers that will be used in an analysis.

Q    And these records, as well as those that have already been introduced, enable you to determine the identity of calls going out and calls coming in?

A    The subscribers, yes.

MR. SAMUELS:  Your Honor, at this time, I would offer Government Exhibits 123 all the way up through 131.

THE COURT:  They are all admitted.

123 through 131, or 132?

MR. SAMUELS:  131 at this time, Your Honor.

THE COURT:  123 through 131 are admitted.

MR. SAMUELS:  Thank you.

(Government Exhibits 123 through 131, admitted.)

BY MR. SAMUELS:

Q     Now, Mr. Swartz, do you have Government Exhibits 174 through 204B in front of you?

You will shortly.

THE COURT:  Have they been admitted?

MR. SAMUELS:  They have not, Your Honor.  I will have him identify them.

THE COURT:  All right.

BY MR. SAMUELS:

Q     Mr. Swartz, what are 174 through 204B?

A     174 through 204B are the conversations that were obtained from the wiretap that we are introducing as evidence.  Each number, 174 -- the even number is going to be the actual pen register report that signifies the date and time of the call and the number that was called.  The letter A behind each number is going to be the actual audio call, which is on a CD ROM, and we have put that into the system here to play.  And then the letter B behind that respective number is the actual transcript from those calls, and there is 31 of those.

THE COURT:  So you have the pen register, then the call, and then the transcript.

THE WITNESS:  Yes, ma'am.

THE COURT:  So it is the number, then A and B.

THE WITNESS:  Yes, ma'am.

BY MR. SAMUELS:

Q    Mr. Swartz, were you involved in the editing and transcription process for these calls in 174 through 204B?

A    Yes, I was.

Q    How were you involved in that, sir?

A    Actually through a multistep process we whittled those down to this collection of calls here.  Once we got that whittled down to these calls, I then reviewed those calls and reviewed them with the transcript to make sure that they are accurate.

Q    This certainly doesn't represent all the calls collected in the case, then?

A    No.

Q    And are all the calls indicated in 174 through 204B -- do they involve the parties to this case and/or Ms. Voss?

A    Yes, they do.

MR. SAMUELS:  Your Honor, I would offer Government Exhibits 174 through 204B.

THE COURT:  They are admitted.

(Government Exhibits 174 through 204B, admitted.)

BY MR. SAMUELS:

Q    Mr. Swartz, if you could pull up 174 so we could give the jury the sense of the call detail information you spoke of with the pen register.

Now what specifically does this pen register information show?

A     The section that I have blown up here -- this is again a printout from the computer system that does the intercept work for us.  The first line there is project number, and that is part of our filing system within the computer, and then we further designate it with a case number, and in this case it was the homicide case of Cory Voss.

The next line down is the call number, and in this case this first call that we are going to play is Call No. 43. Those run in sequential order through the end of the wiretap, each call being given a different call number.  And then you know what the call number is separate from the actual phone that it was intercepted on by the next line down, which indicates the target number, and in this case it (757)223-1119, and that is the residential phone at 740 Mayland Drive, the Voss residence.

You can skip down one line to the dates, and you can see that the date is November 16, 2007, and the time is in military time, 2351 and 4 seconds.  The duration of this call is 41 minutes and 12 seconds, and the number dialed there is a speed-dial number, and because of that, there is no subscriber information in there.

The lower section there has to do with the messages that come from the telephone company that signify what this call is.

Q     And, Mr. Swartz, how long was the wire up and running?

How long was the Newport News Police Department and the federal agencies involved -- how long were they recording calls in terms of dates?

A    It was -- the initial period of authorization was for 30 days, and we had obtained an extension order to do another 30 days.  However, we only went into that extension period for five or six hours.

Q    Mr. Swartz, if you scroll down there on the wire details, does it indicate portions of the calls that are intercepted and portions of the call that are not?

A    In the majority of the calls that we are going to play for the court, they are -- you will only see under audio times just the "on" time.  And what this indicates here is that minimization was occurring during this call.

Q    What is minimization, Mr. Swartz?

A    Minimization -- we are only authorized to intercept -- the order that we received to do this monitoring of these telephones authorizes us to with certain objectives.  They are stated in the court order as to the crimes that we can intercept conversations about, the people that we can intercept conversations about, and if there is a conversation that is personal in nature and we don't believe that conversation is going turn into any kind of criminal activity, we have to minimize that conversation.

But the order authorizes us to be able to do what is

called spot monitoring, and that is, after a brief period of time, you can go back and listen in to the call, see if the parties have changed to the call, and see whether or not the substance of the conversation has changed. Particularly if it has turned to criminal, then we are going to listen for a little bit longer period of time.

And so these times that are reflected here on and off are the actual monitor of this call minimizing this conversation.

Q    Mr. Swartz, from 174, from this pen register sheet, can you determine the parties to the call, the actual people talking on the call, not just the phone numbers?

A    No. No, this is data.

Q    Who are the parties to the call on 174, the call reflected in 174?

A    This is actually a very long call. It was 41 minutes in duration, and it began with a conversation between Catherina Voss and Michael Draven. There were actually several different people that got onto the telephone, and we have excerpted a certain portion of this call.

Q    Mr. Swartz, you have had the opportunity to hear the individuals who have been on these various calls throughout the course of the investigation?

A    Yes.

Q    Mr. Swartz, would you please play the call reflected in

174.

(The audio was played.)

BY MR. SAMUELS:

Q    Now, Mr. Swartz, in that excerpt, are you familiar with the script they are talking about there?

A    A script called *The Perfectionist*.

Q    Is that a script that was recovered in the course of the search warrant?

A    Yes, it was.

Q    Does it involve contract killing in some respect?

A    I have not read it, but that is my understanding.

Q    Now, was that done early in the period of monitoring for these wire interceptions?

A    Yes.  It was like the second day of monitoring.

Q    You spoke last week about how there were investigative events that were married up with these interceptions; is that right?

A    There was a strategy that was developed to do what we refer to as tickle the wire, starting -- treating it as a cold case homicide, and moving forward through a logical sequence of events, to see what kinds of conversations we could intercept on the phone.

Q    Now, Mr. Swartz, the date of that call was 11-16-2007?

A    Yes, sir.

Q    The next exhibit, Exhibit 175 -- what is the date and the

**628**

time and the parties to that call, Mr. Swartz?

A    This is a call that occurred on November 17, 2007, at 7:44 p.m., and it is a conversation between Michael Draven and Catherina Voss.

Q    Now, were there a number of investigative steps that happened before this call took place?

A    Yes.  One of the -- the very first thing that was done were the detectives were sent out to interview Catherina Voss's mother, Rose Wiggins.  The next thing that happened were the detectives traveled -- and when I speak of detectives, it's Detective Rilee and Detective Williams, the lead homicide investigators.  They were sent to Ohio and Michigan to interview the mother of Cory Voss and the sister of Cory Voss.

Q    And where was Michael Draven when this call was made on November 17, 2007?

A    He was in a drug study in Baltimore, Maryland.

Q    And is that evidenced in Government Exhibit 102, which shows the records from Parexel?

A    That's the summary chart, yes.

Q    And what about David Runyon?  Where is David Runyon?

A    David Runyon -- they came to the drug study at different times, and this was the date, November 17, that David Runyon came to the drug study at Parexel.

Q    Were they in different drug studies?

A     Yes.

Q     Mr. Swartz, would you please play the call referenced in Exhibit 175.

(The audio was played.)

BY MR. SAMUELS:

Q     Mr. Swartz, the reference in that call to Michael Draven talking to somebody up at the study, and there being a Russian girl involved, have you reviewed a number of e-mails associated with the David Runyon bushido.dragon@yahoo account in this case?

A     Yes, I have.

Q     Are there a number of references in those e-mails to Mr. Runyon's contacts with women from Russia?

A     The Ukraine, yes.

Q     Did that continue up to the fall of 2007?

A     Yes.

Q     Mr. Swartz, the next call.

THE COURT:  Let's do one more call this evening.

MR. SAMUELS:  Yes, ma'am.  This a short one.

BY MR. SAMUELS:

Q     Government Exhibit 176, Mr. Swartz -- what is the date and time and of the parties to this call?

A     This call occurred on November 18, 2007, at 2:16 p.m.  It is a call that was intercepted on the residential phone at the Voss residence, and it is a call between Catherina Voss and

Michael Draven.

Q     Where is Mr. Draven during the time period of this call?

A     He is still at the Parexel study.

Q     Mr. Swartz, would you please play this call.

            (The audio was played.)

            THE COURT:  Is that it?

            MR. SAMUELS:  Yes, Your Honor.

            THE COURT:  All right.  Ladies and gentlemen of the jury, that brings us to the conclusion of our trial day. Again put the case out of your minds for the evening, and enjoy your family and friends.  If there are any media accounts, don't read them, don't listen to them.

            I do have a sentencing in the morning, so we have to start this case at 10:30.  So if you would be here at 10:30 tomorrow morning, we will see you then.  Have a great evening.

            (The jury exited the courtroom.)

            THE COURT:  You can step down, Mr. Swartz.

            Counsel, is there anything further I need to address this evening?

            Mr. Samuels?

            MR. SAMUELS:  Not from the government, Your Honor. Thank you.

            THE COURT:  Mr. Clancy?

            MR. ELLENSON:  May I have a second to ask Mr. Woodward something?

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>   v. )<br>)<br>MICHAEL ANTHONY ERIC DRAVEN )<br>)<br>   and )<br>)<br>DAVID ANTHONY RUNYON, )<br>)<br>      Defendants. ) | CRIMINAL ACTION<br><br>NO. 4:08cr16 |

TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

July 14, 2009

**NINTH DAY OF TRIAL**

Before:   THE HONORABLE REBECCA BEACH SMITH
United States District Judge, and a Jury

GLORIA S. SMITH, OFFICIAL REPORTER

Appearances:

LISA R. MCKEEL
BRIAN J. SAMUELS
Assistant United States Attorneys
        Counsel for the United States

TIMOTHY G. CLANCY
JAMES S. ELLENSON

        Counsel for Michael Anthony Eric Draven

STEPHEN A. HUDGINS
LAWRENCE H. WOODWARD, JR.
        Counsel for David Anthony Runyon

**633**

(The jury entered the courtroom.)

THE COURT: Good morning, ladies and gentlemen.

Madam Clerk, if you would please call the roll of the jury and the case.

THE CLERK: Thank you, Your Honor.

Case number 4:08cr16, United States of America versus Michael Anthony Eric Draven, also known as Anthony James Neff; and David Anthony Runyon.

Ms. McKeel, Mr. Samuels, is the government ready to proceed?

MS. MCKEEL: We are ready. Good morning, Judge.

MR. SAMUELS: Good morning, Your Honor.

THE COURT: Mr. Ellenson, Mr. Clancy, is the defendant Michael Anthony Eric Draven ready to proceed?

MR. CLANCY: We are. Good morning, Your Honor.

MR. ELLENSON: Good morning.

THE CLERK: Mr. Woodward, Mr. Hudgins, is the defendant David Anthony Runyon ready to proceed?

MR. WOODWARD: Yes, ma'am. Good morning.

MR. HUDGINS: Good morning.

THE COURT: Good morning.

(The jurors' names were called.)

THE CLERK: All the jurors are present, Your Honor.

THE COURT: We will continue with Mr. Swartz. You can come back on the stand.

MR. SAMUELS: Your Honor, while Mr. Swartz takes the stand, while we are playing these calls, if there is an issue with the sound, would it be possible for Mr. Swartz to step down and make an adjustment if necessary, while the call is being played?

THE COURT: Yes.

MR. SAMUELS: Thank you, ma'am.

PAUL SWARTZ, DIRECT EXAMINATION (Cont'd), on behalf of the government:

DIRECT EXAMINATION (Cont'd.)

BY MR. SAMUELS:

Q    Good morning again, Mr. Swartz.

A    Good morning.

Q    Mr. Swartz, when we broke yesterday, we had just finished playing Exhibit 176, which was a call on November 18, 2007?

A    Yes, sir.

Q    And the next call you should have is Government Exhibit 177?

A    That is correct.

Q    What is the date and the time and the parties to that call, Mr. Swartz?

A    This is a call that occurred on November 24, 2007, at 2:01 p.m. It was intercepted on the telephone of Michael Draven, and it is a conversation between Michael Draven and Catherina Voss.

Q    Now, Mr. Swartz, between the last call we played on November 18, 2007, and this one on November 24, 2007, were there a number of investigative actions that took place in the case?

A    Yes, there were.

Q    And what had occurred during that time period?

A    Detective Williams and Detective Rilee had traveled to Kentucky -- I believe it was Kentucky -- yes, Fort Campbell, Kentucky, to interview Christopher Larson, who is an enlisted in the Army, and the interview was to discuss his relationship with Catherina Voss.

And then there were several other interviews that were done with people such as David Hill, who goes by the name of Wookie; Craig Robinson; and then on the 24th, the day of this telephone call, there was telephone calls made to both Rose Wiggins and Barbara Wilson, the mother of Cory Voss, and in that conversation they were asked about if they knew anybody by the name of Wookie.

MR. SAMUELS:  Mr. Swartz, would you please play the call associated with 177.

(Counsel attempted to play the audio.)

THE WITNESS:  We have an audio issue.

MR. SAMUELS:  May we have permission for Mr. Swartz to examine the system and make sure the audio is playing?

THE COURT:  Yes.

(The audio was played.)

BY MR. SAMUELS:

Q    Now, Mr. Swartz, you mentioned that the detectives had interviewed Rose Wiggins, Ms. Voss's mother, and presented her with a name?

A    Yes.

Q    What was that name again, sir?

A    Wookie.

Q    Wookie.  Mr. Swartz, the next call is Government Exhibit 178.  What is the date and time of that call, sir, and who are the parties to it?

A    This is a telephone call on November 24, 2007, at 2:06 p.m., and it was intercepted on the Michael Draven telephone, and the call is between Catherina Voss and Michael Draven.

        MR. SAMUELS:  Mr. Swartz, would you please play this call.

        (The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, was that call shortly after the one you just played as Government Exhibit 177?

A    Yes, sir, it was.

Q    And what was the time distance there?

A    Five minutes.

Q    At this point in the investigation, had the detectives

mentioned the name Draven to Ms. Wiggins, Cat Voss's mother?

A    No, they have not.

Q    And the next call you have got is 179.  What is the date and time and the parties to that call, Mr. Swartz?

A    This call occurred on November 24, 2007, at 2:27 p.m.  It is a call that was intercepted on Michael Draven's cellular telephone, and it is a call between Michael Draven and Amar Okanovic.

Q    And where is Michael Draven at this point?  Is he out of that drug study?

A    Yes, he is.

Q    Is he back in the Newport News area?

A    Yes, he is.

        MR. SAMUELS:  Mr. Swartz, would you please play this call.

        (The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, after this call at 2:27 p.m., and after this series of calls discussing the investigation, was there an e-mail sent between Mr. Draven and David Runyon?

A    Yes, there was.

Q    If we could pull up Government Exhibit 139, Mr. Swartz, that e-mail time says 2:14 p.m., but what time Eastern Standard Time has that been sent?

A    That would be 5:14 p.m.

Q     Is this the first e-mail in a train of e-mails between Mr. Draven and Runyon?

A     Yes, it is.

THE COURT:  Who was this from, or whose account?

THE WITNESS:  This is from the Michael Draven MySpace account to the David Runyon MySpace account.

THE COURT:  All right.

BY MR. SAMUELS:

Q     Thank you, Mr. Swartz.  Mr. Swartz, the next call reflected in Government Exhibit 180, what is the time and the date, and who are the parties to this call?

A     This is a telephone call that occurred on November 25, 2007, at 12:20 p.m.  It is a call that was intercepted on Michael Draven's cellular telephone, and it is a conversation with Michael Draven as well as Richard Harper and Juanita Harper.

Q     Mr. Swartz, prior to the intercept of this call on November 25, were there a number of interviews done on November 24 and 25?

A     Yes, there were.

Q     What interviews were done?

A     Detective Rilee and Detective Williams interviewed Richard and Juanita Harper at their residence, and then -- that was on the 24th.  And then on the 25th the detectives traveled to the northwestern part of the state, and they first

interviewed Nicole King, and then subsequent to that they ended up interviewing Randall Fitchett.

Q    Was the interview of Nicole King done on the 25th prior to this call?

A    Yes, it was.

MR. SAMUELS:  Mr. Swartz, would you please play the call on 180.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, do you know from the investigation where Michael Draven and Cat Voss were during that conversation?

A    740 Mayland Drive.

Q    Cat Voss's residence?

A    Yes.

Q    There is reference in that conversation to a crime line and reports?

A    Yes.

Q    Was that part of the investigation?

A    Yes.  There was an initial crime line call that came from Ashley Holland, and she subsequently cooperated with the investigation.  But to try to protect her identity, when the detectives conducted various interviews, they said that there were several calls to the crime line.

Q    And there was also a reference in that call to Cat Voss sending an e-mail to Nicole King?

A    Yes.

Q    Have you recovered that e-mail in the course of the investigation?

A    Yes, we have.

Q    What does it say?

A    She is asking Nicole King -- or she tells Nicole King that she had gotten a call from Michael, and -- asking her to call Nicole, and that she thinks that the reason the police are asking about Randy is his credibility.

Q    And that call was on 11-25 at about 12:20 p.m.?

A    Yes, sir.

Q    Was there an e-mail sent between Michael Draven's account and David Runyon's account shortly thereafter?

A    Yes, there was.

Q    Could we pull up Government Exhibit 139B.  Mr. Swartz, again, whose account is this from, and who is it sent to?

A    This is an e-mail that was sent from the Michael Draven MySpace account to the David Runyon MySpace account.

Q    And it says 10:24 there, but what is that East Coast time?

A    That would be 12:24 p.m.

Q    12:24, or 1:24?

A    I'm sorry, 1:24, a three-hour difference.

Q    In the course of the interviews at this time that have been done in the Newport News area, have the detectives

mentioned the name David Runyon to anyone?

A    No, they have not.

Q    Following these calls and this e-mail, was there then an interview with Randy Fitchett?

A    Yes, there was.

Q    And was there a subsequent response the same day between the account associated with David Runyon and the account of Michael Draven?

A    Yes, there was.

Q    Can we pull up 139C, please.  Now, Mr. Swartz, is this from the account of David Runyon to the MySpace account of Michael Draven?

A    Yes, it is.

Q    And the time, East Coast time?

A    Would be at 5:04 p.m.

Q    The next call is Government Exhibit 181, and what is the date and the time and the parties to that call, Mr. Swartz?

A    This is a call that occurred on November 27, 2007, at 8:33 a.m.  It was a call that was intercepted on Michael Draven's cellular telephone, and it is a conversation between Michael Draven and Juanita Harper.

MR. SAMUELS:  Mr. Swartz, would you please play this call.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, the reference in that call to Andy -- who is Andy?

A    That is David Hill, also known as Wookie.

Q    And he was interviewed previously, two days before?

A    He had been interviewed, and then there was an incoming call from him.

Q    Mr. Swartz, the next call, Government Exhibit 182 -- what is the date and time of that call and the parties to it?

A    This is a call on November 27, 2007, at 9:46 a.m.  It was intercepted on Michael Draven's cellular telephone, and this is a call that is involving Michael Draven, Catherina Voss, and Juanita Harper.

Q    Now, 11-27-07 -- was that the date that Mr. Draven was interviewed at his apartment by the detectives?

A    Yes.

Q    Had that interview been set up in advance?

A    That was the first interview of Mr. Draven.

Q    Had it been set up prior to the 27th?

A    There were a series of telephone calls that set up that interview.  Initially it was supposed to occur at Starbucks, which is where Michael Draven had requested it occur -- I mean, where -- initially there was discussion about it being at Starbucks.  Ultimately they settled on the interview being at the apartment in Concord Lakes.

        MR. SAMUELS:  Mr. Swartz, would you please play the

call at 182.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, after this call, did the interview with Mr. Draven in his apartment follow this call?

A    Yes, it did.

Q    About what time was that interview?

A    The interview started around 2 o'clock in the afternoon.

Q    Can we pull up Government Exhibit 210.  There was some reference in this call, Mr. Swartz, to things being moved, things being bagged up?

A    Yes.

Q    Mr. Swartz, you were in the courtroom when Mr. Vollmer testified?

A    Yes, I was.

Q    And these pictures were taken prior to the interview of Mr. Draven?

A    Yes, they were.

Q    If we could flip through 210A, B, C, and D.  Mr. Swartz, were these pictures all taken prior to that interview?

A    Yes, they were.

Q    And are there things in that truck that are bagged up?

A    Yes, there were tubs of things, trash bags, a fishing pole, and like a garment bag.

Q    Mr. Swartz, the next call, Government Exhibit 183 -- when

did that occur in relation to interview of Mr. Draven?

A    This next call occurred on November 27, 2007, at 3:38 p.m.   This is a call that was intercepted on Catherina Voss's cellular telephone with Juanita Harper, and this is an edited call that we are playing a portion of.   But this was immediately following the interview of Michael Draven.

Q    Was there telephone service at the apartment at 881 Katherine Court?

A    Not to my knowledge.

MR. SAMUELS:   Mr. Swartz, would you please play this call.

THE COURT:   That was Mr. Draven's apartment?

THE WITNESS:   Yes, ma'am.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, there was a reference at the beginning of that call to another call that was going on around the same time with Michael Draven, is that right, that Ms. Harper had called Cat Voss, and she had gotten off the phone with Michael Draven?

A    Cat Voss talking to Michael -- no, what Cat Voss was wanting to do was to talk to Michael Draven on a cellular telephone other than his own.

Q    Okay.   So that other cellular telephone belonged to Juanita Harper?

A    The one that this conversation was intercepted on, yes.

Q    Now, the next exhibit, Mr. Swartz, is Government Exhibit 184.  What is the date and time of that call, sir?

A    This is a call that was intercepted on November 30, 2007, at 6:05 p.m.  This was intercepted on Michael Draven's cellular telephone, and it is a conversation between Juanita Harper and Michael Draven.

Q    Mr. Swartz, prior to this call, between the call we just listened to and this one, were there a number of investigative actions that took place in West Virginia?

A    At this point we shifted the focus to conducting interviews in West Virginia in attempts to try to contact David Runyon.

Q    And were there a number of efforts to find David Runyon on November 28?

A    Yes, there were.

Q    And who was interviewed on November 28 and 29?

A    Christine Chipps, Sarah Baker, Paula Dalton, and Virginia Pina, and a couple other people.

Q    Did those interviews result in an e-mail being sent from Mr. Runyon's MySpace account to the MySpace account of Mr. Draven?

A    Yes.

Q    If we can pull up Government Exhibit 140, Mr. Swartz, does this begin a train of e-mails between the accounts of

Mr. Draven and Mr. Runyon?

A     Yes, it does.

Q     Who was this first one sent to?

A     The e-mail at the top is an e-mail message from the MySpace account of David Runyon to the MySpace account of Michael Draven.  It is on November 30, 2007, at 12:54 p.m.

Q     And does the call in 184 follow a number of these e-mails that we have previously been over?

A     Yes, it does.

            MR. SAMUELS:  Mr. Swartz, would you please play that call?

            THE COURT:  Is this a call that follows this e-mail?

            THE WITNESS:  Yes, ma'am.

            (The audio was played.)

BY MR. SAMUELS:

Q     Now, Mr. Swartz, the e-mails that were referenced in that phone conversation -- were those e-mails included in the thread of e-mails at Government Exhibit 140?

A     That is correct.

Q     And do you know whether the detectives going over to West Virginia and interviewing Christine Chipps and Virginia Pina and those other folks even mentioned the name Michael Draven?

A     I'm not aware of that.

Q     And did Michael Draven send another e-mail to Mr. Runyon following that phone call?

A     Yes, he did.

Q     If you would look at Government Exhibit 140D. Mr. Swartz, is this from the e-mail account of Michael Draven to the e-mail account of David Runyon at MySpace?

A     Yes, it is.

Q     And the time is 3:19, but is that actually 6:19 p.m.?

A     That is correct.

Q     Mr. Swartz, following the sending of that e-mail Government Exhibit 185 is another phone conversation.  Who were the parties to that call, and what is the date and the time?

A     This is a telephone call that was intercepted on November 30, 2007, at 6:26 p.m.  It was intercepted on Michael Draven's cellular telephone, and it was actually also intercepted on Catherina Voss's cellular telephone, and it is a conversation between those two parties.

          MR. SAMUELS:  Would you please play at the call, Mr. Swartz.

          (The audio was played.)

BY MR. SAMUELS:

Q     Mr. Swartz, Government Exhibit 186 -- is that another call on the same day?

A     Yes, it is.

Q     And what is the date, time, and parties to that call?

A     This is a telephone call that occurred on November 30,

2007, at 6:29 p.m., and it was intercepted on Michael Draven's cellular telephone, and it is a conversation between Michael Draven and David Runyon.

Q    And is this just after the call ended with Cat Voss?

A    Yes, it is.

MR. SAMUELS:  Mr. Swartz, would you play this call.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, following this call at 6:29, was there some e-mail traffic between Mr. Runyon and Mr. Draven?

A    Yes, there was.

Q    If we could look at Government Exhibit 140E.  Mr. Swartz, is this one of a series of e-mails in the thread that we have been talking about?

A    Yes, it is.

Q    And in relation to the call that we just heard, when would this particular e-mail have been sent, and who were the parties to it?

A    This e-mail was sent at 6:56 p.m. on November 30, and that is Eastern Standard Time.  The last call that we played was at 6:29 p.m., so about 25 minutes later.

Q    And following this e-mail are there a number of e-mails back and forth between the two that we have discussed already?

A    Yes, there are.

Q    Mr. Swartz, the next government exhibit, 187 -- what is

the date and the time to that call, sir, and who are the

parties to it?

A     This call occurred on November 30, 2007.  It was

intercepted at 11:08 p.m.  The call was intercepted on Michael

Draven's cellular telephone, and this is a conversation

between Michael Draven and Charles Smith, and we are going to

play a portion of that call.

Q     And this is the same day as the previous calls we have

listened to over the last few exhibits?

A     Yes, it is.

Q     Is this the Charles Smith that testified here last week?

A     Yes, it is.

          MR. SAMUELS:  Mr. Swartz, would you please play this

call.

          (The audio was played.)

BY MR. SAMUELS:

Q     Mr. Swartz, the next day was December 1, 2007.

          THE COURT:  Are we are starting on a new day now?

          MR. SAMUELS:  Yes, ma'am.

          THE COURT:  Then I think we will take a ten-minute

recess.

          (Recess)

          (The jury returned to the courtroom.)

          THE COURT:  All the jurors are back from break.  We

are on December 1 now?

MR. SAMUELS: December 1, Your Honor, yes.

BY MR. SAMUELS:

Q   Mr. Swartz, on December 1 was there an exchange of e-mails between Mr. Draven and Mr. Runyon about setting up a phone call?

A   Yes, there were.

Q   If we could pull up Exhibit 140K, if we could blow that up, Mr. Swartz, does that include the initial e-mail from Mr. Draven to Runyon, and the response?

A   Yes, it does.

Q   And what are the time periods -- I know what they are as referenced on the screen there, but what is the actual time, Eastern Standard Time, that that e-mail has been sent and answered?

A   The upper e-mail was on December 1 at 1:47 p.m.

Q   And following that, do you have Government Exhibit 188?

A   Yes, I do.

Q   And what is the date and the time of that phone call, and who are the parties to it?

A   This call was intercepted on December 1, 2007, at 4:03 p.m. This call was intercepted on Catherina Voss's cellular telephone as well as Michael Draven's cellular telephone.

MR. SAMUELS: Mr. Swartz, would you please play this call.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, following this call at about 4 o'clock on December 1, was there another e-mail from Mr. Draven's account to Mr. Runyon's account regarding arranging a phone call?

A    At 6:53 p.m.

Q    Pull up 140L, please.  Mr. Swartz, on this same day, December 1, did the investigation reveal a call from someone's phone associated with the investigation to Mr. Runyon?

A    Yes, it did.

Q    And what was that call, sir?

A    At 7:22 p.m. there was a 12-minute telephone call from the cellular telephone subscribed to David Runyon to the -- I'm sorry, it was from Richard Harper's cellular telephone to David Runyon's cellular telephone.

Q    And that is contained in the toll records, Mr. Swartz?

A    Yes, it is.

Q    Mr. Swartz, the next call, Government Exhibit 189 -- what is the date and the time and the parties to that call, sir?

A    This call occurred on December 5, 2007, at 7:14 p.m. This is a telephone call that was intercepted on both Michael Draven's cellular telephone and Catherina Voss's cellular telephone.

Q    And who are the parties to it, Mr. Swartz?

A    Excuse me just one second.

This is a conversation between Michael Draven and Juanita Harper.

Q    And, Mr. Swartz, prior to this call, on December 5, 2007, was Mr. Runyon interviewed in West Virginia?

A    Yes, he was.

Q    And what day was that?

A    He was interviewed on December 3, 2007.

Q    Following that interview, did Mr. Runyon send an e-mail to Mr. Draven talking about that interview?

A    Yes, he did.

Q    If we could pull up Government Exhibit 142, Mr. Swartz, what is the date and the time, East Coast time, of that e-mail, and who was it from and who is it sent to?

A    This is an e-mail that was on December 5, 2007, at 12:43 p.m., and it is an e-mail from the MySpace account of David Runyon to the MySpace account of Michael Draven.

Q    And the last line -- would you read the very last line on that page?

A    Down here at the bottom?

Q    Yes, sir.

A    My phone is temporarily shut off, by the way, so e-mail me back.

Q    Following this e-mail, is there a thread of e-mails back and forth between Mr. Draven and Mr. Runyon?

A    Yes, there are.

Q   And does this phone call, 189 -- does that occur in the midst of that thread back and forth?

A   Yes, it does.

MR. SAMUELS:  Would you please play 189.

(The audio was played.)

BY MR. SAMUELS:

Q   Mr. Swartz, Government Exhibit 190 -- is that another call on the same day, December 1 -- excuse me -- December 5?

A   Yes, it is.

Q   And what is the time on that call, and who are the parties to it?

A   This call occurred on -- at 7:45 p.m. on December 5.  It is a call that was intercepted on Michael Draven's cellular telephone, and it is a call between Juanita Harper and Michael Draven.

MR. SAMUELS:  Could you please play that call, Mr. Swartz.

(The audio was played.)

BY MR. SAMUELS:

Q   Now, Mr. Swartz, at this time, 7:45 p.m. on December 5, were a number of these e-mails back and forth from Mr. Draven to Mr. Runyon located in Mr. Draven's MySpace account?

A   Yes, they were, after the fact.

Q   And the next call we have is Government Exhibit 191. What is the date and the time and the parties to this call?

A    This is a call that occurred on December 5, 2007, at 8:02 p.m.   This call was intercepted on Michael Draven's cellular telephone and then the residential telephone at 740 Mayland Drive, and the parties to this call are Michael Draven and Catherina Voss.

Q    Is this call approximately 15 minutes after the one we just listened to?

A    Yes, it is.

        MR. SAMUELS:   Would you please play 191.

        (The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, the next call we have is Government Exhibit 192.   What is the date and the time and the parties to that call, sir?

A    This call occurred on December 7, 2007, at 2:23 p.m. This call was intercepted on Michael Draven's cellular telephone, and this is a call between Michael Draven and Juanita Harper.

Q    Now, was there investigative action taken on December 7 involving Mr. Draven?

A    Yes.

Q    What had occurred prior to this call, Mr. Swartz?

A    Just prior to this call, Detective Williams and Detective Rilee -- and at this point was when we strategically had the Special Agent James Liscinsky from ATF introduce the federal

aspect of this investigation -- they conducted a second interview of Michael Draven at the Voss residence while Catherina Voss was in Richmond.

Q    Was Mr. Draven confronted with some of the evidence gathered in the investigation to date?

A    Yes, he was.

MR. SAMUELS:  Mr. Swartz, would you please play the call indicated in 192.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, is there a call immediately following that that was captured?

A    One minute later, yes.

Q    Is that Government Exhibit 193?

A    Yes, it is.

Q    Who are the parties to that call, sir?

A    This call is between Michael Draven and Catherina Voss, and was intercepted on their respective telephones, cellular telephones.

MR. SAMUELS:  Would you please play this call, sir.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, following that call, some minutes later is there another call between Mr. Draven and Ms. Voss?

A    Yes.

Q    That is Government Exhibit 194?

A    Yes, it is.

Q    What is the time of that call and the date?

A    It is on December 7, 2007, at 2:36 p.m., and again this call is between Michael Draven and Catherina Voss, and was intercepted on their respective cellular telephones.

Q    Now, do we know where Michael Draven is at this point?

A    He is at the Voss residence.

MR. SAMUELS:  Would you please play this call, sir.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, the next call is reflected in Government Exhibit 195?

A    Yes, sir.

Q    Is that on the same day, December 7?

A    It is later that evening, yes.

Q    And what is the time and who are the parties to that call?

A    This call occurred on December 7, 2007, at 8:02 p.m.  It is a call that was intercepted on Michael Draven's cellular telephone, and it is a conversation between Juanita Harper and Michael Draven.

Q    Now, Mr. Swartz, beyond the interview of Michael Draven that was conducted earlier that day, were there any other investigative steps taken on December 7 that preceded this

GLORIA S. SMITH, OFFICIAL REPORTER

**657**

call?

A    That is the point where we also introduced the federal grand jury aspect of the investigation, where we started to serve subpoenas on various individuals, such as David Hill, a/k/a Wookie; and Rose Wiggins, which was Catherina Voss's mother.

MR. SAMUELS:  Mr. Swartz, would you please play the call at 195.

THE COURT:  These were subpoenas for grand jury testimony?

THE WITNESS:  Yes, ma'am.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, following this phone call, did agents and detectives continue to serve grand jury subpoenas?

A    Yes, they did.

Q    Was one of those subpoenas served on Richard Harper?

A    Yes, it was.

Q    And also following this phone call, was there an e-mail from Mr. Draven to Mr. Runyon?

A    Yes, there was.

Q    If we could show Government Exhibit 143, Mr. Swartz, what is the time that this e-mail is sent, East Coast time, in relation to the call that we just heard?

A    This e-mail was sent at 8:31 p.m., and it is

approximately half an hour after the beginning of the prior conversation.

Q    And is it an e-mail, or some sort of posting?

A    It's a notification via e-mail that there is a comment that is posted, and it's a request to have that accepted.

THE COURT:  Wait just a minute.  This is a request to Mr. Runyon's account.

THE WITNESS:  Yes.

THE COURT:  From MySpace?

THE WITNESS:  From the Michael Draven MySpace account.

THE COURT:  From the Michael Draven MySpace.  All right.

BY MR. SAMUELS:

Q    What is the requested posting that Mr. Draven has made here?

A    Lost your e-mail and pass.  Thought this saying was nice. It is better to remain silent and be thought the culprit than to speak and convict yourself.  Draven.

Q    Following this e-mail, Mr. Swartz, was there another one where Mr. Draven goes into more detail about the interview with law enforcement that day?

A    Yes, there was.

Q    Can we show Government Exhibit 143A?  Mr. Swartz, what is the time of this e-mail, East Coast time?

A    9:33 p.m.

Q    This is an e-mail between Mr. Draven's MySpace sent to Mr. Runyon's MySpace?

A    That is correct.

Q    On the same day, other than Richard Harper being served and the other individuals you spoke of, was there anyone else that was served with grand jury subpoenas?

A    Yes, there were three other individuals, all of which have testified here:  Kushtrim Bytyqi, Amar Okanovic, and Amer Ribic, I think is how you say his name.

Q    Is Government Exhibit 196 a call regarding the service of those subpoenas?

A    Yes, it is.

Q    What is the date and the time of that call, Mr. Swartz, and who are the parties to it?

A    This is a call that was intercepted on December 8, 2007, at 4:14 p.m.  This call was intercepted on the cellular telephone of Michael Draven, and it is a conversation between Michael Draven and Amar Okanovic.

        MR. SAMUELS:  Mr. Swartz, would you please play this call.

        (The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, the next exhibit is 197.  What is the date and the time of that call, sir, in relation to the one we just

listened to, and who are the parties to it?

A    This is a conversation that occurred on December 8, 2007, at 9:26 p.m.  This call was intercepted on Michael Draven's cellular telephone, and it is a call between Michael Draven and David Runyon on a new telephone number, and this was approximately five hours later.

Q    Is this a new telephone number for Mr. Runyon?

A    Yes, it is.

MR. SAMUELS:  Would you please play this call, Mr. Swartz.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, the next government exhibit, 198 -- what is the date and the time of that call, and who are the parties to it, sir?

