## IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID ANTHONY RUNYON,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT NEWPORT NEWS

### JOINT APPENDIX - VOLUME III OF X
#### (Pages 924 - 1316)

Michele J. Brace
VA Capital Representation
Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
(434) 817-2970
mbrace@mindsort.com

Dana C. Hanson Chavis
Susanne Bales
Assistant Federal Defender
Federal Defender Services
of Eastern Tennessee
800 South Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979
dana_hansen@fd.org
susanne_bales@fd.org

G. Zachary Terwilliger
Lisa R. McKeel
Brian J. Samuels
Office of the U. S. Attorney
Fountain Plaza 3, Suite 300
721 Lakefront Commons
Newport News, VA 23606
(757) 591-4000
zachary.terwilliger3@usdoj.gov
lisa.mckeel@usdoj.gov
brian.samuels@usdoj.gov

*Counsel for Defendant-Appellant*          *Counsel for Plaintiff-Appellee*

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

# TABLE OF CONTENTS

*Volume I of X*

<u>Appendix Page</u>

District Court Docket [4:08-cr-00016-RBS-DEM-3]................................................1

Indictment
        Filed February 13, 2008 (Doc.3) ....................................................46

Notice of Intent to Seek the Death Penalty
        Filed July 17, 2008 (Doc.67)...........................................................63

Voss Statement of Facts
        Filed July 18, 2008 (Doc.70)...........................................................70

Notice Pursuant to Fed. R. Crim. P. 12.2 with attachment1
        Filed December 12, 2008 (Doc. 135) ............................................78

        Att. 1:    Abreviated CV – Evan S. Nelson, PH.D., ABPP (Doc.135-1)......83
        Att. 2:    CV – Evan S. Nelson, PH.D., ABPP (Doc.135-2)........................84

Defendant's Motion to Continue Trial
        Filed Feb. 20, 2009 (Doc.160).......................................................93

Order Granting Motion to Continue
        Feb. 23, 2009 (Doc.162)................................................................97

Notice Regarding Mental Health Experts
        Filed April 8, 2009 (Doc.177) .....................................................101

Defendant's Motion to Continue Trial Date
        Filed April 13, 2009 (Doc.179) ...................................................105

Response of the USA to Defendant's Motion to Continue
        Filed April 21, 2009  (Doc.181) ..................................................122

Order Denying Defendant's Motion to Continue and USA Motion to Sever
        Entered May 7, 2009 (Doc.194) ..................................................126

Juror Questionnaire Order with attachment 1
June 11, 2009 (Doc.211)..................................................................................139

Att. 1:    Blank Juror Questionnaire Filed June 11, 2009 (Doc.211-1) ......142

Memorandum Order Denying Defendant's Objections to Nonstatutory
Aggravating Factors
Entered June 17, 2009 (Doc.217) ................................................................161

Defendant's Supp. Notice Regarding Mental Health Experts
Filed June  29, 2009 (Doc.230) ...................................................................173

Forensic Psychiatric Evaluation by Dr. Patterson
Filed June 29, 2009 (Doc.276) (Unsealed March 2, 2016 Order dkt516)...177

Forensic Psychological Evaluation by Dr. Montalbano
Filed June 30, 2009 (Doc.277) (Unsealed March 2, 2016 Order dkt516)...201

Transcript of First Day of Trial,
On June 30, 2009 (Doc.326 filed Mar. 31, 2010) ......................................232

Voir Dire (pp.1-134)....................................................................................233

Transcript of Second Day of Trial,
On July 1, 2009 (Doc.327 filed Mar. 31, 2010) .........................................365

Voir Dire (pp. 138, 194-195) .......................................................................366

Transcript of Third Day of Trial,
On Jul. 2, 2009 (Doc.328 filed Mar. 31, 2010) ..........................................369

Preliminary Proceedings (p.198) .................................................................370

Transcript of Fourth Day of Trial,
Jul. 6, 2009 (Doc.329, filed Mar. 31, 2010) ...............................................371

Testimony of Rose Wiggins (pp.257-265)
Direct Examination by Ms. McKeel.......................................................374
Cross Examination by Mr. Woodward....................................................380
Redirect Examination by Ms. McKeel ...................................................382

Testimony of John Willmer (pp.353-374)
    Direct Examination by Mr. Samuels ....................................................383
    Cross Examination by Mr. Woodward.................................................401
    Redirect Examination by Mr. Samuels................................................403

Testimony of Randy Lassiter (pp.435-469)
    Direct Examination by Ms. McKeel.....................................................406
    Cross Examination by Mr. Ellenson.....................................................463
    Redirect Examination by Ms. McKeel .................................................437

Transcript of Sixth Day of Trial,
    On July 8, 2009 (Doc.331filed March 31, 2010) ........................................440

Testimony of Nichole King (pp.731-764)
    Direct Examination by Ms. McKeel.....................................................442
    Cross Examination by Mr. Woodward.................................................469

Testimony of Lawrence Ford (pp.765-774)
    Direct Examination by Ms. McKeel.....................................................476
    Cross Examination by Mr. Clancy .......................................................484

Testimony of George Koski (pp.840-856)
    Direct Examination by Ms. McKeel.....................................................486
    Cross Examination by Mr. Woodward.................................................499

## *Vol II of X*

Transcript of Seventh Day of Trial,
    On July 9, 2009 (Doc.332, filed Mar. 31, 2010) ........................................503

Testimony of Paul Swartz (pp.900-918)
    Direct Examination by Mr. Samuels ....................................................506

Testimony of William Banks (pp.1031-1063)
    Direct Examination by Ms. McKeel.....................................................526
    Cross Examination by Mr. Woodward.................................................544
    Redirect Examination by Ms. McKeel .................................................556
    Recross Examination by Mr. Ellenson .................................................558

Testimony of Paul Swartz (pp.1065-1117)
    Direct Examination by Mr. Samuels ....................................................561

Cross Examination by Mr. Woodward ...................................................605
Redirect Examination by Ms. McKeel ...................................................612

Transcript of Eighth Day of Trial,
On Jul.y 13, 2009 (Doc.333, filed Mar. 31, 2010) ......................................613

Proceedings re Stipulation No. 94 ..............................................................615

Testimony of Paul Swartz (pp.1354-1370) (recalled)
Direct Examination by Mr. Samuels .......................................................616

Transcript of Ninth Day of Trial,
On July 14, 2009 (Doc.334, filed Mar. 31, 2010) ......................................632

Testimony of Paul Swartz (pp.1378-1491) (resumed)

Direct Examination by Mr. Samuels ....................................................635
Cross Examination by Mr. Clancy ........................................................722
Redirect Examination by Mr. Samuels...................................................745

Transcript of Tenth Day of Trial,
On July 15, 2009 (Doc. 335, filed Mar. 31, 2010) ..................................... 749

Proceedings re Stipulations (pp.1509-1519) .............................................752
Court's Rulings re Motions .......................................................................754

Transcript of Eleventh Day of Trial,
On July 16, 2009 (Doc.336, filed Mar. 31, 2010) ......................................762

Closing Arguments:

AUSA McKeel, Guilt Phase Closing (pp.1582-1613) ...........................764
Counsel Woodward, Guilt Phase Closing (pp.1633-1656) ....................796
AUSA McKeel, Guilt Phase Rebuttal Closing (pp.1656-1665).............819

Court Jury Instructions (pp.1666-1714) ....................................................829

Supplemental Motion to Continue Capital Sentencing Hearing
Filed July 17, 2009 (Doc.240) ........................................................................882

Statement of Defense Counsel
Filed July 17, 2009 (Doc.242)..............................................................................889

Verdict Guilt Phase
Filed July 17, 2009 (Doc.245),..................................................................894

Second Supp. Motion to Continue Capital Sentencing Hearing
July 20, 2009 (Doc.247) ......................................................................895

Transcript of Thirteenth Day of Trial,
On July 22, 2009 (Doc. 338, filed Apr. 2, 2010)........................................902

Counsel Hudgins,  Eligibility Phase Closing (pp. 1769-1772) ...................903

Order Granting Motion to Continue
Filed July 22, 2009 (Doc.254) ...................................................................907

Special Verdict Eligibility Phase
Filed July 22, 2009 (Doc.255) ...................................................................910

Order Appointing Dr. Merikangas
Entered July 22, 2009 (Doc.257)................................................................917

Defendant's Motion to Supp. Mental Health Report
Filed August 10, 2009 (Doc.269) ..............................................................919

*Vol III of X*

Transcript of Fifteenth Day of Trial,
On August 20, 2009 (Doc. 340, filed Apr. 2, 2010)....................................924

Argument/Ruling Dr. Cunningham Testimony (p.2076-2084)...................925

Testimony of Dr. Cunningham (pp. 2084-2192)
Direct Examination by Mr. Hudgins ....................................................933
Cross Examination by Mr. Samuels .....................................................1007

Defendant's Mitigating Factors Enumerated
Filed August 21, 2009 (Doc.285) ..............................................................1042

Transcript of Sixteenth Day of Trial,
On August 24, 2009 (Doc.341, filed Apr. 29, 2010)..................................1047

Testimony of Deputy Westrick, Portsmouth Sheriff's Office (pp.2199-2209)
    Direct Examination by Mr. Hudgins ...................................................1049
    Cross Examination by Mr. Samuels .................................................1056

Testimony of Deputy Johnson, Portsmouth Sheriff's Office (pp.2209-2217)
    Direct Examination by Mr. Hudgins ...................................................1059
    Cross Examination by Ms. McKeel....................................................1065
    Redirect Examination by Mr. Hudgins..............................................1067

Testimony of Deputy Anderson, Portsmouth Sheriff's Office (pp.2217-2225)
    Direct Examination by Mr. Hudgins ...................................................1067
    Cross Examination by Ms. McKeel....................................................1072

Testimony of Deputy Marbry, Portsmouth Sheriff's Office (pp.2226-2234)
    Direct Examination by Mr. Hudgins ...................................................1076
    Cross Examination by Mr. Samuels .................................................1080

Testimony of Deputy Singledecker, Portsmouth Sheriff's Office
(pp.2234-2239)
    Direct Examination by Mr. Hudgins ...................................................1084
    Cross Examination by Ms. McKeel....................................................1087

Testimony of Deputy Diaz, Portsmouth Sheriff's Office (pp.2239-2244)
    Direct Examination by Mr. Hudgins ...................................................1089
    Cross Examination by Mr. Samuels .................................................1092

Testimony of David H. Runyon (pp.2366-2409)
    Direct Examination by Mr. Hudgins ...................................................1095
    Cross Examination by Mr. Samuels .................................................1136

Testimony of Suk Cha Runyon (pp.2410-2439)
    Direct Examination by Mr. Hudgins ...................................................1139

Transcript of Seventeenth Day of Trial,
    On August 25, 2009 (Doc.342, filed Apr. 29, 2010)................................1170

Testimony of Phyllis Provost (pp.2518-2527)
    Direct Examination by Mr. Hudgins ...................................................1171
    Cross Examination by Ms. McKeel....................................................1177

Transcript of Eighteenth Day of Trial,
  On August 26, 2009 (Doc.343, filed Apr. 29, 2010)...................................1181

  AUSA Samuels, Sentence Selection Closing (pp.2588-2626)..................1182
  Counsel Woodward, Sentence Selection Closing (pp.2632-2656) ...........1226
  AUSA Samuels, Sentencing Rebuttal Closing (pp. 2656-2664)...............1250
  Court Jury Instructions (pp.2664-2696) ..................................................1258

Transcript of Nineteenth Day of Trial,
  On August 27, 2009 (Doc. 344, filed Apr. 29, 2010)................................1292

  Jury Question  (pp.2707-2710) ......................................................................1298

Special Verdict Form - Selection Phase
  Filed August 27, 2009 (Doc.291) .................................................................1311

*Volume IV of X*

## **Gov't Trial Exhibits**

Gov't Ex. 23:  Commonwealth of Virginia Department of Forensic
               Science Certificate of Analysis ......................................1317

Gov't Ex. 28:  ATM Still Photos..........................................................1318

Gov't Ex. 65:  Bates 065-006 Global Cash Receipt.............................1352

Gov't Ex. 94:  Summary of Funds Available to/Spent by Cat Voss......1364

Gov't Ex. 101:  Others' Inboxes............................................................1365

Gov't Ex. 109:  Sprint Detail Records for Runyon phone
                304-685-6845...................................................1367

Gov't Ex. 135:  Map of cell tower locations .........................................1393

Gov't Ex. 217:  "Checklist for Crime" .................................................1395

Gov't Ex. 236:   Photo of bullets...........................................................1397

Gov't Ex. 311:   City of Wichita Municipal Court 01-CR-1407.............1398

Gov't Ex. 313:  Wichita Police Dept. Incident Report dated
                 Jul. 23, 1994.....................................................1404

Gov't Ex. 315:    Magistrate Court of Monongalia County, West Virginia
1412 ..............................................................................1412

Gov't Ex. 316:    Morgantown Police Dept. Investigation/Incident Report
dated Jan. 6, 2007 ......................................................1433

Position of US with Respect to Sentencing Factors
Filed November 10, 2009 (Doc.301)........................................................1443

Judgment
Filed December 4, 2009 (Doc.313) .........................................................1458

Defendant's Motion for Limited Unsealing of Record
On March 17, 2015 (Doc.415)...................................................................1466

Memorandum in Support of Defendant's Motion for Limited Unsealing of
Record with Exhibit 3
On March 17, 2015 (Doc.416)...................................................................1468

    Ex. 3:    Declaration of Michele Brace (Doc.416-3)..............................1474

United States' Response to Motion for Limited Unsealing of Record
On March 31, 2015 (Doc.418)...................................................................1476

Defendant's Rebuttal Supporting Motion for Limited Unsealing of Record
Filed April 3, 2015 (Doc.421) ..................................................................1481

Order Granting Limited Unsealing of Record
Filed Apr. 7, 2015 (Doc.422) ....................................................................1487

Supp. Order Regarding Limited Unsealing of Record Questionnaires
Filed April 13, 2015 (Doc.423), ...............................................................1494

Original §2255 Motion with Exhibit 1
Filed October 5, 2015 (Doc.478)...............................................................1497

    Ex. 1:    Records Request to Bureau of Prisons, 06/02/15
(Doc.478-1)............................................................... 1622A – 1622C
    Ex. 2–36:  Omitted – See JA pp. 1992 - 2247

Defendant's First Motion for Discovery  with Exhibits 1 – 5
Filed December 9, 2015 (Doc.491) .........................................................1623

Ex. 1:   ATF ROI dated Feb. 2, 2009 (Doc.491-1).....................................1661

Ex. 2:   USA v. Runyon Disk Index (Doc.491-2) ......................................1663

Ex. 3:   USA Gov't Witness List Fax, p.9 (Doc.491-3) .............................1664

Ex. 4:   Medical/Mental Health Records Request to Portsmouth Sheriff's
         Department from FDSET dated Oct. 2, 2015 (Doc.491-4)..........1666

Ex. 5:   Medical/Mental Health Records Request to Portsmouth Sheriff's
         Department from FDSET dated Nov. 3, 2015 (Doc.491-5)........1667

United States' Response to Original §2255 Motion
         Filed January 11, 2016  (Doc.497) ...........................................1670

Order directing reply to §2255
         Entered January 15, 2016 (Doc.499)........................................1811

USA Opposition to First Motion for Discovery
         Filed January 15, 2016 (Doc.500) ...........................................1812

Reply Supporting First Motion for Discovery
         Filed January 29, 2016 (Doc.506) ...........................................1824

Amended §2255 Motion  with Exhibits 1 – 39
         Filed February 4, 2016 (Doc.511) ...........................................1842

Ex. 1:   Placeholder (Doc.511-1) ..............................................1991

Ex. 2:   Dr. Merikangas Report 9/25/15 (Doc.511-2)..............................1992

Ex. 3:   McNally Declaration 3/11/09 (Doc.511-3).................................1998

Ex. 4:   Cronin Declaration 9/26/15 (Doc.511-4)....................................2002

Ex. 5:   Hudgins Declaration 9/22/15 (Doc.511-5) .................................2016

Ex. 6:   Woodward Declaration 9/24/15 (Doc.511-6) .............................2019

Ex. 7:   Costa Declaration 9/30/15 (Doc.511-7).....................................2022

Ex. 8:   Cunningham Declaration 9/25/15 (Doc.511-8) ..........................2024

Ex. 9:    Cat Voss Declaration 9/10/15 (Doc.511-9) .................................2079

Ex. 10:   David Dalton Declaration 9/28/15 (Doc.511-10) ......................2082

Ex. 11:    Paula Dalton Declaration 9/28/15 (Doc.511-11) ......................2083

Ex. 12:    Matt Long Declaration 9/29/15 (Doc.511-12)...........................2085

Ex. 13:    Scott Linker Declaration 9/24/15 (Doc.511-13) .......................2086

Ex. 14:    Excerpt Cell Phone Tracking Evidence (Doc.511-14) ..............2089

Ex. 15:    Babineau letter regarding death authorization 2/10/09
          (Doc.511-15),.................................................................2109

Ex. 16:    Portsmouth Jail Records 2008 (Doc.511-16).............................2119

Ex. 17:    David Dombrowski progress notes (Doc.511-17) .....................2123

Ex. 18:    Lake Martin Community Hospital response (Doc.511-18) .......2125

Ex. 19:    Hudgins time schedule with mark ups ECF No 165
          (Doc.511-19)..................................................................2128

Ex. 20:    Dr. Mirsky letter 7/2/09 (Doc.511-20)......................................2131

Ex. 21:    Dr. Mirsky/Hudgins emails 7/22-23/09 (Doc.511-21) .............2132

Ex. 22:    Dr. Mirsky letter 9 18 09 (Doc.511-22)....................................2133

Ex. 23:    Army medical records (Doc.511-23) .........................................2136

Ex. 24:    Handwritten letter regarding 1996 car accident (Doc.511-24)..2160

Ex. 25:    Suk Cha Runyon medical records (Doc.511-25)........................2162

Ex. 26:    David Dombrowski declaration 9/23/15 (Doc.511-26)..............2177

Ex. 27:    Mark Runyon declaration 9/25/15 (Doc.511-27) ......................2187

Ex. 28:    Maria Runyon declaration 9/16/15 (Doc.511-28).....................2194

Ex.29:    Dr. Dudley report 9/29/15 (Doc.511-29) ..................................2199

Ex. 30:    Thomas Preston interview 10/4/08 (Doc.511-30)......................2223

Ex. 31:    Robert Seeger declaration 8/24/15 (Doc.511-31) .....................2226

Ex. 32:   Deborah Seeger declaration 8/24/15 (Doc.511-32) ...................2229

Ex. 33:   Captain Harris Declaration Fayetteville GA Police Dept.
          1/13/16 (Doc.511-33) .................................................2234

Ex. 34:   Scotty Fleming criminal history (Doc.511-34)..........................2235

Ex. 35:   Dr. Mirsky report 8/28/15 (Doc.511-35) ...............................2237

Ex. 36:   Teresa Norris declaration 9/29/15 (Doc.511-36).......................2244

Ex. 37:   Racial Disparities Staff Report by the Subcommittee
          on Civil and Constitutional Rights (Doc.511-37) .....................2248

Ex. 38:    Cohen Bell Declaration (Doc.511-38) ...................................2261

Ex. 39:    Declaration of Michele J Brace (Doc.511-39).........................2269

Order
    Entered February 8, 2016 (Doc.513)........................................2271

## *Volume VI of X*

Reply Supporting Original §2255 Motion
    Filed March 28, 2016 (Doc.526) ...........................................2272

    Ex. A: Clinical Screening Information (Doc.526-1) ..................2366

Petitioner's Second Motion for Discovery
    Filed April 1, 2016 (Doc.530) ..............................................2368

United States' Response to Second Motion for Discovery
    Filed April 8, 2016 (Doc.532) ..............................................2376

Reply Supporting Second Motion for Discovery with Attachments A – C
    Filed April 13, 2016 (Doc.533) ...........................................2384

    Att. A:   Strengthening Forensic Science in the United States, A Path
              Forward (Doc.533-1) ...............................................2392

    Att. B:   Charter USDOJ National Commission on Forensic Science
              (Doc.533-2),.........................................................2473

Att. C:   National Commission on Forensic Science Views of the
Commission Validation of Forensic Science Methodology
(Doc.533-3)..............................................................................2482

United States' Response to Amended §2255 Motion
Filed April 22, 2016 (Doc.536) .............................................................2485


Motion for Leave to Supplement Second Motion for Discovery
Filed May 24, 2016 (Doc.541) ...............................................................2644


Order Granting Supplement of Discovery Motion
Entered June 7, 2016 (Doc.544) ............................................................2648


Supplemental Memo to Second Motion for Discovery
Filed June 8, 2016 (Doc.545) ................................................................2651


Att. A:   John Nixon Declaration (Doc.545-1) .......................................2654

Reply Supporting Amended §2255 Motion  with Exhibits 1 – 5
Filed July 7, 2016 (Doc.551)..................................................................2656


Ex. 1:   Stephen Hudgins Declaration dated Jun. 22, 2016 (Doc.551-1) .2803


Ex. 2:   John Nixon Declaration dated May 18, 2016 (Doc.551-2) .........2807


Ex. 3:   Joseph Kennedy Declaration dated Jul. 6, 2016 (Doc.551-3) .....2809


Ex. 4:   Stephen Hudgins Calendar from Appointment to Beginning of
Runyon Trial (Doc.551-4) .........................................................2812


Ex. 5:   USA Strikes of Black Veniremen Report (Doc.551-5) ...............2813

*Volume VII of X*

Order for Subpoena Duces Tecum
Entered July 12, 2016 (Doc.552)............................................................2817


Subpoena to Dept. of Forensic Science with attachment 1
Filed July 13, 2016 (Doc.553) ................................................................2818

Att. 1:   Order for Subpoena to Dept. of Forensic Science
      (Doc.553-1)...............................................................................2822

Order for Costa Grand Jury Testimony
      Entered July 26, 2016  (Doc.555)..........................................2823
Opinion Denying §2255 Motion and Denying Discovery
      Filed Jan. 19, 2017 (Doc.560, 560-1, 560-2, 560-3, 560-4)..............................2824

Judgment
      Filed January 20, 2017 (Doc.561),....................................3070

Petitioner's Motion for Sealed Materials Subpoenaed by Court
      Filed February 1, 2017 (Doc.564).....................................3071

Petitioner's Memorandum for Sealed Materials Subpoenaed by Court
      Filed February 1, 2017  (Doc.565).....................................3074

Rule 59(e) Motion to Alter or Amend
      Filed February 16, 2017 (Doc.566)....................................3079

Rule 59(e) Memorandum with attachment A
      Filed Feb. 16, 2017  (Doc.567) .........................................3081

      Att. A:   Paula Dalton Declaration (Doc.567-1)...............................3102

Order Denying Access to Sealed Material Subpoenaed by Court
      Entered February 21, 2017 (Doc.568)................................3103

Petitioner's Third Motion for Discovery
      Filed February 24, 2017 (Doc.570)....................................3111

United States' Response to Third Motion for Discovery
      Filed March 31, 2017 (Doc.574).......................................3122

United States' Response to Rule 59(e) Motion
      Filed March 31, 2017 (Doc.575).......................................3132

Petitioner's Reply Supporting Third Motion for Discovery
      Filed April 6, 2017 (Doc.576),.........................................3135

Record Notation Order
      Filed June 16, 2017 (Doc.583) .........................................3138

Order Directing Re-entry of Order Denying 59(e) Motion and Denying Third Motion
for Discovery
Entered June 21, 2017  (Doc.586) ..................................................................... 3140

Re-entered Order Denying 59(e) Motion and Denying Third Motion for Discovery
Filed June 21, 2017 (Doc.587), ......................................................................... 3143

Petitioner's Motion to Expand Record
Filed August 18, 2017 (Doc.588) ...................................................................... 3154

Petitioner's Motion to Permit Copying and Distribution of Protected Documents
Filed August 18, 2017 (Doc.589), ..................................................................... 3157

Notice of Appeal
Filed August 18, 2017 (Doc.590) ...................................................................... 3160

Order Granting Motion to Expand the Record
Entered September 15, 2017 (Doc.596) ............................................................. 3163

Order Granting Motion to Permit Copying and Distribution of Protected Documents
Entered September 15, 2017 (Doc.597) ............................................................. 3166

*Volume VIII of X - Sealed*

Supplemental Motion for Neuropsychologist Expert Services and Approval of
Additional Funds for Paralegal/Discovery Coordinator Services Ex Parte
Filed February 5, 2009 (Doc.153) ..................................................................... 3169

Att. 1:    02/05/09 Cover Letter (Doc.153-1) ....................................................... 3172
Att. 2:    CV – Scott D. Bender, Ph.D., ABPP-CN (Doc153-2) ........................ 3173

Supplemental Motion for Psychiatrist and to Change the Designation of the
Neuropsychologist Expert Previously Approved by the Court
Filed June 8, 2009 (Doc.204) ........................................................................... 3176

Letter from Judge Smith directing three juror lists to be picked up by counsel
Filed June 12, 2009 (Doc.210) .......................................................................... 3178

Order deferring action on defendant's motion for psychiatrist Dr. Merikangas
Entered June 23, 2009 (Doc.229) ...................................................................... 3181

Psychological Evaluation of Dr. Mirsky
   Filed July 20, 2009 (Doc.246) .......................................................................... 3184

Strike List for First Day
   Filed April 13, 2015 (Doc.424) ........................................................................ 3190

Strike List for Second Day
   Filed Apr. 13, 2015 (Doc.424-1) ...................................................................... 3194

Order sealing Claim S2 and Exhibit S-1
   Entered October 5, 2015 (Doc.477) ................................................................. 3198

Original Claim S-2
   Filed Oct. 5, 2015 (Doc.477-1) ........................................................................ 3203

Exhibit S-1
   Filed Oct. 5, 2015 (Doc.477-2) ........................................................................ 3223

Addendum S-1 to First Motion for Discovery
   Dec. 4, 2015 (Doc.490) ..................................................................................... 3236

United States' Response to Original Claim S2
   Filed January 11, 2016 (Doc.498) .................................................................... 3237

Petitioner's Motion to File Under Seal One Claim and One Exhibit in His
Amended Motion for Collateral Relief
   Filed February 4, 2016 (Doc507) ..................................................................... 3245

Amended Claim S2
   Filed Feb. 4, 2016 (Doc.508) ........................................................................... 3249

Reply Supporting Original Claim S2
   Filed Mar. 28, 2016 (Doc.525) ......................................................................... 3269

United States' Response to Amended Claim S2
   Filed Apr. 22, 2016 (Doc.537) .......................................................................... 3275

Reply Supporting Amended Claim S2
   Filed July 7, 2016 (Doc.549) ............................................................................ 3284

Completed Questionnaire of Prospective Juror 1 ........................................................ 3291

Completed Questionnaire of Prospective Juror 2 ........................................................ 3310

Completed Questionnaire of Prospective Juror 4 .................................................. 3329

Completed Questionnaire of Prospective Juror 7 .................................................. 3348

Completed Questionnaire of Prospective Juror 10 ................................................ 3367

Completed Questionnaire of Prospective Juror 12 ................................................ 3386

Completed Questionnaire of Prospective Juror 13 ................................................ 3405

Completed Questionnaire of Prospective Juror 14 ................................................ 3424

Completed Questionnaire of Prospective Juror 15 ................................................ 3443

Completed Questionnaire of Prospective Juror 18 ................................................ 3462

Completed Questionnaire of Prospective Juror 20 ................................................ 3481

Completed Questionnaire of Prospective Juror 23 ................................................ 3500

Completed Questionnaire of Prospective Juror 24 ................................................ 3519

Completed Questionnaire of Prospective Juror 27 ................................................ 3538

Completed Questionnaire of Prospective Juror 28 ................................................ 3557

*Volume IX of X - Sealed*

Completed Questionnaire of Prospective Juror 29 ................................................ 3576

Completed Questionnaire of Prospective Juror 31 ................................................ 3595

Completed Questionnaire of Prospective Juror 32 ................................................ 3614

Completed Questionnaire of Prospective Juror 34 ................................................ 3633

Completed Questionnaire of Prospective Juror 35 ................................................ 3652

Completed Questionnaire of Prospective Juror 40 ................................................ 3671

Completed Questionnaire of Prospective Juror 46 ................................................ 3690

Completed Questionnaire of Prospective Juror 50 ................................................ 3709

Completed Questionnaire of Prospective Juror 51 ................................................ 3728

Completed Questionnaire of Prospective Juror 52 ................................................ 3747

Completed Questionnaire of Prospective Juror 54 ................................................ 3766

Completed Questionnaire of Prospective Juror 63 ...................................................... 3785

Completed Questionnaire of Prospective Juror 64 ...................................................... 3804

Completed Questionnaire of Prospective Juror 65 ...................................................... 3823

Completed Questionnaire of Prospective Juror 66 ...................................................... 3842

Completed Questionnaire of Prospective Juror 67 ...................................................... 3861

Completed Questionnaire of Prospective Juror 68 ...................................................... 3880

Completed Questionnaire of Prospective Juror 69 ...................................................... 3899

Completed Questionnaire of Prospective Juror 70 ...................................................... 3918

Completed Questionnaire of Prospective Juror 73 ...................................................... 3937

Completed Questionnaire of Prospective Juror 74 ...................................................... 3956

Completed Questionnaire of Prospective Juror 75 ...................................................... 3975

Completed Questionnaire of Prospective Juror 78 ...................................................... 3994

Completed Questionnaire of Prospective Juror 80 ...................................................... 4013

*Volume X of X - Sealed*

Completed Questionnaire of Prospective Juror 81 ...................................................... 4032

Completed Questionnaire of Prospective Juror 82 ...................................................... 4051

Completed Questionnaire of Prospective Juror 84 ...................................................... 4070

Completed Questionnaire of Prospective Juror 86 ...................................................... 4089

Completed Questionnaire of Prospective Juror 87 ...................................................... 4108

Completed Questionnaire of Prospective Juror 91 ...................................................... 4127

Completed Questionnaire of Prospective Juror 95 ...................................................... 4146

Completed Questionnaire of Prospective Juror 97 ...................................................... 4165

Completed Questionnaire of Prospective Juror 98 ...................................................... 4184

Completed Questionnaire of Prospective Juror 100 .................................................... 4203

Completed Questionnaire of Prospective Juror 106 .................................................... 4222

Completed Questionnaire of Prospective Juror 107......................................................... 4241

Completed Questionnaire of Prospective Juror 109......................................................... 4260

Completed Questionnaire of Prospective Juror 110......................................................... 4279

Completed Questionnaire of Prospective Juror 113......................................................... 4298

Completed Questionnaire of Prospective Juror 115......................................................... 4317

Completed Questionnaire of Prospective Juror 116......................................................... 4336

Completed Questionnaire of Prospective Juror 117......................................................... 4355

Completed Questionnaire of Prospective Juror 118......................................................... 4374

Completed Questionnaire of Prospective Juror 119......................................................... 4393

Completed Questionnaire of Prospective Juror 120......................................................... 4412

Completed Questionnaire of Prospective Juror 124......................................................... 4431

Completed Questionnaire of Prospective Juror 126......................................................... 4450

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division


UNITED STATES OF AMERICA )
)                CRIMINAL ACTION
        v.                   )
)                NO. 4:08cr16
DAVID ANTHONY RUNYON,        )
)
        Defendant.           )


TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

August 20, 2009


**FIFTEENTH DAY OF TRIAL**

**(Penalty Phase)**


Before:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge, and a Jury


Appearances:

          LISA R. MCKEEL
          BRIAN J. SAMUELS
          Assistant United States Attorneys
              Counsel for the United States

          STEPHEN A. HUDGINS
          LAWRENCE H. WOODWARD, JR.
              Counsel for David Anthony Runyon

GLORIA S. SMITH, OFFICIAL REPORTER

**924**

\* ⊤ \*

So we will need to be in luncheon recess. You will have a bit longer than usual. You will be in luncheon recess until 1:30, so you have a couple of hours for your luncheon recess. You are excused for lunch.

(The jury exited the courtroom.)

THE COURT: Counsel, the affidavit from Ms. Linker is still marked received and not admitted, and I will still keep this and await any rebuttal. I would tell you that I don't think it says anything except what the police officer testified to with the police report in. But if there is some type of attack or you feel it is appropriate rebuttal, it is now not in evidence, it is just marked received and under advisement, so it still remains not admitted.

Is there anything else that we need to take up at this juncture, Ms. McKeel?

MS. MCKEEL: No, ma'am.

MR. HUDGINS: No, Your Honor.

THE COURT: Then if you would reconvene at 1:30, that will be hopefully the time that we will be ready to move forward. So the court stands in recess until 1:30.

(A recess was taken for lunch.)

AFTERNOON SESSION

THE COURT: Counsel and the defendant are present.

I will give you a brief oral ruling in regard to Dr. Cunningham's testimony, and then we can proceed into the

testimony, which may require further rulings during the course of that testimony. I reserve the option to issue a written opinion preserving and putting in more detail the court's reasoning and legal authority for its rulings at a later time.

On June 16, 2008, this court entered an order regarding mental health evidence, which I will refer to as the order, which required notice of intent to introduce expert evidence relating to mental disease or defect at the penalty phase of the trial no later than 90 days prior to the jury's selection. That is docket No. 65.

On December 12, 2008, defendant Runyon properly filed his notice pursuant to Federal Rule of Criminal Procedure 12.2, which I will on occasion refer to as the notice, and that is Docket No. 131.

Mark D. Cunningham, PhD, was among those experts listed in the notice. The notice specifically stated as follows, quote: Dr. Cunningham will describe developmental factors in defendant's background that singly and cumulatively increase his risk to adverse adolescent and adult outcomes, including delinquency, criminality, and criminal violence.

Dr. Cunningham will describe and particularize to the defendant scholarly findings supporting the nexus such risk factors have with adverse outcomes, providing the jury with a basis for giving informed weight to the defendant's history as it considers mitigation. Dr. Cunningham's

testimony will be accompanied by numerous digital demonstrative exhibits to facilitate the jury's understanding of the defendant's history and implications of this history and the associated scholarly perspectives.

Pending review and analysis of correctional records and other factors as well as strategic determinations by counsel, Dr. Cunningham may be called upon to address factors that increase the likelihood of the defendant making a positive adjustment to a life term in the Federal Bureau of Prisons, BOP, i.e., positive prisoner evidence. If called upon to provide such analysis and testimony, Dr. Cunningham will particularize to the defendant scholarly and research findings regarding rates and correlates of prison misconduct and violence, including the effectiveness of BOP in securely managing prisoners and in limiting serious violence against staff and other inmates.

That was Paragraph 2 of the notice.

On July 20, 2009, Dr. Cunningham filed a mental health evaluation report, which I will interchangeably call the report, and that was Docket No. 246.

A motion in limine of the United States to limit testimony of defendant's expert, Dr. Mark Cunningham, which I will call interchangeably the motion, was filed on August 10, 2009, and that is Docket No. 267. The United States in that motion first asks the court to prevent Dr. Cunningham from

testifying about the first paragraph that I read before. It is Paragraph 2, but it is the first part of Paragraph 2 that I previously read and quoted from.

The United States first asks the court to prevent Dr. Cunningham from testifying about developmental factors in the defendant's background which increase the defendant's risk of adverse outcomes, because there was no mention of any such data regarding this area of testimony in his mental health evaluation report filed on July 20, 2009. The defendant has not contested this point, and there is no developmental factor data in the report as referenced in the quote from the notice. Since the defendant has not contested it, and there is nothing to this effect in the report, therefore no such testimony is anticipated or would be allowed from Dr. Cunningham in this area.

Mr. Hudgins, that is correct, that it has not been offered; is that correct?

MR. HUDGINS: That is correct, Your Honor.

THE COURT: All right. So that basically makes that portion of the motion a nonissue.

Second, the United States asks the court to preclude Dr. Cunningham -- what they call his usual testimony regarding capital defendants' future dangerousness in two areas: One, the risk that the defendant will engage in violent misconduct in the future while in prison; and, two, the ability of the

federal Bureau of Prisons to manage and guard against inmate conduct, thus reducing the risk that this defendant poses for future dangerousness. That's in the United States' motion at 4.

The United States argues that this testimony would be fallacious because the testimony would be irrelevant, prejudicial, and confusing to the jury, and would allow Dr. Cunningham to discuss topics on which he is not an expert.

Before I address that portion of the motion for purposes of testimony, I would move to the third objection of the United States, which we briefly addressed yesterday afternoon, and that third objection was put forth in the United States' motion to allow defendant to supplement mental health reports, which I interchangeably called the response, filed on August 14, 2009. That argument that was put forth was that the testimony should be confined to the data and information that was included in the report.

We went through that yesterday, and while I'm sympathetic to the United States, and I find that it was a late disclosure of the information and was not properly disclosed in the report, that data will be admitted to the extent that it comports with my other rulings in terms of how he qualifies as an expert and on which subjects he can express opinions.

So consequently I'm not overlooking the late

disclosure, but I don't find bad faith on the part of counsel. I do think it should have been more timely produced by Dr. Cunningham, since he obviously testifies repetitively on this subject. The case law is replete with his testimony. I think I have found at least ten cases where courts have addressed his testimony at the district court level. So I'm of the opinion, as I indicated yesterday, some of these studies go back to four or five years ago that are being referenced, and they certainly should have been produced.

But to the extent that they interplay with the court's ruling to allow certain testimony, I will allow the late disclosure. So to that extent I rule on the motion, and I don't find bad faith by counsel. I know that counsel has been diligently preparing and working on this case.

That brings us to the testimony regarding what I will just call part two of the notice, the review and analysis of correctional records and other factors that Dr. Cunningham plans to address.

To the extent that he is going to address this defendant's ability to adjust in the prison system, using what I think he calls his positive prisoner analysis or base rate analysis, to the extent that that base rate analysis is specifically tied in to Mr. Runyon and Mr. Runyon's background and ability, the court will allow that testimony.

To the extent that it is just a review of general

Bureau of Prisons data and the facilities that may be offered and how an individual may adjust, when you don't know what facility they are going to be in and that it will actually be Mr. Runyon, and it is not individually specific to Mr. Runyon, I'm not going to allow that testimony.

So the testimony of Dr. Cunningham needs to be confined to the likelihood that this defendant will make a positive adjustment to a life term in the Bureau of Prisons, his positive prisoner evidence, to the extent that it is particularized to this defendant and this defendant's ability to adjust to prisoner life.

I would note that there was an objection by the United States to the exhibits, and part of that objection -- and I know everything was somewhat co-mingled because of the different types of pleadings -- but to the use of undisclosed exhibits. Part of that was that Dr. Cunningham would be referring to these exhibits and reports which would be statistical and demonstrative research exhibits, and to the extent that he uses those the way any expert would use it, to say, this is what an expert in my field -- in other words, he qualifies as an expert, it is something that an expert in the field would look at vis-a-vis this individual, I would allow that.

But I won't allow it in terms of just, these are the options out there, and this is the BOP data, and consequently,

with this kind of data, anybody can get in with certain caveats and perform at a particular prison. So that is not going to be allowed, the Bureau of Prisons data in general, unless it can be tied to this defendant and something that an expert in the field would rely on, the way you would present to any expert witness: Is this a treatise that you rely on, and the source of it, and how you used it as a basis to form your opinion; in other words, the traditional expert rules in terms of reliance upon scholarly works and treatises and data and information in the field.

I hope that that is helpful. At a threshold level, Dr. Cunningham needs to be put on the stand, and the defendant can set his qualifications, offer him as an expert, and then I will give the United States a chance to inquire, and then he will be qualified in a field to testify about this defendant, and then after that qualification, the examination can go forward.

So that's at this juncture the best direction that I can give everyone.

Do you have any other questions at this point?

MR. SAMUELS: No, Your Honor, thank you.

THE COURT: Mr. Hudgins?

MR. HUDGINS: No, Your Honor -- well, I'm sorry, yes, I do.

I think that there may be a question after you have

heard the qualifications about a particular area that we would like for him to go into, and I'm assuming we could address that at a side bar after you have heard the testimony.

THE COURT:  Go into his qualifications, and if you feel that I have qualified him in that area, you start into it, the other side objects, and I will take it up the way I would any objection.  In other words, he is qualified, I feel confident that the attorneys will follow the rules, and if there is an objection, the United States can make it.  If they don't object at this juncture, they would waive it.

MR. HUDGINS:  All right.

THE COURT:  Then we can bring the jury in.

(The jury returned to the courtroom.)

THE COURT:  All the jurors are back from their luncheon recess, and we are now ready to begin evidence in the defense at this mitigation selection phase of the trial.

Mr. Hudgins or Mr. Woodward, your first witness?

MR. HUDGINS:  Dr. Mark Cunningham, Your Honor.

THE COURT:  All right.  Dr. Cunningham, if you would come forward and be sworn.

(Dr. Cunningham was sworn.)

MARK DOUGLAS CUNNINGHAM, DIRECT EXAMINATION on behalf of the defendant, as follows:

DIRECT EXAMINATION

BY MR. HUDGINS:

Q    Dr. Cunningham, if you would, state your name for the jury, please.

A    Mark Douglas Cunningham.

Q    Dr. Cunningham, how are you employed?

A    I'm a clinical and forensic psychologist in private practice and also an independent research scientist.

Q    How long have you been a psychologist?

A    About 31 years.

Q    Can you explain what a clinical psychologist is?

A    Yes, sir.  Clinical psychology is what you would expect a psychologist to do.  That's the evaluation and treatment of psychological disorders, counseling and testing and interviewing, that sort of thing.

Q    What is a forensic psychologist?

A    Forensic psychology is any way that psychology as a science can be helpful to some issue that is before the court, all the way from evaluating parenting capabilities in family cases, or in criminal court, things like competency to stand trial or mental state at time of offense, or sentencing considerations.

Q    Are you board certified in any particular area?

A    Yes, sir, I'm board certified in clinical psychology and also board certified in forensic psychology, both of those by the American Board of Professional Psychology, which is the board certification organization that is recognized by the

American Psychological Association.

Q    Can you explain for the jury briefly what board certification entails.

A    Yes, sir.  Board certification in psychology is somewhat different than it is in medicine, where it is a relatively routine credential that is pursued at the end of residency, at the end of the specialization training period.

In psychology you are not allowed to even sit for that examination until you are some number of years out from getting your doctorate degree.  In forensic psychology it is at least five years out.  So it is a credential, especially in forensic psychology, that is intended to represent not the beginning stages of specialization, but instead, the highest sophistication of practice.

Q    How many board-certified clinical psychologists are there in the United States?

A    About 1200.

Q    Does the certification for a forensic psychologist differ from that for a clinical psychologist?

A    Yes, sir.  It is a more arduous process, and there are many fewer.

Q    Approximately how many are forensic psychologists?

A    There are about 270 board-certified forensic psychologists in the United States.

Q    Have you ever served as a work sampler or oral examiner

of psychologists seeking to become board certified in the forensic area?

A    Yes, sir, I have.  Those are both stages of seeking board certification, the first stage being that you submit examples of your work that are heavily supplemented with review of research and case law and ethical considerations.  That's then critically reviewed by two or three board-certified forensic psychologists.  If they believe it demonstrates that highest level of practice, then you are allowed to sit for an oral exam, where three board-certified forensic psychologists could ask me anything in the field of forensic psychology that they wanted to over a three-hour period of time.  I spent about seven or eight months studying 30 to 40 hours a week for that culminating oral examination, and then subsequently have served as both one of the reviewers of work samples and have also been an oral examiner.

Q    Are you licensed in any state to practice psychology?

A    Yes, sir, I am.

Q    What states are you licensed in?

A    I'm licensed as a psychologist in Texas, Louisiana, Arkansas, Oklahoma, Tennessee, South Carolina, New York, Connecticut, Illinois, Indiana, Idaho, Oregon, New Mexico, Arizona, Colorado.  I may have left some out.  16 states.

Q    So it is pretty national in scope?

A    Yes, my practice is national in scope.

Q    Have you received any recognition or awards for any of your research activities or publications?

A    Yes, sir, I have.

Q    And was there a particular one in 2005 that you are particularly proud of?

A    Yes, sir.  In 2005 I was given the Texas Psychological Association award for outstanding contribution to science for having made a substantial and important contribution to the body of knowledge in psychology.

Q    And is that something that is awarded yearly?

A    Yes, sir, that is an annual award that is given to a single psychologist.

Q    Did your research and scholarship result in an even more prestigious award the following year, in 2006?

A    Yes, sir.  In 2006 I was honored with the American Psychological Association award for distinguished contributions to research in public policy.  That's research that informs some important issue before the courts or legislative bodies or to the public as a whole.

Q    What is the organization that bestows that award?

A    It's the American Psychological Association.

Q    Approximately how many members are in that?

A    About 165,000 members of the American Psychological Association, about 80,000 of whom hold doctorate or PhD degrees.

Q    Have you received any other honors in the past two years?

A    Yes, sir.  I was also made a fellow of the American Psychological Association.  That's a distinction that reflects having made outstanding contribution to the field of psychology at a national level, and it requires both nomination by a division within the American Psychological Association and then election by the council of representatives of APA.

Q    Can you give us a brief summary of your educational background as it relates to psychology.

A    Yes, sir.  I received my undergraduate degree with a major in psychology from Abilene Christian College and graduated with high honors.  I then attended graduate school at Oklahoma State University in a doctoral training program in clinical psychology that was accredited by the American Psychological Association, and received both my master's and doctorate degrees at Oklahoma State.

I did a one-year clinical psychology internship at the National Naval Medical Center in Bethesda, Maryland, which is the large Navy hospital in suburban Washington, D. C., and was an active duty Navy officer and clinical psychology intern.

I was then assigned as a staff psychologist at the Submarine Base Medical Center in Groton, New London, Connecticut, which at that time was the primary submarine

facility on the Atlantic coast. And I was again an active duty Naval officer and clinical psychologist and worked with a psychiatrist in providing mental health services to about 15,000 active duty and, to the extent that we could, about 40,000 family members, or what the Navy calls dependents.

While there, I taught in the local community college system, and I also did two years of part-time postdoctoral study at the Yale University School of Medicine. And then I left the Navy in 1981, took a full-time academic position for a couple of years as assistant professor of psychology, a full-time college teacher, and started a practice at the same time, and then have simply been in practice since 1983.

Initially that was primarily clinical in nature. Over time that began to be steadily more and more court-related consultations. But since 1983 my education has been continuing education in nature, classes and workshops I attend, and also the research and writing that I'm involved in.

Q    As part of that continuing education, have you also taught in some of those or been the presenter in some of those continuing education programs?

A    Yes, sir, on many occasions. Most of the full-day workshops that I have provided have been under the sponsorship of the American Academy of Forensic Psychology. That's the scholarly association of board-certified forensic

psychologists. One of the primary aims of the academy is to raise the standard of the practice of psychology as it comes into the courtroom. That doesn't mean teaching psychologists how to talk better or be more persuasive, but instead to equip them with the best understanding of the issues that they are evaluating, with the most appropriate techniques for assessing that, and then illuminated by the best available research and science.

I provide -- I'm an invited workshop teacher of full-day workshops on capital sentencing evaluations; in other words, teaching psychologists how to evaluate and what research is relevant to proceedings such as are occurring here today.

Q    Have you ever been published in the areas of clinical or forensic psychology?

A    Yes, sir, on over 30 occasions, in edited textbooks, in peer-reviewed scientific journals, and also in other professional publications.

Q    You mentioned peer-reviewed journals. What are peer-reviewed journals?

A    Peer-reviewed journals are the primary way that scientists exchange information with each other. And the way that works is the existing research that has been done in the field is summarized and critiqued and integrated so that other professionals have one place they can go to to get an

understanding in a given area of the science, instead of having to read every paper; or some original research is performed and written up into like a research paper.

In either case, that paper is submitted to the scientific journal. The editor of that journal is a nationally recognized scientist himself or herself, in most instances, and that editor reviews it for its scholarly and scientific value, and then sends it out to two or three recognized scientists who have knowledge of the area that the paper is written in.

And they critically review it for whether or not it adequately accounts for research that has been done in the field up to that time, for whether -- the way the study is designed, whether the scientific methodology is sound and whether the conclusions make sense. In the leading journals maybe only 15 percent of the papers pass that screening process. Even if it does pass that screen, very often there are revisions that are requested.

But ultimately if it passes through that screening and critical review, it is then published in that scientific journal and is said to have passed peer review. In other words, it has passed through that critical scientific screen.

Q    Have you ever acted as one of the reviewers in that process?

A    Yes, sir, I have. I'm on the editorial board of the

journal *Assessment*, which means that they regularly send papers for me to review.  And then there are about another half dozen or so scientific peer-reviewed journals that call on me to review papers periodically when they are in an area of expertise that I have.

Q    Have you ever authored or coauthored peer-reviewed articles?

A    Oh, yes, sir.  Again on -- I think there are at this point well over 20 major peer-reviewed papers that I have authored or co-authored, maybe 25.

Q    What types of subjects have you addressed in those articles?

A    These articles have addressed standards of evaluations at capital sentencing, death row inmates, capabilities of death row inmates, and then many of them have addressed violence in prison, rates of violence in prison, what we call correlates of violence in prison, which means things that are associated with or predictive of violence in prison.

So my colleagues and I have done large-scale research on groups of prison inmates, murderers, capital offenders, high-security inmates, trying to understand what factors are associated with prison violence.  One of our studies involves 50,000 inmates in a state prison, including 5,000 who were convicted of first degree murder, evaluating are murderers more violent in prison than inmates who have

been convicted of other offenses.  That would be an example of some of the large-scale research that we have done.

Q    Can you give the jury an idea of what kind of commitment, what kind of time is required to produce one of these articles?

A    Depending on the subject and the complexity of it or the study, it may take anywhere from scores of hours, 50, 60, 70 hours, to several hundred hours.  It simply depends on the size of the project.

Q    Dr. Cunningham, is there research on what causes criminal violence?

A    Yes, sir, there is.  There is research on what causes criminal violence as we would look at the community, violence that happens in the community, and there is also a growing understanding of factors that are associated with violence in prison, with what is predictive of it or what is associated with it and what is not.

Q    Have many of your studies and scholarly works dealt with that subject?

A    Yes, sir.  In terms of what causes violence in the community, I haven't directly gathered data and done active research in that area, but I'm a student of that research, and so I talk about it and summarize it in some of my papers and book chapters.

In the area of factors that are associated with

**943**

violence in prison, my colleagues and I are -- our research group have been the major source of large-scale studies on rates and correlates or factors that are associated with violence in prison, including murderers, capital murderers, inmates in high security, inmates in federal high security. Our research group has done most of the major studies in those areas.

Q    Can you pick one of those studies and briefly describe it for the jury so they get an idea of particularly what you are talking about?

A    Yes, sir.  I described a moment ago the study of 50,000 inmates and 5,000 murderers to identify whether or not the murderers -- whether being convicted of murder is a factor that is predictive of violence in prison.  That is kind of a fancy way of counting.  In other words, you count how many disciplinary offenses or assaults the murderers are involved in, as opposed to the property offenders, for example.  That is an example of an extremely large-scale study.

Other times the total population that is relevant may be pretty small.  So another study that my colleagues and I did was to look at 145 federal capital inmates, whether they were either allowed to plead to a life term by the government after they had been death-penalty charged, or their jury sentenced them to life in prison instead of death.

We then looked at the disciplinary records of those

145 inmates -- at that point we looked at them, they had averaged about six years in the Bureau of Prisons after their conviction -- to see how they had done, what happened to these guys.

That would be an example of -- that's the total universe. Those are all the federal capital offenders serving life that we could get data on who had been in prison at least six months. So sometimes the size might be small because that's all there is, and in other instances the size might be extraordinarily large, might be up to 50,000.

Q    What is the bottom line of this research?

A    The bottom line is that the seriousness of the offense that sent you to prison is not predictive of violence in prison. That's number one. Being a convicted murderer or a convicted capital murderer is not associated with a greater likelihood of disciplinary misconduct or violence in prison. That is number one.

THE COURT:  Before he gives opinions, don't you think you have to qualify him?  I believe now he is giving opinions.

MR. HUDGINS:  Yes, ma'am.  We will move on.

THE COURT:  I think the rules first require qualification, and the United States may want an opportunity to examine on those qualifications.

MR. HUDGINS:  Yes, ma'am.

BY MR. HUDGINS:

Q     Doctor, to what professional organizations do you belong?

A     I'm a fellow of the American Psychological Association. I'm a fellow of the American Academy of Forensic Psychology. That is that scholarly association of board-certified forensic psychologists. I'm a fellow of the American Academy of Clinical Psychology. I'm a member of the Texas Psychological Association.

I'm listed in the National Register of Health Service Providers in Psychology, which means that my training was in an organized medical setting so I'm better equipped to treat more serious disorders. I hold a CPQ, which is a screening of credentials. I'm in the American Correctional Association. I'm an adjunct member of the Texas District Attorneys Association. There are some other organizations that I'm similarly affiliated with.

Q     Have you ever testified in court proceedings before?

A     Yes, sir, I have, in military courts, state courts, federal courts, here in Virginia and in over 30 other states.

Q     Do you have an estimate of how many times you believe you have testified in any type of court proceeding?

A     Over 250 times.

Q     In those, have you been recognized as an expert?

A     Yes, sir, in clinical and/or forensic psychology on all occasions.

Q    Have you ever not been accepted as an expert when you were offered?

A    No, sir, not in those areas of clinical and/or forensic psychology.

MR. HUDGINS:  I have an exhibit that I would like to show the doctor, Your Honor.

THE COURT:  All right.  Do I have a copy of it?

BY MR. HUDGINS:

Q    Doctor, do you recognize that document?

A    Yes, sir.  This is my *curriculum vitae*, which is a fancy word for a resume, updated as of August 11 of this year, and this reflects my education, licenses, scholarly publications, seminars, scholarly symposiums that I participated in, that kind of thing.

Q    It is updated and current?

A    Yes, sir, it is.  It doesn't include all -- this doesn't summarize all of my expertise, for example, about the Federal Bureau of Prisons or federal capital inmates, but it does reflect my publications and education and those things.

Q    Have you done independent study on the Bureau of Prisons and capital inmates?

A    Yes, sir, I have.  I have testified in over 50 federal capital cases.  In the course of that, in many occasions, many cases, I have been provided with extensive data from the Bureau of Prisons about different types of disciplinary

infractions and different severities of violence that happen at different levels of security within the Bureau of Prisons, including even --

MR. SAMUELS:  Judge, I don't think this goes to his qualifications.  I think he is starting to move into an opinion area or testimony.

THE COURT:  Sustained.  He is again starting to discuss the results of studies and things that he has done, as opposed to offering his qualifications.

MR. HUDGINS:  I will tailor the question differently.

BY MR. HUDGINS:

Q    Doctor, have you done independent research into the areas in the Bureau of Prisons concerning capital offenders?

A    Yes, sir, I have.

Q    Without telling us the results of what you found, can you tell us what the research was that you have done?

A    Yes, sir.  We -- my colleagues and I reviewed the disciplinary records and also demographic characteristics of all of the federal capital offenders, either sentenced to life or sentenced to death, that records were available on.  We compared that to the rates of violence at high security in U. S. penitentiaries.  And there are two studies, peer-reviewed studies, that have been published out of that data.

Then there are many instances where I have analyzed the statistical data that has been provided to me by the Bureau of Prisons about rates of violence at different levels of security, so that that would inform my testimony.

Q    Have you also made a study of what types of security level a person with certain charges would be housed under in the Bureau of Prisons?

A    Yes, sir, I have familiarized myself with regulations and classification policies of the Bureau of Prisons for where, for example, capital inmates are assigned within the system, at what security level they are assigned. I have been in a U. S. penitentiary. I have toured a super maximum federal installation on three occasions.

So my understanding about the Federal Bureau of Prisons is based both on that direct contact as well as on detailed statistical data that has been provided to me in a large number of cases, and study of that, as well as review of relevant regulations.

MR. HUDGINS: Thank you.

Your Honor, at this time we would offer the *curriculum vitae* of Dr. Cunningham as an exhibit. And I'm not sure what our next defense exhibit is. Is it 4 or 5?

MR. SAMUELS: Judge, can we approach on that?

THE COURT: All right.

(The following discussion occurred at side bar out

of the hearing of the jury:)

MR. SAMUELS: Judge, I object to the *curriculum vitae* coming in. He summarized his qualifications. I don't know why the resume has to come in on top of that. I can see the court looking at it to determine whether or not he is qualified, but I don't see why it needs to be made a separate exhibit, when he has already testified to his qualifications. It would appear to just be bolstering him.

MR. HUDGINS: Judge, it is much more detailed than what he testified to. I don't want to have him go through each article he has published and that kind of thing. It seems like that would be not a good use of our time. But I can do that.

MR. SAMUELS: I can tell the court, I'm not going to have a problem with him being qualified as a clinical and forensic psychologist. I am going to have some questions as to his expertise on the Bureau of Prisons. I don't think that is reflected anywhere in the *curriculum vitae*.

MR. HUDGINS: I don't think it is either. I mean, he testified that it wasn't.

THE COURT: I'm going to admit his *curriculum vitae*. It doesn't have the results of anything here. It would just be too laborious to go through. I would allow Mr. Hudgins to say, read me the articles that you published, and that would take too long. I have seen his *curriculum vitae* before,

because it was attached to, I think --

MR. HUDGINS:  To his report.

THE COURT:  To his report.  And when I was looking to rule today, I made sure that none here had any results. There are some implications in cases, but they don't have the results of the study, and that's what I don't think he should be testifying to at this point.

So I will admit his *curriculum vitae* for these are the things that he has done, not necessarily that he is an expert in each of these fields.  Is that agreeable?

MR. HUDGINS:  Yes, ma'am.

MR. SAMUELS:  Yes, ma'am.

(Proceedings resumed in open court as follows:)

THE COURT:  I'm going to admit the *curriculum vitae* as Runyon Exhibit No. 1.  It is reflective of what Dr. Cunningham has done.  That does not necessarily qualify him as an expert in all of the areas that are on this *curriculum vitae* or may be referenced in some way on his *curriculum vitae*.  So with that caveat, this is a *curriculum vitae* of his education, or a resume of his education, board certifications, publications, papers, and so forth, and it is for that purpose that the court admits it.

MR. HUDGINS:  Thank you, Your Honor.

(Runyon Exhibit No. 1, admitted.)

MR. HUDGINS:  Your Honor, at this point we would

move for the recognition of Dr. Cunningham as an expert in the field of clinical and forensic psychology, and also for the information that he will provide on the Bureau of Prisons as he has described, the research that he has done on it.

THE COURT: The court will first, before any qualification, allow the United States to cross-examine him in regard to his qualifications. And you all do need to approach about one thing that I forgot to mention when you were up here.

(The following discussion occurred at side bar out of the hearing of the jury:)

THE COURT: Regardless of what he qualifies in, I want you to be very careful about talking about Bureau of Prisons regulations, because, number one, there was a court in Tennessee that I referred to yesterday, and they discussed when you start talking about regulations, you are getting into areas of law, and I don't know that he qualifies as an expert on what all the regulations are and how they are promulgated. They can change day by day.

So be very careful when you get into areas of asking him about regulations that could be changed tomorrow, if Congress changes it. And the interpretation and adoption of regulations is something that is a very tricky area. But as you have said, I will let him talk about the things that he has looked at within the Bureau of Prisons to then form an

expert opinion about this prisoner analysis and the base rate analysis.

In other words, what I'm going to let him do is use the information to say, I used this information as someone in my field would do to come up with this base rate analysis as it applies to this defendant. That is what I'm going to be inclined to do.

MR. SAMUELS: Judge, I understand that, so far as it goes to the base rate analysis. My concern is when he is talking about, I have looked at prison classification systems and prison rules and regulations, so I can tell you where the defendant is going to be sent and how that is going to go, and I think that's where he was going.

THE COURT: If he does, you object, and I will sustain it.

MR. HUDGINS: I don't want to get overboard with that, and that's what I was talking about when I said we might need a side bar.

He won't say that this is where he will go, but what he would say is that this is the type of security level, based on what he is convicted of, that he would have, and this is -- I mean, yes, on one of the diagrams, you probably saw in there in one of the diagrams, this is a typical cell a person in this security level would have.

THE COURT: What we may have to do is take that

outside the presence of the jury and then decide whether it is appropriate testimony, because I'm afraid that he is going to be a witness who just springs up with this.

MR. SAMUELS: That is my concern as well.

MR. HUDGINS: When I get there, I will let the court know.

MR. SAMUELS: My concern is it is the regulations that is telling where that inmate goes, and the basis of his testimony ends up being regulations and legal areas that he shouldn't be testifying to.

THE COURT: When I qualify him, I will make it specific that he is not a qualified expert in legal matters and certain regulations, if that's the way the examination goes. Let's see what you examine first, and then we will make a ruling.

MR. SAMUELS: Yes, ma'am.

(Proceedings resumed in open court as follows:)

VOIR DIRE EXAMINATION

BY MR. SAMUELS:

Q    Good afternoon, Dr. Cunningham.

A    Good afternoon.

Q    Dr. Cunningham, I just have a few questions for you about your qualifications.

A    Yes, sir.

Q    You mentioned you were board certified in clinical

psychology and forensic psychology. When did you receive those board certifications, sir?

A    I was board certified in forensic psychology in 1995. I was board certified in clinical psychology last year.

Q    And your services as a clinical psychologist is not what you are being called to testify about today; is that right?

A    Yes and no. It is difficult to separate. Clinical psychology involves the study of behavior, including abnormal behavior. Violence is a type of abnormal behavior. What happens in prison has to do with clinical-related issues, and so I bring that expertise to bear. What I'm doing here today doesn't involve diagnosis and doesn't involve treatment, but it does bring clinical psychology as a science to bear.

Q    Let me talk to you about the Bureau of Prisons. Have you ever worked for the Bureau of Prisons, sir?

A    No, sir.

Q    Have you ever worked in any capacity for either the Federal Bureau of Prisons or a state bureau of prisons?

A    No, sir, I have never been employed by a Department of Corrections.

MR. SAMUELS: I have no further questions. Thank you, Your Honor.

MR. HUDGINS: No redirect on the qualifications.

THE COURT: I will qualify Dr. Cunningham as a clinical psychologist and a forensic psychologist, and he can

render an opinion pursuant to the court's previous rulings and the notice that was filed pursuant to Federal Rule of Criminal Procedure 12.2 in regard to any analysis that he has made in regard to factors that would increase the likelihood of this defendant, Mr. Runyon, making a positive adjustment to a life term in the Federal Bureau of Prisons; in other words, a positive prisoner evidence analysis in regard to this defendant's ability to adjust to the prison sentence.

And to the extent that that includes base rate analysis testimony that would be particularized ultimately to this defendant and that relies on scholarly and research findings regarding tests and correlates of prison misconduct and violence, he can so testify.

MR. HUDGINS:  Thank you, Your Honor.

THE COURT:  But I want to put forward the caveat that the court does not find that he is an expert on regulations of the Bureau of Prisons.  He has not been employed by the Bureau of Prisons, and there is no indication that he is an expert in Bureau of Prisons regulations and how they would be applied to this defendant, unless you can establish that.  There is nothing before the court at this juncture that I know of that would so qualify him.

MR. HUDGINS:  Your Honor, should I make inquiry of those things at this point?

THE COURT:  Yes.  Let me ask him a couple of

questions that you might want to follow up on.

You can follow up on, in terms of his knowledge of the Bureau of Prisons, whether he has ever had any official affiliation or employment by the Bureau of Prisons and what access to knowledge he has.

MR. HUDGINS:  Thank you, Your Honor.

THE COURT:  And where he gets that knowledge from, without him opining about what his opinion is of that data that he has accessed.

MR. HUDGINS:  Yes, ma'am.

DIRECT EXAMINATION (Cont'd.)

BY MR. HUDGINS:

Q   Doctor, do you understand that in my questions I'm not asking for the results of the studies that you have done, but what studies you have done to acquire knowledge?

A   Yes, sir, I understand.

Q   And I know from the question that you were asked earlier, you have never been employed by the Bureau of Prisons or any department of corrections; is that correct?

A   That's correct.

Q   And have you had any kind of official affiliation with the Bureau of Prisons?

A   No, sir, not beyond being designated as someone that they would provide information to.  But I have never been a consultant for them or been in any kind of official designated

capacity for the Bureau of Prisons.

Q    Now, when you say that you have been designated as someone they would provide that type of information to, what is the process?  What are you doing when you are designated for that information?

A    I'm either in a -- I'm in a position of having been an expert who was identified who would be testifying about these sort of matters in a federal capital case.  As a result of that, the federal judge may order the Bureau of Prisons to turn over extensive statistical data to me from a computer system that they refer to as a KI/SSS system, which is a computerized data base of different levels of disciplinary infractions by level of security within the Bureau of Prisons, and even by individual prisons.  And typically as that data has been given to me, it encompasses a period of years, like 2001 to 2005, or 1997 to 2003, typically a five-year period of time that that data would be provided.

I would then analyze that data to develop an understanding of what rates of violence are occurring at what level of security and in what prisons.  Additionally that data was made available to us so that we could do a more substantial analysis of it.  For example, we looked at capital inmates who had been sentenced to death or life in prison.

THE COURT:  When you say "we," who is "we"?

THE WITNESS:  My research colleagues, Dr. Thomas J.

Reidy and Dr. John Sorensen. Dr. Reidy is a forensic psychologist in private practice and also a coinvestigator, coresearcher. Dr. John Sorensen is a criminal justice professor at a state university in Texas. And many of the papers that we have done have been within this -- and investigations have been within this research group.

THE COURT: Was there any type of KI/SSS data, as you referred to it, requested and supplied to you for this case?

THE WITNESS: No, ma'am.

BY MR. HUDGINS:

Q   Is the KI/SSS data something that is particular to a case, or is it something that if you got the information, it is information that you can then use other than for a particular case?

A   Yes, sir, unless it is under a protective order and unless -- in other words, unless the court has said, you may only use this data in this case. The findings of that data about rates of violence at different levels of security within the Bureau of Prisons and violence of different severities --

MR. SAMUELS: Judge, I think we are going into the results of the data again.

THE COURT: If he has looked at specific data for this case, as I previously ruled, and it is something that he relies on in his field, then he can tell everyone in the

courtroom what piece of paper. Just to say, I have looked at KI/SSS data or I have looked at general Bureau of Prisons data -- if he is going to form an opinion about Mr. Runyon, he must refer to a specific piece of data that he has looked at and how he ties it in to this defendant, and I will allow that testimony.

But I'm not going to allow, I have looked at KI/SSS data over the last five years, and I make this general conclusion about it and about inmates in general, because my ruling is it has to be specific to Mr. Runyon and his particularized background.

BY MR. HUDGINS:

Q    Now, as far as the regulations that require certain things at the Bureau of Prisons, is that something that you have done individual research on yourself?

A    Yes, sir, I have retrieved those regulations that specify at what level of security --

MR. SAMUELS: Your Honor, I'm going to object. He can't testify about Bureau of Prisons regulations as a matter of law. He is not a Bureau of Prisons official. He can't be testifying about his review of those regulations.

THE COURT: Sustained.

MR. HUDGINS: Judge, I'm not asking him about what he has found. I'm trying to lay a foundation for his knowledge of that.

THE COURT: Go ahead and inquire about it. I don't know why we can't just move on to Mr. Runyon and what he looked at and his opinions about his positive adjustment, because that's what the notice said. That's what I think we ought to move on to.

MR. HUDGINS: I can go there. That's why I asked if I should inquire about the qualifications first.

THE COURT: Go ahead down that line.

MR. HUDGINS: Okay.

BY MR. HUDGINS:

Q    Dr. Cunningham, were you asked at some time to review the case of David Runyon?

A    Yes, sir, I was.

Q    And what was it that you were asked to do in that case?

A    What I was asked to do, relevant to my testimony today, is to identify what the likelihood was that he would make an adjustment to a life term in the Federal Bureau of Prisons without serious violence; what's the likelihood he would spend his life in prison, if given that sentence, without seriously assaulting somebody.

Q    What information was available to you to help you with that evaluation?

A    I reviewed his educational records. I reviewed his employment records. I reviewed his criminal records. I reviewed information regarding this offense. I reviewed his

military records.  I reviewed records of his pretrial confinement in the Portsmouth jail, and prior he was at Newport News.

I think those are the major categories of -- I think I mentioned military records.  I think those are the major categories of records specific to him that I reviewed.  I also then reviewed research findings, including data from the Bureau of Prisons, that would help me understand how to interpret the information that I learned specific to him.

THE COURT:  And now we come to the point of you have got to identify the specific data.  In other words, before an expert can just give an opinion that says, I've reviewed data, you have to tell us what data you have reviewed.  In other words, it is not just, I reviewed data from the Bureau of Prisons, and I have published a lot of articles on this.

You have to tell this jury and this court what specific data you are relying upon, because they are entitled to know that, as well as the United States in order to cross-examine.

THE WITNESS:  Should I begin by detailing each of the records that I reviewed pertaining to this case, or go to the data that -- the studies that illuminated and gave meaning to this?

BY MR. HUDGINS:

Q    That's what the judge is asking about at this point, is

what studies did you review.

THE COURT: What data did he rely on? It has to be identified for the United States to be able to cross-examine.

In other words, when an expert testifies, he has to say, I looked at this treatise, this article, this study, I looked at this information about the defendant; looking at those two, I have formed this opinion.

Then you are able to cross-examine that expert to say, all right, I know that you looked at these things on Mr. Runyon, and you looked at these studies and you formed an opinion. But the basis for the opinion can't be some generalized answer, I looked at data from the Bureau of Prisons. It has to be this report on this date with this information in it.

MR. HUDGINS: And, Judge, that's where we go with the testimony. This is just kind of a general introduction of what the doctor reviewed.

THE COURT: But let him specifically say what he reviewed for this case, because everybody is entitled to know, and if it hasn't been made known, we have some discovery problems.

BY MR. HUDGINS:

Q    Doctor, can you review the particular treatises and studies that you are referring to.

THE COURT:  That you reviewed for this case.

THE WITNESS:  My review for this case includes knowledge that I have accumulated in the course of the research and study that I have done, and I can specify the particular sources of that knowledge.  Let me start regarding the specific sources of knowledge about federal capital inmates, whether they were sentenced to life or death.

I have personally examined the printout for each of these individuals, whether sentenced to life or death, the printout that specifies their movement history within the Bureau of Prisons, that specifies the initial sentencing data.

MR. SAMUELS:  Your Honor, I'll object, because this doesn't relate to Mr. Runyon.  It is not a treatise he has relied on.  It's just data.

THE COURT:  Have you been produced it?

MR. SAMUELS:  No, ma'am.

THE COURT:  Do you have any idea what defendants he is talking about?

MR. SAMUELS:  No, ma'am, I don't.

THE COURT:  Neither does the court.

Ladies and gentlemen of the jury, if you would step out for a moment, please?

(The jury exited the courtroom.)

THE COURT:  Mr. Hudgins and Dr. Cunningham, I want you to know that the court is not going to allow you to

testify that because I am who I am and have done all of these studies, I can have this opinion, because those are not the rules of evidence. There has to be a specific basis for an opinion if you are going to base it on a study or a piece of paper or something that you have reviewed.

If you have reviewed one hundred capital cases, then you have to specify exactly which hundred capital cases they are, and you have to give it to the other side. I frankly have no idea what he has reviewed to come up with his opinions other than his general research in the field, and that is too nebulous. It is not pinned down enough.

He can't say, I have reviewed printouts of a hundred inmates. Let's see the printouts. Let's look at the source data. That's what I'm talking about. Like any other expert, this is what I reviewed in my field, this is what I have reviewed on this defendant, and this is my opinion. And this is what I'm not following with Dr. Cunningham.

I will let him testify about certain things if we know what he is looking at. Can you follow up on that with him?

MR. HUDGINS: Yes.

BY MR. HUDGINS:

Q    Doctor, as far as the future dangerousness idea that we are talking about here is concerned, the studies that you are talking about -- are they studies that are published studies?

Are they studies that you have made of this data?

A    Yes, sir.  These are -- virtually all of the information that I'm going to be talking about is contained in peer-reviewed studies.  The references for those specific studies are at the bottom of the slides, as I am talking about these different concepts.

So, far example, if we are talking about the 145 federal capital offenders who were sentenced to life, that is from a paper that is identified on the transparencies, and that paper was published in 2008, "Assertions of Future Dangerousness at Federal Capital Sentencing."

Q    Can you tell us what page of the handout?

A    Of the handout, yes, sir.  Let me turn to that.  That study is first referenced at the bottom right of Page 1, and subsequently is referenced on Page 4 in the bottom left.

THE COURT:  Excuse me.  The bottom right of Page 1, I don't see any specific study referenced.

THE WITNESS:  No, ma'am, that one does not have the study footnote on it.  The footnote does occur for that on Page 4, bottom left.

That was also cited on Page 7 of my report in the references.

BY MR. HUDGINS:

Q    And are all of the studies that you cite or that will be cited during your testimony footnoted or somehow referred to

in the handout with the four-page --

A    Yes, sir, those that are not specifically footnoted, there are some references that are in the report that I provided in that reference list and are cited in the text of that report as well.

Q    Are any of them, any of the things that you will be referring to, not cited somewhere, either in the report or in the handout?

A    No, sir.

THE COURT:  What report?

THE WITNESS:  My --

MR. HUDGINS:  The report that was filed February 5, '09.

THE COURT:  And what was cited in there?

THE WITNESS:  There is a reference list, Your Honor, that is just over two pages long.

THE COURT:  So all of those.

THE WITNESS:  Yes, ma'am.

THE COURT:  Are they going to be tied in to this defendant?

THE WITNESS:  Yes, ma'am.

MR. HUDGINS:  Yes, Your Honor.  That's the nature of the handout.  The presentation goes through the information regarding Mr. Runyon and ties it to the specific articles that he will be testifying about.  That's why I said what I had

asked him and the way I had asked it was kind of just a general introduction for the jury, but that he will talk specifically about the articles that are referenced in here and how they relate to Mr. Runyon.

THE COURT:  How do you know where Mr. Runyon is going to be placed?

THE WITNESS:  First, there is a Bureau of Prisons regulation that specifies that an offender who is serving more than 30 years or a nonparolable life sentence will be placed at a USP level, or a high-security-level facility, unless the public safety factor is waived.  That public safety factor has to be waived at a regional level.

In my inspection of the movement histories of every offender who has been sentenced, capital offender who has been sentenced to capital life or death, they have all started out at at least a high security or USP level or higher.  Some have gone to ADX, for example, right from court.

The others have started out at a USP level.  Some, because of their conduct, their positive conduct in the Bureau of Prisons over time, a few have gone down to an FCI level. The public safety factor has been waived, and they have gone to medium security.  But they all started out at a high security level or higher, both from the regulation and from my review of their movement history.

THE COURT:  Do you want to inquire about any of

this, Mr. Samuels?

MR. SAMUELS:  I do, Judge.

VOIR DIRE EXAMINATION

BY MR. SAMUELS:

Q    Dr. Cunningham, your review of Bureau of Prisons regulations -- that is review of regulations in the Code of Federal Regulations; is that right?

A    That is within the security designation and custody classification manual.  And I can give you the specific citation.  That's page 7 of the handout's bottom right-hand corner.

Q    And those citation manuals, that 5100.08 -- that is a CFR provision, isn't it, Dr. Cunningham, from the Code of Federal Regulations?

A    I don't know the answer to that.

Q    And the individual data, prisoner movements that you talked about, none of that is related to David Runyon, of course?

A    He is not among them.  But the data on where other federal offenders have gone, particularly when they have all gone to a high security level, means that this regulation has been operationalized in every case.

If I'm going to make an assessment of Mr. Runyon, I have to know at what level of security is he going to be at. So this tells me the minimum level that he will be at.  That

is important data for me to have as I individualize a risk assessment to him, so that I know what group statistical data to bring to bear about his risk.

Q    But you are not involved in the classification decisions for any prisoners in terms of where they are being placed; correct?  That is done by the Bureau of Prisons.

A    That's correct.

Q    And psychologists aren't involved in that in any way; right?

A    I don't know that they are not involved in any way. There are classification officers that do that primarily. There is mental health information that is incorporated into those classification decisions.

Q    You are not certainly not involved in any way?

A    I am not.

Q    You don't know what facility he will be sent to?

A    Only that it will be a USP level or higher.  I don't know which USP it will be, but the level of security is both by regulation and by the universe of offenders who have --
capital offenders who have entered the Bureau of Prisons.

Q    That is based on your review of Bureau of Prisons regulations, which could come from the Code of Federal Regulations; you don't know.

A    It is based on the review of the regulations and also my review of all instances of capital offenders entering the

Bureau of Prisons.

Q    But in terms of saying which particular facility he would go to and how long he would stay there, you certainly couldn't do that?

A    No, sir, I can't name the facility.  What I'm looking at is what is the level of violence at a high-security-level facility.  What is the level of violence?  That's the base rate.  That's the group rate.  That's one way of defining David Runyon in his individualized likelihood of violence in prison, is he is a USP inmate.

Okay.  Given that he is a USP inmate, now what do we know about what level of violence is associated with that?  Just like if I said, he is a 16-year-old driver, or he is an urban driver.  Now what do I now about that?  He is a male, age 44.  What I do know about his likelihood of having heart disease by that defining characteristic?

Q    But, Dr. Cunningham, as you sit here today, you cannot say where he is going to be sent; correct?

A    Not specific facility.  I can tell you the minimum level of security that he will enter the Bureau of Prisons at.

Q    Only based, not on your knowledge as an expert, but on your review of regulations of the Bureau of Prisons?

A    No, sir, that is not the case.  The reason that I know this regulation is because I have made some expert inquiry, and certainly, except for my colleagues, I am probably one of

three or four people in the United States, to my knowledge, who have gone through each and every capital offender's file, looking at demographic information, sentencing information, movement history, disciplinary records, to then have, in fact, a fully expert opinion about what happens to these guys once they are in prison, where do they go, and what the rates of violence are among those offenders. And it is expertly informed by firsthand knowledge, or at least as firsthand as you can get from looking at their individual files.

THE COURT: Ultimately the jury will determine the level of expertise and so forth, and there is no reason to get into a contest with Dr. Cunningham in this regard. The court has made its ruling. I'm going to let him testify. His testimony still has to be Defendant-Runyon-specific; in other words, the likelihood of Defendant Runyon making a positive adjustment under his factors and the general classification. I will not, and I reiterate, I will not allow Dr. Cunningham to testify about any specific facility Mr. Runyon may be placed, because there is no way that anyone knows that.

So to the extent that you are going to talk about ADX or anything like that, you cannot indicate that he is going to be placed there, because no one knows where he is going to be placed within the Bureau of Prisons. You can talk generally about your study and the classification and what you have said, Dr. Cunningham.

THE WITNESS: Yes, ma'am.

THE COURT: But not that if he goes to this facility, such and such and such, because we just don't know where he is going to be. Do you understand?

THE WITNESS: Yes, ma'am, I do.

THE COURT: Other than that, I'm going to let him discuss this defendant's characteristics, the classification system, his knowledge of it, and then you can cross-examine like you have done here to diminish the weight of that testimony. I will instruct the jury that to the extent that there is testimony outside of the court's ruling that relates to this defendant, it is to be disregarded or not given any weight, something to that effect, if it is outside of the parameters.

But I'm going to let him testify, as I said before, in general on where, in his opinion, Mr. Runyon would be -- how he would be classified, at his age, with his length of sentence, based upon Dr. Cunningham's review of similar inmates. I think that is appropriate testimony.

MR. SAMUELS: Judge, if I could just ask one area of clarification, because did I understand from the court's order that he would not be allowed, and I don't think a basis has been established, for him to opine about the security procedures and mechanisms and restraint mechanisms that are in place at any particular Bureau of Prisons. I don't think he

**973**

has been qualified as an expert in that area, to be able to come in and testify that these restraints and these security provisions are applicable to any particular prison. I haven't heard qualification on that.

THE COURT: I agree.

MR. SAMUELS: Thank you, Your Honor.

MR. HUDGINS: I think that we had established that already, Your Honor.

THE COURT: Restraints?

MR. HUDGINS: That we weren't going to get into that.

THE COURT: Exactly, that you weren't going into that specific area. But I will let him testify about his review of 50 capital cases, or however many, and that they have a minimum security -- one can develop an expertise in that area to say, well, I know that you have got to at least be at this level of security. That type of testimony, as far as I'm concerned, is particularized enough to the defendant, as long as we stay away from a specific facility and generalized discussion that doesn't relate to defendant Runyon.

MR. HUDGINS: Yes, ma'am.

THE COURT: Bring the jury back in.

You can go through all this in cross-examination, Mr. Samuels, to the extent you want to do so.

MR. SAMUELS:  Thank you.

(The jury returned to the courtroom.)

THE COURT:  I think we have got everything worked out, and we are ready to proceed.

MR. HUDGINS:  Thank you, Your Honor.

DIRECT EXAMINATION (Cont'd)

BY MR. HUDGINS:

Q    Dr. Cunningham, have you prepared some demonstrative exhibits for the court and the jury to kind of help out with your testimony?

A    Yes, sir, I have.

Q    And you can display them on the screen?

A    Yes, sir, I can.

Q    And you have control of those, so you will be able to go through them as necessary?

A    Yes, sir.

Q    Dr. Cunningham, you have made an individualized appraisal of David Runyon and how he might adapt to life without parole in the penitentiary; is that correct?

A    Yes, sir, I have.

Q    And without making a conclusion at this point in time, what features or characteristics of Mr. Runyon did you rely on in arriving at your conclusion?

A    I have provided a list of those that are relevant to his likelihood of violence in prison.  These are all based on the

use of group statistical data. This is the insurance company method, that you identify somebody as belonging to various groups, and then you study your experience with that group, like 16-year-old male unmarried drivers. That's defining the group, and then the insurance company tracks their experience with that group. That is how they set the premium.

It is the same thing that happens in prognosis, what is your likelihood of a heart attack, if you are this age male with this blood pressure and this weight, that kind of thing.

THE COURT: Let's go through the factors that you looked at.

THE WITNESS: Yes, ma'am. The factors were that he is age 38 at entrance into the Bureau of Prisons; that he has a high school diploma and an associate's degree; that he has a history of community employment; that he has continuing contact and relationship with family and community members; that he has had a nonviolent adjustment to confinement in jail pending these proceedings; the -- what is called the appraisal of the correctional staff, which is what level of security they have seen him as requiring as they have housed him pretrial; that he would be a federal capital inmate in the Bureau of Prisons; that he would be serving a life-without-release sentence; and that he would be an inmate in the Bureau of Prisons, and more specifically, at a high-security facility within the Bureau of Prisons.

Those are all different ways of grouping, of placing Mr. Runyon in one group or another, and then looking at what the data tells us, what information we have about what that means about how somebody behaves in prison.

BY MR. HUDGINS:

Q   The first factor that you have listed there is that he will be age 38 when he enters the Bureau of Prisons.

A    Yes, sir.

Q   Have you done any individual research on age as a factor in this case?

A    Yes, sir, I have, in terms of helping me understand what meaning it has that David Runyon is 38.  Before you, you see a graph based on a study that I did with Attapol Kuanliang, Dr. Attapol Kuanliang, and Dr. John Sorensen.  In this study we looked at over 33,000 inmates to try to identify how often were they getting in trouble based on the age that they were when they came to prison.  Those ages are across that bottom line there, and those ages are 13 to 17, 18 to 20, 21 to 25, 26 to 30, 31 to 35, 36 to 40 -- and that green line -- that's the age level that Mr. Runyon would be at -- or 41 years or older.

Now, what you can see there -- and then along that left-hand axis, that vertical axis, is how often these events were happening.  And what you can see is regardless of the severity of the misconduct that we are talking about, whether

we are talking about any disciplinary violation, all the way to the most serious assaults, the older the inmate is as he comes into prison, the progressively less likely those things are to occur. Age is one of the most powerful factors in identifying who is going to get in trouble or commit assaults in prison; how old are they when they hit the prison gates. And then as they continue to age out in prison over time, that risk rate further declines.

Q    And Mr. Runyon's age of 38 would be relatively young, or old?

A    That's relatively old in terms of lowered risk of disciplinary misconduct, potential violence. That is everything from threats against staff, to weapons, contraband, to fistfights, to assaults of any severity, minor assaults, serious assaults. They are all showing that same age-related progression, that the older the inmate is, the less likely that is to occur.

Q    Does this hold true for federal inmates as well?

A    Yes, sir. This is a study of general inmates, general prison inmates.

The next graph looks at 145 federal capital inmates who were sentenced to life without possibility of release after being death penalty charged. They were allowed to either plead to life, or their jury sentenced them to life. With Dr. John Sorensen and Dr. Tom Reidy, we looked at how

these guys behaved in the Bureau of Prisons.

Now, they averaged about six years on their capital sentences, some of them as few as six months, some of them as long as 13 or 14 years. But they averaged about six years, and you see the same kind of curve. The older the inmate is as he comes into prison, the older this capital inmate is as he comes into prison, the less likely he is to be involved in potential violence or assaults in general or serious assaults.

Now, that holds true even though this inmate was older at the time that he committed the -- he or she committed the capital offense. Even so, even though they did the offense out here in the community when they are older, even so, when they get to prison, that age factor still holds, with older inmates being much less likely to be involved in a misconduct of whatever severity you want to look at.

Q   And are you aware of any other data that is involving the age of the offender when they come into the --

A   Yes, sir, I am. This is a finding that was known in the criminal justice literature before my research group began gathering this data, although we have broken it out into the severity of disciplinary infractions, which had not been done effectively before.

This graphic is looking at the same thing, how old the inmate is, across the bottom, and how often they are getting disciplinary write-ups. And you see the same thing,

that the rate of those disciplinary write-ups peak at about age 18 to 23 -- that's the top of that curve -- and fall steadily across the life span. And I have got again a green dotted line. That reflects David Runyon's age of 38, and the arrow shows this is what we would anticipate as he continues to get older in prison.

So at age 38 he is already at less than half the risk of misconduct in prison as compared to the younger guys, and as he gets older in prison, we would expect that to decline further.

The next data -- this is based on state prisons nationwide. It's data collected by the U. S. Department of Justice and published by the Bureau of Justice Statistics. And again you are looking at much the same thing as we were with this prior slide, the age of the inmates -- those are across the bottom of this graph -- and how often they are getting in trouble. That's shown by the elevation of the line. Again we have a green dotted line for where David Runyon is at age 38.

So you can see that as compared to those inmates that are in their early twenties, an inmate who is between the ages of 35 and 44 has less than one fourth the incidence of disciplinary tickets in prison as those young guys do. Now, they are still getting write-ups, about half a write-up a year, but that is compared to the young guys, who are

averaging about 2.7 write-ups per year.

Q    Did you also look at David's educational background?

A    Yes, sir, I did.

Q    And that was a factor that you had enumerated in one of the earlier slides; is that correct?

A    Yes, sir, it is.

Q    What did you learn about his educational background?

A    I learned that he graduated from high school in 1989.  I actually saw the copy of his high school transcript, as well as grade reports and that sort of thing.

He then obtained an Associate of Arts degree, or a two-year degree, from Wentworth Military Academy, and again I reviewed the transcripts of that study and also the certificate of his associate's degree.  And then he did a little bit of additional college work in criminal justice.  So he has a high school diploma, plus a two-year degree, and a little bit extra.

Q    What is the significance, as far as how he is going to adjust to life in prison, of this educational background?

A    Well, inmates who have at least a GED have better adjustments in prison and are less likely to be violent.  Now, that was a conclusion of a very large-scale study by a couple of researchers named Harer, Miles Harer, and Langan.  They looked at over a hundred thousand inmates in the federal Bureau of Prisons, and one of the factors that they identified

is that inmates who had a high school diploma or a GED are less often involved in violence in prison.

Now, we found the same effect in research that I did with, again, Dr. Sorensen and Dr. Reidy. We looked at about 2500 inmates in a high-security state prison over an eleven-year period of time, and we found that when you hold other factors constant -- in other words, when you use a statistical technique to control for age and for what kind of sentence the person is serving, and whether they have been to prison before, that having at least a GED, that those inmates have half the incidence of assaults as the inmates had who had less education than that. In other words, if you have got at least a GED, even not counting age, it cuts your assault risk in half.

Q    Doctor, did you look at David's work history?

A    Yes, sir, I did.

Q    And what did you learn about his work history?

A    He has a history of having been employed at Kinko's. He was in the U. S. Army from '94 to '97, as I recall, and also the Kansas Army National Guard. He was with Wells Fargo guard service, the Kansas Department of Corrections, and then he was working in research trials as a pharmaceutical subject or guinea pig in some of their drug studies.

Studies that have been done in this area that are summarized in some of my own publications identify that

inmates who have histories of gainful employment in the community are more likely to have a positive nonviolent adjustment to prison.

There is a researcher named Quay who developed a classification system where he identified these individuals who had community employment histories as being what he classified as industrious inmates who were more likely to occupy themselves constructively in prison and do a lot of the work that gets done in prisons and contribute to institutional order.

So this is a factor, the community stability factor, or an industriousness factor, as Quay looked at, that is associated with better prison adjustment.

Q   Doctor, you looked at David's pretrial incarceration; is that correct?

A   Yes, sir, that's correct.

Q   Do you know how long he has been incarcerated pretrial, approximately?

A   Yes, about 19 months.

Q   And was it significant to look at his record during the pretrial confinement?

A   Yes, sir, it was.  What I found was during those months of pretrial confinement that he had no disciplinary infractions.  Now, this is the notion that the best predictor of future behavior is past behavior.  That's important, as

long as you have two fundamental elements. You have to have enough behavior to form a pattern, and your context of prediction has to be sufficiently similar.

In other words, violence in the community predicts violence in the community. It doesn't predict violence in prison. Violence in custody, violence in prison predicts violence in prison.

It is the same idea as if we looked at the way that my 16-year-old might drive on Friday night when he is out with his friends.

THE COURT: Let's don't go into the driving area.

THE WITNESS: Yes, ma'am. It is to say that there are many situations where context is important, and that you see very different behavior depending on what context somebody is in. And we will look at that in some additional research studies as we progress.

BY MR. HUDGINS:

Q    One of the factors that you looked at was the appraisal of the correctional staff there. Can you describe for the jury, what is the appraisal of the correctional staff?

A    The appraisal means the correctional professionals who are tasked with the responsibility of confining this person pretrial, in the interest of keeping other inmates safe and themselves safe, what level of security did they view this inmate or this offender as requiring, in full knowledge of the

charges that were against him.

And what we find is that in the Portsmouth jail, that he is in general population. That means he is mixed with the other inmates. He is not restrained when he has contact with the other inmates, nor is he restrained when he is in contact with staff members. And so the judgment of those correctional professionals was not that he needed to be in solitary confinement by himself, but instead that he could be safely managed in a general population of the jail.

Q    Now, obviously David will be a capital offender; is that correct?

A    Yes, sir.

Q    Is that significant in this type of analysis that you are doing?

A    Yes, sir. One of the things that I looked at, one way of grouping him is as a convicted murderer, and then also as a convicted capital murderer, and then looking at what that means about him, given that conviction status.

Q    Are there studies that do that?

A    Yes, sir, there are. This is a study that I began to describe to you earlier, where we looked at over 50,000 inmates in a state prison system. And as we looked at these inmates, we looked at the offense of conviction -- that means what were they convicted of to put them in prison -- and then, how often did they get disciplinary write-ups for any purpose,

for anything, all the way from not making their beds, through assaults, potentially violent -- those are things like having a weapon, or trying to escape or riot or fighting or assaults -- then all assaults, assaults with injuries, and assaults with serious injuries, to see if murderers were more often violent in prison and how often they were violent in prison. And here is what we found.

We looked at 5,000 inmates who had been convicted of first degree murder, looked at 11,000 who were convicted of property offenses, and at that whole population, all the inmates that were in this prison during the entirety of that calendar year. And what we found was that when we looked at total violations, about one convicted murderer in three got a disciplinary ticket in any given year for something. But that is about 20 percent better than the other guys they are in prison with. In other words, they are getting in trouble less often than the other inmates.

When we look at potentially violent misconduct, even holding all other factors constant, the murderers are about 20 percent less likely to be involved in potentially violent misconduct.

So in the beginning we know that they are better inmates in terms of general adjustment, and also in terms of potentially violent misconduct. Once we get out to assaults or assaults with injuries or assaults with serious injuries,

the murderers look just like everybody else that they are in prison with. In other words, the seriousness of the offense didn't predict that they were going to be in trouble or be violent more often.

Well, we looked at this, and we said, wait a minute, the murderers -- they have probably been in prison longer, and maybe that's why their rates of disciplinary misconduct are lower and why they have the same rates of assaults. So we looked only at people that came to prison the year before. And the murderers looked just like everybody else. You say, wait a minute, but the murderers probably went to a higher level security. So then we looked at everybody that went to prison the year before that went to high security. The murderers looked just like the other inmates.

So even as we looked at trying to be sure that we had accurately accounted for this, what we found was that the murderers had low rates of violence and were not more violent than the other people they were in prison with.

Now, if you will notice across the top here, this part that is highlighted in yellow, the more serious the violence is, the dramatically less likely it is to occur. So about two and a half inmates in a hundred are involved in an assault in a given year, whether they are a convicted murderer or not, but only about one in 500 is involved in an assault that results in more than first aid injuries. So as that

severity increases, the likelihood of it decreases very dramatically.

Q    Are you aware of any other large-scale studies that deal with this topic?

A    Yes, sir, there is another large-scale study that my research colleague, Dr. John Sorensen, did with Rocky Pilgrim, and there they looked at over 6,000 murderers in a state prison, and based on their follow-up with them, they projected the risk of them being involved in violence across a 40-year term in prison.  And what they estimated was that in the group as a whole, about 16 percent would be involved in an assault; it means 84 percent would not, 16 percent would.

Most of that risk was the risk of an assault of another inmate.  Lifetime risk of an aggravated assault of a correctional officer was one percent.  Lifetime risk of killing another inmate was a fifth of a percent, or one in 500.

And so again, the more serious the violence is, the dramatically less likely it is to occur.

Q    David will be a capital inmate; is that right?

A    Yes, sir.

Q    How about, is there any study on capital inmates or murderers?

A    Yes, sir.  Let me talk to you about what we found out about those 145 federal capital inmates Dr. Sorensen and Dr.

Reidy and I studied, you know, that we looked at an average of six years of confinement in the Bureau of Prisons after they had been sentenced to life.

What we found is that about one in five were involved in assaultive infractions during that period of time. About one in 11, about nine percent, were involved in a serious assault. Now, in the Bureau of Prisons a serious assault is not one that seriously hurts somebody. It is one that has the potential to do that. So if I drop a padlock in a sock, and I swing it at somebody and I miss, that is a serious assault in the Bureau of Prisons, even though there was no contact and no injury. So about nine percent, about one in ten or eleven, of the inmates averaging six years is involved in an assault like that.

In terms of an assault that sent somebody to the hospital with nonlife-threatening injury, less than one percent of the inmates were involved in that kind of assault. None of the inmates assaulted somebody that sent them to the hospital with a life-threatening injury. None of these 145 inmates allowed to plead or sentenced by their juries killed anybody in prison. None of them seriously assaulted staff members.

We then wanted to look to see if they were more violent than the other people they were in high security with in U. S. penitentiaries. So we looked at the rate of these

same infractions among individuals that -- the other 18,000 guys they are in prison with, and the capital murderers looked just like the other guys in high security. They are not more often involved. As we move up this same increasing severity, the capital offenders are not statistically significant from the other 18,000 guys they are in prison with.

Q   Doctor, I want to skip the next two, 16 and 17, and if we can go to number 18.

A   Yes, sir.

Q   Have you conducted a study of cases that you have actually provided a risk assessment in and how those people did after the risk assessment and after they entered the Bureau of Prisons?

THE COURT:  Speak up just a little bit, Mr. Hudgins.

MR. HUDGINS:  I'm sorry, Your Honor.

THE COURT:  Go ahead.

MR. HUDGINS:  Do you want me to repeat this question?

THE COURT:  You heard it, didn't you?

THE WITNESS:  Yes, ma'am, I did.

Yes, sir, I have.  In fact, this study is now in press, which means it has passed peer review and is simply awaiting physical printing in the *Journal of the American Academy of Psychiatry and the Law*.

And in this study I sought the disciplinary records

on as many capital offenders as I could who I had been personally involved in either doing a risk assessment of, like I have with Mr. Runyon, or where I testified about conditions of security that could be brought to bear that would reduce the likelihood of violence.

Now, as I sought that follow-up, I identified 44 federal capital cases like that and was able to get data on 43 -- in other words, I was able to get the disciplinary records of 43 of the 44. One guy was -- there were no records available. He was in some specialized situation.

Of the state cases, there were about 120 state cases where I had provided assessments, but the states -- only about 30 -- not all the states would release the data to me. So I was only able to get data on 30 of the 120. So we have a total of 73 that I was able to get information on. And averaging about four and a half years in prison after their trials, about 12 percent, about one guy in eight, was involved in an assault.

Almost all of those were minor assaults. One inmate was involved in an attempted serious assault. Now, that is something less than the lock-in-a-sock-that-missed, because, remember, that would have been a serious assault. This is something less than that. None of them sent anybody to the hospital with or without a life-threatening injury. None of them killed anybody. None of them seriously assaulted a staff

member.

Q    Doctor, if you would skip number 19 and go on to number 20?

A    Yes, sir.

Q    David will have -- if he is sentenced that way, he will be given a life sentence, and you have listed that as a factor?

A    Yes, sir.

Q    Can you describe for the jury what it is in the studies that shows the effect of a life sentence?

A    Yes, sir, I can.  We have two studies that I have done in that respect.  This first one was done again with Dr. Sorensen and Dr. Reidy, and this is the study that I described to you where we looked at 2500 inmates over an eleven-year period of time in a high-security prison, so that we could do an apples-to-apples comparison within the same facility of inmates who were serving life without parole and inmates who were parole eligible.

And what we found is that, again using that statistical technique, a regression analysis to hold all other factors constant, to control for age, education, and prior prison and that kind of thing, inmates that were serving life-without-parole sentences were half as likely to be involved in assaults as the parole-eligible inmates they were side by side with in the same facility over the same

eleven-year period of time.

So rather than being worse inmates because they had nothing to lose, no hope for parole, instead, their assault rates were half those of the parole-eligible inmates that were side by side with them.

Q    This was a study in one particular state or penitentiary?

A    Yes, sir, this was in a high-security prison in Missouri.

Q    Are you aware of any other studies on the same thing that show the same thing?

A    Yes, there is another large-scale study that I did with Dr. Sorensen, and this was in a different prison system.  This was in the Florida Department of Corrections, and this time we looked at 9,000 inmates that were all serving long sentences. In other words, all of them were going to be serving more than ten years.

And this time what we found is that the life-without-parole inmates were about like the other long-term inmates.  They were a little better than the guys serving ten to 20.  They weren't quite as good as the guys serving 30 or more, but the differences were very small.

So when we compare the life without parole to inmates potentially serving shorter sentences, then they do better.  When we look at them as compared to other long-term inmates, then they look about like other long-term inmates. They have relatively low rates of serious violence, and they

are not more likely to be involved in that violence because they are serving life without parole.

Q   Doctor, has the Department of Justice published any conclusions about the relationship between the offense that a criminal did in the community and his adjustment to prison?

A   Yes, sir, they have.  And here is what they have described in their reviews.  These are based on research up to the early 1990s.  This is before the research that my coresearchers and I have done, but they have identified the same thing that we have now confirmed in our own large-scale studies.  Number one, past violence in the community is not strongly or consistently associated with prison violence. Number two, current offense, prior convictions, and escape history have only a weak association with prison misconduct. It is not a very strong predictor at all.  Number three, the severity of the offense is not a good predictor of prison adjustment.

Q   Have you prepared a model to demonstrate that for the jury?

A   Yes, sir, I have.

Violence is almost never a function of just the person.  Instead, it's a person in a particular interaction, in a given context, and it is out of that whole matrix, out of that whole interaction, that you get violence.

Now, when you put somebody in prison, now you have

an inmate who is interacting with other inmates.  Now, that is critically important, because on the outside you can do violence or victimize somebody and tell yourself you are never going to be caught, they won't know who you are.  Only in prison, any violence that you do, the victim knows who you are, and now you have to deal with him and his cousins and his friends, who you don't even know, from now on, and he did something that got him sent to prison, too.

So it is a very different group you are with, and vigilant staff, staff who you are going to have to deal with from now on after you go off on them in some way, in a highly restrictive context, where there are searches and restrictions and that kind of thing, close supervision, and the effect of that is to form a barrier that effectively blocks the occurrence of the most serious violence.

In other words, even though in prison you have got a population that was involved in serious crimes and violence in the community, when you put those people in prison, the effectiveness of that prison environment is that the rates of serious violence are very low.

Q    Are you familiar with the different levels of custody at the Bureau of Prisons?

A    Yes, sir, I am.

Q    And what are those levels?

A    Those range at the lowest level of security of a minimum

security prison; then low security; then medium security; then U. S. penitentiaries, or high security; and then there are even prisons within the prisons of those U. S. penitentiaries that are security housing units; and then there is a super maximum facility that the Bureau of Prisons operates as well called ADX Florence.

Q   And at what level is a federal inmate housed if he is sentenced to life without possibility of release?

A   A federal inmate is housed at a U. S. penitentiary level or higher at entrance into the Bureau of Prisons.

Q   I going to skip number 28.  If you could go to 29. Doctor, you have a list there of the U. S. penitentiaries. Are these all facilities that have the level of security that you just described?

A   Yes, sir, these are all operated as high-security facilities.  And the census is the number of inmates that were in each of them as of August 13, and you have a total of, as of last week, 25,061, who are maintained in high-security U. S. penitentiaries.  That represents about 14.6 percent of the Bureau of Prisons inmate population.

Q   Do you have information on the mix of inmates who are in the U. S. penitentiaries?

THE COURT:  Without going into that, this 25,061 individuals, some of them are life sentences, some of them aren't.  It depends upon many factors that are determined

within the Bureau of Prisons.  Is that correct?

THE WITNESS:  Yes, ma'am, that's correct.

THE COURT:  All right.  And that is all that we need to go into on that.

BY MR. HUDGINS:

Q    Doctor, it is fair to say that we don't know which of the U. S. penitentiaries David Runyon would be sentenced to; is that correct?

A    That's correct.  We don't know which one of these facilities he would go to.

Q    But I think you have testified that the level of security we do know at a minimum.

A    Yes, sir, that he will go to a U. S. penitentiary, to a high-security facility, at a minimum.

Q    If I could get you to go to another slide.

THE COURT:  Before you go to it, tell me which one it is.

MR. HUDGINS:  Thirty-nine, Your Honor.

THE WITNESS:  Can I simply advance to it?

THE COURT:  No, you may not.  I need to know what slide you are in.  I don't have mine numbered.

MR. HUDGINS:  I'm sorry, Your Honor.

THE COURT:  If you can show me, because there are many in here that are not pertinent to this case.

MR. HUDGINS:  Yes, ma'am.

THE COURT: Which number is this, and then I can count forward.

MR. HUDGINS: It will be on Page 10 of what you have.

THE COURT: No, you are on Page 8 of what I have.

MR. HUDGINS: I'm skipping. I'm skipping to page 10, the left lower corner.

THE COURT: You are on Page 10, the bottom left?

MR. HUDGINS: Yes, ma'am.

THE COURT: That's fine. That's okay.

THE WITNESS: Your Honor, in getting there, should I advance very quickly through these other slides, or go to the computer and go to this slide directly?

THE COURT: Go to the computer and go to that slide directly.

THE WITNESS: Yes, ma'am.

BY MR. HUDGINS:

Q   Dr. Cunningham, as the jury is looking at the inmate's likelihood for violence in David Runyon's case, are assaults in the U. S. penitentiaries something that you have information on?

A   Yes, sir, they are.

Q   And can you tell us what that information is?

A   Yes, sir. I have broken this out by different types of assaults. And this is for the year April 2004 to March 2005.

The rates of violence in that whole level of security are relatively stable over time, from one year to the next, across that whole level of security, which is what this reflects.

During that year 94 percent of the inmates at a U. S. penitentiary level didn't assault anybody. Just less than one percent assaulted an inmate with a weapon. 2.1 percent assaulted an inmate without a weapon. About a half percent, about one guy in 250, assaulted a staff member with a weapon. And about two and a half percent assaulted a staff member without a weapon. So that gives some sense of just assaults in general.

If we look at serious assaults, those are the ones that have the potential to cause serious injury, whether they did or not. Now, just over one percent commit assaults in a given year that have the potential for serious injury.

Now, these are anchoring points, as we look at characteristics of David Runyon, like his education or his age or his community employment history. Those factors are reducing his risk as we would look at this number.

So the risk for the group as a whole, it is about one percent a year. But his age and education and other factors cause his likelihood of that to be well less than this one percent that the group as a whole has.

And if we are talking about assaults that send somebody to the hospital with a life-threatening injury, that

is happening about two and a half times per thousand inmates per year. That is about a fourth of a percent. And again these are anchoring points that we would then look at David Runyon's risk of as being below this, based on these individualizing factors that I described.

Q    Doctor, skipping the next slide and going on to the following one, what about the possibility of capital inmates killing someone in prison?

THE COURT:  You are talking about within the prison?

MR. HUDGINS:  I'm sorry?

THE COURT:  Are you still within the prison setting?

MR. HUDGINS:  Within the prison setting. A capital inmate committing a homicide within a prison setting.

BY MR. HUDGINS:

Q    Is there data on that?

A    Yes, sir, there are two types of data that are relevant to that. One of them -- well, three. One is to look at how often inmate-on-inmate homicides happen in the Bureau of Prisons. Another is how often do they happen among inmates at a USP level of security, at that high-security level. As we would look at the likelihood of assaults in the Bureau of Prisons in general, that rate is about six per 100,000 inmates per year, about six per 100,000.

Now, there are occurrences of inmates killing a

staff member. Thankfully that is very, very rare. The last time that happened in the Bureau of Prisons was 12 years ago, in 1997. That rate is less than one in a million per year. So it happens, but thankfully very rarely. That happens in state prisons about one time in the whole United States in any given year. The last time in federal prison was about 12 years ago.

So again if we are going to think about what is the likelihood of that type of casualty from David, then we have to think about that's the base rate. This is how often it happens. So, then, where is he as compared to other inmates in terms of his risk?

Now, to try to get some sense of the relative degree of risk, I have provided a -- the incidence of homicide among males in the open community. And so, for example, while the rate of homicide in federal prison is about six per 100,000, that is about half the rate of homicide among males in the open community of the United States, about half the likelihood in Virginia. Richmond -- the rate among males there is about 22 per 100,000 inmates per year.

And so the incidence of homicide in federal prison is somewhere between a third and a fourth the rate of Richmond in the open community. This is additional evidence that prison works. Even though you have got these serious criminals in prison, they are very effectively able, even with

that population, to minimize the incidence of homicide.

Now, a more fair comparison is to look at how many homicides are happening at a USP level, at high security, and the rates there are higher. The rates there are 26 per 100,000 inmates. And again as we would look at community males, that is higher than Virginia or the United States as a whole. It's equivalent or less than the rates in many large American cities. But that rate is higher at a USP level of security.

Q    As you have said, with so many criminals, some of them serious, some of them violent, criminals housed closely together like that, how do we account for the lower rates in the prison?

A    I created a graphic that talks about that. On the right-hand side of this scale are the risk factors that might have caused somebody to behave violently to bring them to commit these offenses that brought them to prison.

Now, when you put somebody in prison, some of those you take away. They no longer have access to the high lethality handguns, for example, or if they had a substance abuse problem, or there are other issues you may have removed. But most of what happens is you've stacked up the other side of the scale with security and structure and staff and confinement and consequences, and that essentially holds this person in check who, in the community, without those things,

may have had a number of risk factors for violence.

Q    Can you summarize for the jury these base rate findings regarding prison violence?

A    Yes, sir.  First, capital inmates have low rates of violence when they are in a general prison population.  The seriousness of the offense does not predict prison violence. The infraction rates, whether it is general disciplinary infractions or violence, are lower the older an inmate is when he hits the gates and as he or she ages out across a lifetime in prison.

Now, again those anchoring rates that we are looking at across decades in prison, the incidence of assault is someplace around 20 to 30 percent, depending on the study, lifetime risk.  Repetitive assault, about ten percent. Aggravated assault on a staff member, lifetime risk about one percent.  Likelihood of killing another inmate, depending on the study, lifetime risk, somewhere between one in a hundred and one in 500, anywhere from a fifth of a percent to one percent.  Annual risk of killing a staff member is less than one in a million per year.

Q    Relative to the group rates that we have been talking about, how do we individualize this to David Runyon?

A    Using these as anchoring points, on the side of an increased risk of violence in prison, the fact that this offense was associated with a carjacking or if it was a

**1003**

robbery, that would serve to elevate somewhat the risk relative to the group. That would be a factor that would increase the risk somewhat.

On the other hand, there are a number of factors that are on the side of saying his risk is below those group rates, and those are his age; his education; his community employment; his having continuing contact, correspondence with family; not being violent in jail pretrial; and how he is viewed by the correctional professionals as they have been housing him pretrial.

Q    Using the actuarial risk model that we have been talking about, where does David's risk fall relative to other inmates?

A    Let me describe that in terms of three different studies, the three different models that we could plug him into, and his characteristics into.

The first one is that study that Sorensen and Pilgrim did of the 6,000 convicted murderers in state prison who they projected the risk across a 40-year term in prison. That's the one that said there was a 16 percent likelihood. Well, there are factors that raise or lower that 16 percent likelihood.

When we look at those factors in light of David Runyon, depending on whether this offense represents a robbery or not, if it represents a robbery, then we are going to add seven percent onto that risk. If it doesn't represent a

robbery, if that is not what this was about, then you don't get that add-on for robbery. And so then his likelihood, lifetime likelihood, is somewhere between two percent -- that is if we don't tag him with a robbery -- or nine percent if you include that as a risk factor.

Now, much of that risk is likelihood of assault of another inmate, using this model. Lifetime risk of an aggravated assault on a staff member is less than one percent. Lifetime risk of killing another inmate is less than a fifth of a percent, about one in 500. So that is one study. That is one model that he can be plugged into that is based on 6,000 convicted murderers.

There is another model that is based on 136 capital murderers in state prison, and this time we are looking at his risk as compared to other capital offenders. The first one was saying, where is he relative to the murderers as a whole. Remember the group as a whole had a 16 percent risk, and his is between 2 and 9 percent. This time we are looking at capital murderers.

As we would match particular characteristics about David Runyon, that would place him in the lowest of the three risk groups of capital murderers sentenced to life in prison. Among that group, during an average of the first two years they were in prison -- and if violence is going to occur, it tends to occur early on in a prison stay -- there were no

assaults among that lowest risk group. There were no serious assaults among that lowest risk group. So that's how we would assign him as compared to other capital offenders in this study.

And then there is a third study that looks at 14,000 inmates coming into a state prison and looking at how they behave during their first year in prison. And when we would plug in his characteristics to that statistical model, then he's -- among these 14,000 inmates, his risk group is the lowest two percent. In other words, 98 percent of those incoming inmates have a higher risk profile for violence than he does. Among that group that he is in, that lowest two percent, about five percent of those inmates, about one in 20, engaged in potentially violent misconduct. That is all the way from threats to weapons to fistfights to assaults.

Q    Doctor, you are not saying that there is no chance that David Runyon or anyone else coming into the Bureau of Prisons would be involved in some serious act of violence once they are in the Bureau of Prisons?

A    No, sir. This is not saying, yes, it will happen or absolutely no, it will not happen. I couldn't say that about anybody, any inmate, anybody in this room. This is saying, what is the relative likelihood, what is the likelihood of that occurring, and how likely is he, as compared to other inmates, whether they are other murderers, other capital

murderers, or inmates in general, where is David Runyon in proportionate risk as well as absolute percentage.

Q    And for David Runyon, what is the bottom line?

A    That his likelihood of serious violence in prison is very low. The more serious that violence is, the much lower that risk becomes.

MR. HUDGINS:  Thank you.

Judge, I don't have any other questions at this time.

THE COURT:  All right. Then we will take an afternoon recess, and then resume with the testimony. The court stands in recess.

(Recess)

(The jury returned to the courtroom.)

THE COURT:  All the jurors are back.

Mr. Samuels, cross-examination?

CROSS-EXAMINATION

BY MR. SAMUELS:

Q    Good afternoon again, Dr. Cunningham.

A    Good afternoon.

Q    Dr. Cunningham, I'd like to start where we ended, just so that I'm clear in your conclusion.

And what you are saying is that although there may be a low probability of David Runyon committing serious violence in prison, you can't predict with any certainty

**1007**

whether that is going to happen or not?

A    I can describe the relative likelihood.  It is not a prediction in terms of, yes, he will, no, he won't.

Q    That would be like looking into a crystal ball, and you as a scientist wouldn't be able to do that; right?

A    That's correct.

Q    And even if it is a very low risk, one in ten, one in a thousand, one in a million, you couldn't say whether this defendant is that one, could you?

A    No, sir.

Q    There would be no way for you to do that based on the research you have described or the literature you have reviewed?

A    There is no way to do that, period.  All you can ever do is identify what's the relative likelihood and how does that compare to others.

Q    If I understand this correctly, there is a base rate that serves as an anchor point; is that right?

A    Yes, sir.

Q    And what is the most common characteristic for that base rate?

A    Well, all of the base rates that we are talking about involve an inmate in prison.  So that would be the most common characteristic.  That is common to all of these different studies I talked about.  After that, the most common one

differed.  Sometimes it was age, sometimes it was at a USP level security, sometimes it is murderers, sometimes it is capital murderers.  There are different ways of then grouping those individuals.

Q    So the different studies you have described, some of them have involved just inmates at the federal level; correct?

A    Yes, sir.  When we looked at -- for example, at 6 per 100,000 homicides in the Bureau of Prisons, that involved all inmates in the Bureau of Prisons.

Q    And then some of them involved inmates sentenced to life without parole for capital murder; correct?

A    Yes, sir.

Q    Some of them were state inmates?

A    Yes, sir.

Q    Some of the studies were for longer periods of time, and some of them were for shorter periods of time?

A    Yes, sir, that's correct.

Q    And you are taking all these different studies, with all these different characteristics, to come up with this base rate that you use as an anchor point; is that right?

A    Broadly, that's correct, yes, sir.

Q    And then from that anchor point, if I understand this correctly, you would look at certain risk factors that could either go above the base rate, a higher probability, or below the base rate, for a lower probability of violence; is that

right?

A     Yes, sir.  Where we are able to, we may identify correlates that then raise or lower the risk.

Q     But it can't go too far off that central anchor point; isn't that right?

A     Well, it depends on -- not without good data.  You can go pretty far off the anchor point by age.  Remember, among those 6,000 murderers that had a 16 percent lifetime likelihood of violence, if you were over age 35, that took 14 points off the risk.  That brought you down to two percent, unless you had some other risk factor.  So it can be pretty powerful if there -- and move that rate pretty far if you have got good data to support it.

Q     The base rate that you have described, the general base rate for future violence down the road, that is a base rate that has been the same in a number of cases you have testified about; correct?

A     Yes, sir, the group rate would not change.  The individualized factors would be different from case to case, but the group rate would only be modified as more research was done and that was added to the mix.

Q     But if you go too far off that base rate one way or the other, isn't there a greater chance for error?

A     Unless you have really sound data.

          Well, it is kind of a matter of terminology.

Inmates who are 35 years old, they have their own base rate.
That rate is substantially lower than the rate of the guys who
are 20.  So if we are looking at all inmates, then it pulls it
this far.  But really we are talking about gathering group
data at all these different points along the way.

Q    I understand.  How many capital cases have you testified
in, Dr. Cunningham?

A    Testified in about 55 federal capital cases, and
somewhere between 85 and 90 state capital cases.

Q    And what is the time period that you have done most of
this testimony?

A    This is since 1995.  That is in the last 14 years.

Q    So that would be the same time period that you got your
board certification for clinical psychology; isn't that right?

A    I was board certified in forensic psychology in 1995,
yes, sir.

Q    And how many cases have you consulted in?

A    How many capital cases have I consulted in?

Q    Yes, sir.

A    There are probably that many more again that I have
consulted in and not been called to testify, or that I was
identified as a potential witness but never called.

Q    And those 55 federal cases that you spoke of from 1995 to
2009, have you always been called by the defense to testify?

A    That's correct.

Q    And in your consultations has that always been with the defense?

A    Only the defense has consulted with me or called me to testify in a capital case.

Q    And in each of these capital cases in which you testified, the 55 cases, have you ever found the defendant to be a risk of danger in the future?

A    I have always described some probability of risk in every case where that was individualized.  Now, not all 55 cases did I testify about risk assessment.  Sometimes I testified about mitigation factors in terms of damaging developmental factors.

Q    Let's just confine it to the cases in which you have testified about risk assessment.  In those cases have you ever offered the opinion that the defendant is in fact a risk of violence?

A    I have always specified some risk.  I have never said the risk was more likely than not, given either the group that he would belong to or conditions of confinement that are available to the Bureau of Prisons to more securely house that offender.

Q    Dr. Cunningham, your practice is designed towards getting work in capital cases; isn't that correct, sir?

A    I wouldn't characterize it in that way.  Capital work is not the only forensic work that I'm involved in.  My practice is directed toward trying to provide the most scientifically

informed testimony. Ultimately that's likely to serve my own professional career. But the focus is on the quality of the work. It is not on the salesmanship of trying to get more.

Q And do you have other individuals that work with you in your practice, other employees of your practice?

A Administrative clerical support.

Q Does your wife work with you?

A Yes, she does.

Q And does she have a videography service?

A Yes, she does. That is separate from my practice. She does the heavy-lifting accounting and practice management within my office, and then she has her own business where she does documentaries and videography and legal-video-related things, including in capital cases.

Q Is that from the mitigation side of the house?

A Well, there is not a mitigation side of the house. The work that she does, if she is asked to do a mitigation documentary, would be in the -- she would be retained by the defense to prepare a documentary interviewing family and third parties, sometimes overseas, who can't otherwise make it easily into the United States. She will interview those individuals, and the defense will make that into a video, a documentary to be played associated with the trial.

Q What is mitigation evidence, Dr. Cunningham?

A Mitigation is, I guess, ultimately whatever the jury

wants it to be.  It's associated with a concept that we call moral culpability.

THE COURT:  I find that to be an improper question, because that draws a legal conclusion in matters that the court will -- he is not qualified to testify about what constitutes mitigation evidence in a case.

MR. SAMUELS:  It was inartfully phrased, Your Honor. I will go back and clarify what I'm trying to get at here.

BY MR. SAMUELS:

Q    Dr. Cunningham, how many capital cases have you been involved in in 2009?

A    I have testified in five or six cases this year, I think.

Q    Are you testifying later this month in one?

A    Not in -- no other cases in August.  In September I will be called to testify in a mental-retardation-related capital assessment.

Q    Who is calling you to testify in that, sir?

A    There I'm being called by the defense in a case called *U. S. v. Paul Hardy*.  That is in New Orleans, Louisiana.

Q    Dr. Cunningham, in 2008 what percentage of your yearly income came from being involved in capital cases?

A    I can't give you a precise number.  I would estimate between 60 and 70 percent of my professional income comes from work in capital cases at one phase or another.

Q    What does the other 30 or 40 percent come from?

A    That comes from work in noncapital cases.  Those may be all the way from competency to stand trial, mental state at time of offense, other criminal-related issues.  I do some civil cases.  I do some consultations regarding sex offenders. There are a variety of other forensic consultations that I'm involved in besides just capital sentencing related.

Q    Dr. Cunningham, you talked about a number of awards you have received.

THE COURT:  Is your testimony strictly for the defense, or you have testified for both the defense and the prosecution?

THE WITNESS:  I have been called by both the defense and the state in noncapital cases.  I have only been called by the prosecution in capital cases.

THE COURT:  By the prosecution?

THE WITNESS:  Yes, ma'am -- I'm sorry.  I have only been called by the defense in capital cases.  I have been called by the defense and the prosecution in noncapital cases.

BY MR. SAMUELS:

Q    Dr. Cunningham, in 2004 you received an award from the -- the John Augustus award; is that right?

A    That's correct.

Q    Was that from the National Association of Sentencing Advocates?

A    Yes, sir, that's correct.

Q    Is that an organization that provides defense-related services for capital cases?

A    Some of the members are involved in that.  Some of them are mitigation investigators.  There are also individuals involved in that organization that were with the sentencing-related commissions.  There were some research-oriented folks associated with it, people that were writing presentencing reports on behalf of the courts.  There were a number of different professionals that were involved in that organization, but a significant portion of them were involved in doing mitigation investigation in capital cases.

Q    And that mitigation -- without regard to what it is, that comes in on the defense side of the case; correct?

A    Yes, sir, those are individuals that had been retained by the defense, those mitigation investigators were.  There are other professionals that are not defense related that were part of that organization.

Q    Dr. Cunningham, are you participating in October in a seminar entitled, Defending Illinois Death Penalty Cases?

A    I believe I have been asked to speak at that seminar.  I don't remember the -- I know I have been asked to speak at a seminar in Illinois.  The title of it I don't know.  But I have been asked to speak.

Q    Have you been on the faculty for the DePaul University College of Law Mitigation Training Program?

A     Yes, sir, I have.

Q     And is that again an organization that provides training services for defending capital cases?

A     That's correct.

Q     Have you been involved in other seminars for the National Legal Aid or Public Defenders Association?

A     Yes, sir, I have.

Q     Dr. Cunningham, do you have a view on the death penalty?

A     Not an advocacy view in terms of being in favor of it or opposed to it.  I have many views about the death penalty, about the importance of the reliability of these proceedings, about the excellence that needs to be brought to bear.  I have many opinions about it.  But I am not an advocate on one side of the issue or the other.

Q     Well, personally, are you opposed to it, or do you support it?

A     As I have said, I'm not an advocated on either side.  I can envision a capital case that -- that could result in a death penalty or that I could be involved in that could potentially do that.  But I'm not an advocate on either side of the issue.  I don't have an advocacy view.

Q     But you have always testified for the defense in capital cases?

A     I never testify for anybody.  I have always been called by the defense.  Now, I have offered to do consultations with

the U. S. Attorney's office. I have offered to come and speak to the U. S. Attorney's organization and to consult on capital cases for the U. S. Attorney. That testimony and consultation hasn't been requested. But I have indicated that I am not opposed to it and I'm available to provide that.

Q It has been requested of the defense, though, in capital cases; correct?

A I have been called -- the phone rings, and I pick it up. I have invited the U. S. Attorney's office to place those calls. They haven't done that so far.

Q When were you retained in this case, Dr. Cunningham?

A I don't know that I have that information with me. About a year ago, as I recall. But I don't recall specifically.

Q And what is your hourly rate? What is your fee schedule for participating in this case?

A My fee is $300 per hour in public-funded cases like this is. It is 360 an hour if it was a privately funded civil case. But my fee in this case is 300 per hour.

Q You prepared a report in this case dated February 5, 2009; is that right?

A Yes, sir, that's correct.

Q And this report was being submitted to the attorney general to try and convince them to withdraw the notice of death against David Runyon; is that right?

A I don't recall the purpose of the report. I just recall

I was asked to provide a report.

Q   How much time did you spend on the case before providing the conclusions in this five-page report?

A   I don't have that billing statement broken out.  Most of the work I did on the case was up to that time, and the time I have spent since then has been shorter in comparison.  The billing statement would reflect that.  I would expect that I had spent about, oh, 25 hours.  My estimate would be I'd spent maybe 20 hours up to the time this report was prepared, and then I have spent about another -- let me try to do the math on this.  My total billings as of a couple of days ago were about 24 hours of total professional time that I had spent.  I think I'd probably spent 15 to 20 of those hours up to the time of preparation of this report, and spent another five to nine hours up to -- again, up to a couple of days ago, preparing exhibits and doing additional work and review.

Q   Dr. Cunningham, in this report you indicate that you reviewed records from David Runyon?

A   Yes, sir.

Q   You don't list the records that you reviewed in this report, though, do you?

A   In the report it doesn't list them, no.

Q   And have you reviewed any records since February 5, 2009, related to this case?

A   I have reviewed them again.  I have gone back over

records again.  I'm trying to think about whether I have been provided with anything new since then.

Q    Did you interview anyone before preparing this report?

A    No, sir.

THE COURT:  Did you interview Mr. Runyon?

THE WITNESS:  No, ma'am.

BY MR. SAMUELS:

Q    Dr. Cunningham, you have done interviews in the past of criminal defendants on whose behalf you are testifying; correct?

A    I never testify on anyone's behalf, but I have done interviews of criminal defendants in cases where I was called.

Q    And you have expressed the view before that it is important to do so; correct?

A    No, sir.  It depends on what the referral question is. The information that's obtained from the defendant may be very helpful on some matters and may not add much at all in others.

Violence risk assessment for prison is an arena where the interview of the defendant is a very minor component, because the factors that are predictive of violence in prison can be obtained from other sources, their demographic, their age and education and response to confinement and that sort of thing.  So there is not a lot that an interview adds to an assessment of somebody's long-range risk of violence in prison.

Q   Dr. Cunningham, isn't it important for you as a forensic psychologist and a scientist to have all available information from all sources before arriving at a conclusion?

A   No, sir. As a forensic psychologist and a scientist, you never have all the information. That's a limitless universe. It is important to have the information that is predictive or relevant to the issue that you are evaluating. The factors that I have identified are the ones that have been demonstrated in the science as being predictive of violence in prison.

So while much other information might be interesting, it isn't relevant in terms of having predictive significance. So I could have spent a lot of time, billed all kinds of hours doing all kinds of work that was unnecessary and irrelevant, because only a limited set of factors are predictive of violence in prison.

Q   Dr. Cunningham, have you testified in the past that you can't have confidence in your individualization of the base rate without interviewing the defendant?

A   No, sir, I -- I have certainly said that the findings are somewhat more tentative or that they are missing that small piece of data, but not that those findings can't have significant empirical support without it.

Now, that's evolved some, I would expect, over the years that I have testified, as more science has been gathered

about what factors are predictive. As the research base has increasingly focused on factors that are available in the records that are demographic, the role of an interview of a defendant for a risk assessment for prison has progressively shrunk.

Q   Did you testify in the case of *United States versus Joseph Bullock* in Richmond, Virginia, in 1999?

A   Yes, sir, I did.

Q   And I'm going to read to you here, Question: So in order for you give the individualization of your base rates, you were indicating to us that you must interview the defendant; is that right?

Answer: Let me take that in stages. There is some concerted individualization of base rates that can be done on the basis of the records that are available. A tentative individualization could be done on the basis of facts presented in a hypothetical. For me to have confidence in my individualization of the base rates, for that to be as complete as possible, then I would want to review records and also interview him directly.

Would you have said that, sir?

A   Yes, sir, ten years ago, in 1999, that is about 27 scholarly papers ago. The large body of large-scale studies on rates and correlates of violence in prison have been published since 1999 by my research group. So my opinions now

are informed by a much greater body of information than was available to anybody in 1999.

Q    So now it is not necessary to interview the defendant?

A    Well, it is not that it is unnecessary.  It is that it is a very minor component of the assessment.

Q    Well, some of these studies that you have referred to in your presentation, they are older than 1999, aren't they?

A    Yes, sir.  When I talked about data that was available from the Department of Justice, some of their studies, that was 1991.  The graph that I showed about the disciplinary infractions in prison -- that was from Hirschi and Gottfredson back in the 1980s.  I think the original data had been gathered in the late 1970s.

Q    1975, isn't it, if I'm looking at the right graph, Dr. Cunningham?

A    Let me turn to that.  I believe that that may be '79 instead of '75.  I can't make it out on my copy.  It was published by Hirschi and Gottfredson in the 1980s.

Q    And then the Bureau of Justice statistics that you relied on, that was in 1989.

A    That was in the 1980s, yes, sir.  That was to demonstrate these findings have some historical continuity, that as we look at research that was available even 20 years ago, it wasn't as well defined in terms of taking violence and looking at it specifically, but the trend is the same.

Q    Dr. Cunningham, let me ask you this. If you had interviewed David Runyon, and he had said to you, I killed before, and I'm going to do it again when I get into prison, is that something that you would consider as a risk factor in your analysis?

A    Yes, sir.

Q    So without interviewing him, you have no idea what his predisposition is based on an interview?

A    The predisposition broadly is not predictive of violence in prison. Now, if somebody states, I am going to try to kill a corrections officer when I get to prison, or I'm going to try to kill another inmate when I get to prison, that's obviously a risk factor that I would take into consideration. That's a really improbable statement for a capital offender to make.

Q    You don't know that, do you, because you haven't interviewed the defendant?

A    Well, if the defendant is not volunteering for execution, if he is allowing a defense to be put forward, there is almost no likelihood that he would tell an evaluating expert, guess what, I'm going to try to kill somebody the first chance I get. Now, if he --

Q    Isn't that just speculation?

A    No, sir, I don't think that is simply speculation.

Q    Dr. Cunningham, did you talk to anybody else in this

case, the defendant's family members or friends or anyone like that?

A    No, sir.

Q    Did you read any interview reports of any of these individuals?

A    No, sir.

Q    So the characteristics that you are basing this on are the general characteristics of age, continuing employment, and so forth that you discussed?

A    They are not general characteristics.  They are the only characteristics that are reliable correlates of violence in prison.  Whatever the characteristics are from the research, that's what I have described.  I have not speculated about characteristics that are not confirmed by the research or in fact have been discounted by the research.

Q    Now, this base rate of violence that we talk about that we anchor our assessment to; correct --

A    Yes, sir.

Q    -- is only as good as the information that is reported; right?

A    Yes, sir.

Q    So your description of studies of prison infractions or reported assaults -- those are all reported incidents; correct?

A    That's correct.

Q   Now, assaults and infractions happen in prisons without ever being reported, don't they?

A   Yes, depending on the severity.  You are going to capture all of the murders in prison.  None of those are going to get by you.  You are going to get all the assaults on staff, virtually.  Those are not going to be unreported.  You are going to get all the injuries that are serious enough to send somebody to the hospital.

Now, what you are not going to get all of are more minor assaults, kind of mutual fistfight things.  You might not get all of those.  So there are lower levels of assault that may go unreported that you are not as sure about the rates of.  But your rates that you have the greatest concern with, serious assaults, homicides -- those rates are likely to be pretty close to being accurate.

Q   Dr. Cunningham, even violent men who go to prison, convicted murderers, they are probably going to be low on that base rate scale because of the anchoring point; right?

A   No, sir, they have -- they have a low base rate.  In other words, they have a low rate of serious violence in prison.  That's why a low probability is attached to them, because when you track those guys in prison, they aren't often in serious violence.

Q   Is there any tracking done of convicted murderers for murder for hire that you are aware of?

A    Yes, sir, in -- I think that's a factor that we looked at in our study of federal capital inmates, that 145.  Let me turn to that study.  I think that is a factor that -- among the offense categories.

Q    You are not aware of any study that solely tracks convicted murderers of murders for hire, are you, Dr. Cunningham?

A    Not a study that only tracks those offenders.  As I said, I think that was an offense category that we looked at in our research of federal capital offenders, in tracking them in prison to see whether or not that was a factor that was predictive of a greater risk of violence in prison.

Q    Which includes all different types of murderers; correct?

A    Yes, sir.  We divided them up into different categories, and the category that included robbery and carjacking, those inmates were somewhat more likely to be involved in violence in prison, as compared to all of the other inmate categories of murderers, of capital offenders, who were not more likely to be violent.

Q    Dr. Cunningham, let's talk about the risk factors that are associated with Mr. Runyon.  And I think the first one that you discussed -- you talked about his age, and you also talked about community employment; is that right?

A    Yes, sir.

Q    And you talked about that he had gainful employment?

A    Yes, sir.

Q    And did you review his records as to his employment?

A    Yes, sir.

Q    And did you see from those records that he has not done well in a structured employment environment?

A    It has been inconsistent.  There are some times that he has done well for a while, and invariably ultimately he ends up doing badly in that.  But the point of that factor is not whether he has good interpersonal relationships on the job. It is, does he seek to be constructively occupied historically, does he seek to earn a living gainfully.  That's the factor in that that is associated with prison violence.

Q    Well, Dr. Cunningham, you are aware that for the past number of years, he has been employed sporadically in these drug studies; is that right?

A    Yes, sir, my recollection is for several years, a couple of years before this offense, he was in the drug studies.  I don't recall it being like the previous decade.

Q    And he was barred from reenlistment in the Army?

A    To my recollection.

Q    He was suspended from work at the El Dorado corrections facility?

A    Yes, sir.

Q    He was given reprimands as a police officer at the Fayetteville Police Department?

A    Yes, sir.

Q    Does any of this history affect your assessment that he has been gainfully employed and this is a positive factor in the risk assessment analysis?

A    No, sir.  For purposes of this risk assessment, the issue is that the person seeks employment.

Now, if he had -- if he was a particularly constructive worker, that would be an additional positive factor in his favor.  But simply having repetitively sought employment is a factor that is associated with lower likelihood of prison violence, as compared to offenders who have historically earned their living from crime, like being drug dealers, or having -- their occupation is that they are robbers.

Q    And do you base that on a particular study, Dr. Cunningham?

A    Yes, sir.  Let me think about -- I described Quay's research.  His study, I think, was published in 1984, that identifies this classification of inmates that are identified as industrious.  There are other scholars who talk about this as a community stability factor, this gainful employment.  Beyond that, I don't think I can call them off the top of my head.

Q    All right.  The next category you talked about were his continuing relationships, and you were talking about that in

your report.

A    Yes, sir.

Q    You talked about the fact that his family and friends have not been able to visit him for financial reasons; is that right?

A    That's correct.

Q    And then you said that you anticipated that they will visit him when he gets designated, if he gets designated in a Bureau of Prisons facility?

A    If he is designated in a closer locale to them.  I don't know that they would have an easier time visiting him if he were still at distance.

Q    So you don't know if they will really visit him or not, based on where he is designated?

A    I don't know if they are going to visit.  If they are corresponding with him now, I would anticipate that that would continue.  But whether they can afford to visit, that I don't know.

Q    But you based your assessment of that factor on your anticipation that they would visit him; isn't that what you said in your report?

A    No, sir.  I said, he does, however, continue to have interaction with family members through correspondence.  I said it is anticipated they will begin visiting if he is assigned to a U. S. penitentiary in their geographic region.

Q    No idea if that will happen or not.

A    Don't know.  Often there is an attempt made to do that, but I don't know if that will occur.

Q    We next move on to the correctional appraisal, and you talked about Mr. Runyon being placed in general population. Did you talk to anyone from the jail about this?

A    I did not.

Q    Did you talk to the United States marshals about where he was placed?

A    No, sir.

Q    Did you review any records from the prison facility?

A    Yes, sir, I did.

Q    What records were those, Dr. Cunningham?

A    Let me see if -- I did not bring all of the records with me, but let me turn to a list of records, and also I can see which ones I brought with me.

Q    Do you know whether those records were provided to the United States in the course of discovery?

A    I do not.

       Portsmouth city jail records, inmate communications, incident report, medical, Newport News city jail records. That was in Binder 5 of 6.  And I took some of those documents out and placed them in the single binder that I'm traveling with.

Q    Just tell me when you reviewed those records and what was

the last date on those records, Dr. Cunningham.

A    I don't have the last date or the specific time of review.  Let me see what records I have with me about that.

Q    Is it fair to say that you reviewed those records prior to your February 9, 2009, report?

A    I don't recall the timing of when I reviewed those records.  I did not bring those records with me in these materials.

Q    So you didn't review those records in the last week or so?

A    No, sir -- I'm not answering whether I did that.  These are the records that I extracted last evening to try to limit how much I was traveling with.  But I was reviewing his records yesterday, and had previously as well.

Q    Dr. Cunningham, you talked a lot about the context of the situation in which capital defendants are placed; correct?

A    Yes, sir.

Q    Is there a difference in context between a jail and a prison facility?

A    Yes, sir.

Q    What is that difference?

A    The difference is, first, jail is a much harder place to do time, because they are not equipped for long-term confinement the way a prison is.  So in a U. S. penitentiary, inmates have a job they go out and do, and there is

programming activities of many different types, and there is organized recreational things to occupy the inmates, because that is a facility that is intended for people to be there for years.

The jail is more of a transient confinement population, and mostly they are housing individuals, but without much in the way of programming or activities or jobs or those kinds of things, and you have a mix of inmates continually coming in and out. So you are much more likely to be tested by other inmates. Conflicts are easier to occur. The inmates coming in have more recent substance abuse histories that may be operating on them as well. So there are a number of things about jail that make it more challenging than adapting into a high-security, this-is-where-you-are-going-to-live prison setting.

Q    Dr. Cunningham, David Runyon has been in jail pending trial on this matter; correct?

A    That's correct.

Q    So he has got some sort of incentive to model his behavior prior to the trial; right?

A    There is incentive, yes, sir.

Q    That incentive is removed once he is sentenced to a Bureau of Prisons facility?

A    The trial-related incentive is. As we look at --

Q    The trial-related incentive. That's all I'm talking

about.  That's removed?

A    Yes, sir.  That doesn't seem to be a very significant factor as we look at how capital offenders behave in prison.  But that incentive is removed, however minor it is.

Q    In looking at David Runyon's correctional appraisal, if you knew he had manipulated an assault on an inmate that was going to be a witness against him, would that factor into your risk assessment?

A    If he had done that from prison, if he was attempting to control that from prison, then that would be a factor that would relate -- well, if he is trying to organize an assault of another inmate who is in custody, then that would be relevant, depending on what his agenda is for doing that.  If he is talking about organizing an assault in the open community, that's a whole different risk analysis.

Q    No, I'm talking about in the prison.  If he is organizing an assault or manipulating an assault on another inmate, is that relevant to the risk assessment analysis?

A    Yes, sir, all things being equal, that would increase his risk.  Now, the extent of that depends on, is he organizing that assault in order to prevent prosecution, or is he doing it out of general retaliation?  If it is to prevent prosecution, then that motivation ends at the point that he is convicted.  If it is retaliation directed, then that agenda may continue as a risk factor.

Q    An assault is not just an assault?

A    No, sir, it's not quite that simple.

Q    I see.  Dr. Cunningham, would an inmate who was a former corrections officer and was aware of security procedures and mechanisms, would that be a risk factor in your analysis at all?

A    No, sir.  Inmates who are in prison pretty quickly become intimately familiar with correctional procedures.  The nature of a prison is it doesn't matter if you are aware of it or not.  It is equipped, particularly at a high-security level, to contain individuals who are motivated to escape, who are paying attention, who are aware of what's happening in the correctional procedures around them.  And so his prior background with that would only be of some assistance in the first three or four weeks.  After that, any inmate who is in that facility will have gathered pretty close to that kind of information.

Q    Dr. Cunningham, can the lack of remorse that an individual has about a crime they committed -- can that affect the base rate?

A    No, sir, there is no indication that remorse has any predictive effect on violence in prison at all.

Q    Are you aware of any studies that show that?

A    Yes, sir.  They have looked at this in terms of a larger personality type, called antisocial personality disorder, that

is characterized by not having remorse, repeatedly doing things that are grounds for arrest, lying, exploiting, manipulating, putting other people at risk. About 75 percent of the guys in prison can be diagnosed with antisocial personality disorder.

Now, in state prisons about 40 percent of them have been down in that prison system before. That tells you something about their functional remorse. They did more crime that got them sent back to prison. When we study those inmates, it turns out being an antisocial personality disorder, not just having lack of remorse, but having all those other things, too, is not predictive of serious violence.

Even when we look at the narrow end of people that have a particularly severe case of that antisocial personality disorder, are particularly calloused, even that is not predictive of serious violence in American prisons.

So there are studies that have looked at those personality characteristics. They have intuitive appeal. You would kind of think they would tell you something. Turns out the data tells us they do not predict violence in prison. They are illusory. It is only something -- it is more like it is a superstition.

Q    Dr. Cunningham, you talked about the risk that individuals present and how prisons address that risk to some

degree. Now, if prisons are overcrowded and understaffed, this could affect the security and the risk assessment, could it not?

A     It can affect the risk of violence, yes, sir. If the prison is mismanaged and badly led, then that affects the rate of violence in that prison.

Q     Well, could understaffing and overcrowdedness cause that as well?

A     There is a mixed literature about that. Some of the studies find that overcrowding alone is not associated with increased rates of violence. But often there are other issues that may go along with that that are a problem.

Q     I'd like to turn to your BOP analysis, where you talk about assaults in U. S. penitentiaries.

A     Yes, sir.

Q     And I think you referred to only one inmate-on-staff homicide in the last 12 years; is that right?

A     That is my understanding yes, sir.

Q     That is not correct, is it, Dr. Cunningham?

A     I think the last one was in 1997, as best I understand it.

Q     There was a corrections officer killed in 2008 at USP Atwater, one of the high-security prisons you spoke about; isn't that correct?

A     I do not have that information. I don't have that.

Q    And prison violence has escalated throughout the course of 2008, hasn't it?

A    I don't have the most recent data from BOP to see what is happening with that rate during 2008.  As I described, those levels have been reasonably stable over time.

Q    In fact, your study of assaults in U. S. penitentiaries is from April 2004 to March 2005; correct?

A    That particular study, yes, sir.  We have another one that is 2001 to 2005.

Q    Nothing more recent than that?

A    No, sir, I have not gotten more recent data.

Q    Do you keep abreast of the news and the literature regarding violence and assaults in prison, Dr. Cunningham?

A    I'm not following the newspaper for this.  I do try to stay abreast of scholarly research and, to the extent that I'm able to access it, data from the federal system.

Q    So if a BOP leadership official said that the prisons are currently operating at 37 percent over rated capacity and currently staffed at an 87 percent staff level, does that affect the risk assessment at all?

A    If the most current rates of assault in BOP and at a UPS level -- if those rates are significantly higher than these rates, then those higher rates are relevant to the risk level. The overcrowding is not; the staffing is not.  What is relevant is what is the rate at which this is happening in

these facilities.  So if that person testifies about those rates, those rates are important as these anchoring points.

Q    And you are not aware of recent incidents of violence reported at the Bureau of Prisons prison facilities in 2008 or 2009?

A    I do not have 2008 and 2009 data.

Q    You can't tell us how many homicides occurred at the Bureau of Prisons in 2008?

A    No, sir, not from official BOP sources.

Q    Dr. Cunningham, you would agree that violence occurs in prison that is not reported at some level?

A    I described that, yes, sir.

Q    And the prediction that you are making is that David Runyon will not engage in serious violence.

A    That's correct.

Q    This is a probability, it is not a prediction; correct?

A    That's correct.

Q    You can't say whether David Runyon will do that or not?

A    I can't say that as an absolute about anyone.

Q    And are you aware of any studies that would look at the factors you described -- age, community service, continuing employment -- and would have predicted that David Runyon would end up being a contract killer?

A    I'm unaware --

        MR. HUDGINS:  Your Honor, I object to that question.

He is not qualified on that type of question, and it doesn't have anything to do with what he has testified to up to this point.

MR. SAMUELS:  Judge, I think he has talked about his awareness of various characteristics and how they play into risk assessment.

THE COURT:  He is qualified as a forensic psychologist and a clinical psychologist.  You can ask him if that is something that he is called upon to make, that is, an assessment on outside of the prison system, or if his expertise is simply limited to the prison system.

BY MR. SAMUELS:

Q    Is that correct, Dr. Cunningham?  Is your expertise limited to the prison system?

A    My greatest expertise is on violence in prison.  I am unaware -- well -- I'm unaware of any research that dials in on specific background factors like you have described -- well, let me back up.

There are studies that look at likelihood of homicide by age.  There is likely data on incidence of homicide by education or by employment status.  As those factors are present, the likelihood of homicide in the community is lower.  In other words, younger individuals with less education and without employment histories are more likely to be involved in homicides.  It is unlikely everywhere

along that continuum, but the young guys are more likely than these other characteristics that you have described.

MR. SAMUELS: Thank you, Your Honor. If I could have just one moment.

Thank you, Your Honor. Nothing further.

THE COURT: Mr. Hudgins?

MR. HUDGINS: No redirect, Your Honor. Thank you.

THE COURT: All right. Even though it was a demonstrative exhibit, we will need the disk for the record. It is here, is it not, Mr. Swartz?

MR. SWARTZ: It is on a thumb drive.

THE COURT: All right. You have got that. Okay.

Can I excuse Dr. Cunningham?

MR. HUDGINS: Yes, Your Honor. Thank you.

THE COURT: Thank you, Dr. Cunningham. You are excused.

THE WITNESS: Thank you, ma'am.

THE COURT: Ladies and gentlemen of the jury, that brings us to the end of our trial day, and as I have indicated to you, we won't be in trial tomorrow because the defense witnesses -- when the court issued the various subpoenas and discussed it with counsel, everybody agreed that those would be issued for Monday. So that's when those subpoenas are effective and we are expecting the witnesses to be available. Many of them are coming from out of town.

**1041**

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division**

**UNITED STATES OF AMERICA**

v.                                                   Criminal No. 4:08cr16

**DAVID ANTHONY RUNYON**

## DEFENDANT'S MITIGATING FACTORS ENUMERATED

The mitigating factors which a given defendant asserts have been proved by a preponderance of the evidence are as follows:

AS TO DAVID ANTHONY RUNYON:

1.    David Anthony Runyon will serve a sentence of life in prison without the possibility of release if not sentenced to death.

2.    David Anthony Runyon does not have a serious criminal record.

3.    Other persons equally culpable in the crime will not be punished by death.

4.    David Anthony Runyon has worked and has been legally employed for all of his life.

5.    David Anthony Runyon committed acts of kindness and generosity for his neighbors and his community.

-1-

**1042**

6.      David Anthony Runyon grew up in a family filled with parental conflict until his mother and biological father separated.

7.      David Anthony Runyon witnessed and experienced domestic violence between his parents during his early life.

8.      David Anthony Runyon has demonstrated his ability to make a positive adjustment to incarceration.

9.      David Anthony Runyon has the respect and support of correctional officers.

10.      David Anthony Runyon has had no disciplinary write-ups while incarcerated and has helped other inmates to conduct themselves in non-violent or non-aggressive ways.

11.      David Anthony Runyon has contributed to the well-being of his fellow inmates through Bible study.

12.      If David Anthony Runyon is sentenced to life in prison without the possibility of release, he will have the opportunity to continue to contribute to help other inmates.

13.      David Anthony Runyon does not present a risk of future violence or danger to the public while in prison for the rest of his life.

14.      David Anthony Runyon, Jr., the son of David Anthony Runyon, will suffer emotional harm if his father is executed.

-2-

**1043**

15. Suk Cha Runyon, the mother of David Anthony Runyon, will suffer emotional harm if her son is executed.

16. David Anthony Runyon served his country as a member of the United States Army and was honorably discharged.

17. David Anthony Runyon graduated from high school and earned an associate of arts degree from Wentworth Military Academy and took further college courses to expand his education.

DAVID ANTHONY RUNYON

By:_____/s/_____
Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of August, 2009, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Blair C. Perez, Esquire
United States Attorney's Office
101 W. Main Street, Suite 8000
Norfolk, VA 23510
Telephone: 757.441.6331
Telefax: 757.441.6689
blair.perez@usdoj.gov

-3-

**1044**

Brian J. Samuels, Esquire
VSB No. 65898
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
brian.samuels@usdoj.gov

Lisa R. McKeel, Esquire
VSB No. 28652
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone: 757.591.4000
Telefax: 757.591.0866
lisa.mckeel@usdoj.gov

Lawrence Hunter Woodward, Jr., Esquire
Shuttleworth, Ruloff, Swain, Haddad & Morecock, P.C.
Counsel for David Anthony Runyon
4525 South Boulevard, Suite 300
Virginia Beach VA 23452
Telephone: 757.671.6047
Telefax: 757.671.6004
lwoodward@srgslaw.com

Larry M. Dash, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
150 Boush Street, Suite 403
Norfolk, VA 23510
larrydash@fd.org

Paul G. Gill, Esquire
Office of the Federal Public Defender
Counsel for Catherina Rose Voss
830 E. Main Street, Suite 1100
Richmond, VA 23219
paulgill@fd.org

-4-

**1045**

Jeffrey A. Swartz, Esquire
Rabinowitz, Swartz, Taliaferro, Swartz & Goodove
Counsel for Catherina Rose Voss
150 Boush Street, Suite 800
Norfolk, VA 23510
jswartz@rstsg.com

James S. Ellenson, Esquire
Law Office of James Stephen Ellenson
Counsel for Michael Anthony Eric Draven
Bank of America Building
2600 Washington Avenue, Suite 1000
Newport News, VA 23607
jseatty@aol.com

Timothy G. Clancy, Esquire
Moschel & Clancy, PLLC
Counsel for Michael Anthony Eric Draven
2101 Executive Drive, Third Floor
Tower Box 78
Hampton VA 23666
tclancy@moschelandclancy.com

                                                           /s/

Stephen A. Hudgins, Esquire
VSB No. 20315
Counsel for David Anthony Runyon
Cope & Olson, P.L.C.
11836 Canon Blvd., Suite 100
Newport News, VA 23606
Telephone: 757.596.0316
Telefax: 757.596.5320
shudgins@com.hrcoxmail.com

-5-

**1046**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

UNITED STATES OF AMERICA    )
                               )       CRIMINAL ACTION
     v.                 )
                               )       NO. 4:08cr16
DAVID ANTHONY RUNYON,    )
                               )
     Defendant.        )

TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

August 24, 2009

**SIXTEENTH DAY OF TRIAL**

**(Penalty Phase)**

Before:    THE HONORABLE REBECCA BEACH SMITH
              United States District Judge, and a Jury

Appearances:

        LISA R. MCKEEL
        BRIAN J. SAMUELS
        Assistant United States Attorneys
            Counsel for the United States

        STEPHEN A. HUDGINS
        LAWRENCE H. WOODWARD, JR.
            Counsel for David Anthony Runyon

GLORIA S. SMITH, OFFICIAL REPORTER

(The jury entered the courtroom.)

THE COURT: Good morning, ladies and gentlemen of the jury. I hope you had a nice weekend, and we are ready to start our trial week.

Madam clerk, would you please call the case and the roll of the jury.

THE CLERK: Thank you, Your Honor.

Case No. 4:08cr16, United States of America versus David Anthony Runyon.

Ms. McKeel, Mr. Samuels, is the government ready to proceed?

MS. MCKEEL: We are ready. Good morning, Judge.

MR. SAMUELS: Good morning, Your Honor.

THE COURT: Good morning.

THE CLERK: Mr. Woodward, Mr. Hudgins, is the defendant ready to proceed?

MR. HUDGINS: Mr. Runyon is ready, Your Honor.

MR. WOODWARD: Good morning, Your Honor.

THE COURT: Good morning.

(The jurors' names were called.)

THE CLERK: Thank you.

All the jurors are present, Your Honor.

THE COURT: Mr. Hudgins, Mr. Woodward, your next witness?

MR. HUDGINS: Thank you, Your Honor.

Eric Westrick.

THE COURT:  Sir, if you would please come forward and be sworn.

(Mr. Westrick was sworn.)

ERIC WESTRICK, DIRECT EXAMINATION on behalf of the defendant, as follows:

DIRECT EXAMINATION

BY MR. HUDGINS:

Q    Good morning, Mr. Westrick.

A    Good morning, sir.

Q    Would you state your full name for the ladies and gentlemen of the jury, please.

A    Eric Westrick.

Q    Mr. Westrick, how are you employed?

A    I'm employed -- I work in corrections in the Portsmouth Sheriff's Office.

Q    Do you work in the jail over there?

A    Yes, sir.

Q    How long have you been employed there?

A    Two and a half years, sir.

Q    What is your position?

A    Corrections deputy, working the floors of the jail.

Q    Can you give the jury a little bit of idea of what that entails, what your responsibilities are?

A    I maintain the security of the jail, make sure the

inmates are safe, make sure there's no contraband in the jail, keep the cleanliness of the jail.

Q   Do you have direct contact with the inmates?

A   Yes, sir.

Q   And how does that come about?  What kind of duties do you have that bring you into direct contact with the inmates?

A   While serving the trays, passing the mail out, taking them down for contact if there is a visit with a lawyer or family member.

Q   Do you do rounds on the floors that bring you into contact with the prisoners?

A   Yes, sir, we do those twice an hour.

Q   Twice an hour.  Do you actually have voice contact with the prisoners as you are doing that?

A   Yes, sir.

Q   Can you describe that?  What do you do when you are doing the rounds?

A   When I'm making a round, I make sure everyone is okay.  I ask if they are doing okay right now or if they need anything.

Q   Okay.  Do you have contact or do you know David Runyon?

A   Well, after being there for so long, calling his name for trays, I got to kind of like know his name and face from being there for so long.

Q   When you say "for so long," has he been there for over a year?

2201

A    I'd say about so, yes, sir.

Q    Were you already working there when Mr. Runyon came there?

A    Yes, sir.

Q    So you have been there the whole time he has been there?

A    Yes, sir.

Q    What floor or what area is Mr. Runyon on?

A    He is up on the eighth floor, which are -- on each floor there is four blocks.  He is in the C block, which on the east side of the jail is the A and B side blocks.  And he is on the west side, which is the very first block on the west side, which is the C block.

Q    Can you describe for the jury what the layout of that block is?

A    Yes.  The layout of the jail, when you first come on that side, you have six or seven cells against the wall, which each cell either has one bunk or two bunks.  And inside their cell, you come out, there is a dayroom, which is another closed-in area, with a table and a bench area where they can eat their meals at and watch TV.

Q    Now, you said there are six or seven cells, and they are in a line; is that correct?

A    Yes, sir.

Q    Are they separated by some kind of wall?

A    Yes, sir, there is a wall between each cell.

Q   So you don't look from one cell into the other cell?

A   Correct.

Q   Do the fronts of the cells -- are they bars?

A   Yes, sir, the front of the cells can close on certain instances.

Q   Do the cells open into the dayroom?

A   Yes -- no, I'm sorry, sir.  No, sir, they do not.  They close -- they slide.

Q   Okay.  Do the doors of the cells -- when you go out of the cells, do you go into the dayroom?

A   Yes, sir.

Q   Is the dayroom across the whole front of all of those six or seven cells?

A   Yes, sir.

Q   And then when you approach to give them their trays and things like that, do you do that actually into the dayroom?

A   Yes, sir.  There is a chuckhole where you just pass the tray through.

Q   And so the dayroom is open in front of all of the cells, and that is an area where the inmates can congregate, and is there a television in there?

A   Yes, there is a television on the outside.

Q   So they are all free to be in that area together?

A   Yes, sir.

Q   There are doors on the individual cells; is that

correct?

A     Yes, sir.

Q     Do they remain open all of the time unless there is some reason to close them?

A     Yes, sir, they do stay open at all times unless there is an altercation or something going down on the block, and we have to roll the gates.

Q     So even at night when they would normally be sleeping, those doors are open unless there is some problem?

A     Correct.

Q     So how often would you be able to have contact with or observe David Runyon in your duty?

A     I probably work the floor about three times a month.

Q     And your shifts are 12 hours?

A     Yes, sir, our shifts are 12 hours.

Q     Why is it just three days or three shifts a month that you are on a floor?  Is that the normal rotation?

A     It is just an estimate of how many days that I work that floor.  It just all depends on how our watch commanders put us.

Q     Is that because you are rotated from shift to shift and from floor to floor?

A     Correct.

Q     So in the time that you have been there and been able to observe David Runyon, it has been over a year, and it has been

about three times a month for 12-hour shifts on each of those times?

A    Yes, sir.

Q    Is that pretty standard for everybody who is working, that you move from place to place and would spend approximately -- and I understand you are not saying that is exactly how many shifts a month you would be in contact with him, but approximately that?

A    Yes, sir.

Q    And is that standard for everybody who is working?

A    Yes, sir.

Q    Now, in the times that you have been able to observe Mr. Runyon, do you have a general impression of what kind of person he has been, what kind of inmate?

A    Yeah, he kept to hisself a lot.  He stays in his cell. Didn't really see him out that much, unless he came out for his tray or -- pretty much kept to himself.

Q    Is he quiet, or boisterous?

A    He is very quiet.

Q    Have you seen him interact with other inmates in the dayroom or from the cell?

A    Yes, I have seem him interact a couple of times with a couple of guys.

Q    Ever see any kind of problems between he and any of the other inmates?

A    No, sir.

Q    Any problems with him and the staff?

A    No, sir.

Q    How does he interact with the staff as far as --

A    Very respectful.

Q    Very respectful?

A    Yes, sir.

Q    Do the inmates have rules that they have to abide by?

A    Yes, sir.  We have an inmate handbook, which is all the rules and regulations of the jail.

Q    Are you aware of him ever violating any of the orders or rules in that book?

A    Not that I know of, sir.

Q    Have you ever had any problem with him disobeying an order that you gave him or doing something that he wasn't supposed to do?

A    No, sir.

Q    Are you aware of him incurring any infractions since he has been there at the jail?

A    No, sir.

Q    And any kind of fights or arguments, anything of that nature?

A    No, sir.

Q    As the inmates go, how would you classify Mr. Runyon, as far as is he a good inmate, somebody that you don't have any

problem with?

A    Yeah, I would classify him as a good inmate.

MR. HUDGINS:  Thank you.  Please answer any questions that the government attorney has, please.

THE WITNESS:  Okay.

CROSS-EXAMINATION

BY MR. SAMUELS:

Q    Good afternoon, Deputy Westrick.

A    Good afternoon, sir.

Q    Or good morning, rather.

A    Yeah.

Q    Mr. Westrick, the inmates at Portsmouth City Jail -- are they all either awaiting trial or awaiting sentencing?

A    Not all of them.  Some are convicted.

Q    Are most of them that are there awaiting trial or sentencing?

A    Yes, sir.

Q    And you described that you work the floor for about three times a month in that floor where Mr. Runyon was housed.  Now, how does that work?  Are you inside that dayroom that entire 12-hour shift?

A    No, sir.

Q    Where are you?

A    There is a deputy's office on the north end, which is on the one side of the jail, next to A block, which is on the

east side.

Q    So how much time are you actually spending looking into that dayroom or observing the inmates?

A    It depends on how long it takes to serve trays, and usually rounds usually don't take much longer than five to ten minutes.  So probably about two minutes per round.

Q    So in that 12-hour shift, a matter of minutes that you are actually spending observing the inmates?

A    No, because it takes a little longer to serve trays. Trays usually take about maybe 15 minutes per cellblock.

Q    15 minutes per cellblock?

A    Yes.

Q    So less than an hour, though, would you say, in that 12-hour shift that you are actually in a position to be observing the inmates?

A    Close.

Q    So less than an hour, and that is about three times a month?

A    Yes, sir.

Q    And are you aware of any other infractions or rule-breaking that would have occurred when you weren't on shift?

A    No, sir.

Q    Do you have access to any of those records?

A    No, sir.

Q    In your experience as a deputy, are there rules that are broken, fights that occur, that deputies are not aware of?

A    Yes, sir, that probably does happen.

Q    Does that happen when you put a number of inmates in a tighter space together, that sometimes they will fight or have altercations that the deputies don't notice?

A    Yeah, it could happen.

Q    And do you know if David Runyon was in his cell by himself, or was he in a cell with someone else?

A    He was in a cell by himself.  He is a single cell.

Q    And do the inmates have the ability to be able to shut those doors?

A    No, sir.

Q    That is done only if there is a problem?

A    Yes, sir.

        MR. SAMUELS:  Thank you, Deputy Westrick.

        No further questions, Your Honor.

        MR. HUDGINS:  No redirect, Your Honor.

        THE COURT:  All right.  Then thank you very much, Deputy Westrick.  You are excused.

        THE WITNESS:  Thank you, ma'am.

        MR. HUDGINS:  Deputy Lauretta Johnson.

        (Ms. Johnson was sworn.)

        LAURETTA JOHNSON, DIRECT EXAMINATION on behalf of the defendant, as follows:

DIRECT EXAMINATION

BY MR. HUDGINS:

Q    Good morning, Deputy Johnson.

A    Good morning.

Q    Would you state your name for the ladies and gentlemen of the jury, please.

A    Lauretta Kim Johnson.

Q    Ms. Johnson, how are you employed?

A    I work for the Portsmouth Sheriff's Office.

Q    And what is your position there?

A    I work as a deputy sheriff.

Q    You work in the jail?

A    Well, yes, I started working in the jail, yes, sir, and right now I'm working inside booking.

Q    Okay.  How long have you worked at the jail?

A    Three years and three months.

Q    And you said that now you are starting to work in booking?

A    Yes, sir.

Q    Does that take you out of the jail, of working with the inmates in the jail?

A    Well, working on the floors.  It takes me out of working on the floors, so now I'm working at where the inmates first come to be processed at.

Q    How long have you been doing the booking?

A    It's been like a little over three months.

Q    Prior to that, did you work on the floor with the inmates?

A    Yes, sir.

Q    Were you working on the floor with the inmates when David Runyon came into the Portsmouth City Jail?

A    Yes, sir.

Q    Was that -- you don't know the exact date that he came in, do you?

A    No, sir.

Q    Was it over a year ago?

A    I think so.

Q    Okay.  Now, when he first came in, did you work so that you had direct contact with him at times?

A    Yes, sir.

Q    And do you have an estimate or a feel for how often you would come into contact with David Runyon?

A    Probably two or three times a month.

Q    And do you all work different shifts on different floors in different areas?

A    Yes, sir, we rotate shifts.

Q    Is that why you would only come into contact with him two or three times a month?

A    Yes, sir.

Q    And is that pretty standard, that everybody works

different shifts and different areas so that they don't come into contact with the same prisoners any more regularly than that?

A    Yes, sir.

Q    When you would come into contact with David Runyon, how would that occur?  What reasons would there be that you would come into contact with him?

A    Well, working on the floors, we had to do rounds twice an hour, and then we would serve them breakfast, lunch, and dinner, and then we'd pass out the mail, or when they have to go down to medical or attorney visits or regular visits.

Q    Now, you said you do rounds twice an hour?

A    Yes, sir.

Q    And do you do that twice every hour, all day long?

A    Well, we are required to do it twice an hour.  Like on night shift, I may make four or five rounds an hour, just to keep busy.

Q    When you make the rounds, what do you do?  Do you speak to the inmates?  Is there a protocol for what you are supposed to do to check and see that they are okay?

A    Yes, sir.  We're supposed to visually look inside each cell as we make our rounds, make sure that the person is not hurt and the person is doing what they are supposed to be doing.

Q    If it is during the day when they are not asleep, do you

speak to them and ask them if they are okay or anything like that, or are you just looking in on them?

A    I may stop occasionally and talk to the inmates and stuff.  A lot of times they might ask us for communication slips or ask for something they might need, like to order canteen or something like that.

Q    When you deliver the trays, do you deliver the trays to the individual inmate, or do you just put them all out in the same place, or how does that work?

A    We have to call them name by name, and I'll basically give them -- one person a tray, so that person has to come up and get their tray.

Q    So you see that individual person and do whatever interaction that takes place when they come to get the tray?

A    Yes, sir.

Q    How long are the shifts?

A    We either work from 8 at night to 8 in the morning, or 8 in the morning to 8 p.m.

Q    So if you are working the day shift, do you serve all of the meals, or has a meal already been served at that point?

A    When we work day shift, we're serving lunch and dinner.

Q    And night shift serves breakfast?

A    Yes, sir.

Q    So each shift is going to serve some meal?

A    Yes, sir.

Q    Now, during the time that David Runyon has been there, I assume you have had the same -- the contact with him that you have described that would be basic to any inmate in that block; is that true?

A    Yes, sir.

Q    During the times that you have had contact with him, how has he interacted with you as a person?  Has he been a problem, has he been respectful?  How has he interacted with you?

A    He has been no problem.  He is very respectful.  He says good morning, good afternoon, and different things, and if he needs something, like a communication slip, he asks for it.  I haven't had any problems with him.

Q    When he asks for something like that, is he respectful, is he rude?  How does he -- when he asks for something like a communication slip, how does he do that?

A    He acts very respectfully.

Q    Does he thank you when he receives the things that you bring for him?

A    Yes, sir.

Q    Have you ever known him to have any kind of altercation with another inmate in the jail?

A    No, sir.

Q    Have you ever known him to have any kind of problem with any of the staff there at the jail?

A     No, sir.

Q     Are you aware of any infractions that he has committed since he has been there?

A     No, sir.

Q     And you are speaking of what you are aware of on your shift; correct?

A     That's correct.

Q     You don't know what may occur on other shifts or with other people?

A     No, sir.

Q     As far as what's going on on that block, when you are on duty, is it your duty to be aware of what is going on and if there is any problem or anything like that going on?

A     Yes, sir.

Q     And when you are on duty and you are not making the rounds, where are you?

A     On the floor basically in the office or maybe -- it's four different blocks on a floor, so basically may be in another block.

Q     And how many deputies are on duty in that office at a time?

A     Just one, sir, unless we have somebody in training.

Q     Okay.  And do you feel like when you are on duty there, you are aware if there is any problems going on in that block?

A     Yes, sir.

Q     Is that your responsibility?

A     Yes, sir.

MR. HUDGINS:  Thank you, Ms. Johnson.  I don't have any other questions.

CROSS-EXAMINATION

BY MS. MCKEEL:

Q     Good morning, Deputy Johnson.

A     Good morning.

Q     Deputy Johnson, is there a person at the jail that is in charge of infractions and that knows everything about everybody's infractions?

A     Well, if a person -- if a inmate gets written up, the infractions -- we have to turn them into our watch commander, and then the watch commander turns it into the front office.

Q     Who is responsible at the front office for all infractions?

A     Well, it either goes like to Major Benzie or Captain Facenda.

Q     So your job is to be on that floor -- on different blocks on that floor and to feed the prisoners; correct?

A     Yes, ma'am.

Q     And how long would you say -- how often do you interact with David Runyon?  You said you have seen him two to three times a month.  How much time have you spent with him?

A     I really haven't spent any like one-on-one time.  Just

GLORIA S. SMITH, OFFICIAL REPORTER

**1065**

like if he has to go down for a visit or go down to medical, and stuff like that.

Q   So just minutes.

A   Yes, ma'am.

Q   So two to three times a month you spend just minutes with David Runyon, just like you spend with all the other prisoners?

A   Yes, ma'am.

Q   And that's all the contact that you have had with him?

A   Yes, ma'am.

Q   Are there camera surveillance on all the cells and all the floors to be able to watch all the prisoners?

A   Yeah, there is cameras on the floors, yes, ma'am.

Q   Okay.  So if there was anything going on -- when you say you go to the office, you could see in the office the cameras; is that correct?

A   No, ma'am.  It's cameras in the TV room they can see all that also.

Q   Cameras in what room?

A   In the TV room.

Q   Okay.  And in the Portsmouth jail where are prisoners allowed to go, just the cell block with the dayroom, or are they allowed to mingle about on other floors?

A   No, ma'am, they are not allowed to mingle on any floors. They are locked up inside those cells.

MS. MCKEEL:  That's all I have.  Thank you.

MR. HUDGINS:  Just one clarification.

REDIRECT EXAMINATION

BY MR. HUDGINS:

Q    You mentioned that they were locked up in the cells.  Are their cell doors closed, or are their cell doors open so that they can come out into the dayroom?

A    The cell doors are open, but it's another part around there that is closed up and it's locked.  We got like sallyport doors where we open those and let them out.

Q    They can't come out of the dayroom?

A    No, sir.

Q    But they can mingle amongst themselves in that block in the dayroom; is that correct?

A    That's correct.

MR. HUDGINS:  Thank you.  No other questions.

MS. MCKEEL:  Nothing further.

THE COURT:  Thank you, Deputy Johnson.

MR. HUDGINS:  Deputy Brandy Anderson.

(Ms. Anderson was sworn.)

BRANDY ANDERSON, DIRECT EXAMINATION on behalf of the defendant, as follows:

DIRECT EXAMINATION

BY MR. HUDGINS:

Q    Good morning, Deputy Anderson.

A    Good morning, sir.

Q    Would you state your full name for the ladies and gentlemen of the jury, please.

A    Brandy Nicole Anderson.

Q    How are you employed?

A    The Portsmouth Sheriff's Office.  I'm a deputy sheriff.

Q    Where do you work for the sheriff's department?

A    In corrections in the jail.

Q    And what is your position with the sheriff's department?

A    I'm a corrections deputy.  I work on the floors.

Q    Can you give the ladies and gentlemen of the jury a little bit of idea of what that entails, what you do working on the floors in the jail?

A    Basically we serve trays, we do rounds, we make sure that the inmates are taken care of, that everything is good to go with everything.  We just take care of everything.  We do our job, and --

Q    Okay.  And as you are doing the trays and doing the rounds and that kind of thing, how often would you come into contact with a particular inmate during a day, during a shift?

A    During a shift, I would say we'd come in contact at least five or six times an hour.  I mean, depending on how often a deputy does their rounds, and I do mine often, so I come in contact pretty often.

Q    What is the minimum requirement for how many rounds you

**1068**

do in an hour?

A    Two times an hour.

Q    You are saying that when you are on duty, do you do more than that?

A    Yes, sir.

Q    Okay.  And when you serve the trays, do you come into contact with the prisoners?

A    Yes, sir, we do.

Q    Tell them how that works.

A    When we serve trays, we call them by their names.  They are required to come up to the -- we call it a chuckhole, with their wristbands on, and we give it hand to hand.

Q    Okay.  Do you usually have any interaction with them when they come up to get the tray, any words?

A    Yes, sir.  More than likely, you know, you ask them how they are doing, is everything okay, and they will approach you and say good morning or good evening.

Q    When do you the rounds, is there any interaction when you do the rounds?

A    Depending if they are sleeping or -- I mean, if they approach you, yes.  They do approach you more than likely, so, of course.

Q    When you do rounds, do you go to the individual cells and look in on the prisoners, or how does that work?

A    Well, they are in a cellblock, and there is up to maybe

15 in each block, and they have each individual cell inside the block, so when you are doing your rounds, you are required to look in each individual cell, so, yes, sir, I look in every cell and check on everybody.

Q    How long have you been doing this job where you are actually on the floor in the jail?

A    I have been there for 14 months.  I'm sorry, I apologize.  24 months.

Q    Were you there when David Runyon came to the Portsmouth City Jail?

A    Yes, sir.

Q    How often over the course of a month would you be on a shift where you would be on the same block where he was?

A    Four or five times a month probably.

Q    Okay.  Do the shifts rotate so that you are not in the same block every day or every time you are on shift?

A    Yes, sir.

Q    Have you had that kind of contact with David Runyon, and you said four to five times a months perhaps?

A    Yes, sir.

Q    When you have contact with him, can you kind of characterize him?  What is he like as far as his interaction with you?

A    He is very polite, and basically it's yes, ma'am, no, ma'am.  I've never had an issue with him.  He is very quiet,

keeps to himself. Really that's about it.

Q    Have you seen him interact with the other prisoners in his block?

A    Yes, sir.

Q    And is -- I mean, does he ever get into altercations with them that you have seen or any kind of problems with the other inmates?

A    No, sir.

Q    How about the staff? Have you had any or are you aware of any problems that he has had with dealing with the staff?

A    No, sir, he has never been an issue, not that I'm aware of, not that I have heard.

Q    Have you observed him, in particular how he spends his time? Does he read, does he sleep, does he just --

A    Yes, sir, I have noticed he reads a lot, he sleeps a lot, and I mean, he will come out every now and then and interact with everybody. But other than that, he is normally reading, writing, or sleeping.

Q    Have you noticed in particular anything that he particularly reads or studies?

A    I have seen him with the Bible a few times, and really that's it. I have really just seen him with a Bible. I don't really look into it. I just see him reading, and I just go about my business.

Q    Have you ever had occasion for David Runyon to help in a

situation where there might have been some tension with another inmate or anything like that?

A    Well, I was in an argument with an inmate at one point, and he did just come out, and he just said, you know, just back off a little bit, that's no way to treat Ms. Anderson. And it helped a lot. And he just backed off, and the day went on, progressed on.

Q    After that, was there any problem between he and that inmate or anything like that?

A    No, not at all.

MR. HUDGINS:  Thank you.  I don't have any other questions at this point.  Please answer the United States.

CROSS-EXAMINATION

BY MS. MCKEEL:

Q    Good morning, Deputy Anderson.

A    Good morning, ma'am.

Q    You said that you have seen David Runyon a number of times during the month.  How much time do you spend with David Runyon when you see him?

A    I would maybe -- maybe a three-minute conversation, just to ask how he is doing, how he has been.

Q    Do you have a conversation with him?

A    Well, if he approaches me and asks me how I'm doing, then I'll say, I'm doing fine, how are you, and that's about it. Usually he'll let me know he is doing fine, and I just go

around.

Q    Just chitchatting conversation; is that what you are talking about?

A    Yes, ma'am.

Q    So no more than three minutes?

A    No more.

Q    If he approaches you?

A    Yes, ma'am.

Q    How many times has he approached you?

A    Not often.  Maybe four or five times.  I mean, in the whole year, more than likely, I'm approaching him, because I have to hand out things to him or stuff like that.  But if he is approaching me, it is just more to ask me how I'm doing, like, for instance, for the issue that we had in the block, he was just asking how I was doing after that.

Q    An inmate argued with you?  What did he argue --

A    He wasn't arguing, he was just -- I was up for trays, and he wasn't ready to get up, and he didn't want to get his wristband or anything like that.  So he just offered -- he was like, just be respectful.

Q    I'm sorry?

A    He had said for him to be respectful, and he was.  He just went and got his wristband, gave me his tray.

Q    So it wasn't an argument.  All there was, one of the prisoners didn't want to give his tray up yet, and David

**1073**

Runyon just told the prisoner just to be respectful; is that what happened?

A    Yes, ma'am.

Q    And the prisoner was respectful?

A    Yes, ma'am.

Q    So the prisoner listened to David Runyon.

A    Yes, ma'am.

Q    And when you -- if you had to estimate how much time you have spent with David Runyon in a year, give us an estimate.

A    I couldn't -- I mean, I have maybe seen him -- I would say, oh, gosh --

Q    Is it like one hour for a whole year?

A    Oh, no, it would definitely be more.  I would give you about 12 hours for a whole year.

Q    And so you are interacting with him more than just giving the trays, you say, and then doing your rounds.  Are you interacting with him more often than that?

A    No, that's about it.  I mean, when we have to escort, because it's a system in our jail, like we work as a team, and if we need to escort him down to medical or anywhere, we jump on it and help.  So I have helped escort him down many times. I have helped -- I mean, it would be -- other than doing rounds and serving trays, yes, ma'am, I have communicated with him, by escorting him or just coming up there on the floor doing rounds for other deputies, yes, ma'am.

Q    How long does it take to escort?

A    Depending on how long the elevator takes.  I mean, we have to wait, and, I mean, it could take up to five minutes, just waiting.

Q    So five minutes for an escort.  And then to pass out trays, how long does that take?

A    In a block, it would probably take about maybe -- I'd estimate seven minutes each block.

Q    Seven minutes.

A    If you are not given a hard time.

Q    Do inmates give you a hard time?

A    No, ma'am.

Q    Well, you have just mentioned unless someone gives you a hard time.

A    Well, unless they don't want to get up, or they don't want to go get -- have their wristband or bring their cup, or you have to wait for them, so aside from that.

MS. MCKEEL:  That's all I have.

MR. HUDGINS:  No redirect, Your Honor.

THE COURT:  Thank you, Ms. Anderson.

THE WITNESS:  No problem, ma'am.

MR. HUDGINS:  Deputy Candace Mabry.

(Ms. Mabry was sworn.)

CANDACE MABRY, DIRECT EXAMINATION on behalf of the defendant, as follows:

DIRECT EXAMINATION

BY MR. HUDGINS:

Q    Good morning, Deputy Mabry.

A    Good morning.

Q    Would you state your full name for the ladies and gentlemen of the jury, please.

A    Candace A. Mabry.

Q    And how are you employed, Deputy?

A    How?

Q    Yes.

A    I'm a deputy sheriff.

Q    In the Portsmouth City Jail?

A    At the Portsmouth City Jail, yes, sir.

Q    What are your duties there at the jail?

A    I work floors, which details securing the inmates.  I also work in intake, which is booking, where I book inmates as they come in.

Q    How long have you been employed there?

A    Two years September.

Q    Have you worked on the floors throughout that time that you have been there?

A    Yes.

Q    And can you tell us if you were there when David Runyon first came to the Portsmouth City Jail?

A    Yes.

Q    Can you tell us how often during the course of a month you would usually have contact with Mr. Runyon as far as when you -- your shift would take you into contact with him?

A    A few times out of the month, because in the middle of me switching to intake and getting trained --

THE COURT:   I can't hear you.

THE WITNESS:   I'm sorry.   In the middle of me going to intake and getting the training at intake, it has kind of like taken me off the floors here recently.   But like in the beginning, I was working the eighth floor quite often, which is the floor that Mr. Runyon --

BY MR. HUDGINS:

Q    During that time, how often would your shift take you there?

A    Probably almost once a week, because sometimes if I'm running, I wouldn't necessarily work the eighth floor, but I would go up and take people to contact visits or make a round for another deputy on the floor, if he was tied up with something else or something like that.

Q    When you say when you are running, is that when you are doing that kind of activity rather than being assigned to a specific location?

A    Right, when we're downstairs and we take care of other duties at the jail that's downstairs in the basement, and we call that running.

Q    How long have you been in the position that you are in now where you are training for intake and that has kind of taken you --

A    About two months.

Q    But you still are working on the floors?

A    Yes, I rotate.

Q    So you are still in contact with Mr. Runyon and other inmates a couple of times a month?

A    Yes, sir.

Q    Are your shifts such that you rotate from place to place and from shift to shift?

A    Each day that we work, we are in a different place.

Q    Okay.  And that's why you don't come into contact with a particular inmate any more often than that?

A    Yes, sir, that's correct.

Q    Can you tell the jury, when you come into contact with inmates when you are working on the floor, what is the nature of that?  How do you come into contact with them?

A    Well, we make rounds.  We have to hand them mail.  We have to serve trays.  We have to take them to contact visits. We have to take them to medical, transporting them.  We take them down for court.  So that's basically how we are in contact with them.

Q    When you make rounds, how often do you do that?

A    Twice an hour.

Q    What is the procedure?  Do you speak to them?  Do you just look in on them?  What do you do when you make rounds?

A    You're just basically inspecting, making sure that they are not violating any of the, you know, policies or procedures.  You are inspecting to make sure they don't have anything in the bars, making sure that no one is injured in any kind of way, visually checking the inmates, you know, check them, make sure they haven't been in any fights in between your last round, that sort of thing.

Q    During the course of the time that you have been there, have you come into the kind of contact with David Runyon that you have described in general?

A    Yes, sir.

Q    And when you have contact with him, how would you describe him as far as his interaction with you and --

A    He is always polite.  When I call him for his tray, he always says, you know, how're you doing, Ms. Mabry.  He always says thank you, or if he asks me for something, you know, he says please, that sort of thing.  He is real polite.

Q    Are you aware of him, to your knowledge, ever getting in any kind of altercation with another inmate?

A    No, sir, not to my knowledge.

Q    Are you aware of him ever having any kind of altercation with any of the staff there at the jail?

A    No, sir, not to my knowledge.

Q    Have you observed him interacting with other inmates in his block?

A    A few, but not that often.  He is pretty quiet.  But I -- I've seen him really -- he talks to like maybe two guys that I have noticed.

Q    Two in particular?

A    Two in particular, yeah.

Q    Does he seem to get along okay with them?

A    Yes, sir.

Q    You have never seen them have an altercation or an argument or anything like that?

A    No, sir.

Q    Is it your responsibility when you are on the floor to be aware of what is going on on the floor and make sure there aren't any altercations or arguments and that kind of thing?

A    Yes, sir.

Q    And you have never observed anything like that going on with Mr. Runyon?

A    No, sir.

          MR. HUDGINS:  Thank you, Ms. Mabry.  Please answer any questions of the United States.

                   CROSS-EXAMINATION

BY MR. SAMUELS:

Q    Good morning, Ms. Mabry.

A    Good morning.

Q     Ms. Mabry, you spoke about having to rotate on floors for different shifts; is that correct?

A     Yes, sir.

Q     Why do they have you do that?  Why do you rotate to different floors and different areas?

A     I think it is more for the comfort of the deputy, so one doesn't get stuck working the same floor, dealing with the same individuals every day.  So that's why -- ever since I have been working there, that is how it has been.  We rotate every day.

Q     Okay.  And when you are working the floor that David Runyon is on, I understand that there is a cellblock area that has a dayroom and a number of cells; is that right?

A     That's correct.

Q     And when you actually interact with the inmates for mealtime or for mail, is that through a door?

A     No, it's a -- we call it a chuckhole.  They come up to the chuckhole, and we slide the tray through the chuckhole. It's a little window cut out between the bars, and, we'll pass the tray through that.

Q     And is that into their actual individual cell, or is that into the dayroom?

A     Into the dayroom, the front of the dayroom.

Q     So when you do the rounds, are you walking into the dayroom, or are you walking by a door that you can see into

the dayroom?

A    It's a catwalk.  We walk down the catwalk where they are behind the bars, and that's where we look at -- you know, look through the bars.

Q    So you would be looking through the bars into the dayroom?

A    Yes, sir, and you can also see into their cells.

Q    Other than when you are doing your rounds, there is no deputy that is stationed out on that catwalk continually monitoring the dayroom?

A    No, sir.

Q    So when you are doing your shift, you are walking by that a couple of times an hour, I believe you said?

A    Yes, sir.

Q    So the time that you would have spent interacting with David Runyon over the course of a month would be about how much?

A    I would probably -- like I said, probably like a few times out of the month, but I can't really say like time, you know, because we work 12 hours shifts, so when I work the floor, I would be up there for a whole 12 hours out of that day.

Q    And any interactions with Mr. Runyon would be minutes at a time; is that right?

A    That is correct.

Q   Now, the inmates that are in that particular block, are there about 15 inmates in there, give or take?

A   Yes, sir.

Q   Do those inmates rotate out as they go either to trial or to sentencing or they are sent somewhere permanently?

A   Yes, sir.

Q   Does that happen fairly frequently?

A   Yes, sir.

Q   Mr. Runyon has been there the entire time that you have been there and observing him?

A   Yes, sir.

Q   Ms. Mabry, do you recall an instance where you escorted Mr. Runyon to a contact visit?

A   Yes, sir.

Q   Did he say something to you about this case?

A   Yes, sir.

Q   What did he say to you?

A   He just stated that they were trying to give him the death penalty for something that he didn't do.

Q   Did you have any response to him?

A   No, sir.

        MR. SAMUELS:  Thank you, Ms. Mabry.  No further questions, Your Honor.

        MR. HUDGINS:  No redirect, Your Honor.

        THE COURT:  All right.  Thank you, Deputy Mabry.

THE WITNESS:  You're welcome, ma'am.

MR. HUDGINS:  Deputy Singledecker.

(Ms. Singledecker was sworn.)

ERICA SINGLEDECKER, DIRECT EXAMINATION on behalf of the defendant, as follows:

DIRECT EXAMINATION

BY MR. HUDGINS:

Q    Good morning, Deputy Singledecker.

A    Good morning.

Q    Would you state your name for the ladies and gentlemen of the jury, please.

A    Erica Singledecker.

Q    How are you employed?

A    I work in the Portsmouth City Jail for the sheriff's office in Portsmouth.

THE COURT:  Can you speak up, please?

THE WITNESS:  Yes.  I work for the sheriff's office in Portsmouth.

BY MR. HUDGINS:

Q    What are your duties at the jail?

A    We maintain security of the inmates and make security checks at the jail.

Q    Can you tell the ladies and gentlemen of the jury what that entails, as far as in a work period, what do you do while you are there?

A    We work 12-hour shifts from eight in the morning till eight at night.  We make two rounds an hour, serve trays, and pass out mail, escort the inmates from their blocks if they have lawyers come to visit them, escort them to medical, escort them back.  That's pretty much it.

Q    When you serve the trays, do you have interaction with the particular inmate who are you serving?

A    Yes.  You call their names, and they come up and get the tray, five-minute -- two-second conversation, just to see how they are doing.

Q    Do they come up individually to get the trays?

A    Yes, sir.

Q    When you do the rounds, what do you do as far as when you check on them?  What are you doing when you do the rounds?

A    You look in each cell to make sure if they are sleeping, to make sure they are asleep, if they are up, any unusual activity.  Just look in on the cells to make sure everything is normal.

Q    If they are up and awake, do you usually speak to them?

A    Good morning, good afternoon, not -- if they have questions, we answer their questions.  Just casual conversation.

Q    How long have you been working there at the jail?

A    Since July of last year.

Q    Of last year?

A     Yes.

Q     Was David Runyon already there you went to work there?

A     Yes.

Q     How often in the course of a month do you -- approximately how often do you come into contact with him as far as working the shift in his block?

A     Three to four times a month.

Q     Three to four times a month.  And that's a 12-hour shift?

A     Yes, sir.

Q     Can you characterize what type of inmate you view David Runyon as?

A     Keeps to himself, very polite.  Doesn't cause trouble. Reads in his cell.  Watches TV.

Q     During the time that you have been there, have you ever known him to get into an altercation with another inmate?

A     No, sir.

Q     Have you observed him interacting with the other inmates on the block?

A     Yes, sir.

Q     Does he seem to get along well with the other folks that are there?

A     Yes, sir.

Q     Have you ever known him to get into any kind of altercation or have difficulty with any staff at the jail?

A     No, sir.

Q    You said that he reads a lot and keeps to himself and is quiet.  Have you seen any particular things that he reads, studies, anything like that?

A    I have seen him with law materials, and the Bible.

Q    Have you ever heard him raise his voice, get loud?

A    No, sir.

Q    Anything of that nature?

A    No, sir.

         MR. HUDGINS:  Thank you, Deputy.  Please answer any questions the United States has.

                        CROSS-EXAMINATION

BY MR. SAMUELS:

Q    Good morning, Deputy Singledecker.

A    Good morning.

Q    Ma'am, you testified that you had worked at the Portsmouth City Jail since July of last year?

A    Yes, sir.

Q    What did you do prior to that?

A    I worked in retail and construction.

Q    So your experience with the Portsmouth City Jail, is that your first experience in the corrections field?

A    Yes, sir.

Q    And in the year that you have been there, you testified that you have had some interactions with David Runyon.  Have you had any longer substantive conversations with him, or is

**1087**

it just very casual as you are doing your rounds?

A    Casual.  We escort them -- when I would escort him to downstairs, just ask him how he is doing, make sure he is doing okay, if he needs anything.  But not a whole lot of long conversations.

Q    And most of the interactions when you are doing your rounds, you are on the outside of the dayroom looking in at the inmates behind the bars inside the dayroom?

A    Yes, sir.

Q    How do inmates get reading material at the Portsmouth City Jail?

A    Publishers can send them to them.

Q    Okay.

A    They get -- once a month donated books will come, and we will pass them out.

Q    Does that include Bibles?

A    Bibles are given out by missionaries, and they are given a little testimony book -- I think it is the New Testament book -- by us.

Q    Do most inmates, then, have Bibles available to them?

A    Yes.

MR. SAMUELS:  Thank you, Deputy Singledecker.  No further questions.

THE WITNESS:  Thank you.

MR. HUDGINS:  No redirect, Your Honor.

THE COURT:  Thank you, Ms. Singledecker.  You are excused.

Your next witness?

MR. HUDGINS:  Hector Diaz.

(Mr. Diaz was sworn.)

HECTOR DIAZ, DIRECT EXAMINATION on behalf of the defendant, as follows:

## DIRECT EXAMINATION

BY MR. HUDGINS:

Q    Good morning, Deputy Diaz.

A    Good morning.

Q    If you would, state your name for the ladies and gentlemen of the jury, please.

A    Deputy Diaz.

Q    Deputy, how long have you been a deputy at the Portsmouth City Jail?

A    Seven years.

Q    Can you tell the ladies and gentlemen of the jury what your duties are as a deputy there?

A    Just maintain peace in the jail and, you know, keep control of everything.

Q    Do you work on the floor with the prisoners?

A    Yes, sir, I do.

Q    Can you tell us what that involves?  What do you specifically do when you are on the floor there?

A    Feeding and monitoring them.

Q    When you are monitoring, is there a -- do you do rounds?

A    Yes, two rounds.

Q    Two rounds; is that an hour?

A    Yes, an hour.

Q    And when you are working, you work 12-hour shifts?

A    Yes, sir.

Q    Can you say approximately how often during the course of a month you would be in a particular area, like the area where David Runyon is?

A    Just, you know, the individual -- just the normal rounds, you know.

Q    Well, you rotate -- your shift rotates from time to time and from place to place, doesn't it?

A    Yeah, from different floor to floor, because it has eight floors.

Q    Can you give us an estimate of how many times in a month you would be on a specific floor, on the eighth floor?

A    No, because they switch me around.

Q    Numerous times during a month?

A    Numerous.

Q    Okay.  During your time there at the jail, have you come into contact with David Runyon?

A    Yeah, I have come in contact.

Q    You were already working in the jail when he came there;

is that true?

A    Yes, sir.

Q    Do you know how long he has been there?  Has it been over a year?

A    I believe so.

Q    Have you had, then, a fair amount of contact with him over the course of that year?

A    Not really, for the fact that most of the time they schedule me on the harder floors.

Q    Okay.  Have you been on his floor?

A    Yes, I have.

Q    When you have been on his floor, have you had any kind of problem with him?

A    No.

Q    And how would you characterize him as an inmate?

A    Just keeps to himself, you know.  Doesn't bother nobody, just basically keeps to himself.

Q    Is he fairly quiet, then?

A    Yes.

Q    Have you ever observed him have any kind of altercation or problem with another inmate?

A    No, I haven't.

Q    Have you ever had any kind of problem with him?

A    No, I haven't.  You know, whenever I feed him and give him his tray, he just takes his tray and, you know, goes back

to his cell.

Q    Is he polite when you do interact with him?

A    Yes, sir.

Q    Are you aware of any infractions he has had during the time that he has been there at the jail?

A    None that I'm aware of.

MR. HUDGINS:  Thank you.  Please answer any questions the United States has.

CROSS-EXAMINATION

BY MR. SAMUELS:

Q    Good morning, Deputy Diaz.

A    Good morning.

Q    Deputy Diaz, you have been at the Portsmouth City Jail for seven years?

A    Yeah, a little bit over seven.

Q    Sir, why do they rotate the guards or the deputies to different areas to do rounds?

A    It's just the way the jail -- they just run the shifts, you know, just to keep everybody equal floors on different floors.

Q    Is there a security rationale behind that, to have different deputies interacting with different inmates and not always be with the same inmates?

A    Yeah, to just keep it equal.

Q    And most inmates at the Portsmouth City Jail are awaiting

either trial or sentencing?

A     Yes, sir.

Q     In your seven years there, is it fair to say that most of the inmates that were there when you started have now moved on and been assigned to the Department of Corrections or a Bureau of Prisons facility?

A     Yeah, that, or have come back.  You know, sometimes they -- it just cycles out.

Q     Do you know the mix of federal inmates versus state inmates at the jail?

A     The correct estimate, no, not off the top of my head.

Q     How many inmates does the jail have?

A     I believe right now it is somewhere around 392.

Q     392?  And in the course of doing rounds, can you put any kind of figure on the amount of time that you observed or spent with David Runyon in the course of a month?

A     No, not at all.  You know, I just, you know, just basically observe.  If there is something wrong, then that's kind of when I take kind of notice.

Q     And you would only know if there was something wrong if you observed it or if it happened in your presence?

A     Yes.

Q     In your seven years there, are there infractions or scuffles that happen that are not reported and not seen by the guards?

**1093**

A    I mean, I'm sure there is, you know.

MR. SAMUELS:  Thank you, Deputy.  No further questions.

THE WITNESS:  Not a problem.

MR. HUDGINS:  No redirect, Your Honor.

THE COURT:  All right.  Thank you, Mr. Diaz.  You are excused.

Your next witness?

MR. HUDGINS:  William Banks, Your Honor.

(Mr. Banks was sworn.)

WILLIAM BANKS, DIRECT EXAMINATION on behalf of the defendant, as follows:

DIRECT EXAMINATION

BY MR. HUDGINS:

Q    Good morning, Agent Banks.

A    Good morning, Mr. Hudgins.

Q    If you would state your name, just so the record is clear who we are talking to now.

A    Yes, sir.  William Banks, B-A-N-K-S, ATF special agent.

Q    Agent Banks, when you last testified, we went through a lot of documents from Exhibit 319, Government Exhibit 319.

A    Yes, sir.

Q    And there are some of the documents that we didn't look at specifically that I want to ask you about now.

A    Yes, sir.

relationship with my son. I feel like I owe him a lot. I don't know that *per se* I let him down or that I didn't let him down, but I feel like I owe him. I'm his dad. That's the way I feel.

MR. HUDGINS: Thank you, Mr. Dombrowski. Please answer any questions the United States has.

MS. MCKEEL: No questions, Your Honor.

THE COURT: All right. Mr. Dombrowski, you are excused. Thank you.

THE WITNESS: Thank you, ma'am.

MR. HUDGINS: David Runyon.

(Mr. David H. Runyon was sworn.)

DAVID H. RUNYON, DIRECT EXAMINATION on behalf of the defendant, as follows:

DIRECT EXAMINATION

BY MR. HUDGINS:

Q   Good afternoon, Mr. Runyon. Would you state your full name for the jury, please.

A   Yes. My full name is David H. Runyon.

Q   Your middle name is Harold; is that right?

A   Incorrect. It's a middle initial only.

Q   Is that right? All right. Thank you.

We have a lot of Davids. We just had David Dombrowski, and you are David H. Runyon. Your stepson is David --

A      -- A. Runyon.

Q      And his son is?

A      David, Jr.

Q      Is that right?

A      Yes.

Q      I don't know if the jury has gotten confused with that. We all have seen those names a lot.

THE COURT:  We have David Dombrowski, the biological father.  We have David H. Runyon, the adoptive father.  We have David Anthony Runyon, the defendant, and David Anthony Runyon, Jr., who is the defendant's son.

MR. HUDGINS:  That's correct.

BY MR. HUDGINS:

Q      Mr. Runyon, where do you live, sir?

A      I live in Richland, Missouri.

Q      And you are here solely for the purpose of this trial; is that correct?

A      Yes.

Q      And your wife, Suk Cha, is here with you; is that correct?

A      Yes.

Q      And she is David's biological mother?

A      Yes.

Q      You are his adoptive father?

A      Yes.

Q   Are you employed in Missouri at this point?

A   I'm not employed.

Q   You have reached the milestone of being retired; is that correct?

A   I consider it retired, yes.

Q   You were in the service for a number of years and retired from the service?

A   Twenty years, U. S. Army.

Q   And then how were you employed after that?

A   I was employed at Missouri Department of Corrections for eleven years, and I took early retirement.

Q   And, Suk Cha, your wife -- she has health issues, does she not?

A   Yes, she does.

Q   What kind of problems is she suffering from now?

A   Mainly chronic pain.  There is a couple other -- fibromyalgia, that type of thing there.  It is mainly chronic pain over the years.

Q   Is it related to arthritis?

A   Yes.  Osteoarthritis.

Q   Does she get treatment for that?

A   Yes, she does.

Q   And she has had some surgical procedures to try to alleviate the pain?

A   Yes, she has.  The past year especially has done well.

GLORIA S. SMITH, OFFICIAL REPORTER

Q    And she has others planned in the future in other areas to try to alleviate pain in other areas; is that accurate?

A    Yes.

Q    All right.  Mr. Runyon, when did you first meet Suk Cha?

A    First met Suk Cha, would have been in the fall of 1975.

Q    What were the circumstances of that meeting?

A    She was working in a club at the time, and being young then, I attended the bars and so forth, and that's where we met.

Q    And where was that?

A    That would have been at Killeen, Texas.

Q    You were in the Army at that point?

A    Yes, I was.

Q    And tell us about the meeting.  How did you come to meet and develop an interest in each other?

A    Well, back at that time I was attending a lot of the bars as usual, and I just happened to be in one of the bars that I frequent, and she happened to be working there, and I just had an attraction there.

     Something told me that she's just not the type of person that belongs in a bar, working in a bar, somebody there who is desperate, probably needed it, and I just liked the way she approached people, the way she talked to people, so forth, and I think it was an infatuation.

Q    And how did you approach her?  How did the two of you get

together, beyond just seeing her at the bar?

A    Well, one of my things was, at the bar I guarded the ladies' restroom, had to sit on one of the stands next to it and so forth.  And she happened to be around one of the bars, and I noticed -- or one of the tables, and guys were giving her a hard time.  And she surprised me, somebody as very stern and serious minded, and I just kind of like said hi to her a couple of times, coming around the restroom and so forth, and that's how we kind of got kind of an interest in that.

I found out that she lived in a trailer and so forth, and the interest went further as to be walking all the way back to her trailer and so forth.  I lived on post at the time.

Q    Did you have a vehicle?

A    No, I did not.

THE COURT:  You said you guarded the ladies' restroom.  That was your job?

THE WITNESS:  No, it wasn't my job, I just happened to be somebody that did that.  That's the way she looked at it.  I used to sit right there next to the ladies' restroom.

THE COURT:  You mean that's where you sat when you were in the bar?

THE WITNESS:  Yes, that's where I sat.  I didn't work in the bar.

BY MR. HUDGINS:

Q    Did you walk her home to the trailer?

A    We walked almost three and a half miles at the time.  We did a lot of talking.

Q    Did you have a vehicle at that time?

A    I did not have a vehicle then, no.

Q    Was that her regular way to get back and forth from the trailer to the place that she worked, that she walked?

A    No, I think she had some assistance, somebody there in the trailer, a friend of hers and so forth, that drove her to work.  Before, I think she got back the same way.  Somebody had driven her back.

Q    She didn't have a vehicle.

A    That's correct.

Q    She would rely on someone else?

A    Yes.

Q    Now, after having done that, when you all walked and talked, did she tell you that she had two children?

A    Not at that time, no.  Not initially, no.

Q    Did the relationship develop to the point that you did learn things like that?

A    Yes, I did learn later on.  I think she was trying to feel me out and didn't want to reveal -- if I recall, the first time I met -- saw Davy and his brother Mark was at their babysitter's.  And if I recall, it was back in the winter of that same year there.  So then at that time I knew that she

had two children.

Q    Okay.  Did you progress soon to dating and going out?

A    Uh-huh, yes.  Mostly I just went back to her trailer.
We'd had gone out walking mainly, a couple of places and so
forth.  And lots of times we walked up to where the boys were,
the babysitter.

Q    Did you have occasion during that time to observe her
with the boys, or was it pretty much just getting them from
the babysitter?

A    No, the way she handled the boys was very loving, very
dear.  She was always worried, I think, about the boys being
at the babysitter's so much.  She had to keep them there
because of her work.  I think she hesitated for a while there
as to making sure of our relationship and -- to where she did
not reveal immediately as to, you know, she had two children.

Q    How long did you all date before you planned to get
married?

A    It would have been about five months, six months at the
most.

Q    And once you got married, where did you move together to?

A    Once we got married there, we stayed in Killeen.  I was
still in the military.  We had obtained a car at that time.
And then from Killeen, Texas, there, I had orders for Germany.

Q    How old was Davy?

A    Davy would have been about five years old.

Q   And how long was it after you got married that you got the orders for Germany?

A   I think I recall probably August, end of August of 1976.

Q   So just a matter of months?

A   Pardon?

Q   So it was just a matter of months?

A   Right about a month, yeah.

Q   And did the family move with you to Germany?

A   No, they did not.  I took them to my parents' house --

Q   Okay.

A   -- and left them there.  Of course she had a misunderstanding.  She thought that we were taking them with -- she was going to go overseas with me.  There was some misunderstanding.

Q   When you say "she," you are talking about Suk Cha thought that they were going?

A   Yeah.

Q   Okay.

A   So they stayed there, in about the September time frame.

Q   How long did they stay with your parents?

A   A little over a month and a half, at the most.

Q   Did they then follow you to Germany?

A   Yes.  When I was in Germany, my whole mind was set on getting a place over there to move in, getting the car arranged, since we had -- paying for the car, I wanted to make

sure I get the car paid off so we don't -- you know, it had to be paid off before we send it to Germany. So it took me a while to get that all arranged.

Q   The two of you weren't together that long before you went to Germany. Did you get a feel for Davy and Mark and kind of get to know them before you went to Germany, or --

A   Oh, yes. Davy especially was -- the first time I walked in the trailer, she had the boys there. Davy was just bubbly. I mean, just a bubbly child. His eyes were bright. He looked intelligent. He looked more mature than what his age was at the time. He could articulate his words, even at that young age. Very outgoing boy.

Markie -- I had noticed he was constantly crying, a lot of crying, because he was only about two and a half years old, I think, at that time.

Q   Now, after they -- before they came to Germany, had you found housing for you and that kind of thing, for you and the family?

A   Yes, I found housing.

Q   Were you living on the economy, or were you living on the base?

A   We were living on the economy.

Q   All right. And can you describe for the jury what kind of residence you had over there?

A   In like an apartment complex, if I recall about five

floors high, single stairs, very small rooms, old place.  In fact, it was a place that military was not supposed to get because of the -- apparently the landlord and so forth.  But I was desperate, and somebody in the command had helped me on that, to obtain that place.  So that's where we stayed.

Q    Now, did David -- was he in school at that point, or was he still preschool?

A    No, David -- let me go back.  Fort Hood, Texas, he went to kindergarten for about -- well, that early spring, April, May, just two months.  Then he had the summer break.  Then we went overseas.  Then there I think Davy finished his schooling right there, finished -- went into the kindergarten, finished that there.

Q    In Germany?

A    Germany, yes.

Q    Did he go to a Department of Defense school, or did he go to a school on the economy?

A    Department of Defense school.

Q    Okay.  And how did he do?  Did he make an adjustment pretty well to the new school there and kindergarten?

A    Davy has never had any problem adjusting anywhere in school.  He fell right in with the kids.  No problem whatsoever with school.

Q    Did it make any difference that you were living on the economy rather than on the base, as far as him being able --

having friends from school and that kind of thing?

A    No.  Most of Davy's friends was right there in the housing complex.  We had other military families living there.

Q    So there were other military families there even though they weren't supposed to be?

A    Yes.

Q    Okay.

A    All surviving, young, low rank at the time.  We were, too, but had four or five kids right there on that stairwell that Davy associated and played with constantly.

Q    Did he seem to get along well with the other kids there?

A    Yes, he got along real well.

Q    Any problem with them?  Any problem with him bullying them, them bullying him, any of that kind of thing?

A    No.  David never showed the bullying type, and I have never seen kids there on that stairwell bully him.  Mainly his brother, Mark.

Q    His brother would bully him?

A    Well, I think they were bullying Mark more.

Q    Oh, the other kids.

A    He was younger.

Q    Okay.  How long were you in Germany?

A    Germany would be five years.

Q    So David went through most of elementary school there?

A    Yes, probably third, fourth grade.

Q    DOD school the whole time?

A    Yes, DOD school the whole time.

Q    Did he participate in any kind of out-of-school activities like sports or anything like that?

A    Not at this time.

        THE COURT:  What year did you marry David's mother?

        THE WITNESS:  April 5, 1976.

        THE COURT:  How old was David then?

        THE WITNESS:  Well, David was just a bubbly child. I mean, he was outgoing and so forth.

        THE COURT:  How old, approximately, was he then?

        THE WITNESS:  David was probably about four and a half, about five years old.

        THE COURT:  Then you were in the military at that time.

        THE WITNESS:  Yes.

        THE COURT:  So you are now talking about his education in the military up through approximately what age?

        I'm not clear.  You started asking about sports. Where are you now in the military, and how old was David?

        THE WITNESS:  Okay.  Back in 1976 David was about five years old.  I was in the military.  Went to Germany, in Germany for five years.  So he went through his five years from there, then ten years old, eleven years old, and his whole time was in Defense Department schools.

THE COURT: All right. How old was David when you legally adopted him?

THE WITNESS: David would have been five years old at that time.

THE COURT: So when you married his mother, you adopted David.

THE WITNESS: Yes.

THE COURT: All right.

BY MR. HUDGINS:

Q    How was David's relationship with Suk Cha during the time that you were in Germany?

A    Very close. David and his mother is very close, probably a lot closer than Mark is. Very, very close.

Q    Did she do things with him, go out and, you know, play ball with him or take him places, anything like that?

A    No, she really didn't take him out that I know of, because I was at work all the time, but she was a homemaker a lot. She was always cautious about them being out on the playground. In Germany there they have got the playground situated right in the middle of the complex, where you can see out the windows easily, so she was always cautious about them out at the playground.

Q    Did she let them go out on the playground to play with the other kids?

A    Yes.

Q    Did you as a family have any activities that you particularly enjoyed doing together?

A    Mainly we did a lot of fishing.  Even from Fort Hood, Texas, that first time frame there, a couple of months, all the way to Germany, we did the same thing in Germany, all through his growing-up years.

Q    Did all of you participate in that, in the fishing?

A    Yes.

Q    Were you going out in a boat, were you going out to a stream and casting?  What kind of fishing were you doing?

A    No, mainly we were just on-shore fishing, bottom fishing, you might want to call it.  I didn't do any artificial lure fishing, that type of thing.  Germany was a lot of fishing for trout.  They had a trout lake there.  We picnicked there as we fished, so forth.

Q    Before you came back from Germany, were there any kind of incidents that David got involved in that created a problem for you, either with your command or with local authorities, anything like that?

A    No, not while we were in Germany there.  I have never had any occasion through my whole career as to being called to the command for any incident with Davy.

Q    And your relationship with Suk Cha -- was that good and stable?  Any problems there?

A    We struggled for about six years.  I think that was

because of the culture difference.  It took a lot of adjustment.  For me it took a lot of compromising.  During that time -- before, I was a pretty selfish person at that time.  That's probably why we did a lot of fishing.  But a lot of adjustment, culture adjustment.  It took quite a few years to get over that.

THE COURT:  You are talking about now the time period of '76 to '81?

THE WITNESS:  That's Germany, yes.

THE COURT:  Is that the time period you are talking about?

THE WITNESS:  Yes, ma'am.

BY MR. HUDGINS:

Q     You are talking about your first six years of marriage?

A     Yes.

Q     Did you have verbal arguments about things that were differences between you?

A     Yeah, we had some, because mainly my -- the way I was brought up and so forth, her culture thinks a little bit differently, so if there was anything that pertained to specific issues of family -- child rearing, for instance -- I'm more lenient, I think it is.  She would be more strict.  I think that had a lot to do with her culture.  I had never been to Korea before at that time, so a lot of adjustments we went through.  And, you know, it stabilized and so forth.  We just

come to what they call an understanding, basically.

Q   Now, when you left Germany, David would have been about ten or eleven, I think?

A   Yes, he was probably about ten.

Q   Where were you stationed after that?

A   After Germany, we went to Fort Hood -- I'm sorry -- Fort Leonard Wood, Missouri.

Q   How long were you there?

A   We would have been there for about three and a half years.

Q   And so David would have been in about what grade, fifth, sixth, when you went there?  Fourth?

A   Probably fourth grade, in there.  Although we got there in 1981, 1982, we moved off post.  We were on quarters when we got there.  We moved off post in 1982, in an old house.  That put him to a school on the outside.

Q   Had he been going to a --

A   DOD school.

Q   When you were on the post?

A   Yeah.

Q   And how long did he go to that?

A   Probably -- let's see.  We got there in May of 1981, so would have been the fall.  We moved off post in probably about that summer of 1982.  Summer of '82 he went to a private school where we lived out in the country.  We only stayed out

there for a year, come back on post in 1983. So he come back to DOD school.

Q    So he was in three different schools, basically --

A    Yes.

Q    -- in three different years?

A    Yes.

Q    How did he adjust to that?

A    He adjusted very well.

Q    Did he seem to get along -- did he have friends at each one of the places?

A    Every place we have gone, every school he has gone, he has had some friends.

Q    Did he have friends that were close enough that they would come to your home and spend the night, or he would go to their home and spend the night or that they would come over and play?

A    Come over and play, not spend the night, that I recall, and not that Davy went over and spent the night. But they would do a lot of playing out in the yard, and lots of times David would be going to their house, too, to play, but not staying overnight.

Q    Did he get along well with the friends that you saw him with?

A    Yes.

Q    Any incidents that you can think of that stand out in

your mind where he got into conflicts that -- you know, that came to parents' attention, anything like that?

A    No, not David.

Q    Now, that was at Fort Leonard Wood.  How was your relationship with Suk Cha at that point?  Had you all kind of stabilized your differences?

A    Yes, we did.  Calmed down a lot.  Still had to get rid of my selfish ways, though, but she was more understanding.  She was definitely more understanding than I was in a lot of things, but it has calmed down during that time frame, yes.

Q    At that time did David participate in any extracurricular things in school or in the community?

A    The only thing is -- let's see.  It would probably be 1983, if I'm not mistaken.  One time it was *tae kwon do*.  I think he attended for a year, went up as far as green belt. Then I think he tried baseball, if I remember, looking back, and something about Little League.  And I think the 1984 time frame when he was 13, I recall I think he did Babe Ruth for about a couple of months, because we had to move overseas again.

Q    So he had to stop that because of your transfer?

A    Yes.

Q    Where were you transferred at that point?

A    I had an opportunity to make my selection where I wanted to go, so I decided, well, I hadn't been to Korea.  Davy and

Mark had not seen their mother's homeland. Their mother definitely had some issues she needed to settle back there in Korea.

Q    What were they? Family issues, or --

A    Yes, family issues, and particularly her father. They would not let her know where he was buried. So I decided, well, I'll go ahead and try, and they gave me permission to go to Korea, but that would have been an unaccompanied tour, one year, in 1984. Dependents are not supposed to be there, but I took them anyway, took Markie, Davy, and Suk, and we lived on the economy there in 1984 and 1985.

THE COURT: You lived where? I'm sorry, I couldn't hear you.

THE WITNESS: We lived in Korea in 1984 to 1985, lived in Korea -- had been on the economy in Korea.

BY MR. HUDGINS:

Q    When you say on the economy, that means you were not living on post, you were living in civilian housing?

A    Correct, yeah. Technically the military did not recognize them as being over there.

Q    Now, I assume, then, they could not go to a DOD school in that situation?

A    Right, they could not.

Q    Did they go to a local school?

A    No. What they did, I signed up with Pensacola, down in

Pensacola where it's a home school, before we even departed, kind of keep them in the learning mode while we were in Korea for a short time. Right when we got there, we decided to let them experience Korean school, so we let Mark and Davy go to a Korean school for, I think, probably three months.

Q    Did they speak Korean?

A    No.

Q    I mean, didn't they speak Korean in the school?

A    They spoke Korean in the school. Some of them spoke English in the school, a little bit of English in the school. But they had no problem in the school.

Q    And they went for how long?

A    Probably about three months. We had to take them out, because the principal -- of course, I don't know the language myself. David's mother talked to him, and the principal was concerned because they are in that country on a passport, and you have allegiance to a country, and you have to be very careful of that. So they just had their experience in school for about three months.

Q    How long were you in Korea? For a year?

A    Yes.

Q    And where did you go from there?

A    From one year, that would have been to Fort Belvoir, Virginia, 1985.

Q    At that point was Davy going into high school?

A    Yes.

Q    And you lived in Northern Virginia then.  Did you live on the post, or did you live on the economy?

A    No, we lived on post, in quarters.

Q    Did David and Mark go to the public school system up there?

A    Yes, they did.

Q    David went to -- was it Hayfield High School?

A    Yes.

Q    At that point did he start wanting to participate in sports or other things outside of just going to school?

A    Yes.  And I would only allow them to take one extracurricular sport that they want to participate in.

Q    Did their mom, Suk Cha, resist them participating in any sports?

A    She didn't -- at that time I don't think she resisted on any sports that I recall, no.  She just took what I told them, to be in one sport, and they elected a sport and spent the whole four years.

Q    And what did David elect?

A    Wrestling.

Q    Did he enjoy that?

A    Yeah, he seemed to enjoy it.  He was just very enthused about it.

Q    Did you go to matches, you and Suk Cha?

A    Yes, we did.

Q    And was that a regular thing that you did, or an unusual thing?

A    That's a regular thing we did.  I think if I'm not mistaken, we went to all the matches, and I went to a couple of practices where Davy was practicing.

Q    Other than going to school and doing the wrestling, did he do anything else?  Was he working outside the home?

A    Yes, he did.  I don't think I had to sign for him to work outside.  I think it was at the age of either 16 or 17, I allowed them to work.  They wanted to go outside and work, so they worked at Burger King, both him and his brother.  I do know that Mark -- I had to sign for school that, you know, that understanding that he is still in school, but he is going -- we are going to allow him to go ahead and work out there.  And the whole purpose of that was so he could have some spending money.

Q    Now, you stayed in Northern Virginia for about four years?

A    It would have been about four years, yes.

Q    Where were you transferred to after that?

A    Then went back to Korea.

Q    How old was David at that point?

A    David would have been 18.

Q    Was he graduating from high school?

A    Yes.  He graduated before we left.

Q    And Mark -- how old would he have been?

A    Mark would have been 16.

Q    So was he going back to Korea with you?

A    Yes, reluctantly.

Q    He was going reluctantly?

A    Yes.

Q    And David was going to Wentworth Military Academy; is that correct?

A    Yes, decided to go to Wentworth.

Q    Was part of Mark's reluctance that his brother wasn't going to be around anymore?

A    Very much so.

Q    Now, how long were you in Korea when you went back over there?

A    Two years.

Q    Two years.  And that is how long David was at Wentworth; is that right?

A    Yes.

Q    You didn't see him during that two-year period?

A    No.

Q    How did he manage that?  I mean, what did he do during the summers and holidays and things like that when he was out of school?

A    I don't know.  With his writings, I think he was either

chasing girls or something, but in the summertime I think he had a couple of girlfriends he went to see and so forth.

Q    So you are not sure how he managed where he lived?

A    I can't say specifically on that, no.

Q    Did he write to you?

A    Yes.

Q    Did you write back?

A    Yes, we wrote back.

Q    Did he tell you what he was doing, or did you inquire how he was making it, that kind of thing?

A    Yeah.  He acknowledged in there in his letters that it was pretty strenuous.  Of course one of the things he stressed in his letters, he had to go through a lot of initiations, the first about two weeks.  I think they call it the break-in period.  He did write about that there was a girl he was seeing, and basically what was going on at the academy itself.

Q    When was the next time that you actually saw David?

A    I think when David would have been -- 1992 -- that would have been -- we got back in 1991 from Korea, returned back.

Q    Where did you go when you came back?

A    Fort Leonard Wood, Missouri.

Q    Mark wasn't with you anymore at that point, was he?

A    No, he wasn't.

Q    Did he come back to the United States before you and Suk Cha did?

A    Yes.

Q    And how long after you went over there did he come back?

A    Probably at least four or five months, if I can remember.

Q    Before you came back, or after --

A    Yes, I'm pretty sure it was the winter of 1989.

Q    Okay.  And he came back and lived with a man who ran a bait and tackle shop that he had worked for before you left this area; is that right?

A    That's our understanding.  Mark made the telephone call from Korea there and apparently made the arrangements.  And apparently that's where we understand that he was staying.

Q    Okay.  So he made his own arrangements for where he was going to come at that time?

A    Yes.

Q    Was he 15 at that point?

A    No, he would have been 16.

Q    Sixteen?

A    Yeah.

Q    Did he use his own funds to get over here?

A    I recall he did use his own funds.  I think he had savings, that I remember.

Q    Okay.  When was the next time after Mark left home that you saw him?

A    Mark would have been -- immediately -- 1991, probably that winter, '91, when we returned from Korea to Fort Leonard

Wood. We met him. He was at Fort Leonard Wood there. He stopped by.

Q But he didn't move back home, just stopped by to see you?

A Just stopped by.

Q He was still under 18 at that point, wasn't he?

A Yes.

Q When David came to -- or when you saw him next, what were the circumstances of that? Was he visiting, or what was going on that you saw David?

A Yeah. Both, I think, David and Mark at the time -- David came back because I was -- I had some of their hunting equipment in our household goods, and I remember that they came back so I could give that to them and decide what they wanted to do with it.

Q How long did they stay? Or how long did David stay?

A Not long. That I recall, probably at least a few days. I'm pretty sure we went hunting one of the days, Mark, David, and myself. But after that, I think they left wherever, I think back to Kansas.

Q What was David doing for a living at that time?

A Don't know at that time. I just know -- I did know that he worked at one of the state prisons there in Kansas. But I don't know if it was during that time.

THE COURT: What did he do after Wentworth?

THE WITNESS: Lived back -- he lived in Kansas, and

**1120**

we didn't know exactly what jobs he had back then after Wentworth. I think he was still in the National Guard, because he got his second lieutenant commission, as I understand. So he would have to be working somewhere. I just know that he worked in Kansas there at one state prison. Don't even remember what year that was. I do recall that he worked at a place for catching shoplifters at one of the stores for a while.

BY MR. HUDGINS:

Q Some kind of security for the store?

A Yes, but I don't know -- that wouldn't have been in the early nineties. Probably have been later, before he was married.

Q So after they came by and visited that time, did he leave the area? Do you know where he went, where he was living, anything like that?

A No, did not.

Q When is the next time that you had contact with him?

A After that, I think it was after he was married. '96, I think he stopped by the house we had. I was already retired, retired from the military in '92, October, end of October. So he was married in, what, I think '96, if I remember. He come to the house with his family at that time, and that's the first time after I saw him in '92, so it would have been about '96.

Q   At that point was his son born, or was it just his wife and her two children?

A   No, I think just the wife and the two children.

Q   Was he in the service at that point, in the Army?

A   He was just going into the service, if I remember.

Q   Was he asking anything of you as far as helping him with going into the service or anything of that nature?

A   No.  What I remember was about the family, and he wanted us to take care of them.

Q   Of the family?

A   Family.

Q   Is that while he was going into the service, or --

A   Yes, apparently when he was going into the service.

Q   Was that basically till he got on his feet or --

A   I don't know.  I just know that I refused.

Q   Okay.  And did they leave?

A   Yes.

Q   Do you know where they went after that?

A   I don't know where he took his family back to, where he took them.

Q   How long before you saw him again?

A   After that would have been the year 2000.

Q   What were the circumstances of that?

A   His brother's wedding in Hawaii.

Q   Did everyone go to Hawaii to -- that was to Mark's

wedding?

A    Yes.

Q    Was that a pleasant experience, or how did that go?

A    No, it was not too pleasant experience, especially for his mother.  I think it was a tension between her and Mark, mostly.  As far as Davy, though, he was just happy as ever.  I mean, we gone and did a lot of things before the wedding.  They went scuba diving, things like that.  His family went out on a fishing trip on a boat.  But there was some tension between his mother and Mark, so it was kind of tense.

Q    But there wasn't any tension between David and his family and Suk Cha?

A    At that time?

Q    At the wedding in Hawaii.

A    David's family was not there.  David was the only one.

Q    When you said his family, you were talking about Mark's family?

A    I'm talking -- okay.  I should back up and say our family, then, because it was just Suk Cha and myself.

Q    So it was just David?

A    Yeah.

Q    Maria and none of the children were there?

A    Maria and none of the children were there.

Q    And David and Suk Cha seemed to be fine?

A    Yes.

Q    Their relationship?

A    Definitely.

Q    Okay.  Now, when you left Hawaii, when is the next time that you had contact with David?

A    It would have been in 2002, probably in the early summer.

Q    What was the nature of that?

A    We made contact.  His mother was concerned, wanted Davy to come home or finish his school on the GI bill.  She talked to me.  I was reluctant at the time, but I went ahead and thought about it, said, give him an opportunity for school, bring him home.  Staying home, he can register at one of the schools there in Fort Leonard Wood, and that was our agreement, agreement between David and I over the phone, that his whole purpose was to come here and finish school.

Q    Now, was he still married to Maria at that point?

A    At that time I kept thinking he was still married to Maria.

Q    Were they separated?

A    I did not know anything at that time when we made the agreement that they were separated.

Q    When you all were making this agreement for him to come there and go to school, was he coming by himself, or was the whole family coming?

A    Coming by himself.

Q    Did he talk about what was going on with the family?

A    No, not at that time.

Q    Were you curious as to why he was coming by himself, when he had a wife and at least one child of his own?

A    Well, he said the only way he is going to be able to finish school is get way from Maria and that family, especially Maria, and that's one thing that his mother was very hot on there, so I thought that, well, the only way to get him into school and finish is probably to get him home to do that.

Q    But you didn't talk specifically to him about that?

A    No, did not.

Q    I assume he came and went back to school, came to the home and lived with you and went back to school?

A    Yeah, he came to the home, and he went ahead and he got out there and got him a job.

THE COURT:  What year are we in, Mr. Runyon?

THE WITNESS:  This would be 2002.

THE COURT:  All right.  Where were you living?

THE WITNESS:  We were in the Fort Leonard Wood area -- no, at that time, I'm sorry, we were in Richland, Missouri.

THE COURT:  So he came to go to school?

THE WITNESS:  Yes.

THE COURT:  Did he go to school?

THE WITNESS:  Yes, he started school.

GLORIA S. SMITH, OFFICIAL REPORTER

**1125**

THE COURT: Go ahead.

BY MR. HUDGINS:

Q    Richland is just down the interstate from Fort Leonard Wood; is that correct.

A    About 20 miles.

Q    Was he going to school full time?

A    To my understanding, he was.

Q    Was he also working?

A    Yes.

Q    Do you recall what he was doing for a job?

A    The first job he got was at the -- clerk -- desk clerk at the Hampton Inn up in St. Roberts, would have been about 20 miles, right outside of Fort Leonard Wood.

Q    How long did he live in your home at this point?

A    Probably -- if I recall, it would have been up till October -- till November of 2002.

Q    And when did he move back into your home -- or into your home?

A    He came -- okay. He came in 2002, stayed in the home. He left home, still in the area, living outside of the home in the area, surrounding area there, back in October, about the end of October of 2002.

THE COURT: So when in 2002 did he come to live with you?

THE WITNESS: In the spring of 2002, about that May

or June time frame.

THE COURT: Did he start school right then?

THE WITNESS: Yes. As far as I know, he went and registered for school.

THE COURT: What school?

THE WITNESS: It would have been Columbia University -- Columbia College I think is what they call it.

THE COURT: And then he left the home in October of 2002?

THE WITNESS: Yes.

BY MR. HUDGINS:

Q    And when he left, did he stay in the area?

A    Stayed in the area.

Q    Got his own place?

A    Got his own place.

Q    Did you continue to have contact with him after he moved out?

A    Yes, we had some frequent contacts.

Q    How long did he stay in the area?

A    He had stayed in the area until spring of 2003.

Q    And did you continue to have contact with him until the spring of 2003?

A    Until spring of 2003, yes.

Q    Was he still in school?

A    To my knowledge, he wasn't in school then.

Q    He was not?

A    He was not in school.

Q    Okay.  Do you know when he stopped going to school?

A    I do not know when he stopped going to school.

Q    Do you know what he was doing for a living?

A    He had many jobs.  I know that he worked at the Hampton Inn.  I understand he worked for a rent place, a rental place for furniture, appliances.  Then I understand also he worked at Piney Hills Center.  That's for -- it's kind of a correction place for bad boys, high school boys and so forth.

Q    Like an adolescent detention center?

A    Yes.

THE COURT:  This looks like a good place for an afternoon recess.

Ladies and gentlemen of the jury, you can take an afternoon recess.

(The jury exited the courtroom.)

THE COURT:  Mr. Runyon, if you would step out, you can have a recess.  And don't discuss your testimony with anyone.

THE WITNESS:  Okay.

(The witness exited the courtroom.)

THE COURT:  Mr. Hudgins, this is so attenuated. What mitigating factor are you trying to show here?  You enumerated the mitigating factors that you were seeking to

show on Friday. Which one is all of this about?

MR. HUDGINS: It's about probably several of them. But I would say the primary one is the relationship that he has with his family.

THE COURT: All right. Relationship with the family -- that is not a specific act that is enumerated here. It is frankly laborious.

MR. HUDGINS: I understand.

THE COURT: Sitting here listening to you going through all of this information, much of which -- I haven't said anything, and I'm not going to stop you, and there has been no objection, but it is frankly very laborious in terms of how it relates to one of these mitigating factors that you have enumerated. I can understand some of it, but some of it doesn't even help, because they haven't had contact, and he doesn't seem to know what Mr. Runyon is doing, and so forth.

MR. HUDGINS: Well, that's part of it, Your Honor, is the lack of contact, and when he goes to school and is kind of just dropped off for two and a half years, and then when the parents come back, there is not really a reconnection there, and there just doesn't seem to be much caring about what is going on with him, and that is what we are trying to show.

THE COURT: That is going to hurt the Mitigating Factor No. 15, that the mother of David Anthony Runyon will

suffer emotional harm if her son is executed. Obviously any parent will suffer emotional harm, but if there is not a close relationship, and it is not being shown to be a close relationship, that may well be a diminishment to this mitigating factor.

That's all I'm saying. I read your mitigating factors, and I'm having some difficulty understanding how this information -- it would be more helpful, in my opinion, if you would spot right in on it, and spot right in on, where was he educated, and what did he do. But that's all that I'm going to say in that regard.

It just doesn't seem that we are going anywhere, to spot in on something that then hits on the mitigating factor that you have listed, and that is the only thing that I'm raising, is that I understand a continuum of testimony, but the continuum of testimony has to have some end point in relationship to a mitigating factor.

I'm going to allow it, but it certainly doesn't seem like it is going anywhere into a conclusion of one of these factors.

The court stands in recess for 15 minutes.

(Recess)

THE COURT: Mr. Hudgins, the clerk indicated that you had some forms that you needed to sign. They can be signed at the end of the day. I'm not going to hold up 15

GLORIA S. SMITH, OFFICIAL REPORTER

1130

people for you all to go down to the marshal's office to sign forms. Or the marshals can bring them up here to be signed, but we are not going to hold up the trial for you all to go down there to sign forms for release of witnesses and so forth on a court break. So you all need to make arrangements outside of the proceedings for that.

MR. HUDGINS: Yes, ma'am.

Mr. Runyon, you can get back on the stand.

(The jury returned to the courtroom.)

THE COURT: All the jurors are back from break.

You can resume, Mr. Hudgins.

MR. HUDGINS: Thank you, Your Honor.

BY MR. HUDGINS:

Q    Mr. Runyon, you are aware that David had a grandchild -- or that David had a child, who was your grandchild?

A    Yes.

Q    When did first become aware of Davy, Jr.'s, existence?

A    Probably would have been after he was born.

Q    Right after? I mean, did somebody contact you, or --

A    No, I don't remember that. I don't recall how it was done.

Q    How you learned about --

A    I think it was done by phone.

Q    Have you met Davy?

A    Yes, I have.

Q   And when did that occur?

A   It would have been January 24, 2008.

Q   So last year?

A   Yes.

Q   And prior to that, you had never seen him.  Had you ever spoken to him on the phone, or --

A   No.

        THE COURT:  Was there a reason that you didn't have any contact with your grandson?

        THE WITNESS:  Yes, mainly because of David's mother chose not to have -- that was some battles that his mother, David's mother, and I have gone through.

BY MR. HUDGINS:

Q   With David?

A   No, with the grandchild.

        THE COURT:  I'm not clear.  Now, why hadn't you had any contact with the grandchild?

        THE WITNESS:  His mother and I -- David's mother and I have always wrestled with, argued about at times, as to why not see it.  She does not want any relationship with the grandchild because of Maria.

BY MR. HUDGINS:

Q   Because of Maria?

A   Maria.

Q   So she has had difficulty with Maria?

A    Yes.

Q    Now, in 2002, when David left the area where you all lived, did he move to West Virginia at that point?

A    I don't know.

Q    You don't know?

A    I did not know where he went.  He left in 2003.  He was gone.

Q    2003, I'm sorry.

A    Yes.

Q    Have you recently been able to reestablish contact with David?

A    No.

Q    Are you corresponding with him?

A    Currently, yes.

Q    Okay.  And when did that start?

A    That started right after grand jury.

Q    And are you corresponding with him fairly regularly at this point?

A    Yes.  All the letters that Davy writes, we have responded back.

Q    And how often do you receive mail from him?

A    David -- almost two or three a week.  Here recently, it was ten all bunched together, different dates.

Q    And did you respond to those?

A    Not to the last ones, we have not responded to.

Q    Is that because you haven't had a chance to, because of the time?

A    Yes, also the time, and also I think the last time he wrote us was just before -- this was after his first trial.

THE COURT:  When you say his first trial, you mean --

THE WITNESS:  Yes.

THE COURT:  You mean his conviction.

THE WITNESS:  Yes.

THE COURT:  The first phase of the trial.

THE WITNESS:  The first phase, yes.

BY MR. HUDGINS:

Q    Has the correspondence been a positive thing?  Has it been something that you feel like has reestablished a relationship with him?

A    Yes, and Davy in a lot of his letters has responded with something in his past that he remembers, some things I forgot that we have done that he has remembered.  He has expressed a lot about his mother, how he has missed her, and things like that, how he has missed our time together, in a lot of his correspondence.

Q    Have you observed his mother Suk Cha and her reaction to the correspondence that comes from David?

A    Most of the correspondence that we have read, a lot of it, pertaining to like where he speaks about her was -- she

was okay with. A lot of the letters that I have read to her and she read herself, she has this notion that he's not ready to listen.

THE COURT: Has this notion that what?

THE WITNESS: He is not ready to listen.

BY MR. HUDGINS:

Q    To listen to her?

A    Yes.

Q    If David is sentenced to life in the penitentiary, will you be able and will his mother be able to visit him, depending on where he is physically located?

A    Yes, we will.

Q    Is that something that you plan to do if he is within a distance that is reasonable for you to do that?

A    No matter how far he is, that's what we plan to do.

Q    What effect will it have on you if David receives the death penalty, emotionally?

A    Emotionally?

Q    Yes, sir.

A    I would say just to me it would be sad, but it's accepted. I accept whatever the jury determines. But for me it would be sad, not very much emotional, because I think I have placed in my mind already that it could go either way, and I'm past that stage of -- emotional stage.

Q    In the correspondence that you have seen from David in

the recent past, do you feel that he is a person who has something to still offer to other inmates, to people he comes into contact with?

A    Yes.  Most of his letters, the tone in his letters have been very caring.  He has also mentioned, I think, in his letters about some offenders -- I think he is doing some Bible study or something of that nature in the jail where he is at, which to me, that is a positive thing.  He has expressed a lot of that.

MR. HUDGINS:  Thank you, Mr. Runyon.  Please answer any questions that the United States has for you.

CROSS-EXAMINATION

BY MR. SAMUELS:

Q    Good afternoon, Mr. Runyon.  Mr. Runyon, David received a scholarship to the Wentworth Military Academy; that's correct, right?

A    Yes.

Q    And that was a good opportunity for him to go to that school for two years and possibly develop into a military career?

A    Yes, that was the opportunity, yes.

Q    Was that something that you encouraged him to do?

A    No, I did not encourage him to do that.

Q    David had been to a number of schools between the time he went to the Wentworth Military Academy and the time he came to

live with you and your wife in 2002, I believe; is that right?

A    Could you repeat the question?

Q    Certainly.  David had been to a number of schools, other than the Wentworth Academy, between time he finished there and the time he came to your home to start Columbia College in 2002?

A    Not to my knowledge.

Q    Not to your knowledge?

A    No.

Q    And was there an arrangement that you had with David when he came to live with you in terms of him going to school and you providing help with a place to stay?

A    Yes.  I was reluctant to have him come to the home.  Now I don't know why, but the thing is I made agreement with Davy that the sole purpose that you'll be coming home here is your opportunity for you to attend school and finish, because you've got your GI bill.

Q    And did he live up to his end of the bargain in that arrangement?

A    As far as I'm concerned, he did not.

Q    Why was that, sir?

A    I don't know why.  He just didn't attend the rest of the school.  He just went for a short time.  I don't even know how long that was, but it was just a short time.

Q    And since 2003 when he left the Missouri area, have you

had any contact with him from 2003 up until you learned about these charges and this offense that he was indicted for?

A    No, I have not.

Q    Did you know where he was living?

A    Yes.

Q    Did you know who he was living with?

A    No.

Q    Did you know what he was doing for work?

A    No.

Q    Did you get any phone calls or e-mails from him, or letters?

A    No.

Q    So when you started reestablishing contact with him, it was after he had already been charged for this offense?

A    Yes.

                MR. SAMUELS:  Thank you, Mr. Runyon.

                Nothing further, Your Honor.

                MR. HUDGINS:  No redirect, Your Honor.

                THE COURT:  Thank you, Mr. Runyon.  You are excused.

                Your next witness?

                MR. HUDGINS:  Suk Cha Runyon, Your Honor.

                THE COURT:  You can remain in the courtroom, if you want, Mr. Runyon, or you can wait outside, whichever.

                (Ms. Runyon was sworn.)

                SUK CHA RUNYON, DIRECT EXAMINATION on behalf of the

defendant, as follows:

DIRECT EXAMINATION

BY MR. HUDGINS:

Q    Ms. Runyon, if you would, can you state your full name for the jury, please.

A    My name is Suk Cha Runyon.

Q    And you are David's mother; is that correct?

A    I am David's mother.

Q    Ms. Runyon, where were you born?

A    I born from North Korea.

Q    And were you born prior to the Korean War?

A    I born 1945, and all my relative left to the South Korea, the border and everything, but -- except my grandfather died. He buried there.  Rest of all our relative moved down to South Korea, prisoner -- refugee.

Q    Ms. Runyon, you were born in North Korea; is that correct?

A    Yes.

Q    And when the war was breaking out, did you have to escape into South Korea?

A    Yes.

Q    And your father was --

A    He was on the China, took every bit of money he have on the backpack, went to China for business trip, and day after he left, day after he crossed the border, war break out.

Q    Now, you had a difficult time getting out of North Korea into South Korea?

A    We didn't have no money, and we have -- my stepmother have five children.  She ripped a blanket, tied to each of us the waist so we don't lose, because people was like river tide, all screaming, crying, calling for name.  I remember about that part.

Q    You made your way to South Korea, and actually your father came back from China?

A    And we met -- we was out every day, picking some edible wheat or a farmer leftover vegetable or anything edible.  We always go out together.  Then we bring -- we put it in the big -- I don't know what that is -- drum.  We put in there, put the water in.  There is -- I know U. S. military powder milk drum, and we get that --

MR. SAMUELS:  Judge, may we approach?

THE COURT:  Yes.

(The following discussion occurred at side bar out of the hearing of the jury:)

MR. SAMUELS:  Judge, I understand we need to get a little bit of background, and to give her a chance to calm down up there, but it seems that we are going into an area far outside the mitigating factors and far outside preliminary background, where she is starting to give more of her life story.

**1140**

THE COURT: I agree. Why can't we fast-forward this, to she has gone from the north to the south, to when she was with his father, and Mr. Runyon was born. We do not need all of her background here.

MR. HUDGINS: I wasn't going to get into all of it. I wanted to have a little bit about the fact that she did have a hard time coming down from the north. I mean, I understand, too, it is going to be difficult for the jury to understand her anyway.

The only other thing that I was going to ask her about is she did suffer some abuse at the hands of her brother.

THE COURT: But what does that have to do with this defendant?

MR. HUDGINS: It is what made her who she is, which our feeling is it helped make him who he is.

MR. SAMUELS: But that only affects it insofar as her treatment with him. If he is painting an alternate picture, how is it relevant, what happened to her?

THE COURT: What you need to do is move to her relationship with Mr. Runyon's fathers, biological father and stepfather, and then if there is a problem, you can ask her the root of that.

But to lead in with it is not appropriate. It is only relevant if it becomes pertinent, according to her

testimony, in regard to Mr. Runyon, the defendant.  So what you need to do is establish her relationship with his biological father, her relationship with him, with the stepfather, and then you can go back and tie it into her background, if it is relevant.  But her background doesn't have relevance yet.

MR. HUDGINS:  Okay.

MR. SAMUELS:  Thank you, ma'am.

(Proceedings resumed in open court as follows:)

BY MR. HUDGINS:

Q    Ms. Runyon, did you and your family get yourself set up in South Korea?

A    At war refugee center.

Q    And at some point in time did you go to work in a tailor shop after you were through with school?

A    That's when I grow up.

Q    Okay.  How old were you when you went to work in a tailor shop?

A    I think -- I think I was about 22.

Q    Okay.

A    23.

Q    Did you meet David Dombrowski in the tailor shop?

A    Yes.

Q    Were you about 22 at that time, or had you been older?

A    Yes.  I was -- I was going 25 that spring when we

married.  I think that's when I was 25.

Q    You and he got married?

A    Yes.

Q    And he got stationed back in the United States at Fort Hood; is that right?

A    Yes.

Q    Did you come with him when he came back to the United States?

A    No.

Q    You had to wait a little while; is that right?

A    Yes.

Q    Were you pregnant with David --

A    Yes.

Q    -- when you were waiting?

A    Yes.

Q    Did you have any trouble with your pregnancy?

A    Well, I find out after he left -- I didn't know what is what.  I was 25.  I didn't know what is what, not -- we don't teach you about the womanhood, you know.  And later I find out I was pregnant.  So --

Q    Did you have a problem when you were flying to the United States?  Did you have a physical problem?

A    Yes.  Day I supposed to fly in Northwest line to -- and I have a hard time scheduling, and I couldn't -- I mean, it was so confusing for me, everything, you know.  And rescheduling

everything, house and the financial-wise, everything, but I have to change the airplane, everything.

Q    Did you have to go into the hospital?  Did you have a problem?

A    Yeah, I think probably like San Francisco, something on the way.

THE COURT REPORTER:  I'm sorry, what was that?

THE WITNESS:  San Francisco, something like that.  I don't know.  You know, I didn't know what is what.  But on the airport, I was asking the direction, and I pass out.

BY MR. HUDGINS:

Q    Did they take you to the hospital?

A    Yeah.  And I wake up, and they say, you are having a miscarriage.  Do you want to have it treat here, or you want to go?  Because I didn't have money to pay the hospital, and, you know, as is, I know this flight -- I know my husband waiting other side or not.  And he didn't have money either, you know.  So I tell them, I'm going have to go, you know.  So I went.

Q    And you arrived at Fort Hood, and your husband, at that time David Dombrowski, was stationed there; is that right?

A    Yes.  And he was waiting in the airport three days.

Q    And did you set up household there in Fort Hood?

A    No, I just came in with one little suitcase.

Q    Okay.  But did Mr. Dombrowski have a place for you to

live there?

A    I find out that later he got a -- he extend the Army.  He got some money, and he bought the house.  He was put the chain-link fence for the baby and the painting the house, all that kind of stuff.  So it is old rundown place, but it is livable for his wife and kids.

Q    How long were you at Fort Hood?

A    I come in 1973, July 13 -- I think -- yeah, I think '73, August, I think, we left the Panama, if I'm not mistaken. Something like that.

Q    So how long was it that you were there?

A    July '73, probably around August -- so probably two years, two, three years.

Q    Toward the end of the time that you were at Fort Hood, did Mr. Dombrowski start doing some things that were creating a problem between you and he?

A    Well, he's a generally nice man, kind heart.  But his background, the whole family like that, I find out doesn't have a good lifestyle.  Friend calling for the gamble --

THE COURT REPORTER:  I'm sorry?

THE WITNESS:  Friend calling our house, calling to gamble, asked him what time to meet, and where, what -- you know, gamble friend.

THE COURT:  In other words, somebody called your house?

THE WITNESS:  Yes.

THE COURT:  Who had been gambling with him?

THE WITNESS:  Yeah, try make sure he come and he wants to talk to him, stuff like that.

BY MR. HUDGINS:

Q    Did you all argue about that, about his gambling and drinking?

A    First time I didn't know he was gambling.  I thought he was having affair.  But then I find out he was gambling.  That's worse than having affair for me, you know.  Gambling and -- then he asked me to go to people working together, meeting.  I went there.  That was a drinking party.

So, you know, I just, you know, a little bit, and he probably about finish one beer, something like that.  I tell him, I want to go home.  My children with babysitter.  Money we can't afford to.  I have so much thing to do with that money, more for my children.  I don't want to pay the babysitter.  And I insist go home.  And he was mad.  He was mad.  He drive Panama Canal driver, like 120 mile, on the wrong side.  Then car coming, he cut it in this way.  I said, that, you know, this man, if we die, what happen to our children?

Q    Was this when you were in Panama?

A    Yes.

Q    Okay.  Did you all have arguments where the children were

there?

A    Oh, no.  There is nothing to argue about.  I made up mind.  This man does not care about his children.  You know, if you be die that day, what happen to our two kids?  I said, he don't care.  He don't care our children.  And I'm done with.  I don't want nothing to do with.  I have a lousy childhood.  I'm not going to have -- I'm not going to have my children go through anything emotional or physically.  I'm not going to have it, period.

And I start to keep eye on him.  I know now he is a drinking party, now I know he is gambling.  I beg.  I pray and pray.  I read the Bible.  We going -- I know God does not want us break the marriage.  I read the beginning Bible all the way to end.  There isn't any mercy I can get away with divorcing him and the God would allow and forgive me.  If your husband have affair with other woman, that will give you reason to leave him.  But not to marry again, how am I going support my children?  I don't have a proper job training.  I mean, I read English and write, but my speaking is lousy.

Q    Did you decide, though -- ultimately you decided that the best thing was for you to separate and divorce; is that right?

A    No, at that point I still was stay probably about eight months.  I'm praying and seeking for God help and allow me -- guiding me, show me your guidance what I supposed to do.  If I leave without -- he's not having affair, that's not right with

your God. Then if you end or even that -- let's say he have affair, I'm not allowed to divorce him, then if I can't marry, how am I going support, think of my children, and who is going to be father to them?

So I was begging and pleading and threatening, you name it, any way this God can pull any kind of trick and manipulation. I try all kinds of way every day. Even I swallow medicine. When he was trying to parking on the parking lot, I swallow medicine.

Q    You tried to make him think you were committing suicide?

A    That's right. You got it fast. Then when he come in and walk in door, I started gagging. Then I went to bathroom, I put the finger here, I threw up all. Then he realize -- he realized what I did, and he called the ambulance and took it in. Well, God blessed me. He knew what I was up to. Every bit of medicine came out. Nothing left on the stomach.

And I was mad at the doctor. Why did you save me? You know, what I'm good for? I'm no good for nothing. I'm no use for.

Q    How long after that did you decide to get the divorce?

A    When I come out from hospital, I was working on immediately.

THE COURT:  I'm sorry?

THE WITNESS:  Leaving him immediately, because that was my last straw to convince him, do something, wake up, your

children need you. Okay, I'll be here. Then what kind of father not going to take care of children?

THE COURT: Ms. Runyon, how old were your children then?

THE WITNESS: Davy was two and a half years old -- no, about three. Oh, maybe three and a half, because Mark was a little toddler walk, probably around one.

THE COURT: So you have two boys?

THE WITNESS: Yes.

THE COURT: What is the age difference? How many months apart?

THE WITNESS: They are two and a half years different.

THE COURT: All right. Go ahead.

BY MR. HUDGINS:

Q    And so you got the divorce.

A    No. You got to hear this. That's the crucial part. He was still running around gambling. And my children -- my upstairs neighbor lady have a problem with her husband. She is gripping her teeth. She says she going to get revenge when she go back to states. But I can't, because every time he come back, any little sound, anything, pick up the kid like a chicken leg and throw them around. I couldn't do that. So I'm going get beat up real good. So I can't wait on go back to states. But, see, when I'm in the hospital suicide, and

I'm going to stick it to him, I mad at the doctor. Why did you save, you know. See, I really meant to die. Then he is going to have to do something with.

THE COURT: Where were you then?

THE WITNESS: Army hospital.

THE COURT: What Army hospital?

THE WITNESS: Panama.

THE COURT: So you were in Panama at this time?

THE WITNESS: Yes. I think it's Fort Clayton Hospital.

THE COURT: So Mr. Dombrowski was stationed in Panama.

THE WITNESS: Yes.

THE COURT: All right. And did there come a time when you left Panama?

THE WITNESS: No, I left.

THE COURT: Go ahead.

BY MR. HUDGINS:

Q    When you left, did you come back to Fort Hood and seek a divorce?

A    Oh, yes. And I told him before, when I leave, don't even think you are going come back and don't come back to us. No way. If you going do that, you need to do it now.

Q    So when you got the divorce, what did you -- were you -- you were there alone with two boys?

A    Yes.

Q    How long was it after that that you met Mr. Runyon?

A    I can't remember, for after long time, my memory just not return, stop coming back.

Q    Was it less than a year?

A    Yes.

Q    Okay.

A    I went looking for the job.  I'm not going to wait for I don't get no money, then looking for job.  Then meantime there's a space for the children to fill and take care of rent.

       And when I left to that Texas, I mean, I can get the job morning, I can get the job afternoon, and I make good money.

Q    Did Mr. Runyon -- he brought some stability to your situation, didn't he?  I mean, you guys got together and set up a nice home?

A    When?  When I come states first time?

Q    When Mr. Runyon came into your life.

A    Oh, Mr. Runyon.  Well, he didn't have a nickel on him. He had old, worn-out boots, Army boots.

Q    He was in the Army?

A    Yes.

Q    At that time?

A    Yes.  He didn't have nothing.

Q    Did you all --

A    He come knocking on the door, he eating my food and my kids' trick-or-treat candy.  My children don't know the candy sweetness until through their high school graduate.  They still remember come from school, drop the backpack, and I'm in the kitchen start to cooking dinner, and he grab apple, something, crunch it off, and eating.

THE COURT:  How did you meet Mr. Runyon?

THE WITNESS:  Well, like when I come back, I couldn't even find dishwash job for one dollar in that Texas.  All the Mexican took over.  Not even dishwasher job.

Before I left, I know I'm going to get a job.  No problem at all.  I'm a hard worker.  I work hard.  I'm very nice to people.  I know how to be.  And I don't have no reason to be mean to anybody, you know.  They are customer.  I get very good tip.  I make very top tip.  If I'm a waitress, I make very, very large amount of tip.

BY MR. HUDGINS:

Q    Ms. Runyon, let me ask you about David's schooling.  Shortly after you and Mr. Runyon got married, did you move to Germany?

A    Yes.

Q    Was David in kindergarten at that time?

A    When -- yes.

Q    Okay.  Did he go to the Department of Defense school in

Germany?

Did he go to school on the base?

A    We were just stationed over there, but we stayed there four years.  I know when he was in the Texas when I met him, he was a clerk.  He was always a clerk.

Q    I'm asking you where David went to school in Germany. Did he go to school?

A    My husband?

Q    No, David, your son.

A    Little Davy, my son?  He went to military dependent school.

Q    Okay.  Did he get along well with the other kids that he was in school with?

A    Oh, yes.  He's always good boy.  Teacher just call me how good he is and asks to do things, willing to help, you know, in the classroom.

Q    Did you as a family do things together like camping or fishing?

A    Always.  We never did anything -- my second husband, inexperience and no money when I met him, but he keep all the teaching.  He think he be good to children, that makes me happy.  He can get less with me, and he learning give little wife attention, and the children is most important.

Q    So you had a good family relationship?

A    Oh, yeah, we don't do nothing with, and he know what I

stand for.  I tell him when he asked for marriage, no drink. Can of beer, okay, couple, at home.  But no drunkenness, no gamble, no lie.  If you do any of this, first forgiveness, I forgive you.  Second time, I will put up with you.  Third time, I'm done with him.  I don't want nothing to do with people lie.  I don't have a stomach for, I don't have time for in my life.  Life is too short.

Q   How did David do right through school?  You all moved a lot because you were in the service?

A   Yes.

Q   How did David do as far as adapting to new schools and new friends and that kind of thing?

A   No problem.  He always have a good friend, always a teacher just praise him when I go see.  And when it is open, first change the grade, either parents-teacher meeting, I go, I tell them, don't worry about it.  You do what you need do to discipline children.  If you need to spank him, go ahead spank him.  But I prefer to put him in corner, have him to think about what he did wrong.  But if you need to spank him, go ahead and spank him, but I don't want to see no bruise, because if you do, I will have your hide.  And I will, too.  I mean it.  Never.

She say, oh, he is just so sweet boy, he's so helpful.  But nothing new.  He was helpful, was holding the door.  Watch your step, honey, don't be trouble.  That's the

kind of boy we have, and let him stay out in the neighborhood. That was him. He always look after his brother and other neighborhood kids, youngest one.

Q    When he was in high school, you lived in Northern Virginia; is that right?

A    Yes.

Q    And he went to Hayfield High School?

A    Yes.

Q    How did he do as far as grades there?

A    He did good, but I push him. For the couple list, I be happy, A plus, because I know we can't afford to send to college, so he's going to have to earn the scholarship. Couple of A plus makes your mother very happy, but couple of B, but I like the A minus fine, you know.

Q    Did David play sports at Hayfield High School?

Was David involved in any kind of sports at Hayfield High School?

A    Yes. I didn't want him to be, because look at him physically. Look at me. Anybody look at him, hey, I can beat that sucker. Me, I been through -- he is repeating my life. I try be nice, happy all I could, nice. Now it's not, but his generation different, totally. Anybody can see --

Q    He did wrestling; is that right?

A    Yes, but he is not cut out for wrestling. Look at his body size. What do you think he can do with anything, you

**1155**

know?  But he say, mom, I need this for extra curricular, and the working, all that for on the scholarship, so I have to let him do it.

Q    You didn't want him to do it, though?

A    No, because I know anybody put one leg on him, it would pin him down, choke.  I know what our weakness, I know where our strong point is.  That is not his strong point.  His strong point is detail.  He will make wonderful, excellent engineering, drafting, blueprint.  And big -- my husband was dropping the jaw he saw his blueprints on the school project. For his age, such detail, he just wouldn't believe it.

And he is good with math.  I always push the math, and I don't let him use calculator.  What you are going to do electricity went off, huh?  Then everybody, well, went off, I can't do anything.  Use your brain.  When you talk, your mother used, when I did business, dealing with the customers, price negotiator, this is what.  You're dealing with negotiation with price same time in your head, calculator, okay, how much was the material and the zipper and the button, and this, that, the other.  How can I go?

Q    Did David get a scholarship?

He got a scholarship to Wentworth, didn't he?

A    Yes, but I did want him to get the scholarship Air Force. What is left over is Army.  That's us.  Leftover, Army people. Air Force, Navy had better pay, better feed, chow better.  And

they stick with it, they are higher when they retire, higher trying to retire.

Army don't care. You know, I been through hell with the Army hospital. I don't want him to go in the Army. But Air Force say if he make Wentworth, career's good. He know they accept him. So I talked to him good. I want to see other careers, everything else. I wasn't too happy about it, but what else can you do? So that's why I left him to go.

Q   After he got out of Wentworth, you were still in Korea; is that correct?

A   Yes.

Q   You were on a tour in Korea with your husband?

A   Yes.

Q   The whole time that David was at Wentworth?

A   Yes.

Q   So you didn't see him during all of that time?

A   No. He went through, I'm sure, a lot of hardship when we was in the oversea.

Q   You say he went through a lot of hardship?

A   I'm sure when he was in the school.

Q   Did he write to you?

A   Oh, yes.

Q   And did you write back to him?

A   Oh, yes.

Q   Did you ever talk to him on the telephone during that two

years?

A     Well, we can't afford to talk.

Q     After he came back from -- or finished Wentworth, do you know what he did for a living until he went into the Army?

A     What do you mean, when he was in the --

Q     When he got out of Wentworth, when he graduated from Wentworth, do you know what he did for a living until he went into the Army?

A     He was married to Maria.

Q     I'm sorry?

A     He was in the Wichita and married -- he was on the Wichita.

Q     He was in Wichita?

A     I don't know what he did.

THE COURT:  Was he in the National Guard?

THE WITNESS:  I don't know.  I don't remember.  He always say he's doing fine, and the letter is a six-, eight-page letter, you know, detail and what he is doing in his life, you know, every little thing.  He's like a -- like a girl and mother talk.  He and I relationship is like a mother and daughter, close mother and daughter, like sister.  That kind of relationship I have with Davy.  We are very close.  We talk everything, and sometime even embarrass me.  We talk about everything.

BY MR. HUDGINS:

Q    During that time right before he went into the Army --

A    Yes.

Q    -- did he get married to Maria?

A    Oh, that's a long after I come back to states.  Oh, he came home with bring the baby, with Mark, his younger brother, to us.  And I wasn't going to have her.  So I told him I want him to come home and to go from the Leonard Wood, to go -- we were talking about when he went to high school.  I was asking him, what do you want to be?  What do you want to be in the future?  If you be garbage collector or whatever, I'm fine, but as long as you know I don't like dishonest people.  So as long as you are honest, hard-working man, you know there is a lot of way to steal.  You getting paid, you not putting out your work, that is stealing free paycheck.  As long as you work hard, and little bit more, fine with me.

Q    The time that you are talking about right now, is that after he graduated Wentworth but before he went into the Army?

A    We are talking about last year of high school, beginning, we are talking about where he needed to decide or getting the idea what he want to do with the life, what area he needed to point, we need to do that, you know what I mean, to build it that way.

And he is good with math, and I always push for man need math.  And he is with -- with my husband find graphics so good, we was talking about engineering, and he said he liked

it.  Job field survey at that time, engineer was a big thing,
good pay.  Job field is open.  So I told him, and he likes
that, and that's where he likes to be.  So okay, then, you got
to study the math.  You have to get scholarship, and that's
what we did.

Q    So he got the scholarship and went to Wentworth?

A    Yeah.

Q    Right before he went into the Army, did he marry Maria?

A    Oh, yes.  That kills me.

Q    Tell the jury why.  What did you feel when he married
Maria, and what did you feel about her?

A    When he was there, lady called me who raised Maria, live
with her father without marry.  That man all those year
without ever her marriaging, raise his child, two children,
and when he done with her, he throw her out.  But she called
me, background of their life, and Maria -- since was 12 years
old, she date like 24-, 26-years-old man.  She always have
money in her book, plenty money, lot of big bill, always
getting jewelry, clothes, shoes, always.  And the man stopped
spending money on her?  She get another one.  That is how she
do.  She know how to suck the men so fast, spend his money so
good.  Davy working at the time -- she say, he's working three
job.  He don't even know what -- how he got broke so fast.

Q    So you felt like she was marrying David to take advantage
of him and have him just pay for everything?

A    No.  She didn't want him for the build a life, raise her children with him.  She's hooking him up for free meal ticket, and when down to no good, like her first husband, have her drawing the welfare check, then she is going to ditch him. And if she can't get some money out of that, too, she will go out with other men.

Q    Did you tell David that that is how you felt about Maria?

A    Oh, yes.  One thing I know, I have a sixth sense with people.  You can't fool me.

Q    Did that create trouble between you and David?  Did that harm your relationship?

A    It put the Davy pitiful situation.  You ought to see his eyes and pleading, his pitiful face, pleading, begging.  He loved that -- can I use bad word?

THE COURT:  Well, I don't know what word you are going to use.

MR. HUDGINS:  I don't think you need to.

THE COURT:  I don't know whether it is bad or not.

THE WITNESS:  That blood-sucking, wicked bitch.  He don't even know how do he broke, and she nag him, and he said, okay, I find another job.  What he is going to do, find a fourth job?  No time to sleep.  She killing me, she drawing blood out of my vein.

And she don't know how to cook, and she don't even feed my poor son's stomach, and she is sucking all the money

out. She drained blood out of my vein. I like to pull my hair and die. I like to find her, choke her, pull her neck out. I beg and plead, David -- his first love, he's flipped. He keep begging and pleading, mom, you know, she does need the help. Maybe -- nobody -- she have a rough childhood. She don't ever like my mother, so if you -- he know maybe I love her unconditionally, she will change. I tell Davy, there is people can change or condition can change, or who are born that way. She is born that way. Okay?

BY MR. HUDGINS:

Q   He did eventually leave her, didn't he?

A   Oh, he try --

Q   He eventually left her and came and stayed with you for a period of time?

A   No, he tried to leave her when he find out she is writing hot check. And trouble with the CO -- if he can't control his dependent, he's in trouble, he is not going to be promoted. I tell her, don't do that. More money he make, promote, more money for you. So I'm dangling the bait, you know. So you be a good wife, don't bad-mouth, be good wife. So he can promote.

THE COURT: Ms. Runyon, how long was David married to Maria? How many years, do you know?

THE WITNESS: I think six year.

THE COURT: Six years.

THE WITNESS: Yeah. But he did run away. He did run away couple of time. Then every time he got away, she had little Davy take candy, candy -- she have him take a sinus pill, used to take a green pill. That burns that little baby brain off, burn off the brain.

BY MR. HUDGINS:

Q    Ms. Runyon, at the end of the marriage --

A    She had him to take that medicine, candy, candy, then take emergency and cry a river.

THE COURT: Are you talking about her children now?

THE WITNESS: Maria have take little Davy, his son, biological son, when was baby, take a little sinus pill, it was green color, tell him, candy, eat, eat, have him swallow so she can take hospital, then she call him, and he run to the hospital. He can't leave. He have to go home with.

THE COURT: So you are talking about Maria and your grandson, David.

THE WITNESS: Yes.

THE COURT: Go ahead.

THE WITNESS: She put in son many time, and he say, mom, I'm going to have to stay with. And her -- her older daughter constantly whacking the little Davy.

BY MR. HUDGINS:

Q    He did finally leave, though.

A    Yes.

Q     And he came to your house?

A     But he told me he is going to have to stay there until he know who his father is.  He's going teach him how to protect himself.  He stay six year, and he teach little Davy when she hit him, sock it to him, punch him back.  So I had her later on the phone, she had him, and I hear "waaaying" going on.  Little Davy punching his older sister, and she is crying.  Then I hear Maria say, what you do that for, yelling at little Davy.  Then I hear Davy say, she hit him.  That's why he punch her.  I hear all that stuff.  So he stay six year.

Q     And he came to your home when he left; is that right?

A     Yes.

Q     How long did he stay there?

A     I tell him only one condition.  You know where you make mistake, right?

Q     I asked how long did he stay there?

A     Not very long.  I kick him out not too long after.

          THE COURT:  Why did you ask him to leave?

          THE WITNESS:  Because he didn't learn his lesson.  I came only one condition:  You going school, college.  You going to take not just occasionally some course.  You going to take some will help you through professional life, prepare for the job, can get a job.  You know, this is not luxury college.  When he come back, I asked him, how about take a vocational school?  He said, no.

BY MR. HUDGINS:

Q   Ms. Runyon, you know why we are here, I know.  You know that David has been found guilty of the charge that he has?

A   Yes.

Q   Is that right?

A   Yes.

Q   And you know what the decision is that the jury has to make.  In the recent past, have you been writing to David and getting letters from David and --

A   Yes.

Q   -- has that gotten your relationship back on a pretty firm ground?

A   We don't have to.  I'm with him, every day.  Sun come up, I think about him.  When I'm eating, I think about him.  Sun go down, I sit on the back door kitchen, I cry for him.  He never left me.  I'm with him.  I'm praying, only thing I can send help.  I can't be with him.  I'm asking the Lord, send guardian angel, front and back.  I asked for two, protect him from the evil, nobody take advantage of him.  And I know him.

And I don't know about the God.  I know he loves me. Through my life he showed me many way I wouldn't be here, I wouldn't be alive.  But he love me so much, he done so much for me, I didn't have no reason for to live without him.  Why don't he love my son?  Why don't he bless my son?  Why don't he protect him?  I don't know.  I am really wonder about him.

I stopped going church.  I am plea bargain with him.  I'm negotiating with God.  You love me so much, you prove to me many time.  You know what he means to me.  He is my breath.  He is my everything.  He die, I die.  I don't have no reason for live for.  When his breath is gone, I'll be gone.  But as long as he live, I have to breathe for him.  I have to.

MR. HUDGINS:  Thank you, Ms. Runyon.

THE WITNESS:  He is a good, good person.

MR. HUDGINS:  I don't have any more questions.

Ms. Runyon, please answer any questions --

MR. SAMUELS:  No questions, Your Honor.

THE COURT:  Can I excuse Ms. Runyon?

MR. SAMUELS:  Yes, ma'am.

MR. HUDGINS:  Yes, ma'am.

THE COURT:  Ms. Runyon, you are excused.  But you can just stay there for now.

Ladies and gentlemen of the jury, that brings us to the end of our trial day.

THE WITNESS:  I can say one more, please?

THE COURT:  Only if the attorneys agree.

THE WITNESS:  Can I say one more word, please?  One more word?

THE COURT:  There is no question.

THE WITNESS:  I want to say one more thing, please.

MR. SAMUELS:  Judge, there is no question.

**1166**

THE WITNESS:  Would you allow me to say one more thing?

MR. HUDGINS:  Judge, I'll ask.

THE COURT:  All right.  Go ahead.

THE WITNESS:  I make it short.  I know you have children.  There is always favorite children, no good favored children.  You mad at kid.  You know that each child have individual personality.  All right?  You know your children like your back hand, what they capable or not, even they -- after later.  I never seen all my life grow up and to this day or anybody complaining about Davy.  He's always kind to people, help the people, and he get punished for, like everybody grabbing rock, he go up to it and wonder what was going on.  They throw the rock on the car.  Car owner run out, correct Davy.  Everybody run off.  He have a rock in his hand.  He didn't know what was going on, and they look, and the other run off.  And he comes to third floor, says, your son throw the rock.  We were watching on the third floor on the hallway, watching the whole thing.  He is the one that get the blame.

That's about the size of him.  I never seen in my life, I swear on the Bible, to God, if I lie, Lord struck me to death right here at this moment.  I never seen him unkind to anybody, anything.  He just don't have one piece of hair in his body mean streak or mean to anybody.  He love everybody in society and warmness to humankind.

It is just not him. He has to have a -- what kind of twin? I forgot the word. Identical twin, identical evil twin. It's just not him. His character-wise, his life-wise -- that is all what they been accused of, cold-blooded murder. No. He is not, I swear to God. He doesn't have one streak of hair in his body that kind. He's stepped over and over again, and pay for, but he think everybody is good friend. I said, they are taking advantage of you. No, they're my friend. They rent house together. They don't pay, and always four, five months later, they leave, soak him. Then he find another friend again, but they are different? No, they are no different. One side of the brain is missing. He don't have a brain -- the bad part that can be bad. Some people bad. He missing that part of a brain. I can talk to him out of -- there are some bad people.

MR. HUDGINS: Ms. Runyon, thank you, ma'am.

THE COURT: Ladies and gentlemen of the jury, that brings us --

THE WITNESS: Thank you so much.

THE COURT: You can wait, Ms. Runyon. We will dismiss the jury for the day.

That brings us to the end of the trial day, and if you would, return tomorrow morning at ten a.m. Remember not to discuss the case with anyone, the same instructions that I have given you each time you have left. So have a good

S. Runyon - Direct                                    2440

evening, and we will see you tomorrow morning at ten.

(The jury began exiting the courtroom.)

THE WITNESS:  Please have mercy.

THE COURT:  Ms. Runyon?

(The jury exited the courtroom.)

THE COURT:  Counsel, are there any other matters the court needs to address this evening, Ms. McKeel, Mr. Samuels?

MS. MCKEEL:  No, ma'am.

THE COURT:  Mr. Hudgins, Mr. Woodward?

MR. HUDGINS:  No, Your Honor.

THE COURT:  All right.  Then we will stand in recess until ten a.m. tomorrow morning.

(Proceedings were concluded at 5:31 p.m.)

GLORIA S. SMITH, OFFICIAL REPORTER

**1169**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division


UNITED STATES OF AMERICA )
                         )          CRIMINAL ACTION
     v.                  )
                         )          NO. 4:08cr16
DAVID ANTHONY RUNYON,    )
                         )
          Defendant.     )


TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

August 25, 2009


**SEVENTEENTH DAY OF TRIAL**

**(Penalty Phase)**


Before:    THE HONORABLE REBECCA BEACH SMITH
           United States District Judge, and a Jury


Appearances:

           LISA R. MCKEEL
           BRIAN J. SAMUELS
           Assistant United States Attorneys
               Counsel for the United States

           STEPHEN A. HUDGINS
           LAWRENCE H. WOODWARD, JR.
               Counsel for David Anthony Runyon

GLORIA S. SMITH, OFFICIAL REPORTER

**1170**

Q    And during the time period that you were separated there after 2002, was he contributing financially to you and your children?

A    No.

Q    And you had no real contact with him until -- from July 2002 up through early 2007; correct?

A    No.

Q    And David has had a strained relationship with his family; is that right?

A    Yes.

        MR. SAMUELS:  Thank you, ma'am.

        Nothing further, Your Honor.

        MR. HUDGINS:  No redirect, Your Honor.

        THE COURT:  All right.  Then the court excuses you, Ms. Runyon.

        THE WITNESS:  Thank you.

        THE COURT:  Your next witness?

        MR. HUDGINS:  Phyllis Provost, Your Honor.

        (Ms. Provost was sworn.)

        PHYLLIS W. PROVOST, DIRECT EXAMINATION on behalf of the defendant, as follows:

                    DIRECT EXAMINATION

BY MR. HUDGINS:

Q    Good morning, Dr. Provost.

A    Good morning.

Q Would you state your full name for the ladies and gentlemen of the jury, please.

A Phyllis Williams Provost.

Q And Dr. Provost, where are you from?

A I'm from Wichita, Kansas.

Q Are you employed in Wichita?

A Yes.

Q How are you employed?

A I am the associate pastor at First United Methodist Church.

Q I'm calling you Dr. Provost. What is your doctorate in?

A I have a doctorate in pastoral counseling. My master's was in theology, and it's an extension of that degree.

Q How long have you been a pastor?

A Since 1993.

Q And so there is no confusion, David Runyon was never a member of a congregation that you served, was he?

A No.

Q That is not how you know David, and that is not why you are here; is that right?

A That's correct.

Q How did you come to know David?

A As a friend.

Q Okay. When did you first meet him?

A I think it was around the year 2000, in and around there.

In there.

Q    And how did that happen?

A    He was a friend of my husband, Tom, and --

Q    Is that Tom Kumorowski?

A    Yes, correct.

Q    And you understand he has testified here earlier; is that right?

A    Yes.  And they were friends, and I met David through him.

Q    How did that come about?  Did you meet David at the workplace, or did you meet him at your home or at his home?

A    I think I may have met him at The Bullet Stop, where several of the guys gathered, and Tom went there, and I think that's probably where we met.

Q    Okay.  Did David at some point come to work with your husband, Tom?

A    Yes, he did.  They worked at Davis-Moore in the detail department, and then David went to work in another area there, and so I would go up to visit, visit there.

Q    Another area of the same car dealership?

A    Uh-huh.

Q    Now, did your husband have a son?

A    Yes.

Q    What was his name?

A    John.

Q    Did John and David's children have a relationship?

A    Yes.  Our families did some things together.  I remember going bowling.  I remember John's birthday party at Chuck-E-Cheese.  We went there together.  The usual things that families do, backyard barbecue kind of thing.

Q    Did you get to see David spending time with his own children?

A    Yes.

Q    And was it your understanding two of those children were his wife's from a prior relationship, and one of them was theirs together?

A    Yes.

Q    How did he interact with those three children?

A    Very patient.  With Dave, what you see is what you get. He's a very genuine person.  And he was so openly caring, very patient.  He was patient with John as well.

Q    John being your husband's son, your stepson?

A    Uh-huh.

Q    Did John have a special need or --

A    Significant.

Q    -- or disability?

A    Yes.

Q    What was that?

A    John has been diagnosed as PDDNOS, Pervasive Developmental Disorder Not Otherwise Specified, which is a -- it's on the autistic spectrum, and when he was six, he was

labeled as BD, behavior disorder, in school. It's hard to get that label at that young of age. He had significant difficulties that expressed itself in anger and agitation. A lot of people -- a lot of people John wouldn't even talk to. He would be absolutely completely silent. And with others, he was highly agitated. John was known to throw chairs. He's come a long way. But a part of the reason that he came a long way was because of David Runyon.

Q    What did David Runyon do that was significant to John?

A    He accepted him as he was, and he was patient. Some people tend to get agitated around others that are agitated, and he didn't. He would just -- he would relax himself, you know, his body posture, and he would be welcoming and accepting of John, talked very quietly, and John responded. And I will always appreciate the change that was effected. John is an honor student now. He had a lot of change in his life, and David Runyon was a part of that.

Q    How long ago was it that David was in the area where you were and interacted with John?

A    Well, he -- it would have been around 2001, 2002, right -- and I wish I could remember exactly the time. I think my memory is like fall of 2001-ish that he lived with us, Dave did, when he and Maria were separated for a while. So there was greater interaction then.

Q    How long a period did he live in the home with you?

A    I'm thinking around three weeks-ish.

Q    That was quite sometime ago?

A    It was.

Q    Why do you believe that that had a significant effect on John?

A    Because John -- when -- John is now 17.  When he was very little and his mother had custody, I think that part of John's difficulties came because you don't understand mental illness, and -- when I say "you," I mean people.  They don't know how to handle it, and so to keep him from being violent, his mother would give him candy and said that would stop that.  It doesn't stop it.  And John learned to be a tyrant.  And so that was a problematic way of interacting with a child at a very difficult time.

Most of what we do, I think, is formed in that time frame, and so at a very critical point when John was asking us, literally asking -- and I have never heard a child do that either -- for structure, that he wanted limits, to receive that touches your heart, and to be able to give that with love is so received, and that's what David did.  He gave those limits, you know, and there were limits that were needed, as a good friend.

Q    While he was only in your home for three weeks or so, how long a period of time was he interacting with you as a friend of yours, coming to your home and seeing John?

A    I'm thinking that was probably around a two-year period that he was around there a little bit more.

Q    Can you describe for the jury David Runyon?  What characteristics of him would you want them to be aware of?

A    Patience.  Again I'm thinking with John.  He was a wonderful houseguest.  I'm not sure if you can say it, but I didn't think there was ever a man that volunteered to take out the trash.  It was just he was helpful.  He wanted to do what he could for you.  He went over and above.  It was like he was living -- it was like he was living his life in gratitude.  He was a joy to have around.  Quiet.  Gentle.  Fun.  Generous.  Kind.  Those are the words that come to my mind when I think about him.  He wanted to help.

        MR. HUDGINS:  Thank you, Dr. Provost.  Please answer any questions that the United States has for you.

                          CROSS-EXAMINATION

BY MS. MCKEEL:

Q    Ma'am, will you spell your last name, please?

A    P-R-O-V-O-S-T.

Q    Thank you.  Now, are you still married to Mr. Kumorowski?

A    No.

Q    When did you all get married, and when did you divorce?

A    We married in December of 1998, and we divorced in November of last year.

Q    2008?

A    Correct.

Q    And during that time you lived where?

A    In Rose Hill, Kansas.

Q    During the fall of 2001, did you all have custody of the child that you are talking about, John, the 17-year-old now?

A    No.

Q    You did not have custody?

A    No.  He came for weekends and occasionally midweek.

Q    So during the time that David Runyon stayed there, how often did John, the child, visit your home?

A    Well, it would have been on weekends.  Mostly weekends.

Q    So two or three weekends, then, Saturday and Sunday?  Is that what you are calling a weekend?

A    Uh-huh.  Well, Friday.  He would come after school on Friday, and it would be for the weekend, unless there were -- there were oftentimes that, due to his mom's work schedule, John would spend the night, and we would take him to school the next day.  Whether or not that occurred then, I couldn't tell you.

Q    You don't know.  Okay.

Since the fall of 2001, how often have you seen the defendant, David Runyon?

A    Not after about 2002, 2003-ish.  He stayed with us, and then I believe he went -- well, he did go back to live with Maria, and then left, I think, for Missouri.

Q    Now, you said he stayed --

A    And I haven't since then.

Q    You say he stayed with you the fall of 2001 for three weeks, and then he went back to Maria?

A    That's my memory anyway.

Q    Okay.  How often during the time period that you knew David Runyon, besides these three weeks that he stayed with you, did David Runyon come to your house?

A    A few, several, about as often as other -- as couples would generally get together, just --

Q    Ma'am, we don't know that.

A    I don't know.

Q    You don't know.  A couple of times?

A    I'm guessing that maybe as families or David individually, over that couple-of-year period, I don't know. What would it average out to?  I don't know.  Maybe once a month-ish.

Q    And what would happen when David Runyon would visit?  How long would he stay?

A    Well, generally, we'd have an afternoon activity, like I was thinking barbecue -- he would come over and visit for a few hours.

Q    In Kansas do you get a lot of snow during the wintertime?

A    Some.

Q    Are you barbecuing in the winter?

**1179**

A   No, we are not really barbecuing in the winter.  At that time, you know, you would just be doing restaurants, and then we would go to the places like Pizza Hut or something like that.

Q   Okay.  The last contact you had with David Runyon -- do you remember when that was, specifically?

A   I don't remember specifically.

Q   But maybe sometime in 2002?

A   My thinking is around 2002, yeah.

Q   Do you have a MySpace page, or Facebook?

A   Do I?

Q   Do you ever go on these places?

A   I have a Facebook page.

Q   You do.  Did you realize that David Runyon had a MySpace page?

A   No, I didn't.  I'm sorry.  I just got on Facebook because of my kids.  I'm not very good technologically.

Q   Right.  And you have been subpoenaed here today, and your travel was paid for by the court; is that correct?

A   That's correct.

        MS. MCKEEL:  That's all I have.

        MR. HUDGINS:  No redirect, Your Honor.

        THE COURT:  All right.  Then Dr. Provost, you are excused.

        THE WITNESS:  Okay.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division


UNITED STATES OF AMERICA     )
                               )      CRIMINAL ACTION

    v.                    )

                               )      NO. 4:08cr16

DAVID ANTHONY RUNYON,     )

                             )

      Defendant.        )


TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

August 26, 2009


**EIGHTEENTH DAY OF TRIAL**

**(Penalty Phase)**


Before:    THE HONORABLE REBECCA BEACH SMITH
            United States District Judge, and a Jury


Appearances:

        LISA R. MCKEEL
        BRIAN J. SAMUELS
        Assistant United States Attorneys
            Counsel for the United States

        STEPHEN A. HUDGINS
        LAWRENCE H. WOODWARD, JR.
            Counsel for David Anthony Runyon

the jury. It is still morning. That's always a positive aspect.

Madam Clerk, if you would please call the roll.

THE CLERK: Thank you, Your Honor.

(The jurors' names were called.)

THE CLERK: Thank you.

All the jurors are present, Your Honor.

THE COURT: Ms. McKeel or Mr. Samuels?

MR. SAMUELS: Your Honor, with the assistance of the court security officer, could I have this podium turned?

THE COURT: Certainly.

MR. SAMUELS: Thank you, ma'am.

Good morning, ladies and gentlemen. Ladies and gentlemen, one of the most fundamental principles of justice that we have in our society is that the punishment should fit the crime. The more serious the crime, the more serious the punishment. And this principle, of course, goes along with the idea that people should be held fully accountable for their actions. The more harmful those actions are, the more serious the consequence should be for punishment.

When somebody plans out and brutally murders a person, in this case a United States Naval officer and father, for money, using skills taught to him to preserve and defend, with no remorse, no regret, the punishment for that person is authorized by law to be and should be death. The punishment

for this type of murder must be different than it is for the case of a lower level crime, stealing or drug-related, because a premeditated murder reflects an absolute disregard for human life.

It is a crime against the victim, it is a crime against our society, and the law provides for the maximum punishment for this crime. The seriousness of the penalty reflects the seriousness of the criminal acts. In punishing the defendant, David Runyon, for what he did, justice requires that he be held accountable to the fullest extent. He cannot pay that penalty that he owes in prison. He must pay it with his own life.

Now, ladies and gentlemen, over the last two months you have sat through about four weeks of testimony and evidence in the guilt phase and in the eligibility phase that followed, and then the selection phase that we have been through in the last week. You have heard the government's witnesses and the defendant's witnesses, and you have seen hundreds of exhibits in both the guilt phase and the penalty phase. You know this case has been investigated and pursued for over two years, and you have determined in that period that David Runyon is guilty of the premeditated murder of Cory Allen Voss. You have determined in the eligibility phase that he did this murder intentionally, that he did it for money, and that he did it after planning the murder for months.

On two occasions in these two prior phases, at the conclusion of them, at the conclusion of the guilt phase and the conclusion of the eligibility phase, you have taken the facts that you found that have been presented in those cases, and you have applied the law as given to you by the court, and you deliberated to reach a verdict, and you have reached the right verdict that results from those facts.

Now, this last phase, this penalty phase, and what you do when you deliberate, is your opportunity to hold David Runyon fully accountable for the murder that he has committed, for the life that he has taken, the criminal acts that he has done, and the harm those acts have caused on Cory Voss's family and loved ones.

Now, ladies and gentlemen, you won't do it, of course, based on emotion or instinct or any passion or prejudice. You will do it in the same way that you deliberated twice before. You will find the facts, you will be instructed on the law, and you will apply the law to those facts that you find in this penalty phase. And when you do, you will know that the only just sentence for this crime is a sentence of death. This is the only sentence that will adequately punish David Runyon for what he did and account for the harm that he has caused. You will recognize the severity of the crime and the impact that that loss of Cory Voss has had on his family and his friends.

Now, ladies and gentlemen, many of the facts that compel this decision you have found already in our previous two phases. You found it beyond a reasonable doubt, and you know that David Runyon acted as a hired hit man when he killed Cory Voss, that he didn't know Cory Voss, that he did this murder solely for money, after much planning and preparation. These facts alone, which you found in the first two phases, make the defendant eligible, they make him deserving of the death penalty.

But now after a week's worth of penalty phase evidence, you also know that David Runyon used skills acquired during his training and education to commit the murder of Cory Voss. You know that the murder of Cory Voss left an unfillable void in the lives of his family and his friends and his coworkers. You know that David Runyon has expressed absolutely no regret for his actions following the murder of Cory Voss.

And, ladies and gentlemen, we are defined by our actions. We are defined by them in everyday life. We are judged by them in a court of law. The defendant's actions show him to be a defiant and remorseless manipulator, and a murderer who has tried to cover his tracks every step of the way.

Ladies and gentlemen, that is not argument. Those are the facts that have been presented to you. You will take

these facts, you will take the law, the instructions that the court gives you, and you will take your greatest asset, your common sense and your reason and your sense of fairness, to determine the punishment.

And what will you have to decide when you go back to deliberate? In this last phase, as Ms. McKeel told you a week ago, you will weigh various aggravating and mitigating factors to come up with a penalty, a punishment for Cory Voss. As I anticipate that Judge Smith will instruct you, aggravating factors -- and you have found two of those already -- are those facts and circumstances that tend to support that the death penalty is an appropriate punishment for this defendant. They are factors that make this murder more aggravated in nature, that elevate it, and they provide further information about who the defendant is and what he has done in this case and his life.

Mitigating factors, of course, go the opposite way. They tend to weigh against the imposition of the death penalty. And this is not a mathematical test, ladies and gentlemen. This is not going back there and adding aggravating factors on one side and mitigating on the other, and see which you come up with more of to come up with a penalty. As the court will instruct you, you have got to make a careful, reasoned, and mature judgment, and again you are going to use your common sense and your reason to do so.

GLORIA S. SMITH, OFFICIAL REPORTER

**1186**

As I said, you've found two aggravating factors already. You have found that David Runyon committed this offense because he expected to be paid for it. He did it for money, and that was the sole reason. You also know that he did it after substantial planning, after he was involved with Michael Draven and Cat Voss for months before carrying out this murder. Both of these factors, of course, take this murder to the more serious side of the spectrum, and it is why he is eligible for the death penalty.

Now, in this last phase you are going to consider -- we have presented and we have proven four other aggravating factors, and these relate to victim impacts, the impact of this crime on Cory Voss's family and his friends. They relate to the domestic violence that David Runyon has committed among a number of his partners and his estranged spouse over the last 15 years. They relate to his education and his training, the military and police background that he had that enabled him to successfully commit this crime. And they relate to his lack of remorse, that he has shown no regret for this crime, that he has made no measures to atone for what he has done.

Now, the defendant has presented information as well, of course, and that has been done in the last two days. You will have to determine if this information is correct and if it mitigates against the imposition of the death penalty. Then you will have to decide, as you will be carefully

instructed, do these aggravating factors sufficiently outweigh any mitigating factors, if you find some, to justify a sentence of death? And when you find, as you should, that the aggravating factors do outweigh the mitigating factors sufficiently, and that a sentence of death is justified, the law says you should impose the death penalty in this case.

Now, ladies and gentlemen, the purpose of sentencing historically, whether it is done by a judge or whether it is done by a jury, as is being done in this case, is to reflect the nature and the severity of the crime. We look at the crime, what was actually done. We look at the consequences of the crime on the victim, in this case Cory Voss's children, his family, his friends. And we also look at the character and history of the defendant, the person who actually committed the crime.

And although you are considering this through this lens of aggravating and mitigating factors, when you deliberate, you are going to consider the same things that are traditionally considered in every sentencing, the crime, the victim, and the defendant. And this is the part of the process that you all are now part of. This is the duty that our justice system requires you to perform in this case.

Now, looking at the crime first, ladies and gentlemen, you know well the facts of this case. You have sat through about three weeks of evidence before, the guilt phase,

and you know what David Runyon did, and you know why he did it. But I want to go over those with you, because those facts, standing in and of themselves, support the maximum sentence for this defendant, and you have got to consider the role played specifically by this defendant, that he is the one that murdered Cory Voss.

On April 29, 2007, David Runyon entered the vehicle of Cory Voss as he drove through the Langley Federal Credit Union. He entered the vehicle, and he sat in there for a period of time, and he shot him five times and killed him, and he did it for the promise of $20,000.

Now, ladies and gentlemen, you know that was the culminating act, but that the plan for this murder and the involvement of David Runyon started much earlier. It started when he met Michael Draven at a drug study at Parexel in Baltimore, Maryland, and that was in the February, March time frame.

Now, David Runyon -- he didn't know Cory Voss. He had never met him, but he did know, as a former soldier himself, that every military member carries life insurance, in this case life insurance in the amount of $400,000. Now, in the continuing months between February and the time of the murder, we see that David Runyon makes a number of phone calls with Michael Draven, with Catherina Voss. We see how they come up with a plan, how David Runyon wants the money up

front, how he fully inserts himself into this.

We also see how he plans out what he is going to need to commit this murder. You saw a list, a hit list that he had provided that listed all the things that he would need the cover himself and leave no trail, no evidence behind, totally conceal himself for this crime. And this was done in advance. You know how he planned to buy the murder weapon a week before, and that he actually bought it on the day of the murder.

Moving to the day of the murder itself, we know he buys the gun, he takes out the money, he drives from Morgantown, West Virginia, six or seven hours, to Newport News. He has the map. We have all seen the map that was found in the secret compartment in the middle console of his car, the map that has the very details of what he needs to know to murder Cory Voss.

He meets with Michael Draven to confirm these details, and they talk on the phone leading up to this. He then goes to the Langley Federal Credit Union. He finds cover behind those generators in that secluded area that you saw, and he lies in wait for Cory Voss.

Cory Voss goes to that Langley Federal Credit Union ATM at about 11:30 that night, and he is in that drive-through area for a number of minutes. And you will see on the screen, and we have shown you in the course of the evidence, that the

ATM cameras captured the pictures of Cory Voss going through there, and you could see it captures a picture every few seconds while he is sitting there talking on the phone, trying to make a withdrawal, while David Runyon lurks in the bushes behind.

We see Cory Voss sitting there. This, of course, is sped up, but it took 30 seconds or so between each image, and then at some point, we see the door open. When that opens, David Runyon gets inside. Cory Voss has to be shocked and alarmed by this. David Runyon has him drive away.

You see it on the screen there, ladies and gentlemen. The door opens up, and a figure gets inside, a figure with a gun, a gun he bought that very day. He has that gun held on Cory Allen Voss for some period of time, and he forces him to drive away from the ATM machine. A number of minutes later he comes right back, and in that last shot there, you can see the complete fear on the face of Cory Allen Voss as he sits in the car with a man who would kill him, with a gun pointed on him.

Ladies and gentlemen, those snapshots on the screen in front of you show the length of time that David Runyon was in that truck, and he was in there for about nine minutes. Now, I have been talking for just over ten minutes here. Think about that, ladies and gentlemen. Nine minutes is a long period of time. This wasn't opening the door, firing

five quick shots in there, and running away. The plan wouldn't have worked that way. They had to make this look like a carjacking. They had to make it look like a robbery. For them to do that, David Runyon had to try and force Cory Voss to make these withdrawals.

He had him drive away from the machine; he had him drive right back. But there is an intervening period there, ladies and gentlemen. You can see that the truck leaves the ATM at 11:36, and you can see that it comes back at about 11:43, some minutes later, and that is a seven- or eight-minute period of time, just the two men in the car. David Runyon has got a gun pointed at Cory Allen Voss. That time must have felt like an eternity to Cory Voss. And what could he have been thinking with a man sitting there pointing a gun at him? What kind of torture did that cause him to think about?

Cory Voss is wearing a T-shirt, of course, and it's in evidence as Government Exhibit 16. And it talks about Strength through Peace. It is a T-shirt from the USS ELROD. David Runyon -- of course, he is covered from head to toe. He has a mask on. He has got boots on and gloves, all the items you saw on that list, so that he would leave no prints, no evidence behind. He secured violence through his cowardice. What did David Runyon say to Cory Voss to get him to go around and make a second trip to that ATM machine? What

GLORIA S. SMITH, OFFICIAL REPORTER

fear must Cory Voss have felt when he was doing that? We know that Cory Voss drove around again, as he was instructed to do so. He was found, when he was murdered, ladies and gentlemen, in a defensive posture. You remember that Leah Bush testified that he had his arms up, and there was the blood spatter and the stippling on his arms that showed that he must have been reacting. We know that he must have done everything asked of him by David Runyon. He was trying to cooperate, to save himself, to get back to his family. But again, that was never part of the plan.

After at least nine minutes, and probably more, as Cory Voss was found some distance away, David Runyon shot him five times at point-blank range in the chest with hollow-point bullets. And you remember that those hollow-point bullets leave more damage.

That's the night of the murder, ladies and gentlemen, and of course it's the most atrocious part of this crime. But you know that the crime extended well before it and extended well after it, and this supported the substantial planning and the murder for pecuniary gain aggravating factors.

A month later we saw efforts by David Runyon to collect the money. Do you remember those phone calls between David Runyon, Michael Draven, June 1, 2007, about a month after the murder: Where is the money? I want to be paid. He

is owed $20,000 for this murder. He knows that money is coming in from the life insurance. Where is his share? And we know that on that same day, June 1, 2007, the Western Union moneygram goes out to David Runyon.

We know that beyond the efforts to collect the money, we saw efforts to obstruct the investigation, prevent the discovery. You remember the phone calls that were played between David Runyon and Michael Draven and Catherina Voss, and you remember the e-mails that showed the efforts among all three of these individuals to coordinate their stories and present a plausible explanation to the police.

Now, it's true that in this time period David Runyon never got what he hoped for. He never got the money, ladies and gentlemen. What he took was not the money. He stripped away the life of Cory Voss, the loss of which, as you know, has greatly impacted those who loved him, those who worked with him, those who were his friends. The one person, of course, that you can never hear from in any murder case is the victim, so the law permits you to consider the impact of that loss, that unfillable void on his friends, on his family.

And, ladies and gentlemen, that's the first aggravator you are going to have to consider, and you are going to consider these aggravators the same way as you did the prior two of substantial planning and murder for money. You will consider whether you find them unanimously, beyond a

GLORIA S. SMITH, OFFICIAL REPORTER

reasonable doubt. And this first factor claims that David Runyon caused harm and loss to Cory Voss and his family, as shown by Cory Voss's personal characteristics and the impact of his death upon the family, friends, and the co-workers.

Now, ladies and gentlemen, you have heard a lot about David Runyon over the past two days, the relationships he has had and the opportunities that he has had, that he has worked, that he spent time in the military. We presented evidence on that, and the defense did as well. And Cory Voss, of course, as an officer represented what David Runyon never managed to achieve.

Even though David Runyon had some advantages early on, even though he had the scholarship to a military academy, Cory Voss had risen to success through persistence, hard work, and The Toughness -- if you remember his mother describing that that's how he referred to himself. Whatever similarities that these two men had in service to their country, completely wiped away on the night of April 29, 2007. David Runyon didn't just kill Cory Voss. He took his own record of service away. He became a taker of life.

And of course you learned about the life of Cory Voss in this last week. It was a life he worked hard for. It was a life that moved well beyond the small town in Illinois where he grew up, into a military and family life that David Runyon might have once coveted but never achieved. Cory Voss,

you know from his mother, enlisted in the Navy after getting his GED. He dropped out of high school, but he went over and took that GED and made the highest grade in the test. He had, as many high school students do, a difficult time in high school, and it caused him to step away. But after talking with his family, he found stability, he found pride in the United States Navy and serving his country. He found his purpose there. This was going to be his career.

You heard from a number of his shipmates. You heard from Lieutenant Jennifer Hubbard and Lieutenant Jeremy Chayer, and you heard from Commander Matt Graham, all three of which served with Cory Voss on the ELROD. They told you how much he loved his job, even the very mundane parts of it, and how hard he worked at it, from officer of the watch, something that junior officers are tasked with, to the challenging portions of his job of managing communications for navigating the ship.

You heard that he worked so hard to advance from sailor, as he had enlisted, to officer, and how he was always willing to help others. You learned how he was tasked with the important jobs on the ELROD, how much confidence and respect his shipmates had in him. The Navy, without a doubt, ladies and gentlemen, lost a very fine officer on April 29, not from battle, not from war, as you might expect. His life was ripped from them by the actions of a contract killer.

Cory's friends lost someone they could turn to for

support on the long deployments, someone who always offered a joke and guidance in tough times. And you saw, ladies and gentlemen, how this loss has impacted and continues to impact and affect his family members, how his mother got up there on the witness stand and told you that you never expect to lose an adult child in this way. But even if that does occur, it is difficult enough to deal with it on one spectrum, where it is a result of an accident, where it is the result of sickness. Of course, in Cory's case, if it is a result of service in the military, if he is killed that way, it must be something that she might have expected from his military service, and how grateful she was when he returned safely.

But you never it expect for another reason. You don't expect it because of a random act, and you certainly don't -- and she said this was the most shocking part, was that this was a planned murder for money, and that her son was killed not because he was mean, not because he did something to someone, but just because he had a life insurance policy that the defendant wanted.

You saw his younger sister, Kristen Smith, how she modeled her life after her big brother, she followed him into the Navy and stayed with him for a period of time when she came over to the Newport News area, and how she missed so very much a final conversation with her brother, a chance to say goodbye, how her own young son will never have the opportunity

to know his Uncle Cory.

You saw, of course, as well that no one could talk about Cory without talking in very glowing terms about his relationship with his children, Cory and Casey, one year apart, and how much he loved his children and how, outside of the Navy, they were the apple of his eye and what he spent all his free time on.

You have heard from every witness that he was an excellent father, that he attended games with his children and took them to Busch Gardens, and you have seen now, ladies and gentlemen, how those children have struggled since their father has been taken, how they were fine and medication-free before the murder, but in the aftermath of it, they were depressed, they had anxiety, they have been taking medication, and you have seen how they have struggled with the loss of a father who would have loved more than anything to see them grow up.

You saw the pain that Rose Wiggins, Cat Voss's mother, who has taken in her two grandchildren, suffers herself from the loss of Cory, how his children have trouble sleeping, how this crime has totally changed her life because of caring for these children, and how when she sees little Cory out on the football field or she sees Casey doing something at school, how she can see Cory in the acts of his two children.

And, ladies and gentlemen, of course you saw not only the good memories, but the pain that these memories can bring, whether it is to Lieutenant Jeremy Chayer on the bridge of a ship when he remembers Cory Voss wanting to be there as a navigation officer, on a football field practice, or a brother or son that will never make another phone call, that will never send a letter, that will never be able to make another visit. Ladies and gentlemen, the victim, of course, can't speak to you, but the impact should be considered strongly by you.

Jeff Jacoby, a newspaper columnist, wrote on victims and why this is important. He said, it is up to the law to speak for them, to speak for all the grief-stricken survivors confronted with the butchery of someone near and dear. Capital punishment says to them, we, the community, take your loss with the utmost seriousness. We know that you are filled with rage and pain. We know that you may cry for vengeance. You are right to feel that way, but it is not for you to wreak retribution. As a decent and just society, we will do it fairly, after due process, in a court of law.

We are at that point, ladies and gentlemen. This penalty selection process allows you to consider this victim impact evidence in determining what penalty David Runyon should face, giving the full recognition to the impact of this crime on the survivors, his children and his friends.

Ladies and gentlemen, you should find this victim impact aggravating factor beyond a reasonable doubt, and conclude that in light of that factor, in light of the suffering that has been experienced by the victims in this case, that the death penalty is appropriate.

Ladies and gentlemen, the other aggravating factors that we have presented to you relate to David Runyon, and they warrant the death penalty as well. These are factors related to his conduct and his background. Again, two have been proven already and found by you, two statutory aggravating factors, the substantial planning and the murder for money, the pecuniary expectation. And the remaining four -- we call them nonstatutory aggravating factors -- give you more information about the defendant and the cost of his crime.

Now, we talked about the victim impact of this, and you have already found the substantial planning and pecuniary gain, but that is something that you should consider as well when you go back there. You are weighing all the aggravating factors, even the two that you have already found beyond a reasonable doubt.

You know that this crime was planned for months, that David Runyon was integral to its preparation and its planning, how he talked with Cat Voss about it, how they planned to get Cory Voss to the location, to make it look like a random act of violence. You know that the cover-up was

GLORIA S. SMITH, OFFICIAL REPORTER

**1200**

planned and that this had to be done, because in order to get that insurance money, they had to remove suspicion and they had to have themselves cleared from any involvement in this case.

The second factor, ladies and gentlemen, was this pecuniary gain, this murder for money. That was the sole motivator for David Runyon, money and money alone. There was just no other reason. It wasn't for love or passion, anger -- just money. And you must consider the amount of money. What was the cost of a father, ladies and gentlemen, in this case, to David Runyon? What did it take for him to agree to undertake this murder? $20,000. That's all it took to get him to act. This was the price of a life for him. This was how little he valued a life.

He knew Cory Voss was someone's husband. He certainly talked to Cat Voss on the phone. He knew he was someone's father, someone's son, someone who served his country, as he once did. He knew the money was there. You saw in the military records that we presented from David Runyon how he had his own SGLI life insurance policy for $200,000. He knew that Cory Voss, if he was killed, there would be money accruing to Cat Voss.

If you will look at the statement of facts that was introduced for Ms. Voss, and this was introduced by the defendant yesterday, it is defendant Runyon's Exhibit 7, you

will see in there that she talks about when she didn't pay David Runyon right away, he wanted more money, and he kept upping the price. After the murder, of course, there were multiple efforts on his part to collect. We know that before the murder he wanted the money up front, but that didn't happen.

Afterwards, there were multiple calls to Michael Draven, to get that payment, to get any sort of ball rolling on money to him, culminating only in $275. And what was the motivation? Solely greed, ladies and gentlemen. We started this case telling you that the motivation for the murder was greed and lust; not lust for David Runyon, just greed. No other reason. And when you think about that, think about what that tells you about his value for the life of another. He has none, and this should weigh heavily on you when you consider your deliberations.

We next move to the evidence that we presented over the course of the last week, and the first factor that we showed you was that David Runyon has committed acts of domestic violence over the past 15 years. We have shown you that he strikes out to those that are actually closest to him and that this is a recurring pattern. We have also shown you how he will do what he can to avoid responsibility for this, and it is a trend that we have seen continue into this case as well.

The first evidence that we presented to you was based on Theresa Linker, and she was David Runyon's former sister-in-law. In 1994 she got in an argument with David and Maria Runyon. David Runyon slammed her head against the steering wheel and he took out a retractable nightstick. Now, this was in July of 1994. If you will look at the certificates that were provided with his Columbia College records, you will note that he had just gotten training on how to use a retractable nightstick months before. In September of '94 of that year, of course David Runyon goes full-time active duty in the military. He avoids conviction.

We next presented evidence to you of David Runyon's assault in the form of an actual conviction against Maria Runyon. Now, this is Government Exhibit 311, and when you look at this, you will see two pages. One is in a lower court, and then one is in a court above that. In the first, in the lower court, which occurred after the incident where he choked his wife, where he poked and pushed her, you will see that he pled not guilty, but was found guilty by the court in 2001.

This isn't consistent with the image that has been presented of David Runyon as a loving and tolerant husband. These acts of abuse -- and no one knows what happens behind closed doors except when it erupts outside of it, into the domain of the police. You will see the second page of that

conviction shows that he pled guilty to the crime about a year later. It went through one court, and then another.

And this time period, ladies and gentlemen, 2001, 2002, was really the beginning of the life of David Runyon that you certainly didn't hear about from his own witnesses. This is the David Runyon that left his wife and children and didn't provide support for them, that abandoned more gainful attempts at employment, to get employment through these sporadic drug studies that put him into contact with people like Michael Draven.

David Runyon had had no contact, none, with his family for nearly five years prior to the murder, from 2002 to 2007. We know that after he left Maria Runyon, he went and stayed with his parents to try and complete his education. And that was the deal they had with him, that he complete his education and he could stay with them. He walked away from that deal as well. And who he walked into was Virginia Pina, who he met at a strip bar. He was supposed to be completing his education, but he failed to do so.

And we showed you evidence of the domestic violence committed against Virginia Pina and how, although he was charged once, this had happened a number of times. In February 2007, months before the murder, there was an assault with Virginia Pina, where he hits her in the face, because he accuses her of sleeping with someone else. And Virginia Pina

told you about other assaults, other fights, about her cooking, about her not working. And what would David Runyon be doing? She said he was not working the three jobs she was doing. He was playing video games. You see the photographs that were taken after the assault, showing the black eye that David Runyon gave her when he hit her in the face, and you also saw the video, ladies and gentlemen.

(A portion of a video was played.)

MR. SAMUELS: You saw that video, ladies and gentlemen, where David Runyon attempts to manipulate a girlfriend who has got mental problems, who obviously hasn't taken her medication, and is saying that she hit herself in the face that night, that he had done none of that. He is fully aware of her mental situation. He is fully aware of her problems. And, indeed, she was a very pitiable creature up there as she testified, and it shows that David Runyon is a manipulator who will do what he can to avoid responsibility. Again we see this same theme in the aftermath of the murder of Cory Voss.

The next factor that we showed you, ladies and gentlemen, was David Runyon's education and his training, and we showed you that when David Runyon shot Cory Voss five times, center mass, right here, that he did just as he was trained to do by a number of employers. But, ladies and gentlemen, he was trained to protect, to preserve, to defend,

GLORIA S. SMITH, OFFICIAL REPORTER

**1205**

to use the minimum amount of force necessary to achieve a result. He perverted that training in the murder of Cory Voss, ladies and gentlemen.

You saw, and we pointed out, that he took oath after oath after oath in the 1990s, whether an oath to the United States Army, Kansas National Guard, to the police chief in Fayetteville, all promising to uphold the law and support the constitution. Ladies and gentlemen, he cast all these aside on April 29, 2007. He rejected at this point his life in the law, a life that he had sworn to uphold in the law. This was his choice, and the result of that choice now forces him to be subject to that same law he walked away from.

Ladies and gentlemen, when someone rejects their allegiance to country and contracts out their service in a time of combat, we call that person a mercenary. They are not fighting for a cause or a country, they are fighting for money. When they reject the law of society and kill someone solely for money, we call that a contract killer, and that is, of course, the role that David Runyon played in this case. He turned years of training on its head when he killed Cory Voss, and he was a member of the same fraternity that David Runyon was involved with for years, this military and law enforcement community.

Now, you saw over the last couple of days that David Runyon had a number of witnesses who had prior military

training, and it is certainly clear that some sense of camaraderie exists between men who served their country or their community either as an Army officer or as a law enforcement officer, men who have been in difficult conditions together and have suffered through stress and fatigue.

Yet in spite of this, David Runyon kills Cory Voss, a military officer. If he can so easily disregard Cory's life and his service in such an amoral manner, with no regard to that prior service that he used to be a part of, what respect has he shown for life? How can a man who, if you will remember Mr. Eaglebear, the parachute rigger -- Mr. Eaglebear testified that David Runyon spent hours packing parachutes, and they were very careful because they wanted to prevent any kind of accidental death that might occur or any kind of incident if some parachute wasn't carefully packed.

How could a man who did this day in and day out for years deliberately take a life of the same community that he served? The answer, of course, ladies and gentlemen, is that he is not the same man. He is not the David Runyon of the 1990s. He is a man that had rejected that way of life totally by 2007.

But in the 1990s David Runyon acquired all the skills necessary to carry out this murder. We know that he started with the Kansas Department of Corrections. This was a good opportunity for him. He was there for over a year. He

is trained in the use of firearms. He is trained in the use of force and controlling inmates in confined spaces, how to deal with the unexpected, how to be authoritative. This would have been very useful to David Runyon when he was getting in that car with Cory Voss, controlling the situation, making sure that Cory Voss drove around again.

We next learn that he moved to the United States Army and the National Guard, again trained in firearms. And we see a recurring theme, ladies and gentlemen, with this education and this employment experience, in that he is reprimanded, and then he resigns. It's never his fault. It's never his fault that he is late and given a suspension. It is never his fault that he has had unsatisfactory job performance and he is barred from reenlistment.

We see in the Georgia Police Academy he spent 400 hours being trained as a police officer. He is trained in investigative techniques. He knows that when arriving officers come to a crime scene and it's for a murder, they are going to look for certain pieces of evidence, and he knows how to safeguard against that. He knows not to leave fingerprints behind. He knows what DNA is. And he is trained to use a pistol. And he has to qualify with that pistol. How does he qualify? Center mass, ladies and gentlemen, over and over again, the same training that enabled him to kill Cory Voss.

You also saw that he attended a number of colleges.

What was his course work? It was always criminal justice, some sort of law enforcement training. He used these skills that he learned to kill Cory Voss. And you can see how this training came into play when he planned out the crime, when he found a secluded location -- he was trained in cover and concealment -- when he planned the approach to Cory Voss and made him drive around the bank again to make this look like a robbery.

Ladies and gentlemen, it is particularly reprehensible that David Runyon used the very training that he was given to protect our country, to serve the communities he lived in and its citizens, to murder another one of our country's protectors. And you should consider his education and training and how that fed into the crime when you go back and deliberate. This factor, too, has been proven beyond a reasonable doubt.

Finally, ladies and gentlemen, the last aggravator for you to consider is the lack of remorse that David Runyon has shown in the aftermath of the murder of Cory Voss. Now, remorse, of course, means regret, being contrite about what you have done. And you have seen none of that from David Runyon. In fact, you see the opposite. You see that he is proud of what he's done.

After the murder, you saw these efforts to collect the money. There was no atonement, no regret. He wanted to

be paid. You saw efforts to obstruct justice by covering up the crime and concealing the conspiracy. Right away, he knows he has got to get rid of that gun and remove the evidence by using that bore brush to scope it out.

You have heard it in his own words, ladies and gentlemen, and we are going to play a call that shows that.

(An audio recording was played.)

MR. SAMUELS: "I'll hang tough to the bitter end," ladies and gentlemen. That was a call that was recorded right before the grand jury in December of 2007, not long before David Runyon is arrested. He and Michael Draven are planning out their responses to the police. There is no regret. There is no remorse. They are going to avoid capture, and they are going to hang tough to the bitter end.

You know also from witnesses that David Runyon did talk about this murder to some folks. He talked about it to Sarah Baker. He calmly told her about it, about what he did for money, and he told her that there would be trouble if she told anyone about it. And he said that he was a hit man for the mob.

Virginia Pina came in and testified that David Runyon bragged about doing this murder and that he said that he did it for money.

You saw his demeanor when being questioned in the second interview yesterday by Detective Rilee. You can see,

ladies and gentlemen, as he was looking at that map, trying to think up an explanation for why those details leading up to the murder of Cory Voss would be on that map, how he is trying to come up with an explanation, and you can see there, you can see by his demeanor, of his guilt. But you can also see how unaffected he is by the crime that he has committed.

You saw they had a picture on the table there of Cory Voss. David Runyon would pick up that picture and just set it down. No attempts to atone for what he did. The opportunity to cooperate and talk about his involvement was given to him, given to him before it was given to any of the other defendants, and he rejected that. He sat stone-faced after being confronted with all this evidence and expressed no remorse, no regret whatsoever. He turned away every effort that was extended to him to try and put things right, to try and make amends for this horrible crime he has committed.

Lastly you heard from Theodore Schlossman yesterday about how in the prison David Runyon bragged about being a hit man and a hired gun.

Ladies and gentlemen, this lack of remorse truly confirms how the defendant looked at this murder and this crime, not as the taking of a valued life for any justifiable reason whatsoever, but as a job, to earn a fee. You should find this aggravator as well beyond a reasonable doubt.

Ladies and gentlemen, these aggravators, all of

them, evidence is presented to allow you to find them beyond a reasonable doubt and find them unanimously. The defendant, David Runyon, is guilty in this case. He is eligible for the death penalty. These aggravators support the imposition of the death penalty.

Now, the defendant has raised a number of mitigators, and you must consider these as well. You don't have to find them unanimously. Any one of you can find and rely on a piece of mitigating evidence by a preponderance of the evidence. But you must first consider not just do the facts exist, but do they mitigate against the imposition of the death penalty? For example, there is one mitigating factor that says the defendant served in the United States Army, and he was honorably discharged. Well, that doesn't mitigate against the imposition of the death penalty, ladies and gentlemen. In fact, it's the opposite. It is the training that he received in the military, in these other jobs that he has had, that allowed him to commit this crime.

When you look at these mitigators, ladies and gentlemen, I will submit to you that the defendant has tried to make it very much quantity versus quality, based on witnesses who knew the defendant years ago in the 1990s or certainly prior to 2002, or that knew him for minutes at a time, such as the case with the prison deputies. And much of the testimony of these witnesses has little to do with the

mitigators that have been stated.

What is clear, what is absolutely clear from how these witnesses testified, is that the David Runyon they knew years ago is not the David Runyon that committed this murder, that you have seen in the past two months. You know, of course, that he rejected that life that he previously led. He walked away from it. He was not the man in the military officer's uniform or the police uniform. This is the David Runyon you know.

This is the David Runyon that committed the murder. This is from his MySpace page: The two guns, this is what it sounds like when thugs cry, refers to himself as Doctor D, 26 years old, Morgantown, West Virginia. And you know that the friends that testified are not on his MySpace page. These are the people that are on it. These are the people that he knew and had contact with in 2007 at the time of the murder. You see Michael Draven there. You don't see his family there, you don't see any of the friends that knew him at Wentworth Military Academy or in the Army. You don't see any of these people.

The man they talked about is not the man that you have before you today, and you know more about that man than they do, ladies and gentlemen. You have seen his MySpace page. You have heard current witnesses talk about him who knew him in the last year, from Virginia Pina, to Sarah Baker,

to Paula Dalton, who told you how he had had her pawn the gun that was used to commit the murder. You have seen his e-mails. You have heard his voice on the phone calls. You know more about where he was living and what he was doing than any of those witnesses that came in and testified and talked about him.

Now, there are a number of mitigators that were presented, ladies and gentlemen, and I have somewhat broken them into groups. There are a number that have been presented about how David Runyon has been a good prisoner and will be so in the future. But you heard that those five deputies that came in had very little contact with him. Most of it was through bars, several times for several minutes over a month period. They have got no records of his behavior beyond what they've seen. Hector Diaz, the longest-serving deputy -- he's been a deputy for seven years -- and Theodore Schlossman both told you that behavior happens at that jail that is not reported. You can't find by a preponderance of the evidence that David Runyon has been a good inmate based on snippets of observations that have occurred over a period of time.

You heard Debbie Bratton. She was from the El Dorado Corrections Facility, and she talked about being trained as a corrections officer at the same time as David Runyon. And she told you that one of the courses that are given to new corrections officers are Games Inmates Play, that

GLORIA S. SMITH, OFFICIAL REPORTER

inmates are manipulative, that an inmate who has knowledge of security procedures, as David Runyon would, can be a danger, that that is not good for them to have.

The defense also brought in Dr. Cunningham. They brought him in to give the same opinion that he has given in every capital case that he has testified about over the last 15 years, that the defendant will not be a risk of danger in the future. And he did that without ever interviewing the defendant.

The next set of mitigators talks about the defendant's employment and education. Again, ladies and gentlemen, while the information presented is true -- he did go to Wentworth Military Academy, he did serve in the Army -- this doesn't mitigate against the imposition of the death penalty. In fact, it aggravates towards it, because the defendant used that training to commit this crime.

The next mitigator is that the other defendants are equally culpable, Catherina Voss and Michael Draven. No dispute there, ladies and gentlemen, that they were both fully involved in the conspiracy and that they are every bit as guilty as this defendant. But there are differences in their conduct, differences that you will have to consider. And the chief difference is that David Runyon is the one that sat in that vehicle and pulled that trigger five times and killed Cory Voss. He was the one that had the chance to stop this,

to either walk away from it or turn them in. He was the one that ultimately killed Cory Voss.

You also know that the other defendants did express and did admit their involvement in the crime. They took some actions to express remorse or atone for their crimes, and David Runyon has never done that. And those are the differences. That's why on a culpability level David Runyon should be treated differently.

The defendant's mitigators also talk about the effect on David Runyon's family and friends. Of course we recognize that whatever penalty is imposed will cause some sadness on the defendant's family. He had a good upbringing. Again he rejected that, and he walked away from that over five years before the murder. It is clear, ladies and gentlemen, from their testimony that many of these witnesses do not believe in David Runyon's guilt. They have not seen the evidence that you have seen. They can't consider or envision the victim in this case. They say exactly what you would expect friends and family of a defendant to say, and their views are exactly what you would expect friends and family of a defendant to have, and this is exactly why we don't let people who know the defendant sit on a jury. They can't be unbiased in their judgment.

But again, their relationship with the defendant did not exist at the time of this murder. The man they spoke

GLORIA S. SMITH, OFFICIAL REPORTER

**1216**

about is not the man that is sitting here before you, is not the man that killed Cory Voss.

The defendant caused this. It is a consequence of his behavior, and the effects on his family and friends do not weigh against the imposition of the death penalty.

The defendant also points out that the defendant has no real criminal record. Well, he does, ladies and gentlemen. He does have an assault conviction. He has been charged in a number of other incidents. But more to the point, a person with a serious criminal record would not have the training that David Runyon had enabling him to killed Cory Voss and commit this crime.

And when you look at all of these mitigators, most of which have nothing to do with the David Runyon who sits before you today, it deals with his unrelated past, it deals with his uncertain future, it cannot match up against the weight of the aggravating factors that deal with the defendant that is sitting in this courtroom today, that deal with the crime that he caused, and the impact on the family.

Ladies and gentlemen, you should find the four additional aggravating factors beyond a reasonable doubt, and all these factors do support the imposition of the death penalty, not just sufficiently, but they overwhelmingly outweigh the mitigating factors and justify the sentence of death. And when you weigh them, again, you are not weighing

them in terms of how many there are on each side, but you are weighing them in terms of quality. You are looking at them as to whether they tend to support, or whether they tend to take away from, a sentence of death.

Your role as jurors in the sentencing process in sentencing the defendant calls for you to represent the conscience of the community in some regard. This is a weighty decision. We don't deny that, of course, and we call upon you to send a message to the community, send a message with your verdict, that we will not let the premeditated murder of a father and a Naval officer by a contract killer who has had no remorse, that we will protect our citizens from crime and our soldiers, as well as from war.

Now, the weighing of the aggravating and mitigating factors, it channels your discretion, ladies and gentlemen. It provides a lens through which you look at this when you go back to deliberate, and that result leads to a just sentence and holds the defendant accountable for what he did, and that's why the death penalty is appropriate.

Justice is not about bringing back the dead. That will never happen. And it is not about revenge either. It is about enforcing consequences, making people accountable for their actions. We can't expect people to take responsibility for what they have done if the consequences for their actions are not enforced in full. David Runyon is defined by his own

actions. In pulling the trigger and killing Cory Voss, with no regret and no remorse, he should face the fullest measure of accountability that the law provides, and the law provides that the fullest measure is the death penalty, the forfeiture of the defendant's own right to live, in penalty for taking the life of another.

Ed Koch, the former mayor of New York, back when he was mayor, said, it is by exacting the highest penalty for the taking of human life that we affirm the highest value of human life.

In this case you know that David Runyon's regard for human life, his regard for the life of Cory Voss, was measured in money alone, only in the amount that he hoped to be paid.

Ladies and gentlemen, you have sat through four weeks of trial in this case. You have weighed the evidence and found David Runyon guilty beyond a reasonable doubt of three capital offenses, and you have gone back and found that he is eligible to be considered for the death penalty on each of those offenses. You are going to go back today, and you are going to weigh the aggravating and mitigating factors. In the process of making this decision, this protection that has been afforded to this defendant, keep in mind that this was a process, these were protections that were never given to Cory Voss when he was murdered on April 29, 2007.

You are charged with carrying out a duty that our

society and our legal system has placed on you.  You took an oath to do so.  It is an important one.  You took an oath to find the facts and follow the law, and the law states that if you find the aggravators sufficiently outweigh the mitigators, and you find that the death penalty is justified in this case, as it is, you should vote to impose it.  It is the only just resolution, ladies and gentlemen.

On behalf of the United States of America, in memory of Cory Voss, we ask that you do your duty and impose a sentence of death on the defendant for the murder of Cory Allen Voss.

Thank you, ladies and gentlemen.

Thank you, Your Honor.

THE COURT:  Counsel, if you would approach the bench for a moment, please?

(The following discussion occurred at side bar out of the hearing of the jury:)

THE COURT:  Are you going to argue this?

MR. WOODWARD:  I am, Your Honor.

THE COURT:  Okay.  I have been tinkering with the language up here to add in the mitigating factors, and I think I have clarified it enough to do it, and I wanted you to know before you argued, because that way, you will know that they are in the form of verdict and what I'm going to do.

I'm going to list everything, since you all agreed,

and it won't prejudice the United States, because they still have more than an hour left to rebut, and that's what their rebuttal argument is going to be anyway.

But what I'm going to do is say, for each of the listed mitigating factors, you have the -- let me start over. I will do it Section II.

MR. WOODWARD: I understand, Your Honor. I'm following.

THE COURT: You do?

MR. WOODWARD: I can read that. If it was closer, I couldn't. But I can read it from here.

THE COURT: Then I have clarified this to be that they can choose to make their findings with respect to any or all, because the way this read before, is you put these big Xs over pages, and I think that they can choose to X out any factor or not a factor.

I would put, A, statutory mitigation factors, and I would list the two from the instruction, with, under each one, the number of jurors who so find.

MR. WOODWARD: Yes, ma'am.

THE COURT: And then additional nonstatutory mitigating factors, list your 15, and under each one I have number. And then this would be Section A, and this would be Section B, and then Section C would show the following.

So in other words, the form of verdict would be just

as you had before. It would be Part I, and then it would just proceed to Section II. And then Section II would set out the mitigating factors, like I have just said, for you. And then Section III would be the same, Recommendation.

Is everybody in agreement with that?

MR. WOODWARD: I am, Your Honor.

MR. SAMUELS: I agree, Your Honor.

THE COURT: And I will do this. I'm going to let you start. I may break your argument.

MR. WOODWARD: May I make a request, Your Honor? I would really prefer a short lunch and not break my argument, if the court would indulge me.

THE COURT: That's fine.

But let's get this straight first so that I can get it run over lunch. Is everybody in agreement, then, on adding those mitigating factors back in the way I just said?

MR. SAMUELS: Yes, ma'am.

MR. WOODWARD: I think it is actually not 15 anymore. It's probably like 12, whatever it is.

THE COURT: I will run that over the luncheon recess. What we will do is after we finish this bench conference, I will give the jury an hour's lunch, and then I will get this run and do my supervised release hearing, and then we'll come back.

MR. WOODWARD: All right.

THE COURT: There were two or three other minor changes in the instructions that I thought were necessitated.

In No. 8, I'm worried that we won't get it to the jury today, so I had, "as said yesterday." I want to cut out the word "yesterday," that in the government's rebuttal evidence, et cetera, because "yesterday" might be confusing, if they are deliberating tomorrow.

MR. WOODWARD: I understand. No objection.

MR. SAMUELS: No objection.

THE COURT: No. 16, I want to make it clear that they have to consider each count separately, as to that count of conviction, as appropriate to that count of conviction.

Any objection?

MR. SAMUELS: No objection.

MR. WOODWARD: No ma'am. I agree.

THE COURT: And the last one, No. 25, "Section II" then has to be changed to "Section III."

All three of those are nonsubstantive, but I wanted to show them to you.

Is there any objection to those changes in the instructions?

MR. SAMUELS: Not from the government.

MR. WOODWARD: No, Your Honor.

THE COURT: Is there any objection to adding the mitigating factors to the form of verdict?

MR. SAMUELS: No, ma'am.

MR. WOODWARD: No, Your Honor.

THE COURT: You will have the correct one before you argue.

(Proceedings resumed in open court as follows:)

THE COURT: Ladies and gentlemen of the jury, this looks like a good time to take a luncheon recess. The attorneys and the court have been working out various matters this morning and so forth, and actually I have a hearing at 1:30 that won't last long, but I can do it over a luncheon recess. It is just a matter that I need to take up with two attorneys who are not involved in this case, and they have been moved and moved and moved.

So we will do them at 1:30 today, and you can have a 45-minute luncheon recess, until 1:45. We are still in the middle of arguments, and we will continue with the defense argument when we return from lunch.

So you are in recess until 1:45 p.m.

(The jury exited the courtroom.)

THE COURT: Counsel, you can take your luncheon recess until 1:45. This is a very quick hearing, as I understand, and I'm going to see if I can get the attorneys in here a few minutes early.

It is a few minutes before one, and we will be in recess until 1:45 p.m. I will have the new form of verdict,

GLORIA S. SMITH, OFFICIAL REPORTER

**1224**

with the mitigating factors in there for you and the minor corrections that we have talked about in the instructions. I will give you copies of those that you can insert into your packets.

Is there anything else that the court needs to take care of over the luncheon recess or before we adjourn, Mr. Samuels?

MR. SAMUELS: No, ma'am, thank you.

MR. WOODWARD: No, Your Honor. Just in terms of your hearing, may we just push everything down to that table?

THE COURT: Yes. It is a hearing on supervised release that I have been told won't take very long, so if you would, just push your papers down or turn your pads over.

So just turn everything down, and we will recess in this case until 1:45.

(Recess)

AFTERNOON SESSION

THE COURT: Counsel, you've received the corrected jury instructions 4, 8, 11, 15, 16, 21, and 25, with the minor -- they were basically nonsubstantive changes, and you've each received a copy of the corrected or new special verdict form that sets forth the mitigating factors. So is everybody ready to go forward now with the arguments?

MR. SAMUELS: Yes, ma'am.

MR. WOODWARD: Yes, Your Honor.

THE COURT: Then bring the jury in.

(The jury returned to the courtroom.)

THE COURT: All the jurors are back from luncheon recess. We appreciate your patience.

Mr. Woodward, your closing argument?

MR. WOODWARD: Thank you, Your Honor.

Good afternoon, ladies and gentlemen. First of all, I would like to thank all of you all for your service and your attention to this case. I was reflecting upon this, as you might imagine, as I was preparing to talk, and while this is not the first time I have done this kind of case, you are always struck by whether you are equal to the task when you are asked or called upon to do something like this.

And I want to tell you that, because, as Mr. Hudgins and I have tried this case over the last days and weeks, you know, please understand that if either of us have done anything that you thought was unseemly or offended you, even if it didn't draw a rebuke from the court or an objection by counsel, that was never our intent, and you would be not doing your duty if you held that against Mr. Runyon in any way.

The other thing that I would say to you when you get involved in a case like this is when you are lawyers like we are, and Mr. Samuels argues, this is probably -- not probably, this is the most serious thing that you do as a lawyer. Some lawyers go through their careers and never have occasion to do

this. I know Mr. Samuels. I've known Ms. McKeel for a long time. I know they don't come here before you and lightly ask you to put someone to death. I know none of you take that responsibility lightly. I know the court doesn't take its obligation in properly instructing you and ruling on the various objections and evidence lightly.

So again I want you to understand that we know that as hard as all of our job is in some regards, I certainly understand that your job is even more difficult, because three months ago, none of you knew each other, none of you knew or had ever heard of me, and certainly hadn't heard of Mr. Runyon, and now in a few minutes, when we finish, you are going to be asked to go back and weigh everything and make a decision that is going to affect a number of people for the rest of their lives. That is probably the most serious thing any citizen ever gets called upon to do in this system.

Judge Smith is going to instruct you about our system, and one of the things that I have always thought was ingenious -- I guess that's the right word -- about this system, and I certainly don't think everything about our system is ingenious, but one of the instructions she is going to give you is if there is something that you found from this evidence or that you have concluded based upon the presentation that is a mitigating factor or is a reason not to impose the death penalty, and it is not mentioned -- it's not

mentioned in my argument, it's not mentioned in the instructions, it's not brought up at all, you are free to conclude and use that as one of the bases to make your decision, and you will see those instructions and you will get those copies of them.

So again when you go back to deliberate, it's impossible for any lawyer to talk about everything in a closing argument. I get to address you one time. Mr. Samuels or Ms. McKeel will get to address you again.

So I would say to you to please take that instruction, as all instructions, seriously. If there is something that is in your mind and you go back and you say, why didn't his lawyer mention this, or why didn't he bring up that, you are completely free to consider that. And I ask you to do that, if that is in fact the case.

Mr. Samuels in his closing argument quoted -- I think he quoted a newspaper columnist, and he quoted a guy that was a former mayor of New York City. Abraham Lincoln once said the following, that just punishment tempered by mercy bears greater fruit than punishment alone. And I want to talk to you about that in the context of the decision you have got to make, because nobody is here asking you not to punish David Runyon. I'm not asking you to do that; Mr. Hudgins is not asking you to do that. That's not the decision.

And so often in a case like this, and it is so seldom that you have somebody else's life in your hands, at least in my experience, you tend to get into analyzing things in terms of wins and losses. And there are no winners here. There is nothing that is going to happen in this phase of the case that is going to be a win in the sense that we think about that in competitive terms.

So when you go back and you decide about are you going to give Mr. Runyon three life sentences, which is what we are going to argue to you and ask you to do, or you give him the death penalty, that is not a decision that you make in the context, of, well, you know, who is going to win and who is going to lose by that.

But one of the things the law does allow you to do and weigh, and you have heard the evidence, you will hear the instructions, is to consider the effects of what you do on a number of different people, a number of different classes of people. And while I would never pretend to analyze what it was that Mr. Lincoln said, my guess is when he says "bears richer fruit," that's is what he is talking about, is what are the effects, because when you think about this, the effects -- and you will see them in the mitigating factors -- when you come back with your verdict, whether that is late tonight, tomorrow, Friday, whatever it is, that's not when the effect of the sentence ends for anyone. So I ask you again to keep

that in mind and to keep that always as you weigh this and you make this decision.

The other thing that the judge is going to tell you in terms of the instructions is this is a unique, individualized moral decision that each of you has to make. And each of you came in here six, eight weeks ago and were questioned by Judge Smith, and each of you said that you would, given the right circumstances, be able to vote for death. But each of you also said that you could vote for life.

And, you know, each of you will get a chance to express yourself to the other jurors when you go back into the room. Each of you will get a chance to say why you think a particular sentence is or is not appropriate. But you remember, it's an individual decision that you have to make, based upon your own unique moral view of things. That's what the instructions say. That's a paraphrase, but I think you will see an instruction that says that.

So again I ask each of you to have courage, because sometimes, you know, to act upon whatever you believe is the moral thing to do, it requires courage. And I don't know what is going to go on in the jury room, who is going to agree with who, or who is going to disagree with who, or what even the disagreements are going to be about. But anytime you are trying to make a stand for something that you believe is

right, and there are people that you may have come to like and respect that disagree with you, it takes a certain level and a certain kind of courage to be able to say that I'm going to do what I think is right. And again that applies to each of you individually as you deliberate about the case.

The other thing that I have always thought or believed that was unique or I think is unique about this is when you find the mitigating factors -- we will talk about them in a minute -- that is a preponderance-of-the-evidence standard. Almost everything that a jury does in a criminal case in our system has to be done beyond a reasonable doubt, okay, which is a much higher standard, and you have you been instructed on that, and our system is set up as such, that that is the government's burden.

But on the mitigating factors, the things that would weigh against the death penalty, you have to find those only by a preponderance, which is a lower standard, and you also don't each have to find every one. And you will see both instructions from the court as well as the verdict form that indicate that, that, you know, if one or two or three of you believe that there is some factor that is mitigating that two or three or four or five of the others of you don't or don't find, then you will be asked to indicate what the number -- you won't be asked, obviously, to identify yourself, but in terms of numbers, you will be asked to find how many people

GLORIA S. SMITH, OFFICIAL REPORTER

found those factors.

So again now I want to talk a little bit -- that is the procedure in an abbreviated fashion. The judge will instruct you on that.

Now I want to talk about the effect of the sentence and some things that Mr. Hudgins and I on behalf of Mr. Runyon would ask you to consider.

First of all, let me make it clear. Everything that Mr. Samuels said about Cory Voss and the loss and the fact that his children are not going to have him to grow up with -- that's true. You all found that. That is demonstrably true. He was apparently a very good guy. He died a death he shouldn't have died at the hands of some people that he knew and trusted, and also at the hands of some people he didn't know. That's the finding you made, and really certainly you get to consider that evidence.

But, you know, this is not a decision you make out of anger. Every murder case -- murder cases where the death penalty is never sought, murder cases where the death penalty is sought -- in every murder case the victim and the people that know and care about and love the victim suffer, whether it is a shooting, a stabbing, any kind of murder.

So again I don't say that to in any way lighten the pain that Mr. Voss's family feels and the effect it is going to have on them, but I do ask you to consider, does the fact

that there was an impact to Mr. Voss's family really distinguish this from any other murder case? I would suggest to you that while certainly that impact is there, when you go back and you are weighing, is Mr. Runyon the worst of the worst and the person that should get the death penalty, is that impact unique to this? Is the impact that was caused by this any less to Mr. Runyon as to Mr. Draven or Ms. Voss? They all participated in this.

So we certainly understand those effects, and we understand that that's one of the things that you have to weigh in your decision, but I would ask you as you consider this, and one thing that Mr. Samuels said that I agree with is sentencing in a case like this is not about bringing back the victim. And obviously if we could do that, we would probably not be here.

But what it is about is looking at who is going to be affected by your sentence. The Voss children have lost their father. Are they going to be any more or less affected if David Runyon spends the rest of his natural life in prison than if he gets the death penalty? I don't know. I mean, your common sense -- you know, that is a question I would ask you to ask yourself.

The court rightfully allowed each side to put on evidence about who is affected by this case, and you all heard that, because ultimately you have to weigh that when you make

a decision. The people that are hurting because Mr. Voss is no longer here -- what evidence do you have or what basis do you have to conclude that they are going to be hurting any less if Mr. Runyon is dead or alive? So I ask you to think about that.

The other people that are affected by this case are Mr. Runyon's family, and certainly his son is going to be affected by your verdict, and the court is going to tell you in one of the instructions that that's one of the things that you can consider. I wish that I could sit here and tell you to a certainty, looking ten, 20, 30, 40 years into the future, what effect it is going to have on Mr. Runyon's son if he is in prison versus if he is executed as a result of the verdict.

But I would posit to you that I think common sense would tell us that when you get back to what Mr. Lincoln said about the fruits of a sentence or the fruits of justice, one of the fruits that's going to be of your sentence is what effect is it going to have an Mr. Runyon's son. And I ask you to think about that in this context, as between Mr. Runyon and Catherina Voss. And one of the things the judge is going to tell you is you can consider, you know, the other defendants, and Mr. Samuels told you they were all culpable.

Rightly or wrongly, Catherina Voss is going to be in prison the rest of her life. She is going to have the opportunity to see her kids, if they want to see her. She is

going to have the opportunity at some day potentially to see her grandkids, if they want to see her.

I think we have all learned a lot about what kind of person Catherina Voss was during this trial. I don't know what kind of person she is going to be 15, 20, 40 years from now. I don't know what being in prison is going to teach her or what she is going to learn or what any of that will be.

But when you sit back and you think about this offense, Mr. Runyon is here facing this penalty, and neither of the other defendants are. And again I would ask you to consider that when you think about basic fairness and basic justice. Is that really fair? Not is it legal, because, you know, we are not arguing that point, but you certainly have the opportunity to sit back there and say, morally, as the judge is going to tell you, an individual moral decision -- that just doesn't feel right to me.

The other thing that you are going to hear in the instructions, you are never, ever required to impose a death penalty. There is no assumption that there should be a death penalty. There is no presumption that there should be a death penalty. You would be completely within following the court's instructions to go back there and find all the factors that aggravate the offense, and still find that the death penalty is just not appropriate.

That's one of your options, and that's one of the

things that you have to think about, and the system is designed that way, and rightfully so, because it's supposed to be difficult. It is not supposed to be a decision that is made lightly or easily or without a lot of reflection.

So getting back to Mr. Runyon's son, I don't know what he'll be like 10 or 20 or 30 or 40 years from now, but what you do in this case is surely going to affect him. And, you know, I always instruct my -- I have done a number of cases in this court and other courts, and we come together, you know, and we do this case, and when your verdict comes back in, I will go back to my law practice, as will all the other attorneys, the court will have other cases, you will go back about whatever do you in your lives on a daily basis. But the people that are affected by your verdict will live with that effect every day for the rest of their lives, ever how long that might be.

So again I ask you to think about that, and I ask you to consider it. The law allows you to consider it. And please understand, you know, we are not asking you not to punish Mr. Runyon. We are asking to you to give him three life sentences. The court is going to tell you that is life without possibility of parole, if he gets three life sentences. On one of the counts, that's the only choice you have, is life or death.

The other person that will be affected by this

sentence is Mr. Runyon's mother. Now, one of the things that you have learned in this case, and we brought you a lot of the family members and friends. Ms. Runyon -- you saw her on the stand. I don't suspect that she was the perfect mother. I don't suspect Mr. Runyon was the perfect son. But one of the things in life we don't get to pick is our family. And that emotion was real. You all sat here, you all saw Mrs. Runyon, whether she talks to him once every ten years or every day three times a day, the feelings that she had and the emotion that she showed about how this would affect her -- that was real. That wasn't faked, that wasn't contrived.

The feelings from his friends -- Mr. Samuels makes, you know, a point, which is factually correct, that a lot of the people that we called are people that had not had recent contact with Mr. Runyon. But you got to see those people, and you got to hear them, and as the court told you, when you assess somebody, you ought not only listen to what they say, but you look at how they say it and their demeanor.

The feelings that those people had for Mr. Runyon were real. They really cared for him. The things that he did before this case, he was described as generous, he was described as caring about kids, he was described as nice. Now, are all of those people wrong? Is Mr. Runyon completely devoid of those qualities? Are they all -- they just didn't get it? Clearly there was something in Mr. Runyon that they

didn't see at the time they interacted with him, but that doesn't mean it is not -- as I think maybe the United States would have you to believe, that it has got to be one or the other.

I would submit to you that the evidence in this case has shown certainly, based on your finding, that Mr. Runyon is capable of doing some terrible things. But it has also shown that he is capable of and has the impulse to do some things that are very unterrible, very nice, very kind, generous. You all heard them sit there and talk about, you know, people trusted him with their kids. One thing that I think is without dispute is that Mr. Runyon interacted well with children.

There were several different people that came in here and said his children, other people's children, and again when you look at the worth of Mr. Runyon and you have to decide whether you are going to vote to end his life or you are going vote to let his life continue, those are not -- Mr. Samuels would say, well, they don't mitigate the crime. But when you get to this point, you certainly have to consider the crime, but this case is also about the individual. And he has pointed out some things that he wants you to consider that say a lot about some of the bad parts of Mr. Runyon.

But you can't ignore that all of those people who had contact with him over a long period of time saw all of

those good qualities in him. They were people that didn't know each other. They were people that came from different walks in his life. It wasn't a situation where, you know, a bunch of people got together who all knew each other and said, well, we will say this about David Runyon. Those were some people who knew him, you know, from the time he was in high school.

So a legitimate question, then, would be, well, what happened? What happened to the person that they described that gave his last $5 bill, instead of going shopping, gave it to the homeless guy or the one that helped the child with some personality disorder that Ms. Provost talked about? And I don't have a glib answer. I don't have, you know, a pat response, where I stand up and say, you know, right here is what caused Mr. Runyon to get involved in this and to be where we are today.

But that's not what your point is. Your point in this deliberation is to weigh everything you know about Mr. Runyon and the effect that his sentence will have on other people, as well as him, and decide what is just. We are not asking you to not punish him. We are just asking you to look at him and say, is this somebody who deserves to die, or is this somebody who deserves to spend their life in the penitentiary? That's the decision that you have to make.

I want to spend a little bit of time and touch some

GLORIA S. SMITH, OFFICIAL REPORTER

**1239**

more on the other defendants in this case, and I would anticipate that when I finish, Mr. Samuels or Ms. McKeel will get back up and say, well, we are not here to sentence Cat Voss, and we are not here to sentence Michael Draven. And that surely is correct.

But the law allows, and indeed I would suggest to you for good reason, that you have to look at people that are involved in things and their culpability. And one of the things Mr. Samuels talked a lot about was remorse. And the detective took the stand yesterday, and he said, well, when I interviewed Cat Voss, and she knew she had been caught, or words to that effect, then she started crying and saying how much she missed her husband and she wished this had never happened.

And I said to him, I said, Detective Rilee, how do you know when a liar is telling the truth? He said, well, you have to look and see what supports or what contradicts what they are telling you.

I ask you to look through the evidence and think about everything you learned about Ms. Voss in this case, everything she told you through the tapes and everything you learned about her, and find one thing, one thing, other than apparently that bare-bone statement that she made to that detective when she was being interviewed about this crime, that shows any remorse. Your collective memories are far

better than mine, but I would submit to you that that -- the idea that, you know, Ms. Voss, showed remorse and that somehow distinguishes her from Mr. Runyon, that there is no evidence of that.

Michael Draven -- Michael Draven sat here and went to trial. You all rendered a verdict against Mr. Draven, and the court is going to sentence him, not you. But is that remorse such as distinguishes him from Mr. Runyon? Mr. Runyon sat in there in the tape you saw. He didn't say anything, you know. Does that mean that he was worried about his legal rights or wasn't remorseful or whatever? You saw him on there.

But just remember if you go back there and you think, well, the reason Cat Voss is where she is and David Runyon is where he is is because she showed remorse, I would submit to you that that is just patently not what the evidence showed. She went in with the detective, and when he told her she was under arrest and had been caught, she goes, well, God, I wish I could have my husband back. And that's it. She wasn't showing any remorse when she was out spending the $100,000. She wasn't showing any remorse when she was calling and e-mailing and writing to her congressman and her senators trying to find a way to get the other chunk of the insurance money. She certainly wasn't showing any remorse when she was partying and running around and doing all the things with that

money.

So again, you know, Cat Voss is going to have the opportunity to live. She is going to live in a circumstance that nobody would probably be happy about. I'm sure she's not happy sitting in whatever facility she is in. And you have the document. I mean, she got four life sentences plus 20 years. That's Defendant's Exhibit 7 or 9 or whatever it is. You will have that.

But there is certainly nothing about Catherina Voss's background or the way she conducted herself in this case or planning this case in terms of remorse that distinguishes her from David Runyon. There is simply not any evidence of that, and that's not the case.

Mr. Draven -- Mr. Draven went to trial. Mr. Draven didn't -- you know, they say he cooperated. He went to trial. He came in here, he went to trial, he pled not guilty. He stood up -- you know, his attorneys made arguments that you shouldn't find him guilty, as did Mr. Hudgins and I. But what remorse has Michael Draven shown? What remorse has -- you know, when has he ever apologized or done anything remorseful?

And then again it is always unseemly to have to argue something like that, but one of the reasons that the United States -- they put on the aggravating factors. One of the reasons that they are asking you to give Mr. Runyon the death sentence, when the other defendants aren't subject to

it, is because of his lack of remorse.

So obviously it would always be better if, anytime anybody did anything wrong, they were remorseful. But that's not really the issue you have got to think about. The issue is, is there anything about that that distinguishes Mr. Runyon from the other people that were involved in this? And I would submit to you that there is not, and that as a matter of basic looking at this case, that is just not there.

Now, I certainly don't make the decision about who they seek the death penalty against. The United States makes that decision. You will see Cat Voss's guilty plea, and you will see her statement of facts. You ought to take that and ask yourself, what really distinguishes her from David Runyon, and in what ways is she more culpable than David Runyon?

Ms. Rose Wiggins, by all attempts, the lady that raised Cat Voss, who is now raising Cat Voss's children, from what I could tell, a very nice lady placed into a difficult circumstance, trying to do the right thing by her grandchildren. I don't doubt that for a minute, and I don't doubt for a minute that what she said about the suffering is true.

But please remember that this is -- the catalyst, the person that planned and set all this into effect, is the mother of those very children that she is raising, the mother who is going to be able to have a relationship with those

children and her grandchildren and her mother. That's where all of this started.

So again, you know, when you look at the instructions and the law, that's something that you rightfully can and should weigh when you come back and say, you know, we are going to vote to either put Mr. Runyon to death, or we are going to vote to sentence him to life in the penitentiary.

Mr. Runyon's background -- you know, the government put on a lot of evidence. We put on some evidence. And, you know, he certainly -- nobody reasonable could look at that and say that it wasn't checkered in terms of his employment and his relationships. But think about the first part of the government's case. We spent a couple of hours talking about Mr. Runyon being late to work. We had a lady come out here from Kansas -- I think she was from Kansas, the Department of Corrections, and the gist of her testimony was, yes, he received his training, and he was late to work five times, and we sent him a letter saying we were going to suspend him, and he resigned.

And I have to tell you, I was struck by, you know, when I stood up, I think the only thing I asked her, and I showed her the form, which you will have, is all of the other qualities they look for in an employee, Mr. Runyon was satisfactorily performing except he was late to work. Is that something that aggravates a case to where you would impose a

death sentence?

His military career -- certainly every person that is in the military that is in any kind of operational type thing learns something about firearms, and some people learn more than others. And Mr. Runyon again -- he did very well in the military for a period of time, and then he didn't do so well, and they didn't let him reenlist.

But again when you think about the magnitude of what you are being asked to do, what does that really have to do with anything, the fact that he couldn't hold a job or that he would do okay in a job for a little while, and then for whatever reason, be it his own inability to focus or his family situation or his marriage, that he would lose that job? I would submit to you that that is not something that you should consider at all. That has no bearing on distinguishing a person who would receive a death sentence from someone who would not.

They put on a factor of his criminal record. He has one misdemeanor conviction. And I'm always struck by, in these cases, when prosecutors say, well, he has only been convicted once, but all these other things happened that didn't result in convictions, and then they stand up and say, well, we have to give dignity and deference to the findings of courts. Because remember the first one they put on, and you've got the report, there were two people involved in that.

There was Ms. Linker's sister and Mr. Runyon. They both got arrested. Ms. Linker, the police officer testified, the sister, got convicted of assault, and the charge against Mr. Runyon got dismissed. Now, we weren't there, we don't know, you know, but clearly that incident happened 15 years ago. Is that something that, you know, makes him someone that should be put to death?

So again I understand that you folks come in, and this is probably the only case like this you have ever heard, but I would submit to you that a criminal record of one misdemeanor conviction, while it's not something to be proud of, it's certainly not a record that would indicate someone who is a serious, violent person, who, you know, is out committing crimes all the time, one misdemeanor conviction which was almost ten years ago prior to this case.

So again you weigh -- the government would ask you to focus on the day of the crime and the couple of months after that before they arrested, and certainly that is something that you can consider, and I know will consider. But this is a much broader consideration. There is a reason why we bring you evidence sort of from the cradle to the day we are sitting here in court, to the extent we can get it, because the law allows, in fact, requires us, if we can, to let you know as much about Mr. Runyon as we can. And that's why we put on those people that he knew, those people who he

associated with, the good things that he did.

So again I ask you, when you look at that, to consider what is that really? I'm not glad it's happened. I don't think it should have happened. But I will say this. The government called three witnesses in this case that they asked you to rely on to prove their case, and one of them they are asking you to rely on to some degree to give a death penalty to Mr. Runyon had had criminal records that make Runyon's look like nothing. Mr. Schlossman and Mr. Fodrey, and I forget the other person, but they called people that are multiple convicted felons in here as their witnesses, saying, you know, listen to them and hear what they have got to say, and you should make your decision based at least in part on their testimony.

So when you see that, it makes it a little difficult, I would hope and would posit to you, to say that someone who has been convicted of one misdemeanor is somehow -- that's a factor that should separate them and make them eligible for the death penalty or -- excuse me -- make the death penalty appropriate. Those are witnesses that the government called.

The other thing that the United States talked about in their case is what Mr. Runyon is going to do in prison. And when we called Dr. Cunningham, the nature of -- nobody can ever say what any of us are going to do in the future. We can

only look at the probability. And Dr. Cunningham's testimony was designed to show you that people of Mr. Runyon's age in situations where they have been given a life-without-parole sentence are not likely to have problems in prison.

Now, we don't stand here before you and say that that's some guarantee that will never happen, but there is no -- the government didn't present any evidence saying, well, that is not true, people like this have all kinds of problems in prison, people like this are historically and statistically and empirically violent and problematic in prison.

So again when you weigh that, you have -- against that, what you really have is you have Mr. Schlossman coming back, who wants the government to cut his sentence for the second bite at the apple, talking about an incident that, you know, was never reported. None of the deputies saw it. He says he told a doctor at the Norfolk City Jail when he got there that he had been assaulted. I mean, the government has brought in thousands of pages of documents in this case. Where is that record? Where is something, you know, that would support that that even happened?

So again, you weigh that against, you know -- Mr. Samuels would have you believe that the six people we called from the Portsmouth City Jail really don't know what's going on up there, and all of these things go on that nobody ever sees. And, look, I don't think that there is a deputy there

24 hours a day, seven days a week, staring at everything that is going on. But they are there at least 26 times a day. They said they have to make their rounds at least twice an hour, plus they give trays.

So again when you weigh that, you know, the government hasn't alleged in this case that Mr. Runyon is a future danger. They are not asking you to find that he is a future danger to anybody, to other inmates, to staff in a facility, or anything like that. We put that evidence on affirmatively to show you that more likely than not, he would not be. So again the standard that you have to apply is not are we a hundred percent sure. It is what is more likely than not.

So, ladies and gentlemen, it really is a personal, individualized decision. We are asking you on behalf of Mr. Runyon -- and, you know, this is a term I think that is thrown around -- people sometimes derogatorily say or say snidely that, you know, well, he is asking for mercy. That is what we are asking for, mercy guided by the court's instructions and the law and what you know about him. And I would leave with you this. Mercy, you know -- they will probably stand up and say they are asking for mercy but Mr. Runyon didn't show Mr. Voss any mercy.

But really what mercy is about is being able to step back from a situation and look at everything and extend

something to someone that, as Mr. Lincoln said, bears more positive fruit. And I would submit to you that there is no shame in asking for mercy when you need it, and there is no weakness in extending it to somebody. This is not about how tough you can be or how hard you can be. There is nothing weak about being merciful. In fact, it takes a strong person or a strong group of people to be merciful, to be able to see the truth.

I have often argued in cases sometimes the facts make it hard for you to see the truth, and what I would ask you to do in this case, certainly to look at the facts, but to conclude from those facts that the truth is that Mr. Runyon doesn't deserve the death penalty. The fruit that a death penalty sentence will bear in this case will be bad fruit for everybody involved, and I ask you to extend to him an element of mercy and sentence him to life.

Thank you.

MR. SAMUELS: Ladies and gentlemen, this is my last opportunity to speak with you in this case. The government has the burden of proof on these aggravating factors and on asking for appropriate punishment for Mr. Runyon, so we go last. We get the last word.

And I understand that Mr. Woodward has asked you to give mercy to David Runyon. And I do think that it's important for you to ask yourselves what mercy he showed, not

only Cory Voss, but his family and his children? Certainly in that period that he was in the truck with Cory Voss, Cory Voss was trying to comply and do whatever he could to get away, to get back to his family.

Cory Voss -- we don't know what was said. But he was found in a defensive posture. It is likely he asked for mercy. He didn't get a chance to present any mitigating evidence. He didn't get a chance probably to talk about the effect of this crime on his family. There was probably an element of asking for mercy, pleading for his life. Did the defendant show him any mercy? You know, of course, that he did not.

Mercy follows remorse and repentance, ladies and gentlemen, and that's a principle in our justice system, that when people admit their wrongs, when people ask for some sort of acceptance of responsibility and show remorse, they can be extended mercy. Again, has that happened in this case? Has there been any expression of remorse by David Runyon? This case is not about mercy. It's about accountability for the defendant's utterly merciless actions taking the life of Cory Voss.

The life sentence that Mr. Woodward is asking for is the minimum sentence that can be imposed on Count 1. Does this crime, does this defendant deserve the minimum sentence?

Mr. Woodward also talked about the effect of this

crime, and he certainly acknowledged the effect on Cory Voss's family, his children. But he also asked you to consider the effect on David Runyon's family. Ladies and gentlemen, I would ask you to consider that whatever effect David Runyon's penalty has on his family was caused by his own actions, contrary to Cory Voss, who had this thrust upon him.

There was obviously a lot about David Runyon that his family did not know. They had not been in contact with him for a number of years, no knowledge of what he was doing and who he lived with.

David Runyon -- what the evidence shows is that he rejected that life. He chose a different path and he made different choices, and he should be accountable for them.

Cory Voss again did not have that opportunity to use his family in any way as a shield from David Runyon. From everything we know about him, he certainly would have. He will have no last chances to have letters with his children or any relatives. He did not have anyone to plead for him, to ask for mercy, to present mitigation on his behalf. You can't equate anything that David Runyon's family might feel with what has happened to the family of Cory Voss as a result of his life being tragically ripped away from him by David Runyon.

Mr. Woodward spoke about the fact that Catherina Voss and Michael Draven do not face the death penalty in this

GLORIA S. SMITH, OFFICIAL REPORTER

**1252**

case. As I said during my closing, the United States fully agrees that these are despicable people, Cat Voss and Michael Draven both. They are murderers, they were charged, they have been convicted. They will never see life outside a prison cell. But again there are two large differences that make them not equally culpable, and those differences are in their actions.

David Runyon was the triggerman. He is the man who killed Cory Voss. He is the last person that could have stopped this. He is the man that sat in that car for probably ten minutes and pulled the trigger.

He had the power to take the life or to walk away and save a life, and when he exercised this power, when he chose this course, he made that decision to be treated on his own, to be treated differently. He acted with complete free will in doing so. He was not motivated by love or a relationship. He was motivated solely by money.

The other difference, as Mr. Woodward alluded to, is that Cat Voss and Michael Draven did both admit their conduct when they were confronted with it. The justice system always considers acceptance and remorse when determining punishment. Catherina Voss showed this. Her actions are despicable. But take a look at her plea agreement. She pled guilty, and she agreed to everything in that statement of facts which showed her guilt. Did David Runyon do that? Is that a difference

between the two of them that you can consider? It is.

You can look at her plea agreement and see that she did not contest her guilt, did not have someone, a jury, weigh in on all the evidence and determine whether she was guilty. She pled guilty to all of the charges in the indictment and is doing four life sentences and 20 years as a result of that. That time will never be cut. If you look in the plea agreement, it will show that. And she agreed to a full statement of facts.

Michael Draven was not authorized for the death penalty. He did cooperate when he was arrested. He did make that phone call that led to Cat Voss being arrested, and he showed up at her interview that night and encouraged her to plead.

No dispute, ladies and gentlemen, no dispute, that these are terrible people that certainly deserve to be punished and will deserve all the punishment they get. Cat Voss has had her day. Michael Draven will have his soon. But there is a difference in the way they reacted when confronted with this evidence. Mercy follows repentance, ladies and gentlemen. There has just simply been none in this case.

Mr. Woodward talked about Dr. Cunningham and some of the deputies that testified. Dr. Cunningham admitted, of course, that every inmate has some level of risk, and that he can't predict whether the risk is one in a hundred or one in a

thousand or whether or not it will be David Runyon that would enact an episode of prison violence.

Now, we did not allege future dangerousness as an aggravator, but the defendant has listed four separate factors, and you will see them when the instructions are read to you and you get your verdict form, all of which indicate what a positive influence he will be in prison and how he will contribute to the well-being of others. Where is the evidence of that, ladies and gentlemen, beyond these deputies that had very sporadic conduct?

I would submit to you that they have not proven those factors, and here is why. Consider what you know to be true about David Runyon. Consider that he does have a record of domestic violence. It can't be minimized. He has one conviction, two other arrests. One of the women, Virginia Pina, who spoke to you, there were repeated episodes of that type of conduct, and you saw in the videotape how he tried to cover it up. You know that he has got a record of doing poorly in structured settings, that he certainly had an incentive to perform well in the months before trial. And he knows the security rules. He knows the games that inmates play. He has not established those factors by a preponderance of the evidence.

Ladies and gentlemen, sentencing is about accountability. We certainly don't and can't ask the victims

to weigh in on what they want the sentence to be. That is your job to determine. It is not about sympathy, it is not about passion, and it is not about feeling sad about what a family member may be going through. It's weighing those aggravating factors. It is looking at the mitigating factors. There is a process that is enacted for you all to review this evidence and make this decision.

Mr. Woodward talked about David Runyon's jobs, suggesting that the reason that we called Debbie Bratton was to show that David Runyon was late to work. Ladies and gentlemen, David Runyon had a series of jobs in the correctional field and in the military and in the law enforcement field that prepared him and gave him the skills to commit this murder. You certainly have to consider that over and over again he is trained to use firearms. Over and over again he is trained to react to unexpected situations. Debbie Bratton from the El Dorado Corrections Facility told you why it is so important that people are on time for work and that this is a problem when somebody is not at their shift at the designated time.

David Runyon perform poorly in all those structured situations, but he certainly got the training, he certainly got the skills that he needed to do this crime.

Ladies and gentlemen, there was a suggestion in Mr. Woodward's argument from his quote about Abraham Lincoln that

GLORIA S. SMITH, OFFICIAL REPORTER

**1256**

capital punishment is maybe not appropriate in a situation like this, that mercy should override that. Well, there is a lot of types of murders, ladies and gentlemen. We start from the involuntary reckless murder, maybe someone who is drunk and driving in a car and kills someone else. They are reckless in being drunk and driving, so that is still a murder. There is murder for passion. That's murder that results from the heat of the moment.

When you get into the type of substantial planning and premeditation that occurred in this crime, you get into more serious types of murder. Murder for greed, money, somebody he didn't know, the worst possible motive for committing this crime, and that crime and David's Runyon's role in it is certainly something you need to consider when you go back there and deliberate. That was something that was absent in Mr. Woodward's closing and something that is covered in the aggravating factors presented to you by the United States. What about that crime and that defendant aggravates its support of the death penalty?

You have seen, of course, the pain that this murder has caused, the fact that his family never has the chance to be able to say goodbye and to have any sort of last contact with him.

Ladies and gentlemen, it is the evidence that is supporting the imposition of the death penalty in this case,

not what I tell you, not what Mr. Woodward tells you. It is that evidence and those aggravating factors that overwhelm sufficiently the mitigating factors and justify a sentence of death. Justice requires that you weigh them, and I would submit to you that in doing so, you will find that the death penalty is the appropriate sentence in this case.

Thank you, ladies and gentlemen.

Thank you, Your Honor.

THE COURT: Ladies and gentlemen, I will give you a ten-minute recess, and then we will have the instructions of the court, and it should take approximately an hour to instruct you. So take a ten-minute recess, and then we will come back in for final instructions.

(The jury exited the courtroom.)

THE COURT: Counsel, we will take a ten-minute recess, and then I will proceed with the instructions of the court.

(Recess)

(The jury returned to the courtroom.)

THE COURT: All the jurors are back.

Ladies and gentlemen of the jury, we are now in the second and final part of the sentencing. By law, Congress has expressly provided that any person who has been found guilty of certain counts as charged in the indictment, and that was Counts 1, 2, and 5, may be punished by death. Because you

have found the defendant guilty beyond a reasonable doubt of committing the offenses described in Counts 1, 2, and 5, and you have found that the defendant is eligible to be considered for the death penalty on each of these counts, you must now consider whether justice requires imposition of the death penalty for this killing.

This is a decision left exclusively to the jury. I will not be able to change any decision you reach in this regard. You and you alone will decide whether or not the defendant should be sentenced to death. Thus again I stress the importance of your giving careful and thorough consideration to all of the evidence before you. I also remind you of your obligation to follow strictly the applicable law.

As you know, the trial function of the judge is to preside in such a manner that proper, relevant evidence is presented and to instruct the jury on the law applicable to the case. The function of the jury is to determine the facts from fair consideration of the evidence presented in the case and not from anything else. The evidence should be considered and viewed by you in light of your own observations and experience in the ordinary affairs of life.

You have been chosen and sworn as jurors in this case to try the issues of fact presented and determine the sentence of the defendant on each of Counts 1, 2, and 5. You

are to perform this duty without bias or prejudice to any party. The law does not permit you to be governed by conjecture, surmise, speculation, prejudice, or public opinion. Both the accused and the United States expect that you will carefully and impartially consider all the evidence in the case and follow the law as stated by the court.

You are not to single out one instruction alone as stating the law, but instead you must consider the instructions as a whole. Neither are you to be concerned with the wisdom of any rule of law stated by the court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base a verdict upon any other view of the law than that given to you in the instructions of the court. It would also be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything else but the evidence in the case.

As I earlier indicated to you, the indictment is not evidence of any kind against the accused. It does not create any presumption or permit any inference against the defendant. You must not be prejudiced against the defendant because an indictment has been returned against him.

There are two types of evidence from which you may find the truth as to the facts of the case, direct evidence and circumstantial evidence. Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an

eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating some further fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence, nor is a greater degree of certainty required of circumstantial evidence than of direct evidence.

When the attorneys for the parties during the trial and in the presence of the accused stipulate or agree as to the existence of a fact or facts, they are to be taken by you to be conclusively proven and regarded as evidence in the case. Unless you are otherwise instructed, the evidence in the case consists of the sworn testimony of the witnesses, all exhibits received into evidence, all facts which may have been admitted or stipulated, and facts which may involve judicial notice. Any evidence as to which an objection was sustained by the court and any evidence ordered stricken by the court must be entirely disregarded. Unless you are otherwise instructed, anything you may have read, heard, or seen outside of the courtroom is not evidence and must be entirely disregarded.

You are to consider only the evidence in the case. But in your consideration of the evidence, you are not limited to the bald statements of the witnesses. In other words, you are not limited solely to what you see and hear as the witnesses testify. You are permitted to draw from the facts

which have been proven such reasonable inferences as you feel are justified in the light of experience.

During the government's rebuttal evidence, it played for you a videotape of an interrogation of the defendant, David Anthony Runyon. This evidence was offered for the limited purposes of demonstration of remorse in regard to the alleged nonstatutory aggravating factor to this effect, and for relevant culpability in regard to the alleged statutory mitigation factor to this effect.

You are instructed that no statement made by the detectives during the interrogation is itself evidence in this case. You should disregard any statements of fact or opinion made by the interrogating officers, including any speculation about a future jury's possible sentencing decision or the punishment that the defendant might receive, or any characterization by the officers of the defendant's conduct or character. These portions of the video could not be removed without making the interrogation itself unintelligible, but they should not be considered by you in deciding on defendant's sentence.

As I have also indicated to you, statements and arguments of counsel are not evidence in the case. They are intended only to assist the jury in understanding the evidence and the contentions made. Further, no statement, ruling, question, remark, or comment which I have made during the

GLORIA S. SMITH, OFFICIAL REPORTER

1262

course of the trial was intended to indicate my opinion as to how you should decide the case or to influence you in any way in your determination of the facts, nor should you draw any inferences therefrom. You alone are to judge for yourselves the questions of fact in this case.

In this case, as in every criminal case, the burden of proof is upon the government as to each and every element and matter of proof unless I explicitly instruct you otherwise. The law does not require the defendant to produce any evidence nor call any witnesses. The law does not compel a defendant in a criminal case to take the witness stand and testify, and no presumption may be raised and no inference of any kind may be drawn because the defendant did not testify. The law never imposes upon the defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Where the defendant by his earlier statement or other conduct admits some fact against interest, then such statement or other conduct, if knowingly made or done, may be considered as evidence of the truth of the fact so admitted. Also bear in mind that the defendant is not on trial for any act or conduct not alleged in the indictment.

You as jurors are the sole judges of the credibility of the witnesses and the weight their testimony deserves. You are not required to accept testimony, even though the

testimony is uncontradicted and the witness is not impeached. You should carefully consider each witness's intelligence, motive and state of mind, demeanor, and manner while on the stand. Also consider any relation each witness may bear to either side of the case, the manner in which each witness might be affected by your verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause the jury to discredit such testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently. Innocent misrecollection, like failure of recollection, is not an uncommon human experience. In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from an innocent error or an intentional falsehood.

In addition, the testimony of a witness may be discredited, or impeached, by showing that he previously made statements which are inconsistent with his present testimony. It is the province of the jury to determine the credibility, if any, to be given to the testimony of a witness who has been shown to have given a prior inconsistent statement or is impeached.

If a witness is shown knowingly to have testified falsely concerning any material matter, you have the right to distrust the testimony of the witness in other particulars, and you may reject all the testimony of that witness or give it such credibility as you think it deserves.

Witnesses who by education and experience have become experts in some art, science, profession, or calling may state their opinions as to the relevant and material matter in which they profess to be an expert and may also state their reasons for the opinion. You should consider each expert's opinion rendered as evidence in this case and give it such weight as you may think it deserves. If you should decide that an opinion of an expert witness is not based upon sufficient education and experience or if you should conclude that the reason given in support of the opinion is not sound, or if you feel that it is outweighed by other evidence, you may disregard the opinion entirely.

Let me now discuss with you the deliberative steps you should follow in considering the very serious issue before you in determining whether the defendant is to be considered for the death penalty.

Now that you have found the required gateway factors and at least one statutory aggravating factor -- and I'm referring to the last phase of trial, your special verdict form in the election phase, which was filed July 22, 2009,

which you will have in your jury room, together with -- I will go through with you in the end all of the stipulations, all of the evidence, all of the instructions at each phase, and your verdict that you have rendered in each phase. All of that will come back.

But now that you have found the required gateway factors and at least one statutory aggravating factor, as reflected in your special verdict form, as I indicated, filed July 22, 2009, you must consider whether any nonstatutory aggravating factors offered by the government are proven to your unanimous satisfaction beyond a reasonable doubt.

Next, you must consider whether any of you think that any mitigating factors offered by the defendant have been established by a preponderance of the evidence. You may also consider any other factor about the defendant's background or character, whether or not argued by defense counsel, that you believe to be mitigating. If such a factor has been established by a preponderance of the evidence, any member of the jury who finds the existence of a mitigating factor may consider such a factor established, regardless of the number of jurors who concur that the factor has been established.

Next, you must decide whether the aggravating factors which have been proven outweigh the proven mitigating factors, or if there is no mitigating factor, whether the aggravating factors are themselves sufficient to justify a

sentence of death. Based upon this consideration, the jury shall conclude whether it unanimously finds that justice requires imposition of the death penalty as to that crime for the defendant.

Next, even if you find that the aggravating factors sufficiently outweigh the mitigating factors, the jury is never required to impose a sentence of death, notwithstanding that finding.

I will now try to provide a more fulsome explanation about each of these deliberative steps.

Although the law leaves it to you, the jury, to decide in your sole discretion whether the defendant should be sentenced to death, the law narrows and channels your discretion in specific ways, particularly by requiring you to consider and weigh any aggravating and mitigating factors present in this case. These factors have to do with the nature and circumstances of the crime itself and the personal traits, character, and background of the defendant.

Aggravating factors are those facts or circumstances that would tend to support imposition of the death penalty as to a particular defendant. Mitigating factors are those facts that suggest that some punishment less than death, less than the death penalty, is sufficient to do justice with respect to a particular defendant. Your task is not simply to decide whether aggravating and mitigating factors exist in this case.

Rather, you are called upon to evaluate any such factors and to weigh them against each other in order to make a unique, individualized, and reasoned moral judgment about the appropriateness of the death penalty as punishment for each capital offense for the defendant.

In short, the law does not assume that every defendant found guilty of committing a capital offense should be sentenced to death. The law does not assume that the defendant before you at this phase of the trial should be sentenced to death. That decision is committed to the jury, based on each individual juror's careful weighing of the aggravating factors, statutory and nonstatutory, as unanimously found by the jury, and the mitigating factors found by each individual juror.

I will go through the form of verdict, and that also follows these same instructions that I'm giving you now. It will go through the nonstatutory aggravating factors and the mitigating factors, and then a Recommendation section. So I will go through that with you in a moment.

I continue: In this regard, the sentencing phase of the trial differs from the first guilt phase. In the first phase I instructed you to deliberate with a goal of reaching a unanimous decision, one way or the other, as to whether the government had proven the defendant guilty beyond a reasonable doubt of the crimes charged against him in the indictment.

GLORIA S. SMITH, OFFICIAL REPORTER

In this phase, at the end of your deliberations all 12 jurors must unanimously agree that the aggravating factors sufficiently outweigh any mitigating factors, or in the absence of mitigating factors, that the aggravating factors are themselves sufficient to justify a sentence of death. But if any of you, even a single juror, is not persuaded that the aggravating factors sufficiently outweigh any mitigating factors such that a sentence of death is justified, then the jury may not recommend the death penalty on the verdict form.

In short, if you find, after thorough deliberation and the consideration of the views of your fellow jurors, that you are not unanimous in your views, you have nevertheless reached a decision; namely, that the government has not met its burden, and the appropriate penalty is a penalty other than the death penalty as to that count of conviction.

Then you must endeavor to reach a unanimous decision on life without the possibility of release, or some lesser sentence, as appropriate to that count of conviction.

Now, the defendant does not have to present any evidence at this hearing. A defendant does not have to prove to you that he should not be sentenced to death. The defendant is, however, entitled to present any mitigating facts to you.

Now that you have found during the eligibility phase of the trial a threshold intent gateway factor and at least

one statutory aggravating factor proved beyond a reasonable doubt -- and you can refer to your special verdict form in your election phase filed on July 22, 2009 -- you must now consider whether any other nonstatutory aggravating factors alleged by the government have been proven to your unanimous satisfaction beyond a reasonable doubt.

I instruct you that the law permits you to consider only nonstatutory aggravating factors which I outline below, because they are the only nonstatutory aggravating factors on which the government has decided to proceed and as to which the defendant was or is prepared to address. You cannot base your decision on any aggravating factor not cited by the government, even if you think that the evidence establishes such a factor.

As to defendant David Anthony Runyon, the government has identified the following four nonstatutory aggravating factors.

Factor 1. The defendant, David Anthony Runyon, caused injury, harm, and loss to the victim and the victim's family and friends, as evinced by the victim's personal characteristics and by the impact of his death upon the victim's family, friends, and co-workers.

Factor 2. The defendant, David Anthony Runyon, utilized education, training, and experience that he received in college courses focused on criminal justice, as a law

enforcement officer and correctional officer, as an officer of the Kansas National Guard, and as a member of the United States Army to kill Cory Voss.

Factor 3. The defendant, David Anthony Runyon, engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend.

Factor 4. The defendant, David Anthony Runyon, has demonstrated a lack of remorse for his actions, as demonstrated by the evidence in this case after the murder of Cory Allen Voss.

I emphasize again that because these are the only nonstatutory aggravating factors cited by the government, they are by law the only aggravating factors you may consider, in addition to the statutory aggravating factors that you have already found during the eligibility phase. This aspect of the law may strike you as odd, but your oath compels you to follow the law.

Section I of your special verdict form asks whether you are unanimously persuaded that the government has proven one or more of these nonstatutory aggravating factors beyond a reasonable doubt. You need not find any nonstatutory aggravating factors in order to consider a sentence of death. But if you do unanimously find that some or all of the nonstatutory aggravating factors are proved beyond a reasonable doubt, you may consider and weigh those, in the

manner that I will describe, when reaching your decision as to whether the defendant should be sentenced to death on a particular count.

The United States has the burden of proving an aggravating factor beyond a reasonable doubt. Thus while the burden of proof is a strict or heavy burden, it is not necessary that the United States prove an aggravating factor beyond all possible doubt. It is only required that the proof by the United States exclude any reasonable doubt concerning any particular aggravating factor.

The next step in the process is to consider any mitigating factors that may be present in this case. A mitigating factor is not offered to justify or excuse a defendant's conduct. Indeed, if a homicide was justifiable or excusable, a defendant would not be guilty of murder. A mitigating factor instead is intended to present facts about the defendant's life or character or the circumstances surrounding the killing for which he has been convicted that suggest a sentence of death is not appropriate.

It is the defendant's burden to establish any mitigating factors by a preponderance of the evidence. This is a lesser standard of proof under the law than proof beyond a reasonable doubt, the standard which the government must be held to in proving aggravating factors. Preponderance of the evidence means that evidence which, when considered as a

whole, leads you to believe that the defendant's claims are more likely true than not. If the defendant fails to meet this burden, he has not proven that mitigating factor.

Mitigating factors differ from aggravating factors in another important way. Unlike aggravating factors, which the jury must unanimously agree to exist, any member of the jury who finds the existence of a mitigating factor by a preponderance of the evidence may consider such a factor established, regardless of the number of jurors, if any, who concur with that juror that the factor has been established.

Federal law sets forth a number of statutory mitigating factors, and the defendant has submitted some of these mitigating factors with respect to his individual circumstances. The statutory mitigating factors which you have been asked to consider in this case, are, Factor 1, David Anthony Runyon does not have a serious criminal record; Factor 2, other persons equally culpable in the crime will not be punished by death. One other statutory mitigating factor permits you to consider whether other factors in the defendant's background or character mitigate against imposition of a death sentence.

Unlike aggravating factors, you may consider any other factor, whether specifically argued by defense counsel or not, which you believe to be mitigating, if such a factor has been established by a preponderance of the evidence, in

your judgment. In short, you have greater discretion in considering mitigating factors than you have in considering aggravating factors.

Now, the defendant has submitted to the court a list of additional nonstatutory mitigating factors which he claims have been established by a preponderance of the evidence presented in this phase of trial. I will list these factors for you now. They are as follows:

1. David Anthony Runyon will serve a sentence of life in prison without the possibility of release if not sentenced to death.

2. David Anthony Runyon has worked and has been legally employed for all his life.

3. David Anthony Runyon committed acts of kindness and generosity for his neighbors and his community.

4. David Anthony Runyon grew up, witnessed, and experienced domestic violence and parental conflict until his mother and biological father separated.

5. David Anthony Runyon has demonstrated his ability to make a positive adjustment to incarceration.

6. David Anthony Runyon has the respect and support of correctional officers.

7. David Anthony Runyon has had no disciplinary write-ups while incarcerated, and has helped other inmates conduct themselves in nonviolent or nonaggressive ways.

8. David Anthony Runyon does not present a risk of future violence or danger to the public while in prison for the rest of his life.

9. David Anthony Runyon, Jr., the son of David Anthony Runyon, will suffer emotional harm if his father is executed.

10. Suk Cha Runyon, the mother of David Anthony Runyon, will suffer emotional harm if her son is executed.

11. David Anthony Runyon served his country as a member of the United States Army and was honorably discharged.

12. David Anthony Runyon graduated from high school and earned an Associate of Arts degree from Wentworth Military Academy and took further college courses to expand his education.

Finally, I remind you that if any one juror finds any statutory or nonstatutory mitigating factor, whether or not offered by the defendant, established by a preponderance of the evidence, even if no other juror has so found, that juror should consider and weigh, in the manner I will discuss, that mitigating factor against any aggravating factors unanimously found in this case.

Now, any evidence relating to mitigating factors should be fully discussed by all of you to ensure that each juror considers the matter carefully. I reemphasize, however, that unlike aggravating factors, which you must unanimously

find proven beyond a reasonable doubt for you to consider them in your deliberations, the law does not require unanimity with regard to mitigating factors. If any one of you is persuaded that a mitigating factor has been proven by a preponderance of the evidence, even if the rest of the jurors disagree, that juror may still consider that factor in reaching his or her decision in the case.

The defendant has the burden of proving a mitigating factor by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that a particular mitigating factor exists.

You have found the defendant guilty of three capital crimes. Your consideration of guilt or innocence has therefore been completed. You must now determine an appropriate punishment. In considering the appropriate punishment to recommend, you are not to revisit the issue of guilt or innocence. All 12 jurors are bound by your verdict in the first phase of this trial.

Once you have found the aggravating and mitigating factors, the law requires you, the jury, to weigh and evaluate those factors and decide whether you are unanimously persuaded that the aggravating factors you unanimously found have been proven beyond a reasonable doubt sufficiently outweigh any mitigating factors that any one juror has found, proven by a

preponderance of the evidence, to justify a sentence of death on a particular count.

If you have determined that no mitigating factors have been proven to exist, you must decide whether you are unanimously persuaded that the aggravating factors that have been proven beyond a reasonable doubt are themselves sufficient to justify a sentence of death. Passion, prejudice, and arbitrary considerations can play no role in your efforts to reach a just result in this case. In carefully weighing the various factors, you are called upon to make a unique, individualized judgment about the appropriateness of imposing the death penalty on each count for the defendant. This is not a mechanical process. Neither is it determined by raw numbers. You do not simply count factors. Instead you must consider them qualitatively.

Any one aggravating factor proven by the government, if sufficiently serious in your mind, may sufficiently outweigh several mitigating factors. On the other hand, you must also recognize that several aggravating factors may not sufficiently outweigh a single mitigating factor.

In short, what is called for in weighing the various factors is not mathematical skills, but your careful, considered, and mature judgment. At this final weighing stage in the process, you are not called upon simply to find relevant facts. You are called upon to make a reasoned

judgment, based upon all the evidence before you, as to whether the death penalty is an appropriate punishment for the defendant. Remember that, unlike with mitigating factors, you are only permitted to weigh those aggravating factors alleged and proved by the government and cited in these instructions and on the form of verdict.

Only if you are unanimously persuaded that the aggravating factors found to exist sufficiently outweigh the mitigating factors found to exist may you return a decision in favor of capital punishment. Each individual juror must decide whether the defendant should be sentenced to death on a particular count. If even one juror finds that the aggravating factors you have agreed to exist do not sufficiently outweigh one or more mitigating factors which the juror has found to exist, then the jury may not sentence the defendant to death. The same is true if no mitigating factors are found, and one juror finds that the proven aggravating factors are not themselves sufficient to justify a sentence of death.

I also remind you again that whatever findings you make with respect to the aggravating and mitigating factors, you are never required to impose a death sentence. For example, there may be something about this case or about the defendant that one or more of you are not able to identify as a specific mitigating factor, but that nevertheless convinces

you that the death penalty is not appropriate in this case. In such a case, the jury must render its decision against the death penalty, even though a sentence of death is fully supported by the evidence.

In Section III of the special verdict form, for each count you would place an X next to the sentence you unanimously agree to impose. And I will go through the form of verdict with you when I conclude the instructions.

At the end of your deliberations if you unanimously recommend that a sentence of death shall be imposed, then the court is required to sentence the defendant to death. However, if you do not unanimously recommend that a sentence of death shall be imposed, then the court is required to impose a sentence other than death, as authorized by law.

Federal law provides that the alternative sentence to the charge as contained in Count 1 is a mandatory life term of imprisonment. Federal law provides that the alternative sentence to the charges contained in Counts 2 and 5 is imprisonment for any numbers of years up to life. Federal law has abolished parole, and therefore there is no possibility that the defendant will be paroled early for the sentence the court imposes.

The defendant did not testify during the penalty phase. You may not attach any significance to this fact or even discuss it in the course of your deliberations. As I

GLORIA S. SMITH, OFFICIAL REPORTER

**1279**

have previously told you, under our constitution a defendant has no obligation to testify or to present any other evidence. That is true in the penalty phase as in the guilt phase of the trial. Simply put, a defendant is not required to prove that he should be allowed to live. Thus no adverse inference may be drawn against a defendant who does not take the stand, and you may not consider his failure to testify in any way.

It is your duty as jurors to discuss the issue of punishment with one another in an effort to reach agreement, if you can do so without surrendering your honestly held conviction. Each of you must decide this question for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing this matter, do not hesitate to reexamine your own opinion and to change your mind, if you become convinced that you are wrong. But do not give up your honest beliefs as to the weight or effect of the evidence solely because others think differently or simply to get the case over with.

As in the guilt phase of the trial, you, the jury, are the sole judges of the facts in this penalty phase. You determine the credibility of the witnesses and decide whether to accept any piece of evidence as true or what amount of weight to give it, if any. At this phase of the trial, the evidence consists of, one, the evidence received at the guilt phase of the trial, to the extent that it is relevant to your

inquiry regarding the existence of any aggravating or mitigating factors; and, two, the information received at the penalty phase of the trial, including testimony, documents, and stipulations between the parties. You shall only consider evidence received in this courtroom in making your determination. As in the guilt phase, the arguments of the attorneys and the comments and rulings of the court are not evidence.

You may consider both direct and circumstantial evidence, as I have told you, at this phase of the trial, and you may use your common sense in determining whether aggravating or mitigating factors are established. The weighing process you are called upon to undertake in this phase of the trial is different from the fact-finding process which you will perform in this phase and which you have already performed in the guilt phase.

Once you have found the aggravating and mitigating factors, if any, you must use your experience, judgment, and sense of justice in weighing those factors to arrive at your ultimate recommendation in this case.

In considering whether a death sentence is justified, you must not consider the race, color, religious beliefs, national origin, or sex of the defendant or the victim in this case. These facts are completely irrelevant to the important issues you must consider at this phase of the

proceedings. You are not to recommend a sentence of death unless you have concluded that you would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of either the defendant or the victim might have been.

To emphasize the importance of this consideration, the special verdict form has a certificate that must be signed by each juror. When you have reached a decision, each of you is to sign the certificate, but only if this is so, attesting that considerations of race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching your individual decision, and attesting that you would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or victim might have been.

I have now outlined for you the rules of law applicable to your consideration of the death penalty and the process by which you should determine the facts and weigh the evidence. In a few minutes you will retire to your jury room. The importance of your deliberations should be obvious. I remind you that you can return a decision sentencing the defendant to death only if all 12 of you unanimously are persuaded beyond a reasonable doubt that the death sentence is in fact appropriate.

While you are in the jury room, please discuss all aspects of the sentencing issues among yourselves with candor and frankness, but also with a due regard and respect for the opinions of one another. Each of you must decide this question for yourself and not merely go along with the conclusion of your fellow jurors. In the course of your deliberations, no juror should surrender his or her conscientious beliefs of what is the truth, of what is the weight and effect of the evidence, and what should be the outcome, as determined by that juror's individual conscience and evaluation of the case.

Remember that the parties and the court are relying upon you to give full, considered, and mature consideration to the sentencing. By doing so, you carry out to the fullest your oaths as jurors, that you will well and truly try the issues of this case and render a just verdict.

If it becomes necessary during your deliberations to communicate with me for any reason, simply send me a note signed by your foreperson. Do not attempt to communicate with the court or any other court personnel by any means other than a signed writing. Likewise, I will not communicate with any member of the jury on any subject touching on your sentencing decision other than in writing or orally here in court.

When you have reached a decision, as you have before, send me a note signed by your foreperson that you have

reached a decision. Do not indicate what the decision is in the note. In no communication with the court prior to a verdict should you ever give a numerical count of where the jury stands or where you are in your deliberations in that regard. Whichever decision you reach, the foreperson must also sign and fill out the special verdict form accordingly and be prepared to report to the court your findings on your sentencing.

Let me remind you again that nothing that I have said in these instructions and nothing that I have done during the trial has been said or done to suggest to you what I think the outcome should be. What the sentencing decision should be is your exclusive duty and responsibility.

Let me go through the form of verdict with you. What will be coming back with you will be the matters that you have received before. This is the redacted indictment that you have had throughout your deliberations, and that will come back to the jury room with you. All of the stipulations that have been made during the course of the full trial will come back to the jury room. The phase one guilt jury instructions and form of verdict will be back with you in your jury room, and your phase two eligibility jury instructions and form of verdict will be back in the jury room. All of the exhibits that have been received during the course of the full trial will be back with you in the jury room.

Again I would ask the attorneys -- I think you have already done so -- to verify those exhibits with the clerk, and if you haven't, you may do so just before they go back to the jury. But I think you did that on the last recess.

And then finally, the phase three jury instructions and the form of verdict will come back to the jury room with you.

I will go through the Special Verdict Form - Selection Phase at this time. In terms of what I referred to on your Special Verdict Form - Eligibility Phase, with which you are familiar, the statutory aggravating factors are set forth for you on Pages 5 and 6 of that form of verdict which you will have in your jury room.

And then the special verdict form for the selection phase is set forth as follows. Part I sets forth the nonstatutory aggravating factors which the United States must establish beyond a reasonable doubt, and you must unanimously agree that that factor has been established. The form of verdict sets forth the factor, and then you answer "yes" or "no."

It is basically the process that you went through with the aggravating factors in the last phase. But in this phase the United States has set forth and is entitled to present nonstatutory aggravating factors, which you must find beyond a reasonable doubt and unanimously, as you have the

statutory aggravating factors. You have to consider each factor separately, and when you have reached a unanimous decision, you would mark that factor.

Then the instructions tell you regardless of whether you answered "yes" or "no" with respect to any of the nonstatutory aggravating factors which are in Part I, Section I above, continue your deliberations in accordance with the court's instructions and proceed to Section II.

Section II sets forth the mitigating factors which the defendant must prove by a preponderance of the evidence. But you do not have to have unanimous agreement, as I have told you in the instructions, on a mitigating factor.

The instructions on the form of verdict here so tell you that for each of the listed mitigating factors, you have the option to indicate in the space provided the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence. If you choose not to make such a numerical written finding, you simply cross out that factor with an X. That just says you are not giving a written finding. If you choose to make a numerical finding on that statutory mitigating factor -- and I will just give you an example -- you have the statutory mitigating factor listed, and I have listed them for you in the instructions. If you choose to make a numerical finding on the form, you would say number of jurors who so find. If

you choose not to make that finding, you would just X through that factor.

Then you have the same factors and the same process set forth for -- they are called additional nonstatutory mitigating factors. They are not specifically set forth in the statute, but the defendant is allowed to present them, as I have told you in the instructions, and the 12 that the defendant has presented are set forth here. And you would use the same process. If you choose to make a numerical finding on that and put it on the jury form, you can. If you don't, you put an X through it.

Then finally if there are other additional mitigating factors that are found by one or more of the jurors, you can list them, if you so choose, on this form. If none are found, you would put "none," and if you choose to list them, you can, and space is provided here to the end of the Page 3. If you find none, you put "none." If you find a factor, you would write it down, and again you may or may not put a number. If you choose not to put a number, then you would write the factor down, X through it.

And then once you have gone through the process of reviewing all of the mitigating factors, and again you may choose to list a numerical number of jurors who so find or not, and again, as I have told you, one juror may find a factor and consider that, that another juror may not find, and

that is all set forth here on the form, but in great detail in the court's instructions.

Once you have gone through that process of determining the nonstatutory aggravating factors, any mitigating factors, you then proceed with the Recommendation. And it says, based upon consideration of whether the aggravating factors, both statutory, which you found in the last phase, and nonstatutory, which you would find or not find in this phase, based upon consideration of whether those aggravating factors found to exist sufficiently outweigh any mitigating factors found -- and you've reviewed your mitigating factors -- or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend by unanimous vote the following sentence should be imposed upon the defendant, David Anthony Runyon.

And then you have each of the capital counts set forth:  Count 1, conspiracy to commit murder.  You would reach a unanimous decision for the death sentence, and if you don't, then you would consider life imprisonment without possibility of release.  So those are your two considerations there.  And again I remind you any sentence would have to be unanimously determined by the jury.

On Count 2 it says, A, death, and if you can't unanimously agree on that, then it would be, or life

imprisonment without possibility of release, and if you can't unanimously agree on that, then you would consider whether you can unanimously agree that some other lesser sentence should be imposed. Again it is the same process, and Count 2 was carjacking resulting in death.

Count 5 is murder with a firearm in relation to a crime of violence, and again you go through that same process.

Then finally, there is the certification that I have told you that all jurors must sign, and the foreperson then signs the form, and in so signing, the foreperson makes the certification for himself. You would have the same foreperson make the certification for himself, and it certifies this jury form when the foreperson signs. So that will be coming back to you.

Ms. McKeel and Mr. Samuels, has the jury been instructed in accordance with your wishes?

MS. MCKEEL: Yes, ma'am, it has.

THE COURT: All right. Mr. Hudgins and Mr. Woodward, has the jury been instructed in accordance with your wishes?

MR. HUDGINS: Yes, ma'am, it has.

THE COURT: As I have done before, I would ask Ms. Mason, Ms. Seek, and Mr. Sweeney if they would step into the jury room and retrieve any items and turn in their legal pads, and then if you would return to the courtroom.

(The alternates exited the courtroom. When they had returned to the courtroom, the jury was excused to begin deliberations, as follows:)

THE COURT: Ladies and gentlemen of the jury, you can retire to your jury room, and I will get all of the material together, and it will come back to you.

(The jury exited the courtroom to deliberate at 4:03 p.m.)

THE COURT: Mr. Sweeney, Ms. Seek, and Ms. Mason, on behalf of the court and the parties to this case, we can't thank you enough for your contribution. I will tell you that in my 24 years on the bench, I don't think there has been a more diligent jury than this jury has been. And I would also tell you that it is not possible to go forward with a case of this length and this magnitude under the law without having alternate jurors.

I know the parties do so very much appreciate that even though you knew you were alternates and you knew you still had to go through hearing all of this evidence and so forth, I think from this jury, other than the situation involving Ms. Foreman's mother's death, there has never been an excuse, never been a complaint, there has never been people late, and it has been a pleasurable experience for the court from that standpoint, I can tell you. So I do thank you.

I know you would like for me to say at this point

you are released. But you are not. Until the case is finally over and you get notification from the jury clerk, you are still in service. If something occurred during the deliberations at this juncture, you have heard all of the evidence, and you would be called upon. So I still have to tell you you may not discuss the case with anyone until you are released. But again I do thank you for your service.

(The alternate jurors exited the courtroom.)

THE COURT: Ladies and gentlemen, the court is going to be in recess. The clerk is going to send everything back now, but as I told you before, please stay close by such that if there is a question or a verdict or something that we need to assemble for, we can do that without great delay.

The court will be in recess pending further notification.

(Recess)

(Court was reconvened as follows at 5:30 p.m.:)

THE COURT: Counsel, I got a note from the jury a couple of minutes ago that said, We would like to be excused for the evening. We would like to reconvene at 9:30 a.m. Signed, Jeff Fink, the foreperson.

Madam Clerk, you can have the note.

And you can bring the jury in. I will recess them for the evening and tell them we will reconvene at 9:30 a.m.

(The jury returned to the courtroom.)

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division


UNITED STATES OF AMERICA     )
                                )     CRIMINAL ACTION

    v.                     )

                                )     NO. 4:08cr16

DAVID ANTHONY RUNYON,      )

                              )

      Defendant.        )


TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

August 27, 2009


**NINETEENTH DAY OF TRIAL**

**(Penalty Phase)**


Before:   THE HONORABLE REBECCA BEACH SMITH
           United States District Judge, and a Jury


Appearances:

      LISA R. MCKEEL
      BRIAN J. SAMUELS
      Assistant United States Attorneys
          Counsel for the United States

      STEPHEN A. HUDGINS
      LAWRENCE H. WOODWARD, JR.
          Counsel for David Anthony Runyon

GLORIA S. SMITH, OFFICIAL REPORTER

THE CLERK: Case No. 4:08cr16, United States of America versus David Anthony Runyon.

Ms. McKeel, Mr. Samuels, is the government ready to proceed?

MR. SAMUELS: Good morning, Judge. The United States is ready.

THE CLERK: Mr. Woodward, Mr. Hudgins, is the defendant ready to proceed?

MR. HUDGINS: Good morning, Your Honor. Defendant is ready.

THE COURT: And the defendant, Mr. Runyon, is here with his counsel.

Counsel, the court received a call this morning at home a little bit after 8:30 from the jury clerk that Ms. Kocevar, one of the jurors, had contacted the jury clerk to say that her brother-in-law died last night at 2:45 a.m. in Delaware. Her husband had left for Delaware first thing this morning. She wanted to join him, but said that she would come in if directed by the court.

I directed her to come in, but had the clerk put her in the jury assembly room so that the jury would not go forward with any further deliberations.

In the meantime, I instructed the jury clerk to call the next alternate on the list, who was Gennifer Mason, I was informed. So Ms. Mason was called. She was at work. She

has arrived. She is somewhat embarrassed, she says, because she is in her work clothes. But in any event, she has been placed in the witness room on the first floor, so that there would be no communications between anyone and that the jury couldn't start deliberations.

And I don't know, but I'm not even sure all of the jurors are there yet, because somebody might have had a flat tire. But I had Mr. Ivey remind them not to start any deliberations until everyone was there, and that's all they were told.

So we have Ms. Kocevar here. She would like to leave for Delaware to join her husband. Arrangements have not been made, but they will be in the next day or so, she believes, and Ms. Mason is here, ready, willing, and able to go forward.

I note that the jury went out, I believe, a little bit after 4:15 yesterday, so they deliberated only a little bit over an hour. I can bring them in and tell them what has occurred, and that Ms. Mason is joining them, and for them to go back through any deliberations that they had during the last hour, if that's agreeable to everyone. If it is not, Ms. Kocevar is here and will go forward if directed by the court.

I will first ask defense counsel what they want to do.

MR. WOODWARD: Your Honor, on behalf of Mr. Runyon, we believe that the court's proposal would be appropriate, to bring in the alternate and let the juror who suffered a death in her family leave. We certainly -- I know how hard it would be to focus, and I think that would be unfair to her to ask her to deliberate over something like this while she is worried about her husband and a death in the family. And I think the procedure with bringing them in and having them kind of start over or bring the alternate up to date or whatever the procedure, we are fine with that.

THE COURT: Ms. McKeel?

MS. MCKEEL: We agree with the court's proposal, Your Honor.

THE COURT: All right. Then what I'm going to do, we will just briefly recess. I'm just going to have the jury clerk thank Ms. Kocevar and tell her that she is released to go join her husband. I will have Ms. Mason brought up to the courtroom, and then I will have all the jurors brought into the courtroom, and then I will address them all at once. They don't have the exhibits. They are still locked up. So they will then start their deliberations.

So if you would just remain here while I give the instructions to the jury clerk, I would appreciate it.

The court stands in recess.

(Recess)

THE COURT: Counsel, Ms. Kocevar has been excused, and Ms. Mason is waiting outside.

Mr. Ivey, you can bring in Ms. Mason and the other eleven jurors.

(The jurors entered the courtroom.)

THE COURT: Good morning, ladies and gentlemen of the jury.

Early this morning Ms. Kocevar called the jury clerk, who called me at home to indicate that Ms. Kocevar's brother-in-law died during the evening, and her husband had already gone to Delaware first thing this morning. She wanted to join him in Delaware, but she was willing to come in to continue deliberations. She actually did come in. I had her come in just in case, and she did come in, waited in the jury assembly room, and in the meantime we were able to contact Ms. Mason, who was on the job, but said she was willing to come in, and she did. Counsel all agreed that Ms. Kocevar could be excused and Ms. Mason could be substituted in as a regular juror for purposes of the deliberations.

I would tell you that what you need to do is, now it is the 12 of you, and if you would review for Ms. Mason -- you were out only a little over an hour yesterday, and, Mr. Fink, as foreperson, if you would just see that you review with her what was discussed and key her in, and then proceed with your deliberations.

GLORIA S. SMITH, OFFICIAL REPORTER

**1296**

THE FOREPERSON: Yes, ma'am.

THE COURT: Madam Clerk, if you would now call the roll of the jury.

(The jurors' names were called.)

THE CLERK: Thank you. All the jurors are present, Your Honor.

THE COURT: All right. You can retire to your jury room, and we will get all the exhibits in there for you, and you can continue your deliberations.

(The jury exited the courtroom at 10:25 a.m.)

THE COURT: Counsel, again we will be in recess. If everyone would be available in case we have a question or a verdict.

The court stands in recess.

(Recess)

(Court reconvened as follows at 12:20 p.m.:)

THE COURT: Counsel, I received the following note from the jury and made the following response. It said, "We are ready to break for lunch. Jeff Fink." And I put, "Okay. Please break for 45 minutes to an hour. Take the roll when all jurors return. Sign, date, and time it, and return the roll sheet of the jury to the clerk through Mr. Ivey. Thanks. Judge Smith. 12:15 p.m."

So they broke a few minutes ago. I will give this note to the clerk for the record. Consequently, counsel, you

GLORIA S. SMITH, OFFICIAL REPORTER

**1297**

can take a luncheon recess. It is approximately 12:30 now, so you can be in recess until 1:15, and then be available from 1:15 on for anything further.

The court stands in recess until 1:15.

(A recess was taken for lunch.)

AFTERNOON SESSION

(Proceedings were reconvened as follows at 2:20 p.m.:)

THE COURT: Counsel, the court has the following question from the jury, and this is the answer that the court is going to give. I don't entertain argument on it, because it is a legal answer, and I answer it as a matter of law.

The question from the jury says, "We are seeing a conflict between Jury Instruction No. 26 and the paragraph on the recommendation page. If we are not unanimous on the death penalty, do we have to be unanimous on the other choices? And the answer that I put is "yes." And I signed it Judge Smith, 8-27-09, 2:30 p.m.

The statute is quite clear in this regard. The recommendation comes directly word for word from the statute, which says, based upon this consideration, which is whether the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or in the absence of a mitigating factor, whether the aggravating factor or factors

alone are sufficient to justify a sentence of death, the jury by unanimous vote shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibly of release, or some other lesser sentence.

So the jury by unanimous vote has to recommend one of those sentences. And then the statute provides that if the jury does not recommend -- and I'm reading from the statute which says, upon a recommendation under Section 3593(e) that the defendant should be sentenced to death, or life imprisonment without possibility of release, the court shall sentence the defendant accordingly.

So that's why it is called a recommendation, because if they recommend either death or life imprisonment without possibility of parole, the court is required to follow the jury verdict. If on the other hand they recommend some lesser sentence, then the court has discretion with the lesser sentence, under the statutory parameters, which is why at a threshold level it is called a recommendation. And then the statute reads, otherwise, the court shall impose any lesser sentence that is authorized by law.

So, in other words, if the jury doesn't agree -- I'm reading right from the statute. It says if they recommend one of these, then the court must impose it. Otherwise the court shall impose any other lesser sentence that is authorized by law.

So if there is a hung jury and they can't reach a recommendation, then it's up to the court to sentence and impose any lesser sentence that is authorized by law.

So the death penalty would not be available to the court. It would be any other lesser sentence and whatever -- they differ on the counts. Count 1, the only lesser sentence is life without possibility of release. On Count 2, the lesser sentence -- I can't remember the statutory parameters on that, but it is a range of sentencing, and the same with Count 5.

So consequently, I'm not clear as to why the jury sees a conflict between Paragraph 26 and the recommendation page, but the recommendation page is clear, and the statute is clear, that the answer to their question is they have to have a unanimous vote on which penalty to impose.

So I have answered it simply "yes," and I'm going to send that back to the jury.

Do you have any comments that you wish to make, Ms. McKeel?

MS. MCKEEL: No, ma'am. We agree with your analysis.

THE COURT: All right. Mr. Hudgins or Mr. Woodward?

MR. HUDGINS: We have no comments either, Your Honor. We agree with your interpretation.

THE COURT: All right. I do have a copy of the

GLORIA S. SMITH, OFFICIAL REPORTER

**1300**

question and my answer for your records for each of you, and a copy for the clerk for the clerk's records.

Here is a copy for the clerk and a copy, Madam Clerk, that you can give to each counsel.

Then we will be in recess.

(Recess)

(The jury indicated at 6:00 p.m. that it had reached a verdict, and proceedings were reconvened as follows:)

THE COURT: Counsel, first, the court received a note that said, "May we take a 30-minute break?" at 3:30 p.m., signed by the foreperson. And I xeroxed the note and sent back to them, "Return to the court after break, Judge Smith, 8-27-09, 3:35 p.m."

The roll was taken when they returned. Here is the note and the court's response, and then here is their attendance sheet where they came back from the break. I will give those to the clerk.

Then I received this note that says, "We have reached a verdict. Jeff Fink, 6:00 p.m."

So you can bring the jury in.

(The jury returned to the courtroom.)

THE CLERK: Members of the jury, have you agreed upon a verdict?

THE FOREPERSON: Yes, ma'am, we have.

THE CLERK: May we have it, please.

Mr. Runyon, would you please stand.

In Case No. 4:08cr16, United States of America versus David Anthony Runyon, defendant.

Special Verdict Form - Selection Phase. Roman numeral I. Nonstatutory aggravating factors.

Factor No. 1. The defendant, David Anthony Runyon, caused injury, harm, and loss to the victim, Cory Allen Voss, and the victim's family and friends, as shown by the victim's personal characteristics and by the impact of his death upon the victim's family, friends, and co-workers. Yes.

Factor No. 2. The defendant David Anthony Runyon utilized education, training, and experience that he received in college courses focused on criminal justice and as a law enforcement and correctional officer, as an officer of the Kansas National Guard, and as a member of the United States Army to kill Cory Allen Voss. Yes.

Factor No. 3. The defendant David Anthony Runyon engaged in acts of physical abuse towards women, including, but not limited to, his estranged spouse and former girlfriend. Yes.

Factor No. 4. The defendant David Anthony Runyon has demonstrated a lack of remorse for murdering Cory Allen Voss, as demonstrated by the evidence in the case. Yes.

Roman Numeral II. Mitigating Factors.

A. Statutory mitigating factors.

No. 1. David Anthony Runyon does not have a serious criminal record. Number of jurors who so find, 12.

Number 2. Other persons equally culpable in the crime will not be punished by death. Number of jurors who so find, 12.

B. Additional nonstatutory mitigating factors.

No. 1. David Anthony Runyon will serve a sentence of life in prison without the possibility of release if not sentenced to death. Number of jurors who so find, 12.

No. 2. David Anthony Runyon has worked and has been legally employed for all of his life. Number of jurors who so find, 10.

No. 3. David Anthony Runyon committed acts of kindness and generosity for his neighbors and his community. Number of jurors who so find, 11.

No. 4. David Anthony Runyon grew up, witnessed, and experienced domestic violence and parental conflict until his mother and biological father separated. Number of jurors who so find, 11.

No. 5. David Anthony Runyon has demonstrated his ability to make a positive adjustment to incarceration. Number 5 is X'd out.

No. 6. David Anthony Runyon has the respect and support of correctional officers. Number of jurors who so find, zero.

No. 7. David Anthony Runyon has had no disciplinary write-ups while incarcerated and has helped other inmates conduct themselves in nonviolent or nonaggressive ways. Number 7 is X'd out.

No. 8. David Anthony Runyon does not present a risk of future violence or danger to the public while in prison for the rest of his life. Number 8 is X'd out.

No. 9. David Anthony Runyon, Jr., the son of David Anthony Runyon, will suffer emotional harm if his father is executed. Number of jurors who so find, 12.

No. 10. Suk Cha Runyon, the mother of David Anthony Runyon, will suffer emotional harm if her son is executed. Number of jurors who so find, 12.

No. 11. David Anthony Runyon served his country as a member of the United States Army and was honorably discharged. Number of jurors who so find, 12.

No. 12. David Anthony Runyon graduated from high school and earned an Associate of Arts degree from Wentworth Military Academy and took further college courses to expand his education. Number of jurors who so find, 12.

C. The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "none." If more space is needed, write "continued" and use the reverse side of this page.

David A. Runyon continued to witness and experience

**1304**

domestic violence and parental conflict/abuse from mother and adoptive father. Number of jurors who so find, 12.

Mark Runyon, brother of David A Runyon, will suffer emotional harm if his brother is executed. Number of jurors who so find, 12.

David A. Runyon was given the impression that Cory Voss was molesting his daughter. Number of jurors who so find, 11.

Roman numeral III. Recommendation.

Based upon consideration of whether the aggravating factors, statutory and nonstatutory, found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend by unanimous vote that the following sentence should be imposed upon the defendant David Anthony Runyon.

Count 1, conspiracy to commit murder for hire. A, death.

Count 2. Carjacking resulting in death. B, life imprisonment without possibility of release.

Count 5, murder with a firearm in relation to a crime of violence. A, death.

Roman numeral IV. Certification.

By signing below, each juror certifies that

consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision and that the individual juror would have made the same decisions without regard to these considerations. All the jurors and foreperson sign below.

Michael Adams. Charles Bell, Jr. Elfriede Cackowski. Mollie E. Felton. Michael Fien. Becky Plant Graham. Jennifer A. Graham. Denee Harris. Harriet Head. Jason Mayo. Gennifer Mason. And Jeffrey Allen Fink, Foreperson, dated August 27, 2009.

Members of the jury, is this your verdict, so say you all?

All the jurors answered in the affirmative, Your Honor.

THE COURT: You may be seated.

Does anyone desire that the jury be polled?

MS. MCKEEL: No, ma'am, we don't.

MR. WOODWARD: No, Your Honor.

THE COURT: All right. I will poll the jury.

Ladies and gentlemen of the jury, as I call your name, if you would affirm that this is your verdict pursuant to what has been read into the record by the clerk of court, as well as what is reflected on the Special Verdict Form - Selection Phase signed by all of you and also in total signed

by your foreperson, Mr. Fink.

As I call your name, if you would answer the question, is this your verdict?

(The question was posed by the judge to each juror.)

THE COURT: All of the jurors have answered in the affirmative.

Ladies and gentlemen of the jury, I know that this has been a long and difficult process for you, and you have been diligent, perhaps the most diligent jury that this court has seen in terms of your appearance on time, your attentiveness to the evidence, and your diligence through all three phases in this trial. I do thank you on behalf of the court, on behalf of the parties, on behalf of the public, and the people that you have represented and served by being a jury of your peers.

I now will tell you that you are dismissed. Under our rules of court, no attorneys may contact a juror without the court's permission, so if you were for some reason contacted, you should report that to the court if you are contacted by an attorney. You should not be; these attorneys will not violate court rules.

I would tell you that you are free to discuss the case, or not, as you would choose. Again, I thank you. You are excused. If you would just step back into your jury room, I do want to thank you. My procedure is to thank jurors

personally when they have been in any long and difficult trial, and you are otherwise excused.

(The jury exited the courtroom.)

THE COURT: Counsel, I understand that under the Federal Death Penalty Act the court is required to follow the recommendation of the jury. The language is mandatory, and it is so indicated in the statute and the case law.

However, I do feel that a presentence report or a background report should be prepared on Mr. Runyon, because it will follow him through the system, and I think that that's important. I know it is important for the Bureau of Prisons to have such a report, and I would certainly appreciate if counsel would assist the probation office, since you have done so much background research on Mr. Runyon, and he has been in a military family, so consequently I know that there are extended records and so forth. I will direct that a presentence report be prepared. There will be, obviously, no guideline calculation in that report, because those would be inapplicable to the sentencing in this case.

But there will be a background report prepared, and you should have enough information so the probation office can get this report together fairly quickly.

We will now set a sentencing date. The court has Friday, December 4, at 11 a.m.

MS. MCKEEL: The United States has that, Judge.

**1308**

MR. HUDGINS:  That's fine, Your Honor.

MR. WOODWARD:  I have that, Your Honor.

THE COURT:  Then we are going to set Mr. Runyon's sentencing for Friday, December 4, at 11 a.m.  It would be here in Norfolk, because there are other docket considerations, and the trial has occurred here.

Is there anything further for the court to take care of this evening, Ms. McKeel?

MS. MCKEEL:  No, ma'am.

THE COURT:  Mr. Woodward or Mr. Hudgins?

MR. HUDGINS:  No, ma'am.

THE COURT:  I do compliment all counsel on the way that you have conducted yourself throughout the trial and through your very thorough presentation of the evidence and the addressing of all of the issues and the motions.  I know how overwhelming it has been for you, and the court appreciates everything that everyone has done in that regard to meet the scheduling deadlines and the orders that were here, and everyone has done that in a very fine and professional way.

The court stands in recess until tomorrow morning.

(Proceedings were concluded at 6:30 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/_____

Gloria S. Smith

_____

Date

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

FILED
IN OPEN COURT

AUG 2 7 2009

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 4:08cr16 |
| | ) | |
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Defendant | ) | |

## SPECIAL VERDICT FORM - SELECTION PHASE

### I. NON-STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following factors, answer "YES" or "NO" as to whether you, the jury, unanimously find that the United States has established the existence of that non-statutory aggravating factor beyond a reasonable doubt.

Factor 1. The defendant, DAVID ANTHONY RUNYON, caused injury, harm, and loss to the victim, Cory Allen Voss, and the victim's family and friends, as shown by the victim's personal characteristics and by the impact of his death upon the victim's family, friends, and co-workers.

YES X̲
NO _____

Factor 2. The defendant, DAVID ANTHONY RUNYON, utilized education, training, and experience that he received in college courses focused on criminal justice, and as a law enforcement and correctional officer, as an officer of the Kansas National Guard, and as a member of the United States Army, to kill Cory Allen Voss.

YES X̲
NO _____

1311

Factor 3.    The defendant, DAVID ANTHONY RUNYON, engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend.

YES  X

NO

Factor 4.    The defendant, DAVID ANTHONY RUNYON, has demonstrated a lack of remorse for murdering Cory Allen Voss as demonstrated by the evidence in the case.

YES  X

NO

Instructions: Regardless of whether you answered "YES" or "NO" with respect to any of the Non-Statutory Aggravating Factors in Section I above, continue your deliberations in accordance with the Court's instructions and proceed to Section II.

## II.  MITIGATING FACTORS

Instructions: For each of the listed mitigating factors, you have the option to indicate in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence. If you choose not to make these written findings, cross out that factor with a large "X" and then continue your deliberations in accordance with the instructions of the Court.

Regardless of whether or not you choose to make written findings with respect to any or all of the mitigating factors, a finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

A.    Statutory Mitigating Factors

1.    DAVID ANTHONY RUNYON does not have a serious criminal record.

Number of jurors who so find  12  .

2.    Other persons equally culpable in the crime will not be punished by death.

Number of jurors who so find  12  .

-2-

**1312**

B.     Additional Non-Statutory Mitigating Factors

1.     DAVID ANTHONY RUNYON will serve a sentence of life in prison without the possibility of release if not sentenced to death.

Number of jurors who so find \_\_12\_\_.

2.     DAVID ANTHONY RUNYON has worked and has been legally employed for all of his life.

Number of jurors who so find \_\_10\_\_.

3.     DAVID ANTHONY RUNYON committed acts of kindness and generosity for his neighbors and his community.

Number of jurors who so find \_\_11\_\_.

4.     DAVID ANTHONY RUNYON grew up, witnessed, and experienced, domestic violence and parental conflict until his mother and biological father separated.

Number of jurors who so find \_\_11\_\_.

5.     DAVID ANTHONY RUNYON has demonstrated his ability to make a positive adjustment to incarceration.

Number of jurors who so find _____.

6.     DAVID ANTHONY RUNYON has the respect and support of correctional officers.

Number of jurors who so find \_\_0\_\_.

7.     DAVID ANTHONY RUNYON has had no disciplinary write-ups while incarcerated and has helped other inmates conduct themselves in non-violent or non-aggressive ways.

Number of jurors who so find _____.

8.     DAVID ANTHONY RUNYON does not present a risk of future violence or danger to the public while in prison for the rest of his life.

Number of jurors who so find _____.

-3-

**1313**

9.     David Anthony Runyon, Jr., the son of DAVID ANTHONY RUNYON, will suffer emotional harm if his father is executed.

Number of jurors who so find \12\_____.

10.    Suk Cha Runyon, the mother of DAVID ANTHONY RUNYON, will suffer emotional harm if her son is executed.

Number of jurors who so find \12\_____.

11.    DAVID ANTHONY RUNYON served his country as a member of the United States Army and was honorably discharged.

Number of jurors who so find \12\_____.

12.    DAVID ANTHONY RUNYON graduated from high school and earned an associate of arts degree from Wentworth Military Academy and took further college courses to expand his education.

Number of jurors who so find \12\_____.

    C.     The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors.  If none, write "NONE."  If more space is needed, write "CONTINUED" and use the reverse side of this page.

_David A. Runyon continued to witness and experience domestic violence and parental conflict/abuse from mother and adoptive father._

Number of jurors who so find \12\_____.

_Mark Runyon, brother of David A. Runyon will suffer emotional harm if his brother is executed_

Number of jurors who so find \12\_____.

_David A. Runyon was given the impression that Cory Voss was molesting his daughter._

Number of jurors who so find \11\_____.

-4-

**1314**

## III. RECOMMENDATION

Based upon consideration of whether the aggravating factors (statutory and non-statutory) found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that the following sentence should be imposed upon the defendant, DAVID ANTHONY RUNYON:

<u>COUNT ONE - (Conspiracy to Commit Murder for Hire)</u>

A. Death _____

or

B. Life Imprisonment Without Possibility of Release _____

<u>COUNT TWO - (Carjacking Resulting in Death)</u>

A. Death _____

or

B. Life Imprisonment Without Possibility of Release _____

or

C. Some Other Lesser Sentence _____

<u>COUNT FIVE - (Murder with a Firearm in Relation to a Crime of Violence)</u>

A. Death _____

or

B. Life Imprisonment Without Possibility of Release _____

or

C. Some Other Lesser Sentence _____

-5-

**1315**

## IV. CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same decisions without regard to these considerations.

All jurors and foreperson sign below:

REDACTED COPY

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

FOREPERSON _____

Date: August 27, 2009.

-6-

**1316**