## IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID ANTHONY RUNYON,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT NEWPORT NEWS

**JOINT APPENDIX - VOLUME V OF X**
**(Pages 1811 - 2271)**

Michele J. Brace
VA Capital Representation
Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
(434) 817-2970
mbrace@mindsort.com

Dana C. Hanson Chavis
Susanne Bales
Assistant Federal Defender
Federal Defender Services
of Eastern Tennessee
800 South Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979
dana_hansen@fd.org
susanne_bales@fd.org

G. Zachary Terwilliger
Lisa R. McKeel
Brian J. Samuels
Office of the U. S. Attorney
Fountain Plaza 3, Suite 300
721 Lakefront Commons
Newport News, VA 23606
(757) 591-4000
zachary.terwilliger3@usdoj.gov
lisa.mckeel@usdoj.gov
brian.samuels@usdoj.gov

*Counsel for Defendant-Appellant*                    *Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

*Volume I of X*

<u>Appendix Page</u>

District Court Docket [4:08-cr-00016-RBS-DEM-3]................................................1

Indictment
  Filed February 13, 2008 (Doc.3) ........................................................46

Notice of Intent to Seek the Death Penalty
  Filed July 17, 2008 (Doc.67).............................................................63

Voss Statement of Facts
  Filed July 18, 2008 (Doc.70).............................................................70

Notice Pursuant to Fed. R. Crim. P. 12.2 with attachment1
  Filed December 12, 2008 (Doc. 135) ............................................78

    Att. 1: Abreviated CV – Evan S. Nelson, PH.D., ABPP (Doc.135-1)......83
    Att. 2: CV – Evan S. Nelson, PH.D., ABPP (Doc.135-2)........................84

Defendant's Motion to Continue Trial
  Filed Feb. 20, 2009 (Doc.160)........................................................93

Order Granting Motion to Continue
  Feb. 23, 2009 (Doc.162)..................................................................97

Notice Regarding Mental Health Experts
  Filed April 8, 2009 (Doc.177) ......................................................101

Defendant's Motion to Continue Trial Date
  Filed April 13, 2009 (Doc.179) ....................................................105

Response of the USA to Defendant's Motion to Continue
  Filed April 21, 2009  (Doc.181) ....................................................122

Order Denying Defendant's Motion to Continue and USA Motion to Sever
  Entered May 7, 2009 (Doc.194) ...................................................126

Juror Questionnaire Order with attachment 1
June 11, 2009 (Doc.211).....................................................................................139

Att. 1: Blank Juror Questionnaire Filed June 11, 2009 (Doc.211-1) ......142

Memorandum Order Denying Defendant's Objections to Nonstatutory
Aggravating Factors
Entered June 17, 2009 (Doc.217) ..............................................................161

Defendant's Supp. Notice Regarding Mental Health Experts
Filed June 29, 2009 (Doc.230) ...................................................................173

Forensic Psychiatric Evaluation by Dr. Patterson
Filed June 29, 2009 (Doc.276) (Unsealed March 2, 2016 Order dkt516)...177

Forensic Psychological Evaluation by Dr. Montalbano
Filed June 30, 2009 (Doc.277) (Unsealed March 2, 2016 Order dkt516)...201

Transcript of First Day of Trial,
On June 30, 2009 (Doc.326 filed Mar. 31, 2010) ......................................232

Voir Dire (pp.1-134)...................................................................................233

Transcript of Second Day of Trial,
On July 1, 2009 (Doc.327 filed Mar. 31, 2010) .........................................365

Voir Dire (pp. 138, 194-195) .....................................................................366

Transcript of Third Day of Trial,
On Jul. 2, 2009 (Doc.328 filed Mar. 31, 2010) ..........................................369

Preliminary Proceedings (p.198) ...............................................................370

Transcript of Fourth Day of Trial,
Jul. 6, 2009 (Doc.329, filed Mar. 31, 2010) ..............................................371

Testimony of Rose Wiggins (pp.257-265)
Direct Examination by Ms. McKeel.......................................................374
Cross Examination by Mr. Woodward....................................................380
Redirect Examination by Ms. McKeel ...................................................382

Testimony of John Willmer (pp.353-374)
Direct Examination by Mr. Samuels ...................................................383
Cross Examination by Mr. Woodward...............................................401
Redirect Examination by Mr. Samuels...............................................403

Testimony of Randy Lassiter (pp.435-469)
Direct Examination by Ms. McKeel.....................................................406
Cross Examination by Mr. Ellenson....................................................463
Redirect Examination by Ms. McKeel .................................................437

Transcript of Sixth Day of Trial,
On July 8, 2009 (Doc.331filed March 31, 2010)  ........................................440

Testimony of Nichole King (pp.731-764)
Direct Examination by Ms. McKeel.....................................................442
Cross Examination by Mr. Woodward...............................................469

Testimony of Lawrence Ford (pp.765-774)
Direct Examination by Ms. McKeel.....................................................476
Cross Examination by Mr. Clancy ......................................................484

Testimony of George Koski (pp.840-856)
Direct Examination by Ms. McKeel.....................................................486
Cross Examination by Mr. Woodward...............................................499

*Vol II of X*

Transcript of Seventh Day of Trial,
On July 9, 2009 (Doc.332, filed Mar. 31, 2010) ........................................503

Testimony of Paul Swartz (pp.900-918)
Direct Examination by Mr. Samuels ...................................................506

Testimony of William Banks (pp.1031-1063)
Direct Examination by Ms. McKeel.....................................................526
Cross Examination by Mr. Woodward...............................................544
Redirect Examination by Ms. McKeel .................................................556
Recross Examination by Mr. Ellenson .................................................558

Testimony of Paul Swartz (pp.1065-1117)
Direct Examination by Mr. Samuels ...................................................561

Cross Examination by Mr. Woodward .................................................605
Redirect Examination by Ms. McKeel ................................................612

Transcript of Eighth Day of Trial,
On Jul.y 13, 2009 (Doc.333, filed Mar. 31, 2010) .....................................613

Proceedings re Stipulation No. 94 ...............................................615

Testimony of Paul Swartz (pp.1354-1370) (recalled)
Direct Examination by Mr. Samuels ......................................................616

Transcript of Ninth Day of Trial,
On July 14, 2009 (Doc.334, filed Mar. 31, 2010) ......................................632

Testimony of Paul Swartz (pp.1378-1491) (resumed)

Direct Examination by Mr. Samuels .....................................................635
Cross Examination by Mr. Clancy .......................................................722
Redirect Examination by Mr. Samuels...................................................745

Transcript of Tenth Day of Trial,
On July 15, 2009 (Doc. 335, filed Mar. 31, 2010) ..................................... 749

Proceedings re Stipulations (pp.1509-1519) .............................................752
Court's Rulings re Motions ......................................................754

Transcript of Eleventh Day of Trial,
On July 16, 2009 (Doc.336, filed Mar. 31, 2010) ......................................762

Closing Arguments:

AUSA McKeel, Guilt Phase Closing (pp.1582-1613) ...........................764
Counsel Woodward, Guilt Phase Closing (pp.1633-1656) ...................796
AUSA McKeel, Guilt Phase Rebuttal Closing (pp.1656-1665).............819

Court Jury Instructions (pp.1666-1714) ...................................................829

Supplemental Motion to Continue Capital Sentencing Hearing
Filed July 17, 2009 (Doc.240) ......................................................882

Statement of Defense Counsel
Filed July 17, 2009 (Doc.242)...............................................................889

Verdict Guilt Phase
Filed July 17, 2009 (Doc.245),......................................................................894

Second Supp. Motion to Continue Capital Sentencing Hearing
July 20, 2009 (Doc.247) ..............................................................................895

Transcript of Thirteenth Day of Trial,
On July 22, 2009 (Doc. 338, filed Apr. 2, 2010)........................................902

Counsel Hudgins,  Eligibility Phase Closing (pp. 1769-1772) ...................903

Order Granting Motion to Continue
Filed July 22, 2009 (Doc.254)....................................................................907

Special Verdict Eligibility Phase
Filed July 22, 2009 (Doc.255)....................................................................910

Order Appointing Dr. Merikangas
Entered July 22, 2009 (Doc.257)................................................................917

Defendant's Motion to Supp. Mental Health Report
Filed August 10, 2009 (Doc.269) ...............................................................919

*Vol III of X*

Transcript of Fifteenth Day of Trial,
On August 20, 2009 (Doc. 340, filed Apr. 2, 2010)....................................924

Argument/Ruling Dr. Cunningham Testimony (p.2076-2084)....................925

Testimony of Dr. Cunningham (pp. 2084-2192)
Direct Examination by Mr. Hudgins ....................................................933
Cross Examination by Mr. Samuels .....................................................1007

Defendant's Mitigating Factors Enumerated
Filed August 21, 2009 (Doc.285) ..............................................................1042

Transcript of Sixteenth Day of Trial,
On August 24, 2009 (Doc.341, filed Apr. 29, 2010)..................................1047

Testimony of Deputy Westrick, Portsmouth Sheriff's Office (pp.2199-2209)
  Direct Examination by Mr. Hudgins ...................................................1049
  Cross Examination by Mr. Samuels ...................................................1056

Testimony of Deputy Johnson, Portsmouth Sheriff's Office (pp.2209-2217)
  Direct Examination by Mr. Hudgins ...................................................1059
  Cross Examination by Ms. McKeel....................................................1065
  Redirect Examination by Mr. Hudgins...............................................1067

Testimony of Deputy Anderson, Portsmouth Sheriff's Office (pp.2217-2225)
  Direct Examination by Mr. Hudgins ...................................................1067
  Cross Examination by Ms. McKeel....................................................1072

Testimony of Deputy Marbry, Portsmouth Sheriff's Office (pp.2226-2234)
  Direct Examination by Mr. Hudgins ...................................................1076
  Cross Examination by Mr. Samuels ...................................................1080

Testimony of Deputy Singledecker, Portsmouth Sheriff's Office
(pp.2234-2239)
  Direct Examination by Mr. Hudgins ...................................................1084
  Cross Examination by Ms. McKeel....................................................1087

Testimony of Deputy Diaz, Portsmouth Sheriff's Office (pp.2239-2244)
  Direct Examination by Mr. Hudgins ...................................................1089
  Cross Examination by Mr. Samuels ...................................................1092

Testimony of David H. Runyon (pp.2366-2409)
  Direct Examination by Mr. Hudgins ...................................................1095
  Cross Examination by Mr. Samuels ...................................................1136

Testimony of Suk Cha Runyon (pp.2410-2439)
  Direct Examination by Mr. Hudgins ...................................................1139

Transcript of Seventeenth Day of Trial,
  On August 25, 2009 (Doc.342, filed Apr. 29, 2010)................................1170

Testimony of Phyllis Provost (pp.2518-2527)
  Direct Examination by Mr. Hudgins ...................................................1171
  Cross Examination by Ms. McKeel....................................................1177

Transcript of Eighteenth Day of Trial,
     On August 26, 2009 (Doc.343, filed Apr. 29, 2010)...............................1181

     AUSA Samuels, Sentence Selection Closing (pp.2588-2626)..................1182
     Counsel Woodward, Sentence Selection Closing (pp.2632-2656) ...........1226
     AUSA Samuels, Sentencing Rebuttal Closing (pp. 2656-2664)...............1250
     Court Jury Instructions (pp.2664-2696) ...................................................1258

Transcript of Nineteenth Day of Trial,
     On August 27, 2009 (Doc. 344, filed Apr. 29, 2010)...............................1292

   Jury Question  (pp.2707-2710) .......................................................................1298

Special Verdict Form - Selection Phase
     Filed August 27, 2009 (Doc.291) ..................................................................1311

*Volume IV of X*

## <u>Gov't Trial Exhibits</u>

     Gov't Ex. 23:   Commonwealth of Virginia Department of Forensic
                            Science Certificate of Analysis ......................................1317

     Gov't Ex. 28:   ATM Still Photos...........................................................1318

     Gov't Ex. 65:   Bates 065-006 Global Cash Receipt..............................1352

     Gov't Ex. 94:   Summary of Funds Available to/Spent by Cat Voss......1364

     Gov't Ex. 101:  Others' Inboxes.............................................................1365

     Gov't Ex. 109:   Sprint Detail Records for Runyon phone
                            304-685-6845..................................................................1367

     Gov't Ex. 135:   Map of cell tower locations ..........................................1393

     Gov't Ex. 217:   "Checklist for Crime"...................................................1395

     Gov't Ex. 236:    Photo of bullets.............................................................1397

     Gov't Ex. 311:    City of Wichita Municipal Court 01-CR-1407.............1398

     Gov't Ex. 313:   Wichita Police Dept. Incident Report dated
                            Jul. 23, 1994...................................................................1404

Gov't Ex. 315:   Magistrate Court of Monongalia County, West Virginia
1412 ...................................................................................1412

Gov't Ex. 316:   Morgantown Police Dept. Investigation/Incident Report
dated Jan. 6, 2007 ........................................................1433

Position of US with Respect to Sentencing Factors
Filed November 10, 2009 (Doc.301).............................................1443

Judgment
Filed December 4, 2009 (Doc.313) ...............................................1458

Defendant's Motion for Limited Unsealing of Record
On March 17, 2015 (Doc.415)........................................................1466

Memorandum in Support of Defendant's Motion for Limited Unsealing of
Record with Exhibit 3
On March 17, 2015 (Doc.416).........................................................1468

   Ex. 3:   Declaration of Michele Brace (Doc.416-3)..............................1474

United States' Response to Motion for Limited Unsealing of Record
On March 31, 2015 (Doc.418).........................................................1476

Defendant's Rebuttal Supporting Motion for Limited Unsealing of Record
Filed April 3, 2015 (Doc.421) ........................................................1481

Order Granting Limited Unsealing of Record
Filed Apr. 7, 2015 (Doc.422) .........................................................1487

Supp. Order Regarding Limited Unsealing of Record Questionnaires
Filed April 13, 2015 (Doc.423), .....................................................1494

Original §2255 Motion with Exhibit 1
Filed October 5, 2015 (Doc.478)....................................................1497

   Ex. 1:   Records Request to Bureau of Prisons, 06/02/15
(Doc.478-1)................................................... 1622A – 1622C
   Ex. 2–36:  Omitted – See JA pp. 1992 - 2247

Defendant's First Motion for Discovery  with Exhibits 1 – 5
Filed December 9, 2015 (Doc.491) .................................................1623

Ex. 1: ATF ROI dated Feb. 2, 2009 (Doc.491-1)....................................1661

Ex. 2: USA v. Runyon Disk Index (Doc.491-2) .....................................1663

Ex. 3: USA Gov't Witness List Fax, p.9 (Doc.491-3) ............................1664

Ex. 4: Medical/Mental Health Records Request to Portsmouth Sheriff's
Department from FDSET dated Oct. 2, 2015 (Doc.491-4)..........1666

Ex. 5: Medical/Mental Health Records Request to Portsmouth Sheriff's
Department from FDSET dated Nov. 3, 2015 (Doc.491-5)........1667

United States' Response to Original §2255 Motion
Filed January 11, 2016  (Doc.497) .........................................................1670

## Volume V of X

Order directing reply to §2255
Entered January 15, 2016 (Doc.499).......................................................1811

USA Opposition to First Motion for Discovery
Filed January 15, 2016 (Doc.500) ..........................................................1812

Reply Supporting First Motion for Discovery
Filed January 29, 2016 (Doc.506) ..........................................................1824

Amended §2255 Motion  with Exhibits 1 – 39
Filed February 4, 2016 (Doc.511) ..........................................................1842

Ex. 1: Placeholder (Doc.511-1) ..............................................................1991

Ex. 2: Dr. Merikangas Report 9/25/15 (Doc.511-2)..............................1992

Ex. 3: McNally Declaration 3/11/09 (Doc.511-3)..................................1998

Ex. 4: Cronin Declaration 9/26/15 (Doc.511-4)....................................2002

Ex. 5: Hudgins Declaration 9/22/15 (Doc.511-5) .................................2016

Ex. 6: Woodward Declaration 9/24/15 (Doc.511-6) .............................2019

Ex. 7: Costa Declaration 9/30/15 (Doc.511-7)......................................2022

Ex. 8: Cunningham Declaration 9/25/15 (Doc.511-8) ..........................2024

Ex. 9:    Cat Voss Declaration 9/10/15 (Doc.511-9) ................................2079

Ex. 10:   David Dalton Declaration 9/28/15 (Doc.511-10) .......................2082

Ex. 11:    Paula Dalton Declaration 9/28/15 (Doc.511-11) .......................2083

Ex. 12:    Matt Long Declaration 9/29/15 (Doc.511-12) ..........................2085

Ex. 13:    Scott Linker Declaration 9/24/15 (Doc.511-13) .......................2086

Ex. 14:    Excerpt Cell Phone Tracking Evidence (Doc.511-14) ..............2089

Ex. 15:    Babineau letter regarding death authorization 2/10/09
           (Doc.511-15),.......................................................................2109

Ex. 16:    Portsmouth Jail Records 2008 (Doc.511-16)............................2119

Ex. 17:    David Dombrowski progress notes (Doc.511-17) .....................2123

Ex. 18:    Lake Martin Community Hospital response (Doc.511-18) .......2125

Ex. 19:    Hudgins time schedule with mark ups ECF No 165
           (Doc.511-19)........................................................................2128

Ex. 20:    Dr. Mirsky letter 7/2/09 (Doc.511-20)....................................2131

Ex. 21:    Dr. Mirsky/Hudgins emails 7/22-23/09 (Doc.511-21) .............2132

Ex. 22:    Dr. Mirsky letter 9 18 09 (Doc.511-22)...................................2133

Ex. 23:    Army medical records (Doc.511-23) ........................................2136

Ex. 24:    Handwritten letter regarding 1996 car accident (Doc.511-24)..2160

Ex. 25:    Suk Cha Runyon medical records (Doc.511-25).......................2162

Ex. 26:    David Dombrowski declaration 9/23/15 (Doc.511-26).............2177

Ex. 27:    Mark Runyon declaration 9/25/15 (Doc.511-27) ......................2187

Ex. 28:    Maria Runyon declaration 9/16/15 (Doc.511-28)....................2194

Ex.29:    Dr. Dudley report 9/29/15 (Doc.511-29) .................................2199

Ex. 30:    Thomas Preston interview 10/4/08 (Doc.511-30).....................2223

Ex. 31:    Robert Seeger declaration 8/24/15 (Doc.511-31) .....................2226

Ex. 32: Deborah Seeger declaration 8/24/15 (Doc.511-32) ..................2229

Ex. 33: Captain Harris Declaration Fayetteville GA Police Dept.
1/13/16 (Doc.511-33) ................................................2234

Ex. 34: Scotty Fleming criminal history (Doc.511-34).........................2235

Ex. 35: Dr. Mirsky report 8/28/15 (Doc.511-35) ...................................2237

Ex. 36: Teresa Norris declaration 9/29/15 (Doc.511-36)......................2244

Ex. 37: Racial Disparities Staff Report by the Subcommittee
on Civil and Constitutional Rights (Doc.511-37) .....................2248

Ex. 38: Cohen Bell Declaration (Doc.511-38) ......................................2261

Ex. 39: Declaration of Michele J Brace (Doc.511-39)........................2269

Order
Entered February 8, 2016 (Doc.513)........................................................2271

## *Volume VI of X*

Reply Supporting Original §2255 Motion
Filed March 28, 2016 (Doc.526) ............................................................2272

Ex. A: Clinical Screening Information (Doc.526-1) .................................2366

Petitioner's Second Motion for Discovery
Filed April 1, 2016 (Doc.530) ................................................................2368

United States' Response to Second Motion for Discovery
Filed April 8, 2016 (Doc.532) ................................................................2376

Reply Supporting Second Motion for Discovery with Attachments A – C
Filed April 13, 2016 (Doc.533) ..............................................................2384

Att. A: Strengthening Forensic Science in the United States, A Path
Forward (Doc.533-1) ................................................................2392

Att. B: Charter USDOJ National Commission on Forensic Science
(Doc.533-2),...............................................................................2473

Att. C: National Commission on Forensic Science Views of the
Commission Validation of Forensic Science Methodology
(Doc.533-3)............................................................................2482

United States' Response to Amended §2255 Motion
Filed April 22, 2016 (Doc.536) ...............................................2485

Motion for Leave to Supplement Second Motion for Discovery
Filed May 24, 2016 (Doc.541) ................................................2644

Order Granting Supplement of Discovery Motion
Entered June 7, 2016 (Doc.544) ..............................................2648

Supplemental Memo to Second Motion for Discovery
Filed June 8, 2016 (Doc.545) ..................................................2651

Att. A: John Nixon Declaration (Doc.545-1) .........................2654

Reply Supporting Amended §2255 Motion  with Exhibits 1 – 5
Filed July 7, 2016 (Doc.551)....................................................2656

Ex. 1: Stephen Hudgins Declaration dated Jun. 22, 2016 (Doc.551-1) .2803

Ex. 2: John Nixon Declaration dated May 18, 2016 (Doc.551-2) .........2807

Ex. 3: Joseph Kennedy Declaration dated Jul. 6, 2016 (Doc.551-3) .....2809

Ex. 4: Stephen Hudgins Calendar from Appointment to Beginning of
Runyon Trial (Doc.551-4) .........................................................2812

Ex. 5: USA Strikes of Black Veniremen Report (Doc.551-5) ...............2813

### *Volume VII of X*

Order for Subpoena Duces Tecum
Entered July 12, 2016 (Doc.552)..............................................2817

Subpoena to Dept. of Forensic Science with attachment 1
Filed July 13, 2016 (Doc.553) .................................................2818

  Att. 1: Order for Subpoena to Dept. of Forensic Science
     (Doc.553-1)................................................................2822

Order for Costa Grand Jury Testimony
 Entered July 26, 2016  (Doc.555)...........................................2823
Opinion Denying §2255 Motion and Denying Discovery
 Filed Jan. 19, 2017 (Doc.560, 560-1, 560-2, 560-3, 560-4)..............................2824

Judgment
 Filed January 20, 2017 (Doc.561),.....................................3070

Petitioner's Motion for Sealed Materials Subpoenaed by Court
 Filed February 1, 2017 (Doc.564)....................................3071

Petitioner's Memorandum for Sealed Materials Subpoenaed by Court
 Filed February 1, 2017  (Doc.565)...................................3074

Rule 59(e) Motion to Alter or Amend
 Filed February 16, 2017 (Doc.566)..................................3079

Rule 59(e) Memorandum with attachment A
 Filed Feb. 16, 2017  (Doc.567) ......................................3081

  Att. A: Paula Dalton Declaration (Doc.567-1)...............................3102

Order Denying Access to Sealed Material Subpoenaed by Court
 Entered February 21, 2017 (Doc.568)...............................3103

Petitioner's Third Motion for Discovery
 Filed February 24, 2017 (Doc.570)..................................3111

United States' Response to Third Motion for Discovery
 Filed March 31, 2017 (Doc.574)....................................3122

United States' Response to Rule 59(e) Motion
 Filed March 31, 2017 (Doc.575)....................................3132

Petitioner's Reply Supporting Third Motion for Discovery
 Filed April 6, 2017 (Doc.576),.......................................3135

Record Notation Order
 Filed June 16, 2017 (Doc.583) ......................................3138

Order Directing Re-entry of Order Denying 59(e) Motion and Denying Third Motion
for Discovery
    Entered June 21, 2017  (Doc.586) ...................................................................... 3140

Re-entered Order Denying 59(e) Motion and Denying Third Motion for Discovery
    Filed June 21, 2017 (Doc.587), .......................................................................... 3143

Petitioner's Motion to Expand Record
    Filed August 18, 2017 (Doc.588) ........................................................................ 3154

Petitioner's Motion to Permit Copying and Distribution of Protected Documents
    Filed August 18, 2017 (Doc.589), ....................................................................... 3157

Notice of Appeal
    Filed August 18, 2017 (Doc.590) ........................................................................ 3160

Order Granting Motion to Expand the Record
    Entered September 15, 2017 (Doc.596) ............................................................... 3163

Order Granting Motion to Permit Copying and Distribution of Protected Documents
    Entered September 15, 2017 (Doc.597) ............................................................... 3166

*Volume VIII of X - Sealed*

Supplemental Motion for Neuropsychologist Expert Services and Approval of
Additional Funds for Paralegal/Discovery Coordinator Services Ex Parte
    Filed February 5, 2009 (Doc.153) ....................................................................... 3169

    Att. 1:    02/05/09 Cover Letter (Doc.153-1) ...................................................... 3172
    Att. 2:    CV – Scott D. Bender, Ph.D., ABPP-CN (Doc153-2) ........................ 3173

Supplemental Motion for Psychiatrist and to Change the Designation of the
Neuropsychologist Expert Previously Approved by the Court
    Filed June 8, 2009 (Doc.204) .............................................................................. 3176

Letter from Judge Smith directing three juror lists to be picked up by counsel
    Filed June 12, 2009 (Doc.210) ............................................................................ 3178

Order deferring action on defendant's motion for psychiatrist Dr. Merikangas
    Entered June 23, 2009 (Doc.229) ........................................................................ 3181

Psychological Evaluation of Dr. Mirsky
Filed July 20, 2009 (Doc.246)...........................................................................3184

Strike List for First Day
Filed April 13, 2015 (Doc.424).........................................................................3190

Strike List for Second Day
Filed Apr. 13, 2015 (Doc.424-1).......................................................................3194

Order sealing Claim S2 and Exhibit S-1
Entered October 5, 2015 (Doc.477) ..................................................................3198

Original Claim S-2
Filed Oct. 5, 2015 (Doc.477-1) .........................................................................3203

Exhibit S-1
Filed Oct. 5, 2015 (Doc.477-2) .........................................................................3223

Addendum S-1 to First Motion for Discovery
Dec. 4, 2015 (Doc.490) ....................................................................................3236

United States' Response to Original Claim S2
Filed January 11, 2016 (Doc.498)....................................................................3237

Petitioner's Motion to File Under Seal One Claim and One Exhibit in His
Amended Motion for Collateral Relief
Filed February 4, 2016 (Doc507)......................................................................3245

Amended Claim S2
Filed Feb. 4, 2016 (Doc.508) ...........................................................................3249

Reply Supporting Original Claim S2
Filed Mar. 28, 2016 (Doc.525).........................................................................3269

United States' Response to Amended Claim S2
Filed Apr. 22, 2016 (Doc.537) .........................................................................3275

Reply Supporting Amended Claim S2
Filed July 7, 2016 (Doc.549)............................................................................3284

Completed Questionnaire of Prospective Juror 1........................................................3291

Completed Questionnaire of Prospective Juror 2........................................................3310

Completed Questionnaire of Prospective Juror 4 ...................................................... 3329

Completed Questionnaire of Prospective Juror 7 ...................................................... 3348

Completed Questionnaire of Prospective Juror 10 .................................................... 3367

Completed Questionnaire of Prospective Juror 12 .................................................... 3386

Completed Questionnaire of Prospective Juror 13 .................................................... 3405

Completed Questionnaire of Prospective Juror 14 .................................................... 3424

Completed Questionnaire of Prospective Juror 15 .................................................... 3443

Completed Questionnaire of Prospective Juror 18 .................................................... 3462

Completed Questionnaire of Prospective Juror 20 .................................................... 3481

Completed Questionnaire of Prospective Juror 23 .................................................... 3500

Completed Questionnaire of Prospective Juror 24 .................................................... 3519

Completed Questionnaire of Prospective Juror 27 .................................................... 3538

Completed Questionnaire of Prospective Juror 28 .................................................... 3557

*Volume IX of X - Sealed*

Completed Questionnaire of Prospective Juror 29 .................................................... 3576

Completed Questionnaire of Prospective Juror 31 .................................................... 3595

Completed Questionnaire of Prospective Juror 32 .................................................... 3614

Completed Questionnaire of Prospective Juror 34 .................................................... 3633

Completed Questionnaire of Prospective Juror 35 .................................................... 3652

Completed Questionnaire of Prospective Juror 40 .................................................... 3671

Completed Questionnaire of Prospective Juror 46 .................................................... 3690

Completed Questionnaire of Prospective Juror 50 .................................................... 3709

Completed Questionnaire of Prospective Juror 51 .................................................... 3728

Completed Questionnaire of Prospective Juror 52 .................................................... 3747

Completed Questionnaire of Prospective Juror 54 .................................................... 3766

Completed Questionnaire of Prospective Juror 63 .......................................................... 3785

Completed Questionnaire of Prospective Juror 64 .......................................................... 3804

Completed Questionnaire of Prospective Juror 65 .......................................................... 3823

Completed Questionnaire of Prospective Juror 66 .......................................................... 3842

Completed Questionnaire of Prospective Juror 67 .......................................................... 3861

Completed Questionnaire of Prospective Juror 68 .......................................................... 3880

Completed Questionnaire of Prospective Juror 69 .......................................................... 3899

Completed Questionnaire of Prospective Juror 70 .......................................................... 3918

Completed Questionnaire of Prospective Juror 73 .......................................................... 3937

Completed Questionnaire of Prospective Juror 74 .......................................................... 3956

Completed Questionnaire of Prospective Juror 75 .......................................................... 3975

Completed Questionnaire of Prospective Juror 78 .......................................................... 3994

Completed Questionnaire of Prospective Juror 80 .......................................................... 4013

*Volume X of X - Sealed*

Completed Questionnaire of Prospective Juror 81 .......................................................... 4032

Completed Questionnaire of Prospective Juror 82 .......................................................... 4051

Completed Questionnaire of Prospective Juror 84 .......................................................... 4070

Completed Questionnaire of Prospective Juror 86 .......................................................... 4089

Completed Questionnaire of Prospective Juror 87 .......................................................... 4108

Completed Questionnaire of Prospective Juror 91 .......................................................... 4127

Completed Questionnaire of Prospective Juror 95 .......................................................... 4146

Completed Questionnaire of Prospective Juror 97 .......................................................... 4165

Completed Questionnaire of Prospective Juror 98 .......................................................... 4184

Completed Questionnaire of Prospective Juror 100 .......................................................... 4203

Completed Questionnaire of Prospective Juror 106 .......................................................... 4222

Completed Questionnaire of Prospective Juror 107......................................................... 4241

Completed Questionnaire of Prospective Juror 109......................................................... 4260

Completed Questionnaire of Prospective Juror 110......................................................... 4279

Completed Questionnaire of Prospective Juror 113......................................................... 4298

Completed Questionnaire of Prospective Juror 115......................................................... 4317

Completed Questionnaire of Prospective Juror 116......................................................... 4336

Completed Questionnaire of Prospective Juror 117......................................................... 4355

Completed Questionnaire of Prospective Juror 118......................................................... 4374

Completed Questionnaire of Prospective Juror 119......................................................... 4393

Completed Questionnaire of Prospective Juror 120......................................................... 4412

Completed Questionnaire of Prospective Juror 124......................................................... 4431

Completed Questionnaire of Prospective Juror 126......................................................... 4450

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

       Petitioner,

                                         ACTION NO. 4:15cv108
v.                  [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

       Respondent.

### ORDER

This matter comes before the court on the Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence ("Motion"), filed on October 5, 2015. ECF No. 478. The United States filed its Response on January 11, 2016. ECF No. 497. The Petitioner is now **DIRECTED** to file any reply deemed necessary within thirty (30) days of the date of entry of this Order.

The Clerk is **DIRECTED** to forward a copy of this Order to counsel for the Defendant and to the United States Attorney at Newport News.

IT IS SO ORDERED.

                             /s/
                      Rebecca Beach Smith
                        Chief Judge

REBECCA BEACH SMITH
CHIEF JUDGE

January 15, 2016

1811

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Petitioner | ) | CRIMINAL ACTION NO.: 4:08cr16 |
| | ) | CIVIL ACTION NO.: 4:15cv108 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**RESPONSE OF THE UNITED STATES TO MOVANT'S FIRST MOTION FOR
DISCOVERY AND CONSOLIDATED MEMORANDUM OF LAW**

COMES NOW the United States of America, by and through its attorneys, Dana J. Boente, United States Attorney for the Eastern District of Virginia, and Lisa R. McKeel and Brian J. Samuels, Assistant United States Attorneys, and Jeffrey A. Zick, Special Assistant United States Attorney, and submits this Response of the United States to Movant's First Motion for Discovery and Consolidated Memorandum of Law, filed by DAVID ANTHONY RUNYON ("Runyon").

## I.    **Procedural History**

On February 13, 2008, a federal grand jury returned a five-count indictment charging defendant David Runyon, and co-defendants Michael Draven and Catherina Voss, with Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a) (Count 1); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count 2); Bank Robbery Resulting in Death, in violation of 18 U.S.C. §§ 2113(a),(e) and 2 (Count 3); Conspiracy to Commit Robbery Affecting Commerce, in violation of 18 U.S.C. § 1951(a) (Count 4); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(j) (Count 5).   ECF 3.   The indictment also provided the notice of special findings for the death penalty pursuant to 18 U.S.C. §§ 3591, 3592. *Id.*

1

**1812**

The trial of Runyon and Draven began on June 30, 2009, and the guilt phase continued until July 17, 2009, involving over 50 witnesses and over 300 exhibits. On July 15, 2009, the district court dismissed Count 3 pursuant to Rule 29. On July 17, 2009, the jury found both defendants guilty on Counts 1, 2 and 5, and not guilty on Count 4. ECF 245. The eligibility phase was held on July 22, 2009. No evidence was presented and following argument the jury found Runyon intentionally killed Cory Voss. ECF 255. The jury also found the United States had proven the two noticed statutory aggravating factors. *Id.* at pgs. 5-6.

The selection phase of trial began on August 19, 2009. On August 21, 2009, Runyon submitted mitigating factors. ECF 285. The jury returned on August 27, 2009, and found four additional non-statutory aggravating factors, two statutory mitigating factors, and a number of non-statutory mitigating factors. ECF 291. The jury recommended death on Counts 1 and 5 and life imprisonment on Count 2. *Id.* at p. 5. On September 30, 2009, Runyon filed a motion to set aside the verdict, challenging certain victim-impact evidence. ECF 297. The court denied Runyon's motion on October 27, 2009. ECF 299. Runyon was sentenced to death and filed a timely notice of appeal. ECF 312.

Voss pled guilty to the indictment and was sentenced to life in prison on Counts 1, 2, 3 and 5, and 20 years in prison on Count 4. ECF 69, 127. Draven was sentenced to life in prison on Counts 1, 2 and 5, (ECF 304), and his convictions have been affirmed on direct appeal. *United States v. Draven*, 417 F. App'x 362 (4th Cir. 2011).

On February 25, 2013, Runyon's conviction and sentence were affirmed on direct appeal. *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013). On October 6, 2014, the Supreme Court denied Runyon's petition for a writ of certiorari. *Runyon v. United States*, No. 13-254 (Oct. 6, 2014). On October 5, 2015, Runyon filed his motion to vacate, set aside, or correct the sentence

2

**1813**

pursuant to 28 U.S.C. § 2255. ECF 478. The United States filed its response to Runyon's § 2255 motion on January 11, 2016. ECF 497. On December 9, 2015, Runyon filed a First Motion for Discovery and Consolidated Memorandum of Law seeking discovery related to various claims in his § 2255 motion. ECF 491. The United States responds to that motion here.

## II.      Legal Requirements for Discovery in § 2255 Proceedings

A habeas petitioner, unlike a traditional civil litigant, is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Discovery in this setting can occur only with leave of the court, upon a showing of good cause. *See* Rule 6(a) of the Rules Governing § 2255 Cases. In other words, a defendant "may invoke the processes of discovery . . . if, and to the extent that, the judge in the exercise of discretion and for good cause shown, grants leave to do so, but not otherwise." *Hall v. United States*, 30 F. Supp.2d 883, 899 (E.D. Va. 1998). "Good cause" for discovery exists when a petition for habeas corpus establishes a prima facie case for relief. *See Harris v. Nelson*, 394 U.S. 286, 290 (1969). Specifically, discovery is warranted under Supreme Court and Fourth Circuit precedent, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *See Bracy*, 520 U.S. at 908-09 (citing *Harris v. Nelson*, 394 U.S. 286, 295 (1969)); *United States v. Roane*, 378 F.3d 382, 402-03 (4th Cir. 2004) (affirming denial of multiple discovery requests). In *Roane*, the Fourth Circuit rejected the defendants' argument that the trial judge erred by granting summary judgment on some claims without first permitting discovery. *Roane*, 378 F.3d at 403-04. Particularly applicable here, a request for discovery must rely on specific factual allegations: discovery will not be allowed so that the petitioner can "explore [his] case in search of its existence." *See Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir.1999); *accord, United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990). A defendant may not use discovery to

3

go on a "'fishing expedition' through the Government's files in search of evidence to support an imagined and fanciful claim." *United States v. Lighty*, 2014 WL 5509205, at \*3 (D. Maryland Oct. 30, 2014) (citing *Wilson*, 901 F.2d at 381)).

"District courts enjoy nearly unfettered discretion to control the timing and scope of discovery." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 426 (4th Cir. 1996); *see Roane*, 378 F.3d at 403 (reviewing, for abuse of discretion, the denial of discovery in a § 2255 case). Once good cause is shown, the district court has discretion regarding the scope and extent of discovery. *Bracy*, 520 U.S. at 909.

## III.     Runyon Has Failed to Establish Good Cause for Discovery

In his request for discovery, Runyon seeks various forms of discovery related to several claims in his § 2255 motion. Specifically, Runyon requests production of documents regarding the selection of jurors (Claims 16 (*Batson* challenge)), information regarding the application of the death penalty in his case (Claim 12 (selective prosecution)), information regarding co-defendants Voss and Draven (Claim 2 (*Brady* claim)), and information on the purported illegal activities of Clifford Dean Posey and Robert Glenn Ford (Claim 1 (Due Process)). In addition, Runyon also asks this Court for leave to propound interrogatories he claims relate to the above claims, and moves this Court for an order directing the issuance of subpoenas seeking Runyon's mental health records.

Runyon fails to demonstrate good cause for discovery in this proceeding. For the reasons stated below, this motion should be denied.

A.     Discovery related to jury selection (Claim 16).

4

**1815**

Runyon primarily seeks historical evidence of the trial prosecutors' jury selection in other cases—implying either they or their office had a policy of discrimination. In addition, he seeks the trial prosecutors' notes and other documents related to the jury selection in this case.

The *Batson* challenge Runyon raises in Claim 16 of his § 2255 motion is procedurally defaulted. He raises this claim for the first time more than six years after his trial. Further, Runyon fails to demonstrate, much less proffer, cause for his default of this claim. In addition, Runyon fails to demonstrate that his trial and appellate counsel were ineffective for failing to raise this claim. *See* ECF 497 at 128–32, 79–82. Because his claim is either procedurally defaulted or lacks merit, Runyon has failed to establish a prima facie case for relief. Runyon is not entitled to the discovery he seeks.

Runyon's statistical argument—that the United States struck 70 percent of African-American jurors—is insufficient to raise an inference of purposeful discriminatory intent by the United States. *See United States v. Tipton*, 90 F.3d 861, 881, n.11 (4th Cir. 1996) (rejecting gender discrimination claim where defendants produced no evidence to support claim other than "raw figures" of four men versus eight women stricken). Moreover, Runyon's use of statistics does not rise to the level of "'specific allegations' justifying discovery in this case." *Lighty*, 2014 WL 5509205, at *8.

The United States references and incorporates its argument in response to Claim 16 in Runyon's §2255 motion here. Because there is no merit to Runyon's claim, the need for discovery is obviated. Furthermore, the discovery Runyon seeks is wholly speculative and unnecessary. For example, Runyon speculates that the trial prosecutors have exercised race and gender strikes in "at least one other capital case," and that the prosecution notes and documents may reveal race or gender related comments. ECF 491 at 9. But Runyon fails to offer the name of the case or any

**1816**

other evidence for his allegation that the trial prosecutors engaged in race or gender discrimination in jury selection. Runyon's request for discovery is a search for evidence to support an imagined claim and this Court should deny such a fishing expedition.

Likewise, Runyon's bald assertion that the prosecutors notes would be "relevant" to his claim, citing *Miller-El v. Cockrell (Miller-El I)*, 537 U.S. 322 (2003) and *Miller-El v. Dretke, (Miller-El II)*, 545 U.S. 231 (2005), does not satisfy the good cause required for limited discovery in § 2255 proceedings. In *Miller-El-II*, the Supreme Court reminded courts of their responsibility to "assess the plausibility of [a prosecutor's stated] reason in light of all evidence with a bearing on it." 125 S.Ct. at 2331 (citing *Batson*, 476 U.S. at 96-97). The *Miller-El-II* Court, rejected a prosecutor's credibility on the basis of a constellation of facts including the repeated use of a "jury shuffle" to favor the selection of white jurors, the use of disparate voir dire questions to vet black and white veniremen (including inquiries the Court characterized as "trickery"), and evidence that the prosecutor's office had once had a written policy of discrimination. *Id.* at 2323-39. All of these circumstances are missing in this case. Moreover, there is nothing in *Miller- El-II* or any other cases cited by Runyon which support the kind of rummaging through of the government or court files which Runyon seeks. Likewise, again citing *Miller-El II*, he argues that he is entitled to obtain information about other capital cases because it is relevant to whether the United States engaged in impermissible discrimination. Unlike *Miller-El II*, where the prosecutor's office had a documented policy of discrimination, there is no such evidence in this case. These arguments have no application to the instant matter, as discovery on collateral review is not permitted so that a petitioner can "explore [his] case in search of its existence." *Rich*, 187 F.3d at 1067. Given the ample record and controlling Supreme Court and Fourth Circuit precedent, this Court should find that Runyon has failed to show good cause for discovery and deny his request.

6

**1817**

B.   Runyon is not entitled to discovery to support his selective prosecution claim.

Runyon seeks discovery related to Claim 12 in his §2255 motion. Specifically, he requests documents delving into the United States' prosecutorial discretion to notice the death penalty against Runyon. This Court should deny his request.

In Claim 12, Runyon alleges that the Federal Death Penalty Act is administered in a racially biased manner and that the United States improperly sought the death penalty against him based on his race. Specifically, Runyon claims that his trial and appellate counsel were ineffective for failing to raise a selective prosecution claim. But, as the United States argues in response and incorporates here, ECF 497 at 109–15, Runyon cannot meet the "demanding" standard to prove a selective prosecution claim, *United States v. Armstrong*, 517 U.S. 456, 463 (1996), nor can he meet the rigorous standard to obtain discovery in a selective prosecution claim. *United States v. Bass*, 536 U.S. 862, 863 (2002). Likewise, Runyon fails to demonstrate that there is "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

In order to prevail on his selective prosecution claim, Runyon must present some evidence of both discriminatory effect and discriminatory intent. *Bass*, 536 U.S. at 863. Runyon fails to proffer any evidence that a particular group of individuals has been treated any differently than a similarly situated group. *Armstrong*, 517 U.S. at 470 (rejecting statistical studies that failed to identify similarly-situated persons of other races who were treated differently). Because there is no merit to Runyon's claim and he cannot meet the rigorous standard for discovery on his substantive claim, he necessarily cannot demonstrate good cause for discovery here. For the reasons stated in the United States' response to Claim 12, this request should be denied.

C.   Runyon is not entitled to discovery on his procedurally defaulted *Brady* claim.

7

**1818**

In Claim 2 of his §2255 motion, Runyon alleges that the United States violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Kyles v. Whitley*, 514 U.S. 419 (1995), by failing to provide him co-defendant Draven's background and mitigation evidence prior to trial. Runyon requests discovery of a broad range of documents concerning Draven's medical and mental health, social and criminal history, and purported grand jury testimony of alleged victims of Draven's purported actions.

Runyon fails to demonstrate good cause entitling him to discovery here. This claim is procedurally defaulted, thus discovery is unnecessary. Procedural default notwithstanding, as stated in the United States' response to Claim 2, incorporated here by reference, the discovery Runyon seeks is not material to his guilt or innocence, nor is it material to his punishment. The United States did not withhold material evidence as to the guilt or punishment related to Runyon in violation of *Brady*. Even if the facts are fully developed here, Runyon still would not be able to demonstrate that he is entitled to relief. *Bracy*, 520 U.S. at 908–09. The evidence he seeks is not admissible on any issue in the guilt or penalty phases of his trial. This discovery request should be denied.

D.      Runyon fails to demonstrate good cause entitling him to discovery on Claim 1.

In Claim 1 of his §2255 motion, Runyon alleges that the United States violated his right to a fair trial and due process by failing to disclose the subsequent charged criminal offenses of two law enforcement officers involved in his case—Robert Glenn Ford, Runyon's investigator, and Clifford Dean Posey, a former Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives. ECF 478 at 12–16. He seeks discovery of any and all documents in the possession of various agencies related to the investigation of Posey and any documents that refer to Ford.

8

**1819**

As argued by the United States in its response, incorporated here by reference, Runyon's claim is procedurally defaulted and lacks merit. ECF 497 at 18–21. Other than speculation, Runyon proffers no specific allegation that either Ford or Posey tainted Runyon's trial. Because Runyon fails to allege specific allegations to show reason to believe, if the facts are fully developed, he is entitled to relief, he fails to demonstrate good cause for discovery. *Bracy*, 520 U.S. at 908–09.

E.    Runyon is not entitled to propound interrogatories or issue subpoenas.

Runyon asks this Court to grant him leave to propound interrogatories and issue subpoenas related to the above claims. But, as stated in the United States response to those claims, incorporated here by reference, Runyon fails to demonstrate good cause for this additional discovery.

In his request for subpoenas. Runyon seeks his own medical and mental health information from the Portsmouth City Jail and Portsmouth Sheriff's Office. He argues he is entitled to this discovery because if the allegation of ineffective assistance of counsel for failing to investigate his mental health is true, then he is entitled to relief. But, as stated in the United States' response to Claims 4, 5, and 6 in the §2255 motion, trial counsel was not ineffective for failing to investigate Runyon's mental health or other relevant mitigation. ECF 497 at 30–72. The specific allegation Runyon makes regarding the discovery he seeks fails to show reason to believe that, even if the facts are fully developed, he would be entitled to relief. *Bracy*, 520 U.S. at 908–09. The allegation that counsel failed to properly investigate and present mental health evidence fails to consider to double-edged nature of the evidence and discounts the overwhelming evidence in aggravation as a result of Runyon's calculated and cruel crimes. Runyon's trial counsel chose a reasonable strategy for presentation of mitigation and made a strategic decision not to present mental health

9

**1820**

evidence that would have contrasted or contradicted that presentation. Because there is no merit to Runyon's claims of ineffective assistance of counsel for failing to investigate and present mental health evidence, Runyon cannot demonstrate good cause for additional discovery.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Runyon's First Motion for Discovery.

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____/s/_____

Lisa R. McKeel
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph: (757) 591-4000
Fax: (757) 591-0866
Email: Lisa.McKeel@usdoj.gov

By: _____/s/_____

Brian J. Samuels
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph: (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov

By:_____/s/_____

Jeffrey A. Zick
Special Assistant United States Attorney
Attorney for the United States

**1821**

United States Attorney's Office
Fountain Plaza Three, Suite 300
21 Lakefront Commons
Newport News, Virginia 23606
Phone: 757/591-4000
Fax: 757/591-0866
Email: Jeffrey.Zick@usdoj.gov

11

**1822**

CERTIFICATE OF SERVICE

I certify that on January 15, 2016, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system.  I further certify that I caused a true and correct

copy of the foregoing to be mailed to the following non-ECF user:

**Michele Jill Brace**
Virginia Capital Representation Resource Center
2421 Ivy Rd., Suite 301
Charlottesville, VA  22903
Ph:  434-817-2970, 202-223-6380
Email: mbrace@mindsort.com

**Dana Catherine Hansen Chavis**
Federal Defender Services of Eastern Tennessee, Inc.
800 S. Gay St, Suite 2400
Knoxville, TN  37929
Ph:  (865) 637-7979
Fax:  (865) 637-7999
Email:  dana_hansen@fd.org

By: _____ /s /_____
Jeffrey A. Zick
Special Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: 757-591-4000
Fax: 757-591-0866
Email: Jeffrey.Zick@usdoj.gov

12

**1823**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON,<br>Petitioner, | : | No. 4:15cv108 |
| | : | Original Criminal No. 4:08cr16-3 |
| -v- | : | **CAPITAL § 2255 PROCEEDINGS** |
| UNITED STATES OF AMERICA,<br>Respondent. | : | HON. REBECCA BEACH SMITH |

## PETITIONER'S REPLY IN SUPPORT OF FIRST MOTION FOR DISCOVERY

Runyon's discovery motion discusses in detail the circumstances under which this Court can grant a motion for discovery. One point raised in the Government's response is that the required "good cause" for discovery exists when a habeas petition establishes a prima facie case for relief. ECF No. 500, p.3. That standard does not set a high hurdle. As the Court explained in *Johnson v. California*, 545 U.S. 162, 170 (2005), a party makes a prima facie case when he produces evidence "sufficient to permit the trial judge to draw an inference" that a violation occurred. Each of the claims for which Runyon seeks discovery satisfies that standard.

The Government's response asserts that Runyon is not entitled to discovery because his claims are procedurally defaulted or lack merit. The Government makes this assertion in isolated sentences within its discussion of each individual request. It provides no specifics on any assertion; it simply incorporates by reference the arguments in its answer to Runyon's §2255 motion. Runyon is constrained to do the same. He hereby asserts that the referenced claims are not procedurally defaulted, that if they are defaulted there is cause and prejudice to excuse the defaults, and that the

1

**1824**

claims are meritorious and worthy of relief. Runyon further incorporates here by reference the responsive arguments on those points that will appear in his forthcoming reply in support of the §2255 motion. Runyon cannot present those arguments in greater detail at this point because he very recently received the Government's answer, and he has not yet had the opportunity to fully research and draft those arguments.[1]

Even if Runyon's claims were defaulted, the discovery he requests is relevant to his ability to overcome those defaults. For example, facts showing "cause and prejudice parallel two of the three components of the alleged *Brady* violation itself." *Strickler v. Green*, 527 U.S. 263, 282 (1999). Facts showing a pattern or policy of prosecutorial misconduct can similarly contribute to showing cause and prejudice to overcome the procedural default.

## I.      Requests for information regarding the selection of jurors in this case.

The Government's response notably does not raise any of the traditional objections to discovery—that the request is burdensome or overbroad; that the materials sought are privileged or confidential; or that the discovery sought is not relevant to the substance of the claims presented. Instead, the Government argues that Runyon is not entitled to discovery at all. The Government is wrong.

Runyon has already presented credible facts that raise an inference of purposeful discriminatory intent and entitle him to obtain discovery under *Bracy v. Gramley*, 520 U.S. 899 (1997). He has made a specific showing that *all* of the peremptory strikes of African-Americans in this case were exercised by the prosecutors, and that this accomplished the removal of 70% of

---

[1] Runyon's proposed scheduling order (ECF Nos. 501 & 502), which this Court declined to implement (ECF No. 505), would have deferred Runyon's reply regarding discovery until after he filed his reply on the §2255 motion. This would have avoided Runyon's need to incorporate arguments from a pleading that he has not yet filed.

2

the eligible black potential jurors. This targeted statistical evidence is sufficient on its own to require evidentiary development. *See Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003) ("the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when ... [they] used their peremptory strikes to exclude 91% of the eligible African-American venire members ... [and] happenstance is unlikely to produce this disparity); *Batson v. Kentucky*, 476 U.S. 79, 93 (1986) ("seriously disproportionate exclusion of Negroes from jury venires ... is itself such an unequal application of the law ... as to show intentional discrimination") (quoting *Washington v. Davis*, 426 U.S. 229, 241-42 (1976) (internal citation and quotation marks omitted)). The Government's conduct in Runyon's case easily would have required this Court to demand an explanation at trial if defense counsel had objected.

But Runyon has shown more than just statistical evidence. Like African-Americans, Runyon is a member of a racial minority: he is Asian. At the time of voir dire, the prosecutors intended to put into evidence (and did put into evidence) an inflammatory videotape that conveyed "stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act," which the court of appeals said "had no place at this sentencing proceeding." *United States v. Runyon*, 707 F.3d 475, 493-94 (4th Cir. 2013). On brief, the prosecutors engaged in the same kind of inappropriate racial stereotyping. They argued to the Fourth Circuit that their use of the videotape was "not problematic" because it did not present a *bad* stereotype of Asians; it presented a *good* one that purportedly appealed to "positive aspects of [Runyon's] identity." *Id.* at 493-94. The prosecutors' use and subsequent defense of the videotape indicates a degree of animosity toward racial minorities that adds weight to Runyon's statistical evidence. In aggregate, this evidence makes a significant showing of intentional discrimination in selection of the jury.

3

**1826**

The Government argues that for unstated reasons incorporated from its recently filed answer to the §2255 motion, Runyon's Claim 16A, which contains the allegations of racial and gender discrimination, is defaulted. Runyon disagrees. Because of the current schedule for Runyon's filings, he has not had the opportunity to carefully read that answer, nor the ability to research and draft his reply in support of the §2255 motion, but he will address the issue of procedural default in that reply and he incorporates here his argument from that forthcoming pleading.

The Government also argues that for unstated reasons incorporated from its answer to the §2255 motion, Runyon's Claim 16B lacks merit. That is the claim which alleges that defense counsel unreasonably failed to object to the prosecution's discriminatory exercise of peremptory strikes. Runyon disagrees that this claim lacks merit. He must again state that because of the current schedule he has not had the opportunity to carefully read the Government's answer, nor the ability to research and draft his reply in support of the §2255 motion. He will address the merits of his claim in that reply, and he incorporates here his arguments on the merits from that forthcoming pleading.

To the extent the Government makes other arguments in opposition to discovery, they are meritless and sometimes self-contradictory. The Government resists Runyon's request for historical evidence of its policies and prior accusations of discrimination, for example, because it says that information has no application to this case. Yet it recognizes the relevance of such evidence a few paragraphs later when it faults Runyon for having failed to already present evidence of prior policies or prior accusations of discrimination. ECF No. 500, pp.5-6.

4

**1827**

The Government also argues that Runyon is not entitled to discover the kinds of historical documents presented in *Miller-El v. Dretke*, 545 U.S. 231 (2005), because the particular manifestations of prosecutorial discrimination in that case—calling for multiple jury shuffles, asking disparate voir dire questions based on the potential juror's race, and a prior policy of discrimination—are allegedly missing in Runyon's case.[2] Even if those manifestations are not present in Runyon's case, it is irrelevant. Evidence of the prosecution's discriminatory intent is what matters, not the particular mechanisms it uses to exercise that intent.

## II. Requests for information regarding the application of the death penalty in this case.

Runyon has requested the production of documents related to the unconstitutional, discriminatory application of the death sentence in this case (Claim 12)[3] and/or the unconstitutional disparity of the death sentence in this case (Claim 13). These claims are related but assert different legal theories for relief.

### A. Claim 12

To obtain discovery on Claim 12, Runyon need not establish a prima facie case of selective prosecution but must satisfy a "rigorous standard" of producing "'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent." *United States v. Armstrong*, 517 U.S. 456, 468 (1996) (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974)); *United States v. Bass*, 536 U.S. 862, 863 (2002) (same). In this context, "some evidence" means "a credible showing" that "similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465. Evidence "identify[ing]

---

[2] Whether there is a prior policy of discrimination is an open question on which Runyon has requested discovery.

[3] Claim 12 includes an allegation of ineffective assistance of counsel for failing to raise this issue.

5

individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted," therefore suffices. *Id.* at 470. As stated by one court, "the question here is whether [the defendant's] behavior was so dissimilar from that of the [others] in nature, kind, and degree as to nullify the possibility that his discovery request might yield information relevant to a claim of selective prosecution." *Commonwealth v. Bernardo B.*, 900 N.E.2d 834, 846 (Mass. 2009).

The Government's opposition states that Runyon has not "proffer[ed] any evidence that a particular group of individuals has been treated any differently than a similarly situated group." ECF No. 500, p.7. To the contrary, Runyon alleged that the Government could have sought the death penalty for his two white co-defendants but did not, and it chose to seek the death penalty only for him, a member of a minority race. *See Armstrong*, 517 U.S. at 469 (selective prosecution implies that a selection has taken place).

All three co-defendants in this case were charged with the same crimes and the two white co-defendants were charged with three statutory aggravating circumstances whereas Runyon was charged with only two. Runyon's jury found all three co-defendants were equally culpable in the commission of the crime. The majority of the guilt-phase evidence demonstrated the white co-defendants' planning and execution of the crime, the lavish manner in which the two spent the proceeds of the crime, and their coordinated effort to cover-up the crime. Although the white female co-defendant pled guilty and received a life sentence she did not provide additional information regarding the crime nor did she testify against the other two co-defendants during their subsequent joint trial. The white male co-defendant exercised his right to a trial, as did Runyon, but he was not exposed to the death penalty nor did he assist the prosecution against Runyon.

6

**1829**

The Government possessed evidence showing that the white male co-defendant's prior violent conduct and potential for future violent conduct was much stronger than its evidence of Runyon's prior violence. *See* Claim 2. Moreover, the white co-defendants enjoyed $100,000 in proceeds of the crime which establishes a weightier "pecuniary gain" aggravating circumstance than was levied against Runyon. The "substantial planning" aggravator is weightier with respect to the two white co-defendants who, according to the prosecution's theory, engaged in an extensive illicit affair, planned the crime for months, searched for a triggerman, chose the location of the crime, lured the victim to the crime scene and directed Runyon's actions. The "victim impact" aggravator is as strong or stronger against the white co-defendants, especially since the white female co-defendant was the victim's wife and mother of his children and the white male co-defendant was the white female's lover. With regard to the "lack of remorse" aggravator, the white female arranged the crime scene location by opening a bank account, directed her husband to the bank's ATM, and remained on the phone with him as he drove to his death while coordinating his whereabouts with the white male co-defendant. The white female co-defendant lied to military and federal officials and law enforcement to receive a pay-out on her husband's death. Both white co-defendants spent those proceeds and engaged in a coordinated cover-up, tampered with witnesses, and confessed only after being taken into custody and when arrest was inevitable. The white female co-defendant pled guilty for purposes of escaping the death penalty. The white male co-defendant exercised his right to trial and did not apologize or express remorse. Accordingly the "lack of remorse" aggravator asserted against Runyon because he did not confess to the crime is not stronger for him than the white co-defendants.

<div align="center">7</div>

<div align="center">**1830**</div>

The Government's opposition is silent regarding the discriminatory intent prong of Claim 12. Indeed, Runyon has set forth some evidence of intent based on statistical evidence of racial disparity and the prosecution's conduct at Runyon's trial where, as discussed in Claim 16, the prosecution demonstrated a bias against persons of color. The prosecution introduced evidence and comments that "contaminated the sentencing proceeding with invidious considerations concerning [Runyon's] ethnicity and religion." *Runyon*, 707 F.3d at 493-95. The prosecution's closing argument evidenced a further intent to contravene other constitutional rights. It "infringed [Runyon's] Sixth Amendment rights by impugning his decision to proceed to trial[,]" and violated Runyon's Fifth Amendment right against self-incrimination by urging the jurors to penalize him for remaining silent and not articulating remorse. *Id.* at 507-09. The court of appeals' finding that these violations were harmless is irrelevant to Runyon's threshold demonstration of discriminatory intent.

The discriminatory choices and acts of the prosecution in Runyon's case are probative of discriminatory intent reflected in statistical evidence of racial disparity in the application of the Federal Death Penalty Act, particularly in the Eastern District of Virginia. An overwhelming 42 out of 44 death-authorized cases in the Eastern District of Virginia (95%) are prosecutions of non-white men.[4] The race of the defendant directly correlates to the rate of being federally-charged

---

[4] Either race-of-victim or race-of-defendant discrimination, or both, result in disparate charging in capital cases. Because the victim in this case is white, Runyon was three times more likely to be sentenced to death than a defendant who kills a non-white victim. The likelihood that this discrepancy occurs by chance is "essentially zero." In the time-period before this crime, "the race of the victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty[.]" (Attachment A, Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, *Racial Disparities in Federal Death Penalty Prosecutions 1988-1994*, p.7 (March 1994) ("*Racial Disparities*") (quoting U.S. General Accounting Office, Death Penalty Sentencing 5 (Feb. 1990)). The declaration of Lauren Cohen

8

with capital murder. From 1988-1994, the percentage of defendants selected for capital prosecution nationwide who were white was 11% whereas 89% were non-white. (Attachment A, *Racial Disparities*, p.1). For example:

> Three-quarters of those convicted of participating in a drug enterprise under the general provisions of § 848 have been white and only about 24% of the defendants have been black. However, of those chosen for death penalty prosecutions under this section, just the opposite is true: 78% of the defendants have been black and only 11% of the defendants have been white. (See Fig.1). Although the number of homicide cases in the pool that the U.S. Attorneys are choosing from is not known (the Justice Department has not responded to Congressional inquiries for that data), the almost exclusive selection of minority defendants for the death penalty, and the sharp contrast between capital and non-capital prosecutions under § 848, indicate a degree of racial bias in the imposition of the federal death penalty that exceeds even pre-*Furman* patterns.

*Id.* at pp.2-3.

From 1995-2000, the federal death penalty was authorized for 159 defendants. U.S. Dep't. of Justice, *The Federal Death Penalty System: A Statistical Survey (1988)-(2000)*, p.8 (Sept. 12, 2000), *available at* http://www.justice.gov/archive/dag/pubdoc/_dp_survey_final.pdf. Of the 159 death-authorized defendants, 28% were white and 72% were non-white. *Id.* Clearly, the race of the defendant is a significant factor in how the federal death penalty is applied. *Compare Hunter v. Underwood*, 471 U.S. 222, 227 (1985) (finding discriminatory impact from a state law where Blacks were at least 1.7 times as likely to suffer disenfranchisement under the law). Statistics for

---

Bell was inadvertently not attached to Runyon's initial §2255 motion. *See* Attachment B. Although that study focused on the correlation between white female victims and the death penalty, it remains probative in this case where the victim is a white male. In society as a whole, African-Americans account for about half of murder victims. Almost 80% of death row defendants have been executed for killing white victims. *See* Death Penalty Information Center, *Race and the Death Penalty, available at:* http://www.deathpenaltyinfo.org/race-and-death-penalty.

9

**1832**

the Eastern District of Virginia are not only consistent with nationwide statistics but at an authorization rate of 95% for non-whites, they show an even greater disparity in the application of the death penalty. In a related context, the Supreme Court "has recognized that the direct impact of the challenged official action is frequently probative of why the action was taken, since people 'usually intend the natural consequences of their actions.'" *Williams v. Hansen*, 326 F.3d 569, 585 (4th Cir. 2003) (quoting *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977))).

In *United States v. Bass*, 536 U.S. at 863, the Supreme Court acknowledged nationwide statistics demonstrating that "[t]he United States charges blacks with a death-eligible offense more than twice as often as it charges whites[.]" The defendant in *Bass* fell short on his demonstration of a right to discovery because he did not relate the overall statistics to the treatment of similarly situated defendants. *Id.* at 864. From federal cases docketed in 2008, undersigned have identified 12 defendants—including Runyon—who were authorized for the death penalty. *See Federal Capital Prosecutions – race and gender of defendants and victims* (August 2015), *available at:* http://www.capdefnet.org/FDPRC/pubmenu.aspx?menu_id=96&folder_id=5120. Only two of the twelve defendants were white. The impact of both nationwide and district statistics is clearly exemplified in Runyon's case where the similarly situated white co-defendants (charged with the same crimes and three aggravating circumstances compared to Runyon's two) were not exposed to the death penalty. The prosecution chose not to subject two similarly situated co-defendants of another race to the death penalty and Runyon has alleged "some evidence" making a "credible showing of different treatment" which entitles him to discovery on Claim 12. *Armstrong*, 517 U.S. at 470.

<div align="center">10</div>

<div align="center">**1833**</div>

## B. Claim 13

The Government's response is silent as to Runyon's discovery requests in relation to Claim 13 where the lesser "good cause" standard for discovery under Rule 6 applies.

## III.   Requests for medical and mental health information related to David Runyon.

Runyon has requested a subpoena for his medical and mental health records from the Portsmouth City Jail and Portsmouth Sheriff's Office which will support Claims 4, 5, 6, 13, and 14 of his §2255 motion. ECF No. 491, pp.33-36. The Government opposes this request for reasons incorporated from its answer to the §2255 motion and argues that Runyon's claims of ineffective assistance of counsel (Claims 4, 5 and 6) lack merit. ECF No. 500, pp.9-10. Runyon has not had the opportunity to carefully read that answer, nor the ability to research and draft his reply in support of the §2255 motion, but he will fully address the Government's argument in that reply and he incorporates here his argument from that forthcoming pleading.

The Supreme Court has rejected the two bases argued by the Government in its opposition. *See* ECF No. 500, p.9. First, regarding the Government's vague allegation that the mental health evidence has a "double-edged nature," the Supreme Court does not discount the mitigating value of significant mental and psychological impairments just because of the unsurprising "fact that along with ... new mitigation evidence there was also some adverse evidence[.]" *Sears v. Upton,* 561 U.S. 945, 951 (2010). When some adverse evidence accompanies mitigating evidence competent counsel should have been able to "turn some of the adverse evidence into a positive[.]" *Id.* The Court has explained the value of the evidence which "might not have made [the defendant] any more likable to the jury, but it might well have helped the jury understand [him], and his horrendous acts—especially in light of his purportedly stable upbringing." *Id.*

11

**1834**

Second, relief is not foreclosed just because the Government alleges that there was "overwhelming evidence in aggravation as a result of Runyon's calculated and cruel crimes."[5] ECF No. 500, p.9. The Supreme Court has consistently held that a defendant's criminal acts do not excuse counsel's failure to investigate and present mitigating evidence, nor does a defendant's conduct foreclose a life sentence. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 398 (2000) (counsel was ineffective for failing to investigate and present mitigating evidence because it "may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.").

The Government's argument against a subpoena for Runyon's own records would require the Court to render a merits determination of Runyon's several ineffective assistance of counsel claims as opposed to analyzing whether "good cause" exists. An order authorizing the subpoena should be granted because Runyon has set forth specific facts regarding the content of the jail records and the expectation that the discovery will support the claim that counsel unreasonably failed to discover that Runyon suffers from severe mental illness. ECF No. 491, p.35.

The Government's opposition is silent regarding Runyon's request in relation to Claim 13 (regarding the disproportionate and arbitrary imposition of death) and Claim 14 (alleging the death sentence is cruel and unusual punishment because Runyon is severely mentally ill).

---

[5] Although the jurors found the crime involved "substantial planning" they did not find it was "cruel."

12

**1835**

## IV.   Requests for information that would have supported Runyon's sentencing-phase defense.

The Government argues against discovery by asserting for unstated reasons that Runyon would not be able to demonstrate a meritorious claim even if the facts are fully developed. ECF No. 500, p.8. The sole support for this argument is a citation to a Supreme Court case that held the defendant had established "good cause" for discovery. *Id.* That case, *Bracy v. Gramley, supra,* presents a factual scenario similar to this case and illustrates that Runyon, too, has established "good cause" for discovery.

The habeas petitioner in *Bracy* advanced a judicial bias claim stemming from the trial judge's alleged interest in a conviction in Bracy's case "to deflect suspicion that he was taking bribes in other cases[.]" *Bracy,* 520 U.S. at 901. Bracy requested discovery of the prosecution's materials and research in the subsequent criminal prosecution of the judge in order to support the claim of judicial bias in his case. *Id.* at 902 & n.3. Bracy submitted in support of discovery "a copy of the United States' proffer of evidence in aggravation in [the judge's] case, which describes in considerable detail [the judge's] corruption both before and after he became a judge." *Id.* at 906. The Supreme Court held that Bracy's specific allegations established "good cause" for discovery despite the fact that his theory was "quite speculative," *id.* at 905, and "not supported by any solid evidence," *id.* at 908, because the allegations regarding the judge's corruption were true and Bracy's case was tried between two other trials that had been "fixed." *Id.* "It may well be," stated the Court, "that petitioner will be unable to obtain evidence sufficient to support a finding of actual judicial bias in the trial of his case, but we hold that he has made a sufficient showing, as required by Habeas Corpus Rule 6(a), to establish 'good cause' for discovery." *Id.* at 909.

13

**1836**

Runyon's §2255 motion asserts a *Brady* claim based on the prosecution's withholding of evidence that would have added substantial weight to the "equally-culpable co-defendant" mitigating circumstance and reduced the weight of the "abuse of women" aggravating circumstance. Runyon has shown that the prosecution gathered materials and research on co-defendant Draven's background and history of violence and used some of it during Draven's sentencing hearing. Similar to the discovery request in *Bracy* for the Government's information on the judge's conduct, Runyon has requested discovery of the prosecution's evidence of Draven's past conduct. He has made a particularized showing of what he expects to find from the discovery. ECF No. 491, pp.21-25. The information regarding co-defendant Draven, as discussed in Claim 2, is true. It is also true that this information was in the prosecution's possession and was not disclosed to Runyon's counsel. The Government's response does not deny the existence of the requested information nor the fact that it was withheld, it asserts only (for unstated reasons) that the information is not material. The withheld information, however, is relevant and favorable to Runyon's sentencing defense. If the facts are fully developed, Runyon "'may ... be able to demonstrate that he is ... entitled to relief [and] it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry.'" *Bracy*, 520 U.S. at 909 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

The Government's argument against discovery would require the Court to render a merits determination of Runyon's *Brady* claim as opposed to analyzing whether "good cause" exists. The Government asserts that co-defendant Draven's history of violence against children and women—including adjudicated and unadjudicated criminal conduct—would not have been material nor admissible in Runyon's sentencing hearing. This argument overlooks the fact that the

14

**1837**

"centerpiece" of defense counsel's mitigation case was the "equally-culpable co-defendant" mitigating circumstance. *Runyon*, 707 F.3d at 508.

Draven's background was a relevant comparison for whether Runyon should be sentenced to death. This is especially so because the prosecution argued the "abuse of women" aggravator against Runyon but Draven's history of violence against children and women would have overshadowed Runyon's past conduct. The prosecution asserted Draven's violent history was relevant to Draven's life sentence, ECF No. 301, p.5, and pre-determined that it did not merit a death sentence for Draven. Runyon's counsel could have presented to the jurors the withheld evidence to demonstrate that the prosecution did not seek death against Draven despite his substantial history of violence. Just like the prosecution introduced police reports, police officer testimony, a protective order, and victim testimony in support of the "abuse of women" aggravator against Runyon, Runyon could have introduced the same evidence relating to Draven because it supported his mitigation theory.[6] This withheld evidence would have substantially strengthened counsel's argument that because the prosecution did not seek death for Draven, Runyon likewise did not deserve death.

---

[6] The Government is incorrect in its bald assertion that the withheld evidence would not have been admissible, ECF No. 500, p.8, and such an assertion serves only as a diversion. *Sears*, 561 U.S. at 950 ("[T]he fact that some of such evidence may have been 'hearsay' does not necessarily undermine its value—or its admissibility—for penalty phase purposes."). When presenting penalty phase evidence, "[t]he relevant inquiry ... is not whether the [evidence] was admissible under the Federal Rules of Evidence (which do not apply in capital sentencing proceedings), but whether the [evidence] was so unreliable that its admission violated due process." *United States v. Fulks*, 454 F.3d 410, 436 (4th Cir. 2006); *see also United States v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004). With respect to Runyon's discovery request, information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1) (as amended Dec. 1, 2015). It need only be relevant to Runyon's claim. *Id.*

15

Finally, the Government argues for unstated reasons that Runyon's *Brady* claim "is procedurally defaulted" so "discovery is unnecessary."[7] ECF No. 500, p.8. Runyon will fully address the issue of procedural default in his reply to the Government's answer and he incorporates here his argument from that forthcoming pleading. In short, the *Brady* claim is not procedurally defaulted because it could not "be fully and completely addressed on direct review based on the record created" in the trial court. *Bousley v. United States*, 523 U.S. 614, 622 (1998); *Waley v. Johnston*, 316 U.S. 101, 104 (1942) (a claim is not procedurally defaulted when the facts are "dehors the record and their effect on the judgment was not open to consideration and review on appeal.").

**V.     Requests for documents and interrogatory responses regarding the illegal activities of Posey and Ford.**

In Claim 1, Runyon alleges that the Government failed to disclose the involvement of two dishonest law enforcement officers in connection with the criminal proceedings against the defendant. The claim also alleges that trial counsel provided ineffective assistance to the extent they knew these law enforcement officers were dishonest.

As with Claim 16, the Government does not suggest that Runyon's requests for the production of documents and for leave to propound interrogatories are burdensome or overbroad;

---

[7] An allegation of procedural default does not negate a need for discovery. "[D]iscovery is allowed in this case if it would lead to evidence that could excuse the apparent procedural default of Petitioner's claims." *Sample v. Colson*, 958 F.Supp.2d 865, 888 (W.D. Tenn. 2013). A showing of "cause and prejudice" or "actual innocence" clears procedural bars to constitutional claims and the determination of the sufficiency of such a showing may require discovery or an evidentiary hearing. *Wolfe v. Clarke*, 691 F.3d 410, 412-13 (4th Cir. 2012). For example, counsel's failure to investigate and present evidence of co-defendant Draven's history of violence against women and children constitutes a denial of the effective assistance of counsel and also establishes "cause" for any asserted procedural default. *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

16

that the materials and answers he seeks are privileged or confidential; or that the discovery is not relevant to the substance of the claims presented.

The Government opposes all discovery on this claim on the sole ground that for unstated reasons incorporated from its recently filed answer to the §2255 motion, Runyon's claim is defaulted and also lacks merit. Runyon disagrees. Because of the current schedule for Runyon's filings, he has not had the opportunity to carefully read the Government's answer, nor the ability to research and draft his reply in support of the §2255 motion. Runyon will address both the merits and the procedural posture of this claim in that reply, and he incorporates here his arguments from that forthcoming pleading.

### Conclusion

For all the reasons above, and those contained in Runyon's motion for discovery and his §2255 motion, the Court should grant in all respects Runyon's motion for discovery.

Respectfully Submitted,

_____/s/_____
Michele J. Brace, VSB No. 36748

| | |
|---|---|
| Dana Hansen Chavis, *pro hac vice* | Michele J. Brace, VSB No. 36748 |
| Federal Defender Services | Virginia Capital Representation |
| of Eastern Tennessee, Inc. | Resource Center |
| 800 S. Gay Street, Suite 2400 | 2421 Ivy Road, Suite 301 |
| Knoxville, TN 37929 | Charlottesville, VA 22903 |
| Telephone (865) 637-7979 | Telephone (434) 817-2970 |
| Dana_Hansen@fd.org | mbrace@mindsort.com |

Dated: January 29, 2016

17

**1840**

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2016, I have electronically filed the foregoing

Petitioner's Reply in Support of First Motion for Discovery with the Clerk of Court using the

CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Commons, Suite 300
Newport News, VA 23606
(757) 591-4032
Brian.Samuels@usdoj.gov

Jeffrey A. Zick
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Commons, Suite 300
Newport News, VA 23606
Phone: (757) 591-4000
Jeffrey.Zick@usdoj.gov

Lisa Rae McKeel
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Commons Suite 300
Newport News, VA 23606
(757) 591-4040
Lisa.McKeel@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com
*Counsel for Defendant/Movant*
*David Anthony Runyon*

18

**1841**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

DAVID ANTHONY RUNYON,                   :
                                        :
      Petitioner,                      :
                                        :
v.                                      :      No. 4:08-CR-00016
                                        :      CAPITAL § 2255 PROCEEDINGS
UNITED STATES OF AMERICA,               :      Hon. Rebecca Beach Smith
                                        :
      Respondent.                      :


## AMENDED MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE

Michele J. Brace, VSB No 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana Hansen Chavis, *Pro Hac Vice*
Federal Defender Services
 of Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
dana_hansen@fd.org

## COUNSEL FOR PETITIONER DAVID ANTHONY RUNYON

**1842**

## Table of Contents

Table of Contents............................................................................................................i

List of Attachments and Exhibits ...........................................................................vi

Preliminary Statement ...............................................................................................1

Factual Background .....................................................................................................2

Procedural History.......................................................................................................8

Claims for Relief.........................................................................................................11

Claim 1:   The Participation Of Two Dishonest Law Enforcement Officers Tainted
           Runyon's Trial................................................................................................11

    A.     The United States Failed To Timely Disclose The Participation Of Two
           "Dirty Cops," Which Tainted Runyon's Trial. ..........................................11

        1.   Robert Glenn Ford........................................................................................11

        2.   Clifford Dean Posey .....................................................................................14

Claim 2:   The Prosecution Failed To Disclose Impeaching And Exculpatory Evidence In
           Violation Of The Fifth, Sixth, And Eighth Amendments, United States
           Constitution.....................................................................................................16

Claim 3:   Counsel Rendered Ineffective Assistance At The Guilt Phase Of Trial By Failing
           To Investigate, Present, Highlight, And/Or Argue Evidence Of Innocence. ........21

    A.     Chad Costa......................................................................................................21

    B.     Cat Voss ...........................................................................................................25

    C.     Scott Linker .....................................................................................................26

    D.     Rose Wiggins ...................................................................................................27

    E.     David Runyon's Whereabouts The Day Of The Crime............................28

    F.     Cell Tower Testimony Regarding Michael Draven...................................29

    G.     Runyon's Shopping List..................................................................................31

**1843**

H.    Testimony Regarding The Bullets. ...........................................................32

Claim 4:    Counsel Abdicated The Responsibility To Advocate For Runyon At The
Eligibility Phase When He Failed To Address The Relevant Issue And Did Not
Discuss Established Facts That Weighed Against The Statutory Aggravating
Circumstance Of Substantial Planning. ...........................................................35

Claim 5:    Trial Counsel Was Ineffective For Failing To Investigate, Discover, And Present
Evidence That David Runyon Was Incompetent To Stand Trial. .....................38

Claim 6:    Counsel Rendered Ineffective Assistance By Failing To Investigate And Present
Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage
And Mental Health. ...........................................................41

A.    Counsel Hudgins Appeared In The Case Too Late To Effectively Investigate
And Present Mitigation. ...........................................................41

B.    Counsel Abandons The Incomplete Mental Health Investigation And
Presents Repetitive Lay Person Testimony. ...........................................................46

C.    A Complete Psycho-Social History And Its Implications Would Have Added
Weight to Mitigating Factors, Reduced The Weight Of Aggravating Factors
And Informed the Jurors About Runyon's Lesser Moral Culpability.................50

1.    Readily-Available Records. ...........................................................50

1.1    Medical records ...........................................................51

1.2    Letters From Runyon ...........................................................52

1.3    Jail Records ...........................................................52

1.4    Brain Scans ...........................................................53

1.5    Prosecution Expert Reports ...........................................................53

1.6    David Dombrowski (Biological Father) Medical Records...........................53

1.7    Suk Cha Runyon (Biological Mother) Medical Records...........................54

2.    Readily-Available Lay Witness Accounts ...........................................................54

2.1    Witnesses Relevant to the "Abuse of Women" Aggravator...........................56

2.2    Witnesses Relevant to the Family Violence Mitigating Factors.................59

2.3    Witnesses to the 1996 Car Accident and Runyon's Personality Change...61

  2.4 Witnesses Who Knew Runyon In the Time Span Preceding His Arrest..65

  2.5 Evidence Relevant To the Juror-Created Mitigator That Runyon Was Led To Believe Cory Voss Was Molesting His Daughter ............................67

  3. Readily-Available Expert Analysis And Opinions ...........................................67

  3.1 Allan F. Mirsky, Ph.D., ABPP-CN ..................................................................68

  3.2 James R. Merikangas, M.D., L.L.C..................................................................71

  3.3 Mark D. Cunningham, Ph.D., ABPP................................................................72

  3.4 Richard G. Dudley, Jr., M.D..............................................................................76

 D. Counsel's Failure To Investigate And Present Mitigating Evidence Undermines Confidence In Runyon's Death Sentence..........................................81

Claim 7: Runyon's Sixth Amendment Right To Confront The Witnesses Against Him Was Violated When The Prosecution Presented Police And Informant Testimony Of Statements From His Co-Defendant, Michael Draven. Furthermore, His Trial Counsel Were Ineffective When They Failed To Object To The Admission Of This Testimony And Failed To Ask The Court For A Limiting Instruction That They Could Not Be Considered As Evidence of Runyon's Guilt. ..............................84

Claim 8: Ineffective Assistance of Counsel On Direct Appeal. ..........................................86

Claim 9: Runyon's Conviction Under 18 U.S.C. § 924(c) Is Unconstitutional Because It Was Procured In Violation Of The Due Process Clause, The Equal Protection Clause, And The Fifth, Sixth, and Eighth Amendments Of The Constitution. *Johnson v. United States*, 135 S. Ct. 2551 (2015)...........................................88

 A. Introduction........................................................................................................88

 B. Relevant Statutes...............................................................................................89

 C. The Definition of "Crime of Violence" is Unconstitutional. ...............................91

 D. Runyon's Conviction For Murder With A Firearm In Relation To A Crime of Violence Is Unconstitutional...............................................................................93

  1. Carjacking Is Not A Crime of Violence. ..........................................................94

  2. Conspiracy Is Not A Crime of Violence...........................................................97

 E. Resentencing Is Required Because Runyon Was Sentenced To Death Based On An Unconstitutional Statute.........................................................................97

Claim 10: The Jury Instructions At The Sentencing Phase Unconstitutionally Lowered the Government's Burden Of Proof In Violation Of The Fifth, Sixth, and Eighth Amendments. *Ring v. Arizona*, 536 U.S. 584 (2003). ..............................99

Claim 11: The Death Sentences Are Unconstitutional Because They Are Based On Aggravating Circumstances That Fail To Narrow And/Or That Are Arbitrary And Overbroad. ........................................................................... 102

Claim 12: Runyon Was Denied Due Process Of Law, Equal Protection Of The Law, The Right To Be Free Of Cruel And Unusual Punishment, And Effective Assistance Of Counsel Because The Death Penalty Was Disproportionately And Unconstitutionally Applied According To Race, And Trial And Appellate Counsel Made No Objection Based On This Fact. ................................................... 105

Claim 13: Runyon's Death Sentence Is Disproportionate And Arbitrary In Violation Of The Fifth And Eighth Amendment And Trial And Appellate Counsel Were Ineffective For Failing To Raise This Issue. ................................................... 111

Claim 14: Runyon's Death Sentence Violates The Eighth Amendment Because He Is Severely Mentally Ill. ................................................................................ 115

Claim 15: Selection Of The Grand Jury And/Or The Petit Jury Venire For Runyon's Case Was Tainted, And Trial Counsel Unreasonably Failed To Request And Examine The Jury Selection Records. ................................................... 117

    A.    Selection Of The Grand Jury And/Or Petit Jury Venire Jury Was Tainted... 117

    B.    There Was A Failure To Fully And Accurately Comply With The Jury Selection Plan And The Provisions Of 28 U.S.C. § 1861 *et seq.* ........................... 118

    C.    A Person Who Did Not Qualify Participated In Runyon's Trial ...................... 122

    D.    Trial Counsel Unreasonably Failed To Request Or Examine Any Jury Selection Records, In Violation Of The Sixth Amendment. ........................... 123

Claim 16: The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes, And Trial Counsel Unreasonably Failed To Object To These Unconstitutional Strikes. ................................................... 124

    A.    The Relevant Law. ........................................................................... 124

        1.    The Prosecution Engaged In Racial Discrimination In Its Exercise Of Peremptory Strikes. ........................................................................... 127

        2.    The Prosecution Engaged In Gender Discrimination In Its Exercise Of Peremptory Strikes. ........................................................................... 129

iv

1846

     B.      Trial Counsel Unreasonably Failed To Object To The Prosecution's
           Discriminatory Exercise Of Peremptory Strikes. ................................. 130

Claim 17: The Voir Dire Conducted In This Case Violated Runyon's Fifth and Sixth
          Amendment Rights To A Fair Trial And Impartial Jury, And Trial Counsel
          Unreasonably Failed To Object. ........................................................ 133

     A.      The Voir Dire Was Constitutionally Inadequate. ............................... 133

     B.      Trial Counsel Rendered Ineffective Assistance Regarding Voir Dire. ........... 138

Claim S2: The Trial Court Unlawfully Excluded The Potential Jurors Based Solely On Their
          Juror Questionnaire Responses Without Voir Dire, And Trial Counsel
          Unreasonably Failed To Object And Unreasonably Participated. ......................... 139

Prayer for Relief ................................................................................................. 140

Verification ......................................................................................................... 141

Certificate of Service ........................................................................................... 141

**1847**

## List of Attachments and Exhibits

1    Placeholder[1]

2    Merikangas Report, 9/25/15

3    McNally Declaration, 3/11/09

4    Cronin Declaration, 9/26/15

5    Hudgins Declaration, 9/22/15

6    Woodward Declaration, 9/24/15

7    Costa Declaration, 9/30/15

8    Cunningham Declaration, 9/25/15

9    Cat Voss Declaration, 9/10/15

10   David Dalton Declaration, 9/28/15

11   Paula Dalton Declaration, 9/28/15

12   Matt Long Declaration, 9/29/15

13   Scott Linker Declaration, 9/24/15

14   Excerpt – Cell Phone Tracking Evidence

15   Babineau letter regarding death authorization, 2/10/09

16   Portsmouth Jail Records, 2008

17   David Dombrowski progress notes

18   Lake Martin Community Hospital response

19   Hudgins time schedule with mark-ups ECF No. 165

20   Dr. Mirsky letter, 7/2/09

---

[1] Exhibit 1, ECF No. 478-1, is no longer relevant to Petitioner's claims, and as such is not attached to the instant Amended Motion Under § 2255 To Vacate, Set Aside or Correct a Sentence. However, to avoid confusion, the exhibit numbers remain as they were in Petitioner's initial § 2255 motion. ECF No. 478, pp. v-vi. Four additional exhibits have been added, Exhibits 37-39.

vi

**1848**

21      Mirsky & Hudgins emails, 7/22-23/09

22      Dr. Mirsky letter, 9/18/09

23      Army medical records

24      Runyon's handwritten letter regarding 1996 car accident

25      Suk Cha Runyon medical records

26      David Dombrowski declaration, 9/23/15

27      Mark Runyon declaration, 9/25/15

28      Maria Runyon declaration, 9/16/15

29      Dr. Dudley report, 9/29/15

30      Thomas Preston interview, 10/4/08

31      Robert Seeger declaration, 8/24/15

32      Deborah Seeger declaration, 8/24/15

33      Captain Harris Declaration, Fayetteville, GA police dept., 1/13/16

34      Scotty Fleming criminal history

35      Dr. Mirsky report, 8/28/15

36      Teresa Norris declaration, 9/29/15

37      *Racial Disparities* Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary

38      Cohen Bell Declaration

39      Declaration of Michele J. Brace

S-1     Filed under seal with Sealed Claim S2

**1849**

Petitioner, David Anthony Runyon, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing Section 2255 Proceedings ("2255 Rules"), requests that this Court vacate the criminal judgment entered against him, grant him a new trial and/or vacate, set aside, or correct the sentence imposed.[2]

## Preliminary Statement

At the time of this filing, investigation of Runyon's claims for relief continues. Runyon has noted, *infra*, the claims which remain under investigation. Runyon's First Motion for Discovery remains pending. ECF No. 491.

To the extent any of Runyon's claims or subclaims might be perceived as inconsistent with each other, this is expressly permitted under Fed. R. Civ. P. 8(d)(2) and (d)(3). A court may not construe a statement in one claim or subclaim as an admission against another alternative or inconsistent claim or subclaim. *See Independent Enterprises Inc. v. Pittsburgh Water and Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir. 1997); *Rodriguez-Suris v. Montesinos*, 123 F.3d 10, 20-21 (1st Cir. 1997); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §1283. The rule against implicit admission applies regardless whether the party alleges inconsistent facts or inconsistent legal theories. *Id. See also Smith v. Cashland, Inc.*, 193 F.3d 1158, 1161 (10th Cir. 1999) (where plaintiff alleged in sexual harassment suit that she was wrongly fired, former employer could assert simultaneously in defense that (i) plaintiff was not fired, she resigned; and (ii) plaintiff was fired, but solely because of poor performance); *Peter Kiewit Sons' Co. v. Summit Construction Co.*, 422 F.2d 242, 271 (8th Cir. 1969) (plaintiff simultaneously may (i) assert that contract is valid and sue for breach; and (ii) repudiate agreement and seek recovery on quantum meruit claim).

---

[2] In accordance with Rule 2 of the Rules Governing Section 2255 Proceedings, Runyon sets forth the facts and claims entitling him to relief but does not provide full legal argument or citation.

1

### Factual Background

Catherina (Cat) Voss, the wife of a Newport News naval officer, Cory Voss, and mother of two small children, used her husband's time at sea to engage in a series of affairs. The culmination of these was an intense extramarital affair with co-defendant Michael Draven. Wishing to be together, Voss and Draven hatched a plan to: (1) kill her husband when he returned to shore; (2) plan the killing in a manner so they would not be implicated; and, (3) use the proceeds of his Navy gratuity death benefit and life insurance, approximately $300,000, to bankroll their new "family." Setting the scheme in motion, Draven scoured the internet, soliciting, unsuccessfully, the assistance of people to commit a "murder for hire." Draven and Voss decided to make the killing look like a robbery and they scouted locations, deciding upon the ATM at the Langley Federal Credit Union (LFCU) in Newport News.

It was then that Draven met David Runyon. At 5 feet 3 inches tall, Runyon is a small, slim Asian-American man. His mother is Korean and his father is a white American. Runyon's face is asymmetrical due to paralysis on the right side. He has small marks over his face and head from the impact of shattered glass during a car accident. Runyon, an honorably-discharged Army veteran, had subsequently been unable to maintain gainful employment for reasons that are discussed below. Ultimately, he supported himself by participating in clinical drug trials. Draven, who had never really held down any job, met Runyon in March 2007, at one such drug trial when the two were placed in adjoining beds for a few weeks. According to the prosecution, Draven used this time to recruit Runyon to kill Cory Voss.

On April 20, 2007, Cat Voss opened an account at the Langley Federal Credit Union, depositing only the minimum amount of $5.00. No further funds were ever deposited.

On April 29, 2007, in Runyon's hometown of Morgantown, West Virginia, Runyon met with George Koski to purchase a Taurus .357 handgun. They engaged in leisurely conversation, and Runyon provided Koski with his full name and driver's license information. Runyon made a

2

**1851**

transaction at an ATM in Morgantown. According to cell phone records, Runyon was still in West Virginia at 8:37 p.m.

Shortly before 11:30 p.m. that same day, Cat Voss asked her husband, who had by then returned home from sea, to drive to the LFCU and (notwithstanding the impossibility of the task) make a withdrawal. Cell phone records indicated he spoke with Cat Voss along the way and the ATM camera recorded his futile attempts at completing her request. Data from area cell towers indicated Draven was near the credit union at this time. The ATM camera recorded an unidentified person entering the passenger side of Cory Voss's truck and the two driving away from the ATM. A few minutes later, the ATM camera showed Cory Voss had returned to the ATM, made a second unsuccessful attempt at withdrawing money, and drove away. The next day, Cory Voss was found dead in his truck in a parking lot adjacent to the credit union. He had been shot five times.

The following day, Cat Voss collected a $100,000 Navy gratuity death benefit. In three months, Voss and Draven had spent it all.

Voss and Draven knew they were suspects in the crime and gave false statements to police. Throughout the remainder of 2007, law enforcement monitored multiple cell phones owned by Voss and used by her and Draven, as well as Voss's landline. Incoming and outgoing phone numbers, as well as conversations, were recorded. Officers spoke with Voss, Draven, their family, friends and acquaintances. Voss sought help from Navy personnel and even elected officials, to collect the life insurance proceeds. The life insurance company withheld the death pay-out because Voss was a suspect. Gov't Tr. Ex. 281, 281-011. Draven's parents counseled him about how to divert suspicion. They helped Draven remove his belongings from Voss's house to give a false appearance that Draven was not living there. Draven's mother falsely claimed he was at their house at the time of the crime and, later, that he delivered newspapers with her, an alibi rebutted by cell tower data.

3

**1852**

On November 13, 2007, officers approached Runyon in West Virginia about the death of Cory Voss. Runyon voluntarily provided a sample for DNA testing. Runyon's DNA was not connected to the crime.

Voss and Draven learned their friends had been summoned before a grand jury. They encouraged their friends to lie about their intimate relationship. Tr. 994-99; 1009-12, 7/9/09.

On December 11, 2007, police searched the house where Runyon lived, his car, his storage unit, and a prior residence. The prosecutors later used at trial items found during those searches, including: phone numbers for Cat Voss and Michael Draven; a box of .357 magnum bullets with five missing bullets; notes mentioning the LFCU and a length of time consistent with travel to Virginia; and a *list* of items (but not the actual items) including: tarp, trash bag, Taser, Spyderco knife, contacts, watch cap, black hoody sweatshirt, black BDU pants, black jungle boots, black dress socks, gel shoe inserts, leather gloves. *United States v. Runyon*, 707 F.3d 475, 486 (2013); Tr. 1034-36, 1043-45, 7/9/09, Gov't Tr. Ex. 217, 217-001.

Also on December 11, 2007, Runyon was taken to the Morgantown Police Department and interrogated on video tape. Runyon denied involvement in the crime. He was arrested on state charges.

On December 13, 2007, into the early morning hours of December 14, 2007, police interrogated and arrested Michael Draven. At their request, Draven telephoned Voss and asked her to come to the police station. When Voss arrived, she was arrested and interrogated. Voss inculpated herself, said she did not know Runyon but once spoke to him by phone when Draven was incarcerated, and said she did not pay Runyon to kill her husband.

A federal indictment issued on February 13, 2008, charging Catherina Voss, her boyfriend, Michael Draven, and David Runyon with five counts: (1) conspiracy to commit murder for hire, 18 U.S.C. § 1958(a); (2) carjacking resulting in death, 18 U.S.C. § 2119 and 18 U.S.C. § 2; (3) bank robbery resulting in death, 18 U.S.C. § 2113(a) & (e) and 18 U.S.C. § 2; (4) conspiracy to commit robbery

4

**1853**

affecting interstate commerce, 18 U.S.C. § 1951(a); and (5) murder with a firearm in relation to a crime of violence, 18 U.S.C. § 924(c)(1), (j) and 18 U.S.C. § 2. ECF No. 3.

On March 4, 2008, Lawrence H. Woodward, Jr. and Jon M. Babineau were appointed to represent Runyon.

Two months later, on May 5, 2008, defense counsel for Voss, Draven and Runyon went before the Department of Justice's authorization panel to determine whether any of them would be subject to the death penalty.

On July 17, 2008, the prosecution filed a death notice for Runyon and a notice that death would not be sought against Draven. ECF Nos. 67, 68. The next day, in exchange for a sentence of life in prison without parole, Voss pled guilty to all five counts in the indictment. ECF No. 69.

On February 13, 2009, Babineau was removed from Runyon's case due to a conflict of interest. Stephen Hudgins was then appointed to represent Runyon. ECF No. 161. Counsel Woodward moved for a continuance of the March 13, 2009 trial date, noting the appointment of new counsel and because the case involved "tens of thousands of documents and potentially more than 100 witnesses," new counsel needed time to review and analyze the material and meet with and discuss the case with Runyon. ECF No. 160. The trial date was re-scheduled to begin on May 4, 2009. ECF No. 162.

Counsel Hudgins moved for a further trial continuance and attached as exhibits schedules for himself and Woodward. ECF Nos. 164, 165. Counsel Woodward had a five-day medical malpractice trial, two appellate briefs and a two-week federal trial scheduled in the weeks leading up to and immediately following Runyon's May 4th trial date. Counsel Hudgins was newly appointed to the case and had a "full schedule" including a seven-day mortgage fraud case set to begin two weeks before Runyon's trial. ECF No. 165, p. 2. Runyon's trial was moved to June 30, 2009. ECF No. 171.

A month and a half before the new trial date, counsel requested more time to prepare for the trial. ECF No. 179. The Court did not move the start date for the guilt phase of the trial.

**1854**

The guilt phase took place June 30-July 17, 2009.[3] Voir dire comprised the first two days. The overwhelming majority of evidence established Draven and Voss's illicit affair, their plans to kill Voss's husband, and the manner in which the $100,000 Navy gratuity death benefit was spent. The case against Runyon consisted of:

(a)     The fact that, from the end of February to March 14, 2007, Runyon and Draven were employed as test subjects for an experimental drug investigation and thereafter maintained periodic contact;

(b)     An un-recorded telephone call between Runyon and Voss on March 24, 2007, when Draven was in jail;

(c)     The fact that Runyon purchased a gun between noon and 2 p.m. on April 29th, the day of the crime, and made a 1:30 p.m. withdrawal from an ATM machine in West Virginia;

(d)     The fact that Runyon allegedly asked for $500 before the killing but about a month later he received a $275 Western Union money order from Draven's brother;

(e)     The fact that Runyon pawned a .357 handgun in September and November 2007;

(f)     Items seized from Runyon's house, car and storage unit;

(g)     Statements of Voss and Draven characterized as referencing Runyon;

(h)     Witness testimony that Runyon talked about killing a military member or an unidentified person for money.

*Runyon*, 707 F.3d at 485-86.

The trial court dismissed the bank robbery count. Tr. 1519, 7/15/09. The jury convicted Runyon of conspiracy to commit murder for hire, carjacking resulting in death, and murder with a firearm in relation to a crime of violence. Tr. 1714, 1721, 7/16/09; Tr. 1725, 1730, 7/17/09; ECF No. 245, and acquitted him of conspiracy to commit robbery. ECF No. 245.

---

[3] The trial commenced 15 months post-indictment; the average time between indictment and trial in a federal capital case is 31.8 months. McNally declaration, Ex. 3.

The eligibility hearing took place on July 22, 2009. The defense presented no evidence against the prosecution's arguments for death eligibility or against the statutory aggravating circumstances. *Runyon*, 707 F.3d at 485. After deliberating one hour, the jury found Runyon intentionally killed the victim. ECF No. 255. Two statutory aggravating circumstances were also found: (1) Runyon "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value;" and (2) he "committed the offense after substantial planning and premeditation to cause the death of a person." *Id.*, pp. 5-6.

The penalty phase took place August 19-27, 2009. The prosecution presented sixteen witnesses. *Runyon*, 707 F.3d at 487. The prosecution also played a videotape of law enforcement officers' interrogation of Runyon during which they referenced Runyon's race and religion. The court of appeals subsequently determined that "the video had no place at this sentencing proceeding," because "such references are legally irrelevant, [and] they violate a defendant's rights to due process and equal protection of the laws." *Runyon*, 707 F.3d at 493-94.

Deliberations began the afternoon of August 26th. During deliberations the jury inquired as follows: "We are seeing a conflict between Jury Instruction No. 26 and the paragraph on the recommendation page. If we are not unanimous on the death penalty, do we have to be unanimous on the other choices?" Tr. 2707, 8/7/09. After a total of eight hours, the jurors returned a split-sentencing verdict: two death sentences and a sentence of life without the possibility of release. ECF No. 291. The jury found the prosecution proved four non-statutory aggravators, that Runyon: "caused injury, harm, and loss to the victim, Cory Allen Voss, and the victim's family and friends"; "utilized education, training, and experience that he received in college courses focused on criminal justice, and as a law enforcement and correctional officer, as an officer of the Kansas National Guard, and as a member of the United States Army"; "engaged in acts of physical abuse toward women"; and, "demonstrated a lack of remorse[.]" *Runyon*, 707 F.3d at 487.

<center>7</center>

<center>**1856**</center>

The jurors found two statutory mitigating circumstances and eight of twelve non-statutory mitigators proposed by defense counsel: (1) no serious criminal record; (2) other persons equally culpable will not be punished by death; (3) if not sentenced to death, Runyon will serve a life sentence without the possibility of release; (4) & (5) Runyon's son and mother will suffer emotional harm if Runyon is executed; (6) Runyon served his country in the Army and was honorably discharged; (7) Runyon graduated high school, earned an associate's degree and took college courses to expand his education; (8) Runyon worked all his life; (9) Runyon committed acts of kindness and generosity for his neighbors and community; (10) Runyon grew up, witnessed, and experienced domestic violence and parental conflict until his mother and biological father separated.

The jurors also found the following mitigators of their own accord: (1) Runyon continued to witness and experience domestic violence and parental conflict /abuse from his mother and adoptive father; (2) Runyon's brother will suffer emotional harm if Runyon is executed; (3) Runyon was given the impression that the victim was molesting his own daughter.

As demonstrated below, the convictions and sentences were imposed in violation of the constitution or laws of the United States.

**Procedural History**

Runyon is in federal custody, housed on death row at USP Terre Haute. A jury convicted him, in the United States District Court for the Eastern District of Virginia at Newport News, of conspiracy to commit murder for hire, carjacking resulting in death, and murder with a firearm in relation to a crime of violence. Runyon received two death sentences and one sentence of life imprisonment without the possibility of release.

Judgment was entered on December 4, 2009. A notice of appeal was timely filed on the same day. ECF No. 312.

On appeal to the Fourth Circuit, in case number 09-11, Runyon was represented by Teresa Norris and Seth Farber. The following issues were raised:

(i) A series of erroneous rulings and improper prosecution arguments licensed jurors to hold against Runyon his invocation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to trial;

(ii) The district court erroneously permitted the government to rely on improper and prejudicial non-statutory aggravating factors;

(iii) The government advanced arguments that improperly appealed to jurors' emotions, invited speculation, and presented an incorrect, distorted picture of the jury's role;

(iv) The district court committed a series of errors in substituting alternate jurors;

(v) The district court erroneously failed to instruct the jury that it could only impose a death sentence if it found the aggravating factors outweigh the mitigating factors beyond a reasonable doubt;

(vi) Because Runyon's sentencing hearing was fundamentally flawed and influenced by passion, prejudice, and arbitrary factors, his death sentence must be reversed under the cumulative error doctrine and 18 U.S.C. § 3595;

(vii) The death penalty is unconstitutional;

(viii) The murder-for-hire and the carjacking statutes exceed Congress' power under the Commerce Clause and violate the Tenth Amendment;

(ix) In the alternative, because there was no evidence that Runyon traveled in interstate commerce, the Court should have granted Runyon's motion for acquittal on murder-for-hire;

(x) Runyon's conviction for using and carrying a firearm during and in relation to a crime of violence must be vacated because he is not guilty of any of the predicate offenses.

The court of appeals affirmed. It found that four errors but determined each was harmless:

(1) The Court's replacement of a juror for the eligibility phase violated due process because it occurred outside the presence of defense counsel. *Runyon*, 707 F.3d at 516-18. The court applied a plain error standard instead of a harmless error standard because defense counsel failed to object. The plain error standard was not met because the replacement juror was selected in voir dire when all parties were present, and because defense counsel's failure to object and request a continuance indicated the substitution was not prejudicial.

(2) The jurors' consideration of a 42-minute video interrogation of Runyon in the penalty phase was error because exclusion of the entire video was warranted. *Runyon*, 707 F.3d

9

**1858**

at 493-96. The video contained statements capable of inflaming juror's racial, ethnic, or religious prejudices and served to "degrade the administration of justice[,]" *Id.* at 494 (quoting *Battle v. United States*, 209 U.S. 36, 39 (1908)). The video was legally irrelevant, and violated Runyon's rights to due process, equal protection of the laws, and the First Amendment right to freedom of religious beliefs. The references to Runyon's race and religion came directly from the mouths of law enforcement, directly referred to Runyon, were irrelevant, stereotypical and insulting. The court found the error was harmless based on jury instructions, the fact that the jurors nevertheless would have found the lack-of-remorse aggravator because defense counsel never argued against it, and the jurors' finding of the equally-culpable-codefendants mitigator.

(3)     The prosecution presented improper argument regarding: (a) Runyon's exercise of his Sixth Amendment right to a trial by jury, and (b) Runyon's exercise of his Fifth Amendment right against self-incrimination. *Runyon*, 707 F.3d at 507-10. The harmless error finding was based on defense counsel's failure to object, the lack-of-remorse aggravator established by other evidence, and the jurors' finding of the equally-culpable-codefendants mitigator.

(4)     The prosecution presented improper argument when it exhorted the jury to "do your duty" and to "send a message to the community" with the verdict. *Runyon*, 707 F.3d at 514-15. The determination that the error was harmless was based on the fact that the comments were isolated, did not mislead or inflame the jury, and jury instructions minimized the risk of harm.

Runyon filed a petition for writ of certiorari on August 21, 2013. The questions presented were:

(1) Whether, in order to demonstrate that evidentiary errors in a capital sentencing proceeding were harmless, the government must establish that the errors did not affect the verdict of the jury that actually heard the case or whether the government may instead meet its burden by demonstrating that such errors would not have affected a hypothetical, reasonable jury; and

(2) Whether, under the cumulative error doctrine, a reviewing court must reverse if the government cannot establish that preserved errors are harmless beyond a reasonable doubt, or is reversal required only if the errors "so fatally infect[ed] the trial that they violated the trial's fundamental fairness."

After granting the United States eleven extensions, the Supreme Court denied certiorari on October 6, 2014. *United States v. Runyon*, No. 13-254, 135 S.Ct. 46 (2014) (Mem.).

Runyon timely filed an initial motion under 28 U.S.C. § 2255 on October 5, 2015. This pleading is an amended petition as a matter of course under Fed. R. Civ. P. 15(a).

10

**1859**

<u>Claims for Relief</u>

The claims and allegations set forth in all sections of this Amended §2255 Motion are realleged and incorporated by reference in all other sections and claims.

**Claim 1:** **The Participation Of Two Dishonest Law Enforcement Officers Tainted Runyon's Trial.**

There were two "dirty cops" involved in this case, each to Runyon's detriment. These former law enforcement agents engaged in multiple criminal acts involving dishonesty before and/or during their involvement in Runyon's case. Because of the pervasive dishonesty of these individuals, neither the Court nor the parties can have confidence that their work product with respect to Runyon's case was truthful, accurate, and complete. The presence of these individuals denied Runyon his right to a fair trial in violation of due process. *Berger v. United States*, 295 U.S. 78 (1935). To the extent trial counsel knew information about these individuals and failed to take action, trial counsel was ineffective. *Strickland v. Washington*, 466 U.S. 668 (1984).

**A.** **The United States Failed To Timely Disclose The Participation Of Two "Dirty Cops," Which Tainted Runyon's Trial.**

**1.** **Robert Glenn Ford**

The first "dirty cop" was Robert Glenn Ford, a homicide detective with the Norfolk Police Department who retired from public service in 2007—just short of thirty years with the Department. Ford went into practice as a private investigator. Three weeks before this Court appointed Ford to assist Runyon's defense counsel as an investigator, this Court issued a warrant for the arrest of Ford's long-time confidential informant, Marcus Adams, on charges of being a felon in possession of a firearm. Adams entered into a plea agreement, and as part of the cooperation component he was debriefed on November 7, 2008. During that interview, he:

> divulged a scheme in which he acted as the go-between for former homicide detective Robert Glenn Ford, who accepted bribes from criminal defendants in exchange for making false representations to prosecutors and judges that the defendants had assisted him in homicide investigations. As a result of these false statements, the

11

**1860**

defendants received reduced sentences or dismissal of their charges. Adams provided intricate details of the scheme, including the names of the defendants, approximate dates and amounts of the bribes. Subsequent investigation by the Federal Bureau of Investigation corroborated the information provided by Adams.

*United States v. Adams*, No. 2:08-cr-103 (E.D. Va.), ECF No. 37, pp. 2-3.

Ford could not employ an identical scheme after he left the police force, but as a private investigator he could have set up a similar scheme to use selectively. If Ford unearthed a potential defense witness and then learned, for example, that the witness wanted to avoid becoming embroiled in the case, Ford was in a position (for compensation) to file a null report stating that the witness could not be found. Or he could file a false report stating that he located the witness, but that person was antagonistic to the client and had no information of value. Ford would get his bribe, the witness would avoid being called for trial, and the attorney who retained Ford (as well as any other investigator who might be working with the attorney) would be none the wiser. The trial would be tainted, but in ways that could not be cured by cross-examination.

On April 15, 2008, this Court authorized Ford's work on Runyon's case. ECF No. 41 (sealed order). Ford investigated and interviewed witnesses, and provided reports to defense counsel, while the United States investigated Ford and mustered evidence to prosecute him for taking bribes and making false statements in his reports to prosecutors and judges during his tenure as a police officer. Shortly after this Court entered judgment against Runyon, the United States charged Ford with making false statements, conspiracy, and multiple counts of extortion.

Runyon's trial counsel relied on Ford to conduct an honest investigation and to produce reports that were reliable. The United States did not inform Runyon's counsel that it had evidence indicating that Ford extorted bribes from witnesses in connection with his prior investigations and submitted reports to prosecutors and judges that contained false statements. It should have disclosed the kind of information contained in the instant claim, including the fact that there was evidence indicating that Ford had engaged in a pattern of criminal conduct involving dishonesty in his prior

12

**1861**

investigations.[4] This information would have been sufficient for any reasonable defense counsel to question whether they could have confidence in the reliability of Ford's investigations and reports. If the United States had disclosed this information, any reasonable attorney would have recognized the risk that Ford's investigations and reports in Runyon's case might be materially unreliable, would have asked this Court to substitute a different investigator, and would have moved the Court to continue Runyon's case to ensure an untainted reinvestigation. Alternatively, the United States might have informed the Court (rather than defense counsel) that there was evidence of Ford's pattern of criminal conduct involving dishonesty, and the Court could have worked with Runyon's counsel to substitute a different fact investigator and to continue Runyon's case to ensure an untainted investigation.

The government's obligation to promptly notify Runyon that it had evidence of criminal conduct by the defendant's court-appointed investigator was grounded on two different constitutional provisions. First, it was based on Fifth Amendment due process principles concerning the fundamental fairness of trials. *Berger v. United States*, 295 U.S. 78 (1935); *see also United States v. Agurs*, 427 U.S. 97, 110-11 (1976) (although government attorney must prosecute with "earnestness and vigor," he must also "be faithful to his client's overriding interest that 'justice shall be done.'"). As a result of its investigation of Ford, the United States knew or should have known that Runyon was unwittingly using an investigator who had committed criminal acts of dishonesty and who lied in reports to prosecutors and judges. The United States also knew or should have known that if Ford similarly accepted bribes or made false statements to Runyon's counsel, the defense would have been given inaccurate information about the relevant facts, thus depriving Runyon of a fair trial.

---

[4] Runyon recognizes that the investigation of Ford's prior misconduct was highly confidential. We are confident that in the interests of justice, an arrangement could have been devised that would protect the interests of the United States but also would protect the interests of the man who would be going on trial for his life.

13

**1862**

Second, the government's obligation was based on the Sixth Amendment right to counsel. Although an attorney's own acts or omissions are the most common causes of ineffective assistance under the Sixth Amendment, the acts or omissions of others also can render counsel's representation ineffective. In *Williams v. Martin*, 618 F.2d 1021, 1027 (4th Cir. 1980), for example, the court of appeals held that the trial court's refusal to provide a necessary expert deprived the defendant of the effective assistance of counsel. *See also Strickland*, 466 U.S. at 686 (stating that "[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense[,]" and citing examples).[5] Moreover, if counsel did have information about Ford, trial counsel's failure to take appropriate action was deficient performance. *Strickland*, 466 U.S. at 687.

Because of the government's failure to timely disclose information that was uniquely in its possession, Runyon was completely in the dark and lacked the ability to take any preventative or corrective steps while his case was still in the district court.[6]

### 2. Clifford Dean Posey

The second "dirty cop" was Clifford Dean Posey, a Special Agent of the Bureau of Alcohol, Tobacco, and Firearms. Posey was one of the government agents investigating Cory Voss' death and

---

[5] When the prosecution is aware that defense counsel has a conflict of interest, it has a duty to bring that conflict to the court's attention. *United States v. Tatum*, 943 F.2d 370, 379-80 (4th Cir. 1991). By the same reasoning, when the prosecution is aware that the defendant's court-appointed investigator has engaged in criminal acts involving dishonesty that might render the investigator's work product untrustworthy, it has an analogous duty to bring that fact to the attention of defense counsel or the court. In both cases, the prosecution's duty derives from *Berger*, 295 U.S. at 88, which famously pronounces that "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."

[6] Runyon's mitigation investigator was unaware of the federal investigation into Ford's bribes, dishonesty, and false statements. However, she was aware of Ford being under pressure because of media coverage into his involvement in coercing confessions from two defendants in the "Norfolk Four" case. Cronin declaration, Ex. 4.

14

**1863**

developing evidence for prosecution. He worked behind the scenes and did not testify at trial. As a result, the United States knows the scope and nature of Posey's assignments on this matter, but that information can only be known by Runyon's collateral counsel through discovery. Posey's name appears on Government trial exhibit 181 as the transcriber of a recorded telephone call. Gov't Tr. Ex. 181, 181B-002. It appears equally briefly on a few unadmitted documents that the United States provided to trial counsel. Runyon believes, but cannot confirm without discovery, that Posey played a substantial role in investigating and preparing the evidence in this matter.

Court records suggest the government was aware of Posey's misconduct, at the latest, on October 12-13, 2010. *United States v. Posey*, No. 3:11-cr-94, (E.D. Va.), ECF No. 14, p. 5. At that time, Runyon's case was on direct appeal. After investigation, the United States brought charges against Posey in Richmond on April 5, 2011. The record shows that starting no later than 2007 (the year of Cory Voss' death), Posey engaged in criminal acts involving dishonesty over a period of three to four years. While working for ATF, he falsified documents relating to firearms in order to embezzle and convert them to his own use. He sold cigarettes that were intended for use in undercover tobacco investigations, and he again submitted false reports to hide his illegal conduct. He engaged in wire fraud using a fake ID, and he made unauthorized charges to his undercover credit card to buy items for personal use. *Id.*

At the same time, Posey was involved in matters related to the death of Cory Voss. In that capacity he may also have engaged in acts of dishonesty. For example, he may have converted firearms or ammunition that was confiscated from Runyon. He may have falsified the transcriptions of recorded conversations and otherwise altered or fabricated evidence. The United States knew or should have known that the work Posey performed in relation to the prosecution of David Runyon might therefore be compromised and unreliable.

15

**1864**

Posey entered into a plea agreement days after his arrest, and judgment was entered against him on September 21, 2011. *Id.*, ECF No. 38. At that time, Runyon's case was still on direct appeal and he was represented by court-appointed lawyers from South Carolina and New York. Throughout the entire investigation and prosecution of Posey, the Government did not disclose to Runyon's counsel the fact that Posey was being investigated for, nor the fact that he was arrested for, nor the fact that he was convicted of, crimes involving dishonesty.

On information and belief, Posey's participation in the preparation and prosecution of this case resulted in the government's presentation of materially false or unreliable evidence against Runyon. *Brady v. Maryland*, 373 U.S. 83 (1963). Alternatively, if trial counsel knew of Posey's improper conduct, trial counsel was ineffective for failing to investigate and present evidence of the same and Runyon was prejudiced. In either case, Runyon's ability to show materiality or prejudice is dependent on the discovery he has requested.

**Claim 2:** **The Prosecution Failed To Disclose Impeaching And Exculpatory Evidence In Violation Of The Fifth, Sixth, And Eighth Amendments, United States Constitution.**

The government possessed, but did not disclose, evidence of co-Defendant Draven's violent criminal conduct in the past and as recent as one year before the instant crime that would have added substantial weight to the "equally-culpable-codefendant" mitigator found by the jury and would have altered the sentencing balance. Draven's history of violence against women and children would have also reduced the weight of the "abuse of women" aggravator asserted against Runyon.

Soon after Draven was indicted, the government provided Draven's trial counsel with thousands of pages of documents demonstrating:

- Draven has an extensive juvenile history of violent criminal conduct, including, but not limited to, the sexual assault of numerous children;
- Draven had been placed in a residential facility for child sexual assault;
- Draven had been diagnosed as having conduct disorder, undifferentiated type, a precursor to anti-social personality disorder;

16

**1865**

- Draven had been diagnosed with Pedophilia.

Such evidence could not have been more important to Runyon's case in mitigation. The "centerpiece" to counsel's case in mitigation was that he was no more culpable than Draven and Voss, both of whom the government deemed unworthy of the punishment of death. *Runyon*, 707 F.3d at 508. "Runyon's counsel had gone to great lengths to demonstrate that the three defendants, despite all being integrally involved in the murder, had received differential treatment, with the government pursuing the death penalty against Runyon but not against Cat or Draven." *Id.* Counsel had specifically requested that his sentencing jury be instructed that it could consider as mitigation that Runyon was no more culpable than the architects of Cory Voss' murder. Much of the evidence trial counsel presented went to the very argument "that Runyon did not deserve death if neither Cat nor Draven was subject to that sentence." *Id.*

Similarly, much of the evidence presented by the government to rebut Runyon's mitigation case focused on Runyon's history of violent conduct. The government pointed to his assaults on various women, going so far as to play a video of what it described as his manipulation of a helpless female victim. Tr. 2611, 8/26/09. Runyon's sentencing jury found that the government had proved the non-statutory aggravating factor of "abuse of women" beyond a reasonable doubt. The weight the jurors assigned to that aggravator would have been reduced had they known that codefendant Draven "sexually assaulted/abused/stalked or otherwise assaulted a number of individuals, including his younger brother and sister." ECF No. 301, p. 5. As the government argued in support of Draven's sentencing, "Certainly a history of violence and sexual assault by a defendant who has been convicted of a conspiracy to commit murder is relevant to the imposition of punishment." *Id.*

Evidence not disclosed to Runyon's counsel includes "sworn testimony" and "source documents" on Draven's violent and deviant and/or predatory sexual proclivities. *Id.*, p. 6. It demonstrates that Runyon's history of violence against women paled in comparison to that of Draven,

17

**1866**

the man the government deemed unworthy of death. The prosecution urged the death penalty for Runyon based on one misdemeanor conviction for grabbing his wife's arm and poking her nose, one dismissed misdemeanor assault charge, and one unadjudicated act of misdemeanor assault. *See Runyon*, 707 F.3d at 504. Draven's criminal past was far more violent than Runyon's and Draven's victims far more helpless. Draven did not merely grab or poke his victims, he raped them. Under the name "Anthony James Neff," a.k.a, "Andy," Draven sexually abused a developmentally-delayed 15-year-old girl and at least six children under the age of seven. Draven's victims were not merely vulnerable and physically smaller, they were little children; children who were near the age of the Voss children, the children who, under his plan to murder Cory Voss, would have been permanently placed at Draven's fingertips. This information could have transformed the "equally-culpable" mitigating circumstance into a "greater culpability" mitigator if for no other reason than Draven's motive for the crime was to have Voss and her small children to himself.

Using the name "Anthony Exum," Draven stole jewelry from a residence. In response to police questioning he denied any juvenile record. He abused, threatened to kill, stalked, and assaulted these individuals. Under the name "Anthony James Neff," Draven threatened to kill a former girlfriend with a car bomb, threatened to break a man's neck.

Less than one year before the instant crime, Michael Draven beat his girlfriend, slapped her with a knife on her legs and arms and poked the knife at her vagina. She reported that he had previously broken her finger and threatened to kill her and her family members.

> He has stated he will call his uncle Carl and have my whole family killed, burnt to death and he will do me last so then I will truly be alone. He has put a flame on a match + lighter to my skin, arms, face, and hair. He has slapped me in the face, kicked me in the side, held my neck so I could not breathe, held a pillow over my head on multiple occassions [sic]. ... He has scratched me with a knife and put it into my body many times. ... He said he would cut my head off so I could [see] the insides of my body and pour toxic fluid down it and light a flame so I/you can see my insides shrivel. He said he would hire someone to rape my mother and father. He said he would hire a hit man or himself and put a frozen ice pick up my sister []'s vagina so she could not have children anymore. He has threatened to kill me and cut

18

**1867**

my body up in pieces so no one could ever find it and then he would run away so no one could find him. ... He means well but he is a dangerous person to all who cross him or pass him. He has major anger managment [sic] problems and has been physically abusive to other women in the past. He is dangerous to all human beings alike and can go off at any moment.

Draven's background was a relevant comparison for whether Runyon should be sentenced to death. In its arguments for the death penalty, the prosecution compared Runyon to his two co-defendants and attempted to explain its charging decisions while omitting Draven's history of violence. *Runyon*, 707 F.3d at 507-08, 511-12. At Draven's separate sentencing hearing, the prosecutors asserted Draven's violent history was relevant to a life sentence. ECF No. 301, p.5. They had pre-determined that Draven's violent past did not merit a death sentence. Runyon's counsel could have presented to the jurors the withheld evidence to demonstrate that the prosecution did not seek death against Draven despite his substantial history of violence but sought death for Runyon whose incidents of violence were comparatively minor.

The prosecution introduced against Runyon victim testimony, incident reports, and a protective order application, *see, e.g.,* Gov't Ex. 311, 313, 315, 316, and Runyon could have done the same regarding Draven's violent criminal history had the information been disclosed. This withheld evidence would have substantially strengthened counsel's argument that because the prosecution did not seek death for Draven, Runyon likewise did not deserve death.

Though exculpatory, none of this evidence was provided to Runyon's counsel. The government's failure to provide such evidence thus violated the Fifth, Sixth, and Eighth Amendments, and *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Kyles v. Whitley*, 514 U.S. 419 (1995). When the prosecution withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his right to due process of law. *Brady*, 373 U.S. at 87. Had Runyon's sentencing jury known that Draven—whom the government decided did not deserve death—had a far more violent past of severely abusing, not only his girlfriends, but the most-

19

**1868**

vulnerable victims (children and impaired persons) and he carried with him the specter of a far more violent future, there is a reasonable probability that one or more jurors would have refused to sentence Runyon to death. *Cone v. Bell*, 556 U.S. 449, 452 (2009) (vacating death sentence because withheld evidence would have altered "at least one juror's assessment" of appropriate penalty). The evidence the government withheld was therefore material. Accordingly, Runyon is entitled to relief.[7]

This claim is specifically alleged as to all phases of Runyon's trial, including pretrial, guilt, eligibility and selection phases, and there is a reasonable probability that had this evidence been disclosed, Runyon would not have been authorized for death and/or sentenced to death.

To the extent that counsel failed to investigate and present the information about Draven, despite the evidence being withheld by the prosecution, they were ineffective because the information supported the defense.[8] *See* Claims 4 & 6. To the extent that Draven's prurient interest in children motivated the planning of the crime it relates to Claim 4 where Runyon has alleged that counsel failed to advocate for Runyon at the eligibility phase by not presenting evidence and argument removing or reducing the weight of the "substantial planning" statutory aggravating circumstance. Moreover, Draven's history of abusing and terrorizing children, women and men relates to Claim 6 where Runyon has alleged that counsel failed to investigate and present evidence to counter the aggravating circumstances with facts reducing the weight of the aggravators (such as the "substantial planning" and "abuse of women" aggravators) and evidence to substantiate

---

[7] Investigation regarding the government's failure to provide exculpatory information is ongoing and supplemental information will be provided when available.

[8] An alert attorney would have taken notice during trial of the following exchange and investigated further: Randy Fitchett, co-defendant Draven's brother, testified that although his name was listed as the sender he did not send the June 1, 2007 money order made out to Runyon for $275. To challenge Fitchett's credibility, co-defendant Draven's attorney cross-examined Fitchett about the siblings' contentious history. Fitchett accused Draven of raping him and their sister. Tr. 811, 7/8/09. The prosecution objected and Draven's attorney asked no further details about the event. Tr. 812. In response to questioning, Fitchett admitted that Draven denied the rape accusation. Tr. 813.

20

mitigating circumstances (such as the "equally culpable-codefendant" and "molestation of Voss's daughter") mitigators. Finally, after the Government filed a position on Draven's sentencing which revealed some of Draven's violent history, ECF No. 301, counsel were ineffective for failing to file a motion to set aside Runyon's death sentence or for a new sentencing trial.

**Claim 3:**     **Counsel Rendered Ineffective Assistance At The Guilt Phase Of Trial By Failing To Investigate, Present, Highlight, And/Or Argue Evidence Of Innocence.**

David Runyon adamantly asserted his innocence. Hudgins declaration, ¶3, Ex. 5; Woodward declaration, ¶3, Ex. 6. The defense counsel with primary responsibility for guilt-phase preparations was Lawrence Woodward. ECF No. 179 p. 10; Hudgins declaration, ¶1, Ex. 5; Woodward declaration, ¶2, Ex. 6. There was no direct evidence of Runyon's participation. Most of the evidence presented by the prosecution involved the co-defendants, Michael Draven and Cat Voss. Woodward declaration, ¶9, Ex. 6. The guilt-phase theory of the case was reasonable doubt. *Id.* This involved portraying the co-defendants as bad actors and creating doubt regarding David Runyon being the person who shot Cory Voss. *Id.* Trial counsel, however, was ineffective for failing to investigate, present, emphasize, and/or argue evidence that created reasonable doubt or supported Runyon's innocence. *Strickland v. Washington*, 466 U.S. 668 (1984). Such evidence consists of witness testimony, inconsistent and/or irrelevant facts, and unreliable forensic testimony.

**A.      Chad Costa**

Cory Voss was shot five times. Gov't Tr. Ex. 18, 018-002, Autopsy report pp. 1-2.[9] The prosecution argued that Runyon owned a five-shot handgun and emptied the gun on Cory Voss. Tr.

---

[9] Defense counsel failed to emphasize how the random spray of five gunshots were inconsistent with the prosecution's argument—in support of guilt and a non-statutory aggravator— that Runyon utilized special skills as an expert marksman and training to avoid leaving behind evidence. Tr. 1593, 1595, 1611, 8/19/09. Nor did counsel counter the prosecution's penalty phase closing argument that Runyon's specialized training taught him to aim for "center mass" because that was the most deadly target. Tr. 2611-12, 8/26/09. In fact, soldiers and law enforcement are taught to

21

1593, 1595, 1611-12, 7/16/09. Since defense counsel did not present any witnesses who had known Runyon during the "years" that preceded the murder and Runyon's arrest, the prosecution urged the jury to conclude that there was no evidence about the man who was on trial; except, of course, that he was a cold, calculated killer. Tr. 2610, 8/26/09. In fact, the prosecution elicited testimony that Runyon told people he was a hit man.

Chad Costa met David Runyon in the second half of 2007. Costa declaration, p. 1, Ex. 7. They took approximately three trips to New Jersey to work in drug studies and had a lot of time to talk during the seven-hour drives. *Id.* Costa learned that Runyon was in the Army and had been a police officer for a while, but Runyon didn't like the politics. *Id.* Costa knew Runyon liked to brag and make-up things to impress women so he'd have a chance with them. Costa declaration, p. 1, Ex. 7. Runyon wanted people to think he was a "thug" and bought a hoodie, baggy pants and boots to look like a "thug," but he was so small and thin that he just didn't look the part. *Id.* An example of one of Runyon's boasts was a story about road rage. *Id.* A truck driver cut Runyon off and Runyon was able to pull alongside the driver and have him park alongside the road. *Id.* The driver exited his truck with a crowbar. *Id.* They fought, Runyon took the crowbar from the driver, and was going to kill him but his friends pulled him away from the man. *Id.* Costa didn't believe this story because it appeared to him that Runyon couldn't harm anyone.[10] *Id.* Throughout those long car rides, Runyon never told Costa that he had killed anyone. *Id.*

---

shoot at "center mass" because it is the biggest, not the deadliest, target. Counsel's deficient performance with respect to the ballistics evidence is further discussed below.

[10] Consistent with Costa's assessment of Runyon, Runyon's brother Mark has stated that David was "soft" and "tried to gain acceptance from people. He had little self-worth and tried to impress people in order to feel good about himself. David would act as if he was tough and aggressive but in reality, David was very passive. I felt like this put David in unhealthy situations and I wanted to protect him." Mark Runyon declaration, p. 4, Ex. 27.

Costa had seen Runyon with a black, six-shot revolver.[11] *Id.* Costa was certain it held six bullets. *Id.* Two detectives who questioned Costa about Runyon said the gun Costa described was definitely the murder weapon and they wanted to find it. *Id.*

The detectives also told Costa that Runyon had never been a police officer (which was not true). Costa declaration, p. 2, Ex. 7. Costa didn't know anything about the murder and the detectives told him a lot of information about the crime over the course of two hours. *Id.* Costa "learned" that Runyon met a man named Michael Draven at a drug study who, along with his girlfriend Catherina Voss, hired Runyon to commit murder for $250,000. *Id.* The detectives convinced Costa that Runyon committed the murder and they had the evidence they needed for a conviction. *Id.* This influenced Costa's testimony in front of the grand jury and caused him to agree with the prosecutor that Runyon could have committed this crime. *Id.* When Costa said anything positive about Runyon in front of the grand jury the prosecutor gave him a dirty look and changed the subject. *Id.*

Defense counsel had Chad Costa flown-in for the trial but never called him as a witness.[12] ECF No. 220, p. 2; ECF No. 256, p. 2. This failure was prejudicial. Costa's testimony could have created doubt about whether Runyon's handgun was the murder weapon. Costa knew the police were convinced that Runyon's six-shot revolver was the murder weapon which is inconsistent with the victim being shot only five times after the perpetrator emptied the gun. Tr. 1593, 1595, 1611-12, 7/16/09. Costa's testimony that Runyon's handgun held six bullets may have created reasonable doubt about it as the murder. The number and type of bullets is also important because Agent Banks testified Runyon owned a box of .357 ammunition that contained 35 live rounds, ten spent casings, and "five

---

[11] The fact that Runyon's gun was black or was "blued" is undisputed. Counsel failed to point out that the ATM photo, Gov't Tr. Ex.28W, showing a "shine" off the perpetrator's gun, contradicted Runyon's guilt because a "blued" gun reduces glare from light.

[12] Counsel does not remember why witnesses who were subpoenaed and who were present did not testify. Hudgins declaration, ¶9, Ex. 5.

23

**1872**

missing bullets." Tr. 1044, 7/9/09. Counsel failed to object to the relevance of this evidence and testimony, including the five missing .357 bullets when the victim was shot with .38 caliber bullets. He also failed to object to the scientific validity of the ballistics testimony. The admission of such unreliable expert testimony tainted the integrity of the trial process and denied Runyon a just and fair trial. *Napue v. Illinois*, 360 U.S. at 271; *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974).

Costa's testimony could have undermined witness testimony that Runyon admitted to killing someone. Costa never witnessed Runyon admit to a killing but he did witness Runyon's attempts to appear like someone he wasn't and Costa heard Runyon brag about being a tough guy. Moreover, Costa was important because the police provided him details of the crime and influenced Costa's opinion about Runyon's involvement which, in turn, influenced Costa's grand jury testimony. This would have supported the contention that police coerced Sarah Baker to testify that Runyon said he killed someone.[13] In fact, Baker alleged the police threatened to permanently separate her from her children if she did not testify against Runyon. Tr. 1146, 7/13/09. Costa could have provided corroboration of Baker's allegation and the jurors could have discounted her testimony altogether. In response to the prosecution's presentation of evidence that Runyon described himself as a "hit man," Costa knew about Runyon's braggadocios nature. This could have provided an alternate explanation for why Runyon would describe himself in that manner. Thus, Costa's testimony would have been consistent with the reasonable doubt defense: Costa's description of Runyon's gun was inconsistent with the murder weapon; his knowledge of Runyon would have added a different interpretation to the prosecution's version of the case; and this could have created reasonable doubt in the mind of at least one juror. Trial counsel was prejudicially ineffective for failing to present Costa's testimony. *Strickland*

---

[13] Investigation regarding Sarah Baker is ongoing and supplemental information will be provided when available.

24

**1873**

*v. Washington*, 466 U.S. 668 (1984); *see, e.g., Mosley v. Butler*, 762 F.3d 579 (7th Cir. 2014) (counsel ineffective for failing to call witnesses who would have rebutted State's theory of guilt).

### B.    Cat Voss

The prosecution entered into evidence statements and electronic communications of Cat Voss that were not subject to cross-examination. Although her plea agreement required her to testify, ECF No. 69, p. 7, the prosecution did not call her as a witness. Defense counsel also did not call Voss as a witness.[14] The prosecutors told Counsel Woodward that Voss would testify that she hired Runyon and that he and Michael Draven were lying in wait for Cory Voss. Woodward declaration, ¶11, Ex. 6.

In fact, Voss *did not have any personal or independent knowledge* that Runyon was the person who shot Cory Voss. Cat Voss declaration, ¶¶5, 11, 19, Ex. 9. Voss suspects that Draven killed Cory. *Id.*, ¶¶16, 24. When she was speaking with Draven on the telephone just minutes before Cory was killed, Cat did not hear Runyon in the background and suspects that Runyon was not with Draven. *Id.*, ¶16. Furthermore, Draven had been prepared to kill Cory himself.[15] One day when Cory was home, Draven called Cat Voss and said he wanted to come over and kill Cory. *Id.*, ¶24. Cat Voss told him no because her children were also at home.[16] *Id.*

---

[14] Counsel rendered ineffective assistance when they introduced Voss's statement of facts at the penalty phase. It contained prejudicial statements that had not previously been introduced by the prosecution.

[15] Cat Voss identified the handwriting on the map found in Runyon's car as Draven's handwriting. Voss declaration ¶17, Ex. 9. Counsel contemplated a theory that Draven made Runyon the "fall guy." The jurors could have had a reasonable doubt on this basis given Draven's writing on the map, Runyon's eagerness to please other people, *see, e.g.,* Cunningham declaration, p. 37, Ex. 8, and the fact Draven could have accessed Runyon's car when they were housed together for a three-week drug study just prior to the crime.

[16] Investigation of this matter is ongoing and supplemental information will be provided when available.

An expression of doubt as to whether Runyon was the triggerman -- from the co-defendant who was crucial to executing the murder plan -- would have raised a reasonable doubt for the jury. Accordingly, counsel's failure to speak with Cat Voss and present her as a witness was prejudicial.

## C.    Scott Linker

Scott Linker, David Runyon's former brother-in-law, describes Runyon as "passive not aggressive." Linker declaration, p. 1, Ex. 13. Had he been asked, Linker would have testified as follows:

> David loved guns. He was a gun enthusiast but not a "gun nut." David was very knowledgeable about guns and he was a responsible gun owner. David respected the power of a gun and did not take it lightly.
>
> David collected and traded guns like some people do baseball cards. It is what he knew and loved. It was common for David to buy a gun, turn around, and sell it quickly. I remember David bought a Taurus, Raging Bull revolver. He sold it to me two days later because he did not like the way it fired. David did the same thing with ammunition.
>
> David was also an expert marksman. We hunted together a lot. The craziest thing I've ever seen is when David shot a deer from 400 yards away. We were on our way to our hunting spot one day when we saw three deer from the roadway. I wanted to drive closer before taking a shot but David insisted I stop the car. David laid across the car and fired two shots: the first one went through the deer's ear and the second one in his head.
>
> It doesn't make sense to me that David committed this crime because the victim was shot five times. To say David would have to shoot anyone more than once (especially from close range) is ludicrous.
>
> David was also a smart guy. He was educated but also had common sense. I can't believe that David would leave items in his car that implicated him in a murder, especially after he knew the police had talked to him about a murder. This defies all common sense and David would never be that stupid.

Linker declaration, p. 2, Ex. 13.

Counsel rendered ineffective assistance by failing to elicit this information because it provided context for Runyon's ownership of guns and ammunition and his gun purchase on the day of the crime, and it established some of the odd facts of the case that create reasonable doubt.

26

**1875**

In addition, the prosecution introduced into evidence, without objection, guns and ammunition connected to Runyon that had no relation to this case but were consistent with Runyon's lifestyle, as Linker described. The victim was found with five .38 caliber bullet wounds but the prosecution placed before the jury a shotgun, a rifle, a bag of ammunition containing a shotgun shell, a rifle shell, and a box of .22 ammunition, and the box of .357 ammunition described previously, Gov't Trial Ex. 212, 212A, 213, 237, as well as a photograph of the box of ammunition. Gov't Trial Ex. 236. This evidence is irrelevant to the manner in which the victim was killed but it makes sense in light of Linker's knowledge that Runyon was an avid hunter who enjoyed collecting, trading and selling guns and ammunition. Those exhibits were used by the prosecution to somehow illustrate Runyon's guilt but they were consistent with the alternative explanation provided by Linker. Thus, counsel was ineffective for failing to elicit this information from Linker that would have supported reasonable doubt.

### D.    Rose Wiggins

Rose Wiggins, Cat Voss's mother, was the first witness called by the prosecution. She testified that she received a phone call from her daughter, Cat Voss, around 3:00 a.m. indicating that Cory Voss had not come home from a trip to the credit union. Wiggins testified she offered to search for Cory Voss because Cat Voss indicated her children were sleeping. Wiggins then drove by and around the credit union looking for Cory Voss's truck or a white BMW. Tr. 259-61, 7/6/09. She testified she did not know which vehicle Cory Voss had driven. Wiggins stated she returned home and left sometime later and searched the area around the credit union again and still did not see either vehicle. Tr. 261. Wiggins then went to the Voss home. She testified she never saw the truck or the BMW. Tr.262.

Defense counsel failed to inquire about why Wiggins did not know which vehicle Cory Voss had driven to the credit union and he failed to question the whereabouts of the BMW, the car that Cat Voss usually drove. He also failed to question why Wiggins did not immediately go to the Voss

27

**1876**

house to watch the sleeping children while Cat Voss searched for her husband. Wiggins did not go to the Voss house until just before 8:00 a.m. when the children had to catch the school bus. Tr. 263.

Wiggins' timeline did not fit the prosecution's theory that the killing occurred in conjunction with an ATM robbery shortly before midnight on April 29, 2001. Tr. 1595-96, 7/16/09; *see also*, ECF No.70 p.5 ¶17. Wiggins testified she drove by the crime scene after 3 a.m. and again sometime before 8 a.m. but didn't see Cory Voss's vehicle. Cory Voss was found in his truck at 6:49 a.m. in a parking lot adjacent to the credit union after the vehicle had been spotted at 6:10 a.m. Tr. 268, 271. Moreover, when counsel tried to argue that there was a period of time that did not account for Cory Voss's location, Tr. 1634-35, 7/16/09, the prosecution argued that the *lack of evidence* was proof of guilt and asked the jury to speculate what Runyon was saying to Cory Voss between 11:37 and midnight. Tr. 1657, 7/16/09. Had counsel effectively utilized Wiggins' inconsistent testimony, the jury may have had a reasonable doubt about Cat Voss's whereabouts, the prosecution's timeline, and Runyon's involvement.

### E.    David Runyon's Whereabouts The Day Of The Crime[17]

David Runyon lived in Morgantown, West Virginia. Witnesses and electronic transactions placed Runyon in West Virginia on April 29, 2007, at least until 8:37 p.m. The crime occurred on April 29th at 11:33 p.m. over six hours away in Newport News, Virginia. It would have been impossible for Runyon to drive to Newport News in three hours.

Runyon owned two cell phones. Runyon used one phone and gave the other to his son Davy and his son's babysitter, Paula Dalton, so the three could remain in contact when they were apart. Between noon and 2 p.m. on April 29, 2007, Runyon met with George Koski to purchase a handgun. Tr. 847, 7/8/09. That transaction was friendly and the two men engaged in conversation. Tr. 851,

---

[17] Investigation is ongoing and supplemental information will be provided when available.

856, 7/8/09. Runyon was not in a hurry and he provided Koski with his full name and driver's license. Tr. 854-56, 7/8/09. This encounter encompasses strange acts for an alleged "hitman" who was purchasing a murder weapon the day the murder was to occur.

At 1:30 p.m., Runyon withdrew $80 from an ATM in Morgantown. Gov't Tr. Ex. 65, 065-006. Runyon used his cellphone to call Davy at 1:20 p.m. and 2:08 p.m., Gov't Tr. Ex. 109, 109-014, before and after the ATM transaction. The final cellphone call Runyon placed that day was at 8:37 p.m. and that call was also to Davy.[18] None of the calls made by Runyon on April 29th incurred roaming charges, meaning Runyon was in West Virginia when he placed those calls, including the call at 8:37 p.m. *Id.*

Paula Dalton was called by the prosecution as a witness and defense counsel did not elicit testimony that she never received a phone call on Davy's phone from a caller other than David Runyon. Neither the prosecution nor defense counsel asked Paula Dalton whether Runyon provided her with a different phone number to reach him on April 29, 2007. If asked, Paula Dalton would have testified that the only number she used to contact David Runyon was his other cellphone number and the only calls she received from that Runyon's phone were placed by David Runyon. Because the prosecutor argued that Runyon might have left one of his phones in West Virginia before driving to Newport News to commit the crime, Runyon was prejudiced by counsel's failure to elicit this testimony.

### F. Cell Tower Testimony Regarding Michael Draven

The prosecutor presented testimony that Draven was moving away from the credit union at the time of the killing. Tr. 1445-48, 1452-53, 7/14/09. To support this theory, the prosecutor

---

[18] The vast majority of calls placed by Runyon between April 18 and May 17, 2007, were to Davy. Gov't. Tr. Ex. 109, 109-014. Notably, no calls were placed to a Virginia phone number during that time period, and specifically April 29-30, a fact that counsel failed to effectively argue.

introduced a map of cell tower locations as an exhibit through Paul Swartz an investigator at the U.S. Attorney's Office. Gov't Tr. Ex. 135. Circles had been drawn around each tower to represent the radius in which the tower allegedly would service a cell phone. *Id.* The prosecutor elicited testimony that the "movement" of Draven's cellphone signal between the towers proved Draven was located within and moving between the radii of the towers. Tr. 1461, 7/14/09.

Defense counsel's failure to challenge the validity of this testimony was prejudicial. Cell-tower-tracking testimony that purports to locate a person's precise location *is not valid*. This is due to a faulty, underlying presumption that a cell phone connects to the closest tower. *See United States v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012). There are a number of factors that determine which tower a phone connects to and whether it remains connected to that tower, or switches towers, during the duration of a call. Those factors include the technical characteristics of the tower, antennas and phone, environmental and geographical features, and indoor or outdoor usage. Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone*, 18 RICH. J. L. & TECH. 3, at *7 (Fall 2011); *see also* Larry E. Daniel, *Cell Phone Tracking Evidence*, Ex. 14. At best, cell tower information indicates that a person is located within twenty linear miles (up to 500 square miles) of any particular cell tower. *See* Judge Herbert B. Dixon, Jr., *Scientific Fact or Junk Science? Tracking a Cell Phone Without GPS*, 53 The Judges Journal 1 (American Bar Association 2014).

Swartz's map noted three cell towers to which Draven's phone connected that are located within twenty miles of the credit union. Gov't Tr. Ex. 135. Draven's cell phone could have connected to any or all of those towers with or without him changing locations. Accordingly, there was *no reliable evidence* definitively proving that Draven was moving away from the credit union at the time of the crime. Draven could have been at the credit union committing the crime himself, as Cat Voss suspected. This information could have created a reasonable doubt about Runyon's involvement. *See*

30

**1879**

Woodward declaration, ¶9, Ex. 6 (the defense theory "involved portraying the co-defendants as bad actors and creating doubt regarding David Runyon being the person who shot Cory Voss.").

Trial counsel's failure to investigate and challenge forensic evidence was deficient. *Strickland, supra; see Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007) (ineffectiveness for failure to consult expert). To the extent that any of this information was not available at the time of Runyon's trial, it constitutes newly-discovered, scientific evidence of innocence. The admission of such unreliable expert testimony tainted the integrity of the trial process and denied Runyon a just and fair trial. *Napue v. Illinois*, 360 U.S. at 271; *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974).

G. **Runyon's Shopping List**

The prosecution introduced a list of twelve items--written at an unknown time--that was found among Runyon's belongings and characterized it as a checklist for the crime.[19] Gov't Tr. Ex. 217.

Counsel failed to point out that the shopping list does not contain items used in the crime. Most obvious, it does not list a gun. The prosecution, however, argued that Runyon--an allegedly skilled "hit man"--needed to purchase a gun on the day of the crime in order to kill the victim. Tr. 1593, 7/16/09. The list also does not include the mask that the prosecution argued Runyon wore at the time of the crime to hide his face. Tr. 2598, 8/26/09.

Items on the list like the taser, Spyderco knife, tarp, trash bags, black dress socks, gel shoe inserts, and clothing did not have any role in the crime. If anything, the clothing on the list—a black hoody, cap, BDU pants and jungle boots—was consistent with Chad Costa's statement that Runyon bought clothes to look like a "thug" in order to impress people. Costa declaration, p. 4, Ex. 7. Both trial and appellate counsel's failure to counter the prosecution's use of this list as "a checklist of items to be used in the murder," *Runyon*, 707 F.3d at 504, was prejudicial since this exhibit is one more

---

[19] The government did not introduce into evidence any of the items on the undated shopping list.

example of using facts unconnected to the actual crime as "evidence" of Runyon's guilt. Had counsel raised this point, along with the others mentioned herein, the jurors could have reasonably doubted that Runyon was involved in this crime.

**H.     Testimony Regarding The Bullets.**

On the day of the crime, Runyon's cellphone records placed him in Morgantown, West Virginia at a time that would have made it impossible for him to travel to Newport News, Virginia and commit the crime by 11:33 that evening. The murder weapon was never found and the only handgun the government could connect to Runyon was a .357 revolver.

John Willmer testified, without objection, for the prosecution as an expert firearm and toolmark examiner. Tr. 353, 7/6/09. Willmer testified about the Certificate of Analysis report prepared by another person (Gov't Trial Ex. 23) on the bullet recovered from the victim's truck (Gov't Trial Ex. 5) and the bullets/fragments recovered from the body (Gov't Trial Ex. 22). Willmer testified quite definitely that his expertise allowed him to match specific bullets to a specific firearm from which they were fired. Tr. 364, 366. He said the bullets were caliber .38 class and they were fired from one firearm. Tr. 362, 366.

The prosecutor carefully asked Willmer whether he could determine the *type* of firearm that discharged the .38 bullets, "I'm not talking about *brand*, but just what *generic types.*" Tr. 364, 369. Willmer referred to the certificate of analysis and stated, "that includes .38 special brands of firearms, and also firearms that can fire .357 magnum cartridges, brands of firearms that can fire those[.]" Tr. 369. Counsel was ineffective for failing to elicit the specific information in the certificate of analysis which states that "caliber .357 Magnum revolvers with the brand names Astra and Llama" could have produced the rifling characteristics on the bullets. Gov't. Trial Ex. 23. Runyon, however, owned a Taurus .357; a *brand* that is not associated with the .38 bullets at issue. Defense counsel was ineffective

32

**1881**

for failing to challenge the scientific validity of Willmer's testimony[20] and/or for failing to correct the mis-impression, created by the prosecutor's carefully crafted questions, that the .38 bullets could have been fired from Runyon's Taurus .357. The certificate of analysis excludes the Taurus brand of .357 firearms, a fact counsel failed to argue. Gov't Trial Ex. 23.

To the extent counsel was not ineffective for failing to rebut the prosecution's expert evidence, unreliable cell tower-tracking, ballistics testimony, and advances in science reveal that Runyon's convictions and death sentence were based on unreliable evidence, in violation of due process and the Eighth Amendment. "Reliability is ... a due process concern." *White v. Illinois*, 502 U.S. 346, 363-64 (1992). Hence, the Due Process Clause requires that criminal convictions be based on reliable and trustworthy evidence. *See Donnelly v. DeChristoforo*, 416 U.S. at 646; *Thompson v. City of Louisville*, 362 US 199, 204 (1960). The use of exaggerated, inaccurate, or misleading testimony, such as that presented by the prosecution here, deprives a defendant of a fair trial if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue*, 360 U.S. at 271; *see also Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Giglio v. United States*, 405 U.S. 150 (1972).

Similarly, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion); *see also Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980); *Mills v. Maryland*, 486 U.S. 367, 383-84 (1988). This need for heightened reliability requires "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a

---

[20] About five months before Runyon's trial, the National Academy of Sciences ("NAS") issued a landmark report regarding the unreliable state of forensic science in this country. See NAT'L ACAD. OF SCI., STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (Feb. 2009). The NAS Report was highly publicized and a reasonable attorney would have known of its contents, especially an attorney preparing for a trial where forensic evidence was going to be introduced.

defendant shall live or die," *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (plurality opinion), and invalidates death sentences imposed as a result of the jury's consideration of materially inaccurate evidence. *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (Eighth Amendment does not permit a death sentence to be imposed by a jury that was allowed to consider materially inaccurate evidence); *Tuggle v. Netherland*, 516 U.S. 10, 14 (1995) (same). The jury's death verdict here was based in significant part on materially inaccurate and unreliable pseudo-scientific evidence. As such, Runyon's death sentence cannot stand. Given new evidence undermining the reliability of the three prosecution experts' testimony, an evidentiary hearing is necessary to determine the precise impact on the scientific evidence at issue.

The above facts establish reasonable doubt that Runyon was the triggerman. The prosecution's circumstantial case was by no means overwhelming and, in certain respects, it contradicted a finding of guilt. At the close of the prosecution's case, the Court dismissed the bank robbery charge. *Runyon*, 707 F.3d at 486. The jury found Runyon not guilty of conspiracy to commit robbery. *Id.* Clearly, the jurors were willing to acquit Runyon.

*Strickland* requires the Court to determine whether trial counsel's deficiencies "alter[ed] the … evidentiary picture." *Strickland*, 466 U.S. at 696. Had counsel presented the information discussed herein, the evidentiary picture would have been dramatically altered because it presents an alternative explanation to the prosecution's case and the evidence raises a reasonable doubt that Runyon was in Newport News the night that the victim was killed. Counsel's deficient performance was prejudicial and undermines confidence in the outcome of the case.[21] *Id.*

---

[21] Investigation into Runyon's innocence is ongoing and supplemental information will be provided when available.

34

**1883**

**Claim 4:**     **Counsel Abdicated The Responsibility To Advocate For Runyon At The Eligibility Phase When He Failed To Address The Relevant Issue And Did Not Discuss Established Facts That Weighed Against The Statutory Aggravating Circumstance Of Substantial Planning.**

Defense counsel requested that Runyon's capital trial be trifurcated, meaning that if the jury convicts, the decision regarding whether Runyon is eligible for a death sentence should occur in a proceeding separate from the decision whether Runyon should be sentenced to life or death. ECF No. 93 p. 3. Counsel argued that maintaining the presumption of innocence in the context of a capital case is difficult with a death qualified jury and this procedure would protect Runyon's Fifth Amendment right to enter the eligibility phase cloaked in the presumption that he is innocent of the death penalty. ECF No. 93 p. 4. Counsel also argued that a separate phase where the jury deliberates whether the government has met its burden of proving eligibility factors, would prevent that decision from being infected by evidence presented in the selection phase. ECF No. 93 p. 8. The Court granted the request to trifurcate the proceedings. ECF No. 132.

Defense counsel's constitutional obligation was to hold the government to its burden of proof on every element in the case, including death-eligibility. *See also* Claim 11. Counsel had an "overarching duty to advocate the defendant's cause" and "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. In short, counsel's role was "to ensure that the adversarial testing process work[ed] to produce a just result." *Strickland*, 466 U.S. at 687. In this case, counsel failed to guard the presumption of innocence or hold the government to its burden when he abdicated the role of advocate at the eligibility phase. Initially, because counsel failed to adequately investigate Runyon's mental health they did not argue he was ineligible for the death penalty in the first instance. *See* Claim 14. Counsel also failed to ensure that the eligibility factors were constitutional. *See* Claim 11. Finally, counsel failed to present any evidence to counter the eligibility factors. *Runyon*, 707 F.3d at 485.

<div align="center">35</div>

<div align="center">**1884**</div>

In a three-page argument, counsel told the jurors there were "a couple of things that I would like for you to be considering when you are looking at this eligibility phase." Tr. 1769-70, 7/22/09. Those things were: (1) that the law never requires the death penalty; and, (2) that the jurors were not then-deciding whether Runyon should be sentenced to death. *Id.*, 1770, 1771. Those points failed to address the discrete task at hand, which was the purpose for the trifurcated proceeding. Counsel's argument, which intertwined the eligibility phase with the penalty phase, had the opposite effect. Counsel did not address the factors which the government had to prove and which the jurors would be considering. Counsel did not argue facts that weighed against the "substantial planning" statutory aggravating circumstance. Counsel simply requested that the jurors, when arriving at a decision, look at the evidence "with new eyes," in accordance with the Court's instructions. *Id.*, 1772. Counsel, however, had previously argued against the application of the "substantial planning" statutory aggravator and should have placed this argument before the jury for its consideration. *See Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005) ("[D]efense counsel's job is to counter the [prosecution's] evidence of aggravated culpability with evidence in mitigation.").

Five months before the trial, defense counsel submitted a ten-page letter to the United States Attorney's Office requesting that the death notice be withdrawn. Ex. 15. That letter sets forth established facts demonstrating that the co-defendants, Voss and Draven, engaged in extensive planning of the crime and Runyon was merely a tool.[22] Ex. 15, p. 3 (citing 18 U.S.C. § 3592(c)(9)).

> According to the United States' theory of the alleged conspiracy-for-hire, as set forth in Voss' Statement of Facts incorporated into her guilty plea, as well as statements made by the United States at Voss' sentencing, Voss was without question the mastermind of the scheme to murder her husband, Cory Voss. Voss and Draven together created a plan to kill Cory Voss with or without Mr. Runyon's assistance. The

---

[22] The letter also sets forth the factual basis for objecting to the "substantial planning" aggravator based on the principle that the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants. *United States v. Fulks*, 683 F.3d 512, 524 (4th Cir. 2012). Counsel were ineffective for failing to make this objection at trial and/or on direct appeal.

36

United States has acknowledged this fact, stating that "[s]ometime in January of 2007 at least three individuals were approached [by Voss and Draven] and asked about murdering Cory." See Tr. of Sentencing for Catherina Voss at p. 5 (Attached as Exhibit A). The United States characterized Mr. Runyon as merely the tool that Voss and Draven ultimately used to execute their murderous plan. Id. The United States repeatedly refers to the murder plan as being Voss' and/or Draven's plan, not Mr. Runyon's plan. In fact, at Voss' sentencing, the United States characterized the plan to kill Cory Voss as almost exclusively the work of Voss in her fit of greed and lust. Id. at 5 lines 10-11, 21; p. 6, lines 21-22.

Even according to the United States it was Voss and Draven not Mr. Runyon that engaged in the extensive planning and premeditation of the type that constitutes the aggravating factor contained in 18 U.S.C. § 3592(c)(9). The United States stated that "[Runyon] certainly seemed perfect for Cat Voss and Michael Draven *to carry out their plan*" before they began to conspire with Runyon in February and March, 2007. Tr. at p. 5, lines 9-12 (emphasis added). Indeed, the United States never alludes to any participation by Mr. Runyon in preparing the plan to kill Cory Voss nor does any of the evidence suggest that Mr. Runyon played such a role in the conspiracy. The evidence suggests at best that Mr. Runyon did as he was told by Voss and Runyon, as the United States concedes when it asserts that "Runyon had been provided the location, had been provided a description of Cory's car, and about the time that he would be there, and David Runyon traveled from West Virginia to meet Cory Voss." Id. at pp. 6-7. Mr. Runyon's role therefore was markedly different from the role of Voss and Draven, who spent months engaged in detailed planning and scheming to murder Cory Voss. Mr. Runyon's role does not rise to the level of the type of substantial planning that § 3594(c)(9) contemplates as justifying application of that statutory aggravator.

As set forth above, Voss and her lover, co-conspirator Draven, concocted the intricate plan for having Cory Voss killed so that they could be together and live lavishly off the proceeds from Cory Voss' life insurance proceeds, which they did with flair beginning almost immediately after they murdered Cory Voss. Voss is the person who set up the bank account at the federal credit union in a remote location as part of her murder plan, so that she could send Cory Voss out in the dead of night to meet his killer, who she and Draven pre-arranged to be waiting at the credit union at the appointed time. Voss is the individual who callously made the deliberate decision that her children's father would be murdered at a specific time, at a specific place, and in a specific way. On the night of the murder, it was Draven who let the shooter know the exact time Cory Voss would arrive at the federal credit union, Cory Voss' exact physical description, and the exact description of the car Cory Voss was driving. Telephone records show that Voss was on the telephone with Cory Voss almost the entire time it took him to drive to the credit union up until approximately two minutes before the hired gunman entered Cory Voss' vehicle.

If not for Voss's and Draven's actions, Cory Voss would never have been at the federal credit union on the night he was murdered.

Ex. 15, pp. 3-4.

37

**1886**

This argument did not convince the government to withdraw the death authorization, but these were strong arguments that the jury could have considered at the eligibility phase and they could have established a reasonable doubt that Runyon actually engaged in "substantial" planning. At the eligibility hearing, defense counsel failed to mention the "substantial planning" aggravator at all, let alone advocate for Runyon by countering the prosecution's evidence.[23] There is a reasonable probability that presenting an argument like the one above, may have resulted in one less statutory aggravator, and—at the very least—could have reduced the weight assigned to this aggravator by the jurors once they advanced to the penalty phase. Runyon was prejudiced by counsel's failure to do so. Therefore, counsel rendered ineffective assistance due to a failure to challenge the government's case at the eligibility phase.

**Claim 5:      Trial Counsel Was Ineffective For Failing To Investigate, Discover, And Present Evidence That David Runyon Was Incompetent To Stand Trial.**

Runyon exhibited signs of severe mental illness and incompetence from the moment he was arrested. There were numerous red flags that suggested Runyon was, through no fault of his own, unable to assist his counsel.

While Runyon was incarcerated at the Portsmouth City Jail, he was "seen by Dr. Kolongo because he believed he has mustard gas in his head (sinus)." Dr. Kolongo reported Runyon was "somewhat grandiose. His thoughts were flighty and rambled on. He verbalized some delusional material." Dr. Kolongo did not make a final diagnosis but believed schizo-affective disorder and bi-polar disorder needed to be ruled out.[24] Portsmouth City Jail records, Ex. 16. Mitigation specialist

---

[23] Nor did counsel address the "pecuniary gain" statutory aggravating circumstance; a circumstance that was supported only by a receipt that indicated Randy Fitchett (Draven's brother) sent $275 to Runyon two months after the crime.

[24] After the jury found Runyon eligible for the death penalty, Dr. Merikangas informed counsel that Runyon "is either in a fantasy world of grandiose wishful thinking, or suffering from delusions." Merikangas report, Attachment p. 2, Ex. 2.

38

**1887**

Sheila M. Cronin advised trial counsel that Runyon's family history is significant for major psychiatric illnesses as well as neurological/cognitive/developmental disabilities. Cronin declaration, Ex. 4. For example, Runyon's mother exhibited severe mood swings with angry irrational tirades and probably suffers from "bipolar disorder." *Id.*, ¶8. Runyon's biological father suffered major depression. VA progress note, Ex. 17.

Runyon's grandiose delusions were apparent in conversations with his legal team. He repeatedly compared himself to great historical figures. Cronin declaration ¶7, Ex. 4. Runyon's delusions were apparent in letters he wrote to his legal team. One such letter is a "list of lives I have saved over the years." Cronin declaration, Attachment, Ex. 4. Other letters to the defense team reflect fixed delusional beliefs. This correspondence has been reviewed by Drs. Mirsky, Merikangas and Dudley, all of whom note Runyon suffers from a delusional disorder. See Claim 6.C.3 for full discussion of their findings.

Federal law defines incompetency as follows: "[T]he defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense ...." 18 U.S.C. § 4241(d).

Pursuant to 18 U.S.C. § 4241(a), the defense is entitled to "file a motion for a hearing to determine the mental competency of the defendant." Upon the filing of such motion, "[t]he court shall grant the motion ... if there is a reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable ... to assist properly in his defense." *Id.*

The Fourth Circuit has explained that § 4241 "provides a mechanism to secure a judicial determination of a criminal defendant's competency, thereby protecting the defendant's fair trial rights and the integrity of judicial proceedings." *United States v. Broncheau*, 645 F.3d 676, 682 n.8 (4th Cir.

39

**1888**

2011). *United States v. White*, 620 F.3d 401, 404 (4th Cir. 2010) (Defendant suffered from delusional disorder, grandiose type, and not competent to stand trial); *United States v. Culp*, 930 F.2d 23 (4th Cir. 1991) (paranoid schizophrenia and delusional behavior were sufficient to establish a mental disease or defect). Consistent with Fourth Circuit case law, Runyon was incompetent to stand trial. At bottom, such an examination would have revealed Runyon's serious mental illness that, in turn, would have supported an argument against death qualification, *see* Claim 14, and/or would have supported mitigating circumstances resulting in a life sentence. *See* Claim 6.

The Supreme Court has affirmed its understanding of competency in *Godinez v. Moran*, 509 U.S. 389, 396 (1993):

> In *Dusky v. United States*, 362 U.S. 402 (1960) *(per curiam)*, we held that the standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding" of the proceedings against him." *Accord Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."

Throughout the trial, Runyon expressed beliefs that the Court, the prosecution and the court reporter were conspiring to commit premeditated prosecutorial misconduct and to commit illegal and immoral acts to attempt his murder. He repeatedly remarked that events were not recorded by the court reporter in order to conceal this conspiracy and misconduct. "[T]he conviction of an accused person while he is legally incompetent violates due process[.]" *Pate v. Robinson*, 383 U.S. 375, 378 (1966). Trial counsel, of course, had a duty to protect Runyon's due process rights. The failure to protect Runyon's right to be competent during trial qualifies as ineffective assistance of counsel and resulted in the denial of his rights guaranteed by the Fifth, Sixth, and Eighth Amendments. *Strickland v. Washington, supra; Newman v. Harrington*, 726 F.3d 921 (7th Cir. 2013) (IAC for failure to raise the issue of client's competency); *Hummel v. Rosemeyer*, 564 F.3d 290 (3d Cir. 2009) (same).

40

**1889**

**Claim 6:** **Counsel Rendered Ineffective Assistance By Failing To Investigate And Present Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage And Mental Health.**

In *Strickland v. Washington*, the Supreme Court explained that constitutionally effective counsel "plays a crucial role in the adversarial system," is "necessary to accord defendants the ample opportunity to meet the case of the prosecution," 466 U.S. at 685, and ensures the trial is "a reliable adversarial testing process." *Id.* at 689. In assessing prejudice, the court must assess the totality of the evidence: "Some of the errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695-96. Runyon's case is the former – the failure to adequately investigate Runyon's mental health had a pervasive effect because: (a) counsel did not challenge the application of the death penalty as disparate, arbitrary, its cruel and unusual nature based on Runyon's serious mental illness (Claims 13 & 14); (b) counsel did not ensure that Runyon was competent to stand trial (Claim 5); and (c) the jurors did not have an accurate picture of David Runyon, counsel failed to subject the prosecution's case to adversarial testing when available evidence was not presented to counter-balance the aggravating circumstances, *see also* Claim 4, and counsel failed to offer persuasive evidence of traumatic brain damage and mental illness both of which are mitigating factors entitled to great weight. The death penalty was not a foregone conclusion. During deliberations, the jury questioned what would happen if they could not agree on a sentence. Tr. 2707-09, 8/27/09. Had counsel investigated and presented evidence like that which follows there is a reasonable probability that the sentencing outcome would have been different.

**A.** **Counsel Hudgins Appeared In The Case Too Late To Effectively Investigate And Present Mitigation.**

Just four months before the trial began, Stephen Hudgins replaced attorney Jon Babineau, ECF No. 179 pp. 12-13, and assumed Babineau's responsibility for the penalty phase of the case. It was Hudgins who had the most contact with the defense experts and prepared the witnesses for the

41

**1890**

penalty phase. ECF No. 247 p. 2, n.1; Hudgins declaration, ¶1, Ex. 5; Woodward declaration, ¶¶2, 7, Ex. 6. At the time of Hudgins' appointment, Runyon's counsel had already requested and obtained authorization to hire clinical psychologist Evan Nelson,[25] who had yet to conduct an appropriate examination. *See* Hudgins declaration, ¶4, Ex. 5; *see also* Woodward declaration, ¶6, Ex. 6. Dr. Nelson had, however, informed counsel that neuropsychological deficits are a defining element of Runyon's personality and behavior and he recommended a neuropsychological evaluation of Runyon. ECF No. 153 p. 1. Hudgins scrambled to find appropriate mental health experts.

On April 13, 2009, Hudgins moved to continue the trial date for six months, expressing a "firm belief that to require the defendant to proceed to trial on June 30, 2009, will deprive the defendant of his constitutional right to the effective assistance of counsel[.]" ECF No. 179 p. 9.[26] Counsel cited Supreme Court precedent, circuit court cases, and ABA Guidelines which set forth the obligations and prevailing norms of counsel in capital cases to conduct a thorough penalty phase investigation and asserted that more time was required "to perform the minimally required functions of counsel[.]" *Id.* The defense had yet to obtain medical records for Runyon, his mother, and his biological father, and asserted that "these records are absolutely necessary" before mental health experts "can perform testing and render opinions." *Id.*, p. 12.

---

[25] Counsel had represented that Dr. Nelson would: present a reliable social history of David Runyon and his family. The social history will focus especially on the major influences that have shaped David Runyon's life, including factors that may have contributed to David Runyon's psycho-social development and functioning. ECF No. 135 p. 1.

[26] After Hudgins was appointed on February 20th, Counsel Woodward obtained a continuance of the trial date from March 13th to May 4, 2009. ECF Nos. 160, 162; Hudgins declaration, ¶ 2, Ex. 5. Although Woodward felt he was ready to proceed to trial, Hudgins needed time to become familiar with the case and to prepare the penalty phase defense. Woodward declaration, ¶7, Ex. 6.

42

**1891**

In addition, counsel wanted documentation for injuries Runyon sustained in a head-on collision with a drunk driver.[27] Hudgins declaration, ¶5, Ex. 5; Woodward declaration, ¶5, Ex. 6. Runyon was also exposed to grenade blasts in Army training exercises. Hudgins declaration, ¶5, Ex. 5. Counsel knew injuries that affected Runyon's reasoning abilities were important for mitigation. *Id.*

In the continuance motion, counsel recounted the change of counsel in February, and indicated that, regardless, the case could not have gone to trial on the original date because "[t]he mitigation investigation for the penalty phase was not complete and still is not complete at this time." ECF No. 179 p. 13. Accordingly, counsel requested that the trial date be moved to October. Hudgins declaration, ¶2, Ex. 5. In fact, from the date of appointment to the date of trial, Hudgins had 91 working days to investigate and prepare. At least 32 of those days he spent in court on other cases, including a 14-day federal trial. Hudgins declaration, ¶2, Ex.5; Hudgins schedule (with mark-ups), ECF No. 165 pp. 5-7, Ex. 19. Twenty-five additional days were partially spent in court. Ex. 19.

Given counsel's representations regarding the inability to provide effective representation for a June 30th trial date, "and after having considered the numerous legal authorities cited[,]" the prosecution did not object to a six-month extension of the trial date. ECF No. 181 p. 1.

Since counsel requested additional time in order to complete investigation, discovery, and expert testing for only the penalty phase of trial, the Court declined to move the June 30th date for the guilt/innocence phase of trial, but indicated that counsel could renew a continuance motion for the eligibility and penalty phases should the jury convict Runyon. ECF No. 194 pp. 2-4, 9-10 & n.12.

Hudgins secured the appointment of Dr. Mirsky, who conducted a brief examination of Runyon four days before trial began. He informed counsel that there is strong evidence Runyon is

---

[27] Counsel were never going to obtain records from Runyon's Emergency Room visit in 1996, because Lake Martin Community Hospital destroys its records after seven years. Ex. 18, p. 3.

suffering from a neurological disorder and a neurological evaluation was essential. Mirsky letter 7/2/09, Ex. 20. Counsel requested funding for neuropsychiatrist James R. Merikangas. This request was not granted until the jury found Runyon eligible for the death penalty. ECF No. 257.

Counsel's lack of time and single-minded pursuit of medical records to prove Runyon's impairments unduly constrained the investigation of Runyon's mental health. The day before trial began on June 30, 2009, counsel filed another notice regarding mental health experts, but it contained a qualification: "this notice is dependent on defendant's receipt of his and his family's medical records from the United States Government for periods of time when defendant was in the Army and when he and his mother were Army dependents." ECF No. 230 p. 1. Counsel indicated: (1) Dr. Mirsky is a neuropsychologist who will do psychological testing on the defendant if deemed appropriate once the medical records of defendant and his family are received; and (2) Dr. Merikangas is a psychiatrist who will be testifying to factors discovered in defendant's medical records and those of his family and who may interview defendant on issues discovered in the medical records, all as determined to be necessary and appropriate once the medical records are received. ECF No. 230 pp. 1-2.

The jury convicted Runyon on Friday, July 17, 2009, after 4 ½ hours of deliberation. Counsel moved to continue the penalty phase, stating, he "will simply not be ready to present the defendant's case for life at the conclusion of the guilt or innocence phase[.]" ECF No. 240 p. 2 (duplicate filing at ECF No. 247). Counsel asserted that a "mental health examination has uncovered evidence tending to suggest the existence of a significant mental disorder that bears a potentially strong relationship to the defendant's behavior and moral culpability." ECF No. 240 pp. 2-3. Dr. Mirsky's testing revealed deficits that required further neurological testing, ECF No. 242 p. 1, but counsel's motion to fund Dr. Merikangas remained pending. ECF No. 240 p. 3. Counsel also said that they still lacked medical records and the mitigation investigation had not been adequately completed. ECF No. 242 p. 1.

The Court continued the penalty phase for four weeks. ECF No. 254.

44

**1893**

At the eligibility phase, counsel presented no evidence and a three-page argument. *See* Claim 4, *infra*. The jury determined that Runyon was eligible for the death penalty. Thereafter, the Court granted defense counsel authorization to hire Dr. Merikangas. ECF No. 257.

After learning from counsel that the jury found Runyon death-eligible, Dr. Mirsky responded:

> I am firmly convinced that Mr. Runyon is still suffering from the effects of the two blast injuries he sustained when undergoing training exercises in the ROTC. These were compounded by the effects of the motor vehicle accidents. His impaired attention, seen in the poor Continuous Performance Test scores in my report, is one of the classical symptoms of blast injury and impact injury after a car accident. Other symptoms, such as quickness to anger, and impulsivity, are also well documented in the brain injury literature. The occasional dizziness he shows is also symptomatic of brainstem injury. In some sense, because he suffered the blast injuries while in the ROTC, he can be considered a wounded warri[o]r, and this should be considered in his sentencing.

Hudgins/Mirsky email, 7/22-7/23/09, Ex. 21.

Dr. Merikangas evaluated Runyon on July 29, 2009. Merikangas Report, p. 1, Ex. 2. He noted multiple physical abnormalities consisted with trauma. *Id.*, Attachment p.1. He observed that Runyon "presently is either in a fantasy world of grandiose wishful thinking, or suffering from delusions. He clearly has impaired functioning suggestive of frontal lobe brain impairment." *Id.*, Attachment p.2. Both Dr. Merikangas and Dr. Mirsky "noted deficiencies in defendant's psychological testing and history of injuries which could have caused brain injury accounting for these deficiencies," and Dr. Merikangas requested brain scans. ECF No. 269 pp. 1-2. The earliest the scans could be scheduled was five days before the penalty phase. *Id.*, p. 2. The results were released directly to defense counsel and not shown to Dr. Merikangas or a similar expert.[28]

Although counsel had permission to supplement the defense experts' reports, see ECF No. 269, he failed to do so.

---

[28] We now know the scans revealed "multiple white matter hyperintensities consistent with his [Runyon's] history of head injuries and migraine." Merikangas report, p. 4, Ex. 2.

45

**1894**

**B.** **Counsel Abandons The Incomplete Mental Health Investigation And Presents Repetitive Lay Person Testimony.**

Although counsel promised the jury he would "put on … mental health information," he did not. Tr. 1770, 7/22/09. Counsel presented twenty-one witnesses; however, neither Dr. Mirsky nor Dr. Merikangas testified and the jury was not informed of Runyon's brain damage and its impact on his behavior and moral culpability.

One-third of the defense's penalty phase evidence, not only in number of witnesses but also in number of transcript pages, was testimony about Runyon's good behavior as a jail inmate, Tr. 2084-92, 8/20/09; Tr. 2199-2242, 8/24/09, and his very low likelihood of serious violence in prison. Tr. 2158, 8/20/09. It was evidence the jury rejected. *See* ECF No. 291, p. 3.

Counsel tried to present some evidence of Runyon's psycho-social history. The prosecution, however, moved to prevent Dr. Cunningham from testifying about developmental factors in Runyon's background because Dr. Cunningham's report did not include this information. Tr. 2079, 8/20/09. The Court sustained the motion after counsel seemingly conceded the issue. *Id.* Counsel were ineffective for not properly directing their expert or preserving this issue for appeal.

Counsel attempted to present family life history through Runyon's adoptive father. The Court commented, however, that the testimony was attenuated and unrelated to the enumerated mitigating factors. Tr. 2399-2401, 8/24/2009. When Runyon's mother, Suk Cha Runyon began to explain her childhood war-time flight from North Korea, the prosecutor objected: "we are going into an area far outside the mitigating factors and far outside preliminary background, where she is starting to give more of her life story." Tr. 2411, 8/24/2009. The Court agreed Suk Cha's background was not needed and questioned what it had to do with Runyon. *Id.* Counsel were ineffective for failing to articulate the relevance or preserve this issue for appeal. As explained below, transgenerational dysfunction is critical to understanding the formative influences on Runyon's character, psychological limitations, and life trajectory. Simply put, history repeats itself and Runyon was unable to escape the patterns in

46

**1895**

his family history. *See, e.g.*, Cunningham declaration, p. 27, Ex. 8. The remaining penalty phase witnesses spoke briefly about Runyon's childhood and character, his relationships and employment history. *Runyon*, 707 F.3d at 499. They described Runyon as a good friend, a charitable person, a considerate and helpful guest, and a caring father.

At closing, the prosecution argued that Runyon had "a good upbringing" but, "he rejected that, and he walked away from that over five years ago." Tr. 2622, 8/26/09. The prosecution made a number of—what Runyon's appellate counsel later described as—

> "derogatory and superfluous" comments about Runyon's own life, asserting that he "left his wife and children and didn't provide support for them"; "abandoned more gainful attempts at employment, to get employment through these sporadic drug studies that put him into contact with people like Michael Draven"; met his girlfriend "at a strip bar"; and "play[ed] video games" while his girlfriend held down three jobs.

*Runyon*, 707 F.3d at 512.

Defense counsel's argument focused on the inequity of the co-defendants' life sentences and the impact of a death sentence on Runyon's mother, son and friends.[29] Tr. 2640-50, 8/26/09.

> Runyon's counsel had gone to great lengths to demonstrate that the three defendants, despite all being integrally involved in the murder, had received differential treatment, with the government pursuing the death penalty against Runyon but not against Cat or Draven. In particular, the defense introduced Cat's plea agreement and the accompanying statement of facts, which recited her role in the crime in stark detail, and argued vigorously and repeatedly before the jury that Runyon did not deserve death if neither Cat nor Draven was subject to that sentence.

*Runyon*, 707 F.3d at 508.

---

[29] Guilt-phase counsel presented the penalty-phase closing argument. *See* Cronin declaration, ¶15, Ex. 4. Early on in the case, he had remarked about mitigation: "we'll throw a couple of relatives on the stand and that will be enough." *Id.*, ¶12. He displayed an insensitivity to signs of mental illness and thought Runyon's grandiose ideation was funny. *Id.*, ¶7. Counsel failed to recognize that Runyon's conspiracy theories, verbosity, pattern of bouncing from job to job, and series of problem relationships were indicators of brain damage and/or mental illness that required exploration. Guilt-phase counsel's ability to effectively present mitigation was severely impaired by his belief that, in order for mental health evidence to be mitigating, it has to be a mental disease or defect that is not the defendant's fault and, but for it, the defendant would not have committed the crime.

Counsel told the jury, "There is a reason why we bring you evidence sort of from the cradle to the day we are sitting here in court, to the extent we can get it, because the law allows, in fact, requires us, if we can, to let you know as much about Mr. Runyon as we can." Tr. 2652, 8/26/09.

Because counsel did not follow up on his promise to "put on ... mental health information," Tr. 1770, 7/22/09, counsel could not explain the significance of "the fact that he [Runyon] couldn't hold a job or that he would do okay in a job for a little while, and then for whatever reason, be it his own inability to focus or his family situation or his marriage, that he would lose that job?" Tr. 2651, 8/26/2009. Without an explanation, the prosecution's arguments in favor of aggravation could not be counter-balanced. Counsel could not answer the question obvious to all persons in the courtroom:

> So the legitimate question, then, would be, well, what happened? What happened to the person that they described that gave his last $5 bill, instead of going shopping, gave it to the homeless guy or the one that helped the child with some personality disorder[30] that Ms. Provost talked about? And I don't have a glib answer. I don't have, you know, a pat response, where I stand up and say, you know, right here is what caused Mr. Runyon to get involved in this and to be where we are today.
>
> But that's not what your point is.

Tr. 2645, 8/26/09.

The jury deliberated eight hours and sentenced Runyon to death, finding two statutory aggravators and four non-statutory aggravators "outweigh[ed] any mitigating factor or factors."[31] *Runyon*, 707 F.3d at 519; ECF No. 291. The jurors found ten of the fourteen statutory and nonstatutory mitigating circumstances proposed by the defense[32] but also found three mitigating factors that the

---

[30] Phyllis Provost testified that her child was diagnosed with Pervasive Developmental Disorder Not Otherwise Specified (PPDNOS) which is on the autistic spectrum. Tr. 2521, 8/25/2009. This is a mental disorder classified on Axis I by the Diagnostic and Statistical Manual of Mental Disorders, IV-TR, pp. 14, 84 (2000). It is not a personality disorder classified on Axis II.

[31] The statutory aggravators found were: "pecuniary gain" and "substantial planning." 18 U.S.C. §§ 3592(c)(8) & (c)(9). The non-statutory aggravators were (1) "lack of remorse;" (2) "abuse of women;" (3) "specialized training;" and, (4) "victim impact."

[32] The ten mitigators found were: Runyon did not have a serious criminal record; other persons equally culpable in the crime will not be punished by death; Runyon would serve a life without parole

48

defense had not proposed: (1) Runyon "continued to witness and experience domestic violence and parental conflict/abuse from [his] mother and adoptive father;" (2) Runyon's brother "will suffer emotional harm if his brother is executed;" and, (3) that Runyon "was given the impression that Cory Voss was molesting [Voss's] daughter." *Runyon*, 707 F.3d at 487-88. The jurors found over twice as many mitigators as aggravators but it is clear they were unable to assign much weight to the mitigation evidence that was presented. The prosecution had argued to the jurors that "the defendant has tried to make it [mitigation] very much about quantity versus quality[.]" Tr. 2618, 8/26/09.

Dr. Mirsky learned Runyon was sentenced to death after the fact. He wrote counsel, "I wish to make sure that the Court is aware of certain mitigating circumstances that should affect the sentence of your client, Mr. David Runyon." Mirsky letter, 9/18/09, Ex. 22. Dr. Mirsky explained—without having seen Runyon's brain scans[33]—that with blast injuries, such as Runyon experienced in ROTC, "[t]here can be extensive damage to white matter tracts, which serve the vital function of connecting various cortical areas." *Id.* Persons with mild traumatic brain injury (mTBI), such as Runyon,

---

if not sentenced to death; Runyon has worked and has been legally employed all his life; he has committed acts of kindness and generosity for his neighbors and community; Runyon witnessed and experienced domestic violence and parental conflict until his biological father and mother separated; Runyon's son will suffer emotional harm if his dad is executed; Runyon's mother will suffer emotional harm if her son is executed; Runyon was honorably discharged from the U.S. Army and Runyon has a high school diploma, college degree and took further college courses. ECF No. 291, pp. 2-4.

The four rejected mitigators were: Runyon "has demonstrated his ability to make a positive adjustment to incarceration;" Runyon has the respect and support of correctional officers;" Runyon "has had no disciplinary write-ups while incarcerated and has helped other inmates conduct themselves in non-violent or non-aggressive ways; Runyon "does not present a risk of future violence or danger to the public while in prison for the rest of his life;" ECF No. 291, p. 3.

[33] The scans revealed "multiple white matter hyperintensities consistent with his [Runyon's] history of head injuries and migraine." Merikangas report, p. 4, Ex. 2.

49

**1898**

may have symptoms of abnormal behavior, including poor ability to concentrate, committing impulsive acts, and other indications of poor "cognitive control." They can be symptoms of what is referred to as Post Traumatic Stress Disorder, or PTSD, which has not been ruled out in the case of Mr. Runyon. You will recall that in my test of Mr. Runyon, he performed in the very impaired range on tests of sustained attention. This can be symptomatic of mTBI, as well as PTSD.

*Id.*

### C. A Complete Psycho-Social History And Its Implications Would Have Added Weight to Mitigating Factors, Reduced The Weight Of Aggravating Factors And Informed the Jurors About Runyon's Lesser Moral Culpability.

Mental health mitigation would have: (1) been consistent with the evidence defense counsel presented at the penalty phase; (2) provided context and an explanation for Runyon's life trajectory; (3) countered the aggravating evidence; (4) established substantial statutory and non-statutory mitigating circumstances; and, (5) added substantial weight to the mitigators already found by the jury. In short, mental health mitigation was the missing ingredient for a life sentence.

Counsel were either rendered ineffective by a lack of time to conduct an adequate investigation or counsel failed to effectively investigate and/or ignored red flags suggesting Runyon's brain damage and mental health difficulties.[34] Brain damage substantially affects Runyon's problem-solving abilities. His actions are substantially affected by brain damage, mental illness, and other predisposing factors. This powerful mitigation evidence was easily provable at the time of trial through records, lay witnesses and expert witnesses. The information provided below is not exhaustive but is representative of substantial mitigation that Runyon's jurors never heard.

### 1. Readily-Available Records.

Records illustrated Runyon's compromised mental state and indicated the origins of brain damage and mental illness. Although counsel possessed the records, they failed to conduct a reasonable investigation based on what the contents revealed and the jury did not learn the facts below.

---

[34] Some documents filed by counsel are sealed and their contents are not discussed herein.

### 1.1    Medical records

David Runyon is 5 feet 3 inches tall and, when he was in the Army, he weighed less than 130 pounds. Army medical records, p. 1, Ex. 23. Medical records document two motor vehicle accidents and associated problems suffered by Runyon. Defense counsel wanted medical records on Runyon's head injuries, in particular, the 1996 car accident. Hudgins declaration, ¶5, Ex. 5. The initial treatment records could not be located and counsel incorrectly believed that Runyon had not followed-up with Army medical providers. *Id.* In 1995, Runyon sought treatment for cysts on his forehead that he reported had been recurring following a car accident where pieces of glass embedded in his face. Army medical records, p. 1, Ex. 23. Runyon said glass remained under his skin. *Id.*

In November 1996, a drunk driver collided head-on with Runyon. He was extracted from his vehicle with the "jaws of life" and taken to an emergency room. Runyon followed up with an Army doctor who noted multiple injuries to Runyon's legs, knee, calf, shoulder, and neck. *Id.*, pp. 2-3. Physical therapy was prescribed and Runyon was restricted from running, jumping, and marching. *Id.*, pp. 3-5. Runyon continued to follow-up with complaints of vertigo, short-term memory loss, headaches, and insomnia. *Id.*, pp. 8, 12.

Two months after the car accident, Runyon was still experiencing short-term memory loss and insomnia. *Id.*, p. 12. He was informed that PTSD and life stressors could be possible etiologies. *Id.* The plan was to "[e]xplore possible symptoms of depression and antidepressant drugs at the next visit." *Id.* Runyon and his wife, Maria, were in counseling and if that did not improve his symptoms the plan was to begin a course of SSRI antidepressants. *Id.* Also, Runyon was finally diagnosed with a knee/ACL sprain. Army medical records, pp. 14, 16, 17, Ex. 23.

A February 1997, memo regarding a telephone consultation states: "INRE: Post Traumatic Stress Syndrome/Needs recommendation/States urgent/1st Sgt. wants paper work ASAP." *Id.*, p. 15.

**1900**

A doctor noted that, after speaking with Runyon's wife, Maria, and their counselor, he "will recommend/refer patient for further psychiatric evaluation[.]" *Id.*

In August 1997, Runyon complained of ongoing vertigo with long-lasting headaches. *Id.*, p. 19. The doctor's assessment was Positional Vertigo secondary to Vestibular Dysfunction.

The physical examination conducted in conjunction with Runyon's separation from the Army lists: "Poor health. Presently on Meclizine for some kind of positional vertigo. Sleeplessness and constant pain in joints." *Id.*, p. 23. A checklist verifies Runyon's knee and shoulder problems, other symptoms of swollen or painful joints, frequent or severe headache, dizziness or fainting spells, fever, head injury, shortness of breath, frequent trouble sleeping, depression or excessive worry, and loss of memory or amnesia. Physical injuries resulting from the motor vehicle accident, including torn ACL, rotator cuff and calf muscle, were noted. The records end with "Depression diagnosis, Post Traumatic Stress Syndrome." *Id.*, pp. 23-24.

### 1.2    **Letters From Runyon**

David Runyon wrote counsel to inform them of the 1996 car accident, Ex. 24, and about how he had saved a number of people's lives. Cronin declaration, Attachment, Ex. 4.

### 1.3    **Jail Records**

Portsmouth Jail records signaled significant mental health issues. In March 2008, Runyon expressed concern about HIV exposure after aiding his cellmate who fell and lacerated his head. Portsmouth Jail record, p. 2, Ex. 16. Runyon's hands "became covered with blood" and he was worried because he had a hang-nail and open cuts on his hand. He also reported losing 30 pounds since December, occasional dizziness, and light-headedness. *Id.*

In August 2008, Runyon reported a sudden onset of runny nose, watery eyes and feeling sick. *Id.*, p. 3. The episode lasted 30 minutes and Runyon was able to cure himself by washing his face. *Id.* He said he was exposed to mustard gas while in the military and the gas was still in his sinuses, causing

52

**1901**

them to occasionally flare up. *Id.* Personnel assessed this as a possible anxiety attack caused by an old recollection and planned to refer Runyon to the psychiatrist. *Id.* A doctor saw Runyon for the complaint of "mustard gas in his head (sinus)." *Id.*, p. 4. The record notes:

> O: Although he was generally cooperative, he ten[d]ed to be somewhat gran[io]se. His thoughts were flighty & rambled on. He verbalized some delusional material. ... Insight & judgment lacking (poor). He is not experiencing any sleep disturbance. However, he did report not sleeping in the last 24 hours & he has night sweats. ... He is not overtly depressed or suicidal.
>
> A: Axis I: R/O Schizo-Affective Disorder, R/O Bi-Polar Disorder.

*Id.*

### 1.4    Brain Scans

Brain scans in August 2009 revealed multiple white matter hyperintensities consistent with Runyon's history of head injuries and migraine. Merikangas report, 9/23/15, p. 4, Ex. 2.

### 1.5    Prosecution Expert Reports

Guilt-phase counsel believed the prosecution experts determined that "Runyon did not have any mental or emotional issues that would be mitigating." Woodward declaration, ¶12, Ex. 6. Dr. Merikangas had reported, however, that the government experts "suggested that Mr. Runyon suffered from Migraine-like headaches, Attention Deficit Disorder and Post-Traumatic Stress disorder." Merikangas report, Attachment, p. 1, Ex. 2. The prosecution and defense experts agreed on certain aspects of Runyon's psycho-social history.[35]

### 1.6    David Dombrowski (Biological Father) Medical Records

Runyon's biological father suffers major depression that is managed with medications. A progress note dated June 2009, reads: "he [Dombrowski] is feeling ambivalent about the past decision

---

[35] The reports of Dr. Montalbano, ECF No. 277, and Dr. Patterson, ECF No. 276, are sealed, thus, the contents are not discussed herein. *But see* Memorandum Order, ECF No. 278, p. 4 (sealed).

**1902**

to not have conflict with his ex-wife [Suk Cha] about access to his children. Now that they are adults, he hears things which cause him to question their parenting." Dombrowski Progress Note, Ex. 17.

### 1.7    Suk Cha Runyon (Biological Mother) Medical Records

Medical records dating back to 1976 indicate chronic complaints of pain for which multiple tests failed to reveal a physical cause. Psychosomatic complaints signal mental illness. There is a record noting, "she had a couple of episodes of coughing up blood when she was pregnant," and this is relevant to Runyon's neonatal development. Suk Cha Runyon medical records, p. 10, Ex. 25. While still married to Runyon's biological father she sought treatment for pain associated with hitting her lower back on the couch; a complaint consistent with domestic violence. *Id.*, p. 2. As early as 1977, symptoms of Suk Cha's mental illness are noted: she is described as "active and loud" and "very talkative;" *id.*, pp. 3, 8, 15, she has incontinence associated with stress, *id.* p. 5; and, she is diagnosed with moderate depression and anhedonism. *Id.*, pp. 14, 15.

### 2.    Readily-Available Lay Witness Accounts

**Sheila Cronin.** Sheila Cronin conducted a pre-trial psycho-social investigation. "Only a fraction of [Runyon's] social history or other available history of adverse developmental factors, however, was presented in mitigation to Mr. Runyon's sentencing jury." Cunningham declaration, 9/25/15, p. 9 ¶16, Ex. 8. "Even those family and other formative experiences that were referenced were left largely unexplained in terms of their implications for a criminally violent outcome, as the defense did not call a mental health expert to describe the implications of these experiences." *Id.*, ¶18.

Sheila Cronin's global observations about Runyon were:

> My observations of Runyon are that he had a calm, soft-spoken demeanor and appeared unhealthy, almost anemic. He over idealized his family life, had impaired reality testing, and exhibited extremely poor judgment. He was markedly grandiose. Runyon often compared himself to great figures in history. I thought these references were sad. Counsel Woodward thought they were funny. Runyon repeatedly talked about how many lives he had saved. After a member of his defense team visited with Runyon in jail, he would write a letter detailing the discussion. It was as if he felt he had not gotten his point across during the visit. Runyon's letters had a rambling quality.

54

**1903**

Attached to this declaration as Exhibit A is an example of such a letter; it contains a list describing how he saved the lives of seven people. We clearly needed the assistance of mental health experts.

Runyon's mother had a history of severe trauma, was unstable, and likely suffered from bipolar disorder. There were obvious problems with how she raised Runyon. Essentially, she emasculated Runyon. Runyon's adoptive father was emotionally remote and exhibited no affection towards Runyon. His trial testimony could be fairly described as "throwing Runyon under the bus." His demeanor was very cold and he had no compassion for Runyon at all. Runyon spent his childhood and adult life trying to please his parents, make them proud, and earn their approval.

A sad component of Runyon's life is that every time he tried to achieve something, he underachieved or was fired from a job. He had multiple failed career attempts. He also had a series of failed relationships because he chose women who, like his mother, were mentally unstable.

Runyon appeared to perform relatively well in the military until late 1996, when he was involved in a serious head on collision with a drunk driver. I tried to obtain medical records from the civilian hospital where Runyon was transported and treated but was unsuccessful. I did, however, obtain Runyon's military medical records from 1994-1997. The records document that Runyon sought follow-up treatment for effects of the accident. Runyon suffered from vertigo, short-term memory loss, headaches, insomnia, and a personality change. David's ex-wife reported a change in David's personality in that he was less able to cope and deal with frustration; he was much more irritable and short-fused. David's former employer at the Fayetteville Police Department (a position he obtained after his Army discharge) said that David constantly forgot things and had to have instructions repeated. The military records contain diagnoses of Post-Traumatic Stress Syndrome/Disorder, depression and anxiety. I summarized those records for counsel. I also suggested to counsel that neuropsychological testing might clarify if Runyon's symptoms and behavioral changes were related to the closed head injury, PTSD, or both.

Runyon loved his son very much. He also loved Maria's children as if they were his own. Witness accounts were overwhelming consistent regarding Runyon's parenting skills and ability to relate to children. He was universally described as a great father and a person who was loved by children who knew him.

Cronin declaration, ¶¶7-11, Ex. 4.

Cronin further observed that Runyon wrote constantly throughout the trial, to the point of excessiveness or obsessiveness. *Id.*, ¶16.

55

**1904**

## 2.1 Witnesses Relevant to the "Abuse of Women" Aggravator

**Dr. Mark Cunningham** could have described and explained the importance of transgenerational family dysfunction and distress on Runyon's mental state and behaviors. Cunningham declaration, pp. 12-27, 45-46, Ex. 8. Runyon's mother and biological father were raised in violent households, and they created the same environment for Runyon and his brother, Mark.

> [O]bservation of parental violence is associated with a variety of immediate and long-term psychological symptoms and disorders, lower levels of social competence, increased risk of delinquency, increased risk for domestic violence, and increased risk of violent criminal behavior. (Citation omitted). These perspectives are critically important in understanding David's volatile relationships with his wife, Maria, as well as subsequent girlfriends, including domestic violence charges.

*Id.*, p. 46.

The following witnesses testified at trial but were not asked to relay information that would have provided background and context to counter the "abuse of women" aggravator.

**David Dombrowski**, David Runyon's father, states:

My father was born November 2, 1914. He grew up without a father. At approximately age 15 he went to prison for murder. My father worked for the mob, more specifically, Anthony "Tony" LaBarbera. My father was an "enforcer" or hit man for LaBarbera. I think the murder that my father went to prison for was a hit for LaBarbera.

My father was released from prison early because he volunteered for a medical study, while in Boys Town, Nebraska. He was a "test dummy" for a federal study testing treatment for TB. I don't know what effect this had on my father but, when I was in the military, I had a TB test and had a positive reaction. I had to take medication for over a year.

\* \* \*

My father ruled the family with an iron fist. He was a severe alcoholic and regularly beat my mother. My father was a "functional drunk." He worked during the day but got very drunk at night and on the weekends. I cannot recall a time in my childhood when my father was not an abusive alcoholic. I think my father did not have a positive male role model when he was a child and he really did not know how to love. Instead, he had the role as "enforcer" and "Billy Bad Ass" and he treated his family the same way. When he was drunk, his "evil side" came out.

\* \* \*

56

**1905**

Our family environment was very violent and very volatile. Every time my father drank there was a high probability he would become violent. I walked on eggshells all the time with a constant feeling of dread about what was to come. I think my mother took the abuse, and maybe even provoked it, to keep my father from abusing me and my brothers and sisters. My mother would tell me not to get involved in their fighting and to stay away.

My father kept my mother isolated and alone, which made it nearly impossible to report the abuse—not that she would have done that anyway. She was completely dependent on him for everything. Even if she did everything the way he wanted it, my father still got drunk and beat her. On top of being physically abusive, my father degraded my mother. There were times when he came home late from the bar and demanded to know why his supper was not waiting on the table for him. Although my mother had his plate of food in the oven or the refrigerator my father would demand to know why it was not on the table, waiting for him. He made my mother sit down in the kitchen and watch him get his plate out and heat it up. He would yell at her saying things like—do you see how I'm doing this, does this look too hard for you? He kept my mother beat down in every way possible.

\* \* \*

I have come to realize that I mirrored my father's bad behavior, including his quick temper and aggressiveness. Around 1991, I admitted to myself that I had a problem. I began seeing a psychiatrist at the VA hospital. It took a while to get my medication regulated but once it was, I benefitted greatly. Currently, I take Prozac and Buspar. I see the psychiatrist every three months for check-ins and medication management. There have been times when I feel better and think I can manage without medication and will stop taking it. My wife can tell immediately if I've skipped a dose. She says I'm like "night and day." Without medication, I am easily frustrated and very quick tempered; with medication, I am easy going and pleasant to be around. I do not know my exact diagnosis but my problems stem from anxiety and depression.

Dombrowski declaration, ¶¶10-11, 17, 21, 22, 30, Ex. 26.

**Mark Runyon,** David Runyon's brother, states:

Our mother was unstable. She had mental breakdowns. The household would feel a buildup of stress and tension and then she just exploded. She would go "postal," screaming and breaking dishes and lost all control. She could destroy a room in 30 seconds. During these breakdowns my father would tell David and I to go to our room and shut the door until he said we could come out.

Our father would work to calm mother down. He often physically restrained her. When she stopped screaming they would go on as if nothing happened. My parents never discussed these breakdowns. My family simply did not talk to each other. David and I were left to deal with it on our own.

**1906**

Our father continually tried to placate and keep our mother happy to prevent her from having one of her breakdowns. He always sided with our mother and we could not count on him to stand up for us.

Mark Runyon declaration, ¶¶14-16, Ex. 27.

**Scott Linker**, David's former brother-in-law, states:

There came a time that David's commanding officers said he could not re-enlist if he remained with Maria because she had caused so much trouble on the base. Maria called the CO's repeatedly and complained about anything she did not like about David. She also wrote bad checks all over the base. This reflected poorly on David and his CO's wanted her gone. It really bothered David that he could not continue his military career.

Eventually, David and Maria moved back to Kansas. My father Fred had a house in Wichita that was broken into apartments. David and Maria lived in one of those apartments.

Because they lived in separate apartments but in the same house, my father observed David and Maria's relationship and David's relationship with Maria's children, Wren and Kendi, and with their son, Davy. My father heard Maria yell at and berate David. One time, Maria called David a "ying yang mother fucker." My father thought that David should leave Maria because of how badly she treated him. My father thought highly of David because he not only treated Wren and Kendi like his own, but also worked hard and tried to care for the children whereas their own mother (Maria) did not.

It bothered me to see how hard David worked when Maria did not contribute to the family in any manner. Their house was filthy dirty. Dirty laundry and food was everywhere. Maria sat home all day, drank alcohol, and smoked cigarettes.

Linker declaration, ¶¶5-8, Ex. 13.

**Maria Runyon**, David Runyon's ex-wife, states:

In July 1994, there was an incident with my sister Teresa Linker. There was bad blood between us because we had both dated David and he was spending all his time with me. Late one night, Teresa called and said she was coming over to pick up a shirt. David knew Teresa was just asking for trouble so he took the shirt outside to give it to Teresa. I watched from the window and thought I saw shoving but was unsure about who touched who. I ran outside and jumped on Teresa. We started shoving and yelling at each other. Teresa got in her car and left. I thought that was the end of it. A couple of weeks later I learned there were warrants for both me and David. Teresa did not show up for court multiple times. I ended up pleading guilty to a lesser charge. I was told someone had to be held responsible because Teresa had a bloody lip. I don't remember Teresa having a bloody nose when she left my house. David was getting ready to go active duty and his charges were dropped.

58

**1907**

* * *

There were times when David and I fought and became physical with each other. I would say that each of us were to blame for these incidents "50/50." Most of the incidents were a result of my drinking and David trying to calm me down. I was never afraid of David nor did he ever do anything to that made me fear for my life.

In regards to the domestic violence incident on February 7, 2001, I remember that my daughter [Kendi] was sick and I was late getting home because I had to pick up medications. David was upset because he needed the car to go to work. I wanted David to put oil in the car before driving it because it needed oil every few days. David refused. We began fighting over the keys. David grabbed my arm to try to take the keys. At some point, David grabbed me by the neck. I was never scared or worried David was really going to hurt me. I called the police because I was mad that David wanted the car and refused to put oil in it. I did not want to press charges and recanted later because I was not hurt, I was just mad. After this incident, we briefly separated because a restraining order was issued.

David and I separated and got back together a few times. In July 2002, David left me and the kids. Wren was eleven, Kendi was eight and Davy was around five years old. I had no idea where David was or how to get in touch with him. He sent no money. I now realize that David was desperate to get away and he could not handle my drinking. I wish he would've supported the kids but he doesn't hold all the blame for leaving.

Maria Runyon declaration, ¶¶7, 26-28, Ex. 28.

## 2.2     Witnesses Relevant to the Family Violence Mitigating Factors

**Suk Cha Runyon,** David Runyon's mother, could have testified about how she and Runyon were beaten by David Runyon's biological father (David Dombrowski). She could have testified about one episode that is noteworthy because it left Runyon with a crooked smile, in other words, one side of his face droops. When David Runyon was three years old, Dombrowski grabbed David by the wrist and dangled him in the air. Suk Cha ran to stop Dombrowski, jumped on his back, and pulled his hair. Despite this, Dombrowski would not let David go. Instead, he went to David's bedroom, swung him by the wrist, and heaved him across the room. David was rendered unconscious. Cunningham declaration, pp. 21, 30, Ex. 8; Dudley report, p. 8, Ex. 29.

59

**1908**

**David Dombrowski**, David Runyon's biological father, states:

David was a sickly child and I attribute that to Suk Cha not getting the prenatal care she needed. Suk Cha did not want to breast feed and David was fed formula. Suk Cha did not know what to do with David. It seemed like her behavior was much deeper than just first-time mom anxiety. She did not bond with David or Mark. She was not emotionally connected to them in any way. She did not know how, and did not try, to soothe David when he cried. She exhibited no maternal nurturing; she was cold as a fish and David and Mark could sense this. I remember walking in the house and seeing Suk Cha holding David while he cried and wondering who was more scared of who? She held David with semi-outstretched arms; not in any sort of close or connective way. Although Suk Cha would hold David while he cried, she did not try to soothe him. I could walk over to David and simply rub his head or kiss him and he would stop crying, but he would resume crying when I walked away. I always felt like the babies knew their mother was afraid and they—even as infants—picked up on that. I think this was a big part of the reason why David cried a lot.

As the children aged, Suk Cha's treatment or discipline of them became excessive and borderline physically abusive. Suk Cha wanted them to act as adults. When David was barely old enough to walk, Suk Cha would yank him up and start spanking him if he touched something on the coffee table. I did not think that it was appropriate to spank children at that age for touching something on a table. Also, Suk Cha's spankings were hard and she hit David several times in a row. It was excessive. Suk Cha would not allow the kids to be kids. She wanted to keep a very, very clean home with all her home decorations displayed in their proper places. I thought that was unrealistic with young children in the house but Suk Cha made it a point to try.

One time when David was two or three years old, Suk Cha instructed David to finish his dinner and he did not want to. Suk Cha force-fed him until he threw up. She pinned David and forced food down his mouth. David was upset and was crying. A combination of the crying and the food being shoved down his throat caused David to throw up. Suk Cha then got mad and spanked him because he threw up. I tried to intercede and console David but Suk Cha became very angry at me.

There were many instances of normal kid behavior that made Suk Cha very irate. On one occasion, Suk Cha put collared shirts on the boys and one of them ran outside to play and came back with his collar messed up. Suk Cha immediately slapped him across the face and fixed the collar. The boys were terrified of her and they would stop, at the drop of a hat, when they heard her voice.

Suk Cha was extremely difficult to live with. Every little occurrence was blown out of proportion. She wanted everything in her control and if things were not exactly how she envisioned them, she quickly became agitated and spun out of control. Any little thing would send Suk Cha over the edge. If she did not like something I said, she picked up a dish and threw it at me. If the David or Mark touched something she wanted left alone, she grabbed their hand and hit it with a ruler until it was almost bleeding. If she tried to open a can and the can opener was not fast enough, she threw

60

**1909**

it across the room. It made for a miserable home environment and left everyone anxious and walking on eggshells.

Nothing anyone did was ever good enough or pleased Suk Cha. There came a point in time when I did not want to go home. I began staying out late until so I could avoid having to see Suk Cha.

David was the son who tried to keep the peace. He was a "clinger." When Suk Cha and I would argue, David tried to physically hold onto his mother and calm her down - saying things such as "I'm here mommy," "it's okay." David would do anything to get Suk Cha to calm down. When Suk Cha was hitting the children, David would say, "please stop" and "don't hurt us anymore." At times when I came home from work, David would tell me that their mother had been hitting them. If I tried to take up for the kids or confront Suk Cha, it only seemed to make things worse.

Dombrowski declaration, ¶¶36-42, Ex. 26.

**Mark Runyon,** David Runyon's brother, states:

I remember my mother caught me with her cigarettes when I was about twelve years old. She made me smoke an entire pack of cigarettes, hoping I would get sick, but I did not. She then made me eat the cigarettes, still trying to make me sick.

\* \* \*

Our mother was unstable. She had mental breakdowns. The household would feel a buildup of stress and tension and then she just exploded. She would go "postal," screaming and breaking dishes and lost all control. She could destroy a room in 30 seconds. During these breakdowns my father would tell David and I to go to our room and shut the door until he said we could come out.

Our father would work to calm mother down. He often physically restrained her. When she stopped screaming they would go on as if nothing happened. My parents never discussed these breakdowns. My family simply did not talk to each other. David and I were left to deal with it on our own.

Our father continually tried to placate and keep our mother happy to prevent her from having one of her breakdowns. He always sided with our mother and we could not count on him to stand up for us.

Mark Runyon declaration, ¶¶13, 14-16, Ex. 27.

### 2.3    Witnesses to the 1996 Car Accident and Runyon's Personality Change

**Thomas Preston** was a parachute rigger at Fort Benning with Runyon. Preston interview, p.

2, Ex. 30. They were friends, they went hunting together, and their wives socialized together. *Id.*

**1910**

Preston recalled a weekend when Runyon went out of town and didn't return to work on time. *Id.* Preston learned that Runyon had been in a serious car accident and was lucky to be alive. *Id.* pp. 2-3. Preston did not testify at trial.

**Robert and Deborah Seeger** were friends with David and Maria Runyon when both couples were stationed at Fort Benning. R. Seeger declaration, ¶ 8, Ex. 31; D. Seeger declaration, ¶8, Ex.32. They remember David Runyon went out of town to pick up his brother's truck for safe-keeping. *Id.* On the return trip home, a drunk driver collided head-on with Runyon. *Id.* The truck was totaled. *Id.* Robert Seeger picked-up Runyon and brought him back to Fort Benning. R. Seeger declaration, ¶8, Ex. 31. Deborah Seeger remembers Runyon was in a lot of pain afterwards. D. Seeger declaration, ¶8, Ex. 32.

Deborah Seeger noticed that Runyon's behavior changed after the accident: "Before the accident David always tried his best to succeed, look sharp and get the job done. He offered a lot of laughter and smiles for everyone he met. After the accident I noticed that he became angry more easily." *Id.,* ¶9. Runyon would become upset with his wife if dinner was not on the table when he wanted it or if Maria moved something in the house that he believed should be kept in a certain place." *Id.,* ¶10. Runyon became unpredictable and stopped following through on promises. *Id.*

The Seegers were present at Runyon's trial. D. Seeger declaration, ¶¶14-15, Ex. 32. Although deemed to "be essential parts of [the] mitigation case," ECF No. 220 p. 3, they did not testify. Counsel cannot remember why the Seegers were not witnesses. Hudgins declaration, ¶9, Ex. 5.

**Maria Runyon**, David Runyon's ex-wife, did not testify about the car accident and its effects on David Runyon. Maria remembers the car accident; David's physical pain, vertigo, and drastic personality change. After the accident, David became easily frustrated, was easily angered, had less discipline and restraint, did not think things through before he did them, and became paranoid and

**1911**

very vigilant about his surroundings. Maria Runyon declaration, Ex. 28. Maria believes the car accident "changed David forever." *Id.*, ¶35.

> At one point when we were at Fort Benning, David's brother Mark was serving prison time in Fort Knox. Mark asked David to get Mark's truck and his belongings. When David was driving in Dadeville, Alabama, he was hit head on by a drunk driver. David was trapped in the truck and had to be cut out. I can't remember the name of the person who hit David. This person was required to pay restitution, which he did for a few months and then he just stopped.

> After the wreck, David was in a lot of pain and did not want to take medicine. David's pride often kept him from taking medicine when I knew he was feeling really bad. David did not like to take any medicine - even aspirin. He went out of his way to avoid putting anything unnatural in his body. He rarely drank and never did drugs. He even hated the fact that I smoked.

> As a result of the wreck, David experienced severe vertigo and every time he laid down he felt he would pass out. David went to the emergency room on a couple of different occasions due to the vertigo.

> I think the wreck was a very significant event in our lives because David's personality changed dramatically. He was meaner and easily frustrated. The guy I married had good morals, discipline and restraint and, for the most part, this changed. He was easily angered and quick tempered.

> When and David and I would fight I sometimes called and talked with his CO (commanding officer) about David's behavior. The CO made us attend counseling. Then, David was barred from re-enlisting in the Army.

> After David was discharged from the Army we moved to the metro Atlanta area, around Fayetteville. David worked with the Fayetteville Police Department.

> I think sometimes David did not think things through before he did them. When he was a police officer he helped the apartment manager at our complex with a tenant who owed back rent. David was not on duty and it was not his jurisdiction but he took his badge and service weapon. Those things are bad ideas yet it never occurred to David that he could get in trouble.

<div align="center">* * *</div>

> David acted paranoid and was very vigilant of his surroundings. If we went to a restaurant he would not sit down unless he could sit with his back to the wall. He did not like the fact that I smoked because he said it put me in contact with "unsavory characters." When I went outside to smoke people sometimes approached me and asked for a cigarette. David did not like this. I remember David saying that you had to "watch your six and twelves."

<div align="center">63</div>

<div align="center">**1912**</div>

One time I was outside of our house smoking. The house was close to the street and a man came walking down the sidewalk. The man then started walking toward our house. Out of nowhere David appeared and had his gun at his hip. I don't remember if David said anything to the man but he got back on the sidewalk and kept walking. I think the man was probably just going to ask for a cigarette. David describes this episode as saving my life from a would-be rapist.

\* \* \*

When I found out that David was arrested for murder I was surprised to learn that he was involved in drug trials. When I met David he had an aversion to taking medicine. He went to extreme lengths to avoid taking even an aspirin. It was hard to believe David would volunteer for drug trials. David never told me that the reason he went out of town was for drug trials. He told me he was doing some sort of computer work for a hospital.

I was also very surprised that David would even associated with, what he would probably call, "unsavory characters." I can't count the number of times David talked about not hanging around or associating with people with a questionable background or shady characters. I was amazed to hear that David had been associating with the type of people who would be involved in a murder.

Maria Runyon declaration, ¶¶14-20, 23-24. 32-33, Ex. 28.

**Mark Runyon**, David Runyon's brother, did not testify about the car accident. Mark learned about the accident and tried to speak with the drunk driver who totaled Mark's truck when David was driving it back to Georgia. Mark Runyon declaration, ¶26, Ex. 27. Following the accident, David suffered dizzy spells and "saw stars." *Id.*, ¶27. David's personality changed, although Mark attributed the change to David and Maria's high-conflict marriage. *Id.*

David really wanted to continue his military career; he seemed to function well in the military but the issues with Maria kept him from reenlisting. *Id.*, ¶30; *see also* Linker declaration, ¶5, Ex. 13. Maria was a factor in David losing his job as a police officer. *Id.* After he lost that job,

David kept moving around and each place they lived was worse than the last. One of the last times I saw David in Georgia, he and the family were living in a trailer with no running water. David just wasn't together anymore and he stopped being my big brother.

64

**1913**

When I learned that David had left Maria I believed that the constant stress of his marriage and being the only partner pulling any weight took its toll on David. I think David got to the point that the only way he could better the situation was to leave.

*Id.*, ¶¶31-32.

**Captain Jeffrey Harris**, of the Fayetteville Police Department where Runyon worked after leaving the Army, remembers training Runyon. In Captain Harris's opinion, Runyon had a problem retaining things. Harris Declaration, Ex. 33. Every time the class started to move ahead with the training, Captain Harris would have to go back to the first day because Runyon couldn't retain what he learned from the first day. *Id.* They had to start from scratch just about every day. *Id.* Captain Harris's daughter has a learning disability and Runyon's poor retention reminded him of the challenges his daughter faced. Captain Harris did not testify at trial.

### 2.4    Witnesses Who Knew Runyon In the Time Span Preceding His Arrest.

Defense counsel indicated that Runyon "had absolutely no ties to the local community" in Morgantown, West Virginia, where he lived before his arrest in 2007. ECF No. 179 p. 10. This was incorrect and counsel's failure to identify such character witnesses constitutes deficient performance.

The prosecution emphasized the fact that none of the penalty-phase witnesses called by defense counsel had recent contact with Runyon. Tr. 2610, 2613, 2618, 2619, 8/26/09. The prosecution argued that Runyon had changed; he was not the same person who was described by the testifying character witnesses as a good friend, a charitable person, a considerate and helpful guest, and a caring father. There were, however, witnesses available to testify about Runyon during the years immediately before the crime and Runyon's arrest.

**Chad Costa** met David Runyon in the second half of 2007. Costa declaration, Ex. 7. Counsel had Chad Costa flown-in for the trial but did not call him as a witness. Had Costa testified, the prosecution could not have argued that *the absence of testimony* from persons who knew Runyon during the time period preceding the crime *was evidence* that Runyon was not the person portrayed by the

65

**1914**

defense witnesses. Indeed Costa's description of Runyon after the crime and during the six months before his arrest is consistent with the description given by people who knew Runyon a few years before the crime occurred.[36] Costa knew how much Runyon's son meant to him. Costa declaration, Ex. 7. Costa also witnessed Runyon try to help women who were facing many challenges, including substance abuse. He would have provided insight into Runyon's inability to escape the predispositions to poor decision-making regarding romantic partners and to a pattern of failed relationships. As explained below, such predispositions arising from hereditary and childhood experiences are important perspectives for a subsequent expert explanation regarding Runyon's psycho-social history and how it relates to mitigation. *See* Cunningham declaration, Ex. 8.

Costa was present at Runyon's trial and deemed to be an essential part of the mitigation case. ECF No. 220 p. 3. However, he did not testify.

**Matt Long** and **Paula Dalton**[37] knew David Runyon from about 2006-2007. Long declaration, ¶2, Ex. 12; P. Dalton declaration, ¶2, Ex.11. They were roommates for a short period and Matt Long and Runyon hunted together. Long declaration, ¶2, Ex. 12; P. Dalton declaration, ¶3, Ex. 11. Long says "David was an all-around good guy" who loved his son. Long declaration, ¶¶2-3, Ex. 12. Paula Dalton describes David as very nice and kind, polite, and "the perfect gentleman" who tried hard to be a good father to his son. P. Dalton declaration, ¶¶4-5, Ex. 11. Matt Long and Paula Dalton helped keep Davy when Runyon was working out of town. Long declaration, ¶3, Ex. 12; P. Dalton declaration, ¶5, Ex. 11. Matt Long says Runyon always helped him when he needed it. Long

---

[36] Persons who knew David in the years leading up to the crime, and who were available to testify, included David Dalton, Sr., Paula Dalton, and Matt Long. D. Dalton declaration, Ex. 10; P. Dalton declaration, Ex. 11; Long declaration, Ex. 12. Investigation regarding this area is ongoing and supplemental information will be provided when available.

[37] The prosecution called Paula Dalton to testify at trial.

66

**1915**

declaration, ¶3, Ex. 12. Matt Long never heard Runyon talk about coming into a large amount of money or about being hired to kill someone. *Id.*, ¶4.

**David Dalton,** Paula Dalton's father, hunted and fished with Runyon. D. Dalton declaration, ¶3, Ex.10. Runyon rented a room from David Dalton and his wife. *Id.*, ¶2. David Dalton trusted Runyon and Runyon never talked about coming into a lot of money or being hired to kill anyone. *Id.*, ¶¶3-4. David Dalton also helped watch Davy when Runyon was out of town at a drug study. *Id.*, ¶5. Runyon "made sure his son was taken care of when he went out of town for work." *Id.*

### 2.5 Evidence Relevant To the Juror-Created Mitigator That Runyon Was Led To Believe Cory Voss Was Molesting His Daughter

**Maria Runyon,** David Runyon's ex-wife, could have testified that after Runyon left her and the children behind, the step-children's biological father came back in their lives. Unfortunately, he molested Kendi. Maria Runyon declaration, ¶31, Ex. 28. Kendi testified against her biological father and he was convicted and sent to prison. *Id.*; Fleming DOC record, Ex. 34. This occurred within a year prior to Cory Voss' death and Runyon was aware of what had happened to Kendi.

### 3. Readily-Available Expert Analysis And Opinions

Defense counsel does not remember the results of the brain scans or why Dr. Mirsky and Dr. Merikangas did not testify. Hudgins declaration, ¶6, Ex. 5. Had counsel presented expert testimony, it would have established the statutory mitigating circumstances of "impaired capacity" and "disturbance." 18 U.S.C. §§ 3592(a)(1) & (a)(6). Expert testimony also would have explained that Runyon's impaired mental state and impaired decision-making abilities are not of his own volition which bears directly on Runyon's lesser moral culpability.[38] Finally, expert evidence reveals the type

---

[38] *Compare,* Tr. 2621-22, 2658, 8/26/09 (prosecution argument that Runyon walked away from a good family upbringing, rejected his past life, and made a different choice). The prosecutor argued: "He had the power to take the life or to walk away and save a life, and when he exercised this power, when he chose this course, he made that decision to be treated on his own, to be treated differently. He acted with complete free will in doing so." Tr. 2659, 8/26/09.

of brain abnormality and cognitive defects that the Supreme Court has deemed highly relevant to assessing a defendant's moral culpability. *Porter v. McCollum*, 558 U.S. 30, 41, 43 (2009); *see also Sears v. Upton*, 561 U.S. 945, 949 (2010)(describing brain damage as significant mitigating evidence); *Abdul-Kabir v. Quarterman*, 550 U.S. 223, 261-63 (2007) (describing "possible neurological damage" as mitigating evidence); *Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (discussing how organic brain damage is an extreme mental disturbance that significantly impairs cognitive functions and a defendant's mental capacity at the time of the crime).

### 3.1 Allan F. Mirsky, Ph.D., ABPP-CN

Dr. Mirsky conducted neuropsychological evaluations of David Runyon on June 26, 2009, and August 28, 2015. Mirsky report, p. 1, Ex. 35. At trial, Dr. Mirsky could have testified as follows:

> the test results of David Runyon, supported by the relevant scientific literature, indicate the presence of significant damage to the right side of the brain, as well as a psychotic disorder. The numerous affidavits strongly suggest that there was a marked change in his behavior subsequent to a significant head injury. It is entirely possible that the injuries contributed to the development of a psychotic disorder. While the association between cerebral injury and psychosis is complex, traumatic brain injury and the onset of psychosis was early documented in the classic text of Lishman (1998) and has been the subject of considerable research efforts. Review of the family histories of David's relatives suggest strongly that a genetic precursor for psychosis could have been present as well; in effect the psychosis was "released" or expressed by the cumulative effect of the head injuries.

*Id.*, p. 6.

Dr. Mirsky's conclusions are based on Runyon's test results, Runyon's head injuries, and a prior diagnosis of Post-Traumatic Stress Disorder (PTSD). Runyon's test results reveal he has frontal lobe damage, especially of the right ventrolateral prefrontal cortex. *Id.* Runyon's history of head injuries include two incidents of grenades being detonated quite close to him during training exercises while in service. These occurred between 1989 and 1991. Runyon was involved in two serious car accidents with Cognitive sequelae-one in 1990 and the other in 1996. These incidents produced symptoms including brief unconsciousness, vertigo (from which he still suffers occasionally),

68

**1917**

temporary deafness, numbness, impaired memory, "jumbled thoughts," and according to a report

from his estranged wife, marked personality changes including a short temper. *Id.* Dr. Mirsky finds

these circumstances consistent with the diagnosis of PTSD, explaining:

> [Runyon's] history resembles that of many injured service members diagnosed with
> mTBI (mild traumatic brain injury) I have seen at Walter Reed National Military
> Medical Center. Many of these service members develop PTSD, despite the diagnosis
> of "mild." These incidents, especially the severe automobile accidents, were never
> followed up, to my knowledge, with brain imaging studies. Such studies, in a number
> of cases, especially if the imaging reveals demonstrable brain damage, can change the
> diagnosis to "moderate brain injury."

*Id.*, p. 2.

Dr. Mirsky examined Runyon four days before trial. He informed counsel, "it is clear from the

data that there is strong evidence that he [Runyon] is suffering from a neurological disorder[,]" and it

was essential for Runyon to be evaluated by a neurologist. Mirsky letter 7/2/09, Ex. 20. After learning

from counsel that the jury had determined Runyon was death-eligible, Dr. Mirsky responded:

> I am firmly convinced that Mr. Runyon is still suffering from the effects of the two
> blast injuries he sustained when undergoing training exercises in the ROTC. These
> were compounded by the effects of the motor vehicle accidents. His impaired
> attention, seen in the poor Continuous Performance Test scores in my report, is one
> of the classical symptoms of blast injury and impact injury after a car accident. Other
> symptoms, such as quickness to anger, and impulsivity, are also well documented in
> the brain injury literature. The occasional dizziness he shows is also symptomatic of
> brainstem injury. In some sense, because he suffered the blast injuries while in the
> ROTC, he can be considered a wounded warri[o]r, and this should be considered in
> his sentencing.

Hudgins/Mirsky email, 7/22-7/23/09, Ex. 21.

About two months later, after hearing nothing, Dr. Mirsky placed a telephone call to counsel

to find out the status of the case. He learned that Runyon had been sentenced to death. Counsel told

Dr. Mirsky the brain scans "were read as normal." Mirsky letter, 9/18/09, Ex. 22. The scans, which

had been released directly to defense counsel, had not been read by Dr. Merikangas or a similar expert.

In response to this news, Dr. Mirsky wrote counsel a letter stating, "I wish to make sure that

the Court is aware of certain mitigating circumstances that should affect the sentence of your client,

69

**1918**

Mr. David Runyon." Mirsky 9/18/09 letter, Ex. 22. Dr. Mirsky explained—without having seen

Runyon's brain scans[39]—that with blast injuries, such as Runyon experienced in ROTC, "[t]here can

be extensive damage to white matter tracts, which serve the vital function of connecting various

cortical areas." *Id.* He also explained to counsel why the reported "normal" reading did not affect his

opinion. *Id.* He said persons with mild traumatic brain injury (mTBI), such as Runyon,

> may have symptoms of abnormal behavior, including poor ability to concentrate, committing impulsive acts, and other indications of poor "cognitive control." They can be symptoms of what is referred to as Post Traumatic Stress Disorder, or PTSD, which has not been ruled out in the case of Mr. Runyon. You will recall that in my test of Mr. Runyon, he performed in the very impaired range on tests of sustained attention. This can be symptomatic of mTBI, as well as PTSD.

*Id.*

Dr. Mirsky attached charts to his letter depicting Runyon's "very impaired" performance. *Id.*

Counsel was ineffective for failing to present Dr. Mirsky's testimony. Given that Runyon's

military service significantly contributed to his brain damage and deficits in functioning, the jurors

could have assigned substantial weight to the "military service" mitigating circumstance.

Concomitantly, the "special training" aggravator could not reasonably have been given great weight

by the jurors because that same evidence simultaneous established offsetting mitigating evidence in

terms of Runyon's honorable military service. *See Porter*, 558 U.S. at 43 ("Our Nation has a long

tradition of according leniency to veterans in recognition of their service[.]"); *see also, Rompilla*, 545

U.S. at 386 (absent the un-presented mitigating evidence, the jury "could give more relative weight"

to aggravation because counsel missed an opportunity to place significant mitigating evidence on life's

side of the sentencing scale).

---

[39] The scans revealed "multiple white matter hyperintensities consistent with his [Runyon's] history of head injuries and migraine." Merikangas report, p. 4, Ex. 2.

70

### 3.2 James R. Merikangas, M.D., L.L.C.

Dr. Merikangas conducted neurological examinations of David Runyon on July 29, 2009, after Runyon had been found eligible for the death penalty, and on August 24, 2015.

Fourteen days before the penalty phase, Dr. Merikangas prepared a preliminary report while awaiting results of the brain scans. Merikangas report, 9/23/15, Attachment p. 1, Ex. 2. He informed counsel that the prosecution experts' reports "suggested that Mr. Runyon suffered from Migraine-like headaches, Attention Deficit Disorder and Post-Traumatic Stress Disorder." *Id.* Dr. Merikangas' evaluation revealed that Runyon's "head circumference was abnormally small[,]" and:

> He had multiple scars on his head and face from trauma, including an automobile accident that rendered him unconscious and contributed to his PTSD. His right forehead does not wrinkle with facial expression and his right lip sags from a peripheral nerve injury, which may be congenital or the result of beatings he sustained in childhood. There is a lump on the vertex of his scalp from trauma.

*Id.*

Dr. Merikangas explained that "[b]ecause of his [Runyon's] history of multiple head injuries, beatings in childhood, and his current severe headaches, he requires brain imaging and an EEG." *Id.* Psychiatric evaluations suggested that "at the time of the crime in question he was suffering from the effects of, or withdrawal from, the experimental drugs that he was taking as a paid experimental subject." *Id.* pp.1-2. Dr. Merikangas found that "presently" Runyon "was either in a fantasy world of grandiose wishful thinking, or suffering from delusions." *Id.* p. 2.

Had counsel shown Dr. Merikangas the brain scan results, he would have told counsel that they "revealed multiple white matter hyperintensities … consistent with his history of head injur[i]es and migraine." Merikangas report, 9/23/15, p. 4, Ex. 2. Dr. Merikangas would have testified at trial that Runyon is "a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process." *Id.* p.1. Runyon sustained brain damage from the age of three when he was thrown across a room by his father and rendered

71

**1920**

unconscious. *Id.*, p. 4; *Id.*, Attachment p. 1. Runyon's brain damage was exacerbated by a car accident in 1996 that resulted in a personality and mood change and contributed to his Post-Traumatic Stress Disorder. *Id.*, p. 4; *Id.*, Attachment p. 1. Such "brain injury has resulted in impaired executive functioning and decision making." *Id.* Psychological testing also indicates paranoia and delusions. Runyon's history of Post-Traumatic Stress Disorder "may account for some of his disordered mood and cognition." *Id.* "The paranoia and delusions may represent a formal thought disorder, which may be a consequence of his brain injuries, mood disorder, and PTSD." *Id.*

Brain damage, cognitive defects, PTSD, Schizophrenia and other disorders are substantially mitigating but Runyon's jurors were not provided with this information and, therefore, had an inaccurate view of David Runyon. *See Porter*, 558 U.S. at 36 n.4 (discussing the mitigating value of PTSD); *Rompilla*, 545 U.S. at 390 (An investigation of schizophrenia and other disorders "would have destroyed the benign conception of Rompilla's upbringing[.]"). Thus, counsel rendered ineffective assistance by failing to present Dr. Merikangas's testimony.

### 3.3    Mark D. Cunningham, Ph.D., ABPP

In 2009, Dr. Cunningham testified about his prison violence risk assessment of David Runyon. Dr. Cunningham was available to provide an evaluation of adverse factors in Runyon's background and the implications of developmental factors so that the jury would have an informed mechanism for determining their weight and nexus. Cunningham declaration, 9/25/15, p. 50, Ex. 8. Such an evaluation provides an individualized consideration based on the well-established principle that adult outcome is a function of the interaction and balance of predisposing, risk, and protective factors in childhood. *Id.*, p. 10 ¶21. As predisposing and risk factors increase, and protective factors decrease, there is an increasing probability of dysfunction as an adult. *Id.*

The nexus between development and adult behavior is typically neither conscious nor simplistically obvious. *Id.*, ¶22. There is, however, a logical nexus between the adverse developmental

72

**1921**

factors in Runyon's background and the capital offense, *id.*, as well as statutory and non-statutory mitigating circumstances. This is important because the predispositions to mental illness and certain personality traits arising from hereditary and childhood experiences counters attempts by the prosecution to characterize Runyon's conduct and decision-making ability as "willfully self-selected, rather than acknowledging its origins in his heredity, childhood, and/or family experience." *Id.*, p. 29. It was therefore critical that the jurors were informed about the formative influences in Runyon's history, his character, and his psychological limitations. *Id.*, p. 27. Those formative influences, unknown and/or unexplained to Runyon's jurors, are set forth below.

(a) The following have a genetic predisposition/component: Major Depressive Disorder, Anxiety Disorder, Bipolar Disorder, and explosive reactivity and both sides of David Runyon's family have these disorders, or associated traits, in their genetic heritage. Cunningham declaration, 9/25/15, pp. 28, 29, Ex. 8. "Such genetic predispositions coupled with developmental vulnerabilities and childhood maltreatment, increased the risk David would possess traits such as irresponsibility, intermittent callousness, and manipulative behavior." *Id.*, p. 29. This is relevant because the prosecution characterized as aggravation: Runyon's tardiness at work; the alleged abandonment of his child and step-children; and, the self-serving video tape of Virginia Pina where Runyon elicits a recantation of the domestic assault.

(b) Suk Cha's inability to bond with Runyon, the biological father's abandonment of Runyon, and the adoptive father's frequent absences and emotional unavailability also "result[ed] in lasting fundamental psychological harm." *Id.*, pp. 35-36. In particular,

> Suk Cha was not maternally bonded to David. [Dombrowski] described David as responding much more readily to Dombrowski's soothing than that of Suk Cha. This suggests that, in spite of Dombrowski's alcoholism and family violence, David had a more secure attachment to him than to Suk Cha. Thus when Dombrowski abandoned him, David not only lost some protection from his mother's punitive volatility, he also lost a primary emotional attachment.

*Id.*, pp. 46-47.

73

**1922**

The lack of parental/family attachment was reinforced by residential instability that disrupted attachments outside the family unit. *Id.*, p. 47. Runyon's brother explained, "The message was: don't get attached to anything because you will not be here long, people are expendable and everything changes." *Id.*

The lack of attachment provides an explanation for family estrangement which the prosecution capitalized upon, stating that Runyon "walked away from" his "good upbringing" and ceased contact with his parents. *See, e.g.,* Tr. 2619, 2621-23, 2658, 2659, 8/26/09. Even more central to the prosecution's plea for a death sentence were the "lack of remorse" and "victim impact" aggravators. The connection between inadequate attachment and deficits in empathy is an important factor in Runyon's development and provides:

> a context for the deficits in empathy for the victim reflected in David's perpetration of the capital offense. The gravity of disrupted attachment and its implications for later deficiency in the ability of that individual to meaningfully relate to and empathize with others (such as romantic partners), as well as the vulnerability that this fundamental developmental injury has for antisocial conduct and criminal violence are critically important conceptualizations in mitigating his offense.

*Id.*, p. 37.

(c) Runyon "suffered chronic stress in childhood including deficient maternal bonding, paternal alcoholism, observed domestic violence, emotional neglect, physical and emotional abuse, father abandonment, extended absences of adoptive father, recurrent moves, and transcultural relocation." Cunningham declaration, p. 32, Ex. 8. Such trauma can "activate various systems in the brain that actually change neuron response and cognitive pathways. Children that experience on-going high levels of arousal due to trauma will develop systems in their brains that cause them to be constantly hyper-aroused and hypervigilant." *Id.*, p. 32. Alterations in the brain can result in severe problems for children, adolescents, and adults in learning ability, mood, bonding and attachment, problem solving, and increased likelihood of reactivity. *Id.*, p. 32.

74

**1923**

> [O]bservation of parental violence is associated with a variety of immediate and long-term psychological symptoms and disorders, lower levels of social competence, increased risk of delinquency, increased risk for domestic violence, and increased risk of violent criminal behavior. (Hershorn & Rosenbaum, 1985; Jaffe et al., 1986; Jaffe, Hurley, & Wolfe, 1990). These perspectives are critically important in understanding David's volatile relationships with his wife, Maria, as well as subsequent girlfriends, including domestic violence charges.

*Id.*, p. 46.

In addition, Runyon's experiences with childhood physical abuse and neglect:

> disrupt[ed] not just the subjective experience of childhood, but also the trajectory of development and the psychological structures of middle and later adulthood. The fundamental alterations in the way the child perceives himself, others, and the world around him, as well as potential trauma-based adaptations in brain functioning, likely account for the sustained experience or resurgence of PTSD symptoms, or their character-engrained legacy, into adulthood (see Schwarz & Perry, 1994). The bridge between childhood and adulthood experiences of PTSD is consistent with the diagnosis of this disorder in David when he was in the military.

*Id.*, p. 42.

Traumatic childhood experiences have a lasting effect with "potentially broad adverse effects on personality structure, subsequent vulnerability to psychological/psychiatric disorder, life trajectory, behavior, and relationships." *Id.*, p. 43. The particularized childhood experiences of abuse and neglect – which presumably most jurors have never experienced – affect each individual in a distinct manner thus requiring an expert explanation. *Abdul-Kabir*, 550 U.S. at 261. Accordingly, Runyon's jurors should have been informed of the effects of a traumatic childhood when determining his moral culpability. *See, e.g., Porter*, 558 U.S. at 33 (abusive childhood, trauma from military service, and impaired mental health and mental capacity); *Sears*, 561 U.S. at 948 (parents had a physically abusive relationship and divorced when the defendant was young and the defendant was disciplined with age-inappropriate military-style drills); *Rompilla*, 545 U.S. at 392 (parental alcoholism, parental violence, physical abuse, terrifying home environment, no expressions of parental love, affection or approval).

**(d)** Runyon's history of traumatic brain injury, started at age three (at the hands of his biological father) and culminated at the age of 25 with a head-on motor vehicle collision. Frontal lobe

75

**1924**

damage can result in "personality changes of reduced initiative, reduced planning ability and foresight, unreliability, rudeness or tactlessness, and irascibility resulting in … difficulty holding employment." Cunningham declaration, p. 33, Ex. 8. These effects of Runyon's brain damage shine a different and mitigating light on the prosecution's arguments in aggravation: that Runyon's tardiness at work was irresponsible; that he "chose" not to complete college and instead "chose" to follow a different path; and, that he failed at every career attempt but placed the blame on his employers. *Id. See also Sears*, 561 U.S. at 946, 949 (cognitive impairments caused by significant frontal lobe damage suffered as a child).

Additionally, persons with frontal lobe damage are impulsive, have poor anticipation, and once they become fixated on a course of action, they seem to forget that any other is possible. *Id.* Frontal lobe damage reduces the ability to plan and to perceive consequences of actions, results in deficiencies of judgment, and imposes difficulty in reprogramming an ongoing chain of behavior. *Id.*, p. 34. Brain damage not only informs Runyon's pattern of moving from job to job and place to place, and pattern of unstable volatile relationships, but it is a critically important mitigating factor as the jury considered David's judgment and decision-making capability, particularly in light of the statutory aggravators of "substantial planning" and "pecuniary gain," *id.*, and the prosecution's argument that Runyon could have changed course and saved Cory Voss at the last minute. Tr. 2621-22, 2659, 8/26/09.

For all these reasons, counsel rendered ineffective assistance for failing to present this testimony from Dr. Cunningham.

### 3.4 Richard G. Dudley, Jr., M.D.

Dr. Dudley evaluated Runyon on September 2nd and 3rd, 2015. Dudley report, p. 2, Ex. 29. In 2009, it would have been evident to him or another experienced psychiatrist that Runyon was suffering a combination of effects from an extremely difficult childhood, brain damage, and multiple major psychiatric disorders prior to and at the time of the crime. *Id.*, pp. 14-15. This would have

76

**1925**

impaired Runyon's capacity to function at the time of the crime, *id.* p. 14, and there was evidence that Runyon was extremely distressed leading up to the time of the crime. *Id.*, p. 12. Dr. Dudley finds:

> Specifically, with regard to statutory mitigation, it is my opinion, to within a reasonable degree of medical certainty, that these psychiatric difficulties constitute a severe mental or emotional disturbance. It is also my opinion, to within a reasonable degree of medical certainty, that as a result of these psychiatric difficulties, Mr. Runyon's capacity to conform to the requirements of law was significantly impaired.

*Id.*, p. 15.

Dr. Dudley explains the factors that led to Runyon's compromised mental state, beginning with an extremely difficult childhood that had an extremely negative impact on Runyon's development, which then significantly impaired his ability to function. *Id.*, p. 12.

> More specifically, during his earliest years, Mr. Runyon was repeatedly exposed to the physical abuse of his mother by his biological father, which he experienced as so severe that he felt that his father was going to kill his mother. This exposure to domestic violence occurred in the absence of the type of parental nurture and support that might have at least helped to mitigate the impact of this exposure on Mr. Runyon's development.
>
> Such repeated exposure to violence in the absence of parental nurture and support results in the development of psychological trauma-related symptoms such as hypervigilance and overreactivity, and Mr. Runyon reported a long history of such symptoms. When a parental figure repeatedly fails to calm a repeatedly traumatized/frightened child, the child is unable to learn to calm his/her physiological response to frightening situations; this can impact on the development of the child's brain, and as a result, the child becomes physiologically hyper aroused and anxious as well; and Mr. Runyon evidences this difficulty too.

Dudley report, p. 12, Ex. 29.

> In addition to the fact that the absence of parental nurture, support and protection increases the damage caused by repeated exposure to violence during early developmental years, such poor parenting negatively impacts on other aspects of development as well. More specifically, as a result of such poor parenting, children fail to learn how to develop stable relationships, they fail to develop a stable and positive sense of themselves, they fail to learn how to regulate their mood, and they are impulsive. Mr. Runyon evidences all of these psychiatric difficulties too. In addition, there were also other problems that Mr. Runyon endured during his childhood and early adolescent years that also contributed to the development of these same psychiatric difficulties, such as feeling like an outcast in relationship to his peers, not having access to any extended family members who might have offered him at least

77

**1926**

some nurture and support, and being so frequently moved that he was unable to develop any other outside support from other adults or his peers.

*Id.*, p. 13.

Added to the psychiatric difficulties caused by his traumatic childhood, Dr. Dudley further notes that, "Runyon's family history of mental illness and the role of genetic transmission in the etiology of these types of mental illness placed him at increased risk for developing such psychiatric difficulties." *Id.*, p. 13. In fact, Runyon's experience is "characterized by an even more severe disturbance of his mood and more clearly defined psychotic symptoms." *Id.*

> Mr. Runyon then noted that even when he was a child he knew that evil spirits can influence this world; he has seen ghost and entities that he was certain were not shadows or reflections of light; and he noted that he knew that what he was seeing was real because of the way they moved and the fact that he could feel their presence. He reported that he was never afraid of any of that; so he never ran, knowing that he could manage any of that; and as an example, he described an incident that occurred when he was a child, where a glass was moving across the table and he simply caught it. Mr. Runyon then went on to note that there have been times when that evil has tried to use others to cause him harm, either intentionally or through their carelessness; he has been able to foresee that and thereby avoid that; and he gave numerous examples of this happening in his life.

*Id.*, p. 9.

Dr. Dudley describes the convergence of many adverse factors: "episodes of depression and episodes of at least hypomania were superimposed upon the above noted difficulties regulating his mood that he had been experiencing since he was a child." *Id.* p. 13. "In addition, clearly delusional thoughts of both the grandiose and the paranoid type were superimposed upon immature psychological defenses that he had been using and thoughts that he had had for some [time] about evil and the possibility that someone was out to get him." Dudley report, p. 13, Ex. 29.

The psychiatric difficulties arising from Runyon's traumatic childhood and genetic pre-disposition to mental illness are further superimposed on traumatic brain injury resulting in trauma-related psychiatric difficulties and cognitive deficits.

The possibility that subsequent trauma to his brain contributed to the further increased severity of these difficulties, as suggested by other evaluators, cannot be ruled out.

In addition to being a problem in and of themselves, these additional psychiatric difficulties also interacted with and further complicated his above described trauma-related difficulties and other developmental difficulties. For example, the emergence of paranoid delusions that someone was trying to harm him clearly exacerbated his trauma-related hypervigilance and over reactivity. For example, as his mania and grandiose delusions became more severe, they served as a defense against some of his anxiety and fears, but also caused his behavior to become all the more erratic, unpredictable and impulsive.

As noted above, during his young adult years, Mr. Runyon continued to experience traumatic events. These 'near death experiences' further exacerbated his trauma-related difficulties.

Then furthermore, there is the matter of Mr. Runyon's cognitive deficits, seen clinically and confirmed by neurological and neuropsychological testing. Such cognitive deficits further impaired Mr. Runyon's decision-making capacity beyond the impairments resulting from the distorted perceptions of reality, the impairments in judgment, and the impulsivity associated with his other psychiatric disorders.

*Id.*, p. 14. The existence and synergistic effect of all these factors constitute substantial mitigation that Runyon's jurors never heard.

In addition to expert testimony on adverse factors resulting in brain damage and mental illness which affected Runyon's judgment and decision-making abilities, testimony was required to explain how those same factors "are a major determinate" of Runyon's facial expression and affect. *Id.*

During penalty-phase argument, the prosecution emphasized Runyon's alleged "lack of remorse" as a major aggravating factor. Tr. 2588, 2591, 2593, 2615-17, 2657, 2660, 8/26/09. In particular, the prosecutor argued that Runyon's appearance was proof of remorselessness. "You saw his demeanor when being questioned in the second interview yesterday by Detective Rilee ... you can see there, you can see by his demeanor, of his guilt. But you can also see how unaffected he is by the crime that he has committed." Tr. 2616-17, 8/26/09. "He sat stone-faced after being confronted with all this evidence and expressed no remorse, no regret whatsoever." Tr. 2617, 8/26/09.

79

**1928**

Dr. Dudley explains, "facial expression is among the most significant components of 'affect', which is the external representation of what a person is thinking and feeling." Dudley report, p. 15, Ex. 29. One cannot make an accurate determination of what a person may be thinking or feeling based solely on facial expression. That determination must be made in the context of other information. *Id.* For example, "a flattening of the affect is likely a symptom of a psychotic process[.]" *Id.* "[A] blunting of the affect may be a symptom of a clinically significant depression[.]" *Id.* "[A]n inappropriate affect could be due to a variety of psychiatric, neuropsychiatric or other medical condition, all of which would have to be considered and explored ... before attributing such an inappropriate affect to something else." *Id.* In other words:

> Mr. Runyon's facial expression and affect is among the things for which a mental health professional/expert witness should have been called to assist the jury, given that members of the jury wouldn't be expected to be able to do this on their own.
>
> As noted above, it is my opinion that Mr. Runyon has been suffering from multiple major psychiatric disorders. With many of those disorders, alteration of facial expression and affect is a symptom. Therefore, I, or any other experienced psychiatrist, could have been called to opine that Mr. Runyon's psychiatric disorders are a major determinate of his facial expression. In addition, the nature of the injuries that have caused Mr. Runyon's facial asymmetry are also a major determinate of his facial expression. During the course of my examination of Mr. Runyon, it was clear that as a result of the injuries to his face, he had an extremely limited capacity for facial expression, which significantly impaired his affective expression. Here too, I, or any other experienced psychiatrist, neurologist or other similar professional, could have been called to opine that the injuries to Mr. Runyon's face must be taken into consideration when assessing his facial expression.

*Id.*

Jurors must be able to give *meaningful* effect to the mitigating qualities of evidence of childhood neglect and abandonment, neurological damage, mental illness and a troubled childhood. *Abdul-Kabir*, 550 U.S. at 262. Thus, counsel had an absolute duty to not only present this information, but to present it in a *meaningful* manner. Counsel's failure to do so deprived Runyon of the effective assistance of counsel.

**D.    Counsel's Failure To Investigate And Present Mitigating Evidence Undermines Confidence In Runyon's Death Sentence.**

Runyon had a "constitutionally protected right[] to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." *Williams v. Taylor*, 529 U.S. 362, 393 (2000). When assessing the probable effect of unpresented mitigation, the strength of the prosecution's case in aggravation must be considered against the totality of mitigating evidence.

The two statutory aggravating factors found by Runyon's jury during the eligibility phase of his capital sentencing were largely, if not totally, encompassed by the finding of guilt and could not have reasonably been given great weight because jurors had been instructed that the fact of guilt itself was, as a matter of law, insufficient to support a sentence of death. Tr. 1781-85, 7/22/09, hearing on motions. *See also* Claim 11. The "pecuniary gain" aggravating circumstance could not have reasonably been given great weight because the jurors were aware that the only difference in culpability between Runyon and the two co-defendants against whom the prosecution did not seek death was that the former had the financial wherewithal to hire another to carry out their criminal intentions. *See also* Claim 4. Furthermore, it is undisputed that the two co-defendants spent the $100,000 death gratuity benefit in a matter of months while the prosecution could only *suggest* that Runyon received $275 as compensation for the victim's death. In addition, this aggravator could not have been too weighty because the jurors found a mitigating circumstance suggestive of a different motive; that Runyon "was given the impression that Cory Voss was molesting [Voss's] daughter." ECF No. 291, p. 4.

The "substantial planning" aggravating circumstance should have been rebutted not only with the argument that Runyon was simply "a tool" for Catherina Voss, *see supra* Claim 4, but also with evidence of Runyon's brain damage and its effect on his judgment and decision-making abilities. *See, e.g.*, Dudley report pp. 14-15, Ex. 29; Cunningham declaration pp.33-34, Ex. 8.

81

**1930**

The non-statutory aggravators also were not entitled to great weight. The only fact differentiating "victim impact" from that in every other case of first-degree murder was that no weight could be attributed to the impact on Cory Voss's surviving spouse as she was the financier, instigator of, and mastermind behind Cory Voss's murder. Furthermore, this aggravator was balanced against two family sympathy mitigators proposed by the defense based on emotional harm to Runyon's mother and son, plus, the jurors' own finding of family sympathy in that Runyon's brother "will suffer emotional harm if his brother is executed" Penalty phase verdict form, ECF No. 291 p. 4.

The "abuse of women" aggravator was not entitled to great weight because it was partially based on uncharged conduct and dismissed charges involving stale events and it did not make Runyon the worst of the worst. The weight of this aggravator could have been reduced with an explanation about Runyon's upbringing where he witnessed and modeled domestic violence between his parents and inherited limited problem-solving abilities and explosive tendencies. Maria Runyon could have provided context and explanation for the charges related to her and her sister, Teresa Linker. Maria Runyon declaration, ¶¶ 7, 26-28, Ex. 28. Draven's substantial history of violence against women and children also would have reduced the weight of this aggravator. *See* Claim 2(A).

The "lack of remorse" aggravator could have been countered by explaining Runyon's facial asymmetry and explaining that mental illnesses "flatten" and "blunt" affect. Dudley report, p. 15, Ex. 29. The "specialized training" was counter-balanced by the jurors' finding that Runyon's military service and education were also mitigating. Penalty phase verdict form, ECF No. 291 p. 4.

Without knowledge of the wealth of existing mitigation specifically individualized to David Runyon that explains exactly who he is, the overwhelming prosecutorial theme heard by the jurors

82

**1931**

was that Runyon had "a good upbringing" and law-and-order-type careers which he chose to forsake.[40]

This argument, coupled with the defense presentation of only good character witnesses, served to *heighten* Runyon's moral culpability. The "centerpiece" of the defense was the "equally-culpable-codefendants" mitigator. *Runyon*, 707 F.3d at 508. This failed to reduce Runyon's moral culpability, especially when the bar had been set so high, and it failed to address any of Runyon's individual characteristics. As pointed out by the prosecutor during closing argument:

> And when you look at all of these mitigators, *most of which have nothing to do with the David Runyon who sits before you today*, it deals with *his unrelated past*, it deals with his uncertain future, it cannot match up against the weight of the aggravating factors that deal with the defendant that is sitting in this courtroom today, that deal with the crime that he caused, and the impact on the family.

Tr. 2623, 8/26/09.

Runyon's jurors deliberated twice as long for the penalty-phase as for the guilt-phase. The jurors demonstrated they were open to the mitigation contained in Runyon's psycho-social history, as they found on their own that Runyon "continued to witness and experience domestic violence and parental conflict/abuse from [his] mother and adoptive father." Had counsel presented the available mitigating evidence set forth above which explains how and why Runyon's past relates to who he was at the time of the crime, it might well have influenced the jury's appraisal of Runyon's moral culpability. *Williams*, 529 U.S. at 398. For all these reasons, Runyon was denied the effective assistance of counsel at the penalty phase of his capital trial.

---

[40] This argument is reminiscent of the racial stereotype regarding Asians and "honor" invoked by the police during Runyon's videotaped interrogation and which the court of appeals found was erroneously admitted.

**1932**

**Claim 7:** **Runyon's Sixth Amendment Right To Confront The Witnesses Against Him Was Violated When The Prosecution Presented Police And Informant Testimony Of Statements From His Co-Defendant, Michael Draven. Furthermore, His Trial Counsel Were Ineffective When They Failed To Object To The Admission Of This Testimony And Failed To Ask The Court For A Limiting Instruction That They Could Not Be Considered As Evidence of Runyon's Guilt.**

Detective Rilee focused upon Draven and Runyon as suspects in the Voss murder and was gathering evidence upon which to convict them. Detective Rilee interrogated Draven and then, at trial, the prosecution presented Rilee to testify as to the contents of Draven's statements. Tr. 1300-36, 7/13/09. These statements were incriminating to both Draven and to Runyon and the prosecution highlighted those statements in its closing arguments of the guilt phase. Tr. 1600-01, 1603-04, 7/16/09.

The admission of Draven's statements to the police as evidence against Runyon was a violation of his Sixth Amendment right of confrontation. Statements taken by police officers in the course of interrogations are "testimonial" in nature. *Crawford v. Washington*, 541 U.S. 36, 51 (2004). They are testimonial because the circumstances indicate that the "primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Hammon v. Indiana*, 547 U.S. 813, 822 (2006). "Testimonial evidence" is only admissible where the witness is unavailable and the defendant has had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68. Because Draven could not be called as a witness and was thus, unavailable, Runyon never had any opportunity to cross-examine him on his statements to Rilee.

Once Draven's statements were admitted into evidence, defense counsel should have objected and, at least, requested a limiting instruction. Such instructions would have been given had defense counsel asked for them. Tr. 16, 12/8/08, Hearing on Motions. However, no instruction was requested and no instruction was given.

84

**1933**

The effectiveness of any such limiting instruction is questionable, even if one had been given. *See Bruton v. United States*, 391 U.S. 123 (1968) (recognizing the difficulty jurors would have in considering one co-defendant's statement against that co-defendant while disregarding it in the other co-defendant's case). Here, where Draven and Runyon were tried together and where the prosecution alleged a joint scheme to commit murder, jurors would have had a difficult time using Draven's statement only against him. However in this case that question is academic since no such instruction was ever sought and none was given.

Runyon was prejudiced because Draven admitted that he was having an intimate affair with Catherina Voss. Tr. 1320, 7/13/09. This was essential to the government's theory that Draven hired Runyon to kill his lover's husband. It also contradicted the statement that Runyon gave to the police. Tr. 1312, 7/13/09. Draven also claimed that he spoke with Runyon when he called the pay phone at the Waffle House near the crime scene. Tr. 1321, 7/13/09. The prosecution highlighted this fact in its closing argument. Tr. 1593, 7/16/09. All of this information came from Draven's statement and was offered for the truth of the matter asserted and was used by the prosecution to support its charges of capital murder against Runyon.

In addition, the United States presented statements made by Draven to a jail-house informant named Edward Fodrey. Fodrey's testimony could only be considered by the jury as evidence against Draven, yet no limiting instruction was given because Runyon's counsel never asked for one. Fodrey's testimony was prejudicial to Runyon because Fodrey said that Draven admitted to hiring some guy to kill Draven's girlfriend's husband. Tr. 1236, 7/13/09. Runyon had no opportunity to cross-examine Draven on this statement.

The admission of hearsay evidence prejudiced Runyon's constitutional right to a fair trial because his Sixth Amendment right to confront the witnesses against him through cross-examination

85

**1934**

was abridged. Trial counsel were ineffective for failing to make contemporaneous objections and ask for limiting instructions. For these reasons, this a new trial should be granted.

**Claim 8:        Ineffective Assistance of Counsel On Direct Appeal.**

In *Massaro v. United States*, 538 U.S. 500 (2003), the Court resolved a division in the lower courts and held that all claims of ineffective assistance of counsel may be brought for the first time in collateral proceedings under § 2255, regardless whether that claim could have been raised on direct appeal. *Id.* at 508. This rule governs even when the defendant was represented by new counsel on appeal, and even when trial counsel's ineffectiveness was so apparent from the record that it could have been raised on appeal. *Id.* Appellate counsel must be faulted, however, for their failure to appeal other errors that are based in the trial record and thus could have been raised on direct appeal. To the extent there are such claims in this motion, appellate counsel rendered ineffective assistance in failing to timely raise them. Such claims may include, but are not limited to, Claims 7, 11, 12, 13, 14, and 16.

When counsel has filed a brief on appeal, the presumption of effective appellate assistance generally can be overcome only when ignored issues are stronger than those presented. *Smith v. Robbins*, 528 U.S. 259, 288 (2000). That rule may not apply when appellate counsel failed to obtain and review the full trial record and consequently were unaware that a potentially meritorious issue existed. *See generally Johnson v. Johnson*, No. 3:10-cv-502, 2011 WL 2708328, at *6 (E.D. Va. July 12, 2011).

Appellate counsel Norris appropriately compiled a list of trial exhibits and sealed pleadings that were needed for the appeal, including "court record of jury selection/strikes used and Juror Questionnaires for Seated Jurors/Alternates." Teresa Norris declaration, Ex. 36. But appellate counsel did not obtain or attempt to obtain the court record of strikes, nor did they attempt to obtain the questionnaires of potential jurors other than those seated or alternates. As a result, appellate counsel unreasonably lacked the record necessary to investigate *Batson* violations, or to recognize other errors involving jury selection. Appellate counsel were constitutionally deficient in failing to raise claims

86

**1935**

regarding the selection of jurors or any other claim that required the information in the juror questionnaires.

Appellate counsel were also deficient for failing to raise the denial of Runyon's confrontation rights. See Claim 7, confrontation claim. A review of the transcript would have revealed that there was substantial evidence admitted at Runyon's trial in violation of his confrontation rights. Counsel on appeal were ineffective for failing to raise this claim. *Robbins, supra; Strickland, supra.*

In two respects, the direct appeal in Runyon's case also satisfies the requirement in *Robbins.* First, at least one of the issues that was presented on appeal is weaker than the ignored issues. Runyon alleged on appeal that the murder-for-hire and carjacking indictments were unconstitutional because they exceeded Congress' power under the Commerce Clause and impermissibly intruded on the police power reserved to the states under the Tenth Amendment. The Fourth Circuit did not dismiss this allegation as "frivolous," but it made very clear that the claim was very weak. It said the jurisdictional challenge to the murder-for-hire indictment "fails by a wide margin," and it observed that "all of the circuits to address the question" agree that the statute is constitutional. *Runyon,* 707 F.3d at 489. It also held that "Runyon's constitutional attack on the federal carjacking statute [met] the same fate" because it was contrary to binding and long-standing circuit authority. *Id.* The Fourth Circuit similarly regarded as weak Runyon's boilerplate challenge to the constitutionality of the death penalty in all circumstances. *Id.* at 521 n.7.

Second, it was not necessary for Runyon to delete a claim in order to add an ignored issue. The Fourth Circuit granted Runyon 100 pages for his opening brief; he consumed 99 pages using 14-point Times New Roman font, with the last page containing only six lines of text and a vertical signature block. Switching to 14-point Garamond font would have reduced the length of the opening brief to 93 pages with no change in content. Garamond is a highly readable font that typesetters have used since the 16th Century, and experienced lawyers commonly use that space-efficient font when

87

**1936**

faced with a length limitation.[41] In fact, Runyon has used 12-point Garamond throughout this motion to illustrate its properties.

Nor was this a case where extra space would have been superfluous because counsel had said everything they wanted to say within the space allotted. Appellate counsel moved the Fourth Circuit twice for additional space. See CA-ECF Nos. 59 and 61. The first request was granted in part; the second request was denied.

Appellate counsel was ineffective for failing to raise meritorious issues on appeal. This discussion specifically references the *Batson* claim, Claim 16; and the Confrontation Clause claim, Claim 7. Should this Court find any other claims are defaulted for failure to have been raised on appeal, Runyon specifically alleges appellate counsel was ineffective for failing to do so.

**Claim 9:** **Runyon's Conviction Under 18 U.S.C. § 924(c) Is Unconstitutional Because It Was Procured In Violation Of The Due Process Clause, The Equal Protection Clause, And The Fifth, Sixth, and Eighth Amendments Of The Constitution. *Johnson v. United States,* 135 S. Ct. 2551 (2015).**

**A.     Introduction**

Runyon was convicted of conspiracy to commit murder for hire, 18 U.S.C. § 1958(a); carjacking resulting in death, 18 U.S.C. § 2119; and murder with a firearm in relation to a crime of violence, 18 U.S.C. § 924(c), (j), and received death for the conspiracy and 924(c) charges. This claim alleges that in light of a Supreme Court opinion, issued after Runyon's conviction became final, Runyon's conviction for the § 924 offense (and its accompanying death sentence) must be vacated. It also alleges that Runyon's death sentence for the conspiracy conviction must be vacated because the evidence and arguments presented at trial with respect to the § 924 offense painted an inappropriate

---

[41] The Fourth Circuit's certificate of compliance for briefs specifies that parties must use "a proportionally spaced typeface (such as Times New Roman)," which must include serifs and must be 14-point or larger, or "a monospaced typeface (such as Courier New)," which must be 12-point or larger. http://www.ca4courts.gov/docs/pdfs/certcomp.pdf. Garamond satisfies all the requirements of the first option.

picture of the conspiracy offense and consequently contributed to the jury's sentencing decision for the conspiracy charge.

Recently, the Supreme Court released its opinion in *United States v. Johnson*, 135 S. Ct. 2551 (2015), which calls in to question whether conspiracy and carjacking may be relied upon to establish the crime of violence element of 924(c). In *Johnson*, the Supreme Court held that the definition of violent felony used in the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), is unconstitutional because it is vague and does not provide adequate notice. *Johnson, supra.* The reasoning in *Johnson* applies with equal force to the definition of crime of violence found in 18 U.S.C. § 924(c). This Court should vacate Runyon's 924(c) conviction and remand for a new sentencing hearing. In this case, the jury was instructed that the conspiracy and carjacking charges qualified as crimes of violence supporting the 924(c) charge. Tr. 1703-04, 7/16/09.

## B.    Relevant Statutes

Several statutes attempt to define violent criminal conduct which may support enhanced punishment. In the "General Provisions" section of the criminal code, crime of violence is defined as follows:

> (a)    an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b)    any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C § 16(a), (b).

This same definition, verbatim, is present in 18 U.S.C. § 924(c), the statute supporting Runyon's conviction.

**1938**

Similarly, the ACCA enhances punishment for defendants who have three prior violent felonies, defined as offenses that:

(i)      has as an element, the use, attempted use, or threatened use of physical force against the person of another; or

(ii)     is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B)(i), (ii).

Subsection (i) is often called the "force clause;" subsection (ii), the residual clause. U.S.S.G. 2L1.2 (prior conviction for crime of violence enhances sentence for unlawful reentry).

Closely related definitions are found in the Sentencing Guidelines. U.S.S.G. 4.B1.1 (prior conviction for crime of violence supports career offender determination).

The Fourth Circuit regularly relies on case law interpreting the ACCA to interpret 18 U.S.C. § § 16(b) as well as 18 U.S.C. § 924(c). *See United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on an ACCA case to interpret the definition of a crime of violence under § 924(c)(3)(B)); *United States v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same).[42]

---

[42]*See also United States v. Keelan*, 786 F.3d 865, 871 n.7 (11th Cir. 2015) (describing the ACCA otherwise clause and § 16(b) "analogous"); *Roberts v. Holder*, 745 F.3d 928, 930-31 (8th Cir. 2014) (using both ACCA cases and § 16(b) cases to define the same "ordinary case" analysis); *United States v. Sanchez-Espinal*, 762 F.3d 425, 432 (5th Cir. 2014) (despite the fact that the ACCA talks of risk of injury and § 16(b) talks of risk of force, "we have previously looked to the ACCA in deciding whether offenses are crimes of violence under § 16(b)").

*See Jimenez-Gonzales v. Mukasey*, 548 F.3d 557, 562 (7th Cir. 2008) (noting that, "[d]espite the slightly different definitions," the Supreme Court's respective analyses of the ACCA and § 16(b) "perfectly mirrored" each other). *See also United States v. Gomez-Leon*, 545 F.3d 777 (9th Cir. 2008); *United States v. Coronado-Cervantes*, 154 F.3d 1242, 1244 (10th Cir. 1998); *United States v. Kirk*, 111 F.3d 390, 394 (5th Cir. 1997); *United States v. Bauer*, 990 F.2d 373, 374 (8th Cir. 1993) (describing the differences between the statutes as "immaterial" and that interpreting U.S.S.G. § 4.1.1, which uses the ACCA language, "is controlled by" a decision that interprets § 16(b)).

**1939**

### C.    The Definition of "Crime of Violence" is Unconstitutional.

In *Johnson*, the Supreme Court held that the ACCA residual clause is unconstitutionally vague because the process by which courts categorize prior convictions as violent felonies is too "wide-ranging" and "indetermina[te]." 135 S. Ct. at 2557. As a result, the ACCA "both denies fair notice to defendants and invites arbitrary enforcement by judges." *Id.*

The Court began its analysis by explaining that, under *Taylor v. United States*, 495 U.S. 575 (1990), the ACCA requires the categorical approach to determine whether a particular statute qualifies as a violent felony. *Id.* at 2557. Courts must assess whether a crime qualifies as a violent felony "in terms of how the law defines the offense and not in terms of how an individual might have committed it on a particular occasion." *Id.* (quoting *Begay v. United States*, 553 U.S. 137, 141 (2008)).

The Court further clarified that the residual clause "requires a court to picture the kind of conduct that the crime involves 'in the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury." *Id.* (citation omitted). The Court linked the "ordinary case" framework to *James v. United States*, 550 U.S. 192 (2007), in which it held:

> We do not view that approach as requiring that every conceivable factual offense covered by a statute must necessarily present a serious potential risk of injury before the offense can be deemed a violent felony.
>
> . . .
>
> Rather, the proper inquiry is whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another."

*Id.* at 208 (citations omitted). "As long as the offense is of a type that, by its nature, presents a serious potential risk of injury to another, it satisfies the requirements of [the ACCA's] residual provision." *Id.* at 209 (emphasis added, brackets supplied).

*Johnson* concluded that the process of determining what is embodied in the "ordinary case" rather than "real-world facts" is fatally flawed, rendering the ACCA unconstitutionally vague. "[G]rave uncertainty" surrounds the method of determining the risk posed by the "judicially imagined 'ordinary

91

**1940**

case.'" 135 S. Ct. at 2557. "The residual clause offers no reliable way to choose between ... competing accounts of what 'ordinary' ... involves." *Id.* at 2558.

The *Johnson* Court considered and rejected different ways that a court might envision the hypothetical "ordinary case." Specifically, the Court explained that a statistical analysis of reported cases, surveys, expert evidence, Google, and gut instinct are all equally unreliable in determining the "ordinary case." *Id.* at 2557 (quoting *United States v. Mayer*, 560 F.3d 948, 952 (9th Cir. 2009) (Kozinski, J., dissenting from denial of rehearing en banc)). Although earlier ACCA cases relied on statistical analysis and "common sense," *Johnson* concluded that these methods "failed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition." *Id.* at 2559 (referring to *Chambers v. United States*, 555 U.S. 122 (2009), and *Sykes v. United States*, 564 U.S ___, 131 S. Ct. 2267 (2011)).

This flaw alone establishes the residual clause's unconstitutional vagueness. The Court, however, explained that a closely related flaw exacerbates the problem. The Court noted that the residual clause lacks a meaningful gauge for determining when the quantum of risk under the "ordinary case" of a particular statute is enough to constitute a "serious potential risk of physical injury." *Johnson*, 135 S. Ct. 2258. Although the level of risk required under the residual clause must be similar to the enumerated offenses (burglary, arson, extortion, or crimes involving use of explosives), *Johnson* rejected the notion that comparing a felony's "ordinary case" to the risk posed by certain enumerated offenses cures the constitutional problem. *Id.*

The enumerated offenses failed to save the ACCA residual clause because, according to the majority, comparing felonies to enumerated offenses similarly requires resorting to "a judicially imagined abstraction." *Id.* Before courts may even start the comparison, they must first determine what the "ordinary" enumerated crime entails. But the "ordinary" enumerated crimes, *Johnson* emphasized, like any other crime, "are far from clear in respect to the degree of risk each poses." *Id.*

92

**1941**

(quoting *Begay v. United States*, 553 U.S. 137, 143 (2008)). Any attempt to figure out the "ordinary" enumerated offense requires just as much guesswork as figuring out the "ordinary" predicate offense. The Court held that such indeterminacy, unpredictability, and arbitrariness inherent in the "ordinary case" analysis is more than the "Due Process Clause tolerates." *Id.*

Thus, *Johnson* not only invalidated the ACCA residual clause, but it invalidated the "ordinary case" analysis and statutory provisions that compel such an analytical framework. In other words, the only way to apply the residual clause is to use the "ordinary case" analysis, and the "ordinary case" analysis is impossible to apply in a constitutional manner.

### D. Runyon's Conviction For Murder With A Firearm In Relation To A Crime of Violence Is Unconstitutional.

Under *Johnson*, the definition of crime of violence set forth in 18 U.S.C. § 924(c) is unconstitutional. To be sure, 18 U.S.C. § 924(e)(2)(B)(ii) and 18 U.S.C. § 924(c)(3)(B) are not identical. But the differences have no impact on the constitutional analysis. Although the risk at issue in the ACCA is a risk of injury, and the risk at issue in Section 924(c) is a risk that force will be used, this difference is immaterial to the due process problem and has no impact on the *Johnson* analysis. The Court's holding did not turn on the type of risk, but rather how a court assesses and quantifies the risk. That inquiry is the same under both the ACCA and § 924(c). Both statutes require courts first to picture the "ordinary case" embodied by a felony, and then decide if it qualifies as a crime of violence by assessing the risk posed by the "ordinary case."

Relying on *James*, the Fourth Circuit has squarely held that the "ordinary case" analysis applies when construing 18 U.S.C. § 16(b). *United States v. Avila*, 770 F.3d 1100, 1107 (4th Cir. 2014). The Fourth Circuit stated:

> [E]very set of conceivable facts covered by first-degree burglary does not have to present a serious risk of injury for it to qualify as a crime of violence. It is sufficient if "the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James*, 550 U.S. at 208, 127 S.Ct.

93

**1942**

1586. As long as an offense is of a type that, by its nature, presents a substantial risk that physical force against the person or property of another may be used, it satisfies the requirements of 18 U.S.C. § 16(b).

*Id.*

*Avila* controls here because § 16(b) and § 924(c)(3)(B) are identical. The residual clause of 924(c), like the ACCA residual clause, thus requires the "ordinary case" analysis to assess the risk involved in a predicate offense, and how risky that ordinary case is. *Avila*, 770 F.3d at 1107; *Ayala*, 601 F.3d at 267. Since this is the identical analytical step that brought down the ACCA residual clause, § 924(c)(3)(B) cannot survive constitutional scrutiny under the due process principles reaffirmed in *Johnson*. Conspiracy and carjacking cannot qualify as crimes of violence under 924(c)'s residual clause.

The government may argue conspiracy and carjacking qualify as crimes of violence under 924(c)'s force clause. This Court should reject that argument. The Supreme Court, interpreting the "violent felony" requirement of the Armed Career Criminal Act, 18 U.S.C. § 924(e), explained that "physical force" means "violent force"—"strong physical force" which is capable "of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).

### 1.    Carjacking Is Not A Crime of Violence.

Carjacking does not meet this requirement because it can be accomplished by putting someone in fear of future injury to his person or property, which does not require the use, attempted use, or threatened use of "violent force." Additionally, because the act of putting someone in fear of injury can be accomplished without an *intentional* threat of physical force, it fails to satisfy the *intentional* mens rea required under the § 924(c)(3)(A) force clause.

The plain language of the carjacking statute provides that the offense can be accomplished by the act of placing another in fear of injury. This action, at best, constitutes a threat of *injury* to another, which squarely does not require the use or threatened use of "violent force." The Fourth Circuit's decision in *United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012), is directly on point. Indeed, in

94

**1943**

that case, the Fourth Circuit unequivocally held that the threat of *any physical injury*, even "serious bodily injury or death," does not necessarily require the use of physical force – let alone "violent force."

In *Torres-Miguel*, at issue was the defendant's prior conviction for the California offense of willfully threatening to commit a crime which "will result in death or great bodily injury to another." 701 F.3d at 168 (citing Cal. Penal Code § 422(a)). The specific question in the case was whether the statute had an element equating to a threat of "violent force" under the force clause of U.S.S.G. § 2L1.2–a clause that is identical in all relevant respects to the § 924(c)(3)(A) force clause. *Id.* Despite the "death or great bodily injury" element in the California statute, the Fourth Circuit found that the offense was missing a "violent force" element, and thus, could never qualify as a "crime of violence" under the force clause. *Id.* at 168-69. The Fourth Circuit held that "[a]n offense that *results* in physical injury, but does not involve the use or threatened use of force, simply does not meet the Guidelines definition of crime of violence." *Id.* at 168. The Court, in strong words, proclaimed that "of course, a crime may *result* in death or serious injury without involving *use* of physical force." *Id.* Because "the full range of conduct" covered by the carjacking statute does not require "violent force," it simply cannot qualify as a "crime of violence" under § 924(c)(3)'s force clause. *Torres-Miguel*, 701 F.3d at 171.

Even more, the act of putting someone in fear of injury, as defined under the carjacking statute, does not constitute a "crime of violence" under the force clause because it does not require an *intentional* threat of physical force. In *Garcia v. Gonzales*, 455 F.3d 465, 468 (4th Cir. 2006), the Fourth Circuit firmly held that an offense can only constitute a "crime of violence" under the force clause if it has an element that requires an "*intentional* employment of physical force [or threat of physical force]." *Id.* (emphasis added). The "fear of injury" element under the carjacking statute does not require a defendant to intentionally place another in fear of injury. Therefore, it is missing the intentional mens rea necessary under *Garcia*.

**1944**

Federal cases interpreting the "intimidation" element in the federal bank robbery statute (18 U.S.C. § 2113(a)) are instructive here. Federal bank robbery may be accomplished by "intimidation," which means placing someone in fear of bodily harm – the same action required under the carjacking statute. *See United States v. Woodrup*, 86 F.3d 359, 364 (4th Cir. 1996) ("intimidation" under federal bank robbery statute means "an ordinary person in the [victim's position] reasonably could infer a threat of *bodily harm* from the defendant's acts."); *see also United States v. Pickar*, 616 F.2d 821, 825 (2010) (same); *United States v. Kelley*, 412 F.3d 1240, 1241 (2005) (same); *United States v. Yockel*, 320 F.3d 818, 824 (8th Cir. 2003) (same); *United States v. Higdon*, 832 F.3d 312, 315 (5th Cir. 1987) (same).

"Intimidation" is satisfied under the carjacking statute "whether or not the defendant actually intended the intimidation," as long as "an ordinary person in the [victim's] position reasonably could infer a threat of bodily harm from the defendant's acts." *Woodrup*, 86 F.3d at 36. *See also Yockel*, 320 F.3d at 821 (upholding bank robbery conviction even though there was no evidence that defendant intended to put teller in fear of injury: defendant did not make any sort of physical movement toward the teller and never presented her with a note demanding money, never displayed a weapon of any sort, never claimed to have a weapon, and by all accounts, did not appear to possess a weapon); *Kelley*, 412 F.3d at 1244 ("Whether a particular act constitutes intimidation is viewed objectively, ... and a defendant can be convicted under [federal bank robbery] even if he did not intend for an act to be intimidating."); *United States v. Foppe*, 993 F.2d 1444, 1451 (9th Cir. 1993) (same). In other words, a defendant may be found guilty of carjacking even though he did not intend to put another in fear of injury. It is enough that the victim reasonably fears injury from the defendant's actions – whether or not the defendant actually intended to create that fear. Due to the lack of this intent, the carjacking statute criminalizes conduct that does not require an intentional threat of physical force. Therefore, carjacking squarely fails to qualify as a "crime of violence" under *Garcia*. Because the carjacking

96

**1945**

"intimidation" element is defined the same as the Hobbs Act robbery "fear of injury" element, it follows that carjacking fails to qualify as a "crime of violence" under *Garcia.*

In sum, carjacking is not a "crime of violence" under the § 924(c)(3)(A) Force Clause for two independent reasons. First, the statute does not require a threat of *violent force.* Second, the statute does not require the *intentional* threat of the same.

## 2. Conspiracy Is Not A Crime of Violence.

Neither does Runyon's conviction for conspiracy qualify under 924(c)'s force provision. Conspiracy requires merely an agreement to act. Tr. 1689, 7/16/09. A mere agreement cannot qualify as physical force. *Torres-Miguel, supra.* The Fourth Circuit has held that conspiracy qualifies as a crime of violence under the residual clause. *See United States v. White,* 571 F.3d 365 (4th Cir. 2009); *United States v. Vann,* 620 F.3d 431 (4th Cir. 2010). The *Johnson* opinion itself uses conspiracy as an example of how the courts have "trouble making sense of the residual clause." *Johnson v. United States,* 135 S. Ct. 2551, 2559-60 (2015). Conspiracy cannot support the 924(c) conviction under the force clause nor the residual clause.

## E. Resentencing Is Required Because Runyon Was Sentenced To Death Based On An Unconstitutional Statute.

*Johnson* applies retroactively. It "place[s] particular conduct ... beyond the State's power to punish." *Schriro v. Summerlin,* 542 U.S. 348, 352 (2004). *See Price v. United States,* 795 F.3d 731, 734 (7th Cir. 2015) *(Johnson* applies retroactively to cases on collateral review); *see also Pakala v. United States,* 804 F.3d 139, 139-40 (1st Cir. 2015) (same). The Supreme Court recently granted certiorari on the issue of whether *Johnson,* creates a new substantive rule of constitutional law that should be applied retroactively. *Gregory Welch v. United States,* No. 15-6418, certiorari granted, January 8, 2016, to resolve a circuit split over whether Johnson applies retroactively.

**1946**

Remand for new sentencing is appropriate. This was a close case. The jury questioned what would happen if they could not agree on a sentence. Tr. 2707-09, 8/27/09. The jury rejected Count Four, the bank robbery charge. The jury imposed a life sentence for carjacking. Under these circumstances the government cannot meet its burden of demonstrating the *Johnson* error is harmless beyond a reasonable doubt.

In *United States v. Causey*, 185 F.3d 407, 423 (5th Cir. 1999), the Fifth Circuit remanded for resentencing where it dismissed a portion of the capital convictions for lack of evidence, explaining "it is impossible to say" the death sentences "were not influenced by the fact" that defendants had received three eligible convictions, rather than two." *See also United States v. Marquardt*, 786 F.2d 771, 778 (7th Cir. 1986) (excessive number of convictions may prejudice the defendant by "creating the impression of more criminal activity). Further, the trial court's instructions portrayed the § 924(j) murder charge as requiring a high level of culpability. The Court instructed the jury that a conviction under § 924(j) required the jury to find Runyon intended to kill "deliberately and intentionally," or that he acted with "callous and wanton disregard for human life." Tr. 1706, 7/16/09. When the jury was determining the appropriate punishment, the fact that the "murder charge" had been established was likely given great weight. The instructions on the § 924(c), (j) charge repeatedly define murder Tr. 1704, 1705, 1706, 1707, 7/16/09. Clearly, the brunt of the prosecution case for death was premised upon the sole charge that required intentional premeditated murder. After *Johnson*, the key basis for that has been eliminated. Justice demands Runyon receive a new sentencing hearing. *See also Kennedy v. Louisiana*, 554 U.S. 407 (2008) (the Eighth Amendment prohibits the death penalty for a non-homicide crime).

98

**1947**

**Claim 10:** **The Jury Instructions At The Sentencing Phase Unconstitutionally Lowered the Government's Burden Of Proof In Violation Of The Fifth, Sixth, and Eighth Amendments.** *Ring v. Arizona,* **536 U.S. 584 (2003).**

The jury instructions that permitted death upon a finding that aggravating factors "sufficiently outweigh[]" mitigating factors impermissibly lowered the burden of proof in violation of the Fifth, Sixth and Eighth Amendments. *Ring v. Arizona,* 536 U.S. 584 (2003). The Court instructed the jury that it must sentence Runyon to death if it found that aggravating factors sufficiently outweighed mitigating factors:

> In this phase, at the end of your deliberations all 12 jurors must unanimously agree that the aggravating factors sufficiently outweigh any mitigating factors, or in the absence of mitigating factors, that the aggravating factors are themselves sufficient to justify a sentence of death. But if any of you, even a single juror, is not persuaded that the aggravating factors sufficiently outweigh any mitigating factors such that a sentence of death is justified, then the jury may not recommend the death penalty on the verdict form.

> Tr. 2672-73, 2675, 2682-84, 2694, 8/26/09; Tr. 2707, 8/27/09.

This instruction was error. The Fifth, Sixth, and Eighth Amendments require that the jury find each element beyond a reasonable doubt, including the circumstances upon which the death penalty is based. The Court's instruction was plainly inconsistent with this mandate, as it instead directed the jury to apply a "sufficiently outweigh[ed]" standard that lowered the burden of proof.

In *Ring, supra,* the Supreme Court held that the accused has a Sixth Amendment right to have a jury, not merely a judge, find the existence of aggravating circumstances. The Court explained this is so because aggravating circumstances "operate as 'the equivalent of an element of a greater offense,'" and result in greater punishment; therefore, the accused is entitled to the protection of a jury. *Ring,* 536 U.S. at 609 (quoting *Apprendi v New Jersey,* 530 U.S. 466, 494 n.19 (2000)). The reasoning in *Ring* similarly requires the jury to find the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt and further that death is the appropriate punishment. The

99

**1948**

death sentences should be vacated because they were imposed based on an unconstitutionally low standard.

Runyon acknowledges he raised this issue on direct appeal, *United States v. Runyon*, No. 09-11, Appellant's Brief pp. 89-91 (4th Cir. Feb. 29, 2012), and the appeals court decided against him. *Runyon*, 707 F.3d at 516. However, where the controlling law changes, a prior adjudication may not be dispositive. *Davis v. United States*, 417 U.S. 333, 342 (1974) (where movant unsuccessfully raised issue on direct appeal, and where controlling law changed soon thereafter, the appeals court "erred in holding that the 'law of the case,' as determined in the earlier appeal from the ... conviction, precluded him from securing relief under § 2255 on the basis of an intervening change in law"). *See also Sanders v. United States*, 373 U.S. 1, 17 (1963); *Underwood v. United States*, 15 F.3d 16, 18 (2d Cir. 1993).

In *Hurst v. Florida*, 577 U.S. ____, 136 S.Ct. 616 (2016), the Supreme Court struck Florida's capital sentencing scheme, finding it violates the Sixth Amendment because it "does not require the jury to make the critical findings necessary to impose the death penalty." *Hurst*, 136 S.Ct. at 621-22. The State of Florida argued that because the jury found the facts necessary to establish eligibility, the Sixth Amendment was satisfied. The Supreme Court rejected this argument as follows:

> The State fails to appreciate the central and singular role the judge plays under Florida law. ... [T]he Florida sentencing statute does not make a defendant eligible for death until 'findings *by the court* that such person shall be punished by death.' Fla. Stat. § 775.082(1)(emphasis added). The trial court *alone* must find 'the facts ... [t]hat sufficient aggravating circumstances exist' and '[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances."

*Hurst*, 136 S.Ct. at 622.

The *Hurst* Court recognized the unworkable nature of the distinction between eligibility and selection, and held a judicial finding that aggravators outweighed mitigators is unconstitutional. *Id.*

*Hurst* therefore makes clear that it is a jury function to weigh aggravating and mitigating circumstances because the result determines whether a death sentence is imposed. When the weighing function—whether aggravating circumstances outweigh mitigating circumstances—results

100

**1949**

in an affirmative finding, that finding constitutes the final element required for a death sentence. *Hurst*, 136 S.Ct. at 623-24 (specific findings authorizing the imposition of the sentence of death be made by the jury). It is beyond question that all elements leading to a greater punishment must be found by a jury. *Ring*, 536 U.S. at 609 (quoting *Apprendi v New Jersey.*, 530 U.S. 466, 494 n.19 (2000)). It is also beyond questions that all elements must be found beyond a reasonable doubt. *Alleyne v. United* States, 570 U.S. ___, 133 S.Ct. 2151, 2156 (2013). Accordingly, a jury must find—beyond a reasonable doubt—that aggravating circumstances outweigh mitigating circumstances in order to impose a death sentence.

The fact that Runyon's jurors made the specific finding that aggravators "sufficiently" outweighed mitigators is not constitutionally sufficient. They were required to make this final finding that determines a death sentence over a life sentence "beyond a reasonable doubt." The jury instructions did not include the required burden of proof and the jurors did not find the final element required for a death sentence beyond a reasonable doubt. The sentence, therefore, should be vacated.

Just as in *Hurst*, here, the jury was instructed to make its ultimate determination to impose death based on whether the aggravating factors "sufficiently outweigh" mitigating factors. Tr. 2672-73, 2675, 2682-84, 2694, 8/26/09; Tr. 2707, 8/27/09. Given the fact that the Sixth Amendment applies to this ultimate, final determination to impose death, the jury should have been required to make its finding beyond a reasonable doubt.

Finally, the *Hurst* Court addressed prior case law holding "the Sixth Amendment does not require that the specific findings authorizing the imposition of the death sentence be made by the jury." *Hurst*, 136 S.Ct. at 623 (quoting *Hildwin*, 490 U.S. 638, 640-41) (discussing holdings in *Hildwin*, *supra, and Spaziano, supra*). The Court "expressly overruled" its holdings in *Spaziano* and *Hildwin*, noting they were "wrong, and irreconcilable with *Apprendi*." *Hurst*, 136 S.Ct. at 623. Given that the *Hurst*

101

**1950**

opinion expressly overruled prior Supreme Court precedent, it does mark a change in the law. Thus, this Court may review Runyon's claim, even though it was previously reviewed on direct appeal. *See Davis v. United States*, 417 U.S. 333, 342 (1974).

**Claim 11:    The Death Sentences Are Unconstitutional Because They Are Based On Aggravating Circumstances That Fail To Narrow And/Or That Are Arbitrary And Overbroad.**

To be constitutional, an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify imposition of a more severe sentence on the defendant compared to others convicted of the same crime. *Zant v. Stephens*, 462 U.S. 862, 877 (1983). "[O]ne of the most significant developments in our society's treatment of capital punishment has been the rejection of the common-law practice of inexorably imposing a death sentence upon every person convicted of a specified offense."[43] *Woodson v. North Carolina*, 428 U.S. 280, 301 (1976). *See also Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (A constitutional capital sentencing scheme is accomplished by including an element that "may not apply to every defendant convicted of a murder.").

In Runyon's case, the statutory aggravators mirror the conduct required for conviction rather than adding an element of additional culpability. *See also* Claim 4 (counsel failed to advocate for Runyon at the eligibility stage). The two statutory aggravating circumstances in this case were: (1) Runyon "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value, and (2) Runyon "committed the offense after substantial planning and premeditation to cause the death of a person." ECF 255 pp. 5-6. The aggravators are unconstitutional as applied because they add nothing above what was required for a conviction of conspiracy to commit murder for hire. In convicting Runyon, the jurors found he planned with at least one other person to

---

[43] Runyon's appellate counsel were ineffective for failing to raise this claim where the merits are stronger than the jurisdictional challenges that "failed by a wide margin," *Runyon*, 707 F.3d at 489, and the boilerplate challenge to the constitutionality of the death penalty in all circumstances. *Id.* at 521 n.7. *Robbins*, 528 U.S. 259, 288 (2000). *See* Claim 8.

102

kill the victim for money. The prosecutor argued, Runyon did not know the victim but planned with Draven and Voss to kill him "for greed." Tr.2663, 8/26/09. Draven and Voss clearly planned to kill Voss's husband to collect a Navy gratuity death benefit and life insurance proceeds and fund their new "family." Tr. 214, 7/23/09. Clearly, the same facts that support Runyon's conviction also support the two statutory aggravating circumstances. Yet, the Sixth Amendment does not permit a defendant to be "expose[d] ... to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Apprendi v. New Jersey*, 530 U.S. 466, 483 (2000). The impermissible effect of the statutory aggravating circumstances was to make Runyon automatically eligible for the death penalty upon conviction in violation of the Eighth Amendment.

Even if the statutory aggravating circumstances served a narrowing function, the arbitrary and overbroad non-statutory aggravating circumstances counter-acted any narrowing and rendered imposition of the death sentence inconsistent and irrational.

Although the Constitution and Supreme Court precedents do not require the use of statutory aggravating circumstances, when the statute provides precise and distinct aggravating circumstances, the addition of factors beyond those bounds skews the sentencer's weighing process by "creat[ing] the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be[.]" *Stringer v. Black*, 503 U.S. 222, 235 (1992). Such a risk unconstitutionally conflicts with the "constant theme" of post-*Furman* jurisprudence emphasizing "procedural protections that are intended to ensure that the death penalty will be imposed in a consistent, rational manner." *Barclay v. Florida*, 463 U.S. 939, 960 (Stevens, J., concurring). Since *Furman v. Georgia*, the Supreme Court has required any statute governing imposition of the death penalty to "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). The statute "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing

103

**1952**

a sentence of death." *Id.* (quotations and footnotes omitted); *Gregg v. Georgia*, 428 U.S.153, 192 (1976) (opinion of Stewart, Powell & Stevens, JJ.); *id.* at 222 (opinion of White, J., Burger, C.J., & Rehnquist, J.). Deeming it "virtually unthinkable to follow any other course in a legal system . . . operated by following prior precedents and fixed rules of law[,]" *Gregg* noted that "[i]t is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations." 428 U.S. at 193. "No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines." *Id.* at 206-07. Thus, aggravating factors must be narrowly and precisely defined. *Godfrey*, 446 U.S. at 429; *Zant*, 462 U.S. at 877-78 & n.15.

In this case, the non-statutory aggravating factors were arbitrarily determined by the prosecutors, limited only by their imaginations. There was no clear, objective standard that determined the factors which increased Runyon's moral culpability. Thus, there were no procedural protections to ensure that the death penalty was imposed in a consistent and rational manner.

The four non-statutory aggravating factors proposed by the prosecutors and found by Runyon's jury were that Runyon: (1) "caused injury, harm, and loss to the victim ... and the victim's family and friends, as shown by the victim's personal characteristics and by the impact of his death upon the victim's family, friends, and coworkers;"[44] (2) "utilized education, training, and experience that he received in college courses focused on criminal justice, and as a law enforcement and correctional officer, as an officer of the Kansas National Guard, and as a member of the United States Army;" (3) "engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend;" and (4) "demonstrated a lack of remorse" for the crime. Special Verdict Form – Selection Phase, ECF No. 291. These four factors added improper weight to

---

[44] Every murder case results in victim(s).

104

**1953**

the aggravation scale in the jury's weighing process resulting in an arbitrary death sentence in violation of the Eighth Amendment. Accordingly, the death sentences should be vacated.

**Claim 12:** **Runyon Was Denied Due Process Of Law, Equal Protection Of The Law, The Right To Be Free Of Cruel And Unusual Punishment, And Effective Assistance Of Counsel Because The Death Penalty Was Disproportionately And Unconstitutionally Applied According To Race, And Trial And Appellate Counsel Made No Objection Based On This Fact.**

The authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty is impermissibly influenced by race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eight Amendment. The Federal Death Penalty Act is administered in a racially biased manner and the government improperly selected the death penalty for Runyon based upon his race. Trial and direct appeal counsel were ineffective for failing to raise this claim.

In *Wayte v. United States*, 470 U.S. 598 (1985), the Supreme Court held that "[i]t is appropriate to judge selective prosecution claims according to ordinary equal protection standards." *Id.* at 608 (footnote omitted). The same applies to Runyon's claims. To succeed on his claims, Runyon must show that the federal prosecutorial policy had both a discriminatory effect and a discriminatory intent. *United States v. Armstrong*, 517 U.S. 456 (1996). Here, the government could have sought the death penalty for Runyon's two white co-defendants but did not, and it chose to seek the death penalty only for him, a member of a minority race. *See Armstrong*, 517 U.S. at 469 (selective prosecution implies that a selection has taken place). Initially, Runyon can show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose."[45] *Batson*, 476 U.S. 79, 94 (1986). With discovery and an evidentiary hearing, Runyon can prove his claim.

---

[45] The burden then shifts to the prosecution to defend its conduct. To do so, the government must offer concrete factual explanations. "[It] cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties." *Batson*, 476 U.S. at 94.

105

**1954**

In the time-period before this case, "[the] race of the victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty[.]" Ex. 37, (Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, *Racial Disparities in Federal Death Penalty Prosecutions 1988-1994*, p.7 (March 1994) ("*Racial Disparities*") (quoting U.S. General Accounting Office, *Death Penalty Sentencing* 5 (Feb. 1990)). A separate comprehensive statistical analysis of 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008 demonstrates the relationship between victim race and sentencing outcomes in federal capital cases. Cohen Bell Declaration, Ex. 38. A federal defendant charged with killing a white victim is three times more likely to be sentenced to death than a defendant who kills a non-white victim. *Id.* The race of the victim is "highly statistically significant" and the likelihood that the discrepancy occurs by chance is "essentially zero." Although this study focused on the correlation between white female victims and the death penalty, it remains probative in this case where the victim is a white male. In society as a whole, African-Americans account for about half of murder victims. Almost 80% of death row defendants have been executed for killing white victims. *See* Death Penalty Information Center, *Race and the Death Penalty, available at:* http://www.deathpenaltyinfo.org/race-and-death-penalty.

Like the victim's race, the race of the defendant directly correlates to the rate of being federally-charged with capital murder. From 1988-1994, the percentage of defendants selected for capital prosecution nationwide who were white was 11% whereas 89% were non-white. (*Racial Disparities*, p. 1, Ex. 37). For example:

> Three-quarters of those convicted of participating in a drug enterprise under the general provisions of § 848 have been white and only about 24% of the defendants have been black. However, of those chosen for death penalty prosecutions under this section, just the opposite is true: 78% of the defendants have been black and only 11% of the defendants have been white. (See Fig.1). Although the number of homicide cases in the pool that the U.S. Attorneys are choosing from is not known (the Justice Department has not responded to Congressional inquiries for that data), the almost exclusive selection of minority defendants for the death penalty, and the sharp contrast between capital and non-capital prosecutions under § 848, indicate a

**1955**

degree of racial bias in the imposition of the federal death penalty that exceeds even pre-Furman patterns.

*Id.* at pp. 2-3, Ex. 37.

From 1995-2000, the federal death penalty was authorized for 159 defendants. U.S. Dep't. of Justice, *The Federal Death Penalty System: A Statistical Survey (1988)-(2000)*, p. 8 (Sept. 12, 2000), *available at* http://www.justice.gov/archive/dag/pubdoc/ dp survey final.pdf. Of the 159 death-authorized defendants, 28% were white and 72% were non-white. *Id.* Clearly, the race of the defendant is a significant factor in how the federal death penalty is applied. *Compare Hunter v. Underwood*, 471 U.S. 222, 227 (1985) (finding discriminatory impact from a state law where Blacks were at least 1.7 times as likely to suffer disenfranchisement under the law).

Statistics for the Eastern District of Virginia are not only consistent with nationwide statistics but at an authorization rate of 95% for non-whites, they show an even greater disparity in the application of the death penalty. In this District, to undersigned counsel's knowledge, an overwhelming 42 out of 44 death-authorized cases (95%) are prosecutions of non-white men. The 44 cases comprised of 35 African-American men, five Hispanic men, two white men, and one Asian man (in addition to Runyon). No women have been authorized for the death penalty in the Eastern District of Virginia, including Runyon's co-defendant Voss. From federal cases docketed in this District in 2008, undersigned have identified 12 defendants—including Runyon—who were authorized for the death penalty. *See Federal Capital Prosecutions – race and gender of defendants and victims* (August 2015), *available at:* http://www.capdefnet.org/FDPRC/pubmenu.aspx?menu id=96&folder id=5120. Only two of the twelve defendants were white. The impact of both nationwide and district statistics is clearly exemplified in Runyon's case where similarly situated white co-defendants (charged with the same crimes and three aggravating circumstances compared to Runyon's two) were not death-authorized.

107

**1956**

In *United States v. Bass*, 536 U.S. 862, 863 (2002), the Supreme Court acknowledged nationwide statistics demonstrating that "[t]he United States charges blacks with a death-eligible offense more than twice as often as it charges whites[.]" Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the government's authorization process and plea bargaining decisions. In a related context, the Supreme Court "has recognized that the direct impact of the challenged official action is frequently probative of why the action was taken, since people 'usually intend the natural consequences of their actions.'" *Williams v. Hansen*, 326 F.3d 569, 585 (4th Cir. 2003) (quoting *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977))). Trial counsel's failure to obtain this type of information and pursue a pre-trial challenge to the government's racially discriminatory actions constitutes ineffective assistance.

In this case, all co-defendants were charged with the same crimes and the same two statutory aggravators, but Voss and Draven were also charged with a third statutory aggravator. Runyon is the only non-white co-defendant and the only co-defendant for whom death was sought. ECF No. 3 pp. 13-14. Runyon's jury found all three co-defendants were equally culpable in the commission of the crime. The majority of the guilt-phase evidence demonstrated the white co-defendants' planning and execution of the crime, the lavish manner in which the two spent the proceeds of the crime, and their coordinated effort to cover-up the crime. Although the white female co-defendant pled guilty and received a life sentence she did not provide additional information regarding the crime nor did she testify against the other two co-defendants during their subsequent joint trial. The white male co-defendant exercised his right to a trial, as did Runyon, but he was not exposed to the death penalty and he did not assist the prosecution against Runyon.

108

**1957**

The Government possessed evidence showing that the white male co-defendant's prior violent conduct and potential for future violent conduct was more substantial than Runyon's prior violence. *See* Claim 2. Moreover, the white co-defendants enjoyed $100,000 in proceeds of the crime which establishes a weightier "pecuniary gain" aggravating circumstance than was levied against Runyon. The "substantial planning" aggravator is weightier with respect to the two white co-defendants who, according to the prosecution's theory, engaged in an extensive illicit affair, planned the crime for months, searched for a triggerman, chose the location of the crime, lured the victim to the crime scene and directed Runyon's actions. *See* Claim 4 (Eligibility IAC). The "victim impact" aggravator is as strong or stronger against the white co-defendants, especially since the white female co-defendant was the victim's wife and mother of his children and the white male co-defendant was the white female's lover. With regard to the "lack of remorse" aggravator, the white female arranged the crime scene location by opening a bank account, directed her husband to the bank's ATM, and remained on the phone with him as he drove to his death while coordinating his whereabouts with the white male. The white female lied to military and federal officials and law enforcement to receive a pay-out on her husband's death. Both white co-defendants spent those proceeds and engaged in a coordinated cover-up, tampered with witnesses, and "confessed" only after being taken into custody and when arrest was inevitable. The white female co-defendant pled guilty for purposes of escaping the death penalty. The white male co-defendant exercised his right to trial and did not apologize or express remorse. Accordingly the "lack of remorse" aggravator asserted against Runyon because he did not confess to the crime is not stronger for him than the white co-defendants.[46]

In addition to failing to seek death for the two similarly situated, but white, co-defendants, the prosecution introduced evidence and comments that "contaminated the sentencing proceeding

---

[46] Use of Runyon's silence as proof of the "lack of remorse" aggravator violates the Fifth Amendment, *Runyon*, 707 F.3d at 507-09, and it cannot add any weight to the aggravator.

with invidious considerations concerning [Runyon's] ethnicity and religion." *Runyon*, 707 F.3d at 493. A large portion of the prosecution case for death was based on a video recording in which law enforcement commented on Runyon being "an honorable Asian man." *Id.* at 493. The prosecution deliberately introduced Runyon's race and religion into the trial, conveying—what the Fourth Circuit described as—"frankly, stereotyping and insulting notions[.]" *Id.* at 494. The prosecution's closing argument evidenced a further intent to contravene Runyon's constitutional rights. It "infringed [Runyon's] Sixth Amendment rights by impugning his decision to proceed to trial[,]" and violated his Fifth Amendment right against self-incrimination by urging the jurors to penalize him for remaining silent and not articulating remorse. *Id.* at 507-09. The court of appeals' finding that these violations were harmless does not obviate the disturbing fact that the prosecutors intentionally violated multiple constitutional principles and the video injected impermissible racial stereotypes into the case. In addition, as discussed in Claim 16, the prosecution demonstrated a bias against persons of color when peremptory challenges were exercised against 70% of potential African-American jurors.

The discriminatory choices and acts of the prosecution in Runyon's case are probative of discriminatory intent reflected in statistical evidence of racial disparity in the application of the Federal Death Penalty Act, particularly in the Eastern District of Virginia. Runyon has proffered evidence that shows the racial discrepancy present in his case where the prosecution did not seek death against the similarly situated white co-defendants. This showing renders the above statistics all the more probative of discrimination. This Court should vacate Runyon's death sentences.

110

**1959**

**Claim 13:** **Runyon's Death Sentence Is Disproportionate And Arbitrary In Violation Of The Fifth And Eighth Amendment And Trial And Appellate Counsel Were Ineffective For Failing To Raise This Issue.**[47]

Given the relative culpability of the co-defendants in this case, Runyon's sentence of death is disproportional in violation of the Fifth and Eighth Amendments based on the arbitrary and inconsistent imposition of the death penalty where two co-defendants with the same or greater culpability did not face exposure to the death penalty.

In *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court established that the Eighth and Fourteenth Amendments do not tolerate the infliction of a death sentence under legal systems that permit the death penalty to be arbitrarily, capriciously and inconsistently imposed. *Id.* at 310. (Stewart, J., concurring). *Furman* established that "[i]f a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *see also Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (*Furman* established that "if a State wishes to authorize capital punishment it has a constitutional responsibility to ... apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty."). The same is true for the federal government.

The Constitution requires some form of meaningful review of death sentences to guard against arbitrary and inconsistent results. *See Jurek v. Texas*, 428 U.S. 262, 276 (1976); *Proffitt v. Florida*, 428 U.S. 242, 258-60 (1976). Accordingly, courts must "carefully scrutinize" sentencing decisions "to minimize the risk that the penalty will be imposed in error or in an arbitrary and capricious manner. There must be a valid penological reason for choosing from among the many criminal defendants the few who are sentenced to death." *Spaziano*, 468 U.S. at 460 n.7; *Zant v. Stephens*, 462 U.S. 862,

---

[47] Investigation is ongoing and supplemental information will be provided when available.

111

**1960**

873-80 (1983) ("If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."). When determining whether a death sentence is arbitrary, the Supreme Court has directed courts to evaluate a defendant's culpability both individually and in terms of the sentences of co-defendants and accomplices in the same case. *Enmund v. Florida*, 458 U.S. 782, 788, 798 (1982).

The same two statutory aggravators were charged against Voss, Draven and Runyon and a third statutory aggravator was charged against Voss and Draven. ECF No. 3 pp. 13-14. Voss pled guilty but Draven, like Runyon, proceeded to trial. Draven and Voss were instrumental in planning the crime, Draven recruited Runyon for the crime, and Draven and Voss orchestrated the execution of the crime. Afterwards, Draven and Voss—and not Runyon—spent the proceeds of the crime ($100,000). Draven engaged in an orchestrated cover-up with Voss, he and Voss attempted to influence grand jury witnesses, Draven attempted to influence Runyon's statements to police, he and Voss lied to police for months, and Voss lied to military and federal officials and insurance providers in an attempt to receive additional proceeds from her husband's death. *See also* Claim 12.

As discussed in Claim 2, the government also possessed egregious facts regarding Draven's adjudicated and unadjudicated criminal conduct. The facts alleged in support of the "abuse of women" non-statutory aggravator used against Runyon pale in comparison to Draven's criminal history of sexually abusing children and his outstanding charges of second degree assault and deadly weapon with intent to injure resulting from his violent attack on a girlfriend. In particular:

- Draven has an extensive juvenile history of violent criminal conduct, including, but not limited to, the sexual assault of numerous children;
- Draven's history as a sexual predator includes sexual abuse of: a five-year-old girl; two six-year-old boys; his six-year-old brother and his four-year-old sister; a five-year-old child; and, a developmentally delayed 15-year-old girl.
- Draven was placed in a residential facility for child sexual assault;

112

**1961**

- Draven was diagnosed as having conduct disorder, undifferentiated type, a precursor to anti-social personality disorder;
- Draven was diagnosed as suffering from Pedophilia;
- Draven's charge history consists of second-degree assault, possession of a deadly weapon with intent to injure or intimidate or threaten death or bodily injury; and
- Draven also engaged in acts of intimidation, harassment, and bomb threats.

Draven's criminal past was far more violent than Runyon's and Draven's victims far more helpless. Draven did not merely slap or punch his victims, he raped them. His victims were not merely physically smaller, they were little children; children who were near the age of the Voss children, the children who, under his plan to murder Cory Voss, would have been permanently placed at Draven's fingertips. Notwithstanding this evidence, the Government deemed Draven unworthy of the punishment of death.

Given this, the evidence provides no basis for finding Runyon deserving of death and Draven not. *Both went to trial.* At oral argument before the court of appeals, "questions arose with regard to the government's selection of defendants for capital punishment." [48] *Runyon*, 707 F.3d at 520 n.6. The government distinguished Runyon and the other defendants, stating "that Runyon was the actual triggerman in the murder-for-hire scheme; that he accepted payment for killing someone who was essentially a complete stranger; and that he not only never cooperated with the investigation but sought to thwart it at virtually every turn." *Id.* However, the prosecutor argued to the jury that "Draven is just as liable as if he pulled the trigger." Tr. 1665, 7/16/09. Both Draven and Voss denied paying Runyon. They both indicated that Draven owed Runyon money for a loan. The prosecution could only *suggest* that a $275 money order sent under Draven's brother's name two months after the crime was "payment" for the crime. Furthermore, Runyon cooperated with the police investigation by voluntarily providing a DNA sample and speaking with police on two

---

[48] Appellate counsel rendered ineffective assistance to the extent that they failed to show the prosecution exercised its discretion on some impermissible basis.

occasions. The statement that Runyon "sought to thwart" the investigation "at virtually every turn" is unfounded and certainly not proven at trial. The fact that Runyon never confessed to the crime does not constitute uncooperativeness or "thwarting" an investigation. Runyon had an absolute and fundamental right not to incriminate himself and to require the prosecution to prove its case at trial.

Assuming without conceding that Runyon may have pulled the trigger, Draven was actively involved in the murder itself. Draven helped choose the location for the crime and, not only recruited Runyon's participation in Draven and Cat Voss's scheme, Draven attempted to recruit others even before he ever approached Runyon. As evidenced by his cell phone records, Draven was at, or near the scene of the actual murder. In the time that followed the murder, it was Draven that orchestrated the attempted cover-up by: lying to police about his intimate relationship with Cat Voss and the fact that he lived with her; attempting to influence grand jury witnesses; using different phone numbers; and telling Runyon the details of his conversations with police to influence any statement Runyon might make. It cannot be ignored that Draven provided no assistance to the government until he was in police custody. Moreover, the government considered Cat Voss to be the mastermind of the scheme to murder her husband and considered Runyon to be the tool that Voss and Draven used to execute their murderous plan. *See* Claim 4 & Ex. 15 pp. 3-5.

Finally, as discussed in Claim 14, Runyon's serious mental illness and brain damage illustrates his lesser-culpability vis-à-vis the two co-defendants who escaped death-authorization.[49]

Given the disparity and arbitrariness in sentencing between the co-defendants and the clear evidence regarding the role race played in Runyon's death sentence, *see* Claim 12, the death sentences should be vacated.

---

[49] Counsel for all defendants in this case have indicated that Draven was not authorized for death because of his mental health history. A decision that Draven's mental health warranted mercy when Runyon's severe mental illness and brain damage did not, is wholly arbitrary.

114

**1963**

**Claim 14:    Runyon's Death Sentence Violates The Eighth Amendment Because He Is Severely Mentally Ill.**

Executing David Runyon, who is severely mentally ill, violates the Eighth Amendment's prohibition against arbitrary, cruel, excessive and unusual punishment. *See Roper v. Simmons*, 543 U.S. 551, 578 (2005) (persons under 18); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (persons with mental retardation); *see also Corcoran v. State*, 774 N.E.2d 495, 502 (Ind. 2002) (Rucker, J., dissenting); *Bryan v. Mullin*, 335 F.3d 1207, 1246-47 (10th Cir. 2003) (Henry, J., concurring in part and dissenting in part); *State v. Nelson*, 173 N.J. 417, 488 (2002) (Zazzali, J., concurring), *State v. Scott*, 748 N.E.2d 11, 19 (Ohio 2001) (Pfeifer, J., dissenting). The prohibition on executing the severely mentally ill is an established norm of international law. *See* http://www.deathpenaltyworldwide.org/mental-illness.cfm (listing and discussing authorities). At the time of Runyon's trial, there was (and still is) a growing consensus that it is unacceptable to impose the death penalty upon severely mentally ill persons.[50] *See generally USA: The execution of mentally ill offenders*, pp. 20-23, Amnesty International Index: AMR 51/003/2006 (Amnesty International Jan. 2006). "[T]here is a profound inconsistency in exempting people with mental retardation from the death penalty while those with serious mental illness remain exposed to it." *Id.* at p.20-21; *see also, Double Tragedies*, National Alliance on Mental Illness and Murder Victims' Families for Human Rights (2009), *available at:* http://www.deathpenaltyinfo.org/files/DoubleTragedies.pdf (calling for treatment and prevention instead of execution for such offenders).

As of 2014, Americans oppose the death penalty for people with mental illness by more than a 2-1 margin. *New Nationwide Poll Shows Americans Oppose Death Penalty in Cases where Person has Mental*

---

[50] Runyon's prior counsel rendered ineffective assistance for failing to adequately investigate Runyon's mental health and raise the issue. *See* Claims 4, 5 & 6. But for this constitutional error, no reasonable juror would have imposed the death penalty against Runyon. Runyon's severe mental illness renders him categorically ineligible for the death penalty.

1964

*Illness By 2-1 Margin*, Prof. Robert Smith, Press Release, Dec. 1, 2014, *available at*

https://drive.google.com/file/d/0B1LFfr8Iqz_7R3dCM2VJbTJiTjVYVDVodjVVSTNJbHgxZWlB

/view. In particular, the death penalty is disfavored for veterans like Runyon who suffer from service-

related mental health issues. *See Porter v. McCollum*, 558 U.S. 30, 43-44 (2009) (defense counsel's failure

to uncover and present during penalty phase any mitigating evidence regarding defendant's mental

health, family background, or military service was deficient); *see also* K. Keys and B. Pelke, *Purple Hearts*

*On Death Row: War Damaged Vets Should Not Be Executed By the State*, AlterNet.org, (Dec. 4, 2009).

In *Atkins*, the Supreme Court held that the Eighth Amendment's ban on excessive and cruel

and unusual punishments prohibits the execution of individuals who suffered from mental retardation.

536 U.S. at 306. The Court explained that the mentally retarded "have diminished capacities to

understand and process information, to communicate, to abstract from mistakes and learn from

experience, to engage in logical reasoning, to control impulses, and to understand the reactions of

others." *Id.* at 318-20. These deficiencies diminish the culpability of individuals to the extent that

neither of the justifications advanced by states in support of the death penalty—retribution and

deterrence—would be served by permitting their execution. *Id.* In addition, "[m]entally retarded

defendants may be less able to give meaningful assistance to their counsel … and their demeanor may

create an unwarranted impression of lack of remorse for their crimes." *Id.* at 320-21.

In *Roper v. Simmons*, the Supreme Court held that the Eighth Amendment bars the execution

of offenders who were juveniles at the time of the crime. 543 U.S. at 578. In reaching this conclusion,

the Court noted that youth results in "impetuous and ill-considered actions and decisions" juveniles

"are more vulnerable" to negative influences. *Id.* at 569 (internal quotation marks omitted).

Implicit in both opinions is that the death penalty is reserved for only the worst of the worst

offenders. "The mentally ill suffer from many of the same limitations that, in Justice Stevens' words

[in *Atkins*], do not warrant an exemption from criminal sanctions, but they do diminish their personal

116

**1965**

culpability." Alan A. Stone, M.D., *Supreme Court Decision Raises Ethical Questions for Psychiatry*, Psychiatric Times, Vol. XIX Issue 9 (Sept. 2002). Mental illness can also cause "impetuous and ill-considered actions" similar to those resulting from youth and it can cause a "flat" or "blunt" affect that may create an impression of remorselessness similar to the mentally retarded. These circumstances exist in this case, where the crime was certainly ill-considered but also, Runyon was unable to assist himself or counsel because he refused to consider a guilty plea in exchange for life. Furthermore, as discussed previously, Runyon's mental illness was inherently disadvantageous because it affected his facial expression and played into the prosecutor's theme of remorselessness. *See* Claim 6.

Finally, Runyon's severe mental illness significantly reduces his moral culpability—placing him outside that class of defendants to whom the death penalty may be constitutionally applied. His mental illness diminishes his capacity to "understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318-20. Thus, Runyon's death sentence violates every standard of decency and is barred by the Eighth Amendment.

**Claim 15:** **Selection Of The Grand Jury And/Or The Petit Jury Venire For Runyon's Case Was Tainted, And Trial Counsel Unreasonably Failed To Request And Examine The Jury Selection Records.**

**A.** **Selection Of The Grand Jury And/Or Petit Jury Venire Jury Was Tainted.**

Runyon alleges that the procedures used to draw the grand jury and/or the petit jury venire were contrary to law in one or more respects, regardless whether the work was done by the Court, by the Court's employees or agents, or by an outside vendor or service provider. A nonexclusive list of errors includes the following: (1) At one or more steps, there was a failure to fully and accurately comply with the procedures described in the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia ("Plan"). (2) At one or more steps, there was a failure to fully and accurately comply with the jury selection provisions of 28 U.S.C.

117

**1966**

§ 1861 *et seq.* (3) Because of a computer error, inaccurate computer program, misconduct, or other reason, the names on the master jury wheels, the qualified jury wheels, the grand jury list, and/or the venire called for petit jury service in Runyon's case were not drawn at random from their immediate parent list. (4) The names on the master jury wheel, the qualified wheel, the grand jury list, and/or the venire called for petit jury service did not represent a fair cross-section of the community. (5) The composition of the grand jury and/or the petit jury venire did not reflect the composition of the relevant Division (Newport News or Norfolk), including as to race, gender, or age. (6) Nonqualifying individuals participated in the grand jury and/or the petit jury venire, meaning (a) individuals participated whose names were not on the voter registration list, the relevant master jury wheel and/or the qualified jury wheel; (b) individuals participated who did not reside in the relevant Division or District at the time of their service; or (c) individuals participated who did not qualify for any other reason.

The information provided by the Court has been inadequate, thus far, to investigate most of these allegations. Runyon is handicapped by the fact that the Court did not give him "[t]he contents of records or papers used by the jury commission or clerk in connection with the jury selection process" as required by 28 U.S.C. §1867(f). It gave him only a portion of that information. For example, the Court provided statistical breakdowns indicating that it has information about the ethnicity of potential jurors, but did not provide it to counsel. It also provided zip codes as the only geographic information. But census data is not compiled by zip code, and the corresponding census block unit can be identified only by providing a street address. Runyon is continuing to try to investigate the issues above using the tools that were provided to him.

**B.** **There Was A Failure To Fully And Accurately Comply With The Jury Selection Plan And The Provisions Of 28 U.S.C. § 1861 *et seq.***

There was a substantial failure to comply with the jury selection procedures in 28 U.S.C. §§1865 and 1866 and the procedures in the Plan for the Random Selection of Grand and Petit Jurors

in the United States District Court for the Eastern District of Virginia ("Jury Selection Plan").

Congress has not defined the term "substantial" in this context, but it is generally accepted that "the

alleged violations must be weighed against the underlying principles of the [Jury Selection and Service]

Act." *United States v. Gregory*, 730 F.2d 692, 699 (11th Cir. 1984). "These principles are: (1) the random

selection of jurors; and (2) the determination of disqualifications, excuses, exemptions, and exclusions

on the basis of objective criteria only." *United States v. Candelaria-Silva*, 166 F.3d 19, 33 (1st Cir. 1999);

*see also United States v. Aguero*, 248 F. Supp. 2d 1150 (S.D. Fla. 2003) (violation is substantial if jury

administrators failed to use objective criteria to disqualify, excuse, exempt, or exclude potential jurors).

In *United States v. Calabrese*, 942 F.2d 218 (3d Cir. 1991), the court described the appropriate inquiry:

> For wrongful exclusions, determining whether there has been a substantial
> violation has both quantitative and qualitative aspects. Quantitatively, a substantial
> violation generally will not be found if the number of errors is small. Qualitatively, the
> inquiry is whether there has been a frustration of the Act's underlying principle of
> exclusions on the basis of objective criteria only.

*Id.* at 227-28 (citation omitted).

Individuals are deemed qualified to serve on a jury unless they come within one of five

statutory criteria in 28 U.S.C. §1865(b), which addresses factors such as citizenship, minimum age,

ability to speak and understand English, mental or physical infirmity, or a prior felony conviction.

Even if qualified, a person may be temporarily excused from service because of hardship or extreme

inconvenience; or excluded from a particular trial because of factors such as an inability to be impartial

in a particular case; or exempted because of factors such as recent prior jury service. 28 U.S.C.

§1866(c), (e). Consistent with 28 U.S.C. §1863, this court's Jury Selection Plan, pp. 5-6, explicitly lists

the permissible factors for disqualification, exemption, or excuse.

To ensure that decisions to exclude individuals from jury service are made only on the basis

of objective criteria, Congress also mandated juror-by-juror record-keeping. On the juror qualification

form, "[t]he clerk shall enter" the basis for disqualification, exemption, or excuse; he also "shall note"

if a person did not appear in response to a jury summons. §1865(a). When a person is disqualified, excused, exempt, or excluded, "the jury commission or clerk shall note ... the specific reason therefor." §1866(d). *See* Jury Selection Plan, p. 5 (clerk "shall note" the "specific grounds" for exemption, excuse, or exclusion; if a person is unqualified, exempted, or excused, the clerk "shall enter" such determination.

According to the records provided to Runyon's collateral counsel, 423 prospective jurors were called for the petit jury in his case. Of these, 180 were disqualified, excused, exempted or excluded; the remaining 243 completed juror questionnaires. These records also reprint the codes that designate 25 grounds for disqualification, exclusion, or exemption, and they show which codes were applied in Runyon's case: ten (5.6%) of the 180 were over age 70; three (1.7%) were deceased; seven (3.9%) had moved out of the jurisdiction; two (1.1%) were emergency personnel; two (1.1%) had job-related or student reasons; two (1.1%) had to care for small children; one (0.6%) was in the military; and five (2.8%) had recent previous service. This accounts for 32 (17.8%) of the 180.

The remaining excluded jurors—the vast majority—were disqualified, excused, exempted, or excluded for reasons that are not identified, and for which there is no evidence of objective criteria. Quantitatively, the numbers are huge: 94 (52.2%) were excluded because of a "court order," and 54 (30%) for no stated reason. The "court order" category is nearly as uninformative as "no reason given," because the records contain no reason why an order was needed or given. It strains credulity to think that there would be objective criteria for excluding more than half of the 180 potential jurors, using reasons that are not on the Court's expansive list of grounds.[51] The most logical inference is that these individuals were excluded using nonobjective criteria.

---

[51] The court's list includes grounds such as "P.O. Return-No Fwd. Address," "unable to contact," and "no transportation," as well as grounds related to things like medical condition, illness, planned vacation, and financial hardship. None of these grounds were cited for any prospective juror in Runyon's case.

120

**1969**

Even if there was an explanation for the removals by court order (such as additional information not provided to collateral counsel), that is not the end of the issue. The exclusion of another one-third of the 180 prospective jurors for no stated reason whatsoever is not only alarming but also raises more doubts that these individuals were excluded using objective criteria. In *United States v. Royal*, 174 F.3d 1, 12 (1st Cir. 1999)—a fair cross-section case involving alleged discrimination in the selection of the jury—the court said it was troubled by the fact that ten prospective jurors were excused without a recorded reason. In Runyon's case, the number excused without a recorded reason was more than five times larger.

Quantitatively, the "court order" and "no reason given" categories account for 148 (82.2%) of the potential jurors who were disqualified, excluded, or exempt, without any indication of the reason. This is not the kind of "play in the joints of the jury-selection process [that] is necessary in order to accommodate the practical problems of judicial administration." *Hamling v. United States*, 418 U.S. 87, 138 (1974). Qualitatively, these unexplained exclusions frustrated the Act's underlying principle of exclusions on the basis of objective criteria only.

Moreover, there is a racial component to these exclusions. The group of 423 jurors originally called for this case included two Native Americans; 100% of them were excluded—one by court order and one for no reason. The group of 423 included sixteen Asians—an important population because Runyon is Asian. More than half of them were excluded—five by court order, three for no reason, and one for an unobjectionable reason. No other group was decimated at this level.

Section 1867(d) requires a sworn statement if a party moves to challenge compliance with the section procedures. In an abundance of caution, Runyon's counsel has included such a sworn statement as Exhibit 39.

## C.    A Person Who Did Not Qualify Participated In Runyon's Trial

Juror 84 has two different identities. She may be two separate people, meaning that one of those individuals was not a qualified juror and her participation not only was illegal but tainted the proceedings. There may be a more benign explanation, but it cannot be resolved without additional information.

On the Court's Strike List A (ECF 424, sealed), Juror 84 is identified as S.G. A person who identified herself orally at trial as S.G. also participated in voir dire on the first day, Tr. 6/30/2009, page 36. She was struck during the seating of the jury. In addition, Juror 84's juror number, which the Court assigned to potential jurors in alphabetical order, falls in the middle of the G's, right between Juror 82 and Juror 85. But no person named S.G. completed a juror questionnaire. Moreover, there are 54 people on the Norfolk 2007 Master Wheel who have the same last name as S.G., and 30 of them are also on the Norfolk 2007 Qualified Wheel. But none of them has the same first name as S.G.

The questionnaire marked "Juror 84" was filled out by a person who identified herself as S.R. That name appears on both the Norfolk 2007 Master Wheel and Norfolk 2007 Qualified Wheel (100760415), and that participant number is listed in the materials provided to counsel. But neither the trial transcript, nor the strike list, nor any similar trial record shows actual participation by anyone named S.R. Moreover, the Court called jurors for oral voir dire alphabetically, and the potential jurors whose names were in the second half of the alphabet were not called until the second day, when the alternate jurors were selected.

The jury wheels and juror questionnaire identify S.R. as a white female who lived in Virginia Beach. The information provided by the Court similarly indicates that a person with S.R.'s participant number was a white female. It further shows that the person with S.R.'s participant number was 41 years old when the participant number table was generated, which means she would have been 34 or 35 years old at the time of trial. Neither the strike list nor the trial transcript contains comparable

122

**1971**

demographic information about S.G., so there is no data about race or age that is available for comparison. Nothing in S.R.'s juror questionnaire connects her to anyone with the same last name as S.G.

It is possible that S.G. and S.R. are the same person, and that she either married or divorced and changed her name. But the pattern here does not fit that scenario because if Juror 84 was just one person, she flip-flopped back and forth, using the name S.R. when she registered to vote, switching to S.G. on whatever source document the Court used to assign juror numbers, switching back to S.R. when she filled out the juror questionnaire, flipping again to S.G. during oral voir dire, and also using the name S.G. on whatever source document the Court used to compile the strike list. But this cannot be determined without additional information.

Based on his examination of the records to date, Runyon does not rule out the possibility that there may be questions about the identity of other members of the venire, but this cannot be determined without additional information.

**D.      Trial Counsel Unreasonably Failed To Request Or Examine Any Jury Selection Records, In Violation Of The Sixth Amendment.**

Under 28 U.S.C. § 1867(f), trial counsel have an essentially unqualified right to inspect and copy the relevant jury lists in order to determine *whether* the venire was drawn in a manner that complied with statutory and constitutional law. *See Test v. United States*, 420 U.S. 28, 29-30 (1975) (per curiam). There is no burden that counsel must meet. Investigating the records and procedures used for jury selection is a standard component of competent performance by defense counsel in a capital case:

> Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender), whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge. Such challenges may include challenges to the selection of the grand jury and grand jury forepersons as well as to the selection of the petit jury venire.

ABA Guideline 10.10.2, *reprinted* at 31 Hofstra L. Rev. 1049.

Runyon's counsel unreasonably made no effort to request or examine the jury selection records in Runyon's case. Their failure to do so was a product of unreasonable ignorance or sloppiness, not strategy. If trial counsel had performed competently, there is a reasonable probability of a different, untainted jury and a different result.

**Claim 16:     The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes, And Trial Counsel Unreasonably Failed To Object To These Unconstitutional Strikes.**

Of the qualified venire members from which the jury was selected, the prosecution used peremptory strikes to remove 70 percent of the African-Americans who could have served. This was 100 percent of all the strikes exercised against persons of color. The prosecution also discriminated on the basis of gender, by overwhelmingly using its peremptory strikes against women. These discriminatory uses of peremptory strikes violated the Equal Protection Clause of the Fifth Amendment. Defense counsel's failure to object to either or both forms of discrimination violated the Sixth Amendment right to effective assistance of counsel.

**A.     The Relevant Law.**

A defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson v. Kentucky*, 476 U.S. 79, 85-86 (1986). Particularly, this means that the "Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." *Id.* at 89. This protection is necessary, because discriminatory exclusions harm not only the rights of defendants, but also the rights of the excluded jurors and the integrity of the criminal justice system as a whole. *Id.* Indeed, because the harm does not inure solely to the defendant, but also to other parties and even the system as a whole, the defendant need not be of the same race as the excluded jurors to state an Equal Protection claim, and has third-party standing to raise it. *Powers v. Ohio*, 499 U.S. 400 (1991). The discriminatory exclusion of potential jurors is so inimical to the

124

**1973**

administration of justice that the ban on exercising peremptory challenges on such a basis extends to the defendant, *Georgia v. McCollum*, 505 U.S. 42, 54-55 (1992), as well as to civil proceedings, *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 628-29 (1991). *See also Rose v. Mitchell*, 443 U.S. 545, 555-56 (1979) (noting that Constitution bars racial discrimination in grand jury selection procedures, and stating "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice"). As the Court summed up in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994):

> Discrimination in jury selection, whether based on race or gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings. . . . The community is harmed by the [striking party's] participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.

*Id.* at 140.

Moreover, intentional discrimination in the exercise of peremptory strikes is "structural error" and is therefore exempt from harmless-error review. *See Batson*, 476 U.S. at 100; *Miller-El v. Dretke (Miller-El II)*, 545 U.S. 231, 251-52 (2005); *Winston v. Boatwright*, 649 F.3d 618, 632-34 (7th Cir. 2011) (recognizing as structural error violations of *Georgia v. McCollum*); *Williams v. Woodford*, 396 F.3d 1059, 1069-70 (9th Cir. 2005) ("A *Batson* violation is structural error for which prejudice is generally presumed"); *Tankleff v. Senkowski*, 135 F.3d 235, 248 (2d Cir. 1998) (quoting *Powers v. Ohio*, 499 U.S. 400 (1991) ("Because the effects of racial discrimination during voir dire 'may persist through the whole course of the trial proceedings,' we hold that a *Batson/Powers* claim is a structural error that is not subject to harmless error review."). The Fourth Circuit has similarly eschewed harmless error analysis of a *Batson* claim, and has noted decisions of other circuits that have done the same. *See United States v. Legrand*, 483 Fed. App'x 771, 777 n.2 (4th Cir. 2012) (unpublished) (citing *Winston, supra; Forrest*

125

**1974**

*v. Beloit Corp.*, 424 F.3d 344, 349 (3d Cir. 2005)); *Tankleff, supra; Ford v. Norris*, 67 F.3d 162, 170-71 (8th Cir. 1995); *United States v. Thompson*, 827 F.2d 1254, 1261 (9th Cir. 1987).

The now-familiar test for determining whether the rule set forth in *Batson* has been violated involves three steps: (1) the defendant first has the burden to establish a *prima facie* case of discrimination in the use of the prosecution's peremptory strikes; (2) the burden shifts to the prosecution to offer a race-neutral (or gender-neutral) explanation for its peremptory strikes; and (3) the burden returns to the defendant to establish that any neutral explanations offered are pretextual, and that the prosecution in fact is discriminating on an impermissible basis. *Miller-El II*, 545 U.S. at 267-68. This is not simply a matter of comparing the numbers of jurors of a particular race or gender who have been struck, and even one juror struck for racially discriminatory reasons violates the rule in *Batson* and requires vacation of the conviction. *See also United States v. Clemons*, 843 F.2d 741, 747 (3d Cir. 1988) ("Striking a single black juror could constitute a *prima facie* case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks."). That said, disproportionate numbers of strikes are strong evidence giving rise to a *prima facie* case of racial discrimination. *See, e.g., Miller-El v. Cockrell (Miller-El I)*, 537 U.S. 322, 342 (2003) ("the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when … [they] used their peremptory strikes to exclude 91% of the eligible African-American venire members … [and] happenstance is unlikely to produce this disparity); *Batson*, 476 U.S. at 93 ("'seriously disproportionate exclusion of Negroes from jury venires … is itself such an unequal application of the law … as to show intentional discrimination'") (quoting *Washington v. Davis*, 426 U.S. 229, 241-42 (1976) (internal citation and quotation marks omitted)). *Miller-El II*, 545 U.S. at 240 ("The numbers describing the prosecution's use of peremptories are remarkable.")

126

**1975**

### 1.    The Prosecution Engaged In Racial Discrimination In Its Exercise Of Peremptory Strikes.

Of the 243 venire members who completed questionnaires, the Court called 62 members for voir dire on the first day. Runyon refers to this group as the "pseudovenire" because it constituted the total pool of potential jurors who appeared at court and participated in voir dire for seating the jury, and the jury was seated at the end of the first day, solely from this group.[52] Of the 62 individuals in the pseudovenire, 10 were African-American, 1 was Asian, 50 were Caucasian, and 1 offered no response when asked about race on the questionnaire. The pseudovenire was drawn roughly in alphabetical order from the top half of the group of potential jurors that all counsel agreed should be called for questioning. ECF No. 236 (sealed). Ten of these 62 individuals were excluded for cause; none of them were African-American. The Court then announced that it would seat a jury without the voir dire of any additional prospective jurors because the remaining 52 members were sufficient to afford each side the maximum statutory 20 peremptory strikes if it chose to use them, with at least 12 left to seat as jurors. The 52 members consisted of 10 African-Americans, 1 Asian, and 41 Caucasians.

The prosecution proceeded to strike 7 of the 10 African-Americans, even though blacks constituted only 19 percent of the available jurors after exclusions for cause.[53] In other words, it struck 70 percent of the available and qualified black members. The prosecution was responsible for 100 percent of the strikes against African-Americans; the defense struck none. The prevalence of strikes

---

[52] The term "venire" ordinarily refers to the entire group of prospective jurors who are summoned for a trial and from which the jury is selected. In this sense, the venire in Runyon's case could consist of 256 people who were assigned juror numbers. In some cases, courts use the word "venire" to refer to the slightly smaller group of prospective jurors who actually show up at the court and complete a juror questionnaire. Under that definition, the venire in Runyon's case could consist of 243 people.

[53] The 10 identifiable African-Americans in the pseudovenire were potential jurors No. 14, 15, 31, 40, 46, 63, 70, 81, 95, and 116. The 7 African-Americans who were peremptorily struck by the government were Nos. 15, 31, 40, 46, 63, 81, and 116.

127

**1976**

used against African-Americans was sufficient to state a *prima facie* challenge under *Batson*. *Johnson v. California*, 545 U.S. 162, 170 (2005) ("a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred").

Corroborating this statistical evidence is the fact that at the time of voir dire, the prosecutors intended to put into evidence (and did put into evidence) a racially pejorative videotape that showed police officers interrogating Runyon—who is Asian—and repeatedly invoking his Asian heritage as a reason for him to confess. This inflammatory videotape conveyed "stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act," and the court of appeals was adamant that "the officers' comments referencing Runyon's ethnicity and religion . . . had no place at this sentencing proceeding." *Runyon*, 707 F.3d at 493.[54] On brief, the prosecutors engaged in the same kind of inappropriate racial stereotyping. They argued to the Fourth Circuit that their use of the videotape was "not problematic" because it did not present a *bad* stereotype of Asians; it presented a *good* one that purportedly appealed to "positive aspects of [Runyon's] identity." *Id.* at 493-94. The court of appeals rejected this tone-deaf rationale, holding that the statements on the videotape were designed to inflame racial prejudice and "'degrade the administration of justice.'" *Id.* at 494 (quoting *Battle v. United States*, 209 U.S. 36, 39 (1908)).[55] The prosecutors' intent to use, and their racially stereotyped defense of, the videotape indicate a degree of animosity toward racial minorities that adds weight to Runyon's statistical evidence. In aggregate, this evidence makes a significant showing of intentional discrimination in selection of the jury.

---

[54] The Fourth Circuit's opinion referred to ethnicity, but the United States classifies "Asian" as a race rather than an ethnicity. *See* https:///www.census.gov/topics/population/race/about.html.

[55] Although the court of appeals held that the video was unlawfully admitted in the penalty phase of trial, it concluded that this error was harmless.

2.      The Prosecution Engaged In Gender Discrimination In Its Exercise Of Peremptory Strikes.

Independent of their exercise of racially discriminatory strikes, the prosecutors also engaged in a pattern of strikes based on the gender of the prospective jurors. The government is not only barred from exercising peremptory strikes on the basis of race, but also may not exclude potential jurors because of their gender. "[G]ender, like race, is an unconstitutional proxy for juror competence and impartiality." *J.E.B.*, 511 U.S. at 129. Though women were long banned from jury service in the United States because they were considered "to be too fragile and virginal," the Court noted the only interest the state could conceivably have in allowing its officers to use peremptory strikes to ban all persons of a particular gender from a jury was whether "peremptory challenges based on gender stereotypes provide substantial aid to a litigant's effort to secure a fair and impartial jury." *Id.* at 132-36. When confronted with the idea that one gender may be more sympathetic to one side than the other, the Court noted it would "not accept as a defense to gender-based peremptory challenges 'the very stereotype the law condemns.'" *Id.* at 138 (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)). Indeed, "[e]qual opportunity to participate in the fair administration of justice is fundamental to our democratic system," and this ability "reaffirms the promise of equality under the law—that all citizens, regardless of race, ethnicity, or gender, have the chance to take part directly in our democracy." *Id.* at 145-46.

In Runyon's case, the prosecution exercised its peremptory strikes in a manner that discriminated on the basis of gender, by overwhelmingly using them against women. After exclusions for cause, the group of 52 potential jurors was 56 percent women (29 members) and 44 percent men (23 members). The government then used 68 percent of its peremptory strikes (13 of 19) to remove

129

**1978**

women and less than half that amount—32 percent (6 of 19)—to remove men.[56] This is sufficient to create a *prima facie* case that the government not only was discriminating on the basis of race, but also on the basis of gender in its use of peremptory strikes, in violation of the Equal Protection Clause.

**B.      Trial Counsel Unreasonably Failed To Object To The Prosecution's Discriminatory Exercise Of Peremptory Strikes.**

Trial counsel failed to object when the prosecution struck 70 percent of the African-American members of the pseudovenire. Counsel also failed to object when the prosecutors used almost 70 percent of their peremptory strikes against women, removing them in a significantly greater proportion than they appeared in the group of qualified potential jurors. Because there was no objection, the prosecution was never called upon to justify these strikes, and the Court never determined whether the strikes were motivated by racial, ethnic, or gender-based stereotypes. The "rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El II*, 545 U.S. at 251-52. Counsel's failure to challenge the government's peremptory strikes under *Batson* constitutes deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984).

Runyon satisfies the *Strickland* performance prong because reasonably competent capital defense counsel would have been aware of the importance of *Batson* and related cases, and the necessity of raising such pertinent objections. Counsel's "passivity in light of an obvious pattern of strikes against minority prospective jurors [can fall] below an objective standard of reasonableness and amount[] to deficient performance." *Drain v. Woods*, 902 F. Supp.2d 1006, 1025-26 (E.D. Mich. 2012; *see Richardson v. Hardy*, 855 F. Supp.2d 809, 823 n.3 (N.D. Ill. 2012) (failure to assert *Batson* claim with an appropriate record "unquestionably fell below a standard of objective reasonableness"); *see also*

---

[56] The 13 females struck by the prosecution were potential jurors No. 7, 15, 18, 28, 31, 40, 46, 52, 63, 73, 81, 97, and 116. The 6 males struck by the prosecution were potential jurors No. 24, 35, 66, 91, 100, and 109.

130

**1979**

*Government of the Virgin Islands v. Forte*, 865 F.2d 59 (3d Cir. 1989) (defense counsel's failure to object to prosecutor's use of peremptory challenges to excuse white prospective jurors in prosecution of white male for rape of black female was unreasonable under prevailing professional standards); *State v. Williams*, 679 So.2d 275 (Ala. Crim. App. 1996) (new trial granted where counsel failed to make *Batson* objection even though *prima facie* case of racial discrimination existed). The fact that Runyon's counsel did not object reflects a failure "to make the adversarial testing process work." *Strickland*, 466 U.S. at 690.

Prosecutorial zeal in removing jurors who are believed to be unlikely to return a sentence of death is a well-recognized phenomenon in death penalty cases, so much so that the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter "ABA Guidelines") has specifically warned about such practices since at least 2003:

> Bearing in mind that the history of capital punishment in this country is intimately bound up with its history of race relations, counsel should determine whether discrimination is involved in the jury selection process. . . . Death qualification often results in the removal of more prospective jurors who are members of minority groups than those who are white, because minority jurors are more likely to express reservations about the death penalty. Neither race nor gender may form a basis for peremptory challenges, but a recent empirical analysis of capital murder cases supports the conclusion that "discrimination in the use of peremptory challenges on the basis of race and gender . . . is widespread." Counsel should listen closely to the prosecutor's voir dire, challenges for cause and reasons for exercising peremptory challenges, make appropriate objections, and ensure that all information critical to a discrimination claim is preserved on the record.

ABA Guidelines, Guideline 10.10.2 and Commentary, *reprinted in* 31 Hofstra L. Rev. 913, 1053-54 (2003).[57]

As noted previously, a *Batson* violation is structural error. Unlike trial rights, structural rights are "'basic protection[s]' whose precise effects are unmeasurable, but without which a criminal trial

---

[57] The "[p]revailing norms of practice as reflected in American Bar Association standards . . . are guides to determining what is reasonable," though they do not, of course, reflect all reasonable options available to trial counsel. *Strickland*, 466 U.S. at 688 (1984).

131

cannot reliably serve its function." *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). Structural error thus has "consequences that are necessarily unquantifiable and indeterminate." *Id.*; *see United States v. González-Huerta*, 403 F.3d 727, 734 (10th Cir. 2005) ("[I]f, as a categorical matter, a court is capable of finding that the error caused prejudice upon reviewing the record, then that class of errors is not structural."). When trial counsel's deficient performance results in a structural error, the prejudice prong of a *Strickland* claim can be presumed. Both the majority and dissent acknowledged this principle in an en banc Fourth Circuit decision. "[T]he prejudice component of the *Strickland* analysis may be presumed if the nature of the deficient performance is that of a structural error." *Bell v. Jarvis*, 236 F.3d 149, 165 (4th Cir. 2000) (en banc majority); "[A]s the majority properly recognizes, when, as here, the deficient performance constitutes structural error 'the prejudice component of the *Strickland* analysis may be presumed.'" *Id.* at 180 (en banc dissent). [58]

Assuming this Court finds that trial counsel's failure to object to the *Batson* violations satisfies the deficient-performance prong of a *Strickland* claim, it should presume that prejudice resulted from trial counsel's failure to safeguard the fundamental fairness of the jury composition. *Bell, supra; see also Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001) (a "fundamental premise of *Batson* is that criminal defendants and excluded jurors alike are denied equal protection of the laws when the trial jury is constructed in a racially discriminatory manner. The remedy for such an equal protection violation is reversal of the conviction without regard to whether we perceive the defendant to be actually innocent or guilty.").

---

[58] In *United States v. King*, 36 F. Supp.2d 705, 710 (E.D. Va. 1999), this Court wrote "that *Batson* errors are not presumptively prejudicial when raised in an ineffective assistance of counsel claim." That conclusion conflicts with the Fourth Circuit's later en banc opinion in *Bell*.

132

**1981**

**Claim 17:** **The Voir Dire Conducted In This Case Violated Runyon's Fifth and Sixth Amendment Rights To A Fair Trial And Impartial Jury, And Trial Counsel Unreasonably Failed To Object.**

**A.     The Voir Dire Was Constitutionally Inadequate.**

Voir dire "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored" *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Because this function is so important, the Supreme Court has spoken extensively about the imperative of adequate voir dire:

> "[V]oir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)). . . . Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. *Dennis v. United States*, 339 U.S. 162, 171-72 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950). . . . Hence, "[t]he exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness." *Aldridge v. United States*, 283 U.S. 308, 310 (1931).

*Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992).

As Runyon noted elsewhere, the jury in his case was selected from a pseudovenire of 62 potential jurors who had completed juror questionnaires and whose names appeared on the upper half of List 1—the list of individuals that all parties agreed should be called for voir dire. ECF Nos. 210 (sealed), 236 (sealed). In Claim S2, Runyon alleges that the questionnaire used in this case contained flaws that precluded the exclusion of prospective jurors without further inquiry, and he incorporates that allegation here by reference. Of particular importance, the prospective jurors were given no guidance before completing their questionnaires about the standards and procedures that would govern their decisions at trial, and they suffered nearly the same lack of information in responding to the Court's oral voir dire questions.

133

**1982**

The oral voir dire was minimal in comparison to the typical capital trial, and the scope of questioning was remarkably limited.[59] By way of illustration, the Court stated in its introductory voir dire remarks that one of the charges against Runyon was bank robbery, but it did not identify the institution that he was accused of robbing. In questioning the potential jurors, the Court made only one inquiry related to that charge: "Have you or any member of your immediate family that you are aware of been employed by or done business with the Oyster Point Branch of the Langley Federal Credit Union in Newport News?" Tr. 123, 6/30/09. This question is so narrow that it would not elicit a response from potential jurors who were members of the credit union but who transacted business at a different branch—members whose concern about a crime against their member-owned financial cooperative might be a source of bias.[60]

All questions were asked by the Court. They were collective: the court asked yes/no questions, addressing them to the entire group of 62, and it instructed jurors to stand if their answer to a question was yes (or no, depending on the question). In other words, if the court wanted to ask jurors whether there was any reason they could not be impartial, it did not look directly at each individual juror and ask her if there was a reason she could not be impartial; instead, it asked the jurors collectively whether

---

[59] The transcript does not show the time the court was called into session on June 30. The potential jurors entered the courtroom at Tr. 10, and the court conducted voir dire collectively until Tr. 61, at which point it sent the prospective jurors back to the jury room. It then engaged in colloquy with counsel, which included the strikes of some individuals for cause. At 12:20 p.m., the court released most of the prospective jurors for lunch, but it retained 17 who had stood in response to questions that required individual follow-up, such as their knowledge about the case based on press accounts. The court conducted the individual follow-up voir dire from Tr. 71 to Tr. 107. After additional colloquy with counsel, the court conducted further voir dire, again collectively, from Tr. 121 to Tr. 125, and struck some additional jurors for cause. There was another colloquy from Tr. 125 to Tr. 127, and then the jury was picked from Tr. 127 to Tr. 129. After additional colloquy, from Tr. 130 to 135, proceedings concluded at 6:03 p.m.

[60] Langley Federal Credit Union is a large institution. It presently has 19 locations stretching from Williamsburg to Virginia Beach, and more than 225,000 members.

134

**1983**

there was any reason they could not be impartial, and said that if their answer was "yes," they should stand. The court asked follow-up questions only of those who stood.

By this process, 21 of the 62 potential jurors completed the entire oral voir dire without uttering a word, standing, or otherwise interacting with the judge.[61] This procedure violated Runyon's Fifth and Sixth Amendment rights to a fair trial and impartial jury because silence is one of the known tools by which biased jurors avoid being struck. *See, e.g., Williams v. Netherland*, 181 F. Supp. 2d 604 (E.D. Va. 2002) (vacating death sentence where juror was silent in response to certain voir dire questions, thus concealing the facts that she was previously married to an important prosecution witness, and that the capital prosecutor had been her attorney at the divorce), *aff'd sub nom Williams v. True*, 39 Fed. App'x 830 (4th Cir. 2002); *Consolidated Gas & Equipment Co. of America v. Carver*, 257 F.2d 111 (10th Cir. 1958) (awarding new trial in personal injury case where juror, who had an action pending for similar injuries, remained silent about his circumstance when asked in voir dire).

Juror 124, for example, remained silent when the court asked whether any juror was employed by or had done business with Langley Federal Credit Union. The said nothing, even though her employer clearly came under the credit union's umbrella.[62] By remaining silent during oral voir dire,

---

[61] The 21 prospective jurors who did not answer any questions, either orally or by standing, break down as follows:

Jurors No. 23, 68, 70, and 98 were seated at trial.

Jurors No. 7, 18, 31, 35, 46, 63, 66, 91, 109, and 116 were peremptorily struck by the prosecution.

Jurors No. 32, 34, 51, 78, 117, and 119 were peremptorily struck by the defense.

Juror No. 54 was neither seated nor struck. He was carried over to the following day to participate in the selection of alternate jurors.

[62] The juror's jury questionnaire revealed the name of her employer and the nature of her work. The employer's official internet address automatically redirects to a web site that is marked Copyright © 2016 Langley Federal Credit Union, and describes the juror's employer as an affiliate of the credit union. According to the domain look-up service http://www.whois.com, the credit union is the registrar for the employer's domain.

Juror 124 was able to conceal information about her relationship with the credit union and avoid being struck.

When the court's questions all are addressed collectively to a group of more than 60 people, rather than to the individual juror, the opportunity for concealment by silence is especially great. Venire members who are part of such a group, and who do not speak or stand or otherwise call attention to themselves, are the ones least likely to be seen and studied by the trial judge, whose attention will naturally and necessarily be drawn to the potential jurors who *do* speak and *do* stand up. Determinations of bias are supposed to turn largely on the trial judge's assessments of demeanor and credibility, but potential jurors who call no attention to themselves are the least likely to be observed and scrutinized to evaluate their demeanor and credibility. Voir dire is inadequate when it is performed in a manner that allows 34 percent of the jury pool to remain silent, and largely unnoticed, for the entirety of the voir dire. Such voir dire does not protect the integrity of the jury.

Voir dire was inadequate in Runyon's case in other respects. An important and necessary subject of inquiry in any capital case is whether, in the first phase of trial, the potential jurors can make a decision about the defendant's guilt or innocence without considering the sentencing options that might follow. The court did not ask the jurors that question in Runyon's case, although it intended to do so. Instead, it asked:

> THE COURT: Now do you understand that as a juror, however, your first duty is to determine whether defendant is guilty or not guilty without consideration of any possible penalty? Is there anyone who doesn't understand that? If so, please stand.
> (No response.)

Tr. 59, 6/30/09. A careful reading shows that in this question, the court asked the potential jurors only whether they "understood" the law, not whether they could or would comply with that law. To the extent their collective silence can be deemed to be an adequate answer, the potential jurors must be presumed to have answered the question the court actually asked, not the question the court may have wanted to ask.

136

**1985**

The court made the same error again when it purported to ask four questions required by

*Morgan*:

> THE COURT: If your answer is "no" to the following question, please stand.
>
> THE COURT: Do you understand that the law never requires that a person be sentenced to death?
>
> (No response.)
>
> THE COURT: Again if your answer is "no" to any of the following questions, please stand.
>
> THE COURT: Do you understand that the law never requires a person to be sentenced to death even if they have been convicted of being the triggerman in a murder-for-hire case?
>
> (No response.)
>
> THE COURT: Do you understand that the law never requires a person to be sentenced to death even if someone who murders a person by shooting him in the course of a carjacking is so convicted?
>
> (No response.)
>
> THE COURT: Do you understand that the law never requires that a person be sentenced to death even if the person is convicted of murdering a person by shooting him in the course of a bank robbery?
>
> (No response.)

Tr. 123-24, 6/30/09. In each case, the jurors were again asked only whether they "understood"

the law, not whether they could or would obey that law.

The court easily could have posed questions that properly asked about compliance as well as

understanding. It certainly knew how to do so, and in fact it did so in other instances. For example:

> Is there anyone who doesn't understand that, as indicated, if it is appropriate, in the second stage it would be your duty to listen to further evidence and consider the court's instructions and make a determination whether or not to vote for the death penalty? *Do any of you feel you cannot do that?* If so, please stand.

Tr. 59, 6/30/09 (emphasis added).

Because the questions the court failed to ask were essential to the qualification of an impartial

jury for purposes of guilt and/or punishment, Runyon's conviction and sentence were obtained in

violation of the constitution and must be vacated.

137

**1986**

**B.**     **Trial Counsel Rendered Ineffective Assistance Regarding Voir Dire.**

Runyon recognizes that trial counsel filed pretrial motions regarding voir dire, and counsel opposed the court's general procedure for voir dire. But there are additional errors and objections that counsel unreasonably failed to raise, in violation of Runyon's Sixth Amendment right to the effective assistance of counsel.

First, failed to review the juror questionnaires with care for evidence of bias and failed to conduct simple internet research to identify such potential bias.

Second, as noted in Claim S2, trial counsel failed to object to the court's failure to give prospective jurors guidance about the standards and procedures that would govern their decisions at trial, and counsel unreasonably failed to make a similar objection to the court's failure to provide this information prior to the oral voir dire.

Third, trial counsel unreasonably failed to object when the trial court conducted oral voir dire in a manner that permitted 34 percent of the prospective jurors to complete the entire voir dire without responding to any questions, except by remaining silent and remaining still. No one in these circumstances could tell whether a prospective juror's silence meant "no" or meant "I choose not to answer that question." As a result, no one can have confidence that the jurors who were seated without responding to any questions except by silence and stillness were qualified for service. No one can have confidence that the court took cognizance of those prospective jurors at all, much less that it was able to assess their demeanor and credibility.

Fourth, defense counsel unreasonably failed to object to the court's failure to ask five essential questions on voir dire—one question about the ability to be impartial in making a decision about guilt or innocence, and four questions about sentencing that were required by *Morgan*. Trial counsel knew or should have known that the questions posed by the court asked whether the prospective jurors understood the law, but did not ask whether the prospective jurors would comply with the law. To

138

**1987**

the extent trial counsel themselves may have proposed such questions, they were doubly ineffective. Any speaker of plain English would recognize that when one asks a person whether he "understands" the law, one is not asking whether the person will obey that law.

Because they failed to perform competently in each of the three ways just identified, either separately or together, defense counsel's performance fell below the prevailing professional norms for a capital case. There is a reasonable probability that absent counsel's deficient performance, the result would have been different either as to guilt/innocence or punishment.

**Claim S2:** **The Trial Court Unlawfully Excluded The Potential Jurors Based Solely On Their Juror Questionnaire Responses Without Voir Dire, And Trial Counsel Unreasonably Failed To Object And Unreasonably Participated.**

Amended Claim S2 was filed under seal by the Clerk on this date, ECF No. 508. Runyon's motion for leave to seal this claim also was filed on this date, ECF No. 507.

139

**1988**

## **Prayer for Relief**

Wherefore, David Runyon respectfully requests the Court:

(a)     direct the United States to answer this Amended § 2255 Motion (2255 Rule 5(a));

(b)     permit Runyon to file a reply to the amended answer (2255 Rule 5(e));

(c)     provide an opportunity for discovery and expansion of the record (2255 Rule 6 & 7);

(d)     conduct an evidentiary hearing on claims involving material factual disputes (2255 Rule 8);

(e)     vacate the criminal judgment entered against him, grant him a new trial and/or vacate, set aside, or correct the sentence imposed; and,

(f)     grant all other appropriate relief.

<div align="right">Respectfully Submitted,</div>

<div align="right">_____/s/_____</div>

Dana Hansen Chavis, *pro hac vice*  
Federal Defender Services  
 of Eastern Tennessee, Inc.  
800 S. Gay Street, Suite 2400  
Knoxville, TN 37929  
Telephone (865) 637-7979  
Dana_Hansen@fd.org

Michele J. Brace, VSB No. 36748  
Virginia Capital Representation  
 Resource Center  
2421 Ivy Road, Suite 301  
Charlottesville, VA 22903  
Telephone (434) 817-2970  
Mbrace@mindsort.com

Dated: February 4, 2016

**1989**

## Verification

The undersigned, being authorized to sign for the movant, declares under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Executed on this 4th day of February, 2016.

_____/s/_____

Michele J. Brace
Attorney for David Runyon

## Certificate of Service

I hereby certify that on February 4, 2016, I have electronically filed the foregoing Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following.

Brian J. Samuels
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Plaza Three
Newport News, VA 23606
(757) 591-4032
Brian.Samuels@usdoj.gov

Lisa Rae McKeel
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Plaza Three
Newport News, VA 23606
(757) 591-4040
Lisa.McKeel@usdoj.gov

Jeffrey A. Zick
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Commons, Suite 300
Newport News, VA 23606
(757) 591-4000
Jeffrey.Zick@usdoj.gov

_____/S/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Phone: (434) 871-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

141

**1990**

Exhibit 1 to the initial §2255 Motion, ECF No. 478-1, is not relevant to this Amended §2255 Motion. This page is a placeholder to maintain the numbering continuity of the exhibits between the two documents.

# James R. Merikangas, M.D., L.L.C.
*Neurology, Psychiatry, Neuropsychiatry*

September 25, 2015

Dana C. Hansen Chavis
Assistant Federal Community defender
Federal Defender Services of Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, Tennessee 37929-9714

RE: David Runyon

Dear Ms. Chavis,

I first examined David Runyon on July 29, 2009 in Norfolk, Virginia before his trial. My brief report of that examination is attached. I did not get to testify at that time, but if I had, I would have testified that in my expert opinion he was a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process.

I have had the opportunity to examine voluminous records, reports and affidavits and interview notes since that time, including the following:

1. Affidavit of Sheila M. Cronin.
2. Social history of David Anthony Runyon, prepared by Sheila Cronin, Mitigation Specialist, dated August 8, 2009.
3. Memo to counsel- report of telephone call to Jon Babineau and Lawrence Woodward re: David Harold Runyon (adoptive Dad), dated August 21, 2008.
4. David Dombrowski (biological father) trial testimony.
5. Suk Cha Runyon (mother) trial testimony.
6. Mark Runyon (brother) trial testimony.
7. Suk Cha Runyon medical records.
8. David Dombrowski progress notes dated March 9, 2009 from VA clinic.
9. Charles Ferguson, high-school friend, interview dated April 4, 2009; trial testimony.
10. Robert Lockwood, childhood friend, interview dated June 14, 2009; trial testimony.

EXHIBIT 2

4938 Hampden Lane, #428 • Bethesda, MD 20814 • *phone:* (301) 654-1934 • *fax:* (301) 654-1834 • *email:* neuropsych2001@hotmail.com

**1992**

11. Michael Grbic, friend of David's and Michael's parents Andro & Sharon Grbic.
12. Kansas Department of Corrections, employee records.
13. Letter from former employer, Premiere Palace.
14. Letter from David, regarding his voluntary re-enlistment in the Army.
15. Thomas Preston, Army friend, interview dated October 4, 2008.
16. Scott Linker, former brother-in-law interview and trial testimony
17. Robert & Debbie Seeger, friends, interview dated November 9, 2008.
18. Larry Eaglebear, Army friend, interview dated November 22, 2008, trial testimony.
19. Edgar Hannaman, Army supervisor, interview.
20. Maria Runyon, ex-wife, interview dated April 26, 2008; trial testimony.
21. Robin & Jim Carol, friends of ex-wife, Maria & David, interview dated April 27, 2008.
22. Captain Jeffrey Harris, Fayetteville, Georgia, Police Department; David's supervisor, interview dated August 31, 2008.
23. Fayetteville Police Department employment records, including disciplinary records.
24. Robin Carroll, friend of Maria Runyon, interview dated January 27, 2009.
25. Thomas Kumoroswski, friend and coworker, interview dated June 10, 2009; trial testimony.
26. Phyllis Provost, Ph.D., friend; ex-wife of Tom Kumorowski, interview dated June 14, 2009; trial testimony.
27. Police affidavit from Maria Runyon, regarding domestic violence incident on February 7, 2001.
28. David Runyon resume.
29. Virginia Pina, former girlfriend, interview dated December 27, 2008; trial testimony.
30. Handwritten letter from David to Sarah, his girlfriend at the time of his arrest. Estimated the letter was written 2006-2007.
31. Chad Costa, friend, interview dated April 8, 2009.
32. Clinical trial drug list, compiled by trial mitigation specialist, Sheila Cronin; dated April 8, 2009.
33. Statement of George Koski, who sold David a gun.
34. School records.
35. Medical records.
36. Military records.
37. Mental health evaluations, summary of prior testing.
38. Evan Nelson, Ph.D.
39. Raymond Patterson, M.D. evaluation.

EXHIBIT 2

**1993**

40. Paul Montalbano, Ph.D.
41. Allan Mirsky, Ph.D.
42. James Merikangas, M.D., preliminary report.
43. Presentence report – physical & mental health excerpt.
44. David Runyon writings from journal 2006-2007.
45. Memos on pre-trial interviews with David Runyon.
46. David Runyon pre-trial correspondence.
47. Court records. Guilt phase closing arguments, eligibility phase arguments, penalty phase arguments.
48. Direct appeal opinion – facts of the case.

I examined Mr. Runyon again on September 24, 2015, at the Federal Prison in Terre Haute, Indiana.

On examination he was alert, oriented and cooperative. He reported that he was receiving Zoloft 50 mg per day since March. He complained of tinnitus in his right ear, reportedly caused by a concussion in 2009 when he was assaulted in jail. He has severe headaches predominately on the left side of his forehead with sharp pain behind his left eye. Pressure to that area helps relieve the pain. His blood pressure was 100/80 with a pulse rate of 80, and regular. He had no heart murmur. His face is asymmetrical with his lip drooping down on the right and with slight ptosis of the left eye. On examination of the cranial nerves: I, he could distinguish cloves and vanilla. II. Pupils round, regular and reactive to light and accommodation. Discs and fundi appear normal. He is myopic. III, IV, VI, Extraocular movements full and symmetrical, Opticokinetic nystagmus intact. V, VII, trouble closing the right eye independent of the left. Left brow and forehead wrinkles and right does not. Left lip raises more than right. VIII, weber to the left, acuity reduced on the right. IX, X, XII, XII, normal. High round palate is noted.

Deep tendon reflexes are abnormal. Biceps 4+ on right, 3+ on left. Triceps 3+ on right, 2+ on left. Brachioradialis 3+ on right, 2+ on left. Both ankles and Patellar reflexes 4+ with ankle clonus right greater than left. Plantar reflexes down-going, Palmomental negative. Romberg is positive with falling back and to the right. Abdominal reflexes diminished on the left lower quadrant. No drift of the outstretched arms. Sensory examination intact to vibration, with some hyper - aesthesia of the left sole of the foot. He is right handed. Examination of the left shoulder suggests a torn rotator cuff. MRI of that joint is recommended. A 5-hour glucose tolerance test is also recommended for the evaluation of his mental state. The glucose tolerance test may reveal reactive hypoglycemia that would impinge upon his ability to have rational thought.

EXHIBIT 2

**1994**

I reviewed the MRI and Pet scans of the brain done in August 2009. They revealed multiple white matter hyperintensities on the MRI consistent with his history of head injures and migraine. The PET scan was non-diagnostic.

Impression: Brain damage from age 3, exacerbated by auto accident that resulted in a personality and mood change on November 9, 1996. He had an additional head injury when assaulted in jail. His brain injury has resulted in impaired executive functioning and decision making. His psychological testing suggests paranoia and delusions. He also has a history of post-traumatic stress disorder (PTSD) diagnosed previously. PTSD may account for some of his disordered mood and cognition. The paranoia and delusions may represent a formal thought disorder, which may be a consequence of his brain injuries, mood disorder, and PTSD.

Please let me know if I may provide further information.


Sincerely yours,

James R. Merikangas M.D.
Clinical Professor of Psychiatry and Behavioral Sciences
The George Washington University School of Medicine

EXHIBIT 2

**1995**

August 5, 2009

Stephen A. Hudgins, esq.
Cope & Olson, PLC
11836 Canon Blvd., suite 100
Newport News, VA 23606

Re: Runyon, David
Date of birth: July 1, 1971

Dear Mr. Hudgins,

I examined Mr. Runyon at the Portsmouth City Jail on7/29/2009 in regard to his Neuropsychiatric condition. He had undergone extensive psychological examination by Paul Montalbano, PhD on June 27, 2009, and by Raymond F. Patterson, M.D. on February 4, 2009. These evaluations suggested that Mr. Runyon suffered from Migraine-like headaches, Attention Deficit Disorder and Post-Traumatic Stress disorder.

Therefore, I conducted a neurological examination and ordered an MRI scan of the brain, A PET scan of the brain, and an electroencephalogram (EEG). These test have yet to be accomplished, and therefore this is a preliminary report.

On examination he was a 5'3" tall slight of build Korean-American left handed male in no acute distress. His blood pressure was elevated at 170/102, and his pulse was 100. His head circumference was abnormally small at 57 1/2 cm. He had multiple scars on his head and face from trauma, including an automobile accident that rendered him unconscious and contributed to his PTSD. His right forehead does not wrinkle with facial expression and his right lip sags from a peripheral nerve injury, which may be congenital or the result of beatings he sustained in childhood. There is a lump on the vertex of his scalp from trauma. His cranial nerves, including sense of smell were normal except as noted above. His deep tendon reflexes were symmetrically increased at 3+ and his palmomental and Babinski reflexes were absent. The distal phalanges of the thumbs were hyper-extensible. Gait, strength coordination and tone were normal, as was his sensory examination.

Impression: Because of his history of multiple head injuries, beatings in childhood, and his current severe headaches, he requires brain imaging and an EEG. His psychiatric evaluations, including my own, suggest that at the time of the crime in question he was suffering from the effects of, or withdrawal from, the experimental drugs that he was

EXHIBIT 2

**1996**

taking as a paid experimental subject.  I await the chronology and details of the drugs involved.  He presently is either in a fantasy world of grandiose wishful thinking, or suffering from delusions. He clearly has impaired executive functioning suggestive of frontal lobe brain impairment.  Full report will follow the results of his brain imaging.

Sincerely yours.

Signed, James R. Merikangas, M.D.
Clinical Professor of Psychiatry, Virginia Commonwealth University School of Medicine
Clinical Professor of Psychiatry and Behavioral Neuroscience, The George Washington University School of Health Sciences

EXHIBIT 2

**1997**

## DECLARATION OF KEVIN McNALLY
## REGARDING PRE-TRIAL PREPARATION TIME

1.  I currently serve as the Director of the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.  I have served as Resource Counsel since the inception of the Resource Counsel Project in January, 1992.  The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

2.  My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.  An update to the Report states: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to

EXHIBIT 3

**1998**

3. In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases. I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. Resource counsel collect comprehensive, accurate data concerning various practices that have emerged since the federal courts resumed trying capital cases in 1990. This collection of data includes the intervals of time between various pretrial milestones and trial. The federal courts have, with few exceptions, permitted considerable time between the indictment and mitigation submission and between

---

consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable."
http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/Up dateFederalDeathPenaltyCases.aspx

2

EXHIBIT 3

**1999**

the government's notice of intent to seek the death penalty and the commencement of trial.

5. The average time between indictment and the trial date in federal capital cases, from 2004 forward, which actually began trial, is approximately 35.8 months. The average time between indictment and the notice of intent to seek the death penalty is 15.7 months. The average time between the notice of intent to seek the death penalty and the trial date is approximately 20.1 months.[2]

6. The median for the time between indictment and the trial date in federal capital cases, from 2004 forward is 31.8 months. The median for the time between the indictment and the notice of intent is 12.2 months. The median for the time between the notice of intent to seek the death penalty and the trial date is 14.5 months.

7. Pursuant to declarant's responsibilities as Federal Death Penalty Resource Counsel, declarant has compiled the above information regarding federal capital cases in the regular course of the business of the Federal Death Penalty Resource Counsel Project.

---

[2]There are three defendants included in this total that had two trials since 2004. These figures include only the first trial for Donnell Young, Ronell Wilson and George Lecco.

3

EXHIBIT 3

**2000**

I declare under the penalty of perjury under the laws of the United States of America, 28 U.S.C. §1746, that the foregoing is true and correct.  Executed this 24th day of September, 2015.

/s/ Kevin McNally
Kevin McNally

4

EXHIBIT 3

**2001**

## DECLARATION OF SHEILA CRONIN

1. My name is Sheila Cronin. I have over 25 years of experience as a psychiatric social worker. I began working as an investigator in 1996. At the time I became involved in David Runyon's capital case, I had over eight years of experience in capital case mitigation work.

2. In April 2008, attorney Jon Babineau hired me as a mitigation specialist to work on David Runyon's federal capital case. My job was to collect records and conduct interviews regarding Runyon's social history, and amass mitigation evidence for trial. I also provided recommendations regarding areas for exploration by mental health experts.

3. Robert Glenn Ford was an investigator who was also hired by Runyon's defense counsel. Witnesses were spread across the continental United States, as well as Alaska and Hawaii, so Ford and I collaborated to complete as many interviews as possible before trial. Ford did not have much mitigation experience and I often provided him a list of questions to ask witnesses. Both Ford

Page 1 of 8

EXHIBIT 4
**2002**

and I kept Runyon's defense counsel apprised of our witness interviews.

4. During the time I was working with Ford, he was under considerable stress from the fall-out of the infamous "Norfolk Four" case, a rape-murder case that resulted in the wrongful conviction of four men. A non-fiction book had recently been published detailing Ford's involvement, including obtaining coerced confessions from two of the defendants.

5. I also provided defense counsel with status updates on the investigation including summaries of the records we had received.

6. In the midst of the guilt-phase of trial, counsel requested that I prepare an affidavit describing the status of the mitigation investigation. I have been informed by Runyon's current counsel that my affidavit is attached as sealed Exhibit A to a motion to continue the capital sentencing hearing, ECF No. 240.

7. My observations of Runyon are that he had a calm, soft-spoken demeanor and appeared unhealthy, almost anemic. He over idealized his family life, had impaired reality testing, and exhibited extremely poor judgment. He was markedly grandiose.

Page 2 of 8

EXHIBIT 4
**2003**

Runyon often compared himself to great figures in history. I thought these references were sad. Counsel Woodward thought they were funny. Runyon repeatedly talked about how many lives he had saved. After a member of his defense team visited with Runyon in jail, he would write a letter detailing the discussion. It was as if he felt he had not gotten his point across during the visit. Runyon's letters had a rambling quality. Attached to this declaration as Exhibit A is an example of such a letter; it contains a list describing how he saved the lives of seven people. We clearly needed the assistance of mental health experts.

8. Runyon's mother had a history of severe trauma, was unstable, and likely suffered from bipolar disorder. There were obvious problems with how she raised Runyon. Essentially, she emasculated Runyon. Runyon's adoptive father was emotionally remote and exhibited no affection towards Runyon. His trial testimony could be fairly described as "throwing Runyon under the bus." His demeanor was very cold and he had no compassion for Runyon at all. Runyon spent his childhood and adult life

Page 3 of 8

EXHIBIT 4
**2004**

trying to please his parents, make them proud, and earn their approval.

9. A sad component of Runyon's life is that every time he tried to achieve something, he underachieved or was fired from a job.  He had multiple failed career attempts.  He also had a series of failed relationships because he chose women who, like his mother, were mentally unstable.

10.     Runyon appeared to perform relatively well in the military until late 1996, when he was involved in a serious head on collision with a drunk driver.  I tried to obtain medical records from the civilian hospital where Runyon was transported and treated but was unsuccessful.  I did, however, obtain Runyon's military medical records from 1994 – 1997.  The records document that Runyon sought follow-up treatment for effects of the accident. Runyon suffered from vertigo, short-term memory loss, headaches, insomnia, and a personality change.  David's ex-wife reported a change in David's personality in that he was less able to cope and deal with frustration; he was much more irritable and short-fused. David's former employer at the Fayetteville Police Department (a

<div align="center">Page 4 of 8</div>

<div align="center">
EXHIBIT 4
**2005**
</div>

position he obtained after his Army discharge) said that David constantly forgot things and had to have instructions repeated. The military records contain diagnoses of Post-Traumatic Stress Syndrome/Disorder, depression and anxiety. I summarized those records for counsel. I also suggested to counsel that neuropsychological testing might clarify if Runyon's symptoms and behavioral changes were related to the closed head injury, PTSD, or both.

11.     Runyon loved his son very much. He also loved Maria's children as if they were his own. Witness accounts were overwhelming consistent regarding Runyon's parenting skills and ability to relate to children. He was universally described as a great father and a person who was loved by children who knew him.

12.     This case was extremely difficult for me to work on. I had very little communication with counsel. I remember Woodward remarked about mitigation, "we'll throw a couple of relatives on the stand and that will be enough." Hudgins was a very nice person. He was primarily responsible for the penalty phase. I felt

Page 5 of 8

EXHIBIT 4
**2006**

bad for him because having to prepare for the penalty phase in just four months seemed to overwhelm him. I had a very difficult time getting in touch with Hudgins.

13. I remember that counsel seemed to pursue mental health evidence throughout the guilt phase of trial and up to the beginning of the penalty phase. Counsel did not share with me the reports from Dr. Mirsky or Dr. Merikangas and I don't remember if I ever knew what the reports said.

14. Witness preparation for the penalty phase was unlike any I've experienced in a capital case. All the witnesses were from out of state. They were brought to Virginia the weekend before the penalty phase was scheduled to begin. There was not enough time to speak with all of the witnesses about their testimony.

15. I observed the trial. At one point during the penalty phase, the Judge chastised Hudgins. That seemed to be the final straw for Hudgins. In my view, he essentially quit. I heard Hudgins ask Woodward to present the closing argument. There were mitigation witnesses that had been flown in for the trial, who were ready to testify, but who were not called as witnesses.

Page **6** of **8**

EXHIBIT 4
**2007**

16.     I remember that Runyon wrote constantly throughout the trial. I would characterize it as excessive or obsessive. I did not look at the content of his writings. It concerned me, particularly when Runyon continued to write during the testimony of the victim's mother. I wanted him to stop writing but I was not sitting close enough to counsel's table to communicate that message. It has been the practice in other capital cases in which I've been involved that the defendant is told to be very respectful during a victim's testimony. In my opinion, the fact that Runyon was self-absorbed in his writings made a poor impression on the jurors.

17.     I have been told by Runyon's current counsel that the jury found their own mitigating circumstance that Runyon was led to believe that Cory Voss molested Voss's daughter. I was unaware of this jury finding. I also did not know that Runyon's step-daughter, Kendi, was molested by her biological father after Runyon left her behind to escape the volatile situation with his wife Maria.

Page 7 of 8

EXHIBIT 4
**2008**

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 16th day of September, 2015.

Sheila Cronin

Page 8 of 8

EXHIBIT 4
**2009**

~~CHARACTER WITNESS~~ - (continued on ~~next page~~ back of next page)

1) ~~LIST OF LIVES I HAVE SAVED~~ OVER THE YEARS → I HELP PEOPLE NOT HURT THEM!
(JENNY) VIRGINIA PINA — SAVED HER LIFE. SHE CB'D ON MY KITCHEN FLOOR IN MISSOURI 200__. NO PULSE, HAD TO GIVE CPR → 1982.

2) WHILE IN AIRBORNE SCHOOL DEC 94 I SAVED A MAN'S LIFE IN MY STICK. SHORT ORIENTAL GUY, INFANTRYMAN, DRAGON GUNNER, #375? I THINK I WAS #371 & #373 & HE WAS ONLY A COUPLE OF GUYS DOWN THE LINE. 1st WEEK OF SCHOOL ON A TRAINING APPARATUS, A TOWER W/2 CABLES GOING FROM THE TOWER ACROSS TO 2 TELEPHONE POLES ON A BERM. PULLEY'S HOOKED TO THE CABLES & A SET OF PARACHUTE RISERS THAT YOU ATTACH TO YOUR HARNESS. A SIMULATED/MOCK DOOR OF A PLANE THAT YOU EXIT OUT OF & ARE GRADED ON YOUR GOOD OR BAD BODY POSITION/POSTURE. YOU SLIDE DOWN THE CABLE BOUNCING THROUGH THE AIR WHILE YOUR GRADER WATCHES YOU & DETACH YOURSELF WHEN YOU LAND ON THE BERM.

ANYWAYS I'M #4 MAN IN LINE, #3 MAN, MY BUDDY (ABOVE) HOOKED UP HIS RISERS TO HIS HARNESS ON EACH SHOULDER. THERE WAS ALOT OF TENSION, ALL 4 OF US HAD TO PULL ON OUR RISERS TO BRING THE CABLES CLOSER TO THE TOWER JUST SO WE COULD HOOK UP. WHEN YOU EXIT THE DOOR IT PULLS YOU OUT FORCEFULLY TO SIMULATE THE AIR SUCKING YOU OUT OF AN ACTUAL AIRCRAFT. #1 & #2 MAN EXITED THE TOWER. JUST AS #3 MAN IN FRONT OF ME MOVED UP I NOTICED SOMETHING DIDN'T LOOK RIGHT. SOMEHOW THE 2 RISER STRAPS HOOKED TO HIS RIGHT SHOULDER HARNESS WERE SEPARATED & BASICALLY WRAPPED AROUND HIS HELMET & NECK. I RAPPED BOTH OF MY ARMS AROUND HIM & BEGAN YELLING WHAT WAS WRONG WHILE PULLING BACK WITH ALL OF MY MIGHT SO HE WOULDN'T JUMP OUT & SNAP HIS NECK. THE INSTRUCTOR LOST HIS TEMPER WITH MY BUDDY B/C HE WASN'T OBEYING THE "GO" COMMAND. & GRABBED HIM TRYING TO THROW HIM OUT THINKING HE WAS PROBABLY JUST SCARED. I WRAPPED MY RIGHT ARM ON #3's RIGHT RISERS TRYING TO FIX THE PROBLEM BUT THERE WAS TOO MUCH TENSION ALL THE WHILE YELLING AT THE TOP OF MY LUNGS. FINALLY THE INSTRUCTOR SAW MY ARM IN #3's RISER & NOTICED THE PROBLEM. HE STOPPED TRYING TO THROW #3 OUT, I UNWRAPPED MY ARMS WHILE THE INSTRUCTOR RIDICULED THE "STUPID LEG" #3 FOR ALMOST KILLING HIMSELF TO THE GRADER ON THE GROUND. HE WAS UNHOOKED & FIXED. LATER AT AN AWARDS CEREMONY THAT INSTRUCTOR GOT A MEDAL FOR SAVING "AIRBORNE'S LIFE." AFTER FORMATION #3 THANKED ME AGAIN FOR SAVING HIS LIFE STATING HE KNEW WHO REALLY DESERVED THE CREDIT. HE WANTED TO PUSH THE ISSUE WITH MY STICK SERGEANT SO I WOULD GET A MEDAL TOO. I TOLD HIM NOT TO BOTHER WITH IT I DON'T CARE ABOUT MEDALS & I DIDN'T SAVE HIS LIFE SEEKING GLORY. I DID IT INSTINCTIVELY BECAUSE IT WAS THE RIGHT THING TO DO & I TOLD HIM I BELIEVED HE WOULD HAVE DONE IT FOR ME.

#3) CALVIN HAMPTON AN INMATE AT NEWPORT NEWS CITY JAIL. ON MORNING OF MARCH 08 FELL OFF OF HIS TOP BUNK & CRACKED HIS HEAD OPEN. BLOOD WAS GUSHING OUT. I KNEW THAT IF I COULDN'T STOP THE BLEEDING HE WAS DONE BEFORE HELP COULD ARRIVE. I HESITATED THINKING ABOUT THE

EXHIBIT 4

**2010**

2 OPEN CUTS ON MY HANDS & THE POSSIBILITY OF THE OLD MAN WHO HITS A HISTORY OF DRUG ABUSE HAD AIDS, HIV, & OR STD'S. I ONLY HESITATED FOR A MOMENT THOUGH KNOWING I COULDN'T LIVE W/ MYSELF IF HE DIED & I COULD HAVE MADE A DIFFERENCE. I USED THE MOST STERILE THING I COULD THINK OF IN THE CELL, TOILET PAPER. OF COURSE IT SOAKED UP THE BLOOD LIKE A SPONGE BUT IF I WOULD HAVE USED A TOWEL OR SHEET WHICH ONLY GETS WASHED ONCE A WEEK OR A BLANKET WHICH ONLY GETS CLEAN ONCE A MONTH HE WOULD HAVE SURELY GOTTEN STAFF INFECTION THROUGH HIS CUT. SO I GOT BLOOD ALL OVER MY HANDS BUT I GOT THE BLEEDING TO STOP & YELLED LOUD ENOUGH TO WAKE EVERYONE UP IN MY CELL BLOCK SO THEY COULD HELP MAKE NOISE TO GET HELP. THERE IS A FULL INCIDENT REPORT FILED AT NNCJ W/ INTERNAL AFFAIRS. I WOULD ALSO LIKE TO KNOW IF CALVIN HAMPTON IS DOING OK. LAST I HEARD HE HAD BEEN IN THE HOSPITAL FOR 3 DAYS ALREADY. TELL THE GUYS AT NNCJ ON CELL BLOCK 5B I'M DOING GOOD. ALSO TELL LEON & "T" THAT I'D LIKE MY LITTLE BLUE BIBLE BACK. I HAD TO LEAVE IT B/C THE DEPUTY TOLD ME I COULDN'T BRING ANYTHING WITH ME WHEN THE FEDS PICKED ME UP. A US MARSHALL AT THE FED BLDG. SAID THAT WAS FALSE, I COULD HAVE BROUGHT MY BIBLE. A DEPUTY AT NNCJ TOLD ME THERE WAS A VA LAW STATING THAT I DIDN'T NEED MY BIBLE TO PRACTICE MY RELIGION OF CHRISTIANITY. I WAS PRETTY UPSET & WOKE UP MOST ON MY CELLBLOCK COMPLAINING ABOUT THE INCREDIBLE INJUSTICES IN THIS SYSTEM OF OURS. MY NEIGHBOR CHRISTIAN FRIEND PASSED ME A NOTE TO CALM ME DOWN. THEY APPARENTLY HAVE BEEN DOING IT TO INMATES FOR AWHILE. IF IT IS AT ALL POSSIBLE I WOULD LIKE MY "COWBOYS FOR CHRIST" WTBC little blue BIBLE back. Nobody really comes up here to my cell block to share or fellowship with us. If I had my blue bible I could share w/ my cell mates, especially w/ all of my notes & footnotes in my blue bible. These notes help me find the right scriptures to share w/ others at just the right time of need. Also the blue bible has sentimental value. It is a testimony about "turning the other cheek." I earned a black eye while at NCFJ in WV & by not hitting the other inmate while I obviously had plenty of opportunity I was able to give testimony to a violent inmate. While sharing scripture I checked out his little blue bible & was able to get one of my own right before I was transferred to VA.

#4 As a 2nd Lieutenant with 1/137th INFANTRY, MECHANIZED (KSANG) during annual summer training at FT. Carson, Colorado (summer of 1993, ?) While traveling we stopped because of darkness. The LT. COL decided we would continue traveling to our training site 1st thing in the morning. We were ordered to sleep in a 360° security perimeter w/ 0° security since technically we hadn't started training yet. I personally checked on each soldier in my platoon & found one of my men in his sleeping bag stretched out in the middle of the road on the soft gravel. I made him move. He was rebellious & complaining about tree roots & rocks everywhere. He picked a spot on the side of the road but I made him move further to at least put a decent size tree btwn him & the road. I slept on the other side of the road just inside the treeline so he could see me to ensure he wouldn't sneak back out. Sometime during the night a tracked vehicle from some other unit came flying through. It was going so fast I didn't have time to get out of my sleeping bag before it had passed by me. I chased after it yelling. (continued)

EXHIBIT 4

**2011**

Several of us finally got their attention & they stopped. Apparently they had taken a wrong turn & were lost. The soldier I had moved out of the road earlier that evening later thanked me for saving his life. He told me that he didn't ever wake up in time to see the vehicle go by let alone get out of the way if he had still been sleeping in the middle of the road. I told him it was no big deal. It was just a part of my job & that I take the responsibility of taking care of all of my men seriously. I told him I was thankful for having so many good teachers. "Mission first, people always!" He also apologized for giving me a hard time & appreciated me explaining his danger by sleeping in the middle of the road. He said he knew I was right at the time but he still didn't care. If I had left he would have just stretched back out in the road. I never received a medal for this incident. That's not important to me anyways. I'm not even sure if many people ever knew about it. I didn't talk about it either, I believe the soldier was embarrassed about it. After all every infantryman should know better than to sleep in a "danger area" regardless if we're training or not. Many soldiers die in training for poor decision making every year. I didn't want to lose any of my soldiers if their was anything I could do about it. If I'm not mistaken there was a casualty. That same vehicle drove through another platoon on that same road just a little earlier without even knowing they were there. But it could just have been a rumour. They were keeping the incident on the "hush, hush" side. So I'm not really sure. My BNCO was LT. COL. Crane and I believe he was there when we stopped the (M113?) tracked vehicle. I did receive a medal at the end of that training cycle from LT. COL. Crane but that was for superb unit performance. My men earned that medal. Anyway I guess it all evens out! I told Sergeant Flippo & my soldiers I wish I could give them all medals, they deserved & earned it. I was so proud of them. Our performance rating was higher than our active duty counterparts, 5th ID. Hoo-rah for E.CO. 1/137th (m) INF!

#6 While serving with the United States Airborne School for 3 years I received several medals; 1 Army Achievement Medal for packing over 7,000 malfunction free parachutes (life support equipment) in 14 months, 2 presidential unit citations, & 1 superior unit citation. During this time I also am responsible for preventing 100's of injuries during the course of my duties to include last minute inspections of personnel & gear just prior to all kinds of airborne operations. I have personally repacked a live parachute for a general while he watched day & night upon his request grabbed another live chute & proceeded to jump with him out of his "huey" helicopter. I have also noticed & fixed defaults on parachutes from the back of my fellow "Airborne" minutes & sometimes seconds before we "jumped out" or exited the aircraft anywhere from 500 ft to 2,500 ft on average. We suffered no "loses of life" during my 3 years with the school despite gross overload on the number of students per class or "cycle." I am proud to have been a part of that great accomplishment.

EXHIBIT 4

2012

#7 When I was a police officer for the Fayetteville Police Department (Fayetteville, GA in Fayette County just south of Atlanta) I also worked as a courtesy officer for my local apartment complex. I was pretty much on call there when I was off duty. I had a take home squad car so everyone knew when I was off duty. I earned a reputation & many of the tenants talked & confided in me. One night I answered the door to frantic pounding. One of the female tenants I knew from across the street told me the scenario. I immediately used my radio to call directly to dispatch & reported a bad fire. The building held 8 3 & 4 bedroom apartments side by side. Even in the night sky I could see the massive amount of black smoke billowing from the entire rooftop. A preteen girl had apparently started a grease fire on the stove. I pulled my car up in front of the building w/ lights on to mark the building for the responding firemen & hit my siren hoping to wake up the tenants still inside. I [illegible] [illegible]. I had the female tenant get her boys & start beating on doors while I grabbed my fire extinguisher out of the back of my patrol car. The preteen girl that apparently started the fire was standing dumbfounded on the sidewalk. I quickly talked to her & found out her little sister was still inside. I held my breath & went in. I found the little girl crying on the steps & quickly brought her outside to her little sister. I called dispatch & relayed to the Fire Marshall the apartment # & the cause of the fire. The FIRE MARSHALL asked me if I could see & give details on the kitchen. So I took a deep breath, ran in & peeked around the refrigerator at the stove ~~[illegible]~~. I quickly ran back outside & closed the door to stop the oxygen flow to the fire. I just peeked for a half second & the heat was so intense I felt an instant sunburn sensation & my eyebrows & hair curl. I actually saw the metal stove & metal smoke exhaust tray? above the stove melting & dripping down to the floor. The entire ceiling had fire billowing or rolling across it similar to waves of water. When I told the FIRE MARSHALL he told me under no circumstances was I to go back in & especially not to open the door for fear of a backdraft or something. I think it only took about 3 or 4 minutes for the first fire truck to arrive. By then everyone had been evacuated & accounted for outside on the sidewalk. I moved my patrol car back home. ~~[illegible]~~ I then helped

EXHIBIT 4

**2013**

the tenants wherever I could. It took 2 fire departments several hours (maybe 4 or 6) to get the fire out. No casualties. Smoke damage to seven apartments nothing that a fresh coat of paint couldn't fix. The entire roof & the kitchen of the one apartment had to be rebuilt. Apparently the stove fire travelled through the exhaust vent straight up into the attic where it spread rapidly. Thank God for the female tenant smelling smoke, looking outside & seeing her neighbor's little girl standing on the sidewalk stupified. If it wasn't for her quick thinking to come get me for help it could very easily have been much worse. The housing complex was so new it wasn't even on the FIRE DEPT's maps but I had given quick directions & the lights on my patrol car made it easy to see from the main road. The female tenant & her two boys did a great job beating on doors to tell the other tenants about the fire & to evacuate out to the street out front. The FIRE MARSHALL also said the info I gave him allowed him to assess the situation & he had already issued instructions on what needed to be done before the first FIREMAN even arrived. So when they pulled up they got right to work. It also helped him when he arrived that all the tenants were organized outside & he could quickly verify that everyone was accounted for. It was a heck of a fire. Those firemen did an awesome job. I got names & phone #'s where they could be reached since they were the tenants new here all for the FIRE MARSHALL. I let the tenants use my phone. They called friends & family etc.... to make sleeping arrangements for the rest of the night. It was a very long night.... not much else to say about it. Thank God nobody died or even got burned, well besides my little sunburn & a little toxic smoke inhalation that stopped irritating me after a month or so. They say that most people die from the toxic smoke from a house fire. Think about all the different materials in paint, insulation, varnish on wood cabinets plastics that are made with oil, etc.... all released into the smoke from a fire. That's the junk that burned my eyes & sinus even though I was holding my breath.

EXHIBIT 4

**2014**

FindLaw for Legal Professionals - Case Law, Federal and State Resources, Forms, and C...  Page 5 of 5

(#2)

spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

(B)(i) A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless -
(i) the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and
(ii) in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either
(aa) the case was tried by a jury, or
(bb) the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.

(ii) A person shall not be considered to have been convicted of such an offense for purposes of this chapter, if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

(34) The term "secure gun storage or safety device" means -
(A) a device that, when installed on a firearm, is designed to prevent the firearm from being operated without first deactivating the device;
(B) a device incorporated into the design of the firearm that is designed to prevent the operation of the firearm by anyone not having access to the device; or
(C) a safe, gun safe, gun case, lock box, or other device that is designed to be or can be used to store a firearm and that is designed to be unlocked only by means of a key, a combination, or other similar means.

(35) The term "body armor" means any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment.
(b) For the purposes of this chapter, a member of the Armed Forces on active duty is a resident of the State in which his permanent duty station is located.

[Notes]                                    Next

Sponsored Links

VIRGINIA PINA (JENNY), HAD NO PULSE. SHE OD'D ON DRUGS & ALCOHOL ON MY KITCHEN FLOOR IN MISSOURI AFTER HER PARTY BUDDIES LEFT HER ON THE DOORSTEP. I DID CPR & PRAYED W/ ALL OF MY MIGHT. I WAS EXHAUSTED & CRYING WHEN SHE FINALLY CAME BACK. I ENDED UP TAKING 2 DAYS OFF OF WORK TO CARE FOR HER AROUND THE CLOCK. SHE HAD NO MEDICAL INSURANCE & SHE WOULDN'T STAY IN THE HOSPITAL ANYWAYS. SHE WAS MY GIRLFRIEND FOR ABOUT 3 YEARS OFF & ON BUT LIVED W/ ME FOR ABOUT 5. SHE WAS MY ROOMMATE, NOT MY GIRL, FOR A YEAR BEFORE I ASKED HER TO LEAVE/MOVE OUT. SHE COULD NOT KEEP A JOB & WASN'T ABLE TO PAY FOR HER SHARE OF THE RENT ETC..... SHE WAS A GOOD FRIEND. THAT'S WHY I WAS SHOCKED WHEN I WAS ONCE AGAIN IN COURT BEING ACCUSED OF DOMESTIC VIOLENCE IN JANUARY 2007. APPARENTLY SHE SHOWED UP AT HER STEPMOMS WITH A BLACK EYE & HER STEP-MOM CALLED THE COPS ON ME ASSUMING I DID IT. HER STEPMOM DAD HATED ME & WERE EXTREMELY PREJUDICED. I'VE SEEN JENNY HURT HERSELF BEFORE & I'VE EVEN WITNESSED HER GIVE HERSELF A BLACK EYE. AND SOME OTHER GUY DROPPED HER OFF AT HER STEPMOMS ANYWAYS. JENNY LATER STOPPED BY & I ALLOWED HER TO STAY AT MY HOUSE FOR AWHILE SHE EXPLAINED THAT HER STEPMOM THREATENED TO KICK HER OUT OF THE HOUSE ONTO THE STREET IF SHE DIDN'T TELL THE COPS THAT I HIT HER. SHE ALSO GAVE ME A VIDEO TESTIMONY TO USE IN COURT & HER MENTAL HEALTH RECORDS. SHE REFUSED TO GO TO COURT HERSELF TO TESTIFY & TELL THE TRUTH. SHE WAS AFRAID TO GO TO JAIL FOR LYING TO THE COPS. INSTEAD SHE KEPT HIDING TO AVOID THE COURT SUBPOENA & EVERY MONTH I KEPT SHOWING UP TO DEFEND MY GOOD NAME & SCHEDULING MY WORK AROUND THE COURT DATES THE JUDGE ALLOWED THE PROSECUTOR TO CONTINUE THE CASE MANY TIMES & WHEN IT WAS DISMISSED THREATENED M THAT SHE STILL HAD ANOTHER YEAR TO BRING ME BACK TO COURT IF SHE COULD FIND JENNY.

Help | Site Map | Contact Us | Press Kit | About Us | FindLaw Local | Disclaimer | Privacy Policy          Copyright © 1994-2008 FindLaw a Thomson business

DETECTIVE RILEY (NEWPORT NEWS) FOUND JENNY WHILE APPARENTLY LOOKING FOR ME. SHE TOLD ME THAT HE WAS TRYING TO PERSUADE HER TO PICK UP THE DV CHARGES AGAINST ME. HE WAS WANTING TO ASK ME QUESTIONS ABOUT A HOMICIDE, HE HAD MY PICTURE, & THAT I WAS A SUSPECT. HE HAD LEFT HIS CARD BUT SHE DIDN'T HAVE HIS # HANDY TO GIVE TO ME.

THE FEDS TOOK INTO EVIDENCE MY BROWN LEATHER BRIEFCASE. IN IT IS:

DV CHARGE #1  A) COURT PAPER I SIGNED PLEADING "NO CONTEST" TO SIMPLE BATTERY
VS. MARIA RUNYON
"SIMPLE BATTERY"
           B) COPY OF COURT PAPER MISFILED AT THE COURTHOUSE STATING I PLEAD "GUILTY" TO "SIMPLE BATTERY AGAINST MY SPOUSE"
           C) VIDEO TESTIMONY OF MARIA RUNYON STATING THAT I NEVER HIT HER & SHE HAD LIED TO THE COPS.

DV CHARGE #2  A) VANILLA ENVELOPE ABOUT ½" THICK FULL OF JENNY'S (VIRGINIA PINA'S) MENTAL HEALTH
VS. VIRGINIA
PINA (JENNY)     RECORDS SHOWING CASES OF SELF HARMING, SUBSTANCE ABUSE, ETC.....
           B) VIDEO TESTIMONY OF JENNY (VIRGINIA PINA) STATING THAT I NEVER HIT HER & SHE HAD LIED TO THE COPS.

http://caselaw.lp.findlaw.com/scripts/ts_search.pl?title=18&sec=921          3/17/2008

EXHIBIT 4

**2015**

**DECLARATION OF STEPHEN A. HUDGINS**

1. My name is Stephen A. Hudgins. In February 2009, I was in private practice. I was appointed to represent David Runyon because Jon Babineau was removed due to a conflict of interest. I took over Mr. Babineau's role, working mainly on the mitigation portion of the case. Between co-counsel, Larry Woodward, and myself I had the most contact with the defense experts. Mr. Woodward represented Runyon from the start and was mainly responsible for the guilt phase of trial.

2. When I was appointed to represent Runyon, the trial date was March 13, 2009. Immediately after I was appointed, Mr. Woodward requested a continuance of the trial. See Doc. No. 160. The trial date was re-scheduled for May 4, 2009. See Doc. No. 162. I had a jury trial scheduled for seven days to begin on April 21, 2009. See Doc. No. 165. That particular case was ultimately tried over a two-week period from May 6 – May 19, 2009. See *United States v. Garries*, No. 4:08-cr-50. I requested a continuance of Runyon's trial date and it was re-set for June 30, 2009.

3. Mr. Woodward and I spoke with Runyon about pleading guilty in exchange for a life sentence. I believe the prosecutors were willing to enter into a plea agreement throughout Runyon's trial. Runyon's thinking was very rigid. He adamantly asserted he was innocent and would not plead guilty.

4. At the time I entered the case, Runyon's defense team included an investigator, Robert Glenn Ford, and mitigation specialist Sheila Cronin. Dr. Evan Nelson had been hired. I did not believe his opinions were favorable to the defense and I decided a different mental health expert was needed. Ultimately, the defense experts were Dr. Merikangas and Dr. Mirsky.

5. Due to the passage of time since Runyon's trial, I have tried hard to determine my actual recollection of events and to avoid speculation. I know I was looking for an

EXHIBIT 5

**2016**

injury in Runyon's past that affected his reasoning ability. Runyon reported that he had been exposed to grenade blasts in the Army. We searched for medical records related to those episodes. Runyon also reported he was in a car accident and we tried to obtain the initial treatment records. After the car accident, I do not believe Runyon followed up with Army medical providers. I wanted documentation of these events for the penalty phase. The experts also requested Runyon's medical records. We had difficulty obtaining Runyon's military medical records and requested a continuance of the trial date because of this difficulty.

6. The Court granted a four week recess between the eligibility phase and the penalty phase which gave time to work on the mitigation case. During this time I made the final arrangements for the mental health evidence. I filed with the court preliminary reports from Dr. Merikangas and Dr. Mirsky. Dr. Merikangas wanted brain scans of Runyon. I do not remember the results of the scans. I cannot remember why Dr. Merikangas and Dr. Mirsky did not testify in the penalty phase. I remember that Dr. Mirsky contacted me after the trial.

7. With respect to Runyon's background, I travelled to interview Runyon's wife, Maria, his son, Davy, and Runyon's father and mother. I spoke with Runyon's brother by telephone.

8. Aside from the Portsmouth Jail witnesses, all of the penalty phase witnesses were from out-of-state. For the most part, I relied on Ford's and Cronin's interview reports to inform me of the witnesses' knowledge of Runyon. The witnesses arrived in Norfolk right before the penalty phase began. I spent the weekend before and other times during the penalty phase speaking to the witnesses in person at a hotel in Norfolk.

EXHIBIT 5

**2017**

9.  I was recently informed by Runyon's current attorneys that some witnesses were subpoenaed for the penalty phase, were present, but did not testify.  I remember the Seegers -- a husband and wife from Alaska -- but do not remember why they did not testify.

10. Runyon's trial was the first capital trial in many years in the Norfolk Division of the Eastern District of Virginia.  The prosecutors, defense counsel for Runyon, and defense counsel for co-defendant Michael Draven provided input and participated in preparing a questionnaire for the jurors.

11. Runyon wrote throughout the trial.  He filled legal pads with writing but I don't know the contents.  I never had a client write as much during trial as Runyon did.

**I declare under penalty of perjury that the foregoing is true and correct. Executed on the 22 day of September, 2015.**

Stephen A. Hudgins

EXHIBIT 5

## DECLARATION OF LAWRENCE H. WOODWARD, JR.

1. My name is Lawrence H. Woodward, Jr. In March 2008, I was appointed to represent David Runyon. Jon Babineau was my co-counsel at that time.

2. I was primarily responsible for the guilt phase of the case and Mr. Babineau was primarily responsible for the penalty phase.

3. The prosecution was willing to let Runyon plead guilty in exchange for a life sentence. The prosecution maintained this offer throughout the case. Runyon would not agree to plead guilty. The prosecution's offer was communicated to Mr. Runyon on a multitude of occasions throughout the case.

4. Mr. Babineau recommended investigator Robert Glenn Ford, mitigation specialist Sheila Cronin, and Dr. Evan Nelson. I agreed with his recommendations and they were approved by the Court. Mr. Ford and Ms. Cronin worked very hard and did a good job investigating the case and David's background.

5. I remember we were looking for Runyon's military medical records that reportedly were in a St. Louis warehouse. Runyon had told us he was in a serious car accident. We could not verify the car accident and Runyon's family did not know anything about it.

6. Jon Babineau told me that Dr. Nelson was not helpful and we decided not to use him.

7. In February 2009, Mr. Babineau was removed from the case due to a conflict of interest. When Stephen Hudgins -- now Judge Hudgins -- replaced Mr. Babineau as co-counsel, we needed more time for him to get familiar with the case. Mr. Hudgins assumed the role of working on the mitigation portion of the case. He had primary contact with the experts and prepped the witnesses for the sentencing phase.

8. The juror questionnaire used in this case required prospective jurors to think about the death penalty. It was most helpful for de-selecting jurors. Question 61 was informative because jurors who chose answer A, F or G would never be on the jury. All jurors have to be able to consider the death penalty as a sentencing option. In this case, the parties used the juror questionnaires to compose three lists for the trial: (1) a list of jurors that the parties agreed should be called for voir dire; (2) a list of jurors that the parties agreed should be dismissed from consideration and not called for voir dire; and, (3) a list of jurors that the parties could not agree upon. The panel was then drawn from

EXHIBIT 6

**2019**

the lists submitted to the court. Mr. Hudgins and I objected to any jurors who expressed extreme positions on the death penalty in the questionnaire.

9. The guilt-phase theory of defense was reasonable doubt. Most of the evidence involved the co-defendants, Michael Draven and Cat Voss. The defense tried to portray them as the bad actors and to create doubt regarding Mr. Runyon being the person who shot Cory Voss.

10. The theory of defense at the eligibility phase was to avoid alienating the jurors. Runyon was clearly eligible for death and it was the selection phase where the defense presented mitigation and tried to convince the jury to impose a life sentence.

11. I did not want to call Cat Voss as a witness. I did not speak with her but the prosecutors told me she would testify that she hired Runyon and that Runyon and Michael Draven were lying in wait for Cory. Ms. Voss had pled guilty to hiring Mr. Runyon to kill her husband. I had reviewed her statement of facts. Draven's counsel interviewed her and shared the information with me from there interviews.

12. Dr. Patterson and Dr. Montalbano were the prosecution's witnesses in this case. They routinely appear in cases as government witnesses. As I recall, the reports expressed a strong opinion that Runyon did not have any mental or emotional issues that would be mitigating. The defense also retained mental health experts to replace Dr. Nelson. These experts evaluated Mr. Runyon.

13. I gave the closing argument for the selection phase. The strongest argument we had was that it just wasn't fair for Runyon to be sentenced to death when two equally culpable co-defendants were receiving life sentences. Family sympathy was another argument we too presented.

14. Runyon's mother was judgmental of David in interviews. Runyon's adoptive father was not close with David. He was very matter of fact in expressing his relationship and feelings for Runyon. In this case, it seemed that David Runyon was not part of his parents' lives and they were testifying out of obligation. It was also clear that these parents were very strict disciplinarians toward Runyon as he was growing up.

15. The jury was made up of people who expressed they would be fair and who are willing to consider a death sentence as well as willing to consider a sentence that is not the death penalty.

16. I don't know why the death penalty was not authorized for Michael Draven. In my experience, how conservative the administration is -- and the Attorney

General -- makes a difference in whether the death penalty is authorized in murder cases.

17. This declaration consists of my general comments on the case and are from memory. I have discussed the case with Michelle Brace several months ago and Dana Hansen on September 10, 2015, Mr. Runyon's counsel. I informed Ms. Hanson that I would be willing to make a further declaration once I was informed as to what claims were being made on Mr. Runyon's behalf. I requested to know what claims are being made but was not informed. I did not review the file prior to my interview and was not asked to review any documents during my interview. I was asked a number of questions by Ms. Hanson about my opinions on certain witnesses and certain aspects of the federal death penalty scheme. I answered all her questions but have limited my initial declaration to factual matters. If my opinions on any subject are necessary to any claim Mr. Runyon makes, I will express them if requested or ordered by the court. I did not want to express any opinions that would not be helpful to Mr. Runyon unless required to do so based on claims he makes. I also want to insure that the attorney-client privilege or attorney work privilege is not implicated in any opinions I have based on my discussions with Mr. Runyon and my work on the case.

**I declare under penalty of perjury that the foregoing is true and correct. Executed on the _____ day of September, 2015.**

Lawrence H. Woodward, Jr.

EXHIBIT 6

**2021**

## DECLARATION OF CHAD COSTA

1.   My name is Chad Costa.  I live in West Virginia and have a degree from West Virginia University.

2.   I met David Runyon in the second half of 2007.

3.   I took approximately three trips to New Jersey with Runyon to work in drug studies. We had a lot of time to talk during the seven-hour drives.

4.   I learned that Runyon was in the Army and had been a police officer for a while, but Runyon didn't like the politics and left that job.

5.   Runyon talked a whole lot about his son Little Davey. He didn't talk much about any other family members. I know Runyon had a brother.  They weren't speaking because the brother was mad that Runyon hadn't stayed in contact. Runyon said he was never close to his parents and left home as soon as he could. Runyon said his ex-wife, Maria, messed-up his whole life: she broke down his self-esteem and caused him a lot of heartache. He said Maria had many problems in her life and brought problems to their marriage. I heard about Jenny, Runyon's ex-girlfriend, and knew she also caused many problems for Runyon. Runyon told me that both Maria and Jenny had taken out assault warrants against him and he went along with it because he did not want the conflict in court. I met David's girlfriend, Sarah, and knew she was a drug addict and that relationship was also doomed to fail.

6.   Runyon told me he liked to brag about things and make-up things to impress women so he would have a chance with them. Runyon wanted people to think he was a "thug" and bought clothes like a hoodie, baggy pants, and boots, to look like a "thug," However, he was so small and thin that he just didn't look the part. An example of one of Runyon's boasts was a story about road rage. Runyon told me that a truck driver cut him off and Runyon was able to pull alongside the driver and have him park alongside the road. The driver exited his truck with a crowbar. Runyon said they fought, he took the crowbar from the driver, and was going to kill him but his friends pulled him away from the man. I didn't believe this story because it appeared to me that Runyon couldn't harm anyone.

7.   Throughout those long car rides, Runyon never told me that he had killed anyone. I saw Runyon with a black, six-shot revolver. I am certain it held six bullets because David showed me how to block someone from firing it by putting your hand in front of the firing pin. Two detectives who questioned me about Runyon said the gun I described was definitely the murder weapon and they wanted to find it.

8.   The detectives told me that Runyon had never been a police officer. I didn't know anything about the murder and the detectives told me a lot of information over the

**2022**

course of two hours. The detectives said Runyon met a man named Michael Draven at a drug study who, along with his girlfriend Catherina Voss, hired Runyon to commit murder for $250,000. The detectives convinced me that Runyon committed the murder and they had the evidence they needed. This influenced my testimony in front of the grand jury and caused me to agree with the prosecutor that Runyon could have committed this crime. When I said anything positive about Runyon in front of the grand jury, the prosecutor gave me a dirty look and changed the subject.

9.    Runyon's defense counsel had me flown to Virginia for the trial but never called me as a witness.

10.   If asked, I would have testified to all the facts in this affidavit.


I declare under penalty of perjury that the foregoing is true and correct. Executed on the 30 day of September 2015.

CHAD COSTA

# MARK D. CUNNINGHAM, PH.D., ABPP

*Board Certified in Clinical Psychology - Board Certified in Forensic Psychology*
*American Board of Professional Psychology*

610 Brazos Street, Suite 680
Austin, Texas  78701

737-210-8336    Fax 737-210-8339
mdc@markdcunningham.com

*Licensed psychologist: Alabama #1564, Arizona #3662, Arkansas #98-17P, Colorado #2305, Connecticut #846,*
*Florida #PY8347, Illinois #071-006010, Indiana #20041376A, Iowa #1316, Kentucky #1717,*
*Louisiana #794, Nevada #PY0625, New Mexico #0768, New York #017111 [inactive], Oklahoma #1002, Oregon #1333,*
*Pennsylvania #PS016942, South Carolina #764, Tennessee #2255, Texas #22351, Washington #PY60207411*

## Declaration of Mark D. Cunningham, Ph.D., ABPP

I, Mark D. Cunningham, Ph.D., ABPP, depose and state as follows:

1.      I am a clinical and forensic psychologist licensed and qualified to practice psychology in the states of Alabama, Arizona, Arkansas, Colorado, Connecticut, Florida, Illinois, Indiana, Iowa, Kentucky, Louisiana, Nevada, New Mexico, New York [inactive], Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, and Washington.  I attach my curriculum vitae. I am over age 21. I have personal knowledge of the facts contained in this declaration and am competent to testify about them.

2.      Counsel for David Runyon has requested that I provide expert evaluation regarding developmental factors in Mr. Runyon's background that singly and cumulatively increased his risk of adverse adolescent and adult outcomes, that could have been presented in mitigation at his death penalty sentencing phase in 2009. I am the same Mark D. Cunningham who was retained by defense counsel and testified at sentencing in 2009 regarding my violence risk assessment for prison of Mr. Runyon. Had it been requested, I could have provided a broader evaluation of adverse developmental factors (i.e., mitigation) as well. I outline below qualifications and experience that I have in providing such expert consultation and testimony at capital sentencing.

**Special Qualifications**

3.      *Board certification:*  I am one of approximately 300 psychologists in North America who are board certified in *forensic psychology* by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology (ABPP).  This credential is intended to signify the highest levels of expertise and practice in forensic psychology. I am one of approximately 1200 psychologists who are board certified in *clinical psychology* by the American Board of Clinical Psychology (ABPP).

EXHIBIT 8

**2024**

4.      *Capital sentencing testimony:* I have been recognized as a clinical and forensic psychology expert in testifying regarding capital sentencing determinations including adverse developmental factors (i.e., "mitigation") and violence risk assessment (i.e., "future dangerousness") in both state and federal courts. Since 1995, I have testified as a clinical and forensic psychology expert regarding sentencing issues at trial in approximately 140 state capital cases and approximately 65 federal capital cases, as well as in numerous postconviction and federal habeas proceedings. I have been recognized as an expert in clinical and/or forensic psychology in state and/or federal district courts in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Nevada, Ohio, Oklahoma, Pennsylvania, Oregon, Puerto Rico, South Carolina, Tennessee, Texas, Virginia, Washington, and West Virginia. Where qualification was made available by the court, I have never failed to qualify as an expert in clinical and/or forensic psychology.

5.      *Scholarship regarding capital sentencing considerations:* As my curriculum vitae will demonstrate, I am extensively involved in research and the authoring of scholarly publications relevant to evaluations at capital sentencing. These scholarly publications include peer-reviewed papers addressing standards of practice and complex considerations specific to evaluations of mitigating factors in capital cases, as well as evidentiary standards and associated scientific support for various violence risk assessment methodologies at capital sentencing. I am lead investigator or co-investigator of large-scale research projects examining inmate correlates of serious violence in prison. I am the invited author of *Evaluation at Capital Sentencing* (2010), a volume in the Oxford University Press series of texts on "Best Practices" in forensic mental health evaluations. I am first author of the chapter on forensic psychology evaluations in death penalty cases in the well-regarded 12-volume *Handbook of Psychology* (2003, 2013), as well as author of chapters on capital sentencing evaluations in other edited texts. I was the guest editor for a special issue regarding capital sentencing considerations for the *Journal of Psychiatry and Law*.

6.      *Recognition for research, scholarship, and professional practice:* My scholarly activities have been noted by my peers. I am the 2012 co-recipient of the *National Register of Health Service Psychologists A. M. Wellner, Ph.D. Lifetime Achievement Award.* This annual award is the highest honor bestowed, from among 12,000 Registrant psychologists, by the National Register to commemorate numerous and significant contributions to psychology during a distinguished career. I am the recipient of the highly prestigious *2006 American Psychological Association Award for Distinguished Contribution to Research in Public Policy.* The American Psychological Association, a professional organization of 160,000 members, confers this award on one psychologist annually who has made distinguished empirical and/or theoretical contributions to research in public policy, either through a single extraordinary achievement or a lifetime of work. I was awarded the *2005 Texas Psychological Association Award for*

EXHIBIT 8

**2025**

*Outstanding Contribution to Science.* This is an annual award in recognition of significant scientific contribution in the discovery and development of new information, empirical or otherwise, to the body of psychological knowledge. I am a *Fellow* of the American Psychological Association, a peer-reviewed distinction reflecting outstanding contribution to the profession of psychology at a national level. I was the recipient of the *2004 National Association of Sentencing Advocates John Augustus Award.*

7. *Continuing education instruction:* The American Academy of Forensic Psychology is an association of board certified forensic psychologists (ABPP). Under the auspices and at the request of the Academy, I have provided full-day workshops on "The role of the forensic psychologist in death penalty litigation" in Milwaukee, Wisconsin; Austin, Texas; Monterey, California; San Diego, California; Cincinnati, Ohio; LaJolla, California; and San Francisco, California. These workshops emphasized research literature, statistics, and conceptualizations relevant to assessments of capital defendants. I have also provided a full-day workshop for psychologists regarding capital sentencing evaluations under the auspices of the Texas Psychological Association.

**Evaluation procedures**

8. My evaluation consisted of reviewing records, including mitigation investigation summaries. Records relied upon in forming my opinion:

**INTERVIEW BINDER**
1. Affidavit of Deborah Seeger
2. Affidavit of Robert Seeger
3. Mitigation packet on Maria Runyon
4. Mitigation packet on Mark Runyon
5. Mitigation packet on Wren Fleming
6. Scotty Fleming – Kansas Criminal Justice System Records
7. Declaration of Catherina Voss
8. Declaration of Scott Linker
9. Declaration of David Dalton, Sr.
10. Declaration of Paula Dalton
11. Declaration of Matt Long
12. Declaration of Maria Runyon
13. Interview with Suk Cha 09/01/15
14. Handwritten Note re: David Runyon
15. Declaration of Deborah Seeger
16. Declaration of Robert Seeger
17. Interview Notes from Meeting with David & Carol Dombrowski by Jessica Johnson 09/14/2015
    a. Part 1 – History
    b. Part 2 – David Dombrowski mental health issues

Page 3

EXHIBIT 8

**2026**

**BINDER 1**

1. Affidavit of Sheila M. Cronin
2. Social History of David A. Runyon by Sheila Cronin 08/08/09
3. Memo to Counsel: Phone call to Jon Babineau and Lawrence Woodword re: David Harold Runyon (adoptive dad) 08/21/08
4. David Dombrowski (biological father) Trial Testimony Transcript
5. Suk Cha Runyon (mother) Trial Testmony Transcript
6. Mark Runyon (brother) Trial Testimony Transcript
7. Suk Cha Runyon Medical Records
8. David Dombrowski VA Clinic Records
9. Charles Ferguson – High School Friend;
    a. Interview 07/04/09
    b. Trial Testimony Transcript
10. Robert Lockwood – Childhood Friend;
    a. Interview 06/14/09
    b. Trial Testimony Transcript
11. Michael Grbic and Parents brief Interview 04/26/09
12. Kansas Department of Corrections Employee Records 1994
13. Letter from Former Employer - Premiere Palace No Date
14. Letter from David regarding his voluntary re-enlistment in the ARMY No Date
15. Thomas Preston – U.S. Army friend – Interview 10/04/08
16. Scott Linker – Former Brother in Law;
    a. Interview No Date
    b. Trial Testimony Transcript No Date
17. Robert & Debbie Seeger – Friends – Interview 11/09/08
18. U.S. Army Friends;
    a. Larry Eaglebear Interview 11/22/08 & Trial Testimony
    b. Edgar Hannaman Interview No date
19. Family:
    a. Maria Runyon – Ex-Wife – Interviews 04/26/08 & 04/30/08
    b. Maria Runyon – Trial Testimony Transcript
    c. Robin & Jim Carol Friends of Ex-Wife Interview 04/27/08
20. Captain Jeffrey Harries – Fayetteville Police Department, David's Supervisor – Interview 08/31/08
21. Fayetteville Police Department Employment Records including Disciplinary Records
22. Robin Carroll – friend of Maria Runyon – Interview 01/27/09
23. Thomas Kumorowski – Friend & coworker – Interview 06/10/09 and Trial Testimony Transcript
24. Phyllis Provost, Ph. D., - Friend, ex-wife of Tom Kumorowski – Interview 06/14/09 & Trial Testimony Transcript
25. Police Affidavit – Maria Runyon – re: Domestic Violence 2/07/01

EXHIBIT 8

**2027**

26. David Runyon Resume
27. Virginia Pina – Former Girlfriend:
    a.  Interview 12/27/08
    b.  Trial Testimony Transcript
28. Handwritten Letter from David to Sarah – Girlfriend at the time of his arrest
29. Chad Costa – Friend – Interview 08/16/08
30. Clinical Trial Drug List by Sheila Cronin 04/08/09
31. Statement of George Koski (Sold David a gun)
32. David Runyon – School Records
33. David Runyon – Medical Records
34. David Runyon – Military Records
35. Mental Health Evaluations – Summary of prior testing
36. Mental Health Evaluations – Dr. Evan Nelson
    a.  Pre-lim Report
    b.  MMPI-2
37. Dr. Raymond Patterson Evaluation
38. Dr. Paul Montalbano
    a.  Evaluation
    b.  Client Interview
    c.  MMSE Test
    d.  VIP Test
    e.  MMPI-2
    f.  WAIS-III
39. Dr. Allan Mirsky
    a.  Preliminary Report
    b.  Email to Attorney 07/23/09
    c.  Letter to Attorney 09/18/09
40. Dr. James Merikangas – Preliminary Report
41. Presentence Report – Physical & Mental Health Excerpt
42. David Runyon writings from journal 2006 – 2007
43. Memos on pre-trial interviews with David Runyon
44. David Runyon Pre-Trial Correspondence
    a.  List of lives saved
    b.  Letter to biological father
    c.  Letter to mitigation Specialist – Sheila Cronin
    d.  Letters to Attorneys
45. Court Records:
    a.  Guilt Phase Closing Arguments
    b.  Eligibility Phase Arguments
    c.  Penalty Phase Arguments
46. Direct Appeal Opinion – Facts of the Case

EXHIBIT 8

**2028**

**BINDER 2**
1. Sentencing Phase Transcripts of Proceedings
   a. Guilt Phase -- Closing Arguments July 22, 2009
   b. August 19, 2009
      i. Sgt. William Stevens
      ii. David Dalton
      iii. Virginia Pina
      iv. Nick Schmidle
      v. William Banks
      vi. Debbie Bratton
      vii. Mitchell Jones
      viii. Capt. Jeff Harris
      ix. Jennifer Lynn Kime
      x. Lt. Jeremy Chayer
   c. August 20, 2009
      i. Erin Skiba
      ii. Barbara Wilson
      iii. Kristen Smith
      iv. Rose Wiggins
      v. Dr. Mark D. Cunningham pg. 2084
   d. August 24, 2009
      i. Eric WestDavid
      ii. Lauretta Johnson
      iii. Brandy Anderson
      iv. Candace Mabry
      v. Erica Singledecker
      vi. Hector Diaz
      vii. William Banks
      viii. Larry Eaglebear
      ix. Thomas Kumorowski
      x. Michael J. Grbic
      xi. Charles Ferguson
      xii. Scott Linker
      xiii. Tiffany Linker
      xiv. David Dombrowski
      xv. David H. Runyon
      xvi. Suk Cha Runyon
   e. August 25, 2009
      i. Robert Lockwood
      ii. Mark Runyon
      iii. Maria Runyon
      iv. Phyllis W. Provost
      v. Theodore Schlossman

EXHIBIT 8

**2029**

vi.  Larry Rilee
   f.  August 26, 2009
   g.  August 27, 2009

**Conceptual Considerations**

9.      In a death penalty case, once the jury convicted Mr. Runyon of capital murder, its attention would turn to his culpability.  Moral culpability is a concept at the heart of mitigation (*Burger v. Kemp*, 1987), citing *Woodson v. North Carolina* (1976) (see also other SCOTUS decisions, e.g., *Coker v. Georgia*, 1977; *Lockett v. Ohio*, 1978; *California v. Brown*, 1987; *Franklin v. Lynaugh*, 1988; *Penry v. Lynaugh*, 1989; *South Carolina v. Gathers*, 1989; *Payne v. Tennessee*, 1991. An understanding of the concept of moral culpability is critical to the jury's consideration of the nexus between the mitigating factors presented to the jury and the capital offense of which it has just convicted the defendant. To explain, the concept of moral culpability acknowledges an elementary psychological reality: we do not all arrive at our choices out of equivalent raw material. It follows the degree of "blameworthiness" of an individual may vary depending on what factors and experiences shaped, influenced, or compromised that choice. The relationship of developmental damage and other impairing factors to the exercise of choice, and subsequently to moral culpability, is illustrated in the graphic models below. As the damage and impairing factors (e.g. neglect, abuse, psychological disorder, corruptive socialization, substance dependency/intoxication, etc.) increase, choice is exercised on an increasing slope, and moral culpability is correspondingly reduced.



10.     The greater the damaging or impairing factors, the steeper the angle or slope on which the choices are made; and thus the lower the level of moral culpability. The

Page 7

EXHIBIT 8

**2030**

formative or limiting impact from any source of developmental damage or impairment is relevant in weighing moral culpability. An appraisal of moral culpability involves an examination of the degree to which the background and circumstances of the defendant influenced, predisposed, or diminished the defendant's moral sensibilities and the exercise of volition or free will. Stated more plainly, how steep was the angle from which the choices were made?

11. The typical theory of the State at capital sentencing is that the defendant's criminal conduct, including the capital offense, is the result of the totally volitional, unfettered, free exercise of choice of the defendant arising solely from his malignantly evil heart. It was incumbent upon defense counsel to be able to rebut this theory.

**Findings**

12. Available history, however, demonstrates that Mr. Runyon suffered from a myriad of malignant formative influences that he did not choose. Such evidence is consistent with and supports the primary theory of the defense at capital sentencing.

13. Unfortunately, the defense did not present or explain the relevance of the damaging developmental experiences that impacted Mr. Runyon. Thus the jury did not hear testimony that would allow them to make an informed test of the role of unfettered volition as opposed to the influence of bio-psycho-social factors.

14. Review of the sentencing transcript demonstrates Mr. Runyon's defense did not:

   a. articulate a coherent theory of mitigation,

   b. aggregate his experiences and history into meaningful categories of developmental adversity and other impairment, and/or

   c. provide expert testimony regarding the nexus between the adverse developmental or other impairing factors, as well as psychological/psychiatric disorders, that mitigate the crime of which Mr. Runyon was convicted.

15. **No coherent theory of mitigation:** The defense did not explain to the jury how they were to apply the mitigating developmental history they heard. More specifically, the defense did not articulate the role of "moral culpability" as the jury weighed these factors and the associated death-worthiness of David Runyon. Rather, the defense only vaguely specified in an opening statement at sentencing:

> The defense will put on evidence that we believe will make you think that the death penalty is not warranted, things like his history as far as his schooling, his family perhaps mental health information, how he has done since he has been

Page 8

<div align="center">

EXHIBIT 8

**2031**

</div>

incarcerated, those kind of things. We will put on a lot of evidence so you know David Runyon. [07/22/09, p. 1771]

It is a monumental decision that you are called upon to weigh, and as the government said, you will hear the aggravating factors that they will bring evidence to you on. When you are listening to those factors as have been described, we ask you to think about, do these things make David Runyon the worst of the worst? Is he someone who the appropriate penalty for the crime he has been convicted is death? [08/19/09, p. 1818]

16. **Inadequate presentation of mitigating history and its implications:** A psychosocial investigation was undertaken pre-trial by Sheila Cronin, with interviews of some immediate and extended family members and retrieval of records. Only a fraction of this social history or other available history of adverse developmental factors, however, was presented in mitigation to Mr. Runyon's sentencing jury. Though some historical information regarding developmental adversity was elicited from lay witnesses at Mr. Runyon's capital sentencing trial, this illuminated only a very small portion of the damaging formative factors, and these incompletely.

17. The social history presented regarding Mr. Runyon was so fractional that the Government argued in closing:

When you look at these mitigators, ladies and gentlemen, I will submit to you that the defendant has tried to make it very much quantity versus quality... [08/26/09, J.A. 3134]

He [Mr. Runyon] had a good upbringing. Again, he rejected that, and he walked away from that over five years ago. [08/26/09, J.A. 3138].

18. Even those family and other formative experiences that were referenced were left largely unexplained in terms of their implications for a criminally violent outcome, as the defense did not call a mental health expert to describe the implications of these experiences.

19. Specific to Mr. Runyon, there are a number of adverse developmental and life trajectory factors (detailed subsequently) that singly and collectively increased the likelihood of his having adverse and criminally violent outcomes in adulthood. Had the defense sponsored mental health expert testimony regarding the relationship of development to adverse outcomes, this testimony could have aggregated these toxic formative factors and experiences into developmentally meaningful categories. These scholarly and case-specific perspectives were critically important if Mr. Runyon's sentencing jury was to have knowledge of and have an informed mechanism to give weight to adverse factors in his background.

EXHIBIT 8

**2032**

20.     The defense had obtained a preliminary evaluation by Dr. Mirsky, neuropsychologist, but did not receive funding for James R. Merikangas, M.D., psychiatrist and neurologist, until 07/22/09. This is the same day the jury found Mr. Runyon eligible for the death penalty. The delay in obtaining mental health consultation however, provided inadequate time to prompt additional social history investigation based on the findings of this evaluation. These experts, of course, did not have the benefit of a full mitigation investigation to inform their findings nor adequate time to conduct a comprehensive evaluation of Mr. Runyon.

21.     Had a mental health expert been provided with a complete mitigation investigation from which to evaluate the social history and adverse developmental factors in Mr. Runyon's background, the defense could have elicited and the sentencing jury would have had available for its consideration, a well-established and prevailing developmental perspective in 2009 that adult outcome is a function of the interaction and balance of predisposing, risk, and protective factors in childhood (see Hawkins et al., 2000; Masten & Garmezy, 1985; U.S. Department of Justice, 1995). In other words, as predisposing and risk factors increase, and protective factors decrease, there is an increasing probability of dysfunction as an adult.

22.     The defense also could have elicited testimony that the nexus between development and adult behavior is typically neither conscious nor simplistically obvious. Childhood developmental adversity is rarely a "gunshot" that creates an obvious and immediate path of "tissue" destruction. Rather, developmental adversity is analogous to radiation exposure. The child may exhibit only minimal symptoms at the time of exposure. The associated damage is not in kind: years later, as an adult, the person irradiated as a child does not begin emitting radioactivity. Rather, he grows cancers. That these malignancies do not immediately emerge following the exposure, do not "look like" the radiation in their characteristics, may be of different types and in different locations in different patients, and result from a complex interaction with the metabolism and predispositions of the affected patient, does not reflect that the cancer has no nexus to the radiation. Rather, the nexus is demonstrated by the increased rate of malignancy in persons subjected to radiation. Similarly, expectations of an immediate and/or overtly obvious nexus between developmental adversity and criminally violent outcome are both simplistic and inconsistent with well-established psychological science on how pathological exposures in childhood produce dysfunctional adult behaviors This nexus is demonstrated by increased rates of psychological disorder, substance abuse, interpersonal pathology, and criminal behavior, in adulthood among those who were psychologically impaired or injured as children. That said, there is a logical nexus between the adverse developmental factors in Mr. Runyon's background and the capital offense, as will be detailed in later sections of this declaration.

Page 10

EXHIBIT 8

**2033**

23.     Further, in considering the nexus between damaging developmental factors and adverse outcomes in adulthood, the defense did not explain or sponsor testimony that everyone need not totally succumb to adverse developmental exposures in order for a "toxic" effect to be implicated. Correspondingly, all similarly situated persons need not commit acts of criminal violence or suffer adverse life outcomes in order to demonstrate a relationship between background and outcome. The analysis of risk, vulnerabilities, and protective factors in the etiology of adverse life outcomes is quite similar to explanations of why some individuals contract cancer and others do not (i.e., carcinogen exposure, predisposing factors, and protective factors).  All of the children growing up in a neighborhood built on top of a toxic waste dump do not get cancer – rather these children as a group experience a markedly increased incidence of cancer as compared to more benign settings. Similarly, only 20% of heavy smokers eventually suffer from lung cancer – yet the role of this exposure in these cancers is well established. A history of adverse developmental experiences does not invariably result in or markedly impaired adult outcome – only a much-increased likelihood of it.

24.     To illustrate these categories that could have been specified at trial, analysis of Mr. Runyon's background finds numerous distinct toxic formative influences and compromising factors, each with malignant implications for Mr. Runyon's life trajectory.

### Transgenerational

1.  **Transgenerational family dysfunction and distress**
2.  **Hereditary predisposition to psychological/psychiatric disorder and personality pathology**

### Neuro-developmental

3.  **Minimal weight gain and near miscarriages in utero**
4.  **Head injury in motor vehicle accident and subsequent personality change**
5.  **Chronic stress in childhood**
6.  **Neuropsychological dysfunction**

### Parenting and family

7.  **Mother's inadequate bonding to David**
8.  **Mother's emotional neglect and rejection**
9.  **Physical and emotional abuse**
10. **Father's alcohol abuse**
11. **Parental volatility, marital conflict, and family violence**
12. **Abandonment by father**
13. **Residential instability**

EXHIBIT 8

**2034**

### 14. Transcultural relocation

25.     If called to testify regarding the above adverse developmental factors, I would have offered testimony regarding the history associated with each and their nexus with Mr. Runyon's life trajectory.  Such testimony is detailed in the sections that follow.

26.     A number of conventions will be utilized in my findings that follow. First, information heard at the 2009 sentencing phase is referenced in *italics*. Information that could have been discovered in 2009, but was not presented at the sentencing phase is in standard font. Second, Mr. Runyon will be referred to as "David" as this reduces confusion with other male relatives and more accurately reflects his developmental status at the time of the described events. Third, clinical and research perspectives regarding the implications of the various adverse factors will be based on clinical perspectives and scholarly data available in 2009. This will be reflected in the dates of publication of scholarly references. Fourth, the numbering of paragraphs will be discontinued in favor of numbering the adverse developmental factors.

## Transgenerational

### 1.     Transgenerational family dysfunction and distress

Extremely limited information was presented at sentencing regarding David's generational history and associated adverse factors.

*David Dombrowski, biological father, testified his father was intoxicated on weekends and took out his frustrations on the children of the family [0064]. He also described his father as abusing his spouse (Dombrowski's mother) [0065].*

*The Government objected and the Court sustained objections to Suk Cha Runyon (mother) testifying regarding her history as a war refugee [0093]. The defense did not proffer mental expert testimony regarding the developmental (mitigating) implications of transgenerational history.*

The above minimal references to the paternal family system did nothing to convey to the jury the profound transgenerational family dysfunction and distress in the paternal and maternal family systems, or the implications of such history. This transgenerational family dysfunction and distress included the following:

**Maternal family system:**

The pre-trial mitigation investigation of Sheila Cronin provided some illumination of the maternal family system. This history, however, was not presented to David Runyon's sentencing jury.

Page 12

EXHIBIT 8

**2035**

**Mother:**

*Suk Cha Chung was born 05/20/45* in Hambuk, Korea (now *North Korea*). She was the youngest of five children. Her mother died a week after giving birth. Her stepmother was present in the home from her earliest memory.

When Suk Cha was age five, the Korean War broke out. This event and the ensuing dislocations, losses, and traumas are critical to appreciating the limitations she brought to her parenting of David. Because her family was educated and financially well off, the North Korean government targeted them. Her grandfather was captured and killed by the North Koreans, as were her father's in-laws who were hiding him. *Suk Cha's father had gone to China* the day before the war started, as he had a bicycle business there. *Suk Cha's stepmother, Suk Cha and her siblings*, and extended family members began a dangerous *escape to South Korea. The stepmother tied the children together so they would not become separated and lost.* She brought along cash and jewelry to use as bribes along the escape route. Suk Cha recalls walking through soggy rice patties at night and *surviving on edible vegetation found along the way.* One night they boarded a boat in absolute silence so as not to signal their presence to soldiers on shore who would start shooting at them. Suk Cha recalled a baby began to cry and, under pressure from other refugees, the child's mother held the child over the side of the boat and drowned her. Suk Cha reported she did not see the baby drown, but observed the mother holding her arms over the side of the boat. Suk Cha said: "The baby's mother never seemed to stop crying after that."

When their group neared the 38th parallel and was preparing to enter a tunnel, bombers appeared and a bombing attack ensued. They took cover. Mothers were lying on top of their children to protect them. People who were already in the tunnel were killed. When the bombing stopped, Suk Cha observed a cousin of the same age crawl out from under the child's dead mother. Suk Cha recalled: "I keep remembering the blood on my cousin's hand; one of her fingers was gone."

After they crossed the 38th parallel, they stayed in a refugee camp. Food was scarce. They scavenged for discarded turnips. After staying in the refugee camp for an uncertain period of time, the family continued south. Suk Cha described it was known at the time that American soldiers raped teenage girls. She recalled staying at a farmhouse and American soldiers coming around and saying "Sexy? Sexy?" Suk Cha was grabbed by a teenage girl, who quickly put a blanket around her and cradled her in her arms, so that soldiers would think that she had a baby. This ruse was successful. Another teenage girl in the house was not so lucky; she was taken to another room by a soldier and raped.

EXHIBIT 8

**2036**

*Suk Cha's father came from China* on foot *and found the family.* She recalled he was very thin and had long hair and a long beard. The family settled in Seoul and some sense of normalcy was restored for a period of time.

When Suk Cha was approximately 12, her stepmother became involved with a missionary group who turned out to be more of a cult. Marital discord developed and one morning Suk Cha awakened to find her stepmother gone: "She didn't even say good-bye." Suk Cha never saw her again. There was little time for Suk Cha to come to terms with this loss. She recalled the next day her father brought home another woman and there was a big party. This began a painful period in Suk Cha's life, as her second stepmother treated the children very differently when the father was not present, treating the children, paternal grandmother, and servants badly. Suk Cha discontinued her schooling because her stepmother would not give her the tuition money, and Suk Cha did not want to complain to her father. Eventually, the stepmother instructed one of Suk Cha's older brothers to beat Suk Cha. Suk Cha reported this brother would pull her hair out, hit her, and/or drag her out of the house. She reported that the last time, he used a lead pipe to beat her on her shoulders. Suk Cha was determined to make a better life for herself, though her survival skills were impacted by her second stepmother: "You absorb a lot when you're a teen. I'm smart, I watched my stepmother and I learned how to manipulate to get what I wanted."

Suk Cha ran away from home and stayed with relatives who hid her. She described being befriended by a U.S. Army captain who got her employment as a bartender at a U.S. Army officer's event and teaching English to Korean soldiers working for the Criminal Investigative Division. When the captain returned to the United States, Suk Cha began working for a tailor shop across the street from the base. Under pressure from a CID officer friend of Suk Cha, the tailor sold the shop to Suk Cha who kept him as an employee.

Suk Cha reported the second stepmother threw the paternal grandmother out of the house. Suk Cha went to the house and physically attacked the stepmother. A fight ensued with each pulling out each other's hair, and others had to intervene to pull them apart.

*Suk Cha met David Dombrowski (David Runyon's father) when he came into the tailor shop. Dombrowski was U.S. Army enlisted. They were married* on 04/23/70 after dating for several months.

Suk Cha self-described additional instances of volatile emotional reactivity and aggressiveness following her marriage to Dombrowski. She described an angry confrontation with a landlord after they arrived at Ft. Hood. Suk Cha described going to Dombrowski's command in Panama and screaming threats when this officer refused to transfer Dombrowski to other duty *[Dombrowski testified Suk Cha went to his command*

Page 14

EXHIBIT 8

**2037**

*"fussing and a-cussing", J.A. 2871].* She described confronting Dombrowski with much anger after he *stayed out late gambling.*

As will be detailed subsequently, *Suk Cha described Dombrowski drinking and gambling.* She described his beating her and David while intoxicated. She described feeling trapped as she had no money of her own and did not drive. *Suk Cha reported as her depression deepened, she determined to take her own life. She described an intention to kill herself in front of Dombrowski* and the children. *She conceived a plan to take an overdose,* ingesting half the pills as he drove up and the remainder as he entered the apartment. Her timing was spoiled, however, as he was delayed coming into the apartment and she became too drowsy, and realized the children were not in the room. *She was hospitalized* for 5-6 days.

Soon after, Suk Cha separated from Dombrowski and returned to the United States. In late 1975, she *met David Harold Runyon (stepfather) while working as a waitress.* She divorced Dombrowski on 02/22/76 and *married Runyon* on 04/06/76. Within the first two years of the marriage, *Runyon adopted Suk Cha's two children by Dombrowski,* David (dob 01/07/71) and Mark (dob 08/22/73), and they were issued new birth certificates.

Suk Cha appears to have continued to struggle with mood disorder following her divorce from Dombrowski. Mark recalled Suk Cha was not a happy person and was often tearful. This was in marked contrast to her presentation at a social event, when she would act lively and happy. He characterized her as a rigid and controlling person. He described a regimented and harsh family environment. Mark described Suk Cha had a violent temper and would have "meltdowns" 1-2 times yearly. During these episodes, she screamed and yelled, and on one occasion broke every dish in the house – as well as the television, which she targeted with a dish. At least monthly he caught her crying. Sheila Cronin described Suk Cha as hypomanic at times during their interviews, as well as tangential. *Suk Cha's testimony also had a pressured, disorganized quality that was apparently frustrating to defense counsel and the Court.* In her affidavit, Sheila Cronin stated Suk Cha likely suffers from Bipolar Disorder. Suk Cha also exhibits posttraumatic responses. Mark described that she startles and wets her pants in response to hearing a gunshot.

A progress note dated 03/01/93 diagnosed Suk Cha with "moderate depression" [000181]. On 06/27/93 she is diagnosed with "depression" [000182]. On 03/15/94, it was noted she was resistant to taking antidepressants though these made her feel better. A hospital note dated 09/19/07 described her as being loud and cursing about her food tray not corresponding to the graphic art on the cover of the menu. She demanded to see the commander of the hospital.

Suk Cha's marriage with Runyon appears to have been detached. Mark did not observe physical affection between them and did not feel they were happy together. Mark recalled they often fought, but always behind closed doors. Suk Cha is estranged from both of her

EXHIBIT 8

**2038**

sons. She reported her relationship with David was spoiled by his marriage to Maria in 1995, with their communication essentially ending at that point. Suk Cha reported her relationship with Mark was particularly conflicted. She described she has not seen Mark since his wedding in 2000, and previously had not seen him since he left home at age 15 (1988).

### Maternal uncle and aunt:

As described above, Suk Cha reported an older brother was enlisted by the second stepmother to beat her. This went far beyond sibling torment, as he ultimately beat her with a lead pipe about the shoulders.

Suk Cha's sister attempted to cheat Suk Cha out of her share of an inheritance, an intention that was foiled by Suk Cha's appearance in South Korea when Runyon (adoptive father) was stationed there.

### Paternal family system:

The paternal family system history that follows is based on the summary of the federal habeas investigation interview of David Dombrowski (defendant's father, hereafter "Dombrowski") in September 2014.

### Paternal grandparents:

Paternal grandfather, Anthony "Tony" Thomas Dombrowski (1912-1978): *Dombrowski testified at sentencing to only part of his father's history:*

> *...I was born and raised in Chicago. Unfortunately, my father – although he was a construction worker, worked hard all the time, his Friday nights, when he got his paycheck, he spent a lot of time in the bars, and he came home routinely intoxicated and would get pretty upset if dinner wasn't still there and hot an ready for him.*
>
> *Or if he had a bad week or whatever, if he had a bad experience at one of the bars and so forth, we as kids would suffer some of those consequences, inasmuch as he would roust us out of bed in the middle of the night or morning, whichever you want to call it, and, you know, give us the third degree about some little something that Mom had told him earlier in the week about school maybe or something. [J.A. 2855]*

The above testimony, however, provided a profoundly incomplete picture of Tony's history, brutality, and the terror his violence had for the family. A portion of this history was identified in the pre-trial mitigation investigation of Sheila Cronin (see Social

Page 16

EXHIBIT 8

**2039**

History) and additional information was uncovered in the federal habeas investigation interviews of Dombrowski.

On federal habeas investigation interview, Dombrowski reported his father, Tony, was one of four children. Little is known of his family of origin. Tony was an "enforcer" or hit man for Anthony LeBarbera, a mobster. Tony was charged with murder at age 15, apparently this murder was a hit commissioned by LeBarbera. He was initially sent to Boys Town in Nebraska. At age 18 he was transferred to an adult correctional facility to finish his sentence. He was released in his mid-thirties. Dombrowski reported Tony was released from prison early because he volunteered for a federal study testing treatment for tuberculosis. The health implications for Tony of participating in this medical study are unknown. However, Dombrowski reported he had a positive TB test while in the U.S. Army and subsequently was treated with medication for over a year.

The connection to the mob returned later in Tony's life. Dombrowski described LeBarbera had moved his operation to Las Vegas, but returned to Chicago and was looking for men. LeBarbera found Tony and wanted him to work for him. By this time, Tony was married and had four children. LaBarbera allegedly threatened to harm Tony's family if he did not work for LeBarbera. Dombrowski recalled being around 7-8 years old and being sent to live with his aunt, Viola. Dombrowski's other siblings were each sent to live with a different relative. At the time, there was no explanation for why this was happening. Dombrowski is uncertain how long he lived with this aunt, but eventually he and his siblings returned home.

Dombrowski reported later learning his father was continually asked to work for LeBarbera and refused. In order to make the point he was not going to work for the mob, Tony went after and beat the men who were working for LeBarbera to send the message he was not going to be recruited. After Tony beat each person, he would ask if he was out and if the answer was "no," he would hunt down another of LeBarbera's men and beat them. Finally, LeBarbera left Tony alone.

Dombrowski reported his father would never speak of his mob ties (or any history) while sober, but when drunk would talk to Dombrowski about almost anything. Dombrowski described being 100% confident these accounts of mob involvement were factually accurate. Dombrowski described his father as a very violent and aggressive man who operated under a mob mentality. There were associated strong themes that ran through the family: protect your family at all costs, never let anyone disrespect you or your home, stand by your beliefs and morals no matter what the cost, and the man protects the family. Dombrowski recalled his paternal grandmother as being the same way. All problems were solved with violence, usually beating.

Tony received training in prison and spent the majority of his life working in the construction industry. The majority of Dombrowski's childhood the family lived in or

Page 17

EXHIBIT 8

**2040**

around greater Chicago. The family moved many times within greater Chicago as Tony relocated them to be closer to any job site where he would be working for more than three months.

Tony was a severe alcoholic who regularly beat his wife, Elinore. Extreme violence was commonplace and the primary mechanism to solve any problem. Dombrowski characterized Tony as a "functional drunk," in that he would work, but then would get drunk every night and on weekends. When sober, Tony was attentive and almost loving to his children, but when he drank he was violent and abusive – "his evil side came out." Every time Tony drank, there was a high probability he would become violent.

Dombrowski recalled hearing Tony beat Elinore from the other room and subsequently seeing bruises all over Elinore. He described at about age 12-13 attempting to intercede to protect his mother. Dombrowski would run into the room when he heard the sounds of a beating, yelling at his father to stop or pulling at his father's clothing. Tony would yell at Dombrowski to leave and, if he did not, would chase Dombrowski and beat him. Even if Elinore did everything Tony wanted, he still beat her when drunk. Dombrowski recalled Tony was very degrading of Elinore as well. Tony would come home from the bar and demand to know why his supper was not waiting on the table for him. Elinore had his plate in the oven or the refrigerator, but Tony would demand to know why it was not on the table, waiting for him. Tony made Elinore sit down in the kitchen and watch him get his plate and heat it up, demeaning her by saying things like: "Do you see how I'm doing this? Does this look too hard to you?" Dombrowski described the family environment as being very violent and volatile. Dombrowski recalled walking on eggshells with a constant feeling of dread about what was to come. Though most of the violence centered on Elinore, there were times his discipline of the children was probably considered abusive. Certainly, his beatings of Dombrowski when he interceded in the domestic violence were abusive.

Dombrowski described Tony kept Elinore isolated and alone, making it nearly impossible for her to report the abuse. Not that she would have anyway; Elinore was completely dependent on Tony for everything.

Tony was violent with others as well. Dombrowski recalled beating up a peer who had recurrently bullied him. When the father of this bully opened the door and walked into Tony's house demanding for the medical bills to be paid, Tony beat this man inside and out of the house, then kicked him down the apartment steps.

Tony also recalled his father getting into a dispute with a local bar owner where Tony hung out. Dombrowski had a vague recollection of the bar owner attempting to blackmail Tony regarding his prison past. Around this time, Dombrowski observed his father making pipe bombs at their home. Tony had all the parts laid out and showed Dombrowski how to assemble a bomb, telling Dombrowski something to the effect of:

EXHIBIT 8

**2041**

"If you are going to sit there and watch, you might as well help." About two weeks later, the bar burned down. Dombrowski used this story to illustrate how vengeful his father was and that he never made a threat he did not follow through with.

Dombrowski reported his father died around age 66 of cirrhosis.

Paternal grandmother, Elinore Ruth Birdsell Dombrowski:

Elinore was approximately 10 years younger than Tony. Dombrowski described his mother as "slow." He characterized her as "borderline," describing she had limited intellectual functioning. She had to be "led around." Elinore never worked outside of the home. The expectations of her were quite concrete: care for the children, cook, and clean. Even in these repetitive functions Elinore had to be given constant reminders about almost everything. Dombrowski detailed his father, Tony, taught his mother how to cook, but had to give her constant reminders to take something out of the freezer to let it thaw out before she could cook it. Tony had somewhat of a schedule and routine set up for Elinore and she could function adequately, as long as her routine did not change. As long as nothing happened, throughout the day, she would be fine. However, any little kink in her day would throw her off.

Elinore was not able to drive and was therefore completely dependent on Tony to take her anywhere. Tony handled all of the finances and Dombrowski does not recall his mother ever paying a bill or handling money. Elinore did not have a life outside of the home. She did not socialize with others and was essentially dependent on her husband for everything. She was easily persuaded and gullible and was almost childlike in the way you could persuade her.

In hindsight, Dombrowski believes his mother was "handicapped," but was never formally diagnosed. Within the above external structures and routines, she was able to physically care for herself and the children. Dombrowski perceived that his mother loved him and attempted to protect him from his father's abuse. This, however, was a "passive kind of love", as he does not recall her tucking him in or reading to him. At about age 46 (approximately 1968), Elinore left Tony. Dombrowski is not certain of when or how she died.

**Father:**

David Dombrowski was born in 1949 and was a twin (with James "Jimmy"). Dombrowdki described himself as a "slow learner" in school, having difficulty with both reading comprehension and math. He and Jimmy both repeated 3rd grade.

During Dombrowski's childhood, he was recurrently exposed to the alcoholism, domestic violence, his father's community violence, and the vengeful volatility of his father and

EXHIBIT 8

**2042**

the associated household chaos. These traumas were inadequately mitigated by his mother, who was intellectually deficient in her own right.

There were other corruptive exposures as well. Dombrowski reported that as young as age 10, he would go with his father to the bar, so that he could drive his father home after Tony got drunk. When 12-13 years old, Dombrowski would pull his little red wagon to the local bar, load up on beer, and take it back to sell at his father's poker parties. As a means to make money, he also hung out in the bar and shined shoes. This put him in contact with a lot of "drunk people making bad decisions." He characterized this "crude lifestyle" became commonplace for him.

Not surprising in the face of the drunkenness, violence, and vengefulness of his father and the inadequacies of his mother, Dombrowski's childhood and adult adjustment reflected the legacy of this trauma and neglect. He described that at age 10 he *started running away from home [testified to running away at age 13-14, J.A. 2856]*. Often this was *prompted by beatings of* him or *his mother*. Dombrowski recalled he was not worried about running away or what he would do, always having a sense he could take care of himself and was better off anywhere than his house. *He always attended school*, simply arriving in the same clothes he ran away in. His chronic runaways eventually resulted in children's services becoming involved *[court-ordered foster care]*. Dombrowski spent two years in a group home and then went to live with a foster family where Jimmy (his twin) had already been placed -- also due to runaways.

*Dombrowski testified he began to run away from approximately age 13-14, packing a suitcase and staying at a friend's house. He still attended school. He testified that at age15 he went to a group home and about 15 months later to a foster family, staying with them into his junior year in high school.*

Dombrowski reported working at a movie theater while living in the foster home and stealing a handgun from another employee. He hid the gun in the bedroom where it was discovered by the son of the foster parents. Dombrowski walked in on the boy playing with the gun and the boy accidentally shot Dombrowski in the chest.

*Dombrowski testified to taking the gun from his boss's trenchcoat and hiding it in his bedroom. He detailed the ensuing gunshot accident. [J.A. 2857]. Dombrowski testified that after several months of convalescence following the gunshot, he enlisted in the U.S. Army on 08/21/67.*

This incident appears to have had a posttraumatic impact. Dombrowski described:

> I felt like I cheated death and after that I really didn't care what happened to me. Sometimes, I still feel like that." [p. 23, Social History of Sheila Cronin]

EXHIBIT 8

**2043**

Dombrowski also described posttraumatic reactions to shooting three North Korean soldiers in the DMZ, describing: "I had to do it, but I never forgot their faces and I still dream about them" [p. 23, Social History of Sheila Cronin]. He described this experience leaving him with a startle response and also drinking to bury these feelings.

Dombrowski continued to exhibit the sequelae of his family background during his adulthood. *Dombrowski testified while in the Army and married to Suk Cha (David Runyon's mother) he had difficulties with both drinking and gambling:*

> *I got into a little bit of a drinking problem. I got into a little bit of a gambling problem, and it did affect me [J.A. 2869]...I would find a casino somewhere, sit down. And drinks were free in the casino, you know, so I would drink myself drunk and gamble myself broke [J.A. 2873].*

*Dombrowski testified that marital conflicts would ensue when he came home drunk, with David being awakened, observing Dombrowski restraining Suk Cha from hitting Dombrowski, and attempting to intervene [J.A. 2874].*

Suk Cha reported Dombrowski while intoxicated beat her and David. She recalled an instance of him grabbing David by the wrist and dangling him in the air. She ran to stop Dombrowski, jumped on his back, and pulled his hair. Despite this, Dombrowski would not let David go. Instead, he went to David's bedroom, swung him by the wrist, and heaved him across the room. Suk Cha cried as she described Dombrowski's drinking and abuse. She described:

> I tried yelling. I tried begging, crying, manipulation, but nothing worked. Davy tried to protect me and I tried to protect him. I was never so scared in my life. All I could do when he'd beat us is hug little Davy and tell him how sorry I was. [social history by Sheila Cronin]

Though not acknowledging this family violence, he did admit to David being in a volatile environment. Dombrowski reported he has a pattern of being quick-tempered and aggressive, finally admitting to himself in 1991 he had a problem. He described this followed a driving incident where a man cut him off. Dombrowski pulled up to the man's Jeep, pulled him out, and began beating him. Dombrowski's spouse, Carol, described it happened so quickly Dombrowski was beating the man before she could get out of the car. There were other occasions when he "went off the deep end" and got very aggressive with coworkers. Dombrowski described one of his supervisors demanded he seek help for his anger and aggression.

Dombrowski described that in 1991 he went to a local VA clinic and began seeing a psychiatrist. Eventually, a medication regimen was settled on which he regards as benefitting him greatly. He reported being maintained on Prozac (antidepressant) and

EXHIBIT 8

**2044**

Buspar (antianxiety). A progress note dated 06/17/09 noted the prescription of Trazadone (antidepressant) in addition to the Prozac and Buspar. The diagnosis was specified as: Major Depression [000197]. Dombrowski acknowledged that when he has attempted to go off the medication or even skips a dose, he quickly reverts to being easily frustrated and quick-tempered.

Dombrowski reported that within a year after Suk Cha married David Runyon, she sent papers for him to relinquish his parental rights. He described that though he was reluctant to do so, after much badgering from Suk Cha he signed the papers relinquishing his parental rights to his sons, David and Mark.

Dombrowski married Oderay Alverola on 04/01/76. She had a son, Jean Paul, by a prior marriage and together they had a son, Anthony. The marriage ended after 13 years secondary to his alcoholism. They divorced 09/04/90. He described a rage attack one day where he came home to an empty house and tore it to pieces.

Dombrowski married Carol in 1992 and they remain married to date. He retired from the U.S. Army in 1987. He is estranged from his siblings.

### Paternal uncles and aunts:

Limited history regarding paternal aunts and uncles (Dombrowski's siblings) reflects problematic life outcomes as well.

Paternal uncle, James "Jimmy" (dob 1949): Jimmy is a twin of Dombrowski (David Runyon's father). Jimmy was a "con man" and "swindler." He used Dombrowski's Social Security Number and ran up debts in Dombrowski's name. Jimmy has been in and out of trouble for "con man" type things. His substance abuse and mental health history are unknown.

Paternal aunt, Joyce (dob 1950): Dombrowski had little information regarding his sister. He had heard she had suffered from mental health problems.

Paternal aunt, Patricia Ann "Patti" (dob 1952): Dombrowski reported Patti has a problem with alcohol and becomes aggressive when she drinks. Dombrowki and Patti together forcibly retrieved Lynette, Patti's daughter, from Lynette's father while Dombrowski was home on leave from the military. Lynette was later raped and murdered in California, and Patti became obsessed with finding the person she believed to be responsible. Patti may have been charged with misusing her private investigators license in pursuing this individual. Ultimately, DNA revealed Lynette's killer to be another individual who was already serving time on another conviction.

EXHIBIT 8

**2045**

Paternal aunt, Virginia: Virginia's last know residence was Wisconsin. Dombrowski has no other information regarding her.

Paternal aunt, Freda: Freda was born severely intellectually deficient and handicapped. Dombrowski believes she never came home from the hospital after birth, instead going to an institution. Dombrowski identified fetal risk factors of his father's drinking, "bad genes," and Tony beating Elinore during the pregnancy.

Paternal aunt, Catherine: Catherine was also born intellectually disabled, though not as severely as Freda. She attended special classes in school. She has some self-care skills, but her expressive language skills are deficient. Dombrowski noted Catherine shared many characteristics with her mother, Elinore. She is very impressionable and gullible. Catherine is unable hold employment and receives Supplemental Social Security Income (SSI). She did well with a routine, though still requiring reminders. She could not figure out what to do if her routine were disrupted.

**Adoptive father:**

*David Harold Runyon (dob 1950): Runyon, adoptive father*, is the oldest of four children. Suk Cha is his only marriage and his two adoptive sons, David and Mark, are his only children. Like Dombrowski, Runyon is estranged from his family. Though his parents are alive and well, he has not seen them for many years, apparently secondary to their disapproval of his marriage to Suk Cha. Runyon last saw his brother in 1982 and his sisters in 1986. His interpersonal isolation appears to be of longstanding. Runyon recalled having only one long friendship growing up and spending most of his time alone in the woods. He characterized himself as a quiet man who is very self-contained.

Mark described his adoptive father as completely detached from everyone, with unchanging mood and expression. When *taking the boys on joint activities, such as fishing*, he communicated with them very little. That the family activities were accompanied by a lack of conversation or meaningful interaction was a critically important context in light of testimony by the adoptive father and Mark (younger brother) regarding these events.

**Siblings:**

Younger brother, Mark (dob 1973): *Mark is also the product of the relationship of Dombrowski and Suk Cha. He was age two at the time of their separation.* He characterized himself as always having felt "detached" from other people. He attributed this in part to family dysfunction and in part to moving frequently in childhood.

Mark described constantly being in trouble as a child, with *Suk Cha finding fault no matter how hard he tried to please her*. She was not physically affectionate with him.

EXHIBIT 8

**2046**

*Mark testified that in response to this treatment he first ran away at age five and subsequently ran away approximately annually.* Reminiscent of the deprivations Suk Cha experienced at the hands of her second stepmother, Mark described in high school wearing cheap clothes and having no replacements for two front teeth that had been knocked out from a fall from a bicycle. He recalled his mother telling him they could not afford to have them fixed and that he needed to get used to it – that she was preparing him for the real world.

Runyon had been stationed in Korea with the family. After a major confrontation, *Mark returned to the United States alone at age 15*. He lived with roommates and on the streets at times. When he scraped together enough money for a car, he lived in it for six months, bathing in a local creek. He enrolled in a cooking class at a community college so he would be assured of a meal at least three times weekly.

Mark also exhibited a volatile temper. He reported he once hit an employer with a baseball bat and on another occasion smashed a car with a tire iron.

*In 1991, Mark joined the Virginia National Guard* and later transferred to the Kansas National Guard. While at Ft. Benning in 1991 or 1992, he was arrested for theft of military gear. In 1994, he joined the U.S. Army. Also that year, Mark became depressed and started drinking heavily. He characterized he was marginally suicidal during this period. Mark was *deployed to Korea for a year. He was then was stationed at Ft. Campbell, Kentucky* where he met and *married* Tracy Allen. *He was deployed to Haiti.* Mark described becoming increasingly upset and depressed. He recalled having felt a lot of aggression, felt disconnected from people, had no patience with people, and had trouble sleeping. *He described having symptoms of PTSD [J.A. 3003].* He saw a counselor once or twice, but the counselor seemed to not know what to do with him.

On his return to Ft. Campbell he filed for divorce, secondary to *her affair* with his best friend. When she refused him access to their apartment to retrieve his gear, he physically took the keys from her and was arrested for domestic violence.

Seven months prior to his discharge, *Mark got into a fistfight with two other soldiers in the barracks. In the course of this he pulled out his gun and fired it in the air. He was convicted of three felony counts at courts martial and served 11 months in prison.*

Paternal half-brother, Anthony Dombrowski:  No information is available.

Summary:  David Runyon's family history is characterized by marked dysfunction that can be traced across generations. His paternal grandfather was mob-affiliated and had committed murder by age 15. He was an alcoholic who was brutally violent to his spouse and children, as well as community members. He constructed a pipe bomb in front of his son, which was ostensibly used to blow up a local bar. The paternal grandmother was

EXHIBIT 8

**2047**

intellectually deficient and inadequate to mitigate the effects of this volatile, violent home. A paternal uncle is characterized as a con man and swindler, and paternal aunts are intellectually deficient or have had significant life adjustment problems of their own. The father was in bars from childhood, a chronic runaway by his early teens, spent years in a group home and foster care, stole a handgun from his employer, and was subsequently accidentally shot in the chest with this gun. Early in his marriage to David Runyon's mother, he was routinely drunk, gambling heavily, and physically abusive of his spouse and David. Further reflecting his own limited attachment capability, he relinquished his parental rights to his two sons soon after the divorce. Another marriage also ended secondary to his alcoholism. He exhibits explosive reactivity and mood disorder, now controlled by medication. The father has been estranged from his siblings for many years.

The maternal family system is similarly dysfunctional. The maternal grandmother died a week after giving birth to the mother. A stepmother precipitously abandoned the mother at age 12 without saying goodbye. A subsequent stepmother was rejecting and neglectful.

In addition to the above disruptions in parental bonding, the mother in middle childhood was subjected to the ravages of the Korean War. Members of her extended family were executed by the North Korean government and the remainder of the family became refugees in fleeing to the South. In route, the mother experienced marked deprivations, saw civilians killed by combat and a baby drowned to silence it. She was aware of the rapes of teenage girls and was in the next room when this occurred. She suffered beatings at the hands of an older brother. The mother has exhibited explosive reactivity, exhibits posttraumatic reactions, and has been treated for mood disorder. Her presentation implicates Bipolar Disorder. The mother was detached in her marriages and in her relationship with her sons.

The stepfather has a lifelong pattern of interpersonal detachment, a characteristic he continued in his interactions with his spouse and adoptive sons. He has been estranged from his parents and siblings for decades.

The brother also has a pattern of interpersonal detachment. He felt rejected as a child and has been emancipated since age 15. He has had periods of alcohol abuse and depression, as well as episodes of reactive aggression. He has exhibited posttraumatic symptoms. He has been convicted of three felonies associated with the discharge of a firearm in a fight and served 11 months in prison.

**Implications of transgenerational family dysfunction and distress:** Family history is critically important to character and background through several fundamental processes. First, as will be discussed further below, some psychological/psychiatric disorders, personality characteristics, behavior patterns, and social vulnerabilities are genetically transmitted. Thus, independent of whether David had interaction with or knowledge of these

Page 25

EXHIBIT 8

**2048**

individuals in his family system; inherited predispositions, personality aberrations, and behavioral tendencies placed his life trajectory and choices at greater risk.

Second, many characteristics and behaviors are transmitted across generations by "family scripts." Family scripts are broad outlines of behavior and life sequence that are conveyed both verbally and more importantly by example in the lives of parents, grandparents, siblings, and extended family. School dropout, early pregnancy, early marriage, criminal activity, domestic violence, parental abandonment, substance abuse, poor social reciprocity, and/or many other maladaptive behaviors may be extensively represented in a family system from one generation to the next.

Third, modeling of specific behaviors or coping responses is also an important aspect of family influence - for good or ill. In David's immediate observation, there were parental models for family and community relationship detachment, poor marital choices, marital volatility, parental irresponsibility and abandonment, and explosive reactivity.

Fourth, maladaptive behaviors, including criminal activity and violence, may result from "sequential emotional damage." In other words, individuals who have been significantly emotionally damaged in childhood come into adulthood with limited emotional resources, and as a result may not parent their own children humanely or effectively. Crockenberg (1987) summarized research concluding: "parents reenact patterns of caregiving they experienced as children" (p. 964). Consistent with this observation, Green (1988) reported: "The childhood history and background of abusing parents include a high frequency of physical abuse and neglect, scapegoating, maternal deprivation, and exploitation" (843). The children of these neglectful or abusive parents are then, in turn, emotionally damaged themselves and thus at greater risk for broad adverse adult outcomes including child abuse and neglect, substance dependence, criminal activity, and violence. Sequential generational neglect characterized by deficient parental care and attachment is particularly damaging, as it results in fundamental damage to the foundations of personality and interpersonal functioning. The problematic effects of early abandonment, disrupted primary parental attachment, or other disruptions may not be evident until adolescence or early adulthood.

Both Dombrowski and Suk Cha were damaged and limited by the predispositions, traumas, and exposures of their own childhoods. As these damaged people proceeded to parent David and his brother, Mark, they did so through the life-lens, interpersonal impairments, and psychological/personality disorders of these predispositions and limitations. Understanding the extent of their limitations in parenting David rests on knowledge of what happened to them growing up.

David's own life has reflected this generational legacy. There is historical information that would have demonstrated that David was the product of a disturbed family system with associated genetic predispositions, disturbed scripts, pathological modeling, and sequential damage. This generational history was critically important for a capital

Page 26

EXHIBIT 8

**2049**

sentencing jury to have as they examined the formative influences in David's history, his character, and his psychological limitations. This history provides vital insights into the origin and nature of his psychological vulnerabilities.

Equally important in the weighing of his moral culpability, David had no choice regarding the family system that was fundamental to his development. David's participation in the charged offenses is thus not a singularly individual story, but instead occurs within a multigenerational context. While this does not obviate individual responsibility, the above multigenerational context does illustrate that David did not arrive at his offense conduct unassisted by pathological family influences, injury, norms, and modeling.

## 2. Hereditary predisposition to psychological/psychiatric disorder and personality pathology

*As noted above, testimony at sentencing regarding problems in the family system was limited to brief description of the paternal grandfather's (Tony Dombrowski's) drinking and volatility; the father's (David Dombrowski's) teen runaways, taking a gun, and his heavy drinking and gambling during the marriage of his parents during David's early childhood; and Suk Cha's excessive discipline of David in his early childhood.* There was no testimony regarding demonstrations of psychological/psychiatric disorder and/or personality pathology in their behavior or that of other family members, or the implications of this for David's psychological/psychiatric status and personality dysfunctions.

Three psychological/personality disturbances are evident across generations in David's family system:

Mood disorder: Dombrowski (father), Suk Cha (mother), and Mark (brother) have all exhibited and/or been treated for mood disorder. Their symptoms of this were detailed in the earlier section.

Explosive reactivity: Also as detailed in the earlier section, Tony (paternal grandfather), Dombrowski (father), Suk Cha (mother), maternal uncle, and Mark (brother) have exhibited recurrent explosive reactivity.

Interpersonal detachment, inadequate social reciprocity, and antisocial conduct: A constellation of personality characteristics is present in both the paternal and maternal family systems associated with inadequate recognition and/or appreciation of the experience of others.

This is variously exhibited in poor social reciprocity, deficient emotional resonance (i.e., empathy), irresponsibility, manipulation, criminality, and aggression. To capsule such maladaptive behaviors from the more detailed discussion above, the paternal grandfather

Page 27

EXHIBIT 8

**2050**

was mob-affiliated and had committed murder by age 15, spending the next 15-20 years in custody. He was subsequently brutal with his spouse and children, and violent with community members. A paternal uncle is a con man. The father was a gambler, violent with his spouse and David. He continued to provoke violent domestic conflicts even when aware David was present and attempting to intervene as a small child. The father abandoned his sons soon after the divorce. He is estranged from his siblings. The mother has initiated violent confrontations, exploited/extorted her employer out of his business, left her family of origin to emigrate without a second thought, was emotionally detached from her sons, has been chronically estranged from them, and has been noted to be remarkably entitled and demanding in a health care context. The brother is chronically emotionally detached from others, has engaged in weapons assaults including pulling a firearm, and has served 11 months in prison.

**Implications of hereditary predisposition to psychological/psychiatric disorder and personality pathology:**

Mood disorder: Regarding hereditary factors associated with mood disorders, DSM-IV-TR (American Psychiatric Association, 2000) describes that Major Depressive Disorder is 1.5-3 times more common among first-degree relatives of persons with this disorder than among the general population. There is also increased risk for Alcohol Dependence in first-degree relatives, and there may be an increased risk of Anxiety Disorder [page 373]. It is thus notable that Dombrowski (father) has a history of depressive and anxiety symptoms, in addition to Alcohol Dependence.

DSM-IV-TR also describes that first-degree relatives of persons with Bipolar Disorder have increased rates of various forms of Bipolar Disorder, as well as Major Depressive Disorder.

Klein, Depue, and Slater (1985) found mood disorders occur 7.6 times as often in children with at least one affectively ill parent (38%) compared to those without (5.0%). Akiskal et al. (1985) in a prospective investigation of the offspring and younger siblings of patients with Bipolar Disorder found that 57% of these close family relatives were diagnosed with a disorder on the Bipolar spectrum within four years.

Explosive reactivity: There is also a hereditary component to explosive reactivity. DSM-IV-TR specifies:

> Mood Disorders, Substance Abuse Disorders, Intermittent Explosive Disorder, and other Impulse-Control Disorders may be more common among first-degree relatives of individuals with Intermittent Explosive Disorder than among the general population. [p. 665]

Regarding interpersonal detachment, inadequate social reciprocity, and antisocial conduct: The empathy deficits, distorted morality, and low levels of parental bonding / commitment /

EXHIBIT 8

**2051**

protection exhibited by David's parents and multiple members of his family system, as well as the criminal activity of some family members, reflect traits on the Antisocial Personality Disorder continuum that have a genetic predisposition/component, particularly virulent in their transmission when these are exhibited by female relatives (see DSM-IV-TR, p. 704). The deficits exhibited by David's mother place him at particular risk for these traits, as does his genetic heritage of these deficits on both sides of his family. Such genetic predispositions coupled with developmental vulnerabilities and childhood maltreatment, increased the risk David would possess traits such as irresponsibility, intermittent callousness, and manipulative behavior.

The predispositions to such traits arising from hereditary and childhood experience are important perspectives in explaining the presence of disturbed personality traits and criminal violence in David. This was particularly important in light of attempts by the Government at the sentencing phase to characterize David's criminal conduct and personality defects as willfully self-selected, rather than acknowledging its origins in his heredity, childhood, and/or family experience. Note that this discussion is not intended to represent that David suffers from Antisocial Personality Disorder, rather that he exhibits traits on this continuum that have a hereditary component, as well as being secondary to inadequate attachment, trauma exposure, and other developmental factors. Importantly, the personality disturbance resulting from such predispositions and maltreatment is not willfully chosen by the person exhibiting these characteristics. Rather, it is the net result of predisposing influences and damaging developmental experience.

## Neuro-developmental

**3.    Minimal weight gain and near miscarriages in utero**

Suk Cha did not receive prenatal care until late in the second trimester when she began spotting and experiencing abdominal pain. She reported she fainted and *suffered a near miscarriage in July 1970 when at the airport for a flight to the United States*. She suffered a second experience of bleeding during the pregnancy.

Suk Cha reported she was unable to keep food down and gained <u>no weight</u> during the pregnancy. She further reported the doctors did not expect her or the baby to survive labor and delivery. Despite these complications, David was born by natural childbirth weighing 6 lbs. 13 oz. on 01/07/71. Dombrowski believes David may have had a breach presentation.

**Implications of minimal weight gain and near miscarriages in utero:** Suk Cha's failure to have prenatal care or gain weight during the pregnancy raises concerns with the quality of nutrition available to David in utero. This is illustrated by increased infant mortality rates among women who do not gain adequate with pregnancy. Note normal weight women are expected to gain 25-35 lbs. during gestation. Pregnancy complications have been associated with increased risk of delinquency in some studies.

EXHIBIT 8

**2052**

**4.     Head injury in motor vehicle accident and subsequent personality change**

In November 1996, David was involved in a head-on collision with a drunk driver, totaling the truck he was driving [see declaration of Deborah Seeger, 000883; correspondence from Sheila Cronin to Stephen Hudgins, 05/05/09, 000405]. Maria Runyon, former spouse, considers this accident to be a "very significant" event in their lives, as David changed dramatically in its aftermath. She described his personality changed so that he was meaner and more easily frustrated. Maria characterized: "The guy I married had good morals, discipline, and restraint, and, for the most part, this changed" [interview summary, 000892]. David complained of vertigo, sleep disturbance, and memory loss in medical consultations over the next 10 months months [correspondence from Sheila Cronin to Stephen Hudgins, 05/05/09, 000406-407]. At a consultation on 09/09/97, the progress note ends: "Depression diagnosis, Posttraumatic Stress Disorder" [correspondence from Sheila Cronin to Stephen Hudgins, 05/05/09, 000408].

It is notable that this MVA head injury was cumulative in its effect with a number of other head injuries David suffered. David (report of Raymond F. Patterson, M.D., 06/24/09) and Suk Cha (Social History of Sheila Cronin) reported that while living Panama in David's early childhood, he was thrown across the room by Dombrowski. This injury resulted in a crooked smile, as his right lip sags. David also advised Dr. Patterson and Dr. Montalbano, (report Paul Montalbano, Ph.D., 06/27/09) of two additional head injuries resulting in loss of consciousness. One of these occurred in his elementary school years when he ran into a telephone pole. He advised Dr. Patterson of being "knocked out wrestling" (p. 12) as well.

Perhaps most important of the head injuries prior to the MVA, David described loss of consciousness from explosions in military training (reports of Dr. Patterson, Dr. Montalbano, and Dr. Mirsky). Dr. Mirsky detailed two incidents of training grenades exploding in close proximity to David on two occasions in training (correspondence to Stephen A. Hudgins, 09/18/09). Dr. Mirsky (email correspondence to Stephen A. Hudgins, Esq., 07/23/09) described the interactive brain injury implications of these blast exposures and the MVA:

> I am firmly convinced that Mr. Runyon is still suffering from the effects of two blast injuries he sustained when undergoing training exercises in the ROTC. These were compounded by the effects of the motor vehicle accident. His impaired attention, seen in the Continuous Performance Test scores in my report, is one of the classical symptoms of blast injury and impact injury after a car accident. Other symptoms, such as quickness to anger, and impulsivity, are also well documented in the brain injury literature. The occasional dizziness he show is also symptomatic of brainstem injury. In some sense, because he suffered the blast injuries while in the ROTC, he can be considered a wounded warrior, and this should be considered in his sentencing.

EXHIBIT 8

**2053**

**Implications [mechanisms] of head injuries:** A clear understanding of brain anatomy and the nature of the forces that create brain damage is essential in coming to informed conclusions regarding the potential for head injuries to result in brain damage. Begali (1987) described brain tissue as being about 75% water. This brain tissue takes up approximately 80% of the space within the skull with the other 20% being occupied by cerebral spinal fluid (CSF), blood, arteries, and veins. Recognition of this gelatinous quality of the brain makes more understandable the mechanical forces and stresses of brain damage. The gelatinous structure of the brain is described microscopically by Begali as "an intricately patterned collection" of nerve cell bodies, which are called neurons, and their transmission fibers (axons and dendrites) with surrounding support cells (glia). The descending fibers of one cell (axon) and the receiving fibers of another neuron (dendrites) meet in a space called a synapse. Chemicals moving within this synapse trigger the firing of electrical impulses, whereby brain activity and transmission occur.

Begali (1987) identified two distinct mechanical forces that produce brain damage in closed head injury: 1. Direct contact forces and 2. Inertial forces. Direct contact forces refer to damage that results from the inward compression of the skull at the point of impact, the compensatory adjacent outbending that follows, and rebound effects (citing Lezak, 1983; Paug, 1985). The point of original impact is referred to as coup. The effect of the blow literally bouncing the brain off the opposite side of its bony container is referred to as contrecoup (citing Levine, Benton, and Grossman, 1982; Lezak, 1983). Contrecoup results in bruising the brain tissue where it strikes the skull opposite the original impact. Coup and contrecoup lesions are identified as accounting for specific, localized behavior alterations that accompany closed head injuries (citing Lezak, 1983).

Additionally relevant to David's head injury history, Begali noted inertial forces are at play in a motor vehicle accident where acceleration and deceleration forces additionally occur (citing Alexander, 1984; Pang, 1985). Begali described the continuation of brain movement and rotation within the skull following initial impact puts strain on delicate nerve fibers and blood vessels and results in shearing (citing Langfitt and Gennarelli, 1982; Strich, 1969). As brain surfaces are pushed against the inner surface of the skull with sudden deceleration, the brain sustains bruising (citing Lezak, 1983; Pang, 1985). Focal or specific localized bruises or contusions may be caused by inertial impact against irregularities of the skull. These most often occur to the undersides of the frontal and temporal lobes (citing Alexander, 1984; Levine et al., 1985). Lesions to the undersides of the frontal and temporal lobes may have negative consequences on behavior, affect, emotions, memory, and attention (citing Alexander, 1984). Begali noted, in addition to the direct mechanical injuries occurring in closed head injury, secondary phenomena such as brain swelling, elevated intercranial pressure, brain shifting or herniation, infection, and unusual bleeding may ensue and may further traumatize or damage brain tissue (citing Jellinger, 1983; Ransohof and Koslow, 1978; Sharpiro, 1983).

Begali described the tissue damage produced by the primary injury or by the secondary

EXHIBIT 8

**2054**

phenomena as permanent and irreversible regardless of rehabilitative therapy (citing Nork, 1984; Pang, 1985; Rosen and Gerring, 1986).

Please see Adverse Factor #6 for the functional expression of brain damage/dysfunction.

## 5.     Chronic stress in childhood

As is detailed elsewhere, David's childhood and adolescence were impacted by chronic stress, including deficient maternal bonding, paternal alcoholism, observed domestic violence, emotional neglect, physical and emotional abuse, father abandonment, extended absences of adoptive father, recurrent moves, and transcultural relocation.

*Implications of chronic stress in childhood:* Current research confirms that trauma can activate various systems in the brain that actually change neuron response and cognitive pathways. Children that experience on-going high levels of arousal due to trauma will develop systems in their brains that cause them to be constantly hyper-aroused and hyper-vigilant. These changes can result in severe problems for children, adolescents, and adults in learning ability, mood, bonding and attachment, and in problem solving (Perry, 2003). Some of the enduring effects of trauma exposure in childhood may occur through misshaping of the brain's architecture and processing as well as faulty learning. Schwarz and Perry (1994) described:

> "The sustained neurobiological impact of trauma on the developing individual occurs through the "plasticity" of the developing brain – making it "more susceptible to the formation of malignant memories that affect not only the stress response system but also the emerging organization of neuro networks regulating other basic states and characteristics of the individual" (313).

Stated more simply, chronic stress in childhood does more than create bad memories. Rather it alters the reaction patterns (i.e., psycho-physiologic effects), the chemistry (i.e., neuro-hormonal effects), and the architecture (neuro-anatomical effects) of the brain (van der Kolk, 1996). Such changes may increase the likelihood of reactivity.

Please see the next section for the functional expression of brain dysfunction.

## 6.     Neuropsychological dysfunction

It is my understanding the neurological/neuropsychological assessment of David Runyon as part of the federal habeas investigation has revealed the presence of dysfunction.

Evidence of neuropsychological dysfunction had emerged in evaluations performed in 2009 as well. Dr. Allan Mirsky described David's performance on some neuropsychological assessment as consistent with brain injury, and noted the history of

Page 32

EXHIBIT 8

MVA and blast exposures (report, 06/26/09). James K. Merikangas, M.D. observed: "He [Runyon] clearly has impaired executive functioning suggestive of frontal lobe impairment" (correspondence to Stephen A. Hudgins, 08/05/09)

**Implications of neuropsychological deficits for functioning:**

There is an extensive literature on social/interpersonal deficits exhibited by persons with brain injury, particularly deficits associated with the frontal lobes. To illustrate, Milner (1970) described patients suffering frontal lobe injury as often displaying normal scores on standard intelligence tests but displaying personality changes of reduced initiative, reduced planning ability and foresight, unreliability, rudeness or tactlessness, and irascibility resulting in their having difficulty holding employment. Milner cited research extending over several decades demonstrating that individuals with frontal lobe damage had difficulty switching from one task to another. He described:

> The "frontal" patients were not at all capable of solving the problem intellectually...but once they became fixated on one of the solutions they seemed to forget that any other was possible..."frontal" patients have difficulty in changing their behavior when it ceases to be appropriate (p.421)....a great many experiments have indicated that "frontal" animals, including man, are perserverative. The subjects find it difficult to change from one solution of a problem or one form of response to a different one (p. 422).

Milner summarized:

> Frontal patients are often found to be impulsive and incapable of responding according to rules that they can nevertheless verbalize...the frontal cortex has the function of increasing the flexibility of a well-organized subcortical motivational system. In that case, the frontal lobes could be responsible for switching in and out the multiple and sometimes contradictory motivations required to adjust to the complex rules and regulations of social living.

Burton and Volpe (1988) summarized research regarding long-term social emotional consequences of head trauma. They cited Thomsen (1984) who followed head trauma patients over a 10 - 15 year period. Thomsen found persistent emotional lability, irritability, listlessness, and generally disturbed behavior in his long-term follow-up sample. One fifth were overly aggressive or sexually disinhibited. Burton and Volpe described Lezak (1987) as demonstrating a pattern of persistent behavioral and social dysfunction in male head trauma patients studied up to 5 years post trauma. Oddy and Humphrey (1980) were described as reporting that two years after the trauma, head injured patients displayed a decrease in social functioning, although 90% were working in some capacity. Burton and Volpe described that impulsivity and poor anticipation are particularly associated with frontal lobe damage. Burton and Volper described that men more than women react to head

EXHIBIT 8

**2056**

trauma with anger and impulsivity.   Burton and Volpe summarized that significant amount of long lasting emotional disturbance has been reported in head trauma samples with this emotional dyscontrol appearing to represent an interaction of trauma effects and premorbid factors.

Pontius (1972) described that the frontal lobes may be directly or indirectly involved with the process of patterning of ethical behavior.  Pontius noted that frontal lobe dysfunction may result in disruption of the evaluation of personal behavior, reduced problem solving and flexibility, and marked difficulty in reprogramming an ongoing chain of behavior.

Yeudall et al. (1982) reported abnormal neuropsychological test profiles indicative of anterior dysfunction (frontal temporal) were more common in delinquent than in non-delinquent groups, consistent with findings of Lishman and others.  Yeudall et al. identified frontal lobe mediated issues of planning and perceiving consequences of actions as being deficient in the neuropsychologically compromised and delinquent group as well as finding agreement with the research by Pontius indicating juvenile delinquents have an inability to appropriately change an action once started in order to achieve the original goal.

**Implications of neurological insults and deficits for violent offending:** Brain dysfunction from neurological insults and deficits is a risk factor for multiple adverse outcomes that may increase the likelihood of criminal conduct or violent offense.  These adverse effects include social dysfluency, impulsivity, judgment deficits, emotional dyscontrol, and behavioral disturbance.  In 1991, there was a growing body of psychological, psychiatric, and neurological literature reporting brain dysfunction/damage is present in disproportionately high incidence among violent offenders, including murderers.

To illustrate, Lewis et al. (1986), in a study of 15 death row inmates, identified all 15 had histories of severe head injury.  Langevin et al., (1987) found neuropsychological variables to be significant in one fifth to one quarter of violent offenders and found that 1 in 3 killers exhibited clinically significant neuropsychological impairment.  Elliott (1987) stated: "Over the past twenty years it has become increasingly evident that overt and covert neurological and neuropsychological impairments are far more common in recurrently violent individuals than in non-violent population."

Of course the presence of brain dysfunction represented a critically important mitigating factor as the jury considered David's judgment and decision-making capability, particularly as the jury found the statutory aggravators of "substantial planning" and "murder for renumeration."

EXHIBIT 8

**2057**

## Parenting and family

### 7.    Mother's inadequate bonding to David

Suk Cha's history of profound traumatic exposure, superimposed on maternal figure abandonment and rejection, was a poor foundation for establishing a nurturing maternal relationship with her own children. These deficits began to be exhibited toward David before he was even born. Dombrowski reported Suk Cha refused to get prenatal care until the end of the second trimester. It was not until she began spotting and experiencing abdominal pain in the 5th-6th month that Dombrowski prevailed in making her consult a physician. Subsequently, Suk Cha did not want to breastfeed David and he was placed on formula.

Dombrowski observed that Suk Cha did bond with David or Mark, and was not emotionally connected to them in any way. She did not exhibit any maternal nurturing. He characterized: "She was cold as a damn fish." Suk Cha did not know how or did not attempt to soothe David when he cried. Dombrowski recalled walking in and seeing her holding David while he cried and wondering who was more scared of who. Dombrowski said he could walk over to David and simply rub his head or kiss him and he would stop crying, but then would resume crying as soon as he walked away.

The legacy of this bonding failure became evident in Suk Cha's relationships with her sons as they became teens and adults. She has been estranged from both David and Mark for decades.

This history of inadequate bonding is in sharp contrast to the "doting" description of the maternal relationship Suk Cha had with David as described by Charles A. Ferguson, high school friend of David in his sentencing testimony:

> *Her face would light up every time she would see him. I mean, every time. I mean, if I picked David up to see a movie and brought him back a couple of hours later and she saw him – and she always had a serious look on her face except when she saw him. Just a huge smile, and it is one of the things that I – I used to talk to my mom about. I thought that was so odd, but kind of beautiful at the same time. [J.A. 2832]*

Though Ferguson had oriented to something being odd in Suk Cha's interactions with David, this was not explored or placed in a context of inadequate bonding.

**Implications of mother's inadequate bonding to David:**

Psychological impact of deficient bonding (attachment): Psychological research extending over three decades prior to David's capital sentencing trial had unequivocally demonstrated that a secure bonding to a parent figure is crucial to healthy psychological development,

Page 35

EXHIBIT 8

**2058**

not only in infancy, but in later childhood as well (e.g., see Ainsworth, 1979; Cantelon, 1994; Curtis, 1980; Lewis, 1985; Matas, Arend, & Sroufe,1978; Pardeck, 1983; Sroufe, 1979; Sroufe, & Waters, 1977; Yarrow, Goodwin, Manheimer, & Milowe, 1973). Conversely, numerous studies demonstrated that when a child is deprived of the opportunity to develop secure, nurturing bonds early in life; physical, intellectual, and emotional development may be seriously retarded – and such early life experiences can have lasting effects which are not easily remedied (Curtis, 1980). Similarly, recurrently disrupted or broken attachments in childhood – such as occur when a child is moved from caretaker to caretaker - also result in lasting fundamental psychological harm.

The role of secure, nurturing attachment in healthy psychological development: To simplify, an infant is not born because he is ready for independent functioning. Rather he is born while still extraordinarily dependent because he has outgrown the womb. The physical and emotional nurturance of intensive parental care forms a secondary "womb" that is essential for continued development. The attachment to a parental figure, particularly across the first several years of life, is the "umbilical cord" that provides the essential conduit for emotional nurturance in this family womb. It is through a secure, caring relationship with a parent figure that the child establishes the foundation for a stable identity, emotional self-regulation, empathy, capacity for intimacy, and responsible social behavior. As has been described, neither of David's parents gave evidence of having established a meaningful bond with him.

Nexus between inadequate bonding and antisocial behavior: Inadequate bonding in early childhood, whether from failure to establish a secure attachment or the loss of it, is frequently quite central to the etiology of conduct disorders in childhood and antisocial behaviors in adolescence and adulthood – including violent offenses (see Meloy; 1988; Patterson, DeBaryshe, & Ramsey, 1989). It is illuminating to note that callousness and potential criminality can be conceptualized in many cases as severe attachment damage "all grown up" (Meloy, 1988). Green (1988) described the impact of deprivations like David suffered:

> Early and persistent exposure to parental rejections, assault, and deprivation impairs the child's capacity to form subsequent relationships....Most abused children are unable to achieve Erikson's (1950) stage of basic trust. They learn to regard violence and rejection as the major ingredients of human encounters. (850)

David's self-perception, self-esteem, and view of the world as a child was largely shaped by who he saw reflected in his parents' eyes. Children are very egocentric in their perceptions, interpreting their experience of the world in a self-referential fashion. Stated more simply, if a child's father does not seek relationship with or exhibit love for the child, the child does not conclude that the father is irresponsible and/or emotionally deficient. Rather, the child concludes that he [the child] is unlovable. This is the inescapable legacy of this parental disinterest, scapegoating, and rejection. The capacity to value, care, and respond

EXHIBIT 8

**2059**

benevolently to others is not *taught* in childhood; it is *absorbed*. As the child *experiences* these from parent figures, they become an integral part of identity, self-perception, and relationship proclivity. When these crucial emotional experiences are not provided, the capacity to extend these to others is stunted.

The clear delineation of inadequate attachment and its implication as a mitigating factor in David's development is particularly important in providing a context for the deficits in empathy for the victim reflected in David's perpetration of the capital offense. The gravity of disrupted attachment and its implications for later deficiency in the ability of that individual to meaningfully relate to and empathize with others (such as romantic partners), as well as the vulnerability that this fundamental developmental injury has for antisocial conduct and criminal violence are critically important conceptualizations in mitigating his offense.

## 8.    Mother's emotional neglect and rejection

Mark Runyon, brother, characterized that he and David grew up in a very cold, repressed, very strict Christian family [federal habeas interview, 000897]. He recalled no one showed affection – there was no touching, kissing, holding, or comforting from either their mother or adoptive father. Mark recalled sitting on his mother's lap occurred so infrequently, it felt strange when it occurred. Both parents were emotionally detached, from the children and each other. There was no physical affection and little communication shown between the parents. The message was – we are simply surviving. This family theme was conveyed by both parents.

The sense of family alienation was so profound that Mark ran away at five years old. He realized even at that age that he was not receiving love the way other kids did.

Mark described it was impossible to please Suk Cha. *He recalled her overtly telling him he was bad and could never do anything right.* David could also not please her. David, however, kept trying to be attentive to Suk Cha and do things he thought would make her proud of him. Mark described realizing early on this was pointless so quit trying. From his need for her approval, David learned to lie and hide, where Mark got in his parents' face. As a teenager and adult, David's friends described him as very eager to please the people around him.

The descriptions of Suk Cha's emotional detachment and neglect by Dombrowski and Mark are quite discrepant from the characterizations of David Runyon (adoptive) father in sentencing testimony:

> *No, the way she handled the boys was very loving, very dear. She was always worried, I think, about the boys being at the babysitter's so much. [J.A. 2886]*

EXHIBIT 8

**2060**

**Implications of emotional neglect:** Regardless of whether physical or psychological, neglect has been identified as more psychologically and developmentally damaging than physical abuse. Widom (1989) described neglected children as being at *greater* risk for adult violence than abused children. This is a function of insufficient stability and/or security in parental attachments, daily life, or practical care; as well as unmet physical and emotional needs.

It is important to note that parental neglect is not an indication that the parent or parent-figure does not "love" the child. Rather, the quality of love that the neglectful parent provides is inadequate. "Love" in this context is most accurately viewed as a continuum from healthy and affirming to destructive and injurious. This is consistent with the earlier discussion of sequential emotional damage and other trans-generational influences that may result in poor parenting and "love" expressions that are on the lower end of the continuum. Again, the capacity to value, care, and respond benevolently to others is not taught in childhood; it is absorbed. As the child experiences these from parent figures, they become an integral part of identity, self-perception, and relationship proclivity. When these crucial emotional experiences are not provided, the capacity to extend these to others is stunted or expressed in an inconsistent and uneven fashion. Again, this was a crucial perspective in mitigating the capital conduct.

The lack of consistent and well-modulated parental supervision and limit setting in childhood constituted another form of neglect that David experienced. Healthy child development requires not only stable and secure relationships with parents, but also limit-setting and guidance through appropriate and consistent discipline. In the absence of either of these fundamental parenting factors, there is grave risk to psychological health and positive socialization. These fundamental tenets are supported by research (e.g., Patterson, DeBaryshe, & Ramsey, 1989). The risks are multi-fold. First, the child is unable to establish a clear identity without a stable, limit-setting parent to "bounce" off of. Second, the child experiences the absence of appropriate limits as terrifying, with associated deficits in perceived self-competency. Third, the child does not master essential rules and skills for social interactions and relationships. And fourth, without order and external structure, the child does not develop internal structures and capacity for self-guidance. Quite simply, the lack of appropriately modulated parental behavior and well-reasoned discipline contributes to aggressiveness and predisposes to violence in the community. Thus, as Dombrowski (in early childhood) and Suk Cha (throughout childhood) reacted in a volatile and unpredictable fashion, David's self-control was impacted. Similarly, the discipline David received from Suk Cha was reactive and abusive (e.g., ruler slaps to hand as a toddler, stress positions, severe spankings) and thus not the sort that would instill appropriate internal structures. There was no testimony at sentencing that established a nexus between the reactivity and volatility of David's parents in his developmental years with his criminal history and/or the capital offense.

EXHIBIT 8

**2061**

Further, socialization of children and adolescents is integrally influenced by the value system and behavioral modeling of their parents. Corruptive parental models contribute to faulty moral compasses in their children, with much increased risk of criminal outcome.

The critically important role of the family in shaping lifelong attitudes and behaviors, for good or ill, is widely accepted. There is extensive empirical research on the role of relationship, modeling, instruction, structure, and reinforcement on socialization and behavior acquisition within the family. Socialization of children and adolescents is integrally influenced by the value system and behavioral modeling of their parents, as well as by the quality of the parent-child relationship. Corruptive parental models contribute to a faulty moral compass in the child, with much increased risk of unethical conduct and criminal outcome.

Further, healthy child development requires constructive family and community values, structure, modeling, and guidance for the child. Children need positive order and external structures to develop internal psychological structures, moral controls, and capacity for self-guidance. The chaos and abusive discipline of David's experience gave little opportunity for the internalization of family order and structure. When such guidance and structure is not provided, self-control does not develop and aggression can unfold.

Strong positive male role models and relationships are a particularly important part of male child development. In adolescence this assumes additional significance as the teenage male is creating a more adult identity and as the presence of an older male to whom the male teen is well bonded provides limit-setting guidance. In David's case, he had no well-bonded relationship to a constructive father figure.

## 9.    Physical and emotional abuse

*Dombrowski testified that Suk Cha was overly punitive with David as a child, repeatedly slapping his hand until it was bright red for simply touching an object she did not want moved or disturbed [J.A. 2867]. He also described her excessively spanking David as he got older:*

> *She would go to town with him. You could swear she was trying to put him through the chair, as opposed to just spanking him a little bit. It was like, man, his bottom was like seriously red pink. [J.A. 2867]*

On interview, Dombrowski described Suk Cha's maltreatment of David and Mark as stemming from her excessive needs for control and *unrealistic expectation of small children. Thus, not just the severity, but the context of the "discipline" was inappropriate.* He described that Suk Cha wanted David and Mark, even as small children, to act like adults. For example, when David was barely old enough to walk, she would yank him up and *start spanking him if he touched anything on the coffee table.* This included using a ruler on his

EXHIBIT 8

**2062**

hand until it almost bled. *Dombrowski did not think it appropriate to spank a young child for touching something on a table and further thought the number and force of the blows were excessive.* He characterized that Suk Cha could not allow the kids to be kids. She wanted to keep a very, very clean home with all her home decorations displayed in their proper places. This was nearly impossible with small children.

Dombrowski recalled another instance of Suk Cha attempting to force feed David when he was 2-3 years old. The combination of the crying and the food being shoved down his throat resulted in his vomiting. Suk Cha then became angrier and spanked David for throwing up. When Dombrowski attempted to intervene and console David, she became very angry at him.

There were many other instances of Suk Cha having unrealistic expectations of her children. Dombrowski recalled an occasion when she put the boys in collared shirts and one ran out to play. He came back with his collar messed up and Suk Cha immediately slapped him across the face and fixed the collar. Dombrowski perceived the boys were terrified of their mother, recalling they would stop, at the drop of a hat, when they heard her voice.

Dombrowski recalled that when Suk Cha was hitting the boys, David would tell her to please not hurt them anymore. He also recalled coming in from work and David telling him his mother had been hitting them.

Suk Cha reported Dombrowski while intoxicated was abusive to David as well as her. As previously described, she recalled an instance of his grabbing David by the wrist and dangling him in the air. She ran to stop Dombrowski, jumped on his back, and pulled his hair. Despite this, Dombrowski would not let David go. Instead, he went to David's bedroom, swung him by the wrist, and heaved him across the room. Suk Cha cried as she described Dombrowski's drinking and abuse. She described:

> I tried yelling. I tried begging, crying, manipulation, but nothing worked. Davy tried to protect me and I tried to protect him. I was never so scared in my life. All I could do when he'd beat us is hug little Davy and tell him how sorry I was. [social history by Sheila Cronin]

Mark (younger brother) described Suk Cha yelling at him (he could never please her), *making him or David assume stress positions such as holding a can of marbles high over his head* for 20-60 minutes, and *beating them with a flyswatter. He recalled his adoptive father beating him with a paddle that had holes drilled in it.* Mark was less than 8-years-old when subjected to this "discipline" with the paddle [social history of Sheila Cronin].

**Implications of physical and emotional abuse:** The deleterious effects of child maltreatment are well recognized among scholars. To illustrate, the conclusions of the American Psychological Association Presidential Task Force on Violence and the Family

Page 40

EXHIBIT 8

**2063**

(1996) summarized that abused or neglected children may show a variety of initial and long-term psychological, emotional, physical, and cognitive effects including low self esteem; depression; anger, exaggerated fears; suicidal feelings; poor concentration; eating disorders; excessive compliance; regressive behavior; health problems; withdrawal; poor peer relations; acting out; anxiety disorders; sleep disturbance; lack of trust; secretive behavior; excessively rebellious behavior; distorted cognitive, perceptual, emotional, and interpersonal capacities; identity disturbance; insufficient capacity for emotional self-regulation and behavioral control; drug or alcohol problems; and violent and criminal conduct. The task force further identified the following broad conclusions:

1.      Child abuse and neglect can seriously affect a person's physical and intellectual development and can lead to difficulty in self-control.

2.      Abused and maltreated children are more likely than non-abused children to be arrested for delinquency, adult criminal behavior, and violent criminal behavior.

3.      When abused children are not given appropriate treatment for the effects of the abuse, the lifetime cost to society for an abused child is very high.

It should be noted, however, that emotional abuse can have psychologically injurious effects that are equal to or surpass those from physical abuse. The saying that "cuts on the skin heal faster than wounds on the heart" captures this concept.

Widom (1989) described neglected children as being at greater risk for adult violence than abused children.  Neglected and/or abused children may show a variety of initial and long-term psychological, emotional, physical, and cognitive effects (Widom, 2000). The relationship of childhood maltreatment and family violence to adolescent and adult criminal activity and violence is demonstrated in other large-scale studies, as well. To illustrate, Kelly, Thornberry, and Smith (1997) reported on the findings of the Rochester Youth Development Study. This study began in 1988 with the selection of 1,000 7th and 8th graders in Rochester, New York, 14% of whom had an official record of maltreatment. These youths and their primary caretakers were subsequently interviewed every six months regarding violence incidence. This study measured self- or caretaker-report of serious violence among these youth rather than official arrest.  Sixty-nine percent of the abused/neglected children had exhibited criminal violence, compared to 56% of the controls.

Research sponsored by the U.S. Department of Justice (DOJ) demonstrates a nexus between the experience of childhood maltreatment and delinquent, criminal, and criminally violent outcomes. English, Widom, and Brandford (2001), in a DOJ-published study, reported on 15-24-year follow-up of over 800 children who had been abused or neglected, and a matched group of controls. The abused and/or neglected children were 4.8 times more likely to be arrested as juveniles; 2 times more likely to be arrested as adults; and 3.1 times more

EXHIBIT 8

2064

likely to be arrested for violent crime as adults.

Emotional abuse can be as psychologically injurious as physical abuse. This is consistent with the observation that the wounds on the heart are slower to heal than cuts on the skin.

Childhood maltreatment disrupts not just the subjective experience of childhood, but also the trajectory of development and the psychological structures of middle and later adulthood. The fundamental alterations in the way the child perceives himself, others, and the world around him, as well as potential trauma-based adaptations in brain functioning, likely account for the sustained experience or resurgence of PTSD symptoms, or their character-engrained legacy, into adulthood (see Schwarz & Perry, 1994). The bridge between childhood and adulthood experiences of PTSD is consistent with the diagnosis of this disorder in David when he was in the military.

The maltreatment the child experiences becomes pathologically engrained into the developing child's personality structure, resulting in pervasively maladaptive and even criminal functioning. The most serious expressions of trauma in childhood may be delayed. This has been analogized as being like rheumatic fever, where the child initially appears to have recovered, but heart damage becomes apparent many years later. In the same way, grave emotional damage may be done to a developing psyche and value system, even though the expression of this damage may not be evident for many years (see Terr, 1991). Trauma-induced influences on development can extend well beyond childhood, resulting in long-term developmental disturbances and undesirable changes in life trajectory (life direction and course) and eventually coalescing into personality disorders in adulthood. These conceptualizations give some understanding to David's life trajectory, including his pattern of failed career objectives, high-rate of job turnover, and failed relationships. Eventually, David's only means of income was as a paid subject for drug companies.

**Implications of observing the maltreatment of siblings:** Mark, as well as David, was targeted for maltreatment growing up. Psychological research is clear that the observation of siblings being abused by a parent is emotionally damaging. These deleterious effects include: negative perceptions and feelings towards their parents, a fearful and hypervigilant posture toward adults in general, feelings of guilt and responsibility, negative or ambivalent feelings towards siblings, behavior problems, anxiety, shyness, fear of failure (Halperin, 1983; Lynch & Roberts, 1982).

**Implications of traumatic experience in childhood:** Traumatic stress in childhood is widely described in the literature as being central to the development of a spectrum of subsequent psychological/psychiatric disorders. In a review of the literature, Terr (1991) [published in the first issue of the 1991 volume] described childhood psychic trauma as a crucial etiological factor in the development of a number of serious psychological/psychiatric disorders both in childhood and adulthood. Terr compared psychic trauma in childhood to rheumatic fever in that both may set in motion a number of

EXHIBIT 8

**2065**

different problems which may emerge later in life.

Terr identified four characteristics of childhood trauma that appear to last for long period of life regardless of the eventual psychological /psychiatric diagnosis. These characteristics include: (1) visualized or otherwise repeatedly perceived memory of the traumatic event, (2) reenactments of behavior, feelings or defenses associated with the trauma that may recur so frequently as to become distinct personality traits or eventually coalesce into personality disorders in adulthood, (3) trauma specific fears, (4) changed attitudes about people, life, and the future involving a shattering of "the shield of invincibility" and the associated loss of "basic trust" in self and others. Terr described that traumatized children have a permanent recognition of the profound vulnerability of all human beings - particularly themselves.

Terr additionally described that repeated exposure to extreme external events results in massive attempts to protect the psyche and preserve the self involving dysfunctional coping mechanisms of massive denial, repression, dissociation, self anesthesia, self hypnosis, identification with the aggressor, and aggression turned against self. Thus chronic feelings vulnerability may eventually be expressed in reactive behaviors that seem to suggest the opposite. These maladaptive coping patterns may subsequently underlie disturbed behavior, emotions, and relationships. The full nature of the damage may not be evident for many years - hence the rheumatic fever analogy. Terr stated that the repeatedly abused youngster may not settle into a recognizable form of adult character disorder, however, until the late teens or early twenties.

The above cited literature summaries described traumatic experience of childhood having a lasting effect on many of the children who experience trauma with these adverse impacts having potentially broad adverse effects on personality structure, subsequent vulnerability to psychological/psychiatric disorder, life trajectory, behavior, and relationships. It is disturbing to note in the limited longitudinal studies that adverse impacts may arise after many years of apparently well-adjusted function, suggesting that the eventual course of the disorder cannot be reliably predicted from an interval of apparent recovery.

## 10.    Father's alcohol dependence

*Dombrowski testified at trial to having an alcohol problem and drinking heavily in the casino while gambling, then coming home intoxicated in the early morning [J.A. 2873].*

This pattern, however, was far from a situational response to the pressures of the marriage. Dombrowki acknowledged on interview to being alcohol dependent for 15 years after the divorce from Suk Cha. There was no testimony regarding this enduring pattern, its contribution to his failure to remain in David's life, or the implications of parental alcohol abuse and dependence for the children of that household.

EXHIBIT 8

**2066**

**Implications of alcohol dependence of father:** Alcohol abuse has a number of adverse impacts on parental functioning. First, the alcohol abuse of his father represented a genetic predisposition to alcohol abuse and dependence for David, markedly increasing his own risk of this disorder, as well as mood disorder.

Second, parental substance dependence represents a corruptive model of how to cope with life demands and stresses. A substantial aspect of parental socialization of a child occurs through modeling – as the child absorbs behavior patterns from observing the actions of parents, and subsequently imitates these. When this parental modeling is faulty or corruptive, the patterns that have been instilled from early childhood may wreak substantial havoc in the child's own adult behavior, including substance abuse and dependence.

Third, children who grow up in a home characterized by parental substance dependence are at substantially increased risk of psychological injury. Specifically, a parent who is substance dependent is more likely to be emotionally detached – a product of both being under the influence and being preoccupied with drug-seeking behavior. As is discussed elsewhere in this declaration, there is evidence that David's parents were insufficiently bonded to him. Further, Dombrowski's alcoholism is likely to have been an aspect of his abandoning David following the divorce, with associated psychological injury for David.

Fourth, the children of a substance-abusing parent are more likely to be neglected and inadequately supervised. An alcoholic parent is both more likely to physically or emotionally abuse the children of the household, as well as to fail to protect the children from abuse perpetrated by the other parent of the household. Children in such a home often experience marked inconsistency and unpredictability associated with the wide fluctuations in parental reactions and competency. As is described elsewhere, Suk Cha was quite volatile in her reactions. There was additional need, then, for protective stability from a father figure. In his alcoholism and gambling absences, Dombrowski was both not present to provide this. Quite the contrary, his misconduct exacerbated the instability of the home.

Fifth, in the face of the impairment of a substance-abusing parent, the children of an alcoholic or drug abusing parent are frequently compelled to assume roles of premature responsibility. There are descriptions of *David assuming such a role in attempting to calm his parents when they were in conflict* or reacting precipitously. Such demands for precocious maturity are not a benign developmental event. The role reversal of the child assuming responsibility for the parent in an adaptation of precocious "maturity" is ultimately damaging to the child – who experiences increased traumatic and corruptive exposures, inadequate parental structure and guidance, chronic anxiety regarding the unpredictability of the home, feelings of incompetence in not being able to prevent the parent from drinking, and rejection at being abandoned to this role by the non-alcoholic parent. Profoundly ambivalent feelings toward both parents are common as the child feels protective on one

EXHIBIT 8

**2067**

hand but harbors much anger on the other at the lack of support, the demand to assume responsibilities that rightly belong to the parent, and the loss of childhood. Not uncommonly, these conflicted feelings are evidenced in significant depression, anger, and behavior problems.

A review of the literature (West & Prinz, 1987) found a relationship between parental alcoholism and offspring risk for interpersonal relationship deficits, substance abuse, delinquency, and school truancy and dropping out. Drake and Vaillant (1988) reported that by midlife, 28% of the sons of alcoholic men had developed alcohol dependence and 25% were diagnosed with at least one personality disorder. Again demonstrating synergistic effects for developmental adversity, alcohol dependence was predicted in the sample by alcoholic relatives, low SES, and school behavior problems. Personality disorder was predicted by total environmental weaknesses, poor maternal relationships, low IQ, and feelings of inadequacy.

In summary, parental alcoholism or substance dependence is a broad social/psychological risk factor for relationship problems, self-control deficits and behavior disorders, feelings of defectiveness, psychological/psychiatric disorders, and criminal behavior.

## 11.   Parental volatility and family violence

As has been previous detailed, Suk Cha reported Dombrowski beat her and David when drunk.

Also as previously described, though, Dombrowski was not the sole source of family violence in the household. He described Suk Cha as quickly becoming agitated and spinning out of control when something frustrated her or did not match her expectations. This could be anything. Dombrowski described an occasion of Suk Cha not liking something he said, and responding by picking up a saucer from the kitchen table and throwing it at him. Her *aggressive reactivity to benign behaviors of early childhood such as touching an object on a low table* has been previously detailed. Dombrowski recalled if Suk Cha was attempting to use a can opener and it was not working fast enough, she would throw it across the room. He described this violent volatility as making a miserable home environment and leaving everyone walking on egg shells.

As described in an earlier section, Mark described that Suk Cha had a violent temper and would have "meltdowns" 1-2 times yearly. During these episodes, she screamed and yelled, and on one occasion broke every dish in the house -- as well as the television, which she targeted with a dish. Mark recalled one of these blow ups occurred when Runyon (adoptive father) did not get the military assignment Suk Cha wanted him to take. She went "postal." Mark characterized his mother could destroy a room in 30 seconds.

EXHIBIT 8

**2068**

Dombrowski described David as a kid who tried to keep the peace. When Dombrowski and Suk Cha would argue, David would physically hold onto his mother and try to calm her down, saying things such as: "I'm here Mommy." "It's okay." Similarly, Suk Cha recalled David *holding onto Dombrowski's pants pockets in an attempt to restrain him [testified to by Dombrowski, J.A. 2874].*

**Implications of parental volatility and family violence:** Psychological research on the effects of observed family violence indicates that children who are exposed to parental violence, even if they are not targets of this violence, have reactions similar to those of children who have been exposed to other forms of child maltreatment (American Psychological Association, 1996; Widom, 1989a, b, c; Jaffe et al., 1986). In other words, the deleterious effects of observing violence within the home are equivalent to the direct physical abuse of the child. More specifically, observation of parental violence is associated with a variety of immediate and long-term psychological symptoms and disorders, lower levels of social competence, increased risk of delinquency, increased risk for domestic violence, and increased risk of violent criminal behavior. (Hershorn & Rosenbaum, 1985; Jaffe et al., 1986; Jaffe, Hurley, & Wolfe, 1990). These perspectives are critically important in understanding David's volatile relationships with his wife, Maria, as well as subsequent girlfriends, including domestic violence charges.

Research sponsored by the U.S. Department of Justice (Thornberry, 1994), has investigated the relationship of family violence to criminally violent outcome. These findings regarding the association of family violence exposure and subsequent rates of serious youth violence from these families are described in the Rochester Youth Development Study. Three types of family violence exposure were studied: spouse abuse, abuse of children, climate of violence and hostility. Among children without a history of family violence, the rate of serious youth violence was 38%. If one type of family violence was present, the rate of serious youth violence was 60%, increasing to 73% and 78% with an exposure history to two and three types of family violence respectively. All three types of family violence exposure were present in David's household in early childhood.

## 12.    Abandonment by father

*Within approximately a year after divorcing Suk Cha in late 1975, Dombrowski relinquished his parental rights,* effectively abandoning David to a woman he knew lacked maternal bonding to David and who he knew to be markedly volatile, including overly punitive if not overtly abusive discipline.

**Implications of abandonment by father:** By Dombrowski's description, Suk Cha was not maternally bonded to David. He described David as responding much more readily to Dombrowski's soothing than that of Suk Cha. This suggests that, in spite of Dombrowski's alcoholism and family violence, David had a more secure attachment to him than to Suk

EXHIBIT 8

**2069**

Cha. Thus when Dombrowski abandoned him, David not only lost some protection from his mother's punitive volatility, he also lost a primary emotional attachment.

David would have certainly had an egocentric view of his father's abandonment – interpreting that David was unlovable and unimportant, as opposed to viewing his father as having deficient commitment, responsibility, and attachment. This has enduring self-esteem impacts that were not remediated by a detached adoptive father.

## 13. Residential instability

David's development was characterized by recurrent moves. To capsule, *David was born at Ft. Hood, Texas in 1971. In 1973 the family moved to Panama where Dombrowski was stationed. David moved back to Ft. Hood with his mother and brother in 1975. In 1976, David and Mark, with Suk Cha, lived with their adoptive grandparents for six weeks, before joining David Runyon (adoptive father) and Suk Cha in Germany, where they remained for five years, returning in 1981. The family resided in Missouri for the next several years. They lived on base at Ft. Leonard Wood, Missouri for one year, then moved to Nebo Mission for one year, and then back on base for one year. In 1984, the family moved to Korea. In 1985, they moved to Ft. Belvoir, Virginia where David attended high school. The adoptive father, Suk Cha, and Mark moved to Korea, and David began attending Wentworth Academy in Missouri.*

**Implications of residential instability:** *Mark (younger brother) characterized this residential instability* reinforced the family theme of not making attachments. The message was: don't get attached to anything because you will not be here long, *people are expendable* and everything changes [federal habeas interview, 000897].

A requirement for healthy psychological development in childhood is stability: stability of relationships, rules, routine, guidance and supervision, residence, and school. The stability of these *external* structures in childhood gradually promote *internal* structures within the child and adolescent that support emotional and behavioral self-control. In the absence of these external structures, internal controls do not adequately develop – resulting in behavioral misconduct and problems in modulation of emotions. David's childhood was particularly lacking in such well-conceived structures.

The disrupted attachments that accompanied these transitions have already been discussed. This instability additionally blocked bonding to nonfamily neighboring adults and peer who might have otherwise provided bonding to constructive models.

The friendships of childhood and participation in group activities such as sports teams and scouting are the first critical lessons in citizenship. It is through these friendships that the child learns to value, and have loyalty and regard, for persons who are not blood kin. In participating on teams, the child learns to sacrifice self-interest on behalf of the group

Page 47

EXHIBIT 8

**2070**

and to identify with the standards and expectations of the group. These are the building blocks for morality, social responsibility, and citizenship. When a child is deprived of these relationships and activities, they are more than stunted in their social skills, they are at risk of being morally stunted. Developing a functional morality is not simply a cognitive awareness of the rules. It requires identifying with and incorporating these reciprocal social commitments as a part of personality development. Deficiencies in these experiences have a nexus with criminal and violent behavior.

### 14. Transcultural relocation

Three types of transcultural relocation are implicated in David's family and development: (1) Suk Cha's immigration from South Korea to the United States; (2) David's experience as a first generation Korean-American with the mixed and sometimes conflicting cultural expectations; and (3) David's middle childhood move to Germany and return to the U.S. almost five years later.

#### (1) Suk Cha's immigration from South Korea to the United States:

*Suk Cha was age 25 when she immigrated, while pregnant with David, to the United States.*

Implications of Suk Cha's immigration from South Korea to the United States:  Suk Cha's immigration in her early adulthood from South Korea to the United States was a significant adaptive challenge. Importantly, this adaptive demand followed a series of destabilizing events during her development. She had already experienced the wartime traumatic uprooting of her family from North to South Korea. She was subsequently abandoned by her stepmother and compelled to adapt to the punitive and rejecting household of her second stepmother. In late adolescence she was emancipated and without significant family support, in a culture where family cohesiveness and belonging are values of primary importance. Her foundation for a move to a profoundly different cultural context was thus fractured.

Suk Cha then immigrated to the United States alone, without accompanying family members or Korean compatriots who could have provided a nucleus of cultural continuity and emotional support (see Choi, 1997; Kim, 1999). This cultural isolation continued at Ft. Hood and in Panama. In fact, no sooner had she settled at Ft. Hood when Dombrowski got orders to Panama and they relocated there. Added to this were the stresses of pregnancy complications and then being a new mother. Rather than finding her marriage to Dombrowski a source of support (albeit not shared cultural support), it was unstable and abusive. The psychological stresses of such unsupported transitions for Suk Cha were immense. At best, she was in a "survival mode" (see Kim & Wolpin, 2008). Given her suicide attempt, planned to be in front of Dombrowski and her children, she was suffering from a mood disorder. Suk Cha's suicidality, volatility, and bonding failures likely emerged in part from these cross-cultural stresses interacting with the fractures of her development and marital/parenting demands.

EXHIBIT 8

Suk Cha also faced conflicting cultural expectations between Korean culture and American culture: e.g., family harmony vs. individual actualization; stoicism vs. expression of personal feelings and needs; shame at being singled out vs. seeking group recognition; etc. (see Kim & Wolpin, 2008).

*Runyon (adoptive father) testified to marital difficulties during the first six years of marriage to Suk Cha associated with "the culture difference," including differing parenting expectations, and his selfishness [J.A. 2894]*

(2) David's experience as a first generation Korean-American with the mixed and sometimes conflicting cultural expectations:

*David grew up in a household with a Korean national mother and an American father figure.*

Implications of David's experience as a first generation Korean-American with the mixed and sometimes conflicting cultural expectations: David grew up in a household that was at the intersection of two very different cultures. Because of the abandonment of Dombrowski and the passivity/withdrawal of his adoptive father (Runyon), Suk Cha's Korean cultural heritage would have dominated the home. The surrounding community, however, was western European (in Germany) or American. The many conflicting cultural norms and expectations (examples above) created additional challenges to David's ability to form a secure identity and stable value system.

(3) To and from Germany and Korea: *In the Fall of 1976, Runyon (adoptive father) received orders to Germany and relocated there from Ft. Hood, Texas with Suk Cha, David, and Mark. David attended continued Kindergarten there, attending school in Germany through 4th grade. The family then returned to the United States and Runyon was stationed at Ft. Leonard Wood, Missouri. In 1984, the family moved to Korea for one year, returning to the U.S. to Ft. Belvoir, Virginia.*

Implications of transcultural relocation to and from Germany: The above-described international relocation was only an aspect of the adaptation demands impinging on David during these early and middle childhood years. *In the 18 months preceding the move to Germany, David had returned with his mother and brother from Panama to Ft. Hood, separating from his father (Dombrowski). His parents divorced. Both parents remarried and he was faced with incorporating a new father figure. He started Kindergarten and lived in his adoptive grandparents' household. He and his family then moved to another country.* This is an extraordinary series of life changes that would tax the most emotionally resilient child having the most secure parental attachments. For David, these demands were accompanied by none of these supporting assets.

EXHIBIT 8

**2072**

The cross-cultural re-entry from Germany was also a major adaptive challenge, not only for David, but also for his parents. Re-entry into a home culture after a period of years has been identified as a more difficult transition than going abroad (Adler, 1981).

<u>Implications of transcultural relocation to and from Korea:</u>  When the family was in Korea, Suk Cha had a volatile relationship with her family secondary to her appearance disrupting the plan of a sister to receive Suk Cha's share of an inheritance. Thus the extended family context for David was conflicted rather than supportive. Also problematic, *David and Mark were placed in a Korean school,* but had difficulty with the language barrier *and were moved to a school on base.* These experiences complicated David's identification of himself as Korean, as he did not fit in at school or his extended family. This was followed by another transcultural re-entry to the United States.

***Summary:***

The above 14 major adverse developmental factors could have been provided to David's capital sentencing jury in an organized and coherent categorization – each described in anecdotal detail so that the jury could have a subjective appreciation of his experience as a child, and each accompanied by a description of the implications so that the jury would have an informed mechanism for determining their weight and nexus. Instead, the jury received a fragmented and disorganized picture of a portion of these. Those that the jury did hear evidence of, the anecdotal detail were inadequate or lacking. None were accompanied by testimony regarding their implications.

I was practicing as a licensed clinical and forensic psychologist in 2009 and was available to provide an evaluation of adverse factors in Mr. Runyon's background in addition to his violence risk if confined for life in prison. I have a vague recollection of meeting with Mr. Runyon's attorneys and explaining broad capital sentencing considerations (i.e., mitigation, adverse developmental factors) for which I could provide expert testimony, in addition to violence risk assessment for prison. Had I or someone with my experience been provided the above detailed supporting records, the same findings and conclusions as detailed above would have been reached and could have been offered in testimony detailing same at his sentencing phase.

I hereby declare under the penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this 25th day of September, 2015 at Austin, Texas.

Mark D. Cunningham, Ph.D., ABPP

EXHIBIT 8

**2073**

# REFERENCES

Adler, N. (1981). Re-entry: Managing cross-cultural transitions. *Group & Organizational Management, 6*, 341-356.

Ainsworth, M. D. S. (1979). Infant-mother attachment. *American Psychologist, 34*, 932-937.

Akiskal, H.S., Downs, J., Jordan, P., Watson, S., Daugherty, D., & Pruitt, D.B. (1985). Affective disorders in referred children and younger siblings of manic-depressives: Mode of onset and prospective course. *Archives of General Psychiatry, 42*, 996-1003

American Psychiatric Association (2000). *Diagnostic and statistical manual of mental disorders, Fourth edition, Text revision (DSM-IV-TR)*. Washington, DC: Author.

American Psychological Association (1996). *Effects of abuse on children*. Presidential Task Force on Violence and the Family. Author.

Begali, V. (1987). *Head injury in children and adolescents: A resource and review for school and allied professionals*. Brandon, Vermont: Clinical Psychology Publishing Co.

Burger v. Kemp, 483 U.S. 776 (1987)

Burton, L. A. and Volpe, V. T. (1988). Sex difference in emotional status of traumatically brain-injured patients. *Journal of Neurological Rehabilitation, 2*, 151-157.

California v. Brown, 479 U.S. 538 (1987)

Cantelon, S. L. (1994). Family strengthening for high-risk youth. Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice. Fact sheet #8.

Choi, G. (1997). Acculturative stress, social support, and depression in Korean American families. *Journal of Family Social Work, 2*, 81-97.

Coker v. Georgia, 433 US 584 (1977)

Crockenberg, S. (1987). Predictors and correlates of anger toward and punitive control of toddlers by adolescent mothers. *Child Development, 58*, 964-975.

Curtis, C. (1980). The psychological parent doctrine in custody disputes between foster parents and biological parents. *Columbia Journal of Law and Social Problems, 16*, 149-191.

EXHIBIT 8

**2074**

Drake, R. E., & Vaillant, G. E. (1988). Predicting alcoholism and personality disorder in 33-year longitudinal study of children of alcoholics. *British Journal of Addiction, 83,* 799-807.

Elliott, F. A. (1987). Neuroanatomy and neurology of aggression. *Psychiatric Annals, 17,* 385-388.

Franklin v. Lynaugh, 487 U.S. 164 (1988)

Green, A. H. (1988). The abused child and adolescent. In C. J. Kestenbaum & D. T. Williams (Eds.) *Handbook of clinical assessment of children and adolescents* (pp. 842-863). New York: New York University Press.

Halperin, S. M. (1983). Family perceptions of abused children and their siblings. *Child Abuse & Neglect, 7,* 107-115.

Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000). Predictors of youth violence. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Hershorn, M. & Rosenbaum, A. (1985). Children of marital violence: A closer look at the unintended victims. *American Journal of Orthopsychiatry, 55,* 260-266.

Jaffe, P. G., Hurley, D. J., & Wolfe, D. (1990). Children's observations of violence: Critical issues in child development and intervention planning. *The Canadian Journal of Psychiatry, 35,* 466-470.

Jaffe, P., Wolfe, D., Wilson, S., & Zak, L. (1986a). Family violence and child adjustment: A comparative analysis of girls' and boys' behavioral symptoms. *American Journal of Psychiatry, 143,* 74-76.

Jaffe, P., Wolfe, D., Wilson, S., & Zak, L. (1986b). Similarities in behavioral and social maladjustment among child victims and witnesses to family violence. *American Journal of Orthopsychiatry, 56,* 142-146.

Kelley, B. T., Thornberry, T. P., & Smith, C. A. (August, 1997). In the wake of childhood maltreatment. *Juvenile Justice Bulletin.* Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice.

Kim, O. (1999). Mediation effect of social support between ethnic attachment and loneliness in older Korean immigrants. *Research in Nursing & Health, 22,* 169-175

EXHIBIT 8

**2075**

Kim, E. & Wolpin, S. (2008). The Korean American family: Adolescents versus parents acculturation to American culture. *Journal of Cultural Diversity, 15*, 108-116.

Klein, D.N., Depue, R.A., & Slater, J.F. (1985). Cyclothymia in the offspring of parents with bipolar affective disorder. *Journal of Abnormal Psychology, 94*, 115-127.

Langevin, R., Ben-Aron, M., Wortzman, G., Dickey, R., & Handy, L. (1987). Brain damage, diagnosis, and substance abuse among violent offenders. *Behavioral Sciences & the Law, 5*, 77-94.

Lewis, M. (1985). Predicting psychopathology in 6 year olds from early parental relations. *Integrative Psychiatry, 3*, 284-289.

Lewis, D., Pincus, J., Feldman, M., Jackson, L., & Bard, B. (1986). Psychiatric, neurological and psychoeducational chararcteristics of 15 death row inmates in the United States. *American Journal of Psychiatry, 143*, 838-845.

Lindqvist, P. (1991). Homicides committed by abusers of alcohol and illicit drugs. *British Journal of Addiction, 86*, 321-326.

Lockett v. Ohio, 438 U.S. 586, 604 (1978).

Lynch, M. A., & Roberts, J. (1982). *Consequences of child abuse*. San Diego, CA: Academic Press.

Maryland v. Craig, 497 U.S. 836 (1990)

Masten, A.S. & Garmezy, N. (1985). Risk, vulnerability, and protective factors in developmental psychopathology. In *Advances in clinical child psychology: Vol. 8* (pp. 1-52). New York: Plenum Press.

Matas, L., Arend, R. A., & Sroufe, L. A. (1978). Continuity of adaptation in the second year: The relationship between quality of attachment and later competence. *Child Development, 49*, 547-556.

McNeil, D. E., & Binder, R. L. (1991). Clinical assessment of risk of violence among psychiatric inpatients. *American Journal of Psychiatry, 148*, 1317-1321.

Meloy, J. R. (1988). *Psychopathic mind: origin, dynamics, and treatment*. Northvale, NJ: Aronson.

Meloy, J. R. (1988). *Psychopathic mind: Origin, dynamics, and treatment*. Northvale, NJ: Jason Aronson.

EXHIBIT 8

**2076**

Milner, P.M. (1970). *Physiological psychology*. New York: Holt, Rinehart, and Winston.

Pardeck, J. T. (1983). Empirical analysis of behavioral and emotional problems of foster children as related to re-placement in care. *Child Abuse and Neglect*, 7, 75-78.

Patterson, G. R., DeBaryshe, B. D., & Ramsey, E. (1989). A developmental perspective on antisocial behavior. *American Psychologist*, *44*, 329-335.

Payne v. Tennessee, 501 U.S. 808 (1991)

Penry v. Lynaugh, 492 U.S. 302 (1989)

Perry, B. D. (2003). The brain: Effects of childhood trauma. Understanding Childhood Trauma Series. (Chief of Psychiatry at Texas Children's Hospital)

Pontius, A. A. (1972). Neurological aspects in some type of delinquency especially among juveniles: Toward a neurological model of ethical action. *Adolescents, 1972*, (7), 289-308.

Schwarz, E. D. and Perry, B. D. (1994). The post traumatic response in children and adolescents. *Psychiatric Clinics of North America*, *17*, 311-358.

South Carolina v. Gathers, 490 U.S. 805 (1989)

Sroufe, L. A. (1979). The coherence of individual development: Early care, attachment, and subsequent developmental issues. *American Psychologist*, *34*, 834-841.

Sroufe, L. A., & Waters, E. (1977). Attachment as an organizational construct." *Child Development, 48*, 1184-1199.

Stanton, J. (1969). Murderers on parole. *Crime and Delinquency, 15*, 149-155.

Streissguth, A. P., Aase, J. M., Clarren, S. K., Randels, S. P., LaDue, R. A., & Smith, D. F. (1991). Fetal alcohol syndrome in adolescents and adults. *Journal of the American Medical Association, 265*, 1961-1967.

Struve, J., (1990). Dancing with the patriarchy: The politics of sexual abuse. In *The Sexually Abused Male*. New York: Lexington Books.

Swanson, J. W., Holzer, C. E. III, Granju, V. K., & Jono, R. T. (1990). Violence and psychiatric disorder in the community: Evidence from the epidemiologic catchment area surveys. *Hospital and Community Psychiatry, 41*, 761-770.

EXHIBIT 8

Terr, L.C. (1991).  Childhood traumas:  An outline and overview.  *American Journal of Psychiatry, 148 (1),* 10-20.

Thornberry, T.P. (December, 1994). Violent families and youth violence. Fact sheet #21. National Criminal Justice Resources and Statistics. U.S. Department of Justice.

U.S. Department of Justice (1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders, *Juvenile Justice Bulletin,* Juvenile Justice Clearinghouse, Washington, D.C.

van der Kolk, B.A. (1996). The body keeps score: Approaches to the psychobiology of posttraumatic stress disorder. In B.A. van der Kolk, A.C. McFarlane, & L. Weisaeth. (Eds.) *Traumatic Stress: The effects of overwhelming experience on mind, body, and society.*

Waters, E., Wippman, J., & Sroufe, L. A. (1979).  Attachment, positive affect, and competence in the peer group: Two studies in construct validation.  *Child Development, 50,* 821-829.

West, M. O., & Prinz, R. J. (1987) Parental alcoholism and childhood psychopathology. *Psychological Bulletin, 102,* 204-218.

Widom, C.S. (1989).  Child abuse, neglect, and adult behavior:  Research design and findings on criminality, violence, and child abuse. *American Journal of Orthopsychiatric Association, 59,* 355-367.

Widom, C.S. (January, 2000). Childhood victimization: Early adversity, later psychopathology. *National Institute of Justice Journal.*

Woodson v. North Carolina, 438 US 304 (1976)

Yarrow, L. J., Goodwin, M.S., Manheimer, H., & Milowe, I. D. (1973). Infancy experiences and cognitive personality development at 10 years. In L.J. Stone, H.T. Smith, & L.B. Murphy (Eds.) (pp. 1274-1281), *The competent infant: Research and commentary.* New York: Basic Books

EXHIBIT 8

**2078**

### Declaration of Catherina Voss

1. My name is Catherina Voss. I am incarcerated at Carswell Medical Center in Ft. Worth, Texas. I am serving a life sentence for the death of my husband, Cory Voss.

2. In December of 2007, I was arrested and was charged with the death of my husband, Cory. Michael Draven and David Runyon were also arrested for Cory's death.

3. I did not go to trial. I plead guilty because I did not want the death penalty. I pled guilty in exchange for a life sentence.

4. I had only a short amount of time to accept the government's plea offer or the government said they would seek the death penalty against me. I called my mom and told her what was happening and then decided to plead guilty.

5. I signed the statement of facts to my plea agreement although I had no independent, personal knowledge whether some of the statements were true.

6. I have no personal knowledge of Michael Draven sending an email on January 2, 2007, to a person about a "swipe or hit on someone."

7. I don't know if David Runyon was experienced with firearms. Michael Draven told me David Runyon was a police officer at one time.

8. I don't know if Draven and Runyon discussed killing Cory or made arrangements to discuss killing Cory. I only know what Draven told me.

9. David Runyon and I did not discuss a plan for him to murder Cory. I did not talk with Runyon about the amount of money he would be paid for killing Cory. I did not agree to pay him $20,000. I did not talk with Runyon about the timing of payment or the murder of Cory.

10. David Runyon and I had one telephone conversation. I spoke with him because Draven was in jail at the time that Runyon was supposed to meet with Draven. Draven told me they were meeting so he could re-pay Runyon for a loan. This is the only time I ever spoke with David Runyon. When I spoke to David on the phone, I told him that Michael Draven wanted me to speak with my kids about Cory inappropriately touching them when they were in the shower. When I told David this he started to cry. I don't know if this was true and Draven could have made it up to get a reaction, but I did tell David.

11. I have no personal, independent knowledge of what part, if any, David Runyon played in Cory's death. I only know what Draven told me.

12. I have no personal knowledge of how many times Michael Draven communicated with David Runyon or what they communicated about. I only know what Draven told me.

Page 1 of 3

EXHIBIT 9

**2079**

13. I have no personal, independent knowledge of David Runyon purchasing a revolver or any other type of gun. Draven did not tell me about this.

14. I have no personal knowledge that David Runyon travelled from Morgantown, West Virginia to Newport News, Virginia, to kill Cory. The police told me that David Runyon's cell phone was traced to Virginia the night of Cory's death.

15. I never communicated with David Runyon by text message, I only spoke to him on the telephone one time, and we did not talk about killing Cory. I have no knowledge about how many times Draven communicated with Runyon on the day Cory was killed. Draven did not tell me about this.

16. On the night Cory was killed, Draven told me by telephone that he was at the Waffle House with David Runyon but I never heard David Runyon in the background nor did I ever speak with him. I have no personal, independent knowledge whether David Runyon was really there. At that time, I had a feeling that David Runyon was not there. I still suspect that David Runyon was not there.

17. The police told me that a map was found in David Runyon's vehicle. I told the police that the handwriting on the map appeared to be Michael Draven's handwriting.

18. I have no personal or independent knowledge that David Runyon entered Cory's truck at the time Cory was killed at the ATM. I have no knowledge that Runyon caused Cory to drive around the LFCU building and reenter the ATM drive up. I have no knowledge about anything that was said to Cory at that time. Draven did not tell me anything about this.

19. I have no personal or independent knowledge about who shot Cory.

20. I have no personal, independent knowledge about what type of weapon was used to kill Cory, or when and where the weapon was purchased. Draven did not tell me about this.

21. I have no personal or independent knowledge that Draven's brother sent David Runyon money through Western Union, or how much money was sent. Draven did not tell me anything about this.

22. I never communicated with David Runyon by email or telephone to coordinate a false alibi, to cover up any relationship with David Runyon, or to provide false information to law enforcement. I had no relationship with David Runyon.

23. When it came to Cory, I let Michael Draven take care of everything. I only know what he told me.

24. One day, Michael Draven called me when Cory was home. Draven wanted to come to the house and kill Cory himself. I said no because my kids were home. I believe Draven could have killed Cory himself.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on the 10th day of September, 2015.

Catherina Voss

EXHIBIT 9

**2081**

## Declaration of David Dalton Sr.

1.  My name is David Dalton Sr. and I live in Preston County, West Virginia.

2.  I met David Runyon about 2005 in Morgantown, West Virginia. He was friends with my daughter, Paula Dalton. David and Paula lived together for a while. In the fall of 2007, David rented a room from me and my wife and we lived together for a while.

3.  David and I were good friends during this time. We spent time together doing outdoor things like hunting and fishing. David was a very nice young man. I trusted him to live in my house and was not concerned that he would do anything to harm my family or me.

4.  The entire time I knew David he never said anything about coming into a lot of money or about being hired to kill anyone.

5.  David was involved with drug studies during this time. He went out of town for periods at a time to do these studies. I helped keep David's son, Little Davy, when David went to some of these studies. David loved his son a lot. He made sure his son was taken care of when he went out of town for work.

6.  I was brought to Norfolk Virginia to testify before the grand jury and again at David Runyon's trial.

7.  No one from David's defense team spoke with me about David or the case. If they had, I would have told them about the things I have said here.


I declare under penalty of perjury that the foregoing is true and correct. Executed on the 2₄ᵗʰ day of September, 2015.

_David Dalton, Sr._
David Dalton, Sr.

## DECLARATION OF PAULA DALTON

1. My name is Paula Dalton. I live in Reedsville, West Virginia.

2. About 2006, I met David Runyon through my friend Matt Long. We were living in Morgantown, West Virginia. David Runyon and I became friends.

3. Matt and I and David Runyon and his girlfriend Ginny were roommates for a few months in the beginning of 2007. Sometime after that, David Runyon lived with my father, David Dalton. David Runyon and my father went hunting and fishing together. David Runyon dated my cousin Sarah Baker during the time that he lived with my father.

4. David Runyon was always very nice and kind. He was polite and the perfect gentleman. He said "yes, ma'am" and "no sir," and opened doors for me and other women.

5. David Runyon's son came to live with him. David Runyon was excited and happy to be reunited with his son, who we called "Little Davy." David tried to be a good father to his son. I was happy to help David Runyon when he worked a drug study and needed a babysitter for Davy.

6. I was brought to Norfolk Virginia to testify before the grand jury and again at David Runyon's trial.

7. I did not speak to David Runyon's trial attorneys before I testified. If I had, I would have told them the things that I've said in this affidavit.

**I declare under penalty of perjury that the foregoing is true and correct. Executed on the 28th day of September, 2015.**

_Paula Dalton_
**Paula Dalton**

## Declaration of Matt Long

1.  My name is Matt Long and I live in Kingwood, West Virginia.

2.  I knew David from about 2006-2007. We both lived Morgantown, West Virginia. David and I went deer hunting and spent time together outdoors. We were roommates for a short period. David was an all-around good guy.

3.  David worked doing drug studies. He travelled out of town to participate in the studies. David's son, Davy, came to live with him. David loved his son. I helped keep Davy when David was working out of town because David would help me out when I needed it.

4.  I never feared that David would harm me or anyone else. David never talked about coming into a lot of money or about being hired to kill somebody.

5.  No one from David's defense team ever came to speak with me about David before his trial. If they did, I would have told them about the things I have said here.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 29th day of September, 2015.

Matt Long

## DECLARATION OF SCOTT LINKER

1. My name is Scott Linker. I live in Viola, Kansas.

2. I have two sisters: Maria and Teresa. Around 1995, I got to know David Runyon because Teresa met David and then my other sister, Maria, met David. Maria and David eventually married. David was hard working, respectful, caring, and a great friend.

3. My sister, Maria, has never wanted to take care of herself or anyone else. She is always looking for a free ride. If she did not have a man around to care for her, she would depend on our father to carry the weight financially.

4. When Maria married David, he was in the military and was in the process of being assigned to Fort Benning. After David completed basic training, Maria, Wren, and Kendi moved to Georgia with David.

5. There came a time that David's commanding officers said he could not re-enlist if he remained with Maria because she had caused so much trouble on the base. Maria called the CO's repeatedly and complained about anything she did not like about David. She also wrote bad checks all over the base. This reflected poorly on David and his CO's wanted her gone. It really bothered David that he could not continue his military career.

6. Eventually, David and Maria moved back to Kansas. My father Fred had a house in Wichita that was broken into apartments. David and Maria lived in one of those apartments.

7. Because they lived in separate apartments but in the same house, my father observed David and Maria's relationship and David's relationship with Maria's children, Wren and Kendi, and with their son, Davy. My father heard Maria yell at and berate David. One time, Maria called David a "ying yang mother fucker." My father thought that David should leave Maria because of how badly she treated him. My father thought highly of David because he not only treated Wren and Kendi like his own, but also worked hard and tried to care for the children whereas their own mother (Maria) did not.

8. It bothered me to see how hard David worked when Maria did not contribute to the family in any manner. Their house was filthy dirty. Dirty laundry and food was everywhere. Maria sat home all day, drank alcohol, and smoked cigarettes.

9. David was passive and not aggressive. I never heard David so much as raise his voice to anyone, including Maria. He was gentle and loving with the kids. David was adamant the kids were respectful and taught them to say, "no sir" and "yes

EXHIBIT 13

**2086**

ma'am." David shared his love of the outdoors with the kids and took all the kids fishing. David also stressed the safety of guns with Wren and took him hunting.

10. David loved guns. He was a gun enthusiast but not a "gun nut." David was very knowledgeable about guns and he was a responsible gun owner. David respected the power of a gun and did not take it lightly.

11. David collected and traded guns like some people do baseball cards. It is what he knew and loved. It was common for David to buy a gun, turn around, and sell it quickly. I remember David bought a Taurus, Raging Bull revolver. He sold it to me two days later because he did not like the way it fired. David did the same thing with ammunition.

12. David was also an expert marksman. We hunted together a lot. The craziest thing I've ever seen is when David shot a deer from 400 yards away. We were on our way to our hunting spot one day when we saw three deer from the roadway. I wanted to drive closer before taking a shot but David insisted I stop the car. David laid across the car and fired two shots: the first one went through the deer's ear and the second one in his head.

13. It doesn't make sense to me that David committed this crime because the victim was shot five times. To say David would have to shoot anyone more than once (especially from close range) is ludicrous.

14. David was also a smart guy. He was educated but also had common sense. I can't believe that David would leave items in his car that implicated him in a murder, especially after he knew the police had talked to him about a murder. This defies all common sense and David would never be that stupid.

15. I remember talking with David's trial investigator. I also testified at David's trial. I don't remember speaking with David's attorneys before I testified. If I did, it was a very brief conversation.

16. If asked, I would have talked about the things contained in this declaration that were not elicited during my testimony.

EXHIBIT 13

**2087**

I declare under penalty of perjury that the foregoing is true and correct.
Executed on the 24 day of September, 2015.

SCOTT LINKER

EXHIBIT 13

2088

Cell Phone Tracking Evidence

An excerpt from the upcoming book: Cellular Location Evidence for Legal Professionals.

By Larry E. Daniel, EnCE, DFCP, ACE, BCE, CTNS

# Introduction:

We live in a world today where individuals' movements and locations are being recorded in many different ways. These movements and locations are commonly being used as evidence in civil, criminal and domestic litigation. It is of paramount importance that anyone who is involved in litigation that uses cellular location evidence understands the appropriate and inappropriate use of this type of location data.

Recent decisions by some courts have made it possible for government agencies to obtain real time tracking information using an individual's cellular phone or other cellular device without having to show probably cause or obtain a search warrant.

Additionally, the government and courts continue to maintain the position that obtaining historical call detail records for an individual does not require probable cause or a warrant since the person holding the cell phone is voluntarily providing their location data to a third party, namely the cellular service provider. However, obtaining real time geo-location of a cell phone via the emergency 911 (E911) system still requires either a warrant or permission from the cellular carrier.

What this book will cover is how the data for creating location maps for cellular phones and other cellular connected devices is collected, analyzed and presented in court.

## What is Cellular Data Analysis?

Cellular data analysis is the process of collecting, analyzing and presenting the approximate location of a cell phone or other cellular device based on data obtained from the wireless company or in some rare cases, from the device itself.

There are several types of cell phone location data that can be collected and examined;

- Carrier based location data is collected by obtaining historical call detail records for a particular phone from the cellular carrier along with a listing of the cell tower locations for that carrier. This data is then analyzed for the purpose of generally placing a cell phone in a location on a map.
- Cellular data in the form of "pings", which is real time geo-location tracking of a cellular phone or other cellular device by activating the emergency 911 system (E911), which will then use either a network based or handset based method for locating the phone and will provide a location estimate generated via triangulation of the phone handset.
- Law enforcement may issue a warrant to get real-time call detail activity for a phone. This is the same type of data contained in a historical call detail record but is provided in real time.

EXHIBIT 14

**2089**

- Cellular data may come from the device itself in the form of GPS location data either from an application running on the phone, a geo-tagged picture or some other data point.

What is important to understand about geo-location of a cellular phone or other cellular device is that the accuracy of the geo-location is dependent on a number of factors, not the least of which is the ability of the analyst to properly interpret and present the data and the methods used to present the information.

Throughout the remainder of this book, rather than typing out cellular phone or other cellular device, the author will use the term cell phone or handset unless there is a need to specifically describe a different type of cellular device such as an air card.

## How does Cellular Data Analysis Work?

In a nutshell, cell phone location forensics involving historical call detail records generally progresses in the following way:

1. A phone number is identified as belonging to a person of interest.
2. The cellular phone company for the phone number is determined.
3. A warrant, subpoena or an administrative request is given to the cell phone company requesting the records for the phone.
4. An analyst then takes those records and plots them using mapping software such as Microsoft Street and Trips, Google Earth Professional, Microsoft Map Point, Arc GIS, or PenLink.
5. The maps will then be used to further an investigation or presented during litigation and potentially in a court of law.

The second type of data used in cellular data forensics is real time tracking of a cell phone. This is a different process from analyzing historical call detail records and has a different result since real time tracking uses the Emergency 911 (E911) system.

When the E911 system is used, the location of the phone is determined using various methods that will be described in detail later in this book. However, it is important to note that the E911 system is not infallible and does not always provide an accurate location of a cell phone.

An additional method that is sometimes used to attempt to locate a cell phone is geo-tagging of photos where the GPS location is recorded in the metadata of the image automatically by the phone. Geo-tagging is also a function of some digital cameras.

There are also applications on cell phones that can provide some information about the location of a phone based on the GPS location of wireless network routers that are recorded by the phone automatically. Again, the reliability and accuracy of this data is open to interpretation.

## How is Cellular Data Analysis Used?

Cellular data analysis is used quite often in criminal cases to attempt locate a person of interest, either as they go about their criminal enterprises, or in relation to a particular incident or crime.

EXHIBIT 14

**2090**

This type of analysis is also used in civil litigation involving vehicle accidents, property damage claims and other types of cases where the location of a particular cell phone at a particular time is of interest.

Cell phone location analysis is also used to locate missing persons who may have their phone with them when they go missing. This type of cell phone location is normally triggered through an exigent circumstances request to the cellular carrier to begin actively "pinging" the cell phone using the E911 location system to attempt to locate the phone.

## What is the Basis for Cell Phone Tracking Using Call Detail Records?

The process of cell phone tracking using call detail records and tower locations is based on the concept of radio frequency reuse planning. This is the method that cellular companies use to determine when to add cell towers to an area to accommodate increases in user demand.

At the basic level a cell phone is just a two way radio. It requires one channel or frequency to transmit and one channel or frequency to receive. Cell phones can both send and receive at the same time, unlike a walkie-talkie that uses a single channel to send and receive where you have to wait your turn and push the button to send.



The reason that there is a requirement for radio frequency reuse planning is both simple and practical:

The Federal Communications Commission, (FCC) allots a limited number of radio frequencies to each wireless company. The number of frequencies available is far too small to accommodate millions of phone calls at the same time.

In order to compensate for this lack of radio frequencies, wireless companies use technology that allows them to split the frequencies into small sections so to speak, to allow more phones to use the frequencies than would be possible if a phone took up the entire radio channel.

The two primary methods for "sharing" radio channels are Time Division Multiple Access (TDMA) which is used in the Global System for Mobile Communications (GSM) network and Code Division Multiple Access (CDMA) which is used in the CDMA network. AT&T is a GSM wireless company and Sprint is a CDMA wireless company.

EXHIBIT 14

**2091**

For our purposes the methods used to split up radio channels is not important. What is important to understand is that the wireless system needs to support a huge amount of demand for radio channels at any given time and the wireless companies had to figure out a way to do that.

Even with the current technology for splitting up radio channels to handle more calls; that alone is not enough to cover a large number of cell phone users. To overcome that limitation, the wireless companies re-use those same radio frequencies over and over by putting them into clusters of cells, (hence the name cellular), and then separating sets of frequencies by distance so they will not interfere with each other.



The idea to be efficient and to cover lots of cell phone users is to go small. In other words, each of the 7 cells shown in the image above is a cell tower or more properly a cell site. Each of the seven cell sites would have a set of radio frequencies that is different from all the other cell sites around it. This is important since you can only have so many callers on a set of frequencies and on a single cell site due to technical limitations on capacity.

EXHIBIT 14

**2092**



As the number of cell phone users grows in an area, the wireless company has to figure out how to accommodate the new customers. The easiest way for the wireless company to do that is to add additional, smaller cell sites that cover a smaller geographic area. As shown in the figure above, rather than having one huge cell site represented by the red circle, it is more efficient to have seven smaller cell sites that cover more people.



EXHIBIT 14

**2093**

It is this concept of radio frequency reuse planning that has been turned into a forensic method and is what is primarily used today in the United States for showing how a cell phone would have to be located in a particular area.

## What about Triangulation?

The term triangulation is often misused and applied to the analysis of historical call detail records. Call detail records only contain information about a single cell tower that was used when a call was made. To triangulate the location of any phone or object, for best accuracy you have to have three points of reference.

## Is There an Accurate Way to Track a Cell Phone Location?

Yes, but it can only be done in real time by using the cellular system or the cellular phone's GPS unit to track the phone.

There are basically two ways to locate a phone using technology: Handset based GPS and network based triangulation.

By law, cell phones are supposed to contain a GPS chip for the purpose of location the phone in an emergency. However, even today, not every phone has GPS capability.

The most accurate way to locate a phone is by activating the phone's GPS unit and allowing that to provide the phone's location back to the wireless company for transmittal to authorities. GPS location is supposed to be accurate within 50 feet.

The second way to locate a cell phone is by triangulating the phone using network based location services. What this does is calculate the position of the cell phone relative to three or more cell towers and provides that location information back to the wireless company.

When a cell phone user calls 911 on their cell phone, the 911 operator will get a cell tower location, a sector and in some cases a GPS location for the phone.

However, these locations can be off up to several thousand feet from the actual location of the phone.

## How Is Cellular Data Analysis Presented?

The location of a cell phone as evidence is typically presented using mapping software to plot the approximate location and movement of the phone. These maps will then show the location and times of any events of interest such as a bank robbery, shooting, arson or other type of crime or activity.

These maps may also be used to show the location of a person's phone relative to a traffic accident, or to show the movements of a person before or after a traffic accident, fire, or other property incident.

EXHIBIT 14

**2094**

**Here are some of the issues with the way cell tower tracking evidence is presented:**

1. Cell phone tracking is based on an assumption that the location of the user of a cell phone can be determined merely by the location of the cell tower with which the cell phone connects when it is in use.

2. Expert's reports are based upon the faulty assumption that a cell phone connects to the closest cell tower at the time a call is placed on a nearly 1 to 1 causal basis. While it is true that this is *normally* the case, it is not definitive enough to state that it occurs a particular percentage of the time, nor is there any way to determine this information from call detail records, if the tower connected to was in fact the closest tower to the phone at the time of the call.

3. The circles and sectors (pie wedges) drawn on maps to present this evidence are based on the idea that an "expert" can demonstrate the area covered by a cell phone by drawing circles or pie shapes on a map where the circles or pie shapes represent the approximate coverage area of a cell tower and that the cell phone will be in the area defined by the circle or pie shape. The idea is that the expert can determine the approximate coverage of a cell tower by comparing the distance between two cell towers, account for a theoretical overlap of tower coverage, and then draw a circle to represent the coverage area of each tower. The basis for this method is that cell towers are sectorized, meaning that a cell tower has more than one antenna, that each of the antennas points in a compass direction defined in degrees, and that the analyst can determine how far those signals reach based on comparing the locations of the adjacent cellular towers. However, data regarding the actual coverage area of the any tower at the time of the incident is *not* provided by the cellular carrier and there is no method that can be used to determine the coverage of a cell tower at the time of the incident based on historical call detail records. It is not possible to reliably determine the coverage area of a cell tower antenna as it relates to a particular cell phone at the time of a call simply by comparing the distance between cell towers.

4. Cell phones attempt to connect with the tower emitting the strongest and highest quality signal at a given moment, not the closest. The actual determination of which cell tower is used is complex and hinges on a multitude of factors that are not memorialized in the call detail records. There is no data provided to determine **why** that particular tower was used for the call, only that a particular tower was recorded in the call detail records as having been used at the time for the call. Many factors come into play in the selection of a tower to handle a cellular phone call, and these factors are specific to the moment in time when the call is connected. Such factors include:

    a. the loading of the towers in the area, which means, which tower has the available capacity at that moment in time to handle the call

EXHIBIT 14

**2095**

b. the health of the towers in the area at the moment in time, which means, are all towers fully functioning at the time of the call

c. line of sight to the tower from the cellular phone itself

d. radio signal interference from other cell towers in the area

e. the make and model and condition of the particular cell phone being used

f. multi-pathing which is a function of the terrain as well as both natural and man-made clutter in the area such as trees, hills, buildings and signs that cause radios waves to be either reflected or absorbed, also referred to as Rayleigh fading.

g. the strength and quality of signal from the towers around the cell phone

h. whether the phone is inside a building or outside at the time the call was recorded, where structural materials may block the signal from one tower, forcing the cell phone to select a different tower than one it would be able to connect with if it were outdoors.

*"1.3. Selection of a servicing cell*

*If a handset is directly in front of, and with line of site to, the antenna for a given cell and with no other cells of greater or equivalent power close by, it would be unlikely to select any other cell. This means that within the service area of a given cell, there will be regions where a phone could not be reasonably expected to initiate (or respond to) a call on any other cell. The location in question could be termed as the 'dominant' region of the cell. Elsewhere, the received signal strength of other cells will be closer to or supersede that of the cell in question. The effects of clutter (either by line of sight or the effects of localized interference, or 'fast fading') will mean that there may be marked differences of signal strength over very many small distances. If there are other cells serving the area with similar signal strengths, the cell selected as serving by the handset may change frequently. This (usually much larger) region is termed a 'non-dominant' area."* (Source: Journal of Digital Investigation, Volume 8, 2012, "Historical cell site analysis – Overview of principles and survey methodologies", Matthew Tart, Iain Brodie, Nicholas Gleed, James Matthews.)

8. When preparing expert maps, analysts are trained to use the following methods for determining the approximate coverage area of a cell tower antenna sector:

a. Using a standard radius of 1 mile or 3 miles projected from the tower at the center, to the edge of the coverage area or,

EXHIBIT 14

**2096**

b. Drawing the circles on the map after plotting the locations of cell towers where the circles are drawn to overlap each other based on the distance between the cell towers.

c. The compass direction of the tower sector antenna used for a phone call.

d. The beamwidth of the radio signal projected by the sector antenna, if known.

There is no factual basis for drawing coverage circles or pie shapes on a map and the cellular company does not provide such data to experts in cases. The physical location of the cell tower masts is factual in basis because cellular carriers maintain the geo-location (GPS) coordinates of cell towers and provide those GPS locations to the expert for use in his plotting of the locations of the towers. However, there are no published set of principles or methods governing the estimation of cell tower coverage based on simply drawing circles on a map where the circles overlap based on the distance from one tower to other adjacent towers, the size of the circles being determined by the distance between cell towers. In fact, the distance between cell towers on a map have no real bearing on the coverage area of the cell tower at all for the following reasons:

a. Cell towers are placed based on anticipated load, which is the maximum number of cell phone calls anticipated at peak load times for the cell tower. Thus the expected coverage area can vary widely between cell towers.

b. Cell towers are not always configured to provide the same amount of antenna power output, which determines the maximum range of the signal produced by the antennas.

c. Cell towers are placed to cover specific areas by either mechanically or electronically tilting the antennas toward the ground and are not configured to cover an area shown as a perfect circle on a map.

d. Not all tower antennas have the same beamwidth. Beamwidth is the width of the antenna signal defined in degrees. The most widely used analogy to describe beamwidth is to think of the antenna as projecting a beam of light, in the same way that a flashlight beam projects. As the beam exits the flashlight it spreads out in a pattern. In the same say that some flashlights can adjust the width of the beam of light to become wider or narrower, the antennas on a cell tower can be adjusted to project a wider or narrower beam of radio signals. In the absence of the beamwidth being provided by the carrier for each sector, it is common to "assume" a beamwidth of 120 degrees. This is an assumption and should not be allowed to be used as evidence when such data is not provided by the cellular company.

e. Each cell tower that contains sector antennas can have 2 or more of these antennas pointing in different compass directions. Each of the antennas can be configured independent of the other antennas to suit the coverage need for that particular tower. In other words, the antennas can each have a different down tilt, beamwidth and a specified direction for the antenna. While the azimuth, which is the direction the antenna points, may be provided in

EXHIBIT 14

**2097**

the tower locations records, the actual coverage area of the sector antenna can vary widely even between sector antennas on the same tower mast.

f.   In today's cellular system environment, many cell towers contain more than a single set of antennas for a carrier, making it even more difficult to use the standard three sector antenna idea to estimate the coverage area.

9.      There are no principles or methods to determine the coverage area of a cell tower or cell tower sector without applying complex engineering formulae to known parameters for each cell tower sector antenna. It is not possible for anyone to reliably determine the particular coverage area of a cell tower or cell tower antenna after the fact based solely on historical cell tower location data or historical call detail records.  While some analysts will perform drive tests to attempt to make their presentations more "scientific", this is not a reliable method for determining the coverage of a cell tower or sector at the time of an incident.  In order for a drive testing to even be remotely accurate, it would have to be done within a few hours of the incident, every environmental and engineering factor would have to be exactly the same as it was at the time of the incident and this is rarely the case for drive testing in cell phone location cases.  The drive test is normally done weeks, months and even years after the fact.  Additionally, the drive test would have to be done at a minimum on the same day of the week, the same time of the year in areas that have large foliage variations, at the same time of day and under the same weather and cellular traffic conditions.  It is simply not possible to exactly duplicate the conditions of the cellular system at some future time when the analyst gets involved in the case.

10.      Cell tower coverage does not fit into neatly drawn circles or pie shapes.  The inherent issue with using maps with circles and pie shapes drawn in to illustrate the approximate location of a cell phone is that it gives **the incorrect impression, bolstered by expert testimony, that the cell phone location is limited to the area defined by the circle or pie shape**.  Since it is impossible to determine the distance the phone is from a cell tower at any particular time, suggesting that the phone is within an arbitrary boundary drawn on a map is inherently false. While some analysts will attempt to use per call measurement (PCM) data to show the distance of the phone from the tower at the time the call was made, in my experience, PCM data can be off as much as four miles when actually measured against the tower locations and the PCM global positioning (GPS) coordinates provided for that particular phone call.

The image below demonstrates the difference between an idealized layout of a cell network, and the theoretical service areas of 3 sectors within the network. (Source: Journal of Digital Investigation, Volume 8, 2012, "Historical cell site analysis – Overview of principles and survey methodologies", Matthew Tart, Iain Brodie, Nicholas Gleed, James Matthews.)

EXHIBIT 14

**2098**

186            *M. Tart et al. / Digital Inv*



**Fig. 1.** Idealised layout of a network (a) and theoretical service areas of 3 sectors located on the same mast (b).

As shown in the Fig 1 above, cell sectors do not conform to a pie shape. Nor is the coverage area a circle.

*"A single cell site (usually a mast or building) can contain the hardware for several cells, which are then also known as sectors. Typically, there will be three sectors per cell site and each sector will usually point in a different direction (known as the azimuth) but this can vary, usually between one and six. The sectors will operate independently of each other, having unique Cell IDs usually related to each other and similar to the code for the covering cell site. Each sector will provide service over a particular geographical area, and this area will not be uniform (i.e. it will not be a circle, a triangle or any other regular shape); there may be many different shapes according to geography and the need of the network (e.g. long thin cells on motorways). There may also be disconnected areas of service known as hotspots."* (Source: Journal of Digital Investigation, Volume 8, 2012, "Historical cell site analysis – Overview of principles and survey methodologies", Matthew Tart, Iain Brodie, Nicholas Gleed, James Matthews.)

The maps below are from an AT&T Mobility propagation map created by an AT&T engineer of the area around Olathe, Kansas. AT&T Mobility engineers, as well as all cellular company engineers, use industry standard methods for measuring the coverage area, via the use of radio frequency prediction and measurement software to create coverage maps in the normal course of business. These coverage maps are created as a normal function of the cellular companies' management of their cellular networks. Such maps can be generated either by entering the specific engineering data for all cell towers in the area and / or performing measurement tests in the field to determine the actual coverage of cellular towers in the carrier's market. Note that using propagation maps to show the coverage area of a cell phone in relation to a phone is not good science unless the propagation map is created and drive testing is performed to validate the

EXHIBIT 14

**2099**

coverage areas. And if that is to work, all the conditions mentioned above about drive testing would apply.

The maps show that the radio coverage of cell towers and sectors is not limited to a precise circle or pie shape and in fact, that the radio coverage varies a great deal from tower to tower and sector to sector and from day to day. While Olathe, Kansas is not going to be exactly the same as the conditions in another location, the principles of radio propagation are consistent. (Maps used by permission of the Johnson County, KS, Public Defender's office.)



The map illustrates the wide variation in radio coverage at ground level for cell tower sectors in an area.

EXHIBIT 14

**2100**

## How cell phone tracking analysis works in a nutshell:

While there are variations and some analysts will make different claims, the predominant method used to show the approximate location of a phone is to simply draw circles on a map.

Build a Case Step 1: Plot the locations of cell towers on a map.



Build a Case Step 2: Guesstimate the coverage area of the towers by drawing some circles



EXHIBIT 14

**2101**

Build a Case Step 3: Draw in the sector coverage areas for phone calls



Build a Case Step 4: Put in the call information



EXHIBIT 14

**2102**

Build a Case Step 5: Put in the time and location of the incident



Build a Case Step 6: Testify that the phone has to be in one of the pie shapes shown on the map.

As you can see from the example, no science or engineering was used to perform the analysis or to verify the results. Nor is there any method for verifying the results or for predicting what an analyst will draw on the map.

EXHIBIT 14

2103

Applying the method used above to the propagation map shows in greater detail that this method is not reliable for illustrating the coverage of a cell tower or cell sector.



Further applying the method used for estimating the sector coverage area:



EXHIBIT 14

**2104**

If you study the propagation map above with the cell sectors drawn, it is easy to see that the circles and pie shapes have little to no relationship to the way that radio waves actually work. In fact, if you look at the yellow area in the map, you can see not only an irregular shape for the cell sector, a large portion of the cell sector's coverage is disconnected from the tower creating hot spots where a phone can make a call without being anywhere near the tower.

Many companies and agencies use drive testing to bolster their claims of accuracy as to the location of a phone. Drive testing evidence usually looks like a propagation map as shown in the following image:



Note that the drive test area of coverage outlined in black has a vastly different shape than the pie slice shown in yellow for the coverage area. The yellow pin represents a location where the suspect was supposed to have been, but the map shows that the phone could have been in the coverage area of a different cell tower at the time of the call.

Another way to show drive testing results is to show a map with a trail or route that the car and equipment doing the drive testing drove along during the test. The issue with this type of drive testing is exactly the same as any other drive testing methods; if performed months to years after the fact, it has no relationship to the conditions present at the time a phone call was made. In the map below, the green lines and dots show places where the subject phone would have received a signal from the South Goldenrod tower. It immediately begs the question: If the phone is not precisely in one of the green spots, it could not possible make a phone call? Of course it could. But this looks impressive to the layperson.

EXHIBIT 14

**2105**



Single Cell Sector 22292 Coverage Area Map:

## Is cell tower tracking evidence junk science?

If your definition of junk science is presenting evidence that is supposed to be based on some scientific method or forensically sound practice, then I think it would qualify as such.

One of the key principals of determining a method meets the Daubert standard for science is that it is generally accepted in the scientific community.

There is no scientific community for cell phone location evidence outside of law enforcement, those who train law enforcement and some individual practitioners.

To say it is generally accepted does not mean it is valid unless those who are accepting it has tested it and published those results in some type of peer-review journal. To date, I have seen no evidence that any government or non-government agency has ever commissioned a scientific study to determine the accuracy or efficacy of using the methods shown in this paper to determine the location of a cell phone. Members of the FBI Cellular Analysis Survey Team (CAST) have testified in courts that the FBI has used this method in hundreds of cases to locate persons, alive and dead. However, outside of this anecdotal testimony, no evidence has been presented to show the success rate, the standardization of the protocol employed, the error rates of determining a phone location based on drawing circles and pie slices on a map, the entire methodology used to locate these persons via their cell phones, or the error rates in determining that a phone used the closest tower for a particular phone call.

EXHIBIT 14

**2106**

## Is cell tower tracking a forensically sound method?

In order for a method or process to be forensically sound, it should meet three criteria:

1. It must be predictable. In other words, if the variables are known, then the method should always yield a predicted result within an acceptable error range.
2. It must be repeatable. The same method repeated x number of times should always yield the same result.
3. It must be verifiable. The method should be able to be used by any trained person and should produce the same result for every person who uses the method.

Cell phone tracking from call detail records and tower locations would not meet the criteria to be a forensically sound method; nor would drive testing or propagation modeling as both of these methods would produce a different result over a period of time.

## Is there a good use for cellular location evidence?

Properly applied and interpreted cell phone location evidence can be helpful in many cases. The issue is the overstatement of the accuracy of the phone's location.

For instance, if the phone is using a cell tower in a particular town where an incident occurred and the person who was in possession of the phone claims to have been in a different town, it is a simple presentation to dispute the person's claim.

Another good use is for tracking a phone across a distance based on cell tower usage. While the analyst cannot claim a particular road was used, the cellular evidence can certainly illustrate for a jury that the phone did in fact travel from one city to another or some area to another.

In a recent case cell tower evidence was used to show that a phone call was made near the location of the defendant's home and a subsequent call was located near his place of employment. At issue was whether or not it would be possible for the defendant to travel to another location, commit a burglary and still make it to the location near his work in the time span between the calls. By combining the cell phone locations, time estimates from Google Maps and the location of the burglary, the jury was convinced that the defendant could not have committed the burglary and still made it to the location of his work in rush hour traffic in Washington, DC.

Cellular evidence can also be used to show that a phone was near a particular area of interest with some reasonable confidence. And the more data points used can be helpful in showing that even if the analyst cannot determine why the phone picked a particular tower, dozens of uses of the same tower in a short time would lend itself to showing that the phone was using that tower over other towers nearby on a consistent basis.

The other side of cellular evidence is the use of call detail records to show communications via voice, data or text in the context of a timeline. In a recent case involving a tractor trailer truck

EXHIBIT 14

**2107**

involved in an accident it was clear from the call detail records that the driver was not using his cell phone near the time of the accident for phone calls or text messages. The issue for the attorneys who brought in an expert in the case was the time stamps on the cell detail records. Initially it appeared at the times for the phone calls were within minutes of the accident. However, once it was determined that the time stamps were dependent on the time zone of the cellular switch used to handle the call, the time was over an hour prior to the accident. In this case, the truck driver was in the Eastern Time zone when the accident occurred, but the switch that processed the calls was in the Central Time zone and some of the calls reflected the time from the switch. Once the time stamps from the call detail records were moved an hour earlier, the issue was resolved.

End of Excerpt

EXHIBIT 14

**2108**

# SAUNDERS BARLOW RIDDICK BABINEAU, PC

*Attorneys and Counselors at Law*

Jon M. Babineau
William K. Barlow
Wallace W. Brittle, Jr.
Adam M. Carroll

Jeanette L. Ojeda*
William H. Riddick, III
Whitney G. Saunders
Windley Hofler Walden

*Also admitted in Florida

**Jon M. Babineau**
jbabineau@saundersbarlow.com

February 10, 2009

Brian J. Samuels, Esquire
United States Attorney's Office
721 Lake Front Commons, Suite 300
Newport News, VA 23606

Lisa Rae McKeel, Esquire
United States Attorney's Office
721 Lake Front Commons, Suite 300
Newport News, VA 23606

Re: United States of America v. David Anthony Runyon
Case No.: 4:08cr16

Dear Mr. Samuels and Ms. McKeel:

On behalf of co-counsel and the defendant, David Anthony Runyon, I write to request that you recommend to the Attorney General that the United States withdraw its Notice of Intent to Seek the Death Penalty ("Notice") against David Anthony Runyon ("Mr. Runyon" or "David") in this matter. As you are well aware, this matter is set for a jury trial just a few short weeks from now beginning on March 13, 2009. As a practical matter, therefore, this will be our last opportunity to persuade you to withdraw your Notice.

As a threshold matter, this letter is written with the understanding, pursuant to Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410, that any statement made here cannot be used against Mr. Runyon in any way. This would include use of this submission in any fashion in any pleading filed with the Court.

Since we first appeared before the Committee for the Attorney General in March of 2008, we have been engaged in the laborious process of reviewing thoroughly the volumes of

08-0140

SMITHFIELD
(757) 357-4314

**SUFFOLK**
705 West Washington Street
Suffolk, Virginia 23434
Tel: (757) 934-1313
Fax: (757) 934-1318
Real Estate Fax: (757) 934-1299
www.saundersbarlow.com

NORFOLK
(757) 622-8631

EXHIBIT 15

**2109**

Page 2 of 10
February 10, 2009

discovery provided by the United States, having Mr. Runyon evaluated by a forensic psychologist, and conducting the in-depth social history investigation that this case requires. Based on our discoveries over the past several months, it has become increasingly clear that Mr. Runyon is *not* the type of individual for which the federal death penalty was intended.

First, the evidence against Mr. Runyon is not strong enough to produce a verdict that contains the certainty required for imposition of the death penalty.   Second, the two co-conspirators charged in this murder-for-hire case were equally if not more culpable than Mr. Runyon and the death penalty was not authorized as punishment for them.   Third, Mr. Runyon has no appreciable prior criminal record of any kind, save for a misdemeanor domestic incident with questionable circumstances of guilt.   Fourth, from Mr. Runyon's earliest childhood days, he was raised in an atmosphere of physical violence and emotional oppression, resulting in an adult individual who lacks the tools necessary to navigate society successfully.   Fifth, despite his circumstances, Mr. Runyon has exhibited exemplary behavior during his time of incarceration, making him an ideal candidate for a sentence less than death.   Finally, other cases with much more heinous circumstances than this have failed to gain authorization for the death penalty, further illuminating how the authorization of the death penalty for Mr. Runyon in this case is an arbitrary and capricious application of the ultimate penalty.

Based on all of the above, as further detailed below, we beseech you on behalf of Mr. Runyon to recommend to the Attorney General that the United States be allowed to withdraw its Notice of Intent to Seek the Death Penalty against Mr. Runyon.

A.      The evidence cannot produce a verdict certain enough to warrant death.

A review of the evidence against Mr. Runyon reveals that the United States' case will rest entirely on debatable circumstantial evidence including statements made by co-conspirators whose credibility is next to nothing.  The United States does not possess a single piece of forensic evidence linking Mr. Runyon to the murder of Cory Voss. There was no DNA evidence recovered from the crime scene to implicate Mr. Runyon, no fingerprints recovered, and no weapon that has ever been located.  Further, Mr. Runyon made no confessions or inculpatory statements of any kind to law enforcement during the course of their investigation. The statements made by co-conspirators Catherina Voss ("Voss") and Michael Draven ("Draven") prior to the murder provide little probative value as to Mr. Runyon's actual involvement and in fact some of those statements tend to exculpate Mr. Runyon. Finally, there

EXHIBIT 15

**2110**

is a strong argument to be made that any noncustodial statements made by Voss and Draven *after* the murder were not in furtherance of the charged conspiracy (murder-for-hire) and therefore cannot be admitted against Mr. Runyon at his trial under the co-conspirator exception to the hearsay rule.

In sum, even though the legal standard for conviction in this case will be "beyond a reasonable doubt" as it is in every other criminal case, the shockingly large number of capital prisoners who have been exonerated over the past several years has raised the public's demand that convictions in capital cases be made only where the evidence proves guilt to an almost absolute certainty. Evidence from the scientific community can often provide this degree of certainty, but not in this case. Neither scientific evidence nor any other clear-cut proof of culpability will show that it was certainly Mr. Runyon and not any other person who actually killed Cory Voss. This case simply can never yield the type of certainty that the public demands for imposition of the federal death penalty.

**B.**    **Mr. Runyon's two alleged co-conspirators charged in this murder-for-hire case were equally if not more culpable than Mr. Runyon and the death penalty was *not* authorized as punishment for either. This mitigates against imposition of the death penalty. 18 U.S.C. § 3592(a)(4).**

According to the United States' theory of the alleged conspiracy-for-hire, as set forth in Voss' Statement of Facts incorporated into her guilty plea, as well as statements made by the United States at Voss' sentencing, Voss was without question the mastermind of the scheme to murder her husband, Cory Voss. Voss and Draven together created a plan to kill Cory Voss with or without Mr. Runyon's assistance. The United States has acknowledged this fact, stating that "[s]ometime in January of 2007 at least three individuals were approached [by Voss and Draven] and asked about murdering Cory." See Tr. of Sentencing for Catherina Voss at p. 5 (Attached as **Exhibit A).** The United States characterized Mr. Runyon as merely the tool that Voss and Draven ultimately used to execute their murderous plan. Id. The United States repeatedly refers to the murder plan as being Voss' and/or Draven's plan, not Mr. Runyon's plan. In fact, at Voss' sentencing, the United States characterized the plan to kill Cory Voss as almost exclusively the work of Voss in her fit of greed and lust. Id. at 5, lines 10-11, 21; p. 6, lines 21-22.

Even according to the United States, it was Voss and Draven not Mr. Runyon that engaged in the extensive planning and premeditation of the type that constitutes the aggravating factor contained in 18 U.S.C. § 3592(c)(9). The United States stated that

EXHIBIT 15
**2111**

Page 4 of 10
February 10, 2009

"[Runyon] certainly seemed perfect for Cat Voss and Michael Draven *to carry out their plan*" before they began to conspire with Runyon in February and March, 2007. Tr. at p. 5, lines 9-12 (emphasis added). Indeed, the United States never alludes to any participation by Mr. Runyon in preparing the plan to kill Cory Voss nor does any of the evidence suggest that Mr. Runyon played such a role in the conspiracy. The evidence suggests at best that Mr. Runyon did as he was told by Voss and Runyon, as the United States concedes when it asserts that "Runyon had been provided the location, had been provided a description of Cory's car, and about the time that he would be there, and David Runyon traveled from West Virginia to meet Cory Voss." Id. at pp. 6-7. Mr. Runyon's role, therefore, was markedly different from the role of Voss and Draven, who spent months engaged in detailed planning and scheming to murder Cory Voss. Mr. Runyon's role does not rise to the level of the type of "substantial planning" that § 3594(c)(9) contemplates as justifying application of that statutory aggravator.

As set forth above, Voss and her lover, co-conspirator Draven, concocted the intricate plan for having Cory Voss killed so that they could be together and live lavishly off the proceeds from Cory Voss' life insurance proceeds, which they did with flair beginning almost immediately after they murdered Cory Voss. Voss is the person who set up the bank account at the federal credit union in a remote location as part of her murder plan, so that she could send Cory Voss out in the dead of night to meet his killer, who she and Draven pre-arranged to be waiting at the credit union at the appointed time. Voss is the individual who callously made the deliberate decision that her children's father would be murdered at a specific time, at a specific place, and in a specific way. On the night of the murder, it was Draven who let the shooter know the exact time Cory Voss would arrive at the federal credit union, Cory Voss' exact physical description, and the exact description of the car Cory Voss was driving. Telephone records show that Voss was on the telephone with Cory Voss almost the entire time it took him to drive to the credit union, up until approximately two minutes before the hired gunman entered Cory Voss' vehicle.

If not for Voss's and Draven's actions, Cory Voss would never have been at the federal credit union on the night he was murdered. At all times, it was within Voss' power to spare Cory Voss' life by choosing not to send him to the credit union at the appointed time, or by calling off the murder entirely at any point, or at the very least by warning Cory Voss as he drove toward the credit union to forget her prior directions, turn around, and come home. Yet she did none of these things. Draven could have at any time refused to facilitate Voss' plan.

EXHIBIT 15

**2112**

Page 5 of 10
February 10, 2009

Instead, Voss chose to send Cory Voss out to the credit union, directly to his death, according to her plan to satisfy her own selfish material desires. These actions make Voss and Draven just as culpable, just as responsible for Cory Voss' death as if each of them had actually pulled the trigger on the gun themselves. Yet the United States seeks the death penalty for David Runyon alone, who never would have been at the credit union had it not been for Voss and Draven's desires and plans to murder Cory Voss. The authorization of the ultimate penalty of death for Mr. Runyon alone, then, simply defies logic and reeks of the very type of arbitrariness and capriciousness that the federal death penalty, with all its supposed statutory safeguards, seeks to prevent. Continuing to prosecute Mr. Runyon as the sole capital defendant in this conspiracy cannot meet the Attorney General's requirements for fairness and consistency.

**C.    Mr. Runyon has no appreciable prior criminal record of any kind, which mitigates against imposition of the death penalty. 18 U.S.C. § 3592(a)(5).**

Mr. Runyon is not a person with a lengthy record of past violent criminal behavior. To the contrary, Mr. Runyon has no felony convictions for any crimes at all and only one prior misdemeanor conviction that stemmed from a domestic situation with questionable facts. The instant charges represent Mr. Runyon's only serious involvement with the criminal justice system. This factor mitigates against death, as more clearly set forth by Mark D. Cunningham, Ph.D, ABPP, in the attached summary of his opinions regarding Mr. Runyon's negligible capacity for future dangerousness. See Letter from Dr. Mark D. Cunningham (**Exhibit B**).

**D.    Mr. Runyon suffers from a past of physical abuse and emotional oppression which mitigates against imposition of the death penalty. 18 U.S.C. § 3592(a)(8).**

David Anthony Runyon was born in 1971 to David and Suk Cha Dombrowski. His parents met when his father was in the Army and stationed in Korea. His mother, Suk Chad was born in North Korea. Her childhood was marked by the Korean War, her mother's death, her sister's suicide, rejection and emotional abuse by her stepmother and physical abuse at the hands of her older brother. Suk Cha's childhood experiences left her with a mood disorder characterized by rapidly cycling moods, in which a vicious anger is the most prominent. When angry, she makes no attempt to modulate her responses and instead screams, yells, and at times becomes physically violent.

EXHIBIT 15
**2113**

David's biological father, David Dombrowski was born and raised in the United States. Dombrowski's childhood was marked by divorce and domestic violence. Suk Cha and David Dombrowski married in 1970 and had two children, David and Mark. The marriage lasted only a little more than five years, during which time Mr. Dombrowski drank heavily, developed a gambling addiction, and physically abused his wife and his son, David. The marital discord eventually led to a suicide attempt by David's mother, after which the marriage dissolved. David was five years old when his parents divorced and the only memory he has of his father is being thrown across the room by him.

In 1976, Suk Cha met and married David H. Runyon ("Runyon, Sr."), who was also in the Army. Runyon, Sr. was raised in a middle class family but has been a self described "loner" all of his life. He tells of a stable upbringing but admits that he has no affection for his mother. He is intelligent and pleasant, but emotionally detached. Runyon, Sr. adopted Suk Cha's children, David and Mark. Because of his military career, the family had to relocate frequently. Over the course of his childhood, David Runyon, lived in Texas, Panama, Germany, Missouri, Korea and Virginia. He rarely went to the same school for more than three years and never had the opportunity to develop any lasting friendships or roots. To make matters worse, he was unusually small framed for his age. David's parents describe him as passive and very naive about people. In that regard, they feel he is highly vulnerable to manipulation.

Suk Cha was the primary disciplinarian, though Runyon, Sr. often used a paddle as corporal punishment against the children. The paddle contained holes in it to increase the physical sting. Other punishment included forced ingestion of a half a pack of cigarettes, and the children being made to stand in a corner for long periods of time while holding a heavy can in the air, with the children's arms outstretched over their heads. Suk Cha is described by David as possessive, and by Mark as overbearing and emotionally abusive.

David's adult life has been marked by under achievement and a steady decline in the quality and length of employment. He desperately hoped to have a military career like his father and step-father, but failed to perform well in the Army. After David's failed attempt at an Army career, he decided to join the police force, but failed at that job and was fired. David also worked as a Correctional Officer but lost that job as well. David self-sabotages in all aspects of his life, but has absolutely no insight into his behavior. His relationships with women have all failed, largely because he chooses women who are incapable of mature relationships due to

EXHIBIT 15
**2114**

Page 7 of 10
February 10, 2009

mental illness and/or substance abuse.

All these factors present the picture of an individual who was never given the tools required for an adult to cope successfully with the challenges life presents. Consequently, David's social history mitigates against imposition of the death penalty.

**E.    Mr. Runyon has exhibited exemplary behavior during his period of incarceration, demonstrating that if convicted, he is an ideal candidate for a sentence less than death.**

Mr. Runyon has been incarcerated on the present charges for over a year in the penal facilities of the Virginia Department of Corrections. A review of his prison records reveals that during this lengthy period of incarceration, Mr. Runyon has not been involved in a single incident requiring discipline or even any type of incident at all. Mr. Runyon has in fact been a model prisoner, even providing emergency first aid to a prisoner in need on one occasion, and generally spending his time concentrating on his own case and staying completely out of the prison population's general fray, which is no small feat for any prisoner.

As supported by Dr. Cunningham's studies and findings in this case, Mr. Runyon's exemplary behavior, coupled with his relative lack of any serious criminal history, demonstrates without question that death is *not* the only available means of protecting the public from Mr. Runyon. See Letter of Dr. Cunningham (Exhibit B). The death penalty should be reserved for the most heinous, the most dangerous, and the most vile among us who cannot be trusted to refrain from committing violent acts against others even in a tightly-regulated, maximum security prison environment. Mr. Runyon is simply not such an individual and his life should be spared.

**F.    Other cases handled by counsel in this federal circuit with much more heinous circumstances have failed to gain authorization for the death penalty, highlighting the arbitrary and capricious nature of the authorization for imposition of the death penalty against Mr. Runyon.**

The undersigned counsel, along with co-counsel, has been practicing criminal defense attorneys for over twenty years in Virginia, and specifically in the Eastern District of Virginia. During this time, both counsel have defended some of the most notorious and violent criminals. While not discounting the seriousness of the facts involved in any case where

EXHIBIT 15
**2115**

murder is involved, counsel have defended several non-capital murder cases involving facts and proof of crimes much more heinous and deplorable than those facts associated with Mr. Runyon's case. Listed below in bullet-point fashion is a sampling of cases federally prosecuted in the United States District Court for the Eastern District of Virginia, Norfolk Division, for which the death penalty was either not authorized or not sought:

- **Larry Speed (Case No. 2:00cr00092):** Speed was a long-time violent drug dealer in the Norfolk, Virginia area. He ran one conspiracy from 1987-2001. Speed had a lengthy history of numerous drug and violent crime convictions. He was finally prosecuted at a federal level and was convicted of three murders in the Norfolk federal court. One of the federal murders involved kidnapping a rival drug dealer at gunpoint in front of his house, torturing the victim before shooting him, and dumping his body on the side of the road. Despite these aggravating facts, the death penalty was neither sought nor authorized in Speed's federal prosecution.

- **Travis Reese (Case No. 4:08cr00038):** Reese was a drug dealer who had one prior felony for distribution of drugs but no crimes of violence. He picked up a rival dealer who sold him some fake cocaine and shot him in the head at point blank range. The death penalty was not authorized in his federal prosecution.

- **DeMario Boyd (Case No. 4:07cr00123):** Boyd was involved in a drug-related murder. He shot a drug dealer in the head and robbed him of drugs. Boyd had a lengthy record for drug offenses but no violent offenses. After the murder, Boyd fled the Commonwealth, but was later apprehended and prosecuted by the United States for the murder in the Norfolk federal court. The death penalty was not authorized in his federal prosecution.

- **Jason Ortega (Case No. 2:98cr00047):** Ortega was a member of a large drug conspiracy. Ortega committed murder by shooting the victim on the orders of the drug king. The victim was believed to be cooperating with a federal investigation of the drug conspiracy. Ortega had a lengthy record of drug convictions and assaults dating back to his juvenile days. The death penalty was not authorized in his federal prosecution.

- **Carlos Malone (Case No. 2:97cr00117):** Malone was a long-time violent drug dealer in Norfolk. He was linked to several shootings and had a significant criminal history of violence. Malone was prosecuted by the United States for an abduction and murder. Malone rode around with the victim alive, bound and gagged in the trunk of Malone's car. He then killed the victim and dumped the victim's bound and gagged body. The death penalty was not authorized in the federal prosecution.

- **Jamar Hodge (Case No. 4:02cr00030):** Hodge had a lengthy criminal record of violent crime and was linked to several prior shootings and killings. Hodge was federally prosecuted for murdering a rival drug dealer by walking up to the victim in

EXHIBIT 15
**2116**

front of many witnesses and shooting him at point blank range. The death penalty was not authorized in the federal prosecution.

- **Lorenzo Butts (Case No. 2:00cr00067):** Butts has been considered by the United States Attorney's office in Norfolk as one of the most violent individuals ever prosecuted in the Eastern District of Virginia, Norfolk Division. Butts had a long criminal history of violence. Butts ran a huge drug conspiracy which included a number of contract killings. After he killed his last victim, a murder for which he was federally prosecuted, he stuffed the victim's body into a 55 gallon drum and threw the drum into the Elizabeth River to avoid detection. The death penalty was not authorized in the federal prosecution.

- **Samuel Manning (Case No. 4:07cr00081):** Manning has a lengthy criminal history of violence as well as a recent conviction for possession with intent to distribute drugs, for which he is currently serving a ten year prison term. At this time, he is the subject of a federal prosecution for murder during the course of a drug conspiracy. The death penalty was not authorized in the federal prosecution.

The absence of death as a possible penalty for any of the above criminals and/or for any of the above crimes underscores the fact that the decision to seek the death penalty is and must be made with extreme caution, and reserved only for the absolute worst of the worst of the criminal element. Foregoing the death penalty does not in any way diminish a community's abhorrence for violent crime, nor does it discount the impact that even one murder has on a victim, the victim's family and friends, and the community as a whole. Rather, foregoing the death penalty for all but the most egregious of criminals in the most heinous of cases demonstrates how serious the community regards a decision to seek the federal death penalty. The cases cited above include defendants with lengthy criminal histories of drugs and violence, defendants who tortured victims before killing them, killed victims in order to silence them as federal prosecution witnesses, and killed victims in order that their complex drug conspiracies could continue to operate to the detriment of their communities. If the death penalty was not deemed appropriate for those defendants for the crimes they committed, it stretches the imagination to try to understand how the death penalty can fairly be deemed appropriate for Mr. Runyon in this particular case.

### G.   Conclusion

In conclusion and as detailed above, much has been discovered about Mr. Runyon and the crimes alleged since the United States first sought and received authorization to seek the

EXHIBIT 15
**2117**

Page 10 of 10
February 10, 2009

death penalty against Mr. Runyon. Even if Mr. Runyon were to be found guilty of the crimes of which he is accused, this is not a case where society will benefit from a state-sanctioned killing of Mr. Runyon. Mr. Runyon does not have a criminal history of any significance. As recognized by the United States, Mr. Runyon did not engage in any of the detailed and substantial planning with Voss and Draven regarding the murder. There is no evidence of any kind of torture associated with this crime. And unlike many of the drug/murder defendants detailed above, Mr. Runyon has no history of exercising any kind of detrimental criminal enterprise in the communities encompassed within the Eastern District of Virginia. Finally, Mr. Runyon simply would not pose a risk of committing future dangerous or harmful acts on anyone if he were committed to a life in prison rather than to the death chamber. Looking at these factors as a whole, it is clear that the death penalty is not warranted for Mr. Runyon in this matter and that no higher purpose will be served by continuing along the costly course of seeking to have Mr. Runyon put to death in this case. As such, we ask that you recommend to Attorney General Holder, forthwith, that the United States be allowed to withdraw its Notice of Intent to Seek the Death Penalty against David Anthony Runyon. By copy of this letter directly to Attorney General Holder, we will be seeking this relief directly from him as well. I remain,

Very truly yours,

Jon M. Babineau

JMB/kh
Enclosures
cc: Lawrence H. Woodward, Jr., Esquire (w/o enclosures)
    David Anthony Runyon

EXHIBIT 15
**2118**

12/02/2008 11:01 FAX 15759930271          PORTSMOUTH CITY JAIL                    @001

# FAX



Sheriff Bill Watson
Portsmouth Sheriff's Office
701 Crawford Street
Portsmouth, VA 23704-3888
**Medical Office (PHS)**
(757) 391-3190/ FAX (757) 393-5271
http://portsmouthsheriff.org/

To: Saunders Barlow Riddick Babineau, PC

Fax: 757-934-1318

From: Portsmouth City Jail

Date: 12/2/08

Pages: (Including Cover) 8

RE: Runyon, David

Comments or Special Instructions:

**CONFIDENTIALITY NOTICE:**
This Fax transmittal, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise is protected by law. Any unauthorized review; use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies of the document(s) transmitted

EXHIBIT 16

**2119**

PORTSMOUTH SHERIFF'S OFFICE

PROGRESS NOTES

| Date/Time | Inmate's Name: Runyon, David | D.O.B.: |
|---|---|---|

3/18/08  T 98⁶  P 88  R 20  BP 96/50  Wt 129

S  poss. HIV exposure ≈ 3 wks ago @ Newport News city jail b/c inmate in same cell fell + lacerated head c̄ lots of blood. Pt. grabbed toilet tissue and blotted wound, but hands became covered c̄ blood + Pt. reports having an hangnail + open cuts @ that t. Pt. reports ⊖ HIV test within the last year + not known to be Hepatitis positive. Pt. donated blood last since Fall 2007 in Baltimore MD → (158 lbs.)
In addition, Pt. reports body wt. estimated @ 30 lbs since Dec. Says he has a high metabolism + has not been exercising. ⊘ diarrhea, ⊘ night sweats, occ. dizzy + light headed.

O  Thin appearing, pharynx clear
Neck - supple, ⊖ LN
H - RRR s̄ m, L - CTA B
Abd - NT, Ext - ⊘ edema
N̄ obvious skin lesions

A/P  Possible blood born disease exposure
— √ HIV + Hep. panel
? Wt loss
— add PM snack
FM PRN

EXHIBIT 16

**2120**

| Date/Time | Inmate's Name: Burrow, DAVID | D.O.B.: |
|---|---|---|
| 19 MARCH 0_ 0910 | Exam, #22 TRM (Dr Sharp) | |
| 7/2/08 | Annual exam | |
| 02 July 08 1100 | #22 Replaced TRM temp (Dr Sharp) | |

T 97.8  P 70  R 16  BP 100/60  HA-130

ear injury, mustard gas

Patient reports that on August 22nd, he had sudden onset of running nose, watery eyes, feeling sick. Patient thinks that he had mustard gas while in the military in 1990 while in training in Kansas. He thinks that the mustard gas is still in his sinuses and flare up on and off. As for today, patient says that he's fine. The symptoms he reports lasted only 30 minutes and went away after he washed his face. Patient denies anxiety attack or being depressed. Not suicidal.

P/E: NAD

HEENT: PERRLA; No eyes exudate or hemorrhage ___ C TA      Heart: ___ no murmur

Ext: ∅ edema      Neuro: ∅ deficits

A/ 1) Possible anxiety attack caused by old recollection (gas mustard)

P- Return to clinic if recurrence
- Will refer to psych. Pt is clinically stable now. Not depressed.

EXHIBIT 16

2121

**PHS**
PRISON
HEALTH
SERVICES

**PROGRESS NOTES**

| te/Time | Inmate's Name: RUNYON, DAVID ANTHONY D.O.B.: |
|---------|----------------------------------------------|
| /29/08 420 | S. THE INMATE WAS SEEN BY DR. KOLONGO BECAUSE HE BELIEVED HE HAS MUSTARD GAS IN HIS HEAD (SINUS) |
| | O. ALTHOUGH HE WAS GENERALLY COOPERATIVE, HE TENDED TO BE SOMEWHAT GRADIOSE. HIS THOUGHTS WERE FLIGHTY & RAMBLED ON. HE VERBALIZED SOME DELUSIONAL MATERIAL. HE DENIED EXPERIENCING HALLUCINATIONS HE DENIED USING DRUGS & DRINKING ALCOHOLIC BEVERAGES. HE HAD GOOD EYE CONTACT & WAS A GOOD HISTORIAN. INSIGHT & JUDGEMENT LACKING (POOR). HE IS NOT EXPERIENCING ANY SLEEP DISTURBANCE. HOWEVER, HE DID RE-PORT NOT SLEEPING IN THE LAST 24 HOURS & HE HAS NIGHT SWEATS. APPETITE IS GOOD HE IS NOT OVERTLY DEPRESSED OR SUICIDAL. HE IS ALERT & FULLY ORIENTED. |
| | A. AXIS I: R/O SCHIZO-AFFECTIVE DISORDER R/O BI-POLAR DISORDER AXIS II: DEFER AXIS III: UNKNOWN |
| | P. HE IS NOT GROSSLY PSYCHOTIC. HE WILL BE RE-EVALUATED IN APPROX. ONE (1) WEEK WITH POSS-IBLE REFERRAL TO DR. IGNACIO.     TOM ROBERTSO M.H. |

Complete Both Sides Before Using Another Sheet

FOR MENTAL HEALTH USE ONLY

EXHIBIT 16

**2122**

# Progress Notes

Printed On Jun 17, 2009

```
LOCAL TITLE: Mental Health-Physician Note
STANDARD TITLE: MENTAL HEALTH PHYSICIAN NOTE
DATE OF NOTE: MAR 09, 2009@07:49    ENTRY DATE: MAR 09, 2009@07:49:19
     AUTHOR: BRADLEY,EDWARD       EXP COSIGNER:
     URGENCY:                         STATUS: COMPLETED
```

30. MINUTES SPENT FACE TO FACE WITH PATIENT

SUBJECTIVE DATA

CHIEF COMPLAINT:"I'M I'M DOING BETTER WITH THE MEDICINES"

59 YO VETERAN FOLLOWED IN MHC WITH SUPPORTIVE PSYCHOTHERAPY AND MEDICATION
MANAGEMENT FOR THE DIAGNOSIS OF MAJOR DEPRESSION. TODAY PATIENT PRESENTS WITH
GOOD CLINICAL EFFECTS, WITHOUT SIDE EFFECTS. HE IS FEELING AMBIVALENT ABOUT THE
PAST DECISION TO NOT HAVE CONFLICT WITH HIS EX WIFE ABOUT ACCESS TO HIS CHILDREN
NOW THAT THEY ARE ADULTS, HE HEARS THINGS WHICH CAUSE HIM TO QUESTION THEIR
PARENTING.VET HAS BEEN COMPLIANT WITH HIS MEDICATIONS,AND DENIES PSYCHOSIS, MOOD
SWINGS. HE ALSO DENIES ANY RECENT ALCOHOL OR SUBSTANCE USE. HE DENIES S/H
IDEATIONS.HE BELIEVES THE BUSPAR IS MORE BALANCED AS SPLIT DOSE REGIMENT.

MEDICATIONS:
Active Outpatient Medications (including Supplies):

```
    Active Outpatient Medications                    Status
===========================================================================
1)   BUSPIRONE 10MG TAB TAKE ONE TABLET BY MOUTH THREE     ACTIVE
       TIMES A DAY FOR ANXIETY
2)   DIVALPROEX 500MG 24HR (ER) SA TAB TAKE TWO TABLETS BY  ACTIVE
       MOUTH ONCE A DAY FOR ANGER AND IRRITABILITY
3)   FLUOXETINE(PROZAC EQUIV.) 20MG CAP TAKE TWO CAPSULES    ACTIVE
       BY MOUTH ONCE A DAY FOR DEPRESSION
4)   TRAZODONE (DESYREL) 100MG TAB TAKE ONE AND ONE-HALF    ACTIVE
       TABLETS BY MOUTH AT BEDTIME FOR DEPRESSION
```

PROBLEMS AS IDENTIFIED ON PROBLEM LIST-
Active Problem(s)

```
272.4   Hyperlipidemia * (ICD-9-C       11/05/2008 ROYAL,LORENZA SR MD
472.0   Rhinitis * (ICD-9-CM 472.       11/05/2008 ROYAL,LORENZA SR MD
724.5   Chronic Back Pain (ICD-9-       06/12/2007 ROYAL,LORENZA SR MD
V15.81  Personal History of Nonco       09/12/2003 WIGGINS,VALERIE
465.9   Upper Respiratory Infecti       04/04/2003 PARKER,ESSIE
786.6   Swelling, mass, or lump i       08/15/2002 CHRISTIAN,SHERRE A
780.4   Dizziness * (ICD-9-CM 780       01/11/2002 CHRISTIAN,SHERRE A
799.9   POSITIVE HEP C SCREEN       01/11/2002 CHRISTIAN,SHERRE A
```

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation

DOMBROWSKI, DAVID

Printed at TUSCALOOSA

Page 1

EXHIBIT 17

**2123**

# Progress Notes

Printed On Jun 17, 2009

```
473.9  Sinusitis * (ICD-9-CM 473        11/05/2001 CHRISTIAN,SHERRE A
333.1  TREMOR NEC          08/15/2001 FRANCO,FERNANDO
272.0  PURE HYPERCHOLESTEROLEM          08/06/2001 CLEVELAND,KATIE O
799.9  SP LUMBAR SURGERY        07/11/2001 CHRISTIAN,SHERRE A
799.9  NOCTURNAL DYSPNEA        07/11/2001 CHRISTIAN,SHERRE A
781.0  Tremor          07/11/2001 CHRISTIAN,SHERRE A
492.8  EMPHYSEMA NEC         05/18/2001 BAHAR,DAVID
296.30  Major Depression, recurre        02/20/2001 BAN,MARTHA TUCKER
715.90  Degenerative Joint Diseas        02/20/2001 BAN,MARTHA TUCKER




VITAL SIGNS:
96 F [35.6 C] (11/06/2008 09:53)
56 (11/06/2008 09:53)
129/58 (11/06/2008 09:53)
18 (11/06/2008 09:53)



LABORATORY OR OTHER DIAGNOSTIC TESTS DRAWN FOR THIS APPOINTMENT (INCLUDE
No data available



REASON) :NONE NEEDED TODDAY



Herbal/OTC medicationsN/A



Non-TVAMC medications:
RXNV - Non VA Meds

        No Non-VA Meds Extracted



Expired medications:n/a
MENTAL STATUS EXAM/HPI:

APPEARANCE:  __Neatly groomed _X_Casual dress __Disheveled __Other:
DEMEANOR: _X_Cooperative __Uncooperative __Calm __Distant __Guarded
__Hostile__Manipulative  __Other:
SPEECH: _X_Normal rate, tone, volume  __Slowed __Pressured __Slurred
__Rambling __Increased latency __Loud __Hostile/Irritable tone
__Other:
```

| PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| DOMBROWSKI, DAVID | Printed at TUSCALOOSA |

EXHIBIT 17

**2124**

MEMORY TRANSMISSION REPORT

```
                            TIME       : JUL-28-2015  09:47AM
                            TEL NUMBER : +8656377999
                            NAME       : FEDERAL DEFENDER SERVICES
```

FILE NUMBER           :   933

DATE                  :   JUL-28 09:45AM

TO                    :   912568270067

DOCUMENT PAGES        :   002

START TIME            :   JUL-28 09:45AM

END TIME              :   JUL-28 09:46AM

SENT PAGES            :   002

STATUS                :   OK

FILE NUMBER    : 933          *** SUCCESSFUL TX NOTICE ***

---

## FEDERAL DEFENDER SERVICES
### OF EASTERN TENNESSEE, INCORPORATED

530 South Gay Street, Suite 900
Knoxville, Tennessee 37902

Elizabeth Ford
Federal Community Defender

Phone   (865) 637-7979
Fax     (865) 637-7999

July 28, 2015

Lake Martin Community Hospital
ATTN: Medical Records
201 Mariarden Road
Dadeville, AL 36853

RE: David Anthony Runyon
    ss# ___ __ __
    dob

Dear Medical Records :

David Runyon was involved in a car accident on November 9, 1996. After that accident, Mr. Runyon was transported to your hospital for treatment.

The office of the Federal Defender Services of Eastern Tennessee, currently represents individuals in post conviction litigation in federal court. We are requesting copies of any and all hospital records in your file concerning Mr. Runyon. An authorization for release of records signed and notarized by Mr. Runyon is enclosed.

Please contact me at your earliest convenience in order to facilitate our access to the requested files. Thank you for your time and attention in this matter.

Sincerely,

Michael R. Chavis
Investigator
Federal Defender Services
of Eastern Tennessee

EXHIBIT 18

**2125**

Jul 28 2015 07:57AM LMCH 2568270816                          page 1

201 Mariarden Road
Dadeville, AL 36853
Phone: 256-825-7821
Fax: 256-827-0067



**LAKE MARTIN COMMUNITY HOSPITAL**



# Fax

| | | | |
|---|---|---|---|
| **To:** | Michael R. Chavis | **From:** | LMCH—Medical Records |
| **Fax:** | 865-637-7999 | **Pages:** | 2 |
| **Phone:** | | **Date:** | 7/28/2015 |
| **Re:** | David Anthony Runyon | **cc:** | |

☐ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

• **Comments:** The information contained in this facsimile is confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and destroy this copy.

EXHIBIT 18

**2126**

page 2

# NO RECORDS CERTIFICATION

My name is ___Tiffany Walton___ . I am over the age of 18 years, of sound mind, fully capable of making this Certification, and have personal knowledge of the facts stated herein, and they are true and correct.

I am the Custodian of Records of:

**Lake Martin Community Hospital**

A thorough search of our active and archived files reveals no documents or other materials regarding ___David Anthony Runyon___ , for the following reason:

( ✓ ) All records have been destroyed in accordance with our policy. Records are destroyed after 7 years.

(  ) We have no records for the dates requested.

( ✓ ) Patient is not in our system.

_____
Custodian of Records

Signed this __28th__ day of ___July___ , 20 _15_ .

EXHIBIT 18

**2127**

**Stephen Hudgins is appointed to Runyon's case on Friday February 20th. ECF No. 161**

<u>EXHIBIT A</u>

## <u>Stephen A. Hudgins Schedule</u>

| | | |
|---|---|---|
| Feb 25 | 10:00 | Federal Court Sentencing |
| | 1:00 | Newport News (NN) Circuit X 2 |
| | 3:00 | Home Visit (HV)  GAL |
| Feb 26 | 9:00 | York County (YC) J&D |
| | 9:30 | YC J&D |
| | 10:00 | YC J&D X 2 |
| | 1:00 | YC Circuit |
| | 3:00 | Norfolk Federal Conference |
| Feb 27 | 11:00 | Norfolk Federal |
| March 2 | 10:00 | NN Circuit Jury Trial |
| March 3 | 10:00 | Settlement Conference Va. Beach |
| | 1:00 | NN J&D |
| | 2:00 | YC J&D |
| March 4 | 8:30 | NN J&D |
| | 9:00 | Surry Circuit |
| | 2:00 | NN J&D |
| | 4:30 | HV GAL |
| March 5 | 10:00 | NN Circuit |
| March 6 | 10:30 | YC J&D |
| | 12:00 | NN Circuit |
| March 9 | 10:00 | YC General District X2 |
| | 1:30 | YC General District |
| | 3:00 | YC General District |
| | 4:30 | HV GAL |
| March 10 | 10:00 | NN Circuit X2 |
| | 10:30 | NN J&D |
| | 2:00 | NN J&D |
| March 11 | 9:00 | YC General District X 3 |
| | 9:30 | YC General District |
| | 10:00 | YC General District X2 |
| | 2:00 | NN J&D |
| March 12 | 10:00 | YC J&D |
| | 10:30 | YC J&D |
| | 2:00 | NN J&D |
| March 13 | 10:30 | NN J&D |
| | 11:00 | NN J&D |

-5-

EXHIBIT 19

**2128**

| | | |
|---|---|---|
| March 16 | 8:30 | NN Circuit |
| | 9:00 | NN Circuit |
| | 10:00 | NN Circuit |
| March 17 | 8:00 | YC General District |
| | 9:00 | YC J&D |
| | 9:30 | YC General District |
| | 10:00 | YC General District |
| | 2:00 | YC General District |
| March 18 | 8:00 | YC General District |
| | 11:00 | Virginia Beach Circuit |
| | 11:30 | Norfolk Federal |
| | 2:00 | YC General District |
| March 19 | 8:30 | NN J&D X2 |
| | 11:30 | YC J&D |
| | 1:00 | YC Circuit |
| March 23 | **10:00** | **NN Circuit Jury 2-3 day jury trial** |
| March 24 | 9:00 | Suffolk Circuit |
| | 9:00 | NN J&D |
| | 9:30 | NN Federal |
| | 2:00 | YC General District |
| March 25 | 8:00 | YC General District X2 |
| | 10:00 | YC General District |
| March 26 | 8:30 | YC |
| | 10:00 | NN Circuit |
| | 10:30 | NN J&D |
| | 2:00 | James City County |
| March 31 | 10:00 | YC 2 day jury |
| April 1 | 1:00 | NN Circuit |
| April 2 | 10:00 | NN J&D |
| | 10:00 | NN J&D |
| April 3 | all day | Indigent Defense Seminar |
| April 6 | 10:00 | YC General District X2 |
| April 7 | 9:00 | YC Circuit X2 |
| | 10:00 | NN Circuit |
| April 8 | all day | Criminal Law Seminar |
| April 9 | 11:00 | NN Circuit |
| April 10 | | NN Circuit |
| April 13 | 10:00 | NN Circuit |
| April 14 | 9:30 | Hampton Circuit |
| April 15 | 9:00 | YC General District |

-6-

EXHIBIT 19

**2129**

|  | April 16 | 10:00 | YC J&D |
|--|----------|-------|--------|
|  |  | 10:30 | NN J&D |
|  | April 17 | 11:00 | Wmbg J&D |
|  | April 20 | 11:00 | YC General District |
| U.S. v. Garries, No. | April 21 | 10:00 | **Newport News Federal 7 day jury trial** |
| 4:08-cr-50 | April 22 | 2:30 | YC General District |
| 14 day trial | April 23 | 10:30 | YC J&D X 4 |
| May 6-May 19 | April 24 | 10:00 | NN Circuit |
|  | April 27 | 10:30 | YC General District |
|  |  | 11:00 | YC General District |
|  |  | 1:30 | YC General District X2 |
|  |  | 2:00 | YC General District |
|  | April 28 | 8:30 | NN J&D |
|  | May 4 | 11:00 | Norfolk Federal |
|  | May 5 | 9:00 | YC Circuit X2 |
|  |  | 11:00 | YC General District |
|  |  | 2:00 | YC J&D GAL |

18 full days in court
+14 day trial in Garries
32 full days in court     25 days with scehduled court appearances

-7-

EXHIBIT 19

**2130**

JUL-02-2009 13:46 NIMH/DEA/AD 301 480 3402 P.01/01

# CENTER FOR PSYCHOLOGICAL EVALUATION AND CONSULTATION

*Allan F. Mirsky, Ph.D., ABPP*

5502 SPRUCE TREE AVENUE, BETHESDA, MD 20814-1623 (301) 530-9332 FAX (301) 564-9562

Stephen A. Hudgins, Esq.
Cope & Olson
11836 Canon Boulevard, Ste. 100
Newport News, VA 23606
Fax: 757 596 5320

July 2, 2009

Dear Mr. Hudgins,

I have spent 6 hours testing your client Mr. David Runyon at the Portsmouth City Jail on Friday June 26, 2009. My review and analysis of the information is not yet complete. However, it is clear from the data that there is strong evidence that he is suffering from a neurological disorder. It would be essential for Mr. Runyon to be evaluated by a neurologist, and have the necessary tests to establish the nature of his disorder.

Please let me know if you require any additional information on this matter.

Sincerely,

*Allan F. Mirsky*

Allan F. Mirsky, Ph.D. ABPP-CN
Diplomate in Clinical Neuropsychology
American Board of Professional Psychology

Cc: Ms. Sheila Cronin

JUL-02-2009 13:55 301 480 3402 P.01

EXHIBIT 20

Runyon-OAF 0016737

**2131**

arla
_____

**From:**   Allan Mirsky [afmirsky@gmail.com]
**Sent:**   Thursday, July 23, 2009 1:29 AM
**To:**     arla
**Cc:**     afmirsky@gmail.com
**Subject:** Re: David Runyon

Dear Mr. Hudgins,

I am firmly convinced that Mr. Runyon is still suffering from the effects of the two blast injuries he sustained when undergoing training exercises in the ROTC. These were compounded by the effects of the motor vehicle accidents. His impaired attention, seen in the poor Continuous Performance Test scores in my report, is one of the classical symptoms of blast injury and impact injury after a car accident. Other symptoms, such as quickness to anger, and impulsivity, are also well documented in the brain injury literature. The occasional dizziness he shows is also symptomatic of brainstem injury. In some sense, because he suffered the blast injuries while in the ROTC, he can be considered a wounded warrier, and this should be considered in his sentencing.

I should add that I found the additional testing information that was sent to me to be not especially useful or informative. I leave for vacation on Friday, but can be reached on my cell phone 301 792 2971. I will try to send out my raw data to the psychologist you listed in your email to me before I go.

Allan F. Mirsky, Ph.D.

On Wed, Jul 22, 2009 at 5:45 PM, arla <arla@com.hrcoxmail.com> wrote:

> Today the jury determined that David Runyon is eligible for the death penalty
> and the judge scheduled the trial of that matter for August 19 at 10:00 a.m.
> She set a deadline for all defense mental health reports for August 6, 2009,
> and all Government rebuttal reports for August 14, 2009. I will be contacting
> our mitigation witnesses to notify them of the beginning trial date. The
> marshall's service will make arrangements for all non-expert witnesses'
> travel. The Court has said that defense case will begin on Monday, August
> 24, so we will be bringing our non-expert witnesses in over the weekend. I
> will keep you informed.
>
> Steve
>
>
> Stephen A. Hudgins, Esquire
> shudgins@com.hrcoxmail.com
> Cope & Olson, PLC
> 11836 Canon Boulevard, Suite 100
> Newport News VA 23606
> Telephone: (757) 596-0316
> Telefax: (757) 596-5320

7/23/2009

EXHIBIT 21

**2132**

Sep 18 2009 2:36PM    HP LASERJET FAX                                              P.2

## CENTER FOR PSYCHOLOGICAL EVALUATION AND CONSULTATION
### *Allan F. Mirsky, Ph.D., ABPP*

5501 SPRUCE TREE AVENUE, BETHESDA, MD 20814-1623 ♦ (301) 530-9332 ♦ FAX (301) 564-5562

September 18, 2009

Stephen A. Hudgins, Esq.
Cope & Olson, PLC
11836 Canon Blvd., Suite 100
Newport News, VA 23606
757 596.0316
757 596.5320 Fax

Dear Mr. Hudgins,

Pursuant to our conversation yesterday afternoon, I wish to make sure that the Court is aware of certain mitigating circumstances that should affect the sentence of your client, Mr. David Runyon.

While serving in the ROTC, Mr. Runyon was on two training exercises, when "training" grenades exploded quite close to him. The history indicates that he was temporarily unconscious after one or both of these occasions. Recent information, stimulated in part by the war in Iraq and Afghanistan, identifies this type of injury as blast injury, the effects of which on the brain are not well understood. There can be extensive damage to white matter tracts, which serve the vital function of connecting various cortical areas. Such damage is best evaluated with a test known as Diffusion Tensor Imaging, or DTI. Your report to me indicated that the recent MRI and PET imaging studies of Mr. Runyon were read as normal. I have several comments to make about that report.

First, since many years have passed since the blast injuries, it is not evident that the scans might have been read as abnormal at the time of the injuries. The brain has ways of repairing injuries, as best it can.

Second, a DTI test, which might have been abnormal, was not done.

Third, according to current standards in evaluating brain injury in soldiers, Mr. Runyon would automatically be classified as mTBI, or, mild traumatic brain injury. This would follow from a history of a brief loss of consciousness, in the presence of a normal MRI.

Fouth, and more to the point, soldiers with mTBI, may have symptoms of abnormal behavior, including poor ability to concentrate, committing impulsive acts, and other indications of poor "cognitive control." They can be symptoms of what is referred to as Post Traumatic Stress Disorder, or PTSD, which has not been ruled out in the case of Mr. Runyon. You will recall that in my test of Mr. Runyon, he performed in the very impaired range on tests of sustained attention. This can be symptomatic of mTBI, as well as PTSD. I have included two charts of his performance, in comparison with controls, as an adjunct to this document.

I appreciate the opportunity to bring this to your attention, and to the attention of the Court, in the hope that this information will be taken into account in the sentencing of Mr. Runyon.

Sincerely yours,

Allan F. Mirsky, Ph.D., ABPP
Diplomate in Clinical Neuropsychology
American Board of Professional Psychology

Clinical Neuropsychologist
Walter Reed Army Medical Center

SEP-18-2009  15:04                              97%              P.02

EXHIBIT 22

**2133**

Sep 18 2009 2:36PM   HP LASERJET FAX   p.3

## Percent Accuracy—4 CPT Tasks



| | Visual X | Visual AX | Degraded X | Auditory Tones |
|---|---|---|---|---|
| | -9 SD | -3 SD | -4 SD | -1 SD |

■ David R.
☐ Controls

Mr. Runyon's accuracy on these four measures of sustained attention was in the very impaired range.
The SD numbers indicate how far below his scores are in comparison to age-matched controls.
For the first three tasks above, his scores are worse than approximately 99% of the comparable subjects.

EXHIBIT 22

2134

SEP-18-2009  15:05

Sep 18 2009 2:36PM   HP LASERJET FAX

P.4

# Mean Reaction Time--4 CPT Tasks



Milliseconds

■ David R.
□ Controls

A similar pattern of impairment is evident in his reaction time scores,
which are much longer than those of age-matched controls.

P.04

97%

SEP-18-2009  15:06

EXHIBIT 22

**2135**

| MEDICAL RECORD | CONSULTATION SHEET |
|---|---|

**REQUEST**

TO: _Derm_    FROM: (Requesting physician or activity) _TMC # 2_    DATE OF REQUEST _9 Aug 95_

REASON FOR REQUEST (Complaints and findings)

24 y/o O c̄ prob EIC on forehead between brows. Pt states cysts becomes inflamed intermit c̄ purulent drainage. Pt first noted prob following MVA @ which time multiple pieces of glass became embedded. Pt feels may still have foreign body.

PROVISIONAL DIAGNOSIS

EIC

DOCTOR'S SIGNATURE _____ APPROVED _____   PLACE OF CONSULTATION: ☐ BEDSIDE ☐ ON CALL   ☐ ROUTINE ☐ TODAY   ☐ 72 HOURS ☐ EMERGENCY

_Please Eval Treat M_

**CONSULTATION REPORT**

Meds   PMH   PSH   Allergy
 ø        ø       ø     Sulfa
                         Keflex

17 Aug 95    DERMATOLOGY CLINIC
DATE    MARTIN ARMY COMM HOSPITAL
0820              0815
TIME IN      APPOINTMENT TIME

① 24 y/o WM c̄ c/o recurrent inflammatory lesions to forehead and nose x 5 yrs. Pt was involved in MVA resulting in glass embedded in face 5 yrs ago. Some glass removed p̄ MVA but, pt has had recurrent cyst to forehead since MVA ~ 3 time a year.

② C/W, WD, A+O x 4.
- 1 cm erythematous patch to L forehead
- 1.5 cm erythematous patch to bridge of nose
- multiple erythematous papules ranging from 0.1 cm to 0.3 cm to R forehead.

A) Acne > Pt foreign reaction > EIC

P) ① Retin-A 0.025% to affected areas qHS.   — d/c 2 wk
② Pt counseled about avoiding sunlight + using sunscreen lotion > 15.
③ Erythromycin 250 mg tab i PO BID
④ _____

SIGNATURE AND TITLE _____ T. BURCH   DATE
          O-6 PA-S

IDENTIFICATION NO. _____

.....p Chan, MD, COL, MC
, Dermatology Svc.
.....rtin ACH, Ft. Benning

17 Aug 95

WARD NO.

PATIENT'S IDENTIFICATION (For typed or written entries give Name—last, first, middle grade; rank; rate; hospital or medical facility)

Runyon Daniel

C 750 7th

CONSULTATION SHEET
STANDARD FORM 513 (Rev. 9-77)
Prescribed by GSA/ICMR
FPRMR (41 CFR) 201-45.505
513-106

EXHIBIT 23

**2136**

NSN 7840-00-634-4176

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT TREATING ORGANIZATION (Sign each entry) |

DATE: _12 Mov Ad6_    FAMILY PRACTICE CLINIC   MACH

PT. TIME: # SC

TIME IN: 0955

PHYSICIAN: HCG

B/P: 111/72

P: 71

R: 18

T: 98.8

WT: 125   HT: 5'3"

AGE: 25 y.o.

ALLERGIES: Sulfa Drugs

_Physes in ER Saturday 9 Nov 96._
_had was in Auto Accident - (1) CO_
_Seen in Civ ER - was told to_
_See Army MD Monday Am_
_In Gollecridge - May 4th. Ihre_
_OS-4_

_Pt Seen in Lake this Hospital, nedesville_
_Alabama. In this while in 9 Nov._
_Cut up truck → ten on sun hood_
_to Hospital. Was told nothing is brkn._
_Arid t spot chills, Stir, Sore, anything_
_Dont Dont hd pt → head on collision. No LOC. (L) leg_
_Bruised, knee joint agent stay edema. Driv's side door_
_pushed in agent Calf & knee. Pleated crushed_
_Car totaled. Driv '77 Ford, oth down in an '87 Toyota_
_4x4. Estate no in dun, 50mph. Oth driv ? speed_
_(had LOC: amnesia - Suspected 55 mph @ least)._
_Currently pt t pain in (L) ankle, thnk h/slt._
_(L) calf t bruises fin for reht. (L)knee t bruise, feels_
_heck & shakey. (didnt swell much). (R) calf t ache (like a_
_"Charge horse". Was swollen. Hts t attmpts to walk. Current_
_bruises in 5x's)._    _(See reverse)_

PATIENT'S IDENTIFICATION (Use this space for Mechanical Imprint)

20 22937 75 40
543-3828
RUNYON, DAVID A.
M AD
PFC  1/507 CADRE. 1311

RECORDS MAINTAINED AT:

PATIENT'S NAME (Last, First, Middle Initial)

SEX

RELATIONSHIP TO SPONSOR   STATUS

MAJ GUY RUNKLE, M.D., M.
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
Family Practice

SPONSOR'S NAME   ORGANIZATION

DEPART./SERVICE SSN/IDENTIFICATION NO.   DATE OF BIRTH

CHRONOLOGICAL RECORD OF MEDICAL CARE   STANDARD FORM 600 (REV. 5-84)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505

EXHIBIT 23

**2137**

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (Sign each entry) |
|---|---|
| | [illegible] yesterday 2° [illegible] in (R) calf |
| | (R) knee [illegible] (L) |
| | (R) hip – hit steering wheel – [illegible] |
| | Slightly sore. |
| | (L) elbow → hit (L) door. [illegible] |
| | [illegible] elbow shoulder [illegible] |
| | neck – [illegible] (R) [illegible] see [illegible] |
| | on [illegible] (R) side of neck – ache. |
| | [illegible] |
| | [illegible] |
| | [illegible] TTP (R) [illegible] C-S. |
| | [illegible] |
| | [illegible] (L) elbow (+) [illegible] |
| | [illegible] (–) TTP. |
| | Hips [illegible] (–) TTP [illegible] |
| | Thighs [illegible] TTP. Knees FROM, (–) swelling. |
| | [illegible] |
| | mild TTP [illegible] (L) ankle [illegible] |
| | (–) TTP. |
| | multiple [illegible] |
| | A/C: [illegible] calf → (L) [illegible], (R) 26.5 cm |
| | Thigh [illegible]. (–) [illegible] |
| | A/P (1) MVA – ✓ x-rays of neck, elbow, knee, ankle. |
| Xrays [illegible] | (2) [illegible] – ✓ u/s of extremity – d/w Dr. [illegible] |
| neg for [illegible] | Plan: PT forearm/strengthening exercises |
| [illegible] | – Motrin 800mg c̄ food [illegible] [illegible] M.D., M.A. 603 [illegible] Practice |
| fx (L) elbow | – Robaxin [illegible] |
| c-spine neg | – F/U c̄ [illegible] MD p̄ PT or should symptom [illegible] |
| neg doppler [illegible] | PT at own pace + distance x [illegible] days. [illegible], MD CPT, MC |

*U.S. Government Printing Office: 1994 — 300-[illegible] STANDARD FORM 600 BACK (REV. 5-84)

EXHIBIT 23

13-110                                                                    NSN 7540-00-634-4

| MEDICAL RECORD | CONSULTATION SHEET |
|---|---|

**REQUEST**

TO: Pt | FROM: (Requesting physician or activity) BGAH / FPC | DATE OF REQUEST: 12 Nov 96

REASON FOR REQUEST (Complaints and findings)

25y/o WM s/p Head-on MVA collision - Ø Fx c/o ® leg weakness - needs strengthening + ROM exercises.

PROVISIONAL DIAGNOSIS

s/p MVA - weakness.

| DOCTOR'S SIGNATURE | APPROVED | PLACE OF CONSULTATION | ☑ ROUTINE | ☐ TODAY |
|---|---|---|---|---|
| Renta (Dario K. Renta, MD, CPT, MC) | | ☐ BEDSIDE  ☑ ON CALL | ☐ 72 HOURS | ☐ EMERGENCY |

**CONSULTATION REPORT**

RECORD REVIEWED ☐ YES ☑ NO          PATIENT EXAMINED ☐ YES ☑ NO

PHYSICAL THERAPY CLINIC
MACH  FT. BENNING, GA
544-3306 / 3318

S: 25 y.o. ♂ c/o ® calf more pain c on/off swelling S/P MVA x 4 dys. Pt in Civilian hospital. X-ray knee/leg Ø by Rpt. Taking motrin.

O: ⊕ ecchymosis L calf more
Girth: 8" ↑ medial malleolus   R 14½   L 13¼
⊕ TTP Lat head of gastroc
⊖ Thompson Test of gastroc
⊖ defect palpable
Gait moderately antalgic

A: L calf minor tear / contusion
P: ① LLW ② dw B ② ATasm Soar ② Rx/gdls ③ profile gza unna/heel lifts

ARE YOU INTERESTED IN GOING TO ANOTHER MTF?
☑ YES     ☐ NO

(Continue on reverse side)

STG - LMW Gait IWK
LTG - (illegible)

NOV 13 1996

SIGNATURE AND TITLE

| IDENTIFICATION NO. | ORGANIZATION | REGISTER NO. | WARD NO. |
|---|---|---|---|

PATIENT'S IDENTIFICATION (For typed or written entries give: Name - last, first, middle; grade; rank; rate; hospital or medical facility)

Ruggiero, 222037, 015 40
2001075040  DAVID A.
M AD
PFC    1/507CADRE 1311   THC2

214 Logan St.
Ft. Benning, GA.
545 - 7050 WORK
687 - 1221 HOME

CONSULTATION SHEET
Medical Record

STANDARD FORM 513 (REV. 8-93)
Prescribed by GSA/ICMR, FIRMR (41 CFR) 201-9.202-1

EXHIBIT 23

2139

NSN 7540-00-634-4178

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT  TREATING ORGANIZATION (Sign each entry) |
|---|---|
| Nov 96 | PHYSICAL THERAPY CLINIC  S: F/U @ calf mm tear / contusion. WALTER ARMY HOSPITAL 544-3898/3318  9 Nov 96. Pnt has been performing HEP of open-chain AROM able to swim x 15 min c̄ some pain which quickly disappeared. Also c̄ (R) knee / (R) shld pain. Feels (R) LE getting stronger. O: Amb c̄ min antalgia (R) LE AROM/GMT (B) ankles nl, painless. AROM (B) knees WNL c̄ pain (R); GMT nl (B) quads, HS. Girth above med malleolus: (R) 13½" (L) 12½" ⊖ TTP. ⊕ ecchymosis noted. A: resolving contusion/tear (R) gastroc; eval of (R) shld/(L) knee deferred. P: progress to all Phase I and non-impact phase II ankle exercises; pnt advised to report to TMC for 1° evaluation of (R) shld /(L) knee pain. Profile for no run/jump/march x 3 wks and F/U c̄ MS clinic CWA prn STG: nl gait/girth /3 wks. LTG: ⊖ S/p c̄ nl ADL's / 6-8 wks. |

PATIENT'S IDENTIFICATION (Use this space for Mechanical Imprint)

RECORDS MAINTAINED AT▶

| PATIENT'S NAME (Last, First, Middle Initial) | | SEX |
|---|---|---|
| RELATIONSHIP TO SPONSOR | STATUS | RANK/GRADE |
| SPONSOR'S NAME | | ORGANIZATION |
| DEPART./SERVICE  SSN/IDENTIFICATION NO. | | DATE OF BIRTH |

22937 75 40
-1958
Y
DAVID A.
H AD
1/SOTCADRE 1311  THC2

CHRONOLOGICAL RECORD OF MEDICAL CARE

STANDARD FORM 600 (REV. 5-84)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505

EXHIBIT 23

2140

# PHYSICAL PROFILE

For use of this form, see AR 40-501; the proponent agency is the Office of The Surgeon General

**1. MEDICAL CONDITION**

s/p (R) calf tear / contusion

**2.**

| | P | U | L | H | E | S |
|---|---|---|---|---|---|---|
| | | | | | | |

**ASSIGNMENT LIMITATIONS ARE AS FOLLOWS —**

No running, jumping or marching

**CODES**

**4. THIS PROFILE IS** ☐ PERMANENT ☑ TEMPORARY EXPIRATION DATE: 10 Dec 96

**5. THE ABOVE STATED MEDICAL CONDITION SHOULD NOT PREVENT THE INDIVIDUAL FROM DOING THE FOLLOWING ACTIVITIES**

☑ Groin Stretch  ☑ Thigh Stretch  ☐ Lower Back Stretch  ☑ Back & Shoulder Stretch  ☐ Neck Stretch
☐ Hip Raise  ☐ Quads Stretch & Bal.  ☐ Single Knee to Chest  ☐ Upper Back Stretch  ☐ Ankle Stretch
☑ Knee Bender  ☐ Calf Stretch  ☐ Straight Leg Raise  ☑ Chest Stretch  ☐ Hip Stretch
☐ Side-Straddle Hop  ☐ Long Sit  ☐ Elongation Stretch  ☐ One-Arm Side Stretch  ☐ Upper Body Wt Tng
☐ High Jumper  ☐ Hamstring Stretch  ☐ Turn and Bounce  ☐ Two-Arm Side Stretch  ☑ Lower Body Wt Tng
☐ Jogging in Place  ☑ Hams. & Calf Stretch  ☑ Turn and Bend  ☑ Side Bender  ☐ All

**6. AEROBIC CONDITIONING EXERCISES**

☑ Walk at Own Pace and Distance
☐ Run at Own Pace and Distance
☑ Bicycle at Own Pace and Distance
☑ Swim at Own Pace and Distance
☑ Walk or Run in Pool at Own Pace

☐ Unlimited Walking
☐ Unlimited Running
☐ Unlimited Bicycling
☐ Unlimited Swimming

☐ Run at Training Heart Rate for ____ Min.
☐ Bicycle at Training Heart Rate for ____ Min.
☐ Swim at Training Heart Rate for ____ Min.

☐ OTHER

**7. FUNCTIONAL ACTIVITIES**

☐ Wear Backpack (40 Lbs.)
☑ Wear Helmet
☑ Carry Rifle
☐ Fire Rifle
____ With Hearing Protection
☐ KP/Mopping/Mowing Grass
☐ Marching Up to ____ Miles
☐ Lift Up to ____ Pounds
☐ All

**PHYSICAL FITNESS TEST**
☐ Two Mile Run  ☐ Walk
☐ Push-Ups  ☐ Swim
☐ Sit-Ups  ☐ Bicycle

**8. TRAINING HEART RATE FORMULA**

MALES 220      FEMALES 225

MINUS (–) AGE
MINUS (=) RESTING HEART RATE
TIMES (x) % INTENSITY
PLUS (+) RESTING HEART RATE

50% EXTREMELY POOR CONDITION
60% HEALTHY, SEDENTARY INDIVIDUAL
70% MODERATELY ACTIVE, MAINTENANCE
80% WELL TRAINED INDIVIDUAL

| TYPED NAME AND GRADE OF PROFILING OFFICER | SIGNATURE | DATE |
|---|---|---|
| CAROL HOUSE, MAJ, SP PHYSICAL THERAPY | Carol Hoffman PT | 27 Nov 96 |
| TYPED NAME AND GRADE OF PROFILING OFFICER | SIGNATURE | DATE |
| | | |

**ACTION BY APPROVING AUTHORITY**

| PERMANENT CHANGE OF PROFILE | ☐ APPROVED | ☐ NOT APPROVED | |
|---|---|---|---|
| TYPED NAME, GRADE & TITLE OF APPROVING AUTHORITY | SIGNATURE | | DATE |

**ACTION BY UNIT COMMANDER**

THIS PERMANENT CHANGE IN PROFILE SERIAL ☐ DOES ☐ DOES NOT REQUIRE A CHANGE IN MEMBERS
☐ MILITARY OCCUPATIONAL SPECIALTY ☐ DUTY ASSIGNMENT BECAUSE:

| TYPED NAME AND GRADE OF UNIT COMMANDER | SIGNATURE | DATE |
|---|---|---|
| | | |

**PATIENTS IDENTIFICATION** (For typed or written entries give: Name first, first, middle; grade; SSN; hospital or medical facility)

Runyon, David

PFC                    1/507

**UNIT**

**ISSUING CLINIC AND PHONE NUMBER** 9-550

**DISTRIBUTION**
UNIT COMMANDER — ORIGINAL & 1 COPY
HEALTH RECORD JACKET — 1 COPY
CLINIC FILE — 1 COPY
MILPO — 1 COPY

**DA FORM 3349, MAY 86** REPLACES DA FORM 3349-R (TEST) DATED FEB 84 AND DA FORM 3349 DATED 1 JUN 80, WHICH ARE OBSOLETE.

EXHIBIT 23

**2141**

## SCREENING NOTE OF ACUTE MEDICAL CARE

For use of this form, see AR 40-66; the proponent agency is the TSG

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | | SCREENER LOCATION | | |
|---|---|---|---|---|
| | TIME PATIENT ARRIVES 0735 | TIME ENCOUNTER BEGINS | | TIME PATIENT LEAVES |
| DATE DEC 2 1996 | SCREENER LOCATION | CHIEF COMPLAINT MVA 9 NOV 96 F/U PT | | DURATION |
| PATIENT RESIDENCE ( ) BARRACKS ( ) OFF POST ( ) POST HOUSING ( ) TRANSIENT | | VITAL SIGNS TEMPERATURE 96.2   PULSE ____ BP ____ | ALLERGIES NSOL/KEFL RESP ____ | |

FIRST VISIT FOR THIS COMPLAINT ( ) YES ( ) NO. IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ( ) YES ( ) NO

| ALGORITHM/CODE | ALGORITHM/CODE | |
|---|---|---|
| **ALGORITHM SUMMARY** | **ALGORITHM SUMMARY** | |

*[Handwritten clinical notes — illegible]*

COMMENTS (Reasons for referral, method of referral, hospital appointments, self-care protocols, and patient instructions/precautions)

*[Handwritten clinical notes — illegible]*

| PATIENT'S IDENTIFICATION (Use mechanical imprint if available; for typed or written entries give: Name, SSN, Unit, Sex, Birthdate and Duty Phone) | FINAL DISPOSITION |
|---|---|
| Runyon, David A  E4 RA  E /CADRE | ( ) I—PHYSICIAN STAT ( ) IV—SELF CARE PROTOCOL ( ) II—PA STAT ( ) V—HOSP CLINIC REFERRAL ( ) III—PA  *[handwritten]*  AIRMAN'S SIGNATURE AND CODE      William L. Randall  259-88  DOCTORS SIGNATURE PT AND DATE |

DA FORM 5181-R, OCT 85          EDITION OF DEC 84 IS OBSOLETE

EXHIBIT 23

**2142**

| HEALTH RECORD | 16 DEC — CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT  TREATING ORGANIZATION *(Sign each entry)* |

DATE 12 DEC 96                          FAMILY PRACTICE CLINIC   MACH

APPT. TIME 0900

TIME IN 0930            (S) S/P MVA 9...?... HEAD

PHYSICIAN Amador,      ON COLLISION (HIGH SPEED),

B/P 105/73            (+) SEATBELT, (-) AIRBAG.

P 70                  c/o MILD MYALGIAS - NECK,

R 18                  SHOULDERS, KNEES. ALSO S2

T 97.0                OF VERTIGO. WAS SEEN ID ER.

WT 102 lbs  HT 63"    COUPLE OF DAYS AGO - STARTED ON

AGE 25(4.0)           ...?... SENSATIONS OF

ALLERGIES Sulfa Keflex  NUMBNESS WHICH START IN

Allergo               BOTH HANDS & RADIATE INTO

SHOULDERS & ENTIRE UPPER TRUNK.

ALSO SHOOTING SENSATIONS ACROSS BODY.

(O) VS

C-SPINE: FROM, NON-TENDER   5/5 STRENGTH  2+ DTR's UE

L-SPINE: FROM STANDING, (-) SLR

SITTING - 2+ DTR's   5/5 STRENGTH

(-) SITTING SLR.

SUPINE - (+) SLR, (-) PATRICKS

(A) S/P MVA - NL. NEURO EXAM

(P) CONT P.T.          F/U 1° MD ON 16 DEC FOR

CONT MOTRIN.           W/U VERTIGO, PARESTHESIAS.

PATIENT'S IDENTIFICATION *(Use this space for Mechanical)*

20 22937 75 40
545-3828
RUNYON, DAVID A.
M A0
PFC    1/507CADRE 1311  TMC2

RECORDS MAINTAINED AT:
PATIENT'S NAME *(Last, First, Middle Initial)* | SEX
RELATIONSHIP TO SPONSOR | STATUS | RANK/GRADE
SPONSOR'S NAME | ORGANIZATION
DEPART/SERVICE | SSN/IDENTIFICATION NO. | DATE OF BIRTH

CHRONOLOGICAL RECORD OF MEDICAL CARE    STANDARD FORM 600 (REV. 5-84)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505

EXHIBIT 23

**2143**

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (Sign each entry) |

DATE: 16 Dec 96 — FAMILY PRACTICE CLINIC  MACH

APPT. TIME: 1130 — F/U on MVA

TIME IN: 1145

PHYSICIAN: Newton

B/P: 108/69

P: 85

R:

T: 96.0

WT: 125   HT: 63"

AGE: 25

ALLERGIES: Keflex, Sulpha, o/VSS

S/ 25 yo w/o involved in serious MVA and pt was evacuated @ another facility pt c some musculoskeletal pain x several days then resolved. ~ 2 weeks ago pt states been having positional c/o room spinning/ lip numbness progressing to hands then up arms to chest down to waist. Pt given meclizine c some improvement.

plain films
cervical nl

O/ Neuro CN II - XII intact
muscles 5/5 all major muscle groups
Sensory intact
Cerebellar intact, Romberg neg

A/P 1. BPV - c anxiety probable hyperventilation c subsequent paresthesias
- pt given reassurance this not consistent c neurologic injury c probable BPV resolving. continue meclizine TID x 30 days then F/U

Terry J. Newton MD

PATIENT'S IDENTIFICATION
20 22937 75 40
545-3828
RUNYON, DAVID A.
M AD
PFC  1/507CADRE 1311  THC

RECORDS MAINTAINED AT:
Terry J. Newton
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
CPT, MD

CHRONOLOGICAL RECORD OF MEDICAL CARE   STANDARD FORM 600 (REV. 5-84)

EXHIBIT 23

2144

513-110                                                                              NSN 7540-00-834-4127

| MEDICAL RECORD | CONSULTATION SHEET |
| --- | --- |

**REQUEST**

Ortho-Sports Clinic    FROM: (Requesting physician or activity) PT    DATE OF REQUEST 23 Dec 96

REASON FOR REQUEST (Complaints and findings)

25 y/o BT MD s/p MVA 7/10/96. c/o giving way L knee s/p
c/w ACL sprain. Please assess to confirm and recommend
surg vs conservative intervention.

PROVISIONAL DIAGNOSIS

① ACL sprain

| DOCTOR'S SIGNATURE | APPROVED CAROL HOBBS MAJ 9P | PLACE OF CONSULTATION ☐ BEDSIDE ☒ ON CALL | ☒ ROUTINE ☐ 72 HOURS | ☐ TODAY ☐ EMERGENCY |
| --- | --- | --- | --- | --- |

**CONSULTATION REPORT**

RECORD REVIEWED ☐ YES ☐ NO    PATIENT EXAMINED ☐ YES ☐ NO

25 y/o ♂ sustained direct valgus stress to L knee
① 2 subsequent episodes of buckling ① c/o localized swelling
p KS activity. No locking, poor pain localization. Has undergone
rehab x 2 weeks c good results

Exam- ① knee - no effusion. no focal points of tenderness
no laxity to valgus/varus stress  ① 1+ lachman's confirm
endpoint, trace ant. drawer  ⊖ pivot shift

XR  no abnl

A - mild ACL insufficiency
P - Cont rehab
    RTC in 3 months for reeval

(Continue on reverse side)

| SIGNATURE AND TITLE    ...MD | DATE 9/.../97 |
| --- | --- |
| IDENTIFICATION NO. | ORGANIZATION | REGISTER NO. | WARD NO. |

PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle; grade; rank; rate; hospital or medical facility)

Runyon

CONSULTATION SHEET
Medical Record

STANDARD FORM 513 (REV. 8-82)
Prescribed by GSA/ICMR, FIRMR (41 CFR) 201-9.202-1

EXHIBIT 23

**2145**

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (Sign each entry) |
|---|---|
| DEC 23 1996 | PHYSICAL THERAPY CLINIC MACH FT. BENNING, GA 544-3308 / 3318 |

S: F/U ® calf contusion/tear (resolving) and c̄ ® shld/® knee pain p̄ 9 Nov 96. Has been working out at gym; feels ® calf and hip "get tired" easily but are getting better. ® shldr and ® knee still bothering him. Seen by TMC for these problems on 2 Dec. x-rays ® knee taken 12 Dec; ⊖ films ® shldr. Still taking motion/relaxin prn. x-rays ® knee WNL.

O: Gait no longer antalgic; inc overpronation ® > ®. ⊕ TTP, painless ® quads/HS. Girth 18cm prox med malleolus: ® 30cm, ® 30.5cm. AROM ® knee WNL and painless c̄ "popping" noted ® on full flex. Lachman's: mild laxity noted ® c̄ firm endfeel ® and soft endfeel ®. V/V stress WNL ® ⊖ jt line pain; ⊖ McMurray's. ® shldr: AROM WNL c̄ pain localized to post corner of rot cuff at edge of acromion, esp c̄ horizontal abd, ER/IR. GMT WNL painless ® shldr. ⊖ impingement sign/A-C provocation. ⊖ apprehension sign, ⊕ relocd.

A: ① Resolved ® calf contusion/tear.
② R/O ACL sprain ® knee.
③ poss contusion ® rot cuff.

P: 1) to 7th flr PT clinic for supervised rehab/gen strengthening 3x wk. 2) To Sports Clinic 9 Jan ?. 3) Profile for ro eTJ/M/PU 4) Instructed in RT/inonitir shldr exs/icing. 5) Rev 3-4 wks.
STG: def in dos/painless shldr Arom/3-4 wks.
LTG: RTD/6-8 wks

[signature]

EXHIBIT 23

2146

NSN 7540-00-634-4176

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT  TREATING ORGANIZATION *(Sign each entry)* |

DATE ___ NOV 0 9 1997

FAMILY PRACTICE CLINIC  MACH

APPT. TIME 1335

TIME IN 1335

PHYSICIAN R. Newton

B/P 107/66

P 76

R 18

T 98.2

WT 120   HT 63"

AGE 28y/o

ALLERGIES Keflex Sulfa Drugs

Follow Up on Auto Accident 1 Month Johns CSC

S: 26 y/o W♂ S/P auto accident on 9 Nov 96,
Previously complaining of vertigo. Currently symptoms
have resolved after a course of meclizine. Currently
complains of some short term memory loss and insomnia.
MEDS: Motrin 800mg prn   Sochx: ∅ Tob ∅ EtOH
Sxhx: Vasectomy-96
O: GEN: A&O x 3, NAD  EYES: EOMI  PERLA~3mm
MOUTH/PHARYNX: ∅ sores/clear  Neck: ∅ lymphadenopathy
NEURO: CN II-XII intact, UE nl to pain, press, light touch
and graphesthesia, rapid alternating movements intact
Rhomberg steady, gait normal.

30/30 on MMSE

EXTR: .75 cm bump on ® UE 5th metchr

A/P: Insomnia - Pt. claims to follow good sleep hygiene - not
reading in bed, not eating late at night, etc. Also explained
PTSD and life stressors as possible etiology for insomnia
and memory loss. Explore possible symptoms of depression and
antidepression meds at next visit. Wendill Men MS-II

See NC Sweeny @ Family Life
center will contact him + ask him to work c PT
+ couple if not improved c 1-2 visits consider
SSRI for 3-6 mo for sx of PTSD/...

PATIENT'S IDENTIFICATION (Use this space for Mechanical Imprint)

...5-3626   15 40
...YON, DAVID A.
H AO
1/507 CADRE 1311  THC2

| RECORDS MAINTAINED AT: | |
|---|---|
| PATIENT'S NAME (Last, First, Middle Initial) | |
| RELATIONSHIP TO SPONSOR | STATUS | RANK/GRADE |
| SPONSOR'S NAME | | ORGANIZATION |
| DEPART./SERVICE | SSN/IDENTIFICATION NO. | DATE OF BIRTH |

CHRONOLOGICAL RECORD OF MEDICAL CARE   STANDARD FORM 600 (REV. 5-84)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505

EXHIBIT 23

**2147**

**MASTER PROBLEM LIST**

For use of this form . . . 0-55; the proponent agency is the Office of . . . on General

**MAJOR PROBLEMS**

| PROBLEM NUMBER | DATE ONSET | DATE ENTERED | PROBLEM | DATE RESOLVED |
|---|---|---|---|---|
| 1. | | Apr 95 | Health Maint | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |
| 12. | | | | |

**TEMPORARY [MINOR] PROBLEMS.**

| PROBLEM LETTER | PROBLEM | DATES OF OCCURRENCES | | | | | |
|---|---|---|---|---|---|---|---|
| A. | Trouble Breathing | 18 Jun 95 | | | | | |
| B. | UCH | 24 May 95 | | | | | |
| C. | Allergic Reaction Septra | June 95 | | | | | |
| D. | Pneumonia | 95 June | | | | | |
| E. | Acne | Aug 95 | | | | | |
| F. | URTS | 10 Apr 96 | 11 Jan 96 | | | | |
| G. | Situational Aggression | 1/97 | | | | | |
| H. | | | | | | | |

PATIENT'S IDENTIFICATION (Use mechanical imprint if available; for typed or written entries give: Name, SSN, Unit, Sex, Birthdate, and Duty Phone)

```
20 22937 75 40
545-3828
RUNYON, DAVID A.
          M AD
PFC      1/507CADRE 1311  FHC2
```

SUMMARY OF PROBLEMS, ALLERGIES, MEDICATIONS, SURGERIES AND TRAUMAS:

SULFA

NOTE: DO NOT DISCARD FROM CHART

DA FORM 5571. CCT 83

EXHIBIT 23

2148

**PHYSICAL PROFILE**

For use of this form, see AR 40-501; the proponent agency is the Office of The Surgeon General

| 1. MEDICAL CONDITION | 2. | | | | | | |
|---|---|---|---|---|---|---|---|
| S/p (l) knee ACL sprain | | P | U | L | H | E | S |
| | CODES | | | | | | |

3. ASSIGNMENT LIMITATIONS ARE AS FOLLOWS

No running, jumping, marching or pushups

| 4. THIS PROFILE IS: | ☐ PERMANENT | ☒ TEMPORARY EXPIRATION DATE: 4 Feb 97 |
|---|---|---|

5. THE ABOVE STATED MEDICAL CONDITION SHOULD NOT PREVENT THE INDIVIDUAL FROM DOING THE FOLLOWING ACTIVITIES

| | | | | |
|---|---|---|---|---|
| ☒ Groin Stretch | ☒ Thigh Stretch | ☒ Lower Back Stretch | ☐ Neck & Shoulder Stretch | ☒ Neck Stretch |
| ☐ Hip Raise | ☐ Quads Stretch & Bal. | ☐ Single Knee to Chest | ☐ Upper Back Stretch | ☒ Ankle Stretch |
| ☐ Knee Bender | ☐ Calf Stretch | ☐ Straight Leg Raise | ☐ Chest Stretch | ☒ Hip Stretch |
| ☐ Side-Straddle Hop | ☒ Long Sit | ☐ Elongation Stretch | ☐ One-Arm Side Stretch | ☐ Upper Body Wt Tng |
| ☐ High Jumper | ☐ Hamstring Stretch | ☒ Turn and Bounce | ☐ Two-Arm Side Stretch | ☒ Lower Body Wt Tng |
| ☐ Jogging In Place | ☒ Hams. & Calf Stretch | ☒ Turn and Bend | ☐ Side Bender | ☐ All |

| 6. AEROBIC CONDITIONING EXERCISES | 7. FUNCTIONAL ACTIVITIES | 8. TRAINING HEART RATE FORMULA: |
|---|---|---|
| ☒ Walk at Own Pace and Distance | ☐ Wear Backpack (40 Lbs.) | |
| ☐ Run at Own Pace and Distance | ☒ Wear Helmet | MALES 220    FEMALES 225 |
| ☒ Bicycle at Own Pace and Distance | ☐ Carry Rifle | |
| ☐ Swim at Own Pace and Distance | ☐ Fire Rifle | MINUS (−) AGE |
| ☒ Walk or Run in Pool at Own Pace | With Hearing Protection | MINUS (−) RESTING HEART RATE |
| | ☐ KP/Mopping/Mowing Grass | TIMES (×) % INTENSITY |
| ☐ Unlimited Walking | ☐ Marching Up to 2 Miles | PLUS (+) RESTING HEART RATE |
| ☐ Unlimited Running | ☒ Lift Up to 10 Pounds | |
| ☐ Unlimited Bicycling | ☐ All | 50% EXTREMELY POOR CONDITION |
| ☐ Unlimited Swimming | | 60% HEALTHY, SEDENTARY INDIVIDUAL |
| | PHYSICAL FITNESS TEST | 70% MODERATELY ACTIVE, MAINTENANCE |
| ☐ Run at Training Heart Rate for ___ Min. | ☐ Two Mile Run   ☒ Walk | 80% WELL TRAINED INDIVIDUAL |
| ☐ Bicycle at Training Heart Rate for ___ Min. | ☐ Push-Ups   ☐ Swim | |
| ☐ Swim at Training Heart Rate for ___ Min. | ☐ Sit-Ups   ☐ Bicycle | |

OTHER No lifting >10#, sit ups @ own pace/tolerance, no rucksack ☒ TO 1st Floor PT CLINIC 3x WK FOR REHAB

| TYPED NAME AND GRADE OF PROFILING OFFICER | SIGNATURE | DATE |
|---|---|---|
| CAROL HOBBS MAJ PHYSICAL THERAPY | Carol Hobbs MAJ | 9 Jan 97 |
| TYPED NAME AND GRADE OF PROFILING OFFICER | SIGNATURE | DATE |
| | | |

ACTION BY APPROVING AUTHORITY

| PERMANENT CHANGE OF PROFILE | ☐ APPROVED   ☐ NOT APPROVED | |
|---|---|---|
| TYPED NAME, GRADE & TITLE OF APPROVING AUTHORITY | SIGNATURE | DATE |
| | | |

ACTION BY UNIT COMMANDER

| THIS PERMANENT CHANGE IN PROFILE SERIAL: ☐ DOES   ☐ DOES NOT REQUIRE A CHANGE IN MEMBER'S | | |
|---|---|---|
| ☐ MILITARY OCCUPATIONAL SPECIALTY   ☐ DUTY ASSIGNMENT   BECAUSE: | | |
| TYPED NAME AND GRADE OF UNIT COMMANDER | SIGNATURE | DATE |
| | | |

| PATIENT'S IDENTIFICATION (For typed or written entries give: Name (last, first, middle) grade; SSN; hospital or medical facility) | UNIT: | |
|---|---|---|
| Runyon, David | ISSUING CLINIC AND PHONE NUMBER: PT Clinic 4-5305 | |
| SPC          1/502 CADRE | DISTRIBUTION: UNIT COMMANDER – ORIGINAL & 1 COPY / HEALTH RECORD JACKET – 1 COPY / CLINIC FILE – 1 COPY / MILPO – 1 COPY | |

DA FORM 3349, MAY 86   REPLACES DA FORM 5302-R (TEST) DATED FEB 84 AND DA FORM 3349 DATED 1 JUN 80, WHICH ARE OBSOLETE

EXHIBIT 23

**2149**

Personal Data - Privacy Act of 1974 (PL 93-579)          Page 1

Automated Version of DA5008/USAF & USN 600 Overprint

Telephone Consultation
------------------------------------

⬤ted Date: 05 Feb 97 @ 1010          Division: MARTIN ARMY COMMUNITY HO

Clinic: MACH FAMILY PRACTICE          Workload DOES Count

Provider: NEWTON,TERRY J

Allergies:
 SULFA-DRUGS
 CEPHALEXIN

Clerk's Note:
Clerk: AINSWORTH,JEANNE A                          04 Feb 97 @ 1337
PHONE:545-7050/HH:685-9653
INRE:POST TRAMATIC STESS SYNDROME/NEEDS RECOMMENDATION/STATES URGENT/1SGT
WANTS PAPER WORK ASAP.

_____

Problem List:


Provider's Note:
Provider: NEWTON,TERRY J                          05 Feb 97 @ 1008
Spoke with wife and counseller Mr Sweeny.   I will recommend/refer patient for
further psych eval and notify company commander that I recommend no job
change or profile at this time until psych eval is complete.   Will call
⬤ent and inform him of this after notifying CO.

                                        TERRY J. NEWTON, CPT, MC


                    *** END OF REPORT ***

⬤ON,DAVID                      20/          USA ACTIVE DUTY ENLISTED
D⬤                             H: 706-685-9653          W: 706-545-6364
Spon: RUNYON,DAVID             Rank: PRIVATE FIRST CLASS
Unit: 507 IN BN 1 ABN CO E     RR: THC #2 RECORD ROOM

EXHIBIT 23

NSN 7540-00-634-4176

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT  TREATING ORGANIZATION (Sign such entry) |

**FEB 1 8 1997**

PHYSICAL THERAPY CLINIC
MACH, FT. BENNING, GA 31905
(706) 544-3308/3318

S: F/U mild ACL insuff ® per ortho. Seen @ sports Clinic, 9 Jan 97. sched for 7th floor rehab but has been unable to attend 2° to unit; now able to begin. Wishes to jump to maintain jump status. To gain (B) knees.

O: Lachmans: ® 1+ laxity c firm endfeel; 1+ – 2+ laxity ⊖ ≡ firm endfeel. Further eval deferred.

A: ACL laxity ®; ⊖ rehab.

P: discussed case c ortho; no vigorous activity such as jumping until documented good strength and rehab compliance. 7/87th floor for rehab / Knee on / IKT-1600; rev 4 wks. Con't profile.

STG: compliance c rehab prog. / 1 mo.
LTG: defin mgmt / 2 mos.

Carol Hoffs MAJ

PATIENT'S IDENTIFICATION (Use this space for Mechanical Imprint)

20 22937 75 40
543-3828
RUNYON, DAVID A.
H AD
1/507 CADRE 131
PFC

| RECORDS MAINTAINED AT: ▶ | | |
|---|---|---|
| PATIENT'S NAME (Last, First, Middle Initial) | | SEX |
| RELATIONSHIP TO SPONSOR | STATUS | RANK/GRADE |
| SPONSOR'S NAME  THC2 | | ORGANIZATION |
| DEPART./SERVICE | SSN/IDENTIFICATION NO. | DATE OF BIRTH |

CHRONOLOGICAL RECORD OF MEDICAL CARE

STANDARD FORM 600 (REV. 5-84)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505

EXHIBIT 23

2151

# PHYSICAL PROFILE

For use of this form, see AR 40-501; the proponent agency is the Office of The Surgeon General

**1. MEDICAL CONDITION**

(1)AC C insufficiency

**2.**

| | P | U | L | H | E | S |
|---|---|---|---|---|---|---|
| | | | | | | |

**ASSIGNMENT LIMITATIONS ARE AS FOLLOWS** *Situp bownpics; normal* **CODES**

*No running, jumping, marching or pushups no lifting > K#*

**4. THIS PROFILE IS:** ☐ PERMANENT ☒ TEMPORARY EXPIRATION DATE: *19 Mar 05*

**5. THE ABOVE STATED MEDICAL CONDITION SHOULD NOT PREVENT THE INDIVIDUAL FROM DOING THE FOLLOWING ACTIVITIES**

☒ Groin Stretch  ☒ Thigh Stretch  ☐ Lower Back Stretch  ☒ Neck & Shoulder Stretch  ☐ Neck Stretch
☐ Hip Raise  ☐ Quads Stretch & Bal.  ☐ Single Knee to Chest  ☐ Upper Back Stretch  ☐ Ankle Stretch
☒ Knee Bender  ☐ Calf Stretch  ☐ Straight Leg Raise  ☐ Chest Stretch  ☐ Hip Stretch
☒ Side-Straddle Hop  ☐ Long Sit  ☐ Elongation Stretch  ☐ One-Arm Side Stretch  ☐ Upper Body Wt Tng
☐ High Jumper  ☒ Hamstring Stretch  ☐ Turn and Bounce  ☐ Two-Arm Side Stretch  ☐ Lower Body Wt Tng
☐ Jogging In-Place  ☒ Hams. & Calf Stretch  ☐ Turn and Bend  ☐ Side Bender  ☐ All

**6. AEROBIC CONDITIONING EXERCISES**

☒ Walk at Own Pace and Distance
☒ Run at Own Pace and Distance
☒ Bicycle at Own Pace and Distance
☒ Swim at Own Pace and Distance
☒ Walk or Run in Pool at Own Pace

☐ Unlimited Walking
☐ Unlimited Running
☐ Unlimited Bicycling
☐ Unlimited Swimming

☐ Run at Training Heart Rate for ___ Min.
☐ Bicycle at Training Heart Rate for ___ Min.
☐ Swim at Training Heart Rate for ___ Min.

**7. FUNCTIONAL ACTIVITIES**

☐ Wear Backpack (40 Lbs.)
☐ Wear Helmet
☐ Carry Rifle
☐ Fire Rifle
   With Hearing Protection
☐ KP/Mopping/Mowing Grass
☐ Marching Up to _2_ Miles
☒ Lift Up to _10_ Pounds
☐ All

**PHYSICAL FITNESS TEST**
☐ Two Mile Run  ☐ Walk
☐ Push-Ups  ☐ Swim
☐ Sit-Ups  ☐ Bicycle

**8. TRAINING HEART RATE FORMULA**

MALES 220    FEMALES 225

MINUS (−) AGE
MINUS (−) RESTING HEART RATE
TIMES (x) % INTENSITY
PLUS (+) RESTING HEART RATE

50% EXTREMELY POOR CONDITION
60% HEALTHY; SEDENTARY INDIVIDUAL
70% MODERATELY ACTIVE, MAINTENANCE
80% WELL TRAINED INDIVIDUAL

**OTHER** *To 7th Floor PT CLINIC 3x wk for REHAB*
*Cannot jump until cleared by PT sister*

| TYPED NAME AND GRADE OF PROFILING OFFICER | SIGNATURE | DATE |
|---|---|---|
| CAROL HOBBS MAJ, SP PHYSICAL THERAPY | *(signature)* | *17 Feb 09* |
| TYPED NAME AND GRADE OF PROFILING OFFICER | SIGNATURE | DATE |
| | | |

**ACTION BY APPROVING AUTHORITY**

| PERMANENT CHANGE OF PROFILE | ☐ APPROVED | ☐ NOT APPROVED | |
|---|---|---|---|
| TYPED NAME, GRADE & TITLE OF APPROVING AUTHORITY | SIGNATURE | | DATE |
| | | | |

**ACTION BY UNIT COMMANDER**

THIS PERMANENT CHANGE IN PROFILE SERIAL  ☐ DOES  ☐ DOES NOT REQUIRE A CHANGE IN MEMBER'S
☐ MILITARY OCCUPATIONAL SPECIALTY  ☐ DUTY ASSIGNMENT  BECAUSE:

| TYPED NAME AND GRADE OF UNIT COMMANDER | SIGNATURE | DATE |
|---|---|---|
| | | |

**PATIENT'S IDENTIFICATION** (For typed or written entries give: Name (last, first, middle); grade; SSN; hospital or medical facility)

*Runyon, David*

*SPC   1/507 CADRE*

**UNIT:**

**ISSUING CLINIC AND PHONE NUMBER** *PT Clinic 4-3308*

**DISTRIBUTION**
UNIT COMMANDER — ORIGINAL & 1 COPY
HEALTH RECORD JACKET — 1 COPY
CLINIC FILE — 1 COPY
MILPO — 1 COPY

**DA FORM 3349, MAY 86** REPLACES DA FORM 5302-R (TEST) DATED FEB 84 AND DA FORM 3349 DATED 1-JUN 80, WHICH ARE OBSO

EXHIBIT 23

**2152**

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (Sign each entry) |
|---|---|
| 21 Feb 97 | PHYSICAL THERAPY CLINIC MACH, FT. BENNING, GA 544-3308/3318 S/ Pt. to clinic for KT1000, Kincom & Rehab |
| | O/ Kincom Test Results: |
| | 90°/sec (L) Quad 105% of (R) |
| | (L) HS 109% of (R) |
| | 180°/sec (L) Quad 96% of (R) |
| | (L) HS 123% of (R) |
| | KT1000 Max Man 6mm (R) 7mm (L) |
| | Single Leg Jump distance: 80" (B), Single leg hop fatigue: 35 (R) 35 (L) |
| | A/ no deficits noted on the above tests |
| | P/ Cont c rehab - Discuss RTD c Dr Zumwalt |
| | G/ ↑ Strength (L) Q/HS |
| | [signature] |
| | William T Maggart [illegible] |
| 21 Feb 97 | ~~P.T. Note~~ Ortho |
| | MACH |
| | Ft Benning, GA |
| | RTD, airborne status |
| | [signature] |

Government Printing Office: 1994 — 300-[illegible] STANDARD FORM 600 BACK (REV. 5-84)

EXHIBIT 23

513-110                                                                    NSN 7540-00-634-4127

| MEDICAL RECORD | | CONSULTATION SHEET |
|---|---|---|

**REQUEST**

TO: Family Practice Physician    FROM: (Requesting physician or activity) TMC #2    DATE OF REQUEST 8-20-97

REASON FOR REQUEST (Complaints and findings): 26 y/o WM c̄ h/o of positional vertigo, lying supine, X-5 episodes s/p MVA Nov 96. PE unremarkable, Skull films taken @ time of MVA were normal. Please eval. ? does this pt need head CT? current Rx is meclizine 25mg qd.

PROVISIONAL DIAGNOSIS: Positional Vertigo

DOCTOR'S SIGNATURE _____

APPROVED G. L. HATFIELD PA-C GS-11

PLACE OF CONSULTATION: ☐ BEDSIDE  ☐ ON CALL  ☑ ROUTINE / ☐ 72 HOURS  ☐ TODAY  ☐ EMERGENCY

**CONSULTATION REPORT**

RECORD REVIEWED ☐ YES ☐ NO    PATIENT EXAMINED ☐ YES ☐ NO

§ 26 yo ♂ s/p MVA ~ Nov 96 who describes 3 episodes of vertigo upon awakening. Pt describes sleeping on back and awakens c̄ room spinning. Pt also has associated HA's that last 3-4 seconds. Most recent episode was ~10d ago. Sx alleviates c̄ meclizine.

∅ tinnitus  ∅ N/V/D  ∅ photophobia  ∅ recent travel

MVA Nov 96 - c̄ ∅ LOC seen in civilian Hosp ∅ fx or abn noted

PMH: Positional Vertigo    MEDS: meclizine 25mg TID    PSH: ∅    Allergies: NKDA, Keflex, Sulfa meds    Tobacco ∅ EtOH ∅

PE: Gen: young ♂ NAD
HEENT: AT/NC, PERRL, EOMI, TM's clear op clear
Neck: supple ∅ LAD
Lungs: CTAB
CVS: RRR
Abd: soft NTND    ⊖ Hallpike
ext: ∅ c/c/e
Neuro: A&O×3, CN II-XII intact b/l, Motor 5/5 @ CN, Sensory intact to lt touch, Cereb: upper/lower not full ROM

A: positional vertigo, 2° to vestibular dysfunction
P: ① CT scan of head c̄ & s̄ contrast
② continue meclizine 25
③ f/u after CT scan will consider LP...

(Continue on reverse side)

SIGNATURE AND TITLE: ____ De Soto

IDENTIFICATION NO. | ORGANIZATION | P. RUSSELL, LT, MC CPT, MC REGISTER NO. MC 818-74-____ | WARD NO.

PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle; grade; rank; rate; hospital or medical facility)

Runyon, David A  PFC/RA

20-
E Co. 1/507

CONSULTATION SHEET
Medical Record

STANDARD FORM 513 (REV. 8-92)
Prescribed by GSA/ICMR, FIRMR (41 CFR) 201-9.202-1

EXHIBIT 23

**2154**

**SCREENING NOTE OF ACUTE MEDICAL CARE**

For use of this form, see AR 40-54; the proponent agency is the TSG

| TIME PATIENT DEPARTS UNIT (From DD Form 689) | SCREENER LOCATION | | |
|---|---|---|---|
| | TIME PATIENT ARRIVES *1045* | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
| DATE AUG 27 1997 | SCREENER LOCATION TMC #2 FT. BENNING, GA 31905 | CHIEF COMPLAINT *Vertigo.* | DURATION |
| PATIENT RESIDENCE ( ) BARRACKS ( ) POST HOUSING ( ) OFF POST ( ) TRANSIENT | | VITAL SIGNS TEMPERATURE *95.5* PULSE ___ BP ___ | ALLERGIES ___ RESP ___ |
| FIRST VISIT FOR THIS COMPLAINT ( ) YES ( ) NO. IF NO, WAS RETURN SCHEDULED/REQUESTED BY CARE PROVIDER? ( ) YES ( ) NO | | | |
| ALGORITHM/CODE | | ALGORITHM/CODE | |
| ALGORITHM SUMMARY | | ALGORITHM SUMMARY | |

S→ 26 y/o WM c̄ c/o positional dizziness → While lying down. See prev chart entry's dated: 12 Dec, 16 Dec 96 and Jan 97. Has new FP physician whom he has seen.

O→ afebrile NAD    OX3, good historian.

COMMENTS (Reasons for referral, method of referral, hospital appointments, self-care protocols, and patient instructions/precautions)

H - normocephaly s̄ thyromegaly, s̄ Bruits

E- PERRLA, EOMI, fundi - nl

E - TM's intact, Weber L=R, Rinne : AC > BC

N - Deviated nasal septum, sinuses are nontender

T - clear s̄ adenopathy, dentition - good

neck - Supple; FROM s̄ diff.          (OVER)

H -, RR s̄ m ⊕

| PATIENT'S IDENTIFICATION (Use mechanical imprint if available for typed or written entries give: Name, SSN, Unit, Sex, Birthdate and Duty Phone) | FINAL DISPOSITION |
|---|---|
| 22937 75 40 545-3828 RUNYON, DAVID A. M AD PFC 1/507CADRE 1311 TMC2 | ( ) I—PHYSICIAN STAT  ( ) IV—SELF CARE PROTOCOL ( ) II—PA STAT    ( ) V—HOSP CLINIC REFERRAL ( ) III—PA |
| | AIDMAN'S SIGNATURE AND CODE | AUDITOR'S INITIALS AND DATE |

DA FORM 5181-R, OCT 86        EDITION OF DEC 84 IS OBSOLETE

EXHIBIT 23

**2155**

## RECORD OF ACUTE MEDICAL CARE

(Entries on this record should be restricted to further evaluation and treatment of complaint(s) screened)

| DATE | 2ND CARE LOCATION | TIME PATIENT ARRIVES | TIME ENCOUNTER BEGINS | TIME PATIENT LEAVES |
|---|---|---|---|---|
| O→ Cont | Neuro: Sensory — c̄ Paresthesia's | | | |
| | motor — FAROM of extrms | | | |
| | Cerebellar — Station — neg | | | |
| | Romberg — neg | | | |
| | heel to toe Walk — nl | | | |
| | heel Walk — nl | | | |
| | Toe Walk — nl | | | |
| | Finger to nose — nl | | | |
| | CN II — XII — nl | | | |
| | DTR's 2+ | | | |
| A→ | ? positional Vertigo | | | |
| P→ | Refer To Family Practice MD | | | |
| | H/ Medizine 25 mg — q8h #12 | | | |
| | RTD | | | |
| | | | | G. L. HATFIELD PA-C GS-11 |

| SIGNATURE OF HEALTH CARE PROVIDER | SIGNATURE OF MEDICAL SUPERVISOR | AUDITOR'S INITIALS AND DATE |
|---|---|---|

### SPECIAL INSTRUCTIONS

This form will be utilized in lieu of SF 600 (Health Record-Chronological Record of Medical Care) at the BAS level and above when care is initiated by an BDTMC screener. The record of acute medical care will accompany the patient to the next level of care or remain in the BAS depending on disposition reached. This form will be filed in the HREC when evaluation and audit are completed.

REVERSE OF DA FORM 8181-R

EXHIBIT 23

**2156**

NSN 7540-00-634-4176

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT TREATING ORGANIZATION (Sign each entry) |

DATE _____

APPT. TIME 1500

TIME IN 510

PHYSICIAN Rowy

B/P 111/83

P 93

R 18

T 97.2

WT 125  HT 5'5"

AGE 16 yr o

ALLERGIES

FAMILY PRACTICE CLINIC   MACH

See Consultation [illegible]

[illegible handwriting]

COPY MADE BY VA RMC, ST. LOUIS, FROM A RECORD IN ITS POSSESSION

| PATIENT'S IDENTIFICATION (Use this space for Mechanical Imprint) | RECORDS MAINTAINED AT: | | |
|---|---|---|---|
| | PATIENT'S NAME (Last, First, Middle Initial) | | SEX |
| | RELATIONSHIP TO SPONSOR | STATUS | RANK/GRADE |
| | SPONSOR'S NAME | | ORGANIZATION |
| | DEPART./SERVICE SSN/IDENTIFICATION NO. | | DATE OF BIRTH |

CPT
ON DAVID A.
M AG
1/507CADRE 1311   1MC2

CHRONOLOGICAL RECORD OF MEDICAL CARE   STANDARD FORM 600 (REV. 5-84)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505

EXHIBIT 23

**2157**

STANDARD FORM 93
REV. OCTOBER 1974
PRESCRIBED BY GSA/ICMR
FPMR (41 CFR) 101-11.505

APPROVED
OFFICE OF MANAGEMENT AND BUDGET No. 29-R0191

## REPORT OF MEDICAL HISTORY

(THIS INFORMATION IS FOR OFFICIAL AND MEDICALLY-CONFIDENTIAL USE ONLY AND WILL NOT BE RELEASED TO UNAUTHORIZED PERSONS)

| 1. LAST NAME—FIRST NAME—MIDDLE NAME | 2. SOCIAL SECURITY OR IDENTIFICATION NO. |
|---|---|
| Runyon, David Anthony | |

| 3. HOME ADDRESS (No. street or RFD, city or town, State, and ZIP CODE) | 4. POSITION (title, grade, component) |
|---|---|
| FT. BENNING, GA | E-3 |

| 5. PURPOSE OF EXAMINATION | 6. DATE OF EXAMINATION | 7. EXAMINING FACILITY OR EXAMINER, AND ADDRESS (Include ZIP Code) |
|---|---|---|
| ETS | 9 Sep 1995 | MACH. FT BENNING, GA 31905-6100 |

8. STATEMENT OF EXAMINEE'S PRESENT HEALTH AND MEDICATIONS CURRENTLY USED (Follow by description of past history, if complaint exists)

Poor health. Presently on Meclizine for some kind of positional vertigo. Sleeplessness & constant pain in joints.

| 9. HAVE YOU EVER (Please check each item) | | | 10. DO YOU (Please check each item) | | |
|---|---|---|---|---|---|
| YES | NO | (Check each item) | YES | NO | (Check each item) |
| | ✓ | Lived with anyone who had tuberculosis | ✓ | | Wear glasses or contact lenses |
| | ✓ | Coughed up blood | | ✓ | Have vision in both eyes |
| | ✓ | Bled excessively after injury or tooth extraction | | ✓ | Wear a hearing aid |
| | ✓ | Attempted suicide | | ✓ | Stutter or stammer habitually |
| | ✓ | Been a sleepwalker | | ✓ | Wear a brace or back support |

11. HAVE YOU EVER HAD OR HAVE YOU NOW (Please check at left of each item)

| YES | NO | DON'T KNOW | (Check each item) | YES | NO | DON'T KNOW | (Check each item) | YES | NO | DON'T KNOW | (Check each item) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | ✓ | | Scarlet fever, erysipelas | | ✓ | | Cramps in your legs | ✓ | | | "Trick" or locked knee |
| | ✓ | | Rheumatic fever | ✓ | | | Frequent indigestion | | ✓ | | Foot trouble |
| ✓ | | | Swollen or painful joints | | ✓ | | Stomach, liver, or intestinal trouble | | ✓ | | Neuritis |
| ✓ | | | Frequent or severe headache | | ✓ | | Gall bladder trouble or gallstones | | ✓ | | Paralysis (include infantile) |
| ✓ | | | Dizziness or fainting spells | | ✓ | | Jaundice or hepatitis | | ✓ | | Epilepsy or fits |
| | ✓ | | Eye trouble | ✓ | | | Adverse reaction to serum, drug, or medicine | | ✓ | | Car, train, sea or air sickness |
| | ✓ | | Ear, nose, or throat trouble | | ✓ | | Broken bones | ✓ | | | Frequent trouble sleeping |
| | ✓ | | Hearing loss | | ✓ | | Tumor, growth, cyst, cancer | ✓ | | | Depression or excessive worry |
| | ✓ | | Chronic or frequent colds | ✓ | | | Rupture/hernia | ✓ | | | Loss of memory or amnesia |
| | ✓ | | Severe tooth or gum trouble | | ✓ | | Piles or rectal disease | | ✓ | | Nervous trouble of any sort |
| | ✓ | | Sinusitis | | ✓ | | Frequent or painful urination | | ✓ | | Periods of unconsciousness |
| | ✓ | | Hay Fever | | ✓ | | Bed wetting since age 12 | | | | |
| ✓ | | | Head Injury | | ✓ | | Kidney stone or blood in urine | | | | |
| | ✓ | | Skin diseases | | ✓ | | Sugar or albumin in urine | | | | |
| | ✓ | | Thyroid trouble | | ✓ | | VD—Syphilis, gonorrhea, etc. | | | | |
| ✓ | | | Tuberculosis | | ✓ | | Recent gain or loss of weight | | | | |
| | ✓ | | Asthma | | ✓ | | Arthritis, Rheumatism, or Bursitis | | | | |
| ✓ | | | Shortness of breath | | ✓ | | Bone, joint or other deformity | | | | |
| ✓ | | | Pain or pressure in chest | | ✓ | | Lameness | | | | |
| ✓ | | | Chronic cough | | ✓ | | Loss of finger or toe | 12. FEMALES ONLY: HAVE YOU EVER | | | |
| ✓ | | | Palpitation or pounding heart | ✓ | | | Painful or "trick" shoulder or elbow | | | | Been treated for a female disorder |
| ✓ | | | Heart trouble | | ✓ | | Recurrent back pain | | | | Had a change in menstrual pattern |
| ✓ | | | High or low blood pressure | | | | | | | | |

| 13. WHAT IS YOUR USUAL OCCUPATION? | 14. ARE YOU (Check one) |
|---|---|
| | ✓ Right handed    ☐ Left handed |

93-103

EXHIBIT 23

2158

| YES | NO | CHECK EACH ITEM YES OR NO. EVERY ITEM CHECKED YES MUST BE FULLY EXPLAINED IN BLANK SPACE ON RIGHT |
|---|---|---|
| | | 15. Have you been refused employment or been unable to hold a job or stay in school because of: |
| | | A. Sensitivity to chemicals, dust, sunlight, etc. |
| | | B. Inability to perform certain motions. |
| | | C. Inability to assume certain positions. |
| | | D. Other medical reasons (If yes, give reasons.) |
| | | 16. Have you ever been treated for a mental condition (If yes, specify when, where, and give details). |
| | | 17. Have you ever been denied life insurance? (If yes, state reason and give details.) |
| | | 18. Have you had, or have you been advised to have, any operations? (If yes, describe and give age at which occurred.) |
| | | 19. Have you ever been a patient in any type of hospital (If yes, specify when, where, why, and name of doctor and complete address of hospital.) |
| | | 20. Have you ever had any illness or injury other than those already noted (If yes, specify when, where, and give details.) |
| | | 21. Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past 5 years for other than minor illnesses? (If yes, give complete address of doctor, hospital, clinic, and details.) |
| | | 22. Have you ever been rejected for military service because of physical, mental, or other reasons? (If yes, give date and reason for rejection.) |
| | | 23. Have you ever been discharged from military service because of physical, mental, or other reasons? (If yes, give date, reason, and type of discharge: whether honorable, other than honorable, for unfitness or unsuitability.) |
| | | 24. Have you ever received, is there pending, or have you applied for pension or compensation for existing disability? (If yes, specify what kind, granted by whom, and what amount, when, why.) |

→ Knee surgery for torn ACL Left knee

→ Motor Vehicle Accident in Alabama Summer of 96. Torn right rotary cuff, torn right calf muscle

→ Physical therapy for above MVA injuries

I certify that I have reviewed the foregoing information supplied by me and that it is true and complete to the best of my knowledge. I authorize any of the doctors, hospitals, or clinics mentioned above to furnish the Government a complete transcript of my medical record for purposes of processing my application for this employment or service.

| TYPED OR PRINTED NAME OF EXAMINEE | SIGNATURE |
|---|---|
| Runyan, David A. | David A. Runyan |

NOTE: HAND TO THE DOCTOR OR NURSE, OR IF MAILED MARK ENVELOPE "TO BE OPENED BY MEDICAL OFFICER ONLY."
25. Physician's summary and elaboration of all pertinent data (Physician shall comment on all positive answers in items 9 through 24. Physician may develop by interview any additional medical history he deems important, and record any significant findings here.)

(R) Knee surgery for ACL - 1996 - painful trick
(R) Rotary cuff/shoulder. physical therapy -
still hurts, allergic to sulfa + Keflex,
frequent + severe headaches
dizziness - vertigo - vertigo memory loss
wears glasses - wetting - blurry vision from accidents
Hay fever - seasonal - no meds,
head injury - whiplash - 1996;
shortness of breath - vertigo. 9 months ago
cyst on top of head - no problem - sleeping - Depression - dx - post traumatic stress syndrome

| TYPED OR PRINTED NAME OF PHYSICIAN OR EXAMINER | DATE | SIGNATURE | NUMBER OF |
|---|---|---|---|
| EMIL ROHTIAN, MD | 9 Sep 97 | | |

REVERSE OF STANDARD FORM 93

000440

EXHIBIT 23

**2159**

• Car accident 1996 → on active duty Army
severe injuries, NO BROKEN BONES
BACK MUSCLE DAMAGE & SPINAL VERTEBRAE DAMAGE
SEVERE HEAD TRAUMA → EYES BLOODSHOT, BLURRY VISION, CONSTANT
HEADACHE, MEMORY LOSS
SEVERE MUSCLE PAIN THROUGHOUT WHOLE BODY
"U" shaped steering wheel bruise across stomache
seat belt strap bruise across neck & left shoulder
6 months intense therapy on left knee & left elbow & right calf

Army Doctors & NURSES & THERAPISTS refused to talk to me about
my head pains, neck & back pains. Therapist → she told me she would
get in trouble if I told anyone → she lightly rubbed the steroid
"heat" cream on my back to help relieve the tension & the pain.
I was given a huge bottle of "cowpill" muscle relaxers to take as
needed.
  The Army Doctors refused to do an MRI or CAT SCAN on my
head or back/body. They ended up doing an MRI at about
the 6 month mark.
My wife at the time MARIA was going through severe emotional
breakdowns. The Army Doctors talked to her but she wouldn't
tell me what they said. I suspected they told her I could or
would die. We had marital problems as a result. She was a
wreck, extremely unsupportive & unhelpful to me during that time
in my life. We ended up at Social Services seeing 2 different
psychiatrists & counselors. I was diagnosed with PTSD. I told
the dude "whatever." I'm normal, I'm just temporarily broken, &
I'm busy trying to fix myself. My wife is unsupportive, won't
physically help me, won't talk to me & tell me what the doctor's said, &
is demanding time from me so she could weep & cry. She's acting
like she's the one that almost died. I'm the one that's broken not
her. If she won't help me then all I ask is for her to stay
out of my "f__n" way. I'll do it myself!

EXHIBIT 24

**2160**

I used the muscle relaxers regularly for about the first 2 months then I tapered them off & quit alltogether taking them. They helped me when my pain was overwhelming but I didn't like them b/c they turned me into a zombie literally. I think they were called Robaxin or something like that. Feeling the pain was good for me so I could figure out what was broken on me. I was always very "in tune" with my body. At the time of my accident my body was in premium athletic condition, at the age of 25 I was maxing my PT tests at 99 & 100% at the 18 year old standards or special forces standards. Its took me 10 solid years of year round intense physical training to reach this level of fitness. 100 pushups under 2 minutes, 100 situps under 2 minutes & then run 2 miles in less than 12 minutes. In a base wide German exchange competition I was one of 4 that ran the first 10 miles of an 18.6 mile/30 Km run in 1 hour (6 minute mile pace) in uniform, combat boots & a 40+ pound rucksack on my back.

The drunk driver that hit me in a head-on collision in Oaksville, AL in the fall of 1996 almost took my life. I've almost died many times before but God has always protected me & I always came out unscathed. This time I barely lived. My body was broken, my mind was malfunctioning, I couldn't sleep for months, not really sleep. The Robaxin helped me rest enough to get by during these months. At about the 3 month mark I went to the emergency room in the middle of the night. If I laid on my back my spinal cord would get pinched somewhere around the level of my shoulders. I would become nauseas, the room would spin, my body would become highly stressed, short rapid breathing, loss of peripheral vision right before passing out. These effects were instantaneous when my back would move into a straight position. The Army doctors diagnosed me with vertigo & prescribed me Meclizine; told me my inner ear was on the fritz & wouldn't look at my back. I was put on a 1 year waiting list for surgery on my left for a torn ACL. My only son was less than 1 years old at the time knee of my accident & had just been through a life saving surgery. God saved him too.

A warrant was issued for the drunk driver on the charge of attempted vehicular manslaughter. Over one year later I took off of work from the FPD (I was no longer in the Army) & appeared in court to testify. I don't remember much about court, not even his face, reliving the traumatic event was hard on me, but I do remember being asked a question & responding somewhere along the lines of I forgive him & realize that he didn't intentionally plan to kill me ... I asked the court to show him mercy. He only got probation

EXHIBIT 24

**2161**

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (Sign each entry) |

SCREENING SECTION
USDAH
C.C.
DATE 15 Apr 76
S AND S
DISP
US ___ YES ___ NO

① Chronic sinus problem
Requests refillable Rx for Entex
② Pelvic pain x 8 mo
Pain too severe to wait 3 days
① AMIC MD
② GYN ①

OB-GYN CLINIC
APR 15 76
DARNALL ARMY HOSPITAL
FT. HOOD TEXAS

| PATIENT'S IDENTIFICATION (Use this Space for Mechanical Imprint) | PATIENT'S NAME (Last, First, Middle Initial) | | SEX |
|---|---|---|---|
| JO 28646 38 44 | YEAR OF BIRTH | RELATIONSHIP TO SPONSOR | COMPONENT/STATUS | DEPART/SERVICE |
| RUNYON SUK CHA 26SEP77 | SPONSOR'S NAME | | RANK/GRADE |
| 1945 D/W AD ARMY | | | |
| SGT DAVID H | SSAN OR IDENTIFICATION NO. | ORGANIZATION | |

CHRONOLOGICAL RECORD OF MEDICAL CARE
Standard Form 600
September 1971
General Services Administration and
Interagency Comm. on Medical Records
FPMR 101-11.809-5
600-104-01

EXHIBIT 25

**2162**

PATIENT'S LAST NAME—FIRST NAME—MIDDLE NAME

Runyon, Sul, D/w E-5

| | | |
|---|---|---|
| AGE 3/ | SEX F | (Check one) ☐ BEDSIDE, WHEELCHAIR, OR STRETCHER  ☐ BED PATIENT  ☐ AMBULATORY |

RECISTER NO.

WARD NO. ER

EXAMINATION REQUESTED

full pelvis and (L) spine

(Above space for mechanical imprinting, if used)

PERTINENT CLINICAL HISTORY, OPERATIONS, PHYSICAL FINDINGS, AND PROVISIONAL DIAGNOSIS

hit lower back on couch

FILM NO.

RADIOGRAPHIC REPORT

DATE OF REQUEST 6 July 76

REQUESTED BY Dr Webster

NEGATIVE

DON R. HAXCEY

MAJOR MC

DATE OF REPORT:

3 7, 8

SIGNATURE: (Specify location of laboratory if not part of requesting facility)

Standard Form 519-A (Rev. Aug 1954)
Promulgated by Bureau of the Budget
Circular A-32 (Rev.)
RADIOGRAPHIC REPORT
519-207

(NAME OF HOSPITAL OR OTHER MEDICAL FACILITY)

---

PATIENT'S IDENTIFICATION LAST NAME-FIRST NAME-MIDDLE NAME

RUNDOWSKI, SUKCHA.
D/W
E-5 DAVID

| | | |
|---|---|---|
| AGE 30 | SEX F | (Check one) ☐ BEDSIDE, WHEELCHAIR, OR STRETCHER  ☐ BED PATIENT  ☑ AMBULATORY |

REGISTER NO. 30 85 62

WARD NO. HEA/HC

EXAMINATION REQUESTED

(Above space for mechanical imprinting, if used)

PERTINENT CLINICAL HISTORY, OPERATIONS, PHYSICAL FINDINGS, AND PROVISIONAL DIAGNOSIS

PA + LAT CHEST

PT. STATES SHE HAD TUBAL LIGOTAMY. HAS hx of pos. TINE FOR OVER 2 YRS

FILM NO.

RADIOGRAPHIC REPORT

DATE OF REQUEST 2 FEB 76

REQUESTED BY COL WEBB SS

DATE OF REPORT

2/14 KKCP

SIGNATURE: (Specify location of laboratory if not part of requesting facility)

MAJOR MC

Standard Form 519-A (Rev. Aug 1954)
Promulgated by Bureau of the Budget
Circular A-32 (Rev.)
RADIOGRAPHIC REPORT
519-207

(NAME OF HOSPITAL OR OTHER MEDICAL FACILITY)

EXHIBIT 25

2163

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (Sign each entry) |
| MAR 13 1977 | US ARMY HEALTH CLINIC, HANAU APO NEW YORK 09165 |

31 y.o. Oriental ♀ whose husband is in field and apparently unreachable. C/O being weak all over after 2 month Hx of strep throat. Had several passing out spells at home today prompting neighbors to call ambulance. ⟨crossed out⟩ No N. or V., D. coryza, coryza, abd pain, mild sore throat.

Rx c̄ erythromycin 3 wks ago for strep throat. Completed 10 d course.

T=100°F Exam — Alternately active and loud O♀ in WAD and droopy and semi-stuporous Oriental ♀

PATIENT'S IDENTIFICATION (Use this Space for Mechanical Imprint)

PATIENT'S NAME (Last, First, Middle initial) | SEX

YEAR OF BIRTH | RELATIONSHIP TO SPONSOR | COMPONENT/STATUS | DEPART/SERVICE

SPONSOR'S NAME | RANK/GRADE

SSAN OR IDENTIFICATION NO. | ORGANIZATION

CHRONOLOGICAL RECORD OF MEDICAL CARE
Standard Form 600
September 1971
General Services Administration and
Interagency Comm. on Medical Records
FPMR 101-11.809-3
600-104-01

EXHIBIT 25

**2164**

Standard Form 600
General Services Administration and
Interagency Committee on Medical Records
FPMR 101-11.806-8   Exception Approved by NARS
October 1975   1 Aug 79

0800 85
13 Nov
Dr Dell

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (Sign each entry) |

OCT 21 1985   Orthopedic Clinic
DeWitt Army Community Hospital
Fort Belvoir, VA 22060

OCT 22 .85   S/ Flu Multiple joint Pains. Pains improved
Pt also c/o not although still present in wrists.
low prot diet not   Also c/o abd burning pain
acw VF put
hr on   O/ NO PE
LAB   ESR 21   Uct 39.1
RF NEG

ANA pending

A/ Arthritis- improved - Etiology unk
R/o SLE   Doubt Gout

P/ Liberalize diet
✓ FBS, Uric Acid
f/u ANA
Δ to Ecotrin
f/u Dr Dell 3 wks.

[signature]

PATIENT'S IDENTIFICATION (Use this Space for Mechanical Imprint)
80-2834  3834
.31
RENYCH S:  . A
'045 /// A  SA
E7 DAVID 4-3632

PATIENT'S NAME (Last, First, Middle initial)
RUNYON  Suk Cha   SEX F
YEAR OF BIRTH 1945   RELATIONSHIP TO SPONSOR WIFE   COMPONENT/STATUS RA   DEPART/SERVICE ORTHO
SPONSOR'S NAME DAVID H. RUNYON   RANK/GRADE SFC
SSAN OR IDENTIFICATION NO.   ORGANIZATION CoA, 3nd BN

CHRONOLOGICAL RECORD OF MEDICAL CARE
Standard Form 600
600-106-01

EXHIBIT 25

2165

| MEDICAL RECORD | CONSULTATION SHEET |
|---|---|

REQUEST

TO: *Urology*   FROM: *(Requesting physician or activity)*   DATE OF REQUEST: 10/31/87

REASON FOR REQUEST *(Complaints and findings)*

42 y/o ♀, G₂ P₂ Ab₀

CC: *Urinary incontinence, chron...*

PROVISIONAL DIAGNOSIS *R/o Bladder Prolapse*

DOCTOR'S SIGNATURE ART SUTHERLAND, PA-C   APPROVED   PLACE OF CONSULTATION ☐ BEDSIDE ☐ ON CALL   ☒ ROUTINE ☐ TODAY ☐ 72 HOURS ☐ EMERGENCY

CONSULTATION REPORT

U/P: SG 1.005 PH 6.0 Micro: Clean PVT *W/day* 9/4/10

NOV 13 1987  42 y/o ♀ c/o frequency, urgency, & urgency

UROLOGY SERVICE
US DEWITT ARMY HOSPITAL
FT. BELVOIR, VA 22060

incontinence & nocturia x2 yrs — pt. wears pads most of the time & is usually damp - sometimes wet - incontinence occurs not only c stress although there is a stress component as well & no dysuria - no recent episodes of gross hematuria no DM, HTN — no recent UTIs —

past med. prob-∅, NKA, NB, No meds —

√ ∅ allergy —

PE / no abd genitalia - no pelvic exam - small cystocele - some S-P tenderness no SUI

SIGNATURE AND TITLE   Joseph M. Khoury, MD   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

Dx/ urge incontinence c stress component

IDENTIFICATION NO   ORGANIZATION

Non obstructing study

② PVR

CONSULTATION SHEET
STANDARD FORM 513 (Rev 9-77)
Prescribed by GSA/ICMR
FPMR 101-11.806-8
513-107

PRIMUS 1519 DAVIS FORD RD, WOODBRIDGE, VA 2219

RUNYON, SUKCHA
SEX: F DOB:
SSN:                    FMP: 30
SPON: RUNYON, DAVID H   RANK: SFC
VISIT DATE: 31 OCT 1987   NO. 056

DeWitt appt —
13 Nov ③ CM
1300 ④ LTC p above studies

4-2854/4291

EXHIBIT 25

2166

| MEDICAL RECORD | CONSULTATION SHEET |
|---|---|

**REQUEST**

| TO: PT | FROM: *(Requesting physician or activity)* Rheum WRAMC | DATE OF REQUEST 10/19/88 |
|---|---|---|

REASON FOR REQUEST *(Complaints and findings)*

Pt c̄ diffuse musculoskeletal pain & stiffness c̄ completely negative rheumatological evals. Please instruct in daily ROM exercises & daily exercise program.

PROVISIONAL DIAGNOSIS

MJ pain

| DOCTOR'S SIGNATURE Perkins #708 | APPROVED | PLACE OF CONSULTATION ☐ BEDSIDE ☐ ON CALL | ☒ ROUTINE ☐ TODAY ☐ 72 HOURS ☐ EMERGENCY |
|---|---|---|---|

**CONSULTATION REPORT**

PHYSICAL THERAPY SVC.
DEWITT ARMY COMMUNITY HOSPITAL
FT. BELVOIR, VA 22060

S: 43 yo ♀ c/o diffuse musculoskeletal pain ↑'d c̄ damp-cold weather. Reports ankle pain; knee pain wrist + hand pain + shoulder pain. Not on an exercise program.

O: FROM 3UE + BLE. GMMT All 4 extremities WNL. Pain c̄ all resisted motions everywhere. Diffuse body tenderness.

A: WBA

P: Instruct in strengthening exs. Counsel on aerobic exer. benifits.

G: ↓ pain, ↑ strength

*(Continued on reverse side)*

| SIGNATURE AND TITLE P Canevaro CPT SP | OCT 20 1988 |
|---|---|

| IDENTIFICATION NO | ORGANIZATION | REGISTER NO | WARD NO |
|---|---|---|---|

PATIENT'S IDENTIFICATION *(For typed or written entries give Name—last, first, middle, grade; rank; rate; hospital or medical facility)*

※ U.S. GOVERNMENT PRINTING OFFICE: 1987-176-314

Runyon, Suk-cha
DW/AD/A

CONSULTATION SHEET
STANDARD FORM 513 (Rev. 9-77)
Prescribed by GSA/ICMR
FPMR 101-11 806-8
513-107

CHRONOLOGICAL RECORD OF MEDICAL CARE       STANDARD FORM 600 (Rev. 5-84)

EXHIBIT 25

**2167**

PERSONAL DATA - PRIVACY ACT OF 1974 - 5USC522a

Walter Reed Army Medical Center
RADIOGRAPHIC REPORT

Date Report Printed: 88/09/27
Date Initially Printed: 88/09/27
Runyon, Buk Cha                              30-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
DOB:
Sex: Female
Exam Date: 88/09/26      Patient ward:
Exam: HA031  bilat hands (pa, obliq, lat)
Requesting Location: Rheumatology Clinic
Patient Response to Pregnancy Question: Negative
Provisional Diagnosis or Clin History:
        home                    work

Request Entry Date: 88/09/26      Requestor: Seiken
Scheduler: Holley, LaTreaviette
Exam: LS022  l-spine series (5)

DICTATED:      26SEP88
TRANSCRIBED:   27SEP88

BILATERAL HANDS AND LS SERIES, 26SEP88.

HISTORY:  Arthralgias.

FINDINGS:  Frontal and lateral views of the lumbosacral spine are obtained and
these do not reveal any gross abnormalities.  Of note, however, is that due to
the significant kyphosis of the sacrum and due to patient positioning, the
inferiormost aspect of the sacrum is not well evaluated.  There is no other
evidence of degenerative change, fracture or soft tissue swelling.

Frontal, oblique and 'ball catcher's' views of both hands are obtained and the
do not reveal any evidence of arthritis, fracture or dislocation.

IMPRESSION:  1. GIVEN THE TECHNICAL LIMITATIONS OF THE LUMBOSACRAL SPINE AS
DESCRIBED, ESSENTIALLY NORMAL STUDY.
             2. NORMAL HAND SERIES.

PRN/AM/VB

                              s/Allen Meglin, M.D.

EXHIBIT 25

**2168**

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION *(Sign each entry)* |
|---|---|
| FEB 10 1989 | TRIAGE |
| 1115 hrs | DeWitt Army Hospital |
| BP-102/70 | Fort Belvoir, Va. 22060 |
| T- 98.8 | [illegible handwritten notes] |
| | [illegible] |
| | TO GOC for [illegible] |
| 1315 | General OutPatient Clinic |
| Dr [illegible] | DeWitt Army Hospital |
| | Fort Belvoir, Va. 22060 |
| | [illegible handwritten clinical notes] |
| Meds | [illegible] |
| Ecotrin | [illegible] |
| Allg: | [illegible] |
| PCN | [illegible] |
| C#: Mes | |
| Pain | O-Abd [illegible] |
| Smoke | [illegible] |
| 4-5 cigs/day | [illegible] |
| | [illegible] |
| | [illegible] |
| | [illegible] |
| | [illegible] |
| | Ass: [illegible] Disease of Breast |
| | [illegible] |
| | Plan, Referral to Breast clinic |
| | Mammogram - |
| | Ecotrin [illegible] #240 Rx3 |
| | Mylanta [illegible] #6# [illegible] Rx 3 |
| | Pablo Ayala |

EXHIBIT 25

**2169**

NSN 7845-00-634-4176 600-106

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|

DATE — SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (Sign each entry)

**19 FEB 1990**

FAMILY PRACTICE CLINIC
121 EVAC HOSPITAL
APO SF 96301-0017

TEMP ___ WT ___
PULSE ___ BP ___
ALLERGIES ___
MEDICATION ___

O) 44 y/o F A/O x 3 NAD

A) Contact dermatitis

PETER V. WEBER, CPT MC
FAMILY PRACTICE, 121 EVAC HOSP

PATIENT'S IDENTIFICATION (Use this space for Mechanical Imprint)

30
PUNYON, SUK C

RECORDS MAINTAINED AT:
PATIENT'S NAME (Last, First, Middle Initial)
RELATIONSHIP TO SPONSOR — STATUS — RANK/GRADE
SPONSOR'S NAME — ORGANIZATION
SEX

EXHIBIT 25

**2170**

| MEDICAL RECORD | CONSULTATION SHEET |
|---|---|
| | REQUEST |

TO: _Int. Med_  FROM (Requesting physician or activity): _GMC_  DATE OF REQUEST: _12/18/9_

REASON FOR REQUEST (Complaints and findings): 45 yo cold GM ? has diarrhea c̄ ? eat for 10 mos Would you evaluate & treat her please _[signature]_

PROVISIONAL DIAGNOSIS: _IBS_

DOCTOR'S SIGNATURE _[signature]_   APPROVED _[signature]_

PLACE OF CONSULTATION: ☐ BEDSIDE   ☐ ON CALL
☑ ROUTINE   ☐ TODAY   ☐ 72 HOURS   ☐ EMERGENCY

CONSULTATION REPORT

DEC 28 1990   MEDICAL CLINIC BAXA   A 0950
USAH SEOUL 121 EVAC HOSI
APO ... 96301 #737-83??

P Diarrhea since 6/91. 3-4x a day watery No drugs, no food. Used to have constipation.

O ( ' '' ) tender.

A Irritable bowel syndrome.

P Zantac, bid. Donnatal metamucil. (Continued on reverse side)

SIGNATURE AND TITLE _[signature]_   DATE

LTC MC GASTROENTEROLOGY
121st EVAC HOSPITAL

IDENTIFICATION — ORGANIZATION: BUKYON, SUK C

PATIENT IDENTIFICATION (For typed or written entries give Name—last, first, rank, hospital or medical facility)

CONSULTATION SHEET
STANDARD FORM 513 (Rev. 8-7)
Prescribed by GSA/ICMR
FPMR (01 11 806-8
513-107

EXHIBIT 25

**2171**

MEDICAL RECORD             NARRATIVE SUMMARY

---

Date of Admission        Date of Discharge
27 APR 92               29 APR 92

---

CHIEF COMPLAINT: Chest pain.

HISTORY OF PRESENT ILLNESS: This is a 46-year-old Korean female with no
known history of atherosclerotic heart disease who has a two to three day
history of pressure-like chest pain. She stated at the time of admission
that the pain becomes more intense and sharp in nature, but does not
radiate. It is not related to activity, but taking a deep breath does
aggravate the pain. She has not had any recent trauma to her chest. There
has not been any recent cough, fever, or chills. No known history of
asthma or reactive airway disease. She does report a bronchitis with a
questionable pneumonia in the past. The pain is not associated with
vomiting. There is the question of mild nausea and mild shortness of
breath associated with the pain, however, the patient denies any radiation
or any diaphoresis. Cardiac risk factors include a positive family
history, unknown cholesterol, and a history of tobacco abuse when she
smoked up to three packs a week for 25 years. She has no known history of
peptic ulcer disease although she states that she had a couple of episodes
of coughing up blood when she was pregnant. She has a history of a
positive PPD skin test, but has not been treated for active tuberculosis.
She denies any recent swelling of her lower extremities. She is recently
status post a vaginal hysterectomy which she tolerated well and was sent
home on iron. There is no history of diabetes or gout. It should be
noted, however, that the pain resolved in the Emergency Room after the
patient was given nitroglycerin.

PAST MEDICAL HISTORY: She has an allergy to penicillin. Surgeries -
bilateral tubal ligation, transvaginal hysterectomy, and bilateral
salpingo-oophorectomy. Her medical history is otherwise noncontributory.

FAMILY HISTORY: Positive for heart disease and hypertension. There is no
known cancer.

HABITS: She smoked one third to one half pack a day times 25 years. She
uses alcohol occasionally.

REVIEW OF SYSTEMS: Noncontributory.

(continued)

STEVEN LANGE, M.D.                    E-3-10        ISG

| ☐ HISTORY & PHYSICAL EXAMINATION (SF 504, SF 505, & SF 506) | ☐ OPERATION REPORT (SF 516) | NAME RUNYON, SUK C. | |
|---|---|---|---|
| ☐ CONSULTATION SHEET (SF 513) | ☒ NARRATIVE SUMMARY (SF 502) | REGISTER NO. 664959 | SSN 30 |
| ☐ CHRON RECORD OF MEDICAL CARE - (SF 600) | ☐ AUTOPSY PROTOCOL (SF 503) | UNIT | |
| ☐ PROGRESS NOTE (SF 509) | ☐ | DATE DICT | DATE TYPED |
| GLWACH, FT LEONARD WOOD, MO   65473 | | 1 MAY 92 | 1 MAY 92/mls |

EXHIBIT 25

**2172**

MEDICAL RECORD    -2-    NARRATIVE SUMMARY

PHYSICAL EXAMINATION: The patient was alert, oriented, and in no acute distress; but she was mildly anxious. Her blood pressure was 112/88, pulse 75, respirations 16, temperature 98.2. HEENT was unremarkable. Her chest wall was tender to pressure, particularly in the midline. There were no palpable lesions. The breasts were without masses. Her lungs were clear. Heart was S-1 and S-2 without murmurs or gallops. Her abdomen has a well healed umbilical scar. There were no masses or organomegaly. Rectal, pelvic, and neurologic examinations were deferred on admission.

DIAGNOSTIC STUDIES: Her chest x-ray was unremarkable. EKG was within normal limits. ABGs were within normal limits. Cardiac enzymes showed CPK to be 49 on admission and decreased throughout her stay. B bands were 4. cholesterol was 172, SGOT was normal. CBC showed a white count of 10,600, H&H of 13.1 and 38.4 with normal chromic normocytic indices and normal platelets at 288,000. PT and PTT within normal limits.

HOSPITAL COURSE: The patient was admitted to the Intensive Care Unit for cardiac monitoring and treatment. She developed a couple of episodes of pain that responded to nitroglycerin. She was placed on transdermal nitroglycerin. At one time, she did require a couple of milligrams of morphine for her pain; but she then remained pain free throughout the rest of her examination. Cardiac enzymes were negative. The patient was discharged on 28 Apr 92. She was to followup in two days for a treadmill stress test or earlier if she had a return of her pain.

DISCHARGE MEDICATIONS: Transdermal nitroglycerin 0.2 q one hour q day; enteric coated aspirin, one q day; tolmentin 400 mg tid; nitroglycerin sublingual prn. She was instructed in light activity until the time of her treadmill.

STEVEN LANGE, M.D.

| ☐ HISTORY & PHYSICAL EXAMINATION (SF 504, SF 505, & SF 506) | ☐ OPERATION REPORT (SF 516) | NAME RUNYON, SUK C. | |
|---|---|---|---|
| ☐ CONSULTATION SHEET (SF 513) | ☐ NARRATIVE SUMMARY XX (SF 502) | REGISTER NO. | SSN |
| ☐ CHRON RECORD OF MEDICAL CARE - (SF 600) | ☐ AUTOPSY PROTOCOL (SF 503) | UNIT | |
| ☐ PROGRESS NOTE (SF 509) | ☐ | DATE DICT 1 MAY 92 | DATE TYPED 1 MAY 92/mls |

GLWACH, FT LEONARD WOOD, MO  65473

**MEDICAL RECORD REPORT**

OPTIONAL FORM 27

EXHIBIT 25

**2173**

558-102 (See Instructions on Back of this Sheet) NSN 7540-01-075-3786

**EMERGENCY CARE AND TREATMENT** (Medical Record)

TREATMENT FACILITY (Stamp): GLWACH ER

LOG NUMBER:

| ARRIVAL | | TRANSPORTATION TO HOSPITAL (Attach care enroute sheet) | CURRENT MEDS. (Is/ontia immunization and other data) | HISTORY OBTAINED FROM |
|---|---|---|---|---|
| DATE: DAY 20 MONTH Nov YR. 92 | TIME: 14:07 | [X] PRIVATE VEHICLE [ ] AMBULANCE [ ] OTHER (Specify) | Nitro, Cardizem | [X] PATIENT [ ] OTHER (Specify); ALLERGIES: PCN |

PATIENT'S HOME ADDRESS OR DUTY STATION (City, State and ZIP Code): Thorwood Way Lot 20X22 St Roberts — HOME PHONE [redacted]: 336-7104

CHIEF COMPLAINT(S) (Include symptom(s), duration): Chest Pressure = Left ↑ Chest — SEX: F — AGE: 47 — POSSIBLE THIRD PARTY PAYER: [ ] YES [X] NO

TIME SEEN BY PROVIDER: 1435

| VITAL SIGNS | | |
|---|---|---|
| TIME | 1407 | 1425 |
| BP | 98/60 | 117/90 |
| PULSE | 96 | 95 |
| RESP. | 18 | |
| TEMP. | 98.9 | |
| WT. (Child) | | |

CATEGORY (See reverse): EMERGENT / URGENT / NON-URGENT

| ORDERS | INITS. | TIME |
|---|---|---|
| EKG, monitor | KE | 1425 |
| CXR | KE | 1510 |
| CBC | KR | 1510 |

DESCRIBE (1) Subjective data (Pertinent History)/(2) Objective data (Examination - include results of tests and x-rays); (3) Assessment (Diagnosis) (4) Plan/Treatment/Procedures - Include medication given and follow-up:

Bladder X 2 days. ↑ SOB. ↑ fatigue. See Hosp. done. Stress test, Holter monitor, echo. See prior record — Swetson MD

Patient has had left chest pressure/pain since March of 92 - had hysterectomy at that time. Since then has had daily left chest pressure. Pain there almost all the time not related to activity level. Also feels weak all over + nausea all the time. Had treadmill which was inconclusive because of no exercise tolerance. Did not keep appt for persantine thallium stress test because she didn't really want to know if her heart was acting up. ⊕ Smoker. Has Esophageal Motility Disorder

Exam - oriental female who speaks c̄ much fluttering of eyelids. No pre-tibial edema
Lungs - clear
COR - RR. S2 split c̄ (insp).
EKG - nl HCT - 37
CXR - nl
A. I suspect spasm most c̄ her esophageal disease as demonstrated in 1990
P/ u c̄ Dr Lange to get Persantine Thal test

(CONTINUE ON SF 507, IF NEEDED)

ASSESSMENT/DIAGNOSIS: Esophageal motility disorder, Anxiety

DISPOSITION (Check all that apply): HOME / FULL DUTY / QUARTERS 24 Hrs. / 48 Hrs. / 72 Hrs. / MODIFIED DUTY UNTIL: DAY / MONTH / YEAR

REFERRED TO (Indicate clinic): EMERGENCY / TODAY / 72 HOURS / ROUTINE

ADMIT. TO HOSP. UNIT/SERVICE

CONDITION UPON RELEASE: IMPROVED / UNCHANGED / DETERIORATED

TIME OF RELEASE:

SIGNATURE OF PROVIDER AND ID STAMP: [redacted] Hardman — WILLIAM HARDMAN M.D. 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

PATIENT'S IDENTIFICATION (Mechanical imprint) FOR WRITTEN ENTRIES GIVE: Name - last, first, middle; SSN; DOB, service status, name and relation of sponsor or next of kin. (IMPORTANT - LIST ALL ITEMS)

HUNFORD/SUK C
USA DEP AO 156
FORT LEONARD W MO 65473
0031 FT WOOD MEDDAC
PERSONAL DATA/PRIV ACT 1974
Ret Mil

INSTRUCTIONS TO PATIENT (Include medications ordered, any limitations and follow-up plans)

EMERGENCY CARE AND TREATMENT — Medical Record Copy — STANDARD FORM 558 (REV. 6-82) Prescribed by GSA and ICMR FPMR (41 CFR) 101-11.806-8

EXHIBIT 25

NSN 7640-00-634-4178                                                                                600-1

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT  TREATING ORGANIZATION *(Sign each entry)* |

1 Mar 93     47 y/o female Presents for "no flu" — Marli St.

Family Practice Clinic
T. 97 P. 74   18   : 96
: 98#   70
PCN
MPL

The patient is a 47-year-old oriental female here for followup on her peptic acid disease.  She continues to have some epigastric burning and pain.  She denies any hematemesis, hematochezia or melena.  She is sleeping a little bit better after being placed on the Trazodone.

O:  Patient is alert, oriented in no acute distress. Abdomen is soft and nontender.

A:  Peptic acid disease

Moderate depression

PLAN:  Will go ahead and refill her Zantac 150 mg bid.  Will change her to Doxepin 50 mg qhs because of its H2 antagonist affect and will also request a consultation with Internal Medicine for an EGD to evaluate her endoscopically.  She is to followup after having her EGD.

DARWIN L. DAVIS JR, MAJ, MC/LMA
1 Mar 93 FPC  Runnion

PATIENT'S IDENTIFICATION *(Use this space for Mechanical Imprint)*

30
RUNYON, SUX C
F
3A DEP AD
ORT LEONARD W MO 65473

RSONAL DATA/PRIV ACT

RECORDS MAINTAINED AT:

| PATIENT'S NAME *(Last, First, Middle Initial)* | | SEX |
|---|---|---|
| RELATIONSHIP TO SPONSOR | STATUS | RANK/GRADE |
| SPONSOR'S NAME | | ORGANIZATION |
| DEPART./SERVICE | SSN/IDENTIFICATION NO. | DATE OF BIRTH |

CHRONOLOGICAL RECORD OF MEDICAL CARE     STANDARD FORM 600 (REV. 5-84)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45.505

EXHIBIT 25

**2175**

| DATE | SYM  )MS, DIAGNOSIS, TREATMENT, FHLATI(  |RGANIZATION *(Sign each entry)* |
|---|---|

*(S) 47 y/o small presents for*
*F/U for stomach problem*
*Shirley Butts*

Family Practice Clinic
T. $97^2$ P. 72 R. 20 B/P $^{100}/_{70}$
Ht. ___ Wt. *101* #
Allergies *(PCN)*
Meds
*Prevacid*
*Zantac*

SUBJECTIVE:  The patient is a 46-year-old white female here for follow-up on her peptic acid disease and work-up on her chronic fatigue.  She is not sleeping, has anhedonism.  She is not suicidal or homicidal at this time.  She has inability to concentrate and has a very pessimistic mood about the future.

OBJECTIVE:  Patient is alert and oriented in no acute distress today.  Her abdomen is soft and nontender.

ASSESSMENT:  1.  Peptic acid disease, responding well to Zantac.

2.  Depression.

PLAN:  Will start her on Trazodone, 50 mg q hs, and have her continue on Zantac.  She is to follow-up in approximately three weeks.  She is to call if she has any problems with the medication.

DARWIN L. DAVIS, JR, MAJ, MC
D&T:  27 Jan 83/pb

000182

EXHIBIT 25

**2176**

## DECLARATION OF DAVID DOMBROWSKI

1. My name is David T. Dombrowski. I live in Cottondale, Alabama, with my wife Alice. I work as a courier driver, delivering prescription medicine to medical facilities. I am David Runyon's biological father.

2. In 1969, I was in the Army and stationed in Korea. I met Suk Cha, we married, and eventually we returned to the United States. We had two sons, David and Mark. After Suk Cha and I divorced, my sons were adopted by Suk Cha's second husband, David H. Runyon.

3. I came to Virginia to testify at my son's trial. I met with one of the trial attorneys for approximately 10-15 minutes at the hotel. The attorney said he wanted to touch base and let me know the status of the case. At the courthouse, I spoke with one of the trial attorneys for approximately 10-15 minutes. The attorney told me just to answer the questions as best I could. I was not told the subject matter of the questions. During my testimony, I tried to answer the questions to the best of my recollection. I would have testified about the things set forth in this declaration if I had been asked.

4. My mother, Elinore Ruth Birdsell, was born August 6, 1924. She married my father, Anthony "Tony" Dombrowski when she was 25. They lived in the mid-west and spent most of their marriage in the Chicago area. They had five daughters and three sons, including me.

5. I would describe my mother as "slow," meaning she had limited intellectual functioning. She had to be "lead around." She was not able to drive and was, therefore, completely dependent on my father to take her anywhere. My father had to give her constant reminders about almost everything. My father taught my mother how to cook but had to remind her to take something out of the freezer to let it thaw out, before she could cook it. My father handled all of the finances. I do not recall my mother ever paying a bill or handling money. She never worked outside the home. My mother was easily persuaded and gullible. She was almost childlike in the way you could persuade her. I believe my mother was "handicapped" but was never formally diagnosed.

6. My mother was able to physically care for herself. My father expected her to care for the children, cook and clean. She did not have a life outside of the home. She did not socialize with others and was dependent on my father for everything.

7. My father had a schedule and routine set up for my mother and she could function adequately as long as her routine did not change. My mother would feed everyone and get the children off to school and as long as nothing

EXHIBIT 26

**2177**

happened throughout the day she would be fine. If she received a phone call about one of the kids getting in trouble at school or needed to go home early, she had to wait for my father to come home and deal with the problem. If she needed to go to the schools, she would have to wait on my father to drive her to school. This seems minor but any little kink in the day would throw my mother off.

8. My sister, Catherine, has limited intellectual functioning and limited independent living skills. She lives with another sister. Catherine and my mother had very similar levels of functioning.

9. My mother was loving and caring. She tried, as best she could, to protect me and my siblings. My father was very abusive and my mother was the primary target of his abuse. I think this is partly because my mother tried to protect us kids from our father's extremely violent behavior.

10. My father was born November 2, 1914. He grew up without a father. At approximately age 15 he went to prison for murder. My father worked for the mob, more specifically, Anthony "Tony" LaBarbera. My father was an "enforcer" or hit man for LaBarbera. I think the murder that my father went to prison for was a hit for LaBarbera.

11. My father was released from prison early because he volunteered for a medical study, while in Boys Town, Nebraska. He was a "test dummy" for a federal study testing treatment for TB. I don't know what effect this had on my father but, when I was in the military, I had a TB test and had a positive reaction. I had to take medication for over a year.

12. LaBarbera moved his operation to Las Vegas but later returned to Chicago and was looking for men to work for him. LaBarbera found my father and wanted him to return to work for him. Tony refused. By this time, my father was married and had children. LaBarbera threatened to harm our family if my father did not work for him. I was sent t to live with my Aunt Viola. My other siblings were each sent to live with a different relative. At the time, there was no explanation for why this was happening. I'm not sure how long I lived with my Aunt but eventually I and all my siblings returned home. I was around 7 or 8 years old.

13. I learned that my father was continually asked to work for LaBarbera and refused. In order to make the point that he was not going to work for the mob, my father went after and beat the men who were working for LaBarbera to send the message that he was not going to help. After he beat each person, he would ask if LaBarbara would leave him alone. If the answer was no, my father would hunt down another of LaBarbera's men and beat them. Finally, LaBarbera left my father alone.

14. My father never spoke of his mob ties (or really anything for that matter) while sober, but when he got drunk, he would tell me almost anything. I believe what he told me 100% true. My father was a very violent and aggressive man who operated under a mob mentality. There were strong themes which ran through the family: protect your family at all costs, never let anyone disrespect you or your home, stand by your beliefs and morals no matter the costs, and the man of the house protects his family. My father was very matter of fact and to the point. All problems were solved with violence, usually beating.

15. I have contact with only three of the eight children in my family. Those three siblings are living in Georgia. I have no idea where any of my other siblings are residing. I was the protector of the family and peace keeper. My twin, Jimmy, was a "con man," "swindler," and "ladies man." At one point when we were adults, he used my social security number and ran up debt in my name. My sister, Joyce, had mental health problems as a result of not being able to have children. My sister, Patricia, has power of attorney over two of our sisters who have intellectual disabilities. Our sister, Freida, was born severely handicapped. I don't think she ever came home from the hospital and was instead sent to an institution or group home. I remember going with my mother to a group home and visiting Freida. No one ever talked about what was wrong with Freida. I assumed the problem resulted from my father drinking too much and there were "bad genes." My father also beat my mother when she was pregnant and I think this could have impacted the child. Our sister, Catherine, was also born intellectually disabled, although not to the degree of Freida. Catherine was able to live in the home but she was very slow. Catherine did attend school but was in special education classes. Catherine has some independent living skills, in that she can dress and feed herself and is able to stay alone for extended periods of time. Her speech is very broken. It is as if Catherine knows what she wants to say but cannot get the words out. She is also very impressionable and gullible. My mother and Catherine were very much alike. They both were very impressionable and easy to take advantage of. They did really well if they had a routine but could not figure out what to do if there was a variance. They also both required constant reminders.

16. My father became a certified engineer while he was in prison. He spent the majority of his life working in the construction business. Despite receiving no formal training, except for some training while in prison, my father could build or construct just about anything. My family moved around the city of Chicago many, many times. My father refused to travel more than 15 or 20 minutes to a job site. If he learned that a job was going to last any longer than three months and we were living more than 15 minutes away, he would move the family closer to that particular job site.

EXHIBIT 26

**2179**

17. My father ruled the family with an iron fist. He was a severe alcoholic and regularly beat my mother. My father was a "functional drunk." He worked during the day but got very drunk at night and on the weekends. I cannot recall a time in my childhood when my father was not an abusive alcoholic. I think my father did not have a positive male role model when he was a child and he really did not know how to love. Instead, he had the role as "enforcer" and "Billy Bad Ass" and he treated his family the same way. When he was drunk, his "evil side" came out.

18. My father always made sure that he beat my mother when we kids could not see it. We still knew what was happening. My father would come home and tell us to go into another room and then he would start beating my mother. I could hear what was happening and hear him hitting her. Later, I would see bruises all over my mother. I remember my father beating my mother in their bedroom and one time he pinned her in the pantry and hit her so we did not actually see him physically strike her.

19. When I was around the age of 12 or 13, I started interceding to try and protect my mother from my father. I was the unofficial protector of my siblings and took it upon myself to try and protect my mother, even if it meant I was beaten. My father would begin by telling us to get the hell out of the room. I could not take the sounds of my mother being beaten or the sounds of her crying. I would run into my father and yell at him to leave her alone or I pulled on his clothing to try and get him to stop. I knew I ran the risk of also being beaten but it was worth it to try and help my mom. It was stupid to think I was going to stop my father from beating my mother but I thought it would save her some hits if he started chasing me.

20. Usually what happened is that my father yelled at me to get away and if I did not leave, he chased me. I learned I was usually quick enough to get away from my father. I ran away from the house and returned later. There were times when my father caught me and beat me.

21. Our family environment was very violent and very volatile. Every time my father drank there was a high probability he would become violent. I walked on eggshells all the time with a constant feeling of dread about what was to come. I think my mother took the abuse, and maybe even provoked it, to keep my father from abusing me and my brothers and sisters. My mother would tell me not to get involved in their fighting and to stay away.

22. My father kept my mother isolated and alone, which made it nearly impossible to report the abuse – not that she would have done that anyway. She was

EXHIBIT 26

**2180**

completely dependent on him for everything. Even if she did everything the way he wanted it, my father still got drunk and beat her. On top of being physically abusive, my father degraded my mother. There were times when he came home late from the bar and demanded to know why his supper was not waiting on the table for him. Although my mother had his plate of food in the oven or the refrigerator my father would demand to know why it was not on the table, waiting for him. He made my mother sit down in the kitchen and watch him get his plate out and heat it up. He would yell at her saying things like – do you see how I'm doing this, does this look too hard for you? He kept my mother beat down in every way possible.

23. My father's violence did not stop with our family. When I was in fifth grade, two bullies picked on me at school. One day I had had enough and I beat one of the bullies until he couldn't move. Later that day, the boy's father came to our apartment, opened the door and walked inside without asking. My father took this as a major insult and a sign of disrespect. The boy's father began to tell my father that he had to pay for his son's medical bills. My father beat the man and continued beating him until he was outside the apartment and then he kicked the man down the apartment steps.

24. My father had poker parties, almost weekly. I would pull my little red wagon down to the local bar, load up on beer, and take it back to sell at the poker parties. I was probably 12 or 13 years old. As a means to make money, I also hung out in the bar and shined shoes. This put me in contact with a lot of drunk people making bad decisions. It was a crude lifestyle that became commonplace to me. I remember that when I was as young as age 10, my father took me to the bar with him so that I could drive him home after he got drunk. We lived about ten minutes away from the bar.

25. At one of my father's hangouts, where we got the beer for his poker parties, he had a disagreement with the bar owner. The owner was trying to blackmail my father or tell people about his prison past. My father told the bar owner he was going to regret this. Around this time, my father started making pipe bombs at our home. He had all the parts laid out and he showed me how to assemble a bomb. He said something to the effect of – "if you are going to sit there and watch, you might as well help." About two weeks later, that bar burned down. My father was never implicated or charged. I don't know how it happened but I assumed my father blew it up. This is how vengeful my father could be and he never made a threat he did not follow through with. You might say his threats were really a promise and warning of things to come.

26. I started running away from home when I was about ten years old. Many times I ran in reaction to my father beating my mother or me. I made it a point to attend

EXHIBIT 26

**2181**

school so even when I ran away I went to school the next day in the same clothes from the day before. I was not worried about running away or what I would do. I always had the sense I could take care of myself and that I was better off anywhere but home. Eventually children services got involved because I was a chronic run away. I was placed in foster care. I spent two years in a group home and then went to live with a foster family, in Waukegan, Illinois. My twin, Jimmy, was already living with that foster family. Jimmy was also involved with children services due to running away from home and minor juvenile offenses. I stayed in contact with my mother by receiving passes to visit my family. My behavior and school grades were good and I was rewarded with passes.

27. The foster parents, Robert and Sally Alger, were good people who tried to help. I was working at a movie theatre and stole a gun from the manager's office. I hid the gun in my bedroom and the son of the foster family found it. I walked in the room while the kid had the gun and he accidentally shot me. I was in the hospital for a couple of weeks. The foster family felt it best that I not return to their home. I went back to live with my mother and father, in Chicago. As soon as the doctor cleared me, I entered the service. My military career began in August, 1967 and ended on December 10, 1987

28. After enlistment, my contact with my family was sporadic. Around 1968, my mother left my father and moved to California. My three siblings, still left in the home – Catherine, Freida and Michael - also went with my mother to California. There was a brief period, when I was stationed in Fort Leonard Wood that I brought my mother to live with me. She did not like it and, in 1977, moved back to California. My sister, Catherine remained with me for an extra summer, but decided she wanted to live back with our mother.

29. When I was on leave, I would return to Chicago and visit with my father. My father eventually had to quit construction work because his body could not keep up. He took on maintenance positions at apartment complexes and a veterinarian's office. My father stopped drinking, very late in life. He died, around age 66, mainly due to cirrhosis of the liver. My mother died June 22, 1993, due to heart failure.

30. I have come to realize that I mirrored my father's bad behavior, including his quick temper and aggressiveness. Around 1991, I admitted to myself that I had a problem. I began seeing a psychiatrist at the VA hospital. It took a while to get my medication regulated but once it was, I benefitted greatly. Currently, I take Prozac and Buspar. I see the psychiatrist every three months for check-ins and medication management. There have been times when I feel better and think I can manage without medication and will stop taking it. My wife can tell immediately if I've skipped a dose. She says I'm like "night and day." Without

EXHIBIT 26

**2182**

medication, I am easily frustrated and very quick tempered; with medication, I am easy going and pleasant to be around. I do not know my exact diagnosis but my problems stem from anxiety and depression.

31. I was 20 years old when I met Suk Cha while I was stationed in Korea. I didn't learn much about her family because she had little contact with them. I know that they escaped North Korea and that her sister died sometime during the escape. I heard her sister essentially died of exhaustion, while in Suk Cha's arms.

32. I have always wondered if Suk Cha and/or members of her family were providing some sort of information to the United States government. When we were in Korea, Suk Cha made frequent trips to see her brother in Seoul. She was very secretive about these trips and she and her brother never appeared particularly close. After we moved to the United States, she continued to write her brother very, very long letters and she spent large amounts of money talking with him on the phone. I remember receiving $150 phone bills, which was substantial at that time. Suk Cha rarely talked about her family but I gathered that they were prominent in North Korea and were targets due to information they may have had regarding the North Korean government.

33. Suk Cha as very, very paranoid. She was constantly looking over her shoulder and fearful people were coming after her. I thought that some of this behavior might be attributed to the country and environment she grew up. But, I also wondered if her paranoia was influenced by any work she may have provided the government. In hindsight, I have wondered whether I was used by Suk Cha as a ticket to the United States.

34. Our marriage was very good up until we had children. Suk Cha refused to get prenatal care while pregnant with David because she did not trust the American military doctors. When she was about six months pregnant, Suk Cha began spotting and experiencing abdominal pain. I made her see a doctor. I do not remember if David was born vaginally or by caesarian. The hospital staff would not let me in the delivery room. David was possibly breach because I recall that the hospital staff were irritated that Suk Cha had waited so long to see the doctor, otherwise they could have tried to turn David.

35. David was a sickly child and I attribute that to Suk Cha not getting the prenatal care she needed. Suk Cha did not want to breast feed and David was fed formula.

36. Suk Cha did not know what to do with David. It seemed like her behavior was much deeper than just first-time mom anxiety. She did not bond with David or Mark. She was not emotionally connected to them in any way. She did not know how, and did not try, to sooth David when he cried. She exhibited no maternal nurturing; she was cold as a fish and David and Mark could sense this. I

EXHIBIT 26

2183

remember walking in the house and seeing Suk Cha holding David while he cried and wondering who was more scared of who? She held David with semi-outstretched arms; not in any sort of close or connective way. Although Suk Cha would hold David while he cried, she did not try to soothe him. I could walk over to David and simply rub his head or kiss him and he would stop crying, but he would resume crying when I walked away. I always felt like the babies knew their mother was afraid and they- even as infants – picked up on that. I think this was a big part of the reason why David cried a lot.

37. As the children aged, Suk Cha's treatment or discipline of them became excessive and borderline physically abusive. Suk Cha wanted them to act as adults. When David was barely old enough to walk, Suk Cha would yank him up and start spanking him if he touched something on the coffee table. I did not think that it was appropriate to spank children at that age for touching something on a table. Also, Suk Cha's spankings were hard and she hit David several times in a row. It was excessive. Suk Cha would not allow the kids to be kids. She wanted to keep a very, very clean home with all her home decorations displayed in their proper places. I thought that was unrealistic with young children in the house but Suk Cha made it a point to try.

38. One time when David was two or three years old, Suk Cha instructed David to finish his dinner and he did not want to. Suk Cha force-fed him until he threw up. She pinned David and forced food down his mouth. David was upset and was crying. A combination of the crying and the food being shoved down his throat caused David to throw up. Suk Cha then got mad and spanked him because he threw up. I tried to intercede and console David but Suk Cha became very angry at me.

39. There were many instances of normal kid behavior that made Suk Cha very irate. On one occasion, Suk Cha put collared shirts on the boys and one of them ran outside to play and came back with his collar messed up. Suk Cha immediately slapped him across the face and fixed the collar. The boys were terrified of her and they would stop, at the drop of a hat, when they heard her voice.

40. Suk Cha was extremely difficult to live with. Every little occurrence was blown out of proportion. She wanted everything in her control and if things were not exactly how she envisioned them, she quickly became agitated and spun out of control. Any little thing would send Suk Cha over the edge. If she did not like something I said, she picked up a dish and threw it at me. If the David or Mark touched something she wanted left alone, she grabbed their hand and hit it with a ruler until it was almost bleeding. If she tried to open a can and the can opener was not fast enough, she threw it across the room. It made for a miserable home environment and left everyone anxious and walking on eggshells.

EXHIBIT 26

41. Nothing anyone did was ever good enough or pleased Suk Cha. There came a point in time when I did not want to go home. I began staying out late until so I could avoid having to see Suk Cha.

42. David was the son who tried to keep the peace. He was a "clinger." When Suk Cha and I would argue, David tried to physically hold onto his mother and calm her down – saying things such as "I'm here mommy," "it's okay." David would do anything to get Suk Cha to calm down. When Suk Cha was hitting the children, David would say, "please stop" and "don't hurt us anymore." At times when I came home from work, David would tell me that their mother had been hitting them. If I tried to take up for the kids or confront Suk Cha, it only seemed to make things worse.

43. We lived in Texas until David was around three-years-old, at which time I received orders to Panama. Things did not go well in Panama. Suk Cha was worried I was not going to get a position I had been promised so she took it upon herself to bust into the Battalion Commanders office and start raising hell. She was escorted out and my commanders warned me about my wife's behavior. Suk Cha continued to call and harass my superiors. One day, I was called into the Battalion Commander's office and told that Suk Cha had three days to leave the base. Suk Cha and the kids moved back to Texas. It was not long after that when Suk Cha sent me divorce papers.

44. I feel guilty about not being involved with my children. I should have fought for more time with them but, at the time of the divorce, I was so frustrated with Suk Cha, I could not fathom fighting with her anymore.

45. At one point, I was stationed at Fort Leonard Wood, Missouri, at the same time as Suk Cha and her husband, David H. Runyon. I found their address and phone number. I called David H. Runyon to let him know we were on the same base and I asked if I could see David and Mark. My request was okay with him but he said I had to check with Suk Cha. I called and spoke with Suk Cha and she refused to allow me to see my boys. For a couple weeks after that, I parked my car where I could see the Runyon's house and watch David and Mark play outside. I had a limited view which did not tell him everything about their lives but I felt the boys looked happy and had fun playing together. I wanted them to be okay and to be happy.

46. A few years before David was arrested, I tried to find him. I searched on the internet and phone books. I thought I found him at one residence in West Virginia but the landlord told me David had just moved out.

47. I was reunited with David when Shelia Cronin contacted me and told me he had been arrested for murder and was facing the death penalty.

EXHIBIT 26

**2185**

**I declare under penalty of perjury that the foregoing is true and correct.
Executed on the 23rd day of September, 2015.**

David Dombrowski

EXHIBIT 26

**2186**

## DECLARATION OF MARK RUNYON

1. My name is Mark Runyon. I live in Makawao Hawaii.

2. I am David Anthony Runyon's younger brother. Our parents are David Runyon, Sr. and Suk Cha Runyon. David Runyon, Sr. adopted David and me. Our biological father is David Dombrowski.

3. David and I always knew David Runyon, Sr. was not our biological father. I don't recall how or when we were told but we always knew our biological father was someone different.

4. Since David's arrest in 2007, I began learning about my family through Sheila Cronin who worked on David's case. I made contact with my biological dad David Dombrowski. I learned he had tried calling me and my brother David many times throughout the years but our mother would not let him speak with us. David and I grew up thinking our biological dad wanted nothing to do with us.

5. David and I grew up in a very cold, repressed, very strict Christian family. No one showed physical affection – there was no touching, kissing, holding or comforting. Sex was simply for procreation. We never saw our mother or father physically touch, hold each other or kiss. On the rare occasions that my mother sat me upon her lap, it felt weird and unnatural.

6. Our mother and father were emotionally detached from themselves and from us. There was very little communication between our parents and they spoke very little to us. Our parents provided food and shelter but the feeling in our house was that we were simply surviving. Without bonding, attachment, affection, or emotional support from our parents we did not learn how to deal with life, navigate relationships, or cope with stress.

7. As an adult, one of the biggest fears in my life was when my first son was born. I worried that I would not be able to love him because I did not know how to give love or receive it.

8. Even when my family did spend time together, I still felt no emotional attachment to my parents. The only activity my family could enjoy together was fishing. Fishing is generally a quiet activity that one performs somewhat individually. We would spend 4 hours fishing and maybe say ten words the entire time. We had

EXHIBIT 27

**2187**

our own poles, picked our fishing spots and kept to ourselves. To say it was quality family time would be a stretch but this was as close as it got. David and I also enjoyed hunting and going to the shooting range with our father. These activities also involved little communication and limited interaction.

9. Because our father was in the military, we experienced repeated upheaval and moving. David and I learned to not get attached to anything or anyone because we would not be in any one place long. We learned everything changes and often. Moving was commonplace and we learned not to let it bother us. Plus, David and I had each other.

10. My mother made sure that I knew I was the "bad son" and David was the "good son." I never felt love from my parents and my mother told me I was bad and could do nothing right. I learned from an early age that nothing I did would be good enough for my mother so, why try. I challenged my parents much more than David did. For example, David would sneak out of the house when our mother told him not to leave but I would tell her I was leaving so she could watch me walk out. I got in my mother's face. I guess this confirmed in her mind that I was the bad son.

11. David, being the good son, handled our mother differently. He could not please our mother but he kept trying. David was attentive to our mother and tried to do things to make her proud of him. I could tell David wanted some validation that he was good and loved. The problem was that this was never going to happen. Somehow, I knew this at a young age and stopped trying but David did not.

12. I realized very early that I was not loved by my parents as other kids were. I knew something was different. I began to run away from home when I was five years old. I knew no one loved me, so I had no reason to stay. Every time I ran away, I never worried about leaving. It did not scare me. I did not like living in a house where I was not wanted. I believed I would feel better living anywhere else.

13. I remember my mother caught me with her cigarettes when I was about twelve years old. She made me smoke an entire pack of cigarettes, hoping I would get sick, but I did not. She then made me eat the cigarettes, still trying to make me sick. I ran away and stayed one night with a friend. The next day I went to the bus station and planned to buy a ticket to Missouri. I did not know where I would stay in Missouri but I wanted to leave. A police officer saw that I was alone and trying to buy a bus ticket. He took me and called child protective services. I

Page **2** of **7**

EXHIBIT 27

**2188**

remember CPS came to the house and talked with my parents and that was the end of it.

14. Our mother was unstable.  She had mental breakdowns.  The household would feel a buildup of stress and tension and then she just exploded. She would go"postal," screaming and breaking dishes and lost all control.  She could destroy a room in 30 seconds.  During these breakdowns my father would tell David and I to go to our room and shut the door until he said we could come out.

15. Our father would work to calm mother down.  He often physically restrained her.  When she stopped screaming they would go on as if nothing happened.  My parents never discussed these breakdowns.  My family simply did not talk to each other.  David and I were left to deal with it on our own.

16. Our father continually tried to placate and keep our mother happy to prevent her from having one of her breakdowns.  He always sided with our mother and we could not count on him to stand up for us.

17. I remember having contact with my paternal grandparents who live in Akron, Ohio.  The grandparents lived in Akron, Ohio.  David and I went fishing and had fun with our grandfather.  When I was eight years old, our contact with our grandparents ended abruptly.  David and I could not see our grandparents anymore.  I was witness to my grandmother making racist comments to my mother and accused her of marrying my father only for money.

18. When my father was stationed in Korea we met some of my mother's family.  I remember one of my mother's sisters was very angry that my mother was there. Apparently, there was a clause in my grandfather's estate that required my mother to claim her inheritance in Korea before a specific date.  The sister had planned to receive my mother's share of the inheritance because she thought Suk Cha would not get to Korea in time.  I remember thinking it was strange that my mother's sister reacted so angrily when they had not seen each other for such a long time.

19. My high school years in Virginia were one of the happiest times in my life.  David and I spent a lot of time with each other and I felt really close to him.  I knew we were the only family either one of us had.  David and I were both on the wrestling team.  It was something that strengthened the bond between us.  Wrestling also taught us about discipline and hard work.  During the two years that I wrestled, I remember my parents attended one match.

Page **3** of **7**

EXHIBIT 27

**2189**

20. I feel like I have always had more of the older brother role than David has. I always knew I had mental toughness and could survive anywhere. That's why I never worried about running away. David, on the other hand, was soft. He tried to gain acceptance from people. He had little self-worth and tried to impress people in order to feel good about himself. David would act as if he was tough and aggressive but in reality, David was very passive. I felt like this put David in unhealthy situations and I wanted to protect him.

21. After David graduated high school, he was accepted at Wentworth Military Academy in Kansas. At the same time, my father was assigned to Korea. This was the first move I was making without David and I did not want to go.

22. While in Korea, I met an American soldier. I was fifteen years old but I had a fake I.D. and she thought I was eighteen. My parents found out that we had sex and reported her to authorities. She received a six-month jail sentence and was labeled a sexual predator. This made me furious and I began talking about going back to Virginia. My parents agreed to let me go. When I boarded the airplane, I cried because I was so happy to be away from parents.

23. Ever since leaving Korea I have been on my own and I have had very sporadic contact with my parents. Initially, I bounced from job to job and then enlisted in the military.

24. When I learned that David was graduating from Wentworth I thought it was a major accomplishment and wanted to be there to support him. I ended up attending his graduation and transferring to the Kansas Reserves so we could be together again.

25. While in active duty in the Army I was stationed in Korea and deployed to Haiti when stationed at Fort Campbell, in Kentucky. I ended up being court marshalled for discharging my firearm inside the barracks. I had a disagreement with another solider, instead of it being one-on-one his friends jumped in, and it became a five-on-one fight. I fired a shot in the air to get everyone to disperse. I know it was wrong. The difficultly with being immersed in military training is that you are constantly told to take into account the people around you and your surroundings. You don't have much time to judge and you always have to protect yourself and your fellow soldiers.

EXHIBIT 27

**2190**

26. After serving my sentence, I went to see David who was in Georgia. I had asked David to retrieve my truck and my possessions in it for safekeeping while I was incarcerated. I learned that a drunk driver hit David head-on, totaling my truck. The drunk driver was from a prominent family and he was able to escape major trouble. I remember this well because strangely, some of my guns which were in the truck at the time of the wreck ended up in local pawnshops. I think someone, not David, took my guns either during or after the wreck. I tried to talk to the driver about my missing possessions but, instead, the driver sent his girlfriend to meet me and have sex with me. This seemed to be a ploy to get me to stop asking questions.

27. Following the car accident, David suffered dizzy spells and "saw stars." I noticed David's personality had changed but I thought it was because of his marriage to Maria which was very high conflict.

28. In Hawaii there is a crab called an A'ama crab. If you put it in a bucket with another crab, it will not let the other crab climb out of the bucket. It will spend its time continuing to pull down the other crab to keep it from crawling out. This is how I viewed Maria. She had a terrible drinking problem and was concerned only with herself and no one else.

29. David was wonderful to Maria's two kids and treated them as if they were his own. David wanted badly to provide for his family but Maria made that difficult. She did not contribute financially and instead wrote bad checks all over the base. She complained about the housing and how many hours David worked. She did not want him to be gone from the home. If she did not like something David was doing, she called his commanding officer and complained. This, in turn, created problems for David and his military career.

30. David really wanted to continue his military career; he seemed to function well in the military but the issues with Maria kept him from reenlisting. David was barred from re-enlistment because of Maria.

31. When David was discharged from the Army he tried working as a police officer but was not able to complete his probationary period because of Maria interfering with his work and the volatility of their relationship. One time, Maria stabbed David with a pen. Since it punctured his department issue bullet proof vest he reported it and subsequently was terminated by his command. David kept moving around and each place they lived was worse than the last. One of the last times I saw David in Georgia, he and the family were living in a trailer with no

EXHIBIT 27

**2191**

running water.  David just wasn't together anymore and he stopped being my big brother.

32. When I learned that David had left Maria I believed that the constant stress of his marriage and being the only partner pulling any weight took its toll on David.  I think David got to the point that the only way he could better the situation was to leave.

33. Women who needed to be taken care of and who had no sense of independence were always a draw for David.  I think David believed that if he took care of a woman she would value him for it.  The problem is, he chose women (much like our mother) who expected to be taken care of and did not validate David's efforts.  I think this was the only way David knew how to function.  David was caught in a cycle of trying to please someone who could never be pleased in order to feel he was worth something.

34. Eventually I married and moved to Hawaii.  I didn't know where David was or how to reach him.  I called my parents to see if they knew where David was living.  My parents said they had no idea where David was.  I later learned that David had separated from Maria and was staying with my parents at the time of my phone call.  The only explanation I have as to why my parents would lie to me about David is that my mother may have wanted to keep David isolated in order to control his life.

35. I was able to make contact with David in 2007 when he was living in West Virginia.  Davy was living with him and David sounded happy.

36. Sheila Cronin contacted me after David was charged with murder.  I was flown to Norfolk for David's trial.  David's trial attorneys didn't talk with me before I was called to the stand to testify.  I would have testified about the things in this affidavit that David's attorney did not elicit.

37. After the jury voted for death, I went to my mother's hotel room.  She told me that David was dead to her and that I was now the "good son."

EXHIBIT 27

I declare under penalty of perjury that the foregoing is true and correct.  Executed on the 25th day of September, 2015.

MARK RUNYON

EXHIBIT 27

2193

## DECLARATION OF MARIA RUNYON

1. My name is Maria Runyon. I am from Wichita, Kansas but now I live in Oklahoma City, Oklahoma.

2. I was married to David Runyon from 1995-2009. Our son Davy was born in January 1996.

3. During the time I met and was married to David I had a drinking problem. I have struggled with drinking since I was a teenager. When I was sixteen years old my best friend shot herself. I have never able to recover from that and I have been in and out of counseling.

4. Scott Linker is my brother. Teresa Linker is my sister. Teresa met David Runyon shortly before I did.

5. I met David Runyon in Wichita around May 1994. He was working as a security guard but had enlisted and had orders to go to Fort Jackson, South Carolina. I was going through a divorce. My son Wren was about six years old and my daughter Kendi was almost two.

6. It was love at first sight. David and I began spending all our time together. Some people in my family, including Teresa, became mad because I spent so much time with David. He was my first true love.

7. In July 1994, there was an incident with my sister Teresa Linker. There was bad blood between us because we had both dated David and he was spending all his time with me. Late one night, Teresa called and said she was coming over to pick up a shirt. David knew Teresa was just asking for trouble so he took the shirt outside to give it to Teresa. I watched from the window and thought I saw shoving but was unsure about who touched who. I ran outside and jumped on Teresa. We started shoving and yelling at each other. Teresa got in her car and left. I thought that was the end of it. A couple of weeks later I learned there were warrants for both me and David. Teresa did not show up for court multiple times. I ended up pleading guilty to a lesser charge. I was told someone had to be held responsible because Teresa had a bloody lip. I don't remember Teresa having a bloody nose when she left my house. David was getting ready to go active duty and his charges were dropped.

8. David was wonderful with Wren and Kendi. He spent as much time with them as he did with me. They instantly loved David and he is really the only father they have ever known.

9. When David left for Fort Jackson, we wrote each other frequently. For a while, I left Wren and Kendi in Wichita with my father and stayed with David in Virginia. We were married on January 20, 1995. I returned to Wichita to wait for David to get out of A.I.T.

Page 1 of 5

EXHIBIT 28

**2194**

10. When David completed all of his training he was sent to Fort Benning, Georgia. The kids and I moved to Georgia with David. This is where Davy was born. We lived there from about 1995 through 1997.

11. David was a great father. He worshipped the kids. He immediately loved Wren and Kendi like they were his own and never treated them any differently. David was always very hands on with the kids and would hug and kiss them. They knew he loved them. David would get down in the floor and play video games with Wren. Kendi loved cats and David would help her dress the cats up, like her baby dolls, and put them in a stroller. I remember David and Kendi trying to fashion some sort of seat belts to keep the cats in the stroller.

12. David did not talk much about his own family. I met David's mother, Suk Cha, one time. Suk Cha told me she hated me. Suk Cha wanted David to marry a woman that she picked. Suk Cha also hated that I had children from a previous relationship. David's father just followed along with whatever Suk Cha wanted. David's mother and father have never had anything to do with Davy, Wren or Kendi.

13. One thing I remember hearing about David's past is from when he was at Wentworth Academy. David had a bad automobile accident while driving his father's truck.

14. At one point when we were at Fort Benning, David's brother Mark was serving prison time in Fort Knox. Mark asked David to get Mark's truck and his belongings. When David was driving in Dadeville, Alabama, he was hit head on by a drunk driver. David was trapped in the truck and had to be cut out. I can't remember the name of the person who hit David. This person was required to pay restitution, which he did for a few months and then he just stopped.

15. After the wreck, David was in a lot of pain and did not want to take medicine. David's pride often kept him from taking medicine when I knew was feeling really bad. David did not like to take any medicine – even aspirin. He went out of this way to avoid putting anything unnatural in his body. He rarely drank and never did drugs. He even hated the fact that I smoked.

16. As a result of the wreck, David experienced severe vertigo and every time he laid down he felt he would pass out. David went to the emergency room on a couple of different occasions due to the vertigo.

17. I think the wreck was a very significant event in our lives because David's personality changed dramatically. He was meaner and easily frustrated. The guy I married had good morals, discipline and restraint and, for the most part, this changed. He was easily angered and quick tempered.

Page 2 of 5

EXHIBIT 28

2195

18. When and David and I would fight I sometimes called and talked with his CO (commanding officer) about David's behavior.  The CO made us attend counseling.  Then, David was barred from re-enlisting in the Army.

19. After David was discharged from the Army we moved to the metro Atlanta area, around Fayetteville.  David worked with the Fayetteville Police Department.

20. I think sometimes David did not think things through before he did them.  When he was a police officer he helped the apartment manager at our complex with a tenant who owed back rent.  David was not on duty and it was not his jurisdiction but he took his badge and service weapon.  Those things are bad ideas yet it never occurred to David that he could get in trouble.

21. We had financial problems and we were not getting along.  David could be controlling.  I think that maybe because of his military and police training David felt he had a right to tell people what to do.

22. My father had a home, in Wichita, which was broken up into apartments. He said we could live there so we moved back to Wichita around September of 2000.

23. David acted paranoid and was very vigilant of his surroundings.  If we went to a restaurant he would not sit down unless he could sit with his back to the wall.  He did not like the fact that I smoked because he said it put me in contact with "unsavory characters."  When I went outside to smoke people sometimes approached me and asked for a cigarette.  David did not like this.  I remember David saying that you had to "watch your six and twelves."

24. One time I was outside of our house smoking.  The house was close to the street and man came walking down the sidewalk.  The man then started walking toward our house.  Out of nowhere David appeared and had his gun at his hip.  I don't remember if David said anything to the man but he got back on the sidewalk and kept walking.  I think the man was probably just going to ask for a cigarette. David describes this episode as saving my life from a would-be rapist.

25. David worked two jobs in Wichita.  He worked at a gun shop and at a hotel.  He was away from the home more than he was there and this took a toll on the family.  My drinking increased and it was an all-around bad situation.  There were periods of time when David was working long hours and every night.  I would make him stop and get a bottle of liquor to bring home and then I would drink the whole thing.

26. There were times when David and I fought and became physical with each other. I would say that each of us were to blame for these incidents "50/50."  Most of the incidents were a result of my drinking and David trying to calm me down.  I was never afraid of David nor did he ever do anything to that made me fear for my life.

Page 3 of 5

EXHIBIT 28

**2196**

27. In regards to the domestic violence incident on February 7, 2001, I remember that my daughter Wren was sick and I was late getting home because I had to pick up medications. David was upset because he needed the car to go to work. I wanted David to put oil in the car before driving it because it needed oil every few days. David refused. We began fighting over the keys. David grabbed my arm to try to take the keys. At some point, David grabbed me by the neck. I was never scared or worried David was really going to hurt me. I called the police because I was mad that David wanted the car and refused to put oil in it. I did not want to press charges and recanted later because I was not hurt, I was just mad. After this incident, we briefly separated because a restraining order was issued.

28. David and I separated and got back together a few times. In July 2002, David left me and the kids. Wren was eleven, Kendi was eight and Davy was around five years old. I had no idea where David was or how to get in touch with him. He sent no money. I now realize that David was desperate to get away and he could not handle my drinking. I wish he would've supported the kids but he doesn't hold all the blame for leaving.

29. In February 2003, I learned that David was living in Missouri. I went to see him and hoped to get back together. That did not happen and David wanted to see me just so we could get our income taxes filed.

30. When David was living in West Virginia, Davy went to stay with him in February 2007. We talked about Davy living with David. We agreed that Davy would stay with David for the school year and I would get him in the summer. David had a plan to move to Colorado and he was going to pick Davy up at the end of the summer and move to Colorado.

31. Kendi's father, Scotty Fleming, molested her when she was about thirteen years old. In 2006, Kendi testified against him at trial and he was convicted. He died in prison.

32. When I found out that David was arrested for murder I was surprised to learn that he was involved in drug trials. When I met David he had an aversion to taking medicine. He went to extreme lengths to avoid taking even an aspirin. It was hard to believe David would volunteer for drug trials. David never told me that the reason he went out of town was for drug trials. He told me he was doing some sort of computer work for a hospital.

33. I was also very surprised that David would even associated with, what he would probably call, "unsavory characters." I can't count the number of times David talked about not hanging around or associating with people with a questionable background or shady characters. I was amazed to hear that David had been associating with the type of people who would be involved in a murder.

Page 4 of 5

EXHIBIT 28

2197

34. I did not want to testify before the grand jury because I was still married to David. The prosecutor said I had to testify because David and I were separated. Our divorce was finalized in 2009 before David's trial.

35. I spoke with David's investigators, Ford and Cronin, before the trial. I told them about the car wreck David had in 1997 because I considered it significant and felt it changed David forever. The night before I testified I met with David's attorney, Hudgins. I think Shelia Cronin was also there.

36. If asked, I would have testified to all the facts in this affidavit.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the ___16 day of September, 2015.

_____

MARIA RUNYON

EXHIBIT 28

2198

RICHARD G. DUDLEY, JR., M.D.

210 WEST 101ST STREET, SUITE 11K, NEW YORK, NEW YORK 10025
212-222-5122

29 September 2015
PSYCHIATRIC EVALUATION

## IN RE: DAVID RUNYON

Presenting Problem:

David Runyon is a now 44 year old (DOB 7 January 1971) male of mixed parentage (Korean mother and white American father). In 2009, Mr. Runyon was convicted of first-degree murder and sentenced to death, and he is now on the Federal Death Row at USP Terra Haute in Indiana.

Although Mr. Runyon's trial team presented no real mental health testimony during the penalty phase of his capital trial, the combination of information available to the trial team and information gathered by his current legal team has caused his current team to suspect that Mr. Runyon has been suffering from mental health difficulties of such severity that they have had a significant impact on him and his ability to function, that could have been considered for presentation at the time of his trial. Therefore, Mr. Runyon's current counsel referred him to this psychiatrist for an evaluation, focused on the question of whether or not Mr. Runyon has been suffering from clinically significant mental health issues that could have been presented at the time of his trial.

Qualifications:

I'm a physician, licensed to practice medicine in the State of New York, and board certified in psychiatry by the American Board of Psychiatry and Neurology. I received my medical degree from the Temple University School of Medicine in 1972, and completed my residency training in psychiatry at Northwestern University Medical Center's Institute of Psychiatry in 1975. After the completion of my training, I started working for what was then called the New York City

1

EXHIBIT 29

**2199**

Department of Mental Health, Mental Retardation & Alcoholism Services, where I eventually became Deputy Commissioner. I left the Department to become the Medical Director of the Community Mental Health Center that served the West Harlem, Washington Heights and Inwood Communities of New York City, where I developed and then directed a full-service community mental health center.

In 1976, I also started a small private practice in psychiatry, and then in 1984, I expanded that practice into a full-time private practice, equally divided between a clinical practice, primarily focused on the evaluation and treatment of men of color, and a forensic practice, through which I have been retained as an expert in psychiatry in both civil and criminal matters. The forensic part of my practice has included capital litigation, and in that regard, I have testified at the trial level and post-conviction, in State and Federal Courts throughout the United States. In addition, I have taught at both the City University of New York Medical School at City College, and the New York University School of Law.

A copy of my current curriculum vitae is attached to this report.

The Evaluation Process:

My psychiatric evaluation of Mr. Runyon included my own psychiatric examination of him, performed at USP Terra Haute on 2 and 3 September 2015. That examination included a review of his individual and family history, a mental status examination, and a more detailed exploration of any symptoms or signs of mental illness that emerged.

I also reviewed a large number of records and documents. These included a Social History for Mr. Runyon, prepared by Sheila M. Cronin, Mitigation Specialist, and the records and documents that were used in the development of that Social History; various records for Mr. Runyon, including school records, medical records and military records, as well as records and reports of mental health evaluations performed just prior to his trial; and declarations of family members and others who have known Mr. Runyon, and medical records for some of his biologically related family members. The records and documents I reviewed also included Court records, Mr. Runyon's interrogation video, and critical arguments offered during this trial; trial testimony of those family members who testified at his trial; and Mr. Runyon's pre-trial correspondence. In addition, I have reviewed the most recent reports of evaluations performed by Mark D. Cunningham, Ph.D., ABPP, James R. Merikangas, M.D., L.L.C., and Allan F. Mirsky, Ph.D., ABPP-CN, all of whom were retained at the time of Mr. Runyon's trial. Drs. Merikangas and Mirsky were not called to testify. Dr. Cunningham's testimony was limited to future dangerousness.

The above noted records and documents are of the type commonly reviewed when performing psychiatric evaluations in connection with capital trials, and the critical importance of such a review has made such the standard of practice when performing psychiatric evaluations in connection with capital trials. More specifically, the information contained in such records and documents are used to confirm the reports of the individual being evaluated, raise questions

2

EXHIBIT 29

**2200**

about the credibility and/or accuracy of his/her reports, and/or provide additional information that the individual being evaluated is unwilling or unable to provide for whatever reason. Therefore, the responsibility of the legal team to rigorously gather such information is central to the psychiatric evaluation process.

Based on the information obtained through my own psychiatric examination of Mr. Runyon and the records and documents reviewed, and employing knowledge gained through my training and experience, I developed a psychiatric formulation for or opinion regarding Mr. Runyon's mental state both at present and in the past, and the impact of his mental state on his ability to function.

Brief Summary of Information:

Since awareness of Mr. Runyon's mental status/the findings of his mental status examination are so central to efforts to make sense of the information he reported and the relationship of that information to the information available from the above noted other sources, I will start this summary with his mental status examination (which I traditionally describe at the end of this section of my reports).

Mr. Runyon is a now 44 year old (DOB 7 January 1971) male of mixed parentage (Korean mother and white American father) who is short but of average weight for his height, and who appears to be about his stated age. He was dressed in a prison uniform, and he was reasonably groomed. His face was asymmetrical; he had small marks all over his face and head; but he otherwise grossly appeared to be physically healthy despite the fact that he complained of the various physical health difficulties reported by other evaluators. He could clearly speak non-stop if not stopped and given direction by this psychiatrist; his speech was pressured and overly detailed; and he exhibited very loose associations and tangential thinking. However, he appeared to be open and cooperative with the examination process.

- His long-term memory was good, but his short-term memory was only fair
- He acknowledged having been depressed at times, but at the time of the examination, his mood was somewhat elevated/hypomanic
- Taking into consideration his facial asymmetry, his affect was consistent with the other findings of this mental status examination
- The content of his thinking revealed considerable grandiosity and paranoia
- He also described multiple 'near death experiences' and reported having nightmares about some of those experiences, and he reported that those nightmares are superimposed on nightmares about 'someone being out to get him' that he has had since he was a teenager
- Although his intellectual capacity appeared to be within the average range (based mostly on his verbal skills), the executive functions of his brain appeared to be impaired, and his reports to this psychiatrist indicated that there was also considerable impulsivity
- His insight was extremely poor
- His judgment was poor

3

EXHIBIT 29

**2201**

In essence, Mr. Runyon's reports were in no particular order; he was often difficult to follow; and it took considerable effort to repeatedly redirect him to the specific question at hand. However, for the purpose of this report, I've attempted to organize the information gathered from Mr. Runyon in a more coherent manner.

Mr. Runyon described his mother as a very tough, very strict, Korean woman, who is only a little over 4 feet tall, and he attributed her behavior to 'that stubborn streak that many Asians have' and her tough childhood. Upon further exploration about her 'tough childhood', he reported what he knew about her 'hard, traumatic and tragic upbringing' and noted that that made her tough and a survivor. He reported that he and his mother had a strong bond; he tried to protect her from his father's physical abuse of her; and ultimately, she left his father because of him. He noted that it is clear to him that she left his father because of him because his mother is traditional, and if it wasn't because of him, she would have stayed with his father and continued to take the beatings. He reported that things were very difficult for his mother after she left his father; he described having little to eat, etc.; and he noted that since he was the older child, he grew up quickly.

Mr. Runyon reported that after his mother became involved with his stepfather, who was also a white American, they went to visit his family; his stepfather's mother was extremely racist and said things that really hurt his mother; and although his mother never said anything to his stepfather's mother, when he found his mother crying he realized that his stepfather's mother's behavior was clearly breaking her heart. Therefore, he threatened his stepfather's mother and told her that she had been mean to his mother, and they never visited his stepfather's family again. Mr. Runyon noted that he has always been 'the protector'; he has strong feelings about what is right and what is wrong, and he hates bullies; and when he has seen bullies he has always intervened. He described such an encounter when he was about 6 years old; he took on and knocked out a 16 year old boy; and he noted that although he was much smaller than the other boy, he has always been stronger than he appears to be.

Upon further exploration about his mother, Mr. Runyon acknowledged that although his mother is a 'sensitive spirit', she can become 'a firecracker', in that if she gets angry, she can become physical. Upon further exploration, he reported that when angry, she breaks dishes and glassware; he has seen her pound on his stepfather's chest and otherwise go after him; but he never saw his stepfather hit her back. He noted that instead, his stepfather would just hold his head up so that his mother couldn't hit his face, and otherwise just wait for her to calm down. Mr. Runyon then noted that although he has been accused of domestic violent, in relationships he is actually just like his stepfather; he noted that he has been accused of domestic violence because women have been angry at him after he has rejected them; but once he realized that women don't want to give him up and get angry at him when he tries to leave, he learned to take more care when trying to get out of a relationship.

Mr. Runyon also acknowledged that he suspects that his mother suffers from depression. He noted however that although he knows that his mother has lots of problems, he can't really diagnose her; he has had little-to-no contact with her since he was in high school; and he noted that once he left home, he left. When asked how that could be given his report of having such a close bond with his mother, he explained that for a while his mother, stepfather and brother were

4

EXHIBIT 29

**2202**

out of the country, but then he acknowledged that his mother can smother, which has made it hard for him to have her in his life. Upon further exploration, Mr. Runyon became agitated as he noted that he tries to look at the positive things that have happened to him; he tries to focus on, and remember, and cling to those positive things; and he noted that that is what has helped him cope throughout the course of his life. He went on to note that when he thinks about negative things or negative feelings, those thoughts and feelings just 'snow ball', and he can't get them out of his mind; and then he becomes really depressed. He noted that although there are times when he becomes depressed for no apparent reason, he has plenty of reasons to get depressed, and he just doesn't want to focus on them.

Mr. Runyon described his stepfather as his 'role model'; he reported that he always looked up to his stepfather; and he noted that he learned so much from him. He noted that he was always much more aware than his brother about the big difference his stepfather made in his life, and how horrible things could have been without him. Upon further exploration, Mr. Runyon acknowledged that his stepfather worked a lot and rarely had any time to spend with him. He noted however that he misses his stepfather; he wishes that things were not so bad between them now; but his stepfather believed others instead of him, and sees what he has been accused of and been convicted of and sentenced for as a black mark on the family name. Upon further exploration, he also acknowledged that his stepfather never really showed any emotions; there was never any hugs or other forms of tenderness; but his stepfather did support them, and his stepfather did give him his last name.

When asked about how he got along with peers during his childhood and adolescent years, Mr. Runyon reported that during his childhood years and early adolescent years, he was an outcast. He described himself as a skinny little Asian-looking kid. He noted that he wanted things like a social life, friends, sports, etc., just like the other boys had, but he just couldn't get it, and the fact that his mother was overprotective made it even more difficult for him. He noted that in addition, because his father and then his stepfather were in the military, his family was constantly moving; that made it all the more difficult for him to develop friendships with peers; and all of that, in turn, made it difficult for him to even learn about girls and how to deal with girls.

Mr. Runyon noted that it always seemed impossible for him to find a group where he fit in; he was always different and always seemed to stand out; and he noted that actually, that never improved/his life just continued to be like that. Upon further exploration, he noted that he self-identifies as Asian v. mixed race, and he noted that clearly one of the reasons that he never fit in has been racism against Asians. He noted that because his mother was always so controlling, he also eventually learned to be independent and to fight against being controlled by others, and possibly that is also why it has been hard for him to fit in. Mr. Runyon then noted that his mother was always extremely focused on being an American, so much so that she didn't even speak Korean; she wanted to blend in and wanted him to blend in too; and she always said that that was about her hopes for having a better future. However at the same time, his mother was so extremely Korean; she had the sense of her own authority over him that she never let go; and yet she just never understood why therefore they clashed so much that he had to get away from her.

5

EXHIBIT 29

**2203**

Mr. Runyon reported that then during his junior year in high school, he started working out, taking supplements, etc.; within one year he grew considerably; and then he got into wrestling, at which point at least some of the other boys and girls started to try to befriend him. However at that point, he couldn't take advantage of this increased interest n befriending him, in part because he was so socially awkward and in part because he was so totally focused on doing well in school so that he could get into college. He reported that then in addition, his desire to wrestle caused a battle at home; neither his mother nor his stepfather supported that interest; and it was like he was fighting to become a young man. It was against that backdrop that when he left home to attend the military academy, he pulled away from his family.

Mr. Runyon noted that he loves his mother, but he stayed away from her because he couldn't stand being so smothered by her. His mother is just so emotional; you tell her something and she breaks down; and so it is difficult to talk with her about anything. She over reacts to things; there is lots of drama and expectation that he will do what she wants him to do; and if that all of that drama doesn't work, she will do what she feels she need to do to intimidate you.

Mr. Runyon reported that in 1989, after he graduated from high school he entered the military; he was in the military in some shape or form until 1997; and he explained that 'he had learned the ideals of duty, honor and country' from his military stepfather. Mr. Runyon described his experiences in the military academy. More specifically, he reported that during his first year (when he was 18/19 years old) he was constantly under attack; he felt that someone in authority there was trying to force him out; and so he always had to be alert. Upon further exploration, he reported, for example, that the hazing was particularly intense; but he was 'confident and strong mentally'; and since therefore, the hazing wasn't working on him, he became the center of focus. He was up/unable to sleep for days at a time; but even when he fell to the floor he would get right back up; and he was able to take anything that they tossed at him, which made them all the more angry at and jealous of him. He reported that his second year at the academy was better; after that second year he was slated to enter college, but the government funding for college wasn't paid on time, so he couldn't go on to college, and so he decided to get a job, save money and then go to college later.

Mr. Runyon reported that after working in private security for a short while, he started working as a corrections officer; but he left that job after about 1.5 years because he couldn't get a schedule that would allow him to go to college; and he also left because of 'more moral issues' that caused conflicts between him and his boss. Upon further exploration about those 'moral issues', he noted that he felt that they were trying to use him to harass inmates, and he didn't agree with that, and in so doing, they were also trying to put him in harm's way.

Mr. Runyon reported that while at the military academy, he was also involved in the National Guard on weekends, and that continued after he graduated from the military academy. After he left his job as a corrections officer and still hadn't figured out how to go on to college, he gave up his commission in the National Guard; he then enlisted in the regular military; and he explained that although he had rank in the National Guard, he couldn't just move into the military as an officer without a college degree. Mr. Runyon then noted that actually, a lot of guys didn't make it through the military academy that he attended and graduated from; they were just not physically perfect and/or just not mentally strong, etc.; but his problem was different, in

6

EXHIBIT 29

**2204**

that he was both physically and mentally strong. In his case, he had graduated from the military academy; he just then found himself on his own/without family support; and he just couldn't get the money and arrange for a schedule that would allow him to move on to college. Mr. Runyon reported that after his initial basic training he anticipated going on to airborne school, but instead, he ended up being a parachute rigger from 1995 to 1997. He reported that he finally left the military because he found himself in too much conflict with military leaders, and he explained that the standards had just kept decreasing since the time that he graduated from the military academy.

Mr. Runyon reported that after the military he entered the police academy; he talked about how after becoming a police officer, his focus on 'protect and serve' was inconsistent with what he experienced; and he noted that it soon became obvious that his beliefs and his behavior were not valued by the police department. Mr. Runyon then began to describe how he can 'sense a malignant spirit'; how this ability helps him identify evil, go after evil people and protect good people; and how this often places him in the thick of things. He noted that he learned to trust that capacity; he described multiple incidences where, because of that capacity, he was able to jump in and save someone's life; and he noted that he has repeatedly done this despite the risk of harm to himself.

When asked about intimate relationships, Mr. Runyon reported that he really didn't get involved with girls until he was in college, and therefore he was less experienced than the girls that he met. He then reported, however, that his libido is so strong and women feel so safe with him, that after one night with him they move into his life. He noted that after they are in his life he realizes that they have problems; but then he can't kick them out of his life; and he noted that in addition, he has a 'hero complex' that causes him to want to help those in distress.

Mr. Runyon reported that he had his first girlfriend when he was in the military college; when that relationship ended it broke his heart; and so he didn't even have a casual encounter with another woman for about 1.5 years, and ever since then it has been hard for him to fully trust another woman. When asked about his wife/the mother of his child, Mr. Runyon reported that he wasn't emotionally attached to her either, because she was so selfish; he got married to her for the kids (he wanted to give the 2 children she had when he met her what his stepfather gave to him) and he stayed with her for about 6 or 7 years because of those children and the child they had together; and like the other women in his life, she wouldn't give him up/agree to a divorce until about 7 or 8 years after they separated and he was being detained in jail for this matter.

At numerous times during the course of the examination, Mr. Runyon talked about how smart he is, how quickly he learns things, what a good leader and strong manager he is, what an over achiever he is, how bored he gets when he isn't challenged, etc., etc. When asked then why he has had so much difficulty keeping a job, he reported that there is a pattern there. He reported that in many cases, his boss takes the credit for all of the wonderful work that he has done; then the higher ups realize that it was, in fact, him who had done the wonderful work, and so then his boss feels threatened and gets him fired. In other cases, his co-workers become jealous of him and they work to knock him off the pedestal. He then noted that it is not that he is a 'glory hound'; it is just that he holds himself to a higher standard than others; and he noted that he always has to do his best, while others are working below capacity. Then upon reflection, he

7

EXHIBIT 29

**2205**

noted that maybe the fact that he kept moving from job to job was simply the result of his having moved from place to place as an army brat.

When asked about his physical health, Mr. Runyon reported that he has always suffered from hay fever. He is also sensitive to cigarette smoke since he had lung problems. Upon further exploration about the 'lung problems', he described a military exercise where he ended up being exposed to tear gas for too long; he was passed out for hours; and although finally a military doctor got him back, he has had lung problems ever since. Then when he was a police officer, he entered a burning building to save a child; that was the second time his lungs were filled with smoke and chemicals; and that episode resulted in even more problems with his lungs.

When asked about other physical injuries, Mr. Runyon reported that when he was about 3 or 4 years old and living with his mother and biological father in Panama, he tried to stop his father from killing his mother; he bit his father on the back of his knee, which was at his head level; and although that stopped his father from killing his mother, his father then turned on him. He reported that his father squeezed his head and told him to let go, but he kept at it; then his father squeezed his neck until he almost blacked out and the room was spinning; and then, according to his mother, his father threw him against the wall, but his next memory is waking up on the floor. The next day his mother took him and his brother and left his father, and he noted that that incident and all of the times that his father beat his mother contributed to his appreciation for his stepfather, who took care of all of them. When told that it is this psychiatrist's understanding that that incident caused the asymmetry of his face, Mr. Runyon noted that although it seems to him that his face has always been asymmetrical, he had been told that his facial difficulties were a result of that incident.

Mr. Runyon reported that he has always been extremely active and athletic, and noted that in the context of that activity he has hit/knocked his head on several occasions. He reported, for example, that when he was about 6 or 7 years old, he was playing football; the ball was thrown too far and when running to get it he hit the front of his head on a telephone poll; and his next memory was waking up on the ground, holding the ball, and being told that they couldn't get the ball out of his hands. Mr. Runyon also reported that during his first year at the military academy, he was knocked out by a hand grenade simulator; then reportedly, when 2 guys grabbed his legs in order to drag him to safety his head was banging on the ground; and when he woke up, he wa told that he had been out for a while. Mr. Runyon reported that then, when returning to the military academy for his second year, he was in a car accident; he had fallen asleep; and when he ran into a semi that was trying to get out of his way, the window glass exploded and particles of glass got imbedded all over his face and head. Many of those pieces of glass remained under his skin, causing infections; he noted that the last piece of glass didn't come out until about 4 or 5 years after that incident; and he reported that this is why he has all of those small marks on his face and head that were clearly visible to this psychiatrist. He also reported that when he woke up on the day after that car accident, he fell to the floor; the left side of his body wasn't working and it felt as if that entire side of his body had fallen asleep; but then after a while, he was OK and that never happened again.

Mr. Runyon noted that he doesn't like doctors; in addition, since he feels that the body can fix itself, going to see a doctor is a waste of time; and so he didn't usually seek medical treatment

8

EXHIBIT 29

**2206**

when injured unless he was convinced that the injury was so serious that his body just couldn't fix itself. He acknowledged that there were times when he initially thought that what ended up to be a more serious injury wasn't so serious; as a result, required treatment was delayed; but then he explained that that was due to the fact that he has a high pain tolerance, which has ultimately served him well.

Mr. Runyon reported that he was in another car accident in the fall of 1996, when a drunk driver hit him head on; he thought he was going to die; and he ended up trapped in his car, and they had to use the 'jaws of life' to cut him out of the car. He noted that the fact that he didn't have any broken bones was due to the fact that he 'relaxed his body so that the energy passed through him'; but there was muscle and tissue damage and so he was still in a lot of pain; and the pain medication that he was given knocked him out so much that it made it difficult for him to get up in the morning and get to work. He was in the military then; although his job was preparing parachutes, he had to jump out of a plane every 6 months to keep his job, and he only had 4 months to heal before he had to jump again. However, he wasn't healed by then; but he jumped anyway; and he described how the jump pulled everything back into place and essentially healed him. Mr. Runyon reported that when he left the military a year later, he was deemed to be in "perfect health"; but since they wouldn't give him his records he couldn't go to the VA hospital, etc.; and he noted that he believes that this was all part of a scam to keep too many veterans from getting follow-up medical care and other services.

Mr. Runyon reported that while still in the military, he was also diagnosed with Posttraumatic Stress Disorder following that car accident; he noted that he still has flashbacks to the accident; but he reported that at the time he felt, and told the doctor that made the diagnosis, that his response to the accident was perfectly normal and that he could face his fears. Mr. Runyon then noted that he was experiencing flashbacks and nightmares before that accident; he would wake up all wet, his heart would be racing and he would be ready to fight; then there was the way he dealt with situations; and he noted that given all of that and the fact that he had had many 'near death experiences' prior to that accident, he just felt that how he felt was just a normal part of his life.

Mr. Runyon then noted that even when he was a child he knew that evil spirits can influence this world; he has seen ghost and entities that he was certain were not shadows or reflections of light; and he noted that he knew that what he was seeing was real because of the way they moved and the fact that he could feel their presence. He reported that he was never afraid of any of that; so he never ran, knowing that he could manage any of that; and as an example, he described an incident that occurred when he was a child, where a glass was moving across the table and he simply caught it. Mr. Runyon then went on to note that there have been times when that evil has tried to use others to cause him harm, either intentionally or through their carelessness; he has been able to foresee that and thereby avoid that; and he gave numerous examples of this happening in his life.

Mr. Runyon noted that *if* he is afraid of anything, he is afraid to fail. He noted that he has known since he was about 18 or 19 years old that he had to make important decisions, and if he didn't, someone might die, and that is how he has saved so many lives. He noted however that there

9

EXHIBIT 29

**2207**

have been many close calls, and he noted that some of his nightmares involve close calls or his actually failing.

Mr. Runyon described in great detail how he was attacked while being held for trial and how his head was slammed on the cement floor, and he reported that although he doesn't know if he was rendered unconscious or not, he knows that he was at least stunned as he laid there on the floor. He then went on to report that he believes that he was set up for this beating by the corrections officers, who were persuaded to do that by the prosecutor; he believes that they were trying to create a situation where he would get violent so that such violence could be used against him at his trial; and he reported that when that didn't work, they used the guy who beat him as a snitch and the guy then testified against him at his trial.

Mr. Runyon then described multiple irregularities that occurred at this trial and how the prosecutor lied and used every trick possible to influence the jury. He reported that they even threatened his girlfriend to get her to say whatever they wanted her to say at his indictment. He noted that given that he had worked within 'the system' and believed in the system, he was sitting there in shock at all of this misbehavior for most of his trial. Mr. Runyon then went on to point out numerous other indicators of this conspiracy against him; these included, for example, that his trial was set for a Friday the 13th; and he noted that he isn't paranoid if what he is telling this psychiatrist is true and done on purpose.

Mr. Runyon reported that since being on death row, he has come to understand some things about himself, prompted by a combination of the gravity of his situation, the conditions of his confinement, the fact that he has nothing else to do but think, and the fact that his pen pals have gotten him to talk about things and express his emotions in ways that he had never done before. He has come to realize, for example, that there are lots of things in his life that have had an impact on him that he has never dealt with. He has realized that he gets certain thoughts in his head, those thoughts then 'snow ball' and take over, and he then finds it impossible to let those thoughts go.

\*\*\*

Given that the information contained in the records and documents reviewed by this psychiatrist is otherwise available to reviewers of this report, all of that information will not be repeated here. Instead I will simply list at least some of the information or categories of information that are particularly relevant to the opinions listed below.

- Mr. Runyon's mother's pregnancy with him was a high risk pregnancy in that she had no prenatal care during most of the pregnancy; she failed to gain weight during the course of the pregnancy; and she had a couple threatened miscarriages during the course of the pregnancy and complications at the time of delivery.
- Mr. Runyon appeared to have no real knowledge about his family history of major mental illness. Of significance is the fact that there is a clear history of major mental illness on both sides of his family; the etiology of most of the disorders includes genetic

10

EXHIBIT 29

**2208**

transmission; and so therefore, both of Mr. Runyon's parents and Mr. Runyon himself were genetically at increased risk for the development of similar disorders.

- By all reports, both of Mr. Runyon's parents did, in fact, suffer from some of the major psychiatric difficulties that ran in their respective families, in that his mother suffered from a Mood Disorder and was explosive, and his father also suffered from a Mood Disorder and was explosive, and also appears to have abused alcohol.

- Also of significance is the fact that his mother's and his father's developmental years were influenced/impacted upon by the mental illnesses in their respective families of origin; this negatively impacted upon their development; and this impact on their development, superimposed upon their above noted psychiatric difficulties, rendered them even less able to adequately parent Mr. Runyon.

- In addition, both of Mr. Runyon's parents have a significant trauma history, resulting in trauma-related difficulties that further impaired their ability to function.  More specifically, as children, both of his parents were repeatedly exposed to violence, and his mother was also traumatized by the problems she endured in Korea and during her escape from Korea.

- Given all of the above noted, it is not surprising that during Mr. Runyon's early childhood years, the relationship between his parents involved a level of domestic violence that was extremely frightening to him.  It is also not surprising that during those years, his parents were unable to provide him with the type of nurture, support or parental protection that might have helped to mitigate the impact of such an exposure to domestic violence or otherwise fostered his development.

- However, Mr. Runyon's only understanding of his father was that he was a man who was likely to kill his mother and who eventually turned on him too.  Similarly, Mr. Runyon never had and has never really gained any clear understanding of his mother's erratic, at times explosive, and extremely controlling behavior.  Therefore, his experience with both of his parents has been and continues to be confusing and extremely distressful.

- After Mr. Runyon's mother left his father, the next couple years were characterized by rather severe financial hardship, which made it all the more difficult for her to care for and provide for Mr. Runyon and his younger brother.

- When Mr. Runyon's mother became involved with his stepfather, his stepfather did stabilize the family financially.  However, although his stepfather was not as frightening as his biological father, he was not the idealized father that Mr. Runyon reports him to be.  Although Mr. Runyon acknowledges that his stepfather rarely showed emotions and was rarely available to him, by all other reports he was an extremely detached and uninvolved parent.  In fact, when this psychiatrist confronted Mr. Runyon about his characterization of his stepfather, even Mr. Runyon couldn't come up with anything that suggested otherwise, except for the fact that his stepfather adopted him and his brother and financially provided for them.

- The other sources of information available to this psychiatrist offered a clearer picture of Mr. Runyon's military service and subsequent employment history.  Although Mr. Runyon repeatedly described himself in superlatives and as noted above, always blamed others for the work-related difficulties that he has had, these other sources of information didn't support his assertions.

- Based on Mr. Runyon's reports to this psychiatrist and the records and documents reviewed by this psychiatrist, it appears that he has had various types of difficulties for

11

EXHIBIT 29

**2209**

most of his life that have compromised his ability to function (as discussed below). However, the records and documents reviewed by this psychiatrist indicate that his difficulties became even more severe following the automobile accident that he was in when he was about 25 years old. Although Mr. Runyon acknowledges at least some increased difficulty after that accident, the records and documents reviewed by this psychiatrist indicate that the difference in his behavior and ability to function was much more significant.

- Some of the records and documents reviewed by this psychiatrist broaden the picture of Mr. Runyon's thinking and behavior leading up to and at the time of his trial. Collectively, Mr. Runyon's reports and the records and documents reviewed by this psychiatrist indicate that he was extremely distressed, and that his affect was consistent with the level of distress that he was experiencing.

- Both the report of the evaluation of Mr. Runyon by Dr. Mrikangas and the report of the evaluation of Mr. Runyon by Dr. Mirsky confirm that Mr. Runyon suffers from organic brain damage involving the frontal lobe of his brain, resulting in impaired executive functioning. Both doctors also opined that Mr. Runyon was suffering from a psychotic process.

- The report of the evaluation of Mr. Runyon by Dr. Cunningham describes the numerous factors that put Mr. Runyon at increased risk for the development of mental health difficulties; the mental health difficulties that Mr. Runyon developed; and the impact of those mental health difficulties on Mr. Runyon's ability to function.

Summary & Discussion:

The information currently available to this psychiatrist indicates that Mr. Runyon had an extremely difficult childhood, and that the numerous difficulties that he endured had an extremely negative impact on his development, which then significantly impaired his ability to function.

More specifically, during his earliest years, Mr. Runyon was repeatedly exposed to the physical abuse of his mother by his biological father, which he experienced as so severe that he felt that his father was going to kill his mother. This exposure to domestic violence occurred in the absence of the type of parental nurture and support that might have at least helped to mitigate the impact of this exposure on Mr. Runyon's development.

Such repeated exposure to violence in the absence of parental nurture and support results in the development of psychological trauma-related symptoms such as hypervigilance and over-reactivity, and Mr. Runyon reported a long history of such symptoms. When a parental figure repeatedly fails to calm a repeatedly traumatized/frightened child, the child is unable to learn to calm his/her physiological response to frightening situations; this can impact on the development of the child's brain, and as a result, the child becomes physiologically hyper aroused and anxious as well; and Mr. Runyon evidences this difficulty too.

12

EXHIBIT 29

**2210**

It is important to note that although Mr. Runyon's mother took him and his brother and left his father when Mr. Runyon was still quite young, just prior to that separation, Mr. Runyon's father also severely physically abused him, which was also extremely traumatic. Furthermore, after that separation, Mr. Runyon continued to be repeatedly exposed to his mother's erratic and often violent behavior. He also continued to experience the absence of parental nurture and support, both in relationship to his mother and later in relationship to his stepfather as well.

In addition to the fact that the absence of parental nurture, support and protection increases the damage caused by repeated exposure to violence during early developmental years, such poor parenting negatively impacts on other aspects of development as well. More specifically, as a result of such poor parenting, children fail to learn how to develop stable relationships, they fail to develop a stable and positive sense of themselves, they fail to learn how to regulate their mood, and they are impulsive. Mr. Runyon evidences all of these psychiatric difficulties too. In addition, there were also other problems that Mr. Runyon endured during his childhood and early adolescent years that also contributed to the development of these same psychiatric difficulties, such as feeling like an outcast in relationship to his peers, not having access to any extended family members who might have offered him at least some nurture and support, and being so frequently moved that he was unable to develop any other outside support from other adults or his peers.

Mr. Runyon's mother's own trauma history, her other psychiatric difficulties, and her cultural background and experiences were all factors that contributed to her erratic and often violent behavior and her inability to appropriately parent him and his brother; In fact, each of these factors complicated and exacerbated the other, resulting in a level of impairment that was far greater than the simple sum of these difficulties. This same combination of factors rendered her unable to see the impact of all of these difficulties on Mr. Runyon's development; in turn, she failed to get him the type of help he required; and as a result, the psychiatric difficulties that he developed during his childhood and early adolescent years went unidentified and unaddressed, and so he continued to suffer from these difficulties.

The information currently available to this psychiatrist indicates that as Mr. Runyon moved into his late adolescent/early adult years, other psychiatric difficulties emerged, characterized by an even more severe disturbance of his mood and more clearly defined psychotic symptoms. As noted above, Mr. Runyon's family history of mental illness and the role of genetic transmission in the etiology of these types of mental illness placed him at increased risk for developing such psychiatric difficulties.

More specifically, episodes of depression and episodes of at least hypomania were superimposed upon the above noted difficulties regulating his mood that he had been experiencing since he was a child. I say "at least hypomania" because he was hypomanic when he was examined by this psychiatrist, but many of his reports and the information available from other sources of information indicate that he has likely experienced full manic episodes. In addition, clearly delusional thoughts of both the grandiose and the paranoid type were superimposed upon immature psychological defenses that he had been using and thoughts that he had had for some type about evil and the possibility that someone was out to get him.

13

EXHIBIT 29

**2211**

The first such episode of this combined combination of emerging psychiatric difficulties seems to have occurred during Mr. Runyon's first year at the military academy; he described a fixed belief that there was a conspiracy to get rid of him; he was quite grandiose with regard to his sense of himself compared to all the other students; and he reported being up for nights at a time, unable to sleep. Over time, these episodes became more severe; this tends to be the clinical course of such difficulties when they go untreated; and there were also episodes characterized by a clinically significant depression. The possibility that subsequent trauma to his brain contributed to the further increased severity of these difficulties, as suggested by other evaluators, can not be ruled out.

In addition to being a problem in and of themselves, these additional psychiatric difficulties also interacted with and further complicated his above described trauma-related difficulties and other developmental difficulties. For example, the emergence of paranoid delusions that someone was trying to harm him clearly exacerbated his trauma-related hypervigilance and over reactivity. For example, as his mania and grandiose delusions became more severe, they served as a defense against some of his anxiety and fears, but also caused his behavior to become all the more erratic, unpredictable and impulsive.

As noted above, during his young adult years, Mr. Runyon continued to experience traumatic events. These 'near death experiences' further exacerbated his trauma-related difficulties.

Then furthermore, there is the matter of Mr. Runyon's cognitive deficits, seen clinically and confirmed by neurological and neuropsychological testing. Such cognitive deficits further impaired Mr. Runyon's decision-making capacity beyond the impairments resulting from the distorted perceptions of reality, the impairments in judgment, and the impulsivity associated with his other psychiatric disorders.

I have purposely focused on describing the symptoms of Mr. Runyon's psychiatric difficulties, because it is through an understanding of his symptoms and how they interact with and exacerbate each other that one comes to appreciate how his psychiatric difficulties impact on his ability to function. This, of course, is what makes these difficulties potentially mitigating. However, to confirm that it is my opinion that these psychiatric difficulties are a product of mental illness, I also offer the following diagnoses. It is my opinion that Mr. Runyon has been suffering from Posttraumatic Stress Disorder (quite possibly with an organic brain/physiological component further complicating the psychological symptoms of his PTSD); Borderline Personality Disorder; Schizoaffective Disorder, Bipolar Type; and Neurocognitive Disorder.

Given an adequate amount of time, and armed with an adequate set of records and documents and information gathered from family members and others who new Mr. Runyon, at the time of his trial, I, or another experienced psychiatrist, could have discovered that Mr. Runyon was suffering from the same above noted combination of psychiatric difficulties. All of these psychiatric difficulties are chronic and long-standing. Therefore, in the absence of treatment, they would have impaired his capacity to function at the time of the crime for which he has been convicted and sentenced to death, and they would be have been evident at the time of his trial.

<div style="text-align:center">14</div>

EXHIBIT 29

**2212**

Furthermore, I, or another experienced psychiatrist would have recognized that the combination of Mr. Runyon's extremely difficult childhood and these psychiatric difficulties was the type of information that should have been offered to Mr. Runyon's legal team for consideration as mental health mitigation. Specifically, with regard to statutory mitigation, it is my opinion, to with a reasonable degree of medical certainty, that these psychiatric difficulties constitute a severe mental or emotional disturbance. It is also my opinion, to within a reasonable degree of medical certainty, that as a result of these psychiatric difficulties, Mr. Runyon's capacity to conform to the requirements of law was significantly impaired.

Finally, I have been asked to comment on what the defense team might have said when the prosecutor instructed the jury to look at Mr. Runyon's face (as seen in his interrogation video and as seen in court) and see that he lacks remorse.

First of all, facial expression is among the most significant components of 'affect', which is the external representation of what a person is thinking and feeling. As noted above, an assessment of affect is part of the mental status examination which is performed by psychiatrists and other mental health professionals during the course of a mental health examination; it is performed within the context of other information gathered during the course of such an examination; and such an assessment requires much more than simply looking at a person's face. More specifically, for example, the evaluator must know about and appreciate the significance of the fact that a flattening of the affect is likely a symptom of a psychotic process, which would be evident from other information obtained, and thereby not wrongfully attributing such an affect to something else. For example, the evaluator must know about and appreciate the significance of the fact that a blunting of the affect may be a symptom of a clinically significant depression, which would then be otherwise explored for during the course of the examination before wrongfully attributing it to something else. For example, an inappropriate affect could be due to a variety of psychiatric, neuropsychiatric or other medical conditions, all of which would have to be considered and explored for before attributing such an inappropriate affect to something else. In other words, for these and the specific reasons discussed below, an assessment of Mr. Runyon's facial expression and affect is among the things for which a mental health professional/expert witness should have been called to assist the jury, given that members of the jury wouldn't be expected to be able to do this on their own.

As noted above, it is my opinion that Mr. Runyon has been suffering from multiple major psychiatric disorders. With many of those disorders, alteration of facial expression and affect is a symptom. Therefore, I, or any other experienced psychiatrist, could have been called to opine that Mr. Runyon's psychiatric disorders are a major determinate of his facial expression. In addition, the nature of the injuries that have caused Mr. Runyon's facial asymmetry are also a major determinate of his facial expression. During the course of my examination of Mr. Runyon, it was clear that as a result of the injuries to his face, he had an extremely limited capacity for facial expression, which significantly impaired his affective expression. Here too, I, or any other experienced psychiatrist, neurologist or other similar professional, could have been called to opine that the injuries to Mr. Runyon's face must be taken into consideration when assessing his facial expression.

15

EXHIBIT 29

**2213**

Richard G. Dudley, Jr., M.D.
Psychiatrist
Diplomate, American Board of Psychiatry & Neurology

16

EXHIBIT 29

**2214**

# CURRICULUM VITAE

---

Richard G. Dudley. Jr, M.D.
210 West 101st Street, Suite 11-K
New York, New York 10025
(212) 222-5122

## EDUCATION:

* Temple University School of Medicine Philadelphia, Pennsylvania
  M.D., 1972

* Northwestern University Medical Center Chicago, Illinois
  R6 Internship

* Northwestern University Institute of Psychiatry Chicago, Illinois
  Psychiatric Residency, completed 1975

## LICENSURE AND CERTIFICATION:

* License for the Practice of Medicine, State of New York

* Diplomate, American Board of Psychiatry and Neurology

## PAST ACADEMIC APPOINTMENTS:

* Visiting Associate Professor of Medicine, Department of Behavioral Sciences
  City University of New York Medical School at City College

* Adjunct Assistant Professor of Law, School of Law
  New York University

EXHIBIT 29

**2215**

**PROFESSIONAL EMPLOYMENT HISTORY:**

\* January '76 to Present:         Private Practice of Psychiatry

At present, the practice includes a clinical practice primarily focused on adolescents and adults (evaluation, consultation, and both individual and family psychotherapy); a forensic practice (I regularly appear as a psychiatric expert in various types of legal proceedings throughout the United States); and consultation/education (the development and/or presentation of continuing medical education programs, as well as education programs for other health professionals, attorneys, and the public).

\* September '85 to June '05:       Associate Professor of Medicine
                    Behavioral Sciences
                    CUNY Med School at City College

From September, 1985 to August, 1992, I was Director of the Department of Behavioral Sciences, at which time my primary responsibility was to direct the full-year/required course in behavioral sciences. The goal of this course was to help students acquire knowledge, skills and attitudes which would assist them in becoming effective primary care physicians, for a range of persons from different cultural backgrounds, through the incorporation of contributions from the fields of psychiatry, psychology, social work, sociology, and anthropology. After I retired from the position of Director, I continued to teach in the course.

\* September '84 to April '05:       Adjunct Assistant Professor, then

                    Visiting Lecturer
                    School of Law
                    New York University

Initially, as an Adjunct, I team-taught full seminars on "Expert Evidence" and also team-taught Family Law. Then, I transferred to the Law Clinic, funded under a different mechanism, where I team-taught "Expert Evidence" with various law professors in connection with clinical seminars. Lectures included an exploration of the interface between the behavioral and social sciences and the law, and how lawyers might more appropriately work with psychiatric experts. In other settings I have lectured on various other aspects of law and psychiatry to judges, attorneys, law students and others.

2

EXHIBIT 29

**2216**

\* July '82 to June '94:                    Teaching Attending Physician
                                           Department of Psychiatry
                                           New York Medical College
                                           Lincoln Hospital Division

Responsibilities included course, seminar and case conference teaching, as well as individual psychotherapy case supervision for psychiatry residents, and the direction of the psychotherapy group for psychiatry residents. Previously, through the department's Consultation and Liaison Service, I also taught as part of the Chairman's Rounds for the Department of Internal Medicine.

\* January '79 to October '84:              Assistant Director
                                           Professional Services Dept.
                                           Roche Laboratories, Div. of
                                           Hoffmann-La Roche, Inc.

The principal responsibilities were to actively and creatively participate in the medical aspects of marketing Roche products and services, and to direct the activities of the Professional Services Product Group. As a participant on Marketing Teams, I helped to develop marketing strategies and plans, train Roche Field Representatives and implement various promotional programs. My responsibilities also included the coordination of Phase IV research efforts, and the development of scientific exhibits, medical education films, monographs, and symposia for physicians.

\* April '76 to July '82:                   Psychiatric Consultant
                                           Mental Health Programs
                                           Children's Aid Society of
                                           New York City

Responsibilities included teaching, diagnostic evaluations and treatment of selected cases.

\* December '77 to December '78:            Medical Director
                                           Washington Heights-West Harlem
                                           Community Mental Health Center

Responsibilities included the design, development and then day-to-day operation of a full, twelve service community mental health center. When I accepted this position, the center had just been funded, and every program element and support system had to be developed. Once the twelve service chiefs and other key administrative staff were hired, and basic support systems were developed and put into place, I supervised the chiefs, developed in-service training programs and

3

EXHIBIT 29

**2217**

worked towards the development of program elements not covered by the original grant, for example, research programs, transitional housing programs, and vocational rehabilitation programs.

\* January '76 to December '77:                          New York City Department of
                                                         Mental Health, Mental Retardation
                                                         & Alcoholism Services

Assistant to the Commissioner January '76 to November '76

June Jackson Christmas, M.D. -       Commissioner

Deputy Commissioner          February '77 to December '77

Primary responsibilities included the development of new clinical programs/services, as well as the ongoing monitoring, evaluating, and upgrading of the existing mental hygiene service system. This system included all of the medical centers, voluntary hospitals and agencies, and the municipal hospitals and public mental hygiene programs in all five boroughs.

November '76 to January '77:                    [On leave from the Department]

Coordinator/Team Leader
Carter-Mondale Transition Planning Group

The focus of this effort was to develop policy options in the areas of mental health, mental retardation, alcoholism, drug abuse and the developmental disabilities for the incoming administration.

\* January '74 to December '75                    Staff Psychiatrist
                                                 Lower North Community
                                                 Mental Health Center
                                                 Chicago Board of Health

Responsibilities included diagnostic evaluations, treatment and some supervision and teaching. In addition, there was primary responsibility for the Center's adolescent program.

**PROFESSIONAL ORGANIZATIONS:**

\* American Psychiatric Association - Distinguished Life Fellow
    Scientific Program Committee, 1998-2001
    Delegate, APA Assembly 1979-1983

4

EXHIBIT 29

**2218**

* New York County District Branch (APA)
    Committee of Black Psychiatrists 1984-1986
    Committee on Legislation 1980-1983
    Committee on Emergency Psychiatry 1978-1979

* American College of Psychiatrists – Fellow
    Awards Committee 1993-2001
    Nominations Committee 1989-1992

* Black Psychiatrists of America
    Nominations Committee 1985-1987
    Program Committee 1980-1982
    President, Metropolitan New York Chapter 1978-1988

* National Medical Association

* New York Academy of Medicine - Fellow

* One Hundred Black Men 1977-1982
    Health Committee 1979-1981

* American Orthopsychiatric Association 1988-1991
    Program Committee 1989-1990

* American Society for Adolescent Psychiatry 1984-1988

* American Academy of Psychiatry & the Law 1984-1988

* American Medical Association 1970-1976
    Council on Long Range Planning and Development 1973-1975
    Council on Mental Health 1971-1975

* American Medical Student Association Foundation 1979-1980
    Board of Directors 1979-1980

* American Medical Student Association 1970-1973
    Director, Video Journal 1971-1973
    Board of Trustees 1971-1972

* Student National Medical Association 1969-1972


**OTHER PROFESSIONAL ACTIVITIES:**

* Consultant in creative approaches to medical education, using a variety of media

* Lecturer/speaker for professional health and/or law related organizations and groups, as well as non-professional groups throughout the United States and, to a limited extent, abroad -- frequent guest on various television programs, as well as host and guest on radio programs.

* Executive Session on Policing and Public Safety, Harvard Kennedy School, sponsored by the National Institute of Justice, 2013-2015

5

EXHIBIT 29

**2219**

* Commission on Safety and Abuse in America's Prisons, 2005-2006

* Housing Works, Inc., Board of Directors 2005-present

* Vera Institute of Justice, Board of Directors 1989-2014

* Hospital Audiences, Inc., Clinical Advisory Board

* Examiner in Psychiatry, American Board of Psychiatry & Neurology

* Highbridge-Woodycrest Center, Inc., Board of Trustees 1991-2004

* Co-Principal Investigator, Minority Education, Research & Training Institute [New York State Department of Mental Health] 1990-1994

* Public Member, Fatality Review Panel, Child Welfare Administration (formerly Special Services for Children), NYC Human Resources Admin. 1990-1992

* Family Court Advisory Committee, First Judicial Department 1987-1989

* Program Development Committee,  NYU AIDS Mental Health Project (NIMH Contract No. 278-87-005) first 3 years

* Coordinator of Training for Volunteers Minority Task Force on AIDS 1986-1988

* Poison Control Advisory Committee, N.Y. City Department of Health 1980-1981

* Education/Training Consultant, N.Y. State Office of Mental Health 1979

* Consultant, Conference on Minority Mental Health Manpower, HEW-ADAMHA Minority Advisory Committee 1979

* Member, Mental Health Committee, Task Force on the New York City Fiscal Crisis 1978

* Chairperson, Task Panel on the Mental Health of Black Americans, The President's Commission Mental Health 1978

* Physician Resources, Inc. Board of Consultants 1977-1979

* Board of Directors, and Chairman of the Ambulance Committee, New York City Regional Emergency Services Council 1977-1978

* Task Force on Services to Emotionally Disturbed Adolescents, New York City Human Resources Administration 1977

* Advisory Board, Center for Physician Career Development, American Medical Student Association Foundation 1977

* American Bar Association -- Young Lawyer's Section Committee on Mental Health, Physician Member/Consultant, 1974-1975

* The Thresholds (rehabilitation program for young psychiatric patients) Board of Directors 1974-1975

6

EXHIBIT 29

**2220**

**OTHER SELECTED ACTIVITIES:**

* Walter Nicks Dance Theatre Workshop
  Chairman, Board of Directors 1985-1994

* Amistad World Theatre
  Chairman, Board of Directors 1983-1989

* National Urban League
  Black Executive Exchange Program 1979-1981
  Committee on Mental Health 1976-1979

* National Association for the Advancement of Colored People Advisory
  Committee, Project Rebound 1977-1978

* National Advisory Committee on Ethics 1975-1978

* New York City Black Citizens for a Fair Media Psychiatric Consultant 1977-1978

* Young Life, Inc. 1968-1972

* Big Brothers of America 1970-1972


**SELECTED HONORS:**

* New Jersey Black Achiever of Business and Education 1982

* Award of Merit, Black Psychiatrist of America 1977

* "Who's Who in America" 1976–1977

* American Biographical Institute
  "Community Leaders and Noteworthy Americans" Ninth Edition

* Dictionary of International Biography – Cambridge, England
  "Men of Achievement" Fifth Edition

* Solomon Carter Fuller Institute
  Traveling Fellow 1975

* Outstanding Young Men of America 1972

* National Medical Fellowship Recipient 1969–1971


**PUBLICATIONS:**

Dudley, Richard G. Jr., M.D. Childhood Trauma and Its Effects: Implications for Police. New Perspective in Policing Bulletin. Washington, D.C.: U.S. Department of Justice, National Institute of Justice, 2015, NCJ 248686

7

EXHIBIT 29

**2221**

Davis PC, Chandler E, Dudley RG: The Place of Families in Juvenile Defense: Work After *Miller v. Alabama*. New England Journal on Criminal and Civil Confinement, 19 (No. 2):293-301, 2013

Dudley R.G., Blume Leonard P: Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment. The Hofstra Law Review, 36 (No 3): 963-988, 2008.

Dudley RG: Offering Psychiatric Opinion in Legal Proceedings When Lesbian or Gay Sexual Orientation Is an Issue in Mental Health Issues in Lesbian, Gay, Bisexual, and Transgender Communities, Jones BE & Hill MJ (eds), APA Review Psychiatry. Vol. 21, American Psychiatric Publishing, Inc., Washington, D.C. 2002

Dudley RG: All alike but each one different: orphans of the HIV epidemic in Orphans of the HIV Epidemic, Levine C (ed) Unit Hospital Fund, New York. 1993

Dudley RG: Serotonin partial agonists in the treatment of anxiety and depression: Introduction. Journal of Clinical Psychiatry, 51:30, 1990.

Bing EG, Nichols SE, Goldfinger SM, Fernandez F, Cabaj R, Dudley RG, Krener P, Prager M, Ruiz P: The many faces of AIDS: Opportunities for intervention. New Directions For Mental Health Services - Psychiatric Aspects of AIDS, 48:69-81, 1990.

Dudley R.G: Blacks in policy-making positions in Black Families in Crisis- The Middle Class, Coner-Edwards AF and Spurlock J (eds), Brunner/Mazel, New York, 1988.

Davis PC, Dudley RG: The black family in modern slavery. The Harvard Blackletter Journal - Harvard School 4:9-15, 1987.

Davis P, Dudley RG: Family evaluation and the development of standards for child custody determination. Columbia Journal of Law and Social Problems, 19 (No. 4):505-515, 1985.

## LECTURES, PRESENTATIONS, AND EDUCATIONAL VIDEOTAPES

Described upon request

6/2015

RGD:dw

8

EXHIBIT 29

**2222**

On 10/04/08, from 7:30 am – 9:30 am, I did computer work trying to find either a **Tracy Ann** or **Terry Ann**. I located one at **726 Roswell Street, Linden, New Jersey**. I left the motel at 10:30 heading on to Athol, Massachusetts. I drove for several hours. At 2:30, I arrived at **53 Oakland Avenue, Athol, Massachusetts.** I sat outside of **Mr. Thomas Preston's** house because I couldn't get anyone to answer the door. I called the house number, **978-249-3847**, but nobody answered. His wife had told me that he worked nights and probably wouldn't be up that early. She was not home at that time.

## Persons Interviewed

**Name:**      **Thomas Preston**
**Date:**      **October 04, 2008**
**Location:**  **53 Oakland Avenue, Athol, Massachusetts (Preston Residence)**
**Summary:**

**I believe Mr. Preston seems like he would be a very good character witness for David Runyon for things in the past and he could shed some light on some of the problems with Maria.**

At approximately 3:30 pm, Mr. Preston came outside. I saw him and approached him. Mr. Preston is a tall slender (over 6 foot), white male, sandy colored hair, glasses. He is working class. He has a job in the evening; he didn't state what that was. He is also in the Army Reserves. We started the interview.

I asked Mr. Preston a series of questions, as follows:
**Q) How long he had known David Runyon?**
A) He stated about two and a half years. He met him at Fort Benning and he saw him last in July of 1997.
**Q) During his time at Fort Benning, did he know of a Larry Carr?**
A) He said Larry Carr was one of the staff sergeants there. He had heard rumors that Maria Runyon had an affair with Larry Carr. He said that he worked for Larry Carr for about a year to a year and a half.
**Q) What did he know about David Runyon?**
A) He said David used to be a police officer, he was a lieutenant in the National Guard in Kansas, and he joined the army as a PFC. He said he couldn't figure out how he had

- 2 -

EXHIBIT 30

**2223**

done that, but that is what David told him had happened. He said that they were riggers together at Fort Lee, they went to AIT school together at Fort Lee; they were in the same class there. They got to be pretty close. He and David were in charge of the class and that is why they got to be pretty good friends. He and David would go hunting on the weekends and their wives would hang out with each other. He stated that his wife was kind of close to Maria Runyon but his wife also had mental issues.

He supplied me the name of a chief warrant officer, **Mellanbach.** He didn't know much else about him besides he thinks that he is a rigger chief at Fort Bragg. He told me the army depot in Cumberland might be able to tell me where he is at. He told me Mellanbach got to be pretty close with David also.

He said he had never seen David show any anger towards anyone, besides when packing parachutes; it was a very strenuous activity and they had to pack 25 chutes in a week and sometimes it was very frustrating and they would all yell and punch the chutes, but he had never seen David show any anger towards anyone. He said that David liked the army and liked being in the army.

He stated that when he first met Maria, David and Maria were getting along pretty well, and then Maria got pregnant. He said he thinks that Maria got pregnant to keep David around because they had started to have problems in the marriage. After the child was born, you could tell there was a lot of tension between the two of them. David was really close with his child. David always wanted to be a father and he saw it as a good match for him and the child. David wanted to do anything for the child.

He said that David, Maria and the child went home for one weekend (he believed they went home) while David was in the Army. He didn't get back in time so David requested additional time and he was denied. He said when he didn't get back in time; Larry Carr wrote him up and requested that he be punished with an Article 15. He said **Captain Hannaman** was the Captain that gave him the Article 15. He let David explain what had happened. What had actually happened was a car wreck. He said that David, Maria and

- 3 -

EXHIBIT 30

**2224**

the kid were lucky to be alive from what he understood. He said David finally came back a few days later and this is when the Article 15 occurred. He said Maria didn't come back for at least a week or so later. He said that they kind of messed him up a lot but he didn't know all of the particulars.

He stated that he didn't stay in contact with David after he got out of the army but he thought that right now David was still in the army, however he hadn't heard from him since 1997.

**Q) Did he ever know of David to drink or take drugs?**
**A)** He said that David would drink; they would all drink after work, but nothing in excess. He had never seen David take any drugs.

**Q) Did David like to have guns around?**
**A)** He stated that David had a gun safe but the only guns he knew David had were hunting rifles. He had never seen any pistols and he didn't have any more guns than any of the other guys in the army. They all wanted these kinds of guns but they were just for hunting.

**Q) Was David airborne qualified and did he jump out of airplanes?**
**A)** He said that all riggers had to be.

**Q) What did he think about David Runyon being involved?**
**A)** He said the David Runyon he knew would have never been involved in something like this. The David he knew; even if he did get involved in something like this wouldn't have been that stupid. He stated that the David he knew wouldn't have gotten in any kind of conflict like this one.

**Q) Would he be willing to take the stand in David's behalf if we needed him to?**
**A)** He stated that he would.

**Q) Was he willing to come to Norfolk, Virginia and talk to the lawyers?**
**A)** He said that he would as long as the government would pay for it.

The interview ended at approximately 5:30 pm.

-4-

EXHIBIT 30

**2225**

## Declaration of Robert Seeger

1.  My name is Robert Seeger and I am married to Deborah Seeger. We live in Fairbanks, Alaska. I retired from the US Army in April 1997, and retired from the Alaska National Guard in July 2012..

2.  From 1993 through the beginning of 1997, I was stationed in Ft. Benning, Georgia. My wife and I lived in an apartment along with our three children. David Runyon and his wife Maria lived in the same apartment complex. My wife and I got to know David and Maria. Maria had two children and then David and Maria had a son together.

3.  Our families became friends. We sometimes shared meals, went to church together, and our kids played together.

4.  David and I were both stationed at Ft. Benning but we were not in the same company and therefore worked on different parts of the base. I sometimes gave David rides but we were not attached to the same area.

EXHIBIT 31

**2226**

5.   I helped David work on his car because he was not very mechanical.

6.   David was involved with Maria's two children.  He helped care for and raise them as if they were his own.  When Maria became pregnant, he was excited for the child to be born.

7.   David and Maria seemed to have problems in their marriage.  I thought they had money problems.  David was a Private First Class (PFC) and wasn't making a lot so money appeared to be an issue.

8.   David was in a car accident in November of 1996.  He went to Alabama to get his brother's truck.  On his way back to Ft. Benning David was in a bad accident.  The truck was totaled.  I picked him up and brought him back to Ft. Benning.

9.   In 1997, my wife and I moved to Alaska. We lost touch with David and Maria.

10.   In 2008, an investigator spoke with us in Fairbanks.  He was part of David's legal team and told us about the charges against David. This affidavit reflects the things I told him.

11. In 2009, my wife and I received subpoenas to testify on David's behalf. We were flown from Fairbanks to Norfolk, Virginia. An attorney spent about thirty minutes talking to my wife and me about testifying. We were at the courthouse ready and waiting to testify. We were then told that our testimony would not be necessary. We were allowed to leave Norfolk without being able to assist in David's case.

12. If I had been called to testify at David's trial I would have said what I have set forth in this affidavit.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 24th day of August, 2015.

_____
Robert Seeger

EXHIBIT 31

2228

## Declaration of Deborah Seeger

1.     My name is Deborah Seeger.  I am married to Robert Seeger.  We

presently live in Fairbanks, Alaska.

2.     From 1993 through the beginning of 1997, my husband was in the

US Army, stationed in Ft. Benning, Georgia.

3.     While in Ft. Benning, we met David and Maria Runyon.  We lived

in the same housing area.  David was also in the Army and did

something they called "Pack Chutes."  My husband and I became

friends with David and Maria and spent a lot of time together.

4.     During this time, Maria and I did not work outside of the home.

We both had elementary-aged children.  We sometimes watched

each other's children and occasionally shared meals. Maria and I

attended bible study with two other mothers.

5.     Maria had two children from a previous relationship.  David was

very close to Maria's children, Wren and Kendie.  He talked about

adopting but I knew that was expensive and he didn't have a lot of

money.  In 1996, David and Maria had a son they named Davey.

EXHIBIT 32

**2229**

6.    I remember how David interacted with the children.  For example, he played catch with Wren after work and encouraged both Wren and Kendie to help their mom.

7.    Maria confided in me about her marital problems.  Most of David and Maria's problems were about money.  I thought this was because David was a PFC and was not paid much.  My husband and I tried to help David and Maria with their problems by talking with them.  We encouraged them in their personal relationship with the Lord.

8.    In November of 1996, David went to Alabama to pick up his brother's truck because his brother was in jail.  On the return drive to Ft. Benning David was in a head-on collision with a drunk driver, which totaled the truck.  After the accident, David was in a lot of pain.  I know he took medication for the pain.

9.    After the accident, I began noticing changes in David's behavior.  Before the accident David always tried his best to succeed, look sharp and get the job done.  He offered a lot of laughter and

EXHIBIT 32

**2230**

smiles for everyone he met. After the accident I noticed that he became angry more easily. Maria felt it was from the drugs he was taking for the pain he was in.

10. At bible study, our group would talk about any problems we were having. Maria talked about her problems at home and David's change in behavior. David was unpredictable. David had big plans but never completed any of them. He would say he would do something but did not follow through. David would tell the family they would be going to church the next day with us. When it was time to go he would tell them they were not going. After several times of this and everyone being sad about not going to church, Maria would just bring the kids over and we would leave David at home. David also became upset with Maria if dinner wasn't on the table when he wanted it or if Maria moved something in the house that he believed should be kept in a certain place. He also hollered at Maria. David's unpredictability caused tension in their family.

EXHIBIT 32

11. David and Maria sometimes argued to the point that the children came to our house in order to get away.  We tried to counsel Maria and David.  They were good people going through hard times.

12. In 1997, my husband and I moved to Alaska.  We lost touch with David and Maria.

13. In 2008, an investigator spoke with us in Fairbanks.  He was part of David's legal team and told us about the charges against David.  This affidavit reflects the things I told him.

14. In 2009, my husband and I received subpoenas to testify on David's behalf.  We were flown from Fairbanks to Norfolk, Virginia.  An attorney spent about thirty minutes talking to my husband and me about testifying.  We were at the courthouse ready and waiting to testify.  We were then told that our testimony would not be necessary.  We were allowed to leave Norfolk without being able to assist in David's case.

EXHIBIT 32

**2232**

15. If I had been called to testify at David's trial I would have said what I have set forth in this affidavit.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 24th day of August, 2015.

*Deborah A Seeger*

Deborah Seeger

EXHIBIT 32

2233

## DECLARATION OF JEFFREY HARRIS

1. My name is Jeffrey Harris. I am a Captain with the Fayetteville, Georgia police department.

2. In 1998, David Runyon was employed with the Fayetteville Police Department as a police officer. He was in my platoon for approximately six weeks to two months.

3. David Runyon had a problem retaining information. When it was time to advance in the training sessions, we had to return to the first day's training information because David Runyon couldn't remember what he learned from that first day. We had to start from scratch just about every day.

4. In the summer of 2008, a defense investigator spoke with me about David Runyon. I told him about David Runyon's work problems including what is reflected in this declaration. I did not speak with David Runyon's attorney.

5. The prosecution called me as a witness at David Runyon's sentencing. If I had been asked, I would have testified to what I've stated in this declaration.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 13 day of January, 2016.

_Jeffrey Harris #1209_
Jeffrey Harris

## EXHIBIT 33

**2234**



KASPER - OFFENDER POPULATION SEARCH
Kansas Adult Supervised Population Electronic Repository
Kansas Criminal Justice Information System
OFFENDERS SHALL NOT BE ARRESTED SOLELY ON THE BASIS OF
INFORMATION DISPLAYED ON THIS SITE



## FLEMING, SCOTTY  (KDOC# 0087742)

**This information is current as of: Aug 17 2015 5:00AM**

### Names

| Name Type | Name |
|---|---|
| Conviction | FLEMING, SCOTTY |
| True | FLEMING, SCOTTY ALLEN |

### Birthdates

| Birthdate Type | Birthdate |
|---|---|
| True | , |

### Demographics

| Eye Color | Hair Color | Height | Weight | Gender | Race |
|---|---|---|---|---|---|
| Green | Blond or Strawberry | 6'-8" | 367 | Male | White |

XML Document    XML Schema

### Current Status reported by Dept. of Corrections
Current Status Deceased
Date of Death Apr 14, 2010

### Convictions

| County | Case Number (I) | Offense Date | Sentencing Date | ACS | Criminal Conviction Description | Counts | Crime Severity Level | Case Status (II) | State |
|---|---|---|---|---|---|---|---|---|---|
| Sedgwick | 06CR802 | Mar 12, 2006 | Nov 02, 2006 | N/A | Aggravated Indecent Liberties/Child less than 14;Fondling | 1 | Non Drug-Grid Severity Level 3 | Inactive | KS |

(I) If Number includes  JV : Extended juvenile jurisdiction adjudications with adult prison sentences stayed, then imposed.
(II) If Status includes * : Denotes Active for Post Release Supervision Only.

### KDOC Physical Location History(s)

| Location | Movement Date | Movement Reason |
|---|---|---|
| Unknown or N/A | Apr 14, 2010 | Deceased |
| Lansing CF-Central | May 01, 2009 | Inter-Facility Movement |

EXHIBIT 34

2235

| Location | Movement Date | Movement Reason |
|---|---|---|
| Lansing CF-East | Jan 04, 2008 | Inter-Facility Movement |
| Lansing CF-Central | Oct 23, 2007 | Inter-Facility Movement |
| Ellsworth CF | Sep 27, 2007 | Inter-Facility Movement |
| Hutchinson CF-Central | Aug 31, 2007 | Inter-Facility Movement |
| Hutchinson CF-East | Jun 13, 2007 | Inter-Facility Movement |
| Hutchinson CF-Central | Apr 10, 2007 | Inter-Facility Movement |
| Winfield CF | Jan 22, 2007 | Inter-Facility Movement |
| El Dorado CF-RDU | Dec 20, 2006 | New Court Commitment |

Main Site: **Kansas Department of Corrections**

EXHIBIT 34

**2236**

## mCE NTER FOR PSYCHOLOGICAL EVALUATION AND CONSULTATION
### *Allan F. Mirsky, Ph.D., ABPP*

5502 SPRUCE TREE AVENUE, BETHESDA, MD 20814-1623 ♦ (301) 530-9332 ♦ FAX (301) 564-9562

## NEUROPSYCHOLOGICAL EVALUATION

Name of Patient: David Runyon
Date of Birth:
Age: 44
Interview and Report by: Allan F. Mirsky, Ph.D., ABPP-CN
Date of Evaluation: 08/28/15

REASON FOR REFERRAL

I examined Mr. David Runyon on 08/28/15 at the request of Ms. Dana C. Hansen Chavis, Esq. of the Federal Defender Services of Eastern Tennessee. Mr. Runyon was convicted of first–degree murder in 2009, and was sentenced to death. He is currently confined in a maximum security Federal Penitentiary in Terre Haute, Indiana, where I evaluated him. I saw Mr. Runyon six years ago on 06/26/09, prior to his trial, at the request of Mr. Stephen A. Hudgins, Esq., for a neuropsychological evaluation. Mr. Runyon was seen at that time in the Portsmouth, Virginia City Jail.

Mr. Runyon appeared in a prison jump suit, and was unshackled (at my request) during the entire evaluation. He is a small, slim Asian-American man who speaks softly and without appreciable accent of any kind. As previously, his speech was articulate and free of any sign of defect. Mr. Runyon participated in the testing without complaint, and recalled that he had taken some of the tests earlier. There was only one brief bathroom break. My impression was that he enjoyed participating in the testing, as it is was a relief from the solitary confinement in which he spends most of his days. He stated that he occupies most of his time reading, and has made strenuous efforts to improve his cognitive skills, including attention and memory. This, he reports, is accomplished by working on such tasks as cross word puzzles, and he feels that he has seen some improvement in his ability to remain focused in reading. His appearance was somewhat different from that I recalled from six years ago, in that he had a rather odd-looking small, braided "Fu Manchu" type beard.

The following account is reproduced from my prior report of 06/26/09: *Mr. Runyon's educational background includes an Associate of Arts degree, awarded in 1991 from Wentworth Military Academy. He reported as well that he was trained as a classical pianist as a child. Mr. Runyon reports serving as an officer in the U.S. Army from 1989 to 1997, but his recollection of the exact dates was a bit unclear. He also stated that he reenlisted in the service as an enlisted man, and that his military occupational specialty was parachute rigger. When questioned about this somewhat unusual sequence, he said that his reenlistment was motivated by a "strong sense of responsibility to serve my country." He noted that he had two honorable discharges, and that both his biological and adoptive fathers (and grandfathers) were military men. He reports that his work history in recent years has been varied: law enforcement, construction, and tree work. He did not discuss the fact that (according to other information supplied to me) most recently he had been supported by payments for participating in pharmaceutical drug trials, as a normal control. Mr. Runyon*

EXHIBIT 35

**2237**

Re: David Runyon                                                                        2
08/28/15

*denies that alcohol consumption was ever a problem, and states that he never used illegal*
*drugs. However, he described extensive alcohol abuse in his wife, from whom he has been*
*separated since 2002.*

Prior injuries of potential relevance to Mr. Runyon's mental status include two
incidents of grenades being detonated quite close to him during training exercises
while in service. These occurred between 1989 and 1991. He also reports two
serious car accidents with cognitive sequelae—one in 1990 and the other in 1996.
These incidents produced a variety of symptoms, according to Mr. Runyon,
including brief unconsciousness, vertigo (from which he still suffers occasionally),
temporary deafness, numbness, impaired memory, "jumbled thoughts," and
according to a report from his estranged wife, marked personality changes
including a short temper. This account is supported by a large number of sworn
affidavits (recently provided to me) of persons who knew him before and after his
head injury. In addition to these reports of traumatic brain injury, Mr. Runyon
reported that he was assaulted in prison a number of years ago; as a consequence,
he suffers from tinnitus in his right ear. Some of the medical professionals who saw
David have raised the possibility of a post-traumatic stress disorder (PTSD). These
facts are consistent with that diagnosis; the history resembles that of many injured
service members diagnosed with mTBI (mild traumatic brain injury) I have seen at
Walter Reed National Military Medical Center. Many of these service members
develop PTSD, despite the diagnosis of "mild." These incidents, especially the
severe automobile accidents, were never followed up, to my knowledge, with brain
imaging studies. Such studies, in a number of cases, especially if the imaging
reveals demonstrable brain damage, can change the diagnosis to "moderate brain
injury."

On the basis of his demeanor and compliance during the evaluation, I believe that
the current results are an accurate reflection of Mr. Runyon's cognitive status.

TESTS ADMINISTERED              SCORE              INTERPRETATION

(Note that in scores below, SD refers to Standard Deviation, a measure of dispersion
about the mean or average score. A score 2 or more SDs below the mean is worse
than approximately 99% of the age-matched healthy population. Positive, i.e., +SD
scores indicate performance *better* than comparable controls).

*Wechsler Adult Intelligence Scale-III*
*(WAIS-III) Subtests**

| Test | Score | Interpretation |
|------|-------|----------------|
| Vocabulary | 13  14 | -Superior vocabulary (+ 1 S.D.) |
| Arithmetic | 13  14 | -Superior score (+ 1 S.D.) |
| Digit Span | 17  14 | - Superior memory for digit strings (+ 1 S.D.) |
| Information | 11  10 | -Normal general knowledge |

EXHIBIT 35

**2238**

Re: David Runyon
08/28/15
<div align="right">3</div>

| | | | |
|---|---|---|---|
| Similarities | <u>14</u> | 8 | -Marked loss of conceptual skill |
| Digit Symbol Substitution (Coding) | <u>11</u> | 10 | -Good visual-motor coordination |
| Cancellation ** | | 7 | -Impaired visual-motor coordination (-1 S.D.) |
| Symbol Search ** | | 8 | -Poor visual-motor coordination |

*Expected standard score = 10; Verbal IQ – Very Superior; Processing Speed = Impaired. <u>2009 *scores* *Changes, if any, noted.*</u>

**New tests. Note marked difference between scores on verbal tests: (Vocabulary 14, Arithmetic 14, Digit Span 14 , Information 10) and conceptual or visual-motor coordination tests: (Similarities 8, Digit Symbol Substitution 10, Cancellation 7 and Symbol Search 8).

*Tests of Attention/Concentration*

Continuous Performance Tests (CPT)**

| | | |
|---|---|---|
| Visual X task | *81.6% correct* | 100% correct |

-Marked improved score in simple visual sustained attention; normal response speed and response variability

| | | |
|---|---|---|
| Visual AX task | *86% correct* | 97.3%correct |

- Improved score in more complex visual attention task; *high response time variability remains (circa -1 S.D.)*

| | | |
|---|---|---|
| Degraded X task | *45% correct* | 96% correct |

-Very marked improvement in difficult visual attention task; significant number of erroneous responses (-3.5 S.D.)

| | | |
|---|---|---|
| Auditory (tones) task | *92% correct* | 94.7% correct |

-Normal accuracy in auditory attention task, but *very high response time variability (circa -1 S.D.)*

<div align="center">EXHIBIT 35</div>

<div align="center">**2239**</div>

Re: David Runyon                                                                        4
08/28/15

**Scores are % correct responses; expected scores X, AX and Auditory tasks >95%;
Degraded X task, circa 88% correct.


Trail Making Test

| | | |
|---|---|---|
| Part A | *15 sec*  20 sec | -Very fast on this visual-spatial task; +1 SD |
| Part B | *40 sec*  55 sec | -Normal score on this more complex visual-spatial task; somewhat slower |

| | |
|---|---|
| Wisconsin Card Sorting Test (WCST)* | -Identical very good performance; grasped concept of task early = 6 categories; 88% correct responses, no perseverative errors |
| Reciprocal Motor Programs Test*, ** | -Perfect score |

* Two tests of the ability to shift attention; perfect scores

| | | |
|---|---|---|
| Cancellation Test (Shaffer-Mirsky) | *71 (mean correct)* 62 (mean correct) | -Score is now -1 S.D. below age-matched norms |

*Tests of Memory*

Wechsler Memory Scale-III

<u>Verbal Memory Subtests</u> (Expected standard score = 10)

| | | |
|---|---|---|
| Logical Memory I | *13*  13 | -All Verbal Memory scores are superior (+ 1 S.D.) (Unchanged or improved 2009-2015) |
| Logical Memory II | *11*  13 | |
| Verbal Paired Associates I | *11*  13 | |
| Verbal Paired Associates II | 13   13 | |

EXHIBIT 35

**2240**

Re:  David Runyon                                                                          5
08/28/15

<u>Visual-Spatial memory</u>

| | | |
|---|---|---|
| Rey-Osterrieth Complex Figure | (36, 32, 32)+ <br> (35, 34, 34)+ | -Good appreciation of gestalt; superior immediate and delayed recall (Unchanged 2009-2015) |

+ = raw scores for copy, Recall I, Recall II;

*Tests of Verbal Fluency (Raw Scores)*

| | | |
|---|---|---|
| Boston Naming Test | 56 | -Normal score again (2015) |
| Controlled Oral Word Association | 34  50 | -Normal Score (now High Normal) again |

*Test of Symptom Magnification*

| | |
|---|---|
| TOMM** | -Perfect score 50/50 correct |

*Tests of Personality/Adjustment*

| | |
|---|---|
| Brief Symptom Inventory** | -"symptom profile reveals a pattern and magnitude... in the clinical range, and qualifies him as a positive clinical case.  (his) intensity of distress is extremely high." |
| MMPI-2 | -"Individuals with this extreme MMPI-2 clinical profile tend to be quite disturbed psychologically.... Such clients may be overtly paranoid with delusions and clear ideas of reference...He apparently holds some unusual beliefs that appear to be disconnected from reality...A diagnosis of Paranoia or Acute Delusional Disorder should be considered. An underlying Paranoid Personality Disorder is quite possible." |

EXHIBIT 35

**2241**

Re: David Runyon                                                    6
08/28/15

## SUMMARY AND CONCLUSIONS

As was clear in the evaluation of David Runyon in 2009, he possesses superior verbal skills, as is evident in conversing with him. His memory skills are also of a very high order. On the other hand, however, his ability to perform on non-verbal tasks falling in the category of "Processing Speed", i.e., Coding, Cancellation, Symbol Search, Shaffer-Mirsky Cancellation Test, are generally in the impaired range. This type of verbal-performance discrepancy is consistent with damage to the *right* cerebral hemisphere, which may result from the numerous instances of head trauma, he has suffered over the years. As noted above, he still suffers from tinnitus in the *right* ear, a possible consequence of *right*-sided head injury.

It was noted above that many of his scores on the CPT have shown marked improvement since 2009. It seems reasonable that this can be attributed to his strenuous efforts (by his report) to improve memory and concentration by self-study in his years-long incarceration in solitary confinement. Such improvement, on the basis of training, has been reported in patients with schizophrenia (e.g., Medalia, et al., 1998). A diagnosis of psychosis, possibly schizophrenia, is consistent with his responses on the MMPI-2 and BDI ("Paranoia or Acute Delusional Disorder;" "positive clinical case"). It is also of considerable interest that although his accuracy on the CPT has improved, he still shows evidence of marked impulsiveness and high response time variability. The latter, according to research by Stuss and colleagues can be attributed to frontal lobe damage (Picton et al., 2007; Stuss et al., 2003) especially of the *right* ventrolateral prefrontal cortex. Note again evidence of injury to the *right* side of the brain.

The question arises as to whether brain damage and schizophrenia are mutually exclusive. Can they be present in the same individual? Yes, according to one of the pre-eminent experts in the study of schizophrenia, Dr. Nancy Andreason (e.g., Andreason, 2010). Her extensive research has noted the frequent if not typical co-occurrence of abnormal brain tissue and schizophrenia. Moreover, marked impulsiveness is a noted characteristic of frontal lobe injury, in which the individual may not appreciate the consequences of his actions. Of relevance in this respect is David's low score on the Similarities subtest of the WAIS-IV, a measure of conceptual skill.

In conclusion, the test results of David Runyon, supported by the relevant scientific literature, indicate the presence of significant damage to the right side of the brain, as well as a psychotic disorder. The numerous affidavits strongly suggest that there was a marked change in his behavior subsequent to a significant head injury. It is entirely possible that the injuries contributed to the development of a psychotic disorder. While the association between cerebral injury and psychosis is complex, traumatic brain injury and the onset of psychosis was early documented in the classic text of Lishman (1998) and has been the subject of considerable research efforts. Review of the family histories of David's relatives suggest strongly that a genetic precursor for psychosis could have been present as well; in effect the psychosis was "released" or expressed by the cumulative effect of the head injuries.

EXHIBIT 35

**2242**

Re:  David Runyon                                                              7
08/28/15

These considerations, in my view, are strongly mitigating and should be considered in the possible revision/reduction of David Runyon's current sentence.


*Allan F. Mirsky*
_____
Allan F. Mirsky, Ph.D., ABPP
Diplomate in Clinical Neuropsychology
American Board of Professional Psychology

References

Andreason, N. (2010). The lifetime trajectory of schizophrenia and the concept of neurodevelopment. *Dialogues Clin Neurosci.* 12(3):409-15.

Lishman WA. (1998). *Organic Psychiatry: The Psychological Consequences of Cerebral Disorder.* 3rd ed. Malden, MA: Blackwell Science; 922 pp.

Medalia, A., Aluma, M., Tryon, W. & Merriam, A.E. (1998). Effectiveness of attention training in schizophrenia. *Schiz. Bull.*,24 (1) 147-152.

Mirsky, A.F., Anthony, B.J., Duncan, C.C., Ahearn, M.B., & Kellam, S.G. (1991). Analysis of the elements of attention:  A  neuropsychological approach. *Neuropsychology  Review,* , 2, 109-145.

Picton, T. W., Stuss, D. T., Alexander, M. P., Shallice, T., Binns, M. A., & Gillingham, S. S. (2007). Effects of focal frontal lesions on response inhibition. *Cerebral Cortex,* 17(4), 826-838.

Stuss, D.T., Kelly J. ,Murphy, K.J., Binns, M.A., & Alexander, M.P. (2003). Staying on the job: the frontal lobes control individual performance variability. *Brain,* 2363-2380.

EXHIBIT 35

**2243**

## Declaration of Teresa L. Norris

1. My name is Teresa L. Norris. I am an attorney with Blume Norris & Franklin-Best, LLC, in Columbia, South Carolina. I have represented more than 40 capital defendants throughout all stages of the proceedings, from the trial to clemency. While most of my work has been in South Carolina, I also have worked on capital cases in North Carolina, Mississippi, Texas, Virginia, the military, and the federal system.

2. I am an experienced capital habeas attorney. From November 1994 until March 2006, I worked at the South Carolina Death Penalty Resource Center, the Post-Conviction Defender organization, and the Center for Capital Litigation, which would eventually become the Death Penalty Resource and Defense Center. I was the Senior Staff Attorney until April 1996 and thereafter served as Acting Director and then Director. Since April 2006, I have been in private practice, but my practice continues to be almost completely devoted to capital litigation

3. I am also an experienced appellate attorney and have been appointed numerous times by the U.S. Court of Appeals for the Fourth Circuit as lead counsel in capital cases when counsel must be appointed on direct appeal or on collateral appeal under 28 U.S.C. § 2254 or § 2255.

4. Shortly after entry of judgment in David Runyon's case, his trial lawyers were appointed to represent him on appeal. His lead counsel was Lawrence H. Woodward, and co-counsel was Stephen Hudgins. Mr. Hudgins needed to withdraw, and the U.S. Court of Appeals for the Fourth Circuit appointed me in January 2010 to substitute for Hudgins.

5. Our first responsibility was to obtain the complete district court record. I relied on Mr. Woodward to order transcripts of all district court proceedings and to assemble or obtain all remaining parts of the district court record and send them to me. In part this was because he already had many of the relevant documents at his law firm. In part it was because he was best positioned to obtain any documents that he did not have at his office. He was geographically close to the federal courthouse in Norfolk, he knew that court's procedures, and he knew the prosecutors.

6. In October 2010, ten months after I was appointed, I still did not have the complete trial record. I compiled a list for Mr. Woodward of records that I knew were missing, including certain defense and prosecution trial exhibits, several sealed pleadings, the court record of each party's peremptory strikes, and some juror questionnaires. See Ex. 1.

EXHIBIT 36

**2244**

7.    I eventually saw most of the items on this list. However, I have no memory of seeing the court's strike list or any juror questionnaires. I recently searched my electronic files and confirmed that I did not receive the court's strike list or any juror questionnaires. I do not know why I did not obtain those documents, but I knew the importance of obtaining the complete district court record, and any failure to do so was not a strategic decision.

8.    In late May 2011, Mr. Woodward moved to withdraw from the appeal because there had been a complete breakdown in communication between Mr. Woodward and Mr. Runyon. Several weeks later, the Fourth Circuit granted this motion and appointed Seth Farber, who was then a partner at Dewey & LeBoeuf LLP, in New York City, as co-counsel. In the same order, the court of appeals changed my designation to lead counsel.

9.    In reviewing the record, Mr. Farber and I recognized that there had been a number of very serious errors in the proceedings for Mr. Runyon's trial. Unfortunately, several of these errors were not properly preserved for appeal because trial counsel had failed to object. I can recall only a few other capital cases that I have worked on in the past 25 years where defense counsel made so few objections on the record.

10.   Because of trial counsel's failure to object, Mr. Runyon could appeal these errors only under the unfavorable "plain error" doctrine. That is what we decided to do.

11.   Notwithstanding Mr. Woodward's failure to object to these errors, as well as other instances of deficient performance that we recognized in the trial record, we chose not to include in the appeal any issues of ineffective assistance by trial counsel. Based on my extensive experience in habeas cases, I knew that such claims are best presented in collateral proceedings. I also knew that the Supreme Court does not require appellate counsel to include allegations of ineffective assistance by trial counsel.

12.   Because Mr. Farber had a more extensive support staff than me, we agreed that he would be responsible for the preparation and physical production of the appellate briefs and would assemble all of the documents for the joint appendix.

13.   We knew that we had a 100-page limit, and that the Fourth Circuit had twice denied us additional pages. This was a significant constraint.

14.   I was aware of the fact that Mr. Farber produced the brief using Microsoft Word, Times New Roman, 14 point, and this is indicated on the certificate of

<div align="center">Page 2 of 3</div>

<div align="center">EXHIBIT 36</div>

<div align="center">**2245**</div>

Mr. Runyon's opening brief. I knew that Microsoft Word and WordPerfect offer a variety of fonts. I did not consider or think to suggest to Mr. Farber that he switch to a different qualifying font in order to free up space for additional arguments.

**I declare under penalty of perjury that the foregoing is true and correct. Executed on** _Sep. 29_ **, 2015.**

Teresa L. Norris

EXHIBIT 36

**2246**

Additional Sealed Documents Needed

Dkt. #21   – Affidavit of Indigence (Obtained)
Dkt. #179 – Two Sealed Exhibits on missing records and remaining interviews
Dkt. #214 – Sealed Exhibit
Dkt. #231 – Sealed Notice (Obtained)
Dkt. #276 (Obtained), #277 (Obtained) – Sealed Psychiatric Reports of USA Experts provided to defense (Dkt. #250)
Defense Mental Health Reports Provided to USA (Dkt. #246 (Obtained))
Dkt. #240 – Two Sealed Exhibits
Dkt. #278 – Sealed Order (Obtained)

Additional Exhibits Needed



Exhibits       1 Audio
               47-87 Financial Documents
               104-131 Telephone Toll Records
               160-205 Audio
               308 Knowles Plea Agreement
               309 Schlossman Plea Agreement
               310 Fodrey Plea Agreement
               314 Video of Runyon/Pina
               327 Video of Memorial
               328 Video from Voss home
               330 Audio of Runyon Statement
               ??   Audio of Runyon/Draven Call played in USA Sentencing Closing

               D Exh. 1 Audio of Voss Statement 5/3/07
               D Exh. 2 Transcripts of Audio
               R Exh. 1 Movie Script
               R Exh. 1 Cunningham CV
               R Dem. Exh. 1 Cunningham Powerpoint Disk/Slides Judge Ruled Out
               R Exh. 2 Army Records
               R Exh. 3 Runyon Photos
               R Exh. 4 ??
               R Exh. 5 Voss Booking Photo
               R Exh. 6 Davy's Statement
               R Exh. 7 ??

Need court record of jury selection/strikes used and Juror Questionnaires for Seated Jurors/Alternates

EXHIBIT 36

**2247**

/53840

# RACIAL DISPARITIES IN FEDERAL DEATH PENALTY PROSECUTIONS 1988-1994

153840

**U.S. Department of Justice**
**National Institute of Justice**

This document has been reproduced exactly as received from the person or organization originating it. Points of view or opinions stated in this document are those of the authors and do not necessarily represent the official position or policies of the National Institute of Justice.

Permission to reproduce this copyrighted material has been granted by

Public Domain/103 Congress

House Judiciary Committee

to the National Criminal Justice Reference Service (NCJRS).

Further reproduction outside of the NCJRS system requires permission of the copyright owner.

**Staff Report by the**
**Subcommittee on Civil and Constitutional Rights**
**Committee on the Judiciary**
**One Hundred Third Congress, Second Session**
**March, 1994**

Chairman Don Edwards of the House Judiciary Committee's Subcommittee on Civil and Constitutional Rights directed the subcommittee majority staff to prepare this report. This report has not been reviewed or approved by other members of the subcommittee.

EXHIBIT 37

# Racial Disparities in Federal Death Penalty Prosecutions

*"Twenty years have passed since this Court declared that the death penalty must be imposed fairly, and with reasonable consistency, or not at all, and, despite the effort of the states and courts to devise legal formulas and procedural rules to meet this daunting challenge, the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake."*
-Justice Harry A. Blackmun, Feb. 22, 1994[1]

## Summary

Racial minorities are being prosecuted under federal death penalty law far beyond their proportion in the general population or the population of criminal offenders. Analysis of prosecutions under the federal death penalty provisions of the Anti-Drug Abuse Act of 1988[2] reveals that 89% of the defendants selected for capital prosecution have been either African-American or Mexican-American. Moreover, the number of prosecutions under this Act has been increasing over the past two years with no decline in the racial disparities. All ten of the recently approved federal capital prosecutions have been against black defendants. This pattern of inequality adds to the mounting evidence that race continues to play an unacceptable part in the application of capital punishment in America today. It confirms Justice Blackmun's recent conclusion that "the death penalty experiment has failed."

## The Federal Death Penalty

Since the Supreme Court's 1972 decision in *Furman v. Georgia*,[3] the death penalty has been almost exclusively a state prerogative. Congress has so far not adopted the general sentencing procedures that would reinstate the federal death penalty. No federal executions have been carried out since 1963 and, until very recently, prosecutions under federal death penalty law were rare. But that began to change over the past few years, and can be expected to change dramatically if the

---

1. Callins v. Collins, No. 93-7054 (1994) (Blackmun, J., dissenting) (Supreme Court denial of review).

2. 21 U.S.C. 848(e)-(q).

3. 408 U.S. 238 (1972).

EXHIBIT 37

**2249**

House adopts pending legislation to restore generally -- and expand -- the federal death penalty.

In 1988, President Reagan signed the Anti-Drug Abuse Act. This legislation included a provision, sometimes referred to as the "drug kingpin" death penalty, which created an enforceable federal death penalty for murders committed by those involved in certain drug trafficking activities. The death penalty provisions were added to the "continuing criminal enterprise" statute first enacted in 1984, 21 U.S.C. § 848. The drug trafficking "enterprise" can consist of as few as five individuals, and even a low-ranking "foot soldier" in the organization can be charged with the death penalty if involved in a killing.

As the first enforceable federal death penalty adopted after *Furman*, § 848 offers a forewarning as to how a general federal death penalty might be applied. This report, prepared with the assistance of the Death Penalty Information Center in Washington, D.C. and with case data from the Federal Death Penalty Resource Counsel Project, examines the application of § 848.

Three-quarters of those convicted of participating in a drug enterprise under the general provisions of § 848 have been white and only about 24% of the defendants have been black.[4]  However, of those chosen for death penalty prosecutions under this section, just the opposite is true:  78% of the defendants have been black and only 11% of the defendants have been white.  (See Fig. 1). Although the number of homicide cases in the pool that the U.S. Attorneys are choosing from is not known (the Justice Department has not responded to Congressional inquiries for that data), the almost exclusive selection of minority defendants for the death penalty, and the sharp contrast between capital and non-capital prosecutions under § 848, indicate a degree of racial bias in the imposition of the federal death penalty that exceeds even pre-*Furman* patterns.

----

4.  U.S. Dept. of Justice,  Bureau of Justice Statistics, *Special Report:  Prosecuting Criminal Enterprises,*, at 6, Table 10 (convictions 1987-90) (1993).

EXHIBIT 37



Fig. 1: Race of Defendants Selected for Capital Prosecution

Federal regulations require that local U.S. Attorneys obtain the personal written authorization of the Attorney General of the United States before proceeding with a capital prosecution.   So far, former Attorneys General Thornburgh and Barr, and present Attorney General Reno have approved capital prosecutions against a total of 37 defendants under the 1988 "kingpin" law. Twenty-nine of the defendants have been black and 4 have been Hispanic.  All ten of the defendants approved by Attorney General Reno for capital prosecution have been black.  Judging by the death row populations of the states, no other jurisdiction comes close to this nearly 90% minority prosecution rate.[5]

## Pace of Prosecutions Increasing

The pace of these prosecutions has been substantially increasing over the past two years.   Although widely touted during the 1988 election year as a "tough" response to drug crime, there were only seven defendants prosecuted under this Act in the first three years after its passage and only one death sentence handed down. However, in 1992 alone, capital prosecutions against fourteen defendants were announced and another five death sentences resulted from these cases.   Since January, 1993, sixteen more prosecutions have been announced.[6]  (See Fig. 2).

---

5.  See NAACP Legal Defense Fund, *Death Row, U.S.A.*, January 1994 (death rows by state with racial breakdowns).

EXHIBIT 37

2251



Fig. 2: Capital Prosecutions Under § 848

The underlying crimes for which these defendants are being prosecuted are not excusable because the offenders are members of minorities. But the statistics raise the question of why these cases were chosen out of the large number of drug-related homicides over the past five years. By way of comparison, the proportion of African-Americans admitted to federal prison for all crimes has remained fairly constant between 21% and 27% during the 1980s, while whites accounted for approximately 75% of new federal prisoners.[7] Yet, when it comes to the federal death penalty, the scales dramatically tip the other way.

The federal government employed the death penalty for a variety of crimes prior to the 1972 *Furman* decision. But the racial breakdown was also just the opposite from current death penalty prosecutions. Between 1930 and 1972, 85% of those executed under federal law were white and 9% were black. The dramatic racial turnaround under the drug kingpin law clearly requires remedial action.

Although challenged at a Congressional hearing to provide an explanation for such racial disparities, and asked by the Chairman of this Subcommittee for data

---

6. Prosecutions against 10 defendants were approved by Attorney General Reno, including at least one in 1994. Prosecutions against 6 other defendants were approved in the previous Administration, but were not announced until June, 1993.

7. Bureau of Justice Statistics, *Sourcebook of Criminal Justice Statistics, 1991,* at table 6.78, p. 644 (1992).

EXHIBIT 37

on potentially capital cases referred to Washington for approval by federal prosecutors, the Justice Department has offered no response.[8]

It is worth noting that some of the death penalty prosecutions under § 848 have been against defendants who do not seem to fit the expected "drug kingpin" profile.  In a number of cases, the U.S. Attorneys have sought the death penalty against young inner-city drug gang members and relatively small-time drug traffickers.[9]  In other cases, the death penalty was returned against those directly involved in a murder, while the bosses who ordered the killings were given lesser sentences.[10]

## Background on Race and the Death Penalty

Throughout American history, the death penalty has fallen disproportionately on racial minorities.  For example, since 1930 nearly 90% of those executed for the crime of rape in this country were African-Americans.[11]  Currently, about 50% of those on the nation's death rows are from minority populations representing 20% of the country's population.

In 1972, the United States Supreme Court overturned existing death penalty

---

8. On October 21, 1993, Rep. Melvin Watt (D-NC) asked then Deputy Attorney General Philip Heymann for an explanation of the racial disparities in capital prosecutions during the course of a House Judiciary Subcommittee hearing on the Administration's crime bill.  Mr. Heymann promised a reply in two weeks.  To date, Rep. Watt has received no response to his inquiry.  Death Penalty Information Center phone conversation with Rep. Watt's office, Feb. 28, 1994 .

During the same hearing, Rep. Craig Washington (D-Tex.) remarked to Mr. Heymann that "if some redneck county in Texas had come up with figures like that, you'd been down there wanting to know why."  See Federal Death Penalty Update, Newsletter of Federal Death Penalty Resource Counsel Project, January, 1994.

9. See, e.g., United States v. Tipton et al., 3-92-CR68 (E.D. Va.) (prosecution of four young black inner-city gang members in Richmond, Va.); United States v. Bilal Pretlow, No. 90-CR-238 (D.N.J.) (a young black New Jersey gang member who committed suicide during his trial); United States v. Chandler, 996 F.2d 1073 (11th Cir. 1993) (prosecution of rural Alabama marijuana grower in murder-for-hire scheme).

10. See, e.g., United States v. Hutching et al., No. CR-032-S (E.D. Okl.) (two "managers" of the drug enterprise received life sentences for murder while lower level defendant who was present at the murder was sentenced to death); United States v. Michael Murray, Cr. No. 1: CR-92-200 (M.D. Pa.) (Dept. of Justice reportedly declined to approve the U.S. Attorney's request to authorize the death penalty against the gang leader, Jonathan Bradley, whom the indictment alleges ordered the killing. A death sentence is being sought against Murray who was 19 years old at the time of the incident.). Information obtained from the Federal Death Penalty Resource Counsel Project report, Feb. 15, 1994.

11. U.S. Dept. of Justice, Bureau of Justice Statistics, *Capital Punishment, 1981* (1982).

EXHIBIT 37

statutes in part because of the danger that those being selected to die were chosen out of racial prejudice. As the late Justice Douglas said in his concurrence overturning the death penalty:

> [T]he discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect and unpopular minority, and saving those who, by social position, may be in a more protected position.[12]

Following the *Furman* decision, legislatures adopted death sentencing procedures that were supposed to eliminate the influence of race from the death sentencing process. However, evidence of racial discrimination in the application of capital punishment continues. Nearly 40% of those executed since 1976 have been black, even though blacks constitute only 12% of the population. And in almost every death penalty case, the race of the victim is white. (See Fig. 3). Last year alone, 89% of the death sentences carried out involved white victims, even though 50% of the homicides in this country have black victims.[13] Of the 229 executions that have occurred since the death penalty was reinstated, only one has involved a white defendant for the murder of a black person.

---

12. Furman v. Georgia, 92 S. Ct. 2726, 2735 (1972) (Douglas, J., concurring).

13. See, e.g., S. LaFraniere, *FBI Finds Major Increase in Juvenile Violence in Past Decade*, Washington Post, Aug. 30, 1992, at A13 (half of U.S. murder victims are black).

EXHIBIT 37



**Fig. 3: Race of Victim in Cases Resulting in Execution Since 1976**

White   81%

Asian   2%

Black   12%

Hispanic   3%

Race of the victim discrimination was singled out by the U.S. General Accounting Office in its report "Death Penalty Sentencing" which concluded that studies showed:

> [The] race of the victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e., *those who murdered whites were found more likely to be sentenced to death than those who murdered blacks.*[14]

This record of racial injustice played a significant part in Justice Harry Blackmun's recent decision to oppose the death penalty in every case. "Even under the most sophisticated death penalty statutes," said Blackmun, "race continues to play a major role in determining who shall live and who shall die."[15]

## Conclusion

Race continues to plague the application of the death penalty in the United States. On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims. On the federal level, cases selected have

14. U.S. General Accounting Office, *Death Penalty Sentencing* 5 (Feb. 1990) (emphasis added).

15. Callins v. Collins, No. 93-7054 (1994) (Blackmun, J., dissenting).

EXHIBIT 37

almost exclusively involved minority defendants.

Under our system, the federal government has long assumed the role of protecting against racially biased application of the law. But under the only active federal death penalty statute, the federal record of racial disparity has been even worse than that of the states. So far, the number of cases is relatively small compared to state capital prosecutions. However, the numbers are increasing, and under legislation currently being considered in Congress, the federal government would play a much wider role in death penalty prosecutions.

EXHIBIT 37

**2256**

# APPENDIX

## FEDERAL DEATH PENALTY PROSECUTIONS, 1988-94*

Following enactment of the first modern federal death penalty statute on November 18, 1988, 21 U.S.C. §848(e)-(q) (the so-called "drug kingpin" murder provision), the Bush and Clinton Administrations have approved death penalty prosecutions under § 848 against 37 defendants. Of these, four defendants were white, four were Hispanic, and twenty-nine were black. All 10 of the defendants approved for capital prosecution by Attorney General Reno, and all 15 defendants now awaiting federal death penalty trials or currently on trial, are African-American.

**Federal Capital Cases Tried to Date**

The federal death penalty cases brought to trial during 1989 -1994 by the Bush and Clinton Administrations are listed below:

º    A white **Alabama** marijuana grower named Ronald Chandler, was sentenced to death for the murder for hire of a subordinate in his drug ring. Chandler's convictions and death sentence were affirmed by a panel of the Eleventh Circuit July 19, 1993; a petition for writ of certiorari is now pending before the United States Supreme Court. Claiming innocence, Chandler refused a pretrial plea bargain offer for life without possibility of parole. United States v. Chandler, 996 F.2d 1073 (11th Cir. 1993).

º    Three of four young black inner-city gang members in Richmond, **Virginia**, were sentenced to death on February 16, 1993, for their roles in eleven crack-related murders. United States v. Tipton et al., 3-92-CR68 (E.D. Va.). The trial of a fourth defendant, Vernon Thomas, was severed. On April 23, 1993, moments before a scheduled hearing on Mr. Thomas's motion to bar the death penalty due to his mental retardation, the government withdrew its request for the death penalty. Mr. Thomas was ultimately convicted and sentenced to life imprisonment.

º    A Hispanic drug distributor was sentenced to death by a jury on August 2, 1993 in Brownsville, **Texas**, in connection with the murders of three other drug traffickers in the Brownsville area. United States v. Juan Raul Garza, No. CR 93-0009 (S.D. Tex.). Attorney General Barr authorized the prosecution to seek the death penalty in December, 1992. Mr. Garza's appeal is pending

---

*   Case data provided by the Federal Death Penalty Resource Counsel Project, Columbia, SC.

## EXHIBIT 37

**2257**

before the U.S. Court of Appeals for the 5th Circuit.

° Two Hispanic defendants in Texas were sentenced to life imprisonment and forty years, respectively, for the marijuana-related murder of a state police officer after a joint trial. The sentencing jury found no facts legally warranting the death penalty. United States v. Reynaldo & Baldemar Villarreal No. 9:91CR4 (E.D. Tex. 1991), aff'd, 963 F.2d 725 (5th Cir.), cert. denied, 113 S.Ct. 353 (1992).

° Two black Chicago gang members received life sentences for cocaine-related murders after separate trials. The Government had offered one defendant, but not the other, a plea bargain prior to trial. United States v. Alexander Cooper & Anthony Davis, No. 89-CR-0580 (N.D. ILL. 1991).

° A white Mafia contract killer received a life sentence from a Brooklyn, New York jury after being convicted of eight murders, three of which qualified as capital crimes under 21 U.S.C. § 848. United States v. Pitera, 5 F.3d 624 (2d Cir. 1993).

° A young black New Jersey gang member committed suicide during his federal capital trial. United States v. Bilal Pretlow, No. 90-CR-238 (D.N.J.).

° One Hispanic and two white defendants were tried jointly in connection with the drug-related kidnap/murder of a Muskogee, Oklahoma auto dealership employee. United States v. Hutching et al., No. CR-032-S (E.D. Okl.). The two capitally-charged "managers" of the drug enterprise received life sentences from the jury, while the lowest-level defendant, John McCullah (who, unlike the bosses, had been present at the killing) was sentenced to death on March 23, 1993.

Federal Capital Prosecutions Not Yet Tried:

Capital prosecutions initiated since early 1992 which are still pending (either as capital or noncapital cases) in federal district courts involve indictments charging:

° Two black New Orleans inner-city gang members, in connection with an allegedly drug-related murder. United States v. Green & Brown, E.D. La. No. 92-46. On November 24, 1992, the Government dropped its request for the death penalty in this case.

° One black Tampa, Florida drug distributor, for having allegedly ordered a murder in retaliation for the theft of drugs. United States v. Mathias, (M.D. Fla. No. 91-301-CR-T-17(A)). Trial is set in this case for February 2, 1994.

° One black Atlanta drug distributor in connection with three murders. United States v. Williams, No. 1:92-CR-142 (N.D.Ga.). No trial date is set as

EXHIBIT 37

yet.

°      Two black crack cocaine dealers in Macon, **Georgia**, in connection with the murders of two other crack dealers. United States v. Tony Chatfield and Arleigh Carrington, (M.D. Ga. No. 92-82MAC-WDC). Attorney General Barr authorized this death prosecution in his last week in office. On December 6, 1993, the government dropped its request for the death penalty against these two defendants.

°      United States v. Reginald Brown et al., (E.D.Mich.Cr. No. 92-81127). This case reportedly involved six death authorizations against members of a cocaine distribution organization alleged to be responsible for a total of twelve murders over a 4-year period. The initial authorization occurred during the Bush Administration, but the authorizations were not announced until June, 1993. Only three of the six defendants against whom the death penalty has been authorized are currently in custody. One defendant, Terrance Brown, has been found dead, apparently a homicide victim.

The Federal Death Penalty Resource Counsel Project is aware of 7 cases, involving 16 defendants, in which the death penalty is reported to have been authorized by Attorney General Reno or announced since she took office. All 16 defendants are African-American. Three of the cases have been brought in jurisdictions (New York, Michigan, and the District of Columbia) which do not have capital punishment statutes. The cases are:

°      United States v. Darryl Johnson, (W.D.N.Y. Cr. No. 92-159-C-S), involving two alleged cocaine-related killings by a Buffalo, New York group. Trial is not anticipated before the fall of 1994.

°      United States v. Wayne Anthony Perry (D.C.D.C. No. 92-CR-474), an alleged hitman for a D.C. cocaine distribution ring; eight homicide counts. Trial is set for February 8, 1994.

°      United States v. Michael Murray, (M.D.Pa. Cr. No. 1:CR-92-200), involves the killing of a Harrisburg, Pennsylvania drug dealer by a gang headed by one Jonathan Bradley. DOJ reportedly declined to approve the U.S. Attorney's request to authorize the death penalty against Bradley, who allegedly ordered the killing, and against another participant in the shooting, Emmanuel S. Harrison.

°      United States v. Edward Alexander Mack et al., (S.D. Fla. 93-0252-CR-Ungaro-Benages), involves two drug-related murders in the course of a Miami drug trafficking operation. Three defendants are facing the death penalty in this case; trial is not anticipated until the latter part of 1994. Attorney General Reno authorized this capital prosecution in early January 1994.

EXHIBIT 37

•     <u>United States</u> v. <u>Jean Claude Oscar et al.</u>, (E.D.Va. 93 CR 131) involves three capitally charged defendants and two crack-related murders in Norfolk, Va.  Attorney General Reno authorized this capital prosecution in November 1993.

•     <u>United States</u> v. <u>Todd Moore</u>, (E.D. Va. 1994), the prosecution of this black defendant in Norfolk, Va. was announced March 8, 1994.

EXHIBIT 37

**2260**

Declaration of LAUREN COHEN BELL, Ph.D., regarding sentencing dynamics in federal death penalty cases.

1. I am currently Associate Professor of Political Science and Associate Dean of the College at Randolph-Macon College in Ashland, Virginia, where I have been a faculty member since September 1999. Among the subjects I teach are public policy, judicial process, constitutional law, and research methodology.

2. In my research, I regularly perform quantitative analysis of data and rely on the Statistical Package for the Social Sciences (SPSS) to organize and analyze such data. The use of quantitative analysis in social science and the use of SPSS in particular is an integral part of the research methodology course I teach. I have authored or coauthored a total of 21 books, book chapters, and peer-reviewed articles and have presented nearly 30 academic papers at scholarly meetings. I am a member of the editorial board of *Justice System Journal* and a regular manuscript reviewer for *American Politics Research*, Routledge Publishers, *Journal of Politics*, Congressional Quarterly Press, Longman Publishers, Cambridge University Press, *Law and Society Review*, *American Journal of Political Science*, *Justice System Journal*, *Judicature*, *Political Studies Quarterly*, and *PS: Political Science and Politics*.

3. Between August 2006 and August 2007, I served as one of four United States Supreme Court Fellows. I was posted at the U.S. Sentencing Commission where I worked closely with the Office of Research and Data on the design and implementation of the Commission's 2007 study of the effect of minor offenses on the calculation of offenders' criminal history scores.

EXHIBIT 38

**2261**

4. I hold Masters and Ph.D. degrees in political science from the University of Oklahoma's Carl Albert Congressional Research and Studies Center. A copy of my *curriculum vitae* is attached.

5. I have been asked to conduct an analysis of federal capital prosecutions focusing on the dynamics of death sentencing in cases involving white female victims in comparison with the dynamics of death sentencing in cases not involving white female victims.

6. In order to conduct this analysis, I was provided with data maintained by Kevin McNally on behalf of the Federal Death Penalty Resource Counsel Project. I used SPSS to create a database of 403 cases authorized and completed as capital prosecutions by the U.S. Department of Justice between 1989 and August 2008. For purposes of analyzing sentencing dynamics, I excluded from the analysis six cases: one in which the charged offense was treason and there were no identified victims; and five in which there were mass numbers of victims. (These were large-scale terrorist attacks: the Oklahoma City bombing, the September 11 attack, and the bombing of two U.S. embassies in Africa.) The cases were excluded because where there is either no victim or where there are mass casualties it is not possible to isolate a white female victim effect on sentencing. This is consistent with the way other researchers have addressed this issue. This left 397 authorized capital prosecutions for analysis.

7. I used statistical procedures generally applied in the analysis of quantitative data to assess whether the death penalty was imposed differently in cases involving defendants who killed white females as opposed to other types of victims: descriptive statistics provide a "snapshot" of the characteristics of the data; crosstabulations show how two variables interact with one another; and chi-square analysis provides an indicator of whether an

2

EXHIBIT 38

**2262**

observed relationship occurs by chance or because of a systematic interaction between the two variables.

8. My analysis, as reflected in the charts below, demonstrates that defendants who kill white female victims receive the death penalty at a substantially higher rate than defendants whose victims are not white women and that this correlation between white female victims and death sentencing is highly statistically significant, systematic, and not the result of chance.

9. The data used in the analysis have the following characteristics:

| Condition of Interest | Number of Cases |
|---|---|
| All Authorized Cases | 403 |
| Authorized Cases Involving Victim | 402 (see paragraph 6, above) |
| Authorized Cases Excluding Mass Killings | 397 (see paragraph 6, above) |
| Death Penalty Imposed | 60 |
| Death Penalty Not Imposed | 337 |
| White Female Victim (WFV) | 76 |
| No WFV | 321 |
| Sentencing Trial Completed | 182 |
| Sentencing Trial Involving WFV | 42 |
| Sentencing Trial, No WFV | 140 |
| Death Penalty Imposed, WFV | 25 |
| Death Penalty Imposed, No WFV | 35 |

10. The results of the chi-square analysis are as follows. Table 1 summarizes the analysis of death sentences among the set of 397 authorized federal capital cases. As explained in paragraph 6, this includes all but six authorized prosecutions.

3

EXHIBIT 38

**2263**

Table 1: Relationship between the Presence of a White Female Victim (WFV) and Imposition of a Death Sentence, All Authorized Cases (Excluding Mass Killings) [N=397]

| Data Source | Condition (N) | Percent (Formula) |
|---|---|---|
| Set of All Cases (N =76) with WFV | Death-Sentenced (25) | 32.9% (25 of 76) |
| | Non-Death Sentenced (51) | 67.1% (51 of 76) |
| Set of All Cases (N=321) with no WFV | Death-Sentenced (35) | 10.9% (35 of 320) |
| | Non-Death-Sentenced (286) | 89.1% (286 of 320) |
| Set of All Cases (N=60) Involving a Death Sentence | Cases with WFV (25) | 41.7% (25 of 60) |
| | Cases with no WFV (35) | 58.3% (35 of 60) |
| Set of All Cases (N=337) Not Involving a Death Sentence | Cases with WFV (51) | 15.1% (51 of 337) |
| | Cases with no WFV (286) | 84.9% (286 of 337) |

11. Table 1 indicates that defendants in cases involving a white female victim were sentenced to death 32.9 percent of the time (in 25 of 76 cases). Defendants in cases not involving a white female victim were sentenced to death 10.9 percent of the time (in 35 of 321 cases). A defendant charged with killing a white female victim was more than three times (3.02) more likely to be sentenced to death than a defendant charged with killing a victim who was not a white female. These results are statistically significant at the $p<.001$ level, indicating that the probability that this relationship has been observed by chance is essentially zero.

12. Table 2 looks at the smaller set of authorized capital cases that proceeded through to a capital sentencing trial. It indicates that among those for whom life or death decisions were made by judges or juries, defendants in cases involving a white female victim received a death sentence 59.5 percent of the time (in 25 of 42 cases). Defendants in cases where there was no white female victim were sentenced to death 25.0 percent of the

4

EXHIBIT 38

**2264**

time (in 35 of 140 cases). A defendant in a federal capital trial thus was almost two-and-one-half times (2.38) more likely to be sentenced to death in a case involving a white female victim than a defendant in a case in which there was no white female victim. These results are statistically significant at the $p < .001$ level, indicating the probability that this relationship has been observed by chance is essentially zero.

Table 2: Relationship between the Presence of a White Female Victim (WFV) and Imposition of a Death Sentence, Trial Cases Only (Excluding Mass Killings) [N=182]

| Data Source | Condition (N) | Percent (Formula) |
|---|---|---|
| Set of All Cases (N =42) with WFV | Death-Sentenced (25) | 59.5 % (25 of 42) |
| | Non-Death Sentenced (17) | 40.5 % (17 of 42) |
| Set of All Cases (N=140) with no WFV | Death-Sentenced (35) | 25.0 % (35 of 140) |
| | Non-Death-Sentenced (105) | 75.0 % (105 of 140) |
| Set of All Cases (N=60) Involving a Death Sentence | Cases with WFV (25) | 41.7% (25 of 60) |
| | Cases with no WFV (35) | 58.3% (35 of 60) |
| Set of All Cases (N=122) Not Involving a Death Sentence | Cases with WFV (17) | 13.9 % (17 of 122 ) |
| | Cases with no WFV (105) | 86.1 % (105 of 122) |

13. Based on the bivariate results discussed here, I conclude without hesitation that there is a statistically significant and systematic correlation between the presence of a white female victim and the likelihood of a death sentence in a federal capital case. Defendants who killed white female victims are overrepresented among federal death sentenced defendants. They represent 19.1 percent of all authorized prosecutions (76 of 397) and 23.1 percent of authorized prosecutions completing a penalty phase trial (42 of 182); however they represent 41.7 percent of death sentences (25 of 60).

5

EXHIBIT 38

**2265**

14. The analysis reveals a robust correlation between the presence of a white female victim and the imposition of a death sentence. Social scientists consider a result to be robust when changing the assumptions undergirding an analysis would be unlikely to affect its results. The generally accepted standard for statistical significance in political science research is $p<.05$, meaning the probability that the results occurred by chance is less than five percent. In the case of these analyses, the findings are statistically significant at a higher level of $p<.001$, meaning the probability they occurred by chance is less than one-tenth of one percent, or one in one thousand. Given the robust quality of these findings, it is my opinion to a reasonable degree of scientific certainty that this correlation of more severe sentencing outcomes and white female victims is unlikely to disappear even in the presence of other potentially explanatory variables.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 16th day of September, 2008.

*Lauren Cohen Bell*

Lauren Cohen Bell

6

**EXHIBIT 38**

**2266**

Appendix: Bivariate SPSS Results Used to Generate Tables 1 and 2

Table 1:

Case Processing Summary

|  | Cases | | | | | |
|  | Valid | | Missing | | Total | |
|  | N | Percent | N | Percent | N | Percent |
| Death Penalty Imposed * White Female Victim | 397 | 100.0% | 0 | .0% | 397 | 100.0% |

Death Penalty Imposed * White Female Victim Crosstabulation

|  |  |  | White Female Victim | | Total |
|  |  |  | No | Yes |  |
| Death Penalty Imposed | No | Count | 286 | 51 | 337 |
|  |  | % within Death Penalty Imposed | 84.9% | 15.1% | 100.0% |
|  |  | % within White Female Victim | 89.1% | 67.1% | 84.9% |
|  | Yes | Count | 35 | 25 | 60 |
|  |  | % within Death Penalty Imposed | 58.3% | 41.7% | 100.0% |
|  |  | % within White Female Victim | 10.9% | 32.9% | 15.1% |
| Total |  | Count | 321 | 76 | 397 |
|  |  | % within Death Penalty Imposed | 80.9% | 19.1% | 100.0% |
|  |  | % within White Female Victim | 100.0% | 100.0% | 100.0% |

Chi-Square Tests

|  | Value | df | Asymp. Sig. (2-sided) | Exact Sig. (2-sided) | Exact Sig. (1-sided) |
|---|---|---|---|---|---|
| Pearson Chi-Square | 23.165[b] | 1 | .000 |  |  |
| Continuity Correction [a] | 21.482 | 1 | .000 |  |  |
| Likelihood Ratio | 19.743 | 1 | .000 |  |  |
| Fisher's Exact Test |  |  |  | .000 | .000 |
| Linear-by-Linear Association | 23.107 | 1 | .000 |  |  |
| N of Valid Cases | 397 |  |  |  |  |

a. Computed only for a 2x2 table

b. 0 cells (.0%) have expected count less than 5. Minimum expected count is 11.49.

7

EXHIBIT 38

**2267**

Table 2:

**Case Processing Summary**

| | Cases | | | | | |
|---|---|---|---|---|---|---|
| | Valid | | Missing | | Total | |
| | N | Percent | N | Percent | N | Percent |
| Death Penalty imposed * White Female Victim | 182 | 100.0% | 0 | .0% | 182 | 100.0% |

**Death Penalty Imposed * White Female Victim Crosstabulation**

| | | | White Female Victim | | Total |
|---|---|---|---|---|---|
| | | | No | Yes | |
| Death Penalty Imposed | No | Count | 105 | 17 | 122 |
| | | % within Death Penalty Imposed | 86.1% | 13.9% | 100.0% |
| | | % within White Female Victim | 75.0% | 40.5% | 67.0% |
| | Yes | Count | 35 | 25 | 60 |
| | | % within Death Penalty Imposed | 58.3% | 41.7% | 100.0% |
| | | % within White Female Victim | 25.0% | 59.5% | 33.0% |
| Total | | Count | 140 | 42 | 182 |
| | | % within Death Penalty Imposed | 76.9% | 23.1% | 100.0% |
| | | % within White Female Victim | 100.0% | 100.0% | 100.0% |

**Chi-Square Tests**

| | Value | df | Asymp. Sig. (2-sided) | Exact Sig. (2-sided) | Exact Sig. (1-sided) |
|---|---|---|---|---|---|
| Pearson Chi-Square | 17.425[b] | 1 | .000 | | |
| Continuity Correction [a] | 15.898 | 1 | .000 | | |
| Likelihood Ratio | 16.611 | 1 | .000 | | |
| Fisher's Exact Test | | | | .000 | .000 |
| Linear-by-Linear Association | 17.329 | 1 | .000 | | |
| N of Valid Cases | 182 | | | | |

a. Computed only for a 2x2 table

b. 0 cells (.0%) have expected count less than 5. Minimum expected count is 13.85.

EXHIBIT 38

**2268**

## Declaration of Michele J. Brace

1. My name is Michele J. Brace. I am an attorney licensed in the Commonwealth of Virginia. I am appointed counsel to David Anthony Runyon in the matter David Anthony Runyon, Petitioner, versus United States of America, Respondent, in the United States District Court for the Eastern District of Virginia, No. 4:15cv108, Original Criminal No. 4:08cr16.

2. I have reviewed documents provided under seal by the court in this matter that relate to jury selection, including (1) a statistical breakdown of the individuals drawn for the petit jury venire by race, gender, and age; and (2) a list of the reasons for disqualifications, excusals, or exemptions from the petit jury venire, and the race, gender and age of those individuals; (3) an "Excused Table Listing" that contains the codes and descriptions of 25 reasons for disqualification, excusals, or exemptions; and (4) a listing of the codes for race. As relevant here, I also have received a CD that contains a redacted version of the Norfolk 2007 Master Jury Wheel and Qualified Jury Wheel.

3. Based on my review of these materials, I have alleged, in Claim 15 of Mr. Runyon's Amended Motion Under 28 U.S.C. § 2255, that there was a failure to fully and accurately comply with the court's Jury Selection Plan and the provisions of 28 U.S.C. § 1861 et seq., and that Mr. Runyon's trial counsel rendered ineffective assistance by failing to request or examine any jury selection records.

4. To comply with 28 U.S.C. § 1867(d), I am executing this sworn statement identifying facts which, if true, would constitute a substantial failure to comply with the provisions of 28 U.S.C. § 1867 and would entitle Mr. Runyon's attorneys to present testimony of the jury commissioner or clerk, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, to prove the allegations in Claim 15.

5. The facts presented here are based on the documents provided by the court, which I have presumed to be true and accurate. They are not based on my personal knowledge, except to the extent that I calculated percentages or performed similar arithmetic computations.

6. There were 423 prospective jurors called for the petit jury in Mr. Runyon's case. Of this number, 180 were disqualified, excused, or exempted, and the remaining 243 completed juror questionnaires.

7. Of the group of 180 who were disqualified, excused, or exempted, the numbers of individuals, percentage of the whole, and reasons were as follows:

1

# EXHIBIT 39
**2269**

10 (5.6%) – over age 70
3 (1.7%) – deceased
7 (3.9%) – no longer in the jurisdiction
2 (1.1%) – emergency personnel
2 (1.1%) – job-related or student reasons
2 (1.1%) – small children
1 (0.6%) – military
5 (2.8%) – previous service
94 (52.2%) – court order
54 (30%) – no stated reason

8. The "court order" category identifies no reason why an order was needed or given. Together, the "court order" and "no reason given" categories account for 148 (82.2%) of the 180 potential jurors who were disqualified, excused, or exempted.

9. The group of 423 jurors called for the petit venire in this case included two Native Americans; 100% of them were excluded—one by court order and one for no reason. The group of 423 included sixteen Asians; more than half of them were excluded—five by court order, three for no reason, and one because he was no longer in the jurisdiction.

10. 28 U.S.C. § 1866(d) states that whenever a person is disqualified, excused, exempt, or excluded from jury service, the jury commission or clerk shall note the specific reason therefor. The Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia also provides at page 5 that the clerk shall note the specific grounds for exemption, excuse, or exclusion.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 4, 2016.

Michele J. Brace

**EXHIBIT 39**

**2270**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

      Petitioner,

                                 ACTION NO. 4:15cv108
v.                [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

      Respondent.

### ORDER

This matter comes before the court on the Petitioner's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence ("Amended Motion"), filed on February 4, 2016. ECF No. 511. The government is ORDERED to file responsive pleadings to the Petitioner's Amended Motion within sixty (60) days of the date of entry of this Order. The Petitioner is ORDERED to file any Reply deemed necessary within thirty (30) days of the government's Response.

The Clerk is DIRECTED to send a copy of this Order to counsel for the Defendant and to the United States Attorney at Newport News.

      IT IS SO ORDERED.

                            /s/
                      Rebecca Beach Smith
                         Chief Judge
                  REBECCA BEACH SMITH
                  CHIEF JUDGE

February 8 , 2016

**2271**