## IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID ANTHONY RUNYON,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT NEWPORT NEWS

### JOINT APPENDIX - VOLUME VI OF X
### (Pages 2272 - 2816)

| | | |
|---|---|---|
| Michele J. Brace | Dana C. Hanson Chavis | G. Zachary Terwilliger |
| VA Capital Representation | Susanne Bales | Lisa R. McKeel |
| Resource Center | Assistant Federal Defender | Brian J. Samuels |
| 2421 Ivy Road, Suite 301 | Federal Defender Services | Office of the U. S. Attorney |
| Charlottesville, VA 22903 | of Eastern Tennessee | Fountain Plaza 3, Suite 300 |
| (434) 817-2970 | 800 South Gay Street, Suite 2400 | 721 Lakefront Commons |
| mbrace@mindsort.com | Knoxville, TN 37929 | Newport News, VA 23606 |
| | (865) 637-7979 | (757) 591-4000 |
| | dana_hansen@fd.org | zachary.terwilliger3@usdoj.gov |
| | susanne_bales@fd.org | lisa.mckeel@usdoj.gov |
| | | brian.samuels@usdoj.gov |

*Counsel for Defendant-Appellant*       *Counsel for Plaintiff-Appellee*

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

# TABLE OF CONTENTS

*Volume I of X*

<u>Appendix Page</u>

District Court Docket [4:08-cr-00016-RBS-DEM-3].................................................1

Indictment
    Filed February 13, 2008 (Doc.3) ....................................................46

Notice of Intent to Seek the Death Penalty
    Filed July 17, 2008 (Doc.67)..........................................................63

Voss Statement of Facts
    Filed July 18, 2008 (Doc.70)..........................................................70

Notice Pursuant to Fed. R. Crim. P. 12.2 with attachment1
    Filed December 12, 2008 (Doc. 135) ............................................78

        Att. 1:   Abreviated CV – Evan S. Nelson, PH.D., ABPP (Doc.135-1)......83
        Att. 2:   CV – Evan S. Nelson, PH.D., ABPP (Doc.135-2)........................84

Defendant's Motion to Continue Trial
    Filed Feb. 20, 2009 (Doc.160)........................................................93

Order Granting Motion to Continue
    Feb. 23, 2009 (Doc.162)................................................................97

Notice Regarding Mental Health Experts
    Filed April 8, 2009 (Doc.177) .....................................................101

Defendant's Motion to Continue Trial Date
    Filed April 13, 2009 (Doc.179) ...................................................105

Response of the USA to Defendant's Motion to Continue
    Filed April 21, 2009  (Doc.181) ..................................................122

Order Denying Defendant's Motion to Continue and USA Motion to Sever
    Entered May 7, 2009 (Doc.194) ..................................................126

Juror Questionnaire Order with attachment 1
 June 11, 2009 (Doc.211)...................................................................................139

 Att. 1: Blank Juror Questionnaire Filed June 11, 2009 (Doc.211-1) ......142

Memorandum Order Denying Defendant's Objections to Nonstatutory
Aggravating Factors
 Entered June 17, 2009 (Doc.217) ................................................................161

Defendant's Supp. Notice Regarding Mental Health Experts
 Filed June  29, 2009 (Doc.230) ...................................................................173

Forensic Psychiatric Evaluation by Dr. Patterson
 Filed June 29, 2009 (Doc.276) (Unsealed March 2, 2016 Order dkt516)...177

Forensic Psychological Evaluation by Dr. Montalbano
 Filed June 30, 2009 (Doc.277) (Unsealed March 2, 2016 Order dkt516)...201

Transcript of First Day of Trial,
 On June 30, 2009 (Doc.326 filed Mar. 31, 2010) .......................................232

 Voir Dire (pp.1-134)...................................................................................233

Transcript of Second Day of Trial,
 On July 1, 2009 (Doc.327 filed Mar. 31, 2010) ..........................................365

 Voir Dire (pp. 138, 194-195) ......................................................................366

Transcript of Third Day of Trial,
 On Jul. 2, 2009 (Doc.328 filed Mar. 31, 2010) ..........................................369

 Preliminary Proceedings (p.198) ................................................................370

Transcript of Fourth Day of Trial,
 Jul. 6, 2009 (Doc.329, filed Mar. 31, 2010) ...............................................371

 Testimony of Rose Wiggins (pp.257-265)
  Direct Examination by Ms. McKeel........................................................374
  Cross Examination by Mr. Woodward.....................................................380
  Redirect Examination by Ms. McKeel .....................................................382

Testimony of John Willmer (pp.353-374)
Direct Examination by Mr. Samuels ...................................................383
Cross Examination by Mr. Woodward.................................................401
Redirect Examination by Mr. Samuels................................................403

Testimony of Randy Lassiter (pp.435-469)
Direct Examination by Ms. McKeel....................................................406
Cross Examination by Mr. Ellenson....................................................463
Redirect Examination by Ms. McKeel ................................................437

Transcript of Sixth Day of Trial,
On July 8, 2009 (Doc.331filed March 31, 2010) ........................................440

Testimony of Nichole King (pp.731-764)
Direct Examination by Ms. McKeel....................................................442
Cross Examination by Mr. Woodward.................................................469

Testimony of Lawrence Ford (pp.765-774)
Direct Examination by Ms. McKeel....................................................476
Cross Examination by Mr. Clancy ......................................................484

Testimony of George Koski (pp.840-856)
Direct Examination by Ms. McKeel....................................................486
Cross Examination by Mr. Woodward.................................................499

*Vol II of X*

Transcript of Seventh Day of Trial,
On July 9, 2009 (Doc.332, filed Mar. 31, 2010) ........................................503

Testimony of Paul Swartz (pp.900-918)
Direct Examination by Mr. Samuels ...................................................506

Testimony of William Banks (pp.1031-1063)
Direct Examination by Ms. McKeel....................................................526
Cross Examination by Mr. Woodward.................................................544
Redirect Examination by Ms. McKeel ................................................556
Recross Examination by Mr. Ellenson .................................................558

Testimony of Paul Swartz (pp.1065-1117)
Direct Examination by Mr. Samuels ...................................................561

Cross Examination by Mr. Woodward ...................................................605
Redirect Examination by Ms. McKeel ..................................................612

Transcript of Eighth Day of Trial,
On Jul.y 13, 2009 (Doc.333, filed Mar. 31, 2010) ....................................613

Proceedings re Stipulation No. 94 .........................................................615

Testimony of Paul Swartz (pp.1354-1370) (recalled)
Direct Examination by Mr. Samuels ......................................................616

Transcript of Ninth Day of Trial,
On July 14, 2009 (Doc.334, filed Mar. 31, 2010) .....................................632

Testimony of Paul Swartz (pp.1378-1491) (resumed)

Direct Examination by Mr. Samuels ......................................................635
Cross Examination by Mr. Clancy ........................................................722
Redirect Examination by Mr. Samuels...................................................745

Transcript of Tenth Day of Trial,
On July 15, 2009 (Doc. 335, filed Mar. 31, 2010) ....................................749

Proceedings re Stipulations (pp.1509-1519) .............................................752
Court's Rulings re Motions ................................................................754

Transcript of Eleventh Day of Trial,
On July 16, 2009 (Doc.336, filed Mar. 31, 2010) .....................................762

Closing Arguments:

AUSA McKeel, Guilt Phase Closing (pp.1582-1613) ...........................764
Counsel Woodward, Guilt Phase Closing (pp.1633-1656) ...................796
AUSA McKeel, Guilt Phase Rebuttal Closing (pp.1656-1665).............819

Court Jury Instructions (pp.1666-1714) ...................................................829

Supplemental Motion to Continue Capital Sentencing Hearing
Filed July 17, 2009 (Doc.240) ...........................................................882

Statement of Defense Counsel
Filed July 17, 2009 (Doc.242)............................................................889

Verdict Guilt Phase
Filed July 17, 2009 (Doc.245),....................................................................894

Second Supp. Motion to Continue Capital Sentencing Hearing
July 20, 2009 (Doc.247) ...............................................................................895

Transcript of Thirteenth Day of Trial,
On July 22, 2009 (Doc. 338, filed Apr. 2, 2010).........................................902

Counsel Hudgins,  Eligibility Phase Closing (pp. 1769-1772) ...................903

Order Granting Motion to Continue
Filed July 22, 2009 (Doc.254) ....................................................................907

Special Verdict Eligibility Phase
Filed July 22, 2009 (Doc.255) ....................................................................910

Order Appointing Dr. Merikangas
Entered July 22, 2009 (Doc.257)..................................................................917

Defendant's Motion to Supp. Mental Health Report
Filed August 10, 2009 (Doc.269) ...............................................................919

*Vol III of X*

Transcript of Fifteenth Day of Trial,
On August 20, 2009 (Doc. 340, filed Apr. 2, 2010)....................................924

Argument/Ruling Dr. Cunningham Testimony (p.2076-2084)...................925

Testimony of Dr. Cunningham (pp. 2084-2192)
Direct Examination by Mr. Hudgins ....................................................933
Cross Examination by Mr. Samuels ...................................................1007

Defendant's Mitigating Factors Enumerated
Filed August 21, 2009 (Doc.285) .............................................................1042

Transcript of Sixteenth Day of Trial,
On August 24, 2009 (Doc.341, filed Apr. 29, 2010)................................1047

Testimony of Deputy Westrick, Portsmouth Sheriff's Office (pp.2199-2209)
    Direct Examination by Mr. Hudgins ...................................................1049
    Cross Examination by Mr. Samuels ...................................................1056

Testimony of Deputy Johnson, Portsmouth Sheriff's Office (pp.2209-2217)
    Direct Examination by Mr. Hudgins ...................................................1059
    Cross Examination by Ms. McKeel....................................................1065
    Redirect Examination by Mr. Hudgins...............................................1067

Testimony of Deputy Anderson, Portsmouth Sheriff's Office (pp.2217-2225)
    Direct Examination by Mr. Hudgins ...................................................1067
    Cross Examination by Ms. McKeel....................................................1072

Testimony of Deputy Marbry, Portsmouth Sheriff's Office (pp.2226-2234)
    Direct Examination by Mr. Hudgins ...................................................1076
    Cross Examination by Mr. Samuels ...................................................1080

Testimony of Deputy Singledecker, Portsmouth Sheriff's Office (pp.2234-2239)
    Direct Examination by Mr. Hudgins ...................................................1084
    Cross Examination by Ms. McKeel....................................................1087

Testimony of Deputy Diaz, Portsmouth Sheriff's Office (pp.2239-2244)
    Direct Examination by Mr. Hudgins ...................................................1089
    Cross Examination by Mr. Samuels ...................................................1092

Testimony of David H. Runyon (pp.2366-2409)
    Direct Examination by Mr. Hudgins ...................................................1095
    Cross Examination by Mr. Samuels ...................................................1136

Testimony of Suk Cha Runyon (pp.2410-2439)
    Direct Examination by Mr. Hudgins ...................................................1139

Transcript of Seventeenth Day of Trial,
    On August 25, 2009 (Doc.342, filed Apr. 29, 2010)................................1170

Testimony of Phyllis Provost (pp.2518-2527)
    Direct Examination by Mr. Hudgins ...................................................1171
    Cross Examination by Ms. McKeel....................................................1177

Transcript of Eighteenth Day of Trial,
On August 26, 2009 (Doc.343, filed Apr. 29, 2010)................................1181

AUSA Samuels, Sentence Selection Closing (pp.2588-2626)..................1182
Counsel Woodward, Sentence Selection Closing (pp.2632-2656) ...........1226
AUSA Samuels, Sentencing Rebuttal Closing (pp. 2656-2664)..............1250
Court Jury Instructions (pp.2664-2696) ...................................................1258

Transcript of Nineteenth Day of Trial,
On August 27, 2009 (Doc. 344, filed Apr. 29, 2010)...............................1292

Jury Question  (pp.2707-2710) ......................................................................1298

Special Verdict Form - Selection Phase
Filed August 27, 2009 (Doc.291) ...........................................................1311

*Volume IV of X*

**<u>Gov't Trial Exhibits</u>**

Gov't Ex. 23:   Commonwealth of Virginia Department of Forensic
Science Certificate of Analysis ......................................1317

Gov't Ex. 28:   ATM Still Photos..........................................................1318

Gov't Ex. 65:   Bates 065-006 Global Cash Receipt.............................1352

Gov't Ex. 94:   Summary of Funds Available to/Spent by Cat Voss......1364

Gov't Ex. 101:  Others' Inboxes............................................................1365

Gov't Ex. 109:  Sprint Detail Records for Runyon phone
304-685-6845...............................................................1367

Gov't Ex. 135:  Map of cell tower locations ..........................................1393

Gov't Ex. 217:  "Checklist for Crime"...................................................1395

Gov't Ex. 236:   Photo of bullets............................................................1397

Gov't Ex. 311:   City of Wichita Municipal Court 01-CR-1407.............1398

Gov't Ex. 313:   Wichita Police Dept. Incident Report dated
Jul. 23, 1994.................................................................1404

Gov't Ex. 315: Magistrate Court of Monongalia County, West Virginia 1412 ..........................................................................................1412

Gov't Ex. 316: Morgantown Police Dept. Investigation/Incident Report dated Jan. 6, 2007 .........................................................1433

Position of US with Respect to Sentencing Factors
Filed November 10, 2009 (Doc.301)..........................................................1443

Judgment
Filed December 4, 2009 (Doc.313) ...........................................................1458

Defendant's Motion for Limited Unsealing of Record
On March 17, 2015 (Doc.415).....................................................................1466

Memorandum in Support of Defendant's Motion for Limited Unsealing of Record with Exhibit 3
On March 17, 2015 (Doc.416).....................................................................1468

   Ex. 3: Declaration of Michele Brace (Doc.416-3)...............................1474

United States' Response to Motion for Limited Unsealing of Record
On March 31, 2015 (Doc.418).....................................................................1476

Defendant's Rebuttal Supporting Motion for Limited Unsealing of Record
Filed April 3, 2015 (Doc.421) ...................................................................1481

Order Granting Limited Unsealing of Record
Filed Apr. 7, 2015 (Doc.422) ....................................................................1487

Supp. Order Regarding Limited Unsealing of Record Questionnaires
Filed April 13, 2015 (Doc.423), ................................................................1494

Original §2255 Motion with Exhibit 1
Filed October 5, 2015 (Doc.478).................................................................1497

   Ex. 1: Records Request to Bureau of Prisons, 06/02/15
      (Doc.478-1).................................................................. 1622A – 1622C
   Ex. 2–36: Omitted – See JA pp. 1992 - 2247

Defendant's First Motion for Discovery  with Exhibits 1 – 5
Filed December 9, 2015 (Doc.491) .........................................................1623

Ex. 1:  ATF ROI dated Feb. 2, 2009 (Doc.491-1)....................................1661

Ex. 2:  USA v. Runyon Disk Index (Doc.491-2) ....................................1663

Ex. 3:  USA Gov't Witness List Fax, p.9 (Doc.491-3) ............................1664

Ex. 4:  Medical/Mental Health Records Request to Portsmouth Sheriff's
Department from FDSET dated Oct. 2, 2015 (Doc.491-4)..........1666

Ex. 5:   Medical/Mental Health Records Request to Portsmouth Sheriff's
Department from FDSET dated Nov. 3, 2015 (Doc.491-5)........1667

United States' Response to Original §2255 Motion
Filed January 11, 2016  (Doc.497) ...........................................................1670

*Volume V of X*

Order directing reply to §2255
Entered January 15, 2016 (Doc.499).........................................................1811

USA Opposition to First Motion for Discovery
Filed January 15, 2016 (Doc.500) ............................................................1812

Reply Supporting First Motion for Discovery
Filed January 29, 2016 (Doc.506) ............................................................1824

Amended §2255 Motion  with Exhibits 1 – 39
Filed February 4, 2016 (Doc.511) ............................................................1842

Ex. 1:  Placeholder (Doc.511-1) ...............................................1991

Ex. 2:  Dr. Merikangas Report 9/25/15 (Doc.511-2).............................1992

Ex. 3:  McNally Declaration 3/11/09 (Doc.511-3)................................1998

Ex. 4:  Cronin Declaration 9/26/15 (Doc.511-4)...................................2002

Ex. 5:  Hudgins Declaration 9/22/15 (Doc.511-5) ................................2016

Ex. 6:  Woodward Declaration 9/24/15 (Doc.511-6) ............................2019

Ex. 7:  Costa Declaration 9/30/15 (Doc.511-7)....................................2022

Ex. 8:  Cunningham Declaration 9/25/15 (Doc.511-8) ..........................2024

Ex. 9:    Cat Voss Declaration 9/10/15 (Doc.511-9) ................................2079

Ex. 10:   David Dalton Declaration 9/28/15 (Doc.511-10) .......................2082

Ex. 11:   Paula Dalton Declaration 9/28/15 (Doc.511-11) .......................2083

Ex. 12:   Matt Long Declaration 9/29/15 (Doc.511-12) ...........................2085

Ex. 13:   Scott Linker Declaration 9/24/15 (Doc.511-13) ........................2086

Ex. 14:   Excerpt Cell Phone Tracking Evidence (Doc.511-14) ..............2089

Ex. 15:   Babineau letter regarding death authorization 2/10/09
          (Doc.511-15),.................................................................................2109

Ex. 16:   Portsmouth Jail Records 2008 (Doc.511-16).............................2119

Ex. 17:   David Dombrowski progress notes (Doc.511-17) .....................2123

Ex. 18:   Lake Martin Community Hospital response (Doc.511-18) .......2125

Ex. 19:   Hudgins time schedule with mark ups ECF No 165
          (Doc.511-19).................................................................................2128

Ex. 20:   Dr. Mirsky letter 7/2/09 (Doc.511-20)......................................2131

Ex. 21:   Dr. Mirsky/Hudgins emails 7/22-23/09 (Doc.511-21) ..............2132

Ex. 22:   Dr. Mirsky letter 9 18 09 (Doc.511-22)....................................2133

Ex. 23:   Army medical records (Doc.511-23) .........................................2136

Ex. 24:   Handwritten letter regarding 1996 car accident (Doc.511-24)..2160

Ex. 25:   Suk Cha Runyon medical records (Doc.511-25)........................2162

Ex. 26:   David Dombrowski declaration 9/23/15 (Doc.511-26) .............2177

Ex. 27:   Mark Runyon declaration 9/25/15 (Doc.511-27) ......................2187

Ex. 28:   Maria Runyon declaration 9/16/15 (Doc.511-28).....................2194

Ex.29:    Dr. Dudley report 9/29/15 (Doc.511-29) ..................................2199

Ex. 30:   Thomas Preston interview 10/4/08 (Doc.511-30)......................2223

Ex. 31:   Robert Seeger declaration 8/24/15 (Doc.511-31) ......................2226

Ex. 32:   Deborah Seeger declaration 8/24/15 (Doc.511-32) ...................2229

Ex. 33:   Captain Harris Declaration Fayetteville GA Police Dept.
          1/13/16 (Doc.511-33) ....................................................2234

Ex. 34:   Scotty Fleming criminal history (Doc.511-34).........................2235

Ex. 35:   Dr. Mirsky report 8/28/15 (Doc.511-35) ...................................2237

Ex. 36:   Teresa Norris declaration 9/29/15 (Doc.511-36).......................2244

Ex. 37:   Racial Disparities Staff Report by the Subcommittee
          on Civil and Constitutional Rights (Doc.511-37) .....................2248

Ex. 38:    Cohen Bell Declaration (Doc.511-38) ......................................2261

Ex. 39:    Declaration of Michele J Brace (Doc.511-39).........................2269

Order
    Entered February 8, 2016 (Doc.513)......................................................2271

## Volume VI of X

Reply Supporting Original §2255 Motion
    Filed March 28, 2016 (Doc.526) ............................................................2272

    Ex. A: Clinical Screening Information (Doc.526-1) .................................2366

Petitioner's Second Motion for Discovery
    Filed April 1, 2016 (Doc.530) ...............................................................2368

United States' Response to Second Motion for Discovery
    Filed April 8, 2016 (Doc.532) ...............................................................2376

Reply Supporting Second Motion for Discovery with Attachments A – C
    Filed April 13, 2016 (Doc.533) .............................................................2384

    Att. A:   Strengthening Forensic Science in the United States, A Path
              Forward (Doc.533-1) ................................................................2392

    Att. B:   Charter USDOJ National Commission on Forensic Science
              (Doc.533-2),...............................................................................2473

Att. C: National Commission on Forensic Science Views of the Commission Validation of Forensic Science Methodology (Doc.533-3)................................................................2482

United States' Response to Amended §2255 Motion
Filed April 22, 2016 (Doc.536) ...............................................................2485

Motion for Leave to Supplement Second Motion for Discovery
Filed May 24, 2016 (Doc.541) ................................................................2644

Order Granting Supplement of Discovery Motion
Entered June 7, 2016 (Doc.544) .............................................................2648

Supplemental Memo to Second Motion for Discovery
Filed June 8, 2016 (Doc.545) .................................................................2651

Att. A: John Nixon Declaration (Doc.545-1) .......................................2654

Reply Supporting Amended §2255 Motion with Exhibits 1 – 5
Filed July 7, 2016 (Doc.551)..................................................................2656

Ex. 1: Stephen Hudgins Declaration dated Jun. 22, 2016 (Doc.551-1) .2803

Ex. 2: John Nixon Declaration dated May 18, 2016 (Doc.551-2) .........2807

Ex. 3: Joseph Kennedy Declaration dated Jul. 6, 2016 (Doc.551-3) .....2809

Ex. 4: Stephen Hudgins Calendar from Appointment to Beginning of Runyon Trial (Doc.551-4) .........................................................2812

Ex. 5: USA Strikes of Black Veniremen Report (Doc.551-5) ...............2813

*Volume VII of X*

Order for Subpoena Duces Tecum
Entered July 12, 2016 (Doc.552).............................................................2817

Subpoena to Dept. of Forensic Science with attachment 1
Filed July 13, 2016 (Doc.553)................................................................2818

Att. 1: Order for Subpoena to Dept. of Forensic Science
(Doc.553-1)............................................................................2822

Order for Costa Grand Jury Testimony
Entered July 26, 2016  (Doc.555)............................................2823
Opinion Denying §2255 Motion and Denying Discovery
Filed Jan. 19, 2017 (Doc.560, 560-1, 560-2, 560-3, 560-4)............................... 2824

Judgment
Filed January 20, 2017 (Doc.561), .................................... 3070

Petitioner's Motion for Sealed Materials Subpoenaed by Court
Filed February 1, 2017 (Doc.564) .................................... 3071

Petitioner's Memorandum for Sealed Materials Subpoenaed by Court
Filed February 1, 2017  (Doc.565).................................... 3074

Rule 59(e) Motion to Alter or Amend
Filed February 16, 2017 (Doc.566) .................................... 3079

Rule 59(e) Memorandum with attachment A
Filed Feb. 16, 2017  (Doc.567) .................................... 3081

Att. A: Paula Dalton Declaration (Doc.567-1)................................ 3102

Order Denying Access to Sealed Material Subpoenaed by Court
Entered February 21, 2017 (Doc.568)............................... 3103

Petitioner's Third Motion for Discovery
Filed February 24, 2017 (Doc.570) .................................... 3111

United States' Response to Third Motion for Discovery
Filed March 31, 2017 (Doc.574) .................................... 3122

United States' Response to Rule 59(e) Motion
Filed March 31, 2017 (Doc.575) .................................... 3132

Petitioner's Reply Supporting Third Motion for Discovery
Filed April 6, 2017 (Doc.576), .................................... 3135

Record Notation Order
Filed June 16, 2017 (Doc.583) .................................... 3138

Order Directing Re-entry of Order Denying 59(e) Motion and Denying Third Motion
for Discovery
Entered June 21, 2017  (Doc.586) ...................................................................... 3140

Re-entered Order Denying 59(e) Motion and Denying Third Motion for Discovery
Filed June 21, 2017 (Doc.587), ......................................................................... 3143

Petitioner's Motion to Expand Record
Filed August 18, 2017 (Doc.588) ...................................................................... 3154

Petitioner's Motion to Permit Copying and Distribution of Protected Documents
Filed August 18, 2017 (Doc.589), ..................................................................... 3157

Notice of Appeal
Filed August 18, 2017 (Doc.590) ...................................................................... 3160

Order Granting Motion to Expand the Record
Entered September 15, 2017 (Doc.596) ............................................................. 3163

Order Granting Motion to Permit Copying and Distribution of Protected Documents
Entered September 15, 2017 (Doc.597) ............................................................. 3166

*Volume VIII of X - Sealed*

Supplemental Motion for Neuropsychologist Expert Services and Approval of
Additional Funds for Paralegal/Discovery Coordinator Services Ex Parte
Filed February 5, 2009 (Doc.153) ..................................................................... 3169

Att. 1:    02/05/09 Cover Letter (Doc.153-1)...................................................... 3172
Att. 2:    CV – Scott D. Bender, Ph.D., ABPP-CN (Doc153-2) ........................ 3173

Supplemental Motion for Psychiatrist and to Change the Designation of the
Neuropsychologist Expert Previously Approved by the Court
Filed June 8, 2009 (Doc.204) ........................................................................... 3176

Letter from Judge Smith directing three juror lists to be picked up by counsel
Filed June 12, 2009 (Doc.210) ......................................................................... 3178

Order deferring action on defendant's motion for psychiatrist Dr. Merikangas
Entered June 23, 2009 (Doc.229) ...................................................................... 3181

Psychological Evaluation of Dr. Mirsky
   Filed July 20, 2009 (Doc.246)...........................................................3184

Strike List for First Day
   Filed April 13, 2015 (Doc.424)..........................................................3190

Strike List for Second Day
   Filed Apr. 13, 2015 (Doc.424-1)........................................................3194

Order sealing Claim S2 and Exhibit S-1
   Entered October 5, 2015 (Doc.477) ...................................................3198

Original Claim S-2
   Filed Oct. 5, 2015 (Doc.477-1) .........................................................3203

Exhibit S-1
   Filed Oct. 5, 2015 (Doc.477-2) .........................................................3223

Addendum S-1 to First Motion for Discovery
   Dec. 4, 2015 (Doc.490) .....................................................................3236

United States' Response to Original Claim S2
   Filed January 11, 2016 (Doc.498)......................................................3237

Petitioner's Motion to File Under Seal One Claim and One Exhibit in His
Amended Motion for Collateral Relief
   Filed February 4, 2016 (Doc507)......................................................3245

Amended Claim S2
   Filed Feb. 4, 2016 (Doc.508) ............................................................3249

Reply Supporting Original Claim S2
   Filed Mar. 28, 2016 (Doc.525)..........................................................3269

United States' Response to Amended Claim S2
   Filed Apr. 22, 2016 (Doc.537) ..........................................................3275

Reply Supporting Amended Claim S2
   Filed July 7, 2016 (Doc.549).............................................................3284

Completed Questionnaire of Prospective Juror 1......................................3291

Completed Questionnaire of Prospective Juror 2......................................3310

Completed Questionnaire of Prospective Juror 4 ....................................................... 3329

Completed Questionnaire of Prospective Juror 7 ....................................................... 3348

Completed Questionnaire of Prospective Juror 10 ..................................................... 3367

Completed Questionnaire of Prospective Juror 12 ..................................................... 3386

Completed Questionnaire of Prospective Juror 13 ..................................................... 3405

Completed Questionnaire of Prospective Juror 14 ..................................................... 3424

Completed Questionnaire of Prospective Juror 15 ..................................................... 3443

Completed Questionnaire of Prospective Juror 18 ..................................................... 3462

Completed Questionnaire of Prospective Juror 20 ..................................................... 3481

Completed Questionnaire of Prospective Juror 23 ..................................................... 3500

Completed Questionnaire of Prospective Juror 24 ..................................................... 3519

Completed Questionnaire of Prospective Juror 27 ..................................................... 3538

Completed Questionnaire of Prospective Juror 28 ..................................................... 3557

*Volume IX of X - Sealed*

Completed Questionnaire of Prospective Juror 29 ..................................................... 3576

Completed Questionnaire of Prospective Juror 31 ..................................................... 3595

Completed Questionnaire of Prospective Juror 32 ..................................................... 3614

Completed Questionnaire of Prospective Juror 34 ..................................................... 3633

Completed Questionnaire of Prospective Juror 35 ..................................................... 3652

Completed Questionnaire of Prospective Juror 40 ..................................................... 3671

Completed Questionnaire of Prospective Juror 46 ..................................................... 3690

Completed Questionnaire of Prospective Juror 50 ..................................................... 3709

Completed Questionnaire of Prospective Juror 51 ..................................................... 3728

Completed Questionnaire of Prospective Juror 52 ..................................................... 3747

Completed Questionnaire of Prospective Juror 54 ..................................................... 3766

Completed Questionnaire of Prospective Juror 63 ...................................................... 3785

Completed Questionnaire of Prospective Juror 64 ...................................................... 3804

Completed Questionnaire of Prospective Juror 65 ...................................................... 3823

Completed Questionnaire of Prospective Juror 66 ...................................................... 3842

Completed Questionnaire of Prospective Juror 67 ...................................................... 3861

Completed Questionnaire of Prospective Juror 68 ...................................................... 3880

Completed Questionnaire of Prospective Juror 69 ...................................................... 3899

Completed Questionnaire of Prospective Juror 70 ...................................................... 3918

Completed Questionnaire of Prospective Juror 73 ...................................................... 3937

Completed Questionnaire of Prospective Juror 74 ...................................................... 3956

Completed Questionnaire of Prospective Juror 75 ...................................................... 3975

Completed Questionnaire of Prospective Juror 78 ...................................................... 3994

Completed Questionnaire of Prospective Juror 80 ...................................................... 4013

*Volume X of X - Sealed*

Completed Questionnaire of Prospective Juror 81 ...................................................... 4032

Completed Questionnaire of Prospective Juror 82 ...................................................... 4051

Completed Questionnaire of Prospective Juror 84 ...................................................... 4070

Completed Questionnaire of Prospective Juror 86 ...................................................... 4089

Completed Questionnaire of Prospective Juror 87 ...................................................... 4108

Completed Questionnaire of Prospective Juror 91 ...................................................... 4127

Completed Questionnaire of Prospective Juror 95 ...................................................... 4146

Completed Questionnaire of Prospective Juror 97 ...................................................... 4165

Completed Questionnaire of Prospective Juror 98 ...................................................... 4184

Completed Questionnaire of Prospective Juror 100 .................................................... 4203

Completed Questionnaire of Prospective Juror 106 .................................................... 4222

Completed Questionnaire of Prospective Juror 107......................................................... 4241

Completed Questionnaire of Prospective Juror 109......................................................... 4260

Completed Questionnaire of Prospective Juror 110......................................................... 4279

Completed Questionnaire of Prospective Juror 113......................................................... 4298

Completed Questionnaire of Prospective Juror 115......................................................... 4317

Completed Questionnaire of Prospective Juror 116......................................................... 4336

Completed Questionnaire of Prospective Juror 117......................................................... 4355

Completed Questionnaire of Prospective Juror 118......................................................... 4374

Completed Questionnaire of Prospective Juror 119......................................................... 4393

Completed Questionnaire of Prospective Juror 120......................................................... 4412

Completed Questionnaire of Prospective Juror 124......................................................... 4431

Completed Questionnaire of Prospective Juror 126......................................................... 4450

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON,<br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Respondent. | : <br>: <br>: <br>: <br>: <br>: <br>: <br>: <br>: | No. 4:15-cv-108<br>Initial Criminal No. 4:08-cr-16-3<br>CAPITAL §2255 PROCEEDINGS<br><br>HON. REBECCA BEACH SMITH |

## PETITIONER'S REPLY TO RESPONSE OF THE UNITED STATES TO MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

Petitioner David Runyon hereby replies in support of his Motion to Vacate, Set Aside, or Correct the Sentence in his capital case. *See* ECF No. 522; *Ray v. U.S.*, 301 U.S. 158, 161 (1937) (when court grants extension to specific date that is a Sunday, filing is due on Monday). Runyon's motion for leave to exceed the page limit is pending. ECF No. 523.

**AFFIRMATIVE DEFENSES**

The Government's answer, ECF No. 497, pp.13-16, references several affirmative defenses including statute of limitations, procedural default and nonretroactivity. *See Day v. McDonough*, 547 U.S. 198, 205 (2006) (describing affirmative defenses in a §2254 context). These are nonjurisdictional defenses that a collateral respondent is "'obligated to raise'" in the first instance "if it is not to 'lose the right to assert the defense thereafter.'" *Trest v. Cain*, 522 U.S. 87, 89 (1997) (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996)). The burden rests with the Respondent to prove such defenses. *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010). A petitioner has no duty to anticipate or address any affirmative defense in his §2255 motion. To the extent the Government has not raised or adequately presented an affirmative defense to a claim, the Court can deem that defense waived. *See*

**2272**

*Hudson v. Hunt*, 235 F.3d 892, 895 n.1 (4th Cir. 2000) (finding statute of limitations defense waived);

*Riggs v. U.S.*, No. CIVA 7:06-cv-439, 2006 WL 3746674, at *1 fn.1 (W.D. Va. Dec. 15, 2006) (finding procedural default defense waived).

## A. Statute of Limitations

None of Runyon's claims are time-barred. Respondent has acknowledged Runyon's §2255 motion is timely filed, ECF No. 504, p.3, and has not alleged any claims are time-barred.

Nonetheless, the Government discusses this defense generally. It points out that there is a statutory one-year limitations period, and it says that this period begins when the defendant's conviction becomes final by the Supreme Court's denial of certiorari following direct appeal. The Government's description is true but incomplete. Under 28 U.S.C. §2255(f), the one-year limitations period actually runs from the *latest* of four triggering events, of which the finality of conviction may be the *earliest*. If the basis for an additional new claim subsequently accrues, Runyon can timely present that claim in a supplemental §2255 motion so long as he does so within one year of the relevant triggering event.

## B. Procedural Default

The Government alleges that many of Runyon's claims are procedurally defaulted. Runyon disagrees, and he addresses the Government's specific allegations *infra* in his replies on individual claims.

No federal statute or constitutional requirement bars a §2255 petitioner from raising an issue for the first time on collateral review. *Massaro v. U.S.*, 538 U.S. 500, 504 (2003). Claims not raised on direct appeal may be raised for the first time on §2255 review subject to the judicial doctrine of procedural default if the doctrine is asserted by the Government. *See Strickland v. Washington*, 466 U.S. 668, 684 (1984) (noting that the exhaustion rule is not a federal jurisdictional bar); *Yeatts v. Angelone*,

2

166 F.3d 255, 261 (4th Cir. 1999) ("[T]he issue of procedural default generally is an affirmative defense that the [government] must plead in order to press the defense thereafter."). Under the doctrine of procedural default, a §2255 claim is defaulted only if it could have been "fully and completely addressed on direct review based on the record created" in the trial court, but was not raised on direct appeal. *Bousley v. U.S.*, 523 U.S. 614, 622 (1998). The doctrine does not apply to claims that could not have been raised on direct appeal because they required development of facts outside the trial record. *Id.* at 621 (citing *Waley v. Johnston*, 316 U.S. 101 (1942)) (per curiam), and describing it as a case in which "we held that there was such an exception [to procedural default] for a claim that a plea of guilty had been coerced by threats made by a Government agent, when the facts were 'dehors the record and their effect on the judgment was not open to consideration and review on appeal'").[1] *Id.* at 621-22 (quoting *Waley*, 316 U.S. at 104).

The Government acknowledges that in §2255 proceedings the procedural default doctrine never applies to a claim of ineffective assistance of counsel, regardless whether that claim could have been raised on direct appeal. *Massaro*, 538 U.S. at 503-04.

The Government also recognizes that a procedural default is excused—and the claim must be considered on its merits—if the petitioner demonstrates "cause and prejudice." In this context, "cause" means that "some objective factor external to the defense impeded counsel's efforts to comply with the … procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Circumstances in which cause

---

[1] The Ninth Circuit ruled that Waley had defaulted his claim because he was represented by counsel and had consulted with counsel, yet he failed to allege any facts about FBI coercion at the plea colloquy. *Waley v. Johnston*, 124 F.2d 587, 588 (9th Cir. 1941). The Supreme Court reversed. In *Bousley*, the Court distinguished *Waley* on the ground that the facts necessary to adjudicate Waley's claim were outside the trial record and their effect on the judgment was not open to consideration and review on appeal, whereas the facts necessary to adjudicate Bousley's claim were in the plea colloquy and therefore could have been addressed on direct review. *Bousley*, 523 U.S. at 622 ("This type of claim can be fully and completely addressed on direct review based on the record created at the plea colloquy.").

3

**2274**

can be present include, but are not limited to, those where evidentiary facts that were critical to establishment of the claim were unavailable to the defense, *Strickler v. Greene*, 527 U.S. 263, 286 (1999); where interference by governmental officials made compliance with the procedural rule impracticable, *Banks v. Dretke*, 540 U.S. 668, 691 (2004); or where defense counsel rendered ineffective assistance, *Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

"Prejudice" in this context is established if the petitioner demonstrates "that 'there is a reasonable probability' that the result of the [proceeding] would have been different" absent the error. *Strickler*, 527 U.S. at 289 (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)). This parallels the showing required to demonstrate prejudice under *Strickland, supra*, or materiality under *Brady v. Maryland*, 373 U.S. 83 (1963). The Supreme Court emphasizes that in determining prejudice, "a different result" is not calculated by asking "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289-90.

A procedural default also is excused if the petitioner shows "a fundamental miscarriage of justice." *Carrier*, 477 U.S. at 495-96. Although the contours of this exception are not well defined, it is undisputed that a petitioner meets the standard by showing that in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Although not mentioned by the Government, a penalty-phase default can be excused under the "miscarriage of justice" exception even if the defendant cannot show that he is innocent of the crime. Under *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992), such a default is excused if the petitioner shows "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." The Supreme Court has not excluded the possibility that additional circumstances may rise

4

**2275**

to "a fundamental miscarriage of justice" and excuse a procedural default.

## C. Retroactivity of New Rules

The "new rule" doctrine is an affirmative defense. *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). The Government alleges that this doctrine precludes consideration of all or parts of Runyon's claims 9, 10, 11, 13, 14, 17, and S2. Runyon disagrees on two grounds. First, this doctrine does not apply to §2255 motions in the first instance.[2]

The "new rule" doctrine, first announced in *Teague v. Lane*, 489 U.S. 288 (1989), limits the retroactive application of new rules of criminal procedure. *Teague* itself was limited to claims by state prisoners under 28 U.S.C. §2254, and the Court did not address whether its rule would extend to claims by federal prisoners. *See Teague*, 489 U.S. at 327 n.1 (Brennan, J., dissenting). This remains an open issue. In *Danforth v. Minnesota*, 552 U.S. 264 (2008), the Court held that *Teague* does not apply in state collateral proceedings, but reserved "whether the *Teague* rule applies to cases brought under 28 U.S.C. §2255." *Id.* at 269 n.4. In *Chaidez v. U.S.*, 133 S.Ct. 1103 (2013), the Court again reserved whether "*Teague*'s bar on retroactivity does not apply when a petitioner challenges a federal conviction." *Id.* at 1113 n.16.

In *Martinez v. U.S.*, 139 F.3d 412, 416 (4th Cir. 1998), the court of appeals held that *Teague* does apply to federal collateral claims, predicting that "it can safely be assumed that the Court would apply *Teague*'s nonretroactivity principle to suits under §2255." Notwithstanding the Fourth Circuit's confidence, the Supreme Court has repeatedly avoided taking that step.

In her plurality opinion in *Teague*, Justice O'Connor weighed the need to respect and preserve

---

[2] Runyon acknowledges that this Court is bound by circuit precedent holding that *Teague* "applies to *federal* prisoners' actions ... under 28 U.S.C. § 2255." *Martinez*, 139 F.3d at 416. He presents the issue here to preserve it for further review.

5

**2276**

constitutional rights and ensure accuracy and integrity of convictions, against the State's interest in comity and finality. *Teague*, 489 U.S. at 308, 309 (plurality). There are no comity interests when federal courts review federal convictions. Federal courts are not intruding into state criminal proceedings, are not imposing any costs on States by retroactive application of new rules, are not forcing States to marshal resources to defend their judgments, and are not overturning convictions of a coordinate jurisdiction. *See also Danforth*, 552 U.S. at 272-73 ("the text and reasoning of Justice O'Connor's opinion illustrate that the rule was meant to apply only to federal courts considering habeas corpus petitions challenging state-court criminal convictions"). In light of these recognitions, other courts of appeals have expressed reservations. *See, e.g., Reina-Rodriguez v. U.S.*, 655 F.3d 1182, 1189 (9th Cir. 2011) ("'[T]here is some doubt under current Supreme Court jurisprudence whether *Teague* applies to federal prisoners ... who seek federal habeas relief.'"); *Duncan v. U.S.*, 552 F.3d 442, 444 n.2 (6th Cir. 2009) ("It is not entirely clear that *Teague's* framework is appropriate for federal habeas petitions under 28 U.S.C. §2255, because many of the comity and federalism concerns animating *Teague* are lacking."). *See also U.S. v. Payne*, 894 F. Supp. 534, 543 (D. Mass. 1995) (pointing out that §2255 proceedings are "'an integral part of a continuous criminal proceeding that is segmented by no event or condition decisive of finality'") (quoting James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure* §22A.6, at 272-74 (Supp. 1993)).

Second, even if *Teague* applies to §2255 claims, it is expressly limited to new rules of procedure. A rule is procedural if it "regulat[es] *'the manner of determining* the defendant's culpability.'" *Montgomery v. Louisiana*, 136 S.Ct. 718, 730 (2016) (plurality) (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004)). In contrast, "*Teague* requires the retroactive application of new substantive and watershed procedural rules in federal habeas proceedings." *Id.* at 728. A rule is substantive when the Supreme Court has decided the meaning of a criminal statute enacted by Congress, *Bousley*, 523 U.S. at 620, or it "has

6

**2277**

eliminated [the Government's] power to proscribe the defendant's conduct or to impose a given punishment." *Montgomery*, 136 S.Ct. at 730. The mere fact that a new rule includes a process does not mean that it is a procedural rule. As the Court counseled in *Montgomery*, courts must be careful not to conflate a procedural requirement that is necessary to implement a substantive guarantee, with a rule that regulates the manner of determining the defendant's culpability. *Id.* at 734-35. Only the latter is a procedural rule governed by *Teague's* nonretroactivity doctrine.

Another type of rule which must be applied retroactively is a new "watershed" procedural rule. Such a rule is "implicit in the concept of ordered liberty" and crucial to the accuracy of the adjudication. *Graham v. Collins*, 506 U.S. 461, 478 (1993); *Teague*, 489 U.S. at 311 (plurality) (a "watershed" rule must contribute to fact-finding reliability and "alter our understanding of the *bedrock procedural elements*" essential to the fairness of a proceeding.).

A three-part analysis must be undertaken to determine if *Teague* bars relief, but it differs from the Government's three-step analysis.[3] First, the Court must determine if the rule on which the petitioner relies is one of substance or criminal procedure, *Bousley*, 523 U.S. at 620, as those concepts are defined in *Montgomery*. If the rule is substantive, retroactive application is required, *Montgomery*, 136 S.Ct. at 728, and the analysis ends. If the rule is one of criminal procedure that constitutes a "watershed" rule of procedure, retroactive application also is required, *id.*, and the analysis ends. Second, if the rule is one of criminal procedure, the Court must ascertain the date when the petitioner's

---

[3] The Government's analysis begins with a presumption that the new rule is one of criminal procedure, whereas *Montgomery* requires a threshold determination of whether it is the kind of issue that is subject to the limit on retroactivity. The Government's analysis also retains the nomenclature of *Teague*, which describes new substantive rules and watershed procedural rules as "exceptions" to the bar on retroactive application of procedural rules. The Supreme Court has since recognized that those two categories of new rules "'are more accurately characterized as ... not subject to the bar.'" *Montgomery*, 136 S.Ct. at 728 (quoting *Schriro*, 542 U.S. at 352 n.4).

7

**2278**

conviction and sentence became final. *Caspari*, 510 U.S. at 390. Runyon's conviction became final on October 6, 2014, when the Supreme Court denied his petition for a writ of certiorari. Only a decision announced after that date can be "new." Third, if the procedural rule was announced after the date that the conviction became final, the Court must determine whether the rule is actually "new." *Id.* The required inquiry is typically phrased in the negative: a new procedural rule is one that was not dictated by precedent existing at the time the defendant's conviction became final. *Whorton v. Bockting*, 549 U.S. 406 (2007). Stated differently, the Court must survey the legal landscape and determine whether a court, at the time the conviction became final, "would have felt compelled by existing precedent" to apply the subsequently announced procedural rule. *Caspari*, 510 at 390; *Lambrix v. Singletary*, 520 U.S. 518, 527-28 (1997). If not, then the rule is "new," and it does not apply retroactively.

As necessary, Runyon further discusses the Government's specific *Teague* allegations in his replies on individual claims.

**Claim 1:      The Participation Of Two Dishonest Law Enforcement Officers Tainted Runyon's Trial.**

The Government correctly recognizes that this claim could not have been raised at trial because the facts were known only to the Government. *See Amadeo v. Zant*, 486 U.S. 214, 222 (1988) (where county officials concealed facts that would have allowed defendant to challenge composition of jury, the concealment was an "'objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule'" and excused procedural default) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)); *see also Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999) (quoting *Murray*, 477 U.S. 488 (default excused if factual basis for claim was "'not reasonably available to counsel'" or "'some interference by officials … made compliance impracticable'").

The Government argues instead that this claim is defaulted because Runyon did not raise it on direct appeal. The Government skips over the fact that even during direct appeal proceedings, it

8

**2279**

never told Runyon's counsel that Ford or Posey engaged in criminal acts of dishonesty. Runyon's original appellate counsel Woodward knew about the charges against Ford, but he had a conflict of interest. Because he represented Ford, he could not even suggest to anyone that Ford might have been dishonest. The Government did not disclose any information to Runyon's other appellate counsel, who were located in South Carolina and New York.

The Government also does not identify any fact about Ford or Posey that is in the record of Runyon's trial and that could have been a subject of Runyon's appeal. There is none. No part of his §2255 claim could have been "fully and completely addressed on direct review based on the record created" in the trial court. *Bousley*, 523 U.S. at 622. Like the claim that could not have been raised on direct review in *Waley*, the facts necessary for this claim "were 'dehors the record and their effect on the judgment was not open to consideration and review on appeal.'" *Id.* (quoting *Waley* 316 U.S. at 104).

If appellate counsel knew the facts concerning Ford and/or Posey, and if the nature of this claim is one that could appropriately have been raised on direct appeal rather than collateral review, appellate counsel were ineffective in failing to do so. *See* Claim 8.

### A. Robert Glenn Ford.

On the merits, the Government mistakenly treats the claim involving Ford as equivalent to a claim under *Brady v. Maryland*, 373 U.S. 83 (1963). It says that Runyon has failed to identify favorable evidence "stemming from Ford's impeachment related behavior," and it argues that "impeachment evidence for those who do not testify lacks relevance and materiality." ECF No. 497, p.20. But Runyon has not alleged that the Government failed to disclose exculpatory or impeachment information. Ford's history of criminal conduct did not exculpate Runyon. And because Ford did not testify against Runyon, the fact of his dishonesty could not have been used to impeach him.

9

**2280**

The Government knew as early as November 7, 2008 (when Marcus Adams was debriefed), that Ford was a "dirty cop," and it was preparing to charge Ford with multiple counts of extortion, false statements, and other crimes. Just as the Government would not have retained a person like Ford to investigate a crime because of his misconduct, it knew that Ford could not be trusted to conduct an honest investigation for Runyon's defense. Because of its superior knowledge about Ford, and because of its duty to elevate justice over winning a case, the Government had a due process obligation to inform defense counsel or inform the Court, so that Ford could be replaced with an honest and reliable investigator. The Government's protestation that it had no duty to do so is contrary to *Berger v. U.S.*, 295 U.S. 78 (1935).

The Government objects that Runyon has failed to identify any witness reports prepared by Ford that were fabricated or unreliable. Runyon suggests this is not necessary and that deprivation of the honest services of an investigator is inherently prejudicial.

The Government's premise, however, is false. Ford was an experienced investigator (and experienced deceiver), and there is no reason to think he would have done anything so amateurish as submitting affirmatively false statements about an individual that he knew was likely to be called as a defense witness. He would know that his lies would be quickly exposed during pretrial preparation. The false statements in Runyon's case would more likely be by omission. If, for example, Ford found a potential witness who wanted to avoid becoming embroiled in this case, Ford was in a position (for sufficient compensation) to file a report stating that the witness could not be located. Or he could file a report saying that he went to a neighborhood where Runyon's family had once lived and interviewed people who lived in the area, but no one there remembered Runyon or his family. In fact, there may have been one or two neighbors who remembered Runyon or his family and had helpful information, but who decided to pay Ford a bribe so they could avoid involvement in this case. Because Ford's

10

reports may well have omitted the names or locations of such people, retracing his steps to find evidence of actual dishonesty is very difficult, although Runyon's investigation is ongoing.

The Government's reliance on Woodward's statement that Ford did a good job investigating the case is misplaced. Woodward's duty of loyalty to Ford precludes him from taking any other position.[4] Hudgins says he relied on Ford's reports, but he cannot vouch for their veracity. Cronin knew that Ford was under public pressure for his overzealousness in obtaining confessions in the Norfolk Four case, but that is a very different kind of misconduct than the extensive extortion and false statements that the Government failed to disclose to Runyon's defense. Runyon is entitled to discovery and an evidentiary hearing on this claim to develop and present evidence about the extent to which Ford's misconduct may have affected the investigation and the way this case was defended.

## B. Clifford Dean Posey.

The Government again treats this as equivalent to a *Brady* claim, arguing that "there was nothing for the Government to even turn over at the time of [Runyon's] trial." ECF No. 497, p.21. At this point, Runyon has asserted a *Berger* claim, although he cannot rule out the possibility that the requested discovery will reveal a *Brady* violation based on exculpatory or impeachment information that the Government possessed at the time of trial but failed to disclose. Runyon is entitled to discovery so he can make a determination himself, and an evidentiary hearing so he can present his case to the Court, if the facts warrant. There is no dispute that at all of the times he was investigating Cory Voss' death and helping to prepare the Government's case for trial, Posey also was engaging in criminal misconduct that involved stealing evidence from the Government and making false

---

[4] Woodward likely had a conflict of interest when he agreed to represent Ford. Runyon has not alleged the conflict of interest as a claim in his §2255 motion because the conflict did not arise until after Runyon's trial, when Woodward agreed to be Ford's attorney. But the conflict is a fact that the Court can consider.

11

statements in his reports. The Government does not, and cannot, deny that Posey may have engaged in criminal conduct in preparing Runyon's case. It cannot deny that this may have tainted Runyon's trial. It cannot deny that it alone knows the work Posey was assigned to perform on this case, the recorded conversations he transcribed, the evidence he handled, the extent to which anyone checked his work product, and the effect he had on Runyon's trial. It also cannot deny that it knew about Posey's misconduct not later than October 2010, when Runyon's case was still on direct appeal.[5] Because the Government gave the defense no information, Runyon does not rule out any possibilities.

The Government opines that Posey's involvement in Runyon's case was minor and error-free. But because this is Runyon's claim, and because adverse parties often draw different inferences from the same materials, Runyon must be allowed to obtain and review the documents he has requested in discovery, and to draw his own conclusions from those documents. As an example of the reason Runyon should not have to rely on the Government's assessment, we note that the Government does not address the fact that Posey's criminal conduct included converting firearms and ammunition that had been confiscated by ATF, and the possibility that Posey may have converted firearms or ammunition that belonged to Runyon, which could have affected litigation regarding the handgun used to kill Voss.

**Claim 2:       The Prosecution Failed To Disclose Impeaching And Exculpatory Evidence In Violation Of The Fifth, Sixth, And Eighth Amendments, United States Constitution.**

"Under *Brady*, the [prosecution] violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 132 S.Ct. 627, 630 (2012). Here, the prosecution decided one year before the penalty phase began that it would pursue a non-statutory aggravating circumstance on the basis that Runyon

---

[5] Runyon's opening brief on appeal was not filed until February 29, 2012.

"engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend." ECF No. 67, p.3. It had a concomitant duty to learn of any favorable evidence possessed by law enforcement or members of the prosecution team that could be used in defense of this aggravator and to disclose that evidence to Runyon's counsel. *Kyles*, 514 U.S. at 437. The prosecution also knew Runyon's penalty-phase defense was centered on the differential treatment afforded the other co-defendants with respect to punishment and it had a duty to disclose evidence that was favorable to this defense and the "equally-culpable co-defendant" mitigator. *Id.*

The prosecution possessed information about co-defendant Draven's history of violence against women and children. Respondent acknowledges that this evidence was disclosed to Draven's counsel at least one year before Runyon's penalty phase began. ECF No. 497, p.22. Respondent admits Draven's violent background, criminal history, and mental health assessments were material to Draven's punishment and further admits this information was not disclosed to Runyon's counsel.[6] ECF No. 497, pp.22, 24. The *Brady* element in dispute is whether the withheld evidence is material to Runyon's punishment.

### A. The withheld evidence is material.

The materiality standard is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. In other words, "the question is not whether the defendant would more likely than not have

---

[6] Before trial, the parties entered an agreed discovery motion that included *Brady* material. ECF No. 31, pp.3-4. The prosecution represented it intended to comply fully with its *Brady* obligations, it had complied, and it was aware of its continuing duty of disclosure. ECF No. 98, pp.9-10. In turn, the Court made findings that the prosecution "has provided defendant with all of the Rule 16 material that is in its possession," ECF No. 114, p.3, and recounted the prosecution's representation "that it has already provided discovery pursuant to the Discovery Order and, to the extent that it becomes aware of and obtains additional discoverable material, will continue to make the materials available to [Runyon]." ECF No. 115, p.2.

**2284**

received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434.

In *Banks*, 540 U.S. at 700-01, the Supreme Court found withheld evidence was material because it was significant to a predicate for capital murder and it related to the defendant's eligibility for the death sentence and the prosecution's argument for imposing death. The withheld evidence left the jurors ignorant of an informant's "true role" in the case and undermined confidence that the defendant had received a fair trial. *Id.* at 702-03. This was especially so because the informant's testimony was the centerpiece of the prosecution's penalty-phase case. *Id.* at 701.

In this case, inequitable punishment was the centerpiece of Runyon's penalty-phase defense. *U.S. v. Runyon*, 707 F.3d 475, 508 (4th Cir. 2013). The withheld information regarding co-defendant Draven's background would have been advantageous to Runyon's defense because it demonstrates that despite ample facts supporting several aggravating factors for Draven, and despite all co-defendants' "integral[] involve[ment] in the murder, [Runyon] had received differential treatment, with the Government pursuing the death penalty against Runyon but not against Cat or Draven." *Id.* Draven's severe sexual, physical and emotional abuse of women and children was a relevant comparison-point for the "abuse of women" non-statutory aggravator. Had the jurors known the magnitude of Draven's true culpability, the "equally-culpable co-defendant" mitigator could have transformed into a "co-defendant with greater culpability" mitigating circumstance, especially since Draven was also charged with more statutory aggravators than Runyon. ECF No. 3, pp.13-14.

A history of violent crimes is "arguably more relevant and probative than any other type of aggravating evidence supporting imposition of the death penalty[.]" *U.S. v. Beckford*, 964 F. Supp. 993, 1000 (E.D. Va. 1997) (internal quotation marks and citation omitted). The fact that the prosecution failed to seek death for Draven despite his pattern of violent criminal behavior and propensity for

14

**2285**

future violence was highly relevant to Runyon's comparative punishment defense. As explained by the Court when it agreed to charge the "abuse of women" non-statutory aggravator against Runyon: "[v]iolent adjudicated criminal acts that tend to show a pattern of violence against women are relevant, probative, and helpful to the sentence in distinguishing those who deserve capital punishment," and are "relevant to the inquiry of who should live and who should die." ECF No. 217, p.10, n.6 (citing *U.S. v. Grande*, 353 F. Supp. 2d 623, 631, 637 (E.D. Va. 2005)); *U.S. v. Beckford, supra.* It was necessary for the jurors in this case to distinguish between Runyon and his co-defendants in order to justify a death sentence for only Runyon and the prosecution's failure to disclose probative facts relevant to the disparity of punishment among the co-defendants impaired Runyon's defense and denied the jurors an accurate accounting of the co-defendants' relative culpability.

The *Brady* violation tainted the jury's determination regarding the "abuse of women" aggravating circumstance, the "equally-culpable co-defendants" mitigators, and its sentencing verdict. The prosecution's argument for a death sentence based on Runyon's conviction of misdemeanor simple battery for grabbing his wife's arm and poking her nose encouraged the jurors to infer that Runyon engaged in more serious violent acts "behind closed doors." Tr.2609, 8/26/09. The jurors were invited to condemn Runyon because "he left his wife and children and didn't provide support for them." Tr.2610, 8/26/09. At the same time, the prosecution kept from the jurors' consideration a plethora of information illustrating Draven's sexual assault of children and his pattern of felonious sexual and physical abuse of women. A penalty phase proceeding where the jurors were informed of Draven's violent history is significantly different than the actual proceeding where the jurors decided—without knowledge of Draven's pattern of violence—that Runyon should be the sole person to die, based in part on the "abuse of women" aggravator. The withheld evidence was advantageous to Runyon's defense and could reasonably have put the penalty phase in such a different light that it

15

**2286**

undermines confidence in the jury's death verdict. *See, e.g., U.S. v. Hammer*, 404 F. Supp. 2d 676, 799 (M.D. Pa. 2005) (citing *Sochor v. Florida*, 504 U.S. 527, 532 (1992); *Espinosa v. Florida*, 505 U.S. 1079, 1081 (1992)) ("Under a weighing statute such as the Federal Death Penalty Act of 1994, a death sentence resulting from a tainted aggravating circumstance cannot stand.").

## B. Runyon's *Brady* claim is not procedurally defaulted.

The *Brady* claim is based on information outside the trial record and unknown to trial counsel because it was not disclosed by the prosecution. There is no procedural default because this due process violation could not have been "fully and completely addressed on direct review based on the record created" in the trial court. *Bousley v. U.S.*, 523 U.S. at 622 *Waley v. Johnston*, 316 U.S. 101, 104 (1942) (a claim is not procedurally defaulted when the facts are "dehors the record and their effect on the judgment was not open to consideration and review on appeal.").

Even if this claim is somehow defaulted, Runyon is still entitled to develop and prove his claim because a meritorious *Brady* claim subsumes and satisfies the "cause and prejudice" standard. *Wolfe v. Clarke*, 691 F.3d 410, 420 (4th Cir. 2012). "Cause and prejudice" to overcome a procedural bar "parallel two of the three components of the alleged *Brady* violation itself." *Banks*, 540 U.S. at 691 (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999) (internal quotation marks omitted)) (addressing *Brady* claim in a §2254 case). "Cause" is already established because Respondent concedes the newly discovered "evidence [was] not turned over to Runyon" prior to trial. ECF No. 497, p.24. The "prejudice" requirement "exists when the suppressed evidence is 'material' for *Brady* purposes." *Banks*, 540 U.S. at 691 (citing *Strickler*, 527 U.S. at 282). Accordingly, this claim is reviewed on its merits and the ultimate question remains one of materiality.

### C. The withheld evidence is not cumulative and the harmless error doctrine is inapplicable.

"Assuming this evidence was discoverable to Runyon," Respondent argues (without explanation) that "it would have been cumulative and any error would be harmless." ECF No. 497, p.24.

A defendant "may benefit from the 'cumulativeness' of evidence that is 'favorable' under *Brady*." *McHone v. Polk*, 392 F.3d 691, 703 (4th Cir. 2004). Nevertheless, co-defendant Draven's violent criminal history is material to any evidence presented in this case. In fact, evidence of Draven's past violence against women and children is entirely new information and the withheld evidence simply cannot be cumulative.

Finally, the Supreme Court has made clear that harmless error is not a consideration in *Brady* claims. Once the materiality of withheld evidence is established, the *Brady* violation cannot subsequently be found harmless. *Kyles*, 514 U.S. at 435-36. Runyon can demonstrate materiality, as discussed above and in his amended §2255 motion, and Respondent's assertion of harmlessness cannot defeat the *Brady* claim.

### D. Discovery and an evidentiary hearing should be granted.

Materiality is a fact-driven issue. An adverse determination cannot be made at this stage of the proceedings. *U.S. v. White*, 366 F.3d 291, 297 (4th Cir. 2004). Instead, factual development is warranted because Runyon has alleged facts which, if true, entitle him to relief. *Raines v. U.S.*, 423 F.2d 526, 529-30 (4th Cir. 1970) (discussing fact-finding procedures); *see also* RULES GOVERNING SECTION 2255 PROCEEDINGS, Rules 6-8. Runyon has already filed a discovery request that sets forth good cause for the release of information relevant to materiality. ECF No. 491, pp.21-25; ECF No. 506, pp.13-16. This request should be granted.

An evidentiary hearing should also be granted because Respondent's answer creates material factual disputes with respect to Runyon's non-frivolous *Brady* allegations. *White*, 366 F.3d at 297 (citing *Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977)); 28 U.S.C. §2255 (requiring an evidentiary hearing on a habeas claim "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief"). Respondent not only disputes the significance of the withheld evidence but alternatively asserts that the withheld evidence is cumulative. ECF No. 497, p.24. These disputes require fact-finding on the newly-discovered evidence about co-defendant Draven. *Townsend v. Sain*, 372 U.S. 293, 313 (1963); *Wolfe*, 691 F.3d at 421-22.

For all these reasons, Runyon is entitled to discovery and an evidentiary hearing on this claim followed by a grant of relief.

**Claim 3:     Counsel Rendered Ineffective Assistance At The Guilt Phase Of Trial By Failing To Investigate, Present, Highlight, And/Or Argue Evidence Of Innocence.**

Respondent primarily argues that the guilt-phase performance of Runyon's counsel was not deficient. ECF No. 497, p.25. In doing so, Respondent raises several factual issues—including the strength of evidence, the scope of counsel's investigation and the reasonableness of counsel's actions—which require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

**A.  Chad Costa[7]**

The prosecution presented evidence and argument: (1) about Runyon's character; (2) that

---

[7] Respondent points to an error in the initial §2255 motion that has been corrected in the amended §2255. Chad Costa met Runyon after the crime but before Runyon's arrest. The claims regarding Costa remain valid with this time-frame. Costa's knowledge regarding Runyon's romantic relationships is relevant to the penalty phase and this information was re-organized in the amended §2255.

18

**2289**

Runyon made incriminating statements to others; (3) that Runyon's shopping list was connected to the crime; and (4) that attempted to tie Runyon's revolver to the crime. Respondent asserts (without explanation) that counsel's failure to present Costa as a witness does not constitute deficient performance because Costa's testimony was inadmissible. The rules of evidence, however, would not have precluded Costa's testimony. *See, e.g.,* FED. R. EVID. Rules 104(e), 401, 404(a)(2)(A), 405, 602, 801. Respondent further alleges Costa's testimony would have been duplicative of other (undescribed) defense evidence. To the contrary, Costa's testimony was unique, relevant and probative of Runyon's reasonable doubt defense.

Costa's contacts with, and knowledge of, Runyon and Runyon's revolver were relevant to counter the prosecution's evidence and narrative in the four areas described above and would have made the facts asserted by the prosecution less probable. Costa possessed knowledge and an opinion of Runyon's character that differed from the prosecution's theory and Costa could have testified to the nature and extent of his observations regarding Runyon. Costa handled and observed Runyon's revolver and his description of the six-shot black revolver is inconsistent with the prosecution's evidence that the murder weapon was a five-shot handgun from which the five recovered bullets were fired. This testimony was significant in light of a recently issued report from the National Academy of Sciences that described the unreliability of forensic testimony purporting to match a specific firearm to specific bullets. Costa could have testified that Runyon did not confess the crime to him which supports the argument that Runyon did not confess to others. Costa also could have corroborated other witnesses' allegations of police influence and coercion to obtain certain testimony. This could have raised doubts regarding that testimony. Costa's testimony was consistent with the defense theory and counsel's failure to call him as a witness was prejudicial.

## B. Cat Voss

Respondent argues counsel was not ineffective for failing to speak with co-defendant Cat Voss and present her as a witness because it is "highly doubtful" that Voss would have testified and "highly doubtful" that Voss's attorney "would have let her testify[.]" ECF No. 497, pp.26-27. Respondent also questions the weight that her testimony would have carried with the jury. *Id.* p.27.

First, Voss's attorneys could not have prevented her from testifying. Second, courts should not assume that a potential witness will not testify. *U.S. v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004). Third, it is a fundamental premise of the criminal trial system that determinations as to weight and credibility of witness testimony belong to the jury. *U.S. v. Scheffer*, 523 U.S. 303, 313 (1998); *U.S. v Luciano*, 343 F.2d 172, 173 (4th Cir. 1965) ("No matter how impaired [the] evidence, the jury had the right to believe all or so much of it as they thought proper."). To the extent the jurors found discrepancies between Voss's statement of facts and her testimony, "their natural intelligence and their practical knowledge of [human nature,]"*Scheffer*, 523 U.S. at 313, could have led them to conclude that Cat Voss would have signed any statement placed in front of her by the prosecution to avoid the death penalty. This is especially true because some assertions in the statement of facts were obviously not personally known by Voss.[8]

Finally, Respondent argues that counsel's penalty phase performance somehow renders counsel's failure to call Voss in the guilt phase "harmless" error. ECF No. 497, p.27. This argument overlooks the fact that Runyon was both convicted and sentenced to death and counsel's guilt-phase

---

[8] Examples include: the deposits of the credit union "are insured by the National Credit Union Administration Board"; "the activities of the credit union operate in and affect interstate commerce"; the number of phone and text communications between Draven and Runyon during particular time periods; Cory Voss's truck "had been transported and shipped in interstate commerce"; the findings of the medical examiner; and the forensic analysis on the bullets. ECF No. 70.

20

**2291**

deficiencies left the jurors unaware that Voss did not hire Runyon to kill her husband and she believed co-defendant Draven was the actual perpetrator. ECF No. 478-9, ¶¶9, 10, 18, 24.

### C.  Scott Linker

Respondent argues counsel was not ineffective in failing to call Scott Linker at the guilt phase because his testimony would have been irrelevant and inadmissible. Alternatively, Respondent argues that Linker's testimony could have supported the prosecution's "hit man" theory. ECF No. 497, pp.27-28. The latter argument has no significance. The jurors convicted Runyon on the prosecution's "hit man" theory without hearing from Linker. The former argument is incorrect. Linker's testimony explained items of physical evidence—long guns and ammunition—which the prosecution introduced into evidence.

"Few rights are more fundamental than that of the accused to present witnesses in his own defense[.]" *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). This right is tempered only by procedural rules that govern the orderly presentation of facts. *Id.* at 410-11. Although Respondent seemingly would have this Court adopt a narrower definition of relevance than provided by the Rules of Evidence or would have the Court curtail defense evidence on the belief that evidence of guilt is strong, rules cannot be applied mechanistically where constitutional rights directly affecting the ascertainment of guilt are implicated. *Chambers*, 410 U.S. at 302; *Holmes v. South Carolina*, 547 U.S. 319, 329-30 (2006).

In this case, the prosecution placed into evidence a rifle and shotgun owned by Runyon, neither of which were the murder weapon. Gov't Trial Ex. 212, 212A. Runyon was entitled to present evidence demonstrating that his ownership of the firearms was not related to the crime or to a propensity to commit a crime. Linker's testimony would have provided such an explanation for Runyon's possession, knowledge, and use of firearms and it was therefore relevant and probative of

the issues before the jury.

### D.  Rose Wiggins

Respondent points out an error in a record citation to the prosecution's closing argument. ECF No. 497, p.28. That error has been corrected in the amended §2255 motion.

### E.  David Runyon's Whereabouts The Day Of The Crime

Respondent asserts that it was more important to know when the co-defendants spoke to each other than to corroborate the electronic information placing Runyon in West Virginia at the time of the crime. ECF No. 497, p.29. It is within the jurors' purview to assign importance to evidence, but even based on the weight assigned by Respondent to the co-defendant's communications, this, too, is an area in which trial counsel performed deficiently.

Counsel did not directly argue the fact that records showed David Runyon did not speak with the co-defendants on the day of the crime. Nor did counsel argue that there was no such contact the day before the crime. In fact, there was a significant time span before the crime from Runyon's last call with co-defendant Draven and their next contact after the crime. Counsel failed to argue that the evidence showed no contact between the co-defendants immediately before, during and after the crime and thus no opportunity to plan and coordinate the crime with the victim's whereabouts.

### F.  Cell Tower Testimony Regarding Michael Draven

Counsel did not investigate the validity of cell-tower tracking testimony nor present evidence or argument that such testimony could not exclude the possibility that co-defendant Draven was at the scene at the time of the crime.[9] Such evidence and argument would have supported the defense

---

[9] Prosecution witness Paul Swartz relied upon a map of Newport News that reflected three cell phone towers to which Draven's phone had connected on the night of the crime. Gov't. Tr. Ex. 135. Runyon's initial §2255 motion discussed the Government's exhibit and stated there were three towers within the area of the credit union. ECF No. 478, p.26. Respondent has pointed out that there

22

theory that someone else—such as co-defendant Draven—committed the crime. *See, e.g., Elmore v. Ozmint*, 661 F.3d 783, 786 (4th Cir. 2011) (counsel ineffective for "blind acceptance of the State's forensic evidence" and failure to investigate or adequately challenge that evidence); *Roberts v. Howton*, 13 F. Supp. 3d 1077 (D. Or. 2014) (counsel's handling of cell tower tracking evidence was ineffective).

Respondent contests the strength of evidence Runyon has initially proffered in support of this claim. ECF No. 497, p.29. He criticizes Exhibit 14 while overlooking that courts have found cell-tower tracking evidence to be unreliable. *See, e.g., Roberts, supra; U.S. v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012). Respondent is critical of the fact that Runyon has not designated an expert for this claim, however, an expert designation is not required at this stage of the case or for Runyon to demonstrate an entitlement to fact-finding proceedings and an evidentiary hearing.

Respondent also disputes that trial counsel could be ineffective in this manner because counsel presented the general theory of another perpetrator. ECF No. 497, p.29. The fact that counsel presented a theory of defense is not determinative of whether counsel presented that defense in a constitutionally ineffective manner. *Strickland* requires consideration of that evidence which was presented at trial in conjunction with post-conviction evidence to determine whether counsel's performance prejudiced the defense. *See Elmore*, 661 F.3d at 868-70. Here, counsel failed to support the alternate perpetrator theory by not challenging the cell-tower testimony in addition to other instances of deficient performance set forth in Runyon's §2255 motion.

## G. Runyon's Shopping List

Trial counsel failed to argue that Runyon's shopping list was unrelated to the crime and, in

---

were more towers than what the map represented. ECF No. 497, p.29. The fact that there are additional towers in the vicinity does not demonstrate a weakness in Runyon's claim. It demonstrates that Swartz's testimony omitted certain variables impacting the reliability of cell tower evidence to reflect a caller's location. *See Roberts*, 13 F. Supp. 3d at 1092-93, 1102-03.

23

particular, the list omitted those items that the prosecution argued were utilized by the perpetrator: a gun and a mask. Respondent asserts that counsel made this argument, but he didn't. ECF No. 497, p.30 (alleging that "Runyon is wrong" in alleging counsel did not argue that the listed items were not used in the crime).

Counsel questioned the ATF agent about whether the listed items were recovered in the searches of Runyon's property. Tr.1050, 7/9/09. The agent answered: "I can't comment to that sir. We took a lot of clothing out of Lot 67, and I'm not comfortable saying whether or not some of those clothing items -- I can tell you we never recovered a taser. I'm not sure about a Spyderco knife." Tr.1050-51, 7/9/09. This answer indicated that some, if not all, of the listed items were missing. Respondent fails to recognize how eliciting testimony that the items were missing places them in the same category as Runyon's gun, which the prosecution argued Runyon had disposed of because it was the murder weapon. This is an incriminating presentation of evidence by defense counsel rather than an exculpatory demonstration that the listed items were inconsistent with the crime.

Respondent provides a rationale for counsel's failure to persuasively argue about the shopping list and asserts that trial counsel "correctly" did not highlight the list because of notations related to the credit union that were on the same piece of paper. ECF No. 497, p.30. Yet, in closing argument, counsel mentioned the map. The map had notations related to the credit union *as well as* notes about the victim's truck and the victim's name. Gov't Tr. Ex. 214. Counsel told the jurors, "I admit that's a hard thing to explain, having that map. That's suspicious." Tr.1654, 7/17/09. Respondent's assertion that competent counsel would not reference the shopping list should equally apply to the map which contained even more information related to the crime.

To be sure, competent counsel can address the prosecution's evidence in a light favorable to the defense. Counsel did not do so in this case although he did mention that Runyon was not asked

24

**2295**

when the notes on the map were written. Tr.1654, 7/17/09. The prosecution presented a significant amount of testimony about a trip to Nags Head shortly after the crime taken by Draven, Voss and her children, and Draven's brother and his girlfriend. The group spent thousands of dollars on hotels, jewelry, food and champagne. Counsel failed to point out that inside the map was the photograph of Draven and Voss at Nags Head. The photo could have been taken *after the crime*, during that May vacation. Tr.1605, 7/17/09. The jurors could have inferred that Runyon came into possession of the map at the same time as the photograph—after the crime.

**Claim 4:      Counsel Abdicated The Responsibility To Advocate For Runyon At The Eligibility Phase When He Failed To Address The Relevant Issue And Did Not Discuss Established Facts That Weighed Against The Statutory Aggravating Circumstances.**

Respondent argues that counsel's performance cannot be deemed ineffective because there was overwhelming evidence of the statutory aggravating factors and the "substantial planning" aggravator "was inherent in the jury's determination that Runyon and Draven were guilty of Conspiracy to Commit Murder for Hire Resulting in Death." ECF No. 497, p.34. Respondent also asserts it was a reasonable strategic decision for counsel "to avoid alienating the jury by openly contesting what was otherwise very obvious and apparent in the jury's determination of guilt." *Id.*, p.33. Counsel's decision to forgo presenting proof at a separate trial stage and in support of a separate issue on the belief that it wouldn't make a difference or it would "alienate the jury" is not reasonable. Counsel had a duty to investigate and respond to the prosecution's case in aggravation. *Rompilla*, 545 U.S. 374, 385-87 (2005).

Counsel's failure to discuss the issue of eligibility or the statutory aggravating circumstances is not addressed in Respondent's answer. This deficient performance was prejudicial because two statutory aggravating circumstances were carried into the selection phase without any attempt by counsel to mitigate their weight. Conceding through silence two aggravating factors that the jurors

25

were to weigh in favor of a death sentence is not a reasonable "start" for the penalty phase as Respondent suggests. ECF No. 497, p.33. Constitutionally effective counsel would have submitted evidence to mitigate the aggravators and to do so would not have alienated the jurors; it would have fulfilled counsel's duty "to ensure that the adversarial testing process work[ed] to produce a just result." *Strickland*, 466 U.S. at 687.

**Claim 5:   Trial Counsel Were Ineffective For Failing To Investigate, Discover, And Present Evidence That David Runyon Was Incompetent To Stand Trial.**

Respondent argues that counsel had no duty to investigate Runyon's mental health because, in Respondent's view, the facts of this case were not as "bizarre" as a case where a man raped and robbed a 67-year-old woman. ECF No. 497, p.37. The test for whether counsel is on notice of a reasonable avenue for investigation is not limited to whether the facts surrounding the crime are illogical. The test is whether a reasonable attorney would follow leads based on facts that were known or should have been known. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). In this case, facts counsel knew or should have known about their client and the case signaled a need for a mental health investigation, above and beyond the pre-existing duty to investigate.

First, "facts, which were either known or ascertainable with reasonable diligence by counsel prior to trial, provided a reasonable basis for believing th[at] defenses based on [Runyon's] mental capacity might have been plausible." *Becton v. Barnett*, 920 F.2d 1190, 1193 (4th Cir. 1990) (citation omitted). Mental health records from the local jail stated that Runyon was suffering anxiety attacks, he was grandiose and delusional, and his thoughts were flighty and rambling. ECF No. 478-16, pp.3-4. If counsel were not observant enough to see the scars on Runyon's face, head, and body or the asymmetry in Runyon's face, a medical screening of Runyon conducted in conjunction with his

26

**2297**

employment in a drug study recorded the facial asymmetry and at least one prominent scar.[10] *See* Exhibit A, Bristol-Myers Squibb Clinical Research Center, Clinical Pharmacology Unit Screening Information, 8/30/04. In conversations with counsel, Runyon displayed a very rigid thought process. ECF No. 478-5, ¶3. He reported grenade-blast injuries from the Army and trauma from an automobile accident. ECF No. 478-5, ¶5; ECF No. 478-6, ¶5. Runyon compared himself to great historical figures and recounted the many lives he had saved. ECF No. 478-4, p.3 ¶7; He wrote long, rambling letters before trial that indicated communication problems with counsel. ECF No. 478-4, p.3 ¶7; ECF No. 478-4, pp.9-14. During trial Runyon wrote obsessively. ECF No. 478-4 p.7 ¶16; ECF No. 478-5, p.3 ¶11. Counsel knew Runyon's mother had a history of trauma and a mood disorder, his father was cold and unfeeling, and they were very strict disciplinarians toward Runyon when he was growing up. *See*, *e.g.*, ECF No. 478-4, p.3 ¶8; ECF No. 478-6, p.2 ¶14; ECF No. 478-15, pp.5-6.

Second, even under Respondent's "bizarre facts" test for investigation, counsel were aware that facts in this case simply do not make sense. According to the prosecution's theory, Runyon agreed, with a man he just met and a woman he never met, to kill a man he did not know, for absolutely no money up front. Runyon then waited until *the day of the crime* to purchase a gun (the alleged murder weapon) from a man he did not know and under circumstances where there was no certainty that the transaction would actually occur. At the point of purchase Runyon gave the seller his license and personal information and spent time discussing personal, family details with the seller. Runyon then allegedly drove from Morgantown, West Virginia late that afternoon—without accounting for any travel delays and leaving no room for error—to arrive in Newport News, Virginia, in time to encounter

---

[10] Respondent states that "various medical screenings Runyon underwent in connection with these studies suggested no issues with regard to his competence." ECF No. 497, pp.37-38. Undersigned are unaware of mental health examinations performed in relation to the studies and Respondent has not produced any.

the victim at the credit union. Runyon allegedly used .38 caliber bullets in the .357 revolver even though he owned .357 ammunition. Runyon would have then left Virginia without receiving any payment although the co-defendants obtained $100,000 approximately 24 hours after the victim's death. Runyon kept the alleged murder weapon and created a paper trail of the .357 at a pawn shop. He also kept notes on the credit union and a map of Newport News along with a photograph of the co-defendants *even after* police interviewed him about the murder and during which he voluntarily gave a DNA sample. These are strange facts especially when considered in light of the assertion that Runyon used specialized education, training and experience to carry-out the crime and "avoid" detection.

Third, the Sixth Amendment right to counsel "imposes a correlative duty on defense counsel to undertake reasonable steps to investigate all open avenues of defense." *Wood v. Zahradnick*, 578 F.2d 980, 982 (4th Cir. 1978). This includes a pre-existing duty to investigate and raise mitigating mental health factors both pre-trial to the prosecutor and court and to the jury and court at sentencing. *Wiggins*, 539 U.S. at 524-25 (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1, commentary, pp.4-55 (2d ed. 1982), and, ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1(C), p.93 (1989)).

"The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case[.]" *U.S. v. Williams*, 615 F.2d 585, 594 (3d Cir. 1980) (quotation and citations omitted). Thus, when objective facts signal the need to explore a client's mental health, the "[f]ailure to adequately investigate the possibility of an insanity defense has been held to fall below the standard of competence despite the deference accorded an attorney's judgment in evaluating the effectiveness of representation." *Becton*, 920 F.2d at 1192. As set forth in the §2255 motion and above, there were facts indicating a "reasonable cause to believe" that Runyon was

28

**2299**

"suffering from a mental disease or defect" that rendered him unable "to assist properly in his defense."[11] 18 U.S.C. §4241(a) (setting forth the standard under which a competency hearing shall be granted). Under such circumstances, Runyon has satisfied the performance prong of *Strickland* because he need only demonstrate that the Court would have held a competency hearing; he does not need to show that he would actually have been found incompetent. *Becton*, 920 F.2d at 1193–94. Even if the hearing did not result in a finding of incompetence the examination would have revealed Runyon's serious mental illness and would have supported substantial mitigation. *See Porter v. McCollum*, 558 U.S. 30, 40 (2009) (describing mitigation that arose from court-ordered competency evaluations).

Finally, Respondent argues that Runyon's defense was not prejudiced because "counsel did make a full examination for any identifiable mental health issues." ECF No. 497, p.38. A full examination of Runyon's psycho-social history and mental health was not completed before the trial began because counsel Hudgins had less than 59 full working days to learn about and investigate the case for mitigation purposes, ECF No. 478-5, and the mental health experts had not conducted full examinations before trial began. *See also* Claim 6.

For example, Dr. Nelson had not completed a full examination and he recommended a neuropsychological evaluation of Runyon. ECF No. 153, p.1. Dr. Mirsky began an examination of Runyon four days before trial. ECF No.478-20. He informed counsel that his review and analysis was not complete and that it was essential for Runyon to undergo a neurological examination. *Id.* Counsel requested the assistance of Dr. Merikangas to conduct that examination, but the trial court declined to appoint him at that point. As a result, Dr. Merikangas was unable to examine Runyon until *after* Runyon was convicted and found eligible for the death penalty. ECF No.478-2, p.5 of 6, Dr.

---

[11] The fact that Runyon is above average intelligence does not negate a determination of incompetency or mental disease or defect.

29

Merikangas August 5, 2009 preliminary report. Dr. Merikangas issued only a preliminary report because he required more information and test results. *Id.* This incomplete effort at investigating Runyon's mental health cannot, under any measure, be considered "a full examination for any identifiable mental health issues."

**Claim 6:** **Counsel Rendered Ineffective Assistance By Failing To Investigate And Present Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage And Mental Health.**

Respondent characterizes this claim as an attack on counsel's sentencing-phase strategy and avoids the central issue of counsel's deficient investigation by ignoring the specific factual allegations and by incorrectly characterizing information known and unknown by counsel. Accordingly, Respondent raises several factual issues—including the strength of evidence, the scope of counsel's investigation and the reasonableness of counsel's actions—which require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

*Strickland v. Washington* prescribes the proper framework and focus for this claim. It provides that a failure to uncover and present mitigating evidence at sentencing cannot be justified as a tactical decision to focus on a particular defense theory when counsel have not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, Commentary, pp.4-55 (2d ed. 1980)). The reasonableness of the mitigation theory actually proffered by counsel is not relevant when evaluating the impact of evidence that would have been available and likely introduced, had counsel completed a constitutionally adequate investigation before settling on a particular mitigation theory. *Sears v. Upton*, 561 U.S. 945, 954-55 (2010). "[R]egardless of how much or how little mitigation evidence was presented during the initial penalty phase," *Sears*, 561 U.S. at 956, the inquiry into whether counsel exercised reasonable professional judgment "focus[es] on

30

**2301**

whether the investigation supporting counsel's decision not to introduce mitigating evidence ... was itself reasonable." *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). In this case, there was no "decision" to forego the introduction of mitigating evidence. Counsel did not present certain mitigating evidence because they failed to conduct an adequate investigation and uncover the available evidence.

**A. All mental health experts consulted by defense counsel indicated Runyon was suffering from a mental disease or defect but the experts lacked the information, testing, and time required for a complete examination.**

Respondent concedes that Drs. Mirsky and Merikangas made only preliminary findings. ECF No. 497, p.54 ("Their reports were preliminary in nature[.]"). The prosecution never received a full report from Dr. Merikangas and Dr. Mirsky did not supplement his report. ECF No. 497, p.55. Respondent repeatedly asserts, however, that the defense experts were not favorable, *see, e.g.,* ECF No. 497, pp.54, 65, and states that "counsel cannot be held accountable for relying on experts after providing them sufficient evidence." *Id.,* p.46. Respondent is incorrect. The defense experts' preliminary assessments *were* favorable to the defense. Counsel did *not* timely obtain expert assistance nor provide the experts sufficient information for an adequate examination.[12]

First, the preliminary findings of the defense experts contained classic mitigating evidence and warranted further investigation. Dr. Mirsky found: (a) "strong evidence that he [Runyon] is

---

[12] The first expert counsel contacted, Dr. Nelson, did not conduct a complete examination or a psycho-social history and assessment. He did, however, inform counsel that neuropsychological deficits were a defining element of Runyon's personality and behavior and he recommended a neuropsychological evaluation of Runyon. ECF No. 153, p.1. Counsel then sought assistance from experts in that field. In *Sears*, 561 U.S. at 951, the Court held that "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive—perhaps in support of a cognitive deficiency mitigation theory. In particular, evidence of Sears' grandiose self-conception and evidence of his magical thinking ... were features, in another well-credentialed expert's view, of a 'profound personality disorder.'"(Citation omitted). The performance of Runyon's counsel failed in this regard.

31

suffering from a neurological disorder," ECF No. 478-20; (b) Runyon has classic symptoms and suffers the effects of blast and impact injuries and brain injury, ECF No. 478-21; (c) Runyon is properly classified as having mild traumatic brain injury, ECF No. 478-22; (d) Runyon displays symptoms of Post Traumatic Stress Disorder, *id.*; and, (e) Runyon has a very impaired ability to sustain attention and has impairments in reaction time. *Id.*, pp.1-3. All of these findings are mitigating. *See, e.g., Porter*, 558 U.S. at 41 (evidence of poor mental health or mental impairment could influence a jury's appraisal of the defendant's moral culpability); *Sears*, 561 U.S. at 949 (describing brain damage as significant mitigating evidence); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 261-63 (2007) (describing "possible neurological damage" as mitigating evidence); *Rompilla*, 545 U.S. at 392 (discussing how organic brain damage is an extreme mental disturbance that significantly impairs cognitive functions and a defendant's mental capacity at the time of the crime).

Dr. Merikangas reported: (a) that the prosecution experts' evaluations suggested Runyon suffers from Migraine like headaches, Attention Deficit Disorder and Post Traumatic Stress Disorder, ECF 478-2, p.5; (b) Runyon has physical signs of trauma, *id.*; (c) he has Post Traumatic Stress Disorder, *id.*; (d) he suffers severe headaches, *id.*; (e) withdrawal from experimental drugs may have affected him at the time of the crime, *id.*, pp.5-6; (f) he was currently either in a fantasy world of grandiose thinking or suffering from delusions; *id.*, p.6; and, (g) he has impaired executive functioning suggestive of frontal lobe brain impairment. *Id.* All of these findings are mitigating. *Ibid.*

Second, counsel failed to timely obtain expert assistance. Respondent concedes that—the day before trial began—defense counsel provided notice of their intent to substitute Drs. Mirsky and Merikangas as the defense experts but the doctors had not yet begun or concluded their evaluations of Runyon. ECF No. 497, p.50 (citing ECF No. 230). Once retained, the experts requested more

32

information and testing but received neither. They were not given Runyon's medical records or other relevant background materials.

Dr. Mirsky reported to counsel: (a) that an evaluation by a neurologist was essential, ECF No. 478-20; (b) testing information sent to him by the prosecution expert was "not especially useful or informative," ECF No. 478-21; (c) counsel's report that the brain scans "were read as normal" was not conclusive on whether Runyon had brain damage, ECF No. 478-22, p.1; (d) Diffusion Tensor Imaging had not been done, *id.*; and, (e) Post Traumatic Stress Disorder had not been ruled out. *Id.*

Dr. Merikangas was not appointed until the day the jury found Runyon eligible for the death sentence. ECF No. 257. He requested: (a) a chronology and details of the experimental drugs Runyon was administered before the crime, and (b) brain imaging, including MRI, PET, and EEG. ECF No. 478-2, pp.5-6. He was not given the brain scans performed during the penalty trial. Dr. Merikangas recently reviewed the scans from August 2009. "They revealed multiple white matter hyperintensities ... consistent with his [Runyon's] history of head injur[i]es and migraine." ECF 478-2, p.4.

Respondent nevertheless discounts the scans based on defense counsel's representation to Dr. Mirsky that the scans were read as normal. *See, e.g.*, ECF No. 497, p.58. Counsel made that remark to Dr. Mirsky *after* Runyon was sentenced to death. ECF. 478-22, p.1. Even then, when Dr. Mirsky informed counsel that his opinion regarding Runyon's brain injury and PTSD was unchanged, counsel failed to act. *Id.*

The fact that Runyon suffers from a mental disease or defect, in part based on injuries incurred during his military service, was mitigating. The available mental health mitigation was consistent with non-statutory mitigators regarding Runyon's childhood experiences of domestic

33

**2304**

violence and parental conflict and Runyon's military service. It was not inconsistent with the defense theories of equally-culpable co-defendants and family sympathy. Based on what counsel learned (or should have learned) from the mental health experts, the investigation was incomplete and prematurely abandoned.

**B. Counsel did not reasonably abandon the psycho-social investigation.**

Respondent argues that counsel's limited mental health investigation was adequate because offering expert testimony would have opened the door to harmful testimony from the prosecution's experts and because counsel did not have a factual basis to follow-through with the investigation. Neither contention is supported by the evidence before the Court.

**1. Counsel did not abandon the investigation upon receipt of the prosecution experts' reports.**

Respondent implies that defense counsel abandoned the mental health investigation once the prosecution experts' reports were revealed. ECF No. 497, p.51 (the defense filed its notices of intent to introduce mental health testimony before defense counsel received reports from the prosecution's experts). The causation Respondent claims does not exist. Counsel received the reports the day the jury found Runyon eligible for the death penalty. ECF No. 252. Nine days before the penalty phase began, counsel re-asserted an intent to present mental health experts and requested permission to supplement the defense experts' reports. ECF No. 269. Thus, counsel clearly contemplated mental health testimony even after they received the prosecution experts' reports.

Respondent argues as if counsel in this case were uniquely confronted with the proposition that if they "opened the door to a mental health defense, the Government would have presented mental health experts in rebuttal." ECF No. 497, pp.51-52. This is the nature of the adversarial system. "If there is one area where expert witnesses are almost always diametrically opposed, it is the field of psychiatry." *U.S. v. Mansfield*, 24 M.J. 611, 618 (A.F.C.M.R. 1987) (rejecting the argument

34

that abandoning expert evidence was reasonable because the prosecution could respond with damaging information). The fact that the prosecution will present its own experts does not justify counsel's failure to present mental health mitigation in support of a life sentence. *Porter*, 558 U. S. at 43 ("it was not reasonable to discount entirely the effect that [a defense expert's] testimony might have had on the jury" just because the prosecution's expert provided contrary testimony).

> **2. Reports of the prosecution experts did not contain additional aggravating evidence and were not inconsistent with defending the proposed aggravating circumstances or establishing mitigating circumstances.**

The record before the Court does not support Respondent's theory that counsel avoided damaging prosecution evidence by abandoning the mental health investigation. The reports of the prosecution's experts, Drs. Patterson and Montalbano, were not so detrimental to Runyon's defense that they rendered non-prejudicial counsel's failure to complete the mental health investigation and offer mitigating evidence. In fact, Respondent concedes that Dr. Patterson, who opined Runyon met the criteria for a personality disorder with narcissistic features, concluded "no mitigating *or aggravating* mental health factors existed." ECF No. 497, p.53 (emphasis added). Dr. Patterson stated: "Although [Runyon's] personality traits have affected relationships and job performance, they do not, in my opinion, represent a serious mental illness that has any impact as mitigating *or aggravating factors regarding sentencing* on his current charges if found guilty." ECF No. 276, p.23 (emphasis added). Dr. Patterson noted that Dr. Montalbano's findings were consistent with his own. ECF No. 276, p.24. The reports of the prosecution experts would not have established additional aggravation and accordingly do not support Respondent's speculation as to a possible "strategy" behind counsel's abandonment of the mental health investigation.

The expert testimony Respondent asserts would have been harmful contained facts that were

35

**2306**

already before the jury.[13] Respondent states that the prosecution experts would have testified "that Runyon failed to accept responsibility for his actions[.]" ECF No. 497, pp.53-54. Similar testimony was already before the jury as it was a central prosecution theme: Runyon lacked remorse because he failed to take responsibility for the crime. The prosecution presented testimony and exhibits attempting to establish a pattern of conflicts that arose during Runyon's various jobs and attempting to show that Runyon consistently denied fault, shifted blame, and rationalized such conflicts. The prosecutor argued: "we see a recurring theme, ladies and gentlemen, with this education and this employment experience, in that he is reprimanded, and then he resigns. It's never his fault. It's never his fault that he is late and given a suspension. It is never his fault that he has had unsatisfactory job performance and he is barred from reenlistment." Tr.2614, 8/26/09. The prosecutor also presented evidence regarding domestic battery charges and argued they had shown how Runyon "will do what he can to avoid responsibility for this, and it is a trend that we have seen continue into this case as well." Tr.2608, 8/26/09; *see also* Tr.2611, 8/26/09 ("Runyon is a manipulator who will do what he can to avoid responsibility. Again we see this same theme in the aftermath of the murder[.]").

The jurors found the lack-of-remorse non-statutory aggravating circumstance without testimony from the Government's experts. Counsel's failure to complete the mental health investigation and present expert testimony did not close the door to additional aggravating evidence, it prevented the jurors from considering a true depiction of David Runyon and his moral culpability. For example, Dr. Montalbano's report would have provided the jurors with the explanation that Runyon's "strong ego" and tendency to "externalize blame and to rationalize his own behavior" are products of his personality dysfunction. ECF No. 277, pp.26, 27; *see also* ECF No. 276, p.23 (Runyon

---

[13] Not all of the testimony would have been duplicative of other prosecution evidence; some had mitigating value. *See infra* 6(B)(3).

36

demonstrates personality features including "externalizing his responsibilities for conflicts" and not taking responsibility).

Respondent contemplates that the prosecution experts "could very well have conflicted with Dr. Cunningham's conclusion that Runyon presented a very low risk of future violence." ECF No. 497, pp.53-54. Respondent acknowledges, however, that the jurors rejected Dr. Cunningham's risk-assessment testimony without hearing from the prosecution's experts. ECF No. 497, p.42. Dr. Montalbano's report on Runyon's "correctional course and adjustment" would have likely supported Dr. Cunningham's risk-assessment testimony since it found: (a) Runyon "had no disciplinary infractions" during his year-and-a-half in pre-trial custody; (b) Runyon "was credited with providing emergency first aid to a cellmate, who suffered a seizure and associated head injury;" (c) Runyon's placement in general population reflected an appraisal that he was at low risk for violence in the prison environment; and (d) Runyon was "an isolative individual, who spent much of his time in his cell ... engaging in activities such as reading." ECF No. 277, p.20. Again, counsel's failure to complete the mental health investigation and present expert testimony did not prevent the admission of additional aggravating evidence; it resulted in the jurors making a moral culpability determination based on an incomplete picture of David Runyon.

### 3. Counsel abandoned the investigation despite several red flags signaling the existence of substantial mitigating evidence.

In addition to facts signaling the need for investigation, *see supra* Claim 5, and the mitigating information conveyed to counsel by their own experts, *see supra* 6(A), the reports of the prosecution's experts (Drs. Montalbano and Patterson) included information warranting further investigation.

The prosecution experts confirmed some of Runyon's psycho-social history, including his head injuries. Each expert noted Runyon's head trauma at about age three when he was abused by his biological father, a run-in with a telephone pole around age five, being "knocked out" during high

37

**2308**

school wrestling matches, concussions from military training involving explosions, and "a bad car accident" in 1996. ECF No. 276, pp.11-12; ECF No. 277, p.20. Dr. Montalbano found evidence of the 1996 car accident: the main reason Runyon was barred from reenlistment in the Army was a problem with attention to detail and a failure to follow instructions. ECF No. 277, p.29. This was a problem that did not predate the car accident and Dr. Montalbano opined that "problems such as attention to detail may have been the part of the sequalae from this event." *Id.* Maria Runyon's grand jury testimony also corroborated the car accident. ECF No. 277, p.20. Dr. Montalbano's testing revealed a substantial variance between Runyon's verbal and performance IQ scores and significant deficits in working memory. ECF No. 277, pp.24-25. "[O]nly a more detailed neuropsychological, neurological and biopsychosocial investigation would definitely rule in or rule out brain dysfunction[.]" ECF No. 277, p.30. If counsel had followed these leads and conducted an adequate investigation the jurors would have learned of Runyon's brain damage.

Dr. Patterson's report noted that the "sag" on the right side of Runyon's face resulted from abuse by his biological father. ECF No. 276, p.11. Had counsel pursued this information they could have presented such evidence to the jurors and strengthened the non-statutory mitigating circumstances based on Runyon's childhood environment. This information also would have rebutted the prosecution's argument that Runyon's appearance in the interrogation videotape evidenced a lack of remorse. *See* ECF No. 478, pp.71-72, 74.

Dr. Montalbano's report discussed the effect of adverse developmental factors in Runyon's life. He found several adverse factors which "may well have contributed to his [Runyon's] personality disorder[.]" ECF No. 277, p.30. Runyon's personality disorder, in turn, "contributed significantly to his poor vocational performance and his unstable interpersonal history." ECF No. 277, pp.30-31. Dr. Montalbano devoted multiple pages in his report to explaining how various personality-driven factors

38

2309

resulted in Runyon's "significant underachievement" and inability to maintain consistent employment, lack of self-awareness and rigid tendency to deny or minimize problems, apparent lack of remorse, lack of consistent contact with his family, poor impulse control and poor judgment in establishing relationships with unstable females. *Id.*, pp.25-30. Had counsel followed-up on Dr. Montalbano's discussion of adverse factors they could have obtained favorable testimony on this subject matter from Dr. Cunningham.[14] *See* ECF No. 478, pp.64-68.

At trial the prosecution portrayed Runyon's participation in drug studies as an intentional "[abandonment of] more gainful attempts at employment, to get employment through these sporadic drug studies that put him into contact with people like Michael Draven." Tr.2610, 8/26/09. In contrast, Dr. Patterson reported that when Runyon's "mother was in a lot of physical pain, and he first found out about drug trials because he was doing research online resulting in his decision to participate in drug trials while he was in West Virginia." ECF No. 276, p.12. Runyon felt like he was doing "something good for people and he had only seen three or four other Asians so that he [wa]s 'representing that culture.'" ECF No. 276, p.13. Had counsel pursued information in Dr. Patterson's report, the jurors could have been provided with context regarding Runyon's motivations for participating in drug studies that would have countered the prosecution's argument.

In light of information that was known (or should have been known) by counsel, the failure to conduct an adequate psycho-social investigation was unreasonable.

---

[14] Respondent states that "developmental factors were both known and put forward by counsel for Runyon," ECF No. 497, p.59, but only some were "put forward" by counsel in a letter to the United States Attorneys. ECF No. 478-15. Counsel did not present evidence *to the jurors* regarding how development factors impacted Runyon's cognition, emotions, and behaviors. Subsequently, replacement counsel failed to present at either the eligibility or selection phase the mitigation narrative reflected in that letter and developed by his predecessor.

39

**2310**

## C.     Counsel's deficient performance resulted in prejudice.

Respondent argues that the unpresented mitigating evidence was "of [d]ubious [v]alue," ECF No. 497, p.57, and asserts that "counsel elected to pursue a mitigation strategy based not on dubious mental health information, but on positive aspects of Runyon's character."[15] *Id.*, p.60. Respondent would have the Court *assume* that defense counsel made informed choices not to present certain mitigating evidence. However, penalty-phase counsel did not believe mental health evidence was "dubious."[16] Counsel wanted to present evidence of trauma and Runyon's diminished ability to reason. ECF No. 478-5, pp.1-2, ¶5; ECF No. 478-6, p.1 ¶5. This evidence was available and was not inconsistent with the evidence which was presented at the penalty phase.

Finally, Respondent argues that trial counsel presented a reasonable defense based on the fact that "Runyon was a decent person who deserved mercy." ECF No. 497, p.62. When advocating for a life sentence there is a substantial difference between: (a) a presentation based on the fact that Runyon was a decent person who killed someone, and (b) a presentation based on the fact that Runyon was a decent person who had experienced lifelong traumas resulting in mental illness, personality dysfunction, and brain damage that affected his cognitive functioning and made him susceptible to being used as a tool by the codefendants to kill co-defendant Voss's husband. Unfortunately, counsel were not in a position to "choose" among these presentations because the psycho-social investigation

---

[15] Respondent also asserts that the jury imposed a death sentence because it found in the eligibility phase that Runyon "intentionally killed Cory Allen Voss, that he did so for money, [and] he did so after substantial planning." ECF No. 497, p.68. Under this view, prejudice could not be established because the selection phase of trial and mitigation were irrelevant. Respondent effectively says the jury determined the aggravating factors and decided upon death as early as the guilt phase and no later than the eligibility phase.

[16] Respondent repeatedly downplays the unpresented mitigation evidence even though it is the type of evidence that the Supreme Court has declared could influence a jury's appraisal of a defendant's moral culpability. *See supra* 6(A).

40

**2311**

was inadequate.

**Claim 7:** **Runyon's Sixth Amendment Right To Confront The Witnesses Against Him Was Violated When The Prosecution Presented Police And Informant Testimony Of Statements From His Co-Defendant, Michael Draven. Furthermore, His Trial Counsel Were Ineffective When They Failed To Object To The Admission Of This Testimony And Failed To Ask The Court For A Limiting Instruction That They Could Not Be Considered As Evidence Of Runyon's Guilt.**

The jury was told that co-defendant Draven said on the night of the crime he called and spoke to Runyon, who was at a payphone located near the crime scene. Draven also said in a separate statement that he hired a "friend" to commit the crime. Trial counsel failed to make contemporaneous objections or request a curative instruction when these statements were admitted through the testimony of Detective Rilee, who obtained the first statement while interrogating Draven, and jail-house informant Edward Fodrey who recounted the second statement.

Respondent first defends the Confrontation Clause violations by claiming that Detective Rilee's description of co-defendant Draven's admission was otherwise admissible as a statement made in furtherance of a conspiracy. ECF No. 497, p.74. Draven's admission that he spoke to Runyon while Runyon was at a location within a short distance from the scene of the crime is unrelated to any conspiracy, including a conspiracy to cover-up the crime. Draven's statement is the only evidence that places Runyon in Newport News, Virginia shortly before the crime occurred. Draven and Runyon certainly did not "conspire" to place Runyon in that location when all other evidence demonstrated Runyon was in Morgantown, West Virginia at a time that made it impossible for Runyon to commit the crime in Newport News.[17]

---

[17]Respondent's assertion that "Draven was attempting to clear Runyon from suspicion" with this statement is nonsensical. ECF No. 497, p.75. Draven places Runyon near the crime scene and admits they were in contact right before the crime occurred. These are not statements of a person "attempting to clear himself" and others. *See id.*

41

**2312**

Respondent alternatively suggests that Draven's statement was not inculpatory as to Runyon because the connection between Draven's admission and the Voss murder is not apparent from the face of the statement itself. ECF No. 497, pp.75-76 (citing *U.S. v. Lighty*, 616 F.3d 321 (4th Cir. 2010)). Again, Respondent ignores that this is the only evidence that placed Runyon in Newport News, Virginia near the time of the crime. Runyon's jurors heard from Detective Rilee that Draven identified Runyon as the person at the Waffle House payphone, *i.e.*, the person within a short distance of the scene of the crime, and this contradicted Runyon's account of his whereabouts. *Lighty* is a case that involved redactions of proper names from a non-testifying co-defendant's statement and it cannot support Respondent's argument because Runyon was specifically named in co-defendant Draven's statement.

As to Edward Fodrey's recitation of Draven's statements, Respondent again relies upon *Lighty* and its progenitor *U.S. v. Akinkoye*, 185 F.3d 192 (4th Cir. 1999), and insists that Fodrey's recitation of Draven's statement was not inculpatory because it did not mention Runyon by name. ECF No. 497, p.78. In *Lighty* and *Akinkoye* the statements in question could have referred to a number of other persons and in *Akinkoye* the redaction pointed to a person other than the defendant raising the Confrontation Clause challenge. *See Akinkoye*, 185 F.3d at 198. Here, no such possibility exists. The jurors had no basis to conclude that Draven's statement to Fodrey referred to anyone but Runyon.

In *Lighty*, the prosecution presented a non-testifying codefendant's redacted out-of-court statement that replaced the defendant's proper name with a general reference. The court found that the defendant could not be identified as the subject of the co-defendant's statement absent additional evidence. It reasoned that the prosecution would have to present additional witnesses, who could be confronted, in order to connect the defendant to the statement. *Lighty*, 616 F.3d at 377. The *Lighty* court approved the admission of such a redacted statement but admissibility was also dependent upon

42

**2313**

the administration of a proper limiting jury instruction. *Id.* (citing *Richardson v. Marsh*, 481 U.S. 200, 208-09 (1987)).

Here, Fodrey testified that Draven said he "hired some other guy" that "was a friend of his" to murder Corey Voss. Respondent argues that this reference is ambiguous enough to pass Sixth Amendment scrutiny because there was evidence that Draven had "reached out" to other people. ECF No. 497, p.78. However, there was one person and one person alone who had already been identified as Draven's "friend" and that was Runyon.

The jurors were clear that the three defendants were Draven, his girlfriend Cat Voss and his friend David Runyon. In opening statement, the prosecutor said that in order for co-defendants Draven and Voss to make a life together they had to get rid of Voss's husband: "Enter the defendant, David Runyon, a friend of Michael Draven's from hospital drug studies that the two men did together." Tr.214, 7/2/09. The jurors heard a phone conversation between Voss and Draven that referred to Draven's "friend" as the person Draven was supposed to have lunch or dinner with before Draven was arrested. Gov't Tr. Ex. 163A. Voss referenced having a conversation with Draven's "friend" and the prosecution alleged this conversation involved Voss asking Runyon to kill her husband. Four and a half days into the prosecution's case, when Fodrey testified that Draven said he hired a "friend," that term obviously referred to Runyon or involved that inference which the jurors could make without any additional evidence. *See Lighty*, 616 F.3d at 376-77. *See also, U.S. v. Ramirez*, 29 Fed. App'x 111, 115 (4th Cir. 2002) (Although "partner" may be, in isolation, a "neutral pronoun," in the context of prior evidence it was "facially incriminating.").

Respondent attempts to sweep aside trial counsel's failure to make a contemporaneous objection to these violations and failure to request a limiting instruction with the conclusory statement that such an instruction would have drawn unwanted attention to the un-confronted, inculpatory

43

2314

statements. ECF No. 497, p.77. This argument fails because a jury is rightfully presumed to follow a judge's cautionary instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). If fact-finding procedures reveal that this was the reason counsel did not to object or request limiting instructions, then counsel's decision was unreasonable and legally unsupportable.

Finally, Respondent asserts that Runyon has not shown cause and prejudice for the procedural default resulting from the fact that the Confrontation Clause claim was not raised on direct appeal. ECF No. 497, p.72. Runyon has alleged, however, that his direct appeal counsel were ineffective for not raising the Confrontation Clause claim and the claim's probable merit establishes prejudice. *See* Claim 8.

**Claim 8:     Ineffective Assistance Of Counsel On Direct Appeal.**

Runyon raises the issues of ineffective assistance of appellate counsel as both a substantive claim and as "cause" for any claim that may be deemed procedurally defaulted.

Respondent asserts that counsel did not have a duty to appeal every non-frivolous issue if counsel made a strategic decision to forgo such issues. ECF No.497, p.80. Respondent does not argue, however, that those circumstances are present in Runyon's case. Respondent's argument is focused against a finding of prejudice from counsel's deficient performance.

Appellate counsel rendered deficient performance because one or more issues were not raised even though they are clearly stronger than two issues presented in the appellate brief. *See, Smith v. Robbins*, 528 U.S. 259, 288 (2000). This is an easy determination because it requires only a comparison of the strength of the ignored issue and the strength of the issues raised, *id.*, and the Fourth Circuit identified two very weak claims in Runyon's appellate brief. The claim based on an alleged Commerce Clause violation had been rejected by "all of the circuits to address the question" and was contrary to

44

**2315**

binding and long-standing circuit authority. *Runyon*, 707 F.3d at 489. The boilerplate challenge to the constitutionality of the death penalty in all circumstance similarly failed by a wide margin. *Id.* at 521 n.7.

With respect to the contested issue of prejudice, Respondent mis-states the *Strickland* standard. Respondent argues against prejudice stating: "Runyon has failed to set forth any issue which if it had been appealed would have resulted in any different outcome in his case;" "Runyon fails to demonstrate that he would have prevailed on this issue on direct appeal;" and, "the additional issues Runyon suggests have no merit[.]" ECF No. 497, pp.81, 82-83.

Runyon need not show that there would have been a different outcome or that he would have prevailed on direct appeal had an omitted issue been raised. He does not even have to establish by a preponderance of the evidence that the result would have been different. *Williams*, 529 U.S. at 405-06. Runyon need only demonstrate "a reasonable probability that … the result of the proceeding would have been different." *Id.* at 406 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Such a determination may require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

**Claim 9:** **Runyon's Conviction Under 18 U.S.C. §924(c) Is Unconstitutional Because It Was Procured In Violation Of The Due Process Clause, The Equal Protection Clause, And The Fifth, Sixth And Eighth Amendments Of The Constitution. *Johnson v. U.S.*, 135 S.Ct. 2551 (2015).**

**A. Introduction**

In *Johnson v. U.S.*, 135 S.Ct. 2551 (2015), the Supreme Court found the residual clause of the Armed Career Criminal Act ("ACCA") unconstitutionally vague. The residual clause of the ACCA defines a "violent felony" as an offense that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. §924 (e)(2)(B)(ii). The Supreme Court found this language

**2316**

unconstitutional for two reasons: first, it requires a court to imagine the "ordinary case" of a crime, an "inherently indeterminate" task; second, the judicial assessment of risk is untethered to any sort of standards. *Johnson*, 135 S.Ct. at 2558-59. Runyon alleges his convictions under 924(c), which has a similar residual clause,[18] is unconstitutional under *Johnson, supra. See* Claim 9, ECF No. 478, pp.80-90.

Respondent asserts Runyon's case is not affected by *Johnson*, offering numerous contentions as to why this is so. Runyon addresses each contention in turn.

### B. Legal Background

As discussed in Runyon's motion for §2255 relief, multiple provisions of the federal law contain, or incorporate, a definition of "violent felony" or "crime of violence." *See* 18 U.S.C. §924(e) ("ACCA"); 18 U.S.C. §16(b) ("General Provisions" definition of crime of violence); 18 U.S.C. §924(c) (brandishing or carrying a firearm during commission of a crime of violence).

Courts regularly compare the similarities between the residual clause in the ACCA to the clause at issue here. Although the comparison tends to specifically address 18 U.S.C. §16(b), that statute is identical to §924(c)(3)(B). *See, e.g., Chambers v. U.S.*, 555 U.S. 122, 133, n.2 (2009) (citing circuit splits on §16(b) in the context of a residual clause case because §16(b) "closely resembles ACCA's residual clause") (Alito, J., concurring). *See also U.S. v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on an ACCA case to interpret the definition of a crime of violence under §924(c)(3)(B)); *U.S. v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same); *U.S. v. Keelan*, 786 F.3d 865, 871 n.7 (11th Cir. 2015) (describing the ACCA otherwise clause and §16(b) as "analogous"); *Roberts v. Holder*, 745 F.3d 928, 930-31 (8th

---

[18] In pertinent part, the ACCA residual clause defines a "violent felony" as an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. §924(e)(2)(B)(ii). The 924(c)(3)(B) residual clause defines a crime of violence as one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

46

Cir. 2014) (using both ACCA cases and §16(b) cases to define the same "ordinary case" analysis); *U.S. v. Sanchez-Espinal*, 762 F.3d 425, 432 (5th Cir. 2014) (despite the fact that the ACCA talks of risk of injury and §16(b) talks of risk of force, "we have previously looked to the ACCA in deciding whether offenses are crimes of violence under §16(b)").

After *Johnson*, the lower courts, and this Court, are confronted with cases raising questions about how the *Johnson* opinion affects these other similarly worded provisions, including 924(c)(3)(B) and/or 16(b), which are at issue in Runyon's case.

As of this filing, there is a circuit split on whether the concerns underlying the *Johnson* opinion are also present in convictions resting on 18 U.S.C. §§16(b) and 924(c)(3)(B). The Fifth, Seventh, and Ninth Circuits have held that 924(c)(3)(B) suffers the same constitutional frailties that resulted in 924(e)'s downfall. *U.S. v. Gonzalez-Longoria*, 813 F.3d 225, 235 (5th Cir. 2016) *reh'g granted*, No. 15-40041, 2016 WL 766980 (5th Cir. Feb. 26, 2016) ("Under *Johnson*, this means that §16 is unconstitutionally vague, and we so hold."); *U.S. v. Vivas-Ceja*, 808 F.3d 719, 723 (7th Cir. 2015) ("Applying *Johnson*'s reasoning here, we conclude that §16(b) is unconstitutionally vague."); *Dimaya v. Lynch*, 803 F.3d 1110, 1120 (9th Cir. 2015) (18 U.S.C. §16(b) is unconstitutional because it requires judicial imagination of an ordinary case of a crime and because vague and uncertain standards are relied upon in determining risk; by implication, the identically worded portion of 924(c) is unconstitutional). One Circuit has held that *Johnson* does not render 924(c)(3)(B) unconstitutional. *U.S. v. Taylor*, No. 09-5517, 2016 WL 537444, at *35 (6th Cir. Feb. 11, 2016) (reh'g pending).

District courts have also reached inconsistent conclusions. *See, e.g., U.S. v. Tiffany Renee Edmundson*, No. PWG-13-15 (D. Md. Dec. 30, 2015) ECF No. 67. (18 U.S.C. §924(c)(3)(B) is void for vagueness); *but see U.S. v. Pedro Anthony Romero Cruz*, No. 1:14-CR-306-GBL (E.D. Va. Mar. 8, 2016) ECF No. 738 (18 U.S.C. §924(c)(1) and (2) unaffected by *Johnson*).

47

**2318**

This Court is likewise confronted with a shifting legal landscape. At bottom, though, Runyon's convictions suffer the same infirmities that caused the Supreme Court to act in *Johnson*. Section 924(c)(3)(B), like the ACCA residual clause, requires the two-step analysis condemned in *Johnson*: an "ordinary case" analysis followed by an imprecise risk analysis. Because these are the steps condemned in *Johnson*, §924(c)(3)(B) cannot withstand scrutiny. It violates the due process principles reaffirmed in *Johnson*. Relief is warranted.

## C. Argument

The Government's numerous contentions may be broadly described as follows:

1) Runyon's *Johnson* claim is procedurally barred.

2) There is less documented judicial confusion about application of 18 U.S.C. §924(c) than there is about ACCA; thus, 924(c) is constitutional.

3) Section 924(c) is not plagued by a confusing list of enumerated offenses; thus it is constitutional;

4) Section 924(c) is more narrowly drafted than the ACCA; thus it is constitutional.

5) Alternatively, the Government asserts Runyon's convictions do not implicate the residual clause at all. They are based on the force clause of 924(c), which was not affected by *Johnson*.

6) Finally, the Government argues Runyon's sentencing hearing is not tainted.

### 1. This Court May Review Runyon's *Johnson* Claim.

Respondent faults Runyon for failing to raise this claim sooner. But Runyon raised the claim as soon as it became available. The *Johnson* holding is "new" because it expressly overruled two prior decisions—*James v. U.S.*, 550 U.S. 192 (2007), and *Sykes v. U.S.*, 131 S.Ct. 2267 (2011)—that had affirmed sentences imposed under the residual clause. *Johnson*, 135 S.Ct. at 2563 ("Our contrary

48

**2319**

holdings in *James* and *Sykes* are overruled."). That *Johnson* expressly overruled prior precedent demonstrates that the decision is "new." *See Teague*, 489 U.S. at 301 ("[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final.").

Respondent also asserts *Johnson* will not apply retroactively. A Supreme Court decision applies retroactively to cases on collateral review if it announces a "new" rule that is "substantive." *Schriro*, 542 U.S. at 351. *Johnson* satisfies both requirements. In addition to being new, the *Johnson* holding is "substantive." Under Supreme Court precedent, a decision is considered "substantive" if it "narrow[s] the scope of a criminal statute by interpreting its terms." *Schriro*, 542 U.S. at 351. A decision is also "substantive" if it "prohibit[s] a certain category of punishment for a class of defendants because of their status or offense." *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997) (internal quotation marks and citation omitted). Such decisions "apply retroactively because they 'necessarily carry a significant risk that a defendant . . .' faces a punishment that the law cannot impose upon him." *Schriro*, 542 U.S. at 352 (quoting *Bousley*, 523 U.S. at 620). Applying these standards, a decision that narrows the reach of the ACCA—as *Johnson* does by declaring one of its provisions unconstitutional—is "substantive." *Johnson* meets the standard for retroactive application. The Supreme Court granted certiorari in *Welch v. U.S.*, No. 15-6418, to review the retroactivity of *Johnson*.[19]

This Court should reject Respondent's procedural default argument and review the merits of

---

[19] After filing a response in Runyon's case, the United States filed its merits brief in *Welch*, in which it agreed with Welch that the rule in *Johnson* is substantive rather than procedural and that it applies retroactively. Brief for the United States, *Welch v. U.S.*, No. 15-6418, available at http://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/briefs_2015 _2016/15-6418_resp_UnitedStates.authcheckdam.pdf. Given the Government's position in *Welch*, the retroactive application of *Johnson* to Runyon's case should no longer be contested. Nonetheless, Runyon replies here to the argument in the Government's pre-*Welch* response.

49

Runyon's claim.

## 2. Documented judicial confusion does not create vagueness.

Respondent contends that the ACCA residual clause is unconstitutional because the Supreme Court repeatedly failed to construe it in a workable manner. Respondent also relies on the fact that the lower courts have not been as "confused" by §924(c)(3)(B).

Respondent misinterprets the import of the prior case law. Prior judicial debate about the application of a law does not create vagueness. At most it may confirm "its hopeless indeterminacy." *Johnson*, 135 S.Ct. at 2558. *See also Dimaya*, 803 F.3d at 1119; *Vivas-Ceja*, 808 F.3d at 723; *Gonzalez-Longoria*, 813 F.3d at 235.

Moreover, in *Johnson*, the Supreme Court was clear that its basis for finding the residual clause unconstitutional was its reliance on the ordinary case assessment and the vague standard for assessing risk. *Johnson*, 135 S.Ct. at 2561.

## 3. The absence of enumerated offenses does not render 924(c) constitutional.

Respondent claims that because the enumerated offenses in ACCA are absent from 924(c), it is constitutional.

It is true that the Supreme Court lamented the confusing list of enumerated offenses that accompany the ACCA definition of "a crime of violence." *Johnson*, 135 S.Ct. at 2558. But the Court also noted the enumerated offenses "did not succeed in bringing clarity" because it "did not (and could not) eliminate the need to imagine the kind of conduct typically involved in a crime." *Johnson*, 135 S.Ct. at 2559. The *Johnson* Court made clear that the "ordinary case" problem was the key feature: "More importantly, almost all of the cited laws require gauging the riskiness of conduct in which an individual engages on a particular occasion.... The residual clause, however, requires application of the 'serious potential risk' standard to an idealized ordinary case of the crime." *Johnson*, 135 S.Ct. at

50

**2321**

2561. More plainly stated, the enumerated offenses are best understood as a way to salvage the unconstitutional definition. The fact that §924(c)(3) does not have a possibly salvaging list of enumerated offenses arguably makes it more vague, not less. *See Dimaya*, 803 F.3d at 1117-18; *Vivas-Ceja*, 808 F.3d at 723; *Gonzalez-Longoria*, 813 F.3d at 232.

Further, as a matter of logic, the absence of the enumerated offenses is irrelevant. This is because the threshold question is how to determine the ordinary case of a predicate offense. Only *after* determining the ordinary case would a reviewing court consider the enumerated offenses. The question of how to define the ordinary case is the problem. The list of enumerated offenses did not solve the problem but neither did it create it.

### 4. Section 924(c) is not more narrowly drawn than the ACCA (or the distinctions the Government notes are constitutionally irrelevant).

Respondent claims that §924(c)(3)(B) does not go beyond the elements of the offense to consider potential extra-offense conduct; thus §924(c)(3)(B) is constitutional. Respondent is in error.

Initially, Respondent overlooks that the Supreme Court has equated the scope of these two statutes. *See, e.g., Begay v. U.S.*, 556 U.S. 137, 144-45 (2008). *See also* p.46 for discussion of Supreme Court, appeals court and district court cases noting similarities between the statutes.

The ACCA and 18 U.S.C. §924(c)(3)(B) are not identical. But the differences have no impact on the constitutional analysis. Although the risk at issue in the ACCA is the risk of injury, and the risk at issue in §924(c) is a risk that force will be used, the difference is immaterial to the due process problem. In *Johnson*, the Court's holding did not turn on the type of risk, but rather how a court assesses or quantifies the risk. This process is the same under both the ACCA and §924(c). Both statutes require courts first to picture the "ordinary case" embodied by a felony, and then decide if it qualifies as a crime of violence by assessing the quantum of risk posed by the "ordinary case."

The Fourth Circuit applied the "ordinary case" analysis in *U.S. v. Avila*, 770 F.3d 1100, 1107

51

**2322**

(4th Cir. 2014), in construing §16(b): "As long as an offense is of a type that, by its nature, presents a substantial risk that physical force against the person or property of another may be used, it satisfies the requirements of 18 U.S.C. §16(b)." *Avila* controls here because §§16(b) and §924(c)(3)(B) are identical. And of course, the Fourth Circuit has applied the "ordinary case" inquiry to the §924(c) residual clause. *U.S. v. Fuertes*, 805 F.3d 485, 500 n.6 (4th Cir. 2015); *see also U.S. v. Naughton*, 621 Fed. App'x. 170, 178 (4th Cir. Sept. 2, 2015).

Respondent also claims §924(c)(3)(B) is limited to "'offenses that naturally involve a person acting in direct disregard of the risk that physical force might be used ....'" ECF No. 497, p.91 (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 10 (2004)). The Government continues that under §924(c)(3)(B), the ordinary case is limited to the elements of the offense. *Id.* But such an assertion cannot be reconciled with the Fourth Circuit's holdings in *Avila* and *Fuertes*, applying the problematic "ordinary case" analysis. Moreover, by focusing on the risk during the predicate offense, §924(c)(3)(B) is as broad as the ACCA's residual clause.

At bottom, this argument cannot win the day because the fundamental problem with the residual clauses of the ACCA and §924(c)(3)(B) is the threshold "ordinary case" inquiry that the Supreme Court determined is impossibly arbitrary.

### 5. Section 924(c)(3)(B) is vague as applied to Runyon.

Respondent argues Runyon may not challenge his §924(c) conviction because his conduct was clearly violent. But this argument ignores the fact that in the context of interpreting §924(c), courts apply the categorical approach. This entails the court envisioning an idealized "ordinary case," and asking whether that "ordinary case" involves a substantial risk that violent force will be used. *See Johnson*, 135 S.Ct. at 2557-58. Under the categorical approach, Runyon's actual conduct has no bearing on the resolution of this question.

52

**2323**

Moreover, in Justice Thomas' opinion concurring in the judgment, he opined the ACCA's residual clause covered an "unmistakable core of forbidden conduct" and thus it was not facially invalid. *See Johnson*, 135 S.Ct. at 2573 (Thomas, J., concurring in the judgment). The *Johnson* majority rejected this argument and this Court should as well.

### 6. Carjacking and conspiracy to commit murder for hire are not crimes of violence under the force clause of section 924(c)(3)(A).

The next question here is whether Runyon's carjacking and conspiracy offenses qualify as crimes of violence under the force clause of §924(c). Runyon explained in his 2255 motion that carjacking does not qualify as a crime of violence. ECF No. 478, pp.86-89. He explained this conclusion is consistent with the Fourth Circuit's holding in *U.S. v. Torres-Miguel*, 701 F.3d 165 (2012). Runyon continues to rely on the arguments raised in the §2255 motion and only addresses matters not previously discussed. Respondent argues that because a death resulted from the carjacking, "it can hardly be said that this charge does not require force under any definition." Respondent also notes that 18 U.S.C. §2119 contains a *mens rea* that the defendant act with the intent to cause death or serious bodily harm. ECF No. 497, p.95. Carjacking is defined as follows: "Whoever, with the intent to cause death or serious bodily harm, takes a motor vehicle ... from the person or presence of another by force and violence or by intimidation...." 18 U.S.C. §2119. In *Johnson*, the Supreme Court defined physical force, as used in §924(c)(3)(A) to mean "violent force—that is, force capable of causing physical pain or injury to another person." Carjacking does not qualify as a "crime of violence" under §924(c)(3)(A) because it does not include as a necessary element, "the use, attempted use, or threatened use," of "force capable of causing physical pain or injury to another." *Johnson*, 559 U.S. at 140.[20]

---

[20] Runyon notes the Eleventh Circuit and the Second Circuit have found carjacking qualifies as a crime of violence. *U.S. v. Moore*, 43 F.3d 568, 573 (11th Cir. 1994); *U.S. v. Mohammed*, 27 F.3d 815,

Nor is this conclusion altered by the sentencing provision of the carjacking statute, which notes that if death occurred, Runyon may face the death penalty. This sentencing provision does not require that the death result from using physical force. *See U.S. v. Barraza*, 576 F.3d 798, 807 (8th Cir. 2009). *See also Torres-Miguel*, 701 F.3d at 168 (explaining that the fact that serious bodily injury occurs does not per se establish a crime of violence).

Conspiracy to commit murder for hire is also not a crime of violence under the force provision of 18 U.S.C. §924(c). As explained in Runyon's §2255 motion, conspiracy does not qualify as a crime of violence under the force provision of §924. ECF No. 478, p.89. The fact that death resulted does not alter this conclusion. *See Torres-Miguel, supra.*

Respondent also contends that a different outcome is required because the Supreme Court overruled *Torres-Miguel* in *U.S. v. Castleman*, 134 S.Ct. 1405 (2014). ECF No. 497, p.97. Respondent is in error.

In *Torres-Miguel*, at issue was the defendant's prior conviction for the California offense of willfully threatening to commit a crime which *will result in death or great bodily injury to another. Torres-Miguel*, 701 F.3d at 168 (citing Cal. Penal Code §422(a)) (emphasis added). The specific question in the case was whether the statute had an element equating to a threat of violent force under the force clause of U.S.S.G. 2L1.2, a clause that is identical in all relevant respects to the §924(c) force clause. *Id.* Despite the death or great bodily injury element in the California statute, the Fourth Circuit found that the offense was missing a violent force element, and thus, could never qualify as a crime of violence under the force clause. *Id.* at 168-69. The court held that [a]n offense that *results* in physical injury, but does not involve the use or threatened use of force, simply does not meet the Guidelines

---

819 (2d Cir. 1994). But these opinions were issued well before the 2010 Supreme Court opinion in *Johnson.*

definition of crime of violence. *Id.* at 168. The court, in strong words, proclaimed that *"of course,* a crime may *result* in death or serious injury without involving *use* of physical force." *Id.* (emphasis added).

Relying on several appellate decisions from various Circuits, the Fourth Circuit reasoned that there are many ways in which physical injury, even death, can result without use of violent force. *Id.* at 168-69. For example, as the Fifth Circuit has noted, a defendant can violate statutes like California Penal Code 422(a) by threatening to poison another, which involves no use or threatened use of force. *Torres-Miguel,* 701 F.3d at 168-69 (citing *U.S. v. Cruz-Rodriguez,* 625 F.3d 274, 276 (5th Cir. 2010)); *see also U.S. v. Gomez,* 690 F.3d 194, 201 (4th Cir. 2012) (child abuse statute which required sustaining physical injury to child can be violated by an affirmative act or by neglecting to act, neither of which necessarily requires the use of physical force against the child). In reaching its decision, the *Torres-Miguel* court also relied on the Second Circuits' decision in *Chrzanoski v. Ashcroft,* 327 F.3d 188, 194 (2d Cir. 2003). In that case, at issue was whether a prior Connecticut conviction for third degree assault qualified as a crime of violence under the force clause.

For even further support, in *Torres-Miguel,* 701 F.3d at 169, the Fourth Circuit embraced the Tenth Circuit's decision in *U.S. v. Perez-Vargas,* 414 F.3d 1282, 1287 (10th Cir. 2005). In that case, "the [Tenth Circuit] explained that, although the Colorado [third degree assault] statute required [an act causing] bodily injury [by means of a dangerous weapon], imposing that injury does not necessarily include the use or threatened use of physical force as required by the Guidelines and so the Colorado crime was not categorically a crime of violence under U.S.S.G. §2L1.2." *Torres-Miguel,* 701 F.3d at 169 (citing *Perez-Vargas,* 414 F.3d at 1287) (internal quotation marks omitted). The Tenth Circuit reasoned that "several examples [exist] of third degree assault that would not use or threaten the use of physical force: . . . intentionally placing a barrier in front of a car causing an accident, or intentionally exposing someone to hazardous chemicals." *Perez-Vargas,* 414 F.3d at 1286.

55

**2326**

Contrary to Respondent's assertions, *U.S. v. Castleman*, 134 S.Ct. 1405 (2014) did not overrule *Torres-Miguel*. In *Castleman*, the Supreme Court held that a prior Tennessee domestic violence offense that had an element of physical injury qualified as a misdemeanor crime of domestic violence under the force clause of 18 U.S.C. §922(g)(9). *Id.* at 1413-15. However, the force clause of 922(g)(9) is critically different from that applicable here and in *Torres-Miguel*. In fact, in *Castleman*, the Supreme Court, in great length, explained that it was applying a definition of physical force to 922(g)(9) that was starkly different from that of the ACCA/§924(c)(3) force clause, which requires violent physical force. 134 S.Ct. at 1410-15. Unlike the definition of physical force at issue here (and in *Torres-Miguel*), the *Castleman* Court applied the common law definition of physical force that encompassed even the slightest offense of touching, *i.e., de minimis* force. *Id.* at 1410. In this context, the Court held that physical injury necessarily requires de minimis force. *Id.* at 1413-15.

But more importantly, the Supreme Court in *Castleman* explicitly refused to evaluate the validity of the logic rejecting *Torres-Miguel*. The *Castleman* Court wrote that "*[w]hether or not the causation of bodily injury necessarily entails violent force [is] a question we do not reach.*" *Id.* at 1413 (emphasis added). That, of course, is the question any decision abrogating *Torres-Miguel* must answer. Because *Castleman* failed to reach the question *Torres-Miguel* answered, *Torres-Miguel* retains its vitality and remains binding precedent that this Court has no choice but to follow.

### 7. The death sentence on Count One was tainted by the sentence for Count Five.

Respondent erroneously asserts that Runyon offers no authority in support of his request for a new sentencing hearing. In his motion, Runyon cited the Eighth Amendment, which requires heightened reliability in capital sentencing proceedings. He also cited *Kennedy v. Louisiana*, 554 U.S. 407 (2008). Finally, he cited case law from the Fifth and Seventh Circuits. ECF No. 478, pp.89-90.

Respondent also complains that Runyon wrongly seeks to have this Court consider the totality

56

**2327**

of the circumstances in determining whether to grant a new sentencing hearing, while also seeking to have this Court apply "Runyon's categorical approach" in reviewing whether recent Supreme Court precedent affects his capital convictions. There is no inconsistency because these are two separate inquiries requiring different analyses. The categorical approach was recognized by the Supreme Court in *Taylor v. U.S.*, 495 U.S. 575 (1990), and is among the controlling precedent to be applied to Runyon's substantive claim.

Once this Court strikes Runyon's death sentence under *Johnson*, as it must, the Eighth Amendment requires this Court to conduct an exhaustive review of the constitutionality of Runyon's death sentence. Such review would necessary entail consideration of the fact that the jury returned a mixed verdict. Furthermore, the Government has not and cannot argue the *Johnson* error is harmless. The *Johnson* error is harmful and relief is warranted.

**Claim 10:    The Jury Instructions At The Sentencing Phase Unconstitutionally Lowered The Government's Burden Of Proof In Violation Of The Fifth, Sixth, And Eighth Amendments. *Ring v. Arizona*, 536 U.S. 584 (2003).**

Respondent contends Runyon is barred from raising this claim on collateral review because it was raised on direct appeal. Runyon acknowledges he raised this issue on direct appeal, *U.S. v. Runyon*, No. 09-11, Appellant's Brief pp. 89-91 (4th Cir. Feb. 29, 2012), and the appeals court decided against him. *Runyon*, 707 F.3d at 516. However, where there is an intervening change in law, a prior adjudication may not be dispositive. *Davis v. U.S.*, 417 U.S. 333, 342 (1974) (where movant unsuccessfully raised issue on direct appeal, and where intervening law clarified the issue, the appeals court "erred in holding that the 'law of the case,' as determined in the earlier appeal from the … conviction, precluded him from securing relief under §2255 on the basis of an intervening change in law"). *See also English v. U.S.*, 998 F.2d 609, 612-13 (8th Cir. 1993) (relying upon *Davis* for the proposition that if there is an intervening change in law, an issue that was decided on direct appeal

57

**2328**

may be raised again in §2255 motion); *Underwood v. U.S.*, 15 F.3d 16, 18 (2d Cir.1993) (if an issue was raised on direct appeal, it may not be raised again in a §2255 setting unless there was an intervening change in law); *U.S. v. Palumbo*, 608 F.2d 529 (3d Cir. 1979) (an intervening change in law is an exception to the general rule that a claim may not be brought for a second time in a 2255 motion); Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* (7th ed.), section 41.7[e] (discussing previous determination of an issue as an affirmative defense that may be overcome if there has been an intervening change of law).

Respondent also asserts (without explanation) that the decision in *Hurst* represents a "new rule" that is not retroactively applied to Runyon's case. Runyon disagrees that *Teague* bars relief on this claim. As discussed *supra* the law is unsettled as to whether *Teague* applies in the context of a 2255 motion. If *Teague* does apply in the §2255 setting, it does not bar review of Runyon's claim because *Hurst* does not meet *Teague*'s definition of "new" rule. This is so because *Hurst* was dictated by prior precedent. *See Butler v. McKellar* 494 U.S. 407(1990).

Runyon's case is similar to *Stringer v. Black*, 503 U.S. 222 (1992), where the petitioner sought relief under *Maynard v. Cartwright*, 486 U.S. 356 (1988), and *Clemons v. Mississippi*, 494 U.S. 738 (1990), both of which were issued after his case was decided on direct appeal but while his case was pending on federal collateral review. The Supreme Court noted that while the cases were released after the petitioner's conviction was final, *Teague* did not bar review because the cases were not "new"—that is, they were dictated by prior precedent. *Stringer*, 503 U.S. at 227-28.

Respondent also argues if *Hurst* does apply, Runyon cannot prevail. Respondent is in error.

In *Hurst v. Florida*, 577 U.S. __, 136 S.Ct. 616 (2016), the Supreme Court struck Florida's capital sentencing scheme, finding it violates the Sixth Amendment because it "does not require the jury to make the critical findings necessary to impose the death penalty." *Hurst*, 136 S.Ct. at 621-22. The State

58

**2329**

of Florida argued that because the jury found the facts necessary to establish eligibility, the Sixth Amendment was satisfied. The Supreme Court rejected this argument as follows:

> The State fails to appreciate the central and singular role the judge plays under Florida law. ... [T]he Florida sentencing statute does not make a defendant eligible for death until 'findings *by the court* that such person shall be punished by death.' Fla. Stat. § 775.082(1)(emphasis added). The trial court *alone* must find 'the facts ... [t]hat sufficient aggravating circumstances exist' and '[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances."

*Hurst*, 136 S.Ct. at 622.

The *Hurst* Court recognized the unworkable nature of the distinction between eligibility and selection, and held a judicial finding that aggravators outweighed mitigators is unconstitutional. *Id.*

*Hurst* therefore makes clear that it is a jury function to weigh aggravating and mitigating circumstances because the result determines whether a death sentence is imposed. When the weighing function—whether aggravating circumstances outweigh mitigating circumstances—results in an affirmative finding, that finding constitutes the final element required for a death sentence. *Hurst*, 136 S.Ct. at 623-24 (specific findings authorizing the imposition of the sentence of death must be made by the jury). It is beyond question that all elements leading to a greater punishment must be found by a jury. *Ring*, 536 U.S. at 609 (quoting *Apprendi v New Jersey.*, 530 U.S. 466, 494 n.19 (2000)). It is also beyond questions that all elements must be found beyond a reasonable doubt. *Alleyne v. U.S.*, 570 U.S. ___, 133 S.Ct. 2151, 2156 (2013). Accordingly, a jury must find—beyond a reasonable doubt—that aggravating circumstances outweigh mitigating circumstances in order to impose a death sentence.

The fact that Runyon's jurors made the specific finding that aggravators "sufficiently" outweighed mitigators is not constitutionally sufficient. They were required to make this final finding that determines a death sentence over a life sentence "beyond a reasonable doubt." The jury instructions did not include the required burden of proof and the jurors did not find the final

59

**2330**

element required for a death sentence beyond a reasonable doubt. The sentence, therefore, should be vacated.

Just as in *Hurst*, here, the jury was instructed to make its ultimate determination to impose death based on whether the aggravating factors "sufficiently outweigh" mitigating factors. Tr.2672-73, 2675, 2682-84, 2694, 8/26/09; Tr.2707, 8/27/09. Given the fact that the Sixth Amendment applies to this ultimate, final determination to impose death, the jury should have been required to make its finding beyond a reasonable doubt.

**Claim 11:** **The Death Sentences Are Unconstitutional Because They Are Based On Aggravating Circumstances That Fail To Narrow And/Or That Are Arbitrary And Overbroad**

To be constitutional, aggravating circumstances must genuinely narrow the class of persons eligible for the death penalty from all persons convicted of a given offense and must reasonably justify imposition of a more severe sentence on the defendant compared to others convicted of the same crime. *Zant v. Stephens*, 462 U.S. 862, 877 (1983).

**A. The statutory aggravating circumstances failed to perform the constitutionally required narrowing function.**

Respondent concedes that the jurors relied upon two statutory aggravating factors that duplicated elements of the offense of conviction. ECF No. 497, p.108 ("The fact that two statutory aggravating factors mirror elements of the offenses . . . does not violate any constitutional principle."). Respondent asserts the eligibility findings were "very obvious and apparent in the jury's determination of guilt." *Id.*, p.33. The same evidence established "that Runyon had deliberately shot and killed Cory Voss, and that he did so with the expectation of being paid after substantial planning had occurred." *Id.*, p.32. The substantial planning statutory aggravator "was inherent in the jury's determination that Runyon and Draven were guilty of Conspiracy to Commit Murder for Hire Resulting in Death." *Id.*, p.34. The fact that the statutory aggravating factors duplicated elements of the offense means that the

60

**2331**

aggravators did not perform a narrowing function in this case and Runyon's death sentence is unconstitutional.

Respondent argues that no constitutional violation occurred because "[a]n element of the underlying offense may be presented as an aggravating factor when the class of defendants eligible for the death penalty are [sic] narrowed at the guilt stage, as opposed to the penalty phase." ECF No. 497, p.107. This argument fails because under the FDPA narrowing does not occur at the guilt phase of the case. Narrowing occurs at the eligibility phase where at least one statutory aggravating circumstance must be found.[21] *U.S. v. Caro*, 597 F.3d 608, 623 (4th Cir. 2010); *U.S. v. Higgs*, 353 F.3d 281, 294 (4th Cir. 2003) ("Once the jury finds the requisite intent and statutory aggravating factors, the crime is death-eligible."); *U.S. v. Jones*, 132 F.3d 232, 248-49 (5th Cir. 1998) ("Although the federal death penalty regime defines capital offenses, the narrowing function does not occur until the penalty phase of the trial."). Neither statutory aggravating factor elevated Runyon's moral culpability above that already determined by his conviction thus the death sentence is unconstitutional. *See* §2255 motion, ECF No. 478, pp.92-93.

Respondent's second argument is equally unavailing. Respondent asserts that the mental state finding at the eligibility phase fulfilled the narrowing requirement. ECF No. 497, p.108. Respondent cites no authority for the proposition that a jury finding of an intentional killing, standing alone, sufficiently placed Runyon in a narrowed class of persons eligible for the death sentence from all persons convicted of the offense. To the contrary, the mental state requirement in 18 U.S.C. §3591(a)

---

[21] Although *Lowenfield v. Phelps*, 484 U.S. 231 (1988), and *Tuilaepa v. California*, 512 U.S. 967 (1994), contain applicable principles of law, this claim is not controlled by the outcomes of those cases. *Lowenfield* involved a non-weighing statutory scheme that, like the statute in *Tuilaepa*, accomplished narrowing at the guilt-phase through a narrowed definition of capital murder. The FDPA is a weighing scheme that narrows through the application of statutory aggravating factors.

"codifies the command in *Enmund* ... and *Tison* ... to limit the imposition of the death penalty to those murderers who both undertake felony participation and demonstrate at least reckless indifference to human life. Satisfaction of these elements only begins the death penalty inquiry; it does not and cannot establish death penalty eligibility by itself."[22] *U.S. v. Webster*, 162 F.3d 308, 355 (5th Cir. 1998). The finding of a statutory aggravating circumstance is mandatory to achieve narrowing under the FDPA. If no statutory aggravating factor is found to exist, the court must impose a sentence other than death. 18 U.S.C. §3593(d).

**B.   This claim is not barred by the doctrines of procedural default or non-retroactivity.**

In reply to Respondent's assertion of procedural default, Runyon asserts that the ineffective assistance of counsel constitutes cause and prejudice to overcome any such bar to litigating the merits of this claim. *See also* Claim 8.

Respondent also asserts that this claim is barred by the non-retroactivity doctrine but Runyon's claim is not dependent upon a "new procedural law." The applicable principles of law, including *Apprendi v. New Jersey* and *Ring v. Arizona*, were announced before Runyon's conviction became final.

**C.   The non-statutory aggravators negated any narrowing that might have previously occurred, they are arbitrary and capricious, and at least one is overbroad.**

Respondent argues Runyon's constitutional claims regarding the non-statutory aggravators were "thoroughly analyzed" on direct appeal. ECF No. 497, p.109. The challenges addressed by the court of appeals, however, dealt with evidentiary and statutory concerns.[23] Appellate counsel did not

---

[22] In this case, felony participation is not an issue because Runyon was charged as a principal. The jury's eligibility-phase finding under §3591(a)(2)(A) that Runyon committed an intentional killing is duplicative, in other words, it does not super-add any fact different from what the jurors were required to find in order to convict Runyon. The jurors merely re-confirmed their earlier finding of intent at the guilt phase.

[23] Appellate counsel did not challenge "the propriety of the prosecution proposing" the lack-of-remorse aggravator but challenged the evidence introduced to support it. *Runyon*, 707 F.3d at 492.

raise the claim asserted here: that the non-statutory aggravators resulted in an unprincipled, arbitrary and capricious imposition of the death penalty. Counsel's failure to properly present these meritorious claims to the court of appeals constitutes ineffective assistance.

Regarding the non-statutory aggravators placed into the sentencing balance, Respondent stretches *Tuilaepa* too far. Neither *Tuilaepa*, nor the court of appeals' opinion in this case, *Runyon*, 707 F.3d at 491, hold that aggravating circumstances need not be scrutinized once narrowing has occurred. Indeed, Justice Scalia specifically recognized this in his concurrence where he was the sole member of the Court to announce such a viewpoint. *Tuilaepa*, 512 U.S. at 980 (Scalia, J. concurring) ("Today's decision adheres to our cases which acknowledge additional requirements" for factors that guide the jury in selecting which defendants receive the death sentence.). A two justice concurrence noted that the aggravating factor at issue *did* channel the jury's sentencing discretion and recounted that protections against arbitrary sentencing focus "on the eligibility determination and the actual sentencing decision." *Id.* at 981-82 (Stevens, J., joined by Ginsburg, J., concurring in the judgment).

Aggravating circumstances that influence the jurors' decision-making process must be analyzed for clarity, objectivity, and principled guidance.[24] *Maynard v. Cartwright*, 486 U.S. 356, 364 (1988); *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). This

---

With respect to the "victim impact" aggravator, appellate counsel challenged the scope of the evidence introduced to support it. *Id.* at 499, 501. Three bases were asserted against the aggravator based on Runyon's education, training and experience: that it was vague and overbroad; that it relied upon elements of his background that were actually mitigating; and, that the evidence supporting it was insufficient. *Id.* at 502-03. The "abuse of women" aggravator was challenged: (1) as a circumvention of the prior-conviction aggravator expressly contained in the FDPA because it was based on unadjudicated and on "minor misconduct;" and, (2) as improperly supported by evidence which should have been excluded. *Id.* at 505-06.

[24] For example, the "victim impact" aggravator is constitutionally infirm because the sentencer fairly could conclude that it applies to every defendant eligible for the death penalty. *See Arave v. Creech*, 507 U.S. 463, 474 (1993).

63

is because when jurors are instructed to weigh an arbitrary and capricious or overbroad aggravating circumstance an arbitrary thumb is placed on death's side of the scale. *Stringer v. Black*, 503 U.S. 222, 232 (1992). Accordingly, Runyon's death sentence is unconstitutional because the prosecutor's unrestricted selection of facts to be designated as aggravating circumstances was included in the jury's sentencing determination.

**Claim 12:**     **Runyon Was Denied Due Process Of Law, Equal Protection Of The Law, The Right To Be Free Of Cruel And Unusual Punishment, And Effective Assistance Of Counsel Because The Death Penalty Was Disproportionately And Unconstitutionally Applied According To Race, And Trial And Appellate Counsel Made No Objection Based On This Fact.**

Respondent avers that Runyon is entitled to neither relief, nor even discovery, on his intertwined claims of selective prosecution based upon Runyon's race (Runyon is first generation Korean-American) and trial counsel's ineffectiveness for failing to pursue that claim. ECF No. 497, p.115 ("Runyon fails to proffer any evidence, let alone some evidence, demonstrating that this claim would have been successful."). Respondent's argument, however, is largely irrelevant for two reasons. First, Runyon did not merely cite national statistics regarding the Government's disturbing pattern of disproportionately seeking death against non-whites. Runyon pled that the prosecution *in this case* sought death against the non-white Runyon while not seeking death against his white co-defendants and then emphasized their racial differences during trial. ECF No. 478, p.96. It is well-established that that the co-defendants were charged with the same crimes and Runyon has argued from the beginning, and throughout his §2255 motion, that the codefendants were equally culpable.[25] The jurors found that the codefendants were equally culpable. ECF No. 291, p.2. Second, Respondent implicitly

---

[25] The allegations set forth in all sections of Runyon's §2255 motion were realleged and incorporated by reference in all other sections and claims. ECF No. 478, p.19. Runyon's First Motion for Discovery and Reply (ECF Nos. 491, 506)—filed before Respondent's Answer—and his Amended §2255 Motion provide additional facts supporting this claim. ECF No. 511, pp.105-10.

concedes that the codefendants were similarly situated when arguing in response to Claim 13 that "the Eighth Amendment does not require comparative proportionality review between sentences received by similarly situated defendants." ECF No. 497, p.117.

Respondent cannot make those facts "go away" simply by failing to acknowledge that they exist and that they have been pled. Runyon has alleged thus far uncontested evidence that the prosecutors in this case added to the statistical evidence that the FDPA is administered in a racially-discriminatory manner by seeking death against a non-white defendant while eschewing that penalty for his equally-culpable (if not more culpable) white co-defendants. Runyon is entitled to discovery for the reasons contained in his pending discovery motion and reply. ECF No. 491, pp.12-21 and ECF No. 506, pp.5-10. Relief from the unconstitutional death sentences should follow.

**Claim 13:     Runyon's Death Sentence Is Disproportionate And Arbitrary In Violation Of The Fifth And Eighth Amendments.**

Respondent characterizes this claim as "nothing more than a claim for proportionality review."[26] ECF No. 497, p.117. Runyon claims, under the circumstances of his case, the death penalty is disproportionate and arbitrary and contrary to the Eighth Amendment's "'precept of justice that punishment for crime should be graduated and proportioned to the offense'" and the offender. *Atkins v. Virginia*, 536 U.S. 304, 311-13 (2002) (quoting *Weems v. U.S.*, 217 U.S. 349, 367 (1910).

If the implementation of the federal death penalty in a particular case does not result an evenhanded, rational and consistent imposition of the death penalty, there must be means to ensure the death sentence was not wantonly or freakishly imposed. *Compare, Pulley v. Harris*, 465 U.S. 37, 49-

---

[26] This claim *does not* present the issue in *U.S. v. Higgs*, 353 F.3d 281 (4th Cir. 2003), where the defendant argued that the FDPA is facially unconstitutional because it does not require proportionality review in all cases. *Id.* at 320-21.

50 (1984). Supreme Court precedent requires that a decision-maker's discretion to determine whether a human life should be taken or spared "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); *Zant v. Stephens*, 462 U.S. 862, 874 (1983). Similarly, the FDPA requires appellate review to determine whether the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. 18 U.S.C. §3595(c). Here, the prosecution's decision to seek a death sentence against Runyon but not his co-defendants resulted in a disproportionate and arbitrary application of the death penalty.

Respondent's claim that *McCleskey v. Kemp*, 481 U.S. 279, 296-97 (1987), allows the Government unfettered discretion in selecting a death sentence for only one of three equally culpable co-defendants goes too far. ECF No. 497, pp.117-18. "[A]t all stages of the proceedings the Due Process and Equal Protection Clauses protect persons ... from invidious discriminations." *Griffin v. Illinois*, 351 U.S. 12, 18 (1956). Invidious discrimination occurs "[w]hen the law lays an unequal hand on those who have committed precisely the same offense[.]" *Selective Serv. Sys. v. Minnesota Pub. Interest Research Grp.*, 468 U.S. 841, 880 (1984). The Court in *McCleskey*, 481 U.S. at 305, noted that there must be rational criteria establishing that a particular defendant's case should be subject to the death penalty. A defendant can demonstrate an abuse of prosecutorial discretion with exceptionally clear proof. *Id.* at 297. Here, the existence of such proof has been pled and Runyon is entitled to present evidence of the same.

Respondent also suggests such a claim would be barred by the *Teague* doctrine or, even were it not, would be barred by the failure of Runyon's counsel to present this claim at the time of trial. *Teague* is inapplicable. This claim does not rely on a new procedural rule but on principles established before Runyon's case became final. For example, *McCleskey* was decided over fifteen years prior to

66

**2337**

Runyon's trial. To the extent that Respondent suggests this claim could have been raised during direct proceedings, the Government's failure to reveal the factual basis of the claim as it was required to do under *Brady* provides cause to excuse any default. *See* Claim 2. Furthermore, to the extent that Respondent now claims those facts could have been discovered earlier, trial or appellate counsel's ineffectiveness in failing to discover and present them earlier would also provide such cause.

**Claim 14: Runyon's Death Sentence Violates The Eighth Amendment Because He Is Severely Mentally Ill**

Respondent argues that the execution of the severely mentally ill does not violate the Eighth Amendment because there exists no national consensus to that effect. ECF No. 497, pp.120-23. Accordingly, Respondent contends that Runyon seeks a "new rule" that would be barred by *Teague*. *Id.*, pp.119-20.

This claim, however, seeks only an application of the firmly established rule set out in *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958), and reaffirmed and applied in a different context every few years. *See, e.g., Miller v. Alabama*, 132 S.Ct. 2455, 2463-64 (2012), *Graham v. Florida*, 560 U.S. 48, 58-62 (2010); *Kennedy v. Louisiana*, 554 U.S. 407, 419-22 (2008); *Roper v. Simmons*, 543 U.S. 551, 560-64 (2005); *Atkins v. Virginia*, 536 U.S. 304, 311-13 (2002); *Thompson v. Oklahoma*, 487 U.S. 815, 818-38 (1988); *Ford v. Wainwright*, 477 U.S. 399, 405-06 (1986) *Enmund v. Florida*, 458 U.S. 782, 789-93 (1982); *Coker v. Georgia*, 433 U.S. 584, 593-96 (1977). The rule of *Trop* and its progeny is that punishments which are contrary to the evolving standards of decency that mark the progress of a maturing society violate the Eighth Amendment. *Trop*, 356 U.S. at 101.

Thus, Runyon should be allowed to demonstrate that mental illness of the nature he alleges in his §2255 motion, *see* ECF No. 478, p.100; *see also* Claims 5 & 6, meets those standards outlined in *Trop*, *Roper*, and *Atkins*. Runyon's severe mental illness results in a "diminished capacity to understand

67

**2338**

and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318-20. His execution would violate evolving standards of decency.

Respondent suggests that evolving standards of decency may be determined solely from country-wide legislation. ECF No. 497, p.121. A long line of Supreme Court precedent dictates the standard is not so easily gleaned. Inquiry into evolving standards of decency involves not merely what is impermissible under presently existing statutes, but also what is actually practiced. *See, e.g., Hall v. Florida*, 134 S.Ct. 1986, 1997-98 (2014); *Roper*, 543 U.S. at 564-65; *Atkins*, 536 U.S. at 316. Moreover, it is not only the legislation and practice within the states and federal government from which the standard is gleaned but also the legislation and practices within other countries and international authorities. *Roper*, 543 U.S. at 575-78. The prohibition on executing the severely mentally ill is an established norm of international law.[27] Finally, the Court's own independent judgment must also be

---

[27] *U.N. Human Rights Comm'n., Sahadath v. Trinidad and Tobago*, Communication No. 684/1996, CCPR/C/74/D/684/1996, Apr. 15, 2002 (issuance of an execution warrant in the case of a mentally ill prisoner violates Article 7 of the ICCPR); *U.N. Human Rights Comm'n., Francis v. Jamaica, Communication No. 606/1994*, U.N. Doc. CCPR/C/54/D/606/1994, Aug. 3, 1995 (incarceration on death row of a prisoner whose mental health had "seriously deteriorated" amounted to cruel, inhuman or degrading treatment in violation of Article 7 of the ICCPR). The U.N. Commission on Human Rights has adopted a series of resolutions urging states that retain the death penalty not to impose it "on a person suffering from any form of mental disorder." U.N. ECOSOC, Implementation of the Safeguards Guaranteeing Protection of Rights of those Facing the Death Penalty, p.51, para. 1(d), ECOSOC Res. 1989/64, U.N. Doc. E/1989/91, 1989; U.N. ECOSOC, Implementation of the Safeguards Guaranteeing Protection of the Rights of those Facing the Death Penalty, ECOSOC Res. 1996/15, U.N. Doc. E/CN.15/1996/15, Jul. 23, 1996); U.N. Comm'n on Human Rights Res., "Question of the Death Penalty," E/CN.4/RES/1999/61, adopted April 28, 1999; U.N. Comm'n on Human Rights Res., "The Question of the death penalty," E/CN.4/RES/2000/65, adopted April 27, 2000; U.N. Comm'n on Human Rights Res., "Question of the death penalty," E/CN.4/20050L.77 2005/59, adopted April 20, 2005. The European Union has likewise declared that the execution of persons "suffering from any form of mental disorder ... [is] contrary to internationally recognized human rights norms and neglect[s] the dignity and worth of the human person." European Union, Delegation of the European Comm'n to the USA, EU Memorandum on the Death Penalty, presented to U.S. Assistant Secretary of State for Human Rights, http://www.eurunion.org/eu/EU-

brought to bear. *See id.* at 564.

Respondent alternatively argues this claim is procedurally defaulted by prior counsel's failure to properly present it during direct proceedings. ECF No. 497, p.119. Runyon alleges that, even if this claim could have been raised during direct proceedings, counsel rendered ineffective assistance by failing to do so and that counsel's failure constitutes both an independent constitutional violation and cause and prejudice excusing any alleged procedural default. *See* Claims 5, 6 & 8.

In conclusion, because Runyon invokes no "new rule of law," *Teague* is not implicated here. Moreover, under the firmly established Eighth Amendment standards of *Trop*, *Roper*, and *Atkins*, Runyon can demonstrate that he is entitled to relief.

**Claim 15:**     **Selection Of The Grand Jury And/Or The Petit Jury Venire For Runyon's Case Was Tainted, And Trial Counsel Unreasonably Failed To Request And Examine The Jury Selection Records.**

When Runyon filed his §2255 motion, he did not know what information the jury selection documents would contain. Collateral counsel thus alleged what they hoped would describe the universe of claims that might be evidenced by those documents. Runyon's Amended §2255 motion contains more specific allegations, which the Government will answer in due course, and to which Runyon will then reply. The amended claim is outside the scope of the instant reply.

The Government prophylactically alleges that Runyon's substantive allegations, whatever they may be, are procedurally defaulted. But Claim 15 also includes an allegation of ineffective assistance of counsel, and this excuses any default. The Government responds to that allegation by stating that

---

Memorandum-on-the-Death-Penalty-February-25-2000.html, Feb. 25, 2000; see also, Council of the European Union, EU Guidelines on Death Penalty, III (iv), April 12, 2013, http://eeas.europa.eu/human_rights/guidlines/death_penalty/docs/guidelines_death-penalty-st08416_en.pdf.

there is no case law finding a lawyer ineffective for failing to request jury selection documents. This argument is misplaced for three reasons.

First, investigating compliance with the jury selection procedures *for the defendant's trial* is simply a specific application of counsel's well-established obligation to investigate the facts and the law that are relevant to the defendant's trial. *Strickland*, 466 U.S. at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Wiggins*, 539 U.S. at 533 (counsel's decision not to investigate "must be directly assessed for reasonableness in all the circumstances") (internal quotation marks and citation omitted); *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) (an "attorney must look into readily available sources of evidence"). The purpose of the specific investigation into jury selection procedures is "to determine whether [the defendant] has a potentially meritorious jury challenge." *Test v. U.S.*, 420 U.S. 28, 30 (1975) (emphasis added). Requesting the jury selection documents is essential for this purpose because "without inspection, a party almost invariably would be unable" to discharge that duty. *Id.* Counsel's duty to "exercise ... diligence" is explicitly contained in the statute, 28 U.S.C. §1867(a).

Second, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms," *Strickland*, 466 U.S. at 688. Counsel's Sixth Amendment obligation does not depend on the existence of a prior published opinion stating that an attorney's performance was deficient in a specific circumstance. The weight of prevailing professional norms supports the view that counsel must request and examine the jury selection documents before trial. The ABA Guidelines, quoted in Runyon's claim, describe that requirement with the greatest precision and in the most pertinent context, but they are not the only source of norms.[28] *See also* Office of Justice

---

[28] The ABA Guidelines are entitled to particularly great weight because they "are not aspirational. Instead, they embody the current consensus about what is required to provide effective

70

Programs, 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance, pp. I10-I12 (2000) (providing survey of guidelines across multiple jurisdictions); ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4-7.2 Selection of Jurors (3d ed. 1993) ("Defense counsel should prepare himself or herself prior to trial to discharge effectively his or her function in the selection of the jury, including the raising of any appropriate issues concerning the method by which the jury panel was selected"); National Legal Aid and Defender Assn.: Performance Guidelines for Criminal Defense Representation 7.2 Voir Dire and Jury Selection (1997) ("Defense counsel should be familiar with the procedures by which a jury venire is selected in the particular jurisdiction and should be alert to any potential legal challenges to the composition or selection of the venire"). The Supreme Court cited with approval each of the foregoing sources of attorney norms in *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010). Requesting and examining the jury selection documents carries no risk to the defense, and to obtain access to otherwise nonpublic jury selection records, counsel must only state in good faith that he is preparing a motion challenging the jury selection procedures. *U.S. v. Alden*, 776 F.2d 771, 773 (8th Cir. 1985). There is no reason for counsel to forgo the request if there is a possibility of a substantial violation of the Jury Selection and Service Act ("JSSA") and if counsel intends to seek redress if he discovers such a violation.

Third, if a jury selection challenge is timely raised, it can result in relief. In *U.S. v. Branscome*, 682 F.2d 484 (4th Cir. 1982), for example, the Fourth Circuit quashed indictments on the ground that the method used to empanel a grand jury violated the JSSA. In that case, the clerk had asked a randomly chosen pool of prospective jurors for volunteers to serve on the grand jury, and then filled out the quota with additional jurors chosen at random. *See also U.S. v. Ovalle*, 136 F.3d 1092 (6th Cir.

---

defense representation in capital cases." ABA Guideline 1.1, *History of Guideline, reprinted* at 31 Hofstra L. Rev. 913, 920 (2003).

71

**2342**

1998) (substantial violation of JSSA where jury selection plan provided for random removal from jury wheel of one in five non-African-Americans because of their racial status); *U.S. v. Exum*, 744 F. Supp. 803 (N.D. Ohio 1990) (substantial violation of JSSA if jurors on qualified wheel are called to serve as summary jurors where Act limits wheel to calling grand and petit jurors). Moreover, a defendant's allegation of substantial violation can result in reversal on appeal or other subsequent proceedings. *See, e.g., U.S. v. Calabrese*, 942 F.2d 218 (3d Cir. 1991) (vacating conviction for substantial violation of JSSA and remanding for new trial where trial court had blanket order excluding potential jurors based merely on jurors' knowledge of defendant, without anything more); *U.S. v. Okiyama*, 521 F.2d 601 (9th Cir. 1975) (reversing conviction with recommendation to dismiss indictment, despite absence of any showing that defendant was prejudiced, where deficiencies in process of selecting grand and petit jurors created serious risk that those selected did not have sufficient proficiency in English to understand proceedings in which they were to participate); *U.S. v. Clay*, 159 F. Supp. 2d 1357 (M.D. Ala. 2001) (remanding for new trial where clerk placed names of deferred jurors in separate pool and preferred them disproportionately over jurors drawn directly from qualified wheel).

Because competent counsel can obtain the reversal of a conviction or the quashing of an indictment on direct review if there was an error or misconduct in the jury selection proceedings, counsel's failure to timely investigate and, if warranted, to allege the defects can constitute deficient performance under *Strickland*. And because JSSA itself contains no prejudice component, and because a substantial violation of the JSSA is a structural error because it infects the entire proceeding, the prejudice component of an ineffective assistance claim can be presumed. *Bell v. Jarvis*, 236 F.3d 149, 165, 180 (4th Cir. 2000) (en banc) (discussing IAC claim in the context of a claim involving structural error and citing *McGurk v. Stenberg*, 163 F.3d 470, 473 (8th Cir. 1998) (noting that the prejudice

72

**2343**

component of *Strickland* may be presumed if the nature of the deficient performance is that of structural error)).

**Claim 16:     The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes, And Trial Counsel Unreasonably Failed To Object To These Unconstitutional Strikes.**

**A. The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes.**

The Government's sole ground for opposing Claim 16A is that it is defaulted. That is wrong. The claim is not defaulted because it could not have been "fully and completely addressed on direct review based on the record created" in the trial court. *Bousley*, 523 U.S. at 622. *See supra* at pp.2-4 (discussion of law governing procedural default). The transcript of jury selection begins with the court reporter's descriptive note that "The jury selection process was begun," Tr.127, 6/30/09, and it continues with two more notes that "Jury selection continued," Tr.129, 6/30/09. Consistent with this court's custom, the reporter did not otherwise record the process of striking individual venire members.[29] The conclusion of jury selection is indicated in the transcript by the Court reading the names of 13 individuals who should return the following day, comprised of the 12 selected jurors plus one person held over for the next day's selection of alternates. *Id.* The venire members who had been struck were excused without being named.

The transcript does not identify who was struck peremptorily or by which party, nor does it contain any information about the race and gender of potential jurors—either those struck or not

---

[29] Runyon does not suggest that the reporter failed to capture statements of a party or of the Court. As ECF No. 423, p.2, expressly states, the transcripts and strike lists together "contain the full record of the jury selection process." Rather, counsel understands that the process of peremptory strikes in this Court is silent. The clerk draws a group of tags from a box, each representing a qualified member, and the parties then transfer individual tags from one side of a board to the other to indicate their strikes. The transcript contains no record of the tags that were drawn or any party's transfer of a tag to exercise a strike.

struck. The courtroom deputy had a list of the venire members who participated in oral voir dire and took notes of each for-cause and peremptory strike including the striking party, but these notes—now called the strike lists—were not entered on the docket and made available to counsel until two years after the mandate issued in Runyon's direct appeal. *See* ECF No. 424 (sealed, entered 4/13/15). Even then, the lists were entered as records in the collateral proceedings, not in the trial proceedings. In a Supplemental Order accompanying that filing, the Court explained that these lists came from the courtroom deputy's "internal strike and selection order notes," which was "submitted to the Clerk for statistical purposes following trial." ECF No. 423, p.1.

Because the lists were not entered on the docket and made available to counsel until after the appeal, they were not a part of record on appeal. That record consists of "(1) the original papers and exhibits filed in the district court; (2) the transcript of proceedings, if any; and (3) a certified copy of the docket entries prepared by the district clerk." Fed. R. App. P. 10(a). The record on appeal does not include a courtroom deputy's internal notes that were not entered on the docket prior to the appeal, and whose existence was not noted in any transcript or other trial record. Because the facts necessary to identify the existence of the violations described in Claim 16 were outside the trial record, this claim could not have been presented on appeal without further factual development. Consequently, this claim was not open to consideration and review on appeal under *Waley, supra,* and it is not defaulted.

If the trial record was somehow sufficient to present the issue fully and clearly on appeal, appellate counsel were ineffective in failing to do so. Their deficient performance excuses the default, and Runyon is entitled to de novo review.

As noted in Claim 8, assembling the record for review was the responsibility of attorney Lawrence Woodward, who was initially one of Runyon's appellate lawyers.[30] ECF No. 478-36, p.1 ¶¶5-6. Co-counsel Teresa Norris compiled a list for Woodward identifying documents that he still had not obtained, including "court record of jury selection/strikes used." *Id.*, p.4. Norris's declaration states that she never received a strike list, and that her failure to obtain that record for the appeal was not a tactical decision. *Id.*, p.2 ¶7. It appears, instead, to have been:

> "the result of inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). As a result, [counsel's] conduct fell below constitutionally required standards. *See id.*, at 533 ("'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'")) (quoting *Strickland*, 466 U.S., at 690-691).

*Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005).

In other words, appellate counsel's deficiency was a threshold failure to investigate and obtain the records necessary to determine *whether* there was an error in jury selection. If counsel had obtained those records and decided not to appeal it, their choice would be evaluated under *Jones v. Barnes*, 463 U.S. 745 (1983), and *Smith v. Robbins*, 528 U.S. 259 (2000), which require deference to counsel's professional judgment. But where there was no competent investigation, counsel could not weigh the (unknown) claim against other potential claims and make a reasonable strategic choice in the first instance. *Rompilla, supra.*

Runyon was prejudiced by appellate counsel's failure to obtain the record necessary to recognize and pursue a claim that the Government used its peremptory strikes in a discriminatory manner. If counsel had performed competently, they would have discovered a claim that was stronger than some other issues presented in Runyon's direct appeal. Moreover, as noted in Claim 8, a change

---

[30] Nine months before Runyon's opening brief was filed, Woodward was replaced by co-counsel Seth Farber.

75

of font would have enabled counsel to present the jury selection issue without disturbing other appellate issues.

Even if the record on jury selection was somehow sufficient to present the issue fully and completely on direct appeal, and even if appellate counsel were not ineffective in failing to do so—all of which Runyon contests—the default is excused because trial counsel were ineffective in failing to challenge the Government's discriminatory exercise of peremptory strikes, for the reasons alleged below. As a result, Runyon is entitled to de novo review.

**B. Trial Counsel Unreasonably Failed To Object To The Prosecution's Discriminatory Exercise Of Peremptory Strikes.**

The petitioner, not the respondent, has "exclusive authority to define the nature of his or her claims." *Dougherty v. Cerra*, 987 F. Supp. 2d 721, 729 (S.D. W.Va. 2013). In his §2255 motion, Runyon chose to present two discrete claims alleging the discriminatory exercise of peremptory strikes, one based on race and one based on gender. He did this in part because the legal standards for these claims are slightly different and some of the evidence is different. He may prevail on both grounds, but he recognized from the start that the Court could conclude he can go forward on just one, and he structured his motion with that understanding. The Government has responded as if Runyon presented a unitary claim based on a (nonexistent) combined race-gender category. It intermixes its evidence on the two claims, apparently taking the position that Runyon can obtain relief only if he shows that the Government discriminated on both grounds. In this Reply, Runyon attempts to disentangle the Government's arguments, and he addresses independently the Government's evidence relating to each claim.

76

### 1. Strikes Based on Race.

On Claim 16B.1, the Government argues that it did not exercise strikes discriminatorily based on race, and consequently trial counsel's failure to object did not fall below an objective standard of reasonableness. This argument fails by a wide margin.

Under the three-part test in *Batson v. Kentucky*, 476 U.S. 79 (1986), the opponent of the strikes must present a prima facie case of discrimination. A prima facie case "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 170 (2005) (quoting *Batson*, 476 U.S. at 94). And because this step of the analysis requires only an "inference," the standard "is not onerous." *Paulino v. Castro*, 371 F.3d 1083, 1092 (9th Cir. 2004) (internal quotation marks and citation omitted).

The Government argues that Runyon has failed to establish certain factors that allegedly are necessary to make a prima facie case. Without conceding that all of these factors are essential, the facts show that Runyon satisfies them.

First, the Government's argument that Runyon cannot establish the first factor of a prima facie case—that he is a member of a distinct racial group—rests on the egregious misrepresentation that Runyon is not Asian-American, but White. The Government asserts three times that Runyon is "white," ECF No. 497, pp.128, 130, 131, and that for this reason he "patently cannot satisfy" the first factor, *id.*, p.130. But Runyon's race is Asian, and the Government knew this long before trial. It is explicit in the interrogation video the Government intended to play at trial, and did play at trial, and which the Fourth Circuit quoted in its opinion. *Runyon*, 707 at 493 ("Detective Rilee asked Runyon: '[Y]ou're Asian, right, Asian-American? ... 'Yes sir,' he answered.'"). The Government's mental health experts executed reports expressly identifying Runyon as Asian-American. ECF No. 277, p.1; ECF

77

**2348**

No. 276, p.19.[31] In the current collateral litigation, Runyon asserted in his §2255 motion that he is Asian-American, ECF No. 478, p.2, and again in his motion for discovery that he is Asian, ECF No. 491, p.13 n.5. Asians are a distinct racial group.[32] This factor is satisfied.

Second, the Government states that because Runyon and the victim are both white, Runyon cannot satisfy the second factor—that the prosecutors used peremptory strikes to remove jurors who were members of the defendant's (minority) race. ECF No. 497, p.131. Runyon and the victim are not the same race. As presented by the prosecution at trial, this was an interracial crime in which an Asian man killed a white man. Moreover, Runyon would have had standing under *Powers v. Ohio*, 499 U.S. 400, 415 (1991), to assert the rights of the excluded African-American jurors for this factor even if Runyon were white. The *Powers* right carries even greater weight here because Runyon is Asian. He and the excluded jurors have in common the attribute of being members of a racial minority that has experienced discrimination. This factor is satisfied.

Third, the Government argues that Runyon cannot satisfy the third factor—additional facts and circumstances that raise an inference of discriminatory purpose. Runyon's pending motion for discovery seeks documents that may reveal more of those kinds of facts and circumstances. But even before having the fruits of discovery, Runyon has shown additional facts and circumstances. At the time of voir dire, the prosecutors intended to put into evidence (and did put into evidence) a videotape that conveyed "stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act," and contained statements that were "capable of inflaming jurors' racial or ethnic prejudices."

---

[31] Runyon's race is also discussed in pretrial filings. In a pretrial motion for continuance, ECF No. 179, p.10, the defense explained that Runyon's mother is Korean and that Runyon spent time living in Korea. Runyon's race also underlay questions proposed by the defense for the jury questionnaire, ECF No. 156-1, p.9, and for voir dire, ECF No. 158, p.2.

[32] "Asian" is one of the racial classifications used by the Court for its statistical reports, and by the U.S. Census Bureau, *see* https://www.census.gov/topics/population/race/about.html.

**2349**

*Runyon*, 707 F.3d at 493-94. The prosecutors' knowledge that African-American jurors would see and hear this videotape, and the substantial likelihood that it would evoke memories of analogous statements that had been made to those jurors personally, or made historically to members of their race, raises a strong inference that the Government struck African-American jurors on account of race. The Government did not want black jurors because they would be offended by the statements in the videotape or would sympathize with Runyon as the target of racial insults. This factor is satisfied.

Fourth, the Government argues that more than "raw figures" are required to raise an inference of purposeful discrimination. ECF No. 497, pp.130-31. Runyon already has shown more than raw figures, *see supra*, and he may be able to augment that showing after receiving discovery. But raw figures are well within the "wide variety of evidence" that can contribute to an inference of discriminatory purpose. *Johnson*, 545 U.S. at 169; *see also Miller-El v. Cockrell (Miller-El I)*, 537 U.S. 322, 342 (2003) (statistical evidence alone raises debate when government used peremptory strikes to exclude 91 percent of eligible African-American venire members and "[h]appenstance is unlikely to produce this disparity"); *Batson*, 476 U.S. at 97 (circumstances giving rise to inference of discrimination can include "a 'pattern' of strikes against black jurors included in the particular venire"); *id.* at 93 ("seriously disproportionate exclusion of Negroes from jury venires ... is itself such an unequal application of the law ... as to show intentional discrimination") (quoting *Washington v. Davis*, 426 U.S. 229, 241-42 (1976) (internal citation and quotation marks omitted)). In Runyon's case, there were 10 African-Americans in the pool of 52 qualified venire members; 100 percent of the strikes against African-Americans were exercised by the Government; the Government excluded 70 percent of the eligible African-Americans through its peremptory strikes; and happenstance was unlikely to produce that disparity. These facts add more weight to the inference of discriminatory purpose.

79

**2350**

Addressing the second step of a *Batson* analysis, the Government states that it removed the seven African-American venire members based on their answers to Question 61 in the jury questionnaire. It says it struck Jurors 31, 40, 46, 63, and 81 because they circled option D, indicating that they generally oppose the death penalty; and it struck Jurors 15 and 116 because they circled both option C and option D, indicating both that they generally favor and generally oppose the death penalty.[33] The Government also notes that three of these African-Americans, Jurors 15, 31, and 63, had served in the military or had relatives who presently or previously served in the military, but it does not identify this as a reason for any of its strikes.[34] The Government identifies no reason for any of its challenged strikes other than views on the death penalty, and thus its defense of the *Batson* charge must stand or fall on that reason. *Miller-El v. Dretke (Miller-El II)*, 545 U.S. 231, 252 (2005); *U.S. v. Barnette*, 644 F.3d 192, 205 (4th Cir. 2011). Runyon does not contest that the Government has presented a race-neutral reason that satisfies its burden at the second step of the *Batson* analysis.

For the third step of the *Batson* analysis, Runyon anticipates that his pending discovery motion will lead to additional facts showing that the Government's reason for the strikes is a pretext. But a comparative analysis already casts significant doubt that this is the real reason for the strikes of the African-American jurors. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." *Miller-El II*, 545 U.S. at 241. The Court clarified that the term "permitted to serve" is not limited to individuals who were seated as

---

[33] Runyon refers to this as an expression of neutrality about the death penalty because options C and D straddle the center line. Question 61 included no other mechanism for venire members to indicate that they had a neutral view of the death penalty.

[34] The Government struck these jurors but hypothesizes that—for purposes of Runyon's claim of ineffective assistance of counsel—the defense would not have wanted people with military connections serving on the jury.

80

jurors; it means prospective jurors who were not struck by the prosecution, regardless whether they ultimately served on the jury. *Id.* at 244-45 and n.4; *see also U.S. v. Bell*, 523 Fed. App'x. 956, 960 (4th Cir. 2013) (comparing challenged juror to individuals who were qualified and "nonstruck"); *Hayes v. Thaler*, 361 Fed. App'x. 563, 571-73 (5th Cir. 2010) (comparing excluded black jurors with nonblack jurors who were "not struck").

The Government's stated reason for striking the seven African-American jurors applies just as well to two similar nonblack venire members that it did not strike. One similar member is Juror 2, who is white. He circled option D, indicating that he generally opposes the death penalty. That is the same option circled by five of the excluded black jurors, and it is more anti-death than the neutral position taken by the other two black jurors, who circled options C and D.[35]

The second similar nonblack member is Juror 54, who is Asian. He circled option D, indicating that he generally opposes the death penalty. That is the same position taken by five of the excluded black jurors and more anti-death than the position of the other two. Juror 54 was "permitted to serve" because he was qualified on the first day of jury selection and was not struck by any party, although the Government had an unused strike available that it could have exercised. Juror 54 was carried over to the second day for inclusion in the selection of alternates. On that day he again was neither selected nor struck.[36]

The Government's stated reason for striking two of the African-American jurors also applies equally well to two of the alternate jurors who were not struck. Jurors 143 and 201 are both white,

---

[35] To the extent it is relevant, Juror 2, like three of the African-Americans who were struck, had a military connection because a close family member had previously served in the military. Juror 2 was seated on the jury.

[36] Like four of the African-Americans who were struck, Juror 54 did not serve in the military, nor did a close family member.

**2352**

and both were seated as alternates. Each of them circled both option C and option D, which is the same answer marked by excluded black Jurors 15 and 116.

The pretextual nature of the Government's reason is corroborated by the answers to Questions 55 and 56 on the questionnaire.[37] Question 55 asks whether the juror supports, opposes, or neither supports nor opposes the death penalty. Question 56 asks how strongly he holds that view—very strongly, moderately, or not strongly at all. Two of the excluded black members who circled option D, Jurors 31 and 40, marked that they moderately *support* the death penalty. Another two who circled option D, Jurors 63 and 81, marked that they are neutral. The two who circled option C and option D, Jurors 15 and 116, also marked that they are neutral. By comparison, Juror 2 and Juror 54, who are not black and were not struck, circled option D and marked that they are neutral— thus taking a position that is the same as or more anti-death than six of the excluded black jurors. Only one of the seven excluded African Americans, Juror 46, said on Question 55 that she was opposed to the death penalty.

The Government argues that regardless of its own motives, it was not ineffective for defense counsel to refrain from making a *Batson* objection with respect to the three struck African-Americans who had been in the military or had family members who presently or previously were in the military (Jurors 15, 31, and 63) because "[p]resumably Runyon would not want people serving on the jury who may have sympathy for the victim Cory Voss, a Naval Officer." ECF No. 497, p.131. Even if this hypothesis was true, it would not excuse counsel's failure to object to the Government's peremptory

---

[37] The Government's stated reason for striking African-American jurors did not mention Questions 55 and 56, but the Court can consider those limited questions because they address the very same subject as Question 61 and do not expand the inquiry.

strikes of the four black venire members who did not have military connections. But in fact the premise of the hypothesis is false.

First, Runyon himself has a military background, and defense counsel expected this to be a factor for the case in mitigation. *See* ECF No. 291, p.4 (all 12 jurors finding mitigating factors that Runyon "served his country as a member of the United States Army and was honorably discharged," and that he "earned an associate of arts degree from Wentworth Military Academy"). Runyon was helped by having jurors who would understand and appreciate his military service. Second, defense counsel's own pattern of strikes shows they did not oppose the inclusion of jurors with military connections. The venire included a large proportion of individuals with military connections, but the defense used less than half (9 of 20) of its strikes to remove members with military or family military backgrounds (Jurors 4, 32, 50, 51, 65, 74, 84, 118, and 119). If the defense was concerned about having seated jurors with military backgrounds, it easily could have used more of its strikes to remove them— including removing the four people with military backgrounds who sat on the jury (Jurors 2, 23, 86, and 124). In truth, it is the Government that used nearly two-thirds of its strikes (12 of 19) to remove jurors who—under its own hypothesis—might have had sympathy for Cory Voss because of their military backgrounds (Jurors 7, 15, 18, 28, 31, 35, 52, 63, 66, 91, 97, and 100).

Runyon expects to obtain additional facts in discovery, but even in light of the facts above, it should be clear that counsel's failure to make a *Batson* challenge was unreasonable and fell below the prevailing norms of professional performance. To the extent the *Batson* claim is defaulted and not otherwise excused, trial counsel's deficient performance excuses that default. Runyon is entitled, at a minimum, to discovery and an evidentiary hearing on his *Strickland* claim. For the reasons stated in Runyon's §2255 motion, prejudice is presumed.

83

**2354**

## 2.  Strikes Based on Gender.

Claim 16B.2 alleges gender discrimination under *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). Courts use the same three-step analysis as for a *Batson* claim, but the criteria for establishing a prima facie case are not identical. A party alleging gender discrimination in the exercise of peremptory strikes does not need to prove that he is a member of a distinct group, or that the excluded jurors share his gender. Rather:

> We look at all relevant circumstances when determining whether the requisite prima facie showing has been made. *Batson*, 476 U.S. at 96. For example, a pattern of strikes against members of a particular gender may give rise to an inference of discrimination, and similarly so may a disproportionate number of peremptory challenges exercised to exclude members of a particular group. *Harris v. Hardy*, 680 F.3d 942, 949-50 (7th Cir. 2012). So too may a prosecutor's comments and statements. *See Batson*, 476 U.S. at 97. The test is not rigorous. [*U.S. v.*] *McMath*, 559 F.3d [657,] 664 [(7th Cir. 2009)].

*U.S. v. Johnson*, 756 F.3d 532, 536-37 (7th Cir. 2014) (internal citations omitted).

Runyon's §2255 motion shows that the Government peremptorily struck more than twice as many women as men—13 versus 6. Runyon's pending motion for discovery seeks documents that may reveal more of those kinds of facts and circumstances. Even without the benefit of discovery, Runyon can identify a reason why the Government preferred male jurors. The prime mover in the plot to kill Cory Voss was his wife, Cat—a co-defendant who escaped a death sentence by pleading guilty. To obtain a verdict of death for Runyon, the Government knew that it had to persuade jurors that Cat's moral culpability was not greater than Runyon's. Both genders could be expected to assign the same moral weight to Cat's greed and her active participation in the crime. But they likely would give differing moral weights to evidence of the depraved and promiscuous lifestyle that Cat lived when Cory was at sea. Male jurors were more likely to view this aspect of Cat's conduct as somewhat titillating and give it diminished weight; female jurors were likely to be less forgiving and to view it as contributing to greater moral culpability. In particular, Cat's practice of leaving her children with near-

84

**2355**

strangers or drugging them with cold medicine so that she could party at bars and with men would more likely be viewed by females, especially those with children, as contributing to greater moral culpability. Thus, excluding women from the jury would advance the Government's goal of achieving a death sentence for Runyon.

With respect to the second step of a *J.E.B/Batson* analysis, the Government says that it struck nine females, Jurors 7, 28, 31, 40, 46, 52, 63, 97, and 81, because they circled option D on Question 61, indicating that they generally oppose the death penalty; and it struck four females, Jurors 15, 18, 73, and 116, because they circled both option C and option D, indicating neutrality. The Government also states that six of these females, Jurors 7, 15, 18, 31, 52, and 63, had served in the military or had relatives who presently or previously served in the military.[38] In all other respects the Government's statements regarding the black jurors apply to female jurors. It identifies no reason for any strikes of females other than their views on the death penalty, and Runyon does not contest that this is a gender-neutral reason that satisfies the Government's burden at this step.

For the third step of the *J.E.B./Batson* analysis, Runyon again anticipates that his pending discovery motion will lead to additional relevant facts showing that the Government's reason for the strikes is pretextual. But the same comparative analysis discussed above with respect to African-Americans casts significant doubt on the Government's stated reason for striking females. There were similarly situated males who were not struck. Juror 2 and Juror 54, who both are male, each circled option D on Question 61, indicating that they generally oppose the death penalty. That is the same option circled by nine of the excluded female jurors, and it is more anti-death than the position circled by the other four female jurors who were struck. Like eight of the females who the Government

---

[38] The Government has undercounted. Female Jurors 28 and 97 also had family members who were or had been in the military.

**2356**

struck, Juror 2 had a military connection because a close family member had previously served in the military. Juror 2 and Juror 54 were both "permitted to serve." Juror 2 was actually seated on the jury. Juror 54 was qualified to sit and was not struck, although the Government had an unused strike that it could have exercised to remove him.

The pretextual nature of the Government's reason is again corroborated by the answers to Questions 55 and 56 on the questionnaire. Two excluded female members, Jurors 31 and 40, circled option D but marked on Questions 55 and 56 that they moderately *support* the death penalty. A third excluded female, Juror 73, circled options C and D, but also marked that she *very strongly supports* the death penalty. By comparison, Juror 2 and Juror 54, who are both male and were not struck, circled option D and marked that they are neutral on the death penalty—thus taking a position that is more anti-death than these three excluded females.

The Government suggests that defense counsel did not make a *J.E.B.* objection because they presumably would not have wanted jurors who had served in the military or had close family members with present or past military service. The record refutes this suggestion for the reasons stated above with respect to strikes based on race. Runyon expects to obtain additional facts in discovery, but even in light of the facts above, it should be clear that counsel's failure to make a *J.E.B./Batson* challenge was unreasonable and fell below the prevailing norms of professional performance. To the extent this claim is defaulted and not otherwise excused, trial counsel's deficient performance excuses that default. Runyon is entitled, at a minimum, to discovery and an evidentiary hearing on his *Strickland* claim. For the reasons stated in Runyon's §2255 motion, prejudice is presumed.

86

**2357**

**Claim 17:** **The Voir Dire Conducted In This Case Violated Runyon's Fifth And Sixth Amendment Rights To A Fair Trial And Impartial Jury, And Counsel Rendered Ineffective Assistance.**

**A.      The Voir Dire Was Constitutionally Inadequate.**

The Government's argument that this claim is barred by *Teague* is frivolous. The right to adequate voir dire generally, and regarding the death penalty specifically, is not a new rule. It was firmly established long before Runyon's trial:

> [P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors. *Dennis v. United States,* 339 U.S. 162, 171-172 (1950); *Morford v. United States,* 339 U.S. 258, 259 (1950). *"Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States,* 451 U.S. 182, 188 (1981) (plurality opinion).

*Morgan v. Illinois,* 504 U.S. 719, 729-30 (1992); *see also Turner v. Murray,* 476 U.S. 28, 35-36 (1986) (finding constitutional right to adequate voir dire on racial bias where state charged interracial crime as capital offense, even though circumstances would not mandate same voir dire in noncapital case). To the extent Runyon's claim is defaulted, it is excused by the deficient performance of trial counsel (Claim 17B) or appellate counsel (Claim 8).

Voir dire is inadequate if, under the circumstances, it does not enable the parties and court to identify unqualified jurors. The circumstances can include, for example, the nature of the charges, the extent of pretrial publicity, the presence of racial or ethnic issues, or any other circumstance where a potential juror—even when well-meaning—may harbor bias. Minimal voir dire raises a red flag and calls for close examination to ensure that all essential issues were adequately addressed. The voir dire in Runyon's case, which proceeded from "Good morning" to the seating of a jury in one day, was

87

**2358**

minimal in multiple ways: it had a short time span,[39] it posed limited questions, and it largely accepted

cursory or silent responses rather than eliciting or probing individualized views.

In *Morgan*, the Court found voir dire about the death penalty to be inadequate even though

the trial court posed multiple follow-the-law questions and every empaneled juror stated that he could

be fair and impartial. Illinois said this was sufficient, but the Court disagreed. *"Witherspoon* and its

succeeding cases would be in large measure superfluous were this Court convinced that such general

inquiries could detect those jurors with views preventing or substantially impairing their duties in

accordance with their instructions and oath." *Id.* at 734-35.

The Government's response talks about the importance of voir dire and the Court's discretion

to conduct all of the questioning, but it does not engage the specific voir dire questions (or their

absence) in this case. Those questions speak for themselves. Their required purpose was to identify

potential jurors who were unqualified. As noted in the §2255 motion, the Court presented four

questions about the death penalty that asked only whether jurors understood a provision of law:

> Tr.123, 6/30/09: If your answer is "no" to the following question, please stand. Do you understand that the law never requires that a person be sentenced to death? (No response.)

> Tr.123, 6/30/09: Again if your answer is "no" to any of the following questions, please stand. Do you understand that the law never requires a person to be sentenced to

---

[39] The Westlaw database contains seven opinions or statements where the Supreme Court reported the length of voir dire in a capital case. Runyon has omitted none: *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) ("Eleven days of the *voir dire* were devoted to determining whether the potential jurors were death qualified."); *Miller-El v. Dretke*, 545 U.S. 231, 275 (2005) ("Jury selection in Miller-El's trial took place over five weeks...."); *Penry v. Johnson*, 532 U.S. 782, 801 (2001) ("*Voir dire* was a month-long process...."); *Johnson v. Texas*, 509 U.S. 350, 357 (1993) ("more than 90 prospective jurors were questioned over the course of 15 days"); *Swindler v. Lockhart*, 495 U.S. 911, 913 (1990) ("[d]uring the five days of *voir dire*") (statement dissenting from denial of certiorari); *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 503 (1984) ("the voir dire [in the trial the press wanted to attend] consumed six weeks"); *Irvin v. Dowd*, 366 U.S. 717, 720 (1961) ("[d]uring the course of the voir dire examination, which lasted some four weeks").

88

**2359**

death, even if they have been convicted of being the triggerman in a murder for hire case? (No response.)

Tr.123-24, 6/30/09: Do you understand that the law never requires a person to be sentenced to death even if someone who murders a person by shooting him in the course of carjacking is so convicted? (No response.)

Tr.124, 6/30/09: Do you understand that the law never requires that a person be sentenced to death even if the person is convicted of murdering a person by shooting him in the course of bank robbery? (No response.)

These questions did nothing to expose unqualified jurors. They were less probative than the inadequate follow-the-law questions posed in *Morgan* because they asked only about understanding, not compliance. They certainly were not phrased to expose jurors who would automatically vote for the death penalty—an inquiry that is mandatory on request in a capital case. *Morgan*, 504 US 719, 729.

The Government says Runyon's criticism of these questions places form over substance, but that is effectively the argument Illinois unsuccessfully made in *Morgan*. There is no evidence that attentive lay jurors would discern and answer the questions the court intended to ask rather than the ones it did ask. And we should be grateful for that, because jury selection would devolve into chaos if potential jurors were free to decide that the court must have meant to ask a different question, and they answered the imagined question rather than the question the Court actually posed.

The Court asked only three other questions about the death penalty.[40] The first, viewed most generously, asked jurors if they could refrain from making a sentencing decision until they heard the penalty phase evidence:

Tr.59, 6/30/09: Is there anyone who doesn't understand that, as I indicated, if it is appropriate, in a second stage it would be your duty to listen to further evidence and consider the court's instructions and make a determination whether or not to vote for the death penalty? Do any of you feel you cannot do that? If so, please stand.

---

[40] Although this reply focuses on voir dire concerning capital punishment questions, Runyon does not concede that voir dire was adequate on any other issues.

89

The other two questions were intended to detect jurors with views preventing or substantially impairing their duties:

> Tr.124, 6/30/09: Please stand if your answer is "yes" to the following question. Do you have personal or moral opinions regarding the imposition of the death penalty that would substantially impair your ability to weigh the aggravating and mitigating factors and follow the court's instructions regarding the death penalty?

> Tr.124, 6/30/09: Again, please stand if your answer is "yes" to the following question. Would your personal or moral views about the death penalty prevent or substantially impair the performance of your duties as juror in accordance with your instructions given to you by the court and your juror's oath? Stand if your answer is "yes."

These questions were important but inadequate to reveal biased jurors. First, the questions ask jurors to judge their own impartiality—a task that few people can perform with objectivity. *See, e.g.*, *Morgan*, 504 U.S. at 735 n.9. *Morgan* appears to contemplate that the court should be the judge of the jurors' impartiality, after hearing each juror's explication of his personal or moral views about the death penalty and about mitigation evidence. Second, the Court needed to ask proper reverse-*Witherspoon* questions, which counsel requested, Tr.116, 6/30/09, and which *Morgan* thus required the court to pose, *id.* at 736: "Do you believe the death penalty should always be imposed if a defendant is found guilty of murder?" "Of being the triggerman in a murder-for-hire?" "Of committing murder in the course of carjacking?" "Of committing murder in the course of bank robbery?" Each of these unasked questions was designed to expose prospective jurors who were disqualified.

Runyon also claims that in the totality of circumstances, voir dire is inadequate when 34 percent of the jury pool can remain silent and effectively unnoticed. All that anyone learned at voir dire about these nonspeaking venire members is that they knew how to sit still and say nothing. When the Court directed venire members to stand if their answer to a question was yes, the fact that a juror remained seated might mean his answer was no; it also might mean he was avoiding the question because a truthful answer would be embarrassing or painful, or because a truthful answer would be

90

**2361**

inconsistent with the member's desire to increase (or decrease) the likelihood of being seated as a juror in this case. When members are called upon and confronted individually, however, they are forced to respond in some affirmative way. If they engage in subterfuge or evasion, the court (and counsel) can observe and assess their inflection, sincerity, demeanor, candor, body language, and understanding. As the Supreme Court observed in *Reynolds v. U.S.*, 98 U.S. 145, 156-57 (1878), "[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words."

The Government argues that Runyon has not proffered evidence suggesting that a qualified juror concealed a bias. The defendant's death sentence in *Morgan* was vacated without such evidence. *Morgan* shows that when voir dire is inadequate to reveal *whether* a juror may be biased, that alone is enough to require reversal. *Morgan*, 504 U.S. at 739. Even if more was required, there are two obvious reasons why Runyon has not identified a qualified venire member who concealed bias. First, venire members answered most questions by silence, so the record contains few if any relevant statements that can be mined for evidence of bias. Second, Runyon cannot investigate concealed bias without communicating with members of the venire, which the Court has ordered him not to do.

## B.      Counsel Rendered Ineffective Assistance Regarding Voir Dire.

Constitutionally inadequate voir dire does not happen by itself. If voir dire is not adequate, it is the fault of the court or of counsel. Runyon alleges in his §2255 motion and above that the Court bears responsibility because it was charged with ensuring the adequacy of voir dire and it conducted all of the questioning itself. It made the ultimate decisions about the questions to ask and how to ask them. If the inadequacies were not the Court's fault, they were counsel's fault. And if a claim of error by the Court is now defaulted, Runyon's counsel bear responsibility for that default.

91

**2362**

### 1. Trial Counsel

In Claim 17A, Runyon alleges three respects in which trial counsel's representation regarding jury selection fell below the threshold of professional performance. The Government addresses the substance of none of them. With respect to counsel's performance, it argues only that counsel were not deficient in these respects because they filed *other* motions and made *other* objections concerning jury selection. But the Supreme Court "ha[s] never held that counsel's effort to present *some* [challenges to voir dire] should foreclose" a claim that counsel were ineffective in failing to present others. *Sears v. Upton*, 561 U.S. 945, 955 (2010). In this case, the trial counsel's filing of other motions and objections is evidence that they recognized the supervening importance of voir dire and the need to spare no effort. This is consistent with the conventional wisdom of experienced trial lawyers "that most trials are won or lost in jury selection. ... [and] in many capital cases, jury selection is literally a matter of life or death." Blume, John H.; Johnson, Sheri Lynn; Threlkeld, A. Brian; *Probing "Life Qualification" Through Expanded Voir Dire*, 29 HOFSTRA L. REV. 1209-11 nn.1&2 (2001) (collecting treatises and journal articles); *see also* ABA Guidelines, Guideline 10.10.2 and Commentary, *reprinted in* 31 Hofstra L. Rev. at 1049, 1051.

So long as the voir dire was inadequate, it was defense counsel's obligation to try to correct the problem. Where the Court purported to grant Runyon's motions but failed to follow through—such as posing do-you-understand-the-law questions rather than accurate reverse-*Witherspoon* questions—defense counsel had a duty to object and demand the inquiry that *Morgan* required.

As to prejudice, the Government asserts only that the voir dire was not constitutionally infirm in the first instance. It implicitly concedes that Runyon was prejudiced if voir dire was not adequate. Even without such a concession, Runyon would be entitled to relief because inadequate voir dire requires vacating his death sentence without showing that a biased juror was seated. The error is

92

**2363**

treated as structural, and the prejudice prong of ineffective assistance may be presumed. *Bell v. Jarvis*, 236 F.3d at 165, 180.

### 2. Appellate Counsel

Regardless whether the inadequacy of the trial court's voir dire was preserved in the trial record, appellate counsel rendered ineffective assistance in failing to raise it on direct appeal, as alleged in Claim 8. Even under a plain error standard, it was a winning claim. Trial counsel requested reverse-*Witherspoon* questions, and the Court was mandated by *Morgan* to ask them. It didn't. Runyon was not required to show that a qualified juror was biased. On the merits, there is no ground on which the court of appeals could have refused to vacate Runyon's sentence.

**Claim S2:    The Trial Court Unlawfully Excluded the Potential Jurors Based Solely on Their Juror Questionnaire Responses Without Voir Dire, and Trial Counsel Unreasonably Failed to Object and Unreasonably Participated.**

The reply on this claim has been provided to the Clerk and is pending a ruling on Runyon's motion for leave to file it under seal.

Respectfully Submitted,

_____/s/_____

Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of Eastern Tenn., Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: March 28, 2016

93

**2364**

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2016, I have electronically filed the foregoing **Petitioner's Reply To Response Of The United States To Motion To Vacate, Set Aside, Or Correct Sentence** with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

94

**2365**

**BRISTOL-MYERS SQUIBB**
Clinical Research Center

**CLINICAL PHARMACOLOGY UNIT**
Screening Information

| Protocol No. | Subject No. | Admission Date/Time | Subject Initials | D | A | R |
|---|---|---|---|---|---|---|
| IM 119-002 | | | | | | |

Name: David A Runyon

DATE OF SCREENING VISIT: 8/30/04

**MEDICAL HISTORY:**

Past illnesses: Muscle weakness @ midday

Surgical: Vasectomy 1996, face since birth, wisdom teeth is nacte 1997

Sensitivities: hay fever cat hair pollen

Signature: V Dawson RN

**SCREENING PHYSICAL ASSESSMENT:**

TEMPERATURE: 97° oral    RESPIRATION: 18

PULSE ___ (SUPINE)   PULSE ___ (STANDING)   PULSE 73 (SITTING)

BP ___ (SUPINE)   BP ___ (STANDING)   BP 114/79 (SITTING)

HEIGHT: 159 cm   WEIGHT: 60.0 kg   FRAME: S

BMI: 23.73

COMMENTS: mean OK
placed @ 1340 vs @ 1350
⊖ abd ⊖ scar
rectal exam OK per Dr Li
hands and feet ok ✓

IM119-002
SUB: DAR05999
Day 1 0:00
PERIOD: -1
Sitting Full
Blood Pressure
900404012

**REVIEW OF SYSTEM**

CNS —
SENSORIUM —
C/P —
M/S —
—
—
G/I
G/U
HPTC
ADDENDA

```
Vitals 30 Aug 04 13:50
13:50 BP mmHg:114/ 79
13:50 MAP mmHg: 91
13:50 BPM BPM: 73
SpO2  :No reading
13:50 Temp °F: 97.1
```

**PRE-STUDY PHYSICAL EXAMINATION:**

HEENT
H/L
ABDOMEN
EXTREMITIES
GENERAL CONDITION
COMMENTS

H & P NORMAL ___    H & P ABNORMAL ___

Date/Time ___    Signature of Physician ___

Instructions: Time and initials of individual performing test are to be entered on appropriate line:

| Blood | PK | Urine | PK | Stool | | ECG | MK |
|---|---|---|---|---|---|---|---|
| S.L.S./V.I.P. GIVEN | ✓ | | Vital Signs | ✓ | Height/Weight | MK | |

G:/ROCHELLE/CPU/FORMS/SCREENING PHYSICAL ASSESSMENT.doc/
Revised: 12/16/99

22442

22442

**BRISTOL-MYERS SQUIBB**
Clinical Research Center

**CLINICAL PHARMACOLOGY UNIT**
Generic Screening Questions

|  | YES | NO |
|---|---|---|
| 1. Are you seeing **ANY** healthcare practitioner at this time for **ANY** condition? | ☐ | ☒ |
| 2. Do you have **ANY** problems with your teeth or gums (i.e., dental problems)? | ☐ | ☒ |
| 3. Are you taking **ANY** drugs from **ANY** source? | ☐ | ☒ |
| 4. Have you ever had an anxiety or panic attack? | ☐ | ☒ |
| 5. Do you have a history of depression? | ☐ | ☒ |
| 6. Do you have a history of **ANY OTHER** medical, dental, psychiatric, or psychological problem not previously covered by these forms? | ☐ | ☒ |
| 7. Are there any foods you cannot eat for any reason? | ☐ | ☒ |

**IF YOUR ANSWER TO ANY OF THESE QUESTIONS WAS "YES", PLEASE EXPLAIN BELOW:**

muscle weakness @ side of jaw since birth.
ok for this study by Dr Li.      u
8/30/04

I understand that the Investigator must know my **complete** medical, dental, and psychological history in order to protect me from harm during a clinical study. I understand that **failure to reveal my complete history** may endanger my health and well-being during a clinical study.

SIGNATURE OF VOLUNTEER

DATE  8/30/04

CPU 31  9/98

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

|  |  |  |
|---|---|---|
| DAVID ANTHONY RUNYON, Petitioner, | : : : : : : : : : : : | No. 4:15-cv-108 Initial Criminal No. 4:08-cr-16-3 CAPITAL §2255 PROCEEDINGS HON. REBECCA BEACH SMITH |
| v. |  |  |
| UNITED STATES OF AMERICA, Respondent. |  |  |

**SECOND MOTION FOR DISCOVERY**
**AND CONSOLIDATED MEMORANDUM OF LAW**

David Anthony Runyon, by counsel, hereby files this motion for discovery

pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United

States District Courts, the Federal Rules of Civil Procedure, the Federal Rules of

Criminal Procedure, the Equal Protection and Due Process clauses of the Fifth

Amendment, and the Eighth Amendment. In this motion Runyon asks for a court

order requiring the Virginia Department of Forensic Science to release to

undersigned counsel copies of all records related to forensic services in FS Lab

#T07-4553. This request includes reports, requests for examination, certificates of

analysis, bench notes, handwritten and typed notes, charts, drawings, diagrams,

digital photographs in .pdf format, color copies of film photographs, email,

memoranda and written correspondence.

**2368**

An order of the Court is necessary for undersigned to obtain access to the records. The Department of Forensic Science has records related to Runyon's case but, citing an exclusion to the Virginia Freedom of Information Act, declines to release them. (Attachment A, Letter from Amy M. Curtis). The Department will provide the records pursuant to a subpoena duces tecum or a court order. *Id.*

A full discussion of the rules for discovery in Section 2255 cases is set forth in Runyon's first motion for discovery and is incorporated herein. ECF No. 491 pp.2-5. In short, if Runyon demonstrates "good cause" then discovery should be granted. "Good cause" for discovery is established when (1) the movant makes credible allegations of a constitutional violation; and (2) the requested discovery will enable the movant to investigate and prove his claims. *Bracy v. Gramley*, 520 U.S. 899, 904, 908-09 (1997).

The requested records are relevant to Runyon's Claim 3 which alleges that counsel were ineffective for failing to investigate, present, emphasize and/or argue evidence that created reasonable doubt or supported Runyon's innocence. ECF No. 511, p.21. To prevail on an ineffective assistance of counsel claim, Runyon must demonstrate that counsel's performance was deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 692 (1984). Trial counsel have been found ineffective for failing to investigate and present ballistics evidence that is inconsistent with the prosecution's case. *See, e.g., Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005) (counsel's failure to retain a ballistics expert was prejudicial where the prosecution

2

**2369**

relied on ballistics evidence); *see also Hinton v. Alabama*, 134 S.Ct. 1081 (2014) (counsel ineffective where his investigation into ballistics evidence was unreasonably limited).

During Runyon's trial, the prosecutor told the jury that the five bullets used in the crime were fired from the same gun and the bullets are "the only evidence that was left behind by the killer." Tr. 218.[1] The prosecution's theory necessarily relied on ballistics evidence to show a correlation between the five bullets from the crime and a gun owned by Runyon. A forensic examiner from the Virginia Department of Forensic Science, John Willmer, testified that the bullets used in the crime were fired from the same gun. Tr. 362. The Certificate of Analysis on the bullets generated by James Pickelman from the Virginia Department of Forensic Science was introduced into evidence. Gov't Tr. Ex. 23. Four bullets and one bullet jacket and fragment were also introduced into evidence. Gov't Tr. Ex. 5 & 22. Willmer testified the bullets were .38 class and that .38 caliber bullets could be fired from a .357 revolver. Tr. 362, 364. Testimony and exhibits were introduced to show that Runyon purchased a Taurus .357 revolver the day of the crime and that he pawned the same revolver on separate occasions before his arrest. The prosecution's presentation of Willmer's testimony and proof of Runyon's gun ownership "could not fail to suggest an inference that this was the weapon used to commit the offense for

---

[1] Four bullets and one bullet jacket and fragments were recovered and this is referred to as five bullets.

3

which [Runyon] was on trial." *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 845 (4th Cir. 1964).

Defense counsel's performance was deficient due to an inadequate investigation into Runyon's .357 revolver and the prosecution's ballistics evidence. As discussed in Claim 3, counsel failed to investigate and present lay-witness evidence distinguishing Runyon's revolver from the silver or steel, five-shot handgun alleged to be the murder weapon. For example, Chad Costa handled and observed Runyon's .357 and described it as a black, six-shot revolver.

In addition, the Certificate of Analysis (Gov't Tr. Ex. 23) should have alerted counsel to inconsistencies between the ballistics evidence and Runyon's revolver. An obvious discrepancy is that it does not mention the Taurus brand of .357 revolvers. It states that the bullets were "fired from the same firearm having a barrel rifled with six (6) lands and grooves inclined to the right[.]" Gov't Tr. Ex. 23. Firearms which produce those characteristics include .357 Magnum revolvers "with the brand names Astra and Llama" and include .38 Special revolvers "with the brand names Astra, Beistegui, Charter Arms, Llama, Quality Firearms, Rossi and Taurus[.]" *Id.*; *see also* Tr. 369 (Pickelman's report includes .38 special brands of firearms and brands of firearms that can fire .357 magnum cartridges that have those rifling specifications). Counsel failed to adequately investigate, cross-examine and/or rebut the testimony of the forensic examiner which was used to connect Runyon's Taurus .357 revolver to the .38 bullets used in the crime.

4

**2371**

It is anticipated that records regarding the bullets in this case that are held by the Virginia Department of Forensic Science will support the claim that Runyon's defense was prejudiced by counsel's failure to investigate. The records should include, but are not limited to, a written report, bench notes of the examiner describing the physical characteristics of the bullets, and photographs depicting the bullets. *See*, Tr. 359. Those records were used by Willmer for the purpose of identifying the five bullets as having been fired from one firearm. Tr. 358, 362. They are especially important because the actual bullets, Government trial exhibits 5 and 22, cannot be located and therefore cannot be physically examined.[2] The DFS records presently constitute the best and only evidence of what was left at the scene "by the killer."

Had counsel investigated the ballistics issue and/or consulted with a ballistics expert, the jurors would have learned of discrepancies between Runyon's .357 revolver and the ballistics evidence. *See, Soffar v. Dretke*, 368 F.3d 441, 476 (5th Cir.) *amended on rehearing in part on other grounds*, 391 F.3d 703 (5th Cir. 2004) ("defense counsel were deficient in not seeking out a ballistics expert when there were such readily apparent discrepancies between the ballistics evidence and the State's theory of the case."). The fact that Runyon's gun was not the murder weapon might not have been absolute proof of Runyon's innocence, but had it been

---

[2] The clerk's office has informed counsel that the bullets were returned to the ATF agent for safe-keeping.  The ATF has informed the parties that it cannot locate the bullets that were Government exhibits 5 and 22.

made known, "it might well have nurtured, even generated, a reasonable doubt as to guilt." *Barbee*, 331 F.2d at 847. Since no other evidence directly places Runyon at the crime scene there is a reasonable probability that at least one juror—presented with evidence that Runyon did not possess the murder weapon—would have found Runyon not-guilty. *Soffar*, 368 F.3d at 478-79 (counsel's failure to consult with a ballistics expert was prejudicial where there was no "clear objective evidence" of guilt as demonstrated through forensics). If these allegations are true, Runyon is entitled to a new trial.

The allegations supporting Claim 3 establish good cause for factual development regarding the ballistics evidence because additional information "might demonstrate" Runyon is entitled to relief based on trial counsel's ineffectiveness in this aspect of the case. *Hill v. Ozmit*, 339 F.3d 187, 201 (4th Cir. 2003). *See also Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997) (denial of discovery was an abuse of discretion where it may establish the prejudice required for an ineffective assistance of counsel claim); *Toney v. Gammon*, 79 F.3d 693, 696 (8th Cir. 1996) (denial of discovery was an abuse of discretion where it was requested to support counsel's ineffectiveness for failing to "highlight lack of evidence linking [the defendant] to the crime[.]").

For these reasons, Runyon requests a court order requiring the Virginia Department of Forensic Science to release to undersigned counsel copies of all records related to forensic services in FS Lab #T07-4553 regarding the bullets

6

**2373**

and/or firearm involved in this case, including but not limited to, reports, requests

for examination, certificates of analysis, bench notes, handwritten and typed notes,

charts, drawings, diagrams, digital photographs in .pdf format, color copies of film

photographs, email, memoranda and written correspondence.

Respectfully Submitted,


_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
 Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: April 1, 2016

**2374**

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2016, I have electronically filed the foregoing Second Motion for Discovery and Consolidated Memorandum of Law with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels, Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Jeffrey A. Zick, Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

Lisa R. McKeel, Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

8

**2375**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Petitioner | ) | CRIMINAL ACTION NO.: 4:08cr16 |
| | ) | CIVIL ACTION NO.: 4:15cv108 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**RESPONSE OF THE UNITED STATES TO PETITIONER'S SECOND MOTION FOR
DISCOVERY AND CONSOLIDATED MEMORANDUM OF LAW**

COMES NOW the United States of America, by and through its attorneys, Dana J. Boente,

United States Attorney for the Eastern District of Virginia, and Lisa R. McKeel and Brian J.

Samuels, Assistant United States Attorneys, and Jeffrey A. Zick, Special Assistant United States

Attorney, and submits this Response of the United States to Petitioner's Second Motion for

Discovery and Consolidated Memorandum of Law, filed by DAVID ANTHONY RUNYON

("Runyon"). (ECF 530)

I.      **Procedural Background**

Runyon was convicted of conspiracy to commit murder-for-hire (Count 1) (18 U.S.C. §

1958(a)), carjacking resulting in death (Count 2) (18 U.S.C. §§ 2119 and 2), murder with a firearm

in relation to a crime of violence (Count 5) (18 U.S.C. § 924(j)), was sentenced to death on Counts

1 and 5, and those convictions and death sentences were affirmed on direct appeal. *United States

v. Runyon*, 707 F.3d 475 (4th Cir. 2013). The Supreme Court denied Runyon's petition for a writ

of certiorari. *Runyon v. United States*, 135 S. Ct. 46 (Oct. 6, 2014).

On October 5, 2015, Runyon filed a timely motion under 28 U.S.C. § 2255 to vacate, set

aside, or correct a sentence. (ECF 478). Before the United States filed its response to Runyon's

1

**2376**

§ 2255 motion, he filed a motion for discovery seeking the production of documents, leave to propound interrogatories, and leave to issue subpoenas to third parties. (ECF 491). The United States responded to Runyon's § 2255 motion on January 11, 2016 (ECF 497), and the discovery motion on January 15, 2016. (ECF 500).

Runyon then filed an amended § 2255 motion on February 4, 2016. (ECF 511). Again, before the United States responded to the amended motion, Runyon filed a second motion for discovery on April 1, 2016, seeking records from the Commonwealth of Virginia Department of Forensic Science related to Claim 3 in his amended § 2255 motion. (ECF 530).

## II.   Legal Requirements for Discovery in § 2255 Proceedings

A habeas petitioner, unlike a traditional civil litigant, is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Discovery in this setting can occur only with leave of the court, upon a showing of good cause. *See* Rule 6(a) of the Rules Governing § 2255 Cases. In other words, a defendant "may invoke the processes of discovery . . . if, and to the extent that, the judge in the exercise of discretion and for good cause shown, grants leave to do so, but not otherwise." *Hall v. United States*, 30 F. Supp.2d 883, 899 (E.D. Va. 1998). "Good cause" for discovery exists when a petition for habeas corpus establishes a prima facie case for relief. *See Harris v. Nelson*, 394 U.S. 286, 290 (1969). Specifically, discovery is warranted under Supreme Court and Fourth Circuit precedent, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *See Bracy*, 520 U.S. at 908–09 (citing *Harris v. Nelson*, 394 U.S. 286, 295 (1969)); *United States v. Roane*, 378 F.3d 382, 402–03 (4th Cir. 2004) (affirming denial of multiple discovery requests). In *Roane*, the Fourth Circuit rejected the defendants' argument that the trial judge erred by granting summary judgment on some claims without first permitting discovery.

2

*Roane*, 378 F.3d at 403-04. Particularly applicable here, a request for discovery must rely on specific factual allegations: discovery will not be allowed so that the petitioner can "explore [his] case in search of its existence." *See Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir.1999); *accord, United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990). A defendant may not use discovery to go on a "'fishing expedition' through the Government's files in search of evidence to support an imagined and fanciful claim." *United States v. Lighty*, 2014 WL 5509205, at *3 (D. Maryland Oct. 30, 2014) (citing *Wilson*, 901 F.2d at 381)).

"District courts enjoy nearly unfettered discretion to control the timing and scope of discovery." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 426 (4th Cir. 1996); *see Roane*, 378 F.3d at 403 (reviewing, for abuse of discretion, the denial of discovery in a § 2255 case). Once good cause is shown, the district court has discretion regarding the scope and extent of discovery. *Bracy*, 520 U.S. at 909.

## III.   Runyon Has Failed to Establish Good Cause for Discovery

In his second request for discovery, Runyon seeks discovery related to Claim 3 in his amended § 2255 motion. (ECF 511, at 32–34). Specifically, he asks for a court order requiring the Virginia Department of Forensic Science to release all documents related to forensic services in FS Lab #T07-4553. This request relates to the ballistics testing completed on the recovered bullets and bullet jacket. Runyon is not entitled to discovery here because he cannot establish a prima facie for relief. *Bracy*, 520 U.S. at 908–09.

In Claim 3, Runyon contends his trial counsel were ineffective for failing to challenge the scientific validity of John Willmer's testimony and failing to correct the "mis-impression" that the bullets found in this case could have been fired from the gun Runyon purchased on the day of the murder—a Taurus .357 revolver. Willmer, a forensic firearms and toolmark expert, testified that

3

**2378**

a microscopic analysis of the bullets recovered from the victim's truck and the bullet jacket and lead fragments recovered from the victim's body, demonstrated that the bullets were fired from the same firearm. TT, pgs. 361–62; GX 23.[1] The bullets were found to be characteristic of .38 special class bullets, encompassing a couple of calibers together. TT, pg. 362. The analysis also found that "the bullets are characteristic of being revolver ammunition components, and the predominate ammunition component in that caliber is .38 special and .357 magnum revolvers that would be typical of firing this particular bullet with the rifling specifications that it has." *Id.* Because only the bullets were recovered, there was no way to determine whether the ammunition came from .38 special or .357 magnum cartridges, but the ammunition could be used for both the .38 and .357 firearms. *Id.* at 363–64.[2] Willmer testified that that the list of firearms that could have fired the bullets in GX 23 was not all inclusive—there could be other firearms not listed that could have fired the bullets in this case. *Id.* at 369–70. In fact, the list of revolvers that are chambered to fire the .38 Special cartridge includes the Taurus brand. *See* GX 23.

Runyon has failed to show good cause entitling him to discovery. The gravamen of Runyon's claim is that trial counsel was ineffective for failing to challenge Willmer's testimony as exaggerated, inaccurate or misleading. First, there was nothing unreliable in the scientific validity of Willmer's testimony, and Runyon offers no study or evidence that rebuts the validity of the analysis that Willmer or other experts performed on the bullets. Second, there was nothing misleading about Willmer's analysis or testimony. Runyon contends that the list of firearms in GX 23 that could have fired the bullets only named Astra and Llama brand firearms. ECF 511, pg. 32. But Willmer testified that the list was not all-inclusive and the Taurus .357 magnum

---

[1] In addition to his independent examination of the bullets and bullet jacket, Willmer relied on the analysis completed by another forensic expert. *See* TT, pgs. 359–60; GX 23.

[2] George Koski, the person who sold Runyon the .357 magnum five-shot revolver on the day of the murder, also testified that the gun he sold to Runyon would shoot .38 special bullets. TT, p. 849.

revolver can shoot .38 Special bullets. TT, pg. 370; GX 23. Moreover, Runyon's reliance on Chad Costa's recollection of Runyon having a six-shot Taurus revolver adds little to his claim. George Koski testified that on the day of the murder he sold Runyon a .357 magnum five-shot revolver. TT, p. 843, 849; GX 103 and 103A.

Given this evidence, it was reasonable for trial counsel to forgo a more forceful challenge to the ballistics evidence. Runyon offers no theory, credible or otherwise, challenging Willmer's testimony. More importantly, the ballistics evidence was but one small piece of evidence demonstrating Runyon's guilt. Even without the ballistics evidence, the evidence of guilt against Runyon was overwhelming. *See Runyon*, 707 F.3d at 521 ("There is simply no question that Runyon fired five bullets into the body of an innocent naval officer—at close range and in cold blood.") Runyon purchased a .357 handgun with ammunition on the day of the murder, TT, pgs. 843–51; GX 103–103B, which was later pawned by a friend of Runyon's in West Virginia. TT, pgs. 1190–95. A map of Newport News with a description of Corey Voss's vehicle and reference to the location where Voss was eventually murdered was found in Runyon's vehicle along with a photograph of Draven and Cat Voss and their social security numbers. TT, pgs. 1025–30, 1324–26; GX 214 and 215. In Runyon's former residence, agents found a box of Winchester .357 magnum hollow point bullets with five missing from the box. TT, p. 1044; GX 236 and 237. There were numerous phone calls and emails between Runyon, Draven and Cat Voss establishing their relationship, the murder-for-hire scheme and its cover-up. GX 159–173A.

Runyon fails to demonstrate that trial counsel fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 690. Likewise, Runyon fails to show prejudice resulting from counsel's alleged error. *Id.* at 693. Given the mountain of evidence demonstrating guilt, Runyon cannot show a reasonable likelihood that the result of his trial would have been different

5

**2380**

had trial counsel more fully challenged the ballistics evidence. This Court should deny Runyon's

discovery request because there is no reason to believe that he "may, if the facts are fully

developed, be able to demonstrate that he is entitled to relief." *Bracy*, 520 U.S. at 908–09.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Runyon's Second Motion for Discovery.

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____/s/_____

Lisa R. McKeel
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph:  (757) 591-4000
Fax: (757) 591-0866
Email: Lisa.McKeel@usdoj.gov

By: _____/s/_____

Brian J. Samuels
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph:  (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov

By:_____/s/_____

Jeffrey A. Zick
Special Assistant United States Attorney
Attorney for the United States

**2381**

United States Attorney's Office
Fountain Plaza Three, Suite 300
21 Lakefront Commons
Newport News, Virginia 23606
Phone: 757/591-4000
Fax: 757/591-0866
Email: Jeffrey.Zick@usdoj.gov

**2382**

<u>CERTIFICATE OF SERVICE</u>

I certify that on April 12, 2016, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system.  I further certify that I caused a true and correct

copy of the foregoing to be mailed to the following non-ECF user:

**Michele Jill Brace**
Virginia Capital Representation Resource Center
2421 Ivy Rd., Suite 301
Charlottesville, VA  22903
Ph:  434-817-2970, 202-223-6380
Email:  mbrace@mindsort.com

**Dana Catherine Hansen Chavis**
Federal Defender Services of Eastern Tennessee, Inc.
800 S. Gay St, Suite 2400
Knoxville, TN  37929
Ph:  (865) 637-7979
Fax:  (865) 637-7999
Email:  dana_hansen@fd.org

By: _____/s /_____
                              Jeffrey A. Zick
                              Special Assistant United States Attorney
                              Attorney for the United States
                              United States Attorney's Office
                              Fountain Plaza Three, Suite 300
                              721 Lakefront Commons
                              Newport News, Virginia 23606
                              Phone: 757-591-4000
                              Fax: 757-591-0866
                              Email: Jeffrey.Zick@usdoj.gov

**2383**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON,<br>Petitioner, | : <br> : <br> : | No. 4:15-cv-108 <br> Initial Criminal No. 4:08-cr-16-3 <br> CAPITAL §2255 PROCEEDINGS |
| v. | : <br> : | HON. REBECCA BEACH SMITH |
| UNITED STATES OF AMERICA,<br>Respondent. | : <br> : <br> : <br> : | |

**REPLY TO RESPONSE OF THE UNITED STATES TO PETITIONER'S
SECOND MOTION FOR DISCOVERY AND CONSOLIDATED
MEMORANDUM OF LAW**

Respondent opposes Runyon's request for records regarding the ballistics evidence while ignoring the fact that Runyon seeks to discover what he was entitled to review at the pre-trial and/or trial stages of his case. ECF No. 31, p.2 (Discovery Order); FED. R. CRIM. P. 16(a)(1)(E)-(G); FED. R. EVID. 702, 703, & 705. Defense counsel was entitled to inspect the bullets. He was entitled to the results and reports of the ballistics examination generated by the Virginia Department of Forensic Science (DFS). He was entitled to the facts and data underlying the opinions of forensic experts. The fact that trial counsel failed to obtain this information is prima facie proof of counsel's deficient performance, as alleged in Claim 3.

The record of the case, including the exhibits introduced against Runyon, is a public record open to inspection. Undersigned counsel undertook a diligent review of

**2384**

the record maintained by the clerk of court. Exhibits consisting of bullets and firearms are not maintained by the clerk of court but are given to the ATF agent for safe-keeping. Counsel and/or counsel's agent were unable to inspect the four bullets and bullet jacket, exhibits 5 and 22, because the ATF agent cannot locate the exhibits. As indicated in Runyon's motion, ECF No. 530, p.5, the DFS records presently constitute the best and only evidence of the bullets and bullet jacket left at the crime scene.

Respondent acknowledges initially that Runyon need only demonstrate good cause for discovery but asserts this standard is not established because: (1) the prosecution expert's testimony was all-inclusive of .357 and .38 brands of firearms, and (2) Chad Costa's statements regarding the characteristics of Runyon's firearm "adds little" to Runyon's claim since they contradict other testimony. ECF No. 532, pp.4-5. To the contrary, this illustrates the point that counsel failed to investigate and present evidence challenging the prosecution's forensic testimony. Counsel's reasonable doubt strategy required an effective challenge to the prosecution's attempt to connect Runyon's gun to the crime. If the forensic analysis revealed that almost every brand of .357 and .38 firearms could have fired the bullets then Chad Costa's contrary description of Runyon's .357 raised a factual dispute supporting a reasonable doubt of Runyon's guilt. Thus, Runyon's §2255 pleadings contain specific allegations that, if the facts are fully developed, will demonstrate that he is entitled to relief. *Bracy v. Gramley*, 520 U.S. 899, 908-08 (1997).

2

**2385**

Respondent also asserts that "Runyon offers no study or evidence that rebuts the validity of the analysis ... performed on the bullets." *Id.*, p.4. At the discovery stage, Runyon need not rebut the validity of the prosecution's evidence. He need only demonstrate that the requested information "might demonstrate" he is entitled to relief on his ineffective assistance of counsel claim. *Hill v. Ozmint*, 339 F.3d 187, 201 (4th Cir. 2003). Runyon's discovery motion made this showing by discussing the discrepancies above and relying upon his allegations in Claim 3 which include the fact that, about five months before Runyon's trial, the National Academy of Sciences ("NAS") issued a landmark report regarding the unreliable state of forensic science in this country. ECF No. 511, p.33 n.20 (citing Nat'l Acad. of Sci., *Strengthening Forensic Science in the United States: A Path Forward* (Feb. 2009)) ("NAS report") (Attachment A) (Partial: pp.1-53 (introduction); pp.150-55 (toolmark and firearms identification)).

The NAS Report concluded that "[w]ith the exception of nuclear DNA analysis ... no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source." (Attachment A, NAS Report, p.7). As the NAS Report recognized, "there is a notable dearth of peer-reviewed, published studies establishing the scientific bases and validity of many forensic methods," *id.* p.8, and the report makes clear that these deficient methods include the precise types of scientific evidence presented at Runyon's trial: toolmark and firearm identification. *Id.*, pp.150-55. "The fact is that many forensic tests—such as those

3

used to infer the source of toolmarks or bite marks—have never been exposed to stringent scientific scrutiny." *Id.*, p.42. Although the NAS Report is perhaps the most renowned publication revealing the unreliable and unscientific nature of this type of forensic testimony, it is not the first nor the last.

Even before the 2009 NAS Report, counsel should have been aware of published criticism regarding the reliability of "ballistics" or firearms identification testimony.[1] Such criticism and concern continues today. In 2014, the National Institute of Standards and Technology reported on a project goal to develop objective toolmark identification criteria and error rate estimates so "examiners in court will not only present their subjective opinion of identification, but also will have an independent objective measurement of similarity between the evidence items."[2] In 2015, the Attorney General endorsed a charter for the National Commission on Forensic Science (NCFS), a purpose of which is to "strengthen the

---

[1] Scholarly and legal scrutiny of firearms identification testimony since 2005—four years before Runyon's trial—is collected and discussed in an article by Lanigan Bonnie: *Firearms identification: the need for a critical approach to, and possible guidelines for, the admissibility of "ballistics" evidence*, 17 Suffolk J. of Trial & Appellate Advocacy, 54 & notes 2, 7-9, 12, 13, 45, 58, 83-95, 115, 120 (Feb. 1, 2012). *See also* Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 The Columbia Sci. and Tech. L. Rev. 1, 2 (2005) (discussing *United States v. Kain*, Crim. No. 03-573-1 (E.D. Pa. 2004), and demonstrating that "because of the systemic scientific problems, firearms and toolmark identification testimony should be inadmissible across-the-board.").

[2] Robert M. Thompson & Xiaoyu Alan Xheng, *NIST Forensic Topography Analysis Project Seeks to Improve Ballistics Identification*, 2 NIST Forensic Sci. News pp.1, 4 (Summer 2014), *available at:* http://www.nist.gov/forensics/upload/Summer-2014.pdf

4

validity and reliability of the forensic sciences" and "develop proposed guidance concerning the intersection of forensic science and the courtroom[.]" (Attachment B, Charter). It is the view of the NCFS that "[a] trusted and impartial process of judging scientific merit of forensic practices and the presentation of data must be developed to ensure that all forensic results are based on sound and current science." (Attachment C, Nat'l. Comm. on Forensic Sci., *Views of the Commission: Validation of Forensic Science Methodology*, p.3 (Feb. 29, 2016).

Last month, March 2016, the Principal Deputy Assistant Attorney General and head of the Justice Department's Office of Legal Policy presented materials to the NCFS for the purpose of addressing testimonial inaccuracies of forensic examiners in disciplines including firearms/ballistics. Office of Legal Policy Presentation, *The Forensic Science Discipline Framework*, pp.4, 6, 7, *available at*: https://www.justice.gov/ncfs/file/835636/download. The materials set forth the framework for adopting and implementing "correct testimonial standards" and for reviewing closed cases involving FBI forensic testimony for "testimonial inaccuracies." *Id.*, pp.8, 9, 11. Runyon's case will not be selected for review because his case is not closed and the examiner who testified—although trained by the FBI—was not an FBI agent. Discovery therefore should also be granted because the Department of Justice has identified a clear need to review ballistics/firearms testimony like the testimony presented at Runyon's trial.

Finally, Respondent fails to address the cases included in Runyon's motion which provide for discovery under substantially similar circumstances and, instead,

ultimately argues against discovery by asserting an inapplicable standard: that Runyon has not established the merits of his ineffective assistance of counsel claims. ECF No. 532, pp.5-6. This argument would require the Court to render a merits determination of Runyon's several ineffective assistance of counsel claims as opposed to analyzing whether "good cause" exists. An order authorizing access to the DFS records should be granted because Runyon has set forth specific facts regarding the content of the DFS records and the expectation that the discovery will support the claim that counsel unreasonably failed to investigate and discover that Runyon's gun was not the murder weapon.

WHEREFORE, Runyon respectfully requests a court order requiring the Virginia Department of Forensic Science to release to undersigned counsel copies of all records related to forensic services in FS Lab #T07-4553 regarding the bullets and/or firearm involved in this case, including but not limited to, reports, requests for examination, certificates of analysis, bench notes, handwritten and typed notes, charts, drawings, diagrams, digital photographs in .pdf format, color copies of film photographs, email, memoranda and written correspondence.

Respectfully Submitted,

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com
Dana C. Hansen Chavis, *pro hac vice*

6

**2389**

Asst. Federal Community Defender
Federal Defender Services of
  Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: April 13, 2016

7

**2390**

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2016, I have electronically filed the foregoing Reply to Response of the United States to Petitioner's Second Motion for Discovery and Consolidated Memorandum of Law with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

8

**2391**

Case 4:08-cr-00016-RBS-DEM Document 533-1 Filed 04/13/16 Page 1 of 81 PageID# 5048

The author(s) shown below used Federal funds provided by the U.S. Department of Justice and prepared the following final report:

| | |
|---|---|
| **Document Title:** | **Strengthening Forensic Science in the United States: A Path Forward** |
| **Author:** | **Committee on Identifying the Needs of the Forensic Sciences Community, National Research Council** |
| **Document No.:** | **228091** |
| **Date Received:** | **August 2009** |
| **Award Number:** | **2006-DN-BX-0001** |

This report has not been published by the U.S. Department of Justice. To provide better customer service, NCJRS has made this Federally-funded grant final report available electronically in addition to traditional paper copies.

Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Attachm **2392** S Report

http://www.nap.edu/catalog/12589.html
We ship printed books within 1 business day; personal PDFs are available immediately.



**Strengthening Forensic Science in the United States: A Path Forward**

Committee on Identifying the Needs of the Forensic Sciences Community,   National Research Council

ISBN: 0-309-13131-6, 352 pages, 6 x 9,  (2009)

**This PDF is available from the National Academies Press at:**
**http://www.nap.edu/catalog/12589.html**

Visit the National Academies Press online, the authoritative source for all books from the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, and the National Research Council:

- Download hundreds of free books in PDF
- Read thousands of books online for free
- Explore our innovative research tools – try the "Research Dashboard" now!
- Sign up to be notified when new books are published
- Purchase printed books and selected PDF files

**Thank you for downloading this PDF.  If you have comments, questions or just want more information about the books published by the National Academies Press, you may contact our customer service department toll-free at 888-624-8373, visit us online, or send an email to feedback@nap.edu.**

**This book plus thousands more are available at http://www.nap.edu.**

Copyright © National Academy of Sciences. All rights reserved.
Unless otherwise indicated, all materials in this PDF File are copyrighted by the National Academy of Sciences.  Distribution, posting, or copying is strictly prohibited without written permission of the National Academies Press.  Request reprint permission for this book.

THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

Attachm   2393   S Report

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

# STRENGTHENING

# FORENSIC SCIENCE

## IN THE UNITED STATES

### A PATH FORWARD

Committee on Identifying the Needs of the Forensic Science Community

Committee on Science, Technology, and Law
Policy and Global Affairs

Committee on Applied and Theoretical Statistics
Division on Engineering and Physical Sciences

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Attachment 2394 AS Report
Copyright © National Academy of Sciences. All rights reserved.

THE NATIONAL ACADEMIES PRESS   500 Fifth Street, N.W.   Washington, DC 20001

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

This study was supported by Contract No. 2006-DN-BX-0001 between the National Academy of Sciences and the National Institute of Justice. Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the organizations or agencies that provided support for the project.

**Library of Congress Cataloging-in-Publication Data**

Strengthening forensic science in the United States : a path forward : summary / Committee on Identifying the Needs of the Forensic Science Community, Committee on Science, Technology, and Law Policy and Global Affairs, Committee on Applied and Theoretical Statistics, Division on Engineering and Physical Sciences.
    p. cm.
  Includes index.
  ISBN-13: 978-0-309-13135-3 (hardcover)
  ISBN-10: 0-309-13135-9 (hardcover)
  ISBN-13: 978-0-309-13131-5 (pbk.)
  ISBN-10: 0-309-13131-6 (pbk.)
  1. Forensic sciences—United States. 2. Criminal investigation—United States. 3. Evidence, Criminal—United States. I. National Research Council (U.S.). Committee on Identifying the Needs of the Forensic Science Community. II. National Research Council (U.S.). Committee on Science, Technology, and Law Policy and Global Affairs. III. National Research Council (U.S.). Committee on Applied and Theoretical Statistics.
  HV8073.S7347 2009
  363.250973—dc22

                       2009011443

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, N.W., Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, *http://www.nap. edu*.

Copyright 2009 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

# THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. Charles M. Vest is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. Charles M. Vest are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

Attachment 2396 NAS Report
Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

**Attachme   2397   AS Report**

Copyright © National A           nces. All rights reserved.

# COMMITTEE ON IDENTIFYING THE NEEDS OF THE
# FORENSIC SCIENCE COMMUNITY

HARRY T. EDWARDS, (*Co-chair*), Judge, U.S. Court of Appeals for the District of Columbia Circuit

CONSTANTINE GATSONIS, (*Co-chair*), Director, Center for Statistical Sciences, Brown University

MARGARET A. BERGER, Suzanne J. and Norman Miles Professor of Law, Brooklyn Law School

JOE S. CECIL, Project Director, Program on Scientific and Technical Evidence, Federal Judicial Center

M. BONNER DENTON, Professor of Chemistry, University of Arizona

MARCELLA F. FIERRO, Medical Examiner of Virginia (ret.)

KAREN KAFADAR, Rudy Professor of Statistics and Physics, Indiana University

PETE M. MARONE, Director, Virginia Department of Forensic Science

GEOFFREY S. MEARNS, Dean, Cleveland-Marshall College of Law, Cleveland State University

RANDALL S. MURCH, Associate Director, Research Program Development, Virginia Polytechnic Institute and State University

CHANNING ROBERTSON, Ruth G. and William K. Bowes Professor, Dean of Faculty and Academic Affairs, and Professor, Department of Chemical Engineering, Stanford University

MARVIN E. SCHECHTER, Attorney

ROBERT SHALER, Director, Forensic Science Program, Professor, Biochemistry and Molecular Biology Department, Eberly College of Science, The Pennsylvania State University

JAY A. SIEGEL, Professor, Forensic and Investigative Sciences Program, Indiana University-Purdue University

SARGUR N. SRIHARI, SUNY Distinguished Professor, Department of Computer Science and Engineering and Director, Center of Excellence for Document Analysis and Recognition (CEDAR), University at Buffalo, State University of New York

SHELDON M. WIEDERHORN (NAE), Senior NIST Fellow, National Institute of Standards and Technology

ROSS E. ZUMWALT, Chief Medical Examiner, Office of the Medical Examiner of the State of New Mexico

*v*

Attachme 2398 \S Report
Copyright © National A ces. All rights reserved.

*Staff*

**ANNE-MARIE MAZZA,** Study Director

**SCOTT T. WEIDMAN,** Director, Board on Mathematical Sciences and Their Applications

**JOHN SISLIN,** Program Officer, Board on Higher Education and Workforce

**DAVID PADGHAM,** Program Officer, Computer Science and Telecommunications Board (until 5/08)

**STEVEN KENDALL,** Senior Program Associate

**KATIE MAGEE,** Senior Program Assistant (until 9/07)

**KATHI E. HANNA,** Consultant Writer

**SARA D. MADDOX,** Editor

**ROBIN ACKERMAN,** Christine Mirzayan Science and Technology Policy Fellow

**GEMAYEL JEAN-PAUL,** Christine Mirzayan Science and Technology Policy Fellow

**JOHNALYN D. LYLES,** Christine Mirzayan Science and Technology Policy Fellow

**SANDRA OTTENSMANN,** Christine Mirzayan Science and Technology Policy Fellow

**DEIRDRE PARSONS,** Christine Mirzayan Science and Technology Policy Fellow

**SARAH RYKER,** Christine Mirzayan Science and Technology Policy Fellow

**SUNBIN SONG,** Christine Mirzayan Science and Technology Policy Fellow

*vi*

Copyright © National Academy of Sciences. All rights reserved.

Attachment 2399 NAS Report

## COMMITTEE ON SCIENCE, TECHNOLOGY, AND LAW

DONALD KENNEDY (NAS/IOM), *(Co-chair)*, President Emeritus
and Bing Professor of Environmental Science Emeritus, Stanford
University; Emeritus Editor-in-Chief, *Science*

RICHARD A. MERRILL (IOM), *(Co-chair)*, Daniel Caplin Professor of
Law Emeritus, University of Virginia Law School

FREDERICK R. ANDERSON, JR., Partner, McKenna, Long, & Aldridge
LLP

MARGARET A. BERGER, Suzanne J. and Norman Miles Professor of
Law, Brooklyn Law School

ARTHUR I. BIENENSTOCK, Special Assistant to the President for
SLAC and Federal Research Policy, Stanford University

BARBARA E. BIERER, Senior Vice President for Research, Brigham and
Women's Hospital

ELIZABETH H. BLACKBURN (NAS/IOM), Morris Herzstein Professor
of Biology and Physiology, Department of Biochemistry and
Biophysics, University of California, San Francisco

JOE S. CECIL, Project Director, Program on Scientific and Technical
Evidence, Federal Judicial Center

RICHARD F. CELESTE, President, Colorado College

JOEL E. COHEN (NAS), Abby Rockefeller Mauzé Professor and Head,
Laboratory of Populations, The Rockefeller University and Columbia
University

KENNETH W. DAM, Max Pam Professor Emeritus of American and
Foreign Law and Senior Lecturer, University of Chicago Law School

ROCHELLE COOPER DREYFUSS, Pauline Newman Professor of Law
and Director, Engelberg Center on Innovation Law and Policy, New
York University School of Law

ALICE P. GAST (NAE), President, Lehigh University

LAWRENCE O. GOSTIN (IOM), Associate Dean for Research and
Academic Programs, Linda D. and Timothy J. O'Neill Professor
of Global Health Law, Georgetown University; Professor of Public
Health, The Johns Hopkins University

GARY W. HART, Wirth Chair Professor, School of Public Affairs,
University of Colorado, Denver

BENJAMIN W. HEINEMAN, JR., Senior Fellow, Harvard Law School
and Harvard Kennedy School of Government

DAVID BROCK HORNBY, Judge, U.S. District Court, District of Maine

DAVID KORN (IOM), Vice Provost for Research, Harvard University

RICHARD A. MESERVE (NAE), President, Carnegie Institution of
Washington

Copyright © National A          2400          ces. All rights reserved.

DUNCAN T. MOORE (NAE), Professor, The Institute of Optics, University of Rochester

ALAN B. MORRISON, Visiting Professor, Washington College of Law, American University

HARRIET RABB, Vice President and General Counsel, Rockefeller University

PAUL D. RHEINGOLD, Senior Partner, Rheingold, Valet, Rheingold, Shkolnik & McCartney LLP

BARBARA ROTHSTEIN, Director, Federal Judicial Center

JONATHAN M. SAMET (IOM), Founding Director, Institute for Global Health and Chairman, Department of Preventive Medicine, University of Southern California

DAVID S. TATEL, Judge, U.S. Court of Appeals for the District of Columbia Circuit

*Staff*

ANNE-MARIE MAZZA, Director
STEVEN KENDALL, Senior Program Associate

*viii*

Copyright © National A          2401          nces. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## COMMITTEE ON APPLIED AND THEORETICAL STATISTICS

KAREN KAFADAR, (*Chair*), Rudy Professor of Statistics and Physics,
Indiana University

AMY BRAVERMAN, MISR Co-Investigator, Statistics and Data Analysis,
Earth and Space Sciences Division, Jet Propulsion Laboratory

CONSTANTINE GATSONIS, Director, Center for Statistical Sciences,
Brown University

MICHAEL GOODCHILD (NAS), Professor, Department of Geography,
University of California, Santa Barbara

KATHRYN B. LASKEY, Professor, Department of Systems Engineering
and Operations Research, George Mason University

MICHAEL LESK (NAE), Professor, Library and Information Sciences,
Rutgers University

THOMAS A. LOUIS, Professor, Department of Biostatistics, Bloomberg
School of Public Health, The Johns Hopkins University

MICHAEL A. NEWTON, Professor, Department of Biostatistics and
Medical Informatics, University of Wisconsin, Madison

MICHAEL L. STEIN, Professor, Department of Statistics, The University
of Chicago

*Staff*

SCOTT WEIDMAN, Director
NEAL GLASSMAN, Senior Program Officer
BARBARA WRIGHT, Administrative Assistant

*ix*

Attachme  2402  S Report
Copyright © National A              ices. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

Copyright © National Academy of Sciences. All rights reserved.

# Acknowledgments

## ACKNOWLEDGMENT OF PRESENTERS

The committee gratefully acknowledges the contributions of the following individuals who made thoughtful presentations before it:

Chris Asplen, *Gordon Thomas Honeywell Government Affairs*; Peter D. Barnett, *Forensic Science Associates*; Richard E. Bisbing, *McCrone Associates, Inc.,* and *Scientific Working Group on Materials Analysis (SWGMAT)*; Joseph P. Bono, *U.S. Secret Service*; Michael R. Bromwich, *Fried, Frank, Harris, Shriver & Jacobson LLP*; Bruce Budowle, *Federal Bureau of Investigation*; James Burans, *U.S. Department of Homeland Security*; Thomas Cantwell, *U.S. Department of Defense*; Larry Chelko, *U.S. Army Criminal Investigation Laboratory*; John Collins, *DuPage County Sheriff's Office Crime Laboratory*; Charles Cooke, *Office of the Director of National Intelligence*; Robin Cotton, *Boston University School of Medicine*; Joseph A. DiZinno, *Federal Bureau of Investigation*; James Downs, *National Association of Medical Examiners* and *Consortium of Forensic Science Organizations* and *Georgia Bureau of Investigation*; Itiel Dror, *University of Southampton*; Arthur Eisenberg, *Forensic Quality Services*; Barry A. J. Fisher, *Los Angeles County Sheriff's Department*; Eric Friedberg, *Stroz Friedberg, LLC*; Robert E. Gaensslen, *University of Illinois at Chicago*; Brandon L. Garrett, *University of Virginia*; Michael D. Garris, *National Institute of Standards and Technology*; Ed German, *U.S. Army* (ret.); Paul C. Giannelli, *Case Western Reserve University School of Law*; Bruce A. Goldberger, *American Academy of Forensic Sciences*; Hank

*xi*

Copyright © National Academy of Sciences. All rights reserved.

Greely, *Stanford University*; Barbara Guttman, *National Institute of Standards and Technology*; David W. Hagy, *U.S. Department of Justice*; Randy Hanzlick, *Fulton County Medical Examiner's Center* and *Emory University School of Medicine*; Carol Henderson, *National Clearinghouse for Science, Technology and the Law* and *Stetson University*; Matthew J. Hickman, *U.S. Department of Justice*; Peter T. Higgins, *The Higgins-Hermansen Group*; Max M. Houck, *West Virginia University*; Vici Inlow, *U.S. Secret Service*; Jan L. Johnson, *Illinois State Police*; Jay Kadane, *Carnegie Mellon University*; David Kaye, *Arizona State University*; Peter D. Komarinski, *Komarinski & Associates, LLC*; Roger G. Koppl, *Farleigh Dickinson University*; Glenn Langenburg, *Minnesota Bureau of Criminal Apprehension*; Deborah Leben, *U.S. Secret Service*; John Lentini, *Scientific Fire Analysis, LLC*; Alan I. Leshner, *American Association for the Advancement of Science*; William MacCrehan, *National Institute of Standards and Technology*; Bill Marbaker, *American Society of Crime Laboratory Directors*; Kenneth F. Martin, *Massachusetts State Police*; Carole McCartney, *University of Leeds*; Stephen B. Meagher, *Federal Bureau of Investigation* and *Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST)*; Jennifer Mnooken, *University of California, Los Angeles Law School*; John E. Moalli, *Exponent*; John Morgan, *U.S. Department of Justice*; Michael Murphy, *Las Vegas Office of the Coroner*; Peter Neufeld, *The Innocence Project*; John Onstwedder III, *Illinois State Police*; Garry F. Peterson, *Hennepin County Medical Examiner's Office* and *National Association of Medical Examiners*; Joseph L. Peterson, *California State University, Los Angeles*; Peter Pizzola, *New York Police Department Crime Laboratory*; Joe Polski, *Consortium of Forensic Science Organizations* and *International Association for Identification*; Larry Quarino, *Cedar Crest College*; Irma Rios, *City of Houston Crime Lab*; Michael Risinger, *Seton Hall Law School*; Michael J. Saks, *Sandra Day O'Connor College of Law, Arizona State University*; Nelson A. Santos, *Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG)*; David R. Senn, *The University of Texas Health Science Center at San Antonio*; Robert Stacey, *American Society of Crime Laboratory Directors, Laboratory Accreditation Board*; David Stoney, *Stoney Forensic, Inc.*; Peter Striupaitis, *International Association for Identification* and *Scientific Working Group for Firearms and Toolmarks (SWGGUN)*; Rick Tontarski, *U.S. Army Criminal Investigation Laboratory*; Richard W. Vorder Bruegge, *Federal Bureau of Investigation*; Victor W. Weedn; and Tom Witt, *West Virginia University*.

## ACKNOWLEDGMENT OF REVIEWERS

This report has been reviewed in draft form by individuals chosen for their diverse perspectives and technical expertise, in accordance with pro-

Attachment 2405    AS Report
Copyright © National A                ices. All rights reserved.

cedures approved by the National Academies' Report Review Committee. The purpose of this independent review is to provide candid and critical comments that will assist the institution in making its published report as sound as possible and to ensure that the report meets institutional standards for objectivity, evidence, and responsiveness to the study charge. The review comments and draft manuscript remain confidential to protect the integrity of the process.

We wish to thank the following individuals for their review of this report: R. Stephen Berry, University of Chicago; Christophe Champod, Universite de Lausanne, Switzerland; William Chisum, Retired, National Crime Investigation and Training; Joel Cohen, Rockefeller University; Peter DeForest, John Jay College of Criminal Justice; Stephen Fienberg, Carnegie Mellon University; Barry Fisher, Los Angeles County Sheriff's Department; Mark Flomenbaum, Boston University; Ross Gardner, Gardner Forensic Consulting; Paul Giannelli, Case Western Reserve University; Randy Hanzlick, Emory University; Keith Inman, Forensic Analytical Sciences, Inc.; Dan Kahan, Yale Law School; Roger Kahn, Harris County Medical Examiner's Office; Elizabeth Loftus, University of California, Irvine; C. Owen Lovejoy, Kent State University; Kenneth Melson, George Washington University; Michael Murphy, Office of the Coroner/Medical Examiner, Las Vegas, Nevada; Hyla Napadensky, Retired, Napadensky Energetics, Inc.; Joseph Peterson, California State University, Los Angeles; William Press, University of Texas, Austin; Jed Rakoff, U.S. District Court Southern District of New York; Carl Selavka, U.S. Army Criminal Investigation Laboratory; David Stoney, Stoney Forensic, Inc.; and Charles Wellford, University of Maryland.

Although the reviewers listed above have provided many constructive comments and suggestions, they were not asked to endorse the conclusions or recommendations, nor did they see the final draft of the report before its release. The review of this report was overseen by John Bailar, University of Chicago, and Royce Murray, University of North Carolina, Chapel Hill. Appointed by the National Academies, they were responsible for making certain that an independent examination of this report was carried out in accordance with institutional procedures and that all review comments were carefully considered. Responsibility for the final content of this report rests entirely with the authoring committee and the institution.

Attachme    2406   AS Report
Copyright © National A    ices. All rights reserved.

08-cr-00016-RBS-DEM   Document 533-1   Filed 04/13/16   Page 16 of 81 PageID

Copyright © National A          nces. All rights reserved.

# Contents

Preface                                                               xix

Summary                                                                 1
   Introduction, 1
   Findings and Recommendations, 14

1   Introduction                                                       35
    What Is Forensic Science?, 38
    Pressures on the Forensic Science System, 39
    Organization of This Report, 53

2   The Forensic Science Community and the Need for Integrated
    Governance                                                        55
    Crime Scene Investigation, 56
    Forensic Science Laboratories and Service Providers, 57
    Case Backlogs, 61
    NIJ's Coverdell Forensic Science Improvement Grant Program, 62
    Forensic Services Beyond the Traditional Laboratory, 64
    Federal Forensic Science Activities, 65
    Research Funding, 71
    Professional Associations, 75
    Conclusions and Recommendation, 77

Attachme  2408  \S Report
Copyright © National A     ices. All rights reserved.

*xvi*                                              CONTENTS

3   The Admission of Forensic Science Evidence in
    Litigation Law and Science                              85
    Law and Science, 86
    The *Frye* Standard and Rule 702 of the Federal Rules of
        Evidence, 88
    The *Daubert* Decision and the Supreme Court's Construction of
        Rule 702, 90
    The 2000 Amendment of Rule 702, 92
    An Overview of Judicial Dispositions of *Daubert*-Type
        Questions, 95
    Some Examples of Judicial Dispositions of Questions Relating to
        Forensic Science Evidence, 99
    Conclusion, 110

4   The Principles of Science and Interpreting Scientific Data    111
    Fundamental Principles of the Scientific Method, 112
    Conclusion, 125

5   Descriptions of Some Forensic Science Disciplines            127
    Biological Evidence, 128
    Analysis of Controlled Substances, 134
    Friction Ridge Analysis, 136
    Other Pattern/Impression Evidence: Shoeprints and Tire Tracks, 145
    Toolmark and Firearms Identification, 150
    Analysis of Hair Evidence, 156
    Analysis of Fiber Evidence, 162
    Questioned Document Examination, 164
    Analysis of Paint and Coatings Evidence, 167
    Analysis of Explosives Evidence and Fire Debris, 171
    Forensic Odontology, 174
    Bloodstain Pattern Analysis, 177
    An Emerging Forensic Science Discipline: Digital and
        Multimedia Analysis, 179
    Conclusions, 183

6   Improving Methods, Practice, and Performance in
    Forensic Science                                         183
    Independence of Forensic Science Laboratories, 183
    Uncertainties and Bias, 184
    Reporting Results, 185
    The Need for Research, 187
    Conclusions and Recommendations, 188

Copyright © National A        2409        ices. All rights reserved.
Attachme            AS Report

CONTENTS *xvii*

7   **Strengthening Oversight of Forensic Science Practice**      193
Accreditation, 195
Standards and Guidelines for Quality Control, 201
Proficiency Testing, 206
Certification, 208
Oversight as a Requirement of Paul Coverdell Forensic Science
    Improvement Grants, 211
Codes of Ethics, 212
Conclusions and Recommendations, 213

8   **Education and Training in Forensic Science**      217
Status of Forensic Science Education, 218
Challenges and Opportunities to Improve Forensic
    Science Education, 224
Research as a Component of Forensic Science Education
    Programs, 230
Status of Training, 231
Education in the Legal System, 234
Conclusions and Recommendation, 237

9   **Medical Examiner and Coroner Systems: Current and
Future Needs**      241
Medical Examiners and Coroners (ME/C), 243
ME/C Jurisdiction, 244
ME/C Missions, 244
Variations in ME/C Systems, 245
Qualifications of Coroners and Medical Examiners, 247
ME/C Administration and Oversight, 249
ME/C Staffing and Funding, 249
The Movement to Convert Coroner Systems to Medical Examiner
    Systems, 251
Utilization of Best Practices, 252
Potential Scientific Advances That May Assist ME/Cs, 253
The Shortage of Medical Examiners and Forensic Pathologists, 256
Standards and Accreditation for Death Investigation Systems, 258
Quality Control and Quality Assurance, 259
Continuing Medical Education, 259
Homeland Security, 260
Forensic Pathology Research, 261
Common Methods of Sample and Data Collection, 263
Conclusions and Recommendation, 265

Attachme 2410 S Report
Copyright © National A ces. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

10  Automated Fingerprint Identification Systems                      269
Interoperability Challenges, 273
Conclusions and Recommendation, 276

11  Homeland Security and the Forensic Science Disciplines           279
Conclusion and Recommendation, 285

Appendixes

A   Biographical Information of Committee and Staff                 287

B   Committee Meeting Agendas                                       303

Index                                                               315

Copyright © National A    2411    ices. All rights reserved.
Attachme          S Report

08-cr-00016-RBS-DEM Document 533-1 Filed 04/13/16 Page 21 of 81 PageID

# Preface

Recognizing that significant improvements are needed in forensic science, Congress directed the National Academy of Sciences to undertake the study that led to this report. There are scores of talented and dedicated people in the forensic science community, and the work that they perform is vitally important. They are often strapped in their work, however, for lack of adequate resources, sound policies, and national support. It is clear that change and advancements, both systemic and scientific, are needed in a number of forensic science disciplines—to ensure the reliability of the disciplines, establish enforceable standards, and promote best practices and their consistent application.

In adopting this report, the aim of our committee is to chart an agenda for progress in the forensic science community and its scientific disciplines. Because the work of forensic science practitioners is so obviously wide-reaching and important—affecting criminal investigation and prosecution, civil litigation, legal reform, the investigation of insurance claims, national disaster planning and preparedness, homeland security, and the advancement of technology—the committee worked with a sense of great commitment and spent countless hours deliberating over the recommendations that are included in the report. These recommendations, which are inexorably interconnected, reflect the committee's strong views on policy initiatives that must be adopted in any plan to improve the forensic science disciplines and to allow the forensic science community to serve society more effectively.

The task Congress assigned our committee was daunting and required serious thought and the consideration of an extremely complex and decentralized system, with various players, jurisdictions, demands, and limitations. Throughout our lengthy deliberations, the committee heard testimony

Attachme    2412    S Report
Copyright © National A       ices. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

from the stakeholder community, ensuring that the voices of forensic practitioners were heard and their concerns addressed. We also heard from professionals who manage forensic laboratories and medical examiner/coroner offices; teachers who are devoted to training the next generation of forensic scientists; scholars who have conducted important research in a number of forensic science fields; and members of the legal profession and law enforcement agencies who understand how forensic science evidence is collected, analyzed, and used in connection with criminal investigations and prosecutions. We are deeply grateful to all of the presenters who spoke to the committee and/or submitted papers for our consideration. These experts and their work served the committee well.

In considering the testimony and evidence that was presented to the committee, what surprised us the most was the consistency of the message that we heard:

> The forensic science system, encompassing both research and practice, has serious problems that can only be addressed by a national commitment to overhaul the current structure that supports the forensic science community in this country. This can only be done with effective leadership at the highest levels of both federal and state governments, pursuant to national standards, and with a significant infusion of federal funds.

The recommendations in this report represent the committee's studied opinion on how best to achieve this critical goal.

We had the good fortune to serve as co-chairs of the committee entrusted with addressing Congress' charge. The committee, formed under the auspices of the National Academies' Committee on Science, Technology, and Law and Committee on Applied and Theoretical Statistics, was composed of many talented professionals, some expert in various areas of forensic science, others in law, and still others in different fields of science and engineering. They listened, read, questioned, vigorously discussed the findings and recommendations offered in this report, and then worked hard to complete the research and writing required to produce the report. We are indebted to our colleagues for all the time and energy they gave to this effort. We are also most grateful to the staff, Anne-Marie Mazza, Scott Weidman, Steven Kendall, and the consultant writer, Kathi Hanna, for their superb work and dedication to this project; to staff members David Padgham and John Sislin, and editor, Sara Maddox, for their assistance; and to Paige Herwig, Laurie Richardson, and Judith A. Hunt for their sterling contributions in checking source materials and assisting with the final production of the report.

Harry T. Edwards and Constantine Gatsonis
Committee Co-chairs

Copyright © National Academies. All rights reserved.

Attachme   2413   AS Report

# Summary

## INTRODUCTION

On November 22, 2005, the Science, State, Justice, Commerce, and Related Agencies Appropriations Act of 2006 became law.[1] Under the terms of the statute, Congress authorized "the National Academy of Sciences to conduct a study on forensic science, as described in the Senate report."[2] The Senate Report to which the Conference Report refers states:

> While a great deal of analysis exists of the requirements in the discipline of DNA, there exists little to no analysis of the remaining needs of the community outside of the area of DNA. Therefore . . . the Committee directs the Attorney General to provide [funds] to the National Academy of Sciences to create an independent Forensic Science Committee. This Committee shall include members of the forensics community representing operational crime laboratories, medical examiners, and coroners; legal experts; and other scientists as determined appropriate.[3]

The Senate Report also sets forth the charge to the Forensic Science Committee, instructing it to:

(1) assess the present and future resource needs of the forensic science community, to include State and local crime labs, medical examiners, and coroners;

---

[1] P.L. No. 109-108, 119 Stat. 2290 (2005).

[2] H.R. Rep. No. 109-272, at 121 (2005) (Conf. Rep.).

[3] S. Rep. No. 109-88, at 46 (2005).

*1*

Copyright © National Academy of Sciences. All rights reserved.

Attachment S Report
2414

2            *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

(2) make recommendations for maximizing the use of forensic technologies and techniques to solve crimes, investigate deaths, and protect the public;

(3) identify potential scientific advances that may assist law enforcement in using forensic technologies and techniques to protect the public;

(4) make recommendations for programs that will increase the number of qualified forensic scientists and medical examiners available to work in public crime laboratories;

(5) disseminate best practices and guidelines concerning the collection and analysis of forensic evidence to help ensure quality and consistency in the use of forensic technologies and techniques to solve crimes, investigate deaths, and protect the public;

(6) examine the role of the forensic community in the homeland security mission;

(7) [examine] interoperability of Automated Fingerprint Information Systems [AFIS]; and

(8) examine additional issues pertaining to forensic science as determined by the Committee.[4]

In the fall of 2006, a committee was established by the National Academy of Sciences to implement this congressional charge. As recommended in the Senate Report, the persons selected to serve included members of the forensic science community, members of the legal community, and a diverse group of scientists. Operating under the project title "Identifying the Needs of the Forensic Science Community," the committee met on eight occasions: January 25-26, April 23-24, June 5-6, September 20-21, and December 6-7, 2007, and March 24-25, June 23-24, and November 14-15, 2008. During these meetings, the committee heard expert testimony and deliberated over the information it heard and received. Between meetings, committee members reviewed numerous published materials, studies, and reports related to the forensic science disciplines, engaged in independent research on the subject, and worked on drafts of the final report.

Experts who provided testimony included federal agency officials; academics and research scholars; private consultants; federal, state, and local law enforcement officials; scientists; medical examiners; a coroner; crime laboratory officials from the public and private sectors; independent investigators; defense attorneys; forensic science practitioners; and leadership of professional and standard setting organizations (see the Acknowledgments and Appendix B for a complete listing of presenters).

---

[4] Ibid.

Copyright © National Academies. All rights reserved.

08-cr-00016-RBS-DEM Document 533-1 Filed 04/13/16 Page 25 of 81 PageID

*SUMMARY*                                                               *3*

The issues covered during the committee's hearings and deliberations included:

(a) the fundamentals of the scientific method as applied to forensic practice—hypothesis generation and testing, falsifiability and replication, and peer review of scientific publications;

(b) the assessment of forensic methods and technologies—the collection and analysis of forensic data; accuracy and error rates of forensic analyses; sources of potential bias and human error in interpretation by forensic experts; and proficiency testing of forensic experts;

(c) infrastructure and needs for basic research and technology assessment in forensic science;

(d) current training and education in forensic science;

(e) the structure and operation of forensic science laboratories;

(f) the structure and operation of the coroner and medical examiner systems;

(g) budget, future needs, and priorities of the forensic science community and the coroner and medical examiner systems;

(h) the accreditation, certification, and licensing of forensic science operations, medical death investigation systems, and scientists;

(i) Scientific Working Groups (SWGs) and their practices;

(j) forensic science practices—
pattern/experience evidence
   o fingerprints (including the interoperability of AFIS)
   o firearms examination
   o toolmarks
   o bite marks
   o impressions (tires, footwear)
   o bloodstain pattern analysis
   o handwriting
   o hair
analytical evidence
   o DNA
   o coatings (e.g., paint)
   o chemicals (including drugs)
   o materials (including fibers)
   o fluids
   o serology
   o fire and explosive analysis
digital evidence;

(k) the effectiveness of coroner systems as compared with medical examiner systems;

Copyright © National Academy of Sciences. All rights reserved.

Attachme  2416  AS Report

4                    *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

(l ) the use of forensic evidence in criminal and civil litigation—
- o   the collection and flow of evidence from crime scenes to courtrooms
- o   the manner in which forensic practitioners testify in court
- o   cases involving the misinterpretation of forensic evidence
- o   the adversarial system in criminal and civil litigation
- o   lawyers' use and misuse of forensic evidence
- o   judges' handling of forensic evidence;

(m) forensic practice and projects at various federal agencies, including NIST, the FBI, DHS, U.S. Secret Service, NIJ, DEA, and DOD;

(n) forensic practice in state and local agencies;

(o) nontraditional forensic service providers; and

(p) the forensic science community in the United Kingdom.

The testimonial and documentary evidence considered by the committee was detailed, complex, and sometimes controversial. Given this reality, the committee could not possibly answer every question that it confronted, nor could it devise specific solutions for every problem that it identified. Rather, it reached a consensus on the most important issues now facing the forensic science community and medical examiner system and agreed on 13 specific recommendations to address these issues.

### Challenges Facing the Forensic Science Community

For decades, the forensic science disciplines have produced valuable evidence that has contributed to the successful prosecution and conviction of criminals as well as to the exoneration of innocent people. Over the last two decades, advances in some forensic science disciplines, especially the use of DNA technology, have demonstrated that some areas of forensic science have great additional potential to help law enforcement identify criminals. Many crimes that may have gone unsolved are now being solved because forensic science is helping to identify the perpetrators.

Those advances, however, also have revealed that, in some cases, substantive information and testimony based on faulty forensic science analyses may have contributed to wrongful convictions of innocent people. This fact has demonstrated the potential danger of giving undue weight to evidence and testimony derived from imperfect testing and analysis. Moreover, imprecise or exaggerated expert testimony has sometimes contributed to the admission of erroneous or misleading evidence.

Further advances in the forensic science disciplines will serve three important purposes. First, further improvements will assist law enforcement officials in the course of their investigations to identify perpetrators with higher reliability. Second, further improvements in forensic science practices

Copyright © National A         Attachmc   2417   \S Report   ices. All rights reserved.

should reduce the occurrence of wrongful convictions, which reduces the risk that true offenders continue to commit crimes while innocent persons inappropriately serve time. Third, any improvements in the forensic science disciplines will undoubtedly enhance the Nation's ability to address the needs of homeland security.

Numerous professionals in the forensic science community and the medical examiner system have worked for years to achieve excellence in their fields, aiming to follow high ethical norms, develop sound professional standards, ensure accurate results in their practices, and improve the processes by which accuracy is determined. Although the work of these dedicated professionals has resulted in significant progress in the forensic science disciplines in recent decades, major challenges still face the forensic science community. It is therefore unsurprising that Congress instructed this committee to, among other things, "assess the present and future resource needs of the forensic science community," "make recommendations for maximizing the use of forensic technologies and techniques," "make recommendations for programs that will increase the number of qualified forensic scientists and medical examiners," and "disseminate best practices and guidelines concerning the collection and analysis of forensic evidence to help ensure quality and consistency in the use of forensic technologies and techniques." These are among the pressing issues facing the forensic science community. The best professionals in the forensic science disciplines invariably are hindered in their work because these and other problems persist.

The length of the congressional charge and the complexity of the material under review made the committee's assignment challenging. In undertaking it, the committee first had to gain an understanding of the various disciplines within the forensic science community, as well as the community's history, its strengths and weaknesses, and the roles of the people and agencies that constitute the community and make use of its services. In so doing, the committee was able to better comprehend some of the major problems facing the forensic science community and the medical examiner system. A brief review of some of these problems is illuminating.[5]

### Disparities in the Forensic Science Community

There are great disparities among existing forensic science operations in federal, state, and local law enforcement jurisdictions and agencies. This is true with respect to funding, access to analytical instrumentation, the availability of skilled and well-trained personnel, certification, accreditation, and

---

[5] In this report, the "forensic science community," broadly speaking, is meant to include forensic pathology and medicolegal death investigation, which is sometimes referred to as "the medical examiner system" or "the medicolegal death investigation system."

Copyright © National A          2418        ices. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

oversight. As a result, it is not easy to generalize about current practices within the forensic science community. It is clear, however, that any approach to overhauling the existing system needs to address and help minimize the community's current fragmentation and inconsistent practices.

Although the vast majority of criminal law enforcement is handled by state and local jurisdictions, these entities often are sorely lacking in the resources (money, staff, training, and equipment) necessary to promote and maintain strong forensic science laboratory systems. By comparison, federal programs are often much better funded and staffed. It is also noteworthy that the resources, the extent of services, and the amount of expertise that medical examiners and forensic pathologists can provide vary widely in different jurisdictions. As a result, the depth, reliability, and overall quality of substantive information arising from the forensic examination of evidence available to the legal system vary substantially across the country.

## Lack of Mandatory Standardization, Certification, and Accreditation

The fragmentation problem is compounded because operational principles and procedures for many forensic science disciplines are not standardized or embraced, either between or within jurisdictions. There is no uniformity in the certification of forensic practitioners, or in the accreditation of crime laboratories. Indeed, most jurisdictions do not require forensic practitioners to be certified, and most forensic science disciplines have no mandatory certification programs. Moreover, accreditation of crime laboratories is not required in most jurisdictions. Often there are no standard protocols governing forensic practice in a given discipline. And, even when protocols are in place (e.g., SWG standards), they often are vague and not enforced in any meaningful way. In short, the quality of forensic practice in most disciplines varies greatly because of the absence of adequate training and continuing education, rigorous mandatory certification and accreditation programs, adherence to robust performance standards, and effective oversight.[6] These shortcomings obviously pose a continuing and serious threat to the quality and credibility of forensic science practice.

## The Broad Range of Forensic Science Disciplines

The term "forensic science" encompasses a broad range of forensic disciplines, each with its own set of technologies and practices. In other words, there is wide variability across forensic science disciplines with regard to

---

[6] See, e.g., P.C. Giannelli. 2007. Wrongful convictions and forensic science: The need to regulate crime labs. 86 N.C. L. Rev. 163 (2007); B. Schmitt and J. Swickard. 2008. "Detroit Police Lab Shut Down After Probe Finds Errors." *Detroit Free Press*. September 25.

Copyright © National A      2419      ices. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

techniques, methodologies, reliability, types and numbers of potential errors, research, general acceptability, and published material. Some of the forensic science disciplines are laboratory based (e.g., nuclear and mitochondrial DNA analysis, toxicology and drug analysis); others are based on expert interpretation of observed patterns (e.g., fingerprints, writing samples, toolmarks, bite marks, and specimens such as hair). The "forensic science community," in turn, consists of a host of practitioners, including scientists (some with advanced degrees) in the fields of chemistry, biochemistry, biology, and medicine; laboratory technicians; crime scene investigators; and law enforcement officers. There are very important differences, however, between forensic laboratory work and crime scene investigations. There are also sharp distinctions between forensic practitioners who have been trained in chemistry, biochemistry, biology, and medicine (and who bring these disciplines to bear in their work) and technicians who lend support to forensic science enterprises. Many of these differences are discussed in the body of this report.

The committee decided early in its work that it would not be feasible to develop a detailed evaluation of each discipline in terms of its scientific underpinning, level of development, and ability to provide evidence to address the major types of questions raised in criminal prosecutions and civil litigation. However, the committee solicited testimony on a broad range of forensic science disciplines and sought to identify issues relevant across definable classes of disciplines. As a result of listening to this testimony and reviewing related written materials, the committee found substantial evidence indicating that the level of scientific development and evaluation varies substantially among the forensic science disciplines.

### Problems Relating to the Interpretation of Forensic Evidence

Often in criminal prosecutions and civil litigation, forensic evidence is offered to support conclusions about "individualization" (sometimes referred to as "matching" a specimen to a particular individual or other source) or about classification of the source of the specimen into one of several categories. With the exception of nuclear DNA analysis, however, no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source. In terms of scientific basis, the analytically based disciplines generally hold a notable edge over disciplines based on expert interpretation. But there are important variations among the disciplines relying on expert interpretation. For example, there are more established protocols and available research for fingerprint analysis than for the analysis of bite marks. There also are significant variations within each discipline. For example, not all fingerprint evidence is

Copyright © National A        2420        ces. All rights reserved.

Attachme        2420        S Report

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

equally good, because the true value of the evidence is determined by the quality of the latent fingerprint image. These disparities between and within the forensic science disciplines highlight a major problem in the forensic science community: The simple reality is that the interpretation of forensic evidence is not always based on scientific studies to determine its validity. This is a serious problem. Although research has been done in some disciplines, there is a notable dearth of peer-reviewed, published studies establishing the scientific bases and validity of many forensic methods.[7]

## The Need for Research to Establish Limits and Measures of Performance

In evaluating the accuracy of a forensic analysis, it is crucial to clarify the type of question the analysis is called on to address. Thus, although some techniques may be too imprecise to permit accurate identification of a specific individual, they may still provide useful and accurate information about questions of classification. For example, microscopic hair analysis may provide reliable evidence on some characteristics of the individual from which the specimen was taken, but it may not be able to reliably match the specimen with a specific individual. However, the definition of the appropriate question is only a first step in the evaluation of the performance of a forensic technique. A body of research is required to establish the limits and measures of performance and to address the impact of sources of variability and potential bias. Such research is sorely needed, but it seems to be lacking in most of the forensic disciplines that rely on subjective assessments of matching characteristics. These disciplines need to develop rigorous protocols to guide these subjective interpretations and pursue equally rigorous research and evaluation programs. The development of such research programs can benefit significantly from other areas, notably from the large body of research on the evaluation of observer performance in diagnostic medicine and from the findings of cognitive psychology on the potential for bias and error in human observers.[8]

---

[7] Several articles, for example, have noted the lack of scientific validation of fingerprint identification methods. See, e.g., J.J. Koehler. Fingerprint error rates and proficiency tests: What they are and why they matter. 59 HASTINGS L.J. 1077 (2008); L. Haber and R.N. Haber. 2008. Scientific validation of fingerprint evidence under *Daubert. Law, Probability and Risk* 7(2):87; J.L. Mnookin. 2008. The validity of latent fingerprint identification: Confessions of a fingerprinting moderate. *Law, Probability and Risk* 7(2):127.

[8] The findings of forensic science experts are vulnerable to cognitive and contextual bias. See, e.g., I.E. Dror, D. Charlton, and A.E. Péron. 2006. Contextual information renders experts vulnerable to making erroneous identifications. *Forensic Science International* 156:74, 77. ("Our study shows that it is possible to alter identification decisions on the same fingerprint, solely by presenting it in a different context."); I.E. Dror and D. Charlton. 2006. Why experts make errors. *Journal of Forensic Identification* 56(4):600; Giannelli, *supra* note 6, pp. 220-222. Unfortunately, at least to date, there is no good evidence to indicate that the forensic

Copyright © National Academy of Sciences. All rights reserved.

*SUMMARY* 9

## The Admission of Forensic Science Evidence in Litigation

Forensic science experts and evidence are used routinely in the service of the criminal justice system. DNA testing may be used to determine whether sperm found on a rape victim came from an accused party; a latent fingerprint found on a gun may be used to determine whether a defendant handled the weapon; drug analysis may be used to determine whether pills found in a person's possession were illicit; and an autopsy may be used to determine the cause and manner of death of a murder victim. In order for qualified forensic science experts to testify competently about forensic evidence, they must first find the evidence in a usable state and properly preserve it. A latent fingerprint that is badly smudged when found cannot be usefully saved, analyzed, or explained. An inadequate drug sample may be insufficient to allow for proper analysis. And, DNA tests performed on a contaminated or otherwise compromised sample cannot be used reliably to identify or eliminate an individual as the perpetrator of a crime. These are important matters involving the proper processing of forensic evidence. The law's greatest dilemma in its heavy reliance on forensic evidence, however, concerns the question of whether—and to what extent—there is *science* in any given forensic science discipline.

Two very important questions should underlie the law's admission of and reliance upon forensic evidence in criminal trials: (1) the extent to which a particular forensic discipline is founded on a reliable scientific methodology that gives it the capacity to accurately analyze evidence and report findings and (2) the extent to which practitioners in a particular forensic discipline rely on human interpretation that could be tainted by error, the threat of bias, or the absence of sound operational procedures and robust performance standards. These questions are significant. Thus, it matters a great deal whether an expert is qualified to testify about forensic evidence and whether the evidence is sufficiently reliable to merit a fact finder's reliance on the truth that it purports to support. Unfortunately, these important questions do not always produce satisfactory answers in judicial decisions pertaining to the admissibility of forensic science evidence proffered in criminal trials.

In 1993, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[9] the Supreme Court ruled that, under Rule 702 of the Federal Rules of Evidence (which covers both civil trials and criminal prosecutions in the federal courts), a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[10] The Court indicated

---

science community has made a sufficient effort to address the bias issue; thus, it is impossible for the committee to fully assess the magnitude of the problem.

[9] 509 U.S. 579 (1993).

[10] Ibid., p. 589.

Copyright © National Academy of Sciences. All rights reserved.

*10*          *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

that the subject of an expert's testimony should be scientific knowledge, so that "evidentiary reliability will be based upon scientific validity."[11] The Court also emphasized that, in considering the admissibility of evidence, a trial judge should focus "solely" on the expert's "principles and methodology," and "not on the conclusions that they generate."[12] In sum, *Daubert*'s requirement that an expert's testimony pertain to "scientific knowledge" established a standard of "evidentiary reliability."[13]

In explaining this evidentiary standard, the *Daubert* Court pointed to several factors that might be considered by a trial judge: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a particular scientific technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) a scientific technique's degree of acceptance within a relevant scientific community.[14] In the end, however, the Court emphasized that the inquiry under Rule 702 is "a flexible one."[15] The Court expressed confidence in the adversarial system, noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[16] The Supreme Court has made it clear that trial judges have great discretion in deciding on the admissibility of evidence under Rule 702, and that appeals from *Daubert* rulings are subject to a very narrow abuse-of-discretion standard of review.[17] Most importantly, in *Kumho Tire Co., Ltd. v. Carmichael*, the Court stated that "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[18]

---

[11] Ibid., pp. 590 and 591 n.9 (emphasis omitted).

[12] Ibid., p. 595. In *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), the Court added: "[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."

[13] *Daubert*, 509 U.S. at 589, 590 n.9, 595.

[14] Ibid., pp. 593-94.

[15] Ibid., p. 594. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Court confirmed that the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire* importantly held that Rule 702 applies to both scientific and nonscientific expert testimony; the Court also indicated that the *Daubert* factors might be applicable in a trial judge's assessment of the reliability of nonscientific expert testimony, depending upon "the particular circumstances of the particular case at issue." Ibid., at 150.

[16] *Daubert*, 509 U.S. at 596.

[17] See *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-143 (1997).

[18] *Kumho Tire*, 526 U.S. at 153.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

*Daubert* and its progeny have engendered confusion and controversy. In particular, judicial dispositions of *Daubert*-type questions in criminal cases have been criticized by some lawyers and scholars who thought that the Supreme Court's decision would be applied more rigorously.[19] If one focuses solely on reported federal appellate decisions, the picture is not appealing to those who have preferred a more rigorous application of *Daubert*. Federal appellate courts have not with any consistency or clarity imposed standards ensuring the application of scientifically valid reasoning and reliable methodology in criminal cases involving *Daubert* questions. This is not really surprising, however. The Supreme Court itself described the *Daubert* standard as "flexible." This means that, beyond questions of relevance, *Daubert* offers appellate courts no clear substantive standard by which to review decisions by trial courts. As a result, trial judges exercise great discretion in deciding whether to admit or exclude expert testimony, and their judgments are subject only to a highly deferential "abuse of discretion" standard of review. Although it is difficult to get a clear picture of how trial courts handle *Daubert* challenges, because many evidentiary rulings are issued without a published opinion and without an appeal, the vast majority of the *reported* opinions in criminal cases indicate that trial judges rarely exclude or restrict expert testimony offered by prosecutors; most *reported* opinions also indicate that appellate courts routinely deny appeals contesting trial court decisions admitting forensic evidence against criminal defendants.[20] But the reported opinions do not offer in any way a complete sample of federal trial court dispositions of *Daubert*-type questions in criminal cases.

The situation appears to be very different in civil cases. Plaintiffs and defendants, equally, are more likely to have access to expert witnesses in civil cases, while prosecutors usually have an advantage over most defendants in offering expert testimony in criminal cases. And, ironically, the appellate courts appear to be more willing to second-guess trial court judgments on the admissibility of purported scientific evidence in civil cases than in criminal cases.[21]

---

[19] See, e.g., P.J. Neufeld. 2005. The (near) irrelevance of *Daubert* to criminal justice: And some suggestions for reform. *American Journal of Public Health* 95(Supp.1):S107.

[20] Ibid., p. S109.

[21] See, e.g., *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005); *Chapman v. Maytag Corp.*, 297 F.3d 682 (7th Cir. 2002); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083 (10th Cir. 2000); *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000); *Walker v. Soo Line R.R. Co.*, 208 F.3d 581 (7th Cir. 2000); 1 D.L. Faigman, M.J. Saks, J. Sanders, and E.K. Cheng. 2007-2008. *Modern Scientific Evidence: The Law and Science of Expert Testimony.* Eagan, MN: Thomson/West, § 1.35, p. 105 (discussing studies suggesting that courts "employ *Daubert* more lackadaisically in criminal trials—especially in regard to prosecution evidence—than in civil cases—especially in regard to plaintiff evidence").

Attachment 2424 NAS Report
Copyright © National A    2424    ices. All rights reserved.

*12*          *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

Prophetically, the *Daubert* decision observed that "there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly."[22] But because accused parties in criminal cases are convicted on the basis of testimony from forensic science experts, much depends upon whether the evidence offered is reliable. Furthermore, in addition to protecting innocent persons from being convicted of crimes that they did not commit, we are also seeking to protect society from persons who have committed criminal acts. Law enforcement officials and the members of society they serve need to be assured that forensic techniques are *reliable*. Therefore, we must limit the risk of having the reliability of certain forensic science methodologies judicially certified before the techniques have been properly studied and their accuracy verified by the forensic science community. "[T]here is no evident reason why ['rigorous, systematic'] research would be infeasible."[23] However, some courts appear to be loath to insist on such research as a condition of admitting forensic science evidence in criminal cases, perhaps because to do so would likely "demand more by way of validation than the disciplines can presently offer."[24]

The adversarial process relating to the admission and exclusion of scientific evidence is not suited to the task of finding "scientific truth." The judicial system is encumbered by, among other things, judges and lawyers who generally lack the scientific expertise necessary to comprehend and evaluate forensic evidence in an informed manner, trial judges (sitting alone) who must decide evidentiary issues without the benefit of judicial colleagues and often with little time for extensive research and reflection, and the highly deferential nature of the appellate review afforded trial courts' *Daubert* rulings. Given these realities, there is a tremendous need for the forensic science community to improve. Judicial review, by itself, will not cure the infirmities of the forensic science community.[25] The development

---

[22] *Daubert*, 509 U.S. at 596-97.

[23] J. Griffin and D.J. LaMagna. 2002. *Daubert* challenges to forensic evidence: Ballistics next on the firing line. *The Champion*, September-October:20, 21 (quoting P. Giannelli and E. Imwinkelried. 2000. Scientific evidence: The fallout from Supreme Court's decision in *Kumho Tire*. *Criminal Justice Magazine* 14(4):12, 40).

[24] Ibid. See, e.g., *United States v. Crisp*, 324 F.3d 261, 270 (4th Cir. 2003) (noting "that while further research into fingerprint analysis would be welcome, to postpone present in-court utilization of this bedrock forensic identifier pending such research would be to make the best the enemy of the good." (internal quotation marks omitted)).

[25] See J.L. Mnookin. Expert evidence, partisanship, and epistemic competence. 73 BROOK. L. REV. 1009, 1033 (2008) ("[S]o long as we have our adversarial system in much its present form, we are inevitably going to be stuck with approaches to expert evidence that are imperfect, conceptually unsatisfying, and awkward. It may well be that the real lesson is this: those who believe that we might ever fully resolve—rather than imperfectly manage—the

Copyright © National Academy of Sciences. All rights reserved.

of scientific research, training, technology, and databases associated with DNA analysis have resulted from substantial and steady federal support for both academic research and programs employing techniques for DNA analysis. Similar support must be given to all credible forensic science disciplines if they are to achieve the degrees of reliability needed to serve the goals of justice. With more and better educational programs, accredited laboratories, certified forensic practitioners, sound operational principles and procedures, and serious research to establish the limits and measures of performance in each discipline, forensic science experts will be better able to analyze evidence and coherently report their findings in the courts. The current situation, however, is seriously wanting, both because of the limitations of the judicial system and because of the many problems faced by the forensic science community.

## Political Realities

Most forensic science methods, programs, and evidence are within the regulatory province of state and local law enforcement entities or are covered by statutes and rules governing state judicial proceedings. Thus, in assessing the strengths, weaknesses, and future needs of forensic disciplines, and in making recommendations for improving the use of forensic technologies and techniques, the committee remained mindful of the fact that Congress cannot directly fix all of the deficiencies in the forensic science community. Under our federal system of government, Congress does not have free reign to amend state criminal codes, rules of evidence, and statutes governing civil actions; nor may it easily and directly regulate local law enforcement practices, state and local medical examiner units, or state policies covering the accreditation of crime laboratories and the certification of forensic practitioners.

Congress' authority to act is significant, however. Forensic science programs in federal government entities—whether within DOJ, DHS, DOD, or the Department of Commerce (DOC)—are funded by congressional appropriations. If these programs are required to operate pursuant to the highest standards, they will provide an example for the states. More importantly, Congress can promote "best practices" and strong educational, certification, accreditation, ethics, and oversight programs in the states by offering funds that are contingent on meeting appropriate standards of practice. There is every reason to believe that offers of federal funds with "strings attached" can effect significant change in the forensic science com-

---

deep structural tensions surrounding both partisanship and epistemic competence that permeate the use of scientific evidence within our legal system are almost certainly destined for disappointment.").

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

munity, because so many state and local programs currently are suffering for want of adequate resources. In the end, however, the committee recognized that state and local authorities must be willing to enforce change if it is to happen.

In light of the foregoing issues, the committee exercised caution before drawing conclusions and avoided being too prescriptive in its recommendations. It also recognized that, given the complexity of the issues and the political realities that may pose obstacles to change, some recommendations will have to be implemented creatively and over time in order to be effective.

## FINDINGS AND RECOMMENDATIONS

### The Fragmented System: Symptoms and Cures

The forensic science disciplines currently are an assortment of methods and practices used in both the public and private arenas. Forensic science facilities exhibit wide variability in capacity, oversight, staffing, certification, and accreditation across federal and state jurisdictions. Too often they have inadequate educational programs, and they typically lack mandatory and enforceable standards, founded on rigorous research and testing, certification requirements, and accreditation programs. Additionally, forensic science and forensic pathology research, education, and training lack strong ties to our research universities and national science assets. In addition to the problems emanating from the fragmentation of the forensic science community, the most recently published *Census of Crime Laboratories* conducted by BJS describes unacceptable case backlogs in state and local crime laboratories and estimates the level of additional resources needed to handle these backlogs and prevent their recurrence. Unfortunately, the backlogs, even in DNA case processing, have grown dramatically in recent years and are now staggering in some jurisdictions. The most recently published BJS *Special Report of Medical Examiners and Coroners' Offices* also depicts a system with disparate and often inadequate educational and training requirements, resources, and capacities—in short, a system in need of significant improvement.

Existing data suggest that forensic laboratories are underresourced and understaffed, which contributes to case backlogs and likely makes it difficult for laboratories to do as much as they could to (1) inform investigations, (2) provide strong evidence for prosecutions, and (3) avoid errors that could lead to imperfect justice. Being underresourced also means that the tools of forensic science—and the knowledge base that underpins the analysis and interpretation of evidence—are not as strong as they could be, thus hindering the ability of the forensic science disciplines to excel at

Copyright © National A          2427          ices. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

informing investigations, providing strong evidence, and avoiding errors in important ways. NIJ is the only federal agency that provides direct support to crime laboratories to alleviate the backlog, and those funds are minimal. The forensic science system is underresourced also in the sense that it has only thin ties to an academic research base that could support the forensic science disciplines and fill knowledge gaps. There are many hard-working and conscientious people in the forensic science community, but this under-resourcing inherently limits their ability to do their best work. Additional resources surely will be necessary to create high-quality, self-correcting systems.

However, increasing the staff within existing crime laboratories and medical examiners' offices is only part of the solution. What also is needed is an upgrading of systems and organizational structures, better training, the widespread adoption of uniform and enforceable best practices, and mandatory certification and accreditation programs. The forensic science community and the medical examiner/coroner system must be upgraded if forensic practitioners are to be expected to serve the goals of justice.

Of the various facets of underresourcing, the committee is most concerned about the knowledge base. Adding more dollars and people to the enterprise might reduce case backlogs, but it will not address fundamental limitations in the capabilities of forensic science disciplines to discern valid information from crime scene evidence. For the most part, it is impossible to discern the magnitude of those limitations, and reasonable people will differ on their significance.

Forensic science research is not well supported, and there is no unified strategy for developing a forensic science research plan across federal agencies. Relative to other areas of science, the forensic disciplines have extremely limited opportunities for research funding. Although the FBI and NIJ have supported some research in forensic science, the level of support has been well short of what is necessary for the forensic science community to establish strong links with a broad base of research universities. Moreover, funding for academic research is limited and requires law enforcement collaboration, which can inhibit the pursuit of more fundamental scientific questions essential to establishing the foundation of forensic science. The broader research community generally is not engaged in conducting research relevant to advancing the forensic science disciplines.

The forensic science enterprise also is hindered by its extreme disaggregation—marked by multiple types of practitioners with different levels of education and training and different professional cultures and standards for performance and a reliance on apprentice-type training and a guild-like structure of disciplines, which work against the goal of a single forensic science profession. Many forensic scientists are given scant opportunity for professional activities, such as attending conferences or

Copyright © National Academy of Sciences. All rights reserved.

*16*　　　　　*STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

publishing their research, which could help strengthen the professional community and offset some of the disaggregation. The fragmented nature of the enterprise raises the worrisome prospect that the quality of evidence presented in court, and its interpretation, can vary unpredictably according to jurisdiction.

Numerous professional associations are organized around the forensic science disciplines, and many of them are involved in training and education (see Chapter 8) and are developing standards and accreditation and certification programs (see Chapter 7). The efforts of these groups are laudable. However, except for the largest organizations, it is not clear how these associations interact or the extent to which they share requirements, standards, or policies. Thus, there is a need for more consistent and harmonized requirements.

In the course of its deliberations and review of the forensic science enterprise, it became obvious to the committee that, although congressional action will not remedy all of the deficiencies in forensic science methods and practices, truly meaningful advances will not come without significant concomitant leadership from the federal government. The forensic science enterprise lacks the necessary governance structure to pull itself up from its current weaknesses. Of the many professional societies that serve the enterprise, none is dominant, and none has clearly articulated the need for change or presented a vision for accomplishing it. And clearly no municipal or state forensic office has the mandate to lead the entire enterprise. The major federal resources—NIJ and the FBI Laboratory—have provided modest leadership, for which they should be commended: NIJ has contributed a helpful research program and the FBI Laboratory has spearheaded the SWGs. But again, neither entity has recognized, let alone articulated, a need for change or a vision for achieving it. Neither has the full confidence of the larger forensic science community. And because both are part of a prosecutorial department of the government, they could be subject to subtle contextual biases that should not be allowed to undercut the power of forensic science.

The forensic science enterprise needs strong governance to adopt and promote an aggressive, long-term agenda to help strengthen the forensic science disciplines. Governance must be strong enough—and independent enough—to identify the limitations of forensic science methodologies, and must be well connected with the Nation's scientific research base to effect meaningful advances in forensic science practices. The governance structure must be able to create appropriate incentives for jurisdictions to adopt and adhere to best practices and promulgate the necessary sanctions to discourage bad practices. It must have influence with educators in order to effect improvements to forensic science education. It must be able to identify standards and enforce them. A governance entity must be geared toward

Copyright © National Academy of Sciences. All rights reserved.

Attachment 2429 NAS Report

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

(and be credible within) the law enforcement community, but it must have strengths that extend beyond that area. Oversight of the forensic science community and medical examiner system will sweep broadly into areas of criminal investigation and prosecution, civil litigation, legal reform, investigation of insurance claims, national disaster planning and preparedness, homeland security, certification of federal, state, and local forensic practitioners, public health, accreditation of public and private laboratories, research to improve forensic methodologies, education programs in colleges and universities, and advancing technology.

The committee considered whether such a governing entity could be established within an existing federal agency. The National Science Foundation (NSF) was considered because of its strengths in leading research and its connections to the research and education communities. NSF is surely capable of building and sustaining a research base, but it has very thin ties to the forensic science community. It would be necessary for NSF to take many untested steps if it were to assume responsibility for the governance of applied fields of science. The committee also considered NIST. In the end analysis, however, NIST did not appear to be a viable option. It has a good program of research targeted at forensic science and law enforcement, but the program is modest. NIST also has strong ties to industry and academia, and it has an eminent history in standard setting and method development. But its ties to the forensic science community are still limited, and it would not be seen as a natural leader by the scholars, scientists, and practitioners in the field. In sum, the committee concluded that neither NSF nor NIST has the breadth of experience or institutional capacity to establish an effective governance structure for the forensic science enterprise.

There was also a strong consensus in the committee that no existing or new division or unit within DOJ would be an appropriate location for a new entity governing the forensic science community. DOJ's principal mission is to enforce the law and defend the interests of the United States according to the law. Agencies within DOJ operate pursuant to this mission. The FBI, for example, is the investigative arm of DOJ and its principal missions are to produce and use intelligence to protect the Nation from threats and to bring to justice those who violate the law. The work of these law enforcement units is critically important to the Nation, but the scope of the work done by DOJ units is much narrower than the promise of a strong forensic science community. Forensic science serves more than just law enforcement; and when it does serve law enforcement, it must be equally available to law enforcement officers, prosecutors, *and* defendants in the criminal justice system. The entity that is established to govern the forensic science community cannot be principally beholden to law enforcement. The potential for conflicts of interest between the needs of law enforcement and the broader needs of forensic science are too great. In addition, the com-

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

mittee determined that the research funding strategies of DOJ have not adequately served the broad needs of the forensic science community. This is understandable, but not acceptable when the issue is whether an agency is best suited to support and oversee the Nation's forensic science community. In sum, the committee concluded that advancing *science* in the forensic science enterprise is not likely to be achieved within the confines of DOJ.

Furthermore, there is little doubt that some existing federal entities are too wedded to the current "fragmented" forensic science community, which is deficient in too many respects. Most notably, these existing agencies have failed to pursue a rigorous research agenda to confirm the evidentiary reliability of methodologies used in a number of forensic science disciplines. These agencies are not good candidates to oversee the overhaul of the forensic science community in the United States.

Finally, some existing federal agencies with other missions occasionally have undertaken projects affecting the forensic science community. These entities are better left to continue the good work that defines their principal missions. More responsibility is not better for these existing entities, nor would it be better for the forensic science community or the Nation.

The committee thus concluded that the problems at issue are too serious and important to be subsumed by an existing federal agency. It also concluded that no existing federal agency has the capacity or appropriate mission to take on the roles and responsibilities needed to govern and improve the forensic science enterprise.

The committee believes that what is needed to support and oversee the forensic science community is a new, strong, and independent entity that could take on the tasks that would be assigned to it in a manner that is as objective and free of bias as possible—one with no ties to the past and with the authority and resources to implement a fresh agenda designed to address the problems found by the committee and discussed in this report. A new organization should not be encumbered by the assumptions, expectations, and deficiencies of the existing fragmented infrastructure, which has failed to address the needs and challenges of the forensic science disciplines.

This new entity must be an independent federal agency established to address the needs of the forensic science community, and it must meet the following minimum criteria:

- It must have a culture that is strongly rooted in science, with strong ties to the national research and teaching communities, including federal laboratories.
- It must have strong ties to state and local forensic entities as well as to the professional organizations within the forensic science community.

Copyright © National A 2431 AS Report ices. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

- It must not be in any way committed to the existing system, but should be informed by its experiences.
- It must not be part of a law enforcement agency.
- It must have the funding, independence, and sufficient prominence to raise the profile of the forensic science disciplines and push effectively for improvements.
- It must be led by persons who are skilled and experienced in developing and executing national strategies and plans for standard setting; managing accreditation and testing processes; and developing and implementing rulemaking, oversight, and sanctioning processes.

No federal agency currently exists that meets all of these criteria.

**Recommendation 1:**

To promote the development of forensic science into a mature field of multidisciplinary research and practice, founded on the systematic collection and analysis of relevant data, Congress should establish and appropriate funds for an independent federal entity, the National Institute of Forensic Science (NIFS). NIFS should have a full-time administrator and an advisory board with expertise in research and education, the forensic science disciplines, physical and life sciences, forensic pathology, engineering, information technology, measurements and standards, testing and evaluation, law, national security, and public policy. NIFS should focus on:

   (a) establishing and enforcing best practices for forensic science professionals and laboratories;

   (b) establishing standards for the mandatory accreditation of forensic science laboratories and the mandatory certification of forensic scientists and medical examiners/forensic pathologists—and identifying the entity/entities that will develop and implement accreditation and certification;

   (c) promoting scholarly, competitive peer-reviewed research and technical development in the forensic science disciplines and forensic medicine;

   (d) developing a strategy to improve forensic science research and educational programs, including forensic pathology;

   (e) establishing a strategy, based on accurate data on the forensic science community, for the efficient allocation of available funds to give strong support to forensic methodologies and practices in addition to DNA analysis;

Copyright © National Academy of Sciences. All rights reserved.

Attachment 2432 - NAS Report

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

(f) funding state and local forensic science agencies, independent research projects, and educational programs as recommended in this report, with conditions that aim to advance the credibility and reliability of the forensic science disciplines;

(g) overseeing education standards and the accreditation of forensic science programs in colleges and universities;

(h) developing programs to improve understanding of the forensic science disciplines and their limitations within legal systems; and

(i) assessing the development and introduction of new technologies in forensic investigations, including a comparison of new technologies with former ones.

The benefits that will flow from a strong, independent, strategic, coherent, and well-funded federal program to support and oversee the forensic science disciplines in this country are clear: The Nation will (1) bolster its ability to more accurately identify true perpetrators and exclude those who are falsely accused; (2) improve its ability to effectively respond to, attribute, and prosecute threats to homeland security; and (3) reduce the likelihood of convictions resting on inaccurate data. Moreover, establishing the scientific foundation of the forensic science disciplines, providing better education and training, and requiring certification and accreditation will position the forensic science community to take advantage of current and future scientific advances.

The creation of a new federal entity undoubtedly will pose challenges, not the least of which will be budgetary constraints. The committee is not in a position to estimate how much it will cost to implement the recommendations in this report; this is a matter best left to the expertise of the Congressional Budget Office. What is clear, however, is that Congress must take aggressive action if the worst ills of the forensic science community are to be cured. Political and budgetary concerns should not deter bold, creative, and forward-looking action, because the country cannot afford to suffer the consequences of inaction. It will also take time and patience to implement the recommendations in this report. But this is true with any large, complex, important, and challenging enterprise.

The committee strongly believes that the greatest hope for success in this enterprise will come with the creation of the National Institute of Forensic Science (NIFS) to oversee and direct the forensic science community. The remaining recommendations in this report are crucially tied to the creation of NIFS. However, each recommendation is a separate, essential piece of the plan to improve the forensic science community in the United States. Therefore, even if the creation of NIFS is forestalled, the committee

Attachment AS Report
Copyright © National A      2433      nces. All rights reserved.

08-cr-00016-RBS-DEM Document 533-1 Filed 04/13/16 Page 43 of 81 PageID

vigorously supports the adoption of the core ideas and principles embedded in each of the following recommendations.

*Standardized Terminology and Reporting*

The terminology used in reporting and testifying about the results of forensic science investigations must be standardized. Many terms are used by forensic scientists in scientific reports and in court testimony that describe findings, conclusions, and degrees of association between evidentiary material (e.g., hairs, fingerprints, fibers) and particular people or objects. Such terms include, but are not limited to "match," "consistent with," "identical," "similar in all respects tested," and "cannot be excluded as the source of." The use of such terms can and does have a profound effect on how the trier of fact in a criminal or civil matter perceives and evaluates scientific evidence. Although some forensic science disciplines have proposed reporting vocabulary and scales, the use of the recommended language is not standard practice among forensic science practitioners.

As a general matter, laboratory reports generated as the result of a scientific analysis should be complete and thorough. They should contain, at minimum, "methods and materials," "procedures," "results," "conclusions," and, as appropriate, sources and magnitudes of uncertainty in the procedures and conclusions (e.g., levels of confidence). Some forensic science laboratory reports meet this standard of reporting, but many do not. Some reports contain only identifying and agency information, a brief description of the evidence being submitted, a brief description of the types of analysis requested, and a short statement of the results (e.g., "the greenish, brown plant material in item #1 was identified as marijuana"), and they include no mention of methods or any discussion of measurement uncertainties.

Many clinical and testing disciplines outside the forensic science disciplines have standards, templates, and protocols for data reporting. A good example is the ISO/IEC 17025 standard (commonly called "ISO 17025"). ISO 17025 is an international standard published by the International Organization for Standardization (ISO) that specifies the general requirements for the competence to carry out tests and/or calibrations. These requirements have been used by accrediting agencies to determine what a laboratory must do to secure accreditation. In addition, some SWGs in the forensic disciplines have scoring systems for reporting findings, but these systems are neither uniformly nor consistently used. In other words, although appropriate standards exist, they are not always followed. Forensic reports, and any courtroom testimony stemming from them, must include clear characterizations of the limitations of the analyses, including measures

Copyright © National Academy of Sciences. All rights reserved.

22                    *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

of uncertainty in reported results and associated estimated probabilities where possible.

**Recommendation 2:**

> The National Institute of Forensic Science (NIFS), after reviewing established standards such as ISO 17025, and in consultation with its advisory board, should establish standard terminology to be used in reporting on and testifying about the results of forensic science investigations. Similarly, it should establish model laboratory reports for different forensic science disciplines and specify the minimum information that should be included. As part of the accreditation and certification processes, laboratories and forensic scientists should be required to utilize model laboratory reports when summarizing the results of their analyses.

*More and Better Research*

As noted above, some forensic science disciplines are supported by little rigorous systematic research to validate the discipline's basic premises and techniques. There is no evident reason why such research cannot be conducted. Much more federal funding is needed to support research in the forensic science disciplines and forensic pathology in universities and private laboratories committed to such work.

The forensic science and medical examiner communities will be improved by opportunities to collaborate with the broader science and engineering communities. In particular, there is an urgent need for collaborative efforts to (1) develop new technical methods or provide in-depth grounding for advances developed in the forensic science disciplines; (2) provide an interface between the forensic science and medical examiner communities and basic sciences; and (3) create fertile ground for discourse among the communities. NIFS should recommend, implement, and guide strategies for supporting such initiatives.

**Recommendation 3:**

> Research is needed to address issues of accuracy, reliability, and validity in the forensic science disciplines. The National Institute of Forensic Science (NIFS) should competitively fund peer-reviewed research in the following areas:
>
> (a) Studies establishing the scientific bases demonstrating the validity of forensic methods.

Attachme        2435   AS Report
Copyright © National A        ices. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

(b) The development and establishment of quantifiable measures of the reliability and accuracy of forensic analyses. Studies of the reliability and accuracy of forensic techniques should reflect actual practice on realisticcase scenarios, averaged across a representative sample of forensic scientists and laboratories. Studies also should establish the limits of reliability and accuracy that analytic methods can be expected to achieve as the conditions of forensic evidence vary. The research by which measures of reliability and accuracy are determined should be peer reviewed and published in respected scientific journals.

(c) The development of quantifiable measures of uncertainty in the conclusions of forensic analyses.

(d) Automated techniques capable of enhancing forensic technologies.

To answer questions regarding the reliability and accuracy of a forensic analysis, the research needs to distinguish between average performance (achieved across individual practitioners and laboratories) and individual performance (achieved by the specific practitioner and laboratory). Whether a forensic procedure is sufficient under the rules of evidence governing criminal and civil litigation raises difficult legal issues that are outside the realm of scientific inquiry. (Some of the legal issues are addressed in Chapter 3.)

*Best Practices and Standards*

Although there have been notable efforts to achieve standardization and develop best practices in some forensic science disciplines and the medical examiner system, most disciplines still lack best practices or any coherent structure for the enforcement of operating standards, certification, and accreditation. Standards and codes of ethics exist in some fields, and there are some functioning certification and accreditation programs, but none are mandatory. In short, oversight and enforcement of operating standards, certification, accreditation, and ethics are lacking in most local and state jurisdictions.

Scientific and medical assessment conducted in forensic investigations should be independent of law enforcement efforts either to prosecute criminal suspects or even to determine whether a criminal act has indeed been committed. Administratively, this means that forensic scientists should function independently of law enforcement administrators. The best science is conducted in a scientific setting as opposed to a law enforcement setting. Because forensic scientists often are driven in their work by a need to answer a particular question related to the issues of a particular case,

Attachment AS Report
Copyright © National Academy of Sciences. All rights reserved.
2436

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

they sometimes face pressure to sacrifice appropriate methodology for the sake of expediency.

Recommendation 4:

> To improve the scientific bases of forensic science examinations and to maximize independence from or autonomy within the law enforcement community, Congress should authorize and appropriate incentive funds to the National Institute of Forensic Science (NIFS) for allocation to state and local jurisdictions for the purpose of removing all public forensic laboratories and facilities from the administrative control of law enforcement agencies or prosecutors' offices.

Recommendation 5:

> The National Institute of Forensic Science (NIFS) should encourage research programs on human observer bias and sources of human error in forensic examinations. Such programs might include studies to determine the effects of contextual bias in forensic practice (e.g., studies to determine whether and to what extent the results of forensic analyses are influenced by knowledge regarding the background of the suspect and the investigator's theory of the case). In addition, research on sources of human error should be closely linked with research conducted to quantify and characterize the amount of error. Based on the results of these studies, and in consultation with its advisory board, NIFS should develop standard operating procedures (that will lay the foundation for model protocols) to minimize, to the greatest extent reasonably possible, potential bias and sources of human error in forensic practice. These standard operating procedures should apply to all forensic analyses that may be used in litigation.

Recommendation 6:

> To facilitate the work of the National Institute of Forensic Science (NIFS), Congress should authorize and appropriate funds to NIFS to work with the National Institute of Standards and Technology (NIST), in conjunction with government laboratories, universities, and private laboratories, and in consultation with Scientific Working Groups, to develop tools for advancing measurement, validation, reliability, information sharing, and proficiency testing in forensic science and to establish protocols for forensic examina-

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

tions, methods, and practices. Standards should reflect best practices and serve as accreditation tools for laboratories and as guides for the education, training, and certification of professionals. Upon completion of its work, NIST and its partners should report findings and recommendations to NIFS for further dissemination and implementation.

### Quality Control, Assurance, and Improvement

In a field such as medical diagnostics, a health care provider typically can track a patient's progress to see whether the original diagnosis was accurate and helpful. For example, widely accepted programs of quality control ensure timely feedback involving the diagnoses that result from mammography. Other examples of quality assurance and improvement—including the development of standardized vocabularies, ontologies, and scales for interpreting diagnostic tests and developing standards for accreditation of services—pervade diagnostic medicine. This type of systematic and routine feedback is an essential element of any field striving for continuous improvement. The forensic science disciplines likewise must become a self-correcting enterprise, developing and implementing feedback loops that allow the profession to discover past mistakes. A particular need exists for routine, mandatory proficiency testing that emulates a realistic, representative cross-section of casework, for example, DNA proficiency testing.

**Recommendation 7:**

> Laboratory accreditation and individual certification of forensic science professionals should be mandatory, and all forensic science professionals should have access to a certification process. In determining appropriate standards for accreditation and certification, the National Institute of Forensic Science (NIFS) should take into account established and recognized international standards, such as those published by the International Organization for Standardization (ISO). No person (public or private) should be allowed to practice in a forensic science discipline or testify as a forensic science professional without certification. Certification requirements should include, at a minimum, written examinations, supervised practice, proficiency testing, continuing education, recertification procedures, adherence to a code of ethics, and effective disciplinary procedures. All laboratories and facilities (public or private) should be accredited, and all forensic science professionals should be certified, when eligible, within a time period established by NIFS.

Copyright © National A  **2438**  ices. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

Recommendation 8:

> Forensic laboratories should establish routine quality assurance and quality control procedures to ensure the accuracy of forensic analyses and the work of forensic practitioners. Quality control procedures should be designed to identify mistakes, fraud, and bias; confirm the continued validity and reliability of standard operating procedures and protocols; ensure that best practices are being followed; and correct procedures and protocols that are found to need improvement.

*Codes of Ethics*

A number of forensic science organizations—such as AAFS, the Midwestern Association of Forensic Scientists, ASCLD, and NAME—have adopted codes of ethics. The codes that exist are sometimes comprehensive, but they vary in content. While there is no reason to doubt that many forensic scientists understand their ethical obligations and practice in an ethical way, there are no consistent mechanisms for enforcing any of the existing codes of ethics. Many jurisdictions do not require certification in the same way that, for example, states require lawyers to be licensed. Therefore, few forensic science practitioners face the threat of official sanctions or loss of certification for serious ethical violations. And it is unclear whether and to what extent forensic science practitioners are required to adhere to ethics standards as a condition of employment.

Recommendation 9:

> The National Institute of Forensic Science (NIFS), in consultation with its advisory board, should establish a national code of ethics for all forensic science disciplines and encourage individual societies to incorporate this national code as part of their professional code of ethics. Additionally, NIFS should explore mechanisms of enforcement for those forensic scientists who commit serious ethical violations. Such a code could be enforced through a certification process for forensic scientists.

*Insufficient Education and Training*

Forensic science examiners need to understand the principles, practices, and contexts of scientific methodology, as well as the distinctive features of their specialty. Ideally, training should move beyond apprentice-like

Copyright © National A     2439     nces. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

transmittal of practices to education based on scientifically valid principles. In addition to the practical experience and learning acquired during an internship, a trainee should acquire rigorous interdisciplinary education and training in the scientific areas that constitute the basis for the particular forensic discipline and instruction on how to document and report the analysis. A trainee also should have working knowledge of basic quantitative calculations, including statistics and probability, as needed for the applicable discipline.

To correct some of the existing deficiencies, it is crucially important to improve undergraduate and graduate forensic science programs. Legitimization of practices in forensic disciplines must be based on established scientific knowledge, principles, and practices, which are best learned through formal education. Apprenticeship has a secondary role, and under no circumstances can it supplant the need for the scientific basis of education in and the practice of forensic science.

In addition, lawyers and judges often have insufficient training and background in scientific methodology, and they often fail to fully comprehend the approaches employed by different forensic science disciplines and the reliability of forensic science evidence that is offered in trial. Such training is essential, because any checklist for the admissibility of scientific or technical testimony is imperfect. Conformance with items on a checklist can suggest that testimony is reliable, but it does not guarantee it. Better connections must be established and promoted between experts in the forensic science disciplines and law schools, legal scholars, and practitioners. The fruits of any advances in the forensic science disciplines should be transferred directly to legal scholars and practitioners (including civil litigators, prosecutors, and criminal defense counsel), federal, state, and local legislators, members of the judiciary, and law enforcement officials, so that appropriate adjustments can be made in criminal and civil laws and procedures, model jury instructions, law enforcement practices, litigation strategies, and judicial decisionmaking. Law schools should enhance this connection by offering courses in the forensic science disciplines, by offering credit for forensic science courses taken in other colleges, and by developing joint degree programs. And judges need to be better educated in forensic science methodologies and practices.

Recommendation 10:

> To attract students in the physical and life sciences to pursue graduate studies in multidisciplinary fields critical to forensic science practice, Congress should authorize and appropriate funds to the National Institute of Forensic Science (NIFS) to work with appropriate organizations and educational institutions to improve and

Copyright © National A     2440     ices. All rights reserved.

Attachment     AS Report

28          *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

develop graduate education programs designed to cut across orga-
nizational, programmatic, and disciplinary boundaries. To make
these programs appealing to potential students, they must include
attractive scholarship and fellowship offerings. Emphasis should
be placed on developing and improving research methods and
methodologies applicable to forensic science practice and on fund-
ing research programs to attract research universities and students
in fields relevant to forensic science. NIFS should also support
law school administrators and judicial education organizations in
establishing continuing legal education programs for law students,
practitioners, and judges.

### The Medicolegal Death Investigation System

Although steps have been taken to transform the medicolegal death
investigation system, the shortage of resources and lack of consistent edu-
cational and training requirements (particularly in the coroner system)[26]
prevent the system from taking full advantage of tools—such as CT scans
and digital X-rays—that the medical system and other scientific disciplines
have to offer. In addition, more rigorous efforts are needed in the areas
of accreditation and adherence to standards. Currently, requirements for
practitioners vary from nothing more than age and residency requirements
to certification by the American Board of Pathology in forensic pathology.

Funds are needed to assess the medicolegal death investigation system
to determine its status and needs, using as a benchmark the current re-
quirements of NAME relating to professional credentials, standards, and
accreditation. And funds are needed to modernize and improve the medico-
legal death investigation system. As it now stands, medical examiners and
coroners (ME/Cs) are essentially ineligible for direct federal funding and
grants from DOJ, DHS, or the Department of Health and Human Services
(through the National Institutes of Health). The Paul Coverdell National
Forensic Science Improvement Act is the only federal grant program that
names medical examiners and coroners as eligible for grants. However,
ME/Cs must compete with public safety agencies for Coverdell grants; as
a result, the funds available to ME/Cs are inadequate. The simple reality
is that the program has not been sufficiently funded to provide significant
improvements in ME/C systems.

In addition to direct funding, there are other initiatives that should
be pursued to improve the medicolegal death investigation system. The
Association of American Medical Colleges and other appropriate profes-

---

[26] Institute of Medicine. 2003. *Workshop on the Medicolegal Death Investigation System.*
Washington, DC: The National Academies Press.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

sional organizations should organize collaborative activities in education, training, and research to strengthen the relationship between the medical examiner community and its counterparts in the larger academic medical community. Medical examiner offices with training programs affiliated with medical schools should be eligible to compete for funds. Funding should be available to support pathologists seeking forensic fellowships. In addition, forensic pathology fellows could be allowed to apply for medical school loan forgiveness if they stay full time at a medical examiner's office for a reasonable period of time.

Additionally, NIFS should seek funding from Congress to support the joint development of programs to include medical examiners and medical examiner offices in national disaster planning, preparedness, and consequence management, involving the Centers for Disease Control and Prevention (CDC) and DHS. Uniform statewide and interstate standards of operation would be needed to assist in the management of cross-jurisdictional and interstate events. NIFS should support a federal program underwriting the development of software for use by ME/C systems for the management of multisite, multiple fatality events.

NIFS should work with groups such as the National Conference of Commissioners on Uniform State Laws, the American Law Institute, and NAME, in collaboration with other appropriate professional groups, to update the 1954 Model Post-Mortem Examinations Act and draft legislation for a modern model death investigation code. An improved code might, for example, include the elements of a competent medical death investigation system and clarify the jurisdiction of the medical examiner with respect to organ donation.

The foregoing ideas must be developed further before any concrete plans can be pursued. There are, however, a number of specific recommendations, which, if adopted, will help to modernize and improve the medicolegal death investigation system. These recommendations deserve the immediate attention of Congress and NIFS.

**Recommendation 11:**

To improve medicolegal death investigation:

(a) Congress should authorize and appropriate incentive funds to the National Institute of Forensic Science (NIFS) for allocation to states and jurisdictions to establish medical examiner systems, with the goal of replacing and eventually eliminating existing coroner systems. Funds are needed to build regional medical examiner offices, secure necessary equipment, improve administration, and ensure the

Copyright © National A    2442    ices. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

education, training, and staffing of medical examiner offices. Funding could also be used to help current medical examiner systems modernize their facilities to meet current Centers for Disease Control and Prevention-recommended autopsy safety requirements.

(b) Congress should appropriate resources to the National Institutes of Health (NIH) and NIFS, jointly, to support research, education, and training in forensic pathology. NIH, with NIFS participation, or NIFS in collaboration with content experts, should establish a study section to establish goals, to review and evaluate proposals in these areas, and to allocate funding for collaborative research to be conducted by medical examiner offices and medical universities. In addition, funding, in the form of medical student loan forgiveness and/or fellowship support, should be made available to pathology residents who choose forensic pathology as their specialty.

(c) NIFS, in collaboration with NIH, the National Association of Medical Examiners, the American Board of Medicolegal Death Investigators, and other appropriate professional organizations, should establish a Scientific Working Group (SWG) for forensic pathology and medicolegal death investigation. The SWG should develop and promote standards for best practices, administration, staffing, education, training, and continuing education for competent death scene investigation and postmortem examinations. Best practices should include the utilization of new technologies such as laboratory testing for the molecular basis of diseases and the implementation of specialized imaging techniques.

(d) All medical examiner offices should be accredited pursuant to NIFS-endorsed standards within a timeframe to be established by NIFS.

(e) All federal funding should be restricted to accredited offices that meet NIFS-endorsed standards or that demonstrate significant and measurable progress in achieving accreditation within prescribed deadlines.

(f) All medicolegal autopsies should be performed or supervised by a board certified forensic pathologist. This requirement should take effect within a timeframe to be established by NIFS, following consultation with governing state institutions.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

*AFIS and Database Interoperability*

Great improvement is necessary in AFIS interoperability. Crimes may go unsolved today simply because it is not possible for investigating agencies to search across all the databases that might hold a suspect's fingerprints or that may contain a match for an unidentified latent print from a crime scene. It is also possible that some individuals have been wrongly convicted because of the limitations of fingerprint searches.

At present, serious practical problems pose obstacles to the achievement of nationwide AFIS interoperability. These problems include convincing AFIS equipment vendors to cooperate and collaborate with the law enforcement community and researchers to create and use baseline standards for sharing fingerprint data and create a common interface. Second, law enforcement agencies lack the resources needed to transition to interoperable AFIS implementations. Third, coordinated jurisdictional agreements and public policies are needed to allow law enforcement agencies to share fingerprint data more broadly.

Given the disparity in resources and information technology expertise available to local, state, and federal law enforcement agencies, the relatively slow pace of interoperability efforts to date, and the potential gains from increased AFIS interoperability, the committee believes that a broad-based emphasis on achieving nationwide fingerprint data interoperability is needed.

**Recommendation 12:**

Congress should authorize and appropriate funds for the National Institute of Forensic Science (NIFS) to launch a new broad-based effort to achieve nationwide fingerprint data interoperability. To that end, NIFS should convene a task force comprising relevant experts from the National Institute of Standards and Technology and the major law enforcement agencies (including representatives from the local, state, federal, and, perhaps, international levels) and industry, as appropriate, to develop:

(a) standards for representing and communicating image and minutiae data among Automated Fingerprint Identification Systems. Common data standards would facilitate the sharing of fingerprint data among law enforcement agencies at the local, state, federal, and even international levels, which could result in more solved crimes, fewer wrongful identifications, and greater efficiency with respect to fingerprint searches; and

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

(b) baseline standards—to be used with computer algorithms—
to map, record, and recognize features in fingerprint images,
and a research agenda for the continued improvement,
refinement, and characterization of the accuracy of these
algorithms (including quantification of error rates).

These steps toward AFIS interoperability must be accompanied by federal, state, and local funds to support jurisdictions in upgrading, operating, and ensuring the integrity and security of their systems; retraining current staff; and training new fingerprint examiners to gain the desired benefits of true interoperability. Additionally, greater scientific benefits can be realized through the availability of fingerprint data or databases for research purposes (using, of course, all the modern security and privacy protections available to scientists when working with such data). Once created, NIFS might also be tasked with the maintenance and periodic review of the new standards and procedures.

## Forensic Science Disciplines and Homeland Security

Good forensic science and medical examiner practices are of clear value from a homeland security perspective, because of their roles in bringing criminals to justice and in dealing with the effects of natural and human-made mass disasters. Forensic science techniques (e.g., the evaluation of DNA fragments) enable more thorough investigations of crime scenes that have been damaged physically. Routine and trustworthy collection of digital evidence, and improved techniques and timeliness for its analysis, can be of great potential value in identifying terrorist activity. Therefore, the forensic science community has a role to play in homeland security. However, to capitalize on this potential, the forensic science and medical examiner communities must be well interfaced with homeland security efforts, so that they can contribute when needed. To be successful, this interface will require the establishment of good working relationships between federal, state, and local jurisdictions, the creation of strong security programs to protect data transmittals between jurisdictions, the development of additional training for forensic scientists and crime scene investigators, and the promulgation of contingency plans that will promote efficient team efforts on demand. Policy issues relating to the enforcement of homeland security are not within the scope of the committee's charge and, thus, are beyond the scope of the report. It can hardly be doubted, however, that improvements in the forensic science community and medical examiner system could greatly enhance the capabilities of homeland security.

Copyright © National A      **Attachme**  **2445**  **AS Report**  nces. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

Recommendation 13:

> Congress should provide funding to the National Institute of Forensic Science (NIFS) to prepare, in conjunction with the Centers for Disease Control and Prevention and the Federal Bureau of Investigation, forensic scientists and crime scene investigators for their potential roles in managing and analyzing evidence from events that affect homeland security, so that maximum evidentiary value is preserved from these unusual circumstances and the safety of these personnel is guarded. This preparation also should include planning and preparedness (to include exercises) for the interoperability of local forensic personnel with federal counterterrorism organizations.

Attachme   2446   \S Report

Copyright © National A   ices. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

Attachment 2447 NAS Report

Copyright © National Academy of Sciences. All rights reserved.

# 1

# Introduction

The world of crime is a complex place. Crime takes place in the workplace, schools, homes, places of business, motor vehicles, on the streets, and, increasingly, on the Internet. Crimes are committed at all hours of the day and night and in all regions of the country, in rural, suburban, and urban environments. In many cases, a weapon is used, such as a handgun, knife, or blunt object. Sometimes the perpetrator is under the influence of alcohol or illicit drugs. In other cases, no one is physically hurt, but property is damaged or stolen—for example, when burglary, theft, and motor vehicle theft occur. In recent years, information technology has provided the opportunity for identity theft and other types of cybercrime. A crime scene often is rich in information that reveals the nature of the criminal activity and the identities of those persons involved. Perpetrators and victims may leave behind blood, saliva, skin cells, hair, fingerprints, footprints, tire prints, clothing fibers, digital and photographic images, audio data, handwriting, and the residual effects and debris of arson, gunshots, and unlawful entry. Some crimes transcend borders, such as those involving homeland security, for which forensic evidence can be gathered.

Crime scene investigators, with varying levels of training and experience, search for and collect evidence at the scene, preserve and secure it in tamper-evident packaging, label it, and send it to an appropriate agency—normally a crime laboratory, where it may be analyzed by forensic examiners. If a death was sudden, unexpected, or resulted from violence, a medicolegal investigator (e.g., coroner, medical examiner, forensic pathologist, physician's assistant) will be responsible for determining whether a

*35*

Copyright © National A          2448  AS Report.     ...ces. All rights reserved.

Attachm(          ...

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

homicide, suicide, or accident occurred and will certify the cause and manner of death.

Crime scene evidence moves through a chain of custody in which, depending on their physical characteristics (e.g., blood, fiber, handwriting), samples are analyzed according to any of a number of analytical protocols, and results are reported to law enforcement and court officials. When evidence is analyzed, typically forensic science "attempts to uncover the actions or happenings of an event . . . by way of (1) identification (categorization), (2) individualization, (3) association, and (4) reconstruction."[1] Evidence also is analyzed for the purpose of excluding individuals or sources.

Not all forensic services are performed in traditional crime laboratories by trained forensic scientists. Some forensic tests might be conducted by a sworn law enforcement officer with no scientific training or credentials, other than experience. In smaller jurisdictions, members of the local police or sheriff's department might conduct the analyses of evidence, such as latent print examinations and footwear comparisons. In the United States, if evidence is sent to a crime laboratory, that facility might be publicly or privately operated, although private laboratories typically do not visit crime scenes to collect evidence or serve as the first recipient of physical evidence. Public crime laboratories are organized at the city, county, state, or federal level. A law enforcement agency that does not operate its own crime laboratory typically has access to a higher-level laboratory (e.g., at the state or county level) or a private laboratory for analysis of evidence.

According to a 2005 census by the Bureau of Justice Statistics (BJS),[2] 389 publicly funded forensic crime laboratories were operating in the United States in 2005: These included 210 state or regional laboratories, 84 county laboratories, 62 municipal laboratories, and 33 federal laboratories, and they received evidence from nearly 2.7 million criminal cases[3] in 2005. These laboratories are staffed by individuals with a wide range of training and expertise, from scientists with Ph.D.s to technicians who have been trained largely on the job. No data are available on the size and depth of the private forensic laboratories, except for private DNA laboratories.

In general, a traditional crime laboratory has been defined as constituting "a single laboratory or system comprised of scientists analyzing evidence

---

[1] K. Inman and N. Rudin. 2002. The origin of evidence. *Forensic Science International* 126:11-16.

[2] M.R. Durose. 2008. *Census of Publicly Funded Forensic Crime Laboratories, 2005.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl05.pdf.

[3] Ibid., p. 9. "A 'case' is defined as evidence submitted from a single criminal investigation. A case may include multiple 'requests' for forensic services. For example, one case may include a request for biology screening and a request for latent prints."

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

in one or more of the following disciplines: controlled substances, trace, biology (including DNA), toxicology, latent prints, questioned documents, firearms/toolmarks, or crime scene."[4] More recently, increasing numbers of laboratories specialize in the analysis of evidence in one area, for example, DNA or digital evidence. (See Chapter 5 for a more complete description and discussion of the forensic science disciplines.)

The capacity and quality of the current forensic science system have been the focus of increasing attention by Congress, the courts, and the media. New doubts about the accuracy of some forensic science practices have intensified with the growing number of exonerations resulting from DNA analysis (and the concomitant realization that guilty parties sometimes walk free). Greater expectations for precise forensic science evidence raised by DNA testing have forced new scrutiny on other forensic techniques. Emerging scientific advances that could benefit forensic investigation elicit concerns about resources, training, and capacity for implementing new techniques. A crisis in backlogged cases, caused by crime laboratories lacking sufficient resources and qualified personnel, raises concerns about the effectiveness and efficiency of the criminal justice system. When backlogs prolong testing time, issues involving speedy trials may arise. In addition, backlogs discourage law enforcement personnel and organizations from submitting evidence. Laboratories also may restrict submissions of evidence to reduce backlogs. All of these concerns, and more, provide the background against which this report is set.

Finally, if evidence and laboratory tests are mishandled or improperly analyzed; if the scientific evidence carries a false sense of significance; or if there is bias, incompetence, or a lack of adequate internal controls for the evidence introduced by the forensic scientists and their laboratories, the jury or court can be misled, and this could lead to wrongful conviction or exoneration. If juries lose confidence in the reliability of forensic testimony, valid evidence might be discounted, and some innocent persons might be convicted or guilty individuals acquitted.

Recent years have seen a number of concerted efforts by forensic science organizations to strengthen the foundations of many areas of testimony. However, substantial improvement is necessary in the forensic science disciplines to enhance law enforcement's ability to identify those who have or have not committed a crime and to prevent the criminal justice system from erroneously convicting or exonerating the persons who come before it.

---

[4] Ibid., p. 24.

Copyright © National Ai    **Attachme   2450   \S Report**ices. All rights reserved.

*38*        *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

### WHAT IS FORENSIC SCIENCE?

Although there are numerous ways by which to categorize the forensic science disciplines, the committee found the categorization used by the National Institute of Justice to be useful:

1. general toxicology;
2. firearms/toolmarks;
3. questioned documents;
4. trace evidence;
5. controlled substances;
6. biological/serology screening (including DNA analysis);
7. fire debris/arson analysis;
8. impression evidence;
9. blood pattern analysis;
10. crime scene investigation;
11. medicolegal death investigation; and
12. digital evidence.[5]

Some of these disciplines are discussed in Chapter 5. Forensic pathology is considered a subspecialty of medicine and is considered separately in Chapter 9.

The term "forensic science" encompasses a broad range of disciplines, each with its own distinct practices. The forensic science disciplines exhibit wide variability with regard to techniques, methodologies, reliability, level of error, research, general acceptability, and published material (see Chapters 4 through 6). Some of the disciplines are laboratory based (e.g., nuclear and mitochondrial DNA analysis, toxicology, and drug analysis); others are based on expert interpretation of observed patterns (e.g., fingerprints, writing samples, toolmarks, bite marks). Some activities require the skills and analytical expertise of individuals trained as scientists (e.g., chemists or biologists); other activities are conducted by scientists as well as by individuals trained in law enforcement (e.g., crime scene investigators, blood spatter analysts, crime reconstruction specialists), medicine (e.g., forensic pathologists), or laboratory methods (e.g., technologists). Many of the processes used in the forensic science disciplines are largely empirical applications of science—that is, they are not based on a body of knowledge that recognizes the underlying limitations of the scientific principles and methodologies used for problem solving and discovery. It is therefore important to focus on ways to improve, systematize, and monitor the activities and practices

---

[5] National Institute of Justice. 2006. *Status and Needs of Forensic Science Service Providers: A Report to Congress.* Available at www.ojp.usdoj.gov/nij/pubs-sum/213420.htm.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

in the forensic science disciplines and related areas of inquiry. Thus, in this report, the term "forensic science" is used with regard to a broad array of activities, with the recognition that some of these activities might not have a well-developed research base, are not informed by scientific knowledge, or are not developed within the culture of science.

## PRESSURES ON THE FORENSIC SCIENCE SYSTEM

As mentioned above, a number of factors have combined in the past few decades to place increasing demands on an already overtaxed, inconsistent, and underresourced forensic science infrastructure. These factors have not only stressed the system's capacity, but also have raised serious questions and concerns about the validity and reliability of some forensic methods and techniques and how forensic evidence is reported to juries and courts.

### The Case Backlog—Insufficient Resources

According to the 2005 BJS census report, a typical publicly funded crime laboratory ended the year with a backlog of about 401 requests for services, received another 4,328 such requests, and completed 3,980 of them. Roughly half of all requests were in the area of controlled substances. The average backlog has risen since the 2002 census,[6] with nearly 20 percent of all requests backlogged by year end. The Department of Justice (DOJ) defines a case as backlogged if it remains in the laboratory 30 days or more without the development of a report or analysis. Federal, state, and local laboratories reported a combined backlog of 435,879 requests for forensic analysis.[7] According to the census, a typical laboratory performing DNA testing in 2005 started the year with a backlog of 86 requests, received 337 new requests, completed 265 requests, and finished the year with 152 backlogged requests.

The backlog is exacerbated further by increased requests for quick laboratory results by law enforcement and prosecutors. Witnesses before the committee testified that prosecutors increasingly rely on laboratories to provide results prior to approving charges and have increased requests for additional work on the back end of a case, just before trial.[8] Backlogs are compounded by rising police agency requests for testing (e.g., for DNA evidence found on guns and from nonviolent crime scenes). Laboratories

---

[6] J.L. Peterson and M.J. Hickman. 2005. *Census of Publicly Funded Forensic Crime Laboratories, 2002*. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl02.pdf.

[7] Durose, op. cit.

[8] J.L. Johnson, Laboratory Director, Illinois State Police, Forensic Science Center at Chicago. Presentation to the committee. January 25, 2007.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

are thus challenged to balance requests for analyses of "older" and "cold" cases with new cases and must make choices to allocate resources by prioritizing the evidence to be analyzed. In California, voters passed Proposition 69, requiring that a DNA sample be obtained from all convicted felons. This increased the workload and resulted in 235,000 backlogged cases by the end of 2005.[9]

These backlogs can result in prolonged incarceration for innocent persons wrongly charged and awaiting trial and delayed investigation of those who are not yet charged, and they can contribute to the release of guilty suspects who go on to commit further crimes.

### The Ascendancy of DNA Analysis and a New Standard

In the 1980s, the opportunity to use the techniques of DNA technologies to identify individuals for forensic and other purposes became apparent. Early concerns about the use of DNA for forensic casework included the following: (1) whether the detection methods were scientifically valid—that is, whether they correctly identified true matches and true nonmatches and (2) whether DNA analysis of forensic samples is reliable—that is, whether it yields reproducible results under defined conditions of use. A 1990 report by the congressional Office of Technology Assessment concluded that DNA tests were both reliable and valid in the forensic context but required a strict set of standards and quality control measures before they could be widely adopted.[10]

In 1990, the Federal Bureau of Investigation (FBI) established guidelines for DNA analysis and proficiency testing and four years later created the Combined DNA Index System (CODIS), which allows federal, state, and local crime laboratories to exchange and compare DNA profiles electronically, thereby linking crimes to each other and to convicted offenders.

In 1992, the National Research Council (NRC) issued *DNA Technology in Forensic Science*, which concluded that, "No laboratory should let its results with a new DNA typing method be used in court, unless it has undergone . . . proficiency testing via blind trials."[11] In addition, the report cautioned that numerous questions must be answered about using DNA evidence in a forensic context that rarely had to be considered by scientists engaged in DNA research—for example, questions involving contamination, degradation, and a number of statistical issues. While confirming that

---

[9] Durose, op. cit.

[10] U.S. Congress, Office of Technology Assessment. 1990. *Genetic Witness: Forensic Uses of DNA Tests*. OTA-BA-438. Washington, DC: U.S. Government Printing Office, NTIS order #PB90-259110.

[11] National Research Council. 1992. *DNA Technology in Forensic Science*. Washington, DC: National Academy Press, p. 55.

Copyright © National A    **2453**    nces. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

the science behind DNA analysis is valid, a subsequent NRC report in 1996 recommended new ways of interpreting DNA evidence to help answer a key question for jurors—the likelihood that two matching samples can come from different people.[12] This 1996 report recommended a set of statistical calculations that takes population structure into account, which enhanced the validity of the test. The report also called for independent retesting and made recommendations to improve laboratory performance and accountability through, for example, adherence to high-quality standards, accreditation, and proficiency testing.

Since then, the past two decades have seen tremendous growth in the use of DNA evidence in crime scene investigations. Currently more than 175 publicly funded forensic laboratories and approximately 30 private laboratories conduct hundreds of thousands of DNA analyses annually in the United States. In addition, most countries in Europe and Asia have forensic DNA programs. In 2003, President George W. Bush announced a 5-year, $1 billion initiative to improve the use of DNA in the criminal justice system. Called the *President's DNA Initiative*, the program pushed for increased funding, training, and assistance to ensure that DNA technology "reaches its full potential to solve crimes, protect the innocent, and identify missing persons."[13]

Thus, DNA analysis—originally developed in research laboratories in the context of life sciences research—has received heightened scrutiny and funding support. That, combined with its well-defined precision and accuracy, has set the bar higher for other forensic science methodologies, because it has provided a tool with a higher degree of reliability and relevance than any other forensic technique. However, DNA evidence comprises only about 10 percent of case work and is not always relevant to a particular case.[14] Even if DNA evidence is available, it will assist in solving a crime only if it supports an evidential hypothesis that makes guilt or innocence more likely. For example, the fact that DNA evidence of a victim's husband is found in the house in which the couple lived and where the murder took place proves nothing. The fact that the husband's DNA is found under the fingernails of the victim who put up a struggle may have a very different significance. Thus, it is essential to articulate the reasoning process and the context associated with the evidence that is being evaluated.

---

[12] National Research Council. 1996. *The Evaluation of Forensic DNA Evidence: An Update.* Washington, DC: National Academy Press.

[13] See www.dna.gov/info/e_summary.

[14] The American Society of Crime Laboratory Directors. 2004. *180 Day Study: Status and Needs of U.S. Crime Labs.* p. 7, table 2.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## Questionable or Questioned Science

The increased use of DNA analysis as a more reliable approach to matching crime scene evidence with suspects and victims has resulted in the reevaluation of older cases that retained biological evidence that could be analyzed by DNA. The number of exonerations resulting from the analysis of DNA has grown across the country in recent years, uncovering a disturbing number of wrongful convictions—some for capital crimes—and exposing serious limitations in some of the forensic science approaches commonly used in the United States.

According to The Innocence Project, there have been 223 postconviction DNA exonerations in the United States since 1989 (as of November 2008).[15] Some have contested the percentage of exonerated defendants whose convictions allegedly were based on faulty science. Although the Innocence Project figures are disputed by forensic scientists who have reexamined the data, even those who are critical of the conclusions of The Innocence Project acknowledge that faulty forensic science has, on occasion, contributed to the wrongful conviction of innocent persons.[16]

The fact is that many forensic tests—such as those used to infer the source of toolmarks or bite marks—have never been exposed to stringent scientific scrutiny. Most of these techniques were developed in crime laboratories to aid in the investigation of evidence from a particular crime scene, and researching their limitations and foundations was never a top priority. There is some logic behind the application of these techniques; practitioners worked hard to improve their methods, and results from other evidence have combined with these tests to give forensic scientists a degree of confidence in their probative value. Before the first offering of the use of DNA in forensic science in 1986, no concerted effort had been made to determine the reliability of these tests, and some in the forensic science and law enforcement communities believed that scientists' ability to withstand cross-examination in court when giving testimony related to these tests was sufficient to demonstrate the tests' reliability. However, although the precise error rates of these forensic tests are still unknown, comparison of their results with DNA testing in the same cases has revealed that some of these analyses, as currently performed, produce erroneous results. The

---

[15] The Innocence Project. *Fact Sheet: Facts on Post-Conviction DNA Exonerations.* Available at www.innocenceproject.org/Content/351.php. See also B.L. Garrett. Judging innocence. 108 COLUM. L. REV. 55 (2008) (discussing the results of an empirical study of the types of faulty evidence that was admitted in more than 200 cases for which DNA testing subsequently enabled postconviction exonerations).

[16] See J. Collins and J. Jarvis. 2008. The wrongful conviction of forensic science. *Crime Lab Report.* July 16. Available at www.crimelabreport.com/library/pdf/wrongful_conviction.pdf. See also N. Rudin and K. Inman. 2008. Who speaks for forensic science? *News of the California Association of Criminalists.* Available at www.cacnews.org/news/4thq08.pdf, p. 10.

Copyright © National Academy of Sciences. All rights reserved.

*INTRODUCTION* *43*

conclusions of forensic examiners may or may not be right—depending on the case—but each wrongful conviction based on improperly interpreted evidence is serious, both for the innocent person and also for society, because of the threat that may be posed by a guilty person going free. Some non-DNA forensic tests do not meet the fundamental requirements of science, in terms of reproducibility, validity, and falsifiability (see Chapters 4 through 6).

Even fingerprint analysis has been called into question. For nearly a century, fingerprint examiners have been comparing partial latent fingerprints found at crime scenes to inked fingerprints taken directly from suspects. Fingerprint identifications have been viewed as exact means of associating a suspect with a crime scene print and rarely were questioned.[17] Recently, however, the scientific foundation of the fingerprint field has been questioned, and the suggestion has been made that latent fingerprint identifications may not be as reliable as previously assumed.[18] The question is less a matter of whether each person's fingerprints are permanent and unique—uniqueness is commonly assumed—and more a matter of whether one can determine with adequate reliability that the finger that left an imperfect impression at a crime scene is the same finger that left an impression (with different imperfections) in a file of fingerprints. In October 2007, Baltimore County Circuit Judge Susan M. Souder refused to allow a fingerprint analyst to testify that a latent print was made by the defendant in a death penalty trial. In her ruling, Judge Souder found the traditional method of fingerprint analysis to be "a subjective, untested, unverifiable identification procedure that purports to be infallible."[19]

Some forensic science methods have as their goal the "individualization" of specific types of evidence (typically shoe and tire impressions, dermal ridge prints, toolmarks and firearms, and handwriting). Analysts using such methods believe that unique markings are acquired by a source item in random fashion and that such uniqueness is faithfully transmitted from the source item to the evidence item being examined (or in the case of handwriting, that individuals acquire habits that result in unique handwriting). When the evidence and putative source items are compared, a conclusion of individualization implies that the evidence originated from that source,

---

[17] R. Epstein. Fingerprints meet *Daubert*: The myth of fingerprint "science" is revealed. 75 *Southern California Law Review* 605 (2002).

[18] S.A. Cole. 2002. *Suspect Identities: A History of Fingerprinting and Criminal Identification.* Boston: Harvard University Press; Epstein, op. cit.

[19] *State of Maryland v. Bryan Rose.* In the Circuit Court for Baltimore County. Case No. K06-545.

Copyright © National A    2456    ices. All rights reserved.

*44* STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES

to the exclusion of all other possible sources.[20,21] The determination of uniqueness requires measurements of object attributes, data collected on the population frequency of variation in these attributes, testing of attribute independence, and calculations of the probability that different objects share a common set of observable attributes.[22] Importantly, the results of research must be made public so that they can be reviewed, checked by others, criticized, and then revised, and this has not been done for some of the forensic science disciplines.[23] As recently as September 2008, the Detroit Police crime laboratory was shut down following a Michigan State Police audit that found a 10 percent error rate in ballistic evidence.[24]

The forensic science community has had little opportunity to pursue or become proficient in the research that is needed to support what it does. Few sources of funding exist for independent forensic research (see Chapter 2). Most of the studies are commissioned by DOJ and conducted by crime laboratories with little or no participation by the traditional scientific community. In addition, most disciplines in the profession are hindered by a lack of enforceable standards for interpretation of data (see Chapter 7).

### Errors and Fraud

In recent years, the integrity of crime laboratories increasingly has been called into question, with some highly publicized cases highlighting the sometimes lax standards of laboratories that have generated questionable or fraudulent evidence and that have lacked quality control measures that would have detected the questionable evidence. In one notorious case, a state-mandated review of analyses conducted by West Virginia State Police laboratory employee Fred Zain revealed that the convictions of more than 100 people were in doubt because Zain had repeatedly falsified evidence in criminal prosecutions. At least 10 men had their convictions overturned as a result.[25] Subsequent reviews questioned whether Zain was ever qualified to perform scientific examinations.[26]

Other scandals, such as one involving the Houston Crime Laboratory

---

[20] M.J. Saks and J.J. Koehler. 2005. The coming paradigm shift in forensic identification science. *Science* 309:892-895.

[21] W.J. Bodziak. 1999. *Footwear Impression Evidence–Detection, Recovery, and Examination.* 2nd ed. Boca Raton, FL: CRC Press.

[22] Ibid. See also NRC, 1996, op. cit.

[23] P.C. Giannelli. Wrongful convictions and forensic science: The need to regulate crime labs. 86 N.C. L. Rev. 163 (2007).

[24] B. Schmitt and J. Swickard. 2008. Detroit Police lab shut down after probe finds errors. *Detroit Free Press* on-line. September 25.

[25] *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division* (WVa 1993) 438 S.E.2d 501(Zaine I); and 445 S.E.2d 165 (Zain II).

[26] Ibid.

Copyright © National A        2457        nces. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

in 2003, highlight the sometimes blatant lack of proper education and training of forensic examiners. In the Houston case, several DNA experts went public with accusations that the DNA/Serology Unit of the Houston Police Department Crime Laboratory was performing grossly incompetent work and was presenting findings in a misleading manner designed to unfairly help prosecutors obtain convictions. An audit by the Texas Department of Public Safety confirmed serious inadequacies in the laboratory's procedures, including "routine failure to run essential scientific controls, failure to take adequate measures to prevent contamination of samples, failure to adequately document work performed and results obtained, and routine failure to follow correct procedures for computing statistical frequencies."[27,28]

The Innocence Project has documented instances of both intentional and unintentional laboratory errors that have lead to wrongful convictions, including:

- In the laboratory—contamination and mislabeling of evidence.
- In information provided in forensics reports—falsified results (including "drylabbing," i.e., providing conclusions from tests that were never conducted), and misinterpretation of evidence.
- In the courtroom—suppression of exculpatory evidence; providing a statistical exaggeration of the results of a test conducted on evidence; and providing false testimony about test results.[29]

Saks and Koehler have written that the testimony of forensic scientists is one of many problems in criminal cases today.[30] They cite the norms of science, which emphasize "methodological rigor, openness, and cautious interpretation of data," as norms that often are absent from the forensic science disciplines.

Although cases of fraud appear to be rare, perhaps of more concern is the lack of good data on the accuracy of the analyses conducted in forensic science disciplines and the significant potential for bias that is present in some cases. For example, the FBI was accused of bias in the case of the Madrid bombing suspect Brandon Mayfield (see Box 1-1). In that case, the Inspector General of DOJ launched an investigation. The FBI conducted its

---

[27] *Quality Assurance Audit for Forensic DNA and Convicted Offender DNA Databasing Laboratories. An Audit of the Houston Police Department Crime Laboratory-DNA/Serology Section, December 12-13, 2002.* Available at www.scientific.org/archive/Audit%20Document--Houston. pdf.

[28] See also M.R. Bromwich. 2007. *Final Report of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room.* Available at www. hpdlabinvestigation.org.

[29] The Innocence Project. Available at www.innocenceproject.org/Content/312.php.

[30] Saks and Koehler, op. cit.

Copyright © National A        2458        nces. All rights reserved.
Attachment AS Report

46                    *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

---

**Box 1-1**
**FBI Statement on Brandon Mayfield Case**

"After the March terrorist attacks on commuter trains in Madrid, digital images of partial latent fingerprints obtained from plastic bags that contained detonator caps were submitted by Spanish authorities to the FBI for analysis. The submitted images were searched through the Integrated Automated Fingerprint Identification System (IAFIS). An IAFIS search compares an unknown print to a database of millions of known prints. The result of an IAFIS search produces a short list of potential matches. A trained fingerprint examiner then takes the short list of possible matches and performs an examination to determine whether the unknown print matches a known print in the database.

Using standard protocols and methodologies, FBI fingerprint examiners determined that the latent fingerprint was of value for identification purposes. This print was subsequently linked to Brandon Mayfield. That association was independently analyzed and the results were confirmed by an outside experienced fingerprint expert.

Soon after the submitted fingerprint was associated with Mr. Mayfield, Spanish authorities alerted the FBI to additional information that cast doubt on the findings. As a result, the FBI sent two fingerprint examiners to Madrid, who compared the image the FBI had been provided to the image the Spanish authorities had.

Upon review it was determined that the FBI identification was based on an image of substandard quality, which was particularly problematic because of the remarkable number of points of similarity between Mr. Mayfield's prints and the print details in the images submitted to the FBI."

The FBI's Latent Fingerprint Unit has reviewed its practices and adopted new guidelines for all examiners receiving latent print images when the original evidence is not included.

---

SOURCE: FBI. May 24, 2004, Press Release. Available at www.fbi.gov/pressrel/pressrel04/mayfield052404.htm.

---

own review by a panel of independent experts. The reviews concluded that the problem was not the quality of the digital images reviewed, but rather the bias and "circular reasoning" of the FBI examiners.[31]

Parts of the forensic science community have resisted the implications of the mounting criticism of the reliability of forensic analyses by investigative units such as Inspector General reports, The Innocence Project,

---

[31] U.S. Department of Justice, Office of the Inspector General. 2006. *A Review of the FBI's Handling of the Brandon Mayfield Case.* Also see R.B. Stacey. 2005. *Report on the Erroneous Fingerprint Individualization in the Madrid Train Bombing Case.* Available at www.fbi.gov/hq/lab/fsc/current/special_report/2005_special_report.htm.

Attachment 2 2459 NAS Report
Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

and studies in the published literature. In testimony before the committee, it was clear that some members of the forensic science community will not concede that there could be less than perfect accuracy either in given laboratories or in specific disciplines, and experts testified to the committee that disagreement remains regarding even what constitutes an error. For example, if the limitations of a given technology lead to an examiner declaring a "match" that is found by subsequent technology (e.g., DNA analysis) to be a "mismatch," there is disagreement within the forensic science community about whether the original determination constitutes an error.[32] Failure to acknowledge uncertainty in findings is common: Many examiners claim in testimony that others in their field would come to the exact same conclusions about the evidence they have analyzed. Assertions of a "100 percent match" contradict the findings of proficiency tests that find substantial rates of erroneous results in some disciplines (i.e., voice identification, bite mark analysis).[33,34]

As an example, in a FBI publication on the correlation of microscopic and mitochondrial DNA hair comparisons, the authors found that even competent hair examiners can make significant errors.[35] In this study, the authors found that in 11 percent of the cases in which the hair examiners declared two hairs to be "similar," subsequent DNA testing revealed that the hairs did not match, which refers either to the competency or the relative ability of the two divergent techniques to identify differences in hair samples, as well as to the probative value of each test.

The insistence by some forensic practitioners that their disciplines employ methodologies that have perfect accuracy and produce no errors has hampered efforts to evaluate the usefulness of the forensic science disciplines. And, although DNA analysis is considered the most reliable forensic tool available today, laboratories nonetheless can make errors working with either nuclear DNA or mtDNA—errors such as mislabeling samples, losing samples, or misinterpreting the data.

Standard setting, accreditation of laboratories, and certification of individuals aim to address many of these problems, and although many laboratories have excellent training and quality control programs, even

---

[32] N. Benedict. 2004. Fingerprints and the *Daubert* standard for admission of scientific evidence: Why fingerprints fail and a proposed remedy. *Arizona Law Review* 46:519; M. Houck, Director of Forensic Science Initiative, West Virginia University. Presentation to the committee. January 25, 2007.

[33] D.L. Faigman, D. Kaye, M.J. Saks, and J. Sanders. 2002. *Modern Scientific Evidence: The Law and Science of Expert Testimony.* St. Paul, MN: Thompson/West.

[34] C.M. Bowers. 2002. The scientific status of bitemark comparisons. In: D.L. Faigman (ed.). *Science in the Law: Forensic Science Issues.* St. Paul, MN: West Publishing.

[35] M. Houck and B. Budowle. 2002. Correlation of microscopic and mitochondrial DNA hair comparisons. *Journal of Forensic Sciences* 47(5):964-967; see also Bromwich, op. cit.

Attachment 10 NAS Report
Copyright © National Academy of Sciences. All rights reserved.
2460

48                    *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

accredited laboratories make mistakes. Furthermore, accreditation is a voluntary program, except in a few jurisdictions in which it is required (New York, Oklahoma, and Texas)[36] (see Chapter 7).

## The "CSI Effect"

Media attention has focused recently on what is being called the "CSI Effect," named for popular television shows (such as *Crime Scene Investigation*) that are focused on police forensic evidence investigation.[37] The fictional characters in these dramas often present an unrealistic portrayal of the daily operations of crime scene investigators and crime laboratories (including their instrumentation, analytical technologies, and capabilities). Cases are solved in an hour, highly technical analyses are accomplished in minutes, and laboratory and instrumental capabilities are often exaggerated, misrepresented, or entirely fabricated. In courtroom scenes, forensic examiners state their findings or a match (between evidence and suspect) with unfailing certainty, often demonstrating the technique used to make the determination. The dramas suggest that convictions are quick and no mistakes are made.

The CSI Effect specifically refers to the real-life consequences of exposure to Hollywood's version of law and order. Jurists and crime laboratory directors anecdotally report that jurors have come to expect the presentation of forensic evidence in every case, and they expect it to be conclusive. A recent study by Schweitzer and Saks found that compared to those who do not watch CSI, CSI viewers were "more critical of the forensic evidence presented at the trial, finding it less believable. Forensic science viewers expressed more confidence in their verdicts than did nonviewers."[38] Prosecutors and defense attorneys have reported jurors second guessing them in the courtroom, citing "reasonable doubt" and refusing to convict because they believed that other evidence was available and not adequately examined.[39]

Schweitzer and Saks found that the CSI Effect is changing the manner in which forensic evidence is presented in court, with some prosecutors believing they must make their presentation as visually interesting and appealing as such presentations appear to be on television. Some are concerned that the conclusiveness and finality of the manner in which forensic evidence is

---

[36] National Institute of Justice. 2006. *Status and Needs of Forensic Science Service Providers: A Report to Congress.* Available at www.ojp.usdoj.gov/nij/pubs-sum/213420.htm.

[37] See *U.S. News & World Report.* 2005. The CSI effect: How TV is driving jury verdicts all across America. April 25.

[38] N.J. Schweitzer and M.J. Saks. 2007. The CSI Effect: Popular fiction about forensic science affects public expectations about real forensic science. *Jurimetrics* 47:357.

[39] See *U.S. News & World Report,* op. cit.

Copyright © National A          2461          nces. All rights reserved.

presented on television results in jurors giving more or less credence to the forensic experts and their testimony than they should, raising expectations, and possibly resulting in a miscarriage of justice.[40] The true effects of the popularization of forensic science disciplines will not be fully understood for some time, but it is apparent that it has increased pressure and attention on the forensic science community in the use and interpretation of evidence in the courtroom.

### Fragmented and Inconsistent Medicolegal Death Investigation

The medicolegal death investigation system is a fragmented organization of state and local entities called upon to investigate deaths and to certify the cause and manner of unnatural and unexplained deaths. About 1 percent of the U.S. population (about 2.6 million people) dies each year. Medical examiner and coroner offices receive nearly 1 million reports of deaths, constituting between 30 to 40 percent of all U.S. deaths in 2004, and accept about one half of those (500,000, or 1 in 5 deaths) for further investigation and certification.[41] In carrying out this role, medical examiners and coroners are required to decide the scope and course of a death investigation, which may include assessing the scene of death, examining the body, determining whether to perform an autopsy, and ordering other medical tests, forensic analyses, and procedures as needed. Yet the training and skill of medical examiners and coroners and the systems that support them vary greatly. Medical examiners may be physicians, pathologists, or forensic pathologists with jurisdiction within a county, district, or state. A coroner is an elected or appointed official who might not be a physician or have had any medical training. Coroners typically serve a single county.

Since 1877, in the United States, there have been efforts to replace the coroner system with a medical examiner system.[42] In fact, more than 80 years ago, the National Academy of Sciences identified concerns regarding the lack of standardization in death investigations and called for the abolishment of the coroner's office, noting that the office "has conclusively demonstrated its incapacity to perform the functions customarily required of it."[43] In its place, the report called for well-staffed offices of a medical

---

[40] Schweitzer and Saks, op. cit.; S.A. Cole and R. Dioso-Villa. 2007. CSI and its effects: Media, juries, and the burden of proof. *New England Law Review* 41(3):435.

[41] M.J. Hickman, K.A. Hughes, K.J. Strom, and J.D. Ropero-Miller. 2007. *Medical Examiner and Coroners' Offices, 2004.* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/meco04.pdf.

[42] W.U. Spitz and R.S. Fisher. 1982. *Medicolegal Investigation of Death*, 2nd ed. Springfield, IL: Charles C. Thomas.

[43] National Research Council. 1928. *The Coroner and the Medical Examiner.* Washington, DC: National Academy Press.

Copyright © National Academy of Sciences. All rights reserved.

50          *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

examiner, led by a pathologist. In strong terms, the 1928 committee called for the professionalization of death investigation, with medical science at its center.

Despite these calls, efforts to move away from a coroner system in the United States have stalled. Currently, 11 states have coroner-only systems, 22 states have medical examiner systems, and 18 states have mixed systems—in which some counties have coroners and others have medical examiners. Some of these states have a referral system, in which the coroner refers cases to medical examiners for autopsy.[44] According to a 2003 Institute of Medicine report, in addition to the variety of systems in the United States, the location and authority of the medical examiner or coroner office also varies, with 43 percent of the U.S. population served by a medical examiner or coroner housed in a separate city, county, or state government office. Other arrangements involve an office under public safety or law enforcement. The least common placement is under a forensic laboratory or health department.[45]

Variability also is evident in terms of accreditation of death investigation systems. As of August 2008, 54 of the medical examiner offices in the United States (serving 23 percent of the population) have been accredited by the National Association of Medical Examiners, the professional organization of physician medical examiners. Most of the country is served by offices lacking accreditation.[46] Similarly, requirements for training are not mandatory. About 36 percent of the population lives where minimal or no special training is required to conduct death investigations.[47] Recently, an 18-year-old high school student was elected a deputy coroner in Indiana after completing a short training course.[48]

Additionally, funding for programs supporting death investigations vary across the country, with the cost of county systems ranging from $0.62 to $5.54 per capita, and statewide systems from $0.32 to $3.20.[49] Most funding comes from tax revenues, and with such limited funds available, the salaries of medical examiners and skilled personnel are much lower than those of other physicians and medical personnel. Consequently, recruiting and retaining skilled personnel is a constant struggle.

At a time when natural disasters or man-made disasters could create

---

[44] R. Hanzlick and D. Combs. 1998. Medical examiner and coroner systems: History and trends. *Journal of the American Medical Association* 279(11):870-874.

[45] Institute of Medicine. 2003. *Medicolegal Death Investigation System: Workshop Report.* Washington, DC: The National Academies Press.

[46] Ibid.

[47] R. Hanzlick. 1996. Coroner training needs. A numeric and geographic analysis. *Journal of the American Medical Association* 276(21):1775-1778.

[48] See www.wthr.com/Global/story.asp?S=6534514&nav=menu188_2.

[49] IOM, op. cit.

Copyright © National A        2463        nces. All rights reserved.

great havoc in our country, the death investigation system is one that is of increasing importance. Deaths resulting from terrorism, with the exception of any suicide perpetrators, are homicides that require robust medicolegal death investigation systems to recover and identify remains, collect forensic evidence, and determine cause of death.

### Incompatible Automated Fingerprint Identification Systems

In the late 1970s and early 1980s, law enforcement agencies across the Nation began adopting Automated Fingerprint Identification Systems (AFIS) to improve their efficiency and reduce the time needed to identify (or exclude) a given individual from a fingerprint. Before the use of AFIS, the fingerprint identification process involved numerous clerks and fingerprint examiners tediously sifting through thousands of classified and cataloged paper fingerprint cards.

AFIS was an enormous improvement in the way local, state, and federal law enforcement agencies managed fingerprints and identified people. AFIS searches are much faster than manual searches and often allow examiners to search across a larger pool of candidates and produce a shorter list of possible associations of crime scene prints and unidentified persons, living or dead.

Working with a system's software, fingerprint examiners can map the details of a given fingerprint—by features that consist of "minutiae" (e.g., friction ridge endings and ridge bifurcations)—and ask the system to search its database for other records that closely resemble this pattern. Depending on the size of the database being searched and the system's workload, an examiner often can get results back within minutes.

However, even though AFIS has been a significant improvement for the law enforcement community over the last few decades, AFIS deployments and performance (operational capacities) today are still far from optimal. Many law enforcement AFIS installations are stand-alone systems or are part of relatively limited regional networks with shared databases or information-sharing agreements. Today, systems from different vendors often are incompatible and hence cannot communicate. Indeed, different versions of similar systems from the same vendor often cannot effectively share fingerprint data with one another. In addition, many law enforcement agencies also access the FBI's Integrated Automated Fingerprint Identification System database (the "largest biometric database in the world"[50]) through an entirely separate stand-alone system—a fact that often forces fingerprint examiners to enter fingerprint data for one search multiple times in multiple states (at least once for each system being searched). Additionally, searches

---

[50] See www.fbi.gov/hq/cjisd/iafis.htm.

Copyright © National Academy of Sciences. All rights reserved.

52            *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

between latent print to AFIS 10-print[51] files suffer by not being more fully automated: Examiners must manually encode a latent print before searching the AFIS 10-print database. Furthermore, the hit rate for latent prints searched against the AFIS database is approximately 40 percent (see Chapter 10). Much good work in recent years has improved the interoperability of AFIS installations and databases, but the pace of these efforts to date has been slow, and greater progress must be made toward achieving meaningful, nationwide AFIS interoperability.

## The Growing Importance of the Forensic Science Disciplines to Homeland Security

Threats to food and transportation, concerns about nuclear and cyber security, and the need to develop rapid responses to chemical, nuclear, radiological, and biological threats underlie the need to ensure that there is a sufficient supply of adequately trained forensic specialists. At present, public crime laboratories are insufficiently prepared to handle mass disasters. In addition, demands will be increasing on the forensic science community to develop real-time plans and protocols for mass disaster responses by the network of crime laboratories and death investigation systems across the country—and internationally. The development and application of the forensic science disciplines to support intelligence, investigations, and operations aimed at the prevention, interdiction, disruption, attribution, and prosecution of terrorism has been an important component of both public health and what is now termed "homeland security" for at least two decades. With the development and deployment of enhanced capabilities came the integration of forensic science disciplines much earlier in the investigative process. As a result, the forensic science disciplines could be more fruitfully leveraged to generate investigative leads to test, direct, or redirect lines of investigation, not just in building a case for prosecution. Forensic science disciplines are essential components of the response to mass fatality events, whether natural or man made.

## The Admission of Forensic Science Evidence in Litigation

As explained in Chapter 3, most forensic science disciplines are inextricably tethered to the legal system; many forensic fields (e.g., firearms analysis, latent fingerprint identification) are but handmaidens of the legal system, and they have no significant uses beyond law enforcement. There-

---

[51] AFIS 10-print records the fingers, thumbs, and a palm print on a large index card. These prints are carefully taken, clear, and easy to read, and they make up the bulk of the AFIS data available today.

Copyright © National A          nces. All rights reserved.

fore, any study of forensic science necessarily must include an assessment of the legal system that it serves. As already noted, and as further amplified in Chapters 4 and 5, the forensic science system exhibits serious shortcomings in capacity and quality; yet the courts continue to rely on forensic evidence without fully understanding and addressing the limitations of different forensic science disciplines.

The conjunction between the law and forensic science is explored in detail in Chapter 3. The bottom line is simple: In a number of forensic science disciplines, forensic science professionals have yet to establish either the validity of their approach or the accuracy of their conclusions, and the courts have been utterly ineffective in addressing this problem. For a variety of reasons—including the rules governing the admissibility of forensic evidence, the applicable standards governing appellate review of trial court decisions, the limitations of the adversary process, and the common lack of scientific expertise among judges and lawyers who must try to comprehend and evaluate forensic evidence—the legal system is ill-equipped to correct the problems of the forensic science community. In short, judicial review, by itself, is not the answer. Rather, tremendous resources must be devoted to improving the forensic science community. With more and better educational programs, accredited laboratories, certification of forensic practitioners, sound operational principles and procedures, and serious research to establish the limits and measures of performance in each discipline, forensic science experts will be better able to analyze evidence and coherently report their findings in the courts. This is particularly important in criminal cases in which we seek to protect society from persons who have committed criminal acts and to protect innocent persons from being convicted of crimes that they did not commit.

## ORGANIZATION OF THIS REPORT

This report begins with a series of chapters describing the current forensic science system, the use of forensic science evidence in litigation, and science and the forensic science disciplines. It then addresses systemic areas for improvement with the goal of attaining a more rigorous and robust forensic science infrastructure, including standards and best practices, education, and training. Pursuant to its charge, in three chapters the committee addresses special issues in the areas of medicolegal death investigation (Chapter 9), AFIS (Chapter 10), and the interrelationships between homeland security and the forensic science disciplines (Chapter 11).

Copyright © National A    **2466**   ices. All rights reserved.

150　　　　　*STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

work in laboratories that conduct hundreds or thousands of evaluations of impression evidence develop useful experience and judgment, it is difficult to assert that the field has enough collective judgment about the variabilities in lip prints and ear prints based on tens of examinations. The community simply does not have enough data about the natural variability of those less frequent impressions, absent the presence of a clear deformity or scar, to infer whether the observed degree of similarity is significant.

Most of the research in the field is conducted in forensic laboratories, with the results published in trade journals, such as the *Journal of Forensic Identification*. With regard to reporting, SWGTREAD is moving toward the use of standard language to convey the conclusions reached.[58] But neither IAI nor SWGTREAD addresses the issue of what critical research should be done or by whom, critical questions that should be addressed include the persistence of individual characteristics, the rarity of certain characteristic types, and the appropriate statistical standards to apply to the significance of individual characteristics. Also, little if any research has been done to address rare impression evidence. Much more research on these matters is needed.

## TOOLMARK AND FIREARMS IDENTIFICATION

Toolmarks are generated when a hard object (tool) comes into contact with a relatively softer object. Such toolmarks may occur in the commission of a crime when an instrument such as a screwdriver, crowbar, or wire cutter is used or when the internal parts of a firearm make contact with the brass and lead that comprise ammunition. The marks left by an implement such as a screwdriver or a firearm's firing pin depend largely on the manufacturing processes—and manufacturing tools—used to create or shape it, although other surface features (e.g., chips, gouges) might be introduced through post-manufacturing wear. Manufacturing tools experience wear and abrasion as they cut, scrape, and otherwise shape metal, giving rise to the theory that any two manufactured products—even those produced consecutively with the same manufacturing tools—will bear microscopically different marks. Firearms and toolmark examiners believe that toolmarks may be traced to the physical heterogeneities of an individual tool—that is, that "individual characteristics" of toolmarks may be uniquely associated with a specific tool or firearm and are reproduced by the use of that tool and only that tool.

The manufacture and use of firearms produces an extensive set of

---

[58] SWGTREAD. 2006. *Standard Terminology for Expressing Conclusions of Forensic Footwear and Tire Impression Examinations.* Available at www.theiai.org/guidelines/swgtread/ terminology_final.pdf.

Attachme 2467 AS Report
Copyright © National A　　　ices. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

specialized toolmarks. Gun barrels typically are rifled to improve accuracy, meaning that spiral grooves are cut into the barrel's interior. The process of cutting these grooves into the barrel leaves marks and scrapes on the relatively softer metal of the barrel.[59] In turn, these markings are transferred to the softer metal of a bullet as it exits the barrel. Over time, with repeated use (and metal-to-metal scraping), the marks on a barrel (and the corresponding "stria" imparted to bullets) may change as individual imperfections are formed or as cleanliness of the barrel changes. The brass exterior of cartridge cases receive analogous toolmarks during the process of gun firing: the firing pin dents the soft primer surface at the base of the cartridge to commence firing, the primer area is forced backward by the buildup of gas pressure (so that the texture of the gun's breech face is impressed on the cartridge), and extractors and ejectors leave marks as they expel used cartridges and cycle in new ammunition.

Firearms examination is one of the more common functions of crime laboratories. Even small laboratories with limited services often perform firearms analysis. In addition to the analysis of marks on bullets and cartridges, firearms examination also includes the determination of the firing distance, the operability of a weapon, and sometimes the analysis of primer residue to determine whether someone recently handled a weapon. These broader aspects are not covered here.

### Sample and Data Collection

When a tool is used in a crime, the object that contains the tool marks is recovered when possible. If a toolmark cannot be recovered, it can be photographed and cast. Test marks made by recovered tools can be made in a laboratory and compared with crime scene toolmarks.

In the early 1990s, the FBI and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) developed separate databases of images of bullet and cartridge case markings, which could be queried to suggest possible matches. In 1996, the National Institute of Standards and Technology (NIST) developed data exchange standards that permitted the integration of the FBI's DRUGFIRE database (cartridge case images) and the ATF's CEASEFIRE database (then limited to bullet images). The current National Integrated Ballistic Information Network (NIBIN) includes images from both cartridge cases and bullets that are associated with crime scenes and is maintained by the ATF.

Periodically—and particularly in the wake of the Washington, DC,

---

[59] Although the metal and initial rifling are very similar, the cutting of the individual barrels, the finishing machining, and the cleaning and polishing begin the process of differentiation of the two sequentially manufactured barrels.

Copyright © National A    2468    ices. All rights reserved.

*152*        *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

sniper attacks in 2002—the question has been raised of expanding the scope of databases like NIBIN to include images from test firings of newly manufactured firearms. In concept, this would permit downstream investigators who recover a cartridge case or bullet at a crime scene to identify the likely source firearm. Though two states (Maryland and New York) instituted such reference ballistic image databases for newly manufactured firearms, proposals to create such a database at the national level did not make substantial progress in Congress. A recent report of the National Academies, *Ballistic Imaging*, examined this option in great detail and concluded that "[a] national reference ballistic image database of all new and imported guns is not advisable at this time."[60]

## Analyses

In both firearm and toolmark identification, it is useful to distinguish several types of characteristics that are considered by examiners. "Class characteristics" are distinctive features that are shared by many items of the same type. For example, the width of the head of a screwdriver or the pattern of serrations in the blade of a knife may be class characteristics that are common to all screwdrivers or knives of a particular manufacturer and/or model. Similarly, the number of grooves cut into the barrel of a firearm and the direction of "twist" in those grooves are class characteristics that can filter and restrict the range of firearms that match evidence found at a crime scene. "Individual characteristics" are the fine microscopic markings and textures that are said to be unique to an individual tool or firearm. Between these two extremes are "subclass characteristics" that may be common to a small group of firearms and that are produced by the manufacturing process, such as when a worn or dull tool is used to cut barrel rifling.

Bullets and cartridge cases are first examined to determine which class characteristics are present. If these differ from a comparison bullet or cartridge, further examination may be unnecessary. The microscopic markings on bullets and cartridge cases and on toolmarks are then examined under a comparison microscope (made from two compound microscopes joined by a comparison bridge that allows viewing of two objects at the same time). The unknown and known bullet or cartridge case or toolmark surfaces are compared visually by a firearms examiner, who can evaluate whether a match exists.

---

[60] National Research Council. 2008. *Ballistic Imaging*. Washington, DC: The National Academies Press, p. 5.

Copyright © National A        2469        nces. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

## Scientific Interpretation

The task of the firearms and toolmark examiner is to identify the individual characteristics of microscopic toolmarks apart from class and subclass characteristics and then to assess the extent of agreement in individual characteristics in the two sets of toolmarks to permit the identification of an individual tool or firearm.

Guidance from the Association of Firearm and Tool Mark Examiners (AFTE)[61] indicates that an examiner may offer an opinion that a specific tool or firearm was the source of a specific set of toolmarks or a particular bullet striation pattern when "sufficient agreement" exists in the pattern of two sets of marks. The standards then define agreement as significant "when it exceeds the best agreement demonstrated between tool marks known to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool."[62]

Knowing the extent of agreement in marks made by different tools, and the extent of variation in marks made by the same tool, is a challenging task. AFTE standards acknowledge that these decisions involve subjective qualitative judgments by examiners and that the accuracy of examiners' assessments is highly dependent on their skill and training. In earlier years, toolmark examiners relied on their past casework to provide a foundation for distinguishing between individual, class, and subclass characteristics. More recently, extensive training programs using known samples have expanded the knowledge base of examiners.

The emergence of ballistic imaging technology and databases such as NIBIN assist examiners in finding possible candidate matches between pieces of evidence, including crime scene exhibits held in other geographic locations. However, it is important to note that the final determination of a match is always done through direct physical comparison of the evidence by a firearms examiner, not the computer analysis of images. The growth of these databases also permits examiners to become more familiar with similarities in striation patterns made by different firearms. Newer imaging techniques assess toolmarks using three-dimensional surface measurement data, taking into account the depth of the marks. But even with more training and experience using newer techniques, the decision of the toolmark examiner remains a subjective decision based on unarticulated

---

[61] Theory of identification, range of striae comparison reports and modified glossary definitions—An AFTE Criteria for Identification Committee report. 1992. *Journal of the Association of Firearm and Tool Mark Examiners* 24:336-340.

[62] Ibid., p. 336.

Copyright © National Academy of Sciences. All rights reserved.

standards and no statistical foundation for estimation of error rates.[63] The National Academies report, *Ballistic Imaging*, while not claiming to be a definitive study on firearms identification, observed that, "The validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated." That study recognized the logic involved in trying to compare firearms-related toolmarks by noting that, "Although they are subject to numerous sources of variability, firearms-related toolmarks are not completely random and volatile; one can find similar marks on bullets and cartridge cases from the same gun," but it cautioned that, "A significant amount of research would be needed to scientifically determine the degree to which firearms-related toolmarks are unique or even to quantitatively characterize the probability of uniqueness."[64]

## Summary Assessment

Toolmark and firearms analysis suffers from the same limitations discussed above for impression evidence. Because not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result. Sufficient studies have not been done to understand the reliability and repeatability of the methods. The committee agrees that class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark. Individual patterns from manufacture or from wear might, in some cases, be distinctive enough to suggest one particular source, but additional studies should be performed to make the process of individualization more precise and repeatable.

---

[63] Recent research has attempted to develop a statistical foundation for assessing the likelihood that more than one tool could have made specific marks by assessing consecutive matching striae, but this approach is used in a minority of cases. See A.A. Biasotti. 1959. A statistical study of the individual characteristics of fired bullets. *Journal of Forensic Sciences* 4:34; A.A. Biasotti and J. Murdock. 1984. "Criteria for identification" or "state of the art" of firearms and tool marks identification. *Journal of the Association of Firearms and Tool Mark Examiners* 16(4):16; J. Miller and M.M. McLean. 1998. Criteria for identification of tool marks. *Journal of the Association of Firearms and Tool Mark Examiners* 30(1):15; J.J. Masson. 1997. Confidence level variations in firearms identification through computerized technology. *Journal of the Association of Firearms and Tool Mark Examiners* 29(1):42. For a critique of this area and a comparison of scientific issues involving toolmark evidence and DNA evidence, see A. Schwartz. 2004-2005. A systemic challenge to the reliability and admissibility of firearms and tool marks identification. *Columbia Science and Technology Law Review* 6:2. For a rebuttal to this critique, see R.G. Nichols. 2007. Defending the scientific foundations of the firearms and tool mark identification discipline: Responding to recent challenges. *Journal of Forensic Sciences* 52(3):586-594.

[64] All quotes from National Research Council. 2008. *Ballistic Imaging*. Washington, DC: The National Academies Press, p. 3.

Attachm[  2471  ]S Report
Copyright © National A       nces. All rights reserved.

08-cr-00016-RBS-DEM  Document 533-1  Filed 04/13/16  Page 81 of 81 PageID

A fundamental problem with toolmark and firearms analysis is the lack of a precisely defined process. As noted above, AFTE has adopted a theory of identification, but it does not provide a specific protocol. It says that an examiner may offer an opinion that a specific tool or firearm was the source of a specific set of toolmarks or a bullet striation pattern when "sufficient agreement" exists in the pattern of two sets of marks. It defines agreement as significant "when it exceeds the best agreement demonstrated between tool marks known to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool." The meaning of "exceeds the best agreement" and "consistent with" are not specified, and the examiner is expected to draw on his or her own experience. This AFTE document, which is the best guidance available for the field of toolmark identification, does not even consider, let alone address, questions regarding variability, reliability, repeatability, or the number of correlations needed to achieve a given degree of confidence.

Although some studies have been performed on the degree of similarity that can be found between marks made by different tools and the variability in marks made by an individual tool, the scientific knowledge base for toolmark and firearms analysis is fairly limited. For example, a report from Hamby, Brundage, and Thorpe[65] includes capsule summaries of 68 toolmark and firearms studies. But the capsule summaries suggest a heavy reliance on the subjective findings of examiners rather than on the rigorous quantification and analysis of sources of variability. Overall, the process for toolmark and firearms comparisons lacks the specificity of the protocols for, say, 13 STR DNA analysis. This is not to say that toolmark analysis needs to be as objective as DNA analysis in order to provide value. And, as was the case for friction ridge analysis and in contrast to the case for DNA analysis, the specific features to be examined and compared between toolmarks cannot be stipulated a priori. But the protocols for DNA analysis do represent a precisely specified, and scientifically justified, series of steps that lead to results with well-characterized confidence limits, and that is the goal for all the methods of forensic science.

## ANALYSIS OF HAIR EVIDENCE

The basis for hair analyses as forensic evidence stems from the fact that human and animal hairs routinely are shed and thus are capable of being

---

[65] J.E. Hamby, D.J. Brundage, and J.W. Thorpe. 2009. The identification of bullets fired from 10 consecutively rifled 9mm Ruger pistol barrels—A research project involving 468 participants from 19 countries. Available online at http://www.fti-ibis.com/DOWNLOADS/Publications/10%20Barrel%20Article-%20a.pdf.

Copyright © National Academy of Sciences. All rights reserved.

## CHARTER
## U.S. DEPARTMENT OF JUSTICE
### National Commission on Forensic Science

1. **Committee's Official Designation (Title):** The Committee shall be known as the National Commission on Forensic Science (Commission), hereinafter referred to as the Commission.

2. **Authority:** The Commission is established under Agency authority, and will be governed in accordance with the provisions of the Federal Advisory Committee Act (FACA}, as amended, 5 U.S.C. App. 2.

3. **Objectives and Scope of Activities:** The objectives and scope of activities of the Commission are to provide recommendations and advice to the Department of Justice (DOJ) concerning national methods and strategies for: strengthening the validity and reliability of the forensic sciences (including medico-legal death investigation); enhancing quality assurance and quality control in forensic science laboratories and units; identifying and recommending scientific guidance and protocols for evidence seizure, testing, analysis, and reporting by forensic science laboratories and units; and identifying and assessing other needs of the forensic science communities to strengthen their disciplines and meet the increasing demands generated by the criminal and civil justice systems at all levels of government.

4. **Description of Duties:** The duties to support the objectives described in paragraph 3 include:

    a. To recommend priorities for standards development to the Attorney General;
    b. *Tb* review and recommend that the Attorney General endorse guidance identified or developed by subject-matter experts;
    c. To develop proposed guidance concerning the intersection of forensic science and the courtroom;
    d. To develop policy recommendations, including a uniform code of professional responsibility and minimum requirements for training, accreditation and/or certification;
    e. To consider the recommendations of the National Science and Technology Council's Subcommittee on Forensic Science;
    f. To identify and assess the current and future needs of the forensic sciences to strengthen their disciplines and meet growing demands.

5. **Agency or Official to Whom the Committee Reports:** The Commission shall report to the Attorney General, who, through the Deputy Attorney General, shall direct the work of the Commission in fulfilling its mission. The Attorney General will refer recommendations regarding measurement standards and priorities for standards development to the Director of NIST, as the Attorney General deems appropriate.

Attachment B - Charter
## 2473

6. Support: DOJ will provide support services for the Commission. DOJ will coordinate with the National Institute of Standards and Technology (NIST) regarding the duties and activities of the Commission through a Memorandum of Understanding.

7. Estimated Annual Operating Costs and Staff Years: The estimated annual operating costs of the Commission are expected to be approximately $1,000,000. These costs include three workyears of support services and the expenses of members to attend meetings.

8. Designated Federal Officer (DFO): A full-time or permanent part-time DOJ employee, appointed by the Attorney General, will serve as the DFO of the Commission. The DFO will approve of and call all of the Commission meetings; prepare all Commission meeting agendas; facilitate public notice of, and public comment periods at, all Commission meetings; attend all Commission meetings; adjourn any meeting when the DFO determines adjournment to be in the public interest; chair meetings of the Commission when directed to do so by the Agency head; and perform other duties as required by FACA.

9. Estimated Number and Frequency of Meetings: The Commission generally will meet four times each year at approximately three-month intervals.

10. Duration: The period of time necessary for the Commission to carry out its purpose is indefinite.

11. Termination: The Commission's termination date is two years from the date this Charter is filed with Congress, and is subject to renewal in accordance with Section 14 of FACA.

12. Membership and Designation: The Commission will be co-chaired by a senior DOJ official and a senior NIST official. The Commission shall recommend whether the Attorney General should endorse guidance and practice guidelines for DOJ laboratories and forensic-science related policy initiatives. The Commission will consist of approximately 30 members appointed by the Attorney General in consultation with the Director of NIST and the co-chairs -0f the Commission. The Commission members will be selected to achieve a balance of backgrounds, experiences, viewpoints, and expertise in scientific, legal, law enforcement, academic, and advocacy professions. Candidates for membership from non-federal entities will be solicited through the Federal Register and outreach to relevant professional societies.

13. Subcommittees: The Attorney General may approve the establishment of subcommittees for purposes consistent with this Charter. Such subcommittees must report their recommendations and advice to the Commission for full deliberation and discussion. Subcommittees have no authority to make decisions on behalf of the Commission and may not report directly to the Federal Government or any other entity.

2

Attachment B - Charter
**2474**

**2475**

14. **Record Keeping:**  Records of the Commission shall be handled in accordance with General Records Schedule 26, Item 2. These records shall be available for public inspection and copying, subject to the Freedom of Information Act, 5 U.S.C. § 552

15. **Filing Date:**  The filing date is the date this Charter is filed with Congress.

April 23, 2015
Date

Eric H. Holder, Jr.
Attorney General

3

Attachment B - Charter

**2475**

PRINTER'S NOTE

JOINT APPENDIX PAGES 2476 – 2481
INTENTIONALLY LEFT BLANK TO AVOID DUPLICATION

**2476-2481**



# NATIONAL COMMISSION ON FORENSIC SCIENCE

**NIST**
National Institute of
Standards and Technology
U.S. Department of Commerce

## Views of the Commission
## Validation of Forensic Science Methodology

| Subcommittee | | Date of Current Version | 29/02/16 |
|---|---|---|---|
| Scientific Inquiry and Research | | Approved by Subcommittee | 29/02/16 |
| Status | | Approved by Commission | [dd/mm/yy] |
| Initial Draft | | | |

*Note: This document reflects the views of the National Commission on Forensic Science, and does not necessarily represent the views of the Department of Justice or the National Institute of Standards and Technology. This document does not formally recommend any action by a government entity, and thus no further action will be taken upon its approval by the Commission.*

**Views of the Commission**

Forensic data, results, interpretations, and conclusions have life-changing consequences for individuals and society. It is vital that the analytical data be generated through reliable methods and practices built upon valid core scientific principles and methodology. In the American system of criminal justice, the judge is responsible for determining admissibility of scientific evidence; however, advances relevant to forensic science analysis, from data generation to interpretation, are dynamic. Consequently, legal precedent can be issued even when scientific advances may have exposed foundational weaknesses in the forensic test method. Developments in science and technology must be impartially evaluated and communicated in a way that allows courts to make sound decisions regarding admissibility of forensic evidence.

The Organization of Scientific Area Committees (OSAC) is making significant and laudable progress in establishing documentary standards. It is critical that the forensic science community, the Commission and the criminal justice system have confidence in the validity of the science underlying these standards.

Therefore, it is the view of the National Commission on Forensic Science that:

1) All forensic test methods should be shown to be fundamentally valid[1].

---

[1] This refers to developmental validation, defined by the FBI QAS manual as "a process by which a procedure is evaluated to determine its efficacy and reliability for forensic analysis."

**Attachment C**

**2482**

1

2) The National Institute of Standards and Technology (NIST) should assume the role of scientific gatekeeper within the justice system for this purpose.

3) Additional resources should be made available to support this new capacity.

**Overview and Background**

The publication of the 2009 National Academy of Sciences (NAS) report, "Strengthening Forensic Science in the United States: A Path Forward," has catalyzed a change in the forensic science community. Since then, the Department of Justice (DOJ) and NIST intensified their investments in foundational and applied research in forensic science. These developments signal an evolution in the expectations for forensic evidence. While training and experience are a critical component of a forensic scientist's expertise, the underlying foundation of the discipline and associated testimony must be supported by sound research that meets the requirements of forensic practitioners, academic researchers, measurement scientists, and statisticians. The report also found "substantial evidence indicating that the level of scientific development and evaluation varies substantially among the forensic science disciplines" and "[a]body of research is required to establish the limits and measures of performance and to address the impact of sources of variability and potential bias." Therefore there is a clear and compelling need to address the foundational validity of forensic science and forensic medicine practices.

"Validation" as used in this document refers to developmental validation, the process that ensures the effectiveness of forensic tests. As defined by the FBI QAS manual, developmental validation is "a process by which a procedure is evaluated to determine its efficacy and reliability for forensic analysis." This usage should not be confused with performance checks (sometime called "Internal Validations") designed to adhere to ISO 17025 Clause 5.3, Accommodation and environmental conditions: "The laboratory shall ensure that the environmental conditions do not invalidate the results or adversely affect the required quality of any measurement." The performance checks do not take the place of true Validation studies. Developmental validation differs from internal validation conducted by individual forensic science service providers and forensic medicine service providers in that it comes first and includes but is not limited to the acquisition of data on precision, accuracy, the characterization of features, specificity, sensitivity, stability, reproducibility, testing on case-type samples, evaluation in population studies, and the determination of conditions and limitations of a test method for use on forensic and/or casework reference samples. Internal validation is defined by the FBI QAS as "the accumulation of test data within the laboratory to demonstrate that established methods and procedures perform as expected in the laboratory."

The evaluation of validity must be respected by all stakeholders if they are to be utilized by the legal and scientific communities. The Commission believes that NIST has, or has access to, the resources needed to fairly and impartially evaluate the merit of the science underlying forensic procedures and practice. Further, the Memorandum of Understanding Between the Department of Justice and the National Institute of Standards and Technology in Support of the National Commission on Forensic Science outlines two important roles for NIST: "a) conduct research supporting the development and dissemination of methods, standards, and technical guidance for forensic science measurements, and b) test and validate select existing forensic science practices and standards as appropriate." NIST has a long and distinguished history as an internationally

**Attachment C**

**2483**

2

recognized and trusted scientific, technical, and metrological laboratory. The Commission believes that reviews by NIST, supported by this pedigree, can bridge the gap between scientific validity and decisions regarding admissibility.

The Commission acknowledges the deep commitment and hard work of members of the OSAC Subcommittees and their involvement in developing documentary standards and guidance with Scientific Working Groups (SWGs) and standards development organizations such as ASTM. The OSAC Registries of Standards and Guidelines are intended to ensure that a "standard or guideline that is posted on either Registry demonstrates that the methods it contains have been *assessed to be valid* by forensic practitioners, academic researchers, measurement scientists, and statisticians through a consensus development process that allows participation and comment from all relevant stakeholders." A NIST assessment of developmental validation should precede the formation of documentary standards to be placed on the Organization of Scientific Area Committees (OSAC) Registry of Approved Standards.

Requiring an evaluation of developmental validity may delay the population of the OSAC Registries. However, the delay should not impact or influence a court's decision on whether to admit a forensic test method unless and until NIST issues its evaluation. Moreover, because ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas,[2] a judicial determination of admissibility will not be essential to the resolution of the vast majority of criminal cases in the United States.

For some OSAC Subcommittees, this commitment would minimally impact their documentary standards setting program. For other OSAC Subcommittees, their documentary standards setting should focus on test methods that currently meet the aforementioned criteria, as determined by NIST, or on standard terminology, classifications, guides, practices, or specifications,[3] while additional research is conducted for test methods that do not meet the criteria. Some aspects of documentary standards may not require prior validation. For example, a standard can request sample labeling and specific documentation in reports that would be independent of how specific tests are conducted or the limitations of those tests.

It is the view of the NCFS that an institutional entity assigned a permanent scientific review function would facilitate the gathering of scientific research, knowledge and expertise over time creating a service resource for forensic science, technology research and user communities. A trusted and impartial process of judging scientific merit of forensic practices and the presentation of data must be developed to ensure that all forensic results are based on sound and current science.

---

[2] Dept. of Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics Online, Table 5.22.2009, http://www.albany.edu/ sourcebook/pdf/t5222009.pdf

[3] "Know Your Types of Standards," Standardization News, October 2000, available at http://www.astm.org/SNEWS/OCTOBER_2000/oct_howto.html (last accessed, 3/1/2016).

**Attachment C**

**2484**

3

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Petitioner | ) | CRIMINAL ACTION NO.: 4:08cr16 |
| | ) | CIVIL ACTION NO.: 4:15cv108 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

### RESPONSE OF THE UNITED STATES TO DEFENDANT'S AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

COMES NOW the United States of America, by and through its attorneys, Dana J. Boente, United States Attorney for the Eastern District of Virginia, and Lisa R. McKeel and Brian J. Samuels, Assistant United States Attorneys, and Jeffrey A. Zick, Special Assistant United States Attorney, and submits this Response of the United States to Petitioner's Amended Motion to Vacate, Set Aside or Correct a Sentence filed by DAVID ANTHONY RUNYON, ("Runyon"), pursuant to Title 28, United States Code, § 2255.

### INTRODUCTION

On February 4, 2016, Runyon filed an amended motion under 28 U.S.C. §2255 to vacate, set aside, or correct a sentence. ECF 511. Runyon filed this amended motion pursuant to Federal Rule of Civil Procedure 15(a)(1), which allows an amendment as a matter of course 21 days after the filing of a responsive pleading. ECF 502, p. 2. The primary purpose behind Rule 15's amendment is to allow one amendment as a matter of course in response to a responsive pleading. *See* Fed. R. Civ. P. 15(a)(1), Reporter's Comments, 2009 Amendment ("This provision will force the pleader to consider carefully and promptly the wisdom of amending to

1

**2485**

meet the arguments in the motion . . . . The responsive pleading may point out issues that the original pleader had not considered and persuade the pleader that amendment is wise.")

But Runyon's amended motion adds little substance to his original § 2255 motion. In large measure the amended motion is simply an edited version of the original with little change to the language used in each claim. Moreover, the amended motion fails to answer any of the procedural defenses the United States lodged in its response to the original § 2255 motion. To be sure, Runyon has added arguments to some of his claims and clarified his position on others. To the extent that he has added claims—as opposed to clarifying arguments—Runyon has failed to demonstrate, much less argue, that the added claims relate back the original claims in his § 2255 motion as required by Fed. R. Civ. P. 15(c)(1)(B).

Fourth Circuit law provides that the filing of an amended motion supersedes the original motion. *See Young v. City of Mount Ranier*, 238 F.3d 567, 573 (4th Cir. 2001) ("[A]n amended pleading supersedes the original pleading, rendering the original pleading of no effect.") Because of this, the United States' response here, much like Runyon's amended motion, appears similar to the original response. *See* ECF 497.

## I.     PROCEDURAL HISTORY

On February 13, 2008, a federal grand jury returned a five-count indictment charging defendant David Runyon, and co-defendants Michael Draven and Catherina Voss, with Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a) (Count 1); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count 2); Bank Robbery Resulting in Death, in violation of 18 U.S.C. §§ 2113(a),(e) and 2 (Count 3); Conspiracy to Commit Robbery Affecting Commerce, in violation of 18 U.S.C. § 1951(a) (Count 4); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(j)

2

(Count 5). ECF 3. The indictment also provided the notice of special findings for the death penalty pursuant to 18 U.S.C. §§ 3591, 3592. *Id.*

On July 17, 2008, the government filed its notice of intent to seek a death sentence. ECF 67. On August 28, 2008 and September 2, 2008, defendant filed numerous pretrial motions, which were denied. ECF 77–92. Defendant's objections to proposed non-statutory aggravating factors were filed on May 8, 2009, and denied by the court on June 17, 2009. ECF 195 and 217.

The trial of Runyon and Draven began on June 30, 2009, and the guilt phase continued until July 17, 2009, involving over 50 witnesses and over 300 exhibits. On July 15, 2009, the district court dismissed Count 3 pursuant to Rule 29. On July 17, 2009, the jury found both defendants guilty on Counts 1, 2 and 5, and not guilty on Count 4. ECF 245. The eligibility phase was held on July 22, 2009. No evidence was presented and following argument the jury found Runyon intentionally killed Cory Voss. ECF 255. The jury also found the United States had proven the two noticed statutory aggravating factors. *Id.* at pgs. 5–6.

The selection phase of trial began on August 19, 2009. On August 21, 2009, Runyon submitted mitigating factors. ECF 285. The jury returned its verdict on August 27, 2009, and found four additional non-statutory aggravating factors, two statutory mitigating factors, and a number of non-statutory mitigating factors. ECF 291. The jury recommended death on Counts 1 and 5 and life imprisonment on Count 2. *Id.* at p. 5. On September 30, 2009, Runyon filed a motion to set aside the verdict, challenging certain victim-impact evidence. ECF 297. The court denied Runyon's motion on October 27, 2009. ECF 299. Runyon was sentenced to death and filed a timely notice of appeal. ECF 312.

**2487**

Voss pled guilty to the indictment and was sentenced to life in prison on Counts 1, 2, 3 and 5, and 20 years in prison on Count 4. ECF 69, 127. Draven was sentenced to life in prison on Counts 1, 2 and 5, (ECF 304), and his convictions have been affirmed on direct appeal. *United States v. Draven*, 417 F. App'x 362 (4th Cir. 2011).

On February 25, 2013, Runyon's conviction and sentence were affirmed on direct appeal. *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013). On October 6, 2014, Runyon's petition for a writ of certiorari was denied. *Runyon v. United States*, No. 13-254 (Oct. 6, 2014). On October 5, 2015, pursuant to 28 U.S.C. § 2255, Runyon filed a motion to vacate, set aside, or correct his sentence and the next day the court ordered the government to respond. ECF 478, 479. The United States filed its response to Runyon's § 2255 motion on January 11, 2016. ECF 497. On February 4, 2016, Runyon filed an amended § 2255 motion, adding little to his original motion. ECF 511.

## II.   <u>STATEMENT OF FACTS</u>

Defendant David Runyon, a contract killer, murdered Cory Allen Voss, a young Naval officer, in Newport News, Virginia. Runyon was hired for a few hundred dollars by Cory's wife and her lover so that they could collect life insurance proceeds from Cory's death. Runyon shot Cory five times and left him to bleed to death in his truck after arranging the murder to look like a late night robbery. An experienced former police and Army officer, Runyon put his training to use to carry out the murder and conceal who was responsible. He showed no remorse afterwards, as he and his co-defendants strived mightily and desperately to conceal their roles in the crime and obtain the life insurance payout.

4

**2488**

A.   The Guilt Phase

1.   The Murder of Cory Voss on April 29, 2007

In the morning hours of April 30, 2007, Newport News Police responded to a report of a subject sleeping in a truck in a parking lot and found Cory Voss dead inside the vehicle.   Trial Transcript ("TT"), p. 268.   He had been shot multiple times. Cory's wife, co-defendant Catherina Voss, told detectives that Cory had left the house the night before to get some money from Langley Federal Credit Union (LFCU).   The last images of Cory alive were captured by the video surveillance system attached to the ATM at LFCU on April 29, 2007.   TT, pgs. 398 – 410; Gov't. Ex., (hereinafter "GX") 28 - 28GG.   The images showed Cory driving up to the ATM, attempting to make a transaction, someone entering his vehicle and then Cory driving away from the ATM.   TT, pgs. 406-407. Approximately four minutes later, Cory returned and attempted another cash withdrawal through the ATM. TT, p. 408.   Financial records from LFCU confirmed Voss opened an account in her name nine days before the murder with a $5.00 deposit.   TT, pgs. 443-446; GX 31-31F.   On April 29, 2007, Cory attempted three withdrawals, but each transaction was denied for insufficient funds. TT, pgs. 459-461; GX 31GG – II.

2.   The Defendants Who Planned the Murder

Draven and Catherina Voss began having an affair while Cory was deployed on board the USS Elrod.   TT, pgs. 481, 483.   To free themselves of Cory, and to collect insurance and other benefits from his death, Draven and Voss decided to have Cory murdered and hired Runyon as a contract killer.   During interviews with detectives, both Runyon and Draven acknowledged they met through a medical research company where they participated in drug-studies. TT, pgs. 1310, 1314. Other than income Runyon and Draven received from participating in these studies, none of the three defendants had regular employment.   TT, pgs. 481, 483, 711, 717.   Runyon had no

**2489**

bank account, did not pay utilities, and the only financial records found for him were for two reloadable credit cards. TT, pgs. 713, 714. Following Cory's murder on April 29, 2007, Voss received approximately $133,000 in death gratuity, Social Security payments and Navy housing allowance. TT, pgs. 949, 950. Within three months, she had spent the money on trips, jewelry, household items, debt payments, and payments to Draven. TT, pgs. 951, 952. She also sought a $400,000 military life insurance policy held by Cory.

### 3.   Runyon's Purchase of Firearm

On the day of the murder, Runyon, a West Virginia resident, purchased a .357 handgun from George Koski in West Virginia sometime between the hours of noon and 2:00 p.m. Koski also gave Runyon some ammunition with the firearm. TT, pgs. 843-851; GX 103-103B. This firearm was later pawned in West Virginia by a friend of Runyon's, in October and November 2007. TT, pgs. 1190-1195.

### 4.   Crime Scene Evidence

An autopsy confirmed that Cory died as a result of three separate gunshot wounds to his chest and abdomen fired, most likely, from less than two or three feet away. TT, pgs. 319-329; GX 18. The jacketed, hollow-point bullets that killed Cory were fired from the same firearm and were characteristic of .38 class—a .38 caliber revolver or a .357 magnum firearm. TT, pgs. 359-366; GX 5, 22, 23. The firearm was not recovered. TT, pgs. 367, 368.

### 5.   Search Warrants

In December 2007, search warrants were executed in West Virginia for Runyon's residence, vehicle and storage unit. Agents recovered a map of Newport News, Virginia in the center console of Runyon's vehicle. TT, pgs. 1025-1030, 1324-1326; GX 214. The map contained the following written words: "Langley Federal Credit Union, '97 gray Ford Ranger,

6

**2490**

FL hubcap missing, tailgate down, J. Morris Boulevard, Cory." TT, p. 1027; GX 214. Found with the map was a photograph of Voss and Draven, with their names, addresses and social security numbers written on the back. TT, p. 1028; GX 215. Items recovered from Runyon's residence included papers referencing the credit union and phone numbers belonging to Voss, Draven and Runyon. TT, pgs. 1035, 1036. In Runyon's former residence, agents recovered a box of Winchester .357 magnum, hollowpoint bullets with five missing from the box. TT, p. 1044; GX 236, 237. Agents also found notebook paper with a list of items including tarp, trash bag, taser, Spyderco knife, black hoodie sweatshirt, black BDU pants, boots and gloves. TT, p. 1034; GX 217. A separate notebook page made reference to the time it would take to travel to Virginia and the location of LFCU. TT, p. 1035; GX 217.

### 6. Payments to Runyon

A Western Union money order, dated June 1, 2007, showed that Randy Fitchett, Draven's brother, sent Runyon $275.00. TT, p. 804; GX 293. Fitchett denied sending the money order, but recalled that Draven took him to a grocery store, saying that he needed a money order to pay a debt to a friend. TT, pgs. 804-805.

### 7. Phone Calls and Emails

The United States introduced various phone calls and emails between Voss, Draven, and Runyon, establishing their relationship, the murder-for-hire-scheme and its cover-up. GX 159-173A. Prior to the murder, Draven was incarcerated on unrelated charges in the Newport News jail. During that incarceration, he made 36 outgoing calls, portions of which were played for the jury. GX 159-173A. In one recorded call on March 29, 2007, Draven and Voss discussed Runyon's request for more money—namely, $500 up front—and their fear that Runyon had

7

**2491**

turned on them. TT, pgs. 890-893; GX 168, 168A. During the investigation, Voss, Draven, and Runyon communicated via email and phone calls. In one email, dated May 5, 2007, Brownells.com sent Runyon information related to the purchase of a .38 /.357 pistol stainless bore brush, which was billed to a different name at Runyon's address in West Virginia. TT, pgs. 1463-1464; GX 156.

The emails showed a pattern of Draven and Runyon getting their stories straight about their relationships and their alibis. TT, pgs. 1066-1109. Importantly, Draven emailed Runyon on December 7, 2007 about not meeting each other at a Waffle House, money owed, the grand jury and Runyon's talking to Voss on the phone. TT, pgs. 1102-1103; GX 143A. During the course of a wiretap authorized on the phones of Draven, Voss and Runyon, the defendants conspired with one another and others to obstruct justice and tamper with witnesses. TT, pgs. 1354-1491; GX 174-205B. In one call on December 8, 2007, Draven was upset after his interview with detectives and told Runyon the questions he was asked and how he answered them. TT, p. 1403; GX 197, 197B. Runyon responded to Draven that he'd "hang tough to the bitter end." *Id.*

Finally, phone records introduced at trial revealed regular calls to telephones associated with Runyon, Draven and Voss before and after the murder. GX 104-110, 136. Analysis performed on these records revealed multiple calls between Draven and Runyon leading up to and on the night of the murder. TT, pgs. 1414-1417; GX 136. Following the murder, calls with Draven and Runyon continued for months. Several calls occurred just before and after the time that the Western Union wire transfer was sent to Runyon in West Virginia. TT, pgs. 1422-1423; GX 136, 293. Cell tower analysis was also introduced, showing activity that occurred the day leading up to the murder of Cory Voss. TT, pgs. 1435-1465; GX 134, 135, 135A. Toll records revealed a number of calls between Draven and Voss in the hours preceding the murder and calls

8

**2492**

between Draven and pay telephones off of Jefferson Avenue (close to LFCU) beginning at 10:12 pm. TT, p. 1445. Calls continued indicating that Draven's cell phone had changed location, traveling toward the direction of the pay telephones, past the LFCU, and then back past LFCU towards the residence of Draven. TT, pgs. 1452-1454.

8.     Runyon's Statements

On December 3, 2007, Runyon was interviewed in West Virginia by detectives with the Newport News Police Department. TT, pgs. 1309-1314. Runyon admitted knowing Draven and that the two met at a drug study. TT, p. 1310. He denied that he owned any firearms. TT, p. 1314. When asked where he was on April 29 and 30, he could not provide a location to validate his whereabouts on those two days. TT, pgs. 1312-1313.

Following execution of the search warrants in West Virginia on December 11, 2007, Runyon was interviewed a second time. This interview was voluntary; however, Runyon was advised of his *Miranda* rights, waived those rights and agreed to be interviewed at the Morgantown Police Department. TT, pgs. 1322-1323. He again denied that he owned firearms despite the fact that firearms were found in his vehicle. TT, p. 1323. When confronted with the map and photograph found in his vehicle, Runyon appeared overwhelmed and did not immediately answer the detectives' questions. TT, pgs. 1324-1325. While he eventually admitted that the handwriting on the map of Hampton Roads was his, he denied that he wrote on the back of the photograph. *Id.* This interview was videotaped.

Evidence was introduced that Runyon confessed and bragged to several people that he killed Cory Voss. Runyon told his girlfriend Sarah Baker that he murdered Cory with a firearm. TT, pgs. 1135-1137. He told her that he was supposed to get a big sum of money from the insurance, but was never paid. *Id.* Runyon told Virginia Pina, an ex-girlfriend, that he killed

9

**2493**

someone for money.  TT, p. 1857.  After his arrest Runyon confessed to two other inmates that he murdered Cory Voss - he told Jamal Knowles that he killed a Navy guy with a .38 and the firearm was in a pawn shop in West Virginia.  TT, pgs. 1208-1209.  He told Knowles that $600.00 was wired to him and that he was going to get the rest of the money from the insurance claim "on the guys life."  TT., p. 1209.  Runyon told Theodore Schlossman that he drove from West Virginia to Newport News and killed a military man, but got paid only "chump change."  TT, pgs. 1219-1222.

B.    The Eligibilty Phase

Before the eligibility phase started, the court excused juror Robin Foreman after learning her mother had passed away the previous night and replaced her with an alternate juror.  TT, pgs. 1748, 1751-1753.  No additional evidence beyond that introduced during the guilt phase was presented on the gateway eligibility factors, and after hearing argument and receiving jury instructions, the jury found that defendant was over the age of 18, possessed the threshold intent and satisfied both statutory aggravating factors.  TT, pgs. 1797-1799.

C.    The Penalty Selection Phase

1.    Non-Statutory Aggravating Factors

Before trial, the government filed a notice outlining four non-statutory aggravating factors: Runyon (1) harmed the victim's family and friends; (2) used his education and training to kill Cory Voss; (3) engaged in acts of physical abuse towards women; and (4) demonstrated a lack of remorse.  ECF 67, p. 3.

**2494**

### a.   Physical Abuse

Runyon had a history of physically abusing women, including a conviction for simple battery and other charges for domestic assault as well as protective orders against him. TT, pgs. 1824-1825, 1865-1868, GX 311, 313, 314A, 314B, 316.

### b.   Education and Training

Several witnesses testified to Runyon's specialized military education and training over a twenty-year period that included training in firearms, police tactics, close-quarter situations, crime-scene processing and other forensic techniques. Runyon served as a military officer, police officer and corrections officer at various times and received hundreds of hours of documented training. Runyon also received extensive firearms training. TT, pgs. 1911-1914; GX 322, 323.

### c.   Victim Impact

#### 1.   Navy Co-Workers

Cory Voss began his naval career as an enlisted sailor and worked to receive a commission as a Naval Officer. TT, p. 1997. His co-worker, Jennifer Kime, met Cory in January 2006. TT, p. 1990. They became friends and she described Cory as "excellent" in his job as communications officer aboard the USS Elrod. TT, p. 1996. Cory's shipmates were shocked and upset to learn of his death. TT, p. 2004. Jeremy Chayer, a lieutenant in the Navy, was friends with Cory and worked with him in the operations department. TT, pgs. 2006–07. Chayer testified that everyone aboard the Elrod "from the captain all the way down to the new seaman recruit . . loved [Cory]." TT, p. 2009. Chayer provided the Navy with photographs of Cory during his time on board the ship. The photos were used in a video that was produced by the Navy and played at Cory's memorial service and at trial. TT, pgs. 2014–15; GX 327. A

**2495**

second video, recovered during a search of Voss' home was also played at trial. TT, p. 2018; GX 328. The video was approximately nine minutes and contained music and pictures of Cory with his friends and family.

### 2. Friends and Family

Cory's friend, Erin Skiba, socialized with Cory. TT, p. 2043. She described him as an "excellent father," who was "always with his children." *Id.* Cory's mother, Barbara Wilson, spoke of "Allen's" (her name for Cory) childhood growing up in Illinois. TT, pgs. 2046–47. She described the effect Cory's death had on her, on her son and daughter, as well as on her grandchildren. She read a prepared statement describing her loss, "my son was murdered for the insurance money." TT, pgs. 2052–55. Cory's sister, Kristen Smith, summarized the impact Cory's death had on her life, "there is no more time for us. I miss him so much, and I'm so angry that he was taken away. . . I'm sad for me, and I'm sad and I'm so mad for his children, because their father was taken away." TT, p. 2062. Rose Wiggins took custody of Cory's two children after the murder. TT, p. 2069. Wiggins testified that both children suffered from depression and had been in counseling since Cory's death. TT, p. 2068. Both children offered victim impact statements that were read at trial. TT, p. 2070; GX 369, 370.

### d. Lack of Remorse

Evidence of Runyon's lack of remorse had been provided during the guilt phase through phone calls and emails showing Runyon and Draven trying to get their stories straight for police and Runyon's effort to get money. After his arrest, Runyon bragged to Schlossman that he was "a hired gun," "a hit man." TT, p. 2545. Runyon also admitted to Sarah Baker and Virginia Pina that he had "killed somebody" and did it for money. TT, pgs. 1135–37, 1857.

12

**2496**

## 2. Defense Mitigation Case

In mitigation, the defense called 21 witnesses over two days who testified to Runyon's conduct in jail, his character, friendships and employment, as well as his ability to adjust to prison should he receive a life sentence. TT, pgs. 2126-2527. After the mitigation testimony, the plea agreement and statement of facts for Catherina Voss were admitted into evidence. Runyon Ex. 4 and 7.

## 3. Rebuttal Evidence

The United States offered two witnesses in rebuttal to Runyon's mitigation evidence. Detective Larry Rilee described interviews of the two co-defendants, contrasted with a videotaped interview of Runyon. GX 330. During Det. Rilee's testimony at the guilt phase of trial, counsel asked about the December 11, 2007 interview of Runyon, "during this interview you all talked to him for some more time about this, confronted him with some things. He never admitted being involved in the murder." TT, p. 1353. Det. Rilee answered, "No, he didn't." *Id.* Counsel asked, "He denied it?" Det. Rilee responded, "That's correct." *Id.* Once Runyon requested an attorney, the interview was terminated. *Id.* No prior suppression challenge was made to the video interrogation. In the penalty phase of trial, however, counsel objected to the introduction of the videotaped interview. TT, pgs. 2529-2531. The court overruled the objection and the videotape, showing Runyon's demeanor and reaction when confronted with evidence of the crime, was played for the jury. TT, pgs. 2536, 2549–50; GX 330. The court gave a specific instruction to the jury that the tape was offered for the "limited purpose of demonstration of remorse in regard to the alleged non-statutory aggravating factor to this effect, and for relevant culpability in regard to the alleged statutory mitigating factor to this effect." TT, p. 2668. The jury was also instructed, "the defendant did not testify during the penalty phase. You may not

13

**2497**

attach any significance to this fact or even discuss it in the course of your deliberations." TT, pgs. 2685, 2686.

The government also offered the testimony of Theodore Schlossman concerning an incident that happened in the jail while Runyon awaited trial. Runyon learned that Schlossman was on the witness list when they were housed together and Schlossman was assaulted. TT, p. 2542. During the assault Runyon commented "don't black his eyes, don't punch him in his face. Hit him in his head and in his body." TT, p. 2543. He did not want him to go to court "bruised up." *Id.* Schlossman did not report the incident to officers in the jail. TT, p. 2544.

### 4. Jury Deliberation

The jury exited the courtroom to begin deliberations at 4:30 p.m. on August 26, 2009. TT, p. 2696. At 5:30 p.m. the jury notified the court that it would like to be excused for the evening, TT, p. 2697, and the court dismissed the jury until 9:30 a.m. the next day. TT, p. 2698. The jury returned its verdict at 6:00 p.m., recommending a sentence of death for Counts 1 and 5, and a sentence of life imprisonment for Count 2. The Court confirmed this verdict by polling each individual juror. TT, pgs. 2715–16.

## III. LEGAL STANDARDS

Collateral relief under 28 U.S.C. § 2255 is strictly circumscribed. The grounds for relief under § 2255 are narrower than those for relief on direct appeal. With very limited exceptions, relief may not be based on (1) an error that is not of jurisdictional or constitutional dimension, (2) a procedurally defaulted ground, (3) a claim previously raised and rejected on direct appeal, (4) a "new rule" as defined by *Teague v. Lane*, 489 U.S. 288 (1989), or (5) an error that did not have a substantial and injurious effect or influence in determining the jury's verdict.

**2498**

A.    Cognizable Claims

While § 2255 provides a comprehensive remedy, not every alleged error can be corrected on collateral review. *United States v. Foote*, 784 F.3d 931, 932 (4th Cir. 2015). Only those errors presenting a "fundamental defect which inherently results in a complete miscarriage of justice" are cognizable. *Davis v. United States*, 417 U.S. 333, 346 (1974). This standard is only satisfied when a court is presented with "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Foote*, 784 F.3d at 936 (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962).

B.    Time Barred Claims

Statutory law imposes a one-year period of limitations in which federal prisoners may file motions to vacate, set aside or correct his sentence. 28 U.S.C. §2255(f); *United States v. Segers*, 271 F.3d 181, 184 (4th Cir. 2001). The limitations period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from direct appeal, regardless of whether the defendant seeks rehearing. *Segers*, 271 F.3d at 184.

C.    Procedurally Defaulted Claims

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the movant omitted to appropriately raise on appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982). The procedural default doctrine is adhered to by the courts to conserve judicial resources and respect the law's important interest in the finality of judgments. *Massaro v. United States*, 538 U.S. 500, 504 (2003). This doctrine applies even in death penalty cases. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). An exception lies for claims of ineffective assistance of counsel, which should be raised

15

**2499**

in a collateral attack rather than a direct appeal. *United States v. Williams*, 977 F.2d 866, 871 (4th Cir. 1992).

Apart from claims of ineffective assistance of counsel, courts may consider otherwise procedurally defaulted claims in two instances. First, they may consider defaulted claims when a movant demonstrates that the constitutional error "has probably resulted in the conviction of one who is actually innocent." *Bousley v. United States*, 523 U.S. 614, 623–24 (1998). Second, courts may consider defaulted claims if the petitioner establishes cause and prejudice. *United States v. Mikalajunas*, 186 F.3d 490, 492–93 (4th Cir. 1999). "Cause" exists only in those cases in which a factor external to the defense prevented counsel from raising a claim at the appropriate juncture. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The standard for prejudice is that the alleged error that led to the issue not being raised worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error." *Frady*, 456 U.S. at 170.

D.    Claims Previously Adjudicated on Direct Appeal

Generally, a claim raised and rejected on direct appeal cannot be relitigated in a § 2255 motion. *Withrow v. Williams*, 507 U.S. 680, 720–21 (1993) (Scalia, J., concurring) (collecting cases); *Boeckenhaupt v. United States*, 537 U.S. 1182 (4th Cir. 1976). The only notable exception to this bar is when there has been an intervening change in the law, usually a new judicial decision narrowly construing the statute of conviction. *Davis v. United States*, 417 U.S. 333 (1974).

E.    New Rule of Criminal Procedure

Collateral relief is further limited to claims based on established law. *Teague v. Lane*, 489 U.S. 288, 310 (1989). When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending direct review. As to convictions that are already final, however,

**2500**

the rule applies only in limited circumstances." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted). Generally, new procedural rules do not apply retroactively, while new substantive doctrines—those that alter the range of punishable conduct or the class of punishable people—do. *Id.* at 351–52. A court employs a three-step analysis to ascertain whether a new rule of criminal procedure applies. *Beard v. Banks*, 542 U.S. 406, 411 (2004). First, it determines when the judgment became final. *Id.* Second, it decides whether the pertinent rule of law was "new" at the time of finality by deciding whether a "court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (internal quotations omitted). Third, the court considers if a new rule is of "watershed" magnitude, and therefore applicable under an exception to *Teague*. *Id.* at 167. The exception is reserved for genuine "bedrock" rules that are essential to basic fairness. *Id.*

F.      Harmless Error

Even assuming a § 2255 motion demonstrates error, a movant's claims are subject to harmless error review. *United States v. Smith*, 723 F.3d 510, 517 (4th Cir. 2013). Thus, absent a showing that the case involves one of a rare group of structural errors that effect the framework of the trial and require reversal without showing prejudice, a § 2255 movant cannot obtain relief without establishing that an identified legal error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (collecting structural error cases).

**2501**

G.     Claims of Ineffective Assistance of Counsel

Although the doctrine of procedural default generally bars claims not previously raised, a freestanding claim of ineffective assistance of counsel may properly be asserted for the first time in a § 2255 petition. *United States v. DeFusco*, 949 F.2d 114, 120-21 (4th Cir. 1991). To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner's failure to satisfy either prong of the *Strickland* test renders it unnecessary for a reviewing court to consider the other element. *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004). First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. To show that defense counsel's performance was objectively unreasonable, the petitioner must articulate specific acts or omissions whereby counsel's performance fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. When reviewing the propriety of these alleged acts or omissions, courts must give substantial deference to defense counsel's strategic judgments. *Id.* at 689-90.

Second, the petitioner must show that he was prejudiced by counsel's deficient performance, in that it is "reasonably likely" that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Harrington v. Richter*, 131 S. Ct. 770, 791-92 (2011) (citing *Strickland*, 466 U.S. at 696). "The likelihood of a different result must be substantial, not just conceivable." *Id.* (citing *Strickland*, 466 U.S. at 693). The burden is on the petitioner to affirmatively prove prejudice. *Strickland*, 466 U.S. at 693. A petitioner's failure to satisfy either prong of the *Strickland* test renders it unnecessary for a reviewing court to consider the other element. *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004).

18

**2502**

The Supreme Court has repeatedly stated that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight," so that the conduct can be evaluated "from counsel's perspective at the time" and in light of all the circumstances. *Bell v. Cone,* 535 U.S. 685, 698 (2002) (quoting *Strickland,* 466 U.S. at 689). The requirement that counsel's performance be scrutinized deferentially is based on the recognition that it is "all too tempting" for a convicted defendant to "second-guess counsel's assistance" and "all too easy" for a court to find an act or omission "unreasonable" because it was "unsuccessful." *Strickland,* 466 U.S. at 689. Accordingly, courts "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance." *Bell v. Cone,* 535 U.S. at 702 (quoting *Strickland,* 466 U.S. at 689).

H.    Limitations Bar to Amended Claims

The Rules Governing Section 2255 Proceedings do not specify a procedure for amending motions. Courts, therefore, have typically applied the Federal Rule of Civil Procedure 15 to the amendment of a §2255 motion. *United States v. Pittman,* 209 F.3d 314, 317 (4th Cir. 2000). Rule 15(a)(1) provides, "A party may amend a pleading once as a matter of course within (A) 21 days after serving it, or (B) . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."

When proposed claims in an amendment are barred by the statute of limitations, Rule 15(c) provides for the relation back of amendments to the original pleading under certain circumstances. Relation back is permitted when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(2).

**2503**

## IV. ARGUMENT

The defendant has raised numerous claims against his trial and appellate counsel, as well as multiple constitutional claims. At trial Runyon was represented by capital qualified counsel, Lawrence H. Woodward, Jr., and Stephen A. Hudgins. On appeal Runyon was represented by attorneys Teresa Norris and Seth C. Farber. The Government will address each of the claims below:

**Claim 1:** **Runyon fails to establish prejudice from the participation of Robert Glenn Ford and Clifford Posey.**

Runyon claims that two purported dishonest law enforcement officers were involved in the investigation of the case against him, and that the United States failed to disclose this fact to his trial counsel. Although Runyon concludes that this prejudiced both his representation and the evidence presented against him, he cannot point to any action on the part of either individual that prejudiced him in anyway. Rather, he summarily concludes that neither the Court nor the parties can have confidence in the work product of either investigator due to their post-trial convictions.

### A. Procedural Default

At a threshold level, Runyon failed to raise this claim in the course of his direct appeal, thus, he is procedurally defaulted from doing so now. *Bousley*, 523 U.S. at 622. Runyon fails to demonstrate cause for his procedural default or actual prejudice. *Frady*, 456 U.S. at 170. Procedural default notwithstanding, Runyon's claim lacks merit and he is entitled to no relief.

### B. Merits

#### 1. Robert Glenn Ford

Runyon claims that his own investigator, Robert Glenn Ford, who subsequent to Runyon's trial was charged and tried of certain criminal offenses, was tainted such that the results of Ford's investigative efforts in Runyon's case were not reliable. Ford was charged in a

2504

sealed indictment on May 7, 2010. (Docket No. 2:10cr83, ECF No. 1). This was some six months after Runyon was sentenced and nearly a year after his trial had occurred.

Runyon suggests that Ford did not conduct an honest investigation or produce accurate reports based on the later proven facts that Ford had been involved in separate criminal conduct. Specifically, he speculates that Ford could have submitted false reports here in exchange for bribes. Other than speculation, Runyon points to no evidence to support his assertion that Ford conducted an improper investigation. Runyon identifies no witness reports that were fabricated or unreliable in any way. Ford did not testify at trial and no witness testified based on interactions with him.

Furthermore, the factual record compiled by Runyon belies his claims. Attorney Lawrence Woodward indicated that "Mr. Ford and Ms. Cronin [a mitigation investigator] worked very hard and did a good job investigating the case and David's background." Pet. Ex. 6, ¶ 4. Attorney Stephen Hudgins indicated that though he relied on Ford and investigator Shelia Cronin's interview reports to inform him of the witnesses' knowledge of Runyon, he interviewed the witnesses before the penalty phase began. Pet. Ex. 5, ¶ 8. Cronin stated that she often provided Ford with a list of questions to ask and she and Ford kept Runyon's counsel apprised of the witnesses the two interviewed. Pet. Ex. 4, ¶ 3. It further appears that it was known by Runyon's defense team that Ford had come under scrutiny for certain matters related to his prior performance as a police officer. Pet. Ex. 4, ¶ 4. But even years later, neither trial counsel nor Ford's co-investigator have raised any questions concerning the reliability of reports Ford submitted or tasks he performed.[1]

---

[1] It appears that trial counsel were not even made aware that this claim would be raised. Pet. Ex. 6, ¶ 17.

**2505**

Runyon must do more than attempt to link Ford's efforts in his case to Ford's unrelated criminal activity. This separate activity was related to Ford accepting bribes fabricating reports in exchange for bribes that state *defendants* had assisted in investigations in order to obtain reduced sentences. Runyon speculates that this separate pattern of conduct could have conceivably impacted his investigation or trial. But it is just speculation. In order to win habeas relief, Runyon must set forth specific facts in support of each ground for relief. *Roane*, 378 F.3d at 400–01. Conclusory and unsupported statements are insufficient for habeas relief. *Id.*

Moreover, the United States was under no duty to advise Runyon's counsel (who later represented Ford and advocated for his acquittal at his trial on the matter) that Ford was under investigation, particularly when he had not yet been charged. Although no favorable evidence has been identified stemming from Ford's impeachment related behavior, generally, impeachment evidence for those who do not testify lacks relevance and materiality for disclosure purposes. *See United States v. Sanchez*, 118 F.3d 192, 197 (4th Cir. 1997). Runyon's trial counsel identified no investigative actions that would have been done differently or adverse impact that the participation of Ford had on the investigation or defense of Runyon's case. In short, there is no evidence that would permit a finding that Runyon was denied the effective assistance of counsel based on Ford's involvement as his investigator.

2.     Clifford Dean Posey

Runyon next claims that Clifford Dean Posey, a former Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives was a second "dirty cop" that engaged in acts that resulted in the presentation of false or unreliable evidence against Runyon. As with the claim related to Ford, Runyon identifies no prejudice beyond speculation.

As Runyon recognizes, Posey was not indicted until April 2011. (Docket No. 3:11cr94). The Statement of Facts filed in Posey's criminal case makes apparent that his misconduct was not identified until October 2010, well over a year after Runyon's trial had concluded. ECF 14. Thus, there was nothing for the government to even turn over at the time of trial. Additionally, the government had no continuing duty to disclose any of the post-trial information. *See Dist. Atty's Office v. Osborne*, 129 S. Ct. 2308, 2319-20 (2009); *see also United States v. Jones*, 399 F.3d 640, 646-47 (6th Cir. 2005) (holding that evidence that did not exist at the time of trial was not *Brady* material).

Moreover, Runyon identifies no impact whatsoever stemming from the minor involvement of Posey. Runyon's claim that "he believes, but cannot yet confirm, that Posey played a substantial role in investigating and preparing the evidence in this matter," (ECF 511, p.15), is false and without any support. Full discovery, including interview and investigative reports and search warrant affidavits were produced. Posey prepared neither of these types of documents. Posey did not testify at trial or before the grand jury. The record reveals that Posey apparently assisted in transcribing a recorded telephone call as part of the Title III wiretap that was in operation during the investigation. As Runyon was provided with the full audio of all telephone calls and stipulated that the accompanying transcriptions were authentic, he can show no prejudice from Posey's involvement in this aspect of the investigation. ECF 239. There is, thus, no merit to his claim that Posey performed work that was materially false or unreliable. Moreover, like the argument Runyon makes against Ford, his claim here is based solely on speculation. For the foregoing reasons, Runyon is entitled to no relief on this claim.

**Claim 2:**      **The United States did not violate the defendant's constitutional rights by failing to disclose the background of co-defendant Draven.**

Runyon contends that the United States violated his rights under *Brady v. Maryland*, 373

U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972) and *Kyles v. Whitley*, 514 U.S. 419 (1995), by failing to provide him co-defendant Draven's background and mitigation evidence prior to trial. This claim has been procedurally defaulted, as the claim could have been raised at trial and on appeal. In the alternative, the information that the defendant claims should have been disclosed to him was not discoverable. Specifically, the information on Draven's background, criminal history as a juvenile and his mental health assessments, was given in discovery by the United States to Draven after indictment, but before the Attorney General's decision to authorize seeking the death penalty against Draven. This information was not material to Draven's guilt or innocence, but was material to Draven on the issue of punishment. Accordingly, the information was not material to Runyon regarding his guilt or innocence nor was it material to his punishment. As Runyon notes in his motion, the centerpiece of his case during the punishment phase that he presented to the jury, was that equally culpable defendants, Draven and Voss, would not receive the death penalty. The jury found that Runyon proved this mitigating factor. ECF 291.

     A.    Procedural Default

Because Runyon did not raise this issue at sentencing, or on direct appeal, he must demonstrate "cause" excusing his procedural default, and "actual prejudice" resulting from the errors of which he complains. *Frady*, 456 U.S. at 168. Runyon fails to make any argument demonstrating cause and prejudice for his default of this claim. This claim should be denied on this basis alone.

     B.    Draven's Background Evidence

Runyon asserts that the United States should have disclosed co-defendant Draven's background evidence to him because it was material to Runyon's defense on guilt or innocence

and also material to his sentencing. In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that when the government withholds material evidence on the issue of guilt or punishment, it violates the due process rights of the defendant. The Supreme Court defined "material" in *United States v. Bagley*, 473 U.S. 667, 682 (1985) as "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

The documents Runyon claims should have been disclosed to him involve the personal background of co-defendant Draven. Runyon argues, in essence, that Draven was more deserving of the death penalty than Runyon because his background was so much worse. He posits that had Draven's background been presented to the jury, there is a reasonable probability that the jury may not have convicted Runyon and sentenced him to death. But Runyon fails to show how this evidence would be admissible at trial on the issue of guilt or innocence or in the punishment phase. Rather, he makes a conclusory statement that this evidence would have persuaded the jury. *See Roane*, 378 F.3d at 400–01 (conclusory statements insufficient for habeas relief).

The facts remain that Runyon was hired by Draven and Voss to kill Cory Voss, a young Naval officer, so as to obtain insurance proceeds. Runyon traveled from West Virginia to Newport News, Virginia and shot Cory Voss at least five times at close range in Cory's vehicle. Neither Draven, nor Voss pulled the trigger to kill Cory in such brutal manner. The evidence against Runyon was overwhelming—Runyon planned the murder in advance, purchased the firearm the day of the murder and drove to the location of the murder with a map of Hampton and Newport News, Virginia. The map, found in Runyon's vehicle in West Virginia, had the

25

**2509**

name of the bank, the description of Cory's vehicle, Cory's name and the exit to take off the interstate to get to the bank. Also found in Runyon's vehicle was a picture of co-defendants Voss and Draven. Runyon fails to explain how the evidence of Draven's background would be admissible at trial on guilt or innocence and further absolves him of guilt. Likewise, Runyon fails to explain how evidence of Draven's background would be admissible at the punishment phase so as to persuade a jury that he should not be given the death penalty for the murder of Cory Voss. Contrary to Runyon's assertion, this evidence was not exculpatory nor was it impeachment evidence. Ultimately, this evidence was not material within the meaning of *Brady*. This case is distinguishable from *Cone v. Bell*, 556 U.S. 449 (2009). In *Cone*, the evidence suppressed by prosecutors included witness statements and police reports that corroborated the defense that he committed the crimes because of his drug addiction. Here, the evidence not turned over to Runyon was the background of Draven's youth. Accordingly, this evidence was not material to Runyon on the issue of guilt or innocence nor on the issue of punishment for his role in the crime.

Assuming this evidence was discoverable to Runyon, it would have been cumulative and any error here would be harmless. Runyon did present mitigation evidence that equally culpable defendants, Draven and Voss, would not receive the death penalty. The jury found this mitigating factor in Runyon's favor. ECF 291.

**Claim 3:**     **<u>Runyon's trial counsel were not ineffective for failing to investigate and present evidence of innocence at the guilt phase of trial.</u>**

Runyon argues that he is innocent of being a contract killer hired to murder Cory Voss. He argues that his trial counsels were ineffective and failed to present evidence of his innocence pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). As stated above, in order to prevail on an ineffective assistance claim, a criminal defendant must show both (1) that counsel's

26

**2510**

representation was deficient, and (2) that the defendant was prejudiced by counsel's performance. *Id.* at 693. Although a defendant must prove both prongs, a reviewing court need not examine or even address both prongs if a defendant makes an insufficient showing on one. *Id.* at 697.

Runyon argues that had trial counsel presented or highlighted certain evidence, then the jurors could have reasonably doubted that Runyon was involved in the carjacking and murder of Cory Voss. Runyon is wrong—he cannot demonstrate that trial counsels' performance was deficient.

### 1. Chad Costa

Costa, a friend of the defendant's, did not testify at trial on the issue of guilt or innocence. Runyon now accuses his trial counsel of a deficient performance for failing to call Costa as a witness to elicit Runyon's statements during car trips together after the murder of Voss. He further argues that but for this error, the outcome of the trial would have been different. This claim lacks merit.

The testimony that Runyon says Costa would provide is inadmissible hearsay. According to his declaration, ECF 511-7 at ¶ 2, Costa met Runyon sometime in "the second half of 2007". Costa and Runyon took three car trips together and they talked. Trial counsel did not call Costa because they understood the rules of evidence. Trial counsel could not have presented, through Costa, the defendants statements. It is important to note, that Runyon in his petition, states that Costa knew him *before* the crime, however according to Costa's declaration, this is false. Numerous arguments are premised on this notion as to why Costa's testimony was crucial. Runyon murdered Cory Voss on April 29, 2007. He did not meet Costa until *after* the murder, sometime "in the second half of 2007." Accordingly, the arguments that have been put forth that

27

**2511**

counsel was deficient lack merit.

Likewise, Runyon speculates that Costa's purported testimony about his recollection of Runyon's gun being a six-shot revolver would not have changed the outcome of this case. Given the ballistics evidence from the recovered bullets and the overwhelming evidence demonstrating Runyon's guilt, Costa's recollection of a gun he may have seen would have had no effect on the verdict.

As for the allegations that Costa's testimony would have cast doubt about the reliability of the police investigation, the defendant fails to state with specificity how the police investigation was unreliable. Certainly, the defense at trial made this very argument. So, Costa's testimony would add nothing. Likewise, Costa's opinions on Runyon's braggadocios nature and his poor decision making regarding romantic partners adds nothing to whether he murdered Cory Voss and was irrelevant.

Accordingly, trial counsels were not deficient in their performance. To establish counsel's representation was deficient, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Since the testimony offered by Costa was inadmissible for various reasons, the defendant has not made a showing of deficient performance and thus the Court need look no further to the second prong of *Strickland*. Even if the testimony was admissible, for the reasons stated above Runyon suffered no prejudice.

2. Cat Voss

Runyon accuses trial counsel of failing to call co-defendant Cat Voss to testify on his behalf that she doubted Runyon was the triggerman. Despite the fact that Voss pled guilty to having her husband murdered by a hit man and signed a statement of facts, ECF 69, 70; Defense

28

**2512**

Trial Ex. 4 and 7, admitted August 25, 2009, (penalty phase), she now, eight years later, knows very little about what happened to her husband according to her declaration. ECF 511-9. Apparently, she is now recanting her signed statement of facts and Runyon now seeks to rely on her testimony. It is doubtful that in July of 2009, Cat Voss would have taken the witness stand to testify for Runyon after having pled guilty in light of Runyon's defense that one of the other co-defendants was responsible for the murder of Cory Voss. Cat Voss was represented by counsel and it is likewise doubtful that her attorneys would have let her testify to what she now declares under oath. Voss risked her plea agreement of life imprisonment instead of the death penalty with the United States should she have testified falsely in contravention of her Statement of Facts. Pet. Ex 4, ¶¶ 5 and 13 and ECF 69. For Runyon to now suggest that her testimony would have raised reasonable doubt is speculative. It is just as likely the jury would not believe a word she said since she would have been impeached by the statement of facts she signed. Runyon has failed to show that counsels' failure to call Cat Voss as a witness at trial was deficient. Trial counsel made a tactical decision to use the documents instead of Cat Voss' testimony to argue that she, as an equally culpable defendant, did not receive the death penalty. Trial counsel was successful in this endeavor, as the jury found this mitigating factor for Runyon. Any error here is thus harmless. *Brecht*, 507 U.S. at 637.

### 3. Scott Linker

Runyon argues that had Linker been called as a witness during the guilt phase, his testimony would have created reasonable doubt. In addition, Runyon argues that his trial counsel were ineffective for failing to object to the admission of guns and ammunition found in Runyon's possession. Neither of these arguments have merit.

According to Linker's declaration, ECF 511-13, Runyon loved guns, traded and collected them, was an expert marksman and he doesn't think that Runyon killed Cory Voss. All of this testimony is irrelevant and thus inadmissible at the guilt phase of trial. Certainly, none of the proposed testimony goes to the guilt or innocence of Runyon. Runyon argues that this testimony puts in context the gun purchase the day of the murder and therefore supplied reasonable doubt. This testimony does not put into context the sale of the gun on the day of the murder. Linker's testimony easily could have the opposite effect—that Runyon's love of guns and that he was an excellent marksman make him a good candidate to be a hit man or contract killer. Counsel was not deficient in their performance at trial for failing to call Linker. Nor has Runyon demonstrated any prejudice for this purported error. Linker's testimony would not have changed the outcome of Runyon's case. *Strickland*, 466 U.S. at 694, 696.

Trial counsels' performance was likewise not deficient for failing to object to evidence of other guns and ammunition found in Runyon's possession. Runyon fails to explain how this evidence was irrelevant. Moreover, his contention that trial counsel failed to argue that this evidence

### 4. Rose Wiggins

Runyon argues that his counsel was deficient for failing to "effectively utilize" Wiggins's testimony to create doubt as to his involvement in the murder. He contends that Wiggins's testimony was inconsistent with the United States' timeline of the murder. This claim lacks merit.

Rose Wiggins, Cory Voss' mother-in-law, "drove by the scene" and did not see Cory's truck at 3:00 a.m. TT, pg. 259. She offered to look for Cory because her daughter, Cat Voss, was home with her sleeping children. *Id.* at 260. Wiggins testified that she looked for both

**2514**

Cory's truck and the family BMW that Cat Voss normally drove.   *Id.*  Wiggins did not see either vehicle when she drove by the Langley Federal Credit Union bank. *Id.* at 261.  Later that morning, Wiggins drove through the bank parking lot to look for Cory on her way to Cat Voss's home. *Id.* at 261–62.  She did not see either Voss vehicle. *Id.* at 262.

Runyon contends that his trial counsel was prejudicially ineffective for failing to ask Wiggins why she did not know which vehicle Voss was driving, the whereabouts of the Voss BMW, and question why Wiggins did not immediately go to the Voss home while Cat Voss searched for Cory.  Runyon claims that the answers to these questions would have created reasonable doubt as to his involvement in the conspiracy and murder.

Trial counsel was not deficient in his questioning of Wiggins and Runyon cannot demonstrate prejudice from counsel's failure to ask the above questions.  Wiggins testified that she looked for both vehicles when she drove by the bank.  She also testified that she offered to search for Cory because Cat Voss was home with her sleeping children.  The jury heard the fact that Wiggins did not see Cory's vehicle when she twice went to the bank.  Trial counsel used this testimony to argue that there was doubt as to Cory Voss's location and that someone else could have entered his vehicle prior to its return to the ATM the second time.  TT pgs. 1634–35.

Moreover, Runyon fails to demonstrate how his trial counsel could have used Wiggins's testimony to demonstrate he was not involved in the murder.  There is nothing in the record that indicates Wiggins was involved in the substantial planning of the murder or that she knew Runyon.  Runyon's claim is speculative and he cannot demonstrate prejudice.

### 5.   Runyon's Whereabouts On The Day of the Murder

Runyon fails to make a clear argument on counsel's deficiencies except to write, "defense counsel did not elicit testimony that she (Paula Dalton) never received a phone call on Davy's

**2515**

phone from a caller other than David Runyon." Presumably, Runyon's claim is that trial counsel failed to ask a question of the government's witness Paula Dalton. Runyon next states, in a conclusory manner, that he was prejudiced by this failure to ask Dalton this question. Runyon fails to show by asking this one question or even a series of questions that trial counsel was deficient. Moreover, he must prove prejudice by demonstrating there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Bacon v. Lee,* 225 F.3d 470, 478 (4th Cir.2000), *cert. denied,* 532 U.S. 950 (2001) (citing *Strickland,* 466 U.S. at 694). In order to do so, the petitioner must show a "probability sufficient to undermine confidence in the outcome." *Roane,* 378 F.3d at 405 (citing *Strickland,* 466 U.S. at 694). Government witness Paul Swartz testified regarding the phone calls made to and from Runyon, Cat Voss and Draven. What is important at trial is not when Runyon may or may not have spoken with Dalton, but when the co-conspirators spoke to each other. TT, pgs. 1378-1464. Trial counsel cross-examined Paul Swartz on the phone analysis presented at trial. TT, pgs. 1476-1488. Runyon fails to adequately explain how he was prejudiced. His claim fails as counsel was not deficient in his performance at trial.

## 6. Cell Tower Testimony by Paul Swartz regarding Draven

Runyon argues that trial counsel was deficient in failing to challenge the testimony of Paul Swartz regarding cell tower analysis of co-defendant Draven. Importantly, Runyon is wrong when he states "Three cell towers are located within twenty miles of the credit union." ECF 511, pg. 30. Specifically, Paul Swartz testified, "No, there are more nTelos cellular towers than what are represented on that map." TT, pg. 1469. Runyon again makes a conclusory statement that trial counsel were deficient in their investigation of this matter. He proffers no specific argument or evidence that trial counsel could use to challenge Swartz's testimony. The

**2516**

evidence Runyon presents for this proposition are articles written by persons that have not been represented to be experts. One of those articles (ECF 511-14) has not been published.

The use of cell phone location records has been widely accepted by numerous federal courts. *See United States v. Eady*, No. 2:12-cr-00415-DCN-3, 2013 WL 4680527, at *4 (D. S.C. Aug. 30, 2013) (collecting cases). Runyon's reliance on *United States v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012), is misplaced. In that case, the court found testimony related to a theory known as "granulization"—a theory that estimates the range of cell sectors—was unreliable and thus inadmissible. *Id.* at 956–57. Here, Swartz did not testify to any inadmissible theory regarding cell sector location. Runyon fails to demonstrate any deficient performance by his trial counsel.

At trial, Runyon's defense was that someone else was responsible for killing Cory Voss. To that end, his trial counsel used the evidence presented on cell phone location to bolster the defense theory. For example, Swartz testified that Draven's location was unknown between 11:11 p.m. and 11:45 p.m. on the night of the murder based on the cell phone location records, TT, pgs. 1477–78, and argued that the evidence lacked any demonstration that Runyon's phone was in Newport News during the time of the murder. TT, pgs. 1636–53. Trial counsel was not deficient in their performance nor was there any prejudice, as their theory of the case was presented to the jury.

### 7. Runyon's Shopping List

Runyon argues that his trial counsel failed to *highlight* that the checklist of items found in Runyon's belongings in his bedroom were not items used in the crime. GX 217, TT, pgs. 1034–1035. Runyon is wrong. Trial counsel brought up the fact during his cross-examination of ATF Special Agent William Banks that some of the items were not recovered. TT, pgs. 1050–1052.

**2517**

Accordingly, Runyon's trial counsel were not deficient in their performance. Furthermore, trial counsel was correct NOT to highlight this exhibit in closing argument. This damaging piece of evidence also had written on it the following word and numbers; "6.25 hours", "380 miles", "LANGLEY FED. CREDIT UNION", "Exit 252", "Jefferson", "1742 Jefferson Ave", "11742 Jefferson", "873-3944". It is important to note that evidence was adduced at trial to verify the information on this US trial Exhibit 217. Jefferson Avenue is the street that one would have to travel to get to Langley Federal Credit Union. TT, pgs. 271-273. 11742 Jefferson Avenue is the address of Langley Federal Credit Union. TT, p. 397. It takes roughly six hours to get from Morgantown, West Virginia to Newport News, Virginia. TT, p. 1030. To be sure, a competent counsel would not ask the jury to look at this document again. Runyon's argument that his trial and appellate counsel were deficient in their failure to highlight this evidence is absurd.

### 8. Testimony Regarding the Bullets

Runyon adds an argument to his original § 2255 motion contending that his trial counsel were ineffective for failing to challenge the expert scientific evidence that was presented. In a conclusory fashion, Runyon argues that "new evidence undermining the reliability of the three prosecution experts' testimony," requires an evidentiary hearing. ECF 511, pg. 34. But, other than a citation to the full National Academy of Sciences 2009 report on the state of forensic evidence, Runyon does not proffer any new evidence that calls into question the expert testimony in his trial. He only argues that his trial counsel were ineffective for failing to challenge the cell tower and ballistics evidence.

The amended claim that counsel failed to investigate and challenge the ballistics evidence is untimely since it was not filed within the one-year period required by 28 U.S.C. §§ 2255(f)(1) and(f)(3). Runyon does not demonstrate, much less argue, that this claim relates back to any of

34

**2518**

his previous claims. The timeliness of this claim notwithstanding, Runyon fails to demonstrate that the claim has merit.

Runyon contends that the ballistics evidence and testimony of John Willmer were unreliable. Specifically, he claims his trial counsel were ineffective for failing to challenge the scientific validity of Willmer's testimony and failing to correct the "mis-impression" that the bullets found in this case could have been fired from Runyon's Taurus .357.

Willmer, a forensic firearms and toolmark expert, testified that a microscopic analysis of the bullets recovered from the victim's truck and the bullet jacket and lead fragments recovered from the victim's body, demonstrated that the bullets were fired from the same firearm. TT, pgs. 361–62; GX 23.[2] The bullets were found to be characteristic of .38 class bullets, encompassing a couple of calibers together. TT, pg. 362. The analysis also found that "the bullets are characteristic of being revolver ammunition components, and the predominate ammunition component in that caliber is .38 special and .357 magnum revolvers that would be typical of firing this particular bullet with the rifling specifications that it has." *Id.* Because only the bullets were recovered, there was no way to determine whether the ammunition came from .38 special or .357 magnum cartridges, but the ammunition could be used for both the .38 and .357 firearms. *Id.* at 363–64. Finally, Willmer testified that that the list of firearms that could have fired the bullets in GX 23 was not all inclusive—there could be other firearms not listed that could have fired the bullets in this case. *Id.* at 369–70.

The gravamen of Runyon's claim is that trial counsel was ineffective for failing to challenge Willmer's testimony as exaggerated, inaccurate or misleading. First, there was nothing unreliable in the scientific validity of Willmer's testimony. Runyon offers no study or

---

[2] In addition to his independent examination of the bullets and bullet jacket, Willmer relied on the analysis completed by another forensic expert. *See* TT, pgs. 359–60; GX 23.

2519

evidence that rebuts the validity of the analysis that Willmer or other experts performed on the bullets. Second, there was nothing misleading about Willmer's analysis or testimony. Runyon contends that the list of firearms that could have fired the bullets only named Astra and Llama brand firearms. ECF 511, pg. 32. But Willmer testified that the list was not all-inclusive. TT, pg. 370. Moreover, the list in GX 23 does include the Taurus brand firearm as producing the general rifling characteristics like those present on the recovered bullets.

Given this evidence, it was reasonable for trial counsel to forgo a more forceful challenge to the ballistics evidence. Runyon offers no credible theory challenging Willmer's testimony. In addition, even without the ballistics evidence, the evidence of guilt against Runyon was overwhelming. *See Runyon*, 707 F.3d at 521 ("There is simply no question that Runyon fired five bullets into the body of an innocent naval officer—at close range and in cold blood.") Runyon fails to demonstrate that trial counsel fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 690. Likewise, Runyon fails to show prejudice resulting from counsel's alleged error. Given the mountain of evidence demonstrating guilt, Runyon cannot show a reasonable likelihood that the result of his trial would have been different had trial counsel more fully challenged the ballistics evidence. This claim should be denied.

**Claim 4:**     **Trial Counsel did not provide ineffective assistance to Runyon by failing to advocate on his behalf at the eligibility phase of the trial.**

Runyon claims that trial counsel failed to advocate for him at the eligibility phase by failing to address the relevant issue, and otherwise failing to discuss established facts that weighed against the aggravating factor of substantial planning. As with his other claims, Runyon cannot establish that his counsel provided less than adequate representation in his argument. Moreover, the evidence of Runyon's eligibility for the death penalty was overwhelming, such

36

**2520**

that he cannot establish that the outcome would have been different even had trial counsel advocated in a different manner.

As Runyon indicates and as outlined above, the guilt and sentencing proceedings were trifurcated, such that the eligibility and penalty phases were separated into two distinct proceedings. A defendant is not eligible for a death sentence unless certain statutory criteria are satisfied. First, the government must prove beyond a reasonable doubt that the defendant was more than 18 years old at the time of the murder and that the defendant acted with any one of four mental states specified in the FDPA. *See* 18 U.S.C. § 3591(a)(2)(A)-(D). Second, the government must prove beyond a reasonable doubt the existence of at least one statutory aggravating factor. *See* 18 U.S.C. § 3592(c)(1)-(16). In the wake of *Ring v. Arizona*, 536 U.S. 584 (2002), all of these eligibility factors operate as the functional equivalent of elements of the offense and are treated as such. *United States v. Barnette*, 390 F.3d 775, 784 (4th Cir. 2004) ("the *Ring* Court made clear that when a statute requires the finding of an aggravating factor as a condition to imposition of the death penalty, the aggravating factor requirement functions as an element of the offense"), *vacated and remanded on other grounds*, 546 S. Ct. 803 (2005).

In this case, the gateway factors (also known as "threshold findings") consisted of the following:

(a). The defendant was more than 18 years of age at the time of the murder. Section 3591(a);

(b). The defendant, DAVID ANTHONY RUNYON, intentionally killed Cory Allen Voss. Section 3591(a)(2)(A);

(c). The defendant, DAVID ANTHONY RUNYON, intentionally inflicted serious bodily injury that resulted in the death of Cory Allen Voss. Section 3591(a)(2)(B);

(d). The defendant, DAVID ANTHONY RUNYON, intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal

37

**2521**

force would be used in connection with a person, other than one of the participants in the offense, and Cory Allen Voss died as a direct result of the act. Section 3591(a)(2)(C);

(e). The defendant, DAVID ANTHONY RUNYON, intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Cory Allen Voss died as a direct result of the act. Section 3591(a)(2)(D).

The statutory aggravating factors consisted of the following:

(a). The defendant, DAVID ANTHONY RUNYON, committed the offenses described in Counts One, Two, Three, and Five, as consideration for the receipt, or in the expectation of the receipt, of anything of value. Section 3592(c)(8).

(b). The defendant, DAVID ANTHONY RUNYON, committed the offenses described in Counts One, Two, Three, and Five, after substantial planning and premeditation to cause the death of a person. Section 3592(c)(9).

Thus, for Runyon to be eligible for a death sentence, the jury had to find: (1) the defendant was more than 18 years old at the time that he killed Cory Voss; (2) at least one gateway factor; and (3) at least one statutory aggravating factor.

The United States had no additional evidence to present at the eligibility phase—all of the evidence that made Runyon eligible to be considered for the death penalty had been introduced at the guilt phase. That evidence clearly established, as was required for the jury to find at the eligibility phase, that Runyon had deliberately shot and killed Cory Voss, and that he did so with the expectation of being paid after substantial planning had occurred.[3]

Runyon does not contest that the evidence was clear that he was over 18 and that he committed the offense in expectation of pecuniary gain.[4] This intent finding and one statutory

---

[3] Oddly, in his argument in Claim 6, Runyon states that the jury could not have given much weight to the aggravating factors of pecuniary gain and substantial planning because such factors were inherent in the charged crime of murder for hire. In that claim, at least, Runyon does not even challenge that these aggravating factors were not present.

[4] Runyon does make reference that counsel did not address the pecuniary gain aggravating circumstance in the eligibility phase. ECF 511, pg. 38 n. 23. Even assuming Runyon's footnote

**2522**

aggravating factor alone would have been enough to render him eligible to face the death penalty. In arguing, however, that his trial counsel failed to discuss facts related to the substantial planning aggravating factor, Runyon relies not on the trial evidence, but on a letter sent to the United States in advance of trial requesting that the death penalty be withdrawn. ECF 511-15. This letter related to the relationship between Voss, Runyon and Draven and could be perhaps taken as an argument that the three were equally culpable—an argument that trial counsel successfully advanced at the penalty phase as a mitigating factor. It had little to do with the evidence introduced during trial that showed the substantial efforts by all three defendants to plan this murder.

Trial counsel did, in fact, urge the jury to look at the evidence anew and indicated that the guilty verdict could not be determinative in deciding whether Runyon was eligible for death. TT, p. 1772. Counsel stressed to the jury that a death sentence is never required and explained that this eligibility phase was a separate proceeding. Contrary to Runyon's current claims, however, his trial counsel made a strategic decision to avoid alienating the jury by openly contesting what was otherwise very obvious and apparent in the jury's determination of guilt. Counsel Woodward indicated that the theory of defense at the eligibility phase was to avoid alienating jurors. ECF 511-6, ¶ 10. Counsel recognized that Runyon was clearly eligible for the death penalty. After arguing that the evidence did not support his convictions, Runyon's trial counsel made the strategic decision to not make the same arguments to a jury that had already rejected them in finding Runyon guilty of the murder of Cory Voss. What counsel did do was start the foundation for its penalty phase argument. By arguing that the death penalty is never

---

constitutes an argument that counsel was ineffective, it fails because conclusory allegations without more do not warrant habeas relief. *See United States v. Dyess*, 730 F.3d 354, 359–60 (4th Cir. 2013).

39

**2523**

required, Runyon's trial counsel was later able to argue that it was not required for someone like Runyon because he was not the worst of the worst.

Furthermore, notwithstanding any argument that counsel failed to make, the evidence of substantial planning and premeditation was overwhelming. In its argument at the eligibility phase, the United States reviewed the evidence on which the jury could determine that the substantial planning aggravating factor had been proven beyond a reasonable doubt. Such planning was inherent in the jury's determination that Runyon and Draven were guilty of Conspiracy to Commit Murder for Hire Resulting in Death. This conspiracy began months prior to the actual murder; Runyon and Draven met in February and March 2007 at Parexel drug studies in Baltimore, Maryland; phone calls between Runyon, Draven and Voss occurred in March-April 2007, including an 88 minute call between Runyon and Voss; days before the murder Voss opened an LFCU bank account with a secluded drive through ATM; the murder occurred right in the middle of a Runyon drug study where he was supposed to be out of town; a list of items was seized from Runyon's residence with the address of LFCU; a week before the murder, Runyon makes plans to buy a gun from George Koski; the planned use of pay phones on the day of the murder; the six-hour drive from West Virginia to Newport News; the fact that after the murder Runyon purchased a bore brush to scope out the .357 firearm; the map of the murder location found in Runyon's vehicle; the effort to make the crime look like a random act of violence by trying to get Cory to make ATM withdrawals. TT, pgs. 1763-1767.

In addition to instructing the jury that the government had to prove each aggravating factor beyond a reasonable doubt, the Court instructed the jury with respect to the substantial planning aggravating factor as follows:

> The government has alleged that the defendant killed Cory Allen Voss after substantial planning and premeditation. Again, the government must prove these factors to your

40

**2524**

unanimous satisfaction and beyond a reasonable doubt. The words "substantial planning and premeditation" should be given their ordinary everyday meaning.

"Planning" means mentally formulating a method for doing something or achieving some end. "Premeditation" means thinking or deliberating about something and deciding whether to do it beforehand.

"Substantial planning and premeditation" means a considerable or significant amount of planning and premeditation. The fact that the killing occurred does not satisfy this requirement. However, the government need not prove that the defendant planned or deliberated for any particular period of time before killing the victim.

TT, pgs. 1787-1788.

Clearly, the evidence presented at trial overwhelmingly supported this aggravating factor. The jury found it beyond a reasonable doubt on all three counts of conviction. ECF 255. Thus, in view of the extensive amount of evidence of planning in this crime, and the standard the government had to meet, Runyon cannot show a reasonable probability that the jury's decision would have been different in the eligibility phase had his trial counsel adopted a more adversarial posture.

**Claim 5:** **Trial counsel was not ineffective for failing to raise a claim that Runyon was not competent to stand trial.**

Runyon next alleges that his trial counsel was ineffective for failing to investigate, discover, and present evidence that Runyon was incompetent to stand trial. Specifically, Runyon asserts that trial counsel should have filed a motion for a hearing to determine his mental competency, pursuant to 18 U.S.C. §4241(a). Runyon's claim fails under *Strickland v. Washington*, 466 U.S. 668 (1984) and should be denied.[5]

---

[5] Both Claims 5 and 6 relate to Runyon's mental health and what steps trial counsel took to investigate before trial and the sentencing phase. In its response to Claim 6, the United States sets forth a more comprehensive recitation of the actions taken by counsel with respect to a mental health mitigation investigation. Many of these actions also address Runyon's claim that his counsel failed in not seeking a competency evaluation.

**2525**

As stated above, to prevail on a claim of ineffective assistance, the petitioner must satisfy the two-pronged test set forth in *Strickland*. First, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Bacon v. Lee*, 225 F.3d 470, 489 (4th Cir. 2000), *cert. denied*, 532 U.S. 950 (2001) (quoting *Strickland*, 466 U.S. at 688 (1984)). Petitioner's counsel is entitled to a "strong presumption" that his or her strategy and tactics at trial fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The objectiveness of counsel's assistance should be based on his or her perspective at the time of the alleged error, under a "highly deferential" standard. *Id.*

Second, Petitioner must prove prejudice by demonstrating there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* at 694. A petitioner's failure to show either of the two prongs makes it unnecessary for the court to consider the remaining requirement. *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004), *cert. denied*, 546 U.S. 810 (2005) (citing *Williams v. Kelly*, 816 F.2d 939, 946-47 (4th Cir. 1987)).

The burden is on Petitioner to "identify acts or omissions of counsel" that are alleged to be unreasonable. *Strickland*, 466 U.S. at 690. A reviewing court must then determine whether "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland* does not require lawyers to pursue frivolous legal avenues that have no merit in order to build a record that would fend off future claims of ineffective assistance. An attorney is not required to advance frivolous claims and may in fact commit an ethical violation by doing so. *See Virginia Rules of Professional Conduct* R 3.1 (an attorney may not assert a frivolous claim or issue).

42

**2526**

None of these situations is present in the instant case. Counsel's conduct during the trial satisfied the "highly deferential" standard of attorney conduct. *Roane*, 378 F.3d at 404-05 (citing *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *Strickland*, 466 U.S. at 689).

> A.   Counsel's representation did not fall below an objective standard of reasonableness because counsel investigated petitioner's mental status.

In *Wood v. Zahradnick*, the court stated that "counsel has an affirmative obligation to make further inquiry" where she has facts known and available that raise a reasonable doubt as to a defendant's mental condition. 430 F. Supp. 107, 111 (E.D. Va. 1977), *aff'd* 578 F.2d 980 (4th Cir. 1978). In that case, where a man raped and robbed a 67-year old woman for no apparent reason, the "crime itself was of such a bizarre nature as to call into question the petitioner's mental condition." *Id.* Defense counsel did not even take the first step of requesting a mental examination. *Id.* at 112. Thus, the court indicated that counsel's assistance was not "vigorous" enough. *Id.* Similarly, in *Becton v. Barnett*, the court stated that "a lawyer is not entitled to rely on his own belief about a defendant's mental condition, but instead must make a reasonable investigation." 920 F.2d 1190, 1193 (4th Cir. 1990). In that case, the defendant also committed a bizarre and senseless crime, but the record was "devoid of any investigation" into defendant's mental health. *Id.* Thus, the court concluded that counsel did not make a reasonable investigation. *See id.*

By extension, no finding of ineffectiveness will lie for failing to challenge a defendant's competence, if the record does not show that a reasonable attorney would have been on notice of a need to assess competence. *See Foster v. Ward*, 182 F.3d 1177, 1186 (10th Cir. 1999); *United States v. Rivas*, 862 F. Supp. 208, 212 (N.D. Ill. 1994). Here, Runyon's crime was not so bizarre as to immediately put counsel on notice that the defendant's mental condition was questionable. *See Wood*, 420 F. Supp at 111. Prior to trial, no mental health professional that evaluated

**2527**

Runyon raised an issue as to his competence. Furthermore, Runyon had regularly participated in drug studies, the records of which were made available to counsel in discovery. The various medical screenings Runyon underwent in connection with these studies suggested no issues with regard to his competence. *See infra* Response to Claim 6.

Nevertheless, Runyon's counsel did make a full examination for any identifiable mental health issues. Attorney Hudgins looked for "an injury in Runyon's past that affected his reasoning ability." Pet. Ex. 5, ¶ 5. He also filed preliminary reports from Dr. Merikangas and Dr. Mirsky with the court. Pet. Ex. 5, ¶ 6. He even removed a mental health expert because he did not believe that that expert's opinions were favorable to the defense. Pet. Ex. 5, ¶ 4. Attorney Woodward recalled efforts to seek Runyon's military medical records and evidence of a serious car accident, but recalls that they could not verify that the car accident happened either through files or from speaking with Runyon's family. Pet. Ex. 6, ¶ 5. He also recalled that the defense "retained mental health experts to replace Dr. Nelson" and that "[t]hese experts evaluated Mr. Runyon." Pet. Ex. 6, ¶ 13. Unlike counsel in *Wood* and *Becton*, Mr. Woodward and Mr. Hudgins reasonably investigated Runyon's mental health.

The fact that counsel chose not to file a motion for a hearing to determine Runyon's mental competency is not *per se* evidence that they acted unreasonably, where the record shows that they reasonably investigated and considered the possibility that the defendant might have mental health issues, and there was nothing demonstrating that Runyon did not understand the charges against him or that he was unable to assist in his defense. Runyon fails to present any evidence that trial counsels' representation fell outside of the wide range of reasonable professional assistance. Counsel was not required to advance claims that they believed were frivolous. Additionally, as set forth below in response to Claim 6, the information available to

**2528**

counsel indicated that Runyon possessed above average intelligence and had no indication of mental illness.

B. Runyon provides no evidence that there is reasonable probability that, but for a lack of a 18 u.s.c. § 4241 hearing, the trial result would be different.

In *Becton*, the court ruled that the defendant was probably prejudiced, in part because the record showed that "counsel put forth no evidence at all in Becton's behalf." *Becton*, 920 F.2d at 1194. The court lamented that, "[h]ad counsel investigated Becton's mental capacity, he . . . may have been able to prove that Becton was not competent to stand trial." *Id.* In *Mann v. United States*, 66 F.Supp.3d 728, 739 (E.D. Va. 2014), the court ruled that, given "numerous indicators of petitioner's competence," the petitioner could not "demonstrate a reasonable probability that he would have been declared incompetent to stand trial had Counsel moved for a hearing pursuant to 18 U.S.C. § 4241 to determine petitioner's competence . . ." In that case, some indicators that the petitioner was competent included that "petitioner's crime was not bizarre . . . petitioner [did] [not] exhibit withdrawal symptoms . . . or unresponsiveness to Counsel's questions in the preparation of his case." *Id.* at 738.

In the instant case, Runyon's contracted murder of Cory Voss for expected payment, although cruel and calculating, could hardly be classified as bizarre. It was driven by greed on the part of Runyon and planned to appear as a random act of violence with no physical evidence left behind. Runyon provides no evidence that he exhibited withdrawal symptoms throughout the trial, nor does he provide evidence that he was unresponsive to Counsel's questions. Runyon relies on his disordered thoughts and "somewhat grandiose" statements as the only evidence that the Court would rule that he was unfit to stand trial. *See* ECF 511, at 38–39. But neither the declarations from his counsel, the various statements and testimony from friends and family that averred to his intelligence, nor Court's own interactions with Runyon support any indication that

**2529**

a competency exam was required. Runyon had a history of attending various institutions, completing assignments in the military and had worked in various law enforcement capacities — in none of these settings, the records of which were fully available, was any issue raised as to his competency. In fact, as set forth below in response to Claim 6, Runyon was found by all who examined him to be an individual of above average intelligence with a high verbal IQ.

Runyon references *United States v. White* and *United States v. Culp* as examples of cases where delusional and grandiose thinking were grounds to find a defendant incompetent. ECF 511, at 40. A closer look at these cases, however, shows that the proof of incompetence is not comparable to the proof of alleged incompetence in the present case. In *White*, the defendant's doctors found her not competent to stand trial in their preliminary psychological evaluations. *United States v. White*, 620 F.3d 401, 405 (4th Cir. 2010). In the present case, there is no evidence that any of the doctors, either on the side of the defense or the prosecution, stated that Runyon was not competent to stand trial in any of what appears to be numerous evaluations. Additionally, in *White*, the defendant believed that she had cured AIDS and breast cancer. *Id.* at 406. This clear delusion seems far more clearly indicative of a mental health issue than Runyon's mere comparisons of himself to great historical figures. Similarly, in *Culp*, the defendant was diagnosed with paranoid schizophrenia and an independent psychiatrist appointed by the court stated that "he became very psychotic without medication." *United States v. Culp*, 1991 U.S. App. LEXIS 5715 at *3 (4th Cir. N.C. Apr. 9, 1991). The fact that Petitioner might "suffer from delusions" or "grandiose wishful thinking" does not equate him to a paranoid schizophrenic.

Lastly, Petitioner also relies on the standard in *Dusky v. United States* as evidence that he would have been deemed incompetent to stand trial. *See* ECF 511, at 40. The Fourth Circuit has

46

**2530**

ruled, however, that "reliance on *Dusky* is misplaced in the context of an ineffective assistance of counsel case." *Becton*, 920 F.2d at 1193. Petitioner has failed to provide any evidence that a reasonable probability exists that the outcome of his case would have been different but for counsel's alleged unreasonably ineffective assistance.

Furthermore, as more fully discussed below, the evidence available at the time of trial precludes Runyon from establishing that he was prejudiced by his attorneys' failure to challenge his competence. Given Runyon's demeanor and ability to effectively assist his lawyers with such matters as composing examination and choosing witnesses, he cannot show that he "was unable to consult with trial counsel with a reasonable degree of rational understanding or that he lacked a rational and factual comprehension of the proceedings." *Walker v. Gibson*, 228 F.3d 1217, 1231 (10th Cir. 2000) (internal quotes omitted), *abrogated on other grounds in Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001). Because Runyon cannot show any reasonable likelihood that the outcome of his trial was affected by his attorneys' omission of any challenge to his competence, he cannot show prejudicial ineffectiveness. *Id.* In short, Runyon's claim fails both prongs of *Strickland* and should be denied.

**Claim 6:**     **Trial counsel was not ineffective in failing to investigate and present mental health mitigation evidence.**

In this claim, Runyon primarily contends that his trial counsel provided ineffective assistance in the penalty phase of his sentencing by: (1) failing to subject the prosecution's case to adversarial testing when evidence was not presented to counter the aggravating factors; and (2) failing to offer evidence of traumatic brain damage and mental illness.[6] He claims that his counsel's inadequacy had a pervasive effect because counsel also failed to challenge the application of the death penalty and failed to ensure Runyon's competence at trial—challenges

---

[6] Other than grammatical, sentence structure and word choice edits, this claim remains unchanged from the original § 2255 motion.

he raises in Claims 13, 14 and 5. In making this claim, Runyon faults his trial counsel for not pursuing a strategy largely based on mental health related or psychosocial evidence that would have been duplicative of evidence already presented at sentencing, or was uncovered after his sentencing and of undetermined weight and admissibility at the penalty phase. There is no objective evidence, however, that this proposed strategy offered any greater promise than defense counsel's chosen course at Runyon's sentencing.

In this case, trial counsel's mitigation strategy at sentencing focused on: (1) the conspirators (Voss and Draven) that were equally culpable in the offense, but were not subject to the death penalty; (2) that Runyon had done decent things in his past and was of good character such that he was not the "worst of the worst;" and (3) that Runyon would not be a risk of future violence in prison. The jury accepted the first two approaches, but rejected the third, in part, based on the paucity of information offered by the testifying deputies contrasted with the evidence of a jail assault orchestrated by Runyon and also based on a complete rejection of Dr. Cunningham's testimony (upon whom Runyon now relies heavily). Defense counsel's approach led to most or all of the jury finding eight of the thirteen mitigating factors proffered and offering three of their own additional mitigators. The mental health evidence proffered in the Petition was either considered by counsel or not available at the time of the sentencing hearing. Moreover, the information that *was* available indicated that Runyon did not suffer from any mental health issues that would have been of useful mitigation value when balanced against his counsel's chosen strategy at the sentencing hearing.

The fact that defense counsel did not prevail in avoiding a death sentence does not transform its chosen mitigation strategy into ineffective assistance. *See Strickland*, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction

**2532**

or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."); *Lovitt v. True*, 403 F.3d 171, 179 (4th Cir. 2005) (noting that, to pursue a particular theory at sentencing, though it may ultimately fail, often "reflects not incompetence, but rather a sound strategic choice.") For the following reasons, Runyon cannot meet his burden on either prong of the *Strickland* test.

## I. Legal Standards

This claim is governed by the highly deferential standard announced in *Strickland v. Washington*. As stated above, Runyon must demonstrate that his trial counsel performed deficiently and that he suffered prejudice as a result of counsel's alleged error. In evaluating an ineffective assistance claim, particularly this claim, this Court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. In doing so, *Strickland* requires reviewing courts to be "highly deferential" to attorneys' strategic choices to avoid the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* 688-89; *see also Lovitt*, 403 F.3d at 179 (4th Cir. 2005) ("In many cases, counsel's decision not to pursue a particular approach at sentencing reflects not incompetence, but rather a sound strategic choice.")

"*Strickland* does not require defense counsel 'to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.'" *Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2008) (quoting *Wiggins v. Smith*, 539

49

**2533**

U.S. 510, 533 (2003)).   Counsel has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see Wiggins*, 539 U.S. at 533.   Even when the record fails to explain all of trial counsels' decision making, Runyon "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Bell v. Cone*, 535 U.S. 685, 698 (2002)

Runyon's counsel, of course, had a duty to conduct a reasonable investigation. *Strickland*, 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. A showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987).   "A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998) (citing *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)). The duty to investigate depends upon the facts known to the attorney. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); *see Hedrick v. True*, 443 F.3d 342, 350 (4th Cir. 2006). The reasonableness of the investigation is determined by the information conveyed to counsel by his client, as well as other information in his possession, recognizing "the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Chandler v. United States*, 218 F.3d 1305, 1318 & n.22 (11th Cir. 2000) (internal quotation omitted).   Where counsel did not know of facts that would alert him to the need to conduct a particular investigation, a failure to

2534

investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003); *see Bacon v. Lee*, 224 F.3d 470, 481 (4th Cir. 2000).

"Counsel's 'strategic choices made after thorough investigation . . . are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Gray*, 529 F.3d at 229 (quoting *Strickland*, 466 U.S. at 690-91). Investigations into mitigating evidence should involve efforts to "discover all reasonably available mitigating evidence." *Wiggins*, 539. U.S. at 524.

In this case, as will be recounted herein, counsel did just that—employing mental health experts, attempting to find records, obtaining additional tests. Clearly, counsel considered and made all reasonably available inquiry into Runyon's mental health condition. Contrary to other reported cases where counsel ignored red flags and failed to investigate mental health evidence (*Gray*, 529 F.3d at 229; *Rompilla v. Beard*, 545 U.S. 374 (2005)) counsel actively investigated an area of mitigation that did not result in any significant evidence of mental impairment.

Additionally, "[n]o *per se* rule requires the presentment of such evidence at trial. In fact, there are many strategically valid reasons why defense counsel may decide not to offer mental health mitigation testimony: it may not be persuasive; it may appear to be a "flight into theory" without proper grounding in the facts of the case." *Meyer v. Branker*, 506 F.3d 358, 372 (4th Cir. 2007) ("No *per se* rule requires the presentment of [mental health mitigation] evidence at trial.").

In terms of *Strickland's* second prong, Runyon must show a reasonable probability that counsel's deficient performance prejudiced the outcome of the case. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."

**2535**

*Id.* In a case involving failure to investigate mitigation evidence, prejudice occurs when "the likelihood of a different result if the [missing] evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (quoting *Strickland*, 466 U.S. at 694).

    II.    <u>Trial counsel was not ineffective for failing to investigate mental health.</u>

    A.    <u>Trial counsel conducted a thorough mental health investigation.</u>

Runyon claims that attorney Stephen Hudgins appeared too late in the case to effectively investigate mitigation and also claims that Hudgins abandoned the investigation following the guilt phase. The record belies these claims. Hudgins was not starting a mitigation investigation anew. He was building upon the substantial work done by attorney Babineau, as recognized by the Court in its orders related to the requests for a continuance. Hudgins effectively built on this work, finding new experts, arranging for Runyon to be examined, and continuing to try and find medical records in advance of the sentencing phase. This effort continued beyond the guilt and eligibility phases through to the penalty phase.

The record, including the exhibits presented by Runyon in the Petition, reveals that counsel took reasonable steps to investigate and discover evidence regarding Runyon's mental health condition. There were no signs from Runyon that would have alerted his counsel at the time of sentencing to a contrast with the various expert reports that he had no mental disease. Trial counsel cannot be held accountable for relying on experts after providing them sufficient evidence. *See Bell v. Thompson*, 545 U.S. 794, 810 (2005). Thus, "[t]his is not a case in which the defendants attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have

**2536**

obtained[.]" *Van Hook*, 558 U.S. 4, 11 (2009). As set forth herein, the information at hand at the time of the sentencing hearing did not reveal of mitigation defense based on mental health.

The procedural record of the case reveals the various documented steps that counsel took to examine Runyon's mental health. Shortly after the indictment of Runyon, the government filed a motion regarding mental health evidence, to which Runyon responded. ECF 46, 52. This motion came for a hearing before the court on May 30, 2008. Thereafter, on June 16, 2008, the Court entered orders, agreed to by counsel for all three defendants, setting forth a comprehensive scheme for mental health testing and the notice to be provided by the parties. ECF 66, 67.

The order required the defendants to provide written notice not later than 90 days prior to the commencement of jury selection that a particular defendant intended to introduce expert mental health evidence at the penalty phase. The order also indicated that a defendant's failure to provide the required notice could result in the forfeiture of the right to present mental health testimony at trial.

On December 12, 2008, approximately three months prior to the initial trial date of March 13, 2009, and prior to the substitution of attorney Hudgins for attorney Babineau, Runyon filed the required notice and indicated that two mental health experts, Dr. Evan Nelson, a licensed clinical psychologist and Dr. Mark Cunningham, also a licensed clinical psychologist, might be used by the defense at trial. ECF 135. In this December 12, 2008 notice, Runyon also referred to an unnamed neuropsychologist for which Runyon sought Court approval. No mention was made of the need for a psychiatrist or a neurologist. It is apparent that Dr. Nelson did examine Runyon and the result was not favorable, however, no report was ever provided and no indication was made as to the length or number of sessions Runyon had with him.

Based on Runyon's notice, the United States retained its own mental health experts and proceeded to have these experts examine Runyon in February 2009. All of Runyon's background materials in the possession of the government, relating to Runyon's employment and education, were also provided to the government's experts. The reports of these examinations were then filed, under seal, with the Court prior to jury selection in accordance with the June 13, 2008 order. The government also caused the raw data from the examinations of its experts to be sent to Runyon's then designated experts.

On February 13, 2009, following a motion into a potential conflict of interest, attorney Babineau withdrew from the case. ECF 151, 154 and 155. On February 20, 2009, the Court appointed attorney Hudgins as Runyon's second attorney. ECF 161. Runyon moved to continue the trial date and, on March 13, 2009, the Court held a hearing on this motion. In the course of that hearing, attorney Lawrence Woodward represented that "Mr. Hudgins has been working assiduously going through the file with me and has met with the client since he got appointed," but that additional time was needed so he could get fully prepared. Mot. Hearing Tr., p. 7. All counsel had initially agreed on a trial date in September 2009. Though Woodward expressed concern about moving the date to June 2009, in part due to Hudgins' recent entry, the Court reviewed that Babineau had spent extensive time with the case prior to his withdrawal. Hudgins did indicate that he wanted to be sure he had adequate time to be prepared. The Court took counsels' views into consideration and set the trial date for June 30, 2009.

On April 8, 2009, Runyon filed a notice for additional mental health experts— neuropsychologist, Dr. Scott Bender, and a psychiatrist, Dr. Seymour Halleck. ECF 177. Runyon claimed that Dr. Bender would do psychological testing on the defendant, if deemed appropriate, once medical records of Runyon and his family were received for the time that

Runyon was in the Army and he and his mother were Army dependents. The notice further advised that Dr. Halleck would review the defendant's medical records and conduct an interview of the defendant. This notice for Dr. Halleck was the first indication that the defendant intended to utilize a psychiatrist. Thus, after being appointed to the case for just six weeks, Hudgins had taken steps to preserve and investigate a possible mental health defense.

Thereafter, on April 13, 2009, Runyon filed a motion to continue the trial date. ECF No. 179. In a 17-page pleading, attorney Hudgins addressed various issues related to the capital investigation. Defense counsel was clearly aware of his duty to conduct a thorough investigation. Hudgins requested a six-month extension to complete the investigation. Hudgins also explained various issues with the mitigation investigation, revealing certain challenges, but also Hudgins' familiarity with the progress to date. Hudgins expressed concern over the lack of medical records for Runyon and his mother. ECF 179, p. 12.

In its response to the motion to continue, the government noted that it had provided voluminous background materials to Runyon's counsel, including school, employment and military records. ECF 181. The pre-indictment investigation conducted by the government did not reveal a background of abuse or hospitalization of the defendant, which appeared to serve as the justification for obtaining certain types of records. *Id.*

On May 7, 2009, the Court denied the motion to continue. ECF 194. The Court recognized that arguments in favor of a continuance focused on the penalty phase, not the guilt/innocence phase. The Court noted that previous counsel, attorney Babineau, had been paid "for considerable legal services, in addition to significant payments having been made for various investigative and expert services on behalf of Runyon relating to the penalty phases of the proceedings." ECF 194, at note 4, 5. The Court found the request of an additional six

months to be unsupported by the record of legal and investigative services claimed to have been rendered and reimbursed after Court review. The Court denied the motion to continue, but indicated it would consider whether to continue any penalty phase hearings following the conclusion of the guilt/innocence phase.

On June 8, 2009, Runyon filed an *ex parte* Supplemental Motion for Psychiatrist and to Change the Designation of the Neuropsychologist Expert Previously approved by the Court. ECF 204. The motion referenced continuing difficulty in obtaining medical records from the military. The record is clear that counsel continuously attempted to obtain these records. Even without the benefit of these records, and considering the nearness of the trial date, counsel took the effort to obtain additional mental health experts.

On June 29, 2009, one day prior to the start of jury selection, Runyon filed another notice for two replacement experts—Dr. Allan Mirsky, a neuropsychologist, and Dr. James Merikangas, a psychiatrist. ECF 230. Runyon again claimed that both doctors would do testing and interviews of the defendant based upon the receipt of medical records. The government understood that Dr. Mirsky was intended to substitute for Dr. Bender and that Dr. Merikangas was intended to substitute for Dr. Halleck. On June 29 and 30, the government filed, under seal, the reports of its own retained experts—Dr. Raymond Patterson and Dr. Paul Montalbano. ECF 276, 277.

On July 17, 2009, following the close of evidence in the guilt/innocence phase, Runyon filed a Supplemental Motion to Continue Capital Sentencing Hearing, as well as sealed exhibits in support of this motion. ECF 240, 241. Attorney Hudgins requested at least 90 additional days to prepare for any penalty phase. In support of this request, Hudgins asserted that: (1) a recent medical exam uncovered evidence suggesting the existence of a significant mental disorder that

56

**2540**

bore a potentially strong relationship to defendant's behavior; and (2) that additional medical records had to be gathered and collateral investigation of the defendant's social and family history had to conducted. Hudgins also filed a Statement of Counsel, which provided additional details as to the status of the mental health investigation. ECF 242. Specifically, the Statement of Counsel noted that Runyon had been evaluated by neuropsychologist Dr. Mirsky and that such evaluation revealed a need for neurological testing and evaluation by a neurologist. Counsel noted that Dr. Merikangas, a psychiatrist, was also a neurologist that could perform both functions. Counsel noted that needed testing could be performed immediately.

On July 17, 2009, the jury returned its verdict. In conformance with the June 13, 2008, order regarding mental health related evidence, the Court directed that Runyon confirm or disavow his intent to use mental health evidence at the penalty phase by July 20, 2009. Thereafter, expert reports would be exchanged. On July 20, 2009, the sealed reports of Drs. Mirsky and Cunningham were filed with the Court. ECF 246. Also on July 20, 2009, Runyon renewed his recently filed motion to continue the penalty phase and filed a Notice of Intent to Introduce Mental Health Testimony. ECF 247, 248. The Notice advised that Runyon would rely on testimony from Dr. Cunningham, Dr. Mirsky and possibly Dr. Merikangas. Notably, the above-referenced filings were all made *prior* to the defendant's receipt of the reports of the government's experts. The government received these reports on July 21, 2009. ECF 250. Runyon received the reports of the government's experts on July 22, 2009. ECF 252.

The reports of Drs. Montalbano and Patterson, ECF 276 and 277, are certainly relevant both to the claimed mental issues Runyon currently faces and to trial counsel's decision not to proceed with a mental health defense beyond that offered by Dr. Cunningham (which was not based on an examination of Runyon). Had Runyon opened the door to a mental health defense,

**2541**

the rebuttal mental health information offered by Drs. Montalbano and Patterson would have contrasted not only with that information, but also with other proposed mitigating factors that Runyon had offered, including that he had worked and been legally employed (Mitigator No. 2); committed acts of kindness and generosity (Mitigator No. 3); had demonstrated an ability to make a positive adjustment to incarceration, had the respect and support of correctional officers and did not present a risk of future violence (Mitigator No's. 6 – 8); served as a member of the U.S. Army and was honorably discharged (Mitigator No. 11); and took steps to further his education (Mitigator No. 12). ECF 285.

Dr. Montalbano conducted a forensic psychological evaluation of Runyon. ECF 277. His comprehensive 31 page report contained a detailed summary of records reviewed and sources of information, including consultation with Dr. Patterson and interviews and testing of Runyon for over 13 hours in February 2009. The report reviews psychosocial history, educational and occupational history, substance abuse history and medical and mental health history. The reports of prior car accidents and possible concussions are included.

Dr. Montalbano noted that Runyon displayed high average intellectual functioning and no significant evidence of any major mental disorders. Dr. Montalbano did note impairment associated with personality dysfunction and that the traits of such dysfunction predated a claimed car accident in 1996. Dr. Montalbano did discuss the reported car accident, but noted that the results of cognitive testing did not reveal significant cognitive impairment and there was no decline in general intelligence since the time of the claimed automobile accident. Intelligence testing at the time prior to trial revealed Runyon's full scale score to be in the 86th percentile, equating to a qualitative description of "high average." Of note, Runyon flatly denied any

involvement in the alleged offense to Dr. Montalbano. He disagreed with any strategy to absolve him of responsibility or culpability for his actions.

Dr. Patterson produced a similarly extensive twenty-four page report dated June 24, 2009. ECF 276. This report also summarized the various sources of information and records reviewed by Dr. Patterson, as well as summaries of the offense, Runyon's background and psychosocial history. The report contains a description and results of a February 4, 2009 psychiatric exam performed on Runyon by Dr. Patterson. Runyon did report various concussive accidents to Dr. Patterson, but denied any ongoing treatment or that he suffered from any mental illness. As with Dr. Montalbano, Runyon denied any participation in the murder of Cory Voss. Runyon, in fact, distinguished the amount of planning involved in the crime with any prior episodes of short-term memory loss that he related to his prior accident.

Dr. Patterson reported that Runyon was properly oriented and his recall and attention span, ability to abstract and perception of reality were adequate. Dr. Patterson concluded that Runyon did not suffer from any serious mental illness, mental disorder, or brain pathology and no mitigating or aggravating mental health factors existed. Dr. Patterson further opined that Runyon met the criteria for a personality disorder with narcissistic features. In terms of the self-reported history of concussions and short term memory problems, Dr. Patterson concluded that these issues did not represent serious or severe impairments suggestive of significant brain damage or dysfunction.

Both Drs. Montalbano and Patterson noted that Runyon had a history of not taking responsibility for his mistakes or misbehavior and that features of externalizing responsibilities are characteristic of narcissistic disorders. Runyon also displayed a sense of entitlement and deserving of special consideration, related to his sense of honor.

**2543**

In terms of defense expert reports released at this time, Dr. Cunningham's report, dated February 5, 2009, was directed toward a capital violence risk assessment for Runyon. ECF 246. Dr. Cunningham opined that capital juries are prone to make inferences regarding future violence risk based on "perceived remorse" and "perceived personality pathology." Thus, testimony from two government experts that Runyon failed to accept responsibility for his actions and had a personality disorder could very well have conflicted with Dr. Cunningham's conclusion that Runyon presented a very low risk of future violence.

Runyon's additional experts were not definite or consistent in determining that a mental health issue existed prior to sentencing. Their reports were preliminary in nature and expressed a reliance on forthcoming brain testing, which would reveal no abnormalities. Dr. Mirsky's June 26, 2009, six-page report revealed that a neuropsychological evaluation was performed on June 26, 2009. ECF 246. The report contained information concerning alleged incidents of close proximity grenade detonations and car accidents in 1990 and 1996. Dr. Mirsky's report indicated that Runyon had superior cognitive skills and otherwise normal performance and the majority of tests administered by Dr. Mirsky noted normal to exceptional performance by Runyon. Dr. Mirsky did note certain scores consistent with what he termed mild, diffuse brain damage—linked to problems persisting in attention demanding activity for sustained intervals. Such results did not occur in the post-sentencing testing done by Dr. Mirsky. *See* ECF 511–35.

On July 2, 2009, Dr. Mirsky sent Hudgins a letter indicating that Runyon needed to be evaluated by a neurologist. ECF 511–20. Hudgins arranged for that to be done through Dr. Merikangas. On July 22, 2009, the eligibility phase commenced and the jury determined that the defendant was eligible for consideration of the death penalty. ECF 255. Also on July 22, 2009, the Court issued an order granting the defendant's motion to continue the penalty phase for

**2544**

approximately one month, until August 19, 2009. ECF 254. The Court also authorized the appointment of Dr. Merikangas and it was understood that Dr. Merikangas could start the evaluation immediately. TT, p. 1800. Additional deadlines were established for the receipt of Dr. Merikangas' report and any response or rebuttal by the United States. TT, p. 1801.

On the same day as the verdict in the eligibility phase was returned, attorney Hudgins sent an email to Dr. Mirsky regarding the schedule of the next phase of the sentencing proceedings. ECF 511–21. Dr. Mirsky responded to Hudgins, reiterating the information in his prior report and claiming that "because he suffered the blast injuries while in the ROTC, he can be considered a wounded warrier [sic], and this should be considered in his sentencing." Id.

On August 6, 2009, the United States was provided with a page and a half report by Dr. Merikangas, who conducted a neurological and psychiatric evaluation of the defendant. ECF 263. Although Dr. Merikangas did indicate that he was awaiting results of an MRI and a PET scan, he opined that his psychiatric evaluation suggested that the defendant was suffering from the effects of, or withdrawal from experimental drugs and that the defendant is either in a fantasy world of "grandiose wishful thinking, or suffering from delusions." No discussion of the psychiatric evaluation was provided and there was no basis provided for this opinion reached by Dr. Merikangas, who had been appointed as both a neurologist and a psychiatrist. Counsel for the United States made repeated inquiries for any underlying data that would support this psychiatric conclusion and received none. ECF 273. Dr. Merikangas indicated that a full report would follow results of brain imaging, however, the United States never received any such report. In conclusive fashion, Dr. Merikangas stated that Runyon "clearly has impaired executive functioning suggestive of frontal lobe brain impairment." Similarly, Dr. Mirsky, in his report received by the United States after the conclusion of the guilt phase, indicated that he awaited

**2545**

not only neurological test results, but the results of psychological tests administered by Dr. Montalbano, the psychologist retained by the United States. These results were provided to Dr. Mirsky prior to August 6, 2009; however, Dr. Mirsky did not supplement his report by that date.[7]

On August 10, 2009, Runyon filed a Motion to Allow Defendant to Supplement his Mental Health Reports. ECF 269. Defendant contended that both Drs. Merikangas and Mirsky noted "deficiencies in defendant's psychological testing and history of injuries which could have caused brain injury account for these deficiencies." ECF 269, ¶ 1. Also on August 10, 2009, Runyon filed a motion to take the testimony of Dr. Cunningham out of order. ECF 270. The Court granted this motion on August 13, 2009. ECF 272. On August 14, 2009, Runyon filed a motion to release the test results of the MRI and PET scan directly to counsel so that providing these materials to the defense expert could be expedited. ECF. 274. This motion was granted the same day. ECF 275. On August 17, 2009, the Court issued a sealed order on Runyon's motion to supplement his mental health reports. ECF 278.

The parties also litigated the issue of the scope of Dr. Cunningham's testimony prior to the onset of the penalty phase. ECF 267, 283. This litigation resulted in rulings from the Court that limited the scope of Dr. Cunningham's testimony. TT, pgs. 2076 – 2083. Dr. Cunningham testified on behalf of Runyon as a board certified clinical and forensic psychologist. His testimony took a number of hours and spanned over 100 pages of transcript. TT, pgs. 2084 – 2192.

One of counsel's chosen mitigation strategies, shown through the testimony of Dr. Cunningham and that of various deputies at the Portsmouth City Jail where Runyon was housed

---

[7] It was clear that both Drs. Mirsky and Merikangas awaited the results of neurological testing before finalizing their reports. The results of this testing, accomplished before the sentencing proceeding, revealed no abnormalities in the brain scans. Pet. Br. at Ex. 22. Counsel cannot be faulted for not investigating further once these normal results were obtained.

**2546**

prior to trial, was to put forward positive prisoner evidence, i.e., that Runyon would be a low risk of violence were he to receive a sentence of life imprisonment. Dr. Cunningham based this on the defendant's age, educational background (indicating that inmates who have at least a GED have better adjustments in prison, TT, p. 2132, and work history (gainful employment have a positive nonviolent adjustment). *Id.* at 2134. Dr. Cunningham ultimately testified that the Runyon had a very low risk or serious violence in prison. *Id.* at 2158. Dr. Cunningham did not testify as to his review of any mental health reports that had been done by other experts.

### B. Trial counsel presented a mitigation case that countered the aggravating factors and did not include mental health mitigation of dubious value.

Beyond the record establishing the investigative efforts counsel took and what related reports and evidence counsel had at the time of the sentencing hearing, the declarations submitted by Runyon's trial counsel affirm that an adequate mental health investigation was performed, as well as counsel's chosen mitigation strategy. In his attached declaration to Runyon's Petition, attorney Hudgins claims that Runyon's thinking was very rigid—he adamantly asserted his innocence and would not plead guilty. ECF 511–5, at ¶ 3. Hudgins recounted that Dr. Evan Nelson had been hired prior to his appointment. Dr. Nelson's opinions were not favorable to the defense and Hudgins decided a different expert was needed. *Id.* at ¶ 4. Hudgins thereafter obtained Drs. Merikangas and Mirsky. *Id.* Hudgins further recounts that he was looking for an injury in Runyon's past that affected his reasoning ability. *Id.* at ¶ 5. Although Hudgins attempted to obtain medical reports documenting the claimed injuries, he was apparently not able to obtain such records. *Id.* Hudgins' declaration further reveals that he worked with the mental health evidence in the interim between the eligibility and penalty phases

63

**2547**

and filed preliminary reports of Dr. Merikangas and Dr. Mirsky. Dr. Merikangas requested brain scans and the record is clear that Hudgins obtained such scans. *Id.* at ¶ 6.[8]

In his declaration, attorney Woodward also confirmed that Runyon would not agree to plead guilty. ECF 511–6, at ¶ 3. Woodward indicated that the claimed car accident could not be verified and that Runyon's family did not know anything about it. *Id.* at ¶ 5. Additionally, military medical records were sought in the pretrial investigation. *Id.* Woodward also attested that prior attorney Babineau indicated that Dr. Nelson's report was not helpful and that the defense team decided not to use him. *Id.* at ¶ 6. Woodward also recalled that Drs. Patterson and Montalbano expressed the strong opinions that Runyon did not have any mental or emotional issues that would be mitigating. *Id.* at ¶ 12. Woodward indicated that the defense did retain mental health experts to replace Dr. Nelson and these experts evaluated Runyon. *Id.*

Woodward's view was that the strongest arguments at closing were that it was not fair for Runyon to be sentenced to death when two equally culpable co-defendants were receiving life sentences and that family sympathy weighed in Runyon's favor. *Id.* at ¶ 13.[9] These two approaches, when combined with positive prisoner evidence that required the jury to find that Runyon would not be violent in prison, were the three-legged mitigation strategy chosen by Runyon's trial counsel for the penalty phase. This was certainly reasonable in view of the lack of indication that Runyon was suffering from any mitigating mental illness. Woodward and Hudgins were faced with three unfavorable expert reports—one performed by Dr. Nelson, a defense expert. The report of Dr. Cunningham was based on factors that did not relate to mental

---

[8] Although Hudgins indicates that he does not recall the results of such scans, the correspondence between Hudgins and Dr. Mirksy post-sentencing indicates that the scans revealed no abnormalities. (ECF 511–22).

[9] Significantly, Woodward (and presumably Hudgins as well) were not advised as to the nature of the claims prior to making their declarations. (ECF 511–6, at ¶ 17). Thus, neither counsel was permitted to fully explain the mental health investigative steps taken or their chosen mitigation strategy in the view of the counterveiling reports from various experts.

64

**2548**

health and may have been adversely impacted by its inclusion. The reports of the other two experts were not consistent or complete and relied on pending brain scans that were read as normal. Pet. Ex. 22. Finally, the accidents claimed by Runyon as a basis for his head trauma could not be verified by family members or any medical records. Thus, counsel had no basis for undertake additional investigation. *See Bacon*, 224 F.3d at 481.

Investigator Shelia Cronin's observations of Runyon that he "often compared himself to great figures in history" and that he repeatedly "talked about how many lives he had saved" were consistent with the narcissistic personality features described by Drs. Patterson and Montalbano, which counsel certainly could have considered to be an untenable defense. ECF 511-4, at ¶ 7. Cronin also agreed that she did not obtain medical records from the civilian hospital where Runyon was treated after his auto accident. *Id.* at ¶ 10. Cronin did obtain Runyon's military medical records, although no timing is provided. *Id.*

In addition to the declarations of Woodward, Hudgins and Cronin, Runyon also offers the February 10, 2009, letter from attorney Babineau to the United States, requesting that the notice of intent to seek the death penalty be withdrawn. ECF 511-15. Counsel reveals that Runyon was evaluated by a forensic psychologist and that "he was raised in an atmosphere of physical violence and emotional oppression, resulting in an adult individual who lacks the tools necessary to navigate society successfully." ECF 511-2, p. 2. Thus, these developmental factors were both known and put forward by counsel for Runyon. Although attorney Babineau was involved in the mitigation investigation for over a year prior to his substitution, no declaration was submitted from him. Thus, Runyon presents a somewhat incomplete picture of the efforts taken by his counsel. He cannot rely upon an incomplete picture in claiming that counsel's performance was similarly incomplete. That Runyon's counsel chose a strategy based on

different factors than currently highlighted by Runyon does not establish that counsel failed to consider such factors or that such factors would have resulted in a different outcome. "Counsel's 'strategic choices made after thorough investigation . . . are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Gray*, 529 F.3d at 229 (quoting *Strickland*, 466 U.S. at 690-91).

In view of this available information, counsel elected to pursue a mitigation strategy based not on dubious mental health information, but on the positive aspects of Runyon's character. Most of the mitigating factors focused on Runyon's work and educational history, his positive relationships with his parents and children. To this end, the mitigators proposed by Runyon were designed to address certain aggravating factors that had been put forward by the government.

For example, Runyon addressed the aggravating factor relating to his military and law enforcement service by showing his accomplishments in those fields and submitting mitigating factors based on his military service and education, which the jury found had been established. ECF 291, p. 4. Runyon called William Banks and Larry Eaglebear to testify as to Runyon's military background. TT, pgs. 2239-2274. Defense counsel attempted to show that Runyon had performed well in the military through the earning of various awards and testimony concerning his accomplishments. *Id.* at 2247–2253. One recommendation for award, dated August 25, 1997, that followed various claimed accidents and head injuries, stated that "Private First Class Runyon performed magnificently as a parachute packer by packing over 5,000 malfunction-free personal parachutes while assigned to the parachute pack platoon. His skills and attention to detail allowed over one thousand basic, airborne, jumpmaster, pathfinder, and ranger students to

66

**2550**

safely complete their qualifying jumps." *Id*. at 2253; Defense Trial Ex. 2E, admitted August 25, 2009, (penalty phase).

Various witnesses testified along with this strategy that Runyon was a good father and did other kind and generous acts, including working with a special needs child. TT, pgs. 2267, 2281, 2320, 2490, 2512, 2516, 2521. This served to establish mitigating factors and counter the aggravating factors related to Runyon's abuse of women, his lack of remorse and even the victim impact testimony related to Cory Voss. Runyon called some eight witnesses to discuss his positive attributes. One of the last witnesses described Runyon as having the characteristics of "patience" and that "[i]t was just he was helpful. He wanted to do what he could for you. He went over and above. It was like he was living – it was like he was living his life in gratitude. He was a joy to have around. Quiet. Gentle. Fun. Generous. Kind." *Id*. at 2524. His son even authored a letter attesting to the great times he had with Runyon and asking the jury to spare his life. *Id*. at 2516. Various family witnesses also testified as to Runyon's family upbringing – including his mother, biological and adoptive fathers and his brother and former wife.

Thus, Runyon's counsel made a clear decision to present him as a family man of character in the hope that this would counter the aggravating evidence presented concerning his background. In their opening to the penalty phase, counsel highlighted Runyon's 13-year old son. *Id*. at 1817. Counsel raised the question repeatedly as to whether Runyon's background – his military experience, his regular work history, his minimal criminal history, made him the worst of the worst such that the death penalty would be appropriate. *Id*. at 1818–1820. A significant portion of the mitigation case was also spent on his positive adjustment to incarceration.

**2551**

In closing during the penalty phase, counsel for Runyon relied on the impact of the sentencing on his family and his son. *Id.* at 2640. Counsel discussed that Runyon had various friends who cared for him, that described his positive qualities, including how well he interacted with children. *Id.* at 2643–2645. Counsel for Runyon minimized problems with Runyon's employment -- the same problems they now seek to highlight -- claiming that being late to work should not result in a death sentence. *Id.* at 2650–2651. Counsel stated: "But again when you think about the magnitude of what you are being asked to do, what does that really have to do with anything, the fact that he couldn't hold a job or that would do okay in a job for a little while, and then for whatever reason, be it his own inability to focus or his family situation or his marriage, that he would lose that job? I would submit to you that that is not something that you should consider at all. That has no bearing on distinguishing a person who receives a death sentence from someone who would not." *Id.* at 2651. Their theory of defense was that Runyon was a decent person who deserved mercy, not that he killed Cory Voss because of some mental illness or that any such problems with family or problems with focus should be considered in determining whether Runyon deserved the death penalty.

III.     Runyon's counsel did not fail to locate available evidence.

Runyon claims that his counsel failed to locate or focus on a series of items that would have compelled a more in-depth mental health mitigation defense. His claim in this regard is largely predicated on information that either was presented already, or was not in the possession of counsel. Hudgins and Cronin confirmed that sought after medical records could not be obtained, despite their continuing efforts and the record confirms this fact.

There is no indication that Runyon's trial counsel failed to take efforts to obtain the medical records that could have been provided to his medical experts and the experts for the

68

**2552**

government. There are no records supporting that Runyon experienced "blast injuries" while undergoing military training as he claims. Although submitted military records reveal that Runyon reported an automobile accident in November 1996, there are no civilian medical records that reveal the extent of his injuries. No head trauma or long term effects are revealed in the military medical records. ECF 511–23. Runyon reported that army medical personnel refused to talk to him about head pain and refused to do an MRI scan. ECF 511–24. This reported accident, on which Runyon bases his claim of head trauma, was certainly known at the time of trial. Both Patterson and Montalbano found no permanent mental health effect from this accident. ECF 276, 277. Runyon does not link current lay opinion testimony to any mitigation other than the fact of the accident. Again, brain scans at the time of sentencing were read as normal. ECF 511–22.

Runyon does not address the fact that the medical records from various drug testing companies, including Kendall International, Bristol Myers-Squibb and Parexel, that were all produced in the course of discovery revealed no abnormalities. Runyon reported no history of headaches, head trauma, delusions or any symptoms of psychological or neurological distress. Entry, exit and duration exams confirmed this reporting. Runyon had done various drugs tests for a period of years so his record was more developed that that of an average defendant.

The various employment records introduced into evidence similarly did not reveal any mental health issues. Runyon's application to become a Georgia police officer included a physician's affidavit indicating he was free from physical, emotional or mental conditions. This affidavit post-dated the reported 1996 car accident. GX 320.

Runyon relies on his letters that contain grandiose claims of life saving conduct, but this

69

**2553**

information was already contained in prosecution expert reports and the claim of saving lives contributed to an impression of Runyon as suffering from a personality disorder with narcissistic features. Runyon also introduces various jail medical records, which predated the prosecution expert reports and are similarly unavailing. No mental health interventions occurred and, in fact, Runyon presented several deputies that testified on his behalf at the penalty phase as to his good behavior. ECF 511–16.

The information as to Runyon's family background that he claims was not found was contained in some form in either the prior testimony of these family members or the reports of Drs. Montalbano and Patterson. Much of the information concerning the abusive behavior of family members was already presented at trial and the jury found that Runyon had been exposed to domestic violence. ECF 291. Various witnesses did testify to Runyon experiencing family violence and such information was already presented as a mitigating factor. The jury found various mitigating factors related to the violence Runyon experienced. ECF 291. Eleven jurors found that Runyon witnessed and experienced domestic violence and parental conflict until his mother and biological father separated. Jurors added that Runyon continued to witness and experience domestic violence and parental conflict and abuse from his mother and adoptive father. Thus, the jury was presented with this information about Runyon's background.

Runyon's current attempts to add to this are cumulative. In terms of the backgrounds of individual family members, Runyon's counsel attempted to have his mother describe her background, but as this was not relevant to mitigators pertaining to Runyon, the Court rightly sustained the government's objection in this regard. TT, pgs. 2412–2413.

Runyon also concludes that if his counsel had presented expert testimony, it would have established the statutory mitigating circumstances of "impaired capacity" and "disturbance."

70

**2554**

Runyon is incorrect (1) that such mitigating circumstances would have been established and (2) that expert testimony at the time would have done so. A review of the available reports reveals expressly to the contrary—that Runyon was of above average intelligence. Moreover, such reports would have run contrary to the mitigation strategy chosen by Runyon's counsel.

The prosecution expert reports do contain repeated statements from Runyon in terms of his belief in his innocence, his views on women and various high-minded views of himself, the introduction of which certainly would have been at odds with the portrait that Runyon tried to paint through the testimony of his family and friends. Runyon was administered intelligence testing prior to joining the military and Dr. Montalbano noted no significant decline in intelligence when the pre-military scores were compared with the 2009 scores. ECF 277.

Dr. Nelson was the mental health expert that was retained to present a social history of Runyon. Specifically, the notice regarding Nelson stated "The social history will focus especially on the major influences that have shaped David Runyon's life, including factors that may have contributed to David Runyon's psycho-social development and functioning." ECF 135. By all accounts, however, the results of Dr. Nelson's review were not favorable to Runyon.

Both reports of Drs. Mirsky and Merikangas were preliminary in nature and neither expert produced any updated report until well after trial, even though the brain scans requested had been performed. Counsel for Runyon, thus, was left with the prosecution expert reports and the very brief and preliminary reports of Drs. Mirsky and Merikangas, which were not further developed even after counsel requested and obtained permission to have neurological testing done and the results released to the defense experts. As these reports hinged on brain scans that proved to be normal, Runyon's counsel cannot be faulted for not continuing to investigate a mitigation issue.

71

**2555**

In his June 2009 report, Mirsky identified no deficits in functioning that would bear on mitigation in the face of the reports that counsel had received from the other experts.  ECF 246.  Mirsky's 2009 testing noted that Runyon had a Verbal IQ of 135 (very superior); that he had superior vocabulary, very superior memory for digit strings; very good visual motor coordination; superior conceptual skill; very good understanding of concepts and social practices and good general knowledge.  The results revealed fast scores of visual-spatial tasks, a normal score on test of ability to focus and superior verbal memory subtest scores.  Although Runyon reportedly did not perform well at tests of attention or concentration or manual dexterity, there is no explanation as to how these findings were proper mitigation factors.  Similarly, there is little doubt that the jury would have given these much weight given that the jury found the defendant had purposefully planned to kill and then killed Cory Voss.  Dr. Mirsky's 2009 conclusion noted "superior to very superior cognitive skills" a "high verbal IQ", strong performances on memory and ability to focus.  Dr. Mirsky only noted that the poor scores on sustained attention and manual dexterity would indicate that Runyon was unable to persist in any attention-demanding activity for a sustained interval and may explain uneven employment work history.

The more recent reports of the experts that rely on information and affidavits not available at the time of trial do not call into question the competence of Runyon's trial counsel in declining to pursue a mental health defense based on information available at the time.

Dr. Mirsky performed a second evaluation of Runyon on August 28, 2015, some six years past his sentencing.  ECF 511–35.  Much of the information in the seven-page report is a repeat of the June 26, 2009 report.  Although brain imaging scans were done in August 2009, the 2015 report does not refer to these and it is clear these were read as normal.  ECF 511–22.  In the Continuous Performance Test, which in 2009 Dr. Mirsky previously found to be consistent with

**2556**

mild brain damage, Runyon improved to 100% correct. Despite the recorded improvements, Dr. Mirsky now adds a diagnosis of psychosis, possibly schizophrenia, to the prior diagnosis of brain damage and suggests that prior brain injuries contributed to an underlying psychotic disorder.

As discussed, evidence that Runyon was schizophrenic would have sharply contrasted with the portrait that the defense tried to portray at the sentencing hearing and on which the mitigating factors were based. If anything, Runyon appeared to improve many of his prior test scores that Dr. Mirsky found lacking and suggestive of brain disorder. These inconsistent reports over six years with varying diagnoses could have only caused the jury to doubt the legitimacy of the diagnoses. It does not appear that Dr. Mirsky administered the Purdue Pegboard test in 2015, the 2009 score on which he indicated was consistent with mild diffuse brain damage.

Dr. Merikangas provided a four-page declaration dated September 25, 2015, that claims he would have testified at trial in 2009 that Runyon was a brain damaged individual with migranious headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process. ECF 511–2. Dr. Merikangas does not reveal the basis for such opinion, particularly in contrast to his brief August 5, 2009 letter to counsel stating that Runyon was suffering from sort of delusions caused by his drug testing medication. Since that time, Dr. Merikangas reviewed additional information, including trial testimony and medical records. There is a reference to Even Nelson, Ph.D., whose notes or opinions were not provided to the government. In short, Dr. Merikangas' position has not appreciably changed since his initial report. ECF 263.

Dr. Cunningham provided an additional report as an exhibit to the Petition, now claiming that various developmental factors impacted Runyon's moral culpability. ECF 511–8. Dr. Cunningham did testify at trial and the jury rejected his testimony, finding that Runyon failed to

establish that he was not a risk of violent behavior. ECF 291. Moreover, many of the factors Dr. Cunningham now relies on—including Runyon's upbringing and family influences—were presented by family witnesses at trial. Dr. Cunningham's review of records consist of materials that were not available to Runyon's counsel at the time of his sentencing or the trial testimony transcript (in which case, the jury heard from these witnesses and were in the position as they noted, to express their own mitigators). ECF 511-8, ¶ 8.

Furthermore, Dr. Cunningham essentially attempts to usurp the function of the jury by opining that damaging or impairing factors reduced Runyon's moral culpability. But this is not the role of any expert—to opine on whether Runyon is morally culpable such that his free will was diminished. The jury already found that Runyon intentionally killed Cory Voss. The jury also made findings on mitigation related to Runyon's upbringing and the abuse he witnessed and experienced. Furthermore, Cunningham's proffered testimony that Runyon's moral culpability was lessened by developmental factors contrasts with (1) the fact that Runyon repeatedly denied any participation in the murder of Cory Voss and (2) the violence risk assessment on which Dr. Cunningham did testify.

The jury specifically found Runyon to be culpable in the manner that Dr. Cunningham resists: it found that Runyon intentionally killed Cory Allen Voss, that he did so for money, that he did so after substantial planning. This is why the jury sentenced him to death. It is difficult to imagine a murder that does not involve such a heightened degree of choice and planning. Additionally, Runyon does not establish that Cunningham's developmental report would have been admissible.

Finally, Runyon also attaches a report of a Dr. Dudley, based on an examination conducted in 2015, which indicates that Runyon had a difficult childhood and was exposed to

74

**2558**

physical abuse. ECF 511-29. Such information was presented at the sentencing phase and associated mitigators were found by the jury. ECF 291. Rather than link Runyon's purported problems to the car accident and brain damage, as did the other examining experts, Dr. Dudley links Runyon's problems to his childhood, history of family mental disorders. Dr. Dudley offers his opinion that Runyon is suffering from various ailments—PTSD, borderline personality disorder, schizoaffective disorder, bipolar type and neurocognitive disorder. ECF 511-29, p. 14. He indicates that given enough time and adequate records, these diagnoses would have been apparent prior to trial.

But other experts who had access to these same records offered different conclusions. ECF 276, 277. These diagnoses also fail to take into account that Runyon repeatedly denied any involvement in the crime so it is reasonable that his counsel would decline to offer evidence seemed designed to explain behavior that he denied committing. A jury convicted Runyon of the cold-blooded murder of Cory Allen Voss. Dr. Dudley's opinion (even if available) that Runyon suffered from a mental/emotional disturbance and his ability to conform to the requirements of the law is certainly at odds with this. These opinions were also contrary to the many character witnesses called by his counsel.

Runyon's trial counsel did not fail to find information related to his mental health or psychosocial history. To the extent it was mitigating, such information was put before the jury. But counsel made the strategic decision not to proceed with mental health evidence that could have contrasted with his chosen mitigation strategy. The evidence of personality disorder observed by Drs. Patterson and Montalbano would have been aggravating evidence against Runyon. A decision not proceed with this approach was the result of "reasonable professional judgments." *Strickland*, 466 U.S. at 691; *Wiggins*, 539 U.S. at 534.

75

**2559**

IV.   Runyon cannot establish a reasonable probability that the outcome would have been different had his counsel introduced available mental health evidence.

Finally, Runyon can establish no prejudice from the claimed errors of counsel. Each category of evidence that Runyon faults trial counsel for not adducing carries sharp aggravating factors with its mitigating thrust. Such evidence functions as a "two-edged sword." *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989); *see also Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. 2010) ("The Supreme Court has held that evidence of mental impairment can be both mitigating and aggravating[.]"). Considering this danger, even with the diagnoses proffered by Runyon, the Court must consider whether a reasonable attorney put that information before a jury. *See Harrington v. Richter*, 131 S. Ct. 770, 789 (2011) (finding no error when counsel failed to uncover evidence because it would "be reasonable to conclude that a competent attorney might elect not to use it"). Much of the evidence Runyon faults his counsel for not presenting would have been double-edged in terms of mental health and/or duplicative of that already provided by various friends and relatives. Additionally, such evidence would likely have been contrary to the various mitigators focused on Runyon having a low risk of future violence and making a positive adjustment to incarceration.

Although Runyon now submits that such mitigation would have turned the tide in his favor, he cannot discount the substantial evidence in aggravation presented as a result of this calculated and cruel crime. These aggravators revealed a calculated crime, made possible by years of law enforcement and military experience that was born out of a desire for money.

In terms of the non-statutory aggravating factors, the victim impact evidence in the form of evidence from Cory Voss' parents, siblings, children and fellow service members was powerful. Also, the fact that Runyon used the training he received as a military service member

76

**2560**

and law enforcement professional carried significant weight. His history of abuse of women and his manipulation of Virginia Pina in trying to get her to recant her allegations of abuse displayed a character inconsistent with that testified to by his friends and family. Finally, the lack of remorse demonstrated not only by his interrogation video, but by his statements to others and in the course of various emails and phone conversations revealed his culpable mental state while committing this crime. When a person kills someone coolly, calmly, and without any concern or care, this is morally aggravating and informative about the mental state at the time of crime. Runyon fails to show how the mental health evidence he has uncovered would have impacted these non-statutory aggravating factors, which the jury found beyond a reasonable doubt.

Furthermore, evidence concerning Runyon's mental health may have discounted the mitigating factors concerning Runyon's prior acts of kindness and generosity; his prior work, military and educational experience, and the impression that Cory Voss was molesting his daughter. Thus, five out of the eleven found factors could have been affected. Any such mental health evidence would have also made clear that Runyon denied any participation in the plot to kill Cory Voss. Even crediting the evidence presented now would not have mitigated his crime. Runyon relies on indications that he lacked impulse control or had PTSD stemming from various head injuries. There is no tie in to how this mitigates Runyon's participation as a contract killer that planned the execution of Cory Voss and then schemed to avoid apprehension. The behavior was criminal, not clinical.

Runyon summarily concludes that mental health mitigation made the difference between a life sentence and that imposed by the jury. There is no merit to this contention. The aggravators found by the jury related to the degree of planning and skill employed by Runyon— a documented and trained military service member, police officer and corrections employee.

**2561**

This was a planned and purposeful murder. Runyon was contacted well in advance, planned his trip, what equipment he would bring, the firearm he would use, and further planned the concealment of the evidence after the crime. Runyon had consistently denied guilt. A strategy that attempted to somehow attribute his participation in a crime he never admitted to mental health would have run the risk of further offending the jury.

Defense counsel fully and adequately investigated Runyon's mental health background and it was not error for counsel to forgo available information to this end in favor of a strategy that highlighted the positive attributes of Runyon's character. Moreover, he cannot establish a reasonable probability that had mental health evidence played a larger role at sentencing, the outcome would have been different. It is clear that the jury viewed Runyon as a calculating, remorseless killer. While the jury did find and consider certain positive attributes of Runyon's character, Runyon has not shown how a mental health defense that would have opened the door to even greater rebuttal showing him to be a more dangerous individual would have resulted in a different sentence.

**Claim 7:** **Runyon's Sixth Amendment rights were not violated by the presentation of statements from co-defendant Draven and his trial counsel did not fail to object to the admission of such statements.**

Runyon claims that his Sixth Amendment right to confront witnesses was violated when the government presented statements of co-defendant Draven in its case-in-chief.[10] As a corollary to this claim, Runyon claims that his trial counsel were ineffective in failing to object to the admission of such testimony and in failing to ask the Court for an appropriate limiting instruction. These related claims are without merit and afford Runyon no relief.

As a threshold matter, Runyon did not raise this claim in his appeal, thus, he is procedurally defaulted from doing so barring a showing of cause and prejudice, which he has not

---

[10] Runyon's claim here is unchanged from the claim filed in his original § 2255 motion.

78

**2562**

made. Moreover, as set forth below, Runyon is incorrect that his counsel failed to object to the admission of such statements, as these very statements to which he now objects were the subject of pre-trial motions raised by his trial counsel.

A.   The statements of Draven did not violate Runyon's Sixth Amendment right to confront witnesses against him.

Runyon focuses on the pre-arrest, non-custodial statements that co-defendant Draven made to law enforcement, during the course of the conspiracy that continued through the investigation of the murder of Cory Voss. The defendant claims that the introduction of such statements was in violation of *Crawford v. Washington*, 541 U.S. 36, 51 (2004). The defendant also claims that his trial counsel failed to object to such statements.

The government offered Draven's pre-arrest statements made to law enforcement during the course of the investigation into the murder of Cory Voss under two complementing theories: (1) that such statements were made prior to arrest and in furtherance of the conspiracy; and/or (2) that such statements were not offered for the truth of the matter asserted. The proof at trial established that an object of the conspiracy was for the conspirators to obtain the proceeds of the life insurance policy on Cory Voss. It was a part of the conspiracy that the defendants used various methods to conceal the conspiracy and to insure the conspiracy's continuing success including obstructing justice, creating false alibis and providing false information to law enforcement.

Prior to indictment and while the investigation was ongoing, all three defendants made statements to law enforcement officers during the course of the investigation. Draven, was interviewed three times. On two of those occasions, the interviews were non-custodial and prior to arrest. The final interview was custodial and post-arrest. The pre-arrest statements that

79

**2563**

Draven provided during the course of the investigation to law enforcement officers consisted of lies, sprinkled with some truths to try and persuasively obstruct the investigation.

In *Crawford v. Washington*, 541 U.S. 36 (2003), the Supreme Court ruled that testimonial statements of witnesses absent from trial are admissible only where the declarant is unavailable, and the defendant has had a prior opportunity to cross-examine the witness. 541 U.S. at 59. The Court also stated that co-conspirators statements made in furtherance of the conspiracy were not testimonial; "Most of the hearsay exceptions covered statements that by their nature were not testimonial- for example, business records or statements in furtherance of a conspiracy." 541 U.S. at 56. Further, the Court stated that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S. at 59 n. 9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).

Contrary to Runyon's claims then and now, the admission at trial of Draven's pre-arrest statements to law enforcement did not implicate *Bruton* or *Crawford*. These statements were made during the course of the conspiracy and were, thus, properly admissible under Rule 801 (d)(2)(E) of the Federal Rules of Evidence . *See United States v. Shores*, 33 F.3d 438 (4th Cir. 1994) ( "We have held, however, that the *Bruton* rule does not apply if the nontestifying co-defendant's statement is admissible against the defendant under the co-conspirator exception to the hearsay rule set forth in Federal Rule of Evidence 801 (d)(2)(E).") (citing *Folston V. Allsbrook*, 691 F.2d 184, 187 (4th Cir. 1982), *cert. denied*, 461 U.S. 939 (1983)); *see also Crawford*, 541 at 56 ( "Most of the hearsay exceptions covered statements that by their nature were not testimonial- for example, business records or statements in furtherance of a conspiracy.".) Accordingly, the statements made by Draven during the course of the investigation were admissible and did not implicate *Bruton* or *Crawford* as they were made for

**2564**

the purpose of accomplishing the object of the conspiracy, that is, obtaining the life insurance proceeds of Cory Voss.

Moreover, many of the statements made by all the defendants to law enforcement officers were not offered for the truth of the matter asserted, but to show defendants' efforts to mislead law enforcement and the nature of the relationships and activities of the defendants.  As such, these statements did not implicate the Confrontation Clause.  *Crawford*, 541 U.S. at 59 n. 9; *see also United States v. Williams*, 445 F.3d 724, 736 (4th Cir. 2006); *United States v. Stewart*, 433 F.3d 273,  (2d Cir. 2006); *United States v. Postal*, 589 F.2d 862, 888 (5th Cir. 1979) (finding that nonhearsay statements survive *Bruton*).

Runyon, thus, confuses statements that are excluded under *Crawford* and the *Bruton* rule with statements made by non-testifying co-conspirators in furtherance of the conspiracy, which are admissible against all conspirators under Fed. R. Evid. 801(d)(2)(E).  As Draven made these pre-arrest statements during the course and in furtherance of the conspiracy, *Bruton* is inapplicable, and the statements are fully admissible against the three defendants.  *See United States v. Brooks*, 957 F.2d 1138, 1146 (4th Cir. 1992).

Even if *Bruton* did apply to these statements, Draven's express references to Runyon in the course of the pre-arrest did not violate *Bruton* because the references could not fairly be understood to incriminate Runyon.  *See United States v. Locklear*, 24 F.3d 641, 646 (4th Cir. 1994) (observing that co-defendant's redacted statement could not fairly be understood to incriminate defendant Locklear, where in redacted statement co-defendant admitted "that he was familiar with the Locklear brothers and that he had known them all his life").  In fact, Draven was attempting to clear Runyon from suspicion the same way he was attempting to clear himself. Additionally, the fact that Draven admitted to having an affair with Voss did not directly

**2565**

incriminate Runyon and, thus, raises no confrontation problem. Runyon identifies no specific pre-arrest statements from Draven that directly incriminated him beyond the admission that Draven had an affair with Voss or that Draven spoke with Runyon at a payphone. But this latter statement by Draven was not incriminating in and of itself—it only became incriminating when linked to other evidence. *See United States v. Lighty*, 616 F.3d 321, 376 (4th Cir. 2010).

B.  Runyon's counsel did object to the admission of Draven's statements in the course of pre-trial motions.

Contrary to Runyon's claim, his trial counsel *did* object to the admission of co-defendant Draven's statements. Following the filing of a pre-trial motion objecting to the admission of the above-referenced statements, the matter was argued at a pretrial motions hearing on December 8, 2008. The pre-arrest statements of both Draven and Voss were discussed and counsel rightly conceded that *Bruton* and *Crawford* were not implicated if the pre-arrest statements at issue were made in furtherance of the conspiracy. Mot. Hearing Tr., Dec. 8, 2008, pgs. 8-9. Following such argument, the Court determined that such statements were admissible as statements in furtherance of the conspiracy. *Id.* at p. 15. The Court further indicated that it would issue a limiting instruction if such an instruction proved necessary. *Id.* at p. 16. The government agreed not to use and did not use Draven's post-arrest statements in its case-in-chief at trial.

During the course of trial, the government also filed a motion *in limine* to limit the defense from offering self-serving hearsay through the pre-arrest statements of the conspirators. ECF 238. The Court denied this motion, thus, allowing the defendants the ability to elicit any portion of the pre-arrest statements in cross examination that was to the defendant's advantage. TT, pgs. 1293-1297. Thus, Runyon was, in fact, permitted to use the pre-arrest statements to his own advantage at trial.

Prior to the testimony about Draven claiming he spoke to Runyon at a pay phone near the Waffle House, Detective Rilee testified that Runyon stated that he had visited Draven once in the spring of 2007 on his way to Florida and that they met at a Waffle House. TT, pgs. 1311, 1313. Thus, the pay phone testimony from Draven linked to the prior admission from Runyon concerning a claimed innocent purpose for the meeting while Runyon was on a fishing trip. Following this interview with Runyon, law enforcement went back to interview Draven again. Draven denied that Runyon had ever visited him in Newport News, but claimed that he met him at a Waffle House in D.C. TT, pgs. 1315-1316. After being confronted with evidence of his relationship with Cat Voss, Draven acknowledged that he did have a relationship with her. TT, p. 1320.

No prejudice accrued to Runyon from these statements as they did not directly incriminate him. The evidence of such relationship was pervasive throughout the trial and this admission in no way prejudiced Runyon any more than all of the other evidence of the affair did. When confronted with a six-minute call to the Waffle House payphone, Draven admitted that he spoke to Runyon. TT, p. 1321. Following this testimony, counsel for Draven and Runyon then elicited various denials and explanations from both Draven and Runyon. TT, pgs. 1328-1353. Specifically, counsel for Runyon elicited that in the first interview of Draven, there was no mention of Runyon. TT, p. 1341. Thus, counsel for Runyon utilized these pre-arrest statements of Draven to try and show an absence of relationship between the conspirators.

Finally, it was not an error for trial counsel to decline to request a limiting instruction that would have likely served to draw additional attention to the statements of Draven that trial counsel in fact made use of. Runyon does not offer any such suggested limiting instruction in making this claim.

C.     The testimony of Edward Fodrey did not infringe upon Runyon's Sixth Amendment rights.

Runyon also claims that trial testimony by witness Edward Fodrey, regarding statements made by Draven, infringed upon Runyon's *Bruton* rights due to Runyon's inability to cross-examine Draven concerning the statements. But Fodrey made no mention of Runyon in the course of his testimony that would arise to a Confrontation Clause violation. Fodrey testified to admissions made by Draven while the two were incarcerated at Western Tidewater Regional Jail. TT, p. 1233. Fodrey testified that Draven told him "that he hired some other guy" that was "a friend of his, and - - that he found on the internet." TT, pgs. 1236-1237. There was no indication that this "guy" or "friend" was a redacted reference to Runyon absent other linking evidence. Draven deal with various individuals on the internet and had reached out to others (including Charles Smith and Lawrence Ford) about the murder plot. In fact, Fodrey testified that Draven tried to contact a number of people through the internet. *Id.*

Thus, Even if the testimony of Fodrey contained a redacted reference to Runyon, there is no confrontation problem when a confession is redacted to eliminate any reference to the existence of the defendant, *Richardson v Marsh*, 481 U.S. 200, 211 (1987) or "if the defendant's name is replaced by a symbol or neutral pronoun." *United States v Vogt*, 910 F.2d 1184, 1191-1192 (4th Cir. 1990). The Fourth Circuit allows redacted statements that generally refer to another co-defendant through symbols or neutral pronouns or phrases such as "another person" or "another individual" which do not facially implicate the defendant. *United States v Akinkoye*, 185 F.3d192,198 (4th Cir.1999). As there was no direct reference to Runyon, no *Bruton* error occurred. *See Lighty*, 616 F.3d at 376 (indicating that if a proffered statement of one non-testifying co-defendant becomes incriminating against another by virtue of an inference from

2568

other evidence at trial, the Confrontation Clause may not be offended if those statements are redacted).

**Claim 8:** **Appellate counsel was not constitutionally ineffective for failing to raise a *Batson* challenge or Confrontation Clause challenge on direct appeal.**

Runyon contends that he received ineffective assistance of counsel during his direct appeal. Specifically, he argues that his appellate counsel (1) failed to investigate and raise a *Batson*[11] challenge (*see* Claim 16), (2) failed to raise a Confrontation Clause challenge (*see* Claim 7), and (3) failed to use a smaller font in the opening brief which purportedly would have allowed more space in which to add claims in the opening brief. *See Petitioner Brief* at 78–80. In his amended motion, Runyon adds claims of ineffective assistance of appellate counsel for claims 7, 11, 12, 13, 14, and 16.[12] These added claims are time-barred and they do not relate back to Runyon's original claim of ineffective assistance of appellate counsel. As explained below, Runyon fails to show either constitutionally deficient performance or prejudice resulting therefrom. Accordingly, he is not entitled to substantive relief or an evidentiary hearing or discovery on his claims.

A.     Legal Principles

1.     Statute of Limitations

Claims made in a § 2255 motion must be made within the one-year period required by 28 U.S.C. § 2255(f)(1) and (f)(3). Specifically, § 2255(f) provides:

The limitation period shall run from the latest of—

(1) the date on which the judgment of conviction becomes final;

---

[11] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[12] These added claims are made in a conclusory sentence without any additional argument.

(2)   the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3)   the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)   the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

The one-year limitations period began on the date the Supreme Court denied Runyon's petition for writ of certiorari. *See United States v. Segers*, 271 F.3d 181, 184 (4th Cir. 2001). The Supreme Court denied Runyon's petition for writ of certiorari on October 6, 2014. *Runyon v. United States*, No. 13–254 (Oct. 6, 2014). Runyon filed his § 2255 motion on October 5, 2015. The additional claims of ineffective assistance of appellate counsel were not included in his timely original motion. They are thus now time-barred. Runyon fails to dispute, much less argue, that his claims are not untimely.

When claims in an amended pleading are barred by the statute of limitations, Fed. R. Civ. P. 15(c) "provides for the relation back of amendments to the original pleading under certain circumstances." *United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000). Claims "relate back" when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading." Fed. R. Civ. P. 15(c)(2). Again, Runyon fails to address whether the claims of ineffective assistance of appellate counsel he raises here relate back to his contention in Claim 8.

These claims do not relate back to his claims of ineffective assistance of appellate counsel originally raised in Claim 8. In Claim 8, Runyon alleges that his appellate counsel were ineffective for failing to raise a *Batson* challenge, a Confrontation Clause claim, and for failing to use a smaller font in the appellate brief. ECF 478, pgs. 78–80. None of the added claims

86

**2570**

relate to any issue that was raised originally in Claim 8. The claims are thus newly added and cannot be deemed timely. Moreover, even if the claims were timely, for the reasons stated in the United States' response to claims 7, 11, 12, 13, 14, and 16, Runyon is not entitled to relief on the merits.

2.     Runyon is not entitled to relief on the merits.

The statute of limitation bar notwithstanding, Runyon fails to demonstrate he is entitled to relief on the merits. To show that counsel was ineffective on direct appeal, a defendant must show that counsel omitted issues that were clearly stronger than those presented. It is insufficient to show that counsel merely failed to raise a nonfrivolous issue. Counsel is more likely to be effective on appeal when he focuses on quality instead of quantity. As to prejudice, the defendant must show that there is a reasonable probability that, but for counsel's error, he would have prevailed on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285, 288 (2000); *Jones v. Barnes*, 463 U.S. 745, 753 (1983); *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008), (quoting *Strickland*, 466 U.S. at 689). In order to prevail, the defendant must show: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) he suffered actual prejudice. *Strickland*, 466 U.S. at 687. A defendant alleging ineffective assistance of counsel must satisfy both prongs of the *Strickland* test to prevail. *See United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004). Where a court finds that "the defendant makes an insufficient showing on one" of the prongs, consideration of the other is unnecessary. *Merzbacher v. Shearin*, 406 F.3d 356, 365–66 (4th Cir. 2013) (citing *Strickland*, 466 U.S. at 697).

In applying *Strickland* to claims of ineffective assistance of appellate counsel, the Fourth Circuit affords appellate counsel the "presumption that he decided which issues were most likely to afford relief on appeal." *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1989). Effective

**2571**

assistance of appellate counsel does not require the presentation of all issues on appeal that may have merit, *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000), and the court "must accord [] counsel the presumption that he decided which issues were most likely to afford relief on appeal," *id.* internal quotation marks omitted).

In *Evitts v. Lucey*, 469 U.S. 387 (1985), the Supreme Court held that due process of law requires that a defendant receive effective assistance of appellate counsel on direct appeal. Claims for ineffective assistance of appellate counsel, like those for trial counsel, are properly analyzed under the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984); *Smith v. Murray*, 477 U.S. 527, 535–36 (1986) (applying *Strickland* to claim of attorney error on appeal). The Supreme Court, however, also has held that appellate counsel has no constitutional duty to raise every nonfrivolous issue on appeal if counsel, as a matter of professional judgment, decides not to raise such issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). The *Barnes* Court determined that appellate counsel must be allowed to exercise reasonable professional judgment in selecting those issues most promising for review. *Id.* at 752-53. The *Barnes* Court specifically stated that "[a] brief that raises every colorable issue runs the risk of burying good arguments...." *Id.* The professional judgment of appellate counsel includes the determination of which colorable claims to raise—counsel is not ineffective for failing to raise every colorable claim. *Id.* at 753–54; *see also Smith v. Robbins*, 528 U.S. 259, 288 (2000) (noting difficulty of proving claim of ineffective assistance of appellate counsel). Runyon has failed to set forth any issue which if it had been appealed would have resulted in any different outcome in his case, and has therefore failed to show prejudice as required under the second prong of the *Strickland. See Griffin v. Aiken*, 775 F.2d 1226, 1235-36 (4th Cir. 1985).

**2572**

B.      Runyon cannot meet his burden under *Strickland v. Washington.*

1.      Ineffective Assistance of Counsel for failing to raise *Batson* claim (Claim 16)[13].

Runyon contends that his appellate counsel were constitutionally ineffective for failing to raise a *Batson* challenge on direct appeal. He argues that appellate counsel were ineffective for failing to obtain the court record of juror strikes and copies of questionnaires of potential jurors in order to investigate *Batson* violations. *See Petitioner Brief* at 85. Runyon cannot show there is a reasonable probability that, but for counsel's unprofessional errors, the result of his trial would have been different.

As set forth in the Government's response to Claim 16, Runyon cannot show that appellate counsel's oversight to raise this claim on appeal amounted to constitutional ineffectiveness on the part of his appellate counsel because he cannot show deficient performance or prejudice stemming from their alleged failure to press any *Batson* claim. For the reasons set forth in the Government's response to Claim 16—that the alleged *Batson* challenge lacks any merit—Runyon fails to establish that his appellate counsel's failure to raise a *Batson* claim was deficient or that he suffered actual prejudice. Runyon fails to proffer any evidence of discriminatory intent on behalf of the United States, and any Batson claim would have lacked merit. Where an objection to evidence would have been futile, counsel is not constitutionally ineffective for failing to make it. *See Harris v. United States,* 204 F.3d 681, 683 (6th Cir.2000). Failure to raise a futile constitutional challenge did not violate Runyon's Sixth Amendment right to effective assistance. *See Higgs v. United States,* 711 F. Supp. 2d 479, 506 (D. Md. 2010).

---

[13] Claim 16, the substantive *Batson* challenge, is procedurally defaulted because Runyon failed to raise the claim below or on direct appeal. The Government's position in Claim 16 is that the claim has no merit in any event.

2. <u>Ineffective Assistance of Counsel for failing to raise a Confrontation ClauseClaim</u>

Runyon contends that his appellate counsel were ineffective for failing to raise a Confrontation Clause challenge—the same challenge he raises in Claim 7 of his amended § 2255 motion. *See* ECF 511, pgs. 84–86. For the reasons stated in the Government's response to Claim 7, incorporated herein by reference, Runyon fails to show that his appellate counsel performed deficiently or that he suffered actual prejudice.

As stated in response to Claim 7, the statements made by co-defendant Draven that were admitted at trial did not implicate *Bruton* or *Crawford* and were properly admissible under Fed. R. Evid. 801(d)(2)(E). The Confrontation Clause issue Runyon alleges has no merit. As such, appellate counsel was not ineffective for failing to raise this issue on direct appeal. *See, e.g., Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome"). Runyon fails to demonstrate that he would have prevailed on this issue on direct appeal.

3. <u>Appellate counsel was not constitutionally ineffective for failing to use a different font in the opening brief on appeal.</u>

Runyon argues that his appellate counsel were ineffective for failing to switch to a 14-point Garamond font in the opening brief on appeal. He contends that use of this font would have added space for approximately seven additional pages in which appellate counsel could have used for raising additional issues. As stated above, however, the additional issues Runyon suggests have no merit, therefore the use of a different font does not demonstrate he would have prevailed on appeal. Runyon fails to show actual prejudice and is not entitled to relief.

**2574**

**Claim 9:**  **Runyon's conviction under 18 u.s.c. § 924(j) is not affected by the Supreme Court's decision in _Johnson v. United States_**

Runyon claims that in view of the Supreme Court's recent decision in _Johnson v. United States_, 135 S. Ct. 2551 (2015), that his conviction on Count Five for Murder in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(j), is unconstitutional, because the predicate convictions underlying the Section 924(j) charge are not crimes of violence. Runyon also attacks his sentence of death on Count One for Conspiracy to Commit Murder for Hire Resulting in Death, in violation of 18 U.S.C. § 1958(a), claiming that the evidence and arguments presented with respect to the Section 924(j) conviction painted an inappropriate picture of the conspiracy offense and contributed to the jury's sentencing decision on that charge. As a threshold matter, Runyon has waived and/or procedurally defaulted in raising this claim. In addition, relief here is barred under the non-retroactivity doctrine under _Teague_. Even should the Court reach this claim on its merits, however, it is clear that Runyon is entitled to no relief.

At a threshold level, this claim should be dismissed as procedurally defaulted. Runyon failed to raise this claim at any earlier stage of litigation and has failed to show "cause" and "prejudice" to excuse his default. _Frady_, 456 U.S. at 170; _Coleman v. Thompson_, 501 U.S. 722, 753 (1991). In addition, even if _Johnson_ applied here, Runyon would not be entitled to relief because his case is on collateral review. _Teague_, 489 U.S. at 310. Runyon's convictions and sentences were final as of October 6, 2014—prior to _Johnson_. Moreover, the Supreme Court recently granted certiorari review in _Welch v. United States_, 15–6418 (cert. grant Jan. 8, 2014). Runyon is not entitled to relief.

Count Five of the indictment charged Runyon with Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(j). The jury convicted the defendant of this charge and recommended the death penalty at the sentencing phase. Section 924(j) requires that

91

**2575**

the defendant cause the death of a person through the use a firearm during and in relation to a predicate crime of violence.   In this case, the predicate crimes of violence at issue were Conspiracy to Commit Murder for Hire Resulting in Death,  in violation of 18 U.S.C. § 1958(a), as charged in Count One, and Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2, as charged in Count Two.   In addition to the Section 924(j) conviction, the jury also convicted the defendant of both predicate crimes of violence.   Due to the additional element for both underlying crimes that death resulted, both predicate crimes were also eligible for the death penalty and the jury recommended the death penalty on Count One and a sentence of life imprisonment on Count Two.   18 U.S.C. §§ 1958(a), 2119.

Section 924(j) itself provides for an enhanced penalty for a violation of Section 924(c) when a defendant causes a death through the use of a firearm.  18 U.S.C. § 924(j).  If the killing is a murder, the maximum penalty is death.  Id.  Thus, to be convicted of a Section 924(j) charge, a defendant must commit a murder, using a firearm, in the course of a Section 924(c) violation.

Section 924(c)(3) defines "crime of violence" as an offense that is a felony and:

(A)    has an element the use, attempted use, or threatened use of physical force against the  person or property of another, or

(B)    that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Subsection (A) is often referred to as the "force clause;" with subsection (B) referred to as the "residual clause."   Relying on Johnson, which interpreted provisions of the similarly worded Armed Career Criminal Act (ACCA – Section 924(e)(2)(B)), Runyon first contends that the definition of "crime of violence" as contained in the residual clause is unconstitutional.  Of course, as set forth below, should the Court determine that the predicate crimes meet the crime of violence definition under the "force clause," the Court need not entertain this challenge to the

under the rubric of the residual clause. But the government submits that Johnson did not invalidate the residual clause.

I.      The Residual Clause of Section 924(c)(3)(B) survives Johnson.

Runyon contends that the residual clause cannot survive constitutional scrutiny because it requires the "ordinary case" analysis to assess the risk involved in a predicate offense—an analysis that the Supreme Court determined was unconstitutionally vague in Johnson. In Johnson, the Supreme Court held that ACCA's residual clause, i.e., the provision that defines a "violent felony" to include an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii), is vague and "violates the Constitution's guarantee of due process." *See Johnson*, 135 S. Ct. at 2563. But a combination of factors not present in § 924(c)(3)(B) "conspired" to convince the Court in Johnson to find ACCA's residual clause vague. 135 S. Ct. at 2557.

The Court determined that the ACCA's residual clause "leaves grave uncertainty about how to estimate the risk posed by a crime." *Id.* at 2557. The Court also found that ACCA "leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 2558. In particular, the Court held that ACCA's structure "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes." *Id.* This approach was problematic because the degree of risk posed by the enumerated crimes was "'far from clear.'" *Id.* The Court was also concerned that the risk assessment was tied to considering risk in an "ordinary case," but without accounting for "real-world facts or statutory elements." *Id.* Additionally, the Court stressed that it had repeatedly attempted to craft a principled standard for the residual clause but had failed to do so, which further supported its vagueness. *Id.*

93

**2577**

Importantly, *Johnson* concluded that "the uncertainties in [ACCA's] residual clause may be tolerable in isolation," but their presence together led the Court to its holding. Id. at 2560. But unlike the ACCA's residual clause, § 924(c)(3)(B) contains no confusing list of enumerated offenses; it has been limited to a narrow risk of force during the commission of the offense; and the Supreme Court never has disagreed about its proper construction.

A.      The ordinary-case analysis does not itself invalidate § 924(c)(3)(B).

Runyon insists that the key to what makes § 924(c)(3)(B) impossibly vague is its reliance on courts evaluating the "ordinary case" of an offense. *See, e.g., Avila*, 770 F.3d at 1107 (analyzing "ordinary case" under 18 U.S.C. § 16(b)); *United States v. Keelan*, 786 F.3d 865, 871 (11th Cir. 2015) (collecting cases). The Ninth Circuit's opinion in *Dimaya v. Lynch*, 803 F.3d 1110, 1114–20 (9th Cir. 2015), invalidating § 16(b), also made this point central to its analysis.

But what Runyon and *Dimaya* fail to address is that courts at every sentencing must evaluate where a defendant's conduct falls on the spectrum of ways of committing the offense— and hence how a defendant's case compares to a norm. Congress has commanded such an analysis under 18 U.S.C. § 3553(a) and in particular under § 3553(a)(6). The Supreme Court has never suggested that there is a valid constitutional challenge to such statutory rules or the courts' application of them. An inquiry about the risk that force will be used is not an unusual aspect of assessing the gravity of a crime. And § 924(c)(3)(B) requires federal courts to evaluate federal offenses, a topic familiar to the judges who must apply the legal standard. The problem also cannot be eliminated by claiming that § 3553(a)(6) simply asks courts to compare individual cases. Rather, § 3553(a)(6) has long been applied using the general, abstract, and national standards—such as the U.S. Sentencing Guidelines. See, e.g., *Gall v. United States*, 552 U.S. 38, 54 (2007) ("Since the District Judge correctly calculated and carefully reviewed the Guideline

94

**2578**

range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."). Indeed, the Fourth Circuit has repeatedly cautioned against drawing comparisons from a handful of cases because of the dangers that each case has its own unique characteristics, making them dissimilar. *See, e.g., United States v. Chandia*, 675 F.3d 329, 342 (4th Cir. 2012) (citing *United States v. Abu Ali*, 528 F.3d 210, 267 (4th Cir. 2008)). General standards and assessments of the ordinary case are indispensable.

Runyon does not contest, and *Johnson* requires finding, that the force clause of § 924(c)(3)(A) is constitutionally permissible. Thus, on Runyon's view, the force clause would be suddenly transformed into an unconstitutional provision if it were redrafted as follows: "An offense is a crime of violence if it is a felony and its elements involve the use of force, attempted use of force, threatened use of force, or substantial risk that force will be used." This straightforward inquiry is not difficult to apply to robbery offenses or other potential predicates for § 924(c) and encompasses the type of analysis that courts frequently perform.

B.     The Supreme Court has not "repeatedly" failed to construe § 924(c)(3)(B) in a workable way.

*Johnson* emphasized its own "repeated" inability to develop a "principled and objective standard" for ACCA. 135 S. Ct. at 2558. This concern, absent here, further animated the Court's decision to find ACCA vague. *See id.* at 2559 (noting that Johnson was the Supreme Court's "fifth [case] about the meaning of the [ACCA] residual clause"); *see also Sykes v. United States*, 131 S. Ct. 2267, 2287 (2011) (Scalia, J., dissenting) (stating that the Court's repeated failure in addressing ACCA is "[w]hat sets ACCA apart" and "confirms" its vagueness). *Johnson* concluded that its ACCA decisions had been a "failed enterprise." 135 S. Ct. at 2560.

But the Court has rendered only one significant § 16(b) decision, which occurred over ten years ago and caused no controversy among the Justices. *See Leocal*, 543 U.S. at 1. In *Leocal*, a

**2579**

unanimous Court expressed no uncertainty and had no difficulty in adopting an interpretive framework that identified one offense (burglary) as the "classic example" of a § 16(b) qualifying offense, and another (DUI) that was not. *Id.* at 10. The Court's analysis belies a claim that § 924(c)(3)(B) is too uncertain to be readily applied.

C.   Runyon has not shown the same degree of confusion by lower courts about Section 924(c)(3)(B) as about ACCA.

*Johnson* also observed that there were numerous lower court splits about "the nature of the inquiry" that a court should conduct under ACCA. *Johnson,* 135 S. Ct. at 2560. Significantly, the disagreements "went beyond matters of degree." *Id.* Runyon has not shown anywhere near the same level of confusion among lower courts about § 924(c)(3)(B) (or § 16(b)).

Moreover, "That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." *United States v. Petrillo,* 332 U.S. 1, 5 (1947); see also Johnson, 135 S. Ct. at 2560 ("even clear laws produce close cases").

D.   The enumerated offenses in ACCA are absent.

Section 924(c)(3)(B)'s structure differs from the ACCA because it does not contain an introductory list of enumerated crimes followed by an "otherwise" provision that *Johnson* treated as qualified by the predicate offenses. The presence of the enumerated list of offenses in ACCA was a determinative factor in *Johnson.* The enumerated list had troubled members of the Court since *James. See, e.g., James,* 550 U.S. at 215-16, 230 n.7 (Scalia, J., dissenting). And in *Begay v. United States,* even the majority was concerned that "the examples are . . . far from clear with respect to the degree of risk each poses." 553 U.S. 137, 143 (2008).

**2580**

The continuing confusion over how to interpret the list, in conjunction with the residual clause, ultimately convinced the Court in *Johnson* of the ACCA's residual clause's vagueness and pervaded the Court's analysis. For example, the Court attributed part of the "uncertainty about how much risk it takes for a crime to qualify" to the residual clause's structure, which "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes—burglary, arson, extortion, and crimes involving the use of explosives." *Johnson*, 135 S. Ct. at 2558. The Court again referred to the enumerated crimes in explaining why its decisions in *Begay* and *Sykes* did "not succeed in bringing clarity to the meaning of the residual clause." *Id.* at 2559 (*Begay's* test, which turned on the similarity of a crime to the enumerated offenses, failed because "the enumerated crimes are not much more similar to one another in kind than in degree of risk posed"); *id.* ("common sense" used in *Sykes* was not reliable criterion because "[c]ommon sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes"). And, critically, the Court distinguished other statutes requiring risk-based assessments in part because they do not "link[] a phrase such as 'substantial risk' to a confusing list of examples." *Id.* at 2561. Section 924(c)(3)(B), like the statutes the Court distinguished in *Johnson*, contains no "confusing list" to cloud its analysis.

Moreover, § 924(c)(3)(B) contains language identical to many other federal and state statutes. *See, e.g.,* 18 U.S.C. § 16(b); 18 U.S.C. § 3142(f)(1)(A) and (g)(1) (bail statute); 18 U.S.C. § 521(d)(3)(C) (enhanced sentence for criminal gang members); 18 U.S.C. § 3663A(c)(1)(A) (mandatory restitution); 18 U.S.C. § 5032 (juvenile transfer statute); R.I. Gen. Laws 1956, § 21-28-4.07.2(a); Utah Code Ann. § 76-9-802(5)(b)(i). Thus, while the Supreme Court believed that striking ACCA's residual clause would have little effect on other risk-based

**2581**

statutes, *see Johnson*, 135 S. Ct. at 2561, a decision striking § 924(c)(3)(B) would significantly affect other federal and state laws.

E.    Section 924(c)(3)(B) does not go beyond the elements of the offense to consider potential extra-offense conduct.

Another uncertainty about the ACCA that the Supreme Court identified in *Johnson*, but that is absent from § 924(c)(3)(B), is the necessity for courts to go "beyond evaluating the chances that the physical acts that make up the crime injure someone" and to evaluate the risk for injury even "after" completion of the offense. *Id.* at 2557; see *also id.* at 2559 (noting that "remote" physical injury could qualify under ACCA, but that the clause does not indicate "how remote is too remote"). ACCA's inquiry into whether a crime "involves conduct" that presents too much risk of injury goes beyond the offense elements. *Id.* at 2557. The consideration of post-offense conduct was therefore part of ACCA's indeterminate "wide-ranging inquiry." *Id.*

By contrast, and as discussed above, § 924(c)(3)(B) is significantly narrower. As the Supreme Court expressly observed in *Leocal*, unlike the ACCA residual clause, where the "substantial risk" inquiry relates "to the possible effect of a person's conduct," § 16(b) (and Section 924(c)(3)(B)) address "the use of force" "'in the course of committing the offense.'" 543 U.S. at 10 & n.7 (quoting 18 U.S.C. § 16(b)). See also *Fuertes*, 2015 WL 4910113, at *9. This narrower approach means that the assessment is confined to the risks that arise during the commission of the offense. *Leocal*, 543 U.S. at 7 (court must "look to the elements and the nature of the offense of conviction"). Unlike the ACCA, § 924(c)(3)(B) does not go beyond "the physical acts that make up the crime." *Johnson*, 135 S. Ct. at 2557. Further, § 924(c)(3)(B) looks at the risk of the "use of force" rather than the much broader "risk of injury."

**2582**

F.     Section 924(c)(3)(B) is materially narrower than ACCA.

Under *Leocal*, an aggravated felony for purposes of § 16(b) (and, by extension, a "crime of violence" for purposes of § 924(c)(3)(B)) is limited to "offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense." *Leocal*, 543 U.S. at 10; *see also United States v. Taylor*, 814 F.3d 340, 376–77 (6th Cir. 2016) (finding the Johnson analysis inapplicable because § 924(c)(3)(B) is distinctly narrower than ACCA residual clause).  To qualify as a predicate offense under this framework, the offense must proscribe conduct that (1) naturally involves a disregard of a substantial risk of force against another, and (2) the risk of force must arise during the course of committing (3) an active, violent offense.  Id. at 10-11; *see also United States v. Lanier*, 520 U.S. 259, 266 (1997) (clarity may be provided by judicial gloss on an otherwise uncertain statute). *See also Fuertes*, 2015 WL 4910113, at *9.

Under § 924(c)(3)(B) (and § 16(b)), the ordinary case is defined by the elements of the offense, and a court does not, as in ACCA, consider risks that arise only after the physical acts constituting the crime have been completed.  The court asks whether the offense elements would "naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense." *Leocal*, 543 U.S. at 11.  The analysis is non-speculative and consistent with *Johnson*.  If the risk of the use of force is naturally present in the elements of the offense, it qualifies as a crime of violence under § 924(c)(3)(B) (or § 16(b)). This alleviates *Johnson's* concern about ACCA's far ranging inquiry.

There is nothing vague or speculative about asking whether an offense "naturally" involves a risk of the use of force during its commission.  The phrase "by its nature" in § 924(c)(3)(B) simply triggers application of the categorical approach, which looks at offense

99

**2583**

elements. See *United States v. Aragon*, 983 F.2d 1306, 1312 (4th Cir. 1993). Furthermore, the Supreme Court has long examined the "nature" of predicate offenses in applying enhancements. *See, e.g., Moncrieffe v. Holder*, 133 S. Ct. 1678, 1684 (2013). As for the degree of risk necessary, courts have made clear that the need for a "substantial" risk is not vague. *Aragon*, 983 F.2d at 1313-15 (easily applying "substantial risk" standard).

Acts of Congress enjoy a strong presumption of validity. *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). A court's duty is to construe, rather than to condemn, a statute. *See Skilling v. United States*, 561 U.S. 358, 403 (2010). The Supreme Court was convinced by "[n]ine years' experience," and by multiple prior decisions, that ACCA's residual clause was not susceptible to principled construction. *Johnson*, 135 S. Ct. at 2560. Section 924(c)(3)(B) does not possess the "sum" of factors that led Johnson to its conclusion. *Id.*

G.   Runyon cannot present a vagueness challenge because § 924(c)(3)(B) is not unconstitutionally vague as applied to him.

Under the vagueness doctrine, "'[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *United States v. Jaensch*, 665 F.3d 83, 89 (4th Cir. 2011) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010)); see also, e.g., *United States v. Williams*, 553 U.S. 285, 304 (2008); *United States v. McDonnell*, 792 F.3d 478, 509 (4th Cir. 2015).

*Johnson* indicated that a law need not be vague in all its applications to be unconstitutional, but the Court did not decide whether a party must first show a law is vague *as applied* to him before he may make a facial challenge. 135 S. Ct. at 2560-61. Nor did *Johnson* overrule the Supreme Court's numerous cases requiring a court to analyze a vagueness challenge outside of the First Amendment context on the facts of the particular case before it. *See, e.g.,*

**2584**

*Chapman v. United States*, 500 U.S. 453, 467 (1991); *United States v. Powell*, 423 U.S. 87, 92 (1975); *United States v. Mazurie*, 419 U.S. 544, 550 (1975).

Further, while *Johnson* did reject that a provision cannot be facially vague merely because "some conduct clearly falls within the provision's grasp," 135 S. Ct. at 2561, the Court did not hold that any possibility of a vague application requires finding a statute void for vagueness. Rather, it concluded that the residual clause was void for vagueness because of its inherent inability to produce "evenhanded, predictable, or consistent" applications. *Id.* at 2563. The provision was "a judicial morass that defies systemic solution, a black hole of confusion and uncertainty that frustrates any effort to import some sense of order and direction." *Id.* at 2562 (internal quotation marks omitted). But "there are other statutes that by their terms or as authoritatively construed apply without question to certain activities, but whose application to other behavior is uncertain." *Smith v. Goguen*, 415 U.S. 566, 577-78 (1974). For those statutes, the general rule is that a vagueness challenge is not available to one who violates the "hard core" of the statute. *Id.* Facial vagueness challenges should therefore be reserved for statutes that "simply ha[ve] no core," "in the sense that no standard of conduct is specified at all." *Id.* (citation and quotation marks omitted).

The Sixth Circuit recently rejected an identical vagueness challenge to § 924(c)(3)(B) in *Taylor*, 814 F.3d at 375–79. Citing many of the above reasons that *Johnson* does not affect § 924(c)(3)(B), the court found that § 924(c)(3)(B) is considerably narrower than the statute invalidated in *Johnson*, and much of the analysis in *Johnson* is not applicable to § 924(c)(3)(B). *Id.*

Section 924(c)(3)(B) is clearly not a statute that "simply has no core." *See Leocal*, 543 U.S. at 10 (describing burglary as a "classic example" of a crime that satisfies § 16(b) because,

**2585**

"by its nature, [it] involves a substantial risk that the burglar will use force against a victim in completing the crime").

Runyon was charged with and convicted of murdering Cory Voss with a firearm in relation to the crimes of conspiracy to commit murder for hire and carjacking – conduct which even he cannot not deny falls within the "core" of § 924(c)(3)(B) and "involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Cf. *United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) ("Here, the indictment charges a pattern of violent racketeering activities, including murder, kidnapping, and robbery. It is hard to imagine a conspiracy which, by its nature, poses more of a risk that physical force will be used against persons or property."). Both of the predicate crimes had as additional elements that death resulted in the course of the crime – not only was there a risk, for Runyon to be convicted on these crimes, the use of force was a certainty. Thus, his vagueness challenge must fail.

II.     Carjacking Resulting in Death and Conspiracy to Commit Murder for Hire Resulting in Death are both Crimes of Violence under the Force Clause of Section 924(c)(3)(A).

Although acknowledging that Johnson did not invalidate the "force clause" contained in Section 924(c)(3)(A), Runyon contends that neither predicate crime properly qualifies as a crimes of violence under the "force clause." Runyon asserts that the "physical force" required under the force clause is a "violent force" or "strong physical force" capable of causing physical injury to another person.

A.     Carjacking is a Crime of Violence.

Runyon contends that carjacking does not meet the requirements of the force clause because it can be accomplished by putting someone in fear of future injury, which does not

require the use (actual, attempted or threatened) of "violent force." Additionally, Runyon claims that because the act of putting someone in fear of injury can be done without an intentional threat of physical force, it fails to satisfy the intentional *mens rea* required by the force clause.

Runyon overlooks that he was convicted of the crime of Carjacking Resulting in Death – which required the jury to find the specific element that death resulted from the carjacking. It can hardly be said that this charge does not require force under any definition. Moreover, the carjacking statute, Section 2119, contains the specific *mens rea* that a defendant act with the "intent to cause death or serious bodily harm." 18 U.S.C. § 2119. Thus, for the defendant to violate the statute, the jury had to determine that he took a motor vehicle, with the intent to cause death or serious bodily harm, and that death resulted. The Fourth Circuit has held, "[u]nder the definitional requirements of § 924(c)(3), the carjacking statute is a crime of violence." *United States v. Johnson*, 32 F.3d 82, 85 (4th Cir. 1994). *Cf. United States v. Seay*, 553 F.3d 732, 737-38 (4th Cir. 2009) (state statute that required proof that "the conduct must *objectively* cause distress by placing the person in fear of bodily harm" satisfied U.S.S.G. § 4B1.2(a)(1)'s standard of threatened use of physical force).

Runyon argues, however, that carjacking does not qualify under the elements clause of § 924(c)(3)(A) because it can be accomplished by 'fear of injury' which does not require the use, attempted use, or threatened use of 'violent force,'" which is the level of "physical force" required pursuant to *Johnson v. United States*, 559 U.S. 133 (2010). In *Johnson*, the Court held that the phrase "physical force," for the purposes of ACCA's elements clause (which is similar to § 924(c)(3)(A)) means violent force, "that is, force capable of causing physical pain or injury to another person." Id. at 140. Despite Runyon's argument to the contrary, however, carjacking

103

**2587**

(even absent the additional element of death resulting) is a crime of violence under the elements clause of § 924(c)(3)(A).

An offense is committed under the carjacking statute when the defendant "takes a motor vehicle . . . from the person or presence of another . . . by force and violence or by intimidation, or attempts to do so." 18 U.S.C. § 2119. "To obtain a conviction for carjacking, the government must prove that the defendant, (1) with intent to cause death or serious bodily harm, (2) took a motor vehicle, (3) that had been transported, shipped, or received in interstate or foreign commerce, (4) from the person or presence of another (5) by force and violence or by intimidation." *United States v. Fekete*, 535 F.3d 471 (6th Cir. 2008). Satisfying these requirements of the carjacking statute "encompasses 'the use, attempted use, or threatened use of physical force....'" *United States v. Moore*, 43 F.3d 568, 572-73 (11th Cir. 1995); see also *United States v. Mohammed*, 27 F.3d 815, 819 (2d Cir. 1994). Thus, carjacking is a crime of violence and appropriately qualifies as a predicate crime under § 924(c)(3)(A).

Additionally, the carjacking statute need not contain a "stand-alone" "threatening physical force" element in order for this court to conclude that such an element is encompassed within the elements of the offense. See *United States v. Anderson*, 695 F.3d 390, 401 (6th Cir. 2012) (element of force present where offense required proof of serious physical injury; "stand-alone physical force element" not required). Simply put, "[t]he term 'crime of violence' as Congress defined it in 18 U.S.C. § 924(c)(3) clearly includes carjacking. 'Tak[ing] or attempt[ing] to take by force and violence or by intimidation,' 18 U.S.C. § 2119, encompasses 'the use, attempted use, or threatened use of physical force....'" *Moore*, 43 F.3d at 572-73; *see also United States v. Brown*, 200 F.3d 700, 706 (10th Cir. 1999) ("The ... offense of carjacking

**2588**

is always a crime of violence because § 2119 requires taking or attempting to take a vehicle by force and violence or by intimidation....").

Runyon's argument depends on claiming that the "fear of injury" standard fails to satisfy § 924(c)(3)(A)'s requirement of a threatened use of "physical force." In his view, a carjacking victim could be intimidated through means that would not constitute force. In making this argument, he relies on *United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012), a case that neither examined carjacking offenses or Section 924(c)(3). According to Runyon, *Torres-Miguel* establishes that some degree of violent force is required to establish a "crime of violence," such that a fear of future injury could not suffice. If a bank robber entered a bank, donned a gas mask, and threatened to kill everyone inside using poison gas, the robber's threat to gas everyone to death would not constitute a threatened use of the necessary physical force, according to the defendant. But Runyon reads too much into *Torres-Miguel* and fails to take into account later Supreme Court precedent in *United States v. Castleman*, 134 S. Ct. 1405, 14-14-15 (2014).

B.  The Fourth Circuit has already rejected Runyon's narrow reading of "physical force" under federal robbery statutes.

Runyon is simply mistaken that the act of putting another in fear of injury fails to satisfy "physical force" under § 924(c)(3)(A) and in relying on interpretations of the intimidation element in the federal bank robbery statute (18 U.S.C. § 2113(a)). Applying § 924(c)(3)(A), the Fourth Circuit has previously held, "Armed bank robbery is unquestionably a crime of violence, because it 'has as an element the use, attempted use, or threatened use of physical force against the person or property of another.'" *United States v. Adkins*, 937 F.2d 947, 950 n.2 (4th Cir. 1991) (quoting § 924(c)(3)(A) and citing *United States v. Shavers*, 820 F.2d 1375 (4th Cir. 1987)).

C.     <u>Defendant's reading of "physical force" cannot be squared with the Supreme Court's definitions of "physical force."</u>

Runyon's argument also fails because the Supreme Court has defined physical force as "force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010). In measuring the degree of force needed to count as "physical force" for a violent felony, *Johnson* drew the line at force that is sufficient to cause injury. Poisoning and other means of killing a person satisfy that standard. Notably, in keeping with both *Johnson* and Fourth Circuit precedent holding that robbery is a crime of violence, the Fourth Circuit explained that "[t]he test in this circuit for intimidation under § 2113(a) is whether 'an ordinary person in the teller's position reasonably could infer a threat of bodily harm from the defendant's acts.'" *Woodrup*, 86 F.3d at 363 (*quoting Wagstaff*, 865 F.2d at 627; *Higdon*, 832 F.2d at 315). Moreover, the Supreme Court stated that a permissible definition of "physical force" is "[f]orce consisting in a physical act, esp. a violent act directed against a robbery victim." *Johnson*, 559 U.S. at 139 (quoting Black's Law Dictionary 717 (9th ed. 2009)). It makes little sense to accept that "physical force" may be defined by the force used to accomplish robbery but then hold that robbery fails to satisfy the definition of physical force.

In *Castleman*, the Supreme Court rejected a Runyon's argument about Leocal and uses of force just like the one adopted in *Torres-Miguel*:

> [T]he knowing or intentional application of force is a "use" of force. Castleman is correct that under Leocal v. Ashcroft, 543 U.S. 1 (2004), the word "use" "conveys the idea that the thing used (here, 'physical force') has been made the user's instrument." Brief for Respondent 37. But he errs in arguing that although "[p]oison may have 'forceful physical properties' as a matter of organic chemistry, . . . no one would say that a poisoner 'employs' force or 'carries out a purpose by means of force' when he or she sprinkles poison in a victim's drink," ibid. The "use of force" in Castleman's example is not the act of "sprinkl[ing]" the poison; it is the act of employing poison knowingly as a device to cause physical harm. That the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter. Under Castleman's logic, after all, one could say

**2590**

that pulling the trigger on a gun is not a "use of force" because it is the bullet, not the trigger, that actually strikes the victim. *Leocal* held that the "use" of force must entail "a higher degree of intent than negligent or merely accidental conduct," 543 U.S., at 9; it did not hold that the word "use" somehow alters the meaning of "force."

Castleman, 134 S. Ct. at 1414-15.

*Castleman* said it was not addressing whether knowingly or intentionally causing bodily injury counts as "physical force" under the definition used in the Armed Career Criminal Act. 134 S. Ct. at 1414-15. But, again, the Supreme Court's 2010 *Johnson* opinion defined physical force as "force capable of causing physical pain or injury to another person." *Johnson*, 559 U.S. at 140. *Johnson* also endorsed a definition of physical force as "[f]orce consisting in a physical act, esp. a violent act directed against a robbery victim." *Johnson*, 559 U.S. at 139. And the author of Johnson, Justice Scalia, concurred in *Castleman*, reaffirming what *Johnson* said about the ACCA. 134 S. Ct. at 1416-17.

D. Defendant's reading of *Torres-Miguel* would improperly treat it as overruling the Fourth Circuit's prior precedent and would cause § 924(c)(3) to cover no federal criminal offense.

The Fourth Circuit's cases like *Adkins* preclude adopting a reading of "physical force" that excludes first-degree murder and carjacking. Courts interpret statutory language "not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014) (quoting *Maracich v. Spears*, 133 S. Ct. 2191, 2209 (2013)). These "tools of divining meaning—not to mention common sense, which is a fortunate (though not inevitable) side benefit of construing statutory terms fairly" support that federal robbery offenses that can be accomplished through "intimidation" or "fear of injury" satisfy § 924(c)(3)(A). *Id.* *Cf. United States v. Washington*, 743 F.3d 938, 943 (4th Cir. 2014) ("In the time since circuit courts first interpreted [18 U.S.C.] § 2423(a) . . . Congress has

amended the statute numerous times but has never changed it to require the result [the defendant] urges here."). *Abbott*, 562 U.S. at 23 (noting numerous amendments that "expanded the reach or increased the severity of § 924(c)").

Taken collectively, Runyon's theories result in virtually no federal criminal offenses falling within § 924(c)(3)(A). That is true because federal criminal offenses routinely encompass means of causing serious bodily harm that are broader than defendant's interpretation of "physical force." Indeed, even a statute that seemingly tracks the language of § 924(c)(3)(A)— such as 18 U.S.C. § 1512(a)(2)—turns out to rely on a broader definition of "physical force" than defendant's. See 18 U.S.C. § 1515(a)(2) (defining "physical force" as "physical action against another . . . includ[ing] confinement"). Runyon's reading of "physical force" not only leaves § 924(c)(3)(A) with little application, *Castleman*, 134 S. Ct. at 1434, his reading essentially destroys the provision. And courts "cannot interpret federal statutes to negate their own stated purposes." *King v. Burwell*, 135 S. Ct. 2480, 2493 (2015) (*quoting New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 419-20 (1973)). In Leocal, the Supreme Court observed that "we cannot forget that we ultimately are determining the meaning of the term "crime of violence." 543 U.S. at 383. First-degree murder and carjacking are crimes of violence, and they have as elements the use, attempted use, and threatened use of physical force.

Both *Leocal* and *Garcia* dealt with offenses that had a *mens rea* of recklessness or negligence, but carjacking is not such an offense. A defendant cannot be guilty of carjacking— taking a vehicle from a person against that person's will—through a recklessness or negligence mens rea. Runyon's theory both misunderstands the *mens rea* for carjacking and misconstrues *Leocal* and *Garcia*. As to the mens rea, in analyzing bank robbery under § 2113(a), the Supreme Court has explained that "we read subsection (a) as requiring proof of general intent—that is,

**2592**

that the defendant possessed knowledge with respect to the actus reus of the crime (here, the taking of property of another by force and violence or intimidation.)." *Carter v. United States*, 530 U.S. 255, 267 (2000). Although a defendant need not intend to intimidate the person from whom the defendant is taking property against that victim's will, the defendant must know (a) that he is taking property against the victim's will and (b) that the defendant's actions in accomplishing that involve force or are objectively intimidating. See, e.g., United States v. *Bradshaw*, 580 F.3d 1129, 1132-33 (10th Cir. 2009) (citing Carter and noting that the "jury could infer that [the defendant] acted with a knowing intent to intimidate"). This *mens rea* exceeds negligence and recklessness and hence satisfies *Leocal and Garcia*.

E.   Conspiracy to Commit Murder for Hire Resulting in Death is a Crime of Violence.

Runyon also contends that a conspiracy to commit murder for hire is not a crime of violence because it is the agreement that is the crime. As carjacking is clearly a crime of violence under the force clause and was a predicate for the Section 924(j) charge, there is no reason for the Court to reach this claim. Should the Court do so, however, the conspiracy charge at issue does constitute a crime of violence.

In contending that a conspiracy charge cannot constitute a crime of violence under the force clause, Runyon overlooks the clear fact that his conviction under 18 U.S.C. § 1958(a) expressly required the jury to find that death resulted from the agreement. It was the finding of this additional element – that death resulted - that increased the maximum penalty to death and even made him eligible for the death penalty on Count One. 18 U.S.C. § 1958(a). A conviction of conspiracy to commit murder for hire resulting in death does meet the requirements of the force clause because the elements require a resulting death, which arises from the use of physical force being set in motion to cause that death. In this vein, the charge is not an inchoate crime

2593

because the object of the conspiracy must occur for a defendant to be subject to the enhanced penalty.

Other courts have determined that a conspiracy to commit murder for hire constitutes a crime of violence for purposes of Section 924(c). See *United States v. Walker*, 596 Fed. Appx. 302, 313, cert. denied 135 S. Ct. 2393 (June 1, 2015). As the Fourth Circuit opined in *United States v. Laskin*, 926 F.2d 372, 379 (4th Cir. 1991) in finding that a violation of related Section 1952A constituted a crime of violence, "[o]ne can hardly conceive of a more cold-blooded violent act than murder-for-hire." Although acknowledging that the Fourth Circuit has determined conspiracy to be a crime of violence under the residual clause, *United States v. White*, 571 F.3d 365 (4th Cir. 2009), Runyon claims that under Johnson, this finding is invalidated. For the reasons already set forth, it continues to qualify as a crime of violence under the residual clause. But the additional element of death resulting also meets the requirements of the force clause.

F.     The sentence of death on Count One was not improperly tainted by the sentence on Count Five.

Runyon concludes that the death sentence he received on Count One must also be vacated because the evidence and arguments presented at trial with respect to the Section 924(j) offense "painted an in inappropriate picture of the conspiracy offense and contributed to the jury's sentencing decision for the conspiracy charge." *See* ECF 478, pgs. 80-81.

Runyon asserts, with no authority, that a new sentencing is required. Though Runyon's categorical approach to reviewing the Section 924(j) conviction requires a review of the statute and not the underlying facts, he submits that those same underlying facts should be considered in granting a new sentence because this was a "close case" and the jury questioned the result if it could not agree on a sentence. But the jury found that the government had proven all

110

**2594**

aggravating factors alleged beyond a reasonable doubt and many of the aggravating factors related to the planning, pecuniary gain and training that Runyon had to commit this murder for hire. In short, the Conspiracy to Commit Murder for Hire charge was, if anything, a murder crime of the highest culpability.

Runyon wrongly claims, however, that the Section 924(j) conviction required a higher level of culpability than that of the Conspiracy to Commit Murder for Hire conviction. He offers no authority for this claim and it is without merit. The two predicate offenses behind the Section 924(j) conviction were death eligible offenses that, even by Runyon's argument, were properly before the jury. The Section 924(j) count did not result in the jury determining that additional criminal activity took place because the predicate offenses in Counts One and Two contained the same activity as did the predicate crimes of violence for the Section 924(j) charge.

With respect to the Count One conviction, the jury also had to determine that the defendant intended to murder Cory Voss. Moreover, prior to the case proceeding to the penalty phase, the jury had to first determine that the defendant did, in fact, intend to murder Cory Voss in order for the defendant to be eligible for the death penalty. The jury made this finding with respect to both Counts One and Two along with finding the aggravating factor of substantial planning. ECF No. 255. With these findings firmly in place with respect to Counts One and Two prior to the penalty phase, there is no merit to the claim that the Section 924(j) conviction on Count Five required an enhanced culpability that somehow impacted the jury's sentencing decision.

**2595**

**Claim 10 :** **Runyon is barred from relitigating whether the jury instructions impermissibly lowered the burden of proof regarding the weighing of aggravating factors.**

Runyon claims that the jury instructions given in his case that permitted a finding that aggravating factors "sufficiently outweigh" mitigating factors impermissibly lowered the burden of proof in violation of his Fifth, Sixth, and Eighth Amendment rights. *See* ECF 478, pgs. 97–99. He concedes, as he must, that this claim was raised and rejected in his direct appeal. *See United States v. Runyon*, 707 F.3d 475, 515–16 (4th Cir. 2013). He argues, however, that any bar to relitigating his claim does not apply because the claim is related to the issue presented in *Hurst v. Florida*, 136 S. Ct. 616 (2016), a case in which the Supreme Court recently decided that Florida's death penalty scheme violates *Ring v. Arizona*, 536 U.S. 584 (2003). But the decision in *Hurst* does not affect the issue Runyon raises here, and no exception to the relitigation bar applies. Further, this claim is barred under the non-retroactivity doctrine.

A.     Legal Principles

Issues raised on direct appeal may not be raised in a collateral attack, such as a Section 2255 motion. *Boeckenhaupt v. United States*, 537 F.2d 1182 (4th Cir. 1976). A federal prisoner generally cannot raise on collateral review a claim that was previously decided on direct review. *See Withrow v. Williams*, 507 U.S. 680, 720-21 (1993) (Scalia, J., concurring) (collecting cases); *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000); *United States v. Perez*, 129 F.3d 255, 260 (2d Cir. 1997); *Argencourt v. United States*, 78 F.3d 14, 16 n.1 (1st Cir. 1996); *Olmstead v. United States*, 55 F.3d 316, 319 (7th Cir. 1995); *Thompson v. United States*, 7 F.3d 1377, 1378-79 (8th Cir. 1993) (per curiam); *Cabrera v.United States*, 972 F.2d 23, 25 (2d Cir. 1992); *United States v. DeRewal*, 10 F.3d 100, 105 n.4 (3d Cir. 1993); *Kastenbaum v. United States*, 588 F.2d 138, 139 (5th Cir. 1979) (per curiam); *Oliver v. United States*, 90 F.3d 177, 180

(6th Cir. 1996). This rule extends the law-of-the-case doctrine to the federal-prisoner habeas context. The law-of-the-case doctrine is discretionary and subject to override based on the existence of exceptional circumstances. *See United States v. U.S. Smelting Refining & Mining Co.*, 339 U.S. 186, 199 (1950). An exercise of that discretion is rarely warranted. *See, e.g., United States v. McGee*, 201 F.3d 1022, 1023 (8th Cir. 2000) (per curiam); *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999). Typically, only an intervening change in the law—usually a new decision narrowly construing the statute of conviction—forms the basis form the basis for an order permitting relitigation, *See, e.g., Jones*, 178 F.3d at 796; *Davis v. United States*, 417 U.S. 333 (1974).

Collateral relief is further limited to claims based on established law. *Teague* at, 489 U.S. at 310 (1989). When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending direct review. As to convictions that are already final, however, the rule applies only in limited circumstances." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted). Generally, new procedural rules do not apply retroactively, while new substantive doctrines—those that alter the range of punishable conduct or the class of punishable people—do. *Id.* at 351–52.

B.    Argument

Runyon attempts to circumvent the relitigation bar by claiming that *Hurst v. Florida*, represents a change in the law. But *Hurst* is not helpful to Runyon for two reasons: (1) the Supreme Court's decision in *Hurst* does not represent a change in the law with respect to the issue Runyon raised on direct appeal, and (2) even if *Hurst* did represent a change in the law, relief here is barred under *Teague*.

113

**2597**

The issue the Supreme Court decided in *Hurst* was whether Florida's death sentencing scheme violated the Sixth Amendment or Eighth Amendment in light of *Ring v. Arizona*, 536 U.S. 584 (2002). *Hurst*, 136 S. Ct. at 621. Florida's sentencing scheme allowed a jury to recommend a death sentence, but required a judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing a death sentence. *Id.* at 620. The Supreme Court found that Florida's sentencing scheme violated the Sixth Amendment and its *Ring* decision because Florida did not allow a jury to make the critical findings necessary to impose death. *Id.* at 622.

Runyon's claim is not affected by the decision in *Hurst*. Here, Runyon does not allege that the critical decision necessary to impose death was taken from the jury. To the contrary, the claim raised here challenges whether the jury needed to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. But, as the Fourth Circuit found, the plain language of the FDPA provides that the jury must determine "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." *Runyon*, 707 F.3d at 516. Moreover, other courts have found that the reasonable doubt standard does not apply to the weighing of aggravating and mitigating factors, "reasoning that that process constitutes not a factual determination, but a complex moral judgment." *Id.*; *United States v. Gabrion*, 719 F.3d 511, 533 (6th Cir. 2013) (en banc) (citing cases). Runyon is barred from relitigating this claim.

Finally, even if *Hurst* did represent a change in the law, Runyon would not be entitled to relief because his conviction and sentence was final on October 6, 2014, and new rules do not apply to cases on collateral review. *Teague*, 489 U.S. at 310. Further, neither of the *Teague* exceptions to non-retroactivity apply here. For these reasons, this claim should be dismissed.

**2598**

**Claim 11:** **Runyon is procedurally barred from raising a claim that the aggravating factors fail to narrow, or are vague and overbroad; the claim lacks merit in any event.**

In Claim 11, Runyon contends his death sentences are unconstitutional because they are based on aggravating factors that fail to narrow the class of death eligible defendants, and are arbitrary and overbroad. ECF 478 at 99–101.[14] Specifically, he argues that the aggravating factors in his case—pecuniary gain and substantial planning and premeditation—are unconstitutional because they mirror the conduct required for conviction. In addition, Runyon claims that the non-statutory aggravating factors presented at trial are arbitrary and overbroad.

A. Statutory Aggravating Factors

Runyon's claim that the statutory aggravating factors are unconstitutional is procedurally barred. *Bousley v. United States*, 523 U.S. 614, 622 (1998). This claim was not raised in his direct appeal and Runyon fails to demonstrate cause for his procedural default or actual prejudice. The cause and prejudice standard requires Runyon to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. *Frady*, 456 U.S. at 170; *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).

This claim is also barred by the non-retroactivity doctrine. *See Teague v. Lane*, 489 U.S. 288, 310 (1989). As of October 6, 2014, when Runyon's convictions and death sentence became final, existing precedent did not dictate a grant of relief on Runyon's claim. There is no precedent or statute prohibiting the use of aggravating factors that mirror the offense elements as violative of the Eighth Amendment. *See United States v. Coonce*, No. 10-3029-01-CR-S-GAF,

---

[14] Other than different paragraph breaks, the content of this claim is unchanged from the original motion.

2014 WL 1018081, at *5–6 (W.D. Mo. March 14, 2014); *United States v. Sablan*, 2013 WL 5423621, at *7 (E.D. Cal. Sep. 26, 2013). Runyon's reliance on *Apprendi v. New Jersey*, 530 U.S. 466, 483 (2000), to argue a Sixth Amendment violation is misplaced. *Apprendi* held that the Sixth Amendment required a jury to determine any fact that increases the penalty for a crime beyond the prescribed statutory maximum. *Id.* at 490. Here, the jury determined the aggravating factors beyond a reasonable doubt and the Sixth Amendment does not prohibit aggravating factors that mirror the elements of the offense.

Procedural default and non-retroactivity notwithstanding, Runyon's claim regarding the statutory aggravating factors lacks merit. An element of an underlying offense may be presented as an aggravating factor when the class of defendants eligible for the death penalty are narrowed at the guilt stage, as opposed to the penalty phase. *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988). Thus, "the aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *Tuilaepa*, 512 U.S. at 972 (citing *Lowenfield*, 484 U.S. at 244–46). The presentation of aggravating factors assists the jury in the penalty phase in its role of making "an individualized determination on the basis of the character of the individual and the circumstances of the crime" to decide which defendants eligible for the death penalty "will actually be sentenced to death." *Zant v. Stephens*, 462 U.S. 862, 878–79 (1983). The use of special findings that mirror offense elements therefore is permissible.

Moreover, the intent factors that were proven beyond a reasonable doubt under the procedural structure of the FDPA serve to narrow the class of eligible defendants. *See* 18 U.S.C. § 3591(a)(2)(A–D). The fact that two statutory aggravating factors mirror elements of the offenses Runyon was convicted of does not violate any constitutional principle. The jury is entitled to consider the circumstances of the offense in making the individualized determination

116

**2600**

of "whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa*, 512 U.S. at 972.  This claim should be denied.

B.     Nonstatutory Aggravating Factors

Runyon also claims that the non-statutory aggravating factors were vague and overbroad and asks that his death sentence be vacated.  Runyon did challenge the non-statutory aggravating factors on direct appeal.  *Runyon*, 707 F.3d at 491–507.  As noted, issues raised on direct appeal may not be raised in a collateral attack such as a Section 2255 motion.  *Withrow*, 507 U.S. at 720–21.  Runyon fails to cite any intervening change in the law excusing this re-litigation bar. This claim is thus barred from consideration here.

Even if the re-litigation bar does not apply, Runyon's claim lacks merit.  Runyon's trial counsel did raise claims challenging statutory and non-statutory aggravating factors prior to trial. ECF 91, pgs. 61–62 and ECF 195.  Specifically, in ECF 91, Runyon argued that the aggravating factors listed in the FDPA fail to narrow the class of persons eligible for the death penalty from the entire category of persons convicted of crimes involving "intentional" killings.  *Id.* at 61.  He argued, like here, that the aggravating factors were indistinguishable from the elements of the offenses.  *Id.* at 62.  In addition, Runyon challenged the non-statutory aggravating factors by claiming they were overbroad, vague, and that the government's "unconstrained ability to allege various non-statutory aggravators injects impermissible randomness into the process."  *Id.* at 68. *See also* ECF No. 195 (challenging the specific non-statutory aggravating factors alleged by the Government).  This Court denied Runyon's claims that the statutory aggravating factors failed to narrow the class of persons eligible for the death penalty, and that the non-statutory aggravating factors were arbitrary.  ECF 143 at 5–6, and ECF 217.  Moreover, the Fourth Circuit thoroughly analyzed Runyon's constitutional challenge to the non-statutory aggravating factors and denied

2601

the claims. *Runyon*, 707 F.3d at 491–507. There has been no intervening change in the law since this Court or the Fourth Circuit denied Runyon's challenge to the aggravating factors. Indeed, Runyon fails to cite any law in support of his contention that the non-statutory aggravating factors were not rational or contributed to an arbitrary death sentence. For the reasons stated in this Court's pretrial orders and the Fourth Circuit's opinion, this claim should be denied.

**Claim 12:** **Trial counsel was not ineffective in failing to raise a selective prosecution claim.**

Runyon next contends that the Government's process in which it determines whether to seek the death penalty is influenced by race, in violation of the Fifth and Eighth Amendments to the United States Constitution. Specifically, he claims that his trial and appellate counsel were ineffective for failing to raise this claim below. He also requests discovery and an evidentiary hearing. *See Petitioner Brief* at 103.

In order to prevail, Runyon must show: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) he suffered actual prejudice. *Strickland*, 466 U.S. at 687. Runyon must satisfy both prongs of the *Strickland* test in order to prevail. *Roane*, 378 F.3d at 404. Where a court finds that "the defendant makes an insufficient showing on one" of the prongs, consideration of the other is unnecessary. *Merzbacher*, 406 F.3d at 365–66 (quoting *Strickland*, 466 U.S. at 697).

Runyon cannot demonstrate that his counsel performed deficiently or that there is "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. He fails to demonstrate a credible showing of discriminatory effect or discriminatory purpose, he necessarily cannot meet his burden in showing that counsel was ineffective for failing to raise this claim. Moreover, because

**2602**

he has proffered no evidence that meets the rigorous burden establishing a selective prosecution claim, he cannot demonstrate prejudice under *Strickland*. Any selective prosecution claim would have been denied. This claim should be denied.

To demonstrate the existence of prejudicial ineffectiveness, Runyon must establish "a reasonable probability that but for" his counsel's failure to raise this claim, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687. The selective prosecution claim Runyon presents here would not have changed the outcome of his case.

A person raising a selective prosecution claim, as Runyon does here, must establish: (1) the federal prosecutorial policy had a discriminatory effect and (2) it was motivated by a discriminatory purpose. *See United States v. Armstrong*, 517 U.S. 456, 465 (1996); *see also United States v. Venable*, 666 F.3d 893, 900 (4th Cir. 2012). This requires a defendant to establish that "similarly situated individuals of a different race were not prosecuted," *Armstrong*, 517 U.S. at 469–70, and that the decision to prosecute was invidious or in bad faith. *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996).

The standard of proof for a selective prosecution claim is a "demanding" one, *Armstrong*, 517 U.S. at 463, because a claimant is requesting the judiciary to exercise power over a "special province" of the executive branch, *id.* at 464, and judicial review of prosecutorial decisions could "chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* at 465.

Runyon proffers little, if any, evidence to support his claim here. He cites to a study done by Lauren C. Bell, Ph.D., a report by a subcommittee of the Judiciary Committee from 1994, and a survey of death penalty cases from 1988 to 2000 taken by the Department of Justice. Other

**2603**

than a bald assertion that the Government process is racially influenced, he makes no argument that similarly situated individuals of a different race were not prosecuted, nor does he demonstrate that there is a racially disproportionate pattern of capital charging. Trial and appellate counsel was not ineffective for failing to raise this claim because the claim lacks merit. Runyon cannot show that he suffered actual prejudice from the failure to raise this claim.

Moreover, conclusory and unsupported statements are insufficient for habeas relief. *United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004). Thus, "vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court." *United States v. Dyess*, 730 F.3d 354, 359–60 (4th Cir. 2013) (quoting *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000)); *see also Jones v. Gomez*, 66 F.3d 19, 204 (9th Cir. 1995) (noting "conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief") (internal quotation marks omitted); *Andiarena v. United States*, 967 F.2d 715, 719 (1st Cir. 1992) (holding claim that included "wholly conclusory" "abstract allegation" was "properly subject to summary dismissal").

Runyon is not entitled to discovery on this claim. The same justifications supporting the "rigorous standard" to prove a selective prosecution claim also require a correspondingly "rigorous standard" to obtain discovery in aid of such a claim. *Id.* at 468; *Olvis*, 97 F.3d at 743. To obtain discovery on a selective prosecution claim, a defendant must show "some evidence of both discriminatory effect and discriminatory intent." *United States v. Bass*, 536 U.S. 862, 863 (2002) (citing *Armstrong*, 517 U.S. at 465). *Armstrong's* "some evidence tending to show" standard is not to be treated lightly. *See Olvis*, 97 F.3d at 743. Given the heavy burden that discovery can impose on the government, the showing necessary to obtain discovery for a selective prosecution claim must "itself be a significant barrier to the litigation of insubstantial

**2604**

claims." *Id.* (quoting *Armstrong*, 517 U.S. at 464 (noting that a significant barrier to discovery is necessary because discovery "imposes many of the costs present when the government must respond to a prima facie case of selective prosecution")).[15]

A defendant cannot satisfy the discriminatory effect prong by providing statistical evidence that simply shows that the challenged government action tends to affect one particular group. *James*, 257 F.3d at 1179. Rather, the proffered statistics must address the critical issue of whether the particular group was treated differently than a similarly situated group. *Id.* (rejecting statistical studies); *Armstrong*, 517 U.S. at 470 (rejecting statistical studies that failed to identify similarly-situated persons of other races who were treated differently); *Olvis*, 97 F.3d at 745–46.

In *Bass*, a federal capital defendant moved to dismiss the notice of intent to seek the death penalty on the grounds that the government was seeking the death penalty against him because he was black. 536 U.S. 862–63. In the alternative, like defendant here, Bass sought discovery as to the Government's charging practices. The district court granted the motion for discovery, and dismissed the notice of intent when the Government refused to obey the discovery order. *Id.* at 863. The Sixth Circuit affirmed the district court, finding a DOJ study, Department statements, and other statistical evidence met the *Armstrong* requirements of demonstrating both a discriminatory effect and discriminatory purpose. *United States v. Bass*, 266 F.3d 532, 536 (6th Cir. 2001). The Supreme Court, in a *per curiam* opinion, reversed, holding that the defendant had failed to show evidence of discriminatory effect. 536 U.S. at 863–64. The Court stated:

---

[15] *See also United States v. Wilson*, 262 F.3d 305, 315–16 (4th Cir. 2001) ("Because of th[e] necessary presumption of prosecutorial regularity, a presumption of vindictive prosecution, or any other type of selective prosecution, must be supported by a showing sufficiently strong to overcome the presumption of prosecutorial regularity. Indeed, even before a court allows a defendant to have discovery on the government's prosecutorial decisions, the defendant must overcome a significant barrier by advancing objective evidence tending to show the existence of prosecutorial misconduct. The standard is a rigorous one.") (relying on *Armstrong*)).

> Even assuming that the *Armstrong* requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decision-makers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*.

536 U.S. at 864. The Court held that "[t]he Sixth Circuit's decision is contrary to *Armstrong* and threatens the performance of a 'core executive constitutional function.'" *Id.* Thus, the Court established that the framework set forth for adjudicating selective prosecution claims in *Armstrong* controls.

In order to meet the rigorous standard for discovery set forth in *Armstrong* and *Bass*, Runyon must be able to point to instances where the Government elected not to seek the death penalty against Caucasian men who had committed offenses similar to Runyon's. He must also be able to show that these men had similar personal backgrounds or social histories, similar criminal records, and similar motivations for killing their victims. *See Taylor*, 608 F. Supp.2d at 1266 (indicating defendants are similarly situated when their circumstances present "no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions").

Runyon fails to make any argument that the Government elected not to seek the death penalty against similarly situated defendants. He attempts to meet this rigorous standard by citing only to a study conducted by Lauren C. Bell, Ph.D.,[16] and "statistics" kept by the Federal Death Penalty Resource Counsel. *See Petitioner Brief* at 95.

The Bell study and the citation to other statistics, however, represent the same types of broad statistical analyses that were rejected in *Bass* and numerous other federal capital cases.

---

[16] Runyon has provided a declaration from Dr. Bell. This is the same declaration referencing the same study that has been advanced by other capital defendants and rejected as insufficient to support a claim of selective prosecution and request for discovery by federal courts in *United States v. Montgomery*, No. 2:11-cr-20044-JPM-1, 2014 WL 1453527, at *8 (W.D.Tenn. April 14, 2014); *United States v. Sablan*, No. 1:08-CR-00259-PMP, 2014 WL 172533, at *1 (E.D.Cal. January 15,2014); *Lecco*, 2009 WL 3347108, at *4–6.

**2606**

*See Bass*, 536 U.S. at 864; *Taylor*, 608 F.Supp.2d at 1266-67; *United States v. Lecco*, No. 2:05-00107-01, 2009 WL 3347108, at *4, *6 (S.D.WV. October 15, 2009). These studies do nothing to inform this Court about the actual decision makers in defendant's case here. Moreover, they do not explore how any of the cited cases truly involve similarly-situated defendants beyond merely showing the race and gender of defendants and victims and bare sketches of the charges in the cases.

The focus of Dr. Bell's study was the outcome of capital cases, not the charging decisions in capital cases. Thus, her study is not applicable to defendant's future selective prosecution claim in this case. Moreover, her study actually seems to indicate that the Government does *not* seek the death penalty in cases involving white female victims at a higher rate than other types of victims. Dr. Bell's affidavit indicates that in 397 authorized cases submitted for analysis, only 76 involved white female victims. Further, Dr. Bell's study looks only at "raw statistics." There is no analysis of the cases beyond the mere race of the victims to determine if the cases involved "similarly situated" defendants. Accordingly, this evidence is also insufficient to support Runyon's claim or his request for discovery.

Moreover, the procedure used to determine in which cases capital punishment will be sought demonstrates the absence of discriminatory intent. Decisions to seek the death penalty within the federal system are made pursuant to a particular protocol which was promulgated by the Department of Justice ("DOJ") shortly after the enactment of the Federal Death Penalty Act and now appears in Title 9, Section 10, of the United States Attorneys' Manual ("USAM"). Under the protocol, a U.S. Attorney must initially decide whether to charge a defendant in her district with a capital-eligible offense. Once a defendant is charged with such an offense, the U.S. Attorney must make a detailed submission to DOJ that includes a recommendation for or

against seeking the death penalty. *See* USAM § 9–10.040. The submission is reviewed by the Attorney General's Review Committee on Capital Cases, which makes its own recommendation, but not before providing defense counsel an opportunity to make a submission and to present to the Committee the reasons why the death penalty should not be sought. *Id.* at § 9–10.120. The Attorney General then makes the final decision whether to seek or not to seek capital punishment, based on standards that track the factors a jury is required to consider under the FDPA. *See id.* at §§ 9–10.120, 9–10.130. The protocol provides that bias for or against an individual based upon characteristics such as race or ethnic origin may play no role in the decision whether to seek the death penalty. *Id.* § 9–10.030. In fact, in most cases, DOJ's decision-makers are not aware of the race of the defendant or victim.

In sum, Runyon's evidence does not examine the nature and circumstances of the particular defendants who may be similarly situated or the nature of the crimes of which they were accused. *See Lecco*, 2009 WL 3347108, at *6. The statistics also do nothing to examine the backgrounds of the defendants or the victims—the crucial type of information that is used to determine if the Government is justified in seeking the death penalty in a certain case. Further, Runyon does nothing to explain why these studies or statistics could possibly support a selective prosecution claim. We are left with endless questions of who in the various data sets is similarly situated, what aggravating factors motivated the decision to seek the death penalty, and what mitigating factors or other prosecutorial considerations may have militated against seeking the death penalty in those cases. Accordingly, Runyon fails to proffer any evidence, let alone some evidence, demonstrating that this claim would have been successful. Trial counsel was not ineffective for failing to raise this claim.

**Claim 13:    Runyon's sentence of death was neither disproportionate or arbitrary.**

Runyon claims that his death sentences are disproportionate and arbitrary based on his belief that his co-defendant Michael Draven is more deserving of death. Based on the disparity in sentencing between Runyon and Draven, and the purported "clear evidence" that race played a role in Runyon's sentencing, Runyon asks this Court to vacate his sentences. In addition, Runyon has added untimely claims of ineffective assistance of trial and appellate counsel for failing to raise this claim.

A.    **Runyon's claim is procedurally defaulted.**

Runyon could have raised on direct appeal the challenge he raises here, and because he did not, his claim is procedurally defaulted. *See Massaro v. United States*, 538 U.S. 500, 504 (2003). A collateral attack under § 2255 may not substitute for an appeal. *Bousley v. United States*, 523 U.S. 614, 622 (1998). Claims that could have been but were not raised on direct appeal are procedurally barred from review under § 2255, unless the defendant demonstrates "cause" for his default and "actual prejudice" or demonstrates actual innocence. *Id.* The cause and prejudice standard requires Runyon to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. *Frady*, 456 U.S. at 170; *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). This is a "significantly higher hurdle" than the plain error standard required to overcome the default. *United States v. Olano*, 507 U.S. 725 (1983); *Frady*, 456 U.S. at 166. If Runyon cannot show cause and prejudice, he cannot have his claim considered unless he can satisfy the actual innocence exception. *Bousley*, 523 U.S. at 623.

125

**2609**

Runyon has not presented any argument establishing cause for failing to raise this claim on appeal, nor has he raised any argument demonstrating actual prejudice or actual innocence. He cannot show that a factor external to the defense prevented trial counsel from raising his present constitutional claim. Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 347 (1992)). This claim should be denied as procedurally defaulted.

B.    Runyon's claim is also barred by Teague non-retroactivity.

Runyon's claim is also barred by the non-retroactivity doctrine. Under *Teague v. Lane*, 489 U.S. 288 (1989), and its progeny, a defendant may not rely on a "new" rule of "procedure" in seeking to overturn his conviction on collateral review. *See Teague*, 489 U.S. at 310. Here, the constitutional rule Runyon proposes, comparative proportionality review between sentences received by similarly charged defendants, is clearly not one dictated by precedent existing as of October 6, 2014—the date Runyon's convictions became final—and indeed is without support in existing precedent. Further, neither of the two *Teague* exceptions to non-retroactivity applies. Accordingly, Runyon's claim is barred for this additional reason.

C.    Procedural default notwithstanding, this claim has no merit.

Finally, Runyon's claims fail on their merits. Runyon argues that his death sentence is arbitrary because the Government selected to seek death against him and not his co-defendant Draven. Specifically, he claims that the evidence demonstrates that Draven, not Runyon, was more worthy of a death sentence. But Runyon provides no evidence demonstrating that the Government unlawfully or discriminatorily exercised its prosecutorial discretion. Moreover, to the extent that Runyon's claim is one of proportionality review, his claim fails because the

126

**2610**

Constitution does not require comparative proportionality review of sentences received by defendants convicted of the same crime. This claim should be denied.

Runyon's claim is nothing more than a claim for proportionality review. But the Eighth Amendment does not require comparative proportionality review between sentences received by similarly situated defendants. *Pulley v. Harris*, 465 U.S. 37, 50–51 (1984); *United States v. Higgs*, 353 F.3d 281, 321 (4th Cir. 2003). A defendant therefore may not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *McCleskey v. Kemp*, 481 U.S. 279, 306–07 (1987) (emphasis in original). Runyon's claim fails on its merit.

To the extent Runyon claims the Government unlawfully exercised its discretion in noticing death against Runyon and not Draven, the claim likewise fails. "[O]ur constitutional system leaves it to the discretion of the Executive Branch to decide who will face prosecution." *United States v. Passaro*, 577 F.3d 207, 219 (4th Cir. 2009) (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996). This discretion includes the decision whether to seek the death penalty. *See McClesky v. Kemp*, 481 U.S. 279, 296–97 (1987). "Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id.* at 297.

Runyon fails to proffer "clear proof" that the Government exercised its discretion on some impermissible basis. Draven's background is not relevant to the discretionary decision to seek the death penalty against Runyon. Indeed, the Fourth Circuit found that the "prosecution exercised its discretion on the basis of a number of distinctions between Runyon and the other defendants . . . ." *Runyon*, 707 F.3d at 520, n.6. Finally, this Claim is much like the selective

**2611**

prosecution claim Runyon argues in Claim 12.  For the above reasons, and those argued in Claim 12, this claim should be denied.

> D.     Runyon's additional IAC claims are untimely.

Runyon added separate claims of ineffective assistance of both trial and appellate counsel to this claim.  These claims are different in nature than the claim raised in the original § 2255 motion, nor do the new claims arise "out of the conduct, transaction, or occurrence set forth . . . in the original pleading."  Fed. R. Civ. P. 15(c)(2).  The original claim is a constitutional attack on Runyon's death sentence, not a specific challenge to counsels' performance.  There is no "common core of operative facts uniting the original and newly asserted claims." *Mayle v. Felix*, 545 U.S. 644, 659 (2005).  They are wholly different claims that are not related. *See e.g., United States v. Lynn*, No. 3:08-CR-82, 2014 WL 3858543, at **10–11 (E.D. Va Aug. 5, 2014)(finding additional ineffective assistance of counsel claims different from original claims not timely and not related back under Rule 15).

Even assuming these additional new claims are timely and related back, Runyon cannot demonstrate prejudice for counsels' failure to raise this claim.  As stated above, the claim has no merit and Runyon has failed to demonstrate that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 696.

> **Claim 14:     Runyon's sentence does not violate the Eighth Amendment as there is no precedent to shield mentally ill individuals from the death penalty.**

Runyon contends that his death sentence violates the Eighth Amendment because he is severely mentally ill. (Doc. 478 at 105–07.)  Relying on *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), Runyon argues that this Court should promulgate a new constitutional rule barring the execution of individuals displaying severe mental illness at the time of their capital offense.  He reasons that such persons are less morally culpable because

128

**2612**

the mental illness diminishes their capacity to "understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *See* ECF, pg. 117 (quoting *Atkins*, 536 U.S. at 318–20).

This claim fails for several reasons. First, the claim is procedurally defaulted and Runyon does not attempt to proffer any argument demonstrating cause and prejudice for his default. Second, this claim is *Teague*-barred. Third, the claim fails on its merits. The Supreme Court has not established a *per se* exemption to capital prosecution for the mentally ill.

A.     Runyon's claim is procedurally defaulted.

As stated above, the procedural default doctrine generally bars § 2255 review of claims that could have been, but were not, presented at an earlier stage of the litigation unless the defendant shows "cause" and "prejudice" to excuse the default. *Frady*, 456 U.S. at 170. The cause and prejudice standard requires Runyon to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. *Id.*; *Coleman*, 501 U.S. at 753.

Here, Runyon does not attempt to make any showing that a factor external to the defense prevented trial counsel from raising this claim. Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 336, 347).

B.     <u>Runyon's claim is also barred by Teague non-retroactivity.</u>

Runyon's claim is also barred by the non-retroactivity doctrine. *See infra* Claim 12. *Teague*, and its progeny, bar defendants from relying on a "new" rule of procedure in seeking to overturn their convictions on collateral review. 489 U.S. at 310. The rule Runyon posits here was not dictated by precedent at the time his conviction became final, thus it is a "new" rule under *Teague*. Indeed, the constitutional rule Runyon proposes is without support in existing precedent. Further, neither of the two *Teague* exceptions to non-retroactivity applies. Accordingly, Runyon's claim is barred for this additional reason.

C.     <u>Runyon's constitutional claim is without merit in any event.</u>

     1.     <u>There is no national consensus in favor of a blanket exemption to capital punishment for the mentally ill.</u>

At the outset, it is clear and undisputed that the Supreme Court has not recognized mental illness as a *per se* bar to execution. *See Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014) (holding neither *Roper* nor *Atkins* created a new rule of constitutional law making the execution of mentally ill persons unconstitutional); *Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012) (noting absence of case law extending *Atkins* to prohibit the execution of those with mental illnesses); *Baird v. Davis*, 388 F.3d 1110, 1114 (7th Cir. 2004) (recognizing Supreme Court's exemptions from execution for the mentally retarded and minors, but that "it has not yet ruled out the execution of persons who kill under a mental illness").[17] Indeed, in *Atkins*, the Supreme Court expressly limited its holding to the mentally retarded. *Atkins*, 536 U.S. at 320 ("[Offenders who are not mentally retarded] are unprotected by the exemption and will continue to face the threat of execution.").

---

[17] Albeit in a much different context, it is worth noting that the Supreme Court has recognized that the differences between the mentally retarded and the mentally ill permit states to treat them differently. *See Heller v. Doe*, 509 U.S. 312, 321-22 (1993).

Nor do the "evolving standards of decency" command that the Supreme Court's reasoning in *Atkins* or *Roper* should be extended to insulate from capital punishment those with mental illness. *See Thacker v. Workman*, Case No. 06-CV-0028, 2010 WL 3466707, *23-24 (N.D. Okla. Sept. 2, 2010) (declining the petitioner's "invitation to extend the Supreme Court's prohibition on executions of mentally retarded persons and minors to person with mental health issues based on 'evolving standards of decency'"). Indeed, Runyon points to no "objective indicia of society's standards," *Atkins*, 536 U.S. at 312, indicating that modern sensibilities favor such a prohibition on subjecting the mentally ill to capital prosecution. *See id.* ("Proportionality review under those evolving standards should be informed by objective factors to the maximum possible extent." (internal quotations omitted)); *Roper*, 543 U.S. at 563 (holding same).

The clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures. *Atkins*, 536 U.S. at 312. For example, at the time *Atkins* was handed down, the Court tallied that 14 states prohibited the death penalty outright, 18 states plus the federal government prohibited imposition of the death penalty upon mentally retarded individuals, and three more states had similar bills pending. *Id.* at 315; *see also id.* ("It is not so much the number of these States that is significant, but the consistency of the direction of change."). Here, however, Runyon has not cited and the Government has not found a single legislative act prohibiting the imposition of capital punishment upon individuals who displayed mental illness at the time they committed a capital offense, other than, of course, those who satisfy the time-tested defense of insanity.

Likewise, several state high courts have refused to recognize a constitutional bar to imposing capital punishment upon mentally ill individuals. In fact, the wave of post-*Atkins* authority from state courts demonstrates that the national consensus is *against* an absolute bar to

131

**2615**

capital punishment for the mentally ill. *See People v. Hajek*, 324 P.3d 88, 173-74 (Cal. 2014) (holding serious mental illness does not necessarily negate moral responsibility for killing and declining "to say that executing a mentally ill murderer would not serve societal goals of retribution and deterrence" ); *State v. Dunlap*, 313 P.3d 1, 35-36 (Idaho 2013) (joining several state and federal courts "in holding that a defendant's mental illness does not prevent imposition of a capital sentence"); *Malone v. State*, 293 P.3d 198, 216 (Okla. Crim. App. 2013) ("We expressly reject that the *Atkins* rule or rationale applies to the mentally ill."); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010) (holding prohibition under *Atkins* against execution of mentally retarded as cruel and unusual punishment did not extend to a mentally ill defendant); *Dotch v. State*, 67 So.3d 936, 1006 (Ala. 2010) ("Under constitutional guidelines, in order to be exempt from the imposition of the death penalty, a defendant must meet the definition of mentally retarded or the definition of legal insanity . . . and this Court will not extend or expand the constitutional prohibitions against the application of the death penalty in this case.") (citations omitted); *State v. Hancock*, 840 N.E.2d 1032, 1059-60 (Ohio 2006) (holding Eighth Amendment's prohibition against execution of mentally retarded persons did not extend to mentally ill defendant; rather, mental illness was mitigating factor that jury could consider); *Diaz v. State*, 945 So.2d 1136, 1152 (Fla. 2006) (holding that even if petitioner could prove he suffered from mental illness, this fact "would not automatically exempt him from execution as there is no per se 'mental illness' bar to execution"), *abrogated in part on other grounds by Darling v. State*, 45 So.3d 444 (Fla. 2010);[18] *People v. Runge*, 917 N.E.2d 940, 985-86 (Ill. 2009) (declining to extend *Atkins* or *Roper*, and holding that even a finding of "guilty but

---

[18] The Florida and Indiana Supreme Courts have also rejected equal protection challenges to the imposition of the death penalty upon mentally ill persons because such persons are not similarly situated to persons with mental retardation or persons aged younger than 18 at the time of their crimes. *See Carroll v. State*, 114 So.3d 883 (Fla. 2013); *Matheny v. State*, 833 N.E.2d 454 (Ind. 2005).

**2616**

mentally ill" does not preclude imposition of the death penalty); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006) (noting that "federal and state courts have refused to extend *Atkins* to mental illness situations"); *Baird v. State*, 831 N.E.2d 109, 115-16 (Ind. 2005) (holding neither evolving standards of decency, changes in legal landscape, nor development of statewide consensus since petitioner was sentenced to death indicated that death sentence had come to constitute cruel and unusual punishment for persons with mental illness); *Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005) (stating defendant failed to "cite any authority that establishes a constitutional prohibition on convicting and sentencing to death a defendant who is competent but mentally ill," and declining to extend the holding of *Atkins*).

Recognizing there is no national consensus in favor of abolishing the death penalty for mentally ill offenders, this Court's inquiry on the merits should stop here. While the Supreme Court has stated that it must also bring its independent judgment to bear on the question of the acceptability of the death penalty under the Eighth Amendment, *Atkins*, 536 U.S. at 312, the Court has never expressed its independent judgment regarding the propriety of imposing capital punishment upon the mentally ill. Thus, this Court would exercise an extraordinary and unprecedented assumption of power to do so in this case. Instead, this Court should leave to Congress the duty of creating new laws. *Atkins*, 536 U.S. at 324 (Rehnquist, C.J., dissenting) (stating it is undeniable that "the democratic branches of government and individual sentencing juries are, by design, better suited than courts to evaluat[e] and giv[e] effect to the complex societal and moral considerations that inform the selection of publicly acceptable criminal punishments").

133

**2617**

2. The rationale underlying *Atkins* and *Roper* does not apply to the mentally ill.

Even ignoring the legal deficiencies of Runyon's claim, he has not set forth a sufficient basis for this Court to "disagree with the judgment reached by the citizenry and its legislators," *Atkins*, 536 U.S. at 313, as well as the several courts cited above, who have refused to establish a categorical bar to the imposition of capital punishment upon mentally ill individuals who do not meet the criteria of an insanity defense.

In *Atkins* and *Roper*, the Supreme Court held that the justifications for the death penalty (retribution and deterrence) did not apply to the mentally retarded or juveniles because they were generally less morally culpable and less susceptible to deterrence. *See id.* at 319-20; *Roper*, 543 U.S. at 569-70. The *Atkins* Court also stated that the reduced mental capacity of the mentally retarded impermissibly enhanced the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. *Id.* at 320-21 (citing concerns with false confessions, the inability of mentally retarded defendants to assist counsel in presentation of mitigation, that mentally retarded defendants make poor witnesses, that their demeanor may create an impression of lack of remorse, and that evidence of mental retardation may also enhance the likelihood that the jury will find future dangerousness as an aggravating factor).

The Court's rationale underlying its decisions in *Atkins* and *Roper* does not come to bear in the present context. The justifications for capital punishment, to wit: retribution and deterrence, apply with full force to mentally ill persons who do not meet insanity standards. Short of the legally insane, legislatures, courts, and the general public have not recognized the mentally ill to be "categorically less culpable than the average criminal." *See Atkins*, 536 U.S. at 316. Nor have they recognized the mentally ill to lack the capacity to be deterred. The facts of this case certainly bear on these points. Assuming Runyon displayed any form of mental illness

at the time of the murder, its manner of execution, as found by the jury, required substantial planning and premeditation, and was not impulsive or the product of some diminished ability to understand or process the situation. Rather, the murder of Cory Voss required planning and deliberate conduct. This is precisely the type of conduct and thinking that deserves the ultimate punishment and that is intended to be deterred with the federal death penalty.

What is more, classifying a person as mentally ill for the purpose of providing a blanket exemption to capital punishment is fundamentally different from classifying juveniles or the mentally retarded. A person is either under the age of 18 or he is not. He is either mentally retarded or he is not. Mental illness, on the other hand, is subject to varying types and degrees of illness. Even if mental illness is present, there must also be a question of how that illness affected the offender's ability to understand the wrongfulness of his actions or to conform his conduct to the law. Further, mental illness is, in most instances, treatable through medications and/or counseling therapy.

The differences between mentally ill and non-mentally ill offenders, unlike the differences between juvenile and adult offenders, are not "too marked and well understood" to allow a mentally ill person to be sentenced to death despite purportedly reduced culpability. *Roper*, 543 U.S. at 572-73. Further, given the need for individualization in capital sentencing, it would be arbitrary and unnecessary to adopt a categorical rule barring imposition of the death penalty upon the mentally ill. This Court should not agree to establish this new and ill-defined category of murderers who would receive a blanket exemption from capital punishment without regard to the individualized balance between aggravation and mitigation in a specific case. *See Hancock*, 840 N.E.2d at 1059-60. To do so would, in a great number of cases, turn over the

135

**2619**

determination of the appropriateness of capital punishment to mental health professionals of varying qualifications and biases, and leave the sound judgment of juries as an afterthought.

### 3. Other remedies are available.

None of this is to say that individuals with severe mental illness are without recourse. Congress has clearly defined and federal courts have for years applied a defense for the legally insane. It is an affirmative defense . . . that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. 18 U.S.C. § 17(a). Mental disease or defect does not otherwise constitute a defense. *Id.* The defendant bears the burden of proving the defense of insanity by clear and convincing evidence. 18 U.S.C. § 17(b). Should a capital defendant satisfy the elements of the insanity defense, he/she may not only avoid capital punishment, but criminal responsibility altogether. *See* 18 U.S.C. § 4242. Thus, it is wholly unnecessary to hold a separate pretrial hearing to determine whether a capital defendant is mentally fit for capital prosecution.[19]

In sum, neither *Atkins*, nor *Roper* shield mentally ill individuals from capital punishment. Nor does the Constitution or any statute.

---

[19] In a slightly different context, the Supreme Court has held that the Eighth Amendment prohibits the government from carrying out a sentence of death upon a prisoner who is insane. *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986). *See also* 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person."). This prohibition applies despite a prisoner's earlier competency to be held responsible for committing a crime and to be tried for it. *Panetti v. Quarterman*, 551 U.S. 930, 934 (2007). Lower federal courts, however, have refused to extend this rule to mentally ill individuals who do not satisfy the rather strict competency to be executed standard set forth in *Ford*. *See, e.g., Ferguson v. Sec'ty, Fla. Dept. of Corrections*, 716 F.3d 1315 (11th Cir. 2013); *Green v. Thaler*, 2012 WL 4800431 (5th Cir. 2012); *Bedford v Bobby*, 645 F.3d 372 (6th Cir. 2011).

136

**2620**

**Claim 15:** **The selection of the grand jury/or petit jury was not tainted, and trial counsel did not unreasonably fail to request and examine the jury selection records.**

A.    Selection of the grand and petit juries were not tainted.

The defendant assigns numerous errors without specificity regarding the selection of the grand and petit juries. Although the defendant has amended his claim, he has not added a substantive argument. This claim is procedurally defaulted. The defendant could have made this claim at trial and on appeal, but failed to do so. The defendant must demonstrate "cause" for his double procedural default and "actual prejudice" resulting from the error. *Frady*, 456 U.S. at 167-68. The defendant has failed to address cause for his default and what prejudice he suffered.

Procedural default notwithstanding, Runyon fails to articulate any argument, much less any evidence, that supports his claim that he is entitled to relief. He claims that he has not received the evidence necessary to substantiate his claim. The United States disagrees. This claim should be denied.

B. The trial court did not substantially fail to comply with the Jury Selection Plan and the provisions of Title 28 U.S.C. §1861 *et. seq.*

The defendant argues next that the trial court failed to substantially comply with the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia (hereafter the Plan) and the provisions of the Jury Selection and Service Act of 1968, Title 28 U.S.C. §1861 *et. seq.* (hereafter the Act.) As this claim is being made for the first time since the February 2008 indictment, almost eight years after the fact, this claim is procedurally defaulted (see above) and untimely pursuant to the Act. Nonetheless, the trial court did not substantially fail to comply with the EDVA Jury Selection Plan and the statute, thus Runyon is not entitled to a new trial.

1. <u>Timeliness</u>

This claim is untimely. It is important to note that the defendant is not making a Sixth Amendment claim, but rather a statutory and Plan violation claim.[20] Title 28 U.S.C. § 1867, provides a criminal defendant or the United States, upon timely motion, a remedy if a trial court fails to *substantially* comply with the jury selection process as outlined in Title 28, U.S.C. § 1861 *et. seq.;* "(a) In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of due diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury." The defendant has not made a timely motion. In *United States v. Curry*, 993 F.2d 43, 44 (4th Cir. 1993), the Fourth Circuit held that a defendant who was denied the master grand jury list prior to trial does not in and of itself require a reversal, but may lead to a new trial if he could demonstrate, *upon a timely motion*, a violation of the act which prejudiced him. This case is distinguishable from *Curry*, where the defendant had made a request prior to his trial for the master grand jury list and the trial court denied the request. Here, such a request was never made until just prior to the filing of the habeas petition.

Other circuits have addressed the timeliness requirement of a statutory violation. The Fifth Circuit addressed the issue in *United States v. Beardon*, 659 F.2d 590, 597 (5th Cir. Unit B 1981), *cert denied* 456 U.S. 936 (1982). There, some of the defendants involved in the case filed timely motions before trial, while others did not. On appeal, the court held that the defendant's motions that were untimely filed in the trial court, were not cognizable on appeal, "[T]he timeliness and sworn statement requirement of the Act provide that the motion to dismiss must

---

[20] A Sixth Amendment violation claim may avoid the strict timeliness requirements of a statutory claim. See *United States v. Grisham*, 63 F.3d 1074, 1077 (11th Cir. 1995), *cert denied* 516 U.S.1084 (1996).

138

**2622**

state the 'facts' and 'grounds' on which the motion rests. 28 U.S.C.A. §§1867(a), (d). The purpose of these requirements is to allow the court to quickly assess the merits of the motion and to determine whether an evidentiary hearing is warranted." The Eleventh Circuit concurred holding in *United States v. Paradies*, 98 F3d. 1266, 1277 (11th Cir. 1996) that the timeliness of filing a challenge "is to be strictly construed, and failure to comply precisely with its terms forecloses a challenge under the Act. (*quoting United States v. Beardon*, 659 F.2d at 595). The court stated further, "once voir dire begins, Jury Selection Act challenges are barred, even where the grounds for the challenge are discovered only later." *Paradies*, 98 F3d. at 1278. Accordingly, the Court should deny this claim as untimely filed.

2. <u>Declaration of Defense Counsel under 28 U.S.C. § 1867 (d)</u>

Counsel for Runyon, Ms. Brace, filed a Declaration, Exhibit 39, ECF 511-39, pursuant to Title 28 U.S.C. § 1867 (d) which states in pertinent part, "Upon motion filed under subsection (a), (b), or (c), of this section, containing a sworn statement of facts which, if true, would constitute failure to comply with the provisions of this title...." Such a declaration is a prerequsite to a claim under the Act. The United States submits, however, that this Declaration has failed to state facts which, if true, constitute any violation of the Act. Runyon has failed to articulate any facts of a violation of the Act, much less a substantial failure by the Court. *See Paradies*, 98 F3d. at 1278-1279.

3. <u>"Substantial Failure"</u>

The defendant next claims that the Court substantially failed to comply with the Act because it failed to make notations regarding the disqualifications, excuses, exemptions, and exclusions of some potential jurors. Even assuming that this claim is cognizable in a habeas petition, the defendant's claim fails because the Court did not substantially fail to comply with

the Act.

Pursuant to Title 28, U.S.C. §1866(d) and the EDVA Plan, the clerk must note the specific reasons for any disqualification, excusal, exemption or exclusion. Specifically, the defendant claims that the Court failed to specify a reason for the disqualification, excusal, exemptions and exclusions of "148 jurors" (94 under the category "court order" plus 54 where no reason was given).[21] The defendant then posits that because these reasons are not specifically noted there has been a substantial violation of the act that requires reversal of his conviction and a new trial. The defendant cites no case law to support this proposition.

The Court provided counsel, pursuant to Memorandum Orders, ECF 475 and 481, a sealed packet containing a Memorandum dated October 5, 2015 from Amanda Woodall, the Jury Clerk for Norfolk and Newport News Divisions with supporting documents. The Memorandum contained attachments with a statistical breakdown of the Grand Jury (3), a statistical breakdown of the petit jury (4) and the list of reasons for disqualification, etc. (5). The defendant's argument does not concern the Grand Jury, but the petit jury. While the first page of section (4) of the Memorandum entitled "Source List/Race and Gender Report for Entire Pool" that was provided to counsel shows a total number of jurors called at 425, both the United States and the defense actually counted 423 jurors from section (4) of the attachments to the Memorandum. Two hundred forty three (243) jurors filled out a questionnaire, which leaves 180 jurors. Of those 180 jurors, 127 jurors were disqualified/exempted etc., which leaves 53 jurors that were not accounted in the raw numbers of section (5) of the Memorandum.

"A Jury Selection Act violation is substantial only if it frustrates the Act's two basic goals: '(1) random selection of juror's names; and (2) use of objective criteria for determination

---

[21] The United States actually counts 96 jurors that were excused under the category "court order" and that left 53 jurors that were not accounted for in a category of disqualification/ exemption.

of disqualifications, excuses, exemptions, and exclusions'". *Paradies*, 98 F3d. at 1277, *quoting United States v. Gregory*, 730 F.2d 692, 699 (11th Cir. 1984), *cert denied*, 469 U.S. 1208 (1985) and *United States v. Carmichael*, 685 F.2d 903, 911 (4th Cir. 1982). The remedy for a substantial violation is that the court stay the proceedings or dismiss the indictment, whichever is appropriate pursuant to Title 28, U.S.C. §1867(d). The United States submits that the Court may very well have had reasons for these disqualifications, excuses, exemptions, and exclusions that have not been provided to counsel at this point.[22] But even if this evidence no longer exists, there has not been a substantial failure by the Court to comply with the Act. The defendant's mere argument and speculation do not give rise to a substantial failure. Runyon has not produced any specific evidence that the court failed to use objective criteria for any removals. At most, there has been a technical violation of the Act and those types of violations are generally not deemed substantial. *See Carmichael*, 685 F.2d at 911, *United States v. Meredith*, 824 F.2d 1418, 1424 (4th Cir. 1987), *Gregory*, 730 F.2d at 700 and *Paradies*, 98 F3d. at 1280. Specifically, the defendant's argument regarding the number of jurors that he says were excused without notation, 148, fails. First, the exemption category "court order" is a specific category of exemptions. Accordingly, the defendant's argument that it is not a category is without merit. That leaves 53 jurors unaccounted for in the raw numbers of section (5) of the Memorandum. (Despite the differences in the United States and defendant's calculation of the numbers, there are slightly over 50 jurors that the Court's documents do not list a code for disqualification or exemption.) The defendant concludes that these jurors were excluded using nonobjective criteria, which must somehow be discriminatory. There is absolutely no evidence to support this argument and the defendant has not shown any prejudice that has inured to him. The defendant offers *United States*

---

[22] The answer may be as simple as these individuals were deferred or did not return their standard jury questionnaires to the Court or failed to appear on a summons. *See United States v. Aguero*, 248 F. Supp 2d, 1150, 1152 (S.D. Florida, Miami Division Jan. 23, 2003.)

141

*v. Royal*, 174 F3d 1, (1ˢᵗ Cir. 1999) as an example of a judge's displeasure of ten unrecorded dismissals of black jurors. However, the court found that those dismissals did not constitute a substantial violation of the Act. In *Carmichael*, 685 F.2d at 911, the Fourth Circuit ruled that technical violations do not qualify as substantial unless the two objectives furthered by the Act have been affected. These objectives are "random selection of juror names from voter lists and determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only". The defendant has the burden to show that the Court dismissed these jurors using for nonobjective reasons and he has not done so.

The defendant also claims that the petit venire excluded Native Americans and Asians. The defendant claims, according to the records, that one of the Native Americans was excluded by "court order", while the other was not given a reason for the exclusion. There were 16 Asians that were called for jury duty and five were excluded under a "court order", one because he/she no longer lived in the jurisdiction and three where no reason was given. The defendant states in his amended motion, "No other group was decimated at this level". If the defendant is making an argument regarding a violation of the fair cross-section requirement of the Act, he has failed. In order to prevail on this claim, the defendant must show: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to a systematic exclusion of the group in the jury-selection process. *Duren v. Mississippi*, 439 U.S. 357, 364 (1979) and *United Sates v. Lewis*, 10 F.3d 1086, 1089-90 (4ᵗʰ Cir. 1993). While Native Americans and Asians are distinctive groups, the defendant has failed to put forth any evidence that "the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the

142

**2626**

number of such persons in the community; and (3) that this underrepresentation is due to a systematic exclusion of the group in the jury-selection process". Accordingly, these claims fail.

C.      A person who did not qualify did not participate in Runyon's trial .

This claim is procedurally defaulted. Nonetheless, there was no error committed by the court. The defendant contends that a juror with the initials of S.M.G. participated in the trial and is not listed in the qualified jury wheel therefore tainting the jury process. A person with the initials of S.M.G. (juror 84 from sealed Exhibit A list of jurors appearing on June 30, 2009) took part in the petit jury selection process. However, on the juror questionnaire for juror 84, the initials of S.M.R. filled out the questionnaire. The United States submits that the evidence shows that this is the same person. First, while the last initial is different, the first and middle initials are the same. Second, the 2007 Norfolk Qualified Wheel, participation number 100760415, shows a juror with the initials of S.M.R. who lives in Virginia Beach with a zip code of 23464. This person is a white female. The Juror Questionnaire filled out by juror 84 has the initials of S.M.R, who is a white female who lives in Virginia Beach with a zip code of 23464. Additionally, on page 15 of the questionnaire, question 67, the juror wrote that she knew a person on the potential witness list who has the initials of M.D. On the first day of trial, June 30, 2009, juror S.M.G. told the court that she knew the same potential witness, M.D. TT, p 36. Accordingly, juror 84 is the same person. Perhaps this person changed their name due to a marriage or divorce. The defendant's claim is without merit and should be denied.

D.      Trial counsel was not ineffective for failing to request and examine the Jury Lists.

While it is true that counsel has a right to inspect jury lists, the failure to make this request does not make counsel's performance deficient. *Test v. United States*, 420 U.S. 28, 30 (1975). According to *Strickland v. Washington*, 466 U.S. 668 (1984), in order to prevail on an

ineffective assistance claim, a criminal defendant must show both (1) that counsel's representation was deficient, and (2) that the defendant was prejudiced by counsel's performance. *Id.* at 693. Although a defendant must prove both prongs, a reviewing court need not examine or even address both prongs if a defendant makes an insufficient showing on one. *Id.* at 697.

Runyon has failed to show that his counsel's performance was deficient. He merely quotes from the ABA Guideline, which states only "Counsel should consider...." Runyon cites no case law to support the proposition that counsel was deficient for failing to request the jury lists. Furthermore, Runyon cannot prove that he was prejudiced by such failure; he merely makes a speculative conclusion. Accordingly, this claim fails.

**Claim 16:** **<u>The United States did not engage in racial and gender discrimination during jury selection and defense counsels were not deficient in their performance for failing to object.</u>**

Runyon asserts that the United States violated his Fifth Amendment Equal Protection right for the peremptory strikes used at trial, and that his trial counsel failed to object in violation of his Sixth Amendment right to effective assistance of counsel. These claims lack merit.

A. <u>Procedural Default</u>

Runyon's substantive Fifth Amendment claim, that the United States discriminated against blacks and women in the selection of the jury, has been procedurally defaulted. Runyon, who is white, did not make this claim at the time of trial, nor did he raise it on appeal. Instead, he raises this claim for the first time more than six years after his trial. Accordingly, Runyon must show cause for his failure to raise it at an earlier time and actual prejudice resulted from the error. *Frady*, 456 U.S. at 168–70. The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the crime or a denial of an effective

**2628**

assistance of counsel. *Mikalajunas*, 186 F.3d at 493. The standard for prejudice is that the alleged error that led to the issue not being raised on appeal worked to the defendant's "actual and substantial disadvantage, infecting his entire trial with error." *Frady*, 456 U.S. at 170.

Runyon has failed to satisfy the standards set in *Frady* and *Mikalajunas*. Accordingly, his substantive claim fails. *See United States v. Lighty*, 2014 WL 5509205 (D. Maryland Oct. 30, 2014).

B.      Ineffective Assistance of Counsel Claim

To prevail on an ineffective assistance of counsel claim, Runyon must show both that his attorney's performance fell below an objective standard of reasonableness and that he was prejudiced by that deficient performance. *See Strickland*, 466 U.S. at 687. Given there was no discrimination by the United States, Runyon cannot satisfy either of the *Strickland* requirements. Counsel was not ineffective for failing to press this futile motion at trial.

1.  Trial Counsels performance was not deficient.

There were six trial counsel present at trial selecting a jury. Two counsel a piece for both Runyon and co-defendant Draven and they shared the 20 peremptory strikes. There were two counsel for the United States. No objections were made during the jury selection by Runyon's defense counsel or Draven's.

In *Batson v. Kentucky*, the Supreme Court recognized the prohibition against litigants using peremptory challenges "solely on account of race." 476 U.S. at 89. In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128-29 (1994), the Supreme Court extended *Batson*'s holding and found that a gender-based exercise of a peremptory challenge violates the Equal Protection Clause of the Constitution. As the Supreme Court detailed in *Rice v. Collins*, the *Batson*

145

**2629**

decision established the procedure for determining whether a party has improperly relied on race during jury selection:

> A defendant's *Batson* challenge . . . requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race.... Second, if the showing is made, the. . . prosecutor [must] present a race-neutral explanation for striking the juror in question. . . . "[T]he second step . . . does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices.... Third, the Court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."

546 U.S. 333, 338 (2006). As detailed below, Runyon has failed to present adequate evidence as to any of these steps. Consequently, the Court should deny all claims based upon the submissions.

Under *Batson*, a defendant may establish a prima facie case of discrimination by showing that: (1) the defendant is a member of a distinct racial group; (2) the prosecutor has used the challenges to remove from the venire members of the defendant's race; and (3) other facts and circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in his or her selection of the jury pool. *Batson*, 476 U.S. at 96-97. The Supreme Court has modified *Batson* to allow defendants of races different than the excused jurors to have standing to raise *Batson* challenges. *See Powers v. Ohio*, 499 U.S. 400, 415 (1991).

Given the fact that the defendant and the victim are white males, and Runyon alleges discrimination against blacks and women, he patently cannot satisfy the first two elements of a prima facie case. *See Keel v. French*, 162 F.3d 263, 271 (4th Cir. 1998) ("First, neither the defendant nor the victim is of the same race as the jury. While the defendant need not be a member of the same race as the excused jurors in order to raise a *Batson* challenge, that *Keel* and

the jurors are of different races eliminates the argument that the jurors sympathize with the defendant because they share the same race.") (internal citations omitted). Therefore, to establish a prima facie case here, Runyon must show other facts and circumstances surrounding the proceeding sufficient to raise an inference of purposeful intent by the United States to discriminate based on all of the relevant evidence. *United States v. Joe*, 928 F.2d 99, 102(4th Cir. 1991) (*citing Batson*, 476 U.S. at 96).

Runyon argues that by looking solely at the statistics of the strikes made by the United States, he has made a prima facie case of discrimination in violation of *Batson* and *J.E.B.* Runyon further argues that discrimination and the intent of the United States can be shown based upon the fact that the videotape of Runyon's questioning by police was introduced into evidence at the penalty phase of trial. In that videotape, officers referred to Runyon as "an honorable Asian man." Runyon does not make any further argument about the discrimination of women by the United States.

As the Fourth Circuit has noted, "[t]hough statistics are not utterly bereft of analytical value, they are, at best, manipulable and untrustworthy absent a holistic view of the circumstances to which they apply." *Allen v. Lee*, 366 F.3d 319, 330 (4th Cir. 2004). Rather, the defendant must come forward with something beyond mere raw data. *United States v. Tipton*, 90 F.3d 861, 881, n.11 (4th Cir. 1996) (rejecting a gender-discrimination claim where the defendants produced no evidence to support their argument other than "raw figures" of four men versus eight women stricken).

The jury which convicted Runyon, a white male, during the guilt phase consisted of eight women and four men, nine whites and three blacks. The four alternates chosen were two white males and two white females. The United States used 19 of its 20 peremptory strikes to select the

147

**2631**

jury. The United States struck 13 women, six were white and seven were black. During the selection of the alternates, the United States struck one white female and one black male. Runyon and Draven struck, 20 whites, consisting of eight women and 12 men. During the selection of the alternates, Runyon and Draven struck one black male and a female, who failed to identify her race on her questionnaire (juror 166). Counsel for Runyon were not deficient in their performance in failing to make a *Batson* challenge because the United States struck women and blacks who answered question 61 of the questionnaires that they were either opposed to the death penalty (question 61(d)) (Jurors 7, 28, 52, 97, 81, 31, 40, 63, 46, ) or answered both that they were generally opposed and generally in favor of the death penalty (question 61( c) and (d)) (jurors 18, 73, 116, 15). Furthermore, a number of these jurors either had served in the military or had relatives serving in the military or had served in the military (Jurors 7, 52, 31, 63, 18, 15). Presumably, Runyon would not want people serving on the jury who may have sympathy for the victim Cory Voss, a Naval Officer. In *Keel*, 162 F.3d at 271, the Fourth Circuit stated, "Given these jurors opposition to, or hesitation toward, imposing the death penalty, it clear that the prosecutor acted well within constitutional bounds in excusing them." (quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (1985)).

If the government were acting with a purposeful intent to exclude prospective jurors based upon gender or race, it would have used its peremptory remaining strike to exclude another female or black person from the venire. The various statistical permutations presented by the defendant are not only misleading, under the controlling precedent set forth in *Tipton,* they are inadequate to make a prima facie case of discrimination. *See also Keel,* 162 F.3d at 271-72 (defendant failed to establish prima facie case based upon the states use of nearly 70% of its peremptory challenges to strike African-American venire members). Clearly, trial counsels'

**2632**

failure to raise a *Batson* challenge was based upon the premise that there was racially and gender neutral reasons for the prosecution's use of their peremptory strikes. Accordingly, Runyon cannot make a prima facie case and trial counsels conduct did not fall below the conduct reasonably expected of counsel.

In order to prevail on a *Strickland* claim, a criminal defendant must show both (1) that counsel's representation was deficient, and (2) that the defendant was prejudiced by counsel's performance. 466 U.S. at 693. Although a defendant must prove both prongs, a reviewing court need not examine or even address both prongs if a defendant makes an insufficient showing on one. *Id.* at 697. To establish counsel's representation was deficient, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The reasonableness of attorney performance is simply "reasonableness under prevailing professional norms." *Id.* Counsel's performance need do no more than insure the trial was a "reliable adversarial testing process." *Id.*

Runyon fails to demonstrate that his counsel performed deficiently. Moreover, based on this record, Runyon cannot show actual prejudice. He proffers no evidence that the United States used race or gender in exercising its peremptory strikes.

Runyon has failed to produce sufficient evidence to overcome his procedural default and that his trial counsel were ineffective. This claim should be denied.

**Claim 17:** <u>**Runyon's constitutional challenge to the voir dire procedure is procedurally defaulted and trial counsel did not provide ineffective assistance during jury selection**</u>

A.  <u>Runyon's constitutional challenge is procedurally defaulted and Teague-barred.</u>

Runyon contends that the Court's voir dire procedure used in his trial violated his Fifth and Sixth Amendment rights. Specifically, he claims that the questionnaire used in selecting the

149

**2633**

jury was flawed (referencing Claim S2); that this Court gave the jurors no guidance regarding the law before completing the questionnaire; that this Court's oral voir dire was minimal; and that the Court's questions to potential jurors were inadequate.

At a threshold level, this claim is procedurally defaulted. Runyon failed to raise this claim on direct appeal and he fails to demonstrate cause and prejudice for his default. *Frady*, 456 U.S. at 170. This claim should be denied on this basis alone.

This claim is also barred by the non-retroactivity doctrine under *Teague*. As of October 6, 2014, when Runyon's convictions and sentences became final, existing precedent did not dictate a grant of relief on Runyon's claim. Runyon asks this court to apply a new rule contrary to existing precedent giving the trial court discretion to conduct voir dire. Further, neither of the *Teague* exceptions apply here because Runyon's proposal would only take discretion away from the trial court and not exclude certain offenses or offenders from the death penalty, and it is not a watershed rule.

B.    Runyon's claim fails on the merits in any event.

Procedural default notwithstanding, Runyon fails to demonstrate that this Court's voir dire procedure in his trial was constitutionally infirm. The trial court conducted a proper voir dire and Runyon does not proffer any evidence that the jury was impartial.

Voir dire plays an essential role in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury. *United States v. Lancaster*, 96 F.3d 734, 738 (4th Cir. 1996) (citing *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Voir dire also "enable[s] the court to select an impartial jury and assist[s] counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). The conduct of voir dire is committed to the sound discretion of the trial court. *United States v. Bakker*, 925 F.2d 728, 733–34 (4th Cir. 1991). The

**2634**

Supreme Court has generally refrained from dictating the form of voir dire questions. *Lancaster*, 96 F.3d at 739 (citing *Mu'Min*, 500 U.S. at 431). It is well settled that the trial court has discretion to question potential jurors without allowing counsel to question them, and to conduct the questioning collectively rather than individual. *Bakker*, 925 F.2d at 734; *see also* Fed.R.Crim.P. 24(a).

To obtain a new trial based on alleged juror dishonesty during voir dire, a defendant "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). In addition, "even where . . . the two parts of the *McDonough* test have been satisfied, a juror's bias is only established . . . if the juror's motives for concealing information or the reasons that affect the juror's impartiality can truly be said to affect the fairness of the trial." *Conaway v. Polk*, 453 F.3d 567, 588 (4th Cir. 2006) (internal quotation marks omitted).

Runyon first complains that the trial court's oral voir dire was minimal, asked follow-up questions of few potential jurors, and only addressed the potential jurors collectively.[23] But a review of the voir dire conducted by the trial court here reveals that the process the trial court conducted was fair and ensured that an impartial jury was impaneled. Runyon proffers no evidence that his jury was impartial.

Prior to jury selection, the parties submitted and the court accepted a jury screening questionnaire to assist in gathering information from potential jurors. ECF 211. After the parties culled the questionnaires and submitted a stipulated list of jurors they agreed were not qualified to serve, the trial court conducted collective questioning of a group of 62 potential

---

[23] Runyon also incorporates his argument in Claim S-2 that the jury questionnaire was flawed. The Government relies on its response to that argument in Claim S-2.

jurors. TT, p. 10. The trial court explained to the parties that they would be given the opportunity to have the court ask any follow-up questions or object to the voir dire process. *Id.* at 44. During questioning of the first group of 62 potential jurors, the trial court instructed them that they would be required to "put aside any feeling of passion or prejudice and decide this case solely on the evidence that would be introduced during the trial and the instructions that I would give you as the judge, as the court, concerning the law of the case." *Id.* at 52-53.

The trial court also asked appropriate screening questions regarding potential jurors opinions regarding the death penalty as required by *Morgan v. Illinois*, 504 U.S. 719 (1992). (*Id.* at 77, 98–99, 102–03, 124; TT, 7/1/09, pg. 175.) After questioning the potential jurors, the trial court gave the parties an opportunity to submit any follow-up questions to be considered, (*Id.* at 115), and did ask follow-up questions proposed by Runyon. *Id.* at 117–18. Throughout the jury selection process the trial court asked the parties if they had any objections to the voir dire process—as to the process, they did not. *Id.* at 62, 108–09, 125; TT, p. 176.

Runyon's complaint that oral voir dire was constitutionally flawed because it was "minimal" is without merit. He cites no case law requiring a quantitative comparison of voir dire. *See Bakker*, 925 F.2d at 733 (rejecting contention that voir dire was not sufficient because it was completed in one day). The relevant question is whether an impartial jury was seated. *United States v. LaRouche*, 896 F.2d 815, 830 (4th Cir. 1990). Runyon fails to demonstrate that his jury was impartial. The trial court here conducted a sufficient voir dire directed at disclosing those jurors impacted by either media exposure or personal beliefs that had a substantial impact on their ability to serve as jurors.

Runyon also contends that the trial court's collective questioning of potential jurors was inadequate. He argues that 34 percent of the potential jurors did not speak during voir dire and

the trial court therefore did not properly assess their credibility. Runyon argues that questions addressed to groups of individuals provides an opportunity for potential jurors to conceal bias. The trial court's collective questioning of potential jurors here was not constitutionally infirm. The Constitution "does not dictate a catechism for *voir dire,* but only that the defendant be afforded an impartial jury," and the form of voir dire is in large measure left to the discretion of the trial court. *Morgan,* 504 U.S. at 729. Questioning potential jurors in a collective setting was well within the trial court's discretion. *Bakker,* 925 F.2d at 734.

Moreover, Runyon fails to proffer any evidence that a juror concealed any information suggesting that a biased juror served at his trial. Runyon asserts that this Court's voir dire failed to reveal that Juror 124 was purportedly employed by Langley Federal Credit Union, and that trial counsel was ineffective for failing to strike Juror 124. Runyon's argument implies that the Court's voir dire process allowed a bias juror to serve on the jury. The fact that Juror 124's employer was not revealed through oral voir dire does not mean that the juror intentionally concealed the information or that the Court's jury selection process was inadequate. The juror's employer was revealed through a questionnaire, thus the juror did not conceal the information. In addition, this information was available to counsel, through the questionnaire, for a determination as to whether to make a peremptory challenge. Furthermore, any claim of bias as to Juror 124 is belied by the Court's dismissal of the bank robbery charge in count 3. The basis for any bias was thus absent based on the dismissal of the charge.

Runyon points to no evidence that any member of his jury labored under any disqualifying criteria or that any impartiality affected the fairness of his trial. *McDonough,* 464 U.S. at 556. Likewise, for the same reasons, Runyon's claim of ineffective assistance of counsel

153

**2637**

must fail. Runyon cannot demonstrate that he was prejudiced by counsel's failure to strike Juror 124.

Runyon argues that the trial court failed to properly inquire whether potential jurors could "make a decision about his guilt or innocence without considering the sentencing options that might follow." *See Petitioner. Brief* at 120. He complains that the trial court simply asked potential jurors whether they "understood" that their duty was to determine guilt or innocence first without consideration of penalty instead of asking whether they could comply with that command. This argument places form over substance and is without merit.

Both Runyon and the Government submitted proposed voir dire questions, in addition to the jury screening questionnaire, to the trial court prior to jury selection. ECF 158, 173. The trial court, for the most part, used those questions in forming its questioning of potential jurors. At the beginning of the voir dire process, the trial court provided guidance to potential jurors as to their duty as jurors, and informed them that they would be required to put aside any feelings of passion and prejudice and decide the case solely on the evidence that would be presented and the instructions of law given by the court. TT, pgs. 12–13, 52–53.

Runyon contends that the trial court's questioning regarding consideration of penalty and *Morgan* bias were inadequate because the court asked whether jurors "understood" the law in those areas. But trial courts need not use precise questions suggested by counsel, "nor need a particular question be asked if the substance of the inquiry is covered in another question, differently phrased, or in the voir dire as a whole." *Darbin v. Nourse*, 664 F.2d 1109, 1113 (9th Cir. 1981); *see also United States v. Tipton*, 90 F.3d 861, 878 (4th Cir. 1996) (the Constitution dictates no particular catechism for voir dire). Here, prior to the complained of questions, the trial court had already informed potential jurors that if they were chosen they would need to

154

**2638**

follow the instruction of law given by the court. TT, pgs. 52–53. Although it may have been better practice to ask whether potential jurors understood "and could follow" the law, it was unnecessary here because the trial court had informed the potential jurors of their duty to follow the court's instructions of law. Moreover, the trial court did ask potential jurors, pursuant to *Morgan*, whether they had a personal or moral opinion regarding the death penalty that would substantial impair their ability to weigh aggravating and mitigating factors and follow the court's instructions regarding the death penalty. *Id.* at 124–25. Runyon fails to demonstrate that the voir dire procedure used by the trial court failed to uncover bias or partiality in the venire. This claim should be denied.

C.    Trial counsel was not ineffective for failing to object to this Court's voir dire procedure.

Runyon argues that his trial counsel were constitutionally ineffective for failing to object to the following: (1) the trial court's failure to give guidance to potential jurors as to the death penalty in the jury screening questionnaire (Claim S-2), (2) the trial court's oral voir dire procedure, and (3) the trial court's failure to properly ask *Morgan* bias questions and whether potential jurors would comply with the law. A review of these claims above demonstrates that Runyon's contentions are meritless in that counsels' performance was neither deficient nor prejudicial.

In order to prevail on his claim of ineffective assistance of counsel, Runyon must show: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) he suffered actual prejudice. *Strickland*, 466 U.S. at 687. A defendant alleging ineffective assistance of counsel must satisfy both prongs of the *Strickland* test to prevail. *See Roane*, 378 F.3d at 404. Where a court finds that "the defendant makes an insufficient showing on one" of

2639

the prongs, consideration of the other is unnecessary. *Merzbacher v. Shearin*, 406 F.3d 356, 365–66 (4th Cir. 2013) (citing *Strickland*, 466 U.S. at 697).

Runyon cannot satisfy either prong of *Strickland*. Runyon fails to demonstrate that his trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Trial counsel was not deficient for failing to make the objections Runyon now proffers. Prior to trial, counsel filed a motion seeking individual questioning of jurors, attorney questioning, a jury questionnaire, and additional peremptory challenges. ECF 156. Like Runyon's post-conviction counsel here, trial counsel suggested that the court use individual questioning instead of collective. In addition, during voir dire, trial counsel objected to the trial court's *Morgan* question and provided the court with purported corrective language that the court adopted. TT, pgs. 76–77.

Likewise, Runyon fails to demonstrate actual prejudice. In order to satisfy the prejudice prong of *Strickland*, Runyon must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* In other words, he must demonstrate that had counsel objected to the voir dire procedure and the court's questions, the outcome of his case would have been different. But as stated above, the trial court's voir dire procedure here was not constitutionally infirm. Runyon fails to proffer any evidence that the voir dire procedure used by the trial court, including the wording of the trial court's questions, failed to seat an impartial jury. Nor does he demonstrate that counsel was hampered in their ability to exercise peremptory challenges. This claim should be denied.

**Claim S2:**   **The trial court did not violate Runyon's Fifth and Sixth Amendment rights by excluding potential jurors based solely on their juror questionnaire responses without voir dire and defense counsel did not fail to object and unreasonably participate.**

The United States' response to this claim is being filed under seal pursuant to the

Court's Order. ECF 477.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Petitioner's Amended Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. §2255.

DANA J. BOENTE
UNITED STATES ATTORNEY

By:      /s/

Lisa R. McKeel
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph: (757) 591-4000
Fax: (757) 591-0866
Email: Lisa.McKeel@usdoj.gov

By:      /s/

Brian J. Samuels
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph: (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov

By:      /s/

Jeffrey A. Zick
Special Assistant United States Attorney
United States Attorney's Office

157

**2641**

Fountain Plaza Three, Suite 300
21 Lakefront Commons
Newport News, Virginia 23606
Phone: 757/591-4000
Fax: 757/591-0866
Email: Jeffrey.Zick@usdoj.gov

**2642**

## CERTIFICATE OF SERVICE

I certify that on April 22, 2016, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system who will send notice of such filing to the following

ECF users:

**Michele Jill Brace**
Virginia Capital Representation Resource Center
2421 Ivy Rd., Suite 301
Charlottesville, VA  22903
Ph:  434-817-2970, 202-223-6380
Email: mbrace@mindsort.com

**Dana Catherine Hansen Chavis**
Federal Defender Services of Eastern Tennessee, Inc.
800 S. Gay St, Suite 2400
Knoxville, TN  37929
Ph:  (865) 637-7979
Fax:  (865) 637-7999
Email:  dana_hansen@fd.org

By:  _____/s /_____
     Lisa R. McKeel
     Assistant United States Attorney
     Attorney for the United States
     United States Attorney's Office
     Fountain Plaza Three, Suite 300
     721 Lakefront Commons
     Newport News, VA 23606
     Ph:  (757) 591-4000
     Fax: (757) 591-0866
     Email: Lisa.McKeel@usdoj.gov

**2643**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | : | No. 4:15-cv-108 |
| Petitioner, | : | Original Criminal No. 4:08-cr-16-3 |
| | : | CAPITAL §2255 PROCEEDINGS |
| v. | : | |
| | : | HON. REBECCA BEACH SMITH |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |
| | : | |

**MOTION FOR LEAVE TO SUPPLEMENT
SECOND MOTION FOR DISCOVERY
AND CONSOLIDATED MEMORANDUM OF LAW**

Pursuant to Local Civil Rule 7(F)(1) and Local Criminal Rule 47(F)(1), David Runyon, by counsel, hereby seeks leave to file the declaration of John Nixon as a supplement to his pending second motion for discovery. ECF No. 530. The second motion for discovery requests a court order requiring the Virginia Department of Forensic Science to release to undersigned counsel copies of all records related to forensic services in FS Lab #T07-4553. This request includes reports, requests for examination, certificates of analysis, bench notes, handwritten and typed notes, charts, drawings, diagrams, digital photographs in .pdf format, color copies of film photographs, email, memoranda and written correspondence. Runyon supported his request with case law finding counsel ineffective for failing to investigate physical evidence, an unpresented witness's statement that contradicts the prosecution's description of Runyon's gun, and discrepancies in the prosecution's trial evidence.

**2644**

In opposition to the motion for discovery, Respondent asserted Runyon had not shown good cause, mainly because he had not proffered a "study or evidence" to rebut the prosecution expert's trial testimony about the bullets. ECF No. 532, p.4.

In reply, Runyon pointed out that he seeks access to evidence his counsel were entitled to at trial and which his current counsel should have been able to examine, but for the fact that the custodian of the bullets reports they are missing. ECF No. 533, pp.1-2. Although he need not "rebut" the trial evidence in order to obtain discovery, Runyon referred to the 2009 National Academy of Sciences Report cited within his ineffective assistance of counsel claim and discussed additional scientific and scholarly reports and articles on the unreliability of ballistics and toolmark testimony. ECF No. 533, pp.3-5 & n.1 & 2. Runyon also discussed a recent Department of Justice program designed to review cases involving forensics—including firearms and ballistics—for testimonial inaccuracies. ECF No. 533, p.5. Runyon had previously referred to inaccuracies in the forensic evidence presented at his trial. ECF No. 530, pp.4-5.

Now, Runyon wishes to submit in support of his second discovery motion a declaration from John Nixon, a Board Certified Forensic Engineering Scientist. Mr. Nixon has reviewed the record currently available and questions the trial testimony regarding bullet, toolmark, and firearms identification. He has requested the records of the forensic examination performed by the Virginia Department of Forensic Sciences so that he may further assist counsel in Runyon's case.

In his declaration Mr. Nixon indicates, *inter alia*, that there are serious questions about whether the bullets are associated with a Taurus .357 magnum revolver, and that he needs the forensic bench notes and photographs to help identify the caliber. He reports that in searching his database for brands and models of guns of nominal 9mm bore diameter with 6 lands and grooves

2

**2645**

and a right twist, he identified more than 350 such semiautomatic pistols, more than 65 such .38 revolvers, and more than 35 such .357 revolvers. He also reports that experts in his field were cautioned in 2009 about concluding that bullets were fired from a particular firearm, especially when no firearm was available for comparison.

WHEREFORE, Runyon respectfully requests leave to submit the declaration of John Nixon as a supplement to his second motion for discovery and in support of his request for a court order requiring the Virginia Department of Forensic Science to release to undersigned counsel copies of all records related to forensic services in FS Lab #T07-4553 regarding the bullets and/or firearm involved in this case, as detailed in his motion. ECF No. 530.

Respectfully Submitted,

_____/s/_____

Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
  Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: May 24, 2016

3

**2646**

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2016, I have electronically filed the foregoing **Motion for Leave to Supplement Second Motion for Discovery and Consolidated Memorandum of Law** with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
   Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

4

**2647**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

    Petitioner,

                            ACTION NO. 4:15cv108
v.               [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

    Respondent.

## ORDER

This matter comes before the court on the Petitioner's Motion for Leave to Supplement Second Motion for Discovery and Consolidated Memorandum of Law ("Motion"), filed on May 24, 2016. ECF No. 541. The government filed its Response on May 26, 2016, ECF No. 542, and the Petitioner filed his Reply on May 31, 2016. ECF No. 543. The Motion is now ripe for review, and for the reasons stated herein, the court **GRANTS** the Motion.

On April 1, 2016, the Petitioner filed his Second Motion for Discovery, in which he requested a court order requiring the Virginia Department of Forensic Science to release copies of all records related to the ballistics evidence in his case. ECF No. 530, at 1.[1] This Second Motion for Discovery is still

_____

[1] This discovery request relates to Part H of Claim Three of the Petitioner's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence, in which he argues that counsel was ineffective for failing to challenge the ballistics tests and present sufficient evidence and testimony

**2648**

pending, and the Petitioner now seeks to supplement it with a declaration by John Nixon, a Board Certified Forensic Engineering Scientist. Mot. at 2.

The government argues that the request should be denied as the underlying challenge to the ballistics evidence was added in the Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence, which was filed outside the one-year statute of limitations in 28 U.S.C. § 2255(f), and thus, the claim should be considered untimely. Resp. at 2. The government further contends that the ballistics argument has no merit, and allowing the Petitioner to supplement his discovery request would be futile. Id. at 2-3. However, at this point, the court is not ruling on the timeliness of the ballistics argument in Claim Three or the merits of the Second Motion for Discovery. With respect to the instant Motion, the Petitioner has explained how the declaration will support his discovery request, and the government has failed to show any prejudice that would result if the Petitioner were to supplement his Second Motion for Discovery with Mr. Nixon's declaration.

Accordingly, in order to aid the court in resolving the Petitioner's Second Motion for Discovery, the court **GRANTS** the instant Motion and permits the Petitioner to file the

---

about the murder weapon, so as to create reasonable doubt about the Petitioner's guilt. ECF No. 511, at 32-34.

2

**2649**

declaration by John Nixon within five (5) days of the entry date of this Order.

The Clerk is **DIRECTED** to send a copy of this Order to counsel for the Petitioner and to the United States Attorney at Newport News.

IT IS SO ORDERED.

/s/
Rebecca Beach Smith
Chief Judge

REBECCA BEACH SMITH
CHIEF JUDGE

June 7 , 2016

3

**2650**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

|  |  |  |
|---|---|---|
| DAVID ANTHONY RUNYON,<br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Respondent. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | No. 4:15-cv-108<br>Original Criminal No. 4:08-cr-16-3<br>CAPITAL §2255 PROCEEDINGS<br>HON. REBECCA BEACH SMITH |

**SUPPLEMENT TO SECOND MOTION FOR DISCOVERY**

Pursuant to the Court's authorization (ECF No. 544), David Runyon, by counsel, hereby files the declaration of John Nixon (Attachment A) as a supplement to Runyon's pending second motion for discovery (ECF No. 530). Mr. Nixon's declaration explains that he needs to inspect the records of the forensic examination performed by the Virginia Department of Forensic Sciences related to forensic services in FS Lab #T07-4553 regarding the bullets and/or firearm involved in this case, in order to assist Runyon's counsel.

Respectfully Submitted,


_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com


**2651**

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
    Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: June 8, 2016

2

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2016, I have electronically filed the foregoing **Supplement to Second Motion for Discovery** with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

3

**2653**

## Declaration of John Nixon
### CEng, D-IBFES, BEng(Hons), MBA, FIMechE, FCMI, F-AAFS
### Board Certified Forensic Engineering Scientist

1. My name is John Nixon. I am a consultant with Athena Research & Consulting, LLC, PO Box 66, Bippus, Indiana, 46713.

2. I am trained and experienced in weapons systems research, including firearms, ballistics, ammunition, munitions, explosives and crime and accident scene reconstruction.

3. I have been published, presented papers, and provided training in subjects including firearms, ballistics, wound ballistics, tool mark comparison, ammunition, crime and accident scene reconstruction, explosives and destructive devices.

4. I have been qualified and testified as an expert in state and federal courts over 50 times.

5. I have been asked by counsel for David Runyon to review evidence and testimony regarding bullet, toolmark, and firearms identification in connection with Mr. Runyon's case.

6. I have asked to examine the bullets in the case and to review the bench notes and photographs generated by the forensic examination so that I can form a complete opinion on whether the bullets from the crime scene are associated with a Taurus .357 revolver. I have been told that the bullets cannot be located. The bench notes will have measurements of the projectiles such as weight and width and length of markings that will help to identify the caliber.

7. In 2009, experts in my field were cautioned about concluding that bullets were fired from a particular firearm, especially when there was no firearm available for comparison purposes.

8. In my review of materials in Mr. Runyon's case, I noted that the medical examiner identified the bullets as 9mm but John Willmer testified about .38 and .357 handguns.

9. I noted that the testimony regarding the use of a stainless steel bore brush was exaggerated, both in terms of the aggressiveness of such brushes, and their rarity. It is common to use stainless steel bore brushes to clean firearms. Such brushes will not easily affect rifling characteristics.

Page 1 of 2

Attachment A

**2654**

10. A database search for brands and models of guns of nominal '9mm' bore diameter with 6 lands and grooves and a right twist (as noted on the Certificate of Analysis) revealed 383 brands and models of 9mm / 380 semiautomatic pistols; 67 brands and models of .38 revolvers; and, 36 brands and models of .357 revolvers.

11. I could have provided this information and/or testimony in 2009.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 18th day of May, 2016.

_____
John Nixon

Attachment A

**2655**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON,<br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Respondent. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | No. 4:15-cv-108<br>Original Criminal No. 4:08-cr-16-3<br>CAPITAL §2255 PROCEEDINGS<br><br>HON. REBECCA BEACH SMITH |

## PETITIONER'S REPLY TO RESPONSE OF THE UNITED STATES TO AMENDED MOTION TO VACATE SET ASIDE, OR CORRECT SENTENCE

Michele J. Brace, VSB No 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana Hansen Chavis, *Pro Hac Vice*
Federal Defender Services
 of Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
dana_hansen@fd.org

**COUNSEL FOR PETITIONER DAVID ANTHONY RUNYON**

**2656**

TABLE OF CONTENTS

AFFIRMATIVE DEFENSES.................................................................................................................1

    A.   Statute of Limitations..................................................................................................1

    B.   Procedural Default .....................................................................................................2

    C.   Retroactivity of New Rules .......................................................................................4

    D.   Temporal Limitation on Amended Claims...............................................................8

Claim 1:   The Participation Of Two Dishonest Law Enforcement Officers Tainted Runyon's
Trial......................................................................................................................................**10**

    A.   Robert Glenn Ford.....................................................................................................11

    B.   Clifford Dean Posey....................................................................................................13

Claim 2:   The Prosecution Failed To Disclose Impeaching And Exculpatory Evidence In
Violation Of The Fifth, Sixth, And Eighth Amendments, United States Constitution.
15

    A.   The withheld evidence is material...........................................................................16

    B.   Runyon's *Brady* claim is not procedurally defaulted. .........................................19

    C.   The withheld evidence would have been admissible, it is not cumulative, and the
harmless error doctrine is inapplicable....................................................................20

    D.   Discovery and an evidentiary hearing should be granted. ....................................21

Claim 3:   Counsel Rendered Ineffective Assistance At The Guilt Phase Of Trial By Failing To
Investigate, Present, Highlight, And/Or Argue Evidence Of Innocence.....................**22**

    A.   Chad Costa ................................................................................................................22

    B.   Cat Voss ....................................................................................................................24

    C.   Scott Linker ...............................................................................................................26

    D.   Rose Wiggins.............................................................................................................27

    E.   David Runyon's Whereabouts The Day Of The Crime ........................................27

    F.   Cell Tower Testimony Regarding Michael Draven ..............................................28

    G.   Runyon's Shopping List...........................................................................................33

    H.   Testimony regarding the bullets. .............................................................................34

Claim 4:   Counsel Abdicated The Responsibility To Advocate For Runyon At The Eligibility
Phase When He Failed To Address The Relevant Issue And Did Not Discuss
Established Facts That Weighed Against The Statutory Aggravating Circumstances. .**40**

Claim 5:   Trial Counsel Were Ineffective For Failing To Investigate, Discover, And Present
Evidence That David Runyon Was Incompetent To Stand Trial..................................**42**

Claim 6:   Counsel Rendered Ineffective Assistance By Failing To Investigate And Present

i

**2657**

Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage And Mental Health. ...........................................................................................................47

    A.   All mental health experts consulted by defense counsel indicated Runyon was suffering from a mental disease or defect but the experts lacked the information, testing, and time required for a complete examination. .................................48

    B.   Counsel did not reasonably abandon the psycho-social investigation. .........................51

    C.   Counsel did not abandon the investigation upon receipt of the prosecution experts' reports. .........................................................................................................................52

    D.   Reports of the prosecution experts did not contain additional aggravating evidence and were not inconsistent with defending the proposed aggravating circumstances or establishing mitigating circumstances. ..............................................................53

    E.   Counsel abandoned the investigation despite several red flags signaling the existence of substantial mitigating evidence. ...................................................................56

    F.   Counsel's deficient performance resulted in prejudice. .........................................59

Claim 7:   Runyon's Sixth Amendment Right To Confront The Witnesses Against Him Was Violated When The Prosecution Presented Police And Informant Testimony Of Statements From His Co-Defendant, Michael Draven. Furthermore, His Trial Counsel Were Ineffective When They Failed To Object To The Admission Of This Testimony And Failed To Ask The Court For A Limiting Instruction That They Could Not Be Considered As Evidence Of Runyon's Guilt. ...............................................................61

Claim 8:   Ineffective Assistance Of Counsel On Direct Appeal. ...................................................64

Claim 9:   Runyon's Conviction Under 18 U.S.C. §924(c) Is Unconstitutional Because It Was Procured In Violation Of The Due Process Clause, The Equal Protection Clause, And The Fifth, Sixth And Eighth Amendments Of The Constitution. *Johnson v. U.S.*, 135 S.Ct. 2551 (2015). .........................................................................................................67

    A.   Introduction ....................................................................................................................67

    B.   Legal Background ..........................................................................................................67

    C.   Argument ........................................................................................................................70

        1.   This Court May Review Runyon's *Johnson* Claim. ......................................................71

        2.   Documented Judicial Confusion Does Not Create Vagueness. ...............................72

        3.   The Absence Of Enumerated Offenses Does Not Render 924(c) Constitutional. 72

        4.   Section 924(c) Is Not More Narrowly Drawn Than The ACCA (Or The Distinctions The Government Notes Are Constitutionally Irrelevant) ...............73

        5.   Section 924(c)(3)(B) Is Vague As Applied To Runyon. .........................................75

        6.   Carjacking And Conspiracy To Commit Murder For Hire Are Not Crimes Of Violence Under The Force Clause Of Section 924(c)(3)(A). ..................................75

        7.   The Death Sentence On Count One Was Tainted By The Sentence For Count

2658

Five..................................................................................................................................79

Claim 10:   The Jury Instructions At The Sentencing Phase Unconstitutionally Lowered The Government's Burden Of Proof In Violation Of The Fifth, Sixth, And Eighth Amendments. *Ring v. Arizona*, 536 U.S. 584 (2003). .........................................................81

Claim 11:   The Death Sentences Are Unconstitutional Because They Are Based On Aggravating Circumstances That Fail To Narrow And/Or That Are Arbitrary And Overbroad.....84

    A.   The statutory aggravating circumstances failed to perform the constitutionally required narrowing function. ...........................................................................................84

    B.   This claim is not barred by the doctrines of procedural default or non-retroactivity. ...............................................................................................................................................86

    C.   The non-statutory aggravators negated any narrowing that might have previously occurred, they are arbitrary and capricious, and at least one is overbroad...................87

Claim 12:   Runyon Was Denied Due Process Of Law, Equal Protection Of The Law, The Right To Be Free Of Cruel And Unusual Punishment, And Effective Assistance Of Counsel Because The Death Penalty Was Disproportionately And Unconstitutionally Applied According To Race, And Trial And Appellate Counsel Made No Objection Based On This Fact.................................................................................................................................88

Claim 13:   Runyon's Death Sentence Is Disproportionate And Arbitrary In Violation Of The Fifth And Eighth Amendments.................................................................................................90

Claim 14:   Runyon's Death Sentence Violates The Eighth Amendment Because He Is Severely Mentally Ill .....................................................................................................................................92

Claim 15:   Selection Of The Grand Jury And/Or The Petit Jury Venire For Runyon's Case Was Tainted, And Trial Counsel Unreasonably Failed To Request And Examine The Jury Selection Records.....................................................................................................................94

    A.   Selection Of The Grand Jury And/Or The Petit Jury Venire Was Tainted...............94

    B.   There Was a Failure To Fully And Accurately Comply With The Jury Selection Plan And The Provisions Of 28 U.S.C. §1861 *et. seq*.............................................................94

    C.   A Person Who Did Not Qualify Participated In Runyon's Trial............................. 100

    D.   Trial Counsel Unreasonably Failed To Request Or Examine Any Jury Selection Records, In Violation Of The Sixth Amendment. ...................................................... 100

Claim 16:   The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes, And Trial Counsel Unreasonably Failed To Object To These Unconstitutional Strikes........................................................................................................ 105

    A.   Runyon's Claim Is Not Defaulted, Or Counsel's Deficient Performance Is Cause To Overcome The Default........................................................................................................ 107

    B.   The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes. ............................................................................................................. 111

        1.   The Prosecution Unlawfully Struck Jurors Based on Their Race......................... 112

2. The Prosecution Unlawfully Struck Jurors Based on Their Gender..................... 122

C. Trial Counsel Unreasonably Failed To Object To The Prosecution's Discriminatory Exercise Of Peremptory Strikes. ........................................................................................ 126

Claim 17: The Voir Dire Conducted In This Case Violated Runyon's Fifth And Sixth Amendment Rights To A Fair Trial And Impartial Jury, And Counsel Rendered Ineffective Assistance. ................................................................................................................. 131

A. The Voir Dire Was Constitutionally Inadequate. ........................................................ 131

B. Counsel Rendered Ineffective Assistance Regarding Voir Dire. ................................ 138

1. Trial Counsel ................................................................................................................ 138

2. Appellate Counsel........................................................................................................ 139

Claim S2: The Trial Court Unlawfully Excluded the Potential Jurors Based Solely On Their Juror Questionnaire Responses Without Voir Dire, And Trial Counsel Unreasonably Failed To Object And Unreasonably Participated. ..................................................................... 140

iv

LIST OF EXHIBITS

1    Stephen Hudgins Declaration dated June 22, 2016

2    John Nixon Declaration dated May 18, 2016

3    Joseph Kennedy Declaration dated July 6, 2016

4    Stephen Hudgins Calendar from Appointment to Beginning of Runyon Trial

5    USA Strikes of Black Veniremen Report

Petitioner David Runyon hereby replies in support of his Amended Motion to Vacate, Set Aside, or Correct the Sentence in his capital case. *See* ECF No. 511. Runyon's motion for leave to exceed the page limit was filed this date. ECF No. 547. The Court granted the motion to exceed the page limit for this reply. ECF No. 550.

## AFFIRMATIVE DEFENSES

The Government's answer to the amended §2255 motion, ECF No. 536, pp.14-19, references several affirmative defenses including statute of limitations, procedural default and nonretroactivity, and temporal limitations on amended claims. *See Day v. McDonough*, 547 U.S. 198, 205 (2006) (describing affirmative defenses in a §2254 context).

Affirmative defenses are nonjurisdictional defenses that a collateral respondent is "'obligated to raise'" in the first instance "if it is not to 'lose the right to assert the defense thereafter.'" *Trest v. Cain*, 522 U.S. 87, 89 (1997) (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996)). The burden rests with the Respondent to raise and prove such defenses. *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010). A petitioner has no duty to anticipate or address any affirmative defense in his §2255 motion or in his amended §2255 motion. To the extent the Government did not raise or adequately present an affirmative defense to a claim in its answer to the amended §2255 motion, the Court can deem that defense waived. *See Hudson v. Hunt*, 235 F.3d 892, 895 n.1 (4th Cir. 2000) (finding statute of limitations defense waived); *Riggs v. U.S.*, No. CIVA 7:06-cv-439, 2006 WL 3746674, at *1 fn.1 (W.D. Va. Dec. 15, 2006) (finding procedural default defense waived); *see also Young v. City of Mount Ranier*, 238 F.3d 567, 573 (4th Cir. 2001) (amended pleading supersedes original pleading).

### A. Statute of Limitations

Respondent has acknowledged Runyon's §2255 motion was timely filed, ECF No. 504, p.3, and has not alleged any original claims are time-barred. Nonetheless, the Government discusses this

1

**2662**

defense generally. It points out that there is a statutory one-year limitations period, and it says that this period begins when the defendant's conviction becomes final by the Supreme Court's denial of certiorari following direct appeal. The Government's description is true but incomplete. Under 28 U.S.C. §2255(f), the one-year limitations period actually runs from the *latest* of four triggering events, of which the finality of conviction may be the *earliest*. If the basis for an additional new claim subsequently accrues, Runyon can timely present that claim in a supplemental §2255 motion so long as he does so within one year of the relevant triggering event.

The Government alleges that some of the amendments to Runyon's §2255 motion are untimely. That allegation is addressed below in Section D.

## B. Procedural Default

The Government alleges that many of Runyon's claims are procedurally defaulted. Runyon disagrees, and he addresses the Government's specific allegations *infra* in his replies on individual claims.

No federal statute or constitutional requirement bars a §2255 petitioner from raising an issue for the first time on collateral review. *Massaro v. U.S.*, 538 U.S. 500, 504 (2003). Claims not raised on direct appeal may be raised for the first time on §2255 review subject to the judicial doctrine of procedural default if the doctrine is asserted by the Government. *See Strickland v. Washington*, 466 U.S. 668, 684 (1984) (noting that the exhaustion rule is not a federal jurisdictional bar); *Yeatts v. Angelone*, 166 F.3d 255, 261 (4th Cir. 1999) ("[T]he issue of procedural default generally is an affirmative defense that the [government] must plead in order to press the defense thereafter."). Under the doctrine of procedural default, a §2255 claim is defaulted only if it could have been "fully and completely addressed on direct review based on the record created" in the trial court, but was not raised on direct appeal. *Bousley v. U.S.*, 523 U.S. 614, 622 (1998). The doctrine does not apply to claims that could not

2

**2663**

have been raised on direct appeal because they required development of facts outside the trial record. *Id.* at 621 (citing *Waley v. Johnston*, 316 U.S. 101 (1942)) (per curiam), and describing it as a case in which "we held that there was such an exception [to procedural default] for a claim that a plea of guilty had been coerced by threats made by a Government agent, when the facts were 'dehors the record and their effect on the judgment was not open to consideration and review on appeal'").[1] *Id.* at 621-22 (quoting *Waley*, 316 U.S. at 104).

The Government acknowledges that in §2255 proceedings the procedural default doctrine never applies to a claim of ineffective assistance of counsel, regardless whether that claim could have been raised on direct appeal. *Massaro*, 538 U.S. at 503-04.

The Government also recognizes that a procedural default is excused—and the claim must be considered on its merits—if the petitioner demonstrates "cause and prejudice." In this context, "cause" means that "some objective factor external to the defense impeded counsel's efforts to comply with the ... procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Circumstances in which cause can be present include, but are not limited to, those where evidentiary facts that were critical to establishment of the claim were unavailable to the defense, *Strickler v. Greene*, 527 U.S. 263, 286 (1999); where interference by governmental officials made compliance with the procedural rule impracticable, *Banks v. Dretke*, 540 U.S. 668, 691 (2004); or where defense counsel rendered ineffective assistance, *Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

---

[1] The Ninth Circuit ruled that Waley had defaulted his claim because he was represented by counsel and had consulted with counsel, yet he failed to allege any facts about FBI coercion at the plea colloquy. *Waley v. Johnston*, 124 F.2d 587, 588 (9th Cir. 1941). The Supreme Court reversed. In *Bousley*, the Court distinguished *Waley* on the ground that the facts necessary to adjudicate Waley's claim were outside the trial record and their effect on the judgment was not open to consideration and review on appeal, whereas the facts necessary to adjudicate Bousley's claim were in the plea colloquy and therefore could have been addressed on direct review. *Bousley*, 523 U.S. at 622 ("This type of claim can be fully and completely addressed on direct review based on the record created at the plea colloquy.").

3

"Prejudice" in this context is established if the petitioner demonstrates "that 'there is a reasonable probability' that the result of the [proceeding] would have been different" absent the error. *Strickler*, 527 U.S. at 289 (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)). This parallels the showing required to demonstrate prejudice under *Strickland*, *supra*, or materiality under *Brady v. Maryland*, 373 U.S. 83 (1963). The Supreme Court emphasizes that in determining prejudice, "a different result" is not calculated by asking "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289-90.

A procedural default also is excused if the petitioner shows "a fundamental miscarriage of justice." *Carrier*, 477 U.S. at 495-96. Although the contours of this exception are not well defined, it is undisputed that a petitioner meets the standard by showing that in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). As shown in Claim 3, further factual development may enable Runyon to show a fundamental miscarriage of justice. Although not mentioned by the Government, a penalty-phase default can be excused under the "miscarriage of justice" exception even if the defendant cannot show that he is innocent of the crime. Under *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992), such a default is excused if the petitioner shows "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." The Supreme Court has not excluded the possibility that additional circumstances may rise to "a fundamental miscarriage of justice" and excuse a procedural default.

## C. Retroactivity of New Rules

The "new rule" doctrine is an affirmative defense. *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). The Government alleges that this doctrine precludes consideration of all or parts of Runyon's claims

4

9, 10, 11, 13, 14, 17, and S2. Runyon disagrees on two grounds. First, this doctrine does not apply to §2255 motions in the first instance.[2]

The "new rule" doctrine, first announced in *Teague v. Lane*, 489 U.S. 288 (1989), limits the retroactive application of new rules of criminal procedure. *Teague* itself was limited to claims by state prisoners under 28 U.S.C. §2254, and the Court did not address whether its rule would extend to claims by federal prisoners. *See Teague*, 489 U.S. at 327 n.1 (Brennan, J., dissenting). This remains an open issue. In *Danforth v. Minnesota*, 552 U.S. 264 (2008), the Court held that *Teague* does not apply in state collateral proceedings, but reserved "whether the *Teague* rule applies to cases brought under 28 U.S.C. §2255." *Id.* at 269 n.4. In *Chaidez v. U.S.*, 133 S.Ct. 1103 (2013), the Court again reserved whether "*Teague*'s bar on retroactivity does not apply when a petitioner challenges a federal conviction." *Id.* at 1113 n.16. Most recently in *Welch v. U.S.*, 136 S.Ct. 1257 (2016), the Court again reserved the question. It noted the assumption of the parties before it that the *Teague* framework applies in collateral challenges to federal convictions, and said "we proceed on that assumption." *Id.* at 1264. It then granted relief on grounds that would have applied regardless whether *Teague* limited §2255 cases.

In *Martinez v. U.S.*, 139 F.3d 412, 416 (4th Cir. 1998), the court of appeals held that *Teague* does apply to federal collateral claims, predicting that "it can safely be assumed that the Court would apply *Teague*'s nonretroactivity principle to suits under §2255." Notwithstanding the Fourth Circuit's confidence, the Supreme Court has repeatedly avoided taking that step.

In her plurality opinion in *Teague*, Justice O'Connor weighed the need to respect and preserve constitutional rights and ensure accuracy and integrity of convictions, against the State's interest in

---

[2] Runyon acknowledges that this Court is bound by circuit precedent holding that *Teague* "applies to *federal* prisoners' actions ... under 28 U.S.C. §2255." *Martinez*, 139 F.3d at 416. He presents the issue here to preserve it for further review.

5

comity and finality. *Teague*, 489 U.S. at 308, 309 (plurality). There are no comity interests when federal courts review federal convictions. Federal courts are not intruding into state criminal proceedings, are not imposing any costs on States by retroactive application of new rules, are not forcing States to marshal resources to defend their judgments, and are not overturning convictions of a coordinate jurisdiction. *See also Danforth*, 552 U.S. at 272-73 ("the text and reasoning of Justice O'Connor's opinion illustrate that the rule was meant to apply only to federal courts considering habeas corpus petitions challenging state-court criminal convictions"). In light of these recognitions, other courts of appeals have expressed reservations. *See, e.g., Reina-Rodriguez v. U.S.*, 655 F.3d 1182, 1189 (9th Cir. 2011) ("[T]here is some doubt under current Supreme Court jurisprudence whether *Teague* applies to federal prisoners ... who seek federal habeas relief."); *Duncan v. U.S.*, 552 F.3d 442, 444 n.2 (6th Cir. 2009) ("It is not entirely clear that *Teague's* framework is appropriate for federal habeas petitions under 28 U.S.C. §2255, because many of the comity and federalism concerns animating *Teague* are lacking."). *See also U.S. v. Payne*, 894 F. Supp. 534, 543 (D. Mass. 1995) (pointing out that §2255 proceedings are "'an integral part of a continuous criminal proceeding that is segmented by no event or condition decisive of finality'") (quoting James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure* § 22A.6, at 272-74 (Supp. 1993)).

Second, even if *Teague* applies to §2255 claims, it is expressly limited to new rules of procedure. A rule is procedural if it "regulat[es] '*the manner of determining* the defendant's culpability.'" *Montgomery v. Louisiana*, 136 S.Ct. 718, 730 (2016) (plurality) (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004), emphasis in original). In contrast, "*Teague* requires the retroactive application of new substantive and watershed procedural rules in federal habeas proceedings." *Montgomery*, 136 S.Ct. at 728. "'This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond

6

**2667**

the State's power to punish.'" *Welch*, 136 S.Ct. at 1265 (quoting *Schriro*, 542 U.S. at 351-52). A rule is substantive when the Supreme Court has decided the meaning of a criminal statute enacted by Congress, *Bousley*, 523 U.S. at 620, or it "has eliminated [the Government's] power to proscribe the defendant's conduct or to impose a given punishment." *Montgomery*, 136 S.Ct. at 730. The mere fact that a new rule includes a process does not mean that it is a procedural rule. As the Court counseled in *Montgomery*, courts must be careful not to conflate a procedural requirement that is necessary to implement a substantive guarantee, with a rule that regulates the manner of determining the defendant's culpability. *Montgomery*, 136 S.Ct. at 734-35. Only the latter is a procedural rule governed by *Teague*'s nonretroactivity doctrine. Similarly, the fact that a right is protected by the due process clause does not mean that an interpretation or application of that right is necessarily procedural. "[W]hether a new rule is substantive or procedural [is determined by] the function of the rule, not its underlying constitutional source." *Welch*, 136 S.Ct. at 1265.

Another type of rule which must be applied retroactively is a new "watershed" procedural rule. Such a rule is "implicit in the concept of ordered liberty" and crucial to the accuracy of the adjudication. *Graham v. Collins*, 506 U.S. 461, 478 (1993); *Teague*, 489 U.S. at 311 (plurality) (a "watershed" rule must contribute to fact-finding reliability and "alter our understanding of the bedrock procedural elements" essential to the fairness of a proceeding.).

A three-part analysis must be undertaken to determine if *Teague* bars relief, but it differs from the Government's three-step analysis.[3] First, the Court must determine if the rule on which the

---

[3] The Government's analysis begins with a presumption that the new rule is one of criminal procedure, whereas *Montgomery* requires a threshold determination of whether it is the kind of issue that is subject to the limit on retroactivity. The Government's analysis also retains the nomenclature of *Teague*, which describes new substantive rules and watershed procedural rules as "exceptions" to the bar on retroactive application of procedural rules. The Supreme Court has more recently recognized that those two categories of new rules "'are more accurately characterized as ... not subject to the bar.'" *Montgomery*, 136 S.Ct. at 728 (quoting *Schriro*, 542 U.S. at 352 n.4).

7

**2668**

petitioner relies is one of substance or criminal procedure, *Bousley*, 523 U.S. at 620, as those concepts are defined in *Montgomery*. If the rule is substantive, retroactive application is required, *Montgomery*, 136 S.Ct. at 728, and the analysis ends. If the rule is one of criminal procedure that constitutes a "watershed" rule of procedure, retroactive application also is required, *id.*, and the analysis ends. Second, if the rule is one of criminal procedure, the Court must ascertain the date when the petitioner's conviction and sentence became final. *Caspari*, 510 U.S. at 390. Runyon's conviction became final on October 6, 2014, when the Supreme Court denied his petition for a writ of certiorari. Only a decision announced after that date can be "new." Third, if the procedural rule was announced after the date that the conviction became final, the Court must determine whether the rule is actually "new." *Id.* The required inquiry is typically phrased in the negative: a new procedural rule is one that was not dictated by precedent existing at the time the defendant's conviction became final. *Whorton v. Bockting*, 549 U.S. 406 (2007). Stated differently, the Court must survey the legal landscape and determine whether a court, at the time the conviction became final, "would have felt compelled by existing precedent" to apply the subsequently announced procedural rule. *Caspari*, 510 at 390; *Lambrix v. Singletary*, 520 U.S. 518, 527-28 (1997). If not, then the rule is "new," and it does not apply retroactively.

As necessary, Runyon further discusses the Government's specific *Teague* allegations in his replies on individual claims.

### D. Temporal Limitation on Amended Claims

Any amendments to Runyon's §2255 motion are timely. Timeliness can be based on any of three grounds. First, as noted above, the one-year limitations period runs from the *latest* of four triggering events, of which the finality of conviction may be the *earliest*:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if

8

the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. §2255.

A claim added by amendment is thus timely if it is filed within one year of the latest of these triggering events. Second, a claim that is added to the §2255 motion by amendment, even after expiration of the applicable statute of limitations, will be deemed timely if it relates back to a claim that was timely presented. Fed. R. Civ. P. 15(d); Rule 12 of Rules Governing §2255 Proceedings. In the collateral context, a claim added by amendment relates back unless "it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth"). *Mayle v. Felix*, 545 U.S. 644, 650 (2005). Third, limitations periods in collateral cases are subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631 (2010).

In *Wolfe v. Clarke*, 691 F.3d 410 (4th Cir. 2012), the court held that new instances of a previously alleged violation can be considered without the need to amend, and thus without the need to consider the timeliness of such an amendment. In that case, the original habeas petition alleged a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and the Fourth Circuit held that an amendment was not necessary for the petitioner to present evidence of additional instances of such violations. *Wolfe*, 691 F.3d at 422.

As necessary, Runyon further discusses the Government's specific timeliness allegations in his replies on individual claims.

9

**2670**

**Claim 1:** **The Participation Of Two Dishonest Law Enforcement Officers Tainted Runyon's Trial.**

The Government correctly recognizes that this claim could not have been raised at trial because the facts were known only to the Government, which had concealed them. *See Amadeo v. Zant*, 486 U.S. 214, 222 (1988) (where county officials concealed facts that would have allowed defendant to challenge composition of jury, the concealment was an "'objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule'" and excused procedural default) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)); *see also Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999) (quoting *Carrier*, 477 U.S. at 488 (default excused if factual basis for claim was "'not reasonably available to counsel'" or "'some interference by officials ... made compliance impracticable'")).

The Government argues instead that this claim is defaulted because Runyon did not raise it on direct appeal. The Government skips over the fact that even during direct appeal proceedings, it never told Runyon's counsel that Ford or Posey engaged in criminal acts of dishonesty. Runyon's original appellate counsel Woodward knew about the charges against Ford, but he had a conflict of interest. Because he represented Ford on the criminal charges, he could not even suggest to anyone that Ford might have been dishonest. The Government did not disclose any information to Runyon's other appellate counsel, who were remotely located in South Carolina and New York.

The Government also does not identify any fact about Ford or Posey that is in the record of Runyon's trial and that could have been a subject of Runyon's appeal. There is none. No part of this §2255 claim could have been "fully and completely addressed on direct review based on the record created" in the trial court. *Bousley*, 523 U.S. at 622. Like the claim that could not have been raised on direct review in *Waley*, the facts necessary for this claim "were 'dehors the record and their effect on

10

**2671**

the judgment was not open to consideration and review on appeal.'" *Id.* (quoting *Waley* 316 U.S. at 104). *See supra*, Affirmative Defenses.

If appellate counsel knew the facts concerning Ford and/or Posey, and if the nature of this claim is one that could appropriately have been raised on direct appeal rather than collateral review, appellate counsel were ineffective in failing to do so. *See* Claim 8.

## A. Robert Glenn Ford.

On the merits, the Government mistakenly treats the claim involving Ford as equivalent to a claim under *Brady v. Maryland*, 373 U.S. 83 (1963). It says that Runyon has failed to identify favorable evidence "stemming from Ford's impeachment related behavior," and it argues that "impeachment evidence for those who do not testify lacks relevance and materiality." ECF No. 536, p.22. But Runyon has not alleged in this claim that the Government failed to disclose exculpatory or impeachment information. Ford's history of criminal conduct did not exculpate Runyon. And because Ford did not testify against Runyon, the fact of his dishonesty could not have been used to impeach him.

The Government knew as early as November 7, 2008—when Marcus Adams was debriefed nearly eight months before Runyon's trial—that Ford was a "dirty cop." From that day forward, it was preparing to charge Ford with multiple counts of extortion, false statements, and other crimes. Just as the Government at that time would not have retained a person like Ford to investigate a crime because of his misconduct, it knew that Ford could not be trusted to conduct an honest investigation for Runyon's defense. Because of its superior and secret knowledge about Ford's criminal conduct, and because of its duty to elevate justice over winning a case, the Government had a due process obligation to inform defense counsel or inform the Court, so that Ford could be replaced with an honest and reliable investigator. The Government's protestation that it had no duty to do so is contrary to *Berger v. U.S.*, 295 U.S. 78 (1935).

11

The Government objects that Runyon has failed to identify any witness reports prepared by Ford that were fabricated or unreliable. Runyon suggests this is not necessary, and that deprivation of the honest services of an investigator is inherently prejudicial, that the deprivation is particularly acute when that investigator has been appointed by the Court to assist the defense.

The Government's premise, moreover, is false. Ford was an experienced investigator (and experienced deceiver), and there is no reason to think he would have done anything so amateurish as submitting affirmatively false statements about an individual that he knew was likely to be called as a defense witness. He would know that his lies could be quickly exposed during pretrial witness preparation. The false statements in Runyon's case would more likely be by omission. If, hypothetically, Ford found a potential witness who had helpful information but who wanted to avoid becoming embroiled in this case, Ford was in a position (for sufficient compensation) to file a report stating that the witness could not be located. Or, again hypothetically, he could file a report saying that he went to a neighborhood where Runyon's family had once lived and interviewed the people who lived in the area, but no one there remembered Runyon or his family. In fact, there may have been neighbors who remembered Runyon and had helpful information, but who preferred to pay Ford a bribe and avoid involvement in a murder case. Because Ford's reports would have omitted the names and locations of people who paid bribes, finding evidence to prove Ford's dishonesty—especially so many years later—is very difficult, although Runyon's investigation is ongoing.

The most knowledgeable source of information, Ford himself, is inaccessible. His post conviction litigation is still active, and he is represented by counsel.4 Because of a potential overlap in the subjects of representation, Virginia Rule of Professional Conduct 4.2 prohibits Runyon's

---

4 This Court issued an order on April 11, 2016, denying Ford's §2255 motion. *United States v. Ford*, E.D. Va. 2:10-cr-83, ECF No. 137. His informal opening brief was filed in the Fourth Circuit on June 27, 2016. *United States v. Ford*, CA4 16-6680, ECF No. 13.

12

**2673**

counsel from attempting to communicate with Ford without the consent of Ford's attorney. Runyon requested permission, but Ford's attorney has not granted it. The documents requested in discovery may provide additional information or leads for further investigation.

The Government's reliance on Woodward's statement that Ford did a good job investigating Runyon's case is misplaced. Ford wrote the affidavit without knowing what would be in Runyon's §2255 motion. Woodward's duty of loyalty to Ford also precludes him from taking any other position.[5] Moreover, if Ford took bribes and concealed information, Woodward would be ignorant of that fact. Hudgins says he relied on Ford's reports to inform him of the penalty phase witnesses' knowledge of Runyon, ECF No. 511-5, p.2 ¶8, but Hudgins also would be ignorant of information that Ford concealed. Cronin knew that Ford was under public pressure for having obtained coerced confessions from two defendants in the Norfolk Four case, ECF No. 511-4, p.2 ¶4, but that is a very different kind of misconduct than the extensive extortion and false statements that the Government failed to disclose to Runyon's defense, and of which Ford was later convicted. Runyon is entitled to discovery and an evidentiary hearing on this claim to develop and present evidence about the extent to which Ford's misconduct may have affected the investigation and the way this case was defended.

### B. Clifford Dean Posey.

The Government again treats this as equivalent to a *Brady* claim, arguing that "there was nothing for the government to even turn over at the time of [Runyon's] trial." ECF No. 536, p.23. At this point, Runyon has asserted a *Berger* claim, although he cannot rule out the possibility that the

---

[5] Woodward likely had a conflict of interest when he agreed to represent Ford. Runyon has not alleged the conflict of interest as a claim in his amended §2255 motion because the conflict did not arise until after Runyon's trial, when Woodward agreed to become Ford's attorney. But the conflict is a fact that the Court can consider.

13

requested discovery will reveal a *Brady* violation based on exculpatory or impeachment information that the Government possessed at the time of trial but failed to disclose.

As with Ford, the Government chastises Runyon for failing to identify any concrete prejudice. But all the facts about Posey's work on Runyon's case, and about Posey's criminal activities (except as memorialized in the tiny court file), are in the Government's sole possession.[6] That is why Runyon has requested discovery, and has asked for an evidentiary hearing so he can present his case to the Court, if the facts warrant. There is no dispute that at all of the times he was investigating Cory Voss' death and helping to prepare the Government's case for trial, Posey also was engaging in criminal misconduct that involved stealing evidence from the Government and making false statements in his reports. The Government does not, and cannot, deny that Posey may have engaged in criminal conduct in preparing Runyon's case. It cannot deny that this may have tainted Runyon's trial. It cannot deny that it alone knows the work Posey was assigned to perform on this case, the recorded conversations he transcribed, the evidence he handled, the extent to which anyone checked his work product, and the effect he had on Runyon's trial. It also cannot deny that it knew about Posey's misconduct not later than October 2010, when Runyon's case was still on direct appeal.[7] Because the Government gave the defense no information, Runyon does not rule out any possibilities.

The Government opines that Posey's involvement in Runyon's case was minor and error-free. But because this is Runyon's claim, and because adverse parties often draw different inferences from the same materials, Runyon must be allowed to obtain and review the documents he has requested in discovery, and to draw his own conclusions from those documents. As an example of the reason

---

6 Posey is not presently an available source of information. He is no longer in prison, but he has evaded all attempts by Runyon's investigator to talk to him.

[7] Runyon's notice of appeal was filed on December 4, 2009. His opening brief on appeal was not filed until February 29, 2012.

14

**2675**

Runyon should not have to rely on the Government's assessment, we note that the Government does not address the fact that Posey's criminal conduct reportedly included converting firearms and ammunition that had been confiscated by ATF, and the possibility that Posey may have converted firearms or ammunition that belonged to Runyon, which could have affected litigation regarding the handgun used to kill Voss.

**Claim 2: The Prosecution Failed To Disclose Impeaching And Exculpatory Evidence In Violation Of The Fifth, Sixth, And Eighth Amendments, United States Constitution.**

"Under *Brady*, the [prosecution] violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 132 S.Ct. 627, 630 (2012). Here, the prosecution decided one year before the penalty phase began that it would pursue a non-statutory aggravating circumstance on the basis that Runyon "engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend." ECF No. 67, p.3. It had a concomitant duty to learn of any favorable evidence possessed by law enforcement or members of the prosecution team that could be used in defense of this aggravator and to disclose that evidence to Runyon's counsel. *Kyles*, 514 U.S. at 437. The prosecution also knew Runyon's penalty-phase defense was centered on the differential treatment afforded the other co-defendants with respect to punishment and it had a duty to disclose evidence that was favorable to this defense and the "equally-culpable co-defendant" mitigator. *Id.*

The prosecution possessed information about co-defendant Draven's history of violence against a man, girlfriends, a disabled teenager, and children under the age of seven. Respondent characterizes the information as "the background of Draven's youth," ECF No. 536, p.26, but Draven's violent conduct continued to be reported to police less than one year before the instant crime. *See* ECF No. 511, pp.18-19. For example, as an adult, Draven was charged with aggravated

15

**2676**

assault of his girlfriend, bomb threats and death threats against a former girlfriend, harassment and intimidation of girlfriends, intimidation of a male acquaintance, and grand larceny as well as larceny. As a teenager, he sexually assaulted a developmentally-delayed teenager and at least six children under the age of seven. ECF No. 511, pp.18-19.

Respondent concedes that this evidence was disclosed to Draven's counsel at least one year before Runyon's penalty phase began. ECF No. 536, p.24. Respondent also admits Draven's violent background, criminal history, and mental health assessments were material to Draven's punishment and further admits this information was not disclosed to Runyon's counsel.[8] ECF No. 536, pp. 24-25. The *Brady* element in dispute is whether the withheld evidence is material to Runyon's punishment.

### A. The withheld evidence is material.

The materiality standard is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. In other words, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434.

In *Banks*, 540 U.S. at 700-01, the Supreme Court found withheld evidence was material because it was significant to a predicate for capital murder and it related to the defendant's eligibility for the death sentence and the prosecution's argument for imposing death. The withheld evidence left

---

[8] Before trial, the parties entered an agreed discovery motion that included *Brady* material. ECF No. 31, pp.3-4. The prosecution represented it intended to comply fully with its *Brady* obligations, it had complied, and it was aware of its continuing duty of disclosure. ECF No. 98, pp.9-10. In turn, the Court made findings that the prosecution "has provided defendant with all of the Rule 16 material that is in its possession," ECF No. 114, p.3, and recounted the prosecution's representation "that it has already provided discovery pursuant to the Discovery Order and, to the extent that it becomes aware of and obtains additional discoverable material, will continue to make the materials available to [Runyon]." ECF No. 115, p.2.

16

the jurors ignorant of an informant's "true role" in the case and undermined confidence that the defendant had received a fair trial. *Id.* at 702-03. This was especially so because the informant's testimony was the centerpiece of the prosecution's penalty-phase case. *Id.* at 701.

Respondent agrees that inequitable punishment was the centerpiece of Runyon's penalty-phase defense. ECF No. 536, p.24; *see also U.S. v. Runyon*, 707 F.3d 475, 508 (4th Cir. 2013). The withheld information regarding co-defendant Draven's background would have been advantageous to Runyon's defense because it demonstrates that despite ample facts supporting several aggravating factors for Draven, and despite all co-defendants' "integral[] involve[ment] in the murder, [Runyon] had received differential treatment, with the Government pursuing the death penalty against Runyon but not against Cat or Draven." *Runyon*, 707 F.3d at 508. Draven's severe sexual, physical and emotional abuse of women and children was a relevant comparison-point for the "abuse of women" non-statutory aggravator. Hudgins declaration, Ex. 1 ¶14. The prosecutors urged the death penalty for Runyon based on one misdemeanor conviction for grabbing his wife's arm and poking her nose, one dismissed misdemeanor assault charge, and one unadjudicated act of misdemeanor assault. *See Runyon*, 707 F.3d at 504. The prosecution introduced incidents of domestic abuse involving Runyon that paled in comparison to Draven's violent conduct. Hudgins declaration, Ex. 1 ¶14. Had the jurors known the magnitude of Draven's true culpability, the "equally-culpable co-defendant" mitigator could have transformed into a "co-defendant with greater culpability" mitigating circumstance, especially since Draven was also charged with more statutory aggravators than Runyon. ECF No. 3, pp.13-14.

A history of violent crimes is "arguably more relevant and probative than any other type of aggravating evidence supporting imposition of the death penalty[.]" *U.S. v. Beckford*, 964 F. Supp. 993, 1000 (E.D. Va. 1997) (internal quotation marks and citation omitted). The fact that the prosecution failed to seek death for Draven despite his pattern of violent criminal behavior and propensity for

17

future violence was highly relevant to Runyon's comparative punishment defense. The defense argued that co-defendant Voss was a bad actor and would have used co-defendant Draven's background to support the argument that he, too, was a bad actor. Hudgins declaration, Ex. 1 ¶13. The information about co-defendant Draven also would have rebutted the prosecution's argument regarding Runyon's alleged bad personal characteristics. *Id.* ¶14. It was likewise relevant to the guilt-phase defense of portraying the co-defendants as bad actors. *Id.* ¶12. As explained by the Court when it agreed to charge the "abuse of women" non-statutory aggravator against Runyon: "[v]iolent adjudicated criminal acts that tend to show a pattern of violence against women are relevant, probative, and helpful to the sentence in distinguishing those who deserve capital punishment," and are "relevant to the inquiry of who should live and who should die." ECF No. 217, p.10, n.6 (citing *U.S. v. Grande*, 353 F. Supp. 2d 623, 631, 637 (E.D. Va. 2005)); *U.S. v. Beckford, supra.* It was necessary for the jurors in this case to distinguish between Runyon and his co-defendants in order to justify a death sentence for only Runyon and the prosecution's failure to disclose probative facts relevant to the disparity of punishment among the co-defendants impaired Runyon's defense and denied the jurors an accurate accounting of the co-defendants' relative culpability.

The *Brady* violation tainted the jury's determination regarding the "abuse of women" aggravating circumstance, the "equally-culpable codefendants" mitigator, and its sentencing verdict. The prosecution's argument for a death sentence based on Runyon's conviction of misdemeanor simple battery for grabbing his wife's arm and poking her nose also encouraged the jurors to infer that Runyon engaged in more serious violent acts "behind closed doors." Tr.2609, 8/26/09. The jurors were invited to condemn Runyon because "he left his wife and children and didn't provide support for them." Tr.2610, 8/26/09. At the same time, the prosecution kept from the jurors' consideration a plethora of information illustrating Draven's sexual assault of children and his pattern of felonious

18

**2679**

sexual, physical and emotional abuse of women. A penalty phase proceeding where the jurors were informed of Draven's violent history is significantly different than the actual proceeding where the jurors decided—without knowledge of Draven's violent and abusive nature—that Runyon should be the sole person to die, based in part on the "abuse of women" aggravator. The withheld evidence was advantageous to Runyon's defense and could reasonably have put the penalty phase in such a different light that it undermines confidence in the jury's death verdict. Hudgins declaration, Ex. 1 ¶16. *See, e.g., U.S. v. Hammer*, 404 F. Supp. 2d 676, 799 (M.D. Pa. 2005) (citing *Sochor v. Florida*, 504 U.S. 527, 532 (1992); *Espinosa v. Florida*, 505 U.S. 1079, 1081 (1992)) ("Under a weighing statute such as the Federal Death Penalty Act of 1994, a death sentence resulting from a tainted aggravating circumstance cannot stand.").

### B. Runyon's *Brady* claim is not procedurally defaulted.

The *Brady* claim is based on information outside the trial record and unknown to trial counsel because—as Respondent admits—it was not disclosed by the prosecution. There is no procedural default because this due process violation could not have been "fully and completely addressed on direct review based on the record created" in the trial court. *Bousley v. U.S.*, 523 U.S. at 622; *Waley v. Johnston*, 316 U.S. 101, 104 (1942) (a claim is not procedurally defaulted when the facts are "dehors the record and their effect on the judgment was not open to consideration and review on appeal.").

Even if this claim is somehow defaulted, Runyon is still entitled to develop and prove his claim because a meritorious *Brady* claim subsumes and satisfies the "cause and prejudice" standard. *Wolfe v. Clarke*, 691 F.3d 410, 420 (4th Cir. 2012). "Cause and prejudice" to overcome a procedural bar "parallel two of the three components of the alleged *Brady* violation itself." *Banks*, 540 U.S. at 691 (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999) (internal quotation marks omitted)) (addressing *Brady* claim in a §2254 case). "Cause" is already established because Respondent concedes the newly discovered

19

**2680**

"evidence [was] not turned over to Runyon" prior to trial. ECF No. 536, p.26. The "prejudice" requirement "exists when the suppressed evidence is 'material' for *Brady* purposes." *Banks*, 540 U.S. at 691 (citing *Strickler*, 527 U.S. at 282). Accordingly, this claim is reviewed on its merits and the ultimate question remains one of materiality.

## C. The withheld evidence would have been admissible, it is not cumulative, and the harmless error doctrine is inapplicable.

Respondent incorrectly implies the information about Draven was inadmissible. ECF No. 536, p.25. "[T]he fact that some of such evidence may have been 'hearsay' does not necessarily undermine its value—or its admissibility—for penalty phase purposes." *Sears*, 561 U.S. at 950. When presenting penalty phase evidence, "[t]he relevant inquiry ... is not whether the [evidence] was admissible under the Federal Rules of Evidence (which do not apply in capital sentencing proceedings), but whether the [evidence] was so unreliable that its admission violated due process." *United States v. Fulks*, 454 F.3d 410, 436 (4th Cir. 2006); *see also United States v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004). Respondent cannot argue the evidence of Draven's violent past was unreliable because the prosecution presented police reports, police officer testimony, a protective order, and victim testimony in support of the "abuse of women" aggravator against Runyon and Runyon could have introduced the same evidence relating to Draven.

"Assuming this evidence was discoverable to Runyon," Respondent argues (without explanation and in contradiction to the argument that the evidence was inadmissible) that "it would have been cumulative and any error would be harmless." ECF No. 536, p.26. A defendant, however, "may benefit from the 'cumulativeness' of evidence that is 'favorable' under *Brady*." *McHone v. Polk*, 392 F.3d 691, 703 (4th Cir. 2004). In this case, the withheld evidence simply cannot be cumulative because evidence of Draven's past violence against women and children is entirely new information.

20

**2681**

It would have substantially strengthened the equally-culpable codefendant mitigator and weakened the abuse of women aggravator.

Moreover, the Supreme Court has made clear that harmless error is not a consideration in *Brady* claims. Once the materiality of withheld evidence is established, the *Brady* violation cannot subsequently be found harmless. *Kyles*, 514 U.S. at 435-36. Runyon can demonstrate materiality, as discussed above and in his amended §2255 motion, and Respondent's assertion of harmlessness cannot defeat the *Brady* claim.

**D. Discovery and an evidentiary hearing should be granted.**

Materiality is a fact-driven issue. An adverse determination cannot be made at this stage of the proceedings. *U.S. v. White*, 366 F.3d 291, 297 (4th Cir. 2004). Instead, factual development is warranted because Runyon has alleged facts which, if true, entitle him to relief. *Raines v. U.S.*, 423 F.2d 526, 529-30 (4th Cir. 1970) (discussing fact-finding procedures); *see also* RULES GOVERNING SECTION 2255 PROCEEDINGS, Rules 6-8. Runyon has already filed a discovery request that sets forth good cause for the release of information relevant to materiality. ECF No. 491, pp.21-25; ECF No. 506, pp.13-16. This request should be granted.

An evidentiary hearing should also be granted because Respondent's answer creates material factual disputes with respect to Runyon's non-frivolous *Brady* allegations. *White*, 366 F.3d at 297 (citing *Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977)); 28 U.S.C. §2255 (requiring an evidentiary hearing on a habeas claim "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief"). Respondent not only disputes the significance of the withheld evidence but alternatively asserts that the withheld evidence is cumulative. ECF No. 497, p.24. These disputes require fact-finding on the newly-discovered evidence about co-defendant Draven. *Townsend v. Sain*, 372 U.S. 293, 313 (1963); *Wolfe*, 691 F.3d at 421-22.

21

**2682**

For all these reasons, Runyon is entitled to discovery and an evidentiary hearing on this claim followed by a grant of relief.

**Claim 3:      Counsel Rendered Ineffective Assistance At The Guilt Phase Of Trial By Failing To Investigate, Present, Highlight, And/Or Argue Evidence Of Innocence.**

Respondent primarily argues that the guilt-phase performance of Runyon's counsel was not deficient. ECF No. 536, p.27. In doing so, Respondent raises several factual issues—including the strength of evidence, the scope of counsel's investigation and the reasonableness of counsel's actions—which require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

In addition, although Runyon has presented areas of prejudicially deficient performance by topic or individual source, counsel's performance in all aspects and all stages of the case is to be evaluated cumulatively. *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995); *Winston v. Kelly*, 592 F.3d 535, 557 (4th Cir. 2010).

**A.  Chad Costa[9]**

The prosecution presented evidence and argument: (1) about Runyon's character; (2) that Runyon made incriminating statements to others; (3) that Runyon's shopping list was connected to the crime; and (4) that attempted to tie Runyon's revolver to the crime. Respondent's amended response does not contest that counsel failed investigate and present Costa's testimony. Instead, it asserts (without explanation) that counsel's failure to present Costa as a witness does not constitute deficient performance because Costa's testimony was inadmissible. Respondent fails to reconcile this

---

[9] Respondent's amended response persists with the accusation that "Runyon in his petition" pled a "false" fact. ECF No. 536, p.27. The amended response fails to recognize that the amended §2255 corrected an innocent and inconsequential error from the original §2255 and accurately stated when Chad Costa and Runyon met. They met after the crime but before Runyon's arrest. The claims regarding Costa remain valid with this time-frame.

22

**2683**

statement with the rules of evidence which would not have precluded Costa's testimony. *See, e.g.,* Fed. R. Evid. Rules 104(e), 401, 404(a)(2)(A), 405, 602, 801. Respondent alternatively alleges that, even if admissible, Runyon suffered no prejudice when Costa's testimony was not presented to the jury. To the contrary, Costa's testimony was unique, relevant and probative of Runyon's reasonable doubt defense and it would have foreshadowed a mitigation defense that presented Runyon's psychosocial history and his compromised mental health.[10]

Costa's contacts with, and knowledge of, Runyon and Runyon's revolver were relevant to counter the prosecution's evidence and narrative in the four areas described above and would have made the facts asserted by the prosecution less probable. Costa possessed knowledge and an opinion of Runyon's character that differed from the prosecution's theory and Costa could have testified to the nature and extent of his observations regarding Runyon. For example, Runyon's braggadocios personality and attempts to portray himself as a "thug" through his clothing choices constitute an accurate account of Runyon that counters the prosecution theory that Runyon was a skilled "hit man." For the same reason, Costa's testimony would have previewed the sentencing-phase defense.

The amended response asserts that ballistics evidence from the recovered bullets and the "overwhelming evidence" of guilt shields from scrutiny the jury's guilty verdict and counsel's performance. Yet, Costa handled and observed Runyon's revolver and his description of the six-shot black revolver is inconsistent with the prosecution's evidence that the murder weapon was a five-shot handgun from which the five recovered bullets were fired. This testimony was significant in light of the 2009 report from the National Academy of Sciences (NAS Report) that described the unreliability

---

[10] The amended response states: "Runyon speculates that Costa's purported testimony about his recollection of Runyon's gun being a six-shot revolver would not have changed the outcome of this case." ECF No. 536, p.28. This is not so. Runyon argues there is a reasonable probability of a different outcome if the jury had heard Costa's testimony (and all other guilt-phase evidence counsel failed to investigate and present).

23

of forensic testimony purporting to match a specific firearm to specific bullets. Counsel failed to present Costa's testimony about Runyon's gun, failed to cross-examine the prosecution's ballistics expert with the NAS report, and failed to consult with a ballistics expert to investigate the true "strength" of the physical evidence. *See* Nixon declaration, Ex. 2.

Costa could have testified that Runyon did not confess the crime to him. This supports the argument that Runyon did not confess to others. Costa also could have corroborated other witnesses' allegations of police influence and coercion to obtain certain testimony, such as Sarah Baker's. ECF No. 511 p.24. This could have raised doubts regarding that testimony. Costa's testimony was consistent with the defense theory and counsel's failure to call him as a witness was prejudicial.

### B. Cat Voss

Respondent does not contest that counsel failed to speak with co-defendant Cat Voss and present her as a witness but argues that counsel was not ineffective because it is "doubtful" that Voss would have testified and "doubtful" that Voss's attorney "would have let her testify[.]" ECF No. 536, p.29. Respondent also questions the weight that her testimony would have carried with the jury. *Id.* Reacting to Runyon's assertion that Voss's testimony supported the reasonable doubt defense Respondent asserts: "It is just as likely the jury would not believe a word she said[.]" *Id.*

First, Voss's attorneys could not have prevented her from testifying. Second, courts should not assume that a potential witness will not testify. *U.S. v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004). Third, it is a fundamental premise of the criminal trial system that determinations as to weight and credibility of witness testimony belong to the jury. *U.S. v. Scheffer*, 523 U.S. 303, 313 (1998); *U.S. v Luciano*, 343 F.2d 172, 173 (4th Cir. 1965) ("No matter how impaired [the] evidence, the jury had the right to believe all or so much of it as they thought proper."). To the extent the jurors found discrepancies between Voss's statement of facts and her testimony, "their natural intelligence and their

24

practical knowledge of [human nature,]" *Scheffer*, 523 U.S. at 313, could have led them to conclude that Cat Voss would have signed any statement placed in front of her by the prosecution to avoid the death penalty. This is especially true because some assertions in the statement of facts were obviously not personally known by Voss.[11] Defense counsel could have argued that the statement of facts appears to have been written as much to assist the government in its prosecution of Runyon and Draven as it was to memorialize a basis for Voss's guilt. Respondent's argument that it is just as likely they jury would not have believed Voss implicitly concedes a 50-50 probability that Voss would have been believed. Runyon need not demonstrate prejudice by even a preponderance of the evidence, therefore, the issue of fact raised by Respondent is resolved in Runyon's favor.

Finally, Respondent argues that counsel's use of Voss's statement of facts in the penalty phase somehow renders counsel's failure to call Voss in the guilt phase "harmless" error because the jurors found the equally-culpable codefendant mitigator. ECF No. 536, p.29.[12] If Respondent's reference to "harmlessness" refers to a lack of prejudice, that argument overlooks the fact that Runyon was both convicted and sentenced to death (even with the mitigator). Counsel's guilt-phase deficiencies left the jurors unaware that Voss did not hire or agree to pay Runyon to kill her husband and she believed co-defendant Draven was the actual perpetrator. ECF No. 511-9, ¶¶9, 10, 18, 24. This information was

---

[11] Examples include: the deposits of the credit union "are insured by the National Credit Union Administration Board[;]" "the activities of the credit union operate in and affect interstate commerce[;]" the number of phone and text communications between Draven and Runyon during particular time periods; Cory Voss's truck "had been transported and shipped in interstate commerce[;]" the findings of the medical examiner; and, the forensic analysis on the bullets. ECF No. 70.

[12] Respondent's reliance on *Brecht* is inapplicable because the *Strickland* standard controls ineffective assistance of counsel claims. A finding that counsel rendered ineffective assistance is determinative of the claimed constitutional violation; it ends all further inquiry. *Williams v. Taylor*, 529 U.S. 362, 375 (2000) (reiterating the well-settled rule that the deprivation of the right to the effective assistance of counsel is an error that undermines confidence in the fundamental fairness of the trial and such error cannot be deemed harmless).

25

relevant to the guilt and sentencing phases and would have supplied substantial weight for the mitigating circumstance. As Respondent implicitly conceded, the jurors were likely to believe Voss's in-court testimony. Moreover, the information is not in the statement of facts which counsel admitted as a trial exhibit. Counsel could not have made a tactical decision to deprive the jury of this information because counsel did not know about it. ECF No. 511-6, ¶11.

### C. Scott Linker

Respondent does not contest that counsel failed to investigate and present Linker's testimony. Respondent instead argues counsel was not ineffective in failing to call Scott Linker at the guilt phase because his testimony would have been irrelevant and inadmissible. Alternatively, Respondent argues that Linker's testimony could have supported the prosecution's "hit man" theory. ECF No. 536, p.30. The latter argument has no significance. The jurors convicted Runyon on the prosecution's "hit man" theory without hearing from Linker. The former argument is incorrect. Linker's testimony provided context for Runyon's gun purchase the day of the crime and made the prosecution's theory of the case less probable. It also explained items of physical evidence—long guns and ammunition—which the prosecution introduced into evidence.

"Few rights are more fundamental than that of the accused to present witnesses in his own defense[.]" *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). This right is tempered only by procedural rules that govern the orderly presentation of facts. *Id.* at 410-11. Although Respondent seemingly would have this Court adopt a narrower definition of relevance than provided by the Rules of Evidence or would have the Court curtail defense evidence on the belief that evidence of guilt is strong, rules cannot be applied mechanistically where constitutional rights directly affecting the ascertainment of guilt are implicated. *Chambers*, 410 U.S. at 302; *Holmes v. South Carolina*, 547 U.S. 319, 329-30 (2006).

26

**2687**

In this case, the prosecution placed into evidence a rifle and shotgun owned by Runyon, neither of which were the murder weapon. Gov't Trial Ex. 212, 212A. Runyon was entitled to present evidence demonstrating that his ownership of the firearms was not related to the crime or to a propensity to commit a crime. Linker's testimony would have provided such an explanation for Runyon's possession, knowledge, and use of firearms. It was relevant and probative of the issues before the jury.

**D. Rose Wiggins**

Runyon relies on the allegations in his amended §2255. ECF No. 511, pp.27-28.

**E. David Runyon's Whereabouts The Day Of The Crime**

Respondent does not contest the fact that counsel failed to investigate or present evidence (such as Paula Dalton's testimony) corroborating the electronic data which places Runyon in Morgantown, West Virginia at a time that makes it impossible for Runyon to be committing the crime in Newport News, Virginia. ECF No. 511, pp.28-29.

Instead, Respondent asserts that it was more important to know when the co-defendants spoke to each other than to corroborate the electronic information placing Runyon in West Virginia at the time of the crime. ECF No. 536, p.32. It is within the jurors' purview to assign importance to evidence, but even based on the weight assigned by Respondent to the co-defendant's communications, this, too, is an area in which trial counsel performed deficiently.

Counsel did not directly argue the fact that records showed David Runyon did not speak with the co-defendants on the day of the crime. Nor did counsel argue that there was no such contact the day before the crime. In fact, there was a significant time span before the crime from Runyon's last call with co-defendant Draven and their next contact after the crime. Counsel failed to argue that the evidence showed no contact between the co-defendants immediately before, during and after the

27

crime and thus no opportunity to plan and coordinate the crime with the victim's whereabouts.

**F.  Cell Tower Testimony Regarding Michael Draven**

Respondent does not dispute that counsel failed to investigate the validity of cell-tower tracking testimony, failed to obtain expert assistance on this issue, and failed to present evidence establishing the possibility that co-defendant Draven was at the scene at the time of the crime.[13] Such evidence and argument would have made the prosecution's theory less probable and would have supported the defense theory that someone else—such as co-defendant Draven—was the triggerman. Courts have found counsel ineffective for not investigating forensic evidence, including cell-tower tracking testimony. *See, e.g., Elmore v. Ozmint*, 661 F.3d 783, 786 (4th Cir. 2011) (counsel ineffective for "blind acceptance of the State's forensic evidence" and failure to investigate or adequately challenge that evidence); *Roberts v. Howton*, 13 F. Supp. 3d 1077 (D. Or. 2014) (counsel's handling of cell tower tracking evidence was ineffective). Although some courts have permitted the use of cell-tower testimony, "[n]o federal court of appeals has yet said authoritatively that historical cell-site analysis is admissible to prove the location of a cell phone user."[14] *U.S. v. Hill*, 818 F.3d 289, 297 (7th Cir. 2016).

---

[13] Respondent's amended response persists with the accusation that Runyon is "wrong" about the number of cell towers in the Newport News area. ECF No. 536, p.32. The amended response fails to recognize that Runyon's amended §2255 clarified that prosecution witness Paul Swartz relied upon a map of Newport News that reflected three cell phone towers to which Draven's phone had connected on the night of the crime. ECF No. 511, p.30. Respondent's admission that there are additional towers in the vicinity demonstrates that Swartz's testimony omitted certain variables impacting the reliability of cell tower evidence to reflect a caller's location. *See Roberts*, 13 F. Supp. 3d at 1092-93, 1102-03.

[14] The Fourth Circuit very recently issued an opinion involving historical cell-site location information (CSLI). In the course of determining that the Fourth Amendment does not apply when the government obtains CSLI from a cell phone provider, the court of appeals expressly noted, "No government tracking is at issue here." *United States v. Graham*, Nos. 12-4659, 12-4825, ___ F.3d ___, 2016 WL 3068018, at *3 (4th Cir. Mar. 31, 2016). The court commented that a cell phone user "conveys" the location of the cell towers his phone connects with, and CSLI identifies the equipment used to route calls. *Id.* at *5, *8. It "does not enable the government to 'place an individual' at home or at other private locations. The historical CSLI at issue here does not provide location information anywhere near that specific." *Id.* at *2 n.3.

28

Respondent contests the strength of evidence Runyon has initially proffered in support of this claim. ECF No. 536, pp.32-33. The government criticizes Exhibit 14 and seeks to distinguish the circumstances in this case from those in cases where courts have found cell-tower tracking evidence to be unreliable. *See, e.g., Roberts, supra; U.S. v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012). Respondent asserts that the testimony of prosecution expert Paul Swartz did not rely on the inadmissible theory known as granulation. ECF No. 536, p.33. This assertion is incorrect.

To determine the location of a cell phone using the theory of granulization, the cell towers used by the subject phone are identified, the range of the towers' coverage is estimated, and predictions are made as to where the coverage area of one tower will overlap with the coverage area of another. *U.S. v. Reynolds*, 626 F. App'x. 610, 614-17 (6th Cir. 2015) (explaining *Evans*, 892 F.Supp.2d at 952-57). Courts which have applied the rigors of *Daubert* have excluded cell-tower tracking testimony that uses this theory because it rests on the questionable assumption that the subject phone connects to the closest tower. *Evans*, 892 F.Supp.2d at 955-57; *U.S. v. Sepulveda*, 115 F.3d 882, 891 (11th Cir. 1997) (cell site analysis contains inherent uncertainties such as calls bouncing across sites and sectors).

In this case, the testimony of Paul Swartz employed the same faulty theories. Swartz specifically stated that a cellphone call will generally register at the closest tower, Tr.1452, 7/14/09, and his testimony was based on this assumption. Swartz relied upon a map of Newport News that indicated the locations of three cell towers and their alleged signal strengths. Gov't Ex.135. Circles were drawn around each tower to estimate the tower's coverage area and predict the overlap between the towers. Swartz testified that if a call is within a circled area it will "register with that cell tower." Tr.1437, 7/14/09.

> [Prosecutor] Q: Mr. Swartz what do these circles show us in terms of someone using
> a cell phone and being able to identify their location?

29

**2690**

[Swartz] A: It shows that if they are using the cell phone and it registers with that tower they would be within that radius.

THE COURT: So in other words, you cannot only tell that a call is coming from a particular cell phone, but you can put it within a certain area, because it goes through a signal and cell phone tower, and that signal only has a certain radius.

THE WITNESS: That is correct.

*Id.*

Swartz testified that "[if] you are within that red circle and you are not within that green circle, then the call is going to be registered with that cell tower that is represented by that red dot." Tr.1438, 7/14/09. Specifically, Swartz testified that, when Draven placed a call from his cellphone, Draven was located within the circle drawn around the cell tower that was used by the cellphone. Tr.1441-42, 7/14/09. Based on the towers that Draven's cellphone utilized, Swartz placed Draven at his house between 2:53 to 6:06 p.m. *Id.* Swartz then asserted Draven moved north, Tr. 1446, 7/14/09, and at 10:51 p.m. Draven was located within the upper circle which encompassed the Waffle House payphone. Tr.1448, 7/14/09. At 11:45 p.m. Draven placed a call that showed "he is now—the telephone is now within" the circle encompassing his home. Tr.1454, 7/14/09. This testimony was the basis for the prosecution's argument that Draven was not at the credit union at the time of the crime. It was, however, without a scientific basis. When a cell phone connects to a particular tower the most that can be said about its location is that it is within approximately 21 miles of that tower. Kennedy declaration, Ex. 3 ¶6. A cell phone could be located beyond that distance if repeaters are in use. *Id.*

Respondent is critical of the fact that Runyon's amended §2255 motion did not designate an expert for this claim, however, an expert designation is not required at this stage of the case or for Runyon to demonstrate an entitlement to fact-finding proceedings and an evidentiary hearing. In any event, an expert has reviewed the cell-tower tracking evidence and testimony from Runyon's trial and

30

**2691**

has concluded that the evidence cannot place codefendant Draven at a certain location at a certain time. Kennedy declaration, Ex. 3 ¶12. The use of circles to represent the cell tower coverage area on Government Exhibit 135 (the map of Newport News) is not accurate. *Id.*, Ex. 3 ¶10. The signal strength of the towers, as indicated on the map, are not the industry standard and underrepresent the coverage area of each tower. *Id.* ¶9. Also, the format of the call history data from Michael Draven's cell phone does not appear to be the original data released from nTelos.[15] *Id.* ¶8.

More important, a cell phone does not necessarily connect to the closest tower. A cell phone connects to the clearest tower. Kennedy declaration, Ex. 3 ¶5. The industry standard formula for selecting the clearest tower is based on Signal, Interference and Noise Ratios (S/(I+N)). *Id.*, ¶10. According to the scale on the map of Newport News, the three cell towers and the location of the Waffle House, the credit union and Draven's house are within approximately ten linear miles. Gov't Ex.135. When Draven's cell phone connected with any of the three cell towers, Draven could have been located anywhere within that ten mile area or an area up to twice that size. *See id.*, ¶11. This means that Draven could have been at the credit union and could have carried out the crime.

Respondent now argues (and seemingly agrees with Runyon) that the trial evidence proved "Draven's location was unknown between 11:11 p.m. and 11:45 p.m. on the night of the murder." ECF No. 536, p.33. But at trial the prosecutor argued the opposite: that the cell-tower evidence proved Draven was not the triggerman because it showed Draven was driving away from the crime scene to his home:

> At the same time, where is Michael Draven? Well, we know where he is. He is traveling up to meet David Runyon. He is on the move. From 11:11 -- and we have shown you the evidence of this -- he is talking on his cell phone and he is moving down the

---

[15] Trial counsel was ineffective for stipulating to the authenticity and validity of all this information instead of investigating its accuracy. *See* ECF No. 239, pp. 15-16, Trial Stipulation 81. Based on the information currently available, Runyon's expert questions the validity of the signal strengths indicated for the three towers. Kennedy declaration, Ex. 3 ¶9.

31

corridor of Jefferson Avenue to go down to that Waffle House, which is just right off the exit of 64 and Jefferson Avenue. That Waffle House is right there with those pay phones. And we know that Michael Draven goes down there, and he meets David Runyon. They talk moments, probably, and then Michael Draven heads back to his home at the trailer with his mother and her husband.

Tr. 1595, 7/16/09.

Defense counsel did not counter this argument with evidence or argument. In fact, counsel could not counter this argument because counsel failed to consult with an expert or investigate the cell tower evidence. *Standards of Practice for Indigent Defense Counsel*, Standard 4.1(a), 4.1(b)(6), 7.1(b)(3) (Virginia Indigent Defense Comm'n.) (*"Standards of Practice"*) (counsel has a duty to obtain expert assistance to prepare the defense and rebut the prosecution's case). To the contrary, defense counsel vouched for the prosecution's witness, Paul Swartz, and asserted he was "a good investigator and an honest guy." Tr. 1639, 7/16/09.

Respondent also disputes that trial counsel could be ineffective for failing to investigate this aspect of the case because counsel presented the general theory of another perpetrator and counsel argued that the evidence did not place Runyon's cellphone in Newport News at the time of the crime. ECF No. 536, p.33. Respondent fails to acknowledge that defense counsel equivocated and told the jury that the evidence "[d]oesn't mean that [Runyon] has it [his cellphone], doesn't mean he doesn't." Tr. 1638, 7/16/09. The fact that counsel presented a theory of defense does not mean that counsel presented that defense in a constitutionally effective manner. *Strickland* requires consideration of that evidence which was presented at trial in conjunction with post-conviction evidence to determine whether counsel's performance prejudiced the defense. *See Elmore*, 661 F.3d at 868-70. Here, counsel failed to support the alternate perpetrator theory by not challenging the cell-tower testimony in addition to other instances of deficient performance set forth in Runyon's amended §2255 motion.

32

**2693**

## G. Runyon's Shopping List

The amended response couches this claim as a failure to highlight that the list of items were not used in the crime. ECF No.536, p.33. Runyon asserts that trial counsel failed to argue that Runyon's shopping list was unrelated to the crime and, in particular, the list omitted those items that the prosecution argued were utilized by the perpetrator: a gun and a mask. Failing to account for Runyon's initial reply, Respondent again asserts that counsel made this argument, but he didn't. *Id.* (alleging that "Runyon is wrong" in alleging counsel did not argue that the listed items were not used in the crime).

Counsel questioned the ATF agent about whether the listed items were recovered in the searches of Runyon's property. Tr.1050, 7/9/09. The agent answered: "I can't comment to that sir. We took a lot of clothing out of Lot 67, and I'm not comfortable saying whether or not some of those clothing items – I can tell you we never recovered a taser. I'm not sure about a Spyderco knife." Tr.1050-51, 7/9/09. This answer indicated that some, if not all, of the listed items were missing. Respondent fails to recognize how eliciting testimony that the items were missing places them in the same category as Runyon's gun, which the prosecution argued Runyon had disposed of because it was the murder weapon. This is an incriminating presentation of evidence by defense counsel rather than an exculpatory demonstration that the listed items were inconsistent with the crime.

Respondent's amended response asserts the same rationale for counsel's failure to persuasively argue about the shopping list and asserts that trial counsel "was correct" not to discuss the list because of notations related to the credit union that were on the same piece of paper. ECF No. 536, p.34. Counsel could not have contemplated this rationale because in closing argument, counsel mentioned the map which had similar information noted on it. The map had notes related to the credit union *as well as* notes about the victim's truck and the victim's name. Gov't Tr. Ex. 214. Counsel told the jurors,

33

**2694**

"I admit that's a hard thing to explain, having that map. That's suspicious." Tr.1654, 7/17/09. Respondent's assertion that competent counsel would not reference the shopping list should equally apply to the map which contained even more information related to the crime. Under Respondent's theory, counsel was ineffective for discussing the map.

To be sure, competent counsel can address the prosecution's evidence in a light favorable to the defense. Counsel did not do so in this case although he did mention that Runyon was not asked when the notes on the map were written. Tr.1654, 7/17/09. Counsel missed the opportunity to argue that the prosecution's evidence established the notes were written after the crime. The prosecution presented a significant amount of testimony about a trip to Nags Head shortly after the crime taken by Draven, Voss and her children, and Draven's brother and his girlfriend. The group spent thousands of dollars on hotels, jewelry, food and champagne. Counsel failed to point out that inside the map was the photograph of Draven and Voss at Nags Head. The photo could have been taken *after the crime*, during that May vacation. Tr.1605, 7/17/09. The jurors could have inferred that Runyon came into possession of the map at the same time as the photograph—after the crime. Counsel, however, failed to address the prosecution's evidence in a light favorable to, or consistent with, the defense.

## H. Testimony regarding the bullets.

Respondent initially argues that Runyon has not proffered any evidence that undermines the expert testimony in his trial. ECF No. 536, p.34. First, Runyon has requested access to the evidence upon which his convictions are based (records of the forensic examination of the bullets) and has not yet been granted such access. ECF No. 530, Second Motion for Discovery; ECF No. 545, Supplement to Second Motion for Discovery; ECF No. 545-1, Nixon declaration. Respondent has opposed that motion without acknowledging that the bullets entered into evidence at trial are missing and, therefore, cannot be examined. The records Runyon has requested will contain information useful to Runyon's

34

**2695**

expert, who (based on the record currently available) questions the trial testimony that allegedly ties the bullets to Runyon's gun. ECF No. 545-1, Nixon declaration. Second, Respondent argues that Runyon has not offered a study or evidence to rebut the validity of the bullet analysis. ECF No. 532, p.4. Runyon therefore also includes herein examples of scientific studies and legal articles scrutinizing the validity of firearms and toolmark testimony that he provided in his reply in support of the second discovery motion. *See* ECF No. 533 & 533-1, 533-2, 533-3.

Runyon's §2255 motion noted that counsel should have been aware of the fact that about five months before Runyon's trial, the National Academy of Sciences ("NAS") issued a landmark report regarding the unreliable state of forensic science in this country. ECF No. 511, p.33 n.20 (citing Nat'l Acad. of Sci., *Strengthening Forensic Science in the United States: A Path Forward* (Feb. 2009)) ("NAS report") (ECF NO. 511-1) (Partial: pp.1-53 (introduction); pp.150-55 (toolmark and firearms identification)). The NAS Report concluded that "[w]ith the exception of nuclear DNA analysis ... no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source." (ECF NO. 511-1, NAS Report, p.7). As the NAS Report recognized, "there is a notable dearth of peer-reviewed, published studies establishing the scientific bases and validity of many forensic methods," *id.*, p.8, and the report makes clear that these deficient methods include the precise types of scientific evidence presented at Runyon's trial: toolmark and firearm identification. *Id.*, pp.150-55. "The fact is that many forensic tests—such as those used to infer the source of toolmarks or bite marks—have never been exposed to stringent scientific scrutiny." *Id.*, p.42. Although the NAS Report is perhaps the most renowned publication revealing the unreliable and unscientific nature of this type of forensic testimony, it is not the first nor the last.

35

**2696**

Even before the 2009 NAS Report, counsel should have been aware of published criticism regarding the reliability of "ballistics" or firearms identification testimony. For example, scholarly and legal scrutiny of firearms identification testimony since 2005—four years before Runyon's trial—is collected and discussed in an article by Lanigan Bonnie: *Firearms identification: the need for a critical approach to, and possible guidelines for, the admissibility of "ballistics" evidence*, 17 Suffolk J. of Trial & Appellate Advocacy, 54 & notes 2, 7-9, 12, 13, 45, 58, 83-95, 115, 120 (Feb. 1, 2012). *See also* Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 The Columbia Sci. and Tech. L. Rev. 1, 2 (2005) (discussing *United States v. Kain*, Crim. No. 03-573-1 (E.D. Pa. 2004), and demonstrating that "because of the systemic scientific problems, firearms and toolmark identification testimony should be inadmissible across-the-board.").[16] Accordingly, counsel should have been aware of scientific and legal scrutiny of the validity of testimony such as that given by

---

[16] Such criticism and concern continues today. In 2014, the National Institute of Standards and Technology reported on a project goal to develop objective toolmark identification criteria and error rate estimates so "examiners in court will not only present their subjective opinion of identification, but also will have an independent objective measurement of similarity between the evidence items." In 2015, the Attorney General endorsed a charter for the National Commission on Forensic Science (NCFS), a purpose of which is to "strengthen the validity and reliability of the forensic sciences" and "develop proposed guidance concerning the intersection of forensic science and the courtroom[.]" (ECF No. 533-2, Charter). It is the view of the NCFS that "[a] trusted and impartial process of judging scientific merit of forensic practices and the presentation of data must be developed to ensure that all forensic results are based on sound and current science." (ECF No. 533-3, Nat'l. Comm. on Forensic Sci., Views of the Commission: Validation of Forensic Science Methodology, p.3 (Feb. 29, 2016).

In March 2016, the Principal Deputy Assistant Attorney General and head of the Justice Department's Office of Legal Policy presented materials to the NCFS for the purpose of addressing testimonial inaccuracies of forensic examiners in disciplines including firearms/ballistics. Office of Legal Policy Presentation, The Forensic Science Discipline Framework, pp.4, 6, 7, available at: https://www.justice.gov/ncfs/file/835636/download. The materials set forth the framework for adopting and implementing "correct testimonial standards" and for reviewing closed cases involving FBI forensic testimony for "testimonial inaccuracies." *Id.*, pp.8, 9, 11. Runyon's case will not be selected for review because his case is not closed and the examiner who testified—although trained by the FBI—was not an FBI agent.

36

prosecution witness John Willmer. Counsel was ineffective when he failed to investigate and present evidence exposing the weakness of Willmer's testimony.

Respondent also briefly claims that this amended allegation is untimely. ECF No. 536, p.34-35. The assertion of untimeliness is incorrect. The amendment was filed within the time allowed by Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure. It also relates back to Runyon's original §2255 motion which pled that trial counsel failed to investigate and present evidence supporting the reasonable doubt defense and countering the prosecution's evidence and argument that Runyon's revolver was the murder weapon. This subclaim asserts the same type of attorney ineffectiveness and arises "out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(a)(1)(B); *Mayle*, 545 U.S. at 659 (relation-back is allowed when the claim added by amendment arises from the same core facts). There is nothing completely new about this subclaim and Respondent does not allege there is. *Wolfe v. Clarke*, 691 F.3d 410, 422 (4th Cir. 2012) (where habeas petition alleged Brady violations, amendment was not necessary to add evidence of additional instances of such violations).

This subclaim relates-back to Runyon's original §2255 which sufficiently put Respondent on notice that trial counsel were ineffective for failing to investigate and present evidence of innocence, in particular, evidence countering the prosecution's attempt to connect Runyon's Taurus .357 to the crime. ECF No. 511, pp.19-22 and n.9, pp.23-24, 27-28; *see also* ECF No. 526, pp.18-19, 21, 23-24 (further discussing counsel's failure to present testimony that was inconsistent with idea that Runyon's gun was the murder weapon). Runyon pled facts regarding the physical characteristics of Runyon's revolver which are inconsistent with the prosecution's evidence. For example, Runyon owned a black or "blued" six-shot revolver but the victim was shot five times with an unspecified type of handgun and with an ATM photo showing a "shine" off the perpetrator's gun. The original §2255 presented

37

**2698**

additional facts undermining the prosecution theory that Runyon's revolver was the murder weapon: the list of items portrayed by the prosecution as items needed for the crime did not include a gun, although Runyon did not own the revolver before the day of the crime; Runyon was in West Virginia at the time of the crime; and, Runyon's ownership and purchase of firearms was not consistent with the idea that Runyon was the trigger man.

Runyon's amendment details further facts and argument in support of the original allegations based on counsel's failure to investigate and present evidence supporting a reasonable doubt that Runyon's gun was not the murder weapon. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 469-70 (4th Cir. 2007) (Rule 15 seeks to ensure that a factual nexus exists between the amendment and the prior pleading and that a defendant had sufficient notice of new claims such that defendant does not suffer prejudice). The additional details and allegation that the prosecution's presentation of Willmer's firearms and ballistics testimony should have been investigated by counsel, therefore, arise out of the conduct, transaction or occurrence attempted to be set forth in the original §2255.

In the main, Respondent argues that Runyon has not demonstrated this claim has merit. ECF No. 536, p.35. Respondent does not dispute that counsel failed to investigate the ballistics evidence in this case or consult with a ballistics expert or zealously cross-examine the ballistics testimony. Indeed, counsel had a duty to conduct an independent investigation and obtain expert assistance to prepare the defense and rebut the prosecution's case. *Standards of Practice, supra*, Standard 4.1(a), 4.1(b)(6), 7.1(b)(3). Instead, Respondent asserts "it was reasonable for trial counsel to forgo a more forceful challenge to the ballistics evidence[]" because Willmer testified that the list of .357 firearms that could have fired the bullets "was not all-inclusive." ECF No. 536, p.36. Under Respondent's theory, although the Certificate of Analysis named two brands of .357 firearms and neither were the brand of Runyon's .357, the list actually included *all* brands of .357 firearms or at least *could have included* the

38

**2699**

brand of Runyon's firearm. Such wide-sweeping testimony is of little worth in identifying the actual perpetrator.

Counsel was ineffective because consultation with an expert would have revealed that a search for brands and models of guns producing the characteristics noted on the Certificate of Analysis reveals 383 brand and models of 9mm / 380 semiautomatic pistols, 67 brands and models of .38 revolvers, and 36 brands and models of .357 revolvers. ECF No. 545-1 ¶10, Nixon declaration. Moreover, a defense expert could have explained that any inference or conclusion that the bullets were fired from a particular firearm is speculative, especially when the particular firearm was not available for comparison purposes. *Id.* ¶7. A defense expert also could have rebutted Willmer's testimony which inferred that Runyon's cleaned his gun with a wire bore brush in order to cover-up the crime. This testimony "was exaggerated, both in terms of the aggressiveness of such brushes, and their rarity. It is common to use stainless steel bore brushes to clean firearms. Such brushes will not easily affect rifling characteristics." *Id.* ¶9. This testimony would make the prosecution's theory of guilt less probable. Confidence in the jury verdict would have been undermined had counsel countered the prosecution evidence because there is a reasonable probability that jurors would have had a reasonable doubt that Runyon was the triggerman.[17]

---

[17] Respondent asserts that Runyon cannot show prejudice due to the "mountain of evidence demonstrating guilt." Runyon's §2255 motion has shown that there was not a "mountain of evidence" and, instead, the prosecution's case was strategically built on an *absence* of evidence of guilt which was substantially aided by counsel's failure to investigate and present evidence that countered the prosecution theory and tended to show Runyon's innocence. Regardless, to prevail on his ineffective assistance of counsel claim, Runyon need not overcome an alleged mountain of evidence. He "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. Prejudice exists when there is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

**Claim 4:**     **Counsel Abdicated The Responsibility To Advocate For Runyon At The Eligibility Phase When He Failed To Address The Relevant Issue And Did Not Discuss Established Facts That Weighed Against The Statutory Aggravating Circumstances.**

Respondent does not contest that counsel had a duty to investigate and respond to the prosecution's case in aggravation, *Rompilla v. Beard*, 545 U.S. 374, 385-87 (2005), that counsel had an "overarching duty to advocate the defendant's cause" and that counsel was required to "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. Instead, Respondent argues that counsel's performance cannot be deemed ineffective because there was overwhelming evidence of the statutory aggravating factors based on the guilt-phase evidence and convictions. ECF No. 536, pp.36-37. Respondent's amended response, like the initial response, again proffers an incorrect legal standard when he states that "the evidence of Runyon's eligibility for the death penalty was overwhelming, such that he cannot establish that the outcome would have been different even had trial counsel advocated in a different manner." ECF No. 536, pp.36-37. Runyon need not show the outcome would have been "different." He need only demonstrate that there is "a probability sufficient to undermine confidence in the outcome" if counsel had presented evidence and argument to mitigate the aggravating factors. *Strickland*, 466 U.S. at 694. *See also* Note 17, *supra.*

Respondent also asserts it was a reasonable strategic decision for counsel "to avoid alienating the jury by openly contesting what was otherwise very obvious and apparent in the jury's determination of guilt." ECF No. 536, p.39.[18] The issues of prejudice and deficient performance are fact intensive and require further factual development and an evidentiary hearing. *See Blackledge*, 431

---

[18] In contradiction, Respondent praises counsel for urging the jury to look at the guilt-phase evidence anew. ECF No. 536, p.39. Counsel, however, failed to provide a fact-based argument that provided a new way of viewing the guilt-phase evidence in light of the unique inquiries of the eligibility and selection phases that determine a defendant's sentencing fate.

U.S. at 80-81; *Townsend*, 372 U.S. at 313.

Counsel's decision to forgo presenting proof at a separate trial stage and in support of a separate issue on the belief that it wouldn't make a difference or it would "alienate the jury" is not reasonable. This is particularly true because the statutory aggravators carried-over to the penalty phase to be weighed in the jury's selection of a sentence. It was imperative for counsel to mitigate the weight of these factors. *See Rompilla v. Beard*, 545 U.S. 374, 385-87 (2005) (counsel has a duty to investigate proposed aggravating factors and mitigate those factors with readily-available evidence). By essentially conceding the two statutory aggravating circumstances counsel "seriously compromise[ed] their opportunity to respond to [the prosecution's] case for aggravation." *Id.* at 385.

With respect to the "substantial planning" aggravator, Respondent appears to argue that counsel had no duty to advocate for Runyon because the aggravator "was inherent in the jury's determination that Runyon and Draven were guilty of Conspiracy to Commit Murder for Hire Resulting in Death." ECF No. 536, p.40. Respondent fails to address the argument that was available to counsel to mitigate the "substantial planning" aggravator. *See* ECF No. 511, pp.36-37. This argument demonstrated that the other two co-defendants recruited Runyon, planned the crime, and also laid a foundation in support of the "equally culpable co-defendants" mitigating circumstance. Respondent fails to explain how defending against the aggravating weight of this factor would alienate the jury.

With respect to the "pecuniary gain" aggravator, Respondent alleges that Runyon put forth mere conclusory allegations. ECF No. 536, p.38 n.4. An allegation is conclusory only when it is not supported by "facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Note to Rule 4, Rules Government Habeas Corpus Cases). Runyon asserted such facts. At the eligibility hearing, counsel failed to address the

41

**2702**

"pecuniary gain" aggravator. Importantly, the jury had acquitted Runyon of conspiracy to commit robbery. The aggravator was supported only by a receipt indicating Randy Fitchett sent $275 to Runyon two months after the crime. ECF No. 511, p.38 n.23. Voss and Draven received $100,000 almost immediately after the crime and spent the entire amount in about three months, *id.*, p.3; *see also id.*, p.6, and that Draven and Voss denied paying Runyon for the crime. *Id.*, p.113. A declaration from Voss states that she did not agree to pay Runyon to kill her husband. ECF No. 511-9, ¶9. There is nothing conclusory about the facts supporting this claim.

Counsel's failure to discuss and mitigate the two statutory aggravating circumstances was prejudicial because they were carried into the selection phase without any attempt by counsel to mitigate their weight. Conceding through silence two aggravating factors that the jurors then weighed in favor of a death sentence is not a reasonable "start" for the penalty phase as Respondent suggests. ECF No. 536, p.39-40. "[N]o single point in a criminal case is more consequential than sentencing. Representation of a client at sentencing is not a separate aspect of the criminal case, but should be a final step in a case-long plan." *Standards of Practice, supra,* Standard 8.1(b) & Comment. Counsel was duty-bound to "take the steps necessary to advocate fully for the requested sentence[,] to protect the client's interest[,] ... [and] to present supporting evidence ... to establish the facts favorable to the client." *Id.*, Standard 8.5(a) & (b). Constitutionally effective counsel would have submitted evidence to mitigate the aggravators and to do so would not have alienated the jurors; it would have fulfilled counsel's duty "to ensure that the adversarial testing process work[ed] to produce a just result." *Strickland,* 466 U.S. at 687.

**Claim 5:** **Trial Counsel Were Ineffective For Failing To Investigate, Discover, And Present Evidence That David Runyon Was Incompetent To Stand Trial.**

Respondent's amended response, like the initial response, argues that counsel had no duty to investigate Runyon's mental health because, in Respondent's view, the facts of this case were not as

42

**2703**

"bizarre" as a case where a man raped and robbed a 67-year-old woman. ECF No. 536, p.43. The test for whether counsel is on notice of a reasonable avenue for investigation is not limited to whether the facts surrounding the crime are illogical. The test is whether a reasonable attorney would follow leads based on facts that were known or should have been known. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). In this case, facts counsel knew or should have known about their client and the case signaled a need for a mental health investigation, above and beyond the pre-existing duty to investigate. Moreover, regardless of the facts of the crime, standards of practice required counsel to gather information and evidence of the client's competence and mental state at the time of the offense. *See, e.g.*, *Standards of Practice*, *supra*, Standard 2.1(c)(7); *see also* Standard 3.3 (continuing responsibility to raise issue of client's incompetence).

First, "facts, which were either known or ascertainable with reasonable diligence by counsel prior to trial, provided a reasonable basis for believing th[at] defenses based on [Runyon's] mental capacity might have been plausible." *Becton v. Barnett*, 920 F.2d 1190, 1193 (4th Cir. 1990) (citation omitted). Mental health records from the local jail stated that Runyon was suffering anxiety attacks, he was grandiose and delusional, and his thoughts were flighty and rambling. ECF No. 511-16, pp.3-4. If counsel were not observant enough to see the scars on Runyon's face, head, and body or the asymmetry in Runyon's face, a medical screening of Runyon conducted in conjunction with his employment in a drug study recorded the facial asymmetry and at least one prominent scar.[19] *See* ECF No. 526-1. In conversations with counsel, Runyon displayed a very rigid thought process. ECF No.

---

[19] Respondent states that "various medical screenings Runyon underwent in connection with these studies suggested no issues with regard to his competence." ECF No. 536, pp.44. Undersigned are unaware of mental health examinations performed in relation to the studies and Respondent has not produced any.

511-5, ¶3. He reported grenade-blast injuries from the Army and trauma from automobile accidents. ECF No. 511-5, ¶5; ECF No. 511-6, ¶5. Runyon compared himself to great historical figures and recounted the many lives he had saved. ECF No. 511-4, p.3 ¶7. He wrote long, rambling letters before trial that indicated his failure to understand concepts communicated by counsel. ECF No. 511-4, p.3 ¶7; *id.*, pp.9-14. During trial Runyon wrote obsessively. ECF No. 511-4 p.7 ¶16; ECF No. 511-5, p.3 ¶11. Counsel knew Runyon's mother had a history of trauma and a mood disorder. Runyon's father was cold, unfeeling and silent. Runyon grew up in a strictly-disciplined and extremely isolated environment. *See, e.g.,* ECF No. 511-4, p.3 ¶8; ECF No. 511-6, p.2 ¶14; ECF No. 511-15, pp.5-6. Respondent ignores the facts that were known or should have been known by counsel and, instead, argues that counsel "had no indication of mental illness." ECF No. 536, p.45.

Second, even under Respondent's "bizarre facts" test for investigation, counsel were aware that facts in this case simply do not make sense. Respondent has chosen not to acknowledge this reality. *See, e.g.,* ECF No. 536, p.43 ("Runyon's crime was not so bizarre"). According to the prosecution's theory, however, Runyon agreed, with a man he just met and a woman he never met, to kill a man he did not know, for absolutely no money up front. Runyon then waited until *the day of the crime* to purchase a gun (the alleged murder weapon) from a man he did not know and under circumstances where there was no certainty that the transaction would actually occur. At the point of purchase Runyon gave the seller his license and personal information and spent time discussing personal, family details with the seller. Runyon then allegedly drove from Morgantown, West Virginia late that afternoon—without accounting for any travel delays and leaving no room for error—to arrive in Newport News, Virginia, just in time to encounter the victim at the credit union's drive-up ATM. Runyon allegedly used .38 caliber bullets in the .357 revolver even though he owned .357 ammunition. Runyon then left Virginia without receiving any payment although the co-defendants obtained

44

**2705**

$100,000 approximately 24 hours after the victim's death. Runyon kept the alleged murder weapon and created a paper trail of the .357 at a pawn shop. He also kept notes on the credit union and a map of Newport News along with a photograph of the co-defendants *even after* police interviewed him about the murder and during which he voluntarily gave a DNA sample. These are strange facts especially when considered in light of the assertion that Runyon used specialized education, training and experience to carry-out the crime and "avoid" detection.

Third, the Sixth Amendment right to counsel "imposes a correlative duty on defense counsel to undertake reasonable steps to investigate all open avenues of defense." *Wood v. Zahradnick*, 578 F.2d 980, 982 (4th Cir. 1978). This includes a pre-existing duty to investigate and raise mitigating mental health factors both pre-trial to the prosecutor and court and to the jury and court at sentencing. *Wiggins*, 539 U.S. at 524-25 (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1, commentary, pp.4-55 (2d ed. 1982), and, ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1(C), p.93 (1989)).

"The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case[.]" *U.S. v. Williams*, 615 F.2d 585, 594 (3d Cir. 1980) (quotation and citations omitted). Thus, when objective facts signal the need to explore a client's mental health, the "[f]ailure to adequately investigate the possibility of an insanity defense has been held to fall below the standard of competence despite the deference accorded an attorney's judgment in evaluating the effectiveness of representation." *Becton*, 920 F.2d at 1192. As set forth in the §2255 motion and above, there were facts indicating a "reasonable cause to believe" that Runyon was "suffering from a mental disease or defect" that rendered him unable "to assist properly in his

**2706**

defense."[20] 18 U.S.C. §4241(a) (setting forth the standard under which a competency hearing shall be granted). Under such circumstances, Runyon has satisfied the performance prong of *Strickland* because he need only demonstrate that the Court would have held a competency hearing; he does not need to show that he would actually have been found incompetent. *Becton*, 920 F.2d at 1193–94. Even if the hearing did not result in a finding of incompetence the examination should have revealed Runyon's brain damage and severe mental illness and would have supported substantial mitigation. *See Porter v. McCollum*, 558 U.S. 30, 40 (2009) (describing mitigation that arose from court-ordered competency evaluations).

Finally, Respondent raises a material issue of fact by arguing that Runyon's defense was not prejudiced because "counsel did make a full examination for any identifiable mental health issues." ECF No. 536, p.44. This is incorrect. A full examination of Runyon's psycho-social history and mental health was not completed before the trial began, in large part because penalty-phase counsel did not have enough preparation time. Hudgins declaration ¶4, Ex. 1. Counsel Hudgins was appointed 91 working days before the trial. At most, he had 32 full business days to learn about and investigate Runyon's case and prepare for trial before it began. ECF No. 511-5, ¶2 and ECF No. 511-19; *see also* Hudgins' calendar, Ex. 4.

Counsel's investigation was inadequate because the mental health experts had not conducted full examinations before trial began. *See also* Claim 6. For example, Dr. Nelson had not completed a full examination and he recommended a neuropsychological evaluation of Runyon. ECF No. 153, p.1. Dr. Mirsky began an examination of Runyon four days before trial. ECF No.511-20. He informed counsel that his review and analysis was not complete and that it was essential for Runyon to undergo

---

20 The fact that Runyon has above-average intelligence does not negate a determination of incompetency or mental disease or defect. *Cf.* ECF No. 536, p.45 (stating, "the information available to counsel indicated that Runyon possessed above average intelligence").

46

a neurological examination. *Id.* Counsel requested the assistance of Dr. Merikangas to conduct that examination, but the trial court declined to appoint him at that point. As a result, Dr. Merikangas was unable to examine Runyon until *after* Runyon was convicted and found eligible for the death penalty. ECF No.511-2, p.5 of 6, Dr. Merikangas August 5, 2009 preliminary report. Respondent concedes that both Dr. Mirsky and Dr. Merikangas issued only preliminary reports, ECF No. 536, p.44, and complains about not receiving full information or complete reports from the defense experts. *Id.*, pp.61-62. This incomplete effort at investigating Runyon's mental health cannot, under any measure, be considered "a full examination for any identifiable mental health issues."

**Claim 6:** **Counsel Rendered Ineffective Assistance By Failing To Investigate And Present Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage And Mental Health.**

Respondent characterizes this claim as an attack on counsel's sentencing-phase strategy and avoids the central issue of counsel's deficient investigation by ignoring the specific factual allegations and by incorrectly characterizing information known and unknown by counsel. Respondent asserts contrary facts and disputes many of the factual allegations pled by Runyon. Accordingly, Respondent raises several factual issues—including the strength of evidence, the scope of counsel's investigation and the reasonableness of counsel's actions—which require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

*Strickland v. Washington* prescribes the proper framework and focus for this claim. It provides that a failure to uncover and present mitigating evidence at sentencing cannot be justified as a tactical decision to focus on a particular defense theory when counsel have not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, Commentary, pp.4-55 (2d ed. 1980)). The reasonableness of the mitigation theory actually proffered by counsel is not relevant when evaluating

47

**2708**

the impact of evidence that would have been available and likely introduced, had counsel completed a constitutionally adequate investigation before settling on a particular mitigation theory. *Sears v. Upton*, 561 U.S. 945, 954-55 (2010). "[R]egardless of how much or how little mitigation evidence was presented during the initial penalty phase," *Sears*, 561 U.S. at 956, the inquiry into whether counsel exercised reasonable professional judgment "focus[es] on whether the investigation supporting counsel's decision not to introduce mitigating evidence … was itself reasonable." *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). In this case, there was no "decision" to forego the introduction of the unpresented mitigating evidence. Counsel did not present certain mitigating evidence because an adequate investigation was not conducted and available mitigating evidence was not uncovered.

A. **All mental health experts consulted by defense counsel indicated Runyon was suffering from a mental disease or defect but the experts lacked the information, testing, and time required for a complete examination.**

Respondent concedes that Drs. Mirsky and Merikangas made only preliminary findings. ECF No. 536, p.60 ("Their reports were preliminary in nature[.]"). In fact, Respondent complains about not receiving full information or complete reports from the defense experts. *Id.*, pp.61-62. The prosecution never received a full report from Dr. Merikangas and Dr. Mirsky did not supplement his report. *Id.* Respondent asserts, however, that the defense experts were not favorable, *see, e.g.*, ECF No. 536, pp.64, and states that "counsel cannot be held accountable for relying on experts after providing them sufficient evidence." *Id.*, p.52. Notably, Respondent fails to explain what was "unfavorable" about the defense experts and fails to indicate what "evidence" defense counsel gave the experts and why that "evidence" was "sufficient."[21]

---

[21] The first expert counsel contacted, Dr. Nelson, did not conduct a complete examination or a psycho-social history and assessment. He did, however, inform counsel that neuropsychological deficits were a defining element of Runyon's personality and behavior and he recommended a neuropsychological evaluation of Runyon. ECF No. 153, p.1. Counsel then sought assistance from experts in that field. In *Sears*, 561 U.S. at 951, the Supreme Court held that "[c]ompetent counsel

48

The basic premise for Respondent's argument against counsel's ineffectiveness is incorrect. The defense experts' preliminary assessments *were* favorable to the defense and "do not contain negative information about David Runyon." Hudgins declaration ¶8, Ex. 1. Counsel did *not* timely obtain expert assistance nor provide the experts sufficient information for an adequate examination.

First, the preliminary findings of the defense experts contained classic mitigating evidence and warranted further investigation. Dr. Mirsky found: (a) "strong evidence that he [Runyon] is suffering from a neurological disorder," ECF No. 511-20; (b) Runyon has classic symptoms and suffers the effects of blast and impact injuries and brain injury, ECF No. 511-21; (c) Runyon is properly classified as having mild traumatic brain injury, ECF No. 511-22; (d) Runyon displays symptoms of Post Traumatic Stress Disorder, *id.*; and, (e) Runyon has a very impaired ability to sustain attention and has impairments in reaction time. *Id.*, pp.1-3. All of these findings are mitigating. *See, e.g., Porter*, 558 U.S. at 41 (evidence of poor mental health or mental impairment could influence a jury's appraisal of the defendant's moral culpability); *Sears*, 561 U.S. at 949 (describing brain damage as significant mitigating evidence); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 261-63 (2007) (describing "possible neurological damage" as mitigating evidence); *Rompilla*, 545 U.S. at 392 (discussing how organic brain damage is an extreme mental disturbance that significantly impairs cognitive functions and a defendant's mental capacity at the time of the crime).

Dr. Merikangas reported: (a) that the prosecution experts' evaluations suggested Runyon suffers from Migraine like headaches, Attention Deficit Disorder and Post Traumatic Stress Disorder, ECF No. 511-2, p.5; (b) Runyon has physical signs of trauma, *id.*; (c) he has Post Traumatic Stress

---

should have been able to turn some of the adverse evidence into a positive—perhaps in support of a cognitive deficiency mitigation theory. In particular, evidence of Sears' grandiose self-conception and evidence of his magical thinking ... were features, in another well-credentialed expert's view, of a 'profound personality disorder.'"(Citation omitted). The performance of Runyon's counsel failed in this regard.

Disorder, *id.*; (d) he suffers severe headaches, *id.*; (e) withdrawal from experimental drugs may have affected him at the time of the crime, *id.*, pp.5-6; (f) he was currently either in a fantasy world of grandiose thinking or suffering from delusions; *id.*, p.6; and, (g) he has impaired executive functioning suggestive of frontal lobe brain impairment. *Id.* All of these findings are mitigating. *Ibid.*

Second, counsel failed to timely obtain expert assistance. Respondent concedes that—the day before trial began—defense counsel provided notice of their intent to substitute Drs. Mirsky and Merikangas as the defense experts but the doctors had not yet begun or concluded their evaluations of Runyon. ECF No. 536, p.56 (citing ECF No. 230). Once retained, the experts requested more information and testing but received neither. They were not given Runyon's medical records or other relevant background materials.

Dr. Mirsky reported to counsel: (a) that an evaluation by a neurologist was essential, ECF No. 511-20; (b) testing information sent to him by the prosecution expert was "not especially useful or informative," ECF No. 511-21; (c) counsel's report that the brain scans "were read as normal" was not conclusive on whether Runyon had brain damage, ECF No. 511-22, p.1; (d) Diffusion Tensor Imaging had not been done, *id.*; and, (e) Post Traumatic Stress Disorder had not been ruled out. *Id.*

Dr. Merikangas was not appointed until the day the jury found Runyon eligible for the death sentence. ECF No. 257. He requested: (a) a chronology and details of the experimental drugs Runyon was administered before the crime, and (b) brain imaging, including MRI, PET, and EEG. ECF No. 511-2, pp.5-6. He was not given the brain scans performed during the penalty trial. Dr. Merikangas recently reviewed the scans from August 2009. "They revealed multiple white matter hyperintensities … consistent with his [Runyon's] history of head injur[i]es and migraine." ECF 511-2, p.4.

Respondent's amended response, like the initial response, fails to acknowledge the facts alleged in Runyon's amended §2255 motion and initial reply which demonstrate that the defense experts did

50

not see the brain scans and that the scans were consistent with brain injuries. Respondent repeatedly mis-represents that the brain scans did not reveal brain damage. *See, e.g.*, ECF No. 536, pp.62 n.7, 65, 69, 72. Respondent relies upon the fact that defense counsel told Dr. Mirsky (after Runyon was sentenced to death) that the scans were read as normal and then ignores the fact that Dr. Mirsky immediately informed counsel that his opinion regarding Runyon's brain injury and PTSD was unchanged. ECF. 511-22, p.1. Runyon's trial counsel understands the difference between a radiologist's reading and a neuropsychiatrist's/neurologist's reading of a brain scan. Hudgins declaration ¶5, Ex. 1. They look for different things. A radiologist's report of a normal brain MRI was not a reason to cease investigation into Runyon's mental health or social history. *Id.*

Respondent also suggests that neurological testing requested by the defense experts is the same as the brain scans and then hypothesizes that the defense experts did not complete their evaluations because the scans "revealed no abnormalities." ECF No. 536, pp.62 n7. Neither suggestion is true. The fact that Runyon suffers from a mental disease or defect, in part based on blast injuries incurred during his military service, was mitigating. The available mental health mitigation was consistent with non-statutory mitigators regarding Runyon's childhood experiences of domestic violence and parental conflict and Runyon's military service. It was not inconsistent with the defense theories of equally-culpable co-defendants and family sympathy. It was the type of information counsel wanted to present at the penalty phase. Hudgins declaration ¶¶6, 9, Ex. 1. Based on what counsel learned (or should have learned) from the mental health experts, the investigation was incomplete and prematurely abandoned.

**B. Counsel did not reasonably abandon the psycho-social investigation.**

Respondent argues that counsel's limited mental health investigation was adequate because offering expert testimony would have opened the door to harmful testimony from the prosecution's

51

experts and because counsel did not have a factual basis to follow-through with the investigation.[22]

Neither contention is supported by the evidence before the Court.

### C. Counsel did not abandon the investigation upon receipt of the prosecution experts' reports.

Respondent's amended response, like the initial response, implies that defense counsel abandoned the mental health investigation once the prosecution experts' reports were revealed. ECF No. 536, p.57 (the defense filed its notices of intent to introduce mental health testimony before defense counsel received reports from the prosecution's experts). The causation Respondent continues to claim still does not exist. Counsel received the reports the day the jury found Runyon eligible for the death penalty. ECF No. 252. Nine days before the penalty phase began, counsel re-asserted an intent to present mental health experts and requested permission to supplement the defense experts' reports. ECF No. 269. Counsel did not cease an investigation or decide not to present Runyon's mental health and social history based on the prosecution-experts' reports. Hudgins declaration ¶7, Ex. 1. Counsel clearly contemplated mental health testimony even after the prosecution-experts' reports were disclosed.

Respondent argues as if counsel in this case were uniquely confronted with the proposition that if they "opened the door to a mental health defense," the Government would have presented mental health experts in rebuttal." ECF No. 536, p.57-58. Counsel expected the prosecution's experts to express differing, if not unfavorable opinions of Runyon. Hudgins declaration ¶7, Ex. 1. This is the nature of the adversarial system. "If there is one area where expert witnesses are almost always diametrically opposed, it is the field of psychiatry." *U.S. v. Mansfield*, 24 M.J. 611, 618 (A.F.C.M.R.

---

[22] Respondent incorrectly states that Runyon's recent expert reports "rely on information and affidavits not available at the time of trial[.]" ECF No. 536, p.72. The expert and lay-witness declarants affirmed they could have provided information at the time of trial and the records and evidence are either dated before trial or existed before trial.

52

**2713**

1987) (rejecting the argument that abandoning expert evidence was reasonable because the prosecution could respond with damaging information). The fact that the prosecution will present its own experts does not justify counsel's failure to present mental health mitigation in support of a life sentence. *Porter*, 558 U. S. at 43 ("it was not reasonable to discount entirely the effect that [a defense expert's] testimony might have had on the jury" just because the prosecution's expert provided contrary testimony). In this case, reports from the prosecution's experts were not the reason why an adequate investigation and psycho-social history was not completed or presented to the jurors. Hudgins declaration ¶7, Ex. 1.

**D. Reports of the prosecution experts did not contain additional aggravating evidence and were not inconsistent with defending the proposed aggravating circumstances or establishing mitigating circumstances.**

The record before the Court does not support Respondent's theory that counsel avoided damaging prosecution evidence by abandoning the mental health investigation. The reports of the prosecution's experts, Drs. Patterson and Montalbano, were not so detrimental to Runyon's defense that they rendered non-prejudicial counsel's failure to complete the mental health investigation and offer mitigating evidence. For example, the prosecution experts' reports did not negate the mitigating value of the jail records indicating Runyon's mental distress, delusions, grandiose ideations, and psychosis. *See* ECF No. 536, p.70 (jail records predating the prosecution expert reports are unavailing). Importantly, the prosecution's experts were unaware of the jail records at the time they evaluated Runyon.

Respondent concedes that Dr. Patterson, who opined Runyon met the criteria for a personality disorder with narcissistic features, concluded "no mitigating *or aggravating* mental health factors existed." ECF No. 536, p.59 (emphasis added). Dr. Patterson stated: "Although [Runyon's] personality traits have affected relationships and job performance, they do not, in my opinion, represent a serious

53

mental illness that has any impact as mitigating *or aggravating factors regarding sentencing* on his current charges if found guilty." ECF No. 276, p.23 (emphasis added). Dr. Patterson noted that Dr. Montalbano's findings were consistent with his own. ECF No. 276, p.24. A personality disorder diagnosis was not the reason for the incomplete investigation or the reason for not presenting Runyon's mental health and psycho-social history to the jurors. Hudgins declaration ¶11, Ex. 1. The reports of the prosecution experts would not have established additional aggravation and accordingly do not support Respondent's speculation as to a possible strategy behind counsel's abandonment of the mental health investigation.

Respondent fails to acknowledge—even after Runyon's initial reply demonstrated otherwise— that the supposedly harmful facts contained in the prosecution experts' reports were already before the jury.[23] Respondent states that the prosecution experts would have testified "that Runyon failed to accept responsibility for his actions[.]" ECF No. 536, p.60. Similar testimony was already before the jury as it was a central prosecution theme: Runyon lacked remorse because he failed to take responsibility for the crime. The prosecution presented testimony and exhibits attempting to establish a pattern of conflicts that arose during Runyon's various jobs and attempting to show that Runyon consistently denied fault, shifted blame, and rationalized such conflicts. The prosecutor argued: "we see a recurring theme, ladies and gentlemen, with this education and this employment experience, in that he is reprimanded, and then he resigns. It's never his fault. It's never his fault that he is late and given a suspension. It is never his fault that he has had unsatisfactory job performance and he is barred from reenlistment." Tr.2614, 8/26/09. The prosecutor also presented evidence regarding domestic battery charges and argued they had shown how Runyon "will do what he can to avoid responsibility

---

[23] Not all of the testimony would have been duplicative of other prosecution evidence; some had mitigating value. *See infra* Claim 6(B)(3).

for this, and it is a trend that we have seen continue into this case as well." Tr.2608, 8/26/09; *see also* Tr.2611, 8/26/09 ("Runyon is a manipulator who will do what he can to avoid responsibility. Again we see this same theme in the aftermath of the murder[.]"). Any testimony by a prosecution expert that Runyon does not accept responsibility for his actions is simply cumulative to evidence already before the jury. This is demonstrated by the fact that the jurors found the lack-of-remorse non-statutory aggravating circumstance without testimony from the Government's experts.

Counsel's failure to complete the mental health investigation and present expert testimony was not based on a reasonable strategy to close the door to additional aggravating evidence; it prevented the jurors from considering a true depiction of David Runyon and his moral culpability. For example, Dr. Montalbano's report would have provided the jurors with the explanation that Runyon's "strong ego" and tendency to "externalize blame and to rationalize his own behavior" are products of his personality dysfunction. ECF No. 277, pp.26, 27; *see also* ECF No. 276, p.23 (Runyon demonstrates personality features including "externalizing his responsibilities for conflicts" and not taking responsibility). Instead, the jurors did not hear from any expert about how adverse developmental factors in Runyon's life impacted his cognitive ability, his personality, his judgment and behaviors.

Respondent repeatedly asserts—without explanation—that Runyon's above-average intelligence would have run contrary to the mitigation presented by Runyon's counsel. *See, e.g.*, ECF No. 536, pp.58-59, 71. This is incorrect. Runyon's counsel did not present evidence that he had below-average intelligence. (Elsewhere, Respondent asserts that "testimony from friends and family ... averred to his intelligence[.]" ECF No. 536, p.45). The unpresented mitigation—including brain damage, diminished executive functioning, and psychosis—and a higher intelligence quotient are not mutually exclusive. Runyon's trial counsel understands that an above-average I.Q. does not rule out the possibility of mental illness and it is not inconsistent with mental health mitigation. Hudgins

55

**2716**

declaration ¶10, Ex. 1. Runyon's I.Q. was not a reason why counsel ceased investigation into Runyon's mental health and social history. *Id.*

Respondent further contemplates that the prosecution experts "could very well have conflicted with Dr. Cunningham's conclusion that Runyon presented a very low risk of future violence." ECF No. 536, p.60. Respondent also acknowledges, however, that the jurors rejected Dr. Cunningham's risk-assessment testimony without hearing from the prosecution's experts. ECF No. 536, p.48. The prosecution's experts could have only helped support Dr. Cunningham.

Dr. Montalbano's report on Runyon's "correctional course and adjustment" would have likely supported Dr. Cunningham's risk-assessment testimony. Dr. Montalbano found: (a) Runyon "had no disciplinary infractions" during his year-and-a-half in pre-trial custody; (b) Runyon "was credited with providing emergency first aid to a cellmate, who suffered a seizure and associated head injury;" (c) Runyon's placement in general population reflected an appraisal that he was at low risk for violence in the prison environment; and (d) Runyon was "an isolative individual, who spent much of his time in his cell … engaging in activities such as reading." ECF No. 277, p.20. Counsel's failure to complete the mental health investigation and present expert testimony did not prevent the admission of additional aggravating evidence; it left the jurors without knowledge that the prosecution experts provided explanations for David Runyon's behavior and that there were areas of agreement between the prosecution and defense experts. This resulted in the jurors making a moral culpability determination based on an incomplete picture of David Runyon.

### E. Counsel abandoned the investigation despite several red flags signaling the existence of substantial mitigating evidence.

In addition to facts signaling the need for investigation, *see supra* Claim 5, and the mitigating information conveyed to counsel by their own experts, *see supra* Claim 6(A), the reports of the prosecution's experts (Drs. Montalbano and Patterson) included information warranting further

56

investigation. Respondent's amended response, like the initial response, fails to acknowledge or address the red flags signaling the existence of mitigating evidence and requiring investigation.

Respondent ignores the proof Runyon has proffered and asserts counsel did not perform deficiently because there were no records or evidence corroborating Runyon's head injuries. ECF No. 536, p.69. Yet, the prosecution experts confirmed some of Runyon's psycho-social history, including his head injuries. Each expert noted Runyon's head trauma at about age three when he was abused by his biological father, a run-in with a telephone pole around age five, being "knocked out" during high school wrestling matches, concussions from military training involving explosions, and "a bad car accident" in 1996. ECF No. 276, pp.11-12; ECF No. 277, p.20. Dr. Montalbano found evidence of the 1996 car accident: the main reason Runyon was barred from reenlistment in the Army was a problem with attention to detail and a failure to follow instructions. ECF No. 277, p.29. This was a problem that did not predate the car accident and Dr. Montalbano opined that "problems such as attention to detail may have been the part of the sequalae from this event." *Id.* Maria Runyon's grand jury testimony also corroborated the car accident. ECF No. 277, p.20. Dr. Montalbano's testing revealed a substantial variance between Runyon's verbal and performance IQ scores and significant deficits in working memory. ECF No. 277, pp.24-25. "[O]nly a more detailed neuropsychological, neurological and biopsychosocial investigation would definitely rule in or rule out brain dysfunction[.]" ECF No. 277, p.30. If counsel had followed these leads and conducted an adequate investigation the jurors would have learned of Runyon's brain damage.

Dr. Patterson's report noted that the "sag" on the right side of Runyon's face resulted from abuse by his biological father. ECF No. 276, p.11. Had counsel pursued this information they could have presented such evidence to the jurors and strengthened the non-statutory mitigating circumstances based on Runyon's childhood environment. This information also would have rebutted

57

**2718**

the prosecution's argument that Runyon's appearance in the interrogation videotape evidenced a lack of remorse. *See* ECF No. 511, pp.71, 74, 79-80.

Dr. Montalbano's report discussed the effect of adverse developmental factors in Runyon's life. He found several adverse factors which "may well have contributed to his [Runyon's] personality disorder[.]" ECF No. 277, p.30. Runyon's personality disorder, in turn, "contributed significantly to his poor vocational performance and his unstable interpersonal history." ECF No. 277, pp.30-31. Dr. Montalbano devoted multiple pages in his report to explaining how various personality-driven factors resulted in Runyon's "significant underachievement" and inability to maintain consistent employment, lack of self-awareness and rigid tendency to deny or minimize problems, apparent lack of remorse, lack of consistent contact with his family, poor impulse control and poor judgment in establishing relationships with unstable females. *Id.*, pp.25-30. Had counsel followed-up on Dr. Montalbano's discussion of adverse factors they could have obtained favorable testimony on this subject matter from Dr. Cunningham or another experienced mental health professional.[24] *See* ECF No. 511, pp.72-76.

At trial the prosecution portrayed Runyon's participation in drug studies as an intentional "[abandonment of] more gainful attempts at employment, to get employment through these sporadic drug studies that put him into contact with people like Michael Draven." Tr.2610, 8/26/09. In contrast, Dr. Patterson reported that when Runyon's "mother was in a lot of physical pain, and he first found out about drug trials because he was doing research online resulting in his decision to

---

[24] Respondent states that "developmental factors were both known and put forward by counsel for Runyon," ECF No. 536, p.65, but only some were "put forward" by counsel Babineau in a letter to the United States Attorneys. ECF No. 511-15. Counsel who replaced Babineau was unable to speak with Babineau about the case. Hudgins declaration ¶3, Ex. 1.The time Babineau spent on the case was not much benefit to replacement counsel. *Id.* Replacement counsel did not present evidence *to the jurors* substantiating the mitigation narrative reflected in the letter and developed by his predecessor.

58

participate in drug trials while he was in West Virginia." ECF No. 276, p.12. Runyon felt like he was doing "something good for people and he had only seen three or four other Asians so that he [wa]s 'representing that culture.'" ECF No. 276, p.13. Had counsel pursued information in Dr. Patterson's report, the jurors could have been provided with context regarding Runyon's motivations for participating in drug studies that would have countered the prosecution's argument. This also would have mitigated the prosecution's comparative-worth argument made in support of the victim-impact aggravator. *See Runyon*, 707 F.3d at 512.

In light of information that was known (or should have been known) by counsel, the failure to conduct an adequate psycho-social investigation was unreasonable.

**F.   Counsel's deficient performance resulted in prejudice.**

Respondent argues that the unpresented mitigating evidence was "of dubious value," ECF No. 536, p.63, and asserts that "counsel elected to pursue a mitigation strategy based not on dubious mental health information, but on positive aspects of Runyon's character."[25] *Id.*, p.66. However, penalty-phase counsel did not believe mental health evidence was "dubious."[26] Counsel wanted to present evidence of trauma and Runyon's diminished ability to reason. ECF No. 511-5, pp.1-2, ¶5; ECF No. 511-6, p.1 ¶5; Hudgins declaration ¶¶6, 9, Ex. 1. This evidence was available and was not inconsistent with the evidence which was presented at the penalty phase, including mitigators based on Runyon's abusive upbringing, his kindness and generosity, his military experience, and the

---

[25] Respondent also asserts that the jury imposed a death sentence because it found in the eligibility phase that Runyon "intentionally killed Cory Allen Voss, that he did so for money, [and] he did so after substantial planning." ECF No. 536, p.74. Respondent essentially says the jury determined the aggravating factors and decided upon death as early as the guilt phase and no later than the eligibility phase. Under this view, prejudice could not be established because the selection phase of trial and mitigation were irrelevant.

[26] Respondent repeatedly downplays the unpresented mitigation evidence even though it is the type of evidence that the Supreme Court has declared could influence a jury's appraisal of a defendant's moral culpability. *See supra* Claim 6(A).

59

impression that Cory Voss was molesting his daughter.

Respondent incorrectly states that Runyon has failed to show how the unpresented mitigation would have impacted non-statutory aggravating factors. ECF No. 536, p.77. Runyon demonstrated how the unpresented mitigation would have added meaningful weight to the existing mitigators, supported two statutory mitigating circumstances and reduced the weight of statutory and non-statutory aggravating circumstances. *See, e.g.,* ECF No. 511, pp.81-83.

Finally, Respondent argues that trial counsel presented a reasonable defense based on the fact that "Runyon was a decent person who deserved mercy." ECF No. 536, p.68. When advocating for a life sentence there is a substantial difference between: (a) a presentation based on the fact that Runyon was a decent person who killed someone, and (b) a presentation based on the fact that Runyon was a decent person who had experienced lifelong traumas resulting in mental illness, personality dysfunction, and brain damage that affected his cognitive functioning and made him susceptible to being used as a tool by the codefendants to kill co-defendant Voss's husband. This is a point lost on the government whose amended response, like the initial response, asserts that the fact that Runyon was convicted of murder is inconsistent with any presentation of reduced moral culpability based on the adverse developmental factors in Runyon's life.[27] *See, e.g.,* ECF No. 536, pp.74, 75, 77, 78.

---

[27] For example, Respondent states: "[a]ny such mental health evidence would have also made clear that Runyon denied any participation in the plot to kill Cory Voss." ECF No. 536, p.77. But it was already "clear" to the jury in the guilt phase that Runyon denied participation and the prosecution made this denial a central theme at the penalty phase by focusing on the "lack of remorse" aggravator. Respondent repeatedly fails to acknowledge the different objectives of the different stages of the capital trial. Runyon entered the penalty phase with a murder conviction. The relevant inquiry was the appropriate punishment based on Runyon's individual characteristics and moral culpability. *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'") (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

60

**2721**

Ultimately, what is relevant under a *Strickland* analysis is that counsel were not in a position to "choose" among these presentations because the mental health and psycho-social investigation was inadequate.

**Claim 7: Runyon's Sixth Amendment Right To Confront The Witnesses Against Him Was Violated When The Prosecution Presented Police And Informant Testimony Of Statements From His Co-Defendant, Michael Draven. Furthermore, His Trial Counsel Were Ineffective When They Failed To Object To The Admission Of This Testimony And Failed To Ask The Court For A Limiting Instruction That They Could Not Be Considered As Evidence Of Runyon's Guilt.**

The jury was told that co-defendant Draven said on the night of the crime he called and spoke to Runyon, who was at a payphone located near the crime scene. Draven also said in a separate statement that he hired a "friend" to commit the crime. Trial counsel failed to make contemporaneous objections or request a curative instruction when these statements were admitted through the testimony of Detective Rilee, who obtained the first statement while interrogating Draven, and jail-house informant Edward Fodrey who recounted the second statement.

Respondent first defends the Confrontation Clause violations by claiming that Detective Rilee's description of co-defendant Draven's admission was otherwise admissible as a statement made in furtherance of a conspiracy. ECF No. 536, p.80. Draven's admission that he spoke to Runyon while Runyon was at a location within a short distance from the scene of the crime is unrelated to any conspiracy, including a conspiracy to cover-up the crime. Draven's statement is the only evidence that places Runyon in Newport News, Virginia shortly before the crime occurred. Draven and Runyon certainly did not "conspire" to place Runyon in that location when all other evidence demonstrated Runyon was in Morgantown, West Virginia at a time that made it impossible for Runyon to commit the crime in Newport News.[28]

---

[28] Respondent's assertion that "Draven was attempting to clear Runyon from suspicion" with this statement is nonsensical. ECF No. 536, p.81. Draven places Runyon near the crime scene and

Respondent alternatively suggests that Draven's statement was not inculpatory as to Runyon because the connection between Draven's admission and the Voss murder is not apparent from the face of the statement itself. ECF No. 536, pp.82 (citing *U.S. v. Lighty*, 616 F.3d 321 (4th Cir. 2010)). Again, Respondent ignores that this is the only evidence that placed Runyon in Newport News, Virginia near the time of the crime. Runyon's jurors heard from Detective Rilee that Draven identified Runyon as the person at the Waffle House payphone, *i.e.*, the person within a short distance of the scene of the crime, and this contradicted Runyon's account of his whereabouts. *Lighty* is a case that involved redactions of proper names from a non-testifying co-defendant's statement and the jurors received a proper limiting instruction. It cannot support Respondent's argument because Runyon was specifically named in co-defendant Draven's statement and there was no such jury instruction.

As to Edward Fodrey's recitation of Draven's statements, Respondent again relies upon *Lighty* and its progenitor *U.S. v. Akinkoye*, 185 F.3d 192 (4th Cir. 1999), and insists that Fodrey's recitation of Draven's statement was not inculpatory because it did not mention Runyon by name. ECF No. 536, p.84. In *Lighty* and *Akinkoye* the statements in question could have referred to a number of other persons and in *Akinkoye* the redaction pointed to a person other than the defendant raising the Confrontation Clause challenge. *See Akinkoye*, 185 F.3d at 198. Here, no such possibility exists. The jurors had no basis to conclude that Draven's statement to Fodrey referred to anyone but Runyon.

In *Lighty*, the prosecution presented a non-testifying codefendant's redacted out-of-court statement that replaced the defendant's proper name with a general reference. The court found that the defendant could not be identified as the subject of the co-defendant's statement absent additional evidence. It reasoned that the prosecution would have to present additional witnesses, who could be

---

admits they were in contact right before the crime occurred. These are not statements of a person "attempting to clear himself" and others. *See id.*

62

confronted, in order to connect the defendant to the statement. *Lighty*, 616 F.3d at 377. The *Lighty* court approved the admission of such a redacted statement but admissibility was also dependent upon the administration of a proper limiting jury instruction. *Id.* (citing *Richardson v. Marsh*, 481 U.S. 200, 208-09 (1987)).

Here, Fodrey testified that Draven said he "hired some other guy" that "was a friend of his" to murder Corey Voss. Respondent argues that this reference is ambiguous enough to pass Sixth Amendment scrutiny because there was evidence that Draven had "reached out" to other people. ECF No. 536, p.84. However, there was one person and one person alone who had already been identified as Draven's "friend" and that was Runyon.

The jurors were clear that the three defendants were Draven, his girlfriend Cat Voss and his friend David Runyon. In opening statement, the prosecutor said that in order for co-defendants Draven and Voss to make a life together they had to get rid of Voss's husband: "Enter the defendant, David Runyon, a friend of Michael Draven's from hospital drug studies that the two men did together." Tr.214, 7/2/09. The jurors heard a phone conversation between Voss and Draven that referred to Draven's "friend" as the person Draven was supposed to meet before Draven was arrested. Gov't Tr. Ex.163A. Voss referenced having a conversation with Draven's "friend" and the prosecution alleged this conversation involved Voss asking Runyon to kill her husband. Four and a half days into the prosecution's case, when Fodrey testified that Draven said he hired a "friend," that term obviously referred to Runyon or involved that inference which the jurors could make without any additional evidence. *See Lighty*, 616 F.3d at 376-77. *See also U.S. v. Ramirez*, 29 Fed. App'x 111, 115 (4th Cir. 2002) (Although "partner" may be, in isolation, a "neutral pronoun," in the context of prior evidence it was "facially incriminating.").

63

**2724**

Respondent attempts to sweep aside trial counsel's failure to make a contemporaneous objection to these violations and failure to request a limiting instruction with the conclusory statement that such an instruction would have drawn unwanted attention to the un-confronted, inculpatory statements. ECF No. 536, p.83. This argument fails because a jury is rightfully presumed to follow a judge's cautionary instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). If fact-finding procedures reveal that this was the reason counsel did not to object or request limiting instructions, then counsel's decision was unreasonable and legally unsupportable.

Finally, Respondent asserts that Runyon has not shown cause and prejudice for the procedural default resulting from the fact that the Confrontation Clause claim was not raised on direct appeal. ECF No. 536, pp.78-79. Runyon has alleged, however, that his direct appeal counsel were ineffective for not raising the Confrontation Clause claim and the claim's probable merit establishes prejudice. *See* Claim 8.

**Claim 8:      Ineffective Assistance Of Counsel On Direct Appeal.**

Runyon raises the issues of ineffective assistance of appellate counsel as both a substantive claim and as "cause" for any claim that may be deemed procedurally defaulted.

Respondent asserts that counsel did not have a duty to appeal every non-frivolous issue if counsel made a strategic decision to forgo such issues. ECF No.536, p.87. Respondent does not argue, however, that those circumstances are present in Runyon's case. Respondent's argument is focused against a finding of prejudice from counsel's deficient performance.

Appellate counsel rendered deficient performance because one or more issues were not raised even though they are clearly stronger than two issues presented in the appellate brief. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000). This is an easy determination because it requires only a comparison

64

of the strength of the ignored issue and the strength of the issues raised, *id.*, and the Fourth Circuit identified two very weak claims in Runyon's appellate brief. The claim based on an alleged Commerce Clause violation had been rejected by "all of the circuits to address the question" and was contrary to binding and long-standing circuit authority. *Runyon*, 707 F.3d at 489. The boilerplate challenge to the constitutionality of the death penalty in all circumstance similarly failed by a wide margin. *Id.* at 521 n.7.

With respect to the contested issue of prejudice, Respondent mis-states the *Strickland* standard. Respondent argues against prejudice stating: "Runyon has failed to set forth any issue which if it had been appealed would have resulted in any different outcome in his case;" "the additional issues Runyon suggests have no merit[;]" and, Runyon "does not demonstrate he would have prevailed on appeal." ECF No. 536, pp.88, 90.

Runyon need not show that there would have been a different outcome or that he would have prevailed on direct appeal had an omitted issue been raised. He does not even have to establish by a preponderance of the evidence that the result would have been different. *Williams*, 529 U.S. at 405-06. Runyon need only demonstrate "a reasonable probability that ... the result of the proceeding would have been different." *Id.* at 406 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Such a determination may require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

Finally, Respondent asserts part of the instant Claim 8 is time-barred because Runyon has "added claims" that do not relate-back to his initial §2255 motion. ECF No. 536, p.85. This assertion is incorrect. In particular, Respondent incorrectly asserts that Runyon added a reference to the confrontation clause claim, Claim 7. ECF No. 536, p.85. The confrontation clause claim, Claim 7, is

65

**2726**

specifically discussed in the initial §2255 motion. *See* ECF No. 478, p.79. Moreover, initial Claims 12 and 13 alleged trial and appellate counsel ineffectiveness. ECF No. 478, pp.95, 98 n.38.

Respondent is likewise incorrect that additional references to Claims 11-14 and 16 are time-barred. Runyon's amended Claim 8 was timely filed under Fed. R. Civ. P. 15(a)(1)(B). The inclusion of those claims relates back to the initial Claim 8 because they were either referenced in the initial Claim, they were incorporated by reference, ECF No. 478, p.12, they initially contained their own IAC allegations, or they are referenced for purposes of overcoming Respondent's asserted procedural bar defense.

Runyon's initial Claim 8 expressly stated: "Should this Court find any other claims are defaulted for failure to have been raised on appeal, Runyon specifically alleges appellate counsel was ineffective for failing to do so." ECF No. 478, p.80. Runyon's initial reply also stated that procedural default is an affirmative defense. A petitioner has no duty to anticipate or address any affirmative defense in his §2255 motion and the burden rests with Respondent to prove the defense. ECF No. 526, p.1. Runyon again expressly alleged that a procedural default can be overcome "where defense counsel rendered ineffective assistance [of counsel.]" *Id.*, p.4. The initial reply for Claims 11, 13, 14 and 16 alleged that counsel's ineffectiveness overcomes the procedural default asserted in Respondent's initial answer. ECF No. 526, p.62, 67, 69, 74-76. Accordingly, there is nothing completely new about referencing these additional instances of appellate counsel ineffectiveness because they arise "out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleadings." Fed. R. Civ. P. 15(c)(1)(B); *Mayle v. Felix*, 545 U.S. at 659; *Wolfe v. Clarke*, 691 F.3d at 422. Amended Claim 8, in its entirety, is timely.

66

**2727**

**Claim 9:** **Runyon's Conviction Under 18 U.S.C. §924(c) Is Unconstitutional Because It Was Procured In Violation Of The Due Process Clause, The Equal Protection Clause, And The Fifth, Sixth And Eighth Amendments Of The Constitution.** *Johnson v. U.S.*, **135 S.Ct. 2551 (2015).**

## A. Introduction

In *Johnson v. U.S.*, 135 S.Ct. 2551 (2015), the Supreme Court found the residual clause of the Armed Career Criminal Act ("ACCA") unconstitutionally vague. The residual clause of the ACCA defines a "violent felony" as an offense that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. §924 (e)(2)(B)(ii). The Supreme Court found this language unconstitutional for two reasons: first, it requires a court to imagine the "ordinary case" of a crime, an "inherently indeterminate" task; second, the judicial assessment of risk is untethered to any sort of standards. *Johnson*, 135 S.Ct. at 2558-59. Runyon alleges his convictions under 924(c), which has a similar residual clause,[29] is unconstitutional under *Johnson, supra. See* Claim 9, ECF No. 511, pp.88-98.

Respondent asserts Runyon's case is not affected by *Johnson,* offering numerous contentions as to why this is so. Runyon addresses each contention in turn.

## B. Legal Background

As discussed in Runyon's motion for §2255 relief, multiple provisions of the federal law contain, or incorporate, a definition of "violent felony" or "crime of violence." *See* 18 U.S.C. §924(e) ("ACCA"); 18 U.S.C. §16(b) ("General Provisions" definition of crime of violence); 18 U.S.C. §924(c) (brandishing or carrying a firearm during commission of a crime of violence).

Courts regularly compare the similarities between the residual clause in the ACCA to the clause

---

[29] In pertinent part, the ACCA residual clause defines a "violent felony" as an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. §924(e)(2)(B)(ii). The 924(c)(3)(B) residual clause defines a crime of violence as one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

67

at issue here. Although the comparison tends to specifically address 18 U.S.C. §16(b), that statute is identical to §924(c)(3)(B). *See, e.g., Chambers v. U.S.*, 555 U.S. 122, 133, n.2 (2009) (citing circuit splits on §16(b) in the context of a residual clause case because §16(b) "closely resembles ACCA's residual clause") (Alito, J., concurring). *See also U.S. v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on an ACCA case to interpret the definition of a crime of violence under §924(c)(3)(B)); *U.S. v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same); *U.S. v. Keelan*, 786 F.3d 865, 871 n.7 (11th Cir. 2015) (describing the ACCA otherwise clause and §16(b) as "analogous"); *Roberts v. Holder*, 745 F.3d 928, 930-31 (8th Cir. 2014) (using both ACCA cases and §16(b) cases to define the same "ordinary case" analysis); *U.S. v. Sanchez-Espinal*, 762 F.3d 425, 432 (5th Cir. 2014) (despite the fact that the ACCA talks of risk of injury and §16(b) talks of risk of force, "we have previously looked to the ACCA in deciding whether offenses are crimes of violence under §16(b)").

After *Johnson*, the lower courts, and this Court, are confronted with cases raising questions about how the *Johnson* opinion affects these other similarly worded provisions, including §924(c)(3)(B) and/or §16(b), which are at issue in Runyon's case.

As of this filing, there is a circuit split on whether the concerns underlying the *Johnson* opinion are also present in convictions resting on 18 U.S.C. §§16(b) and 924(c)(3)(B). The Fifth, Seventh, and Ninth Circuits have held that 924(c)(3)(B) suffers the same constitutional frailties that resulted in 924(e)'s downfall. *U.S. v. Gonzalez-Longoria*, 813 F.3d 225, 235 (5th Cir. 2016) *reh'g granted*, 815 F.3d 189 (5th Cir. 2016) (Mem) ("Under *Johnson*, this means that §16 is unconstitutionally vague, and we so hold."); *U.S. v. Vivas-Ceja*, 808 F.3d 719, 723 (7th Cir. 2015) ("Applying *Johnson*'s reasoning here, we conclude that §16(b) is unconstitutionally vague."); *Dimaya v. Lynch*, 803 F.3d 1110, 1120 (9th Cir. 2015) (18 U.S.C. §16(b) is unconstitutional because it requires judicial imagination of an ordinary case of a crime and because vague and uncertain standards are relied upon in determining risk; by

68

**2729**

implication, the identically worded portion of 924(c) is unconstitutional). One Circuit has held that *Johnson* does not render 924(c)(3)(B) unconstitutional. *U.S. v. Taylor*, 814 F.3d 340, 378-79 (6th Cir. 2016).

District courts have also reached inconsistent conclusions. *See, e.g., U.S. v. Tiffany Renee Edmundson*, No. PWG-13-15 (D. Md. Dec. 30, 2015) ECF No. 67. (18 U.S.C. §924(c)(3)(B) is void for vagueness); *but see U.S. v. Pedro Anthony Romero Cruz*, No. 1:14-CR-306-GBL (E.D. Va. Mar. 8, 2016) ECF No. 738 (18 U.S.C. §924(c)(1) and (2) unaffected by *Johnson*).

It is significant to note that the Fourth Circuit Court of Appeals has authorized the filing of capital successive 2255 motions for relief raising the claim that 924(c) is void under *Johnson*. *See In re Chadrick E. Fulks*, No. 16-9 (4th Cir. June 17, 2016) (authorizing the filing of a capital 2255 motion where the claim is convictions of that use of a firearm in furtherance of kidnapping and carjacking are void under *Johnson*); *In re Brandon Leon Basham*, No. 16-5 (4th Cir. June 17, 2016)(authorizing the filing of a capital 2255 motion where the claim is convictions for use of a firearm in furtherance of carjacking resulting in death and kidnapping are void under *Johnson*); *In re Richard Allen Jackson*, No. 16-10 (4th Cir. June 16, 2016) (authorizing the filing of a successive capital 2255 motion where the claim is convictions of use of a firearm in furtherance of murder, kidnapping, and aggravated sexual assault are void under *Johnson*); *but see In re Dustin John Higgs*, No. 16-8 (4th Cir. June 27, 2016) (denying authorization to file a capital 2255 motion raising the claim that use of a firearm in support of premeditated murder, felony murder, and kidnapping resulting in murder is void under *Johnson* by a 2-1 vote); *see also In re James H. Roane, Jr.*, No. 16-6 (4th Cir. June 6, 2016) (denying authorization to file a capital successive 2255 motion raising the claim that use of a firearm in support of multiple killings, in furtherance of a continuing criminal enterprise, and in aid or racketeering, are void under *Johnson*).

Also, the Fourth Circuit Court of Appeals has authorized numerous noncapital successive

69

**2730**

2255 motions for relief raising the claim that convictions based on 18 U.S.C. § 924(c) are void pursuant to *Johnson. See, e.g., In re James Powell,* No 16-398 (4th Cir. May 3, 2016 (authorizing a successive 2255 filing raising the claim that conviction for use of a firearm during conspiracy to commit Hobbs Act robbery is void pursuant to *Johnson*); *In re Terrence Smith,* No. 16-388 (4th Cir. May 13, 2016) (authorizing a successive 2255 filing raising the claim that convictions for use of a firearm during conspiracy to commit witness tampering and witness tampering are void pursuant to *Johnson*); *In re. Gerald Rice,* No. 16-591 (4th Cir. May 18, 2016) (authorizing a successive 2255 filing raising the claim that possession of a firearm during Hobbs Act robbery is void pursuant to *Johnson*). Accordingly, there is a split of authority, numerous cases in the Fourth Circuit are raising the issue.

This Court is likewise confronted with a shifting legal landscape. At bottom, though, Runyon's convictions suffer the same infirmities that caused the Supreme Court to act in *Johnson.* Section 924(c)(3)(B), like the ACCA residual clause, requires the two-step analysis denounced in *Johnson*: an "ordinary case" analysis followed by an imprecise risk analysis. Because these are the steps condemned in *Johnson*, §924(c)(3)(B) cannot withstand scrutiny. It violates the due process principles reaffirmed in *Johnson.* Relief is warranted.

## C. Argument

The Government's numerous contentions may be broadly described as follows:

1) Runyon's *Johnson* claim is procedurally barred.

2) There is less documented judicial confusion about application of 18 U.S.C. §924(c) than there is about ACCA; thus, 924(c) is constitutional.

3) Section 924(c) is not plagued by a confusing list of enumerated offenses; thus it is constitutional;

4) Section 924(c) is more narrowly drafted than the ACCA; thus it is constitutional.

70

**2731**

5) Alternatively, the Government asserts Runyon's convictions do not implicate the residual clause at all. They are based on the force clause of 924(c), which was not affected by *Johnson*.

6) Finally, the Government argues Runyon's sentencing hearing is not tainted.

### 1. This Court May Review Runyon's *Johnson* Claim.

Respondent faults Runyon for failing to raise this claim sooner. But Runyon raised the claim as soon as it became available. The *Johnson* holding is "new" because it expressly overruled two prior decisions—*James v. U.S.*, 550 U.S. 192 (2007), and *Sykes v. U.S.*, 131 S.Ct. 2267 (2011)—that had affirmed sentences imposed under the residual clause. *Johnson*, 135 S.Ct. at 2563 ("Our contrary holdings in *James* and *Sykes* are overruled."). That *Johnson* expressly overruled prior precedent demonstrates that the decision is "new." *See Teague*, 489 U.S. 288, 301 (1989) ("[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final.").

Respondent also asserts *Johnson* will not apply retroactively. The Supreme Court resolved this contention with its holding in *Welch v. United* States, 136 S.Ct. 1257, 1264 (2016) that *"Johnson* announced a new rule" of constitutional law that applies retroactively. *See also In Re: Creadell Hubbard*, No. 15-276, 2016 WL 3181417 (4th Cir. June 8, 2016) (recognizing and following the holding in *Welch*) (published opinion). [30]

---

[30] As this Court is aware, a Supreme Court decision applies retroactively to cases on collateral review if it announces a "new" rule that is "substantive." *Schriro*, 542 U.S. at 351. *Johnson* satisfies both requirements. In addition to being new, the *Johnson* holding is "substantive." Under Supreme Court precedent, a decision is considered "substantive" if it "narrow[s] the scope of a criminal statute by interpreting its terms." *Schriro*, 542 U.S. at 351. A decision is also "substantive" if it "prohibit[s] a certain category of punishment for a class of defendants because of their status or offense." *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997) (internal quotation marks and citation omitted). Such decisions "apply retroactively because they 'necessarily carry a significant risk that a defendant . . .' faces a punishment that the law cannot impose upon him." *Schriro*, 542 U.S. at 352 (quoting *Bousley*, 523 U.S.

71

**2732**

This Court should reject Respondent's procedural default argument and review Runyon's claim on the merits.

### 2. Documented Judicial Confusion Does Not Create Vagueness.

Respondent contends that the ACCA residual clause is unconstitutional because the Supreme Court repeatedly failed to construe it in a workable manner. Respondent also relies on the fact that the lower courts have not been as "confused" by §924(c)(3)(B).

Respondent misinterprets the import of the prior case law. Prior judicial debate about the application of a law does not create vagueness. At most it may confirm "its hopeless indeterminacy." *Johnson*, 135 S.Ct. at 2558. *See also Dimaya*, 803 F.3d at 1119; *Vivas-Ceja*, 808 F.3d at 723; *Gonzalez-Longoria*, 813 F.3d at 235.

Moreover, in *Johnson*, the Supreme Court was clear that its basis for finding the residual clause unconstitutional was its reliance on the ordinary case assessment and the vague standard for assessing risk. *Johnson*, 135 S.Ct. at 2561.

### 3. The Absence Of Enumerated Offenses Does Not Render 924(c) Constitutional.

Respondent claims that because the enumerated offenses in ACCA are absent from 924(c), it is constitutional.

It is true that the Supreme Court lamented the confusing list of enumerated offenses that accompany the ACCA definition of "a crime of violence." *Johnson*, 135 S.Ct. at 2558. But the Court also noted the enumerated offenses "did not succeed in bringing clarity" because it "did not (and

---

at 620). Applying these standards, a decision that narrows the reach of the ACCA—as *Johnson* does by declaring one of its provisions unconstitutional—is "substantive." *Johnson* meets the standard for retroactive application. In *Welch*, the Supreme Court unambiguously held *Johnson* applies retroactively. 136 S.Ct. at 1264. Runyon includes this discussion here out of an abundance of caution.

72

**2733**

could not) eliminate the need to imagine the kind of conduct typically involved in a crime." *Johnson*, 135 S.Ct. at 2559. The *Johnson* Court made clear that the "ordinary case" problem was the key feature: "More importantly, almost all of the cited laws require gauging the riskiness of conduct in which an individual engages on a particular occasion.... The residual clause, however, requires application of the 'serious potential risk' standard to an idealized ordinary case of the crime." *Johnson*, 135 S.Ct. at 2561. More plainly stated, the enumerated offenses are best understood as a way to salvage the unconstitutional definition. The fact that §924(c)(3) does not have a possibly salvaging list of enumerated offenses arguably makes it more vague, not less. *See Dimaya*, 803 F.3d at 1117-18; *Vivas-Ceja*, 808 F.3d at 723; *Gonzalez-Longoria*, 813 F.3d at 232.

Further, as a matter of logic, the absence of the enumerated offenses is irrelevant. This is because the threshold question is how to determine the ordinary case of a predicate offense. Only *after* determining the ordinary case would a reviewing court consider the enumerated offenses. The question of how to define the ordinary case is the problem. The list of enumerated offenses did not solve the problem but neither did it create it.

### 4. Section 924(c) Is Not More Narrowly Drawn Than The ACCA (Or The Distinctions The Government Notes Are Constitutionally Irrelevant).

Respondent claims that §924(c)(3)(B) does not go beyond the elements of the offense to consider potential extra-offense conduct; thus §924(c)(3)(B) is constitutional. Respondent is in error.

Initially, Respondent overlooks that the Supreme Court has equated the scope of these two statutes. *See, e.g., Begay v. U.S.*, 556 U.S. 137, 144-45 (2008). *See also* p.___ for discussion of Supreme Court, appeals court and district court cases noting similarities between the statutes.

The ACCA and 18 U.S.C. §924(c)(3)(B) are not identical. But the differences have no impact on the constitutional analysis. Although the risk at issue in the ACCA is the risk of injury, and the risk

73

**2734**

at issue in §924(c) is a risk that force will be used, the difference is immaterial to the due process problem. In *Johnson*, the Court's holding did not turn on the type of risk, but rather how a court assesses or quantifies the risk. This process is the same under both the ACCA and §924(c). Both statutes require courts first to picture the "ordinary case" embodied by a felony, and then decide if it qualifies as a crime of violence by assessing the quantum of risk posed by the "ordinary case."

The Fourth Circuit applied the "ordinary case" analysis in *U.S. v. Avila*, 770 F.3d 1100, 1107 (4th Cir. 2014), in construing §16(b): "As long as an offense is of a type that, by its nature, presents a substantial risk that physical force against the person or property of another may be used, it satisfies the requirements of 18 U.S.C. §16(b)." *Avila* controls here because §16(b) and §924(c)(3)(B) are identical. And of course, the Fourth Circuit has applied the "ordinary case" inquiry to the §924(c) residual clause. *U.S. v. Fuertes*, 805 F.3d 485, 500 n.6 (4th Cir. 2015); *see also U.S. v. Naughton*, 621 Fed. App'x. 170, 178 (4th Cir. Sept. 2, 2015).

Respondent also claims §924(c)(3)(B) is limited to "'offenses that naturally involve a person acting in direct disregard of the risk that physical force might be used ....'" ECF No. 536, p.99 (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 10 (2004)). The Government continues that under §924(c)(3)(B), the ordinary case is limited to the elements of the offense. *Id.* But such an assertion cannot be reconciled with the Fourth Circuit's holdings in *Avila* and *Fuertes*, applying the problematic "ordinary case" analysis. Moreover, by focusing on the risk during the predicate offense, §924(c)(3)(B) is as broad as the ACCA's residual clause.

At bottom, this argument cannot win the day because the fundamental problem with the residual clauses of the ACCA and §924(c)(3)(B) is the threshold "ordinary case" inquiry that the Supreme Court determined is impossibly arbitrary.

74

### 5. Section 924(c)(3)(B) Is Vague As Applied To Runyon.

Respondent argues Runyon may not challenge his §924(c) conviction because his conduct was clearly violent. But this argument ignores the fact that in the context of interpreting §924(c), courts apply the categorical approach. This entails the court envisioning an idealized "ordinary case," and asking whether that "ordinary case" involves a substantial risk that violent force will be used. *See Johnson*, 135 S.Ct. at 2557-58. Under the categorical approach, Runyon's actual conduct has no bearing on the resolution of this question.

Moreover, in Justice Thomas' opinion concurring in the judgment, he opined the ACCA's residual clause covered an "unmistakable core of forbidden conduct" and thus it was not facially invalid. *See Johnson*, 135 S.Ct. at 2573 (Thomas, J., concurring in the judgment). The *Johnson* majority rejected this argument and this Court should as well.

### 6. Carjacking And Conspiracy To Commit Murder For Hire Are Not Crimes Of Violence Under The Force Clause Of Section 924(c)(3)(A).

The next question here is whether Runyon's carjacking and conspiracy offenses qualify as crimes of violence under the force clause of §924(c). Runyon explained in his 2255 motion that carjacking does not qualify as a crime of violence. ECF No. 511, pp.94-97. He explained this conclusion is consistent with the Fourth Circuit's holding in *U.S. v. Torres-Miguel*, 701 F.3d 165 (2012). Runyon continues to rely on the arguments raised in the §2255 motion and only addresses matters not previously discussed. Respondent argues that because a death resulted from the carjacking, "it can hardly be said that this charge does not require force under any definition." Respondent also notes that 18 U.S.C. §2119 contains a *mens rea* that the defendant act with the intent to cause death or serious bodily harm. ECF No. 536, p.103. Carjacking is defined as follows: "Whoever, with the intent to cause death or serious bodily harm, takes a motor vehicle … from the person or presence of another by

75

**2736**

force and violence or by intimidation...." 18 U.S.C. §2119. In *Johnson*, the Supreme Court defined physical force, as used in §924(c)(3)(A) to mean "violent force—that is, force capable of causing physical pain or injury to another person." Carjacking does not qualify as a "crime of violence" under §924(c)(3)(A) because it does not include as a necessary element, "the use, attempted use, or threatened use," of "force capable of causing physical pain or injury to another." *Johnson v. U.S.*, 559 U.S. 133, 140 (2010).[31]

Nor is this conclusion altered by the sentencing provision of the carjacking statute, which notes that if death occurred, Runyon may face the death penalty. This sentencing provision does not require that the death result from using physical force. *See U.S. v. Barraza*, 576 F.3d 798, 807 (8th Cir. 2009). *See also Torres-Miguel*, 701 F.3d at 168 (explaining that the fact that serious bodily injury occurs does not per se establish a crime of violence).

Conspiracy to commit murder for hire is also not a crime of violence under the force provision of 18 U.S.C. §924(c). As explained in Runyon's §2255 motion, conspiracy does not qualify as a crime of violence under the force provision of §924. ECF No. 511, p.97. The fact that death resulted does not alter this conclusion. *See Torres-Miguel, supra.*

Respondent also contends that a different outcome is required because the Supreme Court overruled *Torres-Miguel* in *U.S. v. Castleman*, 134 S.Ct. 1405 (2014). ECF No. 536, p.105. Respondent is in error.

In *Torres-Miguel*, at issue was the defendant's prior conviction for the California offense of willfully threatening to commit a crime which *will result in death or great bodily injury to another. Torres-*

---

[31] Runyon notes the Eleventh Circuit and the Second Circuit have found carjacking qualifies as a crime of violence. *U.S. v. Moore*, 43 F.3d 568, 573 (11th Cir. 1994); *U.S. v. Mohammed*, 27 F.3d 815, 819 (2d Cir. 1994). But these opinions were issued well before the 2010 Supreme Court opinion in *Johnson*.

76

*Miguel*, 701 F.3d at 168 (citing Cal. Penal Code §422(a)) (emphasis added). The specific question in the case was whether the statute had an element equating to a threat of violent force under the force clause of U.S.S.G. §2L1.2, a clause that is identical in all relevant respects to the §924(c) force clause. *Id.* Despite the death or great bodily injury element in the California statute, the Fourth Circuit found that the offense was missing a violent force element, and thus, could never qualify as a crime of violence under the force clause. *Id.* at 168-69. The court held that "[a]n offense that *results* in physical injury, but does not involve the use or threatened use of force, simply does not meet the Guidelines definition of crime of violence." *Id.* at 168. The court, in strong words, proclaimed that "*[o]f course*, a crime may *result* in death or serious injury without involving *use* of physical force." *Id.* (emphasis added).

Relying on several appellate decisions from various Circuits, the Fourth Circuit reasoned that there are many ways in which physical injury, even death, can result without use of violent force. *Id.* at 168-69. For example, as the Fifth Circuit has noted, a defendant can violate statutes like California Penal Code 422(a) by threatening to poison another, which involves no use or threatened use of force. *Torres-Miguel*, 701 F.3d at 168-69 (citing *U.S. v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010)); *see also U.S. v. Gomez*, 690 F.3d 194, 201 (4th Cir. 2012) (child abuse statute which required sustaining physical injury to child can be violated by an affirmative act or by neglecting to act, neither of which necessarily requires the use of physical force against the child). In reaching its decision, the *Torres-Miguel* court also relied on the Second Circuits' decision in *Chrzanoski v. Ashcroft*, 327 F.3d 188, 194 (2d Cir. 2003). In that case, at issue was whether a prior Connecticut conviction for third degree assault qualified as a crime of violence under the force clause.

For even further support, in *Torres-Miguel*, 701 F.3d at 169, the Fourth Circuit embraced the Tenth Circuit's decision in *U.S. v. Perez-Vargas*, 414 F.3d 1282, 1287 (10th Cir. 2005). In that case, "the [Tenth Circuit] explained that, although the Colorado [third degree assault] statute required [an act

77

**2738**

causing] bodily injury [by means of a dangerous weapon], imposing that injury does not necessarily include the use or threatened use of physical force as required by the Guidelines, and so the Colorado crime was not categorically a crime of violence under U.S.S.G. §2L1.2." *Torres-Miguel*, 701 F.3d at 169 (citing *Perez-Vargas*, 414 F.3d at 1287) (internal quotation marks omitted). The Tenth Circuit reasoned that "several examples [exist] of third degree assault that would not use or threaten the use of physical force: . . . intentionally placing a barrier in front of a car causing an accident, or intentionally exposing someone to hazardous chemicals." *Perez-Vargas*, 414 F.3d at 1286.

Contrary to Respondent's assertions, *Castleman* did not overrule *Torres-Miguel*. In *Castleman*, the Supreme Court held that a prior Tennessee domestic violence offense that had an element of physical injury qualified as a misdemeanor crime of domestic violence under the force clause of 18 U.S.C. §922(g)(9). *Castleman*, 134 S. Ct. at 1413-15. However, the force clause of 922(g)(9) is critically different from that applicable here and in *Torres-Miguel*. In fact, in *Castleman*, the Supreme Court, in great length, explained that it was applying a definition of physical force to 922(g)(9) that was starkly different from that of the ACCA/§924(c)(3) force clause, which requires violent physical force. *Id.* at 1410-15. Unlike the definition of physical force at issue here (and in *Torres-Miguel*), the *Castleman* Court applied the common law definition of physical force that encompassed even the slightest offense of touching, *i.e.*, *de minimis* force. *Id.* at 1410. In this context, the Court held that physical injury necessarily requires de minimis force. *Id.* at 1413-15.

But more importantly, the Supreme Court in *Castleman* explicitly refused to evaluate the validity of the logic rejecting *Torres-Miguel*. The *Castleman* Court wrote that "[*w*]*hether or not the causation of bodily injury necessarily entails violent force [is] a question we do not reach.*" *Id.* at 1413 (emphasis added). That, of course, is the question any decision abrogating *Torres-Miguel* must answer. Because *Castleman* failed to reach the question *Torres-Miguel* answered, *Torres-Miguel* retains its vitality and remains binding

78

**2739**

precedent that this Court has no choice but to follow.

### 7. The Death Sentence On Count One Was Tainted By The Sentence For Count Five.

Respondent erroneously asserts that Runyon offers no authority in support of his request for a new sentencing hearing. In his motion, Runyon cited the Eighth Amendment, which requires heightened reliability in capital sentencing proceedings. He also cited *Kennedy v. Louisiana*, 554 U.S. 407 (2008). Finally, he cited case law from the Fifth and Seventh Circuits. ECF No. 511, p.98.

Respondent also complains that Runyon wrongly seeks to have this Court consider the totality of the circumstances in determining whether to grant a new sentencing hearing, while also seeking to have this Court apply "Runyon's categorical approach" in reviewing whether recent Supreme Court precedent affects his capital convictions. There is no inconsistency because these are two separate inquiries requiring different analyses. The categorical approach was recognized by the Supreme Court in *Taylor v. U.S.*, 495 U.S. 575 (1990), and is among the controlling precedent to be applied to Runyon's substantive claim. Once this Court strikes Runyon's death sentence under *Johnson*, as it must, the Eighth Amendment requires this Court to conduct an exhaustive review of the constitutionality of Runyon's death sentence. The Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Accordingly, capital sentencing decisions cannot be made on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Zant v. Stephens*, 462 U.S. 862, 884-85 (1983). In *Johnson v. Mississippi*, 486 U.S. 578 (1988), the Supreme Court ruled that a death sentence must be reversed if it was based "on a reversed conviction." *Id.* at 585. In *Johnson v. Mississippi*, the defendant had been sentenced to death based, in part, on a prior conviction for assault which was overturned after the defendant was sentenced to death. *Id.* at 581. Even though there were aggravating circumstances unrelated to the

79

**2740**

assault conviction that remained undisturbed, the Supreme Court held that a new sentencing was constitutionally required because the jury considered the subsequently invalidated prior conviction, this conviction "provided no legitimate support for the death sentence imposed on petitioner," and there was "a possibility that the jury's belief that petitioner had been convicted of a prior felony would be 'decisive' in the choice between a life sentence and a death sentence.'" *Id.* at 586 (internal citations omitted).

The need for a resentencing when a prior conviction is subsequently invalidated is reinforced by the sentencing package doctrine. Under sentencing package theory, courts have recognized that convictions cannot be viewed in isolation for the purposes of sentencing, but as an entire "sentencing package." *See United States v. Watkins*, 147 F.3d 1294, 1297 (11th Cir. 1998) (listing cases). Accordingly, under the sentencing package doctrine, when a defendant has been convicted and sentenced on a number of convictions simultaneously and one of those convictions is vacated, the defendant should be resentenced on all of the convictions as they are part of one sentencing package. The sentencing package doctrine has been largely accepted by federal courts, *Watkins*, 147 F.3d at 1296 n.3, and was adopted by the Fourth Circuit. *See United States v. Hillary*, 106 F.3d 1170 (4th Cir. 1997) (holding that where a defendant had successfully attacked his § 924(c) conviction in collateral proceedings, the district court had the authority to resentence him on the remaining charges, as the sentence must be viewed in the "aggregate"); *see also United States v. Smith*, 115 F.3d 241, 245 (4th Cir. 1997) (same, and explicitly endorsing "sentencing package theory").

The jury found numerous mitigating factors, including: David Runyon did not have a serious criminal record; Runyon worked and was legally employed during his life; he committed acts of kindness and generosity for his neighbors and his community; he grew up and witnessed domestic

80

violence and parental conflict between his mother and father; his son, mother and brother will suffer emotional harm if he is put to death; he served his country and was honorably discharged; he furthered his education; he continued to witness and experience domestic violence and parental conflict and abuse from mother and adoptive father; and, Runyon was given the impression that the victim was molesting his daughter.

The jury credited and weighed the mitigating evidence they heard when determining his sentence. The mitigating factors found by the jury were numerous and powerful. As a part of their weighing process, however, the jury also considered and weighed Runyon's invalid convictions. Because these convictions are invalid, the jurors were exposed to, and improperly considered, information which "provided no legitimate support for the death sentence imposed on Petitioner." *Johnson v. Mississippi*, 486 U.S. at 586. There is "a possibility that the jury's belief that petitioner had been convicted of a prior felony was 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id.* at 586 (internal citations omitted). Accordingly, Runyon is entitled to a new sentencing proceeding.

Such review would necessary entail consideration of the fact that the jury returned a mixed verdict. Furthermore, the Government has not and cannot argue the *Johnson* error is harmless. The *Johnson* error is harmful and relief is warranted.

**Claim 10:    The Jury Instructions At The Sentencing Phase Unconstitutionally Lowered The Government's Burden Of Proof In Violation Of The Fifth, Sixth, And Eighth Amendments. *Ring v. Arizona*, 536 U.S. 584 (2003).**

Respondent contends Runyon is barred from raising this claim on collateral review because it was raised on direct appeal. ECF No. 536, p.112. Runyon acknowledges he raised this issue on direct appeal, *U.S. v. Runyon*, No. 09-11, Appellant's Brief pp. 89-91 (4th Cir. Feb. 29, 2012), and the appeals court decided against him. *Runyon*, 707 F.3d at 516. However, where there is an intervening change in

81

**2742**

law, a prior adjudication may not be dispositive. *Davis v. U.S.*, 417 U.S. 333, 342 (1974) (where movant unsuccessfully raised issue on direct appeal, and where intervening law clarified the issue, the appeals court "erred in holding that the 'law of the case,' as determined in the earlier appeal from the ... conviction, precluded him from securing relief under §2255 on the basis of an intervening change in law"). *See also English v. U.S.*, 998 F.2d 609, 612-13 (8th Cir. 1993) (relying upon *Davis* for the proposition that if there is an intervening change in law, an issue that was decided on direct appeal may be raised again in §2255 motion); *Underwood v. U.S.*, 15 F.3d 16, 18 (2d Cir.1993) (if an issue was raised on direct appeal, it may not be raised again in a §2255 setting unless there was an intervening change in law); *U.S. v. Palumbo*, 608 F.2d 529 (3d Cir. 1979) (an intervening change in law is an exception to the general rule that a claim may not be brought for a second time in a 2255 motion); Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* (7th ed.), section 41.7[e] (discussing previous determination of an issue as an affirmative defense that may be overcome if there has been an intervening change of law).

Respondent also asserts (without explanation) that the *Teague* non-retroactivity doctrine bars review. ECF No. 536, p.114. Runyon disagrees that *Teague* bars relief on this claim. As discussed *supra* the law is unsettled as to whether *Teague* applies in the context of a 2255 motion. If *Teague* does apply in the §2255 setting, it does not bar review of Runyon's claim because *Hurst* does not meet *Teague*'s definition of "new" rule. This is so because *Hurst* was dictated by prior precedent. *See Butler v. McKellar* 494 U.S. 407(1990).

Runyon's case is similar to *Stringer v. Black*, 503 U.S. 222 (1992), where the petitioner sought relief under *Maynard v. Cartwright*, 486 U.S. 356 (1988), and *Clemons v. Mississippi*, 494 U.S. 738 (1990), both of which were issued after his case was decided on direct appeal but while his case was pending on federal collateral review. The Supreme Court noted that while the cases were released after the

82

**2743**

petitioner's conviction was final, *Teague* did not bar review because the cases were not "new"—that is, they were dictated by prior precedent. *Stringer*, 503 U.S. at 227-28.

Respondent also argues if *Hurst* does apply, Runyon cannot prevail. ECF No. 536, p.114. Respondent is in error.

In *Hurst v. Florida*, 136 S.Ct. 616 (2016), the Supreme Court struck Florida's capital sentencing scheme, finding it violates the Sixth Amendment because it "does not require the jury to make the critical findings necessary to impose the death penalty." *Hurst*, 136 S.Ct. at 621-22. The State of Florida argued that because the jury found the facts necessary to establish eligibility, the Sixth Amendment was satisfied. The Supreme Court rejected this argument as follows:

> The State fails to appreciate the central and singular role the judge plays under Florida law. ... [T]he Florida sentencing statute does not make a defendant eligible for death until 'findings *by the court* that such person shall be punished by death.' Fla. Stat. § 775.082(1)(emphasis added). The trial court *alone* must find 'the facts ... [t]hat sufficient aggravating circumstances exist' and '[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances."

*Hurst*, 136 S.Ct. at 622.

The *Hurst* Court recognized the unworkable nature of the distinction between eligibility and selection, and held a judicial finding that aggravators outweighed mitigators is unconstitutional. *Id.*

*Hurst* therefore makes clear that it is a jury function to weigh aggravating and mitigating circumstances because the result determines whether a death sentence is imposed. When the weighing function—whether aggravating circumstances outweigh mitigating circumstances—results in an affirmative finding, that finding constitutes the final element required for a death sentence. *Hurst*, 136 S.Ct. at 623-24 (specific findings authorizing the imposition of the sentence of death must be made by the jury). It is beyond question that all elements leading to a greater punishment must be found by a jury. *Ring*, 536 U.S. at 609 (quoting *Apprendi v New Jersey.*, 530 U.S. 466, 494 n.19 (2000)). It is also beyond questions that all elements must be found beyond a reasonable doubt. *Alleyne v. U.S.*, 133 S.Ct.

83

**2744**

2151, 2156 (2013). Accordingly, a jury must find—beyond a reasonable doubt—that aggravating circumstances outweigh mitigating circumstances in order to impose a death sentence.

The fact that Runyon's jurors made the specific finding that aggravators "sufficiently" outweighed mitigators is not constitutionally sufficient. They were required to make this final finding that determines a death sentence over a life sentence "beyond a reasonable doubt." The jury instructions did not include the required burden of proof and the jurors did not find the final element required for a death sentence beyond a reasonable doubt. The sentence, therefore, should be vacated.

Just as in *Hurst*, here, the jury was instructed to make its ultimate determination to impose death based on whether the aggravating factors "sufficiently outweigh" mitigating factors. Tr.2672-73, 2675, 2682-84, 2694, 8/26/09; Tr.2707, 8/27/09. Given the fact that the Sixth Amendment applies to this ultimate, final determination to impose death, the jury should have been required to make its finding beyond a reasonable doubt.

**Claim 11:    The Death Sentences Are Unconstitutional Because They Are Based On Aggravating Circumstances That Fail To Narrow And/Or That Are Arbitrary And Overbroad**

To be constitutional, aggravating circumstances must genuinely narrow the class of persons eligible for the death penalty from all persons convicted of a given offense and must reasonably justify imposition of a more severe sentence on the defendant compared to others convicted of the same crime. *Zant v. Stephens*, 462 U.S. 862, 877 (1983).

**A. The statutory aggravating circumstances failed to perform the constitutionally required narrowing function.**

Respondent concedes that the jurors relied upon two statutory aggravating factors that duplicated elements of the offense of conviction. ECF No. 536, p.116 ("The fact that two statutory aggravating factors mirror elements of the offenses ... does not violate any constitutional principle."). The same evidence established the convictions and the statutory aggravating circumstances.

84

Respondent concedes the evidence supporting the eligibility findings had been found by the jury beyond a reasonable doubt in all three counts of conviction. *Id.*, p.41. The substantial planning statutory aggravator "was inherent in the jury's determination that Runyon and Draven were guilty of Conspiracy to Commit Murder for Hire Resulting in Death." *Id.*, p.40. The fact that the statutory aggravating factors duplicated elements of the offense means that the aggravators did not perform a narrowing function in this case and Runyon's death sentence is unconstitutional.

As in the initial answer, Respondent argues that no constitutional violation occurred because "[a]n element of the underlying offense may be presented as an aggravating factor when the class of defendants eligible for the death penalty are [sic] narrowed at the guilt stage, as opposed to the penalty phase." ECF No. 536, p.116. Runyon pointed out in his initial reply that this argument fails because under the FDPA narrowing does not occur at the guilt phase of the case. Narrowing occurs at the eligibility phase where at least one statutory aggravating circumstance must be found.[32] *U.S. v. Caro*, 597 F.3d 608, 623 (4th Cir. 2010); *U.S. v. Higgs*, 353 F.3d 281, 294 (4th Cir. 2003) ("Once the jury finds the requisite intent and statutory aggravating factors, the crime is death-eligible."); *U.S. v. Jones*, 132 F.3d 232, 248-49 (5th Cir. 1998) ("Although the federal death penalty regime defines capital offenses, the narrowing function does not occur until the penalty phase of the trial."); *see also Sattazahn v. Pennsylvania*, 537 U.S. 101, 112 (2003) ("'[M]urder plus one or more aggravating circumstances' is a separate offense from 'murder' *simpliciter.*") (Scalia, Rehnquist, and Thomas, JJ.). Respondent's amended answer fails to acknowledge this controlling authority. Neither statutory aggravating factor

---

[32] Although *Lowenfield v. Phelps*, 484 U.S. 231 (1988), and *Tuilaepa v. California*, 512 U.S. 967 (1994), contain applicable principles of law, this claim is not controlled by the outcomes of those cases. *Lowenfield* involved a non-weighing statutory scheme that, like the statute in *Tuilaepa*, accomplished narrowing at the guilt-phase through a narrowed definition of capital murder. The FDPA is a weighing scheme that narrows through the application of statutory aggravating factors.

85

**2746**

elevated Runyon's moral culpability above that already determined by his conviction thus the death sentence is unconstitutional. *See* Amended §2255 motion, ECF No. 511, pp.102-103.

Respondent's second argument is equally unavailing. Respondent again asserts that the mental state finding at the eligibility phase fulfilled the narrowing requirement. ECF No. 536, p.116. Like in the initial answer, Respondent cites no authority for the proposition that a jury finding of an intentional killing, standing alone, sufficiently placed Runyon in a narrowed class of persons eligible for the death sentence from all persons convicted of the offense. To the contrary, the mental state requirement in 18 U.S.C. §3591(a) "codifies the command in *Enmund* ... and *Tison* ... to limit the imposition of the death penalty to those murderers who both undertake felony participation and demonstrate at least reckless indifference to human life. Satisfaction of these elements only begins the death penalty inquiry; it does not and cannot establish death penalty eligibility by itself."[33] *U.S. v. Webster*, 162 F.3d 308, 355 (5th Cir. 1998). The finding of a statutory aggravating circumstance is mandatory to achieve narrowing under the FDPA. If no statutory aggravating factor is found to exist, the court must impose a sentence other than death. 18 U.S.C. §3593(d).

**B. This claim is not barred by the doctrines of procedural default or non-retroactivity.**

In reply to Respondent's assertion of procedural default, Runyon asserts that the ineffective assistance of counsel constitutes cause and prejudice to overcome any such bar to litigating the merits of this claim. *See also* Claim 8.

---

[33] In this case, felony participation is not an issue because Runyon was charged as a principal. The jury's eligibility-phase finding under §3591(a)(2)(A) that Runyon committed an intentional killing is duplicative, in other words, it does not super-add any fact different from what the jurors were required to find in order to convict Runyon. The jurors merely re-confirmed their earlier finding of intent at the guilt phase.

86

Respondent also asserts that this claim is barred by the non-retroactivity doctrine but Runyon's claim is not dependent upon a "new procedural law." The applicable principles of law were announced before Runyon's conviction became final.

### C. The non-statutory aggravators negated any narrowing that might have previously occurred, they are arbitrary and capricious, and at least one is overbroad.

Respondent argues Runyon's constitutional claims regarding the non-statutory aggravators were "thoroughly analyzed" on direct appeal. ECF No. 536, p.117. The challenges addressed by the court of appeals, however, dealt with evidentiary and statutory concerns.[34] Appellate counsel did not raise the claim asserted here: that the non-statutory aggravators resulted in an unprincipled, arbitrary and capricious imposition of the death penalty. Respondent does not contest this specific point. Counsel's failure to properly present these meritorious claims to the court of appeals constitutes ineffective assistance.

Regarding the non-statutory aggravators placed into the sentencing balance, Respondent stretches *Tuilaepa* too far. Neither *Tuilaepa*, nor the court of appeals' opinion in this case, *Runyon*, 707 F.3d at 491, hold that aggravating circumstances need not be scrutinized once narrowing has occurred. Indeed, Justice Scalia specifically recognized this in his concurrence where he was the sole member of the Court to announce such a viewpoint. *Tuilaepa*, 512 U.S. at 980 (Scalia, J. concurring) ("Today's decision adheres to our cases which acknowledge additional requirements" for factors that guide the

---

[34] Appellate counsel did not challenge "the propriety of the prosecution proposing" the lack-of-remorse aggravator but challenged the evidence introduced to support it. *Runyon*, 707 F.3d at 492. With respect to the "victim impact" aggravator, appellate counsel challenged the scope of the evidence introduced to support it. *Id.* at 499, 501. Three bases were asserted against the aggravator based on Runyon's education, training and experience: that it was vague and overbroad; that it relied upon elements of his background that were actually mitigating; and, that the evidence supporting it was insufficient. *Id.* at 502-03. The "abuse of women" aggravator was challenged: (1) as a circumvention of the prior-conviction aggravator expressly contained in the FDPA because it was based on unadjudicated and on "minor misconduct;" and, (2) as improperly supported by evidence which should have been excluded. *Id.* at 505-06.

87

jury in selecting which defendants receive the death sentence.). A two justice concurrence noted that the aggravating factor at issue *did* channel the jury's sentencing discretion and recounted that protections against arbitrary sentencing focus "on the eligibility determination and the actual sentencing decision." *Id.* at 981-82 (Stevens, J., joined by Ginsburg, J., concurring in the judgment).

Aggravating circumstances that influence the jurors' decision-making process must be analyzed for clarity, objectivity, and principled guidance.[35] *Maynard v. Cartwright*, 486 U.S. 356, 364 (1988); *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). This is because when jurors are instructed to weigh an arbitrary and capricious or overbroad aggravating circumstance an arbitrary thumb is placed on death's side of the scale. *Stringer v. Black*, 503 U.S. 222, 232 (1992). Accordingly, Runyon's death sentence is unconstitutional because the prosecutor's unrestricted selection of facts to be designated as aggravating circumstances was included in the jury's sentencing determination.

**Claim 12:**    **Runyon Was Denied Due Process Of Law, Equal Protection Of The Law, The Right To Be Free Of Cruel And Unusual Punishment, And Effective Assistance Of Counsel Because The Death Penalty Was Disproportionately And Unconstitutionally Applied According To Race, And Trial And Appellate Counsel Made No Objection Based On This Fact.**

Respondent avers that Runyon is entitled to neither relief, nor even discovery, on his intertwined claims of selective prosecution based upon Runyon's race (Runyon is first generation Korean-American) and trial counsel's ineffectiveness for failing to pursue that claim. ECF No. 536, p.124 ("Runyon fails to proffer any evidence, let alone some evidence, demonstrating that this claim would have been successful."). Respondent's argument, however, is largely irrelevant for two reasons. First, Runyon did not merely cite national statistics regarding the Government's disturbing pattern of

---

[35] For example, the "victim impact" aggravator is constitutionally infirm because the sentencer fairly could conclude that it applies to every defendant eligible for the death penalty. *See Arave v. Creech*, 507 U.S. 463, 474 (1993).

disproportionately seeking death against non-whites. Runyon pled that the prosecution *in this case* sought death against the non-white Runyon while not seeking death against his white co-defendants and then emphasized their racial differences during trial. ECF No. 511, p.107-110. It is well-established that that the co-defendants were charged with the same crimes and Runyon has argued from the beginning, and throughout his Amended §2255 motion, that the codefendants were equally culpable.[36] The jurors found that the codefendants were equally culpable. ECF No. 291, p.2. Second, Respondent implicitly concedes that the codefendants were similarly situated when arguing in response to Claim 13 that "the Eighth Amendment does not require comparative proportionality review between sentences received by similarly situated defendants." ECF No. 536, p.127.

Respondent cannot make those facts "go away" simply by failing to acknowledge that they exist and that they have been pled. Runyon has alleged thus far uncontested evidence that the prosecutors in this case added to the statistical evidence that the FDPA is administered in a racially-discriminatory manner by seeking death against a non-white defendant while eschewing that penalty for his equally-culpable (if not more culpable) white co-defendants. This, together with the reasons contained in Runyon's pending discovery motion and reply. ECF No. 491, pp.12-21 and ECF No. 506, pp.5-10, constitutes "a credible showing of different treatment of similarly situated persons" entitling Runyon to discovery. *See Armstrong*, 517 U.S. at 470. Relief from the unconstitutional death sentences should follow.

---

[36] The allegations set forth in all sections of Runyon's Amended §2255 motion were realleged and incorporated by reference in all other sections and claims. ECF No. 511, p.11. Runyon's First Motion for Discovery and Reply (ECF Nos. 491, 506) provide additional facts supporting this claim.

89

**2750**

**Claim 13:**     **Runyon's Death Sentence Is Disproportionate And Arbitrary In Violation Of The Fifth And Eighth Amendments.**

Respondent characterizes this claim as "nothing more than a claim for proportionality review."[37] ECF No. 536, p.127. Runyon claims, under the circumstances of his case, the death penalty is disproportionate and arbitrary and contrary to the Eighth Amendment's "'precept of justice that punishment for crime should be graduated and proportioned to the offense'" and the offender. *Atkins v. Virginia*, 536 U.S. 304, 311-13 (2002) (quoting *Weems v. U.S.*, 217 U.S. 349, 367 (1910).

If the implementation of the federal death penalty in a particular case does not result an evenhanded, rational and consistent imposition of the death penalty, there must be means to ensure the death sentence was not wantonly or freakishly imposed. *Compare, Pulley v. Harris*, 465 U.S. 37, 49-50 (1984). Supreme Court precedent requires that a decision-maker's discretion to determine whether a human life should be taken or spared "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); *Zant v. Stephens*, 462 U.S. 862, 874 (1983). Similarly, the FDPA requires appellate review to determine whether the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. 18 U.S.C. §3595(c). Here, the prosecution's decision to seek a death sentence against Runyon but not his co-defendants resulted in a disproportionate and arbitrary application of the death penalty.

Respondent's claim that *McClesky v. Kemp*, 481 U.S. 279, 296-97 (1987), allows the Government unfettered discretion in selecting a death sentence for only one of three equally culpable co-defendants goes too far. ECF No. 536, pp.127. "[A]t all stages of the proceedings the Due Process and Equal

---

[37] This claim *does not* present the issue in *U.S. v. Higgs*, 353 F.3d 281 (4th Cir. 2003), where the defendant argued that the FDPA is facially unconstitutional because it does not require proportionality review in all cases. *Id.* at 320-21.

Protection Clauses protect persons ... from invidious discriminations." *Griffin v. Illinois*, 351 U.S. 12, 18 (1956). Invidious discrimination occurs "[w]hen the law lays an unequal hand on those who have committed precisely the same offense[.]" *Selective Serv. Sys. v. Minnesota Pub. Interest Research Grp.*, 468 U.S. 841, 880 (1984). The Court in *McCleskey*, 481 U.S. at 305, noted that there must be rational criteria establishing that a particular defendant's case should be subject to the death penalty. A defendant can demonstrate an abuse of prosecutorial discretion with exceptionally clear proof. *Id.* at 297. Here, the existence of such proof has been pled and Runyon is entitled to present evidence of the same.

Respondent also suggests such a claim would be barred by the *Teague* doctrine or, even were it not, would be barred by the failure of Runyon's counsel to present this claim at the time of trial. *Teague* is inapplicable. This claim does not rely on a new procedural rule but on principles established before Runyon's case became final. For example, *McCleskey* was decided over fifteen years prior to Runyon's trial. To the extent that Respondent suggests this claim could have been raised during direct proceedings, the Government's failure to reveal the factual basis of the claim as it was required to do under *Brady* provides cause to excuse any default. *See* Claim 2. Furthermore, to the extent that Respondent now claims those facts could have been discovered earlier, trial or appellate counsel's ineffectiveness in failing to discover and present them earlier would also provide such cause.

Finally, Respondent's new argument that Amended Claim 13 added an untimely claim of ineffective assistance of trial and appellate counsel for failing to raise this issue is incorrect. ECF No. 536, p.125. Runyon's initial §2255 motion alleged trial and appellate counsel ineffectiveness. ECF No. 478, p.98 n.38. The initial reply for Claim 13 alleged that counsel's ineffectiveness overcomes the procedural default asserted in Respondent's initial answer. ECF No. 526 p.67. Runyon's amended Claim 13, including allegations of counsel's ineffectiveness, was timely filed under Fed. R. Civ. P.

91

**2752**

15(a)(1)(B). Accordingly, there is nothing completely new about these allegations and Amended Claim 13, in its entirety, is timely.

**Claim 14:      Runyon's Death Sentence Violates The Eighth Amendment Because He Is Severely Mentally Ill**

Respondent argues that the execution of the severely mentally ill does not violate the Eighth Amendment because there exists no national consensus to that effect. ECF No. 536, pp.130-33. Accordingly, Respondent contends that Runyon seeks a "new rule" that would be barred by *Teague*. *Id.*, p.130.

This claim, however, seeks only an application of the firmly established rule set out in *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958), and reaffirmed and applied in a different context every few years. *See, e.g., Miller v. Alabama*, 132 S.Ct. 2455, 2463-64 (2012), *Graham v. Florida*, 560 U.S. 48, 58-62 (2010); *Kennedy v. Louisiana*, 554 U.S. 407, 419-22 (2008); *Roper v. Simmons*, 543 U.S. 551, 560-64 (2005); *Atkins v. Virginia*, 536 U.S. 304, 311-13 (2002); *Thompson v. Oklahoma*, 487 U.S. 815, 818-38 (1988); *Ford v. Wainwright*, 477 U.S. 399, 405-06 (1986) *Enmund v. Florida*, 458 U.S. 782, 789-93 (1982); *Coker v. Georgia*, 433 U.S. 584, 593-96 (1977). The rule of *Trop* and its progeny is that punishments which are contrary to the evolving standards of decency that mark the progress of a maturing society violate the Eighth Amendment. *Trop*, 356 U.S. at 101.

Thus, Runyon should be allowed to demonstrate that mental illness of the nature he alleges in his Amended §2255 motion, (*see* ECF No. 511, p.123-25; *see also* Claims 5 & 6), meets those standards outlined in *Trop*, *Roper*, and *Atkins*. Runyon's severe mental illness results in a "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318-20. His execution would violate evolving standards of decency.

92

**2753**

Respondent suggests that evolving standards of decency may be determined solely from country-wide legislation. ECF No. 536, p.131. A long line of Supreme Court precedent dictates the standard is not so easily gleaned. Inquiry into evolving standards of decency involves not merely what is impermissible under presently existing statutes, but also what is actually practiced. *See, e.g., Hall v. Florida*, 134 S.Ct. 1986, 1997-98 (2014); *Roper*, 543 U.S. at 564-65; *Atkins*, 536 U.S. at 316. Moreover, it is not only the legislation and practice within the states and federal government from which the standard is gleaned but also the legislation and practices within other countries and international authorities. *Roper*, 543 U.S. at 575-78. The prohibition on executing the severely mentally ill is an established norm of international law.[38] Finally, the Court's own independent judgment must also be brought to bear. *See id.* at 564.

---

[38] *U.N. Human Rights Comm'n., Sahadath v. Trinidad and Tobago*, Communication No. 684/1996, CCPR/C/74/D/684/1996, Apr. 15, 2002 (issuance of an execution warrant in the case of a mentally ill prisoner violates Article 7 of the ICCPR); *U.N. Human Rights Comm'n., Francis v. Jamaica, Communication No. 606/1994*, U.N. Doc. CCPR/C/54/D/606/1994, Aug. 3, 1995 (incarceration on death row of a prisoner whose mental health had "seriously deteriorated" amounted to cruel, inhuman or degrading treatment in violation of Article 7 of the ICCPR). The U.N. Commission on Human Rights has adopted a series of resolutions urging states that retain the death penalty not to impose it "on a person suffering from any form of mental disorder." U.N. ECOSOC, Implementation of the Safeguards Guaranteeing Protection of Rights of those Facing the Death Penalty, p.51, para. 1(d), ECOSOC Res. 1989/64, U.N. Doc. E/1989/91, 1989; U.N. ECOSOC, Implementation of the Safeguards Guaranteeing Protection of the Rights of those Facing the Death Penalty, ECOSOC Res. 1996/15, U.N. Doc. E/CN.15/1996/15, Jul. 23, 1996); U.N. Comm'n on Human Rights Res., "Question of the Death Penalty," E/CN.4/RES/1999/61, adopted April 28, 1999; U.N. Comm'n on Human Rights Res., "The Question of the death penalty," E/CN.4/RES/2000/65, adopted April 27, 2000; U.N. Comm'n on Human Rights Res., "Question of the death penalty," E/CN.4/20050L.77 2005/59, adopted April 20, 2005. The European Union has likewise declared that the execution of persons "suffering from any form of mental disorder ... [is] contrary to internationally recognized human rights norms and neglect[s] the dignity and worth of the human person." European Union, Delegation of the European Comm'n to the USA, EU Memorandum on the Death Penalty, presented to U.S. Assistant Secretary of State for Human Rights, http://www.eurunion.org/eu/EU-Memorandum-on-the-Death-Penalty-February-25-2000.html, Feb. 25, 2000; see also, Council of the European Union, EU Guidelines on Death Penalty, III (iv), April 12, 2013, http://eeas.europa.eu/human_rights/guidlines/death_penalty/docs/guidelines_death-penalty-st08416_en.pdf.

Respondent alternatively argues this claim is procedurally defaulted by prior counsel's failure to properly present it during direct proceedings. ECF No. 536, p.129. This same defense was made in Respondent's initial answer. In response, Runyon's initial reply alleged that, even if this claim could have been raised during direct proceedings, counsel rendered ineffective assistance by failing to do so and that counsel's failure constitutes both an independent constitutional violation and cause and prejudice excusing any alleged procedural default. ECF No. 526, p.69. *See also* Amended Claims 5, 6 & 8. In conclusion, because Runyon invokes no "new rule of law," *Teague* is not implicated here. Moreover, under the firmly established Eighth Amendment standards of *Trop*, *Roper*, and *Atkins*, Runyon can demonstrate that he is entitled to relief.

**Claim 15: Selection Of The Grand Jury And/Or The Petit Jury Venire For Runyon's Case Was Tainted, And Trial Counsel Unreasonably Failed To Request And Examine The Jury Selection Records.**

Runyon acknowledges that his statutory claim for substantive relief is untimely under 28 U.S.C. §1867(a) because he did not bring the claim before voir dire examination began, or within seven days after he discovered or could have discovered the grounds for such a claim. Because trial counsel could have obtained and analyzed the jury selection records within the timeframe of §1867(a), counsel's deficient performance is cause for this default. If some external impediment impeded counsel from obtaining the necessary jury selection records or otherwise made timely compliance with §1867(a) "impracticable," the impediment is cause for the default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

**A. Selection Of The Grand Jury And/Or The Petit Jury Venire Was Tainted.**

Runyon stands on the statement in his §2255 motion.

**B. There Was a Failure To Fully And Accurately Comply With The Jury Selection Plan And The Provisions Of 28 U.S.C. §1861 *et. seq.***

The Jury Selection & Service Act (JSSA) and the district's Jury Selection Plan (the Plan) both require the clerk to note the specific reasons for every disqualification, excusal, exemption, or

94

**2755**

exclusion of every prospective juror.[39] 28 U.S.C. §1866(d), Plan at pp. 5 & 7-8. The Government

agrees. ECF No. 536, p.140. The Government also agrees that a violation of the JSSA is substantial if

it frustrates the basic goal of "'use of objective criteria for determination of disqualifications, excuses,

exemptions, and exclusions.' [*U.S. v.*] *Paradies*, 98 F.3d [1266,] 1277[11th Cir. 1996]." *Id.*, pp.140-41.

The Government further agrees that the Court provided the §2255 parties with an "excused table

listing" identifying the codes of 26 grounds for disqualification, excuse, exemption, or exclusion; that

about 96 potential jurors in Runyon's case were excluded using the code for "court order"; and that

53 potential jurors were given no exclusion code.[40]

The Government suggests that the Court "may very well have had reasons for these

disqualifications, excuses, exemptions, or exclusions that have not been provided to counsel at this

point." ECF No. 536, p.141. That would be inconsistent with the Court's previous ruling. The Court

clearly understood the reason why Runyon requested this information, and its order did not hint that

it would withhold any relevant information:

> The Defendant also requests a statement explaining any exemptions or disqualifications so that he may evaluate such exemptions to ensure that they were based on objective reasons. As the Defendant has explained why this information is necessary to determine if there was a violation of the Act, he will be provided with a document stating the number of individuals excused, disqualified, or exempted, and the reason for such action, along with each individual's race, gender, and age.

---

[39] Although portions of Runyon's claim focus on the clerk's actions, this claim is not meant to fault the clerk individually or fix responsibility for what occurred. As the court explained in *United States v. Jackman*, 46 F.3d 1240, 1245 (2d Cir. 1995), the clerk's *"actions* are necessarily what we must review. But responsibility is another matter, one that is understandably not clear on this record, but is also of no relevance to the validity of [petitioner's] contention." (emphasis in original)

[40] To avoid quibbling over what appears to be an unimportant point, Runyon is using here the numbers as calculated by the Government. The 53 potential jurors with no exclusion code are described by the Government as jurors who "were not accounted for in a category of disqualification/exemption." ECF No. 536, p.140 n.21. Runyon describes the same group as jurors who "were excluded ... for no stated reason" or with "no reason given." ECF No. 511, p.120.

ECF No. 475, p.12. If information about the reasons for any disqualification, excuse, exemption, or exclusion was withheld, Runyon is entitled to receive it under the Court's order. It should be provided to the parties promptly, with opportunity for further briefing.

The Government speculates that the 53 individuals excluded with no reason given may simply have been deferred, or failed to return their juror qualification questionnaire to the Court, or failed to appear on a summons.[41] ECF No. 536, p.141 n.22. These hypotheticals are unlikely. The "excused table listing" contains multiple codes for deferrals including, but not limited to, deferrals for vacations, job-related reasons, illness, and care for small children. The table also lists a code for "other."[42] If any of these 53 individuals were simply deferred, codes were available. Both the JSSA and the Plan explicitly mandate that the reasons be recorded.

Failures to return a jury qualification questionnaire or respond to a summons are also unlikely explanations because the court is required to follow-up in these circumstances. *See* §§1864(a)&(b) (setting out procedures and punishments when individual fails to return questionnaire); §1866(g) (authorizing court to issue show-cause order to any person who fails to comply with summons, and to impose fine, imprisonment, or community service for failure to show good cause). The clerk's office appears to have been diligent in following up on individuals who failed to return a questionnaire or to respect a summons, because it noted its efforts on the qualified wheel, if not also elsewhere, as directed by §1866(d) and the Plan. *See, e.g.,* 2007 Norfolk Qualified Wheel, Part. Nos. 100743060, 100753163,

---

[41] Runyon recognizes that there are distinctions between disqualifications, excuses, exemptions, and exclusions. Because the rules for recording all of these appear to be identical, Runyon's pleadings often use the term "exclusion" or "removal" to refer to all of these collectively.

[42] The uninformative "other" code would have been objectionable for the same reasons as the "court order" code. But the listing of the "other" code on the exclusion table removes the possibility that there was no available code that could be assigned to the 53 individuals. In Runyon's case, the "other" code was not used for any removals.

96

100753546, 100756110, 100765814, 100780874, 100782606 (containing notes showing follow-ups for nonresponse to summons).[43] The clerk's office also appears to have been conscientious about following up on prospective jurors' other reasons for unavailability. *See, e.g.,* 2007 Norfolk Qualified Wheel, Part. Nos. 100736917 (noting death in juror's family), 100745392 (noting follow-up on no-show), 100757873 (noting follow-up on juror form). There is no notation on the 2007 Norfolk Qualified Wheel for any of the 53 individuals who were excluded for no stated reason.

As for the 96 jurors who were excluded with the code "court order," the Government argues that this is a specific category of exemptions, and it says there is no merit to "the defendant's argument that it is not a category." ECF No. 536, p.141. But Runyon has never claimed that the "court order" code does not identify a specific category. Runyon's argument is that this category is devoid of content or standards. ECF No. 511, p.120 ("records [for this category] contain no reason why an order was needed or given"). It contains no information showing that a disqualification, excuse, exemption, or exclusion resulted from the use of objective criteria. Because removing a juror is necessarily an individualized decision, the juror's mere membership in a category called "court order" does not indicate that her removal was based on the use of objective criteria. There is no notation on the 2007 Norfolk Qualified Wheel for any person who was given the code "court order."

When jury records give no reason for exclusions, or the reasons have a title (such as "court order") but no content or standards, those exclusions must be treated as having been made without "use of objective criteria." Any other course would undermine Congress' purpose in strictly limiting exclusions to those set out in §1866(c), and commanding "the jury commission or clerk" to note "the *specific* reason therefor." §1866(d) (emphasis added). Noncompliance with these requirements is "'a

---

[43] Runyon has referenced these entries for illustrative purposes. They do not constitute a comprehensive listing of notes relating to individual jurors on the 2007 Norfolk Qualified Wheel.

97

frustration of the Act's underlying principle of exclusions on the basis of objective criteria only.'" *U.S. v. Calabrese*, 942 F.2d 218, 228 (3d Cir. 1991) (quoting *U.S. v. Bearden*, 659 F.2d 590, 607 (5th Cir. 1981)). The legislative history of the Jury Selection and Service Act (JSSA) supports this position. As the court recognized in *U.S. v. Branscome*, 529 F. Supp. 556, 559 (E.D. Va. 1982), *aff'd*, 682 F.2d 484 (4th Cir. 1982), the JSSA was intended to prohibit jury selection officials, even when well-intentioned, from making subjective decisions about the inclusion or exclusion of potential jurors. *See* H.R. Rep. No. 1076, 90th Cong., 2d Sess. 5 (1968), reprinted in U.S. Code Cong. & Ad. News 1795 (1968); S. Rep. No. 891, 9th Cong., 1st Sess. 17-18 (1967). The court further pointed out in *Calabrese* that mandating the use of objective criteria created "a 'bulwark against impermissible forms of discrimination and arbitrariness.'" *Calabrese*, 942 F.2d at 221 (quoting U.S. Code Cong. & Ad. News at 1793, and also citing National Jury Project, *Jurywork: Systematic Techniques* §5.04[4][3][b] (1990)). Recording the specific reason for every exclusion operates as a critical check on the jury selection officials and furthers Congress' intent. [44]

Assuming the materials made available to counsel constitute the totality of the relevant records regarding the exclusions of the 180 individuals, Runyon has shown a substantial failure to comply with the jury selection procedures in §§1865 & 1866, as well as the procedures in the Plan. Excluding 53 of 180 individuals for no stated reason is *quantitatively* substantial. Excluding 96 individuals for "court order"—a reason that has a title but no content or standards—also is quantitatively substantial. Each

---

[44] The Government suggests that an 83 percent failure to comply with an explicit requirement in the JSSA can be disregarded as a technical violation. ECF No. 536, p.141. The cases it cites do not support that argument. Those cases primarily involve minor deviations from the local Plan, rather than the statute, such as calling slightly fewer than 300 individuals for a case when the local Plan specifies at least 300. *See U.S. v. Carmichael*, 685 F.2d 903, 911 (4th Cir. 1982). Runyon's claim, by contrast, is grounded on statutory mandates. Runyon also does not complain that the reasons for each exclusion were not entered in the right place or on the right list, but that the reasons were not recorded at all, and thus fail to show the exclusions were based on objective criteria.

98

**2759**

group alone is more than large enough to satisfy the quantitative standard, and together they account for nearly 83 percent of all the exclusions. If there are additional records that identify the reasons for the 53 individuals who were removed for no stated reason, or that provide content and standards for the "court order" basis for excluding 96 individuals, the Court should provide this to the parties.

These exclusions also are *qualitatively* substantial. The proper inquiry is whether the instances of noncompliance have frustrated the principle of exclusions "'on the basis of objective criteria only.'" *Calabrese*, 942 F.2d at 228 (quoting *Bearden*, 659 F.2d at 607). Based on the information provided to counsel, this prong is established because there are simply no objective criteria underlying the exclusion of 53 individuals. For another 96 individuals, the only disclosed reason for exclusion is "court order." A court order can be based on objective criteria, but it also can be based on subjective factors, which Congress prohibits in this context. *Branscome, supra.* The records in Runyon's case contain no reason why a court order was needed or given. As Runyon noted in the §2255 motion, it strains credulity to think that more than half of the 180 potential jurors could be excluded using objective criteria that are not already on the Court's expansive exclusion table. The most logical inference is that these individuals were excluded using nonobjective criteria.

The remedy for substantial failure to comply with the JSSA's jury selection procedures is to vacate Runyon's convictions and remand for a new trial. That is the remedy ordered in *Calabrese*, which is the case that is factually most closely on point. In that case, the jury clerk submitted to the district court the "names of people for whom she believed excusal or exclusion was appropriate, with a brief notation indicating the grounds for each person's removal" *Calabrese*, 942 F.2d at 221. The list included 12 potential jurors who each had indicated, in response to a question on the juror qualification questionnaire, that he or she knew one of the defendants. "The district court signed a blanket excusal for all jurors on the list." *Id.* On appeal, the Third Circuit determined that the exclusions, which were

99

**2760**

made without inquiry into the nature of any of these acquaintances, were outside the reasons allowed by the Act, and that the failure to comply with the statute was substantial. Vacating the defendants' convictions and remanding for a new trial, the court said:

> The party raising the challenge need not show prejudice. See United States v. Kennedy, 548 F.2d 608, 612 (5th Cir.), cert. denied, 434 U.S. 865 (1977); House Report, 1968 U.S. Code Cong. & Admin. News at 1806 (noting that a committee amendment "eliminates the need to prove prejudice as a condition of judicial intervention when substantial noncompliance with the act is established").

*Calabrese*, 942 F.2d at 221. It further said that "[b]ecause there is no requirement that prejudice be shown, this is not a case in which a remand to the district court for a factual inquiry into the actual relationships between defendants and the excused jurors is appropriate." *Id.* at 230 n.6. In Runyon's case, there also is no requirement that prejudice be shown.

## C.   A Person Who Did Not Qualify Participated In Runyon's Trial.

Runyon's Amended §2255 motion said "[i]t is possible that S.G. and S.R. are the same person," but it pointed to a pattern of flip-flopping that did not fit the scenario of a person who simply changed her name because of a marriage or divorce. ECF No. 511, p.123. Although the Government does not resolve that flip-flopping, its response identifies a detail that satisfies Runyon's counsel that S.G. and S.R. are the same person. Consequently, Runyon withdraws this allegation.

## D.  Trial Counsel Unreasonably Failed To Request Or Examine Any Jury Selection Records, In Violation Of The Sixth Amendment.

The Government asserts that there is no case law finding a lawyer ineffective for failing to request jury selection documents. ECF No. 536, p.144. The existence of an identical prior winning claim is not an element of a *Strickland* analysis. There are many winning *Strickland* claims based on counsel's failure to investigate, and investigating compliance with the jury selection procedures for the defendant's own trial is simply a specific application of counsel's well-established obligation to investigate the facts and the law that are relevant to his client's case. *Strickland*, 466 U.S. at 691

100

("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Wiggins*, 539 U.S. at 533 (counsel's decision not to investigate "must be directly assessed for reasonableness in all the circumstances"); *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997) ("the attorney must look into readily available sources of evidence"). The purpose of the specific investigation into jury selection procedures is "to determine whether [the defendant] has a potentially meritorious jury challenge." *Test v. U.S.*, 420 U.S. 28, 30 (1975) (emphasis added). Requesting the jury selection documents is essential for this purpose because "without inspection, a party almost invariably would be unable" to discharge that duty. *Id.* Counsel's duty to "exercise … diligence" is explicitly contained in the JSSA, §1867(a).

Runyon also calls the court's attention to *U.S. v. Orange*, 2003 U.S. App. LEXIS 7303, at *4, *6-7 (10th Cir. Apr. 17, 2003). In that case, the Tenth Circuit remanded for further proceedings after recognizing that the §2255 petitioner stated a potentially meritorious claim under *Strickland* when he alleged that defense counsel rendered ineffective assistance in failing to investigate and challenge the jury selection system, including counsel's failure to obtain documents under *Test*.

The Government's only other response to this allegation is to make weak conclusory statements. First, it says Runyon cannot show that counsel's performance was deficient because the relevant ABA Guideline 10.10.2 only says counsel should "consider" whether there is a basis to challenge the selection of the venire. Because the appropriateness of such a challenge will depend on the facts of an individual case, the obvious norm of professional performance is for counsel to "consider" the facts and circumstances, and then make an informed decision whether or not to make a challenge.

Although the ABA Guidelines describes counsel's performance in the most pertinent context, Runyon notes that they are not the only source of norms for challenges to jury selection. *See also* Office

101

**2762**

of Justice Programs, 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance, pp. I10-I12 (2000) (providing survey of guidelines across multiple jurisdictions); ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4-7.2 Selection of Jurors (3d ed. 1993) ("Defense counsel should prepare himself or herself prior to trial to discharge effectively his or her function in the selection of the jury, including the raising of any appropriate issues concerning the method by which the jury panel was selected[.]"); National Legal Aid and Defender Assn.: Performance Guidelines for Criminal Defense Representation 7.2 Voir Dire and Jury Selection (1997) ("counsel should be familiar with the procedures by which a jury venire is selected in the particular jurisdiction and should be alert to any potential legal challenges to the composition or selection of the venire"). The Supreme Court cited with approval each of the foregoing sources of attorney norms in *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010). Requesting and examining the jury selection documents carries no risk to the defense, and to obtain access to otherwise nonpublic jury selection records, counsel must only state in good faith that the records are necessary to investigate and prepare a motion challenging the jury selection procedures.[45] *U.S. v. Alden*, 776 F.2d 771, 773 (8th Cir. 1985). There is no reason for counsel to forgo the request if there is a possibility of a substantial violation of JSSA and if counsel sincerely intends to seek statutory redress if he discovers a meritorious violation.

Second, the Government makes a conclusory assertion that Runyon cannot prove he was prejudiced by counsel's failure. But timely raised jury selection challenges have resulted in relief in numerous cases. In *Branscome, supra*, the Fourth Circuit quashed indictments on the ground that the method used to empanel a grand jury violated the JSSA. In that case, the clerk initially asked a

---

[45] This certification is distinct from the sworn statement required to be filed with a motion under §1867(d).

102

randomly chosen pool of prospective jurors for volunteers to serve on the grand jury, and then the clerk filled out his quota with additional jurors chosen at random. *See also U.S. v. Ovalle*, 136 F.3d 1092 (6th Cir. 1998) (finding substantial violation of JSSA where jury selection plan provided for random removal from jury wheel of one in five non-African-Americans because of their racial status); *U.S. v. Exum*, 744 F. Supp. 803 (N.D. Ohio 1990) (substantial violation of JSSA if jurors on qualified wheel are called to serve as summary jurors where Act limits wheel to calling grand and petit jurors). Moreover, a defendant's timely allegation of substantial violation can result in reversal on appeal or other subsequent proceedings; *Calabrese, supra*, (vacating conviction for substantial violation of JSSA and remanding for new trial where trial court issued blanket order excluding potential jurors based merely on jurors' knowledge of defendant, without anything more); *U.S. v. Okiyama*, 521 F.2d 601 (9th Cir. 1975) (reversing conviction with recommendation to dismiss indictment, despite absence of any showing that defendant was prejudiced, where deficiencies in process of selecting grand and petit jurors created serious risk that those selected did not have sufficient proficiency in English to understand proceedings in which they were to participate); *U.S. v. Clay*, 159 F.Supp.2d 1357 (M.D. Ala. 2001) (remanding for new trial where clerk placed names of deferred jurors in separate pool and preferred them disproportionately over jurors drawn directly from qualified wheel). The errors in Runyon's case are as meritorious as these.

There is ample reason to conclude that if Runyon's counsel had obtained the jury selection documents under authority of *Test* and filed a timely challenge, the Court would have had to stay the proceedings. Based on the records Runyon has received, there is also a reasonable probability that the Court would have found there was a substantial failure to comply with the JSSA and the Plan, and thus that the Court would have had to call for a new venire and the selection of a new petit jury in conformity with §1867(d).

103

**2764**

A new venire would have benefitted Runyon because it would not have been tainted by the racial aspect of the noncompliant exclusions.[46] Those exclusions removed both of the Native Americans and half of the Asians called for his trial, either for no stated reason or for "court order." ECF No. 511, p.121. Runyon is Asian. The challenged exclusions reduced the minority jurors available to participate in the selection of his jury, and particularly jurors of Runyon's own race. *See Vasquez v. Hillery*, 474 U.S. 254, 261 (1986) (granting habeas relief because members of defendant's race were excluded from the grand jury that indicted him).

Racial discrimination in jury selection is generally treated as structural error. *See U.S. v. Gonzales-Lopez*, 548 U.S. 140, 149 n.4 (2006) (confirming that error in *Hillery* was structural because of the difficulty of assessing its effect). The Fourth Circuit holds that the prejudice component of a *Strickland* analysis may be presumed if the nature of the deficient performance is that of a structural error. *Bell v. Jarvis*, 236 F.3d 149, 165, 180 (4th Cir. 2000) (en banc). Other courts agree. *See, e.g., Johnson v. Sherry*, 586 F.3d 439, 446-47 (6th Cir. 2009); *Styers v. Schriro*, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008); *Owens v. United States*, 483 F.3d 48, 64-66 (1st Cir. 2007); *McGurk v. Stenberg*, 163 F.3d 470, 473-74 (8th Cir. 1998).

Of the 180 jurors who did not complete case-specific juror questionnaires, 83 percent were excluded with no reason given, or with a reason that contained no content or standard. Trial counsel unreasonably failed to investigate jury selection by timely requesting jury selection documents and analyzing them for evidence of substantial violations of the JSSA. Prejudice is presumed. Moreover,

---

[46] The Government's response speculates that by making reference in the §2255 motion to the race of excluded jurors, Runyon might be trying to make a fair cross-section claim. He is not. But in a case that had a race-related issue on direct appeal and now presents two race-related claims in the Amended §2255 motion, see Claims 12 & 16, neither Runyon nor the Court cannot overlook the fact that a juror's race would not be a permissible reason for exclusion.

104

**2765**

Runyon was prejudiced by the exclusion of minority jurors. Counsel's deficient performance is a basis for §2255 relief in its own right, and also provides cause to overcome the default of the substantive claim.

**Claim 16: The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes, And Trial Counsel Unreasonably Failed To Object To These Unconstitutional Strikes.**

The Government peremptorily struck 70 percent of the qualified African-American jurors. It used 68 percent of its strikes against qualified female jurors. The Government's answer to these charges is that Runyon is foreclosed from making a prima facie showing of discrimination under *Batson v. Kentucky*, 476 U.S. 79 (1986), because he is white and male. "Given the fact that the defendant and the victim are white males, and Runyon alleges discrimination against blacks and women, he patently cannot satisfy the first two elements of a prima facie case." ECF No. 536, p.146. The Government is wrong on both the law and the facts.

First, it is wrong on the law. A quarter century ago the Supreme Court granted certiorari in *Powers v. Ohio*, 499 U.S. 400 (1991), to decide "whether ... a white defendant may object to the prosecution's peremptory challenges of black venirepersons." *Id.* at 404. Ruling in the defendant's favor, the Court held "that race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges." *Id.* at 416. The Court acknowledged that in *Batson* it had emphasized the racial identity between the black defendant and the struck jurors, but explained that this was merely because such racial identity:

> might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred. But to say that the race of the defendant may be relevant to discerning bias in some cases does not mean that it will be a factor in others, for race prejudice stems from various causes, and may manifest itself in different forms.

105

*Powers*, 499 U.S. at 416; *see United States v. Bynum*, 3 F.3d 769, 772 (4th Cir. 1993) (under Powers, a "criminal defendant may challenge race-based use of peremptories whatever the defendant's own race"); *Kandies v. Polk*, 385 F.3d 457, 474 (4th Cir. 2004) (based on Powers, white defendant had standing to bring Batson claim asserting prosecution's improper exclusion of nine African-American jurors because of their race), *vacated and remanded on other grounds*, 545 U.S. 1137 (2005). Based on *Powers*, courts also recognize that a defendant of one racial minority can challenge the discriminatory exclusion of jurors of a different racial minority. *See, e.g., United States v. Mensah*, 737 F.3d 789, 797 (1st Cir. 2013) (holding that African-American defendant could contest prosecution's strikes of two Asian-American jurors because Supreme Court has recognized, at least since Powers, "that whatever the defendant's race, he has 'the right to be tried by a jury whose members are selected by nondiscriminatory criteria'"). Thus, under law that has been firmly established for at least 25 years, the fact that Runyon is not the same race as the excluded jurors is irrelevant to his *Batson* claim, and the Government's assertion that Runyon's race "patently" forecloses his ability to make a prima facie case is patently wrong.

The Government's response also is wrong on the facts. Runyon's race is Asian, not white. Although his race is irrelevant to his standing to challenge the strikes of African-American jurors, it is material to the merits of Runyon's claim that the prosecution's strikes were motivated in substantial part by race, as discussed below. The Government has known since well before trial that Runyon is Asian.[47] In light of this knowledge, the Government's misrepresentation of his race in §2255

---

[47] The fact that Runyon is Asian is explicit in the interrogation video exhibit the prosecutors intended to play at trial, and did play at trial, and which the Fourth Circuit quoted in its opinion: "Detective Rilee asked Runyon: '[Y]ou're Asian, right, Asian-American?' ... 'Yes sir,' he answered." *Runyon*, 707 F.3d at 493. The Fourth Circuit later described this video as containing statements about Runyon's Asian race that "were capable of inflaming jurors' prejudices." *Id.* at 494. The Government's mental health experts wrote pretrial reports expressly identifying Runyon as Asian, ECF No. 276, p.19, or Asian-American, ECF No. 277, p.1. Runyon's race was also discussed in pretrial filings submitted by the defense. In a motion for continuance, for example, ECF No. 179, p.10, the defense explained that Runyon's mother, Suk Cha Runyon, is a native Korean. Suk Cha was on the pretrial witness list.

106

proceedings is disturbing and illustrates a reckless disregard of the importance that race played in this case.[48] At this point it seems clear that the Government—by raising irrelevant legal arguments and making factually indefensible statements about Runyon's race—is attempting to avoid by any means the consequence of having struck 70 percent of the qualified African-American jurors and having used 68 percent of its strikes against females.

The reasons why Runyon has made a prima facie case of discrimination are discussed below. For some of the same reasons the Supreme Court discussed most recently in *Foster v. Chatman*, 136 S.Ct. 1737 (2016), the Government's explanation of its strikes is pretextual, and the record shows the prosecutors were motivated in substantial part by race.

## A. Runyon's Claim Is Not Defaulted, Or Counsel's Deficient Performance Is Cause To Overcome The Default.

The Government's sole ground for opposing Runyon's substantive *Batson* claim is that it is defaulted. That is wrong. It is not defaulted because it could not have been "fully and completely addressed on direct review based on the record created" in the trial court. *Bousley*, 523 U.S. at 622. *See supra*, Affirmative Defenses (discussing procedural default). On the first day of voir dire, the Court announced that 62 members had been called. Tr.2, 6/30/09. The trial transcript includes the court reporter's descriptive note that "The names of the prospective jurors were called," Tr.10, 6/30/09, but the calling was done off-record, and the individuals' names are not in the transcript. Prospective

---

She testified at trial that she was born in North Korea, and she conceived David after escaping to (and living in) South Korea. Tr.2410, 2414, 8/24/09. Runyon's race also underlay pretrial questions proposed by the defense for the jury questionnaire, ECF No. 156-1, p.9, and for voir dire, ECF No. 158, p.2.

[48] The Government's misrepresentation of Runyon's race must be viewed as intentional, not inadvertent. It made the same assertion that Runyon is white in its answer to the original §2255 motion. ECF No. 497, pp.127, 128, 130. Runyon called the error to the Government's attention in his original reply. ECF No. 526, pp.77-78. Runyon's amended §2255 motion also repeatedly identified his race as Asian. ECF No. 511, pp.2, 83, 107, 110, 121, 128.

107

jurors who gave individual responses to certain voir dire questions are identified in the transcript because they gave their name or number. But 21 of the 62 members did not respond individually to any voir dire question. *See* Claim 17. After the Court removed 10 members for cause, the court reporter entered a descriptive note in the transcript that "The jury selection process was begun," Tr.127, 6/30/09, and it continues with two more notes that "Jury selection continued," Tr.129, 6/30/09. Consistent with this Court's custom, the reporter did not otherwise record the process of striking individual venire members.[49] The conclusion of jury selection is indicated in the transcript by the Court reading the names of 13 individuals who should return the following day. Context makes clear that these were the 12 selected jurors plus one person held over for the next day's selection of alternates. *Id.* The venire members who had been peremptorily struck were excused without being named.

The transcript does not reveal who was struck peremptorily or by which party, nor does it contain any information about the race and gender of potential jurors—either those struck or not struck. The courtroom deputy had a list of all the venire members who participated in oral voir dire and took notes of each for-cause and peremptory strike including the striking party, but these notes—now called the strike lists—were not entered on the docket and made available to counsel until two years after the mandate had issued following Runyon's direct appeal. *See* ECF No. 424 (sealed, entered 4/13/15). Even then, the lists were entered as records in the collateral proceedings, not in the trial

---

[49] Runyon does not suggest that the reporter failed to capture statements of a party or of the Court, because the Court has stated that the transcripts and strike lists together "contain the full record of the jury selection process." ECF No. 423, p.2. Rather, counsel understands that the exercise of peremptory strikes in this Court is a silent process. The clerk draws a group of tags from a box, each denoting a qualified venire member, and they are placed on a board. The parties then alternately move or remove individual tags to indicate their strikes. Neither the trial transcript nor the strike list shows the sequence in which individual tags were drawn or replenished, and the transcript contains no record of any party's transfer of a tag to show its exercise of a strike.

108

proceedings. In a Supplemental Order accompanying the entry of that filing, the Court explained that these lists came from the courtroom deputy's "internal strike and selection order notes," which were "submitted to the Clerk for statistical purposes following trial." ECF No. 423, p.1.

Because the lists were not entered on the docket and made available to counsel until after the appeal, they were not a part of the record on appeal. The record on appeal consists of "(1) the original papers and exhibits filed in the district court; (2) the transcript of proceedings, if any; and (3) a certified copy of the docket entries prepared by the district clerk." Fed. R. App. P. 10(a). The record on appeal does not include internal notes that were not entered on the docket prior to the appeal, and whose existence was not noted in any trial record. Because facts necessary to identify the existence of the violations described in Claim 16 were outside the trial record, this claim could not have been presented on appeal without further factual development.[50] Consequently, this claim was not open to consideration and review on appeal under *Waley, supra*, and it is not defaulted.

If the trial record was somehow sufficient to enable Runyon to present the issue fully and clearly on appeal, appellate counsel were ineffective in failing to do so. Their deficient performance excuses the default, and Runyon is entitled to de novo review. As noted in Claim 8, assembling the record for appeal was the responsibility of attorney Lawrence Woodward, who was initially one of Runyon's appellate lawyers.[51] ECF No. 511-36, p.1 ¶¶5-6. Appellate counsel Teresa Norris compiled a list for Woodward identifying documents that he still had not obtained, including "court record of jury selection/strikes used." *Id.*, p.4. Norris's declaration states that she never received a strike list, and

---

[50] Even *with* these documents, this claim could not have been presented or defended on appeal unless the parties also obtained the venire members' juror questionnaires from the Court. The questionnaires not only identified each member's race and gender, but also contained information about the juror's background, relationships, and views that would be necessary to perform a comparative analysis.

[51] Nine months before Runyon's opening brief was filed, Woodward withdrew and the court of appeals appointed Seth Farber as co-counsel.

109

that her failure to obtain that record for the appeal was not a tactical decision. *Id.*, p.2 ¶7. It appears, instead, to have been:

> "the result of inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). As a result, [counsel's] conduct fell below constitutionally required standards. *See id.*, at 533 ("'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'")) (quoting *Strickland*, 466 U.S., at 690-691).
>
> *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005).

In other words, appellate counsel's deficiency was a threshold failure to investigate and obtain the records necessary to determine *whether* there might be an error in jury selection. If counsel had obtained those records and decided not to appeal the discriminatory exclusion of potential jurors, the reasonableness of their choice would be evaluated under *Jones v. Barnes*, 463 U.S. 745 (1983), and *Smith v. Robbins*, 528 U.S. 259 (2000), which require deference to appellate counsel's reasonable professional judgment. But where there was no competent investigation, counsel could not weigh the (unknown) claim against other potential claims and make a reasonable strategic choice of issues in the first instance. *Rompilla, supra.*

Runyon was prejudiced by appellate counsel's failure to obtain the record necessary to recognize and pursue a claim that the Government used its peremptory strikes in a discriminatory manner. If counsel had performed competently, they would have discovered a claim that was stronger than some other issues presented in Runyon's direct appeal. *See generally* Claim 8.

Even if the record on jury selection was somehow sufficient to present the issue fully and completely on direct appeal, and even if appellate counsel were not ineffective in failing to do so—all of which Runyon disputes—the default of a *Batson* claim is excused because trial counsel were ineffective in failing to challenge the Government's discriminatory exercise of peremptory strikes, for

110

the reasons alleged below. As a result, Runyon is now entitled to de novo review.[52]

## B. The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes.

The petitioner, not the respondent, has "exclusive authority to define the nature of his or her claims." *Dougherty v. Cerra*, 987 F. Supp. 2d 721, 729 (S.D. W.Va. 2013). In his §2255 motion, Runyon elected to present two claims alleging the discriminatory exercise of peremptory strikes, one based on race and one based on gender. Although there are factual overlaps, Runyon separated these claims because the legal standards appeared to be slightly different and some of the evidence is different. The claims are mutually reinforcing and he may prevail on both, but he recognized from the start that the Court could render different decisions on the two grounds, and he structured his motion with that understanding. The Government responds as if Runyon pleaded a unitary allegation based on a combined race-gender category. The Government intermixes its evidence on the two claims, appearing to argue that Runyon can obtain relief only if he shows that the Government discriminated on both grounds. In this Reply, Runyon attempts to disentangle the Government's arguments, and he addresses independently the Government's evidence relating to each claim.

In addition to the trial transcript, the facts related to strikes based on race or gender are contained in the strike lists and juror questionnaires, both made available in §2255 proceedings.

---

[52] Under Fed. R. Civ. P. 8(d) & (e), which applies to §2255 proceedings under Rule 12 of the Rules Governing Section 2255 Proceedings, a party can present inconsistent claims in the alternative without one constituting an admission against the other. *Zee Co. v. Williams, Mullen, Clark & Dobbins, P.C.*, 547 Fed. Appx. 166 (4th Cir. Va. 2013) (quoting *Molsbergen v. United States*, 757 F.2d 1016, 1019 (9th Cir. 1985) ("[A] policy which permits one claim to be invoked as an admission against an alternative or inconsistent claim would significantly restrict, if not eliminate, the freedom to plead inconsistent claims provided by" Rule 8(d)(2))); *see* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §1283. Under this rule, Runyon can allege that counsel lacked facts needed to raise *Batson* claims at trial or on appeal and thus the claims are not defaulted. And he can simultaneously allege in the alternative that counsel knew all the relevant facts and could have presented the claims at trial or on appeal, but unreasonably failed to do so.

111

### 1. The Prosecution Unlawfully Struck Jurors Based on Their Race.

The Government argues that it did not exercise any strikes discriminatorily based on race. Its argument fails by a wide margin.

The "'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster*, 136 S.Ct. at 1747 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)). *Batson* established a three-step process for determining when a strike is discriminatory:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Id.* (quoting *Snyder*, 552 U.S. at 476-77). A prima facie case "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 170 (2005) (quoting *Batson*, 476 U.S. at 94). And because this step of the analysis requires only an "inference," the standard "is not onerous." *Paulino v. Castro*, 371 F.3d 1083, 1092 (9th Cir. 2004) (internal quotation marks and citation omitted); *Brown v. Alexander*, 543 F.3d 94, 103 (2d Cir. 2008) (same); *see also Johnson*, 545 U.S. at 170 (Court did not intend *Batson* prima facie standard to be onerous).

**Step One.** The Government argues that Runyon categorically cannot satisfy certain allegedly required elements of a prima facie case. It paraphrases the elements of a prima facie case as originally set out in *Batson*, but it fails to acknowledge that when the racial relationships differ from those in *Batson*, the elements must be modified to give effect to the Supreme Court's decision in *Powers*.[53] The

---

[53] The elements of a prima facie case, as described in the Government's response, are "(1) the defendant is a member of a distinct racial group; (2) the prosecutor has used the challenges to remove from the venire members of the defendant's race; and (3) other facts and circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in his or her selection of the jury

112

federal courts of appeals, including the Fourth Circuit, have recognized and promulgated such remedial modification in cases, like Runyon's, that are factually dissimilar to *Batson*. In *United States v. McMillon*, 14 F.3d 948 (4th Cir. 1994), for example, the court reformulated the elements of a prima facie case in a way that avoids a conflict with *Powers*:

> [A]s elaborated in *Powers v. Ohio*, 499 U.S. 400 (1991), the plaintiff first must make out a prima facie case of discrimination. This is a three-step process. First, the defendant must show that the prosecutor used one of his peremptory strikes to remove a member of a cognizable racial group from the venire. Second, the defendant can rely on the fact that peremptory challenges permit those who are of a mind to discriminate to do so. Finally, "the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96.

*McMillon*, 14 F.3d at 951-52. *See also Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1026 (4th Cir. 1998) (recognizing that in light of *Powers*, the movant establishes a prima facie case by showing that (1) opposing counsel used peremptory strikes to remove members of a cognizable racial group, and (2) the facts and any other relevant circumstances raise an inference that counsel used the strikes to remove venire members on account of their race).

Applying these reformulated elements, Runyon's §2255 motion already makes a prima facie case, or he is entitled at a minimum to evidentiary development and a hearing to do so:

First, Runyon has shown that the prosecutors used peremptory strikes to remove 70 percent of the qualified African-American prospective jurors. There is no question that African-Americans are members of a cognizable racial group.

Second, Runyon relies on the fact that peremptory challenges permit those of a mind to discriminate to do so.

---

pool." ECF 536, p.146. *Powers* rejected the first two of these elements, holding that the defendant does *not* need to be a member of a distinct racial group, and that the struck jurors do *not* need to be the same race as the defendant.

113

Third, as described below, additional facts and circumstances raise an inference of discriminatory purpose. Runyon's pending motion for discovery seeks categories of documents that were pivotal to the Court's decision in *Foster* and that may reveal more facts and circumstances relevant to Runyon's claim. But even before having the fruits of discovery, Runyon can identify relevant facts and circumstances.

One category of facts and circumstances that raises an inference of discrimination concerns the interrogation videotape exhibit that, at the time of voir dire, the prosecution intended to put into evidence (and did put into evidence). On its face, the videotape conveyed "stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act," and contained statements that were "capable of inflaming jurors' racial or ethnic prejudices." *Runyon*, 707 F.3d at 493-94. Although Runyon and the excluded jurors are of different races, they have in common the attribute of being members of a racial minority that has experienced discrimination. The prosecutors' knowledge that African-American jurors would see and hear this videotape, and the substantial likelihood that it would evoke memories of analogous statements that had been made to those jurors personally, or made historically to members of their race, raises a strong inference that the Government struck these African-American jurors on account of race. Simply put, prosecutors would not want African-Americans on the jury because they likely would be offended by the statements in the videotape or would sympathize with Runyon as a target of racial insults. As a result, those jurors would be less trusting of the Government's evidence, more skeptical of Runyon's guilt, and less likely to support a death sentence.

A second category of facts and circumstances that raises an inference of discrimination concerns the disproportionate size of the Government's strikes of African-Americans. There were 10 African-Americans in the pool of 52 qualified venire members; 100 percent of the strikes used against

114

**2775**

African-Americans were exercised by the Government; and the Government excluded 70 percent of the eligible African-American venire members through its use of peremptory strikes. Runyon again anticipates that he may be able to present additional relevant information after receiving discovery. But the raw figures are well within the "wide variety of evidence" that can contribute to an inference of discriminatory purpose. *Johnson*, 545 U.S. at 169; *see also Miller-El v. Cockrell (Miller-El I)*, 537 U.S. 322, 342 (2003) (statistical evidence alone raises debate when Government used peremptory strikes to exclude 91 percent of eligible African-American venire members and "[h]appenstance is unlikely to produce this disparity"); *Batson*, 476 U.S. at 97 (circumstances giving rise to inference of discrimination can include "a 'pattern' of strikes against black jurors included in the particular venire"); *id.* at 93 ("seriously disproportionate exclusion of Negroes from jury venires ... is itself such an unequal application of the law ... as to show intentional discrimination") (quoting *Washington v. Davis*, 426 U.S. 229, 241-42 (1976) (internal citation and quotation marks omitted)).

In Runyon's case, the numbers are acute. To determine whether happenstance was likely to produce such a disparity, "the relevant statistical question is whether the number of black jurors excluded by the prosecutor ... is statistically significantly larger than the number of black jurors that we expect would be excluded if the prosecutor exercised her peremptory challenges randomly." Jason Kreag, *Prosecutorial Analytics*, WASH. U.L. REV. (forthcoming 2017) (manuscript, at 35, online at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2764399 (last visited July 7, 2016)). The jury was chosen from a qualified venire consisting of 10 black members (19 percent of the venire) and 42 nonblack members (81 percent of the venire). If the prosecutors had used their peremptory strikes randomly, those strikes would have removed 3.6 black members (19 percent of their strikes) and 15.4 nonblack members (81 percent of their strikes). The statistical question is whether the 7 black members actually struck by the prosecutors is statistically significantly larger than the 3.6 black

115

**2776**

members that would be expected from the random exercise of peremptory strikes.

A generally recognized instrument for answering this statistical question is Fisher's exact test. *See, e.g.,* Kreag, *supra* (manuscript, at 20 n.211) (identifying Fisher's exact test as "one statistical test that can be used to answer this question"); MICHAEL O. FINKELSTEIN & BRUCE LEVIN, STATISTICS FOR LAWYERS 123-25; 154-56 (2001) (describing Fisher's exact test); Joseph L. Gastwirth, *Statistical Testing of Peremptory Challenge Data for Possible Discrimination: Application to Foster v. Chatman,* 69 VAND. L. REV. EN BANC 51 (Mar. 16, 2016) at 55 ("Fisher's exact test is an appropriate statistical method for analyzing the pattern of strikes in the context of a *Batson* challenge"). Employing this test, Runyon assessed the null hypothesis that there is no association between the race of the qualified venire members at his trial and the prosecutor's decision to strike members of a particular race—*i.e.,* the hypothesis that a potential juror's race and the prosecutor's decision to strike that juror were independent of each other. The test results show that at a statistically significant level ($p < .05$), the null hypothesis is disproved when the prosecution chooses to strike 7 of 10 African-Americans in a 52-member venire. In other words, there is less than a 3 percent probability that the prosecution's strikes of the black members were independent of the jurors' race. Exhibit 5.[54] This statistical confirmation adds significant weight to the inference that the prosecutors' strikes of African-American jurors were purposeful and were motivated in substantial part by race.

A third category of facts and circumstances that raises an inference of discriminatory purpose concerns the disproportionate distribution of potential jurors on one of the lists the parties submitted

---

[54] Exhibit 5 displays test results for each of the 11 possible permutations, ranging from the prosecutor striking 0 African-Americans in the 52-member venire to striking all 10 of the African-Americans. It shows that the probability of striking 7 of the 10 black members for reasons independent of race is 0.02595 (2.595 percent). By convention, a probability less than 0.05 (5 percent) is generally considered to be statistically significant. Runyon used the online Easy Fisher Exact Test Calculator at http://www.socscistatistics.com/tests/fisher/Default2.aspx to enter the data and perform the computations.

116

at the court's request before voir dire. ECF No. 235 (sealed). Of the 243 prospective jurors who completed juror questionnaires, 22.6 percent (55) were African-American and 72.0 percent (175) were white.[55] On List 1—the 129-member group from which all jurors and alternates were drawn—the proportion of African-Americans dropped by nearly a quarter to 17.1 percent (22) and the proportion of whites increased to 78.3 percent (101). On List 2—the 74 potential jurors who would not be called for voir dire—the proportion of African-Americans was 20.3 percent (15) and the proportion of whites was 77.0 percent (57). But on List 3—the 40 individuals on whom the parties could not agree— there was a wild swing: 45 percent (18) on that list were African-American and only 42.5 percent (17) were white. Although African-Americans comprised just over one-fifth of those who completed questionnaires, they outnumbered white potential jurors on List 3 in absolute numbers and percentages.

Runyon does not presently know which party thought particular African-Americans on List 3 belonged on List 1 and which party thought they belonged on List 2. Resolution of that question likely requires discovery and an evidentiary hearing. But race weighs heavy in the composition of List 2. That the government struck 70 percent of the African-American venire members during voir dire while Runyon struck none raises an inference that the government, rather than the defense, leaned toward putting disputed African-Americans on List 2 for summary dismissal. And that the defense leaned toward putting them on List 1, where they would be called for voir dire and potentially seated on the jury.

**Step Two.** The parties exercised their peremptory strikes on June 30, 2009, more than seven years ago, and it is doubtful that the prosecutors have a present recollection of the reasons for their

---

[55] The percentages here do not add up to 100 because Runyon has not included data for Asians, other, or unreported. Together, those three categories account for 5.4 percent of the total.

117

strikes of the African-American venire members. In cases where there has been a significant passage of time between the strikes and the explanation, some courts direct the Government not only to state a plausible reason for its strikes, but also to "(1) assert that specific, race-neutral reasons were the *actual* reasons for the challenged strikes, and (2) offer some evidence which, if credible, would support the conclusion that those reasons were the *actual* reasons for the strikes." *Shirley v. Yates*, 807 F.3d 1090, 1104 (9th Cir. 2015) (emphases in original). Such direction is based on the Supreme Court's caution that "The *Batson* framework is designed to produce actual answers [from a prosecutor] to suspicions and inferences that discrimination may have infected the jury selection process. . . . It does not matter that the prosecutor might have had good reasons; what matters is the real reason [prospective jurors] were stricken." *Johnson*, 545 U.S. at 172 (internal quotation marks and alterations omitted); *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004); *see also Williams v. Louisiana*, No. 14-9409, 2016 WL 3369515, at *1 (June 20, 2015) (statement of Ginsburg, J., concurring in decision to grant, vacate, and remand) (the court must demand actual answers from the prosecutor; the judge cannot supply possible reasons based on the record because "The judge is an arbiter not a participant in the judicial process"). Runyon suggests it would be appropriate to direct the Government to comply with these requirements. The Court also should grant Runyon's motion for discovery so he can examine whether, as in *Foster*, the requested records contain contrary evidence about the actual reasons for the peremptory strikes.

The Government responds to the §2255 motion by saying that it removed the seven African-American venire members based on their answers to Question 61 in the juror questionnaire, which concerned each member's views about the death penalty. It says it struck Jurors 31, 40, 46, 63, and 81 because they circled option D, indicating they generally oppose the death penalty; and it struck Jurors 15 and 116 because they circled option C *and* option D, indicating both that they generally favor and

118

**2779**

they generally oppose the death penalty.[56] ECF No. 536, p.148. The Government also reports that three of the African-American venire members, Jurors 15, 31, and 63, had served in the military or had relatives who presently or previously served in the military, although it does not assert that these military connections were a reason for any of its strikes. Because the Government identifies no reason for any of its challenged strikes other than the venire members' views of the death penalty, its defense of Runyon's charge "must stand or fall on the plausibility of the reasons [it] gives." *Miller-El v. Dretke (Miller-El II)*, 545 U.S. 231, 252 (2005); *U.S. v. Barnette*, 644 F.3d 192, 205 (4th Cir. 2011); *United States v. Taylor*, 636 F.3d 901, 905 (7th Cir. 2011).

If the reasons proffered in the Government's response are the actual reasons for its strikes of the seven African-American venire members, Runyon does not contest that those reasons would be race-neutral and satisfy the Government's burden at the second step of the *Batson* analysis.

**Step Three.** Because the Government's response states a reason for the strikes, it becomes Runyon's turn to show that the reason is pretextual. Runyon anticipates that his pending discovery motion will lead to additional facts showing that the Government's reason for the strikes of African-American jurors is a pretext. "[A] prosecutor's or a prosecutorial office's history of peremptory strikes are relevant at *Batson*'s step three" because that history can show a pattern of discriminatory or near-discriminatory conduct. Kreag (manuscript, at 36); *see also id.* (manuscript, at 37) ("prior *Batson* close calls" can help identify purposeful discrimination). The "culture of the [prosecutors'] office" also is a factor that courts can take into consideration at this step. *Miller-El I*, 537 U.S. 347. In Runyon's pending first motion for discovery, he has requested those kinds of historical records.

But even without having yet received any discovery, there is strong evidence that the

---

[56] Runyon refers to this as an expression of neutrality about the death penalty because options C and D straddle the center line. Question 61 included no other mechanism for venire members to indicate that they had a neutral position on the death penalty.

Government's response at Step Two is pretextual. At Step Three, the defendant is not required to show that the Government's reasons for a strike were exclusively discriminatory in order to demonstrate pretext. *Snyder*, 552 U.S. at 485. It is enough if the defendant demonstrates that the prosecution's strikes were "motivated in substantial part by race." *Foster*, 136 S.Ct. at 1755.

The first reason why the Government's explanation is pretextual is that a side-by-side comparative analysis shows its strikes were based on race. Comparative analysis is commonly used to expose pretext.[57] *See, e.g., Snyder*, 552 U.S. at 483-84; *Miller-El II*. In Runyon's case, a comparative analysis casts significant—if not dispositive—doubt on the prosecutor's claim that its strikes were nondiscriminatory. "'If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination.'" to be considered at *Batson*'s third step. *Foster*, 136 S.Ct. at 1754 (quoting *Miller-El II*, 545 U.S. at 241). In this context, the term "permitted to serve" means the panelist has not been excused for cause and the prosecutor has chosen not to peremptorily strike him. *See, e.g., Miller-El II*, 545 U.S. at 247-48 (comparing voir dire answer of Joe Warren, a qualified African-American who was struck by the prosecution, with answer of similarly situated white panelist Kevin Duke, who was seated on the jury, and also with answers of similarly situated white panelists Sandra Jenkins and

---

[57] This analysis typically involves comparing the oral voir dire answers given by black members with the answers to the same question given by nonblack members. It also may involve distinguishing the oral voir dire questions a party presents to black venire members from the questions that party presents on the same point to nonblack members. The voir dire in Runyon's case was too limited for such comparisons. The struck African-American members either did not answer any questions except by sitting silently (Jurors 31, 46, and 63); or answered to indicate prior jury service in a civil case (Jurors 15, 40, and 81); or answered to say they knew another member of the venire (Jurors 15 and 116). There can be no examination of disparate questioning because the Court asked all of the voir dire questions itself. Runyon is able to present strong evidence of pretext based on answers in the juror questionnaire, but he notes that the kind of limited voir dire used in this case makes it substantially easier for a party with a mind to discriminate to do so in his peremptory strikes without leaving the kind of telltale signs on which reviewing courts ordinarily must rely to expose unconstitutional strikes.

120

Leta Girard, who were accepted by the prosecution but struck by the defense).

In Runyon's case, there were two similarly situated nonblack venire members that the Government permitted to serve. One was Juror 2, who is white and was seated as a juror. The other was Juror 54, who is Asian and was permitted to serve because he was qualified and was not struck by either party, although the Government had an unused strike available that it could have used to remove him. After selection of the jury, Juror 54 was carried over to the next day for inclusion in the pool from which alternate jurors were selected. On that day he again was neither selected nor struck.

Juror 2 and Juror 54 were similarly situated because they each circled option D on Question 61 of the questionnaire, indicating that they generally oppose the death penalty. That is the option the Government identified as its criterion for exercising peremptory strikes. It is the same option circled by five of the excluded black jurors, and it is *more* anti-death-penalty than the position taken by the remaining two black jurors who were struck, who both circled options C and D.

A second reason why the Government's reason is pretextual is that it is inconsistent with the answers the excluded African-American members gave to Questions 55 and 56 on the juror questionnaire.[58] Inconsistencies are recognized hallmarks of pretext. *See, e.g., Foster*, 136 S.Ct. at 1748-49 (citing inconsistency between prosecution's arguments in *Batson* proceedings and documents in prosecution's files); *Snyder*, 552 U.S. 482-83. Question 55 asks the potential juror whether he supports, opposes, or neither supports nor opposes the death penalty. Question 56 asks how strongly he holds that view—very strongly, moderately, or not strongly at all.

Only one of the excluded African-American members gave an answer on Questions 55 and 56 that was consistent with the Government's position. That person—Juror 46—circled option D on

---

[58] The Court can consider the answers to Questions 55 and 56 on the questionnaire because they address the very same subject as Question 61 and do not expand the inquiry beyond the Government's stated reason for striking the African-American jurors.

121

Question 61, and also marked that she is very strongly opposed to the death penalty on Questions 55 and 56.

By contrast, Juror 40 circled option D on Question 61, but indicated on Questions 55 and 56 that she moderately *supports* the death penalty. This is inconsistent with the Government's position that it struck Juror 40 because of opposition to the death penalty. Two other excluded African-American members (Jurors 15 and 116) circled option C and option D on Question 61, thus indicating neutrality, and indicated on Question 55 that they neither support nor oppose the death penalty. Their unvarying assertions of neutrality are inconsistent with the Government's position that it struck these members because of their position on the death penalty.

Juror 2 and Juror 54, who are nonblack and were not struck by any party, circled option D and marked on Questions 55 and 56 that they neither support nor oppose the death penalty. Thus nonblack Jurors 2 and 54 stated positions that were the same as or *more* anti-death-penalty than the positions of struck Jurors 15, 40 and 116.[59]

The inconsistencies shown above support the proposition that the prosecutors' stated reason for the strikes of African-American members is pretextual, and that these strikes were motivated in substantial part by race.

### 2. The Prosecution Unlawfully Struck Jurors Based on Their Gender.

The Government also argues that it did not exercise strikes discriminatorily based on gender under *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). Courts use the same three-step analysis as for a *Batson* claim, but the criteria for establishing a prima facie case are not necessarily identical:

We look at all relevant circumstances when determining whether the requisite prima

---

[59] Black Jurors 31, 63, and 81, who were struck, gave answers that were the same as those of nonblack Jurors 2 and 54, who were not struck. They all circled option D on Question 61, and they all indicated on Question 55 that they neither supported nor opposed the death penalty.

122

facie showing has been made. *Batson*, 476 U.S. at 96. For example, a pattern of strikes against members of a particular gender may give rise to an inference of discrimination, and similarly so may a disproportionate number of peremptory challenges exercised to exclude members of a particular group. *Harris v. Hardy*, 680 F.3d 942, 949-50 (7th Cir. 2012). So too may a prosecutor's comments and statements. *See Batson*, 476 U.S. at 97. The test is not rigorous. *[U.S. v.] McMath*, 559 F.3d [657,] 664 [(7th Cir. 2009)].

*U.S. v. Johnson*, 756 F.3d 532, 536-37 (7th Cir. 2014) (internal citations omitted).

**Step One.** Runyon's §2255 motion shows that the Government peremptorily struck more than twice as many women as men—13 versus 6. Although the Government suggests that Runyon "patently" cannot make a prima facie case because he is a different gender than the venire members who were struck, *Powers* forecloses that argument. All defendants have standing to object to strikes that are based on gender. *See, e.g., United States v. Martinez*, 621 F.3d 101 (2d Cir. 2010) (constitution bars male defendant from striking male jurors on account of their gender); *United States v. DeGross*, 960 F.2d 1433 (9th Cir. 1992) (en banc) (constitution bars female defendant from striking male juror based on his gender). Runyon's §2255 motion already makes a prima facie case, or he is entitled at a minimum to evidentiary development and a hearing to do so.

First, Runyon has shown that the prosecution used just over two-thirds—68 percent—of its expended strikes to remove female venire members, and it struck more than twice as many women as men. Second, Runyon relies on the fact that peremptory challenges permit those of a mind to discriminate to do so. Third, as described below, additional facts and circumstances raise an inference of discriminatory purpose.

Although these numbers are relevant for making a prima facie case, Runyon acknowledges that they do not disprove the null hypothesis of gender independence at a statistically significant level. Fisher's exact test indicates a probability of 0.24683 (24.683 percent) that the prosecutors' strikes of qualified female venire members at Runyon's trial were independent of the members' gender. To be statistically significant, the probability must be less than 0.05 (5 percent). But Runyon's pending

123

**2784**

motion for discovery seeks documents that may reveal more facts and circumstances that are relevant to the prosecutors' strikes of female jurors.

Even without the benefit of discovery, Runyon can identify a reason why the Government would prefer male jurors and want to exclude female jurors. As the prosecution intended to present this case to the jury (and did present it to the jury), the prime mover and most culpable participant in the plot to kill Cory Voss was his wife, Cat—a co-defendant who escaped a death sentence by pleading guilty prior to Runyon's trial. To obtain a verdict of death for Runyon, the Government knew it had to persuade jurors that Cat's moral culpability was not greater than Runyon's. Jurors of both genders could be expected to assign the same moral weight to Cat's greed, her lies, and her active participation in the crime. But they likely would give differing moral weights to evidence of the depraved and promiscuous lifestyle that Cat lived when Cory was at sea. Male jurors were more likely to view this aspect of Cat's conduct as somewhat titillating and give it diminished weight; female jurors were likely to be less forgiving and to view it as contributing to greater moral culpability. In particular, Cat's practice of leaving her children with near-strangers or drugging them with cold medicine so that she could party at bars and with men (and other women) would more likely be viewed by females as contributing to greater moral culpability. Thus, excluding women from the jury would advance the Government's goal of achieving a death sentence for Runyon.

**Step Two.** With respect to the second step of a *J.E.B./Batson* analysis, the Government says that it struck nine females (Jurors 7, 28, 31, 40, 46, 52, 63, 97, and 81) because they circled option D on Question 61, indicating that they generally oppose the death penalty; and it struck four females (Jurors 15, 18, 73, and 116) because they circled both option C and option D, indicating neutrality. The Government also reports that six of these females (Jurors 7, 15, 18, 31, 52, and 63) served in the military or had relatives who presently or previously served in the military, although it again does not

124

**2785**

identify that as a reasons for its own strikes.[60] In all other respects the Government's statements at Step Two regarding the strikes of African-American jurors apply to its strikes of female jurors. The Government has identified no reason for any strikes of females other than their views on the death penalty.

If the reasons proffered in the Government's response are the actual reasons for its strikes of the 13 female venire members, *see supra*, Runyon does not contest that those reasons would be gender-neutral and satisfy the Government's burden at Step Two.

**Step Three.** For the third step of the *J.E.B./Batson* analysis, Runyon again anticipates that his pending discovery motion will lead to additional relevant facts showing that the Government's reason for the strikes is pretextual. But even without the fruits of discovery, the same side-by-side comparative analysis discussed above with respect to African-Americans indicates pretext and casts significant doubt on the Government's stated reason for striking females. Specifically, there were similarly situated males that the prosecution did not strike. Juror 2 and Juror 54, who both are male, circled option D on Question 61, indicating that they generally oppose the death penalty. That is the same option circled by nine of the excluded female jurors, who also circled option D, and it is *more* anti-death-penalty than the position circled by the other four female jurors who were struck, who circled option C and option D. Male Jurors 2 and 54 were both permitted to serve.

The pretextual nature of the Government's reason is again corroborated by the inconsistencies that exist between the Government's position and the venire members' answers to questions about the death penalty. Only one excluded female member gave an answer on Questions 55 and 56 that was consistent with the Government's position. That person—Juror 46—circled option D on

---

[60] The Government has undercounted. Female Jurors 28 and 97 also indicated family members who had been in the military.

125

Question 61, and also marked on Questions 55 and 56 that she is very strongly opposed to the death penalty.

But other female jurors gave contrary answers. Juror 40 circled option D on Question 61 but indicated on Questions 55 and 56 that she moderately *supports* the death penalty. Juror 73 circled option C and option D on Question 61, but marked on Questions 55 and 56 that she *very strongly supports* the death penalty. These answers are inconsistent with the Government's position that it struck those jurors because of their views on the death penalty. Three additional female members (Jurors 15, 18, and 116) circled option C and option D on Question 61, thus indicating neutrality, and indicated on Question 55 that they neither support nor oppose the death penalty. Their unvarying assertions of neutrality are inconsistent with the Government's position that it struck these members because of their position on the death penalty.

By comparison, Juror 2 and Juror 54, who are both male and were not struck, circled option D on Question 61 and marked on Questions 55 and 56 that they neither support nor oppose the death penalty—Juror 54 holding that view at a moderate strength, and Juror 2 holding that view "not very strongly." The positions of male Jurors 2 and 54 are *more* anti-death-penalty in one or more respects than those of female Jurors 15, 18, 40, 73, and 116.

In sum, Runyon has made a strong showing that the Government purposefully discriminated in its exercise of peremptory strikes based on race and based upon gender, and thus violated Runyon's rights under the Equal Protection Clause. He is entitled, at the least, to further evidentiary development and a hearing.

### C. Trial Counsel Unreasonably Failed To Object To The Prosecution's Discriminatory Exercise Of Peremptory Strikes.

In response to Runyon's *Strickland* claims, the Government presents two categories of arguments. The first is that the prosecutors did not discriminate based on race or gender, and

126

**2787**

consequently it would have been futile for defense counsel to object. This is reminiscent of the Government's argument on direct appeal, which the Fourth Circuit found unpersuasive. The Government's dismissive position there was that the references to Runyon's race and religion in the videotape exhibit were not problematic because they "'appealed not to negative aspects of Runyon's character, but to positive aspects of his identity.'" *Runyon*, 707 F.3d at 494 (quoting Appellee's Br. 33). The prosecutors' current argument, like their prior argument on appeal, reflects their understandable—but untenable—desire to avoid acknowledging their racial animus. But for the reasons Runyon has explained above, the evidence shows that the prosecutors *did* discriminate purposefully in exercising their peremptory strikes and *did* violate the Equal Protection Clause. Runyon briefly highlights those arguments in the context of *Strickland*:

1. The Government argues that trial counsel could not have made a prima facie case because Runyon is white and male, and the struck jurors are not members of his race or gender. Competent trial counsel would have been familiar with the applicable law, would have identified the proper post-*Powers* formulation of the elements of a prima facie case, and would have made a prima facie showing of purposeful discrimination by the prosecution in this case.

2. The Government argues that raw data alone would have been insufficient to show discrimination. Competent counsel would have been familiar with Supreme Court decisions stating that disproportionate strikes can be sufficient to raise an inference of intentional discrimination if— as Runyon has established at least with respect to racial discrimination—happenstance is unlikely to produce that disparity. Competent counsel also would have shown that Runyon's Equal Protection claim is supported by more than just raw data.

3. At the time of voir dire, defense counsel knew the Government would put into evidence a videotape that could be racially inflammatory and contained insulting notions about Asian

men. *Runyon*, 707 F.3d at 493-94. Competent counsel would have recognized that the prosecution would not want African-Americans on the jury because black jurors could be offended by the statements in this videotape or could sympathize with Runyon as the target of racial insults. Objecting to the Government's exclusion of 70 percent of the qualified African-American venire members would have been consistent with the Equal Protection Clause and with the standards of professional performance.

4.      At the time of voir dire, defense counsel knew that Runyon's prospects of getting a life sentence would be enhanced if jurors viewed Runyon as less morally culpable than Cat Voss. Cat's practice of leaving her children with near-strangers or drugging them with cold medicine so that she could party at bars would more likely be viewed by females as evidence of Cat's enhanced moral culpability, and thus be beneficial to Runyon in a side-by-side comparison. Objecting to the Government's discriminatory exclusion of so many female venire members would have been consistent with the constitution and with the standards of professional performance.

5.      The Government now says it based its peremptory strikes on each potential juror's views about the death penalty, as expressed in Question 61 of the juror questionnaire, and asserts that this reason was race-neutral and gender-neutral. If the Government had made the same argument at trial, competent counsel would have shown that the Government did not strike similarly situated non-black jurors or similarly situated male jurors that gave the same answers. Counsel also would have shown that the Government's reason is inconsistent with the potential jurors' answers to Questions 55 and 56 on the juror questionnaire. Competent counsel would have demonstrated that the Government's reason for these peremptory strikes was pretextual. Doing so would have been in Runyon's interest and consistent with the standards of professional performance.

The Government's second category of arguments in opposition to the *Strickland* claim

128

**2789**

concerns the personal or family military connections of the struck jurors. The Government argues that even if its own strikes may have been motivated by the venire member's race or gender, it was reasonable for defense counsel to refrain from making a *Batson* objection. It points out that three of the peremptorily struck African-Americans had been in the military or had family members who presently or previously were in the military (Jurors 15, 31, and 63), and it says that six of the peremptorily struck females had served in the military or had family connections to the military (Jurors 7, 15, 18, 31, 52, and 63).[61] The Government then imagines that "Presumably, Runyon would not want people serving on the jury who may have sympathy for the victim Cory Voss, a Naval Officer." ECF No. 497, p.131.

Even if the Government's hypothesis was true, it would not excuse counsel's failure to object to the Government's discriminatory strikes of the four African-American venire members or the five female venire members who did not have military connections. But in truth the premise of the Government's hypothesis is false:

1.     Runyon himself has both a personal and family military background, and defense counsel expected this to be a significant factor for the case in mitigation. *See, e.g.,* ECF No. 291, p.4 (all 12 jurors finding, as mitigating factors, that Runyon "served his country as a member of the United States Army and was honorably discharged," and that he "earned an associate of arts degree from Wentworth Military Academy"). Counsel knew that Runyon's mitigation case would be helped by having jurors who understood and valued his military service. They had no reason to acquiesce in the peremptory exclusion of such jurors.

2.     Defense counsel's own pattern of strikes shows that the Government's speculation is

---

[61] Actually, there were eight, not six, peremptorily female venire with personal or family military connections. The Government appears to have omitted Jurors 28 and 98.

129

**2790**

erroneous, and that the defense did not fear making a *Batson* challenge with respect to potential jurors with military connections. The military has a large presence in the Norfolk Division, and by undersigned counsel's rough count, nearly half of the 52 qualified prospective jurors or their family members had present or past military connections.[62] Yet the defense used less than half (9 of 20) of its strikes to remove members with military backgrounds (Jurors 4, 32, 50, 51, 65, 74, 84, 118, and 119). If the defense had been concerned about seating jurors with military connections, it undoubtedly would have used more of its strikes to remove them—including removing the four people with military backgrounds who ultimately sat on the jury (Jurors 2, 23, 84, and 124). In truth, it is the Government that used nearly two-thirds of its expended strikes (12 of 19) to remove jurors who— under its own hypothesis—would have had sympathy for Cory Voss because of their own military connections (Jurors 7, 15, 18, 28, 31, 35, 52, 66, 91, 97, and 100).

In sum, Runyon believes that discovery and investigation will reveal additional facts that are relevant to the prosecution's strikes and to his *Strickland* claims. But even based on the facts above, counsel's failure to challenge the strikes of African-Americans and/or of females in this case was unreasonable and fell below the prevailing norms of professional performance. Runyon is entitled, at a minimum, to discovery and an evidentiary hearing on his *Strickland* claim.

Runyon's amended §2255 motion establishes that a *Batson* violation is a structural error. ECF No. 511, pp.125-26. It further establishes that "the prejudice component of the *Strickland* analysis may be presumed" if the "nature of the deficient performance is that of a structural error." *Id.*, p.140 (citing *Bell v. Jarvis*, 236 F.3d 149, 165, 180 (4th Cir. 2000) (en banc)). The Government does not dispute

---

[62] Undersigned counsel counts 24 qualified venire members who listed personal or family military backgrounds on their juror questionnaire: Jurors 2, 4, 7, 15, 18, 23, 28, 31, 32, 35, 50, 51, 52, 65, 66, 74, 84, 86, 91, 97, 100, 118, 119, and 124. Because the questionnaire answers were sometimes imprecise, the count may be off by a small fraction. This list does not include venire members who described working for the military in a civilian capacity.

130

**2791**

either of these principles. Although *Bell* is controlling, Runyon calls to the Court's attention that *Bell* is consistent with other courts of appeals. *See, e.g., Johnson v. Sherry*, 586 F.3d 439, 446-47 (6th Cir. 2009), *Styers v. Schriro*, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008), *Owens v. United States*, 483 F.3d 48, 64-66 (1st Cir. 2007); *McGurk v. Stenberg*, 163 F.3d 470, 473-74 (8th Cir. 1998). Runyon has shown, or with further development and a hearing will be able to show, that he is entitled to relief on his *Batson* claims and associated *Strickland* claim.

**Claim 17:    The Voir Dire Conducted In This Case Violated Runyon's Fifth And Sixth Amendment Rights To A Fair Trial And Impartial Jury, And Counsel Rendered Ineffective Assistance.**

### A. The Voir Dire Was Constitutionally Inadequate.

Even if *Teague* applies to §2255 motions, which Runyon disputes, *see* Affirmative Defenses, *supra*, the Government's argument that this claim is barred by *Teague* is frivolous. The right to adequate voir dire generally, and regarding the death penalty specifically, is not a new rule. It was firmly established more than two decades before Runyon's conviction became final:

> [P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors. *Dennis v. United States*, 339 U.S. 162, 171-172 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950). "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion).

*Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992); *see also Turner v. Murray*, 476 U.S. 28, 35-36 (1986) (recognizing constitutional right to adequate voir dire on racial bias where state charged interracial crime as capital offense, even though circumstances would not mandate same voir dire in noncapital case). To the extent Runyon's claim is defaulted, the default is excused by the deficient performance of trial counsel (Claim 17B) or appellate counsel (Claim 8).

131

Voir dire is inadequate if, under the circumstances, it does not provide the parties and court the opportunity and ability to identify unqualified jurors. The circumstances causing disqualification can include the nature of the charges, the extent of pretrial publicity, the jurors' moral or religious beliefs, or any other circumstance where a potential juror—even when well-meaning—might harbor bias. When voir dire is minimal, this raises a red flag and calls for close examination to ensure that all essential issues have been adequately addressed. The voir dire in Runyon's case, which proceeded from "Good morning" to the seating of a purportedly death-qualified jury in just one day, was minimal in multiple ways: it was conducted in an exceedingly truncated time span for a capital case,[63] it posed limited questions, and it largely accepted cursory or silent responses rather than eliciting or probing individualized views.

In *Morgan*, the Court found voir dire about the death penalty to be inadequate even though the trial court posed multiple questions and every impaneled juror was questioned individually and stated that he could be fair and impartial. Illinois said this was sufficient, but the Supreme Court disagreed. "*Witherspoon* and its succeeding cases would be in large measure superfluous were this Court

---

[63] The Westlaw database contains seven opinions or statements where the Supreme Court reported the length of voir dire in a capital case. Runyon has omitted none: *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) ("Eleven days of the *voir dire* were devoted to determining whether the potential jurors were death qualified."); *Miller-El v. Dretke*, 545 U.S. 231, 275 (2005) ("Jury selection in Miller-El's trial took place over five weeks…."); *Penry v. Johnson*, 532 U.S. 782, 801 (2001) ("*Voir dire* was a month-long process…."); *Johnson v. Texas*, 509 U.S. 350, 357 (1993) ("more than 90 prospective jurors were questioned over the course of 15 days"); *Swindler v. Lockhart*, 495 U.S. 911, 913 (1990) ("[d]uring the five days of *voir dire*") (statement dissenting from denial of certiorari); *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 503 (1984) ("the voir dire [in the capital trial the press wanted to attend] consumed six weeks"); *Irvin v. Dowd*, 366 U.S. 717, 720 (1961) ("[d]uring the course of the voir dire examination, which lasted some four weeks"). The magnitude of difference between these cases, most of which took two to six weeks to seat a qualified capital jury, and Runyon's case, which seated a purportedly qualified jury in one day, should give the Court pause.

132

**2793**

convinced that such general inquiries could detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." *Id.* at 734-35.

The Government's response talks about the importance of voir dire and the Court's discretion to conduct all of the questioning, but it does not engage the specific voir dire questions (or their absence) in this case that relate to the death penalty. Those questions speak for themselves. Their required purpose was to identify potential jurors who were unqualified. As noted in the amended §2255 motion, the Court presented seven questions about the death penalty. Four of them asked only whether the jurors comprehended a principle of law:

> Tr.123, 6/30/09: If your answer is "no" to the following question, please stand. Do you understand that the law never requires that a person be sentenced to death? (No response.)

> Tr.123, 6/30/09: Again if your answer is "no" to any of the following questions, please stand. Do you understand that the law never requires a person to be sentenced to death, even if they have been convicted of being the triggerman in a murder for hire case? (No response.)

> Tr.123-24, 6/30/09: Do you understand that the law never requires a person to be sentenced to death even if someone who murders a person by shooting him in the course of carjacking is so convicted? (No response.)

> Tr.124, 6/30/09: Do you understand that the law never requires that a person be sentenced to death even if the person is convicted of murdering a person by shooting him in the course of bank robbery? (No response.)

These questions did nothing to expose unqualified jurors. They were even less probative than the inadequate follow-the-law questions posed in *Morgan*. These questions called abstract principles of law to the prospective jurors' attention, but they did not ask each juror whether, based on her own views about imposition of the death penalty, she would be able and willing to comply with that law if put to the test. The questions certainly were not phrased to expose jurors who would automatically vote for the death penalty—an inquiry that is mandatory on request in a capital case. *Morgan,* 504 US 719, 729.

133

**2794**

The Government says Runyon's criticism of these questions places form over substance, but that is effectively the argument Illinois unsuccessfully made in *Morgan*. The questions the Court asked in Runyon's case differed in substance, not merely in form, from those that *Morgan* mandates. There is no evidence that attentive lay jurors would have discerned and answered the questions the trial court was required to ask rather than the ones it did ask. And we should be grateful for that, because jury selection would devolve into chaos if potential jurors were free to decide willy-nilly that the Court really must have meant to ask a different question, and they answered the imagined question rather than the question the Court actually posed.

Other than these four do-you-understand-the-law questions, the Court asked only three other questions related to death qualification.[64] The first, viewed most generously, asked jurors if they could refrain from making a sentencing decision until they had heard the penalty phase evidence:

> Tr.59, 6/30/09: Is there anyone who doesn't understand that, as I indicated, if it is appropriate, in a second stage it would be your duty to listen to further evidence and consider the court's instructions and make a determination whether or not to vote for the death penalty? Do any of you feel you cannot do that? If so, please stand.

The other two questions were intended to detect jurors with views preventing or substantially impairing their duties:

> Tr.124, 6/30/09: Please stand if your answer is "yes" to the following question. Do you have personal or moral opinions regarding the imposition of the death penalty that would substantially impair your ability to weigh the aggravating and mitigating factors and follow the court's instructions regarding the death penalty?

> Tr.124, 6/30/09: Again, please stand if your answer is "yes" to the following question. Would your personal or moral views about the death penalty prevent or substantially impair the performance of your duties as juror in accordance with your instructions given to you by the court and your juror's oath? Stand if your answer is "yes."

---

[64] Although this reply focuses on voir dire concerning capital punishment questions, Runyon does not concede that voir dire was adequate on any other issues.

134

2795

These questions were important, but they were inadequate to carry the entire weight of revealing whether some of the prospective jurors were unqualified to decide on the appropriate sentence. First, these last two questions asked jurors to judge their own impartiality—a task that few people are capable of performing with objectivity, as the Supreme Court observed in *Morgan*, 504 U.S. at 735 n.9; *see also* Christopher Robertson, David Yokum & Matt Palmer, *Can Jurors Self-Diagnose Bias? Two Randomized Controlled Trials*, ARIZONA LEGAL STUDIES DISCUSSION PAPER NO. 12-35 (accepted for 7th Annual Conference on Empirical Legal Studies, draft Feb. 14, 2013) (online at http://www.mslitigationreview.com/files/2013/05/Can-Jurors-self-diagnose-bias-2.pdf)).    Noting the unreliability of such self-diagnoses, *Morgan* appears to contemplate that the court itself should be the judge of each juror's impartiality after hearing the juror's explication of his personal or moral views about the death penalty and about mitigation evidence. Second, the Court needed to ask proper reverse-*Witherspoon* questions, which counsel requested, Tr.116, 6/30/09, and which *Morgan* thus required the court to pose, 504 U.S. at 736: "Do you believe the death penalty should always be imposed if a defendant is found guilty of murder?" "Of being the triggerman in a murder-for-hire?" "Of committing murder in the course of carjacking?" "Of committing murder in the course of bank robbery?" Each of these unasked questions was designed to expose prospective jurors who were disqualified.

Runyon also claims that in the totality of circumstances, voir dire is inadequate when 40 percent of the purportedly qualified jurors—21 out of 52—were able to remain silent and effectively unnoticed during the questioning. All that anyone learned at voir dire about these nonspeaking venire members is that they knew how to sit impassively and say nothing. As noted in the §2255 motion, a potential juror's failure to stand might mean her answer to a question was no; it also might mean she was avoiding the question because a truthful answer would be embarrassing or painful, or because she

135

was trying to increase (or decrease) the likelihood of being seated in this case. When venire members are called upon individually, however, they are compelled to respond in an affirmative way. If they engage in subterfuge or evasion, the court (and counsel) can observe and assess their inflection, sincerity, demeanor, candor, body language, and understanding. As the Supreme Court observed in *Reynolds v. U.S.*, 98 U.S. 145, 156-57 (1878), "[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words."

The Government argues that Runyon has not proffered evidence suggesting that a qualified juror concealed a bias. No proffer is required. The defendant's death sentence in *Morgan* was vacated without any such evidence. *Morgan* shows that when voir dire is inadequate to reveal *whether* a juror may be unqualified, that alone is enough to necessitate reversal. *Morgan*, 504 U.S. at 739. Even if more was required, there are two interrelated reasons why Runyon has not identified a venire member who concealed his disqualification. First, because essential questions were not asked (or were answered by silence), the record does not contain responsive statements that Runyon can mine for evidence of bias—or lack of bias. Second, Runyon cannot further investigate any concealed basis for disqualification without communicating with members of the venire, which the Court has repeatedly ordered him not to do.

The Government's response to Runyon's claim also contains a series of misdirected arguments. First, it asserts that Runyon has failed to demonstrate either prong of an allegation of juror dishonesty under *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984). ECF No. 536, pp.151, 153-54. But Runyon's amended §2255 motion does not presently include a claim under *McDonough*. His claim is one of inadequate voir dire, which is a different legal issue with a different legal standard.[65]

---

[65] The Government apparently interprets Runyon's references to Juror 124's silence (ECF No. 511, pp.135-36) as being a *McDonough* allegation that Juror 124 was disqualified. Those references do not constitute a claim. They show that Runyon was not being fanciful or hypothetical when he said

136

Second, the Government argues there was no error because trial courts have discretion to question potential jurors and to conduct that questioning collectively rather than individually. ECF No. 536, pp.150-51. Runyon has not alleged that the Court lacked such authority, and in different circumstances court-conducted collective voir dire might be unobjectionable. Runyon's amended §2255 motion simply alleges that the voir dire *in this capital case* was inadequate, and that constitutional violations *in this capital case* are attributable to, or were exacerbated by, the Court's manner of conducting voir dire. Whether this is called legal error or abuse of discretion, *Morgan* mandates reversal because the voir dire *in this capital case* did not provide the protections guaranteed by the Fifth and Sixth Amendments.

Third, the Government argues that voir dire about the death penalty was adequate because the court had already informed potential jurors that they would be instructed on the law and would be required to follow that law. ECF No. 536, pp.154-55. But instructions and judicial exhortations are not acceptable substitutes for adequate voir dire because they do not identify "prospective jurors who will not be able impartially to follow the court's instructions." *Rosales-Lopez*, 451 U.S. at 188.

Fourth, citing two Fourth Circuit decisions in noncapital cases that were decided before *Morgan*, the Government argues that voir dire is not per se inadequate just because it is completed in one day. ECF No. 536, p.152. Runyon agrees that impartial juries can be seated in one day or less in many noncapital cases, although some cases will require multiple days of voir dire. But even if adequate voir dire could be completed in one day in a *capital* case, which Runyon doubts and which experience does not bear out, *see supra* note 63, his §2255 motion alleges that the voir dire *in this capital case* was not adequate to impanel an impartial jury because the Court did not ask necessary questions.

---

the Court's method of voir dire made it easy for potential jurors to remain silent rather than being forthcoming with their answers.

137

## B. Counsel Rendered Ineffective Assistance Regarding Voir Dire.

Runyon alleges in his §2255 motion and above that the Court bears responsibility for the constitutional inadequacy of the voir dire because it conducted all of the questioning itself. It made the ultimate decisions on which questions to ask (or not ask) and how to ask them. In the alternative, Runyon alleges that defense counsel rendered ineffective assistance in failing to object to the constitutionally inadequate voir dire. He also asserts that if his claim of error by the Court is defaulted, the deficient performance of trial or appellate counsel is cause for the default.

### 1. Trial Counsel

Runyon's motion alleges four respects in which trial counsel's conduct regarding voir dire fell below the norm of professional performance. ECF No. 511, p.138. In response, the Government asserts only that counsel's performance was not deficient in these respects because they filed *other* motions and made *other* objections concerning jury selection. But the Supreme Court "ha[s] never held that counsel's effort to present *some* [challenges to voir dire] should foreclose" a claim that counsel were ineffective in failing to present others. *Sears v. Upton*, 561 U.S. 945, 955 (2010). In Runyon's case, trial counsel's filing of other motions and objections is evidence that they recognized the supervening importance of voir dire and the imperative of properly qualified jurors in a capital case. This is consistent with the conventional wisdom of experienced trial lawyers "that most trials are won or lost in jury selection ... [and] in many capital cases, jury selection is literally a matter of life or death." John H. Blume, Sheri Lynn Johnson & A. Brian Threlkeld, *Probing "Life Qualification" Through Expanded Voir Dire*, 29 HOFSTRA L. REV. 1209-11 nn.1&2 (2001) (collecting treatises and journal articles about lawyers' views of voir dire in capital cases); *see also* ABA Guidelines, Guideline 10.10.2 and Commentary, *reprinted in* 31 Hofstra L. Rev. at 1049, 1051.

*Morgan* contains a clear statement of the law regarding voir dire that concerns the death penalty, and defense counsel failed to protect Runyon's Fifth and Sixth Amendment rights under *Morgan*. When the trial court purported to grant Runyon's motions but failed to follow through—such as by posing do-you-understand-the-law questions rather than accurate reverse-*Witherspoon* questions— defense counsel had a duty to object and demand the inquiry that *Morgan* required. They did not.

As to prejudice, the Government makes conclusory assertions that the voir dire was not constitutionally infirm in the first instance. It implicitly concedes that Runyon was prejudiced if voir dire was not adequate. Even without such a concession, Runyon would be entitled to relief under *Morgan*, because inadequate voir dire requires vacating a death sentence without showing that a biased juror was seated. Because *Morgan* treats the failure to ask certain voir dire questions as structural error—requiring vacation of the sentence without any showing that a biased juror was seated—the prejudice prong of the ineffective assistance claim may be presumed. *Bell v. Jarvis*, 236 F.3d at 165, 180.[66]

### 2. Appellate Counsel

Regardless whether the inadequacy of voir dire was preserved at trial, appellate counsel rendered ineffective assistance in failing to raise it on direct appeal, as alleged in Claim 8. Even under a plain error standard, it was a winning claim: (1) trial counsel requested reverse-*Witherspoon* questions;

---

[66] Although *Strickland* prejudice does not apply to a *Morgan* claim, Runyon notes the Government's response again misstates the *Strickland* test of prejudice. Runyon need not show that there would have been a different outcome or that he would have prevailed on direct appeal if voir dire had been adequate. He does not even have to establish by a preponderance of the evidence that the result would have been different. *Williams*, 529 U.S. at 405-06. Runyon need only demonstrate "a reasonable probability that ... the result of the proceeding would have been different." *Id.* at 406 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Such a determination may require further factual development and an evidentiary hearing. *See Blackledge*, 431 U.S. at 80-81; *Townsend*, 372 U.S. at 313.

139

(2) the Court was mandated by *Morgan* to ask those questions; (3) the Court didn't. Even without considering the additional ways in which voir dire was inadequate, this would have mandated reversal without any showing that a juror was biased. On the merits, there is no ground on which the court of appeals could have refused to vacate Runyon's sentence, and thus no issue that was actually raised on appeal was stronger.

**Claim S2:     The Trial Court Unlawfully Excluded the Potential Jurors Based Solely On Their Juror Questionnaire Responses Without Voir Dire, And Trial Counsel Unreasonably Failed To Object And Unreasonably Participated.**

Runyon's motion for leave to seal the reply to this claim was filed on this date, ECF No. 546.

The Court entered an Order granting the motion to file under seal on this date, ECF No. 548.

Respectfully Submitted,

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
 Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: July 7, 2016

**2801**

CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2016, I have electronically filed the foregoing Reply to Response of the United States to Amended Motion to Vacate, Set Aside, or Correct Sentence with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
    Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

141

**2802**

## DECLARATION OF STEPHEN A. HUDGINS

1. My name is Stephen A. Hudgins. In February 2009, I was in private practice. I was appointed to represent David Runyon.

2. This is my second declaration regarding my representation of David Runyon. The first declaration is dated September 22, 2015.

3. I was appointed to represent David Runyon because Jon Babineau was removed due to a conflict of interest. Mr. Babineau provided me with his files on Runyon's case. He was not, however, responsive to my requests to speak about the case. Mr. Babineau did not return my phone calls and I don't think I ever had a conversation with him about the penalty-phase defense. This may well have been because of the conflict. I reviewed Mr. Babineau's files but proceeded in my own direction in preparing the penalty-phase defense. The time Mr. Babineau spent working on David Runyon's case was not much benefit to me.

4. The work I put into this case was constrained by the short amount of time I had to prepare for trial as well as my existing case load. In my September 2015 declaration I stated, "The Court granted a four week recess between the eligibility phase and the penalty phase which gave time to work on the mitigation case." ECF No. 511-5, ¶6. The court appointed Dr. Merikangas at the beginning of this time-period and after the jury found David Runyon was eligible for the death sentence.

5. In my September 2015 declaration I stated that I do not remember the result of the brain scans of David Runyon which were conducted right before the penalty phase began. ECF No. 511-5, ¶6. I still do not remember the result of the scans. David Runyon's current attorneys informed me that a radiologist reported a "normal brain MRI." This report would not have supplied me with enough information to make a decision to cease investigation of David Runyon's mental health or social history. I understand the difference between a radiologist's reading and a neuropsychiatrist's/neurologist's reading of such scans.

6. David Runyon's current attorneys informed me that Dr. Merikangas recently read the film from the 2009 scans and that one scan revealed brain damage. This is the type of information I would have been looking for at the penalty phase.

7. I do not have any memory about the contents of the prosecution experts' reports. I would expect a prosecution expert to express a differing, if not unfavorable, opinion of my client. I would not have ceased an investigation into, or decided not to present, David Runyon's mental health and social history based on the fact that one or two prosecution experts issued unfavorable reports.

8. I recently reviewed the 2009 reports of Dr. Mirsky and Dr. Merikangas. In my opinion, the reports do not contain negative information about David Runyon.

Exhibit 1

**2804**

9. I recently reviewed Army medical records related to David Runyon's car accident. This is the type of information I was looking for at the penalty phase.

10. I understand that a person's intelligence quotient is unrelated to mental illness. The fact that David Runyon's I.Q. is above average did not rule out the possibility that he suffered from mental illness. Runyon's above-average I.Q. was not inconsistent with mental health mitigation and was not a reason to cease investigation into Runyon's mental health and social history.

11. I would not forego presenting mental health mitigation because a client was diagnosed with a personality disorder. A personality disorder was not a reason to cease investigation into Runyon's mental health and social history nor a reason to forego presentation of mental health and social history mitigation.

12. Runyon's current attorneys recently shared with me information they learned about Michael Draven. I was informed that Michael Draven had a history of domestic violence, sexual assault against a mentally disabled teenager, and sexual acts against children under the age of ten. If I had known this at the time of David Runyon's trial I would have used this information in support of the mitigation case.

13. One of the mitigating factors advanced in the selection phase of trial was the fact that two equally culpable co-defendants would not be sentenced to death. The defense argued that Catherina Voss was a bad actor. The new

information about Michael Draven would likely have been presented because it supported the argument that Michael Draven was a bad actor.

14. The new information about Michael Draven also would have rebutted the prosecution's argument regarding David Runyon's alleged bad personal characteristics. The prosecution introduced incidents of domestic abuse involving David Runyon that paled in comparison to Michael Draven's violent conduct.

15. My co-counsel Larry Woodward presented the guilt-phase defense where he tried to portray the co-defendants as bad actors. The information I recently learned about Michael Draven would have been consistent with this defense.

16. The new information about Michael Draven could have tilted the balance of the jury's sentencing decision because it strengthens the mitigating circumstance that the co-defendants were just as culpable, if not more so, than David Runyon but only Runyon faced a death sentence.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on the 22 day of June, 2016.

_____
Stephen A. Hudgins

**Declaration of John Nixon**
CEng, D-IBFES, BEng(Hons), MBA, FIMechE, FCMI, F-AAFS
Board Certified Forensic Engineering Scientist

1. My name is John Nixon. I am a consultant with Athena Research & Consulting, LLC, PO Box 66, Bippus, Indiana, 46713.

2. I am trained and experienced in weapons systems research, including firearms, ballistics, ammunition, munitions, explosives and crime and accident scene reconstruction.

3. I have been published, presented papers, and provided training in subjects including firearms, ballistics, wound ballistics, tool mark comparison, ammunition, crime and accident scene reconstruction, explosives and destructive devices.

4. I have been qualified and testified as an expert in state and federal courts over 50 times.

5. I have been asked by counsel for David Runyon to review evidence and testimony regarding bullet, toolmark, and firearms identification in connection with Mr. Runyon's case.

6. I have asked to examine the bullets in the case and to review the bench notes and photographs generated by the forensic examination so that I can form a complete opinion on whether the bullets from the crime scene are associated with a Taurus .357 revolver. I have been told that the bullets cannot be located. The bench notes will have measurements of the projectiles such as weight and width and length of markings that will help to identify the caliber.

7. In 2009, experts in my field were cautioned about concluding that bullets were fired from a particular firearm, especially when there was no firearm available for comparison purposes.

8. In my review of materials in Mr. Runyon's case, I noted that the medical examiner identified the bullets as 9mm but John Willmer testified about .38 and .357 handguns.

9. I noted that the testimony regarding the use of a stainless steel bore brush was exaggerated, both in terms of the aggressiveness of such brushes, and their rarity. It is common to use stainless steel bore brushes to clean firearms. Such brushes will not easily affect rifling characteristics.

Page 1 of 2

**2807**

10. A database search for brands and models of guns of nominal '9mm' bore diameter with 6 lands and grooves and a right twist (as noted on the Certificate of Analysis) revealed 383 brands and models of 9mm / 380 semiautomatic pistols; 67 brands and models of .38 revolvers; and, 36 brands and models of .357 revolvers.

11. I could have provided this information and/or testimony in 2009.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 18th day of May, 2016.

_____
John Nixon

Page 2 of 2

**2808**

## DECLARATION OF JOSEPH J. KENNEDY

1. My name is Joseph J. Kennedy.  I am a Senior Manager at Cherry Biometrics Corporation in Falls Church, Virginia.  I develop trade-secret, data center and data transmission hacker blocking technologies.  Geolocation, cell phones and biometric identification are some of the components used.  My education and experience incorporates radio frequency and digital communications including mobile, wi-fi, long lines and switching.  I have knowledge of and experience with past, current and future mobile broadband technologies.  I hold an FCC Radio License.

2. I am a member of the Virginia Wireless Association and the Institute of Electrical and Electronic Engineers(IEEE).

3. I have testified as an expert witness for prosecutors and defense attorneys. In particular, I have testified about historical cell site location information.

4. The range of a cell tower is 21.75 miles.  Cell towers must overlap to avoid busy signals.  Cell tower sectors must overlap to avoid zero coverage areas.

5. Cellphone service providers are influenced by customer demand for clear reception.  The industry standard formula for selecting the clearest tower is based is based on Signal, Interference and Noise Ratios (S/(I+N)).  Minus tariffs and other trade secret information a cell phone connects to the clearest tower.

6. When a cell phone connects to a particular tower the phone is most likely

Exhibit 3

**2809**

within approximately 21 miles of that tower.  A cell phone could be located beyond that distance if repeaters are in use.

7.  Counsel for David Runyon provided me with a map of the Newport News, Virginia area that contained data points for three cell towers and three other locations (labeled Exhibit 135), the testimony of Paul Swartz about Michael Draven's cell tower usage around the time of the crime, and historical call data from Michael Draven's cellphone.

8.  Cellular service providers release call history data in a spread sheet format. The format of the call history data from Michael Draven's cell phone does not appear to be the original data released from nTelos.  The original call data and cell tower information is needed to provide the most accurate opinion.

9.  The signal strength of the three towers indicated on the map (Exhibit 135) is not the industry standard.  I am unable to determine how the signal strength was calculated.  Compared to the industry standard, the signal strengths underrepresent the coverage area of each cell tower.

10.  The map (Exhibit 135) is incorrect as it uses circles to represent the cell tower coverage area.

11.  Based on the scale on the map of the Newport News area, the three cell towers and other three locations indicated on the map are all within approximately ten linear miles.  A person whose cellphone connected with one, or all, of the three cell towers could have been located anywhere within that ten mile area or an area up to twice that size.

Page 2 of 3

Exhibit 3

**2810**

12.  Historical cell site information cannot place an individual at a specific location.  The fact that Michael Draven's cellphone utilized particular cell towers at particular times does not support Paul Swartz's testimony that Michael Draven was at a certain location at a particular time.

13.  At David Runyon's 2007 trial, a person with education and experience similar to mine could have provided the information I have set forth in this declaration

**I declare under penalty of perjury that the foregoing is true and correct. Executed on the __6__ day of July, 2016.**

*Joseph J. Kennedy*

_____

Joseph J. Kennedy

Exhibit 3

**2811**

Steve Hudgins - Days in Court Between Appointment to Runyon Trial

| Date | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 |
|---|---|---|---|---|---|
| 1 | | Sunday New Orleans Training | 1:00 NN Cir. | | |
| 2 | | 10:00 NN Circuit Jury Trial | 10:0 NN J&D (2) | Saturday | |
| 3 | | 10:00 Settlement Conf. Va. Beach; 1:00 NN J&D; 2:00 YC J&D | All day Indigent Defense Seminar | Sunday | |
| 4 | | 8:30 & 2:00 NN J&D (2);9:00 Surry Circuit; 4:30 HV Gal | Saturday | 11:00 Norfolk Federal | |
| 5 | | 10:00 NN Circuit | Sunday | 9:00 YC Cir. (2); 11:00 YC Gen. Dist.; 2:00 YC J&D Gal. | |
| 6 | | 10:30 YC J&D; 12:00 NN Cir. | 10:00 YC Gen. Dist. (2) | U.S. v. Garries, No. 4:08-cr-50 - 9 day trial (6 hours) | Saturday |
| 7 | | Saturday | 9:00 YC Cir. (2); 10:00 NN Cir. | U.S. v. Garries, No. 4:08-cr-50 - 9 day trial (4 hrs. 30 min.) | Sunday |
| 8 | | Sunday | All day Criminal Law Seminar | U.S. v. Garries, No. 4:08-cr-50 - 9 day trial (6 hours) | |
| 9 | | 10:00, 1:30, 3:00 YC Gen. Dis.; 4:30 HV GAL | 11:00 NN Cir. | Saturday | U.S. v. Gary Williams, No. 4:08-cr-87, in court for competency hearing as stand-by counsel. |
| 10 | | 10:00 NN Cir. (2); 10:30 & 2:00 NN J&D | NN Cir. | Sunday | |
| 11 | | 9:00, 9:30, 10:00 YC Gen. Dis. (5); 2:00 NN J&D | Saturday | U.S. v. Garries, No. 4:08-cr-50 - 9 day trial (6 hours) | |
| 12 | | 10:00 YC J&D; 10:30 YC J&D; 2:00 NN J&D | Sunday | U.S. v. Garries, No. 4:08-cr-50 - 9 day trial (6 hours) | U.S. v. Erick Rodgers, No. 4:09-cr-2, in court for sentencing. |
| 13 | | 10:30 NN J&D; 11:00 NN J&D | 10:00 NN Cir. | U.S. v. Garries, No. 4:08-cr-50 - 9 day trial (6 hours) | Saturday |
| 14 | | Saturday | 9:30 Hampton Circuit | Set aside for Garries | Sunday |
| 15 | | Sunday | 9:00 YC Gen. Dist. | U.S. v. Garries, No. 4:08-cr-50 - 9 day trial (7 hours) | |
| 16 | | 8:30 NN Cir.; 9:00 NN Cir.; 10:00 NN Cir. | 10:00 YC J&D; 10:30 NN J&D | Saturday | |
| 17 | | 8:00 YC Gen. Dist.; 9:00 YC J&D; 9:30 YC Gen. Dist.; 10:00 YC Gen. Dist., 2:00 YC Gen. Distr. | 11:00 Wmbg J&D Travel to Oklahoma City | Sunday | |
| 18 | | 8:00 YC Gen. Dist.; 11:00 Virginia Beach Cir. 11:30 Norfolk Federal | Saturday Travel to Oklahoma City | U.S. v. Garries, No. 4:08-cr-50 - 9 day trial (5 hours) | |
| 19 | | 8:30 NN J&D (2); 11:30 YC J&D; 1:00 YC Cir. | Sunday Travel to Oklahoma City | U.S. v. Garries, No. 4:08-cr-50 - 9 day trial (7 hrs. 20 min.) | |
| 20 | Stephen Hudgins Appointed | | 11:00 YC Gen. Dist. | Set aside for Garries | Saturday |
| 21 | Saturday | Saturday | NN Federal jury trial (7 days) | Set aside for Garries | Sunday |
| 22 | Sunday | Sunday | 2:30 YC Gen. Dist. | Set aside for Garries | |
| 23 | | 10:00 NN Cir. Jury Trial | 10:30 YC J&D (4) | Saturday | |
| 24 | | 9:00 Suffolk Cir.; 9:00 NN J&D; 9:30 NN Federal; 2:00 YC Gen. Dist. | 10:00 NN Cir. | Sunday | |
| 25 | 10:00 Federal Court Sentencing 1:00 Newport News (NN) Circuit (2); 3:00 Home Visit (HV) | YC Gen. Dist. (2); 10:00 YC Gen. Dist. | Saturday | Set aside for Garries | |
| 26 | 9:00 York Co. (YC) J&D; 9:30 YC J&D (3); 1:00 YC Cir.; 3:00 Federal Court Norfolk. New Orleans training | 8:30 YC; 10:00 NN Cir.; 10:30 NN J&D; 2:00 James City County | Sunday | U.S. v. Kevin Darden, No. 4:08-cr-122, in court for sentencing. | |
| 27 | 11:00 Federal Court Norfolk. New Orleans training | | 10:30 YC Gen. Dist; 11:00 YC Gen. Dist.; 1:30 YC Gen. Dist. (2); 2:00 YC Gen. Dist. | | Saturday |
| 28 | Saturday - New Orleans training | Saturday | 8:30 NN J&D | | Sunday |
| 29 | | Sunday | | Travel to St. Louis | |
| 30 | | | | Saturday Travel to St. Louis | Runyon - First Day of Trial |
| 31 | | 10:00 YC - two day jury trial | | Sunday Travel to St. Louis | |

Exhibit 4

**2812**

# <u>USA Strikes of Black Veniremen</u>

## Easy Fisher Exact Test Calculator

Success! The Fisher exact test statistic and statement of significance appear beneath the table. Blue means you're dealing with dependent variables; red, independent.

| Results | | | |
|---|---|---|---|
| | Struck by USA | Not Struck by USA | *Marginal Row Totals* |
| Black Veniremen | 0 | 10 | 10 |
| Nonblack Veniremen | 19 | 23 | 42 |
| *Marginal Column Totals* | 19 | 33 | 52  (Grand Total) |

The Fisher exact test statistic value is 0.008572. The result is significant at p < .05.

## Easy Fisher Exact Test Calculator

Success! The Fisher exact test statistic and statement of significance appear beneath the table. Blue means you're dealing with dependent variables; red, independent.

| Results | | | |
|---|---|---|---|
| | Struck by USA | Not Struck by USA | *Marginal Row Totals* |
| Black Veniremen | 1 | 9 | 10 |
| Nonblack Veniremen | 18 | 24 | 42 |
| *Marginal Column Totals* | 19 | 33 | 52  (Grand Total) |

The Fisher exact test statistic value is 0.072269. The result is *not* significant at p < .05.

## Easy Fisher Exact Test Calculator

Success! The Fisher exact test statistic and statement of significance appear beneath the table. Blue means you're dealing with dependent variables; red, independent.

| Results | | | |
|---|---|---|---|
| | Struck by USA | Not Struck by USA | *Marginal Row Totals* |
| Black Veniremen | 2 | 8 | 10 |
| Nonblack Veniremen | 17 | 25 | 42 |
| *Marginal Column Totals* | 19 | 33 | 52  (Grand Total) |

The Fisher exact test statistic value is 0.292524. The result is *not* significant at p < .05.

1

Exhibit 5

**2813**

## Easy Fisher Exact Test Calculator

Success! The Fisher exact test statistic and statement of significance appear beneath the table. Blue means you're dealing with dependent variables; red, independent.

| Results | | | |
|---|---|---|---|
| | Struck by USA | Not Struck by USA | *Marginal Row Totals* |
| Black Veniremen | 3 | 7 | 10 |
| Nonblack Veniremen | 16 | 26 | 42 |
| *Marginal Column Totals* | 19 | 33 | 52  (Grand Total) |

The Fisher exact test statistic value is 0.728639. The result is *not* significant at p < .05.

## Easy Fisher Exact Test Calculator

Success! The Fisher exact test statistic and statement of significance appear beneath the table. Blue means you're dealing with dependent variables; red, independent.

| Results | | | |
|---|---|---|---|
| | Struck by USA | Not Struck by USA | *Marginal Row Totals* |
| Black Veniremen | 4 | 6 | 10 |
| Nonblack Veniremen | 15 | 27 | 42 |
| *Marginal Column Totals* | 19 | 33 | 52  (Grand Total) |

The Fisher exact test statistic value is 1. The result is *not* significant at p < .05.

## Easy Fisher Exact Test Calculator

Success! The Fisher exact test statistic and statement of significance appear beneath the table. Blue means you're dealing with dependent variables; red, independent.

| Results | | | |
|---|---|---|---|
| | Struck by USA | Not Struck by USA | *Marginal Row Totals* |
| Black Veniremen | 5 | 5 | 10 |
| Nonblack Veniremen | 14 | 28 | 42 |
| *Marginal Column Totals* | 19 | 33 | 52  (Grand Total) |

The Fisher exact test statistic value is 0.46697. The result is *not* significant at p < .05.

2

Exhibit 5

**2814**

## Easy Fisher Exact Test Calculator

Success! The Fisher exact test statistic and statement of significance appear beneath the table. Blue means you're dealing with dependent variables; red, independent.

| Results | | | |
|---|---|---|---|
| | Struck by USA | Not Struck by USA | *Marginal Row Totals* |
| Black Veniremen | 6 | 4 | 10 |
| Nonblack Veniremen | 13 | 29 | 42 |
| *Marginal Column Totals* | 19 | 33 | 52  (Grand Total) |

The Fisher exact test statistic value is 0.142449. The result is *not* significant at p < .05.

## Easy Fisher Exact Test Calculator

Success! The Fisher exact test statistic and statement of significance appear beneath the table. Blue means you're dealing with dependent variables; red, independent.

| Results | | | |
|---|---|---|---|
| | Struck by USA | Not Struck by USA | *Marginal Row Totals* |
| Black Veniremen | 7 | 3 | 10 |
| Nonblack Veniremen | 12 | 30 | 42 |
| *Marginal Column Totals* | 19 | 33 | 52  (Grand Total) |

The Fisher exact test statistic value is 0.02595. The result is significant at p < .05.

## Easy Fisher Exact Test Calculator

Success! The Fisher exact test statistic and statement of significance appear beneath the table. Blue means you're dealing with dependent variables; red, independent.

| Results | | | |
|---|---|---|---|
| | Struck by USA | Not Struck by USA | *Marginal Row Totals* |
| Black Veniremen | 8 | 2 | 10 |
| Nonblack Veniremen | 11 | 31 | 42 |
| *Marginal Column Totals* | 19 | 33 | 52  (Grand Total) |

The Fisher exact test statistic value is 0.002721. The result is significant at p < .05.

3

Exhibit 5

**2815**

## Easy Fisher Exact Test Calculator

Success! The Fisher exact test statistic and statement of significance appear beneath the table. Blue means you're dealing with dependent variables; red, independent.

| Results | | | |
|---|---|---|---|
| | Struck by USA | Not Struck by USA | *Marginal Row Totals* |
| Black Veniremen | 9 | 1 | 10 |
| Nonblack Veniremen | 10 | 32 | 42 |
| *Marginal Column Totals* | 19 | 33 | 52 (Grand Total) |

The Fisher exact test statistic value is 0.000199. The result is significant at $p < .05$.

## Easy Fisher Exact Test Calculator

Success! The Fisher exact test statistic and statement of significance appear beneath the table. Blue means you're dealing with dependent variables; red, independent.

| Results | | | |
|---|---|---|---|
| | Struck by USA | Not Struck by USA | *Marginal Row Totals* |
| Black Veniremen | 10 | 0 | 10 |
| Nonblack Veniremen | 9 | 33 | 42 |
| *Marginal Column Totals* | 19 | 33 | 52 (Grand Total) |

The Fisher exact test statistic value is 6E-06. The result is significant at $p < .05$.

4

Exhibit 5

**2816**