IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID ANTHONY RUNYON,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT NEWPORT NEWS

**JOINT APPENDIX - VOLUME VII OF X**
**(Pages 2817 - 3168)**

Michele J. Brace
VA Capital Representation
Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
(434) 817-2970
mbrace@mindsort.com

Dana C. Hanson Chavis
Susanne Bales
Assistant Federal Defender
Federal Defender Services
of Eastern Tennessee
800 South Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979
dana_hansen@fd.org
susanne_bales@fd.org

G. Zachary Terwilliger
Lisa R. McKeel
Brian J. Samuels
Office of the U. S. Attorney
Fountain Plaza 3, Suite 300
721 Lakefront Commons
Newport News, VA 23606
(757) 591-4000
zachary.terwilliger3@usdoj.gov
lisa.mckeel@usdoj.gov
brian.samuels@usdoj.gov

*Counsel for Defendant-Appellant*                    *Counsel for Plaintiff-Appellee*

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

# TABLE OF CONTENTS

*Volume I of X*

Appendix Page

District Court Docket [4:08-cr-00016-RBS-DEM-3]..............................................1

Indictment
Filed February 13, 2008 (Doc.3) ....................................................................46

Notice of Intent to Seek the Death Penalty
Filed July 17, 2008 (Doc.67)..........................................................................63

Voss Statement of Facts
Filed July 18, 2008 (Doc.70)..........................................................................70

Notice Pursuant to Fed. R. Crim. P. 12.2 with attachment1
Filed December 12, 2008 (Doc. 135) .............................................................78

   Att. 1:   Abreviated CV – Evan S. Nelson, PH.D., ABPP (Doc.135-1)......83
   Att. 2:   CV – Evan S. Nelson, PH.D., ABPP (Doc.135-2)........................84

Defendant's Motion to Continue Trial
Filed Feb. 20, 2009 (Doc.160)........................................................................93

Order Granting Motion to Continue
Feb. 23, 2009 (Doc.162)..................................................................................97

Notice Regarding Mental Health Experts
Filed April 8, 2009 (Doc.177) ......................................................................101

Defendant's Motion to Continue Trial Date
Filed April 13, 2009 (Doc.179) ....................................................................105

Response of the USA to Defendant's Motion to Continue
Filed April 21, 2009  (Doc.181) ...................................................................122

Order Denying Defendant's Motion to Continue and USA Motion to Sever
Entered May 7, 2009 (Doc.194) ...................................................................126

Juror Questionnaire Order with attachment 1
June 11, 2009 (Doc.211)................................................................................139

Att. 1:    Blank Juror Questionnaire Filed June 11, 2009 (Doc.211-1) ......142

Memorandum Order Denying Defendant's Objections to Nonstatutory
Aggravating Factors
Entered June 17, 2009 (Doc.217) .................................................................161

Defendant's Supp. Notice Regarding Mental Health Experts
Filed June  29, 2009 (Doc.230) .....................................................................173

Forensic Psychiatric Evaluation by Dr. Patterson
Filed June 29, 2009 (Doc.276) (Unsealed March 2, 2016 Order dkt516)...177

Forensic Psychological Evaluation by Dr. Montalbano
Filed June 30, 2009 (Doc.277) (Unsealed March 2, 2016 Order dkt516)...201

Transcript of First Day of Trial,
On June 30, 2009 (Doc.326 filed Mar. 31, 2010) .......................................232

Voir Dire (pp.1-134)......................................................................................233

Transcript of Second Day of Trial,
On July 1, 2009 (Doc.327 filed Mar. 31, 2010) ..........................................365

Voir Dire (pp. 138, 194-195) ........................................................................366

Transcript of Third Day of Trial,
On Jul. 2, 2009 (Doc.328 filed Mar. 31, 2010) ..........................................369

Preliminary Proceedings (p.198) ..................................................................370

Transcript of Fourth Day of Trial,
Jul. 6, 2009 (Doc.329, filed Mar. 31, 2010) ...............................................371

Testimony of Rose Wiggins (pp.257-265)
Direct Examination by Ms. McKeel........................................................374
Cross Examination by Mr. Woodward.....................................................380
Redirect Examination by Ms. McKeel ....................................................382

Testimony of John Willmer (pp.353-374)
    Direct Examination by Mr. Samuels ...................................................383
    Cross Examination by Mr. Woodward................................................401
    Redirect Examination by Mr. Samuels.............................................403

Testimony of Randy Lassiter (pp.435-469)
    Direct Examination by Ms. McKeel...................................................406
    Cross Examination by Mr. Ellenson..................................................463
    Redirect Examination by Ms. McKeel ..............................................437

Transcript of Sixth Day of Trial,
    On July 8, 2009 (Doc.331filed March 31, 2010) .......................................440

Testimony of Nichole King (pp.731-764)
    Direct Examination by Ms. McKeel...................................................442
    Cross Examination by Mr. Woodward................................................469

Testimony of Lawrence Ford (pp.765-774)
    Direct Examination by Ms. McKeel...................................................476
    Cross Examination by Mr. Clancy .....................................................484

Testimony of George Koski (pp.840-856)
    Direct Examination by Ms. McKeel...................................................486
    Cross Examination by Mr. Woodward................................................499

*Vol II of X*

Transcript of Seventh Day of Trial,
    On July 9, 2009 (Doc.332, filed Mar. 31, 2010) .........................................503

Testimony of Paul Swartz (pp.900-918)
    Direct Examination by Mr. Samuels ...................................................506

Testimony of William Banks (pp.1031-1063)
    Direct Examination by Ms. McKeel...................................................526
    Cross Examination by Mr. Woodward................................................544
    Redirect Examination by Ms. McKeel ..............................................556
    Recross Examination by Mr. Ellenson ..............................................558

Testimony of Paul Swartz (pp.1065-1117)
    Direct Examination by Mr. Samuels ...................................................561

Cross Examination by Mr. Woodward ....................................................605
Redirect Examination by Ms. McKeel ..................................................612

Transcript of Eighth Day of Trial,
    On Jul.y 13, 2009 (Doc.333, filed Mar. 31, 2010) .....................................613

    Proceedings re Stipulation No. 94 ................................................................615

    Testimony of Paul Swartz (pp.1354-1370) (recalled)
        Direct Examination by Mr. Samuels ......................................................616

Transcript of Ninth Day of Trial,
    On July 14, 2009 (Doc.334, filed Mar. 31, 2010) ......................................632

    Testimony of Paul Swartz (pp.1378-1491) (resumed)

        Direct Examination by Mr. Samuels ......................................................635
        Cross Examination by Mr. Clancy .........................................................722
        Redirect Examination by Mr. Samuels....................................................745

Transcript of Tenth Day of Trial,
    On July 15, 2009 (Doc. 335, filed Mar. 31, 2010) ....................................749

    Proceedings re Stipulations (pp.1509-1519) .............................................752
    Court's Rulings re Motions .........................................................................754

Transcript of Eleventh Day of Trial,
    On July 16, 2009 (Doc.336, filed Mar. 31, 2010) ......................................762

    Closing Arguments:

        AUSA McKeel, Guilt Phase Closing (pp.1582-1613) ...........................764
        Counsel Woodward, Guilt Phase Closing (pp.1633-1656) ....................796
        AUSA McKeel, Guilt Phase Rebuttal Closing (pp.1656-1665)............819

    Court Jury Instructions (pp.1666-1714) ....................................................829

Supplemental Motion to Continue Capital Sentencing Hearing
    Filed July 17, 2009 (Doc.240) ....................................................................882

Statement of Defense Counsel
    Filed July 17, 2009 (Doc.242).....................................................................889

Verdict Guilt Phase
Filed July 17, 2009 (Doc.245),..................................................................894

Second Supp. Motion to Continue Capital Sentencing Hearing
July 20, 2009 (Doc.247) ...........................................................................895

Transcript of Thirteenth Day of Trial,
On July 22, 2009 (Doc. 338, filed Apr. 2, 2010)......................................902

Counsel Hudgins,  Eligibility Phase Closing (pp. 1769-1772) ...................903

Order Granting Motion to Continue
Filed July 22, 2009 (Doc.254) ..................................................................907

Special Verdict Eligibility Phase
Filed July 22, 2009 (Doc.255) ..................................................................910

Order Appointing Dr. Merikangas
Entered July 22, 2009 (Doc.257)...............................................................917

Defendant's Motion to Supp. Mental Health Report
Filed August 10, 2009 (Doc.269) ..............................................................919

*Vol III of X*

Transcript of Fifteenth Day of Trial,
On August 20, 2009 (Doc. 340, filed Apr. 2, 2010)..................................924

Argument/Ruling Dr. Cunningham Testimony (p.2076-2084)...................925

Testimony of Dr. Cunningham (pp. 2084-2192)
Direct Examination by Mr. Hudgins ....................................................933
Cross Examination by Mr. Samuels .....................................................1007

Defendant's Mitigating Factors Enumerated
Filed August 21, 2009 (Doc.285) .............................................................1042

Transcript of Sixteenth Day of Trial,
On August 24, 2009 (Doc.341, filed Apr. 29, 2010).................................1047

Testimony of Deputy Westrick, Portsmouth Sheriff's Office (pp.2199-2209)
    Direct Examination by Mr. Hudgins ..................................................1049
    Cross Examination by Mr. Samuels ..................................................1056

Testimony of Deputy Johnson, Portsmouth Sheriff's Office (pp.2209-2217)
    Direct Examination by Mr. Hudgins ..................................................1059
    Cross Examination by Ms. McKeel....................................................1065
    Redirect Examination by Mr. Hudgins...............................................1067

Testimony of Deputy Anderson, Portsmouth Sheriff's Office (pp.2217-2225)
    Direct Examination by Mr. Hudgins ..................................................1067
    Cross Examination by Ms. McKeel....................................................1072

Testimony of Deputy Marbry, Portsmouth Sheriff's Office (pp.2226-2234)
    Direct Examination by Mr. Hudgins ..................................................1076
    Cross Examination by Mr. Samuels ..................................................1080

Testimony of Deputy Singledecker, Portsmouth Sheriff's Office
(pp.2234-2239)
    Direct Examination by Mr. Hudgins ..................................................1084
    Cross Examination by Ms. McKeel....................................................1087

Testimony of Deputy Diaz, Portsmouth Sheriff's Office (pp.2239-2244)
    Direct Examination by Mr. Hudgins ..................................................1089
    Cross Examination by Mr. Samuels ..................................................1092

Testimony of David H. Runyon (pp.2366-2409)
    Direct Examination by Mr. Hudgins ..................................................1095
    Cross Examination by Mr. Samuels ..................................................1136

Testimony of Suk Cha Runyon (pp.2410-2439)
    Direct Examination by Mr. Hudgins ..................................................1139

Transcript of Seventeenth Day of Trial,
    On August 25, 2009 (Doc.342, filed Apr. 29, 2010)................................1170

Testimony of Phyllis Provost (pp.2518-2527)
    Direct Examination by Mr. Hudgins ..................................................1171
    Cross Examination by Ms. McKeel....................................................1177

Transcript of Eighteenth Day of Trial,
      On August 26, 2009 (Doc.343, filed Apr. 29, 2010)................................1181

      AUSA Samuels, Sentence Selection Closing (pp.2588-2626)..................1182
      Counsel Woodward, Sentence Selection Closing (pp.2632-2656) ...........1226
      AUSA Samuels, Sentencing Rebuttal Closing (pp. 2656-2664)..............1250
      Court Jury Instructions (pp.2664-2696) ...................................................1258

Transcript of Nineteenth Day of Trial,
      On August 27, 2009 (Doc. 344, filed Apr. 29, 2010)................................1292

   Jury Question  (pp.2707-2710) ....................................................................1298

Special Verdict Form - Selection Phase
      Filed August 27, 2009 (Doc.291) ..............................................................1311

*Volume IV of X*

## **Gov't Trial Exhibits**

      Gov't Ex. 23:   Commonwealth of Virginia Department of Forensic
                      Science Certificate of Analysis ......................................1317

      Gov't Ex. 28:   ATM Still Photos..........................................................1318

      Gov't Ex. 65:   Bates 065-006 Global Cash Receipt..............................1352

      Gov't Ex. 94:   Summary of Funds Available to/Spent by Cat Voss......1364

      Gov't Ex. 101:  Others' Inboxes.............................................................1365

      Gov't Ex. 109:  Sprint Detail Records for Runyon phone
                      304-685-6845.................................................................1367

      Gov't Ex. 135:  Map of cell tower locations ..........................................1393

      Gov't Ex. 217:  "Checklist for Crime"...................................................1395

      Gov't Ex. 236:   Photo of bullets............................................................1397

      Gov't Ex. 311:   City of Wichita Municipal Court 01-CR-1407.............1398

      Gov't Ex. 313:  Wichita Police Dept. Incident Report dated
                       Jul. 23, 1994.................................................................1404

Gov't Ex. 315:   Magistrate Court of Monongalia County, West Virginia
                 1412 ...............................................................................1412

Gov't Ex. 316:   Morgantown Police Dept. Investigation/Incident Report
                 dated Jan. 6, 2007 .......................................................1433

Position of US with Respect to Sentencing Factors
        Filed November 10, 2009 (Doc.301).........................................1443

Judgment
        Filed December 4, 2009 (Doc.313) ..........................................1458

Defendant's Motion for Limited Unsealing of Record
        On March 17, 2015 (Doc.415)...................................................1466

Memorandum in Support of Defendant's Motion for Limited Unsealing of
Record with Exhibit 3
        On March 17, 2015 (Doc.416)...................................................1468

        Ex. 3:    Declaration of Michele Brace (Doc.416-3)..............................1474

United States' Response to Motion for Limited Unsealing of Record
        On March 31, 2015 (Doc.418)...................................................1476

Defendant's Rebuttal Supporting Motion for Limited Unsealing of Record
        Filed April 3, 2015 (Doc.421) ..................................................1481

Order Granting Limited Unsealing of Record
        Filed Apr. 7, 2015 (Doc.422) ....................................................1487

Supp. Order Regarding Limited Unsealing of Record Questionnaires
        Filed April 13, 2015 (Doc.423), ...............................................1494

Original §2255 Motion with Exhibit 1
        Filed October 5, 2015 (Doc.478)..............................................1497

        Ex. 1:    Records Request to Bureau of Prisons, 06/02/15
                  (Doc.478-1)............................................................ 1622A – 1622C
        Ex. 2–36:  Omitted – See JA pp. 1992 - 2247

Defendant's First Motion for Discovery  with Exhibits 1 – 5
        Filed December 9, 2015 (Doc.491) ..........................................1623

Ex. 1: ATF ROI dated Feb. 2, 2009 (Doc.491-1).....................................1661

Ex. 2: USA v. Runyon Disk Index (Doc.491-2) ......................................1663

Ex. 3: USA Gov't Witness List Fax, p.9 (Doc.491-3) ............................1664

Ex. 4: Medical/Mental Health Records Request to Portsmouth Sheriff's
Department from FDSET dated Oct. 2, 2015 (Doc.491-4)..........1666

Ex. 5: Medical/Mental Health Records Request to Portsmouth Sheriff's
Department from FDSET dated Nov. 3, 2015 (Doc.491-5)........1667

United States' Response to Original §2255 Motion
Filed January 11, 2016 (Doc.497) ........................................................1670

*Volume V of X*

Order directing reply to §2255
Entered January 15, 2016 (Doc.499).......................................................1811

USA Opposition to First Motion for Discovery
Filed January 15, 2016 (Doc.500) .........................................................1812

Reply Supporting First Motion for Discovery
Filed January 29, 2016 (Doc.506) .........................................................1824

Amended §2255 Motion with Exhibits 1 – 39
Filed February 4, 2016 (Doc.511) .........................................................1842

Ex. 1: Placeholder (Doc.511-1) ..............................................................1991

Ex. 2: Dr. Merikangas Report 9/25/15 (Doc.511-2).............................1992

Ex. 3: McNally Declaration 3/11/09 (Doc.511-3)..................................1998

Ex. 4: Cronin Declaration 9/26/15 (Doc.511-4)....................................2002

Ex. 5: Hudgins Declaration 9/22/15 (Doc.511-5) .................................2016

Ex. 6: Woodward Declaration 9/24/15 (Doc.511-6) .............................2019

Ex. 7: Costa Declaration 9/30/15 (Doc.511-7)......................................2022

Ex. 8: Cunningham Declaration 9/25/15 (Doc.511-8) ..........................2024

Ex. 9:    Cat Voss Declaration 9/10/15 (Doc.511-9) ................................2079

Ex. 10:   David Dalton Declaration 9/28/15 (Doc.511-10) ......................2082

Ex. 11:    Paula Dalton Declaration 9/28/15 (Doc.511-11) ......................2083

Ex. 12:    Matt Long Declaration 9/29/15 (Doc.511-12)..........................2085

Ex. 13:    Scott Linker Declaration 9/24/15 (Doc.511-13) ......................2086

Ex. 14:    Excerpt Cell Phone Tracking Evidence (Doc.511-14) ..............2089

Ex. 15:    Babineau letter regarding death authorization 2/10/09
          (Doc.511-15),........................................................................2109

Ex. 16:    Portsmouth Jail Records 2008 (Doc.511-16)............................2119

Ex. 17:    David Dombrowski progress notes (Doc.511-17) ....................2123

Ex. 18:    Lake Martin Community Hospital response (Doc.511-18) .......2125

Ex. 19:    Hudgins time schedule with mark ups ECF No 165
          (Doc.511-19)........................................................................2128

Ex. 20:    Dr. Mirsky letter 7/2/09 (Doc.511-20).....................................2131

Ex. 21:    Dr. Mirsky/Hudgins emails 7/22-23/09 (Doc.511-21) .............2132

Ex. 22:    Dr. Mirsky letter 9 18 09 (Doc.511-22)....................................2133

Ex. 23:    Army medical records (Doc.511-23) ........................................2136

Ex. 24:    Handwritten letter regarding 1996 car accident (Doc.511-24)..2160

Ex. 25:    Suk Cha Runyon medical records (Doc.511-25)........................2162

Ex. 26:    David Dombrowski declaration 9/23/15 (Doc.511-26).............2177

Ex. 27:    Mark Runyon declaration 9/25/15 (Doc.511-27) ......................2187

Ex. 28:    Maria Runyon declaration 9/16/15 (Doc.511-28)......................2194

Ex.29:    Dr. Dudley report 9/29/15 (Doc.511-29) ..................................2199

Ex. 30:    Thomas Preston interview 10/4/08 (Doc.511-30)......................2223

Ex. 31:    Robert Seeger declaration 8/24/15 (Doc.511-31) ......................2226

Ex. 32:   Deborah Seeger declaration 8/24/15 (Doc.511-32) ...................2229

Ex. 33:   Captain Harris Declaration Fayetteville GA Police Dept.
          1/13/16 (Doc.511-33) ...................................................2234

Ex. 34:   Scotty Fleming criminal history (Doc.511-34)..........................2235

Ex. 35:   Dr. Mirsky report 8/28/15 (Doc.511-35) ..................................2237

Ex. 36:   Teresa Norris declaration 9/29/15 (Doc.511-36)......................2244

Ex. 37:   Racial Disparities Staff Report by the Subcommittee
          on Civil and Constitutional Rights (Doc.511-37) .....................2248

Ex. 38:    Cohen Bell Declaration (Doc.511-38) ...................................2261

Ex. 39:    Declaration of Michele J Brace (Doc.511-39)........................2269

Order
     Entered February 8, 2016 (Doc.513)......................................2271

## *Volume VI of X*

Reply Supporting Original §2255 Motion
     Filed March 28, 2016 (Doc.526) ............................................2272

     Ex. A: Clinical Screening Information (Doc.526-1) .................................2366

Petitioner's Second Motion for Discovery
     Filed April 1, 2016 (Doc.530) ...............................................2368

United States' Response to Second Motion for Discovery
     Filed April 8, 2016 (Doc.532) ...............................................2376

Reply Supporting Second Motion for Discovery with Attachments A – C
     Filed April 13, 2016 (Doc.533) .............................................2384

     Att. A:   Strengthening Forensic Science in the United States, A Path
               Forward (Doc.533-1) ................................................2392

     Att. B:   Charter USDOJ National Commission on Forensic Science
               (Doc.533-2),.........................................................2473

Att. C: National Commission on Forensic Science Views of the Commission Validation of Forensic Science Methodology (Doc.533-3)......................................................2482

United States' Response to Amended §2255 Motion
Filed April 22, 2016 (Doc.536) ..........................................................2485

Motion for Leave to Supplement Second Motion for Discovery
Filed May 24, 2016 (Doc.541) ...........................................................2644

Order Granting Supplement of Discovery Motion
Entered June 7, 2016 (Doc.544) ........................................................2648

Supplemental Memo to Second Motion for Discovery
Filed June 8, 2016 (Doc.545) ............................................................2651

Att. A: John Nixon Declaration (Doc.545-1) ......................................2654

Reply Supporting Amended §2255 Motion with Exhibits 1 – 5
Filed July 7, 2016 (Doc.551)..............................................................2656

Ex. 1: Stephen Hudgins Declaration dated Jun. 22, 2016 (Doc.551-1) .2803

Ex. 2: John Nixon Declaration dated May 18, 2016 (Doc.551-2) .........2807

Ex. 3: Joseph Kennedy Declaration dated Jul. 6, 2016 (Doc.551-3) .....2809

Ex. 4: Stephen Hudgins Calendar from Appointment to Beginning of Runyon Trial (Doc.551-4) ........................................................2812

Ex. 5: USA Strikes of Black Veniremen Report (Doc.551-5) ...............2813

*Volume VII of X*

Order for Subpoena Duces Tecum
Entered July 12, 2016 (Doc.552)........................................................2817

Subpoena to Dept. of Forensic Science with attachment 1
Filed July 13, 2016 (Doc.553) ...........................................................2818

      Att. 1:    Order for Subpoena to Dept. of Forensic Science
               (Doc.553-1)...............................................................2822

Order for Costa Grand Jury Testimony
    Entered July 26, 2016  (Doc.555)............................................................2823
Opinion Denying §2255 Motion and Denying Discovery
    Filed Jan. 19, 2017 (Doc.560, 560-1, 560-2, 560-3, 560-4)..............................2824

Judgment
    Filed January 20, 2017 (Doc.561), .................................................... 3070

Petitioner's Motion for Sealed Materials Subpoenaed by Court
    Filed February 1, 2017 (Doc.564) ..................................................... 3071

Petitioner's Memorandum for Sealed Materials Subpoenaed by Court
    Filed February 1, 2017  (Doc.565) ..................................................... 3074

Rule 59(e) Motion to Alter or Amend
    Filed February 16, 2017 (Doc.566) .................................................... 3079

Rule 59(e) Memorandum with attachment A
    Filed Feb. 16, 2017  (Doc.567) ........................................................ 3081

      Att. A:   Paula Dalton Declaration (Doc.567-1)................................. 3102

Order Denying Access to Sealed Material Subpoenaed by Court
    Entered February 21, 2017 (Doc.568)................................................. 3103

Petitioner's Third Motion for Discovery
    Filed February 24, 2017 (Doc.570) .................................................... 3111

United States' Response to Third Motion for Discovery
    Filed March 31, 2017 (Doc.574) ....................................................... 3122

United States' Response to Rule 59(e) Motion
    Filed March 31, 2017 (Doc.575) ....................................................... 3132

Petitioner's Reply Supporting Third Motion for Discovery
    Filed April 6, 2017 (Doc.576), ......................................................... 3135

Record Notation Order
    Filed June 16, 2017 (Doc.583) ......................................................... 3138

Order Directing Re-entry of Order Denying 59(e) Motion and Denying Third Motion for Discovery
    Entered June 21, 2017  (Doc.586) .......................................................................3140

Re-entered Order Denying 59(e) Motion and Denying Third Motion for Discovery
    Filed June 21, 2017 (Doc.587), ...........................................................................3143

Petitioner's Motion to Expand Record
    Filed August 18, 2017 (Doc.588) .........................................................................3154

Petitioner's Motion to Permit Copying and Distribution of Protected Documents
    Filed August 18, 2017 (Doc.589), ........................................................................3157

Notice of Appeal
    Filed August 18, 2017 (Doc.590) .........................................................................3160

Order Granting Motion to Expand the Record
    Entered September 15, 2017 (Doc.596) ................................................................3163

Order Granting Motion to Permit Copying and Distribution of Protected Documents
    Entered September 15, 2017 (Doc.597) ................................................................3166

*Volume VIII of X - Sealed*

Supplemental Motion for Neuropsychologist Expert Services and Approval of Additional Funds for Paralegal/Discovery Coordinator Services Ex Parte
    Filed February 5, 2009 (Doc.153) ........................................................................3169

    Att. 1:    02/05/09 Cover Letter (Doc.153-1).......................................................3172
    Att. 2:    CV – Scott D. Bender, Ph.D., ABPP-CN (Doc153-2)........................3173

Supplemental Motion for Psychiatrist and to Change the Designation of the Neuropsychologist Expert Previously Approved by the Court
    Filed June 8, 2009 (Doc.204) ...............................................................................3176

Letter from Judge Smith directing three juror lists to be picked up by counsel
    Filed June 12, 2009 (Doc.210) .............................................................................3178

Order deferring action on defendant's motion for psychiatrist Dr. Merikangas
    Entered June 23, 2009 (Doc.229) .........................................................................3181

Psychological Evaluation of Dr. Mirsky
        Filed July 20, 2009 (Doc.246)........................................................................ 3184

Strike List for First Day
        Filed April 13, 2015 (Doc.424)...................................................................... 3190

Strike List for Second Day
        Filed Apr. 13, 2015 (Doc.424-1).................................................................... 3194

Order sealing Claim S2 and Exhibit S-1
        Entered October 5, 2015 (Doc.477) ............................................................... 3198

Original Claim S-2
        Filed Oct. 5, 2015 (Doc.477-1) ...................................................................... 3203

Exhibit S-1
        Filed Oct. 5, 2015 (Doc.477-2) ...................................................................... 3223

Addendum S-1 to First Motion for Discovery
        Dec. 4, 2015 (Doc.490) .................................................................................. 3236

United States' Response to Original Claim S2
        Filed January 11, 2016 (Doc.498)................................................................... 3237

Petitioner's Motion to File Under Seal One Claim and One Exhibit in His
Amended Motion for Collateral Relief
        Filed February 4, 2016 (Doc507)................................................................... 3245

Amended Claim S2
        Filed Feb. 4, 2016 (Doc.508) ......................................................................... 3249

Reply Supporting Original Claim S2
        Filed Mar. 28, 2016 (Doc.525)....................................................................... 3269

United States' Response to Amended Claim S2
        Filed Apr. 22, 2016 (Doc.537) ....................................................................... 3275

Reply Supporting Amended Claim S2
        Filed July 7, 2016 (Doc.549).......................................................................... 3284

Completed Questionnaire of Prospective Juror 1........................................................ 3291

Completed Questionnaire of Prospective Juror 2........................................................ 3310

Completed Questionnaire of Prospective Juror 4 ....................................................... 3329

Completed Questionnaire of Prospective Juror 7 ....................................................... 3348

Completed Questionnaire of Prospective Juror 10 ..................................................... 3367

Completed Questionnaire of Prospective Juror 12 ..................................................... 3386

Completed Questionnaire of Prospective Juror 13 ..................................................... 3405

Completed Questionnaire of Prospective Juror 14 ..................................................... 3424

Completed Questionnaire of Prospective Juror 15 ..................................................... 3443

Completed Questionnaire of Prospective Juror 18 ..................................................... 3462

Completed Questionnaire of Prospective Juror 20 ..................................................... 3481

Completed Questionnaire of Prospective Juror 23 ..................................................... 3500

Completed Questionnaire of Prospective Juror 24 ..................................................... 3519

Completed Questionnaire of Prospective Juror 27 ..................................................... 3538

Completed Questionnaire of Prospective Juror 28 ..................................................... 3557

*Volume IX of X - Sealed*

Completed Questionnaire of Prospective Juror 29 ..................................................... 3576

Completed Questionnaire of Prospective Juror 31 ..................................................... 3595

Completed Questionnaire of Prospective Juror 32 ..................................................... 3614

Completed Questionnaire of Prospective Juror 34 ..................................................... 3633

Completed Questionnaire of Prospective Juror 35 ..................................................... 3652

Completed Questionnaire of Prospective Juror 40 ..................................................... 3671

Completed Questionnaire of Prospective Juror 46 ..................................................... 3690

Completed Questionnaire of Prospective Juror 50 ..................................................... 3709

Completed Questionnaire of Prospective Juror 51 ..................................................... 3728

Completed Questionnaire of Prospective Juror 52 ..................................................... 3747

Completed Questionnaire of Prospective Juror 54 ..................................................... 3766

Completed Questionnaire of Prospective Juror 63 ......................................................... 3785

Completed Questionnaire of Prospective Juror 64 ......................................................... 3804

Completed Questionnaire of Prospective Juror 65 ......................................................... 3823

Completed Questionnaire of Prospective Juror 66 ......................................................... 3842

Completed Questionnaire of Prospective Juror 67 ......................................................... 3861

Completed Questionnaire of Prospective Juror 68 ......................................................... 3880

Completed Questionnaire of Prospective Juror 69 ......................................................... 3899

Completed Questionnaire of Prospective Juror 70 ......................................................... 3918

Completed Questionnaire of Prospective Juror 73 ......................................................... 3937

Completed Questionnaire of Prospective Juror 74 ......................................................... 3956

Completed Questionnaire of Prospective Juror 75 ......................................................... 3975

Completed Questionnaire of Prospective Juror 78 ......................................................... 3994

Completed Questionnaire of Prospective Juror 80 ......................................................... 4013

*Volume X of X - Sealed*

Completed Questionnaire of Prospective Juror 81 ......................................................... 4032

Completed Questionnaire of Prospective Juror 82 ......................................................... 4051

Completed Questionnaire of Prospective Juror 84 ......................................................... 4070

Completed Questionnaire of Prospective Juror 86 ......................................................... 4089

Completed Questionnaire of Prospective Juror 87 ......................................................... 4108

Completed Questionnaire of Prospective Juror 91 ......................................................... 4127

Completed Questionnaire of Prospective Juror 95 ......................................................... 4146

Completed Questionnaire of Prospective Juror 97 ......................................................... 4165

Completed Questionnaire of Prospective Juror 98 ......................................................... 4184

Completed Questionnaire of Prospective Juror 100 ....................................................... 4203

Completed Questionnaire of Prospective Juror 106 ....................................................... 4222

Completed Questionnaire of Prospective Juror 107......................................................... 4241

Completed Questionnaire of Prospective Juror 109......................................................... 4260

Completed Questionnaire of Prospective Juror 110......................................................... 4279

Completed Questionnaire of Prospective Juror 113......................................................... 4298

Completed Questionnaire of Prospective Juror 115......................................................... 4317

Completed Questionnaire of Prospective Juror 116......................................................... 4336

Completed Questionnaire of Prospective Juror 117......................................................... 4355

Completed Questionnaire of Prospective Juror 118......................................................... 4374

Completed Questionnaire of Prospective Juror 119......................................................... 4393

Completed Questionnaire of Prospective Juror 120......................................................... 4412

Completed Questionnaire of Prospective Juror 124......................................................... 4431

Completed Questionnaire of Prospective Juror 126......................................................... 4450

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

    Petitioner,

                                    CIVIL NO. 4:15cv108

v.               [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

    Respondent.

## ORDER

The court **DIRECTS** the Clerk to prepare a subpoena duces tecum directing the Virginia Department of Forensic Science to produce under seal to the Clerk, on or before July 22, 2016, all records related to the above-captioned case, with corresponding FS Lab #T07-4553, for in camera review by the court. These records shall be maintained under seal, absent further action by the court. The subpoena shall be served by certified mail on the following:

    Amy M. Curtis, Department Counsel
    Virginia Department of Forensic Science
    700 North 5th Street
    Richmond, Virginia 23219

The Clerk is directed to send a copy of this Order to counsel for the Petitioner and the United States Attorney at Newport News.

IT IS SO ORDERED.

                                 /s/
                          Rebecca Beach Smith
                          Chief Judge

July 12, 2016

**2817**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

| | |
|---|---|
| DAVID ANTHONY RUNYON _____ *Plaintiff* v. UNITED STATES OF AMERICA _____ *Defendant* | ) ) ) ) ) ) ) |

CIVIL NO. 4:15cv108
[ORIGINAL CRIMINAL NO. 4:08cr16-3]

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:     Amy M. Curtis, Department Counsel

_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Produce under seal to the Clerk, on or before July 22, 2016, all records related to the above-captioned case, with corresponding FS Lab #T07-4553, for in camera review by the court. These records shall be maintained UNDER SEAL, absent further action by the court.

| Place: United States District Court Clerk's Office, Room 193 C 600 Granby Street, Norfolk, Virginia 23510 | Due Date: 07/22/2016 |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     07/13/2016

*CLERK OF COURT*

OR

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

**2818**

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:15cv108

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

**2819**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

  (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

      Petitioner,

                                  CIVIL NO. 4:15cv108

v.                [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

      Respondent.

## ORDER

The court **DIRECTS** the Clerk to prepare a subpoena duces tecum directing the Virginia Department of Forensic Science to produce under seal to the Clerk, on or before July 22, 2016, all records related to the above-captioned case, with corresponding FS Lab #T07-4553, for in camera review by the court. These records shall be maintained under seal, absent further action by the court. The subpoena shall be served by certified mail on the following:

    Amy M. Curtis, Department Counsel
    Virginia Department of Forensic Science
    700 North 5th Street
    Richmond, Virginia 23219

The Clerk is directed to send a copy of this Order to counsel for the Petitioner and the United States Attorney at Newport News.

IT IS SO ORDERED.

July 12, 2016

                          /s/
                    Rebecca Beach Smith
                      Chief Judge

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY
                    DEPUTY CLERK

**2821**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

    Petitioner,

                                    CIVIL NO. 4:15cv108
    v.                         [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

    Respondent.

## ORDER

The court **DIRECTS** the Clerk to prepare a subpoena duces tecum directing the Virginia Department of Forensic Science to produce under seal to the Clerk, on or before July 22, 2016, all records related to the above-captioned case, with corresponding FS Lab #T07-4553, for in camera review by the court. These records shall be maintained under seal, absent further action by the court. The subpoena shall be served by certified mail on the following:

    Amy M. Curtis, Department Counsel
    Virginia Department of Forensic Science
    700 North 5th Street
    Richmond, Virginia 23219

The Clerk is directed to send a copy of this Order to counsel for the Petitioner and the United States Attorney at Newport News.

    IT IS SO ORDERED.

                                    /s/
                                    Rebecca Beach Smith
July 12, 2016                       Chief Judge

**2822**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

      Petitioner,

                             CIVIL NO. 4:15cv108
v.                   [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

      Respondent.

## ORDER

The court **DIRECTS** the United States Attorney to file ex parte and under seal the grand jury testimony of Chad Costa, for in camera review by the court, on or before August 1, 2016.

The Clerk is directed to send a copy of this Order to counsel for the Petitioner and the United States Attorney at Newport News.

IT IS SO ORDERED.

                        /s/
                 Rebecca Beach Smith
                    Chief Judge

REBECCA BEACH SMITH
CHIEF JUDGE

July 26, 2016

**2823**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

      Petitioner,

                           CIVIL NO. 4:15cv108
v.                 [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

      Respondent.

OPINION

This matter comes before the court on the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence ("Motion"), filed by David Anthony Runyon ("Petitioner") on February 4, 2016. ECF No. 511.[1] Further before the court are the Petitioner's First Motion for Discovery, filed on December 9, 2015, ECF No. 491, and Second Motion for Discovery, filed on April 1, 2016. ECF No. 530. All matters have been fully briefed and are ripe for decision. For the reasons contained herein, the First Motion for Discovery is **DENIED**, and the Second Motion for Discovery is **DENIED**. The Motion to Vacate brought pursuant to 28 U.S.C. § 2255 is **DENIED**.

---

[1] The Petitioner filed his original Motion under 28 U.S.C. § 2255 on October 5, 2015, ECF No. 478, after which he filed an amended Motion on February 4, 2016. ECF No. 511. This amended Motion is the operative pleading. See infra Part II.

**2824**

## I. FACTUAL BACKGROUND[2]

On April 29, 2007, Cory Allen Voss ("Voss"), an officer in the United States Navy, was murdered. At the time, Voss was married to Catherina Voss ("Cat"), and the couple had two children, ages eight and seven. He was stationed out of Norfolk Naval Base, and lived in Newport News, Virginia, with his wife and children. On April 29, 2007, Voss returned home from a twenty-four hour shift aboard the USS Elrod, where he served as the Communications Officer. That night, Cat asked Voss to go to the ATM at Langley Federal Credit Union ("LFCU") in Newport News, Virginia. The next morning, Voss was found dead in his truck, after being shot five times with a .357 revolver as part of a murder-for-hire conspiracy. The facts neither start nor end here.

Testimony presented at trial revealed that in 2006, while Voss was at sea on a six-month deployment, Cat began having an extramarital affair with Michael Draven ("Draven"). After Voss returned home from that deployment, Cat and Cory Voss began experiencing financial difficulties, and the affair between Cat

---

[2] The following is a summary of the voluminous evidence presented to the jury, both through testimony and exhibits, during the guilt phase of trial. The appellate process is complete, and the case is now on collateral review. See infra Part II.

2

**2825**

and Draven remained ongoing. Cat had no independent source of income, and Draven had no regular employment, but earned some money from participating in experimental clinical drug studies. Cat and Draven realized that if they were to stay together, and have the money to live the lavish lifestyle they wanted, they needed to get rid of Voss. As a member of the United States Navy, Voss had a life insurance policy through the Office of Servicemember's Group Life Insurance ("SGLI"), which named Cat as the primary beneficiary. Once Voss was dead, Cat would receive the $400,000 SGLI life insurance policy benefit, together with other Navy spousal benefits.

Cat and Draven decided that the best way to accomplish their goal was to hire someone to commit the actual murder. Draven had met David Anthony Runyon ("Runyon") while participating in experimental clinical drug trials, and Draven now reached out to Runyon about joining the conspiracy. Runyon was a former police officer and former member of the United States Army, as well as a firearm enthusiast. Runyon agreed to act as the triggerman, in exchange for payment. Once Runyon agreed to participate, phone records show that the defendants began to communicate and plan how to commit the crime.

On April 20, 2007, Cat Voss opened an account with LFCU, into which she deposited only five dollars. On April 29, 2007,

3

**2826**

the day of the murder, Runyon bought a .357 magnum Taurus revolver from George Koski in Morgantown, West Virginia, where Runyon was then living. Koski testified that he wrote down Runyon's driver's license number and phone number, and he also provided Runyon with some old ammunition. Koski further testified that the type of gun he sold Runyon could shoot both .357 magnum and .38 special cartridges. That same day, Runyon drove from Morgantown to Newport News, Virginia, to complete his part of the crime. He stopped at payphones along the way, including one at a Newport News Waffle House, to communicate with Draven, and Draven provided him with identifying information about Voss's truck. Runyon wrote down this information on a map of the Hampton Roads area, which police later discovered in Runyon's car. Phone records also indicate multiple calls between Draven and Cat Voss during this same time span.

Later on the night of April 29, 2007, around 11:00 p.m., Cat sent Voss to the ATM at LFCU. At approximately 11:31 p.m., Voss attempted a transaction but entered the wrong personal identification number. Surveillance footage and phone records reveal that Voss was talking to Cat on his cell phone at this time. At around 11:33 p.m., while Voss was still at the ATM, video shows that an assailant wearing a black hoodie climbed

4

**2827**

into Voss's truck. Voss reentered his truck at around 11:36 p.m. and began to drive away from the ATM, before returning at approximately 11:41 p.m. to attempt three withdrawals. All the withdrawals were denied for insufficient funds, because unbeknownst to Voss, Cat had placed only five dollars in the account. Voss then got back in his truck and drove away. He was found dead in his truck the next morning in a nearby parking lot. He had been shot five times, with three of the shots being fatal. Four hollow-point bullets and one jacket were recovered. The bullets were identified as .38 class, which can be used with guns capable of firing .357 magnum and .38 special cartridges.

Just a few days after the murder, Runyon checked back into a clinical drug study, and ordered online a stainless steel bore brush, which is used to clean the inside of the barrel of a gun, to be shipped to his West Virginia address, but under a false name. Expert testimony revealed this type of brush can impact examinations that attempt to link bullets to a specific gun. Testimony also revealed that in the Fall of 2007, Runyon had a friend pawn his .357 Taurus magnum revolver several times. Then, in December 2007, Runyon instructed his friend to retrieve the firearm from the pawn shop one last time, and to give the gun back to him. The police were unable to locate the gun after its return to Runyon.

**2828**

While the police were beginning the investigation into the crime, the defendants were working together to hide evidence of the murder. Although Cat had received an initial $100,000 death gratuity benefit from the United States Navy, which she and Draven quickly spent, she had yet to receive the $400,000 life insurance benefit on Voss. In order to receive the full payout, Cat had to clear herself from suspicion, and emails and wiretaps showed that the defendants coordinated amongst themselves to align their alibis and hide their relationships with each other from the investigators.

During police interviews, the defendants gave conflicting stories and attempted to obstruct the investigation. Runyon denied owning any firearms, and he was unable to confirm his whereabouts on April 29 and 30, 2007. All of the parties denied the relationship between Draven and Cat for several months, although Draven did eventually admit the affair to the police.[3] Both Draven and Runyon stated they had met or called each other from a Waffle House in Newport News during the Spring of 2007. Draven further admitted that Runyon used the payphone there to

---

[3] Cat admitted the relationship when she pled guilty, as set forth in her Statement of Facts accompanying her plea agreement. Case No. 4:08cr16-1, ECF Nos. 69, 70. Both the plea agreement and Statement of Facts were admitted into evidence by defense counsel, during the mitigation phase of trial. Def. Exs. 4, 7.

.

talk with him on the night of the murder, although Draven claimed that Runyon stopped at the Waffle House on his way to an out-of-state fishing trip.

In December 2007, nearly eight months after the murder, police executed search warrants in West Virginia for Runyon's residences, vehicle, and storage unit, and the contents of the search were introduced during the guilt phase of trial. In the console of Runyon's car, agents found a map of Newport News, Virginia, on which Runyon had written the following: "Langley Federal Credit Union, 97 grey Ford Ranger, FL hubcap missing, tailgate down, J. Morris Blvd, Cory." The description of the Ford Ranger matched the description of Voss's truck, and J. [Clyde] Morris Boulevard is a street near the LFCU that Voss went to on the night he was murdered. Also found with the map was a photograph of Cat and Draven, with their names, addresses, and social security numbers written on the back.

In Runyon's residence, the investigators located a shopping list written by Runyon, which included a taser, Spyderco knife, tarp, trash bag, boots, gloves, military-style pants, and a black hoodie. Runyon had also written on that list the location of LFCU, and travel time and mileage from Morgantown, West Virginia, to Newport News, Virginia. Although Runyon had apparently requested a payment of five hundred dollars ($500) up

7

**2830**

front for the murder, a Western Union receipt indicated that Runyon received two hundred seventy-five dollars ($275) from Draven's brother, Randy Fitchett, on June 1, 2007. Fitchett testified, and while he denied that he sent the money order, he recalled going with Draven to send the money order to a friend of Draven's. Additionally, the police found boxes of .38 special and .357 magnum bullets in the basement of Runyon's former residence.[4] Five of the Winchester .357 magnum hollow-point bullets were missing from the box, and medical reports revealed that Voss had been shot five times by hollow-point .38 class bullets. Expert witness testimony provided that .38 class bullets include .357 magnum and .38 special bullets. Multiple witnesses also testified that Runyon had bragged about killing Voss, or a military member or other unidentified person, for money.

In February 2008, a five-count Indictment was returned against Runyon, Cat, and Draven. Although Cat pled guilty in exchange for a life sentence, the above facts were established through evidence and testimony during the trial against Runyon

---

[4] At the time of the search, Runyon had moved to a new address in Morgantown, West Virginia. Agents searched both Runyon's current and former residences, and the residents at his former address indicated that the bullets found in the basement belonged to Runyon.

8

**2831**

and Draven. The jury then found Runyon guilty of Conspiracy to Commit Murder for Hire, Carjacking Resulting in Death, and Murder with a Firearm in Relation to a Crime of Violence.

## II. PROCEDURAL HISTORY

On February 13, 2008, a federal grand jury returned a five-count Indictment against the Petitioner and his co-defendants, Michael Draven and Catherina Voss, in the murder of Cat Voss's husband, Cory Voss. ECF No. 3. The Indictment charged the defendants with Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a) (Count One); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count Two); Bank Robbery Resulting in Death, in violation of 18 U.S.C. §§ 2113(a), (e), and 2 (Count Three); Conspiracy to Commit Robbery Affecting Commerce, in violation of 18 U.S.C. § 1951(a) (Count Four); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(j) and 2 (Count Five). Id.

The Indictment also included a Notice of Special Findings for the death penalty, pursuant to 18 U.S.C. §§ 3591 and 3592. Id. at 13-14. The Notice set out the statutory requirements for the death penalty: the defendants were more than eighteen years old at the time of the offense; there was the requisite intent

9

**2832**

to cause death, serious bodily injury, or engage in acts of violence using lethal force or knowingly creating a grave risk of death; and there were statutory aggravating factors. <u>Id.</u> at 13. As to Counts One, Two, Three, and Five, all three defendants were found to meet the statutory aggravating factors of having "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value," and having "committed the offense after substantial planning and premeditation to cause the death of a person." <u>Id.</u> at 13-14. Additionally, for those same counts, the grand jury found Cat Voss and Draven satisfied the statutory aggravating factor of having "procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value." <u>Id.</u> at 14.

On March 4, 2008, Lawrence Woodward and John Babineau were appointed to represent the Petitioner. On July 17, 2008, the government filed its Notice of Intent to Seek a Sentence of Death against the Petitioner. ECF No. 67. The government also filed a Notice stating that it would not seek the death penalty against Draven. Case No. 4:08cr16-2, ECF No. 68. Cat Voss pled guilty to all five counts the following day on July 18, 2008.

On February 13, 2009, Babineau withdrew from the Petitioner's case due to a conflict of interest, and attorney

<div align="center">10</div>

<div align="center">**2833**</div>

Stephen Hudgins was appointed. ECF No. 161. The Petitioner filed various pre-trial motions and reports,[5] and on June 30, 2009, the jury trial against the Petitioner and Draven commenced. The first two days consisted of voir dire, and the jury was impaneled on July 2, 2009, after which opening statements and the presentation of evidence began. On July 15, 2009, at the conclusion of all evidence, the court dismissed Count Three, pursuant to Federal Rule of Criminal Procedure 29. On July 17, 2009, the jury found the Petitioner and Draven guilty as to Counts One, Two, and Five, and not guilty as to Count Four. Verdict Form, ECF No. 245, attached hereto as Exhibit A. On July 22, 2009, the trial continued with the eligibility phase, in which the government argued that the Petitioner was eligible to receive the death penalty. The jury found that the Petitioner intentionally killed Cory Voss. Special Verdict Form – Eligibility Phase, ECF No. 255, attached hereto as Exhibit B. The jury also found two statutory aggravators: (1) the Petitioner "committed the offense in consideration for the receipt of, or in expectation of the receipt, of anything of pecuniary value"; and (2) the Petitioner "committed the offense

---

[5] Due to the large volume of filings, the court will not review all the motions and reports at this point. To the extent the filings relate to this Motion, they will be discussed at such point as they are relevant to the claims for relief.

after substantial planning and premeditation to cause the death of a person." Id. On August 19, 2009, the penalty phase of the trial commenced. On August 27, 2009, the jury returned a recommendation for death on Counts One and Five, and life imprisonment on Count Two. Special Verdict Form – Selection Phase, at 5, ECF No. 291, attached hereto as Exhibit C. The jury found four non-statutory aggravating factors. Id.[6] The jury also found two statutory mitigating factors and eight non-statutory mitigating circumstances proposed by defense counsel, along with finding three mitigating factors of their own accord. Id.[7] On

---

[6] The non-statutory aggravating factors found by the jury were that the Petitioner (1) caused injury, harm, and loss to the victim, and the victim's family and friends; (2) utilized training, education, and experience gained during criminal justice college courses, his time in the Kansas National Guard, his work as a law enforcement officer, and his experience as a member of the United States Army; (3) engaged in acts of physical abuse towards women; and (4) demonstrated a lack of remorse. Special Verdict Form - Selection Phase, at 1-2, ECF No. 291.

[7] The statutory mitigating factors found by the jury were that (1) the Petitioner did not have a serious criminal record, and (2) other persons equally culpable in the crime will not be punished by death. Special Verdict Form - Selection Phase, at 1-2, ECF No. 291.
The non-statutory mitigators presented by defense counsel, and found by the jury, were that (1) the Petitioner will serve a sentence of life in prison without the possibility of release, if not sentenced to death; (2) the Petitioner has worked and been legally employed for all of his life; (3) the Petitioner committed acts of kindness and generosity for his neighbors and community; (4) the Petitioner grew up, witnessed, and

12

**2835**

December 4, 2009, pursuant to the jury's verdict, the Petitioner was sentenced to death for Counts One and Five and to life imprisonment without the possibility of release for Count Two. ECF No. 313.[8]

The Petitioner timely filed an appeal, and on February 25, 2013, the Fourth Circuit Court of Appeals affirmed his conviction and sentence. United States v. Runyon, 707 F.3d 475 (4th Cir. 2013). On October 6, 2014, the Supreme Court denied his petition for writ of certiorari. Runyon v. United States, 135 S. Ct. 46 (2014) (No. 13-254). The Petitioner filed

---

experienced domestic violence and parental conflict until his mother and biological father separated; (5) the Petitioner's son will suffer emotional harm, if the Petitioner is executed; (6) the Petitioner's mother will suffer emotional harm, if the Petitioner is executed; (7) the Petitioner served his country as a member of the United States Army and was honorably discharged; and (8) the Petitioner graduated from high school, earned an associate of arts degree, and took further college courses. Id. at 3-4.

The jury also found the following three non-statutory mitigating factors of their own creation: (1) the Petitioner continued to witness and experience domestic violence and parental conflict/abuse from his mother and adoptive father; (2) the Petitioner's brother will suffer emotional harm, if the Petitioner is executed; and (3) the Petitioner was given the impression that Cory Voss was molesting his own daughter. Id. at 4.

[8] Cat Voss was sentenced to life in prison on Counts One, Two, Three, and Five, and twenty (20) years imprisonment on Count Four. Case No. 4:08cr16-1, ECF No. 127. Draven was sentenced to life in prison on all counts of conviction. Case No. 4:08cr16-2, ECF No. 304. Both of these cases are closed, and the convictions and sentences are final.

13

**2836**

his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence on October 5, 2015. ECF No. 478. The government filed its Response on January 11, 2016, ECF No. 497, and the Petitioner filed his Reply on March 28, 2016. ECF No. 526.

On December 9, 2015, the Petitioner filed his First Motion for Discovery. ECF No. 491. The government submitted its Response on January 15, 2016, ECF No. 500, and the Petitioner filed his Reply on January 29, 2016. ECF No. 506. Both the Response and the Reply to the Discovery Motion incorporated the Response and Reply to the § 2255 Motion. On April 1, 2016, the Petitioner filed his Second Motion for Discovery. ECF No. 530. The government filed a Response on April 8, 2016, ECF No. 532, and the Petitioner submitted a Reply on April 13, 2016. ECF No. 533.

On February 4, 2016, the Petitioner filed an amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence. The government filed its Response to the amended Motion on April 22, 2016. The Petitioner submitted his Reply to the amended filings on July 7, 2016. As Fourth Circuit precedent provides that an amended pleading supersedes the original, the court will now consider the amended Motion and corresponding Response and Reply. See Young v. City of Mount Ranier, 238 F.3d

14

**2837**

567, 573 (4th Cir. 2001) ("[A]n amended pleading supersedes the original pleading, rendering the original pleading of no effect.").[9] The court will also consider the First and Second Discovery Motions in the same sections as the claims to which each discovery request relates.

<div align="center">

### III. STANDARDS OF REVIEW

</div>

### A. MOTIONS BROUGHT PURSUANT TO 28 U.S.C. § 2255

A prisoner may challenge a sentence imposed by a federal court, if (1) the sentence violates the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum; or (4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). A sentence is "otherwise subject to collateral attack" if a petitioner shows that the proceedings suffered from "'a fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Addonizio, 442 U.S. 178, 185 (1979) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

The petitioner bears the burden of proving one of those grounds by a preponderance of the evidence. See Miller v. United

---

[9] All citations in this Opinion will refer to the amended pleadings unless otherwise specified.

<div align="center">

15

</div>

<div align="center">

**2838**

</div>

States, 261 F.2d 546, 547 (4th Cir. 1958). If he satisfies that burden, the court may vacate, set aside, or correct the sentence. 28 U.S.C. § 2255(b). However, if the motion, when viewed against the record, shows that the petitioner is entitled to no relief, the court may summarily deny the motion. Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

### 1. Ineffective Assistance of Counsel

In cases where a petitioner claims to have received ineffective assistance of counsel as grounds for relief, a petitioner must show by a preponderance of the evidence that (1) the attorney's performance was deficient; and (2) such deficient performance prejudiced the petitioner by undermining the reliability of the judgment against him. Strickland v. Washington, 466 U.S. 668, 687 (1984).

To show deficient performance, counsel's actions or omissions must be measured against what "an objectively reasonable attorney would have done under the circumstances existing at the time of the representation." Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996); see Lawrence v. Branker, 517 F.3d 700, 708-09 (4th Cir. 2008) (noting that this is a "difficult" showing for a petitioner to make). The court must attempt to "eliminate the distorting effects of hindsight," and instead "must indulge a strong presumption that counsel's

16

**2839**

conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In doing so, a petitioner "must demonstrate that the error worked to his 'actual and substantial disadvantage,' not merely that the error created a 'possibility of prejudice.'" Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). Because a petitioner must satisfy both parts of the Strickland test, a failure to carry the burden of proof as to one prong precludes relief and relieves the court of the duty to consider the other. Strickland, 466 U.S. at 700.

Due process of law also requires that a defendant receive effective assistance of counsel on direct appeal. Evitts v. Lucey, 469 U.S. 387, 396-97 (1985). As with trial counsel, effectiveness of appellate counsel is evaluated under the two prongs of Strickland. See Smith v. Murray, 477 U.S. 527, 535-36 (1986). To determine effectiveness of appellate counsel, a court must evaluate whether counsel failed to raise "a particular nonfrivolous issue [that] was clearly stronger than issues that counsel did present" on direct appeal. Smith v. Robbins, 528

17

**2840**

U.S. 259, 288 (2000). However, appellate counsel need not raise every nonfrivolous claim in their brief. See id.; Jones v. Barnes, 463 U.S. 745, 753 (1983) ("A brief that raises every colorable issue runs the risk of burying good arguments."). As to prejudice, the Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

### 2. Procedural Default

Claims that could have been "fully and completely addressed on direct review based on the record" are considered procedurally defaulted, if raised for the first time during collateral review. Bousley v. United States, 523 U.S. 614, 622 (1998). In order to obtain collateral relief based on issues that could have been raised on direct appeal, but were not, the movant must ordinarily show "'cause' excusing his . . . procedural default," and "'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 167-68 (1982); see also Massaro v. United States, 538 U.S. 500, 504 (2003) ("[C]laims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice."). "The existence of cause for a procedural default must turn on something external to the defense, such as

18

**2841**

the novelty of the claim or a denial of effective assistance of counsel." United States v. Mikalajunas, 186 F.3d 490, 493 (4th Cir. 1999). Prejudice is shown when the alleged errors worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Frady, 456 U.S. at 170.

Even in the absence of cause for the procedural default and resulting prejudice, a defendant may proceed with a collateral attack, if he is able to show that a fundamental miscarriage of justice would result were his claim denied. United States v. Maybeck, 23 F.3d 888, 892 (4th Cir. 1994). To demonstrate a "miscarriage of justice," the petitioner "must show actual innocence by clear and convincing evidence." United States v. Williams, 396 F. App'x 951, 953 (4th Cir. 2010) (unpublished); Mikalajunas, 186 F.3d at 493.

### 3. Bar on Relitigating Claims Brought on Direct Appeal

A petitioner is generally not permitted to relitigate issues brought on direct appeal in a collateral attack. Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (per curiam). Accordingly, courts may "refuse to reach the merits of a constitutional claim previously raised and rejected on direct appeal." Withrow v. Williams, 507 U.S. 680, 720-21 (1993) (Scalia, J., concurring in part and dissenting in part)

19

**2842**

(collecting cases). Exceptional circumstances, however, such as an intervening change in the law, may warrant a departure from this law-of-the-case doctrine. See Davis v. United States, 417 U.S. 333, 342-47 (1974) (holding that when relevant substantive law changed after the petitioner's trial and unsuccessful appeal, the petitioner could file a § 2255 motion for collateral relief based on the intervening change in the law); Jones v. United States, 178 F.3d 790, 796 (6th Cir. 1999) ("It is equally well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law.").

### 4. Retroactive Application of New Rules to Cases on Collateral Review

Generally, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague v. Lane, 489 U.S. 288, 310 (1989). There are two exceptions to this bar on retroactivity. First, "[n]ew substantive rules generally apply retroactively." Schriro v. Summerlin, 542 U.S. 348, 351 (2004). The other exception is for "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." Saffle v. Parks, 494 U.S. 484, 495

20

**2843**

(1990). Only if one of these exceptions is met may a court retroactively apply a new rule of criminal procedure to a case on collateral review.

### 5. Evaluation of New Claims Contained in Amended Pleadings

To be timely, a motion brought pursuant to 28 U.S.C. § 2255 must be filed within one year of the latest of

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

In the instant case, the Petitioner properly amended his Motion, but the amended Motion was filed more than one year after his conviction became final. For the arguments that were raised for the first time in the amended Motion, Rule 15 of the Federal Rules of Civil Procedure provides for "relation back of

21

**2844**

amendments to the original pleading under certain circumstances." United States v. Pittman, 209 F.3d 314, 317 (4th Cir. 2000). Such circumstances occur when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Thus, in a collateral attack, a claim added by amendment relates back unless "it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Mayle v. Felix, 545 U.S. 644, 650 (2005).

### B. DISCOVERY FOR MOTIONS BROUGHT PURSUANT TO 28 U.S.C. § 2255

Discovery for motions brought pursuant to 28 U.S.C. § 2255 can occur only upon leave of the court, and after a showing of good cause by the Petitioner. Rule 6(a), Rules Governing Section 2255 Proceedings for the United States District Courts. According to Rule 6(b), "[a] party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents." Good cause for discovery is found "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . .

22

**2845**

entitled to relief.'" Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)); see also United States v. Roane, 378 F.3d 382, 402-03 (4th Cir. 2004) (clarifying that the good cause standard is met when a petitioner establishes a prima facie case for relief). Importantly, the petitioner must be able to point to specific factual allegations when making his request; he "may not use discovery to go on a 'fishing expedition' through the Government's files in search of evidence to support an imagined and fanciful claim." United States v. Lighty, No. CIV. PJM 12-3065, 2014 WL 5509205, at *3 (D. Md. Oct. 30, 2014) (citing United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990)).

Once good cause is established, the district court has discretion to determine the scope and extent of discovery. See Bracy, 520 U.S. at 909; see also Roane, 378 F.3d at 394 (using an abuse of discretion standard to review a district court's denial of discovery in a § 2255 case). A judge may "authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a), Rules Governing Section 2255 Proceedings for the United States District Courts.

23

**2846**

## IV. THE PETITIONER'S CLAIMS

The Petitioner has raised eighteen claims in his instant Motion, many with one or more subparts. He has also made requests for six different categories of discovery, including requests for both documents and interrogatories. The court will now address each of the eighteen claims in turn. The court will also address the arguments for discovery within the relevant section for each request.[10]

### A. CLAIM ONE – DISHONEST LAW ENFORCEMENT OFFICERS INVOLVED IN CASE

In this claim, the Petitioner asserts that Robert Glenn Ford and Clifford Dean Posey, who assisted in the investigation of the Petitioner's case, were also engaged in criminally dishonest acts before and/or during participation in his case. Mot. at 11. He alleges that their involvement in his case denied him of his right to a fair trial, and that the government should have provided him with information about the charges against both individuals and about Posey's work in the government's investigation. Id. at 11-16. The Petitioner further argues that,

---

[10] The court finds that based on the substantial amount of evidence presented and the extensive filings by both parties, there remain no factual disputes, and an evidentiary hearing is not necessary to resolve the Petitioner's claims.

24

**2847**

if his trial counsel knew about the charges against Ford and Posey, trial counsel was ineffective for not taking appropriate action. Id. at 11, 14, 16. The Petitioner also seeks discovery of documents and records held by various agencies concerning both Ford and Posey, and he requests permission to propound corresponding interrogatories. First Mot. for Discovery at 26-29.

The United States asserts that this claim is procedurally defaulted, and, regardless of the default, lacks merit. Resp. at 20. In his Reply, the Petitioner asserts that the government never told his counsel about the charges against Ford and Posey, even during direct appeal. Reply at 10-11. He claims this prevented him from objecting or raising the issue on appeal, and, as such, the claim is not procedurally defaulted. Id.

### 1. Robert Glenn Ford

The Petitioner alleges that Robert Glenn Ford, a former police officer who was appointed at the request of the Petitioner's trial counsel as an investigator for the defense, ECF Nos. 40, 41, was a "dirty cop," and that his involvement in a bribery scheme may have tainted the investigation in the Petitioner's case. Mot. at 11.

Records show that an informant, Marcus Adams, entered into a plea deal for the charge of Felon in Possession of a Firearm.

25

**2848**

<u>United States v. Adams</u>, 2:08cr103, ECF No. 37. As part of Adams's cooperation, he disclosed that Ford was involved in a scheme whereby Ford "accepted bribes from criminal defendants in exchange for making false representations to prosecutors and judges that the defendants had assisted him in homicide investigations," thereby leading to reduced sentences for the defendants. <u>Id.</u> at 1. On May 7, 2010, nearly six months after the Petitioner was sentenced and almost a year after his trial, Ford was indicted for these actions. <u>United States v. Robert Glenn Ford</u>, 2:10cr83, ECF No. 1. Ford's seven-day jury trial was held in October 2010, and he was sentenced on February 25, 2011. <u>Id.</u> ECF Nos. 57-60, 63, 66, 69, 87, 90. All of these proceedings were public and of record.

The Petitioner's appellate counsel filed their opening appellate brief on February 29, 2012, almost two years after Ford's indictment, and a year after sentencing. Appellate counsel had full benefit of knowledge of Ford's public indictment, trial, and sentencing. As such, the court is unconvinced that this claim could not have been discovered and raised at the time of appeal, and it finds that the claim is procedurally defaulted. However, the Petitioner argues that if appellate counsel knew about Ford's dishonest acts, then appellate counsel was ineffective for not raising this claim on

26

**2849**

appeal, and such ineffectiveness would excuse default. Mot. at 11. The court will now examine the merits of this claim. If it lacks merit, then the Petitioner will have failed to show the required prejudice for ineffective assistance of appellate counsel, and he will be unable to excuse the procedural default.

First, the Petitioner only speculates about what dishonest acts Ford may have been involved in with regard to Ford's investigation of the Petitioner's case. Id. at 12. The Petitioner theorizes that Ford may have filed a false report or taken a bribe from a witness, but the Petitioner can provide no evidence or example of these, or any other, dishonest acts by Ford in the investigation of the Petitioner's case. Id. Frankly, this argument is merely speculation, with no support in fact. There was no evidence or argument presented at Ford's seven-day trial, sentencing, or motions hearings, that in any way involved the Petitioner's case. See United States v. Robert Glenn Ford, 2:10cr83, Transcripts, ECF Nos. 61, 64, 73, 74, 77, 79, 96-103, 108-110, 112.

Further, the Petitioner's lead attorney, Lawrence Woodward, indicated that Ford and Sheila Cronin, a mitigation investigator, "worked very hard and did a good job investigating the case and [the Petitioner's] background." Mot. Attach. 6, ¶ 4. Cronin stated that she often provided Ford with a list of

27

**2850**

questions to ask witnesses. Id. Attach. 4, ¶ 3. The Petitioner's other attorney, Stephen Hudgins, also stated that, although he relied on Ford's and Cronin's witness interviews, he talked to the witnesses himself before and during the penalty phase. Id. Attach. 5, ¶ 8. In sum, defense counsel believed that Ford produced quality work, but counsel also provided questions for Ford to ask witnesses and interviewed witnesses themselves. Ford did not investigate the case alone, and counsel did not rely solely on Ford's reports.

Cronin also stated that she knew that Ford was "under considerable stress from the fall-out of the infamous 'Norfolk Four' case." Id. Attach. 4, ¶ 4. Presumably the Petitioner's defense team was on alert to watch over Ford's work, and yet counsel still found no reason to think that he was manipulating witnesses or performing any of the acts that the Petitioner now speculates occurred. Importantly, Ford's case involved his acceptance of bribes in exchange for lower sentences for defendants, and it was not a case where any judge or prosecutor was found to be corrupt. Ford was a person working for the Petitioner's trial counsel, at their request, under their supervision and direction, and with others of the Petitioner's defense team. The Petitioner offers no basis whatsoever why Ford would manipulate witnesses against him or try to harm his case.

28

**2851**

Additionally, the Petitioner argues that the government should have told defense counsel about Ford's conduct, as it would have caused defense counsel to question the reliability and honesty of Ford's reports to the Petitioner's counsel. Mot. at 12-13. He bases this argument on Fifth Amendment due process principles found in Berger v. United States, 295 U.S. 78 (1935), and an argument that, by not providing trial counsel with this information, the government deprived the Petitioner of effective assistance of trial counsel. Mot. at 13-14. This argument is a bit far-fetched, but the court addresses it below.

As the Petitioner recognizes, the information the government had about Ford's misconduct at the time of the investigation was highly confidential and part of an ongoing criminal investigation not involving the Petitioner's case. Id. at 13 n.4. Ford was not a witness in the Petitioner's case. If anything, Ford would have been a defense witness, not a government witness, so there was no need for impeachment evidence. Ford had not been indicted at that time, and the government was still conducting its investigation. There was no reason that the government should have provided confidential information about the Ford investigation to the Petitioner's counsel. Moreover, as reflected by the transcripts of Ford's

29

**2852**

trial, cited above, there was no evidence presented that even touched upon the Petitioner's case.

In sum, the Petitioner's conclusory, speculative statements do not show that he was harmed by Ford's involvement in his case, or that Ford's unrelated extortion scheme, in which he took bribes to reduce other defendants' sentences, affected the Petitioner or affected his Fifth Amendment right to a fair trial or his Sixth Amendment right to effective assistance of counsel. The Petitioner was not denied any constitutional rights here, and, as such, the court finds this claim has no merit. As this claim has no merit, the Petitioner fails to show any prejudice from appellate counsel's decision not to argue this claim on appeal, and he fails to overcome the procedural default.

The Petitioner's claim for discovery about Ford is further without merit. To receive discovery, the Petitioner must show good cause. Good cause is shown, "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" Bracy, 520 U.S. at 908-09 (quoting Harris, 394 U.S. at 300).

The Petitioner is unable to meet this standard. To learn about the scope of Ford's criminal acts and when the government first knew or should have known about those acts, the Petitioner

30

**2853**

requests "[a]ll documents in the government's possession that both refer or relate to Robert Glenn Ford and this [the Petitioner's] case." First Mot. for Discovery at 29. The Petitioner has shown no cause, much less good cause, as to why this request would help him overcome procedural default or prove ineffective assistance of trial counsel. As Ford was a defense investigator, it would be the Petitioner's defense counsel that knew of Ford's involvement in the Petitioner's case, not the government. While Ford participated in a criminally dishonest scheme to aid criminal defendants, as discussed above, there is no evidence or allegation of record that it in any way involved the Petitioner's case. See United States v. Robert Glenn Ford, 2:10cr83. The Petitioner fails to show how gaining access to the government's records about Ford will help in his request for relief, and the court declines to grant this discovery request.

### 2. Clifford Dean Posey

The Petitioner next alleges that there was a second "dirty cop," Clifford Dean Posey, working on his case, and he argues Posey's involvement led to a due process violation. Mot. at 14. Posey was a special agent with the Bureau of Alcohol, Tobacco, and Firearms, and he was indicted on April 5, 2011, for embezzlement, money laundering, wire fraud, possessing or receiving stolen firearms, and false statements. United States

31

**2854**

v. Clifford Dean Posey, 3:11cr94, ECF No. 3. The Statement of Facts for Posey's case indicates that this conduct began in or around 2007, but was not known or identified by the government until around October 2010, well beyond the Petitioner's trial. Id. ECF No. 14. Posey was sentenced on September 16, 2011. Id. ECF No. 38.

As discussed above, the government argues that this claim about Posey is procedurally defaulted. Resp. at 20. The Petitioner's appellate counsel filed their opening brief on February 29, 2012, and the indictment against Posey was filed sealed on April 5, 2011, and unsealed on April 6, 2011. Posey was sentenced on September 16, 2011. Again, Posey's case is of public record. The court finds that, based on these dates, appellate counsel could have raised this claim on appeal, and the claim is procedurally defaulted. The Petitioner, however, argues that appellate counsel was ineffective for not raising this claim on appeal, and that such ineffectiveness constitutes the cause and prejudice required to overcome default. Reply at 11. As such, the court will now examine the Petitioner's argument to determine if it has any merit. If it does, then the Petitioner may be able to show ineffective assistance of appellate counsel and overcome default.

32

**2855**

Posey investigated Cory Voss's death, but did not testify at trial, and the Petitioner does not know the full extent of Posey's involvement. Mot. at 15. The Petitioner points to a trial exhibit where Posey is listed as the transcriber of a phone call and to a few unadmitted documents that contain Posey's name to support his belief that Posey "played a substantial role in investigating and preparing the evidence in this matter." Id. Posey's dishonest acts, however, were not discovered by the government, until over a year after the Petitioner's trial. Accordingly, the government did not have a duty to give anything to the defense prior to trial, nor did they even have anything to give.

This claim is also entirely speculative. Discovery during trial showed what work Posey had done on the Petitioner's case, and the records indicated this was minimal. The Petitioner presents unsupported theories as to what harmful acts he thinks Posey may have committed, Mot. at 15, but that is not enough for relief. The Petitioner can point to no specific harm, and is simply guessing that Posey may have converted firearms or falsified records, without indicating any such record or any shred of evidence to support this claim. The Petitioner does not make a claim for relief or show constitutional harm. Because the Petitioner fails to present a meritorious claim, he cannot show

33

**2856**

that appellate counsel was ineffective for not raising this claim on appeal, and he does not overcome default.

Not only does the court find this claim to be procedurally defaulted, it also finds that the Petitioner fails to show good cause for discovery. The Petitioner requests information from the government about Posey's involvement with his case and Posey's illegal activities. First Mot. for Discovery at 28. However, trial counsel already conducted discovery and received all documents that showed Posey's involvement with the Petitioner's case. The Petitioner fails to show good cause for further discovery, as he does not show how gaining access to the government's records will assist him in overcoming default or proving ineffective assistance of counsel. As with Ford, the court does not dispute that Posey engaged in criminally dishonest acts in other cases. The Petitioner does not articulate how this current global discovery request will yield additional information about Posey's role in his case. This appears to the court to be an overly broad "fishing expedition," and the Petitioner simply is not entitled to further discovery here.

### 3. Ineffective Assistance of Trial Counsel

The Petitioner briefly alleges that, if trial counsel knew of the investigations into the law enforcement officers, then

34

**2857**

they were ineffective for failing to take appropriate action. Mot. at 11, 14, 16. However, these brief allegations of ineffective assistance of trial counsel do not meet the deficiency and prejudice standard under Strickland. Even assuming counsel knew of the investigations, and nothing suggests they did, the court has already concluded that the claims have no merit. Thus, the Petitioner was not prejudiced by any decision trial counsel may have made not to further explore the issue.

### 4. Conclusion

The Petitioner has failed to overcome the procedural default on his due process claim about the involvement of Ford and Posey in his case. He has also failed to show that trial or appellate counsel were ineffective in their actions regarding Ford and Posey. For these reasons, Claim One is **DENIED**.

### B. CLAIM TWO – PROSECUTION FAILED TO DISCLOSE EXCULPATORY EVIDENCE ABOUT CO-DEFENDANT MICHAEL DRAVEN

In Claim Two, the Petitioner argues that the government failed to disclose evidence of co-defendant Draven's violent criminal past, in violation of the Fifth, Sixth, and Eighth Amendments. Mot. at 16. According to the Petitioner, this evidence would demonstrate that Draven had a particularly violent history, including sexual assaults against children. Id.

35

**2858**

at 16-17.[11] The Petitioner contends that the government should have turned this information over to defense counsel, as it would have been important to the mitigation strategy. Id. Specifically, the Petitioner alleges that such information "would have added substantial weight to the 'equally-culpable-codefendant' mitigator found by the jury and . . . would have also reduced the weight of the 'abuse of women' aggravator." Id. at 16. The Petitioner believes that failure by the government to hand over this information violated his constitutional rights and the holdings in Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and Kyles v. Whitley, 514 U.S. 419 (1995). Mot. at 19. The government argues that this claim is procedurally defaulted, and, regardless of the default, it has no merit. Resp. at 24. For the reasons set forth below, the court agrees.

Claim Two is DENIED.

### 1. Procedural Default

As this claim was not brought on direct appeal, the government argues it is procedurally defaulted. Id. at 24. The Petitioner argues in his Reply that this claim could not have been brought on direct appeal because it contains information

---

[11] For the purpose of evaluating this claim, the court assumes that these allegations are true.

**2859**

that was not disclosed by the prosecution. Reply at 19; see Bousley, 523 U.S. at 622 (petitioner's claim was defaulted because it could have been "fully and completely addressed on direct review based on the record" in the case). The Petitioner further argues that a successful Brady claim satisfies the cause and prejudice standard required to excuse default. Reply at 19-20 (citing Wolfe v. Clarke, 691 F.3d 410, 420 (4th Cir. 2012)).

The court does not agree with the Petitioner that this claim was unavailable on direct review. Information about Draven's past existed during the time of direct appeal, and, as mentioned by the Petitioner later in this claim, such information was cited in Draven's sentencing proceedings, which occurred on November 17, 2009. Case No. 4:08cr16-2, ECF No. 303. The Petitioner's appellate counsel filed their opening brief on February 29, 2012. As such, the court finds that had appellate counsel chosen to pursue this line of investigation, information about Draven's past was available and could have been discovered, and the claim could have been raised on appeal. Nevertheless, the Petitioner may still be able to overcome default, as a successful Brady claim would provide the necessary cause and prejudice. The court will now conduct such an analysis.

37

**2860**

## 2. Brady Claim

In Brady, the Supreme Court held that suppression by the prosecution of evidence material to the defendant's guilt or punishment violates due process. 373 U.S. at 87. To make a successful Brady claim, the Petitioner must prove the following three elements: "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Banks v. Dretke, 540 U.S. 668, 691 (2004) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). Prejudice for the final Brady requirement is met when the evidence is material. Id. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985); see also Kyles, 514 U.S. at 435 (describing materiality as "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"). This level of prejudice is also the prejudice

38

**2861**

required to overcome procedural default. <u>Walker v. Kelly</u>, 589 F.3d 127, 137 (4th Cir. 2009).

There is no question that the government did not provide the Petitioner's trial counsel with information about Draven's past. What the parties now debate is whether this information is material under <u>Brady</u>.[12] As to whether the information is material to the Petitioner's guilt, Draven's past crimes do not affect whether the Petitioner was involved with the murder of Cory Voss. In fact, Draven's past crimes have little relation to his own guilt for the murder of Cory Voss. Although the defense did argue the other co-defendants were bad actors who were attempting to blame the Petitioner for their crimes, the information about Draven's previous violent acts is unrelated to the murder of Cory Voss and fails to suggest that the Petitioner was not involved with the Voss murder. The court finds that even had this information been introduced during the guilt phase,[13] the extensive direct and circumstantial evidence about the

---

[12] Although the parties do not argue the first prong of the test for a <u>Brady</u> violation, the court does not see how this evidence would be exculpatory or impeaching. Nevertheless, it will examine the arguments set forth regarding materiality.

[13] The court is unsure how information about Draven's past crimes could even have been introduced at the guilt stage, with Draven as a co-defendant who did not testify. <u>See also supra</u> note 12.

39

**2862**

Petitioner's involvement in the murder-for-hire cannot support any finding of a reasonable probability that the proceeding would have resulted in a different outcome.

When the police searched the Petitioner's house and car in December 2007, some eight months after the murder, they found a list of items, written in the Petitioner's handwriting, including a taser, Spyderco knife, tarp, trash bag, boots, gloves, military-style pants, and a black hoodie.[14] The list also mentioned the location of Langley Federal Credit Union ("LFCU") and a distance of three hundred eighty (380) miles and driving travel time of 6.25 hours from Morgantown, West Virginia, to Newport News, Virginia. A map was located that contained identifying information about Cory Voss's car, and a Western Union receipt indicated that the Petitioner received $275 from Draven's brother on June 1, 2007. Telephone and email records showed extensive planning and communication by all three defendants, both before, during, and after the murder. The government established that the Petitioner had bought a .357 magnum revolver and ammunition the day of the murder, April 29, 2007, and then he drove from Morgantown, West

---

[14] Video surveillance from the night of the murder shows an intruder wearing a black hoodie enter Cory Voss's truck while Cory Voss is at the ATM.

Virginia, to Newport News, Virginia. A box of .357 bullets with five missing was found at the Petitioner's former residence in Morgantown, West Virginia. A video of the ATM at LFCU showed a man wearing a hoodie entering Cory Voss's car, and Cat Voss had already pled guilty and signed a statement of facts describing the murder of Cory Voss and the Petitioner's involvement.

The next question is whether the evidence is material as to the Petitioner's sentence. The Petitioner's argument centers on how evidence of Draven's past would have influenced a jury during the penalty phase, particularly the weight given to the abuse of women aggravator and the equally culpable co-defendant mitigator. Mot. at 16. The Petitioner argues that the government introduced testimony and incident reports against him to provide support for the abuse of women aggravating factor, and his counsel could have done the same with the requested materials to show that Draven had an equally, if not more, violent past. Id. at 19. He believes at least one juror would have been influenced by knowing the government thought that the Petitioner, but not Draven with his more violent past, was deserving of death. Id. at 19-20.

This argument is a "red herring." First, the jury did find the equally culpable co-defendant mitigator, even without this extra evidence about Draven's history. Special Verdict Form -

41

**2864**

Selection Phase, at 2, ECF No. 291. The information about Draven may have added additional support for this mitigator, but it was clearly unnecessary because the jury did find this mitigating factor. Second, it is unclear how evidence of Draven's past would affect the abuse of women aggravator for the Petitioner. The past conduct of Draven and the Petitioner are separate and distinct. Just because Draven had a more violent past does not negate the Petitioner's violent criminal history. The court is unconvinced that a jury would not have considered the abuse of women factor to be serious in relation to the Petitioner, simply because Draven had past, separate violent acts from those of the Petitioner. Additionally, the Petitioner played a substantial role in the crime, and the evidence was overwhelming that the Petitioner was the actual perpetrator of the murder; Draven's criminal history does not lower the Petitioner's culpability as to his role in the crime of conviction as compared to his co-defendants. The reliability of the penalty phase is not undermined simply because information about a co-defendant's past was not included.

The Petitioner's cite to Banks v. Dretke, 540 U.S. 668 (2004), is not on point here. Mot. at 16-17. In that case, the Court held that information about an informant's role was material, as that information was central to the prosecution's

42

**2865**

argument about the defendant's own propensity to commit violent acts and the jury was unable to accurately assess the informant's credibility without the withheld information. Banks, 540 U.S. at 700-01. That evidence went to the heart of the case and dealt directly with how the jury perceived the defendant's culpability and propensity for violence. Id. Such evidence is quite different from introducing a co-defendant's history in order to weaken already-established violent acts of the Petitioner during the penalty stage, after the Petitioner has been found guilty of the murder in phase one.

Further, in this case, the jury found two statutory aggravating factors in the eligibility phase of trial, and four non-statutory aggravating factors in the penalty selection phase of trial. Special Verdict Form - Eligibility Phase, ECF No. 255; Special Verdict Form - Penalty Selection Phase, ECF No. 291. The jury also found two statutory mitigating factors, and a majority of jurors found eleven other non-statutory mitigating factors, eight presented by defense counsel and three of their own creation. Special Verdict Form - Penalty Selection Phase, ECF No. 291. The jury weighed these factors, and even though it found more mitigating factors, it clearly attached substantial weight to the aggravating factors, such as to outweigh the mitigators. Thus, even had the evidence of Draven's past been

43

**2866**

introduced, the Petitioner is unable to show prejudice. In light of the jury's decision on the other aggravating and mitigating factors and the apparent weight given to the mitigating and aggravating factors, along with all the evidence introduced against the Petitioner during the guilt and penalty phases, the court is not convinced that there is a reasonable probability that the proceeding would have been different, if evidence of another individual's past had been introduced. As such, the Petitioner is unable to show that the information about Draven's crimes is material, and the court finds that this Brady claim is both procedurally defaulted and without merit.

### 3. Ineffective Assistance of Trial Counsel

The Petitioner also raises an ineffective assistance of trial counsel claim. Mot. at 20-21. He argues that "[t]o the extent that counsel failed to investigate and present the information about Draven, despite the evidence being withheld by the prosecution, they were ineffective because the information supported the defense." Id. at 20. The Petitioner further claims that his attorneys were ineffective for not filing a motion to set aside the death penalty or for a new sentencing hearing after the government filed a position paper for Draven's sentencing, which revealed some of Draven's violent past. Id. at 21. In support for why counsel should have further

44

**2867**

investigated the matter, the Petitioner cites the testimony of Draven's brother at trial and the brother's allegation that Draven raped him and his sister. Id. at 20 n.8.

Counsel does not have a duty to include co-defendant background information in the penalty phase or to perform an in-depth investigation because of a statement made by a witness during trial. Moreover, counsel's decision on how to proceed after judgment is entitled to deference, and the Petitioner fails to show how declining to request that his sentence be set aside based on information about Draven was deficient conduct on the part of counsel. Even had counsel discovered more evidence on Draven's past conduct, the lack of materiality discussed above shows that the Petitioner cannot prove a reasonable probability of a different outcome had counsel argued this information during sentencing or used it to support a motion for resentencing. For these reasons, the Petitioner fails to prove that trial counsel's conduct was either deficient or prejudicial to the Petitioner. There was no ineffective assistance of trial counsel on this claim.

### 4. Discovery

The Petitioner also requests discovery in the form of documents and corresponding interrogatories about Draven's past actions and the investigation into Draven's background. First

45

**2868**

Mot. for Discovery at 21-25, 30. The Petitioner suggests no purpose for the requested documents other than using them to prove Draven's past. For purposes of this claim, the court assumed the truth of the Petitioner's allegations about Draven[15] and still found that the Petitioner failed to make a claim. Accordingly, the court finds that the Petitioner fails to make a showing of good cause, or any cause, for the request for discovery and corresponding interrogatories.

**C. CLAIM THREE – COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT GUILT PHASE OF TRIAL BY FAILING TO INVESTIGATE, PRESENT, HIGHLIGHT, AND/OR ARGUE EVIDENCE OF INNOCENCE**

The Petitioner next argues that his trial counsel was ineffective during the guilt phase for failing to investigate and present evidence regarding his innocence. Mot. at 21. He cites multiple pieces of evidence and potential testimony that either were not introduced at trial or that he believes were not fully investigated by counsel, and the court will address each of these witnesses and types of evidence in turn.

To prove ineffective assistance of counsel, the Petitioner must show that (1) counsel's representation was deficient and (2) that he was prejudiced as a result. Strickland, 466 U.S. at 693. The court must evaluate counsel's conduct at the time

---

[15] See supra note 11 and accompanying text.

46

such decisions were made, and not with the "distorting effects of hindsight." Id. at 689. Additionally, counsel's decision to pursue certain lines of defense is owed deference when based on reasonable professional judgment. See id. at 681. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 691. This helps to prevent a court from second guessing counsel's strategy, after such a strategy, although reasonably pursued, was not successful. See id.

### 1. Chad Costa

The Petitioner first argues that counsel should have called Chad Costa to testify during the guilt phase of trial. Mot. at 21-25. He asserts that because defense counsel did not introduce witnesses who knew the Petitioner in the years prior to the murder and arrest, the prosecution was able to argue that there was no evidence to counter the claim that the Petitioner was a cold, calculated killer. Id. at 22. The Petitioner contends that Chad Costa could have testified as someone who knew the Petitioner in the "years that preceded the murder and Runyon's arrest," as Costa met the Petitioner in the second half of 2007, when they would drive together to New Jersey to work in clinical drug studies. Id. This contention again reflects a distortion of the facts, as Costa did not know the Petitioner

47

**2870**

before the murder. The murder occurred on April 29, 2007, but in Costa's declaration, submitted by the Petitioner, Costa states that he met the Petitioner "in the second half of 2007." Id. Attach. 7, ¶ 2. Costa knew the Petitioner briefly before the Petitioner was arrested on March 4, 2008, which is why Costa was questioned by authorities.

The Petitioner next alleges that Costa could have testified that the Petitioner had a tendency to boast, but the Petitioner never told Costa that he killed anyone. Id. at 22-24. This argument does not relate to the Petitioner's innocence. Just because the Petitioner did not tell Costa that he murdered Cory Voss does not mean he is innocent. It is quite conceivable that one might brag or exaggerate to sound tough, but choose to avoid mentioning an actual crime, such as murder.

The Petitioner also argues that the police told Costa about the crime, and that doing so influenced Costa's grand jury testimony. Id. at 23. For this reason, the Petitioner claims that the police investigation into the murder-for-hire conspiracy, and the Petitioner's participation in the conspiracy, was unreliable, and Costa's testimony could have shown the jury this unreliability. Id. at 23-24. This simply is

48

**2871**

not true.[16] The police telling someone about the facts of a crime is hardly coercion or improper conduct.[17]

not true. Finally, the Petitioner argues that Costa had seen the Petitioner with a black, six-shot revolver, and counsel should have questioned Costa to bring out inconsistencies in the government's statements about the murder weapon, which could have provided the jury with reasonable doubt about whether the Petitioner's gun was used to shoot Cory Voss. Id. at 22-23. These alleged inconsistencies deal with the type and number of bullets used, the fact that the gun was black or "blued,"[18] and the pattern of the gunshot wounds. This argument does not persuade the court that counsel acted deficiently. Counsel could reasonably have decided not to draw attention to the

---

[16] The court has reviewed the grand jury testimony and finds that nothing untoward occurred.

[17] Although grand jury testimony is not normally admissible, it would have been admissible to impeach Costa, had he testified, and there is plenty in the testimony that could have been used for such a purpose. Accordingly, were Costa's grand jury testimony to be introduced, it would only have added to the evidence about the Petitioner's gun ownership, and the pawning of such gun, and would have been quite damaging.

[18] "Bluing" refers to a procedure that is done to protect a gun against rust, and is so named because the process gives the gun a blue-black appearance.

49

Petitioner's gun ownership and use,[19] and the court fails to accept the Petitioner's argument that drawing more attention to the gun and his gun ownership would have created a reasonable probability of a different result.

The court declines to second guess counsel's decision not to call Costa to the stand, other than to comment in hindsight, after a review of the grand jury testimony, that it was a good one. Counsel is afforded much deference in litigation strategy, and this decision does not appear to be unreasonable. The Petitioner simply fails to show that Costa's lack of testimony undermines the confidence in the outcome here, particularly given their after-the-murder relationship. The Petitioner shows neither cause nor prejudice here.

### 2. Cat Voss

The Petitioner next argues that his trial counsel was ineffective for not calling his co-defendant, Cat Voss, to testify at trial. Mot. at 25-26. This argument is based on a declaration by Cat Voss, secured by the Petitioner's current habeas counsel on September 10, 2015, in which Cat Voss asserts that she did not have independent personal knowledge about the Petitioner's involvement in the conspiracy to murder Cory Voss.

---

[19] See supra note 17 and accompanying text.

Id. Attach. 9. The Petitioner argues that reasonable doubt would have been raised had Cat Voss testified based on what is contained in this 2015 declaration. Id. at 25-26. This after-the-fact declaration by Cat Voss in 2015 does not reflect the record at the time of trial.

At the time of trial, defense counsel understood that Cat Voss would testify "that she hired Runyon and that Runyon and Michael Draven were lying in wait for Cory." Id. Attach. 6, ¶ 11 (Woodward declaration). At the time of trial, Cat Voss had pled guilty to all counts, had a written Plea Agreement and Statement of Facts, both filed under oath, Case No. 4:08cr16-1, ECF Nos. 69, 70, and she was obligated to testify under the agreement. Plea Agreement ¶ 13. Counsel indicated that when making the decision about whether to call Cat Voss to the stand, they knew all of the foregoing, i.e, that Cat Voss pled guilty to hiring the Petitioner to kill her husband, she had reviewed and signed the Statement of Facts under oath, and further, that Draven's counsel had interviewed Cat Voss and shared the information from that interview with the Petitioner's counsel. Mot. Attach. 6, ¶ 11. Cat Voss's Statement of Facts discusses the involvement of all co-defendants, including the Petitioner, in the plot to kill her husband, and she stated that such

51

2874

information was "true and accurate." Statement of Facts, Case No. 4:08cr16-1, ECF No. 70, attached hereto as Exhibit D.

The Petitioner fails to show deficient action on the part of counsel. It is reasonable that counsel for the Petitioner would not have wanted Cat Voss to testify. Based on the information available at the time, which was that Cat Voss would testify that she and Draven hired the Petitioner to kill her husband, counsel made a sound, strategic decision not to call her as a witness. Cat Voss had just pled guilty to hiring the Petitioner to kill Cory Voss and had signed under oath a Statement of Facts to that effect, and testifying differently would have risked her plea agreement. Had Cat Voss testified according to the current declaration, she would have been impeached with her Statement of Facts, and the Petitioner fails to show how either of these outcomes creates a reasonable probability of a different result. Counsel made a proper decision not to call Cat Voss as a witness.

### 3. Scott Linker

The Petitioner next asserts that his counsel was ineffective for failing to elicit certain testimony from Scott Linker, the Petitioner's former brother-in-law. Mot. at 26-27. According to a September 2015 declaration by Linker, he would have testified that the Petitioner was a "gun enthusiast," who

52

**2875**

collected and traded guns, and was an expert marksman. Id. Attach. 13, ¶¶ 10-12. The Petitioner argues that this testimony would have provided context for his gun purchase the day of the crime, and for his ownership of guns and ammunition that was explored by the government through trial exhibits and testimony. Id. at 26-27. Likewise, it could have provided inferences in the other direction as presented at trial.

Regardless of the government's argument that Linker's testimony is irrelevant, the court finds no reason to believe that the decision not to elicit such testimony was based on unsound trial strategy or lack of investigation by counsel. The testimony could have had the opposite effect of what the Petitioner claims. Instead of showing that the Petitioner did not commit the crime, the jury could have found that because the Petitioner was a "gun enthusiast" and an expert marksman, he was an ideal hit man as alleged by the government. As the jury could easily have viewed this evidence as harmful to the defense, the Petitioner fails to show any prejudice or deficient performance. Accordingly, counsel was not ineffective for not calling Linker as a witness at trial.

### 4. Rose Wiggins

The Petitioner next claims that counsel was ineffective in handling Rose Wiggins's testimony. Mot. at 27-28. Wiggins is Cat

53

**2876**

Voss's mother, and she testified at trial that when Cat called her the night of the murder, Wiggins offered to search for Cory because Cat stated that her children were sleeping. Tr. at 259-61. Wiggins testified that she drove by the credit union parking lot in the early morning, and then again several hours later, and she did not see Cory Voss's truck or the white BMW, which Cat Voss normally drove, in the parking lot. Id. The Petitioner asserts that counsel failed to properly highlight Wiggins's testimony. Mot. at 27-28. Specifically, he argues that counsel failed to ask why Wiggins did not know if Cory Voss had driven his truck or the white BMW, and why Wiggins did not go to Cat's home until around 8:00 a.m. Id. The Petitioner contends that Wiggins's search timeline, during which she did not see either of the vehicles, would have shown inconsistencies with the government's case and caused reasonable doubt. Id. These assertions are not only flimsy, but overreaching and tiresome.

Wiggins's testimony did answer these questions to the extent possible. She did not go to Cat Voss's home until later, because Cat indicated the children were sleeping, so Wiggins volunteered to search for Cory that night. Tr. at 260. She also testified that she looked for both Cory Voss's truck and the white BMW. Id. at 260-61. It is not relevant if she knew which vehicle Cory Voss drove, as she looked for both, and the jury

54

**2877**

heard Wiggins's testimony that she did not see either vehicle during the timeline in question. Moreover, the facts showed that Cory Voss's truck was not at the ATM, but rather in a nearby office complex. There was no testimony from Wiggins that she searched this area. See id. at 257-65.

### 5. Whereabouts of the Petitioner on the Day of the Murder

The Petitioner next claims that there was evidence relating to his cell phones that would have shown that he was not in Newport News at the time of the murder. Mot. at 28-29. The Petitioner starts by stating that he owned two cell phones, one that he kept for himself and one that he provided to his son's babysitter, Paula Dalton, so that all three of them could remain in contact. Id. at 28. Records show that none of the calls made from those phones on the day of the murder incurred roaming charges, which the Petitioner argues is proof that he was in West Virginia at 8:37 p.m., when a call was placed from his phone to his son's phone. Id. at 29. Based on that 8:37 p.m. call, the Petitioner claims that he would not have been able to drive from West Virginia to Newport News in time to commit the murder. Id. at 28.

The Petitioner now argues that counsel never asked prosecution witness Paula Dalton whether she received a call on

55

**2878**

the Petitioner's son's phone from anyone other than the Petitioner, or whether she was given a different contact number for the Petitioner for the date of April 29, 2007, and that failure to ask these questions was prejudicial. Id. at 29. The Petitioner states that Dalton would have testified that the only calls she received on the Petitioner's son's phone were from the Petitioner, and she never was given an alternate phone number for the Petitioner. Id. The Petitioner argues such answers could have rebutted the prosecution's theory that the reason for the lack of roaming charges on April 29, 2007, was that the Petitioner left a phone in West Virginia before driving to Newport News to commit the murder. Id. The Petitioner, however, fails to cite any declaration or other evidence to support this contention. The court cannot assume the witness would have testified to something based solely on a conclusory statement of the Petitioner.[20]

Further, there was cell phone testimony by a government expert, Paul Swartz, who was cross-examined by defense counsel.

---

[20] Although there is a declaration by Dalton, it does not address the issues of whether someone other than the Petitioner ever called her on the cell phone that he provided to her or whether she was given an alternative phone number to reach him on the night of the murder. Mot. Attach. 11. The Petitioner's counsel continues to overreach and second-guess trial counsel to an extent of frivolity and abuse of process.

56

**2879**

Tr. at 1476-88. It was during this cross examination that counsel brought up the fact that the Petitioner's call at 8:37 p.m. did not incur any roaming charges. Id. at 1485. Counsel could have reasonably decided not to ask additional questions about the Petitioner's cell phone use to another witness, and the court sees no reason to doubt counsel's decision. Moreover, the Petitioner has failed to show a reasonable probability that asking a few additional questions on cross examination would have led to a different outcome, considering all the other evidence introduced against him at trial and the lack of clarity about how Dalton would have responded.

### 6. Cell Tower Testimony

The Petitioner's next claim is that the government introduced unreliable cell tower testimony in an effort to show that Draven was moving away from the credit union at the time of the murder and could not have been the person who shot Cory Voss. Mot. at 29-31. At trial, Paul Swartz testified as a government expert about the cell phone tower data and analysis performed on the Petitioner's, and his co-defendants', phones.

57

**2880**

Tr. of 7/14/09.[21] During this analysis, Swartz relied on cell tower data to locate where the co-defendants were during the times preceding and soon after the crime. Id. The Petitioner argues that this type of testing is unreliable, and that his counsel was ineffective for failing to object. Mot. at 30.

The Petitioner first cites several articles written on the subject, but they were published after his trial. Id. In his Reply, he includes a declaration by Joseph F. Kennedy, a Senior Manager at Cherry Biometrics Corporation who works with cell tower data analysis. Reply Attach. 3, at 1. However, the court declines to conclude that counsel was deficient based on one declaration by an alleged expert, when a qualified expert testified at trial and was fully questioned by both parties. Tr. of 7/14/09.

The Petitioner also references several cases to support his argument that other courts have held cell phone tower data to be unreliable; however, the holdings are not so broad as suggested. Reply at 28-29; see Elmore v. Ozmint, 661 F.3d 783, 851 (4th Cir. 2011) (finding ineffective assistance due to counsel's

---

[21] Swartz testified that he had performed over five hundred hours of telephone work, he began doing telephone investigations in 1987, he attends conferences on the subject, and his knowledge on the subject is current due to his training and contact with the telephone companies. Tr. at 1450-51.

blind acceptance of the government's multiple pieces of forensic evidence, "including the medical examiner's time-of-death opinion, the pubic hairs allegedly recovered from [the victim's] bed, the nature of the 'Item T' materials removed from [the victim's] bloody abdomen, and the fingerprint lifted from the blood-smeared toilet in [the victim's] en suite bathroom"); Roberts v. Howton, 13 F. Supp. 3d 1077, 1100-03 (D. Or. 2014) (ruling that counsel was ineffective for advising his client to plead guilty, as counsel failed to investigate preliminary cell tower evidence that could pinpoint the location and direction the defendant was traveling); United States v. Evans, 892 F. Supp. 2d 949, 956-57 (N.D. Ill. 2012) (holding that the government's use of a specific theory of cell tower analysis was unreliable, but noting that other methods of cell site analysis have been tested by the scientific community).

Additionally, in this case, Swartz did not give the precise location of Draven's phone. Rather, he testified that if someone used a phone and it registered with a certain tower, it must be within a specific radius. Tr. at 1437. He did not say where in the radius the phone was located. He acknowledged that a phone may be able to connect with more than one tower, if, for example, a tower is busy. Id. at 1438. Swartz, thus, testified to the general location where a caller would have to be to

59

**2882**

connect to a tower, but not a more specific location based on coverage overlap, as seen in the Evans case.

For the above reasons, counsel was not ineffective in their handling of the cell tower testimony. Counsel did attempt a cross examination, in which they elicited testimony that the cellular records did not indicate that either of the Petitioner's phones was in Newport News, Virginia, on April 29, 2007. Id. at 1478. Counsel then focused on their own theory of the case — that someone else murdered Cory Voss. Based on the evidence and research at the time of trial, counsel did not act deficiently. Further, the Petitioner fails to show prejudice. Swartz did not attempt to precisely determine the Petitioner's location. He simply said that Draven must be located in a certain vicinity based on the surrounding cell towers. The government used this testimony in closing to suggest that Draven spoke with Runyon before heading home, not as definitive proof that Draven was not the shooter. Id. at 1595. As such, the Petitioner fails to show that counsel's decision in 2009 not to further challenge the cell tower data was objectively unreasonable, or that, considering the other evidence and research available at the time of trial, such a

60

**2883**

challenge would have led to a reasonable probability of a different outcome.[22]

### 7. The Petitioner's Shopping List

The Petitioner next challenges another piece of evidence introduced at trial. Mot. at 31-32. This evidence is a "shopping list" that was found among the Petitioner's belongings, months after the murder, together with a map of the Hampton Roads area with identifying information about Cory Voss's car and a photo of Cat Voss and Draven with their names and addresses on the back, and was characterized as a "checklist" for the crime. Gov't Ex. 217. It listed such items as a taser, Spyderco knife, tarp, trash bags, and various pieces of clothing. Id. The Petitioner argues that counsel deficiently failed to highlight that neither a gun nor a mask, both of which were used in the crime, was on the list, and, additionally, that some of the items on the list were not used during the crime. Mot. at 31-32.

Counsel's decision not to highlight the list can be seen as a reasonable strategic decision. Along with the above mentioned

---

[22] At the end of this argument, the Petitioner adds that if information about cell tower reliability was not available at the time of trial, it constitutes newly-discovered evidence of innocence. Mot. at 31. The court does not find that the Petitioner's two-sentence argument for innocence is persuasive, particularly as the Petitioner is still unable to show that the testimony in this case was unreliable or tainted the trial process.

61

items, the list also contained the address of Langley Federal Credit Union, directions to the credit union, and a time of 6.25 hours, which is roughly the time to get from Morgantown, West Virginia, where the Petitioner resided, to Newport News, Virginia. Gov't Ex. 217. It is reasonable that counsel may have thought these writings to be highly prejudicial to the Petitioner, and chose to avoid highlighting the document. This decision was not deficient representation. Further, the Petitioner fails to explain how the lack of two items on the list, or the fact that some items on the list were not related to the crime, means he did not commit the murder. Thus, he fails to show a reasonable probability of a different outcome had counsel spent more time challenging the list.

### 8. Ballistics Tests

The Petitioner next raises several arguments concerning the ballistics testimony. Mot. at 32-34.[23] During the trial, John Willmer, a firearms and toolmark examiner, testified as an

---

[23] The government argues that this claim is untimely because it was not added until the Amended Motion, see Resp. at 34-35, which was filed more than one year after the Petitioner's conviction became final. See 28 U.S.C. § 2255(f). Although the ballistics testing was not challenged earlier, the Petitioner did claim that counsel was ineffective for failing to argue that the Petitioner's gun was not the murder weapon. Reply at 37. As such, the court finds that this new argument tenuously relates

**2885**

expert for the government concerning the bullets and ballistics testing. Tr. at 353-70. The Petitioner now asserts that defense counsel was ineffective for failing to challenge the scientific validity of the ballistics testing and failing to question Willmer during cross examination about the type of bullets found and their relation to the Petitioner's gun. Mot. at 32-33.

The Petitioner first points to the fact that caliber .38 class bullets were found at the crime scene, and the government's evidence was that the murder weapon was the Petitioner's .357 magnum Taurus revolver. Id. During his testimony, however, Willmer specifically stated that caliber .38 class bullets can be used in both .357 magnum revolvers and firearms that can hold .38 special cartridges. Tr. at 362-63. Willmer referenced a certificate of analysis that discussed the types of guns that could fire .38 class bullets and leave rifling characteristics like those on the bullets found at the crime scene. Id. at 369-70. The certificate of analysis stated that these guns "include, but are not limited to, caliber .357 Magnum revolvers with the brand names Astra and Llama." Gov't Ex. 23. The Petitioner now claims that counsel should have

---

to the underlying conduct set out in the original claim, and will consider it. In this way, the appellate court will have full benefit of the court's analysis here.

63

corrected "the mis-impression . . . that the .38 bullets could have been fired from Runyon's Taurus .357" because the "certificate of analysis excludes the Taurus brand of .357 firearms." Mot. at 33. The certificate did not exclude the Taurus .357. The list is clearly not exhaustive, as proven by the statement "include, but are not limited to." Gov't Ex. 23. There was also clear, additional testimony by George Koski, who sold the gun to the Petitioner, that the gun could fire both .357 magnum and .38 special bullets. Tr. at 849.

The Petitioner also challenges the way counsel handled the ballistics tests, as well as ballistics tests in general. Mot. at 32-33; Reply at 34-37. He further requests discovery of the records from his case to help present this argument. Second Mot. for Discovery at 2-6. Trial counsel in the Petitioner's case did not request the bullets or test results, nor did they perform their own tests or hire their own expert. As such, the Petitioner argues that had counsel requested the ballistics tests or performed a more thorough cross examination about the reliability of ballistics tests, there is a reasonable probability that at least one juror would have found reasonable doubt that the Petitioner's gun was the murder weapon. Second Mot. for Discovery at 5-6.

64

**2887**

In support, the Petitioner relies on several studies that discuss the unreliability of forensic testing. Mot. at 33 n. 20; Reply at 35-36. Nothing suggests, however, that counsel did not know of these studies at trial or unreasonably decided to forego a stronger challenge to the ballistics evidence. Decisions about evidence and expert testimony are vital parts of trial strategy, and the court gives much deference to counsel's decisions on these matters.

Additionally, the court subpoenaed the ballistics records from the Virginia Department of Forensic Science, and these reports are filed under seal. After an in camera review by the court of the reports, the court finds nothing contrary to the evidence presented at trial. The certificate of analysis included with the subpoenaed records is the same as the one introduced at trial. Gov't Ex. 23.

Regardless of the reason that counsel did not further challenge the evidence or request copies of the ballistics records, the court finds there is no prejudice, as the records only support the testimony and evidence introduced at trial. As such, the Petitioner fails to show ineffective assistance of counsel. For the above reasons, the court also denies the Petitioner's related discovery request.

65

**2888**

### 9. Conclusion

The court has evaluated all of the witnesses and evidence that the Petitioner now claims should have been introduced by trial counsel, and the court has found no ineffective assistance of counsel here. Even if cumulatively evaluating the suggested evidence and testimony, counsel was not ineffective. It is apparent that counsel had a strategy and focused on the evidence they thought most advantageous to the Petitioner. The Strickland standard is high, and courts do not later judge a strategy to be unreasonable simply because it was ultimately unsuccessful, for with hindsight any number of things could or could not have been done. It is easy to criticize after-the-fact, as the Petitioner's habeas counsel has done here. The question is would the proceeding have reasonably had a different outcome. In light of the voluminous evidence introduced against the Petitioner, see supra Part I and trial record of testimony and exhibits, the court finds no reasonable probability of a different outcome had counsel done all that the Petitioner now requests.

Accordingly, Claim Three is DENIED.

### D. CLAIM FOUR – COUNSEL ABDICATED RESPONSIBILITY TO ADVOCATE AT ELIGIBILITY PHASE OF TRIAL

In this claim, the Petitioner argues that his counsel was ineffective for not advocating for him at the eligibility phase

66

**2889**

of trial. Mot. at 35. This claim is bogus. Before trial began, defense counsel filed a Motion to Trifurcate the Jury Deliberations. ECF No. 93. Counsel requested that instead of having bifurcated proceedings with a guilt phase and penalty phase, the court should also have an eligibility phase, wherein the jury would decide if the government had met its burden in proving the statutory requirements for capital punishment. Id. at 4. By keeping this phase separate from sentencing, the jury would not be swayed by evidence relating to non-statutory aggravating factors and the process of weighing the aggravating and mitigating factors. Id. The court granted this motion on December 8, 2008. ECF No. 132.

The Petitioner, through counsel, now argues that trial "counsel failed to guard the presumption of innocence or hold the government to its burden when he abdicated the role of advocate at the eligibility phase." Mot. at 35. To show that counsel was ineffective in the decision on how to proceed at the eligibility phase, the Petitioner must be able to show that counsel's actions were deficient and that such actions demonstrated a "probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 687, 694.

Part of counsel's strategy during the eligibility phase was to argue that the law never requires the death penalty. Tr.

67

**2890**

at 1771. Counsel told the jury that, even though they had found the Petitioner guilty, they should look at the evidence and consider the judge's instructions "with new eyes." Id. at 1772. Counsel did not present new evidence during this phase, assuming any was available, and that failure to present evidence to counter the eligibility factors is what the Petitioner now argues was ineffective. Mot. at 36.[24]

While counsel certainly has an "overarching duty to advocate the defendant's cause," Strickland, 466 U.S. at 688, the court does not find the Petitioner's argument that trial counsel failed in its duty to advocate at the eligibility phase to be persuasive. To prove death eligibility, the government needed to prove beyond a reasonable doubt that: (1) the Petitioner was older than eighteen years of age at the time of

---

[24] The Petitioner also argues in a footnote that counsel was ineffective for failing to object to the substantial planning aggravator on due process grounds, as the government argued mutually inconsistent theories of the case against the co-defendants with regards to the planning of the crime. Mot. at 36 n.22. Based on the little information provided in this argument, the court does not find that counsel was ineffective. The government never argued that one of the co-defendants was not involved in the planning; rather, it just switched the way the same argument was presented, depending on the co-defendant at issue. Due to the amount of evidence showing substantial planning by all co-defendants relating to the Charge of Conspiracy to Commit Murder for Hire (Count One), counsel was not deficient in failing to object, and the Petitioner shows no prejudice.

68

**2891**

the offense; (2) at least one gateway factor regarding intent was present; and (3) at least one statutory aggravating factor was present. Special Verdict Form - Eligibility Phase, ECF No. 255. The statutory aggravating factors argued by the government at this phase were that: (1) the offense was committed after substantial planning and premeditation to cause the death of another; and (2) the offense was committed in consideration for the receipt of, or in expectation of the receipt of, anything of pecuniary gain. Id.

As these aggravating factors were elements of the crime of Conspiracy to Commit Murder for Hire and were argued at the guilt phase, the government had no new evidence to present at the eligibility phase. Resp. at 38. Rather than make the same argument against these factors, which the jury had already heard and rejected during the earlier phase, defense counsel urged the jury to look at the evidence anew and to consider that the death penalty is never required by law. Tr. at 1771-72. This was a strategic decision by trial counsel not to alienate the jury and to set the stage for the penalty phase. Mot. Attach. 6, ¶ 10.

The purpose of the eligibility phase was not to introduce mitigating factors or have the jury weigh aggravators and mitigators. It was simply to determine if the government met the statutory requirements for the death penalty. At the penalty

69

**2892**

<u>phase, counsel did argue for mitigators to counteract the statutory aggravating factors</u>. In fact, counsel argued that all the co-defendants were equally culpable, and the jury found the equally culpable co-defendant mitigator, during the penalty phase. Special Verdict – Selection Phase, at 2. Considering that the jury had already rejected the claim that the Petitioner was not involved in planning and executing the crime for monetary gain, the court finds that counsel's chosen strategy to handle the eligibility phase was not objectively unreasonable.

The court also finds that the Petitioner did not suffer prejudice from this strategy. The jury had already found the facts required for the two statutory aggravators, so it is unclear how counsel could have fought against those factors at this stage. Even had counsel attempted to introduce evidence of the co-defendants' involvement, such an argument does not negate the amount of evidence put forth at trial that showed substantial planning by the Petitioner. As to the pecuniary gain factor, confidence in the outcome is not undermined simply because counsel declined to again argue that the Petitioner did not receive full payment for the crime, which the jury already knew from the guilt phase. For these reasons, the court **DENIES** Claim Four.

70

**2893**

**E. CLAIM FIVE – TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DISCOVER, AND PRESENT EVIDENCE OF INCOMPETENCY TO STAND TRIAL**

In Claim Five, the Petitioner asserts that counsel was ineffective for failing to argue that he was incompetent to stand trial. Mot. at 38. To support his claim, the Petitioner points to various reports by mental health professionals, which stated that the Petitioner likely suffered from delusional beliefs and that there was a family history of psychiatric illnesses and neurological/cognitive/developmental disabilities. Id. at 38-39.

### 1. Standard for Ineffective Assistance of Counsel for Failure to Request Competency Hearing

"[T]the conviction of an accused person while he is legally incompetent violates due process." Pate v. Robinson, 383 U.S. 375, 378 (1966). To be competent to stand trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam). To ensure that such rights are not violated

> [t]he court shall grant [a motion for a hearing on competency], or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the

71

**2894**

> nature and consequences of the proceedings against him or to assist properly in his defense.

18 U.S.C. § 4241(a).

As to the standard for an ineffective assistance claim relating to failure to investigate competency, the Petitioner must show that counsel acted deficiently and that there was resulting prejudice. Strickland, 466 U.S. at 687. Counsel acts deficiently, if he does not act as a reasonably objective attorney would under the circumstances. Savino, 82 F.3d at 599. "An attorney's duty, of course, does not mandate the exploration of the issues of sanity and/or competency in every instance." Wood v. Zahradnick, 430 F. Supp. 107, 111 (E.D. Va. 1977), aff'd, 578 F.2d 980 (4th Cir. 1978). However, when "the facts known and available, or with minimal diligence accessible, to defense counsel raise a reasonable doubt as to a defendant's mental condition, counsel has an affirmative obligation to make further inquiry." Id. (holding that there was ineffective assistance because counsel did not take even the first step of requesting a mental examination when the defendant's rape and robbery of a sixty-seven-year-old woman for no reason was of "such a bizarre nature as to call into question the petitioner's mental condition").

72

**2895**

If such reasonable doubt is raised, "a lawyer is not entitled to rely on his own belief about a defendant's mental condition, but instead must make a reasonable investigation" before deciding how to proceed. Becton v. Barnett, 920 F.2d 1190, 1192 (4th Cir. 1990) (involving a "senseless" crime where the defendant raped an elderly woman and told counsel that he had been in and out of mental hospitals prior to his arrest). Importantly, proving ineffective assistance of counsel does not require meeting the standard in Dusky, but requires showing that had counsel investigated the defendant's mental health, a hearing could have been held, at which point Dusky would have applied. Id. at 1193.

As support for what constitutes incompetency, the Petitioner cites two Fourth Circuit cases. Mot. at 40.[25] In United States v. White, the defendant was found incompetent to stand trial during a preliminary psychological evaluation. 620 F.3d 401, 405 (4th Cir. 2010). The defendant believed she had found a cure for AIDS and breast cancer. Id. at 406. She refused to leave her cell, even to take a shower or to have staff clean her cell, and she began writing on the walls in blood after her

---

[25] Although these cases deal with determining incompetency versus ineffective assistance for failing to investigate and request a competency hearing, the court finds the facts in them to be instructive when evaluating the facts in the instant case.

73

writing instruments were removed. Id. In United States v. Culp, the defendant robbed a bank because he heard voices telling him to do so, and he was diagnosed with paranoid schizophrenia. 930 F.2d 23 (4th Cir. 1991) (unpublished table decision). He tampered with the pipes in his cell so that it would flood, and an independent psychiatrist reported that he became "very psychotic without medication." Id.

### 2. Whether Counsel was Ineffective for Failing to Investigate Competency and Request a Hearing on the Issue

The Petitioner argues that had trial counsel properly investigated his mental health, they would have determined that he was incompetent to stand trial and requested a hearing to that effect. Mot. at 38-40. The declarations filed with the Petitioner's Motion, however, show that defense counsel investigated the Petitioner's mental health, interviewed mental health experts, and filed such reports with the court. See id. Attachs. 5, 6. Counsel also tried to track down military medical records and evidence of a car accident, although they were unable to find all the sought-after records. Id. Attach. 6, ¶ 5, Attach. 5, ¶ 5.[26]

---

[26] There is no evidence to show that all of these unavailable records exist or could be "tracked down." Moreover, the Petitioner's habeas counsel seem to lose sight of the legal

74

**2897**

The fact that the Portsmouth City Jail records noted the Petitioner was "somewhat grandiose" and "verbalized some delusional material," id. Attach. 16, at 4, is not enough to put counsel on notice that further inquiry, beyond the mental health experts retained and reports already filed, was required. That trial counsel knew the Petitioner compared himself to great historical figures or talked about how many lives he saved, see id. at 39, Attach. 4, ¶ 7, does not rise to the level of incompetency seen in the White and Culp cases cited by the Petitioner. Further, unlike in White, there was no preliminary psychological evaluation that suggested incompetency. Although the Petitioner now argues some of the mental health examinations were preliminary in nature, that does not make counsel's conduct deficient. Reply at 46-47. The records show that the Petitioner underwent multiple tests and counsel gathered numerous medical and other records, and none suggested mental health issues that rose to the level of incompetency to stand trial. See infra Part IV.F.

Additionally, the crime was not so bizarre or senseless as to cause counsel to reasonably question the Petitioner's mental

standard that the evidence has to present a reasonable probability that the outcome would have turned out differently, if the evidence had been presented. It is not a question just of availability, but one of materiality.

75

health and consider an incompetency argument. While murder-for-hire may be cold and calculating, it is not so unique as the facts of Becton and Wood. The Petitioner met Draven while they were paid volunteers in clinical drug trials, and the Petitioner was offered money to murder Cat Voss's husband, and followed through on the plan. The evidence shows that the motive was driven by greed for the Petitioner, and by both greed and lust, for Cat and Draven. The crime was carefully planned, and it presented counsel with no signs to question the Petitioner's competency. In fact, the evidence at trial showed a competent, intelligent defendant. Regardless, counsel still did extensive investigation into the Petitioner's mental health.

Based on counsel's investigation and the facts before the court, the Petitioner fails to show that trial counsel acted in a deficient manner by not requesting a competency hearing, as none was warranted. The Petitioner also does not provide evidence that had a hearing been held, he would have been declared incompetent. The court does not find that counsel was ineffective, and Claim Five is **DENIED**.

### 3. Discovery

For the reasons stated herein, the Petitioner also fails to show good cause for additional discovery. All he seeks for this claim are records from the Portsmouth City Jail. First Mot. for

76

**2899**

Discovery at 33-36. He already has records from the jail, and although those records do reference a follow-up visit, Mot. Attach. 16, at 4, the Petitioner makes no showing that such a visit even happened. Further, he does not state how he hopes these records, which may or may not exist, would prove anything different from the multiple mental health records already filed by counsel in this case. Accordingly, his request for discovery of any Portsmouth City Jail records is DENIED.[27]

### F. CLAIM SIX – COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND PRESENT MITIGATING EVIDENCE REGARDING PSYCHO-SOCIAL HISTORY, BRAIN DAMAGE, AND MENTAL HEALTH

The Petitioner next alleges that his counsel was ineffective for failing to investigate his mental health and psycho-social history, and for not using the results of such an

---

[27] The same reasoning applies to the request for discovery of the Portsmouth City Jail records in relation to all other claims. See First Mot. for Discovery at 33-36 (stating how the records relate to multiple claims in the instant Motion). Counsel talked to multiple mental health experts and had those experts write up reports. Counsel further requested relevant records from the Petitioner's past. Collateral counsel even submitted updated mental health records with the instant Motion. It is unclear and unspecified what the Petitioner hopes to discover in the Portsmouth City Jail records that are not contained in the other reports and the current record before the court. Thus, the court finds that the Petitioner fails to show good cause for global discovery of the Portsmouth City Jail records, to the extent they have not been so discovered, as to all claims mentioned in the First Motion for Discovery.

investigation as mitigating evidence to offset the prosecution's presentation of aggravating factors. Mot. at 41. Specifically, the Petitioner breaks Claim Six down into several subparts: (1) counsel Hudgins appeared in the case too late for him to effectively investigate and present mitigation evidence; (2) counsel failed to present mental health experts, and, instead, used ineffective lay person testimony; (3) a complete psycho-social history, which counsel failed to provide, would have countered the aggravating factors, added weight to the mitigating factors, and informed the jury that the Petitioner had a lesser moral culpability; and (4) the combination of all these factors resulted in prejudice to the Petitioner. The court will address these arguments in turn.

### 1. Ineffective Assistance Standard

To make a successful showing of ineffective assistance of counsel, the Petitioner must prove that (1) his attorneys' performance was seriously deficient, and (2) such deficient performance prejudiced him by undermining the reliability of the judgment against him. See Strickland, 466 U.S. at 687. To show deficient performance, counsel's actions or omissions must be measured against what "an objectively reasonable attorney would have done under the circumstances existing at the time of representation." Savino, 82 F.3d at 599. To demonstrate

78

**2901**

prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

In so doing, the court keeps in mind that when deciding an ineffective assistance claim involving counsel's strategy, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689. As such, "every effort [should] be made to eliminate the distorting effects of hindsight." Id. This is because "[i]n many cases, counsel's decision not to pursue a particular approach at sentencing reflects not incompetence, but rather a sound strategic choice." Lovitt v. True, 403 F.3d 171, 179 (4th Cir. 2005).

Accordingly, "Strickland does not require defense counsel to 'investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.'" Gray v. Branker, 529 F.3d 220, 229 (4th Cir. 2008) (quoting Wiggins v. Smith, 539 U.S. 510, 533 (2003)). The requirement is that "counsel has a duty to make reasonable

79

**2902**

investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. Even a showing that counsel could have conducted a more thorough investigation is not enough to show that counsel was ineffective. See Burger v. Kemp, 483 U.S. 776, 794-95 (1987).

Additionally, there is no per se rule requiring counsel to introduce mental health evidence at the penalty phase of a capital trial. See Meyer v. Branker, 506 F.3d 358, 372 (4th Cir. 2007). "In fact, there are many strategically valid reasons why defense counsel, given the circumstances of an individual case, may decide not to offer mental health mitigation testimony: it may not be persuasive; it may appear to be a 'flight into theory' without proper grounding in the facts of the case." Id. As such, the court must determine whether counsel performed a reasonable investigation of the law and facts regarding the Petitioner's mental health and made an objectively reasonable

80

**2903**

decision to forego a mental health strategy. See Strickland, 466 U.S. at 690-91.

### 2. Hudgins's Involvement with the Case

The Petitioner first alleges that counsel Stephen Hudgins appeared too late in the case to perform an effective mitigation investigation. Mot. at 41. On February 18, 2009, Hudgins was appointed to replace attorney Jon Babineau, who had developed a conflict of interest. ECF No. 161; see also Mot. to Continue at 12-13, ECF No. 179. On February 26, 2009, the Petitioner filed a Motion for Continuance and for Hearing to Schedule Trial. ECF No. 164. The court continued the trial to June 30, 2009. ECF No. 171. As such, Hudgins had four months to get ready for trial once he was appointed. Importantly, Hudgins did not start from the beginning when he was appointed to the Petitioner's defense team. Babineau, along with a mitigation expert and an investigator, had already been conducting an investigation for the penalty phase since June of 2008,[28] and Hudgins was able to use that work as the basis for his continuing investigation. Using what had already been discovered, Hudgins was able to expand on that investigation and

---

[28] See infra Part IV.F.3.

81

**2904**

find new experts, arrange for examinations, and search for additional medical records.

Hudgins may have felt constrained by the amount of time he had on the case and the lack of communication with Babineau,[29] Reply Attach. 1, at 1, but the fact is that Hudgins joined a team that had already done much work on the case. After reviewing the extensive record in this case, which is set out below, the court finds that counsel took reasonable and proper steps to investigate the Petitioner's mental health and psycho-social history, both before and after Hudgins was appointed to the case, and that the Petitioner suffered no prejudice by the later addition of Hudgins to the defense team.

### 3. Counsel's Mental Health Investigation

Investigation into the Petitioner's mental health began soon after he was indicted, when the government filed a motion regarding discovery of mental health evidence on April 25, 2008. ECF No. 46. The court held a hearing on the matter, and on June 16, 2008, issued orders setting forth a comprehensive scheme for mental health testing and notice to each party. ECF Nos. 65, 66. The first order provided that any defendant

---

[29] Once Babineau had withdrawn due to a conflict, he could then only ethically communicate and pass on his efforts before the withdrawal.

82

**2905**

intending to introduce mental health experts at the penalty phase must file written notice of such experts no later than ninety (90) days prior to the commencement of jury selection. Order at 1, ECF No 65. It also stated that failure to provide the proper notice could result in forfeiture of the right to present mental health testimony at trial. Id. at 3.

On December 12, 2008, the Petitioner provided notice that he intended to introduce expert mental health evidence and may call two expert witnesses to testify at the penalty phase: Dr. Evan S. Nelson and Dr. Mark D. Cunningham, both licensed clinical psychologists. Notice at 1-2, ECF No. 135. The Notice also mentioned that the Petitioner was seeking court budget approval for a neuropsychologist. Id. at 3. While Dr. Nelson did examine the Petitioner, no reports were filed, and in a declaration filed with the Petitioner's instant motion, Hudgins asserts that the results of Dr. Nelson's testing were not favorable to the defense. Mot. Attach. 5, ¶ 4. On February 25, 2009, the court approved funding for the Petitioner to hire a neuropsychologist. ECF No. 163.

On April 8, 2009, the Petitioner filed notice that he intended to hire Dr. Scott D. Bender, a neuropsychologist, to perform psychological testing, once the medical records of the Petitioner and his family were received. Notice at 1, ECF

83

2906

No. 177. The Petitioner also indicated that Dr. Seymour Halleck, a psychiatrist, would "be testifying to factors discovered in defendant's medical records and those of his family" and "may interview defendant on issues discovered in the medical records." Id. at 2.

The Petitioner requested another continuance on April 13, 2009. ECF No. 179. In that motion, counsel argued for a six-month extension, due to such challenges as trying to get copies of medical records of the Petitioner's family from the military and dealing with the remoteness of mitigation witnesses. Id. at 13. Although the government did not object, it pointed out that it had provided counsel for the Petitioner with "voluminous background materials, including school, employment and military records." ECF No. 181, at 1 n.1. It further stated that the "pre-indictment investigation conducted by the United States did not reveal a background of abuse or hospitalization of the defendant, which appears to serve as the justification for obtaining certain types of records." Id. The court declined to continue the trial, noting that "[w]hen Babineau withdrew, he had been paid for considerable legal services, in addition to significant payments having been made for various investigative and expert services on behalf of Runyon, relating to the penalty phases of the proceedings." ECF No. 194., at 3 n.4. The court

84

**2907**

indicated that if the Petitioner were found guilty, it would consider a motion to continue the penalty phase at that later time. Id. at 8-9.

On June 9, 2009, the Petitioner filed a motion to appoint additional mental health experts. ECF No. 206. In this filing, counsel again discussed the difficulty in obtaining medical records from the military, and noted its intention to add Dr. James Merikangas, a psychiatrist, as a new expert, and to replace Dr. Bender with Dr. Allan Mirsky, for the neuropsychological services. Id. at 1-3. On June 29, 2009, counsel filed a notice that the Petitioner intended to rely on Dr. Merikangas and Dr. Mirsky as experts, although he stated that the "notice is dependent on defendant's receipt of his and his family's medical records from the United States Government for periods of time when defendant was in the Army and when he and his mother were Army dependents." ECF No. 230, at 1. On June 29 and 30, 2009, the government filed the reports of its mental health experts, Dr. Raymond Patterson and Dr. Paul Montalbano. ECF Nos. 276, 277.

The jury convicted the Petitioner on July 17, 2009. On that same day, the Petitioner filed a Supplemental Motion to Continue Capital Sentencing Hearing, in which he requested a ninety-day continuance to gather records and engage in more mental health

85

**2908**

testing. ECF No. 240, at 1-4. The Petitioner also filed a statement indicating that "Dr. Mirsky's testing revealed deficits which will require neurological testing and the evaluation by a neurologist" and suggesting that Dr. Merikangas, whom he wished to engage as an expert, be appointed to perform those tests. ECF No. 242, at 1-2. On July 20, 2009, the reports of Dr. Mirsky and Dr. Cunningham were filed with the court, ECF No. 246, and the Petitioner filed a Notice of Intent to Introduce Mental Health Testimony at the penalty phase. ECF No. 248. The Notice stated that the Petitioner intended for Dr. Cunningham and Dr. Mirsky, and potentially Dr. Merikangas, to testify at the penalty phase. Id. On July 22, 2009, after the jury found the Petitioner eligible for the death penalty, the court granted the Petitioner's request for Dr. Merikangas to be appointed to serve as a psychiatrist and neurologist. ECF No. 257. The court also ordered that the penalty phase of the trial be continued for four weeks. ECF No. 254.

On August 6, 2009, a preliminary report by Dr. Merikangas was filed with the court. ECF No. 263. In the report, Dr. Merikangas indicated that he had ordered an MRI scan of the brain, a PET scan of the brain, and an electroencephalogram (EEG), none of which had been performed at the time of the report. Id. at 1. He opined that the Petitioner is "either in a

86

**2909**

fantasy world of grandiose wishful thinking, or suffering from delusions." Id. at 2. He ended with a conclusory statement that the Petitioner "clearly has impaired executive functioning suggestive of frontal lobe brain impairment." Id. However, Dr. Merikangas did not indicate what tests and information he relied upon in making these determinations. Counsel for the government made several requests for such underlying data, but did not receive the information. ECF No. 273, at 1-2.

During this period between the eligibility and penalty phases, the Petitioner filed several motions, including motions to supplement his mental health reports after Dr. Merikangas and Dr. Mirsky noted a potential brain injury, and to release the results of the MRI and PET scans directly to defense counsel. ECF Nos. 269, 274. It appears the brain scans were read as normal at this time, although Dr. Mirsky wrote after trial that such a reading is not conclusive as to whether the Petitioner ever suffered brain injuries. Mot. Attach. 22, at 1. Dr. Merikangas now reads the MRI scans as showing white matter hyperintensities, which is consistent with the Petitioner's history of head injuries and migraines, and the PET scan as being "non-diagnostic." Id. Attach. 2, at 4.

Around this time, the parties also argued over the extent of Dr. Cunningham's testimony. According to the Notice filed on

87

**2910**

December 12, 2008, defense counsel intended to have Dr. Cunningham testify as to developmental factors in the Petitioner's background and factors that would indicate a positive adjustment to a term of life imprisonment. ECF No. 135, at 2. On August 10, 2009, the government filed a motion to limit Dr. Cunningham's testimony. ECF No. 267. The court later ruled that Dr. Cunningham could testify as to positive prisoner evidence, if it related to the Petitioner specifically, but not to generalized data from other Bureau of Prisons inmates. Tr. at 2077-83. The court further ruled that Dr. Cunningham could not testify about developmental factors in the Petitioner's background, as Dr. Cunningham did not include this information in his report. Id. at 2079.[30]

A review of the above filings and the court record shows that defense counsel did not neglect their duty to investigate and prepare mitigating mental health evidence, despite the fact that Hudgins joined the case later in the proceedings. Babineau before him, then Hudgins, and the rest of the defense team,

---

[30] The Petitioner states that counsel was ineffective for not properly directing Dr. Cunningham or preserving this issue for appeal. Mot. at 46. However, the Petitioner's one conclusory statement is not enough to show that counsel was deficient or that there was resulting prejudice, particularly as counsel did introduce background factors about the Petitioner through other witnesses.

88

**2911**

effectively searched for experts and various forms of testing, and the Petitioner fails to show that Hudgins was unable to effectively represent him during trial.

As to whether counsel collectively did a proper investigation into the Petitioner's mental health, counsel was not required to follow every conceivable trail of potential mental health information. They were required to conduct a reasonable investigation, which the court must evaluate by taking into account circumstances as they were at the time of counsel's decision. In this case, counsel engaged multiple defense experts and had the Petitioner undergo different tests, including brain scans. When one of the defense experts did not create a favorable report, counsel searched for new experts. Mot. Attach. 5, ¶ 4. As to the brain scans, it appears that counsel was informed they were read as normal at the time of trial. While Dr. Mirsky and Dr. Merikangas later stated that the scans were not conclusive as to brain damage, based on the knowledge available at the time, counsel was not deficient for declining to introduce them, as the jury could have easily concluded either normality or unreliability, neither of which was necessarily favorable to the Petitioner. Further, while counsel did not introduce the brain scans, nothing suggests that their results were what caused counsel to forego use of mental

89

**2912**

health evidence or stop investigating. Reply Attach. 1, at 2. Second-guessing counsel at this stage is fruitless.

Counsel tried to continue the trial on several occasions and argued to the court that more testing and reports were needed. Counsel recognized the perceived problems with the current mental health information and tried to fix them. But regardless of the fact that the court denied some of their motions for the reasons stated on the record,[31] counsel performed a reasonable investigation and followed potential leads to find mitigating mental health evidence. As such, counsel's performance was not deficient, and the investigation was not harmed by the addition of Hudgins to the defense team on February 18, 2009, over four months before the trial.

### 4. Counsel's Decision Not to Introduce Mental Health as a Mitigating Factor

The Petitioner also argues that counsel was ineffective for failing to introduce mitigating mental health evidence at the penalty phase, and for instead relying on "repetitive lay person testimony." Mot. at 46. The court will now evaluate this decision using the two-pronged Strickland standard.

---

[31] None of the court's rulings are at issue here on collateral review.

90

**2913**

The Petitioner's trial counsel chose to argue that the Petitioner was not the "worst of the worst" because (1) two equally culpable co-defendants were not receiving the death penalty, so it was unfair for the Petitioner to receive such a sentence; (2) family sympathy weighed in favor of life imprisonment; and (3) the Petitioner would not be a threat of violence in prison. Id. Attach. 6, ¶ 13; Tr. 1818-21. While at one point counsel may have thought that including mental health information would be beneficial, based on the results of their investigations, tests, and subsequent reports, they chose to forego a mental health mitigator. This decision was a reasonable strategy.[32] As the court detailed earlier in this claim, see supra Part IV.F.3, counsel performed a thorough and in-depth investigation into the Petitioner's mental health history. Counsel had multiple reports and records to evaluate when making their decisions about trial, and the results were such that counsel had to make a tactical choice about whether to introduce mental health information during sentencing.

---

[32] The Petitioner argues that counsel promised the jury that they would introduce mental health information. Mot. at 46. However, what counsel actually said was that if the jury found the Petitioner eligible for the death penalty, counsel would put on evidence including "things like his history as far as his schooling, his family, perhaps mental health information." Tr. at 1770 (emphasis added).

When making this decision, counsel would have looked at the potentially helpful mitigating evidence, but would have also had to look at the evidence that may not help, or could even be harmful, and balance all of these considerations. For example, Hudgins searched for injuries that may have affected the Petitioner's reasoning ability, but was unable to locate records for a grenade blast in the Army and a car accident, both of which the Petitioner reported caused injury. Mot. Attach. 5, ¶ 5, Attach. 6, ¶ 5. Woodward recalls that the government's witnesses, Dr. Patterson and Dr. Montalbano, expressed a strong opinion that the Petitioner did not have any mitigating mental or emotional issues. Id. Attach. 6, ¶ 12. Further, although the defense filed reports from Dr. Mirsky and Dr. Merikangas, and requested a brain scan of the Petitioner, some of the reports remained preliminary at the time of sentencing, and contrasted with the findings in the government's experts' reports. Id. Attach. 5, ¶ 6.

Dr. Cunningham, one of the Petitioner's witnesses, was permitted to testify at the penalty phase only as to specific positive prisoner evidence, and not developmental factors in the Petitioner's background, which the Petitioner's counsel also

92

**2915**

wanted him to discuss.[33] Additionally, if the Petitioner's mental health was introduced at the penalty phase, the government's expert mental health witnesses would have testified and offered contradicting evidence.[34] While such different opinions are to be expected in the adversarial system, how to counteract those differences in opinion is certainly a consideration that counsel must have when deciding whether to introduce mental health evidence. Although counsel had reports that the Petitioner had grandiose thoughts and delusions and head injuries from past accidents, there was a lack of evidence showing how this would act as mitigating evidence for a contract kill. After considering the many records and tests, counsel decided to focus their mitigation strategy on three prongs: equally culpable co-defendants, family sympathy, and lack of a threat in prison.

When evaluating counsel's decision, the court recognizes that there is no per se rule requiring counsel to introduce

---

[33] The court ruled on the record that this latter testimony was outside the scope of Dr. Cunningham's expert reports, and this ruling is not at issue in the collateral proceedings.

[34] For example, the arguments that the Petitioner compared himself to great figures in history and talked about how many lives he saved could also have been shown to fit the government's experts' theory that the Petitioner had narcissistic personality features. Mot. Attach. 4, ¶ 7; Dr. Patterson Report, ECF No. 276, at 23; Dr. Montalbano Report, ECF No. 277, at 27.

93

**2916**

mental health evidence at the penalty phase of a capital trial. Meyer, 506 F.3d at 372. Although such evidence may be helpful, it is not right in all situations, and the court must not look back on this decision and judge it with the distorting effect of hindsight. See Strickland, 466 U.S. at 689. Rather, the court must consider all the options available to counsel at the time of trial and determine if counsel acted as an objectively reasonable attorney would have.

Based on the above information and records, the court finds that counsel thoroughly investigated the Petitioner's mental health and found that there was not enough support to present a viable mitigation argument. It was reasonable for counsel to decide that the strongest argument was that "it just wasn't fair for Runyon to be sentenced to death when two equally culpable co-defendants were receiving life sentences," followed by the argument of family sympathy. Mot. Attach. 6, ¶ 13. Counsel put forth many witnesses who testified that the Petitioner was a good father and did kind acts and helped many people. Other witnesses testified about his time in the military and his work history. The idea was to present evidence that the Petitioner was not the "worst of the worst." Although the Petitioner argues that this was repetitive lay testimony and should have been

94

**2917**

replaced or supplemented with mental health testimony, it had a vital place in the defense's mitigation strategy.[35]

Just because this strategy did not succeed in the end does not mean it was wrong.[36] Counsel performed a most reasonable investigation and carefully considered the available records and evidence when determining their strategy, and the court cannot discount such a strategy based only on the end result. Accordingly, counsel was not deficient for deciding to forego certain mental health evidence and instead present a mitigating strategy that focused on co-defendant culpability, positive prisoner evidence, and family sympathy.

### 5. Decision Not to Present a Complete Psycho-Social History

The Petitioner next argues that counsel was ineffective with respect to the mitigating factors because a complete psycho-social history would have added weight to the mitigating factors and detracted from the weight of the aggravating factors, given context to the Petitioner's life trajectory, and established additional mitigating factors. Mot. at 50. The

---

[35] Had it not been presented, the Petitioner would likely now argue that it should have been. The attorneys simply "can't win for trying," as hindsight involves this type of "Monday morning quarterbacking," i.e., second-guessing after-the-fact.

[36] See supra note 35.

95

**2918**

Petitioner points to readily available evidence and testimony that could have supported his mental health claims and aided in his sentencing. This evidence includes medical records, jail records, letters by the Petitioner, brain scans, government expert reports, and medical records of the Petitioner's biological parents. The testimony includes witnesses who could have testified about various aggravating and mitigating factors, the car accident, the time before the Petitioner was arrested, and how the Petitioner was led to believe that Cory Voss was molesting his daughter. He also discusses several expert analyses and opinions that counsel could have introduced. As discussed above, counsel is given much discretion in deciding on trial strategy. See Strickland, 466 U.S. at 689. Courts must not go into the analysis with an assumption of incompetence, but rather an understanding that counsel's decisions are often based on strategic choices. See id. With this in mind, the court will now address the different pieces of evidence that the Petitioner asserts would have been mitigating.

### a. Various Records, Letters, and Medical Reports

The Petitioner argues that counsel possessed multiple records that would have aided in mitigation, and counsel chose not to introduce these records, or all of the facts in the records, at trial. Mot. at 50. As such, the jury did not hear

96

**2919**

all of the information that the Petitioner now considers to be important to his mitigation case. Id.

The Petitioner first argues that counsel failed to find and introduce records that dealt with his involvement in two car accidents. Id. at 51-52. The Petitioner argues that he sought treatment from Army medical providers in 1995 for cysts on his forehead that he believed were caused by pieces of glass embedded under his skin from an earlier car accident. Id. Attach. 23, at 1. In 1996, he claims involvement in a head-on collision, and military medical records show that the Petitioner followed up with an Army doctor for injuries from that car accident to his legs, knee, calf, shoulder, and neck, and was directed to undergo physical therapy. Id. Attach. 23, at 2-3. He later complained of insomnia, vertigo, and short-term memory loss, and was informed that PTSD and life stressors were possible etiologies. Id. Attach. 23, at 12.

Hudgins has stated that he tried to find records relating to the Petitioner's head injuries, including records of the 1996 car accident, but he could not locate initial treatment records. Id. Attach. 5, ¶ 5. There is nothing to suggest that counsel acted unreasonably in searching for these records. Further, the 1996 car accident was known at the time of trial, and Dr. Montalbano and Dr. Patterson, the government's experts, found no

97

**2920**

permanent health effects from it. ECF Nos. 276, 277. The Petitioner does not show how the records he now cites would have supported a mitigation defense, as many of the factors mentioned in the report, such as possible PTSD, were in other expert reports, and counsel still found a mental health strategy unhelpful.[37] As such, the Petitioner fails to show prejudice from counsel's inability to locate all the records related to the car accidents, or that counsel was deficient in not finding and introducing the records.

The Petitioner further mentions that he wrote letters about the 1996 car accident and how he had saved the lives of multiple people. Mot. at 52. It is unclear how such letters would have aided his mitigation case. Counsel was already aware of the 1996 accident. Expert reports from both parties indicated that the Petitioner experienced grandiose thinking, including that he had saved multiple lives, but no other evidence of these life-saving events seems to exist, outside of the Petitioner's letters. As such, counsel already had the opportunity to consider what to do with the information that was contained in the letters, and

---

[37] Hudgins now states that these records were "the type of information I was looking for at the penalty phase," but he fails to explain whether, and how, they would have changed his strategy. Mot. Attach. 1, at 3.

98

**2921**

based on their chosen strategy, they were not deficient for declining to introduce the letters at trial.

The Petitioner next references records from the Portsmouth City Jail. Id. at 52-53. The report that he mentions includes a discussion of the Petitioner's concern about HIV exposure after his cellmate fell and lacerated his head. Id. Attach. 16, at 2. The Petitioner also experienced a runny nose, watery eyes, and a feeling of sickness, which he attributed to mustard gas exposure in the military. Id. Attach. 16, at 3-4. The jail records state that the Petitioner was "somewhat grandiose," "his thoughts were flighty and rambled on," and that he "verbalized some delusional material." Id. Attach. 16, at 4. This is all similar to the many mental health records and expert opinions that counsel reviewed and decided against introducing. Accordingly, counsel's decision not to introduce these jail records is objectively reasonable, as the records did not aid in the defense's chosen mitigation strategy.

The Petitioner next references brain scans from August 2009. Id. at 53. Dr. Merikangas, a defense expert, now states after-the-fact that the scans show white matter hyperintensities, consistent with the Petitioner's history of head injuries and migraines. Id. Attach. 2, at 4. At the time of trial, however, it appears the scans were read as normal, so

99

**2922**

counsel was not deficient for declining to introduce them. See id. Attach. 22, at 1. Although Hudgins now claims that the results of the scans could have been used during the penalty phase, that does not change the reasonableness of his decision at the time it was made, based on the information then available. Reply Attach. 1, at 2.

The Petitioner argues that counsel could have introduced medical records of his parents, which would have shown a family history of depression and other mental illness, and a possible history of domestic abuse. Mot. at 53-54. However, evidence of the Petitioner's family history and abuse was presented at trial. The jury even found two mitigating factors for the Petitioner because he witnessed domestic violence and family conflict when he was younger. Special Verdict Form – Selection Phase, at 3-4, ECF No. 291. The Petitioner fails to show how additional evidence about his parent's mental health or domestic situation would have supported counsel's chosen strategy, and the court finds that counsel was not ineffective for not introducing this information.

The Petitioner argues that the government's experts' reports indicated that the Petitioner suffered from migraines, attention deficit disorder, and post-traumatic stress disorder. Mot. at 53. Presumably, this assertion is meant as an argument

100

**2923**

that counsel should have tried to have the government records introduced. Had counsel chosen a mental health mitigation strategy, the reports would likely have been presented to the jury; however, the facts in them are not helpful to the defense. Thus, it is unclear why the Petitioner now argues counsel was ineffective for not having the prosecution expert reports introduced, other than to just add more unnecessary confusion at this juncture.

### b. Government Experts – Dr. Patterson and Dr. Montalbano

Dr. Patterson created a twenty-four page report dated June 24, 2009. ECF No. 276. The report by Dr. Patterson states that "it is my opinion that Mr. Runyon does not suffer from any serious mental illness, mental disorder, or brain pathology and that there are no mental health factors that are mitigating or aggravating to whatever sentence, if any, is determined by the court." Id. at 23. He then goes on to say that the Petitioner "meets the criteria for a diagnosis of Personality Disorder, Not Otherwise Specified with Narcissistic Features." Id. Dr. Patterson wrote that such narcissistic traits, including the Petitioner's history of externalizing responsibility and entitlement, may have affected jobs or relationships, but that they are not a serious mental illness that would be either an

101

**2924**

aggravating or mitigating factor in sentencing. Id. He also believed that the Petitioner's self-reported history of concussions and memory problems did not indicate serious or severe impairments suggestive of significant brain damage. Id. at 24.

Dr. Montalbano wrote a thirty-one page report in February 2009 based on extensive testing and discussions with the Petitioner. ECF No. 277. Testing showed the Petitioner's intellectual functioning to be in the high average range, with "no evidence of delusions, hallucinations or disorganized speech or behavior." Id. at 29. He did note that the Petitioner displayed personality driven factors "such as irresponsibility, conflict with peers [and] supervisors, unrealistic expectations for success, irritability and lack of insight," as well as lack of attention to detail. Id. While attention to detail may have been related to the car accident in November 1996, Dr. Montalbano believed the other issues predated the accident. Id.

Dr. Montalbano wrote that "the records reviewed and the testing performed during this evaluation support the conclusion that Mr. Runyon does not suffer from any major mental illness. There is however evidence of personality dysfunction." Id. at 30. He stated that only a more detailed investigation could definitively rule out brain dysfunction, but the results of his

102

**2925**

evaluation "find no significant impairment in overall intellectual functioning." Id. Ultimately, Dr. Montalbano found that "[w]ith regard to the mitigating factors of impaired capacity and severe mental or emotional disturbance, the results of this evaluation do not suggest that Mr. Runyon was under any unusual or substantial emotional or psychological duress during the time frame of the alleged offense." Id. at 31.

Based on the opinions contained in the government's experts' reports, counsel was not deficient for choosing to exclude them from consideration by the jury. While some information may have been helpful, or at least neutral, the majority of the reports would have undermined testimony about the Petitioner's positive family and work history, and would have hindered a mental health mitigation strategy. Defense counsel obviously could not "cherry pick" from these reports — it was all or nothing. Accordingly, the court finds that it was reasonable, and counsel certainly was not ineffective, for avoiding introduction of the government's experts' reports on the Petitioner's mental health.

### c. Lay Witnesses

The Petitioner next lists multiple lay witnesses who could have testified to provide more background into his psycho-social history. Mot. at 54. These witnesses relate to the different

103

**2926**

aggravating and mitigating factors, the car accident, his family background, and his belief that Cory Voss was molesting his own children. The court will address each group of witnesses in turn.

The Petitioner first argues that Dr. Cunningham could have testified about transgenerational family dysfunction and its effect on the Petitioner's mental state, as it relates to the abuse of women aggravator. Id. at 56. The court, however, had limited the scope of Dr. Cunningham's testimony because Dr. Cunningham had not included this information in his mental health reports filed with the court, see Tr. at 2079,[38] so counsel was not ineffective for failing to elicit this testimony.

The Petitioner also contends that David Dombrowski, his father; Mark Runyon, his brother; Maria Runyon, his ex-wife; and Scott Linker, his former brother-in-law, could have testified and provided context related to this aggravating factor. Mot. at 56-59. Counsel's strategy was to focus on positive traits, so drawing attention to instances of domestic violence, failed relationships, and restraining orders may have counteracted that strategy. As such, the Petitioner fails to show that counsel was

---

[38] Again, the court's ruling is not at issue here on collateral review.

104

**2927**

deficient for not introducing this testimony. Further, he fails to show prejudice, as there was already testimony about his family history of domestic violence, and the jury found two mitigators in his favor based on that evidence. Special Verdict Form – Selection Phase, at 3-4, ECF No. 291. It is unclear what more testimony about such violence would have done to lessen the abuse of women aggravator.

The Petitioner next argues that counsel should have introduced lay testimony relevant to the family violence mitigator. Mot. at 59-61. This would include testimony by Suk Cha Runyon, his mother; David Dombroski; and Mark Runyon. Id. As mentioned above, counsel did introduce testimony about the Petitioner's background and abuse at trial. The jury even found mitigating factors related to such evidence, when it determined that the Petitioner witnessed domestic violence and family conflict when he was younger. Special Verdict Form – Selection Phase, at 3-4, ECF No. 291. Additional evidence would have been unnecessary, and counsel reasonably could have concluded that a better plan was to spend that time focusing on a different mitigating factor. Furthermore, defense counsel did try to have the Petitioner's mother testify as to her background. Tr. at 2411-13. The court sustained the government's objection, as this testimony was not relevant to the mitigating factors

105

**2928**

counsel chose to introduce. Id.[39] For these reasons, counsel was not deficient for choosing not to introduce additional evidence about this mitigator, <u>nor can the Petitioner show prejudice as the jury found this factor in favor of the Petitioner.</u>[40]

The Petitioner further contends that counsel should have called Thomas Preston, a parachute rigger who served at Fort Benning with the Petitioner; Robert and Deborah Seeger, friends of the Petitioner at Fort Benning; Maria Runyon; Mark Runyon; and Captain Jeffrey Harris, of the Fayetteville Police Department, to testify about how the car accident affected the Petitioner's personality. Mot. at 61-65. However, the medical records and doctor opinions in the record do not definitively show that the car accident caused long-term effects to the Petitioner's behavior and personality, and none of these witnesses were experts. Even if there was such a personality change, the Petitioner is unable to show prejudice. According to declarations the Petitioner filed, testimony on this subject

---

[39] The Petitioner argues that counsel was ineffective for not explaining the relevance of his mother's testimony or preserving the issue for appeal, but counsel did argue to the court that the testimony would help explain why the Petitioner turned out the way he did. Tr. at 2412. In the court's opinion, this issue was preserved for appeal and not raised. Importantly, though, the court finds that counsel did not act deficiently in this regard.

[40] Again, this is an example of a "red herring" argument.

106

**2929**

would have shown that he became unpredictable, easily frustrated, and paranoid. Id. It is unclear how failure to introduce such information undermines confidence in the outcome, which is that he received the death penalty for a carefully planned contract kill. A personality change is not a defense to murder.

The Petitioner also argues that there were available witnesses who knew him in the time prior to the crime and arrest, and defense counsel should have had those individuals testify. Id. at 65. The Petitioner argues that this could have been used to rebut the government's argument that the defense witnesses had no recent contact with the Petitioner, and that the Petitioner had changed and was not the same caring and kind person described by his witnesses. Tr. at 2610, 2613, 2618-19.

One of these witnesses, Chad Costa, was mentioned in Claim Three, and the court has already discussed why counsel was not ineffective for declining to have him testify. The Petitioner adds nothing in this claim that changes the court's earlier analysis. The other potential witnesses are Matt Long, Paula Dalton, and David Dalton. Mot. at 65-67. Although it is unclear why defense counsel did not call these individuals, the court finds no reason to doubt defense counsel's decision. The Petitioner has failed to show that counsel acted in an

107

**2930**

objectively unreasonable way, and choosing what witnesses to call is certainly an important part of counsel's trial strategy, which is given much deference by the court. The Petitioner also fails to show a reasonable probability of a different outcome had witnesses who knew the Petitioner close to the time of the crime testified, considering all the evidence introduced against him at trial.

The Petitioner next argues that Maria Runyon could have testified that after the Petitioner left her and her children, the children's biological father re-entered their lives, and that within a year of the murder of Cory Voss, the father molested one of the children and was convicted. Id. Attach. 28, ¶ 31. Presumably, the Petitioner cites this information to show additional motivation for his undocumented belief that Cory Voss was molesting his own child and why that would upset him. The jury found in favor of the Petitioner on this mitigator; so he can show no prejudice from counsel's decision not to introduce this evidence. Special Verdict Form - Selection Phase, at 4, ECF No. 291.

### d. Defense Experts – Dr. Mirsky, Dr. Merikangas, Dr. Cunningham, and Dr. Dudley

In the final part of this claim, the Petitioner argues that had counsel included expert mental health testimony, counsel

108

could have established mitigators of disturbance and impaired capacity. Mot. at 67. He argues that such testimony would have shown he had an impaired mental state and decision-making ability, as well as a potential brain abnormality and cognitive defects. Id. at 67-68. This section is similar to Parts IV.F.3 and IV.F.4, and the court incorporates its earlier analysis of the Petitioner's mental health history and counsel's strategy into this section.[41]

The Petitioner alleges that the testimony of Dr. Mirsky would have aided in his mitigation defense. Id. at 68. In August 2015, Dr. Mirsky prepared a declaration after performing a series of tests with the Petitioner. Id. Attach. 35. In his report, Dr. Mirsky wrote that the Petitioner's test results for non-verbal tasks were in the impaired range, and the Petitioner showed evidence of high response time variability, both of which are consistent with damage to the right side of the brain. Id. Attach. 35, at 6. The Petitioner's verbal and memory skills were very strong, and Dr. Mirsky reported that the Petitioner improved or remained consistent on many of the tests that were administered before trial. Id. His final conclusion was that the

---

[41] Here, the Petitioner has filed updated mental health information. The murder occurred on April 29, 2007. The trial was in the Summer of 2009. The four new declarations, which the court will now discuss, were prepared in the Summer of 2015.

109

**2932**

results "indicate the presence of significant damage to the right side of the brain, as well as a psychotic disorder," both of which could stem from past head injuries. Id.

However, these findings were made in 2015 and were not available to counsel at the time of sentencing. As discussed in more detail in the earlier sections, based on the evidence available from multiple tests and medical records at the time of trial, counsel made an informed and reasonable decision not to pursue a mental health-based mitigation strategy. This new declaration does not change counsel's earlier decision.

Moreover, Dr. Merikangas conducted a neurological examination in 2009, after the Petitioner was found eligible for the death penalty, and he conducted another exam on August 24, 2015, in preparation for the filing of the instant Motion. Id. Attach. 2. In 2009, Dr. Merikangas suggested that the Petitioner may suffer from "Migraine-like Headaches, Attention Deficit Disorder and Post-Traumatic Stress Disorder," and suggested that an MRI and PET scan be performed. Id. Attach. 2, at 5. In the 2015 declaration, Dr. Merikangas reported that he had reviewed the MRI and PET scans that were done in August 2009. Id. Attach. 2, at 4. He found that the MRI revealed multiple white matter hyperintensities consistent with the Petitioner's history of head injuries and migraines, and the PET

110

**2933**

scan was non-diagnostic. Id. Dr. Merikangas also stated that if he had testified at trial, he would have said that the Petitioner was "a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process." Id. Attach. 2, at 1. He does not provide much detail for this diagnosis, and the court notes that his reading of the MRI and PET scan was not made until after trial.

Accordingly, the declaration does not indicate that counsel ignored important, potentially mitigating, mental health evidence at the time of trial. Counsel either already had the information and reasonably chose not to use it, or the information was gathered in preparation for filing the instant Motion and would not have been available at trial. Thus, counsel's decision that the best strategy involved focusing on equally culpable co-defendants and other more positive traits was not unreasonable, and this new declaration does not change that decision.

The Petitioner next discusses the report that Dr. Cunningham wrote prior to trial, as well as the recent report he prepared on September 25, 2015. Id. at 72, Attach. 8. Dr. Cunningham testified at trial about his prison violence risk assessment of the Petitioner, but the Petitioner now claims that

111

counsel was ineffective for not having Dr. Cunningham also testify as to adverse factors in the Petitioner's upbringing and background and the possible implications of such developmental factors. Id. at 72. However, counsel had tried to expand the scope of Dr. Cunningham's testimony, but the court limited the topics to which Dr. Cunningham could testify. Tr. at 2079.

The Petitioner is also unable to show a reasonable probability of a different result had Dr. Cunningham testified about his background. Several of the factors now mentioned involve the Petitioner's family and history of domestic violence, which were introduced at trial through other witnesses, and can be seen in the jury's finding of two family violence mitigators. See Special Verdict Form - Selection Phase, at 3-4, ECF No. 291. Further, Dr. Cunningham partially based his 2015 declaration on information not available to counsel at the time of trial, or on the trial testimony itself, in which case the jury heard the information. Mot. Attach. 8., ¶ 8. Accordingly, based on the record at the time of trial, the Petitioner fails to show that counsel acted deficiently in relation to Dr. Cunningham's testimony, or, that by not having Dr. Cunningham testify as the Petitioner now suggests, he suffered actual prejudice.

112

**2935**

The Petitioner finally points to a psychiatric evaluation by Dr. Richard Dudley from September 2015. Id. at 76, Attach. 29. In that report, Dr. Dudley opines that the Petitioner suffers from Post-Traumatic Stress Disorder; Borderline Personality Disorder; Schizoaffective Disorder, Bipolar Type; and Neurocognitive Disorder. Id. Attach. 29, at 14. He also argues that alteration of facial expression and affect are symptoms of these disorders. Id. Attach. 29, at 15. Dr. Dudley attributes these alleged problems to issues in the Petitioner's childhood and history of mental disorders in his family, rather than the brain injuries and car accidents as other experts did, and the Petitioner argues that the jury should have been presented with this information. Id. Attach. 29, at 14-15.

Counsel, however, had a chosen mitigation strategy that was reasonable in light of their investigation. Much of the information in Dr. Dudley's report, such as the Petitioner's family background, was introduced at trial. The other evidence could reasonably have been considered by counsel to be adverse to their chosen strategy. For example, the Petitioner consistently denied involvement in the crime. Counsel may have thought that introducing evidence attempting to explain why the Petitioner committed the crime would go against both what the Petitioner claimed and counsel's strategy based on those

113

**2936**

assertions. While testimony about the Petitioner's affect may have provided some context for the claim that the Petitioner showed no remorse in the interrogation video, the government argued that lack of remorse was shown not only through the video but through numerous phone calls and conversations about collecting the insurance money and plans to thwart the investigation. Tr. at 2615-17. Accordingly, the Petitioner is unable to show how such testimony would have created a reasonable probability of a different outcome. The court is also convinced that counsel's decision was more than reasonable in light of the facts known at the time and the chosen trial strategy that they thought had the best chance of success.

### 6. Evaluation of Counsel's Strategy Based on All of the Above Factors

The court has individually examined many pieces of evidence that the Petitioner argues counsel was ineffective for not introducing, and it has discussed how counsel was not deficient and/or how there was no prejudice from the decision to forego these pieces of evidence or testimony. The court will now collectively evaluate this evidence and whether counsel was deficient for not introducing it, and, if so, whether prejudice resulted.

114

**2937**

To show deficient performance, counsel's actions or omissions must be measured against what "an objectively reasonable attorney would have done under the circumstances existing at the time of the representation." Savino, 82 F.3d at 599. Courts must be aware that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689. Counsel's decisions are often based on a sound strategy, and not incompetence. Lovitt, 403 F.3d at 179. As such, courts should work to eliminate viewing counsel's decision with the "distorting effects of hindsight." Id.

In this case, counsel made a strategic decision to focus on equally culpable co-defendants, family sympathy, and positive prisoner evidence, instead of the Petitioner's mental health, at the penalty phase. This strategy was not ultimately successful, but that does not mean it was deficient. The court has already concluded that counsel performed an objectively reasonable investigation into the Petitioner's mental health, and it will not view counsel's decisions as incompetent based on the fact that some reports were preliminary. Much of the evidence that

115

**2938**

the Petitioner now suggests would have been cumulative, contrary to counsel's strategy, or simply not of help to the Petitioner's case.

Strickland sets a high bar, and just because a strategy appears better or worse in hindsight does not mean that counsel acted deficiently, given the knowledge at the time of trial. The court will not assume incompetence as the reason for counsel's decision, and the Petitioner has failed to show that trial counsel unreasonably ignored a mitigating strategy that appeared stronger than the strategy counsel decided to use. For the above reasons, and after considering all the evidence and testimony now suggested by the Petitioner, the court does not find counsel was deficient in their investigation into his mental health, and decision not to use a mental health mitigation strategy.

The Petitioner's final argument in Claim Six is essentially that counsel's decisions in the penalty phase were not only deficient, but also prejudicial; thus, counsel was ineffective. Mot. at 81.[42] The Petitioner contends that counsel should have offered the evidence and testimony discussed throughout this claim to counter both statutory and non-statutory aggravating

---

[42] The court has already discussed prejudice as to some of the arguments in Claim Six, and now incorporates that reasoning into this discussion.

116

**2939**

factors and to strengthen the mitigating factors. Id. at 81-82. Although the court has already found that counsel was not deficient in their chosen strategy, it will nevertheless evaluate this argument.

In assessing this claim, the court will look at the totality of all the potential evidence now offered by the Petitioner. Even when looking at the combined potential strength of this testimony and evidence, however, the Petitioner's argument fails to establish a reasonable probability of a different outcome had counsel done all that he now requests.

Counsel performed a reasonable investigation into mitigating factors and developed a thought-out trial strategy, and the Petitioner's claim of how the jury might have decided differently does not undermine confidence in the outcome. As the government mentions, the mental health evidence is a two-edged sword. Resp. at 76-77. Presenting certain mental health evidence could just as easily have hurt the mitigating factors actually presented, such as the Petitioner's prior acts of kindness, past work and military experience, and the allegation that Cory Voss was molesting his own daughter. Further, the Petitioner cites mental health reports that tend to show he lacked impulse control or had PTSD, but he fails to show how such evidence

117

**2940**

would lower his culpability when compared to the government's evidence of a calculated and methodically-planned contract kill.

The court is also unconvinced by the Petitioner's argument that his mental health lessens the substantial planning aggravator. Mot. at 81. Based on the mental health reports available, the Petitioner is unable to prove that his mental health left him as a tool for use in Cat Voss's scheme. His monetary motive is quite clear from the evidence, which included his volunteering for clinical drug trials for compensation, and he fails to show that he could be easily manipulated or lacked understanding of what he was doing.

The Petitioner next references the lack of a complete psycho-social history to argue that counsel was unable to counter the aggravating factors and provide support for the mitigating factors, which caused him to suffer prejudice. Id. at 81-83. The Petitioner claims that the lack of remorse aggravating factor was based on his affect, as seen in the interrogation video, and Dr. Dudley's testimony would have helped provide context for his appearance. Id. at 82. The government argued that this aggravator was also shown through phone calls where the Petitioner and Draven planned their responses to the police, and the Petitioner's boasts that he killed Cory Voss for money. Tr. at 2615-17. Based on all this

118

**2941**

other relevant evidence, Dr. Dudley's lack of testimony does not undermine confidence in the jury's finding of this aggravator.

The Petitioner also contends that the pecuniary gain statutory aggravator could not have been given much weight because he did not receive the full payment for the murder of Cory Voss. Mot. at 81. The Petitioner, however, did receive some payment, and his purpose for participating in the murder was monetary gain. The Petitioner does not show how his mental health or psycho-social history would have changed the way the jury viewed this factor. As to the abuse of women aggravator, the jury heard about his family history of domestic violence and found two mitigators in his favor. The Petitioner fails to show how additional evidence would have reduced his culpability for his past acts against women and affected the weight the jury gave to that factor.

### 7. Conclusion

For the above reasons, the Petitioner fails to show a reasonable probability of a different outcome had the evidence he now argues for been introduced at trial. The government introduced compelling evidence against the Petitioner, and the jury found both aggravating and mitigating factors, and was clearly able to weigh the evidence. The court now concludes that the Petitioner is unable to show how introduction of mental

119

**2942**

health evidence or a different focus during the penalty phase would meet the Strickland prejudice standard and undermine confidence in the outcome. The number of exhaustive words, pages, and arguments does not make for a successful outcome in a habeas corpus proceeding, particularly in a case of this comprehensive attention to detail in the presentation of the trial evidence, and the fair consideration by a jury in three phases of trial.

As the court discussed in the earlier parts of this claim, counsel was not deficient in their investigation or decision as to the penalty phase strategy. The court now finds that there was no prejudice resulting from such decisions, and counsel was not ineffective regarding their decisions about the Petitioner's mental health, their investigation into the Petitioner's background, and their final trial strategy.

Claim Six is **DENIED**.

### G. CLAIM SEVEN - CONFRONTATION CLAUSE VIOLATED, AND COUNSEL UNREASONABLY FAILED TO OBJECT AND ASK FOR A LIMITING INSTRUCTION

In this claim, the Petitioner alleges a violation of his Sixth Amendment rights because pre-arrest statements of his co-defendant, Draven, were introduced at trial. Mot. at 84. The statements were made by Draven to a Newport News police officer

120

**2943**

and to his cellmate, and as the Petitioner did not have an opportunity to cross-examine Draven about the statements, he argues that their introduction violated his Confrontation Clause rights. Id.

### 1. Procedural Default

The government argues that this claim is procedurally defaulted, as counsel failed to raise the issue on appeal, and that nevertheless, it has no merit. Resp. at 78-79. The Petitioner asserts that appellate counsel was ineffective for not bringing the claim on direct appeal, and he suffered prejudice as a result; such a finding would excuse the default. Reply at 64. Because the Petitioner alleges ineffective assistance of trial counsel as its own distinct claim, and of appellate counsel as a means to excuse default, the court must examine the arguments in Claim Seven to determine if the Petitioner can prove that counsel acted deficiently and with resulting prejudice.

### 2. Confrontation Clause Claim

During trial, Detective Larry Rilee of the Newport News Police Department testified about several conversations that he had with Draven. Tr. at 1300-09, 1314-22. These conversations included multiple lies, interspersed with bits of truth, such as confirmation that Draven and Cat Voss were having an affair. Id.

121

**2944**

at 1320. Draven also told Detective Rilee that he had called the phone at the Waffle House in Newport News and spoken to the Petitioner the night of the murder. Id. at 1320-21. This fact was then highlighted in the government's closing statement to show that the Petitioner and Draven had contact on the day of the murder. Id. at 1593. The government also introduced testimony from Edward Fodrey, a cellmate of Draven's at Western Tidewater Jail. Id. at 1231-38. During his testimony, Fodrey stated that Draven told him that he hired some "other guy" to get rid of his girlfriend's husband. Id. at 1236. However, as Draven did not testify, the Petitioner had no way to cross-examine him about the statements. Mot. at 84-85.

The Petitioner now argues that introduction of the above statements violated his right to confrontation under the Sixth Amendment, and as set out in Crawford v. Washington, 541 U.S. 36 (2004). Mot. at 84. Crawford held that out-of-court testimonial statements by a witness are not admissible at trial under the Confrontation Clause, unless the witness is unavailable and there was a prior opportunity for cross examination. 541 U.S. at 68. Certain hearsay exceptions, such as statements in furtherance of conspiracy, are not considered testimonial. Id. at 56 ("Most of the hearsay exceptions covered statements that

122

**2945**

by their nature were not testimonial — for example, business records or statements in furtherance of a conspiracy.").

The Petitioner further argues that because the statements were made by the Petitioner's non-testifying co-defendant, counsel should have objected, or at least asked for a limiting instruction. Mot. at 84-86. In Bruton v. United States, 391 U.S. 123, 137-38 (1968), the Court found that a non-testifying co-defendant's confession implicates the defendant's Confrontation Clause right, and a limiting instruction does not necessarily protect that right. However, the Bruton rule does not apply, if the statements are proper co-conspirator statements under the hearsay rules. See United States v. Shores, 33 F.3d 438, 442 (4th Cir. 1994) ("We have held, however, that the Bruton rule does not apply if the nontestifying co-defendant's statement is admissible against the defendant under the co-conspirator exception to the hearsay rule set forth in Federal Rule of Evidence 801(d)(2)(E)." (citing Folston v. Allsbrook, 691 F.2d 184, 187 (4th Cir.1982))).

The court will now evaluate the various statements to which the Petitioner objects. The Petitioner starts by challenging Draven's statement that Draven was having an affair with Cat Voss and Draven's assertion that he spoke with the Petitioner on a pay phone at a Waffle House near the crime scene. Mot. at 85.

123

2946

At trial, the government argued and presented evidence that before the arrest of the Petitioner and his co-defendants, a conspiracy existed and continued among the co-defendants. Tr. at 1596-1608. This continuing conspiracy included lying to law enforcement in an attempt to thwart the investigation and to obtain Cory Voss's life insurance proceeds, and receiving that money was a central purpose of the conspiracy to commit murder for hire. Id.

The particular statements to which the Petitioner now objects were not shown to be lies, pursuant to the trial evidence. However, they were made by Draven after he had told multiple lies to the police about the crime, and were made in the course of an interview during which he was still attempting to cover up the facts of the crime. Id. at 1314-22. During that interview, Draven did not confess to the crime, and soon after that incident, the police interviewed the Petitioner, who continued to lie and attempt to frustrate the investigation. Id. at 1322-26. A conspiracy to cover up the facts of the crime in order to receive the life insurance proceeds was ongoing at the time Draven made the statements, and the court finds these pre-arrest statements were made in furtherance of the conspiracy. As statements of co-conspirators in furtherance of a conspiracy are admissible under Federal Rule of Evidence

124

**2947**

801(d)(2)(E) and are not considered testimonial, their admission is not a Sixth Amendment violation under Crawford, and admission of these statements did not violate the Petitioner's rights.

Additionally, any references to the Petitioner by Draven cannot be said to violate Bruton and incriminate the Petitioner. See United States v. Locklear, 24 F.3d 641, 645-46 (4th Cir. 1994) (finding that a co-defendant's post-arrest statement that "he was familiar with the Locklear brothers and that he had known them all his life" could not "fairly be understood to incriminate [defendant] M. Locklear"). The Petitioner argues that the statement by Draven that he and Cat Voss were having an extramarital affair speaks to the Petitioner's guilt. While the affair may be a motive for Draven and Cat Voss to engage in murder and hire someone to commit it, their affair itself does not directly implicate the Petitioner. The fact that the Petitioner and Draven spoke on the phone is also not incriminating due to the evidence put forth by defense counsel to show a prior relationship between Draven and the Petitioner that arose from their time doing clinical drug studies. Draven was attempting to clear himself from suspicion, and although the phone call placed the Petitioner in Newport News, the fact of the prior relationship provided a non-suspicious reason for the call that does not implicate the Petitioner in the crime. The

125

**2948**

court also notes that it clearly instructed the jurors that they must evaluate the evidence of each defendant's involvement in the crime separately, and return a separate verdict for each defendant. Tr. at 1682.

As to the statements by Edward Fodrey, a jailhouse informant, there is no Confrontation Clause problem. Fodrey made a statement about Draven hiring some "other guy," who "was a friend of his," to kill Cory Voss. Tr. at 1236. The Petitioner's name was never mentioned, and Fodrey testified that Draven tried to contact a number of people online about participating in the conspiracy. Id. Fodrey's statement cannot fairly be said to refer to the Petitioner without additional linking evidence. See United States v. Lighty, 616 F.3d 321, 376-77 (4th Cir. 2010) (noting a difference "between statements that incriminate by inference or only when linked with later evidence and those that obviously refer to a particular person or involve inferences a jury could make even without additional evidence," and only the latter category rises to the level of a constitutional violation (citing Gray v. Maryland, 523 U.S. 185, 196 (1998))).

The Petitioner argues, however, that because the jury heard evidence and argument that connected him with Cat Voss and Draven, it was clear that the Petitioner was Draven's "friend" hired to kill Cory Voss. Reply at 63. This argument is again

126

somewhat nonsensical. Just because people are "friends" does not lead to the conclusion that one would hire the other to commit murder. Moreover, in point of fact, the Petitioner and Draven were friends, and evidence of this connection was certainly relevant and admissible, and just because the statements link to the Petitioner after the introduction of many other pieces of evidence and testimony does not mean the statements violated Bruton. See Lighty, 616 F.3d at 376-77. The important point is that the statements did not directly implicate the Petitioner without additional evidence linking him to the crime.

For the reasons stated above, the introduction of the statements did not violate the Petitioner's rights under the Confrontation Clause or impermissibly refer to the Petitioner in violation of Crawford and Bruton. As this claim has no merit, appellate counsel was not ineffective for declining to include the issue on appeal. Because the Petitioner fails to show cause and prejudice for not having raised the issue on appeal, this portion of Claim Seven is both procedurally defaulted and lacking in merit.

### 3. Ineffective Assistance of Trial Counsel

Along with the underlying Confrontation Clause claim, the Petitioner raises as a separate argument that trial counsel was ineffective for not objecting to the testimony and not asking

127

for a limiting instruction. Mot. at 86. However, trial counsel filed a pre-trial Motion to Sever, in which counsel argued that introduction of Draven's statements at a joint trial would be a Confrontation Clause violation under Bruton. Mem. Supp. at 3-6, ECF No. 89. At an oral hearing on December 8, 2008, the court heard argument on this Motion.

During that hearing, defense counsel argued that the questioning occurred during police interrogation and should be considered testimonial, thus triggering the rules in Bruton and Crawford. Dec. 8, 2008, Tr. at 9-10. The government agreed that the statements were made during police interrogation, but argued that the statements were made in furtherance of the conspiracy and were non-hearsay statements, as they would not be admitted to prove the truth of the matter asserted. Id. at 11. Defense counsel conceded that if the statements were made in furtherance of the conspiracy, and thus properly admissible under Federal Rule of Evidence 801(d)(2)(E) as co-conspirator statements, then Crawford and Bruton would not be implicated. Id. at 8-9. As the court found that the pre-arrest statements were made in furtherance of the conspiracy, it denied the Motion to Sever. Id. at 14-15. The court also noted that although there was a post-arrest statement, the government agreed not to use it in

128

**2951**

its case-in-chief, thus eliminating any need to address Crawford or Bruton in relation to that statement. Id. at 15.

The court indicated during the hearing that it would be willing to give limiting instructions regarding the statements, if requested by counsel. Id. at 16. While it is unclear why counsel did not later request such an instruction, the Petitioner is unable to show that the choice not to do so was deficient or prejudicial. After the court already decided that the statements were made in furtherance of a conspiracy, counsel could reasonably not have wanted to challenge the statements again, particularly as they did not directly implicate the Petitioner without more evidence linking him to the crime. Counsel also knew that the court would, and did, instruct the jury that they must consider the acts of the Petitioner and Draven separately, and must reach a separate verdict for each defendant. See Tr. at 1682. Further, the Petitioner is unable to prove prejudice as the Fodrey statements did not name the Petitioner, and Draven's statements could have multiple connotations. With all the other evidence against the Petitioner, the Petitioner fails to prove that a limiting instruction related to a couple of statements would have created a reasonable probability of a different outcome, and the court finds that trial counsel was not ineffective.

129

**2952**

The Crawford/Bruton challenge to Draven's statements is procedurally defaulted, and without merit. The Petitioner also fails to show ineffective assistance of trial counsel for not objecting to the inclusion of the statements or requesting a limiting instruction. As such, Claim Seven is **DENIED**.

**H. CLAIM EIGHT – THE PETITIONER ARGUES THAT HIS APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE.**

In Claim Eight, the Petitioner alleges ineffective assistance of his appellate counsel because they did not raise certain claims on direct appeal, including but not limited to Claims Seven, Eleven, Twelve, Thirteen, Fourteen, and Sixteen. Mot. at 86-88.[43] The Petitioner also argues that ineffective assistance by appellate counsel should provide an excuse for any procedurally defaulted claim. Id. at 88.

Defendants are entitled to effective assistance of counsel on direct appeal. Evitts, 469 U.S. at 396-97. As with trial counsel, courts evaluate appellate counsel using the two prongs

---

[43] The government argues that this claim is partially time-barred, as the original Motion did not mention ineffective assistance of appellate counsel in relation to claims Eleven, Twelve, Thirteen, and Fourteen. Resp. at 85-87. As failing to raise these additional four claims on direct appeal arises out of the same conduct that was in the original Motion — the failure to raise other claims on direct appeal — the court considers these claims to be timely.

130

2953

of the Strickland test. See Murray, 477 U.S. at 535-36 (applying Strickland to a claim of ineffective assistance of counsel on appeal). To determine whether appellate counsel acted deficiently, a court must evaluate whether counsel failed to raise "a particular nonfrivolous issue [that] was clearly stronger than issues that counsel did present" on direct appeal. Robbins, 528 U.S. at 288; see also Jones, 463 U.S. at 753 ("A brief that raises every colorable issue runs the risk of burying good arguments."). To prove prejudice, the Petitioner must show a reasonable probability that, but for counsel's actions, the result of the proceeding would have been different. Strickland, 466 U.S. at 694.

The Petitioner argues that many of the claims brought in the instant Motion are stronger than those raised on direct appeal, but he places particular emphasis on two claims, the Batson claim (Claim Sixteen) and the Crawford/Bruton claim (Claim Seven). Mot. at 86-87. He argues that the Fourth Circuit denied some of his appellate challenges as "fail[ing] by a wide margin" and contrary to long-standing precedent, and at least one claim in the instant Motion must be stronger than an issue brought on appeal. Mot. at 87 (quoting Runyon, 707 F.3d at 489). As to the Batson claim, he also argues that counsel did not

131

request strike lists or juror questionnaires, making them unable to even investigate whether a Batson claim existed. Id. at 86.

The Petitioner, however, provides no proof that counsel did not carefully consider what claims to bring on appeal. While the court acknowledges that the Fourth Circuit did not accept all of appellate counsel's arguments, this court does not find in favor of the Petitioner on any of the claims raised in the instant Motion, including Claims Seven and Sixteen. As the court does not find that any omitted argument was stronger than any included argument on appeal, the court finds that counsel did not act in an objectively unreasonable manner in deciding what claims to file. The Petitioner is also unable to show a reasonable probability of a different outcome, had counsel raised these new meritless arguments in their appellate brief. Moreover, as the court finds the Batson claim to have no merit now that counsel has had the opportunity to evaluate the strike list and questionnaires, the Petitioner fails to show resulting prejudice from appellate counsel's decision not to request those documents.

The Petitioner finally argues that appellate counsel should have used a different font type so that more arguments could have been included in the appellate brief. Mot. at 87-88. However, appellate counsel used a court-approved font, and, even

132

**2955**

more important, this court finds that the arguments the Petitioner now suggests should have been included have no merit. Accordingly, Claim Eight is **DENIED**.

Because the court finds appellate counsel was not ineffective for failing to raise the additional claims — Claims Seven, Eleven, Twelve, Thirteen, Fourteen, and Sixteen — contained in this Motion, the court also rejects the Petitioner's argument that ineffective assistance of appellate counsel excuses any procedural default. The Petitioner has made no other argument to overcome default for those claims not raised on direct appeal, and these claims are thereby defaulted. See United States v. Frady, 456 U.S. 152, 167-68 (1982).[44]

### I. CLAIM NINE – THE PETITIONER ARGUES THAT THE HOLDING IN JOHNSON V. UNITED STATES, 135 S. CT. 2551 (2015), INVALIDATES HIS CONVICTION.

The Petitioner next argues that the recent Supreme Court case, Johnson v. United States, 135 S. Ct. 2551 (2015), which invalidated the residual clause of the Armed Career Criminal Act ("ACCA"), applies to his case and causes his conviction to be in violation of the Fifth, Sixth, and Eighth Amendments, the Equal

---

[44] See supra Part IV.G (Claim Seven); infra Part IV.K (Claim Eleven); Part IV.L (Claim Twelve); Part IV.M (Claim Thirteen); Part IV.N (Claim Fourteen); Part IV.P (Claim Sixteen) for discussion of the specific claims raised in Claim Eight.

133

Protection Clause, and the Due Process Clause. Mot. at 88. The Petitioner was convicted of Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a) (Count One); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count Two); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(j) and 2 (Count Five). Jury Verdict Form, ECF No. 245; see Indictment, ECF No. 3. The ACCA did not apply to his conviction and sentencing, but he argues that the holding in Johnson nevertheless applies to his case. Id. at 88-89. To evaluate this claim, the court must first address the holding and retroactivity of Johnson.

### 1. Holding and Retroactivity of Johnson v. United States

The ACCA provides enhanced penalties for defendants with three prior convictions for a violent felony or serious drug offense. 18 U.S.C. § 924(e)(1). The ACCA defines violent felony as a felony that

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

134

**2957**

Id. § 924(e)(2)(B). The first subsection is known as the force clause, and the "or otherwise involves conduct that presents a serious potential risk of physical injury to another" language in the second subsection is known as the residual clause.

In Johnson, the Supreme Court held that the ACCA residual clause is unconstitutionally vague. 135 S. Ct. at 2557. The Court stated that "[t]wo features of the residual clause conspire to make it unconstitutionally vague." Id. First, "the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime" Id. Second, "the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." Id. at 2558. The analysis under the residual clause of the ACCA "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes," which can lead to problems as evaluating the degree of risk posed by the enumerated crimes is "far from clear." Id. The Court also discussed the problems that arise when trying to evaluate the "serious potential risk" in an "ordinary case" violent felony analysis, and how these concerns were causing the lower federal courts to split on their interpretations of the residual clause. Id. at 2557-60. The Court thus concluded that the residual clause in the ACCA is unconstitutionally vague. Id. at 2557.

135

**2958**

The Court decided Johnson on June 26, 2015. Generally, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague, 489 U.S. at 310. However, there are two exceptions to the Teague bar on retroactivity. Teague generally does not prohibit retroactive application of new substantive rules. Schriro, 542 U.S. at 351. Additionally, "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding," are an exception to the retroactivity doctrine. Saffle, 494 U.S. at 495.

On April 18, 2016, the Supreme Court held that Johnson created a new substantive rule, which applied retroactively on collateral review. Welch v. United States, 136 S. Ct. 1257, 1265 (2016). Thus, if the holding in Johnson applies to the statute under which the Petitioner was convicted, the court may consider the claim, even though Johnson was decided after his conviction became final, on October 6, 2014, when the Supreme Court declined to grant his petition for a writ of certiorari.

136

**2959**

## 2. Extension of Johnson to the Petitioner's Case

In the instant case, one of the Petitioner's convictions is for Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(j) and 2. The jury was instructed that the possible predicate crimes of violence were Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a), and Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2. Tr. at 1705.

> The relevant crime of violence definition is a felony that:
>
> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).

As with the ACCA, the first subsection is known as the force clause, and the second subsection is known as the residual clause. The Petitioner argues that the residual clause in the ACCA is analogous to the one in Section 924(c)(3); thus, the residual clause in Section 924(c)(3) is unconstitutionally vague. Mot. at 88-93. The government contends that the two residual clauses should not be given the same treatment. Resp. at 93-100.

137

**2960**

Although the language in the ACCA residual clause and the Section 924(c)(3) residual clause are similar, they are not identical. The ACCA residual clause refers to "a serious potential risk of physical injury to another" and is preceded by four enumerated crimes, while the 924(c)(3) clause requires "a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." The court's ruling in Johnson analyzed only the ACCA residual clause, and did not address whether the similar language in Section 924(c)(3) was also unconstitutionally vague.

The Second, Sixth, and Eighth Circuits have held that Johnson did not invalidate the residual clause in Section 924(c)(3). United States v. Prickett, 839 F.3d 697, 700 (8th Cir. 2016); United States v. Hill, 832 F.3d 135, 146 (2d Cir. 2016); United States v. Taylor, 814 F.3d 340, 378-79 (6th Cir. 2016). The Fifth Circuit has held that that the residual clause in 18 U.S.C. § 16(b), which is nearly identical to the Section 924(c)(3) residual clause, was not invalidated by Johnson. United States v. Gonzalez-Longoria, 831 F.3d 670, 677 (5th Cir. 2016) (en banc). However, the Third, Sixth, Seventh, Ninth, and Tenth Circuits have held that the residual clause in § 16(b) was invalidated by Johnson. Baptiste v. Attorney Gen., 841 F.3d 601, 621 (3d Cir. 2016); Golicov v. Lynch, 837 F.3d 1065, 1072 (10th

138

**2961**

Cir. 2016); <u>Shuti v. Lynch</u>, 828 F.3d 440, 446 (6th Cir. 2016); <u>United States v. Vivas-Ceja</u>, 808 F.3d 719, 723 (7th Cir. 2015); <u>Dimaya v. Lynch</u>, 803 F.3d 1110, 1120 (9th Cir. 2015), <u>cert. granted</u>, 137 S. Ct. 31 (2016). The Fourth Circuit has not decided whether the language in the Section 924(c)(3) residual clause is void for vagueness after <u>Johnson</u>. The Fourth Circuit has had opportunities to rule on this issue, but has chosen not to address the question under the principle of constitutional avoidance. <u>See</u> <u>United States v. McNeal</u>, No. 14-4871, 2016 WL 1178823, at *8 n.8 (4th Cir. Mar. 28, 2016); <u>United States v. Naughton</u>, 621 F. App'x 170, 178 n.4 (4th Cir. 2015); <u>United States v. Fuertes</u>, 805 F.3d 485, 499 n.5 (4th Cir. 2015).

District courts in this circuit have declined to extend the ruling in <u>Johnson</u> to the residual clause in Section 924(c)(3). <u>See, e.g.,</u> <u>Frenzel v. United States</u>, No. 1:03CR364, 2016 WL 6804358, at *3 (E.D. Va. Nov. 17, 2016); <u>United States v. Jimenez-Segura</u>, No. 1:07-CR-146, 2016 WL 4718949, at *9 (E.D. Va. Sept. 8, 2016); <u>United States v. Green</u>, No. CR RDB-15-0526, 2016 WL 277982, at *5 (D. Md. Jan. 21, 2016) ("In light of the many differences between the residual clause in Section 924(c)(3)(B) and the Armed Career Criminal Act's residual clause, and in accordance with the Fourth Circuit's decision in <u>Fuertes</u>, this Court's decision in <u>Hayes</u>, and the other United

139

**2962**

States District Court decisions . . . declining to invalidate Section 924(c)(3)(B) under Johnson, the residual clause in Section 924(c)(3)(B) is not unconstitutionally vague."); United States v. Walker, No. 3:15cr49, 2016 WL 153088, at *8-9 (E.D. Va. Jan. 12, 2016); United States v. Hunter, No. 2:12cr124, 2015 WL 6443084, at *2 (E.D. Va. Oct. 23, 2015) (noting that "[t]he residual clause of the ACCA had faced significantly more confusion in the lower courts, was a much broader clause than § 924(c), and required courts to analyze conduct outside of that conduct required for the charged offense").

In accordance with the other courts in this district, this court declines to extend the holding in Johnson to the residual clause in Section 924(c)(3). Even if the court were to extend Johnson's holding to the residual clause in Section 924(c)(3), the question would remain over its retroactive applicability on collateral review, which only the Supreme Court can determine. See 28 U.S.C. § 2244(b)(2)(A); Tyler v. Cain, 533 U.S. 656, 662 (2001). As such, the Petitioner's conviction under Section 924(c)(3) is not unconstitutional. Claim Nine is DENIED.

**J. CLAIM TEN – THE PETITIONER ARGUES THAT THE JURY INSTRUCTIONS LOWERED THE GOVERNMENT'S BURDEN OF PROOF.**

In this claim, the Petitioner argues that the jury instructions at the penalty phase "unconstitutionally lowered

140

**2963**

the government's burden of proof in violation of the Fifth, Sixth, and Eighth Amendments." Mot. at 99. The instructions with which the Petitioner disagrees are the charges that the jury must agree that the aggravating factors "sufficiently outweigh" any mitigating factors. Tr. at 2672-73, 2675, 2682-84, 2694.[45] For support, the Petitioner relies on Ring v. Arizona, 536 U.S. 584, 609 (2002), which held that juries, not judges, must find aggravating factors, and they must do so using a beyond a reasonable doubt standard. Mot. at 99. However, the Petitioner already raised this claim on direct appeal. Runyon, 707 F.3d at 515-16. The Fourth Circuit denied the claim, finding that the court's instructions followed the language of the Federal Death Penalty Act ("FDPA") "virtually verbatim." Id. at 516. The Fourth Circuit also stated that although juries must find

---

[45] One such set of instructions is below:

> In this phase, at the end of your deliberations all 12 jurors must unanimously agree that the aggravating factors sufficiently outweigh any mitigating factors, or in the absence of mitigating factors, that the aggravating factors are themselves sufficient to justify a sentence of death. But if any of you, even a single juror, is not persuaded that the aggravating factors sufficiently outweigh any mitigating factors such that a sentence of death is justified, then the jury may not recommend the death penalty on the verdict form.

Tr. at 2675.

141

**2964**

aggravating factors beyond a reasonable doubt, that standard of proof has not been extended to the weighing of aggravating and mitigating factors by a jury. Id.

### 1. Bar to Relitigating Claims Raised on Appeal

A petitioner generally is not permitted to relitigate issues brought on direct appeal in a collateral attack. See Boeckenhaupt, 537 F.2d at 1183. As such, courts may "refuse to reach the merits of a constitutional claim previously raised and rejected on direct appeal." Withrow, 507 U.S. at 720-21 (Scalia, J., concurring in part and dissenting in part). Exceptional circumstances, however, such as an intervening change in the law, may warrant a departure from this law-of-the-case doctrine. See Davis, 417 U.S. at 342-47 (holding that when relevant substantive law changed after the petitioner's trial and unsuccessful appeal, the petitioner could file a § 2255 motion for collateral relief based on the intervening change in the law); Jones, 178 F.3d at 796 ("It is equally well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law.").

Here, the Petitioner argues that the case Hurst v. Florida, 136 S. Ct. 616 (2016), created an intervening change in the

142

**2965**

controlling law that would allow him to relitigate his claim. Mot. at 100. The government argues that this claim should be denied because Hurst does not represent a change in the law with respect to the issue that the Petitioner raised on direct appeal. Resp. at 113. To determine if the Petitioner may relitigate this claim, the court must first examine the ruling in Hurst.

In Hurst, the Supreme Court found that Florida's capital sentencing procedures violated the Sixth Amendment. 136 S. Ct. at 619.   The sentencing scheme at issue permitted a jury to render an advisory opinion as to whether a defendant should be subject to the death penalty, but the judge made the ultimate determination after holding a separate hearing and independently weighing the mitigating and aggravating factors. Id. at 620. When deciding if this scheme impermissibly took the decision out of the hands of the jury, the Court relied on the holding in Ring. Id. at 621-22. Similar to the sentencing procedure in Ring, the Florida courts did "not require the jury to make the critical findings necessary to impose the death penalty." Id. at 622. The Court reasoned that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." Id. at 619. Accordingly, the Court found that a jury's advisory

143

2966

opinion on the death penalty does not protect a defendant's constitutional rights, and it struck down Florida's capital sentencing scheme. Id.

### 2. Extension of Hurst v. Florida to the Petitioner's Case

The court will now determine whether the rule in Hurst applies to the Petitioner's claim about the standard to be used when juries weigh the aggravating and mitigating factors during the penalty phase. Hurst held that the Sixth Amendment requires a death sentence be based "on a jury's verdict, not a judge's factfinding," and a jury's mere advisory opinion is not enough to safeguard this right. 136 S. Ct. at 624. The Petitioner does not argue that the judge was involved in determining or weighing the aggravating and mitigating factors in his case, or was in any other way improperly usurping the role of the jury in deciding whether to impose the death penalty. Rather, the Petitioner argues that the jury should have been required to make its final comparison of the weight of the aggravating and mitigating factors using a beyond a reasonable doubt standard, not a sufficiently outweighs standard. Mot. at 99-101.

That both Hurst and Ring deal with juries in death penalty trials does not automatically mean that Hurst represents an intervening change in the law set forth in Ring, and argued by

144

**2967**

the Petitioner on his direct appeal. Hurst does not mention the weight a jury should give to the aggravating and mitigating factors, as it is concerned with whether a judge may take over the jury's role in determining these factors. The Petitioner's claim does not deal with that specific issue, and his attempt to link Hurst to his case stretches the holding too far.

As such, the court finds that Hurst does not represent an intervening change in the law, with respect to the issue the Petitioner raised on appeal, and it does not affect the Fourth Circuit's earlier finding that the FDPA requires only that the jury decide "whether all the aggravating . . . factors found to exist sufficiently outweigh all the mitigating . . . factors found to exist," and that this court's instructions during the penalty phase were proper. Runyon, 707 F.3d at 516 (quoting 18 U.S.C. § 3593(e)). The Fourth Circuit found no error here. Id. at 516.

For the above reasons, the Petitioner is barred from relitigating this claim, and Claim Ten is DENIED.

K. CLAIM ELEVEN – THE PETITIONER ARGUES THAT HIS SENTENCE IS UNCONSTITUTIONAL BECAUSE IT IS BASED ON AGGRAVATING CIRCUMSTANCES THAT ARE ARBITRARY AND OVERBROAD.

In this claim, the Petitioner challenges the aggravating factors presented during the penalty and eligibility phases. Mot. at 102-05. The jury found two statutory aggravating factors

145

**2968**

in the Petitioner's case: (1) the Petitioner "committed the offense in consideration for the receipt of, or in expectation of the receipt, of anything of pecuniary value"; and (2) the Petitioner "committed the offense after substantial planning and premeditation to cause the death of a person." Special Verdict Form - Eligibility Phase, at 5-6, ECF No. 255. The non-statutory aggravating factors that the jury found were that the Petitioner (1) "caused injury, harm, and loss to the victim . . . and the victim's family and friends"; (2) "utilized training, education, and experience" gained during criminal justice college courses, his time in the Kansas National Guard, his work as a law enforcement officer, and his experience as a member of the United States Army; (3) "engaged in acts of physical abuse towards women"; and (4) "demonstrated a lack of remorse." Special Verdict Form - Selection Phase, at 1-2, ECF No. 291. He now contends that the statutory factors unconstitutionally mirrored the elements of the conduct required for conviction, and the non-statutory factors were arbitrary and overbroad. Mot. at 102-05.

### 1. Procedural Default and Bar on Relitigation

The government argues that the claim about the statutory factors is procedurally defaulted because it was not raised on appeal, and that the claim regarding the non-statutory factors

146

**2969**

cannot be relitigated because it was raised on appeal. Resp. at 115, 117.[46] The Petitioner argues that he can show cause and prejudice to overcome the procedural default because his appellate counsel was ineffective for not raising the statutory aggravating factor claim on direct appeal. Reply at 86. He further argues that although he challenged the non-statutory factors on appeal, that challenge was based on a different premise than the current claim. Id. at 87.

To determine if the Petitioner can overcome the procedural default, the court will examine the statutory aggravating factor portion of the instant claim to determine if it is stronger than the claims presented on appeal, and if the Petitioner suffered prejudice as a result of counsel's failure to raise it on appeal. If the Petitioner cannot make such a showing, the default may not be excused. The court will also examine the non-statutory factor challenge to see if it is different from the claim presented on appeal, in which case the bar on relitigation would not apply.

---

[46] The government also asserts that this claim is barred by the Teague non-retroactivity doctrine. Resp. at 115. However, there have been no changes to the relevant law since the Petitioner's case became final, so this claim is not barred by Teague.

147

## 2. Standard for Evaluating Aggravating Factors

"[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, 462 U.S. 862, 877 (1983). This "narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses . . . so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase." Lowenfield v. Phelps, 484 U.S. 231, 246 (1988).

Because of the importance in narrowing the application of the death penalty, aggravating factors may not be unconstitutionally vague or overbroad. See Tuilaepa v. California, 512 U.S. 967, 972 (1994). "[T]he [aggravating] circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." Id. During the penalty selection phase, it is vital that juries make an "individualized determination on the basis of the character of the individual and the circumstances of the crime," and aggravating factors assist with this determination

148

**2971**

and narrow down "those defendants who will actually be sentenced to death." Zant, 462 U.S. at 878-79.

### 3. The Petitioner's Statutory Aggravating Factor Claim

The Petitioner argues that because the pecuniary gain and substantial planning statutory factors mirrored elements of the crime of Conspiracy to Commit Murder for Hire, an unconstitutional application of the death penalty resulted. Mot. at 102. However, the Supreme Court has held that a statutory aggravating factor may be the same as an element of the crime of conviction. See Tuilaepa, 512 U.S. at 972 ("The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." (citing Lowenfield, 484 U.S. at 244-46)); Lowenfield, 484 U.S. at 246 ("[T]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.").[47]

The Petitioner argues that because Lowenfield and Tuilaepa involve sentencing schemes with different narrowing procedures than the FDPA, the legal principles contained in them do not

---

[47] Both of these cases involved narrowing the class of defendants eligible for the death penalty at the guilt phase of trial, whereas the FDPA narrowing function occurs during the penalty selection phase.

149

**2972**

apply to his case. Reply at 85. While the court recognizes that the sentencing schemes in those cases differ from the instant case, the court finds that their reasoning extends to the Petitioner's case.[48] The purpose of statutory aggravating factors is not to require the government to prove facts separate from the crime of conviction for death penalty eligibility; their purpose is to narrow down from all those defendants convicted of murder the specific subclass who may receive the death penalty. See Tuilaepa, 512 U.S. at 972. Whether this is done in the guilt phase, penalty selection phase, or, as in the instant case, eligibility phase, is not the important question, so long as the factors perform the proper narrowing function. See Lowenfield, 484 U.S. at 246. Further, there is no bar on aggravating factors overlapping with facts of conviction, and such an overlap has been specifically upheld in certain instances. See Tuilaepa, 512 U.S. at 972; Lowenfield, 484 U.S. at 246.

If an aggravating factor was such that it applied to every defendant convicted of murder, or perhaps even a large percentage of those convicted, then that may be a constitutional

---

[48] The court also notes that the Petitioner fails to provide any case where a court found that an overlap between the statutory aggravating factors and the underlying facts of conviction was unconstitutional, because the narrowing function occurred during the penalty phase instead of the guilt phase.

150

**2973**

concern. But that is not the case before the court. Here, the jury found the Petitioner eligible for death after finding the age requirement, a gateway factor, and two statutory aggravators during the eligibility phase. Special Verdict Form - Eligibility Phase, ECF No. 255. The aggravating factors of committing the crime in expectation of pecuniary gain and after substantial planning do serve to narrow the class of defendants. Not all murders are committed with substantial planning, and many murders are done without any promise or intent of payment.[49] These factors are not vague, and they apply to only a subclass of those convicted of murder. See Tuilaepa, 512 U.S. at 972 (stating that an aggravating circumstance must "not apply to every defendant convicted of a murder," but instead must "apply only to a subclass of defendants convicted of murder").

For the above reasons, the court finds that these statutory factors performed the required narrowing function to prevent

---

[49] The Fourth Circuit has recognized that a "murder for hire" aggravator performs a proper narrowing function, even if the underlying conviction for first-degree murder required a finding of that same murder contract. Grandison v. Corcoran, 225 F.3d 654, 2000 WL 1012953, at *11 (4th Cir. 2000) (unpublished table decision) ("[T]here is no question that Maryland's 'murder for hire' aggravating circumstance narrows the death-eligible pool of murderers, as not every person convicted of first-degree murder will have taken out a murder contract on his victims."). This factor is similar to the pecuniary gain aggravator in the Petitioner's case.

151

arbitrary application of the death penalty. That they overlap with facts of the Petitioner's specific crime of conviction does not mean he suffered a violation of his constitutional rights. As this claim has no merit and it is not clearly stronger than any claim raised on appeal, the Petitioner's appellate counsel was not ineffective for failing to argue it on appeal. Thus, the claim is not only without merit, but it is also procedurally defaulted.

### 4. The Petitioner's Non-Statutory Aggravating Factor Claim

In addition to the two statutory aggravating factors found during the eligibility phase, the jury also found four non-statutory aggravating factors during the penalty selection phase.[50] The Petitioner now argues that these factors were "arbitrarily determined by the prosecutors, limited only by

---

[50] These factors are that the Petitioner (1) "caused injury, harm, and loss to the victim . . . and the victim's family and friends"; (2) "utilized training, education, and experience" gained during criminal justice college courses and his time in the Kansas National Guard, as a law enforcement officer, and as a member of the United States Army; (3) "engaged in acts of physical abuse towards women"; and (4) "demonstrated a lack of remorse." Special Verdict Form - Selection Phase, at 1-2, ECF No. 291.

152

**2975**

their imaginations," and were not based on any clear, objective standard. Mot. at 104.[51]

### a. Bar on Relitigation

The government argues that this claim is barred because it was raised on direct appeal, and regardless, it has no merit. Resp. at 117. The Petitioner did challenge the non-statutory aggravating factors on appeal. Runyon, 707 F.3d at 492-507. Although the factor involving the use of his education and law enforcement training during commission of the crime was challenged for being vague or overbroad,[52] which is part of his current argument, the other factors were challenged for different evidentiary or constitutional reasons. Therefore, there is no relitigation bar to the aggravating factors of harm to the victim and his family, lack of remorse, and abuse of women.

---

[51] The court notes that the Petitioner brought this same challenge before trial. At that time, the Petitioner argued that the non-statutory aggravators were not based on clear and objective criteria, but were "restricted only by the imagination of the prosecutor," thus presenting a risk that the "death penalty [would] be imposed arbitrarily and capriciously." ECF No. 91, at 52-54. The Petitioner later filed an objection arguing that the factors were vague and overbroad. ECF No. 195. The court denied the motions and overruled the objections. ECF Nos. 143, 217.

[52] The Fourth Circuit found that this factor was neither vague nor overbroad. Runyon, 707 F.3d at 502-03.

153

**2976**

**b. The Prosecution's Use of Non-Statutory Aggravating Factors in the Petitioner's Case**

To begin, it is established that the FDPA permits the inclusion of non-statutory aggravating factors during the penalty selection phase. See 18 U.S.C. § 3592(c) ("The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists."). The purpose for an aggravating factor, either statutory or non-statutory, is to "genuinely narrow the class of persons eligible for the death penalty" and "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant, 462 U.S. at 877. "Once a defendant has been rendered eligible for the death penalty by the jury's finding of a statutory aggravating factor, the use of nonstatutory aggravating factors serves only to individualize the sentencing determination." United States v. Higgs, 353 F.3d 281, 320 (4th Cir. 2003).

To prevent an arbitrary and capricious application of the death penalty, aggravating circumstances may not be vague or overbroad. See Tuilaepa, 512 U.S. at 973. A factor is unconstitutionally overbroad "[i]f the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty." Arave v. Creech, 507

154

**2977**

U.S. 463, 474 (1993); see also Tuilaepa, 512 U.S. at 972 (explaining that a factor "must apply only to a subclass of defendants convicted of murder"). A factor is vague if it lacks "some 'common-sense core of meaning . . . that criminal juries should be capable of understanding'". Id. at 973 (quoting Jurek v. Texas, 428 U.S. 262, 279 (1976) (White, J., concurring)). As vagueness review "often 'is not susceptible of mathematical precision,'" it is "quite deferential." Id. (quoting Walton v. Arizona, 497 U.S. 639, 655 (1990)).

The court now finds that the non-statutory factors in the Petitioner's case are not vague or overbroad, and did not lead to an arbitrary and capricious application of the death penalty. There is a common-sense meaning to the factors, which is easily understood by a jury, and the factors could not fairly apply to every defendant eligible for the death penalty. Many defendants do feel remorse for their crimes, and do not attempt to constantly hinder the investigation in an attempt to receive monetary gain for their illegal acts. While many defendants may have a criminal history, their criminal history does not necessarily involve abuse of women. That is a specific category of violence used to narrow those individuals subject to the death penalty, and the Petitioner fails to show how this factor is overreaching. Although the impact on the victim's family may

155

**2978**

apply to most crimes, the Supreme Court has held that such evidence is not barred by the Eighth Amendment, as it may aid the jury in its individualized determination about whether to apply the death penalty. See Payne v. Tennessee, 501 U.S. 808, 827 (1991). Further, these factors do not require technical knowledge to be understood, and could not be considered vague. Although the Petitioner may not relitigate this issue, the court also notes the Fourth Circuit's holding on direct appeal that the aggravating factor of using military and law enforcement training in commission of a crime is not vague or overbroad. Runyon, 707 F.3d at 502-03.[53] As such, the Petitioner has failed to convince the court that these factors led to an arbitrary or capricious application of the death penalty, or failed to perform a proper narrowing function.

---

[53] The Petitioner acknowledges that he challenged this factor on direct appeal for being vague or overbroad, but he claims his new argument is that the factors are arbitrary and capricious. Reply at 87 n.34. The court notes, however, that he includes an overbreadth argument in this challenge, Mot. at 102-03, and evaluating whether the factors are arbitrary and capricious involves looking at whether they are vague or overbroad. For that reason, the court finds that he cannot relitigate this claim. Regardless, the court finds it has no merit. As seen in the Fourth Circuit's ruling, this factor is not vague or overbroad, and the Petitioner fails to show that the prosecutor improperly chose this factor or that a factor related to using the skills acquired in law enforcement training to murder someone is in any way arbitrary or capricious.

156

**2979**

Moreover, although the government has discretion in choosing the non-statutory factors, such a decision is not determined by the mere whim of the prosecutor. The factors have to be narrow and contain a common-sense meaning, and be designed to aid the jury in making its decision. The non-statutory factors at issue here follow these rules. The Petitioner can point to no convincing reason why such narrow and specific factors caused the death penalty to be imposed in an unconstitutional manner; nor does he present any evidence that the prosecution acted arbitrarily or capriciously in using its discretion to choose these factors. Accordingly, the court finds this claim has no merit.

### c. Ineffective Assistance of Counsel

The Petitioner also briefly alleges ineffective assistance of appellate counsel for not raising this specific challenge to the non-statutory factors on appeal. Reply at 87. Considering that the court now finds this claim lacks merit, the Petitioner is unable to show that the arguments raised on appeal are weaker than this claim, or that there is a reasonable probability of a different outcome had appellate counsel included this argument in their brief. As such, the Petitioner fails to prove ineffective assistance of appellate counsel with regard to the non-statutory aggravating factor claim.

157

**2980**

## 5. Conclusion

The challenge to the statutory aggravating factors is procedurally defaulted, as well as without merit, and the challenge to the non-statutory aggravating factors is without merit. The Petitioner also fails to show ineffective assistance of appellate counsel for not raising this specific challenge to the non-statutory factors on appeal. Thus, Claim Eleven is DENIED.

### L. CLAIM TWELVE – THE PETITIONER ARGUES THAT THE GOVERNMENT ENGAGED IN SELECTIVE PROSECUTION BASED ON RACE, AND COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM DURING DIRECT PROCEEDINGS.

In this claim, the Petitioner argues that his rights were violated when the prosecution unconstitutionally sought the death penalty against him based on his race, and his trial and appellate counsel were ineffective for not challenging this decision or raising this claim on appeal. Mot. at 105.[54] He also

---

[54] The government treats this claim as a single claim for ineffective assistance of counsel. Resp. at 118. In his Reply, the Petitioner clarifies that Claim Twelve involves "intertwined claims of selective prosecution . . . and trial counsel's ineffectiveness for failing to pursue that claim." Reply at 88. Likely due to this misunderstanding, the government has failed to raise the affirmative defense of procedural default for the underlying selective prosecution claim. See Yeatts v. Angelone, 166 F.3d 255, 261 (4th Cir. 1999) (treating procedural default as an affirmative defense that must be pled by the government). As such, the court will examine the merits to determine if the

158

seeks extensive discovery for this claim. First Mot. for Discovery at 12-21.

### 1. Standard for Selective Prosecution Claims

Selective prosecution claims require a "court to exercise judicial power over a 'special province' of the Executive." United States v. Armstrong, 517 U.S. 456, 464 (1996). The Attorney General and United States Attorneys are designated by statute as the President's delegates to ensure the faithful execution of the nation's laws, and they have broad discretion in how to discharge this duty. Id. To prevent a chilling effect on law enforcement and the impairment of an executive function, courts require clear evidence of an equal protection violation to overcome the deference given to these executive officers. See id. at 465.

When arguing selective prosecution, "[t]he claimant must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" Id. at 465 (quoting Wayte v. United States, 470 U.S. 598, 608 (1985)). To establish a discriminatory effect in a race case, the petitioner "must show that similarly

---

Petitioner has shown either selective prosecution or ineffective assistance for failing to raise such a challenge.

159

**2982**

situated individuals of a different race were not prosecuted." Id.; see also United States v. James, 257 F.3d 1173, 1179 (10th Cir. 2001) ("[A] defendant cannot satisfy the discriminatory effect prong by providing statistical evidence which simply shows that the challenged government action tends to affect one particular group. Rather, the proffered statistics must address the critical issue of whether that particular group was treated differently than a similarly-situated group."). Discriminatory intent is shown through evidence that "the decision to prosecute was 'invidious or in bad faith.'" United States v. Olvis, 97 F.3d 739, 743 (4th Cir. 1996) (quoting United States v. Greenwood, 796 F.2d 49, 52 (4th Cir. 1986)).

When attempting to prove discriminatory effect, a petitioner must do more than provide vague conclusory statements or generalities. See United States v. Roane, 378 F.3d 382, 400-01 (4th Cir. 2004) (holding that such statements were not even enough for an evidentiary hearing). Further, it is not enough for a petitioner to rely on raw statistics to prove selective prosecution. In United States v. Bass, 536 U.S. 862, 863-64 (2002) (per curiam), the Supreme Court held that discovery for a selective prosecution claim was not warranted based on nationwide statistics showing differences in the percentage of death-eligible charging decisions, based on race.

160

**2983**

The Court stated that the petitioner must make a showing of discriminatory effect by comparing himself to similarly situated defendants, not merely by showing a nationwide pattern of charging decisions. Id. at 864.

### 2. The Petitioner's Argument for Selective Prosecution

To support his claim, the Petitioner cites several studies regarding imposition of the death penalty. Mot. at 106-07. These reports include a declaration by Lauren Cohen Bell, Ph.D.; a report by a subcommittee to the Judiciary Committee from 1994; and a Department of Justice survey of death penalty cases from 1988 to 2000. Id. All of these studies deal with nationwide statistics, and the focus is quite broad. There is no way to narrow down the statistics to find cases with defendants who are similarly situated to the Petitioner. See Bass, 536 U.S. at 863-64 ("Even assuming that the Armstrong requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decisionmakers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants."). Simply relying on raw data about the race and gender of the defendants, sometimes with a brief mention of the charge, is not enough to show selective prosecution. The court further recognizes that many of the studies deal with statistics from

161

the 1980s and 1990s, while the crime at issue occurred in 2007, and was prosecuted in 2008-09.

Even the broad statistics in these studies do not necessarily involve the same issues as the Petitioner's case. The Lauren Cohen Bell ("Bell") study cited by the Petitioner evaluates sentencing outcomes when the victim is a white female. Mot. Attach. 38. In this case, the victim is a white male. Also, the Bell study evaluated sentencing outcomes, see id. at 3, but the Petitioner challenges the actual charging decision made by the prosecutor. Further, the Bell study, as with the other reports cited by the Petitioner, relies simply on raw statistics and fails to explore cases in enough depth to determine how similarly situated defendants are treated. See id. at 3-6. The Petitioner does mention statistics from the Eastern District of Virginia, see Mot. at 107, but the statistics fail to show anything other than the race and gender of the defendant and victim. They do not explain how the Petitioner was allegedly treated differently from defendants who were similarly situated to him, as an individual whose "mother is Korean" and whose "father is a white American." See id. at 2.

The Petitioner also references his own co-defendants as proof that similarly situated defendants were not given the death penalty. Id. at 108-10. He argues that his two white

162

**2985**

co-defendants were not authorized for the death penalty, even though they both had three statutory aggravating factors, and he only had two. Id. at 108. He also argues that the aggravating factors were stronger in the cases of his co-defendants than in his case. Id. at 109.[55]

It is not enough for the Petitioner to simply point to his co-defendants to show unequal treatment, when there are many differences between their cases and the Petitioner's. Cat Voss pled guilty, and thereby avoided any chance of the death penalty. While Draven exercised his right to go to trial, that is not enough to show discriminatory effect. The prosecution had any number of distinctions to take into account when considering all the facts of the crime, including the fact that the Petitioner was the individual who waited for the victim at the ATM machine, actually pulled the trigger and shot the victim, multiple times, and agreed to receive payment to kill a man he did not know; these factors are important considerations when

---

[55] The court has already addressed parts of this argument in Claim Two, Part IV.B, which alleges that Draven had a more violent past than the Petitioner, and in Claim Four, Part IV.D, which alleges that the Petitioner's co-defendants were more involved in the planning of the crime than the Petitioner. The court denies both claims, and incorporates its reasoning into the relevant parts of this claim.

163

2986

making the decision about whether to seek the death penalty.[56] Accordingly, the Petitioner fails to show that he was treated differently from similarly situated defendants, because his co-defendants were not similarly situated to him.

Further, the Petitioner is unable to provide proof that there was discriminatory intent, as he does not present evidence that the decision to seek death authorization was invidious or in bad faith. See Olvis, 97 F.3d at 743. The Petitioner points to the prosecution's introduction of an interrogation video in which law enforcement commented on the Petitioner being "an honorable Asian man," when trying to get a confession. Mot. at 110. While the Fourth Circuit held that admitting the video was error, it held that it was harmless error. Runyon, 707 F.3d

---

[56] The Fourth Circuit noted that

> the prosecution exercised its discretion on the basis of a number of distinctions between Runyon and the other defendants — including that Runyon was the actual triggerman in the murder-for-hire scheme; that he accepted payment for killing someone who was essentially a complete stranger; and that he not only never cooperated with the investigation but sought to thwart it at virtually every turn.

Runyon, 707 F.3d at 520 n.6. The court then stated that based on this evidence, overturning the Petitioner's sentence would exceed its authority, as the Petitioner provided no evidence of an impermissible basis for seeking the death penalty, such as race or religion. Id.

164

**2987**

at 498. The trial lasted several weeks, and the video was just over forty-two minutes long, with the reference to the Petitioner's race just a small part of that length. Id. at 492. The introduction of this video, which provided partial support to one non-statutory aggravator, is not enough to show that the government had an invidious or bad faith motive in seeking the death penalty against the Petitioner. As the Petitioner fails to show both discriminatory effect and discriminatory intent, he does not make out a claim for selective prosecution.

### 3. Ineffective Assistance of Counsel

The Petitioner also argues that his trial and appellate counsel were ineffective for not objecting during direct proceedings to this allegedly discriminatory application of the death penalty. Mot. at 105. To prove a claim of ineffective assistance of counsel, the Petitioner must show deficient action by counsel and resulting prejudice. See Strickland, 466 U.S. at 687. Counsel was not deficient in failing to raise this meritless challenge at the trial or appellate level. As to the trial level, counsel's choice not to raise a claim, with a high burden of proof and little, if any, supporting evidence, does not fall below objectively reasonable norms. At the appellate stage, this claim is not any stronger than the claims counsel

165

**2988**

did raise, and the circuit court noted its assessment of the exercise of prosecutorial discretion in the case. Runyon, 707 F.3d at 520 n.6.[57] Additionally, the Petitioner cannot show any prejudice from failure to raise this argument earlier, as the claim is without merit, and there is no reasonable probability of a different outcome had this claim been raised by trial or appellate counsel. Claim Twelve is **DENIED**.

### 4. Discovery

The Petitioner requests discovery of fourteen different categories of documents dealing with the prosecution's death eligibility determination. First Mot. for Discovery at 18-20. To obtain discovery in a selective prosecution claim, the petitioner must be able to produce "'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent." Olvis, 97 F.3d at 743 (quoting Armstrong, 517 U.S. at 469). The reason for this heightened standard is that the costs associated with the government's response to a prima facie case of selective prosecution, such as diverting prosecutorial resources and intruding on the Executive's function, are also implicated and imposed by discovery. See Armstrong, 517 U.S. at 468. Therefore, a

---

[57] See supra note 56 and accompanying text.

166

petitioner must do more than simply provide raw nationwide statistics to be granted such discovery. See Bass, 536 U.S. at 863-64.

As discussed above, Part IV.L.2, the Petitioner does not meet even the threshold requirements for a selective prosecution claim. While the discovery standard is lower than actually proving selective prosecution, the Petitioner still does not meet the discovery standard. The studies the Petitioner cites do not make a credible showing of discriminatory intent and effect. The studies are limited in time, are based on nationwide data, and do not involve an analysis of similarly situated individuals who did not receive the death penalty. Further, based on the differences between the involvement of the Petitioner's co-defendants in the crime, and Cat Voss's decision to plead guilty, the Petitioner is unable to make a credible showing that similarly situated defendants were not authorized for the death penalty. His reference to the brief mention of race in the interrogation video hardly meets the requirement of showing some evidence of an invidious or bad faith prosecutorial intent. Accordingly, the court finds that the Petitioner fails to make even a good cause showing for discovery, let alone some evidence of a credible showing of discriminatory intent or effect. His

167

**2990**

request for discovery and corresponding interrogatories is DENIED.

### M. CLAIM THIRTEEN – THE PETITIONER ARGUES THAT HIS DEATH SENTENCE IS DISPROPORTIONATE AND IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS, AND COUNSEL WAS INEFFECTIVE FOR NOT RAISING THIS CHALLENGE DURING DIRECT PROCEEDINGS.

In this claim, the Petitioner argues that his sentence is disproportionate and in violation of the Fifth and Eighth Amendments. Mot. at 111. He asserts this is because his two co-defendants were not death authorized, and he claims that this implies an arbitrary and capricious application of the death penalty. Id. He also presents a separate argument that his trial and appellate counsel were ineffective for failing to raise this claim during earlier stages of the proceeding. Id.

### 1. Procedural Arguments

The government argues that this claim is barred by the Teague non-retroactivity doctrine. Resp. at 126. The court fails to understand the purpose of this argument, as there has been no change in the relevant procedural law since the Petitioner's conviction became final. As such, it finds the claim is not barred by the Teague non-retroactivity doctrine.[58]

---

[58] See supra Part III.A.4.

168

**2991**

The government's next procedural challenge is that the ineffective assistance claim is untimely because that claim appeared for the first time in the amended Motion, id. at 128, which was filed more than one year after the Petitioner's conviction became final. See 28 U.S.C. § 2255(f). However, the claim for ineffective assistance is grounded in the failure by trial and appellate counsel to raise the underlying claim of disproportionality in seeking the death penalty. The court finds that because the same conduct that gave rise to the underlying claim forms the basis of the ineffective assistance of counsel claim, the ineffective assistance claim is timely.[59]

The government also asserts that Claim Thirteen is procedurally defaulted. Resp. at 125. The Petitioner argues that the claim is based on information that the government failed to provide under Brady, which would provide cause to excuse default, Reply at 91, but it is unclear what materials the government supposedly withheld that would provide support for this claim. The Petitioner also argues that trial and appellate counsel were ineffective for not raising this claim earlier, and that such ineffectiveness should excuse the default. Id. As such, the court will now examine the claim to determine if the

---

[59] See supra note 43.

169

**2992**

Petitioner can prove ineffective assistance of counsel, both as its own independent constitutional claim and as a means to overcome procedural default.

### 2. Disproportionality of the Petitioner's Sentence

The Petitioner contends that the imposition of the death penalty was arbitrary and inconsistent, and it was disproportionate when compared with his co-defendants, who were not death-authorized. Mot. at 111. In support, he relies on Furman v. Georgia, 408 U.S. 238 (1972). In that case, the court addressed the application of the death penalty and stated that it may not be applied in an arbitrary or capricious manner. Furman, 408 U.S. at 309-10 (Stewart, J., concurring). Due to the severity and finality of such a punishment, the Eighth and Fourteenth Amendments could not allow the death penalty to be "so wantonly and so freakishly imposed." Id. at 310. To avoid such an application of the death penalty, a meaningful objective system of review is required. See Proffitt v. Florida, 428 U.S. 242, 259-60 (1976); see also Spaziano v. Florida, 468 U.S. 447, 460 (1984), overruled on other grounds by Hurst v. Florida, 136 S. Ct. 616 (2016) ("If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish

170

**2993**

between those individuals for whom death is an appropriate sanction and those for whom it is not.").

The Petitioner claims that such an objective system of review was not used in his case, because his co-defendants were not death-authorized, even though he argues that they were more involved with the planning of the crime than him. Mot. at 112-13. Draven and Cat Voss were also charged with three statutory aggravating factors, whereas the Petitioner was charged with only two. See Indictment at 13-14.

In the event this claim is meant as a claim for proportionality review in general, the Petitioner fails to make such a case. Precedent provides that proportionality review, while a safeguard against arbitrary death sentences, is by no means constitutionally required. See Pulley v. Harris, 465 U.S. 37, 44-45 (1984) ("Needless to say, that some schemes providing proportionality review are constitutional does not mean that such review is indispensable. . . . Examination of our [prior] cases makes clear that they do not establish proportionality review as a constitutional requirement."). Further, as the Petitioner even recognizes, see Reply at 90 n.37, the lack of proportionality review by the FDPA does not make the statute unconstitutional. See United States v. Higgs, 353 F.3d 281, 320-21 (4th Cir. 2003) (rejecting claim that the FDPA violates

171

**2994**

the Eighth Amendment "because it does not require proportionality review of a death sentence").

As to the issue of the involvement by the Petitioner versus his co-defendants, just because the Petitioner's participation in the crime differed from that of his co-defendants, does not mean that it was arbitrary or capricious to seek the death penalty against only him. Deciding whether to authorize a defendant for the death penalty requires a look at the individual person and his involvement in the crime. As the court in Enmund v. Florida stated:

> The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for [the defendant's] own conduct. The focus must be on his culpability, not on that of those who committed the robbery and shot the victims, for we insist on "individualized consideration as a constitutional requirement in imposing the death sentence."

458 U.S. 782, 798 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 605 (1978)).

The Petitioner argues that this case supports his contention that courts should look at the sentences of co-defendants and accomplices when determining a defendant's culpability. Mot. at 112. To the extent Enmund addressed the comparison of co-defendants' conduct, it was to note that the defendant was only a minor participant in the crime, and did not

172

**2995**

actually shoot or rob the victim. Enmund, 458 U.S. at 787-88. The Supreme Court then looked at the defendant's individual culpability for just the acts he performed to determine if the death sentence was warranted. Id. at 801 ("For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt.").

Accordingly, this court needs to look at the Petitioner's own involvement in the crime when determining if the death penalty was imposed in an arbitrary and capricious manner. Here, as already discussed in addressing selective prosecution in Claim Twelve, Part IV.L.2, the facts show extensive involvement by the Petitioner, and the Fourth Circuit stated that

> the prosecution exercised its discretion on the basis of a number of distinctions between Runyon and the other defendants—including that Runyon was the actual triggerman in the murder-for-hire scheme; that he accepted payment for killing someone who was essentially a complete stranger; and that he not only never cooperated with the investigation but sought to thwart it at virtually every turn.

Runyon, 707 F.3d at 520 n.6. Unlike the defendant in Enmund, who was a minor participant and did not shoot the victim, the evidence showed that the Petitioner was actively involved in the planning of the crime. He had numerous discussions with his

173

**2996**

co-defendant, Draven, to plot the murder. He assembled the necessary items in his "shopping list" to carry out the crime; he brought the .357 magnum the day of the crime; and he traveled from West Virginia to Hampton, Virginia, and waited for the victim at the Langley Federal Credit Union ATM. Finally, he was the one who pulled the trigger and killed Cory Voss. While his co-defendants were also engaged in the planning of the crime, that does not lower the Petitioner's culpability, especially as Cat Voss, the victim's spouse, pled guilty and was able to avoid the death penalty, and instead received four concurrent life sentences.

The Petitioner further argues that the other aggravating factors in his case are evidence of disproportionality. Mot. at 112-13. He contends that Draven had a much more violent background than him, and that this should have decreased the weight of the violence against women aggravator introduced against him. Id. This argument was fully discussed in Claim Two, Part IV.B, and the court again finds that Draven's background was not material to the Petitioner's case. Draven's past, albeit violent, does not affect the Petitioner's culpability, nor does it negate the prosecutor's decision to seek the death penalty for the Petitioner, given an individualized assessment of the Petitioner's background and involvement in the crime.

174

**2997**

The Petitioner also argues that he never received payment for the murder, and that the most the prosecution could do was suggest he received a $275 money order from Draven's brother as payment for the crime. Id. at 113. The statutory aggravating factor is not that the Petitioner received pecuniary gain for the commission of the crime, but that he "committed the offense in consideration for the receipt of, or in expectation of the receipt, of anything of pecuniary value." Special Verdict Form – Eligibility Phase, at 5, ECF No. 255 (emphasis added). The evidence showed that he committed the murder in consideration for, and in expectation of, the receipt of payment, and that he did, in fact, receive some money. The fact that he never received full payment does not take away from his motive to kill a person he did not know for monetary gain. Regarding the Petitioner's argument that his mental health and brain damage make him less culpable than his two co-defendants, id. at 114, the court addresses, and denies, that argument in Claim Fourteen, Part IV.N.

Further, assuming the Petitioner intends this claim as an argument that the government unlawfully exercised its discretion in seeking the death penalty against him, and not Draven or Cat Voss, the claim fails, as "our constitutional system leaves it to the discretion of the Executive Branch to decide who will

175

**2998**

face prosecution." United States v. Passaro, 577 F.3d 207, 219 (4th Cir. 2009). A petitioner may not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty." McCleskey v. Kemp, 481 U.S. 279, 306-07 (1987).

This is not to say that prosecutors have absolute unchecked discretion. Rather, "[b]ecause discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." Id. at 297. The Petitioner fails to provide that exceptionally clear proof. As discussed in more detail in Claim Twelve, Part IV.L, the Petitioner is unable to show that the government unlawfully sought death authorization for him based on race. In this claim, he is unable to prove any other arbitrary or capricious reason for seeking the death penalty against him, and not his co-defendants. Based on the Petitioner's involvement in the crime, the aggravating factors, and all individual circumstances, seeking the death penalty against the Petitioner, and not his co-defendants, was not disproportionate.

### 3. Ineffective Assistance of Counsel

The Petitioner also raises a challenge of ineffective assistance of trial and appellate counsel for their failure to

176

**2999**

argue disproportionality. Mot. at 111. He raises this ineffectiveness both as its own claim, and as cause to excuse procedural default. Id.; Reply at 91. He also claims that appellate counsel was ineffective for failing to show that the government exercised its discretion on some impermissible basis. Mot. at 113 n.48. To prove ineffective assistance of counsel, he must show that counsel did not act as an otherwise objectively reasonable attorney would have under the circumstances, and that such deficient conduct resulted in prejudice to the Petitioner. Strickland, 466 U.S. at 687.

After having examined the merits of the underlying claim, the court finds that the death penalty was not applied in a disproportionate, arbitrary, or capricious manner. Accordingly, trial and appellate counsel were not ineffective for failing to raise this claim. As to trial counsel, the Petitioner's trial attorneys did raise a variant of this claim when arguing that equally culpable co-defendants did not receive the death penalty. Tr. at 2639-49. The jury found this factor in favor of the Petitioner. Special Verdict Form - Selection Phase, at 2, ECF No. 291. Counsel's failure to bring this challenge in the exact manner that the Petitioner does now is not deficient or prejudicial. Although some of the facts may have amounted to a mitigating factor, they fail to show a constitutional violation,

177

**3000**

and counsel cannot be faulted for declining to raise a meritless argument. As to appellate counsel, this argument is not stronger than the claims brought on direct appeal, and since the argument has no merit, there is no reasonable probability of a different outcome had appellate counsel made this argument in their brief. For these reasons, the court finds that trial and appellate counsel were not ineffective for their decision not to raise this specific proportionality challenge, and the Petitioner cannot overcome the procedural default.

Appellate counsel also was not ineffective for failing to show that the government exercised its discretion on some impermissible basis. The court has determined that the government did not unlawfully decide to impose the death penalty, so the Petitioner would not have been able to make a successful claim at an earlier point in the proceedings. Accordingly, he is unable to prove that counsel's actions were ineffective.

The Petitioner fails to make a showing of ineffective assistance of trial and appellate counsel, and his disproportionality claim is procedurally defaulted as well as lacking in merit. Claim Thirteen is **DENIED**.

178

**3001**

**N. CLAIM FOURTEEN – THE PETITIONER ARGUES THAT HIS DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT BECAUSE HE IS SEVERELY MENTALLY ILL, AND COUNSEL WAS INEFFECTIVE FOR NOT RAISING THIS CHALLENGE DURING TRIAL AND ON APPEAL.**

The Petitioner's next argument is that he is severely mentally ill, and that sentencing him to death violates the Eighth Amendment's ban on cruel and unusual punishment. Mot. at 115. As this claim was not raised on direct appeal, the government argues that it is procedurally defaulted. Resp. at 129.[60] The Petitioner contends that his attorneys were ineffective for not raising this claim, and that such ineffectiveness is its own constitutional claim, as well as cause to excuse procedural default. Reply at 94. Accordingly, to determine if counsel was ineffective for failing to raise this argument, the court will now examine the substance of Claim Fourteen.

### 1. Existing Exceptions to Application of the Death Penalty

When arguing that the court should prohibit the use of the death penalty against defendants with severe mental illness, the Petitioner relies on Atkins v. Virginia, 536 U.S. 304 (2002),

---

[60] The government also argues that this claim is barred by the Teague non-retroactivity doctrine. Resp. at 130. As there has been no change in the relevant procedural law on this issue since the Petitioner's conviction, the Teague doctrine does not apply.

179

**3002**

which held that it is an Eighth Amendment violation to give the death penalty to those defendants considered mentally retarded, and Roper v. Simmons, 543 U.S. 551 (2005), which held that the execution of individuals who were under age eighteen at the time of the crime is unconstitutional.

In Atkins, the court held that it is unconstitutional to apply the death penalty to those who are mentally retarded. 536 U.S. at 321. The court reasoned that those individuals "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Id. at 318. There is also a concern that such defendants "may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." Id. at 320-21. There is no evidence here that the Petitioner is mentally retarded.

In Roper, the court looked at the differences between juveniles and adults, and noted that juveniles lack maturity and have "an underdeveloped sense of responsibility," which results "in impetuous and ill-considered actions and decisions." Roper, 543 U.S. at 569 (internal quotation marks omitted). Further,

180

**3003**

juveniles are "more vulnerable or susceptible to negative influences and outside pressures," and their character "is not as well formed as that of an adult." Id. at 569-70. Accordingly, the court found it unlikely that either of the justifications for the death penalty — retribution and deterrence — would be advanced by imposing the death penalty against those who were juveniles at the time of the crime. Id. at 571-72. The evidence here is that the Petitioner was thirty-six years old when he committed the murder of Cory Voss.

### 2. The Petitioner's Argument to Extend the Holdings in Atkins and Roper

As both parties recognize, the Supreme Court has never held that applying the death penalty against someone who is mentally ill, even severely mentally ill, violates the Eighth Amendment. The Petitioner, however, argues that this court should promulgate a new constitutional rule prohibiting just that. Mot. at 115-17. The Petitioner argues that the same concerns addressed in Atkins and Roper apply to those defendants who are severely mentally ill. Mot. at 115-17. As he claims to be severely mentally ill, such a prohibition would categorically exclude him from application of the death penalty. Id. at 115 n.50.

181

**3004**

To support his claim of extending a ban on capital punishment to those with severe mental illness, the Petitioner argues that national public consensus generally opposes use of the death penalty against defendants suffering from serious mental illness. Mot. at 115-16. He also contends that norms of international law support a prohibition against capital punishment for mentally ill defendants. Id. at 115. He cites various studies and reports to support these assertions. Id. at 115-16. In his Reply, the Petitioner also cites Trop v. Dulles, 356 U.S. 86, 101 (1958), to argue that the "evolving standards of decency" in society require the court not to subject the mentally ill to the death penalty. Reply at 92.

In response to the Petitioner's claim, the government first argues that "[t]here is no national consensus in favor of a blanket exemption to capital punishment for the mentally ill," and the court should not create a new constitutional rule extending such protection. Resp. at 130. It also contends that the reasoning in Atkins and Roper does not extend to those defendants with severe mental illness. Id. at 134-36.

The court will first evaluate whether national consensus is in favor of banning the death penalty against mentally ill defendants. The Supreme Court has not instituted a prohibition on applying the death penalty to those with severe mental

182

**3005**

illness. See Mays v. Stephens, 757 F.3d 211, 219 (5th Cir. 2014) (discussing how neither Atkins nor Roper "created a rule of constitutional law making the execution of mentally ill persons unconstitutional"); Franklin v. Bradshaw, 695 F.3d 439, 455 (6th Cir. 2012) (noting that "no authorities have extended [Atkins or Roper] to prohibit the execution of those with mental illnesses"). Many state high courts have also acknowledged the lack of a bar against imposing the death penalty on the severely mentally ill, and absent meeting the criteria for insanity, courts generally have permitted application of the death penalty against defendants with serious mental illness. See, e.g., Dotch v. State, 67 So. 3d 936, 1006 (Ala. Crim. App. 2010); People v. Hajek, 324 P.3d 88, 173-74 (Cal. 2014); Diaz v. State, 945 So. 2d 1136, 1151-52 (Fla. 2006); State v. Dunlap, 313 P.3d 1, 36 (Idaho 2013); State v. Hancock, 840 N.E.2d 1032, 1059-60 (Ohio 2006); Malone v. State, 293 P.3d 198, 216 (Okla. Crim. App. 2013); Mays v. State, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010).

Rather than focusing on federal and state cases, the Petitioner argues that the court turn to international norms and some public opinion data to evaluate whether evolving standards of decency require the court to create a new constitutional rule prohibiting capital punishment against the severely mentally

183

**3006**

ill. Although the citations to state and federal decisions provided by the government are not binding, the court finds them more instructive than the Petitioner's references to international cases and law. After evaluating the decisions by both federal and state courts that have chosen not to extend Roper and Atkins, this court finds it inappropriate to extend the holdings or the reasoning in Atkins and Roper to defendants with severe mental illness, absent Supreme Court authority.[61]

Finally, as applied to the Petitioner's particular case, the Petitioner fails to show how any alleged mental illness deprived him of the ability to control impulses, make logical decisions, or process information. The crime committed was not a spur-of-the-moment, heat of passion crime, that resulted from impulsivity or an inability to understand what was happening. As found by the jury, it was a calculated murder, which was carefully planned and required deliberate conduct. Thus, even were such a ban against the death penalty for severely mentally

---

[61] While the court declines to extend Roper and Atkins, in the context of defendants with severe mental illness, it does note that many difficulties would arise from such an extension due to the varying degrees and types of mental illnesses. A person is either under age eighteen or not, as in Roper, or has a certain IQ or not, as in Atkins. By contrast, mental illness takes many forms, and it is also unclear what would qualify as a severe or serious mental illness.

184

**3007**

ill defendants to exist, the Petitioner does not show that it would categorically apply to him.

### 3. Ineffective Assistance of Counsel

The Petitioner argues that his trial and appellate counsel were ineffective for not raising this challenge during the direct proceedings. Reply at 94. This ineffectiveness claim is meant as both its own argument and as cause and prejudice to excuse the procedural default of his Eighth Amendment claim. Id.

The Petitioner fails to meet the Strickland requirements of deficient conduct by counsel and resulting prejudice. Strickland, 466 U.S. at 687. As the court finds the claim to extend Roper and Atkins has no merit, the Petitioner has failed to show a reasonable probability of success had counsel presented this argument at trial or on appeal. Further, appellate counsel was not deficient, as this argument is not stronger than any brought on appeal, and trial counsel was not deficient for choosing to forego a claim that is not based on any existing constitutional grounds. Accordingly, the Petitioner is unable to show ineffective assistance of counsel, and this claim is both procedurally defaulted and without merit. Claim Fourteen is **DENIED**.

185

**3008**

**O. CLAIM FIFTEEN - THE PETITIONER ARGUES THAT SELECTION OF THE GRAND AND/OR PETIT JURY WAS TAINTED, AND COUNSEL UNREASONABLY FAILED TO REQUEST AND INSPECT THE JURY SELECTION RECORDS.**

In Claim Fifteen, the Petitioner brings a four-part challenge to the jury selection process, consisting of three statutory claims and one ineffective assistance claim. Mot. at 117-24. The government argues that the three statutory parts are untimely and procedurally defaulted. Resp. at 137-38. The Petitioner acknowledges that the claim is not timely, but he argues that counsel was ineffective for not requesting certain jury selection records, and such ineffectiveness should create cause and prejudice to excuse the default. Reply at 94. Accordingly, to determine whether the Petitioner can overcome the default, the court will now address the merits of this claim. If the Petitioner can show that a statutory claim would have had merit, then he may be able to prove his ineffective assistance claim for counsel's failure to request certain jury lists and overcome the procedural default on the remaining arguments.

**1. Selection of the Grand and/or Petit Jury Venire**

In this claim, the Petitioner argues that the jury selection process was tainted, and he provides a list of alleged errors in the jury selection process. Mot. at 117-18. This list

186

**3009**

includes such assertions as "[a]t one or more steps, there was a failure to fully and accurately comply with the procedures described in the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia" and "[b]ecause of a computer error, inaccurate computer program, misconduct, or other reason, the names on the master jury wheels, the qualified jury wheels, the grand jury list, and/or the venire called for petit jury service in Runyon's case were not drawn at random from their immediate parent list." Id. He provides no additional supporting information for these claims. He complains that the court has failed to provide him with all the necessary information, but the court has already given him the extensive information available regarding jury selection for both the grand and petit juries, and the court does not know to what, if any, necessary information the Petitioner refers. He simply fails to show how the court denied him any specific information that would actually support any of the claims in his list of "errors."

This claim is simply too broad and overreaching. The Petitioner cannot claim that at some point in time there was some sort of error that caused some type of violation in the jury selection process, without providing any specifics as to

187

3010

that problem. As set forth before, the court finds that this claim has no merit.

### 2. Compliance with the Jury Selection Plan and the Provisions of 28 U.S.C. § 1861 et seq.

In this portion of Claim Fifteen, the Petitioner argues that there was a substantial failure by the court to comply with the procedures in the Jury Selection and Service Act, 28 U.S.C. § 1861 et seq. (the "Act"), and in the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia (the "Plan). Mot. at 118-19. To be an actionable violation of the Act, the violation must be substantial, and a violation is substantial if it affects the twin objectives of the Act: (1) to provide for the random selection of jurors; and (2) to ensure that juror disqualifications, excusals, exemptions, and excuses are based on objective criteria. See United States v. Meredith, 824 F.2d 1418, 1424 (4th Cir. 1987); United States v. Carmichael, 685 F.2d 903, 911 (4th Cir. 1982); Paradies, 98 F.3d at 1279.

Technical violations generally do not warrant dismissal or a stay. See Meredith, 824 F.2d at 1424 ("The fact that the array members were passed over for service on previous juries does not amount to substantial noncompliance with the Act. Mere technical deviations do not constitute substantial noncompliance with the

188

**3011**

Act."); Carmichael, 685 F.2d at 911 ("The district court below recognized that there had been a technical violation of the Plan. The Act, however, requires a substantial violation of its provisions before an indictment may be dismissed.").

According to both the Plan and § 1866(d) of the Act, the clerk must note the reason for any person who is disqualified, excused, exempted, or excluded from jury service. The Petitioner argues that the clerk failed to do this, and he uses this as the basis for challenging the court's jury selection procedures. Mot. at 119-21.

In the instant case, four hundred twenty-five (425) jurors were drawn for the petit jury venire, two (2) of whom were deferred and not included on the race/age/gender documents provided to counsel. Out of the remaining four hundred twenty-three (423) potential jurors, two hundred forty-three (243) completed questionnaires. Of the one hundred eighty (180) individuals who did not fill out a questionnaire, the court records provided to counsel show the following facts. Ten (10) jurors were excused for being over the age of seventy; three (3) were deceased; seven (7) had moved out of the jurisdiction; two (2) were emergency personnel; two (2) had job-related or student conflict reasons; two (2) had to care for small children; five (5) had recent previous service; and ninety-six (96) were

189

**3012**

excused by court order. To reiterate, a complete list of the foregoing excused jurors was provided and available to trial and current habeas counsel.

The Petitioner first argues that the court order category is not acceptable under the Plan or Act. This argument is frivolous. The court order category includes those jurors who asked to be excused and had those requests decided by the court. It is a specific category that accounts for ninety-six (96) jurors, and the Petitioner's mere speculation that the court would dismiss these jurors for non-objective reasons does not support a claim under the Plan or Act. All were properly excused on the basis of written requests about their personal and professional conflicts, careers, and problems. There were no subjective excusals by the court, and to speculate or suggest otherwise has no basis in fact.

After accounting for the jurors excused, exempted, or dismissed by the clerk and by court order, there remain fifty-three (53) potential jurors not included on the list of excusals, disqualifications, and exemptions provided to counsel. These remaining individuals are potential jurors who were nonresponsive because of circumstances such as ignoring the summons to fill out the questionnaire and having their mail returned as undeliverable. These fifty-three (53) jurors are

190

**3013**

simply not included, and would not be, on any list of excusals or list to counsel in any case. For example, when a person fails to respond, they are automatically classified in the computer system as nonresponsive, which is a separate area of the jury management system than the excusal codes. The same applies for the remaining jurors not included in the excusal list. As their status in the computer system is not manually edited, unlike that of the responsive jurors who received formal excusals and disqualifications, they were not on the list given to counsel, nor would they be in any case. The court did not exclude them for non-objective reasons. The computer system ministerially accomplishes this task for these jurors by classifying them as nonresponsive.

In sum, the Petitioner's claim that the most obvious reason they were not included is because non-objective criteria were used is not grounded in any facts or the record, and is not persuasive. The Petitioner simply jumps to a negative conclusion without looking at the most likely solution first, that the individuals failed to respond or show up, and were thus input into the computer system in a different manner than those on the excusal list given to counsel.

The Petitioner also summarily presents that of the four hundred twenty-three (423) jurors drawn for the petit jury

191

venire, two (2) self-identified as Native American and sixteen (16) self-identified as Asian. One of those who self-identified as Native American was non-responsive, and the other was excused. Nine (9) of those who self-identified as Asian were excluded for reasons such as failing to respond, failing to appear, or moving from the jurisdiction. If the Petitioner's four sentences describing these statistics are meant as proof that non-objective criteria were used to exclude jurors, it is not enough and is not supported by the record. He must do more than point to some raw figures to show impermissible reasons for excusal.

As the Petitioner can provide no evidence that the excusals and exclusions of potential jurors were done for non-objective reasons, he is unable to make out a substantial violation of the Act or Plan.

### 3. Participation of an Allegedly Unqualified Juror During the Jury Selection Process

The Petitioner withdraws this argument. Reply at 100. The court further notes for the record that no unqualified juror participated in the jury selection process.

192

**3015**

### 4. Ineffective Assistance of Counsel

In the Petitioner's final challenge to this part of the jury selection process, he makes a blanket allegation of ineffective assistance of counsel for counsel's failure to request and examine jury selection records. Mot. at 123-24. It is not clear to what jury selection records the Petitioner refers.

To prove ineffective assistance of counsel, Strickland requires a showing that counsel was both deficient and that there was resulting prejudice to the petitioner. Strickland, 466 U.S. at 687. It is clear that pursuant to 28 U.S.C. § 1867(f), trial counsel has essentially an unqualified right to inspect jury lists to determine whether the jury selection process complied with statutory and constitutional law. See Test v. United States, 420 U.S. 28, 29-30 (1975) (per curiam). The ability to inspect such lists does not require meeting any burden or standard of proof. Here, trial counsel did not make such a request.[62] The Petitioner claims that was due to ignorance

---

[62] Counsel had all completed juror questionnaires, names, addresses, and so forth, of the petit jurors ultimately available for selection for trial. The court assumes that the Petitioner is referring to the group of jurors excused, dismissed, or exempted, and those who did not appear, for

193

**3016**

or sloppiness, and had counsel acted differently, there is a "reasonable probability of a different, untainted jury and a different result." Mot. at 124.[63]

The Petitioner cites an American Bar Association Guideline that suggests "counsel should consider" challenging jury selection procedures, as proof that counsel was deficient. Mot. at 123. He also argues that counsel have been found ineffective for failing to investigate, and that is essentially the case where counsel did not request the jury information. Reply at 100-01. Counsel were actively involved with the jury selection process here and reviewed all two hundred forty-three (243) completed questionnaires of the eligible jurors. That counsel did not pursue information on jurors who did not fill out questionnaires because they did not appear, or who returned their responses late, and counsel did not pursue further those jurors who were excused by the court, does not make them ineffective. The facts show nothing unusual occurring during this procedure, and counsel would not have had reason to

---

example as set forth in Part IV.O.2, and not to the two hundred forty-three (243) jurors who completed the questionnaire.

[63] At a threshold level, and importantly, the Petitioner has not shown a tainted jury. See supra Part IV.O.1.

194

**3017**

consider a possible jury selection challenge. As such, counsel was not deficient for declining to request the lists.[64]

The Petitioner also cannot show prejudice. After receiving the jury lists, the questionnaires, and the information about the race and gender composition of the petit jury venire and grand jury, all of which the Petitioner now claims his trial counsel should have done, but did not, the Petitioner is still unable to make a successful showing of a substantial violation of the Plan or Act. Had counsel requested and inspected the information earlier, they would not have been able to make a meritorious claim at such time. As such, the Petitioner fails to show that counsel was ineffective regarding this decision, and he is unable to overcome the procedural default for his other arguments in this claim. Claim Fifteen is **DENIED**.

**P. CLAIM SIXTEEN – THE PETITIONER ALLEGES THAT THE GOVERNMENT USED ITS PEREMPTORY STRIKES TO DISCRIMINATE BASED ON RACE AND GENDER, AND COUNSEL UNREASONABLY FAILED TO OBJECT.**

In Claim Sixteen, the Petitioner argues that the prosecutors discriminated on the basis of race and gender when using peremptory strikes, in violation of the Fifth Amendment and the holdings in Batson v. Kentucky, 476 U.S. 79 (1986), and

---

[64] See supra notes 62 and 63.

195

**3018**

J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994). Mot. at 124. He also argues that trial counsel unreasonably failed to object to these strikes. Id.

### 1. Procedural Default

The government argues that the Petitioner's Batson/J.E.B. claim is procedurally defaulted, as counsel did not contemporaneously object to the use of the government's peremptory strikes, nor did counsel raise this issue on appeal. Resp. at 144. In his Reply, the Petitioner argues against default for three reasons: (1) the strike lists were not entered on the record and made part of the docket until after the appeal, so appellate counsel could not have raised this claim based on the facts available at the time; (2) if the record was sufficient to raise the issue on appeal, appellate counsel was ineffective for failing to do so; and (3) trial counsel was ineffective for failing to contemporaneously challenge the government's use of peremptory strikes. Reply at 107-11.

The court is not convinced that the strike lists' entry on the docket after the appeal excuses the procedural default. This is not a case where the court or the government failed to provide information to defense counsel until after direct proceedings, and counsel had no way to know about that information until such time. The Petitioner's attorneys could

196

**3019**

have made a <u>Batson</u>/<u>J.E.B.</u> challenge during jury selection, or appellate counsel could have requested strike lists and questionnaires had they thought a <u>Batson</u>/<u>J.E.B.</u> claim would be meritorious.

However, the court must also consider the Petitioner's argument that trial and appellate counsel were ineffective for not raising a <u>Batson</u>/<u>J.E.B.</u> challenge during jury selection or on appeal, and such ineffectiveness should excuse the default. In order to determine (1) whether the failure to raise a <u>Batson</u>/<u>J.E.B.</u> challenge during trial or on appeal was ineffective, thus excusing default, and (2) whether the Petitioner can prove his separate ineffective assistance claim for trial counsel's failure to object to the peremptory strikes, the court will now examine the merits of Claim Sixteen.

### 2. Standard for a <u>Batson</u>/<u>J.E.B.</u> Claim

A defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." <u>Batson</u>, 476 U.S. at 85-86. In <u>Batson</u>, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." <u>Id.</u> at 89. When a defendant makes a <u>Batson</u> challenge, the court must conduct a three-step inquiry. <u>Rice v. Collins</u>, 546 U.S. 333, 338 (2006). First, the court must determine whether the defendant

197

**3020**

has met his burden of making a prima facie case that the prosecutor's peremptory challenge was on the basis of race. Id. Second, the prosecutor has the burden to show a race-neutral reason for the strike. Id. ("'The second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." (quoting Purkett v. Elem, 514 U.S. 765, 767-68 (1995) (per curiam))). Third, the court must decide if "the defendant has carried his burden of proving purposeful discrimination." Id. Although this involves evaluating the reasons put forth by the prosecutor, the ultimate burden of proving racial motivation remains with the defendant. Id.

To meet the first step of a Batson challenge, a defendant must make a prima facie case. This requires showing that

> (1) the defendant is a member of a distinct racial group; (2) the prosecutor has used the challenges to remove from the venire members of the defendant's race; and (3) other facts and circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in his or her selection of the jury pool.

Keel v. French, 162 F.3d 263, 271 (4th Cir. 1998); see also Batson, 476 U.S at 96. This standard has since been modified so that a defendant may raise a Batson claim, even if the defendant is of a different race than the excused juror. Powers v. Ohio, 499 U.S. 400, 415 (1991).

198

**3021**

The Court later extended the holding in Batson and found that gender-based peremptory strikes are unconstitutional. J.E.B., 511 U.S. at 128-29. As with a Batson challenge, the defendant must first make a prima facie case of intentional discrimination. Id. at 144. If the defendant presents a prima facie case, then the prosecution must provide a gender-neutral reason for the strike. Id. at 144-45. This explanation may not be pretextual, but it does not need to be as strong as a for-cause challenge. Id. at 145.

### 3. The Petitioner's Batson Claim

The court will first address the Petitioner's claim that the prosecutor exercised peremptory strikes based on jurors' race. Mot. at 127-28. Accordingly, the court must start by determining if the Petitioner has met his burden of making a prima facie case.

### a. Prima Facie Case

The Petitioner alleges that the government unlawfully struck African American potential jurors. Id. The Petitioner identifies as Asian, as "his mother is Korean" and "his father is a white American." See id. at 2, 128. Although the Petitioner does not attempt to show unlawful peremptory strikes against potential jurors of Asian descent, he may still attempt to show discrimination in the use of peremptory strikes against jurors

199

**3022**

of other distinct races. See Powers, 499 U.S. at 415. But see Keel, 162 F.3d at 271 ("While the defendant need not be a member of the same race as the excused jurors in order to raise a Batson challenge, that Keel and the jurors are of different races eliminates the argument that the jurors sympathize with the defendant because they share the same race." (internal citation omitted)).

In order to meet the third prong of a prima facie case, a showing of facts and circumstances raising an inference of discrimination is required, and raw data alone is often not enough. See Allen v. Lee, 366 F.3d 319, 330 (4th Cir. 2004) ("Though statistics are not utterly bereft of analytical value, they are, at best, manipulable and untrustworthy absent a holistic view of the circumstances to which they apply"); Keel, 162 F.3d at 271 (holding that there was no Batson claim even when the prosecution used nearly seventy percent (70%) of its peremptory strikes to remove potential African American jurors); United States v. Tipton, 90 F.3d 861, 881 n.11 (4th Cir. 1996) (rejecting a claim of gender discrimination in use of peremptory strikes when the defendant provided only "raw figures" that eight out of twenty women were peremptorily struck by the government while only two out of twenty-one men were struck). But see Miller-El v. Cockrell, 537 U.S. 322, 342 (2003) ("[T]he

200

**3023**

statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors.").

Here, the Petitioner's argument for a prima facie case relies mainly on statistics regarding the use of peremptory strikes by the government. Mot. at 127. Sixty-two (62) individuals were called for voir dire on the first day, and ten (10) were excused for cause. Strike List, ECF No. 424. The make-up of the remaining potential jurors was ten (10) individuals who were African American, one (1) who was Asian, and forty-one (41) who were white. Of the twelve members of the petit jury, nine (9) were white and three (3) were African American. The government used only nineteen (19) of its twenty (20) peremptory strikes, and seven (7) of those strikes were against African Americans. Id.

The Petitioner argues that the government struck seventy percent (70%) of the African American potential jurors, and that based on the Fisher Exact test used by the Petitioner, this is statistically significant. Mot. at 127-28; Reply at 115, Attach. 5. While that is true, the statistics also show that the government used only thirty-five percent (35%) of its available peremptory strikes against African Americans, who made up nineteen percent (19%) of the venire on the first day. Although

201

**3024**

there is a difference between those percentages, it is not as alarming as the Petitioner makes it out to be. The end result was a jury that was seventy-five percent (75%) white and twenty-five percent (25%) African American. The government also had one remaining peremptory strike, meaning it could have struck an additional African American juror, if that was its goal. These statistics do not show that the government engaged in discrimination in its use of peremptory strikes.

The only other piece of evidence the Petitioner cites in his Motion is the prosecution's introduction into evidence of an interrogation video that referenced Asian stereotypes. Mot. at 128. While the Fourth Circuit held that admitting the video was error, it recognized such error was harmless, and noted the video was less than an hour in a trial and sentencing that lasted longer than three weeks. Runyon, 707 F.3d at 492, 498-99. The fact that the prosecution introduced a short video clip that touched on race during a weeks-long trial is hardly enough to show a discriminatory intent during voir dire.

In his Reply, the Petitioner also cites the lists created at the court's request before voir dire. Reply at 116-17. Counsel for both parties used the juror questionnaires to make three lists: (1) jurors the parties agreed should be called for voir dire; (2) jurors the parties agreed should not be called

202

**3025**

for voir dire; and (3) jurors upon whom the parties could not agree. Id. The Petitioner now argues that the proportion of African American to white jurors on these lists shows discrimination. Id. at 117. However, these are just more statistics, and these statistics involve choices by both parties. The Petitioner's argument that a higher percentage of African Americans were on List Three — the list of jurors upon whom the parties could not agree — than the other lists does not support a claim of discrimination. As the Petitioner recognizes, it is not apparent which side wanted the jurors on List Three to come in for voir dire and which side did not. The court will not assume the government objected to all the African American jurors on that list. Jurors could have been placed on List Three for many reasons, and the Petitioner's unsupported conclusion that it must have been due to race is not persuasive.

Accordingly, after looking at all the information put forth by the Petitioner, and the lack of any other history of discrimination or discriminatory statement by the government, the Petitioner is unable to make out a prima facie case of racial discrimination.

<div align="center">203</div>

<div align="center">**3026**</div>

### b. The Government's Race-Neutral Reasons for the Strikes and the Petitioner's Response

Even though the Petitioner has failed to carry his burden of making a prima facie case, the court recognizes that the government has provided race-neutral reasons for its strikes. The government asserts that the seven African American potential jurors who were struck answered on their questionnaires that they were either opposed to the death penalty or both generally opposed and generally in favor of it. Resp. at 148; see Keel, 162 F.3d at 271 (holding that peremptory strikes did not violate Batson when "[g]iven these jurors' opposition to, or hesitation toward, imposing the death penalty, it is clear that the prosecutor acted well within constitutional bounds in excusing them").

The Petitioner argues that two non-African American potential jurors who were not struck also indicated general opposition to the death penalty. Reply at 121-22. It is established that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be

204

**3027**

considered at Batson's third step." Miller-El v. Dretke, 545 U.S. 231, 241 (2005).[65]

Although the court considers that these other jurors indicated opposition to the death penalty but were not struck by the government, the court does not find this to be enough to show that the government's reasons were pretextual. Other than the video clip, the Petitioner can point to no statement that is even arguably discriminatory, and the court has already concluded that the references to strike percentages and the lists does not prove discrimination. Accordingly, not only does the Petitioner fail to make a prima facie case, the government also exercised race-neutral reasons for its strikes, and the

---

[65] In the Miller-El case, the Court considered the government's reasoning for its peremptory strikes, along with multiple other actions by the government, when deciding the defendant's Batson claim. The Court noted that the government had the order in which the prospective jurors were seated reshuffled several times in order for more of the African American jurors to be near the back of the panel, making them less likely to be chosen for the jury. Id. at 253-54. More graphic questions were presented to a higher proportion of African American jurors than white jurors, and the questioning about minimum sentences varied by the potential jurors' race, in a way referred to by the Court as "trickery." Id. at 254-63. Further, the District Attorney's Office had a history of excluding African Americans from the jury, and even had a formal written policy on the matter that was used until 1976. Id. at 264. This is much different from showing a video clip that made several brief mentions of race and not striking two jurors who were generally against the death penalty.

205

**3028**

Petitioner fails to show that such reasons were pretextual. The Petitioner has failed to make a Batson claim.

### 4. The Petitioner's J.E.B. Claim

The Petitioner also brings a claim based on J.E.B., in which he argues that the government exercised its peremptory strikes in a discriminatory manner based on gender. Mot. at 129-30. The court will now examine the Petitioner's argument to determine if he has made a prima facie case.

#### a. Prima Facie Case

After strikes for cause, fifty-two (52) potential jurors remained in the venire for the first day. Strike List, ECF No. 424. Twenty-nine (29) were women and twenty-three (23) were men. The government struck thirteen (13) women and six (6) men. Id. The petit jury was made up of eight (8) women and four (4) men. Thus, the end result was a jury that was sixty-seven percent (67%) female and thirty-three percent (33%) male.

The Petitioner argues that this use of peremptory strikes shows discrimination; however, the court disagrees. Fifty-six percent (56%) of the potential jurors remaining after for-cause strikes were women, and the government used only sixty-five percent (65%) of its available peremptory strikes against women. Although the government did strike more women than men, the percentage of its strikes used versus the percentage of women in

206

**3029**

the venire that day is not enough to show even an inference of discrimination. These statistics do not convince the court that the Petitioner has made a prima facie case that the government used its strikes in a discriminatory manner.

### b. The Government's Gender-Neutral Reasons for the Strikes and the Petitioner's Response

Although the Petitioner fails to make a prima facie case, the court recognizes that the government cites the jurors' answer to Question Sixty-One, regarding views on the death penalty, as a proper gender-neutral reason for its strikes. Resp. at 148. The Petitioner argues that the government did not strike two male jurors who gave the same answer to Question Sixty-One as the female jurors who were struck. Reply at 125-26. As with the Batson claim, this is not enough to show that the government's reasons were pretextual. Further, unlike with race, where the Petitioner also cites the video and lists as proof of discrimination, the Petitioner offers no additional evidence to suggest even a possibility of discrimination based on gender. He merely speculates that the government may have wanted male jurors, as it would be easier to persuade male jurors "that Cat's moral culpability was not greater than Runyon's". Id. at 84. Interestingly, the reasoning the Petitioner provides for this speculation is his belief that the male and female jurors

207

**3030**

likely would give differing moral weights to evidence of the depraved and promiscuous lifestyle that Cat lived when Cory was at sea. Male jurors were more likely to view this aspect of Cat's conduct as titillating and give it diminished weight; female jurors were more likely to be less forgiving and to view it as contributing to greater moral culpability. In particular, Cat's practice of leaving her children with near-strangers or drugging them with cold medicine so that she could party at bars and with men would more likely be viewed by females, especially those with children, as contributing to greater moral culpability.

Id. at 84-85.

This reasoning, thought up by the Petitioner and which has no support in the record, just perpetuates negative stereotypes about both men and women, when the reasoning behind the ruling in J.E.B. was largely to eliminate such stereotypes from jury selection. See J.E.B., 511 U.S. at 130-31 ("Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where, as here, the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women."). Accordingly, based on the evidence presented, the Petitioner has failed to show that the government exercised its peremptory strikes in a discriminatory way based on gender.

208

3031

### 5. Ineffective Assistance of Counsel

The Petitioner challenges the effectiveness of both his trial and appellate counsel. He argues that such ineffectiveness will excuse the procedurally defaulted Fifth Amendment claim, and that his trial counsel's ineffectiveness is also a distinct constitutional claim.

#### a. Ineffective Assistance of Trial Counsel

The Petitioner claims that his trial counsel was ineffective for failing to object to the use of the government's peremptory strikes. Mot. at 130. He raises this argument both as a distinct claim and as a means to excuse procedural default. To show ineffective assistance of counsel, he must prove that his counsel's representation was deficient and that there was resulting prejudice. Strickland, 466 U.S. at 687. To establish that there was deficient representation, the Petitioner must show that counsel's representation "fell below an objective standard of reasonableness." Id. at 688.

The basis for the Petitioner's ineffective assistance claim is that counsel should have known about the existence of Batson and J.E.B. and the necessity of raising "pertinent objections" to questionable strikes, and that by failing to object to the strikes, counsel acted deficiently. Mot. at 130-31. The court, however, finds nothing to suggest that experienced counsel did

209

**3032**

not know about the Batson or J.E.B. standards. The government was not striking an inordinate amount of African American or women venire members when compared to their representation after for-cause strikes, and there appear to be no other signs that should have alerted counsel to potential discrimination. Knowing that one piece of evidence, the video, would briefly and once mention the Petitioner's Asian race is not enough for defense counsel to object to all peremptory strikes of African American jurors.

Further, defense counsel may have had its own reasons for wanting to exclude the challenged individuals from the jury, and thus did not object to the government's peremptory strikes. Perhaps that reason was related to those juror's military connections, as suggested by the government. Resp. at 148. Regardless of the reason, the court will give deference to what appears to be a reasonable decision on the part of counsel not to object to strikes that presented no appearance of discrimination. Accordingly, the Petitioner is unable to show that counsel's actions fell below an objective standard of reasonableness. He is also unable to show prejudice, as the above analysis has shown a Batson or J.E.B. challenge would have been meritless. The Petitioner has failed to prove ineffective

210

**3033**

assistance of trial counsel, and has yet to overcome the procedural default on his Fifth Amendment claim.

### b. Ineffective Assistance of Appellate Counsel

To overcome the procedural default, the Petitioner also argues that appellate counsel was ineffective for not requesting the strike sheets and raising a Batson/J.E.B. challenge on appeal. Reply at 109-10. One of the Petitioner's appellate attorneys, Teresa Norris, has stated that the failure to request the strike sheets and questionnaires was not a strategic decision. Mot. Attach. 36, ¶¶ 5-7. Regardless of whether counsel had a good reason for not requesting the documents, the court has already concluded that the Petitioner cannot even make out a prima facie case of discriminatory use of peremptory strikes by the government. The Petitioner is unable to prove that he suffered prejudice by counsel's failure to request the strike sheets, as even with the strike sheets, counsel would not have been able to present a meritorious argument on appeal. Accordingly, the Petitioner fails to make a claim of ineffective assistance of appellate counsel, and he cannot excuse the procedural default. Claim Sixteen is DENIED.

### 6. Discovery

In order to provide additional support for his claim, the Petitioner requests discovery of extensive jury selection

records created by the government, not only for his case but also for other cases tried by the same prosecuting attorneys. First Mot. for Discovery at 7-12. Although the good cause standard for discovery is a lower standard than required for ineffective assistance and Batson/J.E.B. claims, it still requires making specific allegations that may be proven by the requested materials. See United States v. Roane, 378 F.3d 382, 402-03 (4th Cir. 2004) ("Specifically, discovery is warranted, 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" (quoting Bracy v. Gramley, 520 U.S. 899, 908-09 (1997))); see also United States v. Roane, 378 F.3d 382, 402-03 (4th Cir. 2004) (clarifying that the good cause standard is met when a petitioner establishes a prima facie case for relief).

Here, the Petitioner appears to be going on a "fishing expedition," and nothing more. The statistics and video clip cited by the Petitioner are not enough to show the good cause necessary to warrant discovery of the prosecuting attorney's internal jury selection records.[66] The court will not allow the

---

[66] As an aside, these records likely constitute privileged attorney work product, and the Petitioner has made no showing to

Petitioner to receive the extraordinary volume of documents he requests simply to search through them for a possible claim, when he fails to make out even a prima facie case of discriminatory peremptory strikes based on race or gender.[67] The request for discovery is DENIED.

> Q. CLAIM SEVENTEEN - THE PETITIONER ALLEGES THAT THE VOIR DIRE VIOLATED HIS FIFTH AND SIXTH AMENDMENT RIGHTS, AND COUNSEL'S FAILURE TO OBJECT TO VOIR DIRE PROCEDURES WAS UNREASONABLE.

The Petitioner next alleges that the voir dire procedures violated his Fifth and Sixth Amendment rights to a fair trial and impartial jury. Mot. at 133. He asserts that there were several errors made during voir dire, including that the scope of the questioning was limited, that the court collectively asked the jury questions, and that the court did not ask questions required by Morgan v. Illinois, 504 U.S. 719 (1992).

---

overcome such privilege. See Upjohn Co. v. United States, 449 U.S. 383, 401 (1981).

[67] The court acknowledges that the Petitioner does not know the reasoning for the placement of jurors on List Three, but that is not enough for discovery. This request is a "fishing expedition" for a "red herring," and it lacks even the hint of materiality. The Petitioner can point to nothing suggesting discrimination, and his unsupported assumption that the government must have wanted to exclude the African American jurors on List Three is not enough to show good cause. Importantly, the jury was selected from the agreed upon list, List One, without the necessity to reach Lists Two or Three. See infra note 69 and accompanying text.

213

<u>Id.</u> at 133-37.[68] He also claims that trial counsel was ineffective for not objecting to these procedures, <u>id.</u> at 138-39, and suggests that appellate counsel was ineffective for then not raising the issue on appeal. <u>See</u> Reply at 131.

### 1. Procedural Arguments

The government argues that the claim is barred by the <u>Teague</u> non-retroactivity doctrine and that it is procedurally defaulted. Resp. at 149-50. The <u>Teague</u> argument is irrelevant. As the Petitioner notes, the right to adequate voir dire is not new, and there has been no change in the relevant law since the Petitioner's conviction became final. Reply at 131. As to procedural default, the Petitioner asserts that his argument that trial counsel was ineffective for not objecting to the relevant procedures should constitute cause to excuse default. <u>Id.</u> He further argues that appellate counsel's failure to raise this issue on appeal was ineffective, and should also excuse default. <u>Id.</u>

To determine whether the Petitioner can prove his claim of ineffective assistance of counsel, both in its own right and to

---

[68] The Petitioner also incorporates by reference his argument in Claim S-2 that the questionnaire was flawed. Mot. at 133. The court now incorporates by reference its analysis and decision on that claim. <u>See</u> <u>infra</u> Part IV.R.

214

**3037**

excuse default, the court will now examine the various arguments in Claim Seventeen.

### 2. Collective Questioning of the Potential Jurors

The Petitioner argues that the manner of conducting voir dire, which involved asking collective questions to all sixty-two individuals present, was unconstitutional. Mot. at 134-35. After asking the collective questions, the court asked potential jurors to stand depending on their answers, and then further questioned those individuals who stood. Id. In this way, each potential juror was not individually asked each question. Id. The Petitioner argues that this permitted twenty-one of the sixty-two jurors to remain silent during voir dire. Id. at 135. He complains that those jurors who stayed silent may have harbored biases, but the court never engaged in individual questioning to root out those feelings. Id. This argument is far-fetched and frivolous.

"Voir dire plays an essential role in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury." United States v. Lancaster, 96 F.3d 734, 738 (4th Cir. 1996). This is because voir dire "serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." Mu'Min v. Virginia, 500 U.S. 415, 431 (1991).

215

**3038**

The conduct of voir dire is committed to the sound discretion of the trial court, as the court has the opportunity and ability to observe the demeanor and actions of those participating in voir dire, and assess credibility and impartiality. Lancaster, 96 F.3d at 738-39. "[I]t is well established that a trial judge may question prospective jurors collectively rather than individually." United States v. Bakker, 925 F.2d 728, 734 (4th Cir. 1991). Additionally, the Constitution does "not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." Morgan, 504 U.S. at 729. Based on this established precedent, the court was well within its discretion to ask collective questions to those present and then ask specific follow-up inquiries to those jurors who responded in a certain way, even if this meant that some potential jurors were allowed to remain silent.

The Petitioner cites as support that one of the jurors did not stand in response to a question about employment with Langley Federal Credit Union, even though her employer was related to the credit union. Mot. at 135-36. This juror was not employed at the Langley Federal Credit Union in Newport News, Virginia, but at another affiliated entity. Id. at 135. Importantly, the court had already ordered the potential jurors to fill out questionnaires, so much of the information that may

216

**3039**

normally be brought out during voir dire, such as detailed employment information, was already of record and known by counsel. Thus, this one example does not convince the court that the decision to exercise its discretion and ask collective questions, as the Supreme Court has established that it may do, violated the Petitioner's constitutional rights in his capital case.

### 3. Use of Questions Designed to Determine Bias and Ability to Follow the Law and the Court's Instructions

The Petitioner also claims the voir dire was flawed because at several points the court asked whether the potential jurors understood the law, not whether they would or could comply with the law. Mot. at 136-37. This claim is not supported by the record, as it ignores the totality of the voir dire and focuses only on the following five questions by the court:

> THE COURT: Now, do you understand that as a juror, however, your first duty is to determine whether a defendant is guilty or not guilty, without consideration of any possible penalty? Is there anyone who doesn't understand that? If so, please stand.
> (No response.)
>
> THE COURT: If your answer is "no" to the following questions, please stand.
> Do you understand that the law never requires that a person be sentenced to death?
> (No response.)
>
> THE COURT: Again if your answer is "no" to any of the following questions, please stand.

217

**3040**

Do you understand that the law never requires a person to be sentenced to death, even if they have been convicted of being the triggerman in a murder-for-hire case?
(No response.)

THE COURT: Do you understand that the law never requires a person to be sentenced to death even if someone who murders a person by shooting him in the course of a carjacking is so convicted?
(No response.)

THE COURT: Do you understand that the law never requires that a person be sentenced to death even if the person is convicted of murdering a person by shooting him in the course of a bank robbery?
(No response.)

Tr. at 59, 123-24.

The Petitioner states that the above questions ask only whether a juror understands the law, not whether the person could or would follow the law, and that that these were not proper reverse-Witherspoon questions. Mot. at 136-37; Reply at 135. He argues that because the court did not explicitly ask if the jurors could comply with the law, his conviction and sentence were obtained in violation of the Constitution. Id. at 137. In support for his argument against the final four questions, he also cites Morgan, 504 U.S. at 733, which held that a defendant has a right to inquire into whether any juror would ignore the instructions of the court and automatically vote for death after a finding of guilt. He argues that these four questions did not allow for such an inquiry. Mot. at 137.

218

**3041**

At a threshold level, the Petitioner overlooks the entire voir dire conducted and isolates a few questions. The court specifically asked whether there was anyone who did not understand a juror's first duty would be to determine guilt, without consideration of any possible penalty. Tr. at 59, 171. The process made it clear that any determination of whether to impose the death penalty would only take place after an additional hearing. See id.

However, "[j]ust how an inquiry adequate for this specific purpose should be conducted is committed to the discretion of the district courts." Tipton, 90 F.3d at 878. The facts of the instant case are different from Morgan, where the judge asked variations on the following questions: (1) "Do you know of any reason why you cannot be fair and impartial?" (2) "Do you feel you can give both sides a fair trial?" and (3) "Would you follow my instructions on the law even though you may not agree?" 504 U.S. at 723-24. Morgan held these "general fairness and 'follow the law'" type of questions are inadequate in determining jurors who would automatically vote for the death penalty. Id. at 734.

Although the Petitioner argues that the questions in Morgan are similar to the instant case, the Morgan questions are vague and focus on general fairness and ability to apply the law. There is no mention of the death penalty. Here, the court

219

**3042**

specifically asked if the jurors understood the law in relation to the death penalty and the charged crimes. Tr. at 59, 123-24, 171, 174-75. The jury was not provided with vague generic questions, but with questions that focused on the specific issues that would be introduced at trial, and such questions did not violate the Petitioner's rights.

Importantly, at the start of voir dire, the court explained to the jurors that they would have to put aside any passions or prejudices, and decide the case based on the law given by the court and the evidence presented. Tr. at 52-53. The court then asked anyone who felt that he or she could not do that to stand in response. Id. at 53. Later, the court again asked about personal and moral biases regarding the death penalty, and whether such feelings would affect the jurors' ability to weigh aggravating and mitigating factors and follow the court's instructions on the death penalty. Id. at 124-25. All of these questions were in addition to the detailed questions about the application of the death penalty in the questionnaire. ECF No. 211-1 at 11-13.

There is no one way to conduct voir dire, so long as voir dire allows for the selection of an impartial jury. See Morgan, 504 U.S. at 729; see also Darbin v. Nourse, 664 F.2d 1109, 1113 (9th Cir. 1981) ("[A] particular question [need not] be asked if

220

**3043**

the substance of the inquiry is covered in another question, differently phrased, or in the voir dire as a whole."). Just because the phrasing of the questions is slightly different from Morgan does not mean that the Petitioner's rights were violated. The jurors were clearly informed of their duty in relation to applying the law on the death penalty, and the court made sure that they understood this duty. Accordingly, the Petitioner is unable to show that the court's choice of questions violated his constitutional right to an impartial jury.

### 4. Scope and Structure of the Proceedings

The Petitioner also argues that voir dire was minimal and limited. Mot. at 134. What matters, however, is not a quantitative comparison of the length of voir dire, but whether an impartial jury was selected. See United States v. LaRouche, 896 F.2d 815, 830 (4th Cir. 1990) ("Such quantitative comparisons are unhelpful—the only issue is whether [the court's] voir dire was sufficient to impanel an impartial jury."). In the instant case, prior to voir dire, the parties agreed to use a detailed, fifteen-page questionnaire to gather information from the potential jurors. ECF No. 211. After reviewing the questionnaires, the parties submitted three lists: (1) those jurors the parties agreed should be called for voir dire, (2) those jurors the parties agreed should not be called

221

**3044**

for voir dire, and (3) those jurors upon whom the parties could not agree. ECF No. 236. The court then conducted voir dire of sixty-two (62) potential jurors on the first list.[69] The attorneys were told they could object or ask the court to give follow-up questions. Tr. at 44. The jurors were specifically told that they must ignore any prejudice or passion, and must follow the instructions of the court and consider the evidence presented when making a decision. Id. at 52-53, 174.

The court was able to effectively question the potential jurors during voir dire to expose any bias or prejudice not exposed in the questionnaires. Unlike other criminal cases, the jurors had already filled out lengthy questionnaires. This information aided in the voir dire process and allowed the court and parties to efficiently focus on specific issues. Between the questionnaire, collective questions, and follow-up inquiries, the court was able to search for any bias or prejudice held by the jurors and to provide the Petitioner with an impartial jury. Trial counsel was afforded a full opportunity at every juncture of the voir dire process to make and express objections. See Tr. at 10-130. Accordingly, not only is the Petitioner unable to show that a biased juror was seated, but more importantly, the

---

[69] As a panel was selected from the first list, it was unnecessary to reach the second and third lists.

222

Petitioner is unable to show that his voir dire was constitutionally infirm.

### 5. Ineffective Assistance of Counsel

The Petitioner also argues that his trial counsel was ineffective for not objecting to the above procedures. He makes this argument as its own claim and as a way to excuse default. He also argues that his appellate lawyers were ineffective for not including this claim in their appellate brief, and such ineffectiveness should allow him to overcome the procedural default. The court will now address both arguments.

### a. Ineffective Assistance of Trial Counsel

The Petitioner argues that trial counsel rendered ineffective assistance regarding voir dire, first because counsel failed to review the juror questionnaires for evidence of bias and did not conduct outside research to determine such bias. This allegation is simply unsupported by the record and the Petitioner asserts no grounded basis for this accusation against trial counsel. Moreover, whether counsel did or did not do outside research beyond the juror questionnaires is irrelevant, as a proper jury was selected.[70] Next, the Petitioner asserts that counsel was ineffective for failing to object to

---

[70] See infra Part IV.R.3.

223

**3046**

the lack of guidance about the standards that would govern the jury's decision, both at and before voir dire. There was nothing here to which to object.[71] Next, the Petitioner asserts that counsel was ineffective for failing to object to the oral voir dire procedures, which permitted some potential jurors to stay silent during the proceedings. This allegation is meritless.[72] Finally, the Petitioner asserts that counsel was ineffective for failing to object to the questions discussed above that asked whether jurors understood the law, not whether they could comply with the law. However, the Petitioner has not referenced all of the voir dire, but has singled out specific questions the jury was asked. Again, there was nothing here to which to object.[73]

To prove ineffective assistance, the Petitioner must show (1) that his attorney's conduct was deficient because it fell below an objective standard of reasonableness, and (2) that he suffered prejudice as a result. Strickland, 466 U.S. at 687-88. The Petitioner fails to meet either prong. First, counsel's performance was not deficient. As to the allegation that counsel failed to review the questionnaires for bias and perform

---

[71] See supra Parts IV.Q.2, IV.Q.3, IV.Q.4.

[72] See supra Part IV.Q.2.

[73] See supra Part IV.Q.3.

224

**3047**

Internet research to discover such bias, the Petitioner provides no support beyond the one-sentence claim. The court cannot say that counsel acted deficiently, as there is no evidence before it to suggest that counsel did not carefully review the questionnaires or investigate bias.

While the Petitioner alleges that there was insufficient information given, both at and before voir dire, on the proper standards for the jurors to apply, the Petitioner cites no law requiring that the court explain such detailed information prior to oral voir dire. See Mot. at 138. During voir dire, the court did cover the proper legal standards for jurors to be able to follow the evidence and to make their decision based solely on the law as instructed by the court and the evidence as presented at trial. Tr. at 10-130. The court inquired whether the jurors understood this direction and whether they could follow it. Id. at 52-53, 174. Counsel did not act unreasonably by choosing not to object to this level of instruction at this stage. Moreover, preliminary instructions were then given to the selected jurors, before opening statements and the presentation of evidence, id. at 199-213; and the final instructions on the statutes, burden and elements of proof, assessing the credibility of the witnesses, and so forth, were all given with great specificity at the conclusion of the case, after final arguments and before

225

submission to the jury for decision. Id. at 1666-1713. Jurors were thoroughly and properly instructed at all junctures and phases of trial.

It is incorrect that counsel failed to object to the collective questioning. Before trial, counsel filed a motion requesting that (1) prospective jurors complete questionnaires, which was granted and done; (2) counsel be permitted to directly question jurors; (3) individual questioning of jurors be permitted, particularly when evaluating the jurors' views about the death penalty and ability to follow the law; and (4) the Petitioner be given additional peremptory challenges. ECF No. 156. The court ruled on this Motion before the beginning of voir dire, and in relevant part, held that it would conduct collective questioning first, but would proceed with individual questioning as appropriate. Tr. at 5. This procedure was then followed at voir dire. Tr. at 10-130. Moreover, the defendants were given their twenty (20) peremptory challenges. Tr. at 7. Counsel cannot now be faulted for not further objecting to the court's decision to proceed as it did, under established precedent permitting collective questioning by the court, followed by individual questioning.

Finally, as to the claim that counsel failed to object to the questions that asked about understanding versus following

226

**3049**

the law, counsel did raise Morgan.[74] Tr. at 76-77, 116-17. It is clear that counsel knew of Morgan and raised the issue for the questions that they thought might be problematic. The Petitioner is unable to show that counsel did not reasonably consider the various questions when choosing what objections to make under Morgan, and that the court's rulings thereon were flawed.

For the above reasons, the Petitioner cannot show that counsel acted deficiently. Trial counsel did raise many of the above objections, and the ones not raised lack merit and/or foundation in the record. The Petitioner also fails to show that he suffered any prejudice from the actions of counsel or the rulings of the court during voir dire. Accordingly, he fails to make a claim of ineffective assistance of trial counsel, and is unable to excuse default.

### b. Ineffective Assistance of Appellate Counsel

The Petitioner also suggests that his appellate counsel was ineffective for not raising this argument on direct appeal, and such ineffectiveness should excuse default. Reply at 131. After considering the instant claim and finding it to be without merit, the Petitioner is unable to show that this claim was stronger than any raised on appeal, or that had it been raised,

---

[74] See supra Part IV.Q.3.

227

there would have been a reasonable probability of a different outcome.

As the Petitioner fails to show ineffective assistance of either trial or appellate counsel, the Petitioner does not have cause to excuse default. Claim Seventeen is procedurally defaulted and without merit, and is **DENIED**.

> **R. CLAIM S-2 – THE PETITIONER ARGUES THAT THERE WERE PROBLEMS WITH THE JUROR QUESTIONNAIRE AND ITS USE BY THE COURT, AND COUNSEL UNREASONABLY FAILED TO OBJECT.**

Claim S-2 is filed under seal pursuant to the court's Order of October 5, 2015. ECF No. 476.[75] The discussion of this claim need not be under seal, as no personal identity information is divulged about any potential juror.

In his final claim, the Petitioner argues that the use of the juror questionnaire violated his Fifth and Sixth Amendment rights. Mot. at S2-1, ECF No. 508. Before beginning voir dire, the court ordered counsel for both parties to review the completed juror questionnaires and to submit three lists: (1) a

_____

[75] On October 2, 2015, the Petitioner filed a "Motion to File Under Seal Three Claims and One Exhibit to His Forthcoming Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255." ECF No. 471. On October 5, 2015, the court granted that Motion in part, permitting the Petitioner to file Claim S-2 and Exhibit S-1 under seal. ECF No. 476. Claim S-1 is addressed herein as Claim Sixteen, Part IV.P, and Claim S-3 is addressed herein as Claim Seventeen, Part IV.Q.

228

**3051**

list of those jurors that the parties agreed should be called for voir dire; (2) a list of those jurors the parties agreed should not be called; and (3) a list of those upon whom the parties could not agree. ECF No. 210. Counsel complied with this request. ECF No. 236.

The Petitioner now complains of several errors with this procedure. He argues that excluding the persons on List Two, who the parties agreed should not be called, without oral voir dire violated his Fifth Amendment rights to due process and equal protection and his Sixth Amendment right to an impartial jury. Mot. at S2-1. He further argues that there were flaws in the questionnaire, and he points to several individuals who he argues were improperly excluded based on their answers to the questionnaire and without voir dire. Id. at S2-8-16. He also alleges ineffective assistance of trial counsel for their failure to object and decision to participate in the process. Id. at S2-16-19.

### 1. Procedural Default

As with most of the Petitioner's claims, this argument was not raised on appeal. Since it is being raised for the first time on collateral review, the claim is procedurally defaulted.

229

**3052**

Resp. to Claim S-2 at 3, ECF No. 537.[76] The Petitioner argues that this default should be excused, as his attorneys were ineffective for not challenging and bringing this claim earlier. Reply at S2-1, ECF No. 525. In order to determine if the Petitioner can prove his independent ineffective assistance claim, and ineffective assistance to excuse default, the court will now examine the arguments in this claim.

### 2. Exclusion Based Solely on Answers to Questionnaire Inquiries about the Death Penalty

The Petitioner argues that excluding jurors without oral voir dire based on their opinions about capital punishment violated his constitutional rights. Mot. at S2-1. The Supreme Court has held that a potential juror may be excluded for cause based on his or her views about the death penalty, if those views would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). This standard is broader than excluding only those who would never vote for, or against, the death penalty. Id.

---

[76] The government again asserts that Teague bars review of this claim. Resp. at 3-4. As there has been no change in the relevant law since the Petitioner's conviction became final, the court finds that Teague does not apply.

230

**3053**

To support his argument, the Petitioner relies on United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000). Id. at S2-2. In Chanthadara, the trial court excused several potential jurors without conducting voir dire, and the appellate court reviewed the decisions de novo. 230 F.3d at 1269-70. Based on the specific facts of the case before it, the court found that the questionnaire answers of one of the potential jurors were not sufficient to show that she would be unable to follow the court's direction on the law regarding the death penalty. Id. at 1270-73. The court held that exclusion of the juror based on the answers in her questionnaire was constitutional error. Id. at 1272-73. The Tenth Circuit, however, declined to create a per se rule against excusing a juror for cause before voir dire in a capital case, based on that person's view of the death penalty. Id. at 1269.

The Eighth Circuit declined to follow the Chanthadara decision to review de novo the dismissal of a juror based on her questionnaire answers about the death penalty. United States v. Purkey, 428 F.3d 738, 750 (8th Cir. 2005). Instead, it used an abuse of discretion standard, noting that reasons such as judges' expertise, respect for the judicial process, and conservation of judicial resources — not just the ability of a trial judge to assess the credibility of a potential juror

231

**3054**

during voir dire — command deference. Id. at 750. Based on the facts before it, the court held that the district court did not abuse its discretion in dismissing jurors for cause based on their views on the death penalty. Further, in United States v. Quinones, 511 F.3d 289, 301-04 (2d Cir. 2007), the Second Circuit permitted the use of for-cause exclusions in a capital case based only on pre-voir dire questionnaire answers. The court reasoned that "[h]owever strongly we recommend some oral voir dire in capital cases, we do not conclude that the procedure is constitutionally mandated." Id. at 301.

Accordingly, it is established that there is no one constitutionally mandated method of conducting voir dire. A district court has discretion in how to proceed, provided that the process is able to identify unqualified or biased jurors. Morgan, 504 U.S. at 729. This may include oral voir dire, but it also may involve the use of an initial questionnaire. Moreover, it is clear that there is no per se rule against dismissing jurors without voir dire based on their death penalty views.[77] For these reasons, the use of the questionnaire by this court to exclude some jurors before voir dire was not unconstitutional,

[77] Had one of these jurors been selected, the Petitioner would now be arguing error and a constitutional violation in that situation.

232

3055

and nothing to the contrary shows that a biased jury was selected.

### 3. Exclusion of Five Specific Jurors Based on Questionnaire Answers

The Petitioner's next argument deals with the specific questionnaire and dismissed jurors in his case. After jurors returned the questionnaire, the parties created a list of those jurors they agreed should not be called for voir dire. It was only if both parties agreed that the individual was not called. The Petitioner now points to five specific individuals — Jurors 45, 96, 178, 195, and 232 — who he argues were improperly dismissed based on their views about the death penalty, as contained in the questionnaire. Mot. at S-12-18. The Petitioner provides a list of reasons by defense counsel for objecting to specific jurors, and the list gives these five jurors' views on the death penalty as a reason trial counsel placed them on List Two. Mot. Attach. S-1. The Petitioner now argues that this list proves the jurors were dismissed for unconstitutional reasons. Mot. at S2-12.

First, the court has already found there was no error in using the questionnaire as a means to dismiss jurors without oral voir dire. Jury selection involves the experience of counsel and an evaluation of trial strategy. See, e.g., Romero

233

**3056**

v. Lynaugh, 884 F.2d 871, 878 (5th Cir. 1989) ("The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities."). Some of the answers by the five jurors indicated that the juror was strongly opposed to the death penalty, or that not only would the juror have a difficult time making a decision because of his or her views on the death penalty, but that he or she would have a difficult time, regardless of the facts and law in the case. Such views could be seen to substantially impair the juror's performance, and counsel reasonably could have wanted to remove jurors who appeared unable to follow the court's instructions.

Further, "[i]t has long been recognized that 'a court can not be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request.'" United States v. Herrera, 23 F.3d 74, 75 (4th Cir. 1994) (quoting Shields v. United States, 273 U.S. 583, 586 (1927)).[78] As the Petitioner points out, the court instructed the parties to compile a list of those jurors that it agreed should be dismissed based on the questionnaires, so the invited error doctrine in Herrera is not fully applicable. However, the court

---

[78] See supra note 35.

234

gave no instruction on how to create the lists. No party made any objection, and this system served to streamline the process by eliminating jurors that <u>both</u> parties agreed should not be called. If defense counsel did not agree with the government's decision to dismiss a juror, counsel could have put the individual on List Three, which was for those jurors upon whom the parties could not agree. The fact that counsel did agree to dismiss the jurors on List Two means that the defense counsel must have seen the benefit in eliminating them from the jury pool.

Finally, the court does not know if the only reason for the dismissal of the jurors was their death penalty views. It appears that the list was emailed between counsel, but nothing suggests it gives the only, or final, reasons for exclusion. For example, the list also provides that one of the jurors' husbands was a police officer, and another juror was a retired Naval officer — and Cory Voss was also a Naval officer. The court will not discount the exclusion of these five jurors, or any other juror to which the Petitioner now may object, based only on a list that is not proven to contain the exclusive reasons for dismissing the jurors. Accordingly, the Petitioner fails to show how those five jurors, who both parties agreed to put on List Two, were improperly dismissed.

235

### 4. Alleged Flaws with the Questions in the Juror Questionnaire

Not only does the Petitioner argue that jurors should not have been dismissed based on their questionnaire answers, he also challenges the questionnaire content itself. Mot. at S2-8-11. He presents the following arguments for why the questionnaire was flawed: (1) the questionnaire did not contain information about the law or procedures that would govern the jury's decision making at trial; (2) it did not contain a question about whether personal or moral opinions about the death penalty would substantially impair the juror's ability to weigh the aggravating and mitigating factors, and follow the judge's instructions; (3) the questionnaire was internally inconsistent; (4) the options to Question Sixty-One were skewed or based on a flawed legal premise; (5) Question Sixty-One presented jurors with several options about their views on the death penalty but did not allow them to express their opinion in their own words; and (6) the information in Question Fifty-Nine may have distorted jurors' views about the sentencing process. Id. The government essentially ignores this claim in its Response.

The court, however, finds that the questionnaire was not constitutionally infirm. It was designed to gather basic

236

**3059**

information, which could then be expanded upon during voir dire as the parties deemed appropriate. For those jurors whose answers showed hardship, strong views about the death penalty, or some other reason that both parties agreed qualified a juror not to be seated, the questionnaire allowed for proper dismissal. But for the others, it was not necessary at this point to provide background information about the structure of the trial or relevant standards, or to provide opportunities for more in-depth explanations on views about the death penalty. Those topics would be, and were, covered in voir dire. Even assuming that some of the questions could benefit from being reworded, the questions served their purpose of gathering basic information, and that did not violate the Petitioner's rights. As discussed above, a questionnaire can be used in capital cases to assist with voir dire, and the Petitioner has failed to show how the questions and answer choices violated his right to an impartial jury and fair trial. Both the Petitioner and the United States contributed to and agreed upon the questionnaire used in this case. See ECF Nos. 156, 175, 190, 211, 212.

### 5. Ineffective Assistance of Counsel

The Petitioner next claims that trial counsel was ineffective for failing to object to (1) the questionnaire, (2)

237

**3060**

the court's direction to dismiss some potential jurors based only on answers to the questionnaire, and (3) the actual order of dismissal of the jurors on List Two. Id. at S2-16-18. The Petitioner further argues that counsel was ineffective for actively participating in these procedures. Id. at S2-18. He also argues counsel's ineffectiveness is cause to excuse the procedurally defaulted arguments in this claim. Reply at S2-1.

As discussed throughout this Order, to make a showing of ineffective assistance of counsel, a petitioner must show that (1) his counsel's performance was deficient; and (2) such deficient performance prejudiced the petitioner by undermining the reliability of the judgment against him. Strickland, 466 U.S. at 687. The Petitioner fails to meet these Strickland requirements.

The court has already concluded that the general use of a questionnaire to excuse jurors prior to voir dire, even in a capital case, is not unconstitutional. Thus, counsel was not deficient for declining to object when the court suggested the use of the questionnaire. The court also found no constitutional infirmities with the questionnaire itself, so counsel cannot be faulted for not objecting. Additionally, such objections would have been meritless, so the Petitioner is unable to show a

238

**3061**

reasonable probability of a different outcome had counsel objected.

Regarding the failure to object to the actual dismissal order based on List Two and counsel's participation in the process, the court has concluded such acts did not violate the Petitioner's rights and were not unconstitutional. These procedures were agreed to by both parties to streamline the process. This was not a situation where jurors were excused prior to voir dire due to a challenge by the government or a sua sponte dismissal by the court. Other than a list, the origin of which the Petitioner does not explain, the Petitioner presents no proof that counsel unreasonably excused jurors or felt forced to participate. The Petitioner's counsel was actively involved in the process, and the Petitioner has given the court no reason to question counsel's decisions regarding the questionnaire. Trial counsel had already filed multiple requests related to jury selection. ECF No. 156. If counsel did not want to participate, they certainly would have objected. That counsel declined to object to a procedure that has not been held unconstitutional is not deficient. It means that counsel saw the benefit in the process, and the court will not second guess that choice. Based on the above analysis, the court concludes that

239

**3062**

trial counsel was not deficient for not objecting to, and for actively participating in, the voir dire procedures.

Regarding prejudice, the Petitioner states only that "[t]here is a reasonable probability that absent counsel's deficient performance, the composition of the jury would have been different, and that at least one juror would have voted for life." Mot. at S2-20. This blanket statement, with nothing more, is not enough to show the prejudice required for an ineffective assistance of counsel claim. The Petitioner is unable to point to any biased juror who was seated, or any juror improperly struck. Moreover, as discussed in this section, any objection would have been meritless, so the Petitioner fails to show a reasonable probability of a different outcome had counsel acted differently. For these reasons, the Petitioner is unable to prove his ineffective assistance of trial counsel claim, both as its own independent claim and as a means to excuse default.

The court also finds that this claim is not stronger than any claim presented on appeal, and that, as this claim has no merit, there is not a reasonable probability of a different outcome had the Petitioner appealed this issue. For these reasons, the Petitioner is unable to show ineffective assistance of appellate counsel.

240

**3063**

As the Petitioner fails to prove ineffective assistance of counsel, he is unable to overcome the procedural default on his other arguments. Claim S-2 is both procedurally defaulted and lacking in merit, and it is **DENIED**.

## V. CONCLUSION

For the reasons stated herein, the Petitioner's First and Second Motions for Discovery are **DENIED**, and the Motion to Vacate brought pursuant to 28 U.S.C. § 2255 is **DENIED**. The court declines to issue a certificate of appealability for the reasons stated in this Opinion.

The Clerk is **DIRECTED** to send a copy of this Opinion to counsel for the Petitioner and to the United States Attorney at Newport News.

IT IS SO ORDERED.[79]

_____
REBECCA BEACH SMITH
CHIEF JUDGE

January 19, 2017

---

[79] An Index of this Opinion is attached for reference purposes and made a part hereof. Exhibits A, B, C, and D referenced in the Opinion are attached following the Index.

241

**3064**

INDEX

I. FACTUAL BACKGROUND ........................................... 2

II. PROCEDURAL HISTORY ........................................... 9

III. STANDARDS OF REVIEW ........................................ 15

   A. MOTIONS BROUGHT PURSUANT TO 28 U.S.C. § 2255 ............. 15
     1. Ineffective Assistance of Counsel ..................... 16
     2. Procedural Default .................................... 18
     3. Bar on Relitigating Claims Brought on Direct Appeal ...19
     4. Retroactive Application of New Rules to Cases on
       Collateral Review ................................... 20
     5. Evaluation of New Claims Contained in Amended
       Pleadings ........................................... 21

   B. DISCOVERY FOR MOTIONS BROUGHT PURSUANT TO
   28 U.S.C. § 2255 ........................................ 22

IV. THE PETITIONER'S CLAIMS ..................................... 24

   A. CLAIM ONE - DISHONEST LAW ENFORCEMENT OFFICERS INVOLVED IN
   CASE .................................................... 24
     1. Robert Glenn Ford .................................... 25
     2. Clifford Dean Posey .................................. 31
     3. Ineffective Assistance of Trial Counsel .............. 34
     4. Conclusion ........................................... 35

   B. CLAIM TWO - PROSECUTION FAILED TO DISCLOSE EXCULPATORY
   EVIDENCE ABOUT CO-DEFENDANT MICHAEL DRAVEN ............... 35
     1. Procedural Default ................................... 36
     2. Brady Claim .......................................... 38
     3. Ineffective Assistance of Trial Counsel .............. 44
     4. Discovery ............................................ 45

   C. CLAIM THREE - COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT
   GUILT PHASE OF TRIAL BY FAILING TO INVESTIGATE, PRESENT,
   HIGHLIGHT, AND/OR ARGUE EVIDENCE OF INNOCENCE............ 46
     1. Chad Costa ........................................... 47
     2. Cat Voss ............................................. 50
     3. Scott Linker ......................................... 52
     4. Rose Wiggins ......................................... 53

242

**3065**

5. Whereabouts of the Petitioner on the Day of the Murder .................................................. 55
6. Cell Tower Testimony ..................................... 57
7. The Petitioner's Shopping List ......................... 61
8. Ballistics Tests ......................................... 62
9. Conclusion ............................................... 66

D. CLAIM FOUR - COUNSEL ABDICATED RESPONSIBILITY TO ADVOCATE AT ELIGIBILITY PHASE OF TRIAL ............................ 66

E. CLAIM FIVE - TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING  TO INVESTIGATE, DISCOVER, AND PRESENT EVIDENCE OF INCOMPETENCY TO STAND TRIAL ............................................ 71
1. Standard for Ineffective Assistance of Counsel for Failure to Request Competency Hearing ................. 71
2. Whether Counsel was Ineffective for Failing to Investigate Competency and Request a Hearing on the Issue .................................................. 74
3. Discovery ............................................... 76

F. CLAIM SIX - COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND PRESENT MITIGATING EVIDENCE REGARDING PSYCHO-SOCIAL HISTORY, BRAIN DAMAGE, AND MENTAL HEALTH .................................................... 77
1. Ineffective Assistance Standard ....................... 78
2. Hudgins's Involvement with the Case .................. 81
3. Counsel's Mental Health Investigation ................ 82
4. Counsel's Decision Not to Introduce Mental Health as a Mitigating Factor ................................ 90
5. Decision Not to Present a Complete Psycho-Social History .............................................. 95
   a. Various Records, Letters, and Medical Reports ....... 96
   b. Government Experts - Dr. Patterson and Dr. Montalbano ................................... 101
   c. Lay Witnesses .................................. 103
   d. Defense Experts - Dr. Mirsky, Dr. Merikangas, Dr. Cunningham, and Dr. Dudley ................... 108
6. Evaluation of Counsel's Strategy Based on All of the Above Factors ....................................... 114
7. Conclusion ............................................ 119

G. CLAIM SEVEN - CONFRONTATION CLAUSE VIOLATED, AND COUNSEL UNREASONABLY FAILED TO OBJECT AND ASK FOR A LIMITING INSTRUCTION ............................................ 120
1. Procedural Default .................................... 121

243

2. Confrontation Clause Claim ..............................121
3. Ineffective Assistance of Trial Counsel ..............127

H. CLAIM EIGHT - THE PETITIONER ARGUES THAT HIS APPELLATE
COUNSEL RENDERED INEFFECTIVE ASSISTANCE. ................130

I. CLAIM NINE - THE PETITIONER ARGUES THAT THE HOLDING IN
*JOHNSON V. UNITED STATES*, 135 S. CT. 2551 (2015),
INVALIDATES HIS CONVICTION. .............................133
1. Holding and Retroactivity of
*Johnson v. United States* ...........................134
2. Extension of *Johnson* to the Petitioner's Case .......137

J. CLAIM TEN - THE PETITIONER ARGUES THAT THE JURY
INSTRUCTIONS LOWERED THE GOVERNMENT'S BURDEN OF PROOF. ..140
1. Bar to Relitigating Claims Raised on Appeal .........142
2. Extension of *Hurst v. Florida* to the Petitioner's
Case ...............................................144

K. CLAIM ELEVEN - THE PETITIONER ARGUES THAT HIS SENTENCE IS
UNCONSTITUTIONAL BECAUSE IT IS BASED ON AGGRAVATING
CIRCUMSTANCES THAT ARE ARBITRARY AND OVERBROAD. .........145
1. Procedural Default and Bar on Relitigation ..........146
2. Standard for Evaluating Aggravating Factors .........148
3. The Petitioner's Statutory Aggravating
Factor Claim .......................................149
4. The Petitioner's Non-Statutory Aggravating
Factor Claim .......................................152
a. Bar on Relitigation..............................153
b. The Prosecution's Use of Non-Statutory Aggravating
Factors in the Petitioner's Case...................154
c. Ineffective Assistance of Counsel..................157
5. Conclusion .........................................158

L. CLAIM TWELVE - THE PETITIONER ARGUES THAT THE GOVERNMENT
ENGAGED IN SELECTIVE PROSECUTION BASED ON RACE, AND COUNSEL
WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM DURING
DIRECT PROCEEDINGS. .....................................158
1. Standard for Selective Prosecution Claims ...........159
2. The Petitioner's Argument for Selective
Prosecution ........................................161
3. Ineffective Assistance of Counsel ...................165
4. Discovery ..........................................166

244

**3067**

M. CLAIM THIRTEEN - THE PETITIONER ARGUES THAT HIS DEATH
SENTENCE IS DISPROPORTIONATE AND IN VIOLATION OF THE FIFTH
AND EIGHTH AMENDMENTS, AND COUNSEL WAS INEFFECTIVE FOR NOT
RAISING THIS CHALLENGE DURING DIRECT PROCEEDINGS. ....... 168
  1. Procedural Arguments ................................. 168
  2. Disproportionality of the Petitioner's Sentence ...... 170
  3. Ineffective Assistance of Counsel ................... 176

N. CLAIM FOURTEEN - THE PETITIONER ARGUES THAT HIS DEATH
SENTENCE VIOLATES THE EIGHTH AMENDMENT BECAUSE HE IS
SEVERELY MENTALLY ILL, AND COUNSEL WAS INEFFECTIVE FOR NOT
RAISING THIS CHALLENGE DURING TRIAL AND ON APPEAL. ...... 179
  1. Existing Exceptions to Application of the Death
     Penalty .......................................... 179
  2. The Petitioner's Argument to Extend the Holdings in
     Atkins and Roper .................................. 181
  3. Ineffective Assistance of Counsel ................... 185

O. CLAIM FIFTEEN - THE PETITIONER ARGUES THAT SELECTION OF THE
GRAND AND/OR PETIT JURY WAS TAINTED, AND COUNSEL
UNREASONABLY FAILED TO REQUEST AND INSPECT THE JURY
SELECTION RECORDS. ..................................... 186
  1. Selection of the Grand and/or Petit Jury Venire ...... 186
  2. Compliance with the Jury Selection Plan and the
     Provisions of 28 U.S.C. § 1861 et seq. .............. 188
  3. Participation of an Allegedly Unqualified Juror During
     the Jury Selection Process .......................... 192
  4. Ineffective Assistance of Counsel ................... 193

P. CLAIM SIXTEEN - THE PETITIONER ALLEGES THAT THE GOVERNMENT
USED ITS PEREMPTORY STRIKES TO DISCRIMINATE BASED ON RACE
AND GENDER, AND COUNSEL UNREASONABLY FAILED TO OBJECT. .. 195
  1. Procedural Default ................................. 196
  2. Standard for a Batson/J.E.B. Claim ................. 197
  3. The Petitioner's Batson Claim ...................... 199
     a. Prima Facie Case .............................. 199
     b. The Government's Race-Neutral Reasons for the Strikes
        and the Petitioner's Response.................. 204
  4. The Petitioner's J.E.B. Claim ...................... 206
     a. Prima Facie Case .............................. 206
     b. The Government's Gender-Neutral Reasons for the
        Strikes and the Petitioner's Response.......... 207

3068

    5. Ineffective Assistance of Counsel .................... 209
      a. Ineffective Assistance of Trial Counsel............ 209
      b. Ineffective Assistance of Appellate Counsel....... 211
    6. Discovery ........................................ 211

Q. CLAIM SEVENTEEN – THE PETITIONER ALLEGES THAT THE VOIR DIRE
   VIOLATED HIS FIFTH AND SIXTH AMENDMENT RIGHTS, AND
   COUNSEL'S FAILURE TO OBJECT TO VOIR DIRE PROCEDURES WAS
   UNREASONABLE. ........................................ 213
    1. Procedural Arguments ................................ 214
    2. Collective Questioning of the Potential Jurors ....... 215
    3. Use of Questions Designed to Determine Bias and Ability
      to Follow the Law and the Court's Instructions ....... 217
    4. Scope and Structure of the Proceedings .............. 221
    5. Ineffective Assistance of Counsel .................... 223
      a. Ineffective Assistance of Trial Counsel............ 223
      b. Ineffective Assistance of Appellate Counsel........ 227

R. CLAIM S-2 – THE PETITIONER ARGUES THAT THERE WERE PROBLEMS
   WITH THE JUROR QUESTIONNAIRE AND ITS USE BY THE COURT, AND
   COUNSEL UNREASONABLY FAILED TO OBJECT. .................. 228
    1. Procedural Default ................................. 229
    2. Exclusion Based Solely on Answers to Questionnaire
      Inquiries about the Death Penalty .................... 230
    3. Exclusion of Five Specific Jurors Based on Questionnaire
      Answers ............................................ 233
    4. Alleged Flaws with the Questions in the Juror
      Questionnaire ...................................... 236
    5. Ineffective Assistance of Counsel .................... 237

V. CONCLUSION ........................................... 241

**3069**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

      Petitioner,

    v.

UNITED STATES OF AMERICA,

      Respondent.

CIVIL NO. 4:15cv108
[ORIGINAL CRIMINAL NO. 4:08cr16-3]

## JUDGMENT

[X]    **Decision by Court.** This action came on for decision before the Court.
The issues have been decided and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** for the reasons stated herein, the Petitioner's First and Second Motions for Discovery are DENIED, and the Motion to Vacate brought pursuant to 28 U.S.C. § 2255 is DENIED. The court declines to issue a certificate of appealability for the reasons stated in this Opinion. IT IS SO ORDERED.

JAN 19 2017
_____
Date

FERNANDO GALINDO, CLERK

By:_____/s/_____
          Lara Dabbene, Deputy Clerk

**3070**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | |
|---|---|
| DAVID ANTHONY RUNYON, <br> Petitioner, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br> Respondent. | No. 4:15-cv-108 <br> Original Criminal No. 4:08-cr-16-3 <br> CAPITAL §2255 PROCEEDINGS <br><br> HON. REBECCA BEACH SMITH |

**PETITIONER'S MOTION FOR ACCESS TO MATERIALS
SUBPOENAED AND FILED UNDER SEAL**

Petitioner David Anthony Runyon, a federal prisoner under sentence of death, hereby moves the Court for an order allowing him access to materials subpoenaed, filed under seal, and reviewed by the Court during the course of adjudicating Runyon's Amended § 2255 Motion (ECF No. 552 & 555, Orders). Runyon is not seeking to unseal those materials; only to be granted access to review them. The accompanying memorandum sets out the facts and arguments supporting this motion.

Respectfully Submitted,

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

**3071**

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
 Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: February 1, 2017

2

**3072**

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2017, I have electronically filed the foregoing Petitioner's Motion for Expedited Access to Materials Subpoenaed and Filed Under Seal with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

3

**3073**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

|  |  |  |
|---|---|---|
| DAVID ANTHONY RUNYON,<br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Respondent. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | No. 4:15-cv-108<br>Original Criminal No. 4:08-cr-16-3<br>CAPITAL §2255 PROCEEDINGS<br><br>HON. REBECCA BEACH SMITH |

**PETITIONER'S MEMORANDUM IN SUPPORT OF
MOTION FOR EXPEDITED ACCESS TO MATERIALS SUBPOENAED
AND FILED UNDER SEAL**

Petitioner David Anthony Runyon, a federal prisoner under sentence of death, hereby moves the Court for an order allowing him access to all materials subpoenaed, filed under seal and reviewed by the Court during the course of adjudicating Runyon's Amended § 2255 Motion (ECF No. 552 & 555, Orders). Runyon is not seeking to unseal those materials; only to be granted access.

On July 12, 2016, the Court entered an order for a subpoena duces tecum directing the Virginia Department of Forensic Science (DFS) to produce under seal all records related to the above-captioned case, with corresponding FS Lab #T07-4553. ECF No. 552.[1] The Court's Opinion refers to those records.[2] ECF No. 560-1, p.65.

---

[1] A subpoena was issued the following day, ECF No. 553, and the subpoena was received on July 18, 2016, ECF No. 554.

[2] On April 1, 2016, Runyon filed a discovery request for a subpoena for the records related to this case in the possession of the Virginia Department of Forensic Science. ECF No. 530, Second Discovery Motion; ECF No. 533, Discovery Reply; ECF No. 545-1, Supplement to Second Discovery Motion (Nixon Declaration). Runyon reasonably believed that the Court subpoenaed the

**3074**

On July 26, 2016, the Court directed the U.S. Attorney to file ex parte and under seal the grand jury testimony of Chad Costa. ECF No. 555. The Court's Opinion refers to Chad Costa's grand jury testimony. ECF No. 560-1, p.49 & nn.16, 17, p.50.

Runyon's counsel have not seen or reviewed either group of documents that were filed under seal, and Runyon's expert John Nixon[3] has not seen or reviewed the records from the Virginia Department of Forensic Science. Undersigned counsel are currently reviewing the Court's Opinion and preparing a motion under Federal Rules of Civil Procedure, Rule 59(e), however, counsel are unable to address those portions of the Opinion that reference the sealed documents. Accordingly, counsel respectfully request access to review the material that remains sealed, and to do so with the assistance of Runyon's previously identified expert. Counsel specifically request the opportunity to access the originals of any photographic materials because copies may have diminished quality. Counsel also request the opportunity to measure and inspect the originals of any physical evidence that was produced by DFS in response to the Court's subpoena, and for their expert to be allowed to do the same. If the Court be so inclined, counsel have no objection to the presence of a neutral monitor, such as a member of the Clerk's office or a federal marshal, to ensure the integrity of the materials during this review.

After this review, Counsel may need to identify and further discuss these materials

---

DFS materials in order to determine which of them should be provided in discovery. Discovery was denied within the Court's final opinion, for the same reason that the Court denied the merits of Claim 3 in Runyon's Amended § 2555 motion. ECF No. 560-1, p.65.

[3] Nixon's declaration was submitted in support of the second discovery motion and in support of Claim 3. ECF No. 545-1 & 551-2.

2

**3075**

with each other or with their expert, to call them to the attention of this Court (and, if appropriate, to co-counsel) in conjunction with a pleading, or make them available to the court of appeals as part of the record of the case. Counsel therefore request the ability to tag materials with Post-It notes, and for the Court to direct the Clerk to provide him with one photocopy of each tagged item. These copies should be provided under seal, subject to a protective order that permits counsel to make one copy for co-counsel and one copy for further review by Runyon's expert, if necessary. Should counsel notify the Court of their intention to use any such copy as an exhibit to a pleading filed in this Court, they will provide the Clerk with a copy for filing under seal. If either party designates all or a part of these materials for inclusion in a sealed volume of the joint appendix on appeal, that volume will be prepared and filed consistent with Fourth Circuit Local Rules 10 and 25.

With respect to access and review of the materials from the Virginia Department of Forensic Science, counsel further request that the Court direct the Clerk to provide a list of items which were produced by DFS that cannot be duplicated (such as physical items) or items which were produced but duplication would likely result in a degraded copy (such as a microphotograph that will lose detail if duplicated on an ordinary copier). For any such items, permission is sought for Runyon's expert to inspect the physical items and photographs at the courthouse at a time convenient to the clerk and under the clerk's supervision.

Finally, undersigned request any list in the Court's possession that identifies any physical items in this case that DFS retained for security or conditions-of-preservation reasons and did not produce to the Court.

WHEREFORE, Runyon respectfully requests that the Court enter an order:

**3076**

(1) Granting undersigned counsel access to all the records related to the above-captioned case, with corresponding FS Lab #T07-4553 that the Virginia Department of Forensic Science provided to the Court and are filed under seal, *see* ECF No. 552 & 553;

(2) Providing a list of items produced by DFS that are not readily duplicated, if any, and a list of any items that DFS retained for security or conditions-of-preservation reasons; and,

(3) Granting undersigned counsel access to the grand jury testimony of Chad Costa that is filed under seal, *see* ECF No. 555.

Respectfully Submitted,

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
 Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: February 1, 2017

4

**3077**

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2017, I have electronically filed the foregoing Petitioner's Memorandum in Support of Motion for Expedited Access to Materials Subpoenaed and Filed Under Seal with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov


_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

5

**3078**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | |
|---|---|
| DAVID ANTHONY RUNYON, Petitioner, | : No. 4:15-cv-108<br>: Original Criminal No. 4:08-cr-16-3<br>: CAPITAL §2255 PROCEEDINGS |
| v. | : HON. REBECCA BEACH SMITH |
| UNITED STATES OF AMERICA, Respondent. | : |

## MOTION TO ALTER OR AMEND JUDGMENT UNDER FED. R. CIV. P. 59(e)

Petitioner David Runyon, by counsel, respectfully moves this Court under Rule 59(e) of the

Federal Rules of Civil Procedure to alter or amend its Opinion issued on January 19, 2017 (ECF No.

560), and its Judgment entered on January 20, 2017. ECF No. 561. The accompanying memorandum

sets out the facts and arguments supporting this motion.

Respectfully Submitted,

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
    Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
    Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: February 16, 2017

**3079**

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2017, I have electronically filed the foregoing Motion to Alter or Amend Judgment Under Fed. R. Civ. P. 59(e) with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

2

**3080**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

| | |
|---|---|
| DAVID ANTHONY RUNYON,<br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Respondent. | : <br>:       No. 4:15-cv-108<br>: Original Criminal No. 4:08-cr-16-3<br>: CAPITAL §2255 PROCEEDINGS<br>: HON. REBECCA BEACH SMITH<br>:<br>:<br>:<br>: |

## MEMORANDUM IN SUPPORT OF PETITIONER'S MOTION TO ALTER OR AMEND UNDER FED. R. CIV. P. 59(e)

Petitioner David Runyon, by counsel, has moved the Court, pursuant to Fed. R. Civ. P. 59(e), to alter or amend its Opinion issued on January 19, 2017 and Judgment entered on January 20, 2017, denying Runyon's motion for relief pursuant to 28 U.S.C. § 2255. Petitioner is not re-presenting every allegation of error, although he asserts all claims in his § 2255 motion have merit. Petitioner only addresses those issues that demonstrate a manifest error of law and fact, or present a manifest injustice. Runyon's decision not to address any particular claim in this motion constitutes neither a waiver nor a withdrawal of a claim. In support of this motion, Runyon states the following grounds:

### I. PROCEDURAL HISTORY

Runyon filed his § 2255 motion on October 5, 2015. ECF No. 478. On February 4, 2016, Runyon filed an amended motion. ECF No. 511. He requested an opportunity to reply to Respondent's answer, to engage in discovery and request expansion of the record, and to present evidence at an evidentiary hearing on claims involving material factual disputes. *Id.*, p.140.

On December 9, 2015, and April 1, 2016, Runyon requested discovery on factual issues raised by the pleadings. ECF No. 491 & 530; *see also* ECF No. 506 & 533.

**3081**

Respondent filed an answer, ECF No. 536, and Runyon replied on July 7, 2016. ECF No. 551. Respondent did not file a motion to dismiss or a motion for summary judgment.

On January 19, 2017, without taking any evidence, this Court issued an opinion denying Runyon's § 2255 motion and discovery requests. ECF No. 560. Judgment was entered on January 20, 2017. ECF No. 561. Runyon now moves to alter and amend pursuant to Fed. R. Civ. P. 59(e).

## II. RULE 59(e) AND APPLICABLE STANDARDS

Rule 59(e) was adopted "to make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment." It gives a district court a chance to correct its own mistake if one has been made. *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 450 (1982) (internal citation and quotation marks omitted); *see also Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007). A Rule 59(e) motion is appropriate when a court bases its order on a factual error. It also lies when a manifest error of law has occurred. Relief also is appropriate to consider evidence that was not available to the Court when it issued its decision or to prevent manifest injustice. *Zinkand*, 478 F.3d at 637. A district court abuses its discretion under Rule 59(e) when it fails to take relevant factors intended to guide its discretion into account or when it acts on the basis of "legal or factual misapprehensions" respecting those factors. *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 402-03 (4th Cir. 1998) (quoting *James v. Jacobson*, 6 F.3d 233, 242 (4th Cir. 1993)).

## III. THE COURT COMMITTED LEGAL ERROR IN DENYING THE AMENDED § 2255 MOTION WITHOUT THE BENEFIT OF AN EVIDENTIARY HEARING

Runyon requested an evidentiary hearing on various claims alleged in his § 2255 motion, but the Court denied the motion without the benefit of any factual development. The denial of a hearing constituted a manifest error of law because it does not comport with the applicable standards for when such a hearing must be granted. The Court's opinion also committed legal error by making

2

**3082**

determinations despite the existence of material factual disputes. Runyon respectfully requests that this Court reconsider its opinion denying an evidentiary hearing on his § 2255 claims.

### A. The standard governing evidentiary hearings in § 2255 proceedings is a liberal one, under which there is a presumption in favor of holding a hearing whenever disputed issues of fact are alleged.

Runyon had alleged specific facts which, if proved, would entitle him to relief and he was "entitled to careful consideration and plenary processing of [his] claims including full opportunity for presentation of the relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *Townsend v. Sain*, 372 U.S. 293, 311-12 (1963) *superseded on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). The use of mandatory language in 28 U.S.C. § 2255(b) and Rule 8 of the § 2255 RULES indicates an evidentiary hearing is almost always required. This is because "[i]t is the typical, not the rare, case in which constitutional claims turn upon the resolution of contested factual issues." *Townsend*, 372 U.S. at 312.

Respondent's answer contested many of Runyon's factual allegations but did not contest Runyon's request for an evidentiary hearing. The answer argued only that Runyon's Amended § 2255 Motion should be denied. ECF No. 536, p. 157. Respondent did not file a motion to dismiss or motion for summary judgment.

Exceptions to the evidentiary hearing requirement are inapplicable in this case. An exception exists when—unlike Runyon's case—there is conclusive evidence the petitioner is not entitled to relief. 28 U.S.C. § 2255(b). Summary dismissal was also not appropriate in Runyon's case because the allegations he set forth are not "palpably incredible" or "patently frivolous or false." *Blackledge v. Allison*, 431 U.S. 63, 77 (1977) (internal citation and quotation marks omitted). And, while summary judgment—which Respondent did not seek—may provide a mechanism for resolving a § 2255 motion, an evidentiary hearing is "especially warranted" when, as here, Runyon's "factual allegations 'relate[] primarily to purported occurrences outside the Courtroom and upon which the record could,

3

**3083**

therefore, cast no real light,' *Machibroda v. United States*, 368 U.S. 487, 494-95, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962)[.]" *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004); *See also United States v. Witherspoon*, 231 F.3d 923, 925-26 (4th Cir. 2000) (Unless it is clear from the pleadings, files, and records that the prisoner is not entitled to relief, § 2255 makes an evidentiary hearing in open court mandatory). Also, when credibility determinations are necessary to resolve a claim—as in Runyon's case—an evidentiary hearing is "especially warranted." *White*, 366 F.3d at 302 (citing *Raines v. United States*, 423 F.2d 526, 530 (4th Cir.1970)).

A hearing in § 2255 proceedings will frequently be necessary because the claim most often litigated in such proceedings is that trial counsel rendered ineffective assistance – a claim which ordinarily cannot be resolved on the extant record because it involves events and occurrences that took place outside the Courtroom. As the Court explained in *Massaro v. United States*, 538 U.S. 500, 504-06 (2003):

> In light of the way our system has developed, in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance. When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the Court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose. Under *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), a defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial. The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse. *See Guinan, supra*, at 473 (Easterbrook, J., concurring) ("No matter how odd or deficient trial counsel's performance may seem, that lawyer may have had a reason for acting as he did. . . . Or it may turn out that counsel's overall performance was sufficient despite a glaring omission . . ."). The trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them. And evidence of alleged conflicts of interest might be found only in attorney-client correspondence or other documents that, in the typical criminal trial, are not

4

introduced. *See, e.g., Billy-Eko,* [8 F.3d] at 114. Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial.

*See also Machibroda,* 368 U.S. at 494-95.

An evidentiary hearing was required because this case contains material factual disputes, the record does not conclusively refute Runyon's claims, and specific allegations—if true—entitled him to relief. *See* Runyon's Amended § 2255 Motion, ECF No. 511; Runyon's reply, ECF No. 551; Runyon's discovery motions, ECF No. 491, 506, 530, 533, 541, 544.

**B. Because factual development through an evidentiary hearing, including compulsory process, was required to resolve many of Runyon's claims, the *sua sponte* dismissal of his Amended § 2255 Motion is manifest error.**

There are significant factual disputes arising outside of the trial record and an evidentiary hearing was warranted, including but not limited to the following.

**Claim 1:** **The participation of two dishonest law enforcement officers tainted Runyon's trial.**

Claim 1 asserts a due process claim based on the participation of two dishonest law enforcement officers in Runyon's case and alleges trial counsel were ineffective if information about these individuals was known and counsel failed to act. ECF No. 511, pp.11-16; ECF No. 551, pp.10-15. Claim 1 relies upon new facts that were discovered after trial and, therefore, they are not contained in the trial record. Runyon requested discovery on this claim. ECF No. 491, pp.26-33.

This claim involves factual disputes regarding: (a) the scope of ATF Agent Posey's involvement in Runyon's case, including the recorded conservations between the co-defendants and the handling of Runyon's firearms and the bullets from the crime scene, ECF No. 511 p.15; (b) the scope and nature of defense investigator Robert Glenn Ford's criminal acts, *id.*, pp.11-14; (c) the extent

5

**3085**

and timing of the prosecution's knowledge of (a) and (b); and (d) the extent and timing of Runyon's trial counsel's knowledge, if any, of (a) and (b).

Material factual disputes arise not only from the claim itself but also from Respondent's opposition to the claim. Respondent argued this claim should have been raised on direct appeal and, because it was not, Respondent asserted a procedural default. Respondent's procedural defense and general opposition to the merits rely upon facts outside the record. *See* ECF No. 551, pp.10-15. For example, the asserted procedural default depends upon counsel's knowledge of the facts. *See* ECF No. 551, pp.10-11. Although Respondent relied upon trial counsel Woodward's declaration, ECF No. 511-6, that declaration is silent or ambiguous on the specific facts at issue including counsel's actual knowledge and the timing of that knowledge, if any. ECF No. 551, p.13.

**Claim 2:**     **The *Brady* violation.**

Claim 2 asserts a due process violation based on the prosecution's failure to disclose favorable evidence to rebut an aggravating circumstance and to support mitigating circumstances. ECF No. 511, pp.16-21; ECF No. 551, pp.15-22. Claim 2 relies upon new facts that were discovered after trial and facts not contained in the trial record, including facts the prosecution withheld about co-defendant Draven's adjudicated and unadjudicated criminal and violent conduct, *see* Claim 2, facts contained in trial counsel's recent declaration, ECF No. 551-1, pp.3-4 at ¶¶12-16, and facts uncovered by undersigned counsel's independent investigation, *see* ECF No. 491, pp. 22-25 & ECF No. 491-2; ECF No. 487 & 490.

The only disputed element of Runyon's *Brady* claim was materiality. ECF No. 536, p.24 (Respondent acknowledged the information was not revealed to Runyon's counsel but argues materiality). An evidentiary hearing should have been held on the fact-driven issue of materiality. *White*, 366 F.3d at 297. Factual development is warranted because Runyon has alleged facts which, if

6

true, entitle him to relief.[1] *Raines v. United States*, 423 F.2d 526, 529-30 (4th Cir. 1970) (discussing fact-finding procedures); *see also* § 2255 RULES, Rules 6-8.

Respondent's answer created material factual disputes with respect to Runyon's *Brady* allegations. *White*, 366 F.3d at 297 (citing *Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977)); 28 U.S.C. §2255 (requiring an evidentiary hearing on a habeas claim "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief"). Respondent not only disputed the significance of the withheld evidence but alternatively asserted the claim was procedurally defaulted, and that the withheld evidence was inadmissible and cumulative. ECF No. 536, pp.24, 26. A determination regarding admissibility (if required) and/or cumulativeness can only be made after the evidence has been presented and tested at an evidentiary hearing. *See* ECF No. 551, pp.20-21. These disputes required fact-finding on the newly-discovered evidence about co-defendant Draven. *Townsend*, 372 U.S. at 313; *Wolfe v. Clark*, 691 F.3d 410, 421-22 (4th Cir. 2012).

### <u>Claims 3, 4, 5, 6</u>:      Ineffective assistance of counsel.

Runyon has alleged specific facts demonstrating trial and/or appellate counsel rendered ineffective assistance at different stages of the prior proceedings. ECF No. 511, pp.21-83, ECF No. 551, pp. 22-61. "When a colorable Sixth Amendment claim is presented, and where material facts are in dispute involving inconsistencies beyond the record, a hearing is necessary." *United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992). "Ineffective-assistance of counsel claims often depend on evidence

---

[1] Runyon filed a discovery request that set forth good cause for the release of information relevant to materiality. ECF No. 491, pp.21-25; ECF No. 506, pp.13-16. The information that was discovered during this § 2255 proceeding adds additional support to at least one mitigating circumstance. Without discovery, the quantity and content of records that could have been used to impeach the co-defendant's testimony and exculpate Runyon is unknown. The discovery requests should have been granted.

outside the trial record[,]" *Martinez v. Ryan*, 132 S.Ct. 1309, 1318 (2012), and Claims 3-6 rely upon such facts, including: expert reports;[2] declarations;[3] other records related to counsel's representation of Runyon;[4] other records related to David Runyon;[5] and, scholarly articles and government reports.[6] *See also ibid.*

Allegations contained in Claims 3-6 are interrelated, especially with respect to counsel's failure to investigate and present evidence of Runyon's compromised mental state. An evidentiary hearing should be had on any claim that is closely related to, or intertwined with, another issue on which a hearing is held. *See, e.g., Stano v. Dugger*, 901 F.2d 898, 905 (11th Cir. 1990).

Respondent's answer created material factual disputes with respect to Runyon's allegations of counsel's ineffective assistance. Respondent raised factual issues including: admissibility, credibility, and strength of the evidence that counsel failed to investigate and present; the scope of counsel's investigation; whether information was available at the time of trial; and, the reasonableness of counsel's actions. In resolving these disputed facts, the Court made findings for which an evidentiary

---

[2] ECF No. 511-2, 511-3, 511-8, 511-29, 511-35, 511-38/ECF No. 506-2; ECF No. 545-1/ECF No. 551-2; ECF No. 551-3.

[3] ECF No. 511-4, 511-7, 511-9, 511-10, 511-11, 511-12, 511-13, 511-26, 511-27, 511-28, 511-31, 511-32, 511-33; ECF No. 551-1.

[4] ECF No. 491-1, 491-2, 491-3; ECF No. 511-5, 511-6, 511-15, 511-19, 511-21, 511-34, 511-36; ECF No. 551-4, 551-5.

[5] ECF No. 511-16, 511-17, 511-18, 511-20, 511-22, 511-23, 511-24, 511-25, 511-30, ECF No. 526-1.

[6] ECF No. 506-1; ECF No. 511-14, 511-37; ECF No. 533-1, 533-2 & 533-3; ECF No. 545-1.

8

**3088**

hearing was necessary and should have been held. A few examples of material factual disputes are discussed below.

For example, when resolving disputed facts regarding **Claim 3,**[7] the opinion rejects allegations establishing that Runyon was in West Virginia at the time of the crime and states, "the court cannot assume the witness [Paula Dalton] would have testified to something based solely on a conclusory statement of the Petitioner[,]" and notes that Paula Dalton's declaration did not address facts regarding cell phone calls from Runyon. ECF No. 560-1, p.56 & n.20. Although Runyon respectfully disagrees with the first statement (there is no "declaration requirement" for obtaining an evidentiary hearing), he notes that if an evidentiary hearing had been granted, Paula Dalton would have testified in accordance with her first declaration (ECF No. 511-11), and with the second declaration, attached hereto as Attachment A.

Regarding **Claim 6,**[8] with respect to the allegation that Hudgins' performance was affected by a lack of preparation time, the opinion states: "Hudgins may have felt constrained by the amount of

---

[7] Respondent did not dispute that counsel failed to investigate and present witnesses with knowledge about Runyon's whereabouts at the time of the crime and knowledge that could have provided an alternative explanation for evidence that the prosecution asserted related to the crime. Respondent did not dispute that the defense failed to investigate the prosecution's cell-tower tracking evidence and ballistics evidence. Respondent raised factual issues by proposing hypothetical reasons (contradicted by trial counsel's declarations) for counsel's failure. *See, e.g.,* ECF No. 536, pp.30, 32, 34, 36. Respondent also disputed Runyon's allegations regarding the reliability and validity of the prosecution's testimonial forensic evidence, and re-cast the prosecution's guilt-phase theory. *See, e.g.,* ECF No. 532, pp.4-5; ECF No. 551, pp.31-34.

Regarding **Claim 4,** Respondent created questions of fact when he proposed hypothetical reasons for counsel's failures at the eligibility phase and also disputed the factual proof submitted by Runyon. *See, e.g.,* ECF No. 536, pp.38-40; ECF No. 551, pp.40-42.

Regarding **Claim 5,** Respondent disputed the facts counsel knew or should have known. *See, e.g.,* ECF No. 536, pp.43, 44; ECF No. 551, pp.42-47.

[8] Regarding **Claim 6,** Respondent raised a factual issue about information that counsel provided experts and disputed the facts (and nature of the facts) counsel knew or should have known. *See, e.g.,* ECF No. 536, pp.60, 61-62, 69; ECF No. 551, pp.53-59. Respondent disputed the mitigating

9

**3089**

time he had on the case and the lack of communication with Babineau ... but the fact is that Hudgins joined a team that had already done much work on the case." ECF No. 560-1, p.82. Yet, counsel has, in a sworn declaration, stated that "The time Mr. Babineau spent working on David Runyon's case was not much benefit to me[,]" ECF No. 551-1, p.1 ¶3, indicating that counsel were significantly behind in preparing their mitigation case on the eve of trial and underscoring the need for further inquiry at an evidentiary hearing. This is just one of many factual disputes the Court resolved by providing its opinion as to why trial counsel might or might not have acted, despite counsel having said something contrary in his declaration and without hearing from counsel directly at a hearing.

### Claims 12, 13, 14, 16:

Runyon has alleged other constitutional claims that require redress. For some of the claims below, material factual disputes exist that can only be resolved after an evidentiary hearing. If any of the claims have been defaulted, it is because prior counsel were constitutionally ineffective, and ineffective assistance of counsel may constitute cause for a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Determining whether a procedural default occurred and if so whether "cause" and "prejudice" exist involves factual questions which should be resolved at an evidentiary hearing. *See Barnard v. Collins*, 13 F.3d 871, 878-79 (5th Cir. 1994) (the district court's determination that petitioner did not show "cause and prejudice" "seems premature in the absence of an evidentiary

---

value of mental health evidence that counsel failed to investigate and contests the fact that brain scans of Runyon conducted before trial reveal brain damage. *See, e.g.*, ECF No. 536, p.62 n7. Another fact disputed by Respondent was whether information provided to Runyon's current experts was available at the time of trial. *Id.*, p.72. Finally, Respondent proposed hypothetical reasons (contradicted by trial counsel's declarations among other facts in the record) for counsel's failure to investigate and present mitigation evidence. *See, e.g.*, ECF No. 536, pp.57, 60, 66, 77; ECF No. 551 pp.52-56, 59-60.

10

hearing or other appropriate proceeding" because it is a "fact-intensive inquiry"). *See also Jenkins v. Anderson*, 447 U.S. 231, 234 n.1 (1980).

**Claim 12** asserts a selective prosecution claim and counsel's failure to raise the claim which rely upon facts outside the trial record, including facts related to Claim 2. *See, e.g.,* ECF No. 506-1/511-37, 506-2/511-38; ECF No. 551-5. Respondent did not dispute the facts but asserted Runyon is not entitled to relief. In addition, Runyon requested discovery related to this claim. ECF No. 491, pp.7, 12-15; ECF No. 506, pp.5-10. Runyon made "a credible showing of different treatment of similarly situated persons" and discovery should have been granted. *United States v. Armstrong*, 517 U.S. 456, 470 (1996). Runyon should be afforded the opportunity to present evidence in support of his claim at an evidentiary hearing.

**Claim 13** asserts an Eighth Amendment violation where, under the circumstances of this case, the death penalty is disproportionate and arbitrary and Runyon requested discovery. ECF No. 491, pp.15-21, 35-36; ECF No. 506, pp.11-12. Respondent's defenses to this claim raised issues of fact that should be determined after an evidentiary hearing. *See, e.g.,* ECF No. 551, p.91.

**Claim 14** alleges that the death sentence violates the Eighth Amendment because Runyon is severely mentally ill. Factual development, with respect to other claims in the § 2255 motion involving Runyon's mental state, is relevant to this claim. Runyon also requested discovery. ECF No. 491, pp.35-36; ECF No. 506, pp.11-12, 35-36. He should be provided an opportunity to present evidence establishing his severe mental illness and demonstrating how his execution would violate evolving standards of decency. In addition, Respondent's asserted procedural bar (ECF No. 536, p.129) may be overcome through a showing of ineffective assistance of prior counsel.

**Claim 16** asserts the prosecution impermissibly discriminated in the exercise of peremptory strikes and that counsel was ineffective for failing to raise the issue. This claim relies upon facts outside

11

the record, including the strike lists prepared by the Courtroom deputy, the completed juror questionnaires, and, statistical analysis of the jury selection process based upon Fischer's exact test, and appellate counsel's declaration. *See, e.g.*, ECF No. 511-36, p.1 ¶¶5-7; ECF No. 551, p.109, & 511-5; ECF No. 551, pp.116-17. How the jury was selected, and evidence of Respondent's reasons for its strikes should be resolved at a hearing.

In answer, Respondent raised factual issues, including, Runyon's race and why prosecutors struck female and black jurors. *See, e.g.*, ECF No. 536, pp.146, 148; ECF No. 551, pp.106-07. The reason the Government struck women and blacks is the precise question to be answered in this claim and there is a clear conflict in the evidence before the Court. Runyon asserts an impermissible motive of bias; the Respondent asserts a permissible motive. A hearing should be held to resolve this conflict. *See Williams v. Louisiana*, 136 S.Ct. 2156, 2156 (2016) (Mem.) (remanding for further consideration and admonishing "it does not matter that the prosecutor might have had good reasons; what matters is the real reason [jurors] were stricken") (internal citation and quotation marks omitted).

## IV.   THE OPINION SHOULD BE ALTERED OR AMENDED TO CORRECT LEGAL ERROR.

In **Claim 9**, Runyon argued his conviction for murder with a firearm in relation to a crime of violence, 18 U.S.C. § 924(c), (j), is unconstitutional because it was procured in violation of the Due Process Clause, the Equal Protection Clause, and the Fifth, Sixth, and Eighth Amendments of the Constitution, as set forth in *Johnson v. United States*, 135 S.Ct. 2551 (2015). ECF No. 511, p.88. While *Johnson* focused on the definition of violent felony found in the ACCA, 18 U.S.C. § 924(e), its reasoning applied with equal force to the definition of crime of violence found in 18 U.S.C. § 16(b) and to convictions arising under 18 U.S.C. § 924(c), (j). ECF No. 511, p.90. The Fourth Circuit regularly relies on case law interpreting the ACCA to interpret 18 U.S.C. § 16(b) as well as 18 U.S.C. § 924(c). ECF

12

No. 511, p.90 & n.42. Runyon noted a circuit split had developed on whether *Johnson* applies to convictions arising under 18 U.S.C. § 16(b) and § 924(c)(3)(B). ECF No. 551, pp. 68-69. In particular, in *Dimaya v. Lynch*, 803 F.3d 1110, 1120 (9th Cir. 2015), the court held 18 U.S.C. § 16(b) unconstitutional based on *Johnson.* ECF No. 551, p.68.

The Fourth Circuit has held the language of cases discussed 18 U.S.C. § 16(b) is relevant to cases analyzing § 924(c)(3)(B). *See United States v. Fuertes*, 805 F.3d 485, 500 (4th Cir. 2015); *In re Hubbard*, 825 F.3d 225, 231 n.3 (4th Cir. 2016) (same). Thus, *Dimaya* is persuasive authority. On September 29, 2016, the Supreme Court granted certiorari in *Dimaya. Lynch v. Dimaya*, No. 15-1498, 137 S.Ct. 31 (2016) (Mem.).

The opinion noted there is a circuit split, that the Supreme Court is poised to resolve the circuit split in *Dimaya, supra*, and that the Fourth Circuit has not ruled on the issue "under the principle of constitutional avoidance." ECF No. 560-2, p.139. The opinion also denied the *Johnson* claim because the Supreme Court has not held *Johnson* applies retroactively to cases under § 924(c). *Id.*, p.140.

The Fourth Circuit has held cases in abeyance pending resolution of *Dimaya.* In *United States v. Ali*, the appellant Ali was convicted of carrying or using a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c), among other crimes, and received a sentence of nearly 100 years in prison. Relying in part on *Dimaya*, he argued his Section 924(c) convictions were unconstitutional under *Johnson*. Ali argued that "Because the residual clause in § 16(b) is identical to the residual clause in § 924(c)(3)(B) and precedent for § 16(b) is controlling over § 924(c)(3)(B), the outcome in *Lynch v. Dimaya* should also decide whether the residual clause in § 924(c)(3)(B) is unconstitutionally vague." *United States v. Ali*, No. 15-4433 (4th Cir. Sept. 30, 2016), Unopposed Motion to Hold Case in Abeyance and Suspend Oral Argument, Doc. 81, p.3. The Fourth Circuit

13

**3093**

agreed and is holding the case in abeyance pending the Supreme Court's decision in *Dimaya*. *Ali*, Order filed October 4, 2016, Doc. 82, p.1.

The case of *United States v. Simms*, No. 15-4640 (4th Cir.) is also held in abeyance. *Sims*, Order filed January 12, 2017, Doc. 48, p.1. Sims was convicted of crimes based upon § 924(c) and argued his convictions were unconstitutional, relying in part on *Dimaya*.

Further, at least one district court in this circuit is holding a capital § 2255 motion in abeyance pending resolution of *Dimaya*. *Barnette v. United States*, No. 3:12-cv-327-V, 2016 WL 7175637, at *3 (W.D.N.C. Dec. 8, 2016). The district court found that in the interest of judicial economy, a stay was appropriate. *Id.*

This Court's opinion should be altered to hold this case in abeyance pending the Fourth Circuit's resolution of this issue in light of the anticipated *Dimaya* opinion.

The opinion also stated questions remain over whether *Johnson* would apply retroactively to § 924(c)(3) cases on collateral review. ECF No. 560-2, p.140. Runyon respectfully suggests that *Johnson*, *supra*, and *Welch v. United States*, 136 S.Ct. 1257 (2016), resolved retroactivity as related to the residual clause of the ACCA. Because the crime of violence portion of Section 924(c)(3) is linguistically and analytically similar to the ACCA residual clause definition of crime of violence, and because the Fourth Circuit has held caselaw analyzing the provisions is interchangeable, the reasoning of *Johnson* and *Welch* control the outcome here. In *Johnson*, the Supreme Court narrowed the scope of conduct that could be punished under the residual clause of the ACCA. Similarly, *Johnson* narrows the scope of conduct that is punishable under 18 U.S.C. § 924(c)(3).

The Fourth Circuit has held that claims raised in an initial §2255 proceeding do not require a finding of retroactivity by the Supreme Court. *United States v. Thomas*, 627 F.3d 534, 536-37 (4th Cir. 2010) (noting that appeals courts in the Sixth, Eleventh, Third, Seventh and Fifth Circuits have held

14

**3094**

that a district court may make a retroactivity determination in cases filed pursuant to § 2255(f)(3)). Accordingly, this Court may apply the principles of *Johnson*, *supra*, and *Welch*, *supra*, and find the rule in *Johnson* applies retroactively to Mr. Runyon's case.

With respect to **Claim 11**, Respondent conceded that the statutory aggravating factors were duplicative of the elements of his underlying offense. See ECF No. 536, pp. 116, 41, 40. Absent the statutory factors which were inherent in Runyon's conviction, and with the non-statutory aggravating factors removed from death's side of the scale, there is a reasonable possibility that the balance between death and life imprisonment would have been changed for at least one juror. Accordingly, the opinion should be altered and amended to order that Runyon's sentence of death be vacated and his sentence reduced to life imprisonment.

In Runyon's case, the statutory aggravating factors failed to narrow the class of defendants eligible for the death penalty. It may well be true that the Eighth Amendment permitted California and Louisiana to narrow the class of defendants eligible for the death penalty at a separate eligibility phase prior to the sentencing phase (California) or at the guilt phase (Louisiana). Regardless of where narrowing occurs, however, it must genuinely narrow the class of eligible defendants. *Zant v. Stephens*, 462 U.S. 862, 877 (1983). Narrowing did not occur in this case because the statutory aggravating factors added nothing beyond the elements of the offense.

The California and Louisiana death penalty sentencing schemes narrow in different manner from each other and the FDPA. Under the California sentencing scheme, narrowing occurs when a jury, after first finding the defendant guilty of first degree murder, then finds the presence of one or more eligibility factors. *Tuilaepa v. California*, 512 U.S. 967, 975 (1994). As the Court observed in *Tuilaepa*, the eligibility factor cannot apply to every defendant convicted of the underlying offense. *Tuilaepa*, 512 U.S. at 972. In other words, while every defendant convicted of the underlying offense

15

(*i.e.*, first degree murder) might be sentenced to death, California accomplishes the requisite narrowing by also requiring the jury to find an additional circumstance which "[did] not apply to every defendant" convicted of the same crime. *Id.*

Under the Louisiana sentencing scheme, the class of persons eligible for the death penalty is narrowed by strictly limiting the offenses for which death was an available punishment. Louisiana turned five circumstances into elements of the underlying offense. In doing so, however, Louisiana simply changed when the group of "every defendant" was narrowed to just certain defendants, not whether it occurred. *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988).

In contrast, the FDPA broadly defines capital offenses and provides for narrowing by jury findings of aggravating circumstances at the penalty phase. *United States v. Caro*, 597 F.3d 608, 623 (4th Cir. 2010) (at least one statutory aggravating factor must be established before a death sentence may be considered); *United States v. Higgs*, 353 F.3d 281, 294 (4th Cir. 2003) (a jury is required to find at least one statutory aggravating factor before it can consider whether to impose death).

Respondent has conceded here that the statutory aggravating factors upon which they relied during the eligibility phase of Runyon's capital trial were "inherent" in the underlying offenses. ECF No. 536, pp. 116, 41, 40. Thus, every defendant convicted of those offenses would be eligible for the death penalty. This the Eighth Amendment does not allow. *Zant v. Stephens*, 462 U.S. at 877; *Tuilaepa v. California*, 512 U.S. at 972; *Arave v. Creech*, 507 U.S. at 474.

This Court should alter and amend its January 19, 2017 opinion (ECF No. 560) to hold the aggravating circumstances upon which the Government relied during the eligibility phase of Runyon's capital trial failed to narrow the class of defendants eligible for the punishment of death as required under the Eighth Amendment and order that Runyon's sentence of death be vacated and his sentence reduced to life imprisonment.

16

Even assuming, *arguendo*, the opinion correctly determined "there is a common-sense meaning to the factors, which is easily understood by a jury, and the factors could not fairly apply to every defendant eligible for the death penalty," ECF No. 560-3, p.155, the constitutional prohibition against vague and overbroad aggravating circumstances is based on dual grounds.

The Supreme Court in *Ring v. Arizona*, recognized aggravating factors are to be treated as elements of a capital sentence. *Ring*, 536 U.S. at 609 (citing *Apprendi v New Jersey*, 530 U.S. 466, 494 (2000)). That being the case, it is firmly established that an element of a crime is vague and overbroad when: (1) it fails to provide the trier of fact with sufficient guidance to prevent arbitrary enforcement;[9] or, (2) it fails to provide an ordinary citizen with notice of the consequences of his actions. *United States v. Harriss*, 347 U.S. 612, 617 (1954). The Supreme Court recently confirmed that this requirement extends to notice that past conduct may later be used to enhance the penalty for a later anticipated criminal act. *Johnson*, 135 S.Ct. at 2557.

Here, the vagueness (in fact, the completely indeterminate nature) of non-statutory aggravating circumstances permitted under 18 U.S.C § 3593(a)(2) deprived Runyon of notice at the time he, according to the jury's verdict, killed Cory Voss that such past conduct as "abuse of women" or "military training" (and/or other as-yet-unspecified factors) could be used years later to expose him to the death penalty. The prosecution's use of non-statutory aggravating circumstances of which Runyon did not have notice at the time of the offense violated the "first essential of due process of law." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926).

---

[9] *See Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.")

17

Absent the statutory factors inherent in his convictions and with the non-statutory aggravating factors removed from death's side of the scale, there is a reasonable possibility the balance between death and life imprisonment would have been changed for at least one juror. This Court should alter and amend its opinion to hold the non-statutory aggravating circumstances upon which the death sentence rest violate the Fifth Amendment's prohibition against the use of vague and overbroad factors to enhance a criminal sentence and order that Runyon's sentence of death be vacated and his sentence reduced to life imprisonment.

## V.  THE COURT SHOULD REVISIT, UNDER THE CORRECT STANDARD, WHETHER A CERTIFICATE OF APPEALABILITY SHOULD ISSUE.

A certificate of appealability was denied "for the reasons stated in this Opinion." ECF 560-4, p.241. The opinion denies Runyon's claims on their merits, applying standards different from the standard for granting a certificate of appealability (hereinafter "COA"). To obtain a COA, a movant must make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which is different from showing he should prevail on the merits. *Slack v. McDaniel*, 529 U.S. 473 (2000). In *Slack*, the Court held:

> a COA should issue ... if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

A claim is substantial when it "has some merit," *Martinez*, 132 S. Ct. at 1318.

Runyon will not address the debatability of each of his claims; however, he asserts that all of them present questions of some substance that deserve further review. For example, **Claim 9** presents an issue under *Johnson*, 135 S.Ct. 2551, and is illustrative of a claim that is debatable among jurists of reason. ECF No. 560-2, pp.138-39 (discussing the circuit split in applying *Johnson* outside the ACCA residual clause). The *Johnson* claim is also adequate to deserve encouragement to proceed further; as

18

noted in the opinion, the Fourth Circuit has yet to rule on the issue. *Id.*, p.139. The Fourth Circuit has granted successor status in cases raising the constitutionality of § 924(d) under *Johnson*, and Runyon's claim deserves appellate review.

As another example, **Claim 16** argues that where counsel's ineffectiveness results in structural error (here, the *Batson* error), prejudice is presumed. ECF No. 511, pp.125-26, 131-32. The Supreme Court recently granted a writ of certiorari on this question: "Whether a defendant asserting ineffective assistance that results in a structural error must, in addition to demonstrating deficient performance, show that he was prejudiced by counsel's ineffectiveness?" *Weaver v. Massachusetts*, No. 16-240, 2017 WL 125663 (2017) (Mem.). The Supreme Court's review of the issue demonstrates its debatability among jurists of reason and, therefore, it deserves appellate review.

Accordingly, Runyon respectfully requests that the Court alter or amend its opinion and grant a certificate of appealability on each of his claims.

WHEREFORE, because the Court's Opinion and Judgment is based on mistakes of law and fact, relief under Fed. R. Civ. P. Rule 59(e) is appropriate. In particular, Runyon respectfully asks the Court to provide the following relief:

1. alter, amend and set aside its Opinion and Judgment on all the issues addressed herein; and,

2. grant Runyon an evidentiary hearing; or,

3. reopen the proceedings and grant whatever relief this Court deems just.

19

Respectfully Submitted,

_____/s/_____

Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
 Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: February 16, 2017

20

**3100**

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2017, I have electronically filed the foregoing Memorandum in Support of Motion to Alter or Amend Judgment Under Fed. R. Civ. Pro. 59(e) with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
   Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

21

**3101**

## DECLARATION OF PAULA DALTON

1. My name is Paula Dalton.  I live in Reedsville, West Virginia.

2. I met David Runyon around 2006 when I was living in Morgantown.  This is the second declaration I have signed regarding David Runyon.

3. During 2006-2007, I helped David Runyon by babysitting his son, Davy.  David Runyon owned two cellphones.  He used one for himself and one for Davy. When I took care of Davy, David Runyon gave me one of the phones so we could contact each other while David was away.

4. The only phone number David Runyon gave me to contact him was the number to his other cell phone.

5. The calls I would receive on Davy's phone were only from David Runyon. I am familiar with and recognize David Runyon's telephone voice.  I look at the caller ID to see who is calling when I answer a phone.  This is why I would have noticed if I received a call on Davy's phone that was not from David Runyon.

6. If asked, I would have told David Runyon's trial attorneys the things I've said in this declaration and also would have testified to them at trial.

7. If called to testify at an evidentiary hearing I would testify about the facts in this declaration and my first declaration.  I would also provide any additional details that I am asked about.

**I declare under penalty of perjury that the foregoing is true and correct. Executed on the 4th day of February, 2017.**

_Paula Dalton_
**Paula Dalton**

Attachment A
**3102**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

    Petitioner,

                              CIVIL NO. 4:15cv108
v.                [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

    Respondent.

<u>ORDER</u>

This matter comes before the court on the Petitioner's Motion for Access to Materials Subpoenaed and Filed under Seal ("Motion"), ECF No. 564, and the accompanying Memorandum in Support ("Memorandum"), ECF No. 565, which were both filed on February 1, 2017. The government did not respond, and the time for doing so has expired; the Motion is ripe for review. The Petitioner requests access to the sealed materials referenced in the court's Opinion Denying the Petitioner's Motion to Vacate and the Petitioner's First and Second Motions for Discovery ("Opinion"), issued January 17, 2017, ECF No. 560. Mem. at 1-2.

The Petitioner first requests the FS LAB #T07-4553 forensic records, which the court had subpoenaed from the Virginia Department of Forensic Science and then filed under seal for <u>in</u> <u>camera</u> review by the court. Mem. at 1; <u>see</u> Opinion at 65. The

**3103**

Petitioner previously requested these same records in the Petitioner's Second Motion for Discovery. Mem. at 1-2, n.2; see Second Motion for Discovery, ECF No. 530. The court denied the Petitioner's Second Motion for Discovery. Opinion at 65. The Petitioner's Motion and Memorandum raise no new arguments of merit or substance related to the requested forensic records. The Petitioner cannot make an "end run" around the court's discovery ruling simply by stating that counsel would otherwise be "unable to address those portions of the Opinion that reference the sealed documents." Mem. at 2. Counsel can address the matters discussed in the Opinion on this issue, and access to the sealed documents is not necessary to do so.[1] The court **DENIES** the Petitioner's Motion for Access with respect to the aforementioned forensic records for the same reasons it denied the Petitioner's Second Motion for Discovery.[2]

The Petitioner also requests access to the grand jury testimony of Chad Costa, which was filed ex parte and under seal. Mem. at 2; ECF Nos. 555, 556. Rule 6(e) of the Federal

---

[1] The court has fully reviewed the documents in camera and, to the extent the Petitioner questions this court's review and conclusions thereon, the court of appeals likewise will have full access to the sealed documents for in camera review, if it so chooses.

[2] The Petitioner further requests access to "originals of any photographic materials." Mem. at 2. To the extent these photographic materials are not part of the FS LAB #T07-4553 forensic records, the Petitioner's request is too vague and unclear to be granted.

2

Rules of Criminal Procedure "generally bars disclosure of 'matter[s] occurring before the grand jury.'" United States v. Ahmad, No. 1:14CR164, 2014 WL 2766121, at *3 (E.D. Va. June 18, 2014) (quoting Fed. R. Crim. P. 6(e)(2)) (alteration in original). This general rule is subject to some exceptions, one of which authorizes disclosure "preliminarily to or in connection with a judicial proceeding." See Fed. R. Crim. P. 6(e)(3)(E)(i). However, a party seeking access to grand jury testimony must first "'make a strong showing of particularized need'" for such materials. Redd v. United States, No. 1:97CR6, 2013 WL 6185178, at *2 (E.D. Va. Nov. 26, 2013), aff'd in part, appeal dismissed in part, 559 F. App'x 201 (4th Cir. 2014) (quoting United States v. Sells Eng'g, Inc., 463 U.S. 418, 443 (1983)). The Petitioner has not even alleged, let alone made the required "strong showing," that he has a particularized need for such materials. Accordingly, the court DENIES the Petitioner's Motion for Access to Materials with respect to the grand jury testimony of Chad Costa.

For the reasons stated herein, the Petitioner's Motion for Access to Materials Subpoenaed and Filed under Seal, ECF No. 564, is DENIED. The Petitioner has simply received all documents to which he is entitled, and the court finds no reason to revisit its previous rulings.

**3105**

The Clerk is **DIRECTED** to send a copy of this Order to counsel for the Petitioner and to the United States Attorney at Newport News.

IT IS SO ORDERED.

/s/
Rebecca Beach Smith
Chief Judge

REBECCA BEACH SMITH
CHIEF JUDGE

February 21 , 2017

4

**3106**

PRINTER'S NOTE

JOINT APPENDIX PAGES 3107 – 3110
INTENTIONALLY LEFT BLANK TO AVOID DUPLICATION

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON,<br>Petitioner, | : | No. 4:15-cv-108 |
| | : | Initial Criminal No. 4:08-cr-16-3 |
| v. | : | CAPITAL §2255 PROCEEDINGS |
| | : | |
| UNITED STATES OF AMERICA,<br>Respondent. | : | HON. REBECCA BEACH SMITH |
| | : | |

**THIRD MOTION FOR DISCOVERY
AND CONSOLIDATED MEMORANDUM OF LAW**

David Anthony Runyon, by counsel, hereby files this third motion for discovery pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Equal Protection and Due Process clauses of the Fifth Amendment, and the Eighth Amendment. In this motion Runyon asks for a court order requiring the ATF to release to defense expert, Board Certified Forensic Engineering Scientist John Nixon, Government trial exhibits 5 and 22 (bullets and bullet jackets) so that he may conduct testing to identify the items and the type of weapon which could have fired them. See Attachment A, Nixon Declaration. An order of the Court is necessary for the expert to conduct a forensic examination. As is explained below, this motion is filed soon after ATF's revelation that it has possession of these exhibits. The ATF is willing to permit a visual examination of the evidence at its office in Norfolk, Virginia. ATF is unwilling to relinquish custody of the bullets and bullet jackets to the expert so that he may conduct a forensic analysis. Thus, David Runyon moves this Court for an order directing that exhibits 5 and 22 be released to Nixon for forensic testing.

**3111**

### Procedural History

On October 5, 2015, David Runyon timely filed a motion under 28 U.S.C. § 2255 to vacate his convictions and sentence. ECF No. 478.[1] As relevant to this motion, Claim Three alleges that trial counsel were ineffective for failing to investigate and challenge the Government's ballistic evidence. ECF No. 511, pp. 32-34.

As part of his investigation related to the § 2255 motion, Runyon attempted to locate Government trial exhibits 5 and 22 (the bullets and bullet jacket), which reportedly had been returned to the Government after trial. He began those efforts in late 2015. As of February 2, 2016, the Government advised Runyon's counsel that it was unable to locate these exhibits.

On April 1, 2016, Runyon moved to discover records related to the Government's forensic analysis of its ballistic evidence. ECF No. 530. This discovery motion noted that because exhibits 5 and 22 (bullets and bullet jacket) could not be located, the forensic records were the sole source of information regarding evidence used by the prosecutor to connect Runyon to the crime. The motion discussed indicators that warranted a new review of the evidence. ECF No. 530, p.5 fn.2. In its response, the Government did not contest the fact that the bullets and bullet jacket could not be located. ECF No. 536, pp.34-36.

On July 12, 2016, this Court ordered that a subpoena duces tecum issue directing the Virginia Department of Forensic Science to produce the sought-after records under seal for in camera review by the court. ECF No. 552.

---

[1]Runyon filed an amended §2255 motion on February 4, 2016.  ECF No. 511. Aside from the instant cite to the initial motion, all remaining cites here are to the amended motion.

**3112**

On January 19, 2017, this Court denied Runyon's §2255 motion, as well as his discovery motion related to records generated during testing of the ballistic evidence. ECF No. 560, pp.62-65.

On February 2, 2017, the Government advised Runyon's counsel that the trial exhibits 5 and 22 had been "recently locate[d]." Attachment B, p.4, Email string. Counsel promptly communicated with the Government's counsel and attempted to arrange for independent testing of the recently found evidence. Attachment B, p.3, Email string. The proposed independent testing will be 100% non-invasive, non-destructive, and will not alter the evidence. It is Runyon's understanding that the results of this testing would establish the type of bullets and the type of weapon which could have fired them.

The Government advised Runyon's counsel that it is willing to permit only visual inspection of the bullets and jacket, and that it must be conducted at the ATF office in Norfolk, Virginia. The Government advises counsel that the Norfolk office does not contain a laboratory or any other type of necessary and appropriate examining equipment.

Defense expert John Nixon, who is a board certified forensic engineering scientist, with expertise in ballistics, advises that a visual inspection would not produce any useful information for Runyon's purpose. Nixon's facility for forensic analysis is located in Indiana. He uses specialized testing equipment that is expensive, delicate, bulky, and heavy. Thus, he could not travel to Norfolk, Virginia, with the equipment needed to conduct the necessary evaluation. Attachment A, Nixon Declaration.

In order for necessary testing to be conducted by Runyon's expert, the bullets and bullet jacket must be released to Nixon's facility in Indiana. It is part of Nixon's routine professional

3

**3113**

practice in other cases to receive evidence, to test it, and then to return it to its previous custodian or other designated recipient. During the time the materials are in Nixon's custody, he stores the evidence in a secure vault with permanently monitored electronic security and armed human security. Attachment A, Nixon Declaration.

**Runyon requires a court order to conduct investigation he was unable to perform earlier, through no fault of his own.**

A full discussion of the rules for discovery in Section 2255 cases is set forth in Runyon's first motion for discovery and is incorporated herein. ECF No. 491, pp.2-5. In short, if Runyon demonstrates "good cause" then discovery should be granted. "Good cause" for discovery is established when (1) the movant makes credible allegations of a constitutional violation; and (2) the requested discovery will enable the movant to investigate and prove his claims. *Bracy v. Gramley*, 520 U.S. 899, 904, 908-09 (1997).

There is good cause for independent testing of the bullets and bullet jackets. The testing is relevant to Runyon's Claim 3, which alleges that counsel were ineffective for failing to investigate, present, emphasize and/or argue evidence that created reasonable doubt or supported Runyon's innocence. ECF No. 511, p.21. To prevail on an ineffective assistance of counsel claim, Runyon must demonstrate that counsel's performance was deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 692 (1984). Trial counsel have been found ineffective for failing to investigate and present ballistics evidence that is inconsistent with the prosecution's case. *See, e.g., Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005) (counsel's failure to retain a ballistics expert was prejudicial where the prosecution relied on ballistics evidence); *see also Hinton v. Alabama*, 134 S.Ct. 1081 (2014) (per curiam) (counsel ineffective where his investigation into ballistics evidence was unreasonably limited).

4

Runyon acknowledges this Court denied his previous discovery requests related to the Department of Forensic Science documents created during testing of the bullets and bullet jacket. However, the Government only recently located the bullets and the bullet jackets themselves, and for that reason alone Runyon has not previously requested examination of those items by his own expert.

As noted in Runyon's motion for discovery of evidence related to the forensic ballistics testing, during Runyon's trial, the prosecutor told the jury that the five bullets used in the crime were fired from the same gun and the bullets are "the only evidence that was left behind by the killer." Tr. 218, 7/2/09.[2] The prosecution's theory necessarily relied on ballistics evidence to show a correlation between the five bullets from the crime and a gun owned by Runyon. A forensic examiner from the Virginia Department of Forensic Science, John Willmer, testified that the bullets used in the crime were fired from the same gun. Tr. 362, 7/6/09. The Certificate of Analysis on the bullets generated by James Pickelman from the Virginia Department of Forensic Science was introduced into evidence. Tr. 358, 7/6/09; Gov't Tr. Ex. 23. Four bullets and one bullet jacket and fragment were also introduced into evidence. Gov't Tr. Ex. 5 & 22. Willmer testified the bullets were .38 class and that .38 caliber bullets could be fired from a .357 revolver. Tr. 362, 364, 7/6/09. Testimony and exhibits were introduced to show that Runyon purchased a Taurus .357 revolver the day of the crime and that he pawned the same revolver on separate occasions before his arrest. The prosecution's presentation of Willmer's testimony and proof of Runyon's gun ownership "could not fail to suggest an inference that this was the weapon used to

---

[2] Four bullets and one bullet jacket and fragments were recovered and this is referred to as five bullets.

5

**3115**

commit the offense for which [Runyon] was on trial." *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 845 (4th Cir. 1964).

Defense counsel's performance was deficient due to an inadequate investigation into Runyon's .357 revolver and the prosecution's ballistics evidence. As discussed in Claim 3, counsel failed to investigate and present lay-witness evidence distinguishing the appearance of Runyon's Taurus revolver from the silver or steel, five-shot handgun alleged at trial to be the murder weapon. For example, Chad Costa handled and observed Runyon's .357 and described it as a black, six-shot revolver. ECF No. 511-7, Declaration of Chad Costa.

In addition, the Certificate of Analysis (Gov't Tr. Ex. 23) should have alerted counsel to inconsistencies between the ballistics evidence and Runyon's revolver. An obvious discrepancy is that the government's ballistics evidence does not mention the Taurus brand of .357 revolvers. It states that the bullets were "fired from the same firearm having a barrel rifled with six (6) lands and grooves inclined to the right[.]" Gov't Tr. Ex. 23. It said firearms which produce those characteristics include *.357 Magnum* revolvers "with the brand names Astra and Llama" and include *.38 Special* revolvers "with the brand names Astra, Beistegui, Charter Arms, Llama, Quality Firearms, Rossi and Taurus[.]" *Id.*; *see also* Tr. 369 (Pickelman's report includes .38 special brands of firearms and brands of firearms that can fire .357 magnum cartridges that have those rifling specifications). The fact that the report uses qualifying language, i.e., "not limited to," does not refute the fact that the Government's list of .357 revolvers with these characteristics omitted the Taurus brand. Counsel failed to adequately investigate, cross-examine and/or rebut the testimony of the forensic examiner which was used to connect Runyon's Taurus .357 revolver to the .38 bullets used in the crime.

6

**3116**

Federal Rule of Criminal Procedure16(a)(1)(E) provides that upon request, the government must permit the defendant to inspect tangible objects in its possession if the government intends to introduce the items in its case-in-chief. A "concomitant part of the examination or inspection [is] the right of the accused to have an independent" analysis of the object. *United States v. Butler,* 988 F.2d 537, 543 (5th Cir. 1998) (quoting *United States v. Gaultney,* 606 F.2d 540, 545 (5th Cir. 1979), *rev'd on other grounds sub nom. Steagald v. United States,* 451 U.S. 204 (1981)). "Fundamental fairness is violated when a criminal defendant on trial for his liberty is denied the opportunity to have an expert of his choosing, bound by appropriate safeguards imposed by the Court, examine a piece of critical evidence whose nature is subject to varying expert opinion." *Bernard v. Henderson,* 514 F.2d 744, 746 (5th Cir. 1975).

The Rules governing the filing of section 2255 proceedings contemplate discovery consistent with the Federal Rules of Criminal Procedure, after a finding of good cause. Rules—Section 2255 Proceedings Rule 6(a). *See Hall v. United States,* 30 F. Supp. 2d 883, 899 (E.D. Va. 1998) (same).

On February 16, 2017, David Runyon filed a timely Rule 59(e) Motion to Alter or Amend the Court's order denying relief. ECF No. 566, 567. A Rule 59(e) motion is an appropriate vehicle to consider evidence that was not available to the Court when it issued its decision. *Zinkand v. Brown,* 478 F.3d 634, 637 (4th Cir. 2007) (Rule 59(e) motion is appropriate to "account for new evidence not available at trial") (internal citation and quotation marks omitted).

Trial counsel plainly would have been permitted to have their own expert inspect and examine the evidence the Government introduced at trial. Case law further supports independent

7

**3117**

testing. *Butler, supra.* Testing is necessary here to establish *Strickland* prejudice. In light of the Government's recent disclosure that the evidence finally has been located, this discovery motion is timely filed.

Had counsel investigated the ballistics issue and/or consulted with a ballistics expert, the jurors would have learned of discrepancies between Runyon's .357 revolver and the ballistics evidence. *See Soffar v. Dretke*, 368 F.3d 441, 476 (5th Cir. 2004) *amended on reh'g in part on other grounds*, 391 F.3d 703 (5th Cir. 2004) ("[D]efense counsel were deficient in not seeking out a ballistics expert when there were such readily apparent discrepancies between the ballistics evidence and the State's theory of the case."). The fact that Runyon's gun was not the murder weapon might not have been absolute proof of Runyon's innocence, but had it been made known, "it might well have nurtured, even generated, a reasonable doubt as to guilt." *Barbee*, 331 F.2d at 847. Since no evidence directly places Runyon at the crime scene there is a reasonable probability that at least one juror—presented with evidence that Runyon did not possess the murder weapon—would have found Runyon not-guilty. *Soffar*, 368 F.3d at 478-79 (counsel's failure to consult with a ballistics expert was prejudicial where there was no "clear objective evidence" of guilt as demonstrated through forensics). If these allegations are true, Runyon is entitled to a new trial.

The allegations supporting Claim 3 establish good cause for factual development regarding the independent testing of the bullets and bullet jacket. Additional information "might demonstrate" Runyon is entitled to relief based on trial counsel's ineffectiveness in this aspect of the case. *Hill v. Ozmit*, 339 F.3d 187, 201 (4th Cir. 2003). *See also Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997) (denial of discovery was an abuse of discretion where it may establish

8

**3118**

the prejudice required for an ineffective assistance of counsel claim); *Toney v. Gammon*, 79 F.3d 693, 696 (8th Cir. 1996) (denial of discovery was an abuse of discretion where it was requested to support counsel's ineffectiveness for failing to "highlight lack of evidence linking [the defendant] to the crime").

Here, Runyon seeks independent testing of Government exhibits 5 and 22. As demonstrated above, testing in Virginia is not a viable option. Further, Runyon has diligently attempted to locate the bullets since late 2015. More than one year later, after multiple requests and after this Court denied relief, the Government revealed that it had located the exhibits. Nixon is accustomed to receiving and maintaining ballistic evidence. He is qualified to conduct testing and render a reasoned opinion. The ballistics were a key part of the Government case against Runyon. They should be independently tested.

For these reasons, Runyon requests a court order directing ATF to release and to securely transmit exhibits 5 and 22 (bullets and bullet jacket) to John Nixon, Athena Research & Consulting, so that Nixon may perform non-invasive and non-destructive forensic testing and analysis. The order should further direct Nixon to maintain exhibits 5 and 22 under secure conditions, and at the conclusion of his examination to return these exhibits in a secure manner to the ATF in Norfolk or other specified custodian.

Respectfully Submitted,

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
 Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: February 24, 2017

**3120**

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2017, I have electronically filed the foregoing Third Motion for Discovery and Consolidated Memorandum of Law with the Clerk of Court using the CM/ECF No. system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels, Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Jeffrey A. Zick, Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

Lisa R. McKeel, Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

11

**3121**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,      )
          )
    Petitioner        )    CRIMINAL ACTION NO.: 4:08cr16
          )    CIVIL ACTION NO.: 4:15cv108
v.          )
          )
UNITED STATES OF AMERICA,    )
          )
    Respondent.      )

## RESPONSE OF THE UNITED STATES TO PETITIONER'S THIRD MOTION FOR DISCOVERY AND CONSOLIDATED MEMORANDUM OF LAW

COMES NOW the United States of America, by and through its attorneys, Dana J. Boente, United States Attorney for the Eastern District of Virginia, and Lisa R. McKeel and Brian J. Samuels, Assistant United States Attorneys, and Jeffrey A. Zick, Special Assistant United States Attorney, and submits this Response of the United States to Petitioner's Third Motion for Discovery and Consolidated Memorandum of Law, filed by DAVID ANTHONY RUNYON (hereinafter "Runyon"). (ECF 570).

## I.    Procedural Background

On October 5, 2015, Runyon filed a timely motion under 28 U.S.C. § 2255 to vacate, set aside, or correct a sentence. (ECF 478). Before the United States filed its response to Runyon's Section 2255 motion, he filed a motion for discovery seeking the production of documents, leave to propound interrogatories, and leave to issue subpoenas to third parties. (ECF 491). The United States responded to Runyon's Section 2255 motion on January 11, 2016 (ECF 497), and the discovery motion on January 15, 2016. (ECF 500).

Runyon then filed an amended Section 2255 motion on February 4, 2016. (ECF 511). Again, before the United States responded to the amended motion, Runyon filed a second motion

1

**3122**

for discovery on April 1, 2016, seeking records from the Commonwealth of Virginia Department of Forensic Science related to Claim 3 in his amended Section 2255 motion. (ECF 530). The United States filed its response to the second discovery motion on April 8, 2016, (ECF 532), and Runyon filed a reply on April 13, 2016. (ECF 533). The United States filed its response to Runyon's amended Section 2255 motion on April 22, 2016, (ECF 532), and Runyon filed a reply on July 16, 2016. (ECF 551).

On January 19, 2017, this Court denied Runyon's amended Section 2255 motion. (ECF 560; No. 4:15 CV 108, 2017 WL 253963 (E.D. Va. Jan. 19, 2017)). The Court also denied Runyon's two motions for discovery. *Id.* Runyon filed a timely motion to alter or amend under Rule 59(e) of the Federal Rules of Civil Procedure on February 16, 2017. (ECF 567).

On February 24, 2017, Runyon filed a Third Motion for Discovery and Memorandum of Law. In this motion, Runyon requests an order from the Court requiring the Bureau of Alcohol, Tobacco, Firearms and Explosives (BATFE) to release Government trial exhibits to a defense expert so that forensic testing may be conducted.

## II.   Legal Requirements for Discovery in Section 2255 Proceedings

A habeas petitioner, unlike a traditional civil litigant, is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Although Runyon refers to the Federal Rules of Criminal Procedure in demanding a right to inspect these trial exhibits, the procedural setting has changed. Discovery in the habeas setting can occur only with leave of the Court, upon a showing of good cause. *See* Rule 6(a) of the Rules Governing § 2255 Cases. In other words, a defendant "may invoke the processes of discovery . . . if, and to the extent that, the judge in the exercise of discretion and for good cause shown, grants leave to do so, but not otherwise." *Hall v. United States*, 30 F. Supp.2d 883, 899 (E.D. Va. 1998). "Good cause" for discovery exists when a

2

**3123**

petition for habeas corpus establishes a prima facie case for relief. *See Harris v. Nelson*, 394 U.S. 286, 290 (1969). Specifically, discovery is warranted under Supreme Court and Fourth Circuit precedent, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *See Bracy*, 520 U.S. at 908–09 (citing *Harris v. Nelson*, 394 U.S. 286, 295 (1969)); *United States v. Roane*, 378 F.3d 382, 402–03 (4th Cir. 2004) (affirming denial of multiple discovery requests). In *Roane*, the Fourth Circuit rejected the defendants' argument that the trial judge erred by granting summary judgment on some claims without first permitting discovery. *Roane*, 378 F.3d at 403-04. Particularly applicable here, a request for discovery must rely on specific factual allegations: discovery will not be allowed so that the petitioner can "explore [his] case in search of its existence." *See Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir.1999); *accord, United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990). A defendant may not use discovery to go on a "'fishing expedition' through the Government's files in search of evidence to support an imagined and fanciful claim." *United States v. Lighty*, 2014 WL 5509205, at *3 (D. Maryland Oct. 30, 2014) (citing *Wilson*, 901 F.2d at 381)).

"District courts enjoy nearly unfettered discretion to control the timing and scope of discovery." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 426 (4th Cir. 1996); *see Roane*, 378 F.3d at 403 (reviewing, for abuse of discretion, the denial of discovery in a § 2255 case). Once good cause is shown, the district court has discretion regarding the scope and extent of discovery. *Bracy*, 520 U.S. at 909.

### III.    Runyon Has Failed to Establish Good Cause for Discovery

In his third request for discovery, Runyon again seeks discovery related to the ballistics related evidence introduced at his trial and related to Claim 3 in his amended Section 2255 motion.

3

**3124**

Runyon is not entitled to discovery here because, similar to his prior request for discovery, he cannot establish a prima facie for relief. *Bracy*, 520 U.S. at 908–09.    In his second request for discovery, Petitioner sought a court order requiring the Virginia Department of Forensic Science to release all documents related to forensic services in FS Lab #T07-4553. This request related to the ballistics testing completed on the recovered bullets and bullet jacket, but was denied by the Court in its consideration of Claim 3 of Runyon's amended Section 2255 motion.  (ECF 560-1, 65).

In Claim 3, Runyon contended his trial counsel were ineffective for failing to challenge the scientific validity of John Willmer's testimony and failing to correct the "mis-impression" that the bullets found in this case could have been fired from the gun Runyon purchased on the day of the murder—a Taurus .357 revolver.  Willmer, a forensic firearms and toolmark expert, testified that a microscopic analysis of the bullets recovered from the victim's truck and the bullet jacket and lead fragments recovered from the victim's body, demonstrated that the bullets were fired from the same firearm. TT, pgs. 361–62; GX 23.  The bullets were found to be characteristic of .38 special class bullets, encompassing a couple of calibers together. TT, pg. 362. The analysis also found that "the bullets are characteristic of being revolver ammunition components, and the predominate ammunition component in that caliber is .38 special and .357 magnum revolvers that would be typical of firing this particular bullet with the rifling specifications that it has." *Id.* Because only the bullets were recovered, there was no way to determine whether the ammunition came from .38 special or .357 magnum cartridges, but the ammunition could be used for both the .38 and .357 firearms. *Id.* at 363–64. Willmer testified that that the list of firearms that could have fired the bullets in GX 23 was not all inclusive—there could be other firearms not listed that could

4

**3125**

have fired the bullets in this case. *Id.* at 369–70. In fact, the list of revolvers that are chambered to fire the .38 Special cartridge includes the Taurus brand. *See* GX 23.

On July 12, 2016, the Court ordered that a subpoena *duces tecum* be issued directing the Virginia Department of Forensic Science to produce records for *in camera* review by the Court. (ECF 552). In the Court's order denying Petitioner's Section 2255 motion, the Court also denied Petitioner's second discovery request and rejected the very grounds on which he again offers in support of his third discovery motion. (ECF 560-1, 63 – 65). Contrary to Petitioner's claim that there existed a mis-impression that .38 bullets could have been fired from Petitioner's Taurus .357 because the Certificate of Analysis excluded the Taurus brand of .357 firearms, the Court found that the Certificate did not, in fact, exclude the Taurus .357. (ECF 560-1, 64). The Court also rejected Petitioner's claim that trial counsel was ineffective for failing to hire a ballistics expert and failing to conduct a more thorough cross-examination about the reliability of ballistics tests. (ECF 560-1, 64). The Court found that there was no evidence that trial counsel was unaware of certain ballistics studies and that "[d]ecisions about evidence and expert testimony are vital parts of trial strategy and the court gives much deference to counsel's decisions on these matters." (ECF 560-1, 65). Finally, after the Court reviewed the ballistics records obtained from the Virginia Department of Forensic Science, it found "nothing contrary to the evidence presented at trial." The Court concluded that Runyon had failed to show ineffective assistance of counsel on this ground and also denied the second discovery request. *Id.*

Runyon's third request, although focused on the physical evidence rather than the Certificate of Analysis, truly reiterates the same ground as his second request – the issue of whether trial counsel was ineffective for failing to challenge or investigate the ballistics evidence, which, has been fully reviewed and denied by the Court. In view of the Court's disposition of Claim 3,

5

**3126**

including the Court's *in camera* review of the Virginia Department of Forensic records, Runyon again has failed to show good cause entitling him to discovery. Although Runyon claims that he has hitherto been unaware of and been unable to examine the recovered bullets and jacket introduced as Government Exhibits 5 and 22, his argument is unchanged from his second request for discovery and the result should be the same. The Court has already found that no prejudice exists regardless of the fact that counsel did not challenge the evidence or request copies of the ballistics records. (ECF 560-1, 65). According to Runyon, what should have triggered trial counsel's attention to this issue was the Certificate of Analysis, not the bullets themselves. The Court has already this issue in denying relief on Claim 3.

Contrary to the claim of Petitioner that the Certificate of Analysis should have alerted counsel to inconsistencies between the ballistics evidence and Runyon's revolver, the Court found that no such inconsistencies exist. (ECF 560-1, 64). There was nothing unreliable in the scientific validity of Willmer's testimony, and Runyon again offers no study or evidence that rebuts the validity of the analysis that Willmer or other experts performed on the bullets. Second, there was nothing misleading about Willmer's analysis or testimony. Willmer testified, and the Court also found, that the list of possible firearms on the Certificate of Analysis was not all-inclusive and the Taurus .357 magnum revolver can shoot .38 Special bullets. TT, pg. 370; GX 23. Runyon claims that had counsel investigated the ballistics issue and/or consulted a ballistics expert "the jury would have learned of discrepancies between Runyon's .357 revolver and the ballistics evidence." (ECF 570 at 8). But there simply were no such discrepancies.

Given this evidence, it was reasonable for trial counsel to forgo a more forceful challenge to the ballistics evidence. There was nothing in the Certificate of Analysis that would have prompted an examination of the bullets, to which trial counsel had access to prior to trial. Thus,

6

**3127**

the location of these exhibits now (to which the Certificate of Analysis relates) does not alter the analysis of trial counsel's performance under *Strickland*.

Runyon continues to offer no theory, credible or otherwise, challenging Willmer's testimony. The ballistics evidence was but one small piece of evidence demonstrating Runyon's guilt. Even without the ballistics evidence, the evidence of guilt against Runyon was overwhelming. *See Runyon*, 707 F.3d at 521 ("There is simply no question that Runyon fired five bullets into the body of an innocent naval officer—at close range and in cold blood.") Runyon purchased a .357 handgun with ammunition on the day of the murder, TT, pgs. 843–51; GX 103–103B, which was later pawned by a friend of Runyon's in West Virginia. TT, pgs. 1190–95. A map of Newport News with a description of Corey Voss's vehicle and reference to the location where Voss was eventually murdered was found in Runyon's vehicle along with a photograph of Draven and Cat Voss and their social security numbers. TT, pgs. 1025–30, 1324– 26; GX 214 and 215. In Runyon's former residence, agents found a box of Winchester .357 magnum hollow point bullets with five missing from the box. TT, p. 1044; GX 236 and 237. There were numerous phone calls and emails between Runyon, Draven and Cat Voss establishing their relationship, the murder-for-hire scheme and its cover-up. GX 159–173A.

Runyon again fails to demonstrate that trial counsel fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 690. Likewise, as the Court found in its treatment of Claim 3, Runyon fails to show prejudice resulting from counsel's alleged error. *Id.* at 693. Given the mountain of evidence demonstrating guilt, Runyon cannot show a reasonable likelihood that the result of his trial would have been different had trial counsel more fully challenged the ballistics evidence or conducted an independent examination of the bullets. This Court should deny Runyon's third discovery request because there is no reason to believe that he "may, if the facts

7

**3128**

are fully developed, be able to demonstrate that he is entitled to relief." *Bracy*, 520 U.S. at 908–09.

## III.    CONCLUSION

In this request, Runyon continues to attempt "to explore [his] case in search of its existence." *See Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir.1999); *accord, United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990). For the reasons herein, as well as the Court's own analysis of the matters pertaining to Claim 3, to which this request also pertains, the Court should deny Petitioner's third request for discovery.

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____/s/_____

Lisa R. McKeel
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph:  (757) 591-4000
Fax: (757) 591-0866
Email: Lisa.McKeel@usdoj.gov

By: _____/s/_____

Brian J. Samuels
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph:  (757) 591-4000
Fax: (757) 591-0866

**3129**

Email: Brian.Samuels@usdoj.gov

By:_____/s/_____

Jeffrey A. Zick
Special Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
21 Lakefront Commons
Newport News, Virginia 23606
Phone: 757/591-4000
Fax: 757/591-0866
Email: Jeffrey.Zick@usdoj.gov

9

**3130**

## CERTIFICATE OF SERVICE

I certify that on March 31, 2017, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system.  I further certify that I caused a true and correct

copy of the foregoing to be mailed to the following non-ECF user:

**Michele Jill Brace**
Virginia Capital Representation Resource Center
2421 Ivy Rd., Suite 301
Charlottesville, VA  22903
Ph:  434-817-2970, 202-223-6380
Email: mbrace@mindsort.com

**Dana Catherine Hansen Chavis**
Federal Defender Services of Eastern Tennessee, Inc.
800 S. Gay St, Suite 2400
Knoxville, TN  37929
Ph:  (865) 637-7979
Fax:  (865) 637-7999
Email:  dana_hansen@fd.org

By: _____/s /_____
        Brian J. Samuels
        Assistant United States Attorney
        Attorney for the United States
        United States Attorney's Office
        Fountain Plaza Three, Suite 300
        721 Lakefront Commons
        Newport News, Virginia 23606
        Phone: 757-591-4000
        Fax: 757-591-0866
        Email: Brian.Samuels@usdoj.gov

**3131**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| | ) | |
| Petitioner | ) | CRIMINAL ACTION NO.: 4:08cr16 |
| | ) | CIVIL ACTION NO.: 4:15cv108 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**ADDENDUM TO RESPONSE OF THE UNITED STATES TO PETITIONER'S**
**MOTION TO ALTER OR AMEND UNDER FED. R. CIV. P. 59(e) AND**
**PETITIONER'S MOTION IN ABEYANCE**

COMES NOW the United States of America, by and through its attorneys, Dana J. Boente, United States Attorney for the Eastern District of Virginia, and Lisa R. McKeel and Brian J. Samuels, Assistant United States Attorneys, and Jeffrey A. Zick, Special Assistant United States Attorney, and submits this Addendum to the Response of the United States (ECF 573) to Petitioner's Motion to Alter or Amend the Judgment under Fed. R. Civ. P. 59(e) (ECF 567) and Motion to hold Petitioners' Rule 59 (e) in Abeyance (ECF 569), filed by DAVID ANTHONY RUNYON ("Petitioner").

In submitting its Response to the Petitioner's Rule 59(e) Motion on March 31, 2017, the United States does not waive any *Teague* retroactivity arguments that were previously offered in its Response to the Petitioner's amended Section 2255 motion, which Response was filed on April 22, 2016. (ECF 536). Specifically, as to Claim 9 of his amended Section 2255 motion that is addressed further in the Response to the Rule 59(e) motion, the United States submits that

1

**3132**

Petitioner's argument is barred under the retroactivity analysis set forth in *Teague v. Lane*, 489 U.S. 288, 310 (1989).

<div style="margin-left: 40%;">

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____/s/_____

Lisa R. McKeel
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph: (757) 591-4000
Fax: (757) 591-0866
Email: Lisa.McKeel@usdoj.gov

By: _____/s/_____

Brian J. Samuels
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph: (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov

By:_____/s/_____

Jeffrey A. Zick
Special Assistant United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
21 Lakefront Commons
Newport News, Virginia 23606
Phone: 757/591-4000
Fax: 757/591-0866
Email: Jeffrey.Zick@usdoj.gov

</div>

2

**3133**

## CERTIFICATE OF SERVICE

I certify that on March 31, 2017, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system who will send notice of such filing to the following

ECF users:

**Michele Jill Brace**
Virginia Capital Representation Resource Center
2421 Ivy Rd., Suite 301
Charlottesville, VA  22903
Ph:  434-817-2970, 202-223-6380
Email: mbrace@mindsort.com

**Dana Catherine Hansen Chavis**
Federal Defender Services of Eastern Tennessee, Inc.
800 S. Gay St, Suite 2400
Knoxville, TN  37929
Ph:  (865) 637-7979
Fax:  (865) 637-7999
Email:  dana_hansen@fd.org


By: _____/s /_____
    Brian J. Samuels
    Assistant United States Attorney
    Attorney for the United States
    United States Attorney's Office
    Fountain Plaza Three, Suite 300
    721 Lakefront Commons
    Newport News, VA 23606
    Ph:  (757) 591-4000
    Fax: (757) 591-0866
    Email: Brian.Samuels@usdoj.gov

3

**3134**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

DAVID ANTHONY RUNYON,           )
                                )
    Petitioner,                 )    No. 4:15-cv-108
                                )    Original Criminal No. 4:08-cr-16-3
    v.                          )    CAPITAL §2255 PROCEEDINGS
                                )    HON. REBECCA BEACH SMITH
UNITED STATES OF AMERICA,        )
                                )
    Respondent.                 )

## PETITIONER'S REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO THIRD MOTION FOR DISCOVERY

Runyon submits this brief reply to the Government's opposition to his third discovery motion that requests access to the bullets and bullet jacket for non-destructive examination by his expert. ECF No. 570, Third Motion for Discovery.

The conclusory argument in opposition that "[t]here was nothing unreliable about the validity" of the analysis performed on the bullets or the trial testimony (ECF No. 574, p.6) contradicts the Justice Department's acknowledgment that there are wide-spread testimonial inaccuracies of forensic examiners, including firearms/ballistics examiners. ECF No. 533, pp.4-5. Runyon previously provided scholarship and studies on the unscientific nature of ballistics and toolmark comparison and testimony. ECF No. 533, pp.3-5 & ECF No. 533-1, 533-2 and 533-3. The declaration of John Nixon addresses issues regarding the testimony presented in Runyon's case. ECF No. 545-1; see also ECF No. 530, pp.4-5 (discussing inaccuracies in the forensic evidence presented at his trial).

The Government states that the discovery request should be denied for the same reasons that the Court previously denied discovery of the ballistics examination records and denied Runyon's IAC claim based on deficiencies regarding the ballistics evidence. Counsel is unable to

**3135**

address those rulings without access to the information relied upon by the Court. See ECF Nos.

564 & 565 (motion for access).

Respectfully Submitted,

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
  Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: April 6, 2017

2

**3136**

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2017, I have electronically filed the foregoing Petitioner's Reply to the Government's Response in Opposition to Third Motion for Discovery filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov


_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
   Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

3

**3137**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

      Petitioner,

                                  CIVIL NO. 4:15cv108
v.                    [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

      Respondent.

## RECORD NOTATION ORDER

This matter comes before the court on the Notice of Supplemental Authority filed by the Petitioner on June 6, 2017. ECF No. 581.[1] Said supplemental authority is noted for the record and requires no action on the part of this court.[2] All previous Opinions, Orders, and rulings of the court remain in full force and effect, with attendant appellant deadlines running.

The Clerk is **DIRECTED** to send a copy of this Record Notation Order to counsel for the parties.

---

[1] The United States responded to the Notice of Supplemental Authority on June 8, 2017. ECF No. 582. See infra note 2 and accompanying text.

[2] The court has already ruled on the Petitioner's Rule 59(e) Motion in its Memorandum Order of April 27, 2017, ECF No. 579, and the court agrees with the United States that the Supreme Court's decision to grant review in Carpenter v. United States, No. 16-402, 2017 WL 2407484 (June 5, 2017) is not applicable to, and has no effect on, this court's resolution of the Petitioner's Rule 59(e) Motion.

3138

IT IS SO ORDERED.

/s/
Rebecca Beach Smith
Chief Judge

REBECCA BEACH SMITH
CHIEF JUDGE

June 16, 2017

2

**3139**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

    Petitioner,

                                           CIVIL NO. 4:15cv108

v.                            [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

    Respondent.

## ORDER

This matter comes before the court on the Petitioner's "Unopposed Emergency Motion for Relief under Federal Rule of Civil Procedure 60(b), Seeking Withdrawal" and incorporated Memorandum of Law ("Emergency Rule 60(b) Motion"), ECF No. 584, and the Petitioner's Motion to Expedite Ruling on the 60(b) Motion ("Motion to Expedite"), ECF No. 585, both filed on June 20, 2017.

I.

On April 27, 2017, the court issued a Memorandum Order denying the Petitioner's Rule 59(e) Motion. ECF No. 579. The clerk erroneously entered the court's Memorandum Order of April 27, 2017, on a court-only docket drive, as opposed to a public access docket drive. Consequently, copies of the Memorandum Order were not electronically distributed to counsel

**3140**

for the Petitioner and the United States Attorney, as reflected on the clerk's docket entry. See ECF No. 579. Moreover, the public docket did not show the substance or date of entry of the Memorandum Order of April 27, 2017, as required by Rule 79.[1] As a result, neither the United States nor the Petitioner had access to or received notice of the Memorandum Order of April 27, 2017.

On June 6, 2017, believing that a previous Rule 59(e) Motion, ECF No. 566, remained pending, the Petitioner filed a Notice of Supplemental Authority. ECF No. 581. On June 16, 2017, the court issued a Record Notation Order, ECF No. 583, stating that it had already ruled on the Rule 59(e) Motion in its Memorandum Order of April 27, 2017. On June 19, 2017, counsel informed the clerk that the Memorandum Order of April 27, 2017, was neither visible nor accessible on the public docket, and that they had not received the Memorandum Order. On the afternoon of June 19, 2017, the clerk immediately corrected the error and made the Memorandum Order of April 27, 2017, publicly available.

II.

The court now **DIRECTS** the clerk specifically to re-enter the Memorandum Order of April 27, 2017, on the public docket

---

[1] Federal Rule of Civil Procedure 79(a)(3) requires that docket entries "show . . . the substance and date of entry of each order."

2

**3141**

with a new, separate docket entry.[2] See generally Correll v. Thompson, 63 F.3d 1279, 1285 n.3 (4th Cir. 1995). The court DISMISSES the Petitioner's Emergency Rule 60(b) Motion, ECF No. 584, and the Petitioner's Motion to Expedite, ECF No. 585, as MOOT. The Clerk is DIRECTED to send a copy of this Order to counsel for the Petitioner and to the United States Attorney at Newport News.

IT IS SO ORDERED.

/s/
Rebecca Beach Smith
Chief Judge

REBECCA BEACH SMITH
CHIEF JUDGE

June 21, 2017

---

[2] As set out by Federal Rule of Appellate Procedure 4(a), "A judgment or order is entered for purposes of this Rule 4(a) . . . when the judgment or order is entered in the civil docket." Fed. R. App. P. 4(a)(7). The clock limiting the time for filing a notice of appeal runs from the date of entry of an order. Fed. R. App. P. 4(a)(1).

3

**3142**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

      Petitioner,

                                        CIVIL NO. 4:15cv108
   v.                      [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

      Respondent.

## MEMORANDUM ORDER

This matter comes before the court on the Petitioner's Motion to Alter or Amend Judgment under Federal Rule of Civil Procedure 59(e) ("Rule 59 Motion") and accompanying Memorandum in Support, filed on February 16, 2017. ECF Nos. 566, 567. On January 19, 2017, the court issued an Opinion denying, among other motions, the Petitioner's Motion to Vacate under § 2255. ECF No. 560 ("§ 2255 Opinion"). The § 2255 Opinion is the subject of the instant Rule 59 Motion.

Additionally, on February 22, 2017, the Petitioner filed a Motion to Hold Petitioner's Rule 59(e) Motion in Abeyance and Incorporated Memorandum in Support. ECF No. 569 ("Abeyance Motion"). On February 24, 2017, the Petitioner filed a Third Motion for Discovery and Consolidated Memorandum of Law. ECF No. 570 ("Discovery Motion"). On March 31, 2017, after being granted

**3143**

an extension of time to file, the government filed its Responses to the Petitioner's Rule 59 Motion, Abeyance Motion, and Discovery Motion. ECF Nos. 573, 574. The Petitioner filed a Reply to the government's Response to the Discovery Motion on April 6, 2017. ECF No. 576. The Rule 59 Motion, Abeyance Motion, and Discovery Motion are ripe for review. For the reasons below, the court **DENIES** the Rule 59 Motion (ECF No. 566), Abeyance Motion (ECF No. 569), and Discovery Motion (ECF No. 570).

<div align="center">I.</div>

The Abeyance Motion requests that the court hold the Rule 59 Motion in abeyance pending resolution of <u>Sessions v. Dimaya</u>, 137 S. Ct. 31 (2016) (granting certiorari). At a threshold level, <u>Dimaya</u> is inapplicable, as it concerns the constitutionality of 18 U.S.C. § 16(b), which is not a controlling issue in the Petitioner's Rule 59 Motion and was not a controlling issue in the Petitioner's Motion to Vacate under § 2255. <u>See</u> § 2255 Opinion at 138-39. Moreover, the Abeyance Motion is perplexing in and of itself. The Petitioner appears to argue that the court should hold his Rule 59 Motion in abeyance pending <u>Dimaya</u>, but part of the Rule 59 Motion asks the court to amend its § 2255 Opinion in order to hold the Petitioner's § 2255 Motion in abeyance pending <u>Dimaya</u>. <u>See</u> Rule 59 Mot. at 1. Thus, the court could not hold the § 2255 Motion in abeyance

<div align="center">2</div>

<div align="center">**3144**</div>

without first amending the § 2255 Opinion under Rule 59, which necessitates denial of the Abeyance Motion. However, finding no good reason to hold the Petitioner's Rule 59 Motion in abeyance,[1] the court **DENIES** the Petitioner's Abeyance Motion and considers the Petitioner's Rule 59 Motion.

The Petitioner's Rule 59 Motion requests the court to alter or amend its § 2255 Opinion. There are three grounds for amending a judgment under Federal Rule of Civil Procedure 59(e): "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." Hutchinson v. Staton, 994 F.2d 1076, 1081 (4th Cir. 1993). "A Rule 59(e) motion is not intended to allow for reargument of the very issues that the court has previously decided." DeLong v. Thompson, 790 F. Supp. 594, 618 (E.D. Va. 1991), aff'd, 985 F.2d 553 (4th Cir. 1993). Parties may not use Rule 59(e) "to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the

---

[1] The court further observes that, if the Petitioner's Rule 59 Motion were meritorious, and, as the Petitioner claims, the court had actually committed manifest errors of law and fact, there would be no reason to hold either the Rule 59 Motion or the § 2255 Motion in abeyance. The Petitioner's argument for abeyance is nonsensical and "smacks" of an attempt to delay and convolute these proceedings, thereby increasing the costs of unnecessary protracted litigation.

**3145**

first instance." Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998). A Rule 59(e) motion is not warranted by "'mere disagreement with the court's ruling.'" United States v. Carter, No. 3:15cv161, 2016 WL 1752761, at *4 (E.D. Va. Apr. 29, 2016), aff'd, No. 16-1689, 2016 WL 6123513 (4th Cir. Oct. 20, 2016) (quoting Smith v. Donahoe, 917 F. Supp. 2d 562, 572 (E.D. Va. 2013)). Nor does Rule 59(e) provide "'an unhappy litigant one additional chance to sway the judge.'" Id. (quoting Durkin v. Taylor, 444 F. Supp. 879, 889 (E.D. Va. 1977)).

The Petitioner states that he "is not re-presenting every allegation of error," and instead "only addresses those issues that demonstrate a manifest error of law and fact, or present a manifest injustice." Mem. Supp. at 1. However, the Petitioner's Memorandum in Support "is no more than an expression of a view of the law contrary to that set forth in the [c]ourt's opinion." Durkin, 444 F. Supp. at 889. Accordingly, the court "has no proper basis upon which to alter or amend the [Opinion] previously entered." Id. The Petitioner cannot use Rule 59 as a platform to argue line by line with the court's § 2255 Opinion, as he attempts to do. Simply put, the Petitioner is attempting to use the Rule 59 Motion to reargue issues already decided by the court, and it raises no new matters of merit or substance to warrant Rule 59 relief.

4

**3146**

**A.**

First, the Petitioner argues that "the court committed legal error in denying the Amended 2255 Motion without the benefit of an evidentiary hearing." Mem. Supp. at 2. The Petitioner asserts that the denial of an evidentiary hearing was "a manifest error of law because it does not comport with the applicable legal standards for when such a hearing must be granted." Id. The Petitioner goes on to allege that the court "also committed legal error by making determinations despite the existence of material factual disputes." Id. at 2-3. He requests that the court "reconsider its opinion denying an evidentiary hearing." Id. at 3. Evidentiary hearings are not required under § 2255, if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; see United States v. Witherspoon, 231 F.3d 923, 925 (4th Cir. 2000). The court previously found that no material factual disputes remained and, thus, that no evidentiary hearing was necessary to resolve the Petitioner's claims. § 2255 Opinion at 24, n.10.

The Petitioner argues that certain "specific allegations—if true—entitled [Runyon] to relief." Mem. Supp. at 5. However, the Petitioner's speculative theories are not issues of fact that require an evidentiary hearing. Hypothetical musings such as that Agent Posey "may have converted firearms or ammunition

5

**3147**

that was confiscated from Runyon," that "[h]e may have falsified transcriptions of recorded conversations or otherwise altered or fabricated evidence," see Amended Motion to Vacate, ECF No. 511, at 15, or that Ford could theoretically file false reports in order to obtain bribe money, see id. at 12-13, for example, are not properly considered factual disputes.[2] It was, and remains, clear from the record that the Petitioner was not entitled to relief, and no evidentiary hearing was, or is, necessary. Because the court finds no manifest injustice or error of law or fact in its resolution of these claims, the court DECLINES to alter or amend its § 2255 Opinion based on the Petitioner's argument that an evidentiary hearing was required.

### B.

The Petitioner's next argument is that "the opinion should be altered or amended to correct legal error." Mem. Supp. at 12. The Petitioner argues that the "opinion should be altered to hold this case in abeyance pending the Fourth Circuit's resolution of this issue in light of the anticipated Dimaya opinion"[3] and that the § 2255 Opinion should also be altered "to hold the aggravating circumstances upon which the Government

---

[2] The Petitioner did not see fit to address every issue that he classifies as a "significant factual dispute," see Mem. Supp. at 5, and thus, the court finds no reason to address all of them individually, particularly when it already dealt with these issues in detail in its § 2255 Opinion.

[3] See supra Part I at 2-3.

6

**3148**

relied . . . failed to narrow the class of defendants . . . as required under the Eighth Amendment." Id. at 14, 16. The Petitioner expresses disagreement with the court's application of the law, and requests that the court alter or amend its ruling accordingly. However, this disagreement of law is not a sufficient basis for a Rule 59(e) motion, but rather a ground for appeal. The Petitioner's Rule 59(e) Motion raises no new matters of merit or substance in this argument. Because the court finds no legal error in its resolution of these claims, the court DECLINES to alter or amend its § 2255 Opinion based on the Petitioner's argument of legal error.

### C.

Finally, the Petitioner argues that "the court should revisit, under the correct standard, whether a certificate of appealability should issue." Id. at 18. In so doing, he states that he "will not address the debatability of each of his claims." Id. The court agrees that the test for certificates of appealability is not whether the claim is meritorious, but rather, that the issue is debatable among jurists of reason. See Buck v. Davis, 137 S. Ct. 759, 777 (2017). In cases "[w]here a district court has rejected the constitutional claims on the merits," 28 U.S.C. § 2253(c) requires the petitioner to "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or

7

**3149**

wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). In those cases where "the district court denies a habeas petition on procedural grounds," the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Id.</u>

The Petitioner has made no such showing. The court declined to issue a certificate of appealability for the numerous reasons outlined in the § 2255 Opinion. The court thoroughly evaluated each of the Petitioner's claims in its § 2255 Opinion, and it painstakingly explained in detail the many deficiencies of the Petitioner's claims. In this case, the deficiencies were so great that they left no room for reasonable debate. The Petitioner's claims were neither meritorious nor debatable, and, in this court's assessment, no jurist of reason could disagree with the court's resolution of them. Accordingly, the court **DECLINES** to alter or amend its § 2255 Opinion to grant a certificate of appealability.

## II.

In the Discovery Motion, the Petitioner requests an order directing that bullets and bullet jackets be released to the Petitioner's expert for forensic testing. Discovery Mot. at 1. The Petitioner's Discovery Motion makes no factual allegations

8

**3150**

to support the request. The Petitioner now seeks discovery of evidence not previously requested—bullets and bullet jackets instead of the previously requested ballistics documents—to support the Petitioner's argument in Claim Three of his § 2255 Motion. Discovery Mot. at 4. In § 2255 proceedings, a judge may authorize discovery, if the petitioner shows good cause. § 2255 Rule 6; see Hall v. United States, 30 F. Supp. 2d 883, 899 (E.D. Va. 1998). Here, the Petitioner has not shown good cause, but instead has made a request that amounts to an impermissible "fishing expedition." See Hall, 30 F. Supp. 2d at 900.

The Petitioner protests that "[c]ounsel is unable to address [the court's] rulings without access to the information relied upon by the [c]ourt." Reply at 1-2. However, the purpose of a Rule 59(e) motion is not to "address" the court's ruling. This court's § 2255 Opinion is not a pleading to which the Petitioner is entitled to respond line by line, nor is the court an opposing party whose assertions entitle the Petitioner to discovery. The court's § 2255 Opinion is a ruling, and a Rule 59(e) Motion is a request that the court alter or amend such a ruling, not an invitation to rehash arguments rejected by the court. Indeed, much of the argument in the Petitioner's Discovery Motion is identical to that of a previously denied discovery motion. Compare Discovery Motion, ECF No. 570, at 5-8, with Second Motion for Discovery, ECF No. 530, at 3-6. The

9

**3151**

Petitioner has not shown good cause for further discovery, and, thus, the Discovery Motion is **DENIED**.

### III.

The court issued its § 2255 Opinion on January 19, 2017, ECF No. 560, addressing in detail all grounds raised by the Petitioner, even including frivolous ones such as ineffective assistance of appellate counsel for not using a smaller font so as to be able to raise more grounds on direct appeal, even though appellate counsel used a font approved by the Fourth Circuit Court of Appeals and the United States Supreme Court. § 2255 Opinion at 132-133. The collateral review is completed in this court and the case is now ripe for appeal, without further tactics of delay and repetition, thereby impeding resolution of the matter and increasing costs and fees.[4]

The Petitioner's Rule 59 Motion, Abeyance Motion, and Discovery Motion are **DENIED**. The court declines to issue a certificate of appealability for the reasons stated herein, and in the § 2255 Opinion. The Clerk is **DIRECTED** to send a copy of this Memorandum Order to counsel for the Petitioner and to the United States Attorney at Newport News.

---

[4] _See supra_ note 1.

IT IS SO ORDERED.

/s/
Rebecca Beach Smith
Chief Judge

REBECCA BEACH SMITH
CHIEF JUDGE

April 27, 2017

**3153**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| Petitioner, | ) | No. 4:15-cv-108 |
| | ) | Original Criminal No. 4:08-cr-16-3 |
| v. | ) | |
| | ) | CAPITAL §2255 PROCEEDINGS |
| UNITED STATES OF AMERICA, | ) | HON. REBECCA BEACH SMITH |
| Respondent. | ) | |

## PETITIONER'S UNOPPOSED MOTION TO EXPAND THE RECORD

Petitioner David Runyon, by counsel, hereby moves to expand the record to ensure that all documents in this case are included in the record on appeal. Counsel for the government does not oppose this motion. Ex. A. Runyon's motion is based on communications with the Clerk's Office for the Fourth Circuit Court of Appeals. The clerk's staff advised counsel that the record on appeal is limited to items that were placed on the district court's docket. According to the clerk, if an item does not have a docket number, it is not considered part of the record on appeal.

At least one issue that Runyon expects to appeal relies on juror questionnaires from his capital trial. This Court granted Runyon's motion for access to the juror questionnaires and to the lists of peremptory strikes. ECF No. 422. Although this Court provided the parties' attorneys with paper copies of the juror questionnaires, *see* ECF No. 427, it is undersigned counsel's understanding that the questionnaires do not have a docket number. By contrast, the peremptory strike lists were made a part of the record on appeal because this Court put them on the docket. ECF No. 424. On inquiry, the clerk's office of this Court previously advised Runyon's counsel that there is no docket number for the juror questionnaires. To ensure that the questionnaires are included in the record on appeal, Runyon hereby moves the Court to expand the record to include the juror questionnaires (under seal).

**3154**

This Court also provided the parties' counsel with materials relating to jury selection, including redacted copies of certain master jury wheels and qualified jury wheels, a statistical breakdown of the grand jury, a statistical breakdown of the individuals drawn for the petit jury venire, and a list of reasons for any disqualifications, excusals, or exemptions from the petit jury venire. ECF No. 475. These materials were provided to counsel on CD or on paper, *see* ECF No. 486, and there is no indication that any of them were given a docket number. To ensure that these materials are included in the record on appeal, Runyon hereby moves the Court to expand the record to include these materials (under seal).

WHEREFORE, Runyon asks the Court to expand the record so these materials are included in the record on appeal.

Respectfully Submitted,

_____/s/_____

Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
 Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: August 18, 2017

2

**3155**

CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2017, I have electronically filed the foregoing PETITIONER'S UNOPPOSED MOTION TO EXPAND THE RECORD using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817 2970
Fax (434) 817 2972

3

**3156**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

DAVID ANTHONY RUNYON,          )
      Petitioner,                )          No. 4:15-cv-108
                                 )          Original Criminal No. 4:08-cr-16-3
      v.                         )
                                 )          CAPITAL §2255 PROCEEDINGS
UNITED STATES OF AMERICA,       )          HON. REBECCA BEACH SMITH
      Respondent.                )

### PETITIONER'S UNOPPOSED MOTION TO PERMIT THE COPYING AND DISTRIBUTION OF PROTECTED DOCUMENTS

Counsel for Petitioner David Runyon acknowledged, in ECF Nos. 431-1 and 486-1, that she received certain documents from this Court, including juror questionnaires and jury selection records, and that "no copies–paper, electronic, or otherwise–are to be made of these materials." Counsel for the United States acknowledged the same. In an abundance of caution, Runyon now moves the Court to permit him to copy those materials for subsequent legal proceedings. Counsel for the government does not oppose this motion with respect to use for appeal. Ex. A.

Fed. R. App. P. 30(a) requires counsel for the appellant to prepare and file an appendix to the briefs containing, *inter alia*, the "parts of the record to which the parties wish to direct the court's attention." Either party may designate documents covered by ECF Nos. 431-1 and/or 486-1 for inclusion in the appendix. To comply with Rule 30(a), Runyon may need to make copies of at least some of these documents. For example, Runyon's lead counsel customarily uses a commercial legal printer in Richmond for appellate briefs and appendices. If the appendix in Runyon's case is prepared by such a printer, counsel will need to make paper or electronic copies of protected documents in order to transmit them to the printer. Counsel also will have to authorize the printer to make both paper and electronic copies of the appendix as needed for filing in the court of appeals. *See* Fourth Circuit Local Rule 30(b)(4). Even if counsel prepares the appendix

**3157**

in-house, this will involve making and filing both paper and electronic copies of documents covered by ECF Nos. 431-1 and/or 486-1.

Although the Court may not have intended its prohibition to extend to copies made for use in subsequent legal proceedings, it would be imprudent for Runyon's counsel to simply assume that ECF Nos. 431-1 and 486-1 do not mean precisely what they say: "no copies–paper, electronic, or otherwise." Consequently, Runyon's counsel ask the Court to clarify that both parties may copy the protected documents for use on appeal.[1]

WHEREFORE, Runyon asks the Court to clarify that the parties may copy documents referenced in ECF Nos. 431-1 and 486-1 for use on appeal.

<div align="right">

Respectfully Submitted,

_____/s/_____

Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
 Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: August 18, 2017

</div>

---

[1] Runyon presumes that all documents referenced in ECF No. 431-1 and ECF No. 486-1 are, or will be, sealed by this Court. Consequently, any copies of these documents that are used will be printed in a sealed volume of the appellate appendix.

CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2017, I have electronically filed the foregoing PETITIONER'S UNOPPOSED MOTION TO PERMIT THE COPYING AND DISTRIBUTION OF PROTECTED DOCUMENTS using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817 2970
Fax (434) 817 2972

3

**3159**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

DAVID ANTHONY RUNYON,       )
                                     )
      Petitioner,           )     No. 4:15-cv-108
                                     )     Original Criminal No. 4:08-cr-16-3
      v.                     )     CAPITAL §2255 PROCEEDINGS
                                     )     HON. REBECCA BEACH SMITH
UNITED STATES OF AMERICA,    )
                                     )
      Respondent.         )

### NOTICE OF APPEAL

COMES NOW the Petitioner, David Anthony Runyon, by and through counsel, and hereby gives notice of his intention to appeal to the United States Court of Appeals for the Fourth Circuit the following rulings of the United States District Court for the Eastern District of Virginia:

1.     The Judgment (ECF No. Doc. 561) entered on January 20, 2017, and the attendant Opinion (ECF No. 560) entered on January 19, 2017, denying Petitioner's Amended Motion to Vacate under 28 U.S.C. §2255; and,

2.     The Memorandum Order (ECF No. 587) denying Petitioner's timely Motion to Alter or Amend Under Fed. R. Civ. P. 59(e), which the District Court signed on April 27, 2017, but did not enter until June 21, 2017, *see* explanatory Order (ECF No. 586).

The District Court denied a certificate of appealability ("COA"), and Runyon plans to request that the Fourth Circuit grant a COA on multiple issues. *See* Fed. R. App. P. 22(b) & Fourth Circuit Local Rule 22(a)(2).

**3160**

Respectfully Submitted,

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana C. Hansen Chavis, *pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
 Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

Dated: August 18, 2017

2

**3161**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2017, I have electronically filed the foregoing NOTICE OF APPEAL using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Jeffrey A. Zick
Special Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4000
Fax (757) 591-0866
Jeffrey.Zick@usdoj.gov

_____/s/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

3

**3162**

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Newport News Division

|  |  |  |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| Petitioner, | ) | No. 4:15-cv-108 |
|  | ) | Original Criminal No. 4:08-cr-16-3 |
| v. | ) | |
|  | ) | CAPITAL §2255 PROCEEDINGS |
| UNITED STATES OF AMERICA, | ) | HON. REBECCA BEACH SMITH |
| Respondent. | ) | |

## <u>ORDER</u>

Upon the motion of the Petitioner, DAVID ANTHONY RUNYON, by and through his attorneys, and with the agreement of the Government, by and through its counsel, it is hereby,

ORDERED that:

1. The record on appeal in this matter is hereby expanded to include the following documents:

 a. The completed questionnaires of all prospective jurors who returned a questionnaire prior to the Petitioner's trial. See Order at 3, ECF No. 422.

 b. The following documents related to selection of the grand and petit juries for Petitioner's trial: (1) a CD of the 2005 and 2007 Master Jury Wheels for Newport News and Norfolk in .txt format, with Social Security Numbers and addresses redacted; (2) a CD of the 2005 and 2007 Qualified Jury Wheels for Newport News and Norfolk in .txt format, with Social Security Numbers, addresses, and phone numbers redacted; (3) a statistical breakdown of the grand jury by race, gender, and age; (4) a statistical breakdown of the individuals drawn for the petit jury venire by race, gender, and age; and (5) a list of the reasons for any disqualifications, excusals, or exemptions from the petit jury venire, and the race, gender, and age of

1

**3163**

those individuals, but omitting any personal identifying information. See Order at 15, ECF No. 475.

The Court has previously provided each of the above-listed documents to the parties' counsel on CD or on paper. See Certifications, ECF Nos. 431 and 486. The parties agree that this stipulation ensures that the documents are within the scope of the record on appeal, as that term is defined in Fed. R. App. P. 10(a) and in Fourth Circuit Local Rule 10(d). Thus, these documents will be available to both parties and to the Court of Appeals for use on appeal, as needed.

2. The parties agree that if either of them designates a listed document for inclusion in the Joint Appendix on appeal, the volume of the Appendix containing that document must be filed under seal.

The Clerk is directed to send a copy of this Order to counsel for the Petitioner and to the United States Attorney at Newport News.

IT IS SO ORDERED.

/s/
Rebecca Beach Smith
Chief Judge

Rebecca Beach Smith
Chief Judge

September 15, 2017

We ask for this:

2

3164

_____/s/_____

Michele J. Brace
Virginia Bar No. 36748
Senior Staff Attorney
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Phone: (434) 817 2970
Fax: (434) 817 2972
Email: mbrace@mindsort.com
*Counsel for David Anthony Runyon*


Dana C. Hansen Chavis
*Pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
  Eastern Tennessee. Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Phone: (865) 637 7979
Fax: (865) 637-7999
E-mail: Dana_Hansen@fd.org
*Counsel for David Anthony Runyon*

_____/s/_____

Lisa R. McKeel
Virginia Bar No. 28652
Assistant United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: (757) 591-4000
Fax: (757) 591-0866
Email: Lisa.McKeel@usdoj.gov
*Attorney for the United States of America*


_____/s/_____

Brian J. Samuels
Virginia Bar No. 65898
Assistant United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov
*Attorney for the United States of America*


_____/s/_____

Jeffrey A. Zick
Special Assistant United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: (757) 591-4000
Fax: (757) 591-0866
Email: Jeffrey.Zick@usdoj.gov
*Attorney for the United States of America*

3

**3165**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| Petitioner, | ) | No. 4:15-cv-108 |
| | ) | Original Criminal No. 4:08-cr-16-3 |
| v. | ) | |
| | ) | CAPITAL §2255 PROCEEDINGS |
| UNITED STATES OF AMERICA, | ) | HON. REBECCA BEACH SMITH |
| Respondent. | ) | |

## ORDER

Upon the motion of the Petitioner, DAVID ANTHONY RUNYON, by and through his attorneys, and with the agreement of the Government, by and through its counsel, it is hereby,

ORDERED that:

1. Notwithstanding the Court's prior direction to the parties that they make "no copies—paper, electronic, or otherwise" of certain documents, the Court recognizes that the parties may make paper and electronic copies of these documents as necessary for appeal. It is the Appellant's responsibility to prepare and file the Appendix on appeal. Fed. R. App. P. 30(a). If either party designates listed documents for the Appendix, it will be necessary for Runyon's counsel to make copies of those documents in order to provide them to a commercial legal printer if one is used, to authorize the printer to print copies of those document in the Appendix, to file both paper and electronic copies of the Appendix in the quantities ordered by the court of appeals, and to serve paper copies of the sealed volumes on all counsel of record.

2. The listed documents, which the parties were previously directed not to copy at all, and which the Court agrees they may copy as necessary for appeal, are as follows:

    a. The completed questionnaires of all prospective jurors who returned a questionnaire prior to the Petitioner's trial. See Order at 3, ECF No. 422.

**3166**

b. The following documents related to selection of the grand and petit juries for Petitioner's trial: (1) a CD of the 2005 and 2007 Master Jury Wheels for Newport News and Norfolk in .txt format, with Social Security Numbers and addresses redacted; (2) a CD of the 2005 and 2007 Qualified Jury Wheels for Newport News and Norfolk in .txt format, with Social Security Numbers, addresses, and phone numbers redacted; (3) a statistical breakdown of the grand jury by race, gender, and age; (4) a statistical breakdown of the individuals drawn for the petit jury venire by race, gender, and age; and (5) a list of the reasons for any disqualifications, excusals, or exemptions from the petit jury venire, and the race, gender, and age of those individuals, but omitting any personal identifying information. See Order at 15, ECF No. 475.

The parties agree that each of these documents are, and must be treated as being, under seal. If they are reprinted in an Appendix or other pleading, the parties agree that the volume or pleading will be filed under seal.

The Clerk is directed to send a copy of this Order to counsel for the Petitioner and to the United States Attorney at Newport News.

IT IS SO ORDERED.

/s/
Rebecca Beach Smith
Chief Judge
Rebecca Beach Smith
Chief Judge

September 15, 2017

We ask for this:

2

**3167**

_____/s/_____

Michele J. Brace
Virginia Bar No. 36748
Senior Staff Attorney
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Phone: (434) 817 2970
Fax: (434) 817 2972
Email: mbrace@mindsort.com
*Counsel for David Anthony Runyon*


Dana C. Hansen Chavis
*Pro hac vice*
Asst. Federal Community Defender
Federal Defender Services of
  Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Phone: (865) 637 7979
Fax: (865) 637-7999
E-mail: Dana_Hansen@fd.org
*Counsel for David Anthony Runyon*

_____/s/_____

Lisa R. McKeel
Virginia Bar No. 28652
Assistant United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: (757) 591-4000
Fax: (757) 591-0866
Email: Lisa.McKeel@usdoj.gov
*Attorney for the United States of America*


_____/s/_____

Brian J. Samuels
Virginia Bar No. 65898
Assistant United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov
*Attorney for the United States of America*


_____/s/_____

Jeffrey A. Zick
Special Assistant United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Phone: 757/591-4000
Fax: 757/591-0866
Email: Jeffrey.Zick@usdoj.gov
*Attorney for the United States of America*

3

3168