# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Respondent-Appellee, | ) | No. 17-5 |
| | ) | |
| v. | ) | **Death Penalty Case** |
| | ) | |
| DAVID ANTHONY RUNYON | ) | |
| Petitioner-Appellant. | ) | |

## APPELLANT'S APPLICATION FOR
## A CERTIFICATE OF APPEALABILITY

Petitioner David Runyon requests that the Court grant him a certificate of appealability ("COA") with respect to each issue detailed below and in his opening brief, and to order full merits briefing.

## STATEMENT OF THE CASE

This is an appeal of the denial of Runyon's 28 U.S.C. §2255 motion to vacate, set aside, or correct a sentence. Runyon is filing his opening brief and appendix concurrently with this COA request. Runyon incorporates his opening brief here by reference.

In the United States District Court for the Eastern District of Virginia, Runyon was convicted and sentenced to death on each of two courts: conspiracy to commit murder for hire, and murder with a firearm in relation to a crime of violence. He was sentenced to life imprisonment on a third count: carjacking resulting in death. This

Court upheld his convictions and sentences on direct review, *U.S. v. Runyon*, 707 F.3d 475 (4th Cir. 2013).

In collateral proceedings, Runyon presented 18 claims for relief, many with multiple parts. The district court denied each claim without granting discovery or an evidentiary hearing. At its conclusion, the court's opinion included this single sentence: "The court declines to issue a certificate of appealability for the reasons stated in this Opinion." J.A.3064.

In a Rule 59(e) motion, Runyon called to the court's attention that it used an incorrect standard when it denied a COA based solely on its view of the merits of the claims. J.A.3098-99. In denying the 59(e) motion, the court clarified the standard, but then denied a COA for largely the same reason as before:

> The court declined to issue a certificate of appealability for the numerous reasons outlined in the §2255 Opinion. The court thoroughly evaluated each of the Petitioner's claims in its §2255 Opinion, and it painstakingly explained in detail the many deficiencies of the Petitioner's claims. In this case, the deficiencies were so great that they left no room for reasonable debate. The Petitioner's claims were neither meritorious nor debatable, and, in this court's assessment, no jurist of reason could disagree with the court's resolution of them.

J.A.3150. Runyon asks this Court for a COA.

## STANDARD FOR A CERTIFICATE OF APPEALABLITY

To obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). If the claim is denied on procedural grounds, a COA should issue if the applicant shows: (1) "that jurists of reason would

find it debatable whether the petition states a valid claim of the denial of a constitutional right" and (2) "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). A COA must be granted if it appears that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Id.* at 484 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)).

A determination to grant a COA does not require, and in fact forbids, "full consideration of the factual or legal bases adduced in support of the claims." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). Instead, the relevant inquiry "is the debatability of the underlying constitutional claim, not the resolution of that debate." *Id.* at 342. "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. Because (i) each claim for which Runyon seeks appellate review involves a substantial showing of the denial of a constitutional right; (ii) the district court's resolution of the claims is debatable among jurists of reason; and (iii) further consideration should be encouraged, a COA should issue and the Court should fully consider the merits of these claims.

## ARGUMENT

1. **Reasonable jurists could debate whether Runyon's conviction under 18 U.S.C. §924(c) is unconstitutionally vague under the reasoning in *Johnson v. U.S.*, 135 S. Ct. 2551 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).**

*Johnson* held that the residual clause of the Armed Career Criminal Act, 18 U.S.C. §924(e), is unconstitutionally vague. Based on *Johnson*'s reasoning, Runyon's §2255 motion alleged that the residual clause in §924(c) also is unconstitutionally vague.[1] This issue has been hotly contested, with inconsistent results. *See U.S. v. Graham,* 824 F.3d 421, 424 n.1 (4th Cir. 2016) (en banc) (describing division in circuits on whether *Johnson* made §924(c) residual clause void for vagueness). The Court subsequently granted certiorari in *Sessions v. Dimaya* to determine "Whether 18 U.S.C. 16(b) . . . is unconstitutionally vague." The language in §16(b) is identical to that in §924(c). Thus, the grant of certiorari in *Dimaya* underscored that the constitutionality of §924(c) was debatable among jurists of reason. Both parties' merits briefs in *Dimaya*, and at least one amicus brief, referred to §924(c). That statute also came up briefly on January 17, 2017, at the first *Dimaya* oral argument.[2] Two days later, the district court issued its opinion in Runyon's case, denying his *Johnson* claim and denying a COA.

