## IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

### DAVID ANTHONY RUNYON,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT NEWPORT NEWS

**OPENING BRIEF OF APPELLANT
DAVID ANTHONY RUNYON**

Michele J. Brace
VA Capital Representation
Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
(434) 817-2970
mbrace@mindsort.com

Dana C. Hanson Chavis
Susanne Bales
Assistant Federal Defender
Federal Defender Services
of Eastern Tennessee
800 South Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979
dana_hansen@fd.org
susanne_bales@fd.org

*Counsel for Defendant-Appellant*

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES .................................................................................................v

JURISDICTIONAL STATEMENT ....................................................................................1

ISSUES PRESENTED ..........................................................................................................1

INTRODUCTION ................................................................................................................2

STATEMENT OF CASE .....................................................................................................4

SUMMARY OF ARGUMENT..........................................................................................14

I. Runyon's Conviction Under 18 U.S.C. §924(c) Is Unconstitutional. *Johnson v. U.S.*, 135 S.Ct. 2551 (2015). ...............................................................................14

II. The District Court Erroneously Denied Discovery and an Evidentiary Hearing and the Case Should Be Remanded..........................................................14

III. Runyon's Death Sentence Is Unreliable Because Trial Counsel Failed to Investigate and Present Evidence of His Brain Damage and Mental Illness.....15

IV. Runyon's Death Sentence Is Unreliable Because the Prosecution Withheld and the Jury Did Not Learn About Crucial Evidence Supporting the Statutory Mitigating Circumstance, Equally Culpable Codefendants Not Facing Death. ................................................................................................................18

V. Runyon's Convictions Are Unreliable Because Trial Counsel Ineffectively Failed to Present Evidence of Innocence. ...........................................................21

VI. Prosecutors Discriminated in Exercising Their Peremptory Strikes, and Runyon's Counsel Unreasonably Failed to Challenge the Strikes.......................21

VII. Jury Instructions Unconstitutionally Lowered the Government's Burden of Proof and the Death Sentences Should Be Reversed. ..........................................22

ARGUMENT .......................................................................................................................23

I. Runyon's Conviction Under 18 U.S.C. §924(c) Is Unconstitutional. *Johnson v. U.S.*, 135 S.Ct. 2551 (2015). ...............................................................................23

   A. Standard of Review.............................................................................................23

   B. Argument ............................................................................................................23

      1. Several Statutes Attempt to Define Criminal Conduct............................24

      2. The Definition of "Crime of Violence" in §924(c) Is Unconstitutional................................................................................................25

3.  Courts Use the Categorical Approach to Applying §924(c)......................27

4.  Other Courts Have Held §924(c)(3)(B)'s Residual Clause Unconstitutional..........................................................................................30

5.  The §924(c) Conviction Cannot Be Sustained Under the Force Clause.31

    a.  Conspiracy Is Not a Crime of Violence. ..........................................33

    b.  Taking a Motor Vehicle Is Not a Crime of Violence. ....................34

6.  Resentencing on the Remaining Convictions is Required Because Runyon Was Sentenced to Death Based on an Unconstitutional Statute ...........................................................................................................35

II.  The District Court Erroneously Denied Discovery and an Evidentiary Hearing and the Case Should Be Remanded...........................................................38

  A. Standard of Review....................................................................................................39

  B. Argument .....................................................................................................................39

    1.  Ineffective Assistance of Sentencing Counsel..............................................41

    2. *Brady* Claim........................................................................................................42

    3.  Ineffective Assistance of Guilt Phase ............................................................43

    4. *Batson* Claim .....................................................................................................50

  C. Conclusion ..................................................................................................................51

III.  Runyon's Death Sentence Is Unreliable Because Trial Counsel Failed to Investigate and Present Evidence of His Brain Damage and Mental Illness.....51

  A. Standard of Review....................................................................................................51

  B. Argument .....................................................................................................................51

    1.  Counsel Failed to Investigate and Present Mitigating Evidence. .............52

    2.  Counsel Failed to Investigate and Present Evidence of Brain Damage and Mental Illness ................................................................................................59

    a.  Counsel Failed to Discover Mitigating Evidence............................60

    b.  The district court created post hoc justifications for counsel's failures. ......................................................................................................62

    3.  Had Counsel Performed Effectively, There Is a Reasonable Probability That Jurors Would Not Have Sentenced Runyon to Death ...........................................................................................................................66

a. Evidence of Brain Damage and Mental Illness Could Have Rebutted the Government's Case in Aggravation. .........................68

b. Evidence of Brain Damage and Mental Illness Would Have Reduced Runyon's Culpability. ...........................................71

c. The District Court's Prejudice Analysis Flouts Supreme Court Precedence...........................................................75

C. Conclusion ...................................................................78

IV. Runyon's Death Sentence Is Unreliable Because the Prosecution Withheld and the Jury Did Not Learn About Crucial Evidence Supporting the Statutory Mitigating Circumstance, Equally Culpable Codefendants Not Facing Death. ...................................................................79

A. Standard of Review...........................................................79

B. Argument ...................................................................79

1. The Government Suppressed Material Evidence that Undercut its Case for Death and Added Weight to Runyon's Case for Life. ..............80

2. Materiality...................................................................83

3. Procedural Bar...............................................................84

4. Trial counsel ineffectively failed to investigate and present this material, once it was disclosed post-sentencing. ........................86

C. Conclusion ...................................................................87

V. Runyon's Convictions Are Unreliable Because Trial Counsel Ineffectively Failed to Present Evidence of Innocence. ...................................87

A. Standard of Review...........................................................87

B. Argument ...................................................................87

C. Conclusion ...................................................................101

VI. Prosecutors Discriminated in Exercising Their Peremptory Strikes, and Runyon's Counsel Unreasonably Failed to Challenge the Strikes......................102

A. Factual Background...........................................................102

B. Violation of *Batson v. Kentucky* ...........................................104

1. Standard of Review...........................................................104

2. *Batson's* Legal Test.......................................................105

3. Application of *Batson* to the Strikes of African-American Prospective Jurors ...................................................................106

a. Step One: discriminatory intent ...................................................106

b. Step Two: reason for strikes ........................................................108

c. Step Three: purposeful discrimination ...........................................108

4. The District Court's Analysis Was Fundamentally Flawed ....................111

a. Whether Runyon Made a Prima Facie Showing Is Moot. ...........111

b. The District Court's Ruling Lacks a Factual Foundation and Cannot Be Squared With *Miller-El II* ............................................112

i. *Batson* Does Not Require Overt, Pervasive Discrimination...113

ii. *Batson* Does Not Disfavor Statistical Evidence .....................113

iii. The "Disagree" List Adds Weight to the *Batson* Claim. .......116

C. Ineffective Assistance of Trial Counsel.....................................................117

1. Standard of Review.......................................................................117

2. The Legal Test................................................................................118

3. Trial Counsel's Deficient Performance Is Grounds for Relief and Excuses Any Procedural Default................................................119

D. Default and Ineffective Assistance of Appellate Counsel....................................122

E. Conclusion...........................................................................................126

VII. Jury Instructions Unconstitutionally Lowered the Government's Burden of Proof and the Death Sentences Should Be Reversed. ........................................127

Conclusion ...........................................................................................133

CONCLUSION ........................................................................................133

REQUEST FOR ORAL ARGUMENT....................................................... 135

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME ...............................136

CERTIFICATE OF SERVICE....................................................................137

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abdul-Kabir v. Quarterman,*
550 U.S. 223 (2007) ............................................................................ 17, 68

*Alfred Brian Mitchell v. Royal,*
No. 16-6258 (10th Cir., Order, Apr. 18, 2018) .......................................133

*Alleyne v. U.S.,*
133 S. Ct. 2151 (2013) ...........................................................................132

*Amadeo v. Zant,*
486 U.S. 214 (1988) ..................................................................................85

*Apprendi v. New Jersey,*
530 U.S. 466 (2000) ........................................................................ 127, 128

*Arizona v. Fulminante,*
499 U.S. 279 (1991) ................................................................................118

*Banks v. Dretke,*
540 U.S. 668 (2005) ........................................................................... 43, 50

*Barbee v. Warden, Md. Penitentiary,*
331 F.2d 842 (4th Cir. 1964) ...................................................................99

*Batson v. Kentucky,*
476 U.S. 79 (1986) ............................................................................*Passim*

*Begay v. U.S.,*
553 U.S. 137 (2008) ..................................................................................26

*Bell v. Jarvis,*
236 F.3d 149 (4th Cir. 2000) ........................................................... 118, 122

*Blackledge v. Allison,*
431 U.S. 63 (1977) ....................................................................................40

*Bousley v. U.S.,*
523 U.S. 614 (1998) ....................................................................84, 85, 124

*Bracy v. Gramley,*
    520 U.S. 899 (1997)................................................................... 40, 50

*Brady v. Maryland,*
    373 U.S. 83 (1963).............................................................39, 84, 134

*Brinson v. Vaughn,*
    398 F.3d 225 (3d Cir. 2005) ..............................................................116

*Cara Richman v. Michael Draven a.k.a. Anthony Neff,*
    No. 0101SP052812006 (Dist. Ct. Md, Aug. 22, 2006) ............................82

*Caro v. U.S.,*
    No.16-1, 2018 WL 2113285 (May 8, 2018)..........................................79

*Carpenter v. U.S.,*
    138 S. Ct. 2206 (2018) ....................................................................93

*Castaneda v. Partida,*
    430 U.S. 482 (1977)........................................................................115

*Chinn v. Jenkins,*
    No. 3:02-cv-512, 2017 WL 631412 (W.D. Ohio Feb. 13, 2017) .................130

*Conaway v. Polk,*
    453 F.3d 567 (4th Cir. 2006) ..............................................................95

*Cone v. Bell,*
    556 U.S. 449 (2009)........................................................................85

*Davis v. Bobby,*
    No. 2:10-CV-107, 2017 WL 4277202 (S.D. Ohio Sept. 25, 2017) ..............131

*Davis v. U.S.,*
    417 U.S. 333 (1974)........................................................................128

*Donnelly v. DeChristoforo,*
    416 U.S. 637 (1974)........................................................................93

*Drain v. Woods,*
    595F.App'x 558 (6th Cir 2014) ...................................................118, 122

*Elmore v. Ozmint,*
 661 F.3d 783 (4th Cir. 2011) ................................................................... 64, 91

*Fahy v. Horn,*
 516 F.3d 169 (3rd Cir. 2008) ...................................................................117

*First Options of Chicago, Inc., v. Kaplan,*
 514 U.S. 938 (1995)...................................................................................23

*Foster v. Chatman,*
 69 VAND. L. REV. EN BANC 51 (2016)...........................................108, 111, 120, 121

*Gardner v. Florida,*
 430 U.S. 349 (1977)................................................................... 46, 49 99, 101

*Giglio v. U.S.,*
 405 U.S. 150 (1972)...................................................................................84

*Golphin v. Branker,*
 519 F.3d 168 (4th Cir. 2008) ...................................................................115

*In re Gomez,*
 830 F.3d 1225 (11th Cir. 2016) .................................................................32

*Gordon v. Braxton,*
 780 F.3d 196 (4th Cir. 2015) .....................................................................39

*Government of the Virgin Islands v. Forte,*
 865 F.2d 59 (3d Cir. 1989) ......................................................................119

*Gray v. Branker,*
 529 F.3d 220 (4th Cir. 2008) .........................................................64, 76, 78

*Haliym v. Mitchell,*
 492 F.3d 680 (6th Cir.  2007) ....................................................................86

*Harris v. Nelson,*
 394 U.S. 300...............................................................................................40

*Hernandez v. New York,*
 500 U.S. 352 (1991)..................................................................................108

*Hill v. Ozmit,*
339 F.3d 187 (4th Cir. 2003) ..................................................................40

*Holder v. Welborn,*
60 F.3d 383 (7th Cir. 1995)...................................................................117

*Holloway v. Horn,*
355 F.3d 707 (3d Cir. 2004) .................................................................116

*Howard v. Moore,*
131 F.3d 399 (4th Cir. 1997) ...............................................................114

*In re Hubbard,*
825 F.3d 225 (4th Cir 2016) ..................................................................29

*Hurst v. Florida,*
136 S. Ct. 616 (2016) ............................................................ 129, 131, 134

*Hurst v. State of Florida,*
202 So.3d 40 (2016) ..................................................................... 22, 132

*Johnson v. California,*
545 U.S. 162 (2005)................................................................ 105, 115, 126

*Johnson v. Mississippi,*
486 U.S. 578 (1988)................................................................... 36, 38

*Johnson v. U.S.,*
559 U.S. 133 (2010)................................................................... 31, 32

*Johnson v. U.S.,*
135 S. Ct. 2551 (2015) ....................................................................*passim*

*Juniper v. Zook,*
876 F.3d 551 (4th Cir. 2017) .................................................................80

*Kansas v. Carr,*
136 S. Ct. 633 (2016) ............................................................................130

*Kirkpatrick v. Lenoir County Bd. of Educ.,*
216 F.3d 380 (4th Cir. 2000) ......................................................... 85, 124

*Kyles v. Whitley,*
514 U.S. 419 (1995)................................................................................84, 101

*Lenz v. True,*
370 F. Supp. 2d 446 (W.D. Va. 2005)..................................................41

*Love v. Alamance Cty. Board of Education,*
757 F.2d 1504 (4th Cir. 1985) ...............................................................106

*Machibroda v. U.S.,*
368 U.S. 487 (1962)............................................................................ 39, 41

*Massaro v. U.S.,*
538 U.S. 500 (2003)................................................................................41

*Miller-El v. Cockrell,*
537 U.S. 322 (2003)............................................................110, 113, 115, 121

*Mitcham v. Davis,*
103 F.Supp.3d 1091, 1108-09 (N.D. Cal. 2015) .......................................119

*Murray v. Carrier,*
477 U.S. 478 (1986)..........................................................................85, 123

*Napue v. Illinois,*
360 U.S. 264 (1959)................................................................................93

*News & Observer Pub'g Co. v. Raleigh-Durham Airport Authority,*
597 F.3d 570 (4th Cir. 2010) ...................................................................85

*Porter v. McCollum,*
558 U.S. 30 (2009).........................................................................*passim*

*Powers v. Ohio,*
499 U.S. 400 (1991)................................................................................106

*Quesinberry v. Taylor,*
162 F.3d 273 (4th Cir. 1998) ..................................................................40

*Raines v. U.S.,*
423 F.2d 526 (4th Cir. 1970) ........................................................14, 15, 39

*Ring v. Arizona,*
536 U.S. 584 (2003)............................................................22, 127, 128, 129, 130, 132

*Rompilla v. Beard,*
545 U.S. 374 (2005)............................................................ 17, 65, 68, 125

*Runyon v. U.S.,*
No. 13-254, 135 S. Ct. 46 (2014) ...........................................10

*Sears v. Upton,*
561 U.S. 945 (2010)............................................................*passim*

*Sessions v. Dimaya,*
138 S. Ct. 1204 (2018) ........................................................*passim*

*Shuti v. Lynch,*
828 F.3d 440 (6th Cir. 2016) ................................................29

*Smith v. Robbins,*
528 U.S. 259 (2000)............................................................125

*Sochor v. Florida,*
504 U.S. 527 (1992)............................................................20

*Soffar v. Dretke,*
368 F.3d 441 (5th Cir. 2004) ................................................ 45, 99

*Strickland v. Washington,*
466 U.S. 668 (1984)............................................................*passim*

*Strickler v. Greene,*
527 U.S. 263 (1999)............................................................50

*Stromberg v. California,*
283 U.S. 359 (1931)............................................................33

*Summers v. Dretke,*
431 F.3d 861 (5th Cir. 2005) ................................................79

*Taylor v. United States,*
495 U.S. 575(1990)............................................................26

*Tennard v. Dretke*,
542 U.S. 274 (2004)......................................................................77, 133

*Tice v. Johnson*,
647 F.3d 87 (4th Cir. 2011)....................................................................63

*Toussaint v. U.S.*,
No. 12-CR-00407-CW-1 (N.D. Cal. May 11, 2018) .................................31

*Townsend v. Sain*,
372 U.S. 293 (1963)................................................................................15

*Underwood v. Royal*,
89 F.3d 1154 (10th Cir. 2018) ...............................................................133

*U.S. Postal Serv. Board of Governors v. Aikens*,
460 U.S. 711 (1983)...............................................................................112

*U.S. v. Alex Janows & Co.*,
2 F.3d 716 (7th Cir. 1993)......................................................................123

*U.S. v. Amparo*,
68 F.3d 1222 (9th Cir. 1995) ...................................................................29

*U.S. v. Aragon*,
983 F.2d 1306 (4th Cir. 1993) ....................................................27, 28, 29

*U.S. v. Ayala*,
601 F.3d 256 (4th Cir. 2010) ...................................................................29

*U.S. v. Barnette*,
644 F.3d 192 (4th Cir. 2011) .................................................................112

*U.S. v. Beckford*,
964 F. Supp. 993 (E.D. Va. 1997) ............................................................19

*U.S. v. Bundy*,
392 F.3d 641 (4th Cir. 2004) .................................................................123

*U.S. v. Cardena*,
842 F.3d 959 (7th Cir. 2016) ...................................................................31

*U.S. v. Causey*,
185 F.3d 407 (5th Cir. 1999) ................................................................ 35, 38

*U.S. v. Diaz*,
865 F.3d 168 (4th Cir. 2017) ....................................................................28

*U.S. v. Dinkins*,
691 F.3d 358 (4th Cir. 2012) ................................................ 104, 109, 112

*U.S. v. Dozier,*
848 F.3d 180, 184-87 (4th Cir. 2017) .................................................. 34, 35

*U.S. v. Edwin Alberto Johnson*,
No. BLG-SPW-11-CR-140 (D. Mont. May 7, 2018)................................31

*U.S. v. Ellis*,
121 F.3d 908 (4th Cir. 1997) ..................................................................104

*U.S. v. Evans*,
848 F.3d 242 (4th Cir. 2017) ....................................................................34

*U.S. v. Evans*,
892 F. Supp. 2d 949 (N.D. Ill. 2012)........................................................91

*U.S. v. Fuertes*,
805 F.3d 485 (4th Cir. 2015) ....................................................................30

*U.S. v. Garth*,
188  F.3d 99 (3d Cir. 1999)................................................................84-85

*U.S. v. Graham*,
824 F.3d 421 (4th Cir. 2016) ....................................................................92

*U.S. v. Grande*,
353 F. Supp. 2d 623, 631, 637 (E.D. Va. 2005)) .....................................19

*U.S. v. Grandison*,
885 F.2d 143 (4th Cir. 1989) ..................................................................115

*U.S. v. Grimmond*,
137 F.3d 823 (4th Cir. 1998) .......................................................... 105, 112

*U.S. v. Hammer*,
404 F. Supp. 2d 676 (M.D. Pa. 2005), *appeal dismissed*, 564 F.3d 628
(3d Cir. 2009) ...................................................................................... 20, 84

*U.S. v. Hemingway*,
734 F.3d 343 (4th Cir. 2013) ...............................................................23

*U.S. v. Hill*,
818 F.3d 289 (7th Cir. 2016) ...............................................................91

*U.S. v. Hill*,
832 F.3d 135 (2d Cir. 2016), *amended by* 890 F.3d 51 (2d. Cir. 2018) ........29, 30, 38

*U.S. v. Hillary*,
106 F.3d 1170 (4th Cir. 1997) .............................................................37

*U.S. v. Ingle*,
454 F.3d 1082 (10th Cir. 2006) ...........................................................29

*U.S. v. Jennings*,
195 F.3d 795 (5th Cir. 1999) ...............................................................29

*U.S. v. Johnson*,
873 F.2d 1137 (8th Cir. 1989) .............................................................116

*U.S. v. Johnson*,
953 F.2d 110 (4th Cir. 1991) ...............................................................29

*U.S. v. Kain*,
Crim. No. 03-573-1 (E.D. Pa. 2004) ...................................................97

*U.S. v. Kennedy*,
133 F.3d 53 (D.C. Cir. 1998) ..............................................................29

*U.S. v. King*,
679 F. App'x 297, 299 (4th Cir. 2017) .................................. 15, 43, 44, 93

*U.S. v. Legrand*,
483 F. App'x 771, 777 n.2 (4th Cir. 2012) ..........................................118

*U.S. v. Linder,*
552 F.3d 391 (4th Cir. 2009) ...................................................................79

*U.S. v. Magini,*
973 F.2d 261 (4th Cir. 1992) ......................................................... 51, 117

*U.S. v. Mahbub,*
818 F.3d 213 (6th Cir. 2016) ..................................................................126

*U.S. v. Mansfield,*
24 M.J. 611 (A.F.C.M.R. 1987) ...............................................................65

*U.S. v. Marquardt,*
786 F.2d 771 (7th Cir. 1986) .......................................................... 35, 38

*U.S. v. Martin,*
215 F.3d 470 (4th Cir. 2000) ...................................................................29

*U.S. v. McGuire,*
706 F.3d 1333 (11th Cir. 2013) ..............................................................29

*U.S. v. McNeal,*
818 F.3d 141 (4th Cir. 2016) ...................................................................30

*U.S. v. Melvin,*
621 F. App'x 226, 226-27 (4th Cir. 2015) ...............................................33

*U.S. v. Meza,*
2018 WL 2048899 (D. Mont. May 2, 2018) ...........................................31

*U.S. v. Moussaoui,*
382 F.3d 453 (4th Cir. 2004) ...................................................................95

*U.S. v. Naughton,*
621 F. App'x 170, 178 (4th Cir. 2015) ....................................................33

*U.S. v. Nicholson,*
475 F.3d 241 (4th Cir. 2007) ...................................................................79

*U.S. v. Nicholson,*
611 F.3d 191 (4th Cir. 2010) .....................................................51, 79, 87

*U.S. v. Orville David Morrison,*
No. BLG-SPW-04-CR-126 (D. Mont. May 7, 2018)................................................31

*U.S. v. Pelullo,*
105 F.3d 117 (3rd Cir. 1997) ................................................84

*U.S. v. Poindexter,*
492 F.3d 263 (4th Cir. 2004) ................................................51, 79, 87

*U.S. v. Prickett,*
839 F.3d 697 (8th Cir. 2016) ................................................29

*U.S. v. Rafidi,*
829 F.3d 437 (6th Cir. 2016) ................................................ 29, 30

*U.S. v. Ragin,*
820 F.3d 609 (4th Cir. 2016) ................................................117

*U.S. v. Roane,*
378 F.3d 382 (4th Cir. 2004) ................................................129

*U.S. v. Runyon,*
707 F.3d 475 (2013) ................................................*passim*

*U.S. v. Salas,*
889 F.3d 681 (10th Cir. 2018) ................................................29, 30, 38

*U.S. v. Serafin,*
562 F.3d 1105 (10th Cir. 2009) ................................................29

*U.S. v. Singleton,*
182 F.3d 7 (D.C. Cir. 1999) ................................................29

*U.S. v. Smith,*
115 F.3d 241 (4th Cir. 1997) ................................................37

*U.S. v. Stitt,*
552 F.3d 345 (4th Cir. 2008) ................................................105

*U.S. v. Taylor,*
814 F.3d 340 (6th Cir. 2016) ................................................ 29, 30

*U.S. v. Taylor,*
848 F.3d 476 (1st Cir. 2017) ...................................................................29

*U.S. v. Thompson,*
891 F.2d 507 (4th Cir. 1989) ..................................................................28

*U.S. v. Torres-Miguel,*
701 F.3d 165 (4th Cir. 2012) ........................................................... 33, 34

*U.S. v. Vann,*
660 F.3d 771 (4th Cir. 2011) ..................................................................32

*U.S. v. Walker,*
299 F. App'x 273, 276 (4th Cir. 2008) ............................................ 14, 129

*U.S. v. Watkins,*
147 F.3d 1294 (11th Cir. 1998) ...............................................................37

*U.S. v Whaley,*
No. 18-6025, 2018 WL 3737968 (4th Cir. Aug. 6, 2018).........................15

*U.S. v. White,*
366 F.3d 291 (4th Cir. 2004) .............................................. 15, 39, 51, 117

*U.S. v. White,*
571 F.3d 365 (4th Cir. 2009) ..................................................................33

*U.S. v. Williams,*
864 F.3d 826 (7th Cir. 2017) ..................................................................29

*U.S. v. Winston,*
850 F.3d 677 (4th Cir. 2017) ..................................................................23

*U.S. v. Witherspoon,*
231 F.3d 923 (4th Cir. 2000) ..................................................................39

*Waley v. Johnston,*
316 U.S. 101 (1942)..........................................................................84, 124

*Washington v. Davis,*
426 U.S. 229 (1976)................................................................................115

*Weaver v. Massachusetts*,
137 S. Ct. 1899 (2017) ......................................................................118

*Weeks v. Angelone*,
176 F.3d 249 (4th Cir. 1999), *aff'd* 528 U.S. 225 (2000) ..........................................23

*Welch v. U.S.*,
136 S. Ct. 1257 (2016) ......................................................................24

*Wiggins v. Smith*,
539 U.S. 510 (2003)................................................ 60, 62, 65, 78, 86, 125

*Williams v. Taylor*,
529 U.S. 362 (2000)................................................................59, 62, 76

*Winston v. Kelly*,
592 F.3d 535 (4th Cir. 2010) ...............................................................101

*Wolfe v. Clark*,
691 F.3d 410 (4th Cir. 2012) ................................................................15

*Woodson v. North Carolina*,
428 U.S. 280 (1976)................................................................36

*Yates v. U.S.*,
354 U.S. 298 (1957)................................................................33

*Ybarra v. Filson*,
869 F.3d 1016 (9th Cir. 2017) ...............................................................131

*Zant v. Stephens*,
462 U.S. 862 (1983)................................................................36

## STATUTES

18 U.S.C. §16(a) ................................................................25
18 U.S.C. §16(b) ................................................ 24, 26, 27, 28
18 U.S.C. §924(c) ................................................................*passim*
18 U.S.C. §924(c)(1) ...............................................3, 14, 35, 36
18 U.S.C. §924(c)(3)(A)................................................ 25, 28
18 U.S.C. §924(c)(3)(B)................................1, 25, 28, 29, 30, 31
18 U.S.C. §924(e) ................................................................23

18 U.S.C. §924(e)(2)(B)(i) ..............................................................................................25
18 U.S.C. §1952(a)(2) ....................................................................................................27
18 U.S.C. §1958................................................................................................................23
18 U.S.C. §1958(a) ..................................................................................................... 9, 32
18 U.S.C. §2119.................................................................................................... 23, 32, 34
18 U.S.C. §3592(a)(1) ...................................................................................................68
18 U.S.C. §3592(a)(4) ................................................................................................ 18, 79
18 U.S.C. §3592(c)(8) ...................................................................................................58
18 U.S.C. §3593(d)......................................................................................................127
18 U.S.C. §3593(e)(3) ..................................................................................................128
18 U.S.C. §3599............................................................................................................119
28 U.S.C. § 1291 ...............................................................................................................1
28 U.S.C. §2255................................................................................ 1, 2, 10, 49, 51
28 U.S.C. §2255(b)...............................................................43, 92, 102, 120, 121

# RULES

Fourth Circuit Local Rule of App. Pro. 32.1(b) ................................................31
Fourth Circuit Local Rule of Appellate Procedure 32.1 ..................................31
Fed. R. App. P. 10(a)....................................................................................................125
Fed. R. App. P. 22(b)(1) ................................................................................................1
Fed. R. App. P. 22(b)(2) ................................................................................................1

# OTHER AUTHORITIES

1 ABA Standards for Criminal Justice 4-4.1....................................................................59

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death
    Penalty Cases, Guideline 10.10.2(A) and Commentary, reprinted in 31 *Hofstra L.*
    *Rev.* 1049 (2003) ................................................................................................119

Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular*
    *Site Data to Track the Location of a Cellular Phone,* 18 RICH. J. L. &
    TECH. 3, at 7 (Fall 2011) ..................................................................................91

Adina Schwartz, A Systemic Challenge to the Reliability and Admissibility of
    Firearms and Toolmark Identification, 6 The Columbia Sci. and Tech. L.
    Rev. 1 (2005) ....................................................................................................97

*David C. Baldus, et al., Statistical Proof of Racial Discrimination in the Use of Peremptory*
    *Challenges,* 97 Iowa L. Rev. 1425, 1442 (2012) ..........................................115

Jason Kreag, Prosecutorial Analytics, 94 Wash. U.L. Rev. 771, 806 & n.211 (2017) ..............................................................................................................106-107

Joseph L. Gastwirth, *Statistical Testing of Peremptory Challenge Data for Possible Discrimination: Application to* Foster v. Chatman, 69 VAND. L. REV. EN BANC 51, (2016) ...........................................................................................................................106

Judge Herbert B. Dixon, Jr., *Scientific Fact or Junk Science? Tracking a Cell Phone Without GPS*, The Judges Journal, Vol. 53, No. 1 (American Bar Association, Winter 2014)...............................................................91

Lanigan Bonnie: *Firearms identification: the need for a critical approach to, and possible guidelines for, the admissibility of "ballistics" evidence*, 17 Suffolk J. of Trial & Appellate Advocacy, 54 & notes 2, 7-9, 12, 13, 45, 58, 83-95, 115, 120 (Feb. 1, 2012) ...............................................................................................................97

Michael O. Finkelstein & Bruce Levin, Statistics For Lawyers, 123-25; 154-56 (2001)......................................................................................................107

National Academy of Sciences, *Strengthening Forensic Science in the United States A Path Forward*, (Feb. 2009)..............................................................................................97

Virginia Indigent Defense Commission, *Standards of Practice for Indigent Defense Counsel*, Standard 7.2(C)(2) ...........................................................................................119

Webster's Third New International Dictionary 1507 (2002))..........................................27

# JURISDICTIONAL STATEMENT

David Runyon moved to vacate his convictions and sentences under 28 U.S.C. §2255. J.A.1497; J.A.1842. In one order, the district court denied discovery and an evidentiary hearing, dismissed the §2255 motion, and denied a certificate of appealability. J.A.2824; J.A.3070. On June 21, 2017, the district court denied Runyon's alter or amend motion. J.A.3079; J.A.3081; J.A.3143. On August 18, 2017, Runyon noticed his appeal. J.A.3160. This appeal is from a final order that disposes of all parties' claims.

