IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 17-5

———————

UNITED STATES OF AMERICA,

*Appellee*,

v.

DAVID ANTHONY RUNYON,

*Appellant*.

———————

Appeal from the United States District Court
for the Eastern District of Virginia
at Newport News
*The Honorable Rebecca Beach Smith, Chief District Judge*

———————

BRIEF OF THE UNITED STATES

———————

G. Zachary Terwilliger
United States Attorney

Lisa R. McKeel
Brian J. Samuels
Assistant United States Attorneys
Fountain Plaza Three, Suite 300
Newport News, VA 23606
(757) 591-4000

*Attorneys for the United States of America*

# Table of Contents

**Page**

Table of Authorities ............................................................................................ iv

Introduction ...........................................................................................................1

Issues Presented ....................................................................................................1

Statement of the Case............................................................................................2

    I.       The Defendant's Offense Conduct......................................................2

           A.     The Murder of Cory Voss on April 29, 2007 ...........................2

           B.     The Defendants Who Planned the Murder ................................3

           C.     Runyon's Purchase of Firearm...................................................4

           D.     Crime Scene Evidence ..............................................................4

           E.     Search Warrants ........................................................................5

           F.     Payments to Runyon ..................................................................5

            G.     Phone Calls and Emails ............................................................6

           H.     Runyon's Statements ................................................................8

    II.      Procedural Background ..........................................................................9

Summary of Argument .........................................................................................13

Argument...............................................................................................................15

    I.       The Court should reject the defendant's challenge to his conviction on Count 5 under 18 U.S.C. § 924(j). ...............................15

           A.     The Court should decline to consider the defendant's challenge under the concurrent sentence doctrine. ...................17

           B.     Runyon's conviction rests on predicate offenses that remain valid under § 924(c)'s force clause..............................21

  1. Carjacking is a force-clause crime...................21

  2. Conspiracy to commit murder for hire, resulting in death, is a force-clause crime. ........................23

 C. Any alternative-theory error in this case is harmless................28

II. The defendant's trial counsel was not ineffective in addressing mental-health evidence at the mitigation stage. ...................34

 A. Trial counsel conducted a reasonable investigation. ................38

  1. Blast Injuries.................................40

  2. Car Accident..................................40

  3. Family and Social Background .......................42

  4. Other Evidence ................................44

  5. Brain Damage and Resulting Mental Illness..................45

 B. Trial counsel made a sound strategic decision to forgo presenting mental health evidence. ...........................55

 C. Trial counsel's chosen strategy was not prejudicial. ................61

III. There is was no ineffectiveness assistance of counsel or *Brady* violation with respect to co-defendant Draven's background. ...........65

 A. Procedural Default ....................................67

 B. *Brady* Claim and Materiality ...................................68

 C. Runyon was not deprived of effective assistance of counsel. ........................................72

IV. Any claim of *Batson* error is both procedurally defaulted and unavailing on the merits. .................................73

 A. Runyon's *Batson* claim is procedurally defaulted....................74

 B. Neither trial nor appellate counsel were ineffective for failing to raise a futile *Batson* argument................................76

  1. Runyon's statistical evidence is not persuasive. ...........80

|   | 2. | Runyon's additional evidence fails to establish a prima facie cases of discrimination. | 84 |

|   | C. | Alternatively, the Court should remand for a hearing to conduct steps two and three of the *Batson* analysis. | 90 |

Conclusion .......................................................................................92

Statement Regarding Oral Argument ....................................................93

Certificate of Compliance ...................................................................93

**Table of Authorities**

Page

**Cases**

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) ....................................................37

*Allen v. Lee*, 366 F.3d 319 (4th Cir. 2004) ....................................................... 80, 81, 83

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)....................................................23

*Bacon v. Lee*, 225 F.3d 470 (4th Cir. 2000)....................................................... 35, 37

*Barnes v. Thomas*, 938 F.3d 526 (4th Cir. 2019)....................................................30

*Batson v. Kentucky*, 476 U.S. 79 (1986)....................................................... 74, 77

*Bell v. Cone,* 535 U.S. 685 (2002) ........................................................ 35, 36, 72

*Bousley v. United States*, 523 U.S. 614 (1998)....................................................67

*Boyle v. McKune*, 544 F.3d 1132 (10th Cir. 2008)....................................................53

*Brady v. Maryland*, 473 U.S. 83 (1963) ....................................................65

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)....................................................30

*Brown v. Dixon*, 891 F.2d 490 (4th Cir. 1989) ....................................................86

*Burger v. Kemp*, 483 U.S. 776 (1987) ....................................................36

*Burrage v. United States*, 571 U.S. 204 (2014) ........................................... 23, 25, 27

*Carter v. Lee*, 283 F.3d 240 (4th Cir. 2002) ....................................................76

*Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000)....................................................37

*Cone v. Bell*, 556 U.S. 449 (2009) ....................................................70

*Coulter v. McCann*, 484 F.3d 459 (7th Cir. 2007)....................................................81

*Czech v. Melvin*, 904 F.3d 570 (7th Cir. 2018)....................................................30

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)....................................................82

*Descamps v. United States*, 570 U.S. 254 (2013)....................................................23

*Flowers v. Mississippi*, 139 S. Ct. 2228 (2019)....................................................... 78, 85

*Foster v. Chatman*, 136 S. Ct. 1737 (2016)....................................................85

*Golphin v. Branker*, 519 F.3d 168 (4th Cir. 2008) ....................................................... 80, 81, 85

*Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007) ....................................................27

*Gregg v. Georgia*, 428 U.S. 153 (1976) ........................................................52

*Harrington v. Richter*, 562 U.S. 86 (2011) .......................................... 35, 36, 61, 73

*Hedrick v. True*, 443 F.3d 342 (4th Cir. 2006) .............................................37

*Hernandez v. New York*, 500 U.S. 352 (1991)...............................................74

*Howard v. Moore*, 131 F.3d 399 (4th Cir. 1997).........................................53

*In re Gomez*, 830 F.3d 1225 (11th Cir. 2016)...............................................31

*In re Irby*, 858 F.3d 231 (4th Cir. 2017) ....................................................24

*In re Navarro*, 931 F.3d 1298 (11th Cir. 2019) .........................................28

*In re Williams*, 826 F.3d 1351 (11th Cir. 2016) .........................................18

*Johnson v. United States*, 135 S. Ct. 2551 (2015) .....................................18

*Johnson v. United States*, 520 U.S. 461 (1997) .........................................30

*Jones v. Barnes*, 463 U.S. 745 (1983) .......................................................90

*Keel v. French*, 162 F.3d 263 (4th Cir. 1998)..................................... passim

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) ................................... 76, 77

*Lockett v. Ohio*, 438 U.S. 586 (1978) ......................................... 43, 51, 73

*Lockhart v. Fretwell*, 506 U.S. 364 (1993) .................................................36

*Lovitt v. True*, 403 F.3d 171 (4th Cir. 2005).............................................56

*Majid v. Portuando*, 428 F.3d 112 (2d Cir. 2005)......................................81

*Maryland v. Kulbecki*, 136 S. Ct. 2 (2015) ...............................................36

*Massaro v. United States*, 538 U.S. 500 (2003) .........................................67

*Massaro*, 538 U.S..................................................................................74

*Mathis v. United States*, 136 S. Ct. 2243 (2016) .......................................24

*McClesky v. Zant*, 499 U.S. 467 (1991)........................................... 75, 80

*Meyer v. Branker*, 506 F.3d 358 (4th Cir. 2007) .......................................37

*Miller v. United States*, 261 F.2d 546 (4th Cir. 1958) ...............................15

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) (*Miller-El I*) .......... 81, 82, 87

*Miller-El v. Dretke*, 545 U.S. 231 (2005) (*Miller-El II*)..........................85

*Murray v. Carrier*, 477 U.S. 478 (1986) ...................................................68

*Neder v. United States*, 527 U.S. 1 (1999)................................................29

v

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ........................................................61

*Pinkerton v. United States*, 328 U.S. 640 (1946)..........................................26

*Porter v. McCollum*, 558 U.S. 30 (2009)........................................................53

*Purkett v. Elem*, 514 U.S. 765 (1995) .............................................................77

*Ray v. United States*, 481 U.S. 736 (1987) (per curiam) ...........................19

*Rice v. Collins*, 546 U.S. 333 (2006) .................................................... 77, 90

*Rompilla v. Beard*, 545 U.S. 374 (2005) .............................................. 37, 41

*Runyon v. United States*, 228 F. Supp. 3d 569 (E.D. Va. 2017)........................ 76, 88

*Rutledge v. United States*, 517 U.S. 292 (1996) ...........................................19

*Ryan v. United States*, 688 F.3d 845 (7th Cir. 2012)...................................20

*Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940 (7th Cir. 1997)........................82

*Skilling v. United States*, 561 U.S. 358 (2010) .............................................29

*Smith v. Murray*, 477 U.S. 527 (1986).............................................................89

*Smith v. Workman*, 550 F.3d 1258 (10th Cir. 2008)....................................53

*Snyder v. Louisiana*, 552 U.S. 472 (2008)............................................ 79, 85

*Spencer v. Murray*, 18 F.3d 229 (4th Cir. 1994) ..........................................36

*Strickland v. Washington*, 466 U.S. 668 (1984) .............................. passim

*Tatum v. RJR Pension Inv. Comm.*, 855 F.3d 553 (4th Cir. 2017) ..........................22

*Thaler v. Haynes*, 559 U.S. 43 (2010) (*per curiam*)...................................85

*Thomas v. Gilmore*, 144 F.3d 513 (7th Cir. 1998)........................................37

*United States v. Allred*, 942 F.3d 641 (4th Cir. 2019) ................................24

*United States v. Bagley*, 473 U.S. 667 (1985) ..............................................69

*United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011) .................... 83, 86

*United States v. Battle*, 927 F.3d 160 (4th Cir. 2019),
    *cert. denied*, 2019 WL 6833479 (U.S. Dec. 16, 2019)................................27

*United States v. Beckford*, 962 F. Supp. 804 (E.D. Va. 1997)........................71

*United States v. Blackman*, 746 F.3d 137 (4th Cir. 2014)............................26

*United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011) .........................18

*United States v. Cannon*, 778 F. App'x 259 (4th Cir. 2019)..................................28

*United States v. Castleman*, 572 U.S. 157 (2014) ........................................................25

*United States v. Charles*, 932 F.3d 153 (4th Cir. 2019) ...........................................18

*United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015)....................................29

*United States v. Cooper*, 617 F.3d 307 (4th Cir. 2010) .................................... 15, 34

*United States v. Davis*, 139 S. Ct. 2319 (2019) ................................................ 13, 16

*United States v. Dinkins*, 691 F.3d 358 (4th Cir. 2012).............................................26

*United States v. Draven*, 417 F. App'x 362 (4th Cir. 2011)....................................11

*United States v. Frady*, 456 U.S. 152 (1982)........................................ 38, 67, 68, 75

*United States v. Fulks*, 683 F.3d 512 (4th Cir. 2012) ...............................................15

*United States v. Galati*, 844 F.3d 152 (3d Cir. 2016)...............................................26

*United States v. Gordon*, 156 F.3d 376 (2d Cir. 1998)............................................33

*United States v. Grimmond*, 137 F.3d 823 (4th Cir. 1998)......................................79

*United States v. Hadden*, 475 F.3d 652 (4th Cir. 2007) ..........................................33

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013)..............................................44

*United States v. Hare*, 820 F.3d 93 (4th Cir. 2016)..................................................28

*United States v. Hasting*, 461 U.S. 499 (1983)..........................................................19

*United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) ..............................................66

*United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012),
    *as amended* (Mar. 29, 2012 ........................................................................29

*United States v. Joe*, 928 F.2d 99 (4th Cir. 1991)............................................. 77, 78

*United States v. John-Baptiste*, 747 F.3d 186 (3d Cir. 2014)................................30

*United States v. Lane*, 866 F.2d 103 (4th Cir. 1989) ....................................... 78, 83

*United States v. Luskin*, 926 F.2d 372 (4th Cir. 1991) .................................... 25, 27

*United States v. Malindez*, 962 F.2d 332 (4th Cir. 1992) ........................................78

*United States v. Mathis*, 932 F.3d 242 (4th Cir. 2019),
    *cert. denied sub nom. Uhuru v. United States*,
    2019 WL 6689801 (U.S. Dec. 9, 2019)..........................................................22

*United States v. McCollum*, 885 F.3d 300 (4th Cir. 2018) .....................................24

*United States v. McHan*, 386 F.3d 620 (4th Cir. 2004) ...........................................34

*United States v. McKie*, 112 F.3d 626 (3d Cir. 1997) ...............................................18

*United States v. Mikalajunas*, 186 F.3d 490 (4th Cir. 1999) ............................ 67, 75

*United States v. Montgomery*, 819 F.2d 847 (8th Cir. 1987)....................................84

*United States v. Nicholson*, 611 F.3d 191 (4th Cir. 2010).............................. 15, 34

*United States v. Roane*, 378 F.3d 382 (4th Cir. 2004)................................. 35, 64, 69

*United States v. Ross*, 801 F.3d 374 (3d Cir. 2015).................................................20

*United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013)............................. 12, 63, 88

*United States v. Rutligliano*, 887 F.3d 98 (2d Cir. 2018) ........................................20

*United States v. Sangineto-Miranda*, 859 F.2d 1501 (6th Cir. 1988).....................83

*United States v. Silvers*, 90 F.3d 95 (4th Cir. 1996) ...............................................33

*United States v. Simms*, 914 F.3d 229 (4th Cir. 2019) (en banc) ...........................24

*United States v. Smith*, 723 F.3d 510 (4th Cir. 2013)..............................................30

*United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013) .........................................66

*United States v. Tindle*, 860 F.2d 125 (4th Cir. 1988)............................................79

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)..............................................81

*United States v. Torres-Otero*, 232 F.3d 24 (1st Cir. 2000) ...................................33

*United States v. Torrez*, 869 F.3d 291 (4th Cir. 2017) ...........................................58

*United States v. Townsend*, 178 F.3d 558 (D.C. Cir. 1999) ...................................33

*United States v. Ventura*, 864 F.3d 301 (4th Cir. 2017) .........................................33

*United States v. Williams*, 977 F.2d 866 (4th Cir. 1992).........................................67

*Vasquez v. Thaler*, 389 F. App'x 419 (5th Cir. 2010) .............................................61

*Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995)..................................................37

*Wiggins v. Smith*, 539 U.S. 510 (2003)....................................................... 37, 55, 56

*Winfield v. Roper*, 460 F.3d 1026 (8th Cir. 2006) ......................................... 43, 69

*Wong v. Belmontes*, 558 U.S. 15 (2009)..................................................................40

*Yates v. United States*, 354 U.S. 298 (1957)...........................................................29

**Statutes**

18 U.S.C. § 1951(a) .....................................................................................................9

18 U.S.C. § 1958(a) ..................................................................... 9, 23, 27

18 U.S.C. § 2113 ...............................................................................9

18 U.S.C. § 2119 ...........................................................................9, 21

18 U.S.C. § 3591 ...............................................................................9

18 U.S.C. § 3592 ..................................................................... 9, 38, 39, 65

18 U.S.C. § 3593 .......................................................................... 52, 72

18 U.S.C. § 924(c)(3) .......................................................................16

18 U.S.C. § 924(j)(1) .....................................................................9, 16

## Introduction

Defendant David Runyon, a contract killer, murdered Cory Allen Voss, a young Naval officer, in Newport News, Virginia. Runyon was hired for a few hundred dollars by Cory's wife and her lover so that they could collect life insurance proceeds from Cory's death. Runyon shot Cory five times and left him to bleed to death in his truck after arranging the murder to look like a late night robbery. An experienced former police and Army officer, Runyon put his training to use to carry out the murder and conceal who was responsible. He showed no remorse afterwards, as he and his co-defendants strived mightily and desperately to conceal their roles in the crime and obtain the life insurance payout.

Following a jury trial, Runyon received capital sentences on charges of conspiring to commit murder-for-hire and using a firearm during and in relation to a crime of violence, as well as a sentence of life imprisonment on the charge of carjacking. Because Runyon's arguments in favor of upending those sentences on collateral review are unavailing, this Court should affirm the district court's order denying habeas relief.

