# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID ANTHONY RUNYON,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT NEWPORT NEWS

## REPLY BRIEF OF APPELLANT

Michele J. Brace
VA Capital Representation
Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
(434) 817-2970
mbrace@mindsort.com

Dana C. Hanson Chavis
Susanne Bales
Assistant Federal Defender
Federal Defender Services
of Eastern Tennessee
800 South Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979
dana_hansen@fd.org
susanne_bales@fd.org

*Counsel for Defendant-Appellant*

**LANTAGNE LEGAL PRINTING**
**801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ iii

I. Runyon's conviction under 18 U.S.C. § 924(c) is unconstitutional. *U.S. v. Davis*, 139 S.Ct. 2319 (2019); *Johnson v. U.S.*, 135 S.Ct. 2551 (2015).......................................................................................................1

    A. The government's suggestion that this Court decline to consider Runyon's *Davis* Claim on the basis of the concurrent sentence doctrine has no foundation in law or logic............................................2

    B. Runyon's §924(c) conviction on Count 5 cannot be sustained under the force clause.........................................................................2

    C. Conspiracy to commit murder for hire resulting in death is not a crime of violence ......................................................................................3

        1. Conspiracy to commit murder for hire resulting in death does not qualify as a crime of violence because it does not categorically require the use, attempted use or threatened use of force ........................................................................................3

        2. Conspiracy to commit murder for hire resulting in death does not qualify as a crime of violence because it does not require proof of the heightened *mens rea* necessary to qualify as a crime of violence..........................................................................6

    D. Runyon is entitled to relief if this Court holds that the conspiracy predicate is not a crime of violence....................................................7

    E. Runyon's remaining death sentence must be vacated because there is a possibility that at least one juror considered his unconstitutional conviction in voting for death. The Eighth Amendment and the Due Process Clause require Runyon to receive a new sentencing hearing........................................................14

        1. The "concurrent sentence" doctrine does not apply here...............16

2. This Court should remand to the district court for resentencing......................................................................17

II.  Counsel failed to investigate and present evidence of Runyon's brain damage and mental illness .........................................................19

    A.  Counsel conducted an incomplete mental health investigation and ignored red flags ..............................................................21

    B.  Substantial mitigating evidence was available....................................23

    C.  Counsel did not omit mental health mitigation for an informed and reasoned decision.................................................................30

    D.  The missing mitigation does not undermine the penalty-phase defense.........................................................................................33

        1.  Lack of remorse was already before the jury and would have been mitigated by the missing evidence .......................................34

        2.  Future dangerousness was already before the jury and would have been mitigated by the missing evidence..............................37

    E.  The missing mitigation was compelling ...........................................39

    F.  Mental health mitigation can affect the sentence even if it's unrelated to the crime .....................................................................47

III.  Runyon's death sentence is unreliable because the prosecution withheld, or counsel failed to discover, evidence supporting the equally-culpable co-defendant mitigating circumstance..........................48

IV.  Prosecutors discriminated in exercising their peremptory strikes, and Runyon's counsel unreasonably failed to challenge the strikes...............56

    A.  The first step of the *Batson* inquiry is moot, and this case should be remanded for adjudication of the second and third steps ...............56

    B.  The government's analysis of the statistical evidence is flawed and contrary to established law .......................................................61

C.   Defense counsel unreasonably failed to challenge the government's strikes of black veniremembers....................................64

1.   Defense counsel's performance was deficient..............................66

2.   Because *Batson* errors are structural, the prejudice component of Runyon's *Strickland* claim is presumed ....................................67

D.   The government's arguments about the respective performances of trial counsel and direct appeal counsel are unavailing ...................68

E.   Request for reassignment ...................................................................72

CONCLUSION..........................................................................................................72

CERTIFICATE OF COMPLIANCE.......................................................................74

# TABLE OF AUTHORITIES

**Cases**

*Abdul-Kabir v. Quarterman*,
550 U.S. 233 (5th Cir. 2007) ...................................................... 41, 42

*Adams v. Quarterman*,
324 Fed.Appx. 340 (5th Cir. 2009) ............................................... 35

*Batson v. Kentucky*,
476 U.S. 79 (1986) ........................................................ *passim*

*Beasley v. U.S.*,
219 A.3d 1011 ............................................................... 63

*Bell v. Jarvis*,
236 F.3d 149 (4th Cir. 2000)(en banc) ......................................... 67-68

*Bell v. Ozmint*,
332 F.3d 229 (4th Cir. 2003) .................................................. 57

*Benton v. Maryland*,
395 U.S. 784 (1969) .......................................................... 16

*Bourgeois v. Whitley*,
784 F.2d 718 (5th Cir. 1986) .................................................. 15

*Boyde v. California*,
494 U.S. 370 (1990) .......................................................... 54

*Boyle v. McKune*,
544 F.3d 1132 (10th Cir. 2008) ............................................... 28

*Cone v. Bell*,
556 U.S. 449 (2009) .......................................................... 54

*Davis* v. *Fisk Elec. Co.*,
268 S.W.3d 508 (Tex. 2008) ................................................... 63

*Deck v. Missouri*,
544 U.S. 622 (2005) ....................................................... 18, 19

*DeMarco v. U.S.*,
415 U.S. 449 (1974) .......................................................... 41

*Duncan v. U.S.*,
2019 WL 6053010 (D. Idaho Nov. 15, 2019) ...................................................... 5

*Eddings v. Oklahoma*,
455 U.S. 104, 112 (1982)..................................................................................48

*Foster v. Chapman*,
136 S. Ct. 1737 (2016) ...................................................................... 59

*Gray v. Branker*,
529 F.3d 220 (4th Cir. 2008) ...................................................... 29, 33

*In re Davis*,
829 F.3d 1297 (11th Cir. 2016) ...................................................... 16

*In re Gomez*,
830 F.3d 1225 (11th Cir. 2016) ...................................................... 10

*In re Navarro*,
931 F.3d 1298 (11th Cir. 2019) ...................................................... 11

*Harrison v. Ricks*,
150 Fed.Appx. 95 (2d Cir. 2005) ...................................................... 63

*Hernandez v. N.Y.*,
500 U.S. 352 (1991) ...................................................... 56, 57

*Johnson v. Mississippi*,
486 U.S. 578 (1988) ...................................................... 14, 15, 19

*Johnson v. U.S.*,
135 S.Ct. 2551 (2015) ...................................................... 1

*Kubat v. Thieret*,
867 F.2d 351 (7th Cir. 1989) ...................................................... 15

*In re Navarro*,
931 F.3d 1298 (11th Cir. 2019) ...................................................... 11

*Marinelarena v. Barr*,
930 F.3d 1039 (9th Cir. 2019)(en banc) ...................................................... 13, 14

*Matthews v. Evatt*,
105 F.3d 907 (4th Cir. 1997) ...................................................... 57

*Mellouli v. Lynch*,
135 S. Ct. 1980 (2015) ................................................................. 13

*Miller-El v. Dretke*,
545 U.S. 231 (2005) ............................................................. 63, 64

*Mills v. Maryland*,
486 U.S. 367 (1988) ..................................................................... 15

*Payne v. Tennessee*,
501 U.S. 808 (1991) ..................................................................... 54

*Penry v. Lynaugh*,
492 U.S. 302 (1989) ............................................................. 44, 54

*Porter v. McCollum*,
558 U.S. 30 (2009) ......................................... 34, 37, 41, 42, 43, 48

*Rompilla v. Beard*,
545 U.S. 374 (2005) ....................................... 29, 34, 41, 42, 43, 48

*Saffle v. Parks*,
494 U.S. 484 (1990) ..................................................................... 54

*Sears v. Upton*,
561 U.S. 945 (2010) ....................................... 24, 29, 31, 32, 41, 42

*Tennard v. Dretke*,
542 U.S. 274 (2004) ..................................................................... 48

*Thompson v. Oklahoma*,
487 U.S. 815 (1988) ..................................................................... 54

*Tuilaepa v. California*,
512 U.S. 967 (1994) ..................................................................... 53

*U.S. v. Allred*,
942 F.3d 641 (4th Cir. 2019) ...................................................... 4-5

*U.S. v. Bagley*,
473 U.S. 667 (1985) ..................................................................... 54

*U.S. v. Battle*,
927 F.3d 160 (4th Cir. 2019) ......................................................... 5

*U.S. v. Beckford*,
  962 F.Supp. 804 (E.D. Va. 1997) ......................................................... 53

*U.S. v. Boman*,
  873 F.3d 1035 (8th Cir. 2017) ....................................................... 2, 4

*U.S. v. Burrage*,
  571 U.S. 204 (2014) ............................................................................ 6

*U.S. v. Cannon*,
  778 Fed.Appx. 259 (4th Cir. 2019) .................................................. 11

*U.S. v. Castleman*,
  572 U.S. 157 (2014) ........................................................................ 4, 5

*U.S. v. Chapman*,
  666 F.3d 220 (4th Cir. 2012) ......................................................... 9, 10

*U.S. v. Charles*,
  932 F.3d 153 (4th Cir. 2019) .............................................................. 2

*U.S. v. Clarke*,
  171 F.Supp.3d 449 (D. Md. 2016) ...................................................... 7

*U. S. v. Covington*,
  880 F.3d 129 (4th Cir. 2018).............................................................. 5

*U.S. v. Davis*,
  139 S.Ct. 2319 (2019) .............................................................. 1, 2, 13

*U.S. v. Flack*,
  941 F.3d 238 (6th Cir. 2019) ............................................................ 17

*U.S. v. Fuertes*,
  805 F.3d 485 (4th Cir. 2015) ........................................................ 9, 13

*U.S. v. Hadden*,
  475 F.3d 652 (4th Cir. 2007) ............................................................ 17

*U.S. v. Hare*,
  820 F.3d 93 (4th Cir. 2016) .............................................................. 11

*U.S. v. Jefferson*,
  674 F.3d 332 (4th Cir. 2012) ....................................................... 11, 12

*U.S. v. Kelly*,
  35 F.3d 929 (4th Cir. 1994) ............................................................. 41

*U.S. v. Legrand*,
  483 Fed.Appx. 771 (4th Cir. 2012) ................................................. 68

*U.S. v. Lettiere*,
  2018 WL 3429927 (D. Mont. Jul. 16, 2018) .................................... 10

*U.S. v. Louthian*,
  771 Fed.Appx. 208 (4th Cir. 2019) ................................................. 17

*U.S. v. Luskin*,
  926 F.2d 372 (4th Cir. 1991) ............................................................ 7

*U.S. v. Mansfield*,
  24 M.J. 611 (A.F.C.M.R. 1987) ...................................................... 37

*U.S. v. McCall*,
  934 F.3d 380 (4th Cir. 2019) .......................................................... 72

*U.S. v. McCall*,
  2019 WL 4675762 (E.D.V.A. Sept. 25, 2019) ................................. 10

*U.S. v. McCollum*,
  885 F.3d 300 (4th Cir. 2018) ....................................................... 2, 4

*U.S. v. McNeal*,
  818 F.3d 141 (4th Cir. 2016) ....................................................... 5, 6

*U.S. v. Middleton*,
  883 F.3d 485 (4th Cir. 2018) ....................................................... 5, 7

*U.S. v. Nicholson*,
  611 F.3d 191, 217 (4th Cir. 2010) .................................................. 72

*U.S. v. Palmer*,
  854 F.3d 39 (D.C. Cir. 2017) ......................................................... 17

*U. S. v. Runyon*,
  707 F.3d 475 (4th Cir. 2013)........................................ 33, 47, 55, 59

*U.S. v. Shepard*,
  544 U.S. 13 (2005) ................................................ 9, 10, 12, 13, 14

*U.S. v. Simms*,
914 F.3d 229 (4th Cir. 2019)(en banc) .............................................. 3, 4

*U.S. v. Torres-Miguel*,
701 F.3d 165 (4th Cir. 2012) ....................................................... 4, 5

*U.S. v. Tucker*,
404 U.S. 443 (1972) ................................................................. 14, 16

*U.S. v. Hodge,*
902 F.3d 420 (4th Cir. 2018) ........................................................... 7

*U.S. v. Vann*,
660 F.3d 771 (4th Cir. 2011)(en banc) .......................................... 9, 10

*U.S. v. Ventura*,
864 F.3d 301 (4th Cir. 2017) .......................................................... 18

*U.S. v Whaley*,
733 Fed.Appx. 706 (4th Cir. 2018) .................................................. 31

*U.S. v. White*,
366 F.3d 291 (4th Cir. 2004) .......................................................... 31

*U.S. Postal Serv. Bd. of Governors v. Aikens*,
460 U.S. 711 (1983) .................................................................... 57

*Weaver v. Massachusetts*,
137 S. Ct. 1899 (2017) ................................................................. 68

*Wiggins v. Smith*,
539 U.S. 510 (2003) ................................................................ 23, 33

*Williams v. Taylor*,
529 U.S. 362 (2000) ................................................... 20, 29, 45, 48

**Statutes**

18 U.S.C. § 924 ................................................................ *passim*

18 U.S.C. § 1958 .......................................................................... 1, 7

18 U.S.C. § 2119 ............................................................................. 1

18 U.S.C. § 2255 ...................................................................... *passim*

18 U.S.C. § 3592 .................................................................................... 40

18 U.S.C. § 3593 .................................................................................... 24

**Rules**

Fed. R. Crim. P. 35 ............................................................................... 17

**Other Authorities**

*ABA Guidelines*,
    31 Hofstra L. Rev. 913, 956 (2003) ................................................ 22

**I.** **Runyon's conviction under 18 U.S.C. § 924(c) is unconstitutional.** *U.S. v. Davis*, **139 S.Ct. 2319 (2019);** *Johnson v. U.S.*, **135 S.Ct. 2551 (2015).**

A jury convicted and sentenced Runyon to death on Count 5 for violating 18 U.S.C. §924(c), using a firearm in relation to a crime of violence. The §924(c) charge rested on alternative predicate crimes of violence: conspiracy to commit murder for hire, 18 U.S.C. §1958(a) and carjacking, 18 U.S.C. §2119. His conviction and death sentence on Count 5 must be vacated in light of *U.S. v. Davis,* 139 S.Ct. 2319 (2019), which held that the residual clause of §924(c) is unconstitutionally vague, and because conspiracy to commit murder for hire does not qualify as a crime of violence under §924(c)'s remaining force clause. Runyon's case should be remanded for a new sentencing hearing on his remaining convictions.