A    This call occurred on December 9, 2007, at 7:40 p.m. This is a telephone call between Juanita Harper and Catherina Voss that was intercepted on her residential telephone.

Q    Was this prior to the federal grand jury meeting on December 10?

A    Yes, it was.

MR. SAMUELS:  Mr. Swartz, would you play this call, please?

THE COURT:  How long is this call?

MR. SAMUELS:  It is 2 minutes, 15 seconds, Your

Honor.

THE COURT: All right.

(The audio was played.)

BY MR. SAMUELS:

Q    So, Mr. Swartz, that was on Cat Voss's home line, but Michael Draven was on that line?

A    Yes.

Q    Mr. Swartz, the next day, December 10, 2007, was that the first day of grand jury proceedings involving the people who received subpoenas?

A    Yes, it was.

Q    Do you have Government Exhibit 199?

A    Yes, I do.

Q    What is the date and time of that call, and who are the parties to it?

A    This call was intercepted on December 10, 2007, at 9:17 a.m.  This is a call that was intercepted on both Michael Draven's cellular telephone and Catherina Voss's cellular telephone, and it is a conversation between those two parties.

MR. SAMUELS: Would you play this call, Mr. Swartz.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, was there another call between Mr. Draven and Ms. Voss shortly thereafter?

A    Yes, there was.

Q    And what was the time of that call?

A    At 9:21 a.m.

Q    So that is just several minutes after the previous call in 199?

A    That's correct.

Q    And this is Government Exhibit 200?

A    Yes, it is.

MR. SAMUELS:  Would you play this call, please?

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, is there one more call shortly thereafter between Michael Draven and Cat Voss?

A    Yes, there is.

Q    And is that Government Exhibit 201?

A    Yes, it is.

Q    What is the time on that call, and how long after the previous call is it, sir?

A    This call occurred at 9:47 a.m., and it is about 20 minutes later.

MR. SAMUELS:  Would you please play this call.

(The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, later that day on December 10, was there another phone call between Mr. Draven and Mr. Runyon?

A    Yes, there was.

Q    And what was the time of that call?

A    This call occurred at 5:27 p.m. on December 10.

Q    And it is on Mr. Draven's cell phone?

A    It was intercepted on his cell phone.

Q    This is Government Exhibit 202?

A    Yes, it is.

MR. SAMUELS:  Would you play this call, please.

(The audio was played.)

THE COURT:  We will stop there for now and take a luncheon recess until 2:30.

The court stands in recess.

(A recess was taken for lunch.)

AFTERNOON SESSION

(The jury returned to the courtroom.)

THE COURT:  All the jurors are back from the luncheon recess.

Mr. Samuels?

MR. SAMUELS:  Thank you, Your Honor.

BY MR. SAMUELS:

Q    Mr. Swartz, when we took a break for lunch, we were discussing calls that occurred on December 10, 2007?

A    Yes, sir.

Q    Following December 10, 2007, were there search warrants executed in West Virginia at residences that Mr. Runyon had lived in?

A     Residences and a storage unit.

Q     And was Mr. Runyon's vehicle searched as well?

A     And the vehicle, too.

Q     Government Exhibit 203 -- do you have that there, sir?

A     Yes, I do.

Q     What is the date of that call, the time, and the parties to it?

A     This call occurred on December 12, 2007, at 3:42 p.m. This call was intercepted on Michael Draven's cellular telephone, and it is a conversation between Michael Draven and Juanita Harper.

          MR. SAMUELS:  Mr. Swartz, would you play this call, please.

          (The audio was played.)

BY MR. SAMUELS:

Q    Mr. Swartz, following that call on December 12, was there another one involving Michael Draven that you have as Government Exhibit 204?

A     Yes, there was.

Q     And what is the time of that call in relation to the one we just listened to?

A     This call is about 45 minutes later.  It is at 4:21 p.m.

Q     And who was that call to?

A     This is a telephone call that was intercepted on Michael Draven's cellular telephone, and it was to Prepaid Legal.

Initially there was a representative that took information from Mr. Draven, and then at a certain point an attorney was to get on the telephone, and the call was then minimized at that point.

Q    So there was no interception of the call between Mr. Draven and an attorney; is that right?

A    No, there is not.

            MR. SAMUELS:  Mr. Swartz, would you please play 204.

            (The audio was played.)

BY MR. SAMUELS:

Q    Now, Mr. Swartz, this call was on December 12 of 2007. When did the interception of calls on the three phone lines you've discussed -- when did that end?

A    The -- on December 14, early morning hours of December 14.

Q    About a day and a half after this call?

A    Yes.

Q    Mr. Swartz, in the course of this investigation, have you looked into and analyzed the call records showing calls between the individuals involved in this case?

A    Yes, I have.

Q    And have you prepared a summary reflecting that analysis?

A    Yes, I have.

            MR. SAMUELS:  Your Honor, at this time I would ask the court to read a number of stipulations.

THE COURT:  All right.

MR. SAMUELS:  These would be Stipulations No. 72 and 74.

THE COURT:  No. 72 is as follows:  United States Exhibit Nos. 104 through 107 are telephone toll/call detail records from nTelos for the cellular telephone numbers (757)713-3431, (757)713-7570, (757)715-2616, and (757)725-2615 respectively, which were provided by the nTelos custodian of records.  The records were made by an employee of nTelos at or near the time of occurrence, with knowledge of the matters contained therein, and it was the regular practice of nTelos to make the records.  That is number 72.

And No. 74?

MR. SAMUELS:  Yes, ma'am.

THE COURT:  No. 74 is as follows:  United States Exhibit Nos. 108 through 109 are telephone toll/call detail records from Sprint Nextel for the cellular telephone numbers (304)685-2230 and (304)685-6845, respectively, which were provided by the Sprint Nextel custodian of records.  The records were made by an employee of Sprint Nextel at or near the time of occurrence, with knowledge of the matters contained therein, and it was the regular practice of Sprint Nextel to make the records.

MR. SAMUELS:  Thank you, Your Honor.

BY MR. SAMUELS:

Q    Mr. Swartz, I'm going to hand you what have been marked as Government Exhibits 104 through 110.  Do you have 104 through 110, Mr. Swartz?

A    Yes, I do.

Q    What are those records, and how do they relate to the summary analysis that you prepared?

A    These are telephone toll records of Catherina Voss, Michael Draven, and David Runyon.  They are from various telephones that they utilized, and they were used to prepare the summary.

MR. SAMUELS:  Your Honor, I would offer Government Exhibits 104 through 110.

THE COURT:  They are admitted.

(Government Exhibits 104 through 110, admitted.)

BY MR. SAMUELS:

Q    Mr. Swartz, I'm also going to hand you what has been marked as Government Exhibit 136.  Mr. Swartz, what is Government Exhibit 136?

A    These are printouts of the analysis that was conducted to show the amount of contact between Catherina Voss, Michael Draven, and David Runyon.

Q    And how was 136 prepared?

A    Through analyzing all of the telephone toll records in this case, as well as subscriber records, and then developing some bar grafts to represent on a monthly basis the amount of

call activity.

MR. SAMUELS:  Your Honor, I would offer Government Exhibit 136.

THE COURT:  All right.  It is admitted.

(Government Exhibit 136, admitted.)

BY MR. SAMUELS:

Q    Mr. Swartz, do you have the ability to put up 136 on the screen?

Mr. Swartz, what does the first page of this summary exhibit show?

A    The first page are the exhibits for the telephone toll records or billing records that were utilized in this analysis of Catherina Voss, Michael Draven, and David Runyon.

Q    And if you would flip to your next screen, sir?

Mr. Swartz, before we begin to talk about the contacts, Exhibit No. 104 which shows toll records for the number 713-3431 --

A    Yes.

Q    -- did the investigation establish who used that number for the time period of March and April 2007?

A    Michael Draven.

Q    How was that determined, sir?

A    Initially we -- the first thing that we learned in the investigation was during the first interview with Catherina Voss, she provided a list of several telephone numbers that

were associated with her, as well as the telephone that her husband was using on the night of the murder.

She provided the telephone number of area code (757)713-3430 to Detective Williams and Detective Rilee as a phone that she had provided to a friend of hers. She did not mention who that friend was. We subpoenaed the records for that telephone, the subscriber information as well as the telephone toll records, and found that there was no commonality between any of the activity on that phone and the phone that -- any of the other phones that were associated.

So based upon that, I started to look at telephone records for the telephone of Michael Draven, which was the 713-7570 phone, and other telephones, and I found that one of the most frequently called numbers was a 713-3431, one digit off.

Based upon that, we subpoenaed the toll records of that telephone, and we found that that telephone was utilized on and off, and there was a period of time in March and April where the call activity was consistent with what we had seen on 7570, and that the 7570 phone during the busy periods of time and the common activity on 3431, which we associate with Michael Draven -- there was virtually no activity with 7570.

7570 at a point just after the murder, May 2, was reactivated with a payment by Catherina Voss. She wrote a check, and there was an exhibit -- it was marked as an exhibit

and brought into evidence.

Q    Could we pull up 272, please?  Mr. Swartz, is that the payment you are referring to for the number of 7570 and the reactivation?

A    Reactivation, and the telephone toll records reflected that the activity then began on -- resumed on 7570 on this date, May 2, 2007.

In addition to that, during the investigation we learned, and as was testified in court by Detective Rilee, is during the second interview of Michael Draven, he admitted that he was using the 3431 number on the night of the murder, and it was the phone that had been lent to him by Catherina Voss.

Once we began interceptions, live interceptions during the wiretap, Michael Draven was actually in a study in Baltimore, Maryland, and we did intercept a couple of calls with him on that telephone number in communication with Catherina Voss.

Q    On the 3431 number?

A    On 3431.

Q    Mr. Swartz, if we could go back to the first page of your summary chart, have you done an analysis of the contact between the numbers associated with Michael Draven and David Runyon and the numbers associated with Cat Voss from the March 2007 time frame to December 2007?

A     Yes, I have.

Q     If you could, explain how this summary is presented for March of 2007.

A     Each one of these slides is representative of one month, March through December, and on this slide it is a bar graph with the number of calls going up the left-hand side, and then along the bottom, every other day is marked with a date there.

There is a difference in the colors -- they are color-coded, and you can see the guide on the bottom that the blue is the calls that are associated with the 713-7570, the phone associated with Michael Draven, and the red being the telephone calls associated with Catherina Voss using 715-2616.

Q     Now, Mr. Swartz, so each of the bar graphs represents calls either to or from David Runyon?

A     That is correct.

Q     We are not seeing calls between Michael Draven and Catherina Voss?

A     No, these are just with David Runyon.

Q     Mr. Swartz, when do the calls begin?

A     They begin on March 22, 2007.

Q     And what is the length of the first call, and who was it between?

A     The very first call was between Michael Draven and David Runyon.  It was a 15-minute call on March 22.

Q     And were Mr. Runyon and Mr. Draven involved in a drug

**672**

study in March of 2007?

A    They were, from March 4 to March 14, 2007.

Q    And the next call, also on March 22 -- who was that call between, and what was the time on it, sir?

A    This was a 30-minute call on March 22 between Mr. Draven and Mr. Runyon.

Q    Are there calls as well on this chart between Cat Voss and David Runyon?

A    Yes, those are the calls that are represented in red.

Q    Now, where is Michael Draven when these calls with Cat Voss occur, between Cat Voss and David Runyon?

A    This is the period of time where Michael Draven was in the Newport News City Jail.

Q    And is one of those calls the 88-minute call that you have testified previously about referenced on those jail calls?

A    Yes, it is.

Q    Mr. Swartz, are there any other significant calls represented on this chart in terms of length of time?

A    No, there are not.

Q    Would you go to the next page of your chart, please. Mr. Swartz, after March of 2007 did your summary and your analysis show a shift in the contacts as to whether it was Cat Voss or Michael Draven that was in contact with David Runyon?

A    There was a period of time, as represented on the chart

there, on April 8, where there was telephone -- telephone call with -- between David Runyon and Michael Draven, as well as telephone call between David Runyon and Catherina Voss. And --

MR. CLANCY: Judge, if I could make an objection, I think the most he can say is a phone call associated with or this phone number to this phone number. He can't say, for instance, Draven spoke to Runyon. We are only dealing with numbers.

THE COURT: But when he testifies it is from a number -- from one number to another. I agree.

MR. CLANCY: Yes, ma'am, thank you.

MR. SAMUELS: Yes, ma'am. Thank you, Your Honor.

BY MR. SAMUELS:

Q   Mr. Swartz, you were explaining about the frequency of the calls in April of 2007?

A   Yes. They are represented in the red there. You can see that there are four calls during the month of -- actually there's four calls with the telephone that's associated with Catherina Voss, the 715-2616, and then there is two other calls with the residential phone of Catherina Voss which occurred on the 26th of April.

Q   And is there a call between Catherina Voss and the phone associated with David Runyon the night of the murder?

A   Yes, there is.

Q    What time was that call, sir?

A    This call was at 6:20 p.m.

Q    And in terms of looking at this graph, are there any significant calls in terms of length, and who were those calls between?

A    On April 16 there were two calls from Michael Draven to David Runyon.  One of those was -- to telephones associated --

MR. CLANCY:  Excuse me.  That is contrary to what you just instructed the witness.

THE COURT:  Just say from Michael Draven's number to David Runyon's number, and if he doesn't say that, ~~that is~~ implied in the answer and in the evidence that is being presented.

But it should be from Catherina Voss's number to David Runyon's number, or from David Runyon's number to Catherina Voss or Michael Draven's number to Catherina Voss's number or Catherina Voss's number to Michael Draven's number, and I think the jury understands.

MR. SAMUELS:  Yes, ma'am.

BY MR. SAMUELS:

Q    And just to follow up, Mr. Swartz, all of your summary charts relate to calls between these numbers; correct?

A    That is correct.

THE COURT:  And all of your testimony is calls between the numbers.

THE WITNESS:  The numbers that are associated.

THE COURT:  You weren't actually monitoring the calls on a wiretap at that point?

THE WITNESS:  Not during this time, no.

THE COURT:  You have looked at the phone bills and the phone records, and from those phone records you can tell a call going from one number to another and the length of the call.

THE WITNESS:  That is correct.

BY MR. SAMUELS:

Q    And of course, Mr. Swartz, later on, as we will look in November, December, that's when the monitoring of the calls occurred that you can say who called who?

A    That is correct.

Q    Mr. Swartz, in terms of the length of calls, you were testifying about calls on April 16, 2007, between Mr. Draven's number and Mr. Runyon's number?

A    Yes.  There were two telephone calls.  One was 19 minutes in duration, and the other one was 17 minutes in duration on April 16.

Q    On April 19, 2007, was Mr. Runyon involved in a drug study?

A    Yes, he was.

Q    And what was the time period he was involved in that drug study?

A    From the 19th of April until the 24th of April, and this was the drug study in Philadelphia.

Q    Were there calls following Mr. Runyon's release from that drug study from the number associated with Mr. Runyon to the number associated with Mr. Draven?

A    Yes, there were.

Q    And how many calls were there?

A    There were calls on April 25, and there were -- there were two calls on April 25 between the telephone associated with Mr. Runyon and the telephone associated with Mr. Draven. One was seven minutes in duration, and the other one was seven minutes in duration as well.

Q    And in total for the month of April, how many total calls were there between the numbers associated with Mr. Draven and Ms. Voss and the number associated with Mr. Runyon?

A    There were 18 total calls during the month.

Q    If we could look to the next slide that you have there, Mr. Swartz.  Mr. Swartz, in May of 2007 was Mr. Runyon again involved in a drug study for a period of that time?

A    Yes, he was.

Q    And what was that time period that he was released from that study?

A    May 2 to May 7, 2007, and it was the -- again a study in Philadelphia.

Q    And are there any calls in terms of the length of the

calls following his release from that study?

A    There were -- there was a call on May 9.  There were actually three calls on May 9.  One was five minutes in duration, and the other one was 13 minutes in duration, and these were calls from the number associated with David Runyon to the number associated with Michael Draven.

Q    And were there additional calls from the number associated with Mr. Runyon to the number associated with Mr. Draven later in the month?

A    Yes, there were.

Q    And when were those?

A    On May 22 there were three calls.

Q    Now, sometime during this month, does the number associated with Mr. Draven change from the 3431 number to the 7570 number?

A    Yes, it does.

Q    And is that related to Exhibit 272 we just looked at with the bill being paid?

A    Yes, it does.

Q    Mr. Swartz, would you look at the next slide of your summary.  Mr. Swartz, how many total calls in the month of June between the numbers associated with Mr. Draven and the numbers associated with Mr. Runyon?

A    There were 20 total calls.

Q    How many of those calls were completed?

A       Twelve of them.

Q       Any calls with the numbers associated with Ms. Voss and Mr. Runyon?

A       At this point there are no more telephone calls associated with -- between the number associated with Mr. Runyon and the numbers associated with Catherina Voss.

Q       I note there were seven calls represented on June 1, 2007.  Could you go through those calls, tell us who called who, and the length of time of those calls and when they occurred?

A       On June 1 there were five completed calls and two calls to voice mail.  These were calls from the number associated with David Runyon to the number associated with Mr. Draven.  These calls occurred between 3:56 p.m. and 7:32 p.m.  The first call was 26 minutes in duration, and the last call was 97 minutes in duration, and there were three-minute calls at 7 p.m. and at 7:15 p.m.

Q       If we could look at Government Exhibit 293.  Mr. Swartz, do you recognize Government Exhibit 293, a Western Union transfer?

A       Yes, I do.

Q       And when were these calls made in relation to when this Western Union transfer was sent?

A       The Western Union transfer was sent at 7 p.m., and so there was telephone activity, a three-minute call at 7 p.m.,

at the same time that this telephone -- or this Western Union wire was being sent from Newport News to Morgantown, West Virginia, and then 15 minutes later there was another three-minute telephone call.

Q    You can go back to your summary chart, Mr. Swartz. Mr. Swartz, there is a number of calls later in the month of June 2007.  Do any of those calls coincide with the time period when Cat Voss was filing claims for death benefits?

A    Yes, they do.

Q    And how do they coincide?

A    On June 11 Catherina Voss filed a claim for death benefits, and then there are calls on June 13 and June 17. There are four calls June 15 through June 18, and these are, all four calls, from the number associated with David Runyon to Michael Draven's voice mail.  On the 18th there were two calls, one minute in duration each, and they were within close proximity in time at 11:52 a.m.

And then at 1:15 p.m. and 7:04 p.m. on the 18th there were two calls from the number associated with David Runyon to the number associated with Michael Draven.  Those were eight minutes in duration and ten minutes in duration respectively.

On the 22nd of April, Catherina Voss again files another claim for death benefits, and on the 24th there is a call from a telephone number associated with Mr. Runyon to the

number associated with Michael Draven that went to voice mail.

On that same day there is another filing by Ms. Voss trying to get the death benefit claims, and then on the 25th, there is a 12-minute call from the number associated with Mr. Runyon to the number associated with Mr. Draven, and the next day there is additional paper work filed for death claim benefits.

Q    Mr. Swartz, could you go to the next page of your summary chart.  Mr. Swartz, how many total calls were there between the number associated with Mr. Draven and the number associated with Mr. Runyon in the month of July 2007?

A    There were a total of 26 calls.

Q    And were any of these calls significant in length, over ten minutes long?

A    There were a number of calls that were over ten minutes in duration.  On July 4 there was a 33-minute call.  On July 7 there was a 17-minute call.  On July 8 there was a 38-minute call.  On July 11 there was a 45-minute call.

Q    In that period there, were there any efforts taken by Ms. Voss with regard to the life insurance benefits?

A    This is when she was reaching out to make contact with Detective Rilee to have him contact the insurance company to exonerate her or her family from the -- from any suspicion.

Q    And when was that call, sir?

A    That was on July 9, 2007.

Q    Following July 9 were there any significant calls in length between the numbers associated with Mr. Draven and the number associated with Mr. Runyon?

A    On July 11 there was a 45-minute call and a 12-minute call, and then on the 18th there were two 11-minute calls.

Q    From the 20th of July through the end of the month, were there a number of calls that were less than ten minutes in length or that went to voice mail?

A    Yes.

Q    How many calls were there?

A    Seven calls.

Q    And who initiated those calls, or what number initiated those calls?

A    These were the number associated with David Runyon to Michael Draven's -- the number associated with Michael Draven, and they all went to voice mail.

Q    Mr. Swartz, from your role in the investigation and the evidence presented, where were Michael Draven and Catherina Voss from July 22 through early August 2007?

A    They left on July 22, and this would be Catherina Voss, Michael Draven, and the two children, and they flew to San Diego and stayed out there until August 2.

Q    Mr. Swartz, if we go to the next slide, your August 2007 slide, Mr. Swartz, how many calls were there total for the month of August?

A    There were five calls and one text message.

Q    Now, the text message -- how does that show up on a toll record?  How is that different than a regular phone call?

A    At this point in the investigation is when we transitioned from just operating off historical telephone toll records, and we had moved into monitoring these telephones with pen registers.  So we actually get to see and know that there is a difference between a text message and an actual telephone call being made.

Q    The first two calls there in early August, what numbers are those calls associated with?  What number made those calls, and what number did they go to?

A    They are two calls from the number associated with David Runyon to the number associated with Michael Draven, and they went to voice mail.

Q    Now, Mr. Swartz, it indicates on your summary that only one call was completed.  Can you tell us when that call was, how long it was, and what number initiated the call?

A    This one completed call was on August 12, 2007, and it was a 44-minute call from Michael Draven -- the number associated with Michael Draven to the number associated with David Runyon.

Q    Now, in August 2007 were there any efforts taken by Ms. Voss with regard to the life insurance benefits to her family?

A     Yes.   There were a number of contacts with the late Congresswoman Jo Ann Davis's office, as well as the insurance company, trying to determine the claim of the benefits.

Q     And when were those contacts, Mr. Swartz, in early August or late August?

A     In late August, around August 27.

Q     If we could go to your next slide, September 2007. Mr. Swartz, the summary indicates eight total calls between numbers associated with Mr. Draven and Mr. Runyon?

A     That is correct.

Q     And the first two sets of calls there, those four calls in early September -- who made those calls, and were any completed?

A     On September 5 there were two completed calls.  One was five minutes in duration, and the other was just over one minute in duration.  The first call was from the number associated with David Runyon to the number associated with Michael Draven, and the second one was from the number associated with Michael Draven to the number associated with David Runyon.

Q     After those calls on September 5, were there any actions by Cat Voss, Catherina Voss, with respect to her life insurance benefits?

A     There were additional inquiries made of the insurance company.

Q    What date did those inquiries occur?

A    On September 6.

Q    And that is referenced in Government Exhibit 41?

A    Yes.

Q    Mr. Swartz, is there another call on September 6 between the numbers associated with Mr. Runyon and Mr. Draven?

A    Yes.  There were two calls on September 6.  One of those calls was from the number associated with David Runyon to the number associated with Michael Draven that went to voice mail, and the other one is an incomplete call that was from the number associated with Michael Draven to the number associated with David Runyon.

Q    Mr. Swartz, the call that is represented -- and it looks in the middle of the month there, September 15 -- how long is that call, and what number made that call?

A    That is a 19-minute call on September 15 that was from the telephone number associated with David Runyon to the telephone number associated with Michael Draven.

Q    Did that call follow any prior investigative events?

A    There had been contact made with Kelly Baker.  This was the second interview that had been done with her.

Q    And who is Kelly Baker in relation to either Mr. Draven or Ms. Voss?

A    It was Catherina Voss's best friend.

Q    At the end of the month there in September of 2007, were

there any additional efforts by Ms. Voss to inquire as to the status of her benefits?

A    Yes.  This is when she contacted Senator Jim Webb's office to try to elicit some help in getting her death benefit claims.

Q    And the three calls referenced on September 25 and 26 -- were any of those three calls completed?

A    No, they were not.

Q    And what was the number that originated those calls?

A    They -- all three of these calls were from the telephone number associated with David Runyon to the telephone associated with Michael Draven.

Q    Mr. Swartz, were there any calls between Mr. Draven -- the numbers associated with Mr. Draven and Mr. Runyon in October of 2007?

A    No, there were not.

Q    Were there efforts by Ms. Voss with respect to her inquiries as to her life insurance benefits?

A    Yes, there were.

Q    What were they?

A    Again there was some communication between her and Senator Webb's office, and she also made an inquiry of the U. S. attorney's office.

          MR. SAMUELS:  Your Honor, at this time I request that the court read Stipulation No. 82.

THE COURT: That stipulation, ~~ladies and~~ gentlemen, is as follows: On October 17, 2007, codefendant Catherina Rose Voss called the United States attorney's office in Newport News, Virginia, twice and spoke with Yolanda Cobbs. Catherina Rose Voss, in substance, asked Ms. Cobbs if there was a grand jury investigation opened on her for the murder of Cory Allen Voss. Catherina Rose Voss was told to contact the Newport News Police Department, that the United States attorney's office could not give out any information on the federal grand jury.

Catherina Rose Voss called again and stated that the Newport News Police Department would not give her any information and she needed to find out who murdered her husband.

MR. SAMUELS: Thank you, Your Honor.

BY MR. SAMUELS:

Q   Mr. Swartz, before we move into November 2007, you have testified a number of times about either complete or incomplete calls. Can you explain what a complete and an incomplete call is.

A   The completed call is one -- and it varies between whether you are working with telephone toll records, the paper historical records, or whether you are operating off pen register information. In the pen register information you get the detailed information as to whether or not it is a

completed call, answered or not answered, whether it was forwarded to voice mail.

In the paper toll records that you look at, a completed call for the purposes of this analysis were calls that showed up on both -- both callers' phones, so that there was contact and there would be billing, and it would be reflected as a completed call.

Q    Mr. Swartz, if we could go to your November 2007 page. During the month of November 2007, were there any calls of significant length between the numbers associated with Mr. Draven and the number associated with Mr. Runyon?

A    Yes, there were.

Q    And when did those calls occur, and how long were they?

A    On November 7 there was a 13-minute call from the number associated with Michael Draven to the number associated with David Runyon.  And then on November 9, 2007, there was a three-minute telephone call from the number associated with Michael Draven to the number associated with David Runyon.

Q    And, Mr. Swartz, do the Parexel records indicate whether Mr. Draven and Mr. Runyon were both in the Baltimore area on drug studies for a period of time in November 2007?

A    Yes, they do.

Q    And the last call that is indicated there -- when is that call, and was that a call that was captured on the wire surveillance?

A    Yes.  This was the call on November 30, 2007, at 6:29 p.m., and it is a call from Michael Draven to David Runyon telling him to check his e-mail.

Q    Mr. Swartz, if we could go to your December 2007 page, how many calls were recorded in December 2007 between numbers associated with Mr. Draven and numbers associated with Mr. Runyon?

A    There were seven total calls during the month of December.

Q    And some of these calls were recorded and listened to as part of the wiretap evidence?

A    That is correct.

Q    No calls after December 11, 2007?

A    That is correct.

Q    Mr. Swartz, have you done an analysis of the total number of calls between numbers associated with Mr. Draven and numbers associated with Mr. Runyon?

A    Yes, I have.

Q    Could you show that slide, please.  How many total calls, Mr. Swartz, were there between either numbers associated with Ms. Voss or Mr. Draven and numbers associated with Mr. Runyon?

A    There were 114 total calls.

          THE COURT:  In what time period?

          THE WITNESS:  From March 22, 2007, until December 10, 2007.

BY MR. SAMUELS:

Q    And did you also look at the number of e-mails between these individuals, or the accounts associated with these individuals?

A    Yes, I did.

Q    How many e-mails were there?

A    There were 34 e-mails between the accounts of Michael Draven and David Runyon.

Q    And do these numbers reference completed calls, or just calls that have been made?

A    Total calls.

Q    So was July 2007 the period of the most activity call-wise?

A    Yes, it was.

Q    Mr. Swartz, in the course of your investigation, have you also looked at contacts, telephone contacts, made the night of the murder of Cory Voss, April 29, 2007?

A    Yes, I have.

Q    And have you prepared a summary showing those records?

A    Yes, I have.

Q    I'm going to hand you what have been marked as Government Exhibits 134, 135, and 135A and ask you if you recognize those, sir.

        MR. SAMUELS:  Your Honor, at this time if I could ask the court to read Stipulation No. 81.

THE COURT: That stipulation is as follows. United States Exhibit No. 135 is a map of an aerial view of the City of Newport News with map points depicting the physical locations of nTelos Cellular Tower 42, Newmarket, located at 6060 Jefferson Avenue, Newport News, Virginia, with a signal strength radius of 1.49 miles; nTelos cellular Tower 46, Dwight Construction, located at 473 Wolf Drive, Newport News, Virginia, with a signal strength radius of two miles; nTelos cellular Tower 49, Menchville, located at Nettles Drive and I-64, Newport News, Virginia, with a signal strength radius of 2.26 miles; the Langley Federal Credit Union, located at 11742 Jefferson Avenue, Newport News, Virginia; the Voss residence located at 740 Mayland Drive, Newport News, Virginia; the Harper/Draven residence, located at 350 Circle Drive, Newport News, Virginia; the Rogers Petroleum pay telephone located at 12257 Jefferson Avenue, Newport News, Virginia; and the Waffle House pay telephone located at 12259 Jefferson Avenue, Newport News, Virginia. United States Exhibit No. 135 was prepared by Gregory Williams of Newport News Police Department, and the parties agree that the map points accurately reflect the aforementioned information.

MR. SAMUELS: Thank you, Your Honor.

BY MR. SAMUELS:

Q   Mr. Swartz, do you have Government Exhibits 135, 135A, and 134 in front of you?

A    Yes, I do.

Q    What are each of those exhibits, briefly?

A    Exhibit 134 are printouts of PowerPoint slides that are the analysis that I conducted of the telephone activity that occurred the day and the night of the murder of Cory Voss, April 29 leading into April 30, 2007.

Exhibit 135 is the map of Newport News that has the points -- map points on there that are associated with this analysis. And then 135A is the information from nTelos regarding the specific signal strength of the nTelos towers.

MR. SAMUELS:  Your Honor, I would offer Government Exhibits 134, 135, and 135A.

THE COURT:  They are admitted.

(Government Exhibits 134, 135, and 135A, admitted.)

MR. SAMUELS:  Could we please publish Government Exhibit 135.

Your Honor, if I could have the assistance of the court security officer to set up the actual map for 135?

THE COURT:  That's fine.

MR. WOODWARD:  May I move?

MR. SAMUELS:  Is that all right where I have that positioned?

THE COURT:  That's fine.

BY MR. SAMUELS:

Q    Mr. Swartz, before we begin referring to the chart there,

do you have it up on your screen in front of you as well, sir?

A    Yes, I do.

Q    Could you summarize what this chart actually shows.

A    This chart has several map points that are located on it, and then you can see that there are three circles, each one of them with a different color.  The lower circle on the map is blue in color, and this is to designate the signal strength radius -- I'm not going to be able to zoom in on this from here, but the lower circle that is blue in color represents the signal strength radius of the tower that is the nTelos tower that is physically located on top of Rouse Towers, a building at the intersection of Mercury Boulevard and Jefferson Avenue.  Within that circle is the -- and as a matter of fact, right across the street is Circle Trailer Park, which is the residence where Michael Draven was living with his parents, or his mother Juanita Harper and Richard Harper.

The circle there is for the entire cell tower strength for that tower.  Under normal circumstances a cell tower has three different faces on that, in that there is directional information.  We do not have that information in this case here, so there is a complete circle of what the signal strength is.  Normally the strength would go off in three different directions.

Q    Mr. Swartz, what do you mean by signal strength?

A    It's the signal strength that nTelos has designated.  If there is a call in that area, the phone is going to be bouncing -- or going to register with that cell tower.

Q    And the green and the red circles -- what do those represent?

A    The green circle is the tower that nTelos has named the Dwight Construction Tower.  It's located at 473 Waffle Drive, and it is basically in mid-city Newport News.  Within that circle is the Langley Federal Credit Union, which is where the incident occurred, and also just on the outskirts of this cell tower radius is the residence at 740 Mayland Drive of Catherina Voss.

Q    Mr. Swartz, what do these circles show us in terms of someone using a cell phone and being able to identify their location?

A    It shows that if they are using the cell phone and it registers with that tower, they would be within that radius.

         THE COURT:  So in other words, you cannot only tell that a call is coming from a particular cell phone, but you can put it within a certain area, because it goes through a signal and a cell phone tower, and that signal only has a certain radius.

         THE WITNESS:  That is correct.

BY MR. SAMUELS:

Q    Mr. Swartz, what about between the green circle there,

**694**

which is, I believe, Tower 46, and the blue circle, which is Tower 42 -- what if you are in the middle there, that gray area in the middle?

A    It could bounce off either one of those.

Q    And what about in the overlapping area, between the green and the red circles?

A    That's what I was referring to.  If you are in that circle between where there is an overlap, where you can see between the green and the red, it could hit off either tower, depending upon volume of activity, and a lot of that has to do with the time of the day.  Your call could get diverted to another tower if the tower is busy.

Q    Now, if you are in the red circle and you are closer to the center of that tower, what determines whether your call is going to go to the red circle versus coming to the green circle, that tower?

A    If you are within that red circle and you are not within that green circle, then the call is going to be registered with that cell tower that is represented by that red dot.

Q    Now, Mr. Swartz other than the three circles indicating the radius of the cell phone towers, there are some other locations on this chart; correct?

A    Yes, there are.

Q    Moving down the chart, what are the other locations from top to bottom that are indicated there?

A     Within that red circle, there are several pay phones. The businesses are located right next to each other.  There is the Waffle House just as you come off of Interstate 64, across from Patrick Henry Mall, and there is a pay phone that's located there, and then there is two pay phones at the gas station.  I believe at the time it was an Exxon station, and it has changed since that time, but the company name is Rogers Petroleum.

Q     Mr. Swartz, what exit off of 64 is that Waffle House and that Rogers Petroleum station located off of?

A     I do -- it is the Jefferson Avenue exit.  I do not know what the number is.

Q     Jefferson Avenue is the street directly off that exit?

A     That is correct.

Q     Moving down into the green circle, what is located there, within that circle?

A     Within the green circle is the Langley Federal Credit Union as well as the Voss residence.

Q     Finally, down into the blue circle, the Newmarket Tower?

A     That would be the Michael Draven/Juanita Harper/Richard Harper residence.

Q     Mr. Swartz, have you done an analysis showing how phones hit off these towers on April 29 and 30th, 2007?

A     Yes, I have.

Q     Is that Government Exhibit 134?

A     Yes, it is.

Q     If we could pull up the first page of that exhibit, Mr. Swartz, how was this analysis prepared?

A     These are the source records documents that were utilized to conduct this analysis.  And basically we put together a time line of the activity that occurred that night.

Q     Mr. Swartz, do you have this on PowerPoint slides that you can control up there?

A     Yes, I do.

        MR. SAMUELS:  Your Honor, may I have one moment to transition over?

        THE COURT:  Yes.

        MR. SAMUELS:  Your Honor, may I have Mr. Swartz just take a look at the computer screen to see if we can unlock the system?

        Mr. Swartz, would you do that, please?

        THE COURT:  That's fine.

        MR. SAMUELS:  Thank you, Your Honor.

BY MR. SAMUELS:

Q     Mr. Swartz, you were talking about the records that you used in the analysis?

A     Yes, sir.

Q     Did you use both subscriber records and toll records reflected by these exhibits?

A     Yes, I did.

Q     Let's look to the first page of your summary chart there for April 29, 2007.  Now, Mr. Swartz, what do these entries show at 10:43 a.m. and 10:55 a.m.?

A     These are two telephone calls from the number that's associated with David Runyon to the telephone number that's associated with George Koski.

Q     And the next screen, sir?

THE COURT:  Both of those two telephone numbers are at least West Virginia area codes?

THE WITNESS:  That is correct.

THE COURT:  All right.

BY MR. SAMUELS:

Q     Mr. Swartz, what does this screen show in terms of the contact in terms of what numbers are associated with what individuals?

A     There were nine telephone calls between 2:53 p.m. and 6:06 p.m.  These are telephone calls that are between the number associated with Michael Draven and the residential telephone of Catherina Voss.  During this time frame from 2:53 p.m. to 6:06 p.m., the telephone that's associated with Michael Draven was located at Cell Tower 42, which is the lower circle on the chart.

Q     Indicating that the number associated with Mr. Draven -- that telephone was within that circle?

A     That is correct.

THE COURT: In other words, when it was being used, it was within that circle.

THE WITNESS: That's correct.

BY MR. SAMUELS:

Q Mr. Swartz, what is the longest call you see there from 2:53 p.m. to 6:06 p.m.?

A The longest call was 36 minutes in duration. But there was also a 24-minute call and a 20-minute call.