---

[1] Runyon's jury heard evidence on two potential predicate offenses—one under §924(c)(3)'s residual clause and one under its force clause—and was instructed that finding one predicate was sufficient. The verdict does not identify the jury's choice. Because the verdict is indeterminate, courts must presume the jury selected the predicate more favorable to Runyon.

[2] Following Justice Scalia's death, the Court ordered reargument in *Dimaya*.

The Supreme Court subsequently held in *Dimaya* that §16(b) is unconstitutionally vague, adding great weight to claims like Runyon's. In fact, the Court remanded 27 pending certiorari petitions for consideration in light of *Dimaya.* This group included 12 petitions challenging the constitutionality of the language in §924(c): seven in §2255 proceedings and five on direct appeal. *See* Defender Services Office news, May 15, 2018, https://www.fd.org/news/supreme-court-grants-vacates-and-remands-27-cases-light-sessions-v-dimaya. Runyon's claim remains debatable among jurists of reason, and it merits a COA from this Court.

**2. Reasonable jurists could debate whether the district court erred when it denied Runyon's claims without discovery and an evidentiary hearing.**

The district court held Runyon failed to prove *Brady*, *Batson*, and ineffective assistance claims, while simultaneously denying him the means and opportunity to do so. It denied an evidentiary hearing in circumstances where reasonable jurists could debate whether 18 U.S.C. §2255(b) mandated a hearing. *See Machibroda v. U.S.*, 368 U.S. 487, 494-95 (1962); *U.S. v. White*, 366 F.3d 291, 302 (4th Cir. 2004). It denied discovery where reasonable jurists could debate whether Runyon's allegations show good cause to believe he may be able to demonstrate entitlement to relief. *See Bracy v. Gramley*, 520 U.S. 899, 904, 908-09 (1997); *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998). Reasonable jurists also could debate the propriety of the court conducting its own investigation into the facts of some claims, refusing to disclose the fruits of its

investigation, but relying on those fruits in denying relief. This Court should grant a COA.

Length limitations preclude discussing here all the factual disputes adversely affected by these rulings. As illustrations, Runyon briefly highlights three examples and refers the Court to the broader discussions in his brief.

First, in connection with an ineffective assistance claim, Runyon alleged that trial counsel failed to investigate and challenge evidence that Michael Draven (a codefendant) was the shooter and thus more culpable than Runyon. At trial, a government expert had appeared to exclude that theory, testifying that cell phone tower data showed Draven was moving *away* from the crime scene at the relevant time. But Runyon's post-conviction cell phone tower expert disagreed, identifying errors and misinformation in the trial testimony. J.A.2809. Contrary to §2255(b), the court did not hold an evidentiary hearing to assess credibility or resolve disputed facts. It simply "decline[d] to conclude that counsel was deficient based on one declaration by an *alleged* expert, when a qualified expert testified at trial and was fully questioned by both parties." J.A.2881 (emphasis added). Reasonable jurists could dispute the court's denial of an evidentiary hearing.

Second, in connection with a *Batson* claim, Runyon cited *Miller-El v. Cockrell*, 537 U.S. 322 (2003), and moved for discovery of historical data and materials in the prosecutors' office. He also cited *Foster v. Chatman*, 136 S. Ct. 1737 (2016), and sought the prosecution's jury selection notes from Runyon's trial. None of this information

was available to the defense except by discovery. The court recognized this kind of evidence can be pivotal, and found it significant that the prosecutor's office in *Miller-El* "had a history of excluding African Americans from the jury, and even had a formal written policy on the matter that was used until 1976." J.A.3028. Yet it denied discovery because it deemed Runyon's "statistics and video clip" insufficient to show good cause.[3] Reasonable jurists could debate whether Runyon was entitled to this discovery.