Pursuant to Fed. R. App. P. 22(b)(1), (2) and L.R. 22(a), Runyon files this brief and requests a COA. If granted, jurisdiction will arise under 28 U.S.C. § 1291 and §2253.

# ISSUES PRESENTED

1. Runyon's Conviction Under 18 U.S.C. §924(c)(3)(B) Is Unconstitutional. *Johnson v. U.S.*, 135 S.Ct. 2551 (2015).

2. The District Court Erroneously Denied Discovery and an Evidentiary Hearing and the Case Should Be Remanded.

3. Runyon's Death Sentence Is Unreliable Because Trial Counsel Failed to Investigate and Present Evidence of His Brain Damage and Mental Illness.

4. Runyon's Death Sentence Is Unreliable Because the Prosecution Withheld and the Jury Did Not Learn About Crucial Evidence Supporting the Statutory Mitigating Circumstance, Equally Culpable Codefendants Not Facing Death.

5. Runyon's Convictions Are Unreliable Because Trial Counsel Ineffectively Failed to Present Evidence of Innocence.

6. Prosecutors Discriminated in Exercising Their Peremptory Strikes, and Runyon's Counsel Unreasonably Failed to Challenge the Strikes.

1

7. Jury Instructions Unconstitutionally Lowered the Government's Burden of Proof and the Death Sentences Should Be Reversed.

## INTRODUCTION

The jury that sentenced military veteran David Runyon to death never heard evidence that he suffers from brain damage and mental illness, that he suffers classic symptoms of blast and impact injuries and PTSD, and that he has delusional thought processes and psychosis. This unpresented evidence is compelling and explains his alleged involvement in the crimes for which he received two death sentences. Sentencing counsel failed to complete the mitigation investigation and failed to discover and present this evidence. Not a single mental health expert testified. Evidence that Runyon's thought processes are impaired and that he suffers significant mental illness would have swayed at least one juror. These types of impairments have been cited by the United States Supreme Court as so mitigating that failure to develop and present this type of evidence qualifies as ineffective assistance.

Runyon fared no better in post-conviction proceedings. He timely filed a §2255 motion arguing trial counsel was ineffective. He submitted declarations from four mental health experts, numerous lay witnesses, investigators, and trial counsel. The district court dismissed the claim without granting discovery or a hearing. The district court also barred a hearing on a *Brady* sentencing claim, a *Strickland* guilt phase claim, and a *Batson* claim. All of these claims present substantial extra-record evidence.

Runyon urges this Court to remand his case for an evidentiary hearing so that

these extra-record claims may be developed. The district court's refusal to conduct a hearing forecloses this Court's reliance on the below proceedings and hampers this Court's review. The law contemplates a hearing and the integrity of the proceedings relies upon one. This case should be remanded for a hearing to develop and present these claims.

Should this Court review the claims without the benefit of a hearing this Court must assume all of Runyon's allegations are true. Under that standard Runyon is entitled to relief. He alleges trial counsel did not complete their investigation and failed to discover and present mitigating evidence. The government failed to disclose, or counsel failed to present, evidence supporting the equally culpable statutory mitigator. He also alleges the prosecution improperly struck a large number of black jurors and this was racially motivated. All of these claims merit relief.

Runyon's case presents another independent reason for remand. After Runyon's case was affirmed on direct appeal, the Supreme Court released *Johnson v. U.S.*, 135 S.Ct. 2551 (2015). Under *Johnson*, 135 S.Ct. 2551 (2015), Runyon's case is tainted by an unconstitutional conviction and death sentence for possession of a firearm in relation to a crime of violence. 18 U.S.C. §924(c)(1). The conviction and sentence are void and must be vacated. Given the split sentencing verdict in this case, remand for resentencing on the remaining convictions is warranted.

## STATEMENT OF CASE

### 1.    Pre-trial

On February 13, 2008, the government charged David Runyon, a first-generation Korean-American, Catherina Voss ("Cat") and Michael Draven with capital murder for the death of Cat's husband, Cory Voss.[1] The indictment charged three statutory aggravators against Cat and Draven and two against Runyon. J.A.58-59.

Ten months earlier on the morning of April 30, 2007, Voss, an off-duty Navy officer, was found shot to death in his pickup truck, in a parking lot near a federal credit union in Newport News, Virginia. The victim and Cat were married and had two young children. Cat also was in a secret relationship with Draven, who did not live far from the Voss marital home. Over several months, the two planned to kill her husband. On the night of the crime, Cat sent her husband to withdraw cash from a nearby credit union ATM knowing the account contained only five dollars; it was an ambush. Immediately after her husband's death, the Navy paid Cat $100,000 which she and Draven promptly spent on a lavish vacation in San Diego and other luxuries. J.A.1364.

Meanwhile, as Cat and Draven plotted to kill her husband, David Runyon—who lived in Morgantown, West Virginia—prepared for an extended visit from his

---

[1] Consistent with this Court's opinion on direct appeal, Runyon will reference Catherine Voss as "Cat." *U.S. v. Runyon*, 707 F.3d 475, 485 (2013). Runyon will reference all other parties by their last name.

young son, Davy. He arranged for a babysitter while he participated as a test subject in out-of-town medical research studies. He provided a cell phone for his son Davy's babysitter, Paula Dalton, so the three could remain in contact. Dalton would have confirmed that the only calls she received on Davy's phone were from Runyon. J.A.2083; J.A.3102. At a research study in March 2007, Runyon met Draven. By that time, Cat and Draven had a joint bank account and discussed hiring a hitman. J.A.423; J.A.479-80; J.A485; J.A.1365. In April 2007, within a month of the murder, Draven planned to buy a poisonous ring for Cat to give her husband. J.A.451-454.

ATM photographs established that Cat's husband Voss was killed on April 29, 2007, about 11:33 p.m.. J.A.1340-1351.

Evidence shows Runyon was not in Virginia at the time of the crime. On that day, in Runyon's hometown of Morgantown, West Virginia, Runyon purchased a .357 handgun from George Koski. Runyon provided Koski his name and driver's license information and the two men talked leisurely. Runyon also used an ATM in Morgantown. Cell phone records place Runyon in West Virginia at 8:37 p.m.—over six hours from the crime—when he called his son. Runyon did not call either codefendant. J.A.1380.

For the next ten months, authorities recorded phone conversations often between Cat and Draven. Draven and Runyon spoke some, and discussed upcoming medical research trials, the investigation into the death of Cat's husband and interactions with investigators.

Five months after charging Cat, Draven and Runyon, the government filed notice of the death penalty against Runyon only. One non-statutory aggravator charged that Runyon "engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend." J.A.65. At about the same time, the prosecution disclosed documents to Draven's counsel establishing Draven's pedophilia and predatory, physical and sexual assault of women and children. *See* J.A.2508. Nine months after indictment, Cat pled guilty and was sentenced to life imprisonment. *U.S. v. Runyon*, 707 F.3d 475, 485 (4th Cir. 2013).

Just four months before trial, defense attorney Stephen Hudgins replaced Runyon's attorney who had primary responsibility for investigation and presentation of mitigation. J.A.116-117. Hudgins had 91 working days to investigate and prepare the penalty phase defense. He spent 32 full days plus 25 partial days in court on other cases, including a 14-day trial. J.A.2016; J.A.2128-2130. Defense counsel moved, without objection, for a continuance of the trial date because they needed more time "to perform the minimally required functions of counsel[.]" J.A.105; J.A.122. The district court denied the motion. J.A.126.

### 2. Trial

The government tried Draven and Runyon together but sought death only for Runyon. During jury selection, the prosecution struck 70% (7 of 10) of black jurors and 29% (12 of 42) of non-black jurors. J.A.1973, 1976; J.A.2815.

According to the government's theory, Runyon agreed—with Draven (who he

just met) and Cat (who he never met)—to kill a man he did not know and for no money up front. Runyon then waited until the day of the crime to purchase the alleged murder weapon from a man he did not know and under circumstances where the transaction might not have even occurred. Runyon gave the seller his license information and shared family details. He drove from Morgantown and arrived in Newport News just in time to encounter Voss at the ATM. Runyon used .38 caliber bullets in the .357 revolver although he owned .357 ammunition. Runyon then left Virginia without any payment, while Cat and Draven obtained $100,000 approximately 24 hours after Voss' death. Runyon then created a paper trail of the .357 at a pawn shop. He also kept items later characterized as evidence of the crime *even after* police interviewed him about the murder and he voluntarily gave a DNA sample. About one month after the crime, Draven's brother sent Runyon $275.

The government searched Runyon's personal belongings and claimed it found a "checklist" for the crime, J.A.1395; *Runyon*, 707 F.3d at 504, although the items were unrelated to the actual crime and were not in Runyon's possession. A government witness testified that .38 caliber bullets were fired from one firearm that could have been a .357 revolver. J.A.392; J.A.394; J.A.396; J.A.399. The murder weapon was never located but the government argued it was the .357 Runyon purchased from Koski.

The government argued Cat sent her husband, Voss, to the ATM, and cell tower records showed Draven moving away from the ATM before Voss arrived.

J.A.702-705; J.A.709-710; J.A.1393. The government argued this evidence showed Cat and Draven were not present at the scene of the crime but, by inference, that Runyon was.

The defense attempted to create reasonable doubt through cross-examination of government witnesses.

At the close of proof, the trial court dismissed the bank robbery count. J.A.761. The jury convicted Draven and Runyon of: conspiracy to commit murder for hire, 18 U.S.C. §1958(a); taking a motor vehicle resulting in death, 18 U.S.C. §2119; and, possession of a firearm in relation to a crime of violence where death occurs, 18 U.S.C. §924(c)(1). The jury returned a not guilty verdict for the conspiracy to commit robbery charge. J.A.894.

### 3. Sentencing

The trial court continued the sentencing phase for four weeks (J.A.907) and authorized funding for neuropsychiatrist James Merikangas. J.A.917.

Much of the evidence presented by the government alleged Runyon abused women. The government presented Runyon's misdemeanor conviction for grabbing his wife's arm and poking her nose, one dismissed misdemeanor assault charge, and one unadjudicated act of misdemeanor assault. *See Runyon*, 707 F.3d at 504. The government played a video and described it as Runyon's manipulation of a helpless female. J.A.1205. Jurors also viewed a videotape of Runyon's interrogation that this Court found was capable of inflaming jurors' racial prejudices and implied Runyon's

failure to confess betrayed his religious beliefs. J.A.1262; *Runyon*, 707 F.3d at 494, 496.

The "centerpiece" in mitigation was the statutory mitigator that Runyon was no more culpable than Draven and Cat, both of whom the government deemed unworthy of the death penalty. *Runyon*, 707 F.3d at 508; *see* 18 U.S.C. §3582(a)(4). Counsel failed to present mental health testimony or evidence of Runyon's brain damage or mental illness.

The jury instructions permitted a death sentence if jurors found the aggravating factors "sufficiently outweighed" mitigating factors. J.A.1266-1267; J.A.1269; J.A.1276-78; J.A.1288; J.A.1298. The jury found Runyon committed the offense for pecuniary value and after substantial planning and premeditation. They found four non-statutory aggravators: victim impact, use of military training, abuse of women, and lack of remorse. Jurors found two statutory and eight of twelve non-statutory charged mitigating circumstances: (1) no serious criminal record; (2) equally culpable persons will not be punished by death; (3) a life sentence will not include the possibility of release; (4) & (5) Runyon's son and mother will suffer emotional harm if he is executed; (6) Runyon served in the Army and was honorably discharged; (7) Runyon earned an associate's degree; (8) Runyon worked all his life; (9) Runyon engaged in acts of kindness and generosity; and, (10) growing up, Runyon witnessed and experienced domestic violence and parental conflict until his mother and father separated. Jurors also found uncharged mitigators: (1) Runyon experienced domestic violence and parental conflict from his mother and adoptive father; (2) Runyon's

brother will suffer emotional harm if he is executed; and, (3) Runyon believed the victim molested his own daughter. J.A.910.

Jurors inquired during deliberations: "If we are not unanimous on the death penalty, do we have to be unanimous on the other choices?" J.A.1298. They returned a split verdict: two death sentences and a life without the possibility of release sentence. J.A.1311.

### 4. Direct appeal

This Court found four errors: (1) the jury viewed a video that directly referred to Runyon's race and religion; (2) & (3) the government improperly commented on Runyon's exercise of his rights to trial and against self-incrimination; and (4) the trial court erred by replacing a juror outside defense counsel's presence. The errors were found harmless. *Runyon*, 707 F.3d at 496. Certiorari was denied on October 6, 2014. *Runyon v. U.S.*, No. 13-254, 135 S.Ct. 46 (2014).

### 5. Post-conviction proceeding

New counsel filed a motion under 28 U.S.C. § 2255 on October 5, 2015. J.A.1497, and an amended motion on February 4, 2016. J.A.1842; *see also* J.A.2656. Post-conviction counsel's investigation uncovered extra-record evidence supporting *Strickland, Brady*, and *Batson* claims. What follows is an overview of the district court proceedings for each of these extra-record claims.

***Strickland* sentencing phase claim.** Trial counsel emphasized the fact of equally culpable actors who did not face death. Post-conviction counsel uncovered

10

evidence that Runyon also is underserving of death because he is brain damaged and mentally ill. Runyon offered substantial new, extra-record evidence in support of this claim, including:

- four expert reports establishing that Runyon suffers from, inter alia, brain damage, executive functioning disorder, psychosis, paranoia, delusions which affect his behavior and impair his ability to conform to the requirements of law. J.A.1992; J.A.2024; J.A.2199; J.A.2237;

- army records describing Runyon's treatment after two separate car accidents and containing multiple mentions of PTSD. J.A.2136;

- lay witness testimony describing Runyon's injuries, personality and behavior change after the car wrecks. J.A.2191; J.A.2195;

- the sentencing attorney's declaration explaining he recently reviewed some of the aforementioned evidence and it was "the type of information I would have been looking for at the penalty phase." J.A.2804; and,

- the guilt-phase attorney's declaration describing an overview of his representation but explaining he could not discuss details unless ordered to do so by the district court. J.A.2021.

The order denying a hearing and dismissing the claim speculated about counsel's reasons for failing to investigate and present this evidence. The district court's justifications are not borne out by the record. For example, the court explained counsel was not deficient for ignoring mitigating evidence although the investigation was not complete prior to the sentencing phase. J.A.2932-2933. The court theorized that counsel believed the jury would find evidence of Runyon's brain damage unreliable, although counsel's declaration affirms that—had it been known— this evidence would have been presented. J.A.2804.

**The _Brady_ claim.** The government suppressed evidence that supported the

statutory mitigating circumstance of equally culpable codefendants who did not face death. No longer facing charges, Draven allowed Runyon's post-conviction team access to information including his long history of sexually violent conduct toward women and children. Draven's criminal history is substantially more egregious than Runyon's misdemeanor assault history that the government argued warranted death. Runyon moved for discovery to learn the full nature of the evidence the government suppressed. J.A.1643-1647. He requested an evidentiary hearing on the contested issue of materiality. J.A.1837-1839. The district court simultaneously denied discovery, a hearing, and the claim. J.A.2824-2847.[2]

**_Strickland_ guilt phase claim**. Runyon alleged trial counsel was ineffective for failing to offer the following evidence of innocence:

- an expert report indicating the government's use of cell phone evidence was misleading. J.A.2809.
- a declaration by Paula Dalton explaining the cell phone communications between herself and Runyon. J.A.3102.
- a declaration by codefendant Cat explaining she did not closely read her guilty plea and she did not talk with Runyon about killing her husband. J.A.2079; *but see* J.A.71-72, J.A.77.
- lay witness declarations that Runyon was a gun enthusiast, providing an innocent explanation for the purchase of a firearm. J.A.2086.
- a declaration of Chad Costa describing how the government provided him details about the crime and influenced his testimony in front of the grand jury. J.A.2022.

Runyon also moved for discovery of ballistics reports produced by Virginia

---

[2] Runyon also alleged trial counsel ineffectively failed to bring this evidence to the court's attention when he learned of it post-sentencing. J.A.1443. The district court denied this claim without a hearing as well.

Department of Forensic Science. He supported the discovery request with an expert declaration. J.A.2654.

The district court conducted its own investigation into Runyon's discovery request. It subpoenaed the ballistics reports and grand jury testimony and reviewed the new information *in camera.* J.A.2817; J.A.2818; J.A.2823. Although the court disclosed its review of this evidence, the court denied counsel access to the evidence.

The court declined to consider Runyon's proffered expert declaration and referred to the declarant as an "alleged expert" while saying the government expert at trial was "qualified." J.A.2881. The court found counsel's failure to elicit information contained in the Dalton declaration to be strategic, J.A.2880; a conclusion without evidentiary support. The court found Costa's grand jury testimony damaging but did not permit post-conviction counsel to review it. J.A.2870-2873. The court also reviewed the forensic ballistics evidence it sua sponte subpoenaed and concluded, without input from counsel or an expert, that trial counsel did not act deficiently in this regard. J.A.2885-2889.

**The *Batson* claim.** The court allowed §2255 counsel access to questionnaires and strike lists, J.A.1487, but denied discovery of the prosecution's jury selection files in this case. J.A.3035-3036. The court denied a hearing and dismissed this claim, stating Runyon failed to prove the prosecution possessed a discriminatory intent in striking minority jurors. J.A.3026, 3028-3029.

## SUMMARY OF ARGUMENT

**I.     Runyon's Conviction Under 18 U.S.C. §924(c) Is Unconstitutional.** *Johnson v. U.S.***, 135 S.Ct. 2551 (2015).**

Runyon was convicted of violating 18 U.S.C. §924(c)(1), possession of a firearm in relation to a crime of violence resulting in death. Under *Johnson v. U.S.*, 135 S.Ct. 2551 (2015) and *Sessions v. Dimaya*, 138 S.Ct. 1204 (2018), this conviction is void. The conviction and sentence must be vacated. A new sentencing hearing on remaining counts is warranted. The jury's reliance on the void conviction tainted the sentencing deliberations. This was a close case. The jury asked what would happen if it were not unanimous and imposed life on one of the  death eligible offenses. A jury should decide the appropriate sentence, in light of the changed nature of the remaining charges.

**II.     The District Court Erroneously Denied Discovery and an Evidentiary Hearing and the Case Should Be Remanded.**

The court below should have granted discovery and an evidentiary hearing on the ineffective assistance of counsel, *Brady*, and *Batson* claims because: (a) they are based on facts outside the record, and (b) they present material questions of fact. Evaluation of these claims includes new facts that were either not discovered and presented by counsel or were withheld by the government. For example, the bases for counsel's actions and inactions and the resulting difference on the overall picture of the trial are fact-driven issues.

Runyon alleged facts which, if true, entitle him to relief. *Raines v. U.S.*, 423 F.2d

526, 529-30 (4th Cir. 1970) (discussing fact-finding procedures). So too, materiality is a fact-driven issue and an adverse determination should not have been made without factual development. *U.S. v. White*, 366 F.3d 291, 297 (4th Cir. 2004). The court denied these claims after making credibility and fact determinations that are impermissible absent an evidentiary hearing. For example, the court accepted the government's contention that the withheld evidence was insignificant and doubted the qualifications and credibility of Runyon's experts and evidence. These types of disputes required fact-finding on the newly-discovered and newly presented evidence. *Townsend v. Sain*, 372 U.S. 293, 313 (1963).

This Court consistently requires an evidentiary hearing to resolve *Strickland* claims. *U.S. v Whaley*, No. 18-6025, 2018 WL 3737968, at *1 (4th Cir. Aug. 6, 2018) ("An evidentiary hearing in open court is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record or when a credibility determination is necessary in order to resolve the issue."); *U.S. v. King*, 679 F. App'x 297, 299 (4th Cir. 2017); *Wolfe v. Clark*, 691 F.3d 410, 421-22 (4th Cir. 2012).

Remand for a hearing is warranted.

### III. Runyon's Death Sentence Is Unreliable Because Trial Counsel Failed to Investigate and Present Evidence of His Brain Damage and Mental Illness.

Defense counsel did not conduct an adequate investigation of Runyon's mental health and did not present any of the available expert mental health testimony in mitigation. Runyon was deprived of a fair sentencing hearing because jurors did not

learn of his brain damage or mental illness—powerful factors favoring a life sentence.

Mental health experts consulted by the defense indicated Runyon was suffering from a mental disease or defect. The first expert counsel contacted recommended a neuropsychological evaluation of Runyon. J.A.3169. A second expert found: (a) "strong evidence that he [Runyon] is suffering from a neurological disorder," J.A.2131; (b) Runyon suffers classic symptoms of blast and impact injuries, brain injury, and PTSD; (c) Runyon is properly classified as having mild traumatic brain injury; (d) Runyon's ability to sustain attention and his reaction time are both impaired. J.A.2132. A third expert reported: (a) the prosecution experts' evaluations suggested Runyon suffers from migraine-like headaches, Attention Deficit Disorder and PTSD; (b) Runyon has physical signs of trauma; (c) Runyon suffers severe headaches; (d) withdrawal from experimental drugs may have affected him at the time of the crime (e) Runyon is currently either in a fantasy world of grandiose thinking or suffering from delusions; and, (f) Runyon has impaired executive functioning suggestive of frontal lobe brain impairment. J.A.1992.

Results of Runyon's brain scan "revealed multiple white matter hyperintensities . . . consistent with [Runyon's] history of head injur[i]es and migraine." J.A.1995; *but see* J.A.2133 (counsel reported the brain scan was normal, nevertheless, an expert maintained the opinion that Runyon suffers from brain injury and PTSD). Jail records noted Runyon's mental distress, delusions, grandiose ideations, and psychosis. J.A.2119. Even the governments' experts confirmed some of Runyon's psycho-social

history and his head injuries. They explained how adverse developmental factors in Runyon's life contributed to a personality disorder. They did not uncover aggravating mental health factors. J.A.2543; J.A.199; J.A.230.

Counsel ineffectively failed to complete the mental health investigation and present all of these mitigating findings. *See, e.g.,* P*orter v. McCollum,* 558 U.S. 30, 41 (2009) (evidence of poor mental health or mental impairment could influence a jury's appraisal of the defendant's moral culpability); *Sears v. Upton*, 561 U.S. 945, 949 (2010) (brain damage is significant mitigating evidence); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 261-63 (2007) ("possible neurological damage" is mitigating evidence); *Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (brain damage is an extreme mental disturbance that significantly impairs cognitive functions and a defendant's mental capacity at the time of the crime).

The available, but unpresented, mental health mitigation was consistent with non-statutory mitigators regarding Runyon's childhood experiences of domestic violence and parental conflict, and Runyon's military service. It was not inconsistent with the defense theories of equally culpable codefendants and family sympathy. It was the type of information counsel would have wanted to present at the penalty phase. J.A.2804; J.A.2016-2017; J.A.2019. Based on what counsel learned (or should have learned), the investigation was incomplete and prematurely abandoned.

There is a substantial difference between the mitigation presented to the jury (Runyon was a decent person who killed someone) and a presentation based on an

adequate investigation that would have shown Runyon was a decent person who experienced lifelong traumas resulting in mental illness, personality dysfunction, and brain damage that affected his cognitive functioning and made him susceptible to being used like a tool by the codefendants. Unfortunately counsel was unable to present, or even "choose," the latter mitigation presentation because they did not undertake an adequate investigation. For these reasons, the death sentences should be reversed.

**IV. Runyon's Death Sentence Is Unreliable Because the Prosecution Withheld and the Jury Did Not Learn About Crucial Evidence Supporting the Statutory Mitigating Circumstance, Equally Culpable Codefendants Not Facing Death.**

The "centerpiece" of counsel's mitigation case was the statutory "equally culpable [co]defendants" mitigating circumstance. *See* 18 U.S.C. §3592(a)(4). The government argued against this mitigator and asserted that Runyon had a history of abusing women. The government introduced, for example, Runyon's misdemeanor assault conviction for grabbing his wife's arm and poking her nose. The government argued that past acts of Draven and Voss did not warrant the death penalty; only Runyon was deserving of death.

Jurors found the equally culpable mitigator existed but—supported only with defense counsel's argument on disparity between the codefendants—did not find it weighty enough to impose a life sentence.