## Issues Presented

1. Is Runyon's conviction on Count 5, for violating 18 U.S.C. § 924(j), constitutional in light of *United States v. Davis*, 139 S. Ct. 2319 (2019)?

2. Was Runyon's trial counsel ineffective in failing to present evidence of Runyon's brain damage and mental illness at the penalty phase?

3. Did the prosecution commit a *Brady* violation by withholding evidence supporting Runyon's case that he is not death eligible? Did Runyon's trial counsel provide ineffective assistance by failing to investigate and present this information to the jury?

4. Did the prosecution violate *Batson v. Kentucky*, 476 U.S. 79 (1986), in its use of peremptory jury strikes, and were Runyon's trial counsel and appellate counsel ineffective for failing to previously raise the *Batson* issue in a way that would overcome his procedural default?

**Statement of the Case**

I. **The Defendant's Offense Conduct**

A. **The Murder of Cory Voss on April 29, 2007**

In the morning hours of April 30, 2007, Newport News Police responded to a report of a subject sleeping in a truck in a parking lot and found Cory Voss dead inside the vehicle. Trial Transcript ("TT") 268.[1] He had been shot multiple times.

---

[1] The Joint Appendix does not include the entire trial transcript, but instead only certain portions of it. The government references the Joint Appendix where possible and otherwise references the trial transcript. The government's description of the underlying facts is also consistent with the district court's factual findings. *See* JA2825–32. Should the Court request the entire trial transcript, the government will prepare a supplemental appendix.

Cory's wife, co-defendant Catherina Voss, told detectives that Cory had left the house the night before to get some money from Langley Federal Credit Union (LFCU). The last images of Cory alive were captured by the video surveillance system attached to the ATM at LFCU on April 29, 2007. TT398–410; Gov't. Ex., (hereinafter "GX") 28-28GG. The images showed Cory driving up to the ATM, attempting to make a transaction, someone entering his vehicle and then Cory driving away from the ATM. TT406–07. Approximately four minutes later, Cory returned and attempted another cash withdrawal through the ATM. TT408. Financial records from LFCU confirmed Voss opened an account in her name nine days before the murder with a $5.00 deposit. JA413–16; GX 31-31F. On April 29, 2007, Cory attempted three withdrawals, but each transaction was denied for insufficient funds. JA429–31; GX 31GG-II.

**B.    The Defendants Who Planned the Murder**

Michael Draven and Catherina Voss began having an affair while Cory was deployed on board the USS Elrod. TT481, 483. To free themselves of Cory, and to collect insurance and other benefits from his death, Draven and Voss decided to have Cory murdered and hired Runyon as a contract killer. During interviews with detectives, both Runyon and Draven acknowledged they met through a medical research company where they participated in drug-studies. TT1310, 1314. Other than income Runyon and Draven received from participating in these studies, none

3

of the three defendants had regular employment. TT481, 483, 711, 717. Runyon had no bank account, did not pay utilities, and the only financial records found for him were for two reloadable credit cards. TT713–14. Following Cory's murder on April 29, 2007, Voss received approximately $133,000 in death gratuity, Social Security payments and Navy housing allowance. TT949–50. Within three months, she had spent the money on trips, jewelry, household items, debt payments, and payments to Draven. TT951–52. She also sought a $400,000 military life insurance policy held by Cory.

### C. Runyon's Purchase of Firearm

On the day of the murder, Runyon, a West Virginia resident, purchased a .357 handgun from George Koski in West Virginia sometime between the hours of noon and 2:00 p.m. Koski also gave Runyon some ammunition with the firearm. JA489–97; GX 103-103B. This firearm was later pawned in West Virginia by a friend of Runyon's, in October and November 2007. TT1190–95.

### D. Crime Scene Evidence

An autopsy confirmed that Cory died as a result of three separate gunshot wounds to his chest and abdomen fired, most likely, from less than two or three feet away. TT319–29; GX 18. The jacketed, hollow-point bullets that killed Cory were fired from the same firearm and were characteristic of .38 class-a .38 caliber revolver or a .357 magnum firearm. JA389–96; GX 5, 22, 23. The firearm was not

recovered. JA397, 398.

### E. Search Warrants

In December 2007, search warrants were executed in West Virginia for Runyon's residence, vehicle and storage unit. Agents recovered a map of Newport News, Virginia in the center console of Runyon's vehicle. TT1025–30, 1324–26; GX 214. The map contained the following written words: "Langley Federal Credit Union, '97 gray Ford Ranger, FL hubcap missing, tailgate down, J. Morris Boulevard, Cory." TT1027; GX 214. Found with the map was a photograph of Voss and Draven, with their names, addresses and social security numbers written on the back. TT1028; GX 215. Items recovered from Runyon's residence included papers referencing the credit union and phone numbers belonging to Voss, Draven and Runyon. JA530–31. In Runyon's former residence, agents recovered a box of Winchester .357 magnum, hollow-point bullets with five missing from the box. JA539; GX 236, 237. Agents also found notebook paper with a list of items including tarp, trash bag, Taser, Spyderco knife, black hoodie sweatshirt, black BDU pants, boots and gloves. JA529; GX 217. A separate notebook page made reference to the time it would take to travel to Virginia and the location of LFCU. JA530; GX 217.

### F. Payments to Runyon

A Western Union money order, dated June 1, 2007, showed that Randy

Fitchett, Draven's brother, sent Runyon $275.00. TT804; GX 293. Fitchett denied sending the money order, but recalled that Draven took him to a grocery store, saying that he needed a money order to pay a debt to a friend. TT804–05.

### G.    Phone Calls and Emails

The United States introduced various phone calls and emails between Voss, Draven, and Runyon, establishing their relationship, the murder-for-hire-scheme and its cover-up. GX 159-173A. Prior to the murder, Draven was incarcerated on unrelated charges in the Newport News jail. During that incarceration, he made 36 outgoing calls, portions of which were played for the jury. GX 159-173A. In one recorded call on March 29, 2007, Draven and Voss discussed Runyon' s request for more money—namely, $500 up front—and their fear that Runyon had turned on them. TT890–93; GX 168, 168A. During the investigation, Voss, Draven, and Runyon communicated via email and phone calls. In one email, dated May 5, 2007, Brownells.com sent Runyon information related to the purchase of a .38 / .357 pistol stainless bore brush, which was billed to a different name at Runyon's address in West Virginia. JA720–21; GX 156.

The emails showed a pattern of Draven and Runyon getting their stories straight about their relationships and their alibis. JA561–604. Importantly, Draven emailed Runyon on December 7, 2007, about not meeting each other at a Waffle House, money owed, the grand jury, and Runyon's talking to Voss on the phone.

6

JA597–98; GX 143A. During the course of a wiretap authorized on the phones of Draven, Voss and Runyon, the defendants conspired with one another and others to obstruct justice and tamper with witnesses. JA615–748; GX 174-205B. In one call on December 8, 2007, Draven was upset after his interview with detectives and told Runyon the questions he was asked and how he answered. JA660; GX 197, 197B. Runyon responded to Draven that he'd "hang tough to the bitter end." *Id.*

Finally, phone records introduced at trial revealed regular calls to telephones associated with Runyon, Draven and Voss before and after the murder. GX 104-110, 136. Analysis performed on these records revealed multiple calls between Draven and Runyon leading up to and on the night of the murder. JA671–74; GX 136. Following the murder, calls with Draven and Runyon continued for months. Several calls occurred just before and after the time that the Western Union wire transfer was sent to Runyon in West Virginia. JA679–80; GX 136, 293. Cell tower analysis was also introduced, showing activity that occurred the day leading up to the murder of Cory Voss. JA692–722; GX 134, 135, 135A. Toll records revealed a number of calls between Draven and Voss in the hours preceding the murder and calls between Draven and pay telephones off of Jefferson Avenue (close to LFCU) beginning at 10:12 pm. JA702. Calls continued indicating that Draven's cell phone had changed location, traveling toward the direction of the pay telephones, past the LFCU, and then back past LFCU towards the residence of Draven. JA709–11.

7

## H. Runyon's Statements

On December 3, 2007, Runyon was interviewed in West Virginia by detectives with the Newport News Police Department. TT1309–14. Runyon admitted knowing Draven and that the two met at a drug study. TT1310. He denied that he owned any firearms. TT1314. When asked where he was on April 29 and 30, he could not provide a location to validate his whereabouts on those two days. TT1312–13.

Following execution of the search warrants in West Virginia on December 11, 2007, Runyon was interviewed a second time. This interview was voluntary; however, Runyon was advised of his *Miranda* rights, waived those rights and agreed to be interviewed at the Morgantown Police Department. TT1322–23. He again denied that he owned firearms despite the fact that firearms were found in his vehicle. TT1323. When confronted with the map and photograph found in his vehicle, Runyon appeared overwhelmed and did not immediately answer the detectives' questions. TT1324–25. While he eventually admitted that the handwriting on the map of Hampton Roads was his, he denied that he wrote on the back of the photograph. *Id.* This interview was videotaped.

Evidence was introduced that Runyon confessed and bragged to several people that he killed Cory Voss. Runyon told his girlfriend Sarah Baker that he murdered Cory with a firearm. TT1135–37. He told her that he was supposed to

8

get a big sum of money from the insurance, but was never paid. *Id.* Runyon told Virginia Pina, an ex-girlfriend, that he killed someone for money. TT1857. After his arrest Runyon confessed to two other inmates that he murdered Cory Voss. He told Jamal Knowles that he killed a Navy guy with a .38 and the firearm was in a pawn shop in West Virginia. TT1208–09. He told Knowles that $600 was wired to him and that he was going to get the rest of the money from the insurance claim "on the guys life." TT1209. Runyon told Theodore Schlossman that he drove from West Virginia to Newport News and killed a military man, but got paid only "chump change." TT1219–22.

## II. Procedural Background

On February 13, 2008, a grand jury returned a five-count indictment charging defendant David Runyon and co-defendants Michael Draven and Catherina Voss with Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a) (Count 1); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count 2); Bank Robbery Resulting in Death, in violation of 18 U.S.C. §§ 2113(a), (e) and 2 (Count 3); Conspiracy to Commit Robbery Affecting Commerce, in violation of 18 U.S.C. § 1951(a) (Count 4); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(j) (Count 5). JA46–62. The indictment also provided the notice of special findings for the death penalty. 18 U.S.C. §§ 3591, 3592; JA58–59.

On July 17, 2008, the government filed its notice of intent to seek a death sentence. JA7, 63–69.  On December 12, 2008, the defendant filed his Notice pursuant to Federal Rules of Criminal Procedure 12.2 that he may introduce expert mental health evidence during the penalty phase of trial. JA78–92. On April 8, 2009, the defendant filed a further Notice Regarding Mental Health Experts adding a neuropsychologist and a psychiatrist. JA101–104. Defendant's objections to proposed non-statutory aggravating factors were filed on May 8, 2009, (JA14), which the court denied. JA161–172. On June 11, 2009, the district court issued its Order regarding the Juror Questionnaire. JA139–160. On June 29, 2009, the defendant filed a Supplemental Notice Regarding Mental Health Experts. JA173–76. On June 29, 2009, the United States filed its sealed report regarding the Forensic Psychiatric Evaluation of the defendant by Dr. Raymond Patterson. JA177–200. On June 30, the United States filed its sealed report regarding the Forensic Psychiatric Evaluation of the defendant by Dr. Paul Montalbano. JA201–32.

Trial of Runyon and Draven began on June 30, 2009, and the guilt phase continued until July 17, 2009, involving over 50 witnesses and over 300 exhibits. JA15–18.  On July 15, 2009, the district court dismissed Count 3 pursuant to Rule 29.  JA18.  On July 17, 2009, the jury found both defendants guilty on Counts 1, 2 and 5, and not guilty on Count 4. JA18–19.  The eligibility phase was held on July

22, 2009. No evidence was presented. Following argument the jury found that defendant intentionally killed Cory Voss. The jury also found the United States had proven the two statutory aggravating factors. JA19–20. On August 10, 2009, the defendant filed a Motion to Supplement His Mental Health Reports. JA20. On August 14, 2009 the defendant filed a Motion to Release Test Results to Counsel and the district court granted the request. JA21.

The selection phase began on August 19, 2009. JA21–23. On August 21, 2009, defendant submitted mitigating factors. JA21. The jury returned on August 27, 2009, and found four additional non-statutory aggravating factors, two statutory mitigating factors, and a number of non-statutory mitigating factors. The jury recommended death on Counts 1 and 5 and life imprisonment on Count 2. JA22–23.

On September 30, 2009, defendant filed a motion to set aside the verdict, challenging certain victim-impact evidence. The court denied defendant's motion on October 27, 2009. JA23. Runyon was sentenced to death and filed a timely notice of appeal. JA23–24, 1311–16, 1458–65.

Voss pled guilty to the indictment and was sentenced to life in prison on Counts 1, 2, 3 and 5, and 20 years in prison on Count 4. Draven was sentenced to life in prison on Counts 1, 2 and 5, and his convictions have been affirmed on direct appeal. *United States v. Draven*, 417 F. App'x 362 (4th Cir. 2011).

On February 25, 2013, Runyon's conviction and sentence were affirmed on direct appeal. *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013). On October 6, 2014, Runyon's petition for a writ of certiorari was denied. *Runyon v. United States*, No. 13-254 (Oct. 6, 2014). On October 5, 2015, pursuant to 28 U.S.C. § 2255, Runyon filed a motion to vacate, set aside, or correct his sentence and the next day the court ordered the government to respond. JA1497–1622. The United States filed its response to Runyon's § 2255 motion on January 11, 2016. JA1670–1810. On February 4, 2016, Runyon filed an amended § 2255 motion, adding little to his original motion. JA1842–2270. On March 28, 2016, the defendant filed a reply to the United States' original response. JA2272–2367. The United States responded to the defendant's amended § 2255 motion on April 22, 2016. JA2485–2643. On July 7, 2016, the defendant filed his reply to the United States' amended response to the defendant's § 2255 motion. JA2656–2816.

On January 19, 2017, the district court filed its opinion denying Runyon's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. The district court also denied a certificate of appealability. JA2824–3070.

On August 21, 2017, the defendant filed his Notice of Appeal. ECF No. 1. On August 24, 2018, the defendant filed his brief with this Court, along with a Motion for certificate of appealability. ECF Nos. 27, 36. On August 14, 2019, this Court issued a limited certificate of appealability on the four issues briefed below.

ECF No. 46.

## Summary of Argument

**I.** Runyon's conviction under 18 U.S.C. § 924(c) remains valid. In Count 5 of the indictment, Runyon was charged with and convicted of violating 18 U.S.C. § 924(j) by committing murder with a firearm in relation to a crime of violence. He now asserts that his conviction is invalid because, after *United States v. Davis*, 139 S. Ct. 2319 (2019), it does not rest on a valid crime-of-violence predicate under 18 U.S.C. § 924(c)(3)(A). Because the defendant received a sentence of death and a sentence of life imprisonment on the other two counts of conviction, the Court should decline to reach this issue under the concurrent sentences doctrine. In any event, the claim fails on the merits. Both carjacking and conspiracy to commit murder-for-hire resulting in death are crimes of violence under § 924(c)'s still-valid force clause.

**II.** With regard to the claim that counsel was ineffective for failing to present evidence of Runyon's brain damage and mental illness, counsel did not err as counsel presented a fulsome mitigation case and made strategic decisions to omit information that would have weakened the defense position. According to Runyon, counsel could have adduced evidence that the defendant suffered from frontal lobe damage, post-traumatic stress disorder, migraine-like headaches, attention deficit disorder, impaired executive functioning, and the possible effects

of drug withdrawal. Pet. Br. 51–78. The government disagrees in light of evidence that trial counsel presented much of the same evidence that Runyon claims trial counsel ignored. As to the balance, counsel made tactical decisions to forgo that evidence in order to maintain a consistent line of argument before the jury. Assuming, arguendo, that trial counsel unreasonably omitted any evidence, Runyon cannot demonstrate a reasonable likelihood that the information would have resulted in a more favorable verdict for him.