The government acknowledges that §924(c)(3)(B) is unconstitutional, Gov.Br.16, that a conspiracy offense cannot serve as a valid predicate under the force clause,[1] Gov.Br.24, and that previously asserted procedural default arguments are meritless. Gov.Br.21 fn.2. Instead of conceding relief on Count 5, however, the government raises an assortment of responses, none of which finds a home in this Court's precedents or reasoning. Runyon addresses each in turn below.

---

[1] Although he does not waive his claim that carjacking is not a crime of violence, Runyon acknowledges that this circuit currently holds that carjacking is a crime of violence under the force clause, so does not press that argument further in this brief. Pet.Br.34-35.

**A.   The government's suggestion that this Court decline to consider Runyon's *Davis* Claim on the basis of the concurrent sentence doctrine has no foundation in law or logic.**

Initially, the Government asks the Court to decline to consider Runyon's *Davis* claim entirely based on the concurrent sentence doctrine. Gov.Br.17. But as the government concedes, and recent Fourth Circuit case law explicitly states, "the concurrent sentence doctrine cannot be applied to avoid reviewing the validity of one of a defendant's convictions." *U.S. v. Charles*, 932 F.3d 153, 160 (4th Cir. 2019).

Moreover, in granting a certificate of appealability on this issue, this Court already determined that this claim merits review. Order 1, Doc.46. [2]

**B.   Runyon's §924(c) conviction on Count 5 cannot be sustained under the force clause.**

As Runyon argued in his initial brief, and the government has conceded, conspiracy to commit murder for hire is not a crime of violence. Pet.Br.33-34; Gov.Br.24. *See also U.S. v. McCollum*, 885 F.3d 300, 309 (4th Cir. 2018)(conspiracy to commit murder in aid of racketeering is categorically not a crime of violence); *U.S. v. Boman*, 873 F.3d 1035, 1042 (8th Cir. 2017)(conspiracy to commit murder for hire is categorically not a crime of violence). Nevertheless, the government contends that conspiracy to murder for hire resulting in death contains an additional element that satisfies the force clause. Gov.Br.21-28. The government also contends

---

[2] Accordingly, Mr. Runyon only addresses this doctrine *infra*, in discussing the appropriate sentencing remedy.

that, even if the conspiracy predicate is not a crime of violence, Runyon's conviction on Count 5 should be considered valid because the jury could have based its determination of guilt on the alternative carjacking predicate. Gov.Br.28-34.

Both of these arguments are unavailing.

### C. Conspiracy to commit murder for hire resulting in death is not a crime of violence.

To qualify as a crime of violence under §924(c)(3)(A)'s force clause, an offense must satisfy two requirements. It must have as an element the use, attempted use, or threatened use of force. And it must require that such use, attempt or threat be intentional or knowing; reckless or negligent conduct is not enough. The offense of conspiracy to commit murder for hire resulting in death, like the offense of conspiracy to commit murder for hire, fails to satisfy either of these two requirements.

#### 1. Conspiracy to commit murder for hire resulting in death does not qualify as a crime of violence because it does not categorically require the use, attempted use or threatened use of force.

To determine whether an offense is a crime of violence under 924(c)(3)(A), courts must use the "categorical approach." *U.S. v. Simms*, 914 F.3d 229, 233 (4th Cir. 2019)(*en banc*). The categorical approach requires courts to look only to the statutory elements of an offense, not at the facts of a particular case. *Id.* "When a statute defines an offense in a way that allows for both violent and nonviolent means

of commission, that offense is not 'categorically' a crime of violence under the force clause." *Id.*[3]

While the government has conceded that conspiracy to commit murder for hire does not constitute a crime of violence under the force clause, citing *McCollum*, 885 F.3d at 309, and *Boman*, 873 F.3d at 1042, and recognizes that "a conspiracy offense *generally* will not serve as a valid predicate under the force clause," citing *Simms,* 914 F.3d at 236, the government argues that "resulting in death" is a separate element and that this element requires both the use of physical force and a knowing or intentional *mens rea*. Tellingly, the government cites no case law that supports this holding. And the government is simply wrong on this point.

Conspiracy to commit murder for hire resulting in death does not require— i.e., have "as an element"—the use, attempted use, or threatened use of physical force. As this Court has recognized, "a crime may *result* in death or serious injury without involving the *use* of physical force[.]" *U.S. v. Torres-Miguel,* 701 F.3d 165, 168 (4th Cir. 2012). While the Fourth Circuit acknowledges that a different aspect of *Miguel-Torres* was implicitly abrogated by the Supreme Court's decision in *U.S. v. Castleman*, 572 U.S. 157 (2014), it has reaffirmed this particular holding from *Miguel-Torres* in at least five subsequent decisions. *See U.S. v. Allred*, 942

---

[3] The government concedes that the categorical approach must be employed for this analysis. Gov.Br.24.

F.3d 641, 653 (4th Cir. 2019)(explaining that, although *Castleman* abrogated one aspect of *Torres-Miguel*, it "did not, however, 'abrogate the causation aspect of *Torres-Miguel* that a crime may *result* in death or serious injury without involving the *use* of physical force.'")(quoting *U.S. v. Covington*, 880 F.3d 129, 134 n.4 (4th Cir. 2018)); *U.S. v. Battle*, 927 F.3d 160, 166 (4th Cir. 2019)("It is true that a crime 'may result in' bodily injury without involving the use of force[.]"); *U.S. v. Middleton*, 883 F.3d 485, 491 (4th Cir. 2018)("a crime may *result* in death or serious injury without involving the *use* of physical force")(quoting *Torres-Miguel*, 701 F.3d at 168); *Covington*, 880 F.3d at 134 n.4(same); *U.S. v. McNeal*, 818 F.3d 141, 156 n.10 (4th Cir. 2016)(same).[4]

The government argues that a conspiracy offense that results in death "necessarily requires" that a defendant used physical force. This argument ignores the fact that someone can take a step in furtherance of such a conspiracy that results in the death of another person, including the intended victim, during which death results. For example, a conspirator could invite the intended victim to ride in a car with him and then be hit by an out-of-control truck resulting in the death of

---

[4] *See also Duncan v. U.S.*, 2019 WL 6053010, at *3 (D. Idaho Nov. 15, 2019) ("that in the categorical approach's artificial view, the crime of kidnapping can be committed without using physical force [citations omitted]. The same holds true for the crime of kidnapping resulting in death. As such, neither of the kidnapping charges in Counts One or Two are categorically crimes of violence under §924(c)(3)(A).")

the intended victim. Or a conspirator could arrange a dinner meeting with her intended victim to pump him for information to be used later to carry out the murder, and during that meal, the intended victim could choke to death on a piece of food or suffer a lethal allergy attack. These are just two of many realistic scenarios that show how someone acting in furtherance of a conspiracy to commit murder for hire could cause someone's death without using physical force. These examples specifically counter the government's suggestion, in reliance on *U.S. v. Burrage*, 571 U.S. 204, 214 (2014), that, "[i]n the real-world context, [but-for causation] means that a conspirator must have caused the death of the intended victim." Gov.Br.25.

This same reasoning holds true for conspiracy to commit murder-for-hire resulting in death. It is not categorically not a crime of violence.

> **2.** **Conspiracy to commit murder for hire resulting in death does not qualify as a crime of violence because it does not require proof of the heightened *mens rea* necessary to qualify as a crime of violence.**

For an offense to qualify as a crime of violence under §924(c)'s force clause, it must also require proof that the defendant *intentionally or knowingly* used, attempted to use, or threatened to use physical force. *See U.S. v. McNeal*, 818 F.3d 141, 155-56 (4th Cir. 2016)("[T]o qualify as a crime of violence, an offense must require either specific intent or knowledge with respect to the use, threatened use, or attempted use of physical force."). By contrast, crimes that can be committed

6

recklessly or negligently cannot qualify as crimes of violence. *See Middleton*, 883 F.3d at 498; *U.S. v. Hodge*, 902 F.3d 420, 427 (4th Cir. 2018)(quoting *Middleton* for the proposition that the force clause of the ACCA "requires a higher degree of *mens rea* than recklessness."); *U.S. v. Clarke*, 171 F.Supp.3d 449, 456 (D. Md. 2016).

The government argues that "the force necessary to cause the death of a §1958 victim cannot be undertaken recklessly," Gov.Br.27, because murder for hire is a specific intent crime. This ignores the fact that it charged Runyon with engaging in a *conspiracy*, not a completed act, and with a death that *resulted* from the conspiracy. The government has reminded the Court, based on *U.S. v. Luskin*, 926 F.2d 372, 379 (4th Cir. 1991), that murder-for-hire is a cold-blooded violent act, but the government made the decision to base Count 5 on a conspiracy resulting in death, not murder-for-hire itself. While murder-for-hire may indeed require an intentional act of physical force, conspiracy resulting in death—an easier crime to prove—does not. The government cannot now seek to benefit or shrink from its own charging decision.

This Court should grant relief.

**D.      Runyon is entitled to relief if this Court holds that the conspiracy predicate is not a crime of violence.**

The government contends that, even if this Court determines that the conspiracy predicate is not a crime of violence, Runyon's conviction on Count 5

would remain valid because it could still rest on the predicate crime of carjacking. Gov.Br.28. Not so.

In making this argument, the government asks this Court to find the impossible. The jury in this case was permitted to find §924(c) guilt based on either carjacking *or* conspiracy to commit murder for hire. J.A.913-914. The jury found guilt under these instructions without specifying which predicate offense served as the basis for the §924(c) conviction. J.A.1311-1316. The government itself notes that the jury "did not fill out a special verdict from asking it to specify which predicate offense supported its conviction in Count 5." Gov.Br.28. Yet, the government asks this Court to engage in the fiction that the jury found guilt on the §924(c) charge based on the carjacking predicate because, had it been asked to do so, it *would* have so found. Gov.Br.30-31 . The categorical and modified categorical approach preclude this Court from engaging in speculation of this sort.

What the government is actually arguing here is that because Runyon was convicted of a separate count of carjacking, there were sufficient *facts* to support the §924(c) conviction based on a carjacking predicate. But the mere fact that Runyon was convicted of a separate carjacking charge does not necessarily mean that there were sufficient facts to convict on the use of a firearm during and in relation to that carjacking, as required under §924(c).

In any event, it makes no difference whether the factual evidence was sufficient to convict Runyon for a §924(c) offense based on carjacking. Under the elements-based modified categorical approach, this Court can only find that carjacking was a predicate for the §924(c) *conviction* if it was *necessary* to satisfying the elements of the §924(c) conviction.[5] Here, carjacking was not *necessary* to the §924(c) conviction because jury's verdict could have alternatively rested on conspiracy to commit murder for hire—which the government does not and cannot dispute. Because Runyon's §924(c) conviction *could have* rested on *either* carjacking *or* conspiracy, this Court cannot conclude with "*certainty*" that Runyon was "*in fact*" (i.e., "*necessarily*") convicted of a §924(c) offense predicated on carjacking. *U.S. v. Shepard,* 544 U.S. 13, 21-23 (2005); *U.S. v. Fuertes,* 805 F.3d 485, 498 (4th Cir. 2015).

Due to this ambiguity in the verdict, this Court must find that Runyon's §924(c) conviction was predicated on the least of the two offenses—the conspiracy predicate. Indeed, the Fourth Circuit's decisions in *U.S. v. Vann*, 660 F.3d 771, 774 (4th Cir. 2011)(en banc) and *U.S. v. Chapman,* 666 F.3d 220, 227 (4th Cir. 2012), command this result.

---

[5] Under the elements-based modified categorical approach, a court can consider only a limited set of documents to determine what the defendant was charged with and found guilty of: the indictment, the jury instructions, and the verdict sheet.

Consistent with *Vann* and *Chapman*, the Eleventh Circuit's decision in *In re Gomez,* 830 F.3d 1225, 1227 (11th Cir. 2016) endorses the same result. In that case, the defendant was convicted of an indictment charging a §924(c) offense based on multiple predicate offenses (including Hobbs Act robbery and Hobbs Act conspiracy). *Id.* But the general verdict form was ambiguous because it did not reveal the particular predicate upon which the §924(c) conviction necessarily rested. *Id.* The Eleventh Circuit held that a "crime of violence" finding could not be predicated on this ambiguous verdict. *Id. See also U.S. v. Lettiere*, 2018 WL 3429927, at *4 (D. Mont. Jul. 16, 2018)(where *Shepard* documents failed to reveal whether the jury verdict on the §924(c) offense rested on Hobbs Act robbery or Hobbs Act extortion, the 924(c) conviction was invalid); *U.S. v. McCall*, 2019 WL 4675762, at *6-7 (E.D.V.A. Sept. 25, 2019)(where *Shepard* documents failed to reveal whether the jury verdict on the §924(c) offense rested on a conspiracy offense (that did not constitute a "crime of violence") or an assault with a dangerous weapon offense (that did constitute a "crime of violence"), the conviction was invalid).