THE COURT: For example, I could have a telephone number with a New Jersey area code, but I could be using it down in Newport News in that circle, and it would reflect the usage going off of that cellular tower.

THE WITNESS: Yes, ma'am.

THE COURT: So it is not the number, it is where the phone number is being transmitted, the tower through which it is being transmitted; the locale of the call, not the locale of the telephone number.

THE WITNESS: All cellular telephone calls end up having to hit a tower somewhere to get into the network itself.

THE COURT: So if you are down on the ground in Newport News making a telephone call in that bottom circle, you may have a New-Jersey-registered cell phone, but it is going to bounce off of that tower if you are in that area making the call.

THE WITNESS: Yes, ma'am.

BY MR. SAMUELS:

Q    Mr. Swartz, when you look at those nine calls between 2:53 and 6:06, is there just one cell phone represented there, or are both those cell phone numbers?

A    There is just one cell phone. The 713-3431 number is the number that we associate with Michael Draven, and the other telephone is an actual landline telephone, the residential phone at Catherina Voss's residence.

Q    And a landline is not going to bounce off a cell tower; is that right?

A    That's correct.

Q    If we could go to the next screen.

THE COURT: But the landline can't move around.

THE WITNESS: It cannot.

THE COURT: That's why we call it a landline.

THE WITNESS: Yes, ma'am.

BY MR. SAMUELS:

Q    Mr. Swartz, what are the -- who are the numbers associated with this batch of calls from 6:20 p.m. to 6:29 p.m.?

A    At 6:20 p.m. there was a call, an outgoing call from the cellular telephone that's associated with Catherina Voss to the cellular telephone that's associated with David Runyon. At 6:21 the cellular telephone that's associated with

Catherina Voss -- that call there is represented by -- it looks like it is calling itself, when in fact that's what it is doing.  When you call your voice mail, it is calling your telephone number.

And then at 6:28 p.m. and 6:29 p.m. there were two calls from the residential phone associated with Catherina Voss to the cellular telephone associated with Michael Draven.

Q    Mr. Swartz, what is the next series of numbers that you have?

A    And then there is a break in time, and at 8:40 p.m. there is another call from the residential phone of Catherina Voss to the cellular telephone associated with Michael Draven.

THE COURT:  What does the number 42 represent?

THE WITNESS:  The number 42 is the cell tower, the lower cell tower, the Newmarket tower, the blue circle on the bottom of the chart, representing that the person using that telephone is still making calls from the same area.

THE COURT:  Or receiving them in the same area.

THE WITNESS:  Or receiving them in the same area.

THE COURT:  In other words, that's where that cell phone is located.

THE WITNESS:  Yes, ma'am.

THE COURT:  To either make the call or receive the call.

THE WITNESS:  Or receive it.

BY MR. SAMUELS:

Q    Mr. Swartz, what is the next batch of calls you have on the date of April 29?

A    Then there is a break of time, and at 10:12 p.m. there is a telephone call from telephone number -- and all of these are area code 757 -- but it is 884-9744.  It is a 27-second call to the cellular telephone associated with Michael Draven, and that telephone is the pay telephone at the Waffle House.

And then at 10:13 p.m. there is a two-minute call from the telephone associated with Michael Draven to the cellular -- I'm sorry -- to the pay telephone of the Waffle House.  And then at 10:14 p.m. there is a 38-second call, and this is a call from one of the two pay phones at the Rogers Petroleum station which is located right next door to Waffle House, and this telephone call from the pay phone was to the number associated with Michael Draven.

And then at 10:16 p.m. there is a seven-minute telephone call from the other pay phone at the Rogers Petroleum to the telephone number associated with Michael Draven, and on all of these calls represented on this slide here, you see that it is Cell Tower 42, which is the lower cell tower that Michael Draven's residence is located within.

Q    Mr. Swartz, the other numbers that are connected to those calls -- the 884-9744 number and the other two numbers -- where are they located on your map?

A     They are located in the upper quadrant, within the red circle area, just off the interstate.

Q     Mr. Swartz, what is the next series of calls that you have for April 29?

A     Immediately following these calls with the pay phones at Waffle House and Rogers Petroleum, at 10:23 p.m. there is a 39-second call from the cellular telephone associated with Michael Draven to the residential telephone of Catherina Voss. And then at 10:25 p.m. there is a one-minute telephone call from the residential phone of Catherina Voss to the cellular telephone associated with Michael Draven.

Again there is additional calls at 10:28 and at 10:37, the last call being two minutes and 40 seconds in duration.  On that last call the cellular telephone that's associated with Michael Draven is now registering at Cell Tower 46, which is the cell tower in the middle of the chart.

Q     Mr. Swartz, there is no overlap between the Cell Tower 42, which is the blue circle, and Cell Tower 46, which is the green circle?

A     There is no overlap.

Q     So does that indicate that the cell phone associated with that number has moved from the circle at 42 to the circle at 46?

A     Yes, it does.

THE COURT:  What was the time of the call before the

39-second call?  And that call was from a pay telephone near the Waffle House to the cell phone associated with Michael Draven?

THE WITNESS:  Yes, ma'am.

THE COURT:  What is the next call?

THE WITNESS:  The next call on this page?

THE COURT:  This one.  This is the cell phone of Michael Draven, or registered to him, to the landline at the Voss house.

THE WITNESS:  That is correct.

THE COURT:  And that is at 10:23.

THE WITNESS:  Yes, ma'am.

BY MR. SAMUELS:

Q    Mr. Swartz, the previous call that the judge just asked you about which began -- let me ask you this.  It references a time of 10:16 p.m.  Is that the start time of the call, or the end time of the call?

A    That's the start time of the call.

Q    So for a seven-minute call, it is ending at close to 10:23, right when this call to the number associated with the Voss residence begins?

A    Yes, sir.

THE COURT:  So each of these is a start time, and then you can look at the duration of the call and then determine the amount of time that elapsed between the end of

one call and the start of the next call.

THE WITNESS:  Yes, ma'am.

BY MR. SAMUELS:

Q    Mr. Swartz, what is the next series of calls that you have?

A    Then at 10:51 p.m. there is a 25-second call.  This is from the telephone that's associated with Richard Harper to the cellular telephone that's associated with Michael Draven, and the cell tower for this call was registered in the Cell Tower 49, which is the upper quadrant on the map, within that red circle.

Q    Now, Mr. Swartz, there is an overlap area between the green and the red circles.

A    There is.

Q    But as the call hits off of the 49, is that based on the time of the call as to whether it would hit on the red circle or the green circle?

A    When there are peak times of traffic, such as first thing in the morning, a lot of people are in their cars and they use cellular telephones, and then also drive time in the evening, some cell towers reach their maximum capacity of how many calls they can handle, and the calls will be diverted to other towers.

MR. CLANCY:  Judge, respectfully, I'm going to object.  I'm not sure his expertise is in the management and

direction of cell towers.  I heard how he was qualified yesterday.  He has not been requalified today, and I didn't hear anything about this particular area of expertise.  So I would object to that opinion.

MR. SAMUELS:  Judge, I think he can talk generally about it.  But I would be happy to ask him a few questions about his use of this type of analysis and how he comes by that understanding.

THE COURT:  If you persist in your objection, I will let him inquire into this.

MR. CLANCY:  Me, or him?

THE COURT:  If you persist in the objection, then I'm going to let Mr. Samuels inquire into his expertise in this area.

MR. CLANCY:  Well, yes, ma'am, because I think he is giving an opinion, so I would ask that he do that.

THE COURT:  Go ahead.

MR. SAMUELS:  Thank you, ma'am.

BY MR. SAMUELS:

Q    Mr. Swartz, have you used cell site analysis in prior investigations?

A    Yes, I have.

Q    How have you come to be familiar with it and its use?

A    When I began my experience in doing telephone work, it was at the advent of cellular telephones.  Literally there

were two telephone companies at that time.  I would say that I started doing telephone investigations in 1987, and first started dealing with cellular telephone records in the early 1990s.

Since that time and during my experience as a Newport News police officer, I have obtained over 500 hours that particularly -- that are directly related to either the technical or analytical aspects of doing telephone work.  I have received that training from agencies such as the Drug Enforcement Administration, the Federal Bureau of Investigation.

I also attend an annual conference that is called a CALEA conference, and CALEA is the Communications Assistance to Law Enforcement Act that basically standardized telephones when we moved from the analog world to the digital world, and the law mandates that all the telephone companies send the data to law enforcement in a standard format.  And based upon that, at these conferences we learn about things such as cell towers, and how to -- how they function, because it's obviously a critical part of what we do when we are trying to locate someone.

Q    Mr. Swartz, does that training include any of the technical information that would show how one tower diverts a call to another tower during peak periods of time?

A    The training does, as well as the contact that I have

with all of the various telephone companies that we work with. There are several major carriers, and we work with them on all of our cases. And so in communication with them, we get to know what kind of service they are able to provide and learn things such as peak times of traffic and how cellular towers -- how calls on cellular networks are registered and potentially diverted to other cellular towers.

Q    Mr. Swartz, have you had contact with the companies involved with the phones in this case?

A    In this analysis here, it is with nTelos, and, yes, I have.

Q    And you have had experience in dealing with cell tower analysis on nTelos phones?

A    Yes, I have.

THE COURT:  Do you wish to inquire any further, Mr. Clancy?

MR. CLANCY:  No, ma'am.

THE COURT:  I would find that he properly qualifies as an expert in the analysis of cellular telephone records and communications and the signals going to the towers. The bottom line on this is the call came from either -- the person was either in the red area or somewhere in the overlap area of the red and the green -- I can't see the chart from here. What are the three colors, red, green, and blue?

THE WITNESS:  That's correct, yes, ma'am.

THE COURT: So the bottom line on that last question that we tortured for ten minutes was that the call came from either the red area or where the green area overlaps the red.

THE WITNESS: That is correct, within Cell Tower 49.

THE COURT: All right.

BY MR. SAMUELS:

Q   So, Mr. Swartz, if the call is registering to 49, it is certainly not in the green area that is outside of the overlap area; correct?

A   No, it would not be.

THE COURT: So if it is in 49, it is in the red area or the area that the red overlaps with the green.

THE WITNESS: Yes, ma'am.

BY MR. SAMUELS:

Q   Mr. Swartz, generally, with respect to whether calls are diverted or not, if it is registering on Tower 49, is it going to be closer to 49, or is it going to be closer to 46, at a nonpeak time of calls?

A   It is going to be closer to 49.

Q   And what is the next series of calls you have, Mr. Swartz?

A   Then between 10:57 p.m. and 11:07 p.m. there were four telephone calls from the residential telephone of Catherina Voss to the cellular telephone associated with Michael Draven. The first three calls were relatively short in duration. The

last call was two minutes and 29 seconds.  And all of these calls were while the cellular telephone that's associated with Michael Draven was hitting Tower 49, which is the red circle represented on the map.

Q    Mr. Swartz, is that the same tower where the Waffle House and the Rogers Petroleum gas station are located?

A    Yes, it is.

Q    What is the next series of calls you have, Mr. Swartz?

A    And then at 11:11 p.m. there is a 23-second call from the telephone that's associated with Michael Draven to the telephone that's associated with Richard Harper, and again the phone calls are still being made within the cell tower area of No. 49.

Q    Mr. Swartz, the next series of calls you have?

A    And then there are two calls.  One is at 11:27 p.m., and the other is at 11:30 p.m.  They are just over one minute in duration.  They are telephone calls that are made from the residential telephone of Catherina Voss to the cellular telephone that's associated with Cory Voss, and the cell tower quadrant that's reflected here is where the cellular telephone that's associated with Cory Voss -- where that telephone -- what tower that was hitting off of, which is 46, which is the middle circle, the green circle on the map, and is within the circle of where the Langley Federal Credit Union is.

Q    Mr. Swartz, looking at those circles, is the Langley

Federal Credit Union closer to the center of the green circle, or closer to the center of the red circle?

A      The green circle.

Q      Mr. Swartz, what is the next call that you have?

A      At 11:45 p.m. there is a 49-second call, and this again represents a call to a voice mail, and this is for the telephone that's associated with Michael Draven.  And at this point he is now -- the telephone is now within the cellular quadrant of Cell Tower 42, which is again the lower blue area on the map.

Q      Mr. Swartz, are you familiar, with your background as a police officer, with this area of Newport News?

A      Yes, I am.

Q      And this stretch there represented by these three circles -- does that come close to the Jefferson Avenue route that it takes?

A      That's the Jefferson Avenue corridor, yes.

Q      Is that plenty of time for someone to travel from the area in the red circle to the area in the blue circle at that time of night, 11:45 at night?

A      Yes, it is.

Q      Mr. Swartz, have you reviewed the bank surveillance videos in this case?

A      Yes, I have.

Q      What is the approximate last time that Cory Voss is seen

at the ATM video?

A    At 11:43 p.m.

Q    And that would be located within Tower 46?

A    That's correct.

Q    What are your next calls, Mr. Swartz?

A    At 11:49 p.m. and 11:56 p.m. there are two telephone calls from the residential telephone of Catherina Voss to the cellular telephone that's associated with Cory Voss, and again the cellular telephone that's associated with Cory Voss is still located within the circle of Cell Tower 46, which encompasses the Langley Federal Credit Union.

Q    Now, Mr. Swartz, those calls are less than a second?

A    Less than a minute.  They are six seconds and eight seconds.

Q    Is that enough time to get into somebody's voice mail and leave a message?

A    No.

Q    The next series of calls you have, Mr. Swartz?  What are the numbers associated with these calls, Mr. Swartz?

A    There are nine different telephone calls here between 12:08 a.m. -- and we are now onto April 30, 2007 -- to 2:25 a.m.  These are -- all nine calls are from the residential telephone of Catherina Voss to the cellular telephone that's associated with Cory Voss.  All of these calls for the telephone that is associated with Cory Voss

indicate that that telephone was located still within Cell Tower 46, the middle circle on the chart.

Q    Mr. Swartz, what is the next series of calls that you have, and what do these calls show, sir?

A    At 2:25 a.m. there is a five-minute call from the residential telephone of Catherina Voss to the residential telephone of her mother, Rose Wiggins. And then at 2:37 and at 2:44 there are two calls from the residential telephone of Catherina Voss to the cellular telephone of Rose Wiggins.

Q    Mr. Swartz, the next series of calls that you have?

A    And then at 2:55 a.m. there is a one-minute call from the residential telephone of Catherina Voss to the Riverside Hospital.

Q    The next series of calls?

A    And at 2:57 there is a 41-second call from the residential telephone of Catherina Voss to the cellular telephone of Rose Wiggins. And then at 3:00 a.m. there is a 59-second call from the residential telephone of Catherina Voss to the Langley Air Force Base hospital. And then at 3:02 a.m. there is a 19-second call from the residential telephone of Catherina Voss to the Mary Immaculate Hospital.

And then at 3:03 a.m. there is a six-second call from the residential telephone of Catherina Voss to the telephone that's associated with Cory Voss, and that telephone that's associated with Cory Voss is still located within Cell

Tower 46.

Q    Mr. Swartz, are there a number of other calls between the phone associated with Catherina Voss's residence and either her mother or other hospitals?

A    Yes, there were.

Q    And could you go through those calls, quickly, please.

A    At 3:08 a.m. there is a telephone call from the residential phone of Catherina Voss to the nonemergency telephone of the Newport News Police Department, and we listened to that call on the first day of the trial.

And then there are three calls here between 3:10 and 3:12. The first two calls are telephone calls that are made from the cellular telephone of Rose Wiggins to the cellular telephone associated with Cory Voss, and then the third call at 3:12 is a telephone call from the residential telephone of Catherina Voss to the cellular telephone associated with Cory Voss. And again the Cell Tower 46 that's represented on all three of those calls is where the telephone that's associated with Cory Voss was ringing off of, which again is within the circle of the Langley Federal Credit Union.

Q    Mr. Swartz, would that circle as well include the parking lot near the building where Mr. Voss's body was found?

A    That would be directly behind the Langley Federal Credit Union, yes.

Then at 3:13 a.m. there is a call from the

**714**

residential telephone of Catherina Voss to Riverside Hospital, and then there is three more calls here between 3:21 a.m. and 3:32 a.m. These are calls between the cellular telephone of Rose Wiggins and the residential telephone of Catherina Voss.

And then there is a break in time, and at 5:29 a.m. there is a telephone call from the residential telephone of Catherina Voss to the cellular telephone that's associated with Cory Voss, and that telephone is still in the cell tower area 46.

Q   Mr. Swartz, I'd like you to take a look at Government Exhibit 247B.

THE COURT:  That was the final call?

THE WITNESS:  There is going to be some more calls.

THE COURT:  Go ahead.

MR. SAMUELS:  Thank you, Your Honor.

BY MR. SAMUELS:

Q   Mr. Swartz, do you see the numbers referenced on this piece of notebook paper?

A   Yes, I do.

Q   Do those correlate to any of the calls that you just talked about and identified?

A   Yes.  Riverside Hospital, Langley Air Force Base, Mary Immaculate, and the nonemergency number of the police department.

THE COURT:  What exhibit is this?

MR. SAMUELS:  247B, Your Honor.

THE COURT:  All right.

BY MR. SAMUELS:

Q    These are all calls that were made from the number associated with Catherina Voss on the early morning hours of April 30?

A    Yes, they were.

THE COURT:  What is 247B?  It has been admitted, hasn't it?

MR. SAMUELS:  It has, Your Honor.

THE COURT:  What is it?

MR. SAMUELS:  It's a piece of paper seized in a search warrant of Ms. Voss's residence.

THE COURT:  All right.

BY MR. SAMUELS:

Q    Mr. Swartz, what are the remaining calls that you have collected in your summary, sir?

A    At 5:31 a.m. there is another call from the residential telephone of Catherina Voss to the residential telephone of Rose Wiggins, and then at 5:37 there is another call from the residential telephone of Catherina Voss to Riverside Hospital.

At 5:38 there is a call from the residential telephone of Catherina Voss to the Navy number.  And then there is three calls between 5:42 a.m. and 6:06 a.m.  These are calls all from the residential telephone of Catherina

Voss.  The first one is to Rose Wiggins' residence, and the latter two are to Rose Wiggins' cellular telephone.  And then at 6:11 a.m. there is a two-minute-45-second call from the residential telephone of Catherina Voss to the nonemergency number for the Newport News Police Department.

And at 6:27 a.m. there is a call from the cellular telephone of Rose Wiggins to the cellular telephone that's associated with Cory Voss, and the telephone that's associated with Cory Voss is still located within Cell Tower 46.

And then there is another call to the Navy at 6:38 a.m. from the residential telephone of Catherina Voss.  And then at 6 -- between 6:47 a.m. and 7:45 a.m. there are a series of calls.  All these calls are going to the cellular telephone that's associated with Cory Voss, and they are from the cellular telephone of Rose Wiggins, the residential telephone of Catherina Voss.

THE COURT:  The last three didn't show where the cell phone was located.

THE WITNESS:  That's correct.

BY MR. SAMUELS:

Q    Why is that, Mr. Swartz?

A    At that point it is my understanding the -- that was when the officers had arrived on the scene and were processing the crime scene.

Q    So these calls are related from the records of either the

Voss residence or from Ms. Wiggins' number?

A     That's correct.

Q     Mr. Swartz, in compiling these calls and looking at the cell tower analysis, can you say what it has shown with respect to the phone associated with Michael Draven on the night of April 29, 2007?

A     The cellular telephone that's associated with Michael Draven was at home most of the day.  And if I could just refer back here -- that cellular telephone was located within the quadrant of where his residence is located, the lower circle on the chart, until 10:28 p.m.  And at 10:37 p.m. was the first time that we saw activity with a different cellular tower, which had moved up into the middle part of what is represented on the map there, to Cell Tower 46.

The call -- the first call once he gets up to the third quadrant, the upper quadrant on the chart, begins at 10:51 p.m., and he stays -- excuse me -- that cellular telephone that is associated with him stays within that quadrant of Cell Tower 49 until at least 11:11 p.m., and then at 11:45 p.m. that cellular telephone is now back within the lower quadrant on the map, which encompasses the area that represents his residence.

Q     So from about 10:11 p.m., coming back through 11:45 p.m., that phone has moved up through all three quadrants and back down again?

A     That is correct.

Q     Mr. Swartz, what is the next call that is associated with the numbers for either Michael Draven or Catherina Voss and David Runyon?

THE COURT:  What time is this going to be?

MR. SAMUELS:  This would be in May, Your Honor.

THE COURT:  I think this is a good time to take a ten-minute recess.

(Recess)

(The jury returned to the courtroom.)

THE COURT:  All the jurors back.  You may continue, Mr. Samuels.

MR. SAMUELS:  Thank you, Your Honor.

BY MR. SAMUELS:

Q     Mr. Swartz, when we took a break, I had asked you when was the next call from either Catherina Voss's line or Michael Draven's line to the number associated with David Runyon.

A     There were three calls on May 8, 2007, and these were calls from the number associated with David Runyon to the number associated with Michael Draven.  They all went to voice mail.  And then on that same date, there were three other calls from the number associated with David Runyon to the number associated with Catherina Voss, and all those calls also went to voice mail.

Q    Mr. Swartz, between the time period of the end of April 2007 and May 8, was Mr. Runyon involved in a drug study?

A    Yes, he was.

Q    And where was he physically located from May 2 through May 7?

A    In Philadelphia, from May 2 to May 7, 2007.

Q    Mr. Swartz, I'm going to hand you what has been marked as Government Exhibit 156.  Do you recognize that, sir?

A    Yes, I do.

Q    What is 156, Mr. Swartz?

A    This is an e-mail that is sent to the meRHINO4U@yahoo.com, and it is from brownells.com info, and it is in relation to the purchase of a .38 slash .357 pistol stainless bore brush, and it is being billed to Andy Garcia at 744 Snider Street, Apartment, 3, Morgantown, West Virginia, and it is also being shipped to that same address.  This e-mail was sent on May 5, 2007.

Q    Did it ultimately arrive in the bushido.dragon@yahoo.com site associated with David Runyon?

A    Yes, it did.

        MR. SAMUELS:  Your Honor, I would offer Government Exhibit 156.

        THE COURT:  It is admitted.

        (Government Exhibit 156, admitted.)

        MR. SAMUELS:  If we could publish that, please.

BY MR. SAMUELS:

Q   Mr. Swartz, does this look to be an e-mail from Brownell's that is at first sent to this meRHINO4U@yahoo.com address?

A   Yes, sir.

Q   Is that then forwarded on to the David Runyon bushido.dragon@yahoo.com address?

A   Yes, it was.

Q   And who does it indicate that is from at the top here?

A   From David, and the spelling on the last name is R-U-N-I-O-N.

Q   And what has been ordered?

A   A .38 slash .357 pistol stainless bore brush.

Q   And what is the name it's been sent to, and the billing address?

A   It is -- both the billing address -- the billing name and address are the same as the ship to, which is Andy Garcia, 744 Snider Street, Apartment 3, Morgantown, West Virginia, 26505, in the United States.

Q   Both these e-mails were sent on May 5, 2007?

A   That is correct.

MR. SAMUELS:  Thank you, Mr. Swartz.

Nothing further, Your Honor.

THE COURT:  All right.  Mr. Clancy?

MR. CLANCY:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. CLANCY:

Q    Good afternoon, Mr. Swartz.

A    Good afternoon, Mr. Clancy.

Q    Let's work backwards.  I know you have been on that stand, I think, all day and some of yesterday afternoon, but let's work backwards, if we could.

        Talking about what I believe is Government Exhibit 135, which is -- if you would publish that, please?  And that is simply a smaller version of this large chart here?

A    That is correct.

Q    You used Exhibit 135 in conjunction with Exhibit 134; is that correct?

A    134 is the slide presentation?

Q    Yes, sir.

A    That is correct, yes.

Q    The three circles, it has already been established, represent three different cell towers that service nTelos?

A    That is correct.

Q    Does nTelos use any other cell towers, or -- are these shared towers, or are these exclusively nTelos towers?

A    There are -- I know on the top of Rouse Towers there are several different cellular companies that have cell towers located there.

Q    So that would be -- just for the purpose of the record,

that would be No. 42, what is identified on this cart as Newmarket Tower?

A    That's correct.

Q    All right.

A    They have their respective towers.  Different companies can have multiple towers at the same location.

Q    So your answer to me is nTelos is exclusive, at least with regard to Tower No. 42?

A    What I'm saying is nTelos has towers there, but other companies also have towers there.

Q    If an nTelos-serviced cell phone is used, it can only operate with a tower dedicated exclusively to nTelos?

A    That's correct.  In this situation here, the data that we receive from nTelos is representing their cellular towers.

Q    All right.  So based upon that answer, then, towers 49, 46, and 42 are all exclusive-use nTelos towers?

A    Yes.

Q    You are certain of that?

A    Yes, those are nTelos -- it's data that they are getting from their towers.

Q    And they don't share that or allow other service providers to use their tower?

A    I can't answer that.

         THE COURT:  Who did you get this data from?

         THE WITNESS:  NTelos.

THE COURT: And this is nTelos data from what they have gotten on their towers.

THE WITNESS: Their towers and their telephone records for the calls that were being made.

THE COURT: So these are all nTelos records off of an nTelos-used tower.

THE WITNESS: That's correct.

BY MR. CLANCY:

Q    I understand. I just wanted know whether anybody else used those nTelos towers, and you can't tell us whether they were exclusive or not?

A    No, I can't tell you that.

THE COURT: Let me ask you, but if somebody else used the towers, nTelos wouldn't have the records, would they?

THE WITNESS: No, they would not.

BY MR. CLANCY:

Q    The area that is depicted in Government Exhibit 135, both what has been published and this larger version -- that is an area -- what is that area of Newport News called?

A    In -- the whole area of the map?

Q    Let's say the whole area that appears to be serviced, if you will, by nTelos, down here at the very end, where tower number -- Your Honor, may I stand and just point?

THE COURT: Sure.

BY MR. CLANCY:

Q    Say, right here you have identified 325 Circle Drive. That is right near the James River Bridge, is it not?

A    That is correct.

Q    Is that what this line is here?

A    Yes, sir.

Q    So this area from here down would be all shipyard?

A    Over to your left, over -- over to the left would be the shipyard.  Come back down.

Q    Down in here?

A    Yes.  That is the shipyard along the James River.

Q    And from here over, what would you call this area, all the way up?

A    That's the Jefferson Avenue corridor.

Q    All the way up to the north end of Newport News?

A    Newport News is unique, in that there are two main thoroughfares, Warwick Boulevard, which is Route 60, and Route 143, which is Jefferson Avenue, and they basically run the entire length of the city, and they are separated by the railroad tracks in between the two of them.

Q    Does this map represent virtually the entire City of Newport News?

A    It pretty much does, yes.

Q    What is the population of Newport News?

A    188,000, as I understand it.

THE COURT:  That's the current population.

**725**

THE WITNESS:  Yes, ma'am.

BY MR. CLANCY:

Q    Is it pretty well populated from this point, roughly where the shipyard is, all the way up to the north end where it starts to get a little less populated way at the very end?

A    The City of Newport News is very populated.

Q    Very dense population?

A    Yes, it is.

Q    If nTelos has this circle, representing the blue circle, Tower No. 42, and then there is a gap to get to Tower 46, the Dwight Construction tower -- there appears to be a gap of some distance?

A    Yes.

Q    Does nTelos just not provide service in that area?

A    No, there are more nTelos cellular towers than what are represented on that map.

Q    Are there any other overlapping nTelos circles that aren't represented here?

That is a poorly asked question.  Judge, I'm sorry.

THE COURT:  You need to go back behind the podium.

MR. CLANCY:  I just want to point one more time.

BY MR. CLANCY:

Q    Is there a circle for this area of an nTelos tower that is not identified there?

A    I don't have that in front of me.  I don't know that for

sure.  NTelos service does cover the City of Newport News.

THE COURT:  All right.  You only put on this map the nTelos towers that corresponded with the phone records that you had.

THE WITNESS:  That's correct.

THE COURT:  You didn't put every nTelos tower on there.

THE WITNESS:  No, I did not.

THE COURT:  The nTelos towers on the exhibit that has been admitted are the nTelos towers that correspond with the tower numbers on the phone records.

THE WITNESS:  Yes, ma'am.

BY MR. CLANCY:

Q    Let's go to -- and it doesn't have to be any particular call, but any call of more than, say, five minutes in duration, and you have suggested that 713-3431 was in transit going up to the north end of Newport News and coming back down.  I believe that was your testimony, was it not?

A    It sounded like there were two questions there.

Q    I'm sorry.  You had suggested in your testimony that the cell phone associated with 713-3431 -- that number had traveled from one tower to the next to the next, and then back down?

A    Yes, sir.

Q    My question to you is, when a cell phone is being used

and mobile, moving, does it move from one cell tower to the next?

A    Yes, it does.

Q    You have identified only one cell tower for a call -- you have a call at 3:22 p.m. of 24 minutes and eight seconds.  And that may or may not be one that we have actual movement in.  Where do you decide where the cell tower -- how do you identify the particular cell tower if a cell phone is being moved?  That is horribly asked, and I apologize.

Let me try this.  If a cell phone is being moved from one location to another, and, hypothetically, bouncing from one tower to another, do your records reflect multiple towers?

A    These records are historical in nature, and they only reflect the cell tower where the call began.  If we were in a live collection mode, such as on a pen register, we would then be able to discern the tower where the call began, and then we would also be able to collect the data on where the cell tower was for where the call ended.

Q    All right.  So because these are historical, when you suggest that a particular phone had moved or a particular cell phone had moved, we just know the beginning point of that call?

A    That is correct.

Q    May I direct your attention to a particular slide?  My

exhibit is not labeled. The slide that begins April 29, 2007, 11:11.

THE COURT: What exhibit number is it?

MR. CLANCY: I'm sorry, Judge. It is Exhibit 134. It is that PowerPoint, I believe.

THE COURT: Go to 134. Then what time?

MR. CLANCY: 11:11 p.m.

BY MR. CLANCY:

Q    Now, you had previously testified, I believe, that the cell phone 713-3431 had previously been associated with Newmarket -- Rouse Tower, Newmarket Tower No. 42; is that correct.

A    That's where it was for the early part of the day, yes.

Q    And then you indicated in response to Mr. Samuels' questions that the location of that phone appeared to move, based upon what tower was being employed?

A    Yes, sir.

Q    So that by 11:11 p.m. you said that tower -- you said that cell phone was being used for 23 seconds in Cell Tower No. 49; is that correct?

A    Yes, sir.

Q    And then 34 minutes later it is being used back down to the Newmarket Rouse Tower, Tower No. 42, down at the bottom of this diagram?

A    Yes, sir.

Q    The diagram being Exhibit No. 135; is that right?

A    That is correct.

Q    So based upon what you just testified about multiple uses of towers, all we can say is at 11:11 it was up at one end of Newport News, and the cell phone was at the other end of Newport News at 11:45?

A    That's correct.

Q    Within that 34-minute window, the cell phone, at least based upon these tower records, had to have been moved from one end to the other.

A    That is correct.

Q    One final question before I get off of Exhibit 135.  The distance of the Voss residence to Langley Federal Credit Union, 11742 Jefferson Avenue, the ATM machine where Mr. Voss was shot, or where he was shot just right around the corner -- that has been testified to as a distance of less than five minutes.  Do you agree with that?

A    I would say, particularly at that time of night.

Q    Referring to some of the wiretaps that were played for the ladies and gentlemen of the jury, you had referenced repeatedly in your testimony the e-mails or MySpace communications by and between the Draven account and the Runyon account?

A    Yes.

Q    We had no mention of the Cat Voss account.

A    Correct.

Q    Why is that?

A    There were no e-mails between Catherina Voss and David Runyon.

Q    You have not mentioned any e-mails by and between the Draven account and the one associated with Cat Voss.

A    That is correct -- no, there were a couple.

Q    In your testimony today.

A    Oh, today?

Q    Or late yesterday afternoon.

A    I don't -- no, I don't think so.  We were talking about a specific time frame.

Q    The Catherina Voss e-mails -- are those accessible, because it was a private account?

A    The e-mails of the Catherina Voss from MySpace, we obtained the content of those because we had authorization through a federal search warrant that was executed on MySpace.

Q    One of the phone calls, Exhibit No. 181, is a phone call that was made on November 27 at 8:33 a.m., from -- or involving Ms. Voss, and I don't need to hear the call, but Cat Voss mentions a number of individuals.  Do you have that referenced in your notes, sir?

A    Exhibit 181?

Q    Yes, sir.

A    11-27-07?

Q    Yes, sir.  There was some mention of Andy had mentioned -- had wanted to meet Cat?

A    Yes, that's correct.

Q    Who is Andy?

A    Andy is David Hill, also known as Wookie.

Q    Have you retrieved his phone records?

A    We have subscriber information for him.  We did not obtain any telephone toll records for him, but we do have telephone records of various subjects, and the telephone activity with the telephone number that's subscribed in his name.

Q    Is that Government Exhibit 124?

A    I don't have that --

MR. CLANCY:  That has already been admitted.  Would you publish that, please?

BY MR. CLANCY:

Q    Is that the information you are referring to, sir?

A    Yes, that is the subscriber record from T-Mobile.

Q    Is that the extent of the telephone records you retrieved or examined involving David A. Hill, also known as Wookie?

A    Again, there are toll records of other parties that have had contact with this telephone number, and so in that light, you know, we do have those records.

Q    Perhaps I ought to ask the question this way.  Did you retrieve the entire set of toll records or historical records

involving this account for David A. Hill, also known as Wookie?

A     No, we did not.

MR. CLANCY:  Could I have one moment, Your Honor?

THE COURT:  Yes.

MR. CLANCY:  Thank you.  That's all the questions I have.

THE COURT:  Mr. Woodward?

MR. WOODWARD:  Yes, ma'am.

CROSS-EXAMINATION

BY MR. WOODWARD:

Q     Hi, Mr. Swartz.

A     Afternoon.

Q     Let me start with Government Exhibit 134, which is the night-of-the-incident activity.  Do you have that?  If you could please turn to Page 4 of 134, if we can put that up. The first call is 6:20, April 29.  That is a -- 715-2616 is a Virginia cell phone?

A     Yes, sir.

Q     Is that an nTelos phone?

A     Yes, it is.

Q     Okay.  What tower was that call made on?

A     Do not know that.

Q     Don't know.  Do you not know because you didn't look, or it just wasn't in the records that you got from nTelos?

A     The initial set of records that were subpoenaed by Detective Rilee did not have cell tower information for Catherina Voss's cell phone.

Q     Okay. And obviously this other number, that is an eight-second call, and I think you have told us before that eight seconds is not enough time to go into voice mail or leave a message or anything?

A     That's correct.

Q     As a matter of fact, you reviewed Mr. Runyon's records for the 2230, and that call doesn't even show up on his records.

A     That's correct.

Q     All right. Now, also would you flip to the one that Mr. Clancy was asking about that starts at 11:11, which is again 134-06, by the numbering system that I think you all have used. Do you have that in front of you?

A     Yes, I do.

Q     Just so I'm clear, you know that at 11:11 p.m. the 3431 number was up somewhere in tower -- if I may approach, Your Honor -- somewhere in Tower 49, which could be anywhere on the south part of here up to north here; is that fair?

A     That is correct.

Q     Okay. And then you know that at 11:45 cell phone 3431 was somewhere between here at the north, the top of the blue line, which is 42, and the south edge of the blue line?

A    Within that circle, yes.

Q    Would you agree with me that at -- would you agree with me that the Government Exhibit 28V, if we could pull that up -- would you agree with me, sir, that that shows a time of 23:33:35?

A    Yes, sir.

Q    And you can't -- you can't really tell us where that 3431 number was during that time.

A    We can only tell with a cellular telephone where it is physically located if there is a call being made.

Q    And there were no calls between 11:11 and 11:45?

A    That's correct.

Q    Okay.  Thank you.

And 3431 is the phone you have been using to associate with Mr. Draven.

A    Yes, sir.

Q    Even though the account is in Ms. Voss's name.

A    Yes, sir.

Q    And you would agree with me, sir, that there are no -- in all of these phone records, Exhibits 104 through 110 -- I'm going to ask you about five pages of them specifically -- there are no records that you have looked at that indicate that either one of the cellular telephones associated with David Runyon was ever in Newport News, Virginia, on April 29.

A    That's correct.

Q    And you looked for that.

A    Yes, I did.

Q    Okay.  Now, if we could go to Government Exhibit 104, page 37.

MR. WOODWARD:  And just for the record, Your Honor, what has been admitted, 104, the 3431 actual toll records -- if we can just pull up that one page?

BY MR. WOODWARD:

Q    I want to go -- because the jury -- I want to go through these.  Can you go to the calls that were made at 19:36:34 and 19:37:34 and highlight those?  It is a 60-second call and a 457-second call a little bit less than halfway down the page.