Third, Runyon moved to discover ballistics records at the Virginia Department of Forensic Science (DFS). After reviewing the trial evidence, Runyon's post-conviction firearms expert executed a declaration questioning the government expert's conclusions. Runyon's expert questioned whether the shots were all fired from the same gun, he identified discrepancies regarding the caliber of the bullets, and because the bullets themselves were unavailable, he said he needed to review the government analyst's bench notes. J.A.2651. In response, the court subpoenaed the DFS records for *in camera* review. It then denied discovery and Runyon's post-conviction claim, saying "the court finds nothing contrary to the evidence presented at trial," J.A.2888. Runyon promptly moved to inspect the DFS documents the court had seen; his motion was

---

[3] The prosecution struck 70% of qualified African-American jurors, and a statistical analysis shows only a 2.6% likelihood those strikes were independent of the juror's race. The "video clip" is the police interrogation videotape the prosecutors introduced at trial, which conveyed "stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act," and contained statements that were "capable of inflaming jurors' racial or ethnic prejudices." *Runyon*, 707 F.3d 475, 493-94 (4th Cir. 2013).

denied. J.A.3103. Reasonable jurists could debate the court's denial of discovery, its *in camera* investigation, and its denial of Runyon's claim based on information it refused to reveal.

**3.      Reasonable jurists could debate whether counsel rendered ineffective assistance by failing to investigate and present evidence about Runyon's brain damage and mental health.**

What we now know about Runyon's brain injuries and mental illness is remarkable: traumatic brain damage from a combination of blast and impact injuries (related to his military service), automobile accidents, and physical abuse inflicted in childhood by Runyon's biological father; major psychotic disorders—some from external causes and some potentially genetic—including Post-Traumatic Stress Disorder (PTSD), psychosis (possibly schizophrenia), and delusional disorders. His executive functioning and decision-making are impaired. Courts recognize this—even less than all of this—is the kind of mitigating evidence that can significantly influence a jury's appraisal of moral culpability. *See Porter v. McCollum*, 558 U.S. 30, 41 (2009); *Sears v. Upton*, 561 U.S. 945, 949 (2010); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 261-63 (2007); *Rompilla v. Beard*, 545 U.S. 374, 392 (2005).

This also is the kind of evidence defense counsel were looking for. Yet they abruptly abandoned a mental health investigation, even failing to provide brain scans to their experts. As detailed in Runyon's brief, this course was unreasonable and indefensible, "particularly in light of what counsel actually discovered." *Porter*, 558 U.S. at 39.

This Court has warned against "conjur[ing] up tactical decisions [the] attorney could have made, but plainly did not." *Tice v. Johnson*, 647 F.3d 87, 105 (4th Cir. 2011). The district court supplied explanations for counsel's deficiencies, even when they contradicted counsel's sworn declaration. A strategy cannot be justified "when counsel did not fulfill their obligation to conduct a thorough investigation." *Sears*, 561 U.S. at 953-54. For the many reasons identified in Runyon's brief, reasonable jurists could debate whether counsel's failure to investigate and present evidence of brain damage and mental illness fell below the norms of professional performance, and whether prejudice resulted.

**4.      Reasonable jurists could debate whether the prosecution withheld evidence that substantially supported Runyon's sentencing defense, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).**

The centerpiece of Runyon's case for life was that he is no more culpable than his codefendants. Cat Voss, who conceived the plot to kill her husband, was offered and accepted a plea for life. The government declined to seek death for Draven, who managed and coordinated the plot's execution, and who allegedly recruited Runyon. To show Runyon was more deserving of death, the government asserted that Runyon had a history of abusing women, and in aggravation it introduced Runyon's misdemeanor assault conviction for grabbing his wife's arm and poking her nose. Jurors found the "equally culpable codefendants" mitigator, but considered it an insufficiently weighty basis to sentence Runyon to life.

In post-conviction proceedings, Runyon obtained a trove of evidence—possessed by the government but never disclosed to Runyon's trial counsel—that Draven had an extensive history of violent criminal conduct including sexual assaults of children and of a developmentally delayed 15-year-old; pedophilia and institutionalization for child sexual assault; second-degree assaults; and physical, emotional, and sexual abuse of girlfriends. Less than a year before Cory Voss' death, Draven beat his then-girlfriend, slapped a knife on her legs and arms, and poked the knife at her vagina. She reported that he previously broke her finger, threatened to kill her in a sadistic manner, and threatened to have her family "burned to death." Runyon's history of violence against women paled in comparison.