Had jurors known of Draven's extensive history of violent criminal conduct it

is reasonably probable that at least one juror would have voted for life. Evidence establishing Draven's greater moral culpability included: the sexual assault of children and a developmentally delayed fifteen-year-old; pedophilia and institutionalization for child sexual assault; history of second-degree assaults; physical, emotional and sexual abuse of girlfriends; and threats of death and bodily injury. The fact that the prosecution failed to seek death for Draven despite his pattern of violent criminal behavior and propensity for future violence was relevant to Runyon's disparate punishment defense. As explained by the district court when it agreed to charge the "abuse of women" non-statutory aggravator against Runyon: "[v]iolent adjudicated criminal acts that tend to show a pattern of violence against women are relevant, probative, and helpful to the sentence in distinguishing those who deserve capital punishment," and are "relevant to the inquiry of who should live and who should die." J.A.170 (citing *U.S. v. Grande*, 353 F. Supp. 2d 623, 631, 637 (E.D. Va. 2005)); *U.S. v. Beckford*, 964 F. Supp. 993, 1000 (E.D. Va. 1997) (A history of violent crimes is "arguably more relevant and probative than any other type of aggravating evidence supporting imposition of the death penalty[.]"). It was necessary for the jurors in this case to distinguish between Runyon and his codefendants in order to justify a death sentence for only Runyon. The prosecution's failure to disclose probative facts relevant to the disparity of punishment impaired Runyon's defense and denied the jurors an accurate accounting of relative culpability.

The *Brady* violation tainted the jury's determination regarding the "abuse of

women" aggravator, the "equally culpable codefendants" mitigator, and the sentencing verdict. The government argued for a death sentence because Runyon had grabbed his wife's arm and poked her nose and encouraged jurors to infer that Runyon engaged in more serious violent acts "behind closed doors." J.A.1203. The government invited jurors to condemn Runyon because "he left his wife and children and didn't provide support for them." J.A.1204. At the same time, the government kept from the jurors' consideration a plethora of information illustrating Draven's sexual assault of children and his pattern of sexual, physical and emotional abuse of women. This also prevented jurors from considering that Draven killed Cat's husband to be with her and have unlimited access to her two young children. A penalty phase proceeding where the jurors were informed of Draven's violent, predatory history is significantly different than the actual proceeding where the jurors decided—without knowledge of Draven's greater culpability—that Runyon should be the sole person to die. The withheld evidence was advantageous to Runyon's defense and could reasonably have put the penalty phase in such a different light that it would undermine confidence in the death sentence. J.A.2806; *see, e.g.*, *U.S. v. Hammer*, 404 F. Supp. 2d 676, 799 (M.D. Pa. 2005) ("Under a weighing statute such as the Federal Death Penalty Act of 1994, a death sentence resulting from a tainted aggravating circumstance cannot stand.") (citing *Sochor v. Florida*, 504 U.S. 527, 532 (1992); *Espinosa v. Florida*, 505 U.S. 1079, 1081 (1992)).

Sometime after Runyon had been sentenced to death, the government filed a

sentencing memorandum in Draven's case. Trial counsel ineffectively failed to bring this evidence to the court's attention to Runyon's prejudice. Relief is warranted on this basis as well.

## V. Runyon's Convictions Are Unreliable Because Trial Counsel Ineffectively Failed to Present Evidence of Innocence.

Trial counsel ineffectively failed to investigate and present evidence demonstrating Runyon's innocence. The government presented an implausible theory of Runyon's guilt: that at the last minute, Runyon joined in a plot to murder Cat's husband so that Cat and paramour Draven could receive life insurance proceeds. The government relied upon numerous pieces of circumstantial evidence to establish Runyon's guilt. Trial counsel failed to rebut or demonstrate the unreliability of the evidence. Trial counsel failed to show the misleading nature of the government's cell phone data, failed to offer reliable cell phone data showing innocence, failed to interview codefendant Cat to learn that she had information that called the government's case in to question, failed to offer innocent explanations for Runyon's ownership of a handgun, and failed to point out flaws in the government's forensic ballistics evidence. Effective counsel would have demonstrated the government did not prove guilt beyond a reasonable doubt.

## VI. Prosecutors Discriminated in Exercising Their Peremptory Strikes, and Runyon's Counsel Unreasonably Failed to Challenge the Strikes.

The government peremptorily struck 70% of the qualified African-American jurors. The government struck black jurors but did not strike similarly-situated

nonblack jurors. Peremptory challenges permit those of a mind to discriminate to do so and other circumstances in this case raise an inference of discriminatory purpose. First, the government intended to introduce a videotape that conveyed "stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act," and contained statements that were "capable of inflaming jurors' racial or ethnic prejudices." *Runyon*, 707 F.3d at 493-94. Second, the number of disparate strikes is statistically larger than expected of a random exercise of strikes. Third, the government sought the death penalty for Runyon, who is Korean-American, and not the two white codefendants. Although the government used its strikes to remove members of a cognizable racial group from Runyon's jury, defense counsel failed to object. Counsel's failure to challenge the strikes of African-Americans was unreasonable, fell below the prevailing norms of professional performance, and deprived Runyon of his Sixth Amendment rights to a fair jury trial and to competent counsel.

**VII. Jury Instructions Unconstitutionally Lowered the Government's Burden of Proof and the Death Sentences Should Be Reversed.**

The death sentences were imposed in violation of *Ring v. Arizona*, 536 U.S. 584 (2003), and *Hurst v. Florida*, 136 S.Ct. 616 (2016), because jurors were instructed they could impose death after finding aggravating factors "sufficiently outweigh" mitigating factors, as opposed to, outweigh "beyond a reasonable doubt."

# ARGUMENT

## I. Runyon's Conviction Under 18 U.S.C. §924(c) Is Unconstitutional. *Johnson v. U.S.*, 135 S.Ct. 2551 (2015).

### A. Standard of Review

Whether 28 U.S.C. §924(c) is unconstitutional in light of *Johnson v. U.S.*, 135 S.Ct. 2551 (2015), and *Sessions v. Dimaya*, 138 S.Ct. 1204 (2018), is a legal determination subject to *de novo* review. *First Options of Chicago, Inc., v. Kaplan,* 514 U.S. 938, 947-48 (1995) (questions of law are reviewed de novo); *Weeks v. Angelone,* 176 F.3d 249, 258 (4th Cir. 1999), *aff'd* 528 U.S. 225 (2000) (same). Whether a prior conviction qualifies as a predicate enhancing felony is also a legal question subject to *de novo* review. *See U.S. v. Hemingway,* 734 F.3d 343, 331 (4th Cir. 2013); *U.S. v. Winston,* 850 F.3d 677, 683 (4th Cir. 2017).

### B. Argument

#### Introduction

A jury convicted Runyon of conspiracy to commit murder for hire, 18 U.S.C. §1958; taking a motor vehicle resulting in death, 18 U.S.C. §§2119 and 2; and murder with a firearm in relation to a crime of violence where death is caused, 18 U.S.C. §924(c)(1). The trial court instructed the jury that either the conspiracy or the taking of the motor vehicle could qualify as underlying predicates for the §924(c) conviction.

After this case was affirmed on direct appeal, the Supreme Court found the definition of crime of violence used in the residual clause of the similarly worded Armed Career Criminal Act ("ACCA"), 18 U.S.C. §924(e) is unconstitutional because

it is vague and does not provide adequate notice. *U.S. v. Johnson*, 135 S.Ct. 2551 (2015).[3]

Runyon included a *Johnson* claim in his §2255 motion. J.A.1937-1947. The district court found *Johnson* did not apply to §924(c). J.A.2961. The district court did not address whether the possible predicate offenses were crimes of violence under §924(c).

The Supreme Court recently extended the reasoning of *Johnson* to the definition of crime of violence set forth in 18 U.S.C. §16(b) and also found it unconstitutional. *Sessions v. Dimaya,* 138 S.Ct. 1204 (2018). The section 16(b) definition of crime of violence, which the Supreme Court struck, is identical to the definition in section 924(c). Under *Johnson* and *Dimaya*, the statute upon which Runyon's conviction for possession of a firearm in relation to a crime of violence is based, 18 U.S.C. §924(c), is unconstitutional. This Court should vacate Runyon's 924(c) conviction and remand for a new sentencing hearing on the remaining charges.

### 1. Several Statutes Attempt to Define Criminal Conduct

Several statutes attempt to define violent criminal conduct which may support enhanced punishment. The ACCA enhances punishment for defendants who have three prior violent felonies, defined as offenses that:

> (i)     has as an element, the use, attempted use, or threatened use of physical force against the person of another; or

---

[3] *Johnson* applies retroactively. *Welch v. U.S.*, 136 S. Ct. 1257 (2016).

> (ii)    is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. §924(e)(2)(B)(i), (ii). In *Johnson, supra,* the Court found subpart (ii), the residual clause, unconstitutional.

The "General Provisions" section of the criminal code defines a crime of violence as:

> (a)    an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b)    any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C §16(a), (b). In *Dimaya,* the Court found subpart (b), the residual clause unconstitutional.

The §16 definition of a crime of violence is repeated, verbatim, in 18 U.S.C. §924(c)(3)(A) and 924(c)(3)(B), the statute supporting Runyon's conviction for possession of a firearm in relation to a crime of violence. It is also unconstitutional.

### 2. The Definition of "Crime of Violence" in §924(c) Is Unconstitutional.

In *Johnson*, the Supreme Court held that the ACCA residual clause is unconstitutionally vague because the process by which courts categorize prior convictions as violent felonies is too "wide-ranging" and "indetermina[te]." 135 S. Ct. at 2557. It noted that sentencing courts use the categorical approach to determine whether a particular statutory offense qualifies as a violent felony. *Id.* (citing *Taylor v.*

*U.S.,* 495 U.S. 575 (1990)). Courts are to assess whether a statutory offense qualifies as a violent felony "in terms of how the law defines the offense and not in terms of how an individual might have committed it on a particular occasion." *Id.* (quoting *Begay v. U.S.,* 553 U.S. 137, 141 (2008)). The residual clause "requires a court to picture the kind of conduct that the crime involves 'in the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury." *Id.* (citation omitted). "The residual clause offers no reliable way to choose between . . . competing accounts of what 'ordinary' . . . involves." *Id.* at 2558. This process of determining what is embodied in the "ordinary case" rather than "real-world facts" is the first fatal flaw in the residual clause.

The second fatal flaw is that it lacks a meaningful gauge for determining when the quantum of risk under the "ordinary case" of a particular statute is enough to constitute a "serious potential risk of physical injury." *Id.* "[G]rave uncertainty" surrounds the method of determining the risk posed by the "judicially imagined 'ordinary case.'" *Johnson,* 135 S. Ct. at 2557.

The *Dimaya* Court found that §16(b) suffers from those same two flaws that fell the ACCA. Like the ACCA's residual clause, §16(b) requires the court to identify a crime's "ordinary case" in order to measure the crime's risk, but "[n]othing in §16(b) helps courts to perform that task." *Dimaya,* 138 S. Ct. at 1215. And the Court found that §16(b)'s "substantial risk" threshold is no more determinate than the ACCA's "serious potential risk" threshold. *Id.* Thus, the same "[t]wo features" that

26

"conspire[d] to make" the ACCA's residual clause unconstitutionally vague—"the ordinary case requirement and an ill-defined risk threshold"—also conspired to make §16(b) unconstitutionally void. *Id.* at 1216, 1223 (citing *Johnson*, 135 S. Ct. at 2557).

The possession of a firearm in relation to a crime of violence statute, 18 U.S.C. §924(c), suffers the same infirmities. The language of the statute is identical to the infirm language struck in *Dimaya*. The same analytic framework is used to interpret §924(c). It requires the same ordinary case approach and the same risk threshold that *Johnson* and *Dimaya* found does not pass constitutional muster.

### 3. Courts Use the Categorical Approach to Applying §924(c).

The only distinction between §924(c) and §16(b) is that 924(c) addresses statutory offenses in the instant case, rather than statutory offenses from the past. But this distinction does not render 924(c)'s residual clause constitutional. The text of §924(c)'s residual clause is *identical* to that of §16(b), which was struck in *Dimaya*. In *Dimaya,* the Supreme Court focused on the phrase "by its nature" and explained this phrase directs the inquiry into an offense's "normal and characteristic quality." *Dimaya,* 138 S. Ct. at 1217-18 (quoting Webster's Third New International Dictionary 1507 (2002)) (internal quotation marks omitted).

Under *Dimaya*, the focus is on the nature of the statutory offense. But before *Dimaya*, this Court has already recognized that a focus on a statutory offense, "by its nature" compels a categorical ordinary case approach. In *U.S. v. Aragon*, 983 F.2d 1306 (4th Cir. 1993), the issue was whether the *instant offense*, rather than a prior

conviction, qualified as a "crime of violence" under the Travel Act, 18 U.S.C. §1952(a)(2). *Aragon,* 983 F.2d at 1312. Just like §924(c), the Travel Act has a *contemporaneous* "crime of violence" element defined by the identical §16(b) residual clause. 18 U.S.C. §1952(a)(2). Yet, this Court held that the categorical approach must apply to the Travel Act's §16(b) "crime of violence" requirement for one simple reason: the words "by its nature" in §16(b)'s text require it to do so. The *Aragon* court explained:

> This court has previously held that the language "by its nature" relates to the intrinsic nature of the crime, not to the facts of each individual commission of the offense. *See U.S. v. Thompson,* 891 F.2d 507 (4th Cir. 1989).

> [W]e conclude that the plain language of §16(b) mandates that the court embark upon a categorical approach to determine whether a particular crime, "by its nature," qualifies as a "crime of violence."

*Aragon,* 983 F.2d at 1312-13.

Because §924(c)(3)(B) is exactly the same as §16(b), the plain language of §924(c)(3)(B) also requires the categorical approach. And because *Aragon* held as such in the context of defining a contemporaneous "crime of violence" element for an instant offense (just like that contained in §924(c)(3)(B)), it is directly controlling here.[4]

---

[4] Additionally, this Court, as well as others, have held that the categorical approach applies to multiple other statutes that, like §924(c)(3)(B) and Travel Act, have a contemporaneous "crime of violence" definition (defined by the same residual clause) for the *instant* offense. *See U.S. v. Diaz,* 865 F.3d 168 (4th Cir. 2017) (applying categorical approach to "crime of violence" finding in Mandatory Victims Restitution

This Circuit also has already recognized the similarities between the definitions of crime of violence. It regularly relies on case law interpreting the ACCA to interpret 18 U.S.C. §16(b) as well as 18 U.S.C. §924(c). *See U.S. v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on an ACCA case to interpret the definition of a crime of violence under §924(c)(3)(B)); *U.S. v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same). *In re Hubbard*, 825 F.3d 225, 230 n.3 (4th Cir 2016) ("[T]he language of §16(b) is identical to that in §924(c)(3)(B), and we have previously treated precedent respecting one as controlling analysis of the other.").

This Court, in accord with several other circuits,[5] has now twice held, in explicit

---

Act); *U.S. v. Ingle*, 454 F.3d 1082, 1084-85 (10th Cir. 2006) (applying categorical approach to "crime of violence" finding in the Bail Reform Act); *U.S. v. Singleton*, 182 F.3d 7, 10 (D.C. Cir. 1999) (same) (collecting cases).
This Court has also held that the categorical approach applies to "crime of violence" determinations under the sentencing guidelines for *instant offenses* of conviction due to the "plain language" of the relevant guideline. *See U.S. v. Johnson,* 953 F.2d 110, 114 (4th Cir. 1991) (noting the "substantial intuitive appeal" of applying a circumstance-specific approach to instant offenses but nonetheless concluding that the approach "must . . . be rejected" under "the plain language" of revised guideline commentary); *U.S. v. Martin*, 215 F.3d 470, 474 (4th Cir. 2000) (applying categorical approach to instant conviction "no matter how clear it may be from the record" that the defendant committed a "crime of violence"). The categorical approach is not merely limited to "crime of violence" findings with respect to *prior convictions*.
[5] *See U.S. v. Taylor*, 848 F.3d 476, 491 (1st Cir. 2017); *Hill*, 832 F.3d at 139 (2d Cir. 2016); *U.S. v. Jennings*, 195 F.3d 795, 797-98 (5th Cir. 1999); *U.S. v. Rafidi*, 829 F.3d 437, 444-45 (6th Cir. 2016); *Taylor,* 814 F.3d 340 (6th Cir. 2016); *U.S. v. Williams*, 864 F.3d 826, 828 (7th Cir. 2017); *Prickett*, 839 F.3d at 698; *U.S. v. Amparo*, 68 F.3d 1222, 1225 (9th Cir. 1995); *Salas,* 2018 WL 2074547, at *3 (10th Cir. 2018); *U.S. v. Serafin*, 562 F.3d 1105, 1107-08 (10th Cir. 2009); *U.S. v. McGuire*, 706 F.3d 1333, 1336-37 (11th Cir. 2013); *U.S. v. Kennedy*, 133 F.3d 53, 56-57 (D.C. Cir. 1998).
In *Shuti v. Lynch*, 828 F.3d 440, 449-50 (6th Cir. 2016), the Sixth Circuit in dicta in a §16(b) case suggested that the categorical approach does not apply to §924(c)(3)(B),

terms, that the categorical approach applies to both the §924(c) residual clause and force clause. *See U.S. v. Fuertes*, 805 F.3d 485, 498 (4th Cir. 2015) ("In determining whether an offense qualifies as a 'crime of violence' under either [the §924(c) force clause or residual clause]" the court must "employ the 'categorical approach' or the 'modified categorical approach.'"); *U.S. v. McNeal*, 818 F.3d 141, 152 (4th Cir. 2016) ("'[i]n determining whether an offense is a crime of violence under either clause, we utilize the categorical approach"). Based on *Fuertes* and *McNeal* alone, this Court must find that the categorical approach applies to §924(c)(3)(B).

### 4. Other Courts Have Held §924(c)(3)(B)'s Residual Clause Unconstitutional.

Other circuits have held §924(c)(3)(B)'s residual clause is unconstitutional. The Tenth Circuit, in *U.S. v. Salas*, 889 F.3d 681 (10th Cir. 2018) found exactly that and struck §924(c)(3)(B) as unconstitutionally vague. It explained that a law may be vague "even if it is a criminal offense that requires a determination of guilt beyond a reasonable doubt." *Id.* at 686.

The Second Circuit has also found §924(c)(3)(B)'s residual clause unconstitutional. *U.S. v. Hill*, 832 F.3d 135, 150 (2d Cir. 2016), *amended by* 890 F.3d 51 (2d. Cir. 2018) (post-*Dimaya,* amending decision to remove residual clause analysis and affirming §924(c) conviction solely based on force clause). The Seventh Circuit did the

---

but such suggestion directly conflicts with its previous decisions in *Taylor,* 814 F.3d at 378, and *Rafidi*, 827 F.3d at 44-45, in which the Court definitively held that the categorical approach applies to §924(c)(3). Therefore, *Taylor* and *Rafidi* are the controlling cases on this issue in the Sixth Circuit.

same before *Dimaya. See U.S. v. Cardena,* 842 F.3d 959, 996 (7th Cir. 2016) (§924(c)(3)(B) is unconstitutionally vague because it "is the same residual clause contained in [§16(b)]").

Likewise, several district courts, post-*Dimaya,* have already held that §924(c)(3)(B) is unconstitutionally vague. *See U.S. v. Meza*, 2018 WL 2048899 (D. Mont. May 2, 2018), appeal pending; Order*, U.S. v. Orville David Morrison*, No. BLG-SPW-04-CR-126 (D. Mont. May 7, 2018); Order, *U.S. v. Edwin Alberto Johnson*, No. BLG-SPW-11-CR-140 (D. Mont. May 7, 2018); Order, Jarvis *Toussaint v. U.S.*, No. 12-CR-00407-CW-1 (N.D. Cal. May 11, 2018).[6] Runyon's §924(c) conviction must be vacated.

### 5. The §924(c) Conviction Cannot Be Sustained Under the Force Clause.

Once this Court find's §924(c)'s residual clause unconstitutional, the next question is whether the conviction may be sustained under §924(c)'s force clause. To qualify under the force clause, the elements of the offense must require physical force. The Supreme Court, interpreting the "violent felony" requirement of the ACCA, explained that "physical force" means "violent force"—"strong physical force" which is capable "of causing physical pain or injury to another person." *Johnson v. U.S.*, 559 U.S. 133, 140 (2010). The predicate offenses here do not pass this test.

---

[6] Fourth Circuit Local Rule of Appellate Procedure 32.1 permits citation to unpublished opinions and orders. These orders are available on a "publically accessible electronic database." Fourth Circuit Local Rule of App. Pro. 32.1(b)

In Runyon's case, the indictment charged that the underlying crimes of violence were conspiracy to commit murder for hire, 18 U.S.C. §1958(a) and taking a motor vehicle by force and violence or by intimidation where death results. 18 U.S.C. §2119. J.A.55. The court correctly recognized that these are alternatives, and it specifically instructed the jury that it was necessary to find only that "the defendants did one of the alternative acts as charged, as long as you all agree that the same particular alternative act was committed." J.A.847-848.

If the indictment and jury instructions do not conclusively establish that the jury found one element versus the other, the court must assume the defendant was convicted of the non-qualifying element. *See U.S. v. Vann,* 660 F.3d 771, 774-75 (4th Cir. 2011) (en banc) *See also Johnson,* 559 U.S. at 137 (where court cannot determine the alternative elements on which a defendant's conviction rests, it must assume the conviction rests on the "least of these acts"). The Eleventh Circuit addressed this issue in *In re Gomez,* 830 F.3d 1225 (11th Cir. 2016). There, the §924(c) count charged predicate convictions of drug trafficking offenses, attempted robbery and conspiracy to commit robbery. The Eleventh Circuit reasoned that it could not know "what, if anything, the jury found with regard to Gomez's connection to a gun and these crimes … because the jurors had multiple crimes to consider in a single count." *Id.* at 1227. The court concluded that because it was plausible that the jury found the §924(c) charge based upon conspiracy, Gomez was entitled to proceed with his *Johnson* claim.

This reasoning is on all fours with longstanding Supreme Court precedent.

When a trial judge instructs the jury on alternative grounds for a conviction, and the jury returns a general verdict of guilty, the verdict must be set aside if one of the grounds for conviction is legally invalid, and it is impossible to tell whether the conviction rested on the invalid ground. *Stromberg v. California*, 283 U.S. 359, 368 (1931); *Yates v. U.S.,* 354 U.S. 298, 312 (1957).

### a. Conspiracy Is Not a Crime of Violence.

Runyon's conviction for conspiracy does not qualify under 924(c)'s force provision. Conspiracy requires merely an agreement to act, which cannot qualify as physical force. *Torres-Miguel*, *supra*. This Court has held that conspiracy qualifies as a crime of violence only under the residual clause. *See U.S. v. White*, 571 F.3d 365, 369 (4th Cir. 2009); *U.S. v. Melvin,* 621 F. App'x 226, 226-27 (4th Cir. 2015) *U.S. v. Naughton,* 621 F. App'x 170, 178 (4th Cir. 2015). The *Johnson* opinion itself uses conspiracy as an example of how the courts have "trouble making sense of the residual clause." *Johnson*, 135 S. Ct. at 2559-60.

Because conspiracy does not qualify under the force clause, the inquiry should end. There is no discernible way to determine whether the jury relied upon the conspiracy charge or the taking of a motor vehicle charge in finding Runyon guilty of the 924(c) charge. The indictment charges both offenses as predicates. J.A.57. The verdict form does not specify whether the jurors based their decision on conspiracy or taking of a motor vehicle. J.A.913. The jury was instructed that it need only find Runyon committed one of the offenses. J.A.847-848. It is impossible to determine

upon which offense the jury relied. Further, the jury imposed death for the conspiracy case and life for the taking of the motor vehicle. The jury gave great consideration to the conspiracy charge. Because the jury could have relied on conspiracy as a predicate and that offense does not qualify, the 924(c) conviction is void and must be vacated.

### b. Taking a Motor Vehicle Is Not a Crime of Violence.

Should this Court find the law governing the effect of a general verdict not controlling, the §924(c) still must fall. The motor vehicle taking is not a crime of violence because it can be accomplished without strong physical force. It may be accomplished with intimidation. 18 U.S.C. §2119.

Runyon acknowledges this Circuit has recently found taking a motor vehicle does qualify under the force clause. *U.S. v. Evans,* 848 F.3d 242 (4th Cir. 2017). He offers a good faith basis for urging this Court to conclude taking a motor vehicle does not qualify as a crime of violence.

Because the crime may be accomplished through intimidation, it is not categorically a crime of violence under the force clause. *See U.S. v. Torres-Miguel,* 701 F.3d 165 (4th Cir. 2012). In other words, a defendant may be found guilty of taking a motor vehicle even though he did not intend to put another in fear of injury. It is enough that the victim reasonably fears injury from the defendant's actions – whether or not the defendant actually intended to create that fear. The taking a motor vehicle statute may impose liability if the defendant attempts the crime. 18 U.S.C. §2119. In *U.S. v. Dozier,* this Court found West Virginia attempt to commit a drug crime did not

qualify as a substantive offense supporting sentence enhancement. 848 F.3d 180, 184-87 (4th Cir. 2017).

> **6. Resentencing on the Remaining Convictions is Required Because Runyon Was Sentenced to Death Based on an Unconstitutional Statute.**

It is hard to overstate the pervasive effect the *Johnson* error has on this case. This was a close case. The jury questioned what would happen if they could not agree on a sentence. J.A.1298-1299. The jury rejected Count Four, the bank robbery charge. The jury imposed a life sentence for the taking of the motor vehicle. Under these circumstances the government cannot meet its burden of demonstrating the *Johnson* error is harmless beyond a reasonable doubt.

In *U.S. v. Causey*, 185 F.3d 407, 423 (5th Cir. 1999), the Fifth Circuit remanded for resentencing where it dismissed a portion of the capital convictions for lack of evidence, explaining "it is impossible to say" the death sentences "were not influenced by the fact" that defendants had received three eligible convictions, rather than two." *See also U.S. v. Marquardt*, 786 F.2d 771, 778 (7th Cir. 1986) (excessive number of convictions may prejudice the defendant by "creating the impression of more criminal activity). Further, the trial court's instructions portrayed the §924(c)(1) murder charge as requiring a high level of culpability. The Court instructed the jury that a conviction under §924(c)(1) required the jury to find Runyon intended to kill "deliberately and intentionally," or that he acted with "callous and wanton disregard for human life." J.A.869. When the jury was determining the appropriate punishment, the fact that the

"murder charge" had been established was likely given great weight. The instructions on the §924(c)(1) charge repeatedly define murder. J.A.867, 868, 869, 870. Clearly, the brunt of the prosecution case for death was premised upon the sole charge that required intentional premeditated murder. After *Johnson*, the key basis for that has been eliminated.

The Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Accordingly, capital sentencing decisions cannot be made on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Zant v. Stephens*, 462 U.S. 862, 884-85 (1983). In *Johnson v. Mississippi*, 486 U.S. 578 (1988), the Supreme Court ruled that a death sentence must be reversed if it was based "on a reversed conviction." *Id.* at 585. The defendant had been sentenced to death based, in part, on a prior conviction for assault which was overturned after the defendant was sentenced to death. *Id.* at 581. Even though there were aggravating circumstances unrelated to the assault conviction that remained undisturbed, the Supreme Court held that a new sentencing was constitutionally required because the jury considered the subsequently invalidated prior conviction, this conviction "provided no legitimate support for the death sentence imposed on petitioner," and there was "a possibility that the jury's belief that petitioner had been convicted of a prior felony would be 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id.* at 586

(internal citations omitted).