**III.**     Further, the United States did not commit a *Brady* violation by not disclosing co-defendant Draven's social history and trial counsel was not ineffective by failing to investigate and present this information to the jury. The United States, prior to trial, did not turn over to Runyon the background/social history evidence on co-defendant Draven which was unrelated to the crimes charged. Runyon claims that this was a *Brady* violation. He failed to raise this claim at sentencing or on direct appeal. The United States does not have a duty to turn over irrelevant evidence of a co-defendants social history as it was immaterial to the equally culpable mitigator and thus not a *Brady* violation.

**IV.**     Finally, the United States did not violate *Batson v. Kentucky*, 476 U.S. 79 (1986), in its use of peremptory strikes, to which trial and appellate counsel failed to object. In addition to Runyon's procedural default, Runyon cannot make a

prima facie case of racial discrimination in jury selection through his proffered use of statistics and other evidence. Accordingly, the *Batson* claim is unavailing.

The Court should therefore affirm the judgment.

**Argument**

Once a defendant receives a certificate of appealability, this Court reviews a district court's legal interpretations de novo and factual findings for clear error. *See, e.g.*, *United States v. Fulks*, 683 F.3d 512, 516 (4th Cir. 2012) (citing *United States v. Stitt*, 552 F.3d 345, 350 (4th Cir. 2008)). A defendant seeking relief under § 2255 bears the burden of establishing a constitutional violation. *United States v. Nicholson*, 611 F.3d 191, 196–97 (4th Cir. 2010); *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958). The defendant bears the burden in establishing ineffective assistance of counsel. *United States v. Cooper*, 617 F.3d 307, 312 (4th Cir. 2010); *Nicholson*, 611 F.3d at 196–97.

For the reasons appearing below, this Court should affirm the district court's denial of habeas relief.

**I.  The Court should reject the defendant's challenge to his conviction on Count 5 under 18 U.S.C. § 924(j).**

To begin, Runyon raises a collateral attack on his conviction on Count 5 for violating 18 U.S.C. § 924(j), which imposes certain enhanced penalties for violations of 18 U.S.C. § 924(c).

Under § 924(c), it is a federal crime to discharge a firearm while using or

carrying it during and in relation to a crime of violence, or to discharge it while possessing it in furtherance of a crime of violence. The statute defines "crime of violence" as a federal offense that is a felony and—

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). Subsection (A) is commonly referred to as the "force clause," whereas subsection (B) is commonly referred to as the "residual clause." In *United States v. Davis*, 139 S. Ct. 2319 (2019), the Supreme Court struck down the residual clause as unconstitutionally void for vagueness.

Section § 924(j) imposes enhanced penalties for certain violations of § 924(c). Under that statute, if someone "causes the death of a person through the use of a firearm" while violating § 924(c), "if the killing is murder," the punishment is "death" or "imprisonment for any term of years or for life." 18 U.S.C. § 924(j)(1).

The indictment specified that the predicate crimes of violence supporting Count 5 included (i) conspiracy to commit murder for hire, as charged in Count 1, (ii) carjacking resulting in death, as charged in Count 2, (iii) bank robbery resulting in death, as charged in Count 3, and (iv) Hobbs Act robbery, as charged in Count 4. JA57. The jury ultimately found the defendant guilty on the predicates

16

charged in Counts 1 and 2—*i.e.*, the murder-for-hire conspiracy and carjacking resulting in death. The jury did not a complete a special verdict form asking it to specify which of these two predicates supported its guilty verdict on Count 5. JA894.

The defendant argues that neither of his two predicate offenses—carjacking resulting in death and conspiracy to commit murder for hire—qualify as crimes of violence under § 924(c)'s still-valid force clause. For the reasons appearing below, the defendant's attack on his conviction on Count 5 is unavailing.

### A. The Court should decline to consider the defendant's challenge under the concurrent sentence doctrine.

As an initial matter, the Court should decline to consider the defendant's habeas challenge altogether. The defendant received a sentence of death on Count 5, but he also received a death sentence on Count 1, the murder-for-hire conspiracy. In addition, he received a sentence of life imprisonment on Count 3, the carjacking count. JA1459. As a result, the defendant's conviction on Count 5 will not lead to any additional punishment. The only consequence of the defendant's conviction on Count 5 is his $100 special assessment. JA1460.

In these circumstances, it makes little sense for the Court to consider the defendant's habeas challenge to his conviction on Count 5. Under the concurrent sentence doctrine, a court has "discretion to avoid resolution of legal issues affecting less than all of the counts in an indictment where at least one count will

17

survive and the sentences on all counts are concurrent." *United States v. McKie*, 112 F.3d 626, 628 n.4 (3d Cir. 1997); *see also In re Williams*, 826 F.3d 1351, 1356 (11th Cir. 2016) ("[U]nder the 'concurrent sentence doctrine' … if a defendant has concurrent sentences on multiple counts of conviction and one count is found to be invalid, an appellate court need not consider the validity of the other counts unless the defendant would suffer 'adverse collateral consequences from the unreviewed conviction.'" (quoting *United States v. Bradley*, 644 F.3d 1213, 1293 (11th Cir. 2011))).

This Court recently discussed these issues at length in *United States v. Charles*, 932 F.3d 153 (4th Cir. 2019). The defendant there was sentenced on both drug-trafficking and firearm-possession counts, receiving concurrent sentences of 360 months' imprisonment on both. *Id.* at 155. After the Supreme Court invalidated the residual clause of the Armed Career Criminal Act ("ACCA") in *Johnson v. United States*, 135 S. Ct. 2551 (2015), the defendant filed a habeas petition seeking to challenge his ACCA-enhanced sentence. The district court declined to reach the merits of the defendant's sentence under the concurrent sentence doctrine, and this Court affirmed. *See id.* at 162.

*Charles* explained "that the concurrent sentence doctrine rests on the same rationale underlying harmless-error review—namely, the recognition that to help promote the overall functioning of our justice system, courts should 'conserve

18

judicial resources by ... cleans[ing] the judicial process of prejudicial error without becoming mired in harmless error.'" *Id.* at 158 (quoting *United States v. Hasting*, 461 U.S. 499, 501 (1983) (alterations in original). While a showing of adverse consequence can defeat application of the doctrine, *Charles* stated that such a showing must involve more than "unrealistic speculation." *Id.* at 160.

*Charles* also outlined an additional limitation on the concurrent sentence doctrine. It explained that, in the mine run of cases, "the concurrent sentence doctrine cannot be applied to avoid reviewing the validity of one of a defendant's *convictions*," as opposed to the validity of a defendant's sentences. *Id. Charles* explained that this was so for two reasons. First, it cited the Supreme Court's decision in *Ray v. United States*, 481 U.S. 736 (1987) (per curiam), for the proposition that a special monetary assessment will generally serve as "additional punishment … [such] that the sentences are not truly concurrent." *Id.* Second, it explained a separate conviction may have additional collateral consequences, including "delay [in] the defendant's eligibility for parole" or even "societal stigma accompanying any criminal conviction." *Id.* (quoting *Rutledge v. United States*, 517 U.S. 292, 302 (1996) (cleaned up)).

The government acknowledges that, consistent with *Charles*, the collateral consequences doctrine will generally foreclose a challenge to a defendant's conviction (as opposed to sentence), at least on direct appeal. But, while *Charles*

arose in the context of habeas litigation, it did not directly address the question of whether its limitations on the doctrine apply in every collateral case. There are good reasons to believe that they do not.

First, habeas petitioners have often argued that a special assessment, standing alone, is a sufficient collateral consequence to avoid application of the concurrent sentence doctrine, but that argument has generally been rejected. Because a habeas petition challenges confinement, not monetary penalties, courts have concluded that a habeas petition is not a viable mechanism to challenge a conviction where the only collateral consequence is a monetary penalty. *See United States v. Rutligliano*, 887 F.3d 98, 105 n.2 (2d Cir. 2018) (collecting authority for the proposition that monetary components of a criminal sentence are insufficient to obtain relief on collateral review); *United States v. Ross*, 801 F.3d 374, 381–82 (3d Cir. 2015) ("[W]e are not concerned here with whether a special assessment constitutes 'punishment' within the meaning of the Double Jeopardy Clause; instead, we must determine whether it constitutes 'custody' within the meaning of section 2255."); *Ryan v. United States*, 688 F.3d 845, 849 (7th Cir. 2012) ("A collateral attack under § 2241, § 2254, or § 2255 contests only custody, however, and not fines or special assessments.").

Second, while *Charles* and *Rutledge* may stand for the proposition that there will *generally* be collateral consequences from a concurrent conviction (as opposed

a concurrent sentence), that is not always true. Indeed, this case is the exception that proves the rule. Even if the defendant's challenge to his conviction on Count 5 were sustained, he would still be facing a sentence of death on Count 1 and life imprisonment on Count 2. In those circumstances, it is hard to identify any collateral consequence arising from Count 5 at all.

For these reasons, this case is the rare exception to *Charles*' limitation on the concurrent sentence doctrine. Because the defendant will face no collateral consequences from his conviction under § 924(c), the Court should decline to entertain his collateral attack on Count 5.

### B. Runyon's conviction rests on predicate offenses that remain valid under § 924(c)'s force clause.

In any event, Runyon's claim fails on the merits.[2] His two predicate offenses—carjacking and conspiracy to commit murder for hire resulting in death—remain valid under § 924(c)'s force clause.

### 1. Carjacking is a force-clause crime.

Runyon acknowledges that there is Fourth Circuit precedent establishing that carjacking, as defined in 18 U.S.C. § 2119, is categorically a crime of violence under the force clause. Pet. Br. 34; *see also Evans*, 848 F.3d at 248–49. Runyon

---

[2] In light of the result in *Davis*, the government does not rely on the procedural-default argument it raised in the district court. *See* JA1752.

nonetheless asks this Court to overturn *Evans*, arguing that carjacking is not a crime of violence because it may be accomplished through intimidation. That request contravenes Circuit precedent.

*Evans* held that carjacking is categorically a crime of violence because it requires, as an element, the use or threatened use of force. *Evans*, 848 F.3d at 244–48. In order to be convicted of carjacking, a defendant must take a motor vehicle "by force and violence or by intimidation" with the intent to cause death or serious bodily harm. 18 U.S.C. § 2119. The defendant in *Evans* also argued that intimidation was something less than threatened force. *Id.* at 244–48. The Court rejected this argument, holding that the term "intimidation" denotes a threat to use violent force. *Id*.

To the extent that Runyon asks this Court to reconsider the correctness of this portion of *Evans*, that request is impermissible. One panel will not overrule another absent an intervening change in the law announced by the Supreme Court or this Court sitting en banc. *See Tatum v. RJR Pension Inv. Comm.*, 855 F.3d 553, 560 n.5 (4th Cir. 2017). The request is doubly unpersuasive given that Hobbs Act robbery, too, can be committed by intimidation, yet the Court has recently held that it, too, is a force-clause crime. *United States v. Mathis*, 932 F.3d 242, 266 (4th Cir. 2019), *cert. denied sub nom. Uhuru v. United States*, 2019 WL 6689801 (U.S. Dec. 9, 2019).

### 2. Conspiracy to commit murder for hire, resulting in death, is a force-clause crime.

A conspiracy to commit murder for hire that results in the death of the intended victim, in violation of 18 U.S.C. § 1958(a), is also a force-clause crime. That statute makes it a crime to conspire to commit murder for hire. It then specifies that the maximum penalty is 10 years' imprisonment, unless "personal injury" results, in which case the statutory maximum punishment increases to 20 years' imprisonment, or unless "death results," in which case the offense "shall be punished by death or life imprisonment." 18 U.S.C. § 1958(a).

Because the "personal injury" and "death resulting" prongs of § 1958(a) carry enhanced statutory penalties, they function as elements that must be proven to a jury beyond a reasonable doubt under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *See also Burrage v. United States*, 571 U.S. 204, 210 (2014) ("Because the "death results" enhancement increased the minimum and maximum sentences to which Burrage was exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt"). This means that § 1958(a) describes three divisible offenses: (i) conspiracy to commit murder for hire; (ii) conspiracy to commit murder for hire that results in personal injury; and (iii) conspiracy to commit murder for hire that results in death. Although all three offenses are contained within § 1958(a), these are properly understood as divisible crimes under *Descamps v. United States*, 570 U.S. 254 (2013).

This Court should therefore employ the modified categorical approach to determine whether Runyon's § 1958(a) conviction is a crime of violence by first determining with which variant of the crime he was charged. *See United States v. Allred*, 942 F.3d 641, 648 (4th Cir. 2019) (holding that when faced with a divisible statute, the court must employ a modified categorical approach). Under that approach, a court "looks to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016). Here, the indictment specified that Runyon committed the "death resulting" variant of the crime. JA49.

At this point, it is important to frame the argument in view of several background principles. First, the substantive offense of murder is unquestionably a force-clause crime. *See In re Irby*, 858 F.3d 231, 238 (4th Cir. 2017) (holding that "one cannot unlawfully kill another human being without a use of physical force capable of causing physical pain or injury to another"). Second, a conspiracy offense generally will not serve as a valid predicate under the force clause. *See United States v. Simms*, 914 F.3d 229, 236 (4th Cir. 2019) (en banc) (concluding that conspiracy to commit Hobbs Act robbery is not a force-clause crime under § 924(c)(3)(A)); *see also United States v. McCollum*, 885 F.3d 300, 309 (4th Cir. 2018) (holding that conspiracy to commit murder in aid of racketeering is not

24

categorically a crime of violence). But the conspiracy offense *here* is different. Simply put, it is not possible for a conspiracy with the object of committing murder for hire to result in *death* without the use or threatened use of force.[3]

The additional element of resultant death necessarily requires that a defendant (or, as discussed below, a co-conspirator for whose conduct the defendant is equally liable) use physical force. Where a murder-for-hire conspiracy results in death, it means that the conspiracy itself caused the victim's death. *Cf. Burrage*, 571 U.S. at 214 ("a phrase such as "results from" imposes a requirement of but-for causation"). In the real-world context, this means that a conspirator must have caused the death of the intended victim. Given that the Supreme Court has further held that "the knowing or intentional causation of bodily injury necessarily involves the use of physical force," *United States v. Castleman*, 572 U.S. 157, 169 (2014), it is impossible to imagine a realistic scenario in which a defendant could be found guilty of a successful murder-for-hire conspiracy without someone having purposefully used physical force.

Runyon's arguments to the contrary mistakenly focus on the conspiracy element of § 1958(a), rather than the resultant-death element. While Runyon is

---

[3] The Court previously held that a violation of § 1958's predecessor statute was a "crime of violence," although by emphasizing § 924(c)'s now-invalid residual clause. *See United States v. Luskin*, 926 F.2d 372, 379 (4th Cir. 1991).

correct that a mere conspiracy is categorically not a crime of violence, his argument misses the fact that he was convicted of a murder-for-hire conspiracy that *resulted in death*. That difference is dispositive. *See United States v. Galati*, 844 F.3d 152, 155 (3d Cir. 2016) (holding that a violation of § 1958 resulting in personal injury is a crime of violence under § 924(c)'s force clause).[4]

It is also worth responding to a few counterarguments that the defendant may raise in reply. First, it does not matter that, to be convicted under § 1958, a defendant might not be the person who causes the death of the victim. Such a defendant would remain liable for his co-conspirator's use of force under *Pinkerton v. United States*, 328 U.S. 640 (1946). As this Court has explained, "[t]he *Pinkerton* doctrine provides that a defendant is 'liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy.'" *United States v. Blackman*, 746 F.3d 137, 141 (4th Cir. 2014) (quoting *United States v. Dinkins*, 691 F.3d 358, 384 (4th Cir. 2012)) (affirming a § 924(c) conviction based on *Pinkerton* liability). Here, the death of a victim is necessarily reasonably foreseeable and in furtherance of a conspiracy undertaken "with the intent that a murder be committed."

---

[4] *But see United States v. Boman*, 873 F.3d 1035, 1042 (8th Cir. 2017) (holding that murder-for-hire conspiracy is not a crime of violence, but without considering the personal-injury or death-resulting variations of the crime).