This Court should likewise find that the ambiguous record in the instant case precludes a finding that Runyon's §924(c) conviction either necessarily rested on carjacking or, as the government argues, that the jury "would have" convicted Runyon of using a firearm in relation to the carjacking, if it had been instructed that it needed to perform this specific analysis.

The government cites several decisions which are either inapposite or unpersuasive. First, it cites *U.S. v. Hare,* 820 F.3d 93 (4th Cir. 2016), to argue that Runyon's conviction under §924(c) was predicated on both the conspiracy to commit murder for hire *and* carjacking. However, in *Hare*, the jury explicitly found on a special verdict form that it was unanimously convicting the defendants on each of the two §924(c) convictions based on a "crime of violence" and a "drug trafficking" predicate. *Id.* at 105-06. There was no ambiguity. Only under these very explicit findings did the Fourth Circuit hold that the defendants' convictions rested on both predicate crimes.

There is no special verdict form in Runyon's case establishing which of the predicate crimes his §924(c) conviction was based upon. Thus, *Hare* only highlights the grave ambiguity in Runyon's case.

*U.S. v. Cannon*, 778 Fed.Appx. 259, 260-61 (4th Cir. 2019), also relied on by the government, is also inapposite. In *Cannon*, the defendant pled guilty to his §924(c) charge, and specifically admitted facts that proved his guilt of the offense that supported the valid crime of violence. Likewise, in *In re Navarro*, 931 F.3d 1298 (11th Cir. 2019), also relied on by the government, the defendant pled guilty to §924(c), and admitted facts that proved his guilt of a drug trafficking offense.

The government suggests that *U.S. v. Jefferson*, 674 F.3d 332 (4th Cir. 2012) *as amended* (Mar. 29, 2012), "is a helpful touchstone." Gov.Br.29. It is not. In

*Jefferson*, the court noted that a verdict must be *set aside, not upheld,* if it is impossible to tell whether it rested on a valid or invalid alternative theory. A reviewing court can reverse a conviction only if it can conclude "beyond a reasonable doubt" that a rational jury would have found the defendant guilty absent the error. The court cannot reach such a conclusion in Runyon's case. As important, *Jefferson* did not involve an ambiguous verdict for an offense that had to be determined using the categorical approach. Deciding what a rational jury would have found—as the government here urges this court to do—requires abandoning the categorical approach and engaging in a deep dive into the facts of the case. This is impermissible.

The government appears to contend that the ambiguous record here—one that fails to establish that Runyon's §924(c) conviction was predicated on carjacking— is harmless, because there was *factual evidence* under which the jury *could* have found guilt on the §924(c) offense predicated on carjacking. On this basis, the government asserts the error did not affect Runyon's substantial rights. In so arguing, the government urges an end run around the categorical/modified categorical approach, which forbids "evidentiary inquiries into the factual basis" to determine what the jury could have found. *Shepard*, 544 U.S. at 20. Under the modified categorical approach, an error is harmful when *Shepard* documents fail to establish with "certainty" that the defendant was "necessarily" convicted of an offense that

12

constitutes a "crime of violence." *Id.* at 21. No further inquiry is permitted. To accept the government's argument would defeat the entire purpose of the elements-based categorical/modified categorical approach, and would result in application of the very fact-based approach the Supreme Court rejected in *Davis,* 139 S.Ct. 2319, in the guise of harmless error review.

To repeat the Fourth Circuit's statement in *Fuertes,* 805 F.3d at 498—a §924(c) case—"[t]he point of the categorical inquiry is not to determine whether the defendant's *conduct could* support a conviction for a crime of violence, but to determine whether the defendant *was in fact* convicted of a crime that qualifies as a crime of violence." *Id.* (emphasis added)(citation omitted). Indeed, the *Shepard* inquiry "is not an 'evidence-based one,' but rather an 'elements based inquiry.'" *Marinelarena v. Barr,* 930 F.3d 1039, 1050 (9th Cir. 2019)(en banc)(quoting *Descamps,* 570 U.S. at 266). Under this inquiry, "[o]ff limits to the adjudicator … is any inquiry into the particular facts of the case." *Mellouli v. Lynch*, 135 S.Ct. 1980, 1986 n.4 (2015). Rather, the key question under the modified categorical approach is one of pure law—not fact: "What do the uncontested documents in the record establish about the elements of the crime of conviction with the requisite certainty? That legal query requires no factual finding," *Marinelarena,* 930 F.3d at 1049. "As a result, whether the record of conviction necessarily establish[es]" that the defendant was convicted of a federal offense constituting a "crime of violence" is a

"legal question with a yes or no answer." *Id.* (internal quotation marks and citation omitted). "Once all relevant and available *Shepard* documents have been produced ... the documents either show that the [defendant] was [necessarily] convicted of a ['crime of violence'] under the categorical approach, or they do not." *Id.* at 1050.

The error here was harmful. This Court must vacate Runyon's conviction and sentence on Count 5.

**E. Runyon's remaining death sentence must be vacated because there is a possibility that at least one juror considered his unconstitutional conviction in voting for death. The Eighth Amendment and the Due Process Clause require Runyon to receive a new sentencing hearing.**

Resentencing is required in a non-capital case where the original sentence was informed by a conviction that has subsequently been invalidated. *See U.S. v. Tucker*, 404 U.S. 443 (1972). Where "there is a possibility" that an invalid conviction has informed a death sentence, the Eighth Amendment requires resentencing. *See Johnson v. Mississippi*, 486 U.S. 578, 583 (1988). The Court in *Johnson* emphasized that allowing for this possibility is inconsistent with the Eighth Amendment's "special need for reliability in the determination that death is the appropriate punishment." *Id.* at 584 (internal quotations and citations omitted).

The "possibility" standard means that resentencing is required unless it can be established that the sentencer did not consider the invalid conviction in determining the sentence. This standard applies with special force in capital cases given the

heightened need for reliability imposed by the Eighth Amendment. *See Mills v. Maryland*, 486 U.S. 367, 383-84 (1988). Importantly, under the possibility standard, resentencing is required when there is a possibility that an invalid conviction influenced even a single juror to recommend death. *See Johnson*, 486 U.S. at 586; *Kubat v. Thieret*, 867 F.2d 351, 373 (7th Cir. 1989)(finding a violation of petitioner's Eighth and Fourteenth Amendment rights based on the "substantial possibility that one or more" jurors was influenced by an erroneous jury instruction).

Here, it is likely that Runyon's unconstitutional conviction influenced at least one juror to recommend death. It would, in fact, be entirely speculative to conclude that the jury disregarded what it had been instructed concerning Runyon's underlying convictions when it sought to make the decision between life and death during the penalty phase. *See Johnson*, 486 U.S. at 586 (even without the prosecutor's argument to consider the invalid conviction, "there would be a possibility that the jury's belief that petitioner had been convicted of a prior felony would be decisive in the choice between a life and a death sentence") (internal citation and quotations omitted); *Bourgeois v. Whitley*, 784 F.2d 718, 721 (5th Cir. 1986) (resentencing required "unless it can be ascertained from the record that a trial court's sentence on a valid conviction was not affected" by the invalid conviction).

The possibility clearly exists that Runyon's invalid conviction affected at least one juror's decision to recommend death. To conclude otherwise would entail rank

speculation and thus would be unconstitutionally "callous." *Tucker*, 404 U.S. at 449 n.8.

### 1. The "concurrent sentence" doctrine does not apply here.

Relying on the "concurrent sentence doctrine," the government contends that even if that Runyon's conviction under Count 5 is unlawful, this Court should not re-examine his remaining death sentence. This doctrine "provides that, if a defendant is given concurrent sentences on several counts and the [sentence] on one count is found to be valid, an appellate court need not consider the validity of the [sentence] on the other counts," but *only if* the valid sentence is completely unrelated to the invalid sentence. *In re Davis,* 829 F.3d 1297, 1299 (11th Cir. 2016). That is not the case here.[6]

Where, as here, a jury could well have considered the invalid conviction as part of its basis for imposing the remaining death sentence, the doctrine has no applicability.

---

[6] Even fifty years ago, the Supreme Court said that the concurrent sentence doctrine's (then) "continuing validity" was as a "rule of judicial convenience," that no precedent gives "a satisfactory explanation for the concurrent sentence doctrine," and that "it cannot be taken to state a jurisdictional rule." *Benton v. Maryland*, 395 U.S. 784, 789-91 (1969).

16

**2.  This Court should remand to the district court for resentencing.**

Under the express terms of 18 U.S.C. §2255, the invalidation of Count 5 presents the Court with two options: "resentence" Runyon or "correct" his sentence. *See U.S. v. Hadden*, 475 F.3d 652, 661, 667 (4th Cir. 2007)("[T]he end result of a successful §2255 proceeding must be the vacatur of the prisoner's unlawful sentence (and perhaps one or more of his convictions) and one of the following: (1) the prisoner's release, (2) the grant of a future new trial to the prisoner, (3) a new sentence, be it imposed by (a) a resentencing or (b) a corrected sentence.").

A sentence correction is an "arithmetical, technical or mechanical" exercise that entails no "reevaluation of the appropriateness of [the defendant's] original sentence." *U.S. v. Flack*, 941 F.3d 238, 241 (6th Cir. 2019); *see also U.S. v. Palmer*, 854 F.3d 39, 47-48 (D.C. Cir. 2017); Fed.R.Crim.P. 35 (sentence correction is limited to corrections of "arithmetical, technical, or other clear error"). A resentencing, by contrast, requires such a re-evaluation. The problem in Runyon's case cannot be corrected by an arithmetical calculation. Resentencing is warranted.

In crafting a remedy for Runyon's challenge to his unlawful convictions under count 5, the Court must satisfy the purpose of Section 2255, which is to "place the defendant in exactly the *same* position he would have been had there been no error in the first instance." *U.S. v. Louthian*, 771 Fed.Appx. 208, 209 (4th Cir. 2019) (quoting *U.S. v. Hadden*, 475 F.3d 661, 665 (4th Cir. 2007)). A mere sentence

correction will not accomplish this because it is impossible to conclude with any confidence that the sentencing jury was unaffected by the instructions jurors received before sentencing deliberations. For example, the jury was instructed to accept findings of guilt based on unlawful counts in the indictment. *See* J.A.868-869. It would therefore be inappropriate for the Court here to step into the shoes of the jury and draw that conclusion by way of a mere "correction" of Runyon's sentence.

The only remedy that will put Runyon in the same position he would have been had there been no illicit Count 5 is a full re-sentencing on the remaining capital count. That is especially so because in this case, a death penalty case, the need for "reliable decisionmaking" in sentencing is "acute." *Deck v. Missouri*, 544 U.S. 622, 632 (2005). Indeed, even in non-capital cases, in the wake of the invalidation of a §924(c) conviction, the need for reliable sentencing customarily results in full re-sentencing under the sentencing package doctrine. *See, e.g., U.S. v. Ventura*, 864 F.3d 301, 309 (4th Cir. 2017)("The sentencing package doctrine accounts for the holistic approach that a district court should employ when sentencing a defendant convicted of multiple offenses.")

Here, full resentencing is even more essential because "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the

determination that death is the appropriate punishment in any capital case." *Johnson*, 486 U.S. at 584 (internal citation and quotations omitted); *see also Deck*, 544 U.S. at 632.

**II. Counsel failed to investigate and present evidence of Runyon's brain damage and mental illness.**

Counsel presented no mental health mitigation at the penalty phase. The available, but unpresented, mitigation included that Runyon is a brain-damaged, mentally-ill veteran. Trauma, including childhood abuse, blast injuries from military service, and serious car accidents, caused Runyon to suffer from a mental disease or defect that significantly impaired his executive functioning and decision-making at the time of the crime. Pet.Br.66-78. This evidence was not inconsistent with the defense's sentencing theories of equally culpable co-defendants and family sympathy. J.A.2020. The missing mitigation established two mental-health statutory mitigators, added needed weight to the non-statutory mitigators before the jury, and reduced the weight of individual aggravators, such as lack of remorse. It was the type of information counsel wanted to present at the penalty phase. J.A.2017-2018; J.A.2803-2806. Based on what counsel knew (or should have known), he conducted an incomplete investigation and failed to uncover and present constitutionally-mitigating evidence. There is a reasonable probability that, with this evidence, at least one juror would vote for life.

The government offers three justifications for counsel's failure to present evidence of Runyon's brain damage and mental impairment: the evidence was not available; it was a strategic decision; and, it was "in tension with" statements regarding innocence and would have strengthened the case in aggravation rather than mitigate against it. Each theory lacks legal merit and is contradicted by the record.

Counsel states he had no strategy to withhold evidence of Runyon's brain damage and severe mental impairments. Indeed, he wanted to present that very type of evidence. The experts warned counsel that a complete and proper mental health investigation required testing for brain damage but counsel did not heed that warning. Absent the required investigation, counsel could not make the strategic decision the government claims (but counsel denies) he made. *Williams v. Taylor*, 529 U.S. 362, 396 (2000)(counsel must conduct a thorough investigation in order to make a tactical decision worthy of deference).

The unpresented evidence explained that what the government called Runyon's greater moral culpability for the murder was, in fact, evidence of mental impairments beyond his control. The government may claim an innocent man cannot also be brain damaged and severely-mentally-impaired, but that's not the truth. Finally, the expert opinions discussed below show Runyon's neurological and mental impairments were in no way inconsistent with, much less rebutted by, the government's version of Runyon's role in the crime.