Can you highlight the whole thing across so we can work through just one call, and then -- just those two calls all the way across?

You can't blow it up that wide.  That's fine.

Let me ask you this, Mr. Swartz.  (540)335-5392 -- you learned that, in your investigation, to be Randall Fitchett's phone number?

A    That's correct.

Q    It looks like phone 3431 called Randall Fitchett's phone for 60 seconds at about 7:30, and then called it again for 457 seconds at 7:37?

A    That is actually -- represents one call, if you do the math there.  At this time with nTelos, they're -- the way that

GLORIA S. SMITH, OFFICIAL REPORTER

**736**

they would export the data from their switch, there were

issues, and so you have to interpret that, and I know from

working with nTelos records that that represents one call.

Q    All right.  And now if you could do the second half of it

that starts with the Newmarket.

Now, what I'm understanding is that this portion of

it that shows the Newmarket Tower that they are

highlighting -- because there will be a lot of these records

with the jury -- that shows where the 3431 phone was?

A    That's correct.

Q    That does not show where the (540)335 phone number --

A    That's correct.

Q    So what we know at that time is that the 3431 number was

at the Newmarket Mall Tower, which is the southernmost or the

No. 42.

A    That's correct.

Q    Okay.  And with all of the nTelos records, would that be

true, that the information that's captured in the record

indicates the location of the calling or the subscriber phone,

not whatever phone the subscriber might be calling?

A    That's correct.  The source of these records -- and I

don't remember exactly what exhibit this is, but --

Q    This is 104.

A    104.  These are records for the telephone of 713-3431,

and the tower information is only relative to that phone.

Q    Okay.  So another way of saying that is anybody that is called, you can't tell where they are, you can just tell where the subscriber phone is.

A    Not from these records.

Q    Right.  From these exhibits.

A    Correct.

THE COURT:  In other words, you can tell from the phone, the records that you have, what tower it is going to. If you want the other end, you have to take the other end of the records.

THE WITNESS:  That would be correct.

BY MR. WOODWARD:

Q    I understand.  Now if we would go to Government Exhibit 106, page 85.  About two or three more.

If you could highlight the two calls -- is it easier for me to point them to you?  It is about the bottom ten calls of the page, starting at 21:08:11.

Okay.  There is a call -- there is two calls from -- now, so the record is clear, we are in the phone number that ends in 2616, which was a Catherina Voss cell phone?

A    That is correct.

Q    And it looks like at about 9 -- this is 4-28, the day before the murder.  At nine o' clock she made two calls to David Hill, a/k/a Wookie; is that right?  One of them for -- it is either 50 or 60 seconds, and one of them for 173

seconds?

A    I don't have David Hill's subscriber information in front of me.  If you are representing that that's the number that is subscribed to him, then I would say --

Q    That was what was in the stipulation, that that 385-8720 is David Hill's phone number.  If I'm wrong, I'm sure I'll get corrected.

A    And you are referencing the call at 21:08:11 and 21:09:11?

Q    Yes, sir.

A    And that again --

Q    Is one?

A    It is one call, yes.

Q    Now, if we could go to Page 87 of 106.  And again about the top third of the page, and there is two calls from Ms. Voss again to David Hill's.  This is 5-1.  There is two calls from Ms. Voss to David Hill.  Looks like one at 9:49:06 for 37 seconds, and then 9:49:07 for 37 seconds.  Is that again one call?

A    Again one call.

Q    It is just the way they capture it?

A    Yes.

Q    Okay.  Can we now go to Exhibit 108, page 43.  Mr. Swartz, you would agree with me that Exhibit 108 are the historical records for the phone subscribed to Mr. Runyon that

ends in 2230?

A    That is correct.

Q    Mr. Runyon did not have an nTelos telephone; is that correct?

A    No, he did not.

Q    He had Sprint?

A    That is correct.

Q    Okay.  And in your research and your expertise you've acquired, did you inquire into the way Sprint keeps and maintains its records?

A    Yes, I did.

Q    And did you learn about something called roaming?

A    Yes, I did.

Q    And what is roaming, as you understand it, from your inquiry into this case?

A    Roaming is when there is a home market for a cellular telephone, and then when they move to a different market, that is called roaming.  There was a time when that was pretty significant, because you were roaming on someone else's towers.

In today's world, with nationwide service, and particularly in the case of Sprint Nextel, they do have nationwide service, but there is roaming charges when they move out of the home market, which in this case would be Morgantown, West Virginia.

Q    Would you highlight the first call on -- it is Call No. 130 on Exhibit 108, Page 43.  Do you see that, sir?  It says 4:29, 4:36 p.m.  You would agree with me that that indicates that at least that cell phone was in Morgantown, West Virginia, receiving a call at 4:36 p.m. on April 29.

A    The date and the time are correct.  And what that is representing there is actually a call to voice mail.

Q    Okay.  But it indicates the phone is in Morgantown.

A    That is correct.

Q    Because the roaming feature applies to the voice mail as well.

A    That's correct.

Q    And I'm not going to go through all the records, but there is records that indicate the times when Mr. Runyon is traveling places and calling his voice mail, it is roaming?

A    That's correct.

Q    So that is a call saying that that phone is calling itself, basically.

A    That is correct.

Q    In Morgantown, West Virginia.

A    Yes, in that market.

Q    In that market.  Wherever that is.

A    Yes.

Q    And you didn't inquire into, in your investigation, how big the Morgantown market is?

A    I do not know how big that market is.

Q    Can we now go to Exhibit 109, Page 14.  Now, 109 is the other phone records that are attributed to Mr. Runyon, the phone number that ends in 6845, which was previously admitted; is that correct?

A    Yes, sir.

Q    Okay.  And would you go down and highlight Call No. 40, please.  And again this is also a Sprint telephone?

A    Yes, sir.

Q    All right.  And it is also a Sprint -- it is also from April 29, 2007?

A    That's correct.

Q    Okay.  And Sprint kept the records the same way on this phone as they did on the one that had a different last four?

A    Yes, sir.

Q    And that indicates that this phone, which ends in 6845, is calling Mr. Runyon's other phone, which ends in 2230, at 8:37 at night?

A    Yes, sir.

Q    Are there any records that indicate that the 2230 phone was roaming outside of Morgantown receiving calls at 8:37?

A    No.

Q    There is no such record.

A    No.

Q    Okay.  If we could now -- that's all I have for those

phone records. If we could now go, finally, to Exhibit 136, which is the summary chart about the calls between the parties that you testified to earlier.

A    Yes, sir.

Q    Just so -- if we could just pull up the March -- the March one, just so I can talk about that in general.

The bar graphs don't have anything to do with the length of the calls, they are just the number.

A    Just the number of calls.

Q    And did you do any analysis -- and I will ask this in general, what the -- did you add up any of the times that the calls were for any of these months, March through December?

A    The total duration of the calls?

Q    Right.

A    I did not total them.

Q    For any of these phones did you do any sort of analysis of what the total amount of time that those phones were used to make all calls during that month?

A    Not during that month.

Q    Let me ask the question a different way. You showed nine total calls between three different telephones on this record; is that correct?

A    That is correct.

Q    Because all of these, even though it is not reflected, are to the 2230 number of Mr. Runyon?

A    During this month, yes.

THE COURT: Wait just a minute. The data is there. Anybody who wants to take the time can go through all these phone records and add up the times of the calls, total, add up the times here, and do percentages. It is just an extremely time-consuming process. Am I correct?

THE WITNESS: Software does speed it up for us, but, yes, it can be done on any form or fashion.

THE COURT: It can be done.

THE WITNESS: It can be done.

THE COURT: And you can manually do it. If the jury wants to sit and do it, they can do it, can't they?

THE WITNESS: Yes, they can.

BY MR. WOODWARD:

Q    And the records Judge Smith is referring to are the records that have been admitted as exhibits 104 through 110, among other phone records?

A    That is correct.

Q    Can you now go to April of that chart, which is the next page? That call over there, that number one on April 29 -- do you see that one call?

A    Yes, sir.

Q    That's that eight-second call that you previously testified would not be long enough to go to voice mail and didn't show up on Mr. Runyon's records.

A    That's correct.

Q    That is that same call.

A    Yes, it is.

Q    Okay.  Finally, with regard to the wiretaps, the only question I have in that area, you, I think, testified, and I just want to clarify, that November 30 was the day that your fellow investigators and agents went up to West Virginia and started looking for Mr. Runyon and questioning people about where he was.  Did I get that right?

A    November 28 and 29 were those interviews, and then November 30 was the first e-mail traffic.

Q    So November 28 was when they went up and started talking to Christy Chipps and the Daltons and Virginia Pina, looking for Mr. Runyon?

A    That's correct.

        MR. WOODWARD:  Thank you, Your Honor.  That's all I have for this witness.

        THE COURT:  Redirect?

        MR. SAMUELS:  Briefly, Your Honor.

                    REDIRECT EXAMINATION

BY MR. SAMUELS:

Q    Mr. Swartz, in looking through those phone records, and Mr. Woodward asked you about calls to a number associated with David Hill the day before and a day or two after the murder, did you find any calls between the numbers associated with

Ms. Voss's residence or her cell phone on the day of the murder, April 29?

A    With a number associated with David Hill?

Q    Yes, sir.

A    I don't believe there is.

Q    Okay.  Could we pull up 108-43, please.  Mr. Swartz, Mr. Woodward asked you about the first couple of calls here with the 685-2230 number associated with Mr. Runyon?

A    Yes, sir.

Q    Was that the number most commonly associated with him?

A    Yes.  The majority of the calls represented in the PowerPoint presentation were with the 2230 number.

Q    And the call here that indicates Morgantown on 4-29, and then again Morgantown on 4-30 -- in your experience, does that reference that the phone is within the Morgantown area on those days?

A    Actually, no.  Where it designates in that column where you see a city and a state, that is the designation of the area of which the telephone number that is to the left of it is supposed to be registered to.

If you go down four lines, you can see that there is a call with -- it's a little blurry, but I think it says Reedsville, West Virginia, and then further down, there is Kingwood, West Virginia.  It's just a general area of where that area code, 304, and the first three digits, the exchange,

where that number is registered to.

There is a national numbering plan. It is called NANPA, North American Numbering Plan, something to that effect, and every telephone number is registered to a certain area of the country. You have area code, and then you break it down further by the actual exchange, and that is what is represented in that column.

Q    Now, Mr. Swartz, on 5-2, for example, with these two little phones over here in this column, what does that mean?

A    That is just representative of a Sprint telephone calling another Sprint telephone, and Sprint puts that on the bill for billing purposes. Depending upon what your plan calls for, there might be free minutes if a Sprint customer is calling a Sprint customer.

Q    Where on the bill would it indicate whether the phone is roaming or not?

A    When you get a monthly bill from Sprint Nextel, at the very end of the bill, if there is any roaming charges, they will be broken down by what geographic area they are in, with the telephone numbers that are associated with that.

Q    Would that be on the end of this bill, sir?

A    If there is some.

Q    Can we go to the next page, please. 44, please. Now 45? And that would indicate where in the country that phone is roaming off of?

A    That's correct.

MR. SAMUELS:  Thank you, Mr. Swartz.

No further questions, Your Honor.

THE COURT:  Thank you, Mr. Swartz.

Ladies and gentlemen, that brings us to the end of our trial day.  Again, please don't discuss the case with anyone.  If there are any media accounts, don't read them, don't listen to them.

Also I have a sentencing in the morning, so if you could be here at 10:30, again my review of it would indicate it won't be a very long one.  But be here at 10:30, and we will convene as soon as we can.  Have a great evening.

(The jury exited the courtroom.)

THE COURT:  Ms. McKeel, Mr. Samuels, are we pretty close to the conclusion of your case?

MS. MCKEEL:  We are, Judge.  That would be our last witness.  We just want to get together with the clerk to make sure the exhibits are in, and I think we have about three more stipulations that we would like you to read, and that would conclude our case.

THE COURT:  All right.  So you have got to check the exhibits and take care of any stipulations.

MS. MCKEEL:  Yes, ma'am.

THE COURT:  And then if you could get them cleaned up so they could go ahead and be filed at this juncture, we

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CRIMINAL ACTION |
| v. ) | |
| ) | NO. 4:08cr16 |
| MICHAEL ANTHONY ERIC DRAVEN ) | |
| ) | |
| and ) | |
| ) | |
| DAVID ANTHONY RUNYON, ) | |
| ) | |
| Defendants. ) | |

TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

July 15, 2009

**TENTH DAY OF TRIAL**

Before:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge, and a Jury

GLORIA S. SMITH, OFFICIAL REPORTER

Appearances:

        LISA R. MCKEEL
        BRIAN J. SAMUELS
        Assistant United States Attorneys
            Counsel for the United States

        TIMOTHY G. CLANCY
        JAMES S. ELLENSON

            Counsel for Michael Anthony Eric Draven

        STEPHEN A. HUDGINS
        LAWRENCE H. WOODWARD, JR.
GLORIA S. SMITH, OFFICIAL REPORTER

THE CLERK: Case No. 4:08cr16, United States of America versus Michael Anthony Eric Draven, also known as Anthony James Neff; and David Anthony Runyon.

Ms. McKeel, Mr. Samuels, is the government ready to proceed?

MS. MCKEEL: Good morning, Judge. We are ready to proceed.

MR. SAMUELS: Good morning, Your Honor.

THE CLERK: Mr. Ellenson, Mr. Clancy, is the defendant Michael Anthony Eric Draven ready to proceed?

MR. ELLENSON: We are. Good morning, Judge.

MR. CLANCY: Good morning, Judge.

THE CLERK: Mr. Woodward, Mr. Hudgins, is the defendant David Anthony Runyon ready to proceed?

MR. WOODWARD: Yes, ma'am, good morning.

THE COURT: Good morning.

Counsel, I think the first order of business, Mr. Samuels or Ms. McKeel, have you gotten all of the exhibits admitted?

MR. SAMUELS: Judge, we have. I went through them last night with your clerk. They have all been properly admitted, and we are all on the same page with respect to what has been admitted, and we have gone through each exhibit.

THE COURT: The next thing is, are there any further stipulations that I need to read to the jury?

MR. SAMUELS: Judge, we have put the stipulations together. Counsel and the defendants and Ms. McKeel and I have all signed those stipulations, and I have a new original set which I could tender to the court for filing. We would ask you to read two stipulations out of that set, No. 18 and No. 70.

THE COURT: I need to know where they were in my old one, because I have been marking them off. So No. 18 is still the same? It is about the Ford Ranger?

MR. SAMUELS: Yes, ma'am.

THE COURT: And No. 70 is United States Exhibit No. 294.

MR. SAMUELS: Yes, ma'am, that's correct.

THE COURT: I will read those two stipulations to the jury when they come back in, and then I will ask you if there is anything further, and you can indicate the government rests.

MR. SAMUELS: Yes, ma'am.

THE COURT: Can you file the stipulations? Can you submit those?

MR. SAMUELS: Yes, I can, Judge.

THE COURT: All right.

MR. SAMUELS: Just so the court knows, all the numbers on the stipulations we are filing are the same as Your Honor read, so they are consistent with the record.

THE COURT: All right. They have been signed by both defendants and by all counsel, and I would direct that they be filed in open court and made part of the record, to the extent that they are not already part of the record, because I have read them in.

MR. WOODWARD: Your Honor, just for my recordkeeping purposes, is that the actual document that goes back to the jury? Is that going to be part of the exhibits?

THE COURT: It just goes back as the stipulations, and the court's instructions tell them that any matters that counsel have stipulated, they must accept as fact.

MR. WOODWARD: Yes, ma'am.

THE COURT: It just goes back with the court's instructions, the exhibits, a redacted copy of the indictment, and a verdict form. It goes back with the exhibits.

Are there any other questions about the stipulations or the exhibits?

MR. SAMUELS: Not from the United States, Your Honor.

THE COURT: Counsel, I have received any notice of any further authority on the motions that were made last night. Is there anything further that you need to add today, Mr. Samuels?

MR. SAMUELS: Judge, there is not.

THE COURT: Mr. Clancy?

MR. CLANCY: No, ma'am.

THE COURT: Mr. Woodward?

MR. WOODWARD: No, Your Honor.

THE COURT: In regard to the defense motion that the *prima facie* case is insufficient to support the charge of carjacking resulting in death, I would overrule that motion. The intent requirement is satisfied when the defendants deprived Mr. Voss of the use of his vehicle by demanding and taking control of it, and they possessed it with the intent to seriously harm or kill him, and it did result in his death.

The United States Supreme Court has made it clear in *United States v. Holloway*, 526 U.S. 1 at 12, a 1999 case, that the taking element of Section 2119 is satisfied when the defendant takes control of the victim's vehicle even if he does not force the victim to relinquish it, end quote.

It is the example that I gave you yesterday, where someone for some reason -- perhaps they actually rob the bank, they come out, and the getaway car is gone, and they have to jump into someone else's vehicle, and they need to get from point A to point B. They have no intent ultimately to steal that vehicle. They just need it as a means to get from point A to point B, and if the driver doesn't do that, then the driver may be seriously harmed or killed.

But in any event, the evidence is sufficient to support the specific intent and the intent that is required

for the carjacking resulting in death, under 18 United States Code, Sections 2119 and 2, and it is properly charged in the indictment. I went back through and read the indictment, and it is a proper charge. Drawing all inferences in favor of the United States at this juncture, which the court is required to do, I would find that there is more than sufficient evidence for this count to proceed forward to the jury.

There was a motion also to dismiss for insufficient evidence the count of bank robbery resulting in death. After we left last night, having listened to the various arguments, I identified three areas that everybody was really talking about. In my opinion, there are three different components of this.

One was the argument that it was a factual impossibility, and I would find, as the Fourth Circuit has held, that that is not a defense to a charge of attempt, and this has been alleged as an attempt. The Fourth Circuit in *United States v. Hamrick*, 43 F.3d 877 at 885, a 1995 Fourth Circuit case, has specifically held that the factual impossibility that one cannot ultimately accomplish a crime is not a defense to an attempt. So that, in my mind, was the first component of the motion.

The second component, which I don't know that it was expressed exactly this way, but there was the question of could there be an intent to rob if there was no money in the

account. In other words, one is the factual impossibility. The second is, can you form the requisite intent to commit a crime, the *mens rea*, if the funds are not actually there.

The evidence before the court at this juncture, without someone calling Catherina Voss, drawing all inferences in favor of the government, is that she opened the account, and she would have been the only one that the evidence shows at this juncture would have known there was not money in the account. One can imply by circumstantial evidence and one can argue that they didn't have the intent, and that's something that could be presented to the jury, that they lacked the requisite intent because the money wasn't there.

But in actuality, drawing all inferences in favor of the government, there is no showing that either Mr. Draven or Mr. Runyon didn't know. The showing is that there was a plan to rob him at the ATM, at least make it look like a robbery, and take whatever was there, and then kill him for the reasons that have been set forth.

The third issue that I addressed last night, which I brought up at the end of the session and asked you all to look into it further, was, is this really a robbery of a bank? In other words, the statute deals with the bank and the funds that are secured by the bank. In the two hypotheticals I think we talked about -- or at least one of them was if someone goes up to an ATM machine and withdraws money and then

they are robbed, is that the robbery of the person, or is that the robbery of the bank?

Another example is, for instance, someone goes into a bank. They take out money. The robber is hiding around the corner and goes up to the person and says, now give me your money that I just know you took out of the bank. Is that a robbery of the bank, or the robbery of the person?

I am of the opinion, having looked at the Fifth Circuit case that both sides were able to find, as did the court, as well as the Congressional intent of the statute, that the intent of that statute -- and I would read from the Congressional Record first -- is that the bill provides punishment for those who rob, burglarize, or steal from such institutions, banks, or attempt to do so, end quote. That's from HR 1460, 73rd Congress, Second Session, 1934.

This is a very old statute, and it obviously predates ATM machines and that type of electronic transfer of money, which is why I used the example of somebody going into a bank, the robber is standing back behind the corner, the person comes out of the bank, and the robber robs the person. That is an analogy to someone taking his money from an ATM machine and then being robbed afterwards.

The legislative history emphasizes that the bill was intended to punish those who commit criminal acts directed at a bank, not at a bank's customers. The congressional intent

GLORIA S. SMITH, OFFICIAL REPORTER

757

is more clearly manifested in the caption of 12 United States Code, Section 1588(a), et seq., which is, quote, an act to provide punishment for certain offenses committed against banks organized or operating under the laws of the United States, end quote, and the cite. That was the previous statute which had been repealed and was being replaced.

I could not find a Fourth Circuit case, nor could counsel, but the Fifth Circuit case of *United States v. Burton*, found at 425 F.3d 1008, decided September 20, 2005, deals with the situation that we potentially had here. And I quote from the case: The funds did not belong to the bank. Burton sought and received a limited amount of Childs' money for which he knew her account had sufficient funds. Childs inserted her ATM card, entered her PIN, and withdrew money from her account. This is not a case in which the defendant sought the bank's money.

It cites as a comparison *United States v. Carpenter*. It is a Cf. cite, 611 F.2d 113 at 114. It is a 1980 Fifth Circuit case upholding a bank robbery conviction of a defendant who abducted and held the son of two bank officials until ransom was paid, finding that the abduction and extortionate telephone calls in this case were certainly likely to cause the bank's assets to be drawn upon. And then *United States v. Beck*, 511 F.2d at 997, a 1975 Sixth Circuit case holding the same.

I go on to quote: Childs made a valid, albeit coerced, withdrawal of her own funds, which Burton then stole. See *Van*, 814 F.2d at 1007, finding on similar facts that the evidence in this case clearly shows that no funds belonging to the bank were transferred to -- and in this case it would be appellants, because it was on appeal.

The $150 -- I'm reading from the case -- the $150 was not in the, quote, care, custody, control, management, or possession, end quote, of the bank. We only consider the care, custody, control, management, or possession at the time of the transfer to *Burton*, citing back to the *Van* case, with a parenthetical: The $4,000 did not belong to a bank, and it was not in the care, custody, control, management, or possession of the bank at the time that it was transferred from the robber to the other person, whose names are Bradley and Titus.

Childs had the money and gave it to Burton in her vehicle, not in the bank. Regardless of how brief her possession, the bank at the time did not have care, custody, control, management, and possession of property in Childs' vehicle.

So if one looks at the congressional intent, the analysis of this Fifth Circuit case on point, I agree with that analysis and would find that the evidence is not sufficient to show that there was a bank robbery resulting in

death. Even though it was an attempt, the attempt would have been to get funds from Mr. Voss after he had withdrawn them from the bank. So even if they had succeeded, and that's the way you look at an attempt, assuming that they could succeed, it would have still been taking the funds from Mr. Voss, not from the ATM.

Now, I would say you would have a different situation if someone goes up to an ATM, breaks it open, and takes the money. That's the money in the care, custody, and control of the bank. But once the money leaves the ATM, goes to the person, and it is taken from the person, that would be robbery of the person.

In point of fact, I would find that that is the difference between Count 3 and Count 4, and I do not believe there was a motion in regard to Count 4. But the Count 4, if you look at, is the conspiracy to commit robbery affecting commerce, and that would come from the person. If you look at how that count is alleged, that count is alleged that there would have been robbery from the person, again an attempt.

So the attempt analysis flows, that the attempt -- that it was factually impossible to get money from him, because there wasn't any money in the account, that still holds. The bank argument still holds there. It is attempt from him. And finally, if there is no intent to rob because there is no money, that has not been shown through any

evidence in the case, drawing all inferences in favor of the government, because there would have to be some testimony, Ms. Voss or some e-mail or something, that says she somehow let everybody know that she had only put $5 in there.

In any event, with that ruling, I do grant the defendant's motion in regard to Count 3, bank robbery resulting in death, and I dismiss that count. That leaves the remaining counts 1, 2, 4, and 5 to go forward.

We will call the jury in at this point and proceed with the government resting in front of the jury, and then I will turn to Mr. Clancy and Mr. Ellenson, and from there to Mr. Woodward and Mr. Hudgins to present any defense that they deem appropriate.

Is there any anticipation that your defendant is going to testify, Mr. Clancy?

MR. CLANCY: There is not, Judge.

THE COURT: Mr. Woodward?

MR. WOODWARD: No, Your Honor, Mr. Runyon is not planning to testify.

THE COURT: All right. I just wanted to be sure, so we wouldn't have to interrupt the proceedings, and I would need to address each defendant.

Mr. Clancy and Mr. Ellenson -- and also the same questions to Mr. Woodward and Mr. Hudgins -- have you all reviewed with your clients that they have an absolute right

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

UNITED STATES OF AMERICA           )
                                   )       CRIMINAL ACTION
     v.                            )
                                   )       NO. 4:08cr16
MICHAEL ANTHONY ERIC DRAVEN        )
                                   )
     and                           )
                                   )
DAVID ANTHONY RUNYON,              )
                                   )
          Defendants.              )


TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

July 16, 2009

**ELEVENTH DAY OF TRIAL**


Before:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge, and a Jury


GLORIA S. SMITH, OFFICIAL REPORTER


**762**

Appearances:

  LISA R. MCKEEL
  BRIAN J. SAMUELS
  Assistant United States Attorneys
   Counsel for the United States

  TIMOTHY G. CLANCY
  JAMES S. ELLENSON

   Counsel for Michael Anthony Eric Draven

  STEPHEN A. HUDGINS
  LAWRENCE H. WOODWARD, JR.
   Counsel for David Anthony Runyon

* * *

THE COURT: Those lines will come out.

MR. SAMUELS: Judge, other than that, the United States has no other objections or edits to the instructions.

THE COURT: Mr. Ellenson?

MR. ELLENSON: We would agree, Judge.

MR. WOODWARD: Your Honor, we agree with those changes, that they are proper.

THE COURT: All right. Then I will have those edits made on break, and you can, if you are arguing the instructions, use those numbers.

We can bring the jury in, and you can start your closing arguments.

(The jury entered the courtroom.)

THE COURT: All the jurors are present.

Good morning, ladies and gentlemen. I hope that you had a wonderful evening, and we are ready to go forward with closing arguments and the instructions of the court.

I would call on Ms. McKeel.

MS. MCKEEL: Thank you, Your Honor.

Michael Draven was envious of Cory Voss's life, a life that Cory Voss had worked hard for. As we know, Cory dropped out of high school in the ninth grade, and he eventually at age 18 enlisted in the United States Navy. He went on to get his GED, and he went on to college. And the year before he was murdered, he had become an officer in the

United States Navy.

Michael Draven wanted what he had, what Cory Voss had. He wanted his wife, he wanted his children, and he wanted his money. And we have evidence of that, ladies and gentlemen, from Michael Draven's MySpace page.

Now, we know on May 1 when the Newport News Police Department downloaded Michael Draven's page, what was on it. Well, on Page 2, as you can see, he represents himself to be married and a proud parent. In fact, most of Michael Draven's MySpace page is devoted to Cory Voss's life; that is, his wife and his children.

What do we see on there? We see those photographs of Cat Voss, a number of them. And what does one of the captions say? My beautiful wife. We see pictures of Cory Voss's children. What does Michael Draven call Cory Voss's daughter, Casey? My daughter, Casey. Michael Draven even puts pictures of Cory, Jr., on there and calls him Cory Batta Batter. If you looked at Michael Draven's MySpace page, you might be confused that it was Cory Voss's.

On April 29, 2007, Cory Voss's life was taken. It was taken -- you know, that life was worked so hard to get, and it was taken in a matter of moments, minutes. And it was taken by people, Michael Draven and David Runyon and Cat Voss. Michael Draven wanted Cory Voss's life, and he wanted his insurance policy.

Ladies and gentlemen, this is a tragic case of envy, lust, and greed. Michael Draven was envious of Cory Voss's life, he lusted after his wife, and he wanted his money. He was greedy for that life insurance policy, and so was Cat Voss.

David Runyon -- well, he didn't care about Cory Voss's life. He was a hired killer to come down from West Virginia and to go to that ATM machine and take Cory Voss's life, and he was greedy, because he was going to get paid $20,000 to do it.

This tragic case, begins, though, ladies and gentlemen, back in the summer of 2006. We see that Cory Voss has gone out to sea, has gone to the Mediterranean and parts of Africa to serve his country. And what is Cat Voss doing? Well, she picks up and starts going out with her girlfriends again, and her behavior starts to spiral out of control, and during the summer she meets Michael Draven.

Now, Cat Voss is dating other men during this summer. She is acting inappropriately -- is the nicest word that can be said -- for a wife and a mother of two small children. She is drinking excessively, and at some point taking drugs during that summer, and it is in that summer that she meets Michael Draven. And when she meets him, she still goes out with other men, but at some point in the latter part of that summer, she and Michael Draven begin a sexual

relationship.

In fact, her friends say when she met Michael Draven that this -- she started to act differently than she did with the other men. I believe Michelle Lindblad said one time she saw her, and she was very quiet around Michael Draven. Her personality had somewhat changed.

By the end of the summer into the fall of 2006, Catherina Voss had fallen hard for Michael Draven. In fact, in the e-mail that she wrote -- you can look at your screen -- she states, things got crazy fast, but it's all good. He blows my mind. I love him so much, and I hope that he knows just how much. Cat.

They have problems here, as we see as we get through this time line at this point in time, because both Cat Voss and Michael Draven don't have any money. Cat Voss is living off of Cory Voss's money from the Navy. Neither one of them, Michael Draven, had a steady job, or Cat Voss. Michael Draven fancied himself an actor, poet, photographer, and he did medical research studies. Cat Voss was a stay-at-home mother and had no job.

Now, what she was doing was going out and spending Cory's money at bars and paying for everybody and everyone to have a good time, no doubt worsening a very bad financial situation that Cory and Cat Voss were in. Their finances, ladies and gentlemen, you have heard about during this trial,

and at this time Cory and Cat Voss had tried to rectify their financial problems. They had refinanced their home and had gotten -- consolidated their bills. I think it worked maybe just a little while, before no doubt probably Cat Voss's spending put them right back into trouble again.

Now, Michael Draven, on the other hand -- as you will see from the government's exhibits, he had very little in the bank. As you can see, in, I think, two of his Bank of America accounts he had negative balances. One, in this Langley Federal Credit Union account, he had $67.45. On top of that, he lived with his mother and her husband in a trailer in Newport News.

Now, by the winter of 2006 the relationship between Cat Voss and Michael Draven had come to a point where they wanted to marry. In fact, they started to refer to each other as husband and wife. There is an e-mail that Cat Draven sent. I believe it is December 24.

She probably should have been putting toys together at this point, but she is writing her lover, and this is what she says: Michael, tonight I will dream about you. I will wish for you to be with me as a family. You have made my Christmas a very special one by taking me as your wife. I love you, and nothing would ever change our love for each other. You have such a special place in my heart, and I will always keep you in my thoughts as I go through tomorrow,

GLORIA S. SMITH, OFFICIAL REPORTER

**768**

Christmas Day, with the kids. I wish you were here, and I miss the hell out of you. I love you forever and ever, my heart and soul, merry Christmas, my love, Catherina Draven.

Now, during this time period as they are referring to each other as husband and wife, they take a trip to Nags Head together, and Cat Voss is added to Michael Draven's Langley Federal Credit Union account -- you can see that from one of the government's exhibits -- during this time period.

And by now, Cory Voss is at home, so there is a desperation going on here. You can see it from that e-mail. She doesn't want to be with Cory and her kids Christmas Day, she wants to be with Michael Draven.

As we go in now to early 2007, in January and February of 2007, the plan to kill has begun. Cat Voss and Michael Draven didn't know how they were going to kill Cory yet, but they were searching. And the evidence of that, ladies and gentlemen, is the e-mail to Lawrence Ford. Remember him? I.E., Insufficient Evidence? He testified that Michael Draven writes him an e-mail January 2, 2007: I love the profile -- remember his profile? He was a hit man on his profile. I love the profile, but a simple but unusual question have for you. Have you done a swipe or a hit on someone before? Just wondering.

See, Cat Voss and Michael Draven wanted to be together so bad at this point, this is what it has come to.

In fact, Michael Draven again searches -- this is Michael Draven, MySpace, going to I.E., asking, have you done a hit or a swipe? The next thing Michael Draven does is he talks to his buddy, his research buddy, Charles Smith. He had a little bit of an attitude, but he finally said, yeah, Michael Draven called him, and he said to him he needed to take care of a situation.

Next we know their search leads them to poison rings. Michael Draven talked about poison rings with both Randy Fitchett and Nicole King, and in fact, on February 23 in Nags Head, Government Exhibit 294, Michael Draven purchases a poison ring. That item, ladies and gentlemen, was found in the home of Michael Draven, that receipt.

During this time period in January and February of 2007, Michael Draven and Cat Voss go back to Nags Head, North Carolina, to the Port O' Call Restaurant now, and they speak with Theresa Robinson, who you heard from. And she talks to them, she invites them, she believes they are a couple. And what do they talk about? They, being Cat Voss and Michael Draven, talk about remodeling their house and buying something to put in a grandfather's china cabinet.

In February of 2007, finally, Michael Draven has the answer. And the answer is David Runyon. He meets David Runyon, a man from West Virginia, at Parexel International, and they run -- as you heard from Rachel Garrido, they run a

research facility testing drugs at Harbor Hospital in Baltimore. David Runyon meets him, Michael Draven, and they begin a friendship. Michael Draven knows he is an ex-police officer and a former military man.

During this time period you can see from Government Exhibit 102 that during February and March of 2007 Michael Draven and David Runyon are in the same study. One of the study times, as can you see from the dates of the residency on here, is February 4, 2007, to March 14, 2007. They are together in residency. And then they are together again March 4, 2007, to March 14, 2007.

In one of the studies they are one bed apart. In the other study they are beside each other. This is a facility where they have access to computers, phones, they can hang out in the day room, because what they are doing all day is they are taking medicine and then having their blood tested. Lots of downtime.

Then March 2007 we come to, and the plan is coming together, and the plan is to kill Cory Voss for his insurance money. You see, divorce was not an option for Cat Voss or Michael Draven. They didn't make any money. They didn't have any money. They didn't have steady jobs. Cat Voss had already been through a divorce. She didn't have a job. So if they wanted to be together, they had to get the insurance money, because divorce wouldn't have worked out. Where would

they have gone?  Cat Voss had a nice house, big two-story house, a pool in the backyard.

So divorce was not an option, so this plan was here, ladies and gentlemen.  Except it hits a snag.  Michael Draven gets arrested on unrelated charges, and he is taken to the Newport News City Jail.  And while in jail, you heard those calls.  We are going to play just a few more, some small snippets this time, of those jail calls, and Michael Draven is desperate.  Ladies and gentlemen, these jail calls we would like to play now are one month before the murder.  Keep that in mind when you listen to these jail calls.

(The audio was played.)

MS. MCKEEL:  Hear the desperation there?  The first phone call, Michael Draven:  I'm going to get married to Cat in like four or five months.

Well, how is that going happen?  It is going to happen because the murder is going to happen.

They talk about Dave on the calls.  And Michael Draven -- as Cat Voss is relaying in one of those that he's not sleeping in the bedroom, he's going to move out, he's going to get his own apartment, Michael Draven:  Well, let him.  It will be easier to talk to Dave.

Ladies and gentlemen, you heard from Sergeant Paul Swartz a number of times.  One of those times he talked to you about the phone analysis, and in March we have three completed

calls between Draven and Runyon, and one call with Cat Voss on March 24 for 88 minutes.

Now, ladies and gentlemen, Cat Voss had to take care of a situation while Michael Draven, who had been taking care of it -- he found David Runyon, he was looking for a hit man, doing the poison rings -- Michael Draven was in charge, but Cat Voss had to take over during this time period because Michael Draven was locked up, wasn't sure when he was going to get out. So she talked to David Runyon.

There were time complications here, though, ladies and gentlemen. Cory Voss was getting ready to go out to sea. He was going on training missions to the Bahamas on May 4. David Runyon had to be at another drug study at Wyeth Labs in Philadelphia. We know where he was April 19 through the 24th. He was in Philadelphia, and he had to be back at that study May 2 at 9 a.m., and he stayed there through May 7.

Now, the plan starts to take -- after this time period, starts to take hold here, because what is happening? The plan is set up. Cat Voss goes to the Langley Federal Credit Union to open up a bank account April 20, 2007.

Now, if you recall from the map and the pictures that you saw of the crime scene, Langley Federal Credit Union is -- in order to get to it off Jefferson Avenue, you can either turn into it and then go over, because there is a big ditch right here, there are all these trees right here, to get

over to the ATM, or if you came in from a different way on Jefferson Avenue, you could come down this little side street, past where Cory's body was found, come down that side street. There was a Wachovia Bank beside it, and then the Langley Federal Credit Union was beside that. So it was a secluded area with trees all around. Cat Voss picks that bank, and she opens up the account with $5 in the savings account.