The district court acknowledged the government's failure to disclose this information, but called it a "red herring" because jurors had found the "equally culpable co-defendant" mitigator without knowing Draven's history. J.A.2864. Reasonable jurists could debate the district court's decision because in selecting the appropriate sentence, jurors can give mitigating factors whatever weight they deem appropriate, and here the undisclosed evidence was weighty in Runyon's favor. If informed, sentencing jurors also could have considered the fact that Cory Voss' death gave Draven unlimited access to Voss' two young children. If the government had provided Runyon's counsel with the evidence of Draven's violent and predatory history, there is a reasonable probability this would have altered the moral balance, and at least one juror would have voted for life.

The court also said this *Brady* claim was defaulted because "information about Draven's past existed during the time of direct appeal." J.A.2860. Reasonable jurists would see the error in this ruling, because the test of whether an error can be considered for the first time on direct appeal is not whether the information "existed," but whether the facts were in the record of Runyon's trial. *Waley v. Johnston*, 316 U.S. 101, 104 (1942). They were not. To show the information existed, the district court cited a sealed document on Draven's individual docket, J.A.2860, but that document—whatever it may be—was not publicly available and was never part of Runyon's trial record. The factual basis for this claim was first revealed through post-conviction counsel's investigation. It was not available to Runyon's trial counsel for purposes of raising it on direct appeal. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

**5. Reasonable jurists could debate whether counsel rendered ineffective assistance at the guilt phase of trial by failing to investigate, present, highlight, and/or argue evidence of Runyon's innocence.**

Further contrary to the warning in *Tice*, the district court theorized reasons for a number of defense counsel's acts or failures to act, rather than granting discovery or an evidentiary hearing to resolve the facts. Runyon's brief reports multiple instances of this nature, where counsel failed to investigate, present, highlight, or argue evidence of Runyon's innocence, and the court hypothesized reasons why counsel may have acted or failed to act. Individually or in aggregate, reasonable jurists could debate the court's denial of these allegations. Two are highlighted here.

First, the government asked jurors to infer that Runyon intended to kill Cory

Voss, and traveled to Newport News to do so, based on three items: a map of Newport

News with handwritten notes and a photo of Draven and Cat Voss, both found in the

console compartment of Runyon's truck, and a handwritten list of items found at

Runyon's house. Reasonable investigation by the defense would have shown that the

photo was irrelevant. It was taken after the crime, when Draven and Cat were on

vacation spending Navy death benefit proceeds. J.A.787. Thus, it was irrelevant to

Runyon's actions or intent before the crime. Information on the map was in Draven's

handwriting, J.A.2080, but there was no evidence it was written before the crime or that

Runyon had the map before Voss' death.[4]

Counsel unreasonably failed to inform jurors that the timing of the

photograph—and likely timing of the map—made it irrelevant as proof of intent or of

travel. Contrary to *Tice*, the district court theorized that "[c]ounsel may have thought

these writings to be highly prejudicial to the Petitioner, and chose to avoid highlighting

the document." J.A.2885.

The list, J.A.1395, also was irrelevant. There is no evidence when the list was

made; or that Runyon ever acquired anything on the list; and or that anything on the

---

[4] After Voss' death, Cat had difficulty collecting on her husband's life insurance because of the ongoing police investigation. Knowing Runyon had law enforcement training, Draven called him to discuss how the investigation could be resolved.  It would be completely consistent with Runyon's innocence for Draven to have sent him a marked-up map, and provided other public details about the crime, so Runyon could intelligently respond to Draven's questions.

list—which included trashbags, contacts, and dress socks—was associated with Voss's murder.[5] Witnesses were available who could confirm this read like an ordinary shopping list for items consistent with Runyon's normal activities and lifestyle. See, e.g., J.A.2022. Counsel failed to present this exculpatory information, and allowed the government to characterize the list as something nefarious. J.A.545-46. Reasonable investigation would have rebutted the government's argument that there was "a checklist for killing[.]" J.A.788.

The court disagreed. It said that "[c]ounsel may have thought these writings to be highly prejudicial to the Petitioner, and chose to avoid highlighting the [list]." J.A.2885. It was improper for the court to make this determination without granting a hearing because the record does not support it.