The need for a resentencing when a prior conviction is subsequently invalidated is reinforced by the sentencing package doctrine. Courts have recognized that convictions cannot be viewed in isolation for the purposes of sentencing, but as an entire "sentencing package." *See U.S. v. Watkins*, 147 F.3d 1294, 1297 (11th Cir. 1998) (listing cases). Accordingly, under the sentencing package doctrine, when a defendant has been convicted and sentenced on a number of convictions simultaneously and one of those convictions is vacated, the defendant should be resentenced on all of the convictions as they are part of one sentencing package. The sentencing package doctrine has been largely accepted by federal courts, *Watkins*, 147 F.3d at 1296 n.3, and was adopted by the Fourth Circuit. *See U.S. v. Hillary*, 106 F.3d 1170 (4th Cir. 1997) (where a defendant had successfully attacked his §924(c) conviction in collateral proceedings, the district court had the authority to resentence him on the remaining charges, as the sentence must be viewed in the "aggregate"); *see also U.S. v. Smith*, 115 F.3d 241, 245 (4th Cir. 1997) (same, and explicitly endorsing "sentencing package theory").

The jury found numerous mitigating factors, including: David Runyon did not have a serious criminal record; Runyon worked and was legally employed during his life; he committed acts of kindness and generosity for his neighbors and his community; he grew up and witnessed domestic violence and parental conflict between his mother and father; his son, mother and brother will suffer emotional

harm if he is put to death; he served his country and was honorably discharged; he furthered his education; he continued to witness and experience domestic violence and parental conflict and abuse from mother and adoptive father; and, Runyon was given the impression that the victim was molesting his daughter.

The jury credited and weighed the mitigating evidence they heard when determining his sentence. The mitigating factors found by the jury were numerous and powerful. As a part of their weighing process, however, the jury also considered and weighed Runyon's invalid convictions. Because these convictions are invalid, the jurors were exposed to, and improperly considered, information which "provided no legitimate support for the death sentence imposed on Petitioner." *Johnson v. Mississippi*, 486 U.S. at 586. There is "a possibility that the jury's belief that petitioner had been convicted of a prior felony was 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id.* (internal citations omitted).

Jurists of reason could easily conclude Runyon's §924(c) conviction is void, and that a new sentencing hearing is warranted. *Salas, supra*; *Hill, supra*; *Causey, supra*; *Marquardt, supra*; *Johnson v. Mississippi, supra*.

This Court should vacate Runyon's 924(c) conviction and sentence and remand for a new sentencing hearing.

## II. The District Court Erroneously Denied Discovery and an Evidentiary Hearing and the Case Should Be Remanded.

The district court held Runyon failed to prove each claim, while simultaneously

denying him the opportunity to do so. The extra-record evidence is substantial and calls into question the reliability of Runyon's convictions and sentences. Runyon is entitled to develop and prove his extra-record *Strickland*, *Brady*, and *Batson* claims. Remand for an evidentiary hearing is warranted.

### A. Standard of Review

This Court reviews the lower court's decision not to hold an evidentiary hearing on a §2255 motion for an abuse of discretion. *Gordon v. Braxton*, 780 F.3d 196, 204 (4th Cir. 2015).

### B. Argument

The district court shall "grant a prompt hearing" unless the files and records of the case show "conclusively" a §2255 movant is not entitled to relief. 28 U.S.C. §2255(b). Runyon requested discovery and a hearing on his *Strickland*, *Brady*, and *Batson* claims. The district court flouted the well-established rule that where claims are based on facts arising outside the courtroom, a hearing is "especially warranted." *Machibroda v. U.S.*, 368 U.S. 487, 494-95 (1962); *see also U.S. v. White*, 366 F.3d 291, 302 (4th Cir. 2004); *see also U.S. v. Witherspoon*, 231 F.3d 923, 925-26 (4th Cir. 2000). Also, when credibility determinations are necessary to resolve a claim—as in Runyon's case—an evidentiary hearing is "especially warranted." *White*, 366 F.3d at 302 (citing *Raines v. U.S.*, 423 F.2d 526, 530 (4th Cir. 1970)). A hearing was also warranted to resolve numerous factual disputes.

The district court also denied three separate discovery motions despite the

existence of good cause. *See Bracy v. Gramley*, 520 U.S. 899 (1997). And, the district court conducted its own investigation into the facts alleged in support of the guilt phase ineffectiveness claim. While the court disclosed the fact of its investigation, it refused to disclose the fruits of the investigation.

The district court also erred by denying discovery. "Good cause" for discovery exists when: (1) the movant makes credible allegations of a constitutional violation; and (2) the requested discovery will enable the movant to investigate and prove his claims. *Bracy v. Gramley*, 520 U.S. 899, 904, 908-09 (1997). In *Bracy*, the Supreme Court noted the movant's allegations were "only a theory at this point" and "not supported by any solid evidence[.]" *Id.* at 908. The allegations, however, were specific enough to establish good cause for factual development even if the defendant ultimately "will be unable to obtain evidence sufficient" for actual relief. *Id.* at 909.

A sufficient showing of good cause, as required by Rule 6(a), therefore exists when a "petitioner makes a specific allegation that shows reason to believe that the petitioner *may* be able to demonstrate that he is entitled to relief." *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998) (emphasis added) (citing *Harris v. Nelson*, 394 U.S. at 300). In *Blackledge v. Allison*, the Court described "specific factual allegations" as not "vague (or) conclusory," "palpably incredible," or "patently frivolous or false." 431 U.S. 63, 75-76 (1977) (internal quotation marks and citations omitted). A "plausible indication" that the discovery request "might demonstrate" an entitlement to relief satisfies Rule 6(a). *Hill v. Ozmit*, 339 F.3d 187, 201 (4th Cir. 2003). "More specifically,

a petitioner must state what he hope[s] to find" and how the information will "help him prosecute his [action]." *Lenz v. True*, 370 F. Supp. 2d 446, 455 n.2 (W.D. Va. 2005) (internal citation and quotation marks omitted).

A hearing is necessary to determine the weight and persuasiveness of the unpresented evidence. A hearing is also necessary to determine whether counsel's investigation was reasonable in light of the circumstances of the case. These questions cannot be answered on a cold record. A hearing is warranted.

### 1. Ineffective Assistance of Sentencing Counsel

A trial counsel ineffectiveness claim ordinarily cannot be resolved on the extant record because it hinges on events and occurrences that took place outside the courtroom. As the Court explained in *Massaro v. U.S.*, 538 U.S. 500, 505 (2003), trial records are not developed for the object of litigating or preserving claims of ineffective assistance and are "thus often incomplete or inadequate for this purpose." Evidence is introduced at trial to show guilt or innocence, and the resulting record "in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis." *Id.* If the alleged error is one of commission, "the record may reflect the action taken by counsel but not the reasons for it." *Id.* The record may contain no evidence of alleged errors of omission, "much less the reasons underlying them." *Massaro*, 538 U.S. at 505. Without factual development, the district court, and this Court, are unable to assess *Strickland* prejudice. *Id. See also Machibroda*, 368 U.S. at 494-95.

An evidentiary hearing was required here. Runyon offered the following evidence:

- four expert reports establishing that Runyon suffers from, inter alia, brain damage, executive functioning disorder, psychosis, paranoia, delusions which affect his behavior and impair his ability to conform to the requirements of law. J.A.1992; J.A.2024; J.A.2199; J.A.2237;

- army records describing Runyon's treatment after two separate car accidents and containing multiple mentions of PTSD. J.A.2136;

- lay witness testimony describing Runyon's injuries, personality and behavior change after the car wrecks. J.A.2191; J.A.2195;

- the sentencing attorney's declaration explaining he recently reviewed some of the aforementioned evidence and it was "the type of information I would have been looking for at the penalty phase." J.A.2804; and,

- the guilt-phase attorney's declaration describing an overview of his representation but explaining he could not discuss details unless ordered to do so by the district court. J.A.2021.

This case contains material factual disputes, the record does not conclusively refute Runyon's claims, and specific allegations—if true—entitled him to relief. *See* Runyon's Amended §2255 Motion, J.A.1842; Runyon's reply, J.A.2656; Runyon's discovery motions, J.A.1623; J.A.1824; J.A.2368; J.A.2384; J.A.2644.

### 2. *Brady* Claim

Runyon alleged the government failed to disclose evidence supporting the equally culpable mitigator. J.A.1865. Discovery was necessary to determine the scope and nature of the suppressed evidence. A hearing was warranted to determine whether the evidence was suppressed and whether it was material. The district court denied discovery and dismissed the claim without a hearing. Discovery was the only

way Runyon could uncover evidence sufficient to show materiality and suppression. *See Banks v. Dretke*, 540 U.S. 668, 675 (2005).

Runyon also alleged trial counsel ineffectively failed to present this evidence when it was later disclosed. The trial court speculated on reasons for counsel's deficiency. The trial court should have granted a hearing. *See Massaro*, 538 U.S. at 505.

### 3. Ineffective Assistance of Guilt Phase

A hearing on this issue should have been granted. Instead, the district court credited the trial testimony over the expert declaration presented in the post-conviction proceeding. *See U.S. v. King*, 679 F. App'x 297, 299 (4th Cir. 2017) (a hearing is especially warranted when factual disputes turn upon credibility determinations and relate to purported occurrences outside the courtroom and upon which the record casts no real light). The district court rejected Joseph Kennedy's expert declaration, that the government's cell phone data evidence was misleading. The court expressed doubts about his qualifications and credibility: "the court declines to conclude that counsel was deficient based on one declaration by an *alleged* expert, when a qualified expert testified at trial and was fully questioned by both parties." J.A.2881 (emphasis added). The district court denied an evidentiary hearing on this issue (J.A.2847) and its reliance on the government's trial expert over the expert declaration submitted in support of this issue is contrary to §2255(b). J.A.2881.

Reasonable jurists could debate the district court's decision to deny Runyon an evidentiary hearing where he would have presented such proof, while refusing to

43

credit Runyon's allegations and interpret facts in his favor.[7] *King*, 679 F. App'x at 299; *U.S. v. White*, 366 F.3d 291, 302 (4th Cir. 2004). This is especially so in light of the court's supposition that, because trial counsel asked the government's cell phone witness about Runyon's call at 8:37 p.m. not incurring any roaming charges, counsel "could have reasonably decided not to ask additional questions about Petitioner's cell phone use to another witness[.]" J.A.2880. Reasonable jurists could disagree with this assessment since trial counsel did not interview Dalton about this and could not have made an informed decision to forgo powerful alibi evidence.

Runyon also alleged codefendant Cat did not have firsthand knowledge of Runyon's involvement in the crime. J.A.2079.

The district court improperly dismissed this claim without allowing Runyon an opportunity to present Cat's testimony, and without requiring the government to conduct the proposed cross-explanation relied on in its answer. *See* J.A.2874 ("This after-the-fact declaration by Cat Voss . . . does not reflect the [trial] record[.]"). The district court again found—without acknowledging that trial counsel did not conduct an independent adequate investigation—"a sound, strategic decision not to call [co-defendant Cat] as a witness." J.A.2875. The court also rejected the allegation of deficient performance because Cat "would have been impeached with her Statement of Facts[.]" J.A.2875. Reasonable jurists could disagree because this analysis was

---

[7] The district court said it "cannot assume the witness would have testified to something based solely on a conclusory statement of the Petitioner[,]" and alleged a "lack of clarity about how Dalton would have responded." J.A.2879-2880.

conducted without the benefit of a hearing and fails to account for the contents of the statement itself, which clearly contains facts that Cat could not have personally known, and ignores the government's assessment of a 50% probability that jurors would have believed Cat's testimony.

Runyon alleged trial counsel ineffectively failed to investigate the ballistics evidence. J.A.1881-1883. Runyon requested discovery of the ballistics testing records so they could be reviewed by his expert to help him, among other things, determine the caliber of the bullets recovered from the crime scene. J.A.2368; J.A.2651; J.A.2654. Runyon's firearm expert noticed discrepancies between the caliber reported by the medical examiner and the caliber identified in court testimony. Trial counsel were ineffective in failing to investigate this issue. *Soffar v. Dretke*, 368 F.3d 441, 476 (5th Cir. 2004).

Reasonable jurists could also agree the district court erred when it denied Runyon discovery and an evidentiary hearing and conducted its own ex parte investigation of this claim. The district court denied Runyon's motion for discovery of the records generated by the examination of the bullets by the Virginia Department of Forensic Science and instead obtained and reviewed the records ex parte. J.A.2817 (ordering subpoena duces tecum). The judge then denied Runyon's allegations of prejudice based on information contained in the records that remain sealed and the contents have never been revealed to Runyon's counsel. J.A.2888 ("Regardless of the reason that counsel did not further challenge the evidence or request copies of the

ballistics records, the court finds there is no prejudice, as the records only support the testimony and evidence introduced at trial.'").

In post-conviction proceedings, Runyon challenged the government's claim that ballistic evidence confirmed that all five bullets found in Voss's body came from the same firearm. He submitted the declaration of a ballistics expert in support of his request to examine the government's ballistic evidence. J.A.2654. The district court refused Runyon access to the evidence, but claimed to examine undisclosed "ballistic records" under seal and *in camera.* J.A.2888. Based on evidence not disclosed to Runyon, the district court claimed the records contained "nothing contrary to the evidence presented at trial[,]" and, therefore, Runyon could not show prejudice. J.A.2888. The district court's unilateral review and decision to withhold evidence from him was an abuse of discretion and a denial of due process. *See, e.g.*, *Gardner v. Florida*, 430 U.S. 349, 351 (1977); *see also* J.A.3071; J.A.3074 (moving to access materials the court relied upon).

Runyon also alleged trial counsel also failed to develop and present evidence supporting a defense claim that government agents provided details of the crimes to government witnesses and influenced their testimony. According to government witness Chad Costa, police "told [him] a lot of information" about the murder over the course of a two-hour interview. J.A.2022-2023. He said police "convinced [him] that Runyon committed the murder" and "influenced [his] testimony in front of the grand jury and caused [him] to agree with the prosecutor that Runyon could have

committed the crime." J.A.2022-2023. Costa noted that "[w]hen [he] said anything positive about Runyon in front of the grand jury, the prosecutor gave [him] a dirty look and changed the subject." J.A.2022-2023. This evidence disclosed the government's practice of influencing testimony of witnesses to fit the government's case against Runyon. It would have supported doubts Runyon raised about the integrity of the police investigation, and impeached testimony the government obtained through the expectation of benefits to be provided to the government's jailhouse snitches or by exploiting Runyon's friend Sara Baker's desire to avoid threatened harm to her and her family.

Furthermore, Costa knew Runyon approximately six months before Runyon was arrested. J.A.2022. The prosecution, however, argued that the *absence* of testimony from people who knew Runyon around the time of the killing was evidence that he was a different person than the person portrayed by the defense. The mere *presence* of Costa's testimony would have refuted this line of argument. His testimony that he knew nothing about the murder before speaking to the police and his testimony that Runyon was not the sort of person to kill someone could have negated the prosecution's argument. There was no apparent strategic reason for trial counsel to have flown Costa to the trial and then not put him on the stand when his testimony offered such value to Runyon's defense.

The district court improperly dismissed Runyon's claim without allowing him an opportunity to present Costa's testimony, and without requiring the government to

conduct the cross-examination relied on in its answer. In response to this allegation, the district court conducted its own investigation and ordered the government to file under seal Costa's grand jury testimony. J.A.2823. The court then stated: "The court declines to second guess counsel's decision not to call Costa to the stand, other than to comment in hindsight, after a review of the grand jury testimony, that it was a good one." J.A.2873.

Costa was not a trial witness, therefore, the government had not disclosed that testimony to Runyon's trial counsel. The court refused to give Runyon's current counsel access to that testimony. The court then announced that "[t]he police telling someone about the facts of a crime is hardly coercion or improper conduct," and it "reviewed the grand jury testimony and finds that nothing untoward occurred." J.A.2871-2872. The court found:

> Although grand jury testimony is not normally admissible, it would have been admissible to impeach Costa, had he testified, and there is plenty in the testimony that could have been used for such a purpose. Accordingly, were Costa's grand jury testimony to be introduced, it would only have added to the evidence about the Petitioner's gun ownership, and the pawning of such gun, and would have been quite damaging.

J.A.2872.

The court did not disclose the "plentiful" underlying factual basis. In any event, there was no dispute about Runyon's ownership of a Taurus .357 or the fact that he twice pawned the gun several months after Voss was killed. Reasonable jurists could agree that any more evidence of the same would not have been "quite damaging," as

the district court stated; it would have been cumulative and insignificant.

The district court erred not only because it relied on ex parte facts[8] but also because it misconstrued the issue from the claim that was pled; that counsel failed to investigate the reliability of the police investigation and failed to interview available witnesses, such as Costa, who could have supported the defense theory of reasonable doubt. The district court created an ad hoc justification for counsel's failure to call Costa when it "comment[ed] in hindsight, after a review of the grand jury testimony, that it was a good one." J.A.2873. Reasonable jurists could agree that: (a) the court's independent investigation and reliance upon facts unknown to Runyon constitutes a due process violation and warrants a remand to a different judge; and (b) the district court's factual findings were clearly erroneous and led to an erroneous determination of this issue.

Section 2255 requires a hearing on ineffective assistance of counsel claims unless the records show movant is conclusively not entitled to relief. That can hardly be said of Runyon's sentencing claim. He advanced detailed and specific factual assertions in support of his §2255 motion and the need for a hearing. He alleged trial counsel failed to investigate and present substantial mitigating evidence. He offered multiple detailed expert declarations and numerous lay witness declarations detailing

---

[8] Reasonable jurists could agree that the judge erroneously and independently investigated the facts, secreted those facts from Runyon, and then denied Runyon a hearing where he could have presented Costa's actual testimony. *See, e.g.*, *Gardner v. Florida*, 430 U.S. 349, 351 (1977); *see also* J.A.3071 (moving to access materials the court relied upon).

the unpresented evidence and showing that it would have led at least one juror to vote for life. He also offered evidence that sentencing counsel would have presented the evidence if he had discovered it.

At a hearing, Runyon would have demonstrated that the unpresented evidence differed in kind and nature from the evidence counsel actually presented. Trial counsel argued life was the appropriate sentence because Runyon was good guy and other equally culpable offenders received life. The unpresented evidence differs markedly from what the jury heard and explains the frailties in Runyon's make-up that led him to be involved in the crime of which he has just been convicted.

### 4. *Batson* Claim

The court dismissed this claim because Runyon failed to offer definitive proof of the government's motive in striking minority jurors. Had the court granted discovery, Runyon could have uncovered evidence demonstrating the reasons the prosecution exercised the peremptory strikes. Proof of motive for a strike may only exist in the prosecution file. Discovery may be the only way to prove prosecutorial misconduct. *Banks v. Dretke*, 540 U.S. 668, 675 (2005); *Strickler v. Greene*, 527 U.S. 263, 278 (1999).

Runyon established good cause for the discovery. *See Bracy v. Gramley, supra.* The government struck 70% of African-American jurors, based on their answers to a juror questionnaire. The government did not strike nonblack jurors who answered in the same way. These facts alone demonstrate cause for discovery. The district court erred

by denying discovery and a hearing.

Speculations and unanswered factual questions are the kinds of issues that ordinarily preclude adjudication of a §2255 issue until there has been discovery and an evidentiary hearing. *See, e.g., U.S. v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992); *U.S. v. White*, 366 F.3d 291, 297-300 (4th Cir. 2004).

### C. Conclusion

In short, the district court erred in denying a hearing on all of these claims. This Court can have no confidence that any of these claims were resolved properly where Runyon was denied the opportunity to develop and present the claims. A remand is warranted.

### III. Runyon's Death Sentence Is Unreliable Because Trial Counsel Failed to Investigate and Present Evidence of His Brain Damage and Mental Illness.

#### A. Standard of Review

Whether counsel's performance was constitutionally adequate is a mixed question of fact and law that is reviewed de novo. *Nicholson*, 611 F.3d at 205. This claim was summarily denied so "the nature of the court's ruling is akin to a ruling on a motion for summary judgment," and the facts must be viewed "in the light most favorable to the §2255 movant." *U.S. v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2004).

#### B. Argument

#### Introduction

Counsel's failures to comply with professional norms regarding investigation,

development, and presentation of mitigating evidence deprived the jury of important sentencing information. Jurors did not know of David Runyon's traumatic brain damage and mental illness, and they were without an accurate picture of Runyon's culpability. Counsel also failed to subject the prosecution's case in aggravation to adversarial testing. Had counsel performed a reasonable investigation, they would have discovered that Runyon has frontal lobe brain damage, suffers from Post-Traumatic Stress Disorder (PTSD) and other mental illness, and that his executive functioning and decision-making is impaired. Presenting this missing evidence in Runyon's case—the kind of evidence the Supreme Court finds relevant to an accurate assessment of moral culpability—would have "alter[ed] the entire evidentiary picture[.]" *Strickland v. Washington*, 466 U.S 668, 695-96 (1984). Given the compelling evidence that counsel failed to discover and present, reasonable jurists could disagree with the district court's determination that neither requirement of *Strickland* had been met.

**1. Counsel Failed to Investigate and Present Mitigating Evidence.**

Four months before trial, Stephen Hudgins was appointed to replace Jon Babineau as defense counsel, J.A.116-121, and assumed responsibility for the penalty phase. Hudgins contacted defense experts and penalty-phase witnesses. J.A.896; J.A.2016; J.A.2019. At the time of Hudgins's appointment, a clinical psychologist had

not yet completed an evaluation of Runyon. [9] *See* J.A.2016; J.A.2019. The doctor informed counsel that neuropsychological deficits are a defining element of Runyon's personality and behavior, and he recommended a neuropsychological evaluation of Runyon. J.A.3169. Hudgins "reviewed Mr. Babineau's files but proceeded in [his] own direction in preparing the penalty-phase defense." J.A.2803. Hudgins explained: "[t]he time Mr. Babineau spent working on David Runyon's case was not much benefit to me." J.A.2803.

About six weeks after his appointment, Hudgins provided notice of intent to offer two mental health experts.[10] J.A.101-102. Hudgins moved to continue the trial date for six months, expressing a "firm belief that to require the defendant to proceed to trial on June 30, 2009, will deprive the defendant of his constitutional right to the effective assistance of counsel[.]" J.A.113.[11] The defense had yet to obtain medical records for Runyon, his mother, and his biological father, and asserted that "[t]hese records are absolutely necessary before [mental health] experts … can perform testing and render opinions." J.A.116. In addition, counsel wanted documentation for injuries Runyon sustained in a head-on collision with a drunk driver and wanted to investigate the effects of grenade blasts near Runyon during Army training exercises because

[9]Counsel said Dr. Nelson would present Runyon's social history. J.A.78.

[10] Hudgins later admitted that he had not spoken with Dr. Halleck and then learned that Dr. Halleck was *not* available to work on Runyon's case. J.A.889-890.

[11] The trial date was continued six weeks after Hudgins was appointed. J.A.93, J.A.97; J.A.2016-2017; J.A.2019.

injuries that affected Runyon's reasoning abilities were important for mitigation.[12] J.A.2016-2017; J.A.2019. Regardless of the change of counsel, the case could not have gone to trial on the original date because "[t]he mitigation investigation for the penalty phase was not complete and still is not complete at this time."[13] J.A.117. The district court declined to move the trial date. J.A.127-129, 134-135.

Three weeks before trial, Hudgins sought the appointment of two experts: psychiatrist James Merikangas and neuropsychologist to Allan Mirsky. J.A.3176-3177. Hudgins explained, "there are various medical issues involved in the defendant's past that require review by a psychiatrist to determine their effect on his psychiatric health," however, the issues still needed investigation. J.A.3176. The court took the motion under advisement. J.A.3181.

The timeframe constrained the mental health investigation. Four days before trial, Dr. Mirsky briefly examined Runyon; he informed counsel his analysis was "not yet complete," J.A.2131, and initial testing revealed deficits requiring further testing. J.A.889. The day before trial, counsel filed a supplemental notice for Drs. Mirsky and Merikangas. J.A.230.

Trial began on June 30, 2009, and jurors convicted co-defendant Draven and

---

[12] Upon inquiry, counsel would have known the records from Runyon's 1996 emergency room visit had already been destroyed under the hospital's seven-year retention policy. J.A.2127.

[13] From the date of appointment to trial, Hudgins had 91 working days to investigate and prepare. At least 57 of those days he spent in court on other cases, including a 14-day federal trial. J.A.2016-2017; J.A.2128.

Runyon on Friday, July 17, 2009, after 4 ½ hours of deliberation. Counsel requested 90 days to prepare for the penalty phase, stating, he "will simply not be ready to present the defendant's case for life." J.A.896. A mental health examination suggested "a significant mental disorder that bears a potentially strong relationship to the defendant's behavior and moral culpability" but counsel still lacked medical records and the mitigation investigation was incomplete. J.A.896-897; J.A.889. The court granted a one-month extension, authorized counsel to hire Dr. Merikangas, and required his report to be filed in 15 days. J.A.917.

The 15-day time frame proved impossible and the U.S. Marshals were unable to make Runyon available for the brain scans Dr. Merikangas required until eight days after his report was due. J.A.920. Dr. Merikangas' preliminary report noted he was awaited results of the MRI and PET scans.[14] J.A.1996. He remarked on Runyon's multiple physical abnormalities consistent with trauma and observed that Runyon "presently is either in a fantasy world of grandiose wishful thinking, or suffering from delusions. He clearly has impaired functioning suggestive of frontal lobe brain impairment." J.A.1996-1997. Drs. Merikangas and Mirsky both "noted deficiencies in defendant's psychological testing and history of injuries which could have caused brain injury accounting for these deficiencies." J.A.919.

At the penalty phase, counsel failed to present any testimony from their mental

---

[14] The brain scan report was released directly to counsel and not shown to Dr. Merikangas or any expert. Counsel had permission to supplement the defense experts' reports, but failed to do so.

health experts.

One-third of the defense's penalty phase evidence—both in number of witnesses presented and transcript pages of testimony—was about Runyon's good jail behavior, J.A.1049-1092, and his low likelihood of violence in prison. J.A.1005-1007.

As counsel attempted to present Runyon's life history, the judge openly commented that the testimony of Runyon's adoptive father was attenuated and unrelated to the enumerated mitigating factors. J.A.1128-1130. The prosecutor objected when Runyon's mother, Suk Cha Runyon, began to explain her war-time flight from North Korea as a child. The court openly agreed her background was unnecessary and questioned what it had to do with Runyon. J.A.1141. Referring to the fact that English was not Suk Cha's native language and no interpreter had been enlisted to help with her testimony, counsel capitulated. J.A.1141 ("[I]t is going to be difficult for the jury to understand her anyway."). The remaining penalty phase witnesses spoke briefly about Runyon's childhood and character, his relationships and employment history. *Runyon*, 707 F.3d at 499. They described Runyon as a good friend, a charitable person, a considerate and helpful guest, and a caring father.

In closing, the prosecution argued Runyon had "a good upbringing" but, "he rejected that, and he walked away from that over five years" ago. J.A.1216. The prosecution added:

> "derogatory and superfluous" comments about Runyon's own life, … asserting that he "left his wife and children and didn't provide support for them"; "abandoned more gainful attempts at employment, to get

56

employment through these sporadic drug studies that put him into contact with people like Michael Draven"; met his girlfriend "at a strip bar"; and "play[ed] video games" while his girlfriend held down three jobs.

*Runyon*, 707 F.3d at 512.

Defense counsel's argument focused on the inequity of the life sentences of codefendants Draven and Cat, and the impact Runyon's execution would have on his mother, son and friends.[15] J.A.1234-1244. *See also Runyon*, 707 F.3d at 508.