18 U.S.C. § 1958(a).

For similar reasons, the force necessary to cause the death of a § 1958 victim cannot be undertaken recklessly. *Cf. United States v. Battle*, 927 F.3d 160, 166 (4th Cir. 2019), *cert. denied*, 2019 WL 6833479 (U.S. Dec. 16, 2019) (stating that "a crime 'may result in' bodily injury without involving the use of force"). A violation of § 1958 is a specific-intent crime that can only be committed if the defendant and his fellow co-conspirators have "the intent that a murder be committed." 18 U.S.C. § 1958(a). Because the death resulting from a violation of § 1958 must occur through but-for causation, *Burrage*, 571 U.S. at 214, and because the perpetrator must have the specific intent to commit murder, the force involved must be purposeful. *See United States v. Luskin*, 926 F.2d 372, 379 (4th Cir. 1991) ("One can hardly conceive of a more cold-blooded violent act than murder-for-hire."). To the extent that the defendant argues otherwise, he must point to a specific case without offering a far-fetched hypothetical. *See Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007) (explaining that to show the requisite "realistic probability" of an offense being committed in an usual way, an offender "must at least point to his own case or other cases in which state courts in fact did apply the statute in … [such a] manner").

Accordingly, while conspiracy offenses generally do not qualify as force-clause crimes, a violation of § 1958 resulting in death does. The defendant's

conviction on Count 5 therefore rests on two valid force-clause predicates.

**C.      Any alternative-theory error in this case is harmless.**

It is possible that the Court might adhere to its prior holding in *Evans* that

carjacking is a force-clause crime while reaching the opposite conclusion as to

conspiracy to commit murder for hire resulting in death. Even if that were to occur,

the defendant's conviction on Count 5 would remain valid.

The Court has previously held that one valid predicate is sufficient to

support a conviction under § 924(c). *See United States v. Hare*, 820 F.3d 93, 105–

106 (4th Cir. 2016) (declining to reach the question of whether Hobbs Act robbery

was a force-clause crime in light of a parallel drug-crime predicate); *see also In re*

*Navarro*, 931 F.3d 1298, 1302 (11th Cir. 2019) (reaching a similar conclusion in a

certificate-of-appealability analysis). The Court has continued to adhere to this

approach post-*Davis*. *See, e.g.*, *United States v. Cannon*, 778 F. App'x 259, 260–61

(4th Cir. 2019) (concluding that a § 924(c) conviction was valid where it rested on

both a valid Hobbs Act robbery predicate and an invalid conspiracy predicate).

Here, the jury did not fill out a special verdict form asking it to specify

which predicate offense supported its conviction on Count 5. Even if the jury

verdict contained an alternative-theory error, however, that conviction would

remain valid post-*Davis*.

The Court's opinion in *United States v. Jefferson*, 674 F.3d 332 (4th Cir.

2012), *as amended* (Mar. 29, 2012), is a helpful touchstone. The Court there confronted a situation where the jury had been instructed under two different fraud theories, one that was impermissible following *Skilling v. United States*, 561 U.S. 358 (2010), and one that remained valid. The Court did not simply vacate the convictions affected by this ambiguity. It began with the observation that, under *Yates v. United States*, 354 U.S. 298 (1957), "when a general verdict on a single criminal charge rests on alternative theories, one valid and the other invalid, the verdict must be set aside if it is 'impossible to tell which ground the jury selected.'" *Jefferson*, 674 F.3d at 361 (quoting *Yates*, 354 U.S. at 312). Even so, the Court held that "a *Yates* alternative-theory error is subject to ordinary harmlessness review, and the relevant appellate inquiry is whether the error was harmless beyond a reasonable doubt." *Id.* Thus, *Jefferson* explained that "a reviewing court is not entitled to reverse a conviction that could rest on either a valid or invalid legal theory if the court can conclude 'beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).

*Jefferson* is consistent with how other circuits have grappled with the problem of indeterminate predicate offenses. *See United States v. Christensen*, 828 F.3d 763, 788 (9th Cir. 2015) (applying harmlessness standards to a *Yates* alternative-theory error and citing *Johnson v. United States*, 520 U.S. 461, 470

29

(1997), where the Supreme Court declined to vacate a conviction despite a jury charge that lacked a required materiality instruction because "the evidence supporting materiality was 'overwhelming'"); *United States v. John-Baptiste*, 747 F.3d 186, 207–08 (3d Cir. 2014) (affirming a guilty verdict in view of indeterminate predicates where any alternative-theory error was harmless).

On collateral review, the examination of whether a *Yates* alternative-theory error is harmless is refracted through lens of *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Under the *Brecht* standard, a habeas petitioner must show that a purported error resulted in "actual prejudice." *Id.* at 637. Under this definition, an error is harmless unless it had a "substantial and injurious effect" on the defendant's conviction. *United States v. Smith*, 723 F.3d 510, 517 (4th Cir. 2013); *accord Barnes v. Thomas*, 938 F.3d 526, 533 n.3 (4th Cir. 2019) (explaining that the *Brecht* standard is a "'less onerous harmless-error standard' than the requirement on direct appeal that an error be proven 'harmless beyond a reasonable doubt'" (quoting *Brecht*, 507 U.S. at 623)). The *Brecht* standard also applies in resolving claims of *Yates* alternative-theory errors arising in habeas litigation. *See, e.g.*, *Czech v. Melvin*, 904 F.3d 570, 577–80 (7th Cir. 2018).

Here, the defendant cannot show "actual prejudice" or a "substantial and injurious effect" arising from any *Yates* alternative-theory error. Even absent a special verdict form, it is clear that the jury would have convicted the defendant of

the § 924 offense charged in Count 5 even if the indictment had alleged only carjacking as the predicate offense. In order to reach the opposite conclusion, the Court would have to entertain the possibility that the jury believed the defendant used a firearm in relation to the conspiracy but not to the carjacking itself. This is contrary to the evidence at trial, which established that Runyon killed Cory Voss in his truck, after forcing Cory to drive around to make the contract killing look like a robbery gone-wrong. *See* JA2828. Runyon had been hired to kill Cory by his wife, Cat Voss, and her lover, Michael Draven. *See* JA2830–31. On the day of the murder, Runyon bought a gun in West Virginia and coordinated with Draven and Cat Voss to plan the attack on Officer Voss. *See* JA2827–28. Runyon carried out their plan, and got into Cory's truck while he was parked at an ATM. *See* JA2827–28. Runyon made Cory Voss drive around before stopping in a nearby parking lot, where he shot Cory five times, three of which were fatal. *See* JA2828. Based on these facts, it is incredible to suggest that the jury would not have convicted Runyon for murdering Cory Voss, with a firearm, in relation to the carjacking.

The facts of this case are therefore unlike those in *In re Gomez*, 830 F.3d 1225 (11th Cir. 2016), on which Runyon relies to argue that the Court should vacate his conviction unless *all* of the predicate crimes meet the requirements of the force clause. In that case, the defendant faced a § 924(c) charge based on multiple distinct predicate crimes that stemmed from different incidents, including

31

both drug-trafficking crimes and Hobbs Act robbery charges. *See id.* at 1227. There, because each crime was a separate incident, the Eleventh Circuit could not determine on which predicate crime the jury had based its verdict. *See id*. Unlike *Gomez*, each of Runyon's predicate crimes all stem from the same incident—the murder of Cory Voss. The evidence in this case clearly established that Runyon used a gun during that murder, which was committed during a carjacking and in furtherance of a murder-for-hire conspiracy.

Any *Yates* error in the case is therefore harmless. The jury, based on the overwhelming evidence at trial, would have convicted the defendant on Count 5 based solely on the valid carjacking predicate notwithstanding the inclusion of the conspiracy predicate in the indictment.

Finally, even if the Court were to vacate the defendant's conviction on Count 5, there is no reason to remand the case for resentencing. The defendant insists that, under the sentencing-package doctrine, such a remand would be necessary, Pet. Br. 35–38, but that argument fails to account for the posture of this particular case. The sentencing-package doctrine appropriately recognizes that district court approach multicount cases differently. As the Court has put it, "'when a defendant is found guilty on a multicount indictment, there is a strong likelihood that the district court will craft a disposition in which the sentences on the various counts form part of an overall plan,' and that if some counts are vacated, 'the judge

should be free to review the efficacy of what remains in light of the original plan.'"

*United States v. Ventura*, 864 F.3d 301, 309 (4th Cir. 2017) (quoting *United States v. Townsend*, 178 F.3d 558, 567 (D.C. Cir. 1999)).

But here, the "plan" was dictated by the fact that the defendant received a second capital sentence on Count 1 in addition to the capital sentence on his § 924(j) conviction. The sentencing package in this case would thus remain the same irrespective of whether Count 5 is vacated: the defendant will have received both a capital sentence and a sentence of life imprisonment. The presence or absence of the conviction on Count 5 does not alter this plan at all.

At most, the Court should remand to the district court to decide *whether* to conduct a resentencing, which is a matter within the district court's discretion. *United States v. Hadden*, 475 F.3d 652, 667 (4th Cir. 2007) (citing *United States v. Torres-Otero*, 232 F.3d 24, 29–30 (1st Cir. 2000); *United States v. Gordon*, 156 F.3d 376, 381 (2d Cir. 1998)). But even that is unnecessary. Irrespective of the remedy selected to correct an error on collateral review, "the goal of § 2255 review is to place the defendant 'in exactly the same position he would have been' had there been no error in the first instance." *Id.* at 665 (quoting *United States v. Silvers*, 90 F.3d 95, 99 (4th Cir. 1996)). Because of the defendant's concurrent capital sentences, simply vacating Count 5—which, for the reasons articulated above is unnecessary—would accomplish that goal.

*　　*　　*

Consistent with the foregoing, the defendant's § 924(j) conviction rests on valid predicate offenses and the Court should reject the defendant's collateral attack.

## II. The defendant's trial counsel was not ineffective in addressing mental-health evidence at the mitigation stage.

On appeal from the denial of § 2255 relief, this Court ordinarily reviews the district court's legal conclusions de novo. *Stitt*, 552 F.3d at 350. The Court can affirm on any ground supported by the record, even those not relied upon below. *United States v. McHan*, 386 F.3d 620, 623 (4th Cir. 2004). The defendant bears the burden in establishing ineffective assistance of counsel. *Cooper*, 617 F.3d at 312; *Nicholson*, 611 F.3d at 196–97.

The record fails to support Runyon's allegations or his unpersuasive arguments that trial counsel unreasonably failed to present evidence of mental illness or brain damage. Defense counsel made reasonable strategy calls at the penalty phase. The mental-health evidence that Runyon faults his counsel for not developing and presenting had significant weaknesses factually, and even if the jury had credited it, the evidence was double-edged and could have strengthened government arguments about Runyon's dangerousness. Mental-health evidence aimed at showing Runyon lacked control over his decision-making also would have been in tension with his claims of innocence and would have been less

persuasive given the highly planned murder that he carried out for money.

To succeed on an ineffective assistance of counsel claim, the defendant must satisfy the two-prong test announced in *Strickland v. Washington*. 466 U.S. 668 (1984). First, he "must show that counsel's representation fell below an objective standard of reasonableness." *Bacon v. Lee*, 225 F.3d 470, 478 (4th Cir. 2000) (quoting *Strickland*, 466 U.S. at 688). Second, he must show that he was prejudiced by counsel's deficient performance, in that it is "reasonably likely" that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Harrington v. Richter*, 562 U.S. 86, 111 (2011) (citing *Strickland*, 466 U.S. at 696). Failure to satisfy either prong of the *Strickland* test is dispositive. *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004).

The Supreme Court has repeatedly stated that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight," so that the conduct can be evaluated "from counsel's perspective at the time" and in light of all the circumstances. *Bell v. Cone,* 535 U.S. 685, 698 (2002) (quoting *Strickland,* 466 U.S. at 689). It is "all too tempting" for a convicted defendant to "second-guess counsel's assistance" and "all too easy" for a court to find an act or omission "unreasonable" because it was "unsuccessful." *Strickland,* 466 U.S. at 689. Courts should not "indulge[] in the 'natural tendency to speculate as to whether a different

trial strategy might have been more successful.'" *Maryland v. Kulbecki*, 136 S. Ct. 2, 4 (2015) (per curiam) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)). Likewise, a defense attorney is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 107 (citations omitted). Accordingly, courts "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance." *Bell,* 535 U.S. at 702 (quoting *Strickland,* 466 U.S. at 689). When reviewing the propriety of allegedly deficient acts or omissions, courts defer to counsel's strategic judgments. *Id.* at 689-90. Indeed, a petitioner must overcome the presumption that challenged conduct might be the "result of sound trial strategy." *Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994).

Counsel have a duty to conduct a reasonable investigation. *Strickland*, 466 U.S. at 691. A "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. A showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987). "A reasonable investigation is not … the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the

inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998) (citing *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)). The duty to investigate depends upon the facts known to the attorney. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); *see also Hedrick v. True*, 443 F.3d 342, 350 (4th Cir. 2006). The reasonableness of the investigation is determined by the information conveyed to counsel ... recognizing "the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Chandler v. United States*, 218 F.3d 1305, 1318 & n.22 (11th Cir. 2000) (internal quotation omitted). "Counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). If counsel did not know of facts that would have alerted him to the need to conduct a particular investigation, its omission does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003); *see also Bacon*, 225 F.3d at 481.

Additionally, "[n]o *per se* rule requires the presentment of [mental health] evidence at trial." *Meyer v. Branker*, 506 F.3d 358, 372 (4th Cir. 2007). "There are many strategically valid reasons why defense counsel may decide not to offer mental health mitigation testimony: it may not be persuasive; it may appear to be a 'flight into theory' without proper grounding in the facts of the case." *Id*.

### A.     Trial counsel conducted a reasonable investigation.

Runyon claims his trial counsel failed to investigate and present mitigating evidence, especially evidence of brain damage and mental illness.[5] He alleges his counsel failed to locate or focus on evidence that would have compelled a more in-depth mental health mitigation defense. However, counsel presented a majority of the information upon which Runyon presently relies. The rest was unavailable or unhelpful.

The United States alleged two statutory aggravating factors as to each of three capital counts—that Runyon murdered Cory Voss for pecuniary gain (18 U.S.C. § 3592(c)(8)) and that he did so after substantial planning and

---

[5] In his arguments, Runyon recounts events prior to trial without identifying any inadequacy in counsel's performance. Runyon highlights judicial rulings and comments that ostensibly limited the development or presentation of mitigation evidence. But he identifies neither error in the district court's rulings nor how counsel could have changed those rulings. *See, e.g.*, Pet. Br. 54 ("The district court declined to move the trial date." "The timeframe constrained the mental health investigation."); Pet. Br. 55 ("Counsel requested 90 days . . . The court granted a one-month extension." "The 15-day timeframe [allowed by the court] proved impossible."); Pet. Br. 56 ("The judge openly commented that the testimony . . . was attenuated and unrelated to the . . . mitigating factors." "The court openly agreed [Runyon's mother's] background was unnecessary."); *see also* Order, *United States v. Runyon*, No. 17-5 (4th Cir. Aug. 14, 2019). Runyon could have challenged the district court's rulings on direct appeal and did not, defaulting those issues. *United States v. Frady*, 456 U.S. 152, 165 (1982). Nor does he establish error in the district court's rulings at trial and sentencing now. Counsel's performance should be evaluated in light of those rulings and not without regard to those constraints.

premeditation to kill (§ 3592(c)(9)). Additionally, the government alleged as non-statutory aggravators that Runyon caused harm and loss to the victim's family and friends, that the defendant utilized military and law enforcement training to commit the murder, that the defendant engaged in acts of violence against women, and that he demonstrated a lack of remorse for the murder. JA1185; 1202.

In mitigation, the defense sought to portray Runyon as an essentially decent person whose homicidal conduct was anomalous. Toward that end they presented evidence of his mother, adoptive father, deputies from a local jail and friends. *See, e.g.*, JA1045–1180. Additionally, and to the extent it furthered the narrative that Runyon did not present a continuing threat and was not among the "worst of the worst," defense counsel adduced evidence through a mental health expert, Mark Cunningham, who testified that based on personal factors the risk of Runyon would commit serious violence in prison is very low. JA1007.