**A.** **Counsel conducted an incomplete mental health investigation and ignored red flags.**

Counsel wanted mental health testimony and evidence that Runyon's ability to reason was impaired by past injuries. J.A.2016-2017. Counsel knew that injuries affecting Runyon's reasoning abilities were important for mitigation and he wanted proof of Runyon's head trauma from car accidents and grenade blasts. J.A.2016-2017, J.A.2019. Counsel told the court that Runyon likely had "a significant mental disorder that bears a potentially strong relationship to the defendant's behavior and moral culpability," but counsel did not have records and the investigation was incomplete. J.A.896-897; J.A.889. Counsel described the experts' preliminary assessments as "not contain[ing] negative information about David Runyon[;]" they were favorable to the defense. J.A.2804. Counsel, however, failed to follow up on the information and presented no mental health mitigation. The government acknowledges that counsel failed to provide experts with all necessary information, Gov.Br.47 (noting, "Dr. Mirsky deferred his diagnosis until 'such time as full data are available.'"), but attempts to minimize the impact.

The initial defense expert, Dr. Nelson, did not conduct a complete examination or a psycho-social history. Sealed J.A.3169. The government characterizes Dr. Nelson's review as "[un]favorable to Runyon," Gov.Br.43, but Dr. Nelson advised counsel neuropsychological deficits were a defining element of Runyon's personality and behavior and a neuropsychological evaluation was

21

necessary. Sealed J.A.3169. Without dispute, a full neuropsychological assessment was not completed.

Dr. Mirsky likewise said testing was required, a neurologist was essential, the tech report on Runyon's brain scans was not conclusive, and PTSD was not ruled out. J.A.2131-2133. The government incorrectly infers that counsel gave Dr. Mirsky the brain scans. *Compare* Gov.Br.47 *with* J.A.2133. Dr. Mirsky's letters to counsel prove he received only oral representations from counsel about the scans. J.A.2133. Dr. Mirsky said blast injuries, like those Runyon suffered, can damage the brain's "vital function of connecting various cortical areas." J.A.2133. He maintained his opinion that Runyon's traumatic brain injury was "strongly mitigating." J.A.2142-2143.

Dr. Merikangas requested more information. J.A.1996-1997. Brain imaging was not done until right before the sentencing hearing and he was not given the scans. When he reviewed the scans for postconviction counsel, Dr. Merikangas found they were proof of brain damage, consistent with Runyon's history of head injuries and migraine. J.A.1995.

Counsel's failure to investigate fell below the prevailing standards of practice that "[c]ounsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination." ABA Guidelines, 31 *Hofstra L. Rev.* 913, 956 (2003); ABA Guideline 11.4.1(D)(7) (1989)(counsel shall obtain all necessary

information for the presentation of mitigation). Counsel abruptly and unreasonably terminated the investigation. *Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003).

The government does not dispute that counsel failed to uncover the unpresented mental health mitigation. Instead, it attempts to justify counsel's incomplete investigation with conclusory assertions that "a majority of the information upon which Runyon presently relies" was presented, but cites only one page of testimony from Runyon's mother. Gov.Br.38, 43 (citing J.A.1149).[7] It also suggests "[t]he rest was unavailable or unhelpful." Gov.Br.38; *see also* Gov.Br.55. The government does not acknowledge that all experts told counsel that Runyon suffered from a mental disease or defect. Counsel failed to follow this up with adequate investigation, and no mental health mitigation was presented. Jurors heard none of the facts in the experts' reports, as discussed in Runyon's opening brief at pages 60-75.

### B. Substantial mitigating evidence was available.

The government conjures the rationale that counsel did not *present* mental health evidence because Runyon's head injuries are unsubstantiated. Gov.Br.40. It criticizes the documentary evidence (medical records and lay-witness declarations)

---

[7] Runyon's mother, Suk Cha Runyon, testified: "But I can't [get revenge], because every time he [my husband] come back, any little sound, anything, pick up the kid like a chicken leg and throw them around. I couldn't do that. So I'm going to get beat up real good. So I can't wait on go back to states." J.A.1149.

and denies that Runyon sustained serious injuries from a major car accident because "there are no medical records from the civilian hospital where he received initial treatment[.]" Gov.Br.41. Such criticism is akin to ignoring a patient who presents with red, itchy, and blistered skin and who recounts a recent walk through the woods solely because he did not also show the doctor the poison ivy plant. This attempt to introduce a high evidentiary hurdle to the presentation of mitigating evidence (or as an excuse for counsel's failure to conduct an adequate investigation) has no basis in law. *See* 18 U.S.C. §3593(c) (mitigating factors are established by a preponderance of the evidence).

The record refutes the government's allegations that Runyon's traumatic injuries are "premised on wholly unsubstantiated self-reports," or "non-existent" proof, or that the car accident was "apparently insignificant[.]" *Compare* Gov.Br.40, 41, 42, *with Sears v. Upton*, 561 U.S. 945, 949-50 (2010)(Concern about sources "does not undermine the well-credentialed expert's assessment…[of] cognitive impairment."). Trial counsel avers that the evidence of Runyon's injuries as reflected in brain scans, Army medical records, and lay-witness declarations presented to the court below is the same evidence he was seeking to present at the penalty phase. J.A.2804-2805; J.A.1910-1914.

The civilian hospital that treated Runyon for injuries from the car accident had purged its records, but military medical records show that Runyon sought follow-up

treatment on advice of the civilian doctor. Those records note the date of the accident, Runyon's complaints, cognitive problems, and physical injuries, including: glass under Runyon's skin and bruising on his ankle, calves, knees, hip and elbow. J.A.2136-2140. Runyon had pain in his neck, shoulders and knees, intermittent numbness, and shooting pain sensations across his body. J.A.2143. He had surgery for a torn ACL. J.A.2159. He received physical therapy to regain range of motion and strength. J.A.2139. He suffered from vertigo, short term memory loss, headaches, insomnia, depression, and PTSD. J.A.2147-2152; J.A.2154-2155; J.A.2158-2161.

The government downplays these medical records, Gov.Br.41, but trial counsel avers that he expects such tactics from prosecutors and would not have forgone presentation of this evidence simply because the prosecution contested it or presented a differing expert opinion. J.A.2804.

Other proof substantiates not only the car accident but its effects on Runyon. Runyon's wife and friends said he was hit by a drunk driver and the truck Runyon was driving was totaled. After the accident, Runyon's behavior changed. He was quick to anger, unpredictable, and unreliable. *See, e.g.*, J.A.2191; J.A.2195-2196; J.A.2198; J.A.2224; J.A.2227; J.A.2230-2234. Pretrial jail records noted Runyon's

mental distress, delusions, grandiose ideations, and psychosis.[8] J.A.2119-2122. Runyon has physical signs, symptoms, and test results consistent with head trauma and brain injury. J.A.1996-1997; J.A.2132. To the extent any injuries are self-reported, medical professionals have noted Runyon is a "good historian." J.A.2155. Furthermore, as discussed below, even the prosecution's experts corroborate some of Runyon's psycho-social history, including head injuries.

The prosecution's two experts noted Runyon's head trauma from physical abuse by his biological father. The "sag" on the right side of Runyon's face resulted from such abuse. J.A.187. Had counsel pursued this information it would have strengthened the non-statutory mitigating circumstances based on childhood abuse. This information also rebuts the prosecution's argument that Runyon's facial expression evidenced a lack of remorse. *See* J.A.1920, 1923, 1928-1929; J.A.2213.

Prosecution experts noted other head trauma: a run-in with a telephone pole around age five; being "knocked out" during high school wrestling matches; concussions from military training involving explosions; and, "a bad car accident." J.A.188; J.A.220. Dr. Montalbano noted Maria Runyon's grand jury testimony corroborated the accident. J.A.220. Dr. Montalbano linked the car accident to the

---

[8] The government asserts without explanation that jailors' observations of Runyon's psychosis are "unhelpful" because deputies testified about Runyon's good behavior. Gov.Br.45. The jail records, however, evidence Runyon's mental illness that competent counsel would have investigated.

reason Runyon was barred from reenlistment in the Army: he had newly-acquired problems with attention to detail and a failure to follow instructions. J.A.229. Such problems then manifested in Runyon's inability to maintain civilian employment. Runyon's employer noted he had a problem retaining information from job training sessions. J.A.2234. This evidence directly contradicts the government's argument against prejudice, that "[w]hatever impact the car accident might have subsequently had on Runyon's mental wellbeing, it clearly did not mark a change i[n] his overall character or approach to life." Gov.Br.60-61.

Dr. Montalbano discussed the effect of numerous adverse developmental factors in Runyon's life which "may well have contributed to his [Runyon's] personality disorder[.]" J.A.230. Runyon's personality disorder, in turn, "contributed significantly to his poor vocational performance and his unstable interpersonal history." J.A.230-231. Personality-driven factors resulted in Runyon's "significant underachievement" and inability to maintain consistent employment, lack of self-awareness, rigid tendency to deny or minimize problems, apparent lack of remorse, lack of consistent contact with his family, poor impulse control, and poor judgment in establishing relationships with unstable females. J.A.225-230. The government fails to acknowledge the investigatory leads contained in its experts' reports. Instead, it argues that Runyon's statements of innocence recounted in those reports "certainly would have been at odds with the portrait that Runyon tried to

paint through the testimony of his family and friends." Gov.Br.45.[9] An investigation of these factors would have resulted in favorable testimony from the defense's testifying psychologist, Dr. Cunningham, who counsel retained solely to assess Runyon's prison adjustment. *See* J.A.1921-1925; J.A.2024.

Dr. Cunningham testified that Runyon presented a low risk of future violence. In post-conviction, Dr. Cunningham assessed adverse developmental factors in Runyon's life and their effects. The government attempts to limit the breadth of mitigation evidence that counsel could present even with an adequate investigation. Characterizing Dr. Cunningham's report as impinging on the jury's function to assess moral culpability, the government argues that "counsel operated wholly within their discretion to omit any effort to adduce Dr. Cunningham's wholly irrelevant and scientifically baseless opinion on moral culpability." Gov.Br.52. It asserts an "utter reasonability of the decision," Gov.Br.53, but fails to acknowledge that counsel made no such decision. Counsel did not ask Dr. Cunningham to evaluate Runyon's social history and adverse developmental factors, or give him the information necessary to do so. J.A.2073. Thus, the government's citation to *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008), for the proposition that the choice

---

[9] The government refers vaguely to Runyon's "views on women and various high-minded views of himself" as conflicting with the penalty-phase presentation. Gov.Br.45. It points to no statements by counsel that this was a reason not to complete an investigation or present mitigation; it was not.

of witnesses is a strategic matter, is misplaced because Runyon's counsel was unable to make an informed choice regarding whether to present such evidence. *Williams*, 529 U.S. at 396; *Sears*, 561 U.S. at 953-54 (lower court's finding that a defense decision was reasonable was in tension with counsel's failure to investigate). Had counsel conducted a constitutionally-adequate investigation, the jurors would have learned (from Dr. Cunningham or a similar expert) of Runyon's life experiences and gained an understanding of Runyon and his actions. *See id.* at 951.

The government next denigrates the mitigation evidence contained in Dr. Dudley's report as "opinion shopping" and speculates that the trial court "would have been disinclined to grant" funding for an additional expert. Gov.Br.54. The identity of the expert is irrelevant. The point is that counsel could have presented that mitigation if he had conducted an adequate mental health investigation. *Rompilla v. Beard*, 545 U.S. 374, 382 (2005)(finding counsel's investigation deficient where there were "likely avenues the trial lawyers could fruitfully have followed in building a mitigation case"); *Gray v. Branker*, 529 F.3d 220, 235-36 (4th Cir. 2008)(counsel should have presented the expert opinion in their possession or one similar to that obtained by post-conviction counsel). Dr. Dudley's opinion—including that Runyon has a diminished ability to conform his conduct to the requirement of the law—was based on evidence available to counsel. J.A.2200, 2208-2210.

**C.** **Counsel did not omit mental health mitigation for an informed and reasoned decision.**

Counsel's own words are the best proof of any penalty phase strategy. In §2255 proceedings, trial counsel reviewed the mitigation submitted below and affirmed it was the type of information he had wanted to present at the penalty phase. J.A.2804.

The government argues, "counsel made a strategic decision not [to] pursue mental health evidence in light of the government expert reports, unfavorable defense expert reports, and an MRI report that did not identify abnormalities[.]" Gov.Br.50. The record contradicts such post-hoc rationalizations. Pet.Br.62-66. The scans show brain damage that impairs executive functioning and decision-making—counsel simply needed to provide the scan to his experts. J.A.1992-1995. The government does not address either the facts or law Runyon discusses. It ignores counsel's statements that: he "would not have ceased an investigation into, or decided not to present, David Runyon's mental health and social history based on the fact that one or two prosecution experts issued unfavorable reports[,]" J.A.2804 ¶7; the defense-expert reports "do not contain negative information about David Runyon[,]" J.A.2804 ¶8; and, the radiologist's report on the MRI "would not have

supplied me with enough information to make a decision to cease investigation of David Runyon's mental health or social history."[10] J.A.2804 ¶5.

The government asks the Court to credit its speculation regarding counsel's representation over counsel's actual statements. Without referencing the record, the government claims counsel made a strategic decision to forgo mental health evidence. Gov.Br.39-40. It states that counsel intentionally avoided presenting information of "Runyon's grandiosity and alleged executive dysfunction." Gov.Br.51. Counsel's declarations refute the government's speculation—he said the defense-expert reports did not contain anything negative. J.A.2804 ¶8. Counsel wanted to present evidence of Runyon's impaired decision-making, and the experts could have done so. The Supreme Court has determined that "[c]ompetent counsel should have been able to turn" evidence of a defendant's "grandiose self-conception and evidence of his magical thinking" into support of a "cognitive deficiency mitigation theory" or a "profound personality disorder." *Sears*, 561 U.S. at 951.