Now, we know that on Saturday, April 28, Cory Voss has to go to work very early in the morning. He has to work a 24-hour shift. Cat Voss goes to the bank again, and what does she do? You heard from Denise Chambers. She said a rather unique-looking woman came into the bank that morning, and she wanted these powers of attorney. She had two different powers of attorney, if you will remember from these exhibits. One was a real power of attorney, and you heard from Commander Graham. He had signed that for Cory. And the other was one that came from Cat Voss herself. And one survived death and one did not. Very odd what Cat Voss was thinking here, but nonetheless she did this.

She goes to the bank. She gets Cory's leave and earnings statement and she gets Cory's ID, and what her point is, she is trying to get him on, because the next day is going to be the murder, and Cory needs to be able to go down to the bank. Well, she gets told that the bank doesn't use powers of attorney, but they said they will check come Monday if that

can happen.

What else do we know about this time period, April 28 and the 29th? Well, on April 29 we know that Cory -- this is a Sunday, now -- he comes home from work. Cat Voss has told us what he has done during that day, played with the kids, napped, cut the grass, did things around the house, went to the park with the children.

What is David Runyon doing? Because we know. Well, he's going to buy a firearm that day, on a Sunday. Mr. Koski came from West Virginia and testified that David Runyon bought a .357 five-shot revolver. He said he gave the gun to him clean, in good condition, and he even has David Runyon's driver's license and phone number written down that we verified through this trial through the exhibits.

We know that David Runyon also withdraws some traveling money that day. We also know he sends a quick e-mail to a Russian gal, and he says something to her that he is in a hurry, that he will get back to her.

We know that there are a number of phone calls this day between the parties. You heard from Sergeant Swartz on that, about these phone calls. They are in contact with one another this day. We know that Michael Draven and David Runyon had phone conversations at a pay phone at the Waffle House in Newport News. We know that they met that night.

Now, the evidence you have from that is, from the

wiretap, their conversation as the investigation into them is heating up, they are talking about getting their stories straight, and they are talking about meeting at the Waffle House, and I guess at some point they realize they have given inconsistent stories to the police. But we will get to that. But they meet up at that Waffle House, and we know that because we know where Michael Draven is, too.

Let's first go to the ATM with Cory. Cory is sent by Cat Voss to the ATM. Ladies and gentlemen, I'd like you to take a look at these pictures again. These are the last moments of Cory's life. We know what time he gets there. You will see on the sides that these are time-stamped on the time, and we can see here that Cory Voss is startled. David Runyon enters his vehicle here. Unfortunately, ladies and gentlemen, we couldn't get an enhanced photo, as you can see from the rain guard or the visor, I think that was the term some other people used, blocking David Runyon's face. But we see it right here.

Cory Voss is made eventually to drive away from this ATM. He is forced to take his car to where David Runyon wants it. What happens in these two minutes, ladies and gentlemen, we don't know. Cory comes back up here. And look at Cory's face. He is made to withdraw money, except he doesn't have any there -- 60, 40, 20. David Runyon forces him to do that. We don't know if David Runyon knew if there was money in there

or there wasn't.

That's, ladies and gentlemen, where the carjacking, one of the charges, occurs, and the robbery, attempted robbery, the conspiracy that goes on, when we get into that, of robbing Cory Voss of his money.

At the same time, where is Michael Draven? Well, we know where he is. He is traveling up to meet David Runyon. He is on the move. From 11:11 -- and we have shown you the evidence of this -- he is talking on his cell phone, and he is moving down the corridor of Jefferson Avenue to go down to that Waffle House, which is just right off the exit of 64 and Jefferson Avenue. That Waffle House is right there with those pay phones. And we know that Michael Draven goes down there, and he meets David Runyon. They talk moments, probably, and then Michael Draven heads back to his home at the trailer with his mother and her husband.

Ladies and gentlemen, as you have heard from the evidence, Cory Voss was forced to drive away from that ATM, and he was forced to go just a short distance away from that ATM. You can see from the crime scene photos, there are more businesses in this area. And he goes over to, I believe, near a dentist's office, and Cory Voss is shot five times by David Runyon.

Three of those shots are lethal. One shot shatters his vertebrae. He would not have felt anything below

midchest, Dr. Bush testified to. The other shot, one of the other shots, traveled all through his body and eventually comes out, and it breaks his arm, as can you see from the autopsy photo of the broken arm. And Cory Voss would have felt pain.

Then, ladies and gentlemen, what happens next? Cat Voss is frantically calling, no doubt to see if it has happened, Cory Voss's phone. Of course it rings and rings up until the early morning hours. Now, she is beginning to act her part now. She is going to play the distraught wife, and she has sent Cory Voss, ladies and gentlemen, to that ATM. That's her part.

She has a checklist, no doubt. We found it in the home at Mayland Court, Government Exhibit 247B. She has a checklist: Riverside Hospital, Langley Air Force Base emergency, Mary Immaculate, and police nonemergency. Zero accidents, she writes there. She doesn't call to report her husband missing. Of course not. But she wants to have something there to show she is the distraught wife so this tale is believable.

She then eventually calls to report Cory missing, and the police come, and you saw the evidence with regard to finding Cory's body.

But then begin lies and deception and obstruction of justice by all the defendants in this case.

Sir Walter Scott wrote some words that we all know: Oh, what a tangled web we weave when we practice first to deceive. That's what is going on here now.

On April 30 how does Michael Draven feel? Cory Voss is dead. How does he feel? Let's take a look. Current mood: Accomplished. And he writes a poem to his love, Cat Voss. He posts that April 30. Michael Draven is accomplished, because what? Cory Voss is dead, and now he can have Cat Voss to be his wife, he can have Cory Voss's children to be his children, and he can have the insurance money that's going to come, a sizable insurance policy on a member of the United States Navy: $400,000.

Now, what we see then beginning in May, interestingly enough, David Runyon buys online a stainless steel bore brush for a .357, and he buys it under the name of Andy Garcia. The trouble with that is we find out about that, don't we? We find out in his e-mail that he has done that and where it ships to. He lived at Snider Street at the time -- you have heard testimony about that -- and we found the piece of paper in his home when we did the search warrant in West Virginia that talks about the stainless steel bore brush, and it talks about the name Andy Garcia.

What are Michael Draven and Cat Voss doing? Well, she gets $100,000 on May 1, 2007. And what does she do? She's going to spend that money. And she promptly spends it,

ladies and gentlemen, and she spends it with Michael Draven.

During this time period, as you can see from the government's exhibit, Michael Draven and Cat Voss go on a series of trips. They go to hotels, they get car rentals, they buy jewelry in Nags Head. Remember the Nags Head people coming? Over $10,000 worth of jewelry she is buying him with this money. And what happened to the kids? Remember what Mr. Merrell said? The kids wanted something in there. They didn't give them anything. Mr. Merrell had to give them some puppets.

We next see in the next exhibit how much money that actually went -- money that Michael Draven gained after this murder, this insurance money, into his account, over $10,000. She set up a Concord Lakes Apartment, so he could have his apartment now, so he could move out of the trailer with his mom and her husband. And he goes to Katherine Court, because they can't be seen together, ladies and gentlemen, because that wouldn't do. People might figure it out. So she gets him an apartment.

He gets it with his brother, who comes down -- very sad story there with his brother, Randy Fitchett. His brother stays here for a little while, and decides to go back home.

On June 1, what happens? David Runyon is paid a small amount of money. He is paid from a Western Union wire -- 293 is the government exhibit -- and it says Randy

Fitchett. It is only to deceive you again. Again, remember I told you lies, deception, and obstruction? This is deception again. This exhibit comes in twice, ladies and gentlemen. It comes in where we found the exhibit actually at the defendant's home, Michael Draven. But we also got it from Western Union, and the Western Union exhibit talks about the person, even though it is Randy Fitchett, is listed at Circle Drive -- that's where Draven lives -- and the phone number that's at Circle Drive where Draven lives.

Now, in July this $100,000 is almost spent. What you saw, ladies and gentlemen, is in July starts rolling in on the bank account of Cat Voss insufficient fund notices for her bank. So it is almost gone, and so once again, desperation sets in. They need this insurance money. They don't have jobs now. Cory Voss is not alive to have that paycheck come in. So what are they living off of?

Well, Cat Voss begins to write letters to anybody who will listen to her. Even in July she calls Detective Rilee, if you remember, a couple of times, and she is sending him something for him to send to the insurance company. And that's to get her insurance. She even goes so far later in the summer to write United States Congresswoman Jo Ann Davis and United States Senator Jim Webb. And what is she doing? Again, lies, deception, obstruction of justice -- she is blaming the police.

Federal law enforcement agencies entered this investigation in July of 2007, and you heard, ladies and gentlemen, that at that point a number of actions take place. You hear wiretaps are begun in the late fall and early winter of 2007. And most importantly, at this point in the investigation, Michael Draven is interviewed.

On November 27, 2007, an interview, which had been prearranged to be set up with Michael Draven at Katherine Court, but what do we see, and what do we know that is going on? We see that they are talking on the wires -- Michael Draven and Cat Voss -- about getting their stuff -- they said something different -- but getting Michael Draven's stuff out of her house at Mayland Drive, because the cops are coming now.

And what do we see, ladies and gentlemen, on that date? You can see the time. 12 o'clock. The meeting is set up for 2 o'clock. At 12 o'clock Michael Draven is staging that apartment, because he doesn't live there. He is living with Cat. But he is staging that apartment. As he said on the wiretap, they are putting all kinds of stuff -- Cat Voss says, put your stuff in the trunk and get it over there. He says, you're right. I got to do that.

So he does, he goes and he does it. All his stuff is in the back, you can see from the surveillance video. And all three of them, Michael Draven, Juanita Harper, Richard

Harper -- they are all taking the stuff in and they are setting the place up. So when Detective Rilee and Detective Williams get there, what do they see? They see pictures of Cory Voss everywhere, to make it look like -- deception, lies, and obstruction, ladies and gentlemen -- to make it look like Michael Draven is actually a friend of Cory Voss's.

But we know different, don't we? We heard Michael Draven's words, didn't we? I hate Cory, a month before the murder. What does he say? He lies to the detectives. He says he has no relationship with Cat Voss. They are like brother and sister, and he is good friends with Cory Voss. They hang out together, watch football together. He is asked about the finances of the Vosses. We all know what the finances are. He says they were good. On the night of the murder, he says, oh, I was asleep at his parents' trailer. And the trips -- he is asked about the trips, and we know this by this point, ladies and gentlemen, November 27 of '07, we know this. He lies about those.

Next the police go to West Virginia. We know about David Runyon, too. And what does David Runyon do? He also lies to the detectives. Now, he admits -- now, remember at this time period -- this is December 3 now -- there is all this e-mail back and forth. There is a wiretap going on, and so they know what they need to say a little bit. He says he met Draven two years before, and he is like a cousin to him.

Remember the e-mail traffic between Draven and Runyon: You are a cousin to me, right? You're a cousin. Yeah, I got it.

So Runyon holds up the story, we're cousins, although he messes up here, because he says he has visited Draven twice, once in the summer of 2006, and once in the spring of 2007. Now, ladies and gentlemen, we know that David Runyon and Michael Draven meet in February of 2007, a few short months before the murder. But David Runyon says, oh, I was going on a fishing trip to Florida, and he admits they met at a Waffle House.

He says the last time he saw Draven was February of 2007. We know that's false. We know they were here together by the wiretap the night of the murder of Cory Voss. They met.

Ladies and gentlemen, if you go back to the Parexel exhibit, you will find that David Runyon and Michael Draven were together November 17 through the 19th, at Parexel at Harbor Hospital. Specifically, the agents and officers asked the defendant Runyon where he was April 29. He didn't have an answer. He would have to get back with them. He was asked if he owns firearms. He said he didn't. He was asked about the relationship between Michael Draven and Cat Voss. Again, the lie that everybody is supposed to be telling: They're just friends.

Now, what's interesting is what happens after this.

We know from Exhibit 243 that was December 3. What does David Runyon do December 4? He has his friend, Paula Dalton -- you can take a look at the top of the document -- December 4 Paula Dalton goes out and she gets the guns she has pawned. She gets that .357 firearm Mr. Koski sold to him that he has pawned now, and he pawns it twice during this time period. He gets it out, and that gun is never seen again, ladies and gentlemen.

Michael Draven is interviewed one more time, on December 7, 2007. And where is he now? Oops, he's at Cat Voss's house, not his apartment. And what does he do again? The same old thing. What they have all been doing -- lies, deception, and obstruction of justice.

He lies repeatedly, because this time he is being pressed a little bit harder on his -- the police know it's lies -- on his lies. He is being pressed harder. And what is he being asked? He is even being played those jail calls. He's getting nervous. He has lied already to them about the relationship. Nope, we are brother and sister, and it would be yucky, or whatever he said, to have sex with your sister.

But in the end, after he hears the evidence against him, he finally admits, finally, reluctantly, in the face of that, that he has had a relationship with Cat Voss.

And then he is asked about David. Now, he is not told David Runyon, but he is asked about David. And that is a

little small detail, ladies and gentlemen, but don't let it get lost. The police had never mentioned David Runyon to Michael Draven. Well, he admits, yes, he's a friend. He is asked if he had ever had Runyon visit him. He says, oh, no, no, despite David Runyon's admissions days earlier that they had, that he had been here twice.

He denied ever going -- Michael Draven denied ever going to West Virginia, or denied that David Runyon was ever in Virginia. He is asked about the trips again, where there is overwhelming evidence, ladies and gentlemen. In the face of this evidence he is confronted with, he lies again: We took no trips; if we did, she came separately.

Then in December of 2007 the investigation goes into the search warrants, ladies and gentlemen. On December 11 federal law enforcement officers, along with the Newport News Police Department, go to West Virginia, and they have in hand a federal search warrant, a number of them. They stop the defendant David Runyon in his vehicle. And what do they find in his car? Well, he has lied about firearms. They find two big firearms there, right in his car, traveling with him.

But they also make the other find. The government's exhibit here that you can see on the screen is that map. And where is this found, ladies and gentlemen? It's found in a hidden compartment. No doubt David Runyon had forgot about that, but it is found in a hidden compartment in his Blazer.

And what is on this map from Newport News, Virginia, in his Blazer? What is on it? You can read it. Langley Federal Credit Union, '97 gray Ford Ranger, front left hubcap missing, tailgate down, J. Morris Boulevard, Cory.

Well, ladies and gentlemen, we know Cory is murdered at the Langley Federal Credit Union. We know he has a '97 gray Ford Ranger. The front left hubcap was missing, and the tailgate was down.

What else is found by this map, right beside it in this hidden little compartment, but the infamous picture of the lovebirds, Michael Draven and Cat Voss. They were in Nags Head when this picture was taken, and this is found, and on the back of this photograph are their names and addresses. And that's found in David Runyon's truck in West Virginia.

Agents then travel to Lot 67, a trailer where David Runyon lived at the time, and what else do we find next in this exhibit? Interestingly enough, ladies and gentlemen, we start at the top of the page. We find 6.25 hours, 380 miles. Guess what that is. You have heard plenty of testimony about that. That's the time and the distance, the approximate distance, from Newport News, Virginia, to Morgantown, West Virginia.

If we go down further on this document, where there is no doubt scribbling on it, we see Langley Federal Credit Union. Remember, David Runyon doesn't bank at this bank.

What do we find at the side of the document? We find the words, ladies and gentlemen, a checklist: Tarp, trash bags, Taser, Spyderco knife, contacts, watch, black hoodie sweatshirt, black BDU pants, black jungle boots, black dress socks, gel shoe inserts, and leather gloves, black -- a checklist for killing Cory.

If you look at the side of that document, you will find where it says Jefferson Avenue on the side. You will find a phone number, 827-7200 -- it is cut off here. That's the phone number to Langley Federal Credit Union. And 11742 Jefferson Avenue? That's the address to Langley Federal Credit Union. And these items are found in David Runyon's home.

Agents then travel to Herman Drive, and what do they find there? David Runyon had lived there for a short period of time. You heard from Ms. Chipps -- now it is Mrs. Guyton -- and Mr. Guyton. They tell you that he had lived there for a short period of time before he went on a drug study in the late fall of 2007.

And what is found there? Well, if you go down and you look at their basement, you see a picture of their basement, and these were David Runyon's items, and that trash can specifically. What is in that trash can? A bunch of ammunition, specifically, ladies and gentlemen, as you can see from the ammunition here. But most specifically, ladies and

gentlemen, what do you see here? Five bullets missing, for that five-shot revolver, for the five bullets in Cory Voss's body.

The grand jury investigation begins about this time, too, and what do we see that is going on here? Michael Draven is panicked because the police are getting closer. They have gone now to West Virginia, and they have made the connection. Although they are calling them stupid over and over and over again, Michael Draven knows, and so does David Runyon.

Michael Draven is panicked. David Runyon is asked a series of questions when he is taken into custody that day, December 11. And he is asked about the map, the photo, and what does he say? Ladies and gentlemen, he admits the map is his. And the handwriting? Well, he supposes that's his, too.

Back in Virginia, Michael Draven panicked, Cat Voss panicked. As you can see and you heard the flavor of the wiretap, ladies and gentlemen, Cat Voss at this point is on the edge. She's taking all kinds of pills. Perhaps she can't cope with the guilt. They are panicked about the grand jury investigation. You know from the stipulation Cat Voss has the nerve to call the United States attorney's office and ask if there is a federal grand jury on her.

Michael Draven realizes that on a Friday night his friends get served with grand jury subpoenas. And what does he immediately do? He tells them to come over the next day --

GLORIA S. SMITH, OFFICIAL REPORTER

**789**

this is before grand jury -- they got served on a weekend -- to come over the next day, and let's talk about this. And what do they all sit there and talk about? Let's get the story straight, now: He and Cat are just friends. How many times have we heard that? So those young men, Kush -- I think their nicknames were Kush, Amer, and Amar -- they were prepared to come into grand jury and lie. But when they got there, they didn't.

You see, Michael Draven and Cat Voss knew that once we figured out their relationship, we would figure out the rest. During this time period as the investigation, the grand jury, investigation, the wiretaps, the search warrants -- as this all is going forward, these three people start to worry, and you can hear from the wiretaps about what they are talking about, and they are discussing the investigation. And at one point Michael Draven and David Runyon are talking, and they said something to the effect of, oh, good, bro, I'm glad we talked today. We are on the same sheet of music.

The evidence, ladies and gentlemen, that you have also heard during this trial has been from a number of people who have told you that the defendants have admitted to other people they have committed this crime. You have heard from Jamal Knowles and Theodore Schlossman that David Runyon admitted to them that he killed a Navy sailor in Virginia. He traveled from West Virginia and killed the Navy sailor.

You heard from Sarah Baker, his girlfriend, another reluctant witness who, as she told you, still has feelings for David Runyon. But she told you that he did, in fact, admit to her that he had killed a Navy sailor in Virginia.

Now, ladies and gentlemen, the defendants have been charged with conspiracy to commit murder for hire, conspiracy to commit robbery, and murder with a firearm during a crime of violence. You will be instructed soon by Judge Smith on the law, what the law is. I'd like to briefly go over with you what the United States must prove. And we do have the burden, ladies and gentlemen, and we believe wholeheartedly we have proved this case to you.

Count 1 is the conspiracy to commit murder for hire. The defendants, Catherina Voss, Michael Draven, and Eric Draven (sic), conspired to travel in or cause another to travel in interstate commerce. We know that, ladies and gentlemen. In the conspiracy to murder Cory Voss, David Runyon had to travel in interstate commerce from West Virginia to Virginia to commit this crime. Two, such travel was with the intent to murder Cory Allen Voss, in violation of the laws of the United States or the Commonwealth of Virginia. We know he did that. Three, such travel was in consideration of and a promise and an agreement to pay something of pecuniary value. David Runyon didn't get quite paid the $20,000, but he got paid $275, and we know that's the promise that was made,

because David Runyon was a hired killer. Four, the conspiracy resulted in the death of Cory Voss. We know Cory is dead.

Count 2 was carjacking. The government must prove that the defendants, Catherina Voss, Michael Draven, and David Runyon, took and attempted to take and aided and abetted each other in the taking and attempting to take a motor vehicle from the presence of Cory Voss. Two, while attempting to take, aiding and abetting, and assisting each other to take that motor vehicle, the defendants intended to cause death or serious bodily harm to Cory Allen Voss. Three, the motor vehicle was transported, shipped, and received in interstate commerce. There was a stipulation on that about the Ford Ranger truck made in New Jersey. And, four, the defendants took and attempted to take and aided and abetted and assisted each other in attempting to take the motor vehicle by the use of force, intimidation, and violence. And, five, the death of Cory Allen Voss resulted.

We know this, ladies and gentlemen from the ATM. Those photos are very important. You are going to see where Cory Voss drives up. He's there for a while fumbling. We know he makes some phone calls. You can see that all from the tape, and we know from the phone analysis he is talking back to Cat Voss. He is fumbling, and then at the crucial moment, David Runyon enters that vehicle, and he forces Cory Voss to drive away the first time.

So he takes possession and control of that vehicle, and Cory Voss drives away for approximately two minutes. Cory Voss then comes back, and here is where the conspiracy with the robbery of Cory Voss comes in, because Cory Voss is made to withdraw or attempt to withdraw money from that ATM. That's where that takes place.

We know then, after he gets no money out, Cory Voss has to drive away from that ATM, and we know, from the map that came in very early in this trial, Cory Voss's body is found a small distance away from that bank, and there he is dead.

Count 4 charges the conspiracy to commit robbery of Cory Voss. The defendants, Catherina Voss, Michael Draven, and David Runyon, knowingly and willfully conspired to obtain personal property from the person in the presence of another. Two, the defendants conspired to do so by means of actual and threatened force, violence, and fear of injury, immediate and future, to his person. And, three, interstate commerce was delayed or obstructed.

Ladies and gentlemen, when Cory Voss went to that bank to get that money from the ATM, we know that David Runyon had a gun on him. If you look very closely in those still images, you can see -- when the car light comes on, you can see a shiny object over near the glove compartment of that vehicle. And we know ultimately Cory Voss was shot five

GLORIA S. SMITH, OFFICIAL REPORTER

**793**

times.

Count 5 is murder with a firearm in relation to a crime of violence. The United States must prove the defendants knowingly used or carried or aided and abetted and assisted each other in carrying a firearm. Two, the use or carrying of the firearm occurred during and in relation to a crime of violence prosecutable in a court of the United States, specifically the counts that you have already heard. Three, the use or carrying of the firearm caused the death of Cory Allen Voss. And, four, the killing of Cory Allen Voss was with malice aforethought.

Now, ladies and gentlemen, you may be saying to yourself at this time, okay, well, that's David Runyon. We get that, because he actually conspired, with the conspiracy, with the others, to travel from West Virginia to Virginia to kill Cory Voss to get this money.

But you are probably wondering about, well, what about Michael Draven? Ladies and gentlemen, under the law of aiding and abetting, Michael Draven is just as responsible as David Runyon, and so is Cat Voss. Everything -- once they start this conspiracy, and under aiding and abetting law, once they all make this agreement, that one actor can follow through this agreement and commit the crimes for them, and they are all liable for it. It is just that simple. It's not complicated.

Ladies and gentlemen, the defendants before you, Michael Draven and David Runyon, conspired with each other and Cat Voss to kill Cory Voss for life insurance money. They conspired to make it look like some random act of violence, robbery, carjacking, so you would be thrown off. And they almost got away with it. This investigation was a slow and methodical one. But for the fine work of dedicated law enforcement professionals, they might have. But don't let them.

Ladies and gentlemen, we all have jobs in this courtroom, and your job is to seek justice. And justice, ladies and gentlemen, is finding these two defendants guilty of the crimes for which they are charged.

On behalf of the United States, Brian Samuels and myself and a whole team of people, we thank you so much for your time and your patience, because, no doubt, this was difficult in your life. It's an important case, and we are grateful for your time and your effort.

Thank you.

MR. CLANCY: Good afternoon.

Years ago, a very popular toy that myself and a lot of neighborhood children got from the toy store were a special set of glasses, and these glasses we would put on, and the glasses would take out different colors of the rainbow. In other words, you put on a pair of glasses, and you would look

AFTERNOON SESSION

(The jury returned to the courtroom.)

THE COURT: All the jurors are back from lunch.

Mr. Woodward?

MR. WOODWARD: Thank you, Your Honor.

Good afternoon, ladies and gentlemen. This is my one and only chance to address you, and as you may be aware, when I finish, Ms. McKeel or Mr. Samuels gets a chance to talk again, and then you guys get the case.

When I spoke to you a few days go, I told you that the evidence in this case was going to create as many questions as it answered, and that all I asked of you on behalf of Mr. Runyon was to take each piece of evidence and each witness and ask yourself the question, what does it tell you, and what does it not tell you? I'm going to go through that in a minute, and then the judge, when we finish, will instruct you, and those instructions will be about the burden of proof and the beyond-a-reasonable-doubt standard. And I would say to you, as I was preparing this, it struck me that this is the kind of case that makes those terms and those concepts so important, for this reason.

As Mr. Clancy told you, there is no DNA, there are no fingerprints, there is no physical evidence to either incriminate Mr. Runyon, but, more importantly, to clear Mr. Runyon. There is nothing in this case that you can go to and

say somebody else did it, either today or any day before this or after this. So that's why it is so very important that you think about what this evidence is and what it is not.

I first want to start with the ATM photos. Could you pull up 28CC?

Now, 28CC, if you will notice the time, is 23:36:01, and I asked -- I forget the gentleman who testified, but that's the last picture of the first time Mr. Voss's truck was at the ATM. That is the taillight of the truck pulling away, and there was testimony that it was motion-activated, and prior to this there was a picture of someone opening the door and getting in the truck. Okay?

Could you now pull up 28EE?

This is now 23:41, which is just about five minutes later. And as I was preparing my argument, I toyed with the idea of standing here and looking at my watch and counting off five minutes, but then I figured that wouldn't be a good thing to do. But that is five minutes that that truck has been gone. And you look at that picture, and then you look at 28FF.

Is somebody still in the truck with him? Now, the government wants you to say whoever got in the truck some ten or 15 minutes later is still in there, holding a gun on him, telling him to come back up there, and asking him -- somebody that is going to rob him -- to take out $20, $40, $60? I

would submit to you, you ought to think about that.

Who might know that there is only a small amount of money potentially in that account? What kind of person who, as they say, would drive down from West Virginia and jump somebody at an ATM for a murder for hire is going to say, okay, before I kill you, let's go back to the ATM and get 20 bucks? Can you answer that question from this evidence? Can you even say from this evidence that there is anybody still in that truck? I don't think you can. You look at the pictures.

And obviously, as the judge will tell you repeatedly in the instructions, my comments and Ms. McKeel's and Mr. Clancy's memory of the evidence is not what controls. It is your memory of the evidence which controls. But you don't need a memory to read a clock. Somebody got in the car, the car is gone for five minutes, and then the car comes back up. And, look, admittedly that's the camera angle, but is there somebody still in the car? Notice how long he sits there.

You will have these pictures. But just do the time line. He comes back, he is there two or three minutes, the car drives off, and seven hours later, give or take a few minutes, eight hours later, the body is found in that area down the road.

So when you examine -- and I started with that, because that's a very good example between what is proof and what is inference. Proof is the time that that car was at

that ATM. No reasonable person could stand before you and say, well, you know, these photos are doctored, or that is not really the time they are there. That's proof.

Are they asking you to guess that somebody is still in the car? Inference? Are they asking you to speculate? And that's why the standard is so important, because as we examine a few pieces of this case, you have got to distinguish between what's evidence and what they have proved and what they are asking you to infer from the evidence. So again I just point that out, because their whole case is based on the -- their case is that that's David Runyon that got in the car.

Now, what we also know is, per Mr. Swartz, he went through all kinds of phone records, and they are in a big notebook over there, and we will talk about them more in a minute. You will have them all. But they are Exhibits 104 through 110. And I will tell you there's thousands of calls in there, and I'm going to talk to you. But he told you under oath there is not one shred of evidence in this case that any cell phone associated with Mr. Runyon was ever in Tidewater. Ever. They looked.

Now, whose phones we know were in Tidewater? We know Mr. Draven's phone; we know Mr. David Hill, Wookie; we know Randall Fitchett was here. But what is your evidence that David Runyon was here on April 29? They make a big deal

when he made his statement up there in West Virginia, where they said, where were you on April 29, and he goes, I don't really know, let me check and find out.

Is that what somebody who has cooked up a story and a false alibi is going to say? Or is that what somebody is going to say who is up in a drug study, the police have been looking for him, calling their friends, jiggling the wire, tickling the wire, whatever they do. They agree to talk to the police. They agree to give them a DNA sample. They voluntarily talk to them. And he says, I don't know where I was. I'll be glad to look at my records and find out. I do a lot of drug studies. I travel.

Is that something that somebody that has gotten together and committed a murder for hire cooks up? And what else did he say? He says, I remember meeting Michael Draven, I think twice in Tidewater. I don't know when it was. One time was sometime in the summer of '06, and sometime in the spring of '07. Why would he give them a DNA sample? Why would he even talk to them at all?

We have been regaled with all this evidence about him being an ex-police officer and ex-military and all of that. You know, he doesn't have to talk to them. He voluntarily talked to them, and he told them -- you heard Detective Rilee. He didn't have some glib, you know, here is exactly where I am, here is the five people that can tell you

where I am. That wasn't what it was like. They went up there, they said, we want to talk about Michael Draven, and then somewhere along in the interview, they go, well, where were you that night? Did you do it?

Obviously that's a big shift in a conversation, and he -- that was on December 3, and that will become important again in a minute, but I want you just to focus on that when you think about what the government's evidence is. And I ask you -- I guess I challenge you, if that's the right -- go back and ask yourself, what evidence places David Runyon here on April 29? What witness, what document, what cell phone record, what anything? Look for it. I don't believe it's there, but the 12 of you who end up sitting on this jury are collectively probably far more observant and will have a far better look at it than I do. But I would tell you it is not there.

Let me tell you what is there.

Can you pull up 108, Page 43?

Now, the very first call on there -- these records admittedly are small, and you have got every one of them. The very first call on there is Call No. 130 at the very top of this particular page, and that is Mr. Runyon's 2230 phone for 4-29-07.

And again, it is his phone. Doesn't mean that he has it, doesn't mean he doesn't. But that phone at 4:30

receives a call -- or 4:38, I believe that is, and then if you look at pages -- and I asked Mr. Swartz about this -- 108-50 and 108-51, and you will see them collectively, but what those are, those are the roaming charges for Mr. Runyon's cell phone on that particular date and time on this phone.

And what those charges show is that on that date that phone was never out of Morgantown, West Virginia, because you will look at those, and they show if you get an incoming call and you are roaming, it shows up, or if you make a call and you are roaming, it shows up. And you will look through those records, and there is a number of calls that he gets when he is traveling -- some of them are in Kentucky, some of them are in Baltimore -- not on April 29.

Now if you could go to Exhibit 109, Page 14.

Again what this is, is this is the phone record for Mr. Runyon's other cell phone, the one that ends in the number 6845. That is in evidence as Exhibit 109. And that is -- if you look there on 4-29, it is Call No. 40. It is a little over halfway down the page. At 8:37 p.m. that phone -- there is a call made to that phone -- on that phone on April 29, and if you go then to Page 17 of 109, that's the roaming detail for that phone. That phone never left Morgantown, West Virginia.

And I'm emphasizing that. Mr. Swartz is a good investigator and an honest guy. He conceded that. Trust me,

they looked at all this as closely as I did.

Let's now talk about the call that was placed to Cat Voss while Michael Draven was in jail.

Could you pull up Exhibit 108, Page 33?

On this record, this is the 2230 number for March 24, and you will see Call No. 110. There is an 88-minute call on a phone from Peninsula, Virginia, which is the call that they have talked about that Mr. Runyon made to Ms. Voss's phone.

But I also ask you, what wasn't brought up in the government's case, if you would look at pages 108-38 and 108-39, those are the roaming detail for that phone on that date. That phone never left West Virginia. That call was placed while Mr. Runyon was in West Virginia.

So when you listen to that jail call about Dave or David or whoever, when Ms. Voss -- and they played it, so I don't have to -- Ms. McKeel played it in her closing statement a couple of hours ago. Says he slept in his car. He was coming down here to have dinner, was supposed to meet, and he slept in his car.

Mr. Runyon didn't come down here and sleep in his car. 7:12 that morning, Mr. Runyon is somewhere in Morgantown, West Virginia, talking to Ms. Voss. That's not Mr. Runyon sleeping in his car in Virginia. Just didn't happen.

Now, what do you know about what was said on that call? There has been evidence that they talked about a drug study. That evidence comes in later in the wiretaps. But the only evidence in this case that you have about what was talked about on that call is some comments that Catherina Voss and Michael Draven made.

So when you sit there, and Ms. McKeel stands back up, and as throughout this case, she says, well, that was the call where they planned the murder, that David is the David -- I think she called him "the answer" -- whose word do you rely on? What evidence do you rely on to say that that's what happened on that phone call? Catherina Voss didn't come in here and testify. That call is not recorded.

Their theory is that Mr. Draven and Mr. Runyon met in the middle of February, and by March, you know, Mr. Runyon has decided to come down here and do a murder for hire, basically, I guess, on a contingency. You know, he is not going to get paid anything. He has never met Ms. Voss, has known Mr. Draven on a drug study. They have talked back and forth, and all of a sudden he has decided, you know, I'll come on down and kill this guy, no big deal. That's what they are asking you to believe.

Is that possible? Well, anything's possible. Does it make sense? That's a question that you folks will have to answer for yourself. But don't lose sight of the fact that

that's what their theory is.

I ask you on the jail calls -- I'm not going to play them -- but I ask you to please play -- and you will have the ability to do very short portions -- Exhibit 163A, Page 02; Exhibit 166A, Page 01; and Exhibit 168A; and listen to what they are talking about trusting David. Who is talking about that? Is it Cat Voss talking about trusting David, while Mr. Draven is in jail? Because remember, Mr. Runyon is not on any of these calls. Michael Draven never called David Runyon from jail.

I asked Mr. Swartz, to be fair, did he have the ability in the jail to make long distance calls if he wanted to, and Mr. Swartz said he wasn't sure. But we know it didn't happen. We know that all those calls were between Cat Voss and Michael Draven.

So before I move on to my next area, you really need to ask yourself, what proof do you have that would indicate Mr. Runyon was here on April 29, ten o'clock -- their theory is this call from this pay phone at 10:12, is when the call comes in, is Mr. Runyon calling Mr. Draven. His telephones were in West Virginia.

Now, that doesn't mean -- there has been a lot of, you know, the account of this, this person, or this, and it seems to me -- again this would be you-all's decision -- that the government wants the phones to be with the people and

carried -- you know, when it is beneficial to their theory of the case, it is, well, Michael Draven or Cat Voss or David Runyon has this cell phone every second of every day and it never leaves their side, when it's not -- it's, well, you can't really say anything, it's just the phone. You don't know who has got the phone. You don't know whether the person is with the phone or who is carrying it.

But I would submit to you that, again, just like with the pictures, this is proof. Nobody has come in here and said that these phone records have been doctored or that nTelos or Sprint doesn't know how to keep records or how to take care of their records. So that's not an argument I'm making. That is not asking you to believe a witness. That's proof where the phones were; that's proof in those pictures.

The next thing I would like to talk just a little bit about is guns. There has been a big deal made about this gun that Mr. Runyon bought on April 29. He certainly bought the gun. Mr. Koski was probably one of the nicest people that -- you know, I have been in a lot of courts a long time -- one of the nicest, trying to be most honest people that I have ever seen on a witness stand. Met Mr. Runyon, Mr. Runyon gave him his real name, his real address, his real phone number, his real everything, talked about going fishing with his son, talked about a very -- sounded like a cordial conversation, and he sold him that gun.

Did Cat Voss -- were there any guns in the Voss house? Let me tell you about that. Detective Williams -- what Mr. Ellenson played yesterday -- asked Cat Voss, Detective Williams and Detective Rilee: Did Cory own any guns? Did you own any guns, were there any guns in the house? No, sir, nothing.

Tell you what you do. When you get back in the jury room, you get Exhibit 10, which is Cory Voss's wallet, and you look in Cory Voss's wallet, and you see if there is not a license to carry a concealed weapon in there. You check me on it.

Does that mean that there was a gun that Cat Voss had access to? Would Cat Voss lie about that? You look. You look in that wallet. If it is not in there, I'm sure you all will say -- go back there and say, well, he was wrong about that.