Second, one of the strongest arguments for Runyon's innocence is evidence that he could not have been in Newport News at 11:33 p.m. on April 29, 2007, when Voss was killed there. Runyon lived in Morgantown, West Virginia—a 6-hour drive from Newport News. He owned two cell phones. He used one for himself and gave the other to his son Davy or to the sitter, Paula Dalton, when she was caring for Davy, so the three could remain in contact. J.A.1877. Runyon's phone incurred no roaming charges

---

[5] The government argued that one item on the list—a black hoodie—was relevant because an ATM photograph shows a person wearing a hoodie entering the victim's truck. The photograph actually depicts a shadow.

on April 29, meaning no outgoing calls were placed from beyond West Virginia. Runyon's last call on April 29 was at 8:37 p.m., to his second cell phone. J.A.1380.

At trial, the prosecution called Dalton to testify. Because defense counsel had failed to interview Dalton about the phones and otherwise conduct a reasonable investigation, counsel did not know that when Dalton answered Davy's phone, the calls were always from Runyon, whose voice she knew; and that the only phone number Runyon gave her to contact him was his main cell phone. J.A.3102.

In post-conviction proceedings, Runyon alleged that counsel failed to conduct an adequate investigation, and that competent counsel would have discovered and elicited from Dalton this powerful alibi evidence about Runyon's location. The court denied the claim and denied an evidentiary hearing, summarily refusing to credit Runyon's allegations about the phone and to interpret the facts in his favor.[6]

Reasonable jurists could debate the district court's decision to deny Runyon an evidentiary hearing where he would have presented such proof, while refusing to credit Runyon's allegations and interpret facts in his favor. *U.S. v. King*, 679 F. App'x 297, 299 (4th Cir. 2017); *U.S. v. White*, 366 F.3d 291, 302 (4th Cir. 2004). This is especially so in light of the court's speculation that, because trial counsel asked the government's cell phone witness about roaming charges on Runyon's phone, counsel "could have

---

[6] The district court said it "cannot assume [Dalton] would have testified [at an evidentiary hearing] to something based solely on a conclusory statement of the Petitioner" in his §2255 motion. J.A.2879.

reasonably decided not to ask additional questions about Petitioner's cell phone use to another witness," *i.e.* Dalton. J.A.2880.

**6.      Reasonable jurists could debate whether prosecutors discriminated in exercising their peremptory strikes, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and whether Runyon's counsel unreasonably failed to challenge the strikes.**

The details of Runyon's fact-intensive *Batson* claim are in his brief. Significant highlights include the following:

Runyon is Asian; the crime was interracial.  The government struck 70 percent of the qualified black veniremembers and 29 percent of the nonblack members. Mathematical analysis shows, at a statistically significant level, that the peremptory strikes of African-Americans would not have occurred by happenstance. And at the time of voir dire, prosecutors intended to put into evidence a videotape in which police officers interrogated Runyon and "conveyed what were, frankly, stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act." *Runyon*, 707 F.3d at 494.

The government claimed in post-conviction proceedings that it struck these black veniremembers for only one reason: their response to a multiple-choice item on the juror questionnaire regarding views about the death penalty. This justification was pretextual. A side-by-side comparison shows that on the government's sole criterion, two nonblack veniremembers were permitted to serve although they held positions the same as, or more hostile to the government than, the seven struck black members.

15

*Miller-El v. Dretke*, 545 U.S. 231, 255 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination").

The postconviction court rejected a *Batson* violation, stating that Runyon failed to make a prima facie showing of discrimination. J.A.3028-29. Reasonable jurists could debate whether Runyon's evidence met the low threshold of supporting "*an inference* of discrimination." *Johnson v. California*, 545 U.S. 162, 170 (2005). Reasonable jurists also could debate whether the court should have addressed the prima facie issue at all, because once the government responds to a *Batson* challenge by identifying reasons for its strikes, as it did here, this Court treats considers the prima facie question moot. *U.S. v. Dinkins*, 691 F.3d 358, 380 n.17 (4th Cir. 2012); *Kandies v. Polk*, 385 F.3d 457, 474, 494 (4th Cir. 2008).

The postconviction court also rejected Runyon's contention that the government's reason for its strikes was pretextual. J.A.3028. It based this on Runyon's failure to identify a discriminatory government statement. Reasonable jurists could debate whether such a statement is essential to proving a *Batson* claim. They also could debate whether, if a statement is necessary, the officers' statements in the interrogation video satisfied that requirement.