Counsel had told the jury, "There is a reason why we bring you evidence sort of from the cradle to the day we are sitting here in court, to the extent we can get it, because the law allows, in fact, requires us, if we can, to let you know as much about Mr. Runyon as we can." J.A.1246. However, counsel did not follow up on his promise to "put on . . . mental health information," J.A.904, and he could not explain the significance of "the fact that he [Runyon] couldn't hold a job or that he would do okay in a job for a little while, and then for whatever reason, be it his own inability to focus or his family situation or his marriage, that he would lose that job[.]" J.A.1245. Without an explanation for Runyon's erratic behavior, the prosecution's arguments could not be counter-balanced. Counsel admitted he could not answer the question

---

[15] At the last-minute request of Hudgins, responsibility for the penalty-phase closing argument was transferred to guilt-phase counsel Woodward. *See* J.A.2007. Early on, Woodward remarked about mitigation: "we'll throw a couple of relatives on the stand and that will be enough." J.A.2006-2007. He displayed an insensitivity to signs of mental illness and thought Runyon's grandiose ideation was funny. J.A.2003. He failed to recognize that Runyon's conspiracy theories, verbosity, pattern of bouncing from job to job, and series of problem relationships were indicators of brain damage and/or mental illness that required exploration.

obvious to all in the courtroom:

> So the legitimate question, then, would be, well, what happened? What happened to the person that they described that gave his last $5 bill, instead of going shopping, gave it to the homeless guy or the one that helped the child with some personality disorder[16] that Ms. Provost talked about? And I don't have a glib answer. I don't have, you know, a pat response, where I stand up and say, you know, right here is what caused Mr. Runyon to get involved in this and to be where we are today.

J.A.1239.

The jury deliberated eight hours and sentenced Runyon to death, finding two statutory aggravators and four non-statutory aggravators "outweigh[ed] any mitigating factor or factors."[17] *Runyon*, 707 F.3d at 519; J.A.1311-1316. The jurors found ten of the fourteen statutory and non-statutory mitigating circumstances proposed by the defense[18] but also found three mitigating factors not proposed by the defense: (1)

---

[16] This comment illustrates counsel's ignorance of mental health issues and his failure to engage the assistance of a mental health expert. Provost's child was diagnosed with Pervasive Developmental Disorder, which is a mental disorder on the autistic spectrum. J.A.1174. It is not a personality disorder.

[17] The aggravators found were: "pecuniary gain" and "substantial planning," 18 U.S.C. §3592(c)(8) & (c)(9), and "lack of remorse," "abuse of women," "specialized training," and "victim impact."

[18] Ten mitigators were found: (1) no serious criminal record; (2) equally culpable persons will not be punished by death; (3) Runyon would serve a life without parole if not sentenced to death; (4) Runyon worked and was legally employed all his life; (5) he has committed acts of kindness and generosity for his neighbors and community; (6) he witnessed and experienced domestic violence and parental conflict until his biological father and mother separated; (7) & (8) Runyon's son and mother will suffer emotional harm if Runyon is executed; (9) he was honorably discharged from the U.S. Army; and (10) he has a college degree. J.A.1312-1314. Four mitigators were rejected: "a positive adjustment to incarceration;" Runyon "has the respect and support of correctional officers;" he "had no disciplinary write-ups" while incarcerated and helped other inmates; and, he "does not present a risk of future violence or danger to

Runyon experienced domestic violence from his mother and adoptive father; (2) Runyon's brother will suffer emotional harm if Runyon is executed; and, (3) Runyon believed Voss was molesting his daughter. *Runyon*, 707 F.3d at 487-88. The jurors found over twice as many mitigators as aggravators, but their verdict makes clear they were unable to assign much weight to the mitigation evidence. The prosecution had argued: "the defendant has tried to make it [mitigation] very much about quantity versus quality[.]" J.A.1212.

### 2. Counsel Failed to Investigate and Present Evidence of Brain Damage and Mental Illness

A failure to uncover and present mitigating evidence at sentencing cannot be justified as a tactical decision to focus on a particular defense theory when counsel have not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background." *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, Commentary, pp.4-55 (2d ed. 1980)). "[R]egardless of how much or how little mitigation evidence was presented during the initial penalty phase," *Sears v. Upton*, 561 U.S. 945, 956 (2010), the inquiry "focus[es] on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable." *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). The assessment examines prevailing professional norms at the time of trial, *Porter v. McCollum*, 558 U.S. 30, 39 (2009), and is made "in light of what counsel actually

the public while in prison for the rest of his life." J.A.1313.

discovered." *Wiggins*, 539 U.S. at 525; *Porter*, 558 U.S. at 39-40.

### a. Counsel Failed to Discover Mitigating Evidence.

In this case, counsel did not decide to forego the unpresented mitigating evidence; they failed to discover it. Although counsel sought expert assistance and became aware of mitigating facts warranting further investigation, the experts were without time and information needed to complete final assessments of Runyon. Thus, the jury never knew of Runyon's brain damage and mental illness; classic and powerful evidence in favor of a life sentence.

Dr. Mirsky examined Runyon four days before trial. He told counsel: "it is clear from the data that there is strong evidence that [Runyon] is suffering from a neurological disorder[,]" and it was "essential for Runyon to be evaluated by a neurologist." J.A.2131. Runyon's scores were "clearly indicative of dysfunction in a brainstem-cortical system." J.A.3188. Runyon's symptoms were "consistent with brainstem injury," and "blast injury can have profound effects on neurocognitive functions." J.A.3189. Dr. Mirsky noted that when the "full data are available," he would issue a final report. J.A.3189.

Dr. Mirsky was "firmly convinced" of Runyon's brain damage. J.A.2132. He found Runyon suffers from the combined effects of blast injuries sustained in ROTC and car accidents. Runyon's impaired attention, evidenced by test instruments, is a classic symptoms as well as quickness to anger and impulsivity and occasional dizziness. Dr. Mirsky likened Runyon to a wounded warrior. J.A.2132.

After Runyon was convicted, Dr. Merikangas conducted a neurological examination of Runyon and ordered brain imaging "[b]ecause of [Runyon's] history of multiple head injuries, beatings in childhood, and his current severe headaches[.]" J.A.1996-1997. He informed counsel that the prosecution experts' reports also "suggested that Mr. Runyon suffered from Migraine-like headaches, Attention Deficit Disorder and Post-Traumatic Stress Disorder." J.A.1996. Dr. Merikangas' evaluation revealed that Runyon's "head circumference was abnormally small[,]" and:

> He had multiple scars on his head and face from trauma, including an automobile accident that rendered him unconscious and contributed to his PTSD. His right forehead does not wrinkle with facial expression and his right lip sags from a peripheral nerve injury, which may be congenital or the result of beatings he sustained in childhood. There is a lump on the vertex of his scalp from trauma.

J.A.1996. "[P]resently" Runyon "was either in a fantasy world of grandiose wishful thinking, or suffering from delusions," and he "clearly has impaired executive functioning suggestive of frontal lobe brain impairment." J.A.1997. Dr. Merikangas said he would provide a "full report" following the results of the brain imaging but counsel did not provide him with the scans and never asked for a final report. J.A.1997.

In light of the information counsel possessed, it was unreasonable to halt their investigation of brain damage and mental health evidence. Counsel recently described the unpresented evidence as "the type of information [he] would have been looking for at the penalty phase." J.A.2084, 2085.

### b. The district court created post hoc justifications for counsel's failures.

In *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003), the Supreme Court cautioned against creating "post hoc rationalization[s]" for counsel's performance. That is exactly what the district court did here. Rather than complete the investigation and present evidence of brain damage and mental illness, counsel told the jury there was no explanation for Runyon's claims. J.A.1239. The district court's determination—that counsel reasonably cut short the investigation and chose to forgo presentation of Runyon's brain damage and mental health—is in error; the decision misapprehends both well-established law regarding norms of professional performance and the facts in the record.

The court relied throughout its opinion on the mistaken premise that counsel made a reasonable, strategic decision to forego mental health evidence in order to argue Runyon is not the "worst of the worst." J.A.2904-2919; J.A.2931-2942. Initially, this rationale is faulty because the two concepts are not mutually exclusive. Importantly, counsel's decision to focus on a particular strategy cannot be "'justified by a tactical decision' when 'counsel did not fulfill their obligation to conduct a thorough investigation[.]'" *Sears*, 561 U.S. at 953-54 (quoting *Williams*, 529 U.S. at 396); *see also Wiggins*, 539 U.S. at 522. Choices made by counsel after a less than complete investigation, "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S.

at 690-91. Here, counsel's failure to continue the investigation was unreasonable "particularly in light of what counsel actually discovered," *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (internal quotations omitted), and the inadequate investigation can't support a reasonable strategic decision. The district court, however, said: "[s]econd-guessing counsel at this stage is fruitless," J.A.2913, and "conjure[d] up tactical decisions [the] attorney could have made, but plainly did not." *Tice v. Johnson*, 647 F.3d 87 (4th Cir. 2011).

The court supplied possible explanations for counsel's "tactical choice" to halt the investigation or forego evidence of brain damage and mental illness, J.A.2932-2933; J.A.2912, but counsel's sworn declaration disavowed those reasons. Counsel confirmed that a radiologist's report of a "normal brain MRI" "would not have supplied [him] with enough information to make a decision to cease investigation of David Runyon's mental health or social history." J.A.2804. When recently informed that the film revealed brain damage, trial counsel declared that was "the type of information I would have been looking for at the penalty phase." J.A.2804.

The court found counsel reasonably decided to omit mental health mitigation from the penalty phase defense because the defense experts' reports were preliminary, and "contrasted with the findings in the government's experts' reports." J.A.2915. *See also id.* at J.A.2937. This conclusion is wrong.

First, the court failed to acknowledge that the reports were preliminary because the court denied adequate time for new counsel to investigate and did not approve the

services of Dr. Merikangas until after Runyon was convicted. Also, counsel failed to provide materials that the experts needed to complete their reports. *See Gray v. Branker*, 529 F.3d 220, 239 (4th Cir. 2008).

Second, after receiving reports from the government's experts, counsel affirmed an intent to present mental health experts and obtained permission to supplement the defense experts' reports. J.A.919. Counsel recently explained: "I would expect a prosecution expert to express a differing, if not unfavorable, opinion of my client. I would not have ceased an investigation into, or decided not to present, David Runyon's mental health and social history based on the fact that one or two prosecution experts issued unfavorable reports." J.A.2804. *Cf. Elmore v. Ozmint*, 661 F.3d 783, 859 (4th Cir. 2011) (lower court's reasoning that no investigation by defense counsel was necessary because counsel "reasonably trusted" prosecution's findings, was "abhorrent to *Strickland*, which was designed to protect the Sixth Amendment right to a 'reliable adversarial testing process'") (quoting *Strickland*, 466 U.S. at 688).

In fact, some findings in the prosecution's expert reports agreed with the findings of the defense experts. For example, the government experts "suggested that Mr. Runyon suffered from Migraine-like headaches, Attention Deficit Disorder and Post-Traumatic Stress disorder." J.A.1996. They noted head injuries, including Runyon's head trauma from abuse by his biological father, concussions from military training experiences, and a "bad car accident." J.A.187-188; J.A.220. Dr. Patterson said the "sag" on the right side of Runyon's face resulted from abuse by his biological

father. J.A.187. Testing by Dr. Montalbano, revealed a substantial variance between Runyon's verbal and performance IQ scores, and significant deficits in working memory. J.A.224-225. *Accord* Mirsky report, J.A.2242 ("[t]his type of verbal-performance discrepancy is consistent with damage to the *right* cerebral hemisphere"). Dr. Patterson found no "aggravating" mental health factors for sentencing, J.A.199, and noted that Dr. Montalbano's findings were consistent with his. J.A.200.

Third, the fact that the prosecution would present its own experts does not legally justify counsel's failure to develop and present mental health mitigation. *Porter*, 558 U. S. at 43 ("[I]t was not reasonable to discount entirely the effect that [a defense expert's] testimony might have had on the jury" just because the prosecution's expert provided contrary testimony). *See also U.S. v. Mansfield*, 24 M.J. 611, 618 (A.F.C.M.R. 1987) (rejecting argument that abandoning expert evidence was reasonable because the prosecution could respond with damaging information).

Finally, the unpresented mitigation evidence supported the theory of mitigation offered by the district court: that Runyon was not the "worst of the worst." J.A.2914, 2917. *See, e.g.*, *Wiggins*, 539 U.S. at 535. Had counsel adequately investigated, the evidence would have directly reduced Runyon's culpability. *See, e.g.*, *Porter*, 558 U.S. at 41 (evidence of poor mental health or mental impairment could influence a jury's appraisal of the defendant's moral culpability); *Rompilla*, 545 U.S. at 392 (discussing how organic brain damage is an extreme mental disturbance that significantly impairs cognitive functions and a defendant's mental capacity at the time of the crime).

The record contradicts the court's conclusion that when "[p]etitioner consistently denied involvement in the crime," mental health evidence "could reasonably have been considered by counsel to be adverse to their chosen strategy." J.A.2936. By the sentencing phase, counsel had abandoned attempts to deny Runyon's involvement. Counsel urged jurors to compare Runyon's culpability with the codefendants', saying: "based on your finding, [] Mr. Runyon is capable of doing some terrible things," J.A.1238, and there is no explanation of "what caused Mr. Runyon to get involved in this." J.A.1239.

For these reasons, counsel failed to conduct a professionally reasonable investigation of mitigating evidence.

### 3. Had Counsel Performed Effectively, There Is a Reasonable Probability That Jurors Would Not Have Sentenced Runyon to Death

Absent counsel's unprofessional failure to develop the evidence, jurors would have heard that a combination of factors beyond Runyon's control, including brain damage, significantly affected his cognitive abilities and behavior. Jurors relate to, and easily understand, head injuries suffered by military veterans as well as PTSD. Thus, counsel's failure to present this evidence was prejudicial. *Porter*, 558 U.S. at 36 n.4.

The "centerpiece" of the defense was the "equally culpable-codefendants" mitigator. *Runyon*, 707 F.3d at 508. The evidence presented by trial counsel, however, failed to reduce Runyon's moral culpability and therefore gave jurors an inaccurate basis upon which to apportion responsibility between Runyon and his two

codefendants. In closing, counsel admitted, "I don't have, you know, a pat response, …[to]…what caused Mr. Runyon to get involved in this and to be where we are today." J.A.1239.

The prosecutor argued Runyon's culpability:

> He had the power to take the life or to walk away and save a life, and when he exercised this power, when he chose this course, he made that decision to be treated on his own, to be treated differently. He acted with complete free will in doing so.

J.A.1253. These arguments, coupled with the defense presentation of only good character witnesses, served to heighten—not reduce—Runyon's moral culpability. Had counsel adequately investigated they would have learned about Runyon's individual characteristics—not determined by choice—and how they impacted the trajectory of Runyon's life.

Expert witnesses could have explained that Runyon experienced multiple traumas from a young age and suffers PTSD, but he was able to achieve an associate's degree, find short-term employment and ultimately he supported his wife and son. Then he suffered one brain insult too many when he was hit head-on by a drunk driver. Runyon became irritable and short-tempered and domestic conflict escalated. Brain scans "revealed multiple white matter hyperintensities"—brain damage— "result[ing] in impaired executive functioning and decision making." J.A.1992, 1995. Jurors should have learned of Runyon's frontal lobe brain damage, characterized by "[m]arked impulsiveness," and which affected his ability to "appreciate the

consequences of his actions." J.A.2242.

### a. Evidence of Brain Damage and Mental Illness Could Have Rebutted the Government's Case in Aggravation.

Specifically addressing the prosecutor's argument, jurors would have heard: "persons with frontal lobe damage are impulsive . . . and once they become fixed on a course of action, they seem to forget that any other is possible." J.A.2056. His "psychiatric difficulties constitute a severe mental or emotional disturbance [and] as a result of these psychiatric difficulties, Mr. Runyon's capacity to conform to the requirements of law was significantly impaired." J.A.2213. Expert testimony about the impact of Runyon's neurological damage and deficits would have established the statutory mitigators of "impaired capacity" and "disturbance." 18 U.S.C. §3592(a)(1) & (a)(6).

This missing evidence reveals the type of brain abnormality, cognitive defects, and other mental disorders that the Supreme Court deems highly relevant to assessing a defendant's moral culpability. *Porter*, 558 U.S. at 41, 43; *id.* at 36 n.4 (discussing the mitigating value of PTSD); *see also Sears,* 561 U.S. at 949 (brain damage is significant mitigating evidence); *Abdul-Kabir v. Quarterman*, 550 U.S. 223, 261-63 (2007) ("possible neurological damage" is mitigating evidence); *Rompilla*, 545 U.S. at 392 (organic brain damage is an extreme mental disturbance that significantly impairs cognitive functions and a defendant's mental capacity at the time of the crime); *id.* at 391 (evidence of schizophrenia and other disorders were part of the evidence that "would have

destroyed the benign conception of Rompilla's upbringing").

The effects of Runyon's brain damage and mental illness would have shed a different and mitigating light on the prosecution's arguments in aggravation. For example, the prosecution argued that Runyon's tardiness at work was irresponsible; that he "chose" not to complete college and instead "chose" to follow a different path; and, that he failed at every career attempt but placed the blame on his employers. J.A.2056. The prosecution also argued that Runyon had "a good upbringing" but, "he rejected that, and he walked away from that over five years ago." J.A.1216. The evidence regarding Runyon's mental health and events that led to further issues and changes in his behavior would have provided a much-needed explanation.

Brain damage provides a mitigating understanding of Runyon's patterns of moving from job to job and place to place, and his unstable and volatile relationships. It is an important factor for jurors to consider when assessing Runyon's judgment and decision-making capability compared to that of his codefendants, particularly in light of the statutory aggravators of "substantial planning" and "pecuniary gain," *id.*, and the prosecution's argument that jurors should blame Runyon for not changing course and saving Voss at the last minute. J.A.1193, 1215-1216, 1253.

Reviewing how the missing evidence could have affected evidence in aggravation is part of the kind of probing analysis not undertaken by the court below when determining whether counsel's performance has resulted in prejudice. *See, e.g.,*

69

*Sears*, 561 U.S. at 951 ("Competent counsel should have been able to turn some of the adverse evidence into a positive—perhaps in support of a cognitive deficiency mitigation theory. … This evidence might not have made [the defendant] any more likable to the jury, but it might well have helped the jury understand [him], and his horrendous acts—especially in light of his purportedly stable upbringing.").

Evidence of Runyon's brain damage and mental illness also would have weighed against the argument that Runyon's appearance evidenced a lack of remorse, J.A.1920-1921, J.A.1924-1925. The prosecution emphasized Runyon's alleged "lack of remorse" as an aggravating factor and argued his failure to confess contradicted his religion. J.A.1182-1185, J.A.1187, J.A.1209-1211, J.A.1251, J.A.1254. The prosecutor argued Runyon's appearance was proof of remorselessness: "You saw his demeanor when being questioned in the second interview yesterday by Detective Rilee . . . you can see there, you can see by his demeanor, of his guilt. But you can also see how unaffected he is by the crime that he has committed." J.A.1210-1211. "He sat stone-faced after being confronted with all this evidence and expressed no remorse, no regret whatsoever." J.A.1211.

Had counsel properly investigated, the prosecutor's argument could have been rebutted: "Runyon's psychiatric disorders are a major determinate of his facial expression. In addition, the nature of the injuries that have caused Mr. Runyon's facial asymmetry are also a major determinate of his facial expression." J.A.2213. Jurors should have known this when called on by the prosecutor to assess Runyon's facial

expression for culpability.

### b. Evidence of Brain Damage and Mental Illness Would Have Reduced Runyon's Culpability.

Moreover, there was a wealth of mental health mitigation unknown to jurors. Had counsel continued to develop evidence of Runyon's brain damage and consult with the experts, Dr. Mirsky could have testified that Runyon suffers "significant damage to the right side of the brain, as well as a psychotic disorder." J.A.2242.

Runyon's history of head injuries includes two incidents of grenades being detonated quite close to him during military training exercises and two serious car accidents that produced cognitive sequelae, including brief unconsciousness, vertigo (from which he still suffers occasionally), temporary deafness, numbness, impaired memory, "jumbled thoughts," and marked personality changes including a short temper. J.A.2238. These conditions are consistent with brain damage and PTSD and similar to "that of many injured service members diagnosed with mTBI (mild traumatic brain injury)." J.A.2238 Runyon's brain scans, however, reveal demonstrable brain damage and change the diagnosis to "moderate brain injury." J.A.2238. *See also* J.A.2212 (diagnosing Runyon with PTSD).

The marked change in Runyon's behavior after significant head injury possibly contributed to the development of a psychotic disorder. Runyon's family history "suggest[s] strongly that a genetic precursor for psychosis could have been present as well; in effect the psychosis was 'released' or expressed by the cumulative effect of the

head injuries." J.A.2242. A diagnosis of psychosis, possibly schizophrenia, is consistent with Runyon's test results, and research reveals the "frequent . . . co-occurrence of abnormal brain tissue and schizophrenia." J.A.2242. Dr. Mirsky could have testified: "[m]arked impulsiveness is a noted characteristic of frontal lobe injury, in which the individual may not appreciate the consequences of his actions[.]" J.A.2242.

Had counsel shown Dr. Merikangas the brain scans, he could have testified that they "revealed multiple white matter hyperintensities … consistent with his history of head injur[i]es and migraine." J.A.1995. Runyon is "a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process." J.A.1992. Runyon sustained brain damage from the age of three when he was thrown across a room by his father and fell unconscious, J.A.1995, and it was exacerbated by a car accident, as evidence by personality and mood changes and contributed to his PTSD. J.A.1995. Such "brain injury has resulted in impaired executive functioning and decision making." J.A.1995. Testing also indicates paranoia and delusions. Runyon's history of PTSD "may account for some of his disordered mood and cognition." J.A.1995. "The paranoia and delusions may represent a formal thought disorder, which may be a consequence of his brain injuries, mood disorder, and PTSD." J.A.1995.

Dr. Cunningham could have testified about the interaction of these issues and the effect on Runyon's behavior. He testified at Runyon's trial regarding a violence

72

risk assessment, and was barred from testifying about adverse developmental factors after the prosecution moved to prevent the testimony because it was beyond the scope of Cunningham's report. J.A.928. Given the opportunity, Dr. Cunningham could have also testified that Runyon's history of traumatic brain injury started at age three (at the hands of his biological father). J.A.2024. He would have explained that frontal lobe damage can result in "personality changes of reduced initiative, reduced planning ability and foresight, unreliability, rudeness or tactlessness, and irascibility resulting in . . . difficulty holding employment." J.A.2056. *See also Sears*, 561 U.S. at 946, 949 (cognitive impairments caused by significant frontal lobe damage suffered as a child). Persons with frontal lobe damage are impulsive, have poor anticipation, and once they become fixated on a course of action, they seem to forget that any other is possible. J.A.2056. Frontal lobe damage reduces the ability to plan and to perceive consequences of actions, results in deficiencies of judgment, and imposes difficulty in reprogramming an ongoing chain of behavior. J.A.2057.

Due to the constellation of factors affecting Runyon's brain and behavior, including the effects of an extremely difficult childhood, brain damage, and multiple major psychiatric disorders, Runyon's capacity to function would have been impaired at the time of the crime. J.A.2212-2213. Psychiatrist Richard Dudley has opined: "these psychiatric difficulties constitute a severe mental or emotional disturbance[]" that significantly impaired Runyon's capacity to conform to the requirements of law. J.A.2213.

Dr. Dudley also noted that "Runyon's family history of mental illness and the role of genetic transmission in the etiology of these types of mental illness placed him at increased risk for developing such psychiatric difficulties." J.A.2211. Runyon developed psychiatric issues in childhood, like difficulties in regulating mood, that "went unidentified and unaddressed." J.A.2211. During early adulthood, Runyon's psychiatric difficulties increased, "characterized by an even more severe disturbance of his mood and more clearly defined psychotic symptoms." J.A.2211. Runyon suffered "episodes of depression and episodes of at least hypomania," and "clearly delusional thoughts of both the grandiose and the paranoid type were superimposed upon immature psychological defenses that he had been using and thoughts . . . about evil and the possibility that someone was out to get him." J.A.2211. For example, Runyon believes "evil spirits can influence this world." J.A.2207. He has seen ghosts and felt their presence. "He was never afraid of any of that; so he never ran, knowing that he could manage any of that[.]" J.A.2207. He described watching a glass move across a table and "he simply caught it." J.A.2207. He believes "there have been times when that evil has tried to use others to cause him harm," but "he has been able to foresee that and thereby avoid that[.]" J.A.2207.

"[T]he emergence of paranoid delusions that someone was trying to harm him clearly exacerbated his trauma-related hypervigilance and over reactivity. For example, as his mania and grandiose delusions became more severe, they served as a defense against some of his anxiety and fears, but also caused his behavior to become all the

74

more erratic, unpredictable and impulsive." As a young adult, Runyon suffered "near death experiences" which "exacerbated his trauma-related difficulties." Additionally, cognitive deficits further impaired his decision-making capacity "beyond the impairments resulting from the distorted perceptions of reality, the impairments in judgment, and the impulsivity associated with his other psychiatric disorders." J.A.2212. The synergistic effect of these factors constitutes substantial mitigation that Runyon's jurors never heard.

In addition to expert testimony, counsel could have presented jurors with lay witness and record evidence providing the bases for the experts' testimony. For example, Army medical records described Runyon's treatment after two car accidents and resulting vertigo, short term memory loss, headaches, and PTSD. J.A.2136-2140, J.A.2143, J.A.2147, J.A.2149-2152, J.A.2154, J.A.2158-2159. Counsel recently admitted that the Army records obtained during post-conviction proceedings were "the type of information [he] was looking for at the penalty phase." J.A.2805; J.A.2016-2017. Moreover, witnesses would have testified about the car accident and subsequent changes in Runyon's behavior. *See, e.g.*, J.A.2224; J.A.2230-2231; J.A.2232-2233; J.A.2227; J.A.2195-2196; J.A.2198; J.A.2191; J.A.2234.

### c. The District Court's Prejudice Analysis Flouts Supreme Court Precedence.

The court summarily dismissed Runyon's post-conviction evidence, including the opinions of multiple experts, without properly putting the evidence on the scale

with the "good character" mitigation evidence presented at trial. This was error because, when assessing prejudice, a court must "evaluate the totality of the available mitigation evidence-both that adduced at trial, and the evidence adduced in the habeas proceeding-in reweighing it against the evidence in aggravation."[19] *Williams*, 529 U.S. at 397-98. "It is unreasonable to discount to irrelevance," *Porter*, 558 U.S. at 43, this type of mitigating evidence because it has particular significance to jurors. *See, e.g., Gray v. Branker*, 529 F.3d 220, 235 (4th Cir. 2008) ("[e]vidence of mental disturbance . . . can be persuasive mitigating evidence for jurors considering the death penalty, and this evidence can determine the outcome.").