Significantly, the jury that sentenced Runyon to death nearly unanimously found true every alleged mitigator except those involving the defendant's adjustment to custody and his lack of dangerousness while incarcerated. JA1312–1314. In this regard, their special verdict confirms defense counsel's evident inclination to forgo any evidence that might reinforce how the jury viewed Runyon's dangerousness. Given the clear aims of the defense, and circumstance described below that limited the availability of some evidence, counsel made

entirely strategic and reasonable decisions to forgo some information, including potential mental health evidence.

### 1. Blast Injuries

Runyon's trial counsel sought, but could not obtain, medical records concerning alleged blast injuries sustained in military training that might have assisted the defense experts in diagnosing the defendant. *See* JA2017. Much of the mental health evidence created post-trial relies on evidence of supposed "blast injuries." *See, e.g.*, JA1995; 2053; 2191; 2195; 2210; 2230–2231; 2238. But to the extent the reports identify sequelae from these alleged injuries (*id.*), they do so based entirely on Runyon's self-reports. Despite the defense team's best efforts, the appellate record does not reflect any meaningful third-party documentation to support Runyon's self-serving reportage.

Trial counsel reasonably omitted to present mental health evidence premised on wholly unsubstantiated self-reports. Had counsel done otherwise, the government would have presumably sought to rebut any conclusions with evidence concerning the absence of records documenting the supposed injuries, undermining the credibility and reliability of any expert opinion premised on such vaporous grounds. *Cf. Wong v. Belmontes*, 558 U.S. 15, 23–25 (2009).

### 2. Car Accident

In November 1996, eight years before the murder, Runyon was involved in a

documented automobile collision while a member of the military, but there are no medical records from the civilian hospital where he received initial treatment that reveal the extent of his injuries. Nonetheless, he faults his trial counsel for failing to obtain the non-existent civilian medical records of the accident, while acknowledging that, pursuant to policy, the hospital destroyed the records seven years after the incident. *See* Pet. Br. at n.12. Trial counsel had no obligation to make futile efforts at obtaining records that no longer existed. *See Rompilla*, 545 U.S. at 383 ("Counsel may draw a line when they have good reason to think further investigation would be a waste.").

In any event, the records that do exist suggest that the missing civilian documentation would have done little to assist the defense. Contemporaneous military records document cysts on Runyon's forehead, but lack objective medical evidence of head trauma or long-term effects.[6] JA2136–2159. The records focus mainly on physical injuries, especially knee and shoulder damage. JA2136–2141; 2145–2146. Runyon reported dizziness and vertigo, but the records indicate that his reports were "not consistent [with] neurologic injury." JA2143–2144; 2154–2156. Runyon also reported "some short-term memory loss and insomnia." JA2147.

---

[6] There appears to be a notation in the record referencing a negative x-ray of the cervical spine, but the note is hand written and difficult to read. JA2138.

Admittedly, Runyon now claims that Army medical personnel refused to discuss his supposed head pain or to order a timely MRI. JA2160. Still, he claims that he underwent an MRI six months after the accident, but no evidence of the test appears to exist. JA2160. Unsurprisingly, both government experts, Dr. Raymond Patterson and Dr. Paul Montalbano, found no permanent mental health effect from this accident. JA199–200, 230. As such, Runyon has failed to demonstrate what records his counsel might have reasonably obtained or how they might have assisted his defense.

Counsel were aware of this accident, and despite the lack of medical documentation, his mental health experts considered its likely effects in their preliminary reports. JA1996; 3185. Runyon cites to affidavits expressing *lay* opinions about the effects of the accident on his mental health, but this information was available at the time of trial. JA2005. More fundamentally, he cannot show that the failure to find medical records that apparently had ceased to exist nearly a decade after the collision would have assisted his case: as discussed below, brain scans at the time of sentencing were read as normal. JA2133. Any failure to investigate this apparently insignificant accident was neither unreasonable nor prejudicial.

### 3. Family and Social Background

Runyon's attorneys retained Dr. Evan Nelson, a mental health expert, as a

conduit to present social history evidence. Specifically, the defense stated in a notice that Nelson would testify about "social history . . . especially . . . major influences that have shaped David Runyon's life." JA78. By all accounts, however, the results of Dr. Nelson's review were not favorable to Runyon. JA2016; 2019.

Information relating to Runyon's family and social background was contained in testimony of family members and in the reports of Drs. Montalbano and Patterson. Trial counsel presented much of this information at trial (*see, e.g.*, JA1149), and the jury found that Runyon experienced domestic violence. JA1313–1314. Runyon's current attempts to fault counsel for failing to add to this record amounts to a complaint that they failed to adduced cumulative evidence. *See Winfield v. Roper*, 460 F.3d 1026, 1034 (8th Cir. 2006) (holding failure to present cumulative evidence is not ineffective performance).

Runyon also faults his counsel for failing to present wholly irrelevant evidence—information concerning the histories of his relatives. Runyon's counsel attempted to have his mother describe her background, but this was not relevant to mitigating factors pertaining to Runyon. JA1139–1141. The court rightly sustained the government's objection in this regard, and Runyon cannot challenge that ruling at this juncture. JA1141–1142; *see also Lockett v. Ohio*, 438 U.S. 586, 604 & n.12 (1978) ("[A] mitigating factor [is] any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis

for a sentence less than death. . . . Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense"); *see also United States v. Hager*, 721 F.3d 167, 193 (4th Cir. 2013).

Moreover, the jury findings regarding the defendant's dysfunctional upbringing demonstrate that counsel's investigation was sufficient to prove Runyon's theory. The jury found mitigators related to the violence Runyon experienced. JA1313–1314. Eleven jurors found Runyon witnessed and experienced domestic violence and parental conflict until his mother and biological father separated. JA1313. Jurors also found that Runyon continued to witness and experience domestic violence and parental conflict and abuse from his mother and adoptive father. JA1314. Those theories would not have been entitled to any greater weight based on a showing that anyone other than Runyon had suffered a dysfunctional upbringing, and any decision to forgo investigation of such evidence was reasonable and non-prejudicial.

### 4. Other Evidence

Runyon also faults counsel for failing to present letters that contain grandiose claims of life-saving conduct. But the prosecution expert reported that a claim of saving lives contributed to an impression Runyon suffered from a personality disorder with narcissistic features. JA198–199. Forgone jail records

that predate the expert reports are similarly unhelpful, especially given that Runyon presented several deputies that testified on his behalf at the penalty phase as to his good behavior. JA1049–1092; 2120–2122.

### 5. Brain Damage and Resulting Mental Illness

Runyon incorrectly concludes that if his counsel had presented expert testimony concerning his alleged brain damage and mental illnesses, it would have established statutory mitigators premised on "impaired capacity" and "disturbance.

As noted, the defense attempted to paint Runyon as a decent person who committed a crime inconsistent with his essential character. The unpresented mental health evidence available to the defense would have undermined this effort by underscoring Runyon's delusional views of himself and his circumstances. Moreover, the prosecution expert reports contain repeated statements from Runyon in terms of his belief in his innocence, his views on women and various high-minded views of himself, the introduction of which certainly would have been at odds with the portrait that Runyon tried to paint through the testimony of his family and friends. *See, e.g.,* JA193; 208–209.

Both reports of the defense mental health experts were preliminary in nature and neither expert produced any updated report until well after trial, even though Runyon underwent the brain scans requested. Counsel for Runyon, thus, was left with the prosecution expert reports and the very brief and preliminary reports of

the defense experts, which were not further developed even after counsel requested and obtained permission to have neurological testing done and the results released to the defense experts. As these reports only remained preliminary in anticipation of brain scans that proved to be normal, Runyon's counsel cannot be faulted for not continuing to pursue this line of investigation. *See* JA2133; 2804.

### (i) Dr. Allan Mirsky, Ph.D.

In a June 2009 report, Dr. Mirsky identified no deficits in functioning that would have provided substantive mitigation, especially given the reports that counsel had received from the other experts. JA3184–3189. Dr. Mirsky noted that Runyon had a verbal IQ of 135 (very superior), superior vocabulary, very superior memory for digit strings, very good visual motor coordination, superior conceptual skill, very good understanding of concepts and social practices, and good general knowledge.[7] JA3185–3186. His testing results revealed fast performance of visual-spatial tasks, normal performance on ability to focus, and superior verbal memory subtest scores. JA3187. In sum, Dr. Mirsky's 2009 conclusion noted "superior to very superior cognitive skills," a "high verbal IQ," and strong performances on memory and ability to focus. JA3188. Dr. Mirsky only observed poor scores on

---

[7] Runyon was administered intelligence testing prior to joining the military and government expert Dr. Paul Montalbano, Ph.D., noted no significant decline in intelligence when he compared the pre-military scores with 2009 scores. JA230.

sustained attention and manual dexterity tasks, indicating Runyon might not persist in attention-demanding activities for a sustained interval, potentially explaining his uneven employment history. JA3188–3189.

Whatever deficits Runyon might have demonstrated in tests of attention, concentration or manual dexterity, those findings would not have had any mitigating effect—they do not make him generally more sympathetic, much less do they explain why he involved himself in a complex plot to murder a U.S. Navy officer for money (a crime that surely exhibited the defendant's abilities to persevere through complex tasks and operate a firearm). JA3188–3189; *see also* JA915; 1395; *Runyon*, 70 F.3d at 504.

Dr. Mirsky deferred his diagnosis until "such time as the full data are available." JA3189. However, he provided analysis approaching a diagnosis of mild traumatic brain injury and PTSD, despite the reported normal MRI and his receipt of additional testing information that he found "to be not especially useful or informative." JA2131–2133. The report resulting from the brain imaging indicated that the imaging did not reveal any abnormalities. JA2133; 2804. Runyon's trial counsel subsequently opined that a radiologist's report is not conclusive (JA2804), yet he still did not provide the results of the imaging to his medical experts. This illustrates a strategic choice not to pursue mental health evidence in mitigation. Although trial counsel claimed in 2016 that Dr. James

Merikangas's interpretation of the MRI was "the type of information I would have been looking for," (JA2804) that is not the legal standard for measuring the adequacy of an investigation and this statement does not change the circumstances at the time trial counsel made the decision.

The more recent reports in the record (*see, e.g.*, JA1992–1994; 2026–2030; 2200) rely on information and affidavits not available at the time of trial. They do not call into question the competence of Runyon's trial counsel in declining to pursue evidence unavailable at the time—the timeframe in which defense counsel's performance must be evaluated. Dr. Mirsky performed a second evaluation of Runyon on August 28, 2015, some six years after sentencing. JA2237–2243. Much of the information in the resulting seven-page report echoes that in the document he submitted June 26, 2009. Dr. Mirsky repeated most of the same tests, and found Runyon improved performance in at least one, the Continuous Performance Test. JA2238–2241. Dr. Mirsky stated that similar improvement in performance on the Continuous Performance Test can be observed in patients with schizophrenia and that a diagnosis of psychosis is consistent with other testing. JA2242. Dr. Mirsky also interpreted the results of the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) as consistent with psychosis, possibly schizophrenia. JA2242. However, this testing occurred six years after his

48

trial and was not available to trial counsel.[8] Any argument that Runyon exhibited any symptoms of a psychotic disorder in 2009 is speculative and undercut by Dr. Montalbano's conclusions at the time of trial. JA225–226.

It does not appear that Dr. Mirsky administered the Purdue Pegboard test in 2015, but he indicated the 2009 score was consistent with mild diffuse brain damage. *Compare* JA3188–3189 *with* JA2238–2241. Further, without much explanation, Dr. Mirsky's assessment of Runyon's brain damage converts from "mild, diffuse brain damage" and "brainstem injury" to "frontal lobe damage" and "damage to the right cerebral hemisphere." JA3188–3189; 2242. In the Continuous Performance Test, which in 2009 Dr. Mirsky previously found to be consistent with mild brain damage, Runyon improved to near 100% correct. *Compare* JA3186, 3188 *with* JA2239, 2242. Despite the reportedly normal MRI and the recorded improvements in test performance, Dr. Mirsky added a diagnosis of psychosis, possibly schizophrenia, to the prior diagnosis of brain damage and suggests that prior brain injuries contributed to an underlying psychotic disorder. JA2242.

---

[8] In 2009, Dr. Mirsky noted he was prepared to administer the MMPI-2, but refrained from doing so in anticipation of results from other, previously administered, tests. JA3184. Presumably, those results were among the additional data he later received, only to describe the information as not "especially useful or informative." JA2132.

Even if this diagnosis was available to trial counsel at the time of trial, evidence that Runyon was schizophrenic would have sharply contrasted with the portrait that the defense tried to portray at the sentencing hearing and which formed the basis of the mitigation case. The fact remains that trial counsel made a strategic decision not pursue mental health evidence in light of the government expert reports, unfavorable defense expert reports, and an MRI report that did not identify abnormalities, in favor of a mitigation strategy trial counsel reasonably believed at the time to be the best hope for a life sentence.

### *(ii)     Dr. James Merikangas, M.D*

Dr. Merikangas provided a four-page declaration dated September 25, 2015, claiming he would have testified at trial in 2009 that Runyon was a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process. JA1992. Dr. Merikangas does not reveal the basis for such opinion, particularly in contrast to his brief August 5, 2009 letter to counsel that Runyon was suffering from delusions or was in a "fantasy world of grandiose wishful thinking" and that he suffered from the effects of or withdrawal from his drug testing medication. JA1996–1997. Since that time, Dr. Merikangas reviewed additional information, including trial testimony and medical records. There is a reference to Dr. Nelson, whose notes or opinions trial counsel never provided to the government. In short, Dr.

Merikangas's position has not appreciably changed since his initial report. JA1992–1994; 1996–1997. Had he testified consistent with his 2009 and 2015 opinions, his description of Runyon's grandiosity and alleged executive dysfunction would have emphasized and identified traits the defense reasonably sought to avoid.

### (iii) Dr. Mark Cunningham, Ph.D.

Dr. Cunningham, who testified at trial (JA934–1041), provided a 54-page declaration in 2015, claiming that various developmental factors impacted Runyon's moral culpability. JA2024–2078. The jury rejected the thrust of Cunningham's testimony, finding that Runyon failed to establish that he did not present a risk of violent behavior. JA931; 1313. The testimony of Runyon's relatives forms the bases of many of the factors Dr. Cunningham now asserts— including Runyon's upbringing and family influences. *See, e.g.,* JA1095–1169. The additional records Dr. Cunningham reviewed included materials that were not available to Runyon's counsel at the time of his sentencing. JA2026–2030. To the extent that Dr. Cunningham based any of his proffered testimony on Runyon's extended family testimony, the judge would have properly precluded that testimony. *See, e.g.*, JA1129; 1140–1141; *see also Lockett*, 438 U.S. at 604 and n.12.

Dr. Cunningham also reviewed the trial testimony transcript, which

represents information the jury heard directly and was able to consider in their determination of mitigating factors. In his report, Dr. Cunningham essentially attempts to usurp the function of the jury by opining Runyon's background and mental health diminished his moral culpability. JA2030–2034. However, it is not the role of any expert to opine on the degree of a defendant's moral culpability. *See generally Gregg v. Georgia*, 428 U.S. 153, 183–84 (1976) ("The decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.") The jury found that Runyon intentionally killed Cory Voss in an effort to enrich himself and his co-conspirators. JA911. The jury also made findings on mitigation related to Runyon's upbringing. JA1313–1314. It had the information and the legal duty to weigh the outrageousness of this aggravated crime against those aspects of the defendant's life history that invited sympathy. *See generally* 18 U.S.C. § 3593. In contrast, Dr. Cunningham lacks any particular expertise on that score, much less a legally-cognizable basis upon which to have offered his opinion.