---

[10] The government doubles down on its assertion that the MRI report was negative. Gov.Br.47. It distills a strategic decision from the fact that counsel did not share the brain imaging with his experts. The district court did not conduct an evidentiary hearing, and the government presented no evidence contrary to counsel's declaration. Any dispute about counsel's declaration must be interpreted in Runyon's favor. *U.S. v. White*, 366 F.3d 291, 297 (4th Cir. 2004)(adverse determinations on a fact-driven issue should not be made without factual development); *U.S. v Whaley*, 733 Fed.Appx. 706, 707 (4th Cir. 2018)("An evidentiary hearing in open court is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record or when a credibility determination is necessary in order to resolve the issue.").

Counsel also understood that "a person's intelligence quotient is unrelated to mental illness." J.A.2805 ¶10. The unpresented mitigation—including brain damage, diminished executive functioning, and psychosis—and a higher IQ are not mutually exclusive. The government's contrary argument (Gov.Br.46-47), therefore, was not a reason for counsel's failure to investigate and present mitigation. To the extent the government hints that counsel's decisions were influenced by any diagnosis of a personality disorder, Gov.Br.56, counsel declared the opposite. J.A.2805 ¶11 ("I would not forego presenting mental health mitigation because a client was diagnosed with a personality disorder."). Evidence of a "profound personality disorder" can constitute mitigation. *Sears*, 561 U.S. at 951. Counsel did not think the expert reports were damaging, J.A.2804, contrary to the government's argument. Gov.Br.56. Furthermore, the possibility that the government would present its own experts was not the basis for counsel's failure to present the missing mitigation. J.A.2804.

The government asserts, without citation or explanation, that "[t]rial counsel ultimately chose not to present mental health evidence after it became apparent that such information was unlikely to persuade the jury not to impose a death sentence." Gov.Br.56. The Supreme Court, however, has stated that such information establishes a reasonable probability of a different sentencing decision. Pet.Br.68 (citing cases).

**D.** **The missing mitigation does not undermine the penalty-phase defense.**

The unpresented mitigation is compatible with the penalty-phase evidence and the government fails to explain otherwise. *Wiggins v. Smith*, 539 U.S. 510, 535 (2003)(noting that responsibility and mitigation are not mutually exclusive); *Gray*, 529 F.3d at 236 (mental health evidence does not conflict with mitigation strategy that the defendant "was a good father, son, and community member"). The "centerpiece" of the defense was the "equally culpable-codefendants" mitigator, *Runyon*, 707 F.3d at 508, but the government frames counsel's theory as focusing on Runyon "as an essentially decent person whose homicidal conduct was anomalous[,]" and suggests that this theory is inconsistent with mental health mitigation. Gov.Br.39. Not so. The Court in *Gray* explained: "Evidence of mental disturbance...can be persuasive mitigating evidence for jurors considering the death penalty, and this evidence can determine the outcome." *Id.* at 235. Thus, mental health mitigating factors are the best hope of convincing a jury the defendant does not deserve the death penalty. *Id.* at 236. Counsel wanted to present the type of mental health evidence submitted to the post-conviction court. That mitigation is consistent with counsel's belief that the strongest sentencing argument was the unfair application of the death penalty to Runyon when two equally culpable co-defendants were receiving life. J.A.2020. Runyon suffers brain damage and mental

33

illness through no fault of his own which reduces his moral culpability in relation to the co-defendants' moral culpability.

### 1. Lack of remorse was already before the jury and would have been mitigated by the missing evidence.

The government urges the Court not only to infer a strategy based on Runyon's expressions of innocence to its experts, but also to conclude that strategy necessarily precluded mental health mitigation. Gov.Br.57-58. *But see Porter v. McCollum*, 558 U.S. 30, 40 (2009)(a fatalistic or uncooperative client does not obviate the need for a mitigation investigation); *Rompilla*, 545 U.S. at 382-83 (finding counsel's investigation deficient where he did not look for reasons why the defendant might have committed the crime because family members believed the defendant was innocent). Mental health mitigation is not precluded by those statements nor the fact that Runyon pled not guilty.

Although a government expert reported that Runyon "disagreed with any legal strategy to absolve him of responsibility or culpability for actions he did not commit[,]" J.A.230, there is no proof—including from counsel—that Runyon communicated any resistance to the missing mitigation. The government's argument conflates a conversation between its expert and Runyon about an insanity defense to the crime with a non-existent conversation between counsel and Runyon about mental health mitigation in support of a life sentence. Gov.Br.59. The government expert reported Runyon denied mental illness, saying it is "'something that brings

34

shame on me in a way because I think a lot of people try to do the insanity plea to excuse their actions, but I disagree with that line of thinking altogether.'" Gov.Br.59 (citing J.A.194).

Runyon's pretrial claim of innocence is consistent with his not guilty plea. Moreover, the government experts reported Runyon's statements about how his family would be shamed if he admitted guilt to a crime he did not commit, even if the prosecution took the death penalty "off the table." J.A.193. With this information, jurors would have known that Runyon's not-guilty plea was not entirely self-serving. The fact that the death penalty was an option only because Runyon refused to plead guilty supports the equally-culpable mitigator. Even if Runyon instructed counsel not to present certain evidence, counsel was not relieved of his obligation to conduct a competent mitigation investigation. *Adams v. Quarterman*, 324 Fed.Appx. 340, 347-48 (5th Cir. 2009).

Jurors found the lack of remorse aggravator after the prosecutor had made clear to the jury in the guilt phase that Runyon denied participation in the crime and then made this denial a central theme at the penalty phase. J.A.1182-1185, J.A.1187, J.A.1209-1211, J.A.1251, J.A.1254. The prosecutor even argued Runyon's appearance was proof of remorselessness. J.A.1210-1211.

Mental health mitigation could not add weight to this aggravator and the government points only to statements in the reports of government experts noting

Runyon claimed innocence. Gov.Br.58, 62-63. Yet, one expert provided another explanation for perceived remorselessness: Runyon's strong ego and tendency to "externalize blame and to rationalize his own behavior" are products of his personality dysfunction. J.A.226-227; J.A.199 (Runyon demonstrates personality features including "externalizing his responsibilities for conflicts" and not taking responsibility). Counsel also could have countered the "lack of remorse" aggravator with expert testimony explaining Runyon's facial asymmetry resulted from child abuse and explaining that mental illnesses can "flatten[]" and "blunt[]" affect. J.A.2213. Instead, no expert testified about how adverse developmental factors in Runyon's life impacted his cognitive ability, his personality, his judgment and his behaviors.

The government admits evidence of new mitigating factors would have countered the substantial planning aggravator: "Moreover, evidence that Runyon's brain damage and psychosis resulted in impulsivity, reduced concentration, and impaired executive functioning contrasts with the jury's finding that he engaged in substantial planning[.]" Gov.Br.58. Had jurors known this they may have rejected the substantial planning aggravator. The government argues, however, that counsel omitted such evidence because it presented a "danger" of undercutting counsel's "efforts to portray [Runyon] as non-dangerous[,]" Gov.Br.61-62, and it "fell far from

explaining the crime." Gov.Br.62. In short, the government argues that mental health mitigation, irrelevant to the crime, cannot establish prejudice. Gov.Br.64.[11]

Factually, the government-expert reports did not deter counsel from presenting mental health mitigation. J.A.2804-2805. Legally, the fact that the prosecution would present its own experts does not justify counsel's failure to present mental health mitigation in support of a life sentence. *Porter*, 558 U.S. at 43 ("it was not reasonable to discount entirely the effect that [a defense expert's] testimony might have had on the jury" just because the prosecution's expert provided contrary testimony); *see also U.S. v. Mansfield*, 24 M.J. 611, 618 (A.F.C.M.R. 1987)(rejecting argument that abandoning expert evidence was reasonable because prosecution could respond with damaging information).

### 2. Future dangerousness was already before the jury and would have been mitigated by the missing evidence.

The government suggests "clear aims of the defense" contrary to those attested to by counsel, and asserts in hindsight that the jury verdict somehow

---

[11] The government asserts: "He cannot establish a reasonable probability that had mental health evidence, irrelevant to the crime, played a larger role at sentencing, the outcome would have been different." Gov.Br.64-65. Runyon takes issue with the phrase "played a larger role at sentencing" since it is undisputed that none of the mental health mitigation submitted below was presented at sentencing. The government also asserts, without explanation, that "[m]uch of the [unpresented] evidence" was duplicative. Gov.Br.61. The unpresented mitigation was different in quality and in kind from the evidence presented, which focused on the co-defendants' equal culpability and Runyon's good character.

"confirms defense counsel's evident inclination to forgo any evidence that might reinforce how the jury viewed Runyon's dangerousness." Gov.Br.39. The basis for such speculation is unexplained and untethered to the factual record. A third of the defense case argued that Runyon would not be a future danger—an argument that opened wide the door to evidence of dangerousness.[12] The government cannot point to any statement by Runyon's counsel that supports the idea that mental health mitigation was inconsistent with the defense.

The government argues against prejudice by asserting, without explanation, that mental health mitigation would have undercut the defense's efforts to show Runyon was not a future danger. Gov.Br.62. Counsel's proof on this issue came from Dr. Cunningham but the jurors rejected his risk-assessment testimony. J.A.2532. The prosecution-expert reports, in contrast, actually mitigated future dangerousness.

Dr. Montalbano's report on Runyon's "correctional course and adjustment" supports Dr. Cunningham's testimony. Dr. Montalbano found: Runyon "had no disciplinary infractions" in pretrial custody; Runyon "was credited with providing emergency first aid to a cellmate"; Runyon's placement in general population

---

[12] One-third of the defense's evidence was from jailers and an expert about Runyon's adjustment to incarceration and low likelihood of violence. J.A.1005-1007, 1049-1092. One-third of the non-statutory mitigating circumstances were based on that same evidence—evidence the government now claims counsel shied away from. J.A.1313. The prosecution rebutted the prison adjustment evidence with testimony from an inmate who claimed he was assaulted at Runyon's direction. S.A.2-5.

reflected an appraisal that he was at low risk for violence; and, Runyon was "an isolative individual, who spent much of his time in his cell…engaging in activities such as reading." J.A.220. Counsel's failure to complete an investigation and present mental health mitigation did not prevent the admission of additional aggravating evidence; it left jurors without knowledge that the prosecution experts identified explanations for some of Runyon's behavior and that there were areas of agreement between the prosecution and defense experts. Jurors thus imposed a sentence based on an inaccurate picture of Runyon.

## E. The missing mitigation was compelling.

A death sentence was not a foregone conclusion. Jurors were receptive to psycho-social mitigation. They found their own mitigator in the fact that Runyon "continued to witness and experience domestic violence and parental conflict/abuse from [his] mother and adoptive father." J.A.1314. Jurors deliberated twice as long for the penalty phase as for the guilt phase. They questioned what would happen if they could not agree on a sentence. J.A.1298-1300.

When advocating for a life sentence there is a substantial difference between: (1) a presentation that Runyon was a decent person who killed someone and his equally-culpable co-defendants would serve life sentences, and (2) a presentation that Runyon was a decent person who had experienced lifelong traumas resulting in mental illness, personality dysfunction, and brain damage that affected his cognitive

functioning and made him susceptible to being used as a tool by codefendants to kill co-defendant Voss's husband, and those co-defendants would serve life sentences. J.A.1899-1929(discussing the available but unpresented mitigating evidence). The unpresented mitigation adds two statutory mental health mitigators and meaningful weight to the existing mitigators, including mitigators based on Runyon's abusive upbringing, his kindness and generosity, his military experience, and the impression that Cory Voss was molesting his daughter. J.A.1314. The unpresented mitigation also rebuts the government's case in aggravation. Pet.Br.66-75; J.A.1903-1916.

This is not a case in which the omitted mitigation would have been met with strong aggravating evidence in rebuttal. The government argues it would have introduced information about Runyon's personality, claims of innocence, and lack of remorse in response to the missing mitigation. The jury already knew that information. Additional mitigation could have resulted in a life sentence.

Runyon's jury should have heard expert testimony, *e.g.*, J.A.2212-2213, which established the statutory mitigating circumstances of "impaired capacity" and "disturbance." 18 U.S.C. §3592(a)(1) & (a)(6). Runyon's impaired mental state and impaired decision-making abilities are not of his own volition which bears directly on Runyon's lesser moral culpability. Expert evidence reveals the type of brain abnormality and cognitive defects the Supreme Court has deemed highly relevant to

assessing a defendant's moral culpability. *Porter*, 558 U.S. at 41, 43; *Sears*, 561 U.S. at 949; *Abdul-Kabir*, 550 U.S. at 261-63; *Rompilla*, 545 U.S. at 392.

The government presents an opposite view of the expert opinions in the missing mitigation. Gov.Br.45-55; 60-61. Its argument represents potential cross-examination questions—notably without answers—had Runyon's attorney presented the experts' testimony. But it is only argument. The government did not submit opposing expert opinions in the court below. Nor did the district court conduct an evidentiary hearing to test the expert evidence submitted by Runyon. Even if the government's argument is construed as having a basis in the record facts, this Court does not resolve factual disputes. *See, e.g.*, *DeMarco v. U.S.*, 415 U.S. 449, 450 (1974) (per curiam)("factfinding is the basic responsibility of district courts, rather than appellate courts"); *U.S. v. Kelly*, 35 F.3d 929, 935 (4th Cir. 1994)(same).