Did they run any records in this investigation? Have you heard any evidence, well, we ran through to see if there were any records of a purchase, using that piece of evidence which they have had since the day they found the body, if Mr. Voss ever purchased any weapons, if there was a weapon in the house that Ms. Voss had access to? If they did, they didn't put it on. So again I would suggest that you look at that.

Can we pull up Exhibit 44, Page 50 to 51?

Now, that's Mr. Draven with a gun. I don't know where he got that gun. I don't know where that gun is now. I don't know whose gun it was. I know he had it before this murder, though, because Ms. Voss -- that picture was posted, and Ms. Voss commented on it on April 3.

Can you go to the next page of that, 51?

Would it be a good thing to know, if Mr. Draven had access to a gun, whose guns those were? I don't know. Has anybody run Mr. Draven to see if he had ever purchased a weapon? Again, if they did, they haven't brought you in here and said, look, we know Michael Draven never had a gun, because we checked. You don't have any of that.

Did Michael Draven have a motive? Surely he did, if you believe the government's evidence. Was Michael Draven in the area where this occurred, at or near the time somebody jumped in the car? Sure, he was. And I don't say that because I think that that proves Mr. Draven was the person that jumped in the car. I say that because it surely should create some doubt about whether that was Mr. Runyon.

They've got a picture of Mr. Draven with a firearm. They have got evidence that they presented to you. They put the wallet in. You know, now, maybe Mr. Voss just got that license, and there was no gun in the Voss household. That would have probably been easy enough to find out, but there is no evidence before you of any of that.

GLORIA S. SMITH, OFFICIAL REPORTER

So again that's -- you know, that picture is evidence, that when you looked inside of the wallet and see that concealed weapon, you know, concealed carry permit that Cory Voss had, that's evidence. That is not an inference. That is not asking you to presume this or presume that. That's evidence.

The next thing that I would like to talk a little bit about is this string of e-mails that started in late November, when they started tickling the wire. And I'm not going to play them all again. Mr. Swartz read them all to you. I'm sure you all will have them and look at them and read them. But remember this when you read those e-mails. At the top of every one of them is, fix my page, will you?

And I asked Mr. Swartz when he was on the stand, what does that mean? And he said, you know, that, well, there were some e-mails before this between Draven and Runyon about their MySpace page. And then on, I think it is November 24, I believe that's the right date, Draven sends some e-mail saying, there is some weird stuff going on, I'll get to your page later. And, you know, we have been all through they interview this person, and they interview that person, and they are up in West Virginia talking to Mr. Runyon's friends and family.

But I would ask you to take those e-mails and look at them. If somebody who is trying to cover something up

or hide something -- Mr. Runyon wrote Mr. Draven an e-mail telling him exactly what he told the police. He talked on his own phone. The only person in this case that has never said, let's talk on a different phone, is David Runyon. Draven called Runyon and said, if somebody calls you on another number, pick it up. Excuse me -- e-mailed him. He said, okay, for how long? That wasn't Mr. Runyon's idea.

David Hill, Wookie, Andy -- we don't know anything about his whereabouts on April 29. Have no idea where he was. We know he was one of Cat Voss's lovers who lived on the Langley base for a while, and then moved to Gloucester with his parents. He says, meet me. He sends e-mails -- or not e-mails, but text messages, and says, you know, let's talk on a different phone.

So again I don't know where Mr. Hill was. His name is David. Go back there and do me a favor. Exhibit 301 is a notebook that was seized out of Mr. Draven's house. You can check me on this, but by my count, if you look at -- let me get to the right pages here -- if you look at pages 5 through 13, there is at least four people in there whose names are David, Dave, David.

They also played you a wiretap, one of the early wiretaps, where they are on there, and they go, dog, they go, huh, dog, and then they cut off, like that is supposed to be something secret. Look in that book. There is some guy in

there named Dog from Toano, right in Mr. Draven's book. I don't know who that is. And more importantly, you don't know who that is. You don't know who any of these other Davids are. We do know this, though. David Hill, a/k/a Wookie, made a phone call to Ms. Voss the day before the murder, on the 28th. And when Ashley Holland went in wearing the wire and doing her assistance with the investigation, who was at the house? It wasn't Michael Draven. It wasn't David Runyon. It was David Hill.

Again, I don't think that proves that Mr. Hill committed a murder. I don't know if Mr. Hill possessed firearms. I don't think that proves anything. But what it does prove is how easy -- why our rules are that you don't convict somebody on suspicion, because, look, any reasonable person who has been in this courtroom the last few days would have to conclude that they have cast suspicion on Mr. Runyon. Regardless of what any of you all think of our presentation to this point, if I were to stand up here before you and say they haven't created suspicion about Mr. Runyon, you would think, well, that guy is nuts.

So clearly, but that's not the issue. That's why these rules and these laws and the stuff that the court is going to read to you about beyond a reasonable doubt and forcing the government to a high standard -- that's why you don't convict people on suspicion.

How much suspicion is created with Mr. Draven driving up and down the road, knowing that prior to that he has got guns, playing with them, pointing them at somebody, pointing them at a camera, and he is having sex with the defendant's wife, and he hates the guy, per him -- I don't know. That's what he said. That's not me saying it. Does that create suspicion? Probably does. Does it mean he murdered anybody? Probably doesn't.

So again I think what I would ask you to get back to, is just when you sit down and you think about the evidence in this case, what have they really proven beyond a reasonable doubt? They have proven the money. They spent all that time about Ms. Voss got that $100,000, and she went through it like you-know-what. No question about it. They got receipts, they got bank records, they got ATM records, they got credit card records. Clearly they have proved that Ms. Voss spent that money. Anybody that would stand before you and say they hadn't, in terms of the type of evidence they have presented, would not have any credibility, I wouldn't think.

Randall Fitchett -- Randall Fitchett profited by this. Mr. Draven is talking on the phone with Randall Fitchett three or four hours before the murder, and talks to him all day long. I don't know where Randall Fitchett was on April 29. He says he was at home. But another thing he says, when you look at Mr. Draven's phone records, which are in, Mr.

Fitchett -- this was interesting to me -- said the night of the murder Michael called me at home and told me Cory was dead. Find that phone call. It's not there.

Now, does that mean Mr. Fitchett is a murderer? Does that mean he has a bad memory? Does that mean he doesn't like his brother and is trying to make him look bad because of some kind of history they had as kids? I don't know. But there is nobody to say where Mr. Fitchett is except Mr. Fitchett. And to be fair, perhaps his girlfriend. I don't know.

But they certainly profited by this money. They are getting jewelry, they are getting the trips, and the government's theory is on June 1 my client gets a wire of $275 from Mr. Fitchett or Mr. Draven. You have got the ATM records. You have got that. You will see all that. And they made a big deal that there were 17 phone calls, some connected and some not, that day between Mr. Runyon and Mr. Draven.

When you look at those records, and you look on that day, Mr. Draven called someone at a 318 area code 25 times that day, June 1. If you look at that day, called somebody 25 times on a 318 phone number, and you can add up the seconds. And my addition was he talked to that person for somewhere between three and four hours over the course of that day.

Now, I don't know who that was, and you don't know who that was, and they have presented no evidence about who

that was. But the point is, does that mean that that's evidence that that person is engaged in some kind of criminal activity with Mr. Draven? Absolutely not.

I looked at the records for just one month, and you all will have them all. Mr. Draven made 1910 calls, made and received 1910 phone calls on that 7570 number in the month of June. Again, by my calculation, called over a hundred different numbers or received phone calls from a hundred different numbers.

So when Mr. Clancy was up here talking about to you what glasses you wear or what perspective you have when you look at evidence, I don't know -- who were all those people that he was calling? How many people did he e-mail? They put on a few e-mails. Mr. Swartz conceded that, you know, they picked and played those e-mails, that there were hundreds, if not thousands, of other e-mails to other people. He had 1900 or 1600 friends on his MySpace account.

So again the point becomes, the case cannot be decided because there is no physical evidence. There is no way to come back later and clear anybody with DNA or, you know, there is nothing -- what you have got is what you have got.

And you have got to remember your job is not to bail out the government or to help the government. It is to judge the evidence critically under our law. Nobody would look at

this crime and what happened to Mr. Voss and not want someone to be caught and punished for it.

But you have got to remember, your job is not as an investigator, your job is to decide if the facts that the government presented prove beyond a reasonable doubt that Mr. Runyon got in his car and drove down here and shot that man. That's what they are asking you to say.

Look at the phone records. Look at the e-mails. Look at the jail calls. Look at all the people that are around this case and around Cat Voss that are having -- I mean, look, Ms. Voss's life was Ms. Voss's life. She was out in the street, she's buying cocaine, she's partying. I don't think that that means that all of those people, you know, are murderers.

But anybody that is having sex with her that thinks it's enjoyable would, in the broadest sense of the term, have a motive to get rid of her husband. Anybody that likes money would have a motive to get rid of her husband, if they thought they were going to profit from the money, like Mr. Fitchett or Ms. King.

Or there was evidence put on Mr. Larson -- I think his name is Christopher Larson -- he had a relationship with Ms. Voss, and he got a few plane tickets out of the money. Do I think that proves that he killed anybody? No, but I also think it doesn't tell you where he was or what he was doing or

who he talked to on the telephone or who he was with or anything like that on April 29.

So in closing, there are a couple of other things I want to talk about. They called some jailhouse snitches who were here, convicted felons, trying to say that Mr. Runyon told them this or that in the jail. Is that proof beyond a reasonable doubt? They said his paper work was there, the cells were open, they are in and out. He even said when his lawyer came back, he gave him the motion of discovery. That is something, with all the questions in this case, will you go back and say, well, Jamal Knowles and Peter Schlossman or Ted Schlossman, our whatever his name is -- that is proof beyond a reasonable doubt?

Sarah Baker -- I asked her, I said, Ms. Baker, did you get told if you didn't testify against Mr. Runyon, they were going to take your child? Yes, sir, I absolutely did. Did they call any of the detectives that were there to say that wasn't true? They called them all, but they didn't ask them. If that didn't happen, why didn't they say that? Does that color what she is going to say? She admitted, and they concede, that most all of the details -- they went up looking for her and told her they wanted to question David Runyon about a murder that happened in Virginia of a Navy guy, and they were talking to her about it before they ever talked to Mr. Runyon.

My final point. The stuff that was found in the search in West Virginia, the papers, the map, all of that stuff -- please remember this. On December 3 Mr. Runyon was questioned by the police, was asked if he killed this man, was asked where he was the night of the murder, all of that. Eleven days later, eleven days later, he is driving around in his truck, and all this stuff is there. He told the police that he got the picture from Michael Draven at a study. I don't know if that's what happened or not. That's what he said. But you would have to ask yourself, if he were this person who could plan and is coldly calculating and fixing up an alibi and doing all of that, that he would keep that stuff, if he committed the murder?

I admit that's a hard thing to explain, having that map. That's suspicious. How he got those names -- it is seven and a half months after the murder. Nobody -- you know, they asked him if it was his writing. He said, yeah, I guess. They didn't ask him when he wrote it there. They didn't ask him who gave him the information.

But you would have to ask yourself, if he was somebody that was going to destroy evidence or was going to cover this up, that he would keep that? They put in a transcript about his -- the government put it in, about some course he took, police course or covert police operations or things like that. Does that make any sense, that a guilty guy

would keep stuff that would cast suspicion on him like that?

The gun -- he involved Sarah Baker. You've got to remember they showed you only one in closing. He bought the gun. Ms. Baker came in and testified, well, he had a domestic issue, and he couldn't pawn the gun anymore. He had her pawn that gun one time before there was ever any view of anybody talking to him, any tickling the wire, anything.

And then they go over and they -- they go over to someplace that Mr. Runyon lived two or three months before the search warrant that is inhabited by Mr. Guyton, who has told you that he gets in trouble and perhaps goes to jail if he is in possession of bullets, and they find some bullets, and they say, well, oh, those are Runyon's bullets, that's his stuff. He hadn't been here for two and a half months. It's not mine. I can't have it anyway.

The expert, the guns -- I don't know what kind of gun that is that's in the picture with Mr. Draven, but I do know the gun expert that testified said that there were a number of companies, it could have been a revolver, could have been an automatic, could have been a semiautomatic. We don't know anything about the gun. They are asking you to guess. Is that one of ever how many guns there are that could have caused this death? Yeah, but it is one of thousands.

So all I ask you to do on behalf of David Runyon is simply weigh the evidence critically. Ask yourself with each

piece of evidence, not what Ms. McKeel says it proves, not what I say it doesn't prove, but you, each of you individually, in your own conscience, you look at each witness, and you look at each piece of evidence, and you listen to those tapes, and you weigh all of that, and I would submit to you that if you follow the law, the only proper verdict is to find Mr. Runyon not guilty.

Thank you.

THE COURT: Ms. McKeel?

MS. MCKEEL: Ladies and gentlemen, the most valuable tool, besides the law, that you will take back into the room with you when you go back there is your common sense.

The evidence -- let's talk about what the defense has told you with the evidence. Let's go to the time of death, and where was Cory? Well, ladies and gentlemen, we know that Cory is at the ATM at 11:30, that time area. And we know that if you look at this exhibit and see the time stamp at 23:31, 11:31, Cory is there. Well, his phone -- he is talking on the phone, and we know that, given the phone records that you have heard, he is on the phone and he is at cell tower -- I believe it is 46.

What else do we know about this? We know, and you will see from these exhibits, a number of exhibits, Cory's cell phone never moves. In fact, Cat Voss calls him repeatedly up until after 6 a.m. the next morning, and his

cell phone is still there.

Now, the defense would like you to have some sort of doubt that after Cory went to the bank -- from those pictures you can see him -- that somehow something else just happened to him, and he just wound up dead, and we don't really know what happened. Ladies and gentlemen, that defies common sense. It defies this evidence, too.

Cory Voss went to the bank, sent by Cat Voss. He went to that ATM. He is approached by David Runyon, who gets in the car, forces him to drive away, comes back minutes later, and Mr. Woodward said, what happened during that time period? What did happen? What must David Runyon have been saying to him? What must Cory Voss have been thinking was going to happen to him, when a man he has never seen comes into his vehicle with a gun?

What happens after that, ladies and gentlemen? Cory Voss is forced to drive back in his vehicle, back to that location, and he is forced to withdraw money.

Now, Mr. Woodward asked you to look at 28FF. Could we look at that, please?

Now, we know -- and you have to look at these photos. It is not easy, but you have to look at these photos. And in these photos, you will see light coming on in the cab. You need to look at everything in this photo, the light coming on in the cab. Let's look at the top of Cory Voss's head. Do

you see that? Do you see right up above his head, there is light? Well, you see over to where his head would be if you moved over to the passenger's seat, it is dark? The person is sitting right there. That's what's blocking the light.

Cory Voss is being forced at that point to withdraw that money, but there is no money to withdraw, because that is part of the plan, to make it look like some random person. Now, some random person -- boy, you have heard about that, haven't you? I mean, the defense has told you, don't convict on suspicion. Don't do it. It looks bad for our clients, but don't do it.

Well, they have floated names in here to you of people who have are totally innocent: Wookie, David Hill -- he was a babysitter to Cat, and I don't know what else he did with her, but he was a babysitter. A number of witnesses said that. She has phone calls to him. He is not on trial here, ladies and gentlemen. Neither is Chris Larson. These defendants are on trial. This investigation was a long, methodical investigation.

Let's talk about the glasses that Mr. Clancy wants you to take off or put on -- I'm not sure what. He has attempted to paint the police department and federal agents with putting on glasses and immediately coming to the conclusion it's Michael Draven, because he's the lover. But that is not what happened. Look at the DNA report. The

defense wants you to look at it, so look at it. There is another man's name on there that was under suspicion. He's cleared.

How about -- the defense played this yesterday, that long May 3 -- we put part of it, summarized it for you in the government's case. The defense wanted to play the whole thing. What is on the whole thing? The whole thing is about other people being investigated. They tell Cat Voss some other sailor, some crime line caller, calls in anonymously and says some other sailor did it. They went and questioned him. They told Cat Voss about that. So the glasses, ladies and gentlemen -- that is just unfair.

They want you to be hazy about the facts, because who does that benefit? If you can't determine the facts with all of this evidence, who does it benefit in this courtroom? Michael Draven and David Runyon. No one else. So if you can't come to a conclusion with all this evidence, they benefit.

But who benefited from this crime? We have talked about other people. I think they have even thrown out Randy Fitchett and Nicole King got jewelry. What did they get? They got an engagement ring. Cat Voss bought Randy Fitchett an engagement ring. But, ladies and gentlemen, in that Nags Head trip, over $10,000 of jewelry was bought in those two days. And who did it benefit? Michael Draven and Cat Voss.

Who benefited from the money immediately after this murder? Michael Draven.

Now, David Runyon was supposed to be paid $20,000. He got 275, at least that we can prove. Maybe more in cash. We don't know. I'm not asking you to speculate on that. The crime has occurred. Conspiracy to commit murder for hire has occurred, because it was a promise of pecuniary gain. It was a promise of payment.

Mr. Clancy made a big to-do about the time of death. Ladies and gentlemen, you are going to need to look back at your notes. Dr. Bush cannot with any precise science tell you what time someone died. What she said was, it was an estimate, eight to ten hours at least, and when she received the body, ladies and gentlemen, Cory Voss was refrigerated.

Smoke and mirrors -- get beyond them. Go to the facts and use your common sense. Each and every one of you has it.

Cat Voss -- a lot has been made about Cat Voss. She is a bad, despicable woman, no doubt. The United States agrees. She is evil. But who is her boyfriend? Michael Draven. Who is the contract killer? David Runyon. They are just like her. But they want you -- another smoke and mirrors, ladies and gentlemen -- they want you to think about her and how bad she is, how many men she slept with, how much she drinks and drugs. That's bad. We agree. But think about

the evidence in this case.

Let's talk about David Runyon's phones, because Mr. Woodward sat and talked a while about his phones. Paula Dalton testified David Runyon had two phones, and when he went out -- because, ladies and gentlemen, he did not have a steady job. He did just as Michael Draven did. They were research buddies, and they went to different research labs. He had two phones because he had a son. Paula Dalton said she babysat for the son, and when David Runyon left, he left a phone for them. I think they lived in a trailer, and apparently they didn't have any phone service.

So David Runyon -- one phone is at home in Morgantown, West Virginia, and one phone is traveling. Go back and look at those phones. I believe at one point we have a call where the two phones are talking to each other. So how can that be? David Runyon is traveling down here, ladies and gentlemen, because he is a contract killer.

How about no evidence left at the crime scene? You have heard a lot about that, too. Ladies and gentlemen, the United States submits to you David Runyon is a contract killer. He is not going to leave anything at a crime scene so he can get caught. He is careful. He has planned it. They have planned it from at least February or March of 2007 before April 29. He has a checklist. Now, how does that get explained? How does his checklist, Government Exhibit, I

believe, 217 -- he has everything written down. He has got Langley Federal Credit Union on the paper. He has the address on the paper.

Mr. Woodward wants you to think that somehow David Runyon never would have left that in there, the map and the photo. The map is -- what can you say? The map has it all. Doesn't it just say it all? And who has got it? David Runyon's got it. Because it's in a hidden compartment, ladies and gentlemen, he simply forgot about it.

We know what he really does after he gets questioned by the police on December 3 the first time. What does he do? He gets Paula Dalton to go and get the gun, because that's, ladies and gentlemen, what he is concerned about. He is trained, he is a former military person, he is a former police officer. He has got training -- we have showed that to you -- covert law enforcement. He knows exactly what to do. Was he careless in some of those things? He was. And thank goodness, because he might have gotten away with it.

But, ladies and gentlemen, make no mistake, David Runyon knew what to do when he came down here, and he knew what the most damning piece of evidence for him would be is that gun, and so he is very concerned about that gun, and he gets rid of it. That gun that Mr. Koski testified to, the .357? John Willmer testified -- he was the forensic expert from the Virginia state lab -- he testified that a firearm of

a .357 can fire -- and so did Mr. Koski, for that matter -- both .357 shots and .38.

What does David Runyon have in his home? Both of that kind of ammunition. And what is found at one of his homes? He lives a nomadic lifestyle. His things are in different places. What is found at that home? Ammunition, with five shots missing. But he has gotten rid of that gun. It's gone.

And what does he do after the murder? George Koski -- he buys the gun April 29. What is he doing shortly thereafter? He is buying a bore brush, a stainless steel brush, and John Willmer testified that if you were to clean any gun with that brush -- he doesn't use one -- it would damage the lands and grooves. And what is the defendant? A firearms specialist. What does he know? If it can be found, that gun could ever be found, those lands and grooves could be tested, and it would trace it back to the murder weapon.

Why would you buy a .357 bore brush to clean a clean gun that you have just gotten, and why is he pawning it and then getting it out right after the police question him? Ladies and gentlemen, the evidence is there. You just need to look at it.

Let's talk about what else evidence we have. Mr. Woodward calls them jailhouse snitches. Ladies and gentlemen, anybody who ever takes that witness stand, if they lie under

oath, can be prosecuted. But those people who came before you could get more than that. They could have their plea agreements revoked, they could have another sentence on that, and they could be prosecuted on top of that. You will have to judge that.

But what did they all say, all four of them? And who are they? They are the defendants' friends. They were their buddies. And they came in and said, each and every one of them -- Jamal Knowles, Theodore Schlossman, and for David Runyon, Sarah Baker, who did not want to be here, who did not want to testify, who still has feelings for David Runyon -- and what did she have to say? The defendant admitted killing a Navy sailor in Virginia. And Ed Fodrey had talked with Michael Draven, and Michael Draven admitted it, and admitted it was $20,000 they were going to pay him to murder Cory Voss.

Ladies and gentlemen, the evidence is there. We don't ask you to convict on suspicion. The United States has the burden of proof, and we welcome that burden. Our system of justice requires it. The defendants are on trial -- not Wookie, who has no evidence, not Chris Larson, with no evidence, or the two other people that were investigated prior to this. And no one jumped on a bandwagon and said just because you have an affair makes you a killer. It doesn't. It's everything else.

We welcome the burden of proof, and ladies and

gentlemen, we have given it to you. It's a lot. It is kind of like a rope. These are strings of evidence that, when you tie them all together, make a very strong rope. Ladies and gentlemen, Michael Draven and David Runyon are killers. That's what they are. They have killed Cory Voss.

And Michael Draven is just as liable as if he pulled the trigger. But Michael Draven, not Cat Voss, is the one who asked Lawrence Ford, have you done a swipe or a hit, who called his buddy Charles Smith and asked about taking care of a situation, who talked to Randy Fitchett and Nicole King about hating Cory, killing Cory and poison rings, and you saw the poison ring. But they finally found the answer: David Runyon.

Ladies and gentlemen, on behalf of the United States again, I thank you, we thank you. We ask that you seek justice always, and justice in this case is convicting Michael Draven and David Runyon of the crimes for which they have been charged.

Thank you.

THE COURT: Ladies and gentlemen, we will take a ten-minute recess, and then the court will instruct you. It will take about an hour for the court to instruct you, so you need a recess before we do that.

The court stands in recess.

(Recess)

(The jury returned to the courtroom.)

THE COURT: If anyone has a need to come or go from the courtroom in the next hour, you should do so now, because no one will be able to enter the courtroom or leave the courtroom until the jury instructions are completed.

Members of the jury, now that you have heard all of the evidence to be received in this trial and each of the arguments of counsel, it becomes my duty to give you the final instructions of the court as to the law that is applicable to this case and which will guide you in your deliberations.

All of the instructions of law given to you by the court, those given to you at the beginning of trial, those given to you during the trial, and these final instructions, must guide and govern your deliberations. It is your duty as jurors to follow the law as stated in all of the instructions of the court and to apply these rules of law to the facts as you find them from the evidence received during the trial.

Counsel have quite properly referred to some of the applicable rules of law in their closing arguments to you. If, however, any difference appears to you between the law as stated by counsel and that as stated by the court in these instructions, you are, of course, to be governed by the instructions given to you by the court.

You are not to single out any one instruction alone as stating the law, but you must consider the instructions as

a whole in reaching your decision. Neither are you to be concerned with the wisdom of any rule of law stated by the court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base any part of your verdict upon any other view or opinion of the law than that given in these instructions of the court, just as it would be a violation of your sworn duty as judges of the facts to base your verdict upon anything but the evidence in this case.

You were chosen as jurors for this trial in order to evaluate all of the evidence received and decide each of the factual questions presented by the allegations brought by the government in the indictment and the pleas of not guilty by the defendants. In deciding issues presented to you for decision in this trial, you must not be persuaded by bias, prejudice, or sympathy for or against any of the parties to this case, or by any public opinion.

Justice through trial by jury depends upon the willingness of each individual juror to seek the truth from the same evidence presented to all the jurors here in the courtroom, and to arrive at a verdict by applying the same rules of law as now being given to each of you in these instructions of the court.

You as jurors are the judges of the facts. But in determining what actually happened -- that is, in reaching

your decision as to the facts -- it is your sworn duty to follow all of the rules of law as I explain them to you. You have no right to disregard or give special attention to any one instruction or to question the wisdom or correctness of any rule that I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy. That was the promise you made and the oath you took before being accepted by the parties as jurors, and they have the right to expect nothing less.

The indictment, or formal charge, against each defendant is not evidence of guilt. Indeed, each defendant is presumed by the law to be innocent. The law does not require that either defendant prove his innocence or produce any evidence at all, and no inference whatever may be drawn from the election of a defendant not to testify. The United States has the burden of proving each defendant guilty beyond a reasonable doubt, and if it fails to do so, you must acquit the appropriate defendant.

Thus, while the burden of proof is strict or a heavy burden, it is not necessary that each defendant's guilt be proven beyond all possible doubt. It is only required that

the proof by the United States exclude any reasonable doubt concerning each defendant's guilt.

Testimony and exhibits can be admitted into evidence during a trial only if it meets certain criteria or standards. It is the sworn duty of the attorney on each side of a case to object when the other side offers testimony or an exhibit which that attorney believes is not properly admissible under the rules of law. Only by raising an objection can a lawyer request and obtain a ruling from the court on the admissibility of the evidence being offered by the other side. You should not be influenced against an attorney or his client because the attorney has made objections. Do not attempt, moreover, to interpret my rulings on objections as somehow indicating how I think you should decide this case. I'm simply making a ruling on a legal question.

During the course of a trial I may occasionally ask questions of a witness. Do not assume that I hold any opinion on the matters to which my questions may relate. The court may ask a question simply to clarify a matter, not to help one side of the case or hurt another side. Remember at all times that you as jurors are the sole judges of the facts of the case.

The evidence in this case consists of the sworn testimony of the witnesses, regardless of who may have called them, and all exhibits received into evidence, regardless of

who may have produced them, and all facts which may have been admitted or stipulated, and all facts and events which may have been judicially noticed. I don't believe there are any other than the stipulation that the events are in the Eastern District of Virginia or elsewhere.

Statements and arguments of counsel are not evidence in the case unless made as an admission or stipulation of fact. When the attorneys on both sides stipulate or agree as to the existence of a fact, however, you must, unless otherwise instructed, accept that stipulation as evidence and regard the fact as proven.

Any evidence as to which an objection was sustained by the court and any evidence ordered stricken by the court must be entirely disregarded. Anything you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. You are to consider only the evidence in the case, but in your consideration of the evidence, you are not limited to the bald statements of the witnesses. In other words, you are not limited solely to what you see and hear as the witnesses testify.

You are permitted to draw from facts which you find have been proven such reasonable inferences as you feel are justified in the light of experience. However, you are free to disregard the testimony or opinion of any witness, in whole or in part, whether expert or fact, when you consider that

testimony or opinion in light of the other evidence you heard and believed.

There is nothing particularly different in the way that a juror should consider the evidence in a trial from that in which any reasonable and careful person would deal with any very important question that must be resolved by examining facts, opinions, and evidence. You are expected to use your good sense in considering and evaluating the evidence in the case. Use the evidence only for those purposes for which it has been received, and give -- I'm sorry.

I don't know what you all are doing, but I'm so concentrated and my peripheral vision is such that the papers moving are distracting me. So whatever it is, you have got to stop.

MR. SAMUELS: Yes, ma'am.

THE COURT: Thank you. Let me start this again, please. I will start the instruction over.

There is nothing particularly different in the way that a juror should consider the evidence in a trial from that in which any reasonable and careful person would deal with any very important question that must be resolved by examining facts, opinions, and evidence. You are expected to use your good sense in considering and evaluating the evidence in the case. Use the evidence only for those purposes for which it has been received and give such evidence a reasonable and fair

construction in the light of your common knowledge of the natural tendencies and inclinations of human beings.

If a defendant be proven guilty beyond a reasonable doubt, say so. If not proven guilty beyond a reasonable doubt, say so. Keep constantly in mind that it would be a violation of your sworn duty to base a verdict upon anything other than the evidence received in the case and the instructions of the court. Remember as well that the law never imposes upon the defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence, because the burden of proving guilt beyond a reasonable doubt is always assumed by the government.

As stated earlier, it is your duty to determine the facts, and in so doing, you must consider only the evidence that I have admitted in the case. The term "evidence" includes the sworn testimony of the witnesses and the exhibits admitted in the record. Remember that any statements, objections, or arguments made by the lawyers are not evidence in the case.

The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing, to call your attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls

in the case. What the lawyers say is not binding upon you.

Also during the course of the trial I occasionally make comments to the lawyers or ask questions of a witness or admonish a witness concerning the manner in which he or she should respond to the questions of counsel. Do not assume from anything I may have said that I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

Now, while you should consider only the evidence, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the evidence. In considering the evidence, you may make deductions and reach conclusions which reason and common sense lead you to make, and you should not be concerned about whether the evidence is direct or circumstantial.

Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating that a defendant is either guilty or not guilty. The law makes no distinction between the weight

you may give to either direct or circumstantial evidence.

Statements and arguments of counsel are not evidence in the case. As I have said, when, however, the attorneys on both sides stipulate or agree as to the existence of a fact, the jury must, unless otherwise instructed, accept the stipulation and regard that fact as proven.

A separate crime is charged in each count of the indictment. Each charge and the evidence pertaining to it should be considered separately by the jury. The fact that you may find a defendant guilty or not guilty as to one of the counts should not control your verdict as to any other count.

An indictment is but a formal method used by the government to accuse the defendant of a crime. It is not evidence of any kind against the defendants. The defendants are presumed to be innocent of the crimes charged. Even though this indictment has been returned against the defendants, the defendants begin the trial with absolutely no evidence against them. The defendants have pled not guilty to the indictment, and therefore they deny that they are guilty of the charges.

During the trial you have heard the attorneys use the term "inference," and in their arguments they have asked you to infer on the basis of your reason, experience, and common sense, from one or more established facts, the existence of some other fact. An inference is not a suspicion

GLORIA S. SMITH, OFFICIAL REPORTER

**837**

or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact which you know exists.

There are times when different inferences may be drawn from facts, whether proved by direct or circumstantial evidence. The government asks you to draw one set of inferences, while the defense asks you to draw another. It is for you and you alone to decide what inferences you will draw. The process of drawing inferences from facts and evidence is not a matter of guesswork or speculation. An inference is a deduction or conclusion which you, the jury, are permitted to draw, but are not required to draw, from the facts which have been established by either direct or circumstantial evidence. In drawing inferences, you should exercise your common sense.

So while you are considering the evidence presented to you, you are permitted to draw from the facts you find have been proven such inferences as would be justified in light of your experience. Here again let me remind you that, whether based upon direct or circumstantial evidence, or upon the logical, reasonable inferences drawn from such evidence, you must be satisfied of the guilt of a defendant beyond a reasonable doubt before you may convict.

If a lawyer asks a witness a question which contains an assertion of fact, you cannot consider the assertion as evidence of that fact. The lawyers' questions and statements

are not evidence. The witnesses' answers are the evidence.

The indictment charges the offenses alleged in the indictment were committed on or about a certain date. Although it is necessary for the government to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged in the indictment, it is not necessary for the government to prove that the offense was committed precisely on the date charged.

The rules of evidence ordinarily do not permit witnesses to testify as to their opinions or their own conclusions about important questions in a trial. An exception to this rule exists as to those witnesses who are described as expert witnesses. An expert witness is someone who, by education or by experience, may have become knowledgeable in some technical, scientific, or very specialized area. If such knowledge or experience may be of assistance to you in understanding some of the evidence or in determining a fact, an expert witness in that area may state an opinion as to a matter in which he or she claims to be an expert.

You should consider each expert opinion received in evidence in this case and give it such weight as you may think it deserves. You should consider the testimony of expert witnesses just as you consider other evidence in this case. If you should decide that the opinion of an expert witness is

not based upon sufficient education or experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you should conclude that the opinion is outweighed by other evidence, including that of other expert witnesses, you may disregard the opinion in part or in its entirety. As I have told you several times, you, the jury, are the sole judges of the facts in this case.

You as jurors are the sole and exclusive judges of the credibility of each of the witnesses called to testify in this case, and only you determine the importance or the weight that their testimony deserves. After making your assessment concerning the credibility of a witness, you may decide to believe all of that witness's testimony, only part of it, or none of it. In making your assessment of that witness, you should carefully scrutinize all of the testimony given by that witness, the circumstances under which each witness has testified, and all of the other evidence which tends to show whether a witness in your opinion is worthy of belief.

Consider each witness's intelligence, motive to falsify, state of mind, and appearance and manner while on the witness stand. Consider the witness's ability to observe the matters as to which he or she has testified, and consider whether he or she impresses you as having an accurate memory or recollection of these matters. Consider also any relation a witness may bear to either side of the case, the manner in

which each witness might be affected by your verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause you to disbelieve or discredit such testimony. Two or more persons witnessing an incident or a transaction may simply see or hear it differently. Innocent misrecollection, like failure of recollection, is not an uncommon human experience. In weighing the effect of a discrepancy, however, always consider whether it pertains to a matter of importance or an insignificant detail, and consider whether the discrepancy results from an innocent error or from an intentional falsehood.

After making your own judgment or assessment of the credibility or believability of a witness, you can then attach such importance or weight to that testimony, if any, that you feel it deserves. You will then be in a position to decide whether the government has proven the charge beyond a reasonable doubt.

The testimony of a witness may be discredited, or impeached, by evidence showing that the witness has been convicted of a felony, a crime for which a person may receive a prison sentence of more than one year. Prior conviction of a crime that is a felony is one of the circumstances which you

may consider in determining the credibility of that witness. It is the sole and exclusive right of the jury to determine the weight to be given to any prior conviction as impeachment and the weight to be given to the testimony of anyone who has previously been convicted of a felony.

A defendant has the absolute right not to testify, and the jury must not draw a presumption of guilt or any inference against the defendant because he did not testify. You are not required to accept testimony, even though the testimony is uncontradicted and the witness is not impeached. You may decide because of the witness's bearing and demeanor or because of the inherent improbability of his testimony or for other reasons sufficient to you that such testimony is not worthy of belief.

On the other hand, the government is not required to prove the essential elements of the offense as defined in these instructions by any particular number of witnesses. The testimony of a single witness may be sufficient to convince you beyond a reasonable doubt of the existence of an essential element of the offense charged, if you believe that the witness has truthfully and accurately related what in fact occurred.

During the trial you have heard testimony of witnesses and argument by counsel that the government did not utilize specific investigative techniques; for example, at

GLORIA S. SMITH, OFFICIAL REPORTER

**842**

some point no fingerprints were taken, or chemical analysis may have not been done on every item seized. You may consider these facts in deciding whether the government has met its burden of proof, because, as I told you, you should look at all of the evidence or lack thereof in deciding whether a defendant is guilty.

However, you are also instructed that there is no legal requirement that the government use any of these specific investigative techniques to prove its case. For instance, there is no requirement that the government must attempt to take fingerprints or to have every item seized analyzed. Law enforcement techniques are not your concern. Your concern, as I have said, is to determine whether or not, on the evidence presented or lack of evidence, a defendant's guilt has been proven beyond a reasonable doubt.

The law does not require the prosecution to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters at issue in trial, nor does the law require the prosecution to produce as exhibits all papers and things mentioned in the evidence.

The government has offered into evidence tape recordings of conversations that it attributes to the defendants. As the party offering the evidence, the government bears the burden of proving that it is more likely

than not that the voices heard on the recordings are who they, the government, say they are. You, the jury, as the fact finders determine whether the government has met this burden and further decide the weight to be given to the evidence.

During the course of this trial you have heard recordings of conversations between the defendants and other individuals made by law enforcement agents. Also the government has introduced into evidence recordings of telephone calls made by the defendants from jail. These conversations were legally recorded by the United States. They are a proper form of evidence for this trial and may be considered by you just as any other evidence.