The court alternatively found this claim defaulted. It said trial counsel's failure to challenge these strikes did not constitute cause for the default because "the government was not striking an inordinate amount of African American[s]." J.A.3033. It also

theorized, again contrary to *Tice*, that counsel might have had their own reason to want these African-Americans excluded. Reasonable jurists could debate whether striking 70% of the African-Americans is inconsequential, when striking even one prospective juror for discriminatory purpose is unconstitutional. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). Reasonable jurists also could debate whether the court reasonably relied on counsel's hypotheticized desire to exclude these jurors.

The court also said Runyon's new appellate counsel could have avoided default by raising the unpreserved *Batson* issue on appeal. Jurists of reason could debate whether objective factors, external to the defense, prevented this. Deficits in the trial record hid all trace of a *Batson* violation. The transcript does not identify who was struck or by whom. The strike lists and juror questionnaires (which revealed veniremembers' race) were held administratively, not docketed, and not accessible. The court said new appellate counsel could have requested the strike list and questionnaires "had they thought a *Batson/J.E.B.* claim would be meritorious." J.A.3020. Reasonable jurists could debate whether, without already having the strike lists and questionnaires, appellate counsel could even suspect a *Batson* violation, much less represent it would be meritorious. Even if new appellate counsel obtained these documents, reasonable jurists could debate whether this Court could consider a *Batson* claim on appeal when the relevant facts were outside the record as defined in Rule 10(a).

7. **Reasonable jurists could debate whether the penalty phase jury instructions unconstitutionally lowered the government's burden of proof.**

Jurors were instructed they could sentence Runyon to death if aggravating factors "sufficiently outweigh" mitigating factors. On direct appeal, Runyon asserted that *Ring v. Arizona*, 536 U.S. 584 (2003), and the Fifth and Sixth Amendments, require courts to instruct jurors they may impose a death sentence only if aggravating factors outweigh mitigating factors "beyond a reasonable doubt." This Court rejected the argument. *Runyon*, 707 F.3d at 516. Runyon's §2255 motion raised the same constitutional allegation, but cited *Hurst v. Florida*, 136 S. Ct. 616 (2016), as intervening law that compels such instruction.

*Hurst* moved the analysis beyond factors that affect an increase in punishment, and indicated that the Sixth Amendment reaches "each fact necessary to impose a sentence of death." 136 S. Ct. at 619. Courts declining to discuss this distinction characterize the jury's decision (that aggravators outweigh mitigators) not as a factor necessary to impose the death penalty, but as a "moral judgment" about how to punish a defendant who is death-eligible. *See Runyon*, 707 F.3d at 515. But classifying a sentencing factor as a "moral judgment" is inconsistent with *Hurst*.

The Court struck down the sentencing scheme in *Hurst* not only because the decision was made by a judge, but also because the weighing decision itself was a fact necessary to impose a death sentence. *See Chinn v. Jenkins*, No. 3:02-cv-512, 2017 WL 631412, at *2 (W.D. Ohio Feb. 13, 2017)(*Hurst* Court held relative weight of aggravating and mitigating circumstances is a question of fact that must be found before death sentence can be imposed); *Davis v. Bobby*, No. 2:10-CV-107, 2017 WL 4277202, at *3

(S.D. Ohio Sept. 25, 2017)("the correct reading of *Hurst* is that the relative weight of aggravating circumstances and mitigating factors is a question of fact akin to an element"); *see also Ybarra v. Filson*, 869 F.3d 1016, 1030 (9th Cir. 2017)(assuming arguendo that weighing determination is to be made beyond a reasonable doubt). All elements that subject a defendant to a harsher punishment must be found beyond a reasonable doubt. *See Alleyne v. U.S.*, 133 S. Ct. 2151, 2156 (2013). Accordingly, it is at least debatable among jurists of reason whether the Sixth Amendment requires jurors to find that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt in order to impose a death sentence.

## CONCLUSION

For the reasons set forth above and in Runyon's opening brief, the Court should grant a COA, receive full merits briefing, and hear oral argument.

Respectfully Submitted,

/s/Michele Brace
Michele J. Brace
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
mbrace@mindsort.com

/s/Dana Hansen Chavis
Dana C. Hansen Chavis
Asst. Federal Community Defender
Federal Defender Services of
 Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Dana_Hansen@fd.org

Dated: August 24, 2018

CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2018, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

s/Michele Brace
Michele J. Brace