The court also erred by requiring Runyon to show a connection or nexus between the unpresented mitigating evidence and the crime. J.A.2930 ("It is unclear how failure to introduce [information about the car accident and long-term effects on Runyon's behavior] undermines confidence in the outcome, which is that he received the death penalty for a carefully planned contract kill. A personality change is not a

---

[19] This Court has explained that the weighing process "requires objectivity." *Gray*, 529 F.3d at 237. The district court's opinion suggests that the objectivity required to appropriately assess prejudice was lacking in Runyon's case. For example, the court presumed Runyon's purpose for explaining that the prosecution experts reports did not justify defense counsel's abandonment of mental health mitigation was "to just add more unnecessary confusion at this juncture." J.A.2924. At another point, the court rejected Runyon's argument that mental health evidence should have been presented with or instead of repetitive lay witness testimony by noting, "[h]ad [the lay witness testimony] not been presented, the Petitioner would likely now argue that it should have been. The attorneys simply 'can't win for trying,[.]" J.A.2918.

defense to murder.".[20] *See also* J.A.2940-2941 ("[T]he Petitioner cites mental health reports that tend to show he lacked impulse control or had PTSD, but he fails to show how such evidence would lower his culpability when compared to the government's evidence of a calculated and methodically-planned contract kill."); J.A.2916; J.A.2930. The Supreme Court holds that mitigating evidence is constitutionally relevant even when there is no direct nexus between the evidence and the crime. *See, e.g., Tennard v. Dretke,* 542 U.S. 274, 287 (2004) ("Nothing in our opinion suggested that a [defendant] must establish a nexus between her mental capacity and her crime.")

The court's conclusory findings denying the existence of prejudice reflected a failure to conduct "the type of probing and fact-specific analysis" prejudice inquiry required by the Supreme Court. *Sears*, 561 U.S. at 955. For example, the court opined that confidence in the verdict is not undermined because "mental health evidence is a two-edged sword," and "[p]resenting that evidence could just as easily have hurt the mitigating factors actually presented, such as the Petitioner's prior acts of kindness, past work and military experience, and the allegation that Cory Voss was molesting his own daughter."[21] J.A.2836. It is untrue and untenable to suggest that Runyon's mental

---

[20] This statement of the court confused the *symptom* of personality change with the facts of brain damage and mental illness. Moreover, the penalty phase is about mitigation; not a defense to the crime.

[21] Runyon's counsel did not present evidence or argue that the Voss children were abused. Jurors independently made this conclusion and found it was a mitigating factor.

illness would discredit these factors. *Compare Gray*, 529 F.3d at 236 (mental health evidence does not conflict with mitigation strategy that the defendant "was a good father, son, and community member").

**C. Conclusion**

Even without mental health mitigation, the jurors' sentencing decision was not easy. They deliberated twice as long for the penalty-phase as for the guilt-phase. They were open to the mitigation contained in Runyon's psycho-social history, as demonstrated by their independent determination that Runyon continued to witness and experience domestic violence from[hi] mother and adoptive father. J.A.1312-1314. Presentation of Runyon's brain damage and mental illness may well have influenced the jury's appraisal of Runyon's moral culpability. Jurors instead decided Runyon's fate without any of the significant mental health evidence that constitutes weighty mitigation. Reasonable jurists could disagree with the district court's contrary findings. *Strickland v. Washington*, 466 U.S 668 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003).

The case should be remanded for an evidentiary hearing. Alternatively a review of the merits of the claim demonstrates Runyon is entitled to relief. A new sentencing hearing is warranted.

## IV. Runyon's Death Sentence Is Unreliable Because the Prosecution Withheld and the Jury Did Not Learn About Crucial Evidence Supporting the Statutory Mitigating Circumstance, Equally Culpable Codefendants Not Facing Death.

### A. Standard of Review

The district court held that Runyon's *Brady* claim was procedurally barred.[22] The Court reviews that determination de novo. *U.S. v. Linder,* 552 F.3d 391, 395 (4th Cir. 2009). The district court's finding of no materiality is a mixed question of law and fact that is reviewed de novo. *Caro v. U.S.*, No.16-1, 2018 WL 2113285, at *6 (May 8, 2018); *Summers v. Dretke*, 431 F.3d 861, 878 (5th Cir. 2005).

The district court's finding that trial counsel was not deficient for failing to discover and present this evidence is a mixed question of law and fact that is reviewed de novo. *U.S. v. Nicholson*, 611 F.3d 191, 205 (4th Cir. 2010).

Because the district court denied an evidentiary hearing, the appellate court reviews the facts in the light most favorable to the petitioner. *U.S. v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007); *U.S. v. Nicholson*, 475 F.3d 241, 248 (4th Cir. 2007).

### B. Argument

The Federal Death Penalty Act provides it is a mitigating circumstance that other equally culpable codefendants do not face death. 18 U.S.C. §3592(a)(4). Runyon argued he was no more culpable than Draven and Cat, neither of whom faced death.

---

[22] Although the Court found the claim barred, it reviewed the merits, reasoning a "successful *Brady* claim would provide the necessary cause and prejudice" to overcome a bar. J.A.2860.

*Runyon*, 707 F.3d at 508. *See, e.g.*, J.A.1042; J.A.1234-1235, 1240-1244 (equal culpability jury instruction request). The government countered Runyon was more culpable than Draven, because of his history of abusing women. This history consisted of one misdemeanor conviction for grabbing and poking his wife, one dismissed misdemeanor assault charge, and one unadjudicated act of misdemeanor assault. *See Runyon*, 707 F.3d at 504. Jurors found "abuse toward women" as a non-statutory aggravating circumstance. They also found the statutory "equally culpable" co-defendant mitigator. J.A.1312.

After the jury sentenced Runyon to death, the government filed a sentencing memorandum in Draven's case. J.A.1443, 1447-1448. The government argued Draven's criminal history warranted an increased sentence. Trial counsel failed to raise this issue before the district court or this Court. Thus, Runyon alleged trial counsel ineffectively failed to present this evidence. The government's suppression of material evidence, as well as trial counsel ineffectiveness, caused the jury to not hear evidence that supported the statutory mitigating circumstances.

### 1. The Government Suppressed Material Evidence that Undercut its Case for Death and Added Weight to Runyon's Case for Life.

Evidence in the prosecution's possession but not disclosed to Runyon's counsel until after the jury imposed death undercuts the government's case for death. *See Juniper v. Zook*, 876 F.3d 551, 566 (4th Cir. 2017) (exculpatory evidence demonstrates inconsistencies with the prosecution's case) (collecting cases). Neither

defense counsel nor the jurors knew of Draven's lengthy, violent and deviant, and/or predatory sexual proclivities. The withheld evidence demonstrates that Runyon's alleged history of violence against women paled in comparison to that of Draven, the man the government deemed unworthy of death. Draven's violent background was a relevant comparison for whether Runyon should be sentenced to death. Had this evidence been disclosed, Runyon's counsel could have demonstrated and argued to the jurors that if Draven's substantial history of violence did not warrant a death sentence then the comparatively minor incidents of violence in Runyon's background certainly should not weigh in favor of the death penalty.

Draven's criminal past was far more violent than Runyon's and Draven's victims far more helpless. Draven did not merely grab or poke his victims, he raped them. Under the name "Anthony James Neff," a.k.a., "Andy," Draven sexually abused a developmentally-delayed 15-year-old girl, and at least six children under the age of seven. Draven's victims were not merely vulnerable and physically smaller, they were young children. Draven's victims were near the age of the Voss children, the children who, under Draven's plan to murder Voss, would have been permanently placed at Draven's fingertips. This information could have transformed the "equally culpable" mitigating circumstance into a "greater culpability" mitigator if for no other reason than Draven's motive for the crime was to have Voss and her small children to himself.

Draven also abused, threatened to kill, stalked, and assaulted women. Draven

threatened to kill a former girlfriend with a car bomb and threatened to break a man's neck. Less than one year before the instant crime, Draven beat his girlfriend, slapped her with a knife on her legs and arms and poked the knife at her vagina. She reported that he had previously broken her finger and threatened to kill her in a sadistic manner, and her family members "burned to death." *Cara Richman v. Michael Draven a.k.a. Anthony Neff*, Application for Temporary Protective Order, District Court of Maryland for Baltimore, No. 0101SP052812006, Aug. 22, 2006.

Pursuing an "abuse of women" aggravator against Runyon, the prosecution introduced testimony, incident reports, and a protective order application. *See, e.g.,* J.A.1398; J.A.1404; J.A.1412; J.A.1433. Runyon could have done the same regarding Draven's violent criminal history had the information been disclosed. This withheld evidence would have substantially strengthened counsel's argument that because the prosecution did not seek death for Draven, Runyon likewise did not deserve death.

The district court acknowledged the prosecution withheld the information alleged in Runyon's §2255 motion. J.A.2862. It held, however, that Runyon's *Brady* claim was a "red herring" because the jury had found the equally culpable mitigator. J.A.2864-2865. The district court's materiality analysis failed to engage with the evidence of Draven's greater culpability, and disregarded the jury's duty to weigh— and not merely count—sentencing factors. These analytical errors also informed the lower court's decision to deny discovery and an evidentiary hearing on the *Brady* claim.

### 2. Materiality

Runyon argued Draven was more culpable yet did not face death. The withheld evidence supports this theory.

Three people were criminally responsible for Voss' death. Cat and Draven received and spent a $100,000 life insurance payout. They orchestrated the crime. But at trial, the prosecution railed about Runyon's history of domestic abuse as a reason to sentence him to death painting Runyon as the most culpable of the three persons involved in this crime. At the same time, the prosecution held in its pocket evidence that Draven—who stood to gain access to Cat's anticipated additional $400,000 insurance benefit as well as access to Cat and her two young children—had not only committed violent assaults, some with explicitly sexual components, against numerous women but he was diagnosed as a sexual predator who sexually assaulted children.

While jurors considered Runyon's history of abusive acts, it was important for them to know of Draven's abusive history of sexual assaults against a number of women and even his younger brother and sister. After Runyon was sentenced to death, the government argued in support of Draven's sentencing: "Certainly a history of violence and sexual assault by a defendant who has been convicted of a conspiracy to commit murder is relevant to the imposition of punishment." J.A.1447. This evidence, had it been revealed, would have substantially reduced the weight of the "abuse of women" aggravator used against Runyon. At the same time, substantial weight would have been added to the equally culpable co-defendant mitigator.

Evidence is material when it impacts the weight—in favor of the defendant—of both aggravating and mitigating factors. The government's failure to disclose such evidence violated the Fifth, Sixth, and Eighth Amendments, and *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *Giglio v. U.S.*, 405 U.S. 150 (1972), and *Kyles v. Whitley*, 514 U.S. 419 (1995).

Jurists of reason could determine that evidence of equal culpability but disparity in sentencing between codefendants was material to Runyon's defense, and withholding such evidence from Runyon and excluding it from the jury's sentencing calculus undermines confidence in the death penalty. *See generally U.S. v. Pelullo*, 105 F.3d 117 (3rd Cir. 1997) (relief warranted where government failed to disclose information supporting defendant's version of events); *U.S. v. Hammer*, 404 F. Supp.2d 676 (M.D. Pa. 2005), *appeal dismissed*, 564 F.3d 628 (3d Cir. 2009) (relief warranted where suppressed evidence that rebutted an aggravating circumstance).

### 3. Procedural Bar

The district court held this claim was defaulted because "information about Draven's past existed during the time of direct appeal." J.A.2860. The test is not whether information "existed," but whether it was present in the record of Runyon's trial. *Waley v. Johnston*, 316 U.S. 101, 104 (1942). A claim is appropriately raised on collateral review rather than direct review when the facts are "'dehors the record and their effect on the judgment was not open to consideration and review on appeal.'" *Bousley v. U.S.*, 523 U.S. 614, 622 (1998) (quoting *Waley, supra*). *See U.S. v. Garth*, 188

F.3d 99, 106 (3d Cir. 1999) (*Bousley* "recognized that a defendant is not procedurally barred if the claim could not have been presented earlier without further factual development"); *see generally News & Observer Pub'g Co. v. Raleigh-Durham Airport Auth.,* 597 F.3d 570, 574 (4th Cir. 2010) ("'[C]ourts hearing a case on appeal are limited to reviewing the record that has been developed below.") (quoting *Kirkpatrick v. Lenoir County Bd. of Educ.,* 216 F.3d 380, 384 (4th Cir. 2000)).

To assert this claim was available to Runyon on appeal, the court cited a sealed entry under Draven's docket filed months after Runyon was sentenced to death. J.A.2860. That document—whatever it may be—is not publicly available and it has never been part of Runyon's trial record.

The factual basis for the claim was not reasonably available to counsel for purposes of including the claim on direct appeal. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Amadeo v. Zant*, 486 U.S. 214, 222 (1988) (The withholding of evidence generally constitutes cause.). Because Runyon could not have submitted and supported his *Brady* claim on direct appeal, the district court wrongly held that the claim is defaulted.

Had Runyon's jury known that Draven—whom the government decided did not deserve death—had a far more violent past of severely abusing women and children and carried with him the specter of a far more violent future, there is a reasonable probability that one or more jurors would have refused to sentence Runyon to death. *Cone v. Bell*, 556 U.S. 449, 452 (2009) (vacating death sentence

because withheld evidence would have altered "at least one juror's assessment" of appropriate penalty).

### 4. Trial counsel ineffectively failed to investigate and present this material, once it was disclosed post-sentencing.

After the jury sentencing proceedings in Runyon's case concluded, the government filed its sentencing statement in Draven's case. J.A.1443. The statement references Draven's prior criminal history. Should this Court find trial counsel defaulted the claim, that finding demonstrates counsel's ineffectiveness for failing to investigate and present compelling evidence in support of the equally culpable mitigating circumstance.

The district court found counsel did not have a duty to investigate and present this evidence. J.A.2868. The district court also found any deficiency was not prejudicial. *Id.* The court's reasoning on prejudice suffers the same flaw as its reasoning on materiality. It overlooks the unpresented evidence would have given the equally culpable mitigator more weight. Given the equally culpable mitigator was the centerpiece of Runyon's case for life, counsel should have offered this evidence. This evidence is not cumulative to any other evidence the jury heard and casts the sentencing hearing in a different light. Jurists of reason could conclude counsel ineffectively failed to investigate and present evidence supporting this statutory mitigating circumstance and failed to properly raise the issue post-sentencing. *See Wiggins v. Smith*, 539 U.S. 510 (2003); *Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007)

(failure to investigate available mitigation).

### C. Conclusion

The jury did not hear compelling evidence that supported a statutory mitigating circumstance. This affected the weighing analysis to Runyon's prejudice. For these reasons, the case should be remanded for discovery and an evidentiary hearing. Alternatively, a review of the merits of the claim demonstrates Runyon is entitled to relief. A new sentencing hearing is warranted.

## V. Runyon's Convictions Are Unreliable Because Trial Counsel Ineffectively Failed to Present Evidence of Innocence.

### A. Standard of Review

The question whether counsel's performance was constitutionally adequate is a mixed question of fact and law that is reviewed de novo. *Nicholson*, 611 F.3d at 205. This claim was summarily denied so "the nature of the court's ruling is akin to a ruling on a motion for summary judgment," and the facts must be viewed "in the light most favorable to the §2255 movant." *Poindexter*, 492 F.3d at 267.

### B. Argument

The prosecution's circumstantial case was not so strong as to make guilty verdicts inevitable. Runyon was convicted on three of the five crimes charged.[23] To convict Runyon of conspiracy to commit murder-for-hire (Count One), taking a motor vehicle resulting in death (Count Two), and murder with a firearm in relation to a crime of violence (Count Five), jurors had to unanimously find, among other

---

[23] *Runyon*, 707 F.3d at 486.

elements, that: (i) Cat, Draven, and Runyon conspired to travel in interstate commerce with the intent to murder Voss for pecuniary value; (ii) Cat, Draven, and Runyon took a motor vehicle from Voss; and (iii) Cat, Draven, and Runyon knowingly used a firearm and death resulted from the defendants' actions. In short, the government had to prove beyond a reasonable doubt that Runyon traveled from his home in West Virginia with the intent to kill Voss in exchange for a promise of pecuniary gain. The government had no evidence showing that Runyon was in Virginia at the time of the crimes, or that he spoke with the codefendants in the weeks immediately before, during, or after the crime. J.A.1380.

The circumstantial evidence of guilt included dates and times of telephone calls between Cat, Draven, or Runyon; emails and recorded calls made after the crime; and incriminating statements Runyon allegedly made to "jailhouse snitches" and others. Runyon's counsel argued the circumstantial evidence did not prove beyond a reasonable doubt the elements required for conviction. *See, e.g.*, J.A.796, 808, 811-812, 815-816. Had counsel performed an adequate investigation and challenged the prosecution's proof, there is a reasonable probability of a different guilt-phase result.

First, the government asked jurors to infer travel and intent to murder from a map and photograph found in Runyon's car, and a note and list found at his house. J.A.786-788. A reasonable investigation would have shown that the information on the map was written in Draven's handwriting, J.A.2080, and the photograph of Draven and Cat was taken *after* the murder. J.A.787. Regardless of how this

photograph got into Runyon's car, it did not exist during the time the alleged conspiracy and murder were developed and carried out. Thus, it was not relevant to Runyon's actions or intent during this same period of time. Similarly, Draven's map accompanying the photograph also appeared *after* the murder. Lacking an explanation, trial counsel conceded that the map was "suspicious," and argued only that suspicion was insufficient to prove guilt beyond a reasonable doubt. J.A.817. Counsel did not inform jurors that the timing of the photograph—and likely timing of the map— made it irrelevant as proof of intent or of travel. The district court failed to acknowledge the timing of the photograph and map, and theorized that "[c]ounsel may have thought these writings to be highly prejudicial to the Petitioner, and chose to avoid highlighting the document." J.A.2885. Instead of imagining what trial counsel "may have thought," the court should have granted an evidentiary hearing on this issue.

Reasonable investigation also would have exposed the irrelevance of the list. There is no evidence Runyon ever acquired anything on the list, and no evidence that anything on the list was associated with Voss's murder. The prosecutor argued that an ATM photograph showed a person wearing a hoodie entering the victim's truck. The photograph actually depicts a shadow. J.A.1318-1351.[24] The government introduced reports excluding Runyon's fingerprints and DNA from the truck and crime scene but

---

[24] The evidence was of photographs; the direct appeal opinion refers to "video surveillance." *Runyon*, 707 F.3d at 486.

asked jurors to identify the perpetrator as Runyon because of the list included a "black hoodie."

Witnesses were available to confirm that the list was consistent with a shopping list that needed to be fulfilled because the items were consistent with Runyon's normal activities. *See, e.g.*, J.A.2022. Rather than present this exculpatory information to the jurors, counsel allowed a government witness to imply it was inculpatory. J.A.545-546. Reasonable investigation would have rebutted the government's argument that there was "a checklist for killing." J.A.788.

Second, the prosecution's theory was premised on Runyon having greater culpability because Draven was not the shooter. Prosecutors asked jurors to infer Runyon's involvement by arguing Draven and Cat were at other locations when the crime was committed. In other words, if those codefendants were not the "unidentified intruder" in the photograph, it must have been Runyon. Counsel failed to challenge the scientific validity of testimony from an investigator with the prosecution's office who asserted that cell tower signals from Draven's cellphone indicated that he was travelling away from the scene at the time of the crime. J.A.702-705, 709-711; J.A.1878-1880; J.A.2089; J.A.2689-2693; J.A.2809. The government introduced a map of cell tower locations with circles drawn around each tower to represent the radius in which the tower allegedly serviced cell phones. J.A.1393. The map depicted three cell towers to which Draven's phone connected that are located within approximately ten linear miles of each other, the credit union and Draven's

house. J.A.2810. The investigator testified that the "movement" of Draven's cellphone signal between the towers proved Draven was located within and moving between the radii of the towers. J.A.718. The investigator's testimony was also prejudicial because he said Draven was home during the time of the crime.

Counsel failed to challenge this testimony which was based on the faulty presumption that a cell phone always connects to the closest tower. It doesn't. *See, e.g.*, *U.S. v. Evans*, 892 F. Supp.2d 949 (N.D. Ill. 2012); Aaron Blank*, The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone*, 18 RICH. J. L. & TECH. 3, at *7 (Fall 2011); Larry E. Daniel, *Cell Phone Tracking Evidence*, J.A.2089-2108. At best, cell tower information indicates that a person is located within twenty linear miles (up to 500 square miles) of any particular cell tower. *See* Judge Herbert B. Dixon, Jr., *Scientific Fact or Junk Science? Tracking a Cell Phone Without GPS*, The Judges Journal, Vol. 53, No. 1 (American Bar Association, Winter 2014). Counsel failed to consult an expert and present evidence that Draven's cell phone could have connected to any or all of those towers with or without him changing locations. *Cf. Elmore v. Ozmint*, 661 F.3d 783, 786 (4th Cir. 2011) (counsel ineffective for "blind acceptance of the State's forensic evidence" and failure to investigate or adequately challenge that evidence). Although some courts have permitted the use of cell-tower testimony, "[n]o federal court of appeals has yet said authoritatively that historical cell-site analysis is admissible to prove the location of a cell phone user." *U.S. v. Hill*, 818 F.3d 289, 297 (7th Cir. 2016). This Court recognizes that cell-site location information

(CSLI) "does not enable the government to 'place an individual' at home or at other private locations. The historical CSLI at issue here does not provide location information anywhere near that specific." *U.S. v. Graham*, 824 F.3d 421, 426 n.3 (4th Cir. 2016) (en banc).

In post-conviction proceedings, Runyon presented an expert declaration that undermines this aspect of the prosecution's case. J.A.2809. The fact that Draven's cellphone utilized particular cell towers does not support testimony that Draven was not at the crime scene. Joseph Kennedy, Runyon's post-conviction expert, explained: the range of a cell tower is 21.75 miles; a cell phone can be located anywhere within the range of the tower with which it connects; and, the signal strength on the map exhibit underrepresents the coverage area of each tower. *Id.* Accordingly, trial counsel failed to adequately challenge the prosecution's proof by demonstrating that there was *no reliable evidence* proving that Draven was moving away from the Credit Union at the time of the crime. This information could have created a reasonable doubt about Runyon's involvement. *See* J.A.2020 (the defense theory involved portraying the codefendants "as the bad actors and to create doubt regarding [Runyon] being the person who shot Cory Voss.").

An evidentiary hearing including this issue should have been granted. Instead, the district court, contrary to §2255(b), credited the trial testimony over the expert declaration presented in the post-conviction proceeding. J.A.2881. This Court recognizes a hearing is especially warranted when factual disputes turn upon

credibility determinations and relate to occurrences outside the courtroom. *U.S. v. King*, 679 F. App'x 297, 299 (4th Cir. 2017). The court dismissed Runyon's allegations as "not only flimsy, but overreaching and tiresome." J.A.2877. Subsequently, the Supreme Court held in *Carpenter v. U.S.,* 138 S.Ct. 2206 (2018), that the government cannot lawfully obtain historical cell site location information without a warrant— which was not obtained in this case. The admission of such unreliable evidence tainted the integrity of the trial process and denied Runyon a just and fair trial. *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974).

Third, evidence of the government's inability to place Draven away from the murder scene would have been magnified by evidence of the government's inability to place Runyon in the vicinity of the crimes. Witnesses and electronic transactions placed Runyon in West Virginia on the day of the crime at least until 8:37 p.m. The crime occurred at 11:33 p.m. more than 370 miles away. It would have been impossible for Runyon to drive that distance in three hours. Trial counsel's failure to develop this evidence was prejudicial.

Fourth, Runyon owned two cell phones. He routinely used one phone and left the other with his son Davy or Davy's sitter, Paula Dalton, so the three could maintain contact. Around noon on the day of the crime, Runyon met with George Koski to purchase a handgun.[25] J.A.493. That transaction was friendly and, inconsistent with the government's claim that Runyon was a calculating "hitman;"

---

[25] Runyon owned a variety of guns. J.A.2087.

Runyon provided Koski with his name and driver's license. J.A.497-502. At 1:30 p.m., Runyon withdrew $80 from an ATM in Morgantown. J.A.1358. Runyon called Davy at 1:20 p.m. and 2:08 p.m. J.A.1380. The final call Runyon placed that day was to Davy at 8:37 p.m. That call did not incur roaming charges, meaning Runyon was in West Virginia at the time. J.A.1380.

At trial, the prosecution called Paula Dalton to testify. Counsel had not interviewed Dalton about this and failed to establish alibi evidence that the only calls to Davy's phone were from Runyon. J.A.2084; J.A.3102. As a result, jurors were deprived of evidence establishing that Runyon could not have committed the crime.

<u>Fifth</u>, trial counsel never spoke with Cat who pled guilty and was sentenced before this case went to trial. J.A.2020. She could have made clear that everything she knew about Runyon's alleged involvement in the crimes was told to her by Draven.[26] J.A.2079; J.A.2080. Importantly, Voss would have contradicted the prosecution's argument that she and Runyon planned the crime. She spoke with Runyon once and "did not talk about killing Cory." J.A.2080; *but see* J.A.71-72. There is a reasonable probability of a different outcome if jurors knew the mastermind codefendant doubted Runyon pulled the trigger. This is concrete evidence provided by Voss herself, and is not merely conclusory, nor is it speculative about what she might have

---

[26] The government did not introduce Cat's statement of facts as evidence of Runyon's guilt, but counsel was on notice of the need to investigate allegations therein. J.A.2020. Voss would have admitted that she "signed the statement of facts to [her] plea agreement although [she] had no independent, personal knowledge whether some of the statements were true." J.A.2079.

testified to. Her testimony would have called Runyon's guilt into question.

In the proceeding below, the government argued that a cross-examination of Cat based on her Statement of Facts would have left jurors "just as likely" to *not* believe Voss as to believe her. J.A.2513. This is an implicit concession of a 50-50 probability that jurors *would have* believed Voss had she testified consistent with her declaration. Runyon need not demonstrate prejudice by even a preponderance of the evidence, *Strickland*, 466 U.S. at 693, therefore, the court erred when the issue of fact raised by Respondent was not resolved in support of Runyon's claim of prejudice.[27] *Cf. U.S. v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004) (a court should not assume a potential witness will not testify).

The district court improperly dismissed Runyon's claim without allowing Runyon an opportunity to present Voss's testimony. *See* J.A.2874 ("This after-the-fact declaration by Cat Voss … does not reflect the record at the time of trial.").

Sixth, in support of the §924(c) conviction the government introduced evidence that Runyon owned firearms and ammunition, Gov't Trial Ex. 212, 212A (physical evidence), and purchased a .357 handgun the day of the crime. Counsel failed to present evidence that Runyon was an avid hunter who enjoyed collecting, trading, and selling guns and ammunition. A reasonable investigation would have found witnesses to explain that Runyon was "a gun enthusiast . . . [and] a responsible

---

[27] The government moved to dismiss Runyon's claim as a matter of law and the court was required to fully credit Voss's declaration. *Conaway v. Polk*, 453 F.3d 567, 576 n.9 (4th Cir. 2006).

gun owner . . . [who] collected and traded guns like some people do baseball cards." J.A.2086-2087. This testimony would have provided a reasonable explanation for Runyon's purchase and ownership of firearms, and debunked the government's insistence that jurors infer from this evidence that Runyon was a cold and calculated "hitman."

The district court found "no reason to believe that the decision not to elicit such testimony was based on unsound trial strategy or lack of investigation." J.A.2876. Reasonable jurists could disagree because witness declarations in support of this attest that trial counsel did not interview them. *See, e.g.*, J.A.2082, J.A.2084, J.A.2085, J.A.2087, J.A.3102. Without adequate investigation trial counsel cannot engage in strategic decision-making. *Strickland*, 466 U.S. at 690-91. Erring further, the judge stated that such testimony "could have had the opposite effect of what the Petitioner claims[;]" and that the jury could have found Runyon "was an ideal hit man as alleged by the government." J.A.2876. This analysis misses the mark because, without this type of testimony, the jury already agreed with the government's theory. Reasonable jurists could agree that the failure to investigate and present such testimony could only have helped support the defense case by raising a reasonable doubt; it could not have resulted any more prejudice than the guilty verdict that was rendered in its absence.