Given the role of the jury and recognized limitations on the scope of expert opinion testimony, trial counsel operated wholly within their discretion to omit any effort to adduce Dr. Cunningham's wholly irrelevant and scientifically baseless

opinion on moral culpability. *See Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008) (holding decisions regarding witness choice are "quintessentially" strategic matters for an attorney). The jury alone bore the responsibility for determining Runyon's moral culpability, not Dr. Cunningham. *See Howard v. Moore*, 131 F.3d 399, 429 (4th Cir. 1997) (Michael, J., dissenting) ("The sentencing jury alone . . . must decide the question of the capital defendant's moral culpability."); *cf. Porter v. McCollum*, 558 U.S. 30, 41 (2009) (The "*jury* . . . heard almost nothing that would . . . allow *them* to accurately gauge his moral culpability.") (emphasis added). Indeed, counsel's choice to forgo some potential mitigating evidence did not constitute ineffectiveness, given the utter reasonability of the decision under the circumstances. *See Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008).

### *(iv) Dr. Richard Dudley, Jr., M.D.*

Finally, Runyon also cites a report of Dr. Dudley, based on an examination conducted in 2015, which indicates that Runyon had a difficult childhood and experienced physical abuse. Runyon's trial counsel presented evidence of Runyon's difficult childhood and abuse during the sentencing phase and the jury almost unanimously found the associated mitigating factors. JA1313–1314. Rather than connect Runyon's purported mental health problems to the car accident and brain damage, as did the other examining experts, Dr. Dudley links Runyon's problems to his childhood, and history of family mental disorders. JA2210–2213.

53

Dr. Dudley offers his opinion that Runyon is suffering from various ailments—PTSD, borderline personality disorder, schizoaffective disorder, bipolar type and neurocognitive disorder. JA2212.

Dr. Dudley states that given enough time and adequate records, these diagnoses would have been apparent prior to trial. JA2212. Dr. Dudley's report was not available at trial, though the vast majority of the information he relies upon was. Nonetheless, other experts with access to these same records offered different conclusions. JA177–231. The government's experts certainly presented a different picture of Runyon's mental health after reviewing his records. Further, Dr. Dudley would have been at least the seventh defense mental health expert identified by Runyon's trial counsel to the court.[9] The sheer number of experts identified or consulted by counsel prior to, during, and after trial smacks of opinion shopping. The district court would have been disinclined to grant his request to fund an additional expert. *See* JA3182–3183.

Dr. Dudley's findings also fail to take into account that Runyon repeatedly

---

[9] Trial counsel provided notice of Evan Nelson, Ph.D.; Mark Cunningham, Ph.D.; Scott Bender, Ph.D.; Seymour Halleck, Ph.D.; Allan Mirsky, Ph.D.; and James Merikangas, M.D. JA78; 101; 173. Despite the notice, trial counsel did not retain Dr. Halleck and he did not evaluate Runyon. JA889–890. Dr. Nelson, Dr. Mirsky, and Dr. Merikangas evaluated Runyon prior to or during trial, although Dr. Nelson's opinion was not favorable to the defense. JA1996; 2016; 2019; 3184. Dr. Cunningham did not interview Runyon prior to his testimony in the case. JA1020.

denied any involvement in the crime, a fact that would have naturally restrained counsel from offering evidence designed to explain the behavior or suggested reasons why the defendant might have engaged in it. Dr. Dudley's opinion (even if available) that Runyon suffered from a disturbance that diminished his ability to conform his conduct to the requirements of the law would have undermined any effort to maintain the defendant's factual innocence. The opinions are also contrary to the testimony of many character witnesses called by defense counsel.

Runyon's trial counsel did not fail to find information related to his mental health or psychosocial history. To the extent it was mitigating, such information was before the jury. Trial counsel made the strategic decision not to proceed with mental health evidence that could have contrasted with his chosen mitigation strategy. Evidence of Runyon's personality disorder with narcissistic features would have been damaging and counsel wisely kept the door to that evidence shut. A199; 227–228. As detailed below, a decision not to proceed with this approach was the result of "reasonable professional judgments." *Strickland*, 466 U.S. at 691; *Wiggins*, 539 U.S. at 534.

### B. Trial counsel made a sound strategic decision to forgo presenting mental health evidence.

Runyon's trial counsel did not fail to find information related to the defendant's mental health or psychosocial history. In fact, counsel presented, or attempted to present, such information, to the extent it did not contradict or

undermine the defense's overall strategy. *See Lovitt v. True*, 403 F.3d 171, 179

(4th Cir. 2005) ("In many cases, counsel's decision not to pursue a particular

approach at sentencing reflects not incompetence, but rather a sound strategic

choice."). Trial counsel avoided opening the door to damaging testimony from the

government's experts describing Runyon's personality disorder with narcissistic

features. The decision not to proceed with this approach was the result of

"reasonable professional judgments." *Strickland*, 466 U.S. at 691; *Wiggins*, 539

U.S. at 534.

During closing statement in the eligibility phase, which occurred several

weeks prior to the penalty phase, trial counsel previewed Runyon's penalty phase

evidence by telling the jury that he would present "evidence that we believe will

make you think that the death penalty is not warranted, things like his history as far

as his schooling, his family, *perhaps* mental health information . . ."[10] JA904

(emphasis added). At this stage of the trial, trial counsel may have been unsure of

their ultimate sentencing strategy. Trial counsel ultimately chose not to present

mental health evidence after it became apparent that such information was unlikely

to persuade the jury not to impose a death sentence. Indeed, counsel had lay

---

[10] Though the remark contained no such assurance, Runyon characterizes counsel's statement as a promise to present mental health evidence. Pet. Br. at 57. Runyon made the same argument below, which the court rejected. JA2914 n.32.

witnesses on stand-by ready to testify to penalty phase information pertinent to mental health diagnoses, but did not call them. JA2017–2018. As recited in declarations submitted by Runyon, the witnesses purportedly would have testified about changes in the defendant's personality and behavior after a motor vehicle accident. JA2191; 2195; 2230–2231. Runyon claims that counsel's failure to call those witnesses constituted ineffective assistance. Ineffectiveness is not the best explanation for the omission: rather, the decision not to call these available witnesses demonstrates a strategic choice to eschew this line of mitigation evidence.

During mental health evaluations by government experts, Runyon adamantly maintained his innocence and asserted he would not plead guilty to something he did not do. JA193; 208–209. These statements are consistent with the defense's penalty phase theory and indicate that its strategy was compatible with Runyon's asserted innocence. Runyon made clear during his mental health evaluations that he would not follow any advice from his counsel that was inconsistent with his personal belief in his innocence. JA193; 208–209. He insisted he would not plead guilty to avoid the death penalty. JA193, 209, 230. He expressed the same sentiment to his trial counsel. JA2016. Runyon's clearly stated position supports an inference that trial counsel had no choice but to craft a penalty phase strategy that would not concede or suggest guilt. *Cf. Strickland*, 466 U.S. at 691 ("The

57

reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant . . . ."). Indeed, a defendant may even choose to forego a mitigation defense entirely. *United States v. Torrez*, 869 F.3d 291, 322–23 (4th Cir. 2017). Trial counsel's argument at the penalty phase also supports an inference that Runyon's continued claims of innocence informed trial counsel's strategy: rather than acknowledging that Runyon committed the crime, trial counsel stated, "The evidence in this case has shown certainly, based on [the jury's] findings, that Mr. Runyon is capable of doing some terrible things." JA1238.

Further, Runyon's claims of innocence only served to highlight his lack of remorse, and trial counsel acted reasonably in omitting mental health mitigation evidence that had the potential to further alienate the jury. JA911–915; 1312. For example, evidence of Runyon's reduced moral culpability due to family and social factors would not have convinced a jury that found he experienced abuse as a child, but yet was still morally culpable enough to deserve the death penalty. Moreover, evidence that Runyon's brain damage and psychosis resulted in impulsivity, reduced concentration, and impaired executive functioning contrasts with the jury's finding that he engaged in substantial planning by purchasing a gun, mapping out his route, traveling from West Virginia, following Cat Voss's

instructions, and later covering-up his crime.

Just as he repudiated his guilt, Runyon repeatedly denied suffering from mental illness. JA194, 230. He clearly expressed his disagreement with any defense strategy that would seek to absolve him of responsibility for his crimes due to mental illness. JA194, 230. Given these statements, and Runyon's clear right to have testified, trial counsel reasonably omitted evidence that would have served to provoke his client without meaningfully mitigating the case against him. This is especially true in light of the extent to which his proffered mental health evidence is predicated on unsubstantiated self-reports from an individual described by one of his experts as living in a "fantasy world of grandiose wishful thinking, or suffering from delusions." JA1996.

As noted, the MRI report indicated that the results were normal, but upon viewing the imaging in 2015, Dr. Merikangas observed "white matter hyperintensities on the MRI consistent with his history of head injuries and migraine." JA1995. A PET scan, also conducted in August 2009, was non-diagnostic. JA1995. But Dr. Merikangas determined that Runyon had brain damage exacerbated by his motor vehicle accident in 1996. JA1995. Runyon argues that had trial counsel presented the results of brain scans performed prior to the penalty phase to his mental health experts they would have identified multiple white matter hyperintensities representing frontal lobe brain damage resulting in

impaired executive functioning and decision-making. He also argues his experts would have been able to testify that this type of brain damage can result in marked impulsiveness and an inability to appreciate the consequences of one's actions. He asserts his experts would have testified that these symptoms of damage sustained during a series of traumatic events[11] (JA1996; 2132–2133; 3185; 3189) manifested in the defendant's history of poor job performance and difficult interpersonal relationships.

Runyon's reliance on his 1996 car accident as a precipitating event is unpersuasive for a number of reasons. First, Runyon had a volatile employment history before the accident. JA184; 229. Second, Runyon has a long history of interpersonal conflict that predated the majority of his supposed head injuries. JA183; 213. Finally, despite his relatively high IQ, Runyon was an average student—graduating high school 122nd out of 387 students, with a 3.0 GPA, and receiving an associate's degree 24th out of a class of 31, with a C average. JA183; 216. Whatever impact the car accident might have subsequently had on Runyon's mental wellbeing, it clearly did not mark a change is his overall character or

---

[11] Runyon apparently reported another 1990 car accident to Dr. Mirsky and Dr. Dudley in 2015; however, this was a self-report much like his blast injuries and there is no evidence to support the nature or severity of this accident. JA2206; 2238. Further, it does not appear that Runyon reported this second accident to any mental health evaluator prior to 2015. *See* JA2053.

approach to life. As such, he cannot show that trial counsel had any obligation to present such easily rebutted evidence.

### C.     Trial counsel's chosen strategy was not prejudicial.

Finally, Runyon cannot establish prejudice from the claimed deficiencies of counsel. Each category of evidence that Runyon faults trial counsel for not adducing carries sharp aggravating aspects in addition to its mitigating facets. Such evidence functions as a "two-edged sword." *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989); *see also Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. 2010) ("The Supreme Court has held that evidence of mental impairment can be both mitigating and aggravating."). The district court properly recognized the risk/reward nature of the mental health evidence Runyon now claims would have saved him from the death penalty. The danger presented by this evidence, even with the diagnoses proffered by Runyon, undercuts Runyon's arguments both in faulting his attorneys' strategical calls and in carrying his burden of showing prejudice.. *See Harrington*, 562 U.S. at 108 (finding no error when counsel failed to uncover evidence because it would "be reasonable to conclude that a competent attorney might elect not to use it"). Much of the evidence Runyon faults his counsel for not presenting would have been double-edged in terms of mental health and/or duplicative of that already provided by the various friends and relatives. Additionally, such evidence would likely have been inconsistent with Runyon's claims of innocence and

undercut efforts to portray him as non-dangerous.

Moreover, the jury clearly found the murder was highly planned, driven by a desire for money, and traumatic to the victim's loved ones—weighty aggravation the defense could not counterbalance with showing a few mild deficits that fell far from explaining the crime. The remainder of the government's case in aggravation was no less substantial: Runyon misused military and law enforcement training to commit the crime; he had a history of abusing women; and he displayed a wholesale lack of remorse for the murder. He fails to show how the mental health evidence he has uncovered would have outweighed these non-statutory aggravating factors, especially given that the information would have undercut his other efforts to suggest his essentially good character and lack of dangerousness. Further, Runyon fails to acknowledge the additional evidence in support of the jury-found aggravating factors to which his trial counsel would have opened the door if Runyon's now-desired mental health evidence was introduced. Specifically, it is clear from Runyon's post-crime statements to the government experts that he had no remorse for his actions and incredibly maintained his innocence. JA193; 208–209; 230. The governments experts would have testified that Runyon "does not suffer from any serious mental illness, mental disorder, or brain pathology," and "there is no substantive data to support the conclusion that he was suffering from a severe mental or emotional disturbance" when he committed this crime. JA199;

230.

> "[T]his was simply not a close case." *Runyon*, 707 F.3d at 519.
>
> There is simply no question that Runyon fired five bullets into the body of an innocent naval officer and young father—at close range and in cold blood. There is simply no question that the jury had a strong evidentiary basis for unanimously finding numerous aggravating factors beyond a reasonable doubt—including that Runyon acted with monetary motives, planned and premeditated the murder, exploited his military and law enforcement experience in committing it, and showed not a hint of remorse for inflicting inestimable human damage for a paltry sum.

*Id*. at 521. The late developed evidence of alleged brain damage and mental illness would have amounted to a drop in a bucket of aggravation, serving only to undermine the case concerning Runyon's prior acts of kindness and generosity; and his prior work, military and educational experience. Any mental health evidence would have also made clear that Runyon denied participation in the murder, further exacerbating the evidence of remorselessness. Accordingly, Runyon fails to demonstrate a reasonable probability that the omission of the mental health evidence would have resulted in a more favorable verdict.

The forgone or newly discovered evidence indicates Runyon lacked impulse control or had PTSD. Those conditions certainly do not explain Runyon's long-term participation in a contract murder plot, in which he served as the shooter. His behavior was criminal, not clinical. Presumably, Runyon could have relied on these diagnoses as mitigating in their own right, but given their failure to explain

the crime to any measurable degree, they would have been entitled to little weight while calling into question his supposedly good character and lack of dangerousness. Runyon's assertion that the evidence would have reduced his moral culpability is of no moment, given that the jury did not view the case through that lens. Though the jury unquestionably considered the moral dimensions of the case, it did so in light of the court's instruction to weigh aggravators and mitigators. In any event, evidence of mental health conditions wholly divorced from the crime would not have reduced the perception of Runyon's culpability, even if they served to make him a mildly more sympathetic, albeit altogether more dangerous, figure. His conclusory statements to the contrary do not demonstrate otherwise. *See Roane*, 378 F.3d at 400–01 (conclusory statements are insufficient for habeas relief).

Defense counsel reasonably and adequately investigated Runyon's mental health background, and it was not error for them to forgo available information to this end in favor of a strategy that highlighted the positive attributes of Runyon's character and the inequity of his codefendant's sentences. As one of his attorneys stated, "The strongest argument we had was that it just wasn't fair for Runyon to be sentenced to death when two equally culpable co-defendants were receiving life sentences." JA2020. He cannot establish a reasonable probability that had mental health evidence, irrelevant to the crime, played a larger role at sentencing, the

outcome would have been different.

**III.   There was no ineffective assistance of counsel or *Brady* violation with respect to co-defendant Draven's background.**

During the penalty selection phase of the trial, the United States presented witnesses who testified about Runyon physically abusing women, his skill, education and training and the role they played in the offense, his lack of remorse and victim-impact evidence. JA2494–96. That evidence addressed four non-statutory aggravating factors.

Runyon presented 21 witnesses over two days who testified to his conduct in jail, his character, his friendships and employment, as well as his ability to adjust in prison should he receive a life sentence. He also presented co-defendant Voss' plea agreement and statement of facts. JA2497. He presented the jury with two statutory mitigators—that he did not have a significant criminal record (18 U.S.C. § 3592(5)) and that others equally culpable would not be punished by death (18 U.S.C. § 3592(4))—and 12 non-statutory mitigating factors. The jury, on their own, found three additional non-statutory mitigating factors. They found both statutory mitigating factors unanimously. JA1313. After weighing all the factors, the jury recommended two sentences of death and one sentence of life on the three charges. JA1315.