For example, the government resists Dr. Mirsky's opinion that diagnoses Runyon with psychosis and possibly schizophrenia. Gov.Br.48-49 & n.8. Dr. Mirsky also clearly communicated his opinion regarding traumatic brain injury and PTSD, J.A.2131-2135, and he could have provided the jury with the opinion submitted below to the postconviction court. *See* J.A.2237-2243. Contrary to the government's representation that Dr. Mirsky "identified no deficits in functioning" that provided substantive mitigation, Gov.Br.46, Dr. Mirsky found Runyon suffers from

neurological deficits, he has classic symptoms and suffers the effects of blast and impact injuries and brain injury, he displays symptoms of PTSD, he has traumatic brain injury, and a psychotic disorder. J.A.2237-2243. These conditions are constitutionally mitigating. *See*, *e.g.*, *Porter*, 558 U.S. at 41 (evidence of poor mental health or mental impairment could influence a jury's appraisal of moral culpability); *Sears*, 561 U.S. at 949 (describing brain damage as significant mitigating evidence); *Abdul-Kabir*, 550 U.S. at 261-63 (describing "possible neurological damage" as mitigating); *Rompilla*, 545 U.S. at 392 (describing brain damage as an extreme mental disturbance that significantly impairs cognitive functions and mental capacity).

Runyon's military service contributed to his brain damage and deficits in functioning and, combined with Dr. Mirsky's testimony, adds significant weight to the "military service" mitigator. Concomitantly, the "special training" aggravator could not reasonably weigh much because that same evidence established offsetting mitigation of Runyon's honorable military service. *See Porter*, 558 U.S. at 43 ("Our Nation has a long tradition of according leniency to veterans in recognition of their service[.]"); *see also Rompilla*, 545 U.S. at 386 fn.5 (absent the unpresented mitigation, the jury "could give more relative weight" to aggravation because counsel missed an opportunity to place mitigating evidence on life's side of the sentencing scale).

Dr. Merikangas could have testified that Runyon is "a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process." J.A.1992. Runyon sustained brain damage from physical abuse during childhood and other head trauma, including a car accident "that resulted in a personality and mood change" and contributed to PTSD. J.A.1995. Such "brain injury has resulted in impaired executive functioning and decision making." J.A.1995. Psychological testing also indicates paranoia and delusions. "The paranoia and delusions may represent a formal thought disorder, which may be a consequence of his brain injuries, mood disorder, and PTSD." J.A.1995. Runyon's history of PTSD "may account for some of his disordered mood and cognition." J.A.1995. Brain damage, cognitive defects, PTSD, Schizophrenia and other disorders are substantially mitigating but Runyon's jurors were not given this information and, therefore, had an inaccurate view of him. *See Porter*, 558 U.S. at 36 n.4 (discussing the mitigating value of PTSD); *Rompilla*, 545 U.S. at 390-91 (An investigation of schizophrenia and other disorders "would have destroyed the benign conception of Rompilla's upbringing[.]").

The government states that because the brain scans "proved to be normal, Runyon's counsel cannot be faulted for not continuing to pursue this line of investigation." Gov.Br.46. The conclusion they urge is based on a false premise. The scans proved "multiple white matter hyperintensities … consistent with [Runyon's]

history of head injuries and migraine." J.A.1995. This brain damage "has resulted in impaired executive functioning and decision making." J.A.1995.

The government contends that, even if the missing mitigation was presented, the mitigating factors "would not have been entitled to any greater weight." Gov.Br.44; *see also, e.g.*, Gov.Br.58 (arguing adverse developmental factors would not otherwise "convince[]" the jury that had already found Runyon experienced abuse as a child). Although Runyon's jurors found more than twice as many mitigators as aggravators, their death verdict makes clear they were unable to assign much weight to the mitigators. The missing mitigation supplied that weight.

The missing mental health mitigation also established two mental health mitigators, and reduced the weight of aggravating factors. In the government's view, however, the aggravation was "weighty" and "could not [be] counterbalance[d]." Gov.Br.62. The Supreme Court has never held that mitigation evidence is irrelevant if aggravating evidence is weighty. The relevant inquiry is the appropriate punishment based on Runyon's individual characteristics and moral culpability. *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)("'[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'")(citation omitted). Mitigating

44

circumstances, like the missing mitigation here, can undermine confidence in a death sentence even if they do not undermine aggravating circumstances. *Williams*, 529 U.S. at 398 ("Mitigating evidence unrelated to [aggravation] may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.").

While the government argues that the unpresented mitigation could not tip the balance toward life, it also argues that any rebuttal to new mitigation would have such a significant impact as to act as an exception to counsel's duty to investigate and present mitigation. In the government's view, the government-expert reports negate the missing mitigation. The government overlooks the wealth of mitigation in those reports.

Reports from the prosecution experts confirmed some of Runyon's psycho-social history, had areas of agreement with the defense experts, and provided significant leads to additional mitigation. The reports did not contain additional aggravating evidence. They were not inconsistent with defending against the aggravators or with establishing mitigators.

Dr. Montalbano discussed the effect of adverse developmental factors in Runyon's life; something counsel asked Dr. Cunningham about during his testimony, but was precluded from presenting because counsel failed to provide notice of such testimony. J.A.928. Dr. Montalbano found several adverse factors

which "may well have contributed to his [Runyon's] personality disorder[.]" J.A.230. Runyon's personality disorder, in turn, "contributed significantly to his poor vocational performance and his unstable interpersonal history." J.A.230-231. Dr. Montalbano explained how various personality-driven factors resulted in Runyon's "significant underachievement" and inability to maintain consistent employment, lack of self-awareness and rigid tendency to deny or minimize problems, apparent lack of remorse, lack of consistent contact with his family, poor impulse control and poor judgment in establishing relationships with unstable females. J.A.225-230. Had counsel followed-up on this assessment of adverse factors (and provided adequate notice) they could have obtained favorable testimony on this subject from Dr. Cunningham or another experienced mental health professional. J.A.2024-2073.

Dr. Patterson, who opined Runyon met criteria for a personality disorder with narcissistic features, concluded no mitigating or aggravating mental health factors existed. J.A.199. He said: "Although [Runyon's] personality traits have affected relationships and job performance, they do not, in my opinion, represent a serious mental illness that has any impact as mitigating or aggravating factors regarding sentencing on his current charges if found guilty." J.A.199. Dr. Montalbano's findings were consistent with Dr. Patterson's. J.A.200. A personality disorder

diagnosis was not the reason for the incomplete investigation or for not informing jurors about Runyon's mental health and psycho-social history. J.A.2805.

Dr. Patterson's report should have prompted counsel to discover Runyon's motivation for participating in drug studies. The prosecution portrayed Runyon's drug-study work as an intentional "[abandonment of] more gainful attempts at employment, to get employment through these sporadic drug studies that put him into contact with people like Michael Draven." *Runyon*, 707 F.3d at 512. In contrast, Dr. Patterson reported: Runyon's "mother was in a lot of physical pain, and he first found out about drug trials because he was doing research online resulting in his decision to participate in drug trials while he was in West Virginia." J.A.188. Runyon felt he was doing "something good for people and he had only seen three or four other Asians so that he [wa]s 'representing that culture.'" J.A.189. The jury was sensitive to the suffering of Runyon's mother (and son) as demonstrated by their finding of mitigating circumstances related to them. J.A.1314. The idea that Runyon submitted to medical testing to aid his mother's health was mitigating. It also mitigated the prosecution's comparative-worth argument made in support of the victim-impact aggravator. *See Runyon*, 707 F.3d at 512.

### F. Mental health mitigation can affect the sentence even if it's unrelated to the crime.

Indisputably, Runyon "had a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel…failed to discover[.]"

*Williams*, 529 U.S. at 393. Prejudice exists when jurors are not informed of facts that undermine an otherwise "benign conception" of the defendant's upbringing and/or mental capacity. *Rompilla*, 545 U.S. at 391. Nevertheless, the government argues that the mental health mitigation is "wholly divorced from," or "irrelevant to," the crime and cannot establish prejudice. Gov.Br.64-65. The Supreme Court has never held that *Strickland* prejudice cannot exist unless jurors are provided a rationale for the crime. Moral culpability need not be tethered to criminal conduct. *Williams*, 529 U.S. at 398 ("Mitigating evidence unrelated to [aggravation] may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."). Mitigating evidence is constitutionally relevant even when there is no direct nexus between the evidence and the crime. *Tennard v. Dretke*, 542 U.S. 274, 287 (2004). "Indeed, the Constitution requires that 'the sentencer in capital cases must be permitted to consider any relevant mitigating factor.'" *Porter*, 558 U.S. at 42 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)(troubled childhood and emotional disturbance is effective mitigation)). The government's argument against prejudice is not well-taken.

III. **Runyon's death sentence is unreliable because the prosecution withheld, or counsel failed to discover, evidence supporting the equally-culpable co-defendant mitigating circumstance.**

The government failed to disclose (or defense counsel failed to investigate and present) evidence of co-defendant Draven's history of escalating violence,

including child rape, child molestation and threats and assaults against women. This unpresented evidence would have added weight to the equal culpability mitigator. The government asserts the claim is without merit by focusing on Runyon's guilt. It ignores that the unpresented evidence was relevant to the equal culpability. The government asserts the claim is barred and without merit. The government is in error.

Its procedural bar argument, Gov.Br.66-67, rests on the theory that defense counsel was, or should have been, alerted to Draven's past by memoranda filed after Runyon's jury had returned its binding recommendation of death, but before the trial judge had formally opposed sentence, and should have then pursued a *Brady* claim.

The government's representations that counsel could have discovered admissible evidence of Draven's history of escalating sexual and physical violence are not well-founded. The witness who testified at trial that he and his sister had been raped knew only a tiny slice of Draven's sordid past. The sentencing memoranda was not filed until after Runyon's jurors had already weighed Runyon's and Draven's relative culpability and made their binding recommendation of death. The only sources of Draven's persistent sexual assaults were confidential juvenile records and the confidential presentence report prepared for Draven's sentencing. The only source of Draven's subsequent history of escalating violent threats and assaults was confidential law enforcement records known only to the government.

Defense counsel could not have reasonably discovered this information and it was properly raised in Runyon's postconviction motion.

On the other hand, the government does admit that if the information was reasonably available to defense counsel then the proper time for Runyon to seek relief for his trial counsel's failure was in the post-conviction proceeding below, which Runyon did. Gov.Br.67 ("An exception lies for claims of ineffective assistance of counsel, which should be raised in a collateral attack rather than a direct appeal.").

The government suggests that Runyon seeks a greater degree of relief here, i.e., a new sentencing hearing, than that to which he would have been entitled had his trial counsel raised a *Brady* claim upon receiving the Draven sentencing memoranda. Gov.Br.66. That is incorrect. Because the sentencing memoranda were not filed until after Runyon's jurors had rendered their binding recommendation of death, Runyon would have received the same relief had trial counsel raised a *Brady* claim prior to the trial court's imposition of sentence, i.e., when the government insists he should have done so.

The government agrees that whether trial counsel was ineffective for failing to present "available" evidence and whether the government violated its duty under *Brady* by failing to turn over "unavailable" evidence are both issues which turn upon the same question: was the evidence material? Gov.Br.66-67 ("No continuance was

sought, and counsel was not ineffective for failing to present Draven's background because the evidence lacked materiality."); Gov.Br.72 ("The reasons that Runyon fails to establish a *Brady* claim for Draven's prior sexual offenses also undermine Runyon's claim of ineffective assistance of counsel about that evidence.").

On the determinative issue of materiality, the government offers two reasons why Draven's history of sexual and physical violence, lacks materiality: (1) evidence of a co-defendant's background is irrelevant to the "equally culpable co-defendant" statutory mitigating factor, Gov.Br.71-72; (2) even if it were relevant, there is no reasonable probability evidence of Draven's background would have altered the outcome here, Gov.Br.69-70. The government is incorrect as to both.

Culpability for the purposes of determining whether either Draven or Runyon were deserving of a sentence of death clearly includes their backgrounds, criminal history and character. Without knowing how "deserving" Draven was of the ultimate punishment, Runyon's jury was unable to make the comparison between the relative culpability of the two men and, accordingly, to determine how much weight to afford the fact that the government treated Draven with favor. The evidence which went unpresented to Runyon's sentencing jury materially altered that comparison and did so in a way which revealed that Draven was not merely equally culpable as Runyon, but rather he was exponentially more culpable.

It is important that Runyon's jury rejected the same effort the government makes now to paint Runyon as far more culpable for his role in the offense than Draven. Runyon's jurors knew everything the government argues here: Runyon purchased a gun on the day of the murder; he had to drive from West Virginia to Newport News, Virginia; he had a map and a description of the victim's car and the bank; and, Runyon fired the fatal shots. *Compare* Gov.Br.70 *with* J.A.1189-1191. Still they found Draven equally culpable.

And the record is clear it was right for the jury to find Draven at least equally culpable, a fact the government essentially admitted when they later responded to Draven's pre-sentence report. There, arguing Draven was not merely a participant in the murder of Cory Voss, but its manager or leader, the government argued Draven:

> played an organizational and management role in the conspiracy. (PSR at ¶21) … met and recruited RUNYON while the two were engaged in a medical study in Baltimore, MD in February and March 2007. (PSR at ¶22) [and] had the majority of the contact with VOSS and RUNYON including, of pivotal importance, the contact on the evening of the murder when cell site analysis showed the defendant traveling to meet with RUNYON. (Government Exhibits 134, 136).
>
> …
>
> The evidence produced at trial clearly established the defendant's role as lead recruiter, communicator and facilitator between himself, RUNYON and VOSS.