Tape recordings of conversations identified by witnesses have been received into evidence. Transcripts of those recordings, which have also been received into evidence, were furnished for your guidance as you listened to the tapes, in clarifying portions of the tapes which are difficult to hear and in identifying speakers. However, the tapes are controlling, since they are the evidence from which the transcripts are made. If you perceive any variation between the tapes and the transcripts, you should be guided solely by the tape and your interpretation of what was said on the tape, not by the transcripts.

The government has presented exhibits in the form of charts and summaries. You should consider these charts and

GLORIA S. SMITH, OFFICIAL REPORTER

**844**

summaries as you would any other evidence.

The defendants have pleaded not guilty to the charges contained in the indictment. The pleas of not guilty put in issue each of the essential elements of the offenses as described in these instructions and impose on the government the burden of establishing each of the elements of the offenses beyond a reasonable doubt.

There are two defendants on trial before you. You must, as a matter of law, consider each count of the indictment and each defendant's involvement in that count separately, and you must return a separate verdict on each defendant for each count in which he is charged.

I have a form of verdict, and I will go through that with you in the end, and it will come back to your jury room with you.

In reaching your verdict, bear in mind that guilt is individual. Your verdict of guilty or not guilty must be based solely upon the evidence about each defendant. The case against each defendant on each count stands or falls upon the proof or lack of proof against that defendant alone, and your verdict as to any defendant or any count should not control your decision as to any other defendant or any other count, except, as I will discuss later, in certain circumstances a finding of guilt as to conspiracy may play a role in determining guilt as to acts done in furtherance of that

conspiracy.

You may not draw any inference, favorable or unfavorable, towards the government or the defendants on trial from the fact that certain persons were not named/charged as defendants in the indictment. The circumstances that these persons were not indicted must play no part in your deliberations. Whether a person should be named as a coconspirator or indicted as a defendant is a matter within the sole discretion of the United States attorney and the grand jury. Therefore you may not consider it in any way in reaching your verdict as to these defendants on trial. Your deliberations should focus exclusively on the defendants and the charges before you.

The guilt of an accused in a criminal case may be established without proof that he personally did every act constituting the offense alleged. The law recognizes that ordinarily anything a person can do for himself may also be accomplished by him through direction of another person as his agent or by acting in concert with or under the direction of another person or persons in a joint effort or enterprise.

So if the acts or conduct of an agent, employee, or other associate of the defendant are willfully directed and authorized by him, or if the defendant aids and abets another person by willfully joining together with such person in the commission of a crime, then the law holds the defendant

responsible for the acts and conduct of such other persons just as if he had committed the acts or engaged in such conduct himself.

Notice, however, that before any defendant may be held criminally responsible for the acts of others, it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime. Of course mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime, unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator. In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as described in these instructions was committed by some person or persons, and that the defendant voluntarily participated in its commission, with the intent to violate the law.

The court instructs the jury that although the indictment may charge the defendants with committing an offense in several ways, using the conjunctive -- i.e., that's the word "and" -- it is sufficient if the government proves the offense in the disjunctive -- i.e., that means the word "or." That is to say, the jury may convict on the unanimous finding of any of the elements of a conjunctively charged

offense.

Therefore I instruct you that it is not necessary for the government to prove that the defendants did each of those things named in the indictment. It is sufficient if the government proves beyond a reasonable doubt that the defendants did one of the alternative acts as charged, as long as you all agree that the same particular alternative act was committed.

The question of intent is a matter for you as jurors to determine. Intent is a state of mind. It is not possible to look into a defendant's mind to see what went on at a given time in the past. The only way to arrive at the intention of the defendant in this case is for you to take into consideration all of the facts and circumstances shown by the evidence, including the exhibits, and determine from all such facts and circumstances whether it was the intent of the defendant at the time in question to commit the offenses charged.

Direct proof of intent is not necessary. A careful and intelligent consideration of the facts and circumstances shown by the evidence in any case enables one to infer what another's intentions were in doing or not doing things. With the knowledge of definite acts, you may draw definite logical conclusions. We are in our daily affairs continuously called upon to decide from the acts of others what another's

intentions or purposes are, and experience has taught us that frequently actions speak more clearly than spoken or written words.

Intent may be inferred from acts, although each act standing by itself may seem unimportant. Thus the defendants' intent is a question of fact to be determined from all the evidence.

The word "knowingly" as that term is used in these instructions means that the act was done voluntarily and intentionally and not because of mistake or accident. If you find that a defendant had knowledge of a fact, if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him -- I want to restate that sentence. It wasn't punctuated properly here.

I'm starting the sentence again. You may find that the defendant had knowledge of a fact, if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

Count 1 of the indictment charges the defendants with conspiracy to commit murder for hire, in violation of Title 18 of United States Code, Section 1958(a). The

indictment, in pertinent part, reads as follows: The grand jury charges that beginning in or about January 2007, and continuing to on or about December 14, 2007, within the Eastern District of Virginia and elsewhere, Catherina Rose Voss, Michael Anthony Draven, also known as Anthony James Neff, and David Anthony Runyon, the defendants herein, did unlawfully, knowingly, and intentionally conspire with one another to travel in and cause another to travel in interstate commerce, and to use and cause another to use facilities in interstate commerce, that is, automobiles and cellular telephones, with intent that a murder be committed, in violation of the laws of the United States and the Commonwealth of Virginia, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, resulting in the death of Cory Allen Voss. That is in violation of Title 18 United States Code, Section 1958(a).

Title 18 of United States Code, Section 1958(a), provides in pertinent part, whoever travels in or causes another, including the victim, to travel in interstate or foreign commerce, and uses or causes another, including the intended victim, to use any facility of interstate or foreign commerce with the intent that a murder be committed, in violation of the laws of any state or the United States, as consideration for the receipt of, or as a consideration for a

promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be guilty of an offense against the United States.

The term "anything of pecuniary value" means anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage.

Facility of interstate or foreign commerce includes a means of transportation and communication. The term "murder in violation of the laws of the United States" means an unlawful killing of a human being with malice aforethought that is done in violation of the laws of the United States.

The term "murder in violation of the laws of any state" with respect to the Commonwealth of Virginia means an unlawful killing of another with malice aforethought that occurs within the Commonwealth of Virginia.

In order to sustain its burden of proof for the crime of conspiracy to commit murder for hire, as charged in Count 1 of the indictment, the government must prove the following four essential elements beyond a reasonable doubt: One, the defendants Catherina Rose Voss, Michael Anthony Eric Draven, also known as Anthony James Neff, and David Anthony Runyon conspired to travel in or cause another to travel in interstate commerce; two, such travel was with the intent to murder Cory Allen Voss in violation of the laws of the United

States or the Commonwealth of Virginia; three, such travel was in consideration of and for a promise and agreement to pay something of pecuniary value; and, four, the conspiracy resulted in the death of Cory Allen Voss.

In this case the defendants are accused of having been a member of a conspiracy to violate certain federal laws. A conspiracy is a kind of partnership in crime in which each member becomes the agent of every other member. The gist or essence of the offense of conspiracy is a combination or mutual agreement by two or more persons to disobey or disregard the law.

The crime of conspiracy to violate a federal law is an independent offense. It is a separate and distinct crime from the actual violation of any specific federal laws which the law refers to as substantive crimes. Indeed, you may find the defendant guilty of the crime of conspiracy to commit an offense against the United States even though the substantive crime which was the object of the conspiracy was not actually committed.

Congress has deemed it appropriate to make conspiracy alone a separate crime, even if the conspiracy is not successful. This is because collective criminal activity poses a greater threat to the public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture.

A criminal conspiracy is an agreement or a mutual understanding knowingly made or knowingly entered into by at least two people to violate the law by some joint or common plan or course of action. A conspiracy is, in a very true sense, a partnership in crime. A conspiracy or agreement to violate the law, like any other kind of agreement or understanding, need not be formal, written, or even expressed directly in every detail.

To prove the existence of a conspiracy or an illegal agreement, the government is not required to produce a written contract between the parties or even produce evidence of an express oral agreement spelling out all the details of the understanding. To prove that a conspiracy existed, moreover, the government is not required to show that all of the people named in the indictment as members of the conspiracy were in fact parties to the agreement, or that all the members of the alleged conspiracy were named or charged, or that all the people whom the evidence shows were actually members of the conspiracy agreed to all of the other means or methods set out in the indictment.

The government must prove that a defendant and at least one other person knowingly and deliberately arrived at some type of agreement or understanding that they, and perhaps others, would violate the law by means of some common plan or course of action, as alleged in Count 1 of the indictment.

It is proof of this conscious understanding and deliberate agreement by the alleged members that should be central to your consideration of the charge of conspiracy. Unless the government proves beyond reasonable doubt that a conspiracy as just explained actually existed, then you must acquit the defendants of this charge.

Before the jury may find that the defendants or any other person became members of the conspiracy charged in Count 1 of the indictment, the evidence in the case must show beyond a reasonable doubt that the defendants knew the purpose or goal of the agreement or understanding and deliberately entered into the agreement, intending in some way to accomplish the goal or purpose by this common plan or joint action.

If the evidence establishes beyond a reasonable doubt that the defendant knowingly and deliberately entered into an agreement to commit murder for hire, the fact that the defendant did not join the agreement at its beginning or did not know all of the details of the agreement or did not participate in each act of the agreement or did not play a major role in accomplishing the unlawful goal is not important to your decision regarding membership in the conspiracy. Even a slight connection to a conspiracy may be sufficient to establish a particular defendant's membership in that conspiracy, if proved beyond a reasonable doubt.

However, merely associating with others and discussing common goals, mere similarity of conduct between or among such persons, merely being present at the site where a crime takes place or is discussed, or even knowing about criminal conduct does not of itself make someone a member of a conspiracy or a conspirator.

A conspirator is responsible for offenses committed by another conspirator if the conspirator was a member of the conspiracy when the offense was committed, and if the offense was committed in furtherance of or as a foreseeable consequence of the conspiracy. Therefore if you have first found the defendant guilty of the conspiracy charged in Counts 1 or 4, and if you find beyond a reasonable doubt that during the time the defendant was a member of that conspiracy, another conspirator committed the offense in Counts 1 or 4 in furtherance of or as a foreseeable consequence of that conspiracy, then you may find the defendant guilty of other charges even though the defendant may have not participated in any or all acts which constitute the offenses described in other charges in the indictment.

You will recall that I have admitted into evidence against the defendants the acts and statements of others because these acts and statements were committed by persons who, the government charges, were also confederates or coconspirators of the defendants on trial. The reason for

allowing this evidence to be received against the defendants have to do with the nature of the crime of conspiracy. A conspiracy is often referred to, as I have told you, as a partnership in crime. Thus, as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy.

Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of any member of the conspiracy and in furtherance of the common purpose of the conspiracy are deemed under the law to be the acts of all the members, and all the members are then responsible for such acts, declarations, statements, and omissions.

If you find beyond a reasonable doubt that the defendants whose guilt you are considering were members of the conspiracy charged in the indictment, then any acts done or statements made in furtherance of the conspiracy by persons also found by you to have been members of the conspiracy may be considered against the defendants. This is so, even if such acts were done and statements were made in a defendant's absence and without a defendant's knowledge.

However, before you may consider the statements or acts of a coconspirator in deciding the issue of a defendant's guilt, you must first determine that the acts and statements

were made during the existence and in furtherance of the unlawful scheme. If the acts were done or the statements made by someone whom you do not find to have been a member of the conspiracy, or if they were not done or said in furtherance of the conspiracy, they may be considered by you as evidence only against the member who did or said them.

The term "overt act" means some type of outward, objective action performed by one of the parties to or one of the members of the agreement or conspiracy which evidences that agreement. The overt act may, but for the alleged illegal agreement, appear totally innocent and legal. The government is not required to prove that the parties to or members of the agreement or conspiracy were successful in achieving any or all objects of the agreement or conspiracy. Neither is it necessary for the government to prove any of the overt acts set forth in the indictment.

Count 2 of the indictment charges that on or about April 29, 2007, in Newport News, Virginia, in the Eastern District of Virginia, Catherina Rose Voss, Michael Anthony Eric Draven, also known as Anthony James Neff, and David Anthony Runyon, the defendants herein, with the intent to cause death and serious bodily injury -- excuse me, serious bodily harm, did take and attempt to take from the presence or person of another -- that is, Cory Allen Voss -- by force, violence, and intimidation, resulting in the death of Cory

Allen Voss, a Ford Ranger motor vehicle that had been transported, shipped, and received in interstate commerce, and did aid, abet, and assist each other and others in the commission of the offense.

Title 2119 of Title 18 of United States Code provides in part that whoever, with the intent to cause death or serious bodily harm, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall be guilty of an offense against the United States.

In order to sustain its burden of proof for the crime of carjacking resulting in death, as charged in Count 2 of the indictment, the government must prove the following five essential elements beyond a reasonable doubt: One, the defendants Catherina Rose Voss, Michael Anthony Eric Draven, and David Anthony Runyon took and attempted to take and aided, abetted, and assisted each other in taking and attempting to take a motor vehicle from the presence of Cory Allen Voss; two, while attempting to take, and aiding, abetting, and assisting each other in attempting to take the motor vehicle, the defendants intended to cause death or serious bodily harm to Cory Allen Voss; three, the motor vehicle had been transported, shipped, and received in interstate commerce; four, the defendants took and attempted to take, and aided,

abetted, and assisted each other in taking and attempting to take the motor vehicle by use of force, violation, and intimidation; and, five, the death of Cory Allen Voss resulted from the defendants' actions.

The first element the government must establish beyond a reasonable doubt is that the defendant took the motor vehicle from the person or presence of another. To take a motor vehicle means to acquire possession or control of the vehicle for a period of time. The government does not have to prove that the defendant intended to permanently deprive the owner of possession of the vehicle. Also the government does not have to prove that the victim was forced to leave the vehicle, as long as it proves that the defendant had control of the situation.

To prove that the defendant took the vehicle from the person or presence of another, the government must prove that the victim was sufficiently within reach, inspection, or observation of the vehicle and that he or she could have retained his or her possession of it if not overcome by violence or prevented by fear.

The second element which the government must prove beyond a reasonable doubt is that while taking the motor vehicle, the defendant intended to cause serious bodily harm. The intent requirement of this section, 2119, is satisfied when the government proves that at the moment the defendant

demanded or took control of the vehicle, the defendant possessed the intent to seriously harm or kill the person if necessary to steal the car. The government need not prove that the defendant actually intended to cause the harm. It is sufficient that the defendant was conditionally prepared to act if the person failed to relinquish the vehicle.

The third element the government must prove beyond a reasonable doubt is that the motor vehicle had previously been transported, shipped, or received in interstate or foreign commerce. This requires the government to prove at sometime in the past the vehicle had been shipped, driven, or transported between one state or another, or the District of Columbia, or between the United States and a foreign country.

It is not necessary that the government prove that the defendant had any involvement in the interstate shipping, driving, or transportation, or that the defendant knew the vehicle had previously been shipped, driven, or transported in interstate commerce. I instruct you that the parties have stipulated that the motor vehicle at issue, the 1997 Ford Ranger, had previously been transported, shipped, or received in interstate commerce.

The phrase "by force and violence or by intimidation" means by either, one, the use of actual physical strength or actual physical violence; or, two, doing some act or making some statement to put someone in fear of bodily

harm. The intimidation must be caused by an act knowingly and deliberately done or a statement knowingly and deliberately made by the defendant, which was done or made in such a manner or under such circumstances that would produce such a reaction or such fear of bodily harm in a reasonable person.

The government need not prove actual fear on the part of any person. The government must prove beyond a reasonable doubt, however, that the defendants knowingly and deliberately did something or knowingly and deliberately said something that would cause a reasonable person under those circumstances to be fearful of bodily harm.

The fifth element that the government must prove beyond a reasonable doubt is that the taking or attempted taking of the motor vehicle by the defendant resulted in the death of Cory Allen Voss.

Count 4 of the indictment charges that on or about April 29, 2007, in Newport News, Virginia, in the Eastern District of Virginia, Catherina Rose Voss, Michael Anthony Draven, also known as Anthony James Neff, and David Anthony Runyon, the defendants herein, did knowingly and unlawfully conspire to obstruct, delay, and affect commerce, as that term is defined in Title 18 of United States Code, Section 1951(b)(3), and the movement of articles and commodities in such commerce, by knowingly and willfully committing robbery, as that term is defined in Title 18 of United States Code,

Section 1951(b)(1), in that the defendants did unlawfully conspire to obtain United States currency from the person of Cory Allen Voss against his will and by means of actual and threatened force, violence, and fear of injury, immediate and future, to his person.

Section 1951(a) of Title 18 of the United States Code provides in part that whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce by robbery, or attempts or conspires to do so, shall be guilty of an offense against the United States.

In order to sustain its burden of proof for the crime of conspiracy to commit robbery as charged in Count 4 of the indictment, the government must prove the following elements beyond a reasonable doubt:  One, the defendants Catherina Rose Voss, Michael Anthony Eric Draven, also known as Anthony James Neff, and David Anthony Runyon knowingly and willfully conspired to obtain personal property from the person or in the presence of another; two, the defendants conspired to do so by means of actual and threatened force, violence, and fear of injury, immediate and future, to his person; and, three, interstate commerce was obstructed, delayed, or affected.

The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the

presence of another against his will by means of actual or threatened force or violence or fear of injury, immediate or future, to his person or property, or property in his custody or possession. The term "property" as used in these instructions means money or anything of value.

The first element that the government must prove beyond a reasonable doubt is that the defendant knowingly conspired to obtain or take the personal property of another or from the presence of another. The term "property" includes money and any other tangible or intangible thing of value.

The second element the government must prove beyond a reasonable doubt is that the defendant unlawfully conspired to take this property against the victim's will, by actual or threatened force, violence, or fear of injury, whether immediately or in the future. In considering whether the defendant used or threatened to use force, violence, or fear, you should give those words their common and ordinary meaning and understand them as you normally would.

The violence does not have to be directed at the person whose property was taken. The use of threat of force or violence might be aimed at a third person or cause an economic rather than physical injury. A threat may be made verbally or by a physical gesture. Whether a statement or physical gesture by the defendant actually was a threat depends upon the surrounding facts.

As I have just instructed you, you must determine whether the defendant knowingly and willfully threatened to use force, violence, or fear to unlawfully obtain the property. Fear exists if a victim experiences anxiety, concern, or worry over expected personal harm or business loss, or over financial or job security. The existence of fear must be determined by the facts existing at the time of the defendant's actions.

Your decision whether the defendant used or threatened fear of injury involves a decision about the victim's state of mind at the time of the defendant's actions. It is obviously impossible to ascertain or prove directly a person's subjective feeling. You cannot look into a person's mind to see what his state of mind is or was, but a careful consideration of the circumstances and evidence should enable you to decide whether fear would reasonably have been the victim's state of mind. Looking at the situation and the actions of people involved may help you determine what their state of mind was.

You can consider this kind of evidence, which is called circumstantial evidence, in deciding whether property was obtained by the defendant through the use of threat or fear. You may also consider the relationship between the defendant and the alleged victim in deciding whether the element of fear exists. However, a friendly relationship

between the parties does not mean that you cannot find fear exists.

If you decide that the defendant obtained another's property against his will by the use or threat of force, violence, or fear of injury, you must then decide whether this action would affect interstate commerce in any way or degree. You must determine whether there is an actual or potential effect on commerce between any two or more states or between one state and the District of Columbia or between a state and a U. S. territory or possession, or on commerce within one state that goes through any place outside that state.

If you decide that there was any effect on interstate commerce, then that is enough to satisfy this element. The effect can be minimal. For example, if a successful robbery of money would prevent the use of those funds to purchase articles which traveled through interstate commerce, that would be a sufficient effect on interstate commerce.

If you decide that interstate commerce would potentially or probably be affected if the defendant had successfully and fully completed his actions, then the element of affecting interstate commerce is satisfied. You do not have to find that interstate commerce was actually affected. However, if the defendant has finished his actions and done all he intended to do, and you determine that there has been

no effect on interstate commerce, then you could not find the defendant guilty. If you do not have to decide whether the effect on interstate commerce was harmful -- I'll start that sentence over.

You do not have to decide whether the effect on interstate commerce was harmful or beneficial to a particular business or to commerce in general. The government satisfies its burden of proving an effect on interstate commerce if it proves beyond a reasonable doubt any effect, whether it was harmful or not.

The defendant need not have intended or anticipated an effect on interstate commerce. You may find the effect is a natural consequence of his actions. If you find that the defendant intended to take certain actions -- that is, he did the acts charged in the indictment in order to obtain property -- and you find those actions have either caused or would probably cause an effect on interstate commerce, then you may find the requirement of this element satisfied.

Count 5 of the indictment charges that on or about April 29, 2007, in Newport News, Virginia, Catherina Rose Voss, Michael Anthony Eric Draven, also known as Anthony James Neff, and David Anthony Runyon, the defendants herein, did knowingly carry and use a firearm and in relation to a crime of violence for which they may be prosecuted in a court of the United States; namely, conspiracy to commit murder for hire,

as set forth in Count 1 of the indictment; carjacking resulting in death, as set forth in Count 2 of the indictment; and interference with commerce by robbery, as set forth in Count 4 of the indictment, which are all realleged and incorporated and referenced in this charge, and in the course of said offenses caused the death of another person through the use of a firearm, which killing was a murder as defined in Title 18, United States Code, 1111, in that defendants with malice aforethought did unlawfully kill Cory Allen Voss by shooting him with a firearm, in violation of Title 18, United States Code, Sections 924(j) and 2, and did aid, abet, and assist others in the commission of the offense.

Title 18 of United States Code, Section 924(c)(1), provides in pertinent part whoever during and in relation to any crime of violence for which he may be prosecuted in a court of the United States uses or carries a firearm shall be guilty of a crime against the United States.

Title 18 of the United States Code, Section 924(j), provides in pertinent part that a person who, in the course of a violation of Subsection (c), which is above, causes the death of a person through the use of a firearm, shall, if the killing is a murder as defined in Section 1111, be guilty of a crime against the United States. Section 1111 provides that, quote, murder is the unlawful killing of a human being with malice aforethought.

In order to sustain its burden of proof for the crime of murder with a firearm in relation to a crime of violence, as charged in Count 5 of the indictment, the government must prove the following four essential elements beyond a reasonable doubt: One, that the defendants Catherina Rose Voss, Michael Anthony Eric Draven, and David Anthony Runyon knowingly used or carried and aided, abetted, and assisted each other in using or carrying a firearm; and, two, the use or carrying of the firearm occurred during and in relation to a crime of violence prosecutable in a court of the United States, specifically the crimes referenced in Counts 1, 2, and 4 of the indictment; three, the use or carrying of the firearm caused the death of Cory Allen Voss; and, four, the killing of Cory Allen Voss was done with malice aforethought.

The term "crime of violence" means an offense that is a felony and has as one of its essential elements the use, attempted use, or threatened use of physical force against the person or property of another, or an offense that by its very nature involves a substantial risk that such physical force may be used in committing the offense. The offenses alleged in Counts 1, 2, and 4 of the indictment are crimes of violence.

The term "firearm" means any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive, and the frame or receiver of

any such weapon.

The phrase "uses a firearm" means brandishing, displaying, bartering, striking with, and firing or attempting to fire a firearm to assist or aid in the commission of the crime of violence. A firearm is considered used if it is displayed or mentioned by the offender. In order to satisfy this prong of the element, the United States must prove beyond a reasonable doubt that the defendant actively employed a firearm during and in relation to a crime of violence.

The term "carries a firearm" means the possession of a firearm, coupled with the transportation of that firearm during and in relation to a crime of violence. In order to satisfy this prong of the element, the United States must prove beyond a reasonable doubt that the defendant possessed a firearm which was available for use.

As used in these instructions, the term "malice aforethought" means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life. To find malice aforethought, you need not be convinced that the defendant hated the person killed or felt ill will toward the victim at the time.

In determining whether the killing was with malice aforethought, you must consider the use of a weapon or instrument and the manner in which the death was caused. The United States does not need to show that the defendant

intended to kill or injure Cory Allen Voss. All the United States needs to prove is that the defendant acted with a reckless and wanton disregard for a reasonable standard of care. If you find that the defendant was aware that his actions posed a serious risk of death or serious bodily harm to Cory Allen Voss, you may infer that the defendant acted with malice aforethought.

I caution you, members of the jury, that you are here to determine at this juncture the guilt or innocence of the accused from the evidence in this case. Each defendant is not on trial for any act or conduct or offense not alleged in the indictment. Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case.

You must decide the case on the evidence and the evidence alone. You must not be influenced by sympathy, bias, or prejudice of any kind. Under your oath as jurors, you cannot allow a consideration of the punishment which may be imposed on a defendant, if convicted, to influence your verdict in any way or in any sense enter into your deliberations at this juncture. In other words, at this juncture, you are not to be concerned with punishment. That is not before you. The only thing that is before you at this juncture is the guilt or innocence under the evidence presented and these instructions that have been given you.

Any verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate in an effort to reach an agreement if you can do so without doing violence to your individual judgment.

Each of you must decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. Remember at all times, you are not partisans, you are judges. You are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

Upon retiring to your jury room to begin your deliberations, you will elect one of your members to act as your foreperson. The foreperson will preside over your deliberations and will be your spokesperson here in court. Your verdict must represent the collective judgment of the jury.

In order to return a verdict, it is necessary that

each juror agree to it. Your verdict, in other words, must be unanimous. It is your duty as jurors to consult with one another and to deliberate, as I have indicated to you, with a view towards reaching an agreement, if you can do so without violence to your individual judgment. As I have said before, each of you must decide the case for himself or herself, but only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, as I have said, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but do not surrender your convictions solely based upon the opinion of your fellow jurors just for the purpose of reaching a verdict.

As I have told you in the last instruction, you are not partisans, you are judges, judges of the facts, and your sole interest is to seek the truth from the evidence received during the trial. Your verdict must be based solely upon the evidence received in the case. Nothing you have seen or read or heard outside of the courtroom may be considered. Nothing that I have said or done during the course of the trial is intended in any way to somehow suggest to you what I think your verdict should be. Nothing in these instructions and nothing in any form of verdict prepared for your convenience is to suggest or to convey to you in any way any intimation as to what verdict I think you should return.

What the verdict shall be is exclusively your duty and your responsibility. As I have told you over and over, you are the sole judges of the facts. Again, the punishment provided by law for the offenses charged in the indictment is not within your province at this juncture, and it should never be considered in any way in arriving at an impartial verdict as to the offenses charged.

Now, these are the forms of verdict that will come back to your jury room with you. They are just what we call standard verdict forms. They have the name of the case, United States District Court, Eastern District of Virginia. The case was brought out of the Newport News Division of this court, and that's the name of the case, and the verdict form sets forth the defendant's name.

The one that I picked up first is in regard to Michael Anthony Eric Draven. And as I said, you consider each defendant separately and each count separately. Once you have reached a unanimous verdict as to Count 1, you would write in that verdict, either guilty, not guilty. The same with Count 2, Count 4, and Count 5.

I will advise you that Count 3 is not before you. The court has made those determinations pursuant to the law, and so consequently Count 3 is not before you for determination of guilt or innocence. You are determining Counts 1, 2, 4, and 5.

GLORIA S. SMITH, OFFICIAL REPORTER

**873**

Likewise, there is the same form of verdict for the defendant, David Anthony Runyon, the four counts before you, Counts 1, 2, 4, and 5, and when you have reached a unanimous decision, you would fill that in, and after you are finished, the foreperson dates and signs the form.

These forms of verdict will come back to you. Also you will receive a copy of the court's instructions. That will come back to you. You will have all of the exhibits that have been admitted, and you will have the stipulations that I read, and there may be some additional ones. I don't know. But these are the stipulations that the parties have signed. That will come back to you.

This is what is called a redacted indictment. The reason it is redacted is -- well, there are a couple of reasons. There is something that you need not concern yourself with. It is called the E-Government Act, but the E-Government Act requires certain redactions -- for instance, the name of the foreperson of the grand jury.

So anything that is required under the E-Government Act has been redacted from the indictment, together with Count 3, as I indicated, which has been addressed by the court and is not before you for consideration.

So this is a copy of the indictment, and as I have indicated to you, the indictment is not proof of guilt. It is just a means for you to follow the charges against the

defendants, together with the court's instructions that follow the indictment.

I indicated that the forms of verdict have been provided for your convenience, and you will take them back with you, and I have gone through the process of completing those forms of verdict. I would further tell you that if it becomes necessary during your deliberations to communicate with the court, you should send a note, signed by your foreperson or by one or more members of the jury, through the bailiff, the court security officer. No member of the jury should attempt to communicate with the court by any means other than a signed writing, and the court would not communicate back with a member of the jury on any subject touching on the merits of the case other than through another signed writing or bringing you back here and addressing you in open court.

You will note from the oath that has been taken -- I don't think that's here, but I would tell you that the court security officer and any person connected with the court is forbidden from discussing the merits of the case with you, obviously, in any manner.

And bear in mind that you are never to reveal to any person, even to the court, how the jury stands numerically on the question of whether or not the government has sustained its burden of proof or where you are on a unanimous verdict as

to guilt or innocence. In other words, don't send a note back to the court that says -- I'll be hypothetical -- six-six. Don't give any numerical division at any time in any question that you may have that would come back to the court.

Also understand when you send a question back to the court, you may think it is a simple question, and it may well be a simple question, but the law requires that I do certain things before I can even answer a question from you. So I have to oftentimes reconvene all the parties, review the question, review my answer, and so forth.

So know that we are all still here, it is just that sometimes it may take longer than you can anticipate or you think it should for an answer to a question to come back.

Now, at this juncture, what I'm going to do is I'm going to call the names of the four alternates. But you are not yet released, and what I'm going to do is I'm going to ask that you go and get your things from the jury room, and then wait, because I need to bring you back into court and give you further instructions in more detail in a few minutes. Then after that has occurred, the jury will go back to the jury room.

The alternates, in alphabetical order, are Gennifer Lynn Mason, Jason Lemuel Mayo, Amy D. Seek, James Edward Sweeney. If the four of you would please go to the jury room and get all of your things, and then I will bring you back

here in court for further instructions.

(The alternates exited the courtroom.)

THE COURT: Ms. McKeel, Mr. Samuels, has the jury been instructed in accordance with your wishes?

MS. MCKEEL: Yes, ma'am, it has.

THE COURT: Mr. Ellenson?

MR. ELLENSON: Yes, ma'am.

THE COURT: Mr. Woodward?

MR. WOODWARD: Yes, Your Honor.

(The jury exited the courtroom to begin deliberations at 4:44 p.m.)

(The alternates returned to the courtroom.)

THE COURT: Ms. Mason, Mr. Mayo, Ms. Seek, and Mr. Sweeney, I want to do three things. Number one, I want to thank you for your service thus far. You, as well as your other 12 colleagues, have been absolutely outstanding jurors over the past couple of weeks. I have been on the bench for many years, and I would tell you that you all have just been an outstanding jury in terms of your attention, your timeliness, everything that you have contributed to this case. That's the first thing.

The second thing that I want to tell you is that you are not yet excused. Given the nature of this case, you are not excused until certain matters have to occur under the law, and you may be recalled back in.

So you may not yet, until you are finally excused, and I will communicate with you either directly or through the jury clerk, if you are not called back in -- I would tell you that until you are officially excused, you remain under a court order not to discuss this case in any way with any other person and not to read any media accounts or listen to any news accounts of the case. That's all that I can really tell you now. We do have your legal pads. They will be maintained, and if you are called back in, they will be returned to you.

Did you put your names on them?

(The alternate jurors answered in the affirmative.)

THE COURT: So they will be returned to you if you are called back in, and if you are not, they will be shredded. They are all put into a shredder when everything is concluded, all the deliberations.

So for now, I never know if it is good news or bad news, but you are released for this evening, and you don't have to return unless you are contacted by the jury clerk. But again, you are not excused until contacted either.

So you can go about your business. You are certainly free for tomorrow, and if you are needed, I will give you as much notice as I can. Thank you so much.

JUROR: Will we be back next week, Your Honor?

THE COURT: As far as I know, you will not, at the

moment. You can go ahead and make your regular plans for next week. I can't promise you yet. I'm doing the best I can.

Thank you.

(The alternate jurors exited the courtroom.)

THE COURT: Counsel, I'm going to recess in a moment. When I do, you have to check the exhibits and okay them with the clerk before we send them back, and also you need to stay close by in case you are needed for a question or a verdict or reconvening.

Is there anything else that we need to address at this point, Ms. McKeel?

MS. MCKEEL: No, ma'am, I don't think so.

MR. CLANCY: No, ma'am.

MR. WOODWARD: No, Your Honor.

THE COURT: Before we go any further, I do want to thank all counsel, all six of you. You have been as outstanding as counsel as I thought the jury has been. You have been just very thorough, all of you very efficient, given the nature of the case, in your presentation, and the court very much appreciates everything that all six of you have done in this case.

The court stands in recess.

(A recess was begun at 4:49 p.m., and at 5:44 p.m. the jury contacted the court, as follows:)

THE COURT: Counsel, I received a note from the jury

that says, Judge Smith, May we please be excused for the evening? And this says at 5:30 p.m. What time do we come in Friday morning? So I'm going to bring them in and excuse them for the night, with the standard warning not to discuss the case with anyone else.

And I'm assuming by this note that they are now all available on Friday. I will be sure that that's the case, since they have indicated that three would not be, but I don't know, so we will see. I'm assuming that they are now all available.

And if it is agreeable to counsel, I'm going to tell them to be here by 9:30, and have the jury foreperson check them in, and once they are checked in, to notify the court security officer, and the clerk will unlock the exhibits and deliver them the exhibits. You all will need to be here at 9:30. I will probably be in a meeting until at least 10:00, but that way, they get here and can get going.

Is that agreeable to everyone?

MS. MCKEEL: Yes, ma'am.

MR. WOODWARD: Yes, ma'am.

MR. ELLENSON: Yes, ma'am.

THE COURT: Then we will proceed that way, and if you have any trouble with the tunnel -- I probably wouldn't be able to answer a question before ten anyway without interrupting other matters. * *

GLORIA S. SMITH, OFFICIAL REPORTER

**880**

You can bring the jury in.

(The jury returned to the courtroom.)

THE COURT: Ladies and gentlemen, I received Mr. Fink's note, the foreperson, that you would like to recess this evening, and what time should you come in tomorrow morning. And by this note I'm assuming that all the jurors are available tomorrow, Mr. Fink?

MR. FINK: One has told her boss that she would be at work tomorrow, after we talked yesterday.

THE COURT: Then you can't come in. It has to be all 12 of you. So I don't know if you all -- everybody has to be here to deliberate, or not. It is just the law.

BECKY PLANT GRAHAM: May I speak? I told my boss last week that I would be available on Friday, and he has made commitments to -- we do commercial appraisals -- to other banks and people like this on things that I have to do. And I e-mailed him yesterday, and he said, I need you in the office on Friday.

THE COURT: If you will go back to your jury room, I will discuss it and see what we can do. You will need to go back, and I will have to resolve this and then bring you back in.

I'm sorry.

(The jury exited the courtroom.)

THE COURT: All right. Counsel, I think that there

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division**

**UNITED STATES OF AMERICA**

v.                                                        Criminal No. 4:08cr16

**DAVID ANTHONY RUNYON**

## SUPPLEMENTAL MOTION TO CONTINUE
## CAPITAL SENTENCING HEARING

In the event that the defendant David Runyon is convicted of one or more offenses punishable by death, he hereby moves, through counsel, Lawrence Woodward and Stephen A. Hudgins, for an order continuing the sentencing hearing under 18 U.S.C. §§ 3591 *et seq.* for a period of at least 90 days in order to permit counsel to provide constitutionally effective assistance and to safeguard  the defendant's Eighth Amendment to present evidence in mitigation of punishment. *See Gray v. Branker,* 529 F.3d 220 (4th Cir. 2008), *cert. denied,* 129 S.Ct. 1579 (2009) (holding that defendant was denied effective assistance of counsel by failure to investigate and develop evidence of mental impairment for capital sentencing).

By motion filed on April 13, 2009, the defendant requested that the trial date of June 30, 2009, be continued until October.  On May 7, 2009, the Court denied the motion insofar as it sought a continuance *of the guilt-or-*

1

**882**

*innocence phase*, but expressly declined to rule on whether a continuance would be justified prior to sentencing in the event of a capital conviction. Specifically, the Court ruled:

> With respect to the penalty portions of this trial, if such phases are even needed, the court will consider continuing them as appropriate following the guilt/innocence phase . . . . The jury, with appropriate cautionary instructions, may be reconvened at a later time to conduct any necessary penalty phases, if a continuance to complete preparation for those phases is deemed necessary.