Seventh, after demonstrating Runyon's gun ownership, the government told jurors that the bullets used in the crime were .38 caliber and were fired from one firearm. J.A.392, J.A.396. A witness testified that a .357 handgun was capable of

96

shooting .38 caliber bullets, J.A.394, and the government argued Runyon's .357 was the one firearm that fired the deadly bullets. J.A.825-826. The government also presented testimony and argued that Runyon's purchase of a stainless steel bore brush, several weeks after the crime, was evidence of guilt because it was used to alter the rifling characteristics of his gun. *See* J.A.398, 720-721, 779, 826.

A reasonable investigation would have developed evidence challenging the government's claim that all five bullets were fired from a single gun. In 2009—the year of Runyon's capital trial—the National Academy of Science cautioned ballistics experts against making assertions that scientific evidence can show that particular bullets were fired from a particular firearm. *See* National Academy of Sciences, *Strengthening Forensic Science in the United States A Path Forward*, (Feb. 2009)) ("NAS report") (J.A.2455) ("The fact is that many forensic tests—such as those used to infer the source of toolmarks or bite marks—have never been exposed to stringent scientific scrutiny."); J.A.2467 (toolmark and firearms identification).[28] Counsel should have impeached the unsubstantiated "scientific" testimony upon which the

---

[28] Counsel should have known of published scholarly and legal scrutiny of ballistics and firearms identification testimony since 2005, four years before Runyon's trial. Lanigan Bonnie: *Firearms identification: the need for a critical approach to, and possible guidelines for, the admissibility of "ballistics" evidence*, 17 Suffolk J. of Trial & Appellate Advocacy, 54 & notes 2, 7-9, 12, 13, 45, 58, 83-95, 115, 120 (Feb. 1, 2012) (collecting years of criticism). *See also* Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 Colum. Sci. and Tech. L. Rev. 2, at *1 (2005) (discussing *U.S. v. Kain*, Crim. No. 03-573-1 (E.D. Pa. 2004), and demonstrating that "because of the systemic scientific problems, firearms and toolmark identification testimony should be inadmissible across-the-board").

government asked jurors to base further inferences that were needed to connect Runyon, the alleged murder weapon, and the crimes.

A certificate of analysis presented by the government noted that "caliber .357 Magnum revolvers with the brand names Astra and Llama," among others, J.A.1317, could fire .38 class bullets. J.A.394, J.A.399-400. A reasonable investigation, including consultation with a ballistics expert, would have revealed there are *36 brands and models* of .357 revolvers with nominal 9mm bore that are capable of firing .38 caliber bullets. J.A.2655. Expert consultation also could have shown, contrary to the prosecution's claims, that it is "common" to clean a firearm with a stainless steel bore brush. Those "brushes will not easily affect rifling characteristics." J.A.2654. Counsel was ineffective when he failed to investigate and present evidence exposing the weakness of the prosecution's case.

The district court agreed that counsel failed to consult with an expert or investigate the prosecution's ballistics evidence. J.A.2887. Reasonable jurists could agree that the district court afforded too much deference to trial counsel when it summarily denied this claim because "[n]othing suggests, however, that counsel did not know of these studies at trial or unreasonably decided to forego a stronger challenge to the ballistics evidence." J.A.2888. Trial counsel did not challenge the prosecution's ballistics evidence nor counter the prosecution's narrative about: Runyon's gun ownership; Draven's absence from the crime scene; Runyon's presence at the crime scene; testimony about bullets coming from the same gun; or, the use of a

brush to change a gun's rifling characteristics. The prosecution argued that Runyon's gun ownership suggested that Runyon's gun was the murder weapon. *See Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 845 (4th Cir. 1964). Without a reasonable investigation, a strategic decision cannot be attributed to counsel's failure to present evidence countering the prosecution's proof and consistent with the defense theory. *Strickland*, 466 U.S. at 690-91.

Reasonable jurists could also agree the court erred when it denied discovery and an evidentiary hearing and conducted its own ex parte investigation of this claim. The court denied Runyon's request for records of the forensic examination of the bullets but then the court obtained and reviewed the records ex parte.[29] J.A.2817 (ordering subpoena duces tecum). The court then denied Runyon's allegations of prejudice based on information contained in the sealed records. J.A.2888. The court erred when it reviewed and relied on information not revealed to Runyon. *See, e.g., Gardner v. Florida*, 430 U.S. 349, 351 (1977); *see also* J.A.3071; J.A.3074-3078; J.A.3081-3101 (motion to access materials).

Seventh, counsel failed to develop and present evidence that government agents provided details of the crime to government witnesses and influenced their

---

[29] Runyon requested discovery so the records could be reviewed by his expert to help him, among other things, determine the caliber of the bullets recovered from the crime scene. J.A.2368-2375; J.A.2651-2653; J.A.2654-2655. Runyon's firearm expert noticed discrepancies between the caliber reported by the medical examiner and the caliber identified in court testimony. Trial counsel were ineffective for failing to investigate this issue. *Soffar v. Dretke*, 368 F.3d 441, 476 (5th Cir.) amended on rehearing in part on other grounds, 391 F.3d 703 (5th Cir. 2004).

testimony. According to Chad Costa, police "told [him] a lot of information" about the murder and "convinced [him] that Runyon committed the murder." J.A.2022-2023. Costa noted that "[w]hen [he] said anything positive about Runyon in front of the grand jury, the prosecutor gave [him] a dirty look and changed the subject." J.A.2022-2023 This evidence disclosed the government's practice of influencing witness testimony and could have raised doubts about the police investigation.

Furthermore, Costa knew Runyon approximately six months before Runyon was arrested. J.A.2022. Presentation of Costa's testimony would have rebutted the prosecution's argument that the *absence* of testimony from people who knew Runyon around the time of the killing was evidence that Runyon had changed since the time the penalty-phase witnesses knew him. There was no strategic reason for counsel to compel Costa's trial attendance and then not put him on the stand when his testimony offered value to Runyon's defense.

The court improperly dismissed Runyon's claim without allowing Runyon an opportunity to present Costa's testimony, and without requiring the government to conduct the cross-explanation relied on in its Answer. Moreover, the district court conducted its own investigation and ordered the government to file under seal Costa's grand jury testimony. J.A.2823. The court then relied on its review of Costa's testimony when it denied Runyon's claim. J.A.2871-2872; J.A.2873. Reasonable jurists could agree that the judge erroneously and independently investigated the facts, secreted those facts from Runyon, and then denied Runyon a hearing where he could

have presented Costa's actual testimony. *See Gardner*, 430 U.S. at 351; *see also* J.A.3071; J.A.3074-3078; J.A.3081-3101 (motion to access materials the court relied upon).

## C. Conclusion

A guilty verdict was not inevitable. The prosecution's case was built on evidence of the codefendants' guilt and inferences of Runyon's involvement. Reasonable jurists could agree that had counsel adequately investigated and challenged the prosecution's case, jurors would have seen the evidence in a different light. Trial counsel's performance in all aspects and all stages of the case—and prejudice resulting therefrom—must be evaluated cumulatively. *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995); *Winston v. Kelly*, 592 F.3d 535, 557 (4th Cir. 2010). Importantly, the government convinced jurors that Runyon was eligible for a death sentence because evidence established beyond a reasonable doubt that Runyon committed an intentional killing, *Runyon*, 707 F.3d at 486, and counsel's failure to investigate and adequately confront the government's case for conviction also undermines confidence in jurors' sentencing phase decisions.

This Court should remand for discovery and an evidentiary hearing. Alternatively, a merits review demonstrates Runyon is entitled to relief. Finally, counsel's deficiencies undermine the government's case for death. A new sentencing hearing is warranted.

## VI. Prosecutors Discriminated in Exercising Their Peremptory Strikes, and Runyon's Counsel Unreasonably Failed to Challenge the Strikes.

Claims 8 and 16 demonstrate that prosecutors discriminatorily struck 70% of African-American jurors and did not strike similarly-situated nonblack jurors, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Runyon's attorneys unreasonably failed to challenge these strikes at trial or on direct review. The district court erred as a matter of law and fact, and violated §2255(b) by denying an evidentiary hearing on issues where material facts are in significant dispute.

### A. Factual Background

Trial counsel received a sealed set of 243 questionnaires but they were not entered in the record. Voir dire included only veniremembers who circled answers (c), (d), or (c & d) on Question 61 which directed them to circle "one or more" entries on the following scale:

a) If a person is convicted of murder and the death penalty is requested, I would always vote to impose it, regardless of the facts and the law in the case.

b) I am strongly in favor of the death penalty, and would have a difficult time voting against it, regardless of the facts of the case.

c) I generally favor the death penalty, but I would base a decision to impose it on the facts and the law in the case.

d) I am generally opposed to the death penalty, but I believe I can put aside my feelings against the death penalty and impose it if it is called for by the facts and law in the case.

e) I feel that my opposition to the death penalty will make it difficult for me as a juror to reach a verdict of guilty or not guilty, despite the facts and law in the case.

f) I am strongly opposed to the death penalty, and I will have a difficult time voting to impose it, regardless of the facts and the law in the case.

g)    I am personally, morally, or religiously opposed to the death penalty, and would never vote to impose it, regardless of the facts and the law in the case.

J.A.153-154.

Jury selection took one day. J.A.232-364. After dismissing 10 veniremembers for cause, the court asked all the questions, addressing them to the 52-juror venire collectively. Runyon and Draven collectively exercised 20 peremptory strikes; the government used 19. The transcript does not describe the system used to seat or strike jurors nor report who was struck or by which party, J.A.357-59, and the court did not docket a strike list.

The court below granted post-conviction counsel's motion for the strike lists and juror questionnaires. J.A.1487-1493; J.A.3190-3193; J.A.3194-3197. Its order clarified that "the lists are not public records, … rather they are internal strike and selection order notes made by the courtroom deputy[.]" J.A.1494. The court emphasized that the "transcripts, and the attached [strike lists], contain the full record of the jury selection process." J.A.1495.

With the strike lists, questionnaires, and trial transcript, Runyon's counsel could now (1) identify each veniremember, only some of whom were named in the transcript; (2) determine the race and gender of each member, which information appeared only in the questionnaires; (3) learn which members were peremptorily struck and by which party—information that appeared only in the strike lists; and (4) examine whether—and how—individual members answered questions in voir dire

and on their questionnaires.[30] Citing these documents and other facts, Runyon alleged that the government's peremptory strikes were discriminatory. The government responded that the black jurors were struck because they circled answer (d) to Question 61. J.A.2632. Runyon then pointed to two nonblack jurors who also circled answer (d) but who the government did not strike. J.A.2781-2782.

## B. Violation of *Batson v. Kentucky*

### 1. Standard of Review

Courts ordinarily review a *Batson* decision for clear error because "[t]he outcome . . . turns largely on an evaluation of credibility." *U.S. v. Dinkins*, 691 F.3d 358, 379 (4th Cir. 2012). When, as here, "no factual findings exist," review is plenary. *U.S. v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997).

No *Batson* challenge was made at trial, thus, there are no relevant findings from that stage. There also are no relevant findings from the post-conviction proceedings. The district court did not grant discovery or hold an evidentiary hearing. It recognized the government's post-conviction proffer of a race-neutral reason for its strikes of seven African-Americans, but made no finding that this reason was credible or genuine. It also recognized Runyon's identification of two identically situated

---

[30] Additional material, filed with this brief contains charts that show the nature and sources of relevant juror information. For the day of jury selection, Chart #1 consolidates information from all sources; Chart #2 shows the information from the strike list; Chart #3 shows selected information (race, gender, and views on the death penalty) from the juror questionnaires; Chart #4 shows juror information as derived from the transcript alone.

nonblack veniremembers whom the government did not strike. Because the district court made no germane factual findings, this Court reviews the merits of Runyon's claim *de novo*.

To the extent the district court rendered legal conclusions or failed to conduct the *Batson* inquiry appropriately, review is also *de novo*. *See U.S. v. Stitt*, 552 F.3d 345, 350 (4th Cir. 2008).

### 2. *Batson's* Legal Test

*Batson*'s three-step process is well known. At step one, the defendant "make[s] out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93-94). "[O]nce the defendant has made out a prima facie case, the 'burden shifts to the government to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." *Johnson*, 545 U.S. at 168 (quoting *Batson*, 476 U.S. at 94). Like step one, the burden at step two is one of production, not persuasion. *Id.* at 171. This Court's rule is that the government's proffer of a race-neutral explanation at step two effectively renders the prima facie question moot. *U.S. v. Grimmond*, 137 F.3d 823, 834 (4th Cir. 1998). If the government satisfies this requirement, the question at step three is whether the defendant has shown purposeful discrimination.

The answer to step three may turn on whether the government's proffered reason was genuine or pretextual. "If a prosecutor's proffered reason for striking a

black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El II*, 545 U.S. at 241. A defendant who shows purposeful discrimination is entitled to automatic relief. *Batson*, 476 U.S. at 100; *Miller-El II*, 545 U.S. at 266. Prejudice is presumed because the effects of discrimination during voir dire "may persist through the whole course of the trial proceedings." *Powers v. Ohio*, 499 U.S. 400, 412 (1991).

### 3. Application of *Batson* to the Strikes of African-American Prospective Jurors

#### a. Step One: discriminatory intent

Runyon's factual allegations lend weight to each other and support his claim that the government engaged in purposeful discrimination in jury selection:

- The veniremembers included 41 white, 10 African-American, and 1 Asian. The government struck 70% (7 of 10) of the qualified black members and 29% (12 of 42) of the qualified nonblack members.

- The government exercised all strikes against persons of color. The defense struck none.

- Strikes of the seven African-Americans would not have occurred by happenstance. Fisher's Exact Test shows a probability of 0.026 (i.e., a 2.6% likelihood) that the strikes of African-Americans were independent of their race.[31] *See* J.A.2777; J.A.2813.

---

[31] This Court accepted Fisher's Exact Test in *Love v. Alamance Cty. Bd. of Educ.*, 757 F.2d 1504, 1510 n.4 (4th Cir. 1985), where the test refuted discrimination in selecting assistant principals. It can be used to analyze strikes in the *Batson* context. Joseph L. Gastwirth, *Statistical Testing of Peremptory Challenge Data for Possible Discrimination: Application to Foster v. Chatman*, 69 VAND. L. REV. EN BANC 51, 55 (2016); Jason Kreag,

- Prior to trial, the court directed the parties to jointly submit three lists: (i) those veniremembers they agreed should be called for voir dire, (ii) those they agreed should *not* be called, and (iii) those on which they disagreed. The representation of African-Americans on the "disagree" list was disproportionately high.[32] This suggests that the government—the only party who struck African-Americans—wanted to minimize the number of African-Americans on the jury.

- The disparate application of the death penalty for Runyon and not the two white codefendants evidences racial discrimination.

- The crime was interracial. Runyon is Asian; the victim, Cory Voss, was white.

- Both sides expected Runyon's Korean heritage to be a consideration at trial, particularly for mitigation.

- Prosecutors intended to put into evidence the videotape of police officers interrogating Runyon, and expressing "stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act." *Runyon*, 707 F.3d at 493-94. These references "bore no relevance to the particular issues that the jury was being asked to resolve." *Id.* at 494.

---

*Prosecutorial Analytics*, 94 WASH. U.L. REV. 771, 806 & 807 n.211 (2017), https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=6295&context=law_lawreview; MICHAEL O. FINKELSTEIN & BRUCE LEVIN, STATISTICS FOR LAWYERS 123-25; 154-56 (2001). A person can easily access an appropriate calculator online and enter case-specific data. *See, e.g.,* Easy Fisher Exact Test Calculator at http://www.socscistatistics.com/tests/fisher/Default2.aspx.

Using this test, Runyon assessed the null hypothesis that there was no association between the race of qualified veniremembers and the prosecution's decisions on who to strike—i.e., the hypothesis that a potential juror's race and the prosecutor's decision to strike that juror were independent of each other. Results show, at a statistically significant level ($p < .05$), that the null hypothesis is disproved. J.A.2815.

[32] The 243 prospective jurors who completed questionnaires were 22.6% black and 72.0% white; the remainder were other or unreported. The list the parties agreed to call for voir dire was 17.1% black and 78.3% white; the list they agreed not to call was 20.3% black and 77% white; the list they disagreed upon was 45% black and 42.5% white. J.A.2778.

- The videotape was capable of inflaming jurors' racial or ethnic prejudices. *Id.*

J.A.3178-3180; J.A.2777-2778.

Runyon moved for historical and case-specific discovery related to jury selection by the prosecutors, J.A.1629-1634, and for an evidentiary hearing, J.A.1989; J.A.2787. Both motions were denied. J.A.3034-3036, 3064.

### b. Step Two: reason for strikes

Without expressing any reservation that Runyon's allegations gave rise to an inference of discrimination, the district court shifted the burden to the government to respond. J.A.2271. The government presented the following justifications:[33]

- Five African-Americans (Nos. 31, 40, 46, 63, and 81) were struck because they circled (d) in answer to Question 61 on the juror questionnaire, indicating general opposition to the death penalty. J.A.2632.

- Two additional African-Americans (Nos. 15 and 116) were struck because they circled (c & d) in answer to Question 61, indicating both opposition to and support for the death penalty. J.A.2632.

### c. Step Three: purposeful discrimination

"In the typical peremptory challenge inquiry, the decisive question is whether [the prosecution's] race-neutral explanation for a peremptory challenge should be believed," *Hernandez*, 500 U.S. at 365, or if it is a pretext for discrimination, *Foster*, 136 S.Ct. at 1750 (finding pretext because government "willingly accepted white jurors with the same traits that supposedly rendered [a black juror] unattractive"). "If the

---

[33] Because Runyon is not appealing the *J.E.B.* claim, he has adjusted the government's numbers so they reflect only the strikes of African-Americans.

purportedly race-neutral reason offered by the government for striking an African-American member of the venire applies equally to other members of the venire who are otherwise similarly-situated, but who are not African-American, that is evidence tending to prove purposeful discrimination." *Dinkins*, 691 F.3d at 380-81 (citing *Miller-El II*, 545 U.S. at 241). The government must be judged solely by the justifications it proffered below. "If the [government's] stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Miller-El II,* 545 U.S. at 252.

Identifying purposeful discrimination is greatly simplified in Runyon's case because the government gave one—and only one—justification for all of its strikes of African-Americans: the jurors circled answer (d) or answers (c & d) to Question 61. J.A.2632. Every person who circled a defined response gave the identical answer as every other person who circled that response. A side-by-side comparison of black and nonblack veniremembers leaves no doubt that the government's reason for the challenged strikes was a pretext for racial discrimination.

Two nonblack members also circled (d) on Question 61 but the government permitted them to serve. One of them (No. 2) was seated as a juror; the other (No. 54) was held over to participate in the next day's selection of alternates. The government cited no other factor distinguishing the five black members it struck from the two nonblack members it permitted to serve. On the sole criterion the government asserted as justification, these nonblack members were not just "similarly

situated"—they were "*identically* situated" to the five black members it struck.

The government's only justification for striking African-Americans—their answers to Question 61—is not genuine; it is not credible. *See Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (*Miller-El I*) (implausible justifications suggest pretext). Because "[t]he prosecutors' chosen race-neutral reasons for the strikes do not hold up," and because they retained identically situated nonblack members, "pretext is the fair conclusion." *Miller-El II*, 545 U.S. at 265.

Runyon also enumerated several other circumstances indicating that the strikes were race-based. First, purposeful discrimination is shown in the disproportionate representation of African-Americans on the "disagree" list—the joint list of veniremembers that one side approved for participation in voir dire but the other side did not. J.A.2778.[34] Because the government is the only party who struck African-Americans, it follows that the government disproportionately objected to African-Americans which resulted in a greater number of them on the list of jurors upon whom the parties disagreed.

Second, at the time of voir dire, the prosecutors intended to put the prejudice-inciting video before Runyon's jurors. The video contains the kinds of statements that are "capable of inflaming jurors' racial or ethnic prejudice," *Runyon*, 707 F.3d at 493-94, and this effect is maximized with white jurors. Moreover, although Runyon and

---

[34] Runyon acknowledged there are unresolved facts regarding this list and he requested, but was denied, discovery on this issue. J.A.2954-2956.

the African-American veniremembers are of different races, they are both racial minorities who experience discrimination. Viewing racial insults in the video would offend African-American veniremembers, they would sympathize with Runyon as the target of these insults, and the prosecution would benefit from their exclusion. Thus, the video that insulted Runyon's race indicates the strikes were "'motivated in substantial part by discriminatory intent.'" *Foster,* 136 S.Ct. at 1754 (quoting *Snyder,* 552 U.S. at 478).

Third, discriminatory intent is also inferred by the fact that the government did not seek death against the two white codefendants coupled with the fact that Runyon is Asian and the victim was white. The effect of this disparity would have a greater impact on white jurors, to the government's benefit.

Finally, the statistical analysis of the specific facts of Runyon's case proves purposeful discrimination. There is only a 0.026 probability that the government struck seven of the ten African-Americans independent of their race. J.A.2775-2777.

### 4. The District Court's Analysis Was Fundamentally Flawed

The court denied this claim because it found that, aside from the race-baiting video, the strike percentages and strike lists did not prove discrimination. J.A.3028-3029.

### a. Whether Runyon Made a Prima Facie Showing Is Moot.

The court focused on whether Runyon made a prima facie showing. This Court could treat the prima facie issue as moot and "assume, without deciding," that

Runyon established a prima facie case. That assumption is consistent with Fourth Circuit authorities including *Grimmond*, *supra*, and *Dinkins*, 691 F.3d at 380 n.17. It also is appropriate because once this case moved to step two and the government submitted reasons for the strikes, step one serves no function. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant").

### b. The District Court's Ruling Lacks a Factual Foundation and Cannot Be Squared With *Miller-El II.*

The court held that the government's justification for striking seven black veniremembers was not pretextual, even though the government allowed two identically or similarly situated nonblack members to serve, stating: "the court does not find this to be enough to show that the government's reasons were pretextual." J.A.3028.

This ruling was legally and factually wrong. *Miller-El II*, 545 U.S. at 241, 252, requires no more to establish pretext than what Runyon presented.[35] In concluding that the strikes were not discriminatory, the court incorporated by reference its discussion of a prima facie case. J.A.3028-3029. Without waiving his position that the prima facie issue itself is moot, Runyon addresses the incorporated statements.

---

[35] In *U.S. v. Barnette*, 644 F.3d 192, 205 (4th Cir. 2011), this Court instructed lower courts to engage in this kind of side-by-side comparison of "black venire panelists who were struck and white panelists allowed to serve."

112

### i. *Batson* Does Not Require Overt, Pervasive Discrimination.

*Batson* does not require a discriminatory statement, but the court faulted Runyon for not pointing to one, "other than the video clip[.]" J.A.3028. Even if *Batson* required such a declaration, the statements in the video exhibit would qualify. The direct appeal opinion addressed the video at length, and its assessment was both explicit and disapproving: "[T]he video had no place at this sentencing proceeding" because it showed officers "convey[ing] what were, frankly, stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act," and commenting about Runyon's religious beliefs. *Runyon*, 707 F.3d at 493-94.

The district court downplayed the video, describing it as a short "video that referenced Asian stereotypes" during "a weeks-long trial" and emphasized the harmless error finding. J.A.3025. Racial discrimination does not have to pervade the entire trial. What matters for *Batson* purposes is that statements in the video were racially inflammatory, they were invoked "on multiple occasions during the interrogation," *Runyon*, 707 F.3d at 493, the prosecutors intentionally introduced it into evidence and they disproportionately and disparately struck black jurors.

### ii. *Batson* Does Not Disfavor Statistical Evidence

When presented with *Batson* claims, the Supreme Court has questioned whether the challenged strikes were intentional or could have occurred by happenstance. *See Miller-El I*, 537 U.S. at 342 (noting relevance of statistical evidence showing that

113

"happenstance" was unlikely to have produced same result). In Runyon's case, the prosecutorial strike rate of black veniremembers was 70% (7 of 10); its strike rate of nonblack members was 29% (12 of 42). Runyon employed Fisher's Exact Test to demonstrate the very low probability that the strikes in his case would have occurred by happenstance. J.A.2776-2777. There is only a 2.6% likelihood the government struck seven of ten African-American veniremembers for reasons that were *independent* of their race. J.A.2815. Evidence of a *dependent* relationship between race and strike status goes to the heart of the *Batson* inquiry. *Johnson*, 545 U.S. at 169.

The district court cited cases with facts dissimilar to Runyon's, it suggested that statistical evidence is disfavored or untrustworthy, and it said "raw data alone is often not enough" to make a prima facie case.[36] J.A.3023. It disregarded cases where this Court found statistical evidence sufficient to make a prima facie case, such as *Howard v. Moore*, 131 F.3d 399, 407 (4th Cir. 1997) (en banc) ("prosecutor's striking of six out of the seven black prospective jurors"—without more—"constituted a prima facie case of discrimination").

The court's view that statistical evidence is untrustworthy also runs counter to Supreme Court decisions and other authorities, which reject that idea. *See, e.g., Batson*,

---

[36] Runyon's claim presented more than "raw data alone." In addition to sophisticated statistical analysis of case-specific information, he discussed the role of racially inflammatory statements in the government's interrogation video. Because the trial court allowed no voir dire by the attorneys, Runyon was denied a common source of nonstatistical evidence of discrimination—the prosecutor's use of different scripts for its individual questioning of blacks and whites.

114

476 U.S. at 93 ("'seriously disproportionate exclusion of Negroes from jury venires . . . [can] show intentional discrimination'") (quoting *Washington v. Davis*, 426 U.S. 229, 241-42 (1976))); *Miller-El I*, 537 U.S. at 342 ("statistical evidence alone" can raise debate about whether prosecution "acted with a race-based reason"); *Miller-El II*, 545 U.S. at 240 ("The numbers describing the prosecution's use of peremptories are remarkable"); *Johnson*, 545 U.S. at 167 (citing interracial nature of crime and statistical disparity of peremptory challenges between African-Americans and others); *see also Castaneda v. Partida*, 430 U.S. 482, 496-97 n.17 (1977) (relying on statistics to show that government discriminatorily excluded Mexican-Americans from grand jury); *Golphin v. Branker*, 519 F.3d 168, 187 (4th Cir. 2008) ("statistical evidence is certainly probative under *Miller-El II*"); David C. Baldus, et al., *Statistical Proof of Racial Discrimination in the Use of Peremptory Challenges*, 97 Iowa L. Rev. 1425, 1442 (2012), *available via* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2104171 (noting that Justice Kennedy's analysis in *Miller-El I* emphasized the numerical disparity between prosecutorial strike rates against black veniremembers as compared to strike rates against white venire members).

In rejecting the result of Fisher's Exact Test, the court noted the percentage of African-Americans seated on Runyon's jury was similar to the total percentage of African-Americans in the qualified venire. However, as this Court recognized in *U.S. v. Grandison*, 885 F.2d 143, 148 (4th Cir. 1989), "[t]he defendant's constitutional right is not to a specified percentage of minority jurors, but to a process in which the state

considers prospective jurors wholly independent of their race." For this reason:

> The final composition of the jury . . . offers no reliable indication of whether the prosecutor intentionally discriminated in excluding a member of the defendant's race. . . . "[A] *Batson* inquiry focuses on whether or not racial discrimination exists in the striking of a black person from the jury, not on the fact that other blacks may remain on the jury panel."

*Holloway v. Horn*, 355 F.3d 707, 728-29 (3d Cir. 2004) (quoting *U.S. v. Johnson*, 873 F.2d 1137, 1139 n.1 (8th Cir. 1989)).The district court also pointed out that the prosecution had one unused peremptory strike, "meaning it could have struck an additional African-American juror, if that was its goal." J.A.3025. Then-judge Alito rejected a similar argument in *Brinson v. Vaughn*, 398 F.3d 225 (3d Cir. 2005):

> [A] prosecutor may violate *Batson* even if the prosecutor passes up the opportunity to strike some African American jurors. *Batson* was "designed to ensure that a State does not use peremptory challenges to remove *any* black juror because of his race." 476 U.S. at 99 n.22 (emphasis added). Thus, a prosecutor's decision to refrain from discriminating against some African American jurors does not cure discrimination against others.

*Id.* at 233.

### iii. The "Disagree" List Adds Weight to the *Batson* Claim.

The district court rejected, as "just more statistics," J.A.3026, Runyon's assertion that disproportionate representation of African-Americans on the "disagree" list shows the government wanted to minimize the number of African-American jurors. The court said there are unanswered factual questions about the "disagree" list. It speculated that "[j]urors could have been placed on [that list] for many reasons."

116

J.A.3026. Speculations and unanswered factual questions are the kinds of issues that ordinarily preclude adjudication of a §2255 issue until there has been discovery and an evidentiary hearing. *See, e.g., U.S. v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992); *U.S. v. White*, 366 F.3d 291, 297-300 (4th Cir. 2004). Because the court did not allow discovery or conduct such a hearing, its rejection of Runyon's claim was, at a minimum, premature.[37] Because the court applied the law to a cold record rather than determine any facts, its decision merits no deference. *Cf. Holder v. Welborn*, 60 F.3d 383, 388 (7th Cir. 1995) (suggesting that when *Batson* error is first raised in collateral proceedings, difficulty of reconstructing facts makes deferential review inappropriate).

## C. Ineffective Assistance of Trial Counsel

After rejecting Runyon's *Batson* claim on the merits, the court addressed the allegations of ineffective assistance, both as independent bases for collateral relief and as cause for any default of the *Batson* claim.

### 1. Standard of Review

Whether counsel rendered effective assistance is a mixed question of law and fact that is reviewed *de novo* in §2255 proceedings. *U.S. v. Ragin*, 820 F.3d 609, 617 (4th Cir. 2016). A district court's conclusions as to procedural default also are reviewed *de novo. Fahy*, 516 F.3d at 179.

---

[37] Runyon's discovery request included the prosecutors' lists, notes, and other writings related to jury selection in this case.

### 2. The Legal Test

A defendant alleging ineffective assistance ordinarily must show both deficient performance and prejudice. *Strickland*, 466 U.S. 668. But courts of appeals, including this one, hold that "[t]he prejudice component of the *Strickland* analysis may be presumed if the nature of the deficient performance is that of a structural error." *Bell v. Jarvis*, 236 F.3d 149, 165, 180 (4th Cir. 2000) (en banc); *see also U.S. v. Legrand*, 483 F. App'x 771, 777 n.2 (4th Cir. 2012) (finding racially discriminatory use of peremptory challenges is structural error). The Sixth Circuit has affirmed this rule in the specific context of a *Batson* claim, and holds that counsel's failure to object to the government's discriminatory use of peremptory strikes requires no showing of prejudice. *Drain v. Woods,* 595 F. App'x 558, 583 (6th Cir. 2014). This presumption is rooted in the fact that structural errors have features that generally "defy analysis by 'harmless-error' standards." *Arizona v. Fulminante*, 499 U. S. 279, 309 (1991).

In *Weaver v. Massachusetts*, 137 S.Ct. 1899 (2017), the Court considered whether prejudice must be presumed when counsel's deficient performance results in structural error. The Court included a *Batson* violation in a list of errors that cause fundamental unfairness.[38] *Id.* at 1911-12.

---

[38] The Weaver Court declined to decide "whether the result should be any different if those errors were raised instead in an ineffective-assistance claim on collateral review." *Weaver*, 137 S.Ct. at 1911-12.

### 3. Trial Counsel's Deficient Performance Is Grounds for Relief and Excuses Any Procedural Default

In capital cases, it is a near certainty that conviction will be followed by appeals and post-conviction challenges. *See* 18 U.S.C. §3599. Thus, trial counsel's duty to preserve errors for future review is at its apex. As Runyon's direct appeal attorneys immediately recognized, trial counsel in this case were not diligent: "defense counsel made so few objections on the record." J.A.2245. This Court noted on appeal counsel's failure to preserve error. *See, e.g., Runyon*, 707 F.3d at 517-19 (failure to object to errors regarding substitution of alternates).

Beyond counsel's general duty to preserve errors in a capital case, the norms of professional performance include specific and common-sense requirements for jury selection. These include monitoring prosecution strikes, and objecting if those strikes appear to raise an inference of intentional discrimination. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.10.2(A) and Commentary, reprinted in 31 *Hofstra L. Rev.* 1049, 1053-54 (2003); *see also* Virginia Indigent Defense Commission, *Standards of Practice for Indigent Defense Counsel*, Standard 7.2(C)(2) ("Counsel should timely object to and preserve all issues relating to the unconstitutional exclusion of jurors by the prosecutor.").

The Sixth Amendment requires counsel to object to a possible *Batson* violation rather than be passive. *Mitcham v. Davis*, 103 F.Supp.3d 1091, 1108-09 (N.D. Cal. 2015); *Gov't of the Virgin Islands v. Forte*, 865 F.2d 59 (3d Cir. 1989). Here, counsel's

failure to object to the strikes of African-Americans was objectively unreasonable. *Strickland*, 466 U.S. at 690. The district court rejected this charge for several reasons. All lack merit.

First, the court said trial counsel are experienced lawyers who know the *Batson* standard. But an attorney's performance is measured by the norms of professional practice, not by years on the job. Even experienced and knowledgeable lawyers can render ineffective assistance by inattentiveness, lack of preparation, or failure to investigate. The effectiveness of trial counsel is sharply disputed, and the court erred by resolving it without the evidentiary hearing required by §2255(b).

Second, the court said it was reasonable for counsel not to challenge the strikes because "the government was not striking an inordinate amount" of African-American jurors. J.A.3033. The "'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster*, 136 S. Ct. at 1747 (quoting *Snyder*, 552 U.S. at 478). The Sixth Amendment requires counsel to be alert and attentive, and to object to potentially discriminatory strikes regardless whether they involve a single veniremember or an emerging pattern. A biased strike pattern emerged early in voir dire. The government used one of its first two strikes, one of its next two strikes, one of the following two strikes, and one of the two strikes after that to remove African-Americans (Nos. 31, 15, 40, and 46). J.A.3190-3193; *see* Chart #1. The exclusion of 7 of 10 African-Americans is significant. Competent defense counsel would have seen this pattern of red flags and acted.

Third, the court said there was no sign, other than the percentage struck, that would have alerted trial counsel to potential discrimination by the prosecution. That sign was enough. The number or percent of black veniremembers struck by the prosecution is what prompted the initial challenges in *Batson*, *Miller-El*, *Johnson,* and *Foster*. But there is more. The prosecution did not strike nonblack jurors who gave identical answers on the questionnaire. Any circumstance that raises an *inference* or a *suspicion* of discrimination is sufficient to put counsel on notice of his duty to object.

Fourth, the court speculated that "defense counsel may have had its own reasons for wanting to exclude the challenged individuals from the jury, and thus did not object to the government's peremptory strikes." J.A.3033. An evidentiary hearing was required to determine whether counsel's failure to object was the result of reasonable strategy or the failure to exercise a professional degree of attention. Runyon's §2255 "motion and the files and records of the case" do not "conclusively show that [he] is entitled to no relief." 28 U.S.C. §2255(b).

Fifth, the court further speculated that counsel might not have wanted to challenge the strikes of three African-Americans (No. 15, 31, and 63) because they had "military connections, as suggested by the government." J.A.3033; J.A.2632. The record demonstrates otherwise. Runyon's personal and family military background was a significant factor for mitigation, and defense counsel wanted jurors who would understand and value his military service. J.A.2790-2791. Counsel had no reason to acquiesce in the government's exclusion of these jurors. Even if the district court's

speculation proved to be accurate, it would not excuse counsel's failure to object to the government's strikes of the four African-Americans who did not have military connections.

Ultimately, the court ruled that, "Regardless of the reason, the court will give deference to what appears to be a reasonable decision on the part of counsel not to object to strikes that presented no appearance of discrimination." J.A.3033. Given the court's admission that it does not know whether counsel's failure to object was strategic or unprofessional, the court's errors of law, and its erroneous statements of facts, no deference is warranted. Further, the prejudice component of the *Strickland* analysis should be presumed because counsel's deficient performance resulted in structural error. *Drain,* 595 F. App'x at 583; *Bell*, 236 F.3d at 165.

### D. Default and Ineffective Assistance of <u>Appellate</u> Counsel

Runyon's appellate counsel could not have raised the unpreserved *Batson* claim on direct review because, as explained earlier, the facts that would reveal the violation were not in the trial record. Neither strike lists nor juror questionnaires were part of the record on appeal. As the district court later confirmed, the strike lists were not public records; they were internal notes made for administrative purposes. J.A.1494. Even if appellate counsel could have obtained the facts, this Court could not have adjudicated the claim on direct review because the evidence was *dehors* the trial record. *If* these obstacles could have been overcome, appellate counsel were ineffective in failing to do so.

First, the district court did not dispute these deficits in the trial record. But it said direct appeal counsel could have overcome these hurdles, and thereby alleged a *Batson* error, by requesting "strike lists and questionnaires *had they thought a Batson*/J.E.B. *claim would be meritorious.*" J.A.3020 (emphasis added). This statement reflects circular logic because the premise depends on proof of the conclusion. Without first having both the strike lists and the race/gender information in the questionnaires, new counsel had no reason to suspect that members of a protected class might have been struck discriminatorily. Much less could appellate counsel, based on the limited information shown in Additional Materials Chart #4, have honestly represented to the trial court that a *Batson* claim "would be meritorious." At bottom, the factual basis for a *Batson* claim was unavailable to appellate counsel. This establishes cause for any failure to raise the claim on direct appeal. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Second, even if appellate counsel had obtained both the strike lists and juror questionnaires, this Court could not have adjudicated a *Batson* allegation. "On direct appeal . . . we must restrict our review to the trial record." *U.S. v. Alex Janows & Co.*, 2 F.3d 716, 722 n.1 (7th Cir. 1993); *cf. U.S. v. Bundy*, 392 F.3d 641, 646 (4th Cir. 2004) ("Meaningful appellate review requires an adequate factual record"). Because the facts necessary to adjudicate a *Batson* claim were not in the record of Runyon's trial, the claim could not have been adjudicated on appeal.

Issues are appropriately raised in a collateral petition, rather than on direct

123

review, "when the facts were 'dehors the record and their effect on the judgment was not open to consideration and review on appeal.'" *Bousley v. U.S.*, 523 U.S. 614, 622 (1998) (quoting *Waley v. Johnston*, 316 U.S. 101, 104 (1942) (per curiam)). In *Waley*, the defendant alleged on collateral review that his guilty plea had been coerced by threats from a government agent. The Court held that the coercion claim could not have been considered on direct appeal—even though Waley necessarily knew of those threats at the time of the plea proceedings—because evidence of the threats was not in the record of the plea colloquy. *See generally News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 574 n.2 (4th Cir. 2010) ("From a procedural standpoint, courts hearing a case on appeal are limited to reviewing the record that has been developed below") (quoting *Kirkpatrick v. Lenoir Cty. Bd. of Educ.*, 216 F.3d 380, 384 (4th Cir. 2000)).

Both the strike lists and juror questionnaires were necessary to discover and adjudicate a *Batson* claim on direct review. Because the critical information was not in the trial record, the *Batson* claim was not open to consideration and review on appeal; but it could be raised in a collateral petition where the Court could consider evidence that was outside the trial record.[39]

---

[39] In §2255 proceedings, circumstances changed. The district court docketed the strike lists, making them part of the collateral-review record. J.A.3190-3193; J.A.3194-3197. The juror questionnaires were not docketed, but they were provided to post-conviction counsel for the duration of habeas litigation, and portions were quoted, discussed, and cited in documents *filed* in §2255 proceedings. *See, e.g.,* J.A.3249-3268, and Runyon's *Batson* claim. After Runyon noticed an appeal in the §2255 case, the

Third, assuming, without conceding, that appellate counsel could have obtained the strike lists and questionnaires, and further assuming counsel could have supplemented the record to include them under Rule 10(e)—all of which were necessary prerequisites to consideration of a *Batson* claim on direct review—appellate counsel unreasonably failed to do so. Counsel lacked the documents necessary to investigate and raise a *Batson* claim on appeal, and her failure to obtain those documents was not strategic. J.A.2245. Rather, it was "the result of inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). As a result, counsel's conduct fell below constitutionally required standards. *See Wiggins*, 539 U.S. at 533 ("'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'") (quoting *Strickland*, 466 U.S., at 690-91); *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005).

Furthermore, the *Batson* claim is stronger than at least two other claims raised in the direct appeal brief. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000). This Court dismissed claims VII with a footnote and remarked that claim VIII "fails by a wide margin." *Runyon*, 707 F.3d at 518 n.5; *id.* at 489. Counsel's failure to raise the claim was prejudicial.

---

district court endorsed the parties' joint stipulation that certain documents, including the juror questionnaires, were now prospectively "within the scope of the record on appeal, as that term is defined in Fed. R. App. P. 10(a) and in Fourth Circuit Local Rule 10(d)." J.A.3164.

The district court determined that, if the claim had been raised on direct appeal, this Court would have found no prejudice because Runyon "cannot even make out a prima facie case" of discriminatory strikes. J.A.3034. Viewed under the correct standard, Runyon could have made a prima facie case by presenting "evidence [that] support[s] *an inference* of discrimination." *Johnson*, 545 U.S. at 170 (emphasis in original).

Under the plain error framework that would have applied on direct appeal, review of the forfeited *Batson* claim would turn on a single factor: whether the error was plain. The third and fourth (prejudice) elements of plain error review are *per se* satisfied in the *Batson* context. *U.S. v. Mahbub*, 818 F.3d 213, 223–24 (6th Cir. 2016). The first element of plain error also is per se satisfied because striking a juror based on race is error. *Id.*

### E. Conclusion

This issue has substantial merit. The finding of *Batson* error would vacate *all* of Runyon's convictions. If the facts of this claim were available to direct appeal counsel, the failure to raise it deprived Runyon of his right to the effective assistance of counsel.

This Court should remand for the grant of discovery and an evidentiary hearing. Alternatively, a merits review demonstrates Runyon is entitled to relief on this claim. This Court should vacate Runyon's convictions and sentences.

**VII.** **Jury Instructions Unconstitutionally Lowered the Government's Burden of Proof and the Death Sentences Should Be Reversed.**

Every element of a crime and factor increasing punishment must be established beyond a reasonable doubt. In this case, however, Runyon's jurors were instructed that they could impose a death sentence on Runyon if they found the aggravating factors "sufficiently outweighed" the mitigating factors:

> In this phase, at the end of your deliberations[,] all 12 jurors must unanimously agree that the aggravating factors sufficiently outweigh any mitigating factors, or in the absence of mitigating factors, that the aggravating factors are themselves sufficient to justify a sentence of death. But if any of you, even a single juror is not persuaded that the aggravating factors sufficiently outweigh any mitigating factors such that a sentence of death is justified, then the jury may not recommend the death penalty on the verdict form.

J.A.1266-1267, J.A.1269, J.A.1276-1278, J.A.1288, J.A.1298-1299, J.A.1315. This instruction impermissibly lowered the Government's burden of proof, in violation of the Fifth, Sixth, and Eighth Amendments. *See Ring v. Arizona*, 536 U.S. 584, 589 (2003) ("Capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."); *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) (Criminal defendants are entitled to "a jury determination that [they are] guilty of every element of the crime with which [they are] charged, beyond a reasonable doubt." (internal citations and quotation marks omitted)); 18 U.S.C. §3593(d) ("A finding with respect to any aggravating factor must be unanimous."). Jurors should have been instructed that they had to find unanimously and *beyond a reasonable doubt* that the Government had proven that the

127

aggravating factors outweighed the mitigating factors before they could impose a death sentence on Runyon. In the absence of this constitutionally-mandated instruction, Runyon's death sentence must be vacated.

In *Ring v. Arizona*, the Supreme Court held the Sixth Amendment requires the prosecution to prove, and jurors to find, the existence of any aggravating factor necessary to impose a death sentence. The Court explained that these facts "operate as 'the equivalent of an element of a greater offense,'" and, as such, subject defendants to greater punishment. *Ring*, 536 U.S. at 609 (quoting *Apprendi*, 530 U.S. at 494 n.19). Any finding that subjects a defendant to a greater punishment than he could have faced in the absence of that finding, must be found by jurors.

A federal capital defendant cannot be sentenced to death unless the government proves, and jurors find, that the aggravating circumstances outweigh the mitigating circumstances. *See* 18 U.S.C. §3593(e)(3). In the absence of that finding, the defendant may not be sentenced to death. That finding—that the aggravating circumstances outweigh the mitigating ones—is a necessary prerequisite to a death sentence and must be made by jurors applying the beyond-a-reasonable-doubt standard.

Runyon raised this claim on direct appeal and this Court rejected the claim. *See Runyon*, 707 F.3d at 515-16. Runyon acknowledges this would ordinarily preclude him from raising the claim again in post-conviction proceedings, in the absence of a change in the controlling law. *See Davis v. U.S.*, 417 U.S. 333, 342 (1974) (when

128

controlling law changes, petitioner may re-raise direct appeal claim in a §2255 motion and seek relief). This Circuit continues to follow this reasoning. *U.S. v. Roane,* 378 F.3d 382, 396, n.7 (4th Cir. 2004) (a change in the law may warrant "reconsideration" of a claim decided on direct appeal). If there is a change in the law, a prisoner may relitigate a claim decided on direct appeal. *U.S. v. Walker,* 299 F. App'x 273, 276 (4th Cir. 2008). The Supreme Court's decision in *Hurst v. Florida*, 136 S.Ct. 616 (2016), constitutes such a change.

The decision in *Hurst* moved the analysis beyond factors which effect an increase in punishment and included within the reach of the Sixth Amendment "each fact necessary to impose a sentence of death." 136 S. Ct. at 619. Courts declining to discuss this distinction characterize the jury's decision that aggravators outweigh mitigators—not as a factor necessary to impose the death penalty—but as a "moral judgment" about how to punish a defendant who is death-eligible. *See Runyon*, 707 F.3d at 515. Similar reasoning was expressly rejected by the Supreme Court in *Ring* when it found aggravating circumstances were equivalent to elements of an offense for Sixth Amendment purposes. *Ring*, 536 U.S. at 600 (disavowing prior reasoning used to uphold *Walton* which was that the finding of aggravating facts fell "within the traditional scope of capital sentencing as a choice between a greater and a lesser penalty, not as a process of raising the ceiling of the sentencing range available."). The *Ring* Court emphasized that "no matter how the State labels it [a finding that increases punishment]--it must be found by a jury beyond a reasonable doubt." *Ring,* 536 U.S. at

602. Classifying a sentencing factor as a "moral judgment" does not shield it from the Sixth Amendment. The Sixth Amendment does not permit the elevation of form over function. Such focus on form over function disregards that *Hurst*'s holding is not limited by *Ring*'s application of the Sixth Amendment to factors that increase punishment and make a defendant death eligible.[40]

In *Hurst*, the Court struck down Florida's capital sentencing scheme, finding that it violated the Sixth Amendment because it did "not require the jury to make the critical findings necessary to impose the death penalty." *Id.* at 621-22. The Florida system required the judge—not the jury—to find that "sufficient aggravating circumstances exist" and that they outweigh the mitigating circumstances before subjecting the defendant to the death penalty. *Id.* at 622. The Supreme Court held that this system violated *Ring*.

This was the first time the Supreme Court recognized that the weighing decision itself was a fact necessary to impose a death sentence and therefore must be found by jurors.[41] *Chinn v. Jenkins*, No. 3:02-cv-512, 2017 WL 631412, at \*2 (W.D.

---

[40] The inquiry at issue with regards to the aggravating factor in *Ring*, whether the defendant was the actual killer or if he was "a major participant" in the robbery that led to the killing and "exhibited a reckless disregard or indifference for human life," 536 U.S. at 594, is not so different from determining moral culpability when choosing to impose a sentence of life or death.

[41] Judicial decisions adverse to this proposition erroneously utilize the Supreme Court's decision in *Kansas v. Carr*, 136 S. Ct. 633, 642 (2016), as support for the idea that a "beyond a reasonable doubt" standard does not apply to the jury's weighing determination. The dictum cited by such decisions, however, discusses a jury's dispensation of mercy which has never been constrained by the Sixth Amendment. It

Ohio Feb. 13, 2017) (finding the *Hurst* Court held that the relative weight of aggravating and mitigating circumstances is a question of fact necessary to be found before the death penalty can be imposed); *Davis v. Bobby*, No. 2:10-CV-107, 2017 WL 4277202, at \*3 (S.D. Ohio Sept. 25, 2017) ("the correct reading of Hurst is that the relative weight of aggravating circumstances and mitigating factors is a question of fact akin to an element"). *See also Ybarra v. Filson*, 869 F.3d 1016, 1030 (9th Cir. 2017) (assuming arguendo that the weighing determination is to be made beyond a reasonable doubt). *Hurst*, therefore, made clear it is the jurors' responsibility to weigh aggravating and mitigating circumstances because the outcome determines whether a death sentence may be imposed. If the weighing decision results in a finding that the aggravating circumstances outweigh the mitigating ones, that finding constitutes the final element or necessary fact required for a death sentence. *See Hurst*, 136 S. Ct. at 623–24 (specific findings authorizing imposition of death sentence must be made by jurors).[42] All elements that subject a defendant to a harsher punishment must be

does not directly speak to the government's burden to prove the critical findings for the imposition of the death penalty.

[42] In *Rauf v. State*, the Supreme Court of Delaware held that "Delaware's current death penalty statute violated the Sixth Amendment role of the jury as set forth in *Hurst*." 145 A.3d 430, 433 (Del. 2016). Applying *Hurst*, the Court found that the Sixth Amendment required jurors to assess existing aggravating and mitigating evidence, and that the finding necessary for jurors to select death as the defendant's sentence— in Delaware this was a finding that aggravating circumstances outweigh mitigating circumstances—must be found by jurors unanimously and beyond a reasonable doubt. *Id.* at 434.

Likewise, after remand from the U.S. Supreme Court, the Florida Supreme Court held

found by a jury. *See Ring*, 536 U.S. at 609. All elements must be found beyond a reasonable doubt. *See Alleyne v. U.S.*, 133 S. Ct. 2151, 2156 (2013). Accordingly, the Sixth Amendment requires jurors to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances in order to impose a death sentence.

Similar to the Florida capital sentencing scheme, the Federal Death Penalty Act requires jurors to decide the aggravating factors outweigh the mitigating factors before they may impose a death sentence. After *Hurst*, it is clear that decision must be made by jurors and, pursuant to *Alleyne*, it must be found beyond a reasonable doubt.

Runyon's jurors were only tasked with deciding whether the aggravating factors "sufficiently outweighed" the mitigating factors. That was constitutionally insufficient. They should have been instructed that the Government's burden was proof beyond a reasonable doubt and, if they had any reasonable doubts about the relative weight of the aggravating and mitigating factors, they must impose a life sentence. Because the jury instructions did not include the constitutionally required burden of proof, jurors did not find that the government had proven the final element necessary for imposition of a death sentence. Accordingly, Runyon's death sentence should be vacated.

The district court denied this claim stating that it stretches the holding in *Hurst*

that *Hurst* "mandates that all the findings necessary for imposition of a death sentence are 'elements' that must be found" by a unanimous jury. *Hurst v. State of Florida,* 202 So.3d 40, 57-58 (2016) (the case on remand).

too far. J.A.2968. As set forth above, however, this claim sets forth a substantial showing of the denial of a constitutional right, courts have resolved this issue differently and some would rule in favor of Runyon's claim. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). Jurists of reason have already found this issue worthy of further exploration. *See Alfred Brian Mitchell v. Royal,* No. 16-6258 (Order, 10th Cir., Apr. 18, 2018) (granting a certificate of appealability on whether Oklahoma's death penalty statute is unconstitutional because it does not require a beyond reasonable doubt standard be applied to the jury's weighing determination). *See also Underwood v. Royal,* 89 F.3d 1154, 1183-86 (10th Cir. 2018) (granting a COA on whether the constitutional is violated where the jury is not required to find aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt but declining to grant relief because *Hurst* was not clearly established law the State would have applied). Because reasonable jurists could, and have, found this claim deserves further review, a certificate of appealability should issue.

**Conclusion**

The jury instructions lowered the government's burden of proof at sentencing. This Court should vacate the death sentences and remand for a new sentencing hearing.

**CONCLUSION**

For all the reasons set forth herein, this Court should grant a Certificate of Appealability and issue a final briefing order. Upon full review, this Court must vacate

Runyon's §924(c) conviction and sentence under *Johnson* and remand for a new sentencing hearing on remaining counts. Further, this Court must remand for an evidentiary hearing on Runyon's fact-intensive, extra-courtoom claims. Further, should this Court review the merits of Runyon's *Strickland*, *Brady*, *Batson*, and *Hurst* claims, he is entitled to relief on all of those claims as set forth herein.

Respectfully submitted,

s/Michele J. Brace
Michele J. Brace
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

s/Dana C. Hansen Chavis
Dana C. Hansen Chavis
Asst. Federal Community Defender

s/Susanne Bales
Susanne Bales
Asst. Federal Community Defender

Federal Defender Services of
 Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org
Susanne_Bales@fd.org

Dated: August 24, 2018

## REQUEST FOR ORAL ARGUMENT

Runyon requests oral argument in this Capital Section 2255, 18 U.S.C., case. Runyon's case is uniquely complex. He raises a claim under .*Johnson v. U.S.*, 135 S.Ct. 2551 (2015), that his 18 U.S.C. §924(c) conviction is void. Oral argument may assist the Court in resolution of the claim. In addition, the district court denied an evidentiary hearing on multiple claims that hinge on evidence not yet developed in the courtroom. Oral argument is warranted due to the legally-complex and factually-intensive claims. Given the gravity of the case, argument is appropriate.

s/Michele J. Brace
Michele J. Brace

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME

Runyon filed a motion to extend the word limit to 37,500 words on August 14,

2018. Doc. 25. This Court has not ruled on Appellant's motion.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[X] this brief or other document contains 33,913 words

[  ] this brief uses monospaced type and contains _____[state number of] lines

This brief or other document complies with the typeface and type style requirements because:
[X] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word_____[identify word processing program] in
Garamond, 14 point____[identify font size and type style]; or


s/Michele Brace

Party Name: David A. Runyon

Dated: August 24, 2018

# CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2018, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

s/Michele J. Brace
Michele J. Brace