Runyon claims that the United States violated *Brady v. Maryland*, 473 U.S. 83 (1963), by not disclosing to him evidence about his codefendant Draven's

background and that his counsel was ineffective for not pursuing further Draven's

background at the penalty phase. Runyon contends that he could have used

Draven's history of committing sexual abuse to argue that Draven was more

deserving of a death sentence and that Runyon's abuse of women was not as

serious as Draven's. Neither of Runyon's claims about Draven's background

justifies a new capital sentencing.

During the guilt phase, Draven's counsel elicited before the jury that Draven

had raped his brother and sister when they were children with Runyon's counsel

present. ECF 331 at 811. Moreover, before Runyon was sentenced on December 4,

2009, Draven filed on November 9, 2009, a sentencing position that addressed his

history of sexual abuse, ECF 300, and the government filed a pleading on

November 10, 2009, similarly addressing Draven's history of sexual offenses,

JA1443–57. Draven's history of sexual abuse was available to Runyon's counsel,

and the United States committed no constitutional violation by not separately

disclosing Draven's history of sexual offenses to Runyon's counsel. "There is no

*Brady* violation if the evidence is available to the defense from other sources or the

defense already possesses the evidence." *United States v. Higgs*, 663 F.3d 726, 735

(4th Cir. 2011). Moreover, if a defendant believes that belatedly disclosed evidence

triggers a discovery violation, a continuance is the preferred sanction. *United*

*States v. Sterling*, 724 F.3d 482, 512 (4th Cir. 2013). No continuance was sought,

and counsel was not ineffective for failing to present Draven's background because the evidence lacked materiality. Runyon's *Brady* and ineffectiveness claim about Draven's background fails for multiple reasons, as discussed below.

### A. Procedural Default

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the movant failed to raise on appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982). The procedural-default doctrine conserves judicial resources and protects the finality of judgments. *Massaro v. United States*, 538 U.S. 500, 504 (2003). An exception lies for claims of ineffective assistance of counsel, which should be raised in a collateral attack rather than a direct appeal. *United States v. Williams*, 977 F.2d 866, 871 (4th Cir. 1992).

Apart from claims of ineffective assistance of counsel, courts may consider otherwise procedurally defaulted claims in two instances. First, they may consider defaulted claims when a movant demonstrates that the constitutional error "has probably resulted in the conviction of one who is actually innocent." *Bousley v. United States*, 523 U.S. 614, 623–24 (1998). Second, courts may consider defaulted claims if the petitioner establishes cause and prejudice. *United States v. Mikalajunas*, 186 F.3d 490, 492–93 (4th Cir. 1999). "Cause" exists only in those cases in which a factor external to the defense prevented counsel from raising a

claim at the appropriate juncture. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Prejudice" requires the petitioner to show that the error worried to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error." *Frady*, 456 U.S. at 170.

Because Runyon did not raise a *Brady* claim in his direct appeal, he must demonstrate "cause" excusing his procedural default, and "actual prejudice" resulting from the errors of which he complains. *Frady*, 456 U.S. at 168. Runyon fails to make any argument demonstrating cause and prejudice for his default of this claim.

Runyon argues that the information was not reasonably available to him on direct appeal. But as noted above, Runyon was aware even during the guilt phase of Draven's history of sexual offenses and would have received his co-defendant's sentencing pleadings. Runyon lacks cause for belatedly raising this claim.

### B.   *Brady* Claim and Materiality

Draven's prior sexual offenses also lack materiality. Runyon argues that his background pales in comparison to Draven's prior history of unrelated criminal and bad acts. According to Runyon, he would have sought to present to the jury all the prior bad acts Draven committed unrelated to the murder of Cory Voss and seek to lessen his culpability for his own abuse of women. Presumably, he would have called witnesses to detail these acts, apart from the 21 witnesses he called in

his mitigation defense.

For multiple reasons, Draven's history of sexual offenses lacks materiality. First, the jury found that Runyon established the equally culpable mitigator without this evidence. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Here, the evidence about Draven's sexual offenses would have been cumulative. *See Winfield*, 460 F.3d at 1034 (holding failure to present cumulative evidence is not ineffective performance). Runyon merely makes a conclusory statement that this evidence would have persuaded the jury. *See Roane*, 378 F.3d at 400–401 (conclusory statements insufficient for habeas relief).

Second, Draven's unrelated misconduct had no meaningful value for assessing Runyon's culpability. The facts remain that Runyon was a hired hitman. He was the triggerman who murdered Cory Voss, a young naval officer and father of two, for money.

Cat Voss wanted to be rid of her husband, obtain insurance proceeds and be with her lover Draven. Draven wanted to be rid of Cory Voss so that he could be with Cat Voss and undoubtedly enjoy the insurance proceeds should Cat continue their affair. But Runyon was the one who traveled from West Virginia to Newport

News, Virginia and shot Cory Voss at least five times at close range in Cory's vehicle. Neither Draven, nor Voss pulled the trigger to kill Cory in such brutal manner. The evidence against Runyon was overwhelming—Runyon planned the murder in advance, purchased the firearm the day of the murder, and drove to the location of the murder with a map of Hampton and Newport News, Virginia. The map, found in Runyon's vehicle in West Virginia, had the name of the bank, the description of Cory's vehicle, Cory's name and the exit to take off the interstate to get to the bank. Also found in Runyon's vehicle was a picture of co-defendants Voss and Draven. JA2488–94. Runyon fails to meet his burden to show that, if the jury had known about Draven's youth, the jury would not have sentenced Runyon to death. Likewise, the argument that had the evidence been presented "it would have substantially reduced the weight of the 'abuse of women' aggravator" is pure speculation.

This case is also distinguishable from *Cone v. Bell*, 556 U.S. 449 (2009). In *Cone*, the evidence suppressed by prosecutors included witness statements and police reports that corroborated the defense that he committed the crimes because of his drug addiction. Here, the evidence not turned over to Runyon was the background of Draven's youth. It had nothing to do with the crime for which Runyon was found guilty and sentenced to death, the murder of Cory Voss and his expectation of insurance proceeds.

Moreover, unrelated crimes or bad acts of a co-defendant are not generally discoverable as *Brady* material. *See United States v. Beckford*, 962 F. Supp. 804, 826–27 (E.D. Va. 1997). In *Beckford*, the district court dealt with a pretrial request for material about all criminal acts of co-defendants in furtherance of the drug conspiracy (one of the charges in the case). One of the defendants sought evidence, like Runyon, of *other violent acts not related to the charged homicide crime*. In *Beckford,* as in this case, the defendants claimed that the evidence was relevant to establishing the mitigating factor of equally culpable defendants would not be punished by death because the government's case in aggravation was strong. Thus the evidence would support a sentence of life imprisonment. In *Beckford,* the court stated,

> Permitting the defendants to submit evidence of that sort and the ensuing argument undoubtedly would lead to 'confusion of the issues, or misleading the jury'. 21 U.S.C. § 848(j). In effect, the defendant's propose to conduct a series of separate mini-trials consisting of aggravation cases against each of their own co-conspirators against whom the government could have but did not, seek a penalty of death.

962 F. Supp. at 826. Ultimately, the court denied the request for this discovery:

> Evidence concerning the violent background of co-conspirators would be entirely collateral to the issues properly before the jury at the sentencing phase-whether the culpability of the capital defendants rises to a level deserving of capital punishment. As a matter of law, any probative value of such evidence would be substantially outweighed by the dangers of confusion of the issues or misleading the jury, which would inure to the prejudice of both the defense and the Government.

*Beckford*, 962 F. Supp. at 826–27. Although *Beckford* was decided under Title 21

charges, 18 U.S.C. § 3593(c) has the same mandate about disallowing evidence that may be confusing: "Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues or misleading the jury." Accordingly, this evidence of Draven's background was not material to Runyon on the issue of punishment for his role in the crime and thus its nondisclosure was not prejudicial. The disclosure of irrelevant evidence is never prejudicial.

### C. Runyon was not deprived of effective assistance of counsel.

The reasons that Runyon fails to establish a *Brady* claim for Draven's prior sexual offenses also undermine Runyon's claim of ineffective assistance of counsel about that evidence. Runyon cannot show either deficient performance or prejudice. First, "[j]udicial scrutiny of a counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight," so that the conduct can be evaluated "from counsel's perspective at the time" and in light of all the circumstances. *Bell,* 535 U.S. at 698 (quoting *Strickland,* 466 U.S. at 689). Again, the jury already found that Runyon established the mitigating factor of equally culpable codefendants, and Draven's background would not have materially strengthened Runyon's arguments on that factor. Counsel made a reasonable decision not to invest more time on Draven's record,

addressing evidence of dubious admissibility.

Capital sentencing is individualized, and evidence that does not address a defendant's character, prior record, or role in the offense lacks relevance. *Lockett*, 438 U.S. at 604 & n.12. Runyon's counsel could reasonably decide not to invest further effort in introducing evidence about Draven's past, evidence that was unrelated to the murder for which Runyon was being sentenced.

Runyon also cannot show prejudice for the reasons already discussed above. Runyon presented 21 witnesses and argued in the penalty phase two statutory mitigators and 12 non-statutory mitigators. Further, the jury found three more in favor of the defendant JA1311–16. Runyon cannot claim that one statutory mitigator defined his presentation at sentencing. Runyon was the triggerman. He cannot show that it is 'reasonably likely' that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Harrington*, 562 U.S. at 104. "The likelihood of a different result must be substantial, not just conceivable." *Id*. at 112 (citing *Strickland*, 466 U.S. at 693). Runyon has failed to show a substantial likelihood of a different result. Counsel's decision on how to proceed at trial is entitled to great deference. Mere speculation cannot prevail on appeal.

**IV.  Any claim of *Batson* error is both procedurally defaulted and unavailing on the merits.**

The United States did not discriminate in jury selection and thus the

defendant's claim that the government violated his constitutional rights by contravening *Batson v. Kentucky*, 476 U.S. 79 (1986), is without merit.

As an initial matter, the defendant's *Batson* claim is procedurally defaulted. To show cause for his default, the defendant argues that his trial and appellate counsel were constitutionally deficient by failing to raise his *Batson* claim earlier. That argument is unavailing. As the district court found, the defendant failed to make a prima facie showing of racial discrimination in jury selection. *See Keel v. French*, 162 F.3d 263, 271 (4th Cir. 1998) (holding that a defendant's "failure to establish a prima facie case vitiates any entitlement to a hearing" and thus cannot support a claim for ineffective assistance of counsel for failing to raise a *Batson* objection) (citing *Hernandez v. New York*, 500 U.S. 352, 362 (1991)).

As a result, defense counsel were not ineffective and the defendant cannot overcome his procedural default.

## A. Runyon's *Batson* claim is procedurally defaulted.

Runyon raises a substantive *Batson* claim for the first time in his October 2015 § 2255 motion, more than six years after his trial. That claim is procedurally defaulted. Generally, claims not raised at trial or on direct appeal "may not be raised on collateral review." *Massaro*, 538 U.S. at 504. To bring a claim on collateral review that could have been raised at trial or on direct appeal, the "the movant must show cause and actual prejudice resulting from the errors of which he

complains." *Mikalajunas*, 186 F.3d at 492–93 (citing *Frady*, 456 U.S. at 167–68).[12]

"The existence of cause for a procedural default must turn on something external to the defense." *Id.* at 493. Examples of such impediments include "interference by officials," novelty of the claim, and ineffective assistance of counsel. *McClesky v. Zant*, 499 U.S. 467, 494 (1991). To establish prejudice, the movant must show that the errors at his trial "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170.

Runyon argues that cause is established because he did not possess the strike lists or the juror questionnaires necessary to bring the *Batson* claim prior to this § 2255 proceeding. In making this claim, he overlooks the fact that both he and his trial counsel participated in jury selection, witnessed the government's peremptory strikes, and possessed the juror questionnaires at the time of trial. Furthermore, that some evidence was not in the defendant's possession "fails to establish cause if other known or discoverable evidence could have supported the claim in any event." *McClesky*, 499 U.S. at 497. As the district court noted, "this is not a case where the court or the government failed to provide information to defense counsel

---

[12] Collateral attacks on otherwise procedurally defaulted claims may also be considered if the movant can demonstrate "that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack." *Mikalajunas*, 186 F.3d at 493. To meet this standard, the movant must show actual innocence. *Id.* Because Runyon does not claim actual innocence, he can avoid procedural default only by showing cause and actual prejudice.

until after direct proceedings, and counsel had no way to know about that information until such time." *Runyon v. United States*, 228 F. Supp. 3d 569, 653–54 (E.D. Va. 2017) (*Runyon II*).

Even absent copies of the strike list and questionnaires, Runyon could still have brought his *Batson* claim. Trial counsel had the information contained in the strike lists and juror questionnaires and appellate counsel could have requested the strike lists and questionnaires had they thought a *Batson* claim worthwhile. Thus, Runyon's *Batson*-based ineffectiveness claim fails and he cannot overcome his procedural default.

## B. Neither trial nor appellate counsel were ineffective for failing to raise a futile *Batson* argument.

Runyon also tries to overcome his procedural default through a showing of ineffective assistance of counsel. This claim also fails.

To prevail on an ineffectiveness claim, the defendant must show both that his attorney's performance was deficient and that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687. The errors by counsel must be "so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." *Id.* There is a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002). The defendant bears the burden of rebutting this presumption. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). "The

reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Id.* at 381. The defendant claims that trial and appellate counsels' performance was below an objectively reasonable standard because they failed to raise a *Batson* challenge and that he was prejudiced by their failure to do so because he would have been successful on that claim. Because there was no discrimination by the United States, the defendant cannot satisfy either of the *Strickland* requirements.

In *Batson*, the Supreme Court reaffirmed the prohibition against the use of peremptory challenges "solely on account of race" and established a three-step analysis for challenges to peremptory strikes due to race. *Batson*, 476 U.S. at 84, 89. The threshold question in a *Batson* challenge is whether the defendant has made a prima facie showing of racial discrimination by presenting "facts sufficient to raise an inference of intent by the government to discriminate based on all the relevant circumstances." *United States v. Joe*, 928 F.2d 99, 102 (4th Cir. 1991). If the trial court determines the movant has met this threshold, the government must provide a race neutral explanation for the strike. *Batson*, 476 U.S. at 97. This explanation need not be "'persuasive, or even plausible;' so long as the reason is not inherently discriminatory, it suffices." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995)). Finally, at step three, the trial court determines "whether the defendant has carried his burden of

proving purposeful discrimination." *Rice*, 546 U.S. at 338. If a movant cannot make a prima facie showing, then counsel cannot have performed below an objectively reasonable standard because there was no reasonable basis for counsel to raise a *Batson* objection. *See Keel*, 162 F.3d at 271 (holding that a defendant's "failure to establish a prima facie case vitiates any entitlement to a hearing" and thus cannot support a claim for ineffective assistance of counsel for failing to raise a *Batson* objection). *See also United States v. Malindez*, 962 F.2d 332, 334 (4th Cir. 1992) ("The purpose of the prima facie case requirement is to separate meritless claims of discrimination from those that may have merit.").

The district court determined that the defendant did not make a prima facie showing of racial discrimination in jury selection in his § 2255 motion. "Generally, [a Court of Appeals] will not reexamine the determination of a district court on the existence of a prima facie *Batson* violation." *Joe*, 928 F.2d at 103. This Court should follow the same approach here.

It is well-established that reviewing courts show great deference to decisions of the trial judge in evaluating *Batson* challenges. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019) ("A reviewing court ordinarily should give [the trial court's] findings great deference."); *United States v. Lane*, 866 F.2d 103, 105 (4th Cir. 1989) ("District Court findings regarding whether a prima facie showing has been made, like other findings of discrimination, are entitled to great deference.");

*United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998) ("A finding by the [trial] court concerning whether a peremptory challenge was exercised for a racially discriminatory reason is given great deference by this court.").

The United States acknowledges that several years elapsed between trial in this case and the date on which district court issued its opinion rejecting the defendant's *Batson* challenge. But the six-year period between this *Batson* claim and the trial is not a reason to depart from the practice of showing deference to the *Batson* determinations of the trial judge. *See United States v. Tindle*, 860 F.2d 125, 130 (4th Cir. 1988) (highlighting that the *Batson* ruling was made by the trial judge and giving it great deference even though the *Batson* determination was made nearly four years after trial). Notwithstanding the passage of time, the district court was still able to make firsthand observations about counsel and jurors of the type that are critical in *Batson* determinations. *See Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (highlighting the importance of credibility determinations which are best made by the trial judge during trial and stating "the trial court has a pivotal role in evaluating *Batson* claims").

Furthermore, any delay in deciding this issue is due to the defendant's procedural default. Consistent with the Supreme Court's decision in *McClesky*, "habeas corpus review [ought not] give litigants incentives to withhold claims for manipulative purposes and [to] establish disincentives to present claims when

evidence is fresh." 499 U.S. at 491–92. Thus, this Court should follow well established precedent and defer to the district court's conclusions regarding the defendant's failure to make a prima facie showing.

### 1. Runyon's statistical evidence is not persuasive.

Under *Batson*, "a defendant may establish a prima facie case of discrimination by showing that: (1) the defendant is a member of a distinct racial group; (2) the prosecutor has used the challenges to remove from the venire members of the defendant's race; and (3) other facts and circumstances surrounding the proceeding to raise an inference that the prosecutor discriminated in his or her selection of the jury pool." *Keel*, 162 F.3d at 271.

Runyon rests his prima facie claim on three pillars: statistics; a comparison of jurors; and a video the government played for the jury. These facts and circumstances were considered by the district court and properly found to be insufficient to make a prima facie showing of racial discrimination.

While statistics can help establish a prima facie showing, *Golphin v. Branker*, 519 F.3d 168, 187 (4th Cir. 2008), "the use of raw statistics … is both selective and uninformative." *Allen v. Lee*, 366 F.3d 319, 330 (4th Cir. 2004) (holding there was no prima facie showing where the prosecutor used 85% of his peremptory challenges to strike black prospective jurors and highlighting that the percentage of black jurors accepted by the prosecutor and seated on the jury

exceeded the percentage of black prospective jurors on the venire). "Though statistics are not utterly bereft of analytical value, they are, at best, manipulable and untrustworthy absent a holistic view of the circumstances to which they apply." *Id.*; *see also United States v. Tipton*, 90 F.3d 861, 881 n.11 (4th Cir. 1996) (rejecting a gender-discrimination claim where the defendants produced no evidence to support their argument other than "raw figures" of four men versus eight women stricken).

Runyon's argument exemplifies exactly why this Court has been hesitant to recognize a prima facie showing based on statistics alone. The defendant repeatedly claims that striking 70% of the black prospective jurors establishes a prima facie case. But this fact is not enough. Compare *Miller-El v. Cockrell*, 537 U.S. 322, 331 (2003) (*Miller-El I*) (highlighting that prosecutors struck 91% of eligible black jurors and only 13% of eligible nonblack jurors in concluding movant made a prima facie showing), with *Golphin*, 519 F.3d at 187 (striking 71% of eligible black jurors did not create a *Batson* violation); *Coulter v. McCann*, 484 F.3d 459, 468 (7th Cir. 2007) (denying a *Batson* violation where the prosecution used 90% of its strikes on black jurors); *Majid v. Portuando*, 428 F.3d 112, 131 (2d Cir. 2005) (rejecting a *Batson* claim where the prosecution struck 80% of the potential black jurors).

Knowing this, Runyon falls back on a statistical construct known as Fisher's

Exact Test, claiming that it shows there was only a 2.6% likelihood that the government's strikes of seven out of ten black jurors were independent of their race. But this statistical analysis is misleading. The defendant struck 20 white prospective jurors, Chart 1, and his statistical analysis does not take that into account. Once those 20 white prospective jurors are removed from the defendant's calculation, Fisher's Exact Test does not produce a statistically significant result.[13] In short, the defendant's statistical analysis does not actually show anything conclusive. *See, e.g.*, *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (noting that errors in the population sample can render Fisher's exact test deficient under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)).[14]

Nor is Runyon's statistical evidence otherwise persuasive. The government used its peremptory strikes to remove 70% of potential black jurors and 55% (12 of 22) of potential non-black jurors. Chart 1. Striking a similar percentage of black and non-black jurors does not create an inference of racial discrimination. *See Miller-El I*, 537 U.S. at 331 (highlighting the very large discrepancy between the percentage of eligible black jurors struck with the percentage of eligible non-

---

[13] Analysis performed using the website defendant cited in his brief at 106–07; http://www.socscistatistics.com/tests/fisher/Default2.aspx.

[14] The government has not found—and the defendant does not cite—a case where a circuit court credited Fisher's Exact Test in finding a prima facie case of racial discrimination under *Batson*.

black jurors struck to find a prima facie showing of racial discrimination). As the district court noted, the government used only 35% of its peremptory strikes on prospective black jurors, who made up 19% of the venire that day. Chart 1. The net result is that the petit jury had a higher percentage of black jurors, 25%, than the venire from which it was chosen. *See Allen*, 366 F.3d at 330 (stating that a jury made up of a higher percentage of black individuals than the percentage of black potential jurors in the venire creates an inference of no discrimination); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1521–22 (6th Cir. 1988) ("If the percentage of minority members in the ultimate jury is the same or greater [than the percentage in the group originally drawn for the jury], that would be a factor tending to negate the inference of discrimination."); *see also United States v. Barnette*, 644 F.3d 192, 200 (4th Cir. 2011) (rejecting a *Batson* challenge where the government accepted 25% of the eligible black jurors and black individuals made up 25% of the venire).

Additionally, the government concluded jury selection with an unused peremptory, JA3024 (noting that the government used 19 peremptory challenges), meaning it could have struck an additional black prospective juror if its goal was to keep black individuals off of the jury. While this is not conclusive, it weighs against a finding of discriminatory intent. *Lane*, 866 F.2d at 106; *Sangineto-Miranda*, 859 F.2d at 1522; *United States v. Montgomery*, 819 F.2d 847, 851 (8th

Cir. 1987). As the district court found, the defendant's statistics do not satisfy his burden of making a prima facie showing. Instead, the statistics actually create an inference that no discrimination occurred.

### 2. Runyon's additional evidence fails to establish a prima facie cases of discrimination.

Runyon makes a number of additional arguments in favor of a prima facie showing, none of which are convincing.

To begin, Runyon relies on the percentage of black jurors on the "disagree list." The defendant and the government each made preliminary lists of jurors from the venire of which they approved and disapproved. JA234. These lists were compared to produce three lists: one containing the names of jurors both parties agreed to call, one containing the names of jurors both parties agreed not to call, and one containing the names on which the parties disagreed. *Id.* Runyon claims that the fact that 45% of the "disagree list" was made up of black jurors is prima facie evidence of racial discrimination. But, as the district court correctly noted, these lists were created from input by both parties. The defendant suggests that because he did not strike any black jurors, the Court should assume that the government must have opposed calling all of these black jurors. But the defendant undermines this contention by admitting that he objected to calling some black jurors—the "agree-not-to-call list" was 20.3% black. Pet. Br. 107 n.32. Thus, the district court correctly found that the "disagree list" does not support a prima facie

showing.

Runyon's second argument in favor of his prima facie case misleadingly employs a side-by-side comparison between two black jurors the government struck and a white juror who sat on the petit jury—a form of analysis that is applied at step three of *Batson* analysis as opposed to at step one. *See Flowers*, 139 S. Ct. at 2248 (applying comparative juror analysis at step three); *Foster v. Chatman*, 136 S. Ct. 1737, 1751–53 (2016) (same); *Snyder*, 552 U.S. at 483 (same); *Miller-El v. Dretke*, 545 U.S. 231, 242 (2005) (*Miller-El II*) (same); *Golphin*, 519 F.3d at 179–86 (same). Because a peremptory strike can be used for any reason that does not violate the Equal Protection Clause, s*ee Thaler v. Haynes*, 559 U.S. 43 (2010) (*per curiam*), comparative juror analysis has particular value at step three because it helps the court determine whether the explanation for the strike is a pretext for discrimination.[15] It is far less useful at step one because the government has not provided any explanation for its strikes and thus the court does not know on what factors it should compare jurors. It is impracticable for a court to compare jurors on seemingly every relationship, character trait, and their demeanor during jury selection, which is what would be necessary to carry out comparative juror analysis at step one of the *Batson* analysis.

---

[15] "The prosecution's proffer of [a] pretextual explanation naturally gives rise to an inference of discriminatory intent." *Snyder*, 552 U.S. at 485.

Stated slightly differently, the defendant argues that when the government considering the selection of one juror from a group of 21 individuals, seven of whom were black, who all expressed similar views on the death penalty, the government discriminated by not accepting a black prospective juror. This is not the basis for a prima facie *Batson* showing.

Prior to jury selection, each juror responded to a questionnaire asking about his or her views on the death penalty. JA234. "The government may use a peremptory challenge to strike a juror who has reservations about capital punishment [… even where] the government's reason does not support a challenge for cause…." *Barnette*, 644 F.3d at 215. *See also Brown v. Dixon*, 891 F.2d 490, 496–98 (4th Cir. 1989) (holding that the prosecutor may properly use peremptory challenges to create a jury inclined to impose the death penalty). Question 61 asked jurors to state their view on the death penalty on a scale with seven options. *See, e.g.*, JA3302–03. Prospective jurors who circled (c), "I generally favor the death penalty, but I would base a decision to impose it on the facts and the law in the case," and/or (d), "I am generally opposed to the death penalty, but I believe I can put aside my feelings about the death penalty and impose it if it is called for the by the facts and law in the case," on that question were called for jury selection. *See* Chart 3.

There were 29 prospective jurors who circled (c) on question 61 (three black

and 26 white) and 23 who circled just (d) or (d) and (c) (seven black, 15 white, and one Asian). Chart 1. The government accepted all of the jurors who circled just (c), regardless of race. *Id.* The defendant used peremptory strikes on 18 individuals who circled only (c), leaving the jury with 11 members. *Id.*

Runyon used his final two peremptory strikes on individuals from the group that circled (d), leaving the government searching for one juror from the group of 21 remaining prospective jurors who circled (d) to question 61. Of those 21, 13 were white, seven black, and one was Asian. Chart 1. Since the government had just 20 strikes, one prospective juror from that group was going to sit on the jury while the others would not and, just based on the numbers, the odds were that individual would not be black. Runyon argues that by striking seven black prospective jurors and 12 white prospective jurors but accepting one white and one Asian juror, the government discriminated based on race. But, as already discussed, striking a similar percentage of black, 100%, and non-black, 86%, jurors does not create an inference of discrimination. *See Miller-El I*, 537 U.S. at 331 (comparing the percentage of eligible black jurors struck with the percentage of eligible non-black jurors struck and highlighting the very large discrepancy).

Runyon's final argument, relating to the government's showing of a video at trial, also does not create a prima facie showing of racial discrimination. Although Runyon argues that "the video contain[ed] the kinds of statements that are 'capable

of inflaming jurors' racial or ethnic prejudice,'" Pet. Br. 110 (quoting *United States v. Runyon*, 707 F.3d 475, 493–94 (4th Cir. 2013) (*Runyon I*)), this Court held that admitting the video was harmless error and noted that the video was less than an hour in a trial and sentencing that lasted longer than three weeks. *Runyon I*, 707 F.3d at 498–99. As the district court ruled, just playing the video in these circumstances is "hardly enough to show a discriminatory intent during voir dire." *Runyon II*, 228 F. Supp. 3d at 656. Runyon nonetheless ascribes to the government a plan to have a jury full of white jurors because their racial and ethnic prejudices would be especially inflamed by such a video and black jurors were more likely to sympathize with a minority. This sweeping allegation comes fairly close to stereotyping white jurors' capacity for empathy towards people of another race and black jurors' likelihood of sympathizing with an individual due to race. It is also made without any evidence to support it.

In short, Runyon's ineffective assistance of trial counsel claim must fail due to his inability to make out a prima facie case of racial discrimination. *See Keel*, 162 F.3d at 271. Trial counsel cannot possibly be said to have performed at below an objectively reasonable standard if the defendant was not entitled to a *Batson* hearing because he could not make out a prima facie case. *Id.* While review of trial counsel's actual actions during jury selection is unnecessary, it reinforces the conclusion that counsel was not ineffective.

The defendant and his co-defendant were represented by a total of four attorneys at trial, including two for each defendant. During jury selection, the defendant and co-defendant's counsel were closely attuned to jury selection. They asked the district court to ask specific questions of jurors, objected to decisions on whether or not to strike a juror for cause, and were even lauded by the trial judge for the thoroughness and quality of the job they did reviewing the juror questionnaires. JA322–23. None of the four defense counsel raised any objections to the government's strikes for racial discrimination. As outlined above, in these circumstances, their failure to raise a *Batson* objection was entirely reasonable. The defendant's claim of ineffective assistance of trial counsel must fail because he cannot show counsel acted below objectively reasonable standards and he cannot show a reasonable probability that, had a *Batson* claim been raised, the result of the proceeding would have been different.

Runyon's claim of ineffective assistance of appellate counsel for failing to raise a *Batson* challenge on direct appeal should also be denied. Appellate counsel's failure to raise the *Batson* issue was entirely reasonable since there was insufficient evidence to sustain a prima facie case. *See Keel*, 162 F.3d at 272; *see also Smith v. Murray*, 477 U.S. 527, 535–36 (1986) (stating that appellate counsel acts appropriately by "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail" (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52

(1983))). Even if Runyon could have established a prima facie case, appellate counsel's failure to raise the issue does not constitute ineffective assistance just because the claim would not have been frivolous. *See Barnes*, 463 U.S. at 751–54 (rejecting a claim that appellate counsel has a duty to raise every colorable claim and emphasizing that part of the role of appellate counsel is to select and raise only "the most promising issues for review"). Since it was entirely reasonable for appellate counsel to have concluded that the government did not discriminate in jury selection, failure to raise the issue does not give rise to an ineffective assistance of counsel claim.

## C. Alternatively, the Court should remand for a hearing to conduct steps two and three of the *Batson* analysis.

If the Court were to disagree with the government and conclude that the defendant had made a prima facie showing at *Batson* step one, a remand would be appropriate.

Under the three-step *Batson* process, (i) the movant must make out a prima facie case of racial discrimination; (ii) after determining the movant has met the prima facie burden, the trial judge requests the government provide explanations for its strikes; and (iii) the court determines whether the movant has met his burden of showing purposeful discrimination in jury selection. *Rice*, 546 U.S. at 338. These proceedings have not reached step two. The government has not been prompted to proffer, nor has it provided, an explanation for its strikes. Instead, the

government's responses to the defendant's habeas filings simply recounted all of the facts known to the defendant's trial counsel that were relevant to deciding whether to raise a *Batson* challenge. *See* JA1748–52, 1796–1802, 2569–74, 2628–33. At no point did the government state, or indicate, that it struck any jurors for any particular reason.[16]

*   *   *

The Court should therefore conclude that Runyon has not made out a prima facie case at step one of his *Batson* claim and that any such claim is procedurally defaulted. Alternatively, the Court should remand the matter to the district court for the government to provide a racially-neutral explanation for its peremptory challenges and for the district court to determine whether Runyon has met his burden in proving that juror strikes were racially motivated.

---

[16] The government acknowledges that the district court interpreted its description of which jurors were struck—*i.e.*, jurors who had indicated some opposition to the death penalty—as at least one race-neutral explanation. JA3027.

## Conclusion

For the foregoing reasons, this Court should affirm the district court's order denying habeas relief.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

_____/s/_____
Lisa R. McKeel
Brian J. Samuels
Assistant United States Attorneys

**Statement Regarding Oral Argument**

This case has been tentatively calendared for oral argument during the Court's March 2020 sitting.

**Certificate of Compliance**

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

The Court has granted the government's motion for an expansion of its word limit to 22,000 words. ECF No. 62. I therefore certify that this brief does not exceed 22,000 words (and is specifically 21,924 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

_____/s/_____

Lisa R. McKeel
Assistant United States Attorney
Fountain Plaza Three, Suite 300
Newport News, VA 23606
(757) 591-4000
Lisa.McKeel@usdoj.gov