J.A.1453-1454.

That Runyon and Draven were equally culpable for their roles in the offense, however, does not end the inquiry into whether they were equally culpable for the

purposes of comparing their respective sentences. Notwithstanding the district court opinion in *U.S. v. Beckford*, 962 F.Supp. 804 (E.D. Va. 1997), Gov.Br.71, culpability for the purpose of determining whether a defendant is deserving of a sentence of life or death includes more than simply culpability for the offense itself. And, without knowing whether Draven or Runyon were more deserving of death, Runyon's jurors could not meaningfully compare the disparate sentencing treatment they received. Because Draven's moral culpability turned upon his background every bit as much as Runyon's moral culpability turned upon his, evidence of Draven's background is relevant to comparing the treatment the two men received from the government. Whether as a result of the government's failure to disclose evidence of Draven's background directly to Runyon's trial counsel, or of trial counsel's failure to investigate Draven's background upon learning Draven had raped two of his siblings, the jury here was deprived of this relevant evidence and Runyon was denied a constitutional capital sentencing.

The Supreme Court has observed that it is the balancing of mitigation and aggravation in the sentencing process which determines culpability for the purposes of the appropriate sentence. *Tuilaepa v. California*, 512 U.S. 967, 973 (1994)("The selection decision, on the other hand, requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability.") And further, it has held the personal

characteristics of the defendant are relevant to that inquiry. *Thompson v. Oklahoma*, 487 U.S. 815, 822-23 (1988)(Stevens, J. plurality)(persons under sixteen not capable of acting with the degree of culpability that justifies the ultimate punishment). For the purposes of determining appropriateness of a sentence of death, it is not merely a defendant's legal culpability which is considered, but his moral culpability as well. *Saffle v. Parks*, 494 U.S. 484, 492-93 (1990); *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). Moreover, the inquiry into a defendant's moral culpability extends not merely to the defendant's role in the offense, but to his background as well. *Penry*, 492 U.S. at 322, *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002), *holding modified by Boyde v. California*, 494 U.S. 370 (1990).

Because Runyon's jury found Draven and Runyon equally culpable when comparing their respective roles in the offense, the materiality of the unpresented evidence, and/or the prejudice suffered as a result of counsel's ineffectiveness, turns upon whether there existed a reasonable probability that one juror, having heard the unpresented evidence of Draven's background, would have determined it so sufficiently worse that Runyon's exponentially harsher treatment was unwarranted. *U.S. v. Bagley*, 473 U.S. 667, 682 (1985); *Cone v. Bell*, 556 U.S. 449, 452 (2009). Given the difference in their moral culpability, such a reasonable probability exists here.

Runyon indeed was charged with assaulting a former girlfriend in 1994, thirteen years before the murder, convicted of simple battery for grabbing his wife's arm and poking her in the nose in 2001, and had a protective order entered against him based upon an allegation from a former girlfriend that he had given her a black eye. *Runyon*, 707 F.3d at 504. However, Draven, in the words of the Assistant U.S. Attorney prosecuting him:

> He is a man who is violent and abusive. He is a man who cannot be rehabilitated. The background in the presentence report shows that he was a danger as early as eight years old, when in using matches, he lit his families' trailer on fire. ... When [Draven] was 13 and 14 years old, he molested a number of young children. ... In 1997 [age 16-17] he made a threat to ... one of his [victim's foster mother]. … In 2002 he made additional threats ... to damage a car, threats to hurt a woman. In 2004 he was convicted of felony grand larceny. … In 1994 he was charged with aggravated sexual battery, based on his molestation of his younger sister. In 2006 he was charged with assault second degree and assault with a deadly instrument, and there is still an arrest warrant out for him.... This violence has escalated over time. ... And his background tells us to expect more violence from Michael Draven. He is a dangerous man.

S.A.7-9.

But for the government's *Brady* violation, and/or counsel's ineffectiveness, Runyon's jury would have known that the government had deemed Draven—a man with a history of violence which <u>escalated</u> from molesting (and, in some cases, raping) young children to first degree murder—deserving of no more than a life sentence. The jury would have known that the same government was asking each of them to individually find Runyon deserved not just a worse punishment, but the

greatest punishment available under the law. Runyon has demonstrated a reasonable probability that at least one of those jurors would have declined to do so. Whether as a result of the government's *Brady* violation, or his trial counsel's failure to investigate and then present material evidence of Draven's far greater moral culpability, Runyon is entitled to relief.

## IV. Prosecutors discriminated in exercising their peremptory strikes, and Runyon's counsel unreasonably failed to challenge the strikes.

The government's response includes theories about the *Batson* claims that appear here for the first time. To respond adequately, this portion of Runyon's reply focuses primarily on the government's new arguments. To the extent Runyon does not address an issue from his opening brief, or fails to do so adequately, Runyon incorporates here the facts and arguments in his opening brief.

### A. The first step of the *Batson* inquiry is moot, and this case should be remanded for adjudication of the second and third steps.

*Batson's* three-step process is well established: (1) the defendant must make a prima facie case by showing facts that give rise to an inference of discriminatory purpose; (2) the burden shifts to the government to articulate a race-neutral explanation for its strikes; and (3) the trial court determines whether the defendant has proved purposeful discrimination. *Hernandez v. N.Y.*, 500 U.S. 352, 358-59 (1991).

Runyon asserts that *Batson's* step-one requirement—a prima facie showing of discriminatory strikes—is moot when the government submits its step-two response before the court has ruled on the step-one allegation. Pet.Br.111-112 (citing *inter alia, U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant.")

The government ignores this assertion, and it states alternatively that "Runyon cannot make a prima facie case of racial discrimination in jury selection," Gov.Br.14-15; or that the district court already "determined that [Runyon] did not make a prima facie showing of racial discrimination in jury selection in his §2255 motion." Gov.Br.78.

Runyon's mootness argument is correct. It is supported by additional authorities stating that if the government articulates a race-neutral explanation for its strikes *before* the reviewing court decides whether the defendant has made a prima facie case under *Batson*, "the preliminary issue of whether [the defendant] established a *prima facie* case of discrimination is moot." *Bell v. Ozmint*, 332 F.3d 229, 240 n.5 (4th Cir. 2003)(citing *Hernandez*, 500 U.S. at 359); *Matthews v. Evatt*, 105 F.3d 907, 917 (4th Cir. 1997)(same); *see Batson v. Kentucky*, 476 U.S. 79, 94 (1986).

Runyon's case followed that sequence. His original §2255 petition alleged at step-one that the prosecutors discriminatorily struck seven of the ten African-Americans in the venire. J.A.1608-09. Without receiving a ruling on step-one, the government presented its step-two position that it struck five of these veniremembers because they circled (d) on Question 61, and struck two additional veniremembers because they circled (c&d) on Question 61.[13] J.A.1798-1801. At that point, the prima facie issue became moot because the government had addressed step-two of the *Batson* analysis, obviating any need for the court to decide the merits of step-one.

Runyon subsequently replied with additional facts that were relevant to the step-three issue of purposeful discrimination. J.A.2348-2353. This included the results of Fisher's Exact Test, which is a standard statistical method for determining whether there is a correlation between two variables. The results of Fisher's test showed, at a statistically significant level, that the government's strikes of the seven black veniremembers would not have occurred by happenstance. J.A.2815. Runyon's reply also discussed the videotape that the government intended to play (and did play) in the trial's sentencing phase. The video shows three law enforcement officers interrogating Runyon, making offensive and racially inflammatory

_____

[13] Runyon acknowledges that the government was complying with an order to respond by a date certain. J.A.2271. But the appropriate course for the government was to call the court's attention to the applicable law on timing and request further direction.

statements about his race and religion, and "convey[ing] what were, frankly, stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act." *U.S. v. Runyon*, 707 F.3d 475, 493-96 (4th Cir. 2013). [14] The government presumably wanted jurors who would be receptive to the video rather than offended. J.A.2348-2350. Runyon further reiterated his need for discovery of the kinds of documents that had proved pivotal in other *Batson* cases, such as *Foster v. Chapman*, 136 S. Ct. 1737 (2016). J.A.1630-1631.

Still without a ruling on step-one, Runyon filed an amended §2255 petition that included his *Batson* claim, J.A.1842, the government filed its amended response, J.A.2485, and Runyon replied, J.A.2656.

After all these filings, the district court denied Runyon's *Batson* claim (and his request for discovery and an evidentiary hearing), making a ruling for the very first time on step-one. Because the prima facie issue had become moot months earlier when the government filed its initial §2255 response, the appropriate course now is

---

[14] This Court concluded that it was error for the jury to see the video, but said the error was harmless in relation to the jurors' analysis of the lack-of-remorse aggravator and the equally-culpable mitigator at capital sentencing. *Runyon*, 707 F.3d at 497-98. Because Runyon now discusses the video in a different context and for a different purpose—in relation to alleged racial discrimination by the government in jury selection—the court's previous harmless error decision should be deemed irrelevant.

for this Court to remand Runyon's claim for step-two and step-three analysis, including discovery and an evidentiary hearing.

While not addressing whether the prima facie issue is moot, the government addresses the scope of a *Batson* remand on steps two and three. Gov.Br.90-91. The parties' perspectives differ on step-two, for which the government has the burden to articulate a race-neutral reason for its strikes. The government wants to address that step *de novo* on remand. It argues that in the proceedings below, "at no point did the government state, or indicate, that it struck any jurors for any particular reason." Runyon disagrees, and he points to the government's initial and amended §2255 responses, which appear to state explicitly the step-two reason the government struck the black jurors: because of their answers to question 61. "Counsel for Runyon were not deficient in their performance in failing to make a *Batson* challenge because the United States struck women and blacks who answered question 61 of the questionnaires that they were either opposed to the death penalty (question 61(d)) (Jurors … 81, 31, 40, 63, 46) or answered both that they were generally opposed and generally in favor of the death penalty (question 61(c) and (d)) (jurors … 116, 15)."[15] J.A.1800, 2632.

---

[15] Because Runyon is not appealing an earlier claim of gender discrimination, he redacted this quotation to list only the jurors who are relevant to the racial discrimination claim.

The parties appear to agree that if the *Batson* claim is remanded, adjudication of step-three must be *de novo*.

**B.     The government's analysis of the statistical evidence is flawed and contrary to established law.**

The government presents a statistics-based theory that it did not raise below, that the district court did not discuss, and that is seriously flawed. The court should expressly reject that theory to ensure it does not propagate. The parties do not dispute these population numbers from Runyon's actual trial:

> Qualified veniremembers: 52 (10 black, 42 non-black)
> Prosecution strikes: 19 (7 black, 12 non-black)
> Defense strikes: 20 (0 black, 20 non-black)
> Seated jurors: 12 (3 black, 9 non-black)
> Not struck or seated: 1 (0 black, 1 non-black)

Chart #1. Runyon's computations account for all these participants and all of these strikes. (Sealed Add'l Materials).[16]

---

[16] The government inaccurately says Runyon's "statistical analysis does not take [the defendant's strikes of white prospective jurors] into account." Gov.Br.82. To the contrary, every iteration of Fisher's Exact Test at J.A.2813-2816 takes those strikes into account. The marginal column totals and marginal row totals in that test always add up to 52, which is the exact number of qualified veniremembers. Each intersection of the row labeled "Nonblack Veniremen" and the column labeled "Not Struck by USA" shows the sum of (i) the 20 white veniremembers the defense struck, plus (ii) the 1 Asian veniremember held over, plus (iii) the nonblack jurors that would be seated in that iteration—a number that increases by one each time the number of black jurors who would be seated in that iteration decreases by one. The government's real complaint is that these statistical analyses *do* include Runyon's strikes of 20 white prospective jurors.

The government says it is "misleading" for this Court to take cognizance of the defense's actual strikes at trial because the 20 people Runyon peremptorily struck were all white. Gov.Br.82. To remedy this supposedly "misleading" fact, the government asks this Court to subtract all of Runyon's peremptory strikes from the database for this case. Gov.Br.82. Following its own suggestion, the government uses altered numbers and percentages in its brief from that point forward—as if the qualified venire had consisted of 32 members rather than 52, the numbers of prosecution strikes and seated jurors were as reported, and the defense exercised no strikes.[17] Gov.Br.82. The government cites no legal authority or statistical principle for this distortion of the trial record. The only explanation the government offers is result-oriented: "Once those 20 white prospective jurors are removed from the defendant's calculation, Fisher's Exact Test does not produce a statistically significant result." Gov.Br.82.

This Court must reject the government's approach. A *Batson* allegation is about the *prosecutor's* actions and whether they permit an inference of discrimination. The *defendant's* conduct is irrelevant. The Court made this clear in

---

[17] The government's brief represents, for example, that "The government used its peremptory strikes to remove 70% of potential black jurors and 55% (12 of 22) of potential non-black jurors," a 15-point difference it characterizes as too close to create an inference of racial discrimination. Gov.Br.82. But at Runyon's trial, the government struck 70% of potential black jurors and barely 29% (12 of 42) of the *actual* number of qualified non-black veniremembers, a difference of substantially greater magnitude that strongly supports an inference of racial discrimination.

*Miller-El v. Dretke*, 545 U.S. 231 (2005). At Miller-El's trial, the government called for several "jury shuffles"—a Texas trial procedure in which juror cards are literally shuffled and the veniremembers are reseated in a new order for questioning. The government's shuffles made "no sense except as efforts to delay consideration of black jury panelists to the end of the week, when they might not even be reached." *Id.* at 265. In federal habeas, the Fifth Circuit "declined to give much weight to the evidence of racially motivated jury shuffles because 'Miller-El shuffled the jury five times and the prosecutors shuffled the jury only twice.'" *Id.* at 255 n.14. The Supreme Court reversed and stated an uncompromising rule: "Miller-El's shuffles are *flatly irrelevant* to the question whether prosecutors' shuffles revealed a desire to exclude blacks." *Id.* (emphasis added). *See generally Harrison v. Ricks*, 150 Fed.Appx. 95, 97 (2d Cir. 2005)("[T]he only circumstances that can ever be relevant when a trial court evaluates the strength of a defendant's *prima facie* case are circumstances that raise an inference of discrimination by the *prosecution*")(emphasis in original); *Beasley v. U.S.*, 219 A.3d 1011, 1016 (D.C. App. 2019)(same); *Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 516 n.6 (Tex. 2008)("The concurrence's focus on [petitioner's] strikes misses the mark, as they do not answer whether [respondent's] strikes were improperly based on race. *Cf. Miller-El II*, 545 U.S. at 255 n.14").

Under *Miller-El*, Runyon's strikes of 20 white veniremembers are "flatly irrelevant" to whether the government's strikes of 70% of the black veniremembers were discriminatory. It would be flatly improper for any court to subtract Runyon's actual strikes from the *Batson* database.

### C. Defense counsel unreasonably failed to challenge the government's strikes of black veniremembers.

Twenty years after *Batson*, one would expect all experienced prosecutors and experienced defenders to reflexively count one-by-one during jury selection: How many black veniremembers has my opponent peremptorily struck so far? How many women? How many Hispanics? The very act of counting trains the lawyer's mind toward the next logical questions: Is there a suspicious basis for that strike? Is a pattern of strikes developing? Is my opponent engaging in disparate questioning? This is Jury Selection 101. And while a lawyer's obligation to protect his client from racial discrimination is important in all cases, the consequences of failing to do so in a capital case are especially dire.

At Runyon's trial, the court asked *all* the voir dire questions (including follow-up questions). It did so in a manner that effectively deprived both sides of evidence—other than the numbers—to try to demonstrate that the other party's strikes were discriminatory. The court brought the entire venire into the courtroom and directed its questions to them collectively—instructing prospective jurors to remain seated if their answer to a question was "no," and to stand if their answer was "yes." It asked

follow-up questions only of those who stood. If, hypothetically, one or more potential jurors were partial or disqualified, they had the opportunity to evade detection by simply remaining seated and silent.

Under the protocol for Runyon's trial, 35% of the qualified veniremembers (18 of 52) slipped through the entire course of voir dire without uttering a word, except to respond to the morning and mid-day roll calls.[18] Their voir dire responses, which consisted exclusively of sitting silently, produced no fact by which a lawyer could later assess whether his opposing counsel had exercised a strike for a legitimate reason or a discriminatory one.

An additional 19% of the qualified veniremembers (10 of 52) stood in response to just one voir dire question: whether they previously had sat on a jury. To each person who stood in response to that question, the court individually addressed five brief follow-up questions: (1) What is your name? (2) Where (geographically) did you sit? (3) When? (4) Was the trial civil or criminal? (5) "Would anything about that experience affect your ability to sit on the jury in this case?" *See, e.g.,* J.A.248.

---

[18] Four of the eighteen veniremembers who remained seated and silent for the entire voir dire were black: Nos. 31, 46, and 63 were struck by the prosecution, and No. 70 was seated. The remaining fourteen who sat in silence were non-black: Nos. 7, 18, 35, 66, 91, and 109 were struck by the prosecution; Nos. 32, 34, 50, 78, 117, and 120 were struck by the defense; No. 23 was seated; and No. 54 was held over to the next day for selection of alternates.

*See also* J.A.146-47 (asking same questions on juror questionnaire). All ten members said their prior jury experience would have no effect.[19]

Collectively, 54% (28 of 52) of the qualified veniremembers at Runyon's trial either answered no questions at all in voir dire, or spoke only to report their prior jury service. This collective group included five of the ten African-Americans in the venire, and four of them were peremptorily struck by the government. These simple facts about jury selection would start to raise alarm bells for any experienced defender who was keeping count.

### 1. Defense counsel's performance was deficient.

And in Runyon's case, those alarm bells rang! A veniremember's support for the death penalty was the government's make-or-break criterion for seating. But the prosecutors demonstrated, through their decision not to strike white veniremember No. 2 (who was seated) or Asian veniremember No. 54 (who was held over for selection of alternates), that they were willing to retain *non-black* veniremembers even though those individuals circled (d) on question 61 and did not generally support the death penalty. Yet the prosecutors peremptorily struck all five of the *black* veniremembers Nos. 31, 40, 46, 63, and 81, who gave the identical response

---

[19] Of the ten veniremembers who remained seated and silent except to acknowledge prior jury service, one was black: No. 40, who was struck by the prosecution. The remaining nine were non-black: Nos. 24 and 73 were struck by the prosecution; Nos. 12, 51, 65, 74, and 107 were struck by the defense; and Nos. 64 and 67 were seated.

on question 61: that they did not generally support the death penalty. Circling (d) on question 61 is the *only* justification the government has given for its strikes of those five African-Americans, J.A.2632, and its current brief emphasizes its desire to avoid seating jurors who circled (d). Gov.Br.86-87. Equally telling, the government peremptorily struck both of the *black* veniremembers, Nos. 15 and 116, who circled (c&d) on question 61. The "neutral" position of those black veniremembers was again more prosecution-friendly than the (d) response of the two *non-black* veniremembers the government retained—No. 2 who was seated, and No. 54 who was held over.

This visible evidence of racial discrimination was more than enough to require competent defense counsel to object under *Batson* that the prosecution's strikes of these seven African-American veniremembers were racially discriminatory. It certainly was more than enough to raise an *inference* of discrimination, which is all that *Batson* requires at step-one. Defense counsel's failure to object constituted ineffective assistance of counsel under *Strickland.*

### 2. Because *Batson* errors are structural, the prejudice component of Runyon's *Strickland* claim is presumed.

*Strickland* generally requires the defendant to show a reasonable probability that the result would have been different absent counsel's deficient performance, and the government says Runyon cannot show prejudice. Gov.Br.76-77. As Runyon noted in his opening brief, Pet.Br.118, this Court held in *Bell v. Jarvis*, 236 F.3d 149,

165, 180 (4th Cir. 2000)(en banc), that "the prejudice component of the *Strickland*

analysis may be presumed if the nature of the deficient performance is that of a

structural error." The racially discriminatory use of peremptory challenges is

structural error. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1911 (2017); *see also*

*U.S. v. Legrand*, 483 Fed.Appx. 771, 777 n.2 (4th Cir. 2012).

Under these authorities, trial counsel's performance was deficient in failing to

challenge the *Batson* violation, that deficiency is presumptively prejudicial, and

Runyon is entitled to a new trial.

### D.     The government's arguments about the respective performances of trial counsel and direct appeal counsel are unavailing.

Runyon's opening brief alleges that the prosecutors violated *Batson* and that

defense counsel failed to object. Runyon acknowledges here, as he did below, that

he did not raise the *Batson* issue at trial or on direct appeal, and he alleges cause to

excuse the default in each forum. Cause is based on different facts regarding

counsels' performance at trial versus direct appeal, different facts about the

circumstances in each forum, and different criteria for assessing those claims. The

government conflates the two allegations and effectively responds to neither.

Runyon's <u>trial</u> attorneys had the juror questionnaires and strike lists necessary

to make a timely *Batson* objection. <u>Trial</u> counsel rendered ineffective assistance in

failing to make the objection, and the corresponding errors in the habeas court's

analysis of trial counsel's performance. Pet.Br.119-122.

Runyon's opening brief at 122-126 notes that jury selection is not reported in any meaningful way in the trial transcript (because it excludes, for example, basic information like who was struck and by whom), points out that the record on appeal did not include strike lists or juror questionnaires, and identifies how these circumstances and/or the performance of <u>appellate</u> counsel may excuse the default of a *Batson* claim on direct appeal.

The government says "Runyon argues that cause is established because he did not possess the strike lists or the juror questionnaires necessary to bring the *Batson* claim prior to this §2255 proceeding." Gov.Br.75. That statement is accurate with respect to Runyon's <u>appellate</u> counsel; they did not have the questionnaires and strike lists, and they lacked the means to discover and allege a *Batson* error without them. But the government's next sentence makes clear that it is referring instead to Runyon's <u>trial</u> counsel: "In making this claim, [Runyon] overlooks the fact that both he and his trial counsel participated in jury selection, witnessed the government's peremptory strikes, and possessed the juror questionnaires at the time of trial." Gov.Br.75.

Runyon's trial lawyers obviously were present at trial and participated in jury selection. Runyon also acknowledges that he was present. J.A.234. But the record contains no evidence that Runyon participated in jury selection (except as a spectator), meaningfully witnessed the government's strikes, or possessed—or ever

was allowed to look at—the completed juror questionnaires.[20] The failure to make a timely *Batson* objection was the fault of trial counsel, who had all the information they needed to do so. It was not the fault of the defendant.

The government also suggests for the first time that <u>appellate</u> counsel could have requested the questionnaires and strike lists from <u>trial</u> counsel. The government may have forgotten that trial counsel no longer had the questionnaires. Immediately after alternate jurors were selected, the court told the attorneys to bring all their paper and electronic copies of the questionnaires to court the next day and turn them in to be shredded. J.A.367-368. Defense counsel complied, which is why §2255 counsel could obtain the questionnaires only from the district court, and for the habeas-specific purpose of investigating potential claims of ineffective assistance of trial counsel. J.A.1488. Even if appellate counsel could have gotten the strike lists, these were useless without the juror questionnaires. *Compare* Charts #2 and #3. (Sealed Add'l Materials).

---

[20] At a habeas evidentiary hearing, Runyon anticipates presenting testimony that he was seated near the far end of defense counsel's table; that his lawyers did not consult with him about selecting or excluding any juror; that he was stationed too far from the board to read the names of the veniremembers who were struck or retained; and that his lawyers never told him any of their names. He further anticipates testimony that there was a blank juror questionnaire at counsel table that was visible; that his lawyers had a separate stack of completed questionnaires and sometimes looked at one of them; that counsel never allowed him to see any completed questionnaire; that during jury selection his lawyers whispered, passed papers, and talked only to each other; and that his attorneys took their papers with them whenever there were breaks.

The government also ignores the affidavit of direct appeal counsel Teresa Norris, J.A.2244-2247, which reports attorney Woodward's inability to obtain the strike lists or any questionnaires for use on appeal.[21] Norris would not have repeatedly pushed Woodward to obtain the strike lists and questionnaires if, as the government now suggests, the notes in Woodward's own files contained the information necessary to obtain those documents.[22] Gov.Br.76.

The district court later explained that the trial record did not include the strike lists at all. The lists the court finally docketed and provided to Runyon's §2255 counsel in 2015—six years after trial—were "internal strike and selection order notes made by the courtroom deputy during the jury selection process and submitted to the Clerk for statistical purposes following trial." J.A.1494.

---

[21] Woodward was Runyon's lead counsel at trial and initially his lead counsel on direct appeal. Norris was Woodward's appellate co-counsel, and she became lead appellate counsel when Woodward withdrew. Norris' affidavit indicates that Woodward was tasked with obtaining strike lists and juror questionnaires, but he failed to do so . J.A.2244-2247.

[22] Courts of appeal ordinarily will consider only the trial record, not non-record evidence like an attorney's notes. Pet.Br.123-24. Woodward's notes apparently were facially inadequate to enable him to get the strike lists and questionnaires for purposes of appeal while he was Runyon's appellate attorney. There is no reason to think they would have been sufficient to enable Norris to get the juror questionnaires and strike lists for that purpose after Woodward's withdrawal. If Woodward's notes were sufficient, appellate counsel's failure to obtain those documents would constitute ineffective assistance and excuse the default.

### E.    Request for reassignment.

Runyon suggests that if the Court remands this case to the district court, it should consider reassignment because "the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of ... her mind previously expressed views or findings" regarding the value and reliability of statistical evidence, the inflammatory nature of the police interrogation videotape, and the manner in which she conducted Runyon's trial. *U.S. v. McCall*, 934 F.3d 380, 384 (4th Cir. 2019)(quoting *U.S. v. Nicholson*, 611 F.3d 191, 217 (4th Cir. 2010)). Runyon further suggests it would be appropriate for this Court to instruct the lower court on remand to allow discovery and an evidentiary hearing on Runyon's claims under §2255(b).

### CONCLUSION

This Court must vacate Runyon's §924(c) conviction and sentence under *Davis* and remand for a new sentencing hearing on remaining counts. Further, this Court must remand for an evidentiary hearing on Runyon's fact-intensive, extra-courtroom claims. Further, should this Court review the merits of Runyon's *Strickland*, *Brady*, and *Batson* claims, he is entitled to relief on all of those claims as set forth herein.

Respectfully submitted,

s/Michele J. Brace
Michele J. Brace
Virginia Capital
Representation Resource
Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

s/Dana C. Hansen Chavis
Dana C. Hansen Chavis
Asst. Federal Community Defender

s/Susanne Bales
Susanne Bales
Asst. Federal Community Defender

Federal Defender Services of
Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org
Susanne_Bales@fd.org

# CERTIFICATE OF COMPLIANCE

1. This Reply Brief of Appellant has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2. Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, this Opening Brief of Appellant contains 16,977 words.

3. I understand that a material misrepresentation can result in the court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and a copy of the word or line printout.

Dated:  March 16, 2020

s/Michele J. Brace
Michele J. Brace