Order, May 7, 2009, at 8.

Before and after entry of the May 7 order, defense counsel has been working diligently to prepare for a possible sentencing hearing.[1] However, it has now become apparent that counsel will simply not be ready to present the defendant's case for life at the conclusion of the guilt or innocence phase of his trial unless a substantial continuance is granted.  The reasons why this is so are set forth in greater detail in the defendant's Exhibit "A" submitted under seal in support of this motion, but may be briefly summarized here:

**First**, as the Court is aware a recent specialized mental health examination has uncovered evidence tending to suggest the existence of a

---

[1] Without recapitulating the facts contained in the April 13 motion, counsel would recall that the member of the defense team with primary responsibility for sentencing phase preparation, Jon Babineau, was required to withdraw due to a conflict in February, 2009 and his replacement, Stephen Hudgins, entered the case just six months ago.  For nearly ** weeks of that time, moreover, from April ** to May ***, Mr. Hudgins was engaged in the defense of an unrelated federal criminal case, United States v. ******, No. **CR*****, that further reduced the time available for him to devote to preparing for the possibility of a sentencing hearing in this case.

2

significant mental disorder that bears a potentially strong relationship to the defendant's behavior and moral culpability.  The examiner has advised counsel that additional diagnostic studies are necessary.  A motion to authorize counsel to retain an expert capable of carrying out these studies is pending.  A preliminary report of the neuropsychologist is attached hereto as Exhibit "B".

**Second**, important medical records remain to be gathered, and additional collateral investigation of the defendant's social and family history conducted, in order to either corroborate or rule out the presence of serious mental abnormalities.  Ideally, this record-gathering and collateral investigation would have been largely completed before mental health experts were retained by the defense.  However, as related in the defendant's prior motion for continuance filed on April 13, 2009, this has proven impossible.

The defendant will not recapitulate here the constitutional basis of his continuance motion, as he has already set it forth in his previous Motion to Continue the Trial Date filed on April 13.  Suffice it say that a 90-day continuance of the sentencing phase of his trial in order to allow counsel to complete the essential unfinished preparation that remains is clearly justified, and the equities weigh heavily in favor of granting his request.  Even after

3

**884**

such a brief delay, the total time that will have elapsed between indictment and the jury's sentencing verdict will have been fairly typical of federal death penalty cases.[2] Far greater delays, moreover, are commonplace in federal capital litigation. For example, the most recent federal death sentence case to be affirmed by the Fourth Circuit was decided on appeal nearly four-and-a-half years after the trial jury rendered its sentencing verdict on November 2, 2004. *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009). Given the inevitable vagaries and frequent delays of appellate litigation, it would be penny-wise and pound-foolish to save a few weeks or months by requiring the sentencing jury to make its momentous decision while laboring under a needless blackout of critical information going to the heart of the defendant's culpability and moral desert.

For all of these reasons, including those that have been submitted under seal, counsel for the defendant David Runyon request that the Court adjourn this case for a period of not less than 90 days in order to permit them to complete the essential factual, mental health and legal preparation required to permit a just and reliable determination of whether Mr. Runyon should live or die.

---

[2] Counsel are advised by the Federal Death Penalty Resource Counsel Project that as of 2007, the average time between federal capital indictment and the beginning of trial was just over 20 months---slightly longer than the elapsed period in this case.

4

**885**

DAVID ANTHONY RUNYON

By:_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of July, 2009, I will electronically

file the foregoing with the Clerk of Court using the CM/ECF system, which will

then send a notification of such filing (NEF) to the following:

Blair C. Perez, Esquire
United States Attorney's Office
101 W. Main Street, Suite 8000
Norfolk, VA 23510
Telephone: 757.441.6331
Telefax: 757.441.6689
blair.perez@usdoj.gov

Brian J. Samuels, Esquire
VSB No. 65898
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
brian.samuels@usdoj.gov

5

**886**

Lisa R. McKeel, Esquire
VSB No. 28652
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
lisa.mckeel@usdoj.gov

Lawrence Hunter Woodward, Jr., Esquire
Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
Counsel for David Anthony Runyon
4525 South Boulevard, Suite 300
Virginia Beach VA 23452
Telephone: 757.671.6047
Telefax: 757.671.6004
lwoodward@srgslaw.com

Larry M. Dash, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
150 Boush Street, Suite 403
Norfolk, VA 23510
larrydash@fd.org

Paul G. Gill, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
830 E. Main Street, Suite 1100
Richmond, VA 23219
paulgill@fd.org

Jeffrey A. Swartz, Esquire
Rabinowitz, Swartz, Taliaferro, Swartz & Goodove
Counsel for Catherina Rose Voss
150 Boush Street, Suite 800
Norfolk, VA 23510
jswartz@rstsg.com

6

**887**

James S. Ellenson, Esquire
Law Office of James Stephen Ellenson
Counsel for Michael Anthony Eric Draven
Bank of America Building
2600 Washington Avenue, Suite 1000
Newport News, VA 23607
jseatty@aol.com

Timothy G. Clancy, Esquire
Moschel & Clancy, PLLC
Counsel for Michael Anthony Eric Draven
2101 Executive Drive, Third Floor
Tower Box 78
Hampton VA 23666
tclancy@moschelandclancy.com

                                        _____/s/_____
                                        Stephen A. Hudgins, Esquire
                                        VSB No. 20315
                                        Counsel for David Anthony Runyon
                                        Cope & Olson, P.L.C.
                                        11836 Canon Blvd., Suite 100
                                        Newport News, VA 23606
                                        Telephone: 757.596.0316
                                        Telefax: 757.596.5320
                                        shudgins@com.hrcoxmail.com

888

**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

**UNITED STATES OF AMERICA**

v.                                                                    Criminal No. 4:08cr16

**DAVID ANTHONY RUNYON**

## <u>STATEMENT OF COUNSEL</u>

Since the filing of the motion to continue, David Runyon has been preliminarily evaluated by neuropsychologist, Allan Mirsky. Dr. Mirsky's testing revealed deficits which will require neurological testing and the evaluation by a neurologist. James Merikangas, M.D., the psychiatrist defendant wishes to engage, is also a neurologist so he could perform both functions for the defendant. Dr. Mirsky's report details his findings on testing, but he is limited by the lack of medical records and the necessity for conducting the neurological testing.

Sheila Cronin, defense mitigation expert, has set forth in her affidavit the status of the mitigation case at the present time. It is clear from the affidavit and the previous motion to continue that the sentencing phase of the case must be continued to allow both the mental health evaluation and mitigation investigation to proceed and be adequately completed.

In the court's order regarding defendant's request for the appointment of psychiatrist, James Merikangas, the court questioned the change from Seymour Halleck, Ph.D. to James Merikangas, M.D. as the defense psychiatric expert. At the time the notice was given for Seymour Halleck, Ph.D., counsel was under the impression from regional counsel for the federal death penalty counsel project that Dr. Halleck was available for this case. It had been

1

**889**

difficult to find someone available for the services and the time to file the motion was eminent. For this reason, counsel noted Seymour Halleck, Ph.D. as the psychiatrist in the case. Upon making direct contact with Dr. Halleck, it was discovered Dr. Halleck was over 80 years old and did not wish to become involved in another death penalty case. Upon learning this, the search for a psychiatrist was resumed. Dr. Merikangas was located and given his relatively close location in Bethesda, Maryland, and his willingness to participate in this case, a request was made to appoint him to the case instead of Dr. Halleck.

At the time of the initial request, Dr. Merikangas was being engaged for exactly the same purpose as Dr. Halleck had been noticed. Recently, because of the report from Dr. Mirsky revealing the need for a neurologist, a supplemental notice was given listing Dr. Merikangas as both a psychiatrist and a neurologist. Defendant requests he be appointed for both purposes at this time. He is available to begin testing immediately.

DAVID ANTHONY RUNYON

By:_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

2

**890**

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of July, 2009, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Blair C. Perez, Esquire
United States Attorney's Office
101 W. Main Street, Suite 8000
Norfolk, VA 23510
Telephone: 757.441.6331
Telefax: 757.441.6689
blair.perez@usdoj.gov

Brian J. Samuels, Esquire
VSB No. 65898
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
brian.samuels@usdoj.gov

Lisa R. McKeel, Esquire
VSB No. 28652
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
lisa.mckeel@usdoj.gov

3

**891**

Lawrence Hunter Woodward, Jr., Esquire
Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
Counsel for David Anthony Runyon
4525 South Boulevard, Suite 300
Virginia Beach VA 23452
Telephone: 757.671.6047
Telefax: 757.671.6004
lwoodward@srgslaw.com

Larry M. Dash, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
150 Boush Street, Suite 403
Norfolk, VA 23510
larrydash@fd.org

Paul G. Gill, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
830 E. Main Street, Suite 1100
Richmond, VA 23219
paulgill@fd.org

Jeffrey A. Swartz, Esquire
Rabinowitz, Swartz, Taliaferro, Swartz & Goodove
Counsel for Catherina Rose Voss
150 Boush Street, Suite 800
Norfolk, VA 23510
jswartz@rstsg.com

James S. Ellenson, Esquire
Law Office of James Stephen Ellenson
Counsel for Michael Anthony Eric Draven
Bank of America Building
2600 Washington Avenue, Suite 1000
Newport News, VA 23607
jseatty@aol.com

4

**892**

Timothy G. Clancy, Esquire
Moschel & Clancy, PLLC
Counsel for Michael Anthony Eric Draven
2101 Executive Drive, Third Floor
Tower Box 78
Hampton VA 23666
tclancy@moschelandclancy.com

_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

5

**893**

Verdict

FILED
IN OPEN COURT

Page 1

JUL 17 2009

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

*United States District Court*
*Eastern District of Virginia*
*Newport News Division*

UNITED STATES OF AMERICA

v.

DAVID ANTHONY RUNYON

VERDICT

CASE NUMBER: **4:08cr16**

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

VERDICT FORM

WE, THE JURY, FIND **THE DEFENDANT DAVID ANTHONY RUNYON:**

AS TO COUNT 1 ............................................. _Guilty_
Guilty/Not Guilty

AS TO COUNT 2 ............................................. _Guilty_
Guilty/Not Guilty

AS TO COUNT 4 ............................................. _Not Guilty_
Guilty/Not Guilty

AS TO COUNT 5 ............................................. _Guilty_
Guilty/Not Guilty

REDACTED COPY

FOREPERSON'S SIGNATURE          7/17/09
                                DATE

**894**

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division**

**UNITED STATES OF AMERICA**

v.                                              Criminal No. 4:08cr16

**DAVID ANTHONY RUNYON**

## SUPPLEMENTAL MOTION TO CONTINUE
## CAPITAL SENTENCING HEARING

In the event that the defendant David Runyon is convicted of one or more offenses punishable by death, he hereby moves, through counsel, Lawrence Woodward and Stephen A. Hudgins, for an order continuing the sentencing hearing under 18 U.S.C. §§ 3591 *et seq.* for a period of at least 90 days in order to permit counsel to provide constitutionally effective assistance and to safeguard  the defendant's Eighth Amendment to present evidence in mitigation of punishment. *See Gray v. Branker,* 529 F.3d 220 (4th Cir. 2008), *cert. denied,* 129 S.Ct. 1579 (2009) (holding that defendant was denied effective assistance of counsel by failure to investigate and develop evidence of mental impairment for capital sentencing).

By motion filed on April 13, 2009, the defendant requested that the trial date of June 30, 2009, be continued until October.  On May 7, 2009, the Court denied the motion insofar as it sought a continuance *of the guilt-or-*

1

**895**

*innocence phase*, but expressly declined to rule on whether a continuance would be justified prior to sentencing in the event of a capital conviction. Specifically, the Court ruled:

> With respect to the penalty portions of this trial, if such phases are even needed, the court will consider continuing them as appropriate following the guilt/innocence phase . . . . The jury, with appropriate cautionary instructions, may be reconvened at a later time to conduct any necessary penalty phases, if a continuance to complete preparation for those phases is deemed necessary.

Order, May 7, 2009, at 8.

Before and after entry of the May 7 order, defense counsel has been working diligently to prepare for a possible sentencing hearing.[1] However, it has now become apparent that counsel will simply not be ready to present the defendant's case for life at the conclusion of the guilt or innocence phase of his trial unless a substantial continuance is granted. The reasons why this is so are set forth in greater detail in the defendant's Exhibit "A" submitted under seal in support of this motion, but may be briefly summarized here:

**First**, as the Court is aware a recent specialized mental health examination has uncovered evidence tending to suggest the existence of a

---

[1] Without recapitulating the facts contained in the April 13 motion, counsel would recall that the member of the defense team with primary responsibility for sentencing phase preparation, Jon Babineau, was required to withdraw due to a conflict in February, 2009 and his replacement, Stephen Hudgins, entered the case just six months ago. For nearly ** weeks of that time, moreover, from April ** to May ***, Mr. Hudgins was engaged in the defense of an unrelated federal criminal case, United States v. ******, No. **CR*****, that further reduced the time available for him to devote to preparing for the possibility of a sentencing hearing in this case.

2

**896**

significant mental disorder that bears a potentially strong relationship to the defendant's behavior and moral culpability. The examiner has advised counsel that additional diagnostic studies are necessary. A motion to authorize counsel to retain an expert capable of carrying out these studies is pending. A preliminary report of the neuropsychologist is attached hereto as Exhibit "B".

**Second**, important medical records remain to be gathered, and additional collateral investigation of the defendant's social and family history conducted, in order to either corroborate or rule out the presence of serious mental abnormalities. Ideally, this record-gathering and collateral investigation would have been largely completed before mental health experts were retained by the defense. However, as related in the defendant's prior motion for continuance filed on April 13, 2009, this has proven impossible.

The defendant will not recapitulate here the constitutional basis of his continuance motion, as he has already set it forth in his previous Motion to Continue the Trial Date filed on April 13. Suffice it say that a 90-day continuance of the sentencing phase of his trial in order to allow counsel to complete the essential unfinished preparation that remains is clearly justified, and the equities weigh heavily in favor of granting his request. Even after

3

**897**

such a brief delay, the total time that will have elapsed between indictment and the jury's sentencing verdict will have been fairly typical of federal death penalty cases.[2] Far greater delays, moreover, are commonplace in federal capital litigation. For example, the most recent federal death sentence case to be affirmed by the Fourth Circuit was decided on appeal nearly four-and-a-half years after the trial jury rendered its sentencing verdict on November 2, 2004. *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009). Given the inevitable vagaries and frequent delays of appellate litigation, it would be penny-wise and pound-foolish to save a few weeks or months by requiring the sentencing jury to make its momentous decision while laboring under a needless blackout of critical information going to the heart of the defendant's culpability and moral desert.

For all of these reasons, including those that have been submitted under seal, counsel for the defendant David Runyon request that the Court adjourn this case for a period of not less than 90 days in order to permit them to complete the essential factual, mental health and legal preparation required to permit a just and reliable determination of whether Mr. Runyon should live or die.

---

[2] Counsel are advised by the Federal Death Penalty Resource Counsel Project that as of 2007, the average time between federal capital indictment and the beginning of trial was just over 20 months---slightly longer than the elapsed period in this case.

4

DAVID ANTHONY RUNYON

By:_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of July, 2009, I will electronically

file the foregoing with the Clerk of Court using the CM/ECF system, which will

then send a notification of such filing (NEF) to the following:

Blair C. Perez, Esquire
United States Attorney's Office
101 W. Main Street, Suite 8000
Norfolk, VA 23510
Telephone: 757.441.6331
Telefax: 757.441.6689
blair.perez@usdoj.gov

Brian J. Samuels, Esquire
VSB No. 65898
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
brian.samuels@usdoj.gov

5

**899**

Lisa R. McKeel, Esquire
VSB No. 28652
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
lisa.mckeel@usdoj.gov

Lawrence Hunter Woodward, Jr., Esquire
Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
Counsel for David Anthony Runyon
4525 South Boulevard, Suite 300
Virginia Beach VA 23452
Telephone: 757.671.6047
Telefax: 757.671.6004
lwoodward@srgslaw.com

Larry M. Dash, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
150 Boush Street, Suite 403
Norfolk, VA 23510
larrydash@fd.org

Paul G. Gill, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
830 E. Main Street, Suite 1100
Richmond, VA 23219
paulgill@fd.org

Jeffrey A. Swartz, Esquire
Rabinowitz, Swartz, Taliaferro, Swartz & Goodove
Counsel for Catherina Rose Voss
150 Boush Street, Suite 800
Norfolk, VA 23510
jswartz@rstsg.com

6

**900**

James S. Ellenson, Esquire
Law Office of James Stephen Ellenson
Counsel for Michael Anthony Eric Draven
Bank of America Building
2600 Washington Avenue, Suite 1000
Newport News, VA 23607
jseatty@aol.com

Timothy G. Clancy, Esquire
Moschel & Clancy, PLLC
Counsel for Michael Anthony Eric Draven
2101 Executive Drive, Third Floor
Tower Box 78
Hampton VA 23666
tclancy@moschelandclancy.com

_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

7

**901**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

UNITED STATES OF AMERICA    )
                              )          CRIMINAL ACTION
     v.                       )
                              )          NO. 4:08cr16
DAVID ANTHONY RUNYON,     )
                              )
        Defendant.        )

TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

July 22, 2009

**THIRTEENTH DAY OF TRIAL**

**(Eligibility Phase)**

Before:    THE HONORABLE REBECCA BEACH SMITH
             United States District Judge, and a Jury

Appearances:

        LISA R. MCKEEL
        BRIAN J. SAMUELS
        Assistant United States Attorneys
            Counsel for the United States

        STEPHEN A. HUDGINS
        LAWRENCE H. WOODWARD, JR.
            Counsel for David Anthony Runyon

GLORIA S. SMITH, OFFICIAL REPORTER

* * *

Ladies and gentlemen, the murder of a United States Naval officer, a young man at the start of his career, with two small children, is a terrible crime. That it was done by this defendant in a premeditated way with the expectation of being paid only makes it more tragic and more severe. The severity of this crime, that it contains these characteristics, demands consideration of the ultimate penalty.

On behalf of the United States, Ms. McKeel and the investigative team and myself, I'd ask you to make these findings to ensure that David Runyon moves on to get that consideration for the ultimate penalty.

Thank you.

Thank you, Your Honor.

MR. HUDGINS: Good morning, ladies and gentlemen, Your Honor.

I have just a few things that I want you to consider when you are deliberating on this eligibility phase of this case.

You have heard the United States attorney kind of go through what the procedure is going to be. He has gone through a lot of the instructions that the court will also go through with you. The things that he has told you are things that the court will instruct you on. I won't go through those kinds of things. But there are just a couple of things that I

would like for you to be considering when you are looking at this eligibility phase.

The first thing is that the law never requires that the death penalty be given to someone. No matter what David Runyon is charged with, no matter what the aggravating factors are, the law doesn't require the death penalty. That's why you are here, and that's why you are making the decisions that you are having to make today and possibly down the road.

Today you are looking at what is called the eligibility phase of this trial. That is whether or not David is eligible for the death penalty. You are not deciding at this phase whether you are going to give him the death penalty. Is he eligible for it? And that will be based on the charges that he has been convicted of, the aggravating factors that you have heard about. That is what you will be back there deliberating on this morning.

If you decide that he is eligible for the death penalty, then there will be another proceeding, where we will put on evidence. The government will put on evidence that they believe would make you think that the death penalty is warranted. The defense will put on evidence that we believe will make you think that the death penalty is not warranted, things like his history as far as his schooling, his family, perhaps mental health information, how he has done since he has been incarcerated, those kinds of things. We will put on

a lot of evidence so you know David Runyon.

At this point in time, though, you are not making that decision, and I think that's important for you to think about. You are not deciding whether he gets the death penalty. You are deciding whether he is eligible. If you decide that he is not eligible, then it goes no further, and he gets life in the penitentiary without the possibility of parole.

THE COURT: That would not necessarily be true. He wouldn't be eligible for the death penalty, but ultimately the court determines the penalty.

MR. HUDGINS: I'm sorry, Your Honor. It wouldn't be automatic.

THE COURT: Exactly. In that situation he would be in the same situation as other defendants that would be convicted, and the court would look at the statutory law and so forth and make the appropriate legal and punishment decisions.

MR. HUDGINS: So the jury understands that, the judge would decide what the punishment would be at that point.

But I want you to carry into the jury room with you that the death penalty is never required. And I want you to think about that always when you are looking at this case. Because of the charges, because of any aggravating factors, it's not a requirement that you give that kind of punishment.

The United States has said that because of the circumstances of this case, that you should consider David eligible for that punishment. We are asking that you really look at this and decide if you believe he is eligible, based on the instructions that the judge will give you. Consider it as a new consideration. Just because you have found him guilty of these charges at the trial phase does not mean that you have to find him eligible at this phase. This is a new proceeding, and we ask you to look at it with new eyes, and consider all of the evidence and all of the instructions that the judge will give you before you arrive at your decision on eligibility.

Thank you.

THE COURT: Mr. Samuels?

MR. SAMUELS: Thank you, Your Honor.

Ladies and gentlemen, again the United States has the burden of proof on each of these factors. We have got to prove it beyond a reasonable doubt, which is why I get the last word here, and I just want to comment very briefly on what you are being asked to do this morning.

You are not making a decision about the death penalty today, and it is not a matter of going back there and checking a box and saying he is eligible, he is not eligible. What you are going back there to do today is make a decision on three sets of factors, and depending on the decision you

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES OF AMERICA,

v.                                              Criminal No. 4:08cr16

DAVID ANTHONY RUNYON,

      Defendant.

## ORDER

This matter comes before the court on the motion of defendant David Anthony Runyon ("Runyon") to continue the third phase of the trial in this matter. On April 13, 2009, counsel for Runyon moved the court to continue the trial in this case. (See Docket #179.) On May 7, 2009, the court entered an order denying a continuance as to the guilt/innocence phase of the trial, and noting that, should penalty phases be required for Runyon, based on the outcome of the guilt/innocence phase, counsel would be permitted to renew the motion for a continuance at that time.[1]

On July 17, 2009, Runyon was found guilty of three offenses punishable by death.[2] That same day, defense counsel filed a

_____

[1] As explained in several of the court's orders, trial in this matter is proceeding in three phases. (See December 9, 2008, Order at 2; May 7, 2009, Order at 2 n.3.) In its May 7, 2009, Order, the court indicated that it would consider continuing the latter two phases, applicable only to death penalty-eligible defendants such as Runyon, if the result of the guilt/innocence phase so requires, and the parties make an appropriate showing of need for a continuance at that time.

[2] The jury found Runyon guilty of: (Count One) Conspiracy to Commit Murder for Hire; (Count Two) Carjacking Resulting in Death;

**907**

Supplemental Motion to Continue Capital Sentencing Hearing,[3] seeking an order continuing the sentencing hearing for a period of at least ninety (90) days. Defense counsel also filed certain sealed exhibits in support of the motion. (Docket #241.) The United States responded in opposition on July 21, 2009. On July 22, 2009, Runyon was found eligible for imposition of the death penalty. Following the jury's verdict in this second phase, the court **GRANTED** defendant's motion for a continuance from the bench, and set the third phase of trial for August 19, 2009.[4]

Trial courts are granted "broad discretion" on matters of continuances and "only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." Morris v. Slappy, 461 U.S. 1, 11-12 (internal quotation marks and citation omitted). There are "no mechanical tests" a trial court must employ when deciding whether continuance is appropriate, rather "[t]he answer

---

and (Count Five) Murder with a Firearm in Relation to a Crime of Violence.

[3] Defense counsel filed this Supplemental Motion to Continue Capital Sentencing Hearing twice – both on July 17, 2009, and on July 20, 2009. The filings are identical.

[4] As explained above, see supra note 1 and accompanying text, trial is proceeding in three phases. At the time defense counsel filed their Supplemental Motion to Continue the Capital Sentencing Hearing, the court had already scheduled Phase Two to commence on July 22, 2009, without any objection from defense counsel. Therefore, the current order addresses a continuance of Phase Three only.

2

**908**

must be found in the circumstances present . . . particularly in the reasons presented to the trial judge at the time the request" is made. Ungar v. Sarafite, 376 U.S. 575, 589 (1964). The difficulty inherent in scheduling trials places a burden on trial judges that, "except for compelling reasons," counsels against continuances. Morris, 461 U.S. at 12; see also United States v. Hutchison, 352 F.2d 404, 405 (4th Cir. 1965) (granting a continuance is a matter within the sound discretion of trial judge; reasonable latitude must be allowed). A party seeking a continuance must show that a delay is necessary for just determination of the case. United States v. Clinger, 681 F.2d 221, 223 (4th Cir. 1982).

The court has reviewed defendant's initial motion for a continuance, the supplemental motion, and the exhibits submitted therewith. Based upon the grounds presented, and for the reasons stated herein and from the bench, the court **FINDS** that a continuance of four weeks is warranted with respect to the third and final phase of this trial. As previously stated, Phase Three of the trial will commence on Wednesday, August 19, 2009, at 10:00 a.m. in Norfolk.

The Clerk shall forward a copy of this Order to counsel for the parties.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
United States District Judge

Rebecca Beach Smith
United States District Judge

Norfolk, Virginia
July 22 , 2009

3

**909**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

O FILED
IN OPEN COURT

JUL 2 2 2009

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 4:08cr16 |
| | ) | |
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Defendant | ) | |

## SPECIAL VERDICT FORM - ELIGIBILITY PHASE

I. **AGE:** DAVID ANTHONY RUNYON was more than 18 years of age at the time of the offense.

Count One (Conspiracy to Commit Murder for Hire):

YES __X__

NO _____

Count Two (Carjacking Resulting in Death):

YES __X__

NO _____

Count Five (Murder with a Firearm in Relation to a Crime of Violence):

YES __X__

NO _____

If your finding is "yes," as to Counts One, Two and/or Five, move on to the Threshold Intent/"Gateway" Factors in Section II for that count. If your finding is "no" as to all counts, stop your deliberations and complete Section IV.

**910**

## II. THRESHOLD INTENT / GATEWAY FACTORS

A.     Count One (Conspiracy to Commit Murder for Hire)

Instructions: If you unanimously find that one of these four factors has been proved beyond a reasonable doubt, place an "X" next to "YES" as to that one factor and move on to Count Two. You may find only one factor present for the count. If you do not find any of these four factors present for Count One, move on to Count Two.

1.     DAVID ANTHONY RUNYON intentionally killed Cory Allen Voss.

YES __X____

2.     DAVID ANTHONY RUNYON  intentionally inflicted serious bodily injury that resulted in the death of Cory Allen Voss.

YES _____

3.     DAVID ANTHONY RUNYON  intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants of the offense, and Cory Allen Voss died as a direct result of the act.

YES _____

4.     DAVID ANTHONY RUNYON intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Cory Allen Voss died as a direct result of the act.

YES _____

-2-

**911**

B.      Count Two (Carjacking Resulting in Death):

Instructions: If you unanimously find that one of these four factors has been proved beyond a reasonable doubt, place an "X" next to "YES" as to that one factor and move on to Count Five. You may find only one factor present for the count. If you do not find any of these four factors present for Count Two, move on to Count Five.

1.      DAVID ANTHONY RUNYON intentionally killed Cory Allen Voss.

        YES ___X___

2.      DAVID ANTHONY RUNYON intentionally inflicted serious bodily injury that resulted in the death of Cory Allen Voss.

        YES _____

3.      DAVID ANTHONY RUNYON intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants of the offense, and Cory Allen Voss died as a direct result of the act.

        YES _____

4.      DAVID ANTHONY RUNYON intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Cory Allen Voss died as a direct result of the act.

        YES _____

-3-

**912**

C.     Count Five (Murder with a Firearm in Relation to a Crime of Violence):

Instructions: If you unanimously find that one of these four factors has been proved beyond a reasonable doubt, place an "X" next to "YES" as to that one factor and move to the next set of instructions below. You may find only one factor present for the count. If you do not find any of these four factors present for Count Five, move to the next set of instructions below.

1.     DAVID ANTHONY RUNYON intentionally killed Cory Allen Voss.

       YES _X_____

2.     DAVID ANTHONY RUNYON  intentionally inflicted serious bodily injury that resulted in the death of Cory Allen Voss.

       YES _____

3.     DAVID ANTHONY RUNYON  intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants of the offense, and Cory Allen Voss died as a direct result of the act.

       YES _____

4.     DAVID ANTHONY RUNYON intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Cory Allen Voss died as a direct result of the act.

       YES _____

Instructions: If you did not find any Threshold Intent Factors in Section II above as to Counts One, Two and Five, then that ends your consideration of whether the defendant is eligible to be considered for the death penalty. You must stop your deliberations, complete Section IV, and advise the Court that you have reached a decision.

If you answered "YES" with respect to one of the Threshold Intent Factors in Section II above as to Counts One, Two and/or Five, then continue your deliberations and proceed to the Section III.

-4-

**913**

## III. STATUTORY AGGRAVATING FACTORS

Instructions: Answer "YES" or "NO" as to whether you unanimously find that the government has established, beyond a reasonable doubt, the existence of the statutory aggravating factors enumerated below as to Counts One, Two and Five. You should consider each factor separately, and answer "YES" or "NO" as to each count for both factors. In this category, you may answer "yes" to more than one factor for each count.

Factor 1.    The defendant, DAVID ANTHONY RUNYON, committed the offense in consideration for the receipt of, or in expectation of the receipt, of anything of pecuniary value.

Count One (Conspiracy to Commit Murder for Hire):

YES  X
NO

Count Two (Carjacking Resulting in Death):

YES  X
NO

Count Five (Murder with a Firearm in Relation to a Crime of Violence):

YES  X
NO

-5-

**914**

Factor 2.    The defendant, DAVID ANTHONY RUNYON, committed the offense after substantial planning and premeditation to cause the death of a person.

Count One (Conspiracy to Commit Murder for Hire):

YES X̸

NO _____

Count Two (Carjacking Resulting in Death):

YES X̸

NO _____

Count Five (Murder with a Firearm in Relation to a Crime of Violence):

YES X̸

NO _____

Instructions: Once you have completed the deliberations associated with Section III, please complete Section IV and advise the Court that you have reached a decision.

-6-

**915**

## IV. CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same decisions with regard to the age of defendant DAVID ANTHONY RUNYON, the threshold intent factors and the statutory aggravating factors no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.

All jurors and foreperson sign below:

**REDACTED COPY**

FOREPERSON

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

Date: July 17, 2009.

-7-

**916**



FILED
IN OPEN COURT

JUL 2 2 2009

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES OF AMERICA,

v.                                         Criminal No. 4:08cr16-03

DAVID ANTHONY RUNYON,

        Defendant.

## ORDER

This matter comes before the court on defendant's motion for appointment of James R. Merikangas, M.D.[1]  On June 23, 2009, the court took the motion under advisement pending the outcome of the guilt/innocence phase of the trial.  (Docket #229.)  On July 17, 2009, a guilty verdict was returned against defendant.  On July 22, 2009, the jury found the defendant eligible for imposition of the death penalty.  Accordingly, based on the previous pleadings filed in this matter,[2] and the "Statement of Counsel," filed by defendant on July 17, 2009,[3] the court hereby **GRANTS** defendant's motion.

---

[1] Defendant moved ex parte for Dr. Merikangas' appointment on June 9, 2009.  (Docket #206.)  The court sought clarification on this request on June 17, 2009.  (Docket #218.)  Such additional information and clarification was received on June 22, 2009.  (Docket #222.)  The matter is no longer ex parte.  See infra note 3 and accompanying text.

[2] See supra note 1 and accompanying text.

[3] The Statement of Counsel, which references Dr. Merikangas as "the psychiatrist defendant wishes to engage," and which clarifies an issue raised in the court's order of June 23, 2009, was not filed ex parte, and the United States has addressed this

917

Upon representation of defendant that such services are reasonably necessary to present an adequate defense, pursuant to 18 U.S.C. § 3599(a)(1), (f), and (g), it is **ORDERED** that James R. Merikangas, M.D., be appointed to serve as a psychiatrist and neurologist for defendant Runyon.[4] Dr. Merikangas' fees and expenses (to include all travel and mileage related expenses) shall not exceed $7,500.00, unless the excess amount is certified in advance by the presiding judicial officer.

Said examinations and report of findings by Dr. Merikangas shall be completed on or before August 6, 2009, and filed under seal with the court and transmitted to the United States on or before August 7, 2009. Any rebuttal or revised reports in response by the United States' experts shall be filed under seal with the court and transmitted to the defendant on or before August 14, 2009.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
United States District Judge

Rebecca Beach Smith
United States District Judge

Norfolk, Virginia
July 22 , 2009

---

matter through its opposition to a continuance. (See Docket #249.)

[3] Defendant's original request for appointment of Dr. Merikangas sought his appointment as a psychiatric expert. (See Docket #206 at 2.) Defendant's Statement of Counsel, filed July 17, 2009, indicates that Dr. Merikangas "is also a neurologist," and seeks his appointment for his expertise as both a psychiatrist and a neurologist. (See Docket #242.) As such, Dr. Merikangas is hereby appointed for both purposes.

2

**918**

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
## Newport News Division

### UNITED STATES OF AMERICA

v.                                                    Criminal No. 4:08cr16

### DAVID ANTHONY RUNYON

## MOTION TO ALLOW DEFENDANT TO
## SUPPLEMENT HIS MENTAL HEALTH REPORTS

Comes now the defendant, David Anthony Runyon, by counsel, and moves this Honorable Court to allow him to supplement the mental health reports filed herein by James Merikangas, MD, and Allan F. Mirsky, Ph.D., for the following reasons:

1.     Both Dr. James Merikangas and Dr. Allan F. Mirsky noted deficiencies in defendant's psychological testing and history of injuries which could have caused brain injury accounting for these deficiencies.

2.     The Government's expert, Dr. Paul Montalbano, noted the history of these injuries on page 20 of his report and Government expert, Dr. Raymond Patterson, notes the same history on pages 11 and 12 of his report.

3.     Dr. Montalbano opines on page 30 of his report that "...only a more detailed neuropsychological, neurological, and biopsychological investigation would definitely rule in or out brain dysfunction..."

-1-

**919**

4.    After conducting his examination of Mr. Runyon at the Portsmouth City Jail, Dr. Merikangas ordered an MRI and PET scan of Mr. Runyon's brain.

5.    The earliest the Marshall's office was able to schedule this testing was August 14, 2009.

6.    Defendant's expert reports were due and were submitted on August 6, 2009, to the Court and to the United States. Both reports from Dr. Merikangas and Dr. Mirsky have been of a preliminary nature pending the outcome of further neurological testing as has been scheduled.

7.    Given the seriousness of this case and the statements by the doctors of the necessity for the test results to determine if defendant has damage to his brain as a result of injuries that occurred prior to these offenses for which he has been convicted, defendant requests that he be allowed to supplement the reports of his mental health experts after the MRI and PET scan results are available, if necessary.

DAVID ANTHONY RUNYON


By:_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com


-2-


**920**

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of August, 2009, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Blair C. Perez, Esquire
United States Attorney's Office
101 W. Main Street, Suite 8000
Norfolk, VA 23510
Telephone: 757.441.6331
Telefax: 757.441.6689
blair.perez@usdoj.gov

Brian J. Samuels, Esquire
VSB No. 65898
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
brian.samuels@usdoj.gov

Lisa R. McKeel, Esquire
VSB No. 28652
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
lisa.mckeel@usdoj.gov

-3-

**921**

Lawrence Hunter Woodward, Jr., Esquire
Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
Counsel for David Anthony Runyon
4525 South Boulevard, Suite 300
Virginia Beach VA 23452
Telephone: 757.671.6047
Telefax: 757.671.6004
lwoodward@srgslaw.com

Larry M. Dash, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
150 Boush Street, Suite 403
Norfolk, VA 23510
larrydash@fd.org

Paul G. Gill, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
830 E. Main Street, Suite 1100
Richmond, VA 23219
paulgill@fd.org

Jeffrey A. Swartz, Esquire
Rabinowitz, Swartz, Taliaferro, Swartz & Goodove
Counsel for Catherina Rose Voss
150 Boush Street, Suite 800
Norfolk, VA 23510
jswartz@rstsg.com

James S. Ellenson, Esquire
Law Office of James Stephen Ellenson
Counsel for Michael Anthony Eric Draven
Bank of America Building
2600 Washington Avenue, Suite 1000
Newport News, VA 23607
jseatty@aol.com

-4-

**922**

Timothy G. Clancy, Esquire
Moschel & Clancy, PLLC
Counsel for Michael Anthony Eric Draven
2101 Executive Drive, Third Floor
Tower Box 78
Hampton VA 23666
tclancy@moschelandclancy.com

_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

-5-

**